### United States District Court
### Southern District of Texas
### Victoria Division

STATE OF TEXAS,
STATE OF ALABAMA
STATE OF ALASKA
STATE OF ARKANSAS
STATE OF FLORIDA
STATE OF IDAHO
STATE OF IOWA
STATE OF KANSAS
COMMONWEALTH OF KENTUCKY
STATE OF LOUISIANA
STATE OF MISSISSIPPI
STATE OF MISSOURI
STATE OF MONTANA
STATE OF NEBRASKA
STATE OF OHIO
STATE OF OKLAHOMA
STATE OF SOUTH CAROLINA
STATE OF TENNESSEE
STATE OF UTAH
STATE OF WEST VIRGINIA
STATE OF WYOMING
   *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, in his official
  capacity as Secretary of Homeland
  Security;
U.S. CITIZENSHIP AND IMMIGRATION
  SERVICES;
UR JADDOU, in her official capacity as
  Director of U.S. Citizenship and
  Immigration Services;
U.S. CUSTOMS & BORDER PROTECTION;

Case No. 6:23-cv-7

1

TROY MILLER, in his official capacity as
    Acting Commissioner of U.S. Customs &
    Border Protection;
U.S. IMMIGRATION & CUSTOMS
    ENFORCEMENT; and
TAE JOHNSON, in his official capacity as
    Acting Director of U.S. Immigration &
    Customs Enforcement;
    *Defendants.*

## AMENDED COMPLAINT

1.   The Department of Homeland Security (DHS or Department), under the false pretense of preventing aliens from unlawfully crossing the border between the ports of entry, has effectively created a new visa program—without the formalities of legislation from Congress—by announcing that it will permit up to 360,000 aliens annually from Cuba, Haiti, Nicaragua, and Venezuela to be "paroled" into the United States for two years or longer and with eligibility for employment authorization.

2.   The Department's parole power is exceptionally limited, having been curtailed by Congress multiple times, and can be used "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). But the Department's new "parole" program allows aliens *in their home countries* to obtain the benefit of being able to obtain advance authorization to enter the United States—despite no other basis in law for them doing so.

3.   The parole program established by the Department fails each of the law's three limiting factors. It is not case-by-case, is not for urgent humanitarian reasons, and advances no significant public benefit. Instead, it amounts to the creation of a new visa program that allows hundreds of thousands of aliens

to enter the United States who otherwise have no basis for doing so. This flouts, rather than follows, the clear limits imposed by Congress.

4.    In establishing this unlawful program, the Department did not engage in notice-and-comment rulemaking under the Administrative Procedure Act, substituting instead its unilateral judgment to bring into the United States hundreds of thousands of aliens who otherwise have no other authority to enter.

5.    The Plaintiff States—Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming—face substantial, irreparable harms from the Department's abuses of its parole authority, which allow potentially hundreds of thousands of additional aliens to enter each of their already overwhelmed territories.

6.    The Department does not have the authority to invite more than a third of a million more illegal aliens into the United States annually as it has announced with this program.

7.    The Court should enjoin, declare unlawful, and set aside the Department's lawless parole program.

## PARTIES

### I.    Plaintiffs.

8.    Plaintiff State of Texas is a sovereign State of the United States of America.

9.    Plaintiff State of Alabama is a sovereign State of the United States of America.

10.  Plaintiff State of Alaska is a sovereign State of the United States of America.

11.   Plaintiff State of Arkansas is a sovereign State of the United States of America.

12.   Plaintiff State of Florida is a sovereign State of the United States of America.

13.   Plaintiff State of Idaho is a sovereign State of the United States of America.

14.   Plaintiff State of Iowa is a sovereign State of the United States of America.

15.   Plaintiff State of Kansas is a sovereign State of the United States of America.

16.   Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America.

17.   Plaintiff State of Louisiana is a sovereign State of the United States of America.

18.   Plaintiff State of Mississippi is a sovereign State of the United States of America.

19.   Plaintiff State of Missouri is a sovereign State of the United States of America.

20.   Plaintiff State of Montana is a sovereign State of the United States of America.

21.   Plaintiff State of Nebraska is a sovereign State of the United States of America.

22.   Plaintiff State of Ohio is a sovereign State of the United States of America.

23.   Plaintiff State of Oklahoma is a sovereign State of the United States of America.

24.  Plaintiff State of South Carolina is a sovereign State of the United States of America.

25.  Plaintiff State of Tennessee is a sovereign State of the United States of America.

26.  Plaintiff State of Utah is a sovereign State of the United States of America.

27.  Plaintiff State of West Virginia is a sovereign State of the United States of America.

28.  Plaintiff State of Wyoming is a sovereign State of the United States of America.

## II.  Defendants.

29.  Defendant U.S. Department of Homeland Security is a cabinet-level federal executive agency that oversees the Defendants, U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE), which are constituent agencies of DHS. DHS and its constituent agencies are obligated to enforce the Immigration and Nationality Act (INA).

30.  Defendant Alejandro Mayorkas is the Secretary of DHS. The Plaintiff States sue him in his official capacity.

31.  Defendant Ur Jaddou is the Director of USCIS. The Plaintiff States sue her in her official capacity.

32.  Defendant Troy Miller is the Acting Commissioner of CBP. The Plaintiff States sue him in his official capacity.

33.  Defendant Tae Johnson is the Acting Director of ICE. The Plaintiff States sue him in his official capacity.

JURISDICTION AND VENUE

34. The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to render the declaratory and injunctive relief that the Plaintiff States request.

35. This district is a proper venue because the State of Texas resides in this district and a substantial part of the events and omissions giving rise to the claim occurred here. 28 U.S.C. § 1391(b), (e).

FACTS

## I.   The Parole Authority.

36. The Immigration and Nationality Act details the specific instances where the government may use its authority to parole individuals into the United States who otherwise would not be lawfully permitted to enter, or who are otherwise subject to mandatory detention. *See* 8 U.S.C. § 1182(d)(5).

37. Specifically, Congress has directed that parole may only be granted on a case-by-case basis, and even then, only for "urgent humanitarian reasons or significant public benefit." *Id.* at § 1182(d)(5)(A); *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021).

38. Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, in part because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and *not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other*

6

*category in immigration law, with the intent that they will re-*
*main permanently in the United States.* This contravenes the
intent of section 212(d)(5), but also illustrates why further,
specific limitations on the Attorney General's discretion are
necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

39.  Congress has also emphasized that DHS "may not parole into the
United States an alien who is a refugee unless the Attorney General deter-
mines that compelling reasons in the public interest with respect to that
particular alien require that the alien be paroled into the United States rather
than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B); *see also Texas v.
Biden*, 20 F.4th at 994.

40.  As the Fifth Circuit stated less than two years ago, "[q]uintessential
modern uses of the parole power include, for example, paroling aliens who do
not qualify for an admission category but have an urgent need for medical care
in the United States and paroling aliens who qualify for a visa but are waiting
for it to become available." *Id.* at 947. But the power is not unlimited: "DHS
cannot use that power to parole aliens *en masse*; that was the whole point of
the 'case-by-case' requirement that Congress added in IIRIRA." *Id.* at 997.

41.  The Supreme Court recently affirmed the limited nature of the parole
power, noting that it "is not unbounded: DHS may exercise its discretion to
parole applicants 'only on a case-by-case basis for urgent humanitarian rea-
sons or significant public benefit.' … And under the [Administrative Procedure
Act], DHS's exercise of discretion within that statutory framework must be
reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. 2528, 2543
(2022).

## II. The Parole Program.

42. On December 22, 2022, Secretary Mayorkas issued a decision memorandum that created a new parole program for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Although the Defendants have referred to this memorandum as authority for the new parole program, *see, e.g.*, Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023), they have not publicly released it.

43. On January 5, 2023, President Biden and the Defendants announced the creation of the new parole program, which was modeled off recent programs the Defendants had created for nationals of Ukraine and Venezuela. Press Release, Dept. of Homeland Security, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes (Jan. 5, 2023).[1]

44. According to the Department's announcement, the program "will provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border." *Id.*

45. Secretary Mayorkas said in the press release announcing the program "[w]e can provide humanitarian relief consistent with our values, cut out vicious smuggling organizations, and enforce our laws." *Id.* He added "[i]ndividuals who are provided a safe, orderly, and lawful path to the United States are less likely to risk their lives traversing thousands of miles in the hands of ruthless smugglers, only to arrive at our southern border and face the legal consequences of unlawful entry." *Id.*

---

[1]   https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

46.   Without authority, the Defendants have decreed that, subject to an alien obtaining a "supporter in the United States who commits to providing financial and other support" and certain background checks,"[aliens] can seek *advance authorization* to travel to the United States, and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization[.]" *Id.* (emphasis added).

47.   The Defendants have further decreed that the program "will allow up to 30,000 qualifying nationals *per month* from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period." *Id.* (emphasis added).

48.   On January 6, Defendant USCIS published a new website for this new program, entitled "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans." U.S. CITIZENSHIP AND IMMIG. SERVICES, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV (visited Jan. 23, 2023).

49.   The website lists the basic requirements for the program as they were contained in its announcement the day prior, but added additional details, including:

50.   The "supporter" agrees to provide the alien with financial support for the duration of their parole in the United States and begins the process by filing a Form I-134A "Online Request to be a Supporter and Declaration of Financial Support." *Id.*

51.   There is no cost to apply for the program for the alien or the "supporter."

52.   "Supporters" can include: U.S. citizens or nationals; lawful permanent residents, lawful temporary residents, and conditional permanent residents; *nonimmigrants in lawful status* (who maintain their nonimmigrant status and

have not violated any of the terms or conditions of their nonimmigrant status); asylees, refugees, and *parolees*; *individuals granted Temporary Protected Status*; and, *beneficiaries of deferred action* (including deferred action for childhood arrivals) or deferred enforced departure. *Id.* (emphasis added).

53. The beneficiaries can be any national of Cuba, Haiti, Nicaragua, or Venezuela, plus their immediate family members. But beneficiaries cannot be minor children traveling without adults. *Id.*

54. Upon approval of the Form, the alien is authorized for travel to the United States at the alien's own expense, and upon arrival the alien will be considered for parole into the United States. *Id.*

55. The Defendants did not publish advance notice of the program in the Federal Register prior to posting details about the program on the Department's website.

56. The Defendants have not published the decision memorandum from Secretary Mayorkas despite referring to such a memorandum in the four separate Federal Register notices announcing the parole program that are described below.

57. The Defendants have not published any analysis or supporting materials for the Secretary's decision memorandum.

58. But on January 9, 2023, the Department published four separate notices in the Federal Register regarding the implementation of the parole program, with one notice for each eligible nationality. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

59.  In substance, the Federal Register notices do not differ from the website content—explaining the general parameters of the program and the qualifications for it. But they do offer more analysis from the Department as to why, in the Department's view, the program comports with the limitations on the Secretary's parole power under 8 U.S.C. § 1182(d)(5). *See, e.g.*, 88 Fed. Reg. at 1260–63.

60.  The Defendants did not provide an opportunity for public comment, nor did they undertake a formal notice-and-comment rulemaking process. Instead, they asserted that their new program was exempt from notice-and-comment rulemaking because (1) "the Department is merely adopting a general statement of policy," (2) the program is exempt "because it involves a foreign affairs function of the United States," and (3) "there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable." *See, e.g.*, 88 Fed. Reg. at 1264–65.

61.  The Defendants did not explain or analyze how they would remove from the United States aliens paroled through the program after the end of any period of authorized parole, despite admitting general difficulty removing such aliens to their home countries presently.

62.  The Defendants did not consult the Plaintiff States about the potential effects of this program or the ability of the Plaintiff States to provide services to aliens paroled in through the program.

63.  The Defendants, if in fact they have devised a mechanism, did not explain any such mechanism for the recovery of funds from "supporters" who do not actually provide for the needs of aliens paroled under the program, whether by the Department itself, any federal entity, or most pertinent to the Plaintiff States, by any state.

**III. Irreparable Harm to the Plaintiff States.**

64.  The parole program harms Texas. Texas spends significant amounts of money providing services to illegal aliens because of the federal government's violations of and refusal to enforce federal law. These include education and healthcare, as well as many other social services. Federal law requires Texas to include illegal aliens in some of these programs. As the number of illegal aliens in Texas increases, the number of illegal aliens receiving such services likewise increases.

65.  For example, the Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

66.  The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

67.  The Texas Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

68.  Texas spends hundreds of millions of dollars each year for uncompensated care provided by state public hospital districts to illegal aliens.

69.  Also, Texas spends tens of millions of dollars each year for increased law enforcement as its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to illegal immigration.

70.  Texas spends millions of dollars each year on public education costs to educate illegal aliens, which puts a strain on its system for citizens and which costs are uncompensated from the federal government.

71.  If the Defendants allow these new aliens into the United States in violation of federal law, then the harm will only grow over time.

72.  This increase strains Texas's resources and ability to provide essential services, such as emergency medical care, education, driver's licenses, and other public safety services.

73.  Texas cannot recover from the federal government its increased costs, which it would otherwise not incur if the federal government enforced the law. This affects Texas's sovereign interests in its territory and its ability to properly carry out such interests on behalf of the citizens of the State.

74.  Alabama also "bears many of the consequences of unlawful immigration." *Arizona v. U.S.*, 567 U.S. 387, 397 (2012). The State incurs significant costs providing services to illegal aliens that it would otherwise not incur if the federal government enforced the federal immigration law. Alabama currently has tens of thousands of illegal aliens living in the State. Recent reports estimate that approximately 55,000 to 73,000 illegal aliens are living in the State; about 68% of them are uninsured; about 34% of them have incomes below the poverty line; and these illegal aliens cost Alabama taxpayers more than $324.9 million a year. *See, e.g.*, MIGRATION POLICY INST., *Unauthorized Immigrant Population Profiles*, https://bit.ly/3kws01c (62,000 illegal aliens, 68% uninsured, 34% below poverty level) (last visited Jan. 23, 2023) ("*Population Profiles*"); PEW RESEARCH CENTER, *U.S. Unauthorized Immigrant Population Estimates by State* (2016) ("*Population Estimates*"), https://pewrsr.ch/2NoU5VA (55,000 illegal aliens); FEDN. FOR AM. IMMIG. REFORM, *The Fiscal Burden of Illegal Immigration*, (2017) ("*Fiscal Burden*"), https://bit.ly/3ZYDMBU (73,190 illegal aliens, $324.9 million annual cost).

75. While Alabama is not a contemplated "port[] of entry" according to DHS's press release, *supra* fn.1 above, the federal government itself has

acknowledged that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both," 86 Fed. Reg. at 42,835.

76. Unlawfully adding more aliens through an abuse of the parole power will inevitably increase the costs of Alabama's healthcare system. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 223–30 (1982) (States constitutionally obligated to provide free education to children of unlawfully present aliens); 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255 (Medicare and Medicaid requirement that States provide emergency services to unlawful aliens as condition of program participation).

77. Alaska will also be harmed by the parole program. Alaska has approximately 5,000 to 11,000 illegal aliens living in the State. They cost the State more than $72 million a year. If more illegal aliens enter Alaska, that will force Alaska to expend limited resources on education, healthcare, public assistance, and general government services. The program is also likely to cause increased crime and/or drug trafficking in Alaska's communities, requiring additional expenditures by law enforcement.

78. Arkansas spends significant amounts of money providing services to illegal aliens because of the federal government's abuses of federal law. Those services include education services and healthcare, as well as many other social services. Federal law requires Arkansas to include illegal aliens in some of these programs. As the number of illegal aliens in Arkansas increases, the number of illegal aliens receiving such services likewise increases.

79. The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Arkansas to include illegal aliens in its Emergency Medicaid program. The program costs Arkansas tens of millions of dollars annually.

80.  Arkansas spends millions of dollars each year to provide public education to illegal aliens. There are approximately 5,000 children unlawfully present in Arkansas. *See Unauthorized Population*. Arkansas spends $7,349 on each child who attends its public schools, for a total of $36,745,000 spent to educate children who are illegally present in Arkansas. Ark. House of Reps., *2022 Education Adequacy Study* (Jan 12, 2022), (last accessed Jan. 23, 2023). Increasing the number of children unlawfully present will only increase that financial burden.

81.  Florida will also be irreparably harmed by the parole program. Florida expends significant state resources on providing state services to illegal aliens within the State. The presence of these illegal aliens in Florida—who have been excluded by federal law—violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also costs the State of Florida millions of dollars.

82.  Florida's state prison system spends more than $100 million per year incarcerating criminal aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government under 8 U.S.C. § 1231(i).

83.  Florida spends more than $8,000 per student each year on public-school education, which it provides regardless of immigration status.

84.  Florida's Department of Children and Families provides a variety of public services to illegal aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

85.  Florida frequently pays the cost of emergency medical services for the uninsured, which includes expenses related to the provision of medical services to illegal aliens.

86.  Florida's Department of Economic Opportunity provides unemployment benefits to aliens who are eligible for work authorization, including parolees.

87.  Idaho experiences similar harms. Idaho spends significant amounts of money providing services to illegal aliens because of the federal government's abuses of federal law. Those services include education services and healthcare, as well as many other social services. Federal law requires Idaho to include illegal aliens in those programs. Like many Western states, the number of illegal aliens in Idaho continues to increase—likewise increasing the number of illegal aliens receiving such services.

88.  The number of illegal aliens present in Idaho is estimated to be approximately 35,000.  School age children comprise nearly 6% of that number.

89.  Idaho spends tens of millions of dollars each year to increase law-enforcement capacity, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to illegal immigration. *See, Population Profiles* (25,000 illegal aliens, 60% uninsured, 27% below poverty level); *Population Estimates* (35,000 illegal aliens); *Fiscal Burden* (50,670 illegal aliens, $225.4 million annual cost).

90.  Iowa spends tens of millions of dollars providing services to illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Iowa to include illegal aliens in those programs. As the number of illegal aliens in Iowa increases, the number of illegal aliens receiving such services likewise increases, and so too the burden on the public increases.

91.  In 2007, the Fiscal Services Division of the Iowa Legislative Services Agency found that Iowa was home to an estimated 55,000 to 85,000 illegal

immigrants. At that time, 16 years ago, the total cost of illegal immigrants to the State General Fund was more than $100 million and accounted for about 2.4% of Iowa's general fund expenditures. IOWA LEGIS. SERVICES AGENCY FISCAL SERVICES, *Undocumented Immigrants' Cost to the State* (Feb. 22, 2007), https://bit.ly/3HkKMS5. Even simply adjusting for inflation (without accounting for any increase in services or the number of illegal immigrants) would bring that total to nearly $150 million annually.

92.   Iowa also spends tens of millions of dollars each year for increased law enforcement, while its citizens suffer increased crime, unemployment, environmental harm, and social disorder, due to illegal immigration.

93.   The total costs to Iowa of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases.

94.   Iowa has been identified as a hot spot for trafficking activity due to the junction of Interstate 35 and Interstate 80. Traffickers bring illegal immigrants to and through the State. Proactively, in 2020, Iowa became one of the first states in the country to pass legislation to require motel and hotel staff to receive training in human-trafficking prevention. Iowa bears the additional costs of combating trafficking associated with illegal immigration.

95.   If the Defendants are permitted to allow these new aliens into the United States in violation of federal law, then the harm will only grow over time. This strains Iowa's resources and ability to provide essential services, such as emergency medical care, public education, and other public safety services.

96.   Iowa cannot recover from the federal government its increased costs, which it would otherwise not incur if the federal government enforced the law.

That affects Iowa's sovereign interests in its territory and its ability to carry out properly such interests on behalf of the citizens of the State.

97.   Kansas is also harmed by the Defendants' new parole program.

98.   Kansas will be required to stretch its scarce resources even further under the parole program because, under the program, the Defendants will monthly admit into the interior many thousands of new aliens who will at least temporarily reside there. This will be in addition to the many aliens who illegally cross the border every day (whom the Defendants fail to apprehend). *See* Bradford Betz, *Mayorkas Testifies More Than 389,000 Migrant 'Gotaways' at Border*, FOX NEWS (Apr. 28, 2022), https://fxn.ws/3H0U04z; U.S. CUSTOMS AND BORDER PROTECTION, *On a Typical Day in Fiscal Year 2021, CBP…*, https://www.cbp.gov/newsroom/stats/typical-day-fy2021 (last accessed Jan. 18, 2023) ("[CBP] [c]onducted … 1,703 apprehensions between U.S. ports of entry[,] 25 arrests of wanted criminals at U.S. ports of entry[,] [and] 723 refusals of inadmissible persons at U.S. ports of entry").

99.   The program will result in increased crime and drug trafficking in Kansas communities, requiring additional expenditures by Kansas law enforcement. This is because at least some proportion of those aliens will come to Kansas. That means more people in Kansas, at least some proportion of whom will engage in illegal activity and whom law-enforcement officials will inevitably encounter. *See, e.g.*, *United States v. Salinas-Calderon*, 728 F.2d 1298, 1299–1300 (10th Cir. 1984) (recounting details of a traffic stop conducted by a Kansas Highway Patrol Trooper who encountered six individuals in the bed of a pickup truck who admitted they were unlawfully present in the U.S.); *see also* Tim Hrenchir, *City settles police SUV crash lawsuit for $335K*, TOPEKA CAPITAL-JOURNAL, Mar. 12, 2021, at A4 ("Topeka's city government has agreed to pay $335,000 to settle a lawsuit over an April 2016 crash in which a vehicle

18

driven by an [illegal alien] was hit by a Topeka police SUV, which allegedly went through a red light while responding to a call with its lights and siren on."); Glenn E. Rice, *Man Who Heard Voices Charged With Murdering Tattoo Artist*, KAN. CITY STAR (May 22, 2018), https://bit.ly/3wpXqca, (discussing an illegal alien who allegedly shot and killed another motorist while driving in Kansas City, shot and wounded two men minutes apart in Clay County, and burglarized a residence, stole firearms, and tampered with a motor vehicle in Jackson County); ASSOCIATED PRESS, *Murder & Abduction Suspect Living in U.S. Illegally*, CBS NEWS DFW (Nov. 24, 2016), https://cbsn.ws/3Wy24Qf ("A Texas woman accused of [travelling to Wichita, Kansas and] killing a [Wichita] mother and taking her baby was in the U.S. illegally when she was released from [Sedgwick County (KS) Jail] this summer before immigration officials had a chance to request she be held, law enforcement authorities said.").

100. Additionally, by incentivizing aliens from Cuba, Haiti, Nicaragua, and Venezuela to obtain advance authorization to enter the United States, the parole program will force Kansas to expend its limited resources on education, healthcare, public assistance, and general government services on even more individuals who are not U.S. citizens. *See Plyler v. Doe*, 457 U.S. 202, 223–30 (1982) (establishing that undocumented school-age children are entitled to a free public education); KAN. STATE DEPT. OF EDUC., EXPENDITURES PER PUPIL: 2020–2021 at 8 (Jan. 2021) (2020–2021 school year expenditures per pupil were approximately $15,869), *available at* https://bit.ly/3ZPAelj; KANCARE OMBUDSMAN, KANCARE GEN. INFO. FACT SHEET (updated Nov. 19, 2020), *available at* https://bit.ly/3Da3MAd ("KanCare Eligible Non-Citizens[:] To be considered eligible for any of the KanCare medical assistance programs, non-U.S. citizens must hold (1) legal residency in the U.S. for 5 years or more or (2) hold a certain immigration status."); KAN. DEPT. OF HEALTH & ENVT., DIV.

OF HEALTH CARE FIN., MKEESM MANUAL §§ 2142, 2146 (Jan. 2023), *available at* https://bit.ly/3wjMLzX (pertaining to "Qualified Non-Citizen Status" and "Documentation of Legal Status"); KAN. DEPT. OF HEALTH & ENVT., DIV. OF HEALTH CARE FIN., A-1 NON-CITIZEN QUALIFICATION CHART 1 (Jan. 2023), *available at* https://bit.ly/3WuYXZk ("The purpose of this chart is to provide policy guidance for eligibility staff when addressing requests for coverage when the individual attests to being a non-citizen and provides supporting documentation."); *see also* KAN. DEPT. OF HEALTH & ENVT., MEDICAID TRANSFORMATION 214 (Jan. 2009), *available at* https://bit.ly/3ZTllhH (explaining Kansas's administration of "SOBRA," noting "[illegal aliens] have been found to use hospital and emergency services at over twice the rate of the overall U.S. population," and observing that there is a "large number of" "uninsured" illegal aliens).

101. Kansas has approximately 69,000 to 85,000 illegal aliens already living in the State, about 64% of whom are uninsured and about 25% of whom have incomes below the poverty line. *See Population Profiles* (69,000 illegal aliens, 81% from "Mexico and Central America," 64% uninsured, 11% below 50% of the poverty level); *Population Estimates* (Feb. 5, 2019),. These illegal aliens cost Kansas taxpayers more than $377 million per year. *See Fiscal Burden*. If more illegal aliens enter Kansas, that will increase the costs of the State's healthcare system (among other things).

102. Kentucky is also injured by the Defendants' illegal program. Kentucky will be required to stretch its scarce resources even further under the parole program because it will cause an influx of illegal aliens to be released into the United States, including Kentucky, which increases the burden on the Commonwealth's ability to provide critical governmental services to its citizens.

103. Specifically, the parole program incentivizes further illegal immigration by allowing illegal aliens who have already illegally entered the United States to act as "supporters" and encourage aliens who have not yet left their countries to do so. As a result, the Defendants' unlawful actions will lead to an increased number of illegal aliens in Kentucky, thereby forcing Kentucky to expend limited resources on education, healthcare, public assistance, and general government services.

104. Kentucky has approximately 35,000 to 56,000 illegal aliens living in the Commonwealth; about 60% of them are uninsured; about 37% of them have incomes below the poverty level; and they cost Kentucky taxpayers more than $261 million per year. If more illegal aliens enter the Commonwealth, that will increase the costs of the Commonwealth's healthcare system.

105. According to one estimate, there are approximately 4,000 illegal aliens residing in Kentucky that are under the age of 16. Under Kentucky law, all children residing in the Commonwealth, regardless of lawful status, shall attend public school until age 16, with exceptions for students who attend private, parochial, or home school options. Ky. Rev. Stat. § 159.010. The Defendants' unlawful parole program will result in an increased number of illegal-alien children attending public schools in the Commonwealth, which will increase educational costs, including, but not limited to, requiring additional faculty for ESL instruction, increased administrative costs, and reductions in space at public school facilities.

106. Louisiana will also be injured gravely by the parole program. Louisiana will be required to stretch its resources even further under the parole program, because the parole program involves the unlawful release of hundreds of thousands of illegal aliens into the United States. The parole program

will force Louisiana to expend limited resources on education, healthcare, public assistance, and general government services.

107. Indeed, Louisiana already has approximately 70,000 to 78,000 aliens living in the State who are not lawfully in the United States. More than 70% of them do not have health insurance, about 34% of them have incomes below the poverty level, and they cost Louisiana taxpayers more than $362 million a year. *See, e.g.*, *Population Profiles* (70,000 illegal aliens, 73% uninsured, 34% poverty level); *Population Estimates* (70,000 illegal aliens); *Fiscal Burden* (78,820 illegal aliens, $362 million annual cost). More aliens entering the State will increase the costs of the State's healthcare system.

108. Louisiana spends more than $10,000 per student on public schooling. Melanie Hanson, *U.S. Pub. Educ. Spending Statistics*, EDUC. DATA INITIATIVE (Jun. 15, 2022), https://bit.ly/3H0j5gb. Additional aliens enrolled in public schools increase Louisiana's education expenditures. *See Plyler*, 457 U.S. at 223–30.

109. Defendant DHS has previously recognized that Louisiana "is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Louisiana's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Louisiana." Mem. of Understanding Between DHS & La. Dept. of Justice at 1–2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Louisiana], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased

economic competition with the State of Louisiana's current residents for, among other things, employment, housing, goods and services." *Id.* at 3.

110. Louisiana cannot recover its increased costs, which it would otherwise not incur if the federal government enforced the law, from the federal government. This affects Louisiana's sovereign interests in its territory and its ability to carry out properly such interests on behalf of the citizens of the State.

111. Mississippi is also injured by the parole program. Mississippi will be required to stretch its scarce resources even further under the program because it will cause an influx of illegal aliens who otherwise have no basis for entering the country. The program will further incentivize and exacerbate illegal immigration, and thus will force Mississippi to expend limited resources on education, healthcare, public assistance, law enforcement, and general government services.

112. Mississippi has approximately 20,000 to 28,000 illegal aliens living in the State; about 75% of them are uninsured; about 49% of them have incomes below the poverty level; and they cost Mississippi taxpayers more than $117 million per year. If more illegal aliens enter the State, that will increase the costs to the State's healthcare system.

113. Missouri is directly and adversely affected by increases in illegal immigration at the southern border. Recent studies have established that significant numbers of illegal aliens who enter the United States end up residing in Missouri. *See Texas v. Biden*, 554 F. Supp. 3d 818, 838 (N.D. Tex. 2021), *aff'd*, 20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). Like Texas, Missouri experiences pocketbook injuries as a result of the unlawful presence of illegal aliens in the State in the form of education, healthcare, and law-enforcement costs. These financial injuries are irreparable because Missouri has no plausible recourse to recoup them.

114.Illegal aliens and their children receive education benefits from Missouri at Missouri's expense. *See Plyler v. Doe*, 457 U.S. 202, 205, 230 (1982) (holding that the Constitution prohibits States from "deny[ing] to undocumented school-age children the free public education that it provides to children who are citizens of the United States or legally admitted aliens").

115.As the District Court for the Northern District of Texas has found, the costs to "Missouri … of providing public education for illegal alien children will rise … as the number of illegal alien children present in the State increases." *Texas*, 554 F. Supp. 3d at 838.

116."Some aliens who … are being released or paroled into the United States … will use state-funded healthcare services or benefits in … Missouri." *Id.* "The total costs to [Missouri] will increase as the number of aliens within [Missouri] increases." *Id.* at 839.

117.Federal law requires Missouri to include illegal aliens in its Emergency Medicaid program, which provides health coverage for low-income children, families, seniors, and disabled persons. 42 C.F.R. § 440.255(c).

118.Missouri is also a destination State and hub for human-trafficking crimes within the United States, due to its situation at the confluence of several major interstate highways. *See Texas*, 554 F. Supp. 3d at 839 ("Missouri is … a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally."). Illegal aliens are disproportionately the victims of these crimes. Some illegal aliens also commit crimes. Human-trafficking and other crimes committed by or against illegal aliens inflict irreparable costs on Missouri, both in law-enforcement costs and in providing resources for victims. *See id.* (finding that "[h]uman trafficking" arising from and involving increases in unlawful immigration "causes fiscal harm to … Missouri").

119. Additionally, Missouri is suffering a "fentanyl crisis" that is "worsening." Alex Smith, *Missouri's Fentanyl Crisis is Worsening, But Patients Can't Get Treatment for Substance Abuse*, ST. LOUIS PUBLIC RADIO (Apr. 5, 2022).[2] "St. Louis ranks among the deadliest cities in the country for overdose deaths among African Americans, and … the Black community seems caught between organized crime's fentanyl push and ineffective efforts to stop it." *Id.* Drug smugglers unlawfully entering the United States through the southern border are critical suppliers for distributors of fentanyl and other illegal substances in Missouri and elsewhere in the United States. *See* Anna Giaritelli, *Is America's Immigration Crisis Causing the Fentanyl Epidemic?*, WASHINGTON EXAMINER (July 13, 2022).[3] In addition to devastating the lives and health of Missouri's citizens, drug-related and other crimes committed by or against illegal aliens impose major healthcare and law-enforcement costs on the State. An increased influx of illegal aliens will exacerbate these problems. *See Texas*, 554 F. Supp. 3d at 839 (finding that "[s]ome aliens who … are being released or paroled into the United States … will commit crimes in … Missouri").

120. An increased influx of illegal aliens will also affect Missouri's labor market and reduce job opportunities for U.S. citizens and aliens lawfully present in Missouri, as illegal aliens frequently compete for jobs at lower wages than workers who are lawfully present. Missouri has a large agricultural sector. Illegal aliens unlawfully present in Missouri distort Missouri's labor market and inflict irreparable injury on both the State and its citizens.

---

[2]   Available at https://news.stlpublicradio.org/health-science-environment/2022-04-05/missouris-fentanyl-crisis-is-worsening-but-patients-cant-get-treatment-for-substance-abuse.

[3]   Available at https://www.washingtonexaminer.com/policy/defense-national-security/is-immigration-causing-fentanyl-epidemic.

121. The State of Montana is acutely affected by modifications in federal policy regarding immigration.

122. Montana bears the costs of illegal aliens, including their U.S.-born children, and is forced to expend resources on education, healthcare, public assistance, and general government services.

123. Because Montana has no state sales tax, many illegal aliens pay virtually no state taxes. Therefore, the costs of all the public services they consume are borne by lawfully present taxpayers.

124. Ohio will also be irreparably harmed by the parole program. Ohio expends significant state resources on providing state services to illegal aliens within the State. The illegal parole program will increase the number of illegal aliens in Ohio. While illegal border crossings most severely affect border States, the parole program requires aliens to "provide for their own commercial travel" to the United States, and therefore will affect States beyond the border. Populous States, including Ohio, will likely shoulder a substantial number of illegal aliens, particularly given the requirement that the alien associate with a United States "supporter" to gain entry.

125. Ohio is forced to expend resources on illegal aliens, including emergency medical services and schooling. Ohio schools spend more than $12,000 per pupil, on average, and Ohio provides schooling regardless of immigration status. Ohio is unable to recover these costs from the federal government and would not incur these costs but for the federal government's unlawful "parole" program.

126. The program harms Ohio's quasi-sovereign interests by compromising its territorial integrity and skewing its labor market.

127. Oklahoma will also be irreparably harmed by the parole program. The Defendants' operation of the parole program injures Oklahoma's interests in

its territory and the welfare of its citizens and causes Oklahoma to incur millions of dollars of costs every year.

128. Among other things, Oklahoma must incur the expense of providing a free public education to any school age child admitted through the parole program—a cost of more than $10,000 per year per child. Oklahoma also incurs significant costs for health care and other state services that are broadly available in the state, including to illegal aliens. As a result, increasing the presence of aliens through the parole program will impose significant financial harm on Oklahoma.

129. South Carolina will also be irreparably harmed by the parole program. South Carolina expends significant state resources on providing state services to illegal aliens within the State. For example, South Carolina spends thousands of dollars per student each year on public-school education, which the State provides to students regardless of their immigration status.

130. The parole program will necessarily lead to a new inflow of illegal aliens into South Carolina. By the Defendants' own estimation, up to 30,000 qualifying individuals per month from all four countries will be admitted to the United States under the program. The program could thus allow for the entry of up to 360,000 new illegal aliens to enter the United States per year. Because the program will significantly increase the total number of illegal aliens in the country, the program will harm South Carolina by causing it to expend even more state resources on the newly arrived illegal aliens.

131. Tennessee is also harmed. Tennessee has approximately 128,000 unauthorized individuals living within the State. Tennessee spends significant sums of money providing services to illegal aliens. Those include education services and healthcare, as well as many other social services. As the number of illegal aliens in Tennessee increases, Tennessee will be required to expend its

27

limited resources and additional money on education, healthcare, public assistance, and general government services.

132. The parole program will force Tennessee to increase expenditures on K–12 education. Tennessee spends thousands of dollars per student each year on public school education, which the State provides to students regardless of their immigration status. Tennessee spends approximately $5.5 billion of state funds on K–12 education, a portion of which is already spent on students regardless of immigration status, and additional funding will be required due to the parole program.

133. The parole program will also require Tennessee to increase expenditures on various social services like healthcare. Tennessee already spends approximately $214 million on total uncompensated care costs at public hospitals. Additionally, Tennessee expended approximately $46.7 million on healthcare coverage for undocumented immigrants in its CoverKids (CHIP) program. These expenditures will increase under the parole program.

134. Utah is also harmed. The parole program will create increased crime and drug trafficking in Utah's communities, requiring additional expenditures by law enforcement. In addition, by increasing illegal immigration, the parole program will force Utah to expend limited resources on education, healthcare, public assistance, and general government services.

135. Utah has approximately 89,000 to 113,000 illegal aliens living in the State; about 61% of them are uninsured; about 23% of them have incomes below the poverty line; and they cost Utah taxpayers more than $521 million a year. *See, e.g.*, *Population Profiles* (89,000 illegal aliens, 61% uninsured, 23% below poverty level); *Population Estimates* (95,000 illegal aliens); *Fiscal Burden* (112,600 illegal aliens, $521 million annual cost).

136. The State of West Virginia is affected by modifications in federal policy regarding immigration. It incurs costs related to its nearly 4,000 illegal aliens, including their U.S.-born children, and expends resources on education, healthcare, public assistance, and general government services. For example, West Virginia spends more than $12,000 per year per public-school student, and it provides public education and related benefits (such as free or reduced-price meals) irrespective of immigration status. West Virginia makes illegal aliens paroled under 8 U. S. C. § 1182(d)(5) eligible for Medicaid. If more illegal aliens enter West Virginia, that will increase West Virginia's education, healthcare, and other costs.

137. Wyoming is also injured by the Defendants' new parole program. Wyoming will be required to stretch its scarce resources even further under the new program because it will cause an influx of illegal aliens to be released into the United States (including to Wyoming) which increases the burden on Wyoming's ability to provide critical governmental services to its citizens. The Defendants' unlawful actions will lead to an increased number of illegal aliens in Wyoming, thereby forcing Wyoming to expend additional resources on education, healthcare, public assistance, and general government services.

138. Wyoming has approximately 5,000 to 7,000 illegal aliens living in the State, and they cost Wyoming taxpayers more than $26.1 million a year. *See, e.g.*, *Population Profile* (7,000 illegal aliens); *Population Estimates* (5,000 illegal aliens); *Fiscal Burden* (<6,000 illegal aliens, $26.1 million annual cost).

139. If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

CLAIMS FOR RELIEF

## I.  Count One (APA)

140. Under the Administrative Procedure Act (APA), 5 U.S.C. § 706, a court must decide all relevant questions of law, interpret the constitution and statutes, and determine the meaning or applicability of the terms of an agency action. It must then hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law.

141. The Defendants' parole program should be held unlawful and set aside because:

    a.   The program exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5).

    b.   The Defendants unlawfully failed to engage in notice-and-comment rulemaking.

    c.   The Defendants arbitrarily created a program that allows hundreds of thousands of aliens to enter the United States with no consideration of their ability to remove those aliens from the United States at the end of their respective periods of parole.

    d.   The Defendants arbitrarily created a program that relies upon an alien obtaining a "sponsor" who agrees to provide support for the alien, but with no meaningful mechanism to legally enforce such an agreement against the sponsor.

    e.   The Defendants arbitrarily did not consider and account for the Plaintiff States' legally recognized reliance interest in the enforcement of federal immigration statutes, including by not allowing into the United States individuals who have no right to be here.

30

## II. Count Two (Ultra Vires)

142. A plaintiff may "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

143. The Defendants' parole program exceeds their statutory parole authority under 8 U.S.C. § 1182(d)(5).

### PRAYER FOR RELIEF

For these reasons, the Plaintiff States ask that the Court:

- Stay, postpone, or preliminarily enjoin the Defendants' implementation of the parole program;

- Following a trial on the merits, decree that the parole program was issued in violation of the APA and vacate it, set it aside, or in the alternative, permanently enjoin the Defendants from implementing it;

- Declare that the parole program exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5);

- Award the Plaintiff States their attorneys' fees and costs of court; and

- Award the Plaintiff States all other relief to which they may be entitled.

Dated February 14, 2023.                    Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal
Strategy
Texas Bar No. 24105704
Southern District of Texas No. 3653771
aaron.reitz@oag.texas.gov

/s/ Leif A. Olson
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON*
America First Legal Foundation
Virginia Bar No. 80434
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

*Application for admission forthcoming

32

STEVE MARSHALL
Alabama Attorney General
EDMUND G. LACOUR JR.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*


TIM GRIFFIN
Arkansas Attorney General
NICHOLAS J. BRONNI
Arkansas Solicitor General
HANNAH L. TEMPLIN
Assistant Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201

*Counsel for the State of Arkansas*

RAÚL R. LABRADOR
Attorney General of Idaho
David M.S. Dewhirst, ISB No. 12141
Chief Deputy Attorney General
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
david.dewhirst@ag.idaho.gov

*Counsel for the State of Idaho*

TREG R. TAYLOR
Attorney General of Alaska
CORI M. MILLS
Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*

ASHLEY MOODY
Attorney General of Florida
James H. Percival (FBN 1016188)
Deputy Attorney General of Legal Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

BRENNA BIRD
Attorney General of Iowa
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 281-5164
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

KRIS KOBACH
Attorney General of Kansas
JESSE A. BURRIS, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

JEFF LANDRY
Attorney General of Louisiana
ELIZABETH B. MURRILL (La #20685)
Solicitor General
JOSEPH SCOTT ST. JOHN (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for the State of Louisiana*

ANDREW BAILEY
Attorney General of Missouri
JOSHUA M. DIVINE, Mo. Bar #69875
Solicitor General
CHARLES F. CAPPS, Mo. Bar #72734
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

DANIEL CAMERON
Attorney General of Kentucky
MARC MANLEY
Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for the Commonwealth of Kentucky*

LYNN FITCH
Attorney General of Mississippi
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

AUSTIN KNUDSEN
Attorney General of Montana
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

34

MICHAEL T. HILGERS
Attorney General of Nebraska
ERIC J. HAMILTON
Deputy Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

DAVE YOST
Ohio Attorney General
SYLVIA MAY MAILMAN
Ohio Deputy Solicitor General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
May.Mailman@OhioAGO.gov

*Counsel for the State of Ohio*

GENTNER F. DRUMMOND
Attorney General of Oklahoma
GARRY M. GASKINS, II
Solicitor General
ZACH WEST
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter
CLARK L. HILDABRAND
Assistant Solicitor General
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for the State of Tennessee*

SEAN D. REYES
Utah Attorney General
MELISSA HOLYOAK
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

PATRICK MORRISEY
Attorney General of West Virginia
LINDSAY SEE
Solicitor General
MICHAEL R. WILLIAMS
Senior Deputy Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

BRIDGET HILL
Wyoming Attorney General
RYAN SCHELHAAS
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

## CERTIFICATE OF SERVICE

I certify that this Amended Complaint was filed through the Court's CM/ECF system, which served it upon all counsel of record.

/s/ Leif A. Olson

36