**United States District Court**
**Southern District of Texas**
**Victoria Division**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
|     *Plaintiffs,* | |
| v. | Case 6:23-cv-7 |
| U.S. DEPARTMENT OF HOMELAND | |
|   SECURITY, *et al.*, | |
|     *Defendants.* | |

### **Plaintiff States' Motion for Preliminary Injunction**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Chief, Special Litigation Division
leif.olson@oag.texas.gov

RYAN D. WALTERS
Special Counsel
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
david.bryant@oag.texas.gov

GENE P. HAMILTON
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
*Counsel for the State of Texas*

# TABLE OF CONTENTS

Table of Authorities ..................................................................... 3

Introduction ................................................................................. 6

Background and Facts ................................................................... 7

    I.    Limited Parole Authority. ................................................ 7

    II.   The Parole Program. ...................................................... 8

    III.  Costs Imposed Upon the States. ................................... 10

        A.   Driver's licenses. ................................................ 11

        B.   Education. ........................................................... 11

        C.   Healthcare. ......................................................... 12

        D.   Law enforcement, correctional, and social costs ................. 12

Standard ..................................................................................... 14

Argument .................................................................................... 14

    I.    The States Are Likely to Succeed on the Merits. ........................ 14

        A.   The Parole Program violates the parole authority. ............. 15

        B.   The Defendants did not engage in required notice-and-comment rulemaking. ........................................... 18

        C.   The Parole Program is arbitrary and capricious. ............... 21

    II.   The States Are Suffering Irreparable Harm. ............................. 24

    III.  The Balance of the Equities and Public Interest Favor the States. ........................................................................ 26

    IV.  Relief Should Be Nationwide. ...................................... 27

Conclusion ................................................................................... 28

Certificate of Service ................................................................... 29

Certificate of Word Count ............................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biden v. Texas,*
    142 S. Ct. 2528 (2022) ........................................................................ 8, 16, 22

*City of Arlington, Tex. v. FCC,*
    569 U.S. 290 (2013) ..................................................................................... 14

*Cruz-Miguel v. Holder,*
    650 F.3d 189 (2d Cir. 2011) ....................................................................... 15

*Dept. of Homeland Security v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) .......................................................................... 22, 23

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ................................................................ 19, 20

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ..................................................................................... 22

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,*
    804 F.2d 1390 (5th Cir. 1986) .................................................................... 24

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ...................................................................... 14

*La. Pub. Serv. Commn. v. FCC,*
    476 U.S. 355 (1986) ..................................................................................... 14

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................ 27

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) ....................................................................... 27

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) .................................................................... 26

*Maryland v. King,*
    567 U.S. 1301 (2012) ................................................................................... 25

*Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins.*
   *Co.*,
   463 U.S. 29 (1983) ....................................................................... 22

*Natl. Fedn. of Indep. Bus. v. Dept. of Labor*,
   142 S. Ct. 661 (2022) (per curiam) ............................................. 14

*Natl. Horsemen's Benevolent & Protective Assn. v. Black*,
   53 F.4th 869 (5th Cir. 2022) ...................................................... 21

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................... 26

*Profls. & Patients for Customized Care v. Shalala*,
   56 F.3d 592 (5th Cir. 1995) ........................................................ 18

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................ 23

*Texas v. Biden* (*Texas MPP II*),
   — F. Supp. 3d —,
   2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) ...................... 16, 25

*Texas v. Biden* (*Texas MPP*),
   20 F.4th 928 (5th Cir. 2021),
   *revd. on other grounds*, 142 S Ct. 2528 (2022) .................................. *passim*

*Texas v. Biden* (*Texas MPP*),
   554 F. Supp. 3d 818 (N.D. Tex. 2021),
   *revd. on other grounds*, 142 S. Ct. 2528 (2022) ............................. 15, 17, 18

*Texas v. United States* (*Texas Prioritization*),
   — F. Supp. 3d —,
   2022 WL 2109204 (S.D. Tex. June 10, 2022) .................................. *passim*

*Texas v. United States* (*Texas DACA*),
   328 F. Supp. 3d 662 (S.D. Tex. 2018) ........................................ 19

*Texas v. United States*,
   524 F. Supp. 3d 598 (S.D. Tex. 2021) ........................................ 22

*Texas v. United States* (*Texas DAPA*),
   809 F.3d 134 (5th Cir. 2015) .................................... 11, 18, 19, 26

*Texas v. United States* (*Texas DAPA*),
   86 F. Supp. 3d 591 (S.D. Tex. 2015) ......................................... 26

*United States v. Escobar*,
    No. 2:17-cr-529, 2017 WL 5749620 (S.D. Tex. Nov. 28, 2017)....................27

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ....................................................................................14

*Valley v. Rapides Parish Sch. Bd.*,
    118 F.3d 1047 (5th Cir. 1997) ....................................................................27

*Wages & White Lion Invs., LLC, v. U.S. Food & Drug Admin.*,
    16 F.4th 528 (5th Cir. 2021) .......................................................................27

**Statutes**

5 U.S.C.
    § 553(b)(A) ..................................................................................................18
    § 706(2) ........................................................................................................14

8 U.S.C.
    § 1182(d)(5) ...................................................................................................7
    § 1182(d)(5)(A) ........................................................................... 6, 7, 15, 22
    § 1182(d)(5)(B) .............................................................................................7

**Constitutional Provisions**

U.S. Const. art. I, § 1 ..........................................................................................6

U.S. Const. art. II, § 3, cl. 5.................................................................................6

**Other Authorities**

42 C.F.R. § 440.255(c).......................................................................................12

Implementation of a Parole Process for Cubans, 88 Fed. Reg.
    1266 (Jan. 9, 2023) ............................................................................... *passim*

Implementation of a Parole Process for Haitians, 88 Fed. Reg.
    1243 (Jan. 9, 2023) ......................................................................... 10, 20, 21

Implementation of a Parole Process for Nicaraguans, 88 Fed.
    Reg. 1255 (Jan. 9, 2023)...............................................................................10

Implementation of Changes to the Parole Process for
    Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023)............................... 10, 16, 17

### INTRODUCTION

Congress makes the laws. U.S. Const. art. I, § 1. One of those laws is a limitation imposed upon the parole of aliens because of past executive abuses. That limitation permits the parole of aliens into the United States only on a "case-by-case basis" for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Accordingly, parole cannot be used as an alternative admissions program, nor can it be granted *en masse*—doing so violates the requirement that it be granted only on a case-by-case basis.

The President, and by extension his subordinates in the executive branch, are charged to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3, cl. 5. But instead of taking care to faithfully execute the limits Congress placed on alien parole, the Defendants are subverting them. The new Parole Program they concocted permits hundreds of thousands of aliens per year entry into the United States—aliens who otherwise have no lawful right for admission, entry, or presence. It permits that entry based not upon individual circumstances, but upon membership in particular groups. More, it allows the parolees to seek work authorization, which the Defendants have promised to expedite.

The Parole Program violates the limitations Congress placed on the parole of aliens into the United States and is therefore unlawful. Enforcing that unlawful program is *ultra vires*—outside the Defendants' power. The Parole Program is also unlawful because it was promulgated in violation of the law; the Defendants did not notify the public and seek and consider their comments before promulgation, and the program itself is arbitrary and capricious.

Permitting the Parole Program to continue will irreparably harm the Plaintiff States. The Court should therefore preliminarily enjoin the Defendants from operating the program pending a final judgment.

BACKGROUND AND FACTS

## I.   Limited Parole Authority.

The Secretary of Homeland Security may parole into the United States an otherwise inadmissible alien. *See* 8 U.S.C. § 1182(d)(5). But he may do so only on a "case-by-case basis" for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Congress added each of those restrictions to the parole power in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act, commonly called IIRIRA, because the executive branch had abused that parole power "to admit entire categories of aliens who do not qualify for admission under any other category in immigration law." H.R. Rep. No. 104-469, at 140 (1996). Underscoring this limitation, Congress emphasized that the Secretary and his Department "may not parole into the United States an alien who is a refugee unless [he] determines that compelling reasons in the public interest with respect to *that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B) (emphasis added); *see also Texas v. Biden* ("*Texas MPP*"), 20 F.4th 928, 994 (5th Cir. 2021), *revd. on other grounds*, 142 S Ct. 2528 (2022).

As the Fifth Circuit stated less than two years ago, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *Id.* at 947. But the power is not unlimited: "DHS

7

cannot use that power to parole aliens *en masse*; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA." *Id.* at 997. And the Supreme Court recently affirmed that the parole power is limited, "not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' … And under the [Administrative Procedure Act], DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022).

## II.  The Parole Program.

On December 22, 2022, Secretary Mayorkas issued a memorandum that created a new parole program for nationals of Cuba, Haiti, Nicaragua, and Venezuela. That memorandum has not been released.

On January 5, 2023, President Biden and the other Defendants announced the creation of the Parole Program. *See* Exh. A (Dept. of Homeland Security Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023)). They purport the Program to "provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border." *Id.* at *2. Under the Program, an alien "can seek *advance authorization* to travel to the United States, and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization[.]" *Id.* (emphasis added). The only conditions for doing so are obtaining a "supporter in the United States"— who can be a parolee or DACA recipient—"who commits to providing financial and other

support" and passing unspecified "rigorous biometric and biographic national security and public safety screening…." *Id.*

The Program "will allow up to 30,000 qualifying nationals *per month* from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period." *Id.* (emphasis added).

The Defendants have already published a new website for applications to be submitted for the Program. *See* Exh. B (U.S. Citizenship & Immig. Svcs*., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV (visited Feb. 13, 2023)). That site sets forth parameters for the program consistent with those the Department announced when it created the program:

- First, the "supporter"—who can also be a parolee, DACA recipient, Temporary Protected Status recipient, or a member of other categories of individuals—submits an "Online Request to be a Supporter and Declaration of Financial Support." *Id.* at *7.

- If USCIS "confirms a supporter," then the intended beneficiary alien receives an email from USCIS. *Id.*

- The beneficiary then uses the CBP One Mobile Application to submit biographic information and a photo. *Id.*

- If approved for "advance authorization to travel to the United States to seek a discretionary grant of parole," the beneficiary has 90 days to travel by air to a U.S. port of entry. *Id.* at *7–8.

- When the alien arrives, CBP conducts "additional screening and vetting," though the only such process mentioned is fingerprinting. *Id.* at *8. It then makes a parole determination. *Id.* An alien who is for

9

some reason not approved for parole is not turned away but "processed under an appropriate processing pathway[.]" *Id*.

- An approved alien is "paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization." *Id*.

On January 9, 2023, DHS published four notices, one for each eligible nationality, in the Federal Register regarding the implementation of the Parole Program. *See* Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

The Defendants did not publish advance notice in the Federal Register that they were planning to issue these notices, nor did they give the public and affected stakeholders the opportunity to comment on them. They have not published the decision memorandum that supposedly justifies the Program and the notices. None of the Defendants' materials creates or describes a mechanism for confirming that a sponsor is actually providing financial assistance or for removing parolees after the end of their supposed two-year parole period. None of the notices addresses reliance interests that have developed regarding the pre-Parole Program method of paroling aliens into the United States, much less the enforcement of the parole standards Congress wrote into the law.

### III. Costs Imposed Upon the States.

Unchecked migration imposes millions upon millions of dollars of costs upon the States. As have other courts, the Court recently recognized that

10

Texas, in particular, bears significant burdens because of Defendants'
unlawful actions.

## A.  Driver's licenses.

Texas furnishes driver's licenses to aliens so long as their presence in the
United States is authorized by the federal government. Each additional
customer seeking a Texas driver's license imposes a cost on Texas. Many illegal
aliens released or paroled into Texas will obtain Texas driver's licenses.
Because "driving is a practical necessity in most of" Texas, "there is little doubt
that many" aliens present in Texas because they are paroled into the United
States will obtain, at a cost to Texas, a Texas driver's license. *Texas v. United
States* ("*Texas DAPA*"), 809 F.3d 134, 156 (5th Cir. 2015). As a representative
of Texas's Department of Public Safety recently swore to another court, Texas
incurs direct and indirect costs of roughly $200 for each non-citizen who seeks
a limited-time license. *See* Exh. C.

## B.  Education.

Texas estimates that the average per-student, per-year funding
entitlement for the 2021–22 school year is $9,216. For students qualifying for
bilingual education services, that cost is $11,432. Texas cannot quantify the
number of illegal aliens or children of illegal aliens in its schools. But data from
the Office of Refugee Resettlement of the U.S. Department of Health and
Human Services shows how many minor illegal aliens are released to sponsors
in Texas. As the Court recently held, the estimated cost of educating those
children in Fiscal Year 2022 will be more than $175 million. *See Texas v.
United States* ("*Texas Prioritization*"), — F. Supp. 3d —, 2022 WL 2109204, *14
(S.D. Tex. June 10, 2022); *see also* Exh. D. Indeed, this number is almost
certainly too low: because Texas's estimate of $176.42 million counts only the

11

children who were released to sponsors in the preceding fiscal year, thus becoming eligible for public education in FY2022, not the children who were released in previous years who continue to remain eligible for public education. These costs, unsurprisingly, increase as the number of illegal aliens in the State increases. *Id.* Thus, as the number of illegal aliens who are present in the State increases due to grants of parole or through unlawful entry, the education costs to the State will increase.

### C. Healthcare.

Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program. Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. 42 C.F.R. § 440.255(c). The Court has previously recognized that Texas spends, by its estimate, millions of dollars per year on furnishing healthcare to illegal aliens under these three programs—a total of $87 million in Fiscal Year 2019. Some illegal aliens who are admitted through the Program will require these services, causing Texas to incur costs. *Id.* *15; *see also* Exh. E.

Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens. The last time Texas's Health and Human Services Commission estimated those costs, they were more than $716 million. Some illegal aliens who are admitted through the Program will require these services, causing Texas to incur costs. *Id.*; *see also* Exh. E.

### D. Law enforcement, correctional, and social costs

Texas spends tens of millions of dollars each year for increased law enforcement as its citizens suffer increased crime, unemployment,

environmental harm, and social disorder due to illegal immigration. The federal government reimburses only a fraction of these costs; the rest are borne by Texas and Texans. For example, the federal government's State Criminal Alien Assistance Program reimburses states and localities that incarcerate illegal aliens for some of the salaries they pay to correctional officers. For the most recent application period, July 2018–June 2019, the Texas Department of Criminal Justice sought reimbursement for nearly 9,000 eligible illegal-alien inmates who, based on the per-day, per-inmate average cost of incarceration, cost the State more than $165 million. The federal government reimbursed less than $15 million of that, meaning that incarcerating illegal aliens cost Texas— as the Court found—more than $150 million, a number that will increase as the number of illegal aliens in the State increases. *Id.* *13; *see also* Exh. F.

Those are not the only law-enforcement costs related to illegal aliens. Illegal aliens who are not incarcerated for long enough do not qualify for reimbursement. *See* Exh. F ¶ 4. TDCJ's costs do not include the costs that counties and municipalities incur to incarcerate illegal aliens. And every illegal alien who is incarcerated has been, at the least, arrested, meaning that a municipality, county, or the State has paid some law-enforcement officer to carry out and process the arrest and likely to investigate the underlying crime—or, at the very least, to accept the transfer of the alien from a federal law-enforcement officer. And an alien who is imprisoned as part of a sentence for a judgment of guilt has caused the State or county to pay for prosecutors, court officials, and clerks' staff, if not interpreters, appointed counsel, and defense investigators.

The Parole Program not only states that parolees can obtain work authorization in the United States but that Defendants will work expeditiously to process work authorization requests. The basic economic laws of supply and

demand are in effect in Texas; the necessary effect of authorizing illegal aliens to work in Texas is increase the supply of laborers and therefore depress the wages paid to Texans who are legally present in the United States.

## STANDARD

For a preliminary injunction, the States must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011).

## ARGUMENT

### I.   The States Are Likely to Succeed on the Merits.

Because administrative agencies are creatures of statute, they possess only the authority that Congress has provided. *Natl. Fedn. of Indep. Bus. v. Dept. of Labor*, 142 S. Ct. 661, 665 (2022) (per curiam); *La. Pub. Serv. Commn. v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it."). And it is a core principle that an agency may not rewrite statutory terms to suit its own sense of how the law should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). When agencies exceed their statutory authority, those actions are unlawful and *ultra vires. See City of Arlington, Tex. v. FCC,* 569 U.S. 290, 297 (2013); 5 U.S.C. § 706(2).

The Parole Program exceeds the Defendants' authority, lacked required notice and comment, and is arbitrary and capricious. The States are therefore likely to succeed on the merits.

14

### A.   The Parole Program violates the parole authority.

Congress has expressly and intentionally provided only a narrow path to parole aliens into the United States. Specifically, Section 212(d)(5) of the Immigration and Nationality Act, as amended by IIRIRA, allows parole of aliens "only on a case-by-case basis for urgent humanitarian reasons or significant public health benefit." 8 U.S.C. § 1182(d)(5)(A). "Congress 'specifically narrowed the executive's discretion' to grant parole due to 'concern that parole ... was being used by the executive to circumvent congressionally established immigration policy.'" *Texas v. Biden* (*Texas MPP*), 554 F. Supp. 3d 818, 852 n.11 (N.D. Tex. 2021), *revd. on other grounds*, 142 S. Ct. 2528 (2022) (quoting *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Congress was reacting, that is, to abuses just like the Parole Program:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996). "[A]dmit[ing] entire categories of aliens who do not qualify for admission" is indeed, as the Defendants admit, the Parole Program's purpose. *See* Exh. B at *1 ("nationals of Cuba, Haiti, Nicaragua, and Venezuela" may make use of special processes to apply "for advanced authorization to travel and a temporary period of parole").

The Parole Program facially invokes the "case-by-case" language, but the substance of the Program confirms it is anything but. It authorizes 30,000

parolees per month. *See* 88 Fed. Reg. at 1280. A number so high—approaching a limit of nearly 400,000 parolees *per year*—is commonsense proof that the Defendants are not employing the parole power on a "case-by-case" basis for just those aliens with compelling humanitarian or medical situations. These numbers cannot be described as anything other than *en masse*. "Deciding to parole aliens *en masse* is the opposite of case-by-case decisionmaking" *Texas MPP*, 20 F.4th at 942; indeed, "that was the whole point of the 'case-by-case' requirement that Congress added." *Id.* at 997.

More, it is entirely implausible that Defendants would or could *actually* review and approve each parolee on a "case-by-case" basis. As both Justice Alito and Judge Kacsmaryk have noted in the context of a prior program, "'[T]he number of aliens paroled each month … — more than 27,000 in April of 2022 — gives rise to a strong inference that the Government is not really making these decisions on a case-by-case basis." *Texas v. Biden ("Texas MPP II")*, — F. Supp. 3d—, 2022 WL 17718634, at *13 (N.D. Tex. Dec. 15, 2022) (quoting *Biden*, 142 S. Ct. at 2554 (Alito, J., dissenting)). The Parole Program is even bigger—authorizing 30,000 parolees per month, and the number of applications Defendants would allegedly review would be even higher. The sheer volume of the Program provides an adequate basis to conclude it is *en masse*—and therefore illegal.

That illegality is confirmed by numerous other aspects. For example, the Program openly states its purpose is to be an immigration control measure that supposedly "reduce[s] the number of [aliens from the four covered countries] seeking to irregularly enter the United States" by instead providing them "a meaningful incentive to seek a safe, orderly means of traveling to the United States." 88 Fed. Reg. at 1267. But parole is not "intended to replace established refugee processing channels," as Congress "specifically narrowed the

executive's discretion to grant parole due to concern that parole was being used by the executive to circumvent congressionally established immigration policy." *Texas MPP*, 554 F. Supp. 3d at 852 n.11 (cleaned up).

That type of "circumvent[ion]" is precisely what the Parole Program intends to achieve: the Defendants shunt aliens away from the border and into the United States, not because of individual aliens' humanitarian concerns or public benefits, but "to improve border security, limit irregular migration, and create additional safe and orderly processes…." Exh. A at *1. That is a programmatic, not case-by-case, approach. And that invocation demonstrates precisely why Congress placed on the Defendants the limits that it did: Congress has already decided on the policies that will promote border security and limit irregular migration, and it enacted them into law to prevent the executive branch from creating its own "safe and orderly processes" to supervene the ones that Congress created itself.

Thus, rather than focus on how DHS personnel should determine whether a *specific* alien's parole would yield a humanitarian or public benefit, as one might expect for a proper usage of the parole power, the Defendants repeatedly measure such supposed benefits *in toto*, by accumulating them across hundreds of thousands of paroled aliens. For example, the Defendants assert benefits like "reduc[ing] the strain on DHS personnel and resources" at the southern border caused by "record numbers" of aliens from the four covered countries. *See* 88 Fed. Reg. at 1268–69. But paroling a small number of aliens on a case-by-case basis could never achieve such drastic reductions—it has to be done *en masse*. *See* 88 Fed. Reg. at 1280 (cap must be high enough that it "serves as a meaningful alternative to irregular migration" because otherwise "we would then see increased irregular migration" again). Likewise with the Defendants' invocation of supposed "border security" and "vetting" benefits,

*see, e.g.*, 88 Fed. Reg. at 1272, which would make sense only across thousands of aliens, not "case-by-case" determinations, and which are illogical even on their own terms because the Defendants' "solution" for border security is simply to parole those aliens into the country anyway.

The application process itself confirms that aliens need not demonstrate an individualized humanitarian or public benefit from their parole; they need only point to "reasons, as described" in the notices announcing the Program—namely the generic benefits of reduced crossings writ large. 88 Fed. Reg. at 1275–76. This further confirms there is no actual case-by-case review intended, anticipated, or required.

The Fifth Circuit has already made clear that the parole power cannot be used as an escape valve to avoid the burdens of following Congress's requirements for processing aliens: "the Government's proposal to parole every alien it cannot detain is the opposite of the 'case-by-case' determinations required by law." *Texas MPP*, 20 F.4th at 997. As another court recently put it, "Any class-wide parole scheme … would be a violation of the narrowly prescribed parole scheme in section 1182 which allows parole 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Texas*, 554 F. Supp. 3d at 852.

### B. The Defendants did not engage in required notice-and-comment rulemaking.

Under the APA, rules are subject to notice-and-comment rulemaking unless they fall within one of the APA's exceptions, 5 U.S.C. § 553(b)(A), which "must be narrowly construed." *Texas DAPA*, 809 F.3d at 171 (quoting *Profls. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995)). The Parole Program wasn't adopted after notice and comment, and it is not subject to one of the exceptions. It is therefore unlawful.

18

### 1.   The Program is not a policy statement.

Distinguishing between a rule and a policy statement depends on "two criteria: whether the [agency action] (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas DAPA*, 809 F.3d at 171 (cleaned up). A court making that determination must be "mindful but suspicious of the agency's own characterization," and its primary consideration is whether the action "has binding effect on agency discretion or severely restricts it." *Id.*

Under that evaluation, the Parole Program is not "merely … a general statement of policy," 88 Fed. Reg. at 1276, as the Defendants claim. The Parole Program certainly imposes rights and obligations by establishing a framework for the showing required to parole up to 360,000 aliens into the country annually. *See*, *e.g.*, *Texas v. United States* ("*Texas DACA*"), 328 F. Supp. 3d 662, 731 (S.D. Tex. 2018) (DACA is not a policy statement, for same reasons). And although the Secretary of DHS retains "discretion" to end the Program, the relevant question is whether "*DHS personnel[]*" have "discretion to stray from the guidance," *Texas MPP*, 40 F.4th at 229 (emphasis added), but there is no "evidence of discretion by the individuals processing [parole] applications," *Texas DACA*, 328 F. Supp. 3d at 732. Moreover, the notices announcing the Program are "much more substantive than a general statement of policy," confirming notice-and-comment was required. *Texas MPP*, 40 F.4th at 229.

### 2.   The Program does not concern a foreign-affairs function.

The foreign-affairs exception to the APA's notice-and-comment requirement is narrow, and even "in the immigration context," the government must make a strong showing that allowing even a short notice-and-comment period "will provoke definitely undesirable international consequences." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775–76 (9th Cir. 2018) (Bybee,

J.). Accordingly, courts "disapprove[] the use of the foreign affairs exception where the Government has failed to offer evidence of consequences that would result from compliance with the APA's procedural requirements." *Id.* at 776 (collecting cases).

The Defendants' assertion that the Parole Program "will advance the Administration's foreign policy goals" and was in response "to requests from key foreign partners," 88 Fed. Reg. at 1277, is not enough. As Judge Bybee explained for the Ninth Circuit, even when there are "ongoing negotiations" with other countries, an agency must "explain[] how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment, is necessary for [those] negotiations." *E. Bay*, 932 F.3d at 776 (emphasis in original). The Defendants do no such thing, only pointing to the Parole Program's supposed foreign-affairs benefits and hypothesizing that even a slight delay "could" affect other countries' willingness to assist or cause "an even greater surge in migration" before the Program took effect. 88 Fed. Reg. at 1277.

That is not explanation; it is supposition. The Defendants could have proposed, and opened a notice-and-comment period on, the Parole Program on January 9 and simultaneously stated that anyone attempting to cross illegally after that date would be barred from the Program—similar to what the Program already says, *see, e.g.*, 88 Fed. Reg. at 1252. That would have eliminated the incentive for an "even greater surge in migration" that purported to trouble the Defendants while assuring "key foreign partners" that the U.S. was proceeding expeditiously. But the Defendants do not explain why that option was insufficient; their notices certainly give no indication it would have caused "definitely undesirable international consequences." A purported impact on foreign affairs was not good cause to avoid notice and comment.

### 3.   There was not good cause to skip notice and comment.

The "good cause" exception to notice-and-comment is narrowly construed and only reluctantly countenanced, to be used only "on a break-glass-in-case-of-an-emergency basis[.]" *Natl. Horsemen's Benevolent & Protective Assn. v. Black*, 53 F.4th 869, 883 & n.26 (5th Cir. 2022). The only "good cause" the Defendants posit in their notices is that notice-and-comment "would seriously undermine a key goal of the policy: it would incentivize even more irregular migration." 88 Fed. Reg. at 1277. But as explained above, that simply is wrong. Announcing the Program and stating that anyone who attempts to cross illegally after January 9 (as the Program already says) would have had the same effect: immediately deterring aliens from seeking to cross illegally into the United States.

Nor could the Defendants claim recent events provide an urgent basis to take action. Border crossings have been steadily increasing over the course of the Biden Administration, 88 Fed. Reg. at 1245, 1268–69, which the Defendants themselves chalk up to long-extant things like the "lingering impacts of the COVID-19 pandemic," the refusal of Cuba to accept returned aliens as of February 2020, the response to April 2018 protests in Nicaragua, an assassination and earthquake in Haiti in Summer 2021, and the November 2021 decision by Nicaragua to allow Cubans to visit without visas. 88 Fed. Reg. at 1246, 1258, 1268–70. Those events are neither sudden nor urgent—the most recent of them occurred more than a year before the Defendants announced the Program—let alone so compelling that they overcome the strong presumption of notice-and-comment.

## C.   The Parole Program is arbitrary and capricious.

The APA's arbitrary-and-capricious framework applies, as the Supreme Court has recognized, to "DHS's exercise of discretion within th[e] statutory

framework" of § 1182(d)(5)(A). *Biden*, 142 S. Ct. at 2543. The Defendants were therefore required to examine the relevant data and articulate a satisfactory explanation for their action, including a rational connection between the facts found and the regulatory choice made. *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Texas v. United States*, 524 F. Supp. 3d at 652 (citations omitted). This reasoned decisionmaking includes, among other things, consideration of whether there was legitimate reliance on the status quo prior to an agency's change in course, for "[i]t would be arbitrary and capricious to ignore such matters." *Dept. of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

The Parole Program is arbitrary and capricious because the Defendants have relied on factors which Congress had not intended them to consider, entirely failed to consider an important aspect of the problem, and offered explanations for its decision that run counter to the evidence. *State Farm*, 463 U.S. at 43.

First, because the Defendants addressed only the benefits that might obtain from the *accumulated* effect of paroling thousands of aliens, they did not make—indeed, could not make—the showing actually required by § 1182(d)(5)(A): that admitting each *individual* parolee will yield a humanitarian or public benefit. Similarly, the Program is arbitrary and capricious because it does not require applicants to explain why their parole *specifically* would yield humanitarian or public benefits. *See* Argument § I.A.

Second, the Defendants did not consider and account for the Plaintiff States' reliance interests. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (cleaned up). In fact, perhaps

because they did not conduct notice-and-comment rulemaking, the Defendants did not address reliance interests of any kind. That is a *per se* violation of the APA because it is "arbitrary and capricious to ignore such matters." *Regents,* 140 S. Ct. at 1913.

Nor can the Defendants claim ignorance. They know about the costs imposed on states like Texas as a result of increased illegal immigration because courts have previously held—indeed, this Court has previously held—that the Defendants were arbitrary and capricious for ignoring those costs. *See Texas Prioritization*, 2022 WL 2109204 at *36–39. Those costs are just as relevant here—perhaps even more so, given that aliens paroled into the United States under the Parole Program would be eligible to receive work authorization, which the Defendants claim they are working to make as efficient as possible. *See* 88 Fed. Reg. at 1272, 1276.

Third, the Defendants justify the Parole Program on the basis that there is a sudden surge of migrants from several specific countries, such that emergency measures are needed—so urgent, in fact, that they cannot wait for a notice-and-comment rulemaking. But as explained above, the notices announcing the Program rely on events that are hardly sudden—ranging from COVID-19, to political and natural events occurring well in the past. *See* Argument § I.B.3. Because the cited evidence does not support the justification of this emergency measure, it is arbitrary and capricious.

Fourth, the Defendants did not explain or analyze how they would remove from the United States the hundreds of thousands of aliens paroled through their program at the end of any period of authorized parole, despite admitting general difficulty in removing such aliens even currently, *see, e.g.*, 88 Fed. Reg. at 1270–71, and despite the pattern of so-called "temporary" immigration policies becoming permanently entrenched, *see, e.g., Saget v. Trump*, 375

F. Supp. 3d 280, 295 (E.D.N.Y. 2019). The only substantive acknowledgment of the possibility that the nearly 30,000 new parolees every year will not depart the United States is on the USCIS website, which blandishes, "Individuals with expired parole are expected to depart the country of their own accord. Individuals in the United States encountered after their parole has terminated generally will be placed in removal proceedings." *See* Exh. B at *10. The Defendants' willful blindness to their own historical experience is arbitrary and capricious. Similarly, the Defendants do not explain or analyze how the "sponsor" requirement for applicants will be enforced. Although the sponsor— who can be a parolee himself—must pledge to provide financial support, no enforcement mechanism is described.

These unenforceable "parchment requirements" are designed only to give the appearance of selectivity, all while creating the equivalent of a new visa program for hundreds of thousands otherwise ineligible aliens each year.

* * *

For all these reasons, the States are likely to prevail on the merits of their claims.

## II.   The States Are Suffering Irreparable Harm.

"To show irreparable injury" in lieu of a stay, "it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Rather, the States "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* Courts in this Circuit have held—repeatedly—that "increased costs to States from [federal immigration agency action], and [the] inability to recover from [the] federal government supports [the] determination that States

24

have suffered an irreparable injury for which remedies available at law are precluded due to sovereign immunity." *Texas MPP II*, 2022 WL 17718634 at *17. Those same harms exist here.

As described above, Texas spends millions upon millions of dollars providing services to illegal aliens because of the United States government's failure to enforce federal law—in this case, by paroling hundreds of thousands of aliens into the interior of the United States even though they are not eligible under any statute to be physically present in the country. The State spends tens of millions of dollars each year for increased law enforcement, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to illegal immigration. A rise in illegal immigration thus strains Texas's finances and hampers its ability to provide essential services, such as emergency medical care, education, driver's licenses, and other public safety services. Moreover, the Supreme Court has ruled that increased crime causes an "ongoing and concrete harm" to the State's law enforcement and public safety interests, even aside from financial expenditures. *Maryland v. King,* 567 U.S. 1301, 1303 (2012).

The other States will suffer from the same types of injuries, as explained in the Complaint. Dkt. 18 ¶¶ 74–139.

Each State will suffer harm from the Defendants' unlawful program, which violates each of their sovereign and quasi-sovereign interests in its own territory and the welfare of its own citizens. *See Texas Prioritization*, 2022 WL 2109204 at *16 fn.46 (recognizing the implication of quasi-sovereign interests of Texas "being free from 'substantial pressure' from the federal government to change its laws, and Texas's interest in the enforcement of immigration law— the power to regulate immigration being a sovereign prerogative that Texas wholly ceded to the Government when it joined the Union.").

25

The detailed immigration system Congress established creates a reliance interest for States in the enforcement of the limitations on parole that Congress imposed. *Id.* The Defendants' defiance of those limitations harms each of the States, who have no control over the number of paroled aliens who decide to reside within their boundaries.

These harms are significant, but ultimately, "[w]hen determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts.'" *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022). And as courts have repeatedly held, *see Texas MPP II*, 2022 WL 17718634, at *17, the injuries described above are irreparable because the Defendants' sovereign immunity prevents retrospective relief, *see also Louisiana*, 55 F.4th at 1034. Nor could the Plaintiffs recoup such costs from the parolees themselves. *See Texas DAPA*, 809 F.3d at 186; *Texas v. United States,* 86 F. Supp. 3d 591, 673 (S.D. Tex. 2015) ("The Court agrees that, without a preliminary injunction, any subsequent ruling that finds [a particular immigration policy] unlawful after it is implemented would result in the States facing the substantially difficult— if not impossible—task of retracting any benefits or licenses already provided to [immigrant] beneficiaries. This genie would be impossible to put back into the bottle.").

## III. The Balance of the Equities and Public Interest Favor the States.

The Court should consider the balance-of-equities and public-interest elements together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (merging these two elements when the Government is the nonmoving party); *Texas DAPA*, 809 F.3d at 187 (same). It should weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether

"the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).

The balance of harms favors granting a preliminary injunction because the States' harm is immediate, irreparable, and continuing. The States have a significant interest in maintaining the health and safety of their residents. Conversely, the Defendants face essentially no harm from maintaining the status quo. Any inefficiency resulting from an injunction inhibiting the Defendants is outweighed by the financial losses the States will incur and the damage that increased illegal immigration will do to their citizens. *United States v. Escobar,* No. 2:17-cr-529, 2017 WL 5749620, at *2 (S.D. Tex. Nov. 28, 2017).

Also, the public is served when the law is followed, and "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., LLC, v. U.S. Food & Drug Admin.*, 16 F.4th 528, 560 (5th Cir. 2021) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

The balance of equities and public interest weigh in favor of an injunction.

## IV.  Relief Should Be Nationwide.

"In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas MPP*, 40 F.4th at 229 n.18. Here, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective," as aliens would simply be paroled into the United States through a non-party State. *Id.*; *see also Louisiana v. Becerra,* 20 F.4th 260, 263 (5th Cir. 2021) (nationwide injunction appropriate in part "because of the constitutional command for 'uniform' immigration laws).

The same scope of relief is independently justified on the basis that unlawful agency actions are ordinarily "vacated—not that their application to the individual [plaintiffs] is proscribed." *Texas MPP II*, 2022 WL 17718634 at *18.

## CONCLUSION

The States respectfully request that the Court preliminarily enjoin the Defendants from operating the Parole Program. The States further respectfully request all other relief to which they may be entitled.

Dated February 14, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Respectfully submitted,

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Southern District of Texas No. 3653771
aaron.reitz@oag.texas.gov

/s/ Leif A. Olson
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON*
America First Legal Foundation
Virginia Bar No. 80434
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

*Application for admission forthcoming

### CERTIFICATE OF SERVICE

I certify that on February 14, 2023, I filed this motion through the Court's CM/ECF system, which served it on all counsel of record.

/s/ Leif A. Olson

### CERTIFICATE OF WORD COUNT

I certify that this motion, according to the word-count function of Microsoft Word, on which this motion it prepared, contains 6,464 words.

/s/ Leif A. Olson