```
 1                  IN THE UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         VICTORIA DIVISION

 3    _____
                                      )
 4    THE STATE OF TEXAS, ET AL.,     )
                  Plaintiffs,         )
 5                                    ) CIVIL ACTION NO.
      VS.                             ) 6:23-CV-07
 6                                    )
      U.S. DEPARTMENT OF HOMELAND     )
 7    SECURITY, ET AL.,               ) 4:07 P.M.
                  Defendants.         )
 8    _____)

 9
                              MOTION HEARING
10              BEFORE THE HONORABLE DREW B. TIPTON
                   UNITED STATES DISTRICT JUDGE
11                      FEBRUARY 21, 2023

12    APPEARANCES:

13    FOR PLAINTIFFS:
      MR. LEIF OLSON
14    MR. M. DAVID BRYANT, JR.
      Office of the Attorney General
15    P.O. Box 12548
      Austin, Texas  78711
16    (512)463-4139

17    FOR DEFENDANTS:
      MR. EREZ REUVENI
18    United States Department of Justice
      450 5th Street NW, Room 6047
19    Washington, DC  20009
      (202)307-4293
20
      COURT REPORTER:
21    Heather Alcaraz, CSR, FCRR, RMR
      Official Court Reporter
22    515 Rusk, Suite 8004
      Houston, Texas  77002
23    (713)250-5584

24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer.
```

```
 1                        PROCEEDINGS
 2   _____
 3        (The following hearing was held via video conference.)
 4                            *  *  *
```

16:07:46  5          **THE COURT:**  All right.  Kellie, you can call the case

 6   when ready.

16:09:32  7          **THE CASE MANAGER:**  The Court calls civil action

 8   6:23-CV-7, State of Texas, et al., versus United States

 9   Department of Homeland Security, et al.

16:09:39 10          May I have appearances by counsel?

16:09:49 11          **THE COURT:**  Mr. Olson, can you hear us?

16:09:52 12          **MR. OLSON:**  I can hear you, Your Honor, yes.

16:09:53 13          **THE COURT:**  Okay.  We've asked for appearances.

16:10:00 14          **MR. OLSON:**  Leif Olson on behalf of the plaintiffs,

15   Your Honor.

16:10:03 16          **MR. REUVENI:**  Good morning [sic].  Erez Reuveni on

17   behalf of defendants, Your Honor.

16:10:07 18          **THE COURT:**  All right.  Can everybody hear --

16:10:09 19          **MR. REUVENI:**  Or good afternoon.

16:10:10 20          **THE COURT:**  Yeah.  That's all right.

16:10:11 21          Can everybody hear each other okay?

16:10:13 22          **MR. OLSON:**  Yes, sir.

16:10:14 23          **THE COURT:**  All right.

16:10:15 24          **MR. REUVENI:**  Yes, Your Honor.

16:10:18 25          **MR. BRYANT:**  Your Honor, I'm David Bryant, also on

1    behalf of the attorney general.  I'm not yet making my camera

2    work, but I'll work on that.

16:10:25  3          THE COURT:  Okay.  Who's arguing on behalf of the

4    plaintiffs?

16:10:29  5          MR. OLSON:  I am, Your Honor.

16:10:30  6          THE COURT:  Okay.

16:10:30  7          All right.  If at all possible, if everybody who is

8    not arguing can mute their sound just to make sure that we don't

9    have any accidental echos -- we've got some Zoom scars, to be

10   sure, over the last two or three years.  So we figured out how

11   to navigate those.

16:10:49 12          Okay.  So we are here today to take care --

16:10:56 13          *(Unidentified speaker; indiscernible.)*

16:10:56 14          THE COURT:  All right.  Sounded like we had a little

15   bit of feedback there.  And so, once again, I'll ask everybody

16   who is not -- everybody but -- how do you say your last name?

17   I'm sorry.  Is it Reuveni?

16:11:07 18          MR. REUVENI:  Yes, Your Honor.

16:11:07 19          THE COURT:  Okay.  Great -- Mr. Reuveni and Mr. Olson.

20   If everybody else would mute, that would be great.

16:11:13 21          We're here today for two matters.  One is, of course,

22   the motion to transfer venue.  I'd like to hear argument on

23   that.  I've read the motion and response.

16:11:24 24          Mr. Reuveni, I did receive your reply the day that it

25   was filed.  I know that you have filed it officially since ECF

1   was down the day -- so I did receive it.  My case manager thinks

2   that I enjoy reading over the weekend.  So, anyway, I did get a

3   chance to take a look at that, and the other issue would be just

4   in the event that the case is not transferred, start kind of

5   talking about scheduling.

16:11:50   6        So I think the easiest thing to do is to kind of go

7   down scheduling and how we would proceed if I choose to retain

8   the case.  I'm not saying that I am, but one question that I

9   have is does -- does the jurisdictional provision at issue in

10   the case that is currently before the Supreme Court, which is

11   1252(f) -- does that apply to the statute at issue in our case?

16:12:13   12        Does anybody contend that it does?

16:12:18   13        **MR. OLSON:**  Plaintiffs do not, Your Honor.

16:12:20   14        **THE COURT:**  Mr. Reuveni, do you agree?

16:12:23   15        **MR. REUVENI:**  I -- I can't fully agree yet,

16   Your Honor.  I think we're still formulating our position on

17   that.  I think it's a close call whether we advance that

18   argument, but it's not one that we've decided to give up yet.

16:12:36   19        **THE COURT:**  Okay.  So one of the things I guess I'll

20   want to know is what jurisdictional bars, you know, whether --

21   the jurisdictional bar that is at issue in -- that could

22   possibly implicate the case.  The quicker I know about that,

23   obviously, the better.  So like I said, either 1252 or any of

24   the other -- anywhere else in the INA that it might apply.

16:13:01   25        Mr. Olson, do any of the plaintiffs' claims go to a

1  jury, or is everything to the bench?

16:13:07  2          MR. OLSON:  Everything is to the bench, Your Honor.

16:13:08  3          THE COURT:  All right.  So I've done this two ways.  I

4  have done it where there was a motion for preliminary

5  injunction.  I understand that one has been filed.  The response

6  has not been filed.  Of course, it's not due yet.

16:13:24  7          I've done that before, written a lengthy opinion, and

8  it goes up on appeal, and then we're kind of left to continue

9  litigating, which may result, no matter who I rule for, in

10  another lengthy opinion.  That is not, I think, very efficient.

11  So I am interested in getting the parties' thoughts or reactions

12  to either rolling the -- the -- or consolidating the preliminary

13  injunction either into a summary judgment, dispositive motion

14  cross-motions, or to do the bench trial like we did -- and I'll

15  just say the bench trial really was the -- you know, the

16  admission of some exhibits; there were a couple of witnesses;

17  and then a whole day devoted to oral argument, which, quite

18  frankly, was very helpful.

16:14:14  19          So, Mr. Olson, I guess I'll get your initial reaction

20  to that.

16:14:19  21          MR. OLSON:  Your Honor, because of the sheer number of

22  persons that are involved in the case, the states would prefer a

23  preliminary injunction, to follow, then, by a final

24  determination on the merits.  But we do understand Your Honor's

25  concern about duplicating the amount of work, and if the Court

1    chooses to simply roll a preliminary and final merits into a

2    single proceeding, the states are amenable to that.  We would

3    ask that it be put on a quite accelerated timetable, if that's

4    the case.

16:14:52  5              THE COURT:  All right.  Mr. Reuveni?

16:14:54  6              MR. REUVENI:  So this comes as no surprise,

7    Your Honor, that we would not mind skipping the preliminary

8    injunction phase of this and consolidating with either a summary

9    judgment or bench trial.

16:15:08  10             I do want to flag one item, just for housekeeping

11   purposes, if the case stays here, and that is as the government

12   has done in some of the other more recent national policy

13   immigration cases with multi states, we've sort of been more

14   assertive in advancing our standing arguments.  And so we've

15   asked to move for and received, in many cases, limited

16   jurisdictional discovery.

16:15:31  17             It's not clear as yet whether we'll do that, but in

18   the event we'd ask for that, we'd ask that any sort of schedule,

19   if you do consolidate either a summary judgment or a bench

20   trial, allow for reasonable but efficient time to build in some

21   aspect of that, should we move forward and the Court grant it.

16:15:46  22             THE COURT:  Of course.  So I'm -- to me, I think the

23   United States has been fairly consistent that at least on the

24   merits part, that the case should be limited to the

25   administrative record.

16:15:59 1          As to standing and injury, there has been kind of a

2    dispute about whether or not extra-record evidence comes in, and

3    I certainly understand and will be -- you know, to the extent it

4    stays here, we'll review the requests.  I think it's happened in

5    all of the cases where we've gone extra-record, and if -- on

6    standing and injury, and I don't know that that has been -- as

7    opposed to the merits, and I don't know that that has been hotly

8    contested, but I know that the United States has a position on

9    that, that they don't like to go outside the administrative

10   record.

16:16:31 11         So I do believe that it would be appropriate to make

12   sure that you have the opportunity to -- to request discovery

13   and take depositions on that issue, to the extent that needs to

14   happen.

16:16:43 15         All right.

16:16:47 16         **MR. OLSON:**  Oh, and I'm sorry, Your Honor.  If I may,

17   also, the states would prefer moving to a bench trial instead of

18   cross-motions for summary judgment simply due to the fact that

19   if there are disputed facts, which we suspect there will be,

20   especially when it comes to determining the scope of relief,

21   that determining those on a motion for summary judgment wouldn't

22   be appropriate.

16:17:11 23         **THE COURT:**  Mr. Reuveni, do you have any preference

24   between the cross-motions for summary judgment as opposed to the

25   bench trial?

16:17:20  1          **MR. REUVENI:**  I mean, to the government, it seems

2    pretty much the same.  At the end of the day -- at the end of

3    the day, it seems to us there's a legal question presented here,

4    whether these policies are lawful or not, that you're going to

5    decide based on an administrative record.  We may have factual

6    disputes you have to resolve with respect to injury that, to me,

7    it seems those can be resolved in summary judgment.

16:17:43  8          So I don't have a strong preference other than we've

9    done this most -- routinely in the past has been we just

10   consolidate with summary judgment; we submit our record; the

11   parties submit their declarations or evidence, to the extent any

12   is allowed outside of the record; and the Court can rule one way

13   or the other on the summary judgment.

16:17:59 14          Of course, if the Court desires to hear testimony, it

15   can turn that into an evidentiary hearing.

16:18:05 16          **THE COURT:**  Well, I think --

16:18:05 17          **MR. REUVENI:**  As soon as it can.

16:18:06 18          **THE COURT:**  Yeah, I'm sorry.  I didn't mean to

19   interrupt you.  Go ahead.

16:18:09 20          **MR. REUVENI:**  No, no.  I'm done, Your Honor.

16:18:11 21          **THE COURT:**  So given -- and I guess we're going to get

22   some guidance from the Supreme Court here fairly quickly on the

23   standing issue.  That is one of the questions that is squarely

24   presented in the case that is presently before the Supreme

25   Court.  I think it is helpful for both sides to be able to

1   examine and cross-examine witnesses for the standing and injury

2   purposes.

16:18:32  3        I thought that it was helpful to hear the questions

4   that both sides asked, and I can't really get that in a summary

5   judgment, and I'm really always nervous about resolving fact

6   questions through cross-motions for summary judgment for that

7   reason.  It doesn't really give either side the opportunity to

8   cross-examine the other side and poke holes in their arguments

9   or at least the positions that they take.

16:18:53 10        So I -- I think it does make sense, again, to the

11   extent that I keep the case, that we would set it for trial.

16:18:59 12        I am sensitive, Mr. Olson, to the fact that you would

13   like it to be expedited.  Just kind of playing that out, whether

14   it was going to be by briefs, cross-motions, or by trial, I

15   think I would like to aim for a trial in April.  That would be

16   two months.

16:19:17 17        With respect to the last trial, we had a scheduling

18   conference the first week of December and originally set the

19   case for trial the last week of January.  Some requests for

20   continuances to accommodate either the lawyers or witnesses were

21   made, and I think it rolled over to the beginning of February.

16:19:35 22        Initial reactions to the idea of at least initially

23   setting it in April, Mr. Olson?

16:19:41 24        **MR. OLSON:**  Your Honor, that is -- that sounds like

25   the timetable that we were thinking.

16:19:47  1        **THE COURT:**  Okay.  Mr. Reuveni, what do you think?

       2  Does that give you enough time to do your discovery and...

16:19:54  3        **MR. REUVENI:**  That strikes me as ambitious.  I think,

       4  in the other cases, we've done 30 days in the event that we've

       5  had to.  Again, I'm not -- I don't want to get everyone tied up

       6  in the idea that we will.  We just haven't -- it's just early in

       7  the case.  We are still putting together our preliminary

       8  injunction response, and we don't know what, if anything, we may

       9  need if this ends up being summary judgment or a bench trial.

16:20:15 10        Our thinking may change.  So --

16:20:17 11        **THE COURT:**  Right.

16:20:17 12        **MR. REUVENI:**  -- we'll let you know as soon as we can,

      13  clearly, not to hold things up.  But April, two months from

      14  today, seems pretty aggressive.  If that's what the Court would

      15  like to do, we'll find a way to make it happen.  I know some of

      16  the witnesses that we've used in other cases are fairly busy

      17  people.  I mean, the parties can confer -- I know the Court's

      18  busy, too.  I didn't mean to suggest otherwise.

16:20:40 19        But I think the parties should at least confer and see

      20  what exactly they think they may need and maybe propose

      21  something to the Court.

16:20:45 22        **THE COURT:**  Yeah.  I think --

16:20:46 23        **MR. REUVENI:**  I can't -- oh, I'm sorry.

16:20:48 24        **THE COURT:**  No, no.  That's the problem with Zoom.  I

      25  interrupted you.  You didn't interrupt me.  Go ahead.

16:20:55   1          **MR. REUVENI:**  I'm just loathe to say it would work

2    when I haven't had an opportunity, really, to figure out who I

3    would need as a witness; who we might call; who we might call

4    for the states.  There's also the issue that there are 21 state

5    plaintiffs, I think, in this case.

16:21:08   6          **THE COURT:**  Right.

16:21:08   7          **MR. REUVENI:**  I don't think it's a good use of

8    anyone's time for the federal government to say we need

9    discovery from all 21 states, but if we're here in a world where

10   we can get relief tailored to all 21 states, then I think the

11   government -- we're entitled to ask -- all these states, really,

12   entitled to have a relief, however many there are.  So that's

13   another wrinkle, and I think Mr. Olson and I can work that out

14   at the end of the day.

16:21:31  15      *(Fire alarm sounding.)*

16:21:31  16          **MR. REUVENI:**  (Indiscernible.)

16:21:32  17          **THE COURT:**  Hold on just a second.  We've got a fire

18   alarm going off.  Of course, perfect timing.  The entire time

19   I've been on the bench, we've not had a single fire alarm, but

20   it picked right now.

16:22:41  21      *(Discussion off record between the Court and district*

22       *clerk.)*

16:22:41  23          **THE COURT:**  Okay.  The fire alarm is now off.  I hope

24   that that was not a fire drill scheduled for this particular

25   time.

16:22:55   1          Well, there it goes again.

16:22:57   2      *(Fire alarm sounding.)*

16:23:06   3          THE COURT:  All right.  We have been told to clear the

           4   building.  If you can hang tight for a few minutes, I will let

           5   my case manager let you know.  We won't disconnect the Zoom.  If

           6   you can just hang tight for a minute, we're going to clear the

           7   building till the marshals give us the go-ahead.

           8      *(Recess taken from 4:23 p.m. to 4:38 p.m.)*

           9          THE COURT:  So I think where we left off was the idea

          10   that you might have to do discovery from 21 states.  I think

          11   that what has happened in the past is when we've had multiple

          12   states, that there's really only been one who's kind of taken

          13   the lead on establishing standing for all of the states.

16:38:11  14          Am I misremembering that, and is that what you intend

          15   to do in this case, Mr. Olson?

16:38:18  16          MR. OLSON:  That was our intention, Your Honor, yes.

16:38:19  17          THE COURT:  All right.  So I'm going from memory.  I

          18   think that's what -- the motion for preliminary injunction only

          19   had standing kind of arguments from the State of Texas; is that

          20   correct?

16:38:30  21          MR. OLSON:  That is correct.

16:38:31  22          THE COURT:  All right.  Mr. Reuveni, does that make

          23   your life easier?

16:38:34  24          MR. REUVENI:  It certainly does.  It just makes your

          25   life potentially more difficult on the back end when,

1   assuming -- assuming the government loses, which is the

2   assumption I hate to make, and you're -- and you're asked to

3   issue relief that -- on behalf of all 21 plaintiffs, right, you

4   know?  So perhaps there's a world in which relief can be crafted

5   specific to Texas.  So I won't speculate on how that might look

6   now, but I'm -- we'll probably have that conversation at some

7   point, but --

16:39:06   8        THE COURT:  Are saying -- are you saying that only

9   plaintiffs that have established standing -- I just can't really

10   remember what it is.  It seems like, to me, that if one

11   plaintiff establishes standing, it establishes it for the case.

12   But you're saying, for relief, all of them have to establish

13   standing independently?

16:39:24  14        MR. REUVENI:  That's our view, Your Honor.  I'm sure,

15   you know, plaintiffs would have a different view, and that's

16   fine, but, yeah, standing is enough -- one plaintiff out of

17   however many, that's enough to get you in the courthouse, but if

18   we're talking about relief, then there's something short of a

19   nationwide injunction that will give plaintiffs full relief,

20   then we have no way of really knowing how to craft that if we

21   don't know what their injury is, too.

16:39:44  22        THE COURT:  Okay.

16:39:44  23        MR. REUVENI:  So I am more than happy to limit this to

24   Texas, a one-party standing, so we won't have to get into it or

25   show it or disprove it, but just flagging that down the road --

16:39:55  1          **THE COURT:**  Okay.

16:39:56  2          **MR. REUVENI:**  -- we may revisit this.  And you'll say,

       3  "But, Mr. Reuveni, you said Texas was fine," but I just want to

       4  flag that now in case we get there.

16:40:03  5          **THE COURT:**  Well, I mean, quite frankly, it's not my

       6  argument and not my case; I was just trying to figure out if

       7  that addresses the concern.  So -- all right.

16:40:11  8          Mr. Olson, I'm assuming that we're looking at a time

       9  frame that was somewhat similar.  I mean, what are you talking

      10  about, a day or two for evidence, and then maybe setting aside

      11  an entire day for argument to the extent...

16:40:26 12          **MR. OLSON:**  I think so, Your Honor.  That -- that

      13  sounds appropriate to me.

16:40:30 14          **THE COURT:**  Mr. Reuveni, you know, it's what happened

      15  the one time I've done this before, you know.  So we had the

      16  one-day trial -- actually, it bled over -- bled over into a

      17  second day, and then I gave the parties the entire rest of that

      18  day off, and we just started with argument.  It was a

      19  presentation.

16:40:45 20          It was -- it was, like, the longest oral argument

      21  you'll ever make.  I think we went from about 9:00 until 5:00,

      22  but it was very helpful because we could -- it was -- it was

      23  reasonably informal; you made your presentations; I could ask

      24  questions.  I allowed everybody to -- to confer.

16:41:01 25          But, anyway, if we go that route, does that time

1  frame, you know, anywhere from one to three days, sound right?

16:41:10 2  MR. REUVENI:  You know, I really -- I hate to be in

3  this position where I have to say I'll have to get back to you

4  on that.  I just don't know.  Over here, we just did a trial in

5  Florida where -- some folks who may be familiar with that are on

6  the plaintiffs' side here -- that was five days, but similar

7  sort of arguments; similar sort of claims.  We had testimony for

8  four days, and we had oral argument -- a similar longest

9  oral argument ever from about 10:00 to 5:00 that day.

16:41:34 10  So I just don't know.  It could very well be one day

11  is enough.  It could be more, and so it seems to me, at least --

12  I want to take another shot at maybe persuading you that a

13  two-month trial is a bit aggressive for this reason.  There's

14  just so much we don't know about what we'd have to put up; what

15  we would put together; who our witnesses would be.  At a

16  minimum, Texas -- Mr. Olson and I have some conferring to do, if

17  you end up keeping the case.

16:42:00 18  THE COURT:  Okay.

16:42:01 19  MR. REUVENI:  And so -- oh, go ahead.

16:42:02 20  THE COURT:  All right.  So it is -- it's Tuesday.  I

21  guess I'd ask the parties to confer and maybe submit an outline

22  of a proposed schedule by, maybe, Friday.  That gives you

23  several days to kind of bounce things around.  We need to get

24  the ball started somehow if -- like I said, if the case stays.

16:42:22 25  So does Friday work -- close of business Friday for

1    the parties to be able to confer and -- and talk about, you

2    know, the scope of discovery, how -- you know, and I think that

3    expedited discovery makes sense given the tight constraint so

4    that you would be able to get, you know, responses within a week

5    or two; depositions on short notice, reasonable, with

6    conferring, you know, professionally done.

16:42:51    7          Is -- let me just ask:  Is there an administrative

8    record in this case?

16:42:56    9          **MR. REUVENI:**  There will be, Your Honor.

16:42:57   10          **THE COURT:**  Okay.

16:42:57   11          **MR. REUVENI:**  I do not have possession of it yet.

12   That will take time to put together.

16:43:00   13          **THE COURT:**  Of course.

16:43:00   14          And so -- and is -- does the U.S. intend on filing it

15   in ECF?  That's what they've done before.

16:43:09   16          **MR. REUVENI:**  Yes.  Yes, Your Honor.  We would be

17   filing it and sharing it with the Court, as well as the parties.

16:43:14   18          **THE COURT:**  All right.  Is -- does the United States

19   oppose extra-record discovery as opposed to extra-record

20   evidence?

16:43:21   21          **MR. REUVENI:**  As you alluded to before, Your Honor, it

22   depends as to what.  So our view, as you're familiar with by

23   now, is that this is an administrative record case on the

24   merits.  The review can be limited to the administrative record.

16:43:37   25          With respect to standing or injury, irreparable harm,

1    if we get these, those sorts of things, I don't believe those

2    are confined to the administrative record.  Those are things

3    that are not so limited.

16:43:51 4         But with respect to the merits, including, you know,

5    how this policy came to be, how the policy was issued, those

6    sorts of questions that go to deliberative process, privileges,

7    those sorts of things, but we would oppose any merits discovery.

8    We don't intend to ask for any, and we would oppose plaintiffs

9    asking for any.

16:44:08 10        **THE COURT:**  All right.  Mr. Olson, do you intend to

11   engage in extra-record discovery?

16:44:15 12        **MR. OLSON:**  Your Honor, we think that some

13   extra-record discovery might be necessary going to the injury

14   and scope of relief.  I agree with Mr. Reuveni that I don't

15   think we're going to need any.

16:44:31 16        **THE COURT:**  Okay.

16:44:31 17        **MR. OLSON:**  For (indiscernible) or whether or not the

18   rule (indiscernible).

16:44:36 19        **THE COURT:**  All right.  So you're going to need to

20   file a motion for extra-record discovery, if you're going to do

21   that.  I think it's only fair.  That way you'll have to kind of

22   think methodically or systematically about what you'll need, and

23   then confer with the United States.  If you could file that by

24   Friday -- I assume that you should be able to figure that out.

16:44:54 25        So Friday, if you can confer on scheduling, and if you

1   can confer on extra-record discovery, to the extent that you

2   would like, Mr. Olson -- I'm not ordering it yet, but if you

3   would like to file that or have us consider it, then I think

4   that you need to file a motion.

16:45:12  5          MR. OLSON:  Yes, sir.

16:45:12  6          THE COURT:  All right.  And if the United States is

7   going to oppose any aspect of the request for extra-record

8   discovery, does a week to file a response provide you with

9   enough time?

16:45:27 10          MR. REUVENI:  Yes, Your Honor.  That should be fine.

16:45:29 11          THE COURT:  All right.  So this Friday, then, we would

12   have, hopefully, kind of a proposed schedule that the parties

13   are conferring about -- I'm, you know, trying to let you guys

14   work it out -- and then a motion for extra-record discovery by

15   anybody, and then any response to that would be due a week

16   later.  So a week from Friday.

16:45:50 17          So what does -- what do the states anticipate needing

18   from, I guess, the defendants in this case:  Depositions,

19   written discovery?  Do you anticipate depositions?

16:46:02 20          MR. OLSON:  I don't anticipate depositions,

21   Your Honor.  Based on written discovery that we received, we

22   might need some clarification of what the documents actually

23   reflect and some context around them.

16:46:15 24          THE COURT:  Okay.

16:46:16 25          MR. OLSON:  But as of -- just sort of standard

1   let's-get-a-witness-up-here sort of discovery, I don't

2   anticipate anything like that.

16:46:26 3        THE COURT:  All right.  So the reason I'm saying that

4   is it seems like -- that most of the documents that are outside

5   of the administrative record would be in the plaintiffs' hands,

6   if you're going to try and use it.  I mean, what would you want

7   from the United States besides the administrative record?

16:46:44 8        MR. OLSON:  There have been -- there have been

9   discussions in other cases and in this one, as well, Your Honor,

10  of whether or not there are people who are released on parole;

11  where they've settled; whether or not they, themselves, have

12  been subject to law enforcement; whether or not, you know, they

13  have children who -- we don't know yet any of these people.

14  That information is in the hands of the federal government.

16:47:12 15       THE COURT:  Okay.

16:47:12 16       MR. OLSON:  The states have been able to identify them

17  just based on a name or even a statement of --

16:47:20 18       THE COURT:  Okay.

16:47:21 19       MR. OLSON:  -- how old -- what their legal status is.

16:47:26 20       THE COURT:  All right.  Mr. Reuveni -- Mr. Reuveni,

21  any response to that, or, I guess, comment?

16:47:30 22       And you don't have to have one, I'm just wanting to

23  give you the opportunity.

16:47:36 24       MR. REUVENI:  I'm not sure I fully understood

25  Mr. Olson's question.  Is the idea that they would be asking us

1    for the identity of every single individual paroled into the

2    United States under this program and where they go, and the

3    state would then look into whether any of these individuals have

4    a law enforcement hit in their system?  Is that what I'm

5    hearing?

16:47:56  6        **THE COURT:**  Well, I think what I understood it was --

7    and if I get it wrong, Mr. Olson -- was that in the venue

8    briefing, there was some mention about there not being anybody

9    who had this parole situation in the Victoria Division, and I

10   didn't -- you had made some links to some cites that we're

11   talking about, Here's where people were -- you know, scattered

12   across the state.  But noticeably absent from that is any -- any

13   person in the Victoria Division.

16:48:23 14        I assumed, Mr. Olson, that that's what you

15   were -- what you were getting at.  Is that correct?

16:48:29 16        **MR. OLSON:**  Yes, Your Honor, information like that.

17   And we probably would also want to come up with some sort of

18   method of sampling other persons who have been released during

19   this period so we can discuss the profile of them, the

20   percentage of them who have (indiscernible), who are subject to

21   law enforcement, and that sort of thing.  But I -- that sort of

22   thing is -- definitely work out with the federal government.

16:48:55 23        **THE COURT:**  Right.  I mean, those sound like some

24   pretty discrete, narrow topics to the extent that they are even

25   necessary or that I would permit it.

16:49:04  1          Does the United States expect to have any evidence

2    that is outside the administrative record?

16:49:12  3          **MR. REUVENI:**  With respect to injury, Article III

4    standing and remedy, yes.

16:49:16  5          **THE COURT:**  Okay.

16:49:17  6          **MR. REUVENI:**  Yes, we do.

16:49:18  7          **THE COURT:**  All right.  Okay.  So then I would ask the

8    parties to, I guess, kind of, as I said, think systematically

9    about what evidence that you would need to offer at trial, what

10   you would like from the opposing party, and, hopefully, that is

11   part of this negotiation that you are having.  And if there are

12   some witnesses that you want to present, whether it can be done

13   by affidavit, that would have to be done by agreement.

16:49:39 14          Obviously, affidavits are the definition of hearsay,

15   but if that is effective and both sides agree to it, then that's

16   something -- I mean, I've had a trial where -- a criminal trial

17   where the United States and defense attorney agreed that an

18   affidavit could come in.  I'm not suggesting that that makes

19   sense, but if it does make your life easier, and it's easier to

20   preserve testimony -- and then you could work -- either that, or

21   you could work out depositions and get them deposed -- and I

22   warn you, even if they're your own, so that we're -- you're able

23   to preserve testimony.

16:50:14 24          Okay.

16:50:24 25          Like I said, we -- I guess we know what the schedule

1    is for getting some proposals back.  I'm targeting a trial date

2    in April.  If the parties agree to a different date, obviously,

3    I'll defer to the parties.  I'm not going to micromanage your

4    case.

16:50:38  5         MR. REUVENI:  Your Honor, is it -- when you say April,

6    do you have a specific set of dates in mind?

16:50:42  7         THE COURT:  Not really.

16:50:43  8         MR. REUVENI:  I know some of my --

16:50:44  9         THE COURT:  Not really.

16:50:45 10         MR. REUVENI:  Okay.

16:50:45 11         THE COURT:  No.  I want to give you -- I want to

12    give -- I want to give everybody flexibility.  That's two

13    months, you know, and that's -- I'm doing that for a bit of a

14    reason.

16:50:55 15         The way that it happened before was:  We had the

16    trial.  There was about 30 days where both sides asked to be

17    able to file proposed findings of fact and conclusions of law

18    afterwards, you know, kind of responding to the other side.  And

19    I think it will be helpful -- and we may have a Supreme Court

20    decision that clarifies standing during that time period.  That

21    would be helpful to get that before any decision, like I said,

22    and so that's why I was kind of targeting April.

16:51:23 23         That's May, if you're doing some responses.  The

24    Supreme Court may have ruled by that time.  So, just to be

25    candid, that's one of the -- that's one of the reasons I was

1   kind of picking that month, but if you want to push it back

2   later, or if there's some reason to move quicker, I'm certainly

3   receptive.

16:51:40   4        **MR. REUVENI:**   Thank you, Your Honor.   And then just a

5   second question as we discuss this amongst ourselves and get

6   back to you by Friday.   So there is a pending motion for

7   preliminary injunction.   Would the expectation be that if he's

8   not carried his motions for summary judgment or some-

9   -- something else?

16:51:56   10        **THE COURT:**   Right.

16:51:57   11        **MR. REUVENI:**   I'm trying to understand what I'm

12   looking for here and defense --

16:52:01   13        **THE COURT:**   Right.   So I think, with the motion for

14   preliminary injunction -- so before a bench trial, I've got a

15   joint pretrial order required that has memoranda of law and

16   proposed findings of fact and conclusions of law.   I certainly

17   would want proposed findings of fact and conclusions of law, but

18   you wouldn't need to write the motion for -- I mean, you would

19   not need to provide the memorandum of law if you file a response

20   and, maybe, fully brief the preliminary injunction.

16:52:26   21        That's what happened before.   Quite frankly, it deals

22   with the same issues.   So if y'all can brief that going back and

23   forth, then that would waive that requirement.   So it would be

24   helpful, Mr. Reuveni, if you would file a response like it's a

25   live pleading; but fret not.   There will be no ruling on that

1    motion for preliminary injunction because it will be carried.

16:52:46  2          MR. REUVENI:  Understood, and that's what I was going

3    to propose if you hadn't already done so.  So we will plan on

4    filing that and getting a reply and -- okay.  Very good.

16:52:55  5          THE COURT:  Okay.  Any other questions, I guess, about

6    scheduling?  I'll give you a moment to gather yourself.

7    Hopefully, a fire alarm won't go off in the interim.

16:53:03  8          MR. REUVENI:  Where would we have the trial?  Is that

9    something we should discuss today, or do you want to save that

10   for another status conference?

16:53:15  11         THE COURT:  Well, I mean, it's filed --

16:53:16  12         MR. REUVENI:  I know that --

16:53:16  13         THE COURT:  It's filed in Victoria.  So that -- right

14   now it's Victoria.  If the parties want to confer about a

15   different location, that's something else that we can take up,

16   but...

16:53:28  17         MR. REUVENI:  I just know the parties -- I know that

18   both plaintiffs and defendants in the case you're referring to,

19   the ICE priorities case -- I think you gave us the option, and

20   both parties agreed Houston would be preferable, but obviously,

21   if you have a preference on where it should be --

16:53:42  22         THE COURT:  I really don't.  I'm in three divisions

23   right now, and I'm about to get a fourth.  So, you know, pretty

24   much if you want to -- as long as it's within the continental

25   United States, I may not have a case pending there.

16:53:55  1        So -- and this really is more about making

2   it -- because most -- it's mostly lawyers, right?  It's mostly

3   the lawyers that are going to show up, and a handful of

4   witnesses for both sides, and so, like I said, I will defer to

5   the parties.  I am regularly in all three courthouses.  So...

16:54:12  6        **MR. REUVENI:**  I will -- I will make it a point to

7   confer on that, as well, with Mr. Olson.

16:54:19  8        **THE COURT:**  Okay.  Then let's transition to the motion

9   to transfer.  As I said, I've read the motion, the response, and

10  the reply.

16:54:28 11        So with that in mind, Mr. Reuveni, it's your motion.

12  You can go ahead.

16:54:34 13        **MR. REUVENI:**  Thank you, Your Honor.  May it please

14  the Court, I'll get right to it.

16:54:39 15        So at bottom, this case, more than, we think, any of

16  the other cases that Texas and other plaintiffs have filed

17  against the United States and cases involving national

18  immigration policies and just national policies, generally, has

19  absolutely no connection to the Victoria Division.  It -- it has

20  connections to other places.  It has a connection to Austin,

21  which is where Texas -- the Texas capital is.  It has

22  connections to DC, too, where this policy was promulgated and

23  equipped and primarily being implemented.

16:55:13 24        As you see from our declaration, it has connections to

25  a number of divisions, many divisions, in fact,

1    both -- mostly -- well, Houston has -- one out of two of the

2    individuals that applied and had the application granted are in

3    Houston.  Many others are in other much larger metropolitan

4    areas and smaller cities and towns, but none of them are here in

5    Victoria.  And so, at bottom, there's just really no connection

6    whatsoever.

16:55:40   7          Now, look, we've made this about plaintiffs' practices

8    over the past two years, and we lay that out in our brief.  I

9    don't need to get into it unless there are questions about it.

10   There are 28 cases, 18 in divisions that the assignment of the

11   judge is a preordained conclusion, and other -- the other ten

12   divisions where it's very likely that plaintiffs will be able to

13   know in advance who they are likely to have as their judge.

16:56:08   14         And one, two, ten of these -- I don't know what the

15   cutoff is, frankly, like where it starts to raise questions, but

16   we're here in case number 28, and we think, of all the cases

17   that we've listed there in Exhibit A in our reply, this

18   one -- this is the one where we have to put our foot down

19   because this is the one where there really is no connection

20   whatsoever.

16:56:30   21         And I don't want to -- I don't want to suggest that

22   any of these other cases, that we concede venue.  Venue can be

23   waived.  It doesn't mean we agree there was venue there.

16:56:37   24         But in these other cases you might argue -- for

25   example, in the ICE pri- -- priorities case before Your Honor,

1    that maybe -- I think plaintiffs had evidence there some

2    detainers were lifted, and some of them may have even been

3    lifted in the Victoria Division.  So there was some arguable

4    connection, something, and here there just is nothing.

16:56:56  5          I mean, we went ahead and looked at the numbers, and

6    we have this declaration in front of you for a reason.  We think

7    it's pretty compelling evidence that there's just absolutely no

8    connection to this jurisdiction.  I think it's telling -- or

9    division, I should say.

16:57:07 10          I think it's telling that even in their motion,

11   plaintiffs don't invoke the, quote, substantial connection prong

12   of the venue analysis whatsoever.  They -- it was -- concedes

13   the point in my mind.  They just raise residency.

16:57:22 14          We have arguments on residency where we don't think

15   they're a resident here, but I know they've pointed to cases

16   that go the other way.  But you don't have to decide that issue

17   to rule in the government's favor here.  Whether they're a

18   resident here or not is really beside the point.  I think, most

19   importantly, the Court can and has discretion, under the

20   interest of justice prong of the transfer analysis, to transfer

21   to a case [sic] that is more appropriate where, as here, there's

22   just simply no explanation, not in the papers.

16:57:54 23          I'm eager to hear what Mr. Olson has to say.  I'm

24   happy to be proven wrong, but I have seen nothing in the papers

25   so far explaining why we are here in the Victoria Division.  The

1    best thing I have heard -- or the only thing I have heard is

2    where plaintiffs' papers contend while there's no substantial

3    connection to this venue, that there is -- this is a local

4    controversy local to Victoria.

16:58:18  5          And as I understand their argument, because some

6    people may cross the southern border under this program, they

7    may make their way through -- to Victoria because there is a

8    highway that runs through here on the way to Houston, and

9    another one that runs here elsewhere -- I apologize.  I don't

10   recall exactly where -- and people may come through; they may

11   travel through Victoria.  Some of them may even stop here.  Some

12   of them may eventually reside here.  That's the crux of what is

13   the local controversy in Victoria.

16:58:47 14          And a couple problems there.  I mean, that

15   fundamentally misunderstands how this program works.  This is

16   not a program that takes place at the southern border.

16:58:57 17          Nobody is paroled into the country at the southern

18   border.  So the whole -- the speculation that plaintiffs raise

19   as to how they may be coming here to Victoria is -- is just --

20   not just speculation, but wrong.  This is a program that is

21   designed to ensure nobody arrives at the southern border under

22   this program.  Its goal is to, as we lay out in the papers,

23   alleviate congestion at the southern border.

16:59:19 24          And so beneficiaries are required to travel to an

25   internal port of entry at an airport -- international airport.

1    I don't believe -- I want to be careful here because I'm not

2    certain of this, and so it's not in our declaration, but I don't

3    believe that Victoria Regional Airport is an international

4    airport.  So nobody, through these programs, is flying directly

5    into Victoria on these programs.

16:59:42  6        Houston, San Antonio, Dallas, Fort Worth, many others,

7    no doubt, here and elsewhere in the country -- but these are all

8    places with international airports, and Texas has not filed

9    there, nor has Texas filed in a border jurisdiction where they

10   say, in their understanding of how the program works, the

11   initial harm that they view as occurring is likely to arise.  No

12   one's filed in Brownsville.  No one's filed in McAllen.  No

13   one's filed in El Paso, et cetera.

17:00:10  14        And then the numbers we laid out in our declaration

15   are really one out of two -- 1,466 out of 2,700-plus

16   individuals -- applicants, I should say, who have had their

17   applications granted are tied to Houston.  So this is -- of all

18   the places in Texas, that is the most logical --

17:00:30  19        *(Unidentified speaker; indiscernible.)*

17:00:30  20        **MR. REUVENI:**  Oh, was there -- was there a question?

17:00:33  21        **THE COURT:**  Yeah, I think somebody doesn't have their

22   phone muted.  If we could get everyone who -- except for

23   Mr. Reuveni and Mr. Olson to mute their phones, I would

24   appreciate it.

17:00:45  25        Go ahead, Mr. Reuveni.

17:00:47  1          **MR. REUVENI:**  Thank you, Your Honor.  I was just

2    saying that of all the places, given the data we have, given the

3    declaration, given the allegations in the complaint, which I

4    understand to be:  Texas and others believe that they will face

5    harm in locations where the individuals in question or

6    beneficiaries of these programs will end up.

17:01:04  7          I will quibble a bit and disagree with (indiscernible)

8    on their suggestions that these individuals are likely to commit

9    crimes or become wards of the state or otherwise cause harm to

10   the state.  That's a separate issue for when we get into

11   standing down the line, should we get there, but in terms of

12   their actual allegation that some subset of these individuals

13   will end up in specific locations in Texas, and, therefore,

14   there is a localized connection to those places in Texas, there

15   are at least 20 other divisions that have a greater argument to

16   a connection.

17:01:35 17          There are maybe three other ones that have zero

18   applicants -- or beneficiaries, I should say, from our data, and

19   then there are at least 24 other locations that have some

20   greater connection because people are actually -- the people

21   applying for these application -- for these benefits are

22   actually there right now.

17:01:53 23          And I want to make one thing clear.  I don't think

24   this -- something Your Honor -- you had asked earlier, just to

25   be sure what our data is and is not saying.  Our data is not

1  saying that every single individual counted and attested to in

2  the declaration says they are going to these locations.  We

3  don't have that information.

17:02:10  4       What the data is saying that the bene- -- the

5  applicants who apply on behalf of these individuals, who are

6  either sponsors and are financially responsible for them once

7  they come to the United States, are in those locations, and then

8  our declaration says, essentially, many, but -- we can't predict

9  with certainty that all, but many of these individuals are most

10  likely going to end up close to where their sponsors are, for

11  obvious reasons.  But I want to be sure that I'm not

12  misrepresenting.  We're not saying that actual people who are

13  the beneficiaries of these applications are in Houston, in

14  San Antonio, in El Paso, not in Victoria, et cetera.

17:02:49  15       It's the applicants who are applying on their behalf

16  to be their sponsor, that's the data we do have.  But,

17  nevertheless, this is the evidence in the record.  What's not

18  here is any evidence from either side that anyone is going to

19  end up here -- or is presently in, I should say, in Victoria or

20  likely to, given the data we do not have, end up in Victoria.

17:03:10  21       So that's really the crux of it.  We have now 28 of

22  these cases, and I just counted this up before the hearing.  It

23  looks like there's 28 divisions in Texas.  I can understand

24  Texas taking the position that, We reside everywhere in the

25  state, but they don't file these cases in divisions that have

1    the most logical connection to the state.

17:03:31    2          Again, every major metropolitan area -- I mean, I

3    think it's pretty well-known that's where the largest immigrant

4    populations are; that these cases aren't getting filed there.

5    We're not in the border division.  We're not in the larger

6    divisions here in Texas.

17:03:46    7          And I know Your Honor knows this from a few of the

8    other cases that have been filed in front of you.  You'll

9    recall, for example, the border wall case.  So here's an example

10   of where a division -- divisional -- division assignments end up

11   with, potentially, a preordained judge in the other case, and we

12   have no issue with that whatsoever.  I believe it was a

13   subagency of Texas filed suit in the McAllen Division, and there

14   was random assignment, and it ended up in front of whoever it

15   ended up.  If Texas had initiated that suit itself in the

16   McAllen Division, we'd have no quarrel.  That's where the wall

17   was contracted to be built.  That's where the connections to

18   that case are.

17:04:23   19          Texas came in and, sometime later, filed here in

20   Victoria, and Your Honor ultimately transferred the case to

21   McAllen because that's where everything relevant to that case

22   was -- had occurred.  And I want to be clear here:  Our position

23   is not, as Texas suggested in its brief, that there's anything

24   inherently suspect with single-judge divisions or divisions

25   where the division of work, as assigned by the chief judge, is

1    going to be -- where it's likely some judges are more likely to

2    get cases than others.

17:04:52  3        There are many instances in which a case should -- can

4    and should be heard locally in a division, even if it's a

5    single-judge division where it arises.  This case is just not

6    one of them, particularly after we have a course of conduct

7    28 cases long going back two years.  This case has no

8    connections at all, and I -- I'm very curious to hear

9    what -- what the connection to this venue is.

17:05:17 10        I'd be happy to hear something that I have not -- we

11   have not briefed, but that, to us, is the crux of the issue, is

12   does the -- does the division have any connection, let alone a

13   substantial connection, as required under the venue statutes to

14   the division in question?  And if it doesn't, you know, one

15   time, all right, fine.  Doesn't necessarily raise any questions.

16   Five times -- we're at time 18 for single-judge divisions, and

17   time 28 for just divisions that have no logical connection to

18   the underlying case.

17:05:48 19        And, again, I know we haven't filed these until

20   recently, but this case, more than any that I can think of,

21   given how the program works; given where the individuals are

22   likely to end up; given where the government entities that are

23   responsible for the program; given where Texas is alleging it

24   experiences its harm; and to -- those agencies are likely to be

25   all based out of Austin, the larger municipalities, there's just

1    no logical connection here whatsoever.

17:06:14    2         And so I know -- we lay this out in the brief.  It's

3    really a perception issue.  I mean, you're going -- you keep the

4    case; we'll proceed to trial.  We know we're going to get a fair

5    trial, and we'll live with the verdict one way or the other.

6    When Texas suggested this is a backdoor motion to recuse, that's

7    just -- we reject that.  We have no issue with any of the judges

8    in the Southern District or anywhere else in Texas.  That's not

9    what this is about.  It's really a perception issue where it

10   just seems to us, the U.S. Government, that case after case is

11   getting filed in places that make no sense in terms of how the

12   venue statute works and raises just this question.

17:06:51   13         And we know it's not just asking this.  Not -- no less

14   than -- the chief justice, Justice Gorsuch, Justice Kagan -- and

15   we cite those references in our brief.  There was a year-end

16   report from the chief justice pursuant to the patent docket.

17   Justice Kagan, in -- in recent oral argument raised the issue

18   with respect to another -- another case that arose out of the

19   Southern District, and Justice Gorsuch raised the same issues

20   during the last administration when we were -- when we saw

21   similar events happening from the other side, although, to be

22   clear, not to the extent that Texas has now been filing

23   single -- case after case in front of single-judge divisions.

17:07:29   24         And so it's a perception problem.  There's a huge

25   conversation happening right now about it, and it just -- to us

1   it seems, given how there is no connection whatsoever to this

2   venue, that the thing to do is to transfer the case to a

3   location where it has an actual -- where the case actually has

4   an actual connection; where the harms alleged are actually going

5   to be felt; or to a location where the policies are promulgated,

6   are to be implemented, or to where the witnesses will be.

17:07:58  7        And so as we lay out in our brief in great detail,

8   that's Austin or DC.  But even if you find that Texas is

9   resident in every division in the state, we don't -- this or any

10  other division, particularly given the numbers elsewhere in the

11  Southern District and other divisions, this is not that

12  division.

17:08:17 13        And so unless there are any questions, Your Honor, I

14  think that's about all I have to say.  I'd request I get just a

15  short, short rebuttal, if possible, depending on what Mr. Olson

16  has to say.

17:08:27 17        **THE COURT:**  Absolutely.  I'll let both sides talk as

18  much as they want to.  I'm famous for letting -- that's why it

19  went nine or ten hours that day when we had our close.

17:08:36 20        You did mention the case about the border wall.  There

21  were actually a couple of cases that were filed in the Victoria

22  Division.  You talked about the fact that I transferred that

23  case, and I did that sua sponte.

17:08:48 24        There was -- there was a previously filed case in

25  McAllen that dealt with the same subject matter, and

1    it -- you're right.  I believe it was the Texas land

2    commissioner had previously filed a case in McAllen, which is

3    further along, and, you know, after conferring as we do -- the

4    judges do, I transferred it sua sponte.

17:09:10   5    There was another case, a Title 42 case, that was

6    filed in my court, and Judge Summerhays had that case in

7    Louisiana, and I stayed my case and said that, you know, I was

8    thinking about transferring it.  So that was, you know, another

9    immigration-related case that -- and, ultimately, I think that

10   the plaintiffs -- Texas wound up dismissing that case and maybe

11   joining the one that was in Louisiana.

17:09:37   12   But those are a couple of cases where, you know, there

13   were other pending matters within the Fifth Circuit that it just

14   didn't make sense, to me, because, you know, you don't want two

15   different cases going at the same time.  Those were first filed.

17:09:52   16   So I guess, Mr. Reuveni, what I was asking is, you

17   know, that doesn't really look like a judge who's trying to grab

18   hold of every immigration case and hang onto them, just that

19   national policy, right?

17:10:03   20   **MR. REUVENI:**  No, it doesn't.  And to be clear, that's

21   not, again, what we're suggesting.  And the -- the border wall

22   case is the one that I brought up, and the only point I was

23   trying to make there is -- and this was directed at plaintiffs

24   here, not to you, Your Honor, is that their own

25   subdivision -- or subagency, I should say, filed suit in what is

1    the most logical venue, the McAllen Division, where the wall at

2    issue was supposed to be built, and then Texas -- the Texas AG's

3    office goes and files, some time later, in the Victoria

4    Division.

17:10:33  5         And you -- you transferred it because that was the

6    first-filed case.  That's clearly the reason, but I'm only

7    pointing it out as a data point, that here we have their own

8    agency filing it in what is the most logical location, and then

9    the AG's office coming in and saying, Wait a second.  We're

10   going to file it over here in a place that, pretty clearly, has

11   far less of a connection to it than where it was actually

12   supposed to be constructed.  That's the only point I was trying

13   to make --

17:10:58 14        THE COURT:  Okay.

17:10:59 15        MR. REUVENI:  -- just to paint a picture, out of all

16   28 of the filings, to suggest, you know, maybe one or two is not

17   enough; maybe ten is not enough; but 28 is certainly enough in

18   our view.

17:11:07 19        THE COURT:  Right.  And so you said after -- after

20   that, it starts to raise questions.  What questions does it

21   raise?

17:11:15 22        MR. REUVENI:  It's a perception problem.

17:11:16 23        THE COURT:  What --

17:11:17 24        MR. REUVENI:  It's a perception problem.

17:11:18 25        THE COURT:  What is that perception?

17:11:19  1          MR. REUVENI:  The perception is that Texas --

2  plaintiffs who engage in this pattern of practice and file only

3  in a handful -- I think seven out of 28 of the divisions in the

4  state -- are doing that for a reason, and then it puts you,

5  Your Honor, in an awkward position because now, like you just

6  said -- you just said to me -- like, you said to me, like, Look,

7  I'm not holding onto immigration cases, and that's not what I'm

8  suggesting.

17:11:42  9          That's not what the DOJ is suggesting, but it casts

10  this cloud over the whole proceeding where your ICE priorities

11  case, your -- which, you know, the decision you issued last year

12  was up to the Supreme Court.  You've got a justice of the

13  Supreme Court questioning the value of very careful and detailed

14  factual findings that you've done in that case, and that's to

15  say nothing about the merits of it.  That's to say this whole

16  habit of that -- and pattern that the State is engaged in, it

17  just casts a pall on everything.  And so now we have justices of

18  the Supreme Court questioning the hard work of the lower courts,

19  and then we have the public asking:  Why is Texas filing in

20  these -- in these -- only these specific divisions?

17:12:22 21          So, again, this has -- we are not suggesting anything

22  about any of the judicial officers', who get these cases,

23  reputations.  We are not moving to recuse.  I want to be very

24  clear about that.  That's not what this is about.

17:12:34 25          To us, it's that once Texas starts doing something

1   often enough and you get this sort of why here, why this, when

2   there's no connection, questions are raised.  And so I think

3   that we cite a number of cases -- I know I'm being a little bit

4   less precise than you might like, but I -- we cite a number of

5   cases out of the Fifth Circuit that sort of -- don't articulate

6   what the line is, but they say when you see this sort of

7   behavior, when you see there being no logical connection to the

8   venue in which the case is filed -- and so the plaintiff loses

9   their sort of presumption that they can file in the venue of

10  choice there.

17:13:08 11          And you see it happening over and over and over, it

12  does raise the question of:  Why is this particular plaintiff

13  choosing this handful of particular venues to file their

14  lawsuits?  That's it.  That's what we mean by "raising

15  questions."

17:13:23 16          **THE COURT:**  Okay.

17:13:24 17          **MR. REUVENI:**  Question --

17:13:25 18          **THE COURT:**  Like I said, in your briefing you said

19  there's a perception issue.  What is the perception?  That

20  you're -- so the State of Texas is picking the Victoria Division

21  because...

17:13:37 22          **MR. REUVENI:**  Well, not just the Victoria Division,

23  but, yes, let's focus here because here's where we are.

17:13:41 24          They're picking the Victoria Division because they

25  think that they're likely to get a result that they want in the

1    case.  And so that's not to say that you are, in fact, going to

2    do that, or any other jurist who is presented with this sort of

3    set of events is going to do that, but that's the perception,

4    that they think they can go and handpick their judge, and that

5    they're likely to get the result that they want.

6    And that's a perception as to the courts; that's a

7    perception as to the fairness of the proceedings; and that's a

8    perception all the way up to the Supreme Court where we now have

9    justices of the Supreme Court saying, Okay, I mean, you filed,

10   and you have this habit of filing this way, so I'm not going to

11   give any credence to the factual findings that the district

12   court made.  That's no way, really, to --

13   **THE COURT:**  Do you share that perception?

14   **MR. REUVENI:**  Do I share the perception that

15   Texas -- that I just described?  Yes.  I wouldn't have signed

16   this brief --

17   **THE COURT:**  No, no, no, no.  I'm saying:  Do you share

18   the perception that Texas has gotten -- Texas is picking me

19   because they think that I'm going to rule in their favor?  Do

20   you share that perception?  Do you think that -- do you think,

21   starting off right now, that -- that I'm already going to rule

22   against the United States?

23   **MR. REUVENI:**  No.  I don't -- I do not -- I cannot

24   say -- I cannot say whether we believe that you will rule

25   against us.  I said -- what I can say is Texas believes you will

1   rule against the United States.

17:15:06   2          **THE COURT:**  So that perception is not one that you

3   share, then?

17:15:08   4          Because you've said you're not moving to recuse.  If

5   you thought that I couldn't be fair, then I would expect a

6   motion to recuse.

17:15:19   7      **MR. REUVENI:**  We're not filing a motion to recuse.  We

8   do not --

17:15:22   9      **THE COURT:**  That's not what I asked.  That's not what

10   I asked.  My question to you is if you don't think that I can be

11   fair, then I would expect a motion to recuse.  You would --

12   that, You can't be fair, Judge.

17:15:32   13         **MR. REUVENI:**  Right.  But we don't -- that's not what

14   we think, Your Honor.  This is not about Your Honor, and this is

15   not about -- this is not about Your Honor.  This is about how we

16   think the State -- plaintiffs -- the State of Texas are

17   conducting themselves and how that is being perceived at large

18   in the legal community; within DOJ; within other legal circles;

19   within, again, the Supreme Court itself, which is questioning

20   the -- the -- like, the value of the findings of fact and

21   conclusions of law it's getting in these proceedings.

17:16:03   22         I know I'm dancing a delicate dance here.  I don't

23   want to be cute --

17:16:09   24         **THE COURT:**  No.  What I'm -- what I want is for you to

25   be candid.  I've got thick skin.  Lord knows I better.

17:16:14  1          And so my question is -- I just want to find out:

2      Does the United States think that I can be fair and impartial?

17:16:21  3          MR. REUVENI:   The United States thinks Your Honor can

4      be fair and impartial.  That is why we are not filing a motion

5      to recuse.  And I want to be clear:  We didn't ask you to kick

6      the case somewhere where it's impossible to come back to.  At

7      the time we filed the motion, I believe you were getting cases

8      in the Corpus Christi Division.

17:16:36  9          THE COURT:   That's right.

17:16:37 10          MR. REUVENI:   And one thing we suggested was the

11     cases -- this be transferred there before any of the other

12     locations because we were clear we don't think the problem is

13     whether Your Honor's impartial or not.  We don't think the

14     problem is whether we're going to get a fair trial or not.

15     We -- to repeat myself, we do not think that.  But we did not

16     move to transfer the case only to places where it would be

17     impossible for you to get the case again by random assignment.

17:17:02 18          Our only point is that an absolute random assignment

19     and the repeat pattern of plaintiffs in filing in these single-

20     or almost single-judge divisions, it just raises a pall over

21     everything, and it just -- it raises:  Why is Texas doing this?

22     Why are they filing here?  Why are they not filing in the

23     capital?  Why are they not filing in Houston where one of ten

24     judges has a 1 in 12 percent chance of getting the case?  Why

25     are they not filing where they say the harms are occurring?

17:17:28 1          All of this adds up --

17:17:30 2              **THE COURT:**  Okay.

17:17:30 3          **MR. REUVENI:**  -- to a question of -- to us, it seems

4     like they're putting you in this position, as well.  Like, this

5     is not fair to the judiciary as a whole.  It raises questions

6     about individual judges.  It adds work to individual judges.  It

7     gives specific immigration cases to three or four judges when

8     there should be random assignments.  And that all -- as we've

9     laid out in -- more in the brief is just something that, under

10    the interest of justice, the Court can and should make an effort

11    to push back on.

17:17:58 12             **THE COURT:**  Okay.  All right.  I appreciate that.

17:18:00 13             Mr. Olson?

17:18:06 14         **MR. OLSON:**  Your Honor, the interest of justice

15    (indiscernible) --

17:18:07 16             **THE REPORTER:**  Your Honor, I'm not able to --

17:18:11 17             **THE COURT:**  Yeah.  Mr. Olson, we're having a little

18    bit of a problem hearing you.  Your sound is not as clear as

19    Mr. Reuveni's was.  I don't know if you've got a microphone

20    issue, or if you can get a little closer to it, maybe.

17:18:22 21             **MR. OLSON:**  I can get a little closer --

17:18:24 22             **THE COURT:**  That's better.  That's good.

17:18:26 23             **MR. OLSON:**  I am used to people telling me that I'm

24    being too loud, and I need to hush up, Your Honor.  So I

25    apologize for giving you the opposite problem.

17:18:39  1          The public interest is simply full and fair

2    adjudication of the case, and the standard is whether or not a

3    reasonable person would believe that the case is not being heard

4    impartially.  There is no suggestion here that that is the case,

5    and what I heard from Mr. Reuveni is why does Texas, why does

6    Texas, why does Texas, why does Texas.  These are not concerns

7    about the state of the federal judiciary.  These are concerns

8    about the attorney general of Texas, and if the attorney general

9    of Texas wants to take a political (indiscernible) for filing

10   cases in particular divisions, for whatever reason -- he's an

11   elected official.  If people get upset about that, they'll turn

12   him out.  And if he is bringing cases that aren't fit to be

13   brought, those cases will be booted out of court either by the

14   district judge, who will sit alone in a single division, or by

15   the Fifth Circuit on appeal.

17:19:48  16         There has been no suggestion that that has been a

17   problem, that Texas is either choosing divisions where judges

18   frequently make mistakes that require correction above or that

19   Texas is choosing judges who have already prejudged the merits

20   of the case.

17:20:15  21         I -- I don't envy Mr. Reuveni's position here.  I know

22   that the Department of Justice has -- has its own institutional

23   interests and -- regarding how cases should be assigned.  That's

24   all, but that runs up against the standards that Congress has

25   set forth in the statute.  Is this a proper place for Texas to

1    file?  Yes.  Texas resides in this division.

17:20:59 2         Did the federal government show that in other

3    divisions is clearly more convenient for the parties and the

4    witnesses?  No, it did not.  The statistics that Mr. Reuveni

5    points to were brought up in the reply brief.  Had that been

6    brought up in the opening brief, Texas would have loved to have

7    addressed it.  It was not.

17:21:23 8         There was no identification of potential witnesses.

9    There is no identification of potential evidence other than the

10   location of the administrative record, which (indiscernible)

11   acknowledge will be filed in ECF and is available to anybody who

12   has access to a computer terminal, or at least a computer

13   terminal that has access to the Internet.

17:21:42 14        I will be quite frank, Your Honor.  I don't know why

15   our office chooses to file in seven divisions over and over.

17:21:57 16        **THE COURT:**  I'm having a hard time -- I didn't pick up

17   that last statement.  What did you say?

17:22:01 18        **MR. OLSON:**  Sorry, Your Honor.  I -- to be honest, I

19   don't know why our office files in some divisions over others.

17:22:07 20        **THE COURT:**  Well, I was going to ask you that

21   question.  Why are you filing in Victoria?

17:22:13 22        **MR. OLSON:**  The case is being filed in Victoria, quite

23   frankly, Your Honor, because of our experience with you; because

24   we know that you know these statutes; we know that you give them

25   very close and detailed attention; and our office knows how you

1    run a courtroom.  So we are able to prepare our (indiscernible)

2    for trial and will be much more efficient than if it were

3    randomly assigned to another judge.

17:22:45 4          **THE COURT:**  Okay.

17:22:51 5          **MR. OLSON:**  The long and short of it, Your Honor, is

6    that the public interest is served by having the case decided

7    fairly and quickly.  That is available in the Victoria Division.

8    The federal government does not meet the burden to show that

9    another division was merely more convenient for the parties and

10    the witnesses; it has shown that there are other districts and

11    divisions where Texas could have chosen to file this suit, but

12    it didn't.  It filed it here, and here is where we should stay.

13    Thank you.

17:23:26 14          **THE COURT:**  All right.  Mr. Reuveni, did you have any

15    rebuttal?  I've got questions.  So you're going -- both of you

16    are going to get a lot of chances to talk, but I want -- you

17    asked for the chance to rebut?

17:23:37 18          **MR. REUVENI:**  Yeah.  Yes, Your Honor.  Thank you.

17:23:38 19          Do you have questions for me or questions for

20    Mr. Olson?  I'm happy to wait, if you have questions for him.

17:23:43 21          **THE COURT:**  No, no.  I don't want to disrupt

22    your -- what's fresh in your mind from what you just heard.

23    I've got questions for both of you for sure.  So...

17:23:52 24          **MR. REUVENI:**  Okay.  I just have a -- two or three

25    points here.  I just -- again, I -- when I hear, "I don't know

1    why we file in one division over another," that's not much of an

2    answer.  And this leaves me with a question that I started with

3    and that is repeated again and again in our brief:  Why are we

4    here?  Why Victoria?

17:24:11  5          This, of all cases, because this -- this case --

6    putting aside residence, which we -- which we disagree with,

7    but, again, if you find that Texas is resident in every

8    division, still, the purpose of venue -- the venue statute is

9    supposed to put cases where they have the most logical

10   connection to.  And so there's a limit on a plaintiff's ability

11   to pick and choose where they file, and I think -- we cite the

12   case in the brief -- I think plaintiffs did, too, because it's

13   the Fifth Circuit's most authoritative writing on the issue, but

14   in the *Volkswagen* -- *In Re Volkswagen* case of 2008, the court

15   was very clear:  If there is no connection to the underlying

16   venue, then any presumption that the state gets -- or the

17   plaintiff, I should say, gets in filing there for a valid reason

18   or being connected there is out the window.

17:25:05  19         And I've seen nothing and I've heard nothing that

20   explains why, in this case -- not any other case.  In this case,

21   putting aside everything else that we've said about single-judge

22   divisions and forums and where cases -- where they file their

23   cases -- in this case, putting all that aside, I have no idea

24   why they are here.  I have not heard what is the possible

25   connection to this jurisdiction other than what Mr. Olson just

1    said, which is they like that Your Honor moves cases quickly.

17:25:33  2          I mean, other judges move cases quickly, too, and I --

3    you know, that's -- if Mr. Olson's only problem with this

4    case -- with venue here -- or the only reason he's here, I'm

5    happy to stipulate to a trial in April in another division.  I

6    mean, that -- I say that glibly because that's -- that doesn't

7    seem like the real issue to me, that they want to be here

8    because they understand, from prior experience in front of

9    you -- we do, too.  My colleagues elsewhere in the DOJ appeared

10   before you several times -- that, you know, you move quickly,

11   and you have -- you do -- you get a decision out, and it's a

12   thorough and fair decision.

17:26:09 13          I understand that, but that doesn't sound, to me, like

14   a reason that is relevant to the venue analysis.  That, to me,

15   sounds like they like how you ruled and handled yourself and

16   your cases in your courtroom in the past.  That's not a criteria

17   under *Volkswagen*.  That's not a criteria under 28, U.S.C., 1391.

17:26:28 18          The question is who and where does the substantial

19   connection lay:  Here, Victoria, compared to any other division

20   in the Southern District or a number of other places within

21   Texas?  It's not here.  To me, it seems like the most logical

22   place with the biggest connection, with plenty of judges who

23   also move their cases very quickly, is in Houston where 1,500

24   individuals, out of 2,700 in question, seem to be likely to go

25   to once they enter the United States and make their way to their

1    final destination.

2    And other than the fact that Texas is a resident

3    everywhere in this state, I haven't heard anything about what

4    the connection is here.  And so really, with that, I feel like

5    I'm beginning to say -- I don't want to be annoying by saying

6    the same thing over and over, but that's really what it is, at

7    the end of the day.

8    There is no connection here.  Putting aside the prior

9    27 cases and whether there was an arguable connection, this one

10   doesn't have it at all, and that is why we filed this motion in

11   this case and not in any of those other ones.

12   THE COURT:  Okay.  You moved for transfer based on

13   three grounds.  You focused -- you didn't really focus very much

14   on the first one, which is improper venue.  So, to me, there's

15   improper venue; then there's more reasonable -- I'm sorry, a

16   more convenient venue; and then there's kind of the single-judge

17   division perception, interest of justice.  Did I fairly

18   characterize those three?

19   MR. REUVENI:  Yes, Your Honor.

20   THE COURT:  Okay.  So I didn't hear a whole lot on the

21   1406, which is the improper venue.  So is it the Department of

22   Justice's position that the State of Texas can only -- is -- is

23   only present in Austin for purposes of suing?  It cannot sue in

24   any of the other divisions?

25   MR. REUVENI:  No, that's not quite our position.  Our

1    position is that with respect to the federal government, under

2    23 -- I'm sorry, 28, U.S.C., 1391(e), which is the special venue

3    provision for the federal -- for the federal government as a

4    defendant, if they're not suing where a substantial part of the

5    events in question happened, and they're not suing where

6    defendant resides, yes, they only reside in Austin, but I go

7    back to the example that I gave earlier about the border wall.

17:28:35 8    That agency -- there may be subagency that resides in

9    a more specific division.  There may be an agency who manages

10   the affairs of Texas with respect to, I don't know, health or

11   crime or education specific to somewhere in the Northern

12   division; somewhere in the Southern division; somewhere in the

13   Western division -- I don't know enough about how Texas is

14   organized as a state.  I'm not even going to speculate.  I don't

15   want to look foolish -- but that would be an example of Texas or

16   one of its subagencies suing somewhere other than where Texas

17   resides.

17:29:09 18   But the Texas -- Texas, as a sovereign, speaks through

19   its agents, and here it's speaking through the Texas AG.  The

20   Texas AG's principal place of business -- I don't think anyone's

21   going to dispute -- is in Austin where the Texas AG's office is;

22   where the state capital is.

17:29:26 23   So in that scenario, where there's no connection

24   whatsoever to the underlying division, there's no property at

25   issue in the underlying division, and defendants themselves

1   don't reside in the underlying division, yes, our view is that

2   any state, not just Texas, has to sue where it has its principal

3   place of business, which would be here, Austin.

17:29:43   4        **THE COURT:**  All right.  So the venue provision that I

5   see that Texas has invoked is 1391(e)(1)(C).  So the

6   "substantial part of the events or omissions giving rise to the

7   claim occurred" is in a different provision.  That's in B.  So

8   A, "as a defendant in the action resides," I don't think anybody

9   contends that the United States resides, for venue purposes, in

10   the Victoria Division.

17:30:03   11        The next one is, "a substantial part of the events or

12   omissions giving rise to the claim occurred, or a substantial

13   part of property that is subject to the action is situated."  So

14   there's the substantial part of the events that you've been

15   talking about; is that correct?

17:30:18   16        **MR. REUVENI:**  Yes, Your Honor.

17:30:19   17        **THE COURT:**  All right.  So now I'm talking about C,

18   and I'm -- this is just about improper venue.  C says, "where

19   the plaintiff resides, if no real property is involved."

17:30:28   20        Everybody agrees there's no real property involved,

21   correct?

17:30:31   22        **MR. REUVENI:**  Yes.

17:30:32   23        **THE COURT:**  All right.  So that doesn't have anything

24   to do with where the substantial part -- or the -- the

25   substantial part of the events or omissions giving rise to the

1    claim occurred, correct?

17:30:45   2          **MR. REUVENI:**  That's -- that provision does not, but I

3    -- I don't know if you have more questions on that, but I have

4    an answer that maybe doesn't --

17:30:50   5          **THE COURT:**  No.  I just want to make sure because

6    I -- I don't -- what I've been seeing Texas say is that they

7    reside anywhere in the state of Texas.  I mean, that's really

8    where it is.  That's apart -- separate and apart from the

9    substantial part of the events.

17:31:02  10          Do you think that if it can be -- if the Fifth Circuit

11   held, in a different case, the State of Texas resides anywhere

12   within -- within the state of Texas for division purposes, that

13   1391(e)(1)(C) would apply in this case?

17:31:18  14          **MR. REUVENI:**  Yes, Your Honor.  I -- we would -- we

15   would concede that if you were to find, the Fifth Circuit were

16   to find that Texas is resident in every division in the state

17   under the same logic as some of these other cases, if they're

18   present as a sovereign everywhere in the state, that we don't

19   win our 1406 motion.

17:31:33  20          **THE COURT:**  Okay.

17:31:33  21          **MR. REUVENI:**  But before I -- but --

17:31:35  22          **THE COURT:**  Go ahead.  I'm sorry.  No, I interrupted.

23   I'm sorry.

17:31:38  24          **MR. REUVENI:**  Before -- before I give up on that, I

25   just want to point the Court to 1391(a), which says, "Except as

1   otherwise provided by law" -- and so that first special venue

2   provision.  There's no special provision here.  It's 1391.

3   Texas cites only 1391 in the complaint -- "This section shall

4   govern venue of all civil actions brought in district courts of

5   the United States."

17:32:00  6       And then we cited a case in the reply brief from the

7   Supreme Court in 2013, Atlantic something or other -- but just

8   2013.  And there the Court was pretty clear this is -- you need

9   to find venue based on the provisions in this statute.  You're

10   not looking at what Texas refers to as common sense or what

11   other courts have said is the legislative history.  We need to

12   look at the text.

17:32:22 13       So if we're looking at the text, other than with

14   respect to the federal government, there are only two residency

15   definitions in the statute.  There's (d), which is irrelevant

16   here -- it's residency of corporations where there are multiple

17   districts in the state -- and then there's (c).  There's (c)(1),

18   natural person; (c)(2), an entity with a capacity to sue and be

19   sued; and (c)(3), a defendant not resident.

17:32:45 20       And so it's obviously not (c)(1) or (c)(3).  So all

21   that's left is (c)(2), and as I understand plaintiffs' argument,

22   a state and only a state sovereign exists outside of the venue

23   statute, even though the venue statute says this controls for

24   everything and has specific definitions of residency that go to

25   five or six different entities.  But states, for some reason,

1    Congress decided they meet a different venue provision, a

2    different definition of residency that's not codified in the

3    text of this statute, and to us that seems wrong.  We would

4    start with the text.

17:33:19  5         I know there are other cases.  There are four of them.

6    We concede there are four cases out there that go the other way

7    on this, but each and every one of them just says it's common

8    sense or just says, well, we're looking at legislative history

9    instead of the text.

17:33:33 10         We -- starting with the text and, frankly, ending with

11   the text, because there's no ambiguity there, the only category

12   Texas or any state can fall under is (c)(2), entity with a

13   capacity to sue and be sued.

17:33:44 14         **THE COURT:**  Mr. Reuveni --

17:33:46 15         **MR. REUVENI:**  That provision says --

17:33:46 16         **THE COURT:**  Mr. Reuveni, real quick --

17:33:47 17         **MR. REUVENI:**  Yes, Your Honor.

17:33:52 18         **THE COURT:**  Is there any case -- you said there are

19   four or five cases that have gone the other way on this, that

20   the state is sovereign within -- anywhere within its borders --

21   I mean, resident within anywhere in its borders.  Are you aware

22   of any cases that has held to the contrary?

17:34:09 23         **MR. REUVENI:**  No, Your Honor.  If I was aware, it

24   would be in our brief.  So --

17:34:11 25         **THE COURT:**  No, I just want to say there was a litany

1    of cases that we're talking about at the Supreme Court of Ohio.

2    And I'm not trying to get snarky with you, I just wanted to find

3    out if -- I mean, what do I do when every case that's addressed

4    this issue, you think wrongly, has held against you on it?

17:34:29  5    MR. REUVENI:  Your Honor, that's a -- that's a fair

6    question to us.  I don't have a great answer other than they got

7    it wrong, and there are times, you know, when four or five

8    courts [sic] come before a court and they rule one way, and

9    then, lo and behold, they all get reversed by the higher court

10    or get disagreed with by another court.

17:34:44 11    We think that's the situation here, and I know

12    you've -- were focused on their residence now, but even -- this

13    is why I started off with regardless of whether you think

14    they're a resident here --

17:34:53 15    THE COURT:  Right, no.

17:34:54 16    MR. REUVENI:  -- there's two other off-ramps to the

17    government --

17:34:57 18    THE COURT:  Right.  No, but you led off in your brief

19    with that, and I'm just going systematically through.  I'm just

20    following your motion, and so that was it.

17:35:03 21    And like I said, I wasn't trying to get horsey with

22    you.  I was just trying to find out -- because, like you said,

23    you did focus most of it on the -- on the perception issue and

24    the connection, but the connection is really tied to a

25    different -- the substantial part of the events is really tied

1    to a different venue provision, and I was just wanting to make

2    sure that's true.

17:35:23  3        Mr. Olson, what is -- is the only basis for venue 30-

4    -- 1391(e)(1)(C), in your opinion?

17:35:32  5        **MR. OLSON:**  That's the only one that (indiscernible).

17:35:34  6        **THE COURT:**  Okay.  So when I look at 1391(e)(1)(C), it

7    says, "the plaintiff resides" -- where the plaintiff resides,

8    okay?  Then, if I go up to 1391(c), it says, "Residency."  So

9    that's where I find the definition for residency, and then it

10   says, "For all venue purposes," right after "residency" where it

11   defines resides, I assume.

17:35:58 12        So where do you fit within 1391(c)?  Because it says,

13   "For all venue purposes."

17:36:08 14        **MR. OLSON:**  It seems (indiscernible) --

17:36:14 15        **THE COURT:**  We can't -- we can't -- I can't hear you.

17:36:16 16        **MR. OLSON:**  I'm sorry, Your Honor.  I'm going to need

17   to get a better microphone before my next hearing.

17:36:23 18        **THE COURT:**  All right.

17:36:24 19        **MR. OLSON:**  The state is not included in that section.

20   It was not there.

17:36:28 21        **THE COURT:**  But doesn't it say for all ven- --

22   residency for all venue purposes?

17:36:33 23        **MR. OLSON:**  It does say that for all venue purposes,

24   but that covers the listed entities for all venue purposes.  And

25   unless Congress speaks clearly, that it intends for something to

1    cover a state, it does not because of the state's status as a

2    sovereign.  There would be a better argument that that language

3    covers Texas if, instead of "an entity with a capacity to sue or

4    be sued," it had said "any other plaintiff," or "any other

5    party," but that was not the language that Congress chose.

6           Congress chose to use the language that it typically

7    used to refer to artificial entities that are set up as limited

8    liability or joint stock or voluntary associations.  It was not

9    talking about the separate sovereigns that make up the

10   United States.

11          **THE COURT:**  All right.  Well, let me -- let's move to

12   the convenience, the 1404, and then I'll finish up with the

13   single-judge division question.

14          So for convenience, there are a litany of factors.  I

15   was a labor employment lawyer.  I routinely moved under 1404(a),

16   and it was normally because the plaintiff had sued where they

17   lived, even though -- I practiced primarily in Houston at that

18   time.  That's where they worked.  That's where all the documents

19   were.  That's where all the witnesses were.  In order to get

20   them to go to trial, they wanted to depose everybody.  It was

21   going to be really expensive.

22          In the old days, there was not electronic delivery,

23   and so in order to do that, I needed to list witnesses that I

24   thought would testify and kind of summarize what they were, and

25   I had to do that by affidavit in the Fifth Circuit.  And so

1    that's kind of that first one, the relative ease of access to

2    sources of proof.

17:38:24   3        Mr. Reuveni, I don't know -- I don't know that you

4    spent a lot of time -- you did talk about where the documents

5    were, but from the United States' perspective, everything that

6    you think you're going to produce, or at least 99 percent of it,

7    is the administrative record, correct?

17:38:40   8        **MR. REUVENI:**  I would say 99 percent, but the

9    administrative record is the largest piece of it.  Yes, that's

10   in DC, and then any witnesses that we may -- either be called

11   upon to bring or bring ourselves, if we get into injury, or the

12   other things that are outside the merits, they're all uniformly

13   going to be, most likely, out of DC.

17:38:59   14       **THE COURT:**  Okay.

17:38:59   15       **MR. REUVENI:**  There may be -- there may be a witness

16   or two that speaks to these numbers that we're talking about

17   here, but as of right now, yes, that's right.

17:39:08   18       **THE COURT:**  All right.  So the administrative record

19   is going to be filed on ECF.  So even though it's in DC, it's

20   going to be publicly available around the world, correct?

17:39:17   21       **MR. REUVENI:**  Yes, but I will point out that in pretty

22   much every one of these cases, our plaintiffs have suggested

23   there was an issue with the record, and so I had to submit

24   supplemental documents; in a number of cases have sought to

25   depose individuals about the contents of the record and how it

1    was produced.

17:39:34  2         I know that's speculative right now.  I understand if

3    that's your response to that, but it's not as clean-cut and

4    clear and dry as, Hey, the record's going to be on ECF; what's

5    the problem?  We may have disputes about it, and if there are

6    disputes about it, they may not be most convenient to resolve

7    here in Victoria compared to DC or Austin or elsewhere.

17:39:53  8         **THE COURT:**  Well, and you're talking about the

9    witnesses and the documents.  I mean, are any of your documents

10   going to be in Austin?

17:40:01 11         **MR. REUVENI:**  Our documents, no; Texas' documents,

12   yes.

17:40:04 13         **THE COURT:**  Okay.  Like I said, if it goes to

14   Austin -- it seems to me that most of the witnesses are going to

15   be the plaintiffs', and they need to make them available for

16   deposition.  And if you have witnesses that you don't want to

17   expend, then the plaintiffs need to depose them in Washington if

18   the case is in Austin or Victoria or Houston or Galveston,

19   correct?

17:40:27 20         **MR. REUVENI:**  Correct.

17:40:27 21         **THE COURT:**  Okay.  So, I mean, that's not really where

22   the meat of your argument is.  It's not really that it's

23   inconvenient.  I mean, isn't that -- I mean, that's accurate,

24   right?  Like I said, I don't want to...

17:40:37 25         **MR. REUVENI:**  No, it's fair, Your Honor.  When it

1    comes to 1404 or outside of 1406, the government loses on

2    residency, we have two primary arguments:  That there's just no

3    connection to this forum whatsoever --

17:40:47  4              THE COURT:  Right.

17:40:47  5              MR. REUVENI:  -- and the harms -- harms alleged are

6    all happening somewhere else; and then the interest of justice,

7    that there's the perception of the integrity of the courts.

17:40:58  8              THE COURT:  All right.  So let's move to that, then,

9    the perception of justice.

17:41:01 10              So the focus of your motion, as I see it, is that it

11   should be filed -- if it stays in Texas, it should at least be

12   filed in any division in the Southern District of Texas that has

13   multiple judges; is that correct?

17:41:14 14              MR. REUVENI:  Yes, because we're -- at this point, we

15   are conceding -- or you will have found residence of Texas --

17:41:20 16              THE COURT:  Right.

17:41:20 17              MR. REUVENI:  -- is anywhere.  So, yes, if we're going

18   to stay in the Southern District, it should go somewhere where

19   this perception problem doesn't exist, including, at the time we

20   file the motion, to a potential division where you would still

21   be assigned cases.

17:41:31 22              THE COURT:  Right.  As I'm asking you a question on

23   this, I'm not trying to trick you into conceding on 1406 or

24   1404(a).  I've just moved on like this was the only --

17:41:40 25              MR. REUVENI:  I understand.

17:41:40  1          **THE COURT:**  Okay.  So -- and so you also don't have a

2    problem -- I think, like you said, you talked about it.  You

3    said:  (Reading) Defendants are not moving to recuse and have no

4    concerns with the impartially of this Court or any of the judges

5    in the district.  Indeed, defendants' motion suggested transfer

6    to Corpus Christi where, at the time of the filing, this Court

7    was randomly assigned cases along with two other judges.

17:42:02  8          And so you didn't have a problem with Corpus Christi,

9    obviously, correct?

17:42:06 10          **MR. REUVENI:**  Correct.

17:42:06 11          **THE COURT:**  So you would not have a problem if it was

12   randomly assigned and I -- and I got it to preside over the

13   case?

17:42:15 14          **MR. REUVENI:**  Absolutely.  Correct.

17:42:16 15          **THE COURT:**  All right.  So, obviously, any plaintiff

16   is going to want a judge who is fair and impartial and without

17   bias or prejudice, and that's what you want as well, right, a

18   fair and impartial judge who's not going to be biased or

19   prejudiced, right?

17:42:28 20          **MR. REUVENI:**  Yes, Your Honor.

17:42:29 21          **THE COURT:**  And that's what -- I mean, that's what

22   you've said.  So do you believe that I would preside over this

23   case fairly and impartially if it stayed in Victoria or went to

24   Corpus Christi?

17:42:41 25          **MR. REUVENI:**  Yes, Your Honor.

17:42:42  1          **THE COURT:**  And do you believe that I would preside

2  over this case without bias or prejudice if it was in Victoria

3  or was transferred to Corpus Christi and landed on my docket?

17:42:55  4          **MR. REUVENI:**  We do, Your Honor.  I just -- if I may,

5  I just -- I understand why you're asking me these questions.

6  This is -- this is not -- this is not the focus of our venue

7  argument; we don't think necessarily relevant to the --

17:43:04  8          **THE COURT:**  No, I understand.

17:43:05  9          **MR. REUVENI:**  But I understand.

17:43:07  10          **THE COURT:**  Yeah.  I just want to make sure that it's

11  clear on the record that you're not worried that I'm going to be

12  biased or prejudiced if I get the case in Victoria or

13  Corpus Christi, correct?

17:43:15  14          **MR. REUVENI:**  We are not worried that you will be.

17:43:18  15          **THE COURT:**  And you talked earlier about having

16  conversations internally with some of your colleagues in DOJ.

17  Was there any indication that I was biased or prejudiced in any

18  prior case involving the Administration?

17:43:30  19          **MR. REUVENI:**  I want to be careful here.  I don't want

20  to put any of my colleagues --

17:43:34  21          **THE COURT:**  No, that you have talked to.

17:43:36  22          **MR. REUVENI:**  As hearsay -- but, no, I have been given

23  no reason, as an attorney, to believe that I will not get a fair

24  shake in front of Your Honor.  I've been given no reason to

25  believe that.

17:43:46  1          **THE COURT:**  Okay.  And so the concern is only that

2    there's a public perception.  What makes you think that the

3    public would lack confidence in the impartiality of this Court?

17:44:01  4          **MR. REUVENI:**  See if I can try this a different way

5    because I know you asked me this before, and you're asking it

6    again.

17:44:07  7          **THE COURT:**  I'm asking it a different way.  Mostly,

8    what you're saying is you're not worried about whether or not

9    you're going to get a fair trial.  You're worried that the Court

10   is damaged by the fact that there is a public perception that

11   I'm not going to be fair.  Is that...

17:44:20 12          **MR. REUVENI:**  That's part of it.  It's the perception

13   of -- it's what you just said.  It's that when this case goes up

14   on appeal, and there's a question as to -- amongst the appellate

15   judges or the Supreme Court, if we get there, why this was filed

16   where it was filed, there's a question as to why, if the

17   plaintiffs, State of Texas and others, are filing these in --

18   only in front of a handful of judges -- if, in fact, they

19   agree -- and I believe they do -- with us that every single

20   judge in Texas and any of the districts and divisions can handle

21   a case fairly, impartially, expeditiously and so on, why are

22   they not filing, then, in front of any of these other judges?

17:44:54 23          That's, really, the -- sort of the negative predicate

24   of you are filing in seven divisions, the vast majority of them

25   in four divisions.  You're not filing in your own state capital.

1   You're not filing them in your biggest metropolitan area.

2   You're not filing immigration cases where you say the harms are

3   going to occur and where there is a local interest in having

4   those harms adjudicated by individuals who are in that

5   community, and none of that's happening.

6          So it's not just you, Your Honor.  It's not just

7   Victoria.  It's the whole package of filing in -- almost

8   exclusively in four divisions and what that says about

9   Texas -- what that says about what Texas is saying about the

10  courts.  I mean, I hear, again, Mr. Olson saying he doesn't know

11  why they file where they do, and fine.  But with no explanation,

12  then that's the question:  Why?

13         And the only answer we have, after we've briefed this

14  and had this argument and every opportunity has been given to

15  why here, why Victoria, is because, We like you, Your Honor --

16         **THE COURT:**  Yeah.  Well, I mean --

17         **MR. REUVENI:**  -- that's not an okay -- that's not an

18  okay consideration of the venue statute.

19         **THE COURT:**  Well --

20         **MR. REUVENI:**  They -- they say they want to be in

21  front of you because you move the case quickly and you're fair,

22  fine, but that's not -- that's not an appropriate consideration

23  of the venue.

24         **THE COURT:**  So, I mean, like I said, basically, the

25  concern that I've had is that the public perception is thinking

1   that Texas is hoping that I'm going to rule in their favor.

2   That's why, you know -- but what I've heard you say is that you

3   think that you're going to get a fair trial in front of me, but

4   the public might not think that despite the fact that you do.

17:46:22  5        **MR. REUVENI:**  Yeah, and I think that's a legitimate

6   concern.  I think even if I, the government attorney thinks

7   this, if the public at large begins to doubt Your Honor through

8   the judiciary, if Supreme Court justices begin to doubt the hard

9   work and the impartially of the lower courts and the district

10  court judges that are deciding cases, and then we're -- making

11  fact findings that go up on appeal, then we have a real problem

12  here.

17:46:45 13       We have a real perception problem that can easily be

14  resolved by -- by -- in a case like this where there is no

15  connection whatsoever, and so it's really just, We think we

16  reside everywhere, and yet we're only filing in four or five

17  places --

17:47:01 18            **THE COURT:**  Well, on this --

17:47:02 19            **MR. REUVENI:**  -- let's just randomly assign.

17:47:04 20            **THE COURT:**  On this issue about the public concern

21  about fairness, don't you think you could go a long way toward

22  addressing any concern the public might have by just saying, in

23  public, what you said here on the record as an officer of the

24  Court?  "We don't have any concern about Judge Tipton.  He will

25  give us a fair trial.  We don't have any concern about the way

1    he's presided over previous cases."  Wouldn't that go a long way

2    to addressing any public perception issues?

17:47:28  3         MR. REUVENI:  Your Honor, that's a fair point, but,

4    ultimately, the issue is not so much whether DOJ thinks it's

5    going to have a fair trial in front of one judge or another.

6    The issue is why is this --

17:47:36  7         THE COURT:  No.  No, you told me it was about -- you

8    told me it was about the public perception.  I'm telling you --

9    you just told me:  I think I'll get a fair shot in front of

10   Judge Tipton.  He's fair.  He's not going to be biased or

11   prejudiced.  You know, he ruled against us, but I don't think

12   that the deck was stacked against us.

17:47:52 13        Don't you think if the public heard the Department of

14   Justice say that, that it would go a long way towards addressing

15   your public perception concern?

17:48:03 16        MR. REUVENI:  I mean, I think that's a fair point,

17   Your Honor, and I think, if you're raising the question as to

18   why doesn't the Department of Justice say something to that

19   effect, I would also wonder why doesn't Texas tell the public

20   why it files only in front of six or seven judges.

17:48:17 21        THE COURT:  Well, that's a -- that's a point that I

22   just asked them, right?  I just asked them.  You heard their

23   response, such as it was.

17:48:25 24        But like I said, I am concerned about how the federal

25   courts are perceived.  I'm not worried about the Court of

1    Appeals or the Supreme Court justices thinking I'm in the tank

2    for one side or the other.  You know, they -- I'm not as

3    concerned about that.

17:48:38  4          I think that they'll -- and one of the reasons why is

5    regardless of which way I rule, the losing party is going to

6    immediately seek emergency expedited relief, and that would

7    happen whether or not it was in a full courthouse full of judges

8    or if it -- whoever loses is going to ask for an immediate stay

9    on your case or the -- Texas is going to seek immediate relief.

10   And I've granted stays in my decisions, right, in all the cases,

11   correct?

17:49:05 12         Right?

17:49:07 13         **MR. REUVENI:**  I'm aware of --

17:49:09 14         **THE COURT:**  Right.

17:49:09 15         **MR. REUVENI:**  I can't say as to all of them staying,

16   but I believe Your Honor.

17:49:12 17         **THE COURT:**  Right.  And so then -- so my -- my

18   opinions don't even go into effect until at least three judges

19   of the Fifth Circuit have a chance to review my work and grade

20   my papers.  I mean, my decision doesn't -- and after that, with

21   the cases before the Supreme Court, it was immediately appealed

22   to the United States Supreme Court.

17:49:31 23         So then we had nine very smart people who had the

24   opportunity to review my decision, and it did not go into effect

25   until the Court of Appeals and the Supreme Court had a chance to

1    take a look at it.  Don't you think that that also could go a

2    long way toward addressing public perception issues if they hear

3    that my decision doesn't go into effect until a court of appeals

4    allows it to?

17:49:57  5         MR. REUVENI:  Your Honor, I must admit I have not

6    thought about and we have not really thought about the stay

7    point, and that is -- if what I'm hearing is that as standard

8    practice, Your Honor stays his decisions -- and I think the stay

9    becomes an issue only, really, if it's a nationwide injunction.

17:50:15 10         THE COURT:  No, no.  No, I'm telling you that in every

11   case the United States has moved for a stay, and I have granted

12   it, and then it goes up to the Supreme Court -- then it goes to

13   the Court of Appeals, and it's up to them how long that stay,

14   stays in place.

17:50:29 15         In fact, in the case that's in front of the Supreme

16   Court, the United States, because of an intervening decision

17   that came out of the Supreme Court, came back and asked me about

18   the 1252(f) case.  And they said, you know:  We think that this

19   changes your opinion.  I've looked at it.  I disagree.

17:50:45 20         But I extended my stay sua sponte so that the

21   Fifth Circuit could have enough time to take a look at that.

22   Doesn't that -- I mean, if the public knew about that, don't you

23   think that would go a long way to saying, Hey, this guy's trying

24   to ramrod a decision without anybody being able to review it?

17:51:01 25         Nothing that I've done has been able to go into effect

1    without a court of appeals having it -- a chance to weigh in

2    beforehand.

17:51:12  3         MR. REUVENI:  Your Honor, everything you say, I can't

4    quibble or disagree with that.  The point I was -- I make -- and

5    I apologize if I interrupted you -- is simply when the

6    government seeks an emergency stay, it tends to be because

7    there's an emergency nationwide judgment.  What I'm hearing is

8    that no matter which way you go, if you rule against the

9    government in this case, and you're going to grant a stay of

10   your ruling for some period of time -- I don't know for -- is

11   this -- I admit I'm not familiar with every single stay order

12   you've issued.  So I apologize for that lack of familiarity --

13   but a week, a month, until the Court of Appeals rules, I mean,

14   sure, these things can go --

17:51:47 15         THE COURT:  So to be clear -- to be clear, it's not

16   until a week or a month.  What I did was I granted it either for

17   a week or two weeks until the Fifth Circuit -- because

18   they -- what happens is you immediately file for a stay in front

19   of the Fifth Circuit, and so they then decide whether or not to

20   grant that.  All I'm doing is giving a couple of weeks for the

21   Fifth Circuit to have a chance to decide, and, quite frankly,

22   they did.

17:52:10 23         The first time my preliminary injunction went up, the

24   Fifth Circuit disagreed with me in large part.  They issued a

25   stay very quick; three very smart judges.  And then the en banc

1    Fifth Circuit had a chance to rule on that, and then it came

2    back down.  Again, I came to a decision, and I stayed it.  And

3    then the Fifth Circuit got your application for a motion for a

4    stay on an emergency expedited basis, and that was pending while

5    my stay was in place.

17:52:39  6        It just seems like if there is a public perception

7    that a single judge, wherever they are -- because there's only

8    one judge that can preside over these cases at a time.  If one

9    judge is going to set nationwide policy, don't you think it

10   could go a long way towards addressing public perception

11   problems if the public knew, Hey, before his

12   position -- opinions go into effect, he stays them until the

13   Court of Appeals gets a chance to look at it?

17:53:06  14       **MR. REUVENI:**  Your Honor, speaking for myself, because

15   I have not had the chance to, obviously, discuss this with my

16   chain of command at the DOJ, I can't disagree with what you're

17   saying.  I will say I think it's missing something.  It's

18   missing -- you're -- you're speaking to a DOJ attorney saying

19   why doesn't DOJ publicize X, Y and Z.  All excellent points; all

20   fair questions; all ones I don't have a great answer for as I

21   sit here in front of you right now.

17:53:31  22       **THE COURT:**  Well, the reason --

17:53:31  23       **MR. REUVENI:**  That could go both ways.

17:53:31  24       **THE COURT:**  It's not that you're -- it's not that

25   you're not publicizing it.  It's that you're kind of furthering

1     the public perception concern by filing a motion that says that

2     single-judge divisions are sketchy.  I mean, that's what -- it's

3     hard for someone to look at it and say, Well, what's the

4     problem?

17:53:46  5           Well, Tipton must be in the tank, you know.  And like

6     I said, if you said, No, Tipton is not automatically biased

7     against us; he can provide fair and impartial -- I think the

8     public perception, which is 100 percent of what your

9     single-judge division motion is about, public perception, that,

10    and the fact that my opinion is stayed until a court of appeals

11    gets to look at it seems, to me -- I don't know how a public

12    that doesn't want a particular result, regardless of what the

13    law says, would -- could look at that and go, Oh, okay, well,

14    that makes sense.

17:54:19  15          **MR. REUVENI:**  Again, I can't find really anything to

16    disagree with there, Your Honor, speaking for myself.  I just --

17    to me, that seems incomplete.  To me, if we're going to be

18    asking the questions as sort of clarifying the perception

19    problem for the public at large or for Supreme Court justices or

20    appeal judges who I know you said you're less concerned with --

17:54:38  21          **THE COURT:**  Well, no, don't put words in my mouth on

22    that.  I'm less concerned that they will think that it's

23    sketchy.  The public perception problem is certainly one that

24    makes it look like the judge is in the tank for one side, and

25    everybody on this -- in this hearing that's speaking apparently

1   disagrees with that.  But you're filing a motion that kind of

2   reinforces it without saying, No, Tipton's not in the tank for

3   them, and by the way, he stays his opinions.

17:55:06   4        **MR. REUVENI:**  I wasn't clear.  Our perception issue is

5   Texas' behavior raises the question that Texas seems to think

6   these particular judges are -- and to quote your words,

7   Your Honor -- in the tank for Texas.  I just -- I want to make

8   one point.  I don't want to belabor this, and I think I know

9   where this is all going, and I'm happy to just sit back down and

10   be quiet.  But I just want to make this one -- this last point,

11   because you're raising these questions, and I don't have great

12   answers.

17:55:30   13        But to me, again, if you're asking the U.S.

14   Government, Why don't you communicate publicly X, Y and Z, which

15   would, you know, bring the temperature down and suggest that

16   Judge Tipton or any other judge is a fair and impartial jurist,

17   and you (indiscernible) gas on the fire, it seems, to me, we're

18   missing the same set of questions to the plaintiffs:  Why do you

19   only file -- instead of seven judges -- instead of the dozens

20   and dozens of judges that exist within the Texas -- state of

21   Texas that you're -- you say you reside in every one of these

22   divisions, yet you never file in the vast majority of these

23   divisions.  What is the perception you're sending when you don't

24   file in front of these other judges, including your state

25   capital; including your biggest cities; including places with

1   international airports or the border, relevant to a case like

2   this?

17:56:15  3          And when you do that over and over and over and over

4   again without explanation, and then, when offered the

5   opportunity to answer the question straight up, Why does your

6   office do that, "I don't know, Your Honor," that doesn't give us

7   over here at DOJ a lot of comfort.  We don't really -- so when

8   we're being asked to -- why don't you take the temperature down

9   and say X, Y and Z, a judge in a single division --

17:56:38 10          THE COURT:  Well, like I said, the biggest concern

11   that I have is that if the public thinks that there is a judge

12   who should recuse himself -- I mean, because that's basically

13   what it is.  If there's a judge who should recuse themselves

14   because they can't be fair and impartial -- and I would, and it

15   sounds like everybody who's arguing in this case agrees that's

16   not appropriate, that I would be fair and impartial, but, you

17   know, the judge -- the public is still left with that

18   impression.

17:57:01 19          Like I said, whether or not you issue a press

20   release -- I'm not saying that -- but the fact that you filed a

21   motion which kind of reinforces what I think everybody agrees is

22   a false premise, which is, is that -- that Judge Tipton is going

23   to be biased or prejudiced in favor or against the parties in

24   this case.

17:57:25 25          MR. REUVENI:  And then I think one of the things I

1    know -- I learned late in my career as a lawyer is what I need

2    to do is just sit down and be quiet.

17:57:32  3        THE COURT:  No, that's okay.  I've got some questions

4    for Mr. Olson now.

17:57:35  5        Mr. Olson, so with respect to the single-judge

6    division issues, what was it again?  What were -- why do you

7    file them in Victoria or in -- wherever, the single-judge

8    divisions?  Texas has decided to do it.  There's a lot of

9    divisions and a lot of judges in the state of Texas.

17:57:55 10        I know that you, also, are -- I can see from your

11   response that you're very concerned about the reputation of the

12   federal judiciary, and yet it keeps happening, you know.  So

13   what is it, from your perspective, that you could do?  You know,

14   you could take the tone down by filing in multi-judge divisions

15   as well.

17:58:14 16        MR. OLSON:  Inasmuch as that actually is a public

17   perception, Your Honor, yes, that could -- that could happen.  I

18   doubt that that actually is the public perception so much as it

19   is a couple of law professors beating a drum on Twitter.  I have

20   never heard anybody with any actual knowledge of the federal

21   court system think that a judge was in the tank for one party or

22   another.

17:58:48 23        THE COURT:  But it concerns me that --

17:58:50 24        MR. OLSON:  It's just never happened.

17:58:50 25        THE COURT:  It concerns me that the public may

1    perceive that, either -- whether or not it's based on law

2    professors or whether or not it's based on a motion or whether

3    it's talked about in an oral argument, it concerns me

4    that -- that -- that the public would -- the public needs to

5    have confidence in the federal judiciary.

17:59:09  6          **MR. OLSON:**  I agree, Your Honor, but I think our

7    position is best summed up with what Mr. Reuveni said, which is

8    the perception is Texas' behavior -- not the federal judiciary,

9    but Texas' behavior, and if that's the problem, then there's no

10   basis for a venue transfer.  That's a basis for criticizing the

11   State of Texas:  Why is the State of Texas doing this?  What

12   about the State of Texas' case is so weak that they feel like

13   they have to be coming back to these same judges over and over

14   again?  Can they not win the case unless they have such a good

15   handle on the judge's philosophy that --

17:59:57 16          **THE COURT:**  Well, to me -- this is kind of --

18:00:01 17          **MR. OLSON:**  -- (indiscernible).

18:00:02 18          **THE COURT:**  This is the -- this is converse of what I

19   said to Mr. Reuveni, which is, is that if -- if -- it doesn't

20   really matter because the district judge is going to rule, but

21   then whoever loses is going to take it to the Court of Appeals.

22   These conclusions -- I mean, we're interpreting a statute.  I

23   mean, we are just first base.

18:00:18 24          The Court of Appeals and, sometimes, the Supreme Court

25   is going to be saying what this law says.  All I can do is build

1    a record, make my initial judgment call, and then it's out of my

2    hands.  Like I said, the Fifth Circuit disagreed with me once,

3    and then they agreed with me, and now it's in front of the

4    Supreme Court.

18:00:35  5          But, you know, regardless of how many judges are in a

6    building, and regardless of whether I rule for or against any

7    particular party in this case, you know, this will be my initial

8    ruling, but, eventually, this is going to be a Fifth Circuit

9    ruling or a Supreme Court ruling.  Nobody's going to be looking

10   back and saying this is Tipton's ruling, in the end, and so --

11   whether it's for or against the United States.

18:00:59 12          So like I said --

18:01:00 13          **MR. OLSON:**  I agree with that analysis.

18:01:02 14          **THE COURT:**  But, I mean, even if you lose, though, the

15   first thing you're going to do is go to the Fifth Circuit to try

16   to get me flipped.

18:01:10 17          **MR. OLSON:**  Probably the second thing, Your Honor.

18   The first one would probably be to ask you to reconsider, but

19   I -- I agree that that's high on the list of priorities.

18:01:25 20          But that, again, just goes to show why I don't believe

21   this actually is a public perception problem.  If we are going

22   to try to get you reversed, then we are obviously pursuing a

23   particular legal argument, not pursuing a particular judge.

18:01:43 24          **THE COURT:**  All right.  Well, Mr. Reuveni, I've sort

25   of depressed myself because I've watched the sun go down in your

1    window back there.  The sun was shining when we started this

2    hearing, and now it is -- it is dark outside.  So I'm -- I'm

3    feeling like it's Miller time.

18:01:59  4         So I do want to give everybody the opportunity to, I

5    guess -- have we talked it to death?  Has everyone had the

6    opportunity to weigh in?

18:02:11  7         Mr. Reuveni?

18:02:15  8         **MR. REUVENI:**  I think we are where we need to be.  I

9    just have one last thing to say, and it just goes to something

10   Mr. Olson said, which, apparently, we agree.  The perception

11   problem is not with you, Your Honor.  The perception problem is

12   not with the Article III judges of the Southern District or

13   anywhere in Texas.  The perception problem is:  Why is Texas

14   doing this?  And so that spills over, potentially.  That's the

15   thrust of our argument, but why is Texas doing this when it

16   could be filing these cases -- just to be cute here, there are

17   28 divisions; there are 28 cases.

18:02:46 18         They could have filed one in every single division;

19   give everybody a turn; give everybody an opportunity to be part

20   of this bigger, as you said, Your Honor, nationwide policy-type

21   setting cases.  This is really the crux of the problem for the

22   federal government, that we're in these policy-type setting

23   cases, and there is this perception based on Texas' conduct that

24   they're doing this for a reason.

18:03:07 25         And I just -- as I could go -- after this hearing, and

1   go back to my superiors and say, you know, Here's some things we

2   could do that takes the temperature down, Texas could do the

3   exact same thing by just filing a few of these not in a

4   single-judge division going forward, and, you know, that -- so

5   it begs the question, like, you know -- you made very fair

6   points, and you raised very fair questions to me, Your Honor,

7   but I still haven't heard, from the State of Texas, why they do

8   this, and I still haven't heard why it doesn't create a

9   perception problem.

18:03:37 10          In fact, what I heard them say is they agree it can

11   create a perception problem, and at the end of the day, it's the

12   crux of the government's motion here and the problem we have

13   with this pattern of conduct, and that it just casts a pall on

14   everything.  And at the end of the day, a very careful decision

15   that I think we all agree you are going to issue, is called into

16   question not because of anything the Court has done, but because

17   of the way random divisions are -- are -- are split up and case

18   assignment rules and the litigation choices of the individual

19   plaintiffs bringing these cases.

18:04:12 20          And so for all those reasons, and for many others that

21   we discussed, I think it makes sense, even if you find that

22   the -- Texas is resident here, to transfer this case for random

23   assignment somewhere else in the Southern District.  And now

24   I -- now, for sure, I will sit down and be quiet.

18:04:30 25          **THE COURT:**  All right.  All right.  So what I -- I

1   would invite -- I don't need, but I will invite -- because I've

2   sprung some issues on you during this argument that were not

3   briefed.  Those were kind of issues that I thought about while I

4   was reading your briefing -- to supplement.  And you don't need

5   to, like I said, but I would invite any additional

6   supplementation -- I'm not going to rule from the bench, and so

7   I'll need to kind of take a look at all of that, and I would

8   welcome any additional thoughts that the parties have just, you

9   know, at your own risk over the course of the next couple of

10  weeks.  Make sure that you are -- that you get it in, in that

11  time frame.

18:05:08  12          Does that work for you, Mr. Olson?

18:05:13  13          **MR. OLSON:**  Yes, Your Honor, it does.

18:05:14  14          **THE COURT:**  Mr. Reuveni?

18:05:18  15          **MR. REUVENI:**  Yes.  I'll just take myself off mute.

18:05:20  16          Yes, Your Honor.  So within two weeks' time of today,

17  if we have anything else to say --

18:05:23  18          **THE COURT:**  Like I said, I would -- I may come out

19  with something in less than two weeks.  I'm just saying you're

20  starting to roll the dice after that.  So, I mean, you guys,

21  like I said, were hit with some issues today that were not in

22  the briefs that were things, like I said, that I thought about.

18:05:36  23          If you want to reflect on them as opposed to being on

24  the hot seat, I would enjoy your measured judgment and whatever

25  you had to submit post argument.

18:05:46  1           **MR. REUVENI:**  Very good, Your Honor.

18:05:47  2           **THE COURT:**  All right.  Thank you so much.  If there's

3      nothing further, do we have -- do you have any questions for me

4      based on all of the other things that we've talked about, as

5      well, or this?

18:05:55  6           Mr. Olson first.

18:05:58  7           **MR. OLSON:**  No questions, Your Honor, but I do hope

8      that, much like you did with the prioritization argument, that

9      in the future you remember this argument as having ended at

10     around 5:00 as opposed to around an hour later.

18:06:12 11           **THE COURT:**  No, what I -- what I'm going to remember

12     about it is that a fire alarm went off in the middle of it, and

13     I had to go wait in the street and wait in my robe and wait to

14     go back up.  That was less than elegant.

18:06:23 15           Mr. Reuveni, did you have anything further?

18:06:26 16           **MR. REUVENI:**  Nothing further.  I was just confirming

17     we owe you a proposal in how to proceed timing wise this Friday,

18     and we're going to treat the preliminary injunction brief as a

19     merits brief, and we're going to give you a response within the

20     normal timetable, and we'll work that out with plaintiff on a

21     schedule, and then we're going to do a reply, and that's all.

18:06:45 22           **THE COURT:**  All right.  Thanks very much.  This was

23     very helpful, and I appreciate the thoughts from both sides.

24     Thank you very much.  Good -- good evening.  Sorry to keep you

25     so late.  Sorry about all the distractions.

18:06:58  1          **MR. OLSON:**  Thank you for your time, Your Honor.

18:06:59  2          **MR. REUVENI:**  Thank you.

18:07:00  3          **THE COURT:**  You bet.

18:07:01  4       *(Proceedings concluded at 6:07 p.m.)*

5          I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above matter to the best

7    of my ability and skill, and that any indiscernible designations

8    are because of audio/video interference that precluded me from

9    understanding the words spoken.

10

11   Date:  February 24, 2023

12                              */s/ Heather Alcaraz*
                                 Signature of Court Reporter
13