UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 6:23-cv-00007 |
| DEPARTMENT OF HOMELAND SECURTY, *et al.* | ) ) ) ) | |
| Defendants. | ) ) | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO TRANSFER**

At the Court's invitation, Defendants submit this supplemental brief in support of the motion to transfer to address three points raised at oral argument.

*First*, the Office of the Attorney General of Texas has now admitted that it filed *this* case in the Victoria Division to ensure it would be heard by Judge Tipton: "The case is being filed in Victoria, quite frankly, Your Honor, because of our experience with you." Tr. 45-46:22-3. Plaintiffs have "handpicked [a particular judge] to decide the particular case or motion in question." *Jenkins v. Bellsouth Corp.*, No. CIV.A.CV-02-1057-S, 2002 WL 32818728, at *6 (N.D. Ala. Sept. 13, 2002). That admission is critical. "Judge-shopping doubtless disrupts the proper functioning of the judicial system." *Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1443 (9th Cir. 1995). It does so by "contraven[ing] the very purpose of random assignment, which is to prevent judge-shopping by any party, thereby enhancing public confidence in the assignment process." *Coates v. SAIA Motor Freight Line, LLC*, No. 3:20-CV-25-DMB-RP, 2020 WL 1812020, at *2 (N.D. Miss. Apr. 8, 2020); *accord Chitimacha Tribe of Louisiana v. Harry L. L. Co.*, 690 F.2d 1157, 1164 (5th Cir. 1982) (describing

1

"judge shopping" as "devious" and in "bad faith"); *Jenkins*, 2002 WL 32818728, at \*6 ("The prevention of judge shopping by any party enhances public confidence in the assignment process and, thereby, the integrity of the judicial system. . . . Judges and cases are to be paired randomly, not deliberately"); *Grutter v. Bollinger*, 16 F.Supp.2d 797, 802 (E.D. Mich. 1998) ("system of random assignment is purely objective and is not open to the criticism that business is being assigned to particular judges").

That concern is magnified where, as here, Plaintiffs circumvent the random assignment system by *never* filing in Divisions where they have a non-trivial chance of not knowing what judge they are likely to be assigned. As explained, this is not the first time that Texas has gamed the local rules governing case assignments. In fact, all 28 of the State's lawsuits against the federal government filed in Texas federal district courts have been filed in just seven Divisions where local rules severely limit the number of judges to whom the cases could be assigned (Victoria, Amarillo, Galveston, Lubbock, Tyler, Fort Worth, Midland), including 18 lawsuits in Divisions where the case would necessarily be assigned to a single, pre-determined judge (Victoria, Amarillo, Galveston, Midland), and no less than seven here in Victoria. Dkt. 46, Exs. A, B. None of those cases have been filed in (1) the Division with the most substantial connection to the underlying dispute, (2) Texas's state capital, where the State and most of its agencies and principal officers reside, or (3) any Division with multiple judges where there is a non-trivial chance Texas will not be able to pre-determine the judge to which the case might be assigned. Having had every opportunity to explain this course of conduct, at argument counsel for Plaintiffs remarked only that he did not "know why our office chooses to file in seven divisions over and over." Tr. 45:14-15; *see* Tr. 45:18-19 ("I don't know why our office files in some divisions over others"). That non-response is difficult to reconcile with Texas's pattern of filings and the record evidence in this case

concerning what Divisions have any connection to this lawsuit, which Plaintiffs have not disputed. *See, e.g.*, *Cerda v. Almanza Villarreal Forwarding, LLC*, No. 5:22-CV-43, 2022 WL 7376188, at *1 (S.D. Tex. Oct. 3, 2022) (burden shifts to Plaintiffs once Defendant presents evidence that venue is improper) (collecting cases); *Am. Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 396 (S.D. Tex. 2011) (same).

More importantly, in *this* case, Plaintiffs did not file in the multiple Divisions with a far greater connection to this dispute, including Houston and many other major metropolitan areas, or any Division along the southern border, all Divisions in which Texas also purports to "reside."[1] Dkt. 46 at 7-9; Ex. C, ¶¶ 3-16. Absent any coherent response from Plaintiffs concerning their pattern of conduct, judge-shopping is the only remaining explanation. Again, Texas admitted as much. Tr. 45:22-23 (Plaintiffs filed in Victoria "because of our experience with you; because we know that you know these statutes"); Tr. 46:2-3 (Plaintiffs believe choosing their judge "will be much more efficient than if it were randomly assigned to another judge"); *see* Tr. 46:7 (Plaintiffs believe the Court would decide the case "quickly"). There is no way to describe that other than judge-shopping. *See supra* 1-2.

Where random assignment system is routinely undermined—as it has been here by Texas's pattern of conduct—it is appropriate to transfer a case to another venue even if all other factors counsel in favor of maintaining venue in the Division in which a Plaintiff filed. *See, e.g.*, Dkt. 6 at 14-19 (collecting cases); Dkt 46 at 10-12 (same); Wright & Miller, 14D Federal Practice and

---

[1] The only Division in which Texas filed suit where it faced *any* risk of assignment to a judge other than its preferred judge was the Amarillo Division, where, until last year, 95% of cases were assigned to Judge Kacsmaryk and 5% to Judge Lynn. *See* Dkt. 46 at 13 n.4. And as explained, the one time they failed to procure their desired judge in Amarillo, Texas sought to relate the case after the fact to another case assigned to its preferred judge—a tactic that was rightly rejected by then-Chief Judge Lynn. *Id.*

3

Procedure § 3854 (4th ed.); *Research Automation, Inc. v. Schrader- Bridgeport Intern., Inc.*, 626 F.3d 973, 978 (7th Cir. 2010); *Mizell v. Prism Computer Corp.*, 27 F. Supp. 2d 708, 714 (S.D. Miss. 1998). Simply put, discouraging judge-shopping and the insidious effect it has on public perception of the integrity of the judiciary, provides a "strong reason to transfer this case," *Madani v. Shell Oil Co.*, No. C07-04296 MJJ, 2008 WL 268986, at *3 (N.D. Cal. Jan. 30, 2008), either to the Austin Division of the Western District, the District of Columbia, or to another Division within this District with two or more judges randomly assigned cases.

*Second*, Plaintiffs now apparently *agree* with the premise of Defendants' motion, that the public perception problem raised by judge-shopping "is Texas' behavior" and the assumption that they may procure a favorable ruling from a favorable judge assignment. Tr. 75:6-10. But again, that is classic judge-shopping and creates the "perception that different forms of justice would be available to litigants, depending upon the division in which a suit was filed," regardless of the impartiality of the judge sitting in the single-judge division. *In re Gibson*, 423 F. App'x 385, 388 (5th Cir. 2011); *see* Dkt. 6 at 15. "In federal court, the parties clearly have no right to a 'judge of their choice.'" *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1262 (5th Cir. 1983). Indeed, Plaintiffs stated that to the extent there "is a public perception" problem with judge-shopping by Texas, "filing in multi-judge divisions as well" would mitigate that perception problem. Tr. 74:10-22 (colloquy with the Court). But Plaintiffs have not once filed in such a Division where meaningful random assignment occurs in their 28 lawsuits and counting against the federal government, despite contending that they reside in all 28 Divisions within this State. And their failure to do so, as just explained, undermines public confidence in the assignment process and, thereby, the integrity of the judicial system. Where nothing other than judge-shopping explains a party's behavior, "case transfers to prevent judge-shopping," are appropriate. *Garcia v. Int'l*

4

*Constr. Equip., Inc.*, 765 F. App'x 109, 110 (5th Cir. 2019).

*Third*, Plaintiffs' response to the Court's questions concerning State residency under 28 U.S.C. § 1391, Tr. 56:2-57:10, reveals a fundamental misunderstanding concerning statutory construction. Plaintiffs contend that section 1391(c), which defines "residency" for "all venue purposes" does so only for the three specific categories listed in section 1391(c). Tr. 56:23-57:10 ("It does say that for all venue purposes, but that [only] covers the listed entities for all venue purposes.").

But as Defendants explained, the proper treatment of residency for a sovereign entity must be found somewhere in section 1391, because that statute unambiguously provides that "this section shall govern the venue of *all civil actions* brought in district courts of the United States." 28 U.S.C. § 1391(a) (emphasis added); *see* Dkt. 6 (Transfer Motion) at 6-10; Dkt. 46 (Transfer Reply) at 4-5. The venue provisions thus "define whether venue exists in a given forum." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 56 (2013). And so a State plaintiff's residency—like any plaintiff's—is governed by section 1391's specific residency definitions. The only provision under which a State logically fits is section 1391(c)(2), "an entity with the capacity to sue and be sued." Section 1391(c)(2) is broadly drafted to cover "entities," which among other things, are defined to include "something that has separate and distinct existence and objective or conceptual reality," and "an organization (such as a business or governmental unit) that has an identity separate from those of its members." *See* Entity, Merriam Webster, *at* https://www.merriam-webster.com/dictionary/entity (last accessed Feb. 27, 2023); *accord* Entity, Dictionary.com, *at* https://www.dictionary.com/browse/entity (last accessed Feb. 27, 2023) ("something that has a real existence" or "being or existence, especially when considered as distinct, independent, or self-contained"). States fall comfortably within these broad definitions.

*See* State, ("the political organization of . . . a body of people"), *at* https://www.merriam-webster.com/dictionary/state (last accessed Feb. 27, 2023). Congress did not deviate from these definitions in section 1391(c), so the Court must read them in accord with their ordinary meaning. *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013); *accord Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (explaining that where Congress uses a specific term with a long-understood meaning without defining that term more narrowly, courts must assume Congress did not intend a narrower meaning absent explicit definitions to the contrary). Indeed Congress has repeatedly defined "entity" to include government entities, including States, providing further evidence Congress did not through silence in section 1391(c)(2) mean for "entity" to somehow exclude State Plaintiffs from its coverage. *See, e.g.*, 2 U.S.C. § 1602(14) (defining "entity" to includes a "State or local government"); 11 U.S.C. § 101(15) (similar); 18 U.S.C. § 2711 (similar); 42 U.S. § 12131 (similar).

Contrary to Plaintiffs' contention, Tr. 56:23-57:10, the fact that section 1391 does not explicitly list "States" or "sovereign entities" in section 1391(c) is irrelevant. The broad entity language of section 1391(c)(2) is a "generally phrased residual clause" whose "whole value" "is that it serves as a catchall for matters not specifically contemplated." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009). So it does not matter that Congress may not have had States and other governmental entities "specifically in mind" when it amended section 1391(c)(2) in 2011.[2] *See id.*;

---

[2] For this reason, the cases on which Plaintiffs rely erroneously resorted to legislative history and common sense to rewrite the clear text of section 1391. *See* Dkt. 6 at 8-10; Dkt. 46 at 3-5. Moreover, those cases' treatment of legislative history is selective; they fail to acknowledge that the 2011 amendments to section 1391 were not directed solely at the "division in authority as to the venue treatment of unincorporated associations." *See California v. Azar*, 911 F.3d 558 (9th Cir. 2018). In fact, the legislative history indicates that Congress's purpose was to ensure that section 1391(c) would apply "universally" not just to "corporations," as the prior version of the provisions did, but to "a corporation, an unincorporated association, *and any other entity that has*

*accord Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018) ("Even if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading."). Had Congress wanted to limit the class of plaintiffs covered by section 1391 to exclude sovereign entities, it would have done so. *See id.* With no such textual limitation, the residual clause literally applies to any "entity" regardless of whether they are corporate or sovereign. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("Nor is there any such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *see, e.g.*, *Lamptey v. Cnty. of Orange California*, No. CIVS-08-1956GEBEFB, 2010 WL 1729861, at *2 (E.D. Cal. Apr. 28, 2010) (assuming that a local governmental entity is subject to section 1391(c)). To view it otherwise would rewrite section 1391(c)(2) to read: "an entity with the capacity to sue and be sued, *other than a State government*." But that is not the statute Congress wrote, and so reading that exception into the statute when Congress did not include such an exception relies on the very "canon of donut holes" the Supreme Court has repeatedly instructed the lowers courts does not exist. *See, e.g. Bostock*, 140 S. Ct. at 1747.

Venue is therefore not proper in this Division. Plaintiff Texas resides "in the judicial district in which it maintains its principal place of business," 28 U.S.C. § 1391(c)(2), which is the Austin Division in the Western District. And the "interest of justice" strongly counsels against countenancing Plaintiff's judge-shopping tactics. This case should therefore be transferred to

---

*the right to sue and be sued in its common name*." H.R. Rep. No. 112-10, at 21 (2011) (emphasis added).

either the Austin District of the Northern Division of Texas or to the District of Columbia, where Defendants reside.

## CONCLUSION

For all these reasons, and those raised in prior briefing and at oral argument, this Division is not the appropriate forum for Plaintiffs' claims. This Court should transfer this action, either to the Austin Division of the Western District of Texas or the District of Columbia. At a minimum, should the Court determine venue is in fact proper in the Southern District, it should not countenance Plaintiffs' admitted judge-shopping and should instead transfer this case to another Division within this District for random assignment.

Dated: February 28, 2023              Respectfully submitted,

ALAMDAR S. HAMDANI              BRIAN M. BOYNTON
*United States Attorney*              *Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

/s/ *Erez Reu*veni
EREZ REUVENI
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 307-4293
erez.r.reuveni@usdoj.gov

BRIAN WARD
*Senior Litigation Counsel*

8

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Southern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Erez Reuveni*
EREZ REUVENI
U.S. Department of Justice

**CERTIFICATE OF COMPLIANCE**

I certify that the total number of words in this motion, exclusive of the matters designated for omission, is 2,378 as counted by Microsoft Word.

/s/ *Erez Reuveni*
EREZ REUVENI