# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS, et al.,<br><br>       Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>       Defendants. | Civil Action No. 6:23-cv-00007 |

### MEMORANDUM OF LAW OF IMMIGRATION REFORM LAW INSTITUTE
### AS *AMICUS CURIAE* IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

CHRISTOPHER J. HAJEC
MATT A. CRAPO
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
litigation@irli.org

Counsel for *Amicus Curiae*
Immigration Reform Law Institute

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

SUMMARY OF ARGUMENT .......................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I. Because, even according to Defendants, paroling any individual alien produces no significant public benefit, Defendants' parole program violates 8 U.S.C. § 1182(d)(5)(A) ....................................................................................................... 2

II. Legislative history confirms that Congress intended the parole authority to be exercised only on an individual basis ...................................................................... 5

III. Contemporaneously-enacted agency rules comported with a narrow, individualized approach to parole, particularly with respect to aliens amenable to expedited removal, and other, current regulations still take that approach .............. 6

CONCLUSION ................................................................................................................ 10

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Texas v. Biden (MPP)*,
  20 F.4th 925 (5th Cir. 2021) .................................................................................................. 2

### STATUTES

8 U.S.C. § 1182(d)(5)(A) ................................................................................................ 2, 4, 8, 9

8 U.S.C. § 1182(d)(5)(B) ........................................................................................................ 2

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ........................................................................................... 6

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
  § 602(a), Pub. L. No. 104-208, 110 Stat. 3009 ..................................................................... 2

Refugee Act of 1980,
  § 203(f), Pub. L. No. 96-212, 94 Stat. 102 ........................................................................... 2

### REGULATIONS

8 C.F.R. § 212.5(a) (1997) .................................................................................................. 7, 8

8 C.F.R. § 212.5(b) (2023) ...................................................................................................... 8

8 C.F.R. § 212.5(c) (2023) ...................................................................................................... 8

8 C.F.R. § 212.19(d) ............................................................................................................... 9

8 C.F.R. § 235.3(b) ................................................................................................................. 8

8 C.F.R. § 235.3(b)(2)(iii) ...................................................................................................... 7

8 C.F.R. § 235.3(b)(4) ............................................................................................................ 7

8 C.F.R. § 235.3(b)(4)(ii) ....................................................................................................... 7

8 C.F.R. § 235.3(b)(5)(i) ......................................................................................................... 7

8 C.F.R. § 235.3(c) ................................................................................................. 7, 8

## **MISCELLANEOUS**

H.R. Rep. No. 104-469, pt. 1 (1996) ........................................................................... 5

Implementation of a Parole Process for Cubans,
    88 Fed. Reg. 1266 (Jan. 9, 2023) ........................................................................ 3

Implementation of Changes to the Parole Process for Venezuelans,
    88 Fed. Reg. 1279 (Jan. 9, 2023) ..................................................................... 3, 5

Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens;
    Conduct of Removal Proceedings; Asylum Procedures,
    62 Fed. Reg. 10312 (Mar. 6, 1997) ............................................................. 6, 7, 8

International Entrepreneur Rule,
    82 Fed. Reg. 5238 (Jan. 17, 2017) ....................................................................... 8

Procedures for Credible Fear Screening and Consideration of Asylum, Withholding
    of Removal, and CAT Protection Claims by Asylum Officers,
    87 Fed. Reg. 18078 (Mar. 29, 2022) .................................................................... 7

S. Rep. No. 104-249 (1996) ........................................................................................ 6

## SUMMARY OF ARGUMENT

This Court should grant Plaintiffs' motion for a preliminary injunction barring Defendants from programmatically paroling aliens into the United States. The text of the governing statute requires that parole be given "only on a case-by-case basis for … significant public benefit." Defendants attempt to justify their parole program by claiming that paroling tens of thousands of aliens from a list of countries provides the alleged public benefit of reducing "irregular migration" by making it "regular." Even if this result is of benefit to the public, however, the parole of any individual alien does not serve it significantly. At best, paroling any individual alien, and *also* paroling tens of thousands of other, similar aliens, provides the alleged significant benefit. But even so, paroling the individual alien does not significantly increase the public benefit of giving *en masse* parole to all the others, and thus itself provides no significant public benefit. In short, Defendants, by their own account, are not paroling any individual alien on the basis that doing so will significantly benefit the public.

Defendants' justification for their parole program also runs counter to the text and structure of the statute, the legislative history, contemporary interpretations by the agency charged with enforcing the provision, and recently enacted regulations interpreting the statute. For example, the rule governing parole for entrepreneurs properly construes the parole statute as requiring a showing that a particular alien's presence in the United States provides a significant public benefit. Because Defendants' parole program does not comport with the statutory requirements for parole, this Court should grant Plaintiffs' motion for a preliminary injunction.

1

# ARGUMENT

I. **Because, even according to Defendants, paroling any individual alien produces no significant public benefit, Defendants' parole program violates 8 U.S.C. § 1182(d)(5)(A).**

The current language in 8 U.S.C. § 1182(d)(5)(A), which authorizes parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," was added by section 602(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")[1] "to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Texas v. Biden (MPP)*, 20 F.4th 925, 947 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). The statute's "only on a case-by-case basis" language calls for an individualized determination that the parole of "any [individual] alien applying for admission to the United States" serves an "urgent humanitarian" purpose or that the presence of *that alien* would provide a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

This individualized understanding of the parole authority is buttressed by the text that follows, which directs that "*the* alien" temporarily paroled "shall forthwith return or be returned to the custody from which *he* was paroled and thereafter *his* case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States" "when the purposes of such parole shall … have been served[.]" *Id.*

---

[1] Title VI of division C of Pub. L. No. 104-208, 110 Stat. 3009, 3009-689; *see also* § 203(f) of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 107-08 (codified at 8 U.S.C. § 1182(d)(5)(B)) (providing that DHS "may not parole into the United States an alien who is a refugee unless [DHS] determines that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee") (emphasis added).

(emphasis added). This statutory language makes it abundantly clear that any applicant for parole must show that his or her own presence in the United States satisfies either the "urgent humanitarian" reason or "significant public benefit" standard for parole.

In contrast to an individualized test for parole, Defendants attempt to justify the parole program challenged here by suggesting that it creates a safe and orderly means of migrating to the United States from the four covered countries for up to 30,000 aliens per month, and that providing this migration path will reduce the number of aliens seeking to enter the United States irregularly, reduce the strain on DHS personnel and resources, and thereby improve border security. *See*, *e.g.*, Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1267-69 (Jan. 9, 2023); *see also* Plaintiff States' Motion for Preliminary Injunction ("PI Motion") at 16-17 (discussing Defendants' justifications for the program). But, as Plaintiffs point out in their PI motion, *see* PI Motion at 17, Defendants concede that the purported benefits of the Program can only be attained if a sufficient number of aliens are processed for parole *en masse*. *See* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279, 1280 (Jan. 9, 2023) (finding a 24,000 numerical limit for Venezuelans insufficient to provide an adequate alternative to crossing the border illegally and replacing the prior limit with a *monthly* limit of 30,000 travel authorizations spread across the four covered countries so that the program may "serve[] as a meaningful alternative to irregular migration.").

Because, on Defendants' view, the public benefit of paroling any individual alien depends on the aggregate effect of paroling many similarly-situated aliens *en masse*, the public benefit of paroling any particular alien is insignificant; if that alien were not

paroled, the public benefit allegedly produced by paroling tens of thousands of similar aliens would not be appreciably lessened.  In other words, on Defendants' view, there is no significant public benefit in paroling any particular alien; at best, the alleged significant benefit only comes from paroling that alien *and* tens of thousands of other aliens *en masse*. And the *significant* public benefit only comes from the *en masse* parole, not from the parole of any individual alien. In short, Defendants, by their own account, are not paroling any individual alien on the basis that doing so will significantly benefit the public.

Further, Defendants' parole program inevitably will violate the requirement that "when the purposes of such parole shall … have been served," "the alien shall forthwith return or be returned to the custody from which he was paroled[.]" 8 U.S.C. § 1182(d)(5)(A). The purpose of Defendants' parole program is to reduce "irregular migration" by making it "regular." When that purpose—which, as shown, can only be served by *en masse* parole—has been served, any individual alien, under this requirement, should be returned to custody. But if they were all returned to custody, the purpose of Defendants' parole program would be frustrated, since returning them all to custody would remove the incentive of aliens abroad to choose the "regular" migration option. In other words, Defendants must inevitably violate the return-to-custody requirement of § 1182(d)(5)(A), or fatally undermine their own their parole program.

## II. Legislative history confirms that Congress intended the parole authority to be exercised only on an individual basis.

The legislative history leading up to the enactment of IIRIRA reflects Congress's disapproval of the Executive Branch's overuse of the parole authority. Plaintiffs have identified legislative history that criticized parole abuse. *See* PI Motion at 7 & 15 (quoting H.R. Rep. No. 104-469, Part 1). Additionally, and more specifically, the House Judiciary Committee Report complained of "recent abuse of the parole authority" by the Clinton administration in "using the parole authority to admit up to 20,000 Cuban nationals *annually*." H.R. Rep. No. 104-469, pt. 1 at 140 (1996) (emphasis added). Here, the parole program being challenged permits the parole of up to 30,000 aliens *per month*. *See*, *e.g.*, 88 Fed. Reg. at 1280 (instituting "a monthly limit of 30,000 travel authorizations in the aggregate spread across" aliens from the four covered countries). Thus, the parole program challenged here is more than an order of magnitude bigger than the parole abuse complained of by the House Judiciary Committee in 1996.

Further, the House Judiciary Committee report included examples of what sorts of situations would warrant humanitarian or public interest parole:

> Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, *such as life-threatening humanitarian medical emergencies*, or for specified public interest reasons, *such as assisting the government in a law-enforcement-related activity*. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

H.R. Rep. No. 104-469, pt. 1 at 141 (emphasis added). The Senate Judiciary Committee Report similarly stated that its parole reform provision was intended to "reduce[] the

5

abuse of parole" and "[t]ighten[] the Attorney General's parole authority," and that "[t]he committee bill is needed to address ... the abuse of humanitarian provisions such as asylum and parole." S. Rep. No. 104-249 at 2 (1996).

In sum, the legislative history supports reading 8 U.S.C. § 1182(d)(5)(A) as requiring an individualized showing of an "urgent humanitarian" need or a "significant public benefit" resulting from the parole of an individual alien. Nothing in the legislative history indicates that Congress intended to authorize the kind of *en masse* parole "abuse" it was, in fact, seeking to reign in.

### III. Contemporaneously-enacted agency rules comported with a narrow, individualized approach to parole, particularly with respect to aliens amenable to expedited removal, and other, current regulations still take that approach.

Within six months of the passage of IIRIRA, the Department of Justice, which preceded the Department of Homeland Security ("DHS") as the agency charged with enforcement of the Immigration and Nationality Act, amended the regulations governing parole to comport with the newly enacted law. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997). In that rulemaking, the agency restricted parole for aliens who (like those covered by Defendants' parole program) are subject to expedited removal:

> because section 235(b)(1)(B)(iii)(IV) of the Act [8 U.S.C. § 1225(b)(1)(B)(iii)(IV)] requires that an alien in expedited removal proceedings "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed," the Department feels that parole is appropriate only in the very limited circumstances specified in § 235.3(b)(4).

62 Fed. Reg. at 10320. The newly promulgated 8 C.F.R. § 235.3(b)(4), in turn, permitted parole of aliens awaiting a credible fear interview only where "parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 62 Fed. Reg. at 10356 (setting forth newly promulgated 8 C.F.R. § 235.3(b)(4)(ii)).[2]

These medical emergency and law enforcement objective restrictions on parole remained in place for aliens subject to expedited removal (and who had not established a credible fear of persecution, like the aliens covered by the parole program) until March 29, 2022, when DHS issued an interim final rule removing the "medical emergency" or "legitimate law enforcement objective" language and replacing it with the following: "Parole of such alien shall only be considered in accordance with section 212(d)(5) of the Act and § 212.5(b) of this chapter." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078, 18220 (Mar. 29, 2022) (revising 8 C.F.R. § 235.3(b)(2)(iii), (b)(4)(ii), and (c)).

Even now, under the more general parole regulations applicable to detained arriving aliens,[3] the agency's rule still depends on circumstances particular to a specific

---

[2] The same restrictions on parole applied to aliens subject to expedited removal who did not make a claim of asylum. *See id.* at § 235.3(b)(2)(iii), (5)(i).

[3] The agency explained that only those "aliens found to have a credible fear will be subject to the generally applicable detention and parole standards contained in the Act," *i.e.*, those standards set forth in 8 C.F.R. § 212.5(a). 62 Fed. Reg. at 10320. "[P]arole authority is specifically limited while a credible fear determination is pending under § 235.3(b)(4), [but] those found to have a credible fear and referred for a hearing under section 240 of the Act will be subject to the rule generally applicable to arriving aliens in § 235.3(c)." 62 Fed. Reg. at 10320.

alien. For example, under the post-IIRIRA regulation, parole is deemed appropriate for: (1) aliens who have a serious medical condition; (2) women who are pregnant; (3) juvenile aliens; (4) witnesses in judicial, administrative, or legislative proceedings; and (5) aliens whose continued detention is not in the public interest. *See* 62 Fed. Reg. at 10348 (8 C.F.R. § 212.5(a)). Similar restrictions remain for aliens subject to mandatory detention under current 8 C.F.R. § 235.3(b) or (c). *See* 8 C.F.R. § 212.5(b) (2023). Although these restrictions on parole authority do not directly apply to all other arriving aliens, *see* 62 Fed. Reg. at 10348 (§ 212.5(b)), the regulations still require that parole be granted "in accordance with" 8 U.S.C. § 1182(d)(5)(A), and include some circumstances in which denial of parole is mandatory. *See id.*; *see also* 8 C.F.R. § 212.5(c) (2023).

Other current regulations reflect DHS's understanding that the particular alien's presence in the United States must provide a significant public benefit in order for that alien to qualify for parole under 8 U.S.C. § 1182(d)(5)(A). For example, when DHS promulgated the International Entrepreneur Rule in 2017, it explained that its adjudicators would be required to determine, *inter alia*, "whether the specific applicant's parole would provide a significant public benefit[.]" 82 Fed. Reg. 5238, 5239 (Jan. 17, 2017); *see also id.* at 5250 (providing that DHS will evaluate "whether granting parole to a particular individual would provide a significant public benefit"); *id.* at 5260 ("Imposing a limit on the number of entrepreneurs who may be granted parole based on the same start-up entity is thus consistent with ensuring that each entrepreneur's parole will provide a significant public benefit."). Indeed, the regulation governing parole for

8

entrepreneurs requires DHS to find "that an applicant's presence in the United States will provide a significant public benefit[.]" 8 C.F.R. § 212.19(d).

In sum, the agency's contemporaneous interpretation of 8 U.S.C. § 1182(d)(5)(A) required an individualized showing of an "urgent humanitarian" need or a "significant public benefit" resulting from the parole of an individual alien. Nothing in the contemporaneous interpretations suggested that an insignificant public benefit aggregated with the purported benefit of *en masse* parole would be sufficient to meet the statutory standard for parole under § 1182(d)(5)(A). Other, current regulations reaffirm that there must be something particular about the specific alien's presence in the United States that would provide a significant public benefit in order to satisfy the standard under the parole statute. In short, DHS's latest notices regarding its parole program, which weigh the public benefit in the aggregate and do not depend on anything specific to a particular alien, are inconsistent with both prior and current regulatory interpretations of the requirements of 8 U.S.C. § 1182(d)(5)(A).

//

//

//

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted on March 3, 2023,

 /s/ Matt Crapo
MATT A. CRAPO
CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
mcrapo@irli.org
litigation@irli.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2023, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ Matt Crapo