PRE-DECISIONAL/DELIBERATIVE

such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[60]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to remove Cubans and other populations by sending the message that there is no consequence for illegal entry.

The sharp increase in maritime migration has also had a substantial impact on DHS resources. USCG has surged resources and shifted assets from other missions due to this increased irregular maritime migration. In response to the persistent elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force—Southeast (HSTF-SE) elevated the operational phase of DHS's mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[61] Operation Vigilant Sentry is HSTF-SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.[62] The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF-SE's Unified Command staff and operational rhythm.[63] For example, between July 2021 and August 2022, Coast Guard operational planners surged three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.[64] USCG also added two MH-60 helicopters to respond to increased maritime migration flows in FY 2022.[65] Moreover, USCG has had to almost double its flight hour coverage per month to support migrant interdictions in FY 2022.[66] Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Cuban nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more

---

[60] Data from SBCC, as of December 11, 2022.
[61] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force – Southeast, August 21, 2022.

[62] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).
[63] Id.
[64] Id.
[65] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.
[66] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).

12

PRE-DECISIONAL/DELIBERATIVE

quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay, or repatriate those encountered at sea while also delivering on other maritime missions.

### III. Overview and Discussion of Proposed Cuban Parole Process

Like the Venezuelan process, this proposed Cuban parole process would provide a streamlined way for individuals from Cuba who are outside the United States to be considered, on a case-by-case basis, for advance authorization to travel to the United States and to seek a temporary period of parole for up to two years for significant public benefit and urgent humanitarian reasons, provided that they have a supporter in the United States, pass robust national security and public safety vetting, meet other specified criteria, and warrant a favorable exercise of discretion. The following provides additional detail and analysis of the process's proposed design.

*Supporters*: U.S.-based supporters would initiate an application on behalf of a Cuban national and, if applicable, the national's immediate family members. Supporters could be individuals filing on their own, with other individuals, or on behalf of entities. They would be required to provide evidence of income and assets and declare their willingness to provide financial support to parolees for the length of parole. Supporters would be required to undergo vetting, including to identify potential human trafficking concerns.

*Beneficiaries*: To benefit from this process, Cuban nationals would need to be outside the United States; have a U.S.-based supporter who has agreed to provide financial assistance, as needed; possess a valid passport for international travel; provide for their own commercial travel to an interior POE and final U.S. destination; pass required screening and vetting; and comply with all additional requirements, including vaccination requirements and other public health guidelines identified by the DHS Chief Medical Officer following consultation with the Centers for Disease Control and Prevention (CDC).

Cuban nationals would be ineligible for this process if they;
1) have been ordered removed from the United States within the prior five years;
2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: such individuals may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;
3) have entered Mexico or Panama without authorization after the date of the announcement; or
4) are a permanent resident or dual national of any country or hold refugee status in any country other than Cuba, unless DHS operates a similar parole process for the country's nationals.

Unaccompanied children (i.e., children under 18 not traveling with a parent or legal guardian) would not be eligible for this process.

*Beneficiary vetting*: Potential beneficiaries would be required to submit biographic and biometric information—in the form of a live photograph—in advance of travel. This information

13

PRE-DECISIONAL/DELIBERATIVE

would be used for vetting by the National Targeting Center (NTC) and to inform classified vetting support by national security partners leveraging the process and technology of the National Vetting Center (NVC).

Upon arrival at a POE, DHS will collect additional biometrics—namely, an additional photograph and fingerprints. This biometric information would support additional vetting against available databases to inform an independent and case-by-case determination by CBP officers whether parole is warranted on a discretionary basis.

Beneficiaries also would be subject to continuous vetting throughout their period of parole. Parole could be terminated, and the noncitizen placed into removal proceedings, if derogatory information emerges during continuous vetting.

*Online processing*: All touchpoints in the travel authorization and parole processes—for both supporters and potential beneficiaries up to their arrival at a POE—are accessible online. Potential beneficiaries would be able to access and advance their case online from their home country or other third countries, including Mexico. Approved beneficiaries who pass all the requisite vetting would receive an advance authorization to travel electronically, which would facilitate their ability to fly via commercial carrier into the United States and seek parole at a POE. Beneficiaries would be responsible for arranging and funding their own travel.

*Duration and Conditions of Parole*: If approved on a case-by-case basis at the POE, parole generally would be granted for a period of up to two years. Individuals who do not acquire another lawful means of remaining in the United States would be required to leave prior to the expiration of their parole. During this period, Cubans may be eligible to apply for lawful permanent residence under the Cuban Adjustment Act.[67] Those who overstay the grant of parole without acquiring a lawful means of remaining in the United States generally would be placed in removal proceedings. During this two-year period, the Department would continue to work to address the root causes of irregular migration, improve refugee processing and other safe, lawful, and orderly immigration processes, and increase removal options for Cuban nationals who are subject to a final order of removal.

*Employment Authorization and Public Benefits*: Parolees would be eligible to apply for employment authorization for the duration of the parole.[68] U.S. Citizenship and Immigration Services (USCIS) anticipates that it would be able to adjudicate the majority of such applications within a few weeks after the application is filed.

Because of a combination of employment authorization and the supporter requirement, DHS expects this population to require less in the way of emergency services, short-term shelter, or

---

[67] Cuban Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (1966) (8 U.S.C. 1255 note),, https://www.gpo.gov/fdsys/pkg/STATUTE-80/pdf/STATUTE-80-Pg1161.pdf, (last viewed Dec. 16, 2022).
[68] 8 C.F.R. § 274a.12(c)(11).

14

Cuba AR_000140

PRE-DECISIONAL/DELIBERATIVE

food banks, than the population of Cuban nationals currently encountered crossing the SWB or at sea, thus minimizing—and ultimately reducing—the burden on the states.[69]

Further, Cuban nationals who are paroled into the United States are eligible for certain benefits, akin to those received by admitted refugees, under the HHS-administered Cuban-Haitian Entrant Program (CHEP).[70]  Regardless of benefit eligibility, the proposed process would require parolees to have a willing supporter that would provide additional support, as needed.  In addition, parolees would be eligible to seek employment authorization—an added benefit beyond what is provided for under CHEP.  They will therefore be in a better position to work and support themselves than the present situation where recent migrants from Cuba are processed into immigration proceedings but generally are not immediately eligible to request employment authorization.[71]  DHS believes that these factors should mitigate, if not entirely overcome, any additional burden on states that may result from the creation of this parole process and that any marginal cost is outweighed by the significant public benefits and urgent humanitarian reasons for paroling individuals on a case-by-case basis pursuant to such a process.

*Scope/Termination*:  The Secretary would retain the sole discretion to terminate the process at any point.  The number of travel authorizations granted under this process would be spread across this process and the separate and independent parole Processes for Haitians, Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month.  Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memorandum, once approved, would be an internal policy statement of the Department of Homeland Security.  It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any

---

[69] *Id.*  Noncitizens paroled for a period of one year or more are considered "qualified aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4).  QAs generally must wait five years in order to be eligible for public benefits. *See generally, e.g.*, 8 U.S.C. § 1612.  Because the proposed parole period under this process is only two years, DHS does not expect this policy to have a significant impact on demand for such benefits federally.  Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements.  REAL ID Act of 2005, Pub. L. 109-13, Div. B, section 202(c)(2)(B), (d)(11), 119 Stat. 313, 315 (49 U.S.C. 30301 note).

[70] *See* Refugee Education Assistance Act of 1980, Pub. L. No. 96-422 (8 U.S.C. § 1522 note); 8 C.F.R. § 212.5(h); 45 C.F.R. §§ 400.62, 401.2, 401.12.

[71] Noncitizens paroled for a period of one year or more are considered "qualified aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4).  QAs generally must wait five years in order to be eligible for public benefits. See generally, e.g., 8 U.S.C. § 1612.  Because the proposed parole period under this process is only two years, DHS does not expect this policy to have a significant impact on demand for such benefits federally.  Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements.  REAL ID Act of 2005, Pub. L. 109-13, Div. B, section 202(c)(2)(B), (d)(11), 119 Stat. 313, 315 (49 U.S.C. 30301 note).

15

PRE-DECISIONAL/DELIBERATIVE

party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## IV. Justification for Cuban Parole Process

The Secretary of Homeland Security has, under section 212(d)(5)(A) of the Immigration and Nationality Act (INA), the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[72] Parole is not an admission of the individual to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[73] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[74] DHS may terminate parole in its discretion at any time.[75] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[76]

1. Significant Public Benefit

The proposed process, which would impose new consequences for Cubans who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Cuban nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States would serve a significant public benefit, for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process could result in the following: (i) enhanced border security through a reduction in irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improved vetting for national security and public safety; (iii) reduced strain on DHS personnel and resources; (iv) minimized domestic impact of irregular migration from Cuba; (v) a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfillment of important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

*Enhanced border security by reducing irregular migration of Cuban nationals*

---

[72] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). DHS notes that Cubans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[73] INA §§ 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A).

[74] *See* 8 C.F.R. § 212.5(c).

[75] *See* 8 C.F.R. § 212.5(e).

[76] *See* 8 C.F.R. § 274a.12(c)(11).

16

Cuba AR_000142

PRE-DECISIONAL/DELIBERATIVE

As described above, Cuban nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. DHS assesses that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Cubans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Cuban individuals along the SWB and at sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process will be contingent on the GOM's acceptance of Cuban nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be returned to Cuba or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Cuban nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

*Improved vetting for national security and public safety*

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before such individuals arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Cuban parole process described above would allow DHS to vet potential beneficiaries for national security and public safety purposes before they travel to the United States.

As described above, the proposed vetting would require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

*Reduced burden on DHS personnel and resources*

By reducing encounters of Cuban nationals encountered at sea or at the SWB, and channeling decreased flows of Cuban nationals to interior POEs, we anticipate the proposed process could relieve some of the impact increased migratory flows has had on the DHS workforce along the SWB. This process could free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—allowing for the removal of

17

PRE-DECISIONAL/DELIBERATIVE

more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the proposed process would also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Cubans who seek to enter the United States by sea, and will allow USCG to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.[77]

For those who enter the United States at the SWB, allowing Cubans permitted to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

*Minimize the domestic impact*

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Cuban nationals in substantial numbers, DHS is currently conditionally releasing 87 percent of the Cuban nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Cuban nationals accounted for 23 percent of all encounters released at the border in November 2022.[78] The increased volume of provisional releases of Cuban nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Cuban nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[79] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

---

[77] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).

[78] OIS analysis of CBP subject-level data and OIS Persist Dataset based on data through November 30, 2022.

[79] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States,* Sept. 21, 2022, https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.

Cuba AR_000144

PRE-DECISIONAL/DELIBERATIVE

Nevertheless, local communities have reported strain on their ability to provide needed social services.  Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[80] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[81]  Since Cuban nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this proposed parole process would address these concerns by diverting flows of Cuban nationals into a safe, and orderly process, in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process would help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of migrants arriving at the SWB.  Beneficiaries would be required to fly to the interior, rather than arriving at the SWB.  They also would only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support.  Beneficiaries also would be eligible to apply for work authorization, thus enabling them to support themselves.

*Disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks*

The proposed process, which would incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks.  In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[82] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[83]  The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[84] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[85]  Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since

---

[80] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave,* Apr. 27, 2022, https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[81] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day,* Sept. 23, 2022, https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

[82] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[83] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[84] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[85] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

19

PRE-DECISIONAL/DELIBERATIVE

March 2022.[86]  CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[87]  The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north.  These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[88] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.  Tragically, a significant number of individuals perish along the way.  The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[89]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers and migrant populations continue to use unseaworthy, overly crowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human smuggling networks and migrants consider the attempts worth the risk.[90]

The increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences.  In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration.  In January 2022, the Coast Guard located a capsized vessel with a survivor clinging to the hull.  USCG crews interviewed the survivor who indicated there were 34 others on the vessel, who were not in the vicinity of the capsized vessel

---

[86] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.

[87] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[88] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[89] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.

[90]PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).

Cuba AR_000146

PRE-DECISIONAL/DELIBERATIVE

and survivor.[91]  The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants; the others were presumed lost at sea.[92]

DHS anticipates this process would save lives and undermine the profits and operations of the dangerous TCOs that put migrants lives at risk for profit because it would incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights rather, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB.  By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants.  DHS and federal partners have taken extraordinary measures—including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[93]

*Fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.*

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration.  This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[94] the Collaborative Migration Management Strategy (CMMS);[95] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[96]  The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[97]  The

---

[91] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019
[92] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239
[93] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42, Dec. 13, 2022, https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42, (last visited Dec. 18, 2022).
[94] National Security Council, *Root Causes of Migration in Central America* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

[95] National Security Council, *Collaborative Migration Management Strategy,* July 2021, https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.

[96] *Id*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration), June 10, 2022, https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.

[97] *Id.*

21

PRE-DECISIONAL/DELIBERATIVE

L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[98]

The U.S. Government has been working with the GOC to restart the Cuba Migration Accords. On November 15, 2022, U.S. and Cuban officials met in Havana to discuss the implementation of the Accords and to underscore our commitment to pursuing safe, regular, and humane migration between Cuba and the United States.[99]  These Migration Talks provide an opportunity for important discussions on mutual compliance with the Migration Accords—composed of a series of binding bilateral agreements between the United States and Cuba signed in 1984, 1994, 1995, and 2017—which establish certain commitments of the United States and Cuba relating to safe, legal, and orderly migration.

In September 2022, the U.S. Government announced the resumption of operations under the CFRP program, which allows certain beneficiaries of family-based immigrant petitions to seek parole into the United States while waiting for a visa number to become available.  Beginning in early 2023, U.S. Embassy Havana will resume full immigrant visa processing for the first time since 2017, which will, over time, increase the pool of noncitizens eligible for CFRP.[100] Approved beneficiaries through this process will enter the United States as parolees but will be eligible to apply for adjustment to lawful permanent resident (LPR) status once their immigrant visas become available.  Also during this period, Cubans may be eligible to apply for lawful permanent residence under the Cuban Adjustment Act.[101]

While these efforts represent important progress for certain Cubans who are the beneficiaries of a family-based immigrant petition, CFRP's narrow eligibility, challenges faced operating in Cuba, and more modest processing throughput mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective.  This new process would help achieve these goals by providing an immediate and temporary orderly process for Cuban nationals to lawfully enter the United States while we work to improve conditions in Cuba and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries.  It thus would provide the United States another avenue to lead by example.

The process also would respond to an acute foreign policy need.  Key allies in the region— including specifically the Governments of Mexico, Honduras, Guatemala, and Costa Rica—are affected by the increased movement of Cuban nationals and have been seeking greater U.S. action to address these challenging flows for some time. Cuban flows contribute to strain

---

[98] *Id.*

[99] Department of State, *Migration Talks with the Government of Cuba,* Nov. 15, 2022; https://www.state.gov/migration-talks-with-the-government-of-cuba-2/.

[100] USCIS, *USCIS Resumes Cuban Family Reunification Parole Program Operations,* https://www.uscis.gov/newsroom/alerts/uscis-resumes-cuban-family-reunification-parole-program-operations, Sept. 9, 2022 (last visited Dec. 10, 2022).

[101] Public Law 89-732, Cuban Adjustment Act of 1966 (CAA), Nov. 2, 1966, https://www.gpo.gov/fdsys/pkg/STATUTE-80/pdf/STATUTE-80-Pg1161.pdf, (last viewed Dec. 16, 2022).

Cuba AR_000148

PRE-DECISIONAL/DELIBERATIVE

governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process would add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It would also strengthen the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, as part of a regional response—many of which are already taking important steps. Any effort to meaningfully address the crisis in Cuba would require continued efforts by these and other regional partners.

Importantly, the United States would not implement the new parole process without the ability to remove or return to Mexico Cuban nationals who attempt to enter the United States irregularly across the SWB. The United States' ability to execute this process thus would be contingent on the GOM's willingness to accept the return of Cuban nationals who bypass this new process and attempt to enter the United States irregularly between POEs.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—would require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this proposed process would be responsive to the GOM's request that the United States increase lawful pathways for migrants and would also be aligned with broader Administration domestic and foreign policy priorities in the region. It would couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process would be to reduce the irregular migration of Cuban nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more immigration and refugee pathways in the region, including to the United States.

2. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this proposed process would address the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba. The GOC continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who

23

PRE-DECISIONAL/DELIBERATIVE

oppose their positions.[102]   This process provides a safe mechanism for Cuban nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## V. Consideration of process elements

1. Length of parole and employment authorization

The proposed length of parole is up to two years.  This is consistent with other parole processes, such as the process for Venezuelan nationals and Uniting for Ukraine (U4U) for Ukrainian nationals and their qualifying immediate family members, Operation Allies Welcome for Afghan nationals, and the CFRP established in 2007.  A two-year period of parole would enable a realization of the significant public benefits and meets the urgent humanitarian reasons that Cuban nationals are seeking entry into the United States, for the following reasons:

*First*, the period of parole would need to be sufficiently long to make it an attractive alternative to the status quo, where migrants put their lives in smugglers' hands to enter the country irregularly.  DHS believes that a period of two years would achieve that goal.  It would allow beneficiaries to gain work authorization, contribute to the U.S. economy, and achieve stability and predictability in their lives, even if temporarily.

*Second*, a two-year period of parole would provide eligible beneficiaries sufficient time to pursue a durable immigration status or benefit if eligible under the law.  Beneficiaries may qualify for asylum; others may qualify for adjustment of status pursuant to the Cuban Adjustment Act or based on the immediate availability of a family- or employment-based immigrant visa.

*Third*, a two-year period would provide a window for the U.S. Government to work with the GOC to increasingly accept the return of Cuban nationals who are subject to a final order of removal.  Finally, this two-year period would provide meaningful time to fully develop the multi-prong, regional strategy to address migration in our region, including improving refugee processing and other immigration pathways, both to the United States and to other partner nations.

2. Supporter Vetting

After DHS learned of certain instances in which U4U supporters, including family members, ceased providing housing and other support for parolees prior to the end of their parole period, DHS made form changes and associated vetting enhancements to improve confirmation of supporter suitability, clarify guidance on minimum supporter requirements, and communicate to beneficiaries about what rights, protections and benefits may be available if they are a victim of exploitation.  This was intended to further reduce the risk that supporters do not follow through

---

[102] *Id*.; Congressional Research Service, Cuba: U.S. Policy in the 117th Congress, Sept. 22, 2022, https://crsreports.congress.gov/product/pdf/R/R47246.

Cuba AR_000150

PRE-DECISIONAL/DELIBERATIVE

on their obligations; it was also intended to address risks of human trafficking, and other forms of abuse.

This is particularly important because human smuggling and trafficking, including forced labor, is a major concern in this region.[103] While such risks cannot be completely mitigated, this parole process is structured to address these risks to the greatest extent possible. The process—with the reviews and vetting in place—poses a significantly lower risk of exploitation than the dangerous journey to the SWB. As described above, all migrants, but particularly women and children, are susceptible to the risk of kidnapping, exploitation, sexual abuse, and human trafficking along smuggling routes.[104] A significant portion of such migrants pay smugglers exorbitant fees, thus enriching and supporting the smuggling organizations. Almost all, if not all, migrants are required to pay compulsory fees and taxes by criminal organizations at different points along their journey north.[105] We thus assess that the parole of individuals pursuant to this process, even if we cannot completely mitigate the risk of exploitation, would meaningfully serve the significant public benefit of decreasing reliance on smuggling networks and protecting individuals from trafficking and exploitation.

3. Eligibility Criteria

*Exception for One-Time Voluntary Departure or Withdrawal of an Application for Admission*

Individuals encountered entering the United States irregularly between POEs may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility to seek parole via the Cuba parole process. This exception provides an incentive for migrants, who would otherwise be ineligible for this process, to accept the option to voluntarily leave the United States, and thus, reduce strain on limited DHS personnel and resources associated with obtaining and later executing an order of removal.

*Consideration of Beneficiaries with Particular Vulnerabilities or other Compelling Circumstances*

DHS has separately considered whether it should further focus eligibility only on beneficiaries who may have particular vulnerabilities or other compelling circumstances. We have ultimately concluded that such a requirement is not preferable for a combination of operational and policy reasons.

*First*, it would be very difficult to implement an objective and fair screening mechanism. For instance, any such vulnerability screening would require a process for triaging potential

---

[103] Department of State, *Trafficking in Persons Report* (July 2022), https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf, (last visited Dec. 17, 2022).

[104] *Id.* at 386.

[105] Homeland Security Operational Analysis Center operated by the RAND Corporation, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States?*, 2019. https://www.rand.org/pubs/research_reports/RR2852.html, (last viewed Dec. 17, 2022).

25

PRE-DECISIONAL/DELIBERATIVE

beneficiaries and identifying those who are more vulnerable. To be effective, it would require third parties—likely international NGOs—to play a role in the screening. However, DHS lacks authority to fund such screening outside the United States. Such a screening requirement also would substantially delay the implementation of this new process, in that it would require the creation of infrastructure and deployment of personnel that currently are not in place.

*Second*, imposition of a vulnerability screening requirement would fail to meet the foreign policy goals of providing an alternative option for a broader swath of Cuban nationals who would otherwise make the dangerous journey to the U.S.-Mexico border. Because only a subset would likely meet vulnerability criteria (particularly if there is a high standard for establishing vulnerability), the parole process might not be deemed a viable alternative to irregularly crossing and entry; it would, as a result, fail to serve the disincentive to irregular migration that this process seeks to achieve.

For these programmatic reasons, DHS determined that keeping eligibility at the nationality level—like U4U and the Venezuela process—is the best option to achieving the multiple goals of reducing flows to the border, responding to the foreign policy requests of partner nations, and providing protections to deserving Cuban nationals. DHS similarly rejected this consideration in weighing the scope of the process for Venezuelans.

## VI. Consideration of alternative approaches

DHS has considered several alternative approaches to the proposed parole process coupled with an enforcement mechanism to manage the current surge in migration from Cuban nationals. These alternative approaches are weighed based on the following key goals, as identified above: (i) enhance the security of our SWB by reducing irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

1. Status quo

DHS considered the impact of keeping the status quo, which has resulted in record encounters at the SWB, driven in increasing part by a surge in migration by Cuban nationals. DHS has seen similarly high rates of Cubans encountered at sea in the Caribbean. Importantly, DHS anticipates that encounters of Cuban nationals at the border are likely to continue to increase in the coming weeks and months. This sharp increase shows no signs of abating absent material changes such as those proposed here.

As described above, the current surge in irregular migration from Cuba has forced DHS to reallocate resources and personnel to the SWB and in the Caribbean. Although DHS will continue to use all available resources to enforce the immigration laws of the United States and secure our borders, maintaining this level of emergency supplemental appropriations and TDY

26

PRE-DECISIONAL/DELIBERATIVE

staffing to support SWB and maritime operations is simply not sustainable in the long term. For these reasons, DHS has concluded that maintaining the status quo is not an option.

2. Increased enforcement by third countries

DHS considered whether there is more that could be done to diplomatically influence other foreign partners in the region to do more to address these irregular migratory flows. We continue to engage in such efforts with multiple countries. That said, partner countries have already extended themselves in historic ways with limited results. The bottom line is that our foreign partners do not have the capability to sufficiently impact these flows in the immediate term; currently, only Mexico operates removal flights in the region to Cuba, but their operations are limited.

Simply pressing foreign partners to do more—without also taking steps to provide a lawful process for entry to the United States that can meaningfully shift incentives against irregular migration—will not achieve the desired goals of this process in the time that is needed.

3. Increasing removals to Cuba

DHS data show that increases in returns of individuals from a given country can reduce encounters at the border over time.[106] For example, increases in returns to Guatemala, Honduras, and El Salvador from the United States and Mexico during specific periods of time over the past year have led to a sustained decrease in encounters of migrants from those countries at the border.

DHS is in bilateral discussions with the GOC to restart removal flights in the near future and will continue to engage with the GOC to increase its ability to repatriate its citizens who do not have a legal basis to remain in the United States. However, and despite these ongoing concerted efforts, it is unlikely that a potential restart in removal flights would keep pace with the volume of Cuban nationals that DHS is encountering.

Because of these factors, returns to Cuba—while an effective consequence regime for those who enter the United States irregularly and do not have a valid asylum claim—is not a viable option, at scale, and not a viable option to meet immediate needs.

4. Utilizing contiguous territory return authority

DHS considered whether returning Cuban nationals to Mexico under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C), either through the Migrant Protection Protocols (MPP) or via another programmatic use of the authority, would have a similar effect to the proposed process. As this policy was being finalized, a district court stayed your October 29, 2021 memorandum

---

[106] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, U.S. Customs and Border Protection Commissioner, and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

27

PRE-DECISIONAL/DELIBERATIVE

terminating MPP. See Dkt. 178, *Texas v. Biden*, No. 21-cv-67 (N.D. Tex. Dec. 15, 2022). For two reasons, we have decided that proceeding with the proposed process is preferable to attempting to manage the current surge in migration by relying on the programmatic use of the contiguous territory return authority at this time and for this population.

First, the resources and infrastructure necessary to use contiguous return authority at the scale that would be required given current—and anticipated—flows are not currently available. To employ the contiguous return authority at a scale sufficient to meaningfully address the anticipated migrant flows, the United States would need to rebuild, redevelop, and significantly expand infrastructure for noncitizens to be processed in and out of the United States and attend immigration court hearings throughout the duration of their removal proceedings. This would require, among other things, the construction of substantial additional court capacity along the border. It would also require the reassignment of immigration judges and ICE attorneys to conduct the hearings and CBP personnel to receive and process those who are coming into and out of the country to attend hearings.

Second, programmatic implementation of the contiguous territory return authority requires Mexico's concurrence and support. When DHS was previously under an injunction requiring it to re-implement MPP, the GOM would only accept the return of MPP enrollees consistent with available shelter capacity in specific regions, and indeed had to pause the process at times due to shelter constraints. Notably, Mexico's shelter network is already strained from the high volume of northbound irregular migration we are seeing today. The Government of Mexico announced the end of the court-ordered reimplementation of MPP on October 25, 2022.[107] Any potential re-starting of returns under MPP or another programmatic use of the contiguous-territory return authority would require the Government of Mexico to make a new independent decision to accept noncitizens that would be returned under this authority.

DHS is, however, continuing to evaluate the recent district court decision and considering the effect of the court's stay and other relevant developments on the use of contiguous territory return authority going forward.

5. Increasing the use of detention for Cuban nationals

DHS considered whether it could detain all or most Cuban nationals instead of conditionally releasing them, and thus deter flows and avoid some of the impact in border communities as a result. There are, however, legal and operational limits in the ability to do so.

*First*, there are legal limits on the duration of detention for those ordered removed and who—like the Cuban nationals—do not have a significant likelihood of removal in the foreseeable future. Specifically, the U.S. Supreme Court's ruling in *Zadvydas v. Davis* restricts DHS from detaining

---

[107] Government of Mexico, *Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU*, Oct. 25, 2022, https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-ee-uu, (last visited Dec. 19, 2022).

Cuba AR_000154

PRE-DECISIONAL/DELIBERATIVE

individuals with final orders of removal for more than 180 days unless there is a significant likelihood of removal in the reasonably foreseeable future.[108]

*Second*, it is not a viable option operationally. Even if ICE diverted all of its detention space to focus on Cuban nationals, it would reach its detention capacity in three weeks. Doing so would, however, mean that ICE would no longer have space to detain those put in expedited removal who *could* be removed to their home countries. It would mean releasing others, some of whom may be deemed national security and public safety threats, in contradiction of both statutory mandates and the common-sense policy decision to focus detention space on those who pose a threat to public safety. For these reasons, DHS assesses that addressing the problem by detaining large numbers of Cuban nationals is not a viable option at this time.

6. <u>Increasing other lawful pathways to the United States and other countries</u>

DHS could focus *only* on the lawful pathways, including protection processes, that are already in place and have been already announced. As part of these efforts to meet the deliverables outlined in the L.A. Declaration, the U.S. Government committed during the Summit of the Americas in June 2022 to resettle 20,000 refugees from the Western Hemisphere in FY 2023. For Cubans in particular, the U.S. Government also committed to increasing immigrant visa adjudication and restarting the CFRP program.[109] DHS and interagency partners will continue these efforts and more. However, those alternative processes are narrow and require, in many cases, multiple steps and in-person engagement or referrals that are difficult for many individuals to access and are limited by operational constraints.

A key feature of this proposed process that differentiates it from other processes and programs—and that we deem critical to meet the current moment—is that it is intended to be fully electronic and accessible from anywhere. We thus assess that existing programs are unlikely to provide a sufficiently available and attractive incentive to impact the flows from Cuba today—and that regional efforts to improve safe, orderly pathways, while critically important, will not be sufficiently timely to address the immediate needs. We assess a need to implement the process being considered in order to provide the incentive to wait, rather than make the dangerous journey to the border that we are trying to deter.

**VII. Administrative Procedure Act**

This proposal would be exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

---

[108] *Zadvydas v. Davis*, 533 U.S. 678 (2001).

[109] The White House, *Fact Sheet: The Los Angeles Declaration* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.

29

Cuba AR_000155

PRE-DECISIONAL/DELIBERATIVE

*First*, the Department would merely be adopting a general statement of policy,[110] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[111]  As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second*, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[112]  Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[113]  In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[114]  This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Cuban nationals to enter the United States. The United States would not implement the new parole process without the ability to return Cuban nationals who attempt to enter irregularly across the SWB to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and attempt to enter the United States irregularly between POEs.  Thus, initiating and managing this process would require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now.  It also would complicate broader discussions and negotiations about migration management.  For now, the GOM has indicated it is prepared to make an independent decision to accept a substantial number of Cuban returns or removals.  The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date.  Additionally, making it publicly known that we plan to return or remove nationals of Cuban to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

---

[110] 5 U.S.C. § 553(b)(A).

[111] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

[112] 5 U.S.C. § 553(a)(1).

[113] *Mast Indus. v. Regan*, 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[114] *See, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

30

PRE-DECISIONAL/DELIBERATIVE

Moreover, this process is not only responsive to the interests of the GOM and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration).  It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent.  For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[115]  DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[116]

*Third*, DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be contrary to the public interest and impracticable.  The number of Cubans encountered at the SWB are already high, and the Office of Immigration Statistics estimates border encounters will continue to rise, and potentially rise dramatically, should the Title 42 public health order be lifted.  While DHS has already taken multiple additional measures to address and prepare, a delay would exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[117]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the proposed process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Cuban nationals seeking to enter the United States before the process would take effect.  There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[118]  It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the

---

[115] *See* 82 Fed. Reg. 4902 (Jan. 17, 2017).

[116] *See* 87 Fed. Reg. 63,507 (Oct. 19, 2022).

[117] *See Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[118] *See* 5 U.S.C. § 553(b)(B).

31

PRE-DECISIONAL/DELIBERATIVE

notice-and-comment process.[119] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[120] A number of cases follow this logic in the context of economic regulation.

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well-established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy. For example, as detailed above, implementation of parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a lengthy notice and comment period, it likely would have had the opposite effect, resulting in many hundreds and thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have at times been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. And it is well-established that such persons may change their behavior in response to perceived imminent changes in U.S. immigration policy.[121] Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Cuban nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an

---

[119] *See, e.g.*, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94-95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'— or avoid them—before the freeze deadline." (cleaned up)).

[120] *See, e.g.*, *Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[121] Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, July 26, 2022, https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media, (last viewed Dec. 6, 2022).

32

PRE-DECISIONAL/DELIBERATIVE

opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[122] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[123] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[124] DHS concluded that "a surge could result in significant loss of human life."[125]

---

[122] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[123] *Id.*

[124] *Id.*

[125] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

33

**Recommendation**

Given the immediate challenge we face along the SWB as described in this memo, and the time it will take for the long-term administration strategy to produce durable and lasting results to irregular migration, we recommend the immediate and temporary approach described in this memo to address the current challenge as we await results from the long term, durable approach. Therefore, we recommend that you approve this memo in full, including the proposed parole process for Cuban nationals and the accompanying rationale.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

Approve/d                                                          rove/date_____

DEC 2 2 2022

Modify/date _____       Needs discussion/date_____

34

**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

December 22, 2022

MEMORANDUM TO FILE

ADAM M
HUNTER

Digitally signed by ADAM M
HUNTER
Date: 2022.12.22 17:24:47
-05'00'

FROM:                          Adam Hunter
                               Deputy Assistant Secretary for Immigration Policy
                               Office of Strategy, Policy, and Plans

SUBJECT:                       Data on Maritime Migration

Purpose

This memorandum commits to writing data and information considered by the Department of
Homeland Security's (DHS) Office of Strategy, Policy and Plans (PLCY) in connection with the
development of certain parole processes. The information was provided to Adam Hunter, Deputy
Assistant Secretary for Immigration Policy, by RDML Jo-Ann Burdian, Assistant Commandant
for Response Policy (CG-5R), by email dated December 13, 2022.

Description of Data or Information

Cubans are the top nationality encountered in the Eastern Caribbean Sea over the past year,
where their numbers have surged from 225 maritime encounters in January 2022 to 1,552 in
November 2022.  Second to Cuban irregular maritime migration, Haitian migrant encounters
totaled 325 in January 2022 then surged to 505 encounters in November 2022, in large part due
to three Haitian sail freighter departures in which one landed in southern Florida.  While these
numbers are smaller than SWB trends, they are extraordinarily high for the maritime domain
where the risk and danger of irregular migration is outsized, even when compared with land
routes.   In response to the persistent elevated levels of irregular maritime migration across all
southeast vectors, the Director of Homeland Security Task Force – Southeast (HSTF-SE)
elevated the operational phase of DHS' mass migration plan (Operation Vigilant Sentry) from
Phase 1A (Preparation) to Phase 1B (Prevention).  Operation Vigilant Sentry is HSTF-SE's
comprehensive, integrated, National operational plan for a rapid, effective, and unified response
of Federal, state, and local capabilities in response to indicators and/or warnings of a mass
migration in the Caribbean. The shift to Phase 1B triggered the surge of additional DHS
resources to support HSTF-SE's  Unified Command staff and operational battle rhythm.  For
example, between July 2021 and December 2022, Coast Guard operational planners surged three
times the number of large cutters to the South Florida Straits and the Windward Passage, four
times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support
maritime domain awareness and interdiction operations in the southeastern maritime approaches
to the United States.  Increasing the USCG's operational presence in the region has traditionally

deterred irregular migrant populations from taking the sea.  However, Coast Guard and interagency consent-based interviews suggest that human smuggling networks and the will of would-be irregular migrants consider the risk to taking to the sea worth the attempt(s).

Despite the increased numbers taking to the sea, human smugglers and irregular migrant populations continue to use unseaworthy, overly crowded vessels, piloted by inexperienced mariners, without any safety equipment – including but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons.  In FY22, the USCG recorded 107 non-citizen deaths, including presumed dead, as a result of irregular maritime migration.  In January 2022, the Coast Guard located a capsized vessel with a survivor clinging to the hull.  USCG crews interviewed the survivor who indicated there were 34 others on the vessel, who were not in the vicinity of the capsized vessel and survivor.  The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, the others were presumed lost at sea.  The perils of taking to the sea, for legitimate purposes, are no different for an experienced mariner; however, an inexperienced mariner, without any safety equipment, taking to the sea for illegal purposes, in an overcrowded vessel is risking the lives of all persons onboard.

Historically, USCG encounters at-sea are more often than not compliant, however, USCG crews are also observing an increasing number of encounters where migrant vessels are non-compliant.  In FY 2022, the Coast Guard encountered 26 non-compliant migrant vessels, compared with only one for the previous two years. Non-compliance means upon encountering a migrant vessel, migrants may be observed wielding knives, "clubs,"  or other make-shift weapons meant to dissuade boarding the migrant vessel or coming alongside to render assistance; other USCG observations include instances where migrants have thrown canisters of bodily fluids at USCG crews, and positioning the migrant vessel so as to obstruct the safe navigation of the USCG cutter. USCG crews will de-escalate incidents of non-compliance through persistent on-scene communications until such time the migrants accept USCG assistance to transfer the migrants from their unsafe vessel to a USCG cutter.  Other encounters by USCG crews include migrants ingesting hazardous chemicals (e.g., fuel, bleach) or objects, and even cutting themselves in hopes of being medically evacuated to the United States.  For example, in FY22, there were 11 incidents of self-harm noted by migrants under the care of, or upon encountering, the USCG, or other U.S. government agency, an approximate 200% increase since FY17 in which there four incidents, preceded by 24 incidents in FY16.

USCG and U.S. interagency encounters reflect the risk calculation irregular migrants accept by taking to the sea, putting themselves, smaller accompanied and/or unaccompanied children at risk to reach the United States.  To that end, the USCG views its migrant interdiction mission as a no-fail mission in an effort to save the lives of those unnecessarily taking to the sea.  In support of HSTF-SE, the USCG has diverted assets from other key mission areas, including counter-drug smuggling operations, protection of living marine resources, and support for shipping navigation.  Allocating additional resources to migrant interdictions has also decreased USCG's participation in the international engagement mission.



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

October 29, 2021

MEMORANDUM TO:   Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

Troy A. Miller
Acting Commissioner
U.S. Customs and Border Protection

Ur M. Jaddou
Director
U.S. Citizenship and Immigration Services

Robert Silvers
Under Secretary
Office of Strategy, Policy

FROM:   Alejandro N. Mayorkas
Secretary

SUBJECT:   **Termination of the Migrant Protection Protocols**

---

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*. In this Executive Order, President Biden directed the Secretary of Homeland Security "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." After completing a comprehensive review as directed by EO 14010, I concluded that the Migrant Protection Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect (the "June 1 memo").

1

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations.  *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021).  As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration.  *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original).  The Department is fully complying with the District Court's order.  At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways.  In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border.  I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated.  In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.  Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving

2

either of these goals.  Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities.  It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.  Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border.  Of course, correlation does not equal causation and, even here, the evidence is not conclusive.  I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims.  I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border.  This is a shared responsibility of all countries across the region.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.  This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements.  Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.  Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

3

and lasting changes to the asylum system. MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts. MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix. Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form. For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP. Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP. The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP. But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

4

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



April 26, 2022

MEMORANDUM FOR:   Interested Parties

FROM:   Alejandro N. Mayork
Secretary of Homeland Security

SUBJECT:   **DHS Plan for Southwest Border Security and Preparedness**

## EXECUTIVE SUMMARY

Under the Biden-Harris Administration, the Department of Homeland Security (DHS) has been executing a comprehensive and deliberate strategy to secure our borders and build a safe, orderly, and humane immigration system. After inheriting a broken and dismantled immigration system, since January 2021 DHS has effectively managed an unprecedented number of noncitizens seeking to enter the United States and interdicted more drugs and disrupted more smuggling operations than ever before.

The legal authority for enforcing our border security and immigration laws comes from Title 8 of the U.S Code. Among other things, Title 8 provides that individuals who cross the border without legal authorization are processed for removal and, if unable to establish a legal basis to remain in the United States, promptly removed from the country.

In March 2020, the Centers for Disease Control and Prevention (CDC) invoked a section of Title 42 of the U.S. Code, a law addressing public health, not immigration, to require the immediate expulsion of noncitizen single adults and families in order to protect Americans from the spread of COVID-19. As a result, a significant percentage of all noncitizens encountered at the Southwest Border are currently expelled pursuant to the Title 42 public health Order. Beginning in September 2021, DHS began planning in anticipation of the eventual lifting of Title 42. On April 1, 2022, CDC announced that it was lifting the Order effective May 23. All noncitizens will then be processed pursuant to Title 8 once again.

When the Title 42 public health Order is lifted, we anticipate migration levels will increase, as smugglers will seek to take advantage of and profit from vulnerable migrants. The increase in migration being experienced by the United States is consistent with larger global trends: there are currently more people in the world displaced from their homes than at any time since World War II, including in the Western Hemisphere.

This memorandum provides more details on how DHS is leading the execution of a whole-of-government plan to prepare for and manage increased encounters of noncitizens at our Southwest Border.  Many elements of this plan are already being implemented as we manage a historic number of encounters, including a record number of noncitizens trying to enter the United States multiple times.  Others are elements that we are prepared to implement once the Title 42 termination goes into effect.  The six pillars of our plan are as follows:

*Border Security Pillar 1*: **We are surging resources, including personnel, transportation, medical support, and facilities to support border operations.**

U.S. Customs and Border Protection (CBP) currently has 23,000 Agents and Officers working along the Southwest Border, which includes a recent increase of 600 personnel and support of law enforcement officers and agents from other government agencies.  Additionally, approximately 500 Agents have been returned to the vital border security mission as a result of increased civilian processing personnel to perform those functions, as well as processing efficiency.  By May 23, we will be prepared to hold approximately 18,000 noncitizens in CBP custody at any given time, up from 13,000 at the beginning of 2021, and we have doubled our ability to transport noncitizens on a daily basis, with flexibility to increase further.   In order to safeguard public health and the safety of our workforce, noncitizens, and border communities, our efforts also include medical support and COVID-19 mitigation protocols, including testing and administering age-appropriate COVID-19 vaccines in 24 CBP sites by May 23, building on our existing vaccination program for those in Immigration and Customs Enforcement (ICE) custody.

*Border Security Pillar 2*: **We are increasing CBP processing efficiency and moving with deliberate speed to mitigate potential overcrowding at Border Patrol stations and to alleviate the burden on the surrounding border communities.**

This includes launching three new initiatives, which will support these decompression efforts, while ensuring the continued integrity of our security screening processes: Enhanced Central Processing Centers; en route processing; and streamlined processing.  CBP is also working to increase processing efficiency at Ports of Entry (POEs) to further facilitate safe and orderly inspection of noncitizens.

*Border Security Pillar 3*: **We are administering consequences for unlawful entry, including removal, detention, and prosecution.**

Core to this plan is our commitment to continue to strictly enforce our immigration laws.  This includes increased use of Expedited Removal, detaining single adults when appropriate, referring for prosecution those whose conduct warrants it, and accelerating asylum adjudications that enable us to more quickly process and remove from the United States those who do not qualify for relief under our laws.

*Border Security Pillar 4*: **We are bolstering the capacity of non-governmental organizations (NGOs) to receive noncitizens after they have been processed by CBP and are awaiting the results of their immigration removal proceedings.  And, we are ensuring appropriate**

Cuba AR_000168

**coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities.**

Our goal is to help communities alleviate the pressures they experience by expanding NGO capacity, through communication and coordination with all relevant partners, and other assistance such as the Emergency Food and Shelter Program (EFSP), a Federal Emergency Management Agency (FEMA) grant program that supplements and expands ongoing work of local NGOs to meet the needs of local agencies.

***Border Security Pillar 5*: We are targeting and disrupting the transnational criminal organizations (TCOs) and smugglers who take advantage of and profit from vulnerable migrants, and who seek to traffic drugs into our country.**

In April 2022, DHS and other federal agencies intensified our disruption efforts, marshalling the largest surge of resources and disruptive activities against human smuggling networks in recent memory.  The immediate result has been over 2,500 arrests, investigations, and disruptions of smuggling infrastructure, such as buses and safe houses.  The federal government has also established a new intelligence unit to coordinate and strengthen the capability for early warning of migrant movements.

***Border Security Pillar 6*: We are deterring irregular migration south of our border, in partnership with the Department of State (DOS), other federal agencies, and nations throughout the Western Hemisphere, to ensure that we are sharing the responsibility throughout the region.**

In the past two months, we have signed new migration agreements with Costa Rica and Panama and continue close cooperation with Mexico.  We are also sending a clear message in the region to counteract misinformation from smugglers, including that the termination of the Title 42 public health Order does not mean that the U.S. border is open. As we execute this work, our objective continues to be the safe, orderly, and humane processing of noncitizens, consistent with our laws, while protecting national security and public safety. Across all of our work in this space, we are ensuring we can uphold our laws and our values in treating noncitizens in a humane way, as we did last year when we rapidly addressed the acute needs of unaccompanied children at the Southwest Border.

**Conclusion**

Our outdated immigration system was not built to manage the current levels and types of migratory flows that we are experiencing and is already under strain.  This is true at the federal level, as well as for state, local, and NGO partners.  However, we have been able to manage increased encounters because of prudent planning and execution, and the talent and unwavering dedication of the DHS workforce and our state, local, and community partners.

Despite these efforts, a significant increase in migrant encounters will substantially strain our system even further.  We will address this challenge successfully, but it will take time, and we need the partnership of Congress, state and local officials, NGOs, and communities to do so.  We are operating within a fundamentally broken immigration system that only Congress can fix.

Cuba AR_000169

# BACKGROUND

**After inheriting a broken and dismantled immigration system, the Biden-Harris Administration is securing the border and building a fair, orderly, and humane immigration system, with demonstrable results since January 2021.**

The Biden-Harris Administration inherited a broken and dismantled immigration system.  On January 20, 2021, the President sent the *U.S. Citizenship Act of 2021* to Congress with a call for urgent action.  At DHS, we are working every day, despite that broken system, to secure our borders and build a more just immigration system.

## Securing the Border

DHS works tirelessly to secure the Southwest Border through a combination of highly trained personnel, sophisticated ground and aerial monitoring systems, and robust intelligence and information sharing networks.  Through this layered border security network, we have a better understanding of who is attempting to enter the country than ever before and can focus our enforcement efforts more effectively to address potential threats.

The greatest asset in our border security network is the DHS workforce.  There are currently over 23,000 CBP Agents and Officers working along the Southwest Border.  Over the past year, DHS has supplemented permanent staff by overseeing the deployment of more than 10,000 additional federal personnel to the Southwest Border in multiple rotations.  This includes CBP Agents and Officers; other agency law enforcement personnel; personnel from the Department of Defense (DOD), which has supporting CBP operations since 2006, and the DHS Volunteer Force.  Personnel have been added to increase patrols along the Southwest Border to prevent the entry of people and goods between POEs, enhance processing efficiency, and increase humanitarian capacity.  DHS also has worked to train thousands of additional agents and officers and execute contracts for processing assistance to further augment border security efforts.

DHS has been investing in technology and installing new systems to enhance border security and the effectiveness of our operations, including advanced automated surveillance towers, ground movement detection systems, and new aerial platforms.  These efforts have delivered concrete results, as further described below.

With support from Congress, DHS has been applying appropriated financial resources to support our efforts.  In the Fiscal Year (FY) 2022 budget, DHS secured additional resources: $100 million to strengthen Border Patrol Agent hiring programs and contract for processors to work in Border Patrol stations; more than $250 million in funding for border security technology; over $85 million for non-intrusive inspection technology to scan vehicles and goods entering the country; and more than $70 million for additional aircraft and sensors.  In addition, Congress allocated $1.4 billion to support contingency operations on the Southwest Border.

## Building a More Just Immigration System

Along with our efforts to secure the border, over the past 15 months, we implemented critical reforms that ended cruel and unjust policies of the prior Administration.  We have issued new guidelines regarding immigration enforcement priorities that focus the Department's resources

Cuba AR_000170

on the apprehension and removal of noncitizens who pose a threat to our national security, border security, or public safety. These guidelines mark a new approach to enforcement as they focus resources on those who pose the greatest threat. The most recent guidelines also enable the Department's experienced personnel to use their discretion and focus DHS enforcement resources in a more targeted way, while protecting civil rights and civil liberties.

The results speak for themselves. ICE Enforcement and Removal Operations (ERO) arrested an average of 1,034 aggravated felons per month from February through September 2021, a 53 percent increase over the monthly average during 2016 and a 51 percent increase over the period 2017-2020. During the same period in 2021, ICE removed an average of 937 aggravated felons per month, the highest level ever recorded and the greatest public safety impact since ICE began collecting detailed criminality data. From February-September 2021, 46 percent of ICE removals were of serious criminals overall (persons convicted of felonies or aggravated felonies), compared to 17 percent during 2016 and 18 percent during 2017-2020.

The Department is committed to protecting vulnerable populations and has taken several significant steps to advance our efforts on this front. A few examples:

- We have implemented actions to promote a fair labor market by focusing our enforcement on unscrupulous employers, thereby supporting more effective enforcement of wage protections, workplace safety, labor rights, and other employment laws and standards.
- We have issued a new, comprehensive policy that provides an expanded and non-exhaustive list of Protected Areas – such as courthouses, places of worship, and disaster or emergency relief sites – to ensure that enforcement actions, to the fullest extent possible, are not taken at or near a location that would restrain people's access to essential services or engagement in essential activities.
- We have made significant strides in improving the conditions of care in detention facilities including implementing trauma-informed care in CBP facilities, hiring additional child welfare and medical providers to work in CBP facilities, implementing new policies establishing standards of care for vulnerable individuals, and closing facilities that repeatedly have failed to maintain safe conditions.
- In partnership with DOS, we reimplemented and expanded the Central American Minors program to increase the pool of qualified candidates who can access this safe, orderly pathway. For example, the expansion now allows legal guardians in the United States with a pending asylum application or U visa petition to sponsor their children for resettlement consideration.
- In partnership with the Department of Health and Human Services (HHS), we ensured the safe and humane treatment of unaccompanied children in our custody by quickly reducing the average time to transfer a child into HHS care and the number of unaccompanied children in Border Patrol facilities.
- And critically, we have reunited more than 200 families who were cruelly and unjustly separated at the U.S.-Mexico border by the prior Administration and are working to reunite many more.

Cuba AR_000171

# STATE OF MIGRATION

**The United States is experiencing an increase in migration, consistent with larger global trends.  There are currently more people in the world displaced from their homes than at any time since World War II, including in the Western Hemisphere.**

Over the past few years, irregular migration along the Southwest Border has increased to unprecedented levels and presents new challenges that affect our processing and complicate removals.  In the past three weeks, CBP has encountered an average of over 7,800 migrants per day across the Southwest Border.  This is compared to a historical average of 1,600 per day in the pre-pandemic years (2014-2019).  In addition to this exponential increase, DHS has seen a pronounced shift in the demographics and nationalities of noncitizens encountered at and between land ports of entry – with more single adults claiming fear, varying levels of family units, and a steady flow of unaccompanied children, who have unique vulnerabilities and needs.  Migrants from Cuba, Venezuela, and Nicaragua have steadily increased, accounting for 37 percent of FY 2022 non-Mexican encounters to-date, up from 8 percent between 2014-2019.  And due to the sharp increase in encounters of Ukrainians at the Southwest Border in the wake of the Russian invasion of Ukraine, we have established a new program for processing Ukrainians in Europe that will substantially reduce incentives to seek admission via Mexico.

The United States is not alone in experiencing an increase in migration.  There are currently more people displaced from their homes across the world than at any time since World War II.  In our hemisphere, violence, food insecurity, severe poverty, corruption, climate change, the COVID-19 pandemic, and dire economic conditions all contribute to the increase.  More than 6 million Venezuelan refugees and migrants have fled their homes, making this the second-largest external displacement crisis in the world.  Seventeen countries in Latin America and the Caribbean generously host approximately 80 percent of this Venezuelan diaspora, including an estimated 1.8 million in Colombia, 1.3 million in Peru, and large numbers in Ecuador, Chile, Brazil and elsewhere.  Costa Rica, a country of only 5 million people, is hosting approximately 150,000 Nicaraguan migrants.

Noncitizens making their way to the Southwest Border travel via air, land, and sea into Mexico and up to Mexico's northern states.  These movements into and through Mexico are often facilitated by numerous human smuggling organizations that exploit them for profit, and involve crossing inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow.  Upon reaching the border area, noncitizens seeking to enter the United States without going through the POEs pay cartels to guide them along the final miles of their journey.  This cartel-controlled movement of people across the border is a billion-dollar criminal enterprise.  The cartels willfully place noncitizens in danger during their journey.  Tragically, a significant number of individuals perish along the way.  The depth of suffering these migrants are willing to endure speaks to the desperation they feel about their prospects in their home countries.

**When the Title 42 public health Order is lifted, we anticipate migration levels will increase further, as smugglers will seek to take advantage of and profit from vulnerable migrants.  We will continue to remove individuals without legal claims under Title 8, consistent with our laws.**

Cuba AR_000172

Following the lifting of CDC's Title 42 public health Order, we expect increased border flows, in light of exploitation by smugglers, continued demand for access to the United States from people fleeing violence and economic turmoil in their home countries, and other factors discussed above.  In preparation for this, DHS operational agencies and partners have planned for multiple scenarios to ensure preparedness and the safe, orderly, and humane processing of individuals, consistent with our laws.

**Migration Authorities**

As noted above, we have been managing historic levels of migration: 1.72 million encounters by CBP in FY 2021.  DHS completed 1.2 million repatriations in FY 2021, via a combination of immigration enforcement removals pursuant to Title 8 and public health expulsions pursuant to Title 42.  This was the highest number of repatriations since 2006.

Since March 2020, CDC's Title 42 public health Order has required the immediate expulsion of noncitizen single adults and families at the Southwest Border to mitigate risk to the American public due to COVID-19.  As a result, a significant percentage of all noncitizens encountered at the Southwest Border are currently expelled pursuant to Title 42.  The large number of expulsions during the pandemic has contributed to a higher-than-usual number of noncitizens making repeated border crossing attempts: more than one in three encounters at the Southwest Border are repeat entrants, including almost half of single adult encounters.  Thus, while total enforcement encounters increased 82 percent between 2019 (the last pre-pandemic year) and 2021, the number of unique individuals encountered at the border increased by 30 percent.

In light of CDC's decision to terminate Title 42, beginning on May 23, 2022, families and single adults who cross the border without legal authorization will be placed into Title 8 removal proceedings.  Under Title 8 authorities, noncitizens without a viable asylum claim or unable to establish a legal basis to remain in the United States are removed to their home countries.  Economic need and flight from generalized violence are not a basis for asylum in the United States.  Only those with a well-founded fear of persecution based on protected grounds are eligible for asylum.  Expedited Removal is a tool to quickly remove individuals who do not express a fear of return to their home country, following an assessment of asylum claims.  In addition, Mexican migrants can be quickly removed under Voluntary Removal, a process that in practice takes about the same amount of time as an expulsion pursuant to Title 42.  There are consequences to entering without authorization.  Recent arrivals ordered for removal or subject to Expedited Removal are generally subject to a five-year bar on admission to the United States, and reentry within this five-year period after removal is subject to felony prosecution.

Of note, our border security efforts also address irregular maritime migration, which is always dangerous and often deadly.  The termination of Title 42 will not impact the U.S. Coast Guard's (USCG) ability to rescue and intercept individuals attempting this dangerous journey.  Individuals interdicted at sea who are attempting to enter the United States irregularly are, and will continue to be, subject to repatriation to their home country.  DHS continues to maintain its readiness in the maritime domain and has longstanding plans and procedures that govern how to respond to any potential increase in maritime migration.

Cuba AR_000173

## Border Processing

CBP Agents and Officers work tirelessly to detect and interdict noncitizens who cross the border. Upon encountering individuals who have entered between POEs, Border Patrol Agents transport them to stations for processing. This includes verifying their identities through a review of their documents and biographic information, as well as the collection of biometric records. Each individual processed by CBP is screened against numerous records systems, including the FBI's Terrorist Screening Database, to determine whether or not they pose a national security or public safety threat. After initial identity verification and record checks, CBP Agents and Officers determine the appropriate processing pathway from the available options, which are determined based on an individual's nationality, age, family status, and results of security screening and vetting. This process, including final processing for each pathway, takes, on average, one to two hours per individual.

Adults and families commonly spend 48 to 72 hours in CBP custody awaiting processing and then transfer or release. During this time, individuals are provided food, water, medical care, clothing, and other necessities to ensure their safety. Upon completion of CBP processing, certain noncitizens may be quickly removed and others may be transferred to ICE for continued detention. Unaccompanied children must be transferred to HHS. Noncitizens not transferred to other government agencies are processed for release during the pendency of their removal proceedings. This often includes enrollment in an ICE Alternatives to Detention (ATD) program and coordination with NGOs to assist with planning for travel away from the border and the provision of other basic services. Noncitizens placed into proceedings will have an opportunity to present their case before an Asylum Officer or Immigration Judge who will review their claims and either order their removal or grant them asylum or other relief in accordance with law.

**Our broken immigration system was not built to manage the migration levels and types we are currently experiencing and is already under strain. However, we have been able to effectively manage these encounters because of prudent planning and execution, the talent and unwavering dedication of the DHS workforce, and our state, local, and community partners.**

Congress designed the U.S. border management system over 25 years ago. At the time, the migrant population largely consisted of single adult males who were seeking employment opportunities. As described above, the populations DHS now encounters at the border are substantially different, including many families and unaccompanied children who are seeking humanitarian relief. The current system is outdated, was further dismantled by the last Administration, and was not built to contend with these demands. Further, social media and other online platforms have increased smugglers' access to potential migrants, creating an environment ripe for manipulation of information with respect to migration policies at the border.

As noted above, we are already managing a high volume of migrant encounters (on average 7,800 over the past three weeks), which is significantly higher than our system was built to manage and process effectively. While CBP, ICE, and our community partners are all strained under current operations, we are processing individuals in a safe, humane, and orderly manner as

Cuba AR_000174

a result of improvements we have made over the past year and thanks to the collaboration of outside partners.  DHS efforts include capacity building, strengthened logistics and processing (including the deployment of soft-sided facilities and virtual processing), and decompression tactics to ensure U.S. Border Patrol sectors can most efficiently support one another.

# BORDER SECURITY PLAN

Building on lessons learned and in preparation for the termination of CDC's Title 42 public health Order, DHS commenced planning exercises in Fall 2021.  In February 2022, DHS formally launched the Southwest Border Coordination Center (SBCC), which is coordinating a whole-of-government response to the anticipated increase in border encounters.  I designated a Senior Coordinating Official (SCO) to oversee the SBCC, who reports directly to me.

The SBCC has centralized coordination among key government agencies within a single structure to ensure effective, holistic planning and execution.  It is staffed by dozens of experienced professionals from across DHS and contains subject matter expert representatives from throughout the federal government.  In addition to the full complement of DHS agencies and offices, several federal agencies are supporting the whole-of-government response, including:

- DOS is continuing intensive diplomacy throughout the region designed to limit irregular migration to the Southwest Border;
- DOD will provide, as needed, rapid contracting support for air and ground transportation, as well as land for the establishment of temporary facilities for migrant processing and lodging for housing federal employees near the Southwest Border;
- The Department of Justice (DOJ) is providing transportation support and law enforcement personnel from the Bureau of Prisons and U.S. Marshals Service, and prosecuting smugglers, repeat offenders, and others whose conduct warrants such a response;
- HHS continues to accept the transfer of unaccompanied children from CBP custody, as well as adjudicate requests for medical support via the ESF-8 council, which governs the allocation of Federal medical responses; and,
- The Office of the Director of National Intelligence (ODNI) is providing intelligence coordination and support to strengthen the capability for early warning of migrant surges at the Southwest Border.

**Building on work to date and informed by input from our partners, we developed and are currently executing the DHS Border Security plan, described below.  Our objective continues to be the safe, orderly, and humane processing of noncitizens consistent with our laws to ensure national security and public safety.**

The plan has six pillars: surge resources; increase efficiency to reduce strain on the border; employ an aggressive consequence regime; bolster the capacity of NGOs and partner with state and local partners; go after cartels and smugglers; and work with our regional partners.  This comprehensive plan leverages a whole-of-government approach to prepare for and manage the current and anticipated increases in encounters of noncitizens at our Southwest Border.

Cuba AR_000175

Across each of the lines of effort, DHS has undertaken a deliberate and methodical approach to readiness prior to and for May 23.  Following months of planning based on multiple potential scenarios, we are pre-positioning and expanding available resources.  We are also conducting extensive testing of processes that have not been used at scale since the implementation of Title 42 and new approaches like an en route processing capability, which will be explained below.  Finally, our preparations culminate with us scaling to meet migration levels as they increase over time by accessing additional resources through interagency agreements and contracts.

### *Border Security Pillar 1:* We are surging resources, including personnel, transportation, medical support, and facilities to support border operations.

#### Increased Personnel

Over the past several months, we have deployed additional personnel in support of several key functions.  First and foremost, we are working to maximize the number of CBP Agents and Officers in the field.  As of April 25, CBP has over 23,000 Agents and Officers working along the Southwest Border, over 600 of whom have deployed since February 1 in response to increasing operational demands.  The SBCC will continue to augment CBP's operations by bringing in law enforcement agents and officers from other parts of the country as needed.

Additionally, there are currently over 300 civilian Border Patrol Processing Coordinators who work in Border Patrol stations to complete processing duties; the volume of processing has required some Border Patrol Agents to be assigned to processing.  Over the next few months, we are on track to deploy over 500 additional full-time and contract processors, which relieves Border Patrol Agents to return to the field and continue their tireless work to secure the border.  President Biden's FY 2023 Budget request to Congress proposes hiring an additional 300 Border Patrol Agents and an additional 300 Border Patrol Processing Coordinators.  If enacted, this would be the first increase in the number of Border Patrol Agents since 2011.

The SBCC is augmenting CBP's operations by bringing in law enforcement officers and agents from other parts of the country.  We are also hiring, contracting for, and soliciting volunteers for administrative processing support to enable law enforcement officers and agents to focus on front-line work.

#### Increased Transportation Capacity

CBP utilizes air and ground transportation to prevent Border Patrol facilities from becoming overcrowded.  This long-standing process enables increased efficiency, while better protecting the health and safety of our workforce and noncitizens.   Building on this approach, the SBCC is expanding the capacity for lateral movements of noncitizens within and between Border Patrol sectors to help relieve overcrowded sectors quickly.  For example, CBP will complete a blanket purchase agreement to contract for 394 additional bus movements per day by April 29.  CBP can currently move about 4,900 people per day and this additional capacity will enable the movement of an additional 4,100 people per day, almost double, with the potential for further expansion.  The SBCC has secured eight U.S. Bureau of Prisons buses with supporting personnel to replace buses and drivers currently staffed by Border Patrol Agents.  Those Border Patrol Agents currently staffing buses will then be able to return to the field and perform their critical

Cuba AR_000176

law enforcement and border security missions.  The SBCC is also finalizing an interagency agreement with ICE for contracted ground transportation resources for an additional 40 bus movements per day and air movements for family units.

**Additional Medical Support**

It is among DHS's top priorities to ensure the health, safety, and well-being of those in DHS care and custody, the DHS workforce, and surrounding communities.  To this end, we have invested in ensuring that we have appropriate and accessible medical care, including for those with unique vulnerabilities, medical conditions, and for tender-aged children.  The SBCC is working to make medical resources available by the end of April to provide urgent clinical care for a planning scenario of 18,000 noncitizens in CBP custody at any given time.  The SBCC has developed a medical support plan, which has been reviewed by interagency medical experts, and is currently determining which federal agencies can provide support through an interagency agreement signed with DOD, HHS, USCG, and FEMA.

Beginning in 2021, DHS rapidly scaled its COVID-19 vaccine program to noncitizens in ICE custody.  The provision of vaccines, coupled with the testing of noncitizens on intake and rigorous isolation and quarantine protocols, has led to markedly low morbidity and mortality in ICE facilities.  Separately, on March 28, 2022, DHS expanded its COVID-19 vaccine program to include noncitizens in CBP custody with a goal to expand to 24 sites by May 23.  All Title 8, age-eligible, non-citizens are eligible for the CBP COVID-19 vaccine program and receive their first dose prior to onward travel.  Additionally, at the highest-volume CBP sectors, unaccompanied children are tested on intake for COVID-19 and, if positive, are triaged for immediate movement to HHS facilities.  These mitigation measures at CBP and ICE have kept COVID-19 rates among noncitizens at or lower than surrounding communities during most of 2021 and 2022.

**Increased CBP's Border Holding Capacity**

We have worked to increase CBP's holding capacity, currently at over 17,000 compared to less than 13,000 in January 2021.  This includes three soft-sided facility expansions totaling approximately 1,300 in holding capacity initiated in the past two months and one that will be completed in mid-May.  There are additional facility expansions still in the planning phase.  By April 27, CBP will also complete its assessment of DOD sites for potential additional temporary facilities.

### *Border Security Pillar 2*: We are increasing CBP processing efficiency and moving with deliberate speed to mitigate potential overcrowding at Border Patrol stations and alleviate the burden on the surrounding border communities.

As noted above, CBP's goal at Border Patrol stations is to hold noncitizens in a safe, orderly, and humane environment; ensure appropriate security screening; and to quickly process and transfer screened noncitizens out of CBP custody to ensure that facilities do not become overcrowded, while facilitating the lawful trade and travel that is critical to our economy.  CBP, which initially encounters and apprehends migrants, does not have sufficient capacity or resources in its short-term facilities to hold individuals for over 72 hours.  In the case of unaccompanied children, CBP

Cuba AR_000177

must, by law, transfer these children to the custody of the HHS Office of Refugee Resettlement (ORR) within 72 hours of encounter.

CBP will continue to achieve these goals by employing several strategies, such as transferring noncitizens from stations that are over capacity to those that have capacity and transferring them to ICE ERO for Expedited Removal and detention, where appropriate.  The SBCC is also launching the following three new initiatives to support decompression efforts, which ensure the continued integrity of our security screening processes: enhanced central processing center, en route processing, and streamlined processing.  Further, CBP is working to increase processing efficiency at POEs to allow noncitizens to present for inspection in a safe and orderly manner.

### Enhanced Central Processing Centers (ECPC)

Processing a noncitizen upon apprehension and entering them into immigration removal proceedings involves multiple steps, multiple electronic systems, and, often, multiple federal agencies.  Specific issues include the referral process from CBP to ICE, coordination between CBP and ICE on custody and transportation of noncitizens, and coordination between CBP and HHS on the transfer of unaccompanied children.  To address these challenges, the SBCC is testing and rapidly developing a model that will co-locate CBP, ICE, NGOs, and possibly other entities at ECPCs to eliminate any inefficiencies and more rapidly process noncitizens.  This innovative model will allow CBP to quickly triage noncitizens it encounters based on risk, ensuring that higher risk individuals are held in secure, hardened facilities until they are placed in detention, while lower risk individuals are processed quickly and humanely at facilities that do not require as significant a law enforcement presence.

This will allow the Border Patrol to focus more of its agents on its priority mission to secure our border rather than processing and administrative duties.  ICE personnel will be on-site in order to minimize delays associated with referrals, and NGOs will be present as well to provide legal orientation services and onward transportation for those low-risk individuals who are ultimately released on ATD.  The first ECPC will be operational in Laredo, Texas effective April 29.  Informed by this experience, the SBCC will complete a plan for the development of additional enhanced central processing centers beyond Laredo.

### En Route Processing

As noted above, processing of noncitizens at CBP facilities can be time intensive.  When noncitizens are transported to alleviate overcrowding, the time in transit is an opportunity to process those being transported.  By testing and refining operational plans to complete processing of noncitizens while in transit, the SBCC can move noncitizens out of CBP facilities faster, while retaining the integrity of biometric and biographic screening processes and ensuring noncitizens apprehended at the border are placed expeditiously into removal proceedings.

As part of DHS's strategic use of existing Title 8 processing pathways, this processing would be reserved for family units, especially from countries that do not accept repatriations quickly or at all.  The SBCC is actively engaging with cities that are located within a six-hour drive of the border and will employ en route processing to relieve pressure on Border Patrol facilities and border communities. The SBCC is working closely with local governments, including law

Cuba AR_000178

enforcement, in these cities to ensure that local governments and receiving NGOs have the support and resources they need, as described further below.

The SBCC is testing en route processing and is continuing to develop options to expand its capacity further.  In particular:

- *Del Rio to Laredo:* The SBCC has developed a concept of operations for en route processing from Del Rio to Laredo that has already been successfully tested.
- *Bus Technology:* Border Patrol is outfitting buses with necessary technology to support processing requirements while in transit.

## Streamlining Processing Methods

Processing a single noncitizen for a Notice to Appear (NTA) can take two to three hours, including the time to complete the processing documents and subsequent review between CBP and ICE to ensure accuracy.  An NTA is a charging document, issued by ICE or CBP, which initiates removal proceedings against a noncitizen, and specifies the date and time for the noncitizen to appear in immigration court.  Last year, DHS launched the Southwest Border Technology Integration Program to digitize and automate noncitizen processing.  Today, over 70 percent of Title 8 cases are reviewed and signed digitally by CBP.  We project this has saved over 20,000 hours of processing time already.

The SBCC is identifying and implementing further technological and administrative improvements to reduce overall processing time of noncitizens, while also maintaining security. For example, the SBCC is focused on expanding digital processing towards a fully digital "A-File," which is shared across CBP, ICE, U.S. Citizenship and Immigration Services (USCIS), and DOJ throughout the immigration lifecycle.  Digital A-Files for voluntary returns and digital review and signatures for other disposition types will be implemented by May 23.  DHS will continue to focus on digitizing all other elements of the A-File to maximize efficiency.  In addition, the SBCC is eliminating administrative redundancy by identifying and removing certain forms in the document exchange between CBP and ICE.

## Port of Entry Processing

The imposition of the Title 42 public health Order severely restricted the ability of undocumented noncitizens to present at POEs for inspection and processing under Title 8.  The closure of this immigration pathway for much of the time Title 42 has been in effect has driven people between POEs at the hands of the cartels.  Returning to robust POE processing is an essential part of DHS border security efforts.  Beginning in the summer of 2021, DHS restarted processing vulnerable individuals through POEs under Title 8, on a case-by-case basis for humanitarian reasons, pursuant to the exception criteria laid out in CDC's Title 42 Order.  These efforts, which we have recently expanded, offer individuals in vulnerable situations a safe and orderly method to submit their information in advance and present at POEs for inspection and subsequent immigration processing under Title 8.  We also have enhanced Title 8 POE processing through the development of the CBP One mobile application, which powers advanced information submission and appointment scheduling prior to an individual presenting at a POE. We will make this tool publicly available and continue to expand its use to facilitate orderly immigration processing at POEs.

Cuba AR_000179

## *Border Security Pillar 3:* **We are administering consequences for unlawful entry, including removal, detention, and prosecution.**

Attempting to enter the United States without authorization carries potential long-term consequences, including removal from the United States, bars on subsequent admission, and criminal liability.  By expeditiously removing individuals who do not have a lawful basis to stay in our country, the United States is making clear that while we are a nation of immigrants, we are also a nation of laws.  We will continue fully enforcing those laws, employing a combination of Expedited Removal and removal proceedings before an immigration judge, detaining single adults where appropriate, and referring for prosecution border-related criminal activity.

### Expedited Removal
DHS is preparing to maximize the use of Expedited Removal for populations where removal is possible or likely, consistent with the law, and is working to streamline Expedited Removal processes across relevant federal agencies, with an eye towards quickly removing those who receive a negative credible fear finding while in ICE custody.  DHS is increasing the availability of interview facilities and USCIS officers to conduct credible fear interviews, creating an electronic process to refer appeals of negative fear findings to the DOJ Executive Office for Immigration Review (EOIR), and working with partner countries throughout the hemisphere to significantly improve our ability to quickly remove and repatriate individuals with final orders of removal.

Increased use of Expedited Removal serves key law enforcement and operational goals.  It is a fair and effective means of efficiently removing those with no lawful basis to remain in the United States.  Those subject to Expedited Removal also face a five-year bar on admission from the date of removal and potential criminal prosecution if they seek to unlawfully re-enter, thus serving to deter would-be border crossers.

Single adults placed in Expedited Removal are generally detained throughout the process, making the capacity to detain critical to its effectiveness and to increasing its use.  DHS utilizes a network of detention facilities across the country to detain noncitizens who are subject to Expedited Removal, who pose a threat to public safety or national security, to ensure presence at immigration proceedings, and to effectuate removals.  As COVID-19 physical distancing restrictions are revised, DHS will regain additional bed space within its existing facility footprint.

### Asylum Office Rule
Individuals in Expedited Removal who establish a credible fear of persecution or torture are currently referred to an immigration court for full consideration of their applications for asylum and related protection.  Under the new Asylum Office rule, effective May 31, DHS can instead refer these cases to USCIS for significantly more expeditious adjudication.  The new rule will allow DHS and DOJ to conclude certain asylum cases in months instead of years, meaning that those deemed ineligible for asylum can be removed more quickly.  While full implementation will take time, this will have a transformative impact on the asylum system.

Cuba AR_000180

### Timely Immigration Court Proceedings

For families not processed through Expedited Removal and who are instead placed in removal proceedings, DOJ and DHS have jointly established a new, more efficient process known as the Dedicated Docket to conduct speedier immigration court proceedings that comport with due process.  DHS is utilizing the Dedicated Docket for certain family unit members who arrive between POEs at the Southwest Border and are traveling to one of 11 destination cities.  Families placed on the Dedicated Docket are prioritized for adjudication and are generally expected to receive final decisions in their cases within 300 days of initiation, as opposed to several years.  The Dedicated Docket includes a Family Group Legal Orientation Program in which nonprofit organizations explain the immigration court process and provide referrals to pro bono legal services to support families placed on this Docket.

In addition to the Dedicated Docket, DOJ will continue to operate its long-standing detained docket for individuals in ICE custody, moving cases through the immigration court system in a matter of months, rather than years.

### Prosecuting Border-Related Criminal Activity

DHS will continue to refer border-related criminal activity to DOJ for prosecution where warranted, including that of smugglers, repeat offenders, and other noncitizens whose conduct warrants such law enforcement action.  We also continue to enforce CBP's Repeat Offender initiative to target recidivism.  This enforcement regime has improved DHS's ability to leverage legal consequences to deter irregular migration while conserving limited processing resources.

### *Border Security Pillar 4*: We are bolstering the capacity of NGOs to receive noncitizens after they have been processed by CBP and are awaiting the results of their immigration removal proceedings.  And, we are ensuring appropriate coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities.

Increased migration levels put additional pressure not only on DHS personnel and resources, but also on border communities and NGO partners who play a critical role in helping noncitizens who are released from DHS custody for the pendency of their removal proceedings.  Noncitizens who are not subject to ICE detention are screened by CBP as described above, entered into immigration removal proceedings, and permitted to travel to onward destinations, where they are subject to ongoing supervision.  Once a noncitizen is released from custody by DHS, the Department is no longer operationally engaged in their transportation, medical care, or shelter.  Nonetheless, our goal is to help communities alleviate the pressures they experience by expanding NGO capacity, through communication and coordination, and grants through the Emergency Food and Shelter Program (EFSP).  We are also exploring other ways to provide assistance to communities and welcome the ongoing dialogue we have with local leaders to that end.

### Bolstering NGO Capacity

NGOs play a critical role in providing care and support with onward travel to noncitizens who are entered into immigration removal proceedings, not subject to detention, and released from

CBP custody.  The SBCC has assessed and is tracking NGO capacity and sharing information to ensure there is a common operating picture across all relevant parties, to include gaps that can be remediated with external assistance.

The EFSP, administered by DHS through FEMA, supplements and expands ongoing work of local NGOs to meet the urgent needs of local agencies assisting the unique and vulnerable migration population encountered by DHS.  In FY 2022, Congress authorized $150 million for EFSP Southwest Border support, and this month, FEMA has taken necessary steps to ensure these funds can be accessed by eligible partners in short order.  We are working to ensure the eligibility criteria for EFSP can cover the broadest set of possible needs and will provide more information for entities that are not familiar with EFSP by the end of April.

For the subset of non-citizens who may be released from custody directly into a community (i.e., those who cannot be released in coordination with an NGO due to capacity constraints or other issues), DHS is defining required criteria for CBP leadership to reference when determining whether and how to release individuals.  This is particularly important given the potential for increases in this population going forward.  The criteria will include safety checks, notification to local officials, information on local resources and legal services, and required documentation.  The SBCC will complete an operational checklist, informed by feedback from our local stakeholders including law enforcement partners, also by the end of April.

Additionally, by the beginning of May, the SBCC will complete an updated information package to distribute to all noncitizens released from federal custody. The update was designed to ensure individuals more clearly understand their obligations and requirements for compliance with the enforcement and removal process.

### Communication with State, Local, and Community Leaders
To ensure close operational coordination and support ongoing local planning efforts, the SBCC and CBP leaders continue to engage extensively with state and local governments, including law enforcement entities, public health authorities, and NGOs, including in California, Arizona, New Mexico, and Texas, as well as other locations as needed.  This regular coordination includes a focus on noncitizen transport and capacity planning, resolving logistical challenges, and addressing community concerns through shared solutions.  These and other coordination sessions will increase as operations necessitate.

## *Border Security Pillar 5:* **We are targeting and disrupting the transnational criminal organizations (TCOs) and smugglers who take advantage of and profit from vulnerable migrants, and who seek to traffic drugs into our country.**

DHS works at home and abroad to identify, investigate, and interdict the TCOs that smuggle people and drugs into our country.  Human smuggling organizations peddle misinformation that the border is open, in order to profit from the vulnerability of migrants.  DHS is targeting these organizations, in close collaboration with other federal agencies, state and local law enforcement, and international partners.  While this has been a consistent priority, our efforts have intensified in recent months.

16 of 20

## Migration Intelligence

Building on the Intelligence Community's existing work to monitor migration activity in the Western Hemisphere, in April, ODNI stood up a Migration Intelligence Cell with the goal of providing advanced geographic and time-based warning of large human smuggling movements in the region and analysis and targeting information for disruption activities.  The Migration Intelligence Cell has highlighted to the entire Intelligence Community the priority of human smuggling to prompt additional focus.  This intelligence will be used for disruption activities as well as border security and management actions.

## Disrupting Smuggling Networks

Building on existing efforts, in April 2022 DHS surged disruption efforts in partnership with other federal agencies along six coordinated and interconnected lines of effort.  These include:

- Operation Expanded Impact led by Homeland Security Investigations (HSI), a division of ICE.  HSI is focusing its investigative efforts along the Southwest Border to launch additional criminal investigations of the organizations taking advantage of vulnerable individuals, working to detect, disrupt, and dismantle TCOs involved in narcotics, human smuggling, and human trafficking.  HSI has assigned approximately 250 special agents and criminal analysts to carry out investigations in the United States;
- Operation Sentinel, which is an interagency counter-network operation targeting TCOs affiliated with the smuggling of migrants;
- Joint Task Force Alpha, a DOJ-led effort to target smuggling and trafficking groups;
- Blue Indigo, led by DOJ and DHS to disrupt cartel operations and illicit networks in South Texas;
- Financial disruption conducted by the Treasury Department; and,
- The ODNI cell referenced above.

This is the largest surge of resources and disruptive activities against human smuggling networks in recent memory.  So far this month, these lines of effort produced over 2,500 arrests, investigations, and disruptions of smuggling infrastructure, such as buses and safe houses, among other actions, and have slowed, stopped, or reversed the flows of thousands of migrants.  This activity represents a dramatic increase in human smuggling network-related disruption events in FY 2022 compared to the same time and in the same region in FY 2021.

Partnerships with Mexican and Central American counterparts have resulted in multiple significant enforcement actions against human smuggling and trafficking groups operating in Mexico, Guatemala, El Salvador, and Honduras.  In Guatemala, efforts have focused on the indictments and extraditions of Guatemalan human smugglers to face prosecution.  In Honduras, DHS has provided robust support to Operation Scorpion, a border surge initiative of the Honduran National Police that targets human smugglers and traffickers.

## Drug Seizures and Enforcement

DHS has increased efforts to stem the flow of illegal drugs into the United States.  In FY 2021, HSI Special Agents conducted 12,920 criminal arrests and seized over 2.4 million pounds of narcotics, which included 14,530 pounds of fentanyl.  This compares to FY 2020 seizures of more than 1.4 million pounds.  In addition, HSI Special Agents seized more than $188 million in

Cuba AR_000183

total currency and assets.  In FY 2021, CBP seized 900,000 pounds of narcotics, a significant increase over the previous year.

DHS employs a multi-layered approach to countering narcotics trafficking, in close partnership with other federal and partner government agencies.  CBP's National Targeting Center uses advanced analytics and targeting capabilities to identify critical logistics, financial, and communication nodes and exploit areas of weakness in opioid trafficking networks.  ICE HSI Special Agents exchange information, coordinate investigations, and facilitate enforcement actions with law enforcement partners abroad to deter the ability of TCOs to smuggle drugs, people, and contraband into and out of the United States.

## *Border Security Pillar 6:* **We are deterring irregular migration south of our border, in partnership with the Department of State, other federal agencies, and nations throughout the Western Hemisphere, to ensure that we are sharing the responsibility throughout the region.**

Deterring migrants who will not meet the criteria for asylum is an important tool to alleviate pressure at the border.  As described earlier, that is a challenge.  Across the world, more people are displaced from their homes than at any time since World War II.  While the United States is a destination country for those fleeing their homes, we do not experience the phenomenon alone.  Colombia, Costa Rica, Ecuador, and many other countries in the region are experiencing increases in migration, especially of Venezuelans, but of other nationalities as well.  In light of the increased levels we are experiencing, DHS, working with DOS and other partners, has intensified our work to manage and deter irregular migration throughout the region.

### New Bilateral Arrangements on Migration and Protection

On March 15, I traveled to Costa Rica and joined President Alvarado in announcing a bilateral Migration Arrangement, which outlines our shared commitment to both manage migrant flows and promote economic growth in the region.  On April 19, the U.S. government signed a Bilateral Arrangement on Migration and Protection with the Government of Panama, similarly detailing our collaborative commitments to improve migration management, expand stabilization efforts, and increase access to legal pathways and protection for those in the region.  DHS and DOS are actively engaged with other countries in the region to advance similar bilateral arrangements, as well as a Hemispheric Declaration on Migration and Protection to be completed at the upcoming Summit of the Americas in June 2022.

### Partnership with the Government of Mexico

The Biden-Harris Administration continues to maintain a close partnership with the Government of Mexico to stem irregular migration, which includes creating viable legal pathways, facilitating lawful trade and travel, and combating the shared dangers of transnational organized crime.  Last month, I made my fourth official visit to Mexico City where I met with President López Obrador to intensify our shared commitment to promoting lawful trade and travel and developing a regional approach to migration management.

Cuba AR_000184

**In-Region Messaging**

DHS coordinates closely with DOS to track trends, share research, and coordinate messaging to counter disinformation that smugglers use to victimize vulnerable migrants.  Our approach has included paid advertising on radio and digital platforms and press conferences and media interviews in source and transit countries.  These messages counter disinformation propagated by human smugglers and warn migrants of the dangers of being exploited and facing death at the hands of unscrupulous criminal organizations.

# CONCLUSION

**Despite the efforts of our dedicated DHS workforce and our partners executing this comprehensive plan, a significant increase in migrant encounters will substantially strain our system even further.  We will address this challenge, but it will take time, and we need partnership and support to do so successfully.  We are also operating within a fundamentally broken immigration system that only Congress can fix.**

As described above, DHS and its federal and community partners have been taking steps for months to prepare for the lifting of Title 42, while operating within a system that is not designed to handle the current volume of migrants nor the increased volume we expect over the coming months.  The preparations and deliberate planning detailed in this memorandum will enable us to manage and mitigate known and unanticipated challenges more effectively, while protecting the safety and security of our communities.  But notwithstanding the efforts described in this paper, a significant increase will substantially strain our system even further.

We are especially mindful of the following challenges and potential developments at higher levels of encounters:

- For several months, CBP, ICE, NGOs, and other critical partners have been managing levels beyond the capacity for which their infrastructure was designed and resourced, meaning additional increases will create further pressure and potential overcrowding in specific locations along the border.
- With NGOs strained, there is a potential for a higher number of single adults and families to be released into communities without NGO or other sponsor support.  The federal government has few tools or authorities to support the related impacts on local communities, though we are actively working to develop more.
- Depending on levels, land ports of entry could experience processing delays and disruptions at specific points in time.
- Communication and coordination across state, local, and community leaders requires good faith engagement of all parties, to help ensure we can effectively manage these developments together.

We welcome partners' support in mitigating these risks and challenges.  We appreciate Congress' support in FY 2022, appropriating $1.4 billion for DHS to manage an increase in Southwest Border encounters.  DHS is currently managing these resources responsibly and has submitted the required spend plan to Congress.  DHS expenditures for the $1.4 billion appropriated in FY 2022 include but are not limited to: soft-sided facilities; medical contracts;

Cuba AR_000185

transportation; and support for NGOs through the EFSP.  DHS will also need to utilize its limited transfer and reprogramming authority once the $1.4 billion is exhausted.  Should additional resources be necessary to manage a sustained increase in encounters, DHS will engage Congress on any potential need for supplemental appropriations.

Over the past 15 months, the Department of Homeland Security has demonstrated time and time again our ability to tackle significant challenges, while operating consistent with our laws and our values.  From responding to unprecedented levels of migration and ensuring the safety of individuals in our care to vetting and processing tens of thousands of evacuees from Afghanistan and Ukraine, we have consistently risen to the challenge in extremely difficult circumstances. We will continue to work tirelessly on behalf of the American people, but there is broad agreement that our immigration system is fundamentally broken.  As it has since its first day in office, the Biden-Harris Administration continues to call on Congress to pass legislation that holistically addresses the root causes of migration, strengthens border security, fixes our immigration system, and improves legal pathways.

Cuba AR_000186



**U.S. Department of Homeland Security**
Washington, DC 20528

December 20, 2022

MEMORANDUM TO FILE

FROM: 

Blas Nuñez-Neto
Acting Assistant Secretary for Border and Immigration
Office of Strategy, Policy, and Plans

SUBJECT:                        Data on Migration through the Western Hemisphere

Purpose

This memorandum commits to writing data and information considered by the Department of
Homeland Security's (DHS) Office of Strategy, Policy and Plans (PLCY) ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Description of Data or Information

PLCY states that, according to reporting from U.S. Embassy San Jose, nearly 1,500 Venezuelans
requested asylum in Costa Rica in the latter half of October, which nearly matched the number of
applicants of all nationalities for the first eight months of the year.

PLCY also mentions that, according to reporting from U.S. Embassy San Jose, the Government
of Costa Rica established the Special Temporary Category (STC) of status for Cubans,
Nicaraguans and Venezuelans in Costa Rica who applied for asylum between January 1, 2010
and September 30, 2022 and desire to withdraw their application in favor of receiving STC and
having access to employment authorization and social services.

PLCY states that, according to reporting from U.S. Embassy Bogota, the Government of
Colombia was working on plans to expedite the 26,000-case backlog of asylum cases in the latter
half of 2022.

PLCY describes the Government of Ecuador's phased registration process for temporary
residence permits. Specifically, according to reporting from U.S. Embassy Quito, that the first
phase was launched on September 1, 2022, by opening online registration to an estimated
120,000 Venezuelans who hold or previously held a regular migration stat us and all
unaccompanied minors. More than 68,500 individuals registered within the first week.

PLCY relays how the Government of Ecuador opened Phase Two on November 16, 2022, to
approximately 100,000 non-Venezuelan migrants who entered regularly. As of November 25,

more than 89,000 individuals had registered and over 22,000 have already received their temporary residency visa. PLCY continues to explain that Phase Three will open February 17, 2023, to an estimated 350,000 Venezuelans who entered irregularly.

PLCY outlines the parameters of the new amnesty program, according to reporting from U.S. Embassy Belmopan. This program will include asylum applicants who had previously been denied as long as they were registered in Belize by March 31, 2020. Among other categories that qualify under this amnesty program are individuals who resided in Belize before December 31, 2016. Total beneficiaries are estimated to range between 6,000-8,000 and will receive permanent residency and a path to citizenship.

PLCY mentions how the Government of Mexico would not accept more noncitizens returned to Mexico via the Migrant Protection Protocols (MPP) than local shelters had the capacity for, which was limited. Additionally, reporting from U.S. Embassy Mexico City that describes how MPP returns were paused in San Diego for an extended amount of time in the summer of 2022 due to a lack of shelter space in Tijuana.

PLCY describes concern from international partners, as conveyed by Embassy reporting, about the potential consequences of lifting Title 42, as was originally planned on May 23, 2022. Specifically, partners expressed concern that the end of Title 42 would be perceived by migrants—and messaged by smugglers—as an opening of the U.S. border, which could cause a dramatic and overwhelming increase in migration flows through partner countries. Another potential pull factor cited by partners was the perception that U.S. immigration officials release migrants into the community. Additionally, one partner expressed concern that in the past, rumors alone of the end of Title 42 had spurred the creation of caravans moving towards the border.  In conversations, another foreign partner noted that the lack of consequences at our border is a driver for irregular migration.

PLCY describes conversations with international partners, as relayed in a meeting readout from the Department of State, in which at least one country encouraged the U.S. Government to expand the Venezuela parole process to other nationalities as a pathway for individuals to reach the United States without making the dangerous journey through the hemisphere. PLCY relays information from other conversations with international partners in which they worry that these pathways will be undermined when the Centers for Disease Control and Prevention's Title 42 Order is no longer being implemented.

PLCY describes conversations with international partners in which they conveyed that their willingness to receive increased returns of migrants was contingent on expanding the model provided by U4U and the Venezuela process, which decreased irregular migration throughout the hemisphere by increasing options for lawful pathways and adding consequences for noncitizens who bypass those opportunities to travel irregularly to the United States. In general, international partners have been active participants in carrying out actions related to stabilizing populations, expanding lawful pathways and humanely managing borders, as per the Los Angeles Declaration on Migration and Protection.  However, our foreign partners regularly express concern about having to divert resources from other priorities to respond to the ongoing surge in migration, and believe that the U.S. Government should be doing more, particularly now, to reduce these irregular flows and channel them into safe and orderly processes.

PLCY reports that the Venezuela process was predicated on returning nationals of that country to Mexico under Title 42 authorities, and Mexico has historically not accepted the return under Title 8 of third-country nationals with final orders of removal.

PLCY describes conversations with at least one international partner that refused to entertain negotiating a Safe Third Country Agreement with the United States, claiming it is not a politically viable option for them.

Finally, PLCY considered reporting from U.S. Embassy Panama City stating that 59,800 irregular migrants crossed the Darien Gap in October 2022, which was a 130 percent increase over October 2021. However, there was a sharp decline in migrants crossing from Colombia into Panama after DHS announced the process for Venezuela on October 12. The daily average dropped from 2,500 migrants in the first two weeks of October 2022 to about 1,000 migrants in the last two weeks. Embassy Panama City cited a seasonal decrease from October to November 2021. However, in the same period in 2022, the overall number of Venezuelan migrants crossing has decreased, whereas the overall the number of Ecuadorians and Haitians saw much smaller variation.

Cuba AR_000189



# Cuba: U.S. Policy in the 117ᵗʰ Congress

September 22, 2022

**Congressional Research Service**

https://crsreports.congress.gov

R47246

**CRS REPORT**
Prepared for Members and
Committees of Congress



**Congressional Research Service**
Informing the legislative debate since 1914

**SUMMARY**

R47246

September 22, 2022

**Mark P. Sullivan**
Specialist in Latin
American Affairs

# Cuba: U.S. Policy in the 117th Congress

Political and economic developments in Cuba, a one-party authoritarian state with a poor human rights record, frequently have been the subject of intense congressional concern since the 1959 Cuban revolution. Cuban President Miguel Díaz-Canel succeeded Raúl Castro as president in 2018 and as head of Cuba's Communist Party in 2021. Cuba adopted a new constitution in 2019 that introduced some reforms but maintained the state's dominance over the economy and the Communist Party's predominant political role. In July 2021, anti-government demonstrations broke out throughout the country, with thousands of Cubans protesting poor economic conditions (e.g., food and medicine shortages, blackouts) and long-standing repression of freedom of expression and other basic rights. The government responded with harsh measures that led to the prosecution of hundreds of protesters. The Cuban economy has been hard-hit by the Coronavirus Disease 2019 (COVID-19) pandemic, reduced support from Venezuela, and increased U.S. economic sanctions.

## U.S. Policy

Since the early 1960s, the centerpiece of U.S. policy toward Cuba has been economic sanctions aimed at isolating the Cuban government. Congress has played an active role in shaping policy toward Cuba, including by enacting legislation strengthening—and at times easing—U.S. economic sanctions. In 2014, the Obama Administration initiated a policy shift away from sanctions and toward engagement. This shift included the restoration of diplomatic relations; the rescission of the Cuban government's designation as a state sponsor of international terrorism; and an increase in travel, commerce, and the flow of information to Cuba. The Trump Administration began to reverse course in 2017, introducing new sanctions, including restrictions on transactions with companies controlled by the Cuban military. By 2019, the Trump Administration had largely abandoned engagement and significantly increased sanctions, particularly on travel and remittances.

In its initial months in office, the Biden Administration announced it was conducting a review of policy toward Cuba, with human rights as a core pillar, and would examine policy decisions made by the prior Administration. After the Cuban government's harsh response to the July 2021 protests, the Biden Administration imposed a series of targeted financial sanctions and visa restrictions on those involved. In May 2022, the Administration announced several policy changes aimed at increasing support for the Cuban people. The Administration increased immigrant visa processing at the U.S. Embassy in Havana and said it would reinstate an immigration parole program for Cuban families. It eased travel restrictions by reauthorizing flights to cities beyond Havana and reinstating group people-to-people travel. It also eased restrictions on sending cash remittances by eliminating dollar and frequency limits for family remittances and by reauthorizing donative remittances to Cuban nationals.

Driven by Cuba's difficult economic conditions and political repression, among other factors, irregular Cuban migration to the United States has surged over the past year. U.S. and Cuban officials held migration talks in April 2022, the first since 2018. In September 2022, the Administration announced that the U.S. Embassy in Havana would resume full immigrant visa processing in early 2023 for the first time since 2017.

## Legislative Action in the 117th Congress

The 117th Congress has continued to support funding for Cuba democracy programs and broadcasting to Cuba. For FY2022, in the Consolidated Appropriations Act, 2022 (P.L. 117-103, Division K) and its explanatory statement, Congress provided $12.973 million for Cuba broadcasting, fully funding the Administration's request. The law did not specify an amount for Cuba democracy programs, but an estimated $20 million (the amount requested) is to be provided. For FY2023, the Administration requested $20 million for democracy programs and $13.432 million for broadcasting. The House Appropriations Committee's reported FY2023 foreign aid appropriations bill, H.R. 8282 (H.Rept. 117-401) would provide $12.973 million for broadcasting; the explanatory statement to the Senate bill (S. 4662) recommends providing $13.891 million. H.R. 8282 also would provide $20 million for democracy funding, whereas S. 4662 does not specify an amount for democracy funding.

In other significant action, in July 2022, the House rejected H.Amdt. 300 to H.R. 8294 (a six-bill FY2023 appropriations measure), which would have prevented funding to enforce a prohibition on private financing for U.S. agricultural exports. The House and the Senate also approved several human rights resolutions: H.Res. 760 (November 2021); S.Res. 37 (April 2021); S.Res. 81 (May 2021); S.Res. 310 (August 2021); and S.Res. 489 (January 2022). In addition, the Senate approved S. 2045 in July 2021, which would rename the street in front of the Cuban Embassy after a democracy activist.

Cuba AR_000191

**Appendix A** provides comprehensive information on legislative initiatives on Cuba in the 117th Congress. **Appendix B** provides links to U.S. government information and reports on Cuba. Also see CRS In Focus IF10045, *Cuba: U.S. Policy Overview*; CRS Report RL31139, *Cuba: U.S. Restrictions on Travel and Remittances*; and CRS Insight IN11937, *Biden Administration's Cuba Policy Changes*.

# Contents

Cuba's Political and Economic Environment ............................................................................. 1
  Brief Historical Background ................................................................................................... 1
  Political Conditions .............................................................................................................. 3
    Human Rights .................................................................................................................. 4
  Economic Conditions ........................................................................................................... 7
U.S. Policy Toward Cuba ............................................................................................................ 9
  Historical Background .......................................................................................................... 9
  Policy Shifts Under the Obama and Trump Administrations ................................................ 9
  Biden Administration Policy ...............................................................................................11
  Key U.S. Sanctions ............................................................................................................ 12
  Debate on the Direction of U.S. Policy .............................................................................. 16
Selected Issues in U.S.-Cuban Relations ................................................................................. 18
  U.S. Restrictions on Travel and Remittances ..................................................................... 18
  U.S. Exports and Sanctions ................................................................................................ 20
  Democracy and Human Rights Funding ............................................................................. 22
  Radio and TV Martí ........................................................................................................... 24
  Migration Issues ................................................................................................................ 25
  U.S. Fugitives from Justice ................................................................................................ 29
  Trafficking in Persons and Cuba's Foreign Medical Missions ........................................... 31
Outlook ..................................................................................................................................... 33

## Figures

Figure 1. Provincial Map of Cuba ............................................................................................. 2
Figure 2. U.S. Exports to Cuba, 2007-2021 ............................................................................ 22

## Tables

Table 1. Maritime Interdictions of Cubans by the U.S. Coast Guard ........................................ 27

## Appendixes

Appendix A. Legislative Initiatives in the 117th Congress ........................................................ 34
Appendix B. Links to U.S. Government Reports ....................................................................... 43

## Contacts

Author Information.................................................................................................................... 44

Cuba AR_000193

# Cuba's Political and Economic Environment

## Brief Historical Background[1]

Cuba became an independent nation in 1902. From its discovery by Columbus in 1492 until the Spanish-American War in 1898, Cuba was a Spanish colony. In the 19th century, Cuba became a major sugar producer, with slaves from Africa brought in to work the sugar plantations. The drive for independence from Spain grew stronger in the second half of the 19th century, but independence came about only after the United States entered the conflict, when the USS *Maine* sank in Havana Harbor after an explosion of undetermined origin. In the aftermath of the Spanish-American War, the United States ruled Cuba for four years until Cuba became an independent country in 1902. Nevertheless, the United States retained the right to intervene in Cuba to preserve Cuban independence and maintain stability in accordance with the Platt Amendment,[2] which became part of the Cuban Constitution of 1901 and was incorporated into a 1903 bilateral treaty; the United States established a naval station at Guantanamo Bay, Cuba, in 1903, which remains in operation today.[3] The United States intervened militarily three times between 1906 and 1921 to restore order. In 1934, as part of President Franklin Roosevelt's Good Neighbor Policy toward Latin America, the United States and Cuba negotiated a new bilateral relations treaty that abrogated the 1903 treaty with the Platt Amendment language.[4]

Cuba's political system as an independent nation often was dominated by authoritarian figures. Gerardo Machado (1925-1933), who served two terms as president, became increasingly dictatorial until he was ousted by the military. A short-lived reformist government gave way to a series of governments that were dominated behind the scenes by military leader Fulgencio Batista until he was elected president in 1940. Batista was voted out of office in 1944 and was followed by two successive presidents in a democratic era that ultimately became characterized by corruption and increasing political violence. Batista seized power in a bloodless coup in 1952, and his rule progressed into a brutal dictatorship that fueled popular unrest and set the stage for Fidel Castro's rise to power.

Castro led an unsuccessful attack on military barracks in Santiago, Cuba, on July 26, 1953. After a brief jail term, he went into exile in Mexico, where he formed the 26th of July Movement. Castro returned to Cuba in 1956 with the goal of overthrowing the Batista dictatorship. His revolutionary movement was based in the Sierra Maestra Mountains in eastern Cuba, and it joined with other resistance groups seeking Batista's ouster. Batista ultimately fled the country on January 1, 1959, ushering in 47 years of rule under Fidel Castro, who stepped down from power in 2006 due to poor health.

---

[1] Sources for this background section include U.S. Department of State, "Background Note: Cuba," November 7, 2011, at https://2009-2017.state.gov/outofdate/bgn/cuba/191090.htm; Rex A. Hudson, ed., *Cuba, A Country Study*, Federal Research Division, Library of Congress (Washington, DC: GPO, 2002), at https://www.loc.gov/item/2002018893/; Library of Congress, Federal Research Division, "Country Profile: Cuba," September 2006, at https://www.loc.gov/item/copr/6711798/; Leslie Bethell, ed., *Cuba, A Short History* (Cambridge, UK: Cambridge University Press, 1993); and Hugh Thomas, *Cuba: The Pursuit of Freedom* (New York: Harper & Row, Publishers, 1971).

[2] U.S. Senator Orville Platt introduced an amendment to an army appropriations bill that was approved by both houses and enacted into law in 1901.

[3] For background on the naval station, see CRS Report R44137, *Naval Station Guantanamo Bay: History and Legal Issues Regarding Its Lease Agreements*.

[4] National Archives, Milestone Documents, "Platt Amendment (1903)," February 8, 2022, at https://www.archives.gov/milestone-documents/platt-amendment.

**Figure 1. Provincial Map of Cuba**



**Source:** Congressional Research Service.

Although Fidel Castro promised a return to democratic constitutional rule when he first took power, he instead moved to consolidate his rule, repress dissent, and imprison or execute thousands of opponents. Under the revolutionary government, Castro's supporters gradually displaced members of less radical groups. Castro moved toward close relations with the Soviet Union, and relations with the United States deteriorated rapidly as the Cuban government expropriated U.S. properties. In April 1961, Castro declared that the Cuban revolution was socialist; in December 1961, he proclaimed himself a Marxist-Leninist. Over the next 30 years, Cuba was a close ally of the Soviet Union, depending on it for significant assistance until the dissolution of the Soviet Union in 1991.

Castro ruled by decree until 1976, when he became the country's president (technically, president of the Council of State) under a new constitution that set forth the Cuban Communist Party (PCC), which Castro headed, as the leading force in state and society. When Fidel stepped down in July 2006, his brother Raúl—Cuba's longtime defense minister and first vice president—became provisional president. In 2008, after Fidel announced he would not be returning to government, Cuba's National Assembly chose Raúl as president. He went on to serve two five-year terms until April 2018. More than 10 years after stepping down from power, Fidel Castro died in November 2016 at 90 years of age.

Raúl Castro's government (2006-2018) stands out for two significant policy developments. First, the government implemented a series of gradual market-oriented economic policy changes, including authorization for limited private-sector activity, the legalization of private property rights, and an opening to further foreign investment. Critics, however, maintain that the government did not go far enough toward enacting deeper reforms needed to stimulate the Cuban economy and foster sustainable economic growth. The second notable policy development was

the rapprochement in bilateral relations with the United States during the Obama Administration, which led to the reestablishment of diplomatic relations and government-to-government engagement and to cooperation on a wide range of issues.

## Political Conditions

Cuba remains a one-party authoritarian state with a government that has sharply restricted basic human rights since the early years of the 1959 revolution.[5] The government does not have direct elections for president; instead, pursuant to Cuba's Constitution, the national legislature—the National Assembly of People's Power—elects the president from among its representatives for a five-year term. Although National Assembly representatives are elected by direct vote, only one candidate is offered for each seat and candidates are chosen by candidacy commissions controlled by the PCC, the only recognized party.

Miguel Díaz-Canel succeeded Raúl Castro as president in April 2018 and as head of the PCC at its eighth party congress in April 2021. The departure of Castro and other older leaders from the PCC's Politburo, the party's highest decisionmaking body, reflects a generational change in Cuban leadership that began during Raúl Castro's rule. Even with his retirement as head of government and head of the PCC, Raúl Castro has remained an important figure and continues to advise President Díaz-Canel. When countrywide protests broke out in July 2021, Raúl Castro attended an emergency meeting of the Politburo and subsequently participated in a mass rally held to show support for the government.[6]

> ### Cuba at a Glance
>
> **Population**: 11.1 million (2021, ONEI)
>
> **Area:** 42,426 square miles (ONEI), slightly smaller than Pennsylvania
>
> **Real GDP Growth:** -0.2% (2019); -10.9% (2020); 1.3% (2021 est.); 3.2% (2022 projected) (EIU)
>
> **Key Trading Partners:** *Exports* (2020): Canada, 27.0%; China, 21.8%; Netherlands,11.5%; Spain, 8.4%; Venezuela, 7.3%; *Imports* (2020): Venezuela, 14.7%; China, 13.3%; Spain, 11.7% (ONEI)
>
> **Life Expectancy**: 79 years (2020, WB)
>
> **Literacy (adult)**: 99.8% (2018, UNDP)
>
> **Legislature:** National Assembly of People's Power, currently 605 members (five-year term, elected in March 2018; next due in 2023).
>
> **Sources:** National Office of Statistics and Information (ONEI), Republic of Cuba; U.N. Development Programme (UNDP); Economist Intelligence Unit (EIU); and World Bank (WB).

Cuba adopted a new constitution in 2019. The constitution introduced some reforms, including a limitation on the president's age (60 years, beginning first term) and tenure (two five-year terms), the addition of a presidentially appointed prime minister, and some market-oriented economic reforms, such as the right to private property and the promotion of foreign investment. Nevertheless, the new constitution—the nation's second under PCC rule—maintained the state's dominance over the economy and the PCC's predominant political role. In October 2019, the National Assembly reelected Díaz-Canel as president, pursuant to the new constitution. In December 2019, Díaz-Canel appointed then-Tourism Minister Manuel Marrero Cruz as Cuba's prime minister, essentially serving as the president's top administrator in implementing government policy.

---

[5] See Economist Intelligence Unit (EIU), *Democracy Index 2021*, February 2022, which classifies the Cuban government as *authoritarian* based on some 60 indicators; and Freedom House, *Freedom in the World 2022*, March 2021, which classifies Cuba as *not free* based on the government's poor records on political rights and civil liberties, at https://freedomhouse.org/country/cuba/freedom-world/2022.

[6] Mauricio Vicent, "Raúl Castro's Last Mission: Ensuring Cuban Socialism Outlives Its Founders," *El País*, May 9, 2022.

After more than four years in office, President Díaz-Canel's most notable challenges have included the health and economic impacts of the Coronavirus Disease 2019 (COVID-19) pandemic, a shift in U.S. policy away from bilateral engagement toward increased economic sanctions, and increased social unrest emanating from poor economic conditions and repression against those advocating for freedom of expression. Amid these challenges, the Díaz-Canel government has continued to implement some market-oriented economic reforms, including long-awaited currency reform, and developed its own COVID-19 vaccines to combat the pandemic (see textbox on COVID-19 in Cuba below). The government also cracked down severely on artists and civil society activists pressing for freedom of expression and responded harshly to countrywide protests that erupted in July 2021, with hundreds of protesters arrested and prosecuted. Although Díaz-Canel has received criticism internationally for his government's increased use of repressive policies, Cuba's one-party rule does not appear to be in jeopardy, in large part due to the state's domestic security apparatus and control of virtually all media. Nevertheless, additional public protests are possible given the country's poor economic conditions, marked by food and medicine shortages and by electricity outages that have sparked smaller protests around the country.[7] In August 2022, a massive fire triggered by lightning at Cuba's main oil storage facility increased the frequency of blackouts and resulted in long lines for gasoline.

## Human Rights

The Cuban government has sharply restricted freedom of expression and other basic rights since the early years of the Cuban revolution. Over the years, it has harassed members of human rights and other civil society organizations. These organizations currently include the Ladies in White (*Las Damas de Blanco*), formed in 2003 by the female relatives of the "group of 75" dissidents arrested that year; the Patriotic Union of Cuba (*Unión Patriótico de Cuba*, or UNPACU), established in 2011 with the goal of working peacefully for civil liberties and human rights; and the San Isidro Movement (*Movimiento San Isidro,* or MSI), formed in 2018 by independent artists, musicians, writers, and scholars in response to the government's efforts through Decree-law 349 to restrict artistic expression not authorized by the state.[8] The Cuban government also regularly harasses and restricts the activities of independent journalists critical of the government through arbitrary detentions, threats, and censorship. According to Reporters Without Borders' *2022 World Press Freedom Index*, Cuba ranked near the bottom, 173rd out of 180 countries worldwide.[9]

Amid Cuba's repressive media environment, various independent Cuban blogs and media outlets have been established over the past 15 years. These outlets have benefited from the government's expansion of internet connectivity since 2015. The increase in social media use in Cuba (through foreign platforms such as Facebook, Twitter, and WhatsApp) has opened up a new avenue for freedom of expression. In response, the government has cracked down on those using social media to express critical dissent. The government has interrogated and fined journalists and government critics using social media, citing Decree-law 370, in force since July 2019, which

---

[7] Aleiny Sánchez Martínez, "Más Apagones, Más Protestas en Cuba," *El Toque*, August 3, 2022.

[8] "Decree 349: What Does It Say and What Does It Imply?" *Diario de Cuba*, December 10, 2018; "Cuba: Harassment of San Isidro Movement Exemplifies Ongoing Assault on Freedom of Expression," Amnesty International, November 20, 2020.

[9] Reports Without Borders, "Cuba," in *2022 World Press Freedom Index*, May 3, 2022, at https://rsf.org/en/country/cuba.

prohibits the dissemination of information "contrary to the social interest, morals, good manners, and integrity of people."[10]

**Increased Repression.** Since late 2020, the human rights situation in Cuba has deteriorated considerably. As described below, the government cracked down on artists and others advocating for freedom of expression beginning in November 2020, harshly responded to countrywide protests that erupted in July 2021, and suppressed an opposition civic march planned for November 2021.

The November 2020 crackdown occurred after Cuban rapper and MSI member Denis Solís González was arrested on November 9, 2020. He was charged with "contempt for public authority" and sentenced to eight months in prison. In response, MSI members conducted a peaceful protest, which authorities disrupted.[11] Several MSI members subsequently began a hunger strike at the home of MSI leader Luis Manuel Otero Alcántara. Cuban authorities broke into the home on November 26, alleging violations of COVID-19 protocols, and detained over a dozen people. As word spread by social media, including videos of the government's repression, several hundred Cubans—many young artists—gathered in protest at the Ministry of Culture overnight on November 27. Several observers dubbed the protest an awakening of civil society energized by social media.[12] The November protest also spurred the creation of 27N, a collective of artists and journalists supportive of MSI. Motivated by the repression of the MSI, in February 2021, a group of well-known Cuban hip-hop artists released a song and music video, *Patria y Vida*, critical of the government. The song became an instant hit and energized Cuban youth to such an extent that the government reacted with a campaign attempting to discredit it.[13]

On July 11, 2021, widespread and largely peaceful anti-government demonstrations broke out in Havana and throughout the country, with thousands of Cubans protesting shortages of food and medicine, daily blackouts, slow progress on COVID-19 vaccinations, and long-standing repression of freedom of expression and other basic rights. The protests were the largest since 1994, when Cuba was in the midst of an economic crisis following the loss of financial support from the collapsed Soviet Union. As with the MSI protest in November 2020, social media proved instrumental in bringing out Cubans to demonstrate.

The Cuban government responded to the July 2021 protests with harsh measures, including widespread arrests and detentions of more than 1,000 protesters, civil society activists, journalists, and bystanders. In a televised address, President Díaz-Canel denounced U.S. sanctions for causing shortages of food, medicines, raw materials, and fuel. He acknowledged that some Cubans who were protesting were experiencing shortages but asserted that a core group of manipulators planned the demonstrations. Díaz-Canel called "for all revolutionaries in our country, all communists, to take to the streets."[14] Human Rights Watch issued a report in October

---

[10] Human Rights Watch, *World Report 2022*, January 2022.

[11] Solís was released on July 11, 2021. See "Sale de Prisión el Rapero Contestatario Denis Solís," *14ymedio*, July 12, 2021.

[12] *Economist*, "The Movimiento San Isidro Challenges Cuba's Regime," December 5, 2020; and Ed Augustin, Natalie Kitroeff, and Frances Robles, "'An Awakening': Cubans' Access to the Internet Fosters Dissent," *New York Times*, December 10, 2020.

[13] Osmel Ramirez Alvarez, "*Patria y Vida* Has Touched Cuban Youth in Particular," *Havana Times*, March 27, 2021; and Nora Gámez Torres, "A Song Asks Cubans to Drop Castro's Chant 'Homeland or Death.' The Government Is on Edge," *Miami Herald*, February 23, 2021.

[14] Gladys Leydis Ramos López, "We Defend the Revolution, Above All Else," *Granma*, July 12, 2021.

2021 documenting "human rights abuses, including arbitrary detentions, ill-treatment in detention, and abusive criminal proceedings" against 130 of the July 2021 protesters.[15]

In November 2021, the Cuban government denied permission and disrupted plans for a new civic group, Archipiélago (organized through a Facebook forum), to conduct a countrywide "civic march for change" on November 15. The government used police, state security, and civilian pro-government mobs to thwart the planned protests. Cuban officials also threatened opposition leaders with prosecution, and President Díaz-Canel accused the United States of playing a role in trying to foment protest.[16]

Hundreds of the July 11, 2021, protesters have been tried and convicted, including more than 25 minors. As of the end of August 2022, the human rights group Cuban Prisoners Defenders reported that Cuba had 1,016 political prisoners (up from 152 on July 1, 2021). Of these prisoners, 743 were imprisoned and considered prisoners of conscience, 242 were under some form of conditional release, and 31 were imprisoned for other politically motivated acts.[17] Those imprisoned include MSI leader Otero Alcántara (sentenced to five years), Maykel Castillo Pérez (also known as Maykel Osorbo, a musician and hip-hop artist who participated in the *Patria y Vida* video, sentenced to nine years), and UNPACU leader José Daniel Ferrer (home detention revoked in August 2021, ordered to serve remaining four years in prison).

---

### Human Rights Reporting on Cuba

Below is a selection of organizations and publications that regularly report on human rights condition in Cuba.

**Amnesty International (AI)**, Cuba, https://www.amnesty.org/en/location/americas/central-america-and-the-caribbean/cuba/.

**Cuban Prisoners Defenders**, https://www.prisonersdefenders.org.

**Human Rights Watch (HRW)**, https://www.hrw.org/americas/cuba.

**Inter-American Commission on Human Rights**, *Annual Report 2021*, May 26, 2022, Chapter IV has a section on Cuba, at http://www.oas.org/en/iachr/docs/annual/2021/Chapters/IA2021cap4B.Cuba-en.pdf.

**Inter-American Commission on Human Rights, Special Rapporteur for Freedom of Expression,** Annual Report 2021, Trends on the right to freedom of expression in the Western Hemisphere, May 26, 2022, Cuba section, pp. 130-139, at https://www.oas.org/en/iachr/expression/reports/IA2021ENG.pdf.

**U.S. Department of State**, *Country Report on Human Rights Practices for 2021*, April 12, 2022, at https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/.

**U.S. Department of State**, *2022 Trafficking in Persons Report*, July 2022, Cuba section, pp. 193-195, at https://www.state.gov/wp-content/uploads/2022/08/22-00757-TIP-REPORT_072822-inaccessible.pdf

**Selected Cuban Independent Media: 14ymedio.com**, independent digital newspaper, based in Havana, at http://www.14ymedio.com/; **El Toque,** an independent multimedia platform focused on diverse topics, at https://eltoque.com/; **Periodismo del Barrio**, focusing especially on environmental issues, at https://www.periodismodebarrio.org/; and **TremendaNota**, focusing on the LGBT+ community, at https://www.tremendanota.com/.

---

[15] Human Rights Watch, "Cuba: Peaceful Protesters Systematically Detained, Abused," October 19, 2021.

[16] Frances Robles, "Government Forces Disrupt Planned Protests in Cuba," *New York Times*, November 16, 2021; Mary Beth Sheridan and Alejandra Ibarra Chaoul, "Cuban Security Forces Throttle Planned Day of Nationwide Demonstrations," *Washington Post*, November 16, 2021; Marc Frank and Nelson Acosta, "With Cuban Dissidents Wary or in Jail, Call for Fresh Protests Falls Flat," Reuters News, November 15, 2021; and Nora Gámez Torres, "Government's Crackdown Intensifies in Cuba Weeks Ahead of a Planned Opposition March," *Miami Herald*, October 26, 2021.

[17] Cuban Prisoners Defenders, "Informe Mensual de Prisioneros Políticos" y "Lista de Presos Políticos," September 8, 2022.

# Economic Conditions

Although the Cuban government has permitted an expansion of the private sector over the past decade, the state still controls most means of production and employs a majority of the workforce. Key sectors of the economy that generate foreign exchange include the export of professional services (largely medical personnel); tourism, which has grown significantly since the mid-1990s; nickel mining, with the Canadian mining company Sherritt International involved in a joint investment project; and biotechnology and pharmaceuticals, which supply the domestic health care system and has fostered a significant export industry.

The Cuban economy has been hard-hit by the economic shutdown associated with the COVID-19 pandemic (see text box), reduced support from Venezuela due to that country's economic crisis over the past several years, and U.S. economic sanctions. The Cuban government reports the economy contracted by 10.9% in 2020, grew by 1.3% in 2021, and is projected to expand by 4% in 2022.[18] The Economist Intelligence Unit (EIU) forecasts 3.2% growth in 2022 and projects 4.6% growth in 2023.[19] This forecast could change, given the impact of Russia's invasion of Ukraine on the global economy, including increases in food and fuel prices. The August 2022 fire that severely damaged Cuba's main oil storage facility also may affect this forecast.

Cash remittances from relatives living abroad, especially in the United States, remain an important source of hard currency, amounting to $3.7 billion in 2019.[20] In 2020 and 2021, the amount of remittances sent to Cuba declined significantly due to the disruption of flights during the pandemic and increased U.S. sanctions, which caused Western Union to terminate its services to Cuba in November 2020. A Canadian-based remittance-forwarding company estimates that cash remittances to Cuba fell to $3 billion in 2020 and $1.9 billion in 2021.[21]

> ### COVID-19 in Cuba
>
> Cuba's public health response to the COVID-19 pandemic initially kept cases and deaths low, but both increased in late 2020 and surged until August 2021. The country experienced another surge in cases in January 2022 due to the Omicron variant, but deaths remained low, partly because of high vaccination rates. As of September 2022, Cuba reported over 8,500 deaths since the pandemic began, with a mortality rate of 75 per 100,000 (lower than many countries in the Americas) and had fully vaccinated 88% of its population, one of the highest vaccination rates worldwide.
>
> Cuba has produced its own COVID-19 vaccines—Abdala, Soberana 2, and Soberana Plus (to be used in combination with Soberana 2)—which it has used (along with the Sinopharm vaccine from China) to vaccinate its population. Cuba has two other vaccines in clinical trials. Although the Cuban vaccines have not yet received World Health Organization authorization, several countries (e.g., Iran, Mexico, Nicaragua, Venezuela, and Vietnam) have authorized their emergency use.
>
> **Sources:** Johns Hopkins University School of Medicine, Coronavirus Resource Center, "Cuba," September 19, 2022, at https://coronavirus.jhu.edu/region/cuba; Sara Reardon, "Cuba's Bet on Home-Grown COVID Vaccines Is Paying Off," *Nature*, November 22, 2021; EFE News Service, "Cuba to Send to WHO Information on Abdala Anti-COVID Vaccine in March," February 15, 2022; and Nelson Acosta, "Cuba Lifts Mask Mandate as Vaccination Rate Soars and Deaths Plummet," Reuters News, May 31, 2022.

---

[18] Agencia EFE, "Cuba Creció un 1,3% en 2021, Según Cifras Oficiales," July 21, 2022; Caribbean Council, "Gil Says Economic Recovery Gradual, Inflation Must Be Better Addressed," *Cuba Briefing*, July 25, 2022.

[19] EIU, *Cuba Country Report*, 3rd quarter 2022, p. 6.

[20] Havana Consulting Group and Tech, "COVID-19 puede hacer declinar las remesas a Cuba entre un 30 y 40% en 2020," March 20, 2020.

[21] RevoluGROUP Canada Inc., "RevoluSEND Remittances Adds Cuba and Morocco Topping 116 Countries," news release, February 18, 2022.

Cuba's tourism sector has been especially affected by the pandemic. Due to pandemic-related travel restrictions, the number of international visitors to Cuba fell sharply, from almost 4.3 million in 2019 to almost 1.1 million in 2020 and fewer than 400,000 in 2021.[22] Increased U.S. restrictions on travel to Cuba also contributed to a reduction of visitors (see "U.S. Restrictions on Travel and Remittances," below). These restrictions included changes eliminating people-to-people educational travel, prohibiting cruise ships and private and corporate aircraft from going to Cuba, suspending commercial flights to cities other than Havana, and prohibiting U.S. travelers from staying at over 400 hotels and private residences identified by the State Department as owned or controlled by the Cuban government.

Until 2021, the Díaz-Canel government largely continued a gradualist, cautious approach to economic reform, mainly due to concern about the potential effects on political stability. In December 2020, however, President Díaz-Canel announced in a televised address the elimination of Cuba's dual currency system; on January 1, 2021, the Cuban peso was fixed to a single exchange rate of 24 pesos per U.S. dollar, and the Cuban convertible peso was phased out over several months. Over the medium- to long-term, the currency unification is expected to eliminate economic distortions. To date, however, the move has inflicted significant costs, including high inflation, with estimates ranging from nearly 200%-500% by the end of 2021; inflation has spurred the growth of an informal market for dollars and other convertible currencies. The EIU forecasts that inflation will decline to 59% at the end of 2022 and almost 35% at the end of 2023, but that projection may be jeopardized if the government is unable to resolve shortages.[23]

In early August 2022, the government announced the state banking system would begin purchasing (but not selling) dollars and other convertible currencies at nearly five times the current rate with the goal of undercutting the informal market and acquiring foreign currency. The new rate for buying dollars was set at 120 pesos to the dollar (but reportedly would float), compared with the official rate of 24 pesos and the informal market rate of 115 pesos.[24] On August 22, 2022, the Cuban government announced it would begin selling dollars and other foreign currency, with some restrictions, with the goal of undercutting the informal market, which it blames for high inflation.[25]

Among other reforms, the Cuban government partially liberalized the labor market in February 2021 to allow private-sector participation in more than 2,000 professions. In August 2021, the government legalized the establishment of small- and medium-sized businesses with fewer than 100 employees; by May 2022, more than 3,000 such businesses had been approved.[26] In another incremental measure announced in mid-August 2022, the Cuban government said it plans to

---

[22] República de Cuba, Oficina Nacional de Estadísticas e Información (ONEI), "Arribo de viajeros. Visitantes internacionales. Al cierre de diciembre 2021," February 4, 2022.

[23] EIU, *Cuba Country Report*, 3rd quarter 2022, pp. 8 and 9; Marc Frank, "Cuban Peso in Free Fall Against the Dollar," *Reuters News*, January 26, 2022; Pavel Vidal, "Economic Trend Report, Fourth Quarter, 2021," *Cuba Standard, Economic Reports*, March 2022.

[24] Marc Frank, "Cuba More Than Quadruples Dollar/Peso Exchange Rate," *Reuters News*, August 3, 2022. The informal market rate has continued to climb and, as of September 20, 2022, was 180 pesos to the dollar. For the most recent rate, see *El Toque*, "Tasas de Cambio de Moneda en Cuba Hoy," at https://eltoque.com/tasas-de-cambio-de-moneda-en-cuba-hoy.

[25] Marc Frank, "Cuba to Exchange Some Foreign Currency for Pesos After Two-Year Hiatus," *Reuters News*, August 23, 2022.

[26] BBC News, "Cuba Allows Small- and Medium-Sized Private Businesses," August 7, 2021; Marc Frank and Nelson Acosta, "Cuba's Economic Reforms Allow Small Entrepreneurs to Dream Big," *Reuters News*, December 7, 2021; EIU, *Cuba Country Report*, 2nd quarter 2022, p. 6; and Pavel Vidal, "Economic Trend Report, First Quarter, 2022," *Cuba Standard, Economic Reports*, June 2022.

allow certain foreign investment in local wholesale and retail trade, although some economists doubt whether this limited step will relieve shortages.[27]

# U.S. Policy Toward Cuba

## Historical Background[28]

In the early 1960s, U.S.-Cuba relations deteriorated sharply when Fidel Castro began to build a repressive communist dictatorship and moved his country toward close relations with the Soviet Union. The often tense and hostile nature of the U.S.-Cuba relationship is illustrated by such events and actions as U.S. covert operations to overthrow the Castro government, culminating in the ill-fated April 1961 Bay of Pigs invasion; the October 1962 missile crisis, in which the United States confronted the Soviet Union over its attempt to place offensive nuclear missiles in Cuba; Cuban support for guerrilla insurgencies and military support for revolutionary governments in Africa and the Western Hemisphere; the 1980 exodus of around 125,000 Cubans to the United States in the so-called Mariel boatlift; the 1994 exodus of more than 30,000 Cubans who were interdicted and housed at U.S. facilities in Guantanamo Bay, Cuba, and in Panama; and the 1996 shootdown by Cuban fighter jets of two U.S. civilian planes operated by the Cuban-American group Brothers to the Rescue, which resulted in the deaths of four U.S. crew members.

Since the early 1960s, U.S. policy toward Cuba—long a significant congressional concern—has consisted largely of seeking to isolate the island nation through comprehensive economic sanctions, including an embargo on trade and financial transactions. Especially since the end of the Cold War, Congress has actively shaped U.S. policy toward Cuba. Much of the congressional debate has focused on economic sanctions, first with the enactment of the Cuban Democracy Act of 1992 (CDA; P.L. 102-484, Title XVII) and then with the Cuban Liberty and Democratic Solidarity Act of 1996 (LIBERTAD Act; P.L. 104-114). Both measures tightened U.S. economic sanctions on Cuba that were first imposed in the early 1960s; however, both measures also provided road maps for the normalization of relations, dependent on significant political and economic changes in Cuba. Congress partially modified its sanctions-based policy toward Cuba when it enacted the Trade Sanctions Reform and Export Enhancement Act of 2000 (TSRA; P.L. 106-387, Title IX), allowing for U.S. agricultural exports to Cuba, albeit with severely restrictive financing options. Congress also has funded U.S. government-sponsored broadcasting to Cuba since the 1980s and Cuba democracy and human rights programs since the 1990s.

## Policy Shifts Under the Obama and Trump Administrations[29]

President Obama announced a major shift in U.S. policy toward Cuba in December 2014 that moved away from a sanctions-based policy aimed at isolating Cuba toward a policy of engagement and a normalization of relations. At the time, President Obama said his

---

[27] Marc Frank, "Cuba Cracks Open Door to Foreign Investment in Domestic Trade, Reuters News, August 16, 2022; and Nora Gámez Torres, "As Food Crisis Deepens, Cuba to Allow Some Foreign Investment in Wholesaling and Retail," *Miami Herald*, August 16, 2022.

[28] For additional background, see CRS Report RL30386, *Cuba-U.S. Relations: Chronology of Key Events 1959-1999*. For an extensive review of the history of bilateral relations, see Ada Ferrer, *Cuba: An American History* (New York: Scribner, 2021).

[29] For more on Obama Administration policy, see CRS Report R43926, *Cuba: Issues and Actions in the 114th Congress*, and for more on Trump Administration policy, see CRS Report R45657, *Cuba: U.S. Policy in the 116th Congress and Through the Trump Administration*.

Cuba AR_000202

Administration would "end an outdated approach that, for decades, has failed to advance our interests." He maintained that the United States would continue to raise concerns about democracy and human rights in Cuba but stated, "we can do more to support the Cuban people and promote our values through engagement."[30]

The policy shift led in July 2015 to the restoration of diplomatic relations, which had been severed in January 1961 by the Eisenhower Administration. It also led to the May 2015 rescission of the Cuban government's designation as a state sponsor of international terrorism, a designation that dated to 1982, and to the easing of some restrictions on travel and commerce with Cuba in 2015 and 2016. The restoration of relations resulted in increased government-to-government engagement, with over 20 bilateral agreements on issues such as counternarcotics cooperation, oil spill preparedness and response, civil aviation, health cooperation, maritime issues, and environmental cooperation. It also led to a broad economic dialogue and numerous dialogues on regulatory issues, law enforcement, counterterrorism issues, property claims, and human rights, among other topics.

President Trump unveiled his Administration's Cuba policy in June 2017, introducing new sanctions and rolling back the Obama Administration's efforts to normalize relations. President Trump signed a national security presidential memorandum (NSPM) replacing President Obama's October 2016 presidential policy directive laying out objectives for the normalization process.[31] New sanctions included a prohibition on certain financial transactions with companies controlled by the Cuban military, intelligence, or security services. In September 2017, the State Department reduced the staff of the U.S. Embassy in Havana by about two-thirds in response to unexplained health

---

### Anomalous Health Incidents

Between late 2016 and May 2018, 26 U.S. Embassy Havana community members suffered a series of unexplained injuries, including hearing loss and cognitive issues. In December 2020, the National Academies of Sciences, Engineering, and Medicine released a report concluding the most plausible mechanism for the source of the health symptoms was directed pulsed radio frequency energy. U.S. officials maintain that investigations into the cause or source of these anomalous health incidents have not reached a conclusion. A number of U.S. government and military officials worldwide have reported these symptoms since 2016.

In January 2022, press reports maintained that an interim Central Intelligence Agency (CIA) report concluded that a majority of cases worldwide are unlikely to have been caused by a foreign adversary, although it noted that some two dozen cases remain unexplained. In early February 2022, a panel of experts convened by the Director of National Intelligence and the CIA Deputy Director reported that pulsed radio frequency energy could plausibly explain the health symptoms but maintained that information gaps remain.

Congress enacted legislation (P.L. 117-46) in September 2021 authorizing payment to CIA and State Department personnel who experience certain brain injuries. The National Defense Authorization Act for FY2022 (P.L. 117-81), approved in December 2021, has provisions to address health care and treatment, national security challenges, and U.S. government coordination of the response to the incidents.

**Sources**: Office of the Director of National Intelligence, "Complementary Efforts on Anomalous Health Incidents," February 2, 2022; Julian E. Barnes, "Most 'Havana Syndrome' Cases Unlikely Caused by Foreign Power, CIA Says," *New York Times*, January 20, 2022; David A. Relman and Julie A. Pavlin, eds., *An Assessment of Illness in U.S. Government Employees and Their Families at Overseas Embassies*, National Academies of Sciences, Engineering, and Medicine, 2020.

---

[30] White House, "Statement by the President on Cuba Policy Changes," December 17, 2014, at https://obamawhitehouse.archives.gov/the-press-office/2014/12/17/statement-president-cuba-policy-changes.

[31] U.S. Department of State, "Strengthening the Policy of the United States Toward Cuba," 82 *Federal Register* 48875-48878, October 20, 2017 (consists of the text of National Security Presidential Memorandum, NSPM-5, issued by the President on June 16, 2017), at https://www.federalregister.gov/documents/2017/10/20/2017-22928/strengthening-the-policy-of-the-united-states-toward-cuba; White House, "Presidential Policy Directive–United States-Cuba Normalization," October 14, 2016, at https://obamawhitehouse.archives.gov/the-press-office/2016/10/14/presidential-policy-directive-united-states-cuba-normalization.

injuries of members of the U.S. diplomatic community in Havana (see text box). The embassy staff reduction led to the suspension of most visa processing at the embassy and made it difficult to carry out other embassy functions, including on-the-ground reporting on significant economic and political developments in Cuba and outreach to civil society and human rights activists.

Beginning in 2019, the Trump Administration significantly expanded U.S. sanctions on Cuba. It reimposed some restrictions eased under the Obama Administration and imposed a series of new sanctions designed to pressure the Cuban government on its human rights record and over its support of the Nicolás Maduro government in Venezuela. The Trump Administration also allowed lawsuits against those trafficking in property confiscated by the Cuban government; tightened restrictions on U.S. travel and remittances to Cuba; and, in January 2021, again designated the Cuban government as state sponsor of international terrorism.

## Biden Administration Policy

In its initial months in office, the Biden Administration announced it was conducting a review of policy toward Cuba, with human rights a core pillar, and would review policy decisions made by the prior Administration, including the decision to designate Cuba as a state sponsor of terrorism.[32]

In the aftermath of the Cuban government's harsh response to the July 2021 protests, the Biden Administration expressed solidarity with the Cuban protesters and criticized the Cuban government for its repression. President Biden issued a statement asserting, "We stand with the Cuban people and their clarion call for freedom and relief from the tragic grip of the pandemic and from the decades of repression and economic suffering to which they have been subjected by Cuba's authoritarian regime."[33] Secretary of State Antony Blinken declared, "We join partners across the hemisphere and around the world in urging the Cuban regime to respect the rights of the Cuban people to determine their own future, something they have been denied for far too long."[34]

The Administration imposed targeted sanctions on Cuban officials involved in the repression. In July and August 2021, the Treasury Department imposed financial sanctions on three Cuban security entities and eight officials. Between November 2021 and July 2022, the State Department announced four rounds of visa restrictions against 50 individuals involved in repressing protesters. (For more details, see "Key U.S. Sanctions," below.)

In May 2022, the Administration announced several Cuba policy changes aimed at increasing support for the Cuban people. The changes, which emanated from a policy review begun in 2021, fall into four broad areas—facilitating family reunification, expanding authorized travel, easing restrictions on remittances, and supporting Cuba's private sector. According to a State Department spokesperson, the changes are to provide Cubans with "additional tools to pursue life free from Cuban government oppression and to seek greater economic opportunities."[35]

The Biden Administration has begun implementing the policy changes through various steps and regulatory changes undertaken by relevant U.S. departments and agencies. The Administration

---

[32] U.S. Department of State, "Press Briefing by Press Secretary Jen Psaki and Deputy Director of the National Economic Council Bharat Ramamurti," March 9, 2021.

[33] White House, "Statement by President Joseph R. Biden, Jr. on Protests in Cuba," July 12, 2021.

[34] U.S. Department of State, "Secretary Antony J. Blinken Remarks to the Press on Release of the 2021 Congressional Report Pursuant to the Elie Wiesel Genocide and Atrocities Prevention Act," July 12, 2021.

[35] U.S. Department of State, "Biden Administration Expands Support to the Cuban People," press statement, May 16, 2022.

began increasing immigrant visa processing at the U.S. Embassy in Havana in May 2022 and said it would reinstate the Cuban Family Reunification Parole Program, which was suspended in 2017 amid the drawdown of staff at the U.S. Embassy in Havana. In September 2022, the Administration announced it would resume full immigration visa processing at the embassy in early 2023, the first time since 2017. Driven by Cuba's difficult economic conditions and political repression, among other factors, irregular Cuban migration to the United States has surged over the past year (see "Migration Issues," below).

With regard to travel and remittances, the Biden Administration partially eased restrictions, although it kept some Trump Administration restrictions in place. Among the changes, the Biden Administration reauthorized scheduled and charter flights to locations beyond Havana, reinstated group people-to-people educational travel, eliminated dollar and frequency limits for family remittances, and restored the category of donative remittances (sometimes referred to as non-family remittances) to any Cuban national (see "U.S. Restrictions on Travel and Remittances"). The Administration also announced it would increase support for independent Cuban entrepreneurs by authorizing greater access to U.S. internet services, applications, and e-commerce platforms and by expanding access to microfinance and training.[36]

At the same time, the Administration has continued to speak out about human rights abuses in Cuba and officials maintain that human rights issues will remain at the center of U.S. policy toward Cuba.[37] On the first anniversary of the July 11, 2021, protests, Secretary of State Blinken issued a press statement asserting, "the United States recognizes the determination and courage of the Cuban people as they continue to fight for respect for human rights" and that "it is unacceptable that today, one year after these demonstrations, over 700 protesters remain behind bars."[38]

## Key U.S. Sanctions

Since the early 1960s, when the United States imposed a trade embargo on Cuba, the centerpiece of U.S. policy toward Cuba has been economic sanctions aimed at isolating the Cuban government and influencing its behavior. President Kennedy proclaimed an embargo on trade between the United States and Cuba in February 1962,[39] citing Section 620(a) of the Foreign Assistance Act of 1961 (FAA; P.L. 87-195), which authorizes the President "to establish and maintain a total embargo upon all trade between the United States and Cuba."[40] At the same time, the Treasury Department issued the Cuban Import Regulations to deny the importation into the United States of all goods imported from or through Cuba.[41] The authority for the embargo was expanded in March 1962 to include the Trading with the Enemy Act (TWEA, P.L. 65-91, as amended).[42] In July 1963, the Treasury Department revoked the Cuban Import Regulations and

---

[36] U.S. Department of State, "Biden Administration Measures to Support the Cuban People," fact sheet, May 16, 2022.

[37] White House, "Background Press Call by Senior Administration Officials on New Cuba Policy," press briefing via teleconference, May 16, 2022.

[38] U.S. Department of State, Secretary of State Antony J. Blinken, "The First Anniversary of July 11, 2021, Protests," press statement, July 11, 2022.

[39] Presidential Documents, "Proclamation 3447, Embargo on All Trade with Cuba," 27 *Federal Register* 1085, February 7, 1962.

[40] In October 1960, under the Eisenhower Administration, exports to Cuba were strictly controlled under the authority of the Export Control Act of 1949 in response to the expropriation of U.S. properties. This action in effect amounted to an embargo on exports of all products with the exception of certain foods, medicines, and medical supplies.

[41] U.S. Department of the Treasury, 27 *Federal Register* 1116, February 7, 1962.

[42] U.S. Department of the Treasury, 27 *Federal Register* 2765-2766, March 24, 1962.

replaced them with the more comprehensive Cuban Assets Control Regulations (CACR)—31 C.F.R. Part 515—under the authority of TWEA and Section 620(a) of the FAA.[43]

The CACR remain the main body of Cuba embargo regulations and have been amended repeatedly over the years to reflect changes in U.S. policy. The regulations, administered by the Treasury Department's Office of Foreign Assets Control, prohibit most financial transactions with Cuba, including transactions related to trade, travel, and remittances, and they block Cuban government assets in the United States. The CACR also require all exports to Cuba to be licensed or otherwise authorized by the Department of Commerce, Bureau of Industry and Security, under the terms of the Export Administration Regulations (EAR), at 15 C.F.R. Parts 730-744.[44] (For more details on certain sanctions, see sections on "U.S. Restrictions on Travel and Remittances" and "U.S. Exports and Sanctions," below.)

Congress strengthened sanctions on Cuba with enactment of the CDA, LIBERTAD Act, and TSRA. In addition to these acts, Congress enacted numerous other provisions of law over the years that imposed sanctions on Cuba, including restrictions on trade, foreign aid, and support from the international financial institutions.[45]

- Among its provisions, the CDA prohibits U.S. foreign subsidiaries from engaging in trade with Cuba and prohibits entry into the United States for any seaborne vessel to load or unload freight if it has been involved in trade with Cuba within the previous 180 days unless licensed by the Treasury Department.[46]

- The LIBERTAD Act, enacted in the aftermath of Cuba's shooting down two U.S. civilian planes in February 1996, combines various measures to increase pressure on Cuba and provides a plan to assist Cuba once it begins the transition to democracy. Most significantly, the act codifies the Cuban embargo as permanent law, including all restrictions imposed by the executive branch under the CACR. This provision is noteworthy because of its long-lasting effect on U.S. policy options toward Cuba. The provision prohibits the executive branch from lifting the economic embargo without congressional concurrence through legislation until certain democratic conditions set forth in the law are met, although the President retains broad authority to amend the regulations therein. Title III of the law holds any person or government that traffics in property confiscated by the Cuban government liable for monetary damages in U.S. federal court.[47] Title IV

---

[43] U.S. Department of the Treasury, "Control of Financial and Commercial Transactions Involving Cuba or Nationals Thereof," 28 *Federal Register* 6974-6985, July 9, 1963.

[44] 31 C.F.R. §515.533. In the Export Administration Regulations (EAR), see especially 15 C.F.R. §746.2 on Cuba. The EAR are authorized, in large part, by the Export Control Reform Act of 2018 (P.L. 115-232, Title XVII, Subtitle B) and the three retained sections of the otherwise repealed Export Administration Act of 1979 (P.L. 96-72).

[45] These include several other provisions restricting assistance to Cuba in the Foreign Assistance Act of 1961 (FAA; P.L. 87-195), as well as sanctions provisions in the Export-Import Bank Act of 1945, the International Development Association Act, the Inter-American Development Bank Act, the Breton Woods Agreements Act, 1978, the Tariff Classification Act of 1962, the Trade Act of 1974, the Food Security Act of 1985, and the Omnibus Consolidated and Emergency Supplemental Appropriations, 1999 (Division A, Title II, Section 211, P.L. 105-277). See CRS Report R43888, *Cuba Sanctions: Legislative Restrictions Limiting the Normalization of Relations*.

[46] Pursuant to an October 2016 regulatory change, the Obama Administration eased the 180-day rule by issuing a general license waiving the restriction if the items carried to Cuba would, if subject to the EAR, be designated as EAR 99, meaning the items are not on the Commerce Control List. According to the Commerce Department, EAR items generally consist of low-technology consumer goods. U.S. Department of the Treasury, "Cuban Assets Control Regulations," 81 *Federal Register* 71372-71378, October 17, 2016.

[47] Effective May 2, 2019, the Trump Administration allowed the right to file lawsuits against those trafficking in

denies admission to the United States to aliens involved in the trafficking of confiscated U.S. property in Cuba.

- TSRA authorizes U.S. commercial agricultural exports to Cuba (with prohibitions on U.S. assistance and private financing) and requires "payment of cash in advance" or third-country financing for the exports. The act also prohibits tourist travel to Cuba.

Under the Trump Administration, the United States introduced additional sanctions, discussed below, that have continued under the Biden Administration. These sanctions include restrictions on transactions with entities identified as controlled by the Cuban military, a prohibition on staying at accommodations in Cuba identified as controlled by the Cuban government or by certain prohibited government or PCC officials or their close relatives, and two terrorism-related designations. In addition, both the Trump and Biden Administrations imposed targeted sanctions on Cuban officials and entities, including financial sanctions and visa restrictions, for involvement in human rights abuses.

**Cuba Restricted List.** Pursuant to President Trump's NSPM, the State Department in 2017 identified entities controlled by the Cuban military, intelligence, or security services or personnel and published a list of entities with which direct financial transactions would disproportionately benefit those services or personnel at the expense of the Cuban people or private enterprise in Cuba. The State Department has updated this "Cuba Restricted List" several times, most recently on January 8, 2021. The CACR, as amended by the Treasury Department, prohibits financial transactions with entities on the list, with certain exceptions, including transactions related to air or sea operations supporting permissible travel, cargo, or trade; the sale of agricultural and medical commodities; and direct telecommunications or internet access for the Cuban people.[48] The list currently includes 231 entities and sub-entities, including 2 ministries, 5 holding companies and 55 of their sub-entities (including the Mariel Special Development Zone), 111 hotels, 2 tourist agencies, 5 marinas, 10 stores in Old Havana, and 41 entities serving defense and security sectors.[49]

**Cuba Prohibited Accommodations List.** In September 2020, the Treasury Department amended the CACR to prohibit most categories of authorized travelers to Cuba from lodging, paying for lodging, or making any reservation for or on behalf of a third party to lodge at any property in Cuba that the Secretary of State has identified as a property owned or controlled by the Cuban government, a prohibited Cuban government official, a prohibited member of the Communist Party, or a close relative of either.[50] The State Department subsequently issued a "Cuba Prohibited

---

confiscated property in Cuba pursuant to Title III. Lawsuits can be brought by any U.S. national, including those who were not U.S. nationals at the time of the confiscation. For background, see section on "Property Claims and Title III and IV of the LIBERTAD Act," in CRS Report R45657, *Cuba: U.S. Policy in the 116th Congress and Through the Trump Administration*. Some 44 lawsuits have been filed, including 15 involving claimants certified by the Foreign Claims Settlement Commission (out of 5,913 claims) and 29 noncertified claims against U.S. and foreign companies. Several of the lawsuits have been dismissed. See U.S.-Cuba Trade and Economic Council, Inc. "LIBERTAD Act Filing Statistics," accessed August 29, 2022, at https://www.cubatrade.org/s/Libertad-Act-Filing-Statistics-bh8j.pdf.

[48] U.S. Department of the Treasury, "Treasury, Commerce, and State Implement Changes to the Cuba Sanctions Rules," fact sheet, November 8, 2017; and U.S. Department of the Treasury, "Cuban Assets Control Regulations," 82 *Federal Register* 51998-52004, November 9, 2017.

[49] U.S. Department of State, "Updating the State Department's List of Entities and Sub-entities Associated with Cuba (Cuba Restricted List)," 86 *Federal Register* 1561-1564, January 8, 2021. The list is also available on the State Department's website at https://www.state.gov/cuba-restricted-list/list-of-restricted-entities-and-subentities-associated-with-cuba-effective-january-8-2021/.

[50] U.S. Department of the Treasury, "Cuban Assets Control Regulations," 85 *Federal Register* 60068-60072,

Accommodations List" that included over 400 hotels as well as privately owned residences for rent (*casas particulares*).[51]

**Terrorism Designations.** Since 2020, pursuant to Section 40A of the Arms Export Control Act (P.L. 90-629, as amended), Cuba has been on the annual list of countries certified by the Secretary of State as *not cooperating fully* with U.S. anti-terrorism efforts, a status that prohibits U.S. exports of defense articles and services to the designated foreign government. In May 2020, then-Secretary of State Michael Pompeo added Cuba to the annual list for the first time since 2015. Secretary of State Antony Blinken has continued to include Cuba on the list, most recently in May 2022.[52]

The Cuban government also is designated as a state sponsor of acts of international terrorism pursuant to provisions in several laws, with sanctions that restrict foreign assistance and non-emergency food aid, ban defense exports and sales, and impose certain controls over exports of dual-use items and other miscellaneous financial restrictions.[53] Under the Trump Administration, then-Secretary of State Pompeo designated the government of Cuba as a state sponsor of international terrorism, effective January 12, 2021. The State Department cited Cuba's harboring from justice of 10 leaders of Colombia's National Liberation Army (ELN; a U.S.-designated foreign terrorist organization), who had traveled to Cuba in 2017 to engage in peace talks with the Colombian government, and several U.S. fugitives since the 1970s (see "U.S. Fugitives from Justice" section, below).[54] In August 2022, new Colombian President Gustavo Petro said he was suspending extradition requests for ELN members in Colombia as part of an effort to restart peace talks, which collapsed in 2019.[55]

**Targeted Human Rights Sanctions.** Since 2019, the United States has imposed targeted sanctions on Cuban officials and entities linked to or responsible for human rights abuses. These sanctions include visa restrictions and financial sanctions blocking assets and property, as well as a prohibition against U.S. persons dealing with the blocked individuals or entities.

In 2019 and 2020, under the Trump Administration, the State Department imposed visa restrictions on three high-ranking Cuban officials and their immediate family members for credible information of their involvement in gross violation of human rights, barring them from

---

September 24, 2020.

[51] U.S. Department of State, "Cuba Prohibited Accommodations List Initial Publication," September 28, 2020, at https://www.state.gov/cuba-sanctions/cuba-prohibited-accommodations-list/cuba-prohibited-accommodations-list-initial-publication/.

[52] U.S. Department of State, "Determination and Certification of Countries Not Cooperating Fully with Anti-terrorism Efforts," 85 *Federal Register* 33772, June 2, 2020; and U.S. Department of State, "Determination and Certification of Countries Not Cooperating Fully with Anti-terrorism Efforts," 87 *Federal Register* 31051, May 20, 2022.

[53] The provision of laws is Section 620A of the FAA, Section 40 of the Arms Export Control Act (P.L. 90-629, as amended), and Section 1754(c) of the Exports Controls Act of 2018 (in P.L. 117-232, the John S. McCain National Defense Act for Fiscal Year 2019). See CRS Report R43835, *State Sponsors of Acts of International Terrorism—Legislative Parameters: In Brief*; and U.S. Department of State, "State Sponsors of Terrorism," at https://www.state.gov/state-sponsors-of-terrorism/.

[54] U.S. Department of State, Secretary of State Michael R. Pompeo, "U.S. Announces Designation of Cuba as a State Sponsor of Terrorism," January 11, 2021. Previously, the State Department designated Cuba as a state sponsor in 1982 because of the country's alleged ties to international terrorism; this designation was rescinded under the Obama Administration in 2015. For background on Cuba's initial designation, see CRS Report RL32251, *Cuba and the State Sponsors of Terrorism List*, August 22, 2006. For background on the rescission of Cuba's state sponsor designation, see "State Sponsor of Terrorism Designation," in CRS Report R43926, *Cuba: Issues and Actions in the 114th Congress*.

[55] Julia Symmes Cobb, "Colombia Suspends ELN Rebel Arrest Warrants, Extradition Orders to Restart Peace Talks," Reuters News, August 20, 2022.

entry into the United States, pursuant to a long-standing and annually renewed provision in the Department of State, Foreign Operations, and Related Programs Appropriations Act (SFOPS; currently in Section 7031(c) of P.L. 117-103, Division K). The officials were Raúl Castro, then-Minister of the Interior Julio Cesar Gandarilla Bermejo (who died in 2020), and then-Cuban Defense Minister Leopoldo Cintra Frias (who was replaced in 2021).[56] In September 2020, the Treasury Department imposed, pursuant to the CACR, financial sanctions on Luis Alberto Rodríguez López-Calleja, Raúl Castro's former son-in-law, who headed a holding company of the Cuban military (López-Calleja died in July 2022).[57] In January 2021, Treasury designated for sanctions Cuba's Ministry of the Interior (MININT) and its minister, General Lazaro Alberto Álvarez Casas, pursuant to authorities to deter human rights abuses and public corruption enacted in the Global Magnitsky Human Rights Accountability Act (P.L. 114-328, Title XII, Subtitle F) and implemented by Executive Order 13818.[58]

In the aftermath of Cuba's harsh repression of protests in July 2021, the Biden Administration has imposed targeted visa restrictions, pursuant to Presidential Proclamation 5377, on 50 Cuban officials and financial sanctions, pursuant to Executive Order 13818, on three Cuban security entities and eight officials involved in the repression. Although the Cuban officials whose visas were restricted are unnamed, according to the State Department, they include high-ranking officials of MININT, the Ministry of Revolutionary Armed Forces (MINFAR), and the PCC. They also include officials connected to unfair trials, unjust sentencing, and imprisonment of peaceful protesters and officials who work in the state communications and media sectors.[59] The three security entities sanctioned by the Treasury Department are MINFAR's *Tropas de Prevención,* MININT's *Brigada Especial Nacional* (Special National Brigade), and the *Policia Nacional Revolucionaria* (PNR). Cuban officials sanctioned by Treasury include Minister of Defense Álvaro López Miera and officials of MININT, MINFAR, and the PNR.[60]

## Debate on the Direction of U.S. Policy

Over the years, although U.S. policymakers have agreed on the overall objectives of U.S. policy toward Cuba—to help bring democracy and respect for human rights to the island—there have been different schools of thought about how to achieve those objectives. Some have advocated a policy of keeping maximum pressure on the Cuban government until it reforms while continuing U.S. efforts to support the Cuban people. Others have argued for an approach, sometimes referred to as *constructive engagement*, that would lift some U.S. sanctions that hurt the Cuban people and move toward engaging the Cuban government in dialogue in key areas of U.S. interest. Still

---

[56] U.S. Department of State, Secretary of State Michael R. Pompeo, "Public Designation of Raúl Castro, Due to Involvement in Gross Violations of Human Rights," press statement, September 26, 2019, "Public Designation of Julio Cesar Gandarilla Bermjeo Under Section 7031(c) of the FY2019 Department of State, Foreign Operations List," press statement, November 16, 2019; and "Public Designation of Leopoldo Cintra Frias Due to Involvement in Gross Violations of Human Rights," press statement, January 2, 2020.

[57] U.S. Department of the Treasury, "Notice of OFAC Sanctions Action," 85 *Federal Register*, October 5, 2020.

[58] U.S. Department of the Treasury, "Treasury Sanctions the Cuban Ministry of the Interior and Its Leader for Serious Human Rights Abuse," press release, January 15, 2021.

[59] U.S. Department of State, Secretary of State Antony J. Blinken, "Announcement of Visa Restrictions Against Cuban Officials," press statement, November 30, 2021; "Visa Restrictions Against Cuban Officials," press statement, January 6, 2022; "State Department Takes Steps to Impose Visa Restrictions Against Cuban Officials," press statement, June 16, 2022; and "Announcement of Visa Restrictions Against Cuban Officials," press statement, July 9, 2022.

[60] U.S. Department of State, "Cuba Sanctions," at https://www.state.gov/cuba-sanctions/.

others have called for a swift normalization of U.S.-Cuban relations by lifting U.S. economic sanctions.

The Obama Administration's December 2014 change of U.S. policy—moving from isolation toward engagement and the normalization of relations—highlighted divisions in Congress over Cuba policy. Some Members of Congress lauded the Administration's actions as being in the best interests of the United States and a better way to influence change in Cuba; other Members criticized the Administration for not obtaining concessions from Cuba to advance human rights. Some Members vowed to oppose the Administration's efforts toward normalization, whereas others introduced legislation to normalize relations with Cuba by lifting the embargo in its entirety or in part by easing some aspects of it. Several legislative provisions of House appropriations bills would have blocked some of the Administration's policy changes toward Cuba, and several provisions of Senate appropriations bills would have further eased sanctions on Cuba; ultimately, none of these provisions (or other legislative initiatives on either side of the policy divide) were enacted.[61]

The Trump Administration's approach of rolling back some Obama-era policy changes and introducing new sanctions on Cuba also highlighted divisions in Congress over Cuba policy. Some Members supported the President's action because of Cuba's lack of progress on human rights; others opposed it due to its negative effects on the Cuban people and U.S. business interests. Aside from congressional enactment of a provision in the 2018 farm bill (P.L. 115-334) authorizing funding for two U.S. agricultural export promotion programs in Cuba, Congress did not approve legislative initiatives to ease or further tighten U.S. sanctions. Congress did, however, reject the Administration's attempts to cut democracy funding for Cuba, instead appropriating $20 million each fiscal year (the same amount appropriated annually since FY2014).[62]

The Biden Administration's partial lifting of the Trump-era Cuba policy tightening restrictions on travel and remittances has elicited mixed reactions from Congress. Those Members advocating sustained pressure on Cuba have criticized the Administration's actions as providing support for the Cuban government, and those advocating engagement or support for the Cuban people have lauded the policy change as a step forward. Cuba's increased repression over the past year, including its harsh response to the July 2021 countrywide protests, appears to have eroded congressional support for measures easing economic sanctions on Cuba in the near term. Illustrative of this shift was the House's July 20, 2022, rejection of an amendment to a six-bill FY2023 appropriations measure (H.Amdt. 300 to H.R. 8294) that would have prohibited funding to enforce a sanction in U.S. law prohibiting private financing for U.S. agricultural exports to Cuba. Both houses also have approved human rights resolutions on Cuba, and, as in past Congresses, funding for democracy programs and U.S.-government sponsored broadcasting to Cuba has continued.

---

[61] For background on legislative initiatives after the Obama Administration announced its change of policy toward Cuba, see CRS Report R43926, *Cuba: Issues and Actions in the 114th Congress*.

[62] For background on legislative initiatives on Cuba during the Trump Administration, see CRS Report R44822, *Cuba: U.S. Policy in the 115th Congress* and CRS Report R45657, *Cuba: U.S. Policy in the 116th Congress and Through the Trump Administration*.

# Selected Issues in U.S.-Cuban Relations

## U.S. Restrictions on Travel and Remittances[63]

**Travel Restrictions.** Restrictions on travel to Cuba have been a key and often contentious component of U.S. efforts to isolate Cuba's communist government. The embargo regulations set forth in the CACR do not ban travel itself but restrict financial transactions related to Cuba. Numerous changes to the restrictions have occurred over time. For five years, from 1977 until 1982, there were no restrictions on travel. In 2000, Congress prohibited the authorization of transactions related to U.S. travel to Cuba solely for tourist activities when it enacted TSRA; a provision in the law defined "tourist activities" as any activity not expressly authorized in the 12 categories of travel in the CACR (see text box). The George W. Bush Administration (2001-2009) tightened U.S. restrictions on Cuba travel and the enforcement of travel restrictions. Congress took legislative action in March 2009 to ease restrictions on family travel and on travel related to U.S. agricultural and medical sales to Cuba (P.L. 111-8, Sections 620 and 621 of Division D).

The Obama Administration (2009-2017) significantly eased restrictions on travel to Cuba. In 2009, the Administration lifted restrictions on family travel. In 2011, it eased restrictions on certain other categories of travel, including group people-to-people educational travel, and allowed all U.S. international airports to become eligible for licensed charter flights to and from Cuba (previously, charter flights were limited to international airports in Miami, Los Angeles, and New York). In 2016, the Obama Administration eased restrictions by authorizing general licenses for the existing 12 categories of travel to Cuba (before the change, travelers under several of these categories had to apply for a specific license) and by authorizing individual people-to-people educational travel.[64] In 2016, the Administration increased transportation opportunities to Cuba with regular commercial air service (as opposed to charter flights) and cruise ship service to Cuba from the United States.

> ### Current Permissible Cuba Travel: 12 Categories
>
> - Family Visits
> - Official Government Business
> - Journalistic Activities
> - Professional Research and Professional Meetings
> - Educational Activities (currently includes group people-to-people travel)
> - Religious Activities
> - Public Performances, Clinics, Workshops, Athletic and Other Competitions, and Exhibitions
> - Support for the Cuban People
> - Humanitarian Projects
> - Activities of Private Foundations or Research or Educational Institutes
> - Exportation, Importation, or Transmission of Information or Informational Materials
> - Authorized Export Transactions
>
> **Source:** 31 C.F.R. §515.560, at https://www.ecfr.gov/current/title-31/subtitle-B/chapter-V/part-515/subpart-E/section-515.560.

The Trump Administration (2017-2021) reimposed certain restrictions on travel and limited transportation to Cuba from the United States. In 2017, it eliminated an authorization for individual people-to-people education travel (under the travel category of educational activities), and in 2019, it eliminated group people-to-people travel. Also in 2019, the Administration

---

[63] For more information, see CRS Report RL31139, *Cuba: U.S. Restrictions on Travel and Remittances*.

[64] A general license provides the authority to engage in a transaction without the need to apply to the U.S. Department of the Treasury for a license. In contrast, a specific license is a written document issued by the U.S. Department of the Treasury to a person or entity authorizing a particular transaction in response to a written license application.

prohibited cruise ships, sailboats, fishing boats, and private and corporate aircraft from going to Cuba from the United States. That same year, the Administration restricted regularly scheduled flights to Havana (prohibiting flights to other Cuban cities); in 2020, the Administration also restricted charter flights to Havana. Also in 2020, the Administration eliminated general licenses for attending or organizing professional meetings or conferences in Cuba and for participating in public performances, clinics, workshops, certain athletic or nonathletic competitions, and exhibitions. In addition, as noted above, the Administration's introduction of a "Cuba Restricted List" in 2017 prohibited most categories of authorized travelers from direct financial transaction with certain hotels, tourist agencies, marinas, and stores. The Administration's subsequent introduction of a "Cuba Prohibited Accommodations List" in 2020 prohibited most authorized travelers from lodging at over 400 hotels and privately owned residences for rent.

The Biden Administration has rolled back some of the travel restrictions imposed by the Trump Administration. In June 2022, the Biden Administration reauthorized regularly scheduled and charter flights to Cuban cities other than Havana. It also reinstated group (but not individual) people-to-people educational travel and a general license authorization for attending or organizing professional meetings or conferences in Cuba.

According to Cuban government statistics, the number of travelers from the United States to Cuba reached almost 1.2 million in 2018 but fell slightly to 1.1 million in 2019. Travel declined significantly in 2020 and 2021 to around 188,000 and 36,000 travelers, respectively, largely due to COVID-19-related travel restrictions but also because of U.S. travel restrictions imposed in 2019 and 2020. In the first seven months of 2022, as pandemic-related travel restrictions eased, travel to Cuba from the United States began to pick up, with over 200,000 travelers.[65]

**Restrictions on Remittances.** Much like restrictions on travel, restrictions on sending cash remittances to Cuba have been part of the U.S. sanctions regime and have changed over time. The Obama Administration significantly eased restrictions on remittances. In 2009, it lifted limitations on the amount and frequency of family remittances. It authorized remittances to any Cuban national (up to $500 per quarter) in 2011 and lifted the dollar limit for such donative remittances in 2015. It also authorized by general license remittances to individuals and independent nongovernmental organizations to support humanitarian projects; a rapid peaceful transition to democracy; the strengthening of civil society; and the development of private businesses, including small farms.

In contrast, the Trump Administration imposed restrictions on remittances. In 2019, it capped family remittances to any one Cuban national to $1,000 per quarter, eliminated the category of donative remittances to Cuban nationals, and prohibited family remittances to close family members of prohibited Cuban government officials and Cuban Communist Party officials. In 2020, it added to the "Cuba Restricted List" two Cuban financial services companies—*Financiera Cimex* (FINCIMEX) and American International Services—involved in facilitating the processing of foreign remittances to Cuba. In the same year, it amended the CACR to prohibit the processing of remittances through any entities on the "Cuba Restricted List." These actions led Western Union, which had partnered with FINCIMEX since 2016, to announce termination of its remittances services to Cuba in November 2020.[66] Western Union had been the major financial

---

[65] República de Cuba, Oficina Nacional de Estadísticas e Información (ONEI), Anuario Estadístico de Cuba 2020, Capítulo 15: Turismo (Edición 2021); ONEI, Turismo Internacional Indicadores Seleccionados, Enero- Diciembre 2019 (Edición Marzo 2020), Enero-Diciembre 2020 (Edición May 2021), and Enero-Diciembre 2021 (Edición Marzo 2022); and ONEI, "Turismo, Arribo de Viajeros y Visitantes Internacionales, Información Preliminar," Julio 2022.

[66] Western Union, "Cuba: A Letter to Our Customers," November 13, 2020, at https://www.westernunion.com/blog/a-letter-to-our-cuba-customers/.

services company used for transmitting remittances to Cuba, with more than 400 offices on the island.

The Biden Administration has partially lifted restrictions on remittances. In June 2022, by amending the CACR, it eliminated the dollar and frequency limits for family remittances and restored the category of donative remittances. The Administration maintained that it would not remove entities from the "Cuba Restricted List," so that remittances through FINCIMEX remain prohibited.[67]

**Legislative Initiatives.** In the 117th Congress, two introduced bills would lift economic sanctions on Cuba, including restrictions on travel and remittances: S. 249 (Wyden), the United States-Cuba Trade Act of 2021, introduced in February 2021, and H.R. 3625 (Rush), the United States-Cuba Relations Normalization Act, introduced in May 2021.

## U.S. Exports and Sanctions[68]

U.S. commercial medical exports to Cuba have been authorized since the early 1990s pursuant to the CDA (P.L. 102-484, Title XVII), and commercial agricultural exports have been authorized since 2001 pursuant to TSRA (P.L. 106-387, Title IX), albeit with numerous restrictions and licensing requirements. For medical exports to Cuba, the CDA requires on-site verification that the exported item is to be used for the purpose for which it was intended and only for the use and benefit of the Cuban people. TSRA allows for one-year export licenses to sell agricultural commodities to Cuba, although no U.S. government assistance, foreign assistance, export assistance, credits, or credit guarantees are available to finance such exports. TSRA also denies exporters access to U.S. private commercial financing or credit; all transactions must be conducted in cash in advance or with financing from third countries. The 2018 farm bill (P.L. 115-334) permits funding for two U.S. agricultural export promotion programs—the Market Access Program and the Foreign Market Development Cooperation Program—for U.S. agricultural products in Cuba.

Regulatory changes made to CACR and EAR provisions in 2015-2016 under the Obama Administration included several actions designed to facilitate commercial exports to Cuba (some of these provisions were subsequently further amended during the Trump Administration). The regulatory changes in 2015-2016

- Permitted U.S. financial institutions to open correspondent accounts at Cuban financial institutions to facilitate the processing of authorized transactions (31 C.F.R. §515.584).

- Permitted U.S. private export financing for all authorized export trade to Cuba, except for agricultural goods exported pursuant to TSRA (31 C.F.R. §515.584).

- Revised the definition of the term *cash in advance* for payment for U.S. exports to Cuba to specify that it means *cash before transfer of title*. The change meant that payment may occur before an export shipment is offloaded in Cuba rather than before the shipment leaves a U.S. port (31 C.F.R. §515.533).

- Authorized commercial exports to Cuba of certain goods and services to support the Cuban people by improving their living conditions and supporting

---

[67] U.S. Department of State, "Background Press Call by Senior Administration Officials on New Cuba Policy," press briefing via teleconference, May 16, 2022.

[68] For additional background on U.S. agricultural exports to Cuba, see CRS Report R46791, *U.S. Agricultural Trade with Cuba: Current Limitations and Future Prospects*.

independent economic activity; strengthening civil society; and improving the free flow of information to, for, and among the Cuban people (15 C.F.R. §740.21).

- Included licenses for certain categories of exports under a "general policy of approval." These categories include exports for civil aviation and commercial aircraft safety; telecommunications; U.S. news bureaus; human rights organizations and nongovernmental organizations; environmental protection of U.S. and international air quality, waters, and coastlines; and agricultural inputs (e.g., insecticides, pesticides, herbicides) that fall outside the scope of those exports already allowed under TSRA (15 C.F.R. §746.2). In 2019, the Commerce Department amended the EAR to exclude the export or reexport of aircraft leased to state-owned airlines from its general policy of approval.[69]

- Considered licenses for exports on a case-by-case basis, including certain items exported to state-owned enterprises, agencies, and other organizations of the Cuban government that provide goods and services for the use and benefit of the Cuban people (15 C.F.R. §746.2). In 2017, the Commerce Department amended the EAR to stipulate that export licenses for exports to state-owned enterprises generally would be denied for use by entities on the State Department's "Cuba Restricted List" associated with the Cuban military, police, intelligence, or security services.[70]

Cuba purchased over $6.8 billion in U.S. products, largely agricultural, from 2001 through 2021. U.S. exports to Cuba rose from about $7 million in 2001 to a high of $718 million in 2008, far higher than in previous years. This increase was due in part to the rise in food prices and in part to Cuba's increased food needs in the aftermath of several hurricanes and tropical storms that severely damaged the country's agricultural sector. U.S. exports to Cuba have declined from that highpoint and fluctuated over the years, reaching a low of $177 million in 2020 as the Cuban economy deteriorated amid the COVID-19 pandemic. U.S. exports to Cuba rose to $327 million in 2021, however, increasing 85% over the previous year (see **Figure 2**). In the first half of 2022, U.S. exports to Cuba were valued at $154 million, slightly lower than the same period in 2021. Looking at the composition of U.S. exports to Cuba, the leading products in 2021 were poultry (86%), soybeans (3.9%), and articles and medicines donated for relief or charity by individuals or private agencies (3.4%).[71]

**Legislative Initiatives.** In legislative action in the 117th Congress, on July 20, 2022, the House rejected (163-260) an amendment (H.Amdt. 300, Tlaib) to H.R. 8294, a six-bill FY2023 appropriations measure, which would have prevented any funds from being used to enforce a provision in TSRA (Section 908(b)) prohibiting private financing for U.S. agricultural exports.

Other legislative initiatives introduced in the 117th Congress would lift restrictions on trade with Cuba. Two broad bills, S. 249 (Wyden), the United States-Cuba Trade Act of 2021, introduced in February 2021, and H.R. 3625 (Rush), the United States-Cuba Relations Normalization Act, introduced in May 2021, would repeal or amend provisions of law restricting trade and other relations with Cuba and would extend nondiscriminatory trade treatment to the products of Cuba. S. 1694 (Klobuchar), the Freedom to Export to Cuba Act of 2021, introduced in May 2021, would

---

[69] U.S. Department of Commerce, "Restricting Additional Exports and Reexports to Cuba," 84 *Federal Register* 56117-56121, October 21, 2019.

[70] U.S. Department of Commerce, "Amendments to Implement United States Policy Toward Cuba," 82 *Federal Register* 51983-51986, November 9, 2017.

[71] Trade statistics in this section are from the U.S. Department of Commerce, as presented by Trade Data Monitor.

repeal or amend provisions of law restricting trade and other relations with Cuba, including certain restrictions in the CDA, LIBERTAD Act, and TSRA.

**Figure 2. U.S. Exports to Cuba, 2007-2021**



**Source:** Created by CRS using Commerce Department statistics as presented by Trade Data Monitor.

## Democracy and Human Rights Funding

Since 1996, the United States has provided assistance—through the U.S. Agency for International Development (USAID), the State Department, and the National Endowment for Democracy (NED)—to increase the flow of information on democracy, human rights, and free enterprise to Cuba. USAID and State Department efforts are funded largely through Economic Support Funds (ESF) in the annual SFOPS bill.

From FY2014 through FY2022, this funding included $20 million in each fiscal year. The Trump Administration, as part of its efforts to reduce U.S. foreign assistance worldwide, attempted to cut assistance for Cuba democracy and human rights programs. The Administration did not request any funding for Cuba programs for FY2018 and requested $10 million for FY2019, $6 million for FY2020, and $10 million for FY2021. Congress continued to appropriate $20 million for each of those years.

Since FY2015, the State Department has administered a little over two-thirds of the Cuba democracy and human rights funding, a portion of which is implemented by NED, and USAID has administered the balance. For example, in the State Department's May 2021 notification to Congress for the obligation of FY2020 assistance for Cuba programs, the State Department was to administer $13.75 million (including $6.25 million implemented by NED) and USAID was to administer $6.25 million. The assistance funds three program areas to strengthen independent Cuban civil society; promote the flow of independent media and the free flow of information; and promote the realization and protection of human rights, including the provision of basic assistance (food and medicine) to political prisoners and their families.[72]

---

[72] U.S. Department of State, "Congressional Notification 21-133: Cuba," May 21, 2021. Also see USAID's website for information on its Cuba program, at https://www.usaid.gov/cuba.

NED is not a U.S. government agency but an independent nongovernmental organization and has received about one-third of Cuba democracy and human rights funding in recent years. NED provides funding to a wide variety of human rights and pro-democracy civil society groups worldwide and in Cuba.[73]

**FY2022 Appropriations.** For FY2022, the Biden Administration requested $20 million in ESF to support independent civil society organizations in Cuba that promote democratic values, human rights, and fundamental freedoms. According to the budget request, the programs provide basic needs assistance to political prisoners and their families; strengthen the capacity of civil society groups; and promote the free flow of uncensored information to, from, and within Cuba.[74]

Congress completed final action on FY2022 SFOPS appropriations in March 2022 in the Consolidated Appropriations Act, 2022 (P.L. 117-103, Division K). Although the measure did not specify an amount for Cuba democracy programming, the Administration estimates an allocation of $20 million, the amount originally requested by the Administration.

The House-passed version of the FY2022 SFOPS bill, H.R. 4373, would have provided not more than $20 million in ESF for democracy programs for Cuba (the amount requested by the Administration) in Section 7045(c); of these funds, not less than $5 million would have been made available for programs to support free enterprise, private business organizations, and people-to-people educational and cultural activities. In contrast, Section 7045(c) of the Senate version of the FY2022 SFOPS bill, S. 3075, would have provided for $5 million for such activities in addition to $20 million in democracy funding.

**FY2023 Appropriations.** For FY2023, the Biden Administration again requested $20 million to support democracy programs that align with Administration's goal of supporting the Cuban people, including their economic and political well-being and human rights. According to the request, programs will support independent groups and civil society organizations that promote democratic values, human rights, and fundamental freedoms. The programs will include basic needs assistance for persecuted activists, political prisoners, and their families. Support also will seek to enhance internet freedom and promote the flow of uncensored information to, from, and within the island.[75]

The House Appropriations Committee's reported FY2023 SFOPS bill, H.R. 8282 (H.Rept. 117-401), would provide $20 million for democracy programs, with not less than $5 million to support private enterprise, private business organizations, and people-to-people educational and cultural activities. The introduced Senate SFOPS bill, S. 4662, and its explanatory statement do not specify an amount for Cuba democracy programs.

---

[73] See the National Endowment for Democracy's website for a listing of its Cuba grants in 2021, at https://www.ned.org/region/latin-america-and-caribbean/cuba-2021/, published February 12, 2022.

[74] U.S. Department of State, *Congressional Budget Justification for Foreign Operations, Fiscal Year 2022, Appendix 2*, p. 264.

[75] U.S. Department of State, *Congressional Budget Justification for Foreign Operations, Fiscal Year 2023, Appendix 2*, p. 296.

# Radio and TV Martí[76]

U.S.-government-sponsored radio and television broadcasting to Cuba—Radio and TV Martí—began in 1985 and 1990, respectively.[77] Until October 1999, U.S.-government-funded international broadcasting programs were a primary function of the United States Information Agency (USIA). When USIA was abolished and its functions merged into the Department of State at the beginning of FY2000, the Broadcasting Board of Governors became an independent agency that included such entities as the Voice of America, Radio Free Europe/Radio Liberty, Radio Free Asia, and the Office of Cuba Broadcasting (OCB). In 2018, the Broadcasting Board of Governors officially changed its name to the U.S. Agency for Global Media (USAGM).[78]

OCB, which has been headquartered in Miami, FL, since 1998, manages Radio and TV Martí's multimedia services, which include radio (shortwave and AM), social media platforms (YouTube, Facebook, Instagram, and Twitter), and an online platform with streaming audio and video.[79] OCB provides 24-hour daily broadcasts to Cuba via its medium-wave transmitting station in Marathon, FL, and 18-hour daily broadcasts via USAGM's shortwave transmitting station in Greenville, NC. OCB content is also provided through flash drives, emails, DVDs, and SMS texts to help reach its Cuban audience.[80] According to USAGM's *2023 Congressional Budget Justification*, the OCB had a weekly audience of 1 million Cubans in FY2021. During the July 11, 2021, protests in Cuba, USAGM maintains that despite the government's disruption to social media platforms, circumvention tools helped 3.2 million people consume OCB content on Facebook.[81]

**FY2022 Appropriations.** For FY2022, the Biden Administration requested $12.973 million for OCB funding. USAGM stated in its budget request that OCB would "continue to rigorously follow its fiscal, technological, and editorial reforms" and noted that as OCB continues its reform efforts, a primary focus is to deliver accurate news coverage in Cuba and provide a platform for diverse voices throughout the island. USAGM maintained that OCB would work closely with USAGM and the independent nonprofit Open Technology Fund to increase circumvention of Cuban government censorship.[82]

In the Consolidated Appropriations Act, 2022 (P.L. 117-103, Division K), and its explanatory statement, Congress fully funded the Administration's OCB request. (Both the report to the House-passed FY2022 SFOPS bill (H.Rept. 117-84 to H.R. 4373) and the explanatory statement to the Senate-introduced bill, S. 3075, recommended fully funding the request.) The joint explanatory statement accompanying the law required the State Department to update a Cuba

---

[76] For background on U.S. international broadcasting, including Radio and TV Martí, see CRS Report R46968, *U.S. Agency for Global Media: Background, Governance, and Issues for Congress*.

[77] The Radio Broadcasting to Cuba Act (P.L. 98-111) was signed into law in October 1983. The Television Broadcasting to Cuba Act (P.L. 101-246, Title II, Part D) was signed into law in February 1990.

[78] With the new name, the agency also changed its website to https://www.usagm.gov/.

[79] The Radio and TV Martí website is at https://www.radiotelevisionmarti.com/.

[80] U.S. Agency for Global Media (USAGM), Office of Cuba Broadcasting (OCB), at https://www.usagm.gov/networks/ocb/.

[81] USAGM, *FY2023 Congressional Budget Justification*, May 28, 2021, pp. 30, 93.

[82] USAGM, *FY2022 Congressional Budget Justification*, May 28, 2021, p. 30. OCB's reform efforts, begun in 2019, emanated from a review by an outside panel of experts and an internal USAGM review of OCB's journalistic standards, editorial processes, and personnel practices. The reviews were prompted by media reports in 2018 of a TV Martí program with anti-Semitic content. For background, see section on "Radio and TV Martí" in CRS Report R45657, *Cuba: U.S. Policy in the 116th Congress and Through the Trump Administration*.

internet access report required by Section 7045 of S.Rept. 115-282. In addition, the joint explanatory statement directed federal departments and agencies to comply with reporting requirements in H.Rept. 117-84. One such requirement was that USAGM, in consultation with OCB, produce a report within 90 days of enactment that outlined

- reforms taken to address deficiencies identified in the USAGM-commissioned internal and external reviews of OCB's editorial policies and oversight procedures,
- implementation of recommendations identified in the State Department Office of the Inspector General's report in December 2020,[83] and
- plans for aligning OCB's personnel and activities with the budget request level.

**FY2023 Appropriations.** For FY2023, the Administration requested $13.432 million for OCB. According to the request, OCB will target digitally connected Cubans where circumvention of the regime's censorship proves possible and will continue to align its content production, workforce structure, and skillsets with ongoing reforms aimed at improving content quality, strengthening journalist integrity, and reaching Cuban audiences more effectively. USAGM maintains that OCB will enhance circumvention tools to more effectively reach a larger audience and continue to work with the Open Technology Fund to explore emerging circumvention technologies and alternative methods for content distribution.[84]

The House Appropriations Committee's reported FY2023 SFOPS bill, H.R. 8282 (H.Rept. 117-401), would provide $12.973 million for OCB (same as provided for FY2022); an explanatory statement to the Senate bill, S. 4662, would recommend $13.891 million.[85] The report to the House bill would require a report, within 90 days of enactment, similar to that required for FY2022 on reforms taken by USAGM, implementation of State Department Inspector General recommendations, and plans for aligning OCB's personnel and activities with the budget request level. The explanatory statement to the Senate bill maintains that the Senate Appropriations Committee continues to support the reform of broadcasting standards at OCB, as outlined in USAGM's *Embarking on Reform of the Office of Cuba Broadcasting* from May 2019. It also calls for the USAGM, in consultation with OCB, to continue to provide quarterly updates to the Committees on Appropriations on implementation of OCB reforms.[86]

## Migration Issues

Irregular Cuban migration to the United States has surged over the past year, driven by Cuba's difficult economic conditions and political repression, as well as by the drawdown of staffing at the U.S. Embassy in Havana since 2017 (which reduced access to legal immigration avenues). Congressional concerns have included the status of consular services provided at the U.S. Embassy in Havana and the Cuban Family Reunification Parole (CFRP) Program, which was suspended in 2017. In April 2022, U.S. and Cuban officials held migration talks—the first such talks since 2018—on the implementation of bilateral migration accords. On September 8-9, 2022,

---

[83] U.S. Department of State, Office of Inspector General, *Targeted Inspection of the U.S. Agency for Global Media: Journalistic Standards and Principles*, December 2020, at https://www.stateoig.gov/reports/10801.

[84] USAGM, *FY2023 Congressional Budget Justification*, March 28, 2022, pp. 29-33.

[85] The explanatory statement to S. 4662 is available from the Senate Appropriations Committee at https://www.appropriations.senate.gov/download/sfopsfy23rpt.

[86] USAGM, *Embarking on Reform of the Office of Cuba Broadcasting*, May 21, 2019, at https://www.usagm.gov/wp-content/uploads/2019/05/Embarking-on-OCB-Reform-English.pdf.

the U.S. Coast Guard and Cuban Border Guard held technical talks in Havana on operational cooperation to confront the illegal trafficking of migrants and illicit drug trafficking.[87] On September 21, 2022, the Administration announced that it would resume full immigrant visa processing at the U.S. Embassy in Havana in early 2023 for the first time since 2017.[88]

**Background on U.S.-Cuban Migration Accords.** Since 1984, the United States has entered into four bilateral migration agreements with Cuba that are collectively known as the *Migration Accords*. In 1984—in the aftermath of the 1980 Mariel boatlift, in which 125,000 Cubans fled to the United States with the approval of Cuban officials—the United States negotiated an agreement to resume normal immigration procedures. The United States agreed to grant immigrant visas for up to 20,000 immigrants per year in addition to immigrant visas for parents, spouses, and unmarried children of U.S. citizens.[89]

In 1994 and 1995, Cuba and the United States reached two additional migration agreements designed to stem another mass exodus of Cubans attempting to reach the United States by boat. In August 1994, amid escalating numbers of fleeing Cubans, President Clinton abruptly changed U.S. immigration policy, under which Cubans attempting to flee their homeland were allowed into the United States; he announced that the U.S. Coast Guard and Navy would take Cubans rescued at sea to the U.S. Naval Station at Guantanamo Bay, Cuba. In September 1994, Cuba and the United States reached a second bilateral migration agreement in which both countries agreed to facilitate safe, legal, and orderly Cuban migration to the United States, consistent with the earlier 1984 migration accord. The United States agreed to ensure total legal Cuban migration to the United States would be a minimum of 20,000 each year, not including immediate relatives of U.S. citizens.[90] In May 1995, the two countries reached a third migration agreement in which the United States would parole the more than 30,000 Cubans housed at Guantanamo into the United States but would intercept future Cuban migrants attempting to enter the United States by sea and return them to Cuba.[91]

In January 2017, the United States entered into a fourth migration agreement with Cuba. This agreement ended the so-called *wet foot/dry foot* policy under which thousands of unauthorized Cuban migrants had entered the United States since the mid-1990s. Under that policy, Cuban migrants interdicted at sea—even in U.S. coastal waters—generally were returned to Cuba, whereas those who reached U.S. land were allowed entrance into the United States and generally were permitted to stay. Cubans who reached the U.S. shore and were admitted or granted immigration parole were allowed to apply for permanent resident status in one year, pursuant to the Cuban Adjustment Act of 1966 (P.L. 89-732). Some criticized this policy as encouraging Cubans to risk their lives to make it to the United States and as encouraging alien smuggling. The January 2017 migration agreement that ended the wet foot/dry foot policy specified that Cuban nationals who attempted to enter the United States illegally and did not qualify for humanitarian

---

[87] CE NoticiasFinancieras, "U.S. and Cuban Authorities Discuss Migrant Smuggling in Havana," September 10, 2022.

[88] U.S. Embassy in Cuba, "U.S. Embassy in Havana Prepares for Full Resumption of Immigrant Visa Services in Cuba, Will Accelerate Processing of Cuban Family Reunification," September 21, 2022.

[89] U.S. Department of State, "Cuba Immigration, Joint Communique on Immigration Matters, with Minute on Implementation," TIAS 11057, December 14, 1984.

[90] U.S. Department of State, "Cuba, Normalizing Migration Procedures; Joint Communique Concerning Normalizing Migration Procedures," Temp. State Dept. No. 94-232, September 9, 1994.

[91] U.S. Department of State, "Cuba, Normalizing Migration Procedures, Joint Statement Regarding Normalization of Migration Procedures," May 2, 1995.

relief were subject to removal. The Cuban government agreed to begin accepting the return of Cuban migrants who had been ordered removed.[92]

**Maritime Interdictions.** Since the 1995 migration accord, the U.S. Coast Guard has interdicted thousands of Cubans at sea and returned them to their country. The number of Cubans interdicted at sea by the U.S. Coast Guard has fluctuated annually, influenced by several factors, including the economic situations in both Cuba and the United States. Interdictions reached over 5,000 in FY2016, driven by concerns among Cubans that the favorable treatment granted to Cuban migrants would end. With the change in U.S. immigration policy toward Cuba in January 2017, the number of Cubans interdicted by the Coast Guard dropped significantly. Since Cuba's economic and political situation began to deteriorate in 2021, interdictions have grown significantly, with over 800 Cubans interdicted and returned to Cuba in FY2021, and over 5,600 in FY2022, as of September 15, 2022 (see **Table 1**).

**Table 1. Maritime Interdictions of Cubans by the U.S. Coast Guard**

(FY2016-FY2022)

|  | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022ª |
|---|---|---|---|---|---|---|---|
| Migrants | 5,396 | 1,468 | 259 | 313 | 49 | 838 | 5,689 |

**Source:** United States Coast Guard, 7th District Southeast, news releases.

a.   Interdiction statistics for FY2022 are through September 15, 2022.

**Unauthorized Cuban Migration by Land.** Beginning around FY2013, Cuban migrants without valid entry documentation began to favor land-based routes to enter the United States, especially via Southwest border ports of entry. With the January 2017 change in U.S. immigration policy toward Cubans, the number of Cuban migrants entering the United States by land declined. It began to increase again in FY2021.

According to data from U.S. Customs and Border Protection, nationwide encounters of Cuban migrants rose from 14,105 in FY2020 to 39,303 in FY2021 to almost 198,000 in the first 11 months of FY2022 (through August 2022), with the overwhelming majority at the Southwest land border.[93] The surge is caused by several factors. Notable factors include Cuba's difficult economic conditions, marked by shortages of food and medicine, high inflation, and electricity outages; increased political repression; and the 2017 suspension of immigration interviews and processing at the U.S. Embassy in Havana (these only recently resumed on a limited basis). Another factor that has facilitated irregular Cuban migration by land is that Nicaragua lifted visa requirements for Cubans in November 2021, spurring thousands of Cubans to use that country as the first stop on their journey to the U.S. border.

**Consular Services at the U.S. Embassy in Havana.** As noted, the Biden Administration restarted limited immigrant visa processing at the U.S. Embassy in Havana in May 2022 and said

---

[92] White House, "Statement by the President on Cuban Immigration Policy," January 12, 2017; U.S. Department of Homeland Security, "Statement by Secretary Johnson on the Continued Normalization of Our Migration Relationship with Cuba," January 12, 2017; U.S. Department of Homeland Security, "Fact Sheet: Changes to Parole and Expedited Removal Policies Affecting Cuban Nationals," January 12, 2017; and U.S. Department of State, "Joint Statement Between the United States of America and Cuba," TIAS 17-112, January 12, 2017.

[93] U.S. Department of Homeland Security, U.S. Customs and Border Protection, "Nationwide Encounters," at https://www.cbp.gov/newsroom/stats/nationwide-encounters. Enforcement encounters include Title 8 apprehensions (the temporary detainment of a person who is not lawfully in the United States), Title 8 inadmissibles (foreign nationals encountered at a port of entry who seek lawful admission into the United States but who U.S. authorities determine to be inadmissible), and Title 42 expulsions (public health-related expulsions).

it would reinstate the CFRP Program, which was suspended in 2017; in September 2022, it announced that the U.S. Embassy in Havana would resume full immigrant visa services in Cuba in early 2023. The Department of Homeland Security's U.S. Citizenship and Immigration Services (USCIS), which established the CFRP Program in 2007, began conducting interviews at the U.S. Embassy in Havana in August 2022, focusing on pending CFRP Program applications.[94] When the CFRP Program was established, it aimed to help the United States meet its annual obligation of 20,000 travel documents under the 1994 bilateral migration agreement. The program allows certain U.S. citizens and permanent residents with approved petitions for family members in Cuba to apply for immigration parole for those individuals. If a CFRP application is approved, family members in Cuba are issued documentation to enable them to travel to the United States. Until its suspension, around 75% of the immigrant travel documents issued annually for Cuban nationals were issued under the CFRP Program.[95] Because of the suspension of immigrant visa services at the U.S. Embassy in Havana, the United States has not met its 20,000 commitment under the accord since FY2017.

Limited immigrant visa processing at the U.S. Embassy in Havana began in May 2022, prioritizing IR-5 (parent of a U.S. citizen) cases. Currently, the U.S. Embassy in Georgetown, Guyana, remains the primary processing location for the majority of Cuban immigrant visa applications.[96] When the Biden Administration announced the resumption of limited immigration visa processing and the reinstatement of the CFRP Program, U.S. officials indicated they wanted "to staff up so that that we can begin processing the full 20,000 immigrant visas out of Havana as quickly as possible."[97] When the Administration announced in September 2022 that it was preparing to fully resume immigrant visa services at the U.S. Embassy in Havana in early 2023, it noted that the change will "eliminate the need for Cubans applying for immigrant visas in family preference categories to travel outside of Cuba to Georgetown, Guyana for their interviews."[98]

Most temporary nonimmigrant visa processing at the U.S. Embassy in Havana remains suspended, except for diplomatic or official visas and for medical emergencies.[99] Cubans applying for other categories of nonimmigrant visas must go to a U.S. embassy or consulate in another country. In March 2019, the State Department announced it would no longer issue multiple-entry five-year B-2 visas (for tourism, family visits, medical treatment, and similar travel purposes) for Cuban nationals; instead, it would issue only single-entry B-2 visas for a stay of two months, with the possibility of a 30-day extension.[100] That change has made family travel from Cuba more difficult and has made it harder for those traveling from Cuba to buy supplies for their private-sector businesses.

---

[94] U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS), "USCIS Resumes Cuban Family Reunification Parole Operations," September 1, 2022.

[95] For background on the Cuban Family Reunification Parole Program, see USCIS, "The Cuban Family Reunification Parole Program," at https://www.uscis.gov/humanitarian/humanitarian-parole/cuban-family-reunification-parole-program.

[96] U.S. Embassy in Cuba, "Havana Immigrant Visa Processing FAQs," April 6, 2022, at https://cu.usembassy.gov/havana-immigrant-visa-processing-faqs/.

[97] U.S. Department of State, "Background Press Call by Senior Administration Officials on New Cuba Policy," press briefing via teleconference, May 16, 20222.

[98] U.S. Embassy in Cuba, "U.S. Embassy in Havana Prepares for Full Resumption of Immigrant Visa Services in Cuba, Will Accelerate Processing of Cuban Family Reunification," September 21, 2022.

[99] U.S. Embassy in Cuba, "Nonimmigrant Visas," at https://cu.usembassy.gov/visas/nonimmigrant-visas/.

[100] U.S. Embassy in Cuba, "Decreasing B2 Visa Validity for Cuban Nationals," media note, March 15, 2019.

**Legislative Initiatives.** In the 117th Congress, the joint explanatory statement to the Consolidated Appropriations Act, 2022 (P.L. 117-103, Division K), required an updated State Department report on consular services at the U.S. Embassy in Havana, originally required in S.Rept. 116-126. For FY2023, the explanatory statement to S. 4662 would require a State Department report, within 60 days of enactment, on consular personnel at the U.S. Embassy in Havana and statistics on visas granted to Cubans by type.

Three other introduced bills touch on Cuban immigration issues. H.R. 2684 (Diaz-Balart), introduced in April 2021, would amend the Immigration and Nationality Act (P.L. 82-414, as amended) to establish a Cuban family reunification parole program. H.R. 6907 (Wasserman Schultz), introduced in March 2022, would direct the Secretary of Homeland Security to reinstate the processing of applications for parole under the CFRP Program. S. 2138 (Menendez), introduced in June 2021, would require the Secretary of Homeland Security, in coordination with the Secretary of State, to reinstate the Cuban Medical Professional Parole Program to authorize the admission into the United States of Cuban medical personnel conscripted to study or work in a third country under the Cuban government's direction.[101]

## U.S. Fugitives from Justice

Cuba has provided safe haven to several U.S. fugitives from justice, including convicted murderers and hijackers. Most of these fugitives entered Cuba in the 1970s and early 1980s. For example, Joanne Chesimard, also known as Assata Shakur, was added to the Federal Bureau of Investigation's (FBI's) Most Wanted Terrorist list in May 2013. Chesimard was part of militant group known as the Black Liberation Army. In 1977, she was convicted for the 1973 murder of a New Jersey State Police officer and sentenced to life in prison. Chesimard escaped from prison in 1979 and, according to the FBI, lived underground before fleeing to Cuba in 1984.[102] Another fugitive, William "Guillermo" Morales, who was a member of the Puerto Rican militant group known as the Armed Forces of National Liberation, reportedly has been in Cuba since 1988, after being imprisoned in Mexico for several years. He was convicted in New York on weapons charges in 1979 and sentenced to 10 years in prison and 5 years' probation, but he escaped from prison the same year.[103]

In addition to Chesimard and Morales, several other U.S. fugitives in Cuba are named in the State Department's *Country Reports on Terrorism 2020* (issued in December 2021).[104] Ishmael Muslim Ali (Ronald LaBeet) is wanted for the 1984 hijacking of a flight to Cuba from the U.S. Virgin Islands, where he had received eight life sentences after being convicted of killing eight tourists in 1972.[105] Charles Lee Hill is wanted for his alleged involvement in several violent crimes in

---

[101] Established in 2006 and administered by the Department of Homeland Security, the Cuban Medical Professional Parole Program allowed Cuban medical professionals in third countries to be approved for entry into the United States. The program was terminated in January 2017. See U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, "Cuban Medical Professional Parole (CMPP) Program," January 19, 2017, at https://www.uscis.gov/humanitarian/humanitarian-parole/cuban-medical-professional-parole-cmpp-program.

[102] Federal Bureau of Investigation (FBI), "Most Wanted Terrorists: Joanne Deborah Chesimard," poster, at http://www.fbi.gov/wanted/wanted_terrorists/joanne-deborah-chesimard/view.

[103] James Anderson, "Living in Exile, Maimed Guerrilla Maintains Low-Key Profile in Cuba," *Fort Worth Star-Telegram*, January 16, 2000; Vanessa Bauza, "FBI's Fugitive Is Cuba's Political Refugee," *South Florida Sun-Sentinel*, May 26, 2002; Mary Jordan, "Fugitives Sought by U.S. Find a Protector in Cuba," *Washington Post*, September 2, 2002.

[104] U.S. Department of State, *Country Report on Terrorism 2020: Cuba*, December 16, 2022, at https://www.state.gov/reports/country-reports-on-terrorism-2020/cuba/.

[105] FBI, "Most Wanted: Ishmail Muslim Ali," poster, at https://www.fbi.gov/wanted/dt/ishmail-muslim-ali; and Azam

1971, including the shooting death of a New Mexico State Police officer and the hijacking of a plane to avoid prosecution.[106] Ambrose Henry Montfort is wanted for the hijacking of a passenger aircraft to Cuba in 1983.[107] Victor Manuel Gerena, a member of a Puerto Rican militant separatist group, is wanted for the 1983 armed robbery of a security company in West Hartford, CT.

With the resumption of diplomatic relations with Cuba in 2015, the United States held several law enforcement dialogues that reportedly included discussion of the issue of U.S. fugitives from justice; the most recent such dialogue was in July 2018.[108] As noted, in January 2021, then-Secretary of State Pompeo designated the government of Cuba as a state sponsor of international terrorism, citing Cuba's harboring of several U.S. fugitives from justice among the reasons for designation.[109]

Although the United States and Cuba signed an extradition treaty in 1904 (which entered into force in 1905 and was amended by an additional extradition treaty in 1926), the treaty has not been used under the current Cuban government. Instead, Cuba has returned fugitives to the United States on a case-by-case basis. For example, in 2018, Cuba returned a New Jersey man wanted on murder charges and a long-sought U.S. fugitive from justice wanted in connection with ecoterrorism who had stopped in Cuba on his way to Russia.[110] Generally, however, Cuba has refused to render to U.S. justice any fugitive judged by Cuba to be "political," such as Chesimard, who Cuba contends could not receive a fair trial in the United States.

**Legislative Initiatives.** In the 117th Congress, S. 4715, introduced in August 2022, would call for the immediate extradition and return to the United States of U.S. fugitives receiving safe haven in Cuba. It also would require a State Department report identifying steps taken to secure the extradition or return to the United States of U.S. fugitives residing in Cuba and, to the extent feasible, include an estimate of the number of U.S. fugitives receiving safe haven in Cuba. In addition, the bill would prohibit the use of International Narcotics Control and Law Enforcement assistance for programs or initiatives in Cuba until Cuba fulfills certain conditions regarding its extradition obligations and other broad political and other conditions set forth in the LIBERTAD Act of 1996.

Two other bills have been introduced related to fugitives from Cuba. S. 689, introduced in March 2021, would, among other provisions, require the President to submit a report to certain committees that identifies terrorists and fugitives being provided safe haven in Cuba. H.R. 8651, introduced in August 2022, would require the President to submit an annual report to Congress on fugitives currently residing in other countries whose extradition is sought by the United States. The bill also would express the sense of Congress that in meeting foreign officials, U.S. officials should prioritize advocacy in fulfilling U.S. extradition requests, including that for Joanne Chesimard.

---

Ahmed, "Convicted of Murder and Now Swept Up in U.S.-Cuba Shift," *New York Times*, July 8, 2017.

[106] FBI, "Most Wanted: Charles Lee Hill," poster, at https://www.fbi.gov/wanted/murders/charles-lee-hill.

[107] FBI, "Most Wanted: Ambrose Henry Montfort," poster, at https://www.fbi.gov/wanted/dt/ambrose-henry-montfort.

[108] U.S. Department of State, "United States and Cuba Hold Fourth Law Enforcement Dialogue in Washington, DC," media note, July 10, 2018.

[109] U.S. Department of State, Secretary of State Michael R. Pompeo, "U.S. Announces Designation of Cuba as a State Sponsor of Terrorism," January 11, 2021.

[110] CBS News, "Suspected Eco-Terrorist Arrested in Cuba After 20 Years as a Fugitive," August 11, 2018; and Mimi Whitefield, "Cuba Extradites a 55-Year-Old American Lawyer to Face Murder Changes in N.J.," *Miami Herald*, November 7, 2018.

## Trafficking in Persons and Cuba's Foreign Medical Missions

In 2022, for the fourth consecutive year, the State Department placed Cuba on Tier 3 in its annual *Trafficking in Persons Report* (TIP report), a status that refers to countries whose governments do not fully comply with the minimum standards for combatting trafficking and are not making significant efforts to do so.[111] According to the State Department's 2022 TIP report, issued in July 2022, "there was a government policy or pattern to profit from labor export programs with strong indications of forced labor, particularly in its foreign medical missions' program."[112] As noted in the report, Cuba has over 30,000 medical workers involved in missions in more than 60 countries and overseas territories worldwide. Amid the COVID-19 pandemic, Cuba's emergency medical contingent of nearly 5,000 medical workers has provided assistance to more than 40 countries.

Cuba's foreign medical diplomacy has long been a source of national pride and an example of Cuba's soft power worldwide to promote humanitarianism and generate political goodwill. The diplomacy has included short-term initiatives for disaster relief and epidemic control as well as longer-term initiatives, such as providing primary health care, staffing hospitals, and establishing health care facilities.[113]

Cuba's foreign medical mission program is not a solely humanitarian-based grant but a program in which the Cuban government benefits economically from countries that can pay for the medical services. Cuban government statistics show that in 2020 (latest year available), the export of health services accounted for 58% of Cuba's services exports, making it a major foreign exchange earner. The U.S. State Department maintains that the Cuban government collects between $6 billion and $8 billion annually from its foreign medical missions.[114]

Cuba's medical missions program has received growing criticism in recent years for its labor practices and alleged exploitation of medical personnel.[115] The State Department's 2022 TIP report alleges that the Cuban government continued to deploy medical workers to foreign countries using deceptive and coercive tactics and failed to address labor violations and trafficking crimes, despite an increasing number of allegations about abuses from credible nongovernmental organizations, former participants, and foreign governments. According to the report, the Cuban government failed to inform participants of the terms of their contracts, only paid them a portion of their salaries, and threatened medical professionals and their family members with retaliation if participants left the program.[116]

---

[111] From 2015 through 2018, Cuba was on the Tier 2 Watch List, a status that refers to countries whose governments, despite making significant efforts, do not fully comply with the minimum standards and still have some specific problems or whose governments have made commitments to take additional anti-trafficking steps over the next year.

[112] U.S. Department of State, *Trafficking in Persons Report*, July 2022, pp. 193-195.

[113] For further background on the development of Cuba's foreign medical missions, see Julie M. Feinsilver, "Fifty Years of Cuba's Medical Diplomacy: From Idealism to Pragmatism," *Cuban Studies*, vol. 41 (2010), pp. 85-104; John M. Kirk, "Cuba's Medical Internationalism: Development and Rationale," *Bulletin of Latin American Research*, vol. 28, no. 4, 2009, pp. 497-511; Sarah A. Blue, "Cuban Medical Internationalism: Domestic and International Impacts," *Journal of Latin American Geography*, vol. 9, no. 1, 2010, pp. 31-49; Pascal Fletcher, "Cuban Medics a Big Force on Haiti Cholera Frontline," Reuters News, December 10, 2010; and Monica Mark, "Cuba Leads Fights Against Ebola in Africa as West Frets About Border Security," *Guardian*, October 11, 2014.

[114] ONEI, República de Cuba, Anuario Estadístico de Cuba 2021, Sector Externo, Edición 2022, p. 47; and U.S. Department of State, *Trafficking in Persons Report*, July 2022, p. 195.

[115] For example, see "Cuba: Repressive Rules for Doctors Working Abroad," Human Rights Watch, July 23, 2020.

[116] U.S. Department of State, *Trafficking in Persons Report*, July 2022, p. 195.

The Cuban government has spoken out against criticism of its foreign medical missions, alleging that U.S. influence and actions led to the termination of missions in some countries, such as Brazil and Ecuador. The Cuban government maintains that its "technicians and professionals who participate in these programs do so absolutely of their own free will." The government asserts that Cuban medical professionals on foreign missions "continue to receive their full salary in Cuba, and also a stipend in the country of destination, along with other benefits." It also maintains that when Cuba receives compensation from host countries, the funding contributes to the sustainability of Cuba's health care system and covers the costs for its foreign medical missions, which provide health care services at no cost to many countries worldwide.[117] Cuba's foreign minister has denounced what he characterizes as U.S. lies about Cuba's medical missions.[118]

Many countries view Cuban doctors as a key resource for their overwhelmed health care systems, although hiring Cuban medical personnel can lead to criticisms due to concerns over Cuba's labor practices. In August 2022, the regional government of Calabria in Italy announced that it hired almost 500 doctors from Cuba.[119] In May 2022, Mexican President Andrés Manuel López Obrador announced that Mexico would hire 500 Cuban doctors to help fill shortages; the first contingent of these doctors arrived in Mexico in July. Some in Mexico's medical community have criticized the hiring of Cuban doctors, maintaining there are unemployed Mexican doctors who could do the job and questioning the qualifications of the Cuban medical personnel.[120]

**Legislative Initiatives.** In the 117th Congress, the joint explanatory statement to the Consolidated Appropriations Act, 2022 (P.L. 117-103, Division K), required State Department compliance with a directive in H.Rept. 117-84 related to Cuba's foreign medical mission. H.Rept. 117-84 directs the State Department to assess the Pan American Health Organization's (PAHO's) involvement in Cuba's foreign medical missions program and to update the Committees on Appropriations on its findings, as well as on steps taken to improve PAHO's transparency, internal oversight, and risk management.[121] (In the 116th Congress, the Further Consolidated Appropriations Act, 2020 [P.L. 116-94] and the explanatory statement to the Consolidated Appropriations Act, 2021 [P.L. 116-260], referenced S.Rept. 116-126 and required State Department reports on PAHO's role in facilitating agreements between foreign medical professionals from the Cuban government and other countries.)

In addition, S. 2138 (Menendez), introduced in June 2021, would require an annual State Department report identifying countries hosting Cuba's foreign medical missions and a determination as to whether such personnel are subject to conditions that qualify as severe forms of trafficking in persons. The bill also would provide for the reinstatement of the Cuban Medical Professional Parole Program, and require a joint State Department and Health and Human Services Department report reviewing the findings of the role of PAHO in Brazil's *Mais Médicos* program from 2013 to 2019, a summary of corrective actions to be taken by PAHO, and recommendations for further corrective actions.

---

[117] Ministry of Foreign Affairs of Cuba, "The U.S. Crusade Against Cuba's International Medical Cooperation, Declaration of the Ministry of Foreign Affairs of Cuba," December 5, 2019.

[118] Ministry of Foreign Affairs of Cuba, "Cuban FM Denounces the United States' Lies About Medical Missions," April 29, 2020; and CE NoticiasFinancieras, "Cuba Says U.S. 'Deliberately Lies' in Accusing It of Trafficking," July 19, 2022.

[119] Reuters News, "Cuba to Send Hundreds of Doctor's to Italy's Calabria Region," August 19, 2022.

[120] *Latin News Weekly Report*, "Mexico: Cuban Medical Assistance Prompts Pushback," May 19, 2022; and Paloma Duran, "Cuban Doctors Arrive in Mexico to Address Medical Deficit," *Mexico Business News*, July 26, 2022.

[121] The Pan American Health Organization is the specialized international health agency for the Americas and serves as the regional office for the Americas of the World Health Organization.

# Outlook

Cuba is experiencing one of its most difficult economic and political periods since the end of the Cold War and the cutoff of assistance from the former Soviet Union in the early 1990s. Even before the country's massive oil storage fire in early August 2022, shortages of basic commodities and electricity outages were common. The fire further increased blackouts and long lines for gasoline and has spurred protests, although not at the level of the July 11, 2021, protests that the government harshly repressed. The difficult economic situation and continued political repression also has spurred a migration exodus to the United States via the U.S. Southwest border.

Looking ahead, Cuba's post-pandemic economic recovery likely will be constrained by damage to the country's main oil storage facility and its effect on the already frail, oil-dependent, electric power system. The state's continued domination of the economy, along with continued U.S. economic sanctions, also dims prospects for major economic improvement. Although additional social unrest is possible, it appears the country's one-party rule is strongly buoyed by its domestic security apparatus and control of most media.

When President Biden took office, many observers expected an early reversal of sanctions imposed on Cuba during the previous Administration and a return to a U.S. policy focused on engagement. Early on, the Biden Administration said it was reviewing policy decisions made by the prior Administration and announced that human rights would be a pillar of U.S. policy toward Cuba. As the human rights situation deteriorated and Cuba harshly repressed the July 2021 protests, the Biden Administration condemned Cuba's action and responded with targeted sanctions against those Cuban officials and security entities involved in the repression. The Administration ultimately unveiled several Cuba policy changes in May 2022, with the goal of increasing support to the Cuban people. These changes included efforts to facilitate family reunification and to ease some restrictions on travel and remittances, although many sanctions remain in place.

The 117th Congress has supported continued funding for Cuban democracy programs and U.S. broadcasting to Cuba. It also has expressed heightened concern about the human rights situation in Cuba through the approval of several resolutions. As in the past, Members of Congress maintain diverse opinions regarding the appropriate U.S. policy approach toward Cuba. Numerous legislative initiatives have been introduced to either increase or ease U.S. sanctions on Cuba (**Appendix A**). In July 2022, the House rejected a sanctions-easing amendment to an appropriations measure that would have prohibited funding to enforce a prohibition on private financing for U.S. agricultural exports to Cuba. The vote appears to demonstrate the effect of Cuba's harsh repression on congressional consideration of legislative initiatives on Cuba sanctions.

# Appendix A. Legislative Initiatives in the 117th Congress

This appendix provides a listing of Cuba-related legislation and legislative initiatives in the 117th Congress, including enacted measures and resolutions, bills that received some congressional action, and bills and resolutions that were introduced. This report does not discuss the U.S. Naval Station at Guantanamo Bay, Cuba, with the exception of including in this appendix legislative provisions to prohibit funding from being used for the closure or relinquishment of control of the naval station. For information on the naval base, see CRS Report R44137, *Naval Station Guantanamo Bay: History and Legal Issues Regarding Its Lease Agreements*, by Jennifer K. Elsea.

## Enacted Measures and Approved Resolutions

**P.L. 117-46 (S. 1828).** Helping American Victims Afflicted by Neurological Attacks Act of 2021, or the Havana Act of 2021. Introduced May 25, 2021, and referred to the Senate Committee on Homeland Security and Governmental Affairs. (In the House, a similar bill, H.R. 3356, was introduced May 19, 2021, and referred to House Committee on Foreign Affairs, and to the Permanent Select Committee on Intelligence.) Senate passed S. 1828 by Unanimous Consent June 7, 2021; House passed S. 1828 September 21, 2021, by a vote of 427-0. Signed into law October 8, 2021. The measure provided additional authority to the Central Intelligence Agency and the State Department to provide financial support to those serving abroad who experience traumatic brain injuries.

**P.L. 117-81 (S. 1605).** National Defense Authorization Act (NDAA) for Fiscal Year 2022. Originally approved by the Senate in June 2021 as a bill to designate the National Pulse Memorial Orlando, FL, S. 1605 became the vehicle for the FY2022 NDAA in December 2021. House passed (363-70), amended, December 7, 2021; Senate agreed (88-11) to the House amendment December 15, 2021. Signed into law December 27, 2021. Section 1035 extended a prohibition through FY2022 on the use of funds to close or relinquish control of the U.S. Naval Station, Guantanamo Bay, Cuba. Section 1338 required a report by the Secretary of State, in coordination with the Secretary of Defense, on efforts by China to expand its presence and influence in Latin America and the Caribbean, including, among its various requirements, a detailed description of the relationship between the governments of China and Cuba.

The measure included four provisions related to anomalous health incidents:

- Section 732, providing U.S. government employees and family members access to certain Department of Defense medical facilities for assessment and treatment;

- Section 910, requiring the Secretary of Defense to establish a cross-functional team to address national security challenges posed by such incidents and ensure individuals affected by such incidents receive timely, comprehensive care and treatment;

- Section 4501, authorizing $30 million for anomalous health incidents health care; and

- Section 6603, requiring the President to designate a senior official as Anomalous Health Incidents Interagency Coordinator to coordinate the response of the U.S. government to such incidents, including equitable and timely access to assessment and care for those affected, adequate training and education for U.S. government personnel, U.S. government technological and research efforts, and

the development of options to prevent, mitigate, and deter suspected attacks presenting as such incident.

**P.L. 117-103 (H.R. 2471).** Consolidated Appropriations Act, 2022. Originally introduced in April 2021 as the Haiti Development, Accountability, and Institutional Transparency Initiative Act, the bill became the vehicle for the Consolidated Appropriations Act, 2022, approved in March 2022. It included 12 regular appropriations bills funding federal agencies for FY2022.

Division C (Department of Defense Appropriations Act, 2022), in Section 8148, prohibited the use of funds in the act from being used to carry out the closure or realignment of the U.S. Naval Station at Guantanamo Bay, Cuba.

Division J (Military Construction, Veteran Affairs, and Related Agencies Appropriations Act, 2022), in Section 140, prohibited the use of funds in the act to close or realign the U.S. Naval Station at Guantanamo Bay, Cuba.

Division K (Department of State, Foreign Operations, and Related Programs Appropriations, 2022) continued two long-standing provisions: Section 7007 prohibited direct funding for the government of Cuba, including direct loans, credits, insurance, and guarantees of the Export-Import Bank or its agents; and Section 7015(f) prohibited the obligation or expenditure of assistance for Cuba except through the regular notification procedures of the Committees on Appropriations. The explanatory statement to the bill allocated, as requested by the Administration, $12.973 million for the Office of Cuba Broadcasting.

The joint explanatory statement to Division K included several State Department reporting requirements on Cuba: an update of a report on the condition of the U.S. Embassy in Havana, Cuba, originally required by S.Rept. 116-126; updated reports on consular services (including nonimmigrant visas) and on the causes and responsibility of health illnesses suffered by U.S. government personnel originally required in Section 7035 of S.Rept. 116-126; and an update of a Cuba internet access report required by Section 7045 of S.Rept. 115-282. The explanatory statement also required the Secretary of State to consult with the Committees on Appropriations on implementation of the Helping American Victims Afflicted by Neurological Attacks Act of 2021 (P.L. 117-46).

In addition, the joint explanatory statement directed federal departments and agencies to comply with reporting requirements and directives contained in H.Rept. 117-84 accompanying H.R. 4373, the FY2022 Department of State, Foreign Operations, and Related Programs Appropriations Act (SFOPS) bill passed by the House in July 2021, including

- a directive for the State Department to assess the Pan American Health Organization's (PAHO's) involvement in Cuba's foreign medical missions program and to update the Committees on Appropriations on its findings and on steps taken to improve PAHO's transparency, internal oversight, and risk management;

- a required U.S. Agency for Global Media (USAGM) report, in consultation with the Office of Cuba Broadcasting (OCB), within 90 days of enactment, outlining reforms taken to address deficiencies identified in USAGM-commissioned internal and external reviews of OCB's editorial policies and procedures, implementation of recommendations identified in a December 2020 State Department Office of Inspector General report, and plans for aligning OCB's personnel and activities with the budget request level; and

- a required report within 45 days of enactment detailing the results of the Administration's Cuba policy review that is to address the steps necessary to

advance the normalization of bilateral relations, recommendations for supporting the growth of a Cuban private sector independent of government control, the extent to which the government of Cuba has cooperated over the previous fiscal year on anti-terrorism efforts, and a timeline for safely restoring staffing levels at the U.S. Embassy in Havana.

**S.Res. 37 (Menendez).** The resolution expressed solidarity with the San Isidro Movement, condemned escalated attacks against artistic freedoms in Cuba, and called for the repeal of laws that violate freedom of expression and the immediate release of arbitrarily detained artists, journalists, and activists. Introduced February 8, 2021, and reported by Senate Committee on Foreign Relations with an amendment in the nature of a substitute March 24. Senate passed, amended, by unanimous consent April 15, 2021.

**S.Res. 81 (Rubio).** The resolution honored *Las Damas de Blanco*, a women-led nonviolent movement in support of freedom and human rights in Cuba, and called for the release of all political prisoners in Cuba. Introduced March 1, 2021, and reported by Senate Committee on Foreign Relations March 24. Senate passed by unanimous consent May 12, 2021.

**S.Res. 310 (Menendez).** The resolution expressed solidarity with Cuban citizens demonstrating peacefully for fundamental freedoms, condemned the Cuban regime's acts of repression, and called for the immediate release of arbitrarily detained Cuban citizens. Introduced July 21, 2021, and reported by Senate Committee on Foreign Relations July 28. Senate passed, amended, by unanimous consent August 3, 2021.

**S.Res. 489 (Scott, Rick)/H.Res. 867 (Diaz-Balart).** The resolution commended the actions of Cuban human rights and democracy activist José Daniel Ferrer Garcia and all pro-democracy and human rights activists in demanding fundamental civil liberties in Cuba and speaking out against Cuba's brutal, totalitarian communist regime. S.Res. 489 introduced January 12, 2022; Senate agreed to without amendment by unanimous consent January 12, 2022. H.Res. 867 introduced January 12, 2022; referred to the House Committee on Foreign Affairs.

**H.Res. 760 (Wasserman Schultz).** The resolution expressed solidarity with the Cuban people participating in peaceful protests, condemned Cuba's repression of peaceful protesters and journalists, called on Cuba to end efforts to block internet access or restrict access to certain websites or applications, called on Cuban military and security forces not to arrest or detain peaceful protesters and to release all political prisoners and arbitrarily detained individuals, and urged certain U.S. government actions to support the Cuban people. Introduced and referred to the House Committee on Foreign Affairs November 1, 2021; House considered under suspension of rules and passed (382-40, 4 present) November 3, 2021.

**S.Con.Res. 14.** Concurrent resolution setting forth the congressional budget for the U.S. government for FY2022 and setting forth budgetary levels for FY2023 through FY2031. Introduced August 9, 2021; Senate passed (50-49), amended, August 11, 2021. House passed August 24, 2021, pursuant to the provisions of H.Res. 601 (approved by a vote of 220-212). As approved, Section 3010 provided for a deficit-neutral reserve fund relating to facilitating improved internet service for Cuban citizens; the provision was added by S.Amdt. 3097 (Rubio), which the Senate approved by voice vote on August 10, 2021.

## Other Bills with Legislative Action

**H.R. 4373 (Lee, Barbara)/S. 3075 (Coons).** Department of State, Foreign Operations, and Related Programs Appropriations Act, 2022. H.R. 4373 introduced and reported by House

Committee on Appropriations (H.Rept. 117-84) July 6, 2021. House passed (217-212) July 28, 2021. S. 3075 introduced October 26, 2021.

Both bills would have continued two long-standing Cuba provisions: Section 7007 would have prohibited direct funding for the government of Cuba, including direct loans, credits, insurance, and guarantees of the Export-Import Bank or its agents, and Section 7015(f) would have prohibited obligating or expending assistance for Cuba except through the regular notification procedures of the Committees on Appropriations.

With regard to democracy funding, both bills would have fully funded the Administration's $20 million request. However, Section 7045(c) of the House bill would have provided that of the $20 million, not less than $5 million would be made available for programs to support free enterprise, private business organizations, and people-to-people educational and cultural activities. In contrast, Section 7045(c) of the Senate bill would have provided for $5 million for such activities in addition to the $20 million in democracy funding. In both bills, Section 7045(c) also would have provided that funds under Title I of the act be made available for the operation of, and infrastructure and security improvements to, U.S. diplomatic facilities in Cuba and for costs associated with additional U.S. diplomatic personnel in Cuba.

With regard to U.S.-government sponsored broadcasting to Cuba, the report to the House bill, H.Rept. 117-84, and the explanatory statement to the Senate bill recommended $12.973 million for OCB, the same as the Administration's request.

For final action on FY2022 foreign operations appropriations, see Consolidated Appropriations Act, 2022 (P.L. 117-103, Division K), which included several reporting requirements that originated in H.Rept. 117-84 to H.R. 4373 and the explanatory statement to S. 3075.

**H.R. 4350 (Smith, Adam)/S. 2792 (Reed).** National Defense Authorization Act for Fiscal Year 2022. H.R. 4350 introduced July 2, 2021; reported (H.Rept. 117-118) by the House Committee on Armed Services September 17, 2021; House passed (316-113) September 23, 2021. S. 2792 introduced and reported (S.Rept. 117-39) by the Senate Armed Services Committee September 22, 2021. In November 2021, the Senate began consideration of H.R. 4350, substituting its own version of the bill, but did not complete action when lawmakers could not agree on which amendments to consider for floor action. As approved by the House, H.R. 4350 had a provision (Section 1246) that would require a report on efforts by China to expand its presence and influence, including on the relationship between China and the governments of Venezuela and Cuba. As reported, S. 2792 had a provision (Section 1034) that would extend a prohibition on the use of funds to close or relinquish control of the U.S. Naval Station at Guantanamo Bay, Cuba. For final action on the FY2022 NDAA, see P.L. 117-81 (S. 1605), above.

**H.R. 7900 (Smith, Adam)/S. 4543(Reed).** National Defense Authorization Act for Fiscal Year 2023. H.R. 7900 introduced May 27, 2022; reported (H.Rept. 117-397) by the House Committee on Armed Services July 1, 2022. House passed (329-101) July 14, 2022. S. 4543 introduced and reported (S.Rept. 117-130) by the Senate Armed Services Committee. As passed, H.R. 7900 included a provision (Section 1235) requiring a report on efforts by Russia to expand its presence and influence in Latin America and the Caribbean, including on the relationship between the Russian government and the governments of Cuba, Bolivia, Nicaragua, and Venezuela). As reported, S. 4543 had a provision (Section 1034) that would extend a prohibition on the use of funds to close or relinquish control of the U.S. Naval Station at Guantanamo Bay, Cuba.

**H.R. 8282 (Lee, Barbara)/S. 4662 (Coons).** Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023. H.R. 8282 introduced and reported by House Committee on Appropriations (H.Rept. 117-401) July 1, 2022. S. 4662 introduced July 28, 2022; referred to Senate Committee on Appropriations. The House bill would provide $20 million for

Cuba democracy programs, with not less than $5 million to support private enterprise, private business organizations, and people-to-people educational and cultural activities; the bill also would provide for the operation of, and improvements to, U.S. diplomatic facilities in Cuba and for costs associated with additional U.S. diplomatic personnel.

With regard to Cuba broadcasting, H.Rept. 117-401 would recommend $12.973 million for the OCB and the explanatory statement to the Senate bill would recommend $13.891 million. H.Rept. 117-401 also would require a report, within 90 days of enactment, similar to that required for FY2022 on reforms taken by USAGM, implementation of State Department Inspector General recommendations, and plans for aligning OCB's personnel and activities with the budget request level. The explanatory statement to the Senate bill maintains that the Senate Appropriations Committee continues to support the reform of broadcasting standards at OCB, as outlined in USAGM's *Embarking on Reform of the Office of Cuba Broadcasting* from May 2019, and calls for the USAGM, in consultation with OCB, to continue to provide quarterly updates to the Committees on Appropriations on implementation of OCB reforms.

The explanatory statement to the Senate bill also would require an update of a State Department report on the condition of the U.S. Embassy in Havana originally required in S.Rept. 116-126 and a State Department report, within 60 days of enactment, on consular personnel at the U.S. Embassy in Havana and statistics on visas granted Cubans by type.

**H.Amdt. 300 (Tlaib) to H.R. 8294.** Amendment to prevent funds made available by this act from being made available to implement, administer, or enforce Section 908(b) of the Trade Sanctions Reform and Export Enhancement Act of 2000 (TSRA; 22 U.S.C. §7207(b)), a prohibition on financing of agricultural sales to Cuba. Amendment failed (163-260) July 20, 2022.

**S. 2045 (Cruz)/H.R. 6867 (Diaz-Balart).** The bills would designate the area between the intersections of 16th Street Northwest and Fuller Street Northwest and 16th Street Northwest and Euclid Street Northwest in Washington, DC, as "Oswaldo Payá Way." S. 2045 introduced June 14, 2021, and discharged by Senate Committee on Homeland Security and Governmental Affairs by unanimous consent July 30, 2021. Senate passed by unanimous consent July 30, 2021. H.R. 6867 introduced February 28, 2022; referred to the House Committee on Oversight and Reform.

## Other Introduced Resolutions and Bills

**H.Res. 440 (Malliotakis).** The resolution would commend Lithuania for refusing to ratify the European Union's Political Dialogue and Cooperation Agreement with Cuba. Introduced May 25, 2021; referred to the House Committee on Foreign Affairs.

**H.Res. 527 (Diaz-Balart).** The resolution would express solidarity with the Cuban people in their demands for freedom and respect for human rights. Introduced July 13, 2021; referred to the House Committee on Foreign Affairs.

**H.Res. 529 (Malliotakis).** The resolution would express that the House of Representatives stands in solidarity with the people of Cuba and their fight to achieve freedom, democracy, and human rights. Introduced July 13, 2021; referred to the House Committee on Foreign Affairs.

**H.Res. 534 (Wasserman Schultz).** The resolution would express solidarity with Cuban citizens demonstrating peacefully for fundamental freedoms, would condemn the Cuban regime's acts of repression, and would call for the immediate release of arbitrarily detained Cuban citizens. Introduced July 16, 2021; referred to the House Committee on Foreign Affairs.

**S.Res. 116 (Rubio)/H.Res. 278 (Diaz-Balart).** Similar resolutions would commemorate the 60th anniversary of the Bay of Pigs operation and would remember the members of Assault Brigade

2506. S.Res. 116 introduced March 16, 2021; referred to the Senate Committee on Foreign Relations. H.Res. 278 introduced March 26, 2021; referred to the House Committee on Foreign Affairs.

**S.Res. 173 (Scott, Rick).** The resolution would commend the actions of Cuban democracy and human rights activist José Daniel Ferrer García and the pro-democracy and human rights group the Patriotic Union of Cuba (UNPACU) to uphold fundamental freedoms and condemn Cuba's brutal communist regime. Introduced April 22, 2021; referred to the Senate Committee on Foreign Relations.

**S.Res. 303 (Rubio).** The resolution would express support for the people of Cuba in their demands for freedom and the fulfillment of basic needs and would condemn the communist regime in Cuba. Introduced July 15, 2021; referred to the Senate Committee on Foreign Relations.

**S.Res. 717 (Rubio).** The resolution would honor the life and legacy of Oswaldo Payá Sardiñas and his contributions to promote democracy and human rights in Cuba on the 10th anniversary of his death. Introduced July 21, 2022; referred to the Senate Committee on Foreign Relations.

**S.Res. 728 (Scott, Rick)/H.Res. 1304 (Diaz-Balart).** Identical resolutions would commend the bravery, courage, and resolve of human rights and pro-democracy activists in Cuba one year after the historic march of July 11, 2021. S.Res. 728 introduced July 28, 2022; referred to the Senate Committee on Foreign Relations. H.Res. 1304 introduced July 29, 2022; referred to the House Committee on Foreign Affairs.

**H.R. 198 (Cohen).** Baseball Diplomacy Act. The bill would waive certain prohibitions with respect to nationals of Cuba coming to the United States to play organized professional baseball. Introduced January 5, 2021; referred to the Committee on Foreign Affairs and in addition to the Committee on the Judiciary.

**H.R. 287 (Salazar)/S. 689 (Rubio).** Fighting Oppression Until the Reign of Castro Ends Act, or the FORCE Act. Both bills would prohibit the removal of Cuba from the list of state sponsors of terrorism until the President makes a determination (subject to certain requirements and factors) described in Section 205 of the Cuban Liberty and Democratic Solidarity Act of 1996 (LIBERTAD Act; P.L. 104-114) that a transitional government in Cuba is in place. S. 689 also would require the President to submit a report to certain committees that identifies terrorists and fugitives being provided safe haven in Cuba. H.R. 287 introduced January 13, 2021, and referred to the House Committee on Foreign Affairs. S. 689 introduced March 10, 2021, and referred to the Senate Committee on Foreign Relations.

**H.R. 2684 (Diaz-Balart).** Cuban Family Reunification Modernization Act of 2021. The bill would amend the Immigration and Nationality Act (P.L. 82-414, as amended) to establish a Cuban family reunification parole program. Introduced April 20, 2021; referred to the House Committee on the Judiciary.

**H.R. 3625 (Rush).** United State-Cuba Relations Normalization Act. The bill would remove provisions of law restricting trade and other relations with Cuba; authorize common carriers to install and repair telecommunications equipment and facilities in Cuba and to otherwise provide telecommunications services between the United States and Cuba; prohibit restrictions on travel to and from Cuba and on transactions incident to such travel; call on the President to conduct negotiations with Cuba for the purpose of settling claims of U.S. nationals for the taking of property by the Cuban government and to engage in bilateral dialogue with the Cuban government to secure the protection of internationally recognized human rights; extend nondiscriminatory trade treatment to the products of Cuba; and prohibit limits on remittances to

Cuba. Introduced May 28, 2021; referred to the Committee on Foreign Affairs and in addition to the Committees on Ways and Means, Energy and Commerce, the Judiciary, Agriculture, and Financial Services.

**H.R. 3455 (Wasserman Schultz)/S. 1748 (Menendez).** No Stolen Trademarks Honored in America Act. Identical bills would modify a 1998 prohibition (Section 211 of Division A, Tile II, P.L. 105-277) on recognition by U.S. courts of certain rights to certain marks, trade names, or commercial names. The bills would apply a fix so the sanction would apply to all nationals and would bring the sanction into compliance with a 2002 World Trade Organization dispute settlement ruling. H.R. 3455 introduced May 20, 2021; referred to House Committee on the Judiciary. S. 1748 introduced May 20, 2021; referred to Senate Committee on the Judiciary.

**H.R. 5069 (Tenney).** Championing Uncensored Bandwidths Access Act of 2021, or CUBA Act of 2021. The bill would direct the Secretary of State, in consultation with the Secretary of Defense, the Director of National Intelligence, and the Commissioner of the Federal Communications Commission, to develop and implement a strategy to establish internet resiliency and deliver internet access in Cuba. Introduced August 20, 2021; referred to the House Committee on Foreign Affairs.

**H.R. 5557 (Donalds)/S. 2990 (Scott, Rick).** Denying Earnings to the Military Oligarchy in Cuba and Restricting Activities of the Cuban Intelligence Apparatus Act, or the DEMOCRACIA Act. H.R. 5557 introduced October 12, 2021; referred to the Committee on Foreign Affairs and in addition to the Committees on the Judiciary and Rules. S. 2990 introduced October 18, 2021; referred to the Committee on Foreign Relations.

Among the bills' provisions, Section 4 would require the President to impose sanctions (asset blocking and visa restrictions) on foreign persons determined to be providing financial, material, or technological support or engaging in transactions related to the defense, security, and intelligence sectors of Cuba or any sector certified by the President as involved in carrying out human rights abuses or providing support for international terrorism. Section 5 would require the President to impose sanctions on foreign persons determined to be responsible for or complicit in, or directly or indirectly engaged in, serious human rights abuses or corruption in Cuba or who have materially assisted, sponsored, or provided financial, material, or technological support or goods in services in support of any such activity. Section 5 also would require sanctions on a wide range of Cuban government officials and employees and members of the Cuban Communist Party. Section 6 would require, for the termination of sanctions set forth in Sections 4 and 5, a presidential determination and certification of numerous Cuban government actions and the enactment into law of a joint resolution approving the President's determination and certification. Section 7 would require the President to take actions to provide unrestricted internet service to Cuba, including the establishment of an interagency task force to develop a long-term solution.

**H.R. 6907 (Wasserman Schultz).** Cuban Family Reunification Parole Act of 2022. The bill would direct the Secretary of Homeland Security to reinstate the processing of applications for parole under the Cuban Family Reunification Parole Program. Introduced March 2, 2022; referred to the House Committee on the Judiciary.

**H.R. 7579 (Green, Mark).** Western Hemisphere Nearshoring Act. Among its provisions, the bill would provide for the use of U.S. International Development Finance Corporation funds to finance moving expenses and necessary workforce development costs incurred by companies moving from China to Latin America or the Caribbean and would provide authority for the President to extend duty-free treatment for goods and services of companies moving from China to Latin America or the Caribbean. As defined in the bill, the term *Latin American or Caribbean country* shall include Cuba (or Venezuela) only if the Secretary of State determines and certifies

that the prior authorities of such country have renounced their illegitimate claim to power and if the government of such country has fulfilled certain conditions. Introduced April 26, 2022; referred to House Committee on Ways and Means and in addition to the Committee on Foreign Affairs.

**H.R. 8651 (Smith, Christopher).** Walter Patterson and Werner Foerster Justice and Extradition Act. The bill would direct the President to submit to Congress a report, not later than 270 days after enactment (and each 12-month period thereafter), on fugitives currently residing in other countries whose extradition is sought by the United States and related matters. The bill also would express the sense of Congress that in meetings with foreign officials from which the United States seeks the extradition of fugitives, U.S. ambassadors and other senior officials should prioritize advocacy on fulfilling U.S. extradition requests, including for Joanne Chesimard, an escaped convict and the murderer of New Jersey State Trooper Werner Foerster. Introduced August 2, 2022; referred to House Committee on Foreign Affairs.

**S. 249 (Wyden).** United States-Cuba Trade Act of 2021. The bill, among its provisions, would repeal or amend provisions of law restricting trade and other relations with Cuba; authorize common carriers to install, maintain, and repair telecommunications equipment and facilities in Cuba and provide telecommunications services between the United States and Cuba; prohibit restrictions on travel to Cuba; call for the President to take all necessary steps to advance negotiations with the Cuban government for settling property claims of U.S. nationals and for securing the protection of internationally recognized human rights; extend nondiscriminatory trade treatment to Cuba; prohibit restrictions on remittances to Cuba; and require a presidential determination reported to Congress prior to the denial of foreign tax credit with respect to certain foreign countries. Introduced February 4, 2021; referred to the Senate Committee on Finance.

**S. 1694 (Klobuchar).** Freedom to Export to Cuba Act of 2021. The bill would repeal or amend provisions of law restricting trade and other relations with Cuba, including certain restrictions in the Cuban Democracy Act of 1992, the LIBERTAD Act of 1996, and the TSRA. Introduced May 19, 2021; referred to the Senate Committee on Banking, Housing, and Urban Affairs.

**S. 2138 (Menendez).** Combating Trafficking of Cuban Doctors Act of 2021. The bill would require the Secretary of State to submit an annual report to Congress identifying countries hosting Cuban medical personnel who are participating in Cuban government foreign medical missions and determining whether such personnel in each country are subjected to conditions that qualify as severe forms of trafficking in persons. It also would require the Secretary of Homeland Security, in coordination with the Secretary of State, to reinstate the Cuban Medical Professional Parole Program and the Secretaries of State and Health and Human Services to submit a report to Congress that includes a review and findings of the role of PAHO in Brazil's Mais Médicos program between 2013 and 2019, corrective actions taken by PAHO, and recommendations for further corrective actions. In addition, it would require the Secretaries of State and Health and Human Services to take all necessary steps to ensure PAHO undertakes governance reforms that strengthen internal oversight and risk management for future programs. Introduced June 17, 2021; referred to the Senate Committee on the Judiciary.

**S. 3468 (Risch).** The bill would limit the removal of the Cuban government from the state sponsors of terrorism list until the President submits to Congress a determination and certification regarding certain actions by the Cuban government and until a joint resolution approving the determination and certification is enacted into law. The actions required by the determination and certification are that the Cuban government is cooperating fully with U.S. anti-terrorism efforts; has ceased to provide support to international terrorist groups; has ceased to provide support for acts of international terrorism; has extradited or otherwise rendered to the United States all persons sought by the U.S. Department of Justice for crimes committed in the United States; and

has ceased to provide support, including defense, intelligence, and security assistance, to the illegitimate regime of former President Nicolás Maduro in Venezuela. Introduced January 10, 2022; placed on Senate Legislative Calendar under General Orders.

**S. 4715 (Menendez).** Trooper Werner Foerster and Frank Connor Justice Act. Section 3 of the bill would express the sense of Congress that Joanne Chesimard, William "Guillermo" Morales, and all other fugitives receiving safe haven in Cuba must be extradited or returned immediately to the United States and that the Secretary of State and the Attorney General should leverage all appropriate diplomatic tools to secure the timely extradition or return of all U.S. fugitives from justice residing in Cuba. Section 4 would require a State Department report, within 180 days of enactment, that identifies steps taken to advance efforts to secure the extradition or return of U.S. fugitives residing in Cuba; includes a determination as to whether Cuba is fulfilling its obligations under bilateral extradition treaties; and, to the extent feasible, includes an estimate of the number of U.S. fugitives from justice who are receiving safe haven in Cuba. Section 5 would prohibit the use of International Narcotics Control and Law Enforcement assistance for programs or initiatives in Cuba until Cuba is actively fulfilling its extradition obligations, is returning U.S. fugitives from justice residing in Cuba, and is complying with conditions set for the resumption of economic activity between the United States and Cuba pursuant to law, including the LIBERTAD Act of 1996. Introduced August 2, 2022; referred to the Senate Committee on Foreign Relations.

**S. 4285 (Menendez).** Upholding the Inter-American Democratic Charter Act of 2022. Among its provisions, Section 8 of the bill would require the Secretary of State to develop a plan for addressing threats to democratic governance posed by corruption and criminality and the malign activities of nondemocratic states, including Cuba (as well as the People's Republic of China, Russia, and Iran). Introduced May 19, 2022; referred to the Senate Committee on Foreign Relations.

# Appendix B. Links to U.S. Government Reports

**U.S. Relations with Cuba, Fact Sheet**, Department of State

*Date:* November 22, 2019
*Link:* https://www.state.gov/r/pa/ei/bgn/2886.htm

**Congressional Budget Justification for Foreign Operations FY2022, Appendix 2**, Department of State

*Date:* July 6, 2021
*Link:* https://www.state.gov/wp-content/uploads/2021/06/FY-2022-C-J-Appendix-2-FINAL-6-25-2021.pdf

**Congressional Budget Justification for Foreign Operations FY2023, Appendix 2**, Department of State

*Date:* May 13, 2022
*Link:* https://www.state.gov/wp-content/uploads/2022/05/FY-2023-Congressional-Budget-Justifcation-Appendix-2-final-5-9-2022.pdf

**Congressional Budget Justification FY2022**, U.S. Agency for Global Media

*Date:* May 28, 2021
*Link:* https://www.usagm.gov/wp-content/uploads/2021/06/USAGM-FY-2022-CBJ-Final-05.26.2021.pdf

**Congressional Budget Justification FY2023**, U.S. Agency for Global Media

*Date:* March 28, 2022
*Link:* https://www.usagm.gov/wp-content/uploads/2022/03/USAGMBudget_FY23_CBJ_03-25-22-FINAL.pdf

**Country Reports on Human Rights Practices for 2021, Cuba**, Department of State

*Date:* April 12, 2022
*Link:* https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/

**Country Reports on Terrorism 2020, Cuba,** Department of State

*Date:* December 16, 2021
*Link:* https://www.state.gov/reports/country-reports-on-terrorism-2020/cuba/

**Cuba** web page, Department of State

*Link:* https://www.state.gov/countries-areas/cuba/

**Cuba** web page, Department of Commerce, Bureau of Industry and Security

*Link:* https://www.bis.doc.gov/index.php/policy-guidance/country-guidance/sanctioned-destinations/cuba

**Cuba** web page, Department of Agriculture, Foreign Agricultural Service

*Link:* https://www.fas.usda.gov/regions/cuba

**Cuba Sanctions** web page, Department of State

*Link:* https://www.state.gov/cuba-sanctions/

**Cuba Sanctions** web page, Department of the Treasury, Office of Foreign Assets Control

*Link:* https://home.treasury.gov/policy-issues/financial-sanctions/sanctions-programs-and-country-information/cuba-sanctions

**International Religious Freedom Report for 2021, Cuba**, Department of State

*Date:* June 2, 2022
*Link:* https://www.state.gov/reports/2021-report-on-international-religious-freedom/cuba/

**International Narcotics Control Strategy Report 2022, Volume I,** Drug and Chemical Control, p. 110, Department of State

*Date:* March 1, 2022
*Link:* https://www.state.gov/wp-content/uploads/2022/03/22-00767-INCSR-2022-Vol-1.pdf

**International Narcotics Control Strategy Report 2022, Volume II,** Money Laundering, pp. 78-80, Department of State

*Date:* March 1, 2022
*Link:* https://www.state.gov/wp-content/uploads/2022/03/22-00768-INCSR-2022-Vol-2.pdf

**Trafficking in Persons Report 2022, Cuba,** pp. 193-195, Department of State

*Date:* July 2022
*Link:* https://www.state.gov/wp-content/uploads/2022/08/22-00757-TIP-REPORT_072822-inaccessible.pdf

## Author Information

Mark P. Sullivan
Specialist in Latin American Affairs

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.



**Congressional Research Service**
Informing the legislative debate since 1914



Updated November 17, 2022

# Cuba: U.S. Policy Overview

## Cuban Political and Economic Developments

Cuba remains a one-party authoritarian state with a government that has sharply restricted freedoms of expression, association, assembly, and other basic human rights since the early years of the 1959 Cuban revolution.

Miguel Díaz-Canel succeeded Raúl Castro as president in 2018 and as head of the Cuban Communist Party (PCC) at its eighth party congress in April 2021. The departure of Castro and other older leaders from the PCC's Politburo reflects the generational change in Cuban leadership that began several years ago. While in power (2006-2018), Raúl Castro (who succeeded his brother, longtime leader Fidel Castro) began to move Cuba toward a mixed economy with a stronger private sector, but his government's slow, gradualist approach did not produce major improvements. Cuba adopted a new constitution in 2019 that introduced some reforms but maintained the state's dominance over the economy and the PCC's predominant political role.

The Cuban economy has been hard-hit by the economic shutdown associated with the Coronavirus Disease 2019 (COVID-19) pandemic; Venezuela's economic crisis, which has reduced support from that country; and U.S. sanctions. Cuba reports the economy contracted by 10.9% in 2020 and grew by 1.3% in 2021; in November 2022, the government cut its 2022 growth forecast from 4% to 2%. Cuba's growth forecast has been affected by a slower recovery of the tourism sector, the impact of Russia's invasion of Ukraine on the global economy (including food and fuel prices), an August 2022 fire that severely damaged Cuba's main oil storage facility, and Hurricane Ian, which caused severe damage to western Cuba in late September 2022 and a power outage across the country.

Cuba unified its dual currency system in 2021; the long-debated reform spurred inflation (with some estimates ranging from between 150% and 500% in 2021); the Economist Intelligence Unit is forecasting almost 66% inflation in 2022 and 44% in 2023.

Cuba's public health response to the pandemic initially kept cases and deaths low, but both surged in the summer of 2021. The country experienced another surge in cases in early 2022, but deaths remained low because of high vaccination rates. As of November 2022, Cuba reported over 8,500 deaths since the pandemic began (with one of the lowest mortality rates in the hemisphere) and had fully vaccinated 88% of its population with its own vaccines.

**Increased Repression.** Beginning in November 2020, the government cracked down on the San Isidro Movement (MSI), a civil society group opposed to restrictions on artistic expression. On July 11, 2021, anti-government demonstrations broke out in Havana and throughout the country, with thousands of Cubans protesting economic conditions (food and medicine shortages, blackouts) and long-standing concerns about the lack of political freedoms.

The government responded with harsh measures, including widespread detentions of protesters, civil society activists, and bystanders. Hundreds of the July 2021 protestors have been tried and convicted, including more than 25 minors. The human rights group Cuban Prisoners Defenders (CPD) reported that there were 1,027 political prisoners at the end of October 2022 (up from 152 on July 1, 2021), of which 743 were imprisoned and considered prisoners of conscience by CPD, 255 were under some form of conditional release, and 29 were imprisoned for other politically motivated acts.

## U.S. Policy

Since the early 1960s, when the United States imposed a trade embargo on Cuba, the centerpiece of U.S. policy toward Cuba has consisted of economic sanctions aimed at isolating the Cuban government. The Obama Administration initiated a policy shift away from sanctions and toward engagement and the normalization of relations. Changes included the rescission of Cuba's designation as a state sponsor of international terrorism (May 2015); the restoration of diplomatic relations (July 2015); and eased restrictions on travel, remittances, trade, telecommunications, and banking and financial services (2015-2016). In contrast, the Trump Administration introduced new sanctions in 2017, including restrictions on transactions with companies controlled by the Cuban military. By 2019, the Trump Administration had largely abandoned engagement and significantly increased sanctions, particularly on travel and remittances.

In its initial months, the Biden Administration announced it was conducting a review of policy toward Cuba, with human rights a core pillar, and would review policy decisions made by the prior Administration. In the aftermath of the Cuban government's harsh response to the July 11, 2021 protests, the Biden Administration criticized Cuba's repression and imposed targeted sanctions on those involved. In July and August 2021, the Treasury Department imposed four rounds of financial sanctions on three Cuban security entities and eight officials. Between November 2021 and July 2022, the State Department announced four rounds of visa restrictions against 50 individuals involved in repressing protesters.

In May 2022, the Administration announced several Cuba policy changes aimed at increasing support for the Cuban people. The Administration increased immigrant visa processing at the U.S. Embassy in Havana and said it would reinstate the Cuban Family Reunification Parole (CFRP) program. It eased travel restrictions by reauthorizing scheduled and charter flights to cities beyond Havana and reinstating group people-to-people travel. It eased restrictions on sending cash remittances by eliminating the dollar and frequency limits for family remittances and reauthorizing donative remittances to Cuban nationals.

Cuba AR_000238

**Increased Irregular Migration.** Driven by Cuba's difficult economic conditions and political repression, irregular Cuban migration to the United States has surged over the past year. U.S. Customs and Border Protection (CBP) reported over 39,000 border enforcement encounters of Cuban migrants nationwide in FY2021 and over 224,000 in FY2022, with the overwhelming majority at the Southwest land border. For October 2022, the first month of FY2023, CBP reported almost 30,000 encounters of Cuban migrants. U.S. maritime interdiction of Cubans also has increased, with the Coast Guard reporting 838 interdictions in FY2021; 6,182 in FY2022; and in FY2023, as of mid-November 2022, over 2,000 Cuban migrants.

U.S. and Cuban officials held semiannual migration talks in April 2022 (the first since 2018), and again in November 2022, on the implementation of bilateral migration accords. The Administration announced in September 2002 that the U.S. Embassy in Havana would resume full immigrant visa processing in early 2023—the first time since 2017.

## Selected U.S. Sanctions

**Transactions with the Cuban Military.** In 2017, the State Department published a list of entities controlled by the Cuban military, intelligence, or security services with which direct financial transactions would disproportionately benefit those services or personnel at the expense of the Cuban people or private enterprise. This "Cuba restricted list" includes 231 entities (ministries, hotels, businesses).

**Travel and Remittances.** Since 2019, U.S. restrictions have prohibited travel by cruise ships and by private and corporate aircraft. Since 2020, most U.S. travelers have been prohibited from staying at over 400 hotels and private residences identified as owned or controlled by the Cuban government. In 2020, a prohibition against processing remittances through "Cuba restricted list" entities resulted in Western Union terminating its services to Cuba.

**Terrorism Designations.** Since May 2020, pursuant to the Arms Export Control Act, the Secretary of State has included Cuba on an annual list of countries certified as *not cooperating fully* with U.S. anti-terrorism efforts. In early January 2021, pursuant to several laws, the Secretary of State designated Cuba as a state sponsor of international terrorism, citing its harboring of several U.S. fugitives and members of Colombia's National Liberation Army.

## Injuries of U.S. Embassy Personnel

Between late 2016 and May 2018, 26 U.S. Embassy Havana community members suffered a series of unexplained injuries, including hearing loss and cognitive issues. In December 2020, the National Academies of Sciences, Engineering, and Medicine released a report concluding the most plausible mechanism for the source of the health symptoms was directed pulsed radio frequency energy. U.S. officials maintain that investigations into the cause or source of these anomalous health incidents have not reached a conclusion. A number of U.S. government and military officials worldwide have reported these symptoms since 2016.

Congress enacted legislation (P.L. 117-46) in September 2021 authorizing payment to Central Intelligence Agency and State Department personnel who experience certain brain injuries. The National Defense Authorization Act for FY2022 (P.L. 117-81), approved in December 2021, has provisions to address health care and treatment, national security challenges, and U.S. government coordination of the response to the incidents.

## 117th Congress: Legislative Action on Cuba

For FY2022, the Biden Administration requested $12.973 million for the Office of Cuba Broadcasting (OCB) and $20 million for Cuba democracy programming. In the Consolidated Appropriations Act, 2022 (P.L. 117-103, Division K) and its explanatory statement, Congress fully funded the Administration's OCB request. Although the law did not specify an amount for Cuba democracy programming, the Administration estimates an allocation of $20 million, the amount requested.

For FY2023, the Administration requested $13.432 million for OCB and $20 million for Cuba democracy funding. The House Appropriations Committee's reported FY2023 foreign aid appropriations bill, H.R. 8282 (H.Rept. 117-401), would provide $12.973 million for OCB (same as for FY2022), while an explanatory statement to the Senate bill, S. 4662, would recommend $13.891 million. The House bill would provide $20 million for democracy programs, with not less than $5 million to support private enterprise, private business organizations, and people-to-people educational and cultural activities; the bill would also provide for the operation of, and improvements to, U.S. diplomatic facilities in Cuba, and costs associated with additional U.S. diplomatic personnel.

On July 20, 2022, the House rejected (163-260) an amendment (H.Amdt. 300) to H.R. 8294, a six-bill FY2023 appropriations measure that would have prevented any funds from being used to enforce a U.S. sanctions provision prohibiting private financing for U.S. agricultural exports.

On human rights, the House and Senate approved H.Res. 760 and S.Res. 310, in November and August 2021, respectively; both condemned Cuba's repression, and called for the release of those detained. The Senate also passed S.Res. 37 in April 2021, expressing solidarity with the MSI; S.Res. 81 in May 2021, honoring *Las Damas de Blanco*, a woman-led human rights group; S. 2045 in July 2021, to rename the street in front of the Cuban Embassy after a democracy activist; and S.Res. 489 in January 2022, commending Cuban democracy and human rights activists.

Members of Congress have introduced a wide variety of other legislative initiatives on Cuba in the 117th Congress. These include bills that would ease or lift sanctions or promote engagement and bills that would impose further sanctions or restrictions on Cuba. Other initiatives focus on immigration parole programs for family reunification and for Cuban medical professionals.

For further information on such legislative initiatives, see CRS Report R47246, *Cuba: U.S. Policy in the 117th Congress*. Also see CRS Report RL31139, *Cuba: U.S. Restrictions on Travel and Remittances*.

---

**Mark P. Sullivan**, Specialist in Latin American Affairs

IF10045

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

10/11/22, 5:33 PM    The United States Announces More than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans ...

Case 6:23-cv-00007 Document 92-34 Filed on 03/24/23 in TXSD Page 104 of 269

HOME » NEWS AND INFORMATION » PRESS RELEASES » THE UNITED STATES ANNOUNCES MORE THAN $314 MILLION IN NEW ASSISTANCE FOR VENEZUELANS AND OTHER MIGRANTS AT THE SUMMIT OF THE AMERICAS

# THE UNITED STATES ANNOUNCES MORE THAN $314 MILLION IN NEW STABILIZATION EFFORTS AND HUMANITARIAN ASSISTANCE FOR VENEZUELANS AND OTHER MIGRANTS AT THE SUMMIT OF THE AMERICAS

### For Immediate Release

Friday, June 10, 2022

Office of Press Relations
press@usaid.gov

During the Summit of the Americas, President Biden announced new efforts by the Department of State and USAID that will assist vulnerable refugees and migrants across the region, including those displaced from the political and economic crisis in Venezuela and humanitarian assistance for vulnerable Venezuelans in Venezuela.

**$40 Million in USAID Development Funding**

- With $35.9 million in FY 2021 Development Assistance (DA), Economic Support Fund (ESF), and Global Health Programs–USAID funds for South America, including in Brazil, Colombia, Ecuador, and Peru, USAID will promote the social and economic integration of the millions of Venezuelan migrants through policy reform, pathways for legal status, professional certification, job training and placement, microenterprise creation, access to financial services, and other socio-economic integration efforts.

- In Central America, with $4.1 million in FY 2018 and FY 2019 ESF, USAID will expand integration efforts in Belize, Costa Rica, and Panama, to support the dignified social and economic integration of third country migrants from Nicaragua, as well as from Venezuela, Haiti, and other countries around the region.

**$171 Million USAID Humanitarian Funding**

- This new funding will provide direct relief to vulnerable Venezuelans who have remained within the country, including healthcare, food, nutrition, water and sanitation, and protection services. The new funding will also help Venezuelan migrants and refugees who have fled to Brazil, Colombia, Ecuador, and Peru by providing emergency food assistance. With USAID support, partners aim to address acute food insecurity among Venezuelan migrants and refugees in these four countries by providing them with hot meals, cash transfers, food vouchers, and food kits.

**Nearly $103 Million Department of State Humanitarian Funding**

- This new funding through the State Department's Bureau of Population, Refugees, and Migration (PRM) supports a wide range of life-saving humanitarian programs for Venezuelan refugees and migrants, such as emergency shelter; access to health care, water, sanitation, and hygiene supplies; increased access to education; support for livelihoods; COVID-19 support, and protection for vulnerable groups including women, youth, LGBTQI+, and indigenous people in seventeen countries including Argentina, Aruba, Brazil, Chile, Colombia, Costa Rica, Curacao, Dominican Republic, Ecuador, Guyana, Mexico, Panama, Paraguay, Peru, Trinidad and Tobago, Uruguay, and Venezuela.

Cuba AR_000241

Last updated: September 23, 2022

**SHARE THIS PAGE**

Cuba AR_000242

Cuba_AR_000243

# Joint Brief on Mass Maritime Migration

**UNCLASSIFIED//For Official Use Only**







# Current Situation

**Data Current As of: 12 August**

Data includes all nationalities.
Primary:
- Haiti
- Cuba
- Dominican Republic

**AOR Total**
138% ↓ in FY22(YTD) from FY21
FY22 (YTD) Total Flow – 24,966
*FY21 Total Flow – 10,489*
437% ↑ over previous five year average
*FY16-FY21 Average – 4,645*

**Eastern Caribbean**
308% ↑ in FY22(YTD) from FY21
1,256% ↑ over FY16-FY21 Average
FY22 (YTD) Total Flow – 339
*FY21 Total Flow – 83*
*FY16-FY21 Average – 25*

**Mona Passage**
35% ↑ in FY22(YTD) from FY21
200% ↑ over FY16-FY21 Average
FY22 (YTD) Total Flow – 4,674
*FY21 Total Flow – 3,470*
*FY16-FY21 Average – 1,550*

**North Florida Straits**
27% ↑ in FY22(YTD) from FY21
35% ↑ over FY16-FY21 Average
FY22 (YTD) Total Flow – 747
*FY21 Total Flow – 1,027*
*FY16-FY21 Average – 550*

**Windward Pass**
188% ↑ in FY22(YTD) from FY21
485% ↑ over FY16-FY21 Average
FY22 (YTD) Total Flow – 13,157
*FY21 Total Flow – 4,573*
*FY16-FY21 Average – 2,250*

**South Florida Straits**
357% ↑ in FY22(YTD) from FY21
2,118% ↑ over FY16-FY21 Average
FY22 (YTD) Total Flow – 5,988
*FY21 Total Flow – 1,311*
*FY16-FY21 Average – 270*

**Yucatan**
FY22 (YTD) Total Flow – 61
*FY21 Total Flow – 00*

Data Explanation: Total Flow is based on USCG, Partner Agency, and Partner Nation reports of migrant cases. Additionally when a landing occurs but no apprehensions are made an average is applied based on the vector (i.e. 09 CUB in the S. FL Straits or 19 DOM in the Mona).

**UNCLASSIFIED//For Official Use Only**

Cuba_AR_000244



Migrant Flow Comparison – FY21 to FY22

Caribbean Migrant Flow - Primary Vectors

Aug 2022 data is through Aug 12 - 40% of the month.

FY2022

FY2021

UNCLASSIFIED//For Official Use Only

Cuba AR_000245

North Florida Straits   Mona Passage   South Florida Straits   Windward Passage



# Task Force Director's Risk Calculus

## Jul-Aug 2021 vs Jul-Aug 2022

### Migrant Flow

**2021** 1,397 (175/wk)

+140%

**2022** 3,319 (474/wk)

### Force Laydown

1 Large Cutter + 2 Patrol Boats  +2  →  3 Large Cutters + 7 Patrol Boats

1 Fixed Wing  +1  →  2 Fixed Wing + 2 MH-60

+5  +2

*Includes all Caribbean migrant vectors*

## Operational Commander Considerations

1. Repatriation ability
2. Available deck capacity (based on saturation level on all cutters)
3. # ventures detected
4. Landings
5. Regional Weather/Sea State
6. Tropical Weather Outlook
7. Push factors (socio-economic conditions, surges in violence)
8. Pull factors (perceived US policy, diaspora influence)
9. Indications & warning
10. MOC capacity

## Key Takeaways

- Decisions to increase force laydown are driven by an aggregate of these considerations. There is no single indicator that signals that a mass migration is imminent.

- Although current maritime migration flow is not nearly the volume being observed on the Southwest Border, the dynamic environment and ever-present hazards **make this a higher-consequence mission with far greater possibilities for serious injuries and the loss of life.**

- Increasing our posture by transitioning to **OVS Phase 1B brings additional resources** to this mission while **providing structure** to the surge of forces that has been in place since March 2022.



Cuba_AR_000246
v1.12

UNCLASSIFIED//For Official Use Only



# DoD Support and Integration

- Use of Naval Station Guantanamo Bay (NSGB) **prior to** a Presidentially declared mass migration event
  - ➢ Provide location for Migrant Operations Center (MOC)
  - ➢ Provide services (meals, water, housing, transportation) on a **reimbursable basis**
- Use of Naval Station Guantanamo Bay (NSGB) **following** a Presidentially declared mass migration event
  - ➢ Provide services (meals, water, housing, transportation) on a **non-reimbursable basis**
- Upon an approved Request for Assistance (RFA), DoD can provide support (naval forces) to USCG for the maritime interdiction of migrants.

**DHS and DOS share the responsibility for migrant processing both prior to and after a Presidentially declared mass migration.**

UNCLASSIFIED//For Official Use Only



# Integrated DHS-DoD Preparation & Response



## OVS

**Deterrence**

Routine Operations

Phase 1A: Steady State

Increased op tempo, but able to maintain interdiction-repatriation cycle

Phase 1B: Prevent - Surge Operations

Available DHS assets are unable to maintain interdiction-repatriation balance…

…triggers NSC discussion, POTUS declaration, and/or RFA to DoD

DoD receives requests for interdiction and camp support

Triggers & Decision

Phase 2: Mass Migration

**Deploy**

DoD Executes GTMO Camps up to 10K

## DoD Support

DOD Executes GTMO Camps up to 29.75K

**Operations**

Migrant flow decreases to pre-mass migration level, DHS assets are able to handle

Phase 3: Transition and Recovery

Phase 4: Recover from Mass Migration

**Redeployment**

DOS Coordinates Resettlement/ Repatriation

Cuba_AR_000248





# DoD Migration Camp Capacities



Increased Risk ← → Decreased Capacity

**AOD risk: Physical terrain limitations**

**AOD risk: medical (COVID and non-COVID) and physical protection factors**

**Stressed Infrastructure: 35k***

**Risk: NSGB infrastructure stress (water, power, sewage)**

29,750 migrants (max planning factor)

**NSGB Infrastructure: 29,750 + 9K JTF (~38K)**

~25% decrement (COVID)

**COVID Mitigation: ~22.3K**

~7-10% decrement (by nationality)

**COVID Mitigation + Nationality: ~20K**

~7-10% decrement (by category)

**COVID Mitigation + Nationality + Categories : ~18K**

Total:
- ~39,000 migrants based only on tent/land space
- ~29,750 migrants based on NSGB Infrastructure/Support capacity

Golf Course ~11,000 **4**

Windward

Phillips ~4,000 **2**

McCalla ~11,000 **3**

Leeward **1**

Leeward South ~13,000

**NSGB camp capacities depend on several factors:: composition of migrants + infrastructure + physical terrain. 29,750 is the "max camp service capacity before degradation".**

CUI

Cuba AR_000249





# Readiness Lines of Effort

**Planning Efforts**
- DoD's Caribbean Maritime Mass Migration Plan Reviews
- DoD Component Support Plan for Caribbean Maritime Mass Migration Review

**Exercises**
- DHS UNIFIED SUPPORT 21
- DoD Tabletop Exercise
- DoD-led Interagency Rehearsal of Concept (ROC) Drill
- Naval Station Guantanamo Bay Migrant Operations Exercise
- HSTF-SE Incident Command Post Functional Exercise
- Senior Leader Seminar

**Real World Response**
- Haiti Earthquake Response

**Assessments**
- Joint Assessment of HTI Coast Guard
- DoD Assessment of ability to implement JTF-MIGOPS (focus upon COVID impacts)

**Upcoming**
- Joint Staff Contingency Sourcing Assessment
- SOUTHCOM Sustainment ROC Drill
- Engineer Exercise on GTMO

**Caribbean Maritime Migration plans are coordinated and regularly exercised.**

Cuba_AR_000250

v.12          7

# Challenges & Mitigation

## Challenges

- At-sea migrant holding capacity threshold (saturation) depends on the type and number of surface assets assigned and on station.

- Resources drawn from other missions via appropriate risk management.

- HUMINT in Haiti is extremely limited due to persistent security threat posed by gang activity; results in significant intelligence gap.

- Detection of migrant ventures via ISR without prior cueing.

- Repatriations to Haiti are currently limited only to Cap Haitien.

## Mitigation – Current & Next Steps

- USCG has surged cutters by repurposing from JIATFS counter drug patrols, and domestic fisheries patrols to increase surface asset capacity in migrant vectors.

- Continue to conduct exercises & readiness activities.

- Pre-script RFAs – HSTF-SE will advance these to JTF-E.

- Continued interagency / NSC support for a whole of government approach to detect, deter, and respond to maritime migration.

UNCLASSIFIED//For Official Use Only



Homeland
Security

**From:** [REDACTED] RDML USCG COMDT (USA) [REDACTED]
**Sent:** Tuesday, December 13, 2022 2:57 PM
**To:** [REDACTED]

Please find our input, below. Let me know if you have questions, concerns, or need additional info. Thanks for reaching out to us on this.

Hope we can find some time soon to catch up.

Best,



Cubans are also the top nationality encountered in the Eastern Caribbean Sea, where their numbers have surged from 225 maritime encounters in January 2022 to 1,552 in November 2022[2]  Second to Cuban irregular maritime migration, Haitian migrant encounters totaled 325 in January 2022 then surged to 505 encounters in November 2022, in large part due to three Haitian sail freighter departures in which one landed in southern Florida.  While these numbers are smaller than SWB trends, they are extraordinarily high for the maritime domain where the risk and danger of irregular migration is outsized, even when compared with land routes.  According to Coast Guard migrant statistics, irregular maritime migration flow in the Florida Straits and Caribbean increased by 600 percent between FY20 (5,670) to FY22 (29,520). Of note, irregular maritime migration flow numbers in the first 10 weeks of FY 2023, 8,563, eclipsed the flow for all of FY 2021. In response to the persistent elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force – Southeast (HSTF-SE) elevated the operational phase of DHS'

mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).  Operation Vigilant Sentry is HSTF-SE's comprehensive, integrated, National operational plan for a rapid, effective, and unified response of Federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean. The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF-SE's  Unified Command staff and operational battle rhythm.  For example, between July 2021 and December 2022, Coast Guard operational planners surged three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.  Increasing the USCG's operational presence in the region has traditionally deterred irregular migrant populations from taking the sea.  However, Coast Guard and interagency consent-based interviews suggest that human smuggling networks and the will of would-be irregular migrants consider the risk to taking to the sea worth the attempt(s).

Despite the increased numbers taking to the sea, human smugglers and irregular migrant populations continue to use unseaworthy, overly crowded vessels, piloted by inexperienced mariners, without any safety equipment – including but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons.  In FY22, the USCG recorded 107 non-citizen deaths, including presumed dead, as a result of irregular maritime migration.  In January 2022, the Coast Guard located a capsized vessel with a survivor clinging to the hull.  USCG crews interviewed the survivor who indicated there were 34 others on the vessel, who were not in the vicinity of the capsized vessel and survivor.  The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, the others were presumed lost at sea.  The perils of taking to the sea, for legitimate purposes, are no different for an experienced mariner; however, an inexperienced mariner, without any safety equipment, taking to the sea for illegal purposes, in an overcrowded vessel is risking the lives of all persons onboard.

Historically, USCG encounters at-sea are more often than not compliant, however, USCG crews are also observing an increasing number of encounters where migrant vessels are non-compliant.  In FY 2022, the Coast Guard encountered 26 non-compliant migrant vessels, compared with only one for the previous two years. Non-compliance means upon encountering a migrant vessel, migrants may be observed wielding knives, "clubs,"  or other make-shift weapons meant to dissuade boarding the migrant vessel or coming alongside to render assistance; other USCG observations include instances where migrants have thrown canisters of bodily fluids at USCG crews, and positioning the migrant vessel so as to obstruct the safe navigation of the USCG cutter. USCG crews will de-escalate incidents of non-compliance through persistent on-scene communications until such time the migrants accept USCG assistance to transfer the migrants from their unsafe vessel to a USCG cutter.  Other encounters by USCG crews include migrants ingesting hazardous chemicals (e.g., fuel, bleach) or objects, and even cutting themselves in hopes of being medically evacuated to the United States.  For example, in FY22, there were 11 incidents of self-harm noted by migrants under the care of, or upon encountering, the USCG, or other U.S. government agency, an approximate 200% increase since FY17 in which there four incidents, preceded by 24 incidents in FY16.

USCG and U.S. interagency encounters reflect the risk calculation irregular migrants accept by taking to the sea, putting themselves, smaller accompanied and/or unaccompanied children at risk to reach the United States.  To that end, the USCG views its migrant interdiction mission as a no-fail mission in an effort to save the lives of those unnecessarily taking to the sea.  In support of HSTF-SE, the USCG has voluntarily assumed operational risk in other statutory missions to support migrant interdiction operations to prevent conditions that indicate a mass maritime migration.  Some of these assets have been diverted from other key mission areas, including counter-drug smuggling operations, protection of living marine resources, and support for shipping navigation.  Allocating additional resources to migrant interdictions has also decreased USCG's participation in the international engagement mission.  For instance, USCG was unable to support joint law enforcement operations and training with Jamaica, Bahamas, Colombia, Dominican Republic, and other Eastern Caribbean nations in FY 2022 due to increased maritime migration flows.  This will diminish USCG's role in bolstering

valuable partnerships in the region while countering near peer influence.  If the current irregular maritime migration trends driven by primarily Haitian and Cuban nationals continue, the USCG will not be able to fully support several of its statutory missions.[5]

RDML
Assistant Commandant for Response Policy (CG-5R)





**Explanation of the Decision to Terminate the Migrant Protection Protocols**

October 29, 2021

I.      Executive Summary ................................................................................................ 2

II.     Background ............................................................................................................. 3

    A.    MPP's Statutory Basis and Implementation .................................................. 5

    B.    Prior Evaluations of MPP ............................................................................... 7

    C.    Litigation Regarding the Prior Implementation of MPP................................. 9

    D.    Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP .......................................................................... 10

    E.    Challenge to the Suspension and Termination................................................ 10

III.    Evaluation of MPP ................................................................................................ 11

    A.    Conditions for Migrants in Mexico ............................................................... 12

    B.    *Non-Refoulement* Concerns ........................................................................... 14

    C.    Access to Counsel, Notice of Hearings, and Other Process Concerns .......... 16

    D.    Impacts of MPP on Immigration Court Appearance Rates and Outcomes .... 18

    E.    MPP and Recidivist Irregular Re-Entries ..................................................... 21

    F.    Investments and Resources Required to Operate MPP................................... 22

    G.    Impact of MPP and its Termination on SWB Migration Flows ..................... 23

    H.    Addressing the Concerns of States and Border Communities ....................... 24

    I.    Relationship between Implementation of MPP and Statutory Mandates ....... 26

    J.    Impact on U.S.-Mexico Relationship............................................................. 29

IV.     The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management............................................................................................................ 30

    A.    Managing Flows ............................................................................................ 31

    B.    Managing Asylum Claims ............................................................................. 34

        1.    Dedicated Docket ................................................................................ 34

        2.    Asylum Officer Rule ........................................................................... 35

V.      Consideration of Alternatives to Terminating MPP.............................................. 36

VI.     Conclusion............................................................................................................. 38

Cuba AR_000255

## I.   <u>Executive Summary</u>

On February 2, 2021, President Biden issued an Executive Order directing the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[1]  After extensive review, the Secretary of Homeland Security concluded that the Migrant Protection Protocols (MPP) should be terminated, and on June 1, 2021, issued a memorandum to that effect.[2]  On August 13, 2021, however, the U.S. District Court for the Northern District of Texas determined that the June 1, 2021, memorandum was not issued in compliance with the Administrative Procedure Act (APA) and caused DHS to violate 8 U.S.C. § 1225, vacated the memorandum, and remanded it to the Department for further consideration.  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA"—a ruling that the government is vigorously appealing.

Pursuant to the Texas court's remand, and in continuing compliance with the President's direction in the Executive Order, the Secretary has considered anew whether MPP should be maintained, terminated, or modified in a variety of different ways.  After carefully considering the arguments, evidence, and perspectives of those who support continuing to use MPP, those who support terminating the program, and those who have argued for the use of MPP with modifications, the Secretary has determined that MPP should be terminated.  In reaching this conclusion, the Secretary recognizes that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that will disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving either of these goals.  Significant evidence indicates that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico.  It is possible that some of these humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.

---

[1] Exec. Order No. 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[2] Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of the Migrant Protection Protocols Program* (June 1, 2021) [hereinafter June 1 Memo].

Cuba AR_000256

Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

Importantly, as the Secretary has emphasized, the management of migratory flows is a shared responsibility among all countries in the hemisphere. MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader, and more enduring, solutions. Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.

Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program. But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program—the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systemically tackle the problem of irregular migration and protect our border. Moreover, the personnel required to adequately screen MPP enrollees, potentially multiple times—to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases—pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.

Having assessed the benefits and costs of the previous implementation of MPP as well as how the program could potentially be improved, the Secretary has concluded that there are inherent problems with the program—including the vulnerability of migrants to criminal networks, and the challenges associated with accessing counsel and courts across an international border—that resources cannot sufficiently fix. Others cannot be addressed without detracting from other key Administration priorities. It is thus the Secretary's judgment that the benefits of MPP are far outweighed by the costs of the program, in whatever form.

As a result, for the many reasons described in what follows, the Secretary in a memorandum issued today entitled, "Termination of the Migrant Protection Protocols," has decided to terminate MPP.[3] This determination will be implemented as soon as practicable after a final judicial decision to vacate the Texas injunction that currently requires good-faith enforcement of MPP.

## II.     Background

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On January 20, 2021, Acting Secretary David Pekoske issued a memorandum temporarily suspending new enrollments into the Migrant Protection Protocols (MPP) pending

---

[3] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Sec., *Termination of the Migrant Protection Protocols* (Oct. 29, 2021).

Cuba AR_000257

further review.[4]  Two weeks later, on February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*.[5]  In this Executive Order, President Biden directed the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols" and "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[6]  In response, Secretary Mayorkas initiated a comprehensive review of MPP.  The Secretary, in conjunction with other agencies, also implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and certain of their immediate family members for proceedings.[7]

At the conclusion of his review, on June 1, 2021, Secretary Mayorkas issued a memorandum announcing and explaining his determination that MPP should be terminated (the "June 1 Memorandum").[8]  On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 Memorandum did not reflect reasoned decision-making and thus was not issued in compliance with the Administrative Procedure Act (APA), and that the memorandum caused the Department to violate detention provisions found in 8 U.S.C. § 1225.[9]  The court vacated the June 1 Memorandum in its entirety and remanded it to the Department of Homeland Security (DHS) for further consideration.[10]  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA."[11]  The government is complying with that injunction while appealing the decision.

Pursuant to the district court's remand, and consistent with the President's direction in EO 14010, the Secretary has considered anew whether MPP should be maintained, terminated, or modified.  This memorandum sets forth the results of that analysis and the basis for the Secretary's decision to terminate MPP by way of a separate memorandum being issued today.  The Secretary's memorandum immediately supersedes and rescinds the June 1 Memorandum, as well as Secretary Nielsen's January 25, 2019 memorandum and any other guidance or other documents prepared by the Department to implement it.  The Secretary's decision to terminate

---

[4] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocol Program* (Jan. 20, 2021) [hereinafter MPP Suspension Memorandum].

[5] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[6] *Id.* at 8270.

[7] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[8] *See supra* note 2.

[9] *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021), *appeal pending*, No. 21-10806 (5th Cir. filed Aug. 16, 2021).

[10] *Id.* at *27.

[11] *Id.* (emphasis in original).

Cuba AR_000258

MPP is to be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction that currently requires good faith implementation and enforcement of MPP.

A. MPP's Statutory Basis and Implementation

Enacted in 1996, Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), grants DHS discretionary authority to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a.  Historically, DHS and the legacy Immigration and Naturalization Service (INS) used this discretionary authority on a case-by-case basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry; occasionally, the provision also was used for third-country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.[12]  On December 20, 2018, the Department announced a decision to initiate MPP—a novel programmatic implementation of Section 235(b)(2)(C)—along the Southwest Border (SWB).  That same day, Mexico announced its independent decision to accept those returned to Mexico through the program—a key precondition to implementation.[13]

At the time of its initial announcement, DHS stated that the program was intended to: (1) reduce unlawful migration and false claims of asylum; (2) ensure that migrants are not able to "disappear" into the United States prior to a court decision; (3) focus attention on more quickly assisting legitimate asylum seekers; (4) free up personnel and resources to better protect U.S. territory and clear the backlog of unadjudicated asylum applications; and (5) offer protection to vulnerable populations while they wait in Mexico for their removal proceedings.[14]

---

[12] Prior to MPP, DHS and the former INS primarily used Section 235(b)(2)(C) on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry. CBP, for instance, invoked Section 235(b)(2)(C) to return certain Mexican nationals who were U.S. lawful permanent residents (LPRs) and whose criminal histories potentially subjected them to removal, as well as LPRs who appeared to have abandoned their permanent residence in the United States but were not willing to execute a Form I-407, Record of Abandonment of Lawful Permanent Residence. At the Northern Border, CBP used Section 235(b)(2)(C) to return certain Canadian nationals or those with status in Canada who, for instance, appear to be subject to a criminal ground of inadmissibility. Although guidance is scant, DHS and the former INS also used Section 235(b)(2)(C), on a case-by-case basis, for certain third country nationals even prior to MPP. For example, CBP issued field guidance in 2005 advising that a Cuban national arriving at a land border port of entry may "be returned to contiguous territory pending section 240 proceedings . . . if: (1) the alien cannot demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico." Mem. from Jayson P. Ahern, Asst. Comm'r, Office of Field Ops., CBP, *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry* 2-3 (June 10, 2005). The INS also issued guidance in 1997 and 1998 contemplating the use of Section 235(b)(2)(C) only as a "last resort" and only when the individual does not claim a fear of persecution related to Canada or Mexico. Mem. from Michael A. Pearson, Executive Assoc. Comm'r, Office of Field Ops., INS, *Detention Guidelines Effective October 9, 1998* 3 (Oct. 7, 1998); Mem. from Chris Sale, Deputy Comm'r, INS, *Implementation of Expedited Removal* 4 (Mar. 31, 1997) (same).

[13] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[14] Press Release, DHS, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration [hereinafter Nielsen Release].

5

On January 25, 2019, DHS issued policy guidance for implementing MPP,[15] which was augmented a few days later by operational guidance from U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).[16]  Under MPP, certain non-Mexican applicants for admission who arrived on land at the SWB were placed in removal proceedings and returned to Mexico to await their immigration court proceedings under Section 240 of the INA.[17]  For those enrolled in MPP, DHS attempted to facilitate entry to and exit from the United States to attend their immigration proceedings, which were prioritized on the non-detained docket by the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

MPP was initially piloted at the San Ysidro port of entry and San Diego Immigration Court.  In July 2019, the program was expanded into Texas and as of January 2020, individuals could be enrolled in MPP at locations across the SWB.  Individuals returned to Mexico were processed back into the United States to attend their removal proceedings at one of four immigration court locations in California and Texas.[18]  It was initially anticipated that enrollees' first hearings would be scheduled within 30-45 days, consistent with the goal of timely adjudication of cases.  But enrollment quickly outpaced EOIR's capacity to hear cases.  Over time, capacity constraints meant that even initial hearings were scheduled many months after enrollment.  Large numbers of migrants ended up living in camps in Northern Mexico that were, as well-documented in numerous reports and as described below, crowded, unsanitary, and beset by violence.[19]

Due to public health concerns brought on by the COVID-19 pandemic, EOIR paused immigration court hearings for all non-detained individuals, including those enrolled in MPP, in March 2020.[20]  MPP hearings never resumed prior to the program's January 2021 suspension,

---

[15] Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[16] Guidance documents are available at the archived MPP landing page under the *MPP Guidance Documentation heading:* https://www.dhs.gov/archive/migrant-protection-protocols.

[17] Individuals who could be enrolled into MPP were, generally, individuals from Spanish-speaking countries and Brazil.

[18] Individuals enrolled in MPP in the San Diego or El Paso jurisdictions attended hearings at the immigration courts in San Diego or El Paso; individuals enrolled in MPP in San Antonio or Harlingen jurisdictions attended hearings at the Immigration Hearing Facilities (IHFs) in Laredo or Brownsville, respectively.

[19] *See infra* Section III.A; *see also* Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times, Oct. 23, 2020; Miriam Jordan,  *'I'm Kidnapped': A Father's Nightmare on the Border*, N.Y. Times, Dec. 21, 2019; Nomaan Merchant, *Tents, stench, smoke: Health risks are gripping migrant camp*, A.P. News, Nov. 14, 2019; Human Rights Watch, *Like I'm Drowning: Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Jan. 6, 2021 ("As a result [of MPP], thousands of people are concentrated in dangerous Mexican border towns indefinitely, living in limbo . . . . Migrant shelters in Ciudad Juárez and Tijuana quickly filled, and a large shelter run by Mexican federal authorities in Ciudad Juárez also quickly hit capacity soon after it opened in late 2019. In Matamoros, dangers in the city have led as many as 2,600 people to live in an informal camp on the banks of the river marking the border between Mexico and the United States, a location prone to flooding.").

[20] *See* Press Release, DHS, "Joint DHS/EOIR Statement of MPP Rescheduling," Mar. 23, 2020, https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

Cuba AR_000260

but new enrollments into MPP continued during this period, albeit at significantly reduced rates.[21]

In total, between the initial implementation of MPP on January 25, 2019, and the suspension of new enrollments that became effective on January 21, 2021,[22] DHS returned to Mexico approximately 68,000 individuals, according to DHS and EOIR data.[23]  During that same period, CBP processed a total of 1.5 million SWB encounters, including approximately 1 million encounters processed under Title 8 authorities (including the 68,000 processed through MPP) and approximately 500,000 Title 42 expulsions.[24]

  B.  Prior Evaluations of MPP

Prior to the Secretary's June 1, 2021, termination memorandum, the Department produced two notable assessments of the program that reached divergent conclusions.

In June 2019, as the Department prepared to expand MPP across the entire SWB, it formed a committee of senior leaders from multiple components (known as the "Red Team") to conduct a "top-down review of MPP's policies and implementation strategy and provide overall recommendations to increase the effectiveness of the program."[25]  The Red Team members were chosen, in part, because they had "little to no involvement developing policy or with implementing MPP," thus helping to ensure an independent assessment.[26]  The report and recommendations (the "Red Team Report") was issued October 25, 2019, but not publicly released.[27]  In preparing its report, the Red Team reviewed key MPP background documents, conducted dozens of interviews, made site visits, and performed additional research.[28]  The Red Team identified significant deficiencies in MPP and made multiple recommendations for improving MPP, organized around five different areas: the need for standardization and clarity

---

[21] *See* U.S. Customs and Border Protection, "Migrant Protection Protocols FY2021," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols; U.S. Customs and Border Protection, "Migrant Protection Protocols FY2020," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020; *see also* MPP Suspension Memorandum, *supra* note 4.

[22] MPP Suspension Memorandum, *supra* note 4.

[23] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, https://www.dhs.gov/publication/metrics-and-measures.

[24] DHS Office of Immigration Statistics analysis of U.S. CBP administrative records. In March 2020, the U.S. Centers for Disease Control and Prevention (CDC) issued a public health order under 42 U.S.C. §§ 265 and 268 to prevent the spread of COVID-19 in CBP holding facilities and in the United States.  85 Fed. Reg. 16,559 (Mar. 24, 2020).  The Order temporarily suspending the introduction of certain persons into the United States from countries where a communicable disease exists. *Id*. In August 2021, CDC issued a new Order, which replaced, reaffirmed, and superseded the previous Orders. *See* 86 Fed. Reg. 42,828 (Aug. 5, 2021).

[25] Memorandum from Kevin McAleenan, Acting Sec'y of Homeland Sec., *Review of Migrant Protection Protocols Policy and Implementation* (June 12, 2019).

[26] *Id.* Working under the oversight of the Acting Deputy Secretary of Homeland Security, the Red Team was composed of individuals from the Offices of Privacy, Management, Civil Rights and Civil Liberties, and the Coast Guard.

[27] DHS Office of Operations Coordination, *The Migrant Protection Protocols Red Team Report* (Oct. 25, 2019) [hereinafter Red Team Report].

[28] *Id.* at 4.

Cuba AR_000261

with respect to information provided to migrants upon initial screening and processing; the need for better access to counsel and better mechanisms for communication with counsel; the need to ensure better *non-refoulement* protections;[29] the need for safe housing and protections for those returned to Mexico; and the need for administrative and logistical improvements, including the establishment of measures of effectiveness and better mechanisms for the sharing of key information between migrants and relevant government agencies.  In December 2020—at a point when new enrollments into MPP had already dropped significantly and only a month before the program's suspension—the Department issued supplementary policy and operational guidance designed to address several of the Red Team's recommendations.[30]

Three days after the issuance of the Red Team Report, the Department released publicly a separate review of MPP (the "October 2019 Assessment"), which offered a very different assessment of the program.[31]  The October 2019 Assessment declared that MPP had demonstrated operational effectiveness, including by helping to address "the ongoing crisis at the southern border and restoring integrity to the immigration system."[32]  The assessment noted that apprehensions of noncitizens at and between ports of entry decreased from May through September 2019; reported that rapid and substantial declines in apprehensions occurred in areas where the greatest number of MPP-amenable noncitizens had been processed and returned to Mexico through MPP; asserted that MPP was restoring integrity to the immigration system; claimed that both the U.S. Government and the Government of Mexico (GOM) were endeavoring to provide safety and security for migrants returned to Mexico; and stated that the

---

[29] Article 33 of the 1951 Convention Relating to the Status of Refugees provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Convention Relating to the Status of Refugees, done July 28, 1951, 19 U.S.T. 6259, 6276, 189 U.N.T.S. 150, 176. The United States is not a party to the 1951 Convention, but the United States is a party to the 1967 Protocol Relating to the Status of Refugees, done Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577, which incorporates Article 33 of the 1951 Convention. The phrase "life or freedom would be threatened" is interpreted in U.S. law as meaning that it is more likely than not that the individual would be persecuted. *See, e.g.*, *INS v. Stevic*, 467 U.S. 407, 428 & n.22 (1984). Separately, Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) provides, "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-2822 (8 U.S.C. § 1231 note). Article 3 of the CAT likewise is understood in U.S. law as requiring a "more likely than not" standard.  *See, e.g.*, *Auguste v. Ridge*, 395 F.3d 123, 149 (3d Cir. 2005) (citing Senate Resolution, 136 Cong. Rec. S17,486, S17491-92 (daily ed. 1990)). These *non-refoulement* obligations are non-self-executing, *see, e.g.*, *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009) (1967 Refugee Protocol); *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) (CAT), and are not specifically required by statute with respect to MPP returns.

[30] The policy and operational guidance was published on an MPP website and took the form of a series of memoranda that provided clarity on matters like access to counsel during the *non-refoulement* interview, the importance of maintaining family unity, and more consistent application of the "known mental and physical health" exclusion for enrollment in MPP. DHS, *Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocols Guidance, Initial Document Service* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocol Guidance, MPP Amenability* (Dec. 7, 2020).

[31] DHS, "Assessment of the Migrant Protection Protocols (MPP)," Oct. 28, 2019, https://www.dhs.gov/publication/assessment-migrant-protection-protocols-mpp [hereinafter Oct. 2019 Assessment].

[32] *Id.*

Cuba AR_000262

screening protocols in place were appropriately assessing noncitizens' fear of persecution or torture in Mexico.

The public October 2019 Assessment presented MPP as a resounding success, whereas the internal Red Team Report raised serious concerns with the program.  Notably, the October 2019 Assessment did not acknowledge or address any of the shortcomings identified by the Red Team Report, despite the fact that the Assessment was released *after* the Red Team Report was completed.

C.  Litigation Regarding the Prior Implementation of MPP

MPP was challenged many times on multiple grounds in federal court and remains the subject of ongoing litigation in several jurisdictions.  Among other claims, litigants challenged the program as an impermissible exercise of the underlying statutory authority; argued that MPP caused DHS to return noncitizens to Mexico to face persecution, abuse, and other harms and that its procedures inadequately implemented *non-refoulement* protections; argued that their right to access counsel before and during *non-refoulement* interviews had been violated; contested the return to Mexico pursuant to MPP of noncitizens with mental and physical disabilities; asserted that the program had been implemented in violation of the APA; and contended that MPP's expansion across the SWB was unlawful because it led to the return of migrants to places that were particularly dangerous.[33]  Both in the course of litigation and otherwise, litigants described, and some courts credited, extreme violence and substantial hardships faced by those returned to Mexico to await their immigration court proceedings, as well as substantial danger traveling to and from ports of entry to those hearings.  Litigants described being exposed to violent crime, such as rape and kidnapping, as well as difficulty obtaining needed support and services in Mexico, including adequate food and shelter.[34]  In addition, more than one hundred MPP enrollees who received final orders of removal have petitioned the federal courts of appeal for review of such orders on the grounds that various features of MPP, including limited access to

---

[33] *See, e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021); *Bollat Vasquez v. Wolf*, 520 F. Supp. 3d 94 (D. Mass. 2021); *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020); *E.A.R.R. v. Dep't of Homeland Sec.*, No. 3:20-cv-2146 (S.D. Cal. filed Nov. 2, 2020); *Adrianza v. Trump*, 505 F. Supp. 3d 164 (E.D.N.Y. 2020), *dismissed*, No. 1:20-cv-03919 (E.D.N.Y. Sept. 2, 2021); *Nora v. Wolf*, No. 20-993, 2020 WL 3469670 (D.D.C. June 25, 2020); *Turcios v. Wolf*, No. 1:20-cv-1982, 2020 WL 10788713 (S.D. Tex. Oct. 16, 2020).

[34] For example, in *Innovation Law Lab v. Wolf*, the Ninth Circuit observed:

> The MPP has had serious adverse consequences for the individual plaintiffs. Plaintiffs presented evidence in the district court that they, as well as others returned to Mexico under the MPP, face targeted discrimination, physical violence, sexual assault, overwhelmed and corrupt law enforcement, lack of food and shelter, and practical obstacles to participation in court proceedings in the United States. The hardship and danger to individuals returned to Mexico under the MPP have been repeatedly confirmed by reliable news reports.

951 F.3d at 1078; *see also Bollat Vasquez*, 520 F. Supp. 3d at 111–12 (describing plaintiffs' unrebutted descriptions of rape, death threats, kidnapping risks, and insufficient food and shelter as supported by the U.S. State Department's assignment to Tamaulipas of a "Level 4: Do Not Travel" warning "due to crime and kidnapping").

9

Cuba AR_000263

counsel and inability to access court hearings, prejudiced their ability to pursue relief in removal proceedings.[35]

### D. Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP

On January 20, 2021, Acting Secretary David Pekoske issued a memorandum suspending new enrollments into MPP, effective January 21, 2021, pending further review of the program.[36] The MPP Suspension Memorandum was followed by the President's issuance of EO 14010 on February 2, 2021, which, in addition to requiring the Secretary to review the program, directed the Secretary to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[37]

From February 19, 2021, until the effective date of the district court's order on August 25, 2021, DHS implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and remained outside the United States.[38]  Certain individuals whose removal proceedings were pending before EOIR or whose proceedings resulted in an *in absentia* order of removal or termination, and certain of their immediate family members, were processed into the United States to continue their Section 240 removal proceedings.[39]  About 13,000 individuals were processed into the United States to participate in Section 240 removal proceedings as a result of this process.[40]

### E. Challenge to the Suspension and Termination

On April 13, 2021, the States of Missouri and Texas filed suit in the U.S. District Court for the Northern District of Texas, challenging the suspension of new enrollments into MPP on the grounds that the January 20, 2021, suspension memorandum violated the APA, 8 U.S.C. § 1225, the Constitution, and a purported agreement between Texas and the federal government.

---

[35] *See, e.g., Hernandez Ortiz v. Garland*, No. 20-71506 (9th Cir. filed Mar. 15, 2021) (describing repeated failed attempts to contact legal service providers from within Mexico and ultimately agreeing to proceed pro se because the alternative was to wait longer in Mexico at continued risk to the family's safety); *Del Toro v. Garland*, No. 20-60900 (5th Cir. filed Dec. 14, 2020) (explaining that MPP restricted access to counsel, which prevented the individual from filing an update State Department country report on Cuba for his individual hearing); *Del Carmen Valle v. Garland*, No. 20-72071 (9th Cir. filed July 16, 2020) (arguing that the individual's "extreme distress and vulnerability in Mexico, lack of access to counsel, and difficulty in preparing and presenting her asylum application" as grounds for appeal).

[36] MPP Suspension Memorandum, *supra* note 4.

[37] Exec. Order No. 14010, 86 Fed. Reg. at 8270.

[38] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[39] *Id.*; Press Release, DHS, "DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who Are Eligible for Processing into the United States," June 23, 2021, https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing.

[40] Data on the number of people permitted to enter the United States under this phased process, February 19-August 25, 2021, provided by the Department of State on October 24, 2021.

Cuba AR_000264

Subsequent to the Secretary's June 1, 2021, termination memorandum, Missouri and Texas amended their complaint to challenge the June 1 Memorandum and filed a motion to enjoin the memorandum.

On August 13, 2021, the district court issued a nationwide permanent injunction requiring DHS "to enforce and implement MPP *in good faith*" until certain conditions are satisfied.[41] The district court determined that the June 1 Memorandum was arbitrary and capricious because, according to the court, the Department ignored critical factors and reached unjustified conclusions.  In particular, the district court found that the June 1 Memorandum failed to sufficiently account for several considerations, including the prior administration's assessment of the benefits of MPP; warnings allegedly made by career DHS personnel during the presidential transition process that suspending MPP would lead to a surge of border crossers; the costs of terminating MPP to the States as well as their reliance on MPP; the impact that terminating MPP would have on the Department's ability to comply with detention provisions in the INA, which the court construed to require detention and to foreclose release based on detention capacity concerns; and modifications to MPP short of termination that could similarly achieve the Department's goals.[42]  As a result, the district court enjoined the June 1 Memorandum in its entirety and "remanded" it to the Department for further consideration.[43]  The district court denied a request for a stay of the injunction pending appeal, and the U.S. Court of Appeals for the Fifth Circuit and the Supreme Court of the United States also denied stays.[44]  As a result, the district court's order, as construed by the Fifth Circuit, went into effect at 12:01 a.m. on August 25, 2021.

Since August, the Department has worked actively to reimplement MPP in good faith, as required by the district court's order.[45]  At the same time, pursuant to the district court's order and in continuing compliance with the President's direction in EO 14010, the Secretary has considered anew whether to maintain, terminate, or modify MPP in various ways.

## III.   Evaluation of MPP

In considering whether to maintain, terminate, or modify MPP anew, the Department considered, among other things, the decisions of the *Texas* district court, Fifth Circuit, and Supreme Court; the decisions of multiple other courts in litigation challenging MPP or its termination; the briefs and declarations filed in all such lawsuits pertaining to MPP; various Departmental assessments of MPP, including both the Red Team Report and agency responses and the October 2019 Assessment; a confidential December 2019 Rapid Protection Assessment from the U.N. High Commissioner for Refugees (UNHCR) and publicly available sources of information, including news reports and publicly available sources of information, pertaining to conditions in Mexico; records and testimony from Congressional hearings on MPP and reports

---

[41] *Texas*, 2021 WL at 3603341, at *27 (emphasis in original).

[42] *Id*. at *17-22.

[43] *Id.* at * 27.

[44] *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (U.S. Aug. 24, 2021); *Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021).

[45] *See* Declaration of Blas Nuñez-Neto, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021); Defendants' First Supplemental Notice of Compliance with Injunction, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021).

Cuba AR_000265

by nongovernmental entities; and data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings conducted for MPP enrollees; and the impact of other government programs and policies concerning migration and the southern border.  In addition, over the course of several months, the Secretary and his staff met with a broad array of internal and external stakeholders with divergent views about MPP, including members of the DHS workforce engaged in border management, state and local elected officials across the border region, including from Texas, California, Arizona, and New Mexico, border sheriffs and other law enforcement officials, representatives from multiple nonprofit organizations providing legal access and humanitarian aid to noncitizens across the SWB, and dozens of Members of Congress focused on border and immigration policy.  The Secretary also assessed other migration-related initiatives the Administration is undertaking or considering undertaking.  And he examined the considerations that the district court determined were insufficiently addressed in the June 1 Memorandum, including the view that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its obligations under 8 U.S.C. § 1225.

After carefully considering the arguments, evidence, and perspectives of those who support resuming MPP, with or without modification, as well as those who support termination, the Secretary has determined that MPP should be terminated.  The following outlines the considerations that informed the Secretary's decision.

A.  Conditions for Migrants in Mexico

In January 2019, the Department implemented MPP with the stated expectation that vulnerable populations would get the protection they needed while they waited in Mexico during the pendency of their removal proceedings.[46]  In practice, however, there were pervasive and widespread reports of MPP enrollees being exposed to extreme violence and insecurity at the hands of transnational criminal organizations that prey on vulnerable migrants as they waited in Mexico for their immigration court hearings in the United States.  These security concerns, together with barriers many individuals faced in accessing stable and safe housing, health care and other services, and sufficient food, made it challenging for some to remain in Mexico for the duration of their proceedings.  Notably, the United States has limited ability to fix these issues, given that they relate to migrant living conditions and access to benefits in Mexico—an independent sovereign nation.

Concerns about migrants' safety and security in Mexico, and the effect this had on their ability to attend and effectively participate in court proceedings in the United States, have been highlighted in internal Department documents, court filings, and a range of external studies and press reports.  In its internal evaluation of the program, the Department's Red Team Report emphasized the need for safe housing for vulnerable populations.[47]  The Ninth Circuit, in affirming a district court ruling that enjoined implementation of MPP, determined that

---

[46] See Nielsen Release, supra note 14; see also Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., Policy Guidance for Implementation of the Migrant Protection Protocols (Jan. 25, 2019).

[47] Red Team Report, supra note 27, at 7.

12

"[u]ncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."[48]   A Massachusetts district court similarly described the plaintiffs' claims of extreme violence and insecurity in Mexico and observed that "[t]heir personal accounts are unrebutted and are supported by affidavits from employees of two nongovernmental organizations and the U.S. State Department's assignment to Tamaulipas of a 'Level 4: Do Not Travel' warning 'due to crime and kidnapping.'"[49]   The court further cited a Human Rights First report that included a list of 1,544 allegations of serious harm (including homicide, rape, and kidnapping) faced by individuals placed in MPP from January 2019 to February 2021.[50]

Multiple other reports have similarly highlighted security and treatment concerns. A December 2019 UNHCR Rapid Protection Assessment found that 81% of individuals and families returned to Mexico under MPP did not feel safe in Mexico, and that 48% had been a victim or witness of violence in Mexico.[51]   According to this assessment, children represented about half (48%) of targets for physical violence, and about half (48%) of kidnapping victims.[52] The organization Médecins Sans Frontières (Doctors Without Borders) noted that 75% of its patients who were in Nuevo Laredo in October 2019 due to MPP reported having been kidnapped.[53]   In 2019, a U.S. Commission on Civil Rights report similarly credited several news and NGO reports in noting that "asylum seekers [awaiting proceedings in Mexico] have been killed, women have been raped, and children have been kidnapped."[54]   Similar accounts of insecurity and violence were the subject of numerous press reports describing squalor and violence in the "camps" where many MPP enrollees lived as they waited their court hearings.[55] But as bad as conditions often were in the makeshift border camps, migrants gathered there because the threat of violence and kidnapping in surrounding areas outside of the camps could be

---

[48] *Innovation Law Lab*, 951 F.3d at 1093.

[49] *Bollat Vasquez*, 520 F. Supp. 3d at 111-12 (issuing a preliminary injunction ordering the Department to return to the United States seven plaintiffs who had been enrolled in MPP).

[50] Human Rights First, *Delivered to Danger; Trump Administration sending asylum seekers and migrants to danger*, Feb. 19, 2021, https://www.humanrightsfirst.org/campaign/remain-mexico; *see Bollat Vasquez*, 520 F. Supp. 3d at 99 n.10 (citing a declaration by Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First, regarding an earlier version of this list explaining that "'[a]s of December 15, 2020, Human Rights First has identified 1,314 public reports of murder, torture, rape, kidnapping, and other violent assaults against asylum seekers returned to Mexico under MPP' and that 'the security situation in Mexico, including in the state of Tamaulipas has worsened' with one of Mexico's 'most powerful and violent cartels' reportedly increasing its activities in Tamaulipas and migrants in Matamoros and Nuevo Laredo have been repeatedly targeted'").

[51] UNHCR, *Rapid Protection Assessment: MPP Returnees at the Northern Border of Mexico* 15, Dec. 2019. The UNHCR assessment, shared confidentially with the United States government, is cited here with the express permission of UNHCR.

[52] According to the UNHCR survey, it did not take long for MPP enrollees to experience danger in Mexico. Just over half of the individuals surveyed (51%) had been in Mexico for less than one month and more than nine-in-ten had been in Mexico for less than three months. *Id.* at 7, 17.

[53] Médecins Sans Frontières, *The devastating toll of 'Remain in Mexico' asylum policy one year later*, Jan. 29, 2020, https://www.msf.org/one-year-inhumane-remain-mexico-asylum-seeker-policy; *cf.* Emily Green, *Trump's Asylum Policies Sent Him Back to Mexico. He was Kidnapped 5 Hours Later By a Cartel.*, Vice, Sept. 16, 2019.

[54] U.S. Commission on Civil Rights, *Trauma at the Border; The Human Cost of Inhumane Immigration Policies*, Oct. 2019, https://www.usccr.gov/files/pubs/2019/10-24-Trauma-at-the-Border.pdf.

[55] *See*, *e.g.*, Dickerson, *supra* note 19; Jordan, *supra* note 19; Merchant, *supra* note 19; This American Life, *The Out Crowd*, Nov. 15, 2019, https://www.thisamericanlife.org/688/transcript.

Cuba AR_000267

greater.[56]  Poor conditions and violence in the Matamoros camp also created an operational challenge when migrants at the camp blocked traffic in both directions on the Gateway International Bridge for hours as a sign of protest.[57]  The security and treatment of MPP enrollees also been the subject of congressional oversight and investigation.[58]

The adverse living conditions and violence experienced by migrants returned to Mexico pursuant to MPP are of grave concern to the Secretary.  The return of noncitizens to Mexico under MPP is predicated, by statute, upon individuals' ability to remain in Mexico during the pendency of their removal proceedings.[59]  In practice, however, myriad problems faced by noncitizens returned to Mexico impeded their ability to access those removal proceedings.  As a result, the Secretary has determined that the key predicate on which the statutory authority underlying the program is built—that noncitizens stay in Mexico and continue to participate in their removal proceedings—was upended by reality in too many cases.  This is an intolerable result that is inconsistent with this Administration's values, which include ensuring the rights of migrants to seek lawful protection from removal in a safe environment.

Moreover, these are problems that cannot easily be fixed.  Once migrants are returned to Mexico—an independent sovereign nation—the United States' ability to respond and provide adequate conditions and safety is diminished.

B.  _Non-Refoulement_ Concerns

Concerns about the _non-refoulement_ process under MPP as it was previously implemented and the additional costs and resources that would be required to address those concerns also weigh against continued reliance on MPP.  As previously designed and implemented, MPP's _non-refoulement_ screening process—used to assess whether individuals would likely face persecution on account of a protected ground or torture in Mexico—was limited in at least four respects.

First, as originally implemented, individuals processed for MPP were not questioned by CBP about their fear of persecution or torture in Mexico, but were instead required to affirmatively articulate such a fear regarding return to Mexico—a sharp contrast to the approach

---

[56] _See, e.g._, María Verza and Fernanda Llano, _Lawless Limbo Within Sight of America_, Associated Press, Nov. 18, 2019; Delphine Schrank, _Asylum seekers cling to hope, safety in camp at U.S.-Mexico Border_, Reuters, Oct. 16, 2019, https://www.reuters.com/article/us-usa-immigration-mexico-matamoros-feat-idUSKBN1WV1DY.

[57] Adolfo Flores, "Asylum-Seekers Protesting Squalid Conditions Shut Down A US Border Crossing For 15 Hours," Buzzfeed, Oct. 11, 2019, https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-protesting-bridge-close-matamoros-texas.

[58] _See, e.g._, Press Release, H. Comm. on the Judiciary, "Chairman Nadler Announces House Judiciary Investigation into Trump Administration's 'Remain in Mexico' Policy," Jan. 14, 2020, https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2397; _Examining the Human Rights and Legal Implications of DHS's "Remain in Mexico" Policy_: Hearing Before the H. Comm. on Homeland Sec., 116th Cong. _passim_ (2019).

[59] _See_ 8 U.S.C. § 1225(b)(2)(C) (specifying that the Secretary may return a noncitizen to a contiguous territory "pending a proceeding under [8 U.S.C. §] 1229a").

14

Cuba AR_000268

used in the expedited removal context, in which individuals are affirmatively asked standard questions about fear of return to their home countries and the responses are recorded.[60]

Second, rather than using a screening standard familiar to asylum officers (such as the "significant possibility" standard used for credible fear interviews or the "reasonable possibility" standard used for reasonable fear interviews to screen for possible withholding or deferral of removal claims), *non-refoulement* screenings for MPP applied a more restrictive "more likely than not" standard.[61]  Under this standard, noncitizens had to demonstrate to an asylum officer that it was more likely than not that they would be persecuted or tortured if returned to Mexico in order to avoid a return to Mexico—a higher substantive standard than they would ultimately have had to establish to secure asylum and the same substantive standard they would have had to establish to an immigration judge if they were ineligible for asylum but were seeking withholding or deferral of removal under the INA or regulations implementing CAT.

Third, the Department did not initially allow counsel to participate in the *non-refoulement* interviews.[62]  This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative.[63]  Eventually, and in part as response to a district court order, these restrictions were eased.[64]

---

[60] *See* 8 C.F.R. § 235.3(b)(2). Importantly, even if migrants processed for MPP expressed a fear of repatriation to their home country, they were never asked about any fear of being returned to Mexico. Assessing this feature of the program, Judge Watford of the U.S. Court of Appeals for the Ninth Circuit stated in *Innovation Law Lab* that it was "virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations," as many individuals returned under MPP who feared persecution or torture in Mexico would "be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J. concurring).

[61] Prior to MPP implementation, this standard had been used almost exclusively by immigration judges to adjudicate statutory withholding of removal or withholding or deferral of removal under regulations implementing the Convention Against Torture (CAT). *See* 8 C.F.R. §§ 208.16(a), (c)(4); 208.17(b)(1); 208.31(c); 1208.16(b); 1208.17(b). It was, as a result, not a standard that had previously been used by asylum officers in the screening context, which resulted in additional, burdensome training and implementation requirements.

[62] U.S Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, PM-602-0169 3 (Jan. 28, 2019) ("DHS is currently unable to provide access to counsel during the [*non-refoulement*] assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals."). This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least 48-hour period to find and consult with a legal representative. *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[63] *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[64] *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020). Previously retained counsel were permitted to participate in *non-refoulement* interviews conducted at Immigration Hearing Facilities (IHFs) in Laredo and Brownsville as of December 2019 and within the Ninth Circuit in January 2020. Supplemental guidance issued in December 2020 expanded this access to counsel to all MPP locations and required DHS to ensure the ability of retained counsel to participate telephonically in USCIS' MPP *non-refoulement* assessments, but only "where it does not delay the interview, or is required by court order." Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols, *supra* note 30, at 1-2.

Cuba AR_000269

Fourth, in practice, there were multiple challenges and inconsistencies in the implementation of *non-refoulement* screenings.  The Red Team Report emphasized the need for standard operating procedures to ensure consistency and address problems such as the use of a "pre-screening process" by CBP personnel at some locations that "preempt[ed] or prevent[ed]" USCIS from ever having cases referred for a determination.[65]  The report additionally noted that some CBP officials "pressure[d] USCIS to arrive at negative outcomes when interviewing migrants on their claim of fear of persecution or torture."[66]

Moreover, throughout the use of MPP, more than 2,500 individuals raised fear claims at multiple points in this process, leading to multiple screenings for those individuals during the pendency of their cases.[67]  These kinds of unproductive, redundant screenings are a drain on resources that may be more likely to occur in MPP as individuals are returned to Mexico multiple times over the pendency of a single removal proceeding, often to unsafe conditions.

For all these reasons, the Secretary has concluded that continuation of MPP in its prior form is not advisable.  These concerns likely could be addressed by policy changes that require the affirmative asking, the use of a more appropriate screening standard that protects those who face a reasonable or significant possibility of persecution or torture upon return to Mexico, the opportunity for individuals to consult with counsel prior to screenings, and better training and oversight.  But making these changes would likely lengthen the screenings and require DHS to devote additional asylum officers and detention space to these screenings, both of which are in short supply, especially as a result of challenges related to the COVID-19 pandemic.  New procedures could lengthen the screening process.  Such an approach would divert critical personnel and resources from other Administration priorities, including ongoing efforts to build a more durable, fair, and efficacious asylum system as discussed in greater detail in Section IV.  The additional burdens that would be required to implement a *non-refoulement* process acceptable to the Department weigh against retention of MPP.  Moreover, even if making these changes better protected individuals from being returned to persecution or torture, it would not protect people from generalized violence or other extreme hardships that have no nexus to statutorily protected grounds, and that have been experienced by many returnees.

C.   Access to Counsel, Notice of Hearings, and Other Process Concerns

Individuals in MPP faced multiple challenges accessing counsel and receiving sufficient information about court hearings.  First, there were several problems in communicating accurate and up-to-date information to migrants about rescheduled court hearings.  As noted in the Red Team Report, some migrants in MPP had to give up their shelter space in Mexico when they returned to the United States for their court hearings.  As a result, they were unable to provide the court an address for follow-up communications.[68]  To submit a change of address while in Mexico, migrants had to print and mail a Change of Address Form, which posed logistical challenges for individuals who lacked internet access and who could not readily print and mail

---

[65] Red Team Report, *supra* note 27, at 6.

[66] *Id.* at 4-5.

[67] Data on MPP Cases with Multiple Referrals, provided by USCIS on October 28, 2021.

[68] Red Team Report, *supra* note 27, at 7.

Cuba AR_000270

documents internationally.  This made it difficult to communicate updates regarding enrollees' court cases and hearing dates.

Second, MPP enrollees faced several barriers in accessing counsel both in the United States and in Mexico.  Although MPP enrollees were permitted to meet with counsel at hearing locations prior to their hearings, these meetings were limited to a single hour before the court hearing took place.[69]  Opportunities for attorneys to meet with their clients outside of those organized at the hearing locations were limited due to, among other constraints, complications associated with cross-border communication.  Many migrants lacked access to a telephone with international coverage or other forms of technology that could be used to communicate with counsel.  Some legal services organizations also adopted policies against visiting clients in Mexico due to serious safety concerns.[70]  In addition, because hearings for the tens of thousands of people enrolled in MPP were concentrated in a handful of courts along the border, demand for legal assistance far outstripped supply.[71]

These problems are of significant concern to the Secretary.  Inadequate access to counsel casts doubt on the reliability of removal proceeding.  It also undermines the program's overall effectiveness at achieving final resolution of immigration proceedings; in several cases, noncitizens challenged adverse immigration-judge decisions on the ground that they did not have an adequate opportunity to identify and retain counsel, or to gather or present the evidence in support of their claims.[72]  More broadly, access to counsel is critical to ensuring migrants receive a full and fair hearing; this Administration recognizes the importance of access to counsel in civil contexts, including in immigration proceedings, and considers fostering legal representation and access to justice a priority.[73]

Meanwhile, some of these flaws are exceedingly challenging to fix.  While migrants could be provided additional means to communicate from Mexico with counsel by video or telephone, doing so requires a significant expenditure of resources to ensure that the appropriate technology is available in Mexico.  In-person consultations are significantly constrained by the

---

[69] *See* U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance* 3 (Feb. 12, 2019).  As noted above, DHS also did not initially allow counsel to participate in *non-refoulement* interviews conducted by USCIS.

[70] *See* Brief for the Laredo Project, et al. as Amici Curiae Supporting Respondents at 20-21, *Wolf v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021) ("The Laredo Project considered providing assistance across the border in Nuevo Laredo, but determined that it was far too dangerous. When Laredo Project attorneys took an exploratory trip across the border, the local pastor with whom they were scheduled to meet (who ran a shelter for migrants) was missing; he had been kidnapped by cartel members, reportedly because he attempted to stop them from kidnapping Cuban asylum seekers.").

[71] Human Rights Watch, *We Can't Help You Here"*; *U.S. Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico ("[U]nder the MPP, thousands of asylum seekers have been forcibly concentrated in El Paso and San Diego, overwhelming the limited number of immigration attorneys who practice there.").

[72] *See supra* note 35.

[73] White House, "FACT SHEET: President Biden to Sign Presidential Memorandum to Expand Access to Legal Representation and the Courts," May 18, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/18/fact-sheet-president-biden-to-sign-presidential-memorandum-to-expand-access-to-legal-representation-and-the-courts/.

17

reality that migrants are in Mexico and space for meetings with counsel to take place at ports of entry or upon their return to court is extremely limited. Providing migrants with additional time to consult with attorneys would likely require them to spend a night in detention, which would also place additional strain on CBP facilities that have consistently been operating over their COVID restricted capacity. In fact, the holding areas in six out of nine Border Patrol Sectors are over COVID-capacity as of October 27, 2021.[74]

D.  Impacts of MPP on Immigration Court Appearance Rates and Outcomes

The Department's October 2019 Assessment of MPP concluded that MPP was "restoring integrity to the immigration system" by (1) providing bona fide asylum seekers the opportunity to obtain relief in months, not years, and (2) eliminating the "perverse incentives" that reward and encourage people with non-meritorious asylum claims to enter the United States.[75] But upon further consideration and examination, the facts tell a more complex story, thus undermining the claimed benefits.

MPP did result in some removal proceedings being completed more expeditiously than is typical for non-detained cases. Overall, 41 percent of MPP cases resulted in a final enforcement disposition as of June 30, 2021, versus 35 percent of comparable non-MPP cases.[76] But the fact that MPP may have resolved cases more quickly does not mean that the cases were resolved fairly or accurately. The integrity of the nation's immigration system should be assessed by whether immigration proceedings achieve fair and just outcomes, both for individuals who merit relief and those who do not. In the Secretary's judgment, the data show that MPP generally failed to meet that bar.

Importantly, noncitizens in MPP were substantially more likely to receive *in absentia* removal orders than comparable noncitizens who were not placed in MPP during the relevant time period. Overall, of the 67,694 cases of individuals enrolled in MPP,[77] 21,818 were subject to an *in absentia* order of removal at some point during their removal proceedings—32 percent of all individuals enrolled in MPP.[78] For comparable noncitizens who were not processed

---

[74] Data on holding area capacity by U.S. Border Patrol Sector, provided by CBP on October 28, 2021.

[75] Oct. 2019 Assessment, *supra* note 31, at 3, 6.

[76] For the purposes of this memorandum, comparable noncitizens or comparable non-MPP cases are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 20, 2021, were not enrolled in MPP and were not detained throughout the pendency of their proceedings. Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020) [hereinafter FY 2020 Enforcement Lifecycle Report].

[77] *Id*. This is based on DHS's Office of Immigration Statistics (OIS) analysis of MPP cases; this analysis excludes 345 cases originally identified as MPP enrollees in CBP data because the records are for unaccompanied children, accompanied minors, or Mexican nationals, all of whom are ineligible for the program, or because the records could not be matched to other administrative data.

[78] In his June 1 Memorandum, the Secretary referenced a 44% *in absentia* rate for this time period. The Department has since updated its methodology for measuring *in absentia* rates in two important ways. First, the Department did not count *in absentia* orders that were subject to subsequent motions to reopen or any other further action by DHS or

Cuba AR_000272

through MPP during that same time period and who were also not detained for the duration of their proceedings, the *in absentia* rate was 13 percent—about two-fifths the rate of the MPP group.[79]

Moreover, an additional 6,151 MPP cases were terminated by the immigration court.[80] Courts generally issued such orders in MPP cases when a noncitizen failed to appear but the immigration judge declined to issue an *in absentia* removal given concerns that the noncitizen did not have proper notice of how to attend his or her hearing.[81]  Including these cases brings the total number of cases of individuals in MPP that involved the issuance of an *in absentia* order of removal or termination to 27,969 (41 percent of all MPP cases and nearly three-and-a-half times higher than the *in absentia* rate for comparable noncitizens not enrolled in MPP).[82]

The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP.  For instance, the October 2019 Assessment concluded that MPP was incentivizing people without meritorious claims to voluntarily leave Mexico and return home.[83]  That assessment pointed to the fact that out of more than 55,000 MPP enrollees (at that time), only 20,000 were sheltered in northern Mexico and an additional 900 had returned home through International Organization for Migration's Assisted Voluntary Return program.

---

DOJ, thus undercounting the total number of *in absentia* orders that had been issued. Second, the *in absentia* rate of 44 percent only included cases in which there was a final disposition, rather than the full universe of MPP cases including those that were still pending, thus overstating the percentage. The updated numbers in this memorandum, by contrast, take into account the total number of *in absentia* orders issued in MPP cases, irrespective of whether there was a subsequent motion to reopen or other further action in the case, as well as the total number of MPP cases, including both active cases and those with a final disposition. This analysis captures all *in absentia* orders and compares them to the full set of MPP cases.

[79] *Id.*

[80] For individuals in removal proceedings under Section 240 of the INA who are not in MPP, termination of proceedings is frequently reported by DHS OIS as a form of relief because it generally marks the end of efforts to remove the noncitizen from the country. That situation is very different for noncitizens enrolled in MPP, who are outside of the country during the pendency of removal proceedings and have no basis upon which to seek admission to the United States once proceedings are terminated.

[81] *Matter of Herrera-Vasquez*, 27 I&N Dec. 825 (BIA 2020); *Matter of Rodriguez-Rodriguez*, 27 I&N Dec. 762 (BIA 2020).

[82] The district court in *Texas v. Biden* cited EOIR data indicating that *in absentia* rates in removal proceedings were also quite high in 2015 and 2017—42% and 47% percent, respectively. 2021 WL 3603341, at *21. But there are critical methodological differences between the ways in which these numbers are calculated and the *in absentia* rates presented in this memorandum. As explained in note 77, *supra*, the data presented in this memorandum measure *in absentia* rates as a share of the *total* number of cases. The EOIR data measures *in absentia* orders as a share of *completed* cases only, which excludes cases that remain ongoing that are disproportionately likely to not result in such cases. *See* Ingrid Eagley and Steven Shafer, *Measuring* In Absentia *Removal in Immigration Court*, American Immigration Council, Jan. 2021, https://www.americanimmigrationcouncil.org/research/measuring-absentia-removal-immigration-court. A recalculation of the 2015 and 2017 *in absentia* rates as a share of *total* cases referred to EOIR in those years yields rates of 21 percent and 20 percent, respectively. This is one-half the *in absentia* and termination rate found in MPP cases.

[83] Oct. 2019 Assessment, *supra* note 31, at 3.

19

Other reports suggest, however, that individuals abandoned claims or otherwise failed to appear for proceedings because of insecurity in Mexico and inadequate notice about court hearings.[84]  The difficulties that MPP enrollees faced in Mexico, including the threat of violence and kidnapping, coupled with inadequate and unreliable access to food and shelter, likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their cases had merit.  Indeed, a number of petitions for review filed in federal courts of appeals by individuals in MPP who received *in absentia* removal orders explain their failure to appear based on serious threats to their personal safety.[85]

While individuals in MPP were more likely to receive *in absentia* removal orders than comparable noncitizens not enrolled in MPP, they were also less likely to receive relief or protection from removal.  This was true even though the decision to place someone in MPP was not linked to any assessment of the likely merits of the individual's claim.  DHS data reflect that only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection from removal—a grant rate of just 1.1.[86]  For the comparable set of non-MPP cases from the same time period, the relief-granted rate was nearly two-and-a-half times as high (2.7 percent).[87]

The remarkably low 1.1 percent grant rate for MPP cases—the majority of which involved individuals from the Northern Triangle countries of Central America—is notable also because when MPP was first announced the Department observed that "approximately 9 out of

---

[84] *See*, *e.g.*, Kevin Sieff, "They missed their U.S. court dates because they were kidnapped. Now they're blocked from applying for asylum.," Washington Post, Apr. 24, 2021; Camilo Montoya-Galvez, "'Leave me in a cell': The desperate pleas of asylum seekers inside El Paso's immigration court," CBS News, Aug. 11, 2019, https://www.cbsnews.com/news/remain-in-mexico-the-desperate-pleas-of-asylum-seekers-in-el-paso-who-are-subject-to-trumps-policy/.

[85] *See*, *e.g.*, *Tabera-Columbi v. Garland*, No. 20-60978 (5th Cir. filed Oct. 26, 2020) (noting that MPP enrollee had been sexually assaulted by the police and was in a hospital as a result on the morning of the hearing); *Quinones Rodriguez v. Garland*, No. 20-61204 (5th Cir. filed Dec. 17, 2020) (describing an individual who did not attend the MPP hearing because he was hiding from gangs who threatened to kidnap him on his way to the hearing); *Miranda-Cruz v. Garland*, No. 21-60065 (5th Cir. filed Feb. 1, 2021) (describing a family that was kidnapped en route to an MPP hearing and held for ransom); *see also* Hamed Aleaziz and Adolfo Flores, "They Missed Their US Asylum Hearings Fearing the Cartel Would Kill Them. Now They're Stuck in Mexico," Buzzfeed, May 18, 2021.

[86] Relief or protection from removal is defined to include EOIR grants of asylum, grants of relief in non-asylum removal proceedings, withholding of removal, or conditional grants; DHS grants of Special Immigrant Juvenile (SIJ) status, lawful permanent residence, S, T, or U nonimmigrant status, and Temporary Protected Status (TPS); the exercise of DHS prosecutorial discretion; and findings by DHS that the subject is a U.S. citizen or lawfully present noncitizen not subject to removal. *See* FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

[87] As discussed in note 79, this figure includes cases that were terminated. For those located in the United States, termination ends removal proceedings and effectively allows the subject to remain in the United States until further action is taken. The low relief-granted rates for both the MPP and comparable non-MPP cases are likely the result of a number of different factors. During this period, a policy was implemented that barred asylum for individuals who transited through third countries and decisions were issued that limited humanitarian asylum claims based on family membership and gender; these likely depressed grant rates. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019); *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019), *vacated*, 28 I&N Dec. 304 (A.G. 2021); *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), *vacated*, 28 I&N Dec. 307 (A.G. 2021). Additionally, the period of time being analyzed is both brief and recent. OIS analysis indicates that relief-granted rates tend to increase over the first three to four years after a case resulting from a credible or reasonable fear claim is initiated in immigration court. None of this, however, explains the substantial discrepancy in outcomes between MPP case and comparable non-MPP cases over the same time period. And none of this diminishes the statutory obligation to fairly assess asylum applications with the goal of producing reliable adjudications.

Cuba AR_000274

10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges."[88]  DHS does not have a record of the methodology used to generate this "9 out of 10" statistic.  To the contrary, an analysis of EOIR case outcomes for Northern Triangle asylum-related claims originating in border encounters (i.e., all EOIR removal proceedings originating with border encounters followed by credible fear or reasonable fear claims) in the years leading up to MPP yields a relief-granted rate of about 29 percent—significantly higher than the 10 percent reflected in Department's January 2019 statement.  That relief-granted rate is more than 26 times the 1.1 percent grant rate observed for all forms of relief or protection among MPP enrollees.  These discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by migrants in Mexico and barriers to legal access.[89]

Based on the Department's experience with MPP and informed by the data above, the Secretary has determined that the program did not succeed in a sufficient number of cases at achieving timely and reliable adjudication of migrants' removal proceedings.  Multiple features of MPP, especially combined with the difficulties in accessing counsel and migrants' living experience in Mexico as described above, have led the Secretary to conclude that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims.  Given the Administration's values, commitments, and policy preferences, the Secretary has concluded that this is an unacceptable result.  Individuals who may have abandoned meritorious protection claims should have been offered a meaningful opportunity to seek protection in the United States.  As stated above, the return-to-contiguous-territory authority at INA § 235(b)(2)(C) is predicated on the notion that individuals will be able to pursue their removal proceedings from within Mexico; the fact that so many individuals enrolled in MPP were unable to complete their proceedings due to their tenuous situation in Mexico undercuts a key requirement of the statute.  As a global leader in offering protection and resettlement to refugees, the United States also has a moral obligation to fairly consider such claims.  The Secretary is committed to ensuring meritorious claims are heard, even if that means non-meritorious claims end up being adjudicated as well.

E. <u>MPP and Recidivist Irregular Re-Entries</u>

As discussed below, CBP encounters along the SWB decreased dramatically over a number of months in which MPP was fully operational across the SWB.  But the data also show that a significant share of individuals enrolled in MPP—33 percent as of June 30, 2021—were subsequently encountered attempting to reenter the country without inspection, rather than continuing to wait in Mexico for the resolution of their removal proceedings.[90]  This rate is more

---

[88] Nielsen Release, *supra* note 14.

[89] Indeed, that conclusion is not dissimilar to the one reached in the October 2019 Assessment, when the Department found that "MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, *many of which may be meritless*, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings." Oct. 2019 Assessment, *supra* note 31, at 6 (emphasis added). Implicit in this statement is an acknowledgment that some such claims do have merit.

[90] FY 2020 Enforcement Lifecycle Report, *supra* note 75. When the Department previously considered this issue in June, 27 percent of MPP enrollees had been re-encountered by CBP subsequent to their enrollment in MPP (not

Cuba AR_000275

than two-and-a-half times higher than the historical average for recidivism (defined as re-encounters within 12 months of initial apprehension) of 14 percent for individuals processed under Title 8 authorities.[91]  The high rate of repeat encounters undercuts one of MPP's key claimed advantages—namely its deterrent effect on would-be border crossers.  Contrary to such claims, the data show that MPP enrollees were much more likely try to cross the border after being returned to Mexico than individuals who were removed from the country under other Title 8 authorities.  Such re-encounters also impose significant additional work on frontline Border Patrol agents, who had to encounter, track, and process MPP enrollees multiple times—resources that could and should have been deployed to other objectives.

     F.   <u>Investments and Resources Required to Operate MPP</u>

MPP was, according to the December 2018 announcement, intended to reduce burdens on border security personnel and resources to free them up to better protect the U.S. territory.  It was also intended to help clear the backlog of unadjudicated asylum claims.  In reality, however, backlogs in the Nation's immigration courts and asylum offices grew significantly during the period that MPP was in effect.[92]  In addition, MPP created substantial additional responsibilities on Department personnel that detracted from other critically important mission sets. This played out in numerous ways.

First, each time an MPP enrollee returns to the United States to attend a court proceeding, which could happen multiple times over the life of a case, DHS personnel are required to conduct additional rounds of processing, including biographic and biometric collection, property collection and return, and medical screenings.  None of this is required for those in removal proceedings in the United States.  The labor-intensive process of bringing migrants back into the United States for their court proceedings directly impacts staffing at the four U.S. ports of entry where migrants re-entered, taking frontline personnel away from other key missions—such as facilitating legal cross-border trade and travel.

Second, in order to implement and operate MPP, the Department devoted significant resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities (IHFs) to support EOIR.  During the period when MPP was operational during the prior Administration, IHFs cost approximately $168 million to build and operate.[93]  As part of its current efforts to comply the *Texas* court order and reimplement MPP in good faith, the Department has procured new contracts for IHFs, at a cost of approximately $14.1 million to build and $10.5 million per month to operate.[94]

---

counting encounters at POEs in connection with MPP). The increase since then reflects that individuals enrolled in MPP continued to seek entry without inspection to the United States.

[91] DHS Office of Immigration Statistics data provided on 10/29/2021.

[92] Between January 2019 and January 2021—the period when MPP was operational—the number of pending immigration court cases increased from 829,200 to 1,283,090 (a 55 percent increase). Data on pending caseload, provided by EOIR on October 28, 2021. The backlog of pending affirmative asylum claims increased over the same time period from 331,100 to 399,100. Data on the affirmative asylum backlog, USCIS Refugee, Asylum, and International Operations Directorate on October 27, 2021.

[93] DHS Office of the Chief Financial Officer analysis.

[94] Nuñez-Neto Decl., *supra* note 45, at ¶ 15.

Cuba AR_000276

Third, adjudication of claims by individuals in MPP diverts asylum officers and immigration judges from other key efforts designed, as described in Section IV.B, to more effectively process cases and reduce backlogs.  As initially implemented, MPP required the training of asylum officers to learn the newly applied *non-refoulement* screening standards and support an additional adjudicative caseload.  Moreover, each time migrants came in and out of the United States for court hearings, there was another opportunity to claim fear—and another possible fear screening.  Department data shows that in the short time that MPP was operational, more than 2,500 individuals had repeat fear screenings.[95]

Fourth, the program drew on the same limited resources that non-profits and humanitarian organizations used to help other individuals in Mexico—thus focusing efforts on northern Mexico and diverting resources and services away from other parts of Mexico and the broader region.

Each of these, and other investments or resources, divest resources from other critically important Departmental missions and undercut the Department's ability to pursue longer-term, durable reform.

G. Impact of MPP and its Termination on SWB Migration Flows

In making his determination decision, the Secretary has presumed—as is likely—that MPP contributed to a decrease in migration flows.  From January through May 2019, when MPP was used in a limited number of locations, encounters rose.[96]  But from June 2019, when DHS announced that MPP would be fully implemented along the entire SWB, through September 2019, border encounters decreased rapidly, falling 64 percent in just three months.  Border encounters continued to decrease until April 2020.  Beginning in May 2020, encounters once again started rising.[97]  At that point, individuals continued to be enrolled into MPP, however, at lower rates than previously; immigration court hearings for MPP enrollees were also suspended.

The sharp decrease in SWB encounters during the months in which MPP was fully operational is notable.  Of course, correlation does not equal causation.  And even at the height of MPP's implementation in August 2019, it was not the Department's primary enforcement tool; approximately 12,000 migrants were enrolled in MPP but more than 50,000 were processed under other Title 8 authorities.[98]  In addition, beginning in April 2019, Mexico surged its own enforcement, thus increasing their level of apprehensions and returns.  This, coupled with a range of other push and pull factors, both known and unknown, likely contributed to the decline in encounters.[99]  The relevant data is simply insufficiently precise to make an exact estimate of the extent to which MPP may have contributed to decreased flows at the southwest border.

---

[95] *See supra* note 66.

[96] U.S. Customs and Border Protection, "Southwest Land Border Encounters," https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[97] *Id.*

[98] DHS OIS analysis of U.S. CBP administrative records.

[99] *See* Congressional Research Service, *Mexico's Immigration Control Efforts* (May 28, 2021).

Cuba AR_000277

That said, the Secretary has, nonetheless, evaluated MPP on the premise that it contributed to decreased flows.[100]  Even so, the Secretary has concluded that this benefit cannot be justified, particularly given the substantial and unjustifiable human costs on the migrants who were exposed to harm while in Mexico, and the way in which MPP detracts from other regional and domestic goals and policy initiatives that better align with this Administration's values while also serving to manage migratory flows, as described in Section IV.

    H.  <u>Addressing the Concerns of States and Border Communities</u>

In the course of litigation, plaintiffs have alleged that the Secretary's June 1 Memorandum failed to consider the additional costs that States would allegedly incur as a result of the decision to terminate MPP.  Texas and Missouri, for example, argued—and the district court found—that the termination of MPP could lead to an increased number of noncitizens without proper documentation in their States, which might cause the States to incur additional costs related to the costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs.[101]  State-plaintiffs also alleged that terminating MPP led to an increase in organized crime, human trafficking, and drug cartel activity, specifically with respect to the illegal trafficking of fentanyl.[102]  And State-plaintiffs further claimed that they had developed "reliance interests" dependent on the continued operation of MPP.

The Secretary takes these concerns seriously.  He has sought to understand and address the impacts that Departmental policies and practices may have on communities and has consulted with numerous state and local officials from across the SWB about the Department's border management strategy, including the decision to terminate MPP.  The Secretary has, as a result taken and will continue to take, steps designed to minimize adverse consequences of any policy shifts on border states.

Prior to the district court's injunction, for example, the Department facilitated the safe and orderly entry into the United States of about 13,000 individuals previously enrolled in MPP for purposes of participating in their removal proceedings.  Prior to doing so, however, the Department ensured that these individuals received COVID-19 tests before crossing the border and entering the United States.  The Department also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that facilitated their onward movement to final destinations away from the border.

---

[100] The district court faulted the Secretary for not taking into account alleged warnings to members of the Biden-Harris transition team by career DHS officials that terminating MPP would cause a spike in border encounters. *Texas*, 2021 WL 3603341, at *7. The Department is unaware of any such specific conversations, yet is aware of, and has taken into account, similar concerns raised by others.

[101] *See Texas*, 2021 WL 3603341, at *9-10.

[102] First Amended Complaint at 2, 38-39, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. filed June 3, 2021); *see also* Complaint, *West Virginia v. Biden*, No. 2:21-cv-22 (N.D. W.Va. filed Aug. 19, 2021); First Amended Complaint, *Arizona v. Mayorkas*, No. 2:21-cv-617 (D. Ariz. filed July 12, 2021).

Cuba AR_000278

In addition, the Secretary has devoted extensive resources on efforts designed to stop trafficking networks and protect border states from risks associated with criminal activity. Shortly after assuming office, the Secretary directed FEMA to increase funding for SWB law enforcement through FEMA's Operation Stonegarden, a $90 million grant that supports law enforcement partners, with more than 80% of such funds being been directed to SWB areas. Multiple and significant narcotics seizures have resulted from this initiative.[103] The Secretary also directed DHS to work with GOM partners on joint law enforcement operations designed to attack the smuggling and trafficking organizations. Operation Sentinel, which was launched in April, is a key example of these efforts—a multifaceted counter-network operation focused on identifying and taking law enforcement actions against transnational criminal organizations involved in the facilitation of mass migration to the SWB of the United States. Working with the GOM, DHS law enforcement has identified over 2,200 targets associated with transnational criminal organizations and revoked multiple visas and Trusted Traveler memberships, blocked bank accounts, and blocked certain entities from conducting business with the U.S. government.[104]

These efforts build on the Department's longstanding partnership with state, local, territorial, and tribal (SLTT) governments and law enforcement agencies, including many on the SWB, to address transnational crime, including human smuggling and trafficking. ICE's Homeland Security Investigations, for example, operates 79 Border Enforcement Security Task Forces nationwide, staffed by more than 700 State and Local law enforcement officers, that work cooperatively to combat emerging and existing transnational criminal organizations. Operational successes resulted in the seizure of 2,503 weapons, 215,301 pounds of narcotics, and $104,742,957 in FY20.[105] The ICE Criminal Apprehension Program also helps SLTT law enforcement partners better identify, arrest, and remove priority noncitizens who have been convicted of crimes in the United States and are incarcerated within federal, state, and local prisons and jails. In FY21, ICE issued 65,940 immigration detainers to noncitizens booked in jails or prisons.[106] All such activities are ongoing.

The Department also has carefully reviewed the available information and has not seen any evidence that MPP had any effect on human trafficking and crime, including drug trafficking. Seizures of narcotics, while not necessarily indicative of trafficking activity, are nonetheless the best available data, and do not show any impact related to MPP's implementation. Seizure of narcotics between ports of entry have declined steadily from FY18 to FY21, including a decline of almost 40 percent since the point in time when MPP was fully implemented, through FY21, a time MPP was largely not being implemented.[107] These declines have been driven by a substantial decrease in marijuana smuggling. Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation. Seizure trends for

---

[103] FEMA data on Operation Stonegarden provided on Oct. 28, 2021.

[104] CBP data on Operational Sentinel, provided on Oct. 28, 2021.

[105] ICE data on Border Enforcement Security Task Forces, provided on Oct. 28, 2021.

[106] ICE data on the Criminal Apprehension Program, provided on Oct. 28, 2021.

[107] Analysis of CBP data on drug seizures by U.S. Border Patrol agents, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics.

Cuba AR_000279

hard drugs at ports of entry have been mixed, with fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20.[108]

Meanwhile, the fact that some noncitizens might reside in the United States rather than being returned to Mexico and thus access certain services or impose law enforcement costs is not, in the Secretary's view, a sufficiently sound reason to continue MPP. Federal immigration policy virtually always affects the number of people living within the States. Notably, not all of those burdens are borne by border States—many noncitizens proceed to interior States; others are detained by the federal government. In this case, the Secretary has made the judgment that any marginal costs that might have been inflicted on the States as a result of the termination of MPP are outweighed by the other considerations and policy concerns; it is also the Secretary's view that the other policies and initiatives being pursued by this Administration will ultimately yield better outcomes than MPP.

Moreover, even after his many consultations, the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation (or in response to the prior termination) of MPP. State-plaintiffs in the litigation also have not identified any specific actions they took in reliance on MPP.[109] Moreover, any claimed reliance interest is undermined by the fact that the program itself is discretionary, as are decisions to detain or parole individuals into the country. *No* administration has ever done what State-plaintiffs in the litigation argue is required here—detain or return to Mexico everyone that the Department encounters along the border. States cannot have a reliance interest based on something that has never previously been implemented. Notably, only 6.5 percent of noncitizens encountered along the SWB and processed through Title 8 were enrolled in MPP during the period it was in place. In no month when MPP was operating—including in August 2019, the month with the highest number of MPP enrollments—were more than one-in-five noncitizens encountered at the SWB and processed through Title 8 placed in MPP.[110] The short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the SWB who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States.

I.   Relationship between Implementation of MPP and Statutory Mandates

In enjoining the June 1 Memorandum, the district court faulted the Department for not considering the impact terminating MPP would have on the Department's ability to comply with the detention requirements in 8 U.S.C. § 1225.[111] In so doing, the district court accepted plaintiffs' argument that, pursuant to 8 U.S.C. § 1225, DHS has two options with regard to

---

[108] *Id.*

[109] The district court in *Texas* also discussed a purported "agreement" that the Department entered into with the State of Texas and several other states in early January 2021. *Texas*, 2021 WL 3603341, at *6-7. As the Department has explained in litigation, those documents were void *ab initio* and unenforceable. Any reliance on those documents is therefore unreasonable. To the extent those documents were ever valid, the Department has since terminated them and, in any event, Texas conceded in litigation that the "agreement" was no longer binding as of August 1, 2021.

[110] DHS OIS analysis of CBP administrative records.

[111] *Texas*, 2021 WL 3603341, at *21-23.

Cuba AR_000280

noncitizens seeking asylum at the border: (1) mandatory detention or (2) return to a contiguous territory.[112]  This is a clear misreading of the statute for all of the reasons explained at length by the U.S. Government in the litigation—including a misreading of Section 1225 to effectively mandate detention of all those who are not subject to the contiguous-territory-return provision of 8 U.S.C. § 1225(b)(2)(C) if the agency lacks detention capacity to detain all noncitizens not otherwise subject to contiguous territory return.  It is also completely at odds with the history of immigration detention in this country, and the agency's consistent and longstanding interpretation of its statutory authorities.  Section 1225(b)(2)(C) is discretionary, and nothing in section 1225's text or history suggests any relationship between Congress's grant of return authority and section 1225's detention provisions.

Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory.  Section 1225 "does not mean" that every noncitizen "must be detained from the moment of apprehension until the completion of removal proceedings."[113]  The INA provides DHS with latitude for processing noncitizens beyond returns or detention.  DHS "may ... in [its] discretion" release a noncitizen placed in Section 1229a proceedings through "parole," pursuant to 8 U.S.C. § 1182(d)(5) "for urgent humanitarian reasons or significant public benefit."[114]

Pursuant to Section 1182(d)(5)'s parole authority, Congress has expressly granted DHS the broad authority to release applicants for admission from detention as an exercise of the Department's parole power.  That power has been exercised for as long as the federal government has been regulating immigration.[115]  Indeed, Congress enacted 8 U.S.C. § 1182(d)(5) as a "codification of the [prior] administrative practice."[116]  And in the decades since, immigration agencies have continued to broadly exercise their parole power to release certain noncitizens from detention.  Notably, the statute does not set any limit on the number of individuals DHS can decide to release on parole.  Nor does it provide that the agency cannot rely on its limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225.  Rather, Congress simply required that parole decisions be made on a case-by-case basis and that they be based on "urgent humanitarian reasons" or "significant public benefit."[117]  As the statute does not define those ambiguous terms, Congress left it to the

---

[112] *Id*. at *22.

[113] *Matter of M-S-*, 27 I&N Dec. 509, 516-517 (A.G. 2019); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018).

[114] 8 U.S.C. § 1182(d)(5)(A); *see* 8 C.F.R. §§ 212.5(b), 235.3(c). Additionally, "pending a decision on whether the alien is to be removed" and "[e]xcept as provided in [§ 1226(c)]," noncitizens present in the United States "may" be released on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(2)(A)-(B).

[115] *See, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 651, 661 (1892) (discussing release of noncitizen to care of private organization); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (same).

[116] *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958).

[117] In a section entitled "Limitation on the Use of Parole," Congress amended the parole statute in 1996 to recharacterize the permissible purposes of parole from "emergent reasons or for reasons deemed strictly in the public interest" to "*only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, §§ 302, 602, 110 Stat 3009 (emphasis added). But it did not otherwise alter DHS's parole authority and did not define these manifestly ambiguous statutory terms. Accordingly, after the 1996 amendment to the parole statute, the agency

Cuba AR_000281

agency to define them.[118]   In implementing section 1182(d)(5), the agency has long interpreted the phrase "significant public benefit" to permit it to parole noncitizens "whose continued detention is not in the public interest as determined by" specific agency officials.[119]   And in turn, the agency has for decades viewed detention as not being in the "public interest" where, in light of available detention resources, detention of a specific noncitizen would limit the agency's ability to detain another noncitizen whose release may pose a greater risk of flight or danger to the community.[120]

Moreover, no administration has *ever* interpreted or implemented 8 U.S.C § 1225, as the district court in *Texas* has read it, to require the detention of virtually all inadmissible applicants for admission, except for those returned to Mexico.  The Department does not have—and has never had under any prior administration—sufficient detention capacity to maintain in custody every single person described in section 1225.  In September 2021, for example, CBP encountered approximately 192,000 individuals along the SWB.[121]   And as discussed above, even in August 2019, when MPP enrollments were at their zenith, CBP encountered nearly 63,000 individuals along the SWB.  Meanwhile, ICE Enforcement and Removal Operations (ERO) is generally appropriated for approximately 34,000 detention beds nationwide with some modest fluctuation from year to year.

This variance between border crossings and detention capacity is not new and was in fact the reality even when MPP was in place (see Appendix 1).  From Fiscal Years 2013 to 2019, nearly three-quarters of single adult and family unit members who were encountered at the SWB were either never placed in or released from detention during the pendency of their proceedings—more than 1.1 million (41 percent) were never booked into ICE detention and nearly 900,000 (33 percent) were booked in for a period of time but released prior to the conclusion of their removal proceedings.[122]   Even during the period that MPP was in effect from late January 2019 to January 20, 2021, more than two-thirds of single adults and individuals in family units encountered along the SWB and processed through non-MPP Title 8 authorities— more than 650,000 individuals—were never detained or released from ICE custody during the

---

incorporated the new "case-by-case" requirement into its regulation, while also maintaining its longstanding regulatory authority to release when "continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5), which remained consistent with the statute after the 1996 amendment. Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997).

[118] 8 U.S.C § 1103(a)(1); *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *cf., e.g., Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of same parole regulation).

[119] 8 C.F.R. § 212.5(b)(5).

[120] *See, e.g.*, *Interim Guidance for Implementation of Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture; ICE Policy No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009); *see also Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1377-78 (S.D. Fla. 2002) (referring to INS detention use policies, including parole policies, based on having to establish "priorities for the use of limited detention space"), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

[121] Southwest Land Border Encounters, *supra* note 95.

[122] FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

Cuba AR_000282

duration of their proceedings; a full 42 percent (more than 415,000 individuals) were never booked into ICE detention at all.[123]

By interpreting Section 1225 to mandate either detention or return to Mexico, the court essentially concluded that every single administration since 1997 has repeatedly and consistently violated Section 1225, by exercising the parole authority to release noncitizens detained under that authority, on a case-by-case basis, where detention of a specific noncitizen would limit the agency's ability to detain another noncitizen who release may pose a greater risk of flight or danger to the community.  There is no indication that Congress, in enacting Section 1225, intended to *require* the Secretary to use the explicitly *discretionary* return authority found in 8 U.S.C. § 1225(b)(2)(C) for virtually any noncitizen the Department fails to detain because of resource limitations.[124]  Rather, the decision to use the authority found in 8 U.S.C. § 1225(b)(2)(C) is entrusted to the Secretary's discretion and to his discretion alone.  Given these clear statutory authorities, and DHS's longstanding interpretation of the ambiguous parole statute, the Secretary's decision to terminate MPP creates no conflict with the detention authorities in Section 1225.

J.   Impact on U.S.-Mexico Relationship

Mexico is a sovereign nation.  This means that the U.S. Government cannot return individuals to Mexico without an independent decision by the GOM to accept their entry.  It was for good reason that MPP was put into effect only *after* the U.S. government had conducted diplomatic engagement with GOM and *after* the GOM announced its independent decision to accept returnees.  The initiation of MPP required substantial diplomatic engagement in 2019; it does in 2021 as well.[125]

In deciding to accept returns of non-Mexican nationals under MPP, the GOM agrees to shoulder the burden of receiving these individuals, facilitating legal status and shelter, and accounting for their safety and security.  Not only does this place a great deal of strain on the GOM's ability to provide services for its own citizens and lawful residents, it diverts Mexican law enforcement resources from other missions that are important to the United States—

---

[123] *Id*. Indeed, when the last Administration created MPP, it expressly excluded from its coverage as a matter of discretion certain noncitizens, including citizens or nationals of Mexico, returning lawful permanent residents seeking admission, noncitizens with known physical or mental health issues, and other noncitizens. DHS, "Migrant Protection Protocols (Trump Administration Archive)," https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.

[124] Congress is aware that it would need to appropriate substantial additional funds to detain everyone potentially subject to detention under Section 1225; yet, it has never done so. *See* 8 U.S.C. § 1368(b) (providing for bi-annual reports to Congress on detention space, including estimates on "the amount of detention space that will be required" during "the succeeding fiscal year"). Although Congress has amended Section 1225 since 1996, *see* Pub. L. 110-229, 122 Stat. 754, 867 (2008), it has never amended Section 1225 to mandate the use of return authority when the agency lacks resources to detain all applicants for admission or to override the agency's longstanding interpretation permitting the use of parole to address capacity limitations as a significant public benefit. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[125] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act*, *supra* note 13.

Cuba AR_000283

including addressing transnational organized crime networks and root causes of migration.  Over the past nearly three years, MPP has played an outsized role in its policy and operational engagement with GOM, thus distracting from other diplomatic initiatives and programs concerning migration flows.  These engagements, which have increased substantially in tempo and intensity since the court's order, require enormous amounts of time to prepare for and execute, and involve the same individuals at DHS and DOS who would otherwise be working on advancing other key bilateral priorities.

The Department is eager to expand the focus of the relationship with GOM to address broader issues related to migration to and through Mexico.  This includes implementing the bilateral economic and security frameworks adopted in September and October 2021, respectively;[126] addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more.  Terminating MPP will, over time, help to broaden the United States' engagement with the GOM to address these critical efforts, which we expect will produce more effective and sustainable results than what we achieved through MPP.  It will also provide more space and resources to address the many other bilateral issues that fall within DHS's diverse mission, such as countering transnational organized crime, cybersecurity, trade and travel facilitation, cargo and port security, emergency management, biosurveillance, and much more.

## IV.    The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management

In December 2018, when DHS announced the start of MPP, the Department stated that MPP was expected to provide numerous benefits for the immigration system, including reducing false asylum claims, more quickly adjudicating meritorious asylum claims, clearing the backlog of unadjudicated asylum applications, and, perhaps most importantly, stemming migration flows across the SWB.  All of these goals remain top priorities for the Department and Administration. But the Secretary assesses that there are ways to advance these goals through means other than MPP—through policies and practices that will more effectively and more humanely achieve the stated goals than continuing to implement MPP as designed or in modified form.

Not only has MPP failed to deliver many of its promised benefits, but the burden and attention required to reimplement and maintain MPP will undermine the Department's efforts to address irregular migration and achieve lasting reform of the asylum system through other means.  As noted earlier, the Secretary is undertaking this review on the premise that MPP was responsible for a share of the significant decrease in SWB encounters that occurred during many months of MPP's operations.  However, MPP is not the only, and certainly not the preferred, means of tackling irregular migration.  To the contrary, the Department is currently pursuing a range of other measures that it anticipates will disincentivize irregular migration in ways that are

---

[126] White House, "Joint Statement: U.S.-Mexico High-Level Security Dialogue," Oct. 8, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/joint-statement-u-s-mexico-high-level-security-dialogue/; White House, "Fact Sheet: U.S.-Mexico High-Level Economic Dialogue," Sept. 9, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/09/fact-sheet-u-s-mexico-high-level-economic-dialogue/.

Cuba AR_000284

more consistent with this Administration's values and enduring, including by addressing root causes and building regional solutions.  In addition, the Department is committed to channeling migration through safe and orderly pathways and reforming our asylum adjudication system to achieve more timely, fair, and efficient results,

In July 2021, the Administration released a Blueprint describing its overarching strategy—as well as the concrete steps that will be taken—to ensure a secure, humane, and well-managed border, implement orderly and fair asylum processing, strengthen collaborative migration management with regional partners, and invest in the root causes of migration in Central America.[127]  The Administration, with DHS playing a critical role, has made significant investments and taken substantial actions to move forward with its strategy.

A.  <u>Managing Flows</u>

The current Administration is pursuing a comprehensive vision for managing migration and facilitating safe, orderly, and legal pathways for individuals seeking protection or intending to migrate.[128]  A key part of this vision involves disincentivizing unlawful entries by robustly enforcing our laws at the land border while also ensuring the humane and lawful treatment of those who do arrive in the United States.  Doing so requires a concerted effort to address root causes of migration, provide alternative protection solutions in the region, enhance lawful pathways for migration to the United States, and streamline the fair adjudication of asylum claims at the border—efforts that the Department has determined will be more effective at reducing irregular migration than continuing to implement MPP.

To disincentivize irregular migration, the Administration is pursuing a multi-pronged approach.  At our border, we are employing expedited removal to rapidly, but humanely, return certain individuals and families that are encountered unlawfully crossing between POEs.  Those who do not express fear of persecution or torture, and who are nationals of countries that allow electronic nationality verification (ENV), are returned to their countries within a few days of being encountered.  DHS is working closely with the Department of State to expand the use of these ENV agreements throughout the hemisphere to more expeditiously facilitate removals of individuals who do not claim a fear of persecution or torture.  The Department additionally treats any noncitizen who unlawfully entered the United States on or after November 1, 2020, as a presumed border security enforcement and removal priority under current guidance,[129] as well as in guidance that will become effective on November 29, 2021.[130]

---

[127] White House, "Fact Sheet: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System," July 27, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/.

[128] EO 14010 directed the creation of a Root Causes Strategy and Collaborative Migration Management Strategy. Published in July 2021, the strategies articulate a bold and comprehensive vision for managing migration throughout the Western Hemisphere. *Id.*

[129] Memorandum from Tae D. Johnson, Acting Director, ICE, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021).

[130] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Security, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021).

Cuba AR_000285

Recognizing that the management of migration is a shared responsibility among sending, transiting, and receiving countries, the Administration is also working with our partner countries across the region to manage migratory flows.  As part of these efforts, the United States is working bilaterally and multilaterally with countries across the Western Hemisphere, seeking to encourage humane border enforcement and enhance legal pathways throughout the region.  DHS is also working closely with the Department of State to provide additional technical assistance, mentoring, and resources to border and immigration authorities in the region, with the goal of enhancing the capability and effectiveness of our partners' efforts to identify and interdict unlawful activity.  As part of these efforts, the United States and Colombia co-hosted a regional conference on migration in Colombia on October 20, 2021 that brought together foreign ministries and immigration authorities from 17 partner nations across the hemisphere to directly address recent trends in irregular migration in the region. During this conference, countries committed to enhancing protection, combating human smuggling and trafficking, and expanding humane enforcement efforts.

The Department is also working bilaterally with countries across the region to build law enforcement capacity, tackle transborder crime, and slow migratory flows.  Beginning in April 2021, for example, DHS deployed dozens of CBP personnel to Guatemala to train and support local law enforcement units and help enhance the security of Guatemalan border crossings, checkpoints, and ports.[131]  And in October 2021, for example, the United States and Mexico agreed on joint actions to prevent transborder crime, with a particular focus on reducing arms trafficking, targeting illicit supply chains, and reducing human trafficking and smuggling.[132]  Such efforts build on the successes of Operation Sentinel, in which DHS is working with other U.S. government agencies and the GOM to identify and impose meaningful sanctions on those involved in human smuggling, including by freezing their assets, revoking their visas, and curtailing their trade activities.  DHS seeks to expand these efforts across the hemisphere, with the GOM as a key partner.  However, the senior U.S. and Mexican officials who would lead these efforts are the same officials that have spent much of the past three months negotiating the reimplementation of MPP—detracting from efforts to advance other key parts of the bilateral relationship.

The Administration is also expanding efforts to address root causes of migration and enhance legal pathways for individuals who intend to migrate, as well as building and improving asylum systems in other countries and scaling up protection efforts for at-risk groups.  These efforts reduce incentives to come to the United States to seek protection and, for those who still choose to do so, reduce incentives to cross the border unlawfully.  As part of these efforts, DHS is working with Department of State to expand efforts to build and improve asylum systems in other countries and scale up protection efforts for at-risk groups, thereby providing alternative opportunities for individuals to seek protection without making the often-dangerous journey to the SWB.

The Department of State and DHS, for example, are working to stand up Migrant Resource Centers (MRC) in key sending countries, including Guatemala, where individuals who

---

[131] CBP data on Guatemalan deployments provided on 10/29/2021.

[132] Joint Statement: U.S.-Mexico High-Level Security Dialogue, *supra* note 125.

Cuba AR_000286

intend to migrate can apply for a visa or seek other available protection.[133]  The Department of State established the first MRC in Guatemala this year, and is working with international organizations to expand the MRCs to multiple locations and countries over the coming year.  The Administration is also working to continue to expand the legal pathways that are available for individuals who apply at these facilities.  We are also expanding refugee processing in Central America—including through in-country processing in Northern Triangle countries—and are helping international organizations and local non-governmental organizations identify and refer individuals with urgent protection needs to the U.S. Refugee Admissions Program and resettlement agencies in other countries.

Additionally, on March 10, 2021, DHS, in close coordination with the Department of State, restarted the Central American Minors (CAM) program to reunite eligible children from El Salvador, Guatemala, and Honduras with parents who are lawfully present in the United States. On June 15, 2021, the Departments expanded CAM eligibility to include certain U.S.-based parents or legal guardians who have a pending asylum application or U visa petition filed before May 15, 2021, thereby allowing them to file petitions on behalf of children who are nationals of El Salvador, Guatemala, or Honduras for potential resettlement in the United States.  This important program provides an avenue for children to come to the United States that would not otherwise be available, which in turn supports family unity and reduces the incentives for unlawful entry.  By restarting and expanding this safe, orderly, and lawful pathway through which children may reunite with their parent or legal guardians in the United States, CAM reduces the incentive for such vulnerable and often unaccompanied children to make the dangerous journey to the United States border.[134]

The Department also has expanded access to temporary work visas in the region, thereby providing a lawful pathway to work temporarily in the United States for individuals who might otherwise take the irregular and dangerous journey to the United States in search of economic opportunities and cross the border unlawfully.  To that end, on May 21, 2021, DHS published a temporary final rule making available 6,000 H-2B supplemental visas for temporary non-agricultural workers from Honduras, Guatemala, and El Salvador in FY21.[135]  The Administration is also working to enhance access to H-2A visas for temporary agricultural workers, for when there are insufficient qualified U.S. workers to fill these jobs.  Departments and agencies are engaged with the Northern Triangle governments, international organizations, the private sector, civil society, labor unions, and worker rights organizations to promote this program.

---

[133] *Id.*

[134] *See* "Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program," June 15, 2021, https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.  Under the expanded guidance, eligible minors may apply for refugee status if they are sponsored by a parent or legal guardian in the United States who is in one of the categories: lawful permanent residence; temporary protected status; parole; deferred action; deferred enforced departure; withholding of removal; or certain parents or legal guardians who have a pending asylum application or a pending U visa petition filed before May 15, 2021.

[135] Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 86 Fed. Reg. 28,198 (May 25, 2021).

Cuba AR_000287

These efforts, all of which have only recently been initiated, require diplomatic engagement and investment of resources. They will take some time to achieve substantial results. Once fully operational, they will provide legal and regular pathways for individuals seeking protection and opportunity to work in the United States, thus reducing the need for unlawful crossings and reducing the appeal of exploitative smugglers. By incentivizing migration through lawful channels, and disincentivizing the use of unlawful channels, these initiatives achieve several key goals of MPP, but in a more humane way that matches the Administration's values.

    B.  <u>Managing Asylum Claims</u>

The Department also is taking a number of different steps to better manage asylum claims that will allow the United States to more humanely, and fairly, achieve some of MPP's stated benefits: reducing false asylum claims, more quickly adjudicating meritorious asylum claims, and clearing the backlog of unadjudicated asylum applications.

    1.  *Dedicated Docket*

In May 2021, DHS and DOJ jointly announced a new Dedicated Docket, designed to expeditiously and fairly conduct removal proceedings for families who enter the United States between ports of entry at the SWB.[136] With a goal that immigration judges will generally complete cases on the Dedicated Docket within 300 days, the process is intended to significantly decrease the length of time for adjudication of such noncitizens' cases, while also providing fair hearings for families seeking asylum and other forms of relief or protection from removal. Dedicated Dockets have been established in 11 cities (Boston, Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle) chosen because they are common destination cities for migrants and have robust communities of legal service providers. Once fully up and running, it is expected to adjudicate approximately 80,000 cases each year.

The Dedicated Docket serves multiple goals: It provides a mechanism for the more efficient adjudication of claims. It ensures compliance with court proceedings through use of case management services provided through ICE's Alternatives to Detention (ATD) program.[137] It promotes efficiency and fairness in those proceedings through robust access to legal orientation for families on the docket (including group and individual legal orientations and friend-of-the-court services for unrepresented individuals). And, as MPP was designed to do, it discourages non-meritorious claims by dramatically reducing the amount of time that a noncitizen may remain in the United States while his or her claims for relief or protection are adjudicated.

---

[136] Press Release, DHS, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2021, https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

[137] ICE Enforcement and Removal Operations (ERO), "Alternatives to Detention Program," https://www.ice.gov/detain/detention-management.

Cuba AR_000288

Moreover, it is expected to achieve these goals in ways that avoid the pitfalls associated with MPP. Unlike MPP, which was plagued with high *in absentia* rates, the Dedicated Docket is designed, via the use of ATD and case management services, to ensure high appearance rates and contribute to the proper functioning of our immigration system. As of October 25, 2021, EOIR had conducted nearly 12,000 initial hearings for individuals in Dedicated Docket cases, just 4.5 percent of which had ended in issuance of an *in absentia* order of removal.[138] ICE data reflect a 98.9% attendance rate at all hearings for individuals enrolled into ATD from the SWB from FY14 to FY21.[139]

Two immigration court locations currently hearing Dedicated Docket cases—El Paso and San Diego—are slated for use as part of the court-ordered reimplementation of MPP because of their proximity to ports of entry along the border. To staff MPP cases, EOIR will have to either divert judges from existing initiatives such as the Dedicated Docket—which will prolong those cases and undermine the effort—or reassign other immigration judges handling other non-detained cases, which will exacerbate the 1.4 million case backlog that already exists. It is the Department's reasoned decision—working in close partnership with EOIR—that the limited pool of asylum officers and immigration judges are best spent supporting the Dedicated Docket and other initiatives that achieve the goals of timely and fair adjudications.

## 2. *Asylum Officer Rule*

On August 20, 2021, DHS and DOJ promulgated a Notice of Proposed Rulemaking (NPRM) for the so-called "Asylum Officer Rule," which seeks to address systemic problems with the asylum system in an enduring way consistent with the Administration's values. Specifically, it amends the procedures for credible fear screenings and consideration of asylum, withholding of removal, and CAT, so as to streamline the asylum process and address the current backlogs in the system.[140] The comment period of this NPRM recently closed, and DHS and DOJ are currently reviewing the comments received and working on a final rule.

The proposed rule addresses the fact that the number of asylum and related protection claims at the SWB has increased dramatically over the years, that the system has not been able to keep pace, and that large immigration court backlogs and lengthy adjudicated delays are the result.[141] As stated in the NPRM, the proposed rule also evidences this Administration's recognition that "[a] system that takes years to reach a result is simply not a functional one. It delays justice and certainty for those who need protection, and it encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit."[142] The Asylum Officer Rule thus responds to the very same concerns identified by the last Administration when

---

[138] Data on the number of initial hearings for individuals on Dedicate Docket, provided by EOIR on Oct. 25, 2021.

[139] Data from ICE ERO Custody Management Division FY14, 15, 16, 17, 18, 19, 20, and 21 through Aug. 31, 2021 FAMU BP Apprehensions-Subsequently Enrolled into ATD, ISAP IV EOIR Court Appearance Rates FY14 & FY15 & FY16 & FY17 & FY18 & FY19 & FY20 & FY21 through Aug. 31, 2021.

[140] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021).

[141] *Id.* at 46,907.

[142] *Id.*

Cuba AR_000289

it adopted MPP—and to a number of the concerns relied upon by the *Texas* court—but tackles them in a transformative and systemic way, while holding true to our laws and values.

To support the more expeditious and fair adjudication of claims, the proposed rule would transfer from immigration judges to USCIS asylum officers the initial responsibility for adjudicating asylum and related protection claims made by noncitizens who are encountered at or near the border and who are placed into expedited removal proceedings. Individuals who establish a credible fear of persecution or torture following an initial screening interview would have their applications referred to USCIS, rather than the immigration court, for further consideration of their claim. The initial credible fear interview would serve as the basis for the individual's asylum application, thereby introducing a key efficiency into the process.

Allowing cases with positive credible-fear findings to remain within USCIS for the full asylum merits adjudication, rather than being shifted to immigration judge-review, will capitalize on the investment of time and expertise developed during the screening interview and allow cases to be resolved more quickly. This will, in turn, employ limited asylum officer and immigration court resources more efficiently, reduce asylum backlogs, and protect against further expansions of the already large immigration court backlog. As currently drafted, the NPRM is also designed to include key procedural safeguards—including the ability to appeal, be represented by counsel, and present additional evidence as necessary to ensure due process, respect for human dignity, and equity. Once implemented, the Asylum Officer Rule is expected to represent a transformative and lasting shift in asylum claim processing that will ensure rapid and fair processing in a way that delivers appropriate outcomes and realistically keeps pace with the workflow.

Achieving the rule's objectives will require substantial investment in resources, training, and personnel; to fully implement this new process, USCIS will need to quadruple the current asylum officer corps.[143]  Importantly, these are the same asylum officers needed to conduct *non-refoulement* interviews for MPP. Restarting MPP will likely undercut the ability to implement this new rule as designed.

It is the Department's reasoned view that these limited resources are better expended on implementing both the Dedicated Docket and the Asylum Officer Rule. Like MPP, both the Dedicated Docket and the Asylum Officer Rule are designed to render timely decisions and discourage non-meritorious claims. Unlike MPP, however, they do so without subjecting vulnerable individuals to increased risk in Mexico and without creating the inevitable barriers to accessing counsel that exist for those returned to Mexico.

## V.    Consideration of Alternatives to Terminating MPP

The Department has considered the following as alternatives to terminating MPP: First, implementing MPP in the same manner as the prior Administration. Second, implementing with modifications designed to address some of the access-to-counsel, safety, and other humanitarian considerations, consistent with demands from the GOM. (These modifications are currently

---

[143] *Id*. at 46,933.

Cuba AR_000290

being planned pursuant to the court's order to implement MPP in good faith.)  Third, implementing a significantly modified programmatic use of the Section 235(b)(2)(C) authority, as described below.

Reimplementation of MPP in the same manner as the prior Administration is not currently an available option.  As has been described in court filings, the United States cannot unilaterally implement MPP without the independent agreement of the GOM to accept those who the United States seeks to return.  In ongoing discussions with the GOM, the GOM has made clear it would agree to accept such returns only if certain changes were implemented, including (i) measures to ensure that cases are generally adjudicated within six months, thus limiting the amount of time individuals are waiting in Mexico; (ii) clear means of communicating to MPP enrollees accurate information about the time and date of their hearings; (iii) improved access to counsel; and (iv) better screenings to protect particularly vulnerable individuals from being returned to Mexico.  Each of these changes would, as a result, need to be made in any reimplementation.  Unless the GOM significantly changes its position, resuming the program as it existed previously is simply not possible in the foreseeable future as a matter of international diplomacy.

Moreover, the Secretary has his own independent and significant concerns about the prior implementation of MPP, including concerns about the safety and security of those returned to Mexico, deficiencies in the *non-refoulement* interview process, barriers to access to counsel, and the ways in which reimplementation of MPP would divert from other Administration goals and result in significant burdens for the Department that would limit DHS's opportunities to make other needed reforms consistent with this Administration's policy priorities.  In light of these concerns, the Secretary has decided not to resume MPP in precisely the same form as it previously existed, even if were a viable option.

As an alternative, the Secretary considered a modified implementation and enforcement plan, in the manner that the Administration is planning to start doing in the coming weeks— pending an independent decision by the GOM to facilitate returns—in order to comply with the district court's order.  As the Department moves to reimplement, it is making changes to account for GOM's concerns—changes which are designed to better protect individuals returned to Mexico and ensure, among other things, timely and accurate notice about court hearings.  In addition, the Department is evaluating what changes could be made to address the issues raised in the Red Team Report, to include changes announced by the December 2020 supplementary guidance to better ensure family unity, access to counsel during *non-refoulement* interviews, and assessment of vulnerability.  In addition, in the near term, the Department will need to put in place robust COVID-19 mitigation measures to safeguard DHS personnel, the public, and the migrants themselves from the spread of the pandemic.

The Secretary has carefully considered whether these changes would sufficiently address his concerns regarding MPP to such an extent that he would support reimplementation of a modified MPP in lieu of termination.  But ultimately he has concluded that, while helpful, they fail to address the fundamental problems with MPP—which is that it puts an international barrier between migrants and their counsel and relevant immigration court where their proceedings are pending and it places their security and safety in the hands of a sovereign nation, over which the

Cuba AR_000291

United States does not exercise control.  Further, the reimplementation of MPP diverts resources from key priorities that designed to address the same policy goals more effectively and in a more humane way, including this Administration's landmark efforts to transform our asylum system and address the root causes of migration.

A third alternative still would be to attempt to do even more to address the humanitarian and other concerns associated with MPP, thus designing a programmatic use of the Section 235(b)(2)(C) authority that aggressively tackles the humanitarian concern and is more fully aligned with the Administration's broader vision for migration management.  It is doubtful that DHS *could* adequately address these problems, given Mexican territorial sovereignty.  At best, any such effort would require the provision of significant U.S. foreign assistance to counterparts operating in Mexico to assist with housing, transportation to and from court hearings, and other protections to address safety and security concerns.  Attempting to do so would divert enormous Department of State resources away from the Administration's signature policy goals—to address the root causes and develop regional solutions for enforcing against irregular migration while providing regional approaches to lawful pathways.  Meanwhile, the fundamental flaws with MPP remain.

After careful consideration, and for all the reasons laid out in his termination memo and this explanatory document, the Secretary has concluded that there are inherent problems with the program that no amount of resources can sufficiently fix, and others that cannot be sufficiently addressed without detracting from key Administration priorities and more enduring solutions.

## VI.    <u>Conclusion</u>

In sum, continuation of MPP—even in a significantly modified format—is inconsistent with the current policy approach of this Administration.  Rather than forcing individuals to return to Mexico to await court hearings, this Administration is pursuing a range of other policies and rulemaking efforts—including regional approaches to addressing the root causes of migration and a reform of the asylum system—to better achieve the key goals of securing the border, reducing migratory flows, timely and fairly adjudicating asylum claims, and reducing the asylum backlog.  Many of these efforts are currently underway and will bear fruit over time; the resources needed to implement MPP will detract from these efforts.

It is squarely within the authority of the Secretary of Homeland Security to decide to pursue the immigration policies and practices that he believes are most effective, and to decide not to exercise the discretion granted him by Congress in Section 235(b)(2)(C) of the INA to continue MPP.  The Secretary reserves the prerogative to exercise this discretionary authority if circumstances—and the factors that led to this conclusion—change.  Until such time, the Secretary has determined that MPP is incompatible with his goals for managing migratory flows at the border, and doing so in a humane way, consistent with the Administration's values.

38

**Appendix 1: Encounters by Detention, Fiscal Years 2013-2021**

| Fiscal Year | Total Encounters | Continuous detention | | Booked out prior to final outcome | | Never detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 287,535 | 114,673 | 40% | 76,776 | 27% | 96,086 | 33% |
| 2014 | 338,650 | 113,005 | 33% | 102,371 | 30% | 123,274 | 36% |
| 2015 | 296,856 | 105,425 | 36% | 82,221 | 28% | 109,210 | 37% |
| 2016 | 373,506 | 105,295 | 28% | 131,147 | 35% | 137,064 | 37% |
| 2017 | 292,102 | 73,809 | 25% | 106,405 | 36% | 111,888 | 38% |
| 2018 | 360,574 | 93,449 | 26% | 149,183 | 41% | 117,942 | 33% |
| 2019 | 762,912 | 100,700 | 13% | 246,099 | 32% | 416,113 | 55% |
| 2020 | 312,794 | 61,751 | 20% | 37,981 | 12% | 213,062 | 68% |
| 2021 | 665,158 | 27,402 | 4% | 62,744 | 9% | 575,012 | 86% |
| 2013-2019 | 2,712,135 | 706,356 | 26% | 894,202 | 33% | 1,111,577 | 41% |
| 2013-2021 | 3,690,087 | 795,509 | 22% | 994,927 | 27% | 1,899,651 | 51% |
| Non-MPP Cases | 991,012 | 323,425 | 33% | 251023 | 25% | 416,564 | 42% |

*Note: Non-MPP cases are defined as single adults and family units encountered between Jan. 25, 2019, and Jan. 20, 2021, and not enrolled in MPP and not expelled under Title 42.*

Source: Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020).

Cuba_AR_000294

| unique_1yr | |
|---|---|
| country_simple | Haiti |
| initial_agency | (All) |

Sum of count

Column Labels

| Row Labels | Interior/Other / Border | Maritime Land Border | Northern Land Border | SW Land Border | Grand Total |
|---|---|---|---|---|---|
| 2013 | 319 | 788 | 179 | 846 | 2,132 |
| 2014 | 338 | 1,061 | 124 | 468 | 1,991 |
| 2015 | 280 | 418 | 108 | 335 | 1,141 |
| 2016 | 269 | 189 | 81 | 6,286 | 6,825 |
| 2017 | 246 | 97 | 243 | 9,021 | 9,607 |
| 2018 | 246 | 90 | 173 | 305 | 814 |
| 2019 | 218 | 90 | 175 | 3,039 | 3,522 |
| 2020 | 282 | 125 | 72 | 4,431 | 4,910 |
| 2021 | 386 | 655 | 91 | 43,484 | 44,616 |
| 2022 | 262 | 1,836 | 157 | 48,697 | 50,952 |
| 2023 | 18 | 253 | 56 | 9,107 | 9,434 |
| Grand Total | 2,864 | 5,602 | 1,459 | 126,019 | 135,944 |

| Maritime Border | % yearly increase |
|---|---|
| | 39% |
| | 424% |
| | 180% |

| SW Land Border | % yearly increase |
|---|---|
| | 46% |
| | 881% |
| | 12% |

monthly average

| Maritime Border | %inc | SW Land Border | |
|---|---|---|---|
| 8 | | 253 | |
| 10 | 39% | 369 | 46% |
| 55 | 424% | 3,624 | 881% |
| 153 | 180% | 4,058 | 12% |
| 21 | -86% | 759 | -81% |

OIS Persist Data fy23m11

9753 in SWB May, 2022

Peek:

Cuba_AR_000295

USBP encounters of Venezuela nationals

| | | |
|---|---|---|
| 1,137 | 1-Oct | 1240 |
| 170 | 2-Oct | 1510 |
| 86 | 3-Oct | 1366 |
| | 4-Oct | 1260 |
| | 5-Oct | 1139 |
| | 6-Oct | 1174 |
| | 7-Oct | 1083 |
| | 8-Oct | 1006 |
| | 9-Oct | 1202 |
| | 10-Oct | 1224 |
| | 11-Oct | 1128 |
| | 12-Oct | 796 |
| | 13-Oct | 1256 |
| | 14-Oct | 1056 |
| | 15-Oct | 834 |
| | 16-Oct | 484 |
| | 17-Oct | 298 |
| | 18-Oct | 187 |
| | 19-Oct | 158 |
| | 20-Oct | 159 |
| | 21-Oct | 132 |
| | 22-Oct | 145 |
| | 23-Oct | 160 |
| | 24-Oct | 247 |
| | 25-Oct | 296 |
| | 26-Oct | 415 |
| | 27-Oct | 301 |
| | 28-Oct | 408 |
| | 29-Oct | 405 |
| | 30-Oct | 331 |
| | 31-Oct | 430 |
| | 1-Nov | 412 |
| | 2-Nov | 331 |
| | 3-Nov | 305 |
| | 4-Nov | 348 |
| | 5-Nov | 250 |
| | 6-Nov | 239 |
| | 7-Nov | 265 |
| | 8-Nov | 260 |
| | 9-Nov | 262 |
| | 10-Nov | 262 |
| | 11-Nov | 338 |
| | 12-Nov | 192 |

Average encounters 10/5 - 10/11/22

Average encounters 10/18 - 10/24

Average encounters 11/28 - 12/4

Cuba AR_000296

| Date | Value |
|------|-------|
| 13-Nov | 197 |
| 14-Nov | 158 |
| 15-Nov | 168 |
| 16-Nov | 490 |
| 17-Nov | 1074 |
| 18-Nov | 210 |
| 19-Nov | 90 |
| 20-Nov | 116 |
| 21-Nov | 84 |
| 22-Nov | 126 |
| 23-Nov | 80 |
| 24-Nov | 60 |
| 25-Nov | 51 |
| 26-Nov | 55 |
| 27-Nov | 75 |
| 28-Nov | 66 |
| 29-Nov | 83 |
| 30-Nov | 86 |
| 1-Dec | 102 |
| 2-Dec | 95 |
| 3-Dec | 79 |
| 4-Dec | 93 |

Oct persist

Nov-Dec Data pulled from UIP on 12/5/2022

Cuba_AR_000297

| unique_1yr | |
|---|---|
| country_simple | Unique Haiti |
| initial_agency | (All) |

| Sum of count | Column Labels | | | | |
|---|---|---|---|---|---|
| Row Labels | Interior/Other Al Border | Maritime Border | Northern Land Border | SW Land Border | Grand Total |
| 2013 | 319 | 788 | 179 | 846 | 2,132 |
| 2014 | 338 | 1,061 | 124 | 468 | 1,991 |
| 2015 | 280 | 418 | 108 | 335 | 1,141 |
| 2016 | 269 | 189 | 81 | 6,286 | 6,825 |
| 2017 | 246 | 97 | 243 | 9,021 | 9,607 |
| 2018 | 246 | 90 | 173 | 305 | 814 |
| 2019 | 218 | 90 | 175 | 3,039 | 3,522 |
| 2020 | 282 | 125 | 72 | 4,431 | 4,910 |
| 2021 | 386 | 655 | 91 | 43,484 | 44,616 |
| 2022 | 262 | 1,836 | 157 | 48,697 | 50,952 |
| 2023 | 18 | 253 | 56 | 9,107 | 9,434 |
| Grand Total | 2,864 | 5,602 | 1,459 | 126,019 | 135,944 |

3,242

OIS Persist November

Cuba_AR_000298

Figure 1: Annual USCG interdictions, FY 14 to FY22 by top 4 countries (Cuba, Haiti, DR, Mexico) and all others.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Cuba | 2,090 | 2,736 | 5,221 | 1,465 | 259 | 381 | 43 | 827 | 5,740 |
| Dominican | 269 | 257 | 570 | 519 | 492 | 920 | 1,201 | 744 | 1,804 |
| Haiti | 968 | 561 | 380 | 419 | 609 | 824 | 398 | 1,205 | 4,025 |
| Mexico | 33 | 11 | 3 | 50 | 123 | 160 | 343 | 612 | 676 |
| Other | 31 | 49 | 160 | 59 | 179 | 144 | 94 | 120 | 276 |
| Total | 3,391 | 3,614 | 6,334 | 2,512 | 1,662 | 2,429 | 2,079 | 3,508 | 12,521 |

Table sent from USCG

Cuba AR_000299

USBP encounters of Venezuela nationals

| Date | Value |
|---|---|
| 1-Oct | 1240 |
| 2-Oct | 1510 |
| 3-Oct | 1366 |
| 4-Oct | 1260 |
| 5-Oct | 1139 |
| 6-Oct | 1174 |
| 7-Oct | 1083 |
| 8-Oct | 1006 |
| 9-Oct | 1202 |
| 10-Oct | 1224 |
| 11-Oct | 1128 |
| 12-Oct | 796 |
| 13-Oct | 1256 |
| 14-Oct | 1056 |
| 15-Oct | 834 |
| 16-Oct | 484 |
| 17-Oct | 298 |
| 18-Oct | 187 |
| 19-Oct | 158 |
| 20-Oct | 159 |
| 21-Oct | 132 |
| 22-Oct | 145 |
| 23-Oct | 160 |
| 24-Oct | 247 |
| 25-Oct | 296 |
| 26-Oct | 415 |
| 27-Oct | 301 |
| 28-Oct | 408 |
| 29-Oct | 405 |
| 30-Oct | 331 |
| 31-Oct | 430 |
| 1-Nov | 412 |
| 2-Nov | 331 |
| 3-Nov | 305 |
| 4-Nov | 348 |
| 5-Nov | 250 |
| 6-Nov | 239 |
| 7-Nov | 265 |
| 8-Nov | 260 |
| 9-Nov | 262 |
| 10-Nov | 262 |
| 11-Nov | 338 |
| 12-Nov | 192 |

Average encounters 10/5 - 10/11/22    1,137
Average encounters 10/18 - 10/24    170
Average encounters 11/28 - 12/4    86

Cuba_AR_000300

| | |
|---|---|
| 13-Nov | 197 |
| 14-Nov | 158 |
| 15-Nov | 168 |
| 16-Nov | 490 |
| 17-Nov | 1074 |
| 18-Nov | 210 |
| 19-Nov | 90 |
| 20-Nov | 116 |
| 21-Nov | 84 |
| 22-Nov | 126 |
| 23-Nov | 80 |
| 24-Nov | 60 |
| 25-Nov | 51 |
| 26-Nov | 55 |
| 27-Nov | 75 |
| 28-Nov | 66 |
| 29-Nov | 83 |
| 30-Nov | 86 |
| 1-Dec | 102 |
| 2-Dec | 95 |
| 3-Dec | 79 |
| 4-Dec | 93 |

Oct persist

Nov-Dec Data pulled from UIP on 12/5/2022

Cuba AR_000301

Cuba_AR_000302



USBP Encounters at Southwest Border by Sector, FY 1960 - August 2022

| FY | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1960 | 732 | 3,023 | 1,839 | 3,630 | 1,024 | 5,515 | 3,371 | 1,255 | 633 | 21,022 |
| 1961 | 954 | 3,458 | 1,878 | 3,540 | 1,172 | 6,713 | 2,279 | 1,178 | 573 | 21,745 |
| 1962 | 1,431 | 3,250 | 1,426 | 3,304 | 1,274 | 5,569 | 3,091 | 1,247 | 511 | 21,103 |
| 1963 | 2,026 | 4,417 | 1,690 | 3,813 | 1,753 | 9,992 | 3,768 | 1,466 | 719 | 29,644 |
| 1964 | 3,146 | 4,489 | 2,640 | 4,486 | 2,168 | 9,173 | 4,521 | 1,200 | 696 | 32,519 |
| 1965 | 3,973 | 4,292 | 5,344 | 6,355 | 2,310 | 8,057 | 6,558 | 1,480 | 1,651 | 40,020 |
| 1966 | 6,552 | 6,845 | 6,916 | 10,119 | 3,658 | 8,706 | 13,362 | 2,392 | 4,050 | 62,640 |
| 1967 | 7,049 | 7,906 | 6,974 | 13,656 | 4,178 | 9,029 | 17,844 | 3,068 | 4,269 | 73,973 |
| 1968 | 8,834 | 9,576 | 8,358 | 19,408 | 5,715 | 10,093 | 24,116 | 4,537 | 6,004 | 96,641 |
| 1969 | 11,973 | 12,991 | 9,195 | 31,159 | 8,129 | 14,076 | 33,311 | 8,301 | 8,833 | 137,968 |
| 1970 | 16,770 | 18,711 | 12,028 | 43,640 | 11,569 | 20,708 | 50,663 | 14,222 | 13,469 | 201,780 |
| 1971 | 22,026 | 25,780 | 14,292 | 57,796 | 17,665 | 28,281 | 59,375 | 23,548 | 15,228 | 263,991 |
| 1972 | 20,269 | 31,110 | 15,327 | 78,168 | 21,781 | 29,338 | 73,115 | 32,272 | 19,946 | 321,326 |
| 1973 | 22,378 | 42,232 | 23,125 | 82,386 | 23,854 | 37,092 | 128,889 | 44,824 | 36,286 | 441,066 |
| 1974 | 23,291 | 44,098 | 26,143 | 112,432 | 30,061 | 38,668 | 196,981 | 50,108 | 49,824 | 571,606 |
| 1975 | 20,472 | 32,008 | 27,217 | 99,000 | 26,199 | 31,300 | 185,499 | 39,941 | 50,628 | 512,264 |
| 1976 | 19,846 | 32,988 | 32,327 | 114,886 | 24,665 | 38,839 | 266,709 | 34,641 | 42,598 | 607,499 |
| 1977 | 22,239 | 42,322 | 38,421 | 145,059 | 27,289 | 38,704 | 337,195 | 33,295 | 48,669 | 733,193 |
| 1978 | 20,829 | 54,098 | 42,118 | 174,010 | 36,627 | 45,201 | 325,557 | 34,991 | 56,010 | 789,441 |
| 1979 | 20,116 | 50,262 | 55,532 | 149,722 | 50,666 | 41,915 | 337,930 | 37,075 | 52,580 | 795,798 |
| 1980 | 15,602 | 50,762 | 57,009 | 127,488 | 39,167 | 35,012 | 285,984 | 33,668 | 45,862 | 690,554 |
| 1981 | 17,584 | 50,455 | 59,774 | 146,872 | 36,910 | 32,809 | 326,836 | 33,085 | 45,483 | 749,808 |
| 1982 | 20,268 | 48,753 | 55,440 | 152,882 | 40,385 | 32,533 | 314,979 | 32,344 | 48,236 | 745,820 |
| 1983 | 20,829 | 83,733 | 71,897 | 205,944 | 65,279 | 57,706 | 429,121 | 35,870 | 63,595 | 1,033,974 |
| 1984 | 22,196 | 87,058 | 68,563 | 212,652 | 87,059 | 66,860 | 407,828 | 46,283 | 59,777 | 1,058,276 |
| 1985 | 23,667 | 99,280 | 71,519 | 240,350 | 114,931 | 82,826 | 427,772 | 55,269 | 67,737 | 1,183,351 |
| 1986 | 23,796 | 123,952 | 95,186 | 312,892 | 143,685 | 121,783 | 629,656 | 71,675 | 93,219 | 1,615,844 |
| 1987 | 9,586 | 64,934 | 55,291 | 231,994 | 74,139 | 71,038 | 500,327 | 47,481 | 67,277 | 1,122,067 |
| 1988 | 6,209 | 59,403 | 41,179 | 182,566 | 69,912 | 60,294 | 431,592 | 48,683 | 42,723 | 942,561 |
| 1989 | 5,560 | 46,786 | 27,524 | 168,105 | 75,292 | 79,650 | 366,757 | 51,445 | 31,387 | 852,506 |
| 1990 | 7,180 | 41,373 | 28,708 | 223,219 | 89,052 | 97,018 | 473,323 | 53,061 | 36,387 | 1,049,321 |
| 1991 | 8,764 | 38,554 | 30,450 | 211,775 | 72,293 | 87,319 | 540,347 | 59,728 | 28,646 | 1,077,876 |
| 1992 | 13,819 | 33,414 | 29,852 | 248,642 | 72,449 | 85,889 | 565,581 | 71,036 | 24,892 | 1,145,574 |
| 1993 | 15,486 | 42,289 | 30,058 | 285,781 | 82,348 | 109,048 | 531,689 | 92,639 | 23,548 | 1,212,886 |
| 1994 | 13,494 | 50,036 | 27,654 | 79,688 | 73,142 | 124,251 | 450,152 | 139,473 | 21,211 | 979,101 |
| 1995 | 11,552 | 76,490 | 37,317 | 110,971 | 93,305 | 169,101 | 524,231 | 227,529 | 20,894 | 1,271,390 |
| 1996 | 13,214 | 121,137 | 66,873 | 145,929 | 131,841 | 210,553 | 483,815 | 305,348 | 28,310 | 1,507,020 |
| 1997 | 12,692 | 113,280 | 146,210 | 124,376 | 141,893 | 243,793 | 283,889 | 272,397 | 30,177 | 1,368,707 |
| 1998 | 14,509 | 131,058 | 226,695 | 125,035 | 103,433 | 204,257 | 248,092 | 387,406 | 76,195 | 1,516,680 |
| 1999 | 14,952 | 156,653 | 225,279 | 110,857 | 114,004 | 169,151 | 182,267 | 470,449 | 93,388 | 1,537,000 |
| 2000 | 13,689 | 157,178 | 238,126 | 115,696 | 108,973 | 133,243 | 151,681 | 616,346 | 108,747 | 1,643,679 |
| 2001 | 12,087 | 104,875 | 172,852 | 112,857 | 87,068 | 107,844 | 110,075 | 449,675 | 78,385 | 1,235,718 |

Cuba_AR_000303

| Year | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2002 | 11,392 | 66,985 | 108,273 | 94,154 | 82,095 | 89,927 | 100,681 | 333,648 | 42,654 | 929,809 |
| 2003 | 10,319 | 50,145 | 92,099 | 88,816 | 70,521 | 77,749 | 111,515 | 347,263 | 56,638 | 905,065 |
| 2004 | 10,530 | 53,794 | 74,467 | 104,399 | 74,706 | 92,947 | 138,608 | 491,771 | 98,060 | 1,139,282 |
| 2005 | 10,536 | 68,506 | 55,722 | 122,679 | 75,346 | 134,186 | 126,904 | 439,079 | 138,438 | 1,171,396 |
| 2006 | 7,520 | 42,636 | 61,465 | 122,256 | 74,840 | 110,528 | 142,104 | 392,074 | 118,549 | 1,071,972 |
| 2007 | 5,536 | 22,920 | 55,883 | 75,464 | 56,714 | 73,430 | 152,460 | 378,239 | 37,992 | 858,638 |
| 2008 | 5,391 | 20,761 | 40,961 | 30,312 | 43,658 | 75,473 | 162,390 | 317,696 | 8,363 | 705,005 |
| 2009 | 6,360 | 17,082 | 33,521 | 14,999 | 40,569 | 60,989 | 118,721 | 241,673 | 6,951 | 540,865 |
| 2010 | 5,288 | 14,694 | 32,562 | 12,251 | 35,287 | 59,766 | 68,565 | 212,202 | 7,116 | 447,731 |
| 2011 | 4,036 | 16,144 | 30,191 | 10,345 | 36,053 | 59,243 | 42,447 | 123,285 | 5,833 | 327,577 |
| 2012 | 3,964 | 21,720 | 23,916 | 9,678 | 44,872 | 97,762 | 28,461 | 120,000 | 6,500 | 356,873 |
| 2013 | 3684 | 23510 | 16306 | 11154 | 50749 | 154453 | 27496 | 120939 | 6106 | 414397 |
| 2014 | 4096 | 24255 | 14511 | 12339 | 44049 | 256392 | 29911 | 87915 | 5902 | 479370 |
| 2015 | 5031 | 19013 | 12820 | 14495 | 35888 | 147257 | 26290 | 63397 | 7142 | 331333 |
| 2016 | 6366 | 23078 | 19448 | 25634 | 36562 | 186830 | 31891 | 64891 | 14170 | 408870 |
| 2017 | 6002 | 13476 | 18633 | 25193 | 25460 | 137562 | 26086 | 38657 | 12847 | 303916 |
| 2018 | 8045 | 15833 | 29230 | 31561 | 32641 | 162262 | 38591 | 52172 | 26244 | 396579 |
| 2019 | 9637 | 57269 | 35138 | 182143 | 38378 | 339135 | 58049 | 63490 | 68269 | 851508 |
| 2020 | 8627 | 40342 | 27487 | 54396 | 51425 | 90203 | 53277 | 66074 | 8804 | 400635 |
| 2021 | 37266 | 259294 | 59231 | 193918 | 112241 | 549077 | 142459 | 191232 | 114488 | 1659206 |
| 2022* | 30684 | 428556 | 64221 | 258766 | 100495 | 440423 | 160312 | 230235 | 284078 | 1997770 |

Note: FY 2022 data limited to first 11 months of the fiscal year.

Source: FY 1960 - FY 2012 from US Border Patrol; FY 2013-FY2021 from OIS Persist Dataset.

Cuba AR_000304

Cuba AR_000305

Cuba AR_000306

Cuba_AR_000307

| | Apprehensions of EWIs: total | Apprehensions of EWIs: Mexican nationals | Mx% total |
|---|---|---|---|
| 1981 | 898,550 | 894,771 | 100% |
| 1982 | | | |
| 1983 | | | |
| 1984 | | | |
| 1985 | 1,300,691 | 1,291,734 | 99% |
| 1986 | | | |
| 1987 | | | |
| 1988 | | | |
| 1989 | | | |
| 1990 | 1,131,454 | 1,080,699 | 96% |
| 1991 | | | |
| 1992 | | | |
| 1993 | | | |
| 1994 | | | |
| 1995 | | | |
| 1996 | 1,620,033 | 1,586,492 | 98% |
| 1997 | | | |
| 1998 | | | |
| 1999 | | | |
| 2000 | 1781968 | 1732205 | 97% |
| 2001 | | | |
| 2002 | | | |
| 2003 | | | |
| 2004 | | | |
| 2005 | | | |

Historic Yearbooks

Cuba AR_000308

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Enco | 1,566,421 | 1,231,412 | 930,341 | 906,734 | 1,140,247 | 1,269,230 | 1,168,309 | 954,396 | 792,409 | 619,113 | 527,413 | 401,058 | 426,105 | 489,612 |
| CF Cases Completed (APSO) | | | | | | | | | | | | | | |
| CF Fo | 10,107 | 13,232 | 10,198 | 6,480 | 8,230 | 9,695 | 5,659 | 5,770 | 5,749 | 6,615 | 11,030 | 14,405 | 18,625 | 43,219 |
| | 9,320 | 12,381 | 9,253 | 5,554 | 7,436 | 8,414 | 3,467 | 3,328 | 3,413 | 3,798 | 7,208 | 9,996 | 12,218 | 32,811 |
| CF Nc | 133 | 171 | 222 | 168 | 159 | 193 | 760 | 1,213 | 1,086 | 1,439 | 1,925 | 1,722 | 2,313 | 4,281 |
| Close | 654 | 680 | 723 | 758 | 635 | 1,088 | 1,432 | 1,229 | 1,250 | 1,378 | 1,897 | 2,687 | 4,094 | 6,127 |
| | 92% | 94% | 91% | 86% | 90% | 87% | 61% | 58% | 59% | 57% | 65% | 69% | 66% | 76% |
| | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 1% | 1% | 1% | 2% | 4% | 4% | 9% |

Cuba AR_000310

Cuba_AR_000311

## Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims

| MOST CURRENT OUTCOMES | TOTAL | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022Q3 |
| **Total Encounters1** | 477,459 | 544,668 | 403,473 | 505,086 | 385,192 | 497,699 | 957,155 | 448,731 | 1,725,223 | 1,710,734 |
| **Processed for Expedited Removal** | | | | | | | | | | |
| No fear claim | 236,330 | 229,389 | 180,679 | 228,019 | 160,397 | 214,808 | 223,291 | 91,765 | 84,707 | 84,513 |
| No Fear Claim - confirmed removal or return | 197,061 | 174,897 | 130,485 | 130,208 | 89,147 | 114,822 | 121,450 | 66,035 | 15,055 | 29,389 |
| No Fear Claim - confirmed removal or return | 187,507 | 165,138 | 129,198 | 127,236 | 86,205 | 109,294 | 117,749 | 62,059 | 10,313 | 18,661 |
| Credible Fear Claims (CBP CF disposition and/or has APSO cases) | 38,981 | 54,230 | 50,043 | 97,575 | 71,121 | 99,825 | 101,734 | 25,705 | 69,635 | 55,119 |
| | 8% | 10% | 12% | 19% | 18% | 20% | 11% | 6% | 4% | 3% |
| | 16% | 24% | 28% | 43% | 44% | 46% | 46% | 28% | 82% | 65% |
| *Credible Fear Claims (APSO cases Only)* | 36,026 | 48,670 | 46,394 | 92,709 | 68,711 | 95,660 | 98,279 | 23,955 | 48,410 | 29,139 |
| Positive fear determinations | 30,800 | 34,997 | 33,904 | 73,564 | 53,509 | 74,531 | 70,967 | 8,494 | 33,534 | 17,047 |
| Negative fear determinations | 2,641 | 9,086 | 7,517 | 9,388 | 7,301 | 9,134 | 17,704 | 12,410 | 13,216 | 9,639 |
| Negative fear determinations appealed to EOIR | 2,380 | 7,240 | 6,235 | 7,593 | 5,868 | 6,744 | 14,307 | 9,754 | 12,778 | 9,056 |
| Negative fear determinations vacated by EOIR | 225 | 1,258 | 1,227 | 1,995 | 1,437 | 1,273 | 3,866 | 3,172 | 3,492 | 2,113 |
| Negative fear determinations upheld by EOIR | 2,155 | 5,982 | 5,008 | 5,598 | 4,431 | 5,471 | 10,441 | 6,582 | 9,286 | 6,943 |
| Case closures | 2,585 | 4,587 | 4,973 | 9,757 | 7,001 | 11,995 | 9,608 | 3,051 | 1,660 | 2,453 |
| Case closures referred to EOIR | 965 | 1,543 | 1,810 | 4,639 | 3,839 | 6,585 | 3,310 | 950 | 821 | 780 |
| Case closures not referred to EOIR | 1,620 | 3,044 | 3,163 | 5,118 | 4,062 | 5,410 | 6,298 | 2,101 | 839 | 1,673 |
| Non-Referrals to EOIR | 6,991 | 16,432 | 13,102 | 17,377 | 12,346 | 17,436 | 23,591 | 13,089 | 31,788 | 35,179 |
| Executed Removal Orders | 4,222 | 10,609 | 8,977 | 11,889 | 9,627 | 12,008 | 18,834 | 8,690 | 6,048 | 2,290 |

Total Referrals to EOIR (Includes closed cases, vacated negative decisions and positive decisions)

| | 31,990 | 37,798 | 36,941 | 80,198 | 58,785 | 82,389 | 78,143 | 12,616 | 37,847 | 19,940 |
|---|---|---|---|---|---|---|---|---|---|---|
| **EOIR cases started** | 31,667 | 37,367 | 36,611 | 78,515 | 56,965 | 77,406 | 71,706 | 11,772 | 30,723 | 13,362 |
| Still in EOIR Proceedings | 12,205 | 12,966 | 12,573 | 30,216 | 26,329 | 38,995 | 37,686 | 8,080 | 25,047 | 10,557 |
| EOIR Cases completed | 19,308 | 24,310 | 23,978 | 48,040 | 30,340 | 37,153 | 31,523 | 3,235 | 1,972 | 552 |
| Asylum Granted or other EOIR Relief from Removal | 5,643 | 7,181 | 7,590 | 13,049 | 8,887 | 12,535 | 13,174 | 1,522 | 498 | 78 |
| Grants of relief + other favorable-to-noncitizen judgements appealed | 273 | 515 | 532 | 961 | 686 | 572 | 466 | 90 | 15 | 3 |
| Removal Orders | 13,755 | 17,129 | 16,388 | 34,991 | 21,453 | 24,618 | 18,349 | 1,713 | 1,474 | 474 |
| EOIR Removal Orders + other favorable-to-OPLA judgements app | 2,635 | 4,459 | 5,610 | 12,061 | 6,376 | 5,483 | 3,651 | 509 | 166 | 25 |
| | | | | | | | | | | |
| Executed Removal Orders | 3,982 | 5,443 | 5,003 | 7,158 | 6,007 | 7,207 | 10,705 | 729 | 303 | 110 |
| Total appeals to BIA (sum of rows 25 and 27) | 2,908 | 4,974 | 6,142 | 13,922 | 7,062 | 6,055 | 4,117 | 599 | 181 | 28 |

Cuba AR_000312

Cuba AR_000313

Cuba AR_000314

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Enco | 1,566,421 | 1,231,412 | 930,341 | 906,734 | 1,140,247 | 1,269,230 | 1,168,309 | 954,396 | 792,409 | 619,113 | 527,413 | 401,058 | 426,105 | 489,612 |
| CF Cases Completed (APSO) | | | | | | | | | | | | | | |
| CF Fo | 10,107 | 13,232 | 10,198 | 6,480 | 8,230 | 9,695 | 5,659 | 5,770 | 5,749 | 6,615 | 11,030 | 14,405 | 18,625 | 43,219 |
| CF Nc | 9,320 | 12,381 | 9,253 | 5,554 | 7,436 | 8,414 | 3,467 | 3,328 | 3,413 | 3,798 | 7,208 | 9,996 | 12,218 | 32,811 |
| Close | 133 | 171 | 222 | 168 | 159 | 193 | 760 | 1,213 | 1,086 | 1,439 | 1,925 | 1,722 | 2,313 | 4,281 |
| | 654 | 680 | 723 | 758 | 635 | 1,088 | 1,432 | 1,229 | 1,250 | 1,378 | 1,897 | 2,687 | 4,094 | 6,127 |
| | 92% | 94% | 91% | 86% | 90% | 87% | 61% | 58% | 59% | 57% | 65% | 69% | 66% | 76% |
| | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 1% | 1% | 1% | 2% | 4% | 4% | 9% |

Cuba AR_000315

Cuba_AR_000316

# Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims

|  | TOTAL | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **MOST CURRENT OUTCOMES** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **Total Encounters1** | 477,459 | 544,668 | 403,473 | 505,086 | 385,192 | 497,699 | 957,155 | 448,731 |
| **Processed for Expedited Removal** | 236,330 | 229,389 | 180,679 | 228,019 | 160,397 | 214,808 | 223,291 | 91,765 |
| No fear claim | 197,601 | 174,897 | 130,485 | 130,298 | 89,147 | 114,822 | 121,450 | 66,035 |
| No Fear Claim - confirmed removal or return | 187,507 | 165,138 | 129,198 | 127,236 | 86,205 | 109,294 | 117,749 | 62,059 |
| Credible Fear Claims (CBP CF disposition and/or has APSO cases) | 38,981 | 54,230 | 50,043 | 97,575 | 71,121 | 99,825 | 101,734 | 25,705 |
|  | 8% | 10% | 12% | 19% | 18% | 20% | 11% | 6% |
|  | 16% | 24% | 28% | 43% | 44% | 46% | 46% | 28% |
| *Credible Fear Claims (APSO cases Only)* | 36,026 | 48,670 | 46,394 | 92,709 | 68,711 | 95,660 | 98,279 | 23,955 |
| Positive fear determinations | 30,800 | 34,997 | 33,904 | 73,564 | 53,509 | 74,531 | 70,967 | 8,494 |
| Negative fear determinations | 2,641 | 9,086 | 7,517 | 9,388 | 7,301 | 9,134 | 17,704 | 12,410 |
| Negative fear determinations appealed to EOIR | 2,389 | 7,240 | 6,235 | 7,593 | 5,868 | 6,744 | 14,307 | 9,754 |
| Negative fear determinations vacated by EOIR | 225 | 1,258 | 1,227 | 1,995 | 1,437 | 1,273 | 3,866 | 3,172 |
| Negative fear determinations upheld by EOIR | 2,155 | 5,082 | 5,008 | 5,598 | 4,431 | 5,471 | 10,441 | 6,582 |
| Case closures | 2,585 | 4,587 | 4,973 | 9,757 | 7,001 | 11,995 | 9,608 | 3,051 |
| Case closures referred to EOIR | 965 | 1,543 | 1,810 | 4,639 | 3,839 | 6,885 | 3,310 | 950 |
| Case closures not referred to EOIR | 1,620 | 3,044 | 3,163 | 5,118 | 4,062 | 5,410 | 6,298 | 2,101 |
| Non-Referrals to EOIR | 6,991 | 16,432 | 13,102 | 17,377 | 12,336 | 17,436 | 23,591 | 13,089 |
| Executed Removal Orders | 4,222 | 10,609 | 8,977 | 11,889 | 9,627 | 12,008 | 18,834 | 8,690 |

Cuba_AR_000317

Total Referrals to EOIR (Includes closed cases, vacated negative decisions and positive decisions)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 31,990 | 37,798 | 36,941 | 80,198 | 58,785 | 82,389 | 78,143 | 12,616 |
| EOIR cases started | 31,667 | 37,367 | 36,611 | 78,515 | 56,065 | 77,406 | 71,706 | 11,772 |
| Still in EOIR Proceedings | 12,205 | 12,966 | 12,573 | 30,216 | 26,329 | 38,995 | 37,686 | 8,080 |
| EOIR Cases completed | 19,398 | 24,310 | 23,978 | 48,040 | 30,340 | 37,153 | 31,523 | 3,235 |
| Asylum Granted or other EOIR Relief from Removal | 5,643 | 7,181 | 7,590 | 13,049 | 8,887 | 12,535 | 13,174 | 1,522 |
| Grants of relief + other favorable-to-noncitizen judgements appealed to BIA | 273 | 515 | 532 | 961 | 686 | 572 | 466 | 90 |
| Removal Orders | 13,755 | 17,129 | 16,388 | 34,991 | 21,453 | 24,618 | 18,349 | 1,713 |
| EOIR Removal Orders + other favorable-to-OPLA judgements appealed to BIA | 2,635 | 4,459 | 5,610 | 12,061 | 6,376 | 5,483 | 3,651 | 509 |

Executed Removal Orders

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3,082 | 5,443 | 5,003 | 7,158 | 6,007 | 7,207 | 10,705 | 729 |
| Total appeals to BIA (sum of rows 25 and 27) | 2,908 | 4,974 | 6,142 | 13,922 | 7,062 | 6,055 | 4,117 | 599 |

Cuba_AR_000318

| | 2021 | 2022Q3 |
|---|---|---|
| | **1,725,223** | **1,710,734** |
| | 84,707 | 84,513 |
| | 15,055 | 29,389 |
| | 10,313 | 18,661 |
| | 69,635 | 55,119 |
| | 4% | 3% |
| | 82% | 65% |
| | 48,410 | 29,139 |
| | 33,534 | 17,047 |
| | 13,216 | 9,639 |
| | 12,778 | 9,056 |
| | 3,492 | 2,113 |
| | 9,286 | 6,943 |
| | 1,660 | 2,453 |
| | 821 | 780 |
| | 839 | 1,673 |

| 31,788 | 35,179 |
|---|---|
| 6,048 | 2,290 |

Cuba AR_000319



Cuba_AR_000320

| unique_1yr | |
|---|---|
| country_simple | Haiti |
| initial_agency | (All) |

**Sum of count** — Column Labels

| Row Labels | Interior | Maritime Border | Northern Land Border | SW Land Border | Grand Total |
|---|---|---|---|---|---|
| 2013 | 319 | 788 | 179 | 846 | 2,132 |
| 2014 | 338 | 1,061 | 124 | 468 | 1,991 |
| 2015 | 280 | 418 | 108 | 335 | 1,141 |
| 2016 | 269 | 189 | 81 | 6,286 | 6,825 |
| 2017 | 246 | 97 | 243 | 9,021 | 9,607 |
| 2018 | 246 | 90 | 173 | 305 | 814 |
| 2019 | 218 | 90 | 175 | 3,039 | 3,522 |
| 2020 | 282 | 125 | 72 | 4,431 | 4,910 |
| 2021 | 386 | 655 | 91 | 43,484 | 44,616 |
| 2022 | 262 | 1,836 | 157 | 48,697 | 50,952 |
| 2023 | 18 | 253 | 56 | 9,107 | 9,434 |
| Grand Total | 2,864 | 5,602 | 1,459 | 126,019 | 135,944 |

| Maritime Border % yearly increase | SW Land Border % yearly increase |
|---|---|
| 39% | 46% |
| 424% | 881% |
| 180% | 12% |

monthly average

| Maritime Border | %inc | SW Land Border | %inc |
|---|---|---|---|
| 8 | | 253 | |
| 10 | 39% | 369 | 46% |
| 55 | 424% | 3,624 | 881% |
| 153 | 180% | 4,058 | 12% |
| 21 | -86% | 759 | -81% |

OIS Persist Data fy23m11

9753 in SWB May, 2022

Peak:

Cuba_AR_000321

| unique_1yr | Unique |
| --- | --- |
| country_simple | Haiti |
| initial_agency | USBP |

| Sum of count | Column Labels | | | |
| --- | --- | --- | --- | --- |
| Row Labels | Maritime Border | Northern Land Border | SW Land Border | Grand Total |
| 2013 | 708 | 71 | 2 | 781 |
| 2014 | 1,012 | 26 | 2 | 1,040 |
| 2015 | 370 | 5 | 2 | 377 |
| 2016 | 160 | 4 | 3 | 167 |
| 2017 | 76 | 27 | 54 | 157 |
| 2018 | 72 | 78 | 12 | 162 |
| 2019 | 64 | 126 | 2,038 | 2,228 |
| 2020 | 116 | 18 | 4,298 | 4,432 |
| 2021 | 593 | 26 | 42,135 | 42,754 |
| 2022 | 1,788 | 8 | 27,579 | 29,375 |
| 2023 | 248 | 42 | 139 | 429 |
| Grand Total | 5,207 | 431 | 76,264 | 81,902 |

| % yearly increase | | |
| --- | --- | --- |
| Maritime Bordr | SW Land Border | % yearly increase |
| 81% | 99% | |
| 411% | 865% | |
| 202% | -31% | |

monthly average

| Maritime Border | %Inc | SW Land Border | %Inc |
| --- | --- | --- | --- |
| 11 | | 186 | |
| 2 | -86% | 369 | 99% |
| 2 | 44% | 3,563 | 865% |
| 1 | -69% | 2,448 | -31% |
| 4 | 425% | 36 | -99% |

OIS Persist Data fy23m11

PERCENT OF ALL UNIQUE ENCOUNTERS THAT ARE HAITIAN

sw cbp

| app_region | SW Land Border |
| --- | --- |
| unique_1yr | Unique |

| Sum of count | Column Labels | | | |
| --- | --- | --- | --- | --- |
| Row Labels | 2021 | 2022 | 2023 | Grand Total |
| Brazil | 4.87% | 2.95% | 0.32% | 3.31% |
| Chile | 0.55% | 0.38% | 0.22% | 0.42% |
| Colombia | 0.49% | 7.03% | 8.30% | 4.91% |
| Cuba | 2.78% | 12.27% | 16.50% | 9.48% |
| Ecuador | 5.36% | 1.28% | 4.87% | 3.12% |
| El Salvador | 6.02% | 3.71% | 2.13% | 4.33% |
| Guatemala | 17.48% | 9.19% | 5.83% | 11.67% |
| Haiti | 3.86% | 2.80% | 2.39% | 3.12% |

SE Coastal USBP

| app_region | Maritime Border |
| --- | --- |
| unique_1yr | Unique |
| initial_age | USBP |

| Sum of cou | Column Labels | | | |
| --- | --- | --- | --- | --- |
| Row Labels | 2021 | 2022 | 2023 | Grand Total |
| Brazil | 1.04% | 0.14% | 0.12% | 0.31% |
| Chile | 0.05% | 0.07% | 0.04% | 0.06% |
| Colombia | 1.04% | 0.33% | 0.12% | 0.42% |
| Cuba | 12.15% | 46.38% | 78.63% | 47.66% |
| Ecuador | 0.47% | 0.16% | 0.00% | 0.18% |
| El Salvador | 1.93% | 0.56% | 0.53% | 0.81% |
| Guatemal | 6.31% | 1.57% | 0.57% | 2.23% |

Cuba_AR_000322

| | | | | |
|---|---|---|---|---|
| Honduras | 19.87% | 8.47% | 5.18% | 12.04% |
| India | 0.22% | 0.84% | 0.86% | 0.63% |
| Mexico | 28.04% | 22.80% | 18.30% | 24.09% |
| Nicaragua | 4.20% | 9.04% | 14.30% | 7.98% |
| Other | 1.08% | 3.97% | 6.56% | 3.27% |
| Peru | 0.22% | 2.88% | 4.57% | 2.15% |
| Romania | 0.36% | 0.34% | 0.10% | 0.32% |
| Russia | 0.35% | 1.22% | 2.45% | 1.07% |
| Ukraine | 0.06% | 0.16% | 0.01% | 0.10% |
| Venezuela | 4.20% | 10.68% | 7.11% | 8.01% |
| Grand Total | 100.00% | 100.00% | 100.00% | 100.00% |

| | | | | |
|---|---|---|---|---|
| Haiti | 30.92% | 31.21% | 10.17% | 26.07% |
| Honduras | 7.56% | 2.34% | 1.39% | 3.10% |
| India | 0.05% | 0.12% | 0.12% | 0.11% |
| Mexico | 12.25% | 3.21% | 2.58% | 4.78% |
| Nicaragua | 0.63% | 0.07% | 0.08% | 0.18% |
| Other | 24.61% | 10.98% | 5.62% | 12.28% |
| Peru | 0.21% | 0.00% | 0.00% | 0.04% |
| Romania | 0.36% | 0.16% | 0.00% | 0.16% |
| Russia | 0.00% | 0.21% | 0.00% | 0.12% |
| Ukraine | 0.00% | 0.02% | 0.00% | 0.01% |
| Venezuela | 0.42% | 2.48% | 0.00% | 1.49% |
| Grand Total | 100.00% | 100.00% | 100.00% | 100.00% |

Cuba AR_000323

Cuba_AR_000324

Figure 1: Annual USCG interdictions, FY 14 to FY22  by top 4 countries (Cuba, Haiti, DR, Mexico) and all others.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Cuba | 2,090 | 2,736 | 5,221 | 1,465 | 259 | 381 | 43 | 827 | 5,740 |
| Dominican | 269 | 257 | 570 | 519 | 492 | 920 | 1,201 | 744 | 1,804 |
| Haiti | 968 | 561 | 380 | 419 | 609 | 824 | 398 | 1,205 | 4,025 |
| Mexico | 33 | 11 | 3 | 50 | 123 | 160 | 343 | 612 | 676 |
| Other | 31 | 49 | 160 | 59 | 179 | 144 | 94 | 120 | 276 |
| Total | 3,391 | 3,614 | 6,334 | 2,512 | 1,662 | 2,429 | 2,079 | 3,508 | 12,521 |

Table sent from USCG

| 22 increases over 21 | 21 increases over 20 |
|---|---|
| 234% | 203% |

Cuba AR_000325

| unique_1yr | Unique |
| country_simple | Haiti |
| initial_agency | USBP |

**Sum of count** — Column Labels

| Row Labels | Maritime Border | Northern Land Border | SW Land Border | Grand Total |
|---|---|---|---|---|
| 2013 | 708 | 71 | 2 | 781 |
| 2014 | 1,012 | 26 | 2 | 1,040 |
| 2015 | 370 | 5 | 2 | 377 |
| 2016 | 160 | 4 | 3 | 167 |
| 2017 | 76 | 27 | 54 | 157 |
| 2018 | 72 | 78 | 12 | 162 |
| 2019 | 64 | 126 | 2,038 | 2,228 |
| 2020 | 116 | 18 | 4,298 | 4,432 |
| 2021 | 593 | 26 | 42,135 | 42,754 |
| 2022 | 1,788 | 8 | 27,579 | 29,375 |
| 2023 | 248 | 42 | 139 | 429 |
| Grand Total | 5,207 | 431 | 76,264 | 81,902 |

% yearly increase

| | Maritime Border % yearly increase | SW Land Border % yearly increase |
|---|---|---|
| | 81% | 99% |
| | 411% | 865% |
| | 202% | -31% |

monthly average

| | Maritime Border | SW Land Border | %Inc | %Inc |
|---|---|---|---|---|
| | 11 | 186 | | |
| | 2 | 369 | -86% | 99% |
| | 2 | 3,563 | 44% | 865% |
| | 1 | 2,448 | -69% | -31% |
| | 4 | 36 | 425% | -99% |

OIS Persist Data fy23m11

PERCENT OF ALL UNIQUE ENCOUNTERS THAT ARE HAITIAN

sw cbp
app_region  SW Land Border
unique_1yr  Unique

**Sum of count** — Column Labels

| Row Labels | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|
| Brazil | 4.87% | 2.95% | 0.32% | 3.31% |
| Chile | 0.55% | 0.38% | 0.22% | 0.42% |
| Colombia | 0.49% | 7.03% | 8.30% | 4.91% |
| Cuba | 2.78% | 12.27% | 16.50% | 9.48% |
| Ecuador | 5.36% | 1.28% | 4.87% | 3.12% |
| El Salvador | 6.02% | 3.71% | 2.13% | 4.33% |
| Guatemala | 17.48% | 9.19% | 5.83% | 11.67% |
| Haiti | 3.86% | 2.80% | 2.39% | 3.12% |

SE Coastal USBP
app_region  Maritime Border
unique_1y  Unique
initial_age  USBP

**Sum of cou** — Column Labels

| Row Labels | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|
| Brazil | 1.04% | 0.14% | 0.12% | 0.31% |
| Chile | 0.05% | 0.07% | 0.04% | 0.06% |
| Colombia | 1.04% | 0.33% | 0.12% | 0.42% |
| Cuba | 12.15% | 46.38% | 78.63% | 47.66% |
| Ecuador | 0.47% | 0.16% | 0.00% | 0.18% |
| El Salvador | 1.93% | 0.56% | 0.53% | 0.81% |
| Guatemal | 6.31% | 1.57% | 0.57% | 2.23% |

Cuba AR_000326

| | | | | |
|---|---|---|---|---|
| Honduras | 19.87% | 8.47% | 5.18% | 12.04% |
| India | 0.22% | 0.84% | 0.86% | 0.63% |
| Mexico | 28.04% | 22.80% | 18.30% | 24.09% |
| Nicaragua | 4.20% | 9.04% | 14.30% | 7.98% |
| Other | 1.08% | 3.97% | 6.56% | 3.27% |
| Peru | 0.22% | 2.88% | 4.57% | 2.15% |
| Romania | 0.36% | 0.34% | 0.10% | 0.32% |
| Russia | 0.35% | 1.22% | 2.45% | 1.07% |
| Ukraine | 0.06% | 0.16% | 0.01% | 0.10% |
| Venezuela | 4.20% | 10.68% | 7.11% | 8.01% |
| Grand Total | 100.00% | 100.00% | 100.00% | 100.00% |

| | | | | |
|---|---|---|---|---|
| Haiti | 30.92% | 31.21% | 10.17% | 26.07% |
| Honduras | 7.56% | 2.34% | 1.39% | 3.10% |
| India | 0.05% | 0.12% | 0.12% | 0.11% |
| Mexico | 12.25% | 3.21% | 2.58% | 4.78% |
| Nicaragua | 0.63% | 0.07% | 0.08% | 0.18% |
| Other | 24.61% | 10.98% | 5.62% | 12.28% |
| Peru | 0.21% | 0.00% | 0.00% | 0.04% |
| Romania | 0.36% | 0.16% | 0.00% | 0.16% |
| Russia | 0.00% | 0.21% | 0.00% | 0.12% |
| Ukraine | 0.00% | 0.02% | 0.00% | 0.01% |
| Venezuela | 0.42% | 2.48% | 0.00% | 1.49% |
| Grand Total | 100.00% | 100.00% | 100.00% | 100.00% |

Cuba AR_000327

Cuba_AR_000328

Data on monthly visa issuances downloaded from this website, http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/CuadrosBOLETIN?Anual=2022&Secc=2

Table is OIS estimate of stock based on accumulated flows.

| Country | Stock |
| --- | --- |
| Col | 1691 |
| Venez | 11350 |
| Peru | 233 |
| Cuba | 28971 |
| Haiti | 55429 |
| Guat | 4401 |
| Hond | 20317 |
| ElSal | 6592 |
| Nica | 9957 |
| Other | 20893 |

Cuba AR_000329

Cuba_AR_000330

Figure 1: Annual USCG interdictions, FY 14 to FY22 by top 4 countries (Cuba, Haiti, DR, Mexico) and all others.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | | 22 increases over 21 | 21 increases over 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cuba | 2,090 | 2,736 | 5,221 | 1,465 | 259 | 381 | 43 | 827 | 5,740 | | 234% | 203% |
| Dominican | 269 | 257 | 570 | 519 | 492 | 920 | 1,201 | 744 | 1,804 | | | |
| Haiti | 968 | 561 | 380 | 419 | 609 | 824 | 398 | 1,205 | 4,025 | | | |
| Mexico | 33 | 11 | 3 | 50 | 123 | 160 | 343 | 612 | 676 | | | |
| Other | 31 | 49 | 160 | 59 | 179 | 144 | 94 | 120 | 276 | | | |
| Total | 3,391 | 3,614 | 6,334 | 2,512 | 1,662 | 2,429 | 2,079 | 3,508 | 12,521 | | | |

Table sent from USCG

Cuba_AR_000331

unique_1yr | Unique
country_simple | Haiti
initial_agency | USBP

**Sum of count**

| Row Labels | Maritime Border | Northern Land Border | SW Land Border | Grand Total |
|---|---|---|---|---|
| 2013 | 708 | 71 | 2 | 781 |
| 2014 | 1,012 | 26 | 2 | 1,040 |
| 2015 | 370 | 5 | 2 | 377 |
| 2016 | 160 | 4 | 3 | 167 |
| 2017 | 76 | 27 | 54 | 157 |
| 2018 | 72 | 78 | 12 | 162 |
| 2019 | 64 | 126 | 2,038 | 2,228 |
| 2020 | 116 | 18 | 4,298 | 4,432 |
| 2021 | 593 | 26 | 42,135 | 42,754 |
| 2022 | 1,788 | 8 | 27,579 | 29,375 |
| 2023 | 248 | 42 | 139 | 429 |
| Grand Total | 5,207 | 431 | 76,264 | 81,902 |

**% yearly increase**

| Maritime Border % yearly increase | SW Land Border % yearly increase |
|---|---|
| 81% | 99% |
| 411% | 865% |
| 202% | -31% |

**monthly average**

| | Maritime Border | %Inc | SW Land Border | | |
|---|---|---|---|---|---|
| | 11 | | 186 | | |
| | 2 | -86% | 369 | | 99% |
| | 2 | 44% | 3,563 | | 865% |
| | 1 | -69% | 2,448 | | -31% |
| | 4 | 425% | 36 | | -99% |

OIS Persist Data fy23m11

PERCENT OF ALL UNIQUE ENCOUNTERS THAT ARE HAITIAN

sw cbp
app_region | SW Land Border
unique_1yr | Unique

**Sum of count**

| Row Labels | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|
| Brazil | 4.87% | 2.95% | 0.32% | 3.31% |
| Chile | 0.55% | 0.38% | 0.22% | 0.42% |
| Colombia | 0.49% | 7.03% | 8.30% | 4.91% |
| Cuba | 2.78% | 12.27% | 16.50% | 9.48% |
| Ecuador | 5.36% | 1.28% | 4.87% | 3.12% |
| El Salvador | 6.02% | 3.71% | 2.13% | 4.33% |
| Guatemala | 17.48% | 9.19% | 5.83% | 11.67% |
| Haiti | 3.86% | 2.80% | 2.39% | 3.12% |

SE Coastal USBP
app_region | Maritime Border
unique_1y Unique
initial_age USBP

**Sum of cou**

| Row Labels | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|
| Brazil | 1.04% | 0.14% | 0.12% | 0.31% |
| Chile | 0.05% | 0.07% | 0.04% | 0.06% |
| Colombia | 1.04% | 0.33% | 0.12% | 0.42% |
| Cuba | 12.15% | 46.38% | 78.63% | 47.66% |
| Ecuador | 0.47% | 0.16% | 0.00% | 0.18% |
| El Salvador | 1.93% | 0.56% | 0.53% | 0.81% |
| Guatemal | 6.31% | 1.57% | 0.57% | 2.23% |

Cuba AR_000332

| | | | | |
|---|---|---|---|---|
| Honduras | 19.87% | 8.47% | 5.18% | 12.04% |
| India | 0.22% | 0.84% | 0.86% | 0.63% |
| Mexico | 28.04% | 22.80% | 18.30% | 24.09% |
| Nicaragua | 4.20% | 9.04% | 14.30% | 7.98% |
| Other | 1.08% | 3.97% | 6.56% | 3.27% |
| Peru | 0.22% | 2.88% | 4.57% | 2.15% |
| Romania | 0.36% | 0.34% | 0.10% | 0.32% |
| Russia | 0.35% | 1.22% | 2.45% | 1.07% |
| Ukraine | 0.06% | 0.16% | 0.01% | 0.10% |
| Venezuela | 4.20% | 10.68% | 7.11% | 8.01% |
| **Grand Total** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |

| | | | | |
|---|---|---|---|---|
| Haiti | 30.92% | 31.21% | 10.17% | 26.07% |
| Honduras | 7.56% | 2.34% | 1.39% | 3.10% |
| India | 0.05% | 0.12% | 0.12% | 0.11% |
| Mexico | 12.25% | 3.21% | 2.58% | 4.78% |
| Nicaragua | 0.63% | 0.07% | 0.08% | 0.18% |
| Other | 24.61% | 10.98% | 5.62% | 12.28% |
| Peru | 0.21% | 0.00% | 0.00% | 0.04% |
| Romania | 0.36% | 0.16% | 0.00% | 0.16% |
| Russia | 0.00% | 0.21% | 0.00% | 0.12% |
| Ukraine | 0.00% | 0.02% | 0.00% | 0.01% |
| Venezuela | 0.42% | 2.48% | 0.00% | 1.49% |
| **Grand Total** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |

Cuba_AR_000333

Cuba_AR_000334

| app_region | SW Land Border |
| --- | --- |
| unique_1yr | Unique |
| country_simple | (All) |
| initial_agency | USBP |

**Sum of count**
**Column Labels**

| Row Labels | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Big Bend, TX | 3,226 | 3,537 | 4,501 | 5,711 | 5,353 | 7,163 | 8,726 | 6,529 | 24,098 | 21,433 | 1,958 | 92,235 |
| Del Rio, TX | 20,176 | 21,858 | 16,659 | 20,506 | 12,024 | 14,518 | 54,312 | 28,084 | 186,304 | 391,916 | 77,055 | 843,412 |
| El Centro, CA | 7,762 | 7,512 | 6,974 | 11,973 | 12,033 | 19,370 | 24,916 | 13,538 | 26,088 | 47,319 | 11,712 | 189,197 |
| El Paso, TX | 8,890 | 9,866 | 12,098 | 22,257 | 22,653 | 29,509 | 174,792 | 33,614 | 91,316 | 213,059 | 92,969 | 711,023 |
| Laredo, TX | 40,737 | 35,591 | 28,817 | 29,626 | 20,199 | 26,352 | 30,128 | 32,037 | 52,310 | 49,106 | 5,798 | 350,701 |
| Rio Grande Valley, TX | 126,113 | 215,544 | 120,953 | 162,061 | 120,839 | 146,305 | 318,202 | 61,733 | 421,448 | 374,266 | 46,896 | 2,114,360 |
| San Diego, CA | 14,200 | 15,466 | 14,025 | 19,695 | 17,378 | 26,366 | 43,829 | 28,495 | 69,345 | 102,589 | 23,767 | 375,155 |
| Tucson, AZ | 85,324 | 64,078 | 48,823 | 51,095 | 31,102 | 42,850 | 53,367 | 47,104 | 106,948 | 142,347 | 30,596 | 703,634 |
| Yuma, AZ | 4,392 | 4,543 | 5,971 | 13,084 | 12,019 | 24,984 | 65,572 | 6,340 | 100,833 | 287,701 | 46,764 | 572,203 |
| Grand Total | 310,820 | 377,995 | 258,821 | 336,008 | 253,600 | 337,417 | 773,844 | 257,474 | 1,078,690 | 1,629,736 | 337,515 | 5,951,920 |
| El Paso + Yuma | 13,282 | 14,409 | 18,069 | 35,341 | 34,672 | 54,493 | 240,364 | 39,954 | 192,149 | 500,760 | 139,733 | 1,283,226 |

2023 Total 7,561,533

FY14-19 average: 66,225

FY22 inc from FY21: 161%
FY22 inc from FY14-19: 656%

fold: 7.561533

| app_region | SW Land Border |
| --- | --- |
| unique_1yr | Unique |
| country_simple | Haiti |
| initial_agency | USBP |

**Sum of count**
**Column Labels**

| Row Labels | 2021 | 2022 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 2022 Total | 2023 10 | 11 | 2023 Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Big Bend, TX | 91 | 1 | | 64 | 139 | 2 | 7 | 2 | | | | 1 | | 215 | | | |
| Del Rio, TX | 34,034 | 117 | 245 | 1,427 | 625 | 561 | 339 | 264 | 51 | 6 | 4 | | 4 | 3,644 | 2 | | 2 |
| El Centro, CA | 1 | | | 27 | 51 | 3 | 3 | 14 | 2 | | | | | 103 | 2 | 2 | 4 |
| El Paso, TX | 3,224 | 79 | 386 | 2,594 | 1,431 | 480 | 638 | 2,375 | 5,835 | 60 | 157 | 88 | 62 | 14,185 | 48 | 13 | 61 |
| Laredo, TX | 7 | | | | 1 | | | | | | | | 1 | 3 | | | |
| Rio Grande Valley, TX | 14 | 6 | | | | 1 | 2 | 4 | | 1 | | | 1 | 27 | 1 | 3 | 4 |
| San Diego, CA | 1,211 | | 13 | 16 | 34 | 596 | 3 | | 793 | 30 | 78 | 33 | 22 | 1,097 | 16 | | 16 |
| Tucson, AZ | 1 | | | 87 | 1 | | | | | | | | | 2 | | | |
| Yuma, AZ | 3,552 | 666 | 341 | 2,686 | 857 | | 799 | 1,590 | 593 | 25 | 68 | 38 | 44 | 8,303 | 41 | 11 | 52 |
| Grand Total | 42,135 | 869 | 985 | 6,901 | 3,139 | 1,643 | 1,791 | 4,250 | 7,275 | 122 | 307 | 160 | 137 | 27,579 | 108 | 31 | 139 |
| % in Del Rio | 81% | 13% | 25% | 21% | 20% | 34% | 19% | 6% | 1% | 5% | 1% | 0% | 3% | 13% | 0% | 6% | 1% |
| % in El Paso | 8% | 9% | 39% | 38% | 46% | 29% | 36% | 56% | 80% | 49% | 51% | 55% | 45% | 51% | 44% | 42% | 44% |

Cuba_AR_000335

| | % Yuma | El Paso + Yuma |
|---|---|---|
| | 8% | 16% |
| | 77% | 86% |
| | 35% | 74% |
| | 39% | 77% |
| | 27% | 73% |
| | 36% | 65% |
| | 45% | 80% |
| | 37% | 93% |
| | 8% | 88% |
| | 20% | 70% |
| | 22% | 73% |
| | 24% | 79% |
| | 32% | 77% |
| | 30% | 82% |
| | 38% | 82% |
| | 35% | 77% |
| | 37% | 81% |

OIS Persist Dataset November 2022

Cuba AR_000336



| FY22% | Grand Total |
| --- | --- |
| 1% | 306 |
| 13% | 37,680 |
| 0% | 108 |
| 51% | 17,470 |
| 0% | 10 |
| 0% | 45 |
| 4% | 2,324 |
| 0% | 3 |
| 30% | 11,907 |
| 100% | **69,853** |
| | 54% |
| | 25% |

Cuba AR_000337

17%
42%

Cuba AR_000338

Figure 1: Annual USCG interdictions, FY 14 to FY22  by top 4 countries (Cuba, Haiti, DR, Mexico) and all others.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Cuba | 2,090 | 2,736 | 5,221 | 1,465 | 259 | 381 | 43 | 827 | 5,740 |
| Dominican | 269 | 257 | 570 | 519 | 492 | 920 | 1,201 | 744 | 1,804 |
| Haiti | 968 | 561 | 380 | 419 | 609 | 824 | 398 | 1,205 | 4,025 |
| Mexico | 33 | 11 | 3 | 50 | 123 | 160 | 343 | 612 | 676 |
| Other | 31 | 49 | 160 | 59 | 179 | 144 | 94 | 120 | 276 |
| Total | 3,391 | 3,614 | 6,334 | 2,512 | 1,662 | 2,429 | 2,079 | 3,508 | 12,521 |

Table sent from USCG

Cuba AR_000339

| app_region | SW Land Border |
|---|---|
| unique_1yr | Unique |
| country_simple | (All) |
| initial_agency | USBP |

**Sum of count**

Column Labels

| Row Labels | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 3,226 | 3,537 | 4,501 | 5,711 | 5,353 | 7,163 | 8,726 | 6,529 | 24,098 | 21,433 | 1,958 | 92,235 |
| Del Rio, TX | 20,176 | 21,858 | 16,659 | 20,506 | 12,024 | 14,518 | 54,312 | 28,084 | 186,304 | 391,916 | 77,055 | 843,412 |
| El Centro, CA | 7,762 | 7,512 | 6,974 | 11,973 | 12,033 | 19,370 | 24,916 | 13,538 | 26,088 | 47,319 | 11,712 | 189,197 |
| El Paso, TX | 8,890 | 9,866 | 12,098 | 22,257 | 22,653 | 29,509 | 174,792 | 33,614 | 91,316 | 213,059 | 92,969 | 711,023 |
| Laredo, TX | 40,737 | 35,591 | 28,817 | 29,626 | 20,199 | 26,352 | 30,128 | 32,037 | 52,310 | 49,106 | 5,798 | 350,701 |
| Rio Grande Valley, TX | 126,113 | 215,544 | 120,953 | 162,061 | 120,839 | 146,305 | 318,202 | 61,733 | 421,448 | 374,266 | 46,896 | 2,114,360 |
| San Diego, CA | 14,200 | 15,466 | 14,025 | 19,695 | 17,378 | 26,366 | 43,829 | 28,495 | 69,345 | 102,589 | 23,767 | 375,155 |
| Tucson, AZ | 85,324 | 64,078 | 48,823 | 51,095 | 31,102 | 42,850 | 53,367 | 47,104 | 106,948 | 142,347 | 30,596 | 703,634 |
| Yuma, AZ | 4,392 | 4,543 | 5,971 | 13,084 | 12,019 | 24,984 | 65,572 | 6,340 | 100,833 | 287,701 | 46,764 | 572,203 |
| Grand Total | 310,820 | 377,995 | 258,821 | 336,008 | 253,600 | 337,417 | 773,844 | ###### | 1,078,690 | ###### | 337,515 | 5,951,920 |
| El Paso + Yuma | 13,282 | 14,409 | 18,069 | 35,341 | 34,672 | 54,493 | 240,364 | 39,954 | 192,149 | 500,760 | 139,733 | 1,283,226 |

FY14-19 average   66,225

FY22 inc from FY21   161%
FY22 inc from FY14-19   656%
fold   7.561533

---

| app_region | SW Land Border |
|---|---|
| unique_1yr | Unique |
| country_simple | Haiti |
| initial_agency | USBP |

**Sum of count**

Column Labels

| Row Labels | 2021 / 10 | 2022 / 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 2022 Total | 2023 / 10 | 11 | 2023 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 91 | 1 |  | 64 | 139 | 2 | 7 | 2 |  |  |  |  | 1 | 215 | 2 | 2 | 4 | 306 |
| Del Rio, TX | 34,034 | 117 | 245 | 1,427 | 625 | 561 | 339 | 264 | 51 | 6 | 4 | 1 | 4 | 3,644 |  | 2 | 2 | 37,680 |
| El Centro, CA | 1 |  |  |  | 51 | 3 | 3 | 14 | 2 |  |  |  |  | 103 |  |  |  | 108 |
| El Paso, TX | 3,224 | 79 | 386 | 2,594 | 1,431 | 480 | 638 | 2,375 | 5,835 | 60 | 157 | 88 | 62 | 14,185 | 48 | 13 | 61 | 17,470 |
| Laredo, TX | 7 |  |  |  | 1 |  |  |  |  |  |  |  |  | 3 |  |  |  | 10 |
| Rio Grande Valley, TX | 14 | 6 |  | 27 | 34 | 1 | 2 | 1 |  |  |  |  |  | 27 | 1 |  | 1 | 45 |
| San Diego, CA | 1,211 |  | 13 | 16 | 1 |  | 3 | 4 | 793 | 30 | 78 | 33 | 22 | 1,097 | 16 | 3 | 19 | 2,324 |
| Tucson, AZ | 1 |  |  | 87 |  |  |  |  | 1 | 1 |  |  |  | 2 |  |  |  | 3 |
| Yuma, AZ | 3,552 | 666 | 341 | 2,686 | 857 | 596 | 799 | 1,590 | 593 | 25 | 68 | 38 | 44 | 8,303 | 41 | 11 | 52 | 11,907 |
| Grand Total | 42,135 | 869 | 985 | 6,901 | 3,139 | 1,643 | 1,791 | 4,250 | 7,275 | 122 | 307 | 160 | 137 | 27,579 | 108 | 31 | 139 | 69,853 |
| % in Del Rio | 81% | 13% | 25% | 21% | 20% | 34% | 19% | 6% | 1% | 5% | 1% | 1% | 3% | 13% | 0% | 6% | 1% | 54% |
| % in El Paso | 8% | 9% | 39% | 38% | 46% | 29% | 36% | 56% | 80% | 49% | 51% | 55% | 45% | 51% | 44% | 42% | 44% | 25% |
| % Yuma | 8% | 77% | 35% | 39% | 27% | 36% | 45% | 37% | 8% | 20% | 22% | 24% | 32% | 30% | 38% | 35% | 37% | 17% |
| El Paso + Yuma | 16% | 86% | 74% | 77% | 73% | 65% | 80% | 93% | 88% | 70% | 73% | 79% | 77% | 82% | 82% | 77% | 81% | 42% |

Cuba AR_000340

Cuba_AR_000341

FY22%

1%
13%
0%
51%
0%
0%
4%
0%
30%
100%

Cuba AR_000342

## Custody Summary

| Sector | Count in Custody | | | | Capacity | % Capacit |
|---|---|---|---|---|---|---|
| | SA | FM | UC | Total | | |
| San Diego | 1,387 | 318 | 13 | 1,718 | 1,966 | 87% |
| El Centro | 568 | 286 | 4 | 858 | 512 | 168% |
| Yuma | 1,275 | 734 | 20 | 2,029 | 1,291 | 157% |
| Tucson | 1,204 | 396 | 96 | 1,696 | 1,191 | 142% |
| El Paso | 2,729 | 1,323 | 164 | 4,216 | 2,392 | 176% |
| Big Bend | 1 | 0 | 0 | 1 | 542 | 0% |
| Del Rio | 1,231 | 396 | 87 | 1,714 | 1,845 | 93% |
| Laredo | 531 | 692 | 18 | 1,241 | 2,155 | 58% |
| RGV | 1,400 | 633 | 128 | 2,161 | 4,045 | 53% |
| **USBP Total** | **10,326** | **4,778** | **530** | **15,634** | **15,939** | **98%** |
| San Diego FO | 44 | 28 | 9 | 81 | 386 | 21% |
| Tucson FO | 0 | 0 | 0 | 0 | 96 | 0% |
| El Paso FO | 11 | 7 | 0 | 18 | 137 | 13% |
| Laredo FO | 3 | 0 | 0 | 3 | 283 | 1% |
| **OFO Total** | **58** | **35** | **9** | **102** | **902** | **11%** |
| **Grand Total** | **10,384** | **4,813** | **539** | **15,736** | **16,841** | **93%** |

**Source:** UIP Custody Fact Table as of 12/7/22.

Cuba_AR_000343

| | Average |
|---|---|
| Average in 30 days ending 12/13/22 | 8,281 |
| Average in 30 days ending 4/1/22 | 7,227 |
| Average in November 2021 | 5,828 |

Total Monthly SWB Encounters

| | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| Oct-21 | 66,049 | 51,036 | 47,752 | 164,837 |
| Nov-21 | 63,846 | 50,238 | 60,761 | 174,845 |
| Dec-21 | 51,475 | 48,024 | 79,754 | 179,253 |
| Jan-22 | 60,341 | 31,677 | 62,856 | 154,874 |
| Feb-22 | 71,850 | 39,436 | 54,724 | 166,010 |
| Mar-22 | 88,132 | 46,008 | 88,434 | 222,574 |
| Apr-22 | 82,568 | 43,999 | 109,218 | 235,785 |
| May-22 | 77,454 | 50,178 | 113,505 | 241,137 |
| Jun-22 | 66,730 | 57,948 | 83,156 | 207,834 |
| Jul-22 | 55,692 | 48,504 | 95,966 | 200,162 |
| Aug-22 | 60,772 | 38,575 | 104,740 | 204,087 |
| Sep-22 | 63,431 | 35,995 | 128,121 | 227,547 |
| Oct-22 | 65,788 | 34,851 | 130,039 | 230,678 |

Total daily SWB encounters

| | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| 1/1/2022 | 724 | 405 | 1,625 | 2,754 |
| 1/2/2022 | 766 | 569 | 1,832 | 3,167 |
| 1/3/2022 | 1,214 | 775 | 1,470 | 3,459 |
| 1/4/2022 | 1,371 | 927 | 1,211 | 3,509 |
| 1/5/2022 | 1,513 | 872 | 1,467 | 3,852 |
| 1/6/2022 | 1,573 | 949 | 1,712 | 4,234 |
| 1/7/2022 | 1,658 | 770 | 1,604 | 4,032 |
| 1/8/2022 | 1,528 | 697 | 1,561 | 3,786 |
| 1/9/2022 | 1,534 | 601 | 1,381 | 3,516 |
| 1/10/2022 | 1,833 | 697 | 1,465 | 3,995 |
| 1/11/2022 | 2,164 | 856 | 1,247 | 4,267 |
| 1/12/2022 | 2,063 | 923 | 1,646 | 4,632 |
| 1/13/2022 | 2,031 | 1,129 | 1,945 | 5,105 |
| 1/14/2022 | 2,015 | 931 | 1,741 | 4,687 |
| 1/15/2022 | 2,083 | 1,010 | 2,027 | 5,120 |
| 1/16/2022 | 1,889 | 791 | 2,668 | 5,348 |
| 1/17/2022 | 2,264 | 1,046 | 2,567 | 5,877 |
| 1/18/2022 | 2,495 | 1,613 | 2,970 | 7,078 |
| 1/19/2022 | 2,372 | 1,483 | 2,555 | 6,410 |
| 1/20/2022 | 2,251 | 1,199 | 2,826 | 6,276 |
| 1/21/2022 | 2,166 | 1,187 | 2,577 | 5,930 |
| 1/22/2022 | 2,062 | 1,136 | 2,867 | 6,065 |
| 1/23/2022 | 1,742 | 1,016 | 2,553 | 5,311 |
| 1/24/2022 | 2,255 | 1,249 | 2,628 | 6,132 |
| 1/25/2022 | 2,473 | 1,360 | 2,203 | 6,036 |
| 1/26/2022 | 2,395 | 1,294 | 1,994 | 5,683 |
| 1/27/2022 | 2,588 | 1,557 | 2,304 | 6,449 |
| 1/28/2022 | 2,547 | 1,173 | 2,274 | 5,994 |
| 1/29/2022 | 2,299 | 1,307 | 2,222 | 5,828 |
| 1/30/2022 | 2,087 | 918 | 1,952 | 4,957 |
| 1/31/2022 | 2,386 | 1,237 | 1,762 | 5,385 |
| 2/1/2022 | 2,475 | 1,391 | 2,024 | 5,890 |
| 2/2/2022 | 2,836 | 1,651 | 2,039 | 6,526 |
| 2/3/2022 | 2,506 | 1,436 | 1,823 | 5,765 |
| 2/4/2022 | 2,079 | 1,156 | 1,642 | 4,877 |
| 2/5/2022 | 1,945 | 1,429 | 1,760 | 5,134 |
| 2/6/2022 | 2,009 | 1,115 | 2,023 | 5,147 |
| 2/7/2022 | 2,314 | 1,231 | 1,672 | 5,217 |
| 2/8/2022 | 2,650 | 1,707 | 1,767 | 6,124 |
| 2/9/2022 | 2,576 | 1,675 | 1,710 | 5,961 |
| 2/10/2022 | 2,782 | 1,469 | 1,579 | 5,830 |
| 2/11/2022 | 2,573 | 1,661 | 2,280 | 6,514 |
| 2/12/2022 | 2,400 | 1,684 | 1,973 | 6,057 |

Cuba_AR_000344

| Date | | | | |
|---|---|---|---|---|
| 2/13/2022 | 2,167 | 1,134 | 1,934 | 5,235 |
| 2/14/2022 | 2,390 | 1,184 | 2,346 | 5,920 |
| 2/15/2022 | 2,893 | 1,526 | 1,638 | 6,057 |
| 2/16/2022 | 2,961 | 1,713 | 1,830 | 6,504 |
| 2/17/2022 | 2,925 | 1,484 | 1,993 | 6,402 |
| 2/18/2022 | 2,958 | 1,339 | 2,257 | 6,554 |
| 2/19/2022 | 2,261 | 1,243 | 2,065 | 5,569 |
| 2/20/2022 | 2,347 | 1,144 | 2,078 | 5,569 |
| 2/21/2022 | 2,702 | 1,219 | 1,673 | 5,594 |
| 2/22/2022 | 3,064 | 1,619 | 2,015 | 6,698 |
| 2/23/2022 | 2,895 | 1,556 | 1,610 | 6,061 |
| 2/24/2022 | 2,840 | 1,531 | 2,460 | 6,831 |
| 2/25/2022 | 2,795 | 1,365 | 2,087 | 6,247 |
| 2/26/2022 | 2,480 | 1,364 | 2,210 | 6,054 |
| 2/27/2022 | 2,398 | 1,097 | 2,044 | 5,539 |
| 2/28/2022 | 2,629 | 1,313 | 2,192 | 6,134 |
| 3/1/2022 | 3,057 | 1,805 | 2,276 | 7,138 |
| 3/2/2022 | 3,061 | 1,663 | 2,408 | 7,132 |
| 3/3/2022 | 2,957 | 1,482 | 2,417 | 6,856 |
| 3/4/2022 | 2,961 | 1,384 | 2,711 | 7,056 |
| 3/5/2022 | 2,675 | 1,352 | 2,968 | 6,995 |
| 3/6/2022 | 2,155 | 1,107 | 2,593 | 5,855 |
| 3/7/2022 | 2,527 | 1,347 | 2,544 | 6,418 |
| 3/8/2022 | 3,431 | 1,725 | 2,782 | 7,938 |
| 3/9/2022 | 3,227 | 1,697 | 2,413 | 7,337 |
| 3/10/2022 | 3,209 | 1,445 | 1,991 | 6,645 |
| 3/11/2022 | 3,275 | 1,665 | 2,768 | 7,708 |
| 3/12/2022 | 2,534 | 1,415 | 2,727 | 6,676 |
| 3/13/2022 | 2,150 | 1,091 | 3,193 | 6,434 |
| 3/14/2022 | 2,850 | 1,343 | 2,599 | 6,792 |
| 3/15/2022 | 2,759 | 1,516 | 2,858 | 7,133 |
| 3/16/2022 | 2,803 | 1,444 | 3,016 | 7,263 |
| 3/17/2022 | 3,020 | 1,497 | 2,897 | 7,414 |
| 3/18/2022 | 2,754 | 1,450 | 3,098 | 7,302 |
| 3/19/2022 | 2,619 | 1,135 | 2,986 | 6,740 |
| 3/20/2022 | 2,202 | 954 | 3,529 | 6,685 |
| 3/21/2022 | 2,444 | 1,386 | 3,466 | 7,296 |
| 3/22/2022 | 3,125 | 1,728 | 3,156 | 8,009 |
| 3/23/2022 | 2,887 | 1,546 | 2,805 | 7,238 |
| 3/24/2022 | 2,924 | 1,755 | 2,948 | 7,627 |
| 3/25/2022 | 2,975 | 1,510 | 2,760 | 7,245 |
| 3/26/2022 | 2,579 | 1,519 | 2,810 | 6,908 |
| 3/27/2022 | 2,399 | 1,190 | 3,320 | 6,909 |
| 3/28/2022 | 2,880 | 1,491 | 2,634 | 7,005 |
| 3/29/2022 | 3,010 | 1,669 | 2,928 | 7,607 |
| 3/30/2022 | 3,216 | 1,893 | 3,682 | 8,791 |
| 3/31/2022 | 3,467 | 1,804 | 3,151 | 8,422 |

Cuba AR_000345

| Date | | | | |
|---|---|---|---|---|
| 4/1/2022 | 3,218 | 1,694 | 3,584 | 8,496 |
| 4/2/2022 | 2,783 | 1,640 | 3,668 | 8,091 |
| 4/3/2022 | 2,509 | 1,388 | 3,633 | 7,530 |
| 4/4/2022 | 2,769 | 1,548 | 3,501 | 7,818 |
| 4/5/2022 | 3,416 | 1,898 | 3,651 | 8,965 |
| 4/6/2022 | 3,057 | 1,599 | 3,905 | 8,561 |
| 4/7/2022 | 3,195 | 1,462 | 3,671 | 8,328 |
| 4/8/2022 | 3,090 | 1,581 | 3,943 | 9,162 |
| 4/9/2022 | 2,834 | 1,469 | 4,150 | 8,246 |
| 4/10/2022 | 2,422 | 1,300 | 4,529 | 7,872 |
| 4/11/2022 | 2,816 | 1,590 | 4,192 | 8,935 |
| 4/12/2022 | 3,077 | 1,659 | 4,298 | 8,928 |
| 4/13/2022 | 3,098 | 1,871 | 4,368 | 9,267 |
| 4/14/2022 | 3,054 | 1,753 | 4,132 | 8,939 |
| 4/15/2022 | 2,761 | 1,774 | 3,453 | 8,903 |
| 4/16/2022 | 2,006 | 1,286 | 3,249 | 6,745 |
| 4/17/2022 | 1,638 | 851 | 3,027 | 5,738 |
| 4/18/2022 | 1,869 | 1,151 | 3,532 | 6,047 |
| 4/19/2022 | 2,641 | 1,671 | 3,052 | 7,844 |
| 4/20/2022 | 3,153 | 1,451 | 3,113 | 7,656 |
| 4/21/2022 | 2,947 | 1,556 | 3,213 | 7,616 |
| 4/22/2022 | 2,815 | 1,305 | 3,249 | 7,333 |
| 4/23/2022 | 2,467 | 1,191 | 3,191 | 6,907 |
| 4/24/2022 | 2,150 | 1,079 | 3,734 | 6,420 |
| 4/25/2022 | 2,411 | 1,099 | 3,193 | 7,244 |
| 4/26/2022 | 3,229 | 1,424 | 3,067 | 7,720 |
| 4/27/2022 | 2,691 | 1,376 | 2,928 | 7,260 |
| 4/28/2022 | 2,914 | 1,544 | 3,915 | 7,519 |
| 4/29/2022 | 3,047 | 1,403 | 3,586 | 8,232 |
| 4/30/2022 | 2,491 | 1,386 | 3,395 | 7,463 |
| 5/1/2022 | 2,246 | 955 | 3,293 | 6,596 |
| 5/2/2022 | 2,593 | 1,295 | 3,277 | 7,181 |
| 5/3/2022 | 3,060 | 1,535 | 2,952 | 7,872 |
| 5/4/2022 | 2,693 | 1,494 | 3,530 | 7,139 |
| 5/5/2022 | 2,938 | 1,553 | 3,591 | 8,021 |
| 5/6/2022 | 2,904 | 1,755 | 4,265 | 8,250 |
| 5/7/2022 | 2,490 | 1,315 | 3,611 | 8,070 |
| 5/8/2022 | 1,978 | 1,295 | 3,546 | 6,884 |
| 5/9/2022 | 2,614 | 1,867 | 2,856 | 8,027 |
| 5/10/2022 | 2,552 | 1,449 | 3,895 | 8,145 |
| 5/11/2022 | 2,553 | 1,697 | 4,267 | 6,857 |
| 5/12/2022 | 2,702 | 1,815 | 4,180 | 8,784 |
| 5/13/2022 | 2,880 | 1,487 | 4,364 | 8,547 |
| 5/14/2022 | 2,273 | 1,547 | 4,171 | 8,184 |
| 5/15/2022 | 2,073 | 1,091 | 3,625 | 7,335 |
| 5/16/2022 | 2,402 | 1,470 | 4,016 | 7,497 |
| 5/17/2022 | 3,016 | 1,981 | | 9,013 |



Cuba_AR_000346

| Date | | | | |
|---|---|---|---|---|
| 5/18/2022 | 2,809 | 1,649 | 3,912 | 8,370 |
| 5/19/2022 | 2,921 | 1,922 | 4,043 | 8,886 |
| 5/20/2022 | 2,796 | 1,380 | 4,682 | 8,858 |
| 5/21/2022 | 2,337 | 1,731 | 4,595 | 8,663 |
| 5/22/2022 | 2,043 | 1,262 | 4,101 | 7,406 |
| 5/23/2022 | 2,234 | 1,759 | 3,111 | 7,104 |
| 5/24/2022 | 2,574 | 2,177 | 3,807 | 8,558 |
| 5/25/2022 | 2,333 | 1,863 | 3,738 | 7,934 |
| 5/26/2022 | 2,574 | 1,926 | 3,241 | 7,741 |
| 5/27/2022 | 2,309 | 1,671 | 3,603 | 7,583 |
| 5/28/2022 | 2,131 | 1,744 | 3,427 | 7,302 |
| 5/29/2022 | 1,920 | 1,316 | 3,198 | 6,434 |
| 5/30/2022 | 2,071 | 1,721 | 2,985 | 6,777 |
| 5/31/2022 | 2,435 | 2,456 | 2,228 | 7,119 |
| 6/1/2022 | 2,571 | 1,900 | 2,615 | 7,086 |
| 6/2/2022 | 2,364 | 1,911 | 2,417 | 6,692 |
| 6/3/2022 | 2,622 | 1,769 | 2,676 | 7,067 |
| 6/4/2022 | 1,863 | 1,671 | 2,821 | 6,355 |
| 6/5/2022 | 1,656 | 1,657 | 2,565 | 5,878 |
| 6/6/2022 | 2,422 | 2,074 | 2,380 | 6,876 |
| 6/7/2022 | 2,553 | 2,028 | 2,707 | 7,288 |
| 6/8/2022 | 2,634 | 2,258 | 2,088 | 6,980 |
| 6/9/2022 | 2,551 | 2,173 | 2,493 | 7,217 |
| 6/10/2022 | 2,595 | 1,741 | 2,370 | 6,706 |
| 6/11/2022 | 1,995 | 1,586 | 2,874 | 6,455 |
| 6/12/2022 | 1,952 | 1,468 | 2,999 | 6,419 |
| 6/13/2022 | 1,892 | 1,876 | 2,115 | 5,883 |
| 6/14/2022 | 2,361 | 2,272 | 2,572 | 7,205 |
| 6/15/2022 | 2,451 | 2,274 | 3,299 | 8,024 |
| 6/16/2022 | 2,537 | 1,980 | 3,091 | 7,608 |
| 6/17/2022 | 2,319 | 2,006 | 2,723 | 7,048 |
| 6/18/2022 | 1,963 | 1,705 | 3,503 | 7,171 |
| 6/19/2022 | 1,654 | 1,594 | 3,436 | 6,684 |
| 6/20/2022 | 1,782 | 1,616 | 2,842 | 6,240 |
| 6/21/2022 | 2,558 | 2,104 | 3,380 | 8,042 |
| 6/22/2022 | 2,499 | 2,217 | 2,839 | 7,555 |
| 6/23/2022 | 2,129 | 2,089 | 2,908 | 7,126 |
| 6/24/2022 | 2,278 | 2,162 | 3,005 | 7,445 |
| 6/25/2022 | 1,961 | 1,646 | 2,753 | 6,360 |
| 6/26/2022 | 1,714 | 1,698 | 2,497 | 5,909 |
| 6/27/2022 | 2,064 | 2,025 | 2,719 | 6,808 |
| 6/28/2022 | 2,253 | 2,165 | 2,466 | 6,884 |
| 6/29/2022 | 2,377 | 2,204 | 2,696 | 7,277 |
| 6/30/2022 | 2,160 | 2,079 | 3,307 | 7,546 |
| 7/1/2022 | 1,870 | 1,690 | 2,994 | 6,554 |
| 7/2/2022 | 1,900 | 1,783 | 3,441 | 7,124 |
| 7/3/2022 | 1,701 | 1,322 | 2,991 | 6,014 |

Cuba AR_000347

| Date | | | | |
|---|---|---|---|---|
| 7/4/2022 | 1,993 | 1,782 | 3,101 | 6,876 |
| 7/5/2022 | 2,126 | 1,876 | 3,239 | 7,241 |
| 7/6/2022 | 2,130 | 1,958 | 3,605 | 7,693 |
| 7/7/2022 | 1,796 | 1,711 | 3,383 | 6,890 |
| 7/8/2022 | 1,867 | 1,572 | 3,089 | 6,528 |
| 7/9/2022 | 1,579 | 1,526 | 3,515 | 6,620 |
| 7/10/2022 | 1,488 | 1,469 | 3,381 | 6,338 |
| 7/11/2022 | 1,703 | 1,729 | 2,965 | 6,397 |
| 7/12/2022 | 2,052 | 1,837 | 3,923 | 7,812 |
| 7/13/2022 | 1,930 | 1,744 | 3,735 | 7,535 |
| 7/14/2022 | 1,768 | 1,849 | 3,173 | 6,952 |
| 7/15/2022 | 1,609 | 1,557 | 2,672 | 6,071 |
| 7/16/2022 | 1,579 | 1,199 | 3,678 | 6,844 |
| 7/17/2022 | 1,475 | 1,566 | 3,104 | 5,882 |
| 7/18/2022 | 1,966 | 1,971 | 2,950 | 5,991 |
| 7/19/2022 | 1,941 | 1,516 | 2,908 | 7,379 |
| 7/20/2022 | 1,709 | 1,553 | 3,574 | 6,365 |
| 7/21/2022 | 1,933 | 1,400 | 3,033 | 6,836 |
| 7/22/2022 | 1,464 | 1,168 | 3,141 | 6,366 |
| 7/23/2022 | 1,539 | 1,235 | 2,762 | 5,773 |
| 7/24/2022 | 1,586 | 1,415 | 2,293 | 5,536 |
| 7/25/2022 | 2,031 | 1,602 | 2,855 | 5,294 |
| 7/26/2022 | 1,942 | 1,554 | 2,690 | 6,488 |
| 7/27/2022 | 1,867 | 1,528 | 2,676 | 6,186 |
| 7/28/2022 | 1,773 | 1,214 | 2,473 | 6,071 |
| 7/29/2022 | 1,798 | 1,250 | 2,589 | 5,460 |
| 7/30/2022 | 1,521 | 1,297 | 2,591 | 5,637 |
| 7/31/2022 |  |  |  | 5,409 |
| 8/1/2022 | 1,532 | 1,290 | 2,354 | 5,176 |
| 8/2/2022 | 1,927 | 1,658 | 2,820 | 6,405 |
| 8/3/2022 | 2,003 | 1,409 | 2,739 | 6,151 |
| 8/4/2022 | 1,900 | 1,508 | 2,269 | 5,677 |
| 8/5/2022 | 2,056 | 1,440 | 2,828 | 6,324 |
| 8/6/2022 | 1,859 | 1,233 | 3,113 | 6,205 |
| 8/7/2022 | 1,728 | 995 | 3,037 | 5,760 |
| 8/8/2022 | 1,922 | 1,256 | 2,889 | 6,067 |
| 8/9/2022 | 2,400 | 1,467 | 3,348 | 7,215 |
| 8/10/2022 | 2,192 | 1,235 | 3,759 | 7,186 |
| 8/11/2022 | 1,731 | 1,479 | 3,156 | 6,817 |
| 8/12/2022 | 1,887 | 1,129 | 3,596 | 6,456 |
| 8/13/2022 | 1,667 | 1,180 | 2,919 | 5,986 |
| 8/14/2022 | 1,651 | 945 | 3,443 | 6,055 |
| 8/15/2022 | 1,900 | 1,164 | 3,498 | 6,313 |
| 8/16/2022 | 2,151 | 1,363 | 3,129 | 6,392 |
| 8/17/2022 | 2,096 | 1,482 | 3,663 | 7,296 |
| 8/18/2022 | 2,032 | 1,232 | 3,449 | 6,777 |
| 8/19/2022 |  | 1,130 | 3,740 | 6,902 |

Cuba AR_000348

| | | | | |
|---|---|---|---|---|
| 8/20/2022 | 1,811 | 1,137 | 4,020 | 6,968 |
| 8/21/2022 | 1,740 | 986 | 3,686 | 6,412 |
| 8/22/2022 | 1,806 | 1,040 | 4,061 | 6,907 |
| 8/23/2022 | 2,090 | 1,172 | 3,992 | 7,254 |
| 8/24/2022 | 2,200 | 1,451 | 3,608 | 7,259 |
| 8/25/2022 | 2,242 | 1,253 | 3,787 | 7,282 |
| 8/26/2022 | 2,079 | 1,228 | 3,355 | 6,662 |
| 8/27/2022 | 1,857 | 1,208 | 3,915 | 6,980 |
| 8/28/2022 | 1,662 | 1,010 | 4,288 | 6,960 |
| 8/29/2022 | 1,978 | 1,275 | 3,967 | 7,220 |
| 8/30/2022 | 2,361 | 1,234 | 3,196 | 6,791 |
| 8/31/2022 | 2,130 | 986 | 3,116 | 6,232 |
| 9/1/2022 | 2,203 | 1,186 | 3,838 | 7,227 |
| 9/2/2022 | 2,348 | 1,039 | 4,319 | 7,706 |
| 9/3/2022 | 1,756 | 999 | 4,921 | 7,676 |
| 9/4/2022 | 1,543 | 668 | 3,372 | 5,583 |
| 9/5/2022 | 1,607 | 979 | 4,546 | 7,132 |
| 9/6/2022 | 2,097 | 1,271 | 4,047 | 7,415 |
| 9/7/2022 | 2,209 | 1,363 | 4,540 | 8,112 |
| 9/8/2022 | 2,147 | 1,341 | 4,860 | 8,348 |
| 9/9/2022 | 2,232 | 1,171 | 4,590 | 7,993 |
| 9/10/2022 | 1,912 | 1,061 | 4,356 | 7,329 |
| 9/11/2022 | 1,732 | 1,118 | 4,452 | 7,302 |
| 9/12/2022 | 1,843 | 1,060 | 4,621 | 7,524 |
| 9/13/2022 | 2,379 | 1,393 | 4,827 | 8,599 |
| 9/14/2022 | 2,263 | 1,231 | 4,795 | 8,289 |
| 9/15/2022 | 2,491 | 1,372 | 4,405 | 7,564 |
| 9/16/2022 | 1,851 | 1,127 | 3,701 | 7,383 |
| 9/17/2022 | 1,546 | 1,214 | 4,511 | 7,271 |
| 9/18/2022 | 1,641 | 968 | 4,134 | 6,743 |
| 9/19/2022 | 1,925 | 1,184 | 3,296 | 6,405 |
| 9/20/2022 | 2,432 | 1,420 | 4,014 | 7,866 |
| 9/21/2022 | 2,384 | 1,392 | 3,955 | 7,731 |
| 9/22/2022 | 2,272 | 1,245 | 4,082 | 7,599 |
| 9/23/2022 | 2,213 | 1,399 | 4,081 | 7,693 |
| 9/24/2022 | 1,910 | 1,017 | 4,436 | 7,363 |
| 9/25/2022 | 1,992 | 1,071 | 4,122 | 7,185 |
| 9/26/2022 | 2,427 | 1,197 | 4,086 | 7,710 |
| 9/27/2022 | 2,541 | 1,379 | 4,182 | 8,102 |
| 9/28/2022 | 2,435 | 1,408 | 4,139 | 7,982 |
| 9/29/2022 | 2,501 | 1,490 | 4,429 | 8,420 |
| 9/30/2022 | 2,599 | 1,232 | 4,464 | 8,295 |
| 10/1/2022 | 1,877 | 885 | 4,409 | 7,333 |
| 10/2/2022 | 1,815 | 1,047 | 4,988 | 7,688 |
| 10/3/2022 | 2,044 | 1,063 | 4,408 | 7,515 |
| 10/4/2022 | 2,574 | 1,319 | 4,607 | 8,500 |
| 10/5/2022 | 2,505 | 1,397 | 5,003 | 8,905 |

Cuba_AR_000349

| Date | | | | |
|---|---|---|---|---|
| 10/6/2022 | 2,515 | 1,422 | 4,577 | 8,514 |
| 10/7/2022 | 2,336 | 1,259 | 4,357 | 7,952 |
| 10/8/2022 | 2,040 | 1,250 | 4,641 | 7,931 |
| 10/9/2022 | 1,822 | 1,098 | 4,638 | 7,558 |
| 10/10/2022 | 1,903 | 1,078 | 4,328 | 7,309 |
| 10/11/2022 | 2,273 | 1,290 | 4,257 | 7,820 |
| 10/12/2022 | 2,285 | 1,080 | 3,922 | 7,287 |
| 10/13/2022 | 2,107 | 1,325 | 4,740 | 8,172 |
| 10/14/2022 | 1,929 | 1,100 | 4,437 | 7,466 |
| 10/15/2022 | 1,826 | 1,046 | 3,818 | 6,690 |
| 10/16/2022 | 1,816 | 748 | 3,592 | 6,156 |
| 10/17/2022 | 1,974 | 1,078 | 3,442 | 6,494 |
| 10/18/2022 | 2,513 | 1,405 | 2,930 | 6,848 |
| 10/19/2022 | 2,237 | 1,217 | 3,605 | 7,059 |
| 10/20/2022 | 2,435 | 1,270 | 3,667 | 7,372 |
| 10/21/2022 | 2,372 | 1,065 | 4,018 | 7,455 |
| 10/22/2022 | 2,079 | 1,079 | 3,760 | 6,918 |
| 10/23/2022 | 1,857 | 876 | 4,147 | 6,880 |
| 10/24/2022 | 2,084 | 1,054 | 3,575 | 6,713 |
| 10/25/2022 | 2,582 | 1,322 | 4,235 | 8,139 |
| 10/26/2022 | 2,438 | 1,179 | 4,002 | 7,619 |
| 10/27/2022 | 2,314 | 1,138 | 4,464 | 7,916 |
| 10/28/2022 | 2,231 | 972 | 4,529 | 7,732 |
| 10/29/2022 | 1,979 | 1,098 | 4,908 | 7,985 |
| 10/30/2022 | 1,491 | 906 | 4,093 | 6,490 |
| 10/31/2022 | 1,968 | 945 | 3,965 | 6,878 |
| 11/1/2022 | 2,032 | 1,170 | 4,606 | 7,808 |
| 11/2/2022 | 2,100 | 1,182 | 4,958 | 8,240 |
| 11/3/2022 | 1,983 | 1,094 | 3,950 | 7,027 |
| 11/4/2022 | 2,086 | 1,097 | 4,607 | 7,790 |
| 11/5/2022 | 1,836 | 1,138 | 4,007 | 6,981 |
| 11/6/2022 | 1,619 | 910 | 5,331 | 7,860 |
| 11/7/2022 | 2,044 | 1,127 | 4,216 | 7,387 |
| 11/8/2022 | 2,466 | 1,354 | 4,585 | 8,405 |
| 11/9/2022 | 2,215 | 1,038 | 4,296 | 7,549 |
| 11/10/2022 | 2,162 | 1,226 | 4,695 | 8,083 |
| 11/11/2022 | 2,291 | 1,123 | 5,048 | 8,462 |
| 11/12/2022 | 1,930 | 1,109 | 4,441 | 7,480 |
| 11/13/2022 | 1,638 | 916 | 4,529 | 7,083 |
| 11/14/2022 | 2,088 | 1,066 | 4,732 | 7,886 Production |
| 11/15/2022 | 2469 | 1142 | 4,525 | 8136 UIP |
| 11/16/2022 | 2345 | 1213 | 4,635 | 8193 |
| 11/17/2022 | 2234 | 1268 | 6,063 | 9565 |
| 11/18/2022 | 2068 | 1126 | 4,696 | 7890 |
| 11/19/2022 | 1805 | 1004 | 5,082 | 7891 |
| 11/20/2022 | 1501 | 859 | 4,565 | 6925 |
| 11/21/2022 | 1775 | 1020 | 5,179 | 7974 |

Case 6:23-cv-00007   Document 92-3   Filed on 03/24/23 in TXSD   Page 213 of 269

Cuba_AR_000350

| Date | | | | |
|---|---|---|---|---|
| 11/22/2022 | 1958 | 1221 | 4,762 | 7941 |
| 11/23/2022 | 1802 | 1077 | 4643 | 7522 |
| 11/24/2022 | 1851 | 1257 | 4251 | 7359 |
| 11/25/2022 | 1761 | 831 | 4566 | 7158 |
| 11/26/2022 | 1632 | 925 | 5461 | 8018 |
| 11/27/2022 | 1505 | 861 | 4746 | 7112 |
| 11/28/2022 | 1796 | 1186 | 4747 | 7729 |
| 11/29/2022 | 2092 | 1263 | 4322 | 7677 |
| 11/30/2022 | 1931 | 1216 | 6068 | 9215 |
| 12/1/2022 | 2218 | 1203 | 5092 | 8513 |
| 12/2/2022 | 1901 | 1236 | 6500 | 9637 |
| 12/3/2022 | 1492 | 951 | 5471 | 7914 |
| 12/4/2022 | 1344 | 914 | 5700 | 7958 |
| 12/5/2022 | 1888 | 1142 | 5280 | 8310 |
| 12/6/2022 | 1887 | 1085 | 5411 | 8383 |
| 12/7/2022 | 1971 | 1181 | 6170 | 9322 |
| 12/8/2022 | 1914 | 1422 | 5949 | 9285 |
| 12/9/2022 | 1875 | 1023 | 6505 | 9403 |
| 12/10/2022 | 1487 | 1100 | 6571 | 9158 |
| 12/11/2022 | 1381 | 1186 | 6260 | 8827 |
| 12/12/2022 | 1501 | 934 | 6279 | 8714 |
| 12/13/2022 | 1738 | 1234 | 5830 | 8802 |

Source: OIS pull of UIP 12/14/22

Cuba AR_000351

Table 21.
PERSONS NATURALIZED BY REGION AND COUNTRY OF BIRTH: FISCAL YEARS 2011 TO 2020

| Region and country of birth | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| REGION | | | | | | | | | | |
| Total | 694,193 | 757,434 | 779,929 | 653,416 | 730,259 | 753,060 | 707,265 | 761,901 | 843,593 | 628,254 |
| Africa | 69,738 | 74,775 | 71,872 | 62,175 | 71,492 | 72,338 | 61,851 | 64,934 | 84,990 | 66,436 |
| Asia | 249,940 | 257,035 | 275,700 | 233,163 | 261,374 | 271,733 | 255,306 | 275,621 | 327,273 | 246,099 |
| Europe | 82,209 | 82,714 | 80,333 | 71,325 | 78,074 | 74,344 | 65,141 | 71,438 | 81,040 | 57,403 |
| North America | 217,750 | 261,673 | 271,807 | 222,547 | 247,492 | 259,845 | 258,371 | 277,592 | 276,910 | 204,250 |
| Oceania | 3,734 | 3,886 | 3,849 | 3,399 | 3,811 | 3,953 | 3,327 | 3,792 | 4,308 | 3,392 |
| South America | 70,485 | 76,992 | 76,167 | 60,665 | 67,927 | 70,821 | 63,063 | 67,892 | 68,678 | 50,441 |
| Unknown | 337 | 359 | 201 | 142 | 89 | 26 | 206 | 634 | 394 | 233 |
| COUNTRY | | | | | | | | | | |
| Total | 694,193 | 757,434 | 779,929 | 653,416 | 730,259 | 753,060 | 707,265 | 761,901 | 843,593 | 628,254 |
| Afghanistan | 1,998 | 1,758 | 2,074 | 1,853 | 1,589 | 1,444 | 1,414 | 1,569 | 2,794 | 4,025 |
| Albania | 4,267 | 3,615 | 3,538 | 3,131 | 3,237 | 2,813 | 2,169 | 2,203 | 2,778 | 2,308 |
| Algeria | 773 | 891 | 841 | 928 | 943 | 1,035 | 949 | 918 | 1,235 | 1,063 |
| American Samoa | 205 | 180 | 265 | 187 | 296 | 285 | 216 | 182 | 279 | 177 |
| Angola | 162 | 166 | 143 | 145 | 132 | 131 | 125 | 147 | 136 | 94 |
| Anguilla | 38 | 30 | 26 | 18 | 31 | 16 | 20 | 34 | 25 | 19 |
| Antigua and Barbuda | 386 | 390 | 366 | 358 | 381 | 383 | 311 | 356 | 386 | 265 |
| Argentina | 3,870 | 3,909 | 4,177 | 3,683 | 3,886 | 4,015 | 3,486 | 3,977 | 3,956 | 2,884 |
| Armenia | 3,965 | 3,285 | 3,203 | 2,488 | 2,874 | 2,516 | 1,994 | 2,085 | 2,327 | 1,852 |
| Aruba | 40 | 27 | 42 | 28 | 37 | 28 | 32 | 33 | 54 | 37 |
| Australia | 1,291 | 1,312 | 1,296 | 1,159 | 1,379 | 1,389 | 1,235 | 1,545 | 1,838 | 1,436 |
| Austria | 271 | 241 | 248 | 223 | 207 | 221 | 177 | 238 | 214 | 160 |
| Azerbaijan | 1,153 | 958 | 786 | 585 | 568 | 574 | 483 | 512 | 597 | 451 |
| Bahamas | 609 | 647 | 681 | 545 | 570 | 590 | 481 | 590 | 640 | 481 |
| Bahrain | 80 | 93 | 76 | 90 | 79 | 80 | 77 | 86 | 116 | 79 |
| Bangladesh | 7,325 | 8,417 | 9,571 | 7,475 | 9,750 | 9,949 | 8,629 | 7,797 | 9,067 | 6,883 |
| Barbados | 648 | 687 | 683 | 550 | 646 | 651 | 645 | 555 | 625 | 399 |
| Belarus | 1,814 | 1,896 | 1,797 | 1,437 | 1,710 | 1,518 | 1,313 | 1,393 | 1,735 | 1,302 |
| Belgium | 525 | 522 | 513 | 408 | 505 | 514 | 493 | 520 | 575 | 430 |
| Belize | 742 | 817 | 966 | 773 | 851 | 870 | 810 | 859 | 950 | 669 |
| Benin | 183 | 210 | 206 | 229 | 310 | 317 | 309 | 249 | 343 | 297 |
| Bermuda | 58 | 65 | 59 | 67 | 66 | 61 | 65 | 70 | 64 | 52 |
| Bhutan | 55 | 42 | 275 | 2,639 | 4,562 | 5,563 | 5,557 | 6,180 | 6,920 | 4,536 |
| Bolivia | 1,446 | 2,063 | 1,961 | 1,527 | 1,689 | 1,862 | 1,806 | 1,575 | 1,679 | 1,208 |
| Bosnia and Herzegovina | 4,259 | 4,904 | 3,662 | 2,509 | 3,304 | 2,257 | 1,780 | 1,805 | 1,709 | 1,059 |
| Botswana | 9 | 11 | 29 | 29 | 28 | 28 | 27 | 38 | 41 | 34 |
| Brazil | 10,251 | 9,884 | 9,665 | 8,625 | 10,516 | 10,268 | 9,701 | 10,538 | 10,451 | 8,323 |
| Brunei | 11 | 17 | 11 | 15 | 13 | 10 | 11 | 15 | 26 | 19 |
| Bulgaria | 3,103 | 2,964 | 2,646 | 2,226 | 2,336 | 2,086 | 1,887 | 1,825 | 2,251 | 1,656 |
| Burkina Faso | 163 | 166 | 230 | 235 | 307 | 322 | 303 | 347 | 426 | 376 |
| Burma | 2,321 | 2,384 | 3,489 | 4,225 | 6,045 | 6,956 | 6,825 | 7,858 | 11,674 | 9,181 |
| Burundi | 168 | 209 | 379 | 415 | 437 | 406 | 266 | 284 | 394 | 280 |
| Cabo Verde | 974 | 1,037 | 1,014 | 979 | 1,054 | 1,207 | 1,355 | 1,429 | 1,316 | 930 |
| Cambodia | 4,589 | 6,189 | 4,161 | 2,866 | 2,878 | 2,756 | 2,164 | 2,467 | 2,877 | 2,405 |
| Cameroon | 2,172 | 2,459 | 2,541 | 2,120 | 3,170 | 3,088 | 2,416 | 2,319 | 2,873 | 2,873 |
| Canada | 9,318 | 9,077 | 8,690 | 8,385 | 9,492 | 9,346 | 7,829 | 9,379 | 11,059 | 8,423 |
| Cayman Islands | 15 | 29 | 17 | 13 | 30 | 18 | 23 | 23 | 35 | 19 |
| Central African Republic | 34 | 56 | 54 | 44 | 52 | 80 | 61 | 73 | 120 | 82 |
| Chad | 50 | 69 | 64 | 74 | 84 | 105 | 78 | 72 | 90 | 56 |
| Chile | 1,527 | 1,586 | 1,649 | 1,435 | 1,486 | 1,666 | 1,620 | 1,752 | 1,784 | 1,329 |

Cuba_AR_000352

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| China, People's Republic | 32,864 | 31,868 | 35,387 | 30,284 | 31,241 | 35,794 | 37,674 | 39,600 | 39,490 | 26,110 |
| Colombia | 22,693 | 23,972 | 22,196 | 16,478 | 17,207 | 18,601 | 16,184 | 17,564 | 17,126 | 12,768 |
| Congo, Democratic Republic | 908 | 1,173 | 1,250 | 1,246 | 1,490 | 1,707 | 1,437 | 1,776 | 2,877 | 2,482 |
| Congo, Republic | 345 | 381 | 402 | 438 | 473 | 395 | 322 | 316 | 351 | 191 |
| Costa Rica | 1,511 | 1,597 | 1,661 | 1,461 | 1,633 | 1,862 | 1,720 | 1,860 | 1,859 | 1,394 |
| Cote d'Ivoire | 694 | 868 | 958 | 910 | 1,078 | 1,127 | 907 | 908 | 1,206 | 1,012 |
| Croatia | 569 | 725 | 561 | 428 | 563 | 438 | 351 | 371 | 412 | 271 |
| Cuba | 21,071 | 31,244 | 30,482 | 24,092 | 25,770 | 32,101 | 25,961 | 32,089 | 36,246 | 31,369 |
| Curacao | | | | 11 | 13 | | 20 | 20 | 30 | 28 |
| Cyprus | 115 | 92 | 112 | 112 | 107 | 105 | 84 | 125 | 115 | 81 |
| Czechia | 485 | 477 | 562 | 565 | 733 | 692 | 595 | 644 | 600 | 426 |
| Czechoslovakia (former) | 310 | 291 | 232 | 303 | 371 | 344 | 251 | 260 | 325 | 206 |
| Denmark | 124 | 133 | 127 | 129 | 243 | 1,193 | 769 | 650 | 656 | 508 |
| Djibouti | 22 | 26 | 39 | 26 | 26 | 52 | 48 | 65 | 96 | 94 |
| Dominica | 594 | 597 | 642 | 520 | 653 | 610 | 539 | 612 | 740 | 391 |
| Dominican Republic | 20,508 | 33,351 | 39,590 | 23,775 | 26,665 | 31,320 | 29,734 | 22,970 | 23,101 | 18,675 |
| Ecuador | 6,929 | 8,783 | 9,470 | 6,952 | 7,664 | 8,568 | 7,748 | 7,996 | 7,731 | 5,204 |
| Egypt | 5,848 | 6,191 | 6,213 | 5,094 | 5,693 | 5,696 | 5,154 | 6,549 | 8,311 | 6,336 |
| El Salvador | 13,834 | 16,685 | 18,401 | 15,598 | 16,930 | 17,213 | 16,941 | 17,300 | 18,260 | 12,606 |
| Equatorial Guinea | 9 | 19 | 14 | 12 | 14 | 18 | 8 | 8 | 15 | 18 |
| Eritrea | 985 | 1,059 | 1,145 | 1,045 | 1,494 | 1,797 | 1,424 | 1,457 | 1,951 | 1,597 |
| Estonia | 217 | 234 | 213 | 183 | 208 | 183 | 157 | 190 | 210 | 157 |
| Eswatini | 15 | 15 | 15 | 7 | 12 | 8 | 16 | 16 | 25 | D |
| Ethiopia | 8,519 | 8,803 | 8,323 | 7,002 | 8,312 | 8,725 | 7,370 | 6,769 | 9,065 | 7,385 |
| Fiji | 1,118 | 1,134 | 1,003 | 770 | 850 | 996 | 841 | 875 | 778 | 624 |
| Finland | 344 | 329 | 300 | 274 | 301 | 303 | 279 | 283 | 343 | 250 |
| France | 2,527 | 2,358 | 2,534 | 2,589 | 2,784 | 2,841 | 2,812 | 2,854 | 3,315 | 2,553 |
| French Polynesia | 14 | 15 | 8 | 20 | 14 | 18 | 14 | 13 | 18 | 15 |
| Gabon | 53 | 80 | 72 | 63 | 89 | 83 | 67 | 81 | 113 | 87 |
| Gambia | 505 | 556 | 573 | 510 | 685 | 724 | 586 | 650 | 729 | 610 |
| Georgia | 1,253 | 1,271 | 1,205 | 898 | 1,027 | 988 | 889 | 751 | 973 | 709 |
| Germany | 4,461 | 4,192 | 4,066 | 4,375 | 4,380 | 4,329 | 3,879 | 4,284 | 4,745 | 3,162 |
| Ghana | 4,690 | 5,344 | 5,105 | 5,108 | 6,033 | 6,411 | 5,777 | 6,047 | 6,936 | 4,973 |
| Greece | 844 | 867 | 938 | 780 | 867 | 1,013 | 945 | 1,074 | 1,137 | 828 |
| Grenada | 528 | 683 | 717 | 544 | 664 | 658 | 629 | 463 | 640 | 478 |
| Guatemala | 7,285 | 8,797 | 9,530 | 8,549 | 9,344 | 9,764 | 9,131 | 9,566 | 8,948 | 6,421 |
| Guinea | 575 | 787 | 958 | 908 | 999 | 1,077 | 957 | 924 | 1,069 | 771 |
| Guinea-Bissau | 29 | 30 | 24 | 27 | 29 | 20 | 25 | 28 | 23 | 20 |
| Guyana | 5,413 | 6,201 | 6,295 | 4,327 | 5,162 | 5,284 | 4,527 | 4,625 | 5,089 | 3,631 |
| Haiti | 14,191 | 19,114 | 23,480 | 13,676 | 14,053 | 15,276 | 12,794 | 14,389 | 14,308 | 10,865 |
| Honduras | 3,980 | 5,294 | 5,462 | 4,433 | 5,039 | 5,819 | 7,875 | 5,645 | 6,353 | 5,150 |
| Hong Kong | 2,184 | 1,980 | 2,093 | 1,801 | 1,716 | 1,602 | 1,323 | 1,708 | 1,545 | 1,545 |
| Hungary | 953 | 1,014 | 984 | 891 | 941 | 934 | 729 | 922 | 983 | 754 |
| Iceland | 76 | 97 | 75 | 70 | 88 | 88 | 83 | 69 | 101 | 69 |
| India | 45,985 | 42,928 | 49,897 | 37,854 | 42,213 | 46,188 | 50,802 | 52,194 | 64,631 | 48,109 |
| Indonesia | 2,345 | 2,123 | 2,190 | 1,568 | 1,743 | 1,641 | 1,566 | 1,807 | 2,093 | 1,359 |
| Iran | 9,286 | 9,627 | 11,623 | 9,620 | 10,344 | 9,507 | 8,324 | 8,409 | 11,310 | 8,828 |
| Iraq | 3,360 | 3,523 | 7,771 | 12,377 | 14,899 | 12,130 | 7,875 | 12,448 | 18,366 | 12,321 |
| Ireland | 1,171 | 1,239 | 1,296 | 1,413 | 1,375 | 1,383 | 1,405 | 1,621 | 1,698 | 1,179 |
| Israel | 3,153 | 2,859 | 3,466 | 3,015 | 3,182 | 3,071 | 2,466 | 2,743 | 3,285 | 2,363 |
| Italy | 2,231 | 2,234 | 2,355 | 2,313 | 2,760 | 2,692 | 2,501 | 2,920 | 3,244 | 2,324 |
| Jamaica | 14,591 | 15,531 | 16,442 | 13,547 | 16,566 | 16,772 | 15,087 | 17,213 | 18,010 | 13,465 |
| Japan | 1,744 | 1,663 | 1,837 | 1,635 | 1,858 | 1,758 | 1,713 | 1,869 | 1,969 | 1,584 |
| Jordan | 2,345 | 2,436 | 2,816 | 2,427 | 2,461 | 2,552 | 2,239 | 2,630 | 3,430 | 2,607 |
| Kazakhstan | 891 | 1,040 | 909 | 789 | 819 | 760 | 729 | 823 | 1,147 | 803 |

Cuba AR_000353

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Kenya | 3,621 | 4,170 | 4,257 | 3,885 | 4,738 | 4,834 | 4,348 | 4,302 | 5,329 | 4,186 |
| Korea, North | 13 | 19 | 27 | 24 | 23 | 16 | 15 | 30 | 25 | 17 |
| Korea, South | 12,664 | 13,790 | 15,786 | 13,587 | 14,230 | 14,347 | 14,643 | 16,031 | 16,298 | 11,350 |
| Kosovo | 465 | 510 | 487 | 392 | 547 | 530 | 410 | 451 | 597 | 482 |
| Kuwait | 869 | 820 | 920 | 791 | 819 | 790 | 677 | 789 | 1,111 | 840 |
| Kyrgyzstan | 440 | 420 | 395 | 305 | 418 | 408 | 412 | 483 | 534 | 411 |
| Laos | 5,452 | 7,027 | 3,932 | 2,564 | 2,042 | 1,999 | 1,726 | 2,027 | 2,303 | 1,704 |
| Latvia | 401 | 392 | 364 | 366 | 392 | 356 | 306 | 315 | 365 | 241 |
| Lebanon | 3,127 | 3,002 | 3,002 | 2,528 | 2,463 | 2,284 | 2,081 | 2,339 | 2,683 | 1,715 |
| Lesotho | 11 | 10 | 8 | 11 | 9 | 8 | | 18 | 18 | 7 |
| Liberia | 3,794 | 3,923 | 3,923 | 3,035 | 3,042 | 3,022 | 2,421 | 2,752 | 3,334 | 2,429 |
| Libya | 180 | 195 | 206 | 228 | 193 | 210 | 207 | 308 | 447 | 309 |
| Lithuania | 973 | 938 | 933 | 744 | 752 | 626 | 584 | 699 | 885 | 529 |
| Luxembourg | 18 | 23 | 16 | 34 | 20 | 18 | 14 | 20 | 23 | 20 |
| Macau | 86 | 106 | 97 | 102 | 109 | 101 | 70 | 79 | 92 | 61 |
| Madagascar | 44 | 37 | 50 | 50 | 65 | 75 | 61 | 63 | 63 | 47 |
| Malawi | 86 | 83 | 76 | 76 | 91 | 95 | 84 | 114 | 120 | 91 |
| Malaysia | 1,137 | 1,150 | 1,169 | 1,052 | 1,113 | 1,189 | 1,170 | 1,388 | 1,406 | 942 |
| Mali | 274 | 288 | 332 | 352 | 405 | 456 | 391 | 398 | 446 | 390 |
| Malta | 54 | 44 | 59 | 40 | 50 | 43 | 47 | 51 | 49 | 37 |
| Marshall Islands | 32 | 21 | 17 | 20 | 22 | 27 | 16 | 21 | 15 | 13 |
| Mauritania | 405 | 495 | 520 | 376 | 355 | 323 | 288 | 252 | 319 | 188 |
| Mauritius | 64 | 57 | 67 | 60 | 60 | 63 | 65 | 70 | 67 | 55 |
| Mexico | 94,783 | 102,181 | 99,385 | 94,889 | 105,958 | 103,550 | 118,559 | 131,977 | 122,286 | 84,081 |
| Micronesia, Federated States | 74 | 73 | 96 | 62 | 85 | 67 | 53 | 34 | 39 | 26 |
| Moldova | 1,398 | 1,602 | 1,594 | 1,279 | 1,681 | 1,688 | 1,442 | 1,680 | 2,010 | 1,494 |
| Mongolia | 242 | 286 | 347 | 335 | 324 | 437 | 416 | 468 | 541 | 426 |
| Montenegro | 205 | 231 | 202 | 209 | 209 | 222 | 187 | 205 | 254 | 162 |
| Montserrat | 63 | 51 | 65 | 47 | 43 | 45 | 45 | 52 | 50 | 37 |
| Morocco | 3,656 | 3,872 | 3,768 | 3,538 | 3,805 | 3,684 | 2,943 | 2,644 | 3,142 | 2,462 |
| Mozambique | 49 | 48 | 51 | 34 | 43 | 51 | 38 | 43 | 63 | 32 |
| Namibia | 29 | 42 | 40 | 31 | 27 | 33 | 29 | 29 | 61 | 39 |
| Nepal | 2,235 | 2,448 | 2,711 | 2,888 | 4,225 | 5,004 | 4,509 | 5,352 | 7,409 | 5,793 |
| Netherlands | 60 | 76 | 82 | 665 | 778 | 829 | 699 | 851 | 953 | 667 |
| Netherlands Antilles (former) | | 82 | 43 | 43 | 35 | 42 | 48 | 56 | 56 | 48 |
| New Zealand | 480 | 563 | 482 | 453 | 514 | 565 | 468 | 577 | 668 | 577 |
| Nicaragua | 5,092 | 5,870 | 5,064 | 3,775 | 3,951 | 4,663 | 4,181 | 4,277 | 4,346 | 3,474 |
| Niger | 124 | 143 | 167 | 161 | 180 | 140 | 126 | 110 | 143 | 112 |
| Nigeria | 9,344 | 9,322 | 9,545 | 8,667 | 10,363 | 9,520 | 7,652 | 8,459 | 11,360 | 8,929 |
| North Macedonia | 578 | 635 | 665 | 625 | 611 | 704 | 582 | 669 | 800 | 577 |
| Norway | 90 | 87 | 80 | 92 | 90 | 59 | 60 | 93 | 111 | 270 |
| Oman | 37 | 39 | 41 | 41 | 44 | 58 | 30 | 68 | 68 | 66 |
| Pakistan | 10,655 | 11,150 | 12,948 | 11,210 | 11,912 | 11,729 | 10,166 | 10,414 | 13,079 | 9,975 |
| Palau | 68 | 64 | 50 | 50 | 50 | 43 | 43 | 28 | 32 | 23 |
| Panama | 1,340 | 1,532 | 1,598 | 1,277 | 1,412 | 1,458 | 1,266 | 1,308 | 1,361 | 989 |
| Papua New Guinea | 17 | 16 | 7 | 21 | 7 | 19 | 13 | 19 | 19 | 20 |
| Paraguay | 289 | 338 | 331 | 256 | 338 | 396 | 343 | 401 | 387 | 278 |
| Peru | 10,266 | 11,814 | 9,572 | 10,815 | 10,701 | 11,319 | 10,014 | 10,043 | 9,899 | 6,910 |
| Philippines | 42,520 | 44,958 | 34,591 | 40,815 | 40,815 | 41,285 | 36,828 | 38,816 | 43,668 | 33,417 |
| Poland | 8,844 | 8,715 | 8,697 | 8,304 | 7,886 | 7,198 | 5,840 | 6,370 | 6,973 | 4,653 |
| Portugal | 1,426 | 1,585 | 1,587 | 1,587 | 1,665 | 1,690 | 1,607 | 2,031 | 1,712 | 1,081 |
| Qatar | 101 | 107 | 69 | 69 | 75 | 98 | 95 | 92 | 105 | 120 |
| Romania | 4,314 | 4,253 | 3,267 | 3,267 | 3,478 | 3,379 | 2,986 | 3,104 | 3,627 | 2,320 |
| Russia | 8,257 | 8,154 | 8,222 | 6,552 | 6,552 | 6,067 | 5,534 | 6,225 | 7,628 | 5,360 |
| Rwanda | 265 | 285 | 374 | 300 | 300 | 369 | 267 | 343 | 466 | 410 |

Cuba_AR_000354

| Country | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Saint Kitts and Nevis | 306 | 319 | 315 | 270 | 360 | 345 | 317 | 281 | 335 | 211 |
| Saint Lucia | 600 | 724 | 856 | 635 | 775 | 791 | 697 | 604 | 758 | 574 |
| Saint Vincent and the Grenadines | 416 | 511 | 574 | 405 | 467 | 500 | 507 | 401 | 528 | 363 |
| Samoa | 172 | 178 | 206 | 181 | 213 | 192 | 164 | 168 | 239 | 159 |
| Saudi Arabia | 814 | 779 | 927 | 795 | 796 | 869 | 872 | 990 | 1,313 | 998 |
| Senegal | 752 | 790 | 869 | 806 | 974 | 969 | 882 | 848 | 956 | 742 |
| Serbia | 85 | 109 | 117 | 276 | 522 | 532 | 476 | 596 | 829 | 569 |
| Serbia and Montenegro (former) | 2,185 | 2,012 | 1,830 | 1,338 | 1,297 | 1,164 | 820 | 805 | 820 | 494 |
| Seychelles | 19 | 8 | 15 | 9 | 7 | 17 | 5 | 11 | D | 13 |
| Sierra Leone | 1,831 | 1,861 | 1,613 | 1,406 | 1,692 | 1,662 | 1,328 | 1,177 | 1,604 | 1,319 |
| Singapore | 311 | 293 | 263 | 258 | 285 | 308 | 279 | 332 | 359 | 255 |
| Sint Maarten | - | - | - | 7 | 17 | 33 | 21 | 22 | D | D |
| Slovakia | 421 | 401 | 413 | 317 | 443 | 428 | 384 | 394 | 432 | 275 |
| Slovenia | 57 | 64 | 58 | 52 | 61 | 63 | 52 | 57 | 68 | 68 |
| Somalia | 7,971 | 9,286 | 6,875 | 4,097 | 3,691 | 3,998 | 3,774 | 3,979 | 6,915 | 5,684 |
| South Africa | 2,566 | 2,294 | 2,283 | 2,083 | 2,538 | 2,197 | 1,901 | 2,262 | 2,967 | 2,084 |
| South Sudan | - | 81 | 139 | 132 | 131 | 101 | 74 | 109 | 146 | 101 |
| Soviet Union (former) | 2,812 | 2,610 | 2,807 | 2,334 | 2,372 | 2,268 | 2,123 | 2,252 | 2,280 | 1,589 |
| Spain | 1,253 | 1,242 | 1,367 | 1,326 | 1,414 | 1,515 | 1,469 | 1,674 | 1,945 | 1,517 |
| Sri Lanka | 1,334 | 1,146 | 1,258 | 1,104 | 1,246 | 1,497 | 1,364 | 1,480 | 1,609 | 1,140 |
| Sudan | 2,444 | 2,291 | 1,924 | 1,482 | 1,740 | 1,776 | 1,348 | 1,611 | 2,527 | 1,753 |
| Suriname | 194 | 189 | 160 | 127 | 183 | 164 | 143 | 176 | 170 | 91 |
| Sweden | 872 | 798 | 783 | 724 | 885 | 795 | 708 | 797 | 936 | 731 |
| Switzerland | 427 | 427 | 452 | 388 | 411 | 375 | 333 | 436 | 488 | 365 |
| Syria | 1,981 | 1,814 | 2,196 | 1,832 | 2,004 | 2,043 | 1,789 | 2,475 | 3,364 | 2,455 |
| Taiwan | 5,065 | 4,573 | 5,255 | 4,326 | 4,420 | 4,043 | 4,151 | 4,576 | 4,821 | 3,422 |
| Tajikistan | 155 | 142 | 168 | 146 | 156 | 212 | 222 | 261 | 364 | 251 |
| Tanzania | 516 | 543 | 647 | 525 | 553 | 639 | 547 | 561 | 731 | 530 |
| Thailand | 5,299 | 6,585 | 5,544 | 4,805 | 5,213 | 5,211 | 4,672 | 5,324 | 6,678 | 5,572 |
| Togo | 1,523 | 1,448 | 1,380 | 1,141 | 1,171 | 1,099 | 907 | 893 | 1,054 | 927 |
| Tonga | 251 | 306 | 371 | 473 | 352 | 337 | 262 | 319 | 354 | 300 |
| Trinidad and Tobago | 5,014 | 5,596 | 5,784 | 4,147 | 4,869 | 4,867 | 4,504 | 4,378 | 4,592 | 3,027 |
| Tunisia | 377 | 431 | 499 | 435 | 443 | 473 | 475 | 542 | 730 | 545 |
| Turkey | 3,100 | 3,345 | 3,390 | 2,925 | 3,150 | 3,201 | 3,108 | 3,275 | 3,289 | 2,305 |
| Turkmenistan | 146 | 136 | 160 | 110 | 153 | 102 | 109 | 117 | 203 | 122 |
| Turks and Caicos Islands | 36 | 49 | 47 | 26 | 33 | 31 | 26 | 40 | 28 | 28 |
| Uganda | 838 | 820 | 763 | 724 | 817 | 823 | 742 | 703 | 922 | 727 |
| Ukraine | 8,489 | 9,459 | 8,624 | 6,984 | 8,926 | 8,374 | 6,644 | 6,990 | 8,019 | 5,444 |
| United Arab Emirates | 425 | 431 | 499 | 435 | 443 | 473 | 475 | 542 | 730 | 545 |
| United Kingdom | 9,246 | 9,145 | 9,459 | 8,906 | 10,095 | 9,562 | 9,049 | 10,530 | 12,195 | 8,842 |
| United States | 45 | 46 | 60 | 55 | 75 | 95 | 84 | 122 | 163 | 163 |
| Uruguay | 751 | 840 | 933 | 812 | 902 | 1,044 | 1,028 | 1,073 | 1,089 | 822 |
| Uzbekistan | 2,463 | 3,071 | 2,482 | 1,725 | 1,660 | 1,685 | 1,498 | 1,532 | 1,950 | 1,482 |
| Venezuela | 6,856 | 7,404 | 7,648 | 6,871 | 8,192 | 7,633 | 6,463 | 8,172 | 9,317 | 6,993 |
| Vietnam | 20,922 | 23,490 | 24,277 | 18,837 | 21,976 | 24,848 | 19,323 | 21,082 | 25,646 | 22,705 |
| Virgin Islands, British | 48 | 41 | 45 | 49 | 59 | 46 | 42 | 54 | 59 | 45 |
| Yemen | 1,320 | 1,452 | 1,355 | 1,160 | 1,284 | 1,490 | 1,445 | 1,544 | 2,509 | 2,158 |
| Zambia | 337 | 338 | 352 | 318 | 370 | 404 | 401 | 402 | 501 | 340 |
| Zimbabwe | 715 | 691 | 658 | 734 | 852 | 843 | 675 | 709 | 810 | 559 |
| All other countries[1] | 45 | 40 | 41 | 41 | 41 | 42 | 38 | 42 | 63 | 50 |
| Unknown | 337 | 359 | 201 | 142 | 89 | 26 | 206 | 634 | 394 | 233 |

D Data withheld to limit disclosure.
- Represents zero.
[1] Includes countries with fewer than 10 naturalizations per year.
Note: Based on N-400 data for persons aged 18 and over.

Cuba AR_000355

Source: U.S. Department of Homeland Security.



U.S. Department of Homeland Security

# Fact Sheet: Counter Human Smuggler Campaign Update

**Release Date:** October 6, 2022

*DHS-Led Effort Makes 5,000th Smuggler Arrest in Fewer Than 6 Months*

Launched in April 2022, the Biden Administration's "Counter Human Smuggler" campaign—a first-of-its-kind effort of unprecedented scale led by the Department of Homeland Security (DHS)—is designed to disrupt and dismantle human smuggling networks. In less than six months, this new strategy has produced over a 500% increase in human smuggling disruption activity compared to similar past operations and has recently surpassed 5,000 smuggler arrests.

Transnational criminal organizations (TCOs) that control human smuggling are increasingly exploiting migrants seeking to get to our borders, capitalizing on lies and misinformation and showing very little regard for the lives they endanger every day. Human smuggling syndicates are run like businesses, drawn by high profit margins in what is now a multi-billion-dollar operation. Smuggling networks can be extensive and complex. The Counter Human Smuggler campaign focuses on disrupting key aspects of their criminal operations, including their territory, activities, financial assets, and ability to travel and conduct commerce. DHS has committed over $60 million to the effort and surged more than 1,300 personnel in Latin America and along the Southwest Border.

Because of these increased law enforcement efforts, human smuggling organizations have been forced to change their tactics. Some have shifted their routes. They moved their stash houses – the locations where they hold people being smuggled or stash illicit weapons– further away from the border. They have also increased what they charge and often do not guarantee passage across the border. The smugglers have begun using new methods to conceal and transport migrants. In addition to the arrests, 5,549 disruptions of human smuggler infrastructure have also been carried out, which includes raiding smuggler stash houses, impounding tractor trailers that are used to smuggle migrants, and confiscating smuggler IT to track down more smugglers.

Achieving the 5,000[th] arrest milestone in less than six months demonstrates the effectiveness of this DHS-led interagency collaboration with partners from the U.S. Department of Justice, U.S. Department of State, and other federal, state, local, tribal, territorial, and foreign allies.

A snapshot of the campaign's results, which includes DHS components U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP):

- Homeland Security Investigations (HSI) Midland, HSI Guatemala City, the HSI Guatemala Transnational Criminal Investigative Unit (TCIU), and over 500 Guatemalan law enforcement and military personnel executed a large-scale takedown of human smugglers, consisting of 28 search warrants, resulting in the seizures and arrests of 19 individuals for human smuggling.  Four of the subjects will be extradited to the U.S. for prosecution in the Western District of Texas for the death of a migrant in a human smuggling event, the first time for this type of extradition from Guatemala.  HSI seized over 200 cell phones, 10 vehicles, six firearms, and foreign currency valued at $90,000 in U.S. dollars.
- HSI, with assistance from the United States Border Patrol (USBP) and its state and local law enforcement partners, successfully executed four search warrants, arrested 13 subjects, and apprehended 12 undocumented non-citizens (UNC).  Included in these arrests were several leaders of a human smuggling and money laundering organization.  The 12 UNCs, all Mexican nationals, were apprehended at a stash house in Laredo, Texas.  HSI seized numerous phones, ledgers, computers, seven firearms, three vehicles, 1,000 rounds of ammunition, and an estimated $150,000 in cash and monetary instruments. Additionally, HSI indicted three residences in and around Austin, Texas and anticipate the seizure of these properties, which were purchased with illicit proceeds.
- This interagency campaign also moved quickly to respond to the June 2022 mass casualty event that occurred in San Antonio, Texas, when more than 50 UNCs from Mexico and countries in Central America lost their lives s inside the back of a tractor trailer.  The swift investigation led to four (4) criminal arrests to date in the United States linked to a criminal smuggling organization, and a main target of investigation has been identified outside of the United States.  Investigators continue to gather evidence against the organization responsible in anticipation of future enforcement actions.

Human smuggling is, by definition, a transnational problem. Through its Counter Human Smuggling campaign, the Biden Administration is focused on putting these organizations out of business and working with regional partners in the Americas to apply collective expertise and resources to disrupt and dismantle these transnational criminal organizations.

Cuba AR_000356

###

*This campaign is consistent with our commitments under the Los Angeles Declaration on Migration and Protection endorsed at the Summit of the Americas in June of this year. On October 6, 2022, foreign ministers and representatives from among the twenty-one endorsing countries of the Los Angeles Declaration on Migration and Protection met in Lima, Peru, to advance the shared response to irregular migration and forced displacement throughout the Western Hemisphere. A U.S. Department of State fact sheet detailing progress on existing commitments made under the Los Angeles Declaration can be found* here *(https://www.state.gov/los-angeles-declaration-on-migration-and-protection-lima-ministerial-meeting/).*

## Topics

BORDER SECURITY *(/TOPICS/BORDER-SECURITY)*    HUMAN TRAFFICKING *(/TOPICS/HUMAN-TRAFFICKING)*

## Keywords

DEPARTMENT OF JUSTICE (DOJ) *(/KEYWORDS/DEPARTMENT-JUSTICE-DOJ)*    ENFORCEMENT *(/KEYWORDS/ENFORCEMENT)*

HOMELAND SECURITY INVESTIGATIONS (HSI) *(/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)*    HUMAN SMUGGLING *(/KEYWORDS/HUMAN-SMUGGLING)*

U. S. BORDER PATROL *(/KEYWORDS/U-S-BORDER-PATROL)*

Last Updated: 03/02/2023

Cuba AR_000357

UNCLASSIFIED // FOR OFFICIAL USE ONLY

Cuba AR_000358

# DHS Southwest Border Task Force Executive Leadership Report

23 SEPTEMBER 2022

**Table of Contents**

2. Encounters
3. Encounters: Recent Trends
4. Unaccompanied Children (UC) Dashboard
5. CBP in Custody
6. CBP Encounters
7. Unaccompanied Child Encounters & HHS in Care
8. Unaccompanied Children in Custody & CBP Transfers
9. Family Unit Individual Encounters
10. Family Unit Individual CBP Book-out Dispositions
11. Single Adult Encounters
12. Single Adult CBP Book-out Dispositions
13. Glossary

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Encounters

## DAILY ENCOUNTERS YESTERDAY

**7,055**
Total Encounters
Total includes accompanied minors.
▼7% vs. previous day
▼8% vs. last week's avg
7,596 encounters 2-days ago

**359** — Unaccompanied Children
▼23% vs. previous day
▼6% vs. last week's avg
468 encounters 2-days ago

**1,777** — Family Unit Individuals
▲5% vs. previous day
▲9% vs. last week's avg
1,688 encounters 2-days ago

**4,913** — Single Adults
▼10% vs. previous day
▼8% vs. last week's avg
5,434 encounters 2-days ago

## AVERAGE WEEKLY ENCOUNTERS BY SECTOR

| | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|---|---|---|---|---|---|---|---|---|
| El Paso | 733 | 922 | 931 | 1,040 | 1,108 | 1,245 | 1,725 | 1,689 |
| Del Rio | 1,237 | 1,699 | 1,778 | 1,912 | 1,631 | 1,937 | 1,827 | 1,525 |
| RGV | 912 | 945 | 810 | 802 | 931 | 912 | 895 | 867 |
| All Other | 2,827 | 2,948 | 2,953 | 3,237 | 3,192 | 3,328 | 3,335 | 3,078 |

El Paso Sector — Del Rio Sector — Rio Grande Valley Sector — Other

## AVERAGE WEEKLY ENCOUNTERS BY NATIONALITY



| | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|---|---|---|---|---|---|---|---|---|
| NCA | 1,377 | 1,301 | 1,215 | 1,168 | 1,161 | 1,095 | 1,195 | 1,181 |
| Mex | 1,780 | 2,048 | 1,869 | 1,988 | 2,034 | 1,955 | 2,114 | 1,936 |
| Other | 2,552 | 3,165 | 3,387 | 3,834 | 3,667 | 4,373 | 4,473 | 4,042 |
| Total | 5,709 | 6,514 | 6,471 | 6,990 | 6,862 | 7,423 | 7,782 | 7,159 |

Northern Central America — Mexico — Cuba — Other

## AVERAGE WEEKLY ENCOUNTERS BY FAMILY STATUS

| | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|---|---|---|---|---|---|---|---|---|
| UC | 365 | 370 | 361 | 343 | 392 | 389 | 400 | 378 |
| FM | 1,355 | 1,622 | 1,735 | 1,831 | 1,687 | 1,791 | 1,887 | 1,713 |
| SA | 3,980 | 4,510 | 4,366 | 4,807 | 4,776 | 5,237 | 5,489 | 5,061 |
| Total | 5,709 | 6,514 | 6,471 | 6,990 | 6,862 | 7,423 | 7,782 | 7,159 |

Unaccompanied Children — Family Unit Individuals — Single Adults

23 September 2022

# Encounters: Recent Trends



### DAILY ENCOUNTERS BY NATIONALITY

| | Mexico | Venezuela | Cuba | Nicaragua | Guatemala | Honduras | Colombia | Peru | El Salvador | Ecuador | Haiti | Dom. Rep. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Daily Encounters | 1,936 | 1,078 | 838 | 566 | 489 | 486 | 465 | 261 | 205 | 166 | 136 | 63 |
| 7-Day Average UC | 74 | 8 | 6 | 9 | 143 | 86 | 3 | 2 | 35 | 7 | 0 | 0 |
| 7-Day Average FM | 161 | 285 | 242 | 101 | 51 | 118 | 240 | 122 | 50 | 105 | 43 | 15 |
| 7-Day Average SA | 1,695 | 785 | 590 | 456 | 296 | 282 | 222 | 136 | 121 | 54 | 92 | 48 |
| 12-Month Change | 1% | 220% | 434% | 144% | -39% | -48% | 507% | 808% | -46% | -33% | -71% | N/A |
| 3-Month Change | -10% | 163% | 59% | 59% | -40% | -42% | 8% | 39% | -36% | 52% | 25% | N/A |
| 1-Month Change | -3% | 11% | 22% | 27% | 1% | -1% | 2% | -15% | 7% | 32% | -42% | 49% |
| 1-Week Change | -8% | -11% | -12% | -14% | -3% | -3% | 12% | 2% | 9% | 1% | -22% | -9% |

Data valid as of September 22, 2022 0545. Change percentages reflect the daily average compared to the daily average from the respective period.

### ENCOUNTERS: TOP 6 OTHER COUNTRIES

Nicaragua — Ecuador — Peru — Cuba AR: 000360public — Colombia — Haiti

700
600
500
400
300
200
100
0

4-Aug  11-Aug  18-Aug  25-Aug  1-Sep  8-Sep  15-Sep  22-Sep

### ENCOUNTERS: TOP 5 NON-MEXICAN COUNTRIES

Guatemala — Honduras — El Salvador — Venezuela — Cuba

1,400
1,200
1,000
800
600
400
200
0

4-Aug  11-Aug  18-Aug  25-Aug  1-Sep  8-Sep  15-Sep  22-Sep

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# UC Dashboard



Cuba-AR_000361

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# CBP in Custody

## CBP in Custody

| Country of Citizenship | Total Count | 1-Day Change | 7-Day Avg | 1-Week Change | Avg TIC | < 72 hours | 72 - <120 hours | >= 120 hours |
|---|---|---|---|---|---|---|---|---|
| Mexico | 471 | ▲ 8% | 466 | ▼ 15% | 33 | 443 | 8 | 20 |
| Guatemala | 538 | ▼ 32% | 689 | ▲ 11% | 42 | 456 | 37 | 45 |
| Honduras | 558 | ▲ 21% | 520 | ▲ 1% | 48 | 413 | 125 | 20 |
| El Salvador | 199 | ▲ 4% | 240 | ▼ 14% | 56 | 137 | 30 | 32 |
| NCA Total | 1,295 | ▼ 11% | 1,450 | ▲ 2% | 47 | 1,006 | 192 | 97 |
| Venezuela | 2,904 | ▼ 6% | 3,285 | ▲ 4% | 64 | 1,785 | 683 | 436 |
| Cuba | 1,395 | ▲ 11% | 1,666 | ▲ 26% | 42 | 1,169 | 155 | 71 |
| Nicaragua | 1,254 | ▲ 23% | 1,740 | ▲ 11% | 50 | 953 | 208 | 93 |
| Colombia | 1,091 | ▼ 8% | 1,503 | ▼ 2% | 53 | 838 | 129 | 124 |
| Peru | 473 | ▲ 16% | 668 | ▲ 4% | 57 | 368 | 36 | 69 |
| Ecuador | 461 | ▼ 5% | 525 | ▲ 9% | 73 | 302 | 67 | 92 |
| Haiti | 38 | ▼ 24% | 39 | ▲ 181% | 58 | 28 | 5 | 5 |
| Dom. Rep. | 188 | ▲ 6% | 245 | ▲ 2% | 91 | 90 | 40 | 58 |
| Other | 1,020 | ▼ 10% | 1,342 | ▼ 8% | 76 | 686 | 87 | 247 |
| Other Total | 8,824 | ▼ 10% | 11,013 | ▼ 9% | 59 | 6,219 | 1,410 | 1195 |
| CBP Total | 10,590 | ▼ 10% | 12,928 | ▼ 8% | 56 | 7,668 | 1,610 | 1,312 |

CBP custody data covers persons in custody as of September 23, 2022 05:28.

## CBP Family Unit Individuals in Custody by Location

| USBP Sector/ OFO Field Office | Count | 7-Day Avg | 1-Day Chg | 1-Week Change | % Capacity | Avg TIC |
|---|---|---|---|---|---|---|
| San Diego | 126 | 181 | ▼ 16% | ▲ 19% | 22% | 33 |
| El Centro | 66 | 102 | ▼ 4% | ▼ 33% | 52% | 27 |
| Yuma | 497 | 443 | ▲ 4% | ▼ 33% | 140% | 52 |
| Tucson | 139 | 193 | ▲ 26% | ▼ 22% | 28% | 34 |
| El Paso | 584 | 835 | ▼ 5% | - flat - | 68% | 26 |
| Big Bend | 0 | 0 | - flat - | - flat - | 0% | 0 |
| Del Rio | 250 | 281 | - flat - | ▼ 45% | 54% | 21 |
| Laredo | 35 | 107 | ▲ 73% | ▼ 58% | 6% | 31 |
| RGV | 458 | 728 | ▼ 6% | ▲ 22% | 36% | 55 |
| USBP Total | 2,155 | 2,869 | ▼ 6% | ▼ 16% | 43% | 39 |
| San Diego FO | 44 | 40 | ▼ 47% | ▲ 20% | 42% | 25 |
| Tucson FO | 0 | 1 | - flat - | ▼ 14% | 0% | 0 |
| El Paso FO | 4 | 1 | N/A | ▼ 89% | 9% | 17 |
| Laredo FO | 0 | 8 | ▲ 100% | ▲ 440% | 0% | 0 |
| OFO Total | 48 | 49 | ▲ 2% | ▲ 19% | 18% | 24 |
| Total | 2,203 | 2,919 | ▼ 6% | ▼ 15% | 42% | 38 |

Data covers family unit individuals in custody as of September 23, 2022 05:28.

## CBP Single Adults in Custody by Location

| USBP Sector/ OFO Field Office | Count | 1-Day Change | 7-Day Avg | 1-Week Change | % Capacity | Avg TIC |
|---|---|---|---|---|---|---|
| San Diego | 694 | ▼ 13% | 843 | ▲ 11% | 122% | 62 |
| El Centro | 175 | ▲ 4% | 245 | ▲ 37% | 137% | 38 |
| Yuma | 685 | ▲ 26% | 605 | ▼ 22% | 194% | 36 |
| Tucson | 448 | ▼ 19% | 571 | ▲ 12% | 91% | 55 |
| El Paso | 2,423 | ▼ 10% | 2,592 | ▲ 6% | 282% | 60 |
| Big Bend | 74 | ▲ 469% | 47 | ▲ 313% | 28% | 53 |
| Del Rio | 828 | ▼ 10% | 795 | ▲ 46% | 178% | 25 |
| Laredo | 681 | ▼ 14% | 769 | ▼ 22% | 125% | 81 |
| RGV | 1,672 | ▼ 25% | 2,811 | ▲ 1% | 131% | 102 |
| USBP Total | 7,680 | ▼ 12% | 9,278 | ▼ 7% | 155% | 65 |
| San Diego FO | 85 | - flat - | 93 | ▲ 1% | 80% | 39 |
| Tucson FO | 0 | ▲ 100% | 3 | ▼ 10% | 0% | 0 |
| El Paso FO | 7 | ▲ 40% | 5 | ▲ 27% | 16% | 20 |
| Laredo FO | 7 | ▲ 42% | 12 | ▲ 200% | 9% | 18 |
| OFO Total | 99 | ▼ 7% | 112 | ▲ 7% | 37% | 36 |
| Total | 7,779 | ▼ 12% | 9,390 | ▼ 6% | 149% | 64 |

Data covers single adults in custody as of September 23, 2022 05:28.

Cuba AR_000362

# CBP Encounters

| Country of Citizenship | USBP Encounters | | | | | | OFO Encounters | | | | | | CBP Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 7-Day Avg | 21-Day Avg | UC | FM | SA | Total | 7-Day Avg | 21-Day Avg | UC | FM | SA | Total | 7-Day Avg | 21-Day Avg |
| **Mexico** | 1,652 | 1,663 | 1,738 | 63 | 57 | 1,532 | 308 | 273 | 264 | 10 | 138 | 155 | 1,960 | 1,936 | 2,002 |
| Guatemala | 460 | 480 | 481 | 123 | 62 | 275 | 11 | 9 | 13 | 0 | 5 | 6 | 471 | 489 | 494 |
| Honduras | 399 | 412 | 398 | 89 | 80 | 230 | 80 | 74 | 70 | 1 | 55 | 24 | 479 | 486 | 469 |
| El Salvador | 168 | 188 | 179 | 26 | 43 | 99 | 6 | 18 | 16 | 0 | 4 | 2 | 174 | 205 | 195 |
| **NCA Total** | 1,027 | 1,080 | 1,058 | 238 | 185 | 604 | 97 | 101 | 99 | 1 | 64 | 32 | 1,124 | 1,181 | 1,157 |
| Venezuela | 1,096 | 1,077 | 1,164 | 8 | 293 | 795 | 0 | 1 | 1 | 0 | 0 | 0 | 1,096 | 1,078 | 1,165 |
| Cuba | 767 | 837 | 873 | 9 | 207 | 551 | 2 | 1 | 1 | 0 | 0 | 2 | 769 | 838 | 873 |
| Nicaragua | 501 | 566 | 597 | 13 | 97 | 391 | 0 | 0 | 1 | 0 | 0 | 0 | 501 | 566 | 598 |
| Colombia | 445 | 463 | 451 | 5 | 229 | 211 | 7 | 1 | 2 | 0 | 2 | 5 | 452 | 465 | 453 |
| Peru | 231 | 260 | 268 | 2 | 120 | 109 | 0 | 1 | 1 | 0 | 0 | 0 | 231 | 261 | 269 |
| Ecuador | 165 | 165 | 164 | 6 | 105 | 54 | 0 | 0 | 0 | 0 | 0 | 0 | 165 | 166 | 164 |
| Haiti | 12 | 11 | 6 | 0 | 5 | 7 | 204 | 124 | 163 | 0 | 90 | 114 | 216 | 136 | 169 |
| Dom. Rep. | 54 | 63 | 59 | 0 | 11 | 43 | 0 | 0 | 0 | 0 | 0 | 0 | 54 | 63 | 59 |
| Other | 371 | 360 | 428 | 4 | 103 | 264 | 116 | 110 | 118 | 0 | 71 | 44 | 487 | 470 | 546 |
| **Other Total** | 3,642 | 3,803 | 4,009 | 47 | 1,170 | 2,425 | 329 | 238 | 287 | 0 | 163 | 165 | 3,971 | 4,042 | 4,296 |
| **CBP Total** | 6,321 | 6,546 | 6,805 | 348 | 1,412 | 4,561 | 734 | 613 | 650 | 11 | 365 | 352 | 7,055 | 7,159 | 7,455 |

Note: Data as of 9/23/2022 05:28 describes previous day's total encounters. OFO and CBP total rows also include accompanied minors encountered at ports of entry.

** NOTE: Data reports on all previous day's encounters by CBP; data valid as of 9/23/22 05:28. Daily reporting pulled from the live CBP system are based on interim numbers; values reported today do not capture final data. All Encounters numbers are subsequent between next day and end-of-month reporting.

CBP_APP_00035686

6

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Unaccompanied Child Encounters & HHS in Care

Cuba AR_000364

## CBP Unaccompanied Child Encounters in Custody

### Encounters

| | Count | 21-Day Avg |
|---|---|---|
| Non-Mexicans | 286 | 316 |
| Mexicans 13 and younger | 10 | 10 |
| Mexicans 14 and older | 63 | 64 |
| **Total** | **359** | **389** |

Data as of 9/23/22 05:28 describes previous day's unaccompanied child encounters by CBP.

### CBP Unaccompanied Children in Custody

| | In Custody | In Custody > 72 hours | Avg TIC (hours) | Processed Complete |
|---|---|---|---|---|
| | 451 | 0 | 24 | 302 |
| | 12 | 0 | 14 | 8 |
| | 52 | 0 | 18 | 28 |
| **Total** | **515** | **0** | **23** | **338** |

Data as of 9/23/22 05:28 describes previous day's unaccompanied child encounters and transfers by CBP, and today's unaccompanied children in custody.

### Transfers

| | TOT ERO | Mexican Returns |
|---|---|---|
| | 260 | 0 |
| | 1 | 4 |
| | 3 | 57 |
| **Total** | **264** | **61** |

## CBP Unaccompanied Child Encounters by Country

| Country of Citizenship | % of Total | Count | 7-day Average | 1-day Change | 1-week Change |
|---|---|---|---|---|---|
| **Mexico** | 20% | 73 | 74 | - flat - | ▼ 5% |
| Guatemala | 34% | 123 | 143 | ▼ 29% | ▲ 2% |
| Honduras | 25% | 90 | 86 | ▼ 26% | ▼ 9% |
| El Salvador | 7% | 26 | 35 | ▼ 54% | ▼ 15% |
| **NCA Total** | **67%** | **239** | **264** | **▼ 32%** | **▲ 6%** |
| Venezuela | 2% | 8 | 8 | ▼ 20% | ▲ 38% |
| Cuba | 3% | 9 | 6 | ▼ 18% | ▲ 11% |
| Nicaragua | 4% | 13 | 9 | ▲ 160% | ▼ 23% |
| Colombia | 1% | 5 | 3 | ▲ 25% | ▲ 57% |
| Peru | 1% | 2 | 2 | ▲ 100% | ▲ 50% |
| Ecuador | 2% | 6 | 7 | ▼ 20% | ▼ 11% |
| Haiti | 0% | 0 | 0 | ▲ 100% | ▲ 200% |
| Dominican Republic | 0% | 0 | 0 | - flat - | ▲ 100% |
| Other | 1% | 4 | 4 | ▼ 20% | ▼ 4% |
| **Other Total** | **13%** | **47** | **40** | **▲ 12%** | **- flat -** |
| **Total** | | **359** | **378** | **▼ 23%** | **▲ 6%** |

Data as of 9/23/22 05:28 describes previous day's encounters by CBP.

## CBP Unaccompanied Child Encounters by Location

| USBP Sector / OFO Field Office | % of Total | Count | 7-day Average | 1-Day Change | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 2% | 7 | 10 | ▲ 46% | ▲ 3% |
| El Centro | 3% | 9 | 6 | ▲ 50% | ▲ 39% |
| Yuma | 6% | 20 | 19 | ▲ 100% | ▼ 18% |
| Tucson | 16% | 59 | 50 | ▼ 8% | ▼ 17% |
| El Paso | 15% | 54 | 68 | ▲ 53% | ▼ 4% |
| Big Bend | 1% | 2 | 2 | N/A | ▼ 7% |
| Del Rio | 12% | 43 | 36 | ▼ 54% | ▼ 8% |
| Laredo | 3% | 11 | 10 | ▼ 35% | ▲ 1% |
| RGV | 40% | 143 | 166 | ▼ 30% | ▼ 3% |
| **USBP Total** | **97%** | **348** | **366** | **▼ 24%** | **▼ 6%** |
| San Diego FO | 1% | 2 | 3 | ▼ 33% | ▲ 45% |
| Tucson FO | 1% | 4 | 3 | ▼ 20% | ▲ 77% |
| El Paso FO | 1% | 3 | 1 | ▲ 200% | - flat - |
| Laredo FO | 1% | 2 | 4 | ▲ 33% | ▲ 138% |
| **OFO Total** | **3%** | **11** | **12** | **▼ 8%** | **▲ 15%** |
| **Total** | | **359** | **378** | **▼ 23%** | **▼ 6%** |

Data as of 9/23/22 05:28 describes previous day's encounters by CBP.

## HHS ORR Unaccompanied Children in Care

| | Previous Day | 7-Day Avg | 21-Day Avg |
|---|---|---|---|
| UCs Referred from DHS | 341 | 321 | 331 |
| UCs Discharged from HHS | 339 | 314 | 306 |
| Total in Care | 9,530 | 9,397 | 9,212 |
| Operational Occupancy | 65% | 62% | 61% |
| Discharge Rate | 3.5% | 3.3% | 3.3% |

Data as of 9/23/22 05:00 describe unaccompanied children in care. Operational occupancy includes active influx.

## HHS ORR Unaccompanied Child Discharges by Sponsor Type

| | # Discharges | % Discharges | Avg Days |
|---|---|---|---|
| 1. Parent or Guardian | 779 | 35% | 18 |
| 2. Other Close Relative | 1,015 | 46% | 28 |
| 3. Other Sponsor | 318 | 14% | 56 |
| 4. No Sponsor | 83 | 4% | 97 |
| **Total** | **2,195** | | **31** |

Data as of 9/23/22 05:00 describe unaccompanied child discharges for week ending 9/22/22.

23 September 2022

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Unaccompanied Children in Custody & CBP Transfers

| USBP Sector / OFO Field Office | CBP Unaccompanied Children in Custody | | | | | | | Transfers | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Count | 1-Day Change | 7-Day Average | 1-Week Change | % Capacity | Avg TIC | Processed Complete | TOT ERO | Mexican Returns |
| San Diego | 10 | - flat - | 8 | ▼30% | 2% | 16 | 4 | 3 | 8 |
| El Centro | 11 | ▲267% | 6 | ▲48% | 9% | 21 | 9 | 1 | 0 |
| Yuma | 18 | ▲6% | 20 | ▼24% | 5% | 17 | 14 | 17 | 4 |
| Tucson | 93 | ▲133% | 59 | ▼35% | 19% | 26 | 61 | 18 | 18 |
| El Paso | 123 | ▲4% | 123 | ▲3% | 14% | 32 | 84 | 43 | 4 |
| Big Bend | 1 | N/A | 2 | ▲300% | 0% | 6 | 0 | 0 | 0 |
| Del Rio | 56 | ▲124% | 42 | ▼34% | 12% | 22 | 37 | 21 | 6 |
| Laredo | 11 | ▼27% | 9 | ▲6% | 2% | 18 | 8 | 5 | 11 |
| RGV | 189 | ▲16% | 188 | ▼13% | 15% | 17 | 121 | 154 | 9 |
| **USBP Total** | **512** | **▲31%** | **457** | **▼7%** | **10%** | **23** | **338** | **262** | **60** |
| San Diego FO | 2 | ▼50% | 5 | ▼33% | 2% | 20 | 0 | 2 | 1 |
| Tucson FO | 0 | - flat - | 1 | N/A | 0% | 0 | 0 | 0 | 0 |
| El Paso FO | 1 | N/A | 0 | ▼50% | 2% | 9 | 0 | 0 | 0 |
| Laredo FO | 0 | ▼100% | 2 | ▲175% | 0% | 0 | 0 | 0 | 0 |
| **OFO Total** | **3** | **▼50%** | **8** | **▼10%** | **1%** | **16** | **0** | **2** | **1** |
| **Total** | **515** | **▲30%** | **465** | **▼7%** | **10%** | **23** | **338** | **264** | **61** |

Data as of 9/23/22 05:28 describes today's unaccompanied children in custody and previous day's unaccompanied child transfers by CBP.

Cuba AR_000365

DHS Southwest Border Task Force Executive Leadership Report – Data Tables

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Family Unit Individual Encounters

| Country of Citizenship | USBP Encounters | | | | | | OFO Encounters | | | | | CBP Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change |
| Mexico | 3% | 57 | ▲ 20% | 62 | ▲ 13% | 8% | 138 | ▼ 5% | 99 | ▲ 5% | 11% | 195 | ▼ 10% | 161 | ▼ 3% |
| Guatemala | 3% | 62 | ▼ 48% | 46 | ▼ 4% | 0% | 5 | ▼ 44% | 5 | ▼ 58% | 4% | 67 | ▲ 31% | 51 | ▼ 14% |
| Honduras | 5% | 80 | ▼ 12% | 71 | ▼ 3% | 3% | 55 | ▼ 19% | 47 | ▼ 30% | 8% | 135 | ▼ 15% | 118 | ▼ 13% |
| El Salvador | 2% | 43 | ▲ 8% | 41 | ▼ 13% | 0% | 4 | ▼ 60% | 9 | ▲ 27% | 3% | 47 | ▼ 6% | 50 | ▲ 15% |
| NCA Total | 10% | 185 | ▼ 7% | 158 | ▲ 3% | 4% | 64 | ▼ 26% | 60 | ▼ 30% | 14% | 249 | ▲ 4% | 218 | ▼ 9% |
| Venezuela | 16% | 293 | ▼ 24% | 285 | ▼ 14% | 0% | 0 | - flat - | 0 | ▼ 80% | 16% | 293 | ▼ 24% | 285 | ▼ 15% |
| Cuba | 12% | 207 | ▼ 13% | 242 | ▼ 7% | 0% | 0 | - flat - | 0 | - flat - | 12% | 207 | ▼ 13% | 242 | ▼ 7% |
| Nicaragua | 5% | 97 | ▼ 9% | 101 | ▼ 9% | 0% | 0 | - flat - | 0 | - flat - | 5% | 97 | ▼ 9% | 101 | ▼ 9% |
| Colombia | 13% | 229 | ▲ 3% | 239 | ▼ 15% | 0% | 2 | N/A | 0 | N/A | 13% | 231 | ▲ 4% | 240 | ▲ 15% |
| Peru | 7% | 120 | ▲ 18% | 122 | - flat - | 0% | 0 | - flat - | 0 | ▼ 100% | 7% | 120 | ▲ 18% | 122 | ▲ 1% |
| Ecuador | 6% | 105 | ▲ 13% | 105 | ▼ 2% | 0% | 0 | - flat - | 0 | N/A | 6% | 105 | ▲ 13% | 105 | ▼ 2% |
| Haiti | 0% | 5 | N/A | 3 | ▲ 100% | 5% | 90 | ▲ 84% | 40 | ▼ 52% | 5% | 95 | ▲ 94% | 43 | ▲ 49% |
| Dom. Rep. | 1% | 11 | ▼ 31% | 15 | ▲ 53% | 0% | 0 | - flat - | 0 | - flat - | 1% | 11 | ▼ 31% | 15 | ▲ 53% |
| Other | 6% | 103 | ▲ 13% | 123 | ▼ 28% | 4% | 71 | ▲ 137% | 59 | ▼ 24% | 10% | 174 | ▲ 44% | 181 | ▼ 26% |
| Other Total | 66% | 1,170 | ▲ 3% | 1,235 | ▼ 7% | 9% | 163 | ▲ 106% | 99 | ▼ 39% | 75% | 1,333 | ▲ 10% | 1,334 | ▼ 10% |
| CBP Total | 79% | 1,412 | ▲ 3% | 1,455 | ▼ 6% | 21% | 365 | ▲ 17% | 258 | ▼ 24% | 100% | 1,777 | ▲ 5% | 1,713 | ▼ 9% |

Data reports on previous day's family unit individual encounters by CBP; data valid as of September 23, 2022 0528.

## CBP Family Unit Individual Encounters by Location

| USBP Sector / OFO Field Office | % of Total | Count | 1-day Change | 7-day Avg | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 4% | 68 | ▼ 24% | 99 | ▼ 13% |
| El Centro | 3% | 49 | ▼ 23% | 69 | ▼ 1% |
| Yuma | 20% | 358 | ▼ 52% | 303 | ▼ 3% |
| Tucson | 3% | 55 | ▼ 41% | 65 | ▲ 6% |
| El Paso | 24% | 431 | ▼ 10% | 456 | ▲ 3% |
| Big Bend | 0% | 3 | N/A | 0 | ▲ 50% |
| Del Rio | 16% | 285 | - flat - | 289 | ▼ 18% |
| Laredo | 0% | 2 | ▼ 67% | 4 | ▲ 26% |
| RGV | 9% | 161 | ▼ 11% | 171 | ▲ 5% |
| USBP Total | 79% | 1,412 | ▲ 3% | 1,455 | ▼ 6% |
| San Diego FO | 9% | 153 | ▲ 31% | 136 | ▲ 21% |
| Tucson FO | 2% | 33 | ▼ 54% | 26 | ▲ 46% |
| El Paso FO | 1% | 16 | ▲ 11% | 7 | ▲ 79% |
| Laredo FO | 9% | 163 | ▼ 55% | 88 | ▲ 50% |
| OFO Total | 21% | 365 | ▲ 17% | 258 | ▼ 24% |
| Total | | 1,777 | ▲ 5% | 1,713 | ▼ 9% |

Cuba AR_000366

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Family Unit Individual CBP Book-out Dispositions

## CBP Family Unit Individual Book-out Dispositions by Country of Citizenship

| Disposition Type | Mexico | Guatemala | Honduras | El Salvador | Venezuela | Cuba | Nicaragua | Colombia | Peru | Ecuador | Haiti | Dom. Rep. | Other | CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 29 | 21 | 26 | 5 | N/A | 0 | 0 | N/A | 0 | N/A | 0 | 0 | 0 | 81 |
| Title 42 delayed | 25 | 141 | 10 | 10 | N/A | 0 | 0 | N/A | 33 | N/A | 0 | 0 | 0 | 219 |
| Repatriations processed by CBP | 8 | 1 | 0 | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 9 |
| Transfer to ICE for removal processing | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Transfer to ICE for release with NTA | 5 | 0 | 3 | 0 | 0 | 8 | 0 | 6 | 14 | 0 | 0 | 0 | 4 | 40 |
| Release with NTA | 121 | 9 | 54 | 4 | 0 | 0 | 2 | 34 | 3 | 0 | 96 | 0 | 101 | 424 |
| Release with I-94 parole ATD | 3 | 6 | 12 | 19 | 279 | 213 | 148 | 145 | 66 | 97 | 1 | 18 | 83 | 1,090 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | 210 | 178 | 105 | 38 | 279 | 221 | 151 | 185 | 116 | 97 | 97 | 18 | 188 | 1,883 |

## CBP Family Unit Individual Book-out Dispositions by USBP Sector

| Disposition Type | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | USBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 0 | 36 | 0 | 37 | 2 | 0 | 6 | 0 | 0 | 81 |
| Title 42 delayed | 0 | 0 | 0 | 0 | 2 | 146 | 4 | 21 | 46 | 219 |
| Repatriations processed by CBP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 |
| Transfer to ICE for removal processing | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 4 |
| Transfer to ICE for release with NTA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 32 |
| Release with NTA | 0 | 0 | 2 | 0 | 0 | 0 | 82 | 0 | 2 | 86 |
| Release with I-94 parole ATD | 0 | 181 | 50 | 473 | 119 | 87 | 0 | 115 | 65 | 1,090 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | 0 | 217 | 52 | 510 | 123 | 237 | 92 | 139 | 145 | 1,515 |

## CBP Family Unit Individual Book-out Dispositions by OFO Field Office

| Disposition Type | El Paso | Laredo | San Diego | Tucson | OFO Total |
|---|---|---|---|---|---|
| Title 42 immediate | 0 | 0 | 0 | 0 | 0 |
| Title 42 delayed | 0 | 0 | 0 | 0 | 0 |
| Repatriations processed by CBP | 0 | 4 | 0 | 2 | 6 |
| Transfer to ICE for removal processing | 0 | 0 | 0 | 0 | 0 |
| Transfer to ICE for release with NTA | 0 | 0 | 8 | 0 | 8 |
| Release with NTA | 9 | 172 | 137 | 20 | 338 |
| Release with I-94 parole ATD | 0 | 0 | 0 | 0 | 0 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 3 | 2 | 0 | 11 | 16 |
| Other | 0 | 0 | 0 | 0 | 0 |
| **Total** | 12 | 178 | 145 | 33 | 368 |

Data in "Repatriations processed by CBP" rows represent ER or reinstatement, no fear claim, bag and baggage, voluntary return, and withdrawal dispositions limited to nationals of Mexico, Guatemala, Honduras, and El Salvador.

Data valid as of September 23, 2022 05:28 describes previous day's book-outs of family unit individuals.

Cuba AR_000367

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Single Adult Encounters

| Country of Citizenship | USBP Encounters | | | | | OFO Encounters | | | | | CBP Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change | Count | 1-day Change | 7-day Average | 1-Week Change | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change |
| Mexico | 31% | 1,532 | ▼15% | 1,537 | ▼10% | 155 | ▼28% | 159 | ▲5% | 34% | 1,687 | ▼16% | 1,695 | ▼9% |
| Guatemala | 6% | 275 | ▲18% | 292 | ▲2% | 6 | ▲500% | 4 | ▼58% | 6% | 281 | ▲16% | 296 | ▲2% |
| Honduras | 5% | 230 | ▲11% | 256 | ▲3% | 24 | ▲25% | 27 | ▲30% | 5% | 254 | ▲6% | 282 | ▲5% |
| El Salvador | 2% | 99 | ▲29% | 112 | ▲13% | 2 | ▲83% | 9 | ▲27% | 2% | 101 | ▲34% | 121 | ▲16% |
| NCA Total | 12% | 604 | ▲11% | 659 | ▲2% | 32 | ▲29% | 39 | ▲30% | 13% | 636 | ▲13% | 698 | ▲4% |
| Venezuela | 16% | 795 | ▼5% | 784 | ▼10% | 0 | ▲100% | 1 | ▲80% | 16% | 795 | ▼5% | 785 | ▼10% |
| Cuba | 11% | 551 | ▼4% | 589 | ▼14% | 2 | N/A | 1 | - flat - | 11% | 553 | ▲3% | 590 | ▼14% |
| Nicaragua | 8% | 391 | ▲19% | 456 | ▼15% | 0 | ▲100% | 0 | - flat - | 8% | 391 | ▲19% | 456 | ▼15% |
| Colombia | 4% | 211 | ▲6% | 221 | ▼9% | 5 | N/A | 0 | N/A | 4% | 216 | ▲9% | 222 | ▼8% |
| Peru | 2% | 109 | ▲12% | 136 | ▼4% | 0 | - flat - | 1 | ▲100% | 2% | 109 | ▲12% | 136 | ▼5% |
| Ecuador | 0% | 54 | ▲22% | 54 | ▼9% | 0 | - flat - | 0 | N/A | 1% | 54 | ▲22% | 54 | ▲8% |
| Haiti | 0% | 7 | ▲13% | 8 | ▲100% | 114 | ▲35% | 84 | ▲52% | 2% | 121 | ▲34% | 92 | ▲4% |
| Dom. Rep. | 1% | 43 | ▲13% | 48 | ▲18% | 0 | - flat - | 0 | - flat - | 1% | 43 | ▲13% | 48 | ▲18% |
| Other | 5% | 264 | ▲10% | 234 | ▲15% | 44 | ▲21% | 51 | ▼24% | 6% | 308 | ▲4% | 285 | ▼12% |
| Other Total | 49% | 2,425 | ▲1% | 2,529 | ▼10% | 165 | ▼29% | 139 | ▼39% | 53% | 2,590 | ▲4% | 2,667 | ▼10% |
| CBP Total | 93% | 4,561 | ▼8% | 4,725 | ▼9% | 352 | ▼29% | 336 | ▼24% | 100% | 4,913 | ▼10% | 5,061 | ▼8% |

Data reports on previous day's single adult encounters by CBP; data valid as of September 23, 2022 05:28.

## CBP Single Adult Encounters by Location

| USBP Sector / OFO Field Office | % of Total | Count | 1-Day Change | 7-Day Average | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 8% | 403 | ▲25% | 382 | ▼3% |
| El Centro | 3% | 155 | ▲14% | 185 | ▲4% |
| Yuma | 12% | 597 | ▲35% | 493 | ▲11% |
| Tucson | 14% | 671 | ▼6% | 530 | ▼15% |
| El Paso | 20% | 964 | ▲25% | 1,165 | ▲4% |
| Big Bend | 1% | 46 | ▲318% | 38 | ▼7% |
| Del Rio | 23% | 1,130 | ▲1% | 1,201 | ▲16% |
| Laredo | 4% | 188 | ▲31% | 201 | ▲4% |
| RGV | 8% | 407 | ▼32% | 530 | ▼3% |
| USBP Total | 93% | 4,561 | ▼8% | 4,725 | ▼9% |
| San Diego FO | 2% | 121 | ▼26% | 128 | ▲2% |
| Tucson FO | 0% | 20 | ▲77% | 32 | ▲20% |
| El Paso FO | 1% | 29 | ▼12% | 25 | ▼16% |
| Laredo FO | 4% | 182 | ▼14% | 151 | ▲10% |
| OFO Total | 7% | 352 | ▼29% | 336 | ▼5% |
| Total | | 4,913 | ▼10% | 5,061 | ▼8% |

Cuba AR_000368

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Single Adult CBP Book-out Dispositions

## CBP Single Adult Book-out Dispositions by Country of Citizenship

| Disposition Type | Mexico | Guatemala | Honduras | El Salvador | Venezuela | Cuba | Nicaragua | Colombia | Peru | Ecuador | Haiti | Dom. Rep. | Other | CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title 42: immediate | 1,084 | 224 | 169 | 60 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 1,543 |
| Title 42: delayed | 266 | 151 | 12 | 22 | N/A | 0 | 3 | 99 | N/A | 0 | 0 | N/A | 0 | 554 |
| Repatriations processed by CBP | 177 | 2 | 7 | 2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 188 |
| Transfer to ICE for removal processing | 3 | 2 | 2 | 4 | 130 | 11 | 82 | 63 | 53 | 14 | 8 | 22 | 173 | 567 |
| Transfer to ICE for release with NTA | 1 | 0 | 15 | 2 | 34 | 18 | 5 | 3 | 7 | 1 | 0 | 6 | 19 | 112 |
| Release with NTA | 10 | 5 | 24 | 2 | 47 | 13 | 0 | 3 | 3 | 0 | 104 | 1 | 31 | 243 |
| Release with I-94 parole ATD | 0 | 1 | 1 | 0 | 834 | 661 | 625 | 202 | 88 | 46 | 6 | 29 | 129 | 2,622 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 20 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 23 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 1,561 | 387 | 231 | 92 | 1,045 | 703 | 715 | 370 | 152 | 64 | 118 | 58 | 356 | 5,852 |

## CBP Single Adult Book-out Dispositions by USBP Sector

| Disposition Type | Big Bend | Del Rio | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | USBP Total |
|---|---|---|---|---|---|---|---|---|---|
| Title 42: immediate | 7 | 452 | 180 | 225 | 46 | 72 | 444 | 0 | 1,483 |
| Title 42: delayed | 0 | 11 | 46 | 22 | 164 | 113 | 85 | 81 | 554 |
| Repatriations processed by CBP | 11 | 5 | 3 | 8 | 23 | 9 | 37 | 28 | 126 |
| Transfer to ICE for removal processing | 0 | 80 | 150 | 222 | 27 | 22 | 42 | 3 | 556 |
| Transfer to ICE for release with NTA | 0 | 0 | 0 | 0 | 21 | 34 | 0 | 40 | 95 |
| Release with NTA | 0 | 4 | 1 | 0 | 0 | 65 | 0 | 1 | 73 |
| Release with I-94 parole ATD | 0 | 521 | 319 | 366 | 637 | 348 | 262 | 64 | 2,622 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 18 | 1,073 | 699 | 843 | 918 | 663 | 870 | 217 | 5,509 |

## CBP Single Adult Book-out Dispositions by OFO Field Office

| Disposition Type | El Paso | Laredo | San Diego | Tucson | OFO Total |
|---|---|---|---|---|---|
| Title 42: immediate | 8 | 34 | 14 | 4 | 60 |
| Title 42: delayed | 0 | 0 | 0 | 0 | 0 |
| Repatriations processed by CBP | 8 | 27 | 18 | 9 | 62 |
| Transfer to ICE for removal processing | 2 | 2 | 6 | 1 | 11 |
| Transfer to ICE for release with NTA | 1 | 1 | 15 | 0 | 17 |
| Release with NTA | 5 | 120 | 45 | 0 | 170 |
| Release with I-94 parole ATD | 0 | 0 | 0 | 0 | 0 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 4 | 4 | 5 | 10 | 23 |
| Other | 0 | 0 | 0 | 0 | 0 |
| Total | 28 | 188 | 103 | 24 | 343 |

Data in "Repatriations processed by CBP" rows represent ER or reinstatement, no fear claim, bag and baggage, voluntary return, and withdrawal dispositions limited to nationals of Mexico, Guatemala, Honduras, and El Salvador.

Data valid as of September 23, 2022 05:28 describes previous day's book-out of single adults.

Cuba AR_000369

# Leadership Report Glossary

Definitions are in alphabetical order from left to right, top to bottom

### SW Border Executive Leadership Report Color Chart

| By Demographic – | By Citizenship – | By Agency – |
|---|---|---|
| Unaccompanied Child (UC) | Mexico (Mex) | Customs and Border Protection (CBP) |
| Single Adult (SA) | Northern Triangle Countries (NTC) | Health and Human Services (HHS) |
| Family Unit (FM) | Other | Immigration and Customs Enforcement (ICE) |

| Term | Definition |
|---|---|
| Accompanied Minor | A child who has no lawful immigration status in the United States, is younger than 18 years old, and is traveling with a lawfully admissible adult. |
| All non-Mexican UCs and Mexican UCs 13 or younger | Refers to combined apprehensions/inadmissibles (under Title 8) processed under CBP's immigration authority. Under the Homeland Security Act (as amended by the Trafficking Victims Protection Reauthorization Act) non-Mexican UCs are admitted into ORR care; most Mexican UCs younger than 14 years-old are also transferred into ORR care. |
| Alternatives to detention (ATD) enrollments with tech / without tech | ICE program using technology and other tools to manage a noncitizen's compliance with release conditions while they are on the non-detained docket. |
| Available beds for SW border transfer | Operational metric based on field reporting used by ICE to describe the number of beds in interior facilities available to accept transfers from the border. |
| Average days in care for children discharged in last 7 days | The average number of days spent in ORR care by unaccompanied children who were discharged from ORR care over the past 7 days. |
| Average length of stay (ICE detention) | Calculated as time between book-in and book-out for noncitizens booked out of ICE custody. (Not calculated for noncitizens remaining in ICE custody). |
| Beds available for border designation or transfer (UC Dashboard) | The number of beds ostensibly available for ORR designation or transfer. This includes beds that are available for direct border placement, as well as beds that are technically available, but not necessarily for direct border placement. |
| Capacity (CBP) | Total short-term holding space in CBP border facilities, accounting for COVID-related restrictions. |
| Capacity (ICE) | Total funded ICE detention beds for single adults under current appropriations law, excluding beds that are unavailable due to litigation, COVID, and for operational or other reasons. |
| CBP holding (UC Dashboard) | Noncitizens held for processing in CBP border facilities. |
| CBP processed complete | Noncitizens in CBP facilities who have been completely processed and are awaiting transfer. |
| Children discharged in last 7 days by individual sponsor category (UC Dashboard) | The number of unaccompanied children who have been discharged in the last 7 days, divided into 1 of 4 sponsor categories: 1. Parent or legal guardian; 2. An immediate relative - a brother, sister, grandparent or other close relatives (aunt, uncle, first cousin) who either was or was not previously the UC's primary caregiver; 3. Other sponsor, such as distant relatives and unrelated adult individuals; 4. No sponsors identified. |

| Term | Definition |
|---|---|
| Children transferred out of CBP custody (UC Dashboard) | Unaccompanied children who are booked out of CBP custody for transfer to ORR care facilities. |
| Encounter forecast – UC Dashboard | CBP's projected number of daily encounters with unaccompanied children from countries other than Mexico. |
| Encounters | The sum of USBP Title 8 apprehensions, OFO Title 8 inadmissibles, and noncitizens processed for expulsions under Title 42 authority by USBP or OFO. |
| Expulsions | Noncitizens expelled under Title 42 authority (see Title 42). |
| Family unit individuals (FM) | Individuals processed by CBP who belong to a family unit, defined as one or more minors plus their parent(s) or legal guardian(s) with whom they are traveling; excludes minor children (under the age of 18) traveling with adult family members who are not their parents or legal guardians. All references to family units or FMs are to numbers of individuals in families, not to family groupings. |
| Flight capacity (Ice Air) | The percentage of seats occupied based on total number of seats per flight. |
| I-94 parole-ATD (CBP book-out disposition) | Noncitizens paroled into the United States by CBP and enrolled in an ICE alternatives to detention (ATD) program prior to their release. |
| In CBP holding > 72 hours (UC Dashboard) | The number of Unaccompanied Children (excluding those from Mexico) in CBP custody over 72 hours. With the exception of Mexican and Canadian children who are amenable to Voluntary Return (VR), the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) requires CBP to transfer the child to ORR custody within 72 hours of determining they meet the Unaccompanied Child definition. |
| In Detention (ICE) | Noncitizens detained in ICE civil immigration detention system in furtherance of their removal proceedings or to affect their departure from the United States after a final order of removal from a federal immigration judge. |
| In ORR Care > 35 days (UC Dashboard) | Unaccompanied children who have been in ORR care over 35 days (excluding long term foster care) - an indicator that a child has been in ORR care for a long time, as the process of finding, vetting, and reunifying a sponsor with a child is ideally fewer than 35 days. |

Cuba AR_000370

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Leadership Report Glossary

Definitions are in alphabetical order from left to right, top to bottom

| Term | Definition |
|---|---|
| Mexicans 14 or older (UC Dashboard) | Unaccompanied Children from Mexico may be repatriated by CBP if the following are true: • The child has not been a victim of a severe form of trafficking in persons and there is no credible evidence that the minor is at risk of being trafficked upon return to his/her country of nationality or last habitual residence (as documented on CBP Form 93); • The child does not have a fear of returning to his/her country of nationality or last habitual residence owing to a credible fear of persecution; and • The child is able to decide independently to return voluntarily to his/her country of nationality or last habitual residence. |
| Northern Central America (NCA) | El Salvador, Guatemala, and Honduras. |
| Notice to appear (NTA) | The I-862 form, a document that instructs an individual to appear before an immigration judge. This is the first step in starting removal proceedings under Section 240 of the Immigration and Nationality Act. |
| Other releases (FM and SA Dashboards) | Persons released from CBP custody without being booked into ICE custody or enrolled in ATD. |
| Parole (CBP) | Discretionary permission granted to an otherwise inadmissible noncitizen to temporarily enter the United States due to an emergency and urgent humanitarian reason or significant public benefit |
| Ports of entry | Any location in the United States or its territories that is designated as a point of entry for noncitizens and U.S. citizens. |
| Released ATD - no Tech (FM and SA Dashboards) | Noncitizens released from CBP custody and immediately enrolled in ATD without some form of technology. |
| Released ATD with Tech (FM and SA Dashboards) | Noncitizens released from CBP custody and immediately enrolled in ATD with some form of technology. |
| Repatriations | The sum of Title 8 removals and returns to countries of citizenship. |
| Room occupancy (FM Dashboard) | Number of rooms housing family units in ICE custody divided by the number of total rooms available. |

| Term | Definition |
|---|---|
| Single adults (SA) | Individuals encountered by CBP who are at least 18 years of age and not part of a family unit. |
| Time in custody (TIC) | Elapsed time between a noncitizen's border encounter and the time at which TIC is calculated (applies to noncitizens who remain in CBP custody at the time of the report). |
| Title 42 (T42) | Title 42 of the United States Code, which includes provisions related to public health. Under a March 2020 CDC order, border encounters processed under Title 42 authority are expelled from the United States as expeditiously as possible in the interest of U.S. public health to prevent the spread of COVID-19. |
| Title 42 delayed expulsions | Noncitizens expelled under Title 42 authority following transfer from their encounter area of responsibility to another CBP area of responsibility or to ICE for expulsion by air. |
| Title 42 immediate expulsions | Noncitizens expelled under Title 42 authority by CBP from the area of responsibility of their encounter. |
| Title 8 (T8) | Title 8 of the United States Code, which includes most provisions for immigration enforcement. Encounters processed under Title 8 authority may be subject to removal from the United States. |
| Total beds (UC Dashboard) | The number of 'total beds designated' plus the number of 'beds available to designate' (see definitions of each term). |
| Total beds designated (UC Dashboard) | The number of beds designated to unaccompanied children based on the current census of children (includes those pending transfer from CBP, in transit, and physically in ORR's care). Total beds designated = beds designated to kids in care + beds designated to kids who haven't arrived yet. |
| Total discharges from ORR care (UC Dashboard) | The number of unaccompanied children who have exited ORR's care. |
| Unaccompanied children (UC) | Children who have no lawful immigration status in the United States, are younger than 18 years old, and either: 1. Do not have a parent or legal guardian in the U.S., or 2. Do not have a parent or legal guardian in the U.S. who is able to provide care and physical custody. |
| Unaccompanied children system capacity (UC Dashboard) | A ratio (expressed as a percentage) that compares the total number of unaccompanied children in CBP and ORR care to the total number of ORR beds in use or available for initial ORR designations. |

Cuba AR_000371

14



# Eligible to Naturalize Overview

Click to view Tabular page

| Cob Name | Eligible to Naturalize | State or Territory |
|---|---|---|
| Cuba | All | All |

**U.S. Map view by State or Territory**    *Select a Map view by:* States or Territories

© 2022 Mapbox © OpenStreetMap

**No. Lawful Permanent Residents by States or Territories**    *Select a Chart view by:* States or Territories

| State or Territory | Eligible to Naturalize | LPR Count | |
|---|---|---|---|
| Florida | Yes | 342,341 | |
| | No | 76,761 | |
| Texas | Yes | 31,677 | |
| | No | 9,961 | |
| Nevada | Yes | 10,425 | |
| | No | 2,291 | |
| Kentucky | Yes | 9,412 | |
| | No | 2,574 | |

Values less than 1,000 are suppressed to avoid disclosing information about individuals. In these instances, the map and tables may appear blank or reflect a zero or "D".

OIS Refresh as of:
8/12/2022 12:39:34 PM

Cuba AR_000372

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Uniting for Ukraine

**Since previous report, 792 supporter applications were filed on behalf of Ukrainian U4U parolees. Since March 24th, a total of 152,660 Ukrainians have entered the United States, including 58,356 U4U parolees and 0 unaccompanied children.**

I-134 Data Transmitted From USCIS to CBP → Approval/Denial Status Sent to USCIS → Approved Ukrainian Citizens Schedule Travel → Travel Status Checked For Arriving Ukrainians

## U4U SUPPORTER APPLICATIONS

**133,711**

Cumulative applications

+792 since previous report

## U4U USCIS ACCOUNTS

**96,797**

Cumulative beneficiary accounts

+594 since previous report

## TRAVEL AUTHORIZATIONS

**94,306**

Cumulative approvals

+564 since previous report

## U4U ARRIVALS AT POES

**58,356**

Cumulative parolees

+605 since previous report

**0**

Cumulative UC parolees

+ 0 since previous report

| Port of Entry | Parole Grants |
|---|---|
| Air | 57,908 |
| Land | 445 |
| Sea | 3 |

Pending | Approvals/Confirmations | Denials/Non-Confirmations | Active approvals

**152,660**

Total Entries Since March 24th

+1,042 since previous report

## OTHER ADMISSIONS & HUMANITARIAN RELIEF

### TPS APPLICATIONS

SINCE APR. 19TH

**24,452**

Cumulative applications

+87 since previous report

### EAD APPLICATIONS

SINCE MAR. 24TH

**50,853**

Cumulative applications

+558 since previous report

TPS Applicants | Traditional Parolees | U4U Parolees

### ADMISSIONS & NON-U4U PAROLE

SINCE MAR. 24TH

**24,469**
Admissions
+166 since previous report

**45,966**
Admissions
+247 since previous report

**22,936**
Entries
+5 since previous report

**933**
Admissions
+19 since previous report

B1/B2 | Other | Total

Cuba AR_000373

Notes: Report data are person-level (i.e., exclude duplicate entry records). U4U supporter application denials data include expired applications and exclude administrative closures. Active approvals include unexpired approvals for beneficiaries who remain outside the United States (and are therefore eligible to enter in the future). As of 9/22/22, 100% of Ukrainians with approved U4U travel authorizations arriving at POEs have entered the United States as parolees. TPS application denials data include withdrawn applications. Non-U4U admission and parole data exclude returning LPRs, crew members, inadmissible Ukrainians, and unknown classes of admission. Data validity times: 6:35 AM for U4U parole application and my USCIS account data; 6:12 AM for travel authorization, U4U entries, and other Ukrainian admissions data; 6:43 AM for TPS applications data valid; and 9:00 AM for EAD applications data.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

2

# Uniting for Ukraine

## I-134 Supporters by Top Metro Areas

| Metro Area | Total | % of Total |
|---|---|---|
| New York-Newark-Jersey City, NY-NJ-PA | 22,220 | 17% |
| Chicago-Naperville-Elgin, IL-IN-WI | 16,997 | 13% |
| Seattle-Tacoma-Bellevue, WA | 7,244 | 5% |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 6,046 | 5% |
| Los Angeles-Long Beach-Anaheim, CA | 4,579 | 3% |
| Sacramento-Roseville-Folsom, CA | 3,861 | 3% |
| Miami-Fort Lauderdale-Pompano Beach, FL | 3,529 | 3% |
| Portland-Vancouver-Hillsboro, OR-WA | 3,249 | 2% |
| Detroit-Warren-Dearborn, MI | 2,983 | 2% |
| Cleveland-Elyria, OH | 2,966 | 2% |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 2,587 | 2% |
| San Francisco-Oakland-Berkeley, CA | 1,974 | 1% |
| Non-CBSA | 1,896 | 1% |
| Atlanta-Sandy Springs-Alpharetta, GA | 1,779 | 1% |
| Boston-Cambridge-Newton, MA-NH | 1,634 | 1% |
| Other | 50,167 | 38% |
| **Total** | **133,711** | **N/A** |

## U4U Entries by Top POEs

| Port of Entry | Total | % of Total |
|---|---|---|
| JFK | 12,369 | 21% |
| ORD | 11,207 | 19% |
| EWR | 5,736 | 10% |
| SEA | 3,967 | 7% |
| LAX | 3,178 | 5% |
| MIA | 3,128 | 5% |
| SFO | 2,462 | 4% |
| ATL | 2,324 | 4% |
| IAD | 1,662 | 3% |
| BOS | 1,596 | 3% |
| Other | 10,727 | 18% |
| **Total** | **58,356** | **N/A** |

## U4U Parolees by Age & Sex



Notes: Age group 0-17 contains 3 parolees whose gender is unknown. Age group 31-44 contains 2 parolees whose gender is unknown. Data validity times: 6:35 AM for I-134 supporters by top metro areas; 6:12 AM for U4U entries by POE and U4U Parolees by age & sex.

Cuba AR_000374



Home > Newsroom > All News > Alerts > USCIS Resumes Cuban Family Reunification Parole Program Operations

# USCIS Resumes Cuban Family Reunification Parole Program Operations

Release Date : 09/01/2022

U.S. Citizenship and Immigration Services (USCIS) is resuming operations under the Cuban Family Reunification Parole (CFRP) program, beginning with pending CFRP program applications.

USCIS has begun to mail interview notices to CFRP program petitioners with instructions for the beneficiary interview. On Aug. 18, USCIS began conducting interviews at the U.S. Embassy Havana. USCIS has limited capacity to conduct interviews at this time, so beneficiaries should not take any steps to prepare for an interview until their petitioner receives an interview notice.

In addition, USCIS is sending out general information (PDF, 211.93 KB) about the resumption of the program to petitioners with pending CFRP program applications.

USCIS is not issuing new invitation letters at this time. We will update our website and make public announcements when the next round of CFRP program invitation notices is issued. A petitioner who previously filed a CFRP program application that is still pending should not file another application.

If you are a petitioner with a pending CFRP program application, please ensure that both USCIS and the Department of State's National Visa Center have your current mailing address. To update your address with USCIS, please use our online change of address tool. Contact the National Visa Center by submitting a Public Inquiry Form online.

As USCIS resumes CFRP program interviews, we will not email or call you to ask for money or payment of fees. Do not become the victim of an immigration scam. Visit the Avoid Scams page for information and resources.

The CFRP program was established in 2007 to provide a safe, orderly pathway to the United States for certain Cuban beneficiaries of approved family-based immigrant petitions. The program allows certain eligible U.S. citizens and lawful permanent residents who receive an invitation letter to apply for parole for their family members in Cuba. If USCIS approves these family members for parole, they may come to the United States before their immigrant visa priority dates become current. CFRP processing was suspended due to the significant drawdown in U.S. government personnel from U.S. Embassy Havana for security reasons in 2017 and the closure of the USCIS field office in Havana in 2018.

Last Reviewed/Updated: 09/01/2022

Cuba AR_000376



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

November 15, 2013                                            PM-602-0091

# Policy Memorandum

SUBJECT:   Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S.
Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on
Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

## Purpose

This policy memorandum (PM) amends Chapter 21.1 of the Adjudicator's Field Manual (AFM) to
ensure consistent adjudication of parole requests made on behalf of aliens who are present without
admission or parole and who are spouses, children and parents of those serving on active duty in the
U.S. Armed Forces, in the Selected Reserve of the Ready Reserve or who previously served in the U.S.
Armed Forces or Selected Reserve of the Ready Reserve.

This PM also amends AFM Chapter 40.6 concerning the effects of parole on an alien's inadmissibility
under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i). This amendment to AFM chapter
40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel.

## Scope

This PM applies to and is binding on all U.S. Citizenship and Immigration Services (USCIS)
employees.

## Authority

INA §§ 212(a)(6)(A)(i), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1182(a)(6)(A)(i),
1182(d)(5)(A), 1225(a), and 1255(a), (c)

## Background

### Parole of Spouses, children and parents of Armed Forces personnel

- In partnership with the Department of Defense (DoD), USCIS has launched a number of initiatives
  to assist military members, veterans, and their families to navigate our complex immigration
  system and apply for naturalization and other immigration services and benefits.
- This PM builds on these important initiatives as there is concern within DoD that some active
  members of the U.S. Armed Services, individuals serving in the Selected Reserve of the Ready
  Reserve and individuals who have previously served in the U.S. Armed Forces or Selected Reserve

Cuba AR_000377

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 2

of the Ready Reserve face stress and anxiety because of the immigration status of their family
members in the United States.

- Military preparedness can potentially be adversely affected if active members of the U.S. Armed
  Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly
  called into active duty, worry about the immigration status of their spouses, parents and children.

- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety
  because of the immigration status of their family members in the United States.  We as a nation
  have made a commitment to our veterans, to support and care for them.  It is a commitment that
  begins at enlistment, and continues as they become veterans.

- Responding to these and similar concerns by several Members of Congress about soldiers and
  veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's
  commitment to assisting military families.  The Secretary identified several of the discretionary
  tools that the Department utilizes "to help military dependents secure permanent immigration status
  in the United States as soon as possible."  Among the tools listed was "parole ... to minimize
  periods of family separation, and to facilitate adjustment of status within the United States by
  immigrants who are the spouses, parents and children of military members."[1]

- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for
  "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the
  United States.  Although it is most frequently used to permit an alien who is outside the United
  States to come into U.S. territory, parole may also be granted to aliens who are already physically
  present in the U.S. without inspection or admission.  This latter use of parole is sometimes called
  "parole in place."  The legal authority for granting parole in place was formally recognized by the
  then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2]  That
  opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3]  In
  2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in
  relevant part.[4]  The basic authority for parole in place is INA § 212(d)(5)(A), which expressly
  grants discretion to parole "any alien applying for admission to the United States."  INA §
  235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the
  United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives
(Aug. 30, 2010).
[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission
Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.
[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the
Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted
in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).
[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between
Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007).
The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to
release from detention under  INA § 236(a)(2)(B) (so-called "conditional parole"), see Matter of Castillo-Padilla, 25 I&N
Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole
under INA § 212(d)(5)(A)).

Cuba AR_000378

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 3

- This PM addresses two related issues.  The first is a policy question:  Should parole in place be granted to certain family members of active duty members of the U.S. Armed Forces, *individuals in the Selected Reserve of the Ready Reserve*, or individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve?  The second is a legal question: Does parole in place (for military family members or anyone else) affect whether an alien is inadmissible under INA § 212(a)(6)(A)(i)?  That provision is discussed below and is critical to determining the alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, parole in place is to be granted only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS[5] decides to grant parole in that situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds.  The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).  Aliens who have entered the United States without inspection, while not "arriving aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up.  Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.  As is true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate.  In enacting the various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

---

[5] ICE and CBP also have parole authority.  "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008).  Their decisions whether to grant parole are outside the scope of the present PM.
[6] INA § 235(a)(1).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 4

individual grounds cover past, present, or future events, or some combination thereof.[7]  In particular, when Congress intended that a ground cover both past and present events, it said so explicitly.[8]  In contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense. Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i) would be practically superfluous.  Ordinarily, the only way for an alien to be present in the United States without admission or parole, as the first prong requires, is to have entered without inspection at some point in the past.[9]  Those individuals would already be covered by the second prong if "arrives" were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary. Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two anomalies.  First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically superfluous.  Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i), reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not possibly have intended.  The latter ground renders inadmissible any alien who has ever been unlawfully present in the United States for more than 180 days and then departs, but it limits the inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence.  If the second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct.  *See, e.g.*, sections 212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added); 212(a)(1)(A)(iv) ("determined … to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis added).  Other grounds cover only events that have occurred in the past (up to and including the present time).  *See, e.g.*, sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity) (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted, or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any other alien to enter or to try to enter the United States in violation of law") (emphasis added).  Still others cover only predictions of future activity.  *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge"); 212(a)(10)(A) ("coming to the United States to practice polygamy").

[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted to procure … prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist … party"); 212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit …"); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented, himself or herself" to be a U.S. citizen).

[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within even the more expansive interpretation of the second prong.  If the alien seeks admission at a designated port of entry, is denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be inadmissible under the first ground but not the second one.  It would be far-fetched, however, to assume that this was the only intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).

[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the United States."  But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have to be that "arrives" means "arrives or, if the person has not departed, has arrived."  There is no apparent legal basis or policy reason to interpret "arrives" in that way.

Cuba AR_000380

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 5

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless. One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i). Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years. That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole. Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled. And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place. It is not a question of *parole* curing or erasing the second inadmissibility ground. Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies. An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status. First, adjustment of status requires that the person be "admissible." INA § 245(a)(2). As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i). Second, adjustment of status requires that the alien have been "inspected and admitted or paroled." INA § 245(a). The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well. The alien must still, however, satisfy all the other requirements for adjustment of status. One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection). Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific congressional focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i). It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 6

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States." INA § 245(c)(2). Parole does not erase any periods of prior unlawful status. Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**
AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞   1. A new section 21.1(c) is added to read:

## 21.1   General Information About Relative Petitions

\* \* \* \* \*

(c) <u>Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve</u>.  The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, USCIS grants parole <u>in place</u> only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

o  Completed Form I-131, Application for Travel Document (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

o  Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or *less*, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 7

- o Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173);
- o Two identical, color, passport style photographs; and
- o Evidence of any additional favorable discretionary factors that the requestor wishes considered.

☞ 2. Chapter 40.6.2(a) of the AFM is revised:
   a. By amending Chapter 40.6.2(a)(1);
   b. By deleting Chapter 40.6.2(a)(3)(ii);
   c. By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as Chapter 40.6.2(a)(4)(ii); and
   d. By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

## 40.6.2 Individual Grounds of Inadmissibility Under INA Section 212(a)(6)

### (a) INA Section 212(a)(6)(A):  Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place

(1) General.  INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.  Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

*Parole.*  An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

Cuba AR_000383

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 8

(even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.  Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a). The grant of parole overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  Parole does not erase any periods of prior unlawful status or any other applicable grounds of inadmissibility.  An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

* * * * *

 (4) Exemptions and Waivers

* * * * *

 (ii) Waivers.  There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c).  As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 9

☞   3.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical
order, to read:

| AFM Update AD12-30 11/15/2013 | **Chapter 21.1(c)** **Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |
|---|---|---|

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official
duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit,
substantive or procedural, enforceable at law or by any individual or other party in removal
proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the
Field Operations Directorate.



Cuba AR_000386

FOUO / LAW ENFORCEMENT SENSITIVE

# Customs and Border Protection
# After Action Report (AAR)
# Mass Migration Event (MME)
# Del Rio, Texas
# September 8, 2021 – September 24, 2021
# Report Date: October 7, 2021



# United States Border Patrol
# Del Rio Sector

**Op Order Name:** Del Rio, TX Mass Migration Event (MME)
**Report Date:** October 5, 2021
**Authors:** PAIC ████████████, PAIC ████████████, PAIC ████████████,
PAIC ████████████

## DATES

A.  Mass Migration Event Operational Dates:  September 8, 2021 – September 24, 2021

## LOCATION

Del Rio, Texas, Del Rio Sector (DRT) ████████
████████████████████████

## COMMAND

A.  **Mass Migration Event Chain of Command**:

| | |
|---|---|
| ████████████ | Del Rio Sector (Interim) Chief Patrol Agent |
| | Laredo Sector Deputy Chief Patrol Agent (Incident Commander) |
| ████████████ | Del Rio Station Patrol Agent in Charge (Deputy IC) |
| | Eagle Pass Station Patrol Agent in Charge (Deputy IC) |
| | Special Operations Detachment Patrol Agent in Charge (Deputy IC) |

## DESCRIPTION:

A.  **Executive Summary**

From September 8, 2021 to September 24, 2021, Del Rio Sector (DRT) experienced an unprecedented Mass Migration Event (MME) of primarily Haitian nationals illegally crossing into the United States that created a humanitarian crisis which overwhelmed U.S. Border Patrol (USBP), CBP and greater DHS resources.  This was the largest mass migration event in recorded history of the USBP.  A gap in intelligence dissemination and inadequate resourcing and response capabilities resulted in DRT being unprepared to initially manage the volume and speed of which migrants illegally crossed into the United States in a short period of time.  An Incident Command Post (ICP) stood up by USBP and supported by numerous federal, state, local law enforcement components, and non-governmental organizations (NGOs), led efforts to manage the MME.  During the 17-day MME, DRT, supported by internal and external partners encountered 19,752 migrants making illegal entry seeking passage into the United States.

DRT faced significant challenges when thousands of primarily Haitian nationals illegally crossed into the United States in ████████ at the weir dam and accumulated underneath the Del Rio Port of Entry (DRL POE) International Bridge.  At one point, the mass of subjects underneath the bridge reached approximately 15,000 migrants from 58 different

FOUO//LAW ENFORCEMENT SENSITIVE

countries. USBP, along with internal and external partners, faced conditions consistent with those of a mass casualty type event, public health and humanitarian crisis. Already faced with overcrowded temporary holding facilities and limited ground and air transport capabilities, DRT could not relocate subjects to safer facilities/environments from the bridge in an expeditious manner commensurate with the need. Many of the subjects suffering from heat exhaustion or other conditions necessitated immediate medical attention. Additionally, migrants required water and nourishment while waiting for days in areas that became increasingly unsanitary.

Supported by multiple sectors, internal and external partners, the Incident Commander (IC) employed over ▮▮▮ law enforcement and support personnel to feed, provide general and medical care, transport and process the migrants over the 17-day span. On September 24, 2021, DRT transported the last remaining migrants from underneath the bridge and formally returned command of operations back to Del Rio Station. During the MME, DRT fortunately did not experience any migrant deaths, violent events, or use of force incidents.

## B. Mission Statement

CBP will protect our nation's borders, personnel, infrastructure, and ensure the health and safety of the traveling public, while managing the effects of a land mass migration surge. CBP will provide additional manpower and resources to Del Rio Sector and Field Office to ensure border security in coordination with State and Local law enforcement partners.

## C. Intelligence/ Events Leading to Event

a. Since June of 2021, in the Del Rio Station (DRS) area of responsibility, large numbers of migrants began congregating at the boundary fence near the ▮▮▮▮▮▮ ▮▮▮▮▮▮" waiting to turn themselves in to law enforcement and Border Patrol agents. There was no shelter at this location for migrants, especially families with vulnerable persons, small children and pregnant females, were consistently experiencing medical issues due to the heat and exposure to the elements.

b. On July 30, 2021, DRT implemented a temporary staging area under the DRL POE International Bridge to allow the freely congregating migrants shelter from the elements while they waited to surrender to Border Patrol agents. Due to the number of migrants congregating at this location DRT provided security, 900 feet of temporary fencing, water, four light plants, twelve port-a-potties, hand washing stations, and dumpsters to maintain sanitation and to prevent the spread of disease as much as possible with limited resources.

c. On average, between 200 to 1,000 migrants were staged under the bridge while DRT arranged for transportation to various stations and other Sectors for processing. A large portion these migrants were Haitian. The identified catalyst

LODED/LAW ENFORCEMENT SENSITIVE

that caused a rapid increase in migrants staged under the International Bridge was the short notice cancelation of Title 42 expulsion flights from September 8, 2021, until September 19, 2021, to Haiti. Throughput was interrupted as 900 migrants that were processed for expulsion flights had to be re-processed through other available dispositional pathways. DRT was already holding approximately 3,200 migrants in temporary holding facilities, 688% over its capacity, when the mass migration event began. The number of staged migrants rapidly increased from 2,456 on September 13, 2021, to a high of 14,921 on September 18, 2021.

## D. Timeline of Events

Day 1: Wednesday September 8, 2021
- DRT holding 2,159 in custody / 648 unprocessed
- Title 42 Flights to Haiti Cancelled
- Total DRT POE (Bridge) Encounters 345

Day 2: Thursday September 9, 2021
- Total DRT POE Encounters 454

Day 3: Friday September 10, 2021
- Total DRT POE Encounters 486

Day 4: Saturday September 11, 2021
- Current state of DRT POE is 907 subjects under the bridge. Most are identified as Haitian migrants.
- Numbers of illegal crossings begin to rapidly increase

Day 5: Sunday September 12, 2021
- DRT holding 2,274 in custody / 1,015 unprocessed
- Additional 499 DRT POE Encounters
- A total of 1,500 migrants are reported to be staged under the DRT POE Bridge

Day 6: Monday September 13, 2021
- Additional 738 DRT POE Encounters
- A total of 2,456 migrants are staged under the DRT POE Bridge

Day 7: Tuesday September 14, 2021
- Additional 848 DRT POE Encounters
- A total of 3,171 migrants are staged under the DRT POE Bridge
- Intelligence reports 8 full charter buses arrive in Ciudad Acuna with more on the way

Day 8: Wednesday September 15, 2021
- 7,007 migrants staged under the DRT POE Bridge
- Del Rio Sector requests additional manpower and OA assistance
- Overtime guidance is updated for all USBP manpower

FOUO//LAW ENFORCEMENT SENSITIVE

Day 9: Thursday September 16, 2021
- Encounters increase to over 1,000 per day and rapidly increase
- A total of 10,503 migrants are staged under the DRT POE Bridge
- Initial request to close the Del Rio POE is submitted
- ICE Aviation Operations is directed to resume Haitian flights beginning next week
- OA assistance begins to arrive in mass

Day 10: Friday September 17, 2021
- DRT holding 2,286 in custody / 1,255 unprocessed
- A total of 13,965 migrants are staged under the DRT POE Bridge
- EOC expands for additional OA tracking and transportation coordination
- Del Rio Sector begins transporting migrants to other Sectors for processing assistance
- DHS Volunteer Force reaches high water mark of ███ personnel
- Bureau of Prisons reaches high water mark of ███ personnel
- Texas DPS begins relocating up to ████ troopers to assist in securing the border
- Texas National Guard is activated and begins to arrive in Del Rio
- DRT POE closes at 1600 hours and reroutes traffic to the Eagle Pass POE.
- Eagle Pass POE entry lanes are reduced to one lane of entry for all cross-border traffic
- All Del Rio Sector Checkpoints closed
- SOG Mobile Command Center (MCC) arrives and becomes operational as ICP

Day 11: Saturday September 18, 2021
- A high-water mark of 14,921 migrants staged under the DRT POE bridge
- Outside temperature reaching 106° Fahrenheit.
- Government of Mexico (GOM) increases efforts to deter migrants in Ciudad Acuna
- GOM established 5 active checkpoints on highways leading into the State of Coahuila, Mexico.  All buses with migrants are being turned around.
- ICE ERO increases manpower support to Del Rio Sector

Day 12: Sunday September 19, 2021
- DRT holding 2,789 in custody / 1,986 unprocessed
- A total of 11,941 migrants are staged under the DRT POE bridge
- Texas DPS hits a high-water mark of ████ personnel
- First 3 Title 42 Expulsion Flights to Haiti begin
- Del Rio Police Department deployed to assist
- Kinney County Sheriff's Office deployed to assist
- Val Verde County Sheriff's Office deployed to assist

Day 13: Monday September 20, 2021
- A total of 10,413 migrants are staged under the DRT POE bridge
- HHS DMAT reaches high water mark of ███ personnel for medical assistance
- San Antonio Fire Department personnel arrive for medical assistance

- HSI reaches high water mark of ▮ personnel
- OFO begins processing migrants at the Export Lot and Passport Control Area.
- Prosecution accepted for migrant bus event in Sarita, Texas (escape)

Day 14: Tuesday September 21, 2021
- A total of 8,556 migrants are staged under the DRT POE bridge
- ICE ERO reaches high water mark of ▮ personnel
- Expulsion flights continue to Haiti

Day 15: Wednesday September 22, 2021
- DRT holding in custody 2,745 / 1,103 unprocessed
- A total of 4,994 migrants are staged under the DRT POE bridge
- OFO manpower reaches a high-water mark of ▮ officers
- USBP manpower reaches a high-water mark of ▮ agents

Day 16: Thursday September 23, 2021
- DRT holding 3,216 in custody / 1,059 unprocessed
- A total of 3,447 migrants are staged under the DRT POE bridge

Day 17: Friday September 24, 2021
- DRT holding 2,959 in custody / 743 unprocessed
- All migrants moved to processing facilities.  Zero (0) remain under the DRT POE bridge
- Demobilization begins and OA support begins to reduce
- Operational control of DRT POE is transferred back to Del Rio Station PAIC
- Del Rio POE issues a press release for the re-opening of the port at 1600 hours



FOUO//LAW ENFORCEMENT SENSITIVE

E. **Statistics/ Outcomes based on the information from e3 (All statistics are preliminary, subject to change, and should be considered unofficial)**
   a. Total Encounters (T8 and T42): 19,752
      - No Entry Zone Confirmed: 107
      - Del Rio Zone █: 19,538
      - 5 Encounters (Mexican Nationals) are amenable to Title 42 immediate and therefore do not have an assigned Zone in e3
   b. Disposition Breakdown:
      - Deportable Apprehensions (T8): 13,926
      - Title 42 Delayed (T42): 5,821
      - Title 42 Immediate (T42): 5
   c. Demographics:
      - Family Unit (FMUA): 10,646
      - Single Adults (SAs and FMGs): 9,047
      - Unaccompanied Children (UACs): 59
   d. Peak Holding at POE Bridge was 14,921 on 9/18/2021
   e. Peak Day: 09/21/2021 had a total of 2,958 encounters
   f. Highest in custody number 3,216 on 9/23/2021 (DRT only)
   g. Citizenship:
      - A total of 58 unique Countries of Citizenship were encountered.
      - Top 5 Countries (95% of all encounters):
        1. Haiti: 13,893 (70%)
        2. Chile: 2,146 (11%)
        3. Cuba: 1,210 (6%)
        4. Venezuela: 1,077 (5%)
        5. Brazil: 489 (2%)
      - Haitian subjects traveled through multiple countries prior to entering the United States. Some subjects from Chile, Brazil, or other countries may belong to Haitian Family Units but have citizenship in the country in which they were born.
      - See Country Breakdown (Annex A) for a full list of the 58 countries and encounters.
   h. Total number processed for Title 42 expulsion to Haiti was 4,435 with 3,440 expelled during the reporting period.
      - As of September 30, 2021, 6,085 Haitians have been expelled by aircraft (additional flights are expected)
   i. There were ██ Law Enforcement and support personnel who responded to the MME (Refer to Annex B for agency breakdown)
   j. Contracts for 139 porta potties, 28 hand washing stations, and 8 bulk trash bins were used to support the migrants (this was wholly insufficient but also exhausted total regional supplies)

FOUO//LAW ENFORCEMENT SENSITIVE

k. Red Cross provided 17,000 hygiene kits (each kit contained a razor blade that had to be removed prior to issuance)

l. World Central Kitchen and local contracted vendors provided 14,000 meals daily to migrants on average.

**m.** CBP medical personnel responded to 672 calls for assistance to evaluate and treat migrants.  A total of 425 migrants required advanced care and were referred to HHS DMAT medical personnel.  Migrants were treated for a variety of issues ranging from seizures to respiratory distress.  Medical teams delivered one baby at the POE bridge and 10 others were born at local hospitals.  A total of 16 migrants were transported to local hospitals after being evaluated by DMAT medical personnel.  **<u>There were zero (0) deaths during the MME.</u>**

n. Border Patrol Search and Rescue teams successfully performed 56 water rescues in the Rio Grande River.  Most water rescues occurred on September 23, 2021 (53 rescues)

o. ▮ transport buses and ▮ transport vans were surged into Del Rio for assistance. (There actual requirement was ▮ busses, but the requirement could not be met from current government/private sector supplies)

- ▮ USBP buses
- ▮ Contract Services buses
- ▮ United States Marshal Service buses
- ▮ Bureau of Prison buses
- ▮ leases buses
- ▮ Vans
- ▮ contracted vans

**F. Law Enforcement and Support Partners**

a. Air and Marine Operations
b. Office of Field Operations
c. Department of Homeland Security Volunteer Force
d. Immigration and Customs Enforcement, Enforcement and Removal Operations Special Response Team (ERO/SRT)
e. Homeland Security Investigations Special Response Team (HSI/SRT)
f. Department of Justice (DOJ) Bureau of Prisons (BOP)
g. Health and Human Services (HHS)
h. Texas Department of Public Safety (DPS)
i. Texas Military Department (Texas National Guard)
j. Val Verde County Sheriff's Office (VVSO)
k. City of Del Rio, Mayor's Office
l. Del Rio Police Department (DRPD)
m. Texas Parks and Wildlife Department (TPWD)
n. San Antonio Fire Department (FDSA)
o. Texas Intrastate Fire Mutual Aid System (TIFMAS)
p. National Institute of Migration of Mexico (INM)

FOUO//LAW ENFORCEMENT SENSITIVE

q.  Mission Border Hope (NGO, Eagle Pass, TX)
r.  Val Verde Border Humanitarian Coalition (NGO, Del Rio, TX)
s.  World Central Kitchen (NGO)

**G. Roles and Responsibilities**

The U.S. Border Patrol was the lead Component charged with managing the MME due to statutory authority.  The Incident Command Post (ICP) was stood up on September 16, 2021, and the Incident Commander (IC) was responsible for coordination with supporting federal, state, local partners, and non-governmental organizations.  The IC conducted daily operational briefs with supporting partners for situational awareness as well as task assignments.  Responsibilities were broken down into the support categories of Administrative Support, Intelligence Support, Operational Support, Logistical Support and Medical Support.  The DRT Sector Chief maintained responsibility of controlling the outer perimeter and security patrols within the crowds in the containment zone, which afforded the ability to provide security and immediate medical assistance when necessary



**H. Technical Performance**

The current processing pathways in place are adequate for normal migrant and seasonal flow.  However, the sheer volume of the mass migration overwhelmed throughput within CBP, ICE, and HHS.  Personnel, CBP facility holding/detention capacities, and transportation (ground and air) are wholly insufficient to safely manage this type of Mass Migration event. Synchronization between USBP and ERO manifests continues to evolve to decrease processing and transfer of custody time.

**I. Equipment Performance**

All equipment performed as expected.  Del Rio Sector and CBP Facilities, Maintenance, and Equipment (FM&E) facilitated many contracts in support of life sustaining functions

for migrants and personnel assisting with operations, security, and support. Equipment not readily available to CBP was contracted through local vendors.

**J. Finance and Resources**

   a. Del Rio Sector Finance Office continues to work through pending acquisitions and reconciliation processes. Actual figures are expected to fluctuate as reimbursements and fiscal year closeouts continue. Estimates are current as of October 7, 2021.
   b. DRT Sector Expenses: ███
   c. OFAM / FM&E Expenses: ███
   d. PMOD Expenses: ███
   e. SPAD Expenses: ███
   f. Border Patrol TDY estimate per day ███
   g. Overtime cost estimate ███
   h. HHS DMAT cost estimate: ███
   i. Loyal Source Contract for 13 days: ███
   j. Sanitation Expenses: ███
   k. Del Rio Sector weekly fuel cost: ███
   l. Ground Transportation: ███
   m. ICE flight cost ███
   n. Department of Defense flight support cost estimate - ███
   o. DHS Volunteer Force ███
   **p. Total DRT / Border Patrol Cost Estimate:** ███
   q. Additionally, Office of Field Operations (OFO) reported a loss of an average of ███ daily in estimated duties and fees collected as well as an estimated ███ lost in import value.

**K. Safety Concerns**

Ensuring the safety of migrants, law enforcement, and support personnel was the first line of effort for the IC.

   a. The Del Rio POE closure mitigated potential risk to all personnel below the bridge.
   b. A Temporary Flight Restriction (TFR) was put in place for the safety and security of the migrants and the numerous law enforcement aviation assets supporting operations. Media and privately owned drones caused a concern and the TFR provided an effective way to mitigate safety issues while allowing operations to continue uninterrupted.
   c. AMO was able to synchronize aviation support and leverage local organic resources to provide ISR capabilities to maintain situational awareness and enhance officer safety on a 24 hour cycle.
   d. Local and national media requests for drone coverage were coordinated through the DRT Strategic Communications Office.

LAW ENFORCEMENT SENSITIVE

e. CBP EMTs were immediately requested and redirected to support medical needs.

f. COVID exposure and other contagious disease spread in a mass migration event continues to be a safety issue for law enforcement and the general public. Multiple CBP employees deployed to Del Rio reported testing positive for COVID either during or immediately after their deployment as well as one agent contracting SCABIES infection.

g. FBI continually monitored information from both anti-law enforcement and anti-immigrant threat groups. Many National Security issues were mitigated during the mass migration event to include two special interest migrants with national security concerns being apprehended and the interception of a possible violent actor at the Del Rio Port of Entry.

## L. Communication of Directions, Events and Changes to Plans

Incident command conducted daily scheduled and hasty meetings with all executive leaders throughout the MME. Communication was adequate to ensure operational expectations and requirements were clear for supporting law enforcement personnel. On-site visits by Headquarters personnel and White House officials ensured the full scope of the event was understood for maximum support of resources and planned actions.

## M. Strategic Communications

Strategic Communications (StratCom) and CBP Public Affairs (PA) are a critical role to ensure leadership at all levels as well as the media and the general public have the perspective of the agents on the ground managing the MME. Both DRT StratCom and CBP PA are co-located in Del Rio and synchronizes the messaging. Del Rio Sector StratCom had been messaging the use of the bridge as a staging location for large groups of migrants arriving since July 31, 2021. This created an advantage with the Del Rio Mayor and local law enforcement officials as they were already aware of the situation before the mass migration event occurred. Del Rio Sector had previously posted the use of the bridge and current situation on social media, new articles, distributed photos, and even had Congressional visits at the location before the mass migration event.

On September 13, 2021, numbers staged at the bridge began to rapidly increase. Due to the previous engagements with the City of Del Rio, resources began to arrive in support of the efforts. Messaging was put on hold until press conferences could be held that were approved by the Office of Public Affairs (OPA). The only messaging that StratCom released was the POE closure to the Office of Congressional Affairs (OCA) on September 17, 2021. Media and community members were the only entities distributing information which caused the Border Patrol to lose control of the messaging.

Chief Ortiz provided a short interview with local KENS 5 on September 17, 2021 and held a formal press conference on September 19, 2021. The DHS Secretary also held a press conference on September 20, 2021. Headquarters approval was required for all social media posts. The early and consistent release of unconstrained accurate messaging

from the Border Patrol would have provided a more holistic view to the public and other law enforcement agencies.

Detailing media support and additional StratCom personnel early in the crisis was needed to manage multiple site visits which overwhelmed the small Del Rio StratCom team.

**N. Environmental Concerns**

Summer temperatures reached as high as 106° and weather threatened the safety of the migrants that illegally crossed the border and the law enforcement personnel managing on scene issues.  Additionally, migrants had no water, food, or shelter to protect themselves from the environmental hazards. Medical support was needed for on-site assistance for minor and advanced medical care.  CBP EMTs were the first to surge to the area followed by HHS DMAT personnel for an increased capability and capacity.  Zero fatalities occurred during the MME.

**O. Physiological Impacts (Stress and Fatigue Impact)**

The chaotic scene and high level of coordination required long hours of work in a very stressful environment.  Leadership and personnel performing tasks to care for the migrants endured physical and mental exhaustion to ensure solutions were carried through to manage the MME.  Mandated overtime further reduced rest cycles.  The arrival of additional high-level leadership and detailers was needed early in the mass migration event to reduce physical and physiological impacts.  CBP, State and Local law enforcement as well as all support personnel rose to the challenges of the crisis that produced a highly successful resolution of the MME.

**Lessons Learned (issues/ recommendations)**

**A. Title 42 Flights Cancelled**
   a. On September 8, 2021, DRT Staff was informed by ICE/ERO that Title 42 flights supporting the expulsion of migrants from the United States would be cancelled. USBP was required to reprocess hundreds of migrants under Parole ATD, which created an immediate backlog of nearly over 1000 migrants.  Additionally, it is believed the halt in expulsions was communicated immediately within the Haitian population creating an added pull factor and a rush to cross illegally into the U.S.
   b. In leu of Title 42 expulsion and expected termination of CDC Tile 42 authority, USBP and DHS partners should seek alternative options to immediately remove amenable migrants from custody upon completion of processing.
   c. Advanced warning needs to be given when expulsion flights are cancelled in order to avoid a disruption in throughput due to re-processing requirements.

**B. Del Rio POE Closure**
   a. DRT Staff coordinated with DRL Staff for several days prior to the closure of the DRL POE.  On September 16, 2021, USBP formally made the request the close the Del Rio POE due to increasing number of migrants under the bridge and for

LAW ENFORCEMENT SENSITIVE

security and safety concerns. On the evening of September 17, 2021, the Del Rio Field Office closed the Del Rio POE.  Additionally, the Eagle Pass POE, the nearest POE (approximately 50 miles away) was reduced to one lane due to OFO manpower supporting the MME.  The closures resulted in significant delays for all essential and commercial cross border travel from Ciudad Acuna to Piedras Negras.

b.   In future MMEs, POE closures should be considered, discussed, and planned with OFO to be engaged swiftly to address security concerns.  The POE closure mitigated risks to the migrants directly below the bridge, POE footprint security, and allowed Mexican authorities an opportunity to disperse migrants staged along the Rio Grande River, thus reducing cross border activity at the Weir Dam and the Boat Ramp crossings.

## C.  Migrant Transportation Coordination (Busses)

a.   DHS lacked sufficient transportation and there was no mass transportation coordination mechanism within the Department to relocate the mass of migrants in Del Rio.  CBP and ERO transportation capabilities were also limited.  DOJ Bureau of Prisons assisted CBP by providing busses and drivers that could drive beyond the time restrictions set forth in current CBP transportation contracts.  The Commissioner's Action Group (CAG) assisted with the reallocation of CBP contracted buses and communicated directly with the IC to coordinate additional transportation throughout the Southern United States and to Haiti as well.

b.   Establish a scalable, high capacity CBP transportation contract.  A scalable contract will allow CBP to increase or redirect contracted transportation assets throughout the nation or throughout established regions to better support sectors when migrant flows develop and or evolve.

c.   Establish inter and intra agency MOUs to expand transportation capacity immediately within hours, not days.

d.   As the MME emerged, DRT expanded their sector transportation cell from a minimally staffed coordination element that mostly coordinated movement within sector to a fully staffed unit comprised of subject matter experts who coordinated detainee movement from the incident site to CPCs and stations in and outside of DRT.

## D.  ERO Manifest Issues

a.   USBP does not have access to ERO systems of record utilized for passenger manifests, nor does ERO have access to USBP's detention module in e3.  This lack of access forces USBP agents to manually enter names and dates of birth to generate manifest rosters for ERO.  This process is not efficient – the process to generate a manifest for an expulsion flight of 130 passengers requires 8-man hours to produce from DRT personnel alone.

b.   USBP and ERO systems must be linked to generate passenger manifests more efficiently, or DHS should have a singular processing system that accommodates

FOUO/LAW ENFORCEMENT SENSITIVE

all Departmental requirements from intake/processing, care and custody, and finally book-out/manifesting. It is also recommended USBP maintain ERO teams imbedded onsite at USBP sectors or temporary holding facilities to expedite manifest coordination.

c. CBP and ERO functions in a mass migration event are intertwined with what CBP interdicts.  Greater volumes of people need to be swiftly and effectively moved by ERO to expanded ERO holding capacities across the nation.

## E.  Lead Field Command Construct

a. The Lead CBP Field Coordinator (LFC) construct provides an identified CBP leader directed to develop and maintain a regional based preparedness plan that incorporates coordinated planning and leverages the resources and capabilities of all CBP Components within a region.  Although the Del Rio MME warranted unified emergency and humanitarian responses from CBP, DHS, and local law enforcement resources, the LFC construct was not activated.

b. It is recommended for CBP leadership to consider at what point during a crisis, such as the Del Rio MME, a LFC activation is warranted.  Trigger points may need to be identified that would assist with LFC activation requirements.

## F.  Detention Capacity

a. Del Rio Sector's (DRT) total detention capacity is ▮▮▮ and has been averaging 500 percent over capacity at any given time which results in excessive time-in-custody and overcrowding at every station, including the soft side processing facility in Eagle Pass.  DRT, along with USBP Sectors along the Southwest Border (SWB), continue to experience overcrowding at levels not seen before. There is no indication that ICE/ERO detention capacity will ever increase to meet the flow of migrants illegally entering the Unites States through Del Rio Sector or any SWB sector.  ICE/ERO needs to immediately address their shortfall in holding capacity across the nation.

b. It is recommended that USBP HQ in collaboration with ICE ERO take ownership of the detention space problem and, with the support of all pertinent DHS partners, embark on a Regional Processing and Detention Centers (RPDC) initiative that will alleviate overcrowding in DRT, LRT, and RGV (specifically) as well as the rest of the SWB.  Multiple RPCD facilities centrally located in the southwest or south-central area of Texas and supported by DHS ICE partners would be responsible for Housing, Processing, and the proper disposition of migrants.  The centers would also serve and the central transportation coordination hub.  Initial holding capacities ▮▮▮▮▮ should be scalable and gauged by current in custody numbers, projections for evolving large migration volume headed to our southwest border, and processing times.

LAW ENFORCEMENT SENSITIVE

### G. Designated Areas at IC for Supporting Agencies

   a. Law Enforcement command and supporting elements should be considered when establishing the location of the Incident Command Post (ICP).  The ICP in Del Rio was comprised of a Mobile Command Center (MCC) provided by USBP SOG.  The MCC was located approximately 100 yards away from the migrant staging area.  Although AMO, ERO and Texas DPS had representation in the ICP, no other supporting components or agencies were staged nearby.

   b. When establishing the ICP, the IC, Deputy ICs and planners should allocate adjacent or nearby footprints for support federal, state, and local LE partners to situate their command elements.  Consider climate-controlled shelters for cooperating agency meetings and government or non-government delegation visits.

### H. Regional Mobile Command Centers

   a. DRT does not possess its own MCC and therefore requested SOG's MCC which arrived on September 17, twenty-four hours after it was requested.  Prior to establishing a location for the ICP, the IC staff maintained a mobile posture on foot or in vehicles.

   b. The IC recommends the procurement of sector MCCs to support future incidents.  At a minimum, one MCC could support multiple sectors using a regional concept.  For example, one centrally located MCC could support incidents from Rio Grande Valley to Del Rio Sector.  This should evolve to every sector having an MCC with further ability to create expanded climate-controlled IC tent structures to supplement for multiple LE partner collaboration.

### I. Personnel Lodging

   a. There were ███ law enforcement, first responder, and support personnel (internal and external to DHS) supporting the Del Rio MME.  Del Rio, TX has an approximate population of 36,000 and limited lodging options throughout the local and regional economies.  Many deployed personnel could not secure lodging within a 55-mile radius and traveled over 100 miles from their lodging sites to the Del Rio POE daily.  DRT coordinated with the City of Del Rio to secure 500 retrofitted lodging spaces at the local convention center through contractual services made available to DHS employees.

   b. At the onset of an imminent MME, sectors should immediately examine lodging availability and begin communicating with contractual service representatives to secure available lodging accommodations and other associated resources to support deployed personnel.

### J. Sensitive Compartmented Information Facilities (SCIF)

   a. The dissemination of relevant information for MMEs is critical for Sectors when preparing for mass migration management, and all other law enforcement operations.  Most USBP Sectors do not have the ability to communicate high-

level law enforcement and sensitive information from the Intelligence Community (IC) without Sensitive Compartmented Information Facilities (SCIF).

b. All USBP Sectors must have access to SCIFs located at designated sites within a sector or within reasonable commuting distances to receive pertinent IC information or other sensitive law-enforcement information.  Even portable solutions like Yuma Sector's capability would be acceptable access.  DHS needs to invest in SCIF buildouts for all USBP Sectors.

**K.  Department of Defense (DoD) Crisis Response Force (CRF) Support**

a. Even with the combined resources from DHS and DOJ, DRT experienced significant challenges at the onset of the mass migration event (MME).  The most significant challenges were the transportation, housing, feeding, security, and welfare of migrants.

b. Sectors planning for an MME should consider Department of Defense (DoD) Requests for Assistance (RFA) for Crisis Response Force (CRF) elements.  The CRF was an approved duty description for RFA FY21 however, DoD did not approve the CRF for RFA FY22.  A separate or updated RFA is required for this function to be available to CBP during a mass migration event.  A CRF would provide DHS with assistance to enhance force protection, medical, aviation, and engineering capabilities.  More specifically, the CRF should include additional support functions to include CDL Drivers, high-capacity Transportation Vehicles, high-capacity Field Holding Structures, security functions associated with the stand up of high-capacity field holding structures, medical, and high-capacity fixed wing support for moving both CBP personnel and migrants.  DoD RFAs are submitted through the CBP Executive Agent as requirements are identified by CBP. This RFA needs to be approved yearly, all associated actions executable with preset timelines when CBP identifies emerging incidents and continues to evolve with the expanding MME problem sets impacting the country.

c. The speed, number, and frequency of MMEs require DoD pre-coordinated assistance that is immediately responsive and agile.  DHS always looks internally before seeking assistance outside the department.  CBP currently does not have the organic resources to fill the various capability gaps identified during large mass migration events.

**<u>SUMMARY</u>**

The seventeen (17) day Mass Migration Event (MME) required a whole of government response to ensure the safety, rapid transport, and efficient processing of migrants from 58 different countries that illegally crossed into the United States and congregated under the Del Rio Port of Entry International Bridge.  The MME was unlike anything that CBP had encountered in its history and at its peak, 14,921 migrants were staged under the bridge.  CBP temporary holding facilities were already over capacity and local resources were inadequate to manage the speed and volume of migrants flowing into the United States.  State, Local, and Community partners

LAW ENFORCEMENT SENSITIVE

responded to CBP's support request and exhausted all available resources to assist in managing the event. All Southwest Border Patrol Sectors assisted by sending personnel and resources to Del Rio and hundreds of Border Patrol agents and CBP officers from across the country arrived to assist.

A massive effort to care for the migrant's safety and basic needs was underway as ground and air transportation relocated thousands of migrants to facilities across the Southwest Border for processing. This unprecedented historical response to the MME successfully prevented any loss of life and treated hundreds of migrants in need of medical assistance. The Office of Field Operations played a key role in assisting the Border Patrol and in the closure of the Port of Entry was the turning point that increased safety and gained a greater response from the Government of Mexico and officials in the National Capital Region. The response by the State of Texas and the surge of Department of Public Safety Troopers was monumental.

Intelligence and open-source reporting have indicated that tens of thousands more migrants are traveling to the southern border of the United States that intend to make illegal entry. Transnational Organized Crime (TOC) elements have exploited policy changes and are facilitating the movement of migrants through the Western Hemisphere to the U.S. Southern Border with profit being the primary driving factor. National Security continues to be at greater risk as CBP collapses resources and personnel to manage large groups of migrants. TOC will continue to exploit our border in areas left vulnerable while CBP attends to MME as they occur. Policy changes and increased capacity and capabilities of all components and agencies that have a role in Border Security and thereby National Security, the immigration process, and the detention/adjudication continuum are needed for the humane and efficient management of mass migration.

## ANNEXES:

- Annex A: Country Breakdown of Encounters
- Annex B: Supporting Personnel and Asset List
- Annex C: Photos

End of Report

**ANNEX A: Country Encounter Breakdown (September 8, 2021 to September 24, 2021)**

| | Deportable Aprehensions | T42 Delayed | T42 Immediate | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 1 | 0 | 0 | 1 | 0% |
| ANGOLA | 49 | 0 | 0 | 49 | 0% |
| ARGENTINA | 3 | 0 | 0 | 3 | 0% |
| BAHAMAS | 2 | 0 | 0 | 2 | 0% |
| BANGLADESH | 1 | 0 | 0 | 1 | 0% |
| BENIN | 1 | 0 | 0 | 1 | 0% |
| BOLIVIA | 6 | 0 | 0 | 6 | 0% |
| BRAZIL | 375 | 114 | 0 | 489 | 2% |
| BURKINA FASO | 18 | 1 | 0 | 19 | 0% |
| CAMEROON | 14 | 1 | 0 | 15 | 0% |
| CENTRAL AFRICAN REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| CHAD | 3 | 0 | 0 | 3 | 0% |
| CHILE | 1,626 | 520 | 0 | 2,146 | 11% |
| COLOMBIA | 62 | 0 | 0 | 62 | 0% |
| CONGO | 11 | 0 | 0 | 11 | 0% |
| COSTA RICA | 6 | 0 | 0 | 6 | 0% |
| CUBA | 1,204 | 6 | 0 | 1,210 | 6% |
| CZECH REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| DEM REP OF THE CONGO | 12 | 0 | 0 | 12 | 0% |
| DOMINICAN REPUBLIC | 54 | 1 | 0 | 55 | 0% |
| ECUADOR | 35 | 12 | 0 | 47 | 0% |
| EL SALVADOR | 4 | 8 | 3 | 15 | 0% |
| EQUATORIAL GUINEA | 2 | 0 | 0 | 2 | 0% |
| ERITREA | 5 | 0 | 0 | 5 | 0% |
| ETHIOPIA | 1 | 0 | 0 | 1 | 0% |
| FRANCE | 2 | 1 | 0 | 3 | 0% |
| FRENCH GUIANA | 5 | 0 | 0 | 5 | 0% |
| GAMBIA | 2 | 0 | 0 | 2 | 0% |
| GHANA | 50 | 0 | 0 | 50 | 0% |
| GUATEMALA | 4 | 9 | 0 | 13 | 0% |
| GUINEA | 23 | 0 | 0 | 23 | 0% |
| GUYANA | 9 | 0 | 0 | 9 | 0% |
| HAITI | 8,878 | 5,015 | 0 | 13,893 | 70% |
| HONDURAS | 22 | 54 | 2 | 78 | 0% |
| MALI | 3 | 0 | 0 | 3 | 0% |
| MAURITANIA | 5 | 0 | 0 | 5 | 0% |
| MEXICO | 31 | 69 | 0 | 100 | 1% |
| NICARAGUA | 169 | 1 | 0 | 170 | 1% |
| NIGER | 3 | 0 | 0 | 3 | 0% |
| NIGERIA | 9 | 0 | 0 | 9 | 0% |
| PAKISTAN | 5 | 0 | 0 | 5 | 0% |
| PANAMA | 12 | 1 | 0 | 13 | 0% |
| PAPUA NEW GUINEA | 1 | 0 | 0 | 1 | 0% |
| PERU | 19 | 0 | 0 | 19 | 0% |
| PHILIPPINES | 1 | 0 | 0 | 1 | 0% |
| SAO TOME AND PRINCIPE | 1 | 0 | 0 | 1 | 0% |
| SENEGAL | 48 | 2 | 0 | 50 | 0% |
| SIERRA LEONE | 5 | 0 | 0 | 5 | 0% |
| SOMALIA | 4 | 0 | 0 | 4 | 0% |
| SOUTH AFRICA | 4 | 0 | 0 | 4 | 0% |
| SURINAME | 1 | 0 | 0 | 1 | 0% |
| TAJIKISTAN | 2 | 0 | 0 | 2 | 0% |
| TOGO | 4 | 0 | 0 | 4 | 0% |
| TURKEY | 1 | 0 | 0 | 1 | 0% |
| URUGUAY | 23 | 0 | 0 | 23 | 0% |
| UZBEKISTAN | 9 | 0 | 0 | 9 | 0% |
| VANUATU | 1 | 0 | 0 | 1 | 0% |
| VENEZUELA | 1,071 | 6 | 0 | 1,077 | 5% |
| Total | 13926 | 5821 | 5 | 19752 | |

| | FMUA | Single Adult | UAC | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 0 | 1 | 0 | 1 | 0% |
| ANGOLA | 35 | 12 | 2 | 49 | 0% |
| ARGENTINA | 2 | 1 | 0 | 3 | 0% |
| BAHAMAS | 1 | 1 | 0 | 2 | 0% |
| BANGLADESH | 0 | 1 | 0 | 1 | 0% |
| BENIN | 0 | 1 | 0 | 1 | 0% |
| BOLIVIA | 2 | 4 | 0 | 6 | 0% |
| BRAZIL | 485 | 4 | 0 | 489 | 2% |
| BURKINA FASO | 9 | 10 | 0 | 19 | 0% |
| CAMEROON | 0 | 15 | 0 | 15 | 0% |
| CENTRAL AFRICAN REPUBLIC | 0 | 2 | 0 | 2 | 0% |
| CHAD | 3 | 0 | 0 | 3 | 0% |
| CHILE | 2,144 | 1 | 1 | 2,146 | 11% |
| COLOMBIA | 35 | 27 | 0 | 62 | 0% |
| CONGO | 8 | 3 | 0 | 11 | 0% |
| COSTA RICA | 5 | 1 | 0 | 6 | 0% |
| CUBA | 219 | 988 | 3 | 1,210 | 6% |
| CZECH REPUBLIC | 0 | 2 | 0 | 2 | 0% |
| DEM REP OF THE CONGO | 10 | 1 | 1 | 12 | 0% |
| DOMINICAN REPUBLIC | 25 | 29 | 1 | 55 | 0% |
| ECUADOR | 32 | 15 | 0 | 47 | 0% |
| EL SALVADOR | 8 | 6 | 1 | 15 | 0% |
| EQUATORIAL GUINEA | 0 | 2 | 0 | 2 | 0% |
| ERITREA | 0 | 5 | 0 | 5 | 0% |
| ETHIOPIA | 0 | 1 | 0 | 1 | 0% |
| FRANCE | 3 | 0 | 0 | 3 | 0% |
| FRENCH GUIANA | 4 | 1 | 0 | 5 | 0% |
| GAMBIA | 0 | 2 | 0 | 2 | 0% |
| GHANA | 16 | 34 | 0 | 50 | 0% |
| GUATEMALA | 10 | 3 | 0 | 13 | 0% |
| GUINEA | 3 | 17 | 3 | 23 | 0% |
| GUYANA | 6 | 3 | 0 | 9 | 0% |
| HAITI | 6,805 | 7,063 | 25 | 13,893 | 70% |
| HONDURAS | 45 | 25 | 8 | 78 | 0% |
| MALI | 1 | 2 | 0 | 3 | 0% |
| MAURITANIA | 0 | 5 | 0 | 5 | 0% |
| MEXICO | 27 | 71 | 2 | 100 | 1% |
| NICARAGUA | 69 | 98 | 3 | 170 | 1% |
| NIGER | 3 | 0 | 0 | 3 | 0% |
| NIGERIA | 4 | 5 | 0 | 9 | 0% |
| PAKISTAN | 0 | 5 | 0 | 5 | 0% |
| PANAMA | 12 | 1 | 0 | 13 | 0% |
| PAPUA NEW GUINEA | 0 | 1 | 0 | 1 | 0% |
| PERU | 12 | 7 | 0 | 19 | 0% |
| PHILIPPINES | 1 | 0 | 0 | 1 | 0% |
| SAO TOME AND PRINCIPE | 0 | 1 | 0 | 1 | 0% |
| SENEGAL | 3 | 47 | 0 | 50 | 0% |
| SIERRA LEONE | 4 | 1 | 0 | 5 | 0% |
| SOMALIA | 0 | 4 | 0 | 4 | 0% |
| SOUTH AFRICA | 0 | 4 | 0 | 4 | 0% |
| SURINAME | 1 | 0 | 0 | 1 | 0% |
| TAJIKISTAN | 0 | 2 | 0 | 2 | 0% |
| TOGO | 0 | 4 | 0 | 4 | 0% |
| TURKEY | 0 | 1 | 0 | 1 | 0% |
| URUGUAY | 20 | 2 | 1 | 23 | 0% |
| UZBEKISTAN | 0 | 9 | 0 | 9 | 0% |
| VANUATU | 0 | 1 | 0 | 1 | 0% |
| VENEZUELA | 569 | 500 | 8 | 1,077 | 5% |
| Total | 10,646 | 9,047 | 59 | 19,752 | |



Annex C
Photo Annex
Del Rio Mass Migration Event

LAYDOWN at ONSET



BUILDUP

