ACKNOWLEDGEMENTS

# ACKNOWLEDGMENTS



**THE STAFF OF THE OFFICE TO MONITOR AND COMBAT TRAFFICKING IN PERSONS IS:**

Carter Allen
Sylvia Amegashie
Andrea Balint
Shonnie R. Ball
Getoria Berry
David Biggs
MacKenzie Bills
Michelle Cooper Bloom
Alexandria Boling
Katherine Borgen
Gregory Borgstede
Kelsey Brennan
Ravi Buck
Makira Burns
Carla M. Bury
Erin Chapman
Chane Corp
Sarah Davis
Steven Davis
Amelia Didier
Vivian Ekey
Sarah Evans
Daniel Evensen
Anna Fraser
Lauren Frey

Mark Forstrom
Rachel Fox Smothermon
Lucia Gallegos
Janine Gannon
Beatriz Garcia Velazquez
Brianna Gildner
Natasha Greenberg
Andrew Grimmer
Takiyah Golden
Olivia Hasegawa
Tegan Hare
Jocelyn Harrison
Caitlin B. Heidenreich
Ashley Hernandez
J. Brett Hernandez
Sonia Helmy-Dentzel
Julie Hicks
Crystal Hill
William Hine-Ramsberger
Megan Hjelle-Lantsman
Jennifer M. Ho
Ariana Holly
Moira Honohan
Renee Huffman
Veronica Jablonski

Harold Jahnsen
Sarah Jennings
Maurice W. Johnson
Kari A. Johnstone
Chelsea Kaser
Catherine E. Kay
Emily A. Korenak
Kendra L. Kreider
Christine Leming
Rebecca Lesnak
Abigail Long
LaTina Marsh
Jason Martin
Myrtis Martin
Sunny Massa
Monica Maurer
Kerry McBride
Jasmine McClam
Rendi McCoy
Estelle McKinney
Maura K. McManus
Leah Meyer
Todd Miller
Kristy Mordhorst
Rebecca Morgan

Ericka Moten
Ryan Mulvenna
Cristina Narvaez
Nicole Netzel
Jen Nilson
Amy O'Neill Richard
Zury Palencia
Sarah Phillips
Marissa Pietrobono
Justin D. Pollard
Patrick Read
Andrea E. Reed
Shanique Reed
Stephanie Reed
Casey Risko
Adrienne Sgarlato
Jessica Singh
Stephen Shade
Kaela Shear
Soumya Silver
Susan Snyder
Desirée Suo Weymont
Francesca J. Tadle
Atsuki Takahashi
James Taylor

Chaiszar Turner
Wanda Toney
Kathy Unlu
Melissa Verlaque
Matthew Villemain
Kathleen Vogel
Myrna E. Walch
Frances Wallman
Bianca Washington
Tatum West
Shelly Westebbe
Danielle (Nikki) Wetsel
Shanice Williams
Harrison York
Joshua Youle
Janet Zinn
Salia Zouande

*Special thanks to Bukola Oriola, Dawn Schiller, Jeri Moomaw, Jessa Dillow Crisp, Megan Lundstrom, and Tanya M. Gould, and other subject matter experts with lived experience from the Human Trafficking Expert Consultant Network for their contributions to the introductory essay.*

*Special thanks to Daniel Kim, Lamya Shawki El-Shacke, and the creative services team at Global Publishing Solutions.*

*In loving memory of Wanda Ramsey. Thank you for your years of service and support to the TIP Office and our annual TIP Report.*

Cuba AR_001124



Cuba AR 001125

Cuba AR_001126

Cuba AR_001127



UNITED STATES DEPARTMENT OF STATE PUBLICATION
OFFICE TO MONITOR AND COMBAT TRAFFICKING IN PERSONS

Designed by A/GIS/GPS, July 2022

12/19/22, 4:51 PM
Migration Talks with the Government of Cuba - United States Department of State
Case 6:23-cv-00007    Document 92-5    Filed on 03/24/23 in TXSD    Page 6 of 263

An official website of the United States Government    Here's how you know

Home  >   ...   > Migration Talks with the Government of Cuba

# Migration Talks with the Government of Cuba

**MEDIA NOTE**

**OFFICE OF THE SPOKESPERSON**

NOVEMBER 15, 2022

On November 15, U.S. and Cuban officials met in Havana to discuss the implementation of the U.S.-Cuba Migration Accords. This is the second session in 2022 of these semiannual bilateral discussions on migration, reflecting a commitment by both countries to regularly review the implementation of the Accords.  Deputy Assistant Secretary for Western Hemisphere Affairs Emily Mendrala led the U.S. interagency delegation, and Cuba's Vice Foreign Minister Carlos Fernandez de Cossio led the Cuban delegation.  These migration talks provide an opportunity for discussions on mutual implementation of the Migration Accords, comprised of a series of bilateral agreements between the United States and Cuba done in 1984, 1994, 1995, and 2017.

The U.S. delegation highlighted areas of successful cooperation on migration, while also identifying issues that have been obstacles to fulfilling the goals of the Accords.  Engaging in these talks underscores our commitment to pursuing constructive discussions with the Government of Cuba where appropriate to advance U.S. interests.  The United States also addressed consular services at U.S. Embassy Havana, to include visa and American citizen services.

Ensuring safe, regular, and humane migration between Cuba and the United States remains a mutual interest of both countries and is consistent with U.S. interests in fostering family

reunification and promoting greater respect for human rights and fundamental freedoms in Cuba.

---

TAGS

Bureau of Population, Refugees, and Migration          Bureau of Western Hemisphere Affairs

Cuba     Migration     Office of the Spokesperson

---

# Related Articles

———  DECEMBER 18, 2022

## International Migrants Day

**READ MORE**

———  OCTOBER 6, 2022

## Secretary Antony J. Blinken and Peruvian Foreign Minister César Landa at the Migration Ministerial Opening Session

**READ MORE**

Cuba AR_001130

SEPTEMBER 22, 2022

## Humanitarian Assistance to Respond to the Venezuela Regional Crisis

**READ MORE**

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

Cuba AR_001132



# Collaborative Migration Management Strategy

JULY 2021

NATIONAL SECURITY COUNCIL



THE WHITE HOUSE
WASHINGTON

Cuba AR_001133



# TABLE OF CONTENTS

I.      Executive Summary
II.     Strategic Environment
III.    U.S. Interests
IV.     Desired End State
V.      Strategic Objectives
VI.     Lines of Action

Cuba AR_001134



# Executive Summary

The humanitarian situation in the Northern Triangle (El Salvador, Guatemala, and Honduras) has deteriorated significantly in recent years, prompting an increasing number of people to make the difficult choice to migrate.  In addition to the long-standing drivers of migration, including violence, lack of employment opportunities, and corruption, the COVID-19 pandemic, recurrent droughts, and two hurricanes in November 2020 have devastated communities, created crisis-level food insecurity, and placed the Northern Triangle on the map with other global humanitarian emergencies.  This situation demands both immediate responses and a new, strategic approach for managing regional migration in the medium- to long-term.

 The United States has strong national security, economic, and humanitarian interests in **promoting safe, orderly, and humane migration.**

The United States has strong national security, economic, and humanitarian interests in promoting safe, orderly, and humane migration.  Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, issued February 2, 2021, lays out a four-pronged comprehensive approach that includes addressing the root causes of irregular migration, collaboratively managing migration in the region, expanding lawful pathways for protection and opportunity in the United States, and restoring and enhancing asylum processing at the U.S. Southwest border.  The Executive Order directs the Assistant to the President for National Security Affairs, in coordination with U.S. departments and agencies, to prepare a Root Causes Strategy and a Collaborative Migration Management Strategy (Migration Strategy).

The Migration Strategy identifies and prioritizes actions to strengthen cooperative efforts to manage safe, orderly, and humane migration in North and Central America, in line with our Nation's highest values, while the Root Causes Strategy addresses the underlying factors leading to migration.  Both strategies are driven by the U.S. Government belief that all individuals should be able to find safety and achieve a stable and dignified life within their own countries.  When that is not the case, asylum and other legal migration pathways should be readily available to those who need them.

The Migration Strategy aims to address urgent humanitarian needs in the Northern Triangle, promote access to protection, improve secure and humane border management, provide support for returnees, and enhance access to legal pathways for migration.  Individuals and families' internal and international migration decisions are often interlinked with their access to protection, the availability of legal migration pathways, and their ability to live safe and prosperous lives.  By enhancing humanitarian support, regional protections, and investing in migration management, the United States will help build a more stable region, strengthen legal pathways for those who choose to or are forced to migrate, and reduce irregular migration.

The U.S. Government consulted with a wide range of stakeholders to inform the Migration Strategy, including governments in the region, Members of Congress and their staff, international organizations, civil society organizations, labor unions, and the private sector.

Cuba AR_001135



# Strategic Environment

Over the past decade, millions of people from Mexico, Guatemala, Honduras, and El Salvador have arrived at the U.S. Southwest border in search of protection and opportunity.  Some of the primary factors driving this migration include high levels of crime and violence, lack of economic opportunity, weak governance, widespread corruption and impunity, the impacts of climate change, food insecurity, and the desire for family reunification.  Since 2015, hundreds of thousands of these individuals submitted asylum claims in the United States, showing the scope of regional challenges and contributing to significant backlogs in the U.S. asylum system.

In recent years, there have been some successes in strengthening regional protection frameworks, recognizing and responding to internal displacement, creating effective labor migration programs, strengthening border security, and scaling returnee reception efforts.  However, the COVID-19 pandemic and two devastating hurricanes in Central America in November 2020 strained governments in the region, caused severe economic disruption, and made efforts to institutionalize migration management practices even more challenging.

 The Migration Strategy **identifies and prioritizes actions to strengthen cooperative efforts** to manage safe, orderly, and humane migration in North and Central America.

The United States has strong relationships with a broad range of actors who will be critical partners for implementing the Migration Strategy.  The United States will continue to work closely with international organizations that provide support for refugees, asylum seekers, internally displaced persons (IDPs), and returned migrants, and assist governments with migration management in the region.  Civil society organizations will also be critical as they advise governments on protection and migration management and implement programs to fill gaps in government capacity.  The private sector will be an important player in expanding and supporting labor migration pathways and has a role in helping governments improve migration management.

Cuba AR_001136



# U.S. Interests

The United States has strong national security, economic, and humanitarian interests in reducing irregular migration and promoting safe, orderly, and humane migration.  Irregular migration places a heavy burden on U.S. border security infrastructure and personnel and presents opportunities for criminal actors to exploit vulnerable populations.  The United States is seeking to expand U.S. and international efforts to address the humanitarian situation in the Northern Triangle and improve regional collaborative migration management by promoting strong migration management practices, encouraging greater regional responsibility-sharing, and expanding access to legal pathways.  The United States believes that all individuals should be able to find safety and achieve a stable and dignified life within their own countries, while ensuring that asylum and other legal migration pathways remain available to those who need them.



> The United States believes that all individuals should be able to find safety and achieve a stable and dignified life within their own countries, while **ensuring that asylum and other legal migration pathways remain available to those who need them.**



# Desired End State

This Strategy does not seek to end migration.  To the contrary – human mobility is part of the fabric and tradition of Central and North America.  Instead, the Migration Strategy envisions that migration within and through Mexico and Central America would be by choice, and that fewer people would feel compelled to make that choice.  It envisions more legal pathways available for those who choose to leave. If individuals must flee, they would have options to seek protection within their own countries, within the region, or in the United States.

**5**



# Strategic Objectives

Our strategic objectives are to:  stabilize populations facing acute needs; strengthen international and in-country protections throughout North and Central America so individuals seeking safety have access to protection and services within their countries of origin or in the region; support third country labor migration programs that facilitate equitable access to work opportunities that ensure and expand worker protections; increase reception and reintegration of returned migrants or IDPs to allow them to find safety and support in their countries of origin; support secure and humane border practices that allow regional governments to regulate the movement of people into and out of their territory and respond to large-scale migration events; coordinate migration messaging campaigns to share accurate and timely information about migration laws and policies and counter mis- and disinformation; and expand lawful pathways for protection and opportunity in the United States.

As a part of our work, we will:

*Consult and Coordinate*:  The U.S. Government will continue to consult with Congress, civil society, international organizations, the private sector, labor unions, and governments inside and outside the region.  We will listen, learn the lessons from past efforts, create an approach that draws on input from across sectors, and develop a broad base of support that advances efforts across the Migration Strategy.

*Communicate:*  We will create a robust communications plan, leveraging independent and social media, to convey our efforts to improve migration cooperation, build support for our approach, and instill hope in the region.

*Assess:*  Throughout implementation, we will build in assessment points to ensure our efforts are producing the desired results, strengthening where needed, adjusting course where warranted, and discontinuing as required.

Cuba AR_001138



# Lines of Action

To achieve the strategic objectives set out above, the Migration Strategy sets out concrete lines of effort the United States will pursue to support regional programs to stabilize populations with acute needs; expand access to international protection; strengthen access to protection in countries of origin; expand access to third country labor migration programs that ensure and improve worker protections; assist and reintegrate returned persons; promote secure and humane border management; strengthen regional public messaging on migration, and expand access to lawful pathways for protection and opportunity in the United States.  The Migration Strategy will also help guide U.S. diplomatic engagements with governments in the region and outside the Western Hemisphere, including through multilateral fora and platforms, such as the Regional Conference on Migration and the Comprehensive Regional Protections and Solutions Framework (MIRPS).

## 1.  Stabilize Populations with Acute Needs

The United States will provide and mobilize assistance to address the increased humanitarian needs in the Northern Triangle given the COVID-19 pandemic, November 2020 hurricanes, and prolonged droughts.

- **Surge U.S. assistance.**  The United States will provide increased assistance to address food insecurity and malnutrition, support the agricultural sector to mitigate the effects of droughts and increasingly unpredictable weather and build resilience to future shocks, provide materials to support the rebuilding of shelter and schools, and address the immediate safety and protection needs of refugees, asylum seekers, internally displaced persons, and other vulnerable populations in the region.

- **Work multilaterally.**  The United States will work with the United Nations to mobilize a Humanitarian Response Plan to galvanize international support for the deteriorating situation in the Northern Triangle and coordinate activities under one system.

## 2.  Expand Access to International Protection

A critical element of this strategy is expanding access to international protections for refugees, asylum seekers, and vulnerable migrants within the region, including new mechanisms for protection referrals.  These efforts will be complemented by expanding efforts to integrate refugees into their new communities and specialized programming and support for the most at-risk groups.

- **Build and improve national asylum systems.**  The United States will support regional government efforts to strengthen and expand their asylum systems to provide vulnerable individuals with protection closer to home.  These systems have historically been limited, but with U.S. support, there is potential to offer protections to tens of thousands of people within

7

the region.  For example, since 2016, the Mexican Commission for Refugee Assistance has expanded dramatically with U.S. support, opening new field offices and tripling its annual case processing capacity.  The United States will continue to work with Mexico to build on this success and with other regional governments to help expand their asylum systems.

- **Establish Migration Resource Centers (MRCs).**  The United States will work with international organizations and in coordination with governments to support the establishment of MRCs throughout the region.  These facilities will focus on protection screening, services for people in need of protection, and referrals to protection or other lawful migration pathways.  MRCs will also have referral mechanisms for existing labor migration and reintegration programs for people who do not have protection needs.  Fixed location and mobile MRCs will be strategically located to benefit communities at risk of displacement, those with high levels of emigration, and in major transit hubs.

- **Increase efforts to integrate refugees in the region.**  Once people receive protection within the region, they still face the challenge of integrating into new communities.  The United States will support inclusion and integration programs that ensure individuals can access livelihood opportunities, services, healthcare, and education, and can develop roots in their new communities.  The United States will look to expand successful ongoing integration efforts, such as a program that relocates protection recipients from southern Mexico to industrial belt municipalities in Mexico with labor needs.

- **Support assistance for asylum seekers and refugees.**  The United States will increase shelters and other safe space networks for asylum seekers, refugees, and other vulnerable migrants within the region.  This assistance also includes, but is not limited to, assisting asylum seekers with access to accurate information, legal representation, education, livelihood opportunities, cash and **voucher** assistance, and health care.  The United States will also respond to and support the water, sanitation, and hygiene (WASH) needs for refugees and asylum seekers across the region.

- **Scale up protection efforts for at-risk groups.**  While all displaced individuals are vulnerable, some face heightened risks, including women, children, families, individuals with disabilities, LGBTQI+ individuals, indigenous peoples, and racial minorities.  The United States will support protections for these groups by funding international organizations for targeted programming, encouraging governments to pass and implement legislation that protects these groups, and providing technical assistance to regional government agencies that interact with these populations.  Additionally, the United States will work with regional governments to develop human rights violation early warning systems and prevent and respond to human rights violations and abuses against migrants.

- **Enhance efforts to resettle refugees from the region.**  In recent years, countries including Australia, Brazil, Canada, and Uruguay have resettled small numbers of refugees from El Salvador, Guatemala, and Honduras.  The United States will continue to work with these countries, particularly Canada, to resettle larger numbers of refugees and encourage other governments to do the same.

Cuba AR_001140

## 3.  Expand Access to Protection in Countries of Origin

Individuals seeking protection in a third country have often been previously forcibly displaced at least once within their countries of origin before crossing an international border.  By strengthening protection, assistance, and solutions for IDPs and encouraging governments to find durable solutions, the United States can help people obtain safety and sustainable livelihoods within countries of origin and reduce international forced displacement.

- **Improve protections for IDPs.**  IDPs are often unrecognized or marginalized in their countries of origin, making it a significant humanitarian, human rights, and governance issue. The United States will encourage governments to pass legislation and implement laws recognizing and providing services for IDPs, and fund additional research on internal displacement within the region to better understand the needs of IDPs.

- **Support humanitarian assistance and integration for IDPs.**  The United States will continue to increase shelters and other safe space networks for IDPs.  The United States will support programs offering solutions for these populations, such as relocation and integration support to help them reestablish their lives in their new homes.  This support includes, but is not limited to, assisting IDPs with access to protection services, prevention and response to gender-based violence, education, livelihood opportunities, cash and voucher assistance, health care and WASH needs.

- **Include IDPs and affected communities in development programs.**  The United States will include and prioritize IDPs in development programs that aim to combat insecurity and gender-based violence, reduce poverty, increase opportunities to access permanent housing, improve health outcomes, increase access to justice, and strengthen access to education.

## 4.  Expand Third Country Labor Migration Programs While Improving Worker Protections

The United States aims to enhance coordination with third countries on labor migration programs and worker protections.  Third country labor migration programs allow individuals to find work opportunities and provide support for their families through formalized migration channels.  These programs also provide critical labor to economies, particularly since the COVID-19 pandemic has resulted in reduced inter-regional travel.

- **Expand access to third country labor migration programs with worker protections.**  The United States will support efforts to develop and expand labor migration programs that protect workers' rights and allow equitable access for individuals in the region to find meaningful economic opportunities in a third country while improving worker protections.  Some successful regional labor programs could be expanded or replicated in line with local conditions.  For example, in 2020, a successful pilot program connected workers from Panama with the seasonal coffee harvest in Costa Rica.  This program then expanded to

include temporary workers from Nicaragua.  The United States will support countries with labor needs in developing or expanding similar programs that match regional workers with labor demands, such as Canada and Mexico's temporary worker programs.  The United States will also continue to build the capacity of governments in the region to better assist their populations in identifying temporary labor opportunities and eliminating discriminatory or exploitative labor practices.

- **Expand support for migrant worker protections, including ethical recruitment.** Ensuring protections for migrant workers are a critical component to sustainable and ethical work programs.  The United States will enhance our programming to ensure recruitment and treatment of migrant workers is fair and humane throughout the region by engaging with the private sector, labor unions, governments, and civil society.  The United States will also increase awareness and access to resources to combat labor trafficking.

## 5.  Assist and Reintegrate Returned Persons

Governments have limited capacity to receive their nationals from other countries.  Individuals who are returned to their countries of origin may have spent significant time living abroad and may have limited knowledge on how to obtain documentation, access information, find work, or receive support.  Returned minors may require support to re-enroll in the education system, and they and their families may benefit from psychosocial and other support to increase resilience and overall well-being.  Targeted development assistance programming to reintegrate returned persons into their communities helps them create safe and prosperous lives in the region.

- **Expand reception centers.**  The United States will continue to expand the capacity of governments to develop and sustain reception centers for individuals returning to their countries of origin.  This includes expanding existing centers and adding reception centers. These centers will allow governments to provide specialized services, conduct interviews, connect individuals to reintegration opportunities, and provide medical, counseling, and protection services.

- **Build out reintegration services.**  The United States will work with governments, international organizations, civil society, and the private sector to create and expand reintegration programs that match returnees with jobs that capitalize on skills learned abroad, such as English language proficiency, IT skills, and training in the hospitality sector, among others.  These services will also assist returnees with integration in their host communities through job placement and skills training, and will address the different needs of returnees, including women, minors, and indigenous people.  To support these populations, the United States will work with regional governments, international organizations, and civil society organizations to include and prioritize returnees in development programs and community initiatives.

- **Assist with reintegration policies and frameworks.**  The United States will work with regional governments to develop and implement policies that enable individuals to overcome structural challenges associated with being returned after living overseas.  Programs will facilitate validation of school and work certifications, financial inclusion, nationality status

and identity card issuance, and access to social programs.  The United States will also engage in outreach campaigns to help prevent discrimination.

- **Support Assisted Voluntary Return (AVR).**  The United States will continue to support efforts by regional governments and international organizations to offer individuals the opportunity for AVR should they choose to return to their countries of origin.  These AVR opportunities will provide these individuals with a safe, humane, and dignified way to return home.

## 6.  Foster Secure and Humane Management of Borders

Securing borders with humane border management policies and practices is essential to reducing irregular migration and collaboratively managing migration within the region.  Making advances in these areas requires improving institutional governance and regulation within the region, encouraging collaborative migration and border management approaches, providing equipment to modernize and improve border infrastructure and technology, and taking a comprehensive and coordinated approach to supporting migrant smuggling and human trafficking investigations and enforcement.

- **Provide institutional capacity building, training, technical assistance, and support equipment needs for national migration authorities in the region.**  The United States will work with governments to build the region's migration-focused departments and agencies to develop institutional capacity; establish comprehensive training programs and dedicated professional units, consistent with international law and standards; ensure the development and implementation of humane migration practices; screen for protection needs; institute transparency and internal accountability mechanisms; and secure the necessary resources to fulfill their missions.  The United States will also consider support to regional governments to improve their ability to identify, process, detain, and repatriate individuals without legal standing in a safe and humane manner that is consistent with international law.

- **Support for border infrastructure and technology.**  The United States will provide support for the modernization of border infrastructure and technology.  Improved technology allows regional border officials to monitor trends, identify persons of interest, share information with regional government partners, and use resources more efficiently.  Such efforts can help enhance economic growth and reduce corruption in the region by professionalizing ports of entry and customs authorities and processes.  The United States will also support deploying technologies to increase electronic processing of people and goods, implementing of the World Trade Organization Trade Facilitation Act, and promoting best practices in professional responsibility.

- **Enhance migrant-smuggling and human-trafficking investigations and prosecutions.**  The United States, in partnership with regional governments, will expand and strengthen efforts to hold individuals involved in migrant smuggling, human trafficking, and other crimes against migrants accountable, whether through prosecutions, or, where appropriate, additional financial or other penalties.  For example, in April 2021, the United

**11**

States announced Operation Sentinel, a new counter-network targeting operation focused on transnational criminal organizations involved in migrant smuggling.

- **Promote collaborative migration and border management approaches.**  The United States will facilitate and encourage regional approaches to address migration, including improving or establishing legal frameworks; promoting border security, migration management, and migration enforcement best practices and standards; and enhancing coordination and information sharing.  The United States will also continue to support regional coordination to address large coordinated migration movements.

- **Increase information sharing with and among regional partners.**  The United States will continue to develop and expand efforts to share information with and among regional partners on humane border management best practices, migrant smuggling and human trafficking efforts, and data sharing and transparency.  This includes replicating and enhancing support for programs that facilitate greater information sharing and coordination among local and regional law enforcement, and with U.S. law enforcement partners related to migrant smuggling, human trafficking, other crimes against migrants, and gang activity.

## 7.  Strengthen Regional Public Messaging on Migration

Effective regional communications and messaging allow the United States and other governments to share factual information about their migration policies, counter disinformation, and discourage irregular migration.  Partnerships with international organizations and other stakeholders can amplify these messages and provide complementary messaging.

- **Support regional messaging campaigns.**  The United States will expand its work with regional governments, international organizations, civil society organizations, the private sector, and other stakeholders to share information on regional migration policies and ensure consistent messaging that discourages irregular migration and promotes safe, orderly, and humane migration.

## 8.  Expand Access to Lawful Pathways for Protection and Opportunity in the United States

The United States is committed to enhancing access to protection and opportunity in the United States.  The United States is taking a number of steps to increase access to the U.S. Refugee Admissions Program (USRAP) for Northern Triangle nationals.  The United States is also examining parole options for Northern Triangle nationals, as recommended by Executive Order 14010.  In addition, the United States is evaluating options to enhance access for Northern Triangle nationals to immigrant and non-immigrant visas to the United States, as appropriate and consistent with the law.

Cuba AR_001144

- **Restart and expand the Central American Minors (CAM) program.** The CAM program provides certain minors in El Salvador, Guatemala, and Honduras the opportunity to be considered for refugee resettlement in the United States. Individuals who are determined to be ineligible for refugee status are considered for the possibility of entering the United States under parole.  In March 2021, the United States announced that the CAM program would reopen and process cases that were closed when the program was paused in 2018.  In June 2021, the United States announced the expansion of the program to increase the categories of eligible U.S.-based relatives who can petition for their children in the Northern Triangle.  The United States will continue to consider ways to expand the program.

- **Expand refugee processing in the region.** The United States is seeking to enhance the capacity of international organizations and civil society to identify and refer more individuals with urgent protection needs.  The Costa Rican government paused implementation of the Protection Transfer Arrangement (PTA) in September 2020 due to COVID-19.  With support from the United States, Costa Rica resumed PTA transfers in early April 2021.  In addition, the United States is working to increase USRAP processing capacity in the region during the COVID-19 pandemic, including by implementing and exploring new processes and technologies to support remote case processing.  The United States will also continue to explore additional ways to enhance and expand refugee processing in the region.

- **Increase access to nonimmigrant work visas while ensuring worker protections.** Expanding legal pathways for Northern Triangle nationals seeking to provide for their families is an important component of a comprehensive regional migration response.  It must also address the vulnerability of workers to abusive labor practices.  The United States will undertake efforts to significantly increase the number of Northern Triangle agricultural workers who receive an H-2A visa in FY 2022, paying particular attention to improving recruitment practices in the Northern Triangle and labor conditions in the United States.  The United States will enhance outreach and engagement with U.S. employers; work with Northern Triangle governments, international organizations, civil society, and the private sector to develop a more robust pipeline of Northern Triangle nationals who can meet the needs of U.S. employers when there are insufficient U.S. workers who are qualified and available to perform the work; assist the Northern Triangle governments with registering and vetting workers; connect workers with U.S. employers; and engage with labor unions and worker rights organizations to identify ways to improve transparency in the recruitment process and overall worker protections.  The United States also made 6,000 supplemental H-2B temporary non-agricultural visas available for Northern Triangle nationals in FY 2021.

- **Reduce immigrant visa backlogs.** The United States aims to reduce the backlog of immigrant visa applications for Northern Triangle nationals as quickly as possible.



Cuba AR_001146

JUNE 10, 2022

# Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables

Today, President Biden joins leaders from across the Western Hemisphere to present the Los Angeles Declaration on Migration and Protection at the Summit of the Americas. The Declaration seeks to mobilize the entire region around bold actions that will transform our approach to managing migration in the Americas. The Declaration is organized around four key pillars: (1) stability and assistance for communities; (2) expansion of legal pathways; (3) humane migration management; and (4) coordinated emergency response.

In preparation for the Summit, the United States and other countries in the region developed a suite of bold new migration-related deliverables.

**Pillar I: Stability and Assistance for Communities**

Addressing the unprecedented migration crisis in the region requires us to rethink how we view multilateral development finance and how we manage the strains on our economies. Globally, International Financial Institutions (IFIs) and development assistance have been directed to poor and low-income countries, designations which no longer apply to most of Latin America and the Caribbean. The need for economic stabilization and support is particularly important in countries housing the more than six million refugees and migrants.

- **Belize will implement in August 2022 a program to regularize Central American and CARICOM migrants** who have been living illegally in the country for a specified time.

- **Colombia's leadership in responding to Venezuelan migrants and refugees with forward-leaning policies based on solidarity, humanitarian relief, and protection:** Colombia reaffirms its commitment to fully implement its announcement of temporary protected status for displaced Venezuelan migrants and refugees in its territory. As of June 10, it has granted regularization documents to over 1.2 million individuals, allowing them to work legally, access public and private services, integrate successfully, and contribute to Colombia's economy and society. Colombia further reaffirms its commitment to grant

Cuba AR_001147

regularization permits to 1.5M Venezuelan migrants and refugees in total, by the end of August 2022.

- **Costa Rica commits to plan for a renewal of the special temporary complementary protection category scheme for migrants from Venezuela, Nicaragua, and Cuba**, that have arrived prior to March 2020, contingent on obtaining necessary financial resources, and to convene an international task force to secure additional direct support and financial resources to support its implementation.

- **Ecuador issued an executive decree that creates a path to a regular migration status for Venezuelans who entered the country regularly via an official port of entry, but who are currently out of status.** This process includes unaccompanied or separated migrant children and a migration amnesty. It contemplates the provision of identification documents for the regularization process, taking into account the current difficulties facing Venezuelan citizens. It intends to expand this process to include all Venezuelans.

- **The United States will provide additional U.S. support for a crisis response mechanism on migration**. Working with Congress, we will provide an additional $25 million to the Global Concessional Financing Facility (GCFF) housed at the World Bank to prioritize countries in Latin America such as Ecuador and Costa Rica in their newly announced regularization programs for displaced migrant and refugee populations residing within their respective countries.  The new funding would support registration processes, the extension of social services, integration programs, and would benefit host communities that have generously opened their doors to the most vulnerable.

- **The United States will announce $314 million in new PRM and USAID funding for stabilization efforts in the Americas.** USAID and the State Department's Bureau of Population, Refugees, and Migration (PRM) will announce more than $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere. This includes support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.

**Pillar II: Legal Pathways and Protection**

Expanding legal pathways for protection and opportunity is at the heart of efforts to humanely address irregular migration in the Americas. The goal is to *change the way* people migrate. Countries in the region have strategically pegged priority legal pathway programs with the primary reasons for migrating: (1) jobs; (2) protection; and (3) family reunification.

- **Canada's resettlement and complementary pathways initiative:** Canada is welcoming record numbers of refugees and in line with Canada's immigration levels plans. As part of these growing efforts, Canada will increase refugee resettlement from the Americas and aims to welcome up to 4,000 individuals by 2028, providing durable solutions to a number of refugees in the region. Canada recognizes the important support of the UNHCR and the IOM in the region. Canada will also look to promote its regular pathways in the region to help provide opportunities including to those in vulnerable situations. For example, Canada will advance a promotion and recruitment efforts related to its Francophone Immigration Program which may offer opportunities to French speaking newcomers such as Haitians with skills and experience, some of which may gave have been displaced due to the pandemic.

- **Canada is addressing root causes and investing $26.9 million, in 2022-2023, in additional funding toward migration- and protection-related capacity building in the Americas.** This funding is supporting projects across Latin America and the Caribbean focused on supporting the socio-economic and labour market integration of refugees and migrants; improving border and migration management systems; contributing to the safeguarding of migrants, refugees and host communities' rights; advancing gender equality and inclusive economic growth; and preventing and tackling migrant smuggling and trafficking in persons.

- **Canada expects to welcome more than 50,000 agricultural workers from Mexico, Guatemala and the Caribbean in 2022.** Canada is a strong supporter of labour mobility and continues to actively promote regular pathways for migration, including temporary foreign worker programs that respond to employer labour needs, to address our labour market gaps and as alternatives to irregular migration.

- **Guatemala approves new legislation to promote legal labor migration programs.** On June 1, the Government of Guatemala approved new legislation to incentivize fair recruitment and expand legal pathways for its citizens. The legislation exempts airline tickets from value-added and departure taxes for those traveling for temporary work abroad contracts obtained through the Ministry of Labor.  The new initiative is part of a broader set of Guatemalan programs and policies to expand access to labor migration programs, ensure ethical recruitment, and promote legal protections for Guatemalan workers.

- **Mexico will expand the existing Border Worker Card program to include 10,000 to 20,000 additional beneficiaries.** This program allows greater labor mobility to meet

employer needs in Mexico, promote economic development in Central America, and provide an alternative to irregular migration.

- **Mexico will launch a new temporary labor program providing work opportunities in Mexico for 15,000 to 20,000 workers from Guatemala per year.** The Government of Mexico aims to expand eligibility for that program to include Honduras and El Salvador in the medium-term.

- **Mexico will integrate 20,000 recognized refugees into the Mexican labor market over the next three years.** With the support of UNHCR, the program would connect individuals with legal status as recognized refugees in Mexico to work opportunities in regions with labor shortages. A joint initiative with UNHCR, the private sector and the Mexican Government, both refugees and firms will benefit from successful integration into Mexico's formal labor market.

- **The United States will launch the development of a $65 million U.S. Department of Agriculture (USDA) pilot program to support U.S. farmers hiring agricultural workers under the H-2A program.** In collaboration with other agencies, USDA is exploring a multi-year pilot program funded by the President's American Rescue Plan to provide grants to agricultural employers that hire farmworkers from Northern Central American countries under the seasonal H-2A visa program and agree to additional protections to benefit both U.S. and H-2A workers. The pilot will promote the resiliency of our food and agricultural supply chain and three major Administration priorities: (1) driving U.S. economic recovery by addressing current labor shortages in agriculture; (2) reducing irregular migration through the expansion of legal pathways; and (3) improving working conditions for U.S. and migrant agricultural workers. USDA will enter into a cooperative agreement with the United Farm Workers of America (UFW), which will work with relevant stakeholders, including farmers, farmworkers, farmworker advocates and unions, to ensure that the agency benefits from a wide range of views in designing this program.

- **The United States will provide 11,500 H-2B nonagricultural seasonal worker visas for nationals of Northern Central America and Haiti.** To address labor shortages in key sectors of the U.S. economy and reduce irregular migration, the Department of Homeland Security (DHS) and Department of Labor (DOL) made an additional 11,500 H-2B visas available in late May. These visas are dedicated for nationals of the Northern Central America countries and Haiti for this fiscal year. This is combined with new employer oversight provisions.

- **The United States will roll out new Fair Recruitment Practices Guidance for Temporary Migrant Workers with the cooperation of major employers, including Walmart.** As the United States and various other countries expand temporary worker programs in the Western Hemisphere, President Biden recognizes the importance of safeguarding against exploitation of workers. This is why his Administration will issue first-of-its-kind "Guidance on Fair Recruitment Practices for Temporary Workers." The guidance promotes best practices for governments seeking to increase participation in the H-2 visa programs and employers relying on these programs. The United States has also mobilized the support of major U.S. retailer Walmart, which notes the importance of H-2A migrant workers to U.S. agriculture and that the fair recruitment guidance aligns with the company's own expectations around responsible recruitment.

- **The United States will commit to resettle 20,000 refugees from the Americas during Fiscal Years 2023 to 2024.** This represents a three-fold increase from this year and reflects the Biden Administration's strong commitment to welcoming refugees. The protection needs are significant in the Western Hemisphere. More than 5 million Venezuelans have been displaced in the Americas, and hundreds of thousands more people from other countries across Latin America and the Caribbean are also displaced [across borders]. As the United States scales up its resettlement operations in the Americas, we call on other governments to do the same.

- **The United States will increase resettlement of Haitian refugees.** Reflecting the President's commitment to support the people of Haiti, the United States also commits to receiving an increased number of referrals to the U.S. Refugee Admissions Program for Haitians. The United States encourages other governments to join us in strengthening legal pathways for protection and opportunity for Haitians and other displaced populations in the Americas.

- **The United States will resume and increase participation in the Haitian Family Reunification Parole Program.** The Department of Homeland Security will announce the resumption of the Haitian Family Reunification Parole Program, which allows certain eligible U.S. citizens and lawful permanent residents to apply for parole for their family members in Haiti. Additionally, U.S. Citizenship and Immigration Services will take steps to increase participation in the program by reducing barriers to access. New invitations to apply under the program are anticipated to be issued in early fall 2022. Concurrently, the Department of State will increase efforts to process Haitian immigrant visas and reduce the existing backlog. State is in the process of assessing options to augment consular adjudicator staffing in Embassy Port-au-Prince and review additional operational efficiencies to decrease the immigrant visa backlog for Haitians.

- **The United States will resume the Cuban Family Reunification Parole Program.** Last month, the United States announced the resumption of operations for the Cuban Family Reunification Parole Program (CFRP). CFRP provides a safe, orderly pathway to the United States for certain Cuban beneficiaries of approved family-based immigrant petitions. DHS will resume processing cases this summer, work with the Department of State to begin interviews in Cuba by early fall, and build capacity to consider and process approved applicants, thus contributing to migration accord targets over the next two years.

*Observer States*

- **Spain will double the number of labor pathways for Hondurans** to participate in Spain's circular migration programs.

**Pillar III: Humane Border Management**

Securing borders with humane border management policies and practices is essential to reducing irregular migration and collaboratively managing migration across the hemisphere. The focus moving forward should be on: 1) humane border enforcement; 2) return of migrants lacking protection needs or other legal basis to remain; 3) facilitating returns to countries of most recent residence or origin; 4) support for assisted voluntary returns; and 5) strengthened bilateral and regional law enforcement information sharing and cooperation to combat migrant smuggling and human trafficking.

- **The United States will announce a multilateral "Sting Operation" to disrupt human smuggling networks across the Hemisphere.** The President will announce a first of its kind campaign, unprecedented in scale, to disrupt and dismantle smuggling networks in Latin America. In the last two months, the United States, led by DHS, has surged over 1,300 personnel throughout the region and invested over $50 million to support these activities. Through the end of May, efforts have produced approximately 20,000 total disruption actions including arrests and prosecutions, seizures of property such as houses and vehicles used to hide and smuggle people, and criminal investigations. DHS assesses that this has led to 900 fewer migrants arriving at the Southwest border each day, and we are just getting started. The U.S. will seek to expand efforts with other governments in the region to improve information sharing, build capacity, and advance criminal investigations.

- **The United States will improve the efficiency and fairness of asylum at the border.** In late May, DHS and Department of Justice began implementing a new process that improves and expedites processing of asylum claims made by noncitizens subject to expedited removal, to ensure that those who are eligible for asylum are granted relief

Cuba AR_001152

quickly, and those who are not are promptly removed. The new process is a further step toward a more functional and sensible asylum system that reduces the caseload in immigration courts while also providing individuals with a prompt and fair decision in their case. DHS is phasing in the implementation of this rule and when fully implemented, the rule will shorten the administrative process from several years to just several months.

JUNE 10, 2022

# Los Angeles Declaration on Migration and Protection

We, the Heads of State and Government of the Argentine Republic, Barbados, Belize, the Federative Republic of Brazil, Canada, the Republic of Chile, the Republic of Colombia, the Republic of Costa Rica, the Republic of Ecuador, the Republic of El Salvador, the Republic of Guatemala, Co-operative Republic of Guyana, the Republic of Haiti, the Republic of Honduras, Jamaica, the United Mexican States, the Republic of Panama, the Republic of Paraguay, the Republic of Peru, the United States of America, and the Oriental Republic of Uruguay, gathered in Los Angeles on the margins of the Ninth Summit of the Americas, reiterate our will to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration and to strengthen frameworks for international protection and cooperation.

We embrace the need to promote the political, economic, security, social, and environmental conditions for people to lead peaceful, productive, and dignified lives in their countries of origin.  Migration should be a voluntary, informed choice and not a necessity.

We are committed to protecting the safety and dignity of all migrants, refugees, asylum seekers, and stateless persons, regardless of their migratory status, and respecting their human rights and fundamental freedoms.  We intend to cooperate closely to facilitate safe, orderly, humane, and regular migration and, as appropriate, promote safe and dignified returns, consistent with national legislation, the principle of non-refoulement, and our respective obligations under international law.

We acknowledge that addressing irregular international migration requires a regional approach, and that ongoing health, social, and economic challenges of the pandemic exacerbate the root causes driving irregular migration, including the vulnerabilities of many migrants and their communities.

We value the tradition of our region in welcoming refugees and migrants and showing solidarity with our neighbors.  We recognize the positive contributions of refugees and migrants to the socio-economic development of their host communities.  We recognize the sustained efforts of States in our hemisphere in hosting refugees, providing regular migration

pathways, promoting local economic and social integration, facilitating safe, dignified, and voluntary return, and supporting the sustainable reintegration of returnees.

We remain committed to collectively leveraging the benefits of migration while addressing its challenges in countries and communities of origin, transit, destination, and return.  We do so in a spirit of collaboration, solidarity, and shared responsibility among States and in partnership with civil society and international organizations.  We reaffirm our shared commitment to supporting host communities; strengthening and expanding regular pathways and access to international protection; fostering opportunities for decent work; facilitating regularization and access to basic services; and promoting principles of safe, orderly, humane, and regular migration.

We also intend to strengthen the institutions that are responsible for migration management in our countries and exchange best practices in order to provide efficient and adequate care to migrants and access to protection for refugees.

**Promoting Stability and Assistance for Communities of Destination, Origin, Transit, and Return**

We affirm that countries of origin and countries and communities hosting large numbers of migrants and refugees may need international financing and assistance related to development, basic humanitarian needs, protection, security, public health, education, financial inclusion, and employment, among others.  We support efforts that allow all migrants, refugees, asylum seekers, and persons in situations of vulnerability to integrate into host countries and access legal identity, regular status, dignified employment, public services, and international protection, when appropriate and in accordance with national legislation, to rebuild their lives and contribute to those communities.  We plan to continue efforts to prevent and reduce statelessness.  We intend to expand efforts to address the root causes of irregular migration throughout our hemisphere, improving conditions and opportunities in countries of origin and promoting respect for human rights.  We reaffirm the importance of safe, dignified, and sustainable return, readmission, and reintegration of migrants to help them reestablish themselves in their communities of origin.  We further reaffirm the importance of ensuring all foreign nationals receive prompt consular assistance when needed or requested, and returnees are treated humanely and in a dignified manner, regardless of their immigration status, including in the process of their repatriation and return.

**Promoting Regular Pathways for Migration and International Protection**

We affirm that regular pathways, including circular and seasonal labor migration opportunities, family reunification, temporary migration mechanisms, and regularization programs promote safer and more orderly migration.  We intend to strengthen fair labor migration opportunities in the region, integrating robust safeguards to ensure ethical recruitment and employment free of exploitation, violence, and discrimination, consistent with respect for human rights and with a gender perspective.  We intend to promote, in accordance with national legislation, the recognition of qualifications and the portability of social benefits.  We intend to pursue accountability for those who commit human rights violations and abuses.  We plan to promote access to protection and complementary pathways for asylum seekers, refugees, and stateless persons in accordance with national legislation and with respect for the principle of non-refoulement.  We seek to promote border security and management processes that respect human rights and encourage and facilitate lawful, safe, and secure travel within the region.  We commit to guarantee human rights to individuals in vulnerable situations and to provide access to international protection, as appropriate.  We further intend to provide specialized and gender-responsive attention to individuals in situations of vulnerability.

**Promoting Humane Migration Management**

Renewing our commitment to respect and ensure the human rights of all migrants and persons in need of international protection, we recognize each country's responsibility to manage mixed movements across international borders in a secure, humane, orderly, and regular manner.  We intend to expand collaborative efforts to save lives, address violence and discrimination, counter xenophobia, and combat smuggling of migrants and trafficking in persons.  This includes expanded collaboration to prosecute migrant smuggling and human trafficking criminal organizations as well as their facilitators and money laundering networks.  We commit to provide appropriate protection and assistance to victimized individuals.  We intend, in accordance with national legislation, to improve and facilitate regional law enforcement information sharing, with the purpose of supporting the investigation and prosecution of crimes. We intend to explore new mechanisms, while preserving and leveraging existing regional, subregional, hemispheric, and global fora, to strengthen cooperation on border management and apply current mechanisms on visa regimes and regularization processes to combat exploitation by criminal groups.  In the instance of foreign nationals without a need for international protection and without a legal basis to remain in their country of presence, we commit to conduct any returns in a manner consistent with our respective obligations under international human rights law and international refugee law, and that respects the dignity of the individual, integrates safeguards to prevent refoulement, and promotes the return of children to safe conditions.

**Promoting a Coordinated Emergency Response**

Recognizing the imperative of promoting safe, orderly, and regular migration, and the safety of migrants, refugees, and asylum seekers in the region, we intend to work to cooperate in emergency response and humanitarian assistance in situations of mass migration and refugee movements.  We plan to strengthen existing regional coordination mechanisms and, as appropriate, the participation of civil society and international organizations to advance those aims.  This includes strengthening information sharing, as appropriate and in accordance with national legislation, enhancing early warning systems, leveraging existing relevant fora and processes, and defining a common set of triggers that activate a coordinated response.

**A Shared Approach to Reduce and Manage Irregular Migration**

To advance the common goals laid out in this Declaration and create the conditions for safe, orderly, humane, and regular migration through robust responsibility sharing, we intend to work together across the hemisphere to:

- Convene multilateral development banks, international financial institutions, and traditional and non-traditional donors to review financial support instruments for countries hosting migrant populations and facing other migration challenges, without prejudice to existing financing priorities and programs.

- Improve regional cooperation mechanisms for law enforcement cooperation, information sharing, protection-sensitive border management, visa regimes, and regularization processes, as appropriate and in accordance with national legislation.

- Strengthen and expand temporary labor migration pathways, as feasible, that benefit countries across the region, including through new programs promoting connections between employers and migrant workers, robust safeguards for ethical recruitment, and legal protections for workers' rights.

- Improve access to public and private services for all migrants, refugees, and stateless persons to promote their full social and economic inclusion in host communities.

- Expand access to regular pathways for migrants and refugees to include family reunification options where appropriate and feasible, in accordance with national legislation.

This Declaration builds upon existing efforts and international commitments and advances the vision set forth in the Global Compact on Refugees and the Global Compact for Safe, Orderly and Regular Migration (GCM) anchored in the 2030 Agenda for Sustainable Development.  We acknowledge the progress noted in the International Migration Review Forum Progress Declaration for the GCM.  We affirm the fundamental work that continues under the Comprehensive Regional Protection and Solutions Framework (MIRPS), the Regional Conference on Migration (RCM), and the South American Conference on Migration (SACM), as key regional bodies to facilitate the implementation of this Declaration, as well as the Quito Process and the Regional Inter-agency Coordination Platform for refugees and migrants from Venezuela.  The United Nations 1951 Refugee Convention; its 1967 Protocol; the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment; the Geneva Conventions of 1949 and International Humanitarian Law; the United Nations Convention against Transnational Organized Crime; its Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children; its Protocol against the Smuggling of Migrants by Land, Sea and Air; the United Nations Convention on the Rights of the Child; the International Convention on the Protection of the Rights of all Migrant Workers and Members of their Families; as well as other international conventions, remain binding on Parties to those conventions that endorse this Declaration.  This Declaration aligns with States' commitments in the International Labour Organization's Declaration on Fundamental Principles and Rights at Work and its General Principles and Operational Guidelines for Fair Recruitment.  We reiterate the importance and meaning of the principle of non-refoulement as a cornerstone of the international protection of refugees.  We applaud efforts throughout the region to provide a coordinated and comprehensive response to all migrants, returnees, refugees, asylum seekers, and stateless persons.  We make this Declaration of non-legally binding commitments to enhance cooperation and shared responsibilities on managing migration and protection in ways grounded in human rights, transparency, nondiscrimination, and State sovereignty.

###



# U.S. STRATEGY FOR ADDRESSING THE ROOT CAUSES OF MIGRATION

# IN CENTRAL AMERICA

JULY 2021

NATIONAL SECURITY COUNCIL



**THE WHITE HOUSE**
WASHINGTON

Cuba AR_001159



# U.S. Strategy for Addressing the Root Causes of Migration in Central America

## *Cover Message from Vice President Kamala Harris*

In Central America, the root causes of migration run deep—and migration from the region has a direct impact on the United States. For that reason, our nation must consistently engage with the region to address the hardships that cause people to leave Central America and come to our border.

For decades, our nation has engaged in Central America. Often well intentioned, the engagement has often not been consistent. And over the last few years, the United States significantly pulled back from work in the region.

Under our Administration, President Joe Biden and I have restarted our nation's engagement in Central America and diplomatic efforts with Central American governments. Our Root Causes Strategy is comprehensive and draws from decades of experience—and is based on four core pieces of evidence.

**First, addressing the root causes of migration is critical to our overall immigration effort.**

Just after we took office, President Joe Biden outlined our Administration's vision to reform our immigration system by creating a pathway to citizenship for the nearly 11 million undocumented migrants in our country, modernizing our immigration process, and effectively managing our border.

Shortly after that, the President asked me to lead our nation's efforts to address the root causes of that migration. That is because migration to our border is also a symptom of much larger issues in the region.

**Second, providing relief is not sufficient to stem migration from the region.**

The COVID-19 pandemic and extreme weather conditions have indeed exacerbated the root causes of migration—which include corruption, violence, trafficking, and poverty. While our Administration is proud that we have sent millions of vaccine doses and hurricane relief, we know that it is not enough to alleviate suffering in the long term.

The root causes must be addressed both in addition to relief efforts—and apart from these efforts. In everything we do, we must target our efforts in those areas of highest out-migration—and ensure that these programs meet the highest standards of accountability and effectiveness.

**Third, unless we address all of the root causes, problems will persist.**

Recently, I travelled to Guatemala, where one of the largest challenges is corruption. Our Administration knows that, where corruption goes unchecked, people suffer. And so, on that trip, the United States announced that we will launch an Anticorruption Task Force which will include U.S. prosecutors and law enforcement experts who will investigate corruption cases. It is our goal that, in dealing directly with corruption, we will also mitigate the lack of economic and educational opportunities on the ground.

**1**



**Fourth, and most importantly, the United States cannot do this work alone.**

Our Strategy is far-reaching—and focuses on our partnerships with other governments, international institutions, businesses, foundations, and civil society. At this writing, we have already received commitments from the governments of Mexico, Japan, and Korea, and the United Nations, to join the United States in providing relief to the region. Our Administration is also working hand-in-hand with foundations and non-profits to accelerate efforts in Central America.

While, in the past, the private sector has been an underutilized partner, our Administration is calling on U.S. and international businesses to invest in the region – and thus far, 12 have done so. Private sector investment not only boosts economic opportunity, but it also incentivizes regional governments to create the conditions on the ground to attract such investment.

\* \* \*

**Ultimately, our Administration will consistently engage in the region to address the root causes of migration. We will build on what works, and we will pivot away from what does not work. It will not be easy, and progress will not be instantaneous, but we are committed to getting it right. Because we know: The strength and security of the United States depends on the implementation of strategies like this one**

Cuba AR_001161



# TABLE OF CONTENTS

I.      Introduction

II.     Strategic Environment

III.    Desired End State

IV.     Strategic Framework

V.      Pillar I: Addressing Economic Insecurity and Inequality

VI.     Pillar II: Combating corruption, strengthening democratic governance, and advancing the rule of law

VII.    Pillar III:  Promoting respect for human rights, labor rights, and a free press

VIII.   Pillar IV:  Countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations

IX.     Pillar V:  Combating sexual, gender-based, and domestic violence

X.      Implementation Sequencing Highlights

Cuba AR_001162



# Introduction

It is in the national security interest of the United States to promote a democratic, prosperous, and secure Central America, a region closely connected to the United States by culture, geography, and trade. COVID-19, extreme weather, and severe economic decline are compounding longstanding challenges in the region, forcing far too many Central Americans to conclude the future they desire for themselves and their children cannot be found at home.  They have lost hope and are fleeing in record numbers.

Persistent instability and insecurity in Central America have gone on for too long.  Poverty and economic inequality, pervasive crime and corruption, and political leaders' drift toward authoritarian rule have stunted economic growth and diverted critical resources from healthcare and education, robbing citizens of hope and spurring migration.  The worsening impacts of climate change, manifesting as prolonged periods of drought and devastating storms, have exacerbated these conditions and undermine U.S. and international interests.  All of these factors contribute to irregular migration, and none of them can ultimately be addressed without honest and inclusive democratic governance that is responsive to the needs of citizens in the region.

 This Strategy lays out a framework to use the policy, resources, and diplomacy of the United States, and to leverage the expertise and resources of a broad group of public and private stakeholders, **to build hope for citizens in the region that the life they desire can be found at home.**

The Root Causes Strategy, directed by the President in Executive Order 14010, focuses on a coordinated, place-based approach to improve the underlying causes that push Central Americans to migrate, and that "take(s) into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society."  This Strategy lays out a framework to use the policy, resources, and diplomacy of the United States, and to leverage the expertise and resources of a broad group of public and private stakeholders, to build hope for citizens in the region that the life they desire can be found at home.

The U.S. government consulted with a wide range of stakeholders to inform this Strategy, including governments in the region, Members of Congress and their staff, international organizations, civil society organizations, labor unions, and the private sector.  Consultations will continue throughout implementation.



# Strategic Environment

Weak investment in infrastructure and education and poor rule of law leaves Central America at a competitive disadvantage for external investments, economic growth, and talent retention.  Weather shocks due to climate change contribute to growing poverty, homelessness, and food insecurity. Corruption and other government actions to undermine transparency and democratic governance limit confidence of the public in their governments and discourage domestic and foreign investment.  Threats

4

such as gang violence, criminal activity, and illicit drug flows challenge the security environment in Central America.

Nevertheless, opportunities for change exist.  A growing number of stakeholders, including from civil society and the private sector, are interested in pushing governments toward reforms that foster greater transparency and address climate change.  Likeminded government actors, as well as multilateral banks, private companies, foundations, civil society organizations, and international organizations, are interested in partnering on efforts to address the root causes of migration.  Sustainable technology can help increase access to government services and economic opportunities.  We will take advantage of these opportunities to address the reasons individuals choose to leave their home.



# Desired End State

*A democratic, prosperous, and safe Central America, where people advance economically, live, work, and learn in safety and dignity, contribute to and benefit from the democratic process, have confidence in public institutions, and enjoy opportunities to create futures for themselves and their families at home.*



# Strategic Framework

The Strategy focuses on the most commonly cited factors limiting progress in Central America, particularly those related to economic opportunity, governance and transparency, and crime and insecurity.  It is often a combination of multiple factors, resulting in a lack of hope that their country will improve, that marginalizes large populations within the region and pushes some people to migrate.  As such, we must work across all pillars to create economic opportunities, empower women and youth, support responsive and transparent governments, and build communities where people feel safe.  As individuals observe and experience improvements in these areas, we anticipate more people in El Salvador, Guatemala, and Honduras will have a reason to believe they can build successful lives at home rather than abroad.

> " Effecting systemic change and achieving the desired end state of a democratic, prosperous, and safe region will require the governments of El Salvador, Guatemala, and Honduras to govern in a transparent, professional and inclusive manner **that favors the public interest over narrow private interests.**

U.S. foreign assistance cannot substitute for political will in these countries. Used strategically, however,

U.S. development, diplomatic, and related tools can generate political leverage, empower champions of change, combat impunity and state capture, and catalyze improvements in governance, private investment, and human capital.

Execution of the Strategy will draw on the breadth of the U.S. government and a diverse group of public and private stakeholders.  It will draw on technological advances and leverage existing technology to offer dynamic, creative, efficient, and transparent solutions.  Throughout, it will focus on ensuring opportunities are available to all citizens regardless of gender, race, ethnicity, or sexual orientation.

The strategy is organized under five pillars:

- Pillar I:  Addressing economic insecurity and inequality

- Pillar II:  Combating corruption, strengthening democratic governance, and advancing the rule of law

- Pillar III:  Promoting respect for human rights, labor rights, and a free press

- Pillar IV:  Countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations

- Pillar V:  Combating sexual, gender-based, and domestic violence

Each Pillar is supported by various lines of effort, many of which advance progress in multiple pillars. While implementation of the lines of effort will be similar in each country, the specifics will differ.  To build political will among leaders in Central America, the United States will utilize diplomacy, public diplomacy, sanctions and visa revocations, and targeted foreign assistance programs.

 **Even with a strong, sustained commitment, the type of systemic change envisioned in the Strategy will take time to achieve**, and progress will not be linear.

The United States will combine our efforts with those of other governments, including in Central America and beyond, the private sector, civil society, international organizations, and multilateral banks and institutions, to leverage investments and speak with a similar voice as we advocate for partner government actions to affect sustainable change.  This holistic approach utilizes all U.S. government tools and a broad array of partnerships to leverage expertise, creative ideas, and the power of multiple voices to generate necessary change to provide citizens in the region with hope.  Even with a strong, sustained commitment, the type of systemic change envisioned in the Strategy will take time to achieve, and progress will not be linear.  Implementing the Strategy demands a disciplined approach that relies on innovation and evidence, but also clear accomplishments along the way to maintain momentum.

Across all pillars of our work, we will:

- ***Consult and Coordinate:***  To further develop our path forward, the administration will continue to consult with Congress, civil society, international organizations, the private sector, like-minded partners, and governments.  We will listen, learn the lessons of past efforts, create an approach, which draws on input from across sectors, and develop a broad base of support that advances efforts across the Strategy.

- *Communicate:*  We will create a robust communications plan, leveraging independent and social media, to convey our efforts to improve conditions in the region, build support for our approach, and instill hope in the region.  We will also seek to discourage irregular migration and dispel misinformation.

- *Assess:*  We will move forward deliberately with clear goals, measurable objectives, and strong safeguards to guide our efforts.  Throughout implementation, we will build in assessment points to ensure our efforts are producing the results we seek, strengthening where needed, adjusting course where warranted, and discontinuing as required.



# Pillar I: Addressing Economic Insecurity and Inequality

Despite reductions in poverty rates and increases in GDP per capita prior to the double impacts of the pandemic and hurricanes Eta and Iota, the economies of El Salvador, Guatemala, and Honduras remain largely informal and highly unequal.  Key to growth will be structural reforms to address impediments to investment, economic diversification, increased judicial transparency, improved governance and transparency, expanded access to financial capital for businesses, streamlining of government procedures to start businesses and pay taxes, investment in workers, and formalization of the economy.  Inclusive growth, that reaches women and marginalized populations, and includes decent work, will be critical to creating hope among citizens in the region.  The COVID-19 pandemic exposed weakness in national health care systems, led to severe economic downturns, and devastated tourism.  The consequences of climate change are only projected to get worse, further disrupting growing cycles, upending farmer livelihoods, and exacerbating food insecurity and malnutrition.  Securing commitments from regional governments while working with the private sector, international donors, foundations, international financial institutions (IFIs), and multilateral development banks (MDBs) will be critical to fostering the reforms necessary for businesses to thrive, mobilizing investment, and promoting economic development in the region.  Across these efforts, we will focus on empowering women, youth, and marginalized communities.

## Strategic Objectives:

1. ***Foster a Business Enabling Environment for Inclusive Economic Growth***:  Governments build an enabling environment for business by implementing reforms to address structural impediments to growth, streamlining and digitalizing business registration and operations processes, offering legal certainty, reducing opportunities for corruption, enforcing labor and environmental rules, combating insecurity and extortion, and leveling the playing field for international businesses.  Governments promote and facilitate economic growth in a manner that is available to all sectors of society, including women, minorities, and other marginalized populations.

2. ***Increase and Diversify Trade:***  Customs and border systems are more efficient and less subject to malfeasance, there is increased alignment and reduced redundancy of regulations across the

Cuba AR_001166

region, and infrastructure projects better facilitate trade. Enhance and diversify trade to include new export sectors, including those that reinforce U.S. supply chain needs.

3. ***Enhance Workforce Development, Health, Education, and Protection:*** Governments are able to effectively manage the COVID-19 response and prepare for the potential of future pandemics, and all citizens, including women and girls, have improved access to quality education, health care and clean water access, and social safety nets.

4. ***Build Resilience to Address Climate Change and Food Insecurity:*** Governments target investments so they are better able to mitigate the impact of severe weather events, including flooding and drought. Agriculture, including fisheries and aquaculture, is developed toward higher levels of climate resilience, leading to affordable and available food that can be utilized for a healthy diet, contributing to greater food security.

## Lines of Effort:

1. **Foster a business-enabling environment for inclusive economic growth.** The United States will work with governments to streamline regulatory processes and services, including via digitalization of government services such as records, databases, permitting, and tax collection. This will include efforts to address structural impediments to investment; support business incubation and acceleration to strengthen value chains by helping businesses produce higher-value goods in the agricultural and emerging sectors, and ensure all populations are incorporated into economic development policies.

   - **Promote legal certainty.** Weak rule of law is often cited as the top factor limiting new investment in El Salvador, Guatemala, and Honduras. We will work with the private sector, governments, and civil society to strengthen transparency, promote business ethics, and foster predictable legal and regulatory business environments.

   - **Promote investment-enabling reforms.** The United States will partner with regional governments, multilateral development banks, and the private sector to promote reforms to address structural impediments to investment and facilitate greater private sector participation in these economies, leveraging U.S. government partnerships with these entities to support business development and create jobs.

   - **Embrace technological solutions.** The United States will leverage rights-respecting technology to facilitate economic growth, increase opportunities for excluded populations, promote financial inclusion, and strengthen education and workforce development in coordination with the private sector. This will include extending existing technological solutions to our areas of focus, and guarding against unintended consequences of technological expansion.

   - **Expand opportunity for women, youth, and minorities.** The United States will work to ensure government programs and financial capital reach underserved groups, including small and medium sized enterprises (SMEs), youth, women- and indigenous-owned businesses, businesses serving rural areas, and internally displaced persons (IDPs).

2. **Enhance and diversify trade.** The United States will work with a variety of stakeholders to increase trade, diversify industry, and create decent work for citizens in the region, while working with governments to promote reforms needed to facilitate this growth.

Cuba AR_001167

- **Facilitate trade.**  The United States will work with governments to expand and diversify trade by reducing malfeasance and corruption in customs regimes; promoting prioritization of lending and technical support for infrastructure projects that facilitate trade; aligning and integrating regional customs systems; harmonizing regulatory certification requirements; and supporting business compliance with internationally recognized labor rights, environmental protections, and complex international trade rules.

- **Partner with International Financial Institutions (IFIs) and Multilateral Development Banks (MDBs).**  The United States will partner with IFIs and MDBs to diversify donors and provide a wide range of financing options to governments and private sectors in the region.  We will leverage the IFIs and MDBs to prioritize support for infrastructure development that facilitates trade and investment while incorporating transparency and good governance priorities in their financing and technical assistance initiatives.

- **Partner with the Private sector.**  The United States will partner with private sector companies to sustainably grow economies by attracting greater private investment while encouraging governance, economic, and other reforms to support business-enabling environments that create decent work.  We will conduct outreach to U.S. and vetted multinational businesses that already operate in the region, as well as business chambers of commerce in Central America.

- **Promote cross-border energy infrastructure.**  The United States will support cleaner and more efficient cross-border energy systems including new energy delivery infrastructure to facilitate increased reliability and cross border power integration and trade.

3. **Enhance workforce development, health, and education.**  The United States will support workforce training and vocational education programs, including improving the quality of existing education and increasing children enrolled in education and food programs that ensure children's basic nutritional needs are met; expand access to clean and potable water; and support a stronger COVID-19 response.

- **Increase access to quality education.**  The United States will support governments in providing youth with appropriate, safe, and accessible educational opportunities; and ensuring educational and vocational offerings reflect labor market needs so youth are able to access decent work upon completion of their studies.

- **Improve health.**  The United States will support water and sanitation programs to expand access to clean water.  The United States will support programs to strengthen health systems to address current and future public health challenges.

4. **Build resilience to address climate change and food insecurity.**  The United States will partner with governments, MDBs, IFIs, and the private sector to facilitate the development of agricultural practices to ensure farmers can better respond to the impacts of climate change and extreme weather events, which have contributed to food insecurity.

- **Increase resilience.**  The United States will support improved agriculture production and income generation to reduce food insecurity while supporting sustainable food systems. We will support efforts to improve crop resilience, adopt environmentally and economically sustainable agricultural practices, and improve land and water

management; improve the resilience of residential, commercial, and public buildings and core public infrastructure; and mitigate the impacts of and support a more rapid recovery from hurricanes and other severe weather events.

- **Enhance renewable energy.**  The United States will support new electricity generation projects, including in renewable energy and power grid improvement; a more efficient regulatory framework, especially for distributed generation, increased reliability, grid sustainability, and cross-border power integration and trade.  We will focus on investment categories including power generation with a focus on renewable energy, energy efficiency, and storage; residential, commercial, and public buildings; and water efficient agriculture.



# Pillar II:  Combating corruption, strengthening democratic governance, and advancing the rule of law

Governance challenges, including widespread corruption, undercut progress on economic opportunity, protection of human rights, and civilian security.  Private companies cite corruption as an impediment to investment.  Weak democratic institutions, coupled with rampant impunity, have lowered citizens' trust in their governments and the independence of judicial systems.  Contested elections and opaque government decision-making have led to violence.

As seen during the COVID-19 pandemic, governments all too often fail to provide needed services to their citizens and lack of government investment in infrastructure, education, health, and civilian security has hobbled advancement.  We will partner with civil society and independent media so they can maintain their critical oversight role and will work with civil society, the private sector, governments, and international institutions to advocate for sustainable progress in these areas.

## Strategic Objectives:

1. ***Strengthen Democratic Institutions to Improve Governance and Rule of Law:***  Governments enact and implement legislative reforms towards transparent and participatory policy making and electoral processes, including broad civic engagement.  Oversight is instituted at all levels of government.

2. ***Combat Corruption***:  Governments are freed from entrenched networks of corruption and impunity.  They develop and strengthen independent and transparent systems to eliminate conflicts of interest, including in selection of judges and other government personnel.

3. ***Improve Government Service Delivery:***  Governments improve capacity to raise and manage public resources, initiate reforms to improve fiscal and operational transparency, and provide services to all citizens.

**10**

## Lines of Effort:

1. **Strengthen democratic institutions to improve governance and rule of law.**  The United States will work with countries to promote reform agendas across all branches of government so government better serves all citizens.  This will include a focus on adequately resourcing judicial and oversight institutions, ensuring their independence, and promoting reform of personnel selection and retention processes.

   - **Strengthen the independence of the justice sector.**  The United States will promote a merit-based, independent process for nomination and selection of justice and oversight officials, and establish anti-corruption norms limiting immunity of officials from prosecution and banning candidates for office with disqualifying criminal records.  We will promote adequate funding of justice institutions so they have the resources to serve the country.

   - **Promote transparency.**  The United States will work with partners to promote transparency in electoral systems through reform and enforcement of electoral campaign finance rules and open list systems to allow for direct representation.  We will empower independent audit and oversight institutions to monitor use of public funds, and promote transparency in government processes, including open government mechanisms and the promotion of open data.  We will explore how to leverage the concept of "vetted units" to bring trusted actors into key roles in oversight bodies, including in legislative committees.

   - **Improve efficacy of legislative branches.**  The United States will work with partners to root out corruption in legislative branches and improve the transparent and efficient functioning of those bodies.

   - **Empower public and private sector actors.**  The United States will partner with civil society and independent media so they have the tools, knowledge, and networks needed to safely identify government neglect and abuse, raise awareness, and demand accountability.  We will partner with the private sector to advocate for necessary reforms and regulations to promote transparency.

2. **Prioritize an anticorruption agenda.**  The United States will work regionally, bilaterally, and, if we must, unilaterally to root out corruption and enhance transparency across the region.

   - **Support civil society and media organizations.**  Across Central America, citizens, nongovernmental organizations, and media organizations have led efforts to promote transparency and demand improved governance.  The United States will expand support for NGOs and other entities in the region focused on governance promotion to encourage local leadership of such efforts and foster resiliency and sustainability.

   - **Prevent, detect, investigate, and prosecute corruption.**  The United States will work with partners to develop and implement a variety of anti-corruption tools aimed at preventing, detecting, investigating, and ultimately punishing corruption at all levels and in all branches of the government, and throughout society.  We will identify, support, and

Cuba AR_001170

partner with prosecutorial teams that demonstrate a commitment to holding corrupt actors to account.

- **Sanction corrupt actors.**  The United States will use various tools, including financial sanctions and visa restrictions, to signal we will not tolerate corruption and antidemocratic behavior.  We will press governments to strengthen transparency, accountability, and the rule of law with decisive and meaningful reforms.

3. **Improve administration of public resources.**  The United States will work with governments to establish proper budgeting, management, and use of public resources at the local and national levels to enhance service delivery for all citizens, including in underserved areas and vulnerable populations.

   - **Improve government finances.**  The United States will work with governments to review fiscal policy to identify gaps and incongruences in taxation, and opportunities to progressively expand the tax base, incentivizing individuals and businesses to move into the formal economy and to transition public procurement to a competitive, transparent, and merit-based system to curb political influence and diminish the opportunities for corruption.

   - **Target key populations.**  The United States will work with governments to establish strategies to provide services in marginalized communities, including IDPs, high-threat crime areas, and regions with highest outbound migration.



# Pillar III:  Promoting respect for human rights, labor rights, and a free press

Respect for human rights, labor rights, and press freedom are essential elements to democratic and social development in the region.  Marginalized populations, including women and girls, indigenous, Afro-descendent, and LGBTQI+ populations often suffer discrimination and may be victims of hate crimes. Victims of violence at the hand of the state or criminal organizations suffer from systemic violations of their rights under the law (including redress, protection, and recognition), and IDPs are particularly at risk.  Labor rights activists, human rights and environmental defenders, and independent journalists face violence and intimidation.  Authorities often do not hold perpetrators of these crimes accountable and labor law enforcement is weak.  We will work with partners in the region, including civil society, to promote respect for human rights for all citizens.

## Strategic Objectives:

1. ***Enhance Respect for Human Rights:***  Governments prevent, reduce, and mitigate risk factors and reduce human rights violations.  Civil society organizations and a robust free press hold government actors accountable.  At-risk populations have national and international recourse, including U.S. government support and advocacy.

2. ***Enhance Respect for Labor Rights:*** Governments ensure labor laws are enforced as required by CAFTA-DR, with a particular emphasis on freedom of association and the right to organize and bargain collectively, addressing child labor and forced labor, and promoting decent work in safe, healthy, and inclusive workplaces free from discrimination.

3. ***Promote a Free Press:*** Governments respect the independence of all forms of media so citizens can access information necessary to make informed decisions and hold governments accountable.

## Lines of Effort:

1. **Strengthen respect for human rights.** The United States will work with governments and civil society to strengthen legal frameworks, promote the enforcement of laws that protect citizens' rights, support regional and domestic early warning systems to track risks for violations, and build institutional capacity to protect citizens' rights.

   - **Protect human rights defenders and at-risk populations.** The United States will work with governments and civil society to protect marginalized individuals and groups, including human rights and environmental defenders, youth activists, LGBTQI+ people, indigenous people, IDPs forcibly displaced by violence, labor rights activists, and other individuals who are at risk of persecution or abuse.

   - **Respond promptly and decisively to ensure accountability.** The United States will work with governments so they decisively respond when human rights violations occur, extending access to justice for all citizens, and reducing impunity by ensuring justice and security actors hold perpetrators accountable.

   - **Curb extrajudicial killings.** The United States will support efforts to curb abuses by security personnel, including the police, and hold perpetrators accountable.

   - **Strengthen civil society protections.** The United States will work with governments and civil society organizations to ensure that civil society and media groups are able to hold governments accountable without legal restriction and free from intimidation.

2. **Strengthen respect for labor rights.** The United States will work with governments to strengthen legal frameworks and the enforcement of labor laws, promote decent work, and support workers in exercising their freedom of association and collective bargaining rights.

   - **Protect trade unionists and the right to organize.** The United States will work with governments to ensure laws that protect the rights of workers to organize and bargain collectively are in place and are effectively enforced. The United States will work with governments to empower workers to claim their rights, protect labor rights activists, and build the capacity of democratic, worker-led organizations.

   - **Improve legal frameworks, enforcement, and awareness.** The United States will work with governments to ensure laws that protect fundamental labor rights are in place and enforced, with appropriate dispute resolution mechanisms and proactive outreach to communities, unions, civil society, and employers. The United States will promote labor rights compliance among employers, including accountability in the supply chains of priority sectors. The United States will work with governments, employers, and worker organizations to promote constructive dialogue on labor issues to improve legal

frameworks, inform enforcement strategies, and strengthen worker voices related to labor and employment issues.

3. **Promote a free press.**  The United States will work with governments and civil society to ensure citizens have access to information from independent sources to inform their choices.

   - **Strengthen independent media.**  The United States will support a regulatory environment that ensures independent media can operate without fear of reprisal or intimidation, and will support development of media that can serve as an effective oversight tool to those in power.



# Pillar IV:  Countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations

U.S. assistance contributed to important advances in the professionalism and capability of law enforcement and security services throughout Central America, in particular with the capacity of vetted units, community policing, and violence prevention initiatives.  Homicide rates have decreased and capacity to seize illicit drugs has increased in recent years, though violence against women and children has increased.  Gangs and extortion remain a threat, and transnational crime is on the rise.  Challenges remain with uneven capabilities among law enforcement and security services, inadequate resourcing of security needs, the impact of the pandemic on law enforcement, and the military's role in policing.

Obtaining clear and meaningful commitments from our partners to tackle corruption and support transparency is a foundational element for sustainable progress across the criminal justice systems of Central America.  Increasing security within communities is key to generating hope for citizens in the region so they can move safely to school and work, but also to attract investment.  We will work with partner governments and community organizations to build professional security forces and focus on violence prevention and intervention to build a more secure region.

## Strategic Objectives:

1. ***Professionalize Security Forces***:  Governments support the development of accountable security forces that earn the respect of the citizens they serve.  This includes adopting budgets for security forces that enable them to be sufficiently staffed, trained, equipped, and compensated, and have internal oversight to strengthen accountability.  Governments establish legal limitations on the use of militaries in civilian policing and implement plans for the removal of militaries from civilian policing.

2. ***Counter Organized Crime***:  Security forces counter organized crime and using place-based strategies, disrupt and dismantle transnational criminal organizations and other criminal actors in key corridors to improve citizen security.

3. ***Build Safe Communities through Violence Prevention and Intervention***:  Governments make legal and policy reforms in violence prevention, support rehabilitation and re-insertion into society of former gang members and individuals previously incarcerated, and provide protection to at-risk youth and victims of violence, and other marginalized populations, including prevention of human trafficking.

## Lines of Effort:

1. **Professionalize security forces.**  The United States will support the development of well-trained civilian law enforcement and other security forces that can provide effective, accountable services with respect for the rule of law and human rights.  We will work with governments so civilian law enforcement has the resources and capacity to assume full responsibility for civilian security, enabling the drawdown of military from policing roles.

   - **Improve civilian policing.**  The United States will work with governments to target resources at the most pressing security challenges, while ensuring intelligence-led and community policing concepts are introduced and implemented nationwide, designed to increase dialogue and trust with populations, and establish community-based solutions to crime that respect human rights.

   - **Enhance accountability.**  The United States will work with governments to build accountability into security forces through initiatives to support audit and oversight functions to root out and address misconduct and poor performance.

2. **Counter organized crime.**  The United States will work with governments to increase capacity of law enforcement and other security forces to address the unique transnational and national threats to the region, such as drug trafficking, gangs, extortion, smuggling, corruption, and money laundering, including through vetted and specialized units, regional cooperation, and legislative reform to increase penalties for organized crime.

   - **Build trusted partners.**  The United States will work with and expand vetted and specialized units to build capacity to address complex crimes, including human and drug trafficking, and ensure trusted partners that can work with the United States and others in the region.

   - **Promote regional cooperation.**  The United States will promote coordination and information sharing among countries in the region to address transnational crime, including to combat narcotics and other illicit trafficking.

3. **Build safe communities.**  The United States will work with governments, law enforcement, community organizations, and others to build trust between the community and government, prevent crime, and provide alternatives to youth considering a life of crime.

   - **Create safe spaces.**  The United States will work with municipalities and community organizations to increase the availability of safe spaces, such as parks and youth centers,

and improve the safety of public transportation, so that citizens can engage in economic and social life without fear

- **Create meaningful alternative for at-risk youth.** The United States will work with a diverse range of stakeholders from government, civil society, and the private sector to prevent youth from joining gangs, including through opportunities to play, learn, work, and feel connected with their families and communities.

- **Reintegrate offenders.** The United States will work with governments and civil society to support offenders' efforts to disengage from gangs and reintegrate into communities by addressing trauma, community resiliency, education and economic opportunity, and case management services.



# Pillar V:  Combating sexual, gender-based, and domestic violence

Across the region, gender-based violence (GBV)--including, but not limited to, intimate partner violence, rape, gender-based murder of women and girls (femicide)--and other crimes, including sex and labor trafficking, significantly hinder the ability of women and girls to participate fully in society and contribute to their families and communities.  Women and youth from historically marginalized communities often face even higher levels of GBV.  In El Salvador, Guatemala, and Honduras, women and youth subjected to violence or human trafficking lack sufficient access to justice and protection services.  The ability of law enforcement to combat sexual, gender-based, and domestic violence remains a challenge, and domestic violence has been exacerbated by the COVID-19 pandemic.  We will work with partner governments, civil society organizations, and others to combat violence in the region.

## Strategic Objectives:

1. *Combat sexual, gender-based, and domestic violence:*  Governments and civil society take steps to prevent sexual, gender-based, and domestic violence; hold perpetrators accountable; and protect and provide services for victims.

## Lines of Effort:

1. **Combat sexual, gender-based, and domestic violence.** The United States will work with governments and civil society to prevent, address, and support victims of sexual, gender-based, and domestic violence.

   - **Prevent and prosecute sexual, gender-based, and domestic violence.** The United States will work with governments in the region to implement existing legislation relating to sexual, gender-based, and domestic violence, and ensure law enforcement and the justice sector is equipped to investigate and prosecute these crimes, reducing impunity for

16

these crimes.  We will work with community-based organizations to change the culture around gender-based violence and empower women.

• **Support victims.**  The United States will work with governments and civil society to increase support and protection for survivors of these crimes, and break down stereotypes and cultural norms that permit these crimes to continue.



# Implementation Sequencing Highlights

## Short-Term:

**Build Partnerships:**  We will build a coalition of people, organizations, and businesses committed to creating economic opportunity and fostering political will for structural reforms in Guatemala, El Salvador, and Honduras.

**Mobilize Investment:**  We will work with the private sector to mobilize investment in the region to create economic opportunity.

**Address Acute Causes:**  We will address humanitarian needs from the fall 2020 hurricanes, provide training and finance to jump start the economies after COVID-19 and hurricane devastation, and provide critical support to those in need of food assistance.  We will focus on education and training for youth.

**Communicate:**  We will ensure people in the region know about the United States' commitment to supporting good governance, economic opportunities, and security so they understand help is on the way to build hope for a better future at home.  We will communicate clearly to governments in the region that the United States wants to be a partner in their success, but that this partnership requires a shared commitment to inclusive and transparent democratic governance.

## Medium Term:

**Promote Reforms:**  We will focus our efforts on deepening implementation of initiatives that promote reforms fundamental to addressing root causes of migration, employing the full range of U.S. government tools to combat corruption and promote political will where necessary.

**Create Economic Opportunity:**  We will expand our partnership with foundations, civil society, and the private sector to deliver new economic opportunities to citizens in the region, and mobilize appropriate technological solutions.

**Fight Corruption:**  We will launch a regional anti-corruption initiative and work closely with partners to prosecute corruption and transnational criminal operations, including illicit political finance, migrant smuggling and trafficking cases, that will help improve governance in Central America.

**Combat Insecurity:**  We will target security assistance on the most common security-related drivers of migration, including extortion and gender-based violence.

Cuba AR_001176

**Address Climate Change and Improve Disaster Preparedness:**  We will work with partners to reinforce national and regional preparedness and disaster response capabilities and implement programs to adapt to and mitigate the impacts of climate change.

**Communicate:**  We will continue to communicate progress and actions to build hope across society.

## Long-Term:

**Deepen Partnerships:**  We will solidify and expand implementation across the pillars, informed by constant feedback and consultation from stakeholders in Congress, civil society, international organizations, the private sector, and partner governments.

**Institutionalize Programs:**  We will aim for institutionalization of longer-term structural changes in governance to ensure strong democratic institutions and governments that invest in the well-being of their societies.  We will assess our progress and increase the sustainability of our efforts by transferring increased ownership to partners in the region.

**Integrate Regionally:**  We will seek deeper economic and political integration across Central America, and with North America, to safely and humanely manage migration and to help realize a vision of a more prosperous and stable region.

Cuba AR_001177



Cuba AR_001176



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Information Technology*
Washington, DC  20529

# Memorandum

TO:        Dominic Mancini
           Deputy Administrator,
           Office of Information and Regulatory Affairs,
           Office of Management and Budget

THROUGH:   Eric Hysen                    ERIC N      Digitally signed by ERIC
           DHS Chief Information Officer  HYSEN       N HYSEN
                                                      Date: 2022.12.29
                                                      15:46:20 -05'00'

FROM:      Samantha Deshommes            SAMANTHA L   Digitally signed by
           USCIS Office of Policy and Strategy,  DESHOMMES  SAMANTHA L DESHOMMES
           Chief Regulatory Officer                        Date: 2022.12.29 13:34:32
                                                            -05'00'

SUBJECT:   Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – Form
           I-134A, Online Request to be a Supporter and Declaration of Financial Support;
           and USCIS Form I-134, Declaration of Financial Support

**Purpose:** USCIS is requesting emergency approval of the new USCIS Form I-134A, Online
Request to be a Supporter and Declaration of Financial Support, which is a new collection of
information.  USCIS is also requesting emergency approval of a revision of USCIS Form I-134,
Declaration of Financial Support, to remove the electronic collection of information, which is the
basis for the new USCIS Form I-134A.  USCIS is seeking approval for both collections of
information under 5 CFR 1320.13.

**Background:**  Section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C.
1182(d)(5)) provides the Secretary of Homeland Security with the discretionary authority to
parole noncitizens into the United States temporarily, under such reasonable conditions that the
Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant
public benefit." *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); see also 6 U.S.C. 202(4)
(charging the Secretary with the responsibility for "[e]stablishing and administering
rule…governing…parole").  To support DHS's current efforts to curb a surge in migrants

Cuba AR_001179

crossing the Southwest Border (SWB) without authorization and immediately expand the avenues for lawful migration into the United States, DHS has created a streamlined process that allows certain citizens of designated countries and their immediate family members to come to the United States temporarily as parolees for urgent humanitarian reasons or significant public benefit.  The process currently applies to Ukraine and Venezuela (with a numerical cap), but, with this emergency revision, it is being extended to Nicaragua, Cuba, and Haiti, and the numerical cap on Venezuela is being lifted.  DHS will use Form I-134A to determine whether a U.S.-based individual has sufficient financial resources and access to those funds to support the beneficiary for the duration of their temporary stay in the United States.  Form I-134A is used by a U.S. based individual (the supporter) to request to be considered as a supporter and to agree to provide financial support to the beneficiary named on the form during the beneficiary's period of stay in the United States.

USCIS is now splitting the two versions of the USCIS Form I-134 into separate OMB-controlled collections of information as the populations are different and the purposes for which the information collections are conducted are different enough to warrant their separation.  As a result, USCIS will revert use of USCIS Form I-134 for its original purpose and will begin use of USCIS Form I-134A for the persons identified above as seeking parole into the United States. Other than expanding the eligible countries and associated instructions, the USCIS Form I-134A will match the previously approved online Form I-134 content.  To facilitate the transition between versions, Form I-134 online requests that are saved and in process when the Form I-134A is deployed, will be automatically converted to Form I-134As upon submission and the receipt notices will reflect the new form number and name.

**Discussion:**  OMB has previously approved a revision to USCIS Form I-134, *Declaration of Financial Support* (OMB control number 1615-0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. To support the expanded efforts and make the collection more flexible, DHS has created a new information collection that will be the first step in these parole processes and will cease using the paper USCIS Form I-134 for this purpose.  U.S.-based supporters will submit USCIS Form I-134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States.

DHS requests emergency approval because the delay associated with the normal information collection request clearance process would harm the public interest.  The expansion of these processes to include Cubans, Haitians, and Nicaraguans and the expansion of the current process for Venezuelans will improve border security, limit irregular migration, and create additional safe and orderly processes for people fleeing humanitarian crises to come to the United States.

Each of these countries is experiencing significant political, economic, and humanitarian challenges.  Cuba, Nicaragua, and Venezuela are under the control of repressive authoritarian regimes that routinely oppress dissenting voices.  Haiti, the poorest country in our hemisphere, faces an extremely challenging security environment punctuated by extreme political instability, and its citizens are subject to endemic, indiscriminate violence imposed by the criminal organizations and gangs.  These conditions are driving irregular migration throughout the hemisphere as well as to our border.

Cuba AR_001180

There has been a significant increase in unique encounters of Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals, which jumped by more than 10-fold from an average of 15,557 in FY 2014 – FY 2019 to 169,436 in FY 2021.  CHNV encounters increased further – and sharply – in fiscal year (FY) 2022.  DHS encountered an estimated 605,000 unique CHNV nationals in FY 2022.

This process is directly responsive to requests from key foreign partners—including the Government of Mexico (GOM)—to provide a lawful process for Cuban, Haitian, Nicaraguan, and Venezuelan nationals to enter the United States.  The United States will only implement the new parole process while able to return or remove to Mexico such nationals who enter without authorization across the SWB.  The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of individuals who bypass this process and enter the United States without authorization.  Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this independent U.S. action and ongoing, sensitive diplomatic engagements.

Delaying the information collection approval would be contrary to the public interest because it would incentivize even more irregular migration of Cuban, Haitian, Nicaraguan, and Venezuelan nationals seeking to enter the United States.  Thus, the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration would be exacerbated by a delay of the approval of this request.

USCIS seeks emergency processing of both the Form I-134 and I-134A information collection packages in accordance with 5 CFR 1320.13. USCIS certifies that the requirements of 5 CFR 1320.13(a) are met and that:

- The collection of information is needed immediately and is essential to the mission of the agency.
- The use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information.
- Public harm is reasonably likely to result if normal clearance procedures are followed.

USCIS greatly appreciates the timely consideration of this request.

**Recommendation**: Please sign decision memo requesting emergency approval of this collection of information under 5 CFR 1320.13.

Cuba AR_001181



# Declaration of Financial Support

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134**
OMB No. 1615-0014
Expires 12/31/2024

► **START HERE - Type or print in black ink.**

## Part 1.  Basis for Filing

**1.**   I am filing this form on behalf of:    ☐ Myself as the beneficiary.    ☐ Another individual who is the beneficiary.

## Part 2.  Information about the Beneficiary

Complete **Part 2.** regardless of whether you are filing this form on behalf of yourself as the beneficiary or on behalf of another individual who is the beneficiary.

**1.**   Beneficiary's Current Legal Name (**Do not** provide a nickname.)

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |

**2.**   Other Names Used

Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |
| | | |

**3.**   Date of Birth (mm/dd/yyyy)    **4.**   Gender    **5.**   Alien Registration Number (A-Number) (if any)

☐ Male   ☐ Female     ► **A-**

**6.**   Place of Birth

City or Town

State or Province

Country

**7.**   Country of Citizenship or Nationality

**8.**   Marital Status

☐ Single, Never Married   ☐ Married   ☐ Divorced   ☐ Widowed   ☐ Legally Separated   ☐ Marriage Annulled

☐ Other (Explain):

Cuba AR_001182

## Part 2.  Information about the Beneficiary (continued)

**9.**   Beneficiary's Mailing Address

In Care Of Name (if any)

Street Number and Name                                                                    Apt.Ste. Flr.   Number
☐ ☐ ☐

City or Town                                                                                          State        ZIP Code

Province                                        Postal Code                    Country

**10.**   Are the beneficiary's mailing address and physical address the same?                        ☐ Yes  ☐ No

If you answered "No" to **Item Number 10.**, provide your physical address in **Item Number 11.**

**11.**   Beneficiary's Physical Address

In Care Of Name (if any)

Street Number and Name (Do **not** provide a PO Box in this space unless it is your **ONLY** address.)   Apt. Ste. Flr.   Number
☐ ☐ ☐

City or Town                                                                                          State        ZIP Code

Province                                        Postal Code                    Country

## *Beneficiary's Anticipated Length of Stay*

**12.**   Beneficiary's Anticipated Period of Stay in the United States

From (mm/dd/yyyy)

To (select one):

☐ (mm/dd/yyyy)

☐ No End Date

## Part 2.  Information about the Beneficiary (continued)

### Beneficiary's Financial Information

Provide information about the beneficiary's income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information**.

**Beneficiary's Income**

13.  Provide all of the information requested in the table below about the beneficiary, all of the beneficiary's dependents, and any other individuals the beneficiary financially supports (do not include any individuals named in **Part 3.**).  Information about assets that are not based on employment should be added in **Item Number 16.** and not in **Item Number 13.**

| Individual's Full Name (First, Middle, Last) (do not include any individuals named in **Part 3.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Beneficiary (Type or print "Self" if you are filing for yourself as the beneficiary or "Beneficiary" if someone is agreeing to support you in **Part 3.**) | Income contribution to the beneficiary annually (if none, type or print $0) |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | **Total** Number of Dependents | |
| | | Total Income $ | |

14.  Does any of the beneficiary's total income (including income from dependents and other individuals who contribute to the beneficiary's income, excluding any individuals named in **Part 3.**) come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?            ☐ Yes   ☐ No

15.  If you answered "Yes" to **Item Number 14.**, what amount of the beneficiary's total income comes from an illegal activity or source?                    $ _____

**Part 2.  Information about the Beneficiary** (continued)

**Beneficiary's Assets**

16.   In the table below, provide the amounts of assets available to the beneficiary for the expected period of his or her stay (excluding assets from any individuals named in **Part 3.**).  Attach evidence showing that the beneficiary has these assets.

| Full Name of Asset Holder (First, Middle, Last) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Current Cash Value (U.S. dollars)  $ | |
| | **TOTAL** (U.S. dollars)  $ | |

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.**

If you are not the beneficiary named in **Part 2.**, complete **Part 3.**

1.   Current Legal Name (**Do not** provide a nickname.)

Family Name (Last Name)

Given Name (First Name)

Middle Name

2.   Other Names Used

Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

Family Name (Last Name)

Given Name (First Name)

Middle Name

3.   Current Mailing Address

In Care Of Name (if any)

Street Number and Name

Apt.Ste. Flr.  ☐ ☐ ☐   Number

City or Town

State

ZIP Code

Province

Postal Code

Country

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

**4.**   Is your current mailing address the same as your current physical address?  ☐ Yes  ☐ No

If you answered "No" to **Item Number 4.**, provide your current physical address in **Item Numbers 5.**

**5.**   Physical Address

In Care Of Name (if any)

Street Number and Name                                                              Apt.Ste. Flr.  Number
☐ ☐ ☐

City or Town                                                              State    ZIP Code

Province                                Postal Code                    Country

### *Other Information*

**6.**   Date of Birth (mm/dd/yyyy)

**7.**   Place of Birth

City or Town                                                              State or Province

Country

**8.**   Alien Registration Number (A-Number) (if any)     **9.**   USCIS Online Account Number (if any)
▶ **A-**                                                                    ▶

### *Immigration Status*

**10.**   What is your current immigration status?  Provide documentation as provided in the instructions.

☐ U.S. Citizen

☐ U.S. National

☐ Lawful Permanent Resident   A-Number
▶ **A-**

☐ Nonimmigrant   Form I-94 Arrival-Departure Record Number
▶

Other (Explain):

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

### *Employment Information*

**11.**   Employment Status

☐ Employed (full-time, part-time, seasonal, self-employed)   ☐ Unemployed or Not Employed   ☐ Retired

☐ Other (Explain): _____

If you indicated that you are employed in **Item Number 11.**, provide the information requested in **Item Numbers 12. - 13.**

**12.**   **A.**   ☐ I am currently employed as a/an          Name of Employer

_____          _____

**B.**   ☐ I am currently self-employed as a/an

_____

**13.**   Current Employer's Address

Street Number and Name                                              Apt.Ste. Flr.   Number

_____   ☐ ☐ ☐   _____

City or Town                                              State   ZIP Code

_____   _____   _____

Province                          Postal Code          Country

_____   _____   _____

### *Financial Information*

Provide information about your income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8.  Additional Information**.

**Income**

**14.**   Provide all of the information requested in the table below about yourself, all of your dependents, and any other individuals you financially support (do not include any individuals named in **Part 2.**).  Information about assets that are not based on employment should be added in **Item Number 17.** and not in **Item Number 14.**

| **Full Name** (First, Middle, Last) (do not include any individuals named in **Part 2.**) | **Date of Birth** (mm/dd/yyyy) | **Relationship to the Individual Agreeing to Financially Support** (Type or print "Self" for Individual Agreeing to Financially Support the Beneficiary) | **Income Contribution to the Beneficiary Annually** (if none, type or print $0) |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | **Total** Number of Dependents | |
| | | Total Income $ | |

Cuba AR_001187

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

**15.** Does any of the income listed above come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?    ☐ Yes   ☐ No

**16.** If you answered "Yes" to **Item Number 15.**, what amount of income comes from an illegal activity?   $ [            ]

### Assets

**17.** Fill out the table below regarding the assets available to **you** (do not include any assets from any individuals named in **Part 2.**). Attach evidence showing you have these assets.

| Full Name of Asset Holder (you or your household member) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | Current Cash Value (U.S. dollars)  $ |  |
|  | **TOTAL** (U.S. dollars)  $ |  |

### *Financial Responsibility for Other Beneficiaries*

**18.** Have you previously submitted a Form I-134 on behalf of a person other than the beneficiary listed on this Form I-134?    ☐ Yes   ☐ No

If you answered "Yes" to **Item Number 18.**, provide the information requested in **Item Numbers 19. - 20.**  If you need additional space to complete this section, use the space provided in **Part 8. Additional Information**.

**19.**   Person 1

Family Name (Last Name)        Given Name (First Name)        Middle Name
[            ]                   [            ]                   [            ]

A-Number                        Date Submitted (mm/dd/yyyy)
► A-[            ]              [            ]

**20.**   Person 2

Family Name (Last Name)        Given Name (First Name)        Middle Name
[            ]                   [            ]                   [            ]

A-Number                        Date Submitted (mm/dd/yyyy)
► A-[            ]              [            ]

Cuba AR_001188

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

### *Intent to Provide Specific Contributions to the Beneficiary*

21.   I   ☐ intend   ☐ do not intend to make specific contributions to the support of the beneficiary named in **Part 2.**

Explain the contribution.  For example, if you intend to furnish room and board, state for how long.  If you intend to provide money, state the amount in U.S. dollars and whether it is to be given in a lump sum, weekly, or monthly, and for how long.  If you need additional space, use **Part 8. Additional Information**.

_____

**Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf)**

If you are the beneficiary and are filing Form I-134 on your own behalf, complete and sign **Part 4.**

**NOTE:**  Read the **Penalties** section of the Form I-134 Instructions before completing this section.

### *Beneficiary's Statement*

**NOTE:** Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

1.   I, as the beneficiary, certify the following:

   **A.**   ☐   I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question**.**

   **B.**   ☐   The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood everything.

2.   ☐   At my request, the preparer named in **Part 7.**, _____, prepared this declaration for me based only upon information I provided or authorized.

### *Beneficiary's Contact Information*

3.   Beneficiary's Daytime Telephone Number

_____

4.   Beneficiary's Mobile Telephone Number (if any)

_____

5.   Beneficiary's Email Address (if any)

_____

### *Beneficiary's Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

## Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf) (continued)

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

**1)**  I reviewed and provided or authorized all of the information in my declaration;

**2)**  I understood all of the information contained in, and submitted with, my declaration; and

**3)**  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that I will be able to financially support myself while in the United States.

That I am willing and able to pay for necessary expenses for the duration of my temporary stay in the United States.

### *Beneficiary's Signature*

**6.**  Beneficiary's Signature

Date of Signature (mm/dd/yyyy)

## Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary

If you are filing Form I-134 on behalf of someone else (the beneficiary listed in **Part 2.**), complete and sign **Part 5.**

**NOTE:**  Read the **Penalties** section of the Form I-134 Instructions before completing this section.

### *Statement of Individual Agreeing to Financially Support the Beneficiary*

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.**  I, as the individual agreeing to financially support the beneficiary, certify the following:

**A.**  ☐  I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question.

**B.**  ☐  The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood

**2.**  ☐  At my request, the preparer named in **Part 7.,** _____, prepared this declaration for me based only upon information I provided or authorized.

### *Contact Information of Individual Agreeing to Financially Support the Beneficiary*

**3.**  Daytime Telephone Number

**4.**  Mobile Telephone Number (if any)

**5.**  Email Address (if any)

Cuba AR_001190

**Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary** (continued)

### *Certification of Individual Agreeing to Financially Support the Beneficiary*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

   **1)** I reviewed and provided or authorized all of the information in my declaration;

   **2)** I understood all of the information contained in, and submitted with, my declaration; and

   **3)** All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that the person named in **Part 2.** will be financially supported while in the United States.

That I am willing and able to receive, maintain, and support the person named in **Part 2.** to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States.

I acknowledge that I have read this section, and I am aware of my responsibilities as an individual agreeing to financially support the beneficiary.

### *Signature of Individual Agreeing to Financially Support the Beneficiary*

**6.**  Signature                                                                     Date of Signature (mm/dd/yyyy)

➡️

**NOTE TO ALL INDIVIDUALS AGREEING TO FINANCIALLY SUPPORT THE BENEFICIARY:**  If you do not completely fill out this declaration or if you fail to submit required documents listed in the Instructions, USCIS or the Department of State may deny or not consider your declaration.

**Part 6.  Interpreter's Contact Information, Certification, and Signature**

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.**  Interpreter's Family Name (Last Name)                     Interpreter's Given Name (First Name)

**2.**  Interpreter's Business or Organization Name (if any)

## Part 6.  Interpreter's Contact Information, Certification, and Signature (continued)

### Interpreter's Mailing Address

**3.**  Street Number and Name

Apt. Ste. Flr.  Number

☐ ☐ ☐

City or Town

State

ZIP Code

Province

Postal Code

Country

### Interpreter's Contact Information

**4.**  Interpreter's Daytime Telephone Number

**5.**  Interpreter's Mobile Telephone Number (if any)

**6.**  Interpreter's Email Address (if any)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and _____ which is the same language specified in **Part 4.** or in **Part 5.**, **Item B.** in **Item Number 1.**, and I have read to this individual agreeing to financially support the beneficiary in the identified language every question and instruction on this declaration and his or her answer to every question.  The individual agreeing to financially support the beneficiary informed me that he or she understands every instruction, question, and answer on the declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and has verified the accuracy of every answer.

### Interpreter's Signature

**7.**  Interpreter's Signature

Date of Signature (mm/dd/yyyy)

## Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary

Provide the following information about the preparer.

### Preparer's Full Name

**1.**  Preparer's Family Name (Last Name)

Preparer's Given Name (First Name)

**2.**  Preparer's Business or Organization Name (if any)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary** (continued)

### Preparer's Mailing Address

**3.**   Street Number and Name                                           Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                                State      ZIP Code

Province                          Postal Code            Country

### Preparer's Contact Information

**4.**   Preparer's Daytime Telephone Number          **5.**   Preparer's Mobile Telephone Number

**6.**   Preparer's Email Address (if any)

### Preparer's Statement

**7.**   **A.**  ☐   I am not an attorney or accredited representative but have prepared this declaration on behalf of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) and with that individual's consent.

**B.**  ☐   I am an attorney or accredited representative and my representation of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) in this case ☐ extends  ☐ does not extend beyond the preparation of this declaration.

**NOTE:**  If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this declaration at the request of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself).  The individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) then reviewed this completed declaration and informed me that he or she understands all of the information contained in, and submitted with, his or her declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and that all of this information is complete, true, and correct.  I completed this declaration based only on information that the individual agreeing to financially support the beneficiary provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.**   Preparer's Signature                                                  Date of Signature (mm/dd/yyyy)

## Part 8.  Additional Information

If you need extra space to provide any additional information within this declaration, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this declaration or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.**   Family Name (Last Name)          Given Name (First Name)          Middle Name

**2.**   A-Number (if any) ▶ **A-**

**3.**   **A.**   Page Number   **B.**   Part Number   **C.**   Item Number

   **D.**

**4.**   **A.**   Page Number   **B.**   Part Number   **C.**   Item Number

   **D.**

**5.**   **A.**   Page Number   **B.**   Part Number   **C.**   Item Number

   **D.**

**6.**   **A.**   Page Number   **B.**   Part Number   **C.**   Item Number

   **D.**



# Declaration of Financial Support

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134**
OMB No. 1615-0014
Expires 12/31/2024

## What Is the Purpose of Form I-134?

Some immigration benefits that involve a temporary stay in the United States require U.S. Citizenship and Immigration Services (USCIS) to determine whether the applicant or beneficiary of the request has sufficient financial resources or financial support to pay for expenses during the temporary stay. The individual who signs and submits Form I-134 must establish that he or she has both sufficient financial resources and access to those funds to support the beneficiary listed on Form I-134 for the duration of the beneficiary's stay in the United States.

This version of Form I-134, Declaration of Financial Support, replaces the previously titled "Form I-134, Affidavit of Support."

## Who Must File Form I-134?

Certain individuals applying for parole based on urgent humanitarian reasons or significant public benefit filed on Form I-131, Application for Travel Document, must submit this form with Form I-131. Form I-134 is filed either by the applicant for parole on his or her own behalf, or by another individual on the parole applicant's behalf.

**NOTE:** Whether or not the beneficiary of this Form I-134 will have sufficient means of support while in the United States is an important factor in determining whether to exercise discretion to authorize parole. We require evidence that the beneficiary of this Form I-134 has financial support for the duration of his or her stay in the United States. Lack of evidence of financial support while in the United States is a strong negative factor that may lead to a denial of parole.

## Who May File Form I-134?

You may file this form on behalf of yourself or on behalf of a B, F, or M nonimmigrant requesting extension of stay or change of status.

Form I-134 may also be requested by Department of State in certain instances.

**Do not use Form I-134 if the beneficiary you are agreeing to financially support must have Form I-864, Affidavit of Support Under Section 213A of the INA, filed on his or her behalf instead.**

## Submission of Declaration

If you are agreeing to financially support more than one beneficiary, you must submit a separate Form I-134 for each beneficiary. You, as the individual agreeing to financially support the beneficiary, must sign your full name on the form.

## General Instructions

USCIS provides forms free of charge through the USCIS website.  To view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** and ask that we mail a form to you.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Signature.**  Each declaration must be properly signed and filed.  For all signatures on this declaration, USCIS will not accept a stamped or typewritten name in place of a signature.  A legal guardian may also sign for a mentally incompetent person.  If the request is not signed or if the requisite signature on the request is not valid, USCIS will reject the request. See 8 CFR 103.2(a)(7)(ii)(A).  If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS will deny the request.

**Validity of Signatures.**  USCIS will consider a photocopied, faxed, or scanned copy of the original handwritten signature valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.**  There is no filing fee to file Form I-134.

**Evidence.**  You must submit all evidence requested in these Instructions with your declaration.  If you fail to submit required evidence, USCIS may reject or deny your declaration for failure to submit requested evidence or supporting documents in accordance with 8 CFR 103.2(b)(1) and these Instructions.

**Biometric Services Appointment.**  USCIS may require that you appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition.  After USCIS receives your declaration and ensures it is complete, we will inform you if you need to attend a biometric services appointment.  If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

1.  You provided or authorized all information in the declaration;

2.  You reviewed and understood all of the information contained in, and submitted with, your declaration; and

3.  All of this information was complete, true, and correct at the time of filing.

**Copies.**  You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document.  USCIS may request an original document at the time of filing or at any time during processing of an application or petition.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.  The certification should also include the translator's signature, printed name, the signature date, and the translator's contact information.

### How To Fill Out Form I-134

1.  Type or print legibly in black ink.

2.  If you need extra space to complete any item within this declaration, use the space provided in **Part 8. Additional Information** or attach a separate sheet of paper.  Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3.  Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

4.  **Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf).**  You must sign in **Part 4.** if you are filing Form I-134 on your own behalf.  Select the appropriate box to indicate whether you read this declaration yourself or whether you had an interpreter assist you.  If someone helped you complete the declaration, select the box indicating that you used a preparer.  You also must sign and date your declaration and provide your daytime telephone number, mobile telephone number, and email address.  A stamped or typewritten name in place of a signature is not acceptable.

5.  **Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary.**  You must sign **Part 5.** if you are filing Form I-134 on behalf of someone else (a beneficiary).  Select the appropriate box to indicate whether you read this declaration yourself or whether you had an interpreter assist you.  If someone assisted you in completing the declaration, select the box indicating that you used a preparer.  Further, you must sign and date your declaration and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every declaration **MUST** contain the signature of the individual agreeing to financially support the beneficiary (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

6.  **Part 6.  Interpreter's Contact Information, Certification, and Signature.**  If you used anyone as an interpreter to read the Instructions and questions on this declaration to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the declaration.

7.  **Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary.**  If someone other than you, the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself), completed your declaration, this section must contain the signature.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 6.** and **Part 7.**  If the person who completed this declaration is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this declaration **MUST** sign and date the declaration.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your declaration is an attorney or accredited representative, he or she may also need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your declaration.

---

**We recommend that you print or save a copy of your completed declaration to review in the future and for your records.**

---

**Specific Instruction**

**Part 1.  Basis for Filing.**  Select the appropriate box for **Item Number 1.**

Select the first box if you are the beneficiary who is the alien applying for an immigration benefit.  A beneficiary may file Form I-134 on his or her own behalf.

Select the second box if you are the individual agreeing to financially support the beneficiary.

**Part 2.  Information about the Beneficiary**

The beneficiary is the alien who is applying for an immigration benefit.  A beneficiary may file Form I-134 on behalf of himself or herself.

**Item Number 1.  Beneficiary's Current Legal Name.**  Provide the beneficiary's legal name, as shown on his or her birth certificate or legal name change document.  If the beneficiary has two last names, include both and use a hyphen (-) between the names, if appropriate.  Type or print the beneficiary's last, first, and middle names in each appropriate field.

**Item Number 3.  Date of Birth.**  Enter the beneficiary's date of birth in mm/dd/yyyy format in the space provided.  For example, type or print October 5, 1967 as 10/05/1967.

**Item Number 4.  Gender.**  Provide the beneficiary's gender.

**Item Number 5.  Alien Registration Number (A-Number).**  Provide the beneficiary's A-Number.  The A-Number is the number used to identify an individual's immigration records.  It begins with an "A" and can be found on correspondence the beneficiary received from the Department of Homeland Security (DHS) or USCIS.

**Item Number 6.  Place of Birth.**  Enter the name of the city or town, state or province, and country where the beneficiary was born.  Type or print the name of the country as it was named when the beneficiary was born, even if the country's name has changed or the country no longer exists.

**Item Number 7.  Country of Citizenship or Nationality.**  Provide the name of the country where the beneficiary is a citizen and/or national.  This is not necessarily the country where the beneficiary was born.  If the beneficiary does not have citizenship in any country, type or print "stateless" and provide an explanation in **Part 8. Additional Information**.

**Item Number 8.  Marital Status.**  Select the appropriate box.

**Item Numbers 9. - 11.  Beneficiary's Physical Address.**  Provide the physical address where the beneficiary lives.

**Item Number 12.  Beneficiary's Anticipated Length of Stay.**  Enter the anticipated start date of the beneficiary's stay in the United States in **Item Number 12.**  Select the option that matches the anticipated end date of the beneficiary's stay.  If the beneficiary's stay has an end date, you must enter the anticipated end date in mm/dd/yyyy format in the space provided for that option.  If the beneficiary's anticipated stay does not have an end date, select the "No End Date" option.

**Item Number 13.  Beneficiary's Income.**  Provide information on any income the beneficiary will receive.  If the beneficiary will not receive any income, then type or print $0 in the table. Do not include any individuals named in **Part 3.**

**Item Numbers 14. - 15.**  Identify whether any of the beneficiary's total income comes from an illegal activity or source, such as proceeds from illegal gambling or illegal drug sales or other activities and identify the amount.  Do not include income from illegal gambling or illegal drug sales attributed to any individuals named in **Part 3.**

**Item Number 16. Beneficiary's Assets.**  Provide information about any assets available to the beneficiary for the anticipated period of his or her stay.  List only assets that can be converted into cash within 12 months and that will be used to support the beneficiary while the beneficiary is in the United States.  Provide the value of all assets listed in U.S. dollars, regardless of whether the assets are held in the United States or outside of the United States.  Do not include assets from any individuals named in **Part 3.**

You may include the net value of the beneficiary's home as an asset.  The net value of the home is the appraised value of the home, minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home.  If you list the net value of the beneficiary's home, then you must include documentation demonstrating that the beneficiary owns the home, a recent appraisal by a licensed appraiser, and evidence of the amount of all loans secured by a mortgage, trust deed, or other lien on the home.

You may not include the net value of the beneficiary's automobile unless the beneficiary has more than one automobile, and at least one automobile is not included as an asset.  Submit evidence of the value of the assets listed.  Evidence must include the name of the asset holder, a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.**

**Item Number 1.  Current Legal Name.**  Provide the full name of the individual who is agreeing to financially the support the beneficiary named in **Part 2**.  Provide your legal name, as shown on your birth certificate or legal name change document.  If you have two last names, include both and use a hyphen (-) between the names, if appropriate.  Type or print your last, first, and middle names in each appropriate field.

**Item Number 8.  Alien Registration Number (A-Number).**  Provide your A-Number.  Your A-Number is the number used to identify your immigration records.  It begins with an "A" and can be found on correspondence you have received from the Department of Homeland Security (DHS) or USCIS.

**Item Number 10.  Immigration Status.**  Select the appropriate box for your current immigration status.  Provide evidence of your status.  A U.S. citizen or U.S. national may submit a copy of a birth certificate, certificate of naturalization, certificate of citizenship, consular report of birth abroad to U.S. parents, or a copy of the biographic data page on your U.S. passport.  Proof of lawful permanent resident status includes a photocopy of both sides of the Permanent Resident Card or Alien Registration Receipt Card (Form I-551), or a photocopy of an unexpired temporary Form I-551 stamp in either a foreign passport or DHS Form I-94 Arrival Departure Record.  Proof of lawful nonimmigrant status may include a copy of an unexpired visa in a foreign passport.

**Item Number 17.  Assets.**  Provide information about any assets you will use to support the beneficiary for the anticipated period of his or her stay.  List only assets that can be converted into cash within 12 months and that will be used to support the beneficiary while the beneficiary is in the United States.  Provide the value of all assets listed in U.S. dollars, regardless of whether they are held in the United States or outside of the United States.  Do not include assets from any individuals named in **Part 2.**

You may include the net value of a home as an asset.  The net value of the home is the appraised value of the home, minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home.  If you include the net value of your home, then you must include documentation demonstrating that you own the home, a recent appraisal by a licensed appraiser, and evidence of the amount of all loans secured by a mortgage, trust deed, or other lien on the home.

You may not include the net value of an automobile unless you show that you have more than one automobile, and at least one automobile is not included as an asset.

Submit evidence of the value of your or your household members' assets.  Evidence must include the name of the asset holder, a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

---

**Supporting Evidence (for beneficiary and person providing support to beneficiary)**

As the beneficiary or the person who agrees to financially support the beneficiary, you must show you have sufficient income or financial resources to support the beneficiary.

Evidence should consist of copies of any of the documents listed below that apply.

Failure to provide evidence of sufficient income or financial resources may result in the denial of the foreign national's application for a visa or his or her removal from the United States.

Submit in duplicate evidence of income and resources, as appropriate:

1.  Statement from an officer of the bank or other financial institutions with deposits, identifying the following details regarding the account:

    **A.**  Date account opened;

    **B.**  Total amount deposited for the past year; and

    **C.**  Present balance.

2.  Statement(s) from your employer on business stationery showing:

    **A.**  Date and nature of employment;

    **B.**  Salary paid; and

    **C.**  Whether the position is temporary or permanent.

**1.**  Copy of last U.S. federal income tax return filed (tax transcript); or

**2.**  List containing serial numbers and denominations of bonds and name of record owner(s).

## What Is the Filing Fee?

There is not filing fee for Form I-134.

## Where to File?

Please see our website at **www.uscis.gov/I-134** or visit the USCIS Contact Center at **www.uscis.gov/contactcenter** to connect with a USCIS representative for the most current information about where to file this declaration. The USCIS Contact Center provides information in English and Spanish. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

## Address Change

If you are not a U.S citizen or U.S. national, you must notify USCIS of your new address within 10 days of moving from your previous residence. For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or reach out to the USCIS Contact Center at **www.uscis.gov/contactcenter** for help. The USCIS Contact Center provides information in English and Spanish. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox facilities because the Lockbox does not process change of address requests.

## Processing Information

**Initial Processing.**  Once USCIS accepts your declaration, we will check it for completeness. If you do not completely fill out this declaration, you will not establish a basis of support for the beneficiary or for yourself (if you are applying on your own behalf), and USCIS or the Department of State may reject or deny your declaration.

**Requests for More Information.**  USCIS or Department of State may request that you provide more information or evidence to support your declaration. We may also request that you provide the originals of any copies you submit. If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your declaration. At the time of any interview or other appearance at a USCIS office, we may require that you provide your biometrics to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-134 involves a determination of whether you have established a basis of support for the beneficiary seeking an immigration benefit. USCIS will notify you of the decision in writing.

## USCIS Forms and Instructions

To ensure you are using the latest version of this declaration, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** and ask that we mail a form to you.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

Please visit us at **www.uscis.gov/contactcenter** to get basic information about immigration services and ask questions about a pending case.  Through our digital self-help tools and live assistance, the USCIS Contact Center provides a pathway for you to get consistent, accurate information and answers to immigration case questions.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-134, we will deny your Form I-134 and may deny any other immigration benefit the beneficiary seeks.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this declaration, and the associated evidence, is collected under the Immigration and Nationality Act (INA), sections 1101, 1182(a)(4), 1183, 1184(a), and 1258.

**PURPOSE:**  The primary purpose for providing the requested information on this declaration is to show that the applying immigrant has enough financial support to live without concern of becoming reliant on U.S. Government welfare.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in denial of your immigration benefit.

**ROUTINE USES:**  DHS may share the information you provide on this declaration and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-001 - Alien File, Index, and National File Tracking System and DHS/USCIS-007 - Benefits Information System, and DHS/USCIS-018 Immigration Biometric and Background Check.] and the published privacy impact assessments [DHS/USCIS/PIA-016a Computer Linked Application Information Management System and Associated Systems, DHS/USCIS/PIA-051 Case and Activity Management for International Operations (CAMINO), and DHS/USCIS/PIA-003 Integrated Digitization Document Management Program (IDDMP).] which you can find at **www.dhs.gov/privacy**.  DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 2 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the declaration, preparing statements, attaching necessary documentation, and submitting the declaration.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0014.  **Do not mail your completed Form I-134 to this address.**

**SUPPORTING STATEMENT FOR**
**Declaration of Financial Support**
**OMB Control No.: 1615-0014**
**COLLECTION INSTRUMENT(S): Form I-134**

**A. Justification**

1.  **Explain the circumstances that make the collection of information necessary. Identify any legal or administrative requirements that necessitate the collection. Attach a copy of the appropriate section of each statute and regulation mandating or authorizing the collection of information.**

    Certain aliens seeking parole into the United States pursuant to section 212(d)(5) of the Immigration and Nationality Act (INA), and B, F, and M nonimmigrants seeking extension of stay or change of status under sections 214 and 248 of the INA, must demonstrate that they have sufficient financial resources for the duration of their stay.

2.  **Indicate how, by whom, and for what purpose the information is to be used. Except for a new collection, indicate the actual use the agency has made of the information received from the current collection.**

    The U.S. Department of Homeland Security (DHS) and consular officers of the Department of State (DOS) use both the online and paper versions of Form I-134 to determine whether, at the time of the beneficiary's application, petition, or request for certain immigration benefits, that beneficiary has sufficient financial support to pay for expenses for the duration of their temporary stay in the United States.

3.  **Describe whether, and to what extent, the collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses, and the basis for the decision for adopting this means of collection. Also describe any consideration of using information technology to reduce burden.**

    This information collection provides the most efficient means for gathering and processing information about whether certain noncitizens have financial support to pay for expenses that arise during their temporary stay in the United States.  Form I-134 is available as a fillable PDF on the USCIS website at uscis.gov/i-134.  The form can be completed electronically, printed, signed, and submitted to U.S. Citizenship and Immigration Services (USCIS) by mail.  Form I-134 can also be filed with DOS. See www.travel.state.gov for more information on filing.

4.  **Describe efforts to identify duplication. Show specifically why any similar information already available cannot be used or modified for use for the purposes**

1

**described in Item 2 above.**

A search of USCIS' automated forms tracking system revealed no duplication. There is no similar data collected.

5. **If the collection of information impacts small businesses or other small entities (Item 5 of OMB Form 83-I), describe any methods used to minimize burden.**

This collection of information does not have an impact on small businesses or other small entities.

6. **Describe the consequence to Federal program or policy activities if the collection is not conducted or is conducted less frequently, as well as any technical or legal obstacles to reducing burden.**

If the information is not collected, USCIS would not be able to determine whether certain noncitizens seeking to come to the United States temporarily have sufficient financial support to cover expenses for the duration of their stay in the United States.

7. **Explain any special circumstances that would cause an information collection to be conducted in a manner:**

- **Requiring respondents to report information to the agency more often than quarterly;**

- **Requiring respondents to prepare a written response to a collection of information in fewer than 30 days after receipt of it;**

- **Requiring respondents to submit more than an original and two copies of any document;**

- **Requiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records for more than three years;**

- **In connection with a statistical survey, that is not designed to produce valid and reliable results that can be generalized to the universe of study;**

- **Requiring the use of a statistical data classification that has not been reviewed and approved by OMB;**

- **That includes a pledge of confidentiality that is not supported by authority established in statute or regulation, that is not supported by disclosure and data security policies that are consistent with the pledge, or which unnecessarily impedes sharing of data with other agencies for compatible confidential use; or**

2

- **Requiring respondents to submit proprietary trade secret, or other confidential information unless the agency can demonstrate that it has instituted procedures to protect the information's confidentiality to the extent permitted by law.**

This information collection is conducted in a manner consistent with the guidelines in 5 CFR 1320.5(d)(2).

8. **If applicable, provide a copy and identify the data and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB. Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments. Specifically address comments received on cost and hour burden.**

   **Describe efforts to consult with persons outside the agency to obtain their views on the availability of data, frequency of collection, the clarity of instructions and recordkeeping, disclosure, or reporting format (if any), and on the data elements to be recorded, disclosed, or reported.**

   **Consultation with representatives of those from whom information is to be obtained or those who must compile records should occur at least once every 3 years - even if the collection of information activity is the same as in prior periods. There may be circumstances that may preclude consultation in a specific situation. These circumstances should be explained.**

   USCIS is seeking emergency approval under 5 CFR 1320.13 and, as such, has not yet published a notice in the Federal Register. Public comments will be solicited, and this information collection request will go through a normal Paperwork Reduction Act (PRA) approval process, including a response to all comments received from the public, no later than six months after the approval of this emergency request.

9. **Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

   USCIS does not provide any payment for benefit sought.

10. **Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation or agency policy.**

    There is no assurance of confidentiality.

    This collection is covered under the following Privacy Impact Assessments:

    - DHS/USCIS/PIA-051 - Case and Activity Management for International Operations (CAMINO); and,

Cuba AR_001205

- DHS/USCIS/PIA-003 - Integrated Digitization Document Management Program (IDDMP);

The collection is covered under the following System of Records Notices:
- DHS/USCIS/ICE/CBP-001 - Alien File, Index, and National File Tracking System of Records November 21, 2013, 78 FR 69864;
- DHS/USCIS-007 - Benefits Information System September 29, 2008, 73 FR 56596; and
- DHS/USCIS-018 - Immigration Biometric and Background Check July 31, 2018, 83 FR 36950.

**11.    Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private. This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

This information collection contains questions that are of a sensitive nature. Respondents must provide information and records about personal income and financial resources. This information is necessary to establish that the beneficiary named on Form I-134 has sufficient financial resources to pay for expenses during their temporary stay in the United States.

**12.    Provide estimates of the hour burden of the collection of information. The statement should:**

- **Indicate the number of respondents, frequency of response, annual hour burden, and an explanation of how the burden was estimated. Unless directed to do so, agencies should not conduct special surveys to obtain information on which to base hour burden estimates. Consultation with a sample (fewer than 10) of potential respondents is desirable. If the hour burden on respondents is expected to vary widely because of differences in activity, size, or complexity, show the range of estimated hour burden, and explain the reasons for the variance. Generally, estimates should not include burden hours for customary and usual business practices.**

- **If this request for approval covers more than one form, provide separate hour burden estimates for each form and aggregate the hour burdens in Item 13 of OMB Form 83-I.**

- **Provide estimates of annualized cost to respondents for the hour burdens for collections of information, identifying and using appropriate wage rate categories. The cost of contracting out or paying outside parties for information**

4

**collection activities should not be included here. Instead, this cost should be included in Item 14.**

| Type of Respondent | Form Name / Form Number | A<br>#. of Respondents | B<br>#. of Responses per Respondent | C (=AxB)<br># of Responses | D<br>Avg. Burden per Response (in hours) | E (=CxD)<br>Total Annual Burden (in hours) | F<br>Avg. Hourly Wage Rate* | (=ExF)<br>Total Annual Respondent Cost |
|---|---|---|---|---|---|---|---|---|
| Individuals and Households | Declaration of Financial Support, Form I-134 (paper) | 2,500 | 1 | 2,500 | 2 | 5,000 | $40.89 | $204,450 |
| **Total** | | | | **2,500**\*\* | | **5,000** | | **$204,450** |

*    The above Average Hourly Wage Rate is the May 2021 Bureau of Labor Statistics average wage for All Occupations of $28.01 times the wage rate benefit multiplier of 1.46 (to account for benefits provided) equaling $40.89. The selection of "All Occupations" was chosen because respondents to this collection could be expected from any occupation.
\*\* The estimated number of respondents includes receipts of Form I-134 by both USCIS and Department of State.

13.   **Provide an estimate of the total annual cost burden to respondents or record keepers resulting from the collection of information. (Do not include the cost of any hour burden shown in Items 12 and 14).**

- **The cost estimate should be split into two components:  (a) a total capital and start-up cost component (annualized over its expected useful life); and (b) a total operation and maintenance and purchase of services component. The estimates should take into account costs associated with generating, maintaining, and disclosing or providing the information. Include descriptions of methods used to estimate major cost factors including system and technology acquisition, expected useful life of capital equipment, the discount rate(s), and the time period over which costs will be incurred. Capital and start-up costs include, among other items, preparations for collecting information such as purchasing computers and software; monitoring, sampling, drilling and testing equipment; and record storage facilities.**

- **If cost estimates are expected to vary widely, agencies should present ranges of cost burdens and explain the reasons for the variance. The cost of purchasing or contracting out information collection services should be a part of this cost burden estimate. In developing cost burden estimates, agencies may consult with a sample of respondents (fewer than 10), utilize the 60-day pre-OMB submission public comment process and use existing economic or regulatory impact analysis associated with the rulemaking containing the information collection, as appropriate.**

5

- **Generally, estimates should not include purchases of equipment or services, or portions thereof, made: (1) prior to October 1, 1995; (2) to achieve regulatory compliance with requirements not associated with the information collection; (3) for reasons other than to provide information or keep records for the government; or, (4) as part of customary and usual business or private practices.**

There are no capital, start-up, operational or maintenance costs associated with this collection of information. There is no fee cost to respondents for filing these requests. USCIS, however, estimates that respondents will incur an estimated cost of $4.25 average postage cost for each respondent to submit the completed I-134 (paper) package to USCIS.

Postage to mail completed package (2,500 x $4.25 average postage) = **$10,625** (total annual cost burden to respondents).

14. **Provide estimates of annualized cost to the Federal government. Also, provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment, overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information. Agencies also may aggregate cost estimates from Items 12, 13, and 14 in a single table.**

USCIS establishes its fees using an activity-based costing model to assign costs to an adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs, plus an amount to recover unassigned overhead (which includes the suggested average hourly rate for clerical, officer, and managerial time with benefits) and immigration benefits provided for free. USCIS uses the fee associated with an information collection as a reasonable measure of the collection's costs to USCIS, since these fees are based on resource expenditures related to the benefit in question. In addition, this figure includes the estimated overhead cost for printing, stocking, distributing and processing of this form.

**The estimated cost to the Government is $161,625.** This figure is calculated by multiplying the estimated number of respondents (2,500) by the time required to adjudicate the form (1 hour), which is multiplied by the average hourly rate of USCIS adjudicators ($64.65), for a total of $161,625.

15. **Explain the reasons for any program changes or adjustments reporting in Items 13 or 14 of the OMB Form 83-I.**

USCIS is uniquely revising this information collection to remove the online Form I-134 collection instrument burden.  The online collection of information contains unique data elements for a specific population of filers, not applicable to all I-134 filers.  That data

6

collection and respondent population is being submitted under its own information collection.

| Data collection Activity/Instrument (in hours) | Program Change (hours currently on OMB Inventory) | Program Change (New) | Difference | Adjustment (hours currently on OMB Inventory) | Adjustment (New) [new minus current] | Difference |
|---|---|---|---|---|---|---|
| Form I-134 (paper) | 5,000 | 5,000 | 0 | | | |
| Form I-134 (online) | 251,983 | 0 | -251,983 | | | |
| **Total(s)** | **256,983** | **5,000** | **-251,983** | | | |

USCIS is reporting a decrease of 251,983 hours in the estimated annual hour burden to respondents for this collection of information. This decrease is the result of establishing an separate information collect with unique data elements for a specific population of respondents who can file the information collection online.

USCIS is reporting no change in the estimated annual cost burden to respondents for this collection of information. The cost captured is representative of respondents that will be mailing paper forms to file the information collection.

16. **For collections of information whose results will be published, outline plans for tabulation, and publication. Address any complex analytical techniques that will be used. Provide the time schedule for the entire project, including beginning and ending dates of the collection of information, completion of report, publication dates, and other actions.**

   This information collection will not be published for statistical purposes.

17. **If seeking approval to not display the expiration date for OMB approval of the information collection, explain the reasons that display would be inappropriate.**

   USCIS will display the expiration date for OMB approval of this information collection.

18. **Explain each exception to the certification statement identified in Item 19, "Certification for Paperwork Reduction Act Submission," of OMB 83-I.**

   USCIS does not request an exception to the certification of this information collection.

7

**B. Collections of Information Employing Statistical Methods.**

There is no statistical methodology involved with this collection.

8

# Online Request to be a Supporter and
# Declaration of Financial Support



**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134A**

---

► **START HERE - Type or print in black ink.**

## Part 1.  Basis for Filing

**1.**   I am filing this form on behalf of:   ☐ Myself as the beneficiary.   ☐ Another individual who is the beneficiary.

**2.**   I am filing this form under one of the following:

## Part 2.  Information about the Beneficiary

Complete **Part 2.** regardless of whether you are filing this form on behalf of yourself as the beneficiary or on behalf of another individual who is the beneficiary.

**1.**   Beneficiary's Current Legal Name (**Do not** provide a nickname.)

Family Name (Last Name)          Given Name (First Name)          Middle Name

**2.**   Other Names Used

Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

Family Name (Last Name)          Given Name (First Name)          Middle Name

**3.**   Date of Birth (mm/dd/yyyy)   **4.**   Sex    ☐ M   ☐ F   ☐ X   **5.**   Alien Registration Number (A-Number)   ► **A-**

**6.**   Place of Birth

City or Town          State or Province

Country

**7.**   Country of Citizenship or Nationality

**8.**   Passport Number of the beneficiary's most recently issued passport

Country that issued the most recently issued passport          Expiration date for the most recently issued passport (mm/dd/yyyy)

**9.**   Marital Status

☐ Single, Never Married   ☐ Married   ☐ Divorced   ☐ Widowed   ☐ Legally Separated   ☐ Marriage Annulled

☐ Other (Explain):

---

Form I-134A   Edition   01/04/23

Cuba AR_001211

**Part 2.  Information about the Beneficiary** (continued)

10.   Beneficiary's Mailing Address

In Care Of Name

Street Number and Name                                                                                 Apt. Ste. Flr.   Number

City or Town                                                                                                   State        ZIP Code

Province                                      Postal Code                  Country

11.   Are the beneficiary's mailing address and physical address the same?                           ☐ Yes  ☐ No

If you answered "No" to **Item Number 11.**, provide your physical address in **Item Number 12.**

12.   Beneficiary's Physical Address

In Care Of Name

Street Number and Name (Do **not** provide a PO Box in this space unless it is your **ONLY** address.)   Apt. Ste. Flr.   Number

City or Town                                                                                                   State        ZIP Code

Province                                      Postal Code                  Country

13.   Beneficiary's Daytime Telephone Number          14.   Beneficiary's Mobile Telephone Number (if any)

15.   Beneficiary's Email Address (if any)

*Beneficiary's Anticipated Length of Stay*

16.   Beneficiary's Anticipated Period of Stay in the United States

From (mm/dd/yyyy)

To (select one):

☐   (mm/dd/yyyy)

☐   No End Date

## Part 2.  Information about the Beneficiary (continued)

### *Beneficiary's Financial Information*

Provide information about the beneficiary's income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information**.

**Beneficiary's Income**

17.   Provide all of the information requested in the table below about the beneficiary, all of the beneficiary's dependents, and any other individuals the beneficiary financially supports (do not include any individuals named in **Part 3.**).  Information about assets that are not based on employment should be added in **Item Number 22.** and not in **Item Number 17.**

| Individual's Full Name (First, Middle, Last) (do not include any individuals named in **Part 3.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Beneficiary (Type or print "Self" if you are filing for yourself as the beneficiary or "Beneficiary" if someone is agreeing to support you in **Part 3.**) | Income contribution to the beneficiary annually (if none, type or print $0) |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  | **Total** Number of Dependents |  |
|  |  | Total Income | $ |

18.   Does any of the beneficiary's total income (including income from dependents and other individuals who contribute to the beneficiary's income, excluding any individuals named in **Part 3.**) come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?   ☐ Yes   ☐ No

19.   If you answered "Yes" to **Item Number 18.**, what amount of the beneficiary's total income comes from an illegal activity or source?  (Type or print "N/A" if you answered "No" to **Item Number 18.**)   $ _____

20.   Does any of the beneficiary's total income come from means-tested public benefits as defined in 8 CFR 213a.1?   ☐ Yes   ☐ No

21.   If you answered "Yes" to **Item Number 20.**, what amount of the beneficiary's total income comes from means-tested public benefits?   $ _____

Cuba AR_001213

**Part 2. Information about the Beneficiary** (continued)

**Beneficiary's Assets**

22. In the table below, provide the amounts of assets available to the beneficiary for the expected period of his or her stay (excluding assets from any individuals named in **Part 3.**).  Attach evidence showing that the beneficiary has these assets.

| Full Name of Asset Holder<br>(First, Middle, Last) | Type of Asset | Amount (Cash Value)<br>(U.S. dollars) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **TOTAL** (U.S. dollars) $ | |

**Part 3. Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.**

If you are not the beneficiary named in **Part 2.**, complete **Part 3.**

1. Current Legal Name (**Do not** provide a nickname.)

   Family Name (Last Name)          Given Name (First Name)          Middle Name

2. Other Names Used

   Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

   Family Name (Last Name)          Given Name (First Name)          Middle Name

3. Provide the name of the organization, group, or entity that is providing support to the beneficiary with you (if any).

   Organization, Group, Entity Name

4. Current Mailing Address

   In Care Of Name

   Street Number and Name                                          Apt.Ste. Flr.   Number

   City or Town                                                     State          ZIP Code

   Province                    Postal Code                Country

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

**5.**   Is your current mailing address the same as your current physical address?   ☐ Yes   ☐ No

If you answered "No" to **Item Number 5.**, provide your current physical address in **Item Numbers 6.**

**6.**   Physical Address

In Care Of Name

[                                                                                    ]

Street Number and Name                                                Apt.Ste. Flr.   Number

[                                                        ]   ☐ ☐ ☐   [                    ]

City or Town                                                      State   ZIP Code

[                                                ]   [        ]   [                ]

Province                             Postal Code               Country

[                    ]   [                ]   [                    ]

*Other Information*

**7.**   Date of Birth (mm/dd/yyyy)   [                ]   **8.**   Sex   ☐ M   ☐ F   ☐ X

**9.**   Place of Birth

City or Town                                          State or Province

[                                        ]   [                                        ]

Country

[                                        ]

**10.**   Alien Registration Number (A-Number)   **11.**   USCIS Online Account Number
►  **A-** [                    ]   ► [                        ]

**12.**   Social Security Number                   **13.**   What is your relationship to the beneficiary?
►  [                    ]   [                        ]

*Immigration Status*

**14.**   What is your current immigration status?  Provide documentation as provided in the instructions.

☐ U.S. Citizen

☐ U.S. National

☐ Lawful Permanent Resident

☐ Nonimmigrant  Form I-94 Arrival-Departure Record Number
    ► [                        ]

Other (Explain):

[                                                                                    ]

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

### Employment Information

**15.**   Employment Status

☐ Employed (full-time, part-time, seasonal, self-employed)   ☐ Unemployed or Not Employed   ☐ Retired

☐ Other (Explain): _____

If you indicated that you are employed in **Item Number 15.**, provide the information requested in **Item Numbers 16. - 17.**

**16.**   **A.**   ☐ I am currently employed as a/an        Name of Employer

_____        _____

**B.**   ☐ I am currently self-employed as a/an

_____

**17.**   Current Employer's Address

Street Number and Name                                    Apt.Ste. Flr.   Number
_____        ☐ ☐ ☐  _____

City or Town                                             State   ZIP Code
_____        _____   _____

Province                  Postal Code         Country
_____        _____   _____

### Financial Information

Provide information about your income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8.  Additional Information**.

**Income**

**18.**   Provide all of the information requested in the table below about yourself, all of your dependents, and any other individuals you financially support (do not include any individuals named in **Part 2.**).  Information about assets that are not based on employment should be added in **Item Number 23.** and not in **Item Number 18.**

| Full Name (First, Middle, Last) (do not include any individuals named in **Part 2.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Individual Agreeing to Financially Support (Type or print "Self" for Individual Agreeing to Financially Support the Beneficiary) | Income Contribution to the Beneficiary Annually (if none, type or print $0) |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | **Total** Number of Dependents | |
| | | Total Income | $ |

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

19.  Does any of the income listed above come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?    ☐ Yes  ☐ No

20.  If you answered "Yes" to **Item Number 19.**, what amount of income comes from an illegal activity? (Type or print "N/A" if you answered "No" to **Item Number 19.**)    $ [                    ]

21.  Does any of the income listed above come from means-tested public benefits as defined in 8 CFR 213a.1?    ☐ Yes  ☐ No

22.  If you answered "Yes" to **Item Number 21.**, what amount of income is from means-tested public benefits?    $ [                    ]

### Assets

23.  Fill out the table below regarding the assets available to **you** (do not include any assets from any individuals named in **Part 2.**). Attach evidence showing you have these assets.

| Full Name of Asset Holder (you or your household member) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  | **TOTAL** (U.S. dollars) $ |

### *Financial Responsibility for Other Beneficiaries*

24.  Have you previously submitted a Form I-134A on behalf of a person other than the beneficiary named in **Part 2?**    ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 24.**, provide the information requested in **Item Numbers 25. - 26.**  If you need additional space to complete this section, use the space provided in **Part 8. Additional Information.**

25.  Person 1

Family Name (Last Name)    Given Name (First Name)    Middle Name
[                    ]    [                    ]    [                    ]

A-Number    Date Submitted (mm/dd/yyyy)
► A- [                ]    [                    ]

26.  Person 2

Family Name (Last Name)    Given Name (First Name)    Middle Name
[                    ]    [                    ]    [                    ]

A-Number    Date Submitted (mm/dd/yyyy)
► A- [                ]    [                    ]

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

*Intent to Provide Specific Contributions to the Beneficiary*

27.   You are responsible for receiving, maintaining, and supporting the beneficiary for the duration of their temporary stay in the United States.  Describe the resources you plan to use or provide to ensure the beneficiary has adequate financial support to cover their basic living needs.

28.   You are responsible for ensuring that the beneficiary has safe and appropriate housing for the duration of their parole in the United States.  Describe how you will ensure that the beneficiary's housing needs are met, including where the beneficiary will reside during their temporary stay in the United States, if known.

29.   You are responsible for assisting the beneficiary's access to available services and benefits such as learning English, securing employment opportunities once authorized to work, enrolling children in school, and helping to enroll for benefits for which they are eligible.  Describe what steps you plan to take as part of these responsibilities.

**Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (Only complete this section if Part 1. Basis for Filing selection is "Myself as the beneficiary", otherwise continued to Part 5.)**

If you are the beneficiary and are filing Form I-134A on your own behalf, complete and sign **Part 4.**

**NOTE:**  Read the **Penalties** section of the Form I-134A Instructions before completing this section.

### Beneficiary's Statement

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

1.  I, as the beneficiary, certify the following:

    **A.**  ☐  I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question**.**

    **B.**  ☐  The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood everything.

2.  ☐  At my request, the preparer named in **Part 7.**, _____, prepared this declaration for me based only upon information I provided or authorized.

### Beneficiary's Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

    **1)**  I reviewed and provided or authorized all of the information in my declaration;

    **2)**  I understood all of the information contained in, and submitted with, my declaration; and

    **3)**  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that I will be able to financially support myself while in the United States.

That I am willing and able to pay for necessary expenses for the duration of my temporary stay in the United States.

### Beneficiary's Signature

3.  Beneficiary's Signature

    ➡ _____

Date of Signature (mm/dd/yyyy)

_____

Cuba AR_001219

## Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary

If you are filing Form I-134A on behalf of someone else (the beneficiary listed in **Part 2.**), complete and sign **Part 5.**

**NOTE:**  Read the Penalties section of the Form I-134A Instructions before completing this section.

### Statement of Individual Agreeing to Financially Support the Beneficiary

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.**     I, as the individual agreeing to financially support the beneficiary, certify the following:

**A.** ☐  I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question**.**

**B.** ☐  The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood.

**2.** ☐  At my request, the preparer named in **Part 7.**, _____, prepared this declaration for me based only upon information I provided or authorized.

### Contact Information of Individual Agreeing to Financially Support the Beneficiary

**3.**   Daytime Telephone Number

_____

**4.**   Mobile Telephone Number (if any)

_____

**5.**   Email Address (if any)

_____

### Certification of Individual Agreeing to Financially Support the Beneficiary

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

**1)**  I reviewed and provided or authorized all of the information in my declaration;

**2)**  I understood all of the information contained in, and submitted with, my declaration; and

**3)**  All of this information was complete, true, and correct at the time of filing.

**Part 5. Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary** (continued)

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that the person named in **Part 2.** will be financially supported while in the United States.

That I am willing and able to receive, maintain, and support the person named in **Part 2.** to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States.

I acknowledge that I have read this section, and I am aware of my responsibilities as an individual agreeing to financially support the beneficiary.

### *Signature of Individual Agreeing to Financially Support the Beneficiary*

**6.**   Signature
➡️ [                                        ]

Date of Signature (mm/dd/yyyy)
[                    ]

**NOTE TO ALL INDIVIDUALS AGREEING TO FINANCIALLY SUPPORT THE BENEFICIARY:** If you do not completely fill out this declaration or if you fail to submit required documents listed in the Instructions, USCIS or the Department of State may deny or not consider your declaration.

### Part 6. Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.**   Interpreter's Family Name (Last Name)
[                              ]

Interpreter's Given Name (First Name)
[                              ]

**2.**   Interpreter's Business or Organization Name (if any)
[                              ]

### *Interpreter's Mailing Address*

**3.**   Street Number and Name
[                              ]   Apt. Ste. Flr.  ☐ ☐ ☐   Number [          ]

City or Town
[                              ]   State [    ]   ZIP Code [        ]

Province
[                ]   Postal Code [          ]   Country [                ]

### *Interpreter's Contact Information*

**4.**   Interpreter's Daytime Telephone Number
[                              ]

**5.**   Interpreter's Mobile Telephone Number (if any)
[                              ]

**6.**   Interpreter's Email Address (if any)
[                              ]

**Part 6. Interpreter's Contact Information, Certification, and Signature** (continued)

*Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and [                    ] which is the same language specified in **Part 4.** or in **Part 5.**, **Item B.** in **Item Number 1.**, and I have read to this individual agreeing to financially support the beneficiary in the identified language every question and instruction on this declaration and his or her answer to every question.  The individual agreeing to financially support the beneficiary informed me that he or she understands every instruction, question, and answer on the declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and has verified the accuracy of every answer.

*Interpreter's Signature*

7.   Interpreter's Signature                                                          Date of Signature (mm/dd/yyyy)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary**

Provide the following information about the preparer.

*Preparer's Full Name*

1.   Preparer's Family Name (Last Name)            Preparer's Given Name (First Name)

2.   Preparer's Business or Organization Name (if any)

*Preparer's Mailing Address*

3.   Street Number and Name                                          Apt. Ste. Flr.  Number

City or Town                                                              State      ZIP Code

Province                          Postal Code            Country

*Preparer's Contact Information*

4.   Preparer's Daytime Telephone Number        5.   Preparer's Mobile Telephone Number

6.   Preparer's Email Address (if any)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary** (continued)

### *Preparer's Statement*

**7.**   **A.**   ☐   I am not an attorney or accredited representative but have prepared this declaration on behalf of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) and with that individual's consent.

   **B.**   ☐   I am an attorney or accredited representative and my representation of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) in this case ☐ extends  ☐ does not extend beyond the preparation of this declaration.

**NOTE:**  If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### *Preparer's Certification*

By my signature, I certify, under penalty of perjury, that I prepared this declaration at the request of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself).  The individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) then reviewed this completed declaration and informed me that he or she understands all of the information contained in, and submitted with, his or her declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and that all of this information is complete, true, and correct.  I completed this declaration based only on information that the individual agreeing to financially support the beneficiary provided to me or authorized me to obtain or use.

### *Preparer's Signature*

**8.**   Preparer's Signature

Date of Signature (mm/dd/yyyy)

## Part 8.  Additional Information

If you need extra space to provide any additional information within this declaration, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this declaration or attach a separate sheet of paper. Type or print your name and A-Number at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.** Family Name (Last Name)     Given Name (First Name)     Middle Name

**2.** A-Number     ▶ **A-**

**3.** **A.** Page Number   **B.** Part Number   **C.** Item Number

   **D.**

**4.** **A.** Page Number   **B.** Part Number   **C.** Item Number

   **D.**

**5.** **A.** Page Number   **B.** Part Number   **C.** Item Number

   **D.**

**6.** **A.** Page Number   **B.** Part Number   **C.** Item Number

   **D.**

**From:** ████████
**To:** ████████
**Cc:**
**Subject:** RE: ATA Burden Estimate
**Date:** Monday, December 19, 2022 2:06:10 PM

████████

████████. No, this is not a cap, this is just a different estimate that (as described in the text) takes into account more than just the total number of encounters in FY 22. Leadership advised that this is the current best estimate, accounting for experience with the Venezuela process and resource constraints that limit the rate at which USCIS is expected to adjudicate supporter requests. Happy to hop on a call if helpful.





1300 Pennsylvania Avenue, NW
Washington, DC 20229

U.S. Customs and
Border Protection

December 14, 2022

TO:         Dominic Mancini, Deputy Administrator
            Office of Information and Regulatory Affairs
            Office of Management and Budget

THROUGH:    Eric Hysen
            Chief Information Officer          ELIZABETH   Digitally signed by
                                               A CAPPELLO  ELIZABETH A CAPPELLO
            Department of Homeland Security                Date: 2022.12.15 17:57:24
                                                           -05'00'

                                               MATTHEW    Digitally signed by
                                                          MATTHEW S DAVIES
FROM:       Matthew S. Davies                  S DAVIES   Date: 2022.12.14
                                                          15:10:52 -05'00'
            Executive Director, Admissibility & Passenger Programs
            U.S. Customs and Border Protection

SUBJECT:    Emergency Approval Request for Advance Travel Authorization Capability under
            the Paperwork Reduction Act

This memorandum requests an emergency approval to revise the existing collection of
information under the Paperwork Reduction Act (PRA) for U.S. Customs and Border
Protection's (CBP) Advance Travel Authorization (ATA) capability to collect certain
information, including photographs, in advance of travel.  This information collection was
approved on an emergency basis on October 18, 2022 under Office of Management and Budget
(OMB) Control Number 1651-0143.  This information collection was approved for use by
certain undocumented noncitizens from Venezuela.  At the direction of the Department of
Homeland Security (DHS), CBP plans to expand this to include certain undocumented
noncitizens from Nicaragua, Cuba, and Haiti, and to remove the previously approved numerical
cap for noncitizens from Venezuela.  CBP currently collects photographs of individuals from
these four countries as part of the inspection process at the time of encounter.

DHS is working with its interagency partners to allow certain noncitizens from Venezuela,
Nicaragua, Cuba, and Haiti, and their qualifying immediate family members[1], to submit
information through the recently developed CBP ATA capability within the CBP One™
application as part of the process to request an advance authorization to travel to the United
States to seek a discretionary grant of parole. There is no numerical cap on the number of
noncitizens from these four countries who may apply. Implementation of ATA requires the

---

[1] Immediate family members include spouse and unmarried children under the age of 21.  Eligible family members
must travel with the principal noncitizen to be processed under an ATA program upon arrival in the United States.
Unaccompanied children are not eligible for this process.

collection of a facial photograph via CBP One™. Participation will be limited to those individuals who meet certain DHS established criteria, including possession of a valid, unexpired passport, as well as having an approved U.S.-based supporter. Pending OMB approval, this functionality may launch as early as December 20, 2022.

It is expected that DHS will establish eligibility criteria to identify individuals from certain countries, as identified by the Secretary of DHS, who are able to request advance authorization to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis. It is expected that the identified eligible population includes nationals of countries suffering under repressive authoritarian regimes that are experiencing significant political, economic, and humanitarian crises. Additionally, the United States is currently encountering a large number of undocumented noncitizens at the Southwest Border (SWB) of the United States where, despite surging resources and personnel, CBP is facing significant and unprecedented challenges processing such individuals in a timely manner.

CBP's Office of Field Operations (OFO) developed the ATA capability, a new functionality in CBP One™, which collects a facial photograph and biographic information from a noncitizen who is submitting information to request an advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis.

The facial photograph collected from the noncitizens will be linked to biographic information provided by the individual to U.S. Citizenship and Immigration Services (USCIS). CBP will conduct vetting of noncitizens using the biographic information provided to CBP by USCIS and the facial photograph collected by CBP via CBP One™. This information collection will facilitate the vetting of noncitizens seeking to obtain advance authorization to travel and give air carriers that participate in CBP's document validation program the ability to validate an approved travel authorization, facilitating generation of a noncitizen's boarding pass without having to use other manual validation processes.

CBP One™ allows the user to capture their image and confirm submission after viewing the captured image. If the user is not satisfied with the image captured, the user can retake the image. A user can retake the image up to three times. If after three attempts CBP One™ cannot successfully capture the user's image, CBP One™ will provide the user an error message notifying them that their submission was unable to be completed and that they can access the capability and try again. If the user continues to experience technical difficulties, the CBP One™ application provides a help desk email to provide assistance. In the event that the user is not authorized to travel under this process, they may still seek entry through another process, including by filing a request for consideration of parole with USCIS or applying with the Department of State (DOS) to obtain a visa.

Once submitted, CBP will vet available biographic information and the facial photograph against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety. DHS will limit use and sharing of the

photograph to what is strictly necessary to perform this vetting. Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied. DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel. CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek parole. If the travel authorization is denied, the individual will not be authorized to travel to the United States to seek parole under this process. If approved, the approval establishes that the individual has obtained advance authorization to travel to the United States to seek parole, consistent with 8 C.F.R. 212.5(f), but does not guarantee boarding or a specific processing disposition at a port of entry (POE). Upon arrival to a United States POE, the traveler will be subject to inspection by a CBP officer, who will make a case-by-case processing disposition determination.

DHS requests an emergency approval to revise the existing ATA data collection (OMB Control Number 1651-0143) to allow CBP to collect a facial photograph in advance to permit individuals from Venezuela, Nicaragua, Cuba, and Haiti to obtain advance authorization to travel to the United States to seek a discretionary grant of parole. To support this effort, DHS will soon be publishing accompanying Federal Register notices to announce and establish the parole processes for Venezuela, Nicaragua, Cuba, and Haiti nationals.

The information collected through this emergency will allow DHS to vet noncitizens who may otherwise present themselves for inspection at a southwest land border POE, or enter the United States between POEs, without any prior vetting. The advance vetting affords the noncitizen the opportunity to book international travel to arrive near their intended United States destination address and, as a result, is expected to reduce the strain on CBP resources at the southwest land border. Data will be collected on the efficacy of this process in achieving the desired outcomes, to include reduction in southwest land border encounters, identifying derogatory information before individuals travel, increased arrivals to final destination and grants of parole, and access to employment authorization as well as assessment of the usability of the CBP One™ application and efficacy of automated facial matching, including by demographic group, in order to assess whether this emergency measure has been effective.

Development and deployment of this ATA capability has been expedited to facilitate DHS' ability to respond to the current U.S. Government (USG) resource strain along the SWB, and to enable certain individuals, based on urgent humanitarian reasons or significant public benefit, to travel to the United States to seek a discretionary grant of parole at the POE. This process may also ease the burden on certain locations outside the United States that are unable to continue to support the influx of these migrants because of already overburdened humanitarian relief mechanisms.

DHS is requesting an emergency information collection under 5 CFR 1320.13, with the intention of carrying out all the regular requirements for publication and review after implementation. This collection of information is needed prior to the expiration of time periods established under the normal PRA notice and comment process and is essential to the mission of the agency. Further, the agency cannot reasonably comply with the normal clearance procedures under this part because delayed implementation and awareness of DHS' intent would likely have unpredictable impact on the movement and may further raise pressure on U.S. border operations and the migration management conducted by our foreign partners and could jeopardize our relations with foreign partners.

After implementation of the revised collection, CBP will undergo the normal PRA renewal process.  After publication of the two Federal Register Notices (FRNs) required under the PRA, DHS will address comments and concerns as necessary under the PRA and submit the ICR to OMB for renewal within the required timeframe.

Thank you for your consideration of this Emergency Request.

**Supporting Statement**
**Advance Travel Authorization (ATA)**
**1651-0143**

### A.    Justification

1.    **Explain the circumstances that make the collection of information necessary.  Identify any legal or administrative requirements that necessitate the collection.  Attach a copy of the appropriate section of each statute and regulation mandating or authorizing the collection of information.**

The newly developed CBP Advance Travel Authorization (ATA) allows certain noncitizens from Venezuela and their qualifying immediate family members[1] to submit information within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek a discretionary grant of parole.  CBP is seeking to expand this collection to also include certain noncitizens from Nicaragua, Cuba, and Haiti and their qualifying immediate family members and to remove the previously approved numerical cap for noncitizens from Venezuela. ATA requires the collection of a facial photograph via CBP One™ from those eligible noncitizens who voluntarily elect to participate in the process.  Participation is limited to those individuals who meet certain DHS established criteria, including possession of a valid, unexpired passport, as well as having an approved U.S.-based supporter.  Pending Office of Management and Budget (OMB) approval, the expansion of this functionality will be available as early as late December, 2022.

**Background:**
The United States is currently encountering a large number of undocumented noncitizens at the Southwest Border (SWB) of the United States where, despite surging resources and personnel, CBP is facing unprecedented challenges processing such individuals in a timely manner.

CBP's Office of Field Operations (OFO) developed the ATA capability, a new functionality in CBP One™, which collects biographic information and a facial photograph from a noncitizen who is submitting information to request an advance authorization to travel to the United States to seek a discretionary grant of parole.

**Advance Travel Authorization (ATA):**

The facial photograph collected from the noncitizens will be linked to biographic information provided by the individual to U.S. Citizenship and Immigration Services (USCIS).  CBP will conduct vetting of noncitizens using the biographic information provided to CBP by USCIS and the facial photograph collected by CBP via CBP One$^{TM}$.  This information collection will facilitate the vetting of noncitizens seeking to obtain

---

[1] Immediate family members include spouse and unmarried children under the age of 21.  Eligible family members must travel with the principal noncitizen to be processed under an ATA program upon arrival in the United States. Unaccompanied children are not eligible for this process.

1

advance authorization to travel and give air carriers that participate in CBP's document validation program the ability to validate an approved travel authorization, facilitating generation of a noncitizen's boarding pass without having to use other manual validation processes.

CBP One™ allows the user to capture their image and confirm submission after viewing the captured image. If the user is not satisfied with the image captured, the user can retake the image. A user can retake the image up to three times.  If after three attempts CBP One™ cannot successfully capture the user's image, CBP One™ will provide the user an error message notifying them that their submission was unable to be completed and that they can access the capability and try again.  If the user continues to experience technical difficulties, the CBP One™ application provides a help desk email to provide assistance.  In the event that the user is not authorized to travel under this process, they may still seek entry through another process, including by filing a request for consideration of parole with USCIS or applying with the Department of State (DOS) to obtain a visa.

Once submitted, CBP will vet available biographic information and the facial photograph against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety.  DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting.  Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.  CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek a discretionary grant of parole at the port of entry (POE).  There is no numerical cap on the number of noncitizens from these four countries who may apply.

If the travel authorization is denied, the individual will not be authorized to travel to the United States to seek parole under this process.  If approved, the approval establishes that the individual has obtained advance authorization to travel to the United States to seek parole, consistent with 8 C.F.R. 212.5(f), but does not guarantee boarding or a specific processing disposition at a POE.  Upon arrival to a United States POE, the traveler will be subject to inspection by a CBP officer, who will make a case-by-case processing disposition determination.

This collection of information is authorized by 8 U.S.C. 1182(d)(5), 8 C.F.R. 212.5(f).  The Department has also publicly announced the policy and accompanying collection on its website, and will be promptly issuing a *Federal Register* notice for each of the four named countries.

CBP One™ collects the following information from the individual submitting a request for an advance authorization to travel to the United States to seek parole:

1. Facial Photograph
2. Photo obtained from the passport or Chip on ePassport, where available

2

3. Alien Registration Number
4. First and Last Name
5. Date of Birth
6. Passport Number

Data will be collected on the efficacy of this process in achieving the desired outcomes, to include reduction in SWB encounters, identifying derogatory information before individuals travel, increased arrivals to final destination and grants of parole, and access to employment authorization, as well as assessment of the usability of the CBP One™ application and the efficacy of automated facial matching, including by demographic group, in order to assess whether this emergency measure has been effective.

**2.    Indicate how, by whom, and for what purpose the information is to be used.  Except for a new collection, indicate the actual use the agency has made of the information received from the current collection**.

This information is used by CBP to vet against selected security and law enforcement databases available to DHS and other federal agencies, for national security, border security, public health and safety.  CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek parole.  DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting.  Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.

**3.    Describe whether, and to what extent, the collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g. permitting electronic submission of responses, and the basis for the decision for adopting this means of collection.  Also describe any consideration of using information technology to reduce burden**.

The information is submitted to CBP via the CBP One™ mobile application, which the individual can access to provide basic biographic information.  This biographic information is provided solely to verify that the individual accessing the specific functionality within CBP One™ has a USCIS-approved U.S.-based supporter, has verified their biographic information, and has attested to DHS required attestations related to process eligibility criteria.

**4.    Describe efforts to identify duplication.  Show specifically why any similar information already available cannot be used or modified for use for the purposes described in Item 2 above.**

This information is not duplicated in any other place or any other form.

3

Cuba AR_001232

5. **If the collection of information impacts small businesses or other small entities describe any methods used to minimize burden.**

This information collection does not have an impact on small businesses or other small entities.

6. **Describe consequences to Federal program or policy activities if the collection is not conducted or is conducted less frequently.**

Failure to collect this information would prevent CBP from having access to information needed to conduct vetting to ascertain security and safety risks posed by individuals requesting advance authorization to travel to the United States to seek parole.

7. **Explain any special circumstances.**

This information is collected in a manner consistent with the guidelines of 5 CFR 1320.5(d)(2).

8. **If applicable, provide a copy and identify the date and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB. Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments. Specifically address comments received on cost and hour burden.**

Public comments will be solicited, and this information collection request will go through a normal Paperwork Reduction Act (PRA) approval process, including a response to all comments received from the public, no later than six months after the approval of this emergency request.

9. **Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

There is no offer of a monetary or material value for this information collection.

10. **Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation, or agency policy.**

CBP published the DHS/CBP/PIA-073 Advance Travel Authorization (ATA) to document the general workflow of ATA and the information collected, stored, and used at each step. In addition to the standalone PIA, CBP also concurrently published an appendix update to the DHS/CBP/PIA-068 CBP One Mobile Application. The System of Record Notice (SORN) that permits this information collection is the ATS SORN (DHS/CBP-006 Automated Targeting System, May 22, 2012, 77 FR 30297), which permits collection of information from persons, including operators, crew, and passengers, who seek to, or do in fact, enter,

4

exit, or transit through the United States or through other locations where CBP maintains an enforcement or operational presence by land, air, or sea. Information submitted by noncitizens seeking advance authorization to travel to the United States to seek parole is broadly covered by the ATS SORN.  CBP uses the advance information to compare it against law enforcement and intelligence databases to identify individuals and cargo requiring additional scrutiny, which aligns to the border security mission of DHS.  DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting. Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.

**11.** **Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private.  This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

There are no questions of a sensitive nature.

**12.** **Provide estimates of the hour burden of the collection of information.**

| INFORMATION COLLECTION | TOTAL ANNUAL BURDEN HOURS | NO. OF RESPONDENTS | NO. OF RESPONSES PER RESPONDENT | TOTAL RESPONSES | TIME PER RESPONSE |
|---|---|---|---|---|---|
| Venezuela | 17,517 | 104,894 | 1 | 104,894 | 10 minutes (0.167 hours) |
| Nicaragua | 15,287 | 91,539 | 1 | 91,539 | 10 minutes (0.167 hours) |
| Cuba | 20,615 | 123,442 | 1 | 123,442 | 10 minutes (0.167 hours) |
| Haiti | 5,031 | 30,125 | 1 | 30,125 | 10 minutes (0.167 hours) |
| **Total ATA Process** | 58,450 | 350,000 | 1 | 350,000 | 10 minutes (0.167 hours) |

**Public Cost**

5

The table above provide an estimate of the total annual number of respondents CBP anticipates, broken down by country. This estimate is based on unique CBP encounters and apprehensions of inadmissible nationals of Venezuela, Nicaragua, Cuba, and Haiti in Fiscal Year 2022, resource limitations in processing supporter requests, and the Department's experience administering the Venezuela process, including expected effect on migration flows. It may represent an over-estimate depending on eligibility for consideration and actual interest in each parole process. This breakdown does not suggest a limit or numerical cap for each country; rather, it represents CBP's best guess as to the approximate annual number of responses and how they may be distributed. As of December 2022, the Secretary has directed that the number of travel authorizations granted across all four processes may not exceed 30,000 each month.  That direction is consistent with the estimates presented here.

The estimated cost to the respondents is $2,752,995.  This is based on the estimated burden hours (58,450) multiplied by the average hourly wage rate for all-purpose air travelers ($47.10).  CBP used the U.S. Department of Transportation's (DOT) recommended hourly value of travel time savings for intercity, all-purpose travel by air and high-speed rail, which is provided in 2015 U.S. dollars. CBP assumes an annual growth rate of 0 percent; the 2015 U.S. dollar value is equal to the 2022 U.S. dollar value.[2]

**13.   Provide an estimate of the total annual cost burden to respondents or record keepers resulting from the collection of information.**

There are no record keeping, capital, start-up or maintenance costs associated with this information collection.

**14.   Provide estimates of annualized cost to the Federal Government.  Also provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information.**

It is estimated that 70% of submissions received will be approved automatically by the system, and 30% of the submissions will be reviewed manually by a CBP Officer.

The estimated annual cost to the Federal Government associated with the review of these submissions is $2,353,428. This is based on the number of responses that must be reviewed manually (105,000) multiplied by the time burden to review and process each response (0.33 hours) = 34,650 hours multiplied by the average hourly loaded rate for a CBP Officer

---

2 Source: U.S. Department of Transportation, Office of Transportation Policy. *The Value of Travel Time Savings: Departmental Guidance for Conducting Economic Evaluations Revision 2 (2016 Update)*, "Table 4 (Revision 2 - 2016 Update): Recommended Hourly Values of Travel Time Savings for Intercity, All-Purpose Travel by Air and High-Speed Rail."  September 27, 2016.  Available at https://www.transportation.gov/sites/dot.gov /files/docs/2016%20Revised%20Value%20of%20Travel%20Time%20Guidance.pdf. Accessed May 25, 2022.

Cuba AR_001235

$(\$67.92)^3 = \$2,353,428.$

15. **Explain the reasons for any program changes or adjustments reported in Items 12 or 13.**

There is an increase to the previously reported burden for this information collection due to an increase in respondents and submissions being received; CBP is seeking to expand this collection to remove the previous numerical cap for noncitizens from Venezuela and also include certain noncitizens from Nicaragua, Cuba, Haiti, and their qualifying immediate family members.

16. **For collection of information whose results will be published, outline plans for tabulation, and publication.**

This information collection will not be published for statistical purposes.

17. **If seeking approval to not display the expiration date, explain the reasons that displaying the expiration date would be inappropriate.**

CBP will display the expiration date for OMB approval of this information collection.

18. **"Certification for Paperwork Reduction Act Submissions."**

CBP does not request an exception to the certification of this information collection.

19. **Collection of Information Employing Statistical Methods**

 No statistical methods were employed.

---

3 CBP bases this wage on the FY 2022 salary and benefits of the national average of CBP Officer Positions, which is equal to a GS-11, Step 10.  Source: Email correspondence with CBP's Office of Finance on June 27, 2022.

7

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**U.S. Customs and Border Protection (CBP) Enforcement Encounters - Northern Border (NBO)**
**U.S. Border Patrol (USBP) T8 Apprehensions, USBP T42 Expulsions, Office of Field Operations (OFO) T8 Inadmissible Migrants, and OFO T42 Expulsions by Country of Citizenship and Demographic**
**FY22**
*Data Includes T8 Deportable and Inadmissible Migrants and T42 Expulsions*
Source: Official End of Year Reporting

| Country of Citizenship | OFO | | | | OFO Total | USBP | | | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehens | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | |
| AFGHANISTAN | 22 | 82 | 219 | 3 | 326 | 0 | 2 | 0 | 2 | 328 |
| ALAND ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ALBANIA | 4 | 34 | 86 | 0 | 124 | 3 | 3 | 0 | 6 | 130 |
| ALGERIA | 50 | 59 | 1,449 | 0 | 1,558 | 0 | 1 | 0 | 1 | 1,559 |
| AMERICAN SAMOA | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ANGOLA | 0 | 13 | 8 | 0 | 21 | 0 | 0 | 0 | 0 | 21 |
| ANTIGUA AND BARBUDA | 0 | 4 | 5 | 0 | 9 | 0 | 0 | 0 | 0 | 9 |
| ARGENTINA | 3 | 0 | 44 | 0 | 47 | 0 | 2 | 0 | 2 | 49 |
| ARMENIA | 0 | 0 | 17 | 0 | 17 | 0 | 0 | 0 | 0 | 17 |
| AUSTRALIA | 17 | 58 | 233 | 0 | 308 | 0 | 0 | 0 | 0 | 308 |
| AUSTRIA | 3 | 5 | 20 | 0 | 28 | 0 | 0 | 0 | 0 | 28 |
| AZERBAIJAN | 0 | 2 | 16 | 0 | 18 | 0 | 0 | 0 | 0 | 18 |
| BAHAMAS | 2 | 13 | 79 | 0 | 94 | 0 | 0 | 0 | 0 | 94 |
| BAHRAIN | 0 | 3 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| BANGLADESH | 3 | 16 | 355 | 2 | 376 | 2 | 2 | 0 | 4 | 380 |
| BARBADOS | 1 | 8 | 29 | 0 | 38 | 0 | 0 | 0 | 0 | 38 |
| BELARUS | 0 | 4 | 8 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| BELGIUM | 18 | 84 | 294 | 0 | 396 | 3 | 2 | 0 | 5 | 401 |
| BELIZE | 0 | 0 | 3 | 0 | 3 | 0 | 1 | 0 | 1 | 4 |
| BENIN | 5 | 3 | 175 | 0 | 183 | 0 | 0 | 0 | 0 | 183 |
| BERMUDA | 5 | 0 | 2 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
| BHUTAN | 0 | 0 | 24 | 0 | 24 | 0 | 0 | 0 | 0 | 24 |
| BOLIVIA | 0 | 1 | 11 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| BOSNIA-HERZEGOVINA | 0 | 2 | 11 | 0 | 13 | 0 | 1 | 0 | 1 | 14 |
| BOTSWANA | 0 | 5 | 1 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| BRAZIL | 62 | 343 | 909 | 1 | 1,315 | 4 | 39 | 0 | 43 | 1,358 |
| BRUNEI | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BULGARIA | 1 | 6 | 28 | 0 | 35 | 0 | 4 | 0 | 4 | 39 |
| BURKINA FASO (UPPER VOLTA) | 2 | 2 | 125 | 0 | 129 | 0 | 0 | 0 | 0 | 129 |
| BURUNDI | 2 | 1 | 41 | 0 | 44 | 0 | 0 | 0 | 0 | 44 |
| CAMBODIA | 1 | 0 | 15 | 0 | 16 | 0 | 0 | 0 | 0 | 16 |
| CAMEROON | 24 | 41 | 567 | 0 | 632 | 0 | 0 | 0 | 0 | 632 |
| CANADA | 755 | 3,261 | 36,411 | 41 | 40,468 | 16 | 115 | 1 | 132 | 40,600 |
| CAPE VERDE, REPUBLIC OF | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| CAYMAN ISLANDS | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| CENTRAL AFRICAN REPUBLIC | 0 | 1 | 5 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| CHAD | 3 | 0 | 10 | 0 | 13 | 0 | 0 | 0 | 0 | 13 |
| CHILE | 27 | 144 | 279 | 0 | 450 | 0 | 10 | 0 | 10 | 460 |
| CHINA, PEOPLES REPUBLIC OF | 138 | 944 | 5,597 | 7 | 6,686 | 0 | 12 | 0 | 12 | 6,698 |
| COLOMBIA | 135 | 526 | 1,276 | 1 | 1,938 | 4 | 29 | 0 | 33 | 1,971 |
| COSTA RICA | 0 | 15 | 52 | 0 | 67 | 0 | 1 | 0 | 1 | 68 |
| CROATIA | 0 | 2 | 25 | 0 | 27 | 0 | 1 | 0 | 1 | 28 |
| CUBA | 13 | 45 | 323 | 0 | 381 | 3 | 29 | 0 | 32 | 413 |
| CYPRUS | 0 | 12 | 2 | 0 | 14 | 0 | 0 | 0 | 0 | 14 |
| CZECH REPUBLIC | 0 | 3 | 49 | 2 | 54 | 0 | 0 | 0 | 0 | 54 |
| DEMOCRATIC REPUBLIC OF CONGO (ZAIRE) | 4 | 37 | 232 | 2 | 275 | 0 | 0 | 0 | 0 | 275 |
| DENMARK | 0 | 17 | 24 | 0 | 41 | 0 | 0 | 0 | 0 | 41 |
| DJIBOUTI | 0 | 2 | 6 | 0 | 8 | 0 | 0 | 0 | 0 | 8 |
| DOMINICA | 0 | 2 | 8 | 0 | 10 | 0 | 0 | 0 | 0 | 10 |
| DOMINICAN REPUBLIC | 6 | 31 | 89 | 0 | 126 | 0 | 10 | 0 | 10 | 136 |
| ECUADOR | 1 | 11 | 146 | 0 | 158 | 0 | 86 | 2 | 88 | 246 |
| EGYPT | 8 | 44 | 143 | 0 | 195 | 0 | 0 | 0 | 0 | 195 |
| EL SALVADOR | 2 | 19 | 92 | 0 | 113 | 0 | 30 | 0 | 30 | 143 |
| EQUATORIAL GUINEA | 0 | 0 | 9 | 0 | 9 | 0 | 0 | 0 | 0 | 9 |
| ERITREA | 2 | 11 | 77 | 0 | 90 | 0 | 4 | 0 | 4 | 94 |
| ESTONIA | 0 | 0 | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| ESWATINI | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ETHIOPIA | 0 | 5 | 46 | 0 | 51 | 0 | 0 | 1 | 1 | 52 |
| FIJI | 0 | 0 | 14 | 0 | 14 | 0 | 2 | 0 | 2 | 16 |
| FINLAND | 3 | 13 | 25 | 0 | 41 | 0 | 0 | 0 | 0 | 41 |
| FRANCE | 329 | 1,569 | 6,095 | 2 | 7,995 | 3 | 2 | 0 | 5 | 8,000 |
| GABON | 0 | 4 | 25 | 0 | 29 | 0 | 0 | 0 | 0 | 29 |
| GAMBIA | 0 | 0 | 10 | 0 | 10 | 0 | 1 | 0 | 1 | 11 |
| GEORGIA | 0 | 4 | 37 | 0 | 41 | 0 | 0 | 0 | 0 | 41 |
| GERMANY | 30 | 128 | 420 | 2 | 580 | 0 | 1 | 0 | 1 | 581 |
| GHANA | 18 | 14 | 166 | 1 | 199 | 0 | 2 | 0 | 2 | 201 |
| GREECE | 0 | 45 | 145 | 0 | 190 | 0 | 0 | 0 | 0 | 190 |
| GRENADA | 0 | 1 | 2 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| GUATEMALA | 1 | 36 | 205 | 1 | 243 | 3 | 248 | 2 | 253 | 496 |




Cuba AR_001287

| Country of Citizenship | OFO | | | | OFO Total | USBP | | | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehens | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | |
| GUINEA | 4 | 4 | 129 | 0 | 137 | 0 | 0 | 0 | 0 | 137 |
| GUINEA-BISSAU | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| GUYANA | 2 | 2 | 49 | 0 | 53 | 0 | 0 | 0 | 0 | 53 |
| HAITI | 5 | 57 | 284 | 0 | 346 | 3 | 5 | 0 | 8 | 354 |
| HONDURAS | 0 | 23 | 120 | 0 | 143 | 4 | 73 | 0 | 77 | 220 |
| HONG KONG | 2 | 22 | 57 | 0 | 81 | 0 | 2 | 0 | 2 | 83 |
| HUNGARY | 4 | 19 | 93 | 0 | 116 | 0 | 2 | 0 | 2 | 118 |
| ICELAND | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| INDIA | 197 | 1,391 | 15,498 | 8 | 17,094 | 47 | 189 | 1 | 237 | 17,331 |
| INDONESIA | 1 | 2 | 103 | 0 | 106 | 0 | 1 | 0 | 1 | 107 |
| IRAN | 94 | 441 | 2,185 | 1 | 2,721 | 0 | 1 | 0 | 1 | 2,722 |
| IRAQ | 10 | 19 | 101 | 2 | 132 | 0 | 0 | 0 | 0 | 132 |
| IRELAND | 10 | 58 | 184 | 0 | 252 | 4 | 6 | 0 | 10 | 262 |
| ISLE OF MAN | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ISRAEL | 33 | 189 | 260 | 0 | 482 | 0 | 6 | 0 | 6 | 488 |
| ITALY | 25 | 153 | 362 | 1 | 541 | 1 | 5 | 0 | 6 | 547 |
| IVORY COAST | 10 | 7 | 239 | 0 | 256 | 0 | 0 | 0 | 0 | 256 |
| JAMAICA | 10 | 84 | 325 | 0 | 419 | 0 | 7 | 0 | 7 | 426 |
| JAPAN | 1 | 8 | 205 | 0 | 214 | 0 | 0 | 0 | 0 | 214 |
| JORDAN | 15 | 10 | 95 | 0 | 120 | 0 | 3 | 0 | 3 | 123 |
| KAZAKHSTAN | 0 | 7 | 30 | 0 | 37 | 0 | 0 | 0 | 0 | 37 |
| KENYA | 1 | 12 | 83 | 0 | 96 | 0 | 0 | 0 | 0 | 96 |
| KOREA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| KOSOVO | 0 | 1 | 16 | 0 | 17 | 1 | 0 | 0 | 1 | 18 |
| KUWAIT | 0 | 0 | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| KYRGYZSTAN | 0 | 3 | 8 | 0 | 11 | 0 | 0 | 0 | 0 | 11 |
| LAOS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| LATVIA | 0 | 2 | 6 | 0 | 8 | 0 | 0 | 0 | 0 | 8 |
| LEBANON | 4 | 38 | 168 | 0 | 210 | 0 | 0 | 0 | 0 | 210 |
| LESOTHO | 0 | 3 | 4 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
| LIBERIA | 0 | 0 | 11 | 0 | 11 | 0 | 0 | 0 | 0 | 11 |
| LIBYA | 17 | 2 | 43 | 0 | 62 | 0 | 0 | 0 | 0 | 62 |
| LITHUANIA | 0 | 12 | 14 | 0 | 26 | 0 | 0 | 0 | 0 | 26 |
| LUXEMBOURG | 1 | 0 | 6 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
| MACAO (MACAU) | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MADAGASCAR | 0 | 3 | 34 | 0 | 37 | 0 | 0 | 0 | 0 | 37 |
| MALAWI | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| MALAYSIA | 0 | 3 | 27 | 0 | 30 | 0 | 0 | 0 | 0 | 30 |
| MALI | 3 | 4 | 128 | 0 | 135 | 0 | 0 | 0 | 0 | 135 |
| MARSHALL ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MARTINIQUE | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MAURITANIA | 0 | 0 | 15 | 0 | 15 | 0 | 1 | 0 | 1 | 16 |
| MAURITIUS | 4 | 6 | 61 | 0 | 71 | 0 | 0 | 0 | 0 | 71 |
| MEXICO | 106 | 475 | 1,756 | 2 | 2,339 | 69 | 812 | 1 | 882 | 3,221 |
| MICRONESIA, FEDERATED STATES OF | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MOLDOVA | 2 | 6 | 28 | 0 | 36 | 0 | 0 | 0 | 0 | 36 |
| MONGOLIA | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
| MONTENEGRO | 0 | 1 | 17 | 0 | 18 | 0 | 0 | 0 | 0 | 18 |
| MOROCCO | 17 | 50 | 856 | 1 | 924 | 0 | 0 | 0 | 0 | 924 |
| MOZAMBIQUE | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| MYANMAR (BURMA) | 0 | 6 | 15 | 0 | 21 | 0 | 0 | 0 | 0 | 21 |
| NAMIBIA | 0 | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| NEPAL | 2 | 12 | 136 | 0 | 150 | 0 | 0 | 0 | 0 | 150 |
| NETHERLANDS | 10 | 77 | 173 | 0 | 260 | 0 | 2 | 0 | 2 | 262 |
| NEW ZEALAND | 0 | 16 | 86 | 0 | 102 | 0 | 1 | 0 | 1 | 103 |
| NICARAGUA | 0 | 23 | 73 | 0 | 96 | 0 | 14 | 0 | 14 | 110 |
| NIGER | 0 | 0 | 42 | 0 | 42 | 0 | 0 | 0 | 0 | 42 |
| NIGERIA | 29 | 277 | 820 | 2 | 1,128 | 0 | 1 | 0 | 1 | 1,129 |
| NIUE | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTH KOREA | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTH MACEDONIA | 0 | 10 | 10 | 0 | 20 | 0 | 0 | 0 | 0 | 20 |
| NORWAY | 0 | 2 | 10 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| OMAN | 0 | 3 | 3 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| PAKISTAN | 14 | 102 | 491 | 0 | 607 | 0 | 4 | 0 | 4 | 611 |
| PALESTINE | 0 | 1 | 22 | 0 | 23 | 0 | 0 | 0 | 0 | 23 |
| PANAMA | 2 | 2 | 7 | 0 | 11 | 0 | 2 | 0 | 2 | 13 |
| PARAGUAY | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| PERU | 3 | 19 | 123 | 0 | 145 | 0 | 3 | 0 | 3 | 148 |
| PHILIPPINES | 29 | 223 | 1,268 | 1 | 1,521 | 0 | 4 | 0 | 4 | 1,525 |
| POLAND | 2 | 23 | 180 | 0 | 205 | 0 | 0 | 0 | 0 | 205 |
| PORTUGAL | 7 | 78 | 373 | 0 | 458 | 0 | 2 | 0 | 2 | 460 |
| QATAR | 0 | 0 | 4 | 0 | 4 | 0 | 1 | 0 | 1 | 5 |
| REPUBLIC OF CONGO (BRAZZAVILLE) | 0 | 14 | 79 | 1 | 94 | 0 | 0 | 0 | 0 | 94 |
| REPUBLIC OF SOUTH AFRICA | 4 | 39 | 77 | 0 | 120 | 0 | 0 | 0 | 0 | 120 |
| REUNION | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ROMANIA | 18 | 66 | 192 | 0 | 276 | 99 | 72 | 2 | 173 | 449 |


U.S. Customs and Border Protection

Cuba AR_001288



UNCLASSIFIED // FOR OFFICIAL USE ONLY

| Country of Citizenship | OFO | | | | OFO Total | USBP | | | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehens | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | |
| RUSSIA | 3 | 19 | 181 | 0 | 203 | 0 | 0 | 0 | 0 | 203 |
| RWANDA | 4 | 19 | 123 | 0 | 146 | 0 | 0 | 0 | 0 | 146 |
| SAN MARINO | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SAUDI ARABIA | 7 | 16 | 46 | 0 | 69 | 0 | 0 | 0 | 0 | 69 |
| SENEGAL | 17 | 17 | 319 | 0 | 353 | 0 | 2 | 0 | 2 | 355 |
| SERBIA | 0 | 9 | 26 | 0 | 35 | 1 | 1 | 0 | 2 | 37 |
| SIERRA LEONE | 0 | 3 | 7 | 0 | 10 | 0 | 0 | 0 | 0 | 10 |
| SINGAPORE | 0 | 13 | 27 | 0 | 40 | 0 | 0 | 0 | 0 | 40 |
| SLOVAKIA | 0 | 1 | 18 | 0 | 19 | 0 | 1 | 0 | 1 | 20 |
| SLOVENIA | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| SOLOMON ISLANDS | 0 | 3 | 2 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
| SOMALIA | 0 | 2 | 56 | 0 | 58 | 0 | 5 | 0 | 5 | 63 |
| SOUTH KOREA | 42 | 503 | 699 | 1 | 1,245 | 0 | 0 | 0 | 0 | 1,245 |
| SOUTH SUDAN | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| SPAIN | 15 | 53 | 319 | 0 | 387 | 1 | 16 | 1 | 18 | 405 |
| SRI LANKA | 2 | 40 | 138 | 0 | 180 | 0 | 2 | 0 | 2 | 182 |
| ST. KITTS-NEVIS ISLANDS | 0 | 0 | 15 | 0 | 15 | 0 | 0 | 0 | 0 | 15 |
| ST. LUCIA | 0 | 0 | 13 | 0 | 13 | 0 | 0 | 0 | 0 | 13 |
| ST. VINCENT AND THE GRENADINES | 0 | 0 | 21 | 0 | 21 | 0 | 0 | 0 | 0 | 21 |
| SUDAN | 0 | 3 | 22 | 0 | 25 | 0 | 3 | 0 | 3 | 28 |
| SURINAME | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SWEDEN | 4 | 34 | 102 | 0 | 140 | 0 | 1 | 0 | 1 | 141 |
| SWITZERLAND | 3 | 20 | 90 | 0 | 113 | 0 | 0 | 0 | 0 | 113 |
| SYRIA | 35 | 29 | 138 | 3 | 205 | 7 | 1 | 0 | 8 | 213 |
| TAIWAN - REPUBLIC OF CHINA | 2 | 28 | 160 | 0 | 190 | 0 | 2 | 0 | 2 | 192 |
| TAJIKISTAN | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| TANZANIA | 0 | 4 | 33 | 0 | 37 | 0 | 1 | 0 | 1 | 38 |
| THAILAND | 5 | 22 | 53 | 0 | 80 | 0 | 0 | 0 | 0 | 80 |
| TOGO | 0 | 0 | 103 | 0 | 103 | 0 | 0 | 0 | 0 | 103 |
| TONGA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| TRINIDAD AND TOBAGO | 5 | 9 | 49 | 0 | 63 | 0 | 0 | 0 | 0 | 63 |
| TUNISIA | 25 | 119 | 690 | 0 | 834 | 0 | 0 | 0 | 0 | 834 |
| TURKEY | 12 | 52 | 295 | 1 | 360 | 0 | 2 | 1 | 3 | 363 |
| TURKMENISTAN | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| TURKS AND CAICOS ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| UGANDA | 0 | 13 | 31 | 0 | 44 | 0 | 0 | 0 | 0 | 44 |
| UKRAINE | 43 | 484 | 781 | 6 | 1,314 | 5 | 0 | 0 | 5 | 1,319 |
| UNITED ARAB EMIRATES | 0 | 2 | 12 | 0 | 14 | 0 | 0 | 0 | 0 | 14 |
| UNITED KINGDOM | 21 | 200 | 824 | 0 | 1,045 | 5 | 7 | 0 | 12 | 1,057 |
| UNITED STATES OF AMERICA | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| UNKNOWN | 4 | 3 | 57 | 0 | 64 | 0 | 0 | 0 | 0 | 64 |
| URUGUAY | 3 | 2 | 9 | 0 | 14 | 0 | 0 | 0 | 0 | 14 |
| UZBEKISTAN | 3 | 2 | 11 | 0 | 16 | 0 | 0 | 0 | 0 | 16 |
| VANUATU | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| VENEZUELA | 2 | 42 | 152 | 0 | 196 | 2 | 3 | 0 | 5 | 201 |
| VIETNAM | 14 | 100 | 452 | 0 | 566 | 0 | 24 | 1 | 25 | 591 |
| YEMEN | 0 | 8 | 22 | 0 | 30 | 0 | 1 | 0 | 1 | 31 |
| YUGOSLAVIA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| ZAMBIA | 0 | 0 | 12 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| ZIMBABWE | 0 | 11 | 23 | 0 | 34 | 0 | 0 | 0 | 0 | 34 |
| Grand Total | 2,669 | 13,732 | 90,801 | 95 | 107,297 | 290 | 1,936 | 12 | 2,238 | 109,535 |



UNCLASSIFIED // FOR OFFICIAL USE ONLY

Cuba AR_001289 

**U.S. Customs and Border Protection (CBP) Enforcement Encounters - Southwest Border (SBO)**
U.S. Border Patrol (USBP) T8 Apprehensions, USBP T42 Expulsions, Office of Field Operations (OFO) T8 Inadmissible
Migrants, and OFO T42 Expulsions by Country of Citizenship and Demographic
FY22
*Data Includes T8 Deportable and Inadmissible Migrants and T42 Expulsions*
Source: Official End of Year Reporting

| Country of Citizenship | OFO | | | | OFO Total | USBP | | | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehensions | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | |
| AFGHANISTAN | 3 | 45 | 25 | 0 | 73 | 201 | 553 | 11 | 765 | 838 |
| ALBANIA | 0 | 0 | 1 | 0 | 1 | 8 | 82 | 3 | 93 | 94 |
| ALGERIA | 0 | 0 | 2 | 0 | 2 | 0 | 15 | 0 | 15 | 17 |
| ANDORRA | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 2 |
| ANGOLA | 2 | 1 | 4 | 0 | 7 | 1,260 | 455 | 26 | 1,741 | 1,748 |
| ANTIGUA AND BARBUDA | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| ARGENTINA | 0 | 25 | 29 | 0 | 54 | 336 | 141 | 2 | 479 | 533 |
| ARMENIA | 4 | 1,077 | 1,838 | 29 | 2,948 | 208 | 113 | 2 | 323 | 3,271 |
| ARUBA | 0 | 0 | 0 | 0 | 0 | 5 | 1 | 0 | 6 | 6 |
| AUSTRALIA | 0 | 0 | 8 | 0 | 8 | 0 | 1 | 0 | 1 | 9 |
| AUSTRIA | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| AZERBAIJAN | 0 | 79 | 58 | 0 | 137 | 71 | 126 | 0 | 197 | 334 |
| BAHAMAS | 0 | 0 | 1 | 0 | 1 | 2 | 1 | 0 | 3 | 4 |
| BANGLADESH | 0 | 0 | 10 | 0 | 10 | 279 | 2,080 | 80 | 2,439 | 2,449 |
| BARBADOS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BELARUS | 4 | 947 | 610 | 0 | 1,561 | 143 | 124 | 0 | 267 | 1,828 |
| BELGIUM | 5 | 0 | 0 | 0 | 5 | 3 | 0 | 0 | 3 | 8 |
| BELIZE | 2 | 58 | 155 | 11 | 226 | 263 | 219 | 61 | 543 | 769 |
| BENIN | 0 | 0 | 0 | 0 | 0 | 9 | 48 | 0 | 57 | 57 |
| BOLIVIA | 0 | 0 | 12 | 0 | 12 | 658 | 590 | 15 | 1,263 | 1,275 |
| BRAZIL | 6 | 2,449 | 51 | 1 | 2,507 | 38,524 | 12,231 | 195 | 50,950 | 53,457 |
| BULGARIA | 0 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 4 |
| BURKINA FASO (UPPER VOLTA) | 0 | 0 | 5 | 0 | 5 | 30 | 234 | 0 | 264 | 269 |
| CAMBODIA | 0 | 0 | 1 | 0 | 1 | 0 | 3 | 0 | 3 | 4 |
| CAMEROON | 0 | 8 | 11 | 3 | 22 | 64 | 1,149 | 2 | 1,215 | 1,237 |
| CANADA | 10 | 6 | 78 | 1 | 95 | 14 | 3 | 1 | 18 | 113 |
| CAPE VERDE, REPUBLIC OF | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 4 | 4 |
| CAYMAN ISLANDS | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 4 | 4 |
| CENTRAL AFRICAN REPUBLIC | 0 | 0 | 1 | 0 | 1 | 3 | 10 | 0 | 13 | 14 |
| CHAD | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 0 | 6 | 6 |
| CHILE | 3 | 2,288 | 33 | 1 | 2,325 | 4,782 | 71 | 3 | 4,856 | 7,181 |
| CHINA, PEOPLES REPUBLIC OF | 1 | 11 | 194 | 0 | 206 | 150 | 1,818 | 2 | 1,970 | 2,176 |
| COCOS ISLANDS | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 |
| COLOMBIA | 26 | 190 | 403 | 13 | 632 | 59,245 | 64,492 | 803 | 124,540 | 125,172 |
| COOK ISLANDS | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 2 | 2 |
| COSTA RICA | 1 | 7 | 18 | 2 | 28 | 264 | 305 | 14 | 583 | 611 |
| CUBA | 4 | 35 | 542 | 6 | 587 | 51,617 | 167,744 | 960 | 220,321 | 220,908 |
| CURACAO | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| CZECH REPUBLIC | 0 | 2 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| DEMOCRATIC REPUBLIC OF CONGO (ZAIRE) | 0 | 0 | 2 | 0 | 2 | 342 | 166 | 4 | 512 | 514 |
| DENMARK | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| DJIBOUTI | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| DOMINICA | 0 | 0 | 2 | 0 | 2 | 6 | 5 | 0 | 11 | 13 |
| DOMINICAN REPUBLIC | 0 | 18 | 41 | 0 | 59 | 845 | 4,939 | 30 | 5,814 | 5,873 |
| ECUADOR | 2 | 48 | 62 | 4 | 116 | 12,835 | 10,083 | 1,026 | 23,944 | 24,060 |
| EGYPT | 0 | 0 | 6 | 0 | 6 | 6 | 59 | 0 | 65 | 71 |
| EL SALVADOR | 24 | 2,536 | 1,171 | 103 | 3,834 | 26,288 | 50,580 | 16,328 | 93,196 | 97,030 |
| EQUATORIAL GUINEA | 0 | 0 | 1 | 0 | 1 | 2 | 22 | 0 | 24 | 25 |
| ERITREA | 0 | 0 | 0 | 0 | 0 | 28 | 599 | 2 | 629 | 629 |
| ETHIOPIA | 0 | 0 | 3 | 0 | 3 | 7 | 202 | 2 | 211 | 214 |
| FINLAND | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| FRANCE | 0 | 13 | 17 | 1 | 31 | 53 | 4 | 2 | 59 | 90 |
| FRENCH GUIANA | 0 | 53 | 1 | 0 | 54 | 28 | 0 | 0 | 28 | 82 |
| GAMBIA | 0 | 0 | 0 | 0 | 0 | 2 | 75 | 0 | 77 | 77 |
| GEORGIA | 0 | 52 | 209 | 1 | 262 | 311 | 5,671 | 1 | 5,983 | 6,245 |
| GERMANY | 6 | 8 | 56 | 1 | 71 | 6 | 5 | 0 | 11 | 82 |
| GHANA | 0 | 16 | 46 | 4 | 66 | 455 | 1,573 | 68 | 2,096 | 2,162 |
| GREECE | 1 | 3 | 5 | 0 | 9 | 6 | 1 | 0 | 7 | 16 |
| GUADELOUPE | 0 | 0 | 1 | 0 | 1 | 6 | 73 | 7 | 96 | 97 |
| GUATEMALA | 21 | 2,075 | 982 | 267 | 3,345 | 33,935 | 133,772 | 60,513 | 228,220 | 231,565 |
| GUINEA | 0 | 0 | 6 | 1 | 7 | 78 | 372 | 18 | 468 | 475 |
| GUINEA-BISSAU | 0 | 0 | 0 | 0 | 0 | 6 | 40 | 0 | 46 | 46 |
| GUYANA | 0 | 19 | 4 | 0 | 23 | 58 | 10 | 0 | 68 | 91 |
| HAITI | 5 | 13,122 | 11,723 | 56 | 24,906 | 18,304 | 10,473 | 227 | 29,004 | 53,910 |
| HONDURAS | 88 | 10,290 | 3,265 | 194 | 13,837 | 64,903 | 97,103 | 37,180 | 199,186 | 213,023 |
| HONG KONG | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| HUNGARY | 0 | 2 | 7 | 0 | 9 | 0 | 1 | 0 | 1 | 10 |


U.S. Customs and
Border Protection

Cuba AR_001240 

| Country of Citizenship | OFO | | | | | USBP | | | | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehensions | Single Adults | UC/Single Minors | OFO Total | Family Unit Apprehensions | Single Adults | UC/Single Minors | USBP Total | |
| INDIA | 1 | 6 | 63 | 2 | 72 | 4,979 | 12,862 | 395 | 18,236 | 18,308 |
| INDONESIA | 0 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 4 |
| IRAN | 0 | 7 | 23 | 0 | 30 | 49 | 146 | 1 | 196 | 226 |
| IRAQ | 0 | 0 | 6 | 0 | 6 | 5 | 23 | 0 | 28 | 34 |
| IRELAND | 2 | 0 | 0 | 0 | 2 | 9 | 6 | 0 | 15 | 17 |
| ISRAEL | 0 | 5 | 7 | 0 | 12 | 5 | 20 | 0 | 25 | 37 |
| ITALY | 4 | 0 | 33 | 0 | 37 | 28 | 11 | 2 | 41 | 78 |
| IVORY COAST | 0 | 0 | 2 | 0 | 2 | 11 | 55 | 0 | 66 | 68 |
| JAMAICA | 2 | 79 | 412 | 3 | 496 | 1,250 | 1,909 | 54 | 3,213 | 3,709 |
| JAPAN | 2 | 1 | 11 | 0 | 14 | 0 | 1 | 0 | 1 | 15 |
| JORDAN | 0 | 2 | 3 | 0 | 5 | 10 | 15 | 0 | 25 | 30 |
| KAZAKHSTAN | 0 | 121 | 36 | 2 | 159 | 141 | 117 | 1 | 259 | 418 |
| KENYA | 0 | 0 | 3 | 0 | 3 | 0 | 14 | 0 | 14 | 17 |
| KOSOVO | 0 | 0 | 0 | 0 | 0 | 0 | 80 | 0 | 80 | 80 |
| KUWAIT | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| KYRGYZSTAN | 0 | 223 | 217 | 3 | 443 | 123 | 202 | 0 | 325 | 768 |
| LAOS | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| LATVIA | 0 | 1 | 5 | 0 | 6 | 0 | 3 | 0 | 3 | 9 |
| LEBANON | 0 | 0 | 3 | 0 | 3 | 14 | 34 | 0 | 48 | 51 |
| LIBERIA | 0 | 0 | 1 | 0 | 1 | 0 | 10 | 1 | 11 | 12 |
| LIBYA | 0 | 0 | 1 | 0 | 1 | 0 | 3 | 0 | 3 | 4 |
| LITHUANIA | 0 | 3 | 2 | 0 | 5 | 0 | 2 | 0 | 2 | 7 |
| LUXEMBOURG | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| MACAO (MACAU) | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| MACAU | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| MADAGASCAR | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| MALAWI | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 |
| MALAYSIA | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 1 |
| MALDIVE ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MALI | 0 | 0 | 2 | 0 | 2 | 34 | 179 | 1 | 214 | 216 |
| MARSHALL ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| MARTINIQUE | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| MAURITANIA | 0 | 0 | 2 | 0 | 2 | 9 | 316 | 0 | 325 | 327 |
| MEXICO | 2,536 | 16,444 | 48,535 | 2,044 | 69,559 | 23,302 | 689,528 | 25,950 | 738,780 | 808,339 |
| MICRONESIA, FEDERATED STATES OF | 0 | 0 | 2 | 0 | 2 | 2 | 4 | 0 | 6 | 8 |
| MOLDOVA | 1 | 133 | 104 | 0 | 238 | 33 | 29 | 0 | 62 | 300 |
| MONGOLIA | 0 | 10 | 0 | 0 | 10 | 1 | 1 | 0 | 2 | 12 |
| MONTENEGRO | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 |
| MOROCCO | 0 | 0 | 2 | 0 | 2 | 0 | 33 | 0 | 33 | 35 |
| MOZAMBIQUE | 0 | 0 | 0 | 0 | 0 | 1 | 9 | 0 | 10 | 10 |
| MYANMAR (BURMA) | 0 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 8 |
| NAMIBIA | 0 | 0 | 1 | 0 | 1 | 4 | 1 | 0 | 5 | 6 |
| NEPAL | 0 | 0 | 12 | 0 | 12 | 32 | 1,433 | 29 | 1,494 | 1,506 |
| NETHERLANDS | 0 | 0 | 7 | 0 | 7 | 1 | 1 | 0 | 2 | 9 |
| NETHERLANDS ANTILLES | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| NEW ZEALAND | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| NICARAGUA | 8 | 74 | 230 | 12 | 324 | 29,827 | 130,579 | 3,146 | 163,552 | 163,876 |
| NIGER | 0 | 0 | 0 | 0 | 0 | 11 | 40 | 0 | 51 | 51 |
| NIGERIA | 0 | 3 | 12 | 0 | 15 | 116 | 413 | 2 | 531 | 546 |
| NORTH KOREA | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 4 |
| OMAN | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| PAKISTAN | 0 | 0 | 5 | 0 | 5 | 37 | 296 | 1 | 334 | 339 |
| PALESTINE | 0 | 5 | 2 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
| PANAMA | 1 | 11 | 8 | 0 | 20 | 1,133 | 197 | 4 | 1,334 | 1,354 |
| PAPUA NEW GUINEA | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 3 |
| PARAGUAY | 0 | 0 | 2 | 0 | 2 | 22 | 26 | 0 | 48 | 50 |
| PERU | 4 | 64 | 150 | 4 | 218 | 25,464 | 24,601 | 379 | 50,444 | 50,662 |
| PHILIPPINES | 0 | 1 | 6 | 0 | 7 | 2 | 11 | 0 | 13 | 20 |
| POLAND | 0 | 2 | 8 | 0 | 10 | 1 | 8 | 0 | 9 | 19 |
| PORTUGAL | 0 | 2 | 4 | 0 | 6 | 27 | 3 | 0 | 30 | 36 |
| REPUBLIC OF CONGO (BRAZZAVILLE) | 0 | 0 | 4 | 0 | 4 | 304 | 179 | 18 | 501 | 505 |
| REPUBLIC OF SOUTH AFRICA | 1 | 0 | 4 | 0 | 5 | 15 | 10 | 0 | 25 | 30 |
| ROMANIA | 0 | 46 | 51 | 0 | 97 | 4,649 | 1,089 | 157 | 5,895 | 5,992 |
| RUSSIA | 48 | 9,420 | 7,069 | 29 | 16,566 | 3,028 | 2,155 | 14 | 5,197 | 21,763 |
| RWANDA | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 6 | 9 | 9 |
| SAO TOME AND PRINCIPE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| SAUDI ARABIA | 0 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 4 |
| SENEGAL | 0 | 0 | 7 | 0 | 7 | 86 | 2,458 | 2 | 2,546 | 2,553 |
| SERBIA | 0 | 0 | 3 | 0 | 3 | 0 | 34 | 1 | 35 | 38 |
| SIERRA LEONE | 0 | 3 | 0 | 0 | 3 | 60 | 112 | 6 | 178 | 181 |
| SINGAPORE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| SLOVAKIA | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| SLOVENIA | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| SOLOMON ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SOMALIA | 0 | 0 | 5 | 0 | 5 | 7 | 1,134 | 15 | 1,156 | 1,161 |
| SOUTH KOREA | 1 | 0 | 29 | 0 | 30 | 0 | 5 | 0 | 5 | 35 |
| SOUTH SUDAN | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| SPAIN | 7 | 4 | 93 | 2 | 106 | 75 | 30 | 0 | 105 | 211 |
| SRI LANKA | 0 | 0 | 0 | 0 | 0 | 0 | 233 | 1 | 234 | 234 |
| ST. LUCIA | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 2 | 2 |
| STATELESS | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 3 |
| SUDAN | 0 | 0 | 2 | 0 | 2 | 2 | 54 | 0 | 56 | 56 |
| SURINAME | 0 | 4 | 0 | 1 | 5 | 19 | 2 | 0 | 21 | 26 |
| SWEDEN | 2 | 0 | 4 | 0 | 6 | 1 | 1 | 0 | 2 | 8 |



| Country of Citizenship | OFO | | | | OFO Total | USBP | | | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehensions | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | |
| SWITZERLAND | 0 | 2 | 2 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| SYRIA | 0 | 5 | 7 | 0 | 12 | 35 | 118 | 1 | 154 | 166 |
| TAIWAN - REPUBLIC OF CHINA | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| TAJIKISTAN | 0 | 25 | 64 | 0 | 89 | 93 | 218 | 4 | 315 | 404 |
| TANZANIA | 0 | 0 | 1 | 0 | 1 | 0 | 6 | 0 | 6 | 7 |
| THAILAND | 0 | 0 | 3 | 0 | 3 | 0 | 4 | 0 | 4 | 7 |
| TOGO | 0 | 0 | 0 | 0 | 0 | 55 | 132 | 0 | 187 | 187 |
| TRINIDAD AND TOBAGO | 0 | 0 | 4 | 0 | 4 | 31 | 8 | 1 | 40 | 44 |
| TUNISIA | 0 | 0 | 1 | 0 | 1 | 0 | 5 | 0 | 5 | 6 |
| TURKEY | 3 | 43 | 42 | 1 | 89 | 3,321 | 11,864 | 171 | 15,356 | 15,445 |
| TURKMENISTAN | 0 | 2 | 1 | 0 | 3 | 0 | 5 | 0 | 5 | 8 |
| UGANDA | 0 | 0 | 5 | 0 | 5 | 2 | 14 | 0 | 16 | 21 |
| UKRAINE | 88 | 15,239 | 9,328 | 124 | 24,779 | 353 | 231 | 1 | 585 | 25,364 |
| UNITED ARAB EMIRATES | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 |
| UNITED KINGDOM | 0 | 1 | 24 | 0 | 25 | 20 | 3 | 0 | 23 | 48 |
| UNITED STATES OF AMERICA | 1 | 0 | 4 | 1 | 6 | 0 | 0 | 0 | 0 | 6 |
| UNKNOWN | 11 | 8 | 138 | 27 | 184 | 0 | 0 | 0 | 0 | 184 |
| URUGUAY | 0 | 1 | 3 | 0 | 4 | 253 | 49 | 0 | 302 | 306 |
| USSR | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| UZBEKISTAN | 1 | 60 | 82 | 0 | 143 | 967 | 2,252 | 13 | 3,232 | 3,375 |
| VENEZUELA | 26 | 145 | 249 | 10 | 430 | 66,198 | 119,959 | 1,129 | 187,286 | 187,716 |
| VIETNAM | 0 | 0 | 1 | 0 | 1 | 14 | 243 | 5 | 262 | 263 |
| WESTERN SAHARA | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 4 |
| YEMEN | 0 | 0 | 11 | 0 | 11 | 13 | 51 | 0 | 64 | 75 |
| YUGOSLAVIA | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 |
| ZAMBIA | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 2 | 2 |
| ZIMBABWE | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 |
| Grand Total | 2,963 | 77,684 | 88,897 | 2,964 | 172,508 | 482,962 | 1,574,381 | 149,093 | 2,206,436 | 2,378,944 |



*Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat*

Political repression and escalating economic difficulties on the island, along with a new visa-free travel policy in Nicaragua, are some of the factors driving the change.

Yaquemile, a migrant from Cuba, wading through the Rio Grande from Mexico into Texas in April. Credit...Adrees Latif/Reuters





**By Maria Abi-Habib and Eileen Sullivan**
Published May 3, 2022 Updated May 4, 2022
Leer en español
**Sign up for the Russia-Ukraine War Briefing.** Every evening, we'll send you a summary of the day's biggest news. Get it sent to your inbox.

Cuban migrants are arriving to the United States in the highest numbers seen in four decades, with about 150,000 expected to arrive this year, according to senior American officials, as the economic and political situation on the island grows more desperate.

For decades, Cubans trying to flee repression, food insecurity and economic devastation boarded rickety boats, risking their lives to get to American shores.

Now they are coming in record numbers, but this time on foot, their flight aided by Nicaragua, which dropped visa requirements late last year for Cubans, giving them a toehold in Central America to journey overland through Mexico to the United States. American officials have accused Nicaragua's authoritarian president, Daniel Ortega, of enacting the policy to pressure the United States to drop sanctions on his country.

The surge in Cubans trying to cross the southern border represents just a portion of migrants who have at times overwhelmed border officials as undocumented crossings continue to rise under the Biden administration. March set a record for the number of people caught crossing illegally in a single month in two decades: 221,303.

Since October — the start of the federal government's 2022 fiscal year — nearly 79,000 Cubans have arrived at the United States' southern border, more than in the previous two years combined, according to Customs and Border Protection figures. In March, more than 32,000 Cubans arrived at the border, most of them flying first to Nicaragua then traveling overland to the United States, according to a senior State Department official, who spoke on the condition of anonymity because of ongoing dialogue with the Cuban government.

The official said visa-free travel to Nicaragua was encouraging migrants to spend their life savings to pay smugglers for the journey, and added that some were falling prey to trafficking by criminal groups.
Image



A swimming instructor in Estelí, Nicaragua, teaches would-be migrants how to swim, in anticipation of crossing the Rio Grande, the border between Mexico and the United States.Credit...Maynor Valenzuela/Reuters

The numbers are the highest since the Mariel boatlift in 1980, when 125,000 Cubans migrated to the United States after the island nation opened its seaports to American vessels to evacuate anyone who wanted to leave.

Public discontent in Cuba has been simmering since mass protests erupted last summer across the country over escalating inflation, chronic food and drug shortages and ongoing power outages. During the Obama administration, the United States eased restrictions on travel and remittances to Cuba significantly, but they were resurrected under former President Donald J. Trump, dealing a harsh economic blow.

The demonstrations caught the Communist government by surprise and it has responded by imposing one of the biggest crackdowns in decades. More than 700 Cubans have been charged for taking part in protests, including some teenagers who received 30 years in prison. The deteriorating political and economic conditions are feeding the growing exodus. Nicaragua's government dropped its Cuba visa requirement in November, opening a land route for migrants reluctant to embark on the dangerous sea journey to American shores. Since then the number of flights to Managua from Havana has soared.

"I think we are seeing governments try to weaponize migration because they know it causes political disruptions in receiving countries," said Andrew Selee, the president of the Migration Policy Institute, a research institute in Washington.

Mr. Selee and other analysts said Nicaragua was likely using Cuban migrants to press the United States to lift sanctions on Mr. Ortega and his inner circle. The move has been compared to Belarus dropping visa requirements for Iraqis last year to facilitate their entry into the European Union, in retaliation for sanctions the bloc had levied on Belarus for its disputed election.

"They're not fools," Mr. Selee said. "The government in Managua knew that this would force the U.S. to come to the bargaining table at some point." Still, it is unclear if the looser migration rules would yield any changes in U.S. policy.

Nicaragua's government did not respond to questions sent by The Times. Cuba's government did not respond to requests for comment.



Asylum seekers from Venezuela and Cuba being processed after crossing the border from Mexico in Yuma, Ariz., in February.Credit...Go Nakamura/Reuters

Many Cubans are desperate to leave, even if it means going into debt to go on a perilous journey. Cubans describe selling whatever they have — homes, clothing and furniture — and taking loans with steep interest rates to raise the thousands of dollars they need to get to the United States, even though the average salary on the island is about $46 a month.

Zenen Hernández, 35, was one of 414 Cubans who crossed the Rio Grande into the United States on April 5, out of a total of 1,488 undocumented migrants who crossed that section of the Texas border (about 245 miles) that day.

"Food and medicine are scarce," Mr. Hernández said, describing conditions in Cuba. "It's only poverty."

The Cuban government blames the United States' decades-long embargo of the nation for its economic woes.

The economy there was dismal before the pandemic hit, but Mr. Hernández scraped by, selling bread and chips. By the summer of 2020, the situation had become untenable. When Nicaragua opened its borders to Cubans, he decided it was time to go.

"I had to sell my house," he said.

The cost was steep: $16,000 for the flight to Nicaragua and the ensuing 1,800-mile trek to reach the United States — often on foot — through the jungles, mountains and rivers of Central America and Mexico. Along the way, migrants are routinely threatened and extorted by the police and preyed upon by criminal organizations that kidnap and beat them for ransom. When Mr. Hernández was asked to describe his trip, he choked up recalling the miserable journey.

"I don't have words," he said. "They rob you — the police, the smugglers. They rob you." Pent-up demand for legal crossings is another factor increasing migration. In 2017, the Trump administration slashed staffing at the United States Embassy in Cuba after a series of unexplained health problems that became known as "Havana syndrome" affected American personnel there.

The drawdown forced Cubans to apply for visas from the American embassy in Guyana, a trip too expensive for many. The move also prevented the United States from upholding its commitment to provide 20,000 immigrant visas to Cubans annually, part of a 1994 agreement between the countries to provide a legal pathway and discourage illegal migration.

This week, the United States Embassy in Havana will hold the first interviews for immigrant visa applicants since 2017, one of the senior American officials said.

Image



The Trump administration reduced staffing at the United States Embassy in Havana after personnel were affected by mysterious health incidents.Credit...Amanda Perobelli/Reuters

The first high-level talks between Cuba and the United States since 2018 took place in late April, focused on restoring regular migration channels. The Cuban government asked the United States to uphold the agreement to issue 20,000 immigrant visas annually; the American government requested that Havana start accepting Cuban deportees who have arrived illegally.

The American official said the two sides would likely meet again in six months.

"If the talks are successful, they will get back to a formula that worked before, providing a real, feasible legal channel for Cubans to come to the U.S. in exchange for the deportation of those who don't use the legal channel," said Mr. Selee, of the Migration Policy Institute. "Migration is a rare point of cooperation between the countries that has really worked."

For decades, Cubans who migrated to the United States enjoyed preferential treatment. Those caught at sea were turned back but those who reached U.S. soil were allowed to stay, under a policy commonly referred to as "wet-foot, dry-foot." President Obama ended the policy in 2017. The bilateral talks came ahead of the Summit of the Americas in Los Angeles in June, where countries will try to agree on a regional framework for migration and shore up financial support for Latin American countries with large migrant populations. Colombia received $800 million last year in loans from multilateral lenders, including the World Bank, to support the 1.7 million Venezuelan migrants it hosts, the type of support the summit will look to extend throughout the region.

Although the Biden administration has maintained that only democratic governments will be invited to the summit, Cuba was invited to the previous two, in 2015 and 2018, and is hoping for an invitation this year.

But American officials said that was yet to be decided, sparking ire from the Cuban government. "The United States resorts once again to all kinds of resources and lies to assert the right won by Cuba and its people to be present at these Summits on an equal footing with the rest of the countries in the region," Cuba's foreign minister, Bruno Rodriguez, tweeted on April 25. This is "something shameful."

Bryan Avelar and Frances Robles contributed reporting.

COMPLETE COVERAGE

The House January 6 committee approves its historic final report on the US Capitol riot. Watch CNN

 politics

AudioLive TV

## Mexico border

By [Priscilla Alvarez](), CNN

Published 3:53 PM EDT, Wed September 7, 2022



☐ Video Ad Feedback

See the dangerous risks migrants take crossing US-Mexican border

02:44 - Source: [CNN]()

**(CNN) —** Nearly 750 migrants have died at the southern border this fiscal year, a record that surpasses last year's total by more than 200 people, according to Department of Homeland Security figures shared with CNN.

Migrants often face treacherous terrain when crossing the border – including oppressive desert heat, dangerous waters and falling from the border wall.

Since October 1, which marks the start of the fiscal year, there have been 748 deaths, a

Cuba AR_001250

Homeland Security official told CNN, with a month still left to go in the fiscal year. That's up from 557 southwest border deaths during fiscal year 2021, the previous record.



**RELATED VIDEO**
How these migrants are faring 1 week after Texas paid to bus them out of state

The figures don't always capture all deaths, as other state and local agencies may recover bodies without Border Patrol involvement, meaning the number of deaths is likely higher.

Last week, the bodies of at least eight migrants trying to cross the US border from Mexico were found in the Rio Grande, Customs and Border Protection said. The remains were discovered by agents and Mexican authorities while rescuing other migrants in the river.

An increasing number of migrants continue to appear at the US-Mexico border as conditions deteriorate in Latin America. Arrests of migrants along the US southern border this year remained high, including during months when numbers usually dip, meaning that thousands were exposed to even more difficult elements.

In July, the US Border Patrol made more than 181,000 arrests on the US southern border, according to the latest available agency data.

In the past, many migrant deaths have been related to heat exposure, according to the Border Patrol.

Advocates for migrants say they may be forced to take increasingly risky paths to reach the US, citing border policies like a Trump-era pandemic emergency restriction that allows authorities to turn people away at the border.

"Migrants, refugees, and entire families are using more distant and dangerous routes to come to the United States," Fernando García, executive director of the Border Network for Human Rights, previously told CNN.

Deaths along the US southern border have been rising over the years. In fiscal year 2020, there were 247 deaths and 300 deaths in 2019, marking a significant increase amid a 30-record year for border crossings. The agency data on deaths dates to 1998.

Customs and Border Protection declined to comment on the figures, but said smugglers are taking advantage of desperate migrants.

"Transnational criminal organizations continue to recklessly endanger the lives of individuals they smuggle for their own financial gain with no regard for human life," CBP said in a statement. "Smuggling organizations are abandoning migrants in remote and dangerous areas, leading to a rise in the number of rescues but also tragically a rise in the number of deaths. The terrain along

Cuba AR_001291

the border is extreme, the summer heat is severe, and the miles of desert migrants must hike after crossing the border in many areas are unforgiving."

So far this fiscal year, there have been nearly 19,000 searches and rescues along the US southern border, according to CBP – an increase from 12,833 in fiscal year 2021.

**Paid Links**

Search CNN...

Log In

Live TV

Audio

World

US Politics

Business

Health

Entertainment

Cuba AR_001252

Entertainment

Tech

Style

Travel

Sports

Videos

Features

Weather

More



## FOLLOW CNN POLITICS

   

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2022 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

12/19/22, 4:40 PM    First operational record of a number of firearms have been crossing the US-Mexico border ... Page 131 of 263

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 131 of 263

Cuba AR_001254

Cuba AR_001255

Cuba AR_001256

Cuba AR_001257

Cuba AR_001258



© YAMIL LAGE/AFP via Getty Images

October 5, 2022

# Cuba: Tactics of repression must not be repeated

Following a new wave of __island-wide protests__ in Cuba over the past several days, there are worrying indicators that the authorities are repeating the repressive tactics they used for decades and also during the crackdown on protesters on 11 July last year, said Amnesty International today.

"In the latest wave of protests that have lasted several days, Cubans are exercising their simple but historically repressed rights to freedom of expression and assembly. Alarmingly, it seems the authorities are repeating the tactics of repression they used last year to detain and silence protesters, hundreds of whom remain in prison," said Erika Guevara-Rosas, Americas director at Amnesty International.

"The international community must condemn the cycles of repression we are seeing in Cuba in the strongest possible terms. It is unacceptable for authorities to keep intimidating, threatening, detaining, stigmatizing, and attempting to silence anyone who demands necessities like electricity, food, and freedom."

Since the start of protests in late September, Amnesty International has received reports of on-going internet interference, deployment of police and military, including cadets, to repress the protests, and arbitrary detentions.

Starting on the evening of 29 September, the Cuban authorities appear to have intentionally shut down internet access throughout the country. The internet outage lasted for at **least two** consecutive nights.

Cuban authorities control the country's only telecommunication network and have often **restricted internet access** during politically sensitive times or moments of protests.

## "
# Alarmingly, it seems the authorities are repeating the tactics of repression they used last year to detain and silence protesters, hundreds of whom remain in prison.

**Erika Guevara-Rosas, Americas director at Amnesty International**

Amnesty International has heard that the latest internet outages have made it hard for families to communicate following the passage of hurricane Ian, at a time when many people have had their homes damaged. They have also impacted the ability of independent human rights observers, including Amnesty International, and independent journalists to document the human rights situation in the country. Journalist Luz Escobar told Amnesty International that her internet was cut three nights in a row, impacting her ability to work, and that as of 4 October, **several other journalists** working at her independent online newspaper, 14 y medio, were without internet.

Amnesty International's Crisis Evidence Lab has also analysed several videos that did not appear online before these protests. **One video** which Amnesty International analysed was filmed on Street 41, at the corner of 66 in Havana, Cuba, and appears to show the deployment of plain-clothed military cadets, armed with baseball bats, chanting pro-government slogans, including "I am Fidel."

**Another video**, which also first appeared online in the context of the protests, and which is consistent with other videos Amnesty International has verified from the protests, appears to also show cadets with baseball bats chasing and then detaining protesters.

The Cuban authorities have developed a sophisticated machinery for controlling any form of dissent and protest, as **previously documented by** Amnesty International. While state security officials often carry out **surveillance** and arbitrary detentions of critics, the Committee for the Defence of the Revolution (local members of the Communist Party who collaborate with state officials and law enforcement agencies) also provide the state with information about, what is considered, "counter-revolutionary activity." "Acts of repudiation" – demonstrations led by government supporters with the alleged participation of state security officials – are also commonplace and aimed at harassing and intimidating government critics.

While communication with Cuba remains stunted due to internet interference, Justicia J11, a group established following the crackdown on protesters in July 2021 – has **reported** 26 detentions since 30 September, mostly of young people and artists, 19 of whom they reported remained in detention as of 4 October 2022.

Cuban authorities criminalized nearly all those who participated in the protests in July 2021, including some children, but flatly denied any human rights violations, and placed the blame for the economic situation almost exclusively on the US economic embargo. Similarly, on 2 October 2022, **President Díaz-Canel** downplayed the widespread nature of the latest protests and suggested that a minority of "counter-revolutionaries" with connections outside Cuba, had carried out "acts of vandalism such as blocking roads or throwing rocks" and would be dealt with with the "force of the law."

## Background

Following the passage of hurricane Ian, the electricity has been cut in multiple parts of the island, adding to the frequent electricity outages in recent months. NASA night-time light data **showed** a significant decrease in lights between 23 September, before the passing of Ian, and after, on 30 September.

Electricity outages have exacerbated violations of economic and social rights in the country, as in recent months Cubans have had to line up for many hours to buy food and other necessities, in the context of widespread food shortages.

The recent protests have occurred just 14 months after the similar widespread protests on 11 July 2021, which were followed by a crackdown on dissent. Hundreds remain imprisoned for the 11 July protests, including three prisoners of conscience: artists Luis Manuel Otero Alcántara and Maykel Castillo Pérez, as well as leader of the non-

official opposition, José Daniel Ferrer García. Other prisoners of conscience named by Amnesty International **at the time** were released on the condition of going into exile.

## Topics

NEWS     AMERICAS     CENTRAL AMERICA AND THE CARIBBEAN     CUBA     PRESS RELEASE

CENSORSHIP AND FREEDOM OF EXPRESSION     DETENTION     INTERNET AND SOCIAL MEDIA

PRISONERS OF CONSCIENCE     PROTESTS AND DEMONSTRATIONS     UNLAWFUL DETENTION

## Related Content

COUNTRY
## Cuba

NEWS
## Five things you should know a year on from Cuba's 11 July protests

NEWS

## USA: Biden administration must reverse decision to expand Title 42

NEWS

## USA: Biden administration must not detain Haitian asylum seekers at Guantánamo

NEWS

## Cuba: New criminal code is a chilling prospect for 2023 and beyond

*'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future*
The pandemic and tougher U.S. sanctions have decimated Cuba's economy, prompting the biggest migration since Fidel Castro rose to power.



Roger García Ordaz has tried to leave Cuba for the United States 11 times. "Of course I am going to keep on throwing myself into the sea until I get there," he said.Credit...Eliana Aponte Tobar for The New York Times

**By Ed Augustin and Frances Robles**
Published Dec. 10, 2022Updated Dec. 12, 2022
Leer en español
**Sign up for the Russia-Ukraine War Briefing.** Every evening, we'll send you a summary of the day's biggest news. Get it sent to your inbox.

BARACOA, Cuba — Roger García Ordaz makes no secret of his many attempts to flee.
He has tried to leave Cuba 11 times on boats made of wood, Styrofoam and resin, and has a tattoo for each failed attempt, including three boat mishaps and eight times picked up at sea by the U.S. Coast Guard and sent home.

Hundreds of homemade, rickety boats have left this year from the shores of Baracoa, a fishing village west of Havana where Mr. García, 34, lives — so many that locals call the town "Terminal Three."

"Of course I am going to keep on throwing myself into the sea until I get there," he said. "Or if the sea wants to take my life, so be it."

Living conditions in Cuba under Communist rule have long been precarious, but today, deepening poverty and hopelessness have set off the largest exodus from the Caribbean island nation since Fidel Castro rose to power over half a century ago.

The country has been hit by a one-two-punch of tighter U.S. sanctions and the Covid-19 pandemic, which eviscerated one of Cuba's lifelines — the tourism industry. Food has become even more scarce and more expensive, lines at pharmacies with scant supplies begin before dawn and millions of people endure daily hourslong blackouts.

Over the last year, nearly 250,000 Cubans, more than 2 percent of the island's 11 million population, have migrated to the United States, most of them arriving at the southern border by land, according to <u>U.S. government</u> data.

Image



Hundreds of homemade, rickety boats have left this year from the shores of Baracoa, a fishing village in Artemisa Province west of Havana.Credit...Eliana Aponte Tobar for The New York Times

Even for a nation known for mass exodus, the current wave is remarkable — larger than the 1980 Mariel boatlift and the 1994 Cuban rafter crisis combined, until recently the island's two biggest migration events.

But while those movements peaked within a year, experts say this migration, which they compare to a wartime exodus, has no end in sight and threatens the stability of a country that already has one of the hemisphere's oldest populations.

The avalanche of Cubans leaving has also become a challenge for the United States. Now one of the highest sources of migrants after Mexico, Cuba has become a top contributor to the crush of migrants on the U.S.-Mexico border, which has been a major political liability for President Biden and which the administration considers a serious national security issue.

"The numbers for Cuba are historic, and everybody recognizes that," said a senior State Department official who was not authorized to speak publicly about the matter. "That said, more people are migrating globally now than they ever have been and that trend is certainly bearing out in our hemisphere, too."

Many experts say that U.S. policy toward the island is helping fuel the very migration crisis that the administration is now struggling to address.

To appeal to Cuban American voters in South Florida, the Trump administration discarded President Barack Obama's policy of engagement, which included restoring diplomatic relations and increasing travel to the island. President Donald J. Trump replaced it with a "maximum pressure" campaign that ratcheted up sanctions and severely limited how much cash Cubans could receive from their families in the United States, a key source of revenue.

Image



A group of Cuban migrants being processed by the Border Patrol in July after crossing into the United States in Yuma, Arizona. Over the last year, nearly 250,000 Cubans have migrated to the United States.Credit...Adriana Zehbrauskas for The New York Times

"This is not rocket science: If you devastate a country 90 miles from your border with sanctions, people will come to your border in search of economic opportunity," said Ben Rhodes, who served as deputy national security adviser under Mr. Obama and was the point person on talks with Cuba.

Although President Biden has begun to retreat from some of Mr. Trump's policies, he has been slow to act for fear of angering the Cuban diaspora and incurring the wrath of Senator Robert Menendez, a Democrat and a powerful Cuban American who chairs the Senate Foreign Relations Committee, said William M. LeoGrande, a professor at American University, who has written extensively on U.S.-Cuba relations.

The administration has also expressed concerns over human rights on the island following the Cuban government's crackdown on massive protests last year.

"These two reasons — one domestic politics and one foreign policy — reinforce one another," Mr. LeoGrande said.

While any significant rollback of sanctions remains off the table, the two governments are engaged in efforts to address the extraordinary migration surge.

Washington recently announced that it would restart consular services in Havana in January and issue at least 20,000 visas to Cubans next year in line with longstanding agreements between the two nations, which officials hope will dissuade some people from trying to make dangerous journeys to the United States.

Havana has agreed to resume accepting flights from the United States of Cubans who are deported, another move to try to discourage migration. The Biden administration has also reversed the cap on money that Cuban Americans are allowed to send to relatives and licensed a U.S. company to process the wire transfers to Cuba.

The Cuban government has long blamed Washington's sanctions and a decades-old trade embargo for crippling the country's economy and pushing people off the island, and says a law in place since 1966 that gives most Cubans who meet certain criteria a fast track to residency is a key reason for migration surges.

The law essentially assumes that all Cubans are political refugees who need protection, but has been widely criticized for giving them privileges that are not provided to any other nationality. But Cuba also has a long history of using migration to rid the nation of those it considers malcontents. When political unrest grew, Fidel Castro would publicly bid the agitators — he called them "degenerates" and "worms" — good riddance.

Some 3,000 people left from the port of Camarioca in 1965, and 125,000 departed from Mariel in 1980. In 1994, street protests led to an exodus of about 35,000 people, who washed up on Florida shores on inner tubes and rickety vessels.
Image



American Marines helped a young Cuban child from a boat in Key West in 1980 during the Mariel boatlift. Credit...Fernando Yovera/Associated Press

Cuba's free fall has been accelerated by the pandemic: Over the last three years, Cuba's financial reserves have dwindled, and it has struggled to stock store shelves. Imports — largely food and fuel — have dropped by half. The situation is so dire that the government electric company boasted this month that electrical service had run uninterrupted that day for 13 hours and 13 minutes.

Last year, fed up by the economic decline and a lack of freedom compounded by a Covid-19 lockdown, tens of thousands of Cubans took to the streets in the biggest antigovernment protests in decades. A crackdown followed, with nearly 700 people still imprisoned, according to a Cuban human rights group.

Cubans of fewer means try to leave by building makeshift boats, and at least 100 have died at sea since 2020, according to the U.S. Coast Guard. The Coast Guard has intercepted nearly 3,000 Cubans at sea in the past two months alone.

But these days most Cuban migrants fly off the island, with relatives abroad often paying the airfare, followed by a tough overland journey. (Cuba lifted an exit visa requirement to leave by air a decade ago, though it is still illegal to leave by sea.)

The floodgates opened last year, when Nicaragua stopped requiring an entrance visa for Cubans. Tens of thousands of people sold their homes and belongings and flew to Managua, paying smugglers to help them make the 1,700-mile journey by land to the U.S. border.

Katrin Hansing, an anthropologist at the City University of New York who is on sabbatical on the island, noted that the soaring migration figures do not account for the thousands who have left for other countries, including Serbia and Russia.

"This is the biggest quantitative and qualitative brain drain this country has ever had since the revolution," she said. "It's the best and the brightest and the ones with the most energy." The departure of many younger, working-age Cubans augurs a bleak demographic future for a country where the average life expectancy of 78 is higher than for the rest of the region, experts said. The government already can barely afford the meager pensions the country's older population relies on.

The hemorrhaging of Cubans from their homeland is nothing short of "devastating," said Elaine Acosta González, a research associate at Florida International University. "Cuba is depopulating."

Just a few years ago, the country's future seemed far different. With the Obama administration loosening restrictions on travel to Cuba, American tourists pumped dollars into the island's fledgling private sector.

Now, travel is again severely limited and years of economic downturn have for many Cubans extinguished the last embers of optimism.

Joan Cruz Méndez, a taxi driver who has tried to leave three times, looked out to the sea in Baracoa and explained why so many boats that once lined the town's shores are gone, along with their owners.

Image



Joan Cruz Méndez has tried to leave Cuba three times. "I think a large part of the population has lost hope," he said.Credit...Eliana Aponte Tobar for The New York Times

"The last thing you can lose is hope, and I think a large part of the population has lost hope," said Mr. Cruz, recounting how he had once made it out 30 miles to sea only to be forced to turn back, because too many people onboard got seasick and vomited.

In March, Mr. Cruz, 41, bought a plane ticket for his wife to fly to Panama and tapped his savings to pay a smuggler $6,000 to get her to the United States, where she claimed political asylum. She is working at an auto-parts store in Houston.

In the woods just beyond the town, people were busy building more boats, stripping motors from cars, electric generators and lawn mowers.

When the sea is calm, they wait for the local Cuban Coast Guard contingent to clock off its shift, before carrying the makeshift vessels on their shoulders through town and over craggy rocks before lowering them gently into the water.

In May, Yoel Taureaux Duvergel, 32, and his wife, Yanari, who was five months pregnant with their only child, and four others set out in the wee hours. But their motor broke. They started

rowing, but were intercepted by the U.S. Coast Guard just a few miles from the United States and taken back to Cuba, where Mr. Taureaux tries to get by doing odd jobs.

Image



Yoel Taureaux Duvergel and his wife tried to flee Cuba in May, but were turned back by the U.S. Coast Guard.Credit...Eliana Aponte Tobar for The New York Times

Asked why he had tried to leave, he laughed. "What do you mean why did I want to leave?" he said. "Don't you live in the Cuban reality?"

He intends to try again. "Once you start, you can't stop," he said.

Sitting beside him, Maikol Manuel Infanta Silva, 19, had sold his family's refrigerator to build a boat that sank. He, too, will try again.

By law, he is supposed to be serving in the military, but he fled and tries to make a living catching fish with a harpoon.

In Cuba, he said, "everything keeps getting worse."

  

**Menu**    🔍                                           💻 **Watch Now**

Quick links... ▼

KGUN 9 ON YOUR SIDE  ›  NEWS  ›  **LOCAL NEWS**          

# Local migrant shelter reaching max capacity as it receives hundreds per day

*Posted: 3:00 PM, Sep 22, 2022  Updated: 11:42 AM, Sep 23, 2022*

 By: Denelle Confair



Casa Alitas is reaching max capacity.



Cuba AR_001272



TUCSON, Ariz. — A local migrant shelter may soon have to turn away migrants as they near capacity. That could mean Border Patrol will start to have to do community releases for migrants in their custody.

The influx the shelter has been seeing is putting a strain on their resources. Shelter workers describe the increased numbers as hectic and are hoping for relief.

Recent Stories from kgun9.com



"Unfortunately, the reality is that's increased our numbers past the point that Alitas is able to welcome all of these folks and it could result in straight releases here in Tucson," said Executive Director of Casa Alitas Teresa Cavendish.

Several buses were seen dropping off an upwards of 50 people at the Tucson shelter on Thursday.

At Casa Alitas, they are given COVID tests along with food, water and travel arrangements but with the influx of guests, workers say they just can't keep up.

Cuba AR_001273

"We're tapped out on how many we can receive safely, where it is safe for both our guests, for our volunteers and for our staff. And so anything in excess of our maximum numbers are what they call community releases," explained Cavendish.

For the past three weeks, she says they have been receiving about 400 to 450 migrants a day. The shelter usually receives an average of 300 guests a day.

From men and women to infants, some may start to be turned away. Despite the challenges, volunteers here just do what they can, for the people they can help.

"All of us somewhere in our background. Most likely grandparents more than anything are coming from Europe after World War II or God only knows where," said Laurence Olivier, a volunteer at Casa Alitas.

Casa Alitas is in need of volunteers, as well as supplies such as clothing and toiletries. For more information on donating, check out the Casa Alitas website.

———-

**Denelle Confair** *is an anchor and investigative reporter for KGUN 9. It's been her dream to tell your stories for the past decade. She is extremely curious and wants to continue to use her storytelling for the greater good. Share your story ideas and important issues with Denelle by emailing* **denelle.confair@kgun9.com** *or by connecting on Facebook, and Twitter.*



Scripps Local Media
© 2022 Scripps Media, Inc

*Give Light and the People Will Find Their Own Way*

News    Weather    Traffic    You Ask. We Investigate.™    Support

Sitemap    Privacy Policy    Privacy Center
Journalism Ethics Guidelines    Terms of Use    EEO    Careers
KGUN FCC Public File    KWBA FCC Public File
FCC Application    Public File Contact    Accessibility Statement
Closed Captioning Contact

Cuba AR_001274

Cuba AR_001275

Case 6:23-cv-00007    Document 92-5    Filed on 03/24/23 in TXSD    Page 153 of 263

MORE FROM HOMEPAGE

‹    What we know about the storm and tornadoes that ripped through North Texas

What Texas coach Rodr
Longhorns    ›

NEWS

# Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock'

Mexico will ask the Biden administration to strengthen policies for resettling migrants in the U.S. and foster economic development in the migrants' homelands.



Migrants travelling in a caravan of more than a thousand people from countries such as Nicaragua, Peru, Ecuador, Colombia, Venezuela and the Dominican Republic cross the Rio Bravo river (or Rio Grande river, as it is called in the US) to ask for political asylum in the United States, in Ciudad Juarez, Chihuahua state,

Cuba AR_001276

Mexico, on December 11, 2022. (Photo by HERIKA MARTINEZ / AFP) (Photo by HERIKA MARTINEZ/AFP via Getty Images) (HERIKA MARTINEZ / AFP via Getty Images)



By [Alfredo Corchado](#)
6:00 AM on Dec 13, 2022 CST

Listen to this article now
Powered by **Trinity Audio**

00:00                                    05:21

MEXICO CITY — A senior Mexican official said his country stands ready to work with the Biden administration when a pandemic-related public health order lifts later this month — but if, and only if, the U.S. agrees to fundamental steps, including strengthening policies for resettling migrants in the U.S. and fostering economic development in the migrants' homelands.

In an interview with *The Dallas Morning News*, Roberto Velasco, a top diplomat and Mexico's chief officer for the North America Unit at the Mexican Secretariat of Foreign Affairs, described negotiations with the U.S. as "intense" and "round-the-clock."



**FEATURED ON DALLAS NEWS**

**Dallas Cowboys make a visit to Children's Medical Center**

Dallas Cowboys

The ongoing negotiations between officials from both countries come as more than 1,500 migrants made their way from Ciudad Juárez to El Paso on Sunday,

Cuba AR_001277

after some said they escaped or were rescued by Mexican federal forces from a cell controlled by members of organized crime.

The weekend's surge comes as U.S. and Mexican officials prepare for an increased migrant flow in anticipation of the Dec. 21 lifting of Title 42, the public health order that allows U.S. border agents to expel migrants without giving them a chance to apply for asylum under the justification that it was for pandemic safety.

A federal judge has ordered the end of Title 42, although the Biden administration has said it plans to appeal, it's not clear what the Biden administration's plans are after the lifting of the public health order.



Migrants travelling in a caravan of more than a thousand people from countries such as Nicaragua, Peru, Ecuador, Colombia, Venezuela and the Dominican Republic crossed the Rio Bravo (or Rio Grande, as it is called in the U.S.) to ask for political asylum in the United States in Ciudad Juarez, Chihuahua state, Mexico, on Dec. 11, 2022. (Photo by HERIKA MARTINEZ/AFP via Getty Images) (HERIKA MARTINEZ / AFP via Getty Images)

An average of about 2,400 people are turning themselves in daily to agents of the U.S. Border Patrol in El Paso. Migrants from Latin America — including Peru,

Cuba AR_001278

Nicaragua, Colombia, Ecuador and Venezuela — are crossing the Rio Grande and turning themselves in to agents at a processing center on the U.S. side.

> **Related: Holding onto their dream, a Venezuelan family finds jobs at the Texas-Mexico border**

To relieve pressure on the overcrowded processing center, migrants are being flown to Border Patrol locations in other regions — including the remote Big Bend area, according to U.S. Customs and Border Protection, or CBP. Between three to five flights a day depart from El Paso, according to CBP.

The drama plays out as Homeland Security Secretary Alejandro N. Mayorkas is expected to visit El Paso on Tuesday for a previously planned trip.

> **Related: On a cold riverbank at U.S.-Mexico border, migrants endure limbo as U.S. policy shifts**

It's the chaotic situation on the border that Velasco said the Mexican government wants to avoid. He said he expects the U.S. to seek help from its neighbor to take more migrants, yet declined to elaborate, describing the issue as "sensitive" and "delicate."

Velasco said any scenario where Mexico collaborates with the U.S. after the lifting of Title 42 must have these conditions:

- An expansion of a new humanitarian parole program to apply for asylum in the U.S. without have to traverse Mexico, a journey that's costly and dangerous.

- Efforts to continue the diplomatic dialogue with countries that have poor to no diplomatic ties to the U.S. — like Cuba and Venezuela. These are countries with high numbers of migrants coming to North America often because of U.S. sanctions.

- Stronger policies for resettling migrants across the Americas.

- A strategy for fostering economic development in the migrants' homelands with the hope of stemming migration.

Since late summer, El Paso has become ground zero for migration, with 53,000 encounters recorded by Border Patrol agents in October. A similar number is expected in November, according to the U.S. Border Patrol. Federal agents have recorded a record number of encounters along the entire southern border, more than 2.2 million, in a year.

Mexico plays an outsize influence in the migration flow, as the U.S. is limited in how to manage its ability to expel migrants to countries it has no diplomatic ties with. This is the case for Nicaraguans, the latest group that has put the U.S. in a difficult spot. Mexico won't take them, forcing U.S. immigration authorities to release the migrants with tracking devices to await a court hearing.



Migrants gathered along the banks of the Rio Grande after turning themselves in to U.S. immigration authorities on Wednesday, Nov. 16, 2022, in El Paso.  (Luis Torres / The Dallas Morning News)

Last October, the U.S. and Mexico agreed on a plan that allows some Venezuelan migrants to enter the U.S. legally without having to set foot in Mexico. Under the

Cuba AR_001280

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 158 of 263

plan, migrants were able to apply for humanitarian visas online. A cap was set at 24,000. The idea behind the plan is to ease pressure at the U.S.-Mexico border, Velasco said. More than 6 million people have left Venezuela in the past five years.

"We believe the model we used with Ukrainians and Venezuelans has worked very successfully," said Velasco. "It's a more realistic and creative approach. In essence, we look to create real pathways for a more orderly, safe and regular migration, in contrast with traveling through Mexico and Central America.

"The results are clear: The new pathways work well and irregular migration has very significantly shrunk," he said, adding that the number of Venezuelans entering Mexico has plummeted significantly, from 4,000 to daily to less than 200.

*Angela Kocherga, news director of KTEP public radio, and freelance journalist Luis Torres contributed to this report from Ciudad Juárez.*

> **Related:**  **This affluent city in Mexico has become a waystation for migrants with eyes on Texas**

   

  [Alfredo Corchado](). Alfredo Corchado has covered U.S.-Mexico issues for The News since 1993. A graduate of UTEP, he's also reported from Washington and Cuba. Before the News, Corchado reported at El Paso Herald-Post & The Wall Street Journal in Dallas and Philadelphia. He's author of Midnight in Mexico and Homelands.

 acorchado@dallasnews.com   f /ajcorchado    @ajcorchado

**District Of Columbia Homeowners To Get Old Roofs Replaced (See If You Qualify Here)**

Cuba AR_001281

consumertrustalliance.com | Sponsored

**New Sleep Patch Technology Has Taken The Sleep Industry By Storm**

Zleep | Sponsored                                                    Learn More

**New 4K HD Drone Drops To 50% Off And Takes America By Storm**

Daily Gadget Finds | Sponsored

**If You Used Baby Powder & Have Cancer, You Might Be In For A Large Cash Settlement**

Classactions Together | Sponsored

**Download PDF (Free)**
File Size: 1.2MB. OS: Windows - Convert PDF

PDF Hub | Sponsored

**Prime Is Now $139, But Few Know This Saving Trick**
Amazon Prime has millions of subscribers, but only few know about this amazing savings trick!

ExpertsInMoney.co | Sponsored

**Pizza brings people together, so fire up the love this Season with a Ooni Pizza Oven**

Ooni Pizza Ovens | Sponsored                                         Learn More

**Washington: Unsold SUVs Under $4,000 (Deal of the Day)**
Perform A Simple Search On The Next Page To See Deals

CarsGenius | Sponsored                                               Search Now

## I ORDERED TWO $70.98 MIXED TOOL PALLET UNBOXING: RETAIL VALUE WAS INSANE!!

KIROUSSI | Sponsored

**Buy Now**

## The Killer New Cadillacs Will Leave You Breathless

**Cadillac SUVS | Search Ads** | Sponsored

Cuba AR_001283

**LOCAL NEWS**

# More than 180 people rescued from overloaded vessel in Florida Keys

**BY ASHLEY COX**
NOVEMBER 22, 2022 / 7:09 PM / CNN



crews rescued 22 people off an overloaded sailing vessel after a good Sam reported it to Sector KeyWest watchstanders @ 5 am, Mon, off Rodriguez Key. Rescue crews are battling 6-10 ft seas, 25 mph winds to safely remove the people from the vessel.UNKNOWN

FLORIDA KEYS. (CNN) -- More than 180 people were rescued from an overloaded boat early Monday in the Florida Keys, according to the US Coast Guard and the US Border Patrol.

Some 18 Haitian migrants "who were trapped in dangerous ocean currents while attempting to swim to shore" also were rescued by federal, state and local law enforcement, US Border Patrol Chief Patrol Agent Walter Slosar said Tuesday on Twitter.

Cuba AR_001284

More than 180 rescued people are aboard a cutter, Coast Guard spokesperson Nicole Groll said Tuesday.

Groll said everyone is believed to have been rescued after the migrants were trapped in dangerous ocean currents. No deaths have been reported, Groll said.

The migrants are being processed and, once officials are done speaking to everyone, authorities will have a better idea of what the next steps will be for them, according to Groll.

As the vessel hit the sand bar off Whale Harbor, there were "reports of people in the water and our land partners are on scene," the Coast Guard Southeast said in a tweet on Monday. Rescue efforts were launched, the Coast Guard said.

Conditions were rough for rescue crews, with 6- to 10-foot seas and winds of 25 mph, the Coast Guard told CNN. Whale Harbor is in Islamorada, in the Upper Florida Keys.

Clothing, pots, backpacks and life jackets could be seen on the vessel, photos from a CNN team on the ground show.

The rescue operations began when a good Samaritan reported the vessel to the Key West watch standers at 5 a.m., the Coast Guard said in a tweet.

On Sunday, the Coast Guard said at least five people died after a homemade vessel capsized near Florida's Little Torch Key. Nine people were rescued from the vessel, according to the agency.

Authorities had nearly 7,000 encounters with Haitian migrants in Florida in October, compared to just 1,188 in October 2021, according to US Customs and Border Patrol data. The agency reported nearly 57,000 encounters with Haitian migrants in Florida in 2022, an increase from nearly 49,000 the prior year.

The-CNN-Wire™ & © 2022 Cable News Network, Inc., a Warner Bros. Discovery Company. All rights reserved.

[More than 180 people rescued from overloaded vessel in Florida Keys - CW Tampa (cbsnews.com)](cbsnews.com)

US court rejects maintaining COVID-19 asylum restrictions | wtol.com

**NATION WORLD**

# US court rejects maintaining COVID-19 asylum restrictions

Migrants are waiting for the end of a public-health rule known as Title 42, which has left some biding time in Mexico waiting to seek asylum.



**BREAKING NEWS**   Jan. 6 panel recommends criminal charges for Trump **Read More »**

Author: **GIOVANNA DELL'ORTO (Associated Press)**
Published: **6:48 PM EST December 16, 2022**
Updated: **7:55 PM EST December 16, 2022**

 

EL PASO, Texas — Restrictions that have prevented hundreds of thousands of migrants from seeking asylum in the U.S. in recent years remained on track to expire in a matter of days after an appeals court ruling Friday, as thousands more migrants packed shelters on Mexico's border with the U.S.

The ruling from the D.C. Circuit Court of Appeals means the restrictions known as Title 42 are still set to be lifted Wednesday, unless further appeals are filed.

A coalition of 19 Republican-leaning states were pushing to keep the asylum restrictions put in place by former President Donald Trump at the start of the coronavirus pandemic. Migrants have been denied rights to seek asylum under U.S. and international law 2.5 million times since March 2020 on grounds of preventing the spread of COVID-19. The public-health has left some migrants biding time in Mexico.

Cuba AR_001286

Advocates for immigrants had argued that the U.S. was abandoning its longstanding history and commitments to offer refuge to people around the world fleeing persecution, and sued to end the use of Title 42. They've also argued the restrictions were a pretext by Trump for restricting migration, and in any case, vaccines and other treatments make that argument outdated.

A judge last month sided with them and set Dec. 21 as the deadline for the federal government to end the practice. Conservative states trying to keep Title 42 in place had pushed to intervene in the case. But a three-judge panel on Friday night rejected their efforts, saying the states had waited too long. Louisiana's Attorney General expressed disappointment with the decision and said they would appeal to the Supreme Court.

Border cities, most notably El Paso, Texas, are facing a daily migrant influx that the Biden administration expects to grow if asylum restrictions are lifted. Tijuana, the largest Mexican border city, has an estimated 5,000 people in more than 30 shelters, Enrique Lucero, the city's director of migrant affairs said this week.

In Reynosa, Mexico, near McAllen, Texas, nearly 300 migrants — mostly families — crammed into the Casa del Migrante, sleeping on bunk beds and even on the floor.

Rose, a 32-year-old Haitian, has been in the shelter for three weeks with her daughter and 1-year-old son. Rose, who did not provide her last name because she fears it could jeopardize her safety and her attempts to seek asylum, said she learned on her journey of possible changes to U.S. policies. She said she was happy to wait a little longer in Mexico for the lifting of restrictions that were enacted at the outset of the pandemic and that have become a cornerstone of U.S. border enforcement.

"We're very scared, because the Haitians are deported," said Rose, who is worried any mistakes in trying to get her family to the U.S. could get her sent back to Haiti.



*Credit: AP*

FILE - Migrants wait to cross the U.S.-Mexico border from Ciudad Juárez, Mexico, next to U.S. Border Patrol vehicles in El Paso, Texas, Wednesday, Dec. 14, 2022. A federal judge on Thursday temporarily blocked the Biden administration from ending a Trump-era policy requiring asylum-seekers to wait in Mexico for hearings in U.S. immigration court. (AP Photo/Christian Chavez, File)

Cuba AR_001287

Inside Senda de Vida 2, a Reynosa shelter opened by an evangelical Christian pastor when his first one reached capacity, about 3,000 migrants are living in tents pitched on concrete slabs and gravel. Flies swarm everywhere under a hot sun beating down even in mid-December.

For the many fleeing violence in Haiti, Venezuela and elsewhere, such shelters offer at least some safety from the cartels that control passage through the Rio Grande and prey on migrants.

In McAllen, about 100 migrants who avoided asylum restrictions rested on floor mats Thursday in a large hall run by Catholic Charities, waiting for transportation to families and friends across the U.S.

Gloria, a 22-year-old from Honduras who is eight months pregnant with her first child, held onto a printed sheet that read: "Please help me. I do not speak English." Gloria also did not want her last name used out of fear for her safety. She expressed concerns about navigating the airport alone and making it to Florida, where she has a family acquaintance.



Credit: AP

A migrant sits by his tent inside the Senda de Vida 2 shelter in Reynosa, Mexico, Thursday, Dec. 15, 2022. Nearly three thousand people cram inside the vast compound of tents over cement or gravel by the Rio Grande, steps from the border with the United States, and many more line up outside hoping to come in to relatively safety from the cartels that prey on migrants. (AP Photo/Giovanna Dell'Orto

Andrea Rudnik, co-founder of an all-volunteer migrant welcome association in Brownsville, Texas, across the border from Matamoros, Mexico, was worried about having enough winter coats for migrants coming from warmer climates.

"We don't have enough supplies," she said Friday, noting donations to Team Brownsville are down.

Title 42, which is part of a 1944 public health law, applies to all nationalities but has fallen unevenly on those whom Mexico agrees to take back — Guatemalans, Hondurans, El Salvadorans and, more recently, Venezuelans, in addition to Mexicans. Illegal border crossings of single adults dipped in November, according to a Justice Department court filing released Friday, though it gave no explanation for why. It also did not account for families traveling with young children and children traveling alone.

Cuba AR_001288



Credit: AP

People line up inside and outside the migrant welcome center across from the bus station in Brownsville, Texas, on Friday, Dec. 16, 2022. Volunteers from Team Brownville at the center handed out food and necessities, like toothpaste and socks, to migrants that U.S. officials detained and released across the street. Most of Friday's group said they were from Nicaragua, with a few from the Dominican Republic. (AP Photo/Giovanna Dell'Orto)

According to the filing, Border Patrol agents stopped single adults 143,903 times along the Mexican border in November, down 9% from 158,639 times in October and the lowest level since August. Nicaraguans became the second-largest nationality at the border among single adults after Mexicans, surpassing Cubans.

Venezuelan single adults were stopped 3,513 times by Border Patrol agents in November, plunging from 14,697 a month earlier, demonstrating the impact of Mexico's decision on Oct. 12 to accept migrants from the South American country who are expelled from the U.S.

Mexican single adults were stopped 43,504 times, down from 56,088 times in October, more than any other nationality. Nicaraguan adults were stopped 27,369 times, up from 16,497. Cuban adults were stopped 24,690 times, up from 20,744.

In a related development, a federal judge in Amarillo, Texas, ruled Thursday that the Biden administration wrongly ended a Trump-era policy to make asylum-seekers wait in Mexico for hearings in U.S. immigration court. The ruling had no immediate impact but could prove a longer-term setback for the White House.

White House spokesman Abdullah Hasan said immigration laws would continue to be enforced at the border and the Biden administration would work to expand legal pathways for migrants but discourage "disorderly and unsafe migration."

Cuba AR_001289

"To be clear: the lifting of the Title 42 public health order does not mean the border is open," he said. "Anyone who suggests otherwise is doing the work of smugglers spreading misinformation to make a quick buck off of vulnerable migrants."



**Related Articles**

[Pentagon has received 'several hundreds' of new UFO reports](#)

[Brittney Griner issues first statement since release from Russian prison](#)

**If You Need To Kill Time On Your Computer, You Have to Play this Relaxing Game. No Install.**

Rise of Cultures: Kingdom game | Sponsored

**Why This $1.2 Trillion Market Was Overlooked and Now Beating Gold and Other Popular Assets**

While investors usually hold 15% to 28% of precious metals, with this commodity, that share is only 1%. Once inaccessible, the trillion dollar natural resource can be owned as a physical and digital asset.

Diamond Standard | Sponsored

**Download 16,000 Woodworking Plans and Projects**

Tafizz | Sponsored

**This Exciting Travel Destination Might Surprise You - It Is Warm And Sunny Almost All Year Long**

Ministry of Tourism | Sponsored

**NFL Coaches' and Staff's Favorite Shoes**

Cuba AR_001290

All day comfort for your feet. Unique high performance running shoe technology meets classic styling.

**Custom Suits, Shirts & Menswear. Quality Made to Measure creations at an affordable price.**
Quality Made To Measure Mens Clothing.
**TheSuitGuy** | Sponsored

**Christ the King principal placed on leave due to allegation against him**
WTOL

**Loose mink in Van Wert County continue to cause problems**
WTOL

LOADING NEXT ARTICLE...

.

Cuba AR_001291



# The New Era of Mexican Migration to the United States

Jorge Durand; Douglas S. Massey; Emilio A. Parrado

*The Journal of American History*, Vol. 86, No. 2, Rethinking History and the Nation-State: Mexico and the United States as a Case Study: A Special Issue. (Sep., 1999), pp. 518-536.

Stable URL:
http://links.jstor.org/sici?sici=0021-8723%28199909%2986%3A2%3C518%3ATNEOMM%3E2.0.CO%3B2-H

*The Journal of American History* is currently published by Organization of American Historians.

Your use of the JSTOR archive indicates your acceptance of JSTOR's Terms and Conditions of Use, available at http://www.jstor.org/about/terms.html. JSTOR's Terms and Conditions of Use provides, in part, that unless you have obtained prior permission, you may not download an entire issue of a journal or multiple copies of articles, and you may use content in the JSTOR archive only for your personal, non-commercial use.

Please contact the publisher regarding any further use of this work. Publisher contact information may be obtained at http://www.jstor.org/journals/oah.html.

Each copy of any part of a JSTOR transmission must contain the same copyright notice that appears on the screen or printed page of such transmission.

JSTOR is an independent not-for-profit organization dedicated to creating and preserving a digital archive of scholarly journals. For more information regarding JSTOR, please contact support@jstor.org.

http://www.jstor.org/
Fri May  5 09:37:05 2006

# The New Era of Mexican Migration to the United States

Jorge Durand, Douglas S. Massey, and Emilio A. Parrado

The decade of the 1970s ended a long period of economic growth based on a development model applied widely in the years after World War II. The fundamental aim of this model was to create and sustain internal markets that could serve as springboards for broader economic growth. In industrial nations, governments employed regulation, spending, and monetary policies to generate consumer demand capable of supporting mass production and sustained growth. In developing nations, officials undertook large-scale spending and investment to generate income and eliminate bottlenecks in production; at the same time they erected barriers to the entry of foreign goods and services, thus creating internal demand that national producers—both public and private—could satisfy to initiate and sustain industrialization.

The promotion of economic development through these strategies instigated new migratory movements. In the developing world, much of the geographic mobility was internal, with high rates of rural-to-urban migration and rapid urbanization. In developed countries, domestic labor reserves were quickly exhausted, and foreign workers were imported to enable rapid economic growth without inflation. In Western Europe, for example, immigrant workers were initially recruited from culturally similar but less advantaged countries in the south, such as Spain, Italy, Portugal, and Greece, but by the 1960s these sources were tapped out and migrants from culturally dissimilar and much poorer nations in North Africa and the Middle East were recruited in their stead. By the early 1970s, a series of guest-worker agreements and bilateral treaties had brought hundreds of thousands of Turkish workers into Germany and large numbers of Algerians, Moroccans, and Tunisians into France.[1]

In the United States, foreign workers were imported under the aegis of the 1942 Bracero Accord, which over the next twenty-two years arranged for the recruitment

Jorge Durand is professor in the department for the study of social movements at the University of Guadalajara; Douglas S. Massey is the Dorothy Swaine Thomas Professor of Sociology at the University of Pennsylvania; and Emilio A. Parrado is assistant professor of sociology at Duke University.

[1] Samuel H. Preston, "Urban Growth in Developing Countries: A Demographic Reappraisal," *Population and Development Review,* 5 (June 1979), 195–216; Michael P. Todaro, *Internal Migration in Developing Countries: A Review of Theory, Evidence, Methodology, and Research Priorities* (Geneva, 1976). Charles P. Kindleberger, *Europe's Postwar Growth: The Role of Labor Supply* (Cambridge, Mass., 1967). Solon Ardittis, "Labour Migration and the Single European Market: A Synthetic and Prospective Note," *International Sociology* (Rome), 5 (no. 4, 1990), 461–74. Philip L. Martin, *The Unfinished Story: Turkish Labour Migration to Western Europe* (Geneva, 1991); Gildas Simon, *Géodynamique des migrations internationales dans le monde* (Geodynamics of global international migration) (Paris, 1995).

Cuba AR_001293

and importation of 4.6 million temporary workers from Mexico. When the program finally ended in 1964, the United States did not stop employing Mexican workers; it simply shifted from a de jure policy of active labor recruitment to a de facto policy of passive labor acceptance, combining modest legal immigration with massive undocumented entry. Despite successive amendments to the U.S. Immigration and Nationality Act (in 1965, 1976, 1978, and 1980) intended to restrict Mexican immigration, the number of legal immigrants rose from 38,000 in 1964 to 67,000 in 1986; and over the same period gross undocumented migration grew from 87,000 to 3.8 million entries per year.[2]

The postwar model of industrial growth based on internal market development came undone in the early 1970s, and over the course of the next decade it was progressively abandoned in favor of a new economic model based on international trade. In developed nations, production grew more capital intensive and markets fragmented as mass production methods gave way to just-in-time delivery, flexible accumulation, out-sourcing, and continuous flow manufacturing, all carried out on a global scale. In developing nations, state bureaucracies were slashed, government-owned firms were privatized, and tariff barriers were dismantled to expose formerly protected, insular economies to the full force of global competition.

These changes came earliest in Mexico's northern border region, where in the 1970s the government launched an ambitious industrialization program based on export processing.[3] Binational agreements were negotiated to create a special trade zone along the border within which companies could import unfinished inputs into Mexico, assemble them into final goods, and then reexport them back to the United States paying tax only on the value added (that is, the relatively small cost of labor inputs). Soon *maquila* factories were sprouting up in cities throughout northern Mexico, initiating a wave of rapid economic and demographic growth along the border.

This model of export-led development was ultimately expanded to embrace all of Mexico under presidents Miguel de la Madrid and Carlos Salinas de Gortari in the 1980s. First, Mexico joined the General Agreement on Tariffs and Trade in 1986 and then, in 1988, entered into negotiations with the United States and Canada to create a continent-wide free-trade zone.[4] These negotiations led to the implementation of the North American Free Trade Agreement (NAFTA) on January 1, 1994, creating an open market area extending from the Arctic Ocean to Central America.

The new economic order envisioned by NAFTA had different effects in different regions of Mexico. Along the northern border—especially within dynamic urban centers such as Tijuana, Mexicali, Ciudad Juarez, Nuevo Laredo, and Monterrey—

[2] Kitty Calavita, *Inside the State: The Bracero Program, Immigration, and the I.N.S.* (New York, 1992). Douglas S. Massey and Audrey Singer, "New Estimates of Undocumented Mexican Migration and the Probability of Apprehension," *Demography,* 32 (May 1995), 203–13; U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1990).

[3] Leslie Sklair, *Assembling for Development: The Maquila Industry in Mexico and the United States* (San Diego, 1993).

[4] Richard S. Belous and Jonathan Lemco, eds., *NAFTA as a Model of Development: The Benefits and Costs of Merging High- and Low-Wage Areas* (Albany, 1995); Maria de los Angeles Pozas, *Industrial Restructuring in Mexico: Corporate Adaptation, Technological Innovation, and Changing Patterns of Industrial Relations in Monterrey* (La Jolla, 1993).

free trade and closer ties with the United States brought economic expansion and continued high rates of growth, but interior cities were not so well positioned to compete globally and found themselves sinking further into poverty. For millions of Mexicans, economic restructuring under the neoliberal regime of President Salinas brought joblessness, hardship, neglect, and growing economic marginalization.[5]

Within economically marginalized regions of Mexico, especially, households were left with little more than a decision of whether to emigrate or revolt. It is no coincidence that the first popular armed uprising since the early 1940s occurred in Chiapas, a poor, predominantly rural, and heavily Indian state lacking a strong tradition of migration to the United States.[6] Without social ties connecting residents to work in the United States, the only feasible option for poor Chiapanecos was rebellion. However, in other states also characterized by high levels of marginalization, large Indian populations, and pervasive poverty—but with strong connections to the United States—sporadic guerrilla movements emerged but never evolved into mass popular uprisings (for example, in Guerrero, Oaxaca, and Michoacán). In these states, the inflow of migradollars mitigated the pressures for revolt and circumscribed the appeal of armed rebellion.

The expansion of the global economy also had serious consequences for the United States. After 1973, wages stagnated, unemployment rates rose, income inequality grew, and the distribution of wealth became progressively more skewed. During the 1970s and 1980s, economic insecurity was confined mainly to blue-collar workers; by the early 1990s, however, economic fears and anxieties had spread to white-collar workers as well, as computerization eliminated routine clerical tasks and corporate downsizing condensed successive layers of management. These structural changes coincided with a cyclical recession triggered by the end of the Cold War, a downturn that was especially pronounced in California.[7]

That state, of course, had long been the leading destination for Mexican migrants to the United States. In 1992, 62 percent of all Mexicans legally admitted for permanent residence intended to settle in California, and 60 percent of all undocumented migrants were located in this state. Although some argue that California's economic crisis would have been even more severe were it not for cheap Mexican labor, the coincidence of high immigration with rising income inequality, stagnat-

[5] Fernando Cortés, "La Evolución de la Desigualdad del Ingreso Familiar Durante la Década de los Ochenta" (Trends in family income during the 1980s), typescript, 1993, working paper, Centro de Estudios Sociológicos (El Colegio de México, Mexico, D.F.); Fernando Cortés and Rosa María Rubalcava, "El Ingreso Familiar: Su Distribución y Desigualdad 1984–1989" (Family income: Its distribution and inequality), *Demos: Carta Demográfica sobre México,* 5 (1992), 28–30.

[6] Rodolfo O. de la Garza and Gabriel Szekely, "Policy, Politics, and Emigration: Reexamining the Mexican Experience," in *At the Crossroads: Mexican Migration and U.S. Policy,* ed. Frank D. Bean et al. (Lanham, 1997), 201–26. George Collier, *Basta! Land and the Zapatista Rebellion in Chiapas* (Oakland, 1994).

[7] Sheldon Danziger and Peter Gottschalk, *America Unequal* (Cambridge, Mass., 1995); Edward N. Wolff, "The Rich Get Increasingly Richer: Latest Data on Household Wealth during the 1980s," in *Research in Politics and Society,* vol. V, ed. Richard E. Ratcliff, Melvin L. Oliver, and Thomas M. Shapiro (Greenwich, 1995), 33–68. Bennett Harrison, *Lean and Mean: The Changing Landscape of Corporate Power in the Age of Flexibility* (New York, 1994); Jeremy Rifkin, *The End of Work: The Decline of the Global Labor Force and the Dawn of the Post-Market Era* (New York, 1995).

ing wages, and widespread unemployment created a new politics of nativism.[8] Although it began in California, this nativist movement ultimately spread nation-wide and produced legislative and policy changes whose effects on immigration were modest but whose long-term consequences for both Mexico and the United States were far-reaching.

### The Road to the Immigration Reform and Control Act (IRCA)

In a 1985 speech intended to frame political debate for the 1986 congressional elections, President Ronald Reagan asserted that the United States had "lost control" of its borders to an "invasion" of illegal migrants. In doing so, he transformed undocu-mented immigration from a useful political issue (which it had always been) into a more fundamental question of national security. He thus moved the issue of border control out of the backwaters of the federal bureaucracy and into the realm of high politics. Henceforth immigrants were connected symbolically with invaders, crimi-nals, and drug smugglers, who were pictured as poised menacingly along a lightly defended two-thousand-mile frontier dividing the United States from Mexico and the poor masses of the Third World.

Posed as an issue of national security, undocumented migration by definition required immediate and forceful action. The most promising proposal for repelling the "invasion" came from a bill that had languished in the United States Congress for more than a decade. Reintroduced and cosponsored in 1985 by Sen. Alan Simp-son of Wyoming and Rep. Peter Rodino of New Jersey, the bill made its way through various congressional committees and reached the floor of both chambers in late 1986. With the midterm elections approaching, "doing something" about undocumented migration had become a popular cause and a hot political issue. The bill passed Congress in late October and was signed into law by President Reagan on the eve of the November elections.

The final bill, known as the Immigration Reform and Control Act (or IRCA), con-tained four key provisions: new resources were allocated to the United States Border Patrol for enforcement along the Mexico–United States border; sanctions were enacted to remove the lure of United States jobs by penalizing employers who know-ingly hired unauthorized workers; long-term undocumented residents were offered an amnesty (the so-called LAW, Legally Authorized Worker, program) to wipe the slate clean and secure the support of Latino and civil rights groups; and undocu-mented agricultural workers were offered a special legalization program (known as the Special Agricultural Worker program, SAW) to placate growers in Texas and Cali-fornia and earn their support.

Even though IRCA was enacted as a general change to immigration policy and did

---

[8] U.S. Immigration and Naturalization Service, *1992 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1993); Robert Warren, "Estimates of the Undocumented Immigrant Population Residing in the United States, by Country of Origin and State of Residence: October 1992," typescript, 1995, working papers, Statistical Branch (U.S. Immigration and Naturalization Service, Washington, D.C.). Katrina Burguess and Abraham F. Lowenthal, "Los Desafíos que Vienen del Sur" (Challenges from the south), in *La Conexión Méx-ico California,* ed. Abraham F. Lowenthal and Katrina Burguess (Mexico, D.F., 1995), 305–28.



Retablo of M. Esther Tapia Picón. Undated. Oil on Metal. The caption reads: We give
thanks to the Virgin of San Juan for saving us from the migration
authorities on our way to Los Angeles.
*From Jorge Durand and Douglas S. Massey,* Miracles on the Border *(Tucson, 1995).*

not single out any particular country for enforcement action, there is little doubt
that its primary purpose was to curb undocumented migration from Mexico.
Accordingly, immigrants from that country have borne the brunt of the law's conse-
quences: Mexicans constitute 70 percent of those granted amnesty under the LAW
program, 80 percent of those legalized under the SAW program, and 95 percent of
those apprehended by the Border Patrol since the bill's passage.

Although IRCA's primary purpose may have been to deter undocumented migrants,
it does not seem to have made much progress in meeting that goal.[9] Rather than slow-
ing down the rate of undocumented entry, IRCA seems only to have succeeded in
transforming a seasonal flow of temporary workers into a more permanent popula-
tion of settled legal immigrants. Indeed, more than any other factor, IRCA is respon-
sible for creating a new era in Mexican immigration to the United States and thus
transforming social, economic, and political conditions on both sides of the border.

[9] Shirley J. Smith, Roger G. Kramer, and Audrey Singer, *Characteristics and Labor Market Behavior of the Legal-
ized Population: Five Years Following Legalization* (Washington, 1996). Keith Crane et al., *The Effect of Employer
Sanctions on the Flow of Undocumented Immigrants to the United States* (Santa Monica, 1990); Katharine M.
Donato, Jorge Durand, and Douglas S. Massey, "Stemming the Tide? Assessing the Deterrent Effects of the
Immigration Reform and Control Act," *Demography,* 29 (May 1992), 139–57; Douglas S. Massey and Kristin E.
Espinosa, "What's Driving Mexico-U.S. Migration? A Theoretical, Empirical, and Policy Analysis," *American
Journal of Sociology,* 102 (Jan. 1997), 939–99.

Cuba AR_001297

New Era of Mexico–United States Migration                                         523

## The Great Transformation

The fact that so many Mexicans (2.3 million) took advantage of IRCA's legalization provisions reflects economic circumstances in Mexico as well as opportunities in the United States. The implementation of the SAW and LAW programs (during 1987–1989) coincided with a period of unusually severe inflation and unemployment in Mexico, as presidents de la Madrid and Salinas successively administered the harsh medicine of neoliberalism: balanced budgets, slashed spending, reduced wages, and downsized bureaucracies.[10] The resulting economic dislocations rendered the traditional alternative of returning to Mexico infeasible for many migrants working in the United States. In view of the weak economic conditions at home, migrants opted to remain abroad, accept the proffered legalization, and settle more permanently into a United States life.

IRCA thus dramatically altered the rhythms of seasonal migration back and forth across the border. Prior to 1986, most migrants sought to work abroad temporarily in order to manage risks and acquire capital for a specific goal or purchase. By sending one family member abroad for a limited period of foreign labor, households could diversify their sources of income (thus managing risks) and accumulate savings from their United States earnings (thus acquiring capital). In both cases, the fundamental objective was to return to Mexico. The various privations and sacrifices endured while working abroad were justified ultimately by the dream of a better life at home.

IRCA ruptured this dream in several ways. First, legalization offered migrants the prospect of a secure existence north of the border during a period of exceptional economic and political turmoil at home. The LAW program, in particular, virtually *required* undocumented migrants who had formerly circulated back and forth to remain in the United States until their petitions for legalization were resolved. As soon as the program was announced, all undocumented migrants with a potential claim for amnesty ceased circulating immediately and began preparing their petitions.[11]

Thus, some 461,000 Mexicans filed for legalization under the LAW program in 1987, followed by another 728,000 in 1988 and 41,000 in 1989. These people were joined by 106,000 SAW applicants in 1987, 544,000 in 1988, and 424,000 in 1989. Of the 2.3 million Mexicans who ultimately filed for legalization, most ceased crossing illegally in early 1987, and their removal from the seasonal flow of undocumented migrants caused a sharp reduction in the number of apprehensions in subsequent years. Indeed, arrests along the border fell from 1.6 million in 1986 to 830,000 in 1989, a decline of nearly 50 percent in just three years.[12]

---

[10] De los Angeles Pozas, *Industrial Restructuring in Mexico;* Miguel Angel Centeno, *Democracy within Reason: Technocratic Revolution in Mexico* (University Park, 1994).

[11] Jacqueline Maria Hagan, *Deciding to Be Legal: A Maya Community in Houston* (Philadelphia, 1994).

[12] U.S. Immigration and Naturalization Service, *1986 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1987); U.S. Immigration and Naturalization Service, *1987 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1988); U.S. Immigration and Naturalization Service, *1988 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1989); U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.* Thomas J. Espenshade, "Undocumented Migration to the United States: Evidence from a Repeated Trials Model," in *Undocumented Migration to the United States: IRCA and the Experience of the 1980s,* ed. Frank D. Bean, Barry Edmonston, and Jeffrey S. Passel (Washington, 1990), 159–82; Michael J. White, Frank D. Bean, and Thomas Espenshade, "The U.S. 1986 Immigration Reform and Control Act and Undocumented Migration to the United States," *Population Research and Policy Review,* 9 (May 1990), 93–116; U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.*

Even after being legalized, most Mexican migrants did not return home as frequently as before. For one thing, IRCA required them to remain in the United States and take classes in English and civics in order to obtain their permanent "green cards." Once permanent legal status was achieved, moreover, migrants who returned home were compelled to reenter the United States each year in order to maintain a bona fide status as legal resident aliens, and few families could afford to throw away the economic security represented by having legal residence papers.

Congress had intended legalization to wipe the slate clean, while employer sanctions and border enforcement were intended to prevent the entry of new undocumented immigrants, thus "solving" the problem of undocumented migration. In practice, however, IRCA's border controls and employer sanctions backfired. They did not deter undocumented Mexicans from heading northward or prevent them from crossing the border so much as they discouraged them from returning *home*.[13] Because migrants are at greatest risk while crossing the border, a buildup of enforcement resources there perversely creates strong incentives for undocumented migrants to stay put. Rather than returning home to face another risky crossing later on, migrants rationally chose to hang onto their jobs and settle into the expatriate Mexican community.

Figure 1 illustrates these various perverse effects by showing trends in the probability of returning to Mexico among migrants already in the United States. The probabilities were estimated from life histories complied for 3,166 migrant household heads enumerated in the Mexican Migration Project (MMP), which since 1982 has randomly sampled communities throughout Mexico and combined them with parallel surveys of out-migrants from those places who have settled in the United States, thus creating a representative database on documented and undocumented migration.[14] Further information on these data can be obtained from the MMP website: http://lexis.pop.upenn.edu/mexmig/.

We computed probabilities of returning to Mexico by following respondents year by year from the moment they entered the United States. We then counted up the number of return moves in each year and divided by the number of person-years spent in the United States. To smooth trends over time, we computed three-year moving averages. As figure 1 shows, the likelihood of returning home peaked in 1980, fell through 1986, and then plummeted to very low levels thereafter, remaining at historical lows through the 1990s. Throughout the 1990s, the probability of return migration hovered at just 10 percent to 11 percent.

[13] Wayne Cornelius, "Impacts of the 1986 U.S. Immigration Law on Emigration from Rural Mexican Sending Communities," *Population and Development Review*, 15 (Dec. 1989), 689–705; Donato, Durand, and Massey, "Stemming the Tide?"; Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"; Massey and Singer, "New Estimates of Undocumented Mexican Migration"; Audrey Singer and Douglas S. Massey, "The Social Process of Undocumented Border Crossing among Mexican Migrants," *International Migration Review*, 32 (Fall 1998), 561–92. Sherrie A. Kossoudji, "Playing Cat and Mouse at the U.S.-Mexican Border," *Demography*, 29 (May 1992), 159–80; Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"

[14] These data are described and evaluated in René Zenteno and Douglas S. Massey, "Especifidad versus Representatividad: Enfoques Metodológicos para el Estudio de la Migración Internacional" (Specificity versus representativeness: Methodological foci for the study of international migration), *Estudios Demográficos y Urbanos* (Mexico, D.F.), 14 (Jan. 1999), 75–116.

New Era of Mexico–United States Migration                    525



**Figure 1**
Trends in the Likelihood of Returning to Mexico, 1975–1993



Source: Mexican Migration Project Database (http://lexis.pop.upenn.edu/mexmig/), Population Studies Center, University of Pennsylvania.

As migrant household heads began settling and staying in the United States longer, they naturally sought to reunite with their wives and children, and IRCA consequently became a trigger for additional migration. Some of this new movement was legal, of course. In 1992, for example, 52,000 dependents of persons earlier legalized under IRCA were granted permanent residence, followed by another 55,000 in 1992 and 34,000 in 1994. But most of the post-IRCA movement for family reunification was illegal, averaging perhaps 300,000 persons per year. One study found that having a newly legalized migrant in the family increased the probability of undocumented migration by a factor of seven.[15]

IRCA thus unleashed an intense process of family reunification involving the parents, spouses, children, and siblings of recently legalized immigrants. In doing so, it substantially feminized and urbanized the population of migrants. A relatively large share of those legalized under the LAW program, 43 percent, were women; and although the percentage of women among SAW applicants was smaller, it was nonetheless significant at around 15 percent. The vast majority of those who qualified for amnesty, meanwhile, lived in large cities. Some 95 percent of those legalized under the LAW program, for example, lived in metropolitan areas; and even among SAWs,

[15] Smith, Kramer, and Singer, *Characteristics and Labor Market Behavior of the Legalized Population. Encuesta sobre Migración en la Frontera Norte: Síntesis Ejecutiva* (Survey of migration on the northern border: Executive summary) (Tijuana, 1996). Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"

Cuba AR_001300

**Table 1**

Selected Characteristics of Mexico–United States Migrants on Their First Trip
to the United States

|  | Pre-IRCA 1980–1986 | Transition Period 1987–1990 | New Era 1991–1996 |
|---|---|---|---|
| Undocumented migrants |  |  |  |
| In agriculture | 33.1% | 21.8% | 19.5% |
| Female | 21.3% | 27.8% | 25.6% |
| Women <18 | 22.6% | 26.6% | 31.1% |
| Hourly wage earned (1990 dollars) | $4.81 | $5.14 | $4.44 |
| Employed through contractor | 6.7% | 4.9% | 9.2% |
| In California | 65.7% | 72.2% | 58.6% |
| Number of cases | 2,762 | 389 | 235 |
| Documented migrants |  |  |  |
| In agriculture | 7.4% | 7.7% | 2.6% |
| Female | 47.8% | 50.9% | 59.1% |
| Women <18 | 71.7% | 57.1% | 48.2% |
| Hourly wage earned (1990 dollars) | $6.04 | $5.52 | $4.44 |
| Employed through contractor | 13.2% | 15.4% | 9.4% |
| In California | 73.0% | 72.2% | 65.5% |
| Number of cases | 636 | 389 | 235 |

SOURCE: Mexican Migration Project Database (http://lexis.pop.upenn.edu/mexmig/), Population Studies
Center, University of Pennsylvania.

who were, in theory, agrarian laborers, 84 percent of the applicants gave metropoli-
tan addresses.[16]

Among migrants working in agriculture, moreover, there was a pronounced shift
toward urban occupations in the years after legalization. Agricultural growers, of
course, had envisioned just such a turn of events and had successfully lobbied Con-
gress to have IRCA include a Replenishment Agricultural Worker (RAW) program so
that the newly legalized workers could be replaced after they left for the city. They
also lobbied successfully for an expansion of the H-2A program, a Bracero-like tem-
porary worker program that grew from 2,000 Mexicans in 1986 to 6,000 in 1995.[17]

---

[16] Smith, Kramer, and Singer, *Characteristics and Labor Market Behavior of the Legalized Population*. U.S.
Immigration and Naturalization Service, *1990 Statistical Yearbook of the Immigration and Naturalization Service*
(Washington, 1991).

[17] Katharine M. Donato, Jorge Durand, and Douglas S. Massey, "Changing Conditions in the U.S. Labor
Market: Effects of the Immigration Reform and Control Act of 1986," *Population Research and Policy Review,* 11
(no. 2, 1992), 93–115. Philip L. Martin and J. Edward Taylor, "Harvest of Confusion: SAWS, RAWS, and Farm-
workers," Working Paper PRIP-UI-4, 1988, Program for Research on Immigration Policy (The Urban Institute,
Washington, D.C.). Jorge Durand, "Enganchadores y Contratistas: Un Eslabón Parted en la Migración de Traba-
jadores Mexicanos a Estados Unidos" (Hookers and contratistas: A lost step in the migration of Mexican workers
to the United States), in *Las Relaciones México–Estados Unidos desde la Perspectiva Regional* (Mexico–United States
relations from a regional perspective), ed. Tomás Calvillo (forthcoming); U.S. Immigration and Naturalization
Service, *1995 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1996).

As a program of legalization, therefore, IRCA was a great success: more than two million Mexicans—including many women and children—achieved legal status under the legislation. As an enforcement policy intended to control undocumented migration, however, IRCA was an unequivocal failure. Not only did it fail to deter undocumented migrants from leaving Mexico but it actually encouraged additional undocumented migration by family and friends who had remained behind, and it was instrumental in transforming a predominantly rural, male, and temporary flow of migrant workers into a feminized, urbanized, and permanent population of settled immigrants.

The foregoing trends are documented in table 1, which again uses data from the Mexican Migration Project, showing the characteristics of documented and undocumented migrants leaving on their first trip to the United States during three periods: the pre-IRCA period of 1980–1986, the transition phase of 1987–1990, and the new era of migration of the 1990s. As can be seen, the percentage of undocumented migrants working in agriculture falls steadily over time, reaching just 19.5 percent in 1991–1996. Likewise, the percentage of agrarian workers among those with legal documents, already low before IRCA, reaches just 2.6 percent in the new era. At the same time, the percentage of women rises in both categories. Among the undocumented migrants, the percentage female goes from 21.3 percent in 1980–1986 to 25.6 percent in 1991–1996, whereas among documented migrants the shift is even more dramatic, with the share of women rising from 47.8 percent in the pre-IRCA period to 59.1 percent most recently. Moreover, among undocumented migrants, who have found it increasingly difficult to move back and forth across the border, a growing fraction were dependents. Among undocumented women, for example, the fraction under eighteen rose from 22.6 percent in 1980–1986 to 31.1 percent in 1991–1996.

IRCA's employer sanctions also had profound effects on the United States labor market. In developing them, the United States Congress was mindful of the needs of employers, requiring that sanctions be applied *gradually* to give them time to adjust to the new regime. Congress also did not require employers to verify the *authenticity* of documents offered by laborers to prove their identity and right to work in the United States. Instead, they simply had to fill out an I-9 form to demonstrate they had *seen* what *appeared to be* valid documents. Even if these documents later turned out to be false and the worker was deported, the employer was not liable to prosecution if he or she could produce an I-9 form and a photocopy of the document they had seen. The predictable result was a boom in the market for fraudulent documents.[18]

Despite the low odds of prosecution under the law, employers did face *some* new risks, particularly if they relied heavily on unauthorized labor. To compensate them-

[18] Michael Fix and Paul T. Hill, *Enforcing Employer Sanctions: Challeges and Strategies* (Santa Monica, 1990); Manuel García y Griego and Mónica Verea Campos, "La Crisis Económica Fiscal de California y la Nueva Ofensiva Verbal en Contra de los Indocumentados" (The economic and fiscal crisis of California and the new verbal offensive against undocumented migrants), in *California: Problemas Económicos, Políticos y Sociales* (California: Economic, political, and social problems), ed. Rosa Cusminsky (Mexico, D.F., 1995), 125–52. Gustavo López Castro, "Coyotes and Alien Smuggling," in *Migration between Mexico and the United States, Volume 3,* ed. the staff of the Binational Study of Migration between Mexico and the U.S. (Washington, 1998), 1965–74.

selves for these new risks, employers embarked on a pattern of systematic wage discrimination against Latinos in general and undocumented Mexicans in particular. Rather than taking the time and trouble to identify which migrants were undocumented, they simply discriminated against foreign-looking workers; and rather than denying them jobs, they simply lowered their wages.[19]

Among foreigners, post-IRCA wage discrimination was especially severe against undocumented migrants. Whereas before IRCA undocumented migrants earned the same wages as documented migrants, and rates of pay were determined largely by education, United States experience, and English language ability, afterward undocumented migrants earned wages that were 28 percent less than those earned by documented migrants; and rather than being determined by schooling, experience, and English ability, they were determined by a person's social contacts. As wages deteriorated for undocumented migrants in the wake of IRCA, so did working conditions, with higher proportions earning wages below the legal minimum and larger numbers working under irregular circumstances.[20] As table 1 indicates, entry-level wages for undocumented Mexican workers averaged $4.81 during 1980–1986, rose temporarily to $5.14 during the transition period, and then fell to $4.44 during 1991–1996 (expressed in constant 1990 dollars).

The imposition of employer sanctions also generated significant paperwork burdens for employers, who were required to keep I-9 forms on file for every person they hired. In seasonal industries such as agriculture, construction, food service, janitorial services, and private household work, where the use of casual workers is common and turnover is high, the added burdens were significant, and the prospect of so much paperwork caused many employers to shift from direct hiring of immigrants to a subcontracting arrangement.[21] Labor subcontractors are typically citizens or legal resident aliens who sign a contract with an employer to provide a specific number of workers, for a specified period of time, to engage in a particular task, at a set rate per hour. By working through a subcontractor, employers at once eliminate the risk of prosecution under IRCA and escape the law's tiresome paperwork requirements. As table 1 indicates, the percentage of undocumented migrants hired through a

[19] Deborah A. Cobb-Clark, Clinton R. Shiells, and B. Lindsay Lowell, "Immigration Reform: The Effects of Employer Sanctions and Legalization on Wages," *Journal of Labor Economics,* 13 (July 1995), 472–98; Richard Fry, B. Lindsay Lowell, and E. Haghighat, "The Impact of Employer Sanctions on Metropolitan Wage Rates," *Industrial Relations,* 34 (July 1995), 464–84; B. Lindsay Lowell, Jay Teachman, and Zhongren Jing, "Unintended Consequences of Immigration Reform: Discrimination and Hispanic Employment," *Demography,* 32 (Nov. 1995), 617–28.

[20] Barry R. Chiswick, "Illegal Aliens in the United States Labor Market: An Analysis of Occupational Attainment and Earnings," *International Migration Review,* 18 (no. 3, 1984), 714–32; Barry R. Chiswick, *Illegal Aliens: Their Employment and Employers* (Kalamazoo, 1988); Barry R. Chiswick, "Speaking, Reading, and Earnings among Low-Skilled Immigrants," *Journal of Labor Economics,* 9 (April 1991), 149–70; Katharine M. Donato and Douglas S. Massey, "Effect of the Immigration Reform and Control Act on the Wages of Mexican Migrants," *Social Science Quarterly,* 74 (Sept. 1993), 523–41; Douglas S. Massey, "Do Undocumented Migrants Earn Lower Wages than Legal Immigrants? New Evidence from Mexico," *International Migration Review,* 21 (Summer 1987), 236–74. Julie A. Phillips and Douglas S. Massey, "The New Labor Market for Mexican Immigrants to the United States," *Demography,* 36 (forthcoming). Donato, Durand, and Massey, "Changing Conditions in the U.S. Labor Market."

[21] Philip L. Martin and J. Edward Taylor, "Immigration Reform and Farm Labor Contracting in California," in *The Paper Curtain: Employer Sanctions' Implementation, Impact, and Reform,* ed. Michael Fix (Washington, 1991), 239–61.

Cuba AR_001303

New Era of Mexico–United States Migration          529



Retablo of Braulio Barrientos. 1986. Oil on Metal. Part of the caption reads: While I was
reemigrating to the United States with three friends, the water we were carrying
ran out. Traveling in such great heat and with such thirst, and without
hope of drinking even a little water, we invoked the Virgin of
San Juan and were able to arrive at our destination
and return to our homeland in health.
*From Jorge Durand and Douglas S. Massey,* Miracles on the Border *(Tucson, 1995).*

subcontractor, which fell to 4.9 percent in the transition period, nearly doubled to 9.2
percent by the early 1990s.

In return for absorbing the risks of prosecution and the burdens of paperwork,
subcontractors retain a share of the migrants' earnings, further reducing their net
wages. Whereas before IRCA, migrants employed through a subcontractor earned the
same wages as others, after IRCA they earned 30 percent less.[22] Thus, IRCA's employer
sanctions did not block access of undocumented immigrants to United States jobs;
it simply pushed their employment further underground and induced greater wage
discrimination against Latinos. In short, it created black market conditions that put
downward pressure on all workers regardless of nativity or citizenship.

The new underground economy created by IRCA appears to have had spillover
effects on the native-born working in the same sectors. Whereas research conducted
using the 1980 census (that is, before IRCA) found few effects of immigration on the
wages or employment of natives, work done using the 1990 census (after IRCA)

[22] Phillips and Massey, "New Labor Market for Mexican Immigrants."

uncovered significant negative effects on certain racial and ethnic subgroups.[23] The attempt to eliminate the lure of United States jobs through employer sanctions thus appears to have gone badly awry, contributing to the deterioration of wages at the lower end of the labor market and exacerbating income inequality in the United States. As a result, not only have the wages of undocumented workers fallen, so have the wages of documented workers, which went from an average of $6.04 per hour before IRCA to $4.44 in the early 1990s (again expressed in constant 1990 dollars).

IRCA had one final consequence: the geographic dispersion of Mexican immigrants away from traditional gateway regions. Among migrants legalized under the LAW program, there was a clear pattern of geographic mobility away from areas of Mexican concentration in the years after legalization.[24] With documents in hand, Mexicans were suddenly free to leave historical enclaves and established niches to search for better opportunities elsewhere; and, as legalized immigrants dispersed geographically, so did later waves of immigrants arriving to join them.

Whereas 82 percent of Mexican immigrants arriving in 1986 stated their intention to settle in California, Illinois, or Texas, by 1995 the percentage had dropped to 71 percent. Moreover, only five states received more than a thousand Mexican immigrants in 1986 (the traditional receiving states of Arizona, California, Illinois, New Mexico, and Texas); but by 1995 the number had grown to 11 (with the addition of Colorado, Florida, Georgia, Nevada, Oregon, and Washington). New Jersey–New York combined to equal a twelfth region receiving more than a thousand Mexican immigrants per year. According to data from the Census and Current Population Survey, the proportion of recent Mexican immigrants going to California dropped from 63 percent to 40 percent between 1990 and 1996 while the percentage going to nontraditional states grew from 13 percent to 31 percent, yielding a sharp increase in the diversity of destinations.[25] This dispersion is reflected in the survey data shown in table 1, where the share of undocumented migrants going to California drops from 65.7 percent in 1980–1986 to 58.6 percent in 1991–1996, and the share of documented migrants doing so drops from 73.0 percent to 65.5 percent over the same period.

## Political Aftershocks

IRCA was thus instrumental in transforming Mexican immigration from a seasonal and predominantly male flow of rural, undocumented workers going to a handful of states into an urbanized population of settled legal immigrant families dispersed widely throughout the United States. This transformation has dramatically altered the horizons of life and work for Mexicans north of the border and has transfigured

[23] George J. Borjas, *Friends or Strangers: The Impact of Immigrants on the U.S. Economy* (New York, 1990). George J. Borjas, "The Economics of Immigration," *Journal of Economic Literature,* 32 (Dec. 1994), 1667–1717.
[24] Kristin E. Neuman and Marta Tienda, "The Settlement and Secondary Migration Patterns of Legalized Aliens: Insights from LAPS [Legally Authorized Population Survey] Data," in *Immigration and Ethnicity: The Integration of America's Newest Arrivals,* ed. Barry Edmonston and Jeffrey Passel (Washington, 1994), 187–226.
[25] Jorge Durand, Douglas S. Massey, and Fernando Charvet, "The Changing Geography of Mexican Immigration to the United States, 1910–1996," *Social Science Quarterly* (forthcoming).

New Era of Mexico–United States Migration 531

the political landscape of both countries. As they have put down roots, Mexican immigrants have come to value political participation as never before, and they have begun to enter public debates, political organizations, and electoral campaigns and ultimately to become important political actors north as well as south of the border.

The issue of international migration was barely mentioned in the NAFTA accords, and no steps were taken to prepare for the emergence of a transnational population with claims on citizenship in both the United States and Mexico. Indeed, both sides tacitly agreed to sweep the issue of immigration under the rug. President Salinas opined that Mexico's goal in implementing NAFTA was to export goods and not people, and presidents George Bush and Bill Clinton stated that by encouraging job formation in Mexico NAFTA would ultimately reduce the pressures for undocumented migration to the United States.

Unfortunately, in the same year that NAFTA was implemented, Mexico's intertwined political and economic crises returned with a vengeance. On the very day that the agreement took effect, armed guerrillas launched an offensive in the state of Chiapas; in the ensuing months, both the leader of Mexico's ruling party and its presidential candidate were assassinated. The year ended with Mexico's new finance minister, in office for just three weeks, bungling a devaluation and igniting a new round of capital flight, hyperinflation, and unemployment. Despite the appearance of political stability and economic progress during the Salinas presidency, two ancient problems refused to go away: the economic marginalization of large sectors of the population and the resistance of Mexico's ruling elite to political change.

Given the selling of NAFTA as a means of helping Mexico "export goods and not people," the failure of the Mexican economic miracle created an opening for the return of immigration as a political issue in the United States. With the Mexican economy in distress and a United States financial bailout on the horizon, the specter of massive undocumented migration returned as newspapers throughout the country ran features on the crisis and its likely effects. Mexico's economic collapse and deepening political crisis once again turned the United States public against Mexican immigrants and offered politicians a ripe opportunity.

With the end of the Cold War, the United States obsession with external threats gave way to worries about its internal enemies. As IRCA's massive legalization and its accompanying settlement and dispersal increased the salience of Mexicans in the public eye, immigrants came to be blamed for everything from the high cost of welfare to the fiscal crisis of the social service system. United States politicians deliberately encouraged the belief that United States schools, hospitals, and public services were spending massive resources on immigrants, both legal and illegal, who came to the United States to take unfair advantage of public generosity and the taxes paid by ordinary United States citizens.

Immigration revealed its potency as a political issue in 1994 when California governor Pete Wilson found himself struggling for reelection. With his state still mired in a recession, he was unpopular and far down in the polls until he made immigration his chief campaign issue. He endorsed Proposition 187, a referendum to ban undocumented migrants from receiving public health, education, and welfare ser-

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 184 of 263

vices, and made it his rallying cry. This initiative also obliged government employees to report immigrants they suspected of receiving unauthorized services, effectively deputizing them to enforce United States immigration law. Both the governor and the proposition were endorsed by a substantial majority of the state's voters.

Although it began in California, the anti-immigrant bandwagon soon went national and swept up documented as well as undocumented migrants. The political wave crested in 1996 with the passage of two landmark pieces of legislation: the Illegal Immigration Reform and Immigrant Responsibility Act (better known as the 1996 Immigration Reform Act) and the Personal Responsibility and Work Opportunity Reconciliation Act (better known as the 1996 Welfare Reform Act). The net effect of these two laws was to bar noncitizen immigrants (legal as well as undocumented) from receiving means-tested federal and state benefits and to raise the income threshold required for immigrants to sponsor the entry of relatives. The immigration act also enacted harsher penalties against people who overstayed visas or entered the United States without inspection.[26]

In the political climate of the late 1990s, Mexican immigrants were left with very few ways of protecting themselves and their interests. The only foolproof way of forestalling the potential loss of rights and privileges was through naturalization, which not only guaranteed unhindered access to the full array of United States government benefits but also offered the possibility of voting to fight further losses and restrictions. The reaction of Mexican immigrants to the new political climate was thus predictable: a rush toward United States citizenship. As nativist movements gained strength and began to achieve legislative success, applications for naturalization mushroomed. From 1980 to 1990, the total number of petitions for naturalization fluctuated between 200,000 and 300,000 per year, and as late as 1991 only 207,000 applications were filed (it is not possible to tabulate petitions by Mexicans separately from published INS data). Beginning in that year, however, the number of filings rose precipitously, reaching just under a million in 1995.[27]

Mexicans historically have had the lowest rate of naturalization of any major immigrant group. According to one estimate, only 17 percent of the 1973 cohort of Mexican immigrants had naturalized by 1989, sixteen years later. As a result, Mexicans constitute the largest single population of noncitizen legal immigrants present in the United States. In 1990, 77 percent of all Mexican immigrants—some 3.3 million persons—were unnaturalized. Thus, the potential for increase in naturalization among Mexican immigrants is huge, and, in fact, the number of Mexicans becoming citizens increased by 383 percent from 1990 to 1995.[28]

As if the actions of the United States Congress were not enough, the move toward citizenship was also encouraged by the Mexican congress, which late in 1996 approved amendments to the Mexican constitution permitting dual nationality.

[26] Austin T. Fragomen, "The Illegal Immigration Reform and Immigrant Responsibility Act of 1996: An Overview," *International Migration Review,* 31 (Summer 1997), 438–60.

[27] U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook.*

[28] Zai Liang, "On the Measurement of Naturalization," *Demography,* 3 (Aug. 1994), 525–48. U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook.*

Cuba AR_001307

Before, naturalization in the United States implied the relinquishment of Mexican citizenship and the loss of rights to live, work, own property, and travel freely in Mexico. The new amendments allow Mexicans who become United States citizens to keep Mexican nationality and retain those rights. By recognizing dual nationality, Mexico thus removed a major impediment to naturalization in the United States precisely at a time when legislative and political changes there had dramatically increased the costs of remaining unnaturalized. The end result has been a flood of naturalization.

In reversing its historical opposition to dual nationality, the Mexican government sought to accomplish several goals. First, it sought to mobilize Mexican immigrants to defend their rights in the United States. Second, it also saw immigrant voters as a potential means of influencing United States policy on issues involving trade and bilateral relations. Finally, the political elite paradoxically saw it as a way of incorporating immigrants more effectively into the Mexican political system. The extension of dual nationality represents an important gesture signaling that although political realities may compel immigrants to naturalize, in the eyes of the state they will remain Mexicans. In concert with the move toward dual nationality, various programs were established through Mexican consulates in the United States to organize the Mexican diaspora and to facilitate investment in their home communities.

Assuming that millions of Mexicans respond to the new incentives and suddenly seek United States citizenship, the implications for the future of immigration are enormous, as under United States law the acquisition of citizenship creates legal entitlements for entry by family members. Whereas the spouses and minor children of unnaturalized legal resident aliens have to wait in line for immigrant visas that are numerically limited, the spouses and minor children of United States citizens enter immediately, *outside of* these limitations; and whereas legal resident aliens cannot sponsor the legal entry of parents, siblings, or unmarried adult children, citizens immediately acquire these rights upon naturalization.

Thus, each new person that becomes a United States citizen creates more people entitled to immigrate to the United States without numerical restriction, as well as new classes of people entitled to come in under numerically limited categories. In seeking to discourage immigration by restricting the access of foreigners to United States social services, therefore, Congress has inadvertently encouraged additional immigration. By pushing 3.3 million noncitizen Mexican immigrants decisively toward United States citizenship, it has sown the seeds for an even larger influx of Mexican immigrants down the road.

The massive acquisition of citizenship by Mexicans and other immigrants will thus have political consequences of great importance. To the extent that citizenship brings voter mobilization, it represents a radical change from the past, when Mexican immigrants displayed low rates of political participation in the United States.[29]

---

[29] Rodolfo O. de la Garza and Louis DeSipio, "The Changing Hispanic Political Landscape," in *Redistricting in the 1990s: A Guide for Minority Groups,* ed. William P. O'Hare (Washington, 1989), 171–80; Rodolfo O. de la Garza, Martha Menchaca, and Louis DeSipio, *Barrio Ballots: Latino Politics in the 1990 Elections* (Boulder, 1994).

The passage of anti-immigrant referenda and legislation pushed Mexican immigrants decisively toward new strategies of naturalization and voter mobilization. These strategies paid their first dividends in November 1996, when Rep. Robert Dornan, a conservative Republican from Orange County, California, who made no secret of his anti-immigrant stance, was defeated for reelection by a pan-ethnic coalition of Latinos in which naturalized immigrants cast the decisive votes. Without intending to, United States immigration policy has succeeded in consolidating a broad political coalition among Latinos (and Asians) that cuts across specific nationalities to unite Mexicans, Cubans, Puerto Ricans, and other Central and South Americans.

Like IRCA, therefore, the latest anti-immigrant measures have boomeranged, yielding results contrary to those anticipated by the politicians who instigated them. All signs are that the next several years will yield an intense political battle reminiscent of the civil rights movement of the 1960s, except that Mexican immigrants will now be full partners in the social struggle. A large demonstration in Washington, D.C., during October 1996 included undocumented as well as legal immigrants and was organized by a coalition of different Latinos, who together will soon comprise the largest minority group in the United States.

The reaction has not been long in coming, of course. Republicans, the principal promoters of the anti-immigrant fervor, have viewed the avalanche of naturalizations with alarm and have accused Clinton administration officials of speeding up the process to create Democratic voters and of slipshod practices that have granted citizenship to criminals (once again creating a symbolic link between immigration and criminality). The stage is thus set for a political showdown.

Political mobilization does not stop at the border, however. The economic crisis that persists in Mexico and widespread disenchantment with the performance of the ruling party have turned migrants into vocal critics of the Mexican government's policies. Although discontent in Mexico has led some to armed resistance and others to homegrown justice, it has also led to the mobilization of opposition through established political parties such as the National Action Party (PAN) and the Party of the Democratic Revolution (PRD), in which migrants have contributed both financial and human resources. Just as migrants have awakened to their political potential in the United States, they have become less tolerant of the deficiencies of the Mexican political system, which ultimately is responsible for the social and economic conditions that led them to emigrate in the first place.[30]

Mexican immigrants have thus openly welcomed opposition candidates touring the United States, and they have contributed generously to electoral campaigns in their regions of origin. They have also helped to finance local public works even when elected authorities are not members of the official party. The historical disinterest of Mexican authorities in the situation of migrant communities and in the specific problems of the immigrants themselves has spurred many current and former migrants to political action in Mexico, often within channels outside the official party.

[30] De la Garza and Szekely, "Policy, Politics, and Emigration."

**The New Era of Mexico–United States Migration**

In retrospect, it is now clear that the passage of the Immigration Reform and Control Act in late 1986 was a watershed event in the history of Mexico–United States migration. From the end of the Bracero Program in 1964 through November 1986, the United States for all intents and purposes sponsored a liberal temporary worker program in which millions of workers, predominantly undocumented, circulated back and forth between Mexico and the United States. Although some migrants established ties north of the border and ultimately settled more permanently in the United States, illegal status constituted a deterrent to settlement and there were few reasons to remain anyway. The border was porous, United States jobs were accessible, and employers cared little about whether one was documented or not, so migrants lacked strong incentives to prolong their stay once a savings target or short-term income goal had been reached.

According to computations recently published by Audrey Singer and Douglas Massey, from 1965 through 1986 some 27.9 million undocumented Mexicans entered the United States and 23.3 million returned to Mexico, yielding a net increase of just 4.6 million persons. Over the same period, just 1.3 million Mexicans were admitted to permanent legal residence in the United States. From the end of the Bracero Program to the passage of IRCA, in other words, 84 percent of undocumented entries from Mexico were offset by departures. In an earlier study, when we classified migrants interviewed in 1982–1983 according to the strategy they employed during their years of active United States labor, we found that only 20 percent relied on a settlement strategy; the rest simply crossed into the United States temporarily.[31]

The passage of IRCA inaugurated a new era of Mexico–United States migration in which the United States applied increasingly coercive sanctions and border controls in an effort to constrict established flows while offering regularization to undocumented farm workers and long-term settlers already in the country. The rising hazards of border crossing and the ongoing economic crisis in Mexico gave undocumented migrants new reasons to remain abroad and, when combined with IRCA's legalization of 2.3 million persons, tilted Mexican immigration decisively toward permanent United States settlement. In a few short years it was transformed from a seasonal, undocumented, and regionally specific flow in which rural males predominated into an urbanized and substantially female population of permanent settlers who were increasingly dispersed throughout the United States. In the nine years from 1987 through 1995, 2.7 million Mexicans were admitted to permanent resident status, twice the number admitted over the prior twenty-two years.[32]

The implementation of IRCA's employer sanctions, meanwhile, undermined wages and working conditions for Mexican workers in the United States, opening up wide gaps between documented and undocumented migrants. In addition to fomenting

---

[31] Singer and Massey, "The Social Process of Undocumented Border Crossing." U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.* Douglas S. Massey et al., *Return to Aztlan: The Social Process of International Migration from Western Mexico* (Berkeley, 1987).

[32] U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook.*

wage discrimination, IRCA pushed employers toward labor subcontracting in order to escape its burdensome paperwork requirements and to eliminate the risk of prosecution for unauthorized hiring. The passage of California's Proposition 187 in 1994 sought to bar undocumented migrants from attending public schools, using public hospitals or clinics, or receiving public assistance, and in 1996 the United States Congress disenfranchised noncitizen legal immigrants from means-tested social programs. The post-IRCA period is thus characterized by growing political distinctions between undocumented, documented, and naturalized immigrants and widening economic gaps between them.

The creation of invidious distinctions on the basis of citizenship and the approval of recent amendments to the Mexican constitution permitting dual nationality have unleashed a stampede toward naturalization by millions of Mexican immigrants, a move that will further strengthen the trend toward long-term settlement and integration in the United States and generate additional future immigration as newly naturalized immigrants acquire rights to sponsor the entry of their relatives. In concert with this unprecedented wave of naturalization, the anti-immigrant drift of United States politics has led to a new mobilization of Mexicans as voters. Once politically mobilized, moreover, migrants have felt empowered to express their dissatisfactions with political affairs in Mexico as well as in the United States, giving rise to new transnational political movements.[33]

Although this interplay between politics in Mexico and in the United States may worry officials on both sides of the border, it is nonetheless a harbinger of things to come. Post-IRCA policies in the United States, when combined with political and economic developments occurring under the North American Free Trade Agreement, have had rather unexpected social, economic, and political consequences in promoting a new transnational politics. Authorities in both countries now face a newly mobilized population of Mexicans who operate in a sphere beyond the full control of either government, simultaneously working to defend their rights in the United States and helping to bring about political change in Mexico.

[33] S. Mara Perez Godoy, "Social Movements and International Migration: The Mexican Diaspora Seeks Inclusion in Mexico's Political Affairs: 1968–1998" (Ph.D. diss., University of Chicago, 1998).

Case 6:23-cv-00007 Document 92-5 Filed on 03/24/23 in TXSD Page 189 of 263

**The New York Times** | https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html

## Confusion on the Border as Appeals Court Rules Against Trump's 'Remain in Mexico' Policy

The court upheld an injunction blocking a policy that requires asylum applicants to wait in Mexico until their cases are decided. But a stay on the order means the policy could remain in effect.

 **By Caitlin Dickerson**

Published Feb. 28, 2020   Updated Oct. 29, 2021

A federal appeals court found a central pillar of the Trump administration's immigration agenda legally invalid on Friday, ruling that asylum seekers must be allowed into the United States while their cases weave through American immigration courts.

The court stayed its decision, however, in order to allow the government time to appeal the ruling.

After a year in which nearly a million migrants crossed the southwestern border, jamming processing facilities and defying President Trump's attempts to curtail immigration, border crossings have dropped sharply in recent months, in part because of the administration's "Remain in Mexico" policy, the subject of Friday's court ruling. The decision from the United States Court of Appeals for the Ninth Circuit, if allowed to stand, would eliminate one of the administration's key levers for controlling the arrival of new asylum seekers.

A three-judge panel in San Francisco upheld an injunction blocking the policy, which has required people applying for asylum at the border to wait in Mexico while their claims for protection are reviewed, a process that often takes months or years.

The judges gave lawyers in the case until Monday to respond to the stay.

Since the "Remain in Mexico" restrictions were rolled out early in 2019, more than 59,000 asylum seekers have been turned back by American authorities into Mexican border cities, where kidnappings and violence have surged. Because shelters in Mexico are scant and overrun, many of the migrants are living in vast tent encampments exposed to the elements. Powerful Mexican drug cartels have moved in to exploit them.

"It's a resounding rejection," Judy Rabinovitz of the American Civil Liberties Union, who was the lead lawyer representing the plaintiffs, said of the court's ruling earlier Friday. She added, "The policy is a disgrace, it's illegal, it's morally indefensible, and it needs to stop."

Chad Wolf, acting secretary of homeland security, said U.S. border officials have continued to process meritorious asylum claims and reduced fraudulent and invalid claims.

"Should this ruling stand, the safety and security of our border communities, international relationships and regional stability is at risk," he said in a statement.

"This nationwide injunction is grave and reckless, rewrites the laws passed by Congress and undermines the U.S. Constitution," he said.

Lawyers who brought the challenge represented a group of 11 asylum seekers who had been returned to Mexico and several legal advocacy organizations. The plaintiffs won a nationwide injunction, but because a higher court stayed the ruling, the policy has continued to expand — most recently taking effect in Nogales, Ariz., in December.

Cuba AR_001312

Case 6:23-cv-00007 Document 92-5 Filed on 03/24/23 in TXSD Page 190 of 263



These families from Honduras heard rumors that people in the Remain in Mexico Program might be allowed into the United States and went to the bridge to find out. Cengiz Yar for The New York Times

Friday's appeals court ruling, before it was stayed, prompted widespread celebration among those who had been fighting the policy, followed by hours of confusion over when and how it might go into effect. Mr. Wolf said his department was working with the Justice Department "to expeditiously appeal this inexplicable decision." Human rights organizers in the Mexican border cities where asylum seekers are clustered — including Tijuana, Ciudad Juárez and Matamoros — scrambled to analyze the opinion, while also trying to maintain calm among the thousands of migrants now held up in those cities to prevent a panicked rush toward the United States.

Migrants held in Mexico under the policy began gathering at several international bridges. About 50 collected Friday evening at the Paso Del Norte bridge in Ciudad Juárez, hoping to cross into El Paso, but Mexican authorities closed the bridge to all traffic.

A 28-year-old man from Cuba, who was among those trying to cross, said he would wait for an opportunity. "If God wants us to, we will cross," said the man, who did not want his name published for fear of jeopardizing his asylum case. "I'm going to wait here."

Late Friday, the Customs and Border Protection agency said it had halted processing of new cases under the program, but that was before the stay. "We are continuing to utilize every tool at C.B.P.'s disposal to ensure the integrity of our immigration system and processing programs," the agency said in a statement.

The policy at issue is known formally as "migrant protection protocols" — though the lawyers who challenged it argued that it did just the opposite by placing vulnerable people in harm's way. Instead of safeguarding people fleeing persecution abroad, as is required under federal law, the policy banished them to perilous conditions in a different place, the lawyers said.

Government lawyers defended the policy based on a little-known provision of the 1996 federal immigration law allowing the American government to return some migrants to contiguous countries while their cases for entry into the United States are being processed.

They argued that the provision could be applied to asylum seekers, and that the United States had fulfilled its legal duty to protect people fleeing persecution by conducting a screening to identify possible fears before it sends people back to Mexico.

But those challenging the policy countered that asylum seekers are exempt from the legal provision, and said the government's provisions for screening to determine whether migrants had a credible fear of persecution was insufficient. They pointed to cases of people who had been kidnapped or raped while they were waiting in Mexico and were told afterward by American authorities that their fear of residing in Mexico was not credible.

In a 2-to-1 opinion on Friday, the appeals court judges said the policy violated the federal government's obligation to avoid returning migrants to dangerous places, and they concluded that the legal provision invoked by the government in creating the policy was never meant to be applied to asylum seekers.

They found that the policy was "invalid in its entirety" and concluded that a lower-court ruling that initially enjoined its implementation was "not an abuse of discretion." The stay issued Friday night, the court said, would remain in effect pending review of the government's petition for an immediate appeal.

Cuba AR_001313

Case 6:23-cv-00007    Document 92-5    Filed on 03/24/23 in TXSD    Page 191 of 263

Judge William A. Fletcher, an appointee of President Bill Clinton, wrote the opinion, joined by Judge Richard A. Paez, also a Clinton appointee. Judge Ferdinand F. Fernandez, nominated to the court by President George Bush, dissented.

In a separate ruling on Friday, the same panel of appeals court judges rejected another of the Trump administration's attempts to restrict asylum. In that case, the judges reviewed a policy that blocks anyone who entered the United States illegally — as opposed to presenting themselves at a legal port of entry — from applying for asylum.

The court found unanimously that the policy runs counter to asylum law, which states that people can apply for the status regardless of where they entered the country. That policy had been enjoined by a district court judge shortly after it was announced, and the appeals court on Friday reaffirmed the injunction.

"What's especially significant is that, in both cases, the court found that the administration ignored Congress," said Lee Gelernt, deputy director of the American Civil Liberties Union's Immigrants' Rights Project, who argued the case.

The administration took additional steps last year to make it harder to apply for asylum, signing a deal with Guatemala to resettle asylum seekers there, instead of in the United States. It also adopted a policy requiring most applicants from Central America to first seek asylum in another country along their route of travel.

That policy is also being challenged in federal court.

The policies are part of a constellation of measures undertaken by the Trump administration to help stem the record number of migrant families, mainly from Central America, who began crossing the border in the fall of 2018.

The influx led to overcrowded detention facilities and overwhelmed immigration courts, prompting President Trump to double down on his pledges to build a wall and clamp down on immigration across the southwestern border.



The Migration Protection Protocols Immigration Hearing Facility in Laredo, Texas.  Tamir Kalifa for The New York Times

Taken together, the policies have effectively shrunk the American asylum system to a fraction of what it once was. By the end of the 2019 fiscal year, in October, overall border apprehensions had shrunk to 60,781, from a high of 144,116 in May.

The news that the "Remain in Mexico" policy might be invalidated sparked chaos in some areas of the border, where some migrants have been living for months in filthy and crime-ridden areas, with little hope of entering the United States. Emma Obando, 42, had been cooking plantains for her two sons in the Matamoros tent encampment on Friday when a crying woman ran toward her, yelling to everyone she passed, "We should go; we should cross right now because they have undone the law of M.P.P."

Ms. Obando has been living in Matamoros with her 7- and 10-year-old sons, the elder of whom has autism, since September, after having fled their home in Honduras. She said many migrants flocked to the border after hearing news of the court ruling on Friday, but soon after, organizers called them off, instead advising people not to "make a big fuss" yet, and to prepare their government documents instead.

Eventually, Ms. Obando said, the mood calmed. She decided to try crossing into the United States with her sons on Saturday.

Cuba AR_001314

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 192 of 263

Mexican officials and civic leaders were also trying to make sense of how the ruling might impact their communities.

"There are various unknowns, various questions," said Dirvin Luis García Gutiérrez, the head of the migration program for the population agency in the state of Chihuahua.

He said that Ciudad Juárez, where more than 19,700 migrants have been returned under the program, was currently supporting a transient population of between 13,000 and 15,000 migrants, including migrants returned under the program as well as those who are still waiting to cross into the United States to apply for asylum.

In an immigration court in downtown San Diego on Friday morning, more than a dozen migrants who had been subjected to "Remain in Mexico" were in court for their asylum hearings when the appeals court's opinion was released. Most were not represented by lawyers and had little guidance on how to proceed.

When the "Remain in Mexico" program was initially enjoined by a federal judge in California in April of last year, migrants who had been in court on that day ended up spending more than two weeks in government holding cells while officials decided how to proceed. When the injunction was stayed, the migrants were returned to Mexico, allowed to enter the United States only for their court hearings.

Government officials moved quickly to reverse the decision. It appeared clear that, whatever the immediate outcome, the issue would ultimately be decided by the United States Supreme Court.

Hundreds of asylum seekers who have been returned to Mexico have since given up their claims, accepting free transportation provided by the American government and the United Nations back to their homes in Central America. But others have vowed to continue with their cases.

Yoleydi Gonzalez Jimenez, 26, arrived from Cuba with her husband in the Mexican city of Matamoros in September and has been living in a tent encampment at the end of an international bridge into the United States ever since. With little access to public bathrooms, the camp smells of human waste.

Ms. Gonzalez Jimenez wears socks with her flip-flops to keep warm. A donated air mattress covered with pink and purple sheets fills the tent that has become the couple's home. Their few possessions are stacked on top and become soaked with water that seeps inside when it rains.

"I can't give up after all the time I've been waiting here, even though I feel like I'm going to die," she said after a court hearing in December. Her next hearing was scheduled in Brownsville, Texas. Until then, she was told, she would have to go back to Mexico.

Reporting was contributed by Max Rivlin-Nadler, Manny Fernandez, Zolan Kanno-Youngs and Kirk Semple.

Cuba AR_001315



☰ Menu                                          Subscribe | Log in

The Americas | Serve the people

# Cuba is facing its worst shortage of food since the 1990s

Government bungling and a shortage of dollars are to blame



AFP

Jul 1st 2021 | MIAMI

Share

"CUBANS HAVE always been resourceful," says Ana, the owner of a private farm-to-table restaurant near Havana. "But now we need to be magicians and acrobats." The communist island is facing its worst shortage of food since the 1990s. Finding ingredients was never easy in a place which imports around 70% of its food. Over the past year it has become nearly impossible. When grocery shops

Cuba AR_001316

are empty, as is so often the case, Ana tries the internet or the black market, only to find that prices are prohibitively high. Farmers no longer want to sell produce to her, she says, as they need to eat it themselves.

The government blames the shortage of food mostly on sanctions imposed by the United States—sanctions which, on June 24th, the UN General Assembly voted to

Already have an account? Log in

# Get to the end of the story

Understand the world's biggest issues—free for a month. Cancel at any time

View subscription options →

✓ Distinctive global analysis with more than 100 articles a week on *The Economist* app and economist.com

✓ An immersive world with podcasts and digital newsletters

✓ Intelligent debate with a global community in subscriber-only digital events

## Or continue reading this article

Register now

ADVERTISEMENT

## The Americas

July 3rd 2021

---

→ **Cuba is facing its worst shortage of food since the 1990s**

---

→ **More graves are found at Canadian schools for the indigenous**

---

→ **Latin America's national identities are being questioned**

---

Share    Reuse this content



THE ECONOMIST TODAY

## Handpicked stories, in your inbox

A daily newsletter with the best of our journalism

example@email.com    Sign up

## More from The Americas

# Gustavo Petro, Colombia's president, wants to smother the gig economy

The left-winger has angry taxi-drivers to deal with, too

---

# One Canadian province has decriminalised drugs

British Columbia's bold experiment will be watched closely elsewhere

---

# Joe Biden needs Mexico's co-operation on migration

His administration hopes a new approach will be transformative

Subscribe                                          The Trust Project

Group subscriptions                                Help and contact us

Reuse our content

---

Keep updated

Cuba AR_001319



*Published since September 1843 to take part in* "a severe contest between intelligence, which presses forward, and an unworthy, timid ignorance obstructing our progress."

---

**The Economist**

About

Advertise

Press centre

**The Economist Group**

The Economist Group

Economist Intelligence

Economist Impact

Economist Events

Working Here

Economist Education Courses

Which MBA?

Executive Jobs

Executive Education Navigator

---

Terms of Use    Privacy    Cookie Policy    Manage Cookies    Accessibility    Modern Slavery Statement    Sitemap

California: Do Not Sell My Personal Information

Copyright © The Economist Newspaper Limited 2023. All rights reserved.

COMPLETE COVERAGE

The House January 6 committee approves its historic final report on the US Capitol riot. Watch CNN

# Washington, DC, approves creation of new agency to provide services for migrants arriving from other states

By Aya Elamroussi and Adrienne Winston, CNN

Updated 3:51 AM EDT, Wed September 21, 2022



☰  CNN  US                                                                                          Audio Live TV

Marat Sadana/Reuters

A group of mainly Venezuelan migrants, who were sent by bus from detention in Texas, are dropped off outside the Naval Observatory, the official residence of U.S. Vice President Kamala Harris in Washington, DC, on September 17.

**(CNN) —** The Washington, DC, city council voted Tuesday to create a new office focusing on the recent arrival of migrants who were sent to the district from states whose leaders oppose the Biden administration's stance on immigration policies.

The move aims to improve response to the thousands of migrants who have been arriving in the nation's capital from Arizona and Texas, whose Republican leaders have come under scrutiny for the tactic.

Cuba AR_001321

The Washington city council approved the launch of the new agency in a unanimous vote after Mayor Muriel Bowser requested it to address the needs of migrants.

"With the establishment of the Office of Migrant Services, we stay true to our DC values by creating a framework for providing support to individuals and families while ensuring our homeless services systems continue to support our DC residents," said Bowser, who is a Democrat.



**RELATED ARTICLE**
Texas is sending migrants to New York and Washington, DC, by bus. Many are glad to go

The new agency will be housed within the district's Department of Human Services. Its goal is to provide arriving migrants with basic needs– including meals, transportation, urgent medical care as well as transportation to connect people to resettlement services.

The district will allocate $10 million to establish and support the new office, and Bowser said she will seek reimbursement for part of that funding through the US Federal Emergency Management Agency.

About 8,000 migrants have arrived in the capital over the past six months, according to councilmember Brianna Nadeau, who sponsored the bill proposing the creation of the agency. Nadeau believes that the passage of the bill can help the city provide better assistance to the migrants, according to her spokesperson.

"This legislation will ensure that every migrant is greeted by a bilingual, culturally competent professional; that they have respite; that they have food and clothing, and that they are safe, and welcome," Nadeau said.





Stefani Reynolds/AFP/Getty Images

Migrants from Venezuela, who boarded a bus in Texas, wait to be taken to a local church by volunteers after being dropped off outside the residence of US Vice President Kamala Harris on September 15.

The new agency is being created as at least three Republican governors send migrants out of their states to liberal cities, including Chicago and New York, and recently Martha's Vineyard in Massachusetts. The drop-offs, some of which were done with little notice, have left officials on the receiving end struggling to accommodate the needs of thousands of people

Last week, Texas Gov. Greg Abbott said the state deliberately sent two buses of migrants to Vice President Kamala Harris' official residence in Washington, DC.

Dozens of migrants were left outside the gated residence on grass and sidewalks because those in charge of responding to the group weren't prepared to meet them at that location, leaving volunteers scrambling to make arrangements.

SAMU First Response, one of the groups helping migrants in Washington, was not provided prior notice of the drop-off location, according to the group's managing director, Tatiana Laborde.

"By the time our team got to the migrants, they were very lost," Laborde told CNN Thursday morning. "(The migrants) didn't understand where they were standing – this is a very residential area."



RELATED ARTICLE
Legal group files class action lawsuit on behalf of advocacy group and migrants flown to Martha's Vineyard

Abbott's efforts to send migrants to Washington and New York has cost his state more than $12 million.

"VP Harris claims our border is 'secure' & denies the crisis," Abbott tweeted at the time. "We're sending migrants to her backyard to call on the Biden Administration to do its job & secure the border."

Also last week, Florida Gov. Ron DeSantis took credit for flying about 50 migrants to Martha's Vineyard in Massachusetts, which was not expecting the group. The Republican governor's move was met by backlash from White House, migrants' advocates and Democratic officials.

"We are not a sanctuary state, and it's better to be able to go to a sanctuary jurisdiction, and

Cuba AR_001323

yes, we will help facilitate that transport for you to be able to go to greener pastures," DeSantis said last week. "Every community in America should be sharing in the burdens. It shouldn't all fall on a handful of red states."

The term "sanctuary state" is a broad description applied to jurisdictions that have policies in place designed to limit cooperation with or involvement in federal immigration enforcement actions.

Similarly, Arizona Gov. Doug Ducey has sent more than 1,800 migrants to Washington, DC, and has no plans to stop, according to the Republican governor's office. As of last week, 50 buses carrying migrants from Colombia, Peru, Venezuela have dropped off migrants in the capital, with efforts costing about $4 million.

---

CNN's Paradise Afshar contributed to this report.

---

CONTENT BY GREENSPROUT

The shocking revelation about Prime memberships

You'll want to know this if you have Amazon Prime

You'll want to know this if you have Amazon Prime

Do this before renewing Amazon Prime, it's genius

The Prime benefit Amazon doesn't tell you about

---

CONTENT BY FINANCEBUZZ

Read This Before You Renew Amazon Prime

7 Genius Hacks Amazon Shoppers Must Know

Don't Make Another Purchase On Amazon Before Reading This

Prime Is Now $139, But Few Know These Nearly Secret Tricks

7 Secret Things To Do If You Have Amazon Prime

---

Paid Links

Search CNN…

Log In

Live TV

Audio

World

US Politics

Business

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Features

Weather

Cuba AR_001325

...use of hundreds of services. Washington, D.C. approved its first law agency to provide services for migrants arriving from othe…

More



US

FOLLOW CNN

  

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2022 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Cuba AR_001326

Cuba AR_001327

Cuba AR_001328

Cuba AR_001329

12/19/22, 4:31 PM    DC opens migrant services office. Washington accepted an early agency to provide services for migrants arriving from othe…

Case 6:23-cv-00007    Document 92-5    Filed on 03/24/23 in TXSD    Page 207 of 263

Cuba AR_001330

Cuba AR_001331

Cuba AR_001332

Cuba AR_001333

REUTERS

World   Business   Markets   Breakingviews   Video   More

TOP NEWS

DECEMBER 9, 2021 / 7:45 PM / UPDATED A YEAR AGO

## Migrant truck crashes in Mexico killing 54

By Jacob Garcia

TUXTLA GUTIERREZ, Mexico (Reuters) - Fifty-four mostly Central Americans were killed on Thursday when the truck they were in flipped over in southern Mexico, in one of the worst accidents involving migrants who risk their lives to reach the United States.

**At least 54 migrants die in Mexico truck accident**
01:23

The trailer broke open, spilling out people, when the truck crashed on a sharp curve outside the city of Tuxtla Gutierrez in the state of Chiapas, according to video footage of the aftermath and civil protection authorities.

Chiapas Governor Rutilio Escandon said 49 people died at the scene, and five more while receiving medical attention.

"It took a bend, and because of the weight of us people inside, we all went with it," said a shocked-looking Guatemalan man sitting at the scene in footage broadcast on social media.

"The trailer couldn't handle the weight of people."

More than 100 people were inside the trailer, authorities said. Several dozen were injured and taken to hospitals in Chiapas, which borders Guatemala. Dozens of Guatemalan migrants were named in lists of the injured published on social media.

Cuba AR_001334

A Reuters witness heard cries and sobs among survivors as emergency personnel rushed to the site of where the overturned truck shuddered to a halt by a highway footbridge.

Reuters images showed a white trailer on its side, with injured people splayed out on tarps on the ground. There were also rows of what appeared to be bodies wrapped in white cloth.

A video of the scene streamed on social media showed a woman holding a child wailing in her lap, both covered in blood. Another video showed a man curled up in pain inside the destroyed trailer, hardly moving as helpers pulled out bodies.

Slideshow ( 4 images )

Men, women and children were among the dead, the Chiapas state government said, and President Andres Manuel Lopez Obrador on Twitter expressed his sorrow at the "very painful" incident.

'NOT THE BEST WAY'

Migrants fleeing poverty and violence in Central America typically trek through Mexico to reach the U.S. border, and sometimes cram into large trucks organized by smugglers in extremely dangerous conditions.

"This shows us that irregular migration is not the best way," Kevin Lopez, a spokesman for Guatemala's presidency, told Milenio television after the accident.

He did not know how many Guatemalan victims there were.

El Salvador's foreign minister, Alexandra Hill, said her government was working to see if Salvadorans had died.

Cuba AR_001335

Mexico offered lodging and humanitarian visas to the survivors, and Chiapas Governor Escandon said those responsible for the accident would be held to account.

Officials in Mexico routinely come across migrants packed into trailers, including 600 people found hidden in the back of two trucks in eastern Mexico last month.

Slideshow ( 4 images )

The journey north from Mexico's border with Guatemala is perilous and expensive, and many migrants fall prey to criminal gangs en route. In January, 19 people, mostly migrants, were massacred with suspected police involvement in northern Mexico.

Record numbers of people have been arrested on the U.S.-Mexico border this year as migrants seek to capitalize on President Joe Biden's pledge to pursue more humane immigration policies than his hardline predecessor, Donald Trump.

Mexican authorities in Chiapas have attempted to persuade migrants to not form caravans to walk thousands of miles to the U.S. border, and have begun transporting people from the southern city of Tapachula to other regions of the country.

The Biden administration has also urged migrants not to leave their homelands for the United States, and this week saw the restart of a policy initiated under Trump to send asylum seekers back to Mexico to await their court hearings.

Some critics argue that tougher policies push migrants into the hands of the human smugglers, putting their lives at risk.

"(Authorities) generate smuggled migration that generates billions of dollars in profits," said migrant activist Ruben Figueroa.

Cuba AR_001336

Reporting by Jacob Garcia; Additional reporting by Jose Torres, Lizbeth Diaz, Noe Torres and Stefanie Eschenbacher; Writing by Daina Beth Solomon; Editing by Aurora Ellis, Dave Graham and Robert Birsel

*Our Standards: The Thomson Reuters Trust Principles.*

PAID PROMOTIONAL LINKS    Promoted by Dianomi



Finance with
confidence. Lock in
your rate.

Chase Multifamily
Lending



Our clients deserve the
best. So do you. Apply
today

Fidelity Investments



Uncover
unique
insights on the
economy,
global
transformation
& more.

Bank of America
Institute

Best trading
technology +
$0
commission
equities &
options.

TradeStation



See what it
takes to quit
for good–use
our free
Retirement
Calculator.

Personal Capital

Cuba AR_001337

MORE FROM REUTERS





It's time for a negotiated peace in Ukraine, Kissinger says
18 Dec

'I don't trust it:' Vaccine hesitancy lingers even as China COVID...
19 Dec







Twitter will remove accounts created solely to promote other social...
18 Dec

Musk launches poll asking if he should step down from Twitter
18 Dec

Putin heads for Belarus amid fears of new assault on Ukraine
19 Dec

Cuba AR_001338

Cuba AR_001339

MORE FROM REUTERS



Musk poll shows 57.5% want him to step down as Twitter chief

19 Dec



Multiple victims after shooting in Canada's Vaughan

19 Dec



Taiwan probes TikTok for suspected illegal operations

19 Dec



Special Report: Binance's books are a black box, filings show, as...

19 Dec



'All-time classic': Former players blown away by thrilling World...

19 Dec

Apps    Newsletters    Advertise with Us    Advertising Guidelines    Cookies    Terms of Use    Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

Cuba AR_001340

© 2022 Reuters. All Rights Reserved.

Cuba AR_001341

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 219 of 263

Sign in

Support us  →

**News  Opinion  Sport  Culture  Lifestyle**



US-Mexico border

## Migrants risk death crossing treacherous Rio Grande river for 'American dream'

Nine died while swimming the Rio Grande on Friday as deaths became commonplace this year after a migration shift pushed thousands here

*Valerie Gonzalez in Eagle Pass, Texas*

Mon 5 Sep 2022 02.00 EDT

**T**wo small inflatable floats with printed aquatic animals in bright colors lay by the river under the Eagle Pass port of entry in Texas on Saturday, a day after nine migrants died while swimming the Rio Grande.

A parent had placed their child in the floats and jumped in a river that looked deceptively calm. National guardsmen tasked with watching that section of Eagle Pass saw it for what it was: a treacherous, deep body of water with whirlpools between pillars holding up the international bridge.

"That's the problem with people from other countries," said Tom Schmerber, the Maverick county sheriff. "When they come, they're used to seeing big rivers. Then they see this one. It's not too big for them. But the Rio Grande carries a lot of currents."

Deaths in the river became commonplace this year, after a migration shift pushed thousands here.

Cuba AR_001342

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 220 of 263

"Almost every single day we respond to the river and recover at least one body a day," said Manuel Mello, the Eagle Pass fire chief. "Some days you won't recover for two or three days. [But] Monday or Tuesday we recovered four bodies with the Border Patrol."

Mello estimates about 30 bodies have been taken from the river each month since March.

Migrant encounters, rescues and recidivism rates increased dramatically when Title 42, a public health policy barring migrants from seeking asylum, went into place in the Covid pandemic.

Locals said rains over the last two weeks dumped more water into the river, which had been in drought, adding to its volatility.

Many migrants cross dangerous terrain like the infamous Darien Gap in southern Panama or other perilous routes.

Jhoana Contreras, a 33-year-old Venezuelan mother of three who made it to Eagle Pass after border patrol released her and sent her to Mission: Border Hope, a welcome center in Eagle Pass helping guide migrants through their journeys into the US.

"I didn't think it would ever end," she said of the journey, adding, "because it took days, days and days, rivers, rivers and rivers".

Contreras broke down as she recounted other times she, her husband and brother nearly lost it all.

"We were kidnapped in Guatemala. We went through things we never imagined we'd go through. I thank God who always kept us safe."

Contreras and family members crossed into the US via the Rio Grande, or Rio Bravo as it's known in Mexico, for its wild nature. At one point, she said, she went under the water and was rescued by her husband.

She was one of the lucky ones.



📷 Migrant families enter the Unites States after being smuggled across the Rio Grande river from Mexico into Roma, Texas, on 26 August. Photograph: Adrees Latif/Reuters

On Saturday, dozens of migrants were dropped off and picked up from Mission: Border Hope. Parents shuffled down charter buses with children in their arms. Some children were fast asleep. Others were wide awake.

Contreras' children were not with her.

"I wouldn't want the experience that so many children had on the way," she said. "I saw some children who would faint. They needed food, water, and medicine."

Her mother is watching them while Contreras and her husband work to get permission to bring them to the US.

Cuba AR_001343

Some parents, like Andrés Lecuna, a 39-year-old Venezuelan father of a five-year-old girl, brought their families in spite of the danger.

"It's something I lived through myself, because my daughter and wife nearly drowned. Some people we were traveling with helped save them," Lecuna said. "My arms were giving out, because the current was too strong. I felt I was drowning."

Lecuna's daughter, who wore a pink shirt and braids made by her mother, played with rocks outside the welcome center as her father contemplated the fate of those who died Friday in the same waters.

"I was surprised, because some of those who died were people traveling with us. A mother of an autistic son died. She was traveling with her husband and a daughter," Lecuna said.

The Guardian was not able to verify his account.

He said other men went under, men who knew how to swim like he did.

"I went under with my feet touching the ground and the top of my head wouldn't even touch the surface," he said. He calculated the depth was between 6ft and 9ft. "You get a cramp. Your arms get tired. You go into shock."

Migrants often travel in groups, to help each other through tough spots.

"If we come together, we cross together," said Jorge Luis Acosta, a 34-year-old single man from Cuba in Eagle Pass. "It was a bit dangerous, because it was deep. We were keeping watch over women and children so nothing bad would happen to them."

The last two years have seen record-breaking numbers of people attempting to cross the border illegally. The border patrol sector that includes Eagle Pass has seen almost as many migrants this year as the Rio Grande Valley sector, the traditional route of entry. The Eagle Pass region has seen about 376,000 encounters, while the Valley had nearly 413,000. Many tried to get in more than once.

Recidivism rates increased from 14% in 2015 to 26% and 27% in the last two years.

As desperation grows, more people are willing to risk their lives. From 2019 to 2022, rescues nearly tripled, with a 284% increase, according to US government data. The change started last year, up to nearly 13,000 from about 5,000 in 2020.

"You have females drowning. We found some who were pregnant. Their kids drown. It's not only just them, but families," Sheriff Schmerber said.

For many, the risk seems worth it.

"It's not easy to go through so much adversity, but it's worth it because I believe in the American dream," said Lecuna, who traveled with his wife and daughter.

Acosta said: "They're people just like you. People who are looking for a better life: a better economy, a way to feed, clothe and educate their children. That's all they want."

**$807,476**
contributions

**$1,000,000**
our goal

### Lend us a hand in 2023

We have a small favour to ask. Tens of millions have placed their trust in the Guardian's fearless journalism since we started publishing 200 years ago, turning to us in moments of crisis, uncertainty, solidarity and hope. More than 1.5 million supporters, from 180 countries, now power us financially - keeping us open to all, and fiercely independent. **We're raising $1m to support our reporting in 2023. We hope you'll consider a year-end gift.**

Unlike many others, the Guardian has no shareholders and no billionaire owner. Just the determination and passion to deliver high-impact global reporting, always free from commercial or political influence. Reporting like this is vital for democracy, for fairness and to demand better from the powerful.

And we provide all this for free, for everyone to read. We do this because we believe in information equality. Greater numbers of people can keep track of the events shaping our world, understand their impact on people and communities, and become inspired to take meaningful action. Millions can benefit from open access to quality, truthful news, regardless of their ability to pay for it.

**Help us reach our $1m goal for 2023. Make a year-end gift to the Guardian from as little as $1, or to make an even bigger difference and unlock exclusive extras, consider giving $13 or more each month. Thank you.**

Case 6:23-cv-00007    Document 92-5    Filed on 03/24/23 in TXSD    Page 222 of 263



| Single | Monthly | Annual |
|---|---|---|
| $7 per month | $13 per month | Other |

Continue →    Remind me in January    VISA  🔲  AMERICAN EXPRESS   P PayPal

## Related stories


Migrants still being blocked by 'really dangerous' Trump-era Covid policy
🕐 8 Sept 2022


Texas tragedy highlights migrants' perilous journey to cross US border
🕐 29 Jun 2022


Trump's border wall and the slow decay of American soil
🕐 5 Jan 2022


Haiti deportations justified because of Covid, Biden homeland secretary says
🕐 26 Sept 2021


Is there a crisis border? Advoc say it's 'politic manipulation
🕐 19 Mar 2021

## More from **Headlines**


**Live** / Jan 6 committee refers Donald Trump for criminal prosecution on four counts
4m ago


**A very American coup attempt /**
Jan 6 panel lays bare Trump's bid for power
🕐 2h ago


**California /** An elderly woman in prison is losing her memory. Why won't the state release her?
🕐 11h ago


**Belarus /** Putin's mission to Minsk raises fears he will drag country into Ukraine war
🕐 7h ago


**Canada shoot** Gunman in To slayings had h harassing neig
🕐 5m ago

## Most viewed

Cuba AR_001345

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 223 of 263

Cuba AR_001346

Cuba AR_001347

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 225 of 263

Cuba AR_001348

Cuba AR_001349

12/19/22, 4:44 PM    Migrants risk death crossing treacherous Rio Grande river for American dream | US-Mexico border | The Guardian

Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 227 of 263

Cuba AR_001350

Cuba AR_001351

12/19/22, 4:44 PM
Case 6:23-cv-00007   Document 92-5   Filed on 03/24/23 in TXSD   Page 229 of 263
Migrants risk death crossing treacherous Rio Grande river for American dream | US immigration | The Guardian

Cuba AR_001352

Cuba AR_001353



🏠 (http://www.gob.mx) › Secretaría de Relaciones Exteriores (/sre) › **Prensa**

Publicaciones Recientes  Washington DC para afinar Cumbre de Líderes de América d


# Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU.

Comunicado No. 401

Secretaría de Relaciones Exteriores | 25 de octubre de 2022 | Comunicado

Cuba AR_001354





Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU.

Con respecto a la implementación unilateral de la sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de los Estados Unidos, también conocidos como Protocolos de Protección al Migrante (MPP, por sus siglas en inglés), el Gobierno de México informa lo siguiente:

El 17 de junio de 2022, la Organización Internacional para las Migraciones (OIM) notificó a la Secretaría de Relaciones Exteriores (SRE) sobre la falta de espacio en los albergues en Tijuana, Baja California, para procesar más casos bajo el citado programa. Por tal razón, el ingreso de personas migrantes a México por ese punto de entrada se detuvo a partir del 19 de junio.

El 8 de agosto de 2022, el Departamento de Seguridad Nacional estadounidense (DHS, por sus siglas en inglés) informó que, a partir de esa fecha, comenzaría el fin de la implementación de dicha sección, en cumplimiento con el mandato ordenado por una Corte Federal de Distrito y en concordancia con la decisión de la Suprema Corte de los Estados Unidos del 30 de junio de 2022 sobre este particular.

Cuba AR_001355

El Gobierno de México, a través de la SRE, ha venido verificado que se otorgue la atención humanitaria necesaria a las personas migrantes participantes en el programa, incluyendo la administración de pruebas para COVID-19 y la atención de casos positivos, y seguirá garantizando su adecuada estancia y protección en territorio nacional en esta etapa de terminación de la implementación de la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de los Estados Unidos.

Contesta nuestra encuesta de satisfacción.

---

## ¿Cómo fue tu experiencia en gob.mx?

Twittear

Compartir (https://www.facebook.com/sharer/sharer.php?
u=https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-

Cuba AR_001356

migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-
nacionalidad-de-ee-uu&src=sdkpreparse)

🖨 Imprime la página completa

La legalidad, veracidad y la calidad de la información es estricta responsabilidad de la dependencia, entidad
o empresa productiva del Estado que la proporcionó en virtud de sus atribuciones y/o facultades
normativas.

Cuba AR_001357

REPÚBLICA DE PANAMÁ
GOBIERNO NACIONAL

MIGRACIÓN
SERVICIO, EXCELENCIA Y CONTROL

**Cuadro No. 001  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA POR REGIÓN SEGÚN ORDEN DE IMPORTANCIA: AÑO 2022**

| Región | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| América del Sur | 180,944 | 1,780 | 1,991 | 2,099 | 3,147 | 10,900 | 12,490 | 18,737 | 26,439 | 43,173 | 51,978 | 8,210 | - |
| Antillas | 24,674 | 1,012 | 817 | 876 | 1,311 | 1,493 | 1,369 | 1,789 | 2,501 | 3,049 | 4,926 | 5,531 | - |
| África | 11,058 | 1,316 | 1,056 | 1,259 | 1,072 | 764 | 942 | 1,031 | 1,012 | 841 | 967 | 798 | - |
| Asia | 11,186 | 576 | 378 | 588 | 600 | 734 | 808 | 1,252 | 1,145 | 1,131 | 1,886 | 2,088 | - |
| Europa | 56 | 12 | 7 | 2 | 1 | - | 19 | 8 | 1 | 2 | 3 | 1 | - |
| América Central | 35 | 1 | 2 | 1 | 1 | 1 | 2 | 5 | 4 | 7 | 10 | 1 | - |
| Eurasia | 16 | 3 | 4 | - | - | 2 | 2 | - | - | 1 | 2 | 2 | - |
| Oceanía | 10 | - | 7 | 1 | 2 | - | - | - | - | - | - | - | - |
| América del Norte | 6 | 2 | - | 1 | - | - | 1 | - | 1 | - | 1 | - | - |
| Otras regiones | 2 | - | - | - | - | - | - | - | 1 | - | - | 1 | - |

*Cifras preliminares al 30 de noviembre del 2022 sujetas a revisión y actualización.*

**Cuadro No. 002  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN: AÑO 2022**

| Condición | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Hombres | 165,596 | 3,557 | 3,047 | 3,449 | 4,632 | 10,316 | 11,632 | 17,239 | 23,481 | 35,550 | 41,735 | 10,958 | - |
| Mujeres | 62,391 | 1,145 | 1,215 | 1,378 | 1,502 | 3,578 | 4,001 | 5,583 | 7,623 | 12,654 | 18,038 | 5,674 | - |

**Gráfico No. 001  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA: AÑO 2022**



**Gráfico No. 002  PORCENTAJE DE TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN REGIÓN DE PROCEDENCIA: AÑO 2022**



Cuba AR_001358

**Cuadro No. 003  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA POR PAÍS SEGÚN ORDEN DE IMPORTANCIA: AÑO 2022**

| País | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Venezuela | 148,953 | 1,421 | 1,573 | 1,704 | 2,694 | 9,844 | 11,359 | 17,066 | 23,632 | 38,399 | 40,593 | 668 | - |
| Ecuador | 21,535 | 100 | 156 | 121 | 181 | 527 | 555 | 883 | 1,581 | 2,594 | 8,487 | 6,350 | - |
| Haití | 16,933 | 630 | 471 | 485 | 628 | 810 | 860 | 1,021 | 1,538 | 2,170 | 3,713 | 4,607 | - |
| Cuba | 5,530 | 367 | 334 | 361 | 634 | 567 | 416 | 574 | 589 | 490 | 663 | 535 | - |
| Colombia | 4,876 | 48 | 72 | 59 | 72 | 248 | 287 | 407 | 569 | 1,306 | 1,600 | 208 | - |
| India | 3,248 | 67 | 74 | 88 | 172 | 179 | 228 | 431 | 332 | 350 | 604 | 723 | - |
| Brasil | 2,614 | 168 | 139 | 160 | 134 | 150 | 121 | 149 | 271 | 282 | 488 | 552 | - |
| Senegal | 1,928 | 589 | 280 | 264 | 328 | 127 | 109 | 77 | 95 | 34 | 18 | 7 | - |
| Rep. Dominicana | 2,183 | 15 | 12 | 30 | 48 | 115 | 88 | 194 | 373 | 388 | 542 | 378 | - |
| Bangladesh | 1,829 | 70 | 81 | 201 | 126 | 254 | 210 | 236 | 150 | 189 | 143 | 169 | - |
| Perú | 1,504 | 17 | 23 | 18 | 29 | 88 | 109 | 136 | 247 | 365 | 438 | 34 | - |
| Nepal | 1,512 | 108 | 64 | 56 | 121 | 75 | 136 | 217 | 276 | 117 | 167 | 175 | - |
| Afganistán | 1,624 | 1 | 3 | 40 | 31 | 67 | 82 | 162 | 128 | 180 | 551 | 379 | - |
| Angola | 1,271 | 198 | 304 | 378 | 107 | 32 | 26 | 68 | 71 | 26 | 29 | 32 | - |
| Somalia | 1,366 | 84 | 27 | 60 | 83 | 103 | 149 | 201 | 182 | 134 | 193 | 150 | - |
| Ghana | 1,230 | 113 | 83 | 90 | 141 | 88 | 354 | 84 | 91 | 85 | 55 | 46 | - |
| Camerún | 1,248 | 31 | 24 | 92 | 91 | 103 | 41 | 210 | 132 | 199 | 209 | 116 | - |
| China | 1,310 | 32 | 39 | 56 | 59 | 67 | 66 | 85 | 119 | 136 | 274 | 377 | - |
| Chile | 1,205 | 9 | 17 | 13 | 23 | 37 | 44 | 75 | 112 | 190 | 324 | 361 | - |
| Congo | 610 | 69 | 141 | 143 | 38 | 24 | 13 | 64 | 47 | 5 | 27 | 39 | - |
| Eritrea | 591 | 30 | 32 | 34 | 56 | 72 | 50 | 91 | 69 | 48 | 49 | 60 | - |
| Nigeria | 615 | 23 | 54 | 45 | 53 | 41 | 49 | 31 | 63 | 72 | 72 | 112 | - |
| Guinea | 457 | 40 | 10 | 44 | 40 | 39 | 37 | 31 | 39 | 57 | 72 | 48 | - |
| Uzbekistán | 410 | 164 | 42 | 60 | 13 | 6 | 14 | 31 | 28 | 48 | 3 | 1 | - |
| Mauritania | 300 | 18 | 7 | 8 | 21 | 15 | 17 | 31 | 53 | 28 | 74 | 28 | - |
| Burkina Faso | 317 | 18 | 17 | 22 | 19 | 25 | 24 | 33 | 36 | 34 | 32 | 57 | - |
| Pakistán | 253 | 27 | 9 | 20 | 18 | 30 | 24 | 17 | 24 | 16 | 29 | 39 | - |
| Mali | 227 | 18 | 12 | 19 | 13 | 19 | 10 | 17 | 31 | 47 | 25 | 16 | - |
| Tayikistán | 195 | 88 | 11 | 17 | 2 | 1 | 7 | 16 | 30 | 20 | 3 | - | - |
| Etiopía | 210 | 9 | 7 | 4 | 21 | 20 | 15 | 23 | 26 | 27 | 37 | 21 | - |
| Sri Lanka | 188 | 5 | 12 | 12 | 12 | 26 | 15 | 7 | 13 | 34 | 16 | 36 | - |
| Kirguistán | 198 | 3 | 31 | 2 | 21 | 5 | 14 | 17 | 11 | 8 | 27 | 59 | - |
| Sierra Leona | 153 | 18 | 6 | 9 | 27 | 10 | 8 | 23 | 6 | 10 | 22 | 14 | - |
| Siria | 85 | 6 | 3 | 21 | 3 | 13 | 4 | 7 | 4 | 10 | 13 | 1 | - |
| Togo | 82 | 18 | 16 | 6 | 12 | 2 | 5 | 4 | 4 | 3 | 4 | 8 | - |
| Otros Países | 1,197 | 80 | 76 | 85 | 63 | 65 | 87 | 103 | 132 | 103 | 177 | 226 | - |

**Cuadro No. 004  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN: AÑO 2022**

| Condición | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Adultos | 191,854 | 4,059 | 3,527 | 3,958 | 5,358 | 11,885 | 13,296 | 19,784 | 26,939 | 41,198 | 48,863 | 12,987 | - |
| Menores | 36,133 | 643 | 735 | 869 | 776 | 2,009 | 2,337 | 3,038 | 4,165 | 7,006 | 10,910 | 3,645 | - |

**Gráfico No. 003  PORCENTAJE DE TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN : AÑO 2022**





Servicio N... Cuba AR /001359 ...ación



# Human Smuggling and Associated Revenues

What Do or Can We Know About Routes from Central America to the United States?

VICTORIA A. GREENFIELD, BLAS NUÑEZ-NETO, IAN MITCH, JOSEPH C. CHANG, ETIENNE ROSAS



HOMELAND SECURITY
OPERATIONAL ANALYSIS CENTER

An FFRDC operated by the RAND Corporation under contract with DHS

Cuba AR_001360

Published in 2019

Cuba AR_001361

## Preface

This report presents initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study, which was completed in less than two months, was to develop a preliminary estimate of transnational criminal organizations' (TCOs') revenues from smuggling migrants from the Northern Triangle region of Central America—consisting of Guatemala, Honduras, and El Salvador—to the United States. In addition, we sought to establish what is known or knowable about the characteristics, including the structure, operations, and financing, of TCOs that engage in human smuggling along those routes.

From the start, we intended to frame any revenue estimate as a range to accommodate a short study period and considerable uncertainty; however, as the research progressed, we encountered further challenges. We learned that human smuggling involves many different types of actors and that we could not credibly distinguish most TCOs' activities and revenues from those of other actors, including ad hoc groups and independent operators, that engage in human smuggling. Thus, we could provide, at best, a range for revenues to all types of smugglers, largely irrespective of their affiliations.

Although our findings are subject to a high degree of uncertainty, they represent a contribution to the evidence base informing ongoing U.S. government efforts to address threats to homeland security posed by TCOs and other actors that participate in human smuggling. The U.S. Department of Homeland Security (DHS) can use the insights provided in this report regarding the characteristics of human-smuggling operations to help shape policies and prioritize resources to counter that threat. The findings will also be of interest to others in the policy community, including those who undertake research on its behalf.

This research was sponsored by DHS's Science and Technology Directorate and conducted within the Strategy, Policy, and Operations Program of the Homeland Security Operational Analysis Center federally funded research and development center (FFRDC).

## About the Homeland Security Operational Analysis Center

The Homeland Security Act of 2002 (Section 305 of Public Law 107-296, as codified at 6 U.S.C. § 185), authorizes the Secretary of Homeland Security, acting through the Under Secretary for Science and Technology, to establish one or more FFRDCs to provide independent analysis of homeland security issues. The RAND Corporation operates the Homeland Security Operational Analysis Center (HSOAC) as an FFRDC for the U.S. Department of Homeland Security (DHS) under contract HSHQDC-16-D-00007.

Cuba AR_001362

The HSOAC FFRDC provides the government with independent and objective analyses and advice in core areas important to the department in support of policy development, decisionmaking, alternative approaches, and new ideas on issues of significance. The HSOAC FFRDC also works with and supports other federal, state, local, tribal, and public- and private-sector organizations that make up the homeland security enterprise. The HSOAC FFRDC's research is undertaken by mutual consent with DHS and is organized as a set of discrete tasks. This report presents the results of research and analysis conducted under 70RSAT18FR0000145, the Economic Value of Human Smuggling to Transnational Criminal Organizations.

The results presented in this report do not necessarily reflect official DHS opinion or policy.

For more information on HSOAC, see www.rand.org/hsoac.

For more information on this publication, visit www.rand.org/t/RR2852.

Cuba AR_001363

# Contents

Preface ........................................................................................................................... iii

Figures .......................................................................................................................... vii

Tables .......................................................................................................................... viii

Summary ......................................................................................................................... ix

Acknowledgments ......................................................................................................... xix

Abbreviations ................................................................................................................ xx

1. Introduction ............................................................................................................... 1
   Definition of *Transnational Criminal Organization* ............................................... 3
   Technical Approach to Analysis ............................................................................. 4
   Challenges, Uncertainties, and Mitigations ........................................................... 6

2. The Characteristics of Human Smuggling .................................................................. 9
   Taxonomy of Human Smugglers ........................................................................... 10
      Independent Operators .................................................................................... 11
      Ad Hoc Groups ................................................................................................ 12
      Loose Networks ............................................................................................... 12
      More-Formal Networks ..................................................................................... 13
      Dynamism Within the Spectrum ........................................................................ 13
   Key Roles in Human Smuggling ........................................................................... 14
   The Relationship Between Smuggling Services and Fees ....................................... 15
      All-Inclusive Packages ..................................................................................... 15
      Pay-as-You-Go Arrangements ........................................................................... 18
   The Difficulty of Calculating Human-Smuggling Profits ......................................... 19
   Drug-Trafficking TCOs' Involvement in Human Smuggling ..................................... 21
      Paying the Tax, or *Piso* .................................................................................. 22
      Potential for Broader Convergence of Human Smuggling and Drug Trafficking ..... 23
   Conclusion .......................................................................................................... 25

3. Preliminary Findings on Revenue Estimation ............................................................ 26
   Flows of Unlawful Migrants .................................................................................. 27
   Percentage of Unlawful Migrants Hiring Smugglers ............................................... 30
   Human-Smuggling Fees and Payments .................................................................. 31
   Ranges of Estimates of Smuggling Revenues and *Piso* Collections ....................... 35
      Smuggling Revenues ........................................................................................ 35
      Drug-Trafficking TCOs' *Piso* Collections ........................................................ 37
   Profitability, Risk, and Other Economic Considerations ......................................... 38

4. Concluding Remarks .................................................................................................. 40
   Targeting Human Smuggling ................................................................................ 40
   Allocating Resources ........................................................................................... 41

Cuba AR_001364

Improving Data Collection.................................................................................................................42

Appendix A. Guidance for Literature Review ............................................................................................44

Appendix B. Discussion Points and Questions for Subject-Matter Experts .................................45

Appendix C. Guidance for Data Analysis ..................................................................................................47

Appendix D. DHS and EMIF Sur Data on Smuggling Fees .........................................................50

References ..........................................................................................................................................................51

Cuba AR_001365

# Figures

Figure S.1. Revenues to and Types of Actors Engaged in Human Smuggling............................ xiii

Figure S.2. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars) ............................................................. xv

Figure 1.1. Smuggling Routes from the Northern Triangle to the United States ............................ 1

Figure 1.2. General Framework for Economic Analysis, Including Revenue Estimation .............. 5

Figure 3.1. Revenues to and Types of Actors Engaged in Human Smuggling ............................ 26

Figure 3.2. Estimated Flows of Migrants from the Northern Triangle to the United States ......... 29

Figure 3.3a. Guatemala: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ........... 32

Figure 3.3b. Honduras: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ........... 33

Figure 3.3c. El Salvador: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ........... 33

Figure 3.4. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars) ........................................................... 34

Cuba AR_001366

# Tables

Table S.1. The Spectrum of Actors Engaged in Human Smuggling ............................................... xi

Table 2.1. The Spectrum of Actors Engaged in Human Smuggling ............................................ 11

Table 3.1. Preliminary Estimates of Smuggling Revenues, by Country of Origin for 2017 (in millions of U.S. dollars) ........................................................................................... 36

Table 3.2. Preliminary Estimates of Drug-Trafficking TCOs' Tax, or *Piso*, Collections, by Country of Origin for 2017 (in millions of U.S. dollars) ...................................... 37

Table D.1. Smuggling Fees Reported in DHS Data for Fiscal Year 2017 ................................... 50

Table D.2. Smuggling Fees Reported in EMIF Sur Data for Calendar Year 2017 ...................... 50

Cuba AR_001367

# Summary

This report presents initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study was to develop a preliminary estimate of transnational criminal organizations' (TCOs') revenues from smuggling unlawful migrants from the Northern Triangle (NT) region of Central America—consisting of Guatemala, Honduras, and El Salvador—to the United States. Given a tight deadline and the inherent challenges of research on illicit activities, we recognized the infeasibility of developing a point estimate for revenue and, instead, sought to develop a range of estimates. We also sought to establish what is known or knowable about the characteristics, including structure, operations, and financing, of TCOs that engage in human smuggling along routes from the NT to the United States and the markets in which they operate.

Providing the U.S. Department of Homeland Security (DHS) with a better understanding of how TCOs and other actors that participate in human smuggling are structured, do business, and are financed could help inform efforts to investigate and disrupt them and to make decisions about how to allocate resources to those efforts. For example, such understanding could help DHS identify TCOs' vulnerabilities and supply evidence to weigh the benefits of action. However, our interviews with subject-matter experts (SMEs), review of the literature, and data analysis indicated that many different types of smugglers are involved in human smuggling and that we could not credibly distinguish the activities and revenues of TCOs that smuggle humans ("human-smuggling TCOs") from those of independent operators, ad hoc groups, and others who also engage in human smuggling.

Thus, we could not consider the characteristics of human-smuggling TCOs in isolation, nor could we provide a preliminary estimate—or even a range of estimates—for smuggling revenues that flow solely to these TCOs. Instead, we developed a range for the "aggregate" revenues that flow to all types of smugglers, including not just TCOs but also independent operators, ad hoc groups, and other actors. Separately, we were able to identify and evaluate the "taxes," or *pisos*, that migrants pay to drug-trafficking TCOs for the right to pass through their territories en route to the United States and at the U.S.-Mexico border. Revenues from *pisos* appear to be modest compared with revenues from smuggling.

This summary presents an overview of our findings on the characteristics of human smugglers that operate along routes from the NT to the United States, as well as the characteristics of smuggling, more generally, and preliminary estimates of revenues from this activity along with drug-trafficking TCOs' *piso* collections.

Cuba AR_001368

## The Characteristics of Human Smuggling

We found that many different types of smugglers—or "actors"—are involved in moving unlawful migrants from the NT to the United States and that they provide similarly wide-ranging services. These actors comprise a spectrum, spanning from independent operators who move unlawful migrants along particular segments of the route or offer other discrete services (e.g., a taxi driver based out of one town that ferries migrants to the next major town) to more formally structured networks that may include a central figure who coordinates smuggling efforts along the entire route.

There is some debate in the literature about the extent to which groups of smugglers are becoming more professional and sophisticated, particularly in light of possible increases in smuggling fees. However, our analysis suggests that many, if not most, of these groups are loosely organized, nonhierarchical, and generally do not maintain a definable command structure. The diversity and proliferation of individuals and groups involved in some aspect of human smuggling make it challenging to identify the extent to which these activities are conducted by actual TCOs.

### Taxonomy of Human Smugglers

Table S.1 presents a taxonomy of types actors engaged in human smuggling, based on our review of the literature, including academic articles, press reports, and reports written by government agencies, nongovernmental organizations, and multilateral entities and interviews with SMEs. The table starts with the least organized types of smugglers and ends with the most organized types. At each level, actors differ by organizational cohesion, membership, and geographic dispersion along smuggling corridors.

Cuba AR_001369

**Table S.1. The Spectrum of Actors Engaged in Human Smuggling**

| Type of Actor | Organizational Structure | Services | Group Membership | Geographic Reach |
|---|---|---|---|---|
| Independent operators | One "cell" composed of one or a few individuals | Provide a discrete service (e.g., transportation or lodging) | Do not generally work with other cells or actors | Generally work in one location, or between two locations |
| Ad hoc groups | Two or more independent operators that may not always work together | Provide multiple, complementary services | Generally unaware of other actors and groups more than one degree of separation removed | Work in one, two, or more locations |
| Loose networks | A larger number of small groups that usually work together | May provide end-to-end service along the full route or a portion of the route | Members may know only a limited number of other members | Working in many locations, potentially the full route |
| More-formal networks | A central figure who coordinates groups that consistently work together | Provide end-to-end services | Members generally know each other | Working along the full route |

Many of the actors engaged in human smuggling do not appear to meet the statutory definition of a TCO. For example, few of the actors shown in Table S.1 appear to feature "self-perpetuating associations" that protect their activities through "a pattern of corruption and/or violence," with a "transnational organizational structure," as articulated in 10 U.S.C. § 284(i)(6). Adding another layer of complication, smugglers commonly move between levels or can operate at more than one level along the spectrum, depending on their opportunities. In fact, many of these actors can be thought of as subcontractors, that might offer their services to different networks, groups, or other independent operators at the same time. Partly for these reasons, we were largely unable to disentangle the activities and revenues of TCOs from those of other actors that engage in human smuggling.

## Human-Smuggling Services and Roles

The broad spectrum of actors engaged in human smuggling supports a wide range of service options for unlawful migrants. At one end of the range, the migrants can opt for "all-inclusive" or "end-to-end" arrangements, in which migrants pay a large fee to a network that arranges all their travel—and may even send a representative to travel with them—that can amount to upward of $10,000. At the other end, migrants can "pay as they go" and travel on their own for portions of the route and then connect with local smugglers to pay for transportation and logistical support for other portions of the route, which can cost much less. There is no consensus in the literature or among SMEs concerning what percentage of migrants uses "all-inclusive" arrangements and what percentage chooses to "pay as they go."

Cuba AR_001370

Smugglers typically fill a number of roles, whether they are working as independent operators or as part of a group or network. Depending on the sophistication of the operation, individuals or small groups of people (sometimes referred to as a *cell* by law enforcement) can fill these roles. Below is a brief description of the key roles:

- **Facilitation/coordination.** Identify and recruit migrants, collect up-front fees, pay other smuggling organizations during the migrants' journey, and coordinate some or all the migrants' travel from their source country to their final destination.
- **Transportation.** Transport migrants from one location to another along the route north using conveyances that range from taxis to charter buses and tractor-trailers.
- **Logistics/stash houses.** Provide logistical support, often in the form of lodging or "stash houses" where migrants can take shelter for a few days or even a few weeks.
- **Fraudulent documents.** Provide unlawful migrants with fraudulent documents, including Mexican visas, national identity cards, or birth certificates, to facilitate their travel through Mexico, create synthetic families, or avoid detention.
- **Footguides/coyotes/***polleros***.** Guide migrants seeking to avoid detection while entering the United States—generally single adults—across the border between ports of entry in order to circumvent border security personnel.

*Relationship Between Human Smuggling and Drug Trafficking*

A handful of drug-trafficking organizations that are commonly identified as TCOs maintain control of the primary trafficking corridors into the United States, which allows them to regulate and tax illicit trade through their territory. Controlling prime smuggling territory also affords the drug traffickers an opportunity to charge migrants a "tax," or *piso*, for the right to pass through. According to U.S. government sources, it is all but impossible for migrants to cross some sections of the border, particularly those most tightly controlled by the drug traffickers, without paying the *piso*. Collecting the *piso* requires fairly extensive regulation of migrants passing through a drug-trafficking organization's territory, pointing to coordination between human smugglers and drug traffickers before a migrant reaches the U.S.-Mexico border. The *piso* is perhaps the clearest example of identifiable TCO earnings that can be associated with human smuggling, even if it is not "smuggling revenue," per se. In addition to coordinating *piso* collections, there are some reports that drug-trafficking TCOs coordinate unlawful migrants' border crossing to divert attention from other illicit activities, and that they may recruit or coerce some migrants into carrying drugs for them. Beyond these activities, however, there is little evidence that drug-trafficking TCOs are involved in human smuggling writ large.

## Preliminary Findings on Revenue Estimation

Although we could neither develop a point estimate for revenues from smuggling unlawful migrants from the NT to the United States nor attribute such revenues to particular types of smugglers, we were able to use data from DHS and other sources to construct a range of preliminary estimates of revenue to all smugglers, without regard to their type. Separately, we

xii

Cuba AR_001371

were able to identify migrants' payments to drug-trafficking TCOs, specifically, for passing through these TCOs' territories.

Figure S.1 depicts the flows of revenues associated with human smuggling to human smugglers of all types, including TCOs, and to drug-trafficking TCOs. The larger oval to the right represents the former, designated as "aggregate" smuggling revenue, and the smaller oval to the left represents the latter, designated as "tax" revenue. The intersection of the two ovals represents instances in which smuggling fees cover the tax.

**Figure S.1. Revenues to and Types of Actors Engaged in Human Smuggling**



To estimate revenue to all types of human smugglers (i.e., aggregate smuggling revenue) along routes from the NT to the United States, we required data on three variables: (1) the number of unlawful migrants along a route, (2) the percentage of those migrants who hire smugglers, and (3) the typical payments made, per migrant, to smugglers. We defined three general routes, by country of origin, as "Guatemala–United States," "Honduras–United States," and "El Salvador–United States." We also produced an ancillary, preliminary estimate of drug-trafficking TCOs' *piso* collections.

We analyzed data from 2015–2017 and earlier, but we worked primarily with data from the most recent available year, i.e., 2017, for the smuggling revenue and tax estimates.

xiii

Cuba AR_001372

*Flows of Unlawful Migrants*

To estimate the flow of unlawful migrants from the NT to the United States, we used data on apprehensions and other activity at the U.S.-Mexico border, between ports of entry (POEs), that are collected by the U.S. Border Patrol and data from an analysis of apprehension rates, also between POEs, reported in a 2017 DHS Office of Immigration Statistics study. We tried four different estimation methods (see Appendix C), using different combinations of these data, to produce a range of estimates for unlawful migration from Guatemala, Honduras, and El Salvador. By that approach, we found that the flow of unlawful migrants from the NT to the United States in 2017 could have ranged from about 218,000 to about 345,000 between POEs.

*Percentage of Unlawful Migrants Hiring Smugglers*

To estimate the percentage of unlawful migrants who hire smugglers along the routes, we drew on data from DHS and from a survey of migrants called the Encuesta sobre Migración en la Frontera Sur de México, which translates to "Survey of Migration at Mexico's Southern Border" (we will refer to it by its Spanish abbreviation, EMIF Sur). This survey is conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, which is located in Mexico. Because the DHS data on migrants' use of smugglers might fail to capture a substantial amount of smuggling activity (see Chapter 3), the DHS data suggest a lower bound. From the two sources, we concluded that about one-quarter to two-thirds of unlawful migrants from the NT might have hired smugglers in recent years, with some variation by country of origin.

*Human-Smuggling Fees and Payments*

For this calculation, we also drew from DHS and EMIF Sur data and turned to other sources, including our own interviews with SMEs. We used the DHS data to calculate mean and median smuggling fees, by country of origin, as reported to U.S. Border Patrol agents by unlawful migrants who are apprehended at the U.S.-Mexico border, between POEs. We also looked at the EMIF Sur data on unlawful migrants' actual and agreed payments to smugglers along routes from the NT to and into the United States. The results using the EMIF Sur data, which might include some unrealized payments and more transit in the United States, were substantially higher than the results using the DHS data and—importantly—better aligned with anecdotal evidence and most SME perspectives.

Taking the properties of the DHS and EMIF Sur data into account, we chose to work with the median values for the fees for transit from each country in 2017 to create ranges. Route by route, the median value from the DHS data represented the low end of the range, and the median value from the EMIF Sur data represented the high end (see Figure S.2).

Cuba AR_001373

**Figure S.2. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

### Ranges of Estimates of Smuggling Revenues

We constructed a preliminary estimate, or range of estimates, of smuggling revenue from the low- and high-end figures for (1) unlawful migrant flows, (2) the percentage of those migrants who use smugglers, and (3) the migrants' payments to smugglers. First, we multiplied the low-end figures for each route, then we multiplied the high-end figures for each route, producing a low- and high-end estimate for each route. The DHS data yielded the low-end estimates, route by route, because they were lower for fees and the percentage of migrants using smugglers. At the high end, we were able to differentiate between payments en route to the U.S.-Mexico border as one "segment" of the journey and payments across that border as another "segment," because the EMIF Sur data on fees draw this distinction.

We found that the revenues from smuggling migrants from El Salvador, Guatemala, and Honduras, combined (as would correspond to the larger oval to the right in Figure S.1), could have ranged from a total of about $200 million to a total of about $2.3 billion in 2017 (see Table 3.1 in Chapter 3). The breadth of the range reflects the considerable uncertainty of the underlying estimates of unlawful migrant flows, migrants' use of smugglers, and smuggling fees. At the low end, this estimate very likely understates revenues, partly because of missing information on border crossings between POEs; at the high end, this estimate might be too high, partly because the fee data from EMIF Sur include agreed payments, some of which might not have materialized, in addition to actual payments.

Cuba AR_001374

However, neither end of the range includes fees from migrants who present themselves at POEs, which could increase the revenue estimates slightly, and neither end has been adjusted to account for recidivism, which could decrease them slightly (see Chapter 3).

### Ranges of Estimates of Drug-Trafficking TCOs' Piso Collections

Separately, we developed an ancillary, preliminary estimate for drug-trafficking TCOs' tax, or *piso*, collections, using a similar methodology. The migrant flow numbers were the same as for the preliminary estimate of smuggling revenue, but the percentage and payment estimates differed substantially. Drawing on evidence from the literature review and discussion with SMEs, we postulated that the percentage of migrants who pay these taxes ranged from 50 percent to 75 percent and that the payment figures ranged from $300 to $700. On that basis, the total amount of *pisos* that migrants from the NT might have paid drug-trafficking TCOs in 2017—for traveling the three routes, combined (as would correspond to the smaller oval to the left in Figure S.1)—could have ranged from about $30 million to $180 million in 2017 (see Table 3.2 in Chapter 3).

Whether these sums are reflected in the human-smuggling revenues estimated above, as a pass through to drug-trafficking TCOs, or constitute an additional payment, depends on the smuggling arrangement, be it "all-inclusive" or "pay as you go." If the arrangement were all-inclusive, the tax might be folded into the smuggling fee (as depicted in the intersection of the two ovals in Figure S.1), but it would, nevertheless pass through to the drug-trafficking TCO that demanded payment for the migrant's passage. For this reason, and because of the attribution of the taxes to drug-trafficking TCOs, we present the estimate on its own.

## Concluding Remarks

We developed a preliminary estimate of aggregate revenue from smuggling unlawful migrants from the NT to the United States that ranges from about $200 million to $2.3 billion in 2017. This estimate, as the range implies, is highly uncertain, owing largely to a scarcity of reliable data on migrant flows, migrants' use of smugglers, and smuggling fees. Likewise, we produced an ancillary and still preliminary estimate of drug-trafficking TCOs' tax, or *piso*, collections that also spanned an order of magnitude, from about $30 million to $180 million.

To conclude, we present implications of our findings for targeting human smuggling, informing resource allocation decisions, and improving data collection.

### Targeting Human Smuggling

A key finding of this report is that human smuggling involves many different types of smugglers, or "actors," with organizations that are often informal and based on relationships instead of well-established, enduring hierarchies. Absent formality and strict hierarchical structures, it might be difficult for DHS to effectively target these actors with legal sanctions:

xvi

Cuba AR_001375

Loose networks are difficult to disrupt, ad hoc groups are even less susceptible to disruption, and independent operators are easily replaceable. Facilitators might be less replaceable than other market participants and present a more fruitful avenue for intervention, but going after them might be challenging, especially when they are based in foreign countries, as is typical. Although targeting might be difficult, DHS could consider expanding existing efforts to investigate payments made to human smugglers, especially in the United States, and working more closely with formal and informal banking services to identify suspicious payments. DHS could also consider expanding current efforts to work with foreign law enforcement partners.

### Allocating Resources

As DHS considers how to allocate resources, it might look to compare the size of the human-smuggling market, as measured by estimated revenues, and the sizes of other illicit markets of concern. Our high-end estimate for revenue from human smuggling, i.e., $2.3 billion, was on the same order of magnitude as estimates for revenues from trafficking marijuana, cocaine, and heroin through Mexico and across the U.S.-Mexico border that were developed in a 2010 RAND report by Kilmer et al., which could have totaled up to $7.1 billion, without netting out the costs of the drugs. However, as noted above, we cannot say how much of the revenue from human smuggling flows to TCOs that engage in human smuggling. Moreover, the 2010 RAND estimates for drug-trafficking revenues include only revenues from moving drugs through Mexico and across the U.S.-Mexico border and do not include revenue that drug-trafficking TCOs garner subsequently from distribution, wholesale, or retail activities that occur in the United States. To shed additional light on the dimensions of human smuggling, we also compared revenues from human smuggling with spending on related licit activities, such as air, rail, truck, and other transportation services reported in national accounts, and, from that perspective, the smuggling revenues looked much smaller.

### Improving Data Collection

We also identified potential improvements in data collection and methods that DHS could consider if it wanted to refine the estimate, to better inform policymaking. For example, DHS could standardize its line of questioning during migrant interviews, across apprehension sites, and seek details from migrants that would increase DHS's ability to assess revenues, by route, and distinguish different types of smugglers and payments. DHS could also create a shared portal for data entry that screens for errors, if it has not done so already, and use a randomized survey process to reduce the administrative burden of data collection on frontline personnel and increase the likelihood of successful data entry.

However, a longer-term research project might be able to reduce some of the uncertainty of the revenue estimate even using the imperfect data that DHS already has. For example, we could build on the calculations in this report by taking more time to explore the sensitivity of the

Cuba AR_001376

calculations to underlying assumptions about behavior and markets and explore additional ways to filter and analyze the data.

xviii

Cuba AR_001377

# Acknowledgments

We would like to thank John Vehmeyer for his work as our primary point of contact in the Science and Technology Directorate of the U.S. Department of Homeland Security (DHS) and Shawna Garrison, Advisor to the Commissioner for U.S. Customs and Border Protection, for her insight and assistance. In addition, we would like to thank the subject-matter experts within DHS—at U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement—and at academic institutions for their participation in interviews for this project. Because their participation was confidential, we cannot name them individually, but their contributions were critical to our understanding of the issues and the timely completion of the analysis. We would also like to thank Marc Rosenblum, Deputy Assistant Secretary for the Office of Immigration Statistics, for providing us with the DHS data that formed a large part of the analysis, and the Colegio de la Frontera Norte for publicly posting the data from its "Survey of Migration at Mexico's Southern Border" (EMIF Sur).

Lastly, we are grateful to several RAND colleagues, including Daniel Egel and Elina Treygor for their constructive feedback on earlier drafts of the report, Shelly Culberston for her contributions to the project design and interview protocol, Elizabeth Hammes for helping us conduct a rapid and wide-ranging literature review, Krista Romita Grocholski for her assistance with the data analysis, Holly Johnson for her support in formatting and preparing the report, James Torr for his thoughtful edits, and Erica Robles for her efforts to help us navigate Homeland Security Operational Analysis Center processes and meet challenging deadlines.

Cuba AR_001378

## Abbreviations

| | |
|---|---|
| DHS | U.S. Department of Homeland Security |
| EMIF Sur | Encuesta sobre Migración en la Frontera Sur de México/Survey of Migration at Mexico's Southern Border |
| HSOAC | Homeland Security Operational Analysis Center |
| POE | port of entry |
| NT | Northern Triangle (Guatemala, Honduras, and El Salvador) |
| SME | subject-matter expert |
| TCO | transnational criminal organization |

Cuba AR_001379

# 1. Introduction

In 2017, U.S. Border Patrol agents apprehended about 160,000 unlawful migrants from the Northern Triangle (NT) of Central America—consisting of Guatemala, Honduras, and El Salvador—at the U.S.-Mexico border between ports of entry (POEs). An additional roughly 20,000 family units and unaccompanied children from these three countries presented themselves to U.S. Customs and Border Protection officers at POEs to enter the asylum process in 2017. Many or most of the migrants hired smugglers for assistance or paid others for rights of way at some point during the journey north. Migrants from the NT who hire smugglers might pay them thousands of dollars to make that journey, regardless of whether they attempt to evade capture or present themselves directly to border officials at or between POEs in order to claim asylum.[1] Figure 1.1 depicts common smuggling routes from NT countries through Mexico.

**Figure 1.1. Smuggling Routes from the Northern Triangle to the United States**



SOURCE: Amnesty International, 2010 (now CC BY-NC-ND 4.0).

Of particular concern to policymakers is the possibility that a substantial share of the migrants' expenditures on smuggling services is flowing to transnational criminal organizations

---

[1] In this context, we are using the term *border officials* to refer to U.S. Border Patrol agents *between* POEs and U.S. Customs and Border Protection officers *at* POEs because families and unaccompanied minors from the NT who use smugglers generally present themselves directly to agents and officers in both environments in order to enter the asylum process.

Cuba AR_001380

(TCOs). TCOs that benefit from smuggling migrants from the NT to the United States across the U.S.-Mexico border represent a potential threat to homeland security. They can create, contribute to, or help to shape a criminal industry that exploits and harms the people smuggled, challenges the rule of law in U.S. border states and the countries along transit routes, and degrades confidence in U.S. immigration laws.

To date, the U.S. Department of Homeland Security (DHS) and larger policy community have lacked evidence on the full extent and distribution of migrants' expenditures on smuggling and the characteristics of the smugglers, be they TCOs or others. Providing DHS with a better understanding of how TCOs and other actors that participate in human smuggling are structured, do business, and are financed could help inform efforts to investigate and disrupt them and to make decisions about how to allocate resources to those efforts. For example, such understanding could help DHS identify TCOs' vulnerabilities and supply evidence to weigh the benefits of action.

This report attempts to fill some of these knowledge gaps by presenting initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study, which was conducted in less than two months, was to develop a preliminary estimate of TCOs' revenues from smuggling unlawful migrants from the NT to the United States. In addition, we sought to establish what is known or knowable about the characteristics, including the structure, operations, and financing, of TCOs that engage in human smuggling ("human-smuggling TCOs") along routes from the NT to the United States and the markets in which they operate.[2]

However, we encountered an immediate obstacle to meeting the study's research goals, particularly those of revenue estimation. We found, by interviewing subject-matter experts (SMEs), reviewing the literature, and analyzing data, that many different types of smugglers participate in this market and that we could not credibly distinguish the activities and revenues of human-smuggling TCOs from those of independent operators, ad hoc groups, and others who also benefit from human smuggling. Thus, we could not consider the characteristics of human-smuggling TCOs in isolation nor could we provide an estimate, or even a range of estimates, for revenues flowing solely to human-smuggling TCOs. Instead, we developed a range for revenues that flow to all types of human smugglers, including TCOs. We were, however, able to attribute the revenues from taxes levied on migrants by drug-trafficking TCOs on portions of routes they control directly to those TCOs and estimate them separately.

---

[2] Notwithstanding the focus on revenue as a starting point for understanding "economic value," profitability might say more about human smuggling's contribution to the financial health and viability of these TCOs.

Cuba AR_001381

## Definition of *Transnational Criminal Organization*

To start, we examined formal definitions of *transnational criminal organization* to try to distinguish such organizations from others that might engage in human smuggling along routes from the NT to the United States. TCOs have been defined in U.S. law as

> . . . self-perpetuating associations who operate transnationally for the purpose of obtaining power, influence, monetary and/or commercial gains, wholly or in part by illegal means, while protecting their activities through a pattern of corruption and/or violence, or while protecting their illegal activities through a transnational organizational structure and the exploitation of transnational commerce or communication mechanisms.[3]

The White House's 2011 *Strategy to Combat Transnational Organized Crime* provides further guidance:

> There is no single structure under which transnational organized criminals operate; they vary from hierarchies to clans, networks, and cells, and may evolve to other structures. The crimes they commit also vary. Transnational organized criminals act conspiratorially in their criminal activities and possess certain characteristics which may include, but are not limited to:
>
> - In at least part of their activities they commit violence or other acts which are likely to intimidate, or make actual or implicit threats to do so;
> - They exploit differences between countries to further their objectives, enriching their organization, expanding its power, and/or avoiding detection/apprehension;
> - They attempt to gain influence in government, politics, and commerce through corrupt as well as legitimate means;
> - They have economic gain as their primary goal, not only from patently illegal activities but also from investment in legitimate businesses; and
> - They attempt to insulate both their leadership and membership from detection, sanction, and/or prosecution through their organizational structure.[4]

These definitions and guidance allow for different types of organizational structures, ranging from hierarchies to cells, but they start from the point of "self-perpetuating associations" that act

---

[3] 10 U.S.C. § 284(i)(6). For an alternative definition, see United Nations Office on Drugs and Crime, *Legislative Guide for the Implementation of the United Nations Convention Against Transnational Organized Crime*, 2004. For the purposes of that convention, the United Nations specifies,

> (a) "Organized criminal group" shall mean a structured group of three or more persons, existing for a period of time and acting in concert with the aim of committing one or more serious crimes or offences established in accordance with this Convention, in order to obtain, directly or indirectly, a financial or other material benefit; (b) "Serious crime" shall mean conduct constituting an offence punishable by a maximum deprivation of liberty of at least four years or a more serious penalty; (c) "Structured group" shall mean a group that is not randomly formed for the immediate commission of an offence and that does not need to have formally defined roles for its members, continuity of its membership or a developed structure.

[4] United States, Executive Office of the President, 2011.

Cuba AR_001382

like organizations and call out particular behavior, including violence in pursuit of influence and economic gain. These descriptions suggest that, to be considered a TCO, a human-smuggling group or network needs to have some level of organization and hierarchy; that is, it should be more than just an ad hoc collection of individuals who operate along distinct parts of a route and work together opportunistically with other individuals in various configurations to move people from Central America, across Mexico, and to the U.S. border. One gray area involves slightly more organized groups, consisting of loose networks of individuals who consistently work together or generally leverage the same set of connections along a route.

As Chapter 2 shows, our review of the literature and interviews with SMEs suggest that smugglers bringing migrants from the NT to the U.S. border fall along a spectrum from independent operators, to ad hoc groups of individuals, to loose networks, and to more-formal networks that consistently work together—and it is possible that the same actor may be engaging in human smuggling in some or all of those ways at any given time. This means that even with a formal, official definition, the lines between TCOs and other kinds of smugglers and smuggling networks are blurry. These blurry lines presented substantial analytical challenges and contributed to the difficulty of determining whether migrants are hiring TCOs to smuggle them along a route and how much they are paying them.

## Technical Approach to Analysis

Given the short time frame for this study, we turned to existing literature, available data, and SMEs to learn more about the characteristics of human-smuggling TCOs and other actors that engage in human smuggling:

- **We reviewed existing literature** related, for example, to the types of TCOs that engage in human smuggling along routes from the NT, the flows of migrants from the NT to the United States, the fees that migrants pay to smugglers, and the costs of smuggling.[5]
- **We reviewed available DHS and other data** to cast light on the structure, operations, and financing of TCOs and support revenue estimation, including data on migration flows, smuggling fees, and smugglers' costs.
- **We reached out to SMEs,** including U.S. government officials and academics, to gain their perspectives on this topic and to learn more about available documentation and data. (See Appendix B for more details.)

With this evidence, we implemented a multimethod analysis: We developed a qualitative narrative (see Chapter 2) and scoped the market for smuggling services quantitatively (see Chapter 3). The distinction between the approaches as "quantitative" and "qualitative" is not clear-cut; for example, for our narrative we drew on anecdotal quantitative evidence, culled from

---

[5] Our literature review included academic articles, press reports, and reports written by government agencies, non-governmental organizations, and multilateral entities. See Appendix A for more details.

Cuba AR_001383

the literature, and for the scoping exercise we drew partly from qualitative survey data. By "triangulating" among methods and evidence, we could characterize the TCOs and other entities that engage in human smuggling and set out a general analytical framework for conceptualizing and addressing revenue estimation.

Our study framework, shown in Figure 1.2, depicts a generic, stylized route that begins at a point of origin in the NT, continues through Mexico, and ends at a destination in the United States, given the possibilities that a route can consist of multiple segments, that not all smugglers are TCOs, that not all unlawful migrants hire smugglers of any type for all segments, and various other route characteristics. The route characteristics suggest the kinds of data that would be necessary to conduct an economic analysis, including revenue estimation. The characteristics depicted in Figure 1.2 consist of the route segment, types of smugglers (e.g., TCO, other, or self), smuggling fees, other migrant payments, costs to smugglers, and the number of migrants along the route who travel under those conditions.

**Figure 1.2. General Framework for Economic Analysis, Including Revenue Estimation**



NOTES: Hash lines along the segmented route suggest the potential for more segments.

Some of these characteristics could be parsed further; for example, "other payments" could be divided into bribes to officials and taxes, or *pisos*, that drug-trafficking TCOs levy along the

Cuba AR_001384

routes they control. These bribes and taxes might or might not be included in smuggling fees, as a pass through, depending on the particulars of the smuggling arrangement.[6]

Although not apparent in Figure 1.2, we confined our analysis to a recent period, mostly 2015–2017, and to unlawful migrants coming from and originating in NT countries. As addressed below and in later chapters of this report, data on important elements of the framework were lacking, which substantially hindered progress on revenue estimation, even as a range, and generated considerable uncertainty.[7]

## Challenges, Uncertainties, and Mitigations

We faced analytical challenges relating to time constraints and data quality, completeness, and relevance that yielded a high degree of uncertainty about the findings, especially those concerning revenues.

To mitigate the challenges of an abbreviated timeline (less than two months for the evidence collection, analysis, and writing), we "triangulated," as noted above; independently analyzed the data that we obtained from DHS and other sources; and cross-checked our results with those of other researchers who have worked with similar and different data sets to identify and understand apparent divergences. In addition, as addressed below, we set out to frame our preliminary estimates of revenue, including embedded calculations of unlawful migrant flows, smuggling fees, etc., in terms of ranges. Lastly, we also considered options for improving the fidelity of our estimates under less-binding time constraints.

The data-related challenges were at least as noteworthy.

The data on unlawful migration and human smuggling—like any data on illicit activities—tend to be partial, unreliable, and sometimes ill-suited to the policy questions at hand. Some data derive from direct observation (i.e., the number of individuals that U.S. Border Patrol agents apprehend, see turning back, or see getting away), some derive from statistical analysis that extrapolates from current trends (e.g., migrant flow–estimation methodologies related to recidivism rates), and others derive from surveys of or interviews with migrants and smugglers. All of them have limitations, which are discussed in Chapter 3.

Inevitably, researchers must also grapple with what criminologists call the "dark figure," referring to the amount of unreported or undiscovered illicit activity. For human smuggling, this gap in the data could pertain both to the activities of smugglers and to the flows of unlawful migrants from the NT to the United States. For example, law enforcement is unlikely to observe or understand the totality of a TCO's operations, partly because TCOs seek to conceal them and also because individuals who are affiliated with TCOs may not divulge this information upon

---

[6] Chapter 2 includes a detailed discussion of migrants' payments of taxes, or *pisos*, to TCOs, specifically drug-trafficking TCOs, and Chapter 3 provides an ancillary preliminary estimate of their worth.

[7] For more information about the estimation method, see Chapter 3 and Appendix C.

Cuba AR_001385

capture. Indeed, some or even most people working for a TCO may have little knowledge of the TCO's overall activity. Similarly, government officials will not see all individuals who turn back or get away, and migrants may not provide full information about their journeys. Smuggling, like other illicit activities, tends to rely on trust relationships, and disclosures would violate that trust, risking reprisals and denials of service in the future.

Moreover, researchers cannot presume the accuracy of data related to smuggling or migration. For example, U.S. Border Patrol agents often interview migrants and ask them questions about the details of their journeys, such as smuggling fees, and record the results. However, these officials might ask these questions differently at different locations and might misinterpret or mis-enter the results and migrants might answer these questions incorrectly, either purposefully or because they did not understand the questions.[8]

In addition, as noted above, not all human smugglers are affiliated with TCOs, howsoever defined, and the data provide little insight as to whether migrants hire human-smuggling TCOs or other types of actors. To the best of our knowledge, neither DHS nor any other agency or academic researcher has collected data on smuggling fees that specify smuggler "type" or provide information that could tie the DHS data on smuggling fees to data on smugglers' organizational affiliations. Thus, even if we could distinguish clearly between human-smuggling TCOs and other types of smugglers, and even if we could also develop a reliable estimate of revenues from smuggling NT migrants to the United States, we could not parse the revenues to those TCOs, specifically.

Lastly, estimating revenue from human smuggling, as compared with drug trafficking, presents other challenges relating both to the diversity of the individuals seeking to be smuggled and to the diversity of smuggling services being offered. Drugs are relatively simple, near-homogeneous commodities, and trafficking them involves commensurately little differentiation. A kilogram of cocaine is a kilogram of cocaine, after some adjustment for purity, and trafficking involves moving that kilogram from one place to another, with limited options, e.g., regarding routes and modes of transportation.[9] By contrast, people differ widely—e.g., by gender, age, health status, and physical capability—as do their needs and financial resources. Consequently, human smugglers can differentiate their services, with options including comprehensive "all-inclusive" or "end-to-end" packages on one end of the spectrum, and "pay-as-you go" arrangements, in which migrants pay for discrete services, at the other. (See Chapter 2.) As a result, smuggling fees can and do vary greatly from one journey to another.

None of these challenges has a fully satisfying "fix." For example, to estimate migrant flows, researchers have developed methods based largely on data on apprehensions of unlawful

---

[8] For more information about specific shortcomings of the data, see Chapter 3.

[9] See, for example, Paoli, Greenfield, and Zoutendijk, 2013. For more on drug supply chains, see also Paoli and Greenfield, 2017.

Cuba AR_001386