migrants. These results may be biased upward or downward, depending on the approach, and some of them may be controversial, but they can be and are used to estimate ranges.[10] Regarding the revenues and profits associated with human smuggling, one researcher asks whether it is even possible to conduct economic analyses of this market, because the activity is illegal and highly differentiated.[11] Notwithstanding the "dark figure," other researchers have found ways to deal with illegality in more homogeneous markets, but the diversity of services in this arena would add a layer of complexity.[12]

Some of the least "fixable" challenges are among those most closely aligned with the primary goal of the study: revenue estimation. From the start, we recognized the infeasibility of developing a point estimate for smuggling revenues and intended, instead, to frame any revenue estimate as a range, from low to high, because of the time constraint and also to accommodate the considerable uncertainty in the data. Furthermore, as the research progressed, we found that we lacked an empirical basis for separating the activities and revenues of human-smuggling TCOs from those of others, including ad hoc groups and independent operators, who engage in human smuggling. Thus, we could provide, at best, a range for revenues to all smugglers, irrespective of their affiliations, although we were able to provide a separate preliminary estimate of the right-of-way taxes that migrants pay to drug-trafficking TCOs.

The following chapter presents initial findings on the characteristics of human smugglers that operate along routes from the NT to the United States, as well as the characteristics of human smuggling, more generally, with a focus on actors' roles and the services they provide.

---

[10] See, for example, DHS, Office of Immigration Statistics, 2017.

[11] See Sanchez, 2017, 2018.

[12] Reuter and Greenfield, 2001; Paoli, Greenfield, and Reuter, 2009.

Cuba AR_001387

## 2. The Characteristics of Human Smuggling

This chapter focuses on the characteristics of human smuggling from the NT countries (Guatemala, Honduras, and El Salvador) to the United States, including the structure, operations, and financing of human smugglers. We provide an overview of the main types of smugglers, or "actors," that engage in this market, analyze the roles they typically fill, and discuss the services such actors provide, the fees they charge for those services, and the costs they incur. In effect, this chapter covers the "who," "what," "how," and financial dimensions of human smuggling along routes from the NT to the United States. We conclude the chapter by exploring the linkages between human smuggling and drug-trafficking TCOs.

Smugglers that move migrants from the NT to the United States take many forms, only some of which appear to meet the definition of *transnational criminal organization* laid out in U.S. law and policy guidance, as discussed in Chapter 1. While most unlawful migrants report having engaged the services of a smuggler for at least a portion of the route, it is unclear how many migrants engage smugglers to arrange their entire journey north or engage smugglers for discrete portions of the journey, and how many are using more-organized TCO-like networks as compared with independent operators and ad hoc groups.

The routes migrants use to travel north are well established and primarily follow overland transportation corridors from the NT to Mexico's southern border with Guatemala, and then up through Mexico to the border with the United States. The main variation appears to involve the modes of transportation or conveyances that migrants use, which include buses, taxis, tractor trailers, and freight trains, with comparatively few NT migrants using sea vessels or airplanes for parts of the journey.

Fees paid by unlawful migrants also differ widely, depending on the comprehensiveness and quality of smuggling services that migrants engage. Some migrants can pay thousands of dollars to be smuggled from their home country to the interior of the United States, while others may only pay a few hundred dollars for discrete portions of their journey. Migrants often pay taxes, or *pisos*, to drug-trafficking TCOs (or "cartels") to travel through territory the cartels control, and bribes to officials to go through checkpoints along the routes. Such payments might be in addition to other smuggling fees or included in them, depending on the particular arrangements that migrants make with their smugglers. Migrants' payments to drug-trafficking TCOs are not payments for smuggling, per se, but they are the only revenue associated with human smuggling that we could attribute directly to TCOs of some kind.

Lastly, while the scope of this report is limited to migrants from the NT, our literature review and SME interviews suggest that the smuggling groups operating along this corridor are also moving people of other nationalities. The evidence suggests that these migrants—particularly those from countries outside the Western Hemisphere—may be paying smuggling fees that are

9

orders of magnitude higher. Additionally, the groups specializing in facilitating this extra-hemispheric flow may be more organized and, thus, potentially more liable to meet the definition of a TCO.

## Taxonomy of Human Smugglers

Different types of actors participate in human smuggling, including independent operators that move migrants along particular segments of the route or offer other discrete services (for example, a taxi driver based out of one town on the route that ferries migrants to the next major town); ad hoc or opportunistic groups that might work together from time to time but not regularly; and more-formal enterprises or networks.[13] This reality means that migrants who intend to travel to the United States from Central America can choose from a wide range of service options. At one end of the spectrum, migrants can opt for "all-inclusive" or "end-to-end" arrangements, whereby they pay one facilitator, group, or network that arranges all their travel and may even send a representative to travel with them; at the other end, migrants can "pay as they go," traveling on their own for parts of the route and connecting with local smugglers to pay for transportation and logistical support for other parts of the route. The differences in the kinds of services that are provided by these actors are discussed in more detail below.

There is some debate in the literature about the extent to which groups of smugglers are becoming more professional and sophisticated, in light of possible increases in smuggling fees.[14] However, the majority of sources suggest that most of these groups are loosely organized, are nonhierarchical, and do not maintain a definable command structure.[15] The diversity and proliferation of individuals and groups involved in some aspect of human smuggling make it challenging to identify the extent to which these activities are conducted by actual TCOs.

As noted in Chapter 1, the statutory definition of a TCO includes components that do not appear to be present in many human-smuggling operations, including TCOs being "self-perpetuating associations" that protect their activities through "a pattern of corruption and/or violence," with a "transnational organizational structure."[16]

Table 2.1 presents a taxonomy of human smugglers, based on our review of the literature and interviews with SMEs, starting with the least organized types of smugglers and ending with the most organized. At each level, actors differ by organizational cohesion, membership, and

---

[13] See, for example, Guevara González, 2018.

[14] For a discussion of debate among academic sources on organizational coherence of smuggling organizations, see Sanchez and Zhang, 2018.

[15] Sanchez, 2017, p. 14; Zhang, 2007, p. 89; Guevara González, 2018, pp. 180–184. For example, "A key feature of the smuggling strategy along the U.S.-Mexico border is its relatively low entry costs and lack of vertical integration" (Wuebbels, 2004, p. 23).

[16] 10 U.S.C. § 284.

Cuba AR_001389

geographic dispersion along smuggling corridors. The more organized networks can feature transnational organizational structures, but relatively few appear to meet the bar of being "self-perpetuating associations." And while many of these actors rely on corruption to protect their activities in the form of bribes to officials, relatively few of them appear to use violence for this purpose. The taxonomy should be thought of as a spectrum rather than a set of firm categories; smugglers commonly move between levels or can operate at more than one level along the spectrum, depending on their opportunities. Many of these actors, even those toward the more organized end of the spectrum, can function as subcontractors to other actors at the same or different levels of the spectrum.

**Table 2.1. The Spectrum of Actors Engaged in Human Smuggling**

| Type of Actor | Organizational Structure | Services | Group Membership | Geographic Reach |
|---|---|---|---|---|
| Independent operators | One "cell" composed of one or a few individuals | Provide a discrete service (e.g., transportation or lodging) | Do not generally work with other cells or actors | Generally work in one location, or between two locations |
| Ad hoc groups | Two or more independent operators that may not always work together | Provide multiple, complementary services | Generally unaware of other actors and groups more than one degree of separation removed | Work in one, two, or more locations |
| Loose networks | A larger number of small groups that usually work together | May provide end-to-end service along the full route or a portion of the route | Members may only know a limited number of other members | Working in many locations, potentially the full route |
| More-formal networks | A central figure who coordinates groups that consistently work together | Provide end-to-end services | Members generally know each other | Working along the full route |

### Independent Operators

Smuggling services are often provided by local, independent operators who generally operate in one area and facilitate the movement of migrants along discrete sections of the route from Central America to the U.S. border.[17] These services can include providing facilitation, transportation, housing, food, and fraudulent documents.[18] For example, there may be a "transportation cell," or a small group of individuals, in Tapachula that specializes in recruiting recently arrived migrants from the bus station or border and transporting them to the next major

---

[17] Sanchez, 2018.

[18] For example, "Martinez appears to be an independent contractor. He said he charges $2,500 for the trip from the Guatemalan border to the U.S. border, where he gives Central American migrants fake Mexican identity cards and makes them learn the first stanza of the Mexican national anthem before handing them off to another smuggler" (Associated Press, 2014).

Cuba AR_001390

waypoint along the route north.[19] This group may not have any formal connections to other smuggling groups, instead focusing solely on moving migrants that it encounters or recruits from one city to the next one.[20]

## Ad Hoc Groups

Sometimes, several generally independent operators may come together to pool their services for a given migrant or group of migrants.[21] These opportunistic or ad hoc groupings of smugglers are generally not stable or allegiant to each other, and the smugglers may be working with several different groups at the same time. Expanding on the previous example, the transportation cell in Tapachula may know several different operators that provide housing in the next major waypoint for migrants, and the cell will put its clients in contact with one of them. The group that provides housing might essentially direct migrants to a low-grade hotel (also known as a "stash house") that takes in migrants from other organizations operating along that segment of the route. The stash house operator, in turn, might then connect the migrants with another transportation cell that the migrants would use for the next portion of their journey. The two transportation cells may not be aware of each other, even though both cells participated in smuggling the same migrants along the route.

## Loose Networks

Some smuggling networks along the routes consist of groups that might not be attached formally and consistently to one organization—that is, they might not answer uniformly to the same person—but that generally work with the same preferred or trusted partners along longer sections of the route.[22] These loose networks generally work together, and in some cases the chain of facilitation can extend all the way from the NT to the United States, although the links in the chain might not all know or be aware of each other. The main difference between these loose networks and the ad hoc groupings is that these networks are more organized and the

---

[19] In an interview with PBS Frontline, a smuggler operating as an independent operator admits to finding clients at a bus stop where recently unlawful migrants who have been removed are released (Frontline/World, 2018).

[20] See, for example, Sanchez, 2018; Zhang, 2007; Campana, 2016; Associated Press, 2014.

[21] See, for example, this description of how unlawful migrants arriving at a town on the Guatemala border with Mexico are connected with smugglers:

> As migrants arrive into town, they are approached by taxi drivers who offer their transportation services. Drivers recommend specific hotels or accommodations to their customers, receiving in turn a commission based on the amount of business they bring in. Hotels also serve as brokerage points for those who arrive without a guide. Once at a hotel, migrants in transit can select from a vast range of options, including accommodations, meals, transportation toward the border with Mexico, and assistance crossing the southern border for a fee. (Guevara González, 2018).

[22] See, for example, a Mexican news magazine's description of how three coyotes coordinate the travel of El Salvadorans to Houston (Martinez, 2017).

Cuba AR_001391

various components of the network along the route tend to work together consistently, even if one person does not manage the overall network.[23] An example of this kind of network would involve a facilitator in Guatemala who recruits migrants and then tasks another individual or group with transporting the migrant to the border with Mexico, where yet another individual or group would take custody of the migrant and be responsible for transporting the migrant further north.[24] The migrant may be handed off several times along the trip, with the facilitator being generally aware of the migrant's progress, but the groups that transport and provide housing to the migrant may only be loosely aware of each other.

### More-Formal Networks

Formal, relatively more-hierarchical smuggling networks reportedly exist along the routes from Central America to the United States.[25] However, even these relatively more-organized groups feature command structures that are not truly hierarchical, particularly compared with other organized crime actors, such as cartels or drug-trafficking TCOs. For example, one individual might not have command and control over all of their affiliates or subsidiaries. These relatively more-formal networks generally feature one person or a group of persons that oversees the activities of others in the network, and these networks usually offer "all-inclusive" packages, whereby migrants pay a substantial fee for end-to-end service all the way from their point of origin to their destination in the United States. Some of these networks also appear to specialize in moving migrants from outside the Western Hemisphere.[26]

### Dynamism Within the Spectrum

Low barriers to entry, opportunistic behavior, and fluid allegiances suggest dynamism within the spectrum and make it difficult to reliably assign smugglers—including, individuals, cells, or even some groups—to particular parts of the spectrum. Even if would-be smugglers must have some risk tolerance, many of the activities they engage in do not require specialized knowledge (e.g., driving a taxi, operating a hotel or stash house), such that individuals, in particular, can

---

[23] See, for example, the hierarchy of human-smuggling groups in Palacios's (2014) academic article from less to more organized, culminating with "Systematic complex networks are more extensive and have a hierarchical structure in which a leader manages the network's business and finances" (p. 327).

[24] See, for example, Martinez, 2017.

[25] See, for example, the description of human-smuggling networks in Associated Press (2014) as "a complex corporate structure. Guides at the border usually work for honchos who run the operation from afar and only pocket a fraction of the price charged to the migrants. One of the most important coyotes moving immigrants from El Salvador lives in Texas."

[26] See, for example, U.S. Immigration and Customs Enforcement, 2016.

Cuba AR_001392

come and go easily.[27] Additionally, at any point in time a smuggler might be operating independently, as a member of an ad hoc group, and as a member of a loose network. That is to say, the coalitions of smugglers that operate along the routes from Central America to the United States are opportunistic, extremely fluid, and prone to change, making it extremely difficult to pin down the exact nature of smuggling or of specific groups and networks that are involved in the trade. As noted above and described in the taxonomy, only some actors appear to meet the definition of *transnational criminal organization* found in U.S. law and policy guidance.

## Key Roles in Human Smuggling

Smugglers typically fill a number of roles, whether they are working as independent operators or as part of a network or group. Depending on the sophistication of the operation, individuals or small groups of people (sometimes referred to as a *cell* by law enforcement) can fill these roles.[28] Some of these individuals and cells work as subcontractors or independent operators and may offer their services to several different networks or other smugglers at the same time. This means that human-smuggling networks may feature several cells that work together occasionally or consistently, depending on the relative strength of the networks.

The following is a brief description of the key roles:[29]

- **Facilitation/coordination.** Identify and recruit migrants, collect up-front fees, pay other smuggling organizations during the migrant's journey, and coordinate some or all of the migrants' travel from their source country to their final destination. These individuals or small groups are often based in the NT countries, though some might also be present in population centers in Mexico.[30]
- **Transportation.** Transport migrants from one location to another along the route north. Transportation involves conveyances of different types and sophistication, with actors and modes ranging from local taxi drivers that transport small numbers of migrants from one town to another, to organizations that charter buses or retain tractor trailers to transport large groups long distances. Part of this service often includes paying fees or taxes, including bribes and *pisos* (see the later discussion), to other criminal networks or corrupt officials to cross their territory or pass a checkpoint.

---

[27] For example, Guevara González (2018) describes an interview with a woman who recounts that the first two times she journeyed north, she used smugglers: "By her third trip, she felt confident enough to travel on her own—and now she puts her experience to work facilitating the journeys of unlawful migrants through Mexico."

[28] For further discussion of the unique roles of participants of smuggling organizations, see United Nations Office on Drugs and Crime, 2011, p. 70.

[29] As noted earlier, Guevara González (2018) explains how many of these functions work along the border between Guatemala and Mexico.

[30] See, for example, Garsd's (2016) interview with a smuggler based in Mexico who describes how his network coordinates a series of "walkers" to help Honduran migrants traverse Mexico to the border with the United States.

Cuba AR_001393

- **Logistics/stash houses.** Provide logistical support, often in the form of lodging or stash houses where migrants can take shelter for a few days or even a few weeks. On the U.S. side of the border, stash house operators often move migrants between houses every few days to attract less attention from neighbors and law enforcement.[31]
- **Fraudulent documents.** Provide fraudulent documents for unlawful migrants, such as Mexican visas, national identity cards, and birth certificates. These documents can help migrants travel freely through Mexico and, in some cases, can also be used to create evidence of "synthetic families" with unaccompanied children to present to border officials upon entry into the United States.[32]
- **Footguides/coyotes/*polleros*.** Guide unlawful migrants—generally single adults—on foot across the land border between POEs, to avoid detection by U.S. Border Patrol agents while entering the United States. These footguides are commonly known as *coyotes* or *polleros*. The term *coyote* is also used interchangeably to describe human smugglers in general, and some reports note that these more broadly defined coyotes may operate in the NT countries, travel with migrants throughout their journey, and operate along the U.S.-Mexico border.[33] At the border, footguides often work in concert with "spotters" who try to locate law enforcement assets and personnel to maneuver groups around them via radio or cell phone.

## The Relationship Between Smuggling Services and Fees

Human smugglers provide migrants with a wide range of services, including transportation, lodging, and specialized knowledge to help migrants avoid arrest, extortion, and violence by evading detection or paying bribes and protection fees. Migrants can choose to "pay as they go" and find the services they need for discrete sections of the route north (which may cost them very little in fees), or use "all-inclusive" or "end-to-end" packages that cover their travel from their point of origin to their final destination in the United States (such packages, by comparison, may cost them more than $10,000).[34] We were unable to find much evidence in the literature on how many unlawful migrants are using all-inclusive arrangements versus choosing to pay as they go. Smugglers' services can differ widely based on the needs and financial resources of their clients and, consequently, so can their fees.

*All-Inclusive Packages*

Our review of the literature revealed substantial variation in the fees that smugglers charge for all-inclusive services, but there appears to be broad convergence around these kinds of

---

[31] For example, Nixon and Heisler (2018) describe the key role stash houses play in smuggling migrants in Texas.

[32] For example, Castellano (2014) reports how smugglers in Guatemala describe their connections with Mexican immigration authorities and their ability to procure visas to facilitate travel through Mexico, and Hennessy-Fiske (2018) reports on unrelated adults and children posing as families at the border.

[33] See Martinez's (2017) discussion of the three coyotes involved in smuggling migrants from the NT to Houston.

[34] Sanchez, 2018.

Cuba AR_001394

services costing migrants between $6,000 and $10,000, which is roughly in line with the results of the Encuesta sobre Migración en la Frontera Sur de México, or Survey of Migration at Mexico's Southern Border (which we refer to by its Spanish abbreviation, EMIF Sur), conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, located in Mexico. However, some articles suggest that the fees can be substantially higher. There is also evidence that the fees can vary, depending on whether unlawful migrants are attempting to evade detection at the border, and thus must be smuggled into the interior of the United States (generally single adults), or whether they are turning themselves into border officials at and between POEs and entering the asylum process (generally families and unaccompanied children).[35]

Smugglers can also provide specialized services for clients such as children, pregnant women, and the elderly that reduce exposure to risks and do not require extensive physical activity, such as scaling walls or extended hikes through remote terrain.[36] As one smuggler explains, specialized services that increase a person's chances of successfully evading detection, such as the use of decoys, lookouts, and safe houses, are likely to drive up costs and therefore prices.[37] Some reporting also suggests that smugglers can charge exorbitant fees if they have access to corrupt customs officials who take bribes in exchange for "looking the other way" as migrants' pass through borders.[38] Alternatively, migrants of greater means may choose transportation methods that are more comfortable, such as taxis or personal vehicles, or pay additional fees for smuggling tactics that minimize the risk of detection, such as using fraudulent travel documents. As one scholar notes, "the more money you have, the better service you get."[39]

Selected examples of smuggling fees in press reports are broadly representative:

- A 2018 *New York Times* article drawing on interviews with unlawful migrants found that the fee to enter the United States illegally represented more than half of the overall fee of $12,500 that a family paid for one individual's journey: "The nearly 2,000-mile trip had already cost Mr. Cruz's family more than $6,000 and brought him within sight of Brownsville, Tex. The remaining 500 miles to Houston—terrain prowled by the United States Border Patrol as well as the state and local police—would set them back another $6,500."[40]

---

[35] See, for example, Martinez's (2017) description of the *viaje corto*, or short journey, taken by asylum seekers that allows them to avoid paying the extra fees to avoid detection. Miroff (2018) describes the increasing trend of migrants turning themselves in to border officials. For additional reporting on fees and cost, see *Daily Mail* and Associated Press Reporters, 2014, and Kulish, 2018.

[36] Sanchez, 2017.

[37] González and Solis, 2017.

[38] Frontline/World, 2018.

[39] Cleek, 2018.

[40] Kulish, 2018.

Cuba AR_001395

- A Public Radio International news segment in 2018 described smuggling fees doubling over the past decade: "But in the past few years, the price of this trip has skyrocketed to between $7,000 and $10,000, more than double what it was a decade ago."[41]
- A Mexican online magazine interviewed a smuggler specializing in bringing unlawful migrants from El Salvador to the United States who described how he had raised his fees in 2017 after increased enforcement. The smuggler noted that he used to charge around $8,000 for travel from El Salvador to Houston, but he was now charging $9,500 to $10,000—plus another $1,500 if the unlawful migrants wanted to go past Houston.[42]
- During a National Public Radio interview in 2016, a smuggler claimed to charge as much as $17,000–$19,000 during the interview, while the director of a nonprofit working with unlawful migrants cited a lower figure: "You have to assume the average price is between 6,000 and 10,000. If you pay more, you're more likely to get through without being detected."[43]
- An academic researcher who volunteered at a migrant shelter along the Mexico-Guatemala border during parts of 2014, 2015, and 2016 noted: "Coyotes are known for providing a full-service package, which includes the facilitation of journeys across Mexico and into specific destinations within the United States from the place of origin or residence of the migrant. Few migrants travel in this all-inclusive way, though, because of cost: coyote-led door-to-door journeys are quite expensive. During the period in which this research was carried out, the prices of such all-inclusive packages ranged between 4,000 and 6,000 U.S. dollars."[44]
- An article detailed negotiations with several smugglers in Guatemala in 2014; loosely translated, it stated: "Besides 'The Chuluyo' we negotiated separately with three more Guatemalan traffickers to move 'Karen.' The cost ranged from 6,000–9,000 dollars, with two to three attempts to achieve it." [45]
- An Associated Press article in 2014 included interviews with smugglers: "The trafficker on the Guatemalan border, who spoke with The Associated Press after an intermediary negotiated the time and place, said the people he smuggles pay $10,000 a head for the trip from Central America, which covers everything from hotel and train payments to official bribes and cartel taxes. But occasionally, he said, a cartel will demand as much as an extra $5,000 on threat of death."[46]

These reports generally do not, however, shed light on another key research question: What percentage of unlawful migrants are opting to pay for these "all-inclusive" packages? One exception is an investigative report by the Mexican newspaper *El Universal* into human smuggling from Guatemala, which noted that 75 percent of unaccompanied children hired a

---

[41] Cleek, 2018.

[42] Martinez, 2017.

[43] Garsd, 2018.

[44] Guevara González, 2018, p. 182.

[45] Castellano, 2014.

[46] Associated Press, 2014.

Cuba AR_001396

smuggling network and were accompanied by representatives of these networks—"coyotes"—during their entire journey.[47]

*Pay-as-You-Go Arrangements*

An unknown percentage of unlawful migrants choose to travel on their own without engaging a smuggler to coordinate their entire journey. Instead, they obtain services, as needed, along the route. During their journey, they can enter into agreements with multiple facilitators at different stages in their journeys north, each of which might offer different level of services, possibly tailored to their needs and resources, a model often described as "pay-as-you-go."[48] Because the arrangements are spontaneous, we were unable to find many estimates of what unlawful migrants pay for these discrete services.

One researcher who spent time living in a shelter, known as "La 72," catering to unlawful migrants along Mexico's border with Guatemala noted that "Most Central American migrants staying at La 72 reported relying on the segmented facilitation, where they relied on a guide (*guía* in Spanish) to lead them through specific portions of their journeys. *Guías* are typically local residents . . . with knowledge of the terrain."[49] The researcher went on to describe how unlawful migrants arriving at the town are approached by taxi drivers who offer them transportation and connect them with other logistics providers in the town, who in turn can connect them with a wide array of other services.[50] The fees charged to migrants for segmented facilitation varied significantly, but some of the prices she observed being negotiated for discrete services included

- $15 per night for a bed in a shared hotel room
- $1–$4 to cross the river in a boat
- $1,000 for a guaranteed crossing of the Mexico-Guatemala border past immigration checkpoints on the Mexican side.[51]

In another example, a *New York Times* reporter followed the travels of an unlawful migrant from El Salvador whose family in the United States wired money at different points in the journey when he was unable to continue on his own—including a substantial payment at the beginning of his travel: "Just two days into Mr. Cruz's journey, his family had to wire the smuggling network $1,900 to get him through southern Mexico."[52]

---

[47] Castellano, 2014.

[48] Sanchez, 2018; Organisation for Economic Co-operation and Development, 2015.

[49] Guevara González, 2018, p. 182.

[50] Guevara González, 2018, p. 183.

[51] Guevara González, 2018, pp. 183–187.

[52] Kulish, 2018.

Cuba AR_001397

In yet another example, experts interviewed by Public Radio International described the range of options available to unlawful migrants who set out on their own: "Migrants who have no money can hitchhike, walk or take the train. . . . Some families pay smugglers a few hundred dollars to explain the route. . . . With a little more money, families can pay for a smuggler to book the bus tickets in advance, so migrants just show up and hop from one bus to the next."[53]

An Associated Press article included this description of the service provided by an "independent contractor" who facilitated travel through Mexico:

> He said he charges $2,500 for the trip from the Guatemalan border to the U.S. border, where he gives Central American migrants fake Mexican identity cards and makes them learn the first stanza of the Mexican national anthem before handing them off to another smuggler. Hopefully, if they are apprehended in the U.S., they'll only be sent back to Mexico, where they can try again.[54]

Other sources describe how migrants traveling on their own can choose to ride a freight train for part of their journey north (popularly known as La Bestia, or "the Beast") that may cost nothing, apart from payment to criminals in order to avoid harm.[55]

## The Difficulty of Calculating Human-Smuggling Profits

Although profitability might say more about the financial health and viability of smuggling operations than revenue, profit estimation poses substantially greater challenges. The diversity of business models, and differentiation of smugglers' services among and within models, can yield substantial variation in smuggling fees and, possibly, in the smugglers' profits.[56] For these same reasons—as well as inherent data limitations (see Chapters 1 and 3) and the far greater scarcity of data on smugglers' costs—profit estimation is extremely difficult.[57] As noted elsewhere in this report, some scholars call into question whether it is even possible to undertake economic assessments in this arena, because of both illegality and data deficiencies.[58]

Nevertheless, we found scattered evidence on the reported costs to smugglers for discrete services they provide that, in combination with the evidence on fees cited previously and explored more thoroughly in Chapter 3, could say something about profitability. For example, some reporting describes smuggling organizations that recruit larger numbers of clients can pool

---

[53] Cleek, 2018.

[54] Associated Press, 2014.

[55] See, for example, the description of how migrants may be pushed off the trains if they don't pay protection fees, in Domingo Villegas (2014). For additional reporting on fees and costs, see Tiempo.hn (2017).

[56] As noted in Chapter 3, the smuggler's "accounting profits" might not equate to "economic profits."

[57] For additional comments on the paucity of data on smugglers' costs, see United Nations Office on Drugs and Crime, 2011, p. 85.

[58] Sanchez, 2017, 2018.

Cuba AR_001398

migrants and transport them great distances in tractor trailers or on charter buses, sometimes all the way across Mexico.[59]

A handful of press reports offers more detail on specific costs borne by smugglers. One set of data points on logistics costs, possibly originating in a 2014 Associated Press report, shows up intermittently across news sources and over time and recounts various transportation, lodging, and other costs incurred by smugglers that might sum to around $2,000 or more per migrant.[60] As presented in the 2014 Associated Press report:

- guide who makes the trip: $500–$600
- boatman at Mexico's southern border: $1.50 to cross Suchiate River from Guatemala
- lodging: $11.50 a room, which can hold many migrants
- Central American gang: At least $100 per migrant to board Mexican freight train known as La Bestia, or "the Beast"
- Mexican police and immigration officials: $230–$540 to pass; $25–$40 per person to free detained migrant[61]
- drug cartels: $250–$300 for Mexican migrant, $500–$700 for Central American, about $1,500 for someone from Europe or Asia, plus 10 percent flat fee per smuggler to cross northern Mexico to the U.S. border
- boatmen at Mexico's northern border: $100 per immigrant to cross Rio Grande into the United States
- drivers: $150 for ride from Rio Grande to stash house; $200 for ride north of the U.S. Border Patrol's highway checkpoint to Houston
- caretaker at stash house: $20 per person per day.

An online magazine in Mexico that interviewed smugglers bringing unlawful migrants from El Salvador to the United States in 2017 identified three different coyotes involved in a loose network: one was based in El Salvador and coordinated the journey, one traveled with the unlawful migrants until the U.S.-Mexico border, and a third took the clients across the land border and to Houston. Before 2017, the fees charged to unlawful migrants totaled $8,000 to Houston, but after the increased enforcement by U.S. authorities in 2017, the coyotes were now asking for $9,500–$10,000. Of this total:

- $2,000 covered expenses to get to Reynosa (including corruption of police checkpoints in Guatemala and Mexico, transport, housing, food)
- $300 covered the "cartel fee," or *piso*

---

[59] Caldwell, 2018.

[60] These data have appeared in an online article authored by *Daily Mail* and Associated Press Reporters (2014), citing "Migrants, Coyotes, Court Testimony." This same material has also appeared in several other press reports, with some dated at about the same time as the *Daily Mail* article and some as recently as 2016 and 2017.

[61] It seems unlikely that the fee to free a detainee would be less than the fee to pass by, as implied.

20

- $5,000 paid for the coyote in charge of U.S. border crossing and the travel to Houston (an additional $1,500 was charged if the unlawful migrants wanted to travel past Houston into the interior)
- $1,000 went to the coyote who traveled through Mexico with the unlawful migrants
- $1,700 was the profit earned by the individual who facilitated the overall journey.[62]

A 2018 news article broke down the costs incurred by smugglers involved with the last leg of the journey for those seeking to evade detection while crossing into California. A smuggler specializing in bringing unlawful migrants from Mexicali to Los Angeles claimed to make up to $2,500 per unlawful migrant of the $5,000 to $6,500 that he charged. Of this fee,

> The biggest share, $2,800 to $3,000, goes to the guy driving the migrants to Los Angeles, because he's taking the biggest risk if caught by the Border Patrol. Alexis pays another $100 to $300 per migrant to polleros who work as decoys, lookouts, pickups, or who operate safe houses in Calexico. Alexis says he also has to pay off the Mexican police. They get $200 per migrant.[63]

Lastly, one smuggler interviewed by the Mexican newspaper *El Universal* noted that smugglers in general were making millions of dollars, but in their view most of these profits were being generated from crossings into the United States from Mexico.[64]

The evidence, albeit sparse, suggests that the actors that coordinate the overall travel of unlawful migrants may be netting up to $2,000 per journey, while the actors that coordinate illegal entries between POEs may be netting up to $2,500 per crossing. Others along the line, including the stash house operators who charge a few dollars a day to accommodate migrants, the lookouts who help coyotes avoid law enforcement, and those who transport migrants at various points in the journey, might see substantially less. However, because of the extremely limited data on potential profits that we were able to identify, we did not believe it was possible to generate a credible estimate for profits, and, as addressed in Chapter 3, it is unclear whether these figures would hold up more generally—or in relation to DHS or EMIF Sur data on fees—and how much "economic" profit would remain after accounting for risk.

## Drug-Trafficking TCOs' Involvement in Human Smuggling

The most direct interaction between human smugglers and drug-trafficking organizations, many or most of which clearly manifest the attributes of TCOs, involves the payment of a one-time "tax," referred to at different parts of the border as a toll, mafia fee, or *piso*, that provides migrants with access to smuggling corridors on the U.S.-Mexico border under the control of drug traffickers. The open literature and interviews with SMEs suggest broad agreement about the

---

[62] Martinez, 2017.

[63] González and Solis, 2017.

[64] Castellano, 2014.

Cuba AR_001400

existence of this financial relationship;[65] however, they raise questions about the extent to which these markets and networks overlap more generally.

Human smugglers and drug traffickers conduct similar activities—providing illicit transportation services across international borders—and do so along common smuggling corridors, suggesting opportunities for overlapping business. Some sources suggest that drug-trafficking TCOs have greater financial incentive to participate in human-smuggling activities because smuggling fees have increased in recent years, but the data on trends in fees are mixed, as discussed in Chapter 3.[66] While the open literature is thin in this area, much of it suggests only minimal convergence between human smuggling and drug trafficking, beyond the collection of the *piso*, deconfliction of smuggling routes along the U.S.-Mexico border,[67] and, possibly, strategic use of human smuggling to draw attention from drug trafficking.[68] Several reports suggest that migrants, on occasion, carry drugs across the U.S.-Mexico border in exchange for reduced fees,[69] and other sources suggest that elements of certain drug-trafficking TCOs, particularly Los Zetas, have attempted to play a more direct role in human-smuggling activities.[70] However, our literature review and discussions with SMEs provided little evidence of a broader convergence of these networks and business operations.

### Paying the Tax, or Piso

Over the past decade, the landscape of Mexico's main drug-trafficking TCOs has been characterized by a trend toward fragmentation and splintering, with the emergence of new groups that compete or collaborate with traditional groups.[71] However, despite the fluid nature of these organizations, a handful maintain control of most of the primary trafficking corridors into the

---

[65] For example,

> The most commonly reported interaction between migrants and drug traffickers—and perhaps the only one pointing to the existence of a structured system of financial transactions connecting drug trafficking and migrant facilitators—involved the payment of piso, a one-time toll to access specific parts of the migrant trail under the control of a [drug-trafficking organization]. (Sanchez and Zhang, 2018, p. 141)

[66] Weden, 2016; Olson, 2016; Slack and Whiteford, 2013.

[67] For example, "'Drug traffickers dictate where and when illegal crossings occur,' he said. 'Human smugglers arrange crossings through their 'business relationship' with drug traffickers'" (Prendergast, 2017).

[68] Cabrera, 2015; Slack and Campbell, 2016. The latter write that "Migrants in Altar were consistently being sent in staggered groups of 10 or 20 each half hour with a group of burreros behind the last group as a way to distract the border patrol" (p. 13).

[69] See, for example, Prendergast, 2017; Burnett, 2011.

[70] See, for example, Gallagher's (2018) description of Los Zetas coordinating the movement of tractor-trailers with up to 100 migrants inside.

[71] Beittel, 2018.

Cuba AR_001401

United States.[72] Such control allows these groups to both regulate and tax illicit trade through these territories, whether the trade occurs between or at POEs.[73] The purpose of regulating these movements is partly to ensure that other smuggling activities do not disrupt a drug-trafficking TCO's main drug-trafficking business, for example, by attracting the attention of authorities to key smuggling corridors. As such, drug traffickers would coordinate with human smugglers to deconflict and strategically position their activities and tell them when and where to move migrants across the U.S. border.

Controlling prime smuggling territory also affords drug-trafficking TCOs an opportunity to charge a tax on unlawful migrants seeking to pass through on their way to the United States. These protection payments or security fees function as tolls or taxes and are known to migrants as mafia fees, or *pisos*, depending on the region of the border.[74] According to U.S. government sources, it is all but impossible for migrants to cross some sections of the border, particularly those most tightly controlled by the drug traffickers, without paying the tax.[75]

Collecting the *piso* requires fairly extensive regulation of migrants passing through a drug-trafficking organization's territory, pointing to coordination between human smugglers and drug traffickers before a migrant reaches the U.S.-Mexico border. Migrants are often given a *clave* (or code) that indicates that they "belong to" or have been traveling with a particular human-smuggling organization, and they must provide this *clave* to lookouts who are affiliated with the drug-trafficking TCOs when they enter a border town.[76] Migrants traveling on their own are approached by lookouts and signed up by a smuggling group that requires payment of the *piso*. This system of regulation by drug-trafficking TCOs also depends on retribution against migrants or smugglers who do not pay the *piso* or follow directions about when and where to smuggle. Reports suggest the drug trafficker will kidnap, torture, and sometimes kill migrants and smugglers who do not do as instructed.[77]

### Potential for Broader Convergence of Human Smuggling and Drug Trafficking

Whereas we found evidence in the open literature and SME interviews that suggests financial transactions and coordination among human smugglers and drug traffickers, we found little to

---

[72] U.S. Department of Justice, Drug Enforcement Administration, 2017.

[73] See, for example, the transcript of a *60 Minutes* episode (Pelley, 2018) in which drug-trafficking TCOs are described as a "regulatory mechanism" on the border that "essentially set the rules, so to speak, for illegal activities in the region. It has led to this professionalization, this need to collaborate and coordinate with the drug cartels." See also Leutert, 2017.

[74] Kulish, 2018.

[75] Olson, 2016; Nixon and Heisler, 2018.

[76] Olson, 2016.

[77] Slack and Campbell, 2016, pp. 12–18.

Cuba AR_001402

suggest broader convergence.[78] In particular, evidence that drug-trafficking TCOs are directly involved in human-smuggling operations is lacking. Although some sources suggest that drug traffickers may sometimes force migrants to carry backpacks of drugs across the border, it is not clear how common this practice is.[79] Studies that include testimonials of migrants suggest they are often motivated by financial considerations,[80] and it appears that drug-trafficking TCOs commonly waive the *piso* for migrants that carry drug loads, and sometimes pay them.[81] In this scenario, migrants who do not have enough money to pay for the final leg of their journey sometimes agree to carry drugs in lieu of payment.

We also uncovered reports suggesting that some drug-trafficking TCOs, specifically Los Zetas, are attempting to profit from human smuggling beyond the collection of a tax near the U.S.-Mexico border and have even established affiliates in some of Mexico's southern states and Central American countries.[82] If true, these activities appear to be more focused on extorting migrants than transportation them. For example, Los Zetas affiliates reportedly collected fees from migrants boarding freight trains in southern Mexico.[83] In addition, some of these reports of drug-trafficking TCOs' activities are inconsistent with other studies, including ones involving testimonials from migrant smugglers who operate on the U.S.-Mexico border, suggesting that drug-trafficking groups tend not to become directly involved in transporting migrants.[84] These studies suggest that human smuggling and drug trafficking are separate businesses and indicate that human smugglers are deterred from engaging in drug trafficking because of the risks of retribution and because it could harm their primary business, which depends on referrals.[85] A perception that human smugglers are members of drug-trafficking organizations that are known to extort and kidnap migrants might hurt business.

These studies similarly highlight the disincentives for drug traffickers to become more involved in human smuggling, principally because of the comparatively smaller profit margins involved in smuggling people as opposed to drugs. As one study notes: "In economic terms,

---

[78] Sanchez and Zhang, 2018, pp. 135–151.

[79] Leutert, 2017.

[80] See, for example, Sanchez and Zhang, 2018, p. 143:

> In our study, respondents' testimonies indicated that the decision to carry drugs often was a personal, complex choice, rather than the result of coercion. Lacking financial resources to cover basic needs like room or board, or having run out of money after traveling vast distances and no longer able to afford smuggling fees, some migrants opted to assist drug traffickers in exchange for financial compensation or transportation within the United States.

[81] Sanchez and Zhang, 2018.

[82] International Crisis Group, 2016.

[83] Farah and Lum, 2013.

[84] Palacios, 2014.

[85] Palacios, 2014.

Cuba AR_001403

taking control of migrant smuggling networks (does) not make sense: why engage in the complex activities this business requires when criminals can make large revenues from (smugglers) without doing anything themselves?"[86]

## Conclusion

Our literature review and interviews with SMEs at DHS revealed that many different types of actors are involved in facilitating the movement of unlawful migrants from the NT of Central America to the United States. These smugglers reside on a spectrum that ranges from independent operators to more-formal networks. Only some of these networks appear to meet the statutory definition of a TCO, in that many do not appear to be "self-perpetuating," use violence and corruption systematically, or feature a truly transnational organizational structure. In line with this diversity of actors, smugglers also offer a wide array of services to unlawful migrants, spanning "pay-as-you-go" and "all-inclusive" arrangements. While the routes that unlawful migrants take are well established and primarily follow overland transportation networks, these migrants make use of various conveyances along the route depending on their needs and the fees they pay. Lastly, unlawful migrants generally are required to pay taxes, or *pisos*, to drug-trafficking TCOs along the U.S.-Mexico border for the right to pass through their territory, either directly or through human smugglers.

---

[86] Palacios, 2014.

Cuba AR_001404

# 3. Preliminary Findings on Revenue Estimation

Drawing from the principles of the general framework presented in Chapter 1, we set about estimating revenues from human smuggling, without regard to the type of smuggler. As discussed in Chapter 2, we found that we could not attribute smuggling revenues to particular types of smugglers, although we could evaluate the taxes, or *pisos*, that migrants pay drug-trafficking TCOs to traverse their territory. Unlike the revenue from smuggling fees, the entirety of the revenue from the tax goes to TCOs, specifically drug-trafficking TCOs, that control certain transit routes and border crossings.

Figure 3.1 depicts the flows of revenues associated with human smuggling to human smugglers of all types, including TCOs, and to drug-trafficking TCOs. The larger oval to the right represents the former, designated as "aggregate" smuggling revenue, and the smaller oval to the left represents the latter, designated as "tax" revenue. The intersection of the two ovals represents instances in which smuggling fees cover the tax.

**Figure 3.1. Revenues to and Types of Actors Engaged in Human Smuggling**



Cuba AR_001405

To estimate revenue to all types of human smugglers (i.e., aggregate smuggling revenue) along routes from the NT to the United States, we needed data on three variables: (1) the number of unlawful migrants along a route, (2) the percentage of those migrants who hire smugglers, and (3) the typical payments made, per migrant, to smugglers. Lacking data for specific routes from the NT to the United States, we defined three general routes, by country of origin, as "Guatemala–United States," "Honduras–United States," and "El Salvador–United States"; however, for our high-end estimate, we were also able to differentiate between payments en route to the U.S.-Mexico border as one "segment" of the journey and payments across that border as another segment.

Separately, we developed an ancillary, preliminary estimate for drug-trafficking TCOs' *piso* collections. If migrants hire a smuggler, they might pay the taxes through him or her, as a conduit; alternatively they might pay the taxes directly to the TCO, in which case the taxes would not be included in the smuggling fee. In either case, we could still attribute the payments directly to drug-trafficking TCOs.

For each variable, we present ranges of estimates, based on various assumptions about behavior and markets and data from DHS and other sources, as discussed below. We analyzed data from 2015–2017 or earlier, but, unless noted otherwise, we worked with the most recent available data (2017) for each step of the analysis.[87]

## Flows of Unlawful Migrants

We developed a range of estimates for unlawful migrant flows from DHS data on "apprehensions," "got-aways," and "turn-backs" between POEs at the southwest border and from estimates of apprehension rates, also between POEs.[88] By implication, the data omit activity at POEs, including arrivals of unaccompanied children and families that present themselves to border officials, without attempting evasion, which we address separately, below.

In this context, an *apprehension* is an unlawful migrant who U.S. Border Patrol agents apprehend at the U.S. border; a *got-away* is "a subject who, after making an illegal entry, is not turned back or apprehended"; and a *turn-back* is "a subject who, after making an illegal entry into the United States, returns to the country from which he or she entered, not resulting in an apprehension or got away."[89] Reported apprehensions, got-aways, and turn-backs are parts of the

---

[87] In some instances, such as those of unlawful migrant flows, we looked at data as far back as 2012, but given a spike in reported apprehensions and, hence, in apparent flows in 2014 (see Figure 3.2), we chose to work primarily with the data after that year.

[88] DHS provided us with the underlying data for apprehensions, got-aways, and turn-backs and the point estimates for the so-called "partial apprehension rate" that is depicted in DHS Office of Immigration Statistics, 2017, p. 8, Figure 3. (The estimates in that study extend only as far as 2016, so we applied the 2016 rate to the 2017 data.) We then used these data and the point estimates for the apprehension rate to construct its estimates on flows.

[89] DHS Office of Immigration Statistics, 2017, p. 5.

Cuba AR_001406

"known flows," either by direct observation or by inference, e.g., because of camera views, sensor activations, or other evidence. As discussed in Appendix C, researchers have developed methods to estimate the apprehension rate, which is the share of apprehensions in total attempted border crossings, and overcome the analytical obstacle of unobserved and uninferred got-aways (i.e., "unknown flows").[90] An estimate of migrant flows that makes use of this rate should be more complete than an estimate that makes use of the data on reported got-aways, but the methods for estimating apprehension rate are also imperfect.[91]

We undertook four sets of calculations of unlawful migrant flows (see Appendix C), using two basic methods—one with data on reported got-aways and one with estimates of the apprehension rate—and different combinations of the data on turn-backs, to account for uncertainty about the behavior of turn-backs.[92] First, at the low end, we calculated total flows from each NT country to the United States as the sum of just the apprehensions and got-aways from that country, assuming that all turn-backs will try to cross into the United States again and, eventually, will be apprehended or get away.[93] Second, we dropped that assumption and treated turn-backs as an additive category, with total flows consisting of the sum of apprehensions, got-aways, and turn-backs. Third, we divided apprehensions by the apprehension rate to account for unknown flows, without regard to turn-backs. Fourth, at the high end, we applied the same apprehension rate, but added turn-backs. Got-aways are not included in the final calculation because they are assumed to have been included in the operation involving the apprehension rate.

We found that the range progressed steadily from the low to the high end, but the difference in methods—the use of got-aways or the apprehension rate—accounted for substantially more of the bump-up than the inclusion of turn-backs in either approach.

On that basis, migrant flows from the NT in 2017 could have been as low as about 218,000 and as high as about 345,000, with Guatemala accounting for the largest share, just over 88,000, or about 40 percent, of either estimate (see Figure 3.2).[94] However, the low-end figure is almost certainly too low, because U.S. Border Patrol agents cannot observe or infer every got-away.[95]

---

[90] Estimation is necessary because of the "denominator problem" (see, e.g., DHS Office of Immigration Statistics, 2017, p. 3). To obtain an apprehension rate, one must divide the number of apprehensions by the total number of attempted border crossings, both failed and successful, which include got-aways that cannot be observed or inferred fully. See also Morral, Willis, and Brownell, 2011.

[91] For an overview of various limitations that might make the rate too high or too low, see DHS Office of Immigration Statistics, 2017, pp. 7–8.

[92] With some adaptation to account for uncertainty about the behavior of turn-backs and the limitations of each approach, we drew from concepts and methods presented in DHS Office of Immigration Statistics, 2017.

[93] Lacking country-specific data on turn-backs and got-aways, we assumed that a country's share of all turn-backs and got-aways at the border was the same as its share of all apprehensions at the border. U.S. Border Patrol agents observe turn-backs and got-aways without knowledge of their origin.

[94] These estimates do not include migrants who are apprehended in Mexico or elsewhere en route and do not, eventually, make their way to the U.S.-Mexico border as either an apprehension, turn-back, or got-away. Rodríguez

28

Cuba AR_001407



**Figure 3.2. Estimated Flows of Migrants from the Northern Triangle to the United States**

SOURCE: Author calculations, based on fiscal-year data provided by DHS.

Given modest rates of recidivism for Central Americans in the DHS data, e.g., less than 5 percent for migrants from each NT country in 2017,[96] we did not adjust the flow data for individuals who try to enter the United States repeatedly. However, failure to make an adjustment will result in an upward bias in the preliminary estimates of smuggling revenue, by "double counting" some fees, if migrants purchase a package of smuggling services that includes multiple journeys and need a second or third try (see Chapter 2).

We include a short discussion of the implications of omitting both activity at POEs, which might bias the revenue estimate downward, and adjustments for recidivism, which might bias it upward, after presenting the preliminary revenue estimate.

---

Chávez (2016, p. 9) provides a broader, preliminary estimate of flows of Central American migrants in 2015 that is higher than the DHS-derived, high-end estimate for that year: i.e., 377,000 as compared with 291,000.

[95] Recent research in this arena (e.g., Egan et al., 2018; DHS Office of Immigration Statistics, 2017) has focused on establishing interdiction effectiveness, apprehension rates, and, by extension, successful entries or got-aways. As a related matter, Hale et al. (2018) present estimates of smuggling capacity along routes from Guatemala to the United State that are roughly consistent with our medium-to-high-end estimates for Guatemala.

[96] We calculated recidivism rates as shares of unique NT migrants, based on fingerprint identification numbers, who try to enter the United States and are apprehended more than once in a given period, e.g., a year.

Cuba AR_001408

## Percentage of Unlawful Migrants Hiring Smugglers

For insight into the percentage of unlawful migrants who hire smugglers to help them get from the NT to the United States, we drew data from both DHS and EMIF Sur, a survey conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, which is located in Mexico.[97]

As discussed in other research, the DHS data on migrants' use of smugglers might fail to capture a substantial amount of smuggling activity.[98] One group of researchers noted in 2010 that the "primary concern is that the reported use of smugglers by apprehended migrants in the administrative record is much lower than the reported use of smugglers in migrant survey data," including the EMIF Sur data.[99] It is also lower than one might expect from anecdotal evidence (see Chapter 2) and from our conversations with SMEs. By our calculation, about 32, 22, and 14 percent of the NT migrants in the DHS data reported use of smugglers in 2015, 2016, and 2017, respectively, whereas a 2018 publication from the EMIF Sur data suggests upward of 60 to 65 percent over that period,[100] consistently, and SMEs tend to agree that many or most NT migrants hire a smuggler at some point.[101]

A 2017 publication from the EMIF Sur data offers country-specific figures and suggests slightly lower use rates, ranging from 46.6 percent for migrants from Honduras in 2015 to 66.2 percent for migrants from Guatemala in 2016.[102] For 2017, that source reports 63.4, 61.1, and 57.5 percent for migrants from Guatemala, Honduras, and El Salvador, respectively.

On the basis of those sources, about 25 to 67 percent of NT migrants might have hired smugglers in recent years, with some variation by country of origin. Given difficulty reconciling the country-specific and regional data within and across sources, we chose to work with that broad range, regardless of the route or year under consideration.[103]

---

[97] The EMIF website sets out objectives of the survey at the southern border, e.g., to "increase understanding of the flows of migrants who cross between Mexico and Guatemala in order to work in Mexico or the United States, along with the undocumented migrants that cross Mexican territory and are returned to Guatemala, Honduras and El Salvador by Mexican and U.S. immigration officials" (EMIF, undated-b). For this report, we focused on undocumented migrants from the three NT countries who are returned by U.S. immigration officials, not those returned by Mexican officials. For information about the survey methodology, see EMIF, undated-c.

[98] Roberts et al., 2010; Sanchez, 2016.

[99] Roberts et al., 2010, p. 2.

[100] EMIF Sur, 2018b, p. 3, Chart 8.

[101] Similarly, Hale et al. (2018) asked 270 Central American migrants, "Did someone help or facilitate you make your journey?" and 69 percent of respondents said "yes."

[102] EMIF Sur, 2018a, p. 5, Chart 9b.

[103] Given more time, we would have appealed to the underlying EMIF Sur data, which are available online, to reconcile the country-specific and regional figures and refine the estimate. As for a trend, the DHS data show a pronounced decline in migrants' use of smugglers over the past three years, but the EMIF Sur data do not.

Cuba AR_001409

Separate from those estimates, we postulated, based on conversations with SMEs and information found in the literature, that about half or more migrants, say 50 to 75 percent, pay some form of tax, or *piso*, to drug-trafficking TCOs that they "encounter" on their journeys, regardless of whether they are working with a smuggler or traveling on their own. SMEs indicated that nearly all migrants pay the tax along some routes. Consistent with the proposed range, a taxation rate of about 60 percent of migrants appears in a recent study of organized crime and Central American migration in Mexico.[104]

## Human-Smuggling Fees and Payments

For this calculation, we also drew from DHS and EMIF Sur data and turned to other sources, including our interviews with SMEs.

To start, we used the DHS data to calculate mean and median smuggling fees as reported to U.S. Border Patrol agents by unlawful migrants who are apprehended at the U.S.-Mexico border, between POEs. It is our understanding that the reported fees should cover those migrants' payments to smugglers along the entire route, from the NT into the United States, including fees for travel within the United States, but that the figures might not include all payments. For example, they might only encompass fees for part of the journey, e.g., to the U.S. border, or *pisos* paid to drug-trafficking TCOs.

In data plots, we observed a large number of low-end fees, which might validate concerns about fragmentation or simply reflect the migrants' preferences for inexpensive, pay-as-you-go services (see Chapter 2). We also found extreme high-end outliers, possibly indicating confusion over currency or data entry errors.

In 2017, the averages of the reported smuggling fees in the DHS data were about $4,700 per person for Guatemalan migrants, $3,800 per person for Honduran migrants, $4,600 per person for Salvadorian migrants, and about $4,400 per person for NT migrants overall.[105] (See Appendix D, Table D.1, for more information about the properties of the DHS data.) The median figures for the same year were similar but predictably lower, given the density of low-end observations, the presence of high-end outliers, and considerable other "noise" in the data, with $4,000 for Guatemalan migrants, $3,000 for Honduran migrants, $4,000 for Salvadorian migrants, and $4,000 for NT migrants overall. These mean and median figures were less than expected, given recent press reports (discussed in Chapter 2) and conversations with some SMEs that suggested fees ranging from $6,000 to $10,000 or more but, as noted above, could also reflect migrants' preferences for particular or fewer services.

---

[104] Leutert, 2018.

[105] We also calculated an adjusted mean for each country, by removing observations greater or less than two standard deviations from the unadjusted mean, but this approach had no effect at the low end because there were no observations below the two-standard-deviation threshold.

Cuba AR_001410

For comparative purposes, we also looked at the EMIF Sur data on migrants' actual and agreed payments to smugglers. EMIF Sur asks Guatemalan, Honduran, and Salvadorian migrants who have been returned to their respective countries of origin by U.S. immigration officials how much they paid or agreed to pay to travel (1) from their home country, through Mexico, and to the U.S.-Mexico border and (2) from the U.S.-Mexico border into the United States.[106] The results from the EMIF Sur data, which might include some unrealized payments and more transit in the United States, were higher than the results from the DHS data and better aligned with expectations. The averages and medians for 2017 were similar, with averages of about $10,700, $10,600, and $8,000 for migrants from Guatemala, Honduras, and El Salvador, respectively, and with medians of about $10,300, $11,500, and $8,000 for migrants from Guatemala, Honduras, and El Salvador, respectively (see Appendix D, Table D.2).[107]

Figures 3.3a–3.3c compare mean and median smuggling fees across sources, by country of origin for 2015–2017. Whereas the EMIF Sur data indicate a possible upward trend in smuggling fees over the past three years, the DHS data do not.

**Figure 3.3a. Guatemala: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

---

[106] EMIF Sur also asks similar questions of migrants who have been returned by Mexican immigration officials, but we did not work with those data.

[107] These figures are the sums of the means or medians, respectively, for each country for each segment, first, from the country of origin to the U.S. border and, second, across the U.S. border.

Cuba AR_001411



**Figure 3.3b. Honduras: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**

SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).



**Figure 3.3c. El Salvador: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**

SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

33

Taking the properties of the DHS and EMIF Sur data into account, we chose to work with the median values for the fees for each route in 2017 to create ranges. Route by route, the median value from the DHS data represents the low end, and the median value from the EMIF Sur data represents the high end (see Figure 3.4); for example, for the Honduras–United States route, the median values span $3,000 (from the DHS data) and $11,500 (from the EMIF Sur data).

**Figure 3.4. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

In addition, we found estimates of taxes, or *pisos*, paid to drug-trafficking TCOs' of about $300 per person on the low end[108] and about $500–$700 per person on the high end[109] in various press reports and in discussion with SMEs. For computational purposes, we used a range of $300 to $700 for migrants from all countries and without regard to year.

---

[108] See for example, a human smuggler's description of the $300 *cuota de cartel*, or cartel tax, that he has to pay in Martinez, 2017.
[109] These data have appeared in *Daily Mail* and Associated Press Reporters (2014) and elsewhere. One SME suggested a higher figure, i.e., about $1,100 for one transit zone, but this looked like an outlier.

Cuba AR_001413

## Ranges of Estimates of Smuggling Revenues and *Piso* Collections

Working with ranges for each variable, we constructed a set of preliminary low- and high-end estimates of revenues to all types of smugglers in 2017, by route (Guatemala–United States, Honduras–United States, and El Salvador–United States) and for the NT overall. We did not attempt to parse those revenues by human-smuggling TCO, ad hoc group, independent operator, or other type of smuggler. We also developed an ancillary set of preliminary estimates for drug-trafficking TCOs' *piso* collections that might or might not add to the estimates of smuggling revenue.

### *Smuggling Revenues*

For each general route from the NT to the United States, we constructed a preliminary estimate—or range of estimates—for smugglers' revenue from the low-end and high-end figures for (1) unlawful migrant flows, (2) the percentage of those migrants who use smugglers, and (3) the migrants' payments to smugglers. First, we multiplied the low-end figures for each route, and then we multiplied the high-end figures for each route, producing a corresponding low- and high-end estimate for each route. To illustrate a low-end calculation, using the 2017 data, for Guatemala, we multiplied the low-end flow estimate of just over 88,000 by the low-end use estimate of about 25 percent and then multiplied the product by the low-end fee estimate of about $4,000. The calculation resulted in a low-end, preliminary revenue estimate of $88 million dollars for the Guatemala–United States route in 2017.

To develop the corresponding high-end estimates, by route, we repeated the process, using the high-end estimates for each of the three variables on migrant flows, migrants' use of smugglers, and smuggling fees. At the high end, we also differentiated between payments en route to the U.S.-Mexico border, as one "segment" of the journey, and payments across the border, as another segment. We were able to draw this distinction because the EMIF Sur data on fees, which uniformly constitute the high end of the range, draw this distinction.

On that basis, smugglers' revenues from smuggling migrants from the three NT countries combined (as would correspond to the larger oval to the right in Figure 3.1) could have ranged from about $200 million to $2.3 billion, reflecting the considerable uncertainty of the underlying estimates of migrant flows, migrants' use of smugglers, and smuggling fees (see Table 3.1). At the high end, somewhat more revenue might accrue en route to the U.S.-Mexico border than across that border, and some of the revenue that accrues "across" might pertain to expenditures for domestic U.S. travel.

Cuba AR_001414

**Table 3.1. Preliminary Estimates of Smuggling Revenues, by Country of Origin for 2017 (in millions of U.S. dollars)**

| Country of Origin | Total into United States | | To U.S.-Mexico Border | Across U.S.-Mexico Border |
|---|---|---|---|---|
| | Low End | High End | High End | High End |
| Guatemala | 88 | 957 | 574 | 383 |
| Honduras | 48 | 768 | 434 | 334 |
| El Salvador | 67 | 563 | 281 | 281 |
| **Total Northern Triangle** | **203** | **2,288** | **1,290** | **998** |

SOURCE: Author estimates based on analysis of DHS, EMIF Sur, and other data.

We have no basis for attributing the preliminary "aggregate" estimate of smuggling revenue to any particular type of smuggler, be it TCO or not, but the preponderance of the evidence (see Chapter 2) suggests that much of the revenue from smuggling would not accrue to organizations that one might identify as TCOs, based on official definitions.

At the outset and at each stage of the calculations, we encountered analytical challenges that might suggest, in some instances, that the low end of the preliminary revenue estimate is too low, and, in other instances, that the high end is too high. For example, at the low end, the data are missing observations on got-aways, and, at the high end, the data might include some agreed payments that never materialize.[110] But, some analytical challenges could have affected both ends of the range. In particular, we worked with data on apprehensions between POEs, which meant excluding potentially relevant activity at POEs and undercounting migrant flows, and we did not make any adjustments for recidivism, which introduced the possibility of double counting fees and overstating revenue.

To better understand the implications of omitting POE activity and recidivism adjustments, we undertook two sets of side calculations to account, first, for the missing activity and, second, for possible double counting. In the first instance, if one were to assume that unaccompanied children and families that present themselves to authorities at POEs use smuggling services to travel to the U.S.-Mexico border in the same ways as other unlawful migrants, then, with that activity, the preliminary revenue estimate for all three routes, combined, could have been about 5.5 percent higher at the low end of the range and 3.3 percent higher at the high end.[111] In the second instance, if one were to reduce the preliminary estimates for each country of origin by the

---

[110] Recalling that the fee data from EMIF Sur include not just actual payments, but also agreed payments, the high end of the range might overstate actual revenues, whether before or after crossing the border.

[111] At the high end, we multiplied the number of unaccompanied children and family members who presented themselves at POEs in 2017, by country of origin, by the high-end percentage of use and the EMIF Sur figures for smuggling fees, limited to transit as far as the U.S.-Mexico border, which amounted to 50–60 percent of the total, by country. At the low end, we multiplied the same flows by the low-end percentage and apportioned the DHS figures for fees, using the 50–60 percent shares found in the EMIF Sur data.

Cuba AR_001415

applicable recidivism rate, the estimate for the three routes, combined, would have been about 3.4 percent lower at both ends of the range.[112]

### Drug-Trafficking TCOs' Piso Collections

Unlike the preliminary estimate of revenues from smuggling, the preliminary tax, or *piso*, estimate tracks directly to TCOs, specifically drug-trafficking TCOs. As previously, we arrived at a total value by multiplying migrant flows, by percentages, by payments, but, in this case, the percentages indicate "encounters" with the drug-trafficking TCOs rather than "use" of smugglers and the payments refer to taxes rather than fees. Whereas the migrant flow numbers were the same as for the foregoing revenue estimate, the relevant low- and high-end percentages for these calculations were 50 percent and 75 percent, the relevant payment figures were $300 and $700, and neither the percentages nor payments differed by route.[113]

On that basis, the total amount of *pisos* that unlawful migrants from the NT might have paid to drug-trafficking TCOs in 2017—for traveling the three routes, combined (as would correspond to the smaller oval to the left in Figure 3.1)—could have ranged from about $30 million to $180 million (see Table 3.2). Whether these sums would constitute a share of the foregoing revenue figures or an additional payment would depend, in part, on the smuggling arrangement and whether it was "all-inclusive." If the arrangement were all-inclusive, the tax might be folded into the smuggling fee (as depicted in the intersection of the two ovals in Figure 3.1), but it would, nevertheless, pass through to the drug-trafficking TCO that demanded payment for the migrant's passage.

**Table 3.2. Preliminary Estimates of Drug-Trafficking TCOs' Tax, or *Piso*, Collections, by Country of Origin for 2017 (in millions of U.S. dollars)**

| Country of Origin | Low End | High End |
|---|---|---|
| Guatemala | 13 | 73 |
| Honduras | 10 | 53 |
| El Salvador | 10 | 55 |
| **Total Northern Triangle** | **33** | **181** |

SOURCE: Author estimates based on analysis of DHS and other data.

---

[112] At the low and high end, we simply applied the recidivism rates, by country of origin, ranging from 2.5 to 4.5 percent, to the preliminary estimates of smuggling revenue, by country of origin.

[113] We recognized that TCOs have more or less control along certain routes and at certain border crossings, but we lacked the data to include that level of refinement in its tax estimates.

Cuba AR_001416

## Profitability, Risk, and Other Economic Considerations

Our quantitative analysis has so far focused strictly on revenues, but profitability might be more relevant as a measure of human smuggling's contributions to the financial health and viability of TCOs and other smuggling operations. Unfortunately, the data on smugglers' costs, which would be necessary to calculate profit, are even scarcer than the data on revenue; we are unaware of any systematic collection of data on costs (see Chapter 2).[114]

We found scattered anecdotal evidence suggesting that smugglers' costs are nontrivial but that they could leave room for profit (see Chapter 2). For example, the press has reported transit costs that might sum to around $2,000 or more, depending on incidentals.[115] With costs at that level or even higher, smuggling could be "profitable," at least as an accounting matter, but perhaps not as an economic matter. Some of the difference between revenues and costs might constitute a "risk premium," or compensation for the risks that actors take on when they engage in human smuggling, such as those of a driver who transports unlawful migrants from the U.S.-Mexico border to Los Angeles. Given low barriers to entry in this market—that is, nearly anyone willing to bear the risks of smuggling can offer smuggling services—it is possible that competition among smugglers for migrants' business might drive economic profits to zero or near to zero, after compensating for the risk.

Other researchers admit the difficulty of profit estimation but also call profitability of almost any type into question.[116] One researcher asserts, "it is virtually impossible to estimate the size of the smuggling market. It is even harder to determine its profits, given its underground, unregulated nature."[117] But this researcher also suggests that profits tend to be modest and are absorbed locally. In a prior article, the same researcher finds that "individual facilitators earnings vary considerably," after accounting for all costs, and that "smuggling constitutes in the majority of cases only a supplemental income-generating strategy."[118]

The taxes, or *pisos*, that migrants pay to drug-trafficking TCOs present fewer analytical challenges insomuch as they might amount to pure or nearly pure profit. The TCOs that control particular transit routes and border crossings collect the tax, but they provide few reciprocal services (see Chapter 2). Even if a drug-trafficking TCO describes the payment as "protection" or "security," the protection is largely from the TCO itself. As for risk premium, it is possible that drug-trafficking TCOs incur some risk when they allow migrants to pass through their territory, but these TCOs might use the migrants' passage strategically to divert attention from or

---

[114] For additional comments on the paucity of data on smugglers' costs, see also United Nations Office on Drugs and Crime, 2011, p. 85.

[115] These figures appeared in *Daily Mail* and Associated Press Reporters (2014) and elsewhere.

[116] Sanchez, 2017, 2018.

[117] Sanchez, 2018, p. 2.

[118] Sanchez, 2017, p. 17.

Cuba AR_001417

conceal other illegal activities, such as drug smuggling, and to mitigate their risks.[119] In addition, drug-trafficking TCOs might also employ migrants as unremunerated "mules," or drug couriers, if the migrants cannot afford the *piso*.

---

[119] See, for example, Cabrera, 2015.

Cuba AR_001418

# 4. Concluding Remarks

In this scoping study, we set out to characterize TCOs that smuggle unlawful migrants from the NT of Central America (Guatemala, Honduras, and El Salvador) to the United States and to develop a preliminary estimate of the TCOs' smuggling revenues.

However, as the research progressed, it became clear that many different types of actors engage in human smuggling along those routes, only some of which appear to meet official definitions (in legislation and formal policy guidance) of a TCO. The literature presented strong evidence, confirmed by SMEs, that smugglers operating along the routes from the NT to the United States reside along a spectrum that ranges widely from independent operators, to ad hoc groups, to loose networks, to more-formal networks. Importantly, we could not identify the percentage of unlawful migrants that use each type of smuggler, and thus we could not distinguish the revenues that flow to human-smuggling TCOs from the revenues that flow to other actors engaged in human smuggling. However, we could separately identify the taxes, or *pisos*, that migrants pay to drug-trafficking TCOs to transit through their territory.

With those limitations in mind, we undertook a broader assessment of human smuggling, smugglers, and aggregate smuggling revenues. We developed preliminary estimates—ranges of estimates—of revenue from smuggling unlawful migrants along three routes, from Guatemala, Honduras, and El Salvador to the United States, without regard to the type of smuggler, be it a TCO, independent operator, or other type. We based the estimates on three variables: the flow of unlawful migrants from each country to the United States, the percentage of those migrants that use smugglers along the way, and the fees that the migrants pay to smugglers, each of which entailed estimation of its own.

On that basis, we developed a preliminary estimate of aggregate smuggling revenue—for the three routes, combined, in 2017—that ranged from about $200 million to $2.3 billion. This estimate is, as the range implies, highly uncertain, owing largely to a scarcity of reliable data for each variable. Likewise, we produced an ancillary and still preliminary estimate of drug-trafficking TCOs' *piso* collections that also spanned an order of magnitude, from about $30 million to $180 million.

The rest of this chapter focuses on implications of these findings for DHS for targeting human smuggling, informing resource allocation decisions, and improving data collection.

## Targeting Human Smuggling

A key finding of this report is that human smuggling involves many different types of smugglers, or "actors," with organizations that are often informal and based on relationships

Cuba AR_001419

instead of well-established hierarchies. Absent formality and strict hierarchical structures, it might be difficult for DHS to effectively target them with legal sanctions, for several reasons:

- Loose networks are difficult to disrupt, ad hoc groups are even less susceptible, and independent operators are easily replaceable. As described in Chapter 2, key actors associated with loose networks and involved in smuggling people north may not know each other well or at all, ad hoc groups are even less cohesive and more amenable to reconfiguration, and the independent operators that form part of both kinds of networks have immediate substitutes. This means that even if DHS can apply sanctions to some individuals in a given network or group or to individuals who operate independently, its ability to disrupt their organizations or affect the market may be limited.
- Low barriers to entry can further impede disruption. While individuals might face some personal risk when they engage in smuggling, they appear to engage fluidly—part-time or as opportunities present themselves—at least at low levels (e.g., taxi drivers and hotel or stash house operators) and possibly as facilitators. To build on the above example, this means that even if DHS can apply sanctions to such actors, the actors can generally be replaced easily, and others can fill their roles.
- Going after facilitators might be more fruitful, but doing so effectively might be challenging. To the extent that human-smuggling networks are hierarchical, their leaders are based in foreign countries (i.e., facilitators based in Mexico and the NT for the flows this report has addressed). This means that DHS must be able to work with partner agencies in those countries to apply sanctions to the leaders of these networks, which can be challenging. DHS can and does target individuals involved in human smuggling that are based in the United States, but, as discussed in Chapter 2, these actors are generally not prominent figures in human-smuggling networks, but rather subcontractors.

One area where DHS may be able to affect networks, groups, or the market involves money transfers that take place once individuals arrive in the United States. As noted in Chapter 2, many migrants only make their final payment to smugglers after they arrive in the United States. DHS might consider expanding existing efforts to investigate these kinds of payments, including working more closely with formal and informal banking services, to identify suspicious payments. DHS could also consider expanding current efforts to work with foreign law enforcement partners. As noted above, to the extent that human-smuggling networks are hierarchical, their leadership is almost always foreign-based. This means that DHS must work with foreign partners to effectively sanction the individuals involved.

## Allocating Resources

Comparing the preliminary estimate of revenues from human smuggling to information about other types of illicit—and even licit—activities could help inform DHS's resource allocation decisions. For example, DHS might consider how much it should prioritize efforts to disrupt human-smuggling operations in light of other concerns about TCOs.

To approach that question, we searched for analogous estimates of TCOs' revenues from transporting illicit drugs through Mexico and across the U.S.-Mexico border and compared them

41

to our preliminary estimate of revenues from human smuggling. Although we were not able to find recent estimates of drug-trafficking revenues, estimates developed in a 2010 RAND report for marijuana, cocaine, heroin, and methamphetamine trafficking in that era provided a basis for a rough comparison.[120] According to that report, drug-trafficking organizations' revenues from transporting marijuana through Mexico and across the U.S.-Mexico border, without netting the cost of acquiring the drug, could have amounted to $1.1 billion to $2.0 billion, and the analogous figures for cocaine, heroin, and methamphetamine could have amounted to $3.4, $1.1, and, $0.6 billion, respectively, suggesting a total of up to $7.1 billion.[121]

On that basis, our high-end, preliminary estimate of revenue from human smuggling of $2.3 billion was the same order of magnitude as RAND's earlier estimate of revenue from drug trafficking. However, as noted above, we cannot say how much of the revenue from human smuggling flows to TCOs that engage in human smuggling, as compared with other types of smugglers. Moreover, the RAND estimates for drug-trafficking revenues only included revenues from moving drugs through Mexico and across the U.S.-Mexico border and did not include revenue that drug-trafficking TCOs garner from distribution, wholesale, or retail activities that occur in the United States.

To shed additional light on the dimensions of human smuggling, we also compared revenues from human smuggling to spending on related forms of licit-market activities. Albeit another imperfect analogy, final household consumption expenditures on air, rail, truck and other transportation services in Mexico totaled almost $46 billion in 2015, making revenues from human smuggling look relatively small by comparison—about 5 percent or less—and suggesting little possibility of a noteworthy economywide effect.[122]

## Improving Data Collection

Within the scope of this project, DHS asked the Homeland Security Operational Analysis Center to identify ways to improve its ability to develop estimates of revenues from human smuggling. To that end, some of the data deficiencies uncovered in this report might be insurmountable, given the illicit nature of human smuggling, but some might not be. We have identified potential improvements in data collection and methods that DHS could consider to refine the revenue estimate, reduce the breadth of the range, and better inform policymaking. Not everything can be knowable about smugglers and revenues, let alone profits, along the routes

---

[120] Kilmer et al., 2010.

[121] Kilmer et al. (2010) acknowledge that their estimates are 'substantially less than others,' but they approached revenue estimation with a well-documented and transparent methodology.

[122] Organisation for Economic Co-operation and Development (OECD) data in then-year Mexican pesos, converted using midyear exchange rates.

Cuba AR_001421

from the NT to the United States, but certainly more is knowable than is known already. For example:

- **DHS could standardize its line of questioning during migrant interviews across apprehension sites.** This would allow DHS to collect more consistent information about the interactions between unlawful migrants and human smugglers—including the types of smugglers they encounter and the fees they pay to smugglers.
- **DHS could seek details from migrants that would increase its ability to assess revenues, by route, and distinguish different types of smugglers and payments.** For example, DHS could ask not just "Did you use a smuggler?" and "What did you pay the smuggler?" but also "How many different smugglers did you encounter?" "Were the smugglers operating alone or with others?" "How did you come in contact with the smuggler(s)?" "Did you pay the smuggler(s) up front?" "How many payments did you make?" "What services did you receive for each of these payments?" etc. DHS might also include questions concerning the details of the route, modes of transportation, and preferences for hiring smugglers at different points along the route, such as border crossings. DHS might also seek to distinguish between fees for transit through Mexico and for transit across the U.S.-Mexico border and between those smuggling fees and drug-trafficking TCOs' taxes.
- **DHS could create a shared portal for data entry that screens for errors, if it has not done so already, and use a randomized survey process.** These actions could reduce the administrative burden of data collection on frontline personnel and increase the likelihood of successful data entry. A shared portal that provides a common interface for data entry for all U.S. Border Patrol agents and feeds into a consolidated database could be programmed to recognize inconsistencies, outliers, and other errors. Moreover, if officials interview just a random sample of unlawful migrants, they might have more time to process migrants and attend to other needs, even with additional questions.

We recognize that DHS would need to invest in developing appropriate survey instruments, training personnel to administer them consistently, and developing supporting infrastructure to implement such suggestions.

Even with the imperfect data at hand, a longer-term research project might be able to reduce some of the uncertainty of the preliminary revenue estimate, which could result in better evidence for resource allocation decisions. For example, a research team could build on the calculations in this report by taking more time to explore the sensitivity of the calculations to underlying assumptions about smugglers' and migrants' behavior, how markets operate, trends in pricing, etc. It could also explore additional ways to filter and eliminate "noise" in the data that could result from data entry problems, confusion over payments to smugglers versus other actors, and confusion over the currency that migrants use to pay smugglers.

These are just a few technical suggestions, but with greater awareness of the diversity of actors that engage in human smuggling, DHS might be able to reorient its data collection to reflect that diversity and analyze its implications for homeland security.

Cuba AR_001422

# Appendix A. Guidance for Literature Review

We developed guidance for reviewing the literature (academic articles, press reports, and reports written by government agencies, nongovernmental organizations, and multilateral entities), consisting of instructions, search terms, parameters, and examples of relevant "hits." The guidance included a detailed outline of themes of interest and key terms pertaining to human smuggling from the NT to the United States, drawn from our discussion points for the SME interviews (discussed in Appendix B).

To start, we shared this guidance with library staff, who made a preliminary sweep through the literature in the final days of September 2018 and the first few days of October 2018. The staff used the guidance to create various threads, including, "(smuggler* OR trafficker* OR "human smuggling organization" OR "alien smuggling organization" OR "migrant smuggling organization" OR "human trafficking organization" OR "drug trafficking organization*" OR "transnational smuggling" OR coyote*) AND ("central america*" OR salvador* OR guatemala* OR hondura*) AND (cost OR costs OR piso* OR revenue* OR fee OR fees OR profit*)," and tried other combinations of terms and phrases, including "governance."

The searches covered several bibliographic databases, including Academic Search Complete, Business Search Complete, Social Science Abstracts, Criminal Justice Abstracts, Sociological Abstracts, PAIS Index, Index to Legal Periodicals, eBook Business Book Collection, EBSCO eBook Collection, ERIC, GREENFIle, MEDLINE, EconLit, US Major Dailies, Regional Business News, PsychInfo, Education Abstracts, MAS Ultra, CINAL Plus, Health Source, Military and Government Collection, and Open Source.

Upon completion of the initial sweep, we began scanning the results for relevant material, also working with the guidance.

Cuba AR_001423

# Appendix B. Discussion Points and Questions for Subject-Matter Experts

We developed a set of discussion points and questions, formed as an outline, to guide interviews with SMEs, and slides, including a synopsis of these points and questions, as read-ahead materials for the SMEs.

The discussion points and questions are reprinted below.[123]

## Human Smuggling, Transnational Criminal Organizations, and Revenues Along Routes from Northern Triangle Countries to the United States

### *The Nature of Transnational Criminal Organizations (TCOs) that Engage in Human Smuggling from the Northern Triangle (NT) and Across the U.S.-Mexican Border*

- Where are the TCOs located?
- Do they have operatives or a presence in the United States?
- How are they structured and how big are they?

  - How centralized is decisionmaking?
  - How many employees or affiliates do they have?
  - Do they subcontract for services?

- How do they advertise their services or recruit/connect with migrants?
- To what extent—and how—do they interact with other TCOs, e.g., collaboratively, competitively, or violently?
- To what extent—and how—do they interact with law enforcement?
- Do TCOs that engage in human smuggling also engage in other criminal activities?

### *Extent and Form of NT Migrants' Engagement with TCOs and Other Smugglers*

- What percentage of NT migrants seeks services of TCOs?
- What percentage seeks services of individual operators along the route or travel independently without such services?
- To what extent do NT migrants seek services of TCOs/others for an entire route, as compared to separate segments of a route or border crossings?
- If migrants tend to seek services for particular routes, segments, or crossing, which ones?
- How do NT migrants obtain information about TCOs and other smugglers?

---

[123] The discussion points and questions have been edited only slightly, largely for purposes of formatting.

Cuba AR_001424

*Fees Charged to NT Migrants and Operating Costs*

- What is the average fee a migrant from the NT pays to TCOs?
  - What is the fee for an entire route?
  - What are the fees for particular segments?
  - What is the fee just to cross into the United States?
- How do TCOs receive payment and collect fees?
  - Lump sum or installment?
  - Before departure, along the way, or upon arrival/release in the United States?
- What is included in this fee?
  - How many attempts—or trips—do they get?
  - What kind of transportation do they receive?
  - Does the fee include transportation inside the United States?
  - How do TCOs enforce payments of fees that are to be collected upon arrival/release?
- What costs do TCOs incur en route, e.g., basic transportation, food and shelter, weapons, or bribes and do migrants' fees cover them?
- How much do TCOs profit from smuggling?

*TCO Tactics Along Routes from the Northern Triangle to the United States*

- What routes do TCOs that engage in human smuggling typically use?
- How do those TCOs decide what route to take?
- Do they use buses, cars, trains, boats?
- How closely do they coordinate or interact with other TCOs, including those that engage in drug and/or weapon trafficking, along the routes?
- How do they choose when and where to cross the border into the United States?
- How closely do different TCOs coordinate border crossings with each other?
- Do they pay off or avoid law enforcement and, if so, how?
- Do TCOs that engage in human smuggling typically engage concurrently in other forms of smuggling, e.g., drugs or weapons, or criminal activities?
- To what extent do TCOs or other smugglers invoke violence, e.g., directed at immigrants or other smugglers, and under what circumstances?

*Data Sources, Prior Studies, and Methodologies*

- Are estimates of migrant flows, routes, fees, revenues, costs, etc., available in official reports (e.g., DHS), academic studies, or other documents or databases?
- Are you aware of any official reports (e.g., DHS), academic studies, or other documents that discuss any of these issues, including the fees paid by migrants and the tactics and costs borne by TCOs that engage in human smuggling?
- Are you aware of any promising methodological developments in this arena?

Cuba AR_001425

# Appendix C. Guidance for Data Analysis

Working primarily with data from DHS,[124] and treating migrant flows from each country as "routes," we undertook aggregate revenue calculations based on the numbers of individuals traveling each route, the percentage of migrants who hire smugglers along the route, and the amount that those migrants pay smugglers to help them along the route. Simply put, revenues would equal the product of the number of migrants along each route, the percentages of those migrants who hire smugglers, and the payments, per migrant, to smugglers.

We referred to this as an "aggregate" calculation because the data do not distinguish smugglers by type, e.g., TCO, ad hoc group, or independent operator.

We developed a data analysis outline, or guidance, and embarked on estimating the flows of migrants from each of the NT countries and from the NT overall, their use of smugglers, and their payments to smugglers. In addition, we considered the extent of recidivism among unlawful migrants from each of the NT countries. The data analysis outline is reprinted below.

## Data Analysis Outline[125]

Time frame is 2012–2017, by fiscal year, if corresponding to other U.S. Customs and Border Protection/DHS data regarding apprehensions, turn-backs, got-ways, smuggling costs, etc. In each case calculate for individuals traveling from each of Guatemala, Honduras, and El Salvador and the three countries combined, which is the region known as the "Northern Triangle" (NT).

1. Flows of migrants for each year, calculated as
   a. Apprehensions$_i$ (APP$_i$) + Observed Got-Aways$_i$ (GA$_i$)
   b. APP$_i$ + Observed Turn-Backs$_i$ (TB$_i$) + GA$_i$
   c. APP$_i$/r$_{app}$
   d. APP$_i$/r$_{app}$ + TB$_i$

   **Where:**
   i = Country (Guatemala, Honduras, or El Salvador) or region (NT).
   GA$_i$ = APP$_i$/APP$_{SWB}$ * GA$_{SWB}$
   TB$_i$ = APP$_i$/APP$_{SWB}$ * TBS$_{SWB}$
   SWB = Southwest border, between POEs
   r$_{app}$ = estimated "partial apprehension rate" [DHS Office of Immigration Statistics, 2017, p. 8].[126]

---

[124] We also worked with EMIF Sur data on use of smugglers and smuggling fees.

[125] This outline, developed by the project team to guide the estimation process, has been edited only slightly, largely for purposes of formatting and for consistency with the use of vocabulary in the rest of the report.

Cuba AR_001426

**Assumptions:**

- Recidivism is relatively minor for the NT, pending rate results, below.
- Most NT migrants travel through SWB.
- NT country's and the NT region's share of observed turn-backs and got-aways is approximately the same as its share of recorded apprehensions.
- NT country's and the NT region's apprehension rate is about the same as the overall apprehension rate, $r_{app}$.[127]
- For calculations without turn-backs, someone who turns back will try again and eventually will be apprehended or get away.

2. Recidivism rates[128]

    a. Over the period 2012–2017

    b. For 2012, 2013, 2014, etc., individually

    c. For 2- or 3-year moving averages, as appropriate, pending calculations of days between contacts with border enforcement and numbers of contacts[129]

    d. For appropriate moving averages, either 2- or 3-year, create a table of 'number of tries' and 'number of individuals.'

3. Percentage of migrants that report use of smugglers.
4. Average smuggling fees, adjusted for outliers, e.g., by removing "tails."[130]
5. Median smuggling fees, without adjusting for outliers, etc.

## Recidivism, Apprehension Rates, and Migrant Flows

    Recidivism, which appears to be most common among Mexican nationals, can manifest in the DHS apprehension data when an unlawful migrant who is apprehended between POEs along the southwest border has been apprehended previously. (As noted above, the way to determine whether someone is a recidivist is by comparing fingerprint numbers across records in the apprehension data.) The recidivism phenomenon—namely, apprehension and re-apprehension—is closely related to the class of capture-recapture models commonly used in ecology to estimate wildlife populations, where exhaustive sampling is impractical. In the ecological context, the "recaptured" populations (like recidivists in the border security context) provide critical information for estimating the total wildlife populations (like the entire flow of illegal migrants in the border security context).

---

[126] DHS provided us with the underlying point estimates for the rate.

[127] If 2017 rate is unavailable, use 2016 rate or extrapolate from trends.

[128] Calculated as shares of unique individuals who try to enter the United States and are apprehended more than once in a given period, as specified, based on a comparison of fingerprint numbers in the apprehension data.

[129] Two-year moving averages calculated as 2012–2013, 2013–2014, 2014–2015, 2015–2016, and 2016–2017, and three-year moving averages calculated as 2012–2014, 2013–2015, 2014–2016, and 2015–2017.

[130] We set the cutoff at two standard deviations.

Cuba AR_001427

Espenshade first proposed the repeated trials model (RTM), in 1995, based on the capture-recapture models, to measure the flow of illegal migrants across the southwest border.[131] In addition to the flow, the RTM also estimates the apprehension rate or the probability of apprehension. In the RTM, both the flow and the apprehension rate are functions of the numbers of total apprehensions and recidivist apprehensions. To make the RTM more realistic, Chang and his co-authors later proposed a modified RTM that incorporates at-the-border deterrence, and he developed revised formulas for the flow and the apprehension rate.[132] As recidivism is mainly characteristic of Mexican nationals, Chang also suggested that the apprehension rate should be estimated by using just those records pertaining to Mexican nationals in the apprehension database. The apprehension rate thus obtained is then assumed to be applicable to the entire population.[133] Deterrence is not measured directly, and must be estimated via other means, such as surveys or econometric models. A recent Office of Immigration Statistics report, *Efforts by DHS to Estimate Southwest Border Security between Ports of Entry*, summarizes the development of the estimate of the apprehension rate and its limitations.[134]

---

[131] Espenshade, 1995, pp. 545–565.

[132] Chang et al., 2006.

[133] Whitley et al., 2016.

[134] DHS Office of Immigration Statistics, 2017.

Cuba AR_001428

# Appendix D. DHS and EMIF Sur Data on Smuggling Fees

This appendix presents information on the properties of the data on smuggling fees from DHS and EMIF Sur in Tables D.1 and D.2.

### Table D.1. Smuggling Fees Reported in DHS Data for Fiscal Year 2017

| Country of Origin | Mean Fee | Median Fee | Standard Deviation | Sample Size |
|---|---|---|---|---|
| Guatemala | $4,725 | $4,000 | $4,632 | 6,417 |
| Honduras | $3,777 | $3,000 | $2,936 | 4,379 |
| El Salvador | $4,560 | $4,000 | $3,062 | 5,735 |

### Table D.2. Smuggling Fees Reported in EMIF Sur Data for Calendar Year 2017

| Country of Origin | Mean Fee | Median Fee | Standard Deviation | Sample Size |
|---|---|---|---|---|
| For transit from country of origin to U.S. border | | | | |
| Guatemala | $6,085 | $6,164 | $2,793 | 1,044 |
| Honduras | $6,386 | $6,500 | $1,227 | 462 |
| El Salvador | $3,985 | $4,000 | $1,525 | 1,081 |
| For transit across U.S. border | | | | |
| Guatemala | $4,615 | $4,110 | $3,109 | 1,196 |
| Honduras | $4,230 | $5,000 | $2,427 | 529 |
| El Salvador | $4,040 | $4,000 | $2,305 | 1,486 |
| Totals for transit from country of origin to and across U.S. border | | | | |
| Guatemala | $10,700[a] | $10,274[a] | -- | -- |
| Honduras | $10,617[a] | $11,500[a] | -- | -- |
| El Salvador | $8,025[a] | $8,000[a] | -- | -- |

SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals). Figures might not add due to rounding.
[a] These figures are the sums of the means or medians, respectively, for each country for each segment, first, from the country of origin to the U.S. border and, second, across the U.S. border.

Cuba AR_001429

# References

Amnesty International, *Mexico: Invisible Victims. Migrants on the Move in Mexico*, 2010. As of November 29, 2018:
https://www.amnesty.org/en/documents/AMR41/014/2010/en/

Associated Press, "Human Smugglers Cash In on Central American Migration to U.S.," CBC News website, July 21, 2014. As of October 28, 2018:
https://www.cbc.ca/news/world/human-smugglers-cash-in-on-central-american-migration-to-u-s-1.2712878

Beittel, June S., *Mexico: Organized Crime and Drug Trafficking Organizations*, Washington, D.C.: Congressional Research Service, R41576, July 3, 2018.

Burnett, John, "Migrants Say They're Unwilling Mules for Cartels," NPR website, December 4, 2011. As of October 28, 2018:
https://www.npr.org/2011/12/04/143025654/migrants-say-theyre-unwilling-mules-for-cartels

Cabrera, Chris, testimony on behalf of the National Border Patrol Council before the U.S. Senate Homeland Security and Governmental Affairs Committee, Washington, D.C., October 21, 2015. As of November 8, 2018:
https://www.hsgac.senate.gov/imo/media/doc/Testimony-Cabrera-2015-10-21.pdf

Caldwell, Alicia A., "U.S. Border Crossings Are Fewer, Riskier and More Expensive," *Wall Street Journal*, October 5, 2018

Campana, Paolo, "The Structure of Human Trafficking: Lifting the Bonnet on a Nigerian Transnational Network," *British Journal of Criminology*, Vol. 56, No. 1, 2016, pp. 68–86.

Castellano, Laura, "Devoran Coyotes Millones con Niños," *El Universal*, July 29, 2014. As of October 29, 2018:
http://www.pressreader.com/mexico/el-universal/20140729/281530814157297

Chang, Joseph C., R. Kohout, H. R. Blacksten, and S. Bernard, *CBP Apprehensions at the Border*, Arlington, Va.: Homeland Security Institute, HSI Publication Number RP05-25f-04, 2006.

Cleek, Ashley, "With Smuggling Costs Skyrocketing, Parents Balance Risk and Debt for Their Children's Future," Public Radio International website, February 28, 2018. As of November 7, 2018:
https://www.pri.org/stories/2018-02-28/smuggling-costs-skyrocketing-parents-balance-risk-and-debt-their-childrens-future

Cuba AR_001430

*Daily Mail* and Associated Press Reporters, "From Bribing Drug Cartels and Immigration Officials to Paying for Hotels and Train Rides: Coyote Smugglers Reveal Costs Involved in Smuggling Child Migrants from Central America to the U.S.," *Daily Mail*, July 22, 2014. As of October 18, 2018:
https://www.dailymail.co.uk/news/article-2700946/From-bribing-drug-cartels-immigration-officials-paying-hotels-train-rides-Coyote-smugglers-reveal-costs-involved-smuggling-child-migrants-Central-America-U-S.html

Domingo Villegas, Rodrigo, "Central American Migrants and 'La Bestia': The Route, Dangers, and Government Responses," *Migration Policy Institute*, September 10, 2014. As of November 18, 2018:
https://www.migrationpolicy.org/article/central-american-migrants-and-"la-bestia"-route-dangers-and-government-responses

Egan, Dennis, Paul Kantor, Fred Roberts, Vladimir Menkov, and Katie McKeon, "Estimating Missed Detections at the Southern Border," unpublished presentation at George Mason University by the Borders, Trade, and Immigration Institute: A DHS Center of Excellence led by the University of Houston, via subcontract to Rutgers, 2018.

EMIF, homepage, undated-a. As of November 28, 2018:
https://www.colef.mx/emif/eng/index.php#

EMIF, "Surveys of Migration at Mexico's Northern and Southern Borders: Background and Objective," El Colegio de la Frontera Norte website, undated-b. As of November 8, 2018:
https://www.colef.mx/emif/eng/antecedentes_objetivos.php

EMIF, "Surveys of Migration at Mexico's Northern and Southern Borders: Research Methodology," El Colegio de la Frontera Norte website, undated-c. As of November 8, 2018:
https://www.colef.mx/emif/eng/bases_metodologicas.php

EMIF Sur, "Indicadores Anuales 2017," COLEF.mx website, p. 5, Chart 9b, 2018a. As of November 8, 2018:
https://www.colef.mx/emif/resultados/indicadores/indicadores/Sur/2017/Anual/SUR-Indicadores-ANUALES%202017.pdf

EMIF Sur, "Indicadores Semestrales EMIF Sur: OCT 2017-MZO 2018," COLEF.mx website, March 2018b. As of November 8, 2018:
https://www.colef.mx/emif/resultados/indicadores/indicadores/Sur/2017/S1/SUR-Indicadores-S1-oct2017-marzo2018.pdf

Espenshade, Thomas J., "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing the U.S.-Mexico Frontier," *International Migration Review*, Vol. 29, No. 2, 1995, pp. 545–565.

Cuba AR_001431

Farah, Douglas, and Pamela P. Lum, *Central American Gangs and Transnational Criminal Organizations: The Changing Relationships in a Time of Turmoil*, Washington, D.C.: International Assessment and Strategy Center, February 2013.

Finckenauer, James O., *Chinese Transnational Organized Crime: The Fuk Ching*, Washington, D.C.: National Institute of Justice, 2001. As of November 7, 2018:
https://www.ncjrs.gov/pdffiles1/nij/218463.pdf

Frontline/World, "Extended Interview: A Human Smuggler," PBS website, 2018. As of October 13, 2018:
http://www.pbs.org/frontlineworld/stories/mexico704/interview/smuggler.html

Gallagher, Mike, "Drugs, Guns and People: Smuggling Is a Growing Border Problem," *Albuquerque Journal*, June 10, 2018. As of October 28, 2018:
https://www.abqjournal.com/1183179/drugs-guns-and-people-smuggling-is-a-growing-border-problem.html

Garsd, Jasmine, "Human Smuggler: Central Americans Are Worth Their Weight in Gold," transcript, NPR website, January 28, 2016. As of November 7, 2018:
https://www.npr.org/2016/01/28/464664750/human-smuggler-central-americans-are-worth-their-weight-in-gold

González, Daniel, and Gustavo Solis, "The Wall: A Human Smuggler, and the Wall That Will Make Him Rich," *USA Today*, 2017. As of October 28, 2018:
https://www.usatoday.com/border-wall/story/human-smuggling-crossing-border-illegally-methods/559784001/

Guevara González, Yaatsil, "Navigating with Coyotes: Pathways of Central American Migrants in Mexico's Southern Borders," *Annals of the American Academy of Political and Social Science*, Vol. 676, No. 1, March 2018, pp. 174–193.

Hale, Gary J., Adam N. Hale, Nathan P. Jones, and Russell Lundberg, "Uncovering Human Trafficking Patterns from Guatemala to the U.S.," unpublished presentation at George Mason University by the Borders, Trade, and Immigration Institute: A DHS Center of Excellence led by the University of Houston, 2018.

Hennessy-Fiske, M., "Migrants, Young and Old, Are Not Always Related; Border Patrol Says Fear of Child Trafficking Forces Separations," *Los Angeles Times*, May 8, 2018. As of November 7, 2018:
http://www.latimes.com/nation/la-na-border-patrol-dna-20180508-htmlstory.html

International Crisis Group, *Easy Prey: Criminal Violence and Central American Migration*, Report 57, July 2016.

Cuba AR_001432

Kilmer, Beau, Jonathan P. Caulkins, Brittany M. Bond, and Peter H. Reuter, *Reducing Drug Trafficking Revenues and Violence in Mexico: Would Legalizing Marijuana in California Help?* Santa Monica, Calif.: RAND Corporation, OP-325-RC, 2010. As of November 14, 2018:
https://www.rand.org/pubs/occasional_papers/OP325.html

Kulish, Nicholas, "What It Costs to Be Smuggled Across the U.S. Border," *New York Times*, June 30, 2018. As of October 24, 2018:
https://www.nytimes.com/interactive/2018/06/30/world/smuggling-illegal-immigration-costs.html

Leutert, Stephanie, "When Drug Trafficking Is Your Only Option," *Foreign Policy*, July 14, 2017.

Leutert, Stephanie, *Organized Crime and Central American Migration in Mexico*, Lyndon B. Johnson School of Public Affairs, Policy Research Project 198, 2018.

Martinez, Oscar, "Los Coyotes del Norte Están Aumentando las Cuotas por TRUMP," *Animal Politico*, February 10, 2017. As of October 28, 2018:
https://www.animalpolitico.com/2017/02/coyotes-migracion-trump/

McAuliffe, Marie, and F. Laczko, *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base*, Geneva, Switzerland: International Organization for Migration, 2016.

Miroff, Nick, "The Border Is Tougher to Cross Than Ever. But There's Still One Way into America," *Washington Post*, October 24, 2018. As of November 21, 2018:
https://www.washingtonpost.com/graphics/2018/national/border-asylum-claims/?utm_term=.c35364dae56d

Morral, Andrew R., Henry H. Willis, and Peter Brownell, *Measuring Illegal Border Crossing Between Ports of Entry: An Assessment of Four Promising Methods*, Santa Monica, Calif.: RAND Corporation, OP-328-OSD, 2011. As of November 14, 2018:
https://www.rand.org/pubs/occasional_papers/OP328.html

Nixon, R., and T. Heisler, "High Profits and Misery Meet at Door of Smugglers' Stash Houses," *New York Times*, August 26, 2018. As of November 7, 2018:
https://www.nytimes.com/2018/08/26/us/politics/smugglers-border-immigrants-money.html

Olson, Eric L., *Migrant Smuggling and Trafficking at the Rio Grande Valley: Ten Observations and Questions*, Washington, D.C.: The Wilson Center, September 2016. As of November 8, 2018:
https://www.wilsoncenter.org/sites/default/files/olson_border_2016_0.pdf

Cuba AR_001433

Organisation for Economic Co-operation and Development, *Can We Put an End to Human Smuggling?* Paris, France, MPD No. 9, December 2015.

Palacios, S. P. Izcara, "Coyotaje and Drugs: Two Different Businesses," *Bulletin of Latin American Research*, Vol. 34, No. 3, December 30, 2014, pp. 324–329.

Paoli, Letizia, and V. Greenfield, "The Supply of Doping Products and the Relevance of Market-Based Perspectives: Implications of Recent Research in Italy," in Jens Beckert and Matias Dewey, eds., *Everything Legal? Interfaces Between legality and Illegality in Markets*, Oxford: Oxford University Press, 2017, pp. 245–267.

Paoli, Letizia, V. Greenfield, and P. Reuter, *The World Heroin Market: Can Supply Be Cut?* New York: Oxford University Press, 2009.

Paoli, Letizia, V. Greenfield, and A. Zoutendijk, "The Harms of Cocaine Trafficking: Applying a New Framework for Assessment," *Journal of Drug Issues*, Vol. 43, No. 4, 2013, pp. 407–436.

Pelley, Scott, correspondent, CBS News, transcript of *60 Minutes* episode, "Human Smuggling Across the Southern Border; Desperation and Fear Are Driving a Dangerous Industry That's Virtually Impossible to Completely Stop," March 11, 2018. As of October 28, 2018: https://www.cbsnews.com/news/human-smuggling-across-the-southern-border/

Prendergast, Curt, "Costly Crossing Fees Turn Illegal Immigrants into Marijuana Smugglers," *Arizona Daily Star*, April 8, 2017. As of October 29, 2018: https://tucson.com/news/local/border/costly-crossing-fees-turn-illegal-immigrants-into-marijuana-smugglers/article_1e95e570-080c-5dd7-a240-687cce94ca8f.html

Reuter, Peter, and V. Greenfield, "Measuring Global Drug Markets: How Good Are the Numbers and Why Should We Care About Them?" *World Economics*, Vol. 2, No. 4, October–December 2001, pp. 159–173.

Roberts, Bryan, G. Hanson, D. Cornwall, and S. Borger, *An Analysis of Migrant Smuggling Costs Along the Southwest Border*, Washington, D.C.: U.S. Department of Homeland Security, Office of Immigration Statistics, working paper, November 2010.

Rodríguez Chávez, Ernesto, *Migración centroamericana en tránsito irregular por México. Nuevas cifras y tendencias*, Instituto Tecnológico Autónomo de México (ITAM)/El Colegio de la Frontera Norte (Colef), PB #14, December 2016.

Sanchez, Gabriella, "Latin America," in Marie McAuliffe and Frank Laczko, eds., *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base*, Geneva, Switzerland: International Organization for Migration, 2016, pp. 269–301.

Cuba AR_001434

Sanchez, Gabriella, "Critical Perspectives on Clandestine Migration Facilitation: An Overview of Migrant Smuggling Research," *Journal on Migration and Human Security*, Vol. 5, No. 1, 2017, pp. 9–27.

Sanchez, Gabriella, "Five Misconceptions About Migrant Smuggling," *Migration Policy Center*, Issue 2018/07, May 2018.

Sanchez, Gabriella E., and Sheldon. X. Zhang, "Rumors, Encounters, Collaborations, and Survival: The Migrant Smuggling–Drug Trafficking Nexus in the U.S. Southwest," *Annals of the American Academy of Political and Social Science*, Vol. 676, No. 1, 2018.

Slack, Jeremy, and Howard Campbell, "On Narco-Coyotaje: Illicit Regimes and Their Impacts on the US-Mexico Border; Sociology and Anthropology," *Antipode*, Vol. 48, No. 5, 2016.

Slack, Jeremy, and Scott Whiteford, "Caught in the Middle: Undocumented Migrant's Experiences with Drug Violence," in T. Payan, K. Staudt, and Z. A. Kruszewski, eds., *A War That Can't Be Won: Binational Perspectives on the War on Drugs*, Tucson, Ariz.: University of Arizona Press, 2013, pp. 193–213.

Tiempo.hn, "Human Smugglers Charge at Least $7,000 to Take Migrants to US," in Spanish, August 7, 2017. As of November 7, 2018:
https://tiempo.hn/compatriotas-necesitan-7-mil-dolares-coyote-eeuu/

United Nations Office on Drugs and Crime, *Legislative Guide for the Implementation of the United Nations Convention Against Transnational Organized Crime*, Vienna, Austria, 2004. As of October 25, 2018:
http://www.unodc.org/documents/treaties/Legislative_Guide_2017/Legislative_Guide_E.pdf

United Nations Office on Drugs and Crime, *Smuggling of Migrants: A Global Review and Annotated Bibliography of Recent Publications*, New York, 2011.

United States, Executive Office of the President, *Strategy to Combat Transnational Organized Crime: Addressing Converging Threats to National Security*, Washington, D.C.: Executive Office of the President, July 2011.

U.S. Code, Title 10: Armed Forces; Subtitle A: General Military Law; Part I: Organization and General Military Powers; Chapter 15: Military Support for Law Enforcement Agencies; Section 284: Support for counterdrug activities and activities to counter transnational organized crime.

U.S. Department of Homeland Security, Office of Immigration Statistics, *Efforts by DHS to Estimate Southwest Border Security Between Ports of Entry*, Washington, D.C., 2017. As of October 23, 2018:
https://www.dhs.gov/sites/default/files/publications/17_0914_estimates-of-border-security.pdf

Cuba AR_001435

U.S. Department of Justice, Drug Enforcement Administration, *2017 National Drug Threat Assessment*, DEA-DCT-DIR-040-17, Washington, D.C., October, 2017.

U.S. Immigration and Customs Enforcement, "41 Arrested in Multinational Human Smuggling Takedown in Central America and South America," Washington, D.C., July 8, 2016. As of November 7, 2018:
https://www.ice.gov/es/news/releases/41-arrested-multinational-human-smuggling-takedown-central-america-and-south-america

Weden, Axel Storen, "Deadly Human Trafficking Business on Mexico-US Border," *Al Jazeera*, January 24, 2016. As of November 7, 2018:
https://www.aljazeera.com/indepth/features/2016/01/deadly-human-trafficking-business-mexico-border-160117073423022.html

Whitley, John E., J. W. Bailey, S. K. Burns, D. F. Eisler, C. C. Fletcher, T. P. Frazier, B. R. Gould, K. M. Guerrera, T. C. Heuring, B. Q. Rieksts, and B. Roberts, *Assessing Southern Border Security*, Arlington, Va.: Institute for Defense Analyses, IDA Paper NS P-5304, 2016.

Wuebbels, Mark, "Demystifying Human Smuggling Operations Along the Arizona-Mexican Border," 2004. As of October 13, 2018:
http://traccc.gmu.edu/pdfs/publications/human_trafficking_publications/wuebbe01.pdf

Zhang, Sheldon X., *Smuggling and Trafficking in Human Beings: All Roads Lead to America*, Westport, Conn.: Praeger, 2007.

Zhang, Sheldon X., "The United States," in Marie McAuliffe and Frank Laczko, eds., *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base,* Geneva, Switzerland: International Organization for Migration, 2016, pp. 303–324.

Cuba AR_001436

Unlawful migrants from Central America apprehended at the U.S.-Mexico border each year often hire smugglers for assistance or pay others for rights of way at some point during their journey north. Policymakers face concerns that a substantial share of migrants' expenditures on smuggling services could be flowing to transnational criminal organizations (TCOs), entities that represent a potential threat to homeland security. In response to these concerns, the authors of this report conducted a scoping study to develop a preliminary estimate of TCOs' revenues from smuggling migrants from the Northern Triangle region of Central America (Guatemala, Honduras, and El Salvador) to the United States and to characterize the TCOs' structure, operations, and financing. They conducted interviews with subject-matter experts, a review of literature, and an analysis of governmental and nongovernmental data on migration and human smuggling and found that human smuggling involves many different types of actors and that most TCOs' activities and revenues cannot be separated credibly from those of ad hoc groups, independent operators, and others who engage in human smuggling. They developed a preliminary estimate of revenues from human smuggling flowing to all types of smugglers, not just TCOs—ranging from about $200 million to $2.3 billion in 2017—with uncertainty stemming largely from analytical challenges related to data limitations and time constraints. Separately, they also produced a preliminary estimate of the taxes, or pisos, that migrants pay to drug-trafficking TCOs to pass through their territories, ranging from about $30 million to $180 million.

$24.00

ISBN-10 1-9774-0208-9
ISBN-13 978-1-9774-0208-0



Cover images: CBP.gov, Harry Hu/Adobe Stock
RR-2852-DHS



LANGUAGES          DONATE NOW

# Cuba
## Events of 2021

Cuban Rolando Remedios shows a photo of him being arrested during the July 11 protests on his mobile phone at his home in Havana, Cuba, on August 7, 2021.
© 2021 Photo by YAMIL LAGE/AFP via Getty Images.

AVAILABLE IN

 

The Cuban government continues to repress and punish virtually all forms of dissent and public criticism. At the same time, Cubans continue to endure a dire economic crisis, which impacts their social and economic rights.

In July, thousands of Cubans took to the streets in landmark demonstrations protesting long-standing restrictions on rights, scarcity of food and medicines, and the government's response to the Covid-19 pandemic. The government responded with brutal repression.

## Arbitrary Detention and Short-Term Imprisonment

The government employs arbitrary detention to harass and intimidate critics, independent activists, political opponents, and others.

Security officers rarely present arrest warrants to justify detaining critics. In some cases, detainees are released after receiving official warnings, which prosecutors may use in subsequent criminal trials to show a pattern of what they call "delinquent" behavior.

Cuba AR_001438



DONATE NOW

reporting on the protests, arresting critics and journalists as they headed to demonstrations or limiting their ability to leave their homes. Many were held incommunicado for days or weeks, violently arrested or beaten, and subjected to ill-treatment during detention.

Gabriela Zequeira Hernández, a 17-year-old student, was arrested in San Miguel de Padrón, Havana province, as she was walking past a demonstration on July 11. During detention, two female officers made her strip and squat naked five times. One of them told her to inspect her own vagina with her finger. Days later, a male officer threatened to take her and two men to the area known as the "pavilion," where detainees have conjugal visits. Officers repeatedly woke her up at night for interrogations, asking why she had protested and who was "financing" her. Days later, she was convicted and sentenced to eight months in prison for "public disorder," though she was allowed to serve her sentence in house arrest. She was only permitted to see her private lawyer a few minutes before the hearing.

In October 2021, Cuban authorities said that a demonstration being organized by a group of artists and dissidents for November 15 was "unlawful." Later that month, the Attorney General's Office released a statement "warning" people that they would face criminal prosecution if they "insisted" on carrying out a demonstration on November 15.

Cuban officers have also systematically detained independent journalists and artists. Victims include members of the coalitions of artists known as the "San Isidro," "27N," and "Archipelago" movements, as well as those involved in "Motherland and Life" — a viral song that repurposes the Cuban government's old slogan, "Motherland or Death" (Patria o Muerte) and criticizes repression in the country.

In many cases, police and intelligence officers appeared at critics' homes, ordering them to stay there, often for days or weeks, in what amounted to arbitrary deprivations of liberty.

Officers have repeatedly used regulations designed to prevent the spread of Covid-19 to harass and imprison government critics.

## Freedom of Expression

The government controls virtually all media in Cuba and restricts access to outside information.

In February and August 2021, the Cuban government expanded the number of permitted private economic activities, yet independent journalism remained forbidden.



DONATE NOW

campaigns, travel restrictions, internet cuts, online harassment, raids on homes and offices, confiscation of working materials, and arbitrary arrests. They are regularly held incommunicado.

In 2017, Cuba announced it would gradually expand home internet services. In 2019, new regulations allowed importation of routers and other equipment, and creation of private wired and Wi-Fi internet networks in homes and businesses.

Increased access to the internet has enabled many to communicate, report on abuses, and organize protests in ways virtually impossible a few years ago. Some journalists and bloggers manage to publish articles, videos, and news on websites and social media, such as Twitter and Facebook. Yet the high cost of—and limited access to—the internet prevents all but a small fraction of Cubans from reading independent news websites and blogs.

The government routinely blocks access to many news websites and blogs within Cuba and has repeatedly imposed targeted restrictions on critics' access to cellphone data. On July 11, 2021, when the protests began, several organizations reported countrywide internet outages, followed by erratic connectivity, including restrictions on social media and messaging platforms.

On August 17, the government published Decree-Law 35/2021 regulating the use of telecommunications. The decree, which states its purpose is to "defend" the Cuban revolution, requires providers to interrupt, suspend, or terminate services when a user publishes information that is "fake" or affects "public morality" and "respect for public order."

A "cybersecurity" resolution accompanying Decree-Law 35 contains sweeping provisions labeling protected speech—including publications that "incite protests," "promote social indiscipline," and "slander that impacts the prestige of the country"—as "incidents of cybersecurity" that authorities are required to "prevent" and "eradicate."

Pre-existing Decree-Law 370/2018 still prohibits dissemination of information "contrary to the social interest, morals, good manners and integrity of people." Authorities have used it to interrogate and fine journalists and critics and confiscate their working materials.

## Political Prisoners

Prisoners Defenders, a Madrid-based rights group, reported that, as of September, Cuba was holding 251 people who met the definition of political prisoners, as well as 38 others for their



DONATE NOW

Cubans who criticize the government risk criminal prosecution. They do not benefit from due process guarantees, such as the right to fair and public hearings by a competent, independent and impartial tribunal. In practice, courts are subordinate to the executive branch.

Many people who protested peacefully in July were sentenced through "summary" criminal trials that lacked basic due process guarantees, including the right to legal representation. Protesters were often tried for vaguely defined crimes, such as "public disorder" and "contempt." In August, authorities said 66 people had been convicted in connection with protests; most did not have a lawyer. Some were acquitted on appeal.

In some cases, authorities sought or imposed disproportionate prison sentences against protesters whom they accused of engaging in violence, often by throwing rocks during protests.

On July 11, officers arrested José Daniel Ferrer, leader of the Cuban Patriotic Union, the main opposition party, as he was heading to a demonstration. On July 17, a prosecutor sent him to pre-trial detention, charged with "public disorder" for "deciding to join" the demonstrations. In April 2020, Ferrer had been arbitrarily sentenced to four-and-a-half years of "restrictions on freedom," for alleged "assault." On August 14, 2021, a Santiago de Cuba court required him to serve 4 years and 14 days in prison, ruling he had failed to "strictly respect the laws" and "have an honest attitude toward work," legal conditions for people sentenced to "restrictions on freedom."

Several artists, including Luis Manuel Otero Alcántara and Maykel Castillo, both of whom performed in the music video for "Motherland and Life," remained in pretrial detention, facing arbitrary prosecution, at time of writing.

## Travel Restrictions

Since reforms in 2013, many people who had previously been denied permission to travel to and from Cuba have been able to do so, including human rights defenders and bloggers. The reforms, however, gave the government broad discretionary power to restrict travel on grounds of "defense and national security" or "other reasons of public interest." Authorities continue to selectively deny exit to dissenters.

In March 2021, Cuban authorities denied Karla Pérez, a Cuban journalist studying in Costa Rica, the possibility of returning home. An airline employee informed her during a stopover in



DONATE NOW

## Prison Conditions

Prisons are often overcrowded. Detainees have no effective complaint mechanism to seek redress for abuses. Those who criticize the government or engage in hunger strikes or other forms of protest often endure extended solitary confinement, beatings, restriction of family visits, and denial of medical care.

The government continues to deny international human rights groups and independent Cuban organizations access to its prisons.

In April 2020, to reduce the risk of the Covid-19 virus spreading in prisons, the government suspended family visits. This, coupled with authorities' refusal to allow detainees to call their families, left many arrested during demonstrations incommunicado for days and, in some cases, weeks.

## Labor Rights

Despite updating its Labor Code in 2014, Cuba violates International Labour Organization standards it has ratified on freedom of association and collective bargaining. While Cuban law allows the formation of independent unions, in practice the government only permits the operation of one confederation of state-controlled unions, the Workers' Central Union of Cuba.

Cuba deploys tens of thousands of health workers abroad every year to help tackle short-term crises and natural disasters. They provide valuable services to many communities but under Cuban rules that violate their rights, including to privacy, liberty, movement, and freedom of expression and association. In 2020, Cuba sent some 4,000 doctors to help nearly 40 countries respond to the Covid-19 pandemic; they joined 28,000 health workers already deployed.

## Human Rights Defenders

The government refuses to recognize human rights monitoring as a legitimate activity and denies legal status to local rights groups. Authorities have harassed, assaulted, and imprisoned human rights defenders attempting to document abuses.



DONATE NOW

seek her extradition to Cuba. Diversent heads Cubalex, one of the main rights groups documenting abuses against people who demonstrated in July.

## Sexual Orientation and Gender Identity

The 2019 constitution explicitly prohibits discrimination based on sexual orientation and gender identity. However, many lesbian, gay, bisexual, and transgender (LGBT) people suffer violence and discrimination, particularly in Cuba's interior.

Early drafts of the constitution approved in February 2019 redefined marriage to include same-sex couples, but the government withdrew that proposal following public protests. The government said it would introduce a reform to the Family Code, which governs marriage, for legislative review and later carry on a referendum. In September 2021, the government made public a draft of the reform, which included a gender-neutral definition of marriage. It had not been approved at time of writing.

## Sexual and Reproductive Rights

Cuba decriminalized abortion in 1965 and remains one of the few Latin American countries with such a policy. The procedure is available and free at public hospitals.

## Key International Actors

The US embargo continues to provide the Cuban government with an excuse for problems, a pretext for abuses, and sympathy from governments that might otherwise more rigorously condemn repressive practices in the country.

In June 2021, the United Nations General Assembly voted overwhelmingly to condemn the embargo, for the 29th consecutive year; 184 countries supported the resolution, while the US and Israel opposed it, and Brazil, Colombia, and Ukraine abstained.

Under former President Donald Trump, the US government limited peoples' ability to send remittances to Cuba from the US and imposed new restrictions on travelling to Cuba, banning cruise ship stops, educational trips, and most flights. In January 2021, the Trump administration designated Cuba as a State Sponsor of Terrorism, arguing that it had refused to extradite to Colombia members of the National Liberation Army (ELN) who had travelled to Havana to conduct peace talks with the Colombian government and stayed there.



DONATE NOW

repression against demonstrations. However, as of September, the US had not taken significant steps away from the broader policy of isolation that was entrenched during the Trump era and has failed to improve human rights conditions in Cuba.

In February, the European Union held a human rights dialogue with Cuba. EU High Representative Josep Borrell said in July that demonstrations in Cuba "reflect[ed] legitimate grievances." He expressed concern about government repression and urged Cuba to release all arbitrarily detained protesters. The European Parliament adopted resolutions deploring Cuba's human rights violations in June and September.

The Lithuanian legislature voted in July to oppose ratification of the EU's Political Dialogue and Cooperation Agreement with Cuba, signed in 2016 but never ratified, because of Lithuania's human rights concerns.

Since being elected to the UN Human Rights Council in 2020—its fifth term in the past 15 years—Cuba has opposed resolutions spotlighting human rights abuses in Eritrea, Ethiopia, Syria, and Nicaragua, among other countries.

Browse Countries

Choose

## Keynote



DONATE NOW



## With Autocrats on the Defensive, Can Democrats Rise to the Occasion?



### Kenneth Roth
Former Executive Director

## Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in close to 100 countries worldwide, spotlighting abuses and bringing perpetrators to justice

### DONATE NOW



## Get Updates On Rights Issues From Around The Globe

HUMAN
RIGHTS
WATCH

DONATE NOW

Get the Daily Brief      Get The Week in Rights

## Connect With Us

Contact Us | Corrections | Privacy Policy | Permissions | Blackbaud Security Incident | Site Map | Child Safeguarding

© 2023 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | t 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

Cuba AR_001446



**HUMAN**

**RIGHTS**

**WATCH**

# Prison or Exile

Cuba's Systematic Repression of July 2021 Demonstrators

Cuba_AR_001447



# Prison or Exile

Cuba's Systematic Repression of July 2021 Demonstrators

Copyright © 2022 Human Rights Watch
All rights reserved.
Printed in the United States of America
ISBN: 978-1-62313-988-9
Cover design by Rafael Jimenez

Human Rights Watch defends the rights of people worldwide. We scrupulously investigate abuses, expose the facts widely, and pressure those with power to respect rights and secure justice. Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all.

Human Rights Watch is an international organization with staff in more than 40 countries, and offices in Amsterdam, Beirut, Berlin, Brussels, Chicago, Geneva, Goma, Johannesburg, London, Los Angeles, Moscow, Nairobi, New York, Paris, San Francisco, Sydney, Tokyo, Toronto, Tunis, Washington DC, and Zurich.

For more information, please visit our website: http://www.hrw.org



JULY 2022

ISBN: 978-1-62313-988-9

# Prison or Exile

## Cuba's Systematic Repression of July 2021 Demonstrators

**Introduction** ....................................................................................................1

**Recommendations** ..........................................................................................7

**Selected Cases** ............................................................................................ 9

Lorenzo Rosales Fajardo, 50, and his son, 17, in Palma Soriano ...............................9

Miguel Díaz Sosa, 48, in San Antonio de los Baños.................................................11

Luis Manuel Otero Alcántara, 34, in Havana ......................................................... 12

José Daniel Ferrer García, 51, and José Daniel Ferrer Cantillo, 18, in Santiago  de Cuba ............ 14

Orelvys Cabrera Sotolongo, 36, in Cárdenas.......................................................... 18

Osain Denis Trujillo, 41, in Cárdenas ....................................................................20

María Cristina Garrido Rodríguez, 39, and Angélica Garrido Rodríguez, 41,  in Quivicán ........... 21

Abel González Lescay, 22, in Bejucal ......................................................................23

Yeremin Salsine Jane, 31, in Artemisa. ................................................................24

Yunier Claro Laguardia, 43, in San Antonio de los Baños.........................................26

Brusnelvis Adrián Cabrera Gutiérrez, 20, in Arroyo Naranjo ...................................... 27

Elier Padrón Romero, 26, in Arroyo Narajo ..........................................................29

Juan Enrique Pérez Sánchez, 32, in Nueva Paz.......................................................30

Yasmani Porra Pérez, 36, in Colón.........................................................................33

**Acknowledgments**.......................................................................................35

Cuba AR_001451

# Introduction

On July 11, 2021, thousands of Cubans took to the streets in the largest nationwide demonstrations against the government since the 1959 Cuban revolution. These peaceful protests were a response to longstanding restrictions on rights, food and medicine scarcity, and the government's response to the Covid-19 pandemic. Many protesters chanted "liberty!" or "motherland and life," referencing a Cuban song that repurposes the government's old slogan, "motherland or death" (*patria o muerte*), and criticizes repression in the country.

The government replied to Cubans' exercise of their rights to expression and assembly with brutal, systematic repression and censorship.

Shortly after the protests began, President Miguel Díaz-Canel urged government supporters and security forces to respond to the protests with force. "We call on all revolutionaries to go to the streets to defend the revolution," he said. "The order to fight has been given."[1]

One protester, Diubis Laurencio Tejeda, a 36-year-old singer, died, seemingly at the hands of the police.[2] Cuban rights groups report that over 1,400 people were detained, more than 700 of whom remained behind bars as of July 2022.[3] Cuban courts have confirmed the convictions against more than 380 protesters and bystanders, including several children.[4]

---

[1] "President: the order to fight has been given" ("Presidente: La orden de combate está dada"), Foreign Affairs Ministry press release, July 11, 2021, https://misiones.cubaminrex.cu/es/articulo/presidente-la-orden-de-combate-esta-dada (accessed June 13, 2022).

[2] "Cuba: Peaceful Protesters Systematically Detained, Abused," Human Rights Watch news release, October 19, 2021, https://www.hrw.org/news/2021/10/19/cuba-peaceful-protesters-systematically-detained-abused; "Cuban Human Rights Observatory demands an independent investigation into the death of protester Diubis Laurencio Tejeda" ("OCDH exige investigación independiente sobre la muerte del manifestante Diubis Laurencio Tejeda"), Observatorio Cubano de Derechos Humanos press release, August 14, 2021, https://observacuba.org/ocdh-exige-investigacion-independiente-sobre-muerte-diubis-laurencio-tejeda/ (accessed July 1, 2022).

[3] Cubalex, "List of detainees and disappeared people July 2021" ("Listado de detenidos y desaparecidos Cuba Julio de 2021"), https://docs.google.com/spreadsheets/d/1-380mFpJdDiKTSBoUOg19tv2nJxtNRS3-2HfVUUwtSw/edit#gid=1651014915 (accessed July 1, 2022).

[4] "Information from the Attorney General's Office about criminal process connected to the disturbances provoked on July 11, 2021" ("Información de la Fiscalía General de la República sobre los procesos penales derivados de los disturbios provocados el 11 de julio de 2021"), Attorney General's Office press release, June 13, 2022,

Cuba AR_001452

Several organizations reported countrywide internet outages on July 11, followed by erratic connectivity, including restrictions on social media and messaging platforms.[5]

This report documents a wide range of human rights violations against well-known government critics and ordinary citizens, including harassment, arbitrary detention, abuse-ridden prosecutions, beatings, and other cases of ill-treatment that in some cases constitute torture.

Human Rights Watch found that rights violations committed in the context of the protests followed patterns that strongly suggest the existence of a plan to prevent people from protesting, punish those who did, and instill fear to prevent massive anti-government demonstrations from taking place again. We found a pattern of abuse in over 155 cases documented during our year-long reporting on the repression against July 2021 protesters in Cuba, including the 14 cases described in detail in this report.[6]

Since July 2021, Human Rights Watch interviewed more than 170 people in Cuba to assess what happened to protestors and government critics on July 11, 2021 and since. Interviewees included victims of abuse, their relatives and lawyers, human rights defenders, and journalists. Whenever possible, Human Rights Watch also reviewed case files, sentences passed on protesters, press reports, and publications by Cuban rights groups. We also verified photographs and videos sent directly to researchers and found on social media platforms. Members of the Independent Forensic Expert Group (IFEG) of the International Rehabilitation Council for Torture Victims (IRCT), an international group of prominent forensic experts, provided expert opinion on some evidence of abuses.

---

https://www.fgr.gob.cu/noticias/informacion-de-la-fiscalia-general-de-la-republica-sobre-los-procesos-penales-derivados-de (accessed June 14, 2022).

[5] Netblocks, "Social media restricted in Cuba amid widening anti-government protests," July 12, 2021, https://netblocks.org/reports/social-media-restricted-in-cuba-amid-widening-anti-government-protests-QAdrmwyl (accessed July 1, 2022); Tweet by Access Now, July 11, 2021, https://twitter.com/accessnow/status/1414384042737344514?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1414384042737344514%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.yucabyte.org%2F2021%2F07%2F12%2F11j-internet-cuba%2F (accessed July 1, 2022); Tweet by OONI, July 12, 2021, https://twitter.com/OpenObservatory/status/1414622433156476930?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1414622433156476930%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.yucabyte.org%2F2021%2F07%2F12%2F11j-internet-cuba%2F (accessed July 1, 2022).

[6] For prior Human Rights Watch publications on repression against 2021 demonstrations in Cuba, see, e.g., "Cuba: Peaceful Protesters Systematically Detained, Abused," Human Rights Watch news release, October 19, 2021, https://www.hrw.org/news/2021/10/19/cuba-peaceful-protesters-systematically-detained-abused.

Cuba AR_001453

Witnesses identified officials involved in the abuses as being members of the intelligence services, known in Cuba as "state security;" the military; the National Police; and the special national brigade of the Interior Ministry, known as "black berets." Government-organized groups of civilians known as "rapid response brigades" also carried out several beatings. Prosecutors and judges, who lack independence from the government, enabled and took part in abusive criminal proceedings.

We found that officers repeatedly detained people who were protesting peacefully, arrested critics as they headed to demonstrations, or prohibited them from leaving their homes for days or even weeks.

In most cases documented by Human Rights Watch, detainees were held incommunicado for days, weeks, and sometimes months, without being able to make a phone call or receive visits from their relatives or lawyers.

Most detainees said they were held in crowded and unsanitary prison cells, with little to no access to food, medicines, clean water, or protective equipment to prevent the spread of Covid-19. Many said they were subject to abusive and repeat interrogations in which they were often questioned about issues unrelated to their alleged crimes, such as their family or work. They said they were at times threatened with criminal prosecution if they refused to answer questions about the organization of protests. Some were beaten, forced to squat naked, or subjected to ill-treatment, including sleep deprivation and other abuses that in some cases amount to torture.

Dozens of detainees have been prosecuted in "summary trials" pursuant to Cuban law. Our research shows that protesters were tried jointly, often without legal representation, in largely closed hearings, on vaguely defined charges, such as "public disorder" or "contempt," with evidence consisting largely of security officers' statements.

Dozens of others were prosecuted through "ordinary trials" and sentenced to long prison sentences. Many trials took place before military courts, which contravenes international law. Many were prosecuted for "sedition" and sentenced to disproportionate prison terms of up to 25 years for allegedly participating in violent incidents, such as throwing rocks during the protests.

The prosecutions framed actions such as protesting peacefully, insulting the president or the police, or chanting "motherland and life," legitimate and lawful exercises of freedom of expression and association, as criminal behavior. The prosecution presented, and courts convicted, individuals on unreliable or uncorroborated evidence, such as statements solely from security officers, or alleged "odor traces" of the defendants.

Relatives of detainees, protesters, and activists said that Cuban police officers and state security agents repeatedly harassed them, and in some cases the intimidation forced them to leave the country.

As Cuban authorities take drastic measures to punish people who participated in the demonstrations, they have also taken steps to dismantle the limited space for civil society that allowed these protests to occur in the first place.

In August 2021, the government published Decree Law 35 and several accompanying norms, which severely restrict freedom of expression online.[7] In May 2022, the National Assembly passed a criminal code that, among many other broadly defined norms, includes a provision that would punish with up to 10 years in prison whoever provides, receives, or has funds "with the purpose of paying for activities against the State and its constitutional order." Such broad language opens the door for sanctions that seriously undermine Cubans' right to mobilize and peacefully question government abuse.

The government's repression, as well as its apparent unwillingness to address the underlying causes that took many Cubans to the streets, have forced thousands to leave the country, often through Nicaragua, which waived visa requirements for Cubans in late-2021. The US Border Patrol apprehended over 118,000 Cubans between January and May 2022—a dramatic increase from the over 17,000 in same period in 2021.[8] The US Coast Guard has interdicted over 2,900 Cubans on the sea since October 2021, by far the highest figure in five years.[9]

---

[7] "Cuba: Telecommunications Decree Curtails Free Speech," Human Rights Watch news release, August 25, 2021, https://www.hrw.org/news/2021/08/25/cuba-telecommunications-decree-curtails-free-speech.

[8] US Customs and Border Protection, "Nationwide Encounters," n.d, https://www.cbp.gov/newsroom/stats/nationwide-encounters (accessed June 13, 2022).

[9] US Coast Guard, "Coast Guard repatriates 77 people to Cuba," June 28, 2022, https://content.govdelivery.com/accounts/USDHSCG/bulletins/31e0b01 (accessed July 1, 2022).

Cuba AR_001455

Many Cubans have fled to countries other than the United States, including in Latin America and Europe. Human Rights Watch research in the Darien Gap, a jungle on the border between Colombia and Panama, and in Mexico's southern border shows that Cubans undertaking the dangerous journey north through Latin America face abuse by gangs and difficulty accessing legal status in the region.[10]

The international community has for decades been unable to secure sustained progress on human rights in Cuba. In particular, multilateral pressure—including from Latin American countries, the United States, Canada, and Europe—has been lacking for years.

Efforts by the US government to press for change by imposing a sweeping economic embargo have proven costly and misguided. Rather than isolating Cuba, the decades-long policy has isolated the United States by enabling the Cuban government to garner sympathy abroad while simultaneously alienating Washington's potential allies.

Meanwhile, many Latin American governments, including Mexico and Argentina, have been reluctant to criticize Cuba and, in some cases, have even openly praised the Cuban government, despite its dismal human rights record.

The actions taken by the Cuban government violate a range of human rights protected under several treaties, including the International Covenant on Civil and Political Rights (ICCPR) and the Convention against Torture (CAT). These include the rights to freedom of expression and association, security and liberty, due process guarantees, as well as to be free from torture and other cruel, inhuman, or degrading treatment. Cuba is a party to the CAT and signed the ICCPR in 2008, but it is among the few states that has yet to ratify it.[11] These rights, set out in the Universal Declaration of Human Rights, are also part of customary international law.

---

[10] See, e.g., "Mexico: Asylum Seekers Face Abuses at Southern Border," Human Rights Watch news release, June 6, 2022, https://www.hrw.org/news/2022/06/06/mexico-asylum-seekers-face-abuses-southern-border; "US: LGBT Asylum Seekers in Danger at the Border," Human Rights Watch news release, May 31, 2022, https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border. "Mexico/Central America: New Visa Restrictions Harm Venezuelans," Human Rights watch news release, July 5, 2022, https://www.hrw.org/news/2022/07/05/mexico/central-america-new-visa-restrictions-harm-venezuelans

[11] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted December 10, 1984, ratified by Cuba on May 17, 1995; International Covenant on Civil and Political Rights, adopted December 16, 1966, signed by Cuba on February 28, 2008.

Cuba AR_001456

The United States, Canada, the European Union, and governments in Latin America should ensure a multilateral and coordinated approach towards Cuba that expresses support for the rights of Cuban protesters, journalists, and activists, and condemns repression in the country.

Cuba AR_001457

# Recommendations

## To Latin American Governments, the United States, Canada, the European Union, EU Member States, and Other Concerned Governments:

- Ensure a multilateral and coordinated approach toward Cuba that prioritizes human rights in the country.
- Unequivocally condemn the repression against demonstrators and critics in Cuba and call on the Cuban government to release all those arbitrarily detained.
- Publicly express support for the rights of Cuban protesters, journalists, and activists.
- Implement commitments laid out in the Los Angeles Declaration, adopted during the Summit of the Americas in June 2022, to strengthen safe, legal pathways for Cubans to migrate and to ensure that asylum seekers can access protection.
- Prioritize monitoring and denouncing restrictions on internet access in Cuba.

## To the Biden Administration in the United States:

- Progressively dismantle the policy of isolation toward Cuba, including by replacing the embargo and the existing bans on travel and trade with Cuba with more effective forms of multilateral pressure.

## To Members of the United Nations Human Rights Council:

- States should bring attention to the situation in Cuba and raise human rights concerns during Council meetings and debates, including during Interactive Dialogues with relevant Special Procedures mandate-holders or in their statements under item 4.

## To the UN High Commissioner for Human Rights:

- Closely monitor the human rights situation in Cuba and publicly condemn human rights violations in the country, including systematic abuses against demonstrators and critics.

Cuba AR_001458

## To Relevant UN Special Procedures:

- Monitor and report to the Human Rights Council and, when appropriate, to the Third Committee of the United Nations General Assembly, on human rights violations within their mandates, including on freedom of peaceful assembly and association, freedom of opinion and expression, the situation of human rights defenders, and on torture and other cruel, inhuman, or degrading treatment, particularly regarding Cuban authorities' abusive practices against demonstrators and critics.

## To States Party to the 1984 Convention against Torture and the Inter-American Convention to Prevent and Punish Torture:

- Exercise universal jurisdiction, to the extent permitted under domestic law, over any Cuban officials responsible for torture, in accordance with article 5 of the Convention Against Torture.

Cuba AR_001459

# Selected Cases

## Lorenzo Rosales Fajardo, 50, and his son, 17, in Palma Soriano



After leading a church service at home in Palma Soriano, a city in southeastern Cuba, on July 11, Lorenzo Rosales Fajardo, a 50-year-old evangelical pastor, joined the protests with his son, then 17. A family member said they protested peacefully and refrained from offensive remarks about the government, which would have been against their faith.[12]

Anti-riot police detained Rosales Fajardo, the family member said, dragging him, beating him with batons on his back and face, and knocking out a tooth and several fillings. When his son asked agents for his whereabouts, they detained him as well.

Lorenzo Rosales Fajardo. © Private

They were taken to different police stations. In the early morning, both were transferred to an abandoned school in Santiago de Cuba. Rosales Fajardo was held there for two days; his son, for a week.

Until his release on July 18, the son was held in an overcrowded, improvised cell on the school's second floor. During his detention he was given rotten food and little to no water. Officers repeatedly woke him and other detainees during the night, beat them and pushed them down the stairs, with their hands tied. They were stripped of their clothes and forced to squat naked in front of others on several occasions, the relative, who spoke with him after the release, said. Officers told the son that he was under investigation for "public disorder."

---

[12] Unless otherwise noted, this case is based on Human Rights Watch telephone interview with a relative of the victims, February 10, 2022.

Cuba AR_001460

Rosales Fajardo was transferred on July 14 to the provincial security headquarters in Versalles, a suburb of Santiago de Cuba city. On the way, police beat him and he lost consciousness; when he awoke, agents were urinating on him, the family member said.

His family only learned of his whereabouts when a pastor informed them, six days after the arrest.

At Versalles, Rosales Fajardo was held alone in a small, dark cell. He was interrogated at all hours. Officers asked who was paying him, who his boss was, who had sent him to the protest. The cell sometimes filled up with insects, which he could not see in the dark and bit him all over. He could never tell whether it was day or night, the family member said.

With other detainees, Rosales Fajardo was transferred to a maximum security prison in Boniato, on the outskirts of Santiago de Cuba, on August 6. Prisoners insulted and beat them when they arrived. They forced some to perform oral sex on prisoners, the family member said.

Rosales Fajardo's family was first able to speak with him by phone the day after the transfer and was able to visit him on October 16. He "cannot stop crying," the family member said, when he speaks of the treatment he and others have endured.

After a closed-door trial with 15 other defendants in a Palma Soriano municipal court, on December 20 and 21, 2021, Rosales Fajardo was convicted of "public disorder," "contempt," and "assault." The prosecutor accused him of calling on other neighbors to join the demonstrations, insulting President Díaz-Canel and police officers, and pushing officers to break a police cordon.[13]

His attorney was not allowed to present video evidence, and the court allowed the defense to call only two witnesses, who said Rosales Fajardo had protested peacefully and had not made offensive comments. The judge ruled that all the security agents who testified in the

---

[13] Palma Soriano Prosecutor's Office, Indictment in file 275 of 2021, September 30, 2021 (copy on file with Human Rights Watch); Criminal Chamber of the Municipal Tribunal of Palma Soriano, Ruling 12 of 2022, April 29, 2022 (copy on file with Human Rights Watch).

Cuba AR_001461

trial were "reliable, clear and impartial," while civilian witnesses who testified in favor of the defendants had provided "contradictory" evidence and were not credible.[14]

Rosales Fajardo was sentenced to seven years in prison on April 29, which was confirmed by an appeals court on June 24. Rosales Fajardo remained in Boniato prison at time of writing.

## Miguel Díaz Sosa, 48, in San Antonio de los Baños



Miguel Díaz Sosa. © Private

After nearly three weeks of a pandemic-related lockdown that prevented him from fishing, Miguel Díaz Sosa, a 48-year-old fisherman, joined a July 11 protest in the park in front of his house in San Antonio de los Baños, a municipality in Artemisa province.[15]

The day after the protest, approximately 20 agents from various police units arrested him at home, a family member said.

Authorities held Díaz Sosa incommunicado for 12 days at the local jail and about the same amount of time at the state security's detention center in nearby Guanajay, where his relatives were allowed 10-minute visits once a week but phone calls remained prohibited, the family member said. He was then transferred to Guanajay prison.

In November, he spent nearly 10 days in a cold, damp "punishment cell," accused of having spoken of a protest planned for November 15. Díaz Sosa, who suffers from hypertension and has a plate in his skull from an earlier injury, developed asthma, headaches, and eventually hallucinations, the family member said.

---

[14] Criminal Chamber of the Municipal Tribunal of Palma Soriano, Ruling 12 of 2022, pp. 20, 21.

[15] Unless otherwise noted this case is based on Human Rights Watch telephone interview with a victim's relative, January 31, 2022.

Cuba AR_001462

Months after the arrest, authorities told the family that Díaz Sosa was being accused of "public disorder," for attending the demonstration; "assault," for forcefully breaching the police line with other protesters; and two counts of "contempt" for shouting slogans in opposition to the president and police and telling the secretary of the Communist Party's municipal committee "we do not want dialogue, no more lies."[16]

He was one of 17 people tried jointly, between December 13 and 15, in a Guanajay provincial court. He was able to see his lawyer only once before trial, the family member said. One relative of each accused was allowed to attend the heavily policed proceedings. Attendees were threatened with expulsion, the family member said, if they "so much as glanced sideways."

Defendants and their families were not allowed to see the videos that prosecutors introduced as evidence, said the family member, who was present at the trial. The ruling does not provide information about what these videos purport to show Díaz Sosa doing.[17] Díaz Sosa testified that he had protested peacefully and had not offended nor attacked police. Several witness spoke of his good conduct, but the judges said that they could not be given "complete credit."[18]

Díaz Sosa was convicted on all counts and sentenced to eight years in prison. His family has appealed. Díaz Sosa remained in Guanajay prison at time of writing.

## Luis Manuel Otero Alcántara, 34, in Havana

Luis Manuel Otero Alcántara, an independent artist and one of the performers in "Motherland and Life," was detained on July 11, around 3 p.m.[19] He called his girlfriend to say that he was participating in a peaceful demonstration in downtown Havana. Hours

---

[16] Provincial Prosecutor's Office of Artemisa, Indictment in file 484 of 2021, combined with files 491, 492, 501 and 522, September 17, 2021 (copy on file with Human Rights Watch), p. 3.

[17] Criminal Chamber of the Municipal Court of San Antonio de los Baños, Ruling 1 of 2022, March 15, 2022 (copy on file with Human Rights Watch).

[18] Ibid, p. 29.

[19] Human Rights Watch telephone interview with Ingrid Berrío, July 14, 2021; Human Rights Watch telephone interview with Énix Berrío Sarda, July 15, 2021; Human Rights Watch telephone interview with Claudia Genlui, July 16, 2021.

Cuba AR_001463

later, a witness told his girlfriend that several police officers and state security agents had detained Otero Alcántara.[20]



On July 16, an officer told Otero Alcántara's lawyer that he was being detained in Villa Marista, a state security facility in Havana, and would be transferred to Guanajay maximum security prison. The officer said he was being investigated for "assault," "resistance," and "contempt," but did not explain on what basis or evidence.[21] On August 5, his lawyer was allowed to see him for the first time.[22]

Luis Manuel Otero Alcántara. © Private

Otero Alcántara had been detained previously for short periods of time and charged several times for criticizing the government, but he had never been held in custody while those charges were being deliberated upon.

In February 2022, Alcántara was charged with "insulting national symbols" for his use of the Cuban flag in the performance piece *Drapeau*, which consisted of him wearing the Cuban flag and carrying it around with him 24 hours a day for a month in 2019.[23] A prosecutor in Havana requested a 7-year sentence.[24]

He was also charged with "public disorder" and "contempt" for gathering with Maykel Castillo Pérez, a rap singer, and other people during an April 4, 2021 protest, playing "Motherland and Life" in public, chanting an "offensive" song against President Díaz-Canel and saying "offensive words" against other government officials.[25]

---

[20] Human Rights Watch telephone interview with Claudia Genlui, July 16, 2021.

[21] Ibid.

[22] Ibid.

[23] Provincial Prosecutor's Office of Havana Center, Indictment in file 24 of 2021, February 16, 2021 (copy on file with Human Rights Watch).

[24] Ibid.

[25] Ibid.

Cuba AR_001464

Cuban authorities repeatedly offered Otero Alcántara release from jail in exchange for leaving the country indefinitely—an offer that the Cuban government has made to other critics in recent months.[26] Otero Alcántara publicly rejected it.[27]

Otero Alcántara was tried, along with Maykel Castillo Pérez, on May 30 and 31 before a court in Havana. Authorities only allowed two relatives per detainee to be present at the trial.[28] On June 24, Otero Alcántara was convicted and sentenced to five years.[29]



José Daniel Ferrer García. © Private

Otero Alcántara remained in Guanajay prison at time of writing.

## José Daniel Ferrer García, 51, and José Daniel Ferrer Cantillo, 18, in Santiago de Cuba

José Daniel Ferrer García, president of the opposition group Cuban Patriotic Union (UNPACU), and his son, José Daniel Ferrer Cantillo, were detained on July 11, around 5 p.m., as they headed to a demonstration in front of the José Martí

---

[26] Human Rights Watch telephone interview with Anamely Ramos, April 7, 2022; Human Rights Watch telephone interview with Claudia Genlui, June 7, 2022. For similar cases, see "Cuba: Hamlet Lavastida, an artist who spent almost three months detained, was released" ("Cuba: excarcelan a Hamlet Lavastida, artista que llevaba casi tres meses preso"), *BBC Mundo*, September 26, 2021, https://www.bbc.com/mundo/noticias-america-latina-58700906 (accessed June 11, 2022); "The Cuban journalist and activist Esteban Rodríguez arrives in the US ("El periodista y activista cubano Esteban Rodríguez llega a Estados Unidos"), *14 y Medio*, March 17, 2022, https://www.14ymedio.com/cuba/periodista-activista-Esteban-Rodriguez-Unidos_0_3278072167.html (accessed June 9, 2022).

[27] Human Rights Watch telephone interview with Anamely Ramos, November 22, 2021; "Otero Alcántara and Osorbo rejected the political police's offer of freedom for exile" ("Otero Alcántara y El Osorbo rechazaron oferta de la policía política de libertad por exilio"), *Radio Televisión Martí*, November 22, 2021, https://www.radiotelevisionmarti.com/a/otero-alc%C3%A1ntara-y-el-osorbo-rechazaron-oferta-de-la-polic%C3%ADa-pol%C3%ADtica-de-libertad-por-exilio/307781.html (accessed June 10, 2022); Instagram post by San Isidro Movement, May 23, 2022, https://www.instagram.com/reel/Cd7IqneIcRt/?igshid=MDJmNzVkMjY= (accessed June 10, 2022).

[28] Human Rights Watch telephone interview with Claudia Genlui, May 31, 2022; Human Rights Watch telephone interview with Julio Llopiz Casal, May 31, 2022; Human Rights Watch telephone interview with Manuel Cuesta Morúa, June 1, 2022.

[29] "Information from the Attorney General's Office about the criminal case against the citizens Luis Manuel Otero Alcántara, Maikel Castillo Pérez, Félix Roque Delgado, Juslid Justiz Lazo and Reina Sierra Duvergel" ("Información de la Fiscalía General de La República sobre el proceso penal donde fueron juzgados los ciudadanos Luis Manuel Otero Alcántara, Maikel Castillo Pérez, Félix Roque Delgado, Juslid Justiz Lazo y Reina Sierra Duvergel"); Attorney General's Office press release, June 24, 2022, https://www.fgr.gob.cu/noticias/informacion-de-la-fiscalia-general-de-la-republica-sobre-el-proceso-penal-donde-fueron (accessed June 28, 2022).

theatre in Santiago de Cuba.[30] Ferrer Cantillo told Human Rights Watch that the officers detained them violently, pushing them toward the police car, even when they were not resisting arrest.[31]

The two were taken to the local Center of Operations, Investigations, and Criminal Proceedings (Centro de Operaciones, Investigaciones e Instrucción Penal, UPICO), a detention center, where officers separated them.[32]

Ferrer Cantillo said he and two other detainees were held in a two-by-two-meter cell that had no windows nor artificial light. Officers interrogated him several times, asking him why he had participated in the protests and threatening him with a prison sentence. He began a hunger strike when he arrived in prison. Officers repeatedly took him to the prison's infirmary, but instead of giving him medical assistance, they tried to convince him to abandon his strike, saying that he would die if he continued.[33]

The day after they were detained, Ferrer García's wife went to multiple local police stations to ask for them. Instead of informing her about their whereabouts, an officer detained her for five hours in a local police station where, she says, she was made to stand in the sun for five hours. When they released her, an officer told her that Ferrer was in the UPICO and that he would serve "a lot of time in prison."[34]

A prosecutor's document, dated July 17, instructed Ferrer García to be held in pretrial detention but Ferrer Cantillo to be released. The document says both father and son are under investigation for "public disorder" because they "decided to join" protests "against the revolutionary process" and shouted, "down with Díaz-Canel!" and "down with hunger!" when they were being detained. The document also says that José Daniel Ferrer García

---

[30] Human Rights Watch telephone interview with Nelva Ismarys Ortega, August 18, 2021; Human Rights Watch telephone interview with José Daniel Ferrer García, August 18, 2021.

[31] Human Rights Watch telephone interview with José Daniel Ferrer García, August 18, 2021.

[32] Ibid.

[33] Ibid.

[34] Human Rights Watch telephone interview with Nelva Ismarys Ortega, August 18, 2021.

Cuba AR_001466

"talks against the revolutionary process" and his son "has relationships with people who talk against the revolutionary process."[35]



José Daniel Ferrer Cantillo. © Private

Ferrer Cantillo was released on July 17. An officer gave him a notice informing him that he was under investigation for "public disorder" and told him he could not participate in demonstrations. He refused to sign the notice.[36]

On July 22, their family presented a habeas corpus requesting Ferrer García's release, which was summarily dismissed the next day.[37] The court decision rejecting the petition indicates Ferrer García is "under investigation" but does not indicate what he is being investigated for, nor where he is being held.[38]

Ferrer García's wife said she went to the UPICO several times, but officers refused to inform her about her husband's whereabouts.[39] On July 21, she was again detained for two hours when she asked to see him, she said.[40] On August 12, an officer in UPICO finally confirmed that Ferrer García was there but said he could not receive visits.

On August 14, Ferrer García's wife received a document from a Santiago de Cuba tribunal indicating that Ferrer had to serve 4 years and 14 days in prison in connection with an April

---

[35] Provincial Prosecutor's Office of Santiago de Cuba, Court order of precautionary measures in file 128 of 2021, July 17, 2021 (copy on file with Human Rights Watch).

[36] Human Rights Watch telephone interview with José Daniel Ferrer García, August 18, 2021.

[37] Habeas corpus petition, July 22, 2021 (copy on file with Human Rights Watch).

[38] Provincial Tribunal of Santiago de Cuba, Ruling 4 of 2021, July 23, 2021 (copy on file with Human Rights Watch).

[39] Human Rights Watch telephone interview with Nelva Ismarys Ortega, August 18, 2021.

[40] Ibid.

2020 conviction that imposed "limitations of freedom" on him for allegedly assaulting an individual.[41]

Under Cuban law, people under "limitations of freedom" are required to "have an honest attitude towards work" and "strictly respect the laws"—two conditions the Santiago de Cuba tribunal said Ferrer García had now violated.[42] In October 2020, the United Nations Working Group on Arbitrary Detention concluded that Ferrer García had been arbitrarily detained, denied a fair trial, and been a victim of an "enforced disappearance" following his detention.[43]

His family was allowed to see him in prison only 90 days after his arrest. A family member said he is very ill, has severe head and ear pain, hypertension, a stomach ulcer, and has partially lost his sight. His family sent him medicines but said they did not know if the authorities had handed them to him.[44]

Ferrer García told his family that his cell had no windows nor natural air and that he was not allowed access to the open air. His cell had lights on 24-hours a day.[45]

Ferrer García remained in Mar Verde prison on the outskirts of Santiago de Cuba at the time of writing.[46]

---

[41] Human Rights Watch telephone interview with Nelva Ismarys Ortega, August 18, 2021; Criminal Chamber of the Provincial Tribunal of Santiago de Cuba, Decision to revoke the sanction of limitations of freedom, August 12, 2021 (copy on file with Human Rights Watch).

[42] Criminal Chamber of the Provincial Tribunal of Santiago de Cuba, Decision to revoke the sanction of limitations of freedom, August 12, 2021.

[43] UN Human Rights Committee, "Opinion No. 50/2020 concerning José Daniel Ferrer García (Cuba)," Cuba, UN Doc. A/HRC/WGAD/2020/50, October 14, 2021, https://documents-dds-ny.un.org/doc/UNDOC/GEN/G20/265/53/PDF/G2026553.pdf?OpenElement (accessed June 10, 2022).

[44] Human Rights Watch telephone interview with Ana Belkis Ferrer, June 8, 2022.

[45] Ibid.

[46] Ibid.

Cuba AR_001468

## Orelvys Cabrera Sotolongo, 36, in Cárdenas



Orelvys Cabrera Sotolongo, a journalist for the news website Cubanet, participated in the July 11 protests in Cárdenas, Matanzas province, with his partner, Yunior Pino Pérez. They said the protests were largely peaceful, though in the evening some individuals broke the windows of some stores and vandalized two police cars.[47]

They said they decided to leave the protests and that a police car intercepted them as they walked back home. An officer from the state security, whom Cabrera recognized from a prior detention, asked them for their IDs, which they did not have. Cabrera said the officer told him he was being taken to a police station because he had been seen in the protests.[48] They let his partner go.

Orelvys Cabrera Sotolongo.© Private

In the police car, an officer told Cabrera that they had a video of him vandalizing stores, which Cabrera denies. They took him to a local police station, where an officer accused him of "promoting" and "financing" protests in Cárdenas. Officers interrogated him, then placed him in a police car parked by the station, where he was held handcuffed for several hours that night.[49]

Around midnight, Cabrera said they took him to a facility in Matanzas, known as "El Técnico," belonging to the state security's investigation department. Officers took him to a room and told him that they wanted to "make him aware" that the "revolution had given him everything" and he should not "betray it."[50]

---

[47] Human Rights Watch telephone interview with Yunior Pino Pérez, July 15, 2021; Human Rights Watch telephone interview with Orelvys Cabrera Sotolongo, August 8, 2021.

[48] Human Rights Watch telephone interview with Orelvys Cabrera Sotolongo, August 8, 2021.

[49] Ibid.

[50] Ibid.

Cuba AR_001469

Cabrera said he was held with eight other detainees in a two-by-one-and-a-half-meter overcrowded cell, with little to no ventilation, light, or access to water. The cell only had a small window allowing detainees to see outside and four concrete beds. One of his cellmates had Covid-19 symptoms, Cabrera said.[51]

Officers interrogated him repeatedly during his detention, often telling him that he would not see his family again and could face between 10 to 15 years in prison. On one occasion, an officer accused him of paying people to participate in the protests. Another time, he said, they showed photos of him taking photos of the protests, saying that these amounted to an "instigation to commit crimes."[52]

Cabrera was only allowed to make a phone call on July 21—10 days after his arrest. He called his partner to inform him where he was being held. Until then, his family did not know his whereabouts.[53]

On August 13, officers transferred him to the Combinado del Sur prison in Matanzas, telling him that he had been placed in pretrial detention. In the prison, officers shaved his hair and beard and tested him for Covid-19. His test was negative. He was held with nine other inmates, but the cell was larger and had better ventilation, Cabrera said.[54]

On August 19, officers released him. They said he would be placed under house arrest, pending a trial for "public disorder." An officer told him that he should leave the country.[55]

On September 2, police officers summoned him to a station in Cárdenas, where they fined him 1,000 Cuban pesos (approximately US$40). They told him he had been acquitted for the crime of "public disorder," but remained under investigation for "spreading of an epidemic."[56]

---

[51] Ibid.

[52] Ibid.

[53] Human Rights Watch telephone interview with Yunior Pino Pérez, July 15, 2021; Human Rights Watch telephone interview with Orelvys Cabrera Sotolongo, August 8, 2021.

[54] Human Rights Watch telephone interview with Orelvys Cabrera Sotolongo, August 8, 2021.

[55] Ibid.

[56] Ibid; Control and Collections Office, Document summoning Orelvys Cabrera Sotolongo, September 2, 2021 (copy on file with Human Rights Watch).

Cuba AR_001470

On November 12, state security agents summoned him to their offices in Matanzas, where they said they had initiated an investigation against him for a range of crimes, including for working as a journalist without "permission." They said he could receive a sentence of 30 years in prison, he said. A few days later, a man approached him saying he was a state security agent and told him he should leave Cuba.[57]

On December 19, Cabrera Sotolongo and his partner took a plane to Moscow, Russia, one of the few countries where Cubans do not need a visa. In March, a nongovernmental organization helped them obtain a visa to enter the European Union. They went to the Czech Republic and shortly after took a plane to Mexico. They had requested asylum in the United States at time of writing.[58]

## Osain Denis Trujillo, 41, in Cárdenas

Osain Denis Trujillo, a human rights activist, and his family participated in the July 11 demonstrations in Cárdenas, Matanzas province, to protest limited access to medicine



in Cuba, which, they say, had caused a relative to die in hospital a day earlier.[59]

On July 12, a relative said, a police car and several "black beret" officers appeared at their home and arrested Trujillo. They did not show a warrant nor say why he was being detained. Although Trujillo did not resist, an officer punched him the face repeatedly and then twisted his arm to immobilize him.

The officers took him to a police station in Cárdenas and, hours later, transferred him to a facility of the Technical Department of Investigations

Osain Denis Trujillo. © Private

---

[57] Human Rights Watch telephone interview with Orelvys Cabrera Sotolongo, June 8, 2022.

[58] Ibid.

[59] Unless otherwise noted, this case is based on Human Rights Watch telephone interview with a victim's relative, August 4, 2021.

Cuba AR_001471

(Departamento Técnico de Investigaciones, DTI), a Ministry of Interior agency charged with investigating crimes.

Trujillo was not allowed to call his relatives or lawyers. He received the first visit, from his lawyer, on September 2. Trujillo told his lawyer that officers had beaten him "until he fainted" when he arrived at the DTI facility.

Trujillo suffers from gastritis. His family sent him medicines, but they do not know if he received them. On August 10, his family learned that he had been taken to a hospital for a check-up because he was "vomiting blood."[60]

On March 15-17, 2022 Trujillo stood trial with 15 others in a municipal tribunal in Cárdenas. A prosecutor asked that he be sentenced to seven years in prison for "public disorder" and "contempt."[61] The prosecutor said that Trujillo had tricked officers of the local communist party office into letting him in the building, and then used a microphone to deliver a speech from the office's balcony complaining about the lack of medicines in hospitals. He also accused Trujillo of shouting "motherland and life" and insulting President Díaz-Canel.

The court sentenced to Trujillo to three years in prison. At time of writing, he remained in detention in Agüica prison in Matanzas, pending an appeal.

## María Cristina Garrido Rodríguez, 39, and Angélica Garrido Rodríguez, 41, in Quivicán

María Cristina Garrido Rodríguez, a 39-year-old activist with the Cuban Republican party, and her sister, Angélica Garrido Rodríguez, a 41-year-old housewife, participated in protests on the morning of July 11 in Quivicán, Mayabeque province. The morning protests were peaceful, with demonstrators chanting "motherland and life," and were not repressed, witnesses said.[62]

---

[60] Human Rights Watch telephone interview with victim's relative, August 11, 2021.

[61] Criminal Chamber of the Popular Municipal Tribunal of Cárdenas, Ruling 5 of 2022, April 7, 2022 (copy on file with Human Rights Watch); Provincial Prosecutor of Matanzas, Indictment in file 123 of 2021, November 30, 2021 (copy on file with Human Rights Watch).

[62] Unless otherwise noted, this case is based on Human Rights Watch telephone interviews with victims' family members, June 8, 2022, and June 8, 2022.

Cuba AR_001472

The next day, when María Cristina and Angélica were going to the local police station to see some friends who had been detained during the demonstrations the previous night, two police officers and two state security agents intercepted them on the street and arrested them.


María Cristina Garrido Rodríguez. © Private

The officers took them to the local police station and transferred them later to "El Técnico," a state security facility.

Angélica was not allowed to receive visits until July 26, when her husband was allowed to see her. An officer was in the room, so she could not say much about her detention, her husband said. Angélica mentioned she had not been beaten but said she had suffered psychological abuses. She also said that for some time she had shared a cell with a man.

María Cristina was not allowed to make a phone call or receive visits until July 31, when her husband was allowed to see her for 15 minutes. María Cristina told him that a female officer had beaten her with her fists on her legs and arms. She also said that the same officer repeatedly woke her up in the early morning and forced her to shout "long live Fidel!" and "long live the revolution!" One time, María Cristina refused and was sent for 24 hours to what she described as a "punishment cell," which did not have any light, water, or sanitation facilities.

On January 20 and 21, María Cristina and Angélica were put on trial along with five other people in San José de las Lajas. Only one relative per defendant was allowed to be present.

María Cristina was accused of "resistance," "assault," "instigation to commit crimes," and "public disorder." Angélica was accused of "public disorder" because of her participation in the protests; and of "contempt," "assault," and "resistance" because she allegedly resisted the arrest, her relatives said.

Cuba AR_001473



Angélica Garrido Rodríguez. © Private

Five police officers testified against them, and the defense lawyer was not allowed to present evidence, their relatives said.

The court convicted them of "assault" and acquitted them of the remaining charges. María Cristina was sentenced to seven years in prison and Angélica to three.[63] A higher court confirmed the sentence on May 30, their relatives said, though they have not been able to obtain a copy of the decision.

The two women remained imprisoned in the women's prison in La Lisa, Havana province, at time of writing.

## Abel González Lescay, 22, in Bejucal

Abel González Lescay, a 22-year-old music student, participated in protests in the town of Bejucal, Mayabeque province, on July 11, 2021.[64]

The next day, at 6 a.m., more than 20 police and intelligence officers appeared at his house, asking for him, a relative who witnessed the detention said. When another relative asked to see a warrant, the agents stormed into the house, saying they did not have one. They handcuffed González in his bedroom, and put him, naked, into a police car.

Hours after a relative went to a police station to report the arbitrary detention, an official of the DTI facility in Bejucal called to ask the relative to bring over clothes for González. Officers there said González was under investigation but did not say why or allow the relative to see him.

---

[63] Municipal Court of Quivicán, Ruling 3 of 2022, February 18, 2022 (copy on the file with Human Rights Watch).

[64] Unless otherwise noted, this case is based on Human Rights Watch telephone interview with a victim's relative, June 8, 2022.

Cuba AR_001474

On July 18, after holding him incommunicado for six days, officers took him home, saying he was under house arrest pending trial for "public disorder," a relative said.

On January 22, 2022 he stood trial in Mayabeque with five other defendants. A prosecutor accused him of insulting police officers and President Díaz-Canel during the July 11 demonstration. He asked a judge to sentence González to seven years in prison for the crimes of "public disorder" and "contempt."



Abel González Lescay. © Private

On March 30, a Mayabeque court informed his family that he had been sentenced to six years in prison.[65] His lawyer appealed. At time of writing, González remained under house arrest pending a decision.

## Yeremin Salsine Jane, 31, in Artemisa

Yeremin Salsine Jane, a grocery store employee, was arrested on July 11 at a demonstration in the city of Artemisa, southwest of Havana.[66]

The protest was peaceful, a family member present said, until a police truck carrying state security agents without uniforms arrived. The truck lurched back and forth through the crowd, she said, catching a bicycle underneath and threatening to hit the demonstrators surrounding it. Several tried to stop it, and Salsine Jane climbed on the left running board and hit the side of the truck, a video posted to Facebook on September 6, 2021 shows.[67]

---

[65] Criminal Chamber of the Municipal Court of Mayabeque, Ruling 2 of 2022, March 18, 2022 (copy on the file with Human Rights Watch).

[66] Unless otherwise noted this case is based on Human Rights Watch telephone interview with a victim's relative, February 10, 2022.

[67] Facebook post by Inteligencia Ciudadana, I-CID, September 6, 2021, https://www.facebook.com/marcel.valdes.94/videos/631145941648615/?flite=scwspnss (accessed June 28, 2022). Human

Cuba AR_001475



Yeremin Salsine Jane. © Private

After the truck left, an anti-riot squad attacked demonstrators, the family member said. Agents threw Salsine Jane on the ground, bashing his head, and hit him, hurting his wrist and knee. He passed out for several minutes and woke up in a "pool of blood," the family member said. Agents arrested him and took him to a local police station. That night, he was transferred to a DTI facility in Guanajay and taken the hospital to get stitches.

The family was only able to see him for a few minutes 10 days later, after pleading for proof that he was alive. They said he was stil injured and had a scar on his head, but they were not allowed to take photos. Authorities only allowed Salsine Jane to meet with his lawyer once or twice, citing Covid-19, the family member said.

At a closed-door trial of 13 demonstrators in Artemisa's provincial court, November 22 to 24, prosecutors accussed Salsine Jane of hitting the truck's left door and breaking its window to "intimidate" the driver.[68]

Evidence against him consisted of witness statements and a video in which he is seen stepping onto the running board and pounding the left side of the truck.[69] The court dismissed testimony from a witness who said that Salsine Jane's sole objective had been to stop the truck. According to his family, he was trying to get the driver to stop so others would not get hurt, and he neither hit the driver nor broke the window, which another protester had hurled a rock at.

---

Rights Watch verified this video by identifying the exact location through matching landmarks seen in the video with satellite imagery and was not able to find it posted online before the date of the incident.

[68] Municipal Court of Artemisa, Ruling 56 of 2021, December 27, 2021 (copy on the file with Human Rights Watch), p. 25

[69] Ibid.

Cuba AR_001476

Salsine Jane received a prison sentence of 10 years for "assault," stemming from the truck incident; "contempt" for shouting slogans against authorities and saying they were "corrupt;" and "public disorder," for participating in the protest.[70]

At time of writing, he was being held at Kilo 5 ½ prison in Pinar del Río province, pending appeal before the Supreme Court. The wound to his head, where he received seven stitches, has not healed, and he suffers frequent headaches, the family member said.

## Yunier Claro Laguardia, 43, in San Antonio de los Baños

Yunier Claro Laguardia, a 43-year-old bricklayer, participated peacefully in the protests in the town of San Antonio de los Baños, southwest of Havana, on July 11. Police arrested him at home on August 10, a family member said.[71]

Laguardia was held for two months at Taco Taco prison in San Cristóbal, where authorities denied him calls and visits, citing Covid-19. Since then, he has been held at the Guanajay maximum security prison. Guards beat Laguardia and others on November 13, the family member said, for starting a hunger strike. They stripped them down to their underwear, shackled their hands and feet, threw them on the ground, and beat them up.



At a closed-door trial with 16 others in San Antonio de los Baños court, held December 13 to 15, prosecutors requested a 10-year sentence for Laguardia on charges of "public disorder" and "contempt."[72] They accused him of shouting slogans against the police and the president; calling the secretary of the Communist Party's

Yunier Claro Laguardia. © Private

[70] Ibid, p. 4.

[71] Unless otherwise noted this case is based on Human Rights Watch telephone interview with a victim's relative, January 20, 2022.

[72] Criminal Chamber of the Popular Municipal Court of San Antonio de los Baños, Sentence 1 of 2022, March 15, 2022 (copy on file at Human Rights Watch).

Cuba AR_001477

municipal committee a "liar" and shouting "we do not want dialogue, no more lies;" and leading the crowd toward the city council and the party's headquarters.[73]

Security forces have repeatedly harassed relatives of the protesters from San Antonio de los Baños who were tried jointly. On January 14, 2022, six relatives were summoned to the DTI detention center in Guanajay. They were taken to meet the director of Guanajay prison, the San Antonio de los Baños chief of security, and a security guard. The men interrogated them about photos circulating on social media where they were making an "L" sign with their hands (for "Libertad," freedom in Spanish). They told them they should not have posted the photo, because "that is what the counterrevolutionaries are doing," and threatened to take away their prison visits and to retaliate against detainees if they posted again on social media, a witness said.[74]

On March 15, Laguardia was convicted on all counts and sentenced to four years in prison. The family has decided not to appeal, because his lawyer said that could result in an even higher sentence.

## Brusnelvis Adrián Cabrera Gutiérrez, 20, in Arroyo Naranjo

In July 2021, police summoned Brusnelvis Adrián Cabrera Gutiérrez, a 20-year-old farmworker, twice to the police station in La Güinera, in the Arroyo Naranjo municipality of Havana, showing him and his mother a video of a young man they thought was him, on a motorcycle at a July 12 protest in Havana.[75]

Cabrera Gutiérrez said he had not participated in the protest. According to his mother, he had spent that morning at the pool with his wife, and the afternoon at work, taking the cows out to graze. Cabrera Gutiérrez has tattoo sleeves on both his arms, which the man in the video did not have, his mother said. Both times, officers let him go.

But on July 27, police arrested him at home, saying he was accused of "public disorder"

---

[73] Ibid, pp. 9-11.

[74] Human Rights Watch telephone interview with a family member of a protester detained in San Antonio de los Baños, June 30, 2022.

[75] Unless otherwise noted, this case is based on Human Rights Watch telephone interview with Cabrera Gutiérrez's mother, January 20, 2022.

Cuba AR_001478

and "contempt." He was taken to the 100 y Aldabó DTI facility in Havana and released on bail 37 days later.

In a closed-door proceeding at the Popular Municipal Court Diez de Octubre in Havana, December 14 through 16, Cabrera Gutiérrez and 14 others were accused of "sedition," which is defined broadly under Cuban law as "perturbating the socialist order" with "violence" or "during a serious alteration of public order."[76]



Brusnelvis Adrián Cabrera Gutiérrez. © Private

They were accused of yelling phrases, "inciting a violent insurrection against the revolutionary State," which "lacerated patriotic sentiments" and "exacerbated differences and hate among Cubans," and of making offensive comments about government and communist party authorities.[77] Prosecutors said Cabrera Gutiérrez had "incited" those watching the protest to "join the mess" and "encouraged and signaled" for them to advance toward agents guarding a police station, "enhancing with his actions the climate of unrest and violence."[78]

No witnesses testified against him.[79] The only evidence cited is the video. A forensic expert from the Ministry of Interior said it was "probabl[e]" that the man on the motorcycle was Cabrera Gutiérrez.[80]

Cabrera Gutiérrez's lawyer presented four witnesses to support his alibi: the farm's owner, who was working with him on July 12; two farmworkers who saw him; and the neighbor on

---

[76] Provincial Prosecutor's Office of Havana, Indictment in file 145-A of 2021, September 30, 2021 (copy on file with Human Rights Watch); Provincial Tribunal of Havana, Chamber of Crimes against State Security, Ruling 9 of 2022, March 16, 2022 (copy on file with Human Rights Watch), p. 30; Criminal Code, Law 62 of 1989, signed into law on December 29, 1989, https://www.gacetaoficial.gob.cu/es/ley-no-62-codigo-penal (accessed July 1, 2022), art. 100.

[77] Provincial Tribunal of Havana, Chamber of Crimes against State Security, Ruling 9 of 2022, p. 9.

[78] Provincial Prosecutor's Office of Havana, Indictment in file 145-A of 2021, p. 3.

[79] Provincial Tribunal of Havana, Chamber of Crimes against State Security, Ruling 9 of 2022.

[80] Provincial Prosecutor's Office of Havana, Indictment in file 145-A of 2021, p. 14; Provincial Tribunal of Havana, Chamber of Crimes against State Security, Ruling 9 of 2022, pp. 17-18.

Cuba AR_001479

whose terrain the cows grazed. But the judges dismissed the testimonies as "not credible."[81]

The judge sentenced him to 15 years in prison for "sedition." His lawyer appealed and, in May, the Supreme Court reduced the sentence to 10 years.[82] At time of writing, he was being held at the Combinado del Este prison in Havana.

## Elier Padrón Romero, 26, in Arroyo Narajo

Elier Padrón Romero, a 26-year-old mason's assistant, joined protests in La Güinera, a low-income neighborhood of Arroyo Naranjo, Havana province, on July 12. He participated

peacefully, his mother said, chanting slogans and shooting video on his phone. Nine days later, security agents arrested him at home, without a warrant, she said.[83]

At the station, officers punched, kicked, and beat him with clubs, she said. That afternoon, at a juvenile prison in the San Pedro del Cotorro neighborhood—where many protesters, including children, were held after the July demonstrations—Padrón Romero remained handcuffed as they stripped him naked and pummeled him.



Elier Padrón Romero. © Private

Every day at the juvenile prison, officers beat the detainees with batons, wooden sticks, and twisted cables, she said, ordering them to yell "motherland or death." When they yelled "motherland and life" instead, police hit them harder, she said. On Padrón Romero's last day, when he repeated "motherland and life," an officer put a gun to his head and threatened to kill him, she said.

Later, at Havana's Valle Grande maximum security prison, authorities did not let Padrón

---

[81] Provincial Tribunal of Havana, Chamber of Crimes against State Security, Ruling 9 of 2022, p. 27.

[82] Supreme Court, Ruling 3 of 2022, May 17, 2022 (copy on file with Human Rights Watch).

[83] Unless otherwise noted, all information in this case is based on Human Rights Watch telephone interview with Padrón Romero's mother, February 9, 2022.

Cuba AR_001480

Romero see his family or lawyer for two months. They said cited Covid-19 measures, but his mother believes they kept him hidden because the blows from guards at the juvenile prison had rendered him unable to stand or walk.

Guards at Valle Grande threatened him and others, saying they "did not exist for society" and would be "disappeared if they continued to think" as they did, his mother said.

At a closed-door hearing from December 14 through 16, at the Municipal Court Diez de Octubre in Havana, Padrón Romero and 14 others from the La Güinera protest faced "sedition" charges. Prosecutors accused Padrón Romero of recording the protests while "inciting" people to join and "push" against a police barricade.[84] Their evidence consisted of a video of him filming the protests and several photos showing him with one fist in the air and his phone in the other hand.[85]

Padrón Romero received a 15-year prison sentence and was transferred to the Combinado del Este maximum security prison in Havana, where he remained at time of writing. In May, the Supreme Court reduced his sentence to 10 years.[86] His mother said that, since the trial, police and state security agents have repeatedly appeared at her workplace, in what she described as "surveillance."

## Juan Enrique Pérez Sánchez, 32, in Nueva Paz

Juan Enrique Pérez Sánchez, a 34-year-old phone technician, joined protests in the town of Vegas, in Nueva Paz, Mayabeque province, on July 11 and 12. His wife, who was with him, said they participated peacefully.[87]

On the afternoon of July 12, government workers and a group of government supporters arrived by bus and on foot, she said, and plainclothes and uniformed police began beating protesters. Pérez Sánchez and his wife were among 20 arrested and taken to a detention center in the town of San José de las Lajas. Officers there beat Pérez Sánchez with batons

---

[84] Provincial Prosecutor's Office of Havana, Indictment in file 145-A of 2021 (copy on file with Human Rights Watch), pp. 2-3.

[85] Ibid; Provincial Tribunal of Havana, Chamber of Crimes against State Security, Ruling 5 of 2022, March 16, 2022 (copy on file with Human Rights Watch).

[86] Supreme Court, Ruling 3 of 2022, May 17, 2022 (copy on file with Human Rights Watch).

[87] Unless otherwise noted, all the information in this case is based on Human Rights Watch telephone interview with Pérez Sánchez's wife, February 2, 2022.

Cuba AR_001481

and the Cuban flag he was carrying, threw him on the ground, kicked him, and pepper-sprayed his eyes and mouth, she said.

His wife was released after 11 or 12 days and fined of 7,000 Cuban pesos (approximately $290).

For nearly a month, Pérez Sánchez remained in solitary confinement, she said, interrogated at all hours and prevented from sleeping. In one incident, guards unleashed a dog that knocked him over.

Four military officers asked Pérez Sánchez to sign a paper saying he regretted protesting, she said, and clubbed him when he refused.


Juan Enrique Pérez Sánchez. © Private

Four months after the arrests, when Pérez Sánchez's wife was finally allowed to visit him—now at Melena Dos maximum security prison—bruises still covered his forehead, and his rib cage was purple and swollen, she said. He told her he had not received proper medical care.

At a closed-door trial with 10 others, held at the Popular Municipal Court San José De Las Lajas from December 13 to 15, Pérez Sánchez faced charges of "public disorder," "sabotage," and two counts of "contempt."[88] Prosecutors accused him of encouraging people to join the protest and shout slogans against the government, offending pro-government protesters, and throwing rocks at three stores on the night of July 11, breaking their doors and windows.

---

[88] Office of the Attorney General, Indictment in file 382 of 2021, September 10, 2021 (copy on file with Human Rights Watch).

Cuba AR_001482

Part of the evidence against him consisted of "odor traces" of Pérez Sánchez supposedly found on thrown rocks.[89] Members of the Independent Forensic Expert Group (IFEG) of the International Rehabilitation Council for Torture Victims (IRCT) told Human Rights Watch that such traces "should not be considered as scientifically based evidence because error rate is high or unknown, and there are no standards to control such procedures."[90]

Additionally, three witness, including a local authority, testified against Pérez Sánchez. Only one of them said he had seen him throwing rocks.[91]

He was home fixing phones that night, his wife said, but the court dismissed the testimonies of two witnesses who said they had been at his house that evening as "improbable," and said that a report by the Vegas police chief saying Pérez Sánchez had not participated in rock throwing was "by itself" insufficient evidence.[92]

Pérez Sánchez was sentenced to eight years in prison and was ordered to pay a fine for damage to businesses. His lawyer appealed but a higher court confirmed the sentence in June.

Police officers have threatened and harassed Pérez Sánchez's wife because she published her husband's case on social media. A local police chief called her into the DTI facility nine times and repeatedly threatened to fine her, restrict prison visits, or have Pérez Sánchez transferred to a faraway prison.

---

[89] Ibid; First Criminal Chamber of the Provincial Court of Mayabeque, Ruling 4 of 2022, March 1, 2022 (copy on file with Human Rights Watch), p. 16.

[90] Information provided to Human Rights Watch via email by Máximo Duque and James Lin, Members of the Independent Forensic Expert Group (IFEG), March 3, 2022 (copy on file with Human Rights Watch).

[91] First Criminal Chamber of the Provincial Court of Mayabeque, Ruling 4 of 2022, pp. 12-16.

[92] Ibid, pp. 19 and 21.

Cuba AR_001483

## Yasmani Porra Pérez, 36, in Colón

Yasmani Porra Pérez, 36-years-old and unemployed, participated in a July 11 demonstration in the city of Colón, Matanzas province, about a hundred miles southeast of Havana.



Yasmani Porra Pérez. © Private

Five days later, police and state security agents arrested Porra Pérez at home, without a warrant, his wife said. At the police station, officers beat him on the head, bursting one of his eardrums. His family spent two days looking for him and was only allowed to see him briefly two weeks later, at a distance.[93]

He was eventually transferred to the maximum security Combinado del Sur prison in nearby Matanzas city, his wife said, where for two weeks officials interrogated him repeatedly in the middle of the night. He receives a bucket of water a day for drinking and washing, she said, a soda in the afternoon, and "two fingers worth" of food in the morning, often rotten chicken meat.

Porra Pérez has a mental health condition, his wife said, and has not received any mental health related support since his arrest. He sent letters to his wife saying he "did not want to live anymore."

Prosecutors accused Porra Pérez of saying "threatening and aggressive" words about exchange stores and inciting protesters to damage them, breaking windows, and stealing goods.[94] They also said he had prevented an arrest, including by throwing punches at a police officer.[95]

---

[93] Unless noted otherwise, this case is based on Human Rights Watch telephone interviews with Porra Pérez's wife, January 28, 2022, and the lawyer representing Porra Pérez abroad, January 27, 2022.

[94] Central Territorial Military Court, Ruling 39 of 2022, December 19, 2021 (copy on file with Human Rights Watch), p. 32.

[95] Matanzas Province Military Prosecutor's Office, Indictment in file 86 of 2021, October 22, 2021 (copy on file with Human Rights Watch).

Cuba AR_001484

In late October, a prosecutor issued a formal petition asking a judge to convict Porra Pérez and 11 other defendants. His wife said she only received it a few days before the joint, closed-door trial, which took place December 15 to 17. The trial was held at the Central Territorial Military Court in Matanzas, because the military operates the exchange stores affected. The prosecution of civilians before military courts where civilian courts are functional violates international human rights law.

The evidence consisted of videos, as well as statements by police and military officers.[96] The prosecutor showed a video of a man throwing rocks and holding seemingly stolen goods, but the man was not Porra Pérez, who has a distinctive scar on the back of his head, his wife said. The court disallowed a defense witness who would have testified that his clothes were also different that day, she said. The defense presented two witnesses, both to Porra Pérez's character.[97]

The military court sentenced him to 17 years in prison for "sabotage," "violent robbery," "assault," and "public disorder."[98] His lawyer appealed, but the Supreme Court confirmed the sentence in April.[99] Porra Pérez has been on hunger strike, which weakened his kidneys and made him urinate blood, his wife said.

---

[96] Ibid; Central Territorial Military Court, Ruling 39 of 2022.

[97] Central Territorial Military Court, Ruling 39 of 2022.

[98] Ibid.

[99] Supreme Court, Military Chamber, Ruling 33 of 2022, April 29, 2022 (copy on file at Human Rights Watch).

Cuba AR_001485

# Acknowledgments

This report was researched and written by a team of researchers from the Americas Division at Human Rights Watch, under the supervision of Juan Pappier, senior Americas researcher. Oriana van Praag documented and drafted multiple selected cases of abuse. The report was reviewed and edited by Tamara Taraciuk Broner, acting Americas director; Margaret Knox, senior grantwriter/editor; Bill Frelick, director of the Refugees and Migrants Rights Program; Michael Bochenek, senior counsel at the Children's Rights Division; Regina Tamés, deputy director at the Women's Rights Division; Floriane Borel, senior United Nations advocacy coordinator; Gabi Ivens, head of open source research; Widad Franco, senior United Nations advocacy coordinator; and Carlos Ríos-Espinosa, senior researcher/advocate at the Disability Rights Division. Danielle Haas, senior editor in the Program Office, and Aisling Reidy, senior legal advisor, provided program and legal review, respectively.

Americas Division associates Oriana van Praag and Camilo Moraga-Lewy contributed to the report production. The report was prepared for publication by Travis Carr, senior publications coordinator, Fitzroy Hepkins, administrative manager, and José Martínez, senior administration coordinator. It was translated into Spanish by Gabriela Haymes.

Human Rights Watch would like to thank the many Cuban organizations, activists, and human rights defenders who contributed to this report, especially the human rights groups Cubalex, Prisoners Defenders, and Justicia 11J; the coalitions of artists and activists Movimiento San Isidro and 27N; and the news outlet Cubanet.

Human Rights Watch is deeply grateful to the victims and their relatives who, despite often incredibly difficult circumstances, shared their testimonies with us.

Cuba AR_001486



# Prison or Exile
Cuba's Systematic Repression of July 2021 Demonstrators

On July 11, 2021, thousands of Cubans took to the streets in the largest nationwide demonstrations against the government since the 1959 Cuban revolution. These peaceful protests were a response to longstanding restrictions on rights, food and medicine scarcity, and the government's response to the Covid-19 pandemic.

The government responded to Cubans' exercise of their rights to expression and assembly with brutal, systematic repression and censorship.

*Prison or Exile* documents a wide range of human rights violations committed in the context of the protests, including harassment, arbitrary detention, abuse-ridden prosecutions, beatings, and other cases of ill-treatment that in some cases constitute torture.

In total, Human Rights Watch documented 155 cases of abuse. We found that these violations followed patterns that strongly suggest the existence of a plan to prevent people from protesting, punish those who did, and instill fear to deter future anti-government demonstrations.

Simultaneously, Cuban authorities have taken steps to dismantle the limited space civic space that allowed these protests to occur. The government's repression, as well as its apparent unwillingness to address the underlying problems that took Cubans to the streets, have dramatically increased the number of people leaving the country.

The international community has for decades been unable to effectively promote sustained progress on human rights in Cuba. Multilateral pressure has been lacking.

The United States, Canada, the European Union, and Latin American governments should increase human rights scrutiny over Cuba, including within relevant United Nations bodies, and ensure a multilateral and coordinated approach that expresses support for the rights of Cuban protesters, activists, and independent journalists and artists, and condemns repression in the country.

*(above) Emilio Roman, father of two young men and a daughter who were imprisoned and accused of participating in the July protests against the government, shows a picture of his children at their home in La Güinera neighborhood of Havana, March 29, 2022.*
*© 2022 Yamil Lage/ AFP via Getty Images*

*(front cover) Police walk the streets after a demonstration against the government of President Miguel Díaz-Canel in Arroyo Naranjo Municipality, Havana, on July 12, 2021.*
*© 2021 Yamil Lage/ AFP via Getty Images*

## hrw.org

Cuba AR_001487



# chapter

# IV.b

## Cuba



Inter-American
Commission on
Human Rights




# CHAPTER IV.B

# CUBA

### I.    INTRODUCTION

1.      In exercising its competence to promote and protect human rights in the Americas, the Inter-American Commission on Human Rights ("IACHR" or "the Commission") monitored the human rights situation in Cuba, in particular, events of late 2020 to 2021, which could be relevant to the full enjoyment of human rights.

2.      In June 2020, the IACHR published its country report "Human Rights Situation in Cuba," which provides a general overview of the human rights situation in the country between 2017 and 2019.[1] Following publication of this report, the IACHR noted with concern that the situation analyzed therein, persisted into 2021. In particular, the Commission noted a lack of political participation and of free elections due to the persistence of a single party, the lack of provisions to ensure the separation of powers, through   a National Assembly that exercises broad powers to ensure the separation of powers, and the lack of conditions that provide guarantees for judicial independence.

3.      In this context, during 2021, the IACHR continued in 2021 to become aware of several issues that prevented the enjoyment of rights by people under the jurisdiction of the Cuban State, such as arbitrary restrictions to the right of assembly, the existence of only one party, a ban on association for political purposes, and refusal to incorporate proposals from groups that oppose the government. Further, the IACHR learned of restrictions to political rights, the rights to assembly and association, and the right to freedom of expression and opinion. Additionally, it followed up on the massive violations of freedom rights to personal liberty, security, and personal integrity; protection from arbitrary detention; the inviolability of the home and of transmitting correspondence. In like manner, violations of rights to minimum judicial guarantees and to judicial protection continue to systematically limit the human rights of Cuba's inhabitants. This context has mainly affected human rights defenders, social and political leaders, activists, and independent journalists, as well as persons of African descent, women, LGBTI persons, and members of other vulnerable groups. In this regard, the IACHR expresses serious concern about the levels of harassment against human rights defenders, activists, and members of the opposition in Cuba, who have reported being victims of arbitrary detentions, processes of criminalization charges, and persecution.

4.      Specifically, in 2021 the Commission closely monitored repercussions of the protests of July 11, in Cuba, which have led to the stiffening of repression of dissidence throughout the country and to serious contraventions of human rights. Since the protests began, the Commission has received numerous complaints by civil society organizations that report the existence of systematic criminal prosecution and persecution of peaceful demonstrators, activists, and political opponents through harassment, arbitrary detention, and criminal proceedings that do not observe even minimal due process guarantees.

---

[1] IACHR, Situation of Human Rights in Cuba, February 3, 2020.



5.      To this end, the Commission will dedicate a specific section of this Report to the analysis of social unrest in Cuba, from a perspective that considers the different stages of repression by the State.

6.      In assessing the human rights situation in Cuba, the IACHR decided to include the country in chapter IV-B of its annual report, on the grounds that the country's situation meets the criteria provided for in Article 59, subsection 6.a.i of its Rules of Procedure, which reads:

(a)   A serious breach of the core requirements and institutions of representative democracy mentioned in the Inter-American Democratic Charter, which are essential means of achieving human rights, including:

(i)   there is discriminatory access to or abusive exercise of power that undermines or denies the rule of law, such as systematic infringement of the independence of the judiciary or lack of subordination of State institutions to the legally constituted civilian authority.

7.      The IACHR also concluded that the situation in question meets the criteria set forth in Article 59, subsection 6.c of the same Rules of Procedure, which provides that:

(c)   The State has committed or is committing massive, serious and widespread violations of human rights guaranteed in the American Declaration, the American Convention, or the other applicable human rights instruments.

8.      Pursuant to Article 59(5) of the IACHR's Rules of Procedure, in drawing up this report, the Commission has utilized information from international organizations, civil society, and the Cuban Government itself through the website of the Ministry of Foreign Affairs of Cuba and other official media outlets. It has also drawn on information obtained through other mechanisms of monitoring and protection available to the IACHR, including the system of petitions and cases, precautionary measures, and public hearings. The IACHR examines the information received in light of Inter-American human rights norms and standards, identifies sound government practices, and issues recommendations to the State. It also avails itself of this opportunity to describe its activities in relation to Cuba in 2021.

9.      The Commission is aware of the mounting challenges States face when it comes to securing the full and effective enjoyment of human rights in the hemisphere. The IACHR is available to all actors, especially to authorities of the Cuban State, to provide technical support, as needed, to promote respect for the human rights of all persons in Cuba.

10.     As part of the process of preparing this report, the Commission received ample information from civil society organizations, especially from the Network of Civil Society Organizations (RED Cuba) regarding the human rights situation in Cuba, which was inaugurated on July 12, along with the Office of the Special Rapporteur for Economic, Social, and Cultural Rights (REDESCA, its Spanish acronym). Through this initiative, the IACHR and its REDESCA hope to deepen their work of strategic monitoring through various mechanisms and mandates, while promoting Inter-American standards in matters of human rights protection as synergistically as possible through direct and ongoing cooperation with civil society. Furthermore, the monthly meetings of RED Cuba have successfully made it possible to share more information, receive complaints, and deliver specialized inputs for civil society.

11.     On November 30, 2021, the Commission sent the State of Cuba a copy of the preliminary draft of this report in accordance with Articles 59.7 and 59.10 of its Regulations with a period of one month to receive its observations. The State did not present observations. The IACHR approved this report on January 12, 2022.

Cuba AR_001490



## II.   SITUATION OF HUMAN RIGHTS IN CUBA

### A.   Democratic Institutions

12.      Upon adopting the Inter-American Democratic Charter, the OAS member states recognized that representative democracy is the system by which stability, peace, and development in the region can be achieved, and that it is fundamental for attaining the full exercise of fundamental rights. Article 3 of the Inter-American Democratic Charter establishes that:

> Essential elements of representative democracy include, inter alia, respect for human rights and fundamental freedoms, access to and the exercise of power in accordance with the rule of law, the holding of periodic, free, and fair elections based on secret balloting and universal suffrage as an expression of the sovereignty of the people, the pluralistic system of political parties and organizations, and the separation of powers and independence of the branches of government.[2]

13.      The persistent failure to observe core elements of representative democracy and its institutions is one of the main criteria for including Cuba in this chapter of the Annual Report, pursuant to Article 59(6)(a)(i) of the IACHR's Rules of Procedure. Historically, the IACHR has been critical of the absence of conditions that allow for genuine political participation by sectors that take a different line of thought in Cuba; in particular, it has criticized the holding of elections that lack plurality and independence, and insurmountable obstacles that hinder free access to diverse sources of information. Voices and viewpoints that oppose the government that intend to express views and participate in the conduct of the country's affairs are suppressed because of the single-party system, bans against association for political purposes, and arbitrary restrictions on freedoms of expression, the right of assembly, and other fundamental rights.

### B.   Right to Vote and Participate in Government and Constitutional Reform

14.      In the wake of an electoral process that began in 2017, Raúl Castro Ruz was relieved of the office of President of the Council of State and of Ministers of the Republic of Cuba in April 2018. He was replaced by Miguel Díaz-Canel Bermúdez, as ratified by the National Assembly of the People's Power (ANPP), after being nominated the day before as the sole candidate. During the course of the electoral process, persistent conditions standing in the way of genuine political participation of different sectors of society were observed.

15.      Likewise, on April 19, 2021, in the context of the 8th Congress of the Cuban Communist Party (CCP), former President Raúl Castro officially ended his leadership of the Party. Current President Miguel Díaz-Canel assumed the position of First-Secretary of the Party's Central Committee, the highest position in the hierarchy of the Cuban Communist Party.[3] Despite this, in his address at the closing of the 8th Congress of the CCP, Díaz-Canel indicated that he would continue to consult with Raúl Castro on matters that are strategic for the country.[4] The Congress also considered a few other changes in the configuration of the Party's top leadership, such as reducing its size from 17 to 14 members and eliminating the position of Second-Secretary. Five new members were brought into this new leadership structure, and nine of its members were ratified.[5] However, the Commission notes that these changes of Party form and composition have not had any

---

[2] OAS, Inter-American Democratic Charter, Art. 3. adopted at the 28th Special Session, September 11, 2001, Lima, Peru.

[3] Granma, Miguel Díaz-Canel elected as first secretary of the Communist Party of Cuba Central Committee, April 19, 2021.

[4] *Los tiempos*, Raúl Castro se va, pero seguirá presente en decisiones estratégicas en Cuba, April 20, 2021.

[5] *El País*, Miguel Díaz-Canel asume el mando del Partido Comunista cubano tras la salida de Raúl Castro, April 19, 2021.

Cuba AR_001491



**ANNUAL REPORT 2021**

substantive political impact, so Cuba continues under a single-party model, without free elections and with a State-controlled economy.

16.     The IACHR has also continued to pay close attention to the implementation of the new Constitution of the Republic of Cuba, proclaimed on April 10, 2019.[6] As was highlighted in the country report of 2020, the Commission has noted that the 2019 Constitution maintains the characteristic features of the Cuban Government, describes the State of Cuba as socialist and the Communist Party as its highest political and leadership force in society and in the State, and establishes that it organizes and guides common efforts in the construction of socialism and in advances toward a socialist society. In particular, the Commission reiterates its concern about the restriction of democracy that is an implication of the absence of political pluralism and representativeness. Also deeply troubling are the effects of this norm on political rights, freedom of expression, freedom of thought, and even equality and non-discrimination in relation to political ideas, as described later in this chapter.[7]

17.     Despite the foregoing, the IACHR continues to note that in matters of human rights, the new Constitution gives constitutional rank to judicial guarantees such as habeas corpus and the principle of the presumption of innocence, and to a catalogue of fundamental rights, both civil and political, including the right to life and the prohibition of forced disappearance, torture, and cruel, inhuman, or degrading treatment and punishment. It also enshrines economic, social, cultural, and environmental rights, including the rights to water, health, and education free of charge, among other rights. Likewise, the right to private property is incorporated and the principle of equality is expanded by including a ban on discrimination based on gender, sexual orientation, gender identity, ethnic origin, and disability. The Constitution states that international relations are to be based on the defense and protection of human rights and establishes that the State has an obligation to ensure "the inalienable, indivisible and interdependent enjoyment and exercise of human rights, in keeping with the principle of progressive realization and without discrimination."[8]

18.     In this regard, the IACHR reiterates that the effective observance of the rights to justice (Article XVIII) and due process of law (Article XXVI) of the American Declaration—emanating from the classic separation of powers—is based on the independence of the judicial branch, which is an essential requirement for the practical observance of human rights. In the view of the Commission, the subordination of the courts to the Council of State, headed by the Head of State, means that in Cuba, the Judicial Branch is directly subordinate to the directives of the Executive Branch. Accordingly, the lack of independence of the Judicial Branch compromises its ability to provide guarantees for the enjoyment of human rights.

## C.     Dissidence and Political Activism

19.     In 2021, the IACHR observed in Cuba persistence of violations of the rights to personal liberty, security, and integrity, protection from arbitrary detention, the inviolability of the home, minimum judicial guarantees, and judicial protection for human rights defenders, social and political leaders, and independent

---

[6] IACHR. The Situation of Human Rights in Cuba. OEA/SER.L/V/II. Doc. 2. February 3, 2020, para. 80.

[7] In this regard, see IACHR The Situation of Human Rights in Cuba. OEA/SER.L/V/II. Doc. 2. February 3, 2020, para. 82. With respect to the rights expressly recognized in the Constitution, the Commission takes note of the recognition of the rights to life, the prohibition of forced disappearance, and the prohibition of torture and cruel, inhuman, or degrading treatment or punishment. It also introduces the prohibition of discrimination based on sexual orientation, gender identity, and disability, as well as including the right to privacy. It also establishes the rights to health, education, work, housing, environment, food, and clean water. Most of those economic, social, cultural and environmental rights were enshrined in the previous Constitution as goals or duties of the State, but not as rights of the Cuban population. The Constitution also states that the State, society, and families have obligations about older persons and persons with disabilities.

[8] IACHR, Press release 58/2019, "IACHR Concerned about Cuba's New Constitution and its Implementation," March 4, 2019.

Cuba AR_001492

ANNUAL REPORT **2021**



journalists, in the practice of their professions. The IACHR particularly highlights that, in 2021, repression of dissidence has been stricter in the context of the social unrest that began in Cuba on July 11.

20.      As the IACHR has noted in prior opportunities, there exists in Cuba systematic repression by State agents and groups aligned with the government that seek to block peaceful protests and gatherings organized by defenders of human rights, activists, and those opposed to the government that complain about human rights violations and/or political or social matters. Thus, the Commission perceives that ideological discrepancy remains the primary motive for repressing and prosecuting various kinds of artistic and ideological expression the purpose of which is to protest.

## 1.      General considerations

### a.      *Right to personal liberty, security, and integrity, and protection from arbitrary detention*

21.      Since its 1992-1993 Annual Report9, the Commission has been observing with great concern the systematic use of arbitrary summary detentions as a method of harassment by Cuban authorities, exacerbated in the context of the July 11 protests10. It has also observed the status of those sentenced for political reasons and the differentiated treatment they have received in matters of access to penitentiary benefits.

22.      Specifically, according to available data, through November 15, 2021, at least 2,872 repressive actions were documented.11 Of that number, according to the Cuban Human Rights Observatory (OCDH, its Spanish acronym), 713 took place in June12, when there were 114 detentions and 599 abuses, primarily harassments, parking outside homes of activists, fines, threats, citations, and acts of repudiation.13 Additionally, at least 1,745 repressive actions occurred in the context of the July 11 protests.14 These actions included 1,103 arbitrary detentions.15 Additionally, according to publicly available information, over 200 repressive actions were reported between November 13 and early on November 15, which were attributed to the Government's increased pressure to deter people from participating in the protests.16 These included at least 49 house detentions and 25 threats.17

---

⁹ IACHR, Annual Report 1992-1993, Chapter IV, Status of Human Rights in Several Countries, Cuba: III. Methods of Harassment Used against Human Rights Activists, OEA/Ser.L/V/II.83, Doc. 14, March 12, 1993.

¹⁰ See section "Social uprising in Cuba."

¹¹ See *Observatorio Cubano de Derechos Humanos*: OCDH: 713 acciones represivas en Cuba en junio, de las cuales 114 fueron detenciones arbitrarias, July 5, 2021 and OCDH: Protestas de julio dejaron al menos 1.745 acciones represivas en Cuba, de las cuales 1.103 fueron detenciones arbitrarias, August 3, 2021; and *La Gaceta de la Iberosfera*, Desapariciones, detenciones, amenazas… el régimen castrista intensifica la represión antes de la protesta por la libertad, November 15, 2021.

¹² *Observatorio Cubano de Derechos Humanos*, OCDH: 713 acciones represivas en Cuba en junio, de las cuales 114 fueron detenciones arbitrarias, July 5, 2021.

¹³ *Observatorio Cubano de Derechos Humanos*, OCDH: 713 acciones represivas en Cuba en junio, de las cuales 114 fueron detenciones arbitrarias, July 5, 2021.

¹⁴ *Observatorio Cubano de Derechos Humanos*, OCDH: Protestas de julio dejaron al menos 1.745 acciones represivas en Cuba, de las cuales 1.103 fueron detenciones arbitrarias, August 3, 2021.

¹⁵ *Observatorio Cubano de Derechos Humanos*, OCDH: Protestas de julio dejaron al menos 1.745 acciones represivas en Cuba, de las cuales 1.103 fueron detenciones arbitrarias, August 3, 2021.

¹⁶ *La Gaceta de la Iberosfera*, Desapariciones, detenciones, amenazas… el régimen castrista intensifica la represión antes de la protesta por la libertad, November 15, 2021.

¹⁷ *La Gaceta de la Iberosfera*, Desapariciones, detenciones, amenazas… el régimen castrista intensifica la represión antes de la protesta por la libertad, November 15, 2021.

Cuba AR_001493



23.     As regards persons convicted as "convicts of conscience" or for political reasons, Prisoners Defenders documented 683 cases over a single year, from November 2020 to October 31, 2021.18 Of these, the organization determined that between July 11 and October 31 there were 591 active cases, of which 370 occurred in the context of the July 11 repression. Those 591 individuals were: i) 375 "convicts of conscience": these are individuals deprived of liberty solely for reasons of conscience, the accusations against which are false or for non-crimes; ii) 143 "condemned of conscience": these are individuals who have been prosecuted or sentenced that are subject to forced work at home, measures to limit their freedom, conditional release, and other restrictions on freedom; and iii) 73 "other political prisoners" whose status does not fit the prior categories because of the presence of some form of violence, or for having committed – coupled with their political imprisonment – punishable crimes.19

24.     Furthermore, in this context characterized by arbitrary detentions, the IACHR has noted with concern the existence of a judicial and penitentiary policy that grants differentiated treatment when it comes to benefits, a policy that is detrimental to persons detained for political reasons. Regarding this, in 2015 the Cuban Government began a process known as "draining the prisons", which involves offering widespread pardons and prison releases that benefit solely those inmates who are detained for common crimes.20 In particular, according to a study of prison releases conducted by civil society between June 1, 2020 and May 31, 2021, individuals deprived of liberty for presumably political or "conscience" reasons were denied prison release and other penitentiary benefits that include a 60-day reduction per year served, an additional 60-day reduction for good behavior, and reductions in severity of sentencing regimes, from the most to least severe.21 The implication of this is that most of these individuals will regain their freedom only after serving full sentences.22

25.     Lastly, in 2021 the IACHR granted six precautionary measures in favor of individuals who are human rights defenders, after considering them to be at grave or urgent risk of suffering irreparable damage to their rights. In this regard, the Commission considered the information it had received to be sufficient to decide, prima facie, that these individuals are the object of threats, harassment, surveillance, persecutions, detentions, or acts of violence by State and third-party agents, presumably because of their work as human rights defenders in the country. To this end, the IACHR requested that the State of Cuba adopt the necessary measures to protect the rights to life and personal integrity of the beneficiaries.

26.     Specifically, on January 19, 2021, the IACHR granted precautionary measures on behalf of Juan Antonio Madrazo Luna, Marthadela Tamayo, and Oswaldo Navarro Velos, members of the Comité de Ciudadanos por la Integración Racial [Citizens' Committee for Racial Integration], who faced threats, harassment, surveillance, persecution, detentions, and acts of violence.23 On February 11, 2021, the Commission granted precautionary measures on behalf of 20 members identified with the San Isidro Movement (MSI), who were facing risk due to threats, harassment, surveillance, persecution, detentions, and acts of violence.24 On March 24, 2021, the IACHR expanded precautionary measures on behalf of Aminta

---

18 Prisoners Defenders, Political prisoners in Cuba: new record of 683 in the last 12 months. November 4, 2021.

19 Prisoners Defenders, Political prisoners in Cuba: new record of 683 in the last 12 months. November 4, 2021.

20 Prison Insider, Cuba: la mayor cárcel del mundo, 17 January 2020. See also: Prison Insider, Cuba: el régimen excarcelará a más de 2.600 presos por el hacinamiento en sus cárceles, July 20, 2019.

21 Prisoners Defenders, Convicts of Conscience in Cuba: Analysis of the systematic violation of the right to early release and prison benefits, June 23, 2021.

22 Prisoners Defenders, Convicts of Conscience in Cuba: Analysis of the systematic violation of the right to early release and prison benefits, June 23, 2021.

23 IACHR. Resolution 7/21, Precautionary measure 211/20 - Juan Antonio Madrazo Luna, Marthadela Tamayo and Oswaldo Navarro Veloz regarding Cuba

24 IACHR, Resolution 14/21, Precautionary measure 1101/20 - 20 identified members of the San Isidro Movement (MSI) regarding Cuba

Cuba AR_001494



D'Cárdenas Soroa and Carlos Manuel Álvarez, who were at risk because of their association with the San Isidro Movement (MSI) and objects of stalking, harassment, and aggression.25 On April 5, 2021, the IACHR broadened precautionary measures on behalf of Esber Rafael Ramírez Argota, a member of the Comité de Ciudadanos por la Integración Racial (CIR) and a victim of harassment and other risk events.26

27.      On August 22, 2021, the IACHR expanded precautionary measures on behalf of Lázara Eumelia Ayllón Reyes, Richard Adrián Zamora Brito, and Roberto Miguel Santana, members of the Comité de Ciudadanos por la Integración Racial (CIR), who were at risk.27 Lastly, on August 28, 2021, the IACHR broadened precautionary measures on behalf of Irán Almaguer Labrada, who faced threats, intimidation, and harassment because they belonged to the Movimiento Cristiano Liberación (MCL) and for demanding justice on behalf of their brother, Yander García Labrada (himself a beneficiary of precautionary measures).28 The Commission regrets not having received comment from the State regarding these precautionary measures despite having requested a response pursuant to Article 25(5) of its Rules of Procedure.

### b.    Minimum Due Process Guarantees

28.      The IACHR again expresses its concern that the death penalty remains on the books as a punishment for a significant number of criminal offenses in Cuba.29   Capital punishment is specifically designated for crimes against the security of the State that are described in broad or ambiguous language, and may be imposed in the most summary of proceedings without defendants enjoying even minimal guarantees of the right to adequate legal defense.30 Based on the information available, the last time that the death penalty was imposed in Cuba was in 2003.31   The IACHR expresses disappointment that the process to adopt a new constitution in 2019 did not include the *de jure* abolition of that punishment. In any event, the IACHR finds that the fact that it is in force in domestic legislation and could potentially be applied constitutes a latent threat to

---

25 IACHR, Resolution 29/21, Precautionary measure 1101/20 - Aminta D'Cárdenas Soroa and Carlos Manuel Álvarez regarding Cuba (Persons associated with the San Isidro Movement)

26 IACHR, Resolution 30/21, Precautionary measure 211/20 - Esber Rafael Ramírez Argota regarding Cuba (Member of the Citizens Committee for Racial Integration - CIR)

27 IACHR, Resolución 64/2021, MC 211/20 - Richard Adrián Zamora Brito respecto de Cuba (integrante del Comité Ciudadanos por la Integración Racial - CIR)

28 IACHR, Resolution 68/2021, Precautionary measure 1068/20 - Irán Almaguer Labrada regarding Cuba

29 IACHR. The Situation of Human Rights in Cuba. OEA/SER.L/V/II. Doc. 2. February 3, 2020, para. 188. The maximum punishment of death is provided for under the categories of crimes against the security of the State; peace and international law; public health; life and corporal integrity; normal course of sexual relations; normal development of childhood and youth and against proprietary rights. Under the category of crimes against the security of the State, the criminal offenses which are subject to the death penalty as the maximum punishment are as follows: Acts against the independence or the territorial integrity of the State; promotion of armed action against Cuba; armed service against the State; aiding the enemy; espionage; rebellion; sedition; usurping political or military command; sabotage; terrorism; hostile acts against a foreign State; genocide; piracy; mercenaryism; crime of apartheid and; other acts against the security of the State. Additionally, the law provides for punishment by the death penalty with the following criminal offenses: Production, sale, demand, trafficking, distribution and illicit possession of drugs, narcotics, psychotropic substances, and other items of similar effects; murder; rape; pederasty with violence; corruption of minors; robbery with violence or intimidation of persons. Likewise, the death penalty remains on the books as punishment for a significant number of broad or vague criminal offenses, such as "state of dangerousness."

30 The Law on Criminal Procedure provides for summary proceedings under Articles 479 and 480 thereof. Article 479 establishes: If exceptional circumstances so warrant, the Attorney General of the Republic may request of the President of the People's Supreme Court, and the latter decide that the criminal acts of the jurisdiction of the Courts of Justice shall be adjudicated through summary proceeding, except for those that are under the jurisdiction of the People's Municipal Courts. For its part, Article 480 establishes as follows: At a summary proceeding, to the extent that the competent Court deems necessary, the deadlines that this Law establishes for the processing of preliminary investigations, the oral trial proceeding and motions and appeals process are reduced. Law on Criminal Procedure. Special Proceedings. Title X. Summary Proceeding. Articles 479 and 480.

31 IACHR. The Situation of Human Rights in Cuba. OEA/SER.L/V/II. Doc. 2. February 3, 2020, para. 88.

Cuba AR_001495



the right to life. Accordingly, the Commission reiterates its appeal to the Cuban State to abolish the death penalty, inasmuch as this is the trend throughout the hemisphere.[32]

29.     The Commission has also noted similar vagueness in the definition of "dangerous state," (*Estado peligroso*), as set forth in Article 72 ff. of the Criminal Code.[33]  As established therein, "dangerous state" can be deduced from a special proclivity of the individual to commit criminal offenses, given the observed "manifest contradiction with the norms of socialist morality," which is demonstrated when any of the "indications of dangerousness," are present, which are: habitual intoxication and dipsomania, narcomania, and antisocial conduct; the latter is understood as a person who habitually breaks the rules of social interaction by acts of violence, or by other provocative acts, violates the rights of others or by his or her behavior in general undermines the rules of interaction or disturbs the order of the community or lives, as a social parasite, off other people's work or exploits or engages in socially reprehensible vices.[34]

30.     According to Articles 415 ff. of Decree-Law No. 128 of June 18, 1991[35],  a declaration of pre-criminal dangerousness of antisocial conduct is also issued through a summary proceeding, and may result in arbitrary deprivation of liberty through trial proceedings that do not have the minimum judicial guarantees set forth in the American Declaration of the Rights and Duties of Man.[36]  In this regard, the bodies of the Inter-American human rights system have concurred that "ambiguity in describing crimes creates doubts and the opportunity for abuse of power, particularly when it comes to ascertaining the criminal responsibility of individuals and punishing their criminal behavior with penalties that exact their toll on the things that are most precious, such as life and liberty."[37]

31.     Separately, the IACHR noted with concern statements by the Chief of the Division of Criminal Processes of Cuba's Office of the Prosecutor, José Luis Reyes Blanco, in which he announced the plan to prosecute Cuban activists living abroad who are accused of financing, convening, coordinating, or participating in human rights activities. According to publicly available information, individuals with some level of involvement in these activities could be prosecuted in absentia, and the government would invoke international cooperation to seek extradition of anyone found guilty.[38]

32.     Lastly, and to be addressed in the next section, the Commission has observed a series of violations of due process guarantees in the context of State actions in response to the July 11 protests. Specifically, the IACHR is aware of different violations of the principle of legality and judicial guarantees, such as: i) the use of undefined crimes as pretext to criminalize and arrest those who participated in the protests; ii) keeping detained individuals incommunicado; iii) the absence of legal defense and timely access to the criminal

---

[32] IACHR, The Death Penalty in the Inter-American Human Rights System: From Restrictions to Abolition, 31 December 2011, OEA/Ser.L/V/II Doc.68I.

[33] *Gaceta Oficial*, Law No. 62, Criminal Code, December 29, 1987. Articles 72 to 74: "Article 72. Dangerous state is understood as a special proclivity of a person to commit criminal offenses, as demonstrated by the conduct observed, in manifest contradiction to the norms of socialist morality; Article 73.1. Dangerous state is manifested when any of the following indications of dangerousness appears in the individual: (a) habitual intoxication and dipsomania; (b) narcomania; (c) antisocial conduct. 2. A person who habitually breaks the rules of social interaction by acts of violence, or by other provocative acts, violates the rights of others or due to his behavior in general undermines the rules of interaction or disturbs community order or lives, as a social parasite, off other people's work or exploits or engages in socially reprehensible vices, is considered in a dangerous state. Article 74. The state of mental derangement and of persons with delayed mental development is also considered a dangerous state, if for this reason, they do not possess the faculty to grasp the scope of their actions or of controlling their conduct when it poses a threat to the security of persons or the social order.

[34] *Gaceta Oficial*, Law No. 62, Criminal Code, December 29, 1987.

[35] Official Gazette No. 7 Special Issue, Law Decree No. 128, June 18, 1991.

[36] IACHR. The Situation of Human Rights in Cuba, OEA/SER.L/V/II. Doc. 2. February 3, 2020, para. 189.

[37] Inter-American Court. *Case of Castillo Petruzzi et al. v. Peru*, Judgment of May 30, 1999, Series C. N° 52, para. 121.

[38] OCDH condena la decisión del gobierno cubano de enjuiciar «en ausencia» a exiliados que critiquen la situación de la isla, May 17, 2021.

Cuba AR_001496



files; iv) the rendering of summary judgments; and v) the application of baseless and disproportionate sentences.

## 2.    Social uprising in Cuba

### a.    July 11 protests

33.      According to publicly available information, on Sunday, July 11, 2021, thousands of Cubans took to the streets in more than 40 cities throughout the country to protest peacefully, demanding the exercise of civil liberties and changes to the country's political structure, as well as to protest the lack of access to economic, social, and cultural rights, primarily owing to the persistent shortages of food and medications and the worsening consequences of the Covid-19 pandemic on the island. According to civil society and international bodies, such as the European Parliament, the mass protest of July 11 became one of the largest protests in recent Cuban history.[39]

34.      However, the protests unleashed immediate reactions from the State against the demonstrators and, since July 11, the IACHR has documented the different stages of repression by the State.

35.      In the first stage of reaction by the State, the Commission took note of civil society reports that documented dozens of reports of injuries to individuals caused by excessive use of force by police, as well as threats, harassment, and official statements meant to stigmatize demonstrators and their supporters.[40] In this regard, the Commission and its Offices of Special Rapporteurs issued a press release on July 15 that condemned the State's repression and use of force in the context of the protests, and deemed official statements that characterized demonstrators as enemies to be unacceptable and reckless.[41]

36.      Further, the Commission noted the deliberate internet service outages on the day of the protest, which aimed to block communication about the movement on social media and the independent press. According to information from civil society, the internet disruptions included blocking mobile texting apps and social media platforms, intermittent mobile internet service outages, and slowing internet traffic to and from Cuba, which, according to a report by Internet Outage Detection and Analysis (IODA), slowed to zero on Sunday, July 11.[42]

37.      Additionally, in the weeks following the protest, the Commission was informed about another set of repressive measures that included hundreds of arbitrary detentions and other violations of due process guarantees, mistreatment, deplorable detention conditions, as well as engagement of a reinforced surveillance strategy on the streets throughout the country and monitoring activists' residences. Regarding this, through press releases on July 23 and August 12, 2021, the Commission and the Offices of the Special Rapporteurs

---

[39] European Parliament, European Parliament resolution of 16 September 2021 on the government crackdown on protests and citizens in Cuba (2021/2872(RSP)) and Human Rights Watch, Cuba responds to landmark demonstrations with brutal repression, July 20, 2021.

[40] Prisoners Defenders, Organisations and independent medial call on the Cuban government to respect the right to demonstrate and freedom of expression and to stop violence against demonstrators, July 13, 2021.

[41] IACHR, Press Release No. 177/21 - The IACHR and Its Special Rapporteurships Condemn State Repression and the Use of Force during Peaceful Social Protests in Cuba, and Call for Dialogue on Citizen Demands, July 15, 2021.

[42] IACHR, Press Release No. 177/21 - The IACHR and Its Special Rapporteurships Condemn State Repression and the Use of Force during Peaceful Social Protests in Cuba, and Call for Dialogue on Citizen Demands, July 15, 2021.

Cuba AR_001497



expressed their deep concern about these facts, calling on the State to cease the repression, guarantee due process, and provide dignified treatment to those in its custody.[43]

38.     Later, the IACHR noted the enactment of new telecommunications and cybersecurity regulations, Decree Law 35 for Telecommunications, and Resolution 105 for Responding to Cybersecurity Incidents, published in the Official Gazette of August 17.[44] These laws could be employed as mechanisms for State control over social demonstrations, given that the internet has become a critical space for exercising the right to protest in Cuba. Regarding this, through a communiqué on September 22, the Commission and its Office of the Special Rapporteur for Freedom of Expression expressed their concern that these regulations could place users' rights to privacy at risk.[45]

39.     Additionally, as the third modality of repression, during the hearing on the "Human rights situation in the context of the protests in Cuba", held on October 21, 2021, civil society organizations reported, regarding those who participated in the protests, that the Office of the Prosecutor has initiated legal actions that seek to criminally charge, and request stiffer sentences for, those who participated in the protests. They also report that these prosecutions are characterized by infringements of judicial guarantees, such as: i) detained persons being held incommunicado; ii) interrogations aimed at intimidating; and iii) no access to adequate legal defense.[46]

40.     In this regard, through a press release on November 5, the IACHR urged the State to guarantee that the crimes contained in its legislation is not used inappropriately to restrict other rights, or against dissident persons. Likewise, it reminded the State of its obligation to adopt all necessary measures to prevent State investigations from being used to subject those who legitimately defend their rights through social protest to unfair or baseless prosecution.[47]

41.     Lastly, while monitoring the planned civil protest in Cuba for November 15, the Commission received reports that the State of Cuba engaged in a new wave of repression and intimidation aimed at preventing the protest from taking place. On this specific matter, the IACHR and its Office of the Special Rapporteur for Freedom of Expression made clear in a press release on November 29, 2021, that the various repressive acts carried out on November 12 and 15 have created an environment of generalized terror and self-censorship in the country and have discouraged citizens from exercising the right to protest. Among these acts of repression, they highlight alleged house detentions with police surveillance, arbitrary detentions, acts of repudiation and harassment, summonses to interrogations at police stations, threats of criminal charges, and deliberate internet service outages.[48]

42.     Along these lines, in the next section, the IACHR describes the different responses by the State that have been identified since July 11, 2021, as well as the systematic patterns of human rights violations

---

[43] IACHR-RFOE, Press Release No. R189/21 - The Office of the Special Rapporteur expresses concern over the reports of serious human rights violations in the context of the protests in Cuba, 23 July 2021; y Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021.

[44] Cuba, Ministerio de Justicia, Gaceta Oficial de la República No. 92, August 17, 2021.

[45] IACHR, Press Release No. 249/21 - Concerned About New Telecommunications and Cybersecurity Regulations in Cuba, IACHR and Its Special Rapporteurship for Freedom of Expression Note the Risks these New Regulations Pose for the Exercise of Fundamental Liberties on the Internet, September 22, 2021.

[46] IACHR, Hearing: Human rights situation in the context of the protest in Cuba "Situación de los derechos humanos en el contexto de la protesta en Cuba", 181 period of sessions virtual, October 21, 2021.

[47] IACHR, Press Release No. 295/21 - IACHR Concerned About Tougher Repression and Human Rights Violations in Cuba Since the Protests that Took Place in July, November 5, 2021.

[48] IACHR, Press Release No. 317/21 - IACHR and Its Special Rapporteurship for Freedom of Expression Concerned About State Repression that Prevented Civic Rally in Cuba on November 15, November 29, 2021.

Cuba AR_001498



recorded in the context that was examined, such as: i) use of force and campaigns to intimidate and stigmatize; ii) arbitrary detention, mistreatment, and deplorable detention conditions; iii) criminal prosecution of demonstrators, judicial persecution, and violations of due process; and iv) shutting down democratic spaces through repressive and intimidating strategies that seek to discourage new social demonstrations.

### b.     Responses by the State

### i.     Use of force and campaigns to intimidate and stigmatize

43.      In Cuba, the use of force and strategies deployed to deter the protests of July 11 were evidence of implementation of coordinated actions by the Government to control the public square. According to information from civil society, the State's initial response was characterized by the use of police violence in different locations in the country, which resulted in injuries to dozens of people.[49] Likewise, according to publicly available information, the day after the protests some anti-government activities that stemmed from those protests took place on the island and, on this occasion, in addition to reports of violence against protesters, one person was reported to have died in the municipality of Arroyo Naranjo, in the outskirts of Havana[50], a report the State has confirmed.[51]

44.      Regarding the use of force, the Commission reiterates that it is a "last resort that, limited both qualitatively and quantitatively, intends to prevent a more serious incident than the one that provokes the reaction by the State.[52] Within this context that is characterized by its exceptionalism, both the Commission and the Inter-American Court of Human Rights, have agreed that for the use of force to be justified the principles of legality – absolute necessity and proportionality – must be satisfied. Likewise, police agents organized in the context of protests must be oriented toward, as a rule, the guarantee of exercise of the right to social protest and the protection of protesters and third-parties present. When a demonstration or a protest leads to situations of violence, the interpretation must be that the State was incapable of guaranteeing the exercise of this right.[53]

45.      Furthermore, regarding incitement to violence among civilians, the IACHR noted with concern the speech by the President of the Republic, Miguel Díaz-Canel Bermúdez, on July 12, 2021, in which he incites the civilian population to act, even with violence, against the demonstrators, whom he called "counter-revolutionaries".[54] In that speech, Díaz-Canel said: "There are many of us revolutionaries in this population that are willing to give our lives, and not under orders but rather by conviction. They'll have to step over our dead bodies if they wish to take on the Revolution, and we are willing to do anything and we will be fighting in the streets". In that same vein, the Head of State concluded: "This is why we are calling on all revolutionaries in our country, on all communists, to take to the streets anywhere these provocations are going to take place today, whether now or the coming days."[55] Additionally, the Cubalex organization reported that young Cubans of

---

[49] Prisoners Defenders, Organisations and independent medial call on the Cuban government to respect the right to demonstrate and freedom of expression and to stop violence against demonstrators, July 13, 2021.

[50] BBC News Mundo, Protestas en Cuba: el gobierno confirma un muerto en nuevos disturbios a las afueras de La Habana, July 13, 2021.

[51] Cubadebate, Ministerio del Interior informa sobre hechos vandálicos en La Güinera, July 13, 2021.

[52] IACHR, Report on the situation of Human Rights Defenders in the Americas, OEA/Ser.L/V/II.124.  Doc. 5 rev.1, March 7, 2006, para. 64.

[53] IACHR, Annual Report 2015 Chapter IV.A The Use of Force, paras. 7 and 68.

[54] Granma, A la Revolución la defendemos ante todo, July 12, 2021.

[55] Granma, A la Revolución la defendemos ante todo, July 12, 2021.

Cuba AR_001499



military-draft age (16 to 20 years of age) are being enlisted to repress demonstrators in the context of the protests.[56]

46.      Additionally, the Commission notes that the response by the State has also included dissemination of propaganda and stigmatization campaigns. Since the protests began, information has been disseminated in which the demands of the protests are rebuked, while excluding any information about police repression and accusing those who protest of being "criminals", "vandals", "mercenaries", and "enemies of the State". The Commission also noted the statements by the Minister of the Interior and the office of the Attorney General of the Republic indicating that individuals who participated in the protests could face summary trials within 96 hours.[57] The IACHR also received reports of attacks, acts of intimidation, threats, and campaigns to discredit political dissidents of the regime, journalists, young demonstrators, social leaders, and human rights defenders.

47.      Regarding this, the Commission reminds that social protest is a manifestation of the joint exercise of the rights to assemble and freedom of expression, as well as being a mechanism for political participation and for defending human rights, thus encompassing a fundamental social interest in guaranteeing the functioning of the democratic system and human rights defense.[58] Thus, in line with the jurisprudence of the Inter-American Court, the IACHR indicates that public demonstrations and other forms of protest against government policies and/or the defense of basic liberties, far from being a provocation of public disorder, are part of any pluralist democracy and deserve maximum protection.[59]

48.      The Commission also notes that the repetition of stigmatizing statements can exacerbate the climate of hostility and intolerance of some sectors of the population, which could jeopardize the life and personal integrity of, for example, human rights defenders. This is because, pursuant to the ruling of the Inter-American Court of Human Rights, official addresses could provoke, suggest actions, or be interpreted by public servants or by sectors of society as instructions, instigations, authorizations, or support in the commission of acts.[60]

49.      In parallel, the IACHR notes the intensification of threats, verbal attacks, and aggressions against journalists and those working for the independent media, aimed at silencing them. About this, the Office of the Special Rapporteur for Freedom of Expression (SRFOE) has received reports that the photojournalist for the agency *AP Noticias*, Ramón Espinosa, was assaulted by police agents while covering the demonstration in Havana. Another cameraman working for the same agency was allegedly assaulted by a group of pro-Government citizens.[61]

50.      The Special Rapporteur for Freedom of Expression also received reports of numerous detentions of journalists from media outlets like *Cubanet*, *Tremenda Nota*, *Palenque Visión*, *ADN Cuba*, and *La*

---

[56] Cubalex, El gobierno cubano obliga a jóvenes a sumarse a los grupos de represión, July 13, 2021.

[57] Hacemos Cuba, EN VIVO | Edición especial del programa Hacemos Cuba, July, 12 2021; Diario de Cuba, La Fiscalía de Cuba y el MININT anuncian juicios rápidos para los manifestantes y condenas de hasta 20 años, July 15, 2021.

[58] IACHR, Second Report on the Situation of Human Rights Defenders in the Americas, 2011, para 106; IACHR, Annual Report 2005. Volumen III. Report of the Office of the Special Rapporteur for Freedom of Expression, Chapter V: Public Demonstrations as an exercise of Freedom of Expression and Freedom of Assembly, para 91; and IACHR Annual Report 2015, Chapter IV.A The Use of Force, para. 64 and following.

[59] I/A Court H.R., Case of López Lone et al. v. Honduras. Preliminary Objection, Merits, Reparations and Costs. Judgment of October 5, 2015. Series C No. 302, para. 160.

[60] I/A Court H.R., Case of Ríos et al. v. Venezuela. Preliminary Objections, Merits, Reparations, and Costs. Judgment of January 28, 2009. Series C No. 194, para. 143.

[61] Twitter Agence France-Presse (@AFPespanol). July 11, 2021; Diario de Cuba, July 12, 2021. Grupos prorrégimen hieren a un corresponsal de AP durante la represión de las protestas en La Habana.

Cuba AR_001500



*Hora de Cuba*; and about police agents that blocked several reporters from leaving their homes.[62] The SRFOE also documented the case of journalist Camila Acosta, a female reporter for *Cubanet* and correspondent for the Spanish daily, *ABC*, who was detained on July 12 as she was leaving her home in Havana to run a personal errand with her father.[63] According to the information received, on this occasion, security agents showed up and searched her home, taking with them equipment she used in her work, including her personal computer.[64]

51.     In addition to the foregoing, in the days following the protest, the Commission received complaints of actions by the police and other actors tied to the Cuban government to surveil and monitor residences, creating an environment of fear and self-censorship in the country. According to reports from civil society, in the days following July 11, the homes of activists whose work is well-known, and the homes of their families, were allegedly surveilled by police. Regarding this, the Special Rapporteur for Freedom of Expression received reports indicating that family members of protest participants have chosen not to question the authorities, file complaints, or publicly expose those cases for fear that this could put their lives or personal integrity at risk.[65]

52.     Given these initial responses by the State to the July 11 protest, the Commission noted the beginning of a new wave of repression by the State of Cuba to silence social movements by political opponents and social dissent by using coordinated strategies to delegitimize the social actors involved and to stop their movements through threats of retaliation.

53.     In light of this situation, the IACHR reiterates its condemnation of these repressive actions and the excessive use of force that has been reported, and it calls on authorities to investigate the alleged facts with due diligence. Likewise, the Commission urges the State to channel social discontent through dialogue and active listening to citizen complaints and to take the measures necessary to satisfy them.

**ii.     Arbitrary detentions, mistreatment, and deplorable detention conditions**

54.     The Commission has also monitored the widespread, illegal, and arbitrary detentions that have occurred in Cuba in the context of the social protests that started on July 11, which have reached alarming numbers. Additionally, the IACHR has followed detention conditions experienced by persons who have been deprived of liberty in this scenario.

55.     Specifically, in the case of the recent protest-related detentions, the Commission has been following the number of persons detained, the circumstances of the detentions, the persons who remain deprived of liberty, and the detentions of adolescents. It has also highlighted the lack of official information about these issues. According to *Cubalex y Justicia* 11J of y Justicia 11J on December 9th, the number of persons who have been deprived of liberty in the context of the protests is 1314[66]. Regarding this, the IACHR has noted that a significant number of those detained are activists, artists, journalists, male and female leaders of political

---

[62] La Nación. July 13, 2021. *Protestas en Cuba: denuncian que comenzaron los arrestos de periodistas para impedir que informen*; VOA. July 19, 2021. *Cuba detiene e interroga a decenas de periodistas por las cobertura de las protestas*.

[63] Europa Press. July 12, 2021. *Detenida Camila Acosta, la corresponsal de ABC en Cuba*; Infobae. July 12, 2021. *La dictadura cubana detuvo a la corresponsal del diario español ABC*.

[64] Infobae. July 17, 2021. *El testimonio de Camila Acosta, la periodista que estuvo presa en las celdas de la dictadura cubana: "Dios me puso ahí para contar lo que sucede"*; ABC. July 14, 2021. *La corresponsal de ABC en Cuba, Camila Acosta, será procesada por «delitos contra la seguridad del Estado»*.

[65] IACHR-RFOE, Press Release No. R189/21 - The Office of the Special Rapporteur expresses concern over the reports of serious human rights violations in the context of the protests in Cuba, July 23, 2021.

[66] Information was provided by the Cubalex organization and the Working Group on Political Prisoners, Justicia 11J, on December 9, 2021.



movements that oppose the government, teachers, students, medical personnel, professors, and clergy of several religious denominations.[67]

56.     As for the circumstances that produced these detentions, they took place while the protests were underway or at the homes [of persons who participated] during the days following the protests after they were identified from videos posted on social media.[68] Regarding those individuals who remain in detention, based on data from Cubalex and Justicia 11J de on December 9th, 699 persons were still detained because of their participation in or support of the July 11 protests[69].

57.     Based on the foregoing, the Commission reiterates that, pursuant to what is set forth in its report on Protest and Human Rights, no person who participates in social protests may be subjected to arbitrary detention or imprisonment. Likewise, in the context of social protests, States must refrain from engaging in practices of widespread, collective, or indiscriminate detention or imprisonment.[70] Likewise, the IACHR recalls that, in the context of protests, States must adjust domestic legislation and institutional procedures and practices to prevent, and when it occurs to investigate and punish, cases of arbitrary detention by State agents.[71] This must include, among other obligations, establishing that the liberty of any person may only be deprived in circumstances that are explicitly established by Law.[72]

58.     Likewise, according to information from Cubalex and Justicia 11J as of December 9, at least 44 adolescents have been detained in the context of the protests, of which 14 continue to be deprived of their liberty[73].  In this regard, the Commission recalls that the detention of adolescents is a measure that must be used as a last resort, only exceptionally, and for the shortest period possible.[74] The States have the duty to take necessary measures to reduce to a minimum the contact between adolescents and the criminal justice systems, as well as to limit the use of deprivation of liberty, whether as a preventive or as punishment.[75]

59.     Furthermore, the IACHR has noted with concern the absence of data about detained persons. In particular, the Commission learned that detained persons were being held incommunicado and their whereabouts are unknown to their families.[76] Further, to this date the State has not yet provided information

---

[67] See IACHR Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021; and IACHR-RFOE, Press Release No. R189/21 - The Office of the Special Rapporteur expresses concern over the reports of serious human rights violations in the context of the protests in Cuba, July 23, 2021. About arrest and detention of journalists, see: IACHR, Press Release No. 177/21 - The IACHR and Its Special Rapporteurships Condemn State Repression and the Use of Force during Peaceful Social Protests in Cuba, and Call for Dialogue on Citizen Demands, July 15, 2021.

[68] Prisoners Defenders, Tenebrous balance of 11j in Cuba: more than 5000 arbitrary arrested, 381 convicts and condemned, September 2, 2021.

[69] Information was provided by the Cubalex organization and the Working Group on Political Prisoners, Justicia 11J, on December 9, 2021.

[70] IACHR-RFOE, Protest and Human Rights: Standards on the rights involved in social protest and the obligations to guide the response of the State, OEA/Ser.L/V/II CIDH/RELE/INF.22/19, Septiembre 2019, para. 138.

[71] IACHR-RFOE, Protest and Human Rights: Standards on the rights involved in social protest and the obligations to guide the response of the State, OEA/Ser.L/V/II CIDH/RELE/INF.22/19, Septiembre 2019, para. 140.

[72] IACHR-RFOE, Protest and Human Rights: Standards on the rights involved in social protest and the obligations to guide the response of the State, OEA/Ser.L/V/II CIDH/RELE/INF.22/19, Septiembre 2019, para. 140.

[73] Information was provided by the Cubalex organization and the Working Group on Political Prisoners, Justicia 11J, on December 9, 2021.

[74] IACHR Juvenile Justice and Human Rights in the Americas, OEA/Ser.L/V/II. Doc. 78, July 13,  2011, para. 80.

[75] IACHR Juvenile Justice and Human Rights in the Americas, OEA/Ser.L/V/II. Doc. 78, July 13, 2011, para. 80.

[76] IACHR Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021.

Cuba AR_001502



about the number of persons detained in the context of the protests, nor has it provided official information about any whose whereabouts are unknown.[77]

60.      Regarding the foregoing, the Commission reminds the State of Cuba that persons who have been deprived of liberty and their families have the right to receive accurate information about the grounds for detention and the location where the person is being held.[78] Additionally, the States have the obligation to transmit this data and to set up a public registry of detained persons.[79]

61.      The IACHR has also monitored the conditions under which individuals detained in the context of the protests are serving time in custody. In particular, the Commission and its Office of the Special Rapporteur on Economic, Social, Cultural and Environmental Rights (REDESCA in Spanish) have received information indicating that individuals being held in custody are experiencing deplorable detention conditions and are victims of mistreatment.[80] Based on available data, the Commission notes that detention conditions are characterized by: i) high levels overcrowding; ii) lack of access to adequate drinking water and food; iii) employment of isolation methods; and iv) cells that have structural defects.[81] In the context of the Covid-19 pandemic, the Commission advises that overcrowding and the lack of access to water could increase the risk of contagion among persons who are in custody.

62.      Based on the foregoing, the Commission recalls that overcrowding of individuals being held in custody can itself be a form of cruel, inhumane, or degrading treatment that violates the right to personal integrity and other human rights.[82] Consequently, when a penitentiary system or facility is overcrowded to the point that it becomes materially impossible to provide decent conditions to inmates, it is unreasonable for the State to continue to place individuals in those spaces, because doing so deliberately subjects them to a situation in which their basic rights are violated.[83] Add to this, it is the duty of States to ensure that persons deprived of liberty are given conditions in detention that are compatible with their human dignity. These include access to safe drinking water and food that is sufficient and of quality.[84] Lastly, the Commission reiterates the duty of States to adopt immediate and urgent measures to protect the life, health, and integrity of persons held in custody during the pandemic.[85] This includes outfitting detention conditions in a way that prevents contagion

[77] See IACHR Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021. See also Press Release No. R189/21 - The Office of the Special Rapporteur expresses concern over the reports of serious human rights violations in the context of the protests in Cuba, July 23, 2021.

[78] IACHR-RFOE, Protest and Human Rights: Standards on the rights involved in social protest and the obligations to guide the response of the State, OEA/Ser.L/V/II CIDH/RELE/INF.22/19, Septiembre 2019, para. 231.

[79] IACHR-RFOE, Protest and Human Rights: Standards on the rights involved in social protest and the obligations to guide the response of the State, OEA/Ser.L/V/II CIDH/RELE/INF.22/19, Septiembre 2019, para. 231 and 140.

[80] IACHR Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021.

[81] IACHR Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021; Information provided to the IACHR during a meeting with Amnesty International, August 26, 2021; and Prisoners Defenders, Tenebrous balance of 11j in Cuba: more than 5000 arbitrary arrested, 381 convicts and condemned, September 2, 2021.

[82] IACHR, Report on the Use of Pretrial Detention in the Americas, para. 290.

[83] IACHR, Report on the Use of Pretrial Detention in the Americas, para. 290.

[84] IACHR Report on the Human Rights of Persons Deprived of Liberty in the Americas, OEA/Ser.L/V/II Doc 64, adopted on December 31, 2011, para. 432.

[85] IACHR, Resolution No. 01/2020 Pandemic and Human Rights in the Americas, adopted on April 10, 2020, Operative Part: Persons Deprived of Liberty, para. 45 to 48.

Cuba AR_001503



and, regarding vaccines, creating conditions of true equality for groups that have historically seen their rights violated, prison populations being one such group.[86]

63.　　　Regarding the mistreatment of detained persons, the IACHR was made aware that individuals who participated in the protests have been the targets of torture and cruel and inhumane treatment.[87] This includes beatings, abuse, acts of violence, and being held in patrol vehicles or made to stand in direct sunlight for several hours at a time.[88] In particular, according to data from civil society, many of the persons detained in the context of the protests have been victims of beatings, indignities, and insults.[89] Furthermore, according to publicly available information, detained women, including teenagers, have been victims of forced nudity and have been forced to squat to show they are not hiding anything.[90] Regarding this, the Commission reiterates its condemnation of all forms of cruel, inhumane, and degrading treatment, and reminds that it is absolutely prohibited in any circumstance.[91] Likewise, it reminds that the State has an inalienable responsibility to prevent these acts and in every instance to condemn and punish all material and intellectual perpetrators.[92]

64.　　　Regarding women deprived of liberty, the IACHR reiterates that, under the control of State authorities, they are at increased risk of suffering various forms of violence, harassment, and hostilities, including sexually.[93] Thus, to prevent and combat these types of acts against detained women, the IACHR recalls that a gender perspective means taking into account this specific risk in all its manifestations, as well as those risks that are specific to women belonging to groups that have historically been objects of discrimination.[94] Therefore, the Commission calls on the State of Cuba to adopt concrete measures with due diligence, to prevent and combat torture of women deprived of liberty.

---

[86] IACHR, Resolution No. 01/2021 Covid-19 vaccines and Inter-American Human Rights Obligations, approved on April 6, 2021, Operative Part, para. 1 and 4.

[87] IACHR Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021. In this regard, information provided to the IACHR by Race & Equality during a meeting held with civil society, August 4, 2021.

[88] IACHR Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021; and information provided to the IACHR by Race & Equality during a meeting held with civil society, August 4, 2021.

[89] Prisoners Defenders, Tenebrous balance of 11j in Cuba: more than 5000 arbitrary arrested, 381 convicts and condemned, September 2, 2021.

[90] ADN Cuba, Adolescente cubana en prisión: "Me tuve que quitar el short y el blúmer", July 28, 2021; and Diario de Cuba, El régimen se ensaña con las cubanas presas y con sus hijos, e ignora las reglas de la ONU, September 17, 2021.

[91] IACHR Report on the Human Rights of Persons Deprived of Liberty in the Americas, para. 343.

[92] IACHR Report on the Human Rights of Persons Deprived of Liberty in the Americas, para. 350.

[93] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, para. 195.

[94] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, para. 199.

Cuba AR_001504



ANNUAL REPORT 2021

65.     The graph below[95] shows the number of people that have been detained because of the protests, as well as the number of persons who remain in custody.



[Translation of graph: (blue) Total detainees, (green) Remain in detention]

### ii.     Criminal charges against demonstrators, judicial persecution, and due process violations

66.     About 10 days after the protests, the Commission was made aware of the first prison sentences for some of the individuals arrested in the context of the protests. According to available information, after summary trials by way of direct testimony – an expedited procedure that moves from the police investigation phase directly to trial, without formal charges or pretrial proceedings[96], and in which cases most defendants had no legal counsel, 12 persons were sentenced to 10 months to one year in jail.[97] In particular, the IACHR noted the case of Anyelo Troya, one of the performers of the song, "*Patria y vida*" [Homeland and Life], which has become the anthem for demonstrators in Cuba because it plays on Fidel Castro's classic motto ("*Patria o muerte*" [Homeland or Death]. According to publicly available information, Anyelo's summary trial took place

---

[95] Graphic based on information provided by Cubalex on October 29, 2021 and December 9, 2021.

[96] Prisoners Defenders, Direct Attestation: This is how peaceful demonstrators are being judged in Cuba, July 17, 2021.

[97] BBC News, Protestas en Cuba: dictan penas de prisión para 12 detenidos en las recientes manifestaciones en la isla, July 22, 2021.

Cuba AR_001505



on July 19, 2021, using the legal construct of direct testimony, disregarding the guarantees of legal due process, including the right to a technical defense through the assistance of counsel.[98]

67.      Later, four months after the July 11 protests, the IACHR noted a third wave of repression in Cuba, which primarily took the form of legal proceedings that sought criminal charges and punishment for those who participated in the protests and resulted in the Office of the Prosecutor seeking stiffer sentences.

68.      In this regard, in the context of the hearing on the "Human rights situation in the context of the protests in Cuba", held on October 21, civil society organizations indicated that those legal proceedings are characterized by violations of judicial guarantees, such as: holding detainees incommunicado; interrogations that aim to intimidate; and not allowing adequate legal defense.[99]

69.      Regarding criminal charges issued against protest participants, the IACHR noted that the State of Cuba has taken actions aimed at charging these individuals with crimes by using non-specific crimes. According to available information, they have charged people with crimes such as: public disorder, acts of opposition, contempt, incitement to commit crime, propagation of epidemics, sedition, illegal demonstrations,

---

[98] Cubalex, Valoración de Cubalex sobre el caso de Anyelo Troya, realizador condenado a un año de cárcel, July 23, 2021; Diario de Cuba, Anyelo Troya, uno de los realizadores de 'Patria y Vida', condenado a un año de prisión en un juicio sumario, July 21, 2021.

[99] IACHR, Hearing: Human rights situation in the context of the protest in Cuba "Situación de los derechos humanos en el contexto de la protesta en Cuba", 181 period of sessions virtual, October 21, 2021.

Cuba AR_001506



ANNUAL REPORT **2021**

---

damage and defamation against institutions and organizations and against heroes and martyrs. The graph below[100] shows the main charges applied and their proportionality:



Legend:
- Desorden público
- Atentado
- Desacato
- Instigación a delinquir
- Propagación de epidemias
- Sedición
- Difamación de las instituciones y organizaciones y de los héroes y mártires

[Translation of graph legend:
- public disorder
- acts of opposition [attempted]
- contempt
- incitement to commit crime
- propagation of epidemics
- sedition
- defamation of institutes and organization and of heroes and martyrs]

70.      Additionally, regarding procedural violations, the IACHR identified a systematic pattern of due process violations in the context of deprivation of liberty of persons who participated in the protests, including among others: individuals in custody being held incommunicado, interrogations that aim to intimidate, no

---

[100] Graphic based on information provided by Cubalex on October 29, 2021. Data includes persons in detention and imprisoned who have been able to obtain information about the charges against them in the pre-trial phase. Most have been charged for more than one crime.

Cuba AR_001507



notification of the legal grounds for detention, lack of access or obstacles to access to timely and adequate technical legal defense.

71.     Specifically, in a press release on November 5, the IACHR expressed its concern about reports that detainees are held incommunicado for weeks, and that they are given limited opportunities to communicate with their families and legal counsel. At the time, the IACHR called attention to dissident leaders who are being deprived of liberty are being held incommunicado or having their communications restricted, among whom are José Daniel Ferrer García, leader of *Unión Patriótica de Cuba* (UNPACU); Félix Navarro, president of the Party for Democracy, and Luis Manuel Otero Alcántara, member of San Isidro Movement.[101]

72.     Likewise, according to information available to the Commission, most of the detainees were subjected to interrogations that aimed at intimidation and they did not have adequate legal counsel. In this regard, the IACHR received information that these individuals have been interrogated without knowing the motive or whether the interrogations were related to a criminal investigation. Nor have they been informed of their right to remain silent and their right to the assistance of counsel. Specifically, in the context of these interrogations the IACHR has received reports of threats and acts of intimidation by police and State security agents seeking to obtain information about the protests, about alleged organizers, and financial backers.

73.     Additionally, according to the Human Rights Watch report of October 19, 2021, detainees were held for several days without knowing the grounds for their arrest, and their families and defense counsel rarely had access to the criminal files or copies of the sentences. Add to this, according to the report, many people were tried as a group, without segregation of cases, mostly in closed-door hearings at which the only evidence presented was the testimony of State security agents[102].

74.     On the other hand, according to data from the organization Cubalex and Justice 11J of December 9, of the almost 700 people who would still be in detention, 631 would be under preventive detention; of these, 348 people would have their cases under investigation, pending formal charges by the prosecution before the judicial bodies; and 283 would have been formally charged of crimes and their trials are in the oral trial phase[103]. Of this last group, the Prosecutor's Office would have requested prison sentences that vary between 1 and 30 years in prison.

75.     In particular, on November 9 the Commission learned of the case of Yosvany Rosell García Caso, who was charged with sedition by the Office of the Prosecutor that seeks a 30-year prison sentence for supposedly having convened a protest in her neighborhood on July 10, due to a lack of electricity and, on the following day, having participated in the mass protests of July 11.[104] The IACHR notes that this is the stiffest sentence being sought for the July 11 protesters and it expresses its deep concern about use of the crime of "sedition", one of the most serious crimes in the Cuban Criminal Code, as a means to punish those who participated in the peaceful protests of July 11.

76.     Finally, on December 9, the IACHR received updated information from civil society regarding the total number of people convicted in court for their participation in the protests. According to these data, 83

---

[101] IACHR, Press Release No. 295/21 - IACHR Concerned About Tougher Repression and Human Rights Violations in Cuba Since the Protests that Took Place in July, November 5, 2021.

[102] Human Rights Watch, Cuba: Peaceful Protesters Systematically Detained, Abused Arbitrary Detention, Ill-Treatment, Abusive Trials Affect Hundreds, October 19, 2021.

[103] Information was provided by the Cubalex organization and the Working Group on Political Prisoners, Justicia 11J, on December 9, 2021.

[104] *Diario de Cuba*, Obrero y padre de tres hijos, otro cubano que se enfrenta a 30 años de cárcel por las protestas del 11J, November 9, 2021; *Periódico cubano*, Soldado de Holguín enfrentaría una condena de 30 años por participar en las protestas del 11J, November 8, 2021.

Cuba AR_001508



people would have been tried, of which 64 would have been sanctioned with the deprivation of liberty, 18 with alternative work sanctions without internment or limitation of freedom, and one person would have had the benefit of parole revoked[105].

77.     Considering these facts, the IACHR reinforces its earlier pronouncements, calling on the State to adopt all necessary measures to prevent the use of state investigations to subject those who legitimately demanded their rights through social protest to unfair or groundless trials. This includes ensuring the guarantees of due process to all who were detained or charged in the context of the protests, pursuant to Inter-American standards.

### iv) Shutting down democratic spaces through repressive and intimidating strategies aimed at discouraging new social demonstrations

78.     In November 2021, a new wave of repressive actions by the state was identified in Cuba, which sought to impede new demonstrations in the country. The Commission has received reports about the continuation of arbitrary arrests and detentions, criminal charges, and judicial persecution of dissidents, activists, independent journalists, and human rights defenders, along with an increase in acts of harassment and repudiation against individuals who were trying to organize new protests in the country. All of this is part of a strategy of the State to silence, intimidate, and criminally charge any voice that is contrary to the government position.

79.     Specifically, the Commission and its Special Rapporteur for the Freedom of Expression have monitored the repercussions of the civil march that was scheduled for November 15, in Cuba. According to publicly available information, members of the *Archipiélago* platform and of other civil society groups requested authorization from the competent authorities to conduct a peaceful march against violence, calling for respect for human rights and for the liberation of political prisoners in the country. Nevertheless, the Cuban authorities denied the request, considering it illegitimate and illegal.

80.     Likewise, as indicated in the press release of November 29, the Commission noted that the Office of the Attorney General of the Republic had warned organizers that, if they insisted on the protest, they would be charged with several crimes, including disobedience, illegal demonstrations, and incitement to commit a crime. Additionally, the IACHR received information about various repressive and intimidating acts on November 12 and 15. These include: house arrest with police surveillance, arbitrary detentions, acts of repudiation and harassment against the organizers and any who supported the demonstration, summonses and interrogations at police stations, threats of criminal charges, and deliberate internet service outages.[106]

81.     Additionally, according to information received by the Special Rapporteur for the Freedom of Expression, journalists from several independent media outlets, such as *14yMedio*, *ADN Cuba*, and *La Hora de Cuba* received summonses for interrogations by the police in the preceding days. In this regard, the Special Rapporteur underscored the persistent siege by State security agents at the residences of reporters who actively report on matters of public interest and who question the government. Specifically, it learned that the International Press Center of Cuba withdrew the credentials of five correspondents from the *Agencia EFE* in

---

[105] Information was provided by the Cubalex organization and the Working Group on Political Prisoners, Justicia 11J, on December 9, 2021.

[106] IACHR, Press Release No. 317/21 - IACHR and Its Special Rapporteurship for Freedom of Expression Concerned About State Repression that Prevented Civic Rally in Cuba on November 15, November 29, 2021.

Cuba AR_001509



Havana, two of which were returned hours later. The news agency called this an unprecedented measure against the international press working on the island.[107]

82.    Lastly, the IACHR and SRFOE noted the departure into exile of Yunior García, on November 17, who had been one of the leaders of the *Archipiélago* Platform and one of the promoters of the civil demonstration. According to available information, his departure from the country was driven by threats, house arrest, and acts of harassment against him and his family.

### D.    Topics of special concern and priority groups for the IACHR

### 1.    Freedom of expression

83.    The facts documented by the Rapporteur in 2021 reaffirm the premise that no guarantees currently exist for exercising freedom of expression in Cuba, as was stated in the previous report by this Office. Although the forms of harassment of independent journalists, artists, activists, and any who question official voices are not new, the Rapporteur notes that they are worsening quickly. The reports received from civil society in the context of the protests that began on July 11 are serious and include arbitrary arrests and detentions, holding detainees incommunicado, the use of general crimes to charge individuals who participate in the protests, the employment of summary judgments that do not respect minimal legal due process guarantees, and statements by authorities that seek to stigmatize demonstrators. From what this Office has been able to ascertain, one frequent strategy used by the State to silence critical voices has been internet service disruption, particularly in the context of social unrest.

84.    The context of persecution of the independent press reported by this Office in its previous annual report continued to worsen in 2021. As was indicated in the special report about freedom of expression in Cuba, repression by Cuban authorities against independent journalists is a systematic practice that has existed for a long time. It involves threatening acts, summonses, and interrogations that aim to intimidate; irregular and/or arbitrary arrests and detentions; searches and seizures of journalism equipment and other assets; disrupting internet service; blocking exit and other restrictions to the freedom to circulate; pressure and threats against families and social circles; and other censorship strategies.

85.    In February 2021, journalists and directors of the Cuban Institute for Freedom of Expression and the Press (ICLEP), a Cuban organization that publishes seven free newspapers in the country, suffered constant interrogations and threats by the State's Department of Security. For example, on February 5 the Rapporteur recorded the arrest of Alberto Corzo, the organization's executive director, who was held for more than 24 hours in the province of Matanzas.[108] According to available information, he was interrogated about the work, financing, and editorial policies of ICLEP, specifically related to coverage given to the complaints and activities of the San Isidro Movement (MSI).[109] On that same day, in Havana, Juan Manuel Moreno Borrego was arrested. Borrego is a journalist for *Amanecer Habanero*, one of ICLEP's community media outlets. He was threatened for having published a series of interviews of MSI members.[110] On February 6, the director of training for ICLEP, Pedro Luis Hernández, was detained and threatened both physically and verbally in the

---

[107] IACHR, Press Release No. 317/21 - IACHR and Its Special Rapporteurship for Freedom of Expression Concerned About State Repression that Prevented Civic Rally in Cuba on November 15, November 29, 2021.

[108] Voces del Sur. February 6, 2021. *Régimen cubano mantiene en paradero desconocido al periodista y director ejecutivo del ICLEP Alberto Corzo*; Cubanet. February 8, 2021. *Cuba: Reprimen a varios directivos del ICLEP en operativo nacional*.

[109] ICLEP. February 8, 2021. *Policía Política despliega un operativo nacional para reprimir a directivos del ICLEP*; CPJ. March 5, 2021. *El personal de la organización cubana defensora de la libertad de prensa ICLEP pierde el servicio de Internet y teme ser objeto de interrupciones selectivas*.

[110] ICLEP. February 8, 2021. *Policía Política despliega un operativo nacional para reprimir a directivos del ICLEP*; Cubanet. February 8, 2021. *Cuba: Reprimen a varios directivos del ICLEP en operativo nacional*.

Cuba AR_001510



**ANNUAL REPORT 2021**

province of Sancti Spíritus, by officers of the political police, who warned him that "ICLEP's days are numbered."[111]

86.     Furthermore, in this context, police forces targeted the facilities of the newspaper, *Páginas Villareñas*, which was placed under siege. The telephones of the directors of the following media outlets were blocked intermittently:  *Cocodrilo Callejero, Cimarrón de Mayabeque, El Majadero de Artemisa, Panorama Pinareño, Páginas Villareñas,* and *El Espirituano*. All of these belong to ICLEP.[112] On February 16, according to information received, the journalist Carlos Torres Fleites, of *Páginas Villareñas*, was threatened with prison and death.[113] At least 42 journalists, members of ICLEP, reported outages in both their internet and cell phone service, and irregularities with their personal computers' network connections, according to information received by the Office of the Special Rapporteur.[114]

87.     Among other strategies the government has deployed to restrict journalistic work by media belonging to ICLEP, this Office became aware of the detentions, by agents of the National Revolutionary Police (PNR) and the political police, of the *Páginas Villareñas* reporters, Yoandy Cuéllar, Yunier Pérez, Leticia Torres, Raíza López, Juan Carlos Gutiérrez, and Michel González, on March 14 and 15, 2021.[115] These journalists were released on the same day, following interrogation. Furthermore, in this same context the Police searched the newspaper's headquarters, located in the province of Santa Clara, and confiscated two printers, two laptop computers, four mobile telephones, a tablet, four USB memory sticks, paper, and ink, according to a communiqué from ICLEP.[116] As a result of having their work equipment confiscated, the media outlet's ability to publish the newspaper was seriously affected over the following weeks.[117] *Páginas Villareñas* is a biweekly and free local tabloid that is produced, printed, and distributed in the city of Santa Clara.

88.     On March 18, 2021, the Special Rapporteur recorded with concern the complaint about Cuban authorities having blocked journalist Karla Pérez from entering the country, supposedly because they considered that she was returning to Cuba with "subversive purposes", according to an announcement by the government of Havana.[118] The journalist received permission to fly back to Costa Rica, where she petitioned refugee status, which was ultimately granted to her in August.[119] According to publicly available information, Karla Pérez, 22, was in Costa Rica to study journalism after having been expelled in 2017 from the university

[111] ICLEP. February 8, 2021. *Policía Política despliega un operativo nacional para reprimir a directivos del ICLEP*.

[112] ICLEP. February 8, 2021. *Policía Política despliega un operativo nacional para reprimir a directivos del ICLEP*; Cubanet. February 8, 2021. *Cuba: Reprimen a varios directivos del ICLEP en operativo nacional*.

[113] ICLEP. February 15, 2021. *Policía Política cubana amenaza de muerte al periodista Carlos Torres Fleites*; Voces del Sur. February 15, 2021. *Policía Política cubana amenaza de muerte al periodista Carlos Torres Fleites*.

[114] CPJ. March 5, 2021. *El personal de la organización cubana defensora de la libertad de prensa ICLEP pierde el servicio de Internet y teme ser objeto de interrupciones selectivas*; Diario Las Américas. March 1, 2021. *Régimen cubano espía e interrumpe comunicaciones del ICLEP*; Radio Televisión Martí. *ICLEP denuncia que ETECSA vigila y corta la comunicación entre sus periodistas y directivos*.

[115] Radio Televisión Martí. March 16, 2021. *Detienen y amenazan en Santa Clara a seis periodistas del ICLEP*; CPJ. March 18, 2021. *La Policía cubana allana el periódico Páginas Villareñas, confisca equipos de trabajo y hostiga al personal*.

[116] ICLEP. March 16, 2021. *Represión del régimen cubano obliga al ICLEP a cerrar uno de sus medios de comunicación comunitarios*; Radio Televisión Martí. March 16, 2021. *Detienen y amenazan en Santa Clara a seis periodistas del ICLEP*; CPJ. March 18, 2021. *La Policía cubana allana el periódico Páginas Villareñas, confisca equipos de trabajo y hostiga al personal*.

[117] ICLEP. March 16, 2021. *Represión del régimen cubano obliga al ICLEP a cerrar uno de sus medios de comunicación comunitarios*; CPJ. March 18, 2021. *La Policía cubana allana el periódico Páginas Villareñas, confisca equipos de trabajo y hostiga al personal*; Voz de América. April 24, 2021. *Redadas, multas y detenciones para bloquear la prensa independiente en Cuba*.

[118] El Mundo CR. March 18, 2021. *Impiden ingreso a Cuba de la periodista Karla Pérez González y queda varada en Panamá*; Deutsche Welle (DW). March 19, 2021. *Cuba alega "propósitos subversivos" para vetar el regreso de joven periodista a su país*; Infobae. March 18, 2021. *La periodista cubana está varada en Panamá con prohibición de regresar a su país*

[119] Swiss Info. March 19, 2021. *Periodista solicita refugio en Costa Rica tras impedimento de regresar a Cuba*; Cubanet. August 9, 2021. *Costa Rica concede refugio político a la periodista cubana Karla Pérez González*; France 24. August 11, 2021. *Costa Rica concede refugio a periodista cubana impedida de volver a la isla*.

Cuba AR_001511



ANNUAL REPORT **2021**

of Las Villas, in the Cuban province of Villa Clara, because she belonged to a political organization accused of being "counter-revolutionary", according to the information received by this Office.[120]

89.    Stigmatizing speech against the independent press in Cuba, promoted by government spheres, clearly has the potential to stir up violence against any who criticize official voices. In this context, the Special Rapporteur recorded with concern the complaint filed on May 23 by the journalist, Héctor Valdés Cocho, of *ADN Cuba*, regarding death threats he had received through social media, which were associated with his work as an independent reporter. From what the Rapporteur was able to learn, the threats also extended to his partner, family members, and persons close to him. Among other things, the message warned that his "piquetico" is the only one that is not in prison: "we have you there for a reason, for a reason that will not be very good for you."[121]

90.    Furthermore, in 2021 the Office continued to note the use of Decree-Law 370 about the digitalization of society in Cuba to impose fines on journalists that publish information or opinions that are contrary to official interests.[122]

91.    Another prevalent practice is for the police to establish a siege around the home of some reporters[123], as well as irregular detentions[124], intimidation[125], and internet outages.[126] One of the cases of concern the Office of the Rapporteur highlights is that of journalist Luz Escobar, of *14yMedio*, who was allegedly the target of a police siege. On January 27, in the context of a demonstration to celebrate the birth date of José Martí, and to recall the "27N" protest just two months earlier, Escobar was allegedly obligated to remain in her home for at least four days, by a State Security agent, who remained near her door.[127] Following the days of protest that began in Cuba on July 11, 2021, Escobar remained under house arrest for at least 17 days, with police officers at the door of her home.[128] Iliana Hernández, a reporter for *Cibercuba*, was also the target of

---

[120] Deutsche Welle (DW). March 19, 2021. *Cuba alega "propósitos subversivos" para vetar el regreso de joven periodista a su país*,

[121] Héctor Luis Valdés Cocho Twitter account (@HectorValdes_91). May 23, 2021; ADN Cuba. May 23, 2021. *Amenazan de muerte al activista Héctor Valdés, colaborador de ADN Cuba*; Radio Televisión Martí. May 24, 2021. *Periodista cubano recibe amenazas de muerte contra él y su familia: "No dejaré de decir la verdad"*.

[122] Cibercuba. March 17, 2021. *Multan a periodista independiente que grabó la protesta de un cuentapropista en Guantánamo*; Diario de Cuba. March 16, 2021. *El régimen vuelve a echar mano al Decreto-Ley 370 para evitar que la represión sea divulgada*; Cibercuba. September 14, 2021. *Multan por segunda vez al periodista cubano Emilio Almaguer mientras mostraba síntomas de coronavirus*; Radio Televisión Martí. February 17, 2021. *Buscaron ayuda para una persona con discapacidad y Seguridad del Estado los amenazó con Decreto 370 (VIDEO)*.

[123] Periódico Cubano. August 4, 2021. *La Seguridad del Estado mantiene una fuerte vigilancia contra la periodista Luz Escobar*; Diario de Cuba. June 4, 2021. *Prisión domiciliar, vigilancia y restricción de movimientos en Cuba: la ley para cercenar libertades individuales*; Voces del Sur. March 9, 2021. *Bajo arresto domiciliario sin orden judicial periodistas y activistas de derechos humanos*; Radio Televisión Martí. June 5, 2021. *Detienen a periodista Héctor Luis Valdés Cocho, su colega Iliana Hernández estuvo a punto de ser arrestada (VIDEO)*.

[124] Diario de Cuba. July 18, 2021. *La Seguridad del Estado detiene al periodista cubano Maykel González y lo amenaza con procesarlo por las protestas*; Periódico Cubano. March 12, 2021. *Detienen a la periodista cubana María Matienzo cuando salía a botar la basura*; CPJ. June 23, 2021. *El periodista cubano Lázaro Yuri Valle Roca ha estado detenido por la Policía desde el 15 de junio*.

[125] Cibercuba. June 30, 2021. *Seguridad del Estado amenaza a esposa de periodista independiente con retirarles la custodia de su hijo*; Cubanet. June 29, 2021. *La familia cubana: un instrumento en manos de la dictadura*; Cubanet. February 26, 2021. *Amenazan a reportero de CubaNet con multa de 15 000 pesos*; ADN Cuba. April 11, 2021. *Activistas y periodistas independientes, blancos de otro domingo de represión*; ADN Cuba. July 25, 2021. *Amenazan a otro periodista independiente con la cárcel*; Cibercuba. October 11, 2021. *Periodistas y activistas sitiados por la Seguridad del Estado por segundo día consecutivo*.

[126] See section B *infra* about internet and freedom of expression.

[127] IACHR. The Office of the Special Rapporteur for Freedom of Expression. February 5, 2021. Press Release R28/21. *The Office of the Special Rapporteur expresses concern about the persistent harassment against journalists, artists, and human rights defenders who exercise their freedom of expression in Cuba*; IPYS Venezuela. February 3, 2021. *Enero: 38 hechos violatorios a la libertad de prensa en Cuba | ICLEP*.

[128] Cibercuba. July 28, 2021. *Luz Escobar, 17 días sin poder salir de su casa: "Con la patrulla de la policía en la entrada del edificio"*; Deutsche Welle. August 6, 2021. *Prensa en alemán: arrestos en Cuba y fracaso del referéndum en México*.

ANNUAL REPORT **2021**



ongoing acts of harassment, from what this Office was able to ascertain. On April 8, she was arrested by State Security agents while walking in a public thoroughfare and, in the months that followed, was obligated to remain under house arrest without a court order or formal charges, confined by a police fence that surrounded her house and remained in place for several months.[129]

92.     In another case, Camila Acosta was allegedly violently detained by the Cuban political police while she was on her way to report on the January 27 protests in Havana.[130] Acosta, a reporter for *Cubanet* and correspondent for the Spanish daily, *ABC*, was on several occasions allegedly threatened with charges for the crimes of contempt and disobedience.[131] After being released she had to remain under house arrest without a court order for at least four days in a row.[132] She was also the target of harassment in the weeks following the start of the July protests.[133] She was detained on July 12 while leaving her home in Havana to run a personal errand with her father.[134] According to the information the Office of the Rapporteur received, on this occasion security agents showed up and conducted a search of her home, from which they took all of her job-related equipment, including her personal computer.[135] Like in other cases documented by the Rapporteur in the context of the protests, Acosta was charged with the crimes of contempt and public disorder.[136] After spending four days in prison being held incommunicado, she was placed under a house arrest regime, where she remained for at least ten days.[137] On July 27 she was once again detained for several hours by State security when she attempted to leave her home to ask police about alleged retaliations against her circle of friends and family.[138]

93.     On April 22, 2021, the IACHR resolved to grant precautionary measures on behalf of Joel Suárez Fernández, a journalist for the *Diario de Cuba*, after considering that he is in a situation of serious and urgent risk of irreparable harm to his rights in Cuba. Among the facts that motivated the resolution are several

---

[129] 14yMedio. April 8, 2021. *La reportera Iliana Hernández es detenida junto a unos amigos mientras caminaban por La Habana*; Radio Televisión Martí. July 20, 2021. *Iliana Hernández cumple 90 días de reclusión domiciliaria sin cargos ni juicio*; Human Rights Watch. June 30, 2021. *Cuba: Clampdown on Artists, Journalists  Arbitrary Detention, Restrictions on Movement, Communications*

[130] Cubanet. January 27, 2021. *Seguridad del Estado detiene a Camila Acosta durante transmisión en vivo*; ICLEP. January 27, 2021. *Periodistas y artistas son agredidos por el Ministro de Cultura de Cuba y arrestados por la Policía Política*.

[131] IPYS Venezuela. February 3, 2021. *Enero: 38 hechos violatorios a la libertad de prensa en Cuba | ICLEP*; Asociación Pro Libertad de Prensa (APLP). February 4, 2021. *Periodistas agredidos en Cuba (Enero 2021)*.

[132] Cubanet. January 28, 2021. *Periodista Camila Acosta: "Estoy bajo arresto domiciliario, sin orden judicial"*; IPYS Venezuela. February 3, 2021. *Enero: 38 hechos violatorios a la libertad de prensa en Cuba | ICLEP*.

[133] RSF Reporters Without Borders. August 13, 2021. *Cuba urged to free reporters under house arrest or jailed since a wave of protests a month ago*.

[134] Europa Press. July 12, 2021. *Detenida Camila Acosta, la corresponsal de ABC en Cuba*; Infobae. July 12, 2021. *La dictadura cubana detuvo a la corresponsal del diario español ABC*.

[135] Infobae. July 17, 2021. *El testimonio de Camila Acosta, la periodista que estuvo presa en las celdas de la dictadura cubana: "Dios me puso ahí para contar lo que sucede"*; ABC. July 14, 2021. *La corresponsal de ABC en Cuba, Camila Acosta, será procesada por «delitos contra la seguridad del Estado»*.

[136] Cubanet. July 13, 2021. *Modifican cargos contra Camila Acosta, acusada ahora de "desorden público"*; ABC. July 14, 2021. *Modifican los cargos contra la corresponsal de ABC en Cuba, Camila Acosta, a «desorden público» y «desacato»*.

[137] TN. July 17, 2021. *Interrogatorios, golpes y maltratos: la periodista Camila Acosta contó detalles de sus días en prisión en Cuba*; Infobae. July 17, 2021. *El testimonio de Camila Acosta, la periodista que estuvo presa en las celdas de la dictadura cubana: "Dios me puso ahí para contar lo que sucede"*.

[138] La Vanguardia. July 27, 2021. *Detenida de nuevo la periodista Camila Acosta en Cuba*; ABC. July 27, 2021. *Liberada la corresponsal de ABC en La Habana, Camila Acosta, tras ser detenida e interrogada durante horas*

Cuba AR_001513



ANNUAL REPORT 2021

police citations in which he allegedly was interrogated about his reporting on social media and threatened with prosecution and with consequences to his life and the lives of his family.[139]

94.    Additionally, on April 30, 2021, agents of the Revolutionary National Police and the political police arrested Mary Karla Ares, a reporter for the community newspaper, *Amanecer Habanero*, while she was giving live coverage of a demonstration in support of artist Luis Manuel Otero Alcántara, who at the time was on a hunger and thirst strike to decry the lack of civil liberties in Cuba. Mary Karla Ares was initially taken to a police station in the municipality of Playa, where she was charged for the alleged crime of public disorder and resisting [arrest]. Later, on May 27, she was taken to the Women's Prison of Occidente, located in the municipality of La Lisa.[140] After one month in prison, where she was allegedly held incommunicado and under cruel, inhuman, and degrading treatment, Mary Karla Ares was released on May 29, under a house arrest regime.[141] Of further concern to this Office is the case of journalist Esteban Rodríguez, contributor to *ADN Cuba*, who was detained at the same time as Mary Karla Ares and was charged with the same crimes.[142] Since then and through the date this report was written, Esteban Rodríguez has spent more than 175 days in prison, where he contracted coronavirus.[143] According to the information in the complaint, the journalist, currently being held in the jail at *Combinado del Este* where he awaits trial, was subjected to cruel, inhumane, and degrading treatment.[144] On October 18, he began a hunger and thirst strike to protest the irregularities of his detention and to demand his own release and that his judicial guarantees be respected.

95.    In the context of the July 11 protests, the independent press has reported that it is a constant target of physical aggression, intimidation, detention, and virtual attacks against its news portals. For example, the Rapporteur's Office received reports that the photojournalist for *AP Noticias*, Ramón Espinosa, was assaulted by police agents while he was covering the demonstrations in Havana. Another cameraman for the same agency was allegedly assaulted by a group of pro-Government citizens.[145] Likewise, the Rapporteur's Office received reports about numerous detentions of journalists for outlets such as *Cubanet, Tremenda Nota, Palenque Visión, ADN Cuba,* and *La Hora de Cuba*, and about police operations that blocked several journalists from leaving their homes.[146] Some media outlets in the country's interior were left inoperable as a result of the extended detentions of their reporters. Others had to suspend distribution of their newspapers and in some

[139] IACHR. April 23, 2021. Press Release 101/21. *IACHR adopts precautionary measures in favour of Yoel Suárez Fernández in Cuba*.

[140] CPJ. May 4, 2021. *Detienen a la periodista cubana Mary Karla Ares por dar cobertura a protesta*; Cibercuba. May 2, 2021. *Acusan a periodista Mary Karla Ares de desorden público tras reportar protesta por Luis Manuel Otero en La Habana*; ICLEP. May 26, 2021. *Trasladan a prisión a la periodista del ICLEP Mary Karla Ares*.

[141] Periódico Cubano. May 12, 2021. *Régimen niega medicamentos a la periodista Mary Karla Ares*; 14yMedio. May 13, 2021. *Cumple dos semanas en prisión Mary Karla Ares por filmar la protesta de la calle Obispo*; ICLEP. May 22, 2021. *Torturan y trasladarán a prisión a reportera del ICLEP Mary Karla Ares*; Cubanet. May 29, 2021. *Régimen libera a Mary Karla Ares, pero le impone prisión domiciliaria*; 14yMedio. June 2, 2021. *Mary Karla Ares denuncia "largas horas de interrogatorios" y "tortura psicológica"*.

[142] Cibercuba. April 26, 2021. *Seguridad del Estado detiene a Esteban Rodríguez cerca de la casa de Luis Manuel Otero*; Amnesty International. August 19, 2021. *Cuba: Amnesty International names prisoners of conscience amidst crackdown on protesters*.

[143] Radio Televisión Martí. August 28, 2021. *Movimiento San Isidro denuncia que periodista cubano Esteban Rodríguez vuelve a contagiarse de COVID-19 en la cárcel*; Cibercuba. August 28, 2021. *Activista cubano Esteban Rodríguez vuelve a contagiarse de coronavirus en prisión*.

[144] Diario de Cuba. June 15, 2021. *El activista cubano Esteban Rodríguez, a una cárcel de máxima seguridad, 'esposado de pies y manos'*; Cibercuba. June 14, 2021. *Esteban Rodríguez, esposado de pies y manos, es trasladado a cárcel de máxima seguridad*; Norges Rodríguez Twitter account (@norges14). June 16, 2021.

[145] Agence France-Presse Twitter account (@AFPespanol). July 11, 2021; Diario de Cuba. 12 de julio de 2021. *Grupos prorrégimen hieren a un corresponsal de AP durante la represión de las protestas en La Habana*.

[146] La Nación. July 13, 2021. *Protestas en Cuba: denuncian que comenzaron los arrestos de periodistas para impedir que informen*; VOA. July 19, 2021. *Cuba detiene e interroga a decenas de periodistas por la cobertura de las protestas*.

Cuba AR_001514



municipalities, there were reports that by merely pulling out a cell phone on the street police repression was activated.[147]

96.      The IACHR and its Office of the Special Rapporteur have indicated in their special Report about the situation of freedom of expression in Cuba that state agents are the main source of threats and aggression against the press in that country, a practice that must be scrapped and penalized. The Report recommended that the State of Cuba bring an end to the harassment, including citations, detentions of any length, and judicial harassment of any person for reasons related to the exercise of their freedoms of expression, association, assembly, and others related to these.

97.      Likewise, the IACHR and its SRFOE recall that both the Universal Declaration of Human Rights and the American Declaration of the Rights and Duties of Man, as well as Article 19 of the International Covenant on Civil and Political Rights, signed by Cuba on February 28, 2008, protect journalism work, artistic work, and the defense of human rights. Therefore, those expressing themselves legitimately must not be pressured on how to do their work, cover, and/or disseminate facts in the public interest.

## 2.      Human Rights Defenders

98.      The IACHR observes that, in 2021, the serious human rights crisis in Cuba has deteriorated the human rights situation of human rights defenders as compared with prior years. According to information received and monitoring conducted by this Commission, human rights defenders in the country continue to face acts of harassment and arbitrary violations of the right of free movement, liberty, security, and personal integrity. As reflected above, there is an unrelenting number of petitions that the Commission grant precautionary measures to protect human rights defenders in Cuba.[148]

99.      Since the beginning of 2021 the Inter-American Commission has received information that tells of the escalating repression against human rights defenders. In this context, of special concern is the harassment of members of the San Isidro Movement (MSI), who since November 2020 have been targets of harassment by the police and the Department of State Security. In this regard, the Commission was informed of numerous detentions of individuals who are part of MSI and its allies who have also faced ongoing police surveillance outside their homes, a situation that led the Commission to grant precautionary measures.[149]

100.      Furthermore, according to reports from civil society, through May 2021, 52% of aggressions were committed against female human rights defenders. These reports indicate that in Cuba, female human rights defenders face additional harassment because of their gender, with differentiated impacts.[150] In this regard, the Commission received information about the specific situation of María de los Ángeles Matienzo Puerto and Kirenia Yalit Núñez Pérez, a human rights defender and an independent journalist who have experienced several risk events on a persistent basis between 2013 and 2021, including threats, stalking,

---

[147] Archive of the Special Rapporteur for Freedom of Expression. Listening session with Cuban journalists and media outlets. July 20, 2021; Listening session with female Cuban journalists. July 30, 2021.

[148] IACHR, Resolution 78/21, PM 515-21 - Manuel de Jesús Rodríguez García regarding Cuba, October 3, 2021; Resolution 68/21, PM 1068-20 - Irán Almaguer Labrada regarding Cuba, August 28, 2021; Resolution 64/21, PM 211-20 - Richard Adrián Zamora Brito regarding Cuba, August 22, 2021; Resolution 30/21, PM 211-20 - Esber Rafael Ramírez Argota regarding Cuba, April 5, 2021; Resolution 29/21, PM 1101-20 - Aminta D'Cárdenas Soroa and Carlos Manuel Álvarez regarding Cuba, March 24, 2021; Resolution 26/21, PM 552-20 - María de los Ángeles Matienzo Puerto and Kirenia Yalit Núñez Pérez regarding Cuba, March 14, 2021; Resolution 14/21, PM 1101-20 - 20 identified members of the San Isidro Movement (MSI) regarding Cuba, February 11, 2021; Resolution 7/21 PM 211-20 - Juan Antonio Madrazo Luna, Marthadela Tamayo and Oswaldo Navarro Veloz regarding Cuba, January 19, 2021; Resolution 5/21 PM 1068-20 - Yandier García Labrada regarding Cuba, January 7, 2021.

[149] IACHR, Resolution 14/21, PM 1101-20, 20 identified members of the San Isidro Movement (MSI) regarding Cuba, February 11, 2021.

[150] FDP - Fundación para la Democracia Panamericana, Report 2021 Situación de los Derechos de las Mujeres Defensoras de Derechos Humanos en Cuba, June 19, 2021, at 11.

Cuba AR_001515



**ANNUAL REPORT 2021**

intimidation, aggression, and messages that discredit them. The Commission noted the unique risk Ms. Matienzo Puerto and Ms. Núñez Pérez are facing as female human rights defenders because of gender stereotypes, historical discrimination, and related prejudicial ideas about how they should act or about the roles women should have in society.[151] The Commission emphasizes that in addition to the violation of the right to defend human rights, violence against female defenders carries with it other types of consequences that affect women in a differentiated way because of their gender.[152]

101.     The Commission also received reports of persistent arbitrary detentions as a method of harassment by the police and State Security agents. Likewise, the Commission has identified that human rights defenders in Cuba are consistently deprived of liberty for specific crimes, such as contempt, acts of opposition, and public disorder. On occasion, inside penitentiary facilities, they are the objects of aggression, threats, and mistreatment.[153] The Commission learned, for example, of the case of Yandier García Labrada, an activist and member of the *Movimiento Cristiano Liberación*, who currently is an inmate in the "*El Típico*" prison for "contempt and public disorder."[154] It also granted precautionary measures on behalf of Aminta D'Cárdenas Soroa and Carlos Manuel Álvarez, individuals associated with the San Isidro Movement (MSI). Regarding Aminta D'Cárdenas, the Commission was informed of her detention after she participated in a demonstration, whereas Carlos Manuel Álvarez was detained as he was leaving his relatives' home. According to the information submitted to the IACHR, Carlos Manuel Álvarez was allegedly assaulted after receiving summonses to appear at the police station.[155]

102.     Furthermore, as was laid out in the preceding section, a series of demonstrations began on July 11, 2021, to demand the exercise of civil liberties and changes to the country's political structure, as well as to decry shortages of food, medications, and basic-needs products that had worsened because of the Covid-19 pandemic. As a result of these protests, the latest records of the civil society organization, Cubalex, dated August 10, indicate that 805 persons have been detained, a significant number of which are activists, artists, journalists, leaders of political movements that oppose the government, as well as professors and students. The facts in complaints submitted also include individuals being held incommunicado and families not knowing their whereabouts.[156]

103.     The Commission also received information about the specific situation of José Daniel Ferrer, leader of *Unión Patriótica de Cuba* (UNPACU), in Altamira, Santiago de Cuba. According to the information the Commission received, José Daniel Ferrer began a hunger strike on March 20, 2021, which he sustained for 21 days, in protest of the fact that agents in patrol vehicles had circled the organization's headquarters so as to stop the organization from functioning.[157] Later, the Commission was informed that José Daniel Ferrer had been sentenced to four and a half years of house arrest on April 22, then on July 11 he was sentenced to remain

---

[151] IACHR, Resolution 26/21, PM 552-20 María de los Ángeles Matienzo Puerto and Kirenia Yalit Núñez Pérez regarding Cuba, March 14, 2021.

[152] IACHR, Report on the Situation of Human Rights Defenders and Social Leaders in Colombia, OEA/Ser.L/V/II. Doc. 262, December 6, 2019, para. 74.

[153] IACHR, SPECIAL REPORT ON THE SITUATION OF FREEDOM OF EXPRESSION IN CUBA, OEA/SER.L/V/II, CIDH/RELE/INF.21/18, December 31, 2018, para 136.

[154] IACHR, Resolution 5/21 PM 1068-20 - Yandier García Labrada regarding Cuba, January 7, 2021.

[155] IACHR, Resolution 29/21, PM 1101-20 - Aminta D'Cárdenas Soroa and Carlos Manuel Álvarez regarding Cuba, March 24, 2021.

[156] Press Release No. 211/21 - IACHR and Special Rapporteurs Express Concern over Reports of Arbitrary Detentions, Incommunicado Detention, Lack of Legal Defense, and Other Violations of Due Process during the July 11 Protests in Cuba, August 12, 2021.

[157] France 24, Opositor Cubano levanta huelga de hambre tras retiro de cerco policial, April 12, 2021.

Cuba AR_001516



in jail. It concerns the Commission that, according to the information it received, Ferrer is being held in isolation and is in poor health.[158]

104.    During 2021, the Commission also was informed of other acts of harassment against defenders in Cuba. It learned about the case of Juan Antonio Madrazo Luna, Marthadela Tamayo, and Oswaldo Navarro Veloz, members of the *Comité Ciudadanos por la Integración Racial* (CIR), who reported to the Commission about repressive acts of harassment by the State, seeking to impede the CIR members from circulating, assembling, or freely expressing. They indicated that on several occasions they have been blocked from leaving the country, fined for "civil disobedience", and they have been identified as "traitors" or "opponents". Based on the information it has received, the Commission granted precautionary measures on their behalf, considering that the facts described suggest that the at-risk situation of Juan Antonio Madrazo Luna, Marthadela Tamayo, and Oswaldo Navarro Veloz is susceptible to continue and worsen over time, such that given the imminence of the risk materializing, the Commission deemed it necessary to adopt measures to safeguard their rights to live and personal integrity.[159]

105.    Likewise, in the context of the 180th Period of Session, held in June 2021, the Commission received information about new patterns of violence against human rights defenders in Cuba. Civil Society organizations specifically reported the following: i) health centers being used as spaces for confinement and isolation of defenders, and for imposing involuntary treatments; ii) arbitrary confiscation of humanitarian aid and disruption of assistance efforts by activists and civil society organizations; and iii) abuse of Covid-19 prevention regulations as pretext for imposing fines and arbitrary detentions. Furthermore, the organizations stressed the differentiated impacts on female defenders who face acts of harassment and intimidation, such as requiring nudity during detention, and threats directed at their children.[160]

106.    The IACHR recalls that the main purpose of imposing fines or other sanctions on defenders because of their work and of depriving them of their liberty is to criminalize their activities that promote and defend human rights, as well as to deter them from continuing to promote their causes.[161] Likewise, the Commission reiterates that the bodies of the Inter-American system have indicated that attacks against human rights defenders have a multiplying effect that goes beyond the direct affectation of the individual defender, because when the aggression is committed in retaliation for their activities, it produces fear that spreads to all who defend similar causes.[162]

107.    In this light, the Inter-American Commission considers that the situation of human rights defenders continues to be of concern. The IACHR reiterates the importance of the rights of human rights defenders and their irreplaceable role in guaranteeing the rule of law and the construction of a society that is democratic, solid, and enduring.[163] Therefore, the IACHR reiterates its call on the State to adopt effective measures to guarantee and protect the rights of human rights defenders, activists, journalists, and other social

---

[158] Infobae, El régimen Cubano mantiene al opositor José Daniel Ferrer en una celda de aislamiento en condiciones inhumanas y degradantes, October 10, 2021; AméricaTeve, José Daniel Ferrer, enfermo y semidesnudo en una celda de aislamiento, October 10, 2021; Diario Las Américas, Régimen mantiene a José Daniel Ferrer incomunicado, October 2, 2021.

[159] Resolution 7/21 PM 211-20 - Juan Antonio Madrazo Luna, Marthadela Tamayo and Oswaldo Navarro Veloz regarding Cuba, January 19, 2021.

[160] IACHR, Hearing, 180th period of sessions, New persecution patterns of HR defenders and the situation of women HR defenders in Cuba, June 25, 2021.

[161] IACHR, Situation of Human Rights in Cuba, OEA/Ser.L/V/II. Doc. 2, February 3, 2020, para. 193.

[162] IACHR, Second Report on the Situation of Human Rights Defenders in the Americas, OEA/Ser.L/V/II. Doc. 66, December 31, 2011, para. 25.

[163] IACHR, Criminalization of the Work of Human Rights Defenders, OEA/Ser.L/V/II. Doc. 49/15, December 31, 2015, para. 22; Press Release 288/2019 IACHR and UN Human Rights Presences Once Again Call for the Creation of a Safe, Favorable Environment for Human Rights Defenders in the Americas, November 27, 2019.

Cuba AR_001517



leaders. The IACHR reminds the States of their obligation to prevent threats, aggression, and harassment against these groups and to take all necessary measures to safeguard and provide conditions that enable them to do their work.

### 3.    LGBTI Persons

108.    Regarding the human rights situation of lesbian, gay, bisexual, trans and gender-diverse, and intersex (LGBTI) persons, the Commission takes note of the publication of the Family Code draft legislation, which if approved would recognize access to the legal institution of marriage without discrimination.[164] The Commission notes, however, that this reform will eventually be submitted to a process of consultation and referendum. The Commission once again expresses concern that a human right like marriage equality might be subjected to a mechanism of popular consultation. Along these lines, the IACHR calls on the State to take all measures necessary to legally recognize unions or marriage of persons of the same sex, granting them the same rights conferred to couples of different sexes, including property rights and all other rights that derive from the relationship, without distinction based on sexual orientation or gender identity, under penalty of violating the rights to equality and non-discrimination.[165]

109.    The Commission also received information of complaints about the censorship of a video by a transgender activist on State television[166], as well as complaints about the summons and interrogation of a gay man for reasons related to his work as an activist and defender of the human rights of LGBTI persons.[167] In response, the Commission recalls that the right to freedom of expression enshrined in Article 13 of the American Convention includes the right of individuals to express their sexual orientation and gender identity, and that this type of expression enjoys a special level of protection under the Inter-American instruments, because it relates to an integral element of personal identity and dignity. Further, special protection of this type of expression imposes greater limits on State intervention in human rights defense activities, including demands of recognition, protection, or exercise of a right in the context of social protests.

110.    Lastly, the IACHR underscores that there is no official and disaggregated statistical data about acts of violence against LGBTI persons. Regarding this, the Commission reiterates the importance of the collection of reliable data for planning, adopting, and implementing measures that guarantee full equality for LGBTI persons. It also recalls that data are instrumental for the appropriate application of the due diligence standard for prevention, mitigation, sanction, and reparation for this type of violence.

### 4.    Women

111.    Regarding the situation of the rights of women, the Commission notes that legal limitations persist that hinder the right of women to live a life free of violence and discrimination. The Commission underscores the absence of legislation containing a general definition of discrimination against women, and the inexistence of legislation that addresses and expressly prohibits gender-based violence.[168] Along these lines, the Commission also notes that the Cuba is not yet a party to the Inter-American Convention to Prevent,

---

[164] Ministry of Justice, Anteproyecto Código de las Familias versión 22, August 1, 2021.

[165] IACHR, Situation of Human Rights in Cuba, 2020, para. 328.

[166] Diario de Cuba, "Censurado en Cuba el videoclip 'Es mi vida' de la comunidad LGTBI por razones políticas", May 21, 2021; Radio Televisión Marti, "Televisión cubana censura videoclip dedicado a la comunidad LGBTI", May 20, 2021

[167] ADN Cuba, "Policía política cita a activista Raúl Soublett", February 25, 2021; Diario de Cuba, "La Seguridad del Estado amenaza a un activista cubano por los derechos LGBTI con procesarlo por 'mercenarismo'", October 10, 2021.

[168] Observatorio de Feminicidios. Yo Sí te Creo en Cuba, accessed October 21, 2021; Cuba Debate. Mujeres tras las sombras: Desafíos del feminicidio en Cuba, May 18, 2021; Diario de Cuba. ¿Cuántas mujeres tienen que ser asesinadas para que el Estado cubano asuma su responsabilidad?, May 26, 2021; BID. Un vistazo a la violencia contra la mujer en la región, accessed October 26, de 2021.

Cuba AR_001518



Sanction, and Eradicate Violence Against Women ("Belém do Pará Convention")[169], the principal Inter-American instrument for the defense and protection of the right of women to live a life free of violence and discrimination. Further, the IACHR notes with concern that feminicide is not classified as a crime[170], as well as the lack of an effective protection framework for women who face violence, by establishing that rape cases always be investigated *ex parte* and by permitting criminal prosecutions to be interrupted if victims withdraw their complaint.[171]

112.     The Commission recalls that legislative prohibition of every form of violence and discrimination against women is essential to combat this scourge, and it highlights the duty to conduct *ex oficio* investigation of possible discriminatory connotations because of gender, especially in cases of sexual violence.[172] In this regard, the Commission calls on the State to adopt a legislative framework that makes visible the structural imbalance women face in the enjoyment of their rights, and that is in keeping with the guiding principles for eradication of gender-based violence and discrimination. Further, the Commission reiterates its call on the State to sign and ratify the Belém do Pará Convention.

113.     The Commission also observes that the State does not have official consolidated, up-to-date, and properly disaggregated data with which to analyze the situation of violence and discrimination against women in Cuba, making it challenging to improve policies and evaluate their impacts and effectiveness in changing conditions of structural discrimination and violence.[173] The Commission notes that the National Program for the Advancement of Women establishes as an area of attention the incorporation of a gender focus in statistics and research in order to more thoroughly understand problems that affect women, identify inequalities, and adopt public policies.[174] Regarding this, the Commission calls on the State to ensure the collection of research and data, as well as other pertinent information regarding the causes, consequences, and frequency of violence against women, and to compile, make available, and publish complete, itemized, and periodic information for the purpose of evaluating the impact and efficacy of adopted policies, and to formulate and implement necessary changes.

114.     Regarding the situation of violence women face, and given the absence of official data, the Commission notes the information compiled by civil society organizations, which reports 11 femicides thus far in 2021, highlighting that in most cases the author of the crime was the victim's partner or ex-partner.[175] Likewise, in the specific context of the social protests, the Commission takes note of complaints by human rights defenders who indicate they have suffered acts of harassment, intimidation, required nudity during detention, and threats against their children.[176] Regarding this, the Commission calls on the State to adopt and strengthen policies that prevent acts of violence against women and that take a wholistic approach toward the various

---

[169] General Information of the Treaty: Inter-American Convention on the Prevention, Punishment, and Erradication of Violence against Women, Ratification/Accession by Country, accessed October 21.

[170] *Ibid.*

[171] UN Human Rights Council, Report of the Special Rapporteur on violence against women, its causes and consequences, A/HRC/47/26, April 19, 2021.

[172] IACHR Violence and Discrimination against Women and Girls, Annex 1 Standards and Recommendations, OEA.SER.L/V/II. Doc. 233, November 14, 2019, para. 12-75.

[173] IACHR Violence and Discrimination against Women and Girls, Annex 1 Standards and Recommendations, OEA.SER.L/V/II. Doc. 233, November 14, 2019, para. 15-16.

[174] Decreto Presidencial 198/2021, Official Gazzette No. 14 Special Issue, March 8, 2021.

[175] Observatorio de Feminicidios. Yo Sí te Creo en Cuba, accessed October 21, 2021; Diario de Cuba. Otros dos feminicidios en Cuba, denuncian plataformas independientes, April 14, 2021

[176] IACHR Annex to Press Release 165/21 on the 180th Period of Sessions, July 2, 2021; IACHR, Hearing, 180th period of sessions, New persecution patterns of HR defenders and the situation of women HR defenders in Cuba, June 25, 2021; Human Rights Watch, Cuba: Peaceful Protesters Systematically Detained, Abused  Arbitrary Detention, Ill-Treatment, Abusive Trials Affect Hundreds, October 19, 2021.

Cuba AR_001519



manifestations of violence, having in mind the specific risks women face in certain contexts. It also calls on the State to investigate, sanction, and remedy with due diligence any acts of gender-based violence against women.

115.    Lastly, the Commission notes complaints by civil society organizations about the lack of access to menstrual hygiene products.[177] The Commission highlights that dignified menstruation management is an integral part of the right to sexual and reproductive health, and the lack of access to menstrual hygiene products can have negative effects on health of women, girls, teenagers and menstruating persons. The Commission reiterates its call upon the State to ensure sufficient public health facilities, goods, and services that are sensitive to gender needs[178], including access to menstrual hygiene products.

**5.    Persons of African Descent**

116.    The IACHR observes patterns of racial discrimination in Cuba. In particular, public sources highlight that, following the abolition of slavery in Cuba, persons of African descent have not stopped suffering historical inequalities. They assert that structural racism has led to the denial by the State that racism even exists and that there are no public policies to counter it.[179] The Commission also notes the lack of disaggregated official statistics, as well as the lack of awareness campaigns for society regarding ethnic-racial self-identification.

117.    The Commission also highlights, from information received, the precarization of economic, social, cultural, and environmental rights, with differentiated impacts on women and older persons of African descent.[180] Regarding the right to housing, the IACHR observes that, according to available data, 37% of Cuba's housing fund is classified as having mediocre or poor condition of technical construction. At the same time, there is a deficit of 863,000 properties. Therefore, various sectors state the urgent need to accelerate home-building to reduce social gaps.[181]

118.    In the context of the protests that took place on July 11, 2021, the Commission observes that civil society organizations have reported that racial inequality was one of the original triggers of those social demonstrations, given that persons of African descent have historically been excluded from different sectors, and that the prevailing model in Cuba would exacerbate the conditions of inequality to which they have been historically exposed.[182] Along these lines, the IACHR takes note that, in the opinion of experts, Afro-descendent communities in Cuba allegedly receive greater repression from the regime.[183]

119.    In this context, various sources of available public information have made known that, of the more than 600 Cubans that, as of October 27, 2021, were in prison for having demonstrated on July 11, 2021, a large percentage are persons of African descent.[184] A number of organizations have reported to the IACHR that law enforcement authorities had applied social profiling practices and the excessive use of force against

---

[177] Plataforma Femenina. Menstruación y Derechos Humanos en Cuba, 2021; Race & Equality. Menstruación y Derechos Humanos, un debate necesario para avanzar hacia la plena garantía de Derechos Humanos en la región, May 28, 2021; El Toque. Higiene Femenina en Cuba: Invento y otros trapos, January 2021.

[178] IACHR, Situation of Human Rights in Cuba, OEA/Ser.L/V/II. Doc. 2, February 3, 2020, Recommendation 24.

[179] The Washington post, La 'revolución' no erradicó el racismo en Cuba, August 31, 2021.

[180] Document submitted to the IACHR, CIR, Flamur & Mujeres Esperanza, and DESCA in Cuba, reflections from the perspective of intersectionality, October 2021.

[181] Rebelión, A Cuba le urge acelerar construcción de viviendas para atajar brechas sociales, October 30, 2021.

[182] BBC News, Protests in Cuba: "Los que protestaron el 11 de julio fueron los perdedores del capitalismo de Estado y entre ellos están los afrocubanos", August 20, 2021.

[183] Sentido Común, Las comunidades negras de Cuba reciben la mayor represión del régimen, August 25, 2021.

[184] Martí, Más de 600 cubanos siguen en prisión por manifestarse el 11J, October 27, 2021.

Cuba AR_001520



Afro-Cuban persons that participated in the social protests. In this context, the Commission noted the death of Diubis Laurencio Tejeda, a 36-year-old of African descent, who died in the contest of the demonstrations, the death having occurred near a police station in the municipality of Arroyo Naranjo, on the outskirts of Havana, one of the poorest areas.[185]

### 6.    Persons deprived of liberty

120.    Regarding persons deprived of liberty, the Commission notes the persistently high rates of persons deprived of liberty and the deplorable conditions of their detention. In particular, the IACHR observes that the situation this population faces places their lives and integrity at risk. Likewise, the IACHR expresses its concern over the absence of up-to-date official data about the situation of detained persons.

121.    Regarding the lack of State information about persons deprived of liberty, the Commission calls attention to the fact that the most recent official data was published in 2012, at which time 57,337 persons were detained in the country's prisons.[186] Nevertheless, the Commission reiterates that this number contrasts significantly with the most recent number recorded by civil society organizations, which document almost twice that number as of March 30, 2021: nearly 100,000 persons detained.[187] Considering the country's total population as reported by the World Bank, and the figures submitted by civil society regarding the population of detainees[188], Cuba would rank as having the world's highest prison population per 100,000 inhabitants, namely, 882 persons deprived of liberty per 100,000 inhabitants.

122.    Likewise, the IACHR observes that the State has adopted crime policies that favor an increase in detentions and their respective sentences. According to data contributed by civil society in 2020, more than 32,000 criminal cases are filed per year, which would mean that approximately 40,000 individuals are formally charged each year.[189] Of that total, about 93% are found guilty (approximately 37,200 people), of which 69% (25,500 individuals) are sentenced to prison or correctional labor within a penitentiary facility.[190]

123.    Additionally, regarding the conditions of detention, the Commission notes that the same problems that have been studied on various occasions persist in Cuba's prisons. These conditions of detention are characterized by overcrowding, negligence with medical care, inadequate food, shortages of water for personal hygiene, lack of ventilation, and precarious health and hygiene conditions.[191] According to information reported by civil society, these deplorable conditions have caused tuberculosis outbreaks, acute diarrhea, and other parasite-borne diseases such as scabies.[192] Furthermore, according to publicly available information,

---

[185] BBC Mundo, Protestas en Cuba: el gobierno confirma un muerto en nuevos disturbios a las afueras de La Habana, July 13, 2021.

[186] Institute for Crime & Justice Policy Research, World Prison Brief Database: Cuba, Agosto de 2021.

[187] Observatorio Cubano de Derechos Humanos, OCDH denuncia situación del Covid-19 en cárceles de Camagüey (Cuba) y la nula transparencia del gobierno en la gestión de la pandemia, March 30, 2021.

[188] The World Bank, Population, total - Cuba, 2020.

[189] Prison Insider, Cuba: la mayor cárcel del mundo, January 17, 2020.

[190] Prison Insider, Cuba: la mayor cárcel del mundo, January 17, 2020.

[191] See IACHR Annual Report 2020, Chapter IV.B - Cuba, para. 117; IACHR, Situation of Human Rights in Cuba, para. 379; IACHR Annual Report 2018, Chapter IV.B - Cuba, para. 96; Observatorio Cubano de Derechos Humanos, OCDH denuncia situación del Covid-19 en cárceles de Camagüey (Cuba) y la nula transparencia del gobierno en la gestión de la pandemia, March 30, 2021; Diario de Cuba, Observatorio Cubano de Derechos Humanos: hay más de 200 presos con Covid-19 en las cárceles de Camagüey, March 31, 2021; y La Gaceta, Ausencia de agua, sarna, coronavirus… las lamentables condiciones de las cárceles de la dictadura cubana, May 13, 2021.

[192] Observatorio Cubano de Derechos Humanos, OCDH denuncia situación del Covid-19 en cárceles de Camagüey (Cuba) y la nula transparencia del gobierno en la gestión de la pandemia, March 30, 2021.

Cuba AR_001521



these conditions have also caused persons deprived of liberty to contract mange and leprosy.[193] Based on the foregoing, the IACHR recalls that States have the duty to ensure that persons deprived of liberty be detained under conditions that are compatible with their human dignity. These include adequate medical care; access to safe drinking water; sufficient quality food; appropriate space and ventilations; and adequate hygiene conditions.[194]

124.    Regarding the impact of the COVID-19 pandemic in prisons, according to publicly available information the Commission observes that in 2021 outbreaks were documented in several facilities. For example, the Provincial Prison of Guantánamo[195], the *Combinado Surlas* Provincial Prison[196], the *Melena Uno* prison in Mayabeque[197], the *Cinco y Medio* jail in Pinar del Río[198], the Kilo 7 and Kilo 8 prisons in Camagüey[199], the jail known as "*La Ladrillera*", in Holguín[200], and in the Territorial Criminal Investigation Unit No. 3, in Havana[201]. Given this scenario, the IACHR notes with concern that the causes of the ongoing mass infections include: i) insufficient cleaning resources for sanitizing the cell blocks; ii) lack of safe water for personal hygiene; and iii) lack of adequate ventilation.[202]

125.    Given the foregoing, the Commission reiterates the obligation States in the region must adopt immediate and urgent measures designed to protect the life, health, and integrity of individuals under its custody during the COVID-19 pandemic.[203] This includes the duty of preparing detention conditions to prevent infection and providing treatment for COVID-19. Additionally, in the context of vaccinations, pursuant to Resolution No. 01/21 by the IACHR and its Office of Special Rapporteurs addressing COVID-19 vaccines, the States shall, among other matters, abstain from discriminatory treatments and create conditions of real equality for groups that have historically seen their rights violated, the prison population being one of these groups.[204]

126.    In addition to the foregoing, the Commission notes the existence of mistreatment practices in Cuba's prisons. According to *Human Rights Watch*, persons deprived of liberty are forced to work 12-hour days and, if they do not meet pre-established production quotas, they are punished.[205] Likewise, any who speak out against the government or engage in strikes or other forms of protest in detention are frequently placed in

---

[193] See Diario las Américas, Cuba cierra unidad de penal por brotes de Sarna y COVID-19, April 23, 2021; and La Gaceta, Ausencia de agua, sarna, coronavirus… las lamentables condiciones de las cárceles de la dictadura cubana, May 13, 2021.

[194] See IACHR Report on the Human Rights of Persons Deprived of Liberty in the Americas, OEA/Ser.L/V/II. Doc. 64, December 31, 2011, para. 432 and 557.

[195] Cuba net, Confirman brote de COVID-19 en la Prisión Provincial de Guantánamo, February 11, 2021.

[196] Diario de Cuba, Activistas denuncian un 'gran brote' de Covid-19 en una prisión de Guantánamo y critican la falta de claridad del Gobierno, February 12, 2021.

[197] Radiotelevisión Martí, Prisiones cubanas desbordadas de COVID-19, reportan desde la isla, March 2, 2021.

[198] Cubanet, Prensa independiente reporta brotes de COVID-19 en varias prisiones de Cuba, March 3, 2021.

[199] Diario de Cuba, Observatorio Cubano de Derechos Humanos: hay más de 200 presos con Covid-19 en las cárceles de Camagüey, March 31, 2021.

[200] ADN Cuba, Denuncian brote de COVID-19 en cárcel de Holguín, April 23, 2021.

[201] Diario las Américas, Cuba cierra unidad de penal por brotes de Sarna y COVID-19, April 23, 2021.

[202] See IACHR Annual Report 2020, Chapter IV.B - Cuba, para. 119; and Diario de Cuba, Observatorio Cubano de Derechos Humanos: hay más de 200 presos con Covid-19 en las cárceles de Camagüey, March 31, 2021.

[203] IACHR, Resolution No. 01/2020 Pandemic and Human Rights in the Americas, adopted on April 10, 2020, Operative Part: Persons Deprived of Liberty, para. 45 to 48.

[204] IACHR, Resolution No. 01/2021 Covid-19 vaccines and Inter-American Human Rights Obligations, approved on April 6, 2021, Operative Part, para. 1 and 4.

[205] Human Rights Watch, World Report 2021 – Cuba, 2021.

Cuba AR_001522



isolation cells for extended periods of time and are beaten. Their visitations are also restricted, and they are denied medical care.[206] In this regard, the Commission reiterates its condemnation of all forms of cruel, inhumane, or degrading treatment, and recalls their absolute prohibition in any situation.[207] It further emphasizes that it is an inalienable duty of the State to prevent these acts, condemn their practice, and sanction, in every case, all of their material and intellectual perpetrators.[208] Likewise, it recalls that pursuant to its *Principles and Best Practices for the Protection of Persons Deprived of Liberty in the Americas*, detained persons have the right to lodge complaints or claims about acts of torture, prison violence, corporal punishment, cruel, inhuman, or degrading treatment or punishment.[209]

### 7.    Economic, Social, Cultural, and Environmental Rights (ESCER)

127.    Through its different mechanisms, the Inter-American Commission for Human Rights (IACHR) and the Special Rapporteur for Economic, Social, Cultural, and Environmental Rights (REDESCA, in Spanish), have been constantly following the situation of Economic, Social, Cultural, and Environmental Rights (ESCER) in Cuba. Likewise, the IACHR and its REDESCA have been monitoring with special concern the challenges to guaranteeing the right to health care in Cuba and, particularly, have paid close attention to the reports of infections and deaths due. To COVID-19 during 2021, and to the various obstacles to implementation of a national COVID-19 vaccination plan to ensure that all people under the jurisdiction of the State have speedy and efficient universal access to vaccines.

128.    According to Cuba's Ministry of Public Health, through October 28, 2021, there had been 950,613 confirmed cases of COVID-19 in the country, with 8,223 fatalities.[210] This data notwithstanding, REDESCA notes that civil society organizations have decried the opacity of information and presumably political handling of the figures.[211] In this regard, based on what is set forth in IACHR Resolution 1/2020, REDESCA urges the State to establish a transparent strategy that provides precise data about the pandemic and vaccinations.[212]

129.    Furthermore, in this context of a health emergency, the Office of the Rapporteur has taken noted that in July and August 2021, Cuba experienced one of the COVID-19 infection and hospitalization rates in the Caribbean[213], despite the scientific advances in developing vaccines. Likewise, the IACHR and REDESCA express their concern about the abundant information about limitations in the provision of health services, the shortage of beds or ambulances for treating infected persons[214], the overcrowding of hospitals on the island[215],

---

[206] Human Rights Watch, World Report 2021 – Cuba, 2021.

[207] IACHR Report on the Human Rights of Persons Deprived of Liberty in the Americas, para. 343.

[208] IACHR Report on the Human Rights of Persons Deprived of Liberty in the Americas, para. 350.

[209] IACHR Principles and Best Practices for the Protection of Persons Deprived of Liberty in the Americas, Principle V.

[210] Ministry of Public Health - Cuba, Coronavirus en Cuba, October 29, 2021.

[211] Race and equality, inputs for the umbrella of the networks of civil society organizations whose work relates to the right to health care in Cuba, September 1, 2021.  IACHR/REDESCA integrated network of civil society organizations whose work is in Cuba. Minutes of the meeting on the right to health care and Access to COVID-19 vaccines, September 1, 2021.

[212] IACHR Resolution No. 01/2021 Covid-19 vaccines and Inter-American Human Rights Obligations, approved on April 6, 2021.

[213] Radio Televisión Martí, OPS, Cuba reporta el mayor número de casos en el Caribe, July 7, 2021.

[214] Race and equality, Meeting held under the umbrella network of civil society organizations whose work relates to health rights in Cuba, September 1, 2021.

[215] Diario de Cuba, Colapso hospitalario en Cuba, July 6, 2021.

Cuba AR_001523



ANNUAL REPORT 2021

the shortage of essential medications, oxygen, and other supplies[216], as well as difficulties in accessing treatment for other diseases and pathologies in the context of the pandemic.[217]

130.        Regarding the shortage of essential medications, according to information gathered, eight of every 10 Cuban citizens were unable to obtain medications from pharmacies due to shortages, and 20% reported taking medications that had expired.[218] Likewise, REDESCA continues to be concerned about the fact that people have to turn to the informal marketplace to access medications or essential products[219], as well as about the Government's recommendation that medicinal plants be used as a workaround to the shortage of medications in communities and hospitals.[220]

131.        Additionally, the Commission and its REDESCA have been made aware of a critical situation of necrology services in handling deaths from COVID-19, as well as the existence of common graves, a lack of hearses to transport remains to cemeteries, overcrowded morgues, and problems manufacturing enough caskets.[221] Regarding this, the IACHR and its REDESCA reiterate that, according to IACHR Resolution 4/21, family members of deceased victims during the COVID-19 pandemic must be able to grieve and conduct their burial rites according to their own traditions and world view.[222]

132.        Regarding vaccination against COVID-19, REDESCA notes that since the beginning of the pandemic the Cuban government has focused on research and production of vaccines, instead of relying on international support for this matter. Despite being a major achievement for the country, a consequence of this decision was a delay in the initial vaccination process and the overcrowding of health services, as has been mentioned.[223] At the end of March 2021, the State began phase 3 trials of the Soberana 2 and Abdala vaccines, as well as an intervention study that initially inoculated health workers and at-risk groups.[224] At the beginning of May 2021, a health intervention was approved for vaccine candidates to receive the Abdala and Soberana 2 vaccines, prioritizing older persons and persons with risk factors. It was only on July 9 that the Center for State Control of Medications, Equipment, and Medical Devices (CECMED) decided to grant emergency use authorization for the Cuban Abdala vaccine and, on August 20, to the Soberana 2 and Soberana Plus vaccines.[225]

133.        Additionally, REDESCA is concerned about the health conditions of persons deprived of liberty. Though Cuba has one of the highest populations of persons deprived of liberty in the world, almost 100,000 people and some 200 prisons, the penitentiary facilities on the island are in poor condition from a health standpoint, with overcrowding, bad food, and inadequate medical care for persons deprived of liberty[226],

---

[216] New York Times. 'Ingresan para morir': el coronavirus muestra las fallas del sistema de salud cubano, August 18, 2021.

[217] IACHR/REDESCA, Meeting held under the umbrella of the network of civil society organizations whose work relates to Cuba. Minutes of the meeting on the right to health care and access to COVID-19 vaccines, September 1, 2021

[218] Observatorio Cubano de Derechos Humanos, El Estado de los derechos sociales en Cuba, September 26, 2021.

[219] República, SOS Cuba: Azitromicina, el antibiótico más buscado en el mercado negro cubano, August 6, 2021.

[220] Tv Avila, Plantas Medicinales: una alternativa eficaz en estos tiempos, June 3, 2021.

[221] Diario de Cuba, No solo hay fosas comunes en Santiago de Cuba: las morgues y las funerarias están colapsadas, August 6, 2021.

[222] IACHR Resolution 4/20 - Human Rights of Persons with COVID-19, July 27, 2020, para. 52.

[223] IACHR/REDESCA, minutes of the meeting held under the umbrella of the networks of civil society organizations whose work relates to the right to health care in Cuba, September 1, 2021.

[224] Ministry of Public Health - Cuba, Actualización de la estrategia para el desarrollo de las vacunas cubanas, October 28, 2021.

[225] Ministry of Public Health - Cuba, Actualización de la estrategia para el desarrollo de las vacunas cubanas, October 28, 2021.

[226] Observatorio Cubano de Derechos Humanos, OCDH denuncia situación del Covid-19 en cárceles de Camagüey (Cuba) y la nula transparencia del gobierno en la gestión de la pandemia, March 30, 2021.

Cuba AR_001524



with reports of COVID-19 and scabies/mange infections.[227] Regarding this, information has been received about overcrowding in prison facilities and a high number of COVID-19 infections among detainees, as well as the absence of medical care for individuals who participated in the July 11 protests or who are known for their work in activism and dissidence in the country.[228]

134.     Regarding the right to food, the IACHR and its REDESCA received information about shortages of basic and essential foods in Cuba, which is affecting the proper nutrition of the population, especially the following groups: older persons, those with chronic illnesses, pregnant women, boys, girls, and adolescents. This situation is currently one of the primary challenges the people are facing, which reveals a situation of extreme socioeconomic vulnerability and food insecurity in the country.[229] Of additional concern are the data from the survey conducted by the Cuban Human Rights Observatory, showing that in 2021, 45% of the Cuban population had to go without at least one meal, 73% classify their family's food as deficient, and only 3% indicted that the rations booklet provides enough to cover their food needs for an entire month.[230]

135.     Insofar as this situation is ongoing, the IACHR and its REDESCA reiterate their call on the State to take concrete actions to guarantee all persons, without discrimination, access to adequate food or the means to obtain it, even in situations where resources are limited, such as what is happening during the COVID-19 pandemic. Likewise, they reiterate to the State the call to take urgent action to ensure the provision of sufficient and affordable food to satisfy national demand, especially ensuring the protection of the more vulnerable populations.

136.     Regarding labor and union rights, the IACHR and its REDESCA express their concern about the following: the absence of the full exercise of union freedoms and the right to free association; the existence of arbitrary restriction of free academic expression for professors, and the application of disciplinary sanctions for political reasons. Add to these the structural discrimination that affects women, older persons, Afro-Cuban persons, LGBTI populations, and persons with disabilities; the absence of a decent wage for workers that, given the inflationary situation, makes it impossible to have sufficient purchasing power to meet basic needs to enjoy other rights, such as health care, food, and housing. Also of concern is the general difficulty of access to labor justice and due process for workers.[231]

137.     Regarding persons of African descent, REDESCA takes note that these persons are underrepresented in the labor and economic spheres in Cuba, given that they have fewer opportunities to access decent and salaried jobs and therefore hold jobs on the margins of the economy, for which they receive low wages and persecution if they join independent unions or groups.[232] The IACHR and its REDESCA have indicated that States must guarantee that persons of African descent be able to access decent jobs in the major economic and occupational sectors, without any discrimination, which includes having policies to eradicate discrimination and segregation in both the public and private sectors.[233]

---

[227] Diario de Cuba, Sarna y Covid-19 en una unidad de procesamiento penal en Cuba: 'Partía el alma oír a los presos gritar, April 23, 2021.

[228] Race and equality, Meeting held under the umbrella network of civil society organizations whose work relates to health rights in Cuba, September 1, 2021.

[229] IACHR Press Release 136/2021 IACHR and Its Special Rapporteurship on Economic, Social, Cultural and Environmental Rights Concerned about Persistent Food Shortages in Cuba, May 25, 2021.

[230] Observatorio Cubano de Derechos Humanos, El Estado de los derechos sociales en Cuba, September 26, 2021.

[231] IACHR/REDESCA, Integrated Network of Civil Society Organizations in Cuba. Minutes of the meeting on labor and union rights, October 6, 2021.

[232] International Labour Organization, Observation (CEACR) - adopted 2016, published 106th ILC session (2017)

[233] IACHR Economic, Social, Cultural and Environmental Rights of Persons of African Descent Inter-American Standards to Prevent, Combat and Eradicate Structural Racial Discrimination, March 16, 2021, para. 200.



ANNUAL REPORT **2021**

138.     The IACHR and its REDESCA have also received information that several cases of workplace violence and discrimination against LGBTI persons have been documented in Cuba, including difficulties accessing and retaining jobs and receiving promotions, as well as mistreatment of every kind that hinders them from enjoying decent labor conditions in safe job spaces.[234] In particular, the Commission and the Office of the Special Rapporteur note the situation of workers that are transgender and of African descent, who are more vulnerable to being denied access to jobs, leaving them with prostitution as a last resort.  The information received reports that several people in this community have gone to various centers seeking employment, but is observed are cases of discrimination, insults, and harassment, as well as persecution by police who issue fines and warnings to transgender persons for remaining on the streets. In some cases they have been deprived of liberty.[235]

139.     The Commission and its REDESCA also received information lesbian women suffering discrimination and being expelled from their jobs because of their sexual orientation. Likewise, they faced harassment and humiliation from colleagues at work, such that they felt obligated to hide their sexuality in order to keep their jobs.[236] Regarding the situation of women, the IACHR and the Office of the Special Rapporteur became aware that their access to jobs remains limited, a situation exacerbated by the pandemic, and of discriminatory treatment given the inequality of wages when compared with men, which has led to the need to work double shifts. REDESCA is also concerned about the absence of oversight in the case of domestic and health care workers, which has worsened during the pandemic.[237]

140.     The IACHR and its REDESCA also note that at the end of March 2021, 606,429 individuals were self-employed, of which 212,536 were women (35%).[238] In 2021, the Council of Ministers approved the elimination of the list of 127 approved self-employment activities in Cuba. According to the government, by way of the National Classifier of Economic Activities, there are over 2,000 non-State [self-employment] activities now permitted.[239] Nevertheless, the Office of the Special Rapporteur is concerned about the standards, regulations, and interventions by the State that threaten the freedom of professional exercise of those who are self-employed. Specifically, decree-laws 44/2021 and 45/202, respectively, restrict self-employment and establish sanctions and other measures that contravene self-employment regulations, such as fines and confiscation of instruments, equipment, and raw materials.[240]

141.     In light of the foregoing, the IACHR and its REDESCA recall that the right to work includes the following essential elements: freedom to exercise any legal profession without intrusion by any authority; the right to have a job, which implies the positive obligation of the State to create jobs; and dignity, such that a job must comply with minimal fair conditions.[241] Thus, they urge the State of Cuba to respect the rights of persons to freely choose and accept a job, and not deny or restrict equal access to dignified work.

---

[234] IACHR/REDESCA, Integrated Network of Civil Society Organizations in Cuba. Minutes of the meeting on labor and union rights, October 6, 2021.

[235] IACHR/REDESCA, Integrated Network of Civil Society Organizations in Cuba. Minutes of the meeting on labor and union rights, October 6, 2021.

[236] FLAMUR/CIR/Organización Mujeres Esperanza. Mujeres y DESCA en Cuba: Reflexiones desde la perspectiva de las interseccionalidades, October, 2021, p. 24/25.

[237] IACHR/REDESCA, Integrated Network of Civil Society Organizations in Cuba. Minutes of the meeting on labor and union rights, October 6, 2021.

[238] ECLAC, Economic Survey of Latin America and the Caribbean 2021, Cuba, July 30, 2021, p. 6.

[239] MTSS, Preguntas y respuestas relacionadas con el perfeccionamiento del trabajo por cuenta propia, March 30, 2021.

[240] Cibercuba, Reforma del trabajo por cuenta propia en Cuba: Cómo se prepara el Gobierno para controlar y sancionar, September 2, 2021

[241] Committee on Economic, Social and Cultural Rights, General Comment No. 18, The Right to Work, adopted on November 24, 2005.

Cuba AR_001526



142.     The IACHR and its REDESCA continue to be concerned about the situation of international medical missions. Although they recognize the support the Cuban government has provided to other countries, complaints persist about unequal pay and exploitation of health professionals. On June 10, 2021, the European Parliament approved a resolution that condemns systematic human and labor rights violations by the State of Cuba against its health personnel sent on medical missions to provide services abroad, counter to the fundamental ILO conventions Cuba has ratified.[242] Therefore, the IACHR and its REDESCA reiterate the need to adopt public policies that guarantee effective protection of the rights of health staff providing service in Cuba, as well as in the international missions, pursuant to international human rights standards in this matter, including ILO regulations.

143.     Regarding union rights, the IACHR and its REDESCA express their deep concern about the report submitted by the Independent Association of Cuba (ASIC), which tells of seven independent union activists that participated in the July 11 protest in the province of Holguín, who were repressed and detained.[243] Ramón Zamora Rodríguez, for example, suffered heavy kicks and blows that caused head trauma to the occipital bones and right temple, and injuries to the capsule and ligaments of the middle finger of his right hand. Also, according to the report, because of his union activity was subjected to constant arrests lasting over 72 hours in walled cells and on other occasions was beaten, in addition to acts of repudiation against him and his family.[244] The Commission and its REDESCA reiterate that the freedom to associate with a union is a right that promotes democracy, good governance of the job market, and decent working conditions, and guarantees the right of workers to organize collectively so that they might enjoy their labor rights and engage their autonomous development.[245]

144.     Regarding cultural rights, the IACHR and its Offices of Special Rapporteurs remain concerned about repressive actions against independent journalists and artists, who suffer rights violations for exercising their right to freedom of expression and artistic creativity in Cuba. Of special concern is the harassment of members of the San Isidro Movement (MSI), who are the object of harassment by the political police and the Department of Security of the State.[246] Along these lines, the American Declaration of the Rights and Duties of Man, in addition to guaranteeing the right of all persons to freedom of expression and dissemination of thought, establishes the right to benefit from culture, thus protecting artists and their work, as well as the right to work in conditions that are dignified and free.[247]

145.     Regarding the right to education and academic freedom, the IACHR and its REDESCA express their concern about the information submitted by the Observatory for Academic Freedom (OLA), regarding several cases of violations of academic freedom, university autonomy, and other connected human rights.[248] Through June 2021, OLA recorded 44 cases (22 historical and 22 recent) that are in some way related to the

---

[242] European Parliament, resolution of 10 June 2021 on the human rights and political situation in Cuba

[243] ASIC, Informe de la Asociación Sindical Independiente de Cuba sobre los sucesos ocurridos durante el sonado estallido popular del domingo 11 de julio de 2021, July 20, 2021.

[244] ASIC, Informe de la Asociación Sindical Independiente de Cuba sobre los sucesos ocurridos durante el sonado estallido popular del domingo 11 de julio de 2021, July 20, 2021.

[245] IACHR, Compendium, Labor and Trade Union Rights, para. 50/51.

[246] IACHR, Press Release 119/21 IACHR and Offices of Special Rapporteurs Condemn Harassment of Artists, Journalists, and Activists in Cuba and Call on State to Cease Acts of Persecution Against Those Exercising the Right to Freedom of Expression and Artistic Creation, May 13, 2021.

[247] IACHR, Press Release 119/21 IACHR and Offices of Special Rapporteurs Condemn Harassment of Artists, Journalists, and Activists in Cuba and Call on State to Cease Acts of Persecution Against Those Exercising the Right to Freedom of Expression and Artistic Creation, May 13, 2021.

[248] Observatorio de Libertad Académica, Informe n. 11, June, 2021, p. 11.

Cuba AR_001527



ANNUAL REPORT 2021

rights of academic freedom and university autonomy, and 29 institutions that have engaged in the systematic and widespread violation of human rights.[249]

146.     Additionally, and along the same lines, the IACHR and its REDESCA also express their concern regarding the situation of professors and students that participated in the peaceful protests of July 11, 2021[250], as well as those who announced their participation in the protests of November 15. One such case that came to light wat that of the professor, David Alejandro Martínez Espinosa who, according to the information gathered, was expelled from the University of Medical Science in Cienfuegos on October 19, 2021, for having been one of those who signed the notification of the peaceful march for change, scheduled to take place on November 15, 2021.[251]

### III.     THE STATE'S RELATIONSHIP WITH OTHER ACTORS

147.     Despite the Cuban government's indications that it was willing to cooperate with human rights bodies[252], there were no reports during 2020 of visits by international monitoring bodies. For its part, despite repeated requests for consent, the IACHR has not visited the country. It hereby reiterates again its request to the Cuban State for consent to and facilitation of the realization of its first country visit to the island to enable it to observe the human rights situation firsthand, as well as the progress and challenges it faces on the subject matter, with the aim of guaranteeing respect for human rights in Cuba.

### A.     Status of Cuba in the OAS

148.     On January 31, 1962, the Government of Cuba was excluded from participating in the Inter-American System under Resolution VI, adopted at the Eighth Meeting of Consultation of Ministers of Foreign Affairs, held in Punta del Este, Uruguay.[253]  Subsequently, on June 3, 2009, during the 39th Regular Session of the General Assembly, held in San Pedro Sula, Honduras, the General Assembly of the Organization of American States (OAS), by means of Resolution No. 2438, annulled that Resolution, and provided: "That the participation of the Republic of Cuba in the OAS will be the result of a process of dialogue initiated at the request of the Government of Cuba, and in accordance with the practices, purposes, and principles of the OAS."[254]

149.     As of the date of adoption of this report, the annulment of the 1962 resolution that excluded the Cuban Government from the inter-American system has not resulted in Cuba's reincorporation in the OAS. For example, in 2018, at the Eighth Summit of the Americas, Cuba sent a delegation, and despite walking out of the inaugural session prior to the address delivered by Secretary General of the OAS, it announced that it would continue to "exercise [its] legitimate right to participate at a forum to which it should have been a party for a

---

[249] Observatorio de Libertad Académica, Informe n. 11, June, 2021, p. 11.

[250] IACHR/REDESCA, Integrated Network of Civil Society Organizations in Cuba. Minutes of the meeting on protests, freedom of expression, and ESCER, August 4, 2021.

[251] Diario de Cuba, Represión por el 15N en Cuba: Expulsado un profesor universitario por 'pérdida de ideología' revolucionaria, October 20, 2021.

[252] Prensa Latina, Cuba reitera voluntad de cooperar con órganos de derechos humanos, October 29, 2018.

[253] See the text of Resolution VI in the Final Act of the Eighth Meeting of Consultation of Ministers of Foreign Affairs serving as Organ of Consultation in Application of the Inter-American Treaty of Reciprocal Assistance, Punta del Este, Uruguay, January 22 to 31, 1962, Doc. OEA/Ser.F/II.8, doc. 68, pp. 13-15

[254] The text of Resolution AG/RES. 2438 (XXXIX-0/09) can be found in the "Thirty-Ninth Regular Session, San Pedro Sula, Honduras, June 2 to 4, 2009, Acts and Documents, Volume I," Organization of American States, OAS/Ser.P/XXXIX-0.2, p. 12.

Cuba AR_001528

ANNUAL REPORT **2021**



IACHR Inter-American Commission on Human Rights

long time." At the same event, Foreign Minister Bruno Rodríguez reiterated the position of the Cuban State with respect to what it views as the use of the OAS as an instrument of the geopolitical interests of the United States.

150.    The exclusion of the Cuban government by the OAS has not impeded the Commission from fulfilling its mandate of human rights promotion and protection[255], inasmuch as it recognizes Cuba as "juridically responsible to the Inter-American Commission in matters concerning human rights" because it is "a party to the international instruments initially established to protect human rights in the American hemisphere" and because Resolution VI of the Eighth Meeting of Consultation "excluded the Government of Cuba and not the Cuban State from participation in the Inter-American system."[256]

151.    The Commission reminds that States that have not ratified the American Convention on Human Rights conferred on the Commission the power "to pay particular attention to the observance of the human rights referred to in Articles I, II, III, IV, XVIII, XXV and XXVI of the American Declaration of the Rights and Duties of Man," as established in Article 20(a) of the Statute of the IACHR.

152.    In the framework of this mandate, the Commission has written eight country reports on Cuba, the last one in 2020. Cuba was included in Chapter IV, or the equivalent thereof, of the Annual Report in 1984-1985 to 1994, and uninterruptedly from 1996 to 2018. As of the 2013 amendments to the Rules of Procedure, Cuba's inclusion in annual reports has been based on the criteria under Article 59, section 6, subsections a.i and c of the Rules of Procedure.

153.    Over the past 10 years, the IACHR has held an average of two public hearings per year on Cuba. Additionally, pursuant to Article 18(d) of the Statute, information has been requested from the State, and in turn, individual petitions, cases, and requests for precautionary measures continue to be received, processed and examined.

154.    As of the drafting of this report, Cuba has 41 active precautionary measures, the majority for the protection of activists, dissidents, opposition members, human rights defenders, and political prisoners. Of those, eight were granted in 2020. While the Cuban State does not reply to the IACHR's communications and decisions, civil society organizations report experiencing a cessation or decrease in intensity, temporarily, of the mistreatment, retaliation, harassment and/or assaults to which they were subjected prior to the Commission acting.

### B.    Relations between Cuba and the United States

155.    Since the announcement on December 17, 2014, of the reestablishment of relations between Cuba and the United States of America[257], the Commission has been continually monitoring partial lifting of the economic blockade by the US Congress.[258]

---

[255] In 2018, the IACHR sent two letters requesting information from the State and published two press releases: IACHR, Press release R152/2018, The IACHR publishes merit report in case related to the criminalization of political opinion and deliberation in Cuba, April 11, 2018; and IACHR, Press release R82/2018, The Office of the Special Rapporteur Expresses Concern over Criminal Convictions for desacato laws in Cuba, July 17, 2018.

[256] IACHR. 2002 Annual Report, Chapter IV, Development of human rights in the region, Cuba, OEA/Ser.L/V/II.117 Doc. 1 rev. 1, March 7, 2003, paragraphs 3-7; The Situation of Human Rights in Cuba, Seventh Report, OEA/Ser.L/V/II.61, Doc.29 rev. 1, October 4, 1983, paragraphs 16-46.

[257] The White House, Press Release, Fact Sheet: Charting A New Course On Cuba, December 17, 2014.

[258] IACHR, press release 156/2014: IACHR Welcomes Announcement to Restablish Relations between the United States and Cuba, December 18, 2014.

Cuba AR_001529



156.     In 2019, the U.S. government reactivated several sanctions imposed on the Cuban government.[259]  Toward the beginning 2020, the United States placed restrictions on private flights to all Cuban airports, apart from the José Martí International Airport in Havana.[260]  It had also previously restricted the sending of remittances to the island.[261]  Additionally, it limited the number of flights to a maximum of 3,600 starting on June 1 and through May 31, 2021.

157.     The Commission observed that in 2021 the United States government did not resume its policy of rapprochement with Cuba, nor did it withdraw measures to tighten the embargo.

158.     In particular, the IACHR noted that on May 4, U.S. Secretary of State expressed, during the 51st Conference of the Council of the Americas, that his country, "will condemn repression of human rights on the island" and will defend "the human rights of the Cuban people, including the right to freedom of expression and assembly". For its part, the Cuban Minister of Foreign Relations responded to those statements with the following words: "If Secretary Blinken were interested the human rights of Cubans, he would lift the blockade and the 243 measures applied by the prior administration that are in force today in the midst of COVID-19. He would reestablish consular and family reunification services."[262]

159.          159.     The Commission also observed that on June 23, the United Nations General Assembly (UNGA), in its 75th period of sessions, approved by a vote that carried by 184 votes in favor, Resolution A/RES/75/289, about the need to bring an end to the economic, trade, and financial blockade imposed by the United States of American against Cuba. In the framework of that Resolution, the General Assembly expressed its concern about continuing the blockade because of the negative effects those measures have on the Cuban people and on Cubans who reside in other countries. Additionally, the UNGA reiterated its exhortation that the States bring an end to the coercive laws and measures that implement the blockade in practice.[263]

160.     Furthermore, in the context of the July 11 protests, the government of the United States, based on the Magnitsky Law, announced sanctions against the Minister of the Revolutionary Armed Forces (FAR) and the special forces unit ("black berets") of Cuba's Ministry of Interior[264], the National Revolutionary Police (PNR) and two of its leaders[265], as well as against high-level officials of the Ministry of Interior and the unit known as the "red berets", for the repression of the protests and, in particular, the use of violence against peaceful protesters.[266] Additionally, on August 3, the United States Senate passed a resolution condemning the government of Miguel Díaz-Canel for the manner in which it brought an end to the demonstrations and in support of those who cried out for liberty.[267]

---

[259] Congressional Research Service, "Cuba: U.S. Policy in the 116th Congress", May 14, 2020, pg. 24.

[260] *El Nuevo Herald*, "Estados Unidos elimina los vuelos chárter a Cuba excepto a La Habana", January 10, 2020.

[261] United States Department of State, United States Restricts Remittances and "U-Turn" Transactions to Cuba , September 6, 2019.

[262] El País, Cuba y EE UU vuelven a los tiempos de la confrontación, May 31, 2021.

[263] United Nations, General Assembly, Resolution 75/289 Necessity of ending the economic, commercial and financial embargo imposed by the United States of America against Cuba, 75th sesión, June 23, 2021.

[264] U.S. Department of State, Sanctioning Cuban Security Forces in Response to Violent Repression of Protests, July 22, 2021.

[265] U.S. Department of State, Sanctioning Cuban Police in Response to Violent Repression of Peaceful Protests, July 30, 2021.

[266]U.S. Department of State, Treasury Sanctions Cuban Ministry of Interior Officials and Military Unit in Response to Violence Against Peaceful Demonstrators, August 13, 2021.

[267] Agencia EFE, El Senado de EE.UU. condena la "represión" de las protestas en Cuba, August 4, 2021.

Cuba AR_001530

 

161.      Lastly, the Commission notes that the U.S. government is pursuing strategies to facilitate internet access for Cubans[268], especially given the context of deliberate outages and interruptions to service by Cuban authorities. According to publicly available information, the U.S. government is also evaluating ways to facilitate the flow of remittances to Cuba.[269]

## IV.      CONCLUSIONS AND RECOMMENDATIONS

162.      The IACHR reiterates its interest in conducting its first country visit to Cuba to reach out and open a respectful dialogue with the Cuban State, and thus provide any technical support in the area of human rights that may be required, in the interest of promoting respect and guarantee of human rights on the island. Additionally, the IACHR again recognizes and appreciates the actions taken to foster rights in Cuba and highlights the international cooperation that is offered by the Cuban people to the countries of the region in the fields of health, education, culture, and others.

163.      However, the IACHR notes with great concern that in view of the information collected in 2020 and taking into account the recommendations issued in its most recent country report and in Chapter IV of the Annual Reports of previous years, the Commission observes no improvements in structural aspects such as violations of the rights to liberty and personal integrity, arbitrary restrictions on the right to vote and to participation in government, freedom of expression and the dissemination of ideas. Likewise, violations of due process guarantees and unlawful limitations on the right of residence and movement persist. Moreover, the IACHR finds it unfortunate that the official information available is so limited, and also laments the history of the State distancing itself from this regional human rights body.

164.      Therefore, in compliance with its mandate, the Commission urges the Cuban State to:

**Right to vote and to Participate in Government**

1.   Adopt the legislative and other measures necessary to ensure an electoral system that is inclusive and that ensures the free circulation of ideas and thought, enabling free political participation for all Cuban citizens on an equal footing.

**Representative Democracy and Political Rights**

2.   Adopt measures to guarantee for Cubans the full exercise of political rights provided in the new Constitution.

3.   Adopt the legislative and other measures necessary to ensure an electoral system that is inclusive and ensures the free circulation of ideas and thought, making possible free political participation for all Cuban citizens on an equal footing.

4.   Adopt measures allowing the rights to freedom of assembly and of association for individuals, organizations, and political movements.

5.   Release all persons detained for political reasons or reasons of conscience, including activists, artists, and journalists processed because of their work or activism.

---

[268] Agencia EFE, Biden evalúa opciones para facilitar a los cubanos el acceso a internet, July 30, 2021.

[269] Agencia EFE, Biden evalúa opciones para facilitar a los cubanos el acceso a internet, July 30, 2021.

Cuba AR_001531





**Independence of the Judicial Branch and Due Process Guarantees**

6. Adopt the measures necessary to ensure the full independence of the judicial branch from the other branches of government. The IACHR recommends adopting measures to ensure judges have guarantees as soon as they are selected for carrying out their work independently, impartially, in accordance with the law, and with respect for human rights.

7. Guarantee that crimes codified in legislation is not used inappropriately to restrict other rights, nor used against dissidents.

8. Refrain from making illegal or arbitrary detentions, and when a person is deprived of liberty, ensure that the measure is exceptional and complies with all guarantees for restricting this right, including the requirement to be brought immediately before a judge.

9. Adopt all necessary measures to prevent State-led investigations from leading to unfair or baseless prosecution of those who through social protest legitimately claim their rights. This includes ensuring due process guarantees for all who are detained or charged, in keeping with Inter-American standards.

**Freedom of Expression**

10. Immediately end the harassment, including the summonses, detentions of any length, and harassment of anyone for reasons related to the exercise of their freedom of expression, freedom of association, freedom of assembly, and related rights.

11. Guarantee that citizens and groups, including artists, political dissidents, human rights defenders, and others, have the right to peaceful assembly, to political participation, and to freedom of expression without fear of suffering retaliation or criminalization, thereby enabling and fostering a plural, expansive, and robust public debate.

12. Guarantee the conditions for the free exercise of journalism, establish legal guarantees enshrining the freedom of the press without obstructions, and allow the existence of non-government media outlets.

13. Guarantee access to the Internet without restrictions, thereby promoting universal access to Internet to ensure the effective enjoyment of the right to freedom of expression. In this sense, ensure that provisions of law regulating Internet access in the country are compatible with international human rights law, including the right to freedom of expression and thought and the right to privacy, as well as the principles of equal protection, nondiscrimination, pluralism, and net neutrality. This also includes making the costs of accessing the Internet and expanding connectivity affordable.

14. Refrain from conducting any type of surveillance or data processing, including the storage, analysis, and disclosure of personal information, except when it has a legitimate purpose to do so, or it has the informed consent of the person affected; and adopt normative measures aimed at banning these practices and establish mechanisms of effective and independent oversight.

**Human Rights Defenders**

15. Adopt adequate prevention mechanisms to avoid acts of harassment, threats, assaults, stigmatization, persecution, and criminalization committed by State officials, or with their acquiescence, to the detriment of human rights defenders.

Cuba AR_001532





16. Refrain from imposing arbitrary restrictions on the right to free movement of human rights defenders, allowing them to freely exercise their right to freedom of movement on Cuban territory, as well as to depart and return to the country.

17. Refrain from arbitrarily deprived of their liberty human rights defenders, who perform legitimate human rights defense work in the country.

**LGBTI persons**

18. Take all measures necessary to legally recognize unions or marriage of persons of the same sex, granting them the same rights conferred to couples of different sexes, including property rights and all other rights that derive from the relationship, without distinction based on sexual orientation or gender identity, under penalty of violating the rights to equality and nondiscrimination.

19. Make efforts and allocate sufficient resources to systematically collect and analyze statistics on the prevalence and nature of the violence and discrimination based on prejudice against LGBTI persons or those perceived as such.

20. Guarantee protection of LGBTI persons and address the underlying causes of violence and discrimination against them, and its obligation to act with due diligence to prevent, investigate, try, punish, and provide reparations for human rights violations against LGBTI persons.

21. Adopt gender identity laws that recognize the right of trans and gender-diverse persons to change their images, their names, and "sex" or "gender" markers on birth certificates, identity documents, and other legal documents.

**Women**

22. Ratify the Inter-American Convention on the Prevention, Punishment, and Eradication of Violence against Women (Convention of Belém do Pará) and adopt a general legal definition of all forms of discrimination against women that includes direct and indirect discrimination, pursuant to inter-American and universal standards on the issue.

23. Regularly produce complete statistics on violence and discrimination against women, disaggregated at a minimum by gender, age, ethnic-racial origin, socioeconomic status, disability, and sexual orientation and gender identity/expression, as well as the location of the incidents, with the aim of building an accurate picture of the specific ways in which violence and discrimination affect women.

24. Take measures to guarantee training for public officials at all levels on the rights of women, including security forces and penitentiary staff, even when they are not involved in processing cases of discrimination and violence.

25. Guarantee the lives, security, and integrity of women who perform human rights defense work.

**Persons of African Descent**

26. Adopt special measures to combat all forms of discrimination against persons of African descent, especially as it relates to the access and effective enjoyment of their economic, social, cultural, and environmental rights.

Cuba AR_001533

 

27. Prevent or eradicated the various types of violence against persons of African descent in Cuba and conduct independent investigations into acts of violence and discrimination against them, considering prejudice as a possible motive for such acts.

**Persons Deprived of Liberty**

28. Establish an up-to-date and public registry whose access is simple and unrestricted, with regular updates, on persons deprived of liberty, containing the following information at a minimum: (a) the number of persons deprived of liberty at the respective detention facility; (b) procedural status or situation; (c) gender and age. Specifically, factors such as race, ethnicity, age, sexual orientation, gender identity and expression, interculturality, intersectionality, and disability status, should be included.

29. Guarantee that people in State custody are treated with dignity. Specifically, ensure that detained individuals have the medical care they need for their specific health conditions, receive sufficient food with high nutritional value, and have hygienic living conditions.

30. In the context of the global COVID-19 pandemic, adopt measures to address prison overcrowding, including by reevaluating cases of pretrial detention to identify the ones in which alternatives to deprivation of liberty can be used, giving priority to the populations with the greatest health risks. Additionally, implement actions to create conditions of true equality of access to vaccines for all persons deprived of liberty.

**Economic, social, cultural, and environmental rights**

31. Immediately, urgently, and with due diligence adopt all adequate measures to protect the economic, social, cultural, and environmental rights of the population without any discrimination, with a particular focus on vulnerable populations such as persons with COVID-19—pursuant to the terms of Resolution 4/2020 of the IACHR—older persons, persons with disabilities, persons with comorbidities, children, adolescents, persons in a state of human mobility, and caretakers, as well as anyone who is in spaces controlled by the State, such as penitentiary facilities, isolation facilities, and others.

32. Establish a transparent strategy for confronting the COVID-19 pandemic, making publicly available all relevant information about the pandemic and vaccinations.

33. Adopt public policies and measures that guarantee the effective protection of the rights of health care personnel who are rendering services in Cuba, as well as those on international medical missions, in keeping with the international standards for human rights in that matter, including ILO regulations.

34. Take urgent action to ensure the provision of sufficient and affordable food and medicine to meet national demand, particularly ensuring the protection of the most vulnerable populations.

35. Adopt measures aimed at eradicating discrimination and segregation of vulnerable persons in the workplace, whether in the public or private sector, and respect the rights of individuals to freely choose and accept work, refraining from denial of equal access to dignified work.

36. Refrain from creating barriers to collective organization of workers and respect the right of individuals to protest in defense of their interests in conformity with their decisions.

37. Recognize and protect cultural rights and immediately cease persecution of artists or any other action against their work.

Cuba AR_001534



38. Take measures to guarantee the autonomy of universities and the academic freedom of their faculty and students.

Cuba AR_001535

Smuggling Migrants at the Border Now a Billion-Dollar Business - The New York Times



**The New York Times** | https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html

# Smuggling Migrants at the Border Now a Billion-Dollar Business

With demand for smugglers on the rise, organized crime has moved in, with cruel and violent results.

**By Miriam Jordan**

July 25, 2022

CARRIZO SPRINGS, Texas — From the street, the little brown house was unremarkable yet pleasant. A bright yellow toy school bus and red truck hung on the hog-wire fence, and the home's facade featured a large Texas lone star. But in the backyard was a gutted mobile home that a prosecutor later described as a "house of horrors."

It was discovered one day in 2014, when a man called from Maryland to report that his stepfather, Moises Ferrera, a migrant from Honduras, was being held there and tortured by the smugglers who had brought him into the United States. His captors wanted more money, the stepson said, and were pounding Mr. Ferrera's hands repeatedly with a hammer, vowing to continue until his family sent it.

When federal agents and sheriff's deputies descended on the house, they discovered that Mr. Ferrara was not the sole victim. Smugglers had held hundreds of migrants for ransom there, their investigation found. They had mutilated limbs and raped women.

"What transpired there is the subject of science fiction, of a horror movie — and something we simply don't see in the United States," the prosecutor, Matthew Watters, told a jury when the accused smugglers went on trial. Organized crime cartels, he said, had "brought this terror across the border."

But if it was one of the first such cases, it was not the last. Migrant smuggling on the U.S. southern border has evolved over the past 10 years from a scattered network of freelance "coyotes" into a multi-billion-dollar international business controlled by organized crime, including some of Mexico's most violent drug cartels.



Cuba_AR_001536

12/20/22, 11:06 AM
Case 6:23-cv-00007    Document 92-6    Filed on 03/24/23 in TXSD    Page 151 of 185
As Smuggling Grows Grisly, the Feds Follow a Trail of Dollars and Bodies - The New York Times

The deaths of 53 migrants in San Antonio last month who were packed in the back of a suffocating tractor-trailer without air conditioning — the deadliest smuggling incident in the country to date — came as tightened U.S. border restrictions, exacerbated by a pandemic-related public health rule, have encouraged more migrants to turn to smugglers.

While migrants have long faced kidnappings and extortion in Mexican border cities, such incidents have been on the rise on the U.S. side, according to federal authorities.

More than 5,046 people were arrested and charged with human smuggling last year, up from 2,762 in 2014.

Over the past year, federal agents have raided stash houses holding dozens of migrants on nearly a daily basis.

Title 42, the public health order introduced by the Trump administration at the beginning of the coronavirus pandemic, has authorized the immediate expulsion of those caught crossing the border illegally, allowing migrants to cross repeatedly in the hope of eventually succeeding. This has led to a substantial escalation in the number of migrant encounters on the border — 1.7 million in fiscal 2021 — and brisk business for smugglers.

In March, agents near El Paso rescued 34 migrants from two cargo containers without ventilation on a single day. The following month, 24 people being held against their will were found in a stash house.



The dense brush in South Texas conceals migrants and smugglers trying to evade detection by U.S. authorities. "You could hide a million elephants here," said Jerry Martinez, a captain in the Dimmit County Sheriff's Office.  Christopher Lee for The New York Times

Law enforcement agents have engaged in so many high-speed chases of smugglers lately in Uvalde, Texas — there were nearly 50 such "bailouts" in the town between February and May — that some school employees said they failed to take a lockdown order seriously during a mass shooting in May because so many previous lockdowns had been ordered when smugglers raced through the streets.

Cuba AR_001537

Case 6:23-cv-00007    Document 93-6    Filed on 03/24/23 in TXSD    Page 152 of 185

Teófilo Valencia, whose 17- and 19-year-old sons perished in the San Antonio tragedy, said he had taken out a loan against the family home to pay the smugglers $10,000 for each son's transport.

Fees typically range from $4,000, for migrants coming from Latin America, to $20,000, if they must be moved from Africa, Eastern Europe or Asia, according to Guadalupe Correa-Cabrera, an expert on smuggling at George Mason University.

For years, independent coyotes paid cartels a tax to move migrants through territory they controlled along the border, and the criminal syndicates stuck to their traditional line of business, drug smuggling, which was far more profitable.

That began to change around 2019, Patrick Lechleitner, the acting deputy director at U.S. Immigration and Customs Enforcement, told Congress last year. The sheer number of people seeking to cross made migrant smuggling an irresistible moneymaker for some cartels, he said.

The enterprises have teams specializing in logistics, transportation, surveillance, stash houses and accounting — all supporting an industry whose revenues have soared to an estimated $13 billion today from $500 million in 2018, according to Homeland Security Investigations, the federal agency that investigates such cases.



Rigs hauling migrants blend with the 20,000 trucks that travel daily on the I-35 freeway to and from Laredo, the country's busiest land port. Christopher Lee for The New York Times

Migrants are moved by plane, bus and private vehicles. In some border regions, such as the Mexican state of Tamaulipas, smugglers affix color-coded bands to the wrists of migrants to designate that they belong to them and what services they are receiving.

"They are organizing the merchandise in ways you could never imagine five or 10 years ago," said Ms. Correa-Cabrera.

Groups of Central American families who crossed the Rio Grande recently into La Joya, Texas, wore blue bracelets with the logo of the Gulf Cartel, a dolphin, and the word "entregas," or "deliveries" — meaning they intended to surrender to U.S. authorities and seek asylum. Once they had crossed the river, they were no longer the cartel's business.

Cuba AR_001538

Smuggling Migrants at the Border Now a Billion-Dollar Business - The New York Times

Previously, migrants entering Laredo, Texas, waded across the river on their own and faded into the dense, urban landscape. Now, according to interviews with migrants and law enforcement officials, it is impossible to cross without paying a coyote connected to the Cartel del Noreste, a splinter of the Los Zetas syndicate.

Smugglers often enlist teenagers to transport arrivals to stash houses in working-class neighborhoods. After they gather several dozen people, they load the migrants onto trucks parked in Laredo's vast warehouse district around Killam Industrial Boulevard.

"Drivers are recruited at bars, strip joints, truck stops," said Timothy Tubbs, who was deputy special agent in charge of Homeland Security Investigations for Laredo until he retired in January.

Cuba AR_001539

12/20/22, 11:06 AM
Case 6:23-cv-00007   Document 92-6   Filed on 03/24/23 in TXSD   Page 154 of 185
Smuggling Migrants at the Border Now Is a Billion-Dollar Business - The New York Times



Cuba AR_001540

Case 6:23-cv-00007    Document 92-6    Filed on 03/24/23 in TXSD    Page 155 of 185

"Before smugglers controlled the Rio Grande, some migrants crossed back and forth daily," said Timothy Tubbs, a retired agent with Homeland Security Investigations in Laredo, Texas, a busy smuggling corridor.  Christopher Lee for The New York Times

Rigs hauling migrants blend with the 20,000 trucks that travel daily on the I-35 freeway to and from Laredo, the country's busiest land port. Border Patrol agents posted at checkpoints inspect only a fraction of all the vehicles to ensure traffic keeps flowing.

The tractor-trailer discovered on June 27 with its tragic cargo had passed through a checkpoint about 30 miles north of Laredo without arousing suspicions. By the time it stopped three hours later on a remote road in San Antonio, most of the 64 people inside had already died.

The driver, Homero Zamorano Jr., one of two men indicted on Thursday in connection with the tragedy, said that he was unaware that the air-conditioning system had failed.

The 2014 incident at the stash house in Texas resulted in the arrest of the perpetrators and a subsequent trial, providing an unusually vivid look at the brutal tactics of smuggling operations. Though kidnapping and extortion happen with some frequency, such trials with cooperating witnesses are relatively rare, federal law enforcement officials say. Fearing deportation, undocumented relatives of kidnapped migrants seldom call the authorities.

That case began in the thick brush country eight miles from the Rio Grande, in Carrizo Springs, a popular transit point for people trying to elude detection. "You could hide a million elephants here, this brush is so thick," said Jerry Martinez, a captain in the Dimmit County Sheriff's Office.

Mr. Ferrera, 54, the torture victim, first migrated to the United States in 1993, heading to construction sites in Los Angeles and San Francisco, where he made more than 10 times what he earned back in Honduras. He returned home a few years later.



Moises Ferrera lost mobility in his right hand after smugglers struck it repeatedly with a hammer. "I came here for a better life, to help my family," he said in court testimony. "This is how my hand ended up. This hand's not any good now to work with."  Amanda Andrade-Rhoades for The New York Times

"In those days, you didn't need a coyote," he said in an interview from his home in Maryland. "I came and went a couple times."

Cuba AR_001541

When he set out in early 2014, Mr. Ferrera knew that he would have to hire a smuggler to breach the border. In Piedras Negras, Mexico, a man promised to guide him all the way to Houston. Mr. Ferrera's stepson, Mario Pena, said he wired $1,500 as payment.

After reaching Texas, Mr. Ferrera and several other migrants were delivered to the trailer in Carrizo Springs.

Before long, Mr. Ferrera's stepson received a call demanding an additional $3,500. He said he did not have any more money.

The calls became frequent and menacing, Mr. Pena recalled in an interview; the smugglers let him hear the sound of his stepfather's shrieks and groans as a hammer came down on his fingers.

Mr. Pena managed to wire $2,000 via Western Union, he said, but when the captors realized they could not collect the cash because it was a Sunday, they intensified their assaults.

Mr. Pena called 911.

Law enforcement agents found Mr. Ferrera in the trailer "severely, severely physically harmed, with lots of blood all over him, laying on a sofa" in the living room, according to testimony by one of the agents, Jonathan Bonds.

Another migrant, stripped down to his underwear, was squirming in pain, his bludgeoned hand held aloft, in the front bedroom. In the rear bedroom, agents encountered a nude woman, another migrant, who had just been raped by a smuggler who emerged naked from the bathroom.

The house's owner, Eduardo Rocha Sr., who went by Lalo and was identified as the leader of the smuggling ring, was arrested along with several others, including his son, Eduardo Rocha Jr. The younger Mr. Rocha testified that their cell was affiliated with the Los Zetas cartel and that over two years it had funneled hundreds of migrants into the United States and collected hundreds of thousands of dollars.

The elder Mr. Rocha was sentenced to life in prison. His son and the man who had carried out most of the physical abuse received 15- and 20-year sentences.

Mr. Ferrera testified at their trial. As a victim of a crime who had assisted law enforcement, he was allowed to remain in the United States. But his new life had come with a cost, which he displayed when he held up his right arm for the jury, the fingers now lifeless. "This is how my hand ended up," he said.

Susan C. Beachy contributed research.

Cuba AR_001542



**Immigration**

# As United States' 'Remain in Mexico' plan begins, Mexico plans to shut its 'too successful' humanitarian visa program

**GlobalPost**

*January 24, 2019 • 9:45 PM EST*

By **Sarah Kinosian**



Migrants, part of a caravan travelling to the US, make a human chain to pull people from the river between Guatemala to Mexico in Ciudad Hidalgo and continuing to walk in Mexico, in October 2018. Many migrants headed for the border will likely find themselves waiting in Mexico as part of the US's new "remain in Mexico" policy.

Credit: Leah Millis/Reuters



said. "But it depends on the amount of people we are really talking about. ... This is a US

¨The irony of this measure is that it is going to drive people who are trying to apply for asylum at ports of entry and do things the right



could create total disorder," said Cesar Palencia, head of migrant services in Tijuana. "What are we going to do with all the people they just let in?"



asylum. Urbina said he was facing threats after gang members killed his 16-year-old brother.





**US' indefinite ban on Iranians drafted into Iran's Revolutionary Guard continues to separate families**



**sky**

**'Kneel and apologize!': 76 years after island-wide massacre, Taiwan continues to commemorate — and debate — the tragedy**



Cuba AR_001552



Cuba AR_001553

Politics

# More than 4,000 migrants voluntarily returned to Venezuela from Panama

 Online News Editor    •  November 9, 2022     2 minutes read



Panama City, Nov 9 (EFE).- More than 4,000 irregular Venezuelan migrants have voluntarily returned to their country from Panama in recent weeks, authorities said on Wednesday.

"Through 24 'humanitarian flights,' more than 4,000 (Venezuelan migrants) who have voluntarily returned home have left Panama, (but) even so we had almost 1,000 people in the Veranillo shelter (in the capital) yesterday," said National Migration Service Director Samira Gozaine.

This refuge, a shed without facilities, was set up by the Venezuelan embassy to receive the nationals, many of whom gave up their goal of entering the United States after Washington announced a new immigration policy for Venezuelans on Oct. 12 that left the tens of thousands of them with little hope of entering.

Now, Venezuelans who had already arrived in Mexico or who were in transit through Central America, are now returning to Panama, with many thinking

Cuba AR_001554

that from this country they can travel to Venezuela for free, which is "false," the Panamanian authorities have insisted.

"On the flights, I think more than one million dollars has been spent among people who pay for their own flights. I think it should be noted that there have been many donors (…) Venezuelans and many Panamanians. The Adventist Church has been helping, the Catholic too," Gozaine told local network TVN.

In that sense, the director of migration revealed that Panama's foreign ministry "has been intervening so that Venezuela returns its citizens at no cost on state airlines."

More than 210,000 irregular migrants have passed through Panama this year on their way to the US. They arrived in the country after crossing the dangerous Darien Gap on the border with Colombia. More than 70 percent of them are Venezuelan, according to official data.

In a humble barbershop a few meters from the capital's shelter, 21-year-old Venezuelan Rafael Arocha cut a man's hair on Wednesday in exchange for $3-4. He wants to collect around $260 for a flight home.

In Venezuela, Arocha was a motorcycle taxi driver. He says he left his country on Sep. 30, crossed the Darien Gap, something he "never" will do again, and managed to reach Mexico, but returned "without money or anything" after the US change of policy.

"Unfortunately the doors were closed to us. There is nothing to do (…) I really need to go" home, he said.

Orlando Saavedra, 31, asked Wednesday at a traffic light for a "collaboration" to collect the cost of a ticket back to Venezuela.

He arrived at the shelter on Nov. 4, but says he knows of people who have been there for more than two weeks.

"They are taking out (on voluntary repatriation flights) women with children, but they leave men," he said. EFE

Cuba AR_001555

Case 6:23-cv-00007 Document 92-6 Filed on 03/24/23 in TXSD Page 170 of 185

gf-cl-bv/tw

#EFE    #MIGRATION CRISIS

Cuba AR_001556

# Coast Guard suspends search for migrants off Florida

By ADRIANA GOMEZ LICON January 27, 2022

MIAMI BEACH, Fla. (AP) — The Coast Guard said it suspended its rescue operations at sunset Thursday after announcing earlier that afternoon that it had found four additional bodies in its search for dozens of migrants lost at sea off Florida.

Homeland Security Investigations officials have said they were actively investigating the case as a human smuggling operation.

Authorities have now found a total of five bodies, leaving 34 missing five days after the vessel capsized on the way to Florida from Bimini, a chain of islands in the Bahamas about 55 miles (88 kilometers) east of Miami.

Coast Guard Capt. Jo-Ann F. Burdian said earlier the decision to suspend the search was not an easy one.

"We have saturated the area over and over again," she told a news conference. "We've had good visibility. ... We've overflown the vessel a number of times. ... It does mean we don't think it's likely that anyone else has survived."

The Miami office of Homeland Security Investigations has launched an inquiry, saying the migrants' journey was most certainly part of a human smuggling operation. Under federal law, a smuggler convicted of causing a death is eligible for execution.

"The goal of this investigation is to identify, arrest and prosecute any criminal or criminal organization that organized, facilitated or profited from this doomed venture," said HSI Miami Special Agent in Charge Anthony Salisbury.

Salisbury declined to give any information on the nationalities of the boat passengers but said investigators consider the lone survivor "a victim right now," not a suspect. Salisbury appealed to the public for tips to help identify who organized the boat crossing.

"Please help us bring criminals who prey on and victimize the vulnerable migrant community to justice," he said. "We don't want anybody doing this again. ... This is dangerous stuff."

The lone survivor was found hanging onto the 25-foot (7-meter) vessel about 40 miles (64 kilometers) off Fort Pierce, Florida. He told a good Samaritan and authorities that the boat capsized late Saturday after he and 39 others had set out for Florida from Bimini.

Authorities said the boat was found about 100 miles (160 kilometers) north of where it capsized, apparently pushed by the Gulf Stream, a warm, swift current that wraps around the Florida peninsula and flows along the Atlantic Coast of the United States. No one was wearing a life jacket, the rescued man told authorities.

The Gulf Stream can be treacherous even on a calm, sunny day. Throw in an overloaded boat, inexperienced mariners, stormy weather and the dark of night, and they can become deadly.

A small craft advisory had been issued on Saturday and Sunday as a severe cold front with winds up to 23 mph (37 kph) blew through the dangerous passage, creating swells up to 9 feet (3 meters).

Coast Guard suspends search for migrants off Florida | AP News

# Situation 'dire' as Coast Guard seeks 38 missing off Florida

By ADRIANA GOMEZ LICON
January 26, 2022

MIAMI BEACH, Fla. (AP) — The Coast Guard battled time and currents Wednesday as its planes and ships searched for 38 people missing off the coast of Florida, four days after a suspected human smuggling boat capsized in a storm.

The accident killed at least one person and left a single known survivor, and U.S. authorities launched a criminal investigation.

Capt. Jo-Ann F. Burdian said the survivor told rescuers that the boat capsized Saturday evening shortly after sailing from the Bahamas into a storm. The Coast Guard was alerted Tuesday morning after the crew of a merchant vessel spotted the man sitting alone on the overturned hull of the 25-foot boat. He was taken to a hospital with symptoms of dehydration and sun exposure and turned over to Homeland Security officials, who said he is "conscious and lucid."

Burdian said finding other migrants alive is urgent.

"With every moment that passes, it becomes much more dire and more unlikely" that survivors will be found, she told a news conference.

Crews searched around the clock, extrapolating from where the wreck was spotted about 40 miles (64 kilometers) off Fort Pierce. By Wednesday morning, crews on at least four ships and five aircraft scanned a vast area about the size of New Jersey, Burdian said. The Coast Guard posted on Twitter Wednesday evening that crews would continue to search through the night.

"We are using every piece of information we can to make sure we are exhausting our search efforts," Burdian said. "But we can't search forever."

The weather forecast through Thursday calls for scattered rain and thunderstorms in the search area, with swells cresting at 2 to 3 feet (1 meter) and winds blowing at 12 to 15 mph (19 to 24 kph). The National Weather Service described conditions as "relatively benign" until a strong cold front arrives on Friday.

Homeland Security Investigations opened the criminal probe, said Anthony Salisbury, special agent in charge of agency's Miami office. The effort includes U.S. agents in the Bahamas.

"You're dealing with criminal organizations that have no value for human life or safety. It's really victimizing the migrants. It's just about the money," he said.

Agents have interviewed the survivor, but Salisbury would not identify the man or his nationality, nor reveal the nationalities of any others believed to have been on the vessel.

The rescued man told the Coast Guard he was part of a group of 40 people who left Bimini in the Bahamas, Burdian said. The man said the boat capsized shortly thereafter, and no one aboard was wearing a life jacket, she added.

A small craft advisory had been issued as a severe cold front blew through the dangerous passage on Saturday and Sunday, with winds up to 23 mph (37 kph) and swells up to 9 feet (3 meters). Tommy Sewell, a local fishing guide, said there were high winds and fierce rain squalls from Sunday into Monday.

Burdian would not provide any more details, saying he's now in the custody of the Department of Homeland Security.

Bimini is a small cluster of islands about 55 miles (90 kilometers) east of Miami and about 100 miles (160 kilometers) south of where the survivor was found. The capsized boat was apparently pushed north by the Gulf Stream, a warm, swift current that wraps around the Florida peninsula and flows north along the Atlantic Coast of the United States.

Migrants from around the world have long used the Bahamas as a steppingstone to reach Florida and the United States. They typically try to take advantage of breaks in the weather to make the crossing, but the vessels are often dangerously overloaded and prone to capsizing. There have been thousands of deaths over the years.

For the most part, these migrants are from Haiti and Cuba, but the Royal Bahamas Defense Force has reported apprehending migrants from other parts of the world, including from Colombia and Ecuador earlier this month.

The Bahamas and nearby Turks and Caicos Islands have in recent years stepped up their anti-smuggling enforcement efforts in cooperation with the Coast Guard.

In May, a Canadian man was sentenced in the U.S. to more than two and a half years in prison for his role in an operation that smuggled people from Sri Lanka by plane to Haiti, then by boat to the Turks and Caicos and the Bahamas before heading to South Florida. The case was investigated by the Homeland Security Department, which is also looking into the operation behind the capsized boat.

The Coast Guard constantly patrols the waters around Haiti, the Dominican Republic, Cuba and the Bahamas. On Friday, its crews pulled 88 Haitians from an overloaded sail freighter west of Great Inagua, Bahamas.

Last July, the Coast Guard rescued 13 people after their boat capsized off of Key West as Tropical Storm Elsa approached. The survivors said they left Cuba with 22 people aboard. Nine went missing in the water.

In the fiscal year that ended Sept. 30, the Coast Guard said it apprehended 838 Cubans, 1,527 Haitians and 742 people from the Dominican Republic in the region that includes Florida and the Caribbean. The agency also apprehended migrants from other nations, but it did not provide a breakdown of the other nationalities.

___

Associated Press writers Ben Fox in Washington and Curt Anderson in St. Petersburg, Florida, contributed to this report.

Capsized boat near Florida: Live Updates | AP News

Nicaragua eliminates visa requirement for Cubans
[Reuters](Reuters)



Nicaraguan and Cuban flags flutter as Nicaragua's merchant ship Augusto Cesar Sandino docks at the Mariel port with humanitarian shipment of food, Mariel, Cuba, August 6, 2021.

REUTERS/Alexandre Meneghini

MEXICO CITY, Nov 22 (Reuters) - Nicaragua announced on Monday that it is lifting the visa requirement for Cuban nationals in a move which could make it easier for Cubans to migrate north toward the United States.

Nicaragua's Interior Ministry said in a statement it was immediately establishing a free visa for all Cuban citizens to promote commercial exchange, tourism and humanitarian family relations. While Nicaraguan President Daniel Ortega has aligned himself with the Cuban government, its citizens previously needed visas to visit the Central American country.

In 2014, during the immigration crisis along the border between Nicaragua and Costa Rica, the Ortega government prevented Cubans from passing through its territory, a move many analysts considered a favor to Washington.

But relations between Managua and Washington have deteriorated sharply. Earlier this month, the U.S. government said Nicaragua's recent elections, in which Ortega was re-elected for his fourth consecutive term, were "illegitimate."

The United States has also imposed sanctions on 38 Nicaraguan officials, including Ortega's vice president and wife, Rosario Murillo, and three of their children.

# Los Angeles Times

WORLD & NATION

# Asylum seekers are gathering at the U.S.-Mexico border. This is why



Migrants this week in El Paso warm themselves by a fire at dawn after spending the night outside the U.S.-Mexico border fence. (John Moore / Getty Images)

BY LEILA MILLER | STAFF WRITER

DEC. 23, 2022 12:22 PM PT



CIUDAD JUAREZ, Mexico — The first time Mari Marin Bastidas tried to claim asylum at the U.S. border, she was turned away by authorities who said a policy instituted to

Cuba AR_001564

slow the spread of COVID-19 meant her case would not even get a hearing.

Dejected, she returned to her home in the state of Michoacan in western Mexico.

Two years later, she is back at the border to try again. Word has been spreading that the policy, known as Title 42, is about to be lifted.



A smuggler carries a migrant across the Rio Grande near a high-traffic border crossing area in El Paso. (John Moore / Getty Images)

ADVERTISEMENT

Cuba AR_001565

"I decided to come because of the opportunity that is opening up," said Bastidas, 29. "I'm not going back anymore."

The fate of the policy now [rests with the U.S. Supreme Court](#) as anxiety and confusion build on both sides of the border. In Ciudad Juarez, untold numbers of asylum seekers have been gathering in recent weeks. Across the Rio Grande in El Paso, the mayor has declared a state of emergency in anticipation of a massive influx.

Bastidas, along with her 8-year-old daughter and two brothers, was among scores of migrants waiting along a narrow section of the river.

Some waded across to present themselves to border agents, either not realizing that Title 42 was still in effect or willing to take their chances anyway.

Bastidas and her family decided to wait and made their way to a migrant shelter nearby. They had $500 to carry them over for now.

They plan to claim asylum based on a fear of a local gang that she said had threatened her family for failing to pay a monthly extortion fee of roughly $400. Another brother had been killed several years ago by gang members running a similar scheme.

ADVERTISEMENT

Cuba AR_001566



Colombian migrant Jaider, 18, holds his puppy, Trucha, while looking over the Rio Grande into El Paso. He said he had carried the dog for his entire overland journey from Colombia. (John Moore / Getty Images)

Before Title 42, the United States considered all asylum claims, which often meant releasing migrants into the U.S. until a court rules on their cases — a process that can take years because of a large backlog. A small minority of asylum claims are ultimately accepted. Fleeing poverty is not a valid basis for a claim.

Under Title 42, a decades-old public health measure that the Trump administration resurrected in the early days of the pandemic, asylum seekers can be quickly expelled.

The Biden administration has opposed the policy in court while continuing to use it with help from Mexico, which agreed to accept Central Americans, and later Venezuelans, who the United States turned away.

But last month, a federal judge ruled that Title 42 was being used arbitrarily and was no longer justified as a pandemic health measure. He ordered it be lifted by Dec. 21.

Some 19 Republican-led states appealed to the Supreme Court, arguing that ending the policy would result in a surge of new migrants, and on Monday — two days before the deadline — Chief Justice John G. Roberts Jr. ruled that it would remain in place until the high court decided the case. If the policy falls, it is possible that the Biden administration could find new ways to limit asylum seekers.

ADVERTISEMENT

Still, El Paso has been bracing for the day when asylum seekers can no longer be summarily turned away.

Cuba AR_001568

Confusion mars U.S. immigration crackdown amid Title 42 end - Los Angeles Times



Migrants turning themselves in to U.S. officials stand behind a razor wire barrier by Mexico's border with El Paso. (Christian Chavez / Associated Press)

At one popular crossing spot along the Rio Grande, members of the Texas Army National Guard lined the riverbank with razor wire this week as a deterrent, and were standing watch next to their Humvees.

But already, 1,500 migrants a day on average are being taken into Border Patrol custody in the El Paso region, according to the Department of Homeland Security. After their fingerprints and basic information are recorded, many are expelled under Title 42. Some may be transferred to an immigration detention facility.

Others who might qualify for a Title 42 exemption — usually on humanitarian grounds or because Mexico limits how many migrants it accepts from various countries — may be released and allowed to remain in the United States, often with a court date.

Cuba AR_001569

This week, more than 50 migrants were staying at the Annunciation House shelter just north of the border. With cots in the chapel and playroom, the shelter has room for 60.

ADVERTISEMENT



Migrants eat and wait for help while camping on a street in downtown El Paso. (Andres Leighton / Associated Press)

Cuba AR_001570

Most move out within 48 hours to live with relatives or friends. Others have been bused to religious communities across the country that have offered to take them in.

The quick turnaround is important to make room for new migrants, said Ruben Garcia, who founded and runs the shelter.

"If we're having a difficult time dealing with the number of people who are arriving and we haven't even lifted Title 42, can you imagine what's going to happen when Title 42 gets lifted?" he said.

In anticipation, the city has opened up its convention center for temporary housing. About 200 of the 1,000 beds there were filled on Thursday night.

Still, some migrants are already living on the streets.

Not far from the convention center — where ice skaters glided around a large rink beside a lit-up Christmas tree — dozens of Venezuelan migrants had set up camp along two blocks of sidewalk. Sheets of cardboard served as mattresses. Locals dropped off donations of clothes.

ADVERTISEMENT

A 26-year-old named Yesimar — she spoke on condition that her last name not be used, because she had just crossed the border illegally — wrapped herself in a

Cuba AR_001571