PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 2

of the Ready Reserve face stress and anxiety because of the immigration status of their family members in the United States.

- Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children.

- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them. It is a commitment that begins at enlistment, and continues as they become veterans.

- Responding to these and similar concerns by several Members of Congress about soldiers and veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's commitment to assisting military families. The Secretary identified several of the discretionary tools that the Department utilizes "to help military dependents secure permanent immigration status in the United States as soon as possible." Among the tools listed was "parole … to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members."[1]

- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States. Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission. This latter use of parole is sometimes called "parole in place." The legal authority for granting parole in place was formally recognized by the then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2] That opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3] In 2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in relevant part.[4] The basic authority for parole in place is INA § 212(d)(5)(A), which expressly grants discretion to parole "any alien applying for admission to the United States." INA § 235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives (Aug. 30, 2010).
[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.
[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).
[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007). The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to release from detention under INA § 236(a)(2)(B) (so-called "conditional parole"), see Matter of Castillo-Padilla, 25 I&N Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole under INA § 212(d)(5)(A)).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 3

- This PM addresses two related issues.  The first is a policy question:  Should parole in place be granted to certain family members of active duty members of the U.S. Armed Forces, *individuals in the Selected Reserve of the Ready Reserve*, or individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve?  The second is a legal question: Does parole in place (for military family members or anyone else) affect whether an alien is inadmissible under INA § 212(a)(6)(A)(i)?  That provision is discussed below and is critical to determining the alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, parole <u>in place</u> is to be granted only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS[5] decides to grant parole in that situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds.  The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).  Aliens who have entered the United States without inspection, while not "arriving aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up.  Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.  As is true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate.  In enacting the various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

---

[5] ICE and CBP also have parole authority.  "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008).  Their decisions whether to grant parole are outside the scope of the present PM.
[6] INA § 235(a)(1).

Haiti AR_000378

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 4

individual grounds cover past, present, or future events, or some combination thereof.[7]  In particular, when Congress intended that a ground cover both past and present events, it said so explicitly.[8]  In contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense. Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i) would be practically superfluous.  Ordinarily, the only way for an alien to be present in the United States without admission or parole, as the first prong requires, is to have entered without inspection at some point in the past.[9]  Those individuals would already be covered by the second prong if "arrives" were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary. Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two anomalies.  First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically superfluous.  Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i), reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not possibly have intended.  The latter ground renders inadmissible any alien who has ever been unlawfully present in the United States for more than 180 days and then departs, but it limits the inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence.  If the second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct.  *See, e.g.*, sections 212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added); 212(a)(1)(A)(iv) ("determined … to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis added).  Other grounds cover only events that have occurred in the past (up to and including the present time).  *See, e.g.*, sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity) (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted, or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any other alien to enter or to try to enter the United States in violation of law") (emphasis added).  Still others cover only predictions of future activity.  *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge"); 212(a)(10)(A) ("coming to the United States to practice polygamy").

[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted to procure … prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist … party"); 212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit …"); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented, himself or herself" to be a U.S. citizen).

[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within even the more expansive interpretation of the second prong.  If the alien seeks admission at a designated port of entry, is denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be inadmissible under the first ground but not the second one.  It would be far-fetched, however, to assume that this was the only intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).

[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the United States."  But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have to be that "arrives" means "arrives or, if the person has not departed, has arrived."  There is no apparent legal basis or policy reason to interpret "arrives" in that way.

Haiti AR_000379

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 5

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless. One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i). Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years. That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole. Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled. And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place. It is not a question of *parole* curing or erasing the second inadmissibility ground. Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies. An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status. First, adjustment of status requires that the person be "admissible." INA § 245(a)(2). As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i). Second, adjustment of status requires that the alien have been "inspected and admitted or paroled." INA § 245(a). The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well. The alien must still, however, satisfy all the other requirements for adjustment of status. One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection). Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific congressional focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i). It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

Haiti AR_000380

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 6

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States." INA § 245(c)(2). Parole does not erase any periods of prior unlawful status. Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**
AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞      1. A new section 21.1(c) is added to read:

## 21.1   General Information About Relative Petitions

\* \* \* \* \*

(c) <u>Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve</u>.  The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, USCIS grants parole <u>in place</u> only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

o  Completed Form I-131, Application for Travel Document (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

o  Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or *less*, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and  certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 7

  o  Evidence that the alien's family member is an Active Duty member of the U.S. Armed
     Forces, individual in the Selected Reserve of the Ready Reserve or an individual who
     previously served in the U.S. Armed Forces or the Selected Reserve or the Ready
     Reserve such as a photocopy of both the front and back of the service member's military
     identification card (DD Form 1173);

  o  Two identical, color, passport style photographs; and

  o  Evidence of any additional favorable discretionary factors that the requestor wishes
     considered.

☞   2. Chapter 40.6.2(a) of the AFM is revised:

     a.  By amending Chapter 40.6.2(a)(1);

     b.  By deleting Chapter 40.6.2(a)(3)(ii);

     c.  By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as
         Chapter 40.6.2(a)(4)(ii); and

     d.  By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

## 40.6.2 Individual Grounds of Inadmissibility Under INA Section 212(a)(6)

## (a) INA Section 212(a)(6)(A): Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place

(1) General.  INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds.
The first ground relates to the alien who is "present in the United States without being
admitted or paroled."  This inadmissibility ground generally covers those who entered the
United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives
in the United States at any time or place other than as designated by the [Secretary of
Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up.
Using the present tense ("arrives"), it covers the alien who is in the process of entering
U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus
complementary.  Together, they capture aliens who have already achieved entry without
inspection and those who are in the process of attempting such entry.

*Parole.*  An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible
under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled),
because the person has been paroled.  And since that alien arrived in the United States only
in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 8

(even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.  Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a).  The grant of parole overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  Parole does not erase any periods of prior unlawful status or any other applicable grounds of inadmissibility.  An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

* * * * *

(4) Exemptions and Waivers

* * * * *

(ii) Waivers.  There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c).  As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 9

☞   3. The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical
order, to read:

| AFM Update AD12-30 11/15/2013 | **Chapter 21.1(c)** **Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |
|---|---|---|

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official
duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit,
substantive or procedural, enforceable at law or by any individual or other party in removal
proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the
Field Operations Directorate.

Haiti AR_000384



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Division**

## <u>Haiti: Country Conditions Update</u>
August 2022-October 2022
Last Updated: October 13, 2022

According to a *UN News* article published on September 26, Helen La Lime, head of the United Nations mission in Haiti, stated that an "economic crisis, a gang crisis, and a political crisis have converged into a humanitarian catastrophe" in Haiti.[1] The article further noted that:

> The UN estimates that at least 1.5 million people in the Caribbean country have been directly impacted by recent unrest, with gender-based violence, and in particular rape, being used systematically.

> The economic crisis has caused food prices to soar, while fuel is often available only on the black market.

> Protests broke out in Haiti after the Prime Minister announced on 11 September that the Government will reduce some $400 million in fuel subsidies in efforts to increase revenue for social programmes.

> By the following day, barricades had been erected throughout the country, prompting a nationwide shutdown, with the situation persisting in the capital for a full five days.

> One of the largest gang alliances also blocked the main fuel terminal there on 12 September. The siege lasted for over a week, despite concerted operations by the police over the weekend.[2]

Protests had previously taken place in late August, as the movement calling for acting Prime Minister Ariel Henry to be removed gathered steam.[3]

In mid-October, Reuters reported that a U.S. Department of State spokesman had indicated that the situation in Haiti "has grown dire."[4] *BBC News* stated in August that "an estimated 60% of Port-au-Prince is now classed as 'lawless' by human rights groups."[5]

On October 7, the government of Haiti requested "security assistance to confront gangs" from the international community.[6] That request remained under review by the U.S. Department of State as of October 11.[7] In the meantime, the U.S. Coast Guard is sending a cutter "to patrol the waters

---

[1] Security Council urged to act in face of 'humanitarian catastrophe' in Haiti, UN News, Sep. 26, 2022.
[2] Security Council urged to act in face of 'humanitarian catastrophe' in Haiti, UN News, Sep. 26, 2022.
[3] Sanon, Evens, Haitians launch protests, demand ouster of prime minister, The Associated Press, Aug. 22, 2022.
[4] Haiti's situation is dire and cannot persist, State Department says, Reuters, Oct. 11, 2022.
[5] Gebreab, Efrem and Isaac, Harold, It's like a warzone - Haitians surrounded by turf wars, BBC News, Aug. 8, 2022.
[6] Haiti's situation is dire and cannot persist, State Department says, Reuters, Oct. 11, 2022.
[7] Haiti's situation is dire and cannot persist, State Department says, Reuters, Oct. 11, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

around Port-au-Prince at the request of the Haitian government."[8] Civil society groups in Haiti have expressed concern that foreign military intervention will usher in more violence.[9]

In addition, the United Nations and the Haitian government have reported a new cholera outbreak, with the first cases detected between October 1 and 2.[10] These are the first cases reported in more than three years, as Haiti had attempted to eradicate the disease after a cholera outbreak killed approximately 10,000 people following the 2010 earthquake.[11] Cholera "spreads easily and can cause severe diarrhea and dehydration that can be deadly."[12] As of October 12, at least 18 people had died[13] and there had been 189 cholera-related hospitalizations since the beginning of this new outbreak.[14]

Médecins Sans Frontières (MSF) explained how the conditions as of early October impacted the ability to access medical care in Haiti:

> This resurgence of cholera is taking place at a time when Haitian people face enormous difficulties in accessing healthcare. Insecurity and violence, coupled with severe shortages of fuel and drinking water, have forced many health facilities to reduce their activities and in some cases to stop them altogether. In addition to this, people who need treatment find it increasingly difficult to move around as public transportation is scarcely available due to a lack of fuel in the country.[15]

The following list represents a sample of reports, commentary, and articles published since August 2022 that describe the multifaceted crisis in Haiti:

General

- Haiti's situation is dire and cannot persist, State Department says, Reuters, Oct. 11, 2022.

- Cursino, Malu, Haiti in a humanitarian catastrophe - UN envoy, BBC News, Sep. 27, 2022.

- Haiti facing 'humanitarian catastrophe', says UN envoy, Al Jazeera, Sep. 27, 2022.

---

[8] Hansler, Jennifer and Atwood, Kylie, US deploying delegation to Haiti amid security and humanitarian crises, CNN, Oct. 12, 2022.
[9] Taylor, Luke, 'More bullets, more bloodshed': Haiti aid groups warn against request for foreign forces, The Guardian, Oct. 9, 2022.
[10] Mérancourt, Widlore, Kasulis Cho, Kelly, and Coletta, Amanda, Cholera resurfaces in Haiti as gangs hinder access to water, hospitals, The Washington Post, Oct. 3, 2022.
[11] Mérancourt, Widlore, Kasulis Cho, Kelly, and Coletta, Amanda, Cholera resurfaces in Haiti as gangs hinder access to water, hospitals, The Washington Post, Oct. 3, 2022.
[12] Coto, Dánica, Concerns grow as cholera spreads through Haiti's prisons, The Associated Press, Oct. 12, 2022.
[13] Coto, Dánica, Concerns grow as cholera spreads through Haiti's prisons, The Associated Press, Oct. 12, 2022.
[14] Disease Outbreak News: Cholera - Haiti (12 October 2022), World Health Organization, Oct. 13, 2022.
[15] MSF responds to a resurgence of cholera cases amid insecurity and violence, Médecins Sans Frontières (MSF), Oct. 4, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

- [Security Council urged to act in face of 'humanitarian catastrophe' in Haiti](#), UN News, Sep. 26, 2022.

Food, Fuel, and Water Shortages

- Shellenberger, Michael, [Haiti Riots Triggered by IMF Advice To Cut Fuel Subsidies](#), Forbes, Sep. 22, 2022.

- Milfort, Milo,  Kurmanaev, Anatoly, and Paultre, Andre, [Haiti unrest worsens misery as residences face water shortage](#), Reuters, Sep. 18, 2022.

- [Haiti Unrest Worsens Hunt for Water as Storm Approaches](#), Voice of America, Sep. 17, 2022.

- [Fuel Hike Plunges Haiti Into Near Anarchy](#), The New York Times, Sep. 16, 2022.

- Sanon, Evens, and Coto, Dánica, [Many still seeking food, shelter a year after Haiti quake](#), The Associated Press, Aug. 21, 2022.

Gang Violence

- Taylor, Luke, [They have no fear and no mercy': gang rule engulfs Haitian capital](#), The Guardian, Sep. 18, 2022.

- [Police in Haiti blame gang members for slaying of 3 officers](#), The Associated Press, Sep. 15, 2022.

- Gebreab, Efrem and Isaac, Harold, [It's like a warzone - Haitians surrounded by turf wars](#), BBC News, Aug. 8, 2022.

- Video: [Haiti's gangs: What can be done to loosen their grip?](#), Al Jazeera, Aug. 8, 2022.

Health

- [Disease Outbreak News: Cholera - Haiti (12 October 2022)](#), World Health Organization, Oct. 13, 2022.

- Coto, Dánica, [Concerns grow as cholera spreads through Haiti's prisons](#), The Associated Press, Oct. 12, 2022.

- Mérancourt, Widlore, Kasulis Cho, Kelly, and Coletta, Amanda, [Cholera resurfaces in Haiti as gangs hinder access to water, hospitals](#), The Washington Post, Oct. 3, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

- [Haiti hospitals prepare to close as gangs blockade fuel supplies](#), Al Jazeera, Sep. 27, 2022.

- [Lives being lost in Haiti as life-saving health services risk coming to "standstill"](#), United Nations Children's Fund (UNICEF), Sep. 26, 2022.

<u>Natural Disasters</u>

- Mérancourt, Widlore and Coletta, Amanda, [A year after deadly earthquake, Haitians feel 'abandoned'](#), The Washington Post, Aug. 21, 2022.

<u>Political Crisis:</u>

- Ellsworth, Brian, [Haiti activists rally at White House seeking end of U.S. support for Henry](#), Reuters, Oct. 9, 2022.

- Bernal, Rafael, [More than 100 groups call on Biden to drop support for Haitian prime minister](#), The Hill, Sep. 16, 2022.

- Sanon, Evens, and Coto, Dánica, [Haiti reveals 'colossal loss' of $4M worth of corruption](#), The Associated Press, Aug. 26, 2022.

<u>Protests</u>

- Buschschlüter, Vanessa, [Haiti crisis: Clashes and looting as anger boils over](#), BBC News, Oct. 11, 2022.

- Mérancourt, Widlore and Coletta, Amanda, [Steep fuel price hikes spark violent protests in Haiti](#), The Washington Post, Sep. 16, 2022.

- Sanon, Evens, [Haiti to raise fuel prices, setting off street protests](#), The Associated Press, Sep. 14, 2022.

- [Haiti sees more protests as fuel price hike worsens public anger](#), Al Jazeera, Sep. 14, 2022.

- Sanon, Evens, [Thousands across Haiti demand ouster of PM in new protest](#), The Associated Press, Sep. 7, 2022.

- [Photos: Haitian protesters call for the PM to resign](#), Al Jazeera, Aug. 30, 2022.

- Sanon, Evens, [Haitians launch protests, demand ouster of prime minister](#), The Associated Press, Aug. 22, 2022.



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Division**

<u>Request for Foreign Intervention</u>

- Coto, Dánica, <u>US to pull visas of Haitian officials, send assistance</u>, The Associated Press, Oct. 12, 2022.

- Hansler, Jennifer and Atwood, Kylie, <u>US deploying delegation to Haiti amid security and humanitarian crises</u>, CNN, Oct. 12, 2022.

- Taylor, Luke, <u>'More bullets, more bloodshed': Haiti aid groups warn against request for foreign forces</u>, The Guardian, Oct. 9, 2022.

- <u>Haiti government prepares to ask for 'specialized armed force' from abroad</u>, The Guardian, Oct. 7, 2022.

- Thomas, Merlyn, <u>Haiti asks world for military help to curb chaos</u>, BBC News, Oct. 7, 2022.

- Ellsworth, Brian and Isaac, Harold, <u>Haiti to seek a foreign armed force to combat gangs</u>, decree says, Reuters, Oct. 7, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

## Temporary Protected Status (TPS) Considerations
## Haiti
## June 2021-July 2022

## Overview

According to *Agence France-Presse*, "Haiti today is mired by grinding poverty, murderous gangs who control large parts of the capital, and political chaos."[1] The second half of 2021 in Haiti was marked by two major events: "the assassination of President Jovenel Moïse on 7 July, and an earthquake with a magnitude of 7.2 that struck south-western Haiti on 14 August."[2] The investigation into the assassination remains "stalled" more than a year later.[3] The earthquake affected "more than 800,000 people, including 340,000 children," and caused "an estimated US$1.6 billion in economic losses."[4]

The United Nations Security Council reported in February 2022 that "gang violence continues to terrorize communities across Haiti."[5] The number of gangs in Port-au-Prince has "skyrocketed" since the assassination of President Moïse in July 2021.[6] According to the United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), "violent clashes between armed gangs have dominated socio-economic life in the Port-au-Prince metropolitan area" since June 2021, and "[t]he security situation has deteriorated significantly and reached new levels since the end of April 2022."[7] Haiti faces other challenges as well, including "civil unrest, a power vacuum at all levels, ineffective law enforcement and a flood of firearms onto the island."[8]

In a March 2022 report about conditions in Haiti for returnees, Human Rights Watch noted that:

> Returns to Haiti are life-threatening now, and will continue to be so, until security conditions in Haiti improve. [...] Haiti is experiencing a dire security situation, including loss of government control over strategic areas to the hands of dangerous armed gangs, widely believed to be financed by politicians and to have police officers on their payroll. Violence has worsened an already severe humanitarian crisis.[9]

---

[1] [Haiti's colonial debt burden sparks debate -- but official silence](#), Agence France-Presse, May 24, 2022.
[2] [Country Office Annual Report 2021: Haiti](#), United Nations Children's Fund (UNICEF), p.1, Mar. 2022.
[3] [A year after Haiti's president assassinated, investigation stalls amid political crisis](#), Agence France-Presse, Jul. 7, 2022.
[4] [Country Office Annual Report 2021: Haiti](#), United Nations Children's Fund (UNICEF), p.1, Mar. 2022.
[5] [Haiti's Road to Sustainable Democracy Dependent on Rebuilding Crumbling Institutions, Inclusive Dialogue, Timely Elections, Special Representative Tells Security Council](#), United Nations Security Council, Feb. 19, 2022.
[6] [In Haiti, gang violence strains aid operations and demands new approaches](#), The New Humanitarian, Feb. 7, 2022.
[7] [Haiti: Impact of the deteriorating security situation on humanitarian access: Background note - 8 July 2022](#), UN Office for the Coordination of Humanitarian Affairs (OCHA), Jul. 8, 2022.
[8] [Haiti's Road to Sustainable Democracy Dependent on Rebuilding Crumbling Institutions, Inclusive Dialogue, Timely Elections, Special Representative Tells Security Council](#), United Nations Security Council, Feb. 19, 2022.
[9] [Haitians Being Returned to a Country in Chaos](#), Human Rights Watch, Mar. 24, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

The United States Agency for International Development (USAID) summarized the findings of the United Nations' 2022 Humanitarian Needs Overview (HNO) for Haiti:

> Food insecurity, political instability, violence related to organized criminal group (OCG) activity, limited access to essential services, and exposure to natural hazards—including the August 2021 earthquake and tropical storms—have further escalated humanitarian needs during 2022, according to the UN. Areas affected by the August 2021 earthquake—including Grand'Anse, Nippes, and Sud departments—are among the regions with the greatest humanitarian needs, as well as Ouest, Nord-Ouest, and Centre departments, where recurring drought has exacerbated acute food insecurity conditions; significant humanitarian needs also persist in areas along the Haiti-Dominican Republic border.[10]

Per the United Nations Security Council, "4.9 million people — 43 per cent of the population" of Haiti need humanitarian assistance in 2022.[11]

### Security

In a travel advisory issued on July 5, 2022, the U.S. Department of State categorized Haiti as "Level 4: Do not travel" due to "kidnapping, crime, and civil unrest."[12] The travel advisory also noted that:

> Kidnapping is widespread and victims regularly include U.S. citizens. Kidnappers may use sophisticated planning or take advantage of unplanned opportunities, and even convoys have been attacked. Kidnapping cases often involve ransom negotiations and U.S. citizen victims have been physically harmed during kidnappings. Victim's families have paid thousands of dollars to rescue their family members.

> Violent crime, such as armed robbery and carjacking, is common. Travelers are sometimes followed and violently attacked and robbed shortly after leaving the Port-au-Prince international airport. Robbers and carjackers also attack private vehicles stuck in heavy traffic congestion and often target lone drivers, particularly women. [...]

> Protests, demonstrations, tire burning, and roadblocks are frequent, unpredictable, and can turn violent. [...] Local police generally lack the resources to respond effectively to serious criminal incidents.[13]

---

[10] Haiti: Complex Emergency Fact Sheet #5 Fiscal Year (FY) 2022, U.S. Agency for International Development (USAID), May 4, 2022.
[11] Haiti's Road to Sustainable Democracy Dependent on Rebuilding Crumbling Institutions, Inclusive Dialogue, Timely Elections, Special Representative Tells Security Council, United Nations Security Council, Feb. 19, 2022.
[12] Haiti Travel Advisory, U.S. Department of State, Jul. 5, 2022.
[13] Haiti Travel Advisory, U.S. Department of State, Jul. 5, 2022.



**Refugee, Asylum and
Int'l Operations
Research Unit**

In its most recent country security report published in December 2021, the U.S. Department of State's Overseas Security Advisory Council (OSAC) reported on the expansion of gangs in Haiti:

> Violent criminal gangs pose a growing challenge to state authority, including de facto control of territory. The previous two years have witnessed the emergence of a new federation uniting urban criminal gangs that control entire neighborhoods and extended their reach. This expansion has enabled a wave of kidnappings that increasingly target affluent Haitians, although average Haitians have also been kidnapping victims. [...]

> There are reports of gangs expanding operations outside of Port-au-Prince, leading to increased crime on major routes of travel. Smaller groups of criminals take advantage of social unrest and create barricades across roadways to extort anyone trying to pass. The Haitian National Police (HNP) has a limited ability to respond to this widespread phenomenon.

> Homicides continue to be a major concern.[14]

According to *UN News*, gang violence reached "unprecedented" levels in Haiti in June 2021, as gangs vied for territorial control in heavily populated areas of Port-au-Prince.[15] In a situation report dated June 8, 2021, UNOCHA noted that the violence caused displacements that resulted in "secondary issues, such as the disruption of community-level social functioning, family separation, increased financial burdens on host families, forced school closures, loss of livelihoods and a general fear among the affected populations."[16] In late June 2021, one prominent gang leader reportedly announced "he was launching a revolution" against Haiti's "business and political elites."[17]

Violence has continued to escalate as gangs fight for control of territory.[18] InSight Crime reported in July 2022 that "kidnappings in the first six months [of 2022] increased 171 percent compared to the same period last year."[19] Per *The Associated Press*, the United Nations Human Rights Council documented "934 killings, 684 injuries and 680 kidnappings" in Port-au-Prince from January to June 2022.[20] Neighborhood raids by gangs have caused the closure of "schools, businesses, and hospitals."[21] In a May 2022 press release, the United Nations Office of the High

---

[14] Haiti Country Security Report, U.S. Department of State's Overseas Security Advisory Council (OSAC), Dec. 22, 2021.
[15] 'Unprecedented' rise in gang violence across Haiti's capital displaces thousands, UN News, Jun. 10, 2021.
[16] Haiti: Displacement in Port-au-Prince Situation Report No. 1 - As of 8 June 2021, UN Office for the Coordination of Humanitarian Affairs (UNOCHA), Jun. 8, 2021.
[17] Haiti gang leader launches 'revolution' as violence escalates, Reuters, Jun. 24, 2022.
[18] In worsening gang fighting in Haiti, 20 dead, thousands displaced, Al Jazeera, Apr. 28, 2022.
[19] Den Held, Douwe, Kidnappings of UN Staff, Diplomats in Haiti Could Help Police Get More Funding, InSight Crime, Jul. 6, 2022.
[20] UN decries rising death toll, rights violations in Haiti, The Associated Press, Jul. 18, 2022.
[21] Sanon, Evens, and Coto, Dánica, Gangs strangle Haiti's capital as deaths, kidnappings soar, The Associated Press, May 22, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

Commissioner for Human Rights (OHCHR) described the terror being visited on Haiti's population by gangs:

> Extreme violence has been reported, including beheadings, chopping and burning of bodies, and the killing of minors accused of being informants for a rival gang. Sexual violence, including gang rape of children as young as 10, has also been used by armed gang members to terrorize and punish people living in areas controlled by rival gangs. Sources also reported the presence of minors in the gangs.

> "Armed violence has reached unimaginable and intolerable levels in Haiti," [Michele] Bachelet [the United Nations High Commissioner for Human Rights] said.[22]

According to *Reuters*, "turf wars between gangs in April and May killed 150 people and forced some 10,000 from their homes."[23] Ten days of gun battles in Cité Soleil in July 2022 "killed at least 300 people and left some 160 wounded. The battles have intensified of late in the northern and north-eastern districts of Port-au-Prince, threatening to cut off the capital from the rest of the country."[24] Gang violence has limited access to other parts of the country, as conveyed by the World Food Programme (WFP) in a July 2022 report:

> The complete blockage of the road leading to the impoverished southern peninsula for a year has cut off at least 3.5 million people from the capital — restricting access to markets, basic services and essential humanitarian assistance. Recent clashes have also compromised access to the north."[25]

*The Washington Post* noted this past June that some analysts estimate that gangs "control 60 percent of the country and are on the brink of becoming, collectively, a 'proto state.'"[26] On July 30, 2022, *The New York Times* reported that:

> Gangs are increasing their chokehold on Haiti's capital, using bulldozers to raze entire neighborhoods, overwhelming poorly armed police and taking their violence to within blocks of the seat of government.

---

[22] Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince, Office of the High Commissioner for Human Rights (OHCHR), May 17, 2022.

[23] Isaac, Harold and Ellsworth, Brian, Haiti marks anniversary of Moise murder as gang violence spirals, Reuters, Jul. 7, 2022.

[24] Da Rin, Diego, New Gang Battle Lines Scar Haiti as Political Deadlock Persists, International Crisis Group, Jul. 27, 2022.

[25] Haiti: Violence fuels hunger amid political instability, World Food Programme (WFP), Jul. 18, 2022.

[26] Mérancourt, Widlore, and Coletta, Amanda, Haiti's gangs use TikTok, Instagram, Twitter to recruit and terrorize, The Washington Post, Jun. 11, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

While Haitians have endured relentless bloodshed and tragedy for years, the escalation of lawlessness in recent weeks and the government's inability to exert control has terrified the nation.

Government agencies and ministries have urged employees to stay home as gangs expand their territory and are now close to the presidential palace, the interior ministry, the central bank and the national penitentiary, where hungry prisoners are threatening to riot, officials warn.[27]

*UN News* reported that some gangs had resorted "to extreme tactics to control locals such as denying them access to drinking water and food."[28] *The Associated Press* noted that these tactics have "aggravated malnutrition."[29]

In July 2022, "a major fuel terminal [was] forced to halt operations due to a turf war between rival gangs in a town outside the capital that has killed at least 50 people."[30] *The New York Times* previously described the manner in which gangs exert control over access to fuel in Haiti, where even electricity is dependent on gasoline-powered generators:

A severe fuel shortage is pushing the nation to the brink of collapse because gangs, not the government, rule about half of the nation's capital.

With gangs holding up fuel trucks at will, truck drivers have refused to go to work, setting off a nationwide strike by transportation workers and paralyzing a nation dependent on generators for much of its power. [...]

Jimmy Cherizier, one of the country's most feared gang leaders, acknowledged that his criminal network was blocking the delivery of fuel. His intention, Mr. Cherizier said, was not to hurt ordinary people, but to put pressure on Haiti's political and business elite and push for the prime minister's resignation. [...]

In many countries, a fuel shortage would mean transportation is disrupted. In Haiti, where the electrical grid is unreliable, all the services and institutions that keep the country running — banks, hospitals, cell towers, businesses — get their power from generators, said Maarten Boute, the chief executive of Digicel Haiti, the country's largest mobile and broadband network provider.

Without fuel, "everything just shuts down," Mr. Boute said.[31]

---

[27] Abi-Habib, Maria, and Paultre, Andre, Gangs Advance on the Seat of Haitian Government Power: 'Haitians Are Hostages', July 30, 2022.

[28] Haiti: UN sounds alarm over worsening gang violence across Port-au-Prince, UN News, Jul. 16, 2022.

[29] UN decries rising death toll, rights violations in Haiti, The Associated Press, Jul. 18, 2022.

[30] Isaac, Harold and Ellsworth, Brian, Haiti demonstrators block Port-au-Prince roads to protest fuel shortages, Reuters, Jul. 13, 2022.

[31] Kitroeff, Natalie and Abi-Habib, Maria, Gangs Rule Much of Haiti. For Many, It Means No Fuel, No Power, No Food., The New York Times, Oct. 27, 2021.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

<div align="center"><b>Political Crisis</b></div>

After Jovenel Moïse's assassination on July 7, 2021, Claude Joseph, the acting prime minister at the time, took charge of the country.[32] Joseph resigned several days later "after a brief power struggle with the nation's appointed prime minister, Ariel Henry."[33] Moïse had appointed Henry as prime minister two days before the assassination, but Moïse died before Henry could be sworn in.[34] Claude Joseph had argued that Ariel Henry did not have a "right to the leadership position without the swearing-in ceremony."[35] In its 2022 Freedom in the World Report, Freedom House indicated that a group of diplomats known as the Core Group influenced Joseph's decision to step down:

> The assassination set off a dispute among the local political, civic, and economic actors as to who should head the executive branch, but key diplomatic representatives in the country—known as the Core Group—called on Henry to lead a new government, and Joseph stepped down. [...]
>
> The assassination of President Moïse and its aftermath represented a further degradation of the democratic autonomy of Haitian citizens and politicians. In addition to the violence and criminality associated with the murder itself, many observers decried the role of the Core Group—comprising ambassadors or representatives from Brazil, Canada, France, Germany, Spain, the United States, the European Union, the Organization of American States, and the United Nations—in confirming Ariel Henry as the new acting prime minister and acting president. In a September 2021 resignation letter, the US special envoy to Haiti, Daniel Foote, denounced the diplomatic endorsement of Henry, arguing that it improperly sidelined an alternative plan advanced by a commission of Haitian civil society representatives, which called for a longer transition period to enable thorough institutional reforms before any elections or political settlement.[36]

As *The New Humanitarian* reported in February 2022, Ariel Henry failed to leave office on February 7, the day that Jovenel Moïse's term would have ended.[37] The media outlet assessed that this decision "prolongs the political uncertainty and raises the prospect of renewed violence," and also noted that "[n]o date has been set for new general elections […] largely due

---

[32] Faiola, Anthony, Haiti's acting prime minister Claude Joseph says he will step down amid leadership dispute, The Washington Post, Jul. 19, 2021.

[33] Marnin, Julia, Claude Joseph to Resign as Haitian Prime Minister 12 Days After Jovenel Moise's Assassination, Newsweek, Jul. 19, 2021.

[34] Marnin, Julia, Claude Joseph to Resign as Haitian Prime Minister 12 Days After Jovenel Moise's Assassination, Newsweek, Jul. 19, 2021.

[35] Marnin, Julia, Claude Joseph to Resign as Haitian Prime Minister 12 Days After Jovenel Moise's Assassination, Newsweek, Jul. 19, 2021.

[36] Freedom in the World 2022: Haiti, Freedom House, Feb. 28, 2022.

[37] Obert, Jess DiPierro and Dupraz-Dobias, Paula, In Haiti, gang violence strains aid operations and demands new approaches, The New Humanitarian, Feb. 7, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

to the gang violence and insecurity."[38] Henry is a suspect in the assassination of Jovenel Moïse, and he has "fired government officials who summoned him for questioning in the case."[39]

The last presidential elections were held in Haiti in November 2016.[40] Parliamentary elections were scheduled for 2019 but "have yet to be held."[41] *Reuters* reported in March 2022 that Henry "has promised to hold elections but has made little progress in creating an elections council - a crucial first step for holding a vote."[42]

*The New Humanitarian* reported in February 2022 that "[e]lections are meant to take place this year, but no date has been set – largely because of the gang violence, and due to infighting between Henry and civil society groups who want a transitional two-year government to assume power."[43] Many of those civil society groups have united into an opposition coalition that is now referred to as the Montana Accord,[44] which has advocated the removal of Ariel Henry and the institution of a transitional government "to restore security before ultimately holding elections."[45]

The Montana Accord argues that Ariel Henry's government is illegitimate and unconstitutional.[46] In a February 2022 article, *The New York Times* cited analysts who noted that while the Montana Accord's proposed transitional government "would also be unconstitutional," it would nevertheless:

> have more legitimacy than the Henry government because the group — made up of civil society organizations and powerful political figures — represents a wider array of the population than the current government, which was voted in with an abysmally low turnout.[47]

---

[38] Obert, Jess DiPierro and Dupraz-Dobias, Paula, In Haiti, gang violence strains aid operations and demands new approaches, The New Humanitarian, Feb. 7, 2022.

[39] Abi-Habib, Maria, A Year Since a President's Murder, Haitians Keep Waiting to Hit Rock Bottom, The New York Times, Jul. 6, 2022.

[40] Fauriol, Georges A., Haiti's Problematic Electoral Dynamics, Global Americans, Dec. 21, 2021.

[41] Fauriol, Georges A., Haiti's Problematic Electoral Dynamics, Global Americans, Dec. 21, 2021.

[42] Ellsworth, Brian, Seven U.S. members of Congress call on Biden to withdraw support for Haiti's Henry, Reuters, Mar. 17, 2022.

[43] Obert, Jess DiPierro, Can Haiti's gangs help build a better future for the country?, The New Humanitarian, Feb. 14, 2022.

[44] The name "Montana Accord" also refers to "a power-sharing transition plan ratified by over 900 groups." See: Schuller, Mark, Why Haiti Advocacy Needs New Strategies, NACLA, Mar. 2, 2022.

[45] Abi-Habib, Maria and Kitroeff, Natalie, Haiti Opposition Group Calls on U.S. to End Support for Current Government, The New York Times, Feb. 6, 2022.

[46] Abi-Habib, Maria and Kitroeff, Natalie, Haiti Opposition Group Calls on U.S. to End Support for Current Government, The New York Times, Feb. 6, 2022.

[47] Abi-Habib, Maria and Kitroeff, Natalie, Haiti Opposition Group Calls on U.S. to End Support for Current Government, The New York Times, Feb. 6, 2022. The "abysmally low" voter turnout mentioned here refers to the turnout for the November 2016 presidential "redo" election, which Jovenel Moïse won. See: Charlemagne, Catherine, The Record Low Voter Participation in Haiti's 2016 Election, Haïti Liberté, Dec. 28, 2016. Ariel Henry is in office because Moïse named him as prime minister just days before he was assassinated, and Henry's government includes the remnants of the Moïse administration.



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Unit**

### Economy

The World Bank provided an overview of Haiti's economic difficulties in June 2022:

> Haiti's economic and social development continues to be hindered by political instability, increasing violence, [and an] unprecedented level of insecurity, exacerbating fragility. Haiti remains the poorest country in the LAC[48] region and among the poorest countries in the world. In 2021, Haiti had a GDP[49] per capita of US$1,815, the lowest in the LAC region and less than a fifth of the LAC average of US$15,092. On the UN's Human Development Index, Haiti ranked 170 out of 189 countries in 2020. [...]
>
> Past marginal gains in poverty reduction have been undone by a succession of crises, including the COVID19 pandemic and the assassination of the President Jovenel Moïse, and natural hazard shocks, such as the August 2021 earthquake and tropical storm Grace.   Latest estimates put the 2021 poverty rate, using a lower-middle income country poverty line of US$ 3.2, at 52.3 percent, up from 51 percent in 2020. Haiti is also among the countries with the greatest inequality in the region. This is largely due to two thirds of the poor living in rural areas and the adverse conditions for agricultural production, creating a welfare gap between urban and rural areas. The richest 20 percent of its population holds more than 64 percent of its total wealth, while the poorest 20 percent has less than one percent.[50]

In May 2022, *The New York Times* released a multi-part report titled "The Ransom" about its extensive investigation into Haiti's payments to France and the United States for the debt that Haiti incurred to secure its independence and that "cost Haiti from $21 billion to $115 billion in lost economic growth."[51] *National Public Radio* (NPR) noted that these payments – which were essentially reparations to former slaveholders – have had a lasting negative impact on Haiti's development.[52]

### Healthcare & COVID-19

In August 2021, USAID reported that Haiti's health sector:

> continues to face significant challenges. Weak governance and coordination, geographic and financial barriers to access health services, shortages of essential medicines, and the difficulty of attracting and retaining qualified health professionals, are all chronic struggles for the Ministry of Health (MOH).[53]

---

[48] Latin America and the Caribbean.
[49] Gross Domestic Product.
[50] The World Bank in Haiti, The World Bank, Jun. 14, 2022.
[51] Nagourney, Eric, 6 Takeaways About Haiti's Reparations to France, The New York Times, May 20, 2022.
[52] Rosalsky, Greg, 'The Greatest Heist In History': How Haiti Was Forced To Pay Reparations For Freedom, National Public Radio (NPR), Oct. 5, 2021.
[53] Haiti: Health, U.S. Agency for International Development (USAID), Aug. 3, 2021.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

Gang violence and kidnappings have affected the health sector in Haiti where—according to the United Nations Integrated Office in Haiti (BINUH)—doctors and healthcare workers are among the most targeted individuals for kidnappings, and violence has led to closures of healthcare facilities:

> Kidnappings continued to be a feature of Haitian daily life and a source of revenue for gangs. While kidnappers have not spared any social group, doctors, lawyers, health-care workers, professors and human rights defenders are some of the categories most affected, while kidnapped women and girls are highly likely to be subjected to sexual and gender-based violence during their captivity. To protest against kidnapping, health-care workers, students and public transportation drivers demonstrated around the capital from 14 to 16 March [2022]. Private hospitals and clinics joined these protests by holding a work stoppage. [...]

> Gang violence interrupted specialized emergency and paediatric services; on 1 April [2022], Médecins sans frontières temporarily closed its Cité Soleil hospital out of fear for the safety of its personnel and patients.[54]

Médecins sans Frontières (Doctors Without Borders, MSF) said in July 2021 that the "permanent state of insecurity limits people's access to healthcare. The healthcare system is already extremely unequal, with private healthcare available only to those who can afford it, while public health facilities lack essential resources."[55] In August 2021, MSF permanently closed its hospital in Martissant, a neighborhood near Port-au-Prince, due to security concerns.[56] In October 2021, MSF issued a press release explaining that Haiti's fuel shortage forced them "to limit patients" and only treat "life-threatening emergencies," while also noting that "many other medical structures, both private and public, have also had their services disrupted."[57] Security problems continued to negatively impact MSF's operations and access to medical care in general through July 2022.[58]

Haiti received its first doses of COVID-19 vaccine in July 2021, prior to which it was the only country in Latin America without any doses.[59]  In mid-June 2022, BINUH reported that:

> Haiti has experienced five waves of COVID-19, the last three having coincided with the emergence of different variants of the virus. As at 6 June, 30,892 cases of

---

[54] Report of the Secretary-General [S/2022/481], UN Security Council: United Nations Integrated Office in Haiti (BINUH), pp.8-9, Jun. 13, 2022.
[55] Four questions on the tumultuous situation in Haiti, Médecins sans Frontières (MSF), Jul. 14, 2021.
[56] Médecins sans Frontières closes hospital in Haiti amid rising gang violence, Agence France-Presse, Aug. 3, 2021.
[57] Haiti fuel crisis severely limits access to vital medical care, Médecins sans Frontières (MSF), Oct. 21, 2021.
[58] Dozens of people hit by stray bullets as fierce violence flares up again in Port-au-Prince, Médecins sans Frontières (MSF), Jul. 29, 2022. See also: Haiti: Attacks on medical staff leave population without health care, Médecins sans Frontières (MSF), 22 May 2022.
[59] Statement on the arrival of the first batch of COVID-19 vaccines in Haiti, United Nations Children's Fund (UNICEF), Jul. 14, 2021.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

COVID-19 and 835 deaths have been reported, while the current rates of incidence and hospitalization remain very low. Vaccination efforts continue with ample quantities of vaccines available in the country. Nevertheless, absorption rates among the population remain low owing to operational constraints and vaccine hesitancy. Currently, there are 148 active vaccination sites in Haiti; however, as at 29 May, only 1.8 per cent of the eligible population was fully vaccinated.[60]

### Natural Disasters & Environmental Concerns

According to The World Bank, Haiti is "highly vulnerable" to "natural hazards, such as hurricanes, flooding, and earthquakes."[61]  Haiti placed third on the 2021 Global Climate Risk Index[62] "among the countries most affected by extreme weather events from 2000 to 2019."[63]

On August 14, 2021, Haiti's southern peninsula was struck by a 7.2 magnitude earthquake:

> The 7.2-magnitude earthquake on 14 August 2021, with its epicentre 13 km southeast of Petit Troup de Nippes (Nippes department) had a severe impact on Haiti's departments of Sud, Nippes and Grand 'Anse. The Haitian General Directorate of Civil Protection (DGPC) reported 2,248 deaths; 12,763 injured people; and 329 people who remain missing; this institution has identified 53,815 destroyed homes and 83,770 damaged homes.

> Following the 14 August earthquake, more than 900 aftershocks have been registered; of these, 400 have had a magnitude of 3 or more. This includes a 4.85 magnitude aftershock on 18 August that provoked the collapse of already damaged structures. Following the rapid assessment done by the Haitian departmental health directorates, with PAHO/ WHO support, a total of 88 health centres have been identified as severely damaged (28) and slightly damaged (60).3 According to a satellite assessment by the World Bank, quoted by the DGPC, the country has approximately 1.5 billion US dollars (or 10 per cent of Haiti's gross domestic product) in economic damage and losses.[64]

---

[60] Report of the Secretary-General [S/2022/481], UN Security Council: United Nations Integrated Office in Haiti (BINUH), p.13, Jun. 13, 2022.
[61] Carrasco, Naraya, Varotto, Francesco, and Wrede, Peter, Haiti's Path to Building Financial Resilience Against Disasters, The World Bank Group, Oct. 13, 2021.
[62] Global Climate Risk Index 2021, GermanWatch, Jan. 25, 2021. The Global Climate Risk Index for 2022 has not yet been released.
[63] Haiti, World Food Programme, undated, accessed on Aug. 2, 2022, https://web.archive.org/web/20220714140146/https://www.wfp.org/countries/haiti
[64] Haiti: Earthquake - Operation 6-month Update, Emergency Appeal №: MDRHT018, International Federation of Red Cross and Red Crescent Societies (IFRC), Jun. 1, 2022.



Tropical Storm Grace hit three days later, causing flooding in "many of the same areas" hit by the earthquake and hindering "rescue and relief efforts in the aftermath of the earthquake."[65]

According to the United Nations Children's Fund (UNICEF), the August 2021 earthquake affected over 800,000 people and "worsened the already difficult humanitarian situation in the country," causing "damages and economic losses" of approximately "US$1.6 billion, about 10 per cent of the country's gross domestic product."[66]

### Housing Shortage & Internal Displacement

One of Haiti's long-term challenges is a shortage of "adequate, affordable housing."[67] USAID has identified four major factors contributing to Haiti's housing challenges: 1) a lack of quality housing; 2) unplanned urban growth in informal settlements that "lack access to basic services and are often located in high-risk zones"; 3) limited capacity on the part of the government to manage the housing shortage; and 4) unclear land tenure, particularly in low-income areas where "land tenure is governed by a range of informal arrangements between renters and owners."[68]

The International Displacement Monitoring Centre (IDMC) noted a number of factors that contributed to displacement in Haiti in 2021:

> Haiti is highly vulnerable to a range of natural hazards, including hurricanes, floods and earthquakes. The country has also been struggling with a contracting economy and deepening poverty that were driving instability and insecurity even before the onset of Covid-19. Criminal and gang violence have been on the increase since 2018. These factors combined to trigger an increasing number of internal displacements associated with both disasters and violence in 2021. [...]
>
> Around 220,000 people were living in displacement as a result of disasters across the country at the end of the year [2021].
>
> The disasters of 2021 added to an already fragile situation marked by escalating gang violence that triggered 20,000 new movements, an increase of 157 per cent on 2020 and the highest figure for this type of displacement ever recorded for the country. Most took place between January and June, but the violence continued in the second half of the year as criminal gangs took advantage of the instability caused by the assassination of the country's president, Jovenel Moïse, on 7 July.

---

[65] Country Profile: Haiti 2021, International Displacement Monitoring Centre (IDMC), last updated May 18, 2022.
[66] Earthquake Haiti Humanitarian Situation Report No. 8, United Nations Children's Fund (UNICEF), p.2, Dec. 10, 2021.
[67] Housing & Settlements – Haiti, U.S. Agency for International Development (USAID), last updated Aug. 3, 2021, accessed on Jul. 25, 2021.
[68] Housing & Settlements – Haiti, U.S. Agency for International Development (USAID), last updated Aug. 3, 2021, accessed Jul. 25, 2022.



Gang activity also impeded the delivery of assistance to areas affected by both violence and disasters.[69]

### Food Insecurity

In March 2022, the Integrated Food Security Phase Classification (IPC) categorized Haiti as experiencing "acute food insecurity," with 44% of the population at the crisis level or worse.[70] The WFP notes that Haiti "has one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22 percent of children chronically malnourished."[71]

The WFP described the gravity of the hunger crisis facing "almost half the population of Haiti" in a July 2022 article:

> With almost half the population of Haiti already facing hunger, rising inflation, high costs of food and fuel and the deteriorating security situation are pushing Haitians over the edge.

> Hunger levels are set to rise as the war in Ukraine continues to impact global supplies and surging gang violence restricts movements of goods in the country. The island nation is particularly vulnerable to shocks in the global food and fuel markets as it imports 70 percent of its cereals. Haiti is already seeing a staggering inflation of 26 percent.[72]

*The New Humanitarian* reported in February 2022 that the prices of some staples had increased significantly, especially in the southern peninsula after the earthquake:

> In the capital [Port-au-Prince], a bag of rice weighing roughly 2.7 kilograms has doubled in price to 500 gourdes ($5) in the last few years, while a pack of pasta has nearly doubled to 55 gourdes, said Adeline Chéry, a 56-year-old who works as a cook in a private home.

> Things are worse in the southern peninsula, which was most affected by the August earthquake. In Jérémie, nearly 200 kilometres west of Port-au-Prince, a 12.5-kilogram sack of rice costs 3,600 gourdes ($35), said hair braider Roselène Milfor, 36. "Even when I'm able to make 500 gourdes ($5), you can't make it last," she told The New Humanitarian by phone.

---

[69] Country Profile: Haiti 2021, International Displacement Monitoring Centre (IDMC), last updated May 18, 2022.
[70] Haiti: Integrated Food Security Phase Classification Snapshot, Integrated Food Security Phase Classification (IPC), Mar. 16, 2022.
[71] WFP Haiti Country Brief, April 2022, World Food Programme (WFP), May 25, 2022.
[72] Piorr, Theresa, Haiti: Violence fuels hunger amid political instability, World Food Programme (WFP), Jul. 18, 2022.



> When there's no food, some Haitians consume dirt cakes – discs made of mud, salt, and vegetable shortening that contain trace amounts of fat and minerals. The cakes, also known as "galettes", are sometimes given to pregnant women and children for indigestion.[73]

The August 2021 earthquake hit "[o]ne of Haiti's main food-producing regions, the southern Tiburon Peninsula."[74] The New Humanitarian reported in February 2022 that the 2021 earthquake and subsequent storms damaged crops and irrigation systems, and "destroyed markets, storage facilities, and food processing plants – hits the agricultural sector could ill afford, especially as much of the maize production comes from the verdant south."[75]

Haiti's prisons have been hit hard by a malnutrition crisis, where "54 prison deaths related to malnutrition were documented in Haiti between January and April" of 2022.[76] In June, eight people reportedly died of malnutrition in a prison "that ran out of food two months" earlier.[77] A June 2022 BINUH report noted that "[t]he situation continued to deteriorate in Haitian prisons as the authorities struggled, owing to insufficient funding, to provide two meals daily to prisoners."[78]

[73] Jean, Sarah, Mary, Evens, and Win, Thin Lei, Can Haiti rebuild a food system broken by disaster, historical injustice, and neglect?, The New Humanitarian, Feb. 2, 2022.

[74] Jean, Sarah, Mary, Evens, and Win, Thin Lei, Can Haiti rebuild a food system broken by disaster, historical injustice, and neglect?, The New Humanitarian, Feb. 2, 2022.

[75] Jean, Sarah, Mary, Evens, and Win, Thin Lei, Can Haiti rebuild a food system broken by disaster, historical injustice, and neglect?, The New Humanitarian, Feb. 2, 2022.

[76] Sanon, Evens and Coto, Dánica, Official: 8 more die as Haiti prisons lack food, water, The Associated Press, Jun. 23, 2022.

[77] Sanon, Evens and Coto, Dánica, Official: 8 more die as Haiti prisons lack food, water, The Associated Press, Jun. 23, 2022.

[78] Report of the Secretary-General [S/2022/481], UN Security Council: United Nations Integrated Office in Haiti (BINUH), p.7, Jun. 13, 2022.

FOUO / LAW ENFORCEMENT SENSITIVE

# Customs and Border Protection
# After Action Report (AAR)
# Mass Migration Event (MME)
# Del Rio, Texas
# September 8, 2021 – September 24, 2021
# Report Date: October 7, 2021



# United States Border Patrol
# Del Rio Sector

FOUO / LAW ENFORCEMENT SENSITIVE

| | |
|---|---|
| **Op Order Name:** | Del Rio, TX Mass Migration Event (MME) |
| **Report Date:** | October 5, 2021 |
| **Authors:** | PAIC ▮▮▮▮▮▮▮▮, PAIC ▮▮▮▮▮▮, PAIC ▮▮▮▮▮▮▮, |
| PAIC ▮▮▮▮▮▮▮▮ | |

## DATES

A. Mass Migration Event Operational Dates:  September 8, 2021 – September 24, 2021

## LOCATION

Del Rio, Texas, Del Rio Sector (DRT) ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

## COMMAND

A. **Mass Migration Event Chain of Command**:

| | |
|---|---|
| ▮▮▮▮▮▮▮ | Del Rio Sector (Interim) Chief Patrol Agent |
| | Laredo Sector Deputy Chief Patrol Agent (Incident Commander) |
| ▮▮▮▮▮▮▮ | Del Rio Station Patrol Agent in Charge (Deputy IC) |
| | Eagle Pass Station Patrol Agent in Charge (Deputy IC) |
| | Special Operations Detachment Patrol Agent in Charge (Deputy IC) |

## DESCRIPTION:

A. **Executive Summary**

From September 8, 2021 to September 24, 2021, Del Rio Sector (DRT) experienced an unprecedented Mass Migration Event (MME) of primarily Haitian nationals illegally crossing into the United States that created a humanitarian crisis which overwhelmed U.S. Border Patrol (USBP), CBP and greater DHS resources.  This was the largest mass migration event in recorded history of the USBP.  A gap in intelligence dissemination and inadequate resourcing and response capabilities resulted in DRT being unprepared to initially manage the volume and speed of which migrants illegally crossed into the United States in a short period of time.  An Incident Command Post (ICP) stood up by USBP and supported by numerous federal, state, local law enforcement components, and non-governmental organizations (NGOs), led efforts to manage the MME.  During the 17-day MME, DRT, supported by internal and external partners encountered 19,752 migrants making illegal entry seeking passage into the United States.

DRT faced significant challenges when thousands of primarily Haitian nationals illegally crossed into the United States in ▮▮▮▮ at the weir dam and accumulated underneath the Del Rio Port of Entry (DRL POE) International Bridge.  At one point, the mass of subjects underneath the bridge reached approximately 15,000 migrants from 58 different

FOUO / LAW ENFORCEMENT SENSITIVE

countries.  USBP, along with internal and external partners, faced conditions consistent with those of a mass casualty type event, public health and humanitarian crisis.  Already faced with overcrowded temporary holding facilities and limited ground and air transport capabilities, DRT could not relocate subjects to safer facilities/environments from the bridge in an expeditious manner commensurate with the need.  Many of the subjects suffering from heat exhaustion or other conditions necessitated immediate medical attention.  Additionally, migrants required water and nourishment while waiting for days in areas that became increasingly unsanitary.

Supported by multiple sectors, internal and external partners, the Incident Commander (IC) employed over ███ law enforcement and support personnel to feed, provide general and medical care, transport and process the migrants over the 17-day span.  On September 24, 2021, DRT transported the last remaining migrants from underneath the bridge and formally returned command of operations back to Del Rio Station.  During the MME, DRT fortunately did not experience any migrant deaths, violent events, or use of force incidents.

## B.  Mission Statement

CBP will protect our nation's borders, personnel, infrastructure, and ensure the health and safety of the traveling public, while managing the effects of a land mass migration surge. CBP will provide additional manpower and resources to Del Rio Sector and Field Office to ensure border security in coordination with State and Local law enforcement partners.

## C.  Intelligence/ Events Leading to Event

a.  Since June of 2021, in the Del Rio Station (DRS) area of responsibility, large numbers of migrants began congregating at the boundary fence near the ████████ ████████" waiting to turn themselves in to law enforcement and Border Patrol agents.  There was no shelter at this location for migrants, especially families with vulnerable persons, small children and pregnant females, were consistently experiencing medical issues due to the heat and exposure to the elements.

b.  On July 30, 2021, DRT implemented a temporary staging area under the DRL POE International Bridge to allow the freely congregating migrants shelter from the elements while they waited to surrender to Border Patrol agents.  Due to the number of migrants congregating at this location DRT provided security, 900 feet of temporary fencing, water, four light plants, twelve port-a-potties, hand washing stations, and dumpsters to maintain sanitation and to prevent the spread of disease as much as possible with limited resources.

c.  On average, between 200 to 1,000 migrants were staged under the bridge while DRT arranged for transportation to various stations and other Sectors for processing.  A large portion these migrants were Haitian.  The identified catalyst

FOUO / LAW ENFORCEMENT SENSITIVE

that caused a rapid increase in migrants staged under the International Bridge was the short notice cancelation of Title 42 expulsion flights from September 8, 2021, until September 19, 2021, to Haiti.  Throughput was interrupted as 900 migrants that were processed for expulsion flights had to be re-processed through other available dispositional pathways.  DRT was already holding approximately 3,200 migrants in temporary holding facilities, 688% over its capacity, when the mass migration event began.  The number of staged migrants rapidly increased from 2,456 on September 13, 2021, to a high of 14,921 on September 18, 2021.

**D.  Timeline of Events**

Day 1: Wednesday September 8, 2021
- DRT holding 2,159 in custody / 648 unprocessed
- Title 42 Flights to Haiti Cancelled
- Total DRT POE (Bridge) Encounters 345

Day 2: Thursday September 9, 2021
- Total DRT POE Encounters 454

Day 3: Friday September 10, 2021
- Total DRT POE Encounters 486

Day 4: Saturday September 11, 2021
- Current state of DRT POE is 907 subjects under the bridge.  Most are identified as Haitian migrants.
- Numbers of illegal crossings begin to rapidly increase

Day 5: Sunday September 12, 2021
- DRT holding 2,274 in custody / 1,015 unprocessed
- Additional 499 DRT POE Encounters
- A total of 1,500 migrants are reported to be staged under the DRT POE Bridge

Day 6: Monday September 13, 2021
- Additional 738 DRT POE Encounters
- A total of 2,456 migrants are staged under the DRT POE Bridge

Day 7: Tuesday September 14, 2021
- Additional 848 DRT POE Encounters
- A total of 3,171 migrants are staged under the DRT POE Bridge
- Intelligence reports 8 full charter buses arrive in Ciudad Acuna with more on the way

Day 8: Wednesday September 15, 2021
- 7,007 migrants staged under the DRT POE Bridge
- Del Rio Sector requests additional manpower and OA assistance
- Overtime guidance is updated for all USBP manpower

FOUO / LAW ENFORCEMENT SENSITIVE

Day 9: Thursday September 16, 2021
- Encounters increase to over 1,000 per day and rapidly increase
- A total of 10,503 migrants are staged under the DRT POE Bridge
- Initial request to close the Del Rio POE is submitted
- ICE Aviation Operations is directed to resume Haitian flights beginning next week
- OA assistance begins to arrive in mass

Day 10: Friday September 17, 2021
- DRT holding 2,286 in custody / 1,255 unprocessed
- A total of 13,965 migrants are staged under the DRT POE Bridge
- EOC expands for additional OA tracking and transportation coordination
- Del Rio Sector begins transporting migrants to other Sectors for processing assistance
- DHS Volunteer Force reaches high water mark of ███ personnel
- Bureau of Prisons reaches high water mark of ███ personnel
- Texas DPS begins relocating up to ████ troopers to assist in securing the border
- Texas National Guard is activated and begins to arrive in Del Rio
- DRT POE closes at 1600 hours and reroutes traffic to the Eagle Pass POE.
- Eagle Pass POE entry lanes are reduced to one lane of entry for all cross-border traffic
- All Del Rio Sector Checkpoints closed
- SOG Mobile Command Center (MCC) arrives and becomes operational as ICP

Day 11: Saturday September 18, 2021
- A high-water mark of 14,921 migrants staged under the DRT POE bridge
- Outside temperature reaching 106° Fahrenheit.
- Government of Mexico (GOM) increases efforts to deter migrants in Ciudad Acuna
- GOM established 5 active checkpoints on highways leading into the State of Coahuila, Mexico.  All buses with migrants are being turned around.
- ICE ERO increases manpower support to Del Rio Sector

Day 12: Sunday September 19, 2021
- DRT holding 2,789 in custody / 1,986 unprocessed
- A total of 11,941 migrants are staged under the DRT POE bridge
- Texas DPS hits a high-water mark of ████ personnel
- First 3 Title 42 Expulsion Flights to Haiti begin
- Del Rio Police Department deployed to assist
- Kinney County Sheriff's Office deployed to assist
- Val Verde County Sheriff's Office deployed to assist

Day 13: Monday September 20, 2021
- A total of 10,413 migrants are staged under the DRT POE bridge
- HHS DMAT reaches high water mark of ██ personnel for medical assistance
- San Antonio Fire Department personnel arrive for medical assistance

- HSI reaches high water mark of ███ personnel
- OFO begins processing migrants at the Export Lot and Passport Control Area.
- Prosecution accepted for migrant bus event in Sarita, Texas (escape)

Day 14: Tuesday September 21, 2021
- A total of 8,556 migrants are staged under the DRT POE bridge
- ICE ERO reaches high water mark of ███ personnel
- Expulsion flights continue to Haiti

Day 15: Wednesday September 22, 2021
- DRT holding in custody 2,745 / 1,103 unprocessed
- A total of 4,994 migrants are staged under the DRT POE bridge
- OFO manpower reaches a high-water mark of ███ officers
- USBP manpower reaches a high-water mark of ███ agents

Day 16: Thursday September 23, 2021
- DRT holding 3,216 in custody / 1,059 unprocessed
- A total of 3,447 migrants are staged under the DRT POE bridge

Day 17: Friday September 24, 2021
- DRT holding 2,959 in custody / 743 unprocessed
- All migrants moved to processing facilities.  Zero (0) remain under the DRT POE bridge
- Demobilization begins and OA support begins to reduce
- Operational control of DRT POE is transferred back to Del Rio Station PAIC
- Del Rio POE issues a press release for the re-opening of the port at 1600 hours



FOUO/ LAW ENFORCEMENT SENSITIVE

E. **Statistics/ Outcomes based on the information from e3 (All statistics are preliminary, subject to change, and should be considered unofficial)**
   a. Total Encounters (T8 and T42): 19,752
      - No Entry Zone Confirmed: 107
      - Del Rio Zone ■: 19,538
      - 5 Encounters (Mexican Nationals) are amenable to Title 42 immediate and therefore do not have an assigned Zone in e3
   b. Disposition Breakdown:
      - Deportable Apprehensions (T8): 13,926
      - Title 42 Delayed (T42): 5,821
      - Title 42 Immediate (T42): 5
   c. Demographics:
      - Family Unit (FMUA): 10,646
      - Single Adults (SAs and FMGs): 9,047
      - Unaccompanied Children (UACs): 59
   d. Peak Holding at POE Bridge was 14,921 on 9/18/2021
   e. Peak Day: 09/21/2021 had a total of 2,958 encounters
   f. Highest in custody number 3,216 on 9/23/2021 (DRT only)
   g. Citizenship:
      - A total of 58 unique Countries of Citizenship were encountered.
      - Top 5 Countries (95% of all encounters):
        1. Haiti: 13,893 (70%)
        2. Chile: 2,146 (11%)
        3. Cuba: 1,210 (6%)
        4. Venezuela: 1,077 (5%)
        5. Brazil: 489 (2%)
      - Haitian subjects traveled through multiple countries prior to entering the United States. Some subjects from Chile, Brazil, or other countries may belong to Haitian Family Units but have citizenship in the country in which they were born.
      - See Country Breakdown (Annex A) for a full list of the 58 countries and encounters.
   h. Total number processed for Title 42 expulsion to Haiti was 4,435 with 3,440 expelled during the reporting period.
      - As of September 30, 2021, 6,085 Haitians have been expelled by aircraft (additional flights are expected)
   i. There were ■■■ Law Enforcement and support personnel who responded to the MME (Refer to Annex B for agency breakdown)
   j. Contracts for 139 porta potties, 28 hand washing stations, and 8 bulk trash bins were used to support the migrants (this was wholly insufficient but also exhausted total regional supplies)

FOUO / LAW ENFORCEMENT SENSITIVE

k. Red Cross provided 17,000 hygiene kits (each kit contained a razor blade that had to be removed prior to issuance)
l. World Central Kitchen and local contracted vendors provided 14,000 meals daily to migrants on average.
**m.** CBP medical personnel responded to 672 calls for assistance to evaluate and treat migrants.  A total of 425 migrants required advanced care and were referred to HHS DMAT medical personnel.  Migrants were treated for a variety of issues ranging from seizures to respiratory distress.  Medical teams delivered one baby at the POE bridge and 10 others were born at local hospitals.  A total of 16 migrants were transported to local hospitals after being evaluated by DMAT medical personnel.  **There were zero (0) deaths during the MME.**
n. Border Patrol Search and Rescue teams successfully performed 56 water rescues in the Rio Grande River.  Most water rescues occurred on September 23, 2021 (53 rescues)
o. ▮ transport buses and ▮ transport vans were surged into Del Rio for assistance. (There actual requirement was ▮ busses, but the requirement could not be met from current government/private sector supplies)
   - ▮ USBP buses
   - ▮ Contract Services buses
   - ▮ United States Marshal Service buses
   - ▮ Bureau of Prison buses
   - ▮ leases buses
   - ▮ Vans
   - ▮ contracted vans

**F. Law Enforcement and Support Partners**
a. Air and Marine Operations
b. Office of Field Operations
c. Department of Homeland Security Volunteer Force
d. Immigration and Customs Enforcement, Enforcement and Removal Operations Special Response Team (ERO/SRT)
e. Homeland Security Investigations Special Response Team (HSI/SRT)
f. Department of Justice (DOJ) Bureau of Prisons (BOP)
g. Health and Human Services (HHS)
h. Texas Department of Public Safety (DPS)
i. Texas Military Department (Texas National Guard)
j. Val Verde County Sheriff's Office (VVSO)
k. City of Del Rio, Mayor's Office
l. Del Rio Police Department (DRPD)
m. Texas Parks and Wildlife Department (TPWD)
n. San Antonio Fire Department (FDSA)
o. Texas Intrastate Fire Mutual Aid System (TIFMAS)
p. National Institute of Migration of Mexico (INM)

FOUO / LAW ENFORCEMENT SENSITIVE

q.  Mission Border Hope (NGO, Eagle Pass, TX)
r.  Val Verde Border Humanitarian Coalition (NGO, Del Rio, TX)
s.  World Central Kitchen (NGO)

**G. Roles and Responsibilities**

The U.S. Border Patrol was the lead Component charged with managing the MME due to statutory authority.  The Incident Command Post (ICP) was stood up on September 16, 2021, and the Incident Commander (IC) was responsible for coordination with supporting federal, state, local partners, and non-governmental organizations.  The IC conducted daily operational briefs with supporting partners for situational awareness as well as task assignments.  Responsibilities were broken down into the support categories of Administrative Support, Intelligence Support, Operational Support, Logistical Support and Medical Support.  The DRT Sector Chief maintained responsibility of controlling the outer perimeter and security patrols within the crowds in the containment zone, which afforded the ability to provide security and immediate medical assistance when necessary



**H. Technical Performance**

The current processing pathways in place are adequate for normal migrant and seasonal flow.  However, the sheer volume of the mass migration overwhelmed throughput within CBP, ICE, and HHS.  Personnel, CBP facility holding/detention capacities, and transportation (ground and air) are wholly insufficient to safely manage this type of Mass Migration event. Synchronization between USBP and ERO manifests continues to evolve to decrease processing and transfer of custody time.

**I. Equipment Performance**

All equipment performed as expected.  Del Rio Sector and CBP Facilities, Maintenance, and Equipment (FM&E) facilitated many contracts in support of life sustaining functions

for migrants and personnel assisting with operations, security, and support.  Equipment not readily available to CBP was contracted through local vendors.

**J.  Finance and Resources**

 a.  Del Rio Sector Finance Office continues to work through pending acquisitions and reconciliation processes.  Actual figures are expected to fluctuate as reimbursements and fiscal year closeouts continue.
 Estimates are current as of October 7, 2021.
 b.  DRT Sector Expenses: ███
 c.  OFAM / FM&E Expenses: █████
 d.  PMOD Expenses: ████
 e.  SPAD Expenses: ████
 f.  Border Patrol TDY estimate per day ████████████
 g.  Overtime cost estimate ███
 h.  HHS DMAT cost estimate: ████
 i.  Loyal Source Contract for 13 days: ████
 j.  Sanitation Expenses: ███
 k.  Del Rio Sector weekly fuel cost: ████
 l.  Ground Transportation: ███
 m.  ICE flight cost ██
 n.  Department of Defense flight support cost estimate - ███
 o.  DHS Volunteer Force ███
 **p.  Total DRT / Border Patrol Cost Estimate:** ████
 q.  Additionally, Office of Field Operations (OFO) reported a loss of an average of ████ daily in estimated duties and fees collected as well as an estimated ████ lost in import value.

**K.  Safety Concerns**

Ensuring the safety of migrants, law enforcement, and support personnel was the first line of effort for the IC.

 a.  The Del Rio POE closure mitigated potential risk to all personnel below the bridge.
 b.  A Temporary Flight Restriction (TFR) was put in place for the safety and security of the migrants and the numerous law enforcement aviation assets supporting operations.  Media and privately owned drones caused a concern and the TFR provided an effective way to mitigate safety issues while allowing operations to continue uninterrupted.
 c.  AMO was able to synchronize aviation support and leverage local organic resources to provide ISR capabilities to maintain situational awareness and enhance officer safety on a 24 hour cycle.
 d.  Local and national media requests for drone coverage were coordinated through the DRT Strategic Communications Office.

    e. CBP EMTs were immediately requested and redirected to support medical needs.

    f. COVID exposure and other contagious disease spread in a mass migration event continues to be a safety issue for law enforcement and the general public. Multiple CBP employees deployed to Del Rio reported testing positive for COVID either during or immediately after their deployment as well as one agent contracting SCABIES infection.

    g. FBI continually monitored information from both anti-law enforcement and anti-immigrant threat groups. Many National Security issues were mitigated during the mass migration event to include two special interest migrants with national security concerns being apprehended and the interception of a possible violent actor at the Del Rio Port of Entry.

## L. Communication of Directions, Events and Changes to Plans

Incident command conducted daily scheduled and hasty meetings with all executive leaders throughout the MME. Communication was adequate to ensure operational expectations and requirements were clear for supporting law enforcement personnel. On-site visits by Headquarters personnel and White House officials ensured the full scope of the event was understood for maximum support of resources and planned actions.

## M. Strategic Communications

Strategic Communications (StratCom) and CBP Public Affairs (PA) are a critical role to ensure leadership at all levels as well as the media and the general public have the perspective of the agents on the ground managing the MME. Both DRT StratCom and CBP PA are co-located in Del Rio and synchronizes the messaging. Del Rio Sector StratCom had been messaging the use of the bridge as a staging location for large groups of migrants arriving since July 31, 2021. This created an advantage with the Del Rio Mayor and local law enforcement officials as they were already aware of the situation before the mass migration event occurred. Del Rio Sector had previously posted the use of the bridge and current situation on social media, new articles, distributed photos, and even had Congressional visits at the location before the mass migration event.

On September 13, 2021, numbers staged at the bridge began to rapidly increase. Due to the previous engagements with the City of Del Rio, resources began to arrive in support of the efforts. Messaging was put on hold until press conferences could be held that were approved by the Office of Public Affairs (OPA). The only messaging that StratCom released was the POE closure to the Office of Congressional Affairs (OCA) on September 17, 2021. Media and community members were the only entities distributing information which caused the Border Patrol to lose control of the messaging.

Chief Ortiz provided a short interview with local KENS 5 on September 17, 2021 and held a formal press conference on September 19, 2021. The DHS Secretary also held a press conference on September 20, 2021. Headquarters approval was required for all social media posts. The early and consistent release of unconstrained accurate messaging

FOUO / LAW-ENFORCEMENT SENSITIVE

from the Border Patrol would have provided a more holistic view to the public and other law enforcement agencies.

Detailing media support and additional StratCom personnel early in the crisis was needed to manage multiple site visits which overwhelmed the small Del Rio StratCom team.

**N. Environmental Concerns**

Summer temperatures reached as high as 106° and weather threatened the safety of the migrants that illegally crossed the border and the law enforcement personnel managing on scene issues.  Additionally, migrants had no water, food, or shelter to protect themselves from the environmental hazards. Medical support was needed for on-site assistance for minor and advanced medical care.  CBP EMTs were the first to surge to the area followed by HHS DMAT personnel for an increased capability and capacity.  Zero fatalities occurred during the MME.

**O. Physiological Impacts (Stress and Fatigue Impact)**

The chaotic scene and high level of coordination required long hours of work in a very stressful environment.  Leadership and personnel performing tasks to care for the migrants endured physical and mental exhaustion to ensure solutions were carried through to manage the MME.  Mandated overtime further reduced rest cycles.  The arrival of additional high-level leadership and detailers was needed early in the mass migration event to reduce physical and physiological impacts.  CBP, State and Local law enforcement as well as all support personnel rose to the challenges of the crisis that produced a highly successful resolution of the MME.

**Lessons Learned (issues/ recommendations)**

**A. Title 42 Flights Cancelled**
   a. On September 8, 2021, DRT Staff was informed by ICE/ERO that Title 42 flights supporting the expulsion of migrants from the United States would be cancelled.  USBP was required to reprocess hundreds of migrants under Parole ATD, which created an immediate backlog of nearly over 1000 migrants.  Additionally, it is believed the halt in expulsions was communicated immediately within the Haitian population creating an added pull factor and a rush to cross illegally into the U.S.
   b. In leu of Title 42 expulsion and expected termination of CDC Tile 42 authority, USBP and DHS partners should seek alternative options to immediately remove amenable migrants from custody upon completion of processing.
   c. Advanced warning needs to be given when expulsion flights are cancelled in order to avoid a disruption in throughput due to re-processing requirements.

**B. Del Rio POE Closure**
   a. DRT Staff coordinated with DRL Staff for several days prior to the closure of the DRL POE.  On September 16, 2021, USBP formally made the request the close the Del Rio POE due to increasing number of migrants under the bridge and for

FOUO / LAW ENFORCEMENT SENSITIVE

security and safety concerns. On the evening of September 17, 2021, the Del Rio Field Office closed the Del Rio POE. Additionally, the Eagle Pass POE, the nearest POE (approximately 50 miles away) was reduced to one lane due to OFO manpower supporting the MME. The closures resulted in significant delays for all essential and commercial cross border travel from Ciudad Acuna to Piedras Negras.

b. In future MMEs, POE closures should be considered, discussed, and planned with OFO to be engaged swiftly to address security concerns. The POE closure mitigated risks to the migrants directly below the bridge, POE footprint security, and allowed Mexican authorities an opportunity to disperse migrants staged along the Rio Grande River, thus reducing cross border activity at the Weir Dam and the Boat Ramp crossings.

## C. Migrant Transportation Coordination (Busses)

a. DHS lacked sufficient transportation and there was no mass transportation coordination mechanism within the Department to relocate the mass of migrants in Del Rio. CBP and ERO transportation capabilities were also limited. DOJ Bureau of Prisons assisted CBP by providing busses and drivers that could drive beyond the time restrictions set forth in current CBP transportation contracts. The Commissioner's Action Group (CAG) assisted with the reallocation of CBP contracted buses and communicated directly with the IC to coordinate additional transportation throughout the Southern United States and to Haiti as well.

b. Establish a scalable, high capacity CBP transportation contract. A scalable contract will allow CBP to increase or redirect contracted transportation assets throughout the nation or throughout established regions to better support sectors when migrant flows develop and or evolve.

c. Establish inter and intra agency MOUs to expand transportation capacity immediately within hours, not days.

d. As the MME emerged, DRT expanded their sector transportation cell from a minimally staffed coordination element that mostly coordinated movement within sector to a fully staffed unit comprised of subject matter experts who coordinated detainee movement from the incident site to CPCs and stations in and outside of DRT.

## D. ERO Manifest Issues

a. USBP does not have access to ERO systems of record utilized for passenger manifests, nor does ERO have access to USBP's detention module in e3. This lack of access forces USBP agents to manually enter names and dates of birth to generate manifest rosters for ERO. This process is not efficient – the process to generate a manifest for an expulsion flight of 130 passengers requires 8-man hours to produce from DRT personnel alone.

b. USBP and ERO systems must be linked to generate passenger manifests more efficiently, or DHS should have a singular processing system that accommodates

FOUO / LAW ENFORCEMENT SENSITIVE

all Departmental requirements from intake/processing, care and custody, and finally book-out/manifesting. It is also recommended USBP maintain ERO teams imbedded onsite at USBP sectors or temporary holding facilities to expedite manifest coordination.

c. CBP and ERO functions in a mass migration event are intertwined with what CBP interdicts. Greater volumes of people need to be swiftly and effectively moved by ERO to expanded ERO holding capacities across the nation.

## E. Lead Field Command Construct

a. The Lead CBP Field Coordinator (LFC) construct provides an identified CBP leader directed to develop and maintain a regional based preparedness plan that incorporates coordinated planning and leverages the resources and capabilities of all CBP Components within a region. Although the Del Rio MME warranted unified emergency and humanitarian responses from CBP, DHS, and local law enforcement resources, the LFC construct was not activated.

b. It is recommended for CBP leadership to consider at what point during a crisis, such as the Del Rio MME, a LFC activation is warranted. Trigger points may need to be identified that would assist with LFC activation requirements.

## F. Detention Capacity

a. Del Rio Sector's (DRT) total detention capacity is ███ and has been averaging 500 percent over capacity at any given time which results in excessive time-in-custody and overcrowding at every station, including the soft side processing facility in Eagle Pass. DRT, along with USBP Sectors along the Southwest Border (SWB), continue to experience overcrowding at levels not seen before. There is no indication that ICE/ERO detention capacity will ever increase to meet the flow of migrants illegally entering the Unites States through Del Rio Sector or any SWB sector. ICE/ERO needs to immediately address their shortfall in holding capacity across the nation.

b. It is recommended that USBP HQ in collaboration with ICE ERO take ownership of the detention space problem and, with the support of all pertinent DHS partners, embark on a Regional Processing and Detention Centers (RPDC) initiative that will alleviate overcrowding in DRT, LRT, and RGV (specifically) as well as the rest of the SWB. Multiple RPCD facilities centrally located in the southwest or south-central area of Texas and supported by DHS ICE partners would be responsible for Housing, Processing, and the proper disposition of migrants. The centers would also serve and the central transportation coordination hub. Initial holding capacities ███████ should be scalable and gauged by current in custody numbers, projections for evolving large migration volume headed to our southwest border, and processing times.

FOUO / LAW ENFORCEMENT SENSITIVE

**G. Designated Areas at IC for Supporting Agencies**

    a. Law Enforcement command and supporting elements should be considered when establishing the location of the Incident Command Post (ICP). The ICP in Del Rio was comprised of a Mobile Command Center (MCC) provided by USBP SOG. The MCC was located approximately 100 yards away from the migrant staging area. Although AMO, ERO and Texas DPS had representation in the ICP, no other supporting components or agencies were staged nearby.

    b. When establishing the ICP, the IC, Deputy ICs and planners should allocate adjacent or nearby footprints for support federal, state, and local LE partners to situate their command elements. Consider climate-controlled shelters for cooperating agency meetings and government or non-government delegation visits.

**H. Regional Mobile Command Centers**

    a. DRT does not possess its own MCC and therefore requested SOG's MCC which arrived on September 17, twenty-four hours after it was requested. Prior to establishing a location for the ICP, the IC staff maintained a mobile posture on foot or in vehicles.

    b. The IC recommends the procurement of sector MCCs to support future incidents. At a minimum, one MCC could support multiple sectors using a regional concept. For example, one centrally located MCC could support incidents from Rio Grande Valley to Del Rio Sector. This should evolve to every sector having an MCC with further ability to create expanded climate-controlled IC tent structures to supplement for multiple LE partner collaboration.

**I. Personnel Lodging**

    a. There were &#9608;&#9608; law enforcement, first responder, and support personnel (internal and external to DHS) supporting the Del Rio MME. Del Rio, TX has an approximate population of 36,000 and limited lodging options throughout the local and regional economies. Many deployed personnel could not secure lodging within a 55-mile radius and traveled over 100 miles from their lodging sites to the Del Rio POE daily. DRT coordinated with the City of Del Rio to secure 500 retrofitted lodging spaces at the local convention center through contractual services made available to DHS employees.

    b. At the onset of an imminent MME, sectors should immediately examine lodging availability and begin communicating with contractual service representatives to secure available lodging accommodations and other associated resources to support deployed personnel.

**J. Sensitive Compartmented Information Facilities (SCIF)**

    a. The dissemination of relevant information for MMEs is critical for Sectors when preparing for mass migration management, and all other law enforcement operations. Most USBP Sectors do not have the ability to communicate high-

FOUO / LAW-ENFORCEMENT SENSITIVE

level law enforcement and sensitive information from the Intelligence Community (IC) without Sensitive Compartmented Information Facilities (SCIF).

b. All USBP Sectors must have access to SCIFs located at designated sites within a sector or within reasonable commuting distances to receive pertinent IC information or other sensitive law-enforcement information.  Even portable solutions like Yuma Sector's capability would be acceptable access.  DHS needs to invest in SCIF buildouts for all USBP Sectors.

**K.  Department of Defense (DoD) Crisis Response Force (CRF) Support**

a. Even with the combined resources from DHS and DOJ, DRT experienced significant challenges at the onset of the mass migration event (MME).  The most significant challenges were the transportation, housing, feeding, security, and welfare of migrants.

b. Sectors planning for an MME should consider Department of Defense (DoD) Requests for Assistance (RFA) for Crisis Response Force (CRF) elements.  The CRF was an approved duty description for RFA FY21 however, DoD did not approve the CRF for RFA FY22.  A separate or updated RFA is required for this function to be available to CBP during a mass migration event.  A CRF would provide DHS with assistance to enhance force protection, medical, aviation, and engineering capabilities.  More specifically, the CRF should include additional support functions to include CDL Drivers, high-capacity Transportation Vehicles, high-capacity Field Holding Structures, security functions associated with the stand up of high-capacity field holding structures, medical, and high-capacity fixed wing support for moving both CBP personnel and migrants.  DoD RFAs are submitted through the CBP Executive Agent as requirements are identified by CBP. This RFA needs to be approved yearly, all associated actions executable with preset timelines when CBP identifies emerging incidents and continues to evolve with the expanding MME problem sets impacting the country.

c. The speed, number, and frequency of MMEs require DoD pre-coordinated assistance that is immediately responsive and agile.  DHS always looks internally before seeking assistance outside the department.  CBP currently does not have the organic resources to fill the various capability gaps identified during large mass migration events.

**SUMMARY**

The seventeen (17) day Mass Migration Event (MME) required a whole of government response to ensure the safety, rapid transport, and efficient processing of migrants from 58 different countries that illegally crossed into the United States and congregated under the Del Rio Port of Entry International Bridge.  The MME was unlike anything that CBP had encountered in its history and at its peak, 14,921 migrants were staged under the bridge.  CBP temporary holding facilities were already over capacity and local resources were inadequate to manage the speed and volume of migrants flowing into the United States.  State, Local, and Community partners

FOUO / LAW ENFORCEMENT SENSITIVE

responded to CBP's support request and exhausted all available resources to assist in managing the event.  All Southwest Border Patrol Sectors assisted by sending personnel and resources to Del Rio and hundreds of Border Patrol agents and CBP officers from across the country arrived to assist.

A massive effort to care for the migrant's safety and basic needs was underway as ground and air transportation relocated thousands of migrants to facilities across the Southwest Border for processing.  This unprecedented historical response to the MME successfully prevented any loss of life and treated hundreds of migrants in need of medical assistance.  The Office of Field Operations played a key role in assisting the Border Patrol and in the closure of the Port of Entry was the turning point that increased safety and gained a greater response from the Government of Mexico and officials in the National Capital Region.  The response by the State of Texas and the surge of Department of Public Safety Troopers was monumental.

Intelligence and open-source reporting have indicated that tens of thousands more migrants are traveling to the southern border of the United States that intend to make illegal entry. Transnational Organized Crime (TOC) elements have exploited policy changes and are facilitating the movement of migrants through the Western Hemisphere to the U.S. Southern Border with profit being the primary driving factor.  National Security continues to be at greater risk as CBP collapses resources and personnel to manage large groups of migrants.  TOC will continue to exploit our border in areas left vulnerable while CBP attends to MME as they occur. Policy changes and increased capacity and capabilities of all components and agencies that have a role in Border Security and thereby National Security, the immigration process, and the detention/adjudication continuum are needed for the humane and efficient management of mass migration.

## ANNEXES:

- Annex A: Country Breakdown of Encounters
- Annex B: Supporting Personnel and Asset List
- Annex C: Photos

End of Report

**ANNEX A: Country Encounter Breakdown (September 8, 2021 to September 24, 2021)**

| Country | Deportable Aprehensions | T42 Delayed | T42 Immediate | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 1 | 0 | 0 | 1 | 0% |
| ANGOLA | 49 | 0 | 0 | 49 | 0% |
| ARGENTINA | 3 | 0 | 0 | 3 | 0% |
| BAHAMAS | 2 | 0 | 0 | 2 | 0% |
| BANGLADESH | 1 | 0 | 0 | 1 | 0% |
| BENIN | 1 | 0 | 0 | 1 | 0% |
| BOLIVIA | 6 | 0 | 0 | 6 | 0% |
| BRAZIL | 375 | 114 | 0 | 489 | 2% |
| BURKINA FASO | 18 | 1 | 0 | 19 | 0% |
| CAMEROON | 14 | 1 | 0 | 15 | 0% |
| CENTRAL AFRICAN REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| CHAD | 3 | 0 | 0 | 3 | 0% |
| CHILE | 1,626 | 520 | 0 | 2,146 | 11% |
| COLOMBIA | 62 | 0 | 0 | 62 | 0% |
| CONGO | 11 | 0 | 0 | 11 | 0% |
| COSTA RICA | 6 | 0 | 0 | 6 | 0% |
| CUBA | 1,204 | 6 | 0 | 1,210 | 6% |
| CZECH REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| DEM REP OF THE CONGO | 12 | 0 | 0 | 12 | 0% |
| DOMINICAN REPUBLIC | 54 | 1 | 0 | 55 | 0% |
| ECUADOR | 35 | 12 | 0 | 47 | 0% |
| EL SALVADOR | 4 | 8 | 3 | 15 | 0% |
| EQUATORIAL GUINEA | 2 | 0 | 0 | 2 | 0% |
| ERITREA | 5 | 0 | 0 | 5 | 0% |
| ETHIOPIA | 1 | 0 | 0 | 1 | 0% |
| FRANCE | 2 | 1 | 0 | 3 | 0% |
| FRENCH GUIANA | 5 | 0 | 0 | 5 | 0% |
| GAMBIA | 2 | 0 | 0 | 2 | 0% |
| GHANA | 50 | 0 | 0 | 50 | 0% |
| GUATEMALA | 4 | 9 | 0 | 13 | 0% |
| GUINEA | 23 | 0 | 0 | 23 | 0% |
| GUYANA | 9 | 0 | 0 | 9 | 0% |
| HAITI | 8,878 | 5,015 | 0 | 13,893 | 70% |
| HONDURAS | 22 | 54 | 2 | 78 | 0% |
| MALI | 3 | 0 | 0 | 3 | 0% |
| MAURITANIA | 5 | 0 | 0 | 5 | 0% |
| MEXICO | 31 | 69 | 0 | 100 | 1% |
| NICARAGUA | 169 | 1 | 0 | 170 | 1% |
| NIGER | 3 | 0 | 0 | 3 | 0% |
| NIGERIA | 9 | 0 | 0 | 9 | 0% |
| PAKISTAN | 5 | 0 | 0 | 5 | 0% |
| PANAMA | 12 | 1 | 0 | 13 | 0% |
| PAPUA NEW GUINEA | 1 | 0 | 0 | 1 | 0% |
| PERU | 19 | 0 | 0 | 19 | 0% |
| PHILIPPINES | 1 | 0 | 0 | 1 | 0% |
| SAO TOME AND PRINCIPE | 1 | 0 | 0 | 1 | 0% |
| SENEGAL | 48 | 2 | 0 | 50 | 0% |
| SIERRA LEONE | 5 | 0 | 0 | 5 | 0% |
| SOMALIA | 4 | 0 | 0 | 4 | 0% |
| SOUTH AFRICA | 4 | 0 | 0 | 4 | 0% |
| SURINAME | 1 | 0 | 0 | 1 | 0% |
| TAJIKISTAN | 2 | 0 | 0 | 2 | 0% |
| TOGO | 4 | 0 | 0 | 4 | 0% |
| TURKEY | 1 | 0 | 0 | 1 | 0% |
| URUGUAY | 23 | 0 | 0 | 23 | 0% |
| UZBEKISTAN | 9 | 0 | 0 | 9 | 0% |
| VANUATU | 1 | 0 | 0 | 1 | 0% |
| VENEZUELA | 1,071 | 6 | 0 | 1,077 | 5% |
| **Total** | **13926** | **5821** | **5** | **19752** | |

| Country | FMUA | Single Adult | UAC | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 0 | 1 | 0 | 1 | 0% |
| ANGOLA | 35 | 12 | 2 | 49 | 0% |
| ARGENTINA | 2 | 1 | 0 | 3 | 0% |
| BAHAMAS | 1 | 1 | 0 | 2 | 0% |
| BANGLADESH | 0 | 1 | 0 | 1 | 0% |
| BENIN | 0 | 1 | 0 | 1 | 0% |
| BOLIVIA | 2 | 4 | 0 | 6 | 0% |
| BRAZIL | 485 | 4 | 0 | 489 | 2% |
| BURKINA FASO | 9 | 10 | 0 | 19 | 0% |
| CAMEROON | 0 | 15 | 0 | 15 | 0% |
| CENTRAL AFRICAN REPUBLIC | 0 | 2 | 0 | 2 | 0% |
| CHAD | 3 | 0 | 0 | 3 | 0% |
| CHILE | 2,144 | 1 | 1 | 2,146 | 11% |
| COLOMBIA | 35 | 27 | 0 | 62 | 0% |
| CONGO | 8 | 3 | 0 | 11 | 0% |
| COSTA RICA | 5 | 1 | 0 | 6 | 0% |
| CUBA | 219 | 988 | 3 | 1,210 | 6% |
| CZECH REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| DEM REP OF THE CONGO | 10 | 1 | 1 | 12 | 0% |
| DOMINICAN REPUBLIC | 25 | 29 | 1 | 55 | 0% |
| ECUADOR | 32 | 15 | 0 | 47 | 0% |
| EL SALVADOR | 8 | 6 | 1 | 15 | 0% |
| EQUATORIAL GUINEA | 0 | 2 | 0 | 2 | 0% |
| ERITREA | 0 | 5 | 0 | 5 | 0% |
| ETHIOPIA | 0 | 1 | 0 | 1 | 0% |
| FRANCE | 3 | 0 | 0 | 3 | 0% |
| FRENCH GUIANA | 4 | 1 | 0 | 5 | 0% |
| GAMBIA | 0 | 2 | 0 | 2 | 0% |
| GHANA | 16 | 34 | 0 | 50 | 0% |
| GUATEMALA | 10 | 3 | 0 | 13 | 0% |
| GUINEA | 3 | 17 | 3 | 23 | 0% |
| GUYANA | 0 | 9 | 0 | 9 | 0% |
| HAITI | 6,805 | 7,063 | 25 | 13,893 | 70% |
| HONDURAS | 45 | 25 | 8 | 78 | 0% |
| MALI | 1 | 2 | 0 | 3 | 0% |
| MAURITANIA | 0 | 5 | 0 | 5 | 0% |
| MEXICO | 27 | 71 | 2 | 100 | 1% |
| NICARAGUA | 69 | 98 | 3 | 170 | 1% |
| NIGER | 3 | 0 | 0 | 3 | 0% |
| NIGERIA | 4 | 5 | 0 | 9 | 0% |
| PAKISTAN | 0 | 5 | 0 | 5 | 0% |
| PANAMA | 12 | 1 | 0 | 13 | 0% |
| PAPUA NEW GUINEA | 0 | 1 | 0 | 1 | 0% |
| PERU | 12 | 7 | 0 | 19 | 0% |
| PHILIPPINES | 1 | 0 | 0 | 1 | 0% |
| SAO TOME AND PRINCIPE | 0 | 1 | 0 | 1 | 0% |
| SENEGAL | 3 | 47 | 0 | 50 | 0% |
| SIERRA LEONE | 4 | 1 | 0 | 5 | 0% |
| SOMALIA | 0 | 4 | 0 | 4 | 0% |
| SOUTH AFRICA | 0 | 4 | 0 | 4 | 0% |
| SURINAME | 1 | 0 | 0 | 1 | 0% |
| TAJIKISTAN | 0 | 2 | 0 | 2 | 0% |
| TOGO | 0 | 4 | 0 | 4 | 0% |
| TURKEY | 0 | 1 | 0 | 1 | 0% |
| URUGUAY | 20 | 2 | 1 | 23 | 0% |
| UZBEKISTAN | 0 | 9 | 0 | 9 | 0% |
| VANUATU | 0 | 1 | 0 | 1 | 0% |
| VENEZUELA | 569 | 500 | 8 | 1,077 | 5% |
| **Total** | **10,646** | **9,047** | **59** | **19,752** | |



Annex C
Photo Annex
Del Rio Mass Migration Event

LAYDOWN at ONSET



BUILDUP



Annex C
Photo Annex
Del Rio Mass Migration Event

FINAL LAYDOWN





Annex C
Photo Annex
Del Rio Mass Migration Event

September 16, 2021



September 17, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 18, 2021



September 19, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 22, 2021



September 22, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 23, 2021



September 24, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event





## Del Rio Mass Migration 09/2021
## Known Costs

| Del Rio Surge Requirements | Projected O&S Costs | O&S Obligations |
|---|---|---|
| HHS Disaster Medical Assistance Team (DMAT) & Caregiver Services | | |
| Transportation Costs | | |
| Operational Costs | | |
| TDY | | |
| Overtime | | |
| Volunteer Force | | |
| AMO Flight Hours | | |
| Soft-Sided Facilities (SSF) and Medical Service Contract (MSC)** | | |
| Del Rio Surge Requirements Total | | |

* FY22 Q1 Projected Costs are not provided specific to Del Rio given they are embedded in the overall SWB costs.

** Soft-Sided Facilities and Medical Service Contract costs are not specific to Del Rio; they are embedded in the overall SWB contracts.

Operational Costs include water, food, Del Rio Civic Center, porta-johns, sanitary products, bridge trash clean-up, consumables for safety and sustainment.

TDY, OT, and Volunteer Force are estimates for Del Rio based on latest obligations; Del Rio Sector costs are embedded within overall SWB costs.

Haiti_AR_0013448

**<u>Surge Planning Considerations – Emerging Actions from Del Rio Mass Migration Event</u>**

**<u>September 8, 2021, to September 24, 2021</u>**

Del Rio Sector (DRT) experienced an unprecedented number of migrant apprehensions that placed DRT in a critical state by overwhelming transportation, processing, and detention capacities. A complex issue quickly became chaotic as Emergency Operations increased and multiple components and outside agencies surged manpower and resources to the area. The unique situation did not allow for best practices to be implement and emerging practices became the path forward for a crisis event the Border Patrol had not encountered in its history.

**Emerging Practices and Response Considerations:**

- Activate the Region VI or Region IX LFCs
  - ➢ The Lead CBP Field Coordinator (LFC) is directed to develop and maintain a CBP Region Preparedness Plan that incorporates the coordinated plans and leverages the resources and capabilities of each OBP, OFO, and AMO component within the region.
  - ➢ The CBP Region Preparedness Plan will establish a CBP Region Mass Migration Task Force (MMTF). The MMTF provides the organizational framework to facilitate the assignment of roles to participating agencies, define processes for intra-departmental collaboration, and detect a mass migration event or other contingency operation.
  - ➢ Operation Vigilant Sentry Southwest describes the basic organization and structure by which the MMTF will deploy resources and direct multi-agency operations to address a potential or full-scale mass migration event.
- Plan according to a Mass Casualty Type Event:
  - ➢ Increase capacity and capability for feeding, medical, transportation, and holding.
  - ➢ Contracts were established with local restaurants to prepare meals. World Central Kitchen brought in for meal prep and distribution. They also consolidated local meal contracts into one CBP contract.
  - ➢ Sector MSS personnel were used to receive and distribute food and water while uniformed agents continued security and transport operations.
  - ➢ HHS DMAT (Disaster Medical Assistance Team) was activated for increased medical support. DMAT can provide advanced level care on site.
  - ➢ Bureau of Prison (BOP) bus drivers required deputization to provide support to CBP. Local CBP OCC was able to conduct the deputization. Approximately 48-hour lead time was needed to ensure compliance. The Commissioner's Action Group (CAG) coordinated BOP support.
  - ➢ All SWB Sectors assisted with holding processed and unprocessed migrants to reduce the total numbers in DRT staged at the POE bridge.
  - ➢ Consider all available operational and operational support resources to support MME (ex. MRT, Task Forces, & Checkpoints).
  - ➢ Calls for other federal, state, and local assistance should take place as early as possible.

- <u>Sector Transportation Coordination Cell</u>:
  - ➢ Consider limitations of local ICE/ERO office and contracted transportation services.
  - ➢ Transportation Coordination Cell consists of subject matter experts in flight operations and transportation coordination between sectors and contractual services.
  - ➢ Coordinate detainee transportation with receiving sectors and identify transporting components (CBP Contracted, USBP, DOJ).
  - ➢ Coordinate flight manifest requirements between transporting station/s and ICE/ERO
  - ➢ Coordinate transportation to flight lines
- <u>Personnel Lodging Considerations</u>:
  - ➢ At the onset of an imminent MME, sectors should immediately examine lodging availability and begin communicating with contractual service representatives to secure available lodging accommodations and other associated resources to support deployed personnel.
  - ➢ In instances where lodging through the local economy is not available, communicate with local officials for potential options, such as retrofitting city office space or convention centers.
- <u>Designated Areas at IC for Supporting Agencies</u>
  - ➢ Law Enforcement command and supporting elements should be considered when establishing the location of the Incident Command Post (ICP).  The ICP should be comprised of a Mobile Command Center (MCC) located appropriately distanced from the incident site.
  - ➢ When establishing the ICP, the IC, Deputy ICs and planners should allocate adjacent or nearby footprints for support federal, state, and local LE partners to situate their command elements.  Consider climate-controlled shelters for cooperating agency meetings and government or non-government delegation visits.
- <u>Accountability</u>
  - ➢ Identify an expedient process to account for migrants entering an established containment area.  DRT utilized a ticket system to track the number of migrants making entry into the US.  The same ticket system was also used to prioritize the order of movement of migrants during transport.
- <u>Designated Areas for Medical and NGOs</u>
  - ➢ Identify location/s for Medical sites such as mobile hospitals and decontamination sites.
  - ➢ Consider the location/s for feeding services that affords a practical distance from containment areas.
- <u>Additional Hygiene and Sanitation Assistance</u>
  - ➢ Medical recommendation as per CBP Office of Chief Medical Officer is 1 porta-johns per 32 persons.
  - ➢ Handwashing Stations 1 per 100 persons is recommended.

- ➢ Coordinate for additional bulk water delivery and water buffalo stations for drinking water and personal hygiene.
  - ➢ Collapsible plastic water containers passed out upon arrival for individual use will support the CDC recommended amount of water for adequate life sustainment.
  - ➢ Decontamination stations for agents: power washers for boots and water/bleach buckets for dunking.
- Ensure an early site visit by CBP HQ Personnel, White House Officials, or Commissioner Action Group
  - ➢ Firsthand visual assessment led to greater support.  News and other official reporting do not provide the same impact as being on site.
  - ➢ Ensured financial assistance at a more rapid approval rate
  - ➢ Once the HQ visit was done, expect +72 hours for funding to start flowing.
- Establish a Regional Communication Representative to assist local PAO
  - ➢ Local PAO was overwhelmed with coordinating congressional and dignitary site visits.
  - ➢ Talking points and briefing memos were generated from the Regional Representative that assisted the Chief and IC
  - ➢ Ensured better coordination with Media and NGOs
  - ➢ Allowed IC personnel to focus on the operational requirements
- New Requests for Assistance (RFA) need to be established with DoD
  - ➢ The Crisis Response Force (CRF) activation would have provided a MP Company, Medical, Close Air Rotary Support, and Engineering Support.  A phone call to the J3 at NORTHCOM is the requirement to activate the CRF.  Note: The CRF was not approved by DoD for RFA FY22
  - ➢ RFAs should include: CDL Drivers, High-Capacity Transportation Vehicles, High-Capacity Field Holding Structures, High-Capacity Fixed Wing Support for moving both CBP personnel and migrants.
- Closure of POEs
  - ➢ Full closure of POE directly affected.  Justification is for the safety of the migrants and the LE officials managing the scene.
  - ➢ Partial closure / lane reduction of adjacent POEs (ex. Eagle Pass POE closed all but one lane for all vehicles entering the US)
  - ➢ Closing the POE was the turning point to gains support from both the GOM as well as the NCR.
  - ➢ Implement a TFR (temporary flight restriction) for security and uninterrupted ISR assistance.
- MOU with the United States Coast Guard for fixed wing air support (National Level)
  - ➢ CONUS flights only.  USBP personnel provided security
- Imbed ERO for assistance requirements / pre-coordination planning
  - ➢ Processing support and expedited file completion
  - ➢ Transportation surge
- Request for additional overtime funding
  - ➢ 6th day was mandated

➢ Option of 2-4 additional hours of OT per shift should be considered instead of a mandated 6th day to avoid burnout.

➢ Consider requests for bi-weekly overtime cap waivers for personnel expected to work beyond Congressionally mandated bi-weekly limits.



# Rescue Beacons and Unidentified Remains

Fiscal Year 2022 Report to Congress



*U.S. Customs and Border Protection*

# Message from the Deputy Commissioner of CBP

March 29, 2022

I am pleased to submit the following report, "Rescue Beacons and Unidentified Remains," which has been prepared by U.S. Customs and Border Protection (CBP).



The report has been compiled pursuant to direction set forth in the Missing Persons and Unidentified Remains Act of 2019 (P.L. 116–277).  The report explains CBP's response to the Committee's request to establish a Missing Migrant Program (MMP) regarding preventing the loss of lives of migrants attempting to enter the United States.

Pursuant to congressional requirements, this report is being provided to the following Members of Congress:

>   The Honorable Gary C. Peters
>   Chairman, Senate Committee on Homeland Security and Governmental Affairs
>
>   The Honorable Rob Portman
>   Ranking Member, Senate Committee on Homeland Security and Governmental Affairs
>
>   The Honorable Bennie G. Thompson
>   Chairman, House Committee on Homeland Security
>
>   The Honorable John Katko
>   Ranking Member, House Committee on Homeland Security

I would be pleased to respond to any questions you may have.  Please do not hesitate to contact my office at (202) 344-2001.

Sincerely,

Troy A. Miller
Deputy Commissioner
U.S. Customs and Border Protection

Haiti AR_000435

# Executive Summary

The Department of Homeland Security and CBP are committed to preventing the loss of life of migrants attempting to enter the United States.  In 2017, CBP's U.S. Border Patrol (USBP) began implementing new procedures, partnerships, and databases to assist in locating and identifying migrants who are reported lost or missing.  Through partnerships with federal, state, tribal, and local agencies, along with nongovernmental organizations (NGO) and foreign consular offices, USBP now has a standardized, active MMP in all nine USBP Southwest Border sectors.

Since its inception, MMP has improved response times for 911 calls, increased the number of rescue beacons, and implemented 911 rescue placards with information that assists rescue personnel with locating migrants in distress.  In addition, these efforts have improved information flow with and between federal agencies; state, tribal, and local governments; NGOs, and foreign consular offices associated with locating and identifying migrants in danger or those migrants who may have died during the journey to the United States.  In Fiscal Year (FY) 2021, USBP MMP implemented an Internal Operating Procedure, which increased standardization and led to enhanced reporting.

FY 2021 presented many unprecedented challenges in border security.  In addition to dealing with the consequences of the COVID-19 global pandemic, CBP experienced a historic influx of irregular migration, stressing capacity limitations and requiring the flexing of personnel to address localized surges.  USBP recorded a record number of migrant encounters (1,662,167), migrant rescues (12,857), and unfortunately, migrant deaths (568).  While this is concerning, migrant rescues and migrant deaths could have been much higher if not for the humanitarian efforts and resources dedicated to the MMPs.

As USBP Sector MMPs continue to mature, CBP will continue to communicate the dangers of the border region on multiple media platforms, will increase collaboration with internal and external stakeholders to enhance situational awareness of the border region, and will continue to educate the public on the risks associated with irregular migration caused by criminal organizations.

Haiti AR_000436



# Rescue Beacons and Unidentified Remains

# Table of Contents

I.    Legislative Language ..................................................................................................1

II.   Background .................................................................................................................3
      A.  CBP Migrant Death Mitigation.............................................................................3
      B.  CBP Rescue Efforts ..............................................................................................4

III.  Discussion ..................................................................................................................5
      A.  Migrant Rescues ...................................................................................................8
      B.  Rescue Beacons ..................................................................................................10
      C.  911 Placards........................................................................................................11
      D.  MMP Future Requirements ................................................................................11

IV.   Conclusion ...............................................................................................................13

V.    Appendices...............................................................................................................14
      Appendix A.  List of Abbreviations........................................................................14
      Appendix B.  Map of Migrant Rescues and Rescue Beacons ................................15
      Appendix C.  Map of Migrant Deaths and Rescue Beacons ..................................16

Haiti AR_000437

# I.   Legislative Language

This document was compiled pursuant to direction set forth in the Missing Persons and Unidentified Remains Act of 2019 (P.L. 116–277), which states:

(a) UNIDENTIFIED REMAINS.—
    (1) REPORTING REQUIREMENT.— Not later than 1 year after the date of enactment of this Act, and annually thereafter, the Commissioner of U.S. Customs and Border Protection shall submit a report to the appropriate committees of Congress regarding all unidentified remains discovered, during the reporting period, on or near the border between the United States and Mexico, including—
        (A) for each deceased person—
            (i) the cause and manner of death, if known;
            (ii) the sex, age (at time of death), and country of origin (if such information is determinable); and (iii) the location of each unidentified remain;
        (B) the total number of deceased people whose unidentified remains were discovered by U.S. Customs and Border Protection during the reporting period;
        (C) to the extent such information is available to U.S. Customs and Border Protection, the total number of deceased people whose unidentified remains were discovered by Federal, State, local or Tribal law enforcement officers, military personnel, or medical examiners offices;
        (D) the efforts of U.S. Customs and Border Protection to engage with nongovernmental organizations, institutions of higher education, medical examiners and coroners, and law enforcement agencies—
            (i) to identify and map the locations at which migrant deaths occur; and
            (ii) to count the number of deaths that occur at such locations; and
        (E) a detailed description of U.S. Customs and Border Protection's Missing Migrant Program, including how the program helps mitigate migrant deaths while maintaining border security.

    (2) PUBLIC DISCLOSURE.—Not later than 30 days after each report required under paragraph (1) is submitted, the Commissioner of U.S. Customs and Border Protection shall publish on the website of the agency the information described in subparagraphs (A), (B), and (C) of paragraph (1) during each reporting period.

(b) RESCUE BEACONS.—Not later than 1 year after the date of enactment of this Act, and annually thereafter, the Commissioner of U.S. Customs and Border Protection shall submit a report to the appropriate committees of Congress regarding the use of rescue beacons along the border between the United States and Mexico, including, for the reporting period—
    (1) the number of rescue beacons in each border patrol sector;
    (2) the specific location of each rescue beacon;
    (3) the frequency with which each rescue beacon was activated by a person in distress;
    (4) a description of the nature of the distress that resulted in each rescue beacon activation (if such information is determinable); and

Haiti AR_000438

(5) an assessment, in consultation with local stakeholders, including elected officials, nongovernmental organizations, and landowners, of necessary additional rescue beacons and recommendations for locations for deployment to reduce migrant deaths.

2

Haiti AR_000439

# II.   Background

## A.   CBP Migrant Death Mitigation

U.S. Customs and Border Protection (CBP) initiated the Missing Migrant Program (MMP) in 2017 to prevent the loss of life of migrants during their journey to the United States.

MMP is a humanitarian effort, led by the U.S. Border Patrol (USBP), that focuses on border safety, locating migrants reported missing, rescuing migrants in distress, preventing migrant deaths, and identifying and reunifying decedents with their families in the border region.  Guided by the *Missing Persons and Unidentified Remains Act of 2019*, MMP institutionalizes procedures for third-party missing migrant reports, providing a focal point for collaboration and integration with internal and external stakeholders such as medical examiners and coroners, non-governmental organizations (NGO), academia, and other law enforcement agencies.

In collaboration with CBP's Intergovernmental Public Liaison Office, MMP participates in NGO Days, where CBP hosts NGOs and provides operational briefings, facility tours, border tours, and a presentation on the local MMP.  These types of engagements strengthen our partnerships and establish strong lines of communication for future coordination.

Through MMP, CBP has improved its ability to locate migrants reported missing by conducting more efficient searches of CBP databases for migrants previously encountered by CBP, increasing the number of rescue beacons and 911 rescue placards deployed to reduce rescue times, and coordinating rescue efforts with internal and external partners.  The border region is a harsh environment, and in some rescue scenarios, minutes can be the difference between life and death.  Understanding this urgency and promoting processes and procedures that maximize efficiencies, MMP focuses on four lines of effort to reduce migrant deaths.

The four lines of effort for MMP are as follows:

- **Prevent**
  - Strategic messaging with internal and external stakeholders to highlight the dangers of irregular migration;
  - Informed deployment of rescue equipment; and
  - Improved information flow from foreign consulates and NGOs.
- **Locate**
  - Improved response time for 911 calls and rescues;
  - Database queries; and
  - Physical location determinations.
- **Identify**
  - Biographic information exchange of decedents with NGOs, foreign consular offices, medical examiners offices, and federal, state and local partners, as appropriate.
- **Reunite**
  - Assist with the return of subjects to their native countries and their families; and

3

    o   Provide closure for families of migrants who perished.

## B.   CBP Rescue Efforts

MMP has identified four categories of searches to apply the appropriate resources, to minimize search times, and to enhance the chances of locating missing migrants.  The categories are:

**Category 1 – Subject Query**
- USBP searches its databases to determine if a subject has previously been encountered;
- The subject's name, date of birth, place of birth, and last known location are recorded; and
- The subject's record either is located or not located via database searches and results are shared with MMP partners.

**Category 2 - Search and Rescue**
- USBP receives and records the subject's biographic information, last known location, and other information pertinent to the situation;
- USBP shares recorded information and coordinates the search-and-rescue operations with partners; and
- USBP reports the disposition of the subject (located or not located) and additional information to partners.

**Category 3 - Search and Recovery**
- USBP facilitates a missing migrant search, as described above.
- If the migrant is deceased, the global positioning system location of the remains is reported to the appropriate agency and the landowner, if applicable, is notified.

**Category 4 - Identification of Remains**
- In addition to those actions listed in Category 3:
  - o  USBP coordinates with the local medical examiner to identify the remains;
  - o  USBP searches the National Missing and Unidentified Persons System for identification of the remains; and
  - o  USBP reports any possible identity matches to federal, state, local, and international partners, as appropriate.

In Fiscal Year (FY) 2021, USBP recorded 568 migrant deaths and conducted 3,423 rescue events resulting in 12,857 rescued migrants.  In addition to being an increase from FY 2020, where USBP reported 254 decedents and rescued 5,336 migrants, this also represents a record number for USBP in both migrant rescues and migrant deaths.

Haiti AR_000441

# III.  Discussion

FY 2021 marked a significant increase in both migrant rescues and migrant deaths along the Southwest border.  A few factors led to this increase.  First, USBP recorded 1,662,167 encounters, marking a staggering 310 percent increase from FY 2020, where 405,036 encounters were recorded.  Additionally, as the USBP MMPs continue to mature and expand their partnerships at the federal, state, and local levels, they have become increasingly more aware of reportable incidents, also accounting for an increase in fiscal year reporting.

The tables below demonstrate the significant increase in migrant deaths in every Southwest border sector in FY 2021.  Mexican national decedents were the highest nationality reported, accounting for 59 percent of the overall total.  The South Texas region accounted for 54 percent of the reported decedents with 305.

Table 1

**Southwest Border Migrant Deaths Reported by Sector**

| Sector | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| Rio Grande Valley | 104 | 96 | 69 | 58 | 130 |
| Laredo | 84 | 69 | 78 | 57 | 75 |
| Del Rio | 18 | 20 | 38 | 34 | 100 |
| Big Bend | 3 | 10 | 3 | 15 | 39 |
| El Paso | 8 | 6 | 20 | 10 | 39 |
| Tucson | 73 | 58 | 61 | 43 | 78 |
| Yuma | 2 | 1 | 7 | 7 | 30 |
| El Centro | 2 | 17 | 17 | 17 | 45 |
| San Diego | 4 | 4 | 7 | 13 | 32 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

Table 2

**Migrant Death by Type**

| Type of Death | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| Environmental Exposure-Heat | 68 | 95 | 110 | 104 | 219 |
| Environmental Exposure-Cold | 2 | 28 | 7 | 7 | 21 |
| Train-Related | 2 | 0 | 0 | 1 | 1 |
| Motor-Vehicle-Related | 2 | 5 | 11 | 9 | 41 |
| Water-Related | 91 | 54 | 66 | 41 | 78 |
| Other | 51 | 36 | 21 | 20 | 86 |
| Undetermined | 35 | 37 | 60 | 42 | 73 |
| Skeletal Remains | 47 | 26 | 25 | 30 | 49 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

Haiti AR_000442

| Table 3 | | | | | |
|---|---|---|---|---|---|
| **Migrant Death by Nationality** | | | | | |
| **Nationality** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** | **FY 2021** |
| Bangladesh | 1 | 2 | 1 | 0 | 0 |
| Brazil | 7 | 1 | 1 | 0 | 4 |
| China | 0 | 0 | 1 | 0 | 1 |
| Colombia | 0 | 1 | 0 | 0 | 2 |
| Cuba | 1 | 0 | 0 | 0 | 4 |
| Dominican Republic | 2 | 0 | 3 | 0 | 0 |
| Ecuador | 6 | 2 | 6 | 4 | 12 |
| El Salvador | 15 | 8 | 7 | 2 | 19 |
| Guatemala | 20 | 20 | 21 | 11 | 32 |
| Honduras | 10 | 14 | 16 | 11 | 30 |
| India | 0 | 0 | 1 | 0 | 0 |
| Kazakhstan | 1 | 0 | 0 | 0 | 0 |
| Mexico | 98 | 117 | 124 | 136 | 334 |
| Nicaragua | 1 | 1 | 2 | 0 | 4 |
| Peru | 0 | 1 | 0 | 0 | 0 |
| Romania | 1 | 0 | 0 | 0 | 0 |
| Venezuela | 0 | 0 | 0 | 1 | 1 |
| Unknown | 135 | 114 | 117 | 89 | 125 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

Haiti AR_000443

**Table 4**

**Southwest Border Deaths by Gender, Age Group, and Discoverer**

| Gender | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| Female | 18 | 15 | 28 | 22 | 101 |
| Male | 151 | 164 | 178 | 148 | 364 |
| Unknown | 129 | 102 | 94 | 84 | 103 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

| Age Group | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| 0 - 17 | 9 | 4 | 8 | 7 | 8 |
| 18 - 25 | 29 | 44 | 43 | 46 | 110 |
| 26 - 35 | 43 | 39 | 53 | 42 | 114 |
| 36 - 45 | 30 | 32 | 40 | 27 | 75 |
| 46 - 55 | 6 | 9 | 12 | 9 | 37 |
| 56 and Older | 2 | 2 | 3 | 6 | 13 |
| Unknown | 179 | 151 | 141 | 117 | 211 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

| Discoverer | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| USBP | 201 | 201 | 226 | 200 | 448 |
| Other | 97 | 80 | 74 | 54 | 120 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

The majority of reported migrant deaths were male, accounting for 64 percent of the overall total. Thirty-nine percent were between the ages of 18-35, however 37 percent of the decedent's ages remain unknown. Similar to previous fiscal years, USBP agents discovered the majority of reported migrant deaths, accounting for 79 percent of the total in FY 2021.

Migrant deaths were highest during the months of June (105), August (95), and September (76), which accounted for 49 percent of all reported migrant deaths in FY 2021. In those same months, USBP averaged approximately 187,000 migrant encounters per month. The extreme temperatures along the Southwest border during these months were a contributing factor, often leading to heat-related injuries. Heat exposure continues to be the leading identified cause of migrant deaths along the southwest border.

It is also important to note that migrants are often ill-prepared to make the journey across border waterways and through the harsh terrain of the desert. Transnational criminal organizations engaged in human smuggling typically disregard migrant safety over profit, and underplay the dangers of the environment, misinform migrants on the travel distance, abandon them when they are injured, or leave them behind if they cannot keep up with the group causing them to become lost.

Haiti AR_000444

## A.  Migrant Rescues

The number of individuals rescued and overall rescue events by USBP increased drastically in FY 2021.  This is largely driven by the 310 percent increase in overall USBP encounters, which rose from 405,036 in FY 2020, to 1,662,167 in FY 2021.  Additionally, there was a significant increase in motor-vehicle rescues, specifically with tractor-trailers, which accounted for 47 percent of overall reported rescues.  The overwhelming majority, or 95 percent, of the motor-vehicle rescues were reported in the Laredo Sector.

USBP also reported an increase in rescues associated with 911 calls.  In FY 2021, USBP reported 4,724 rescues from 911 calls, which is a 136 percent increase from FY 2020, where USBP reported 1,586 rescues.  In FY 2021, the MMP Internal Operating Procedure was implemented across all Southwest border sectors, promoting standardization in reporting and accounting for rescue efforts recorded under the MMP.  This data highlights the extraordinary amount of resources USBP has dedicated to this humanitarian mission and to preventing the loss of life in the border region.

**Table 5**

| | Number of Rescue Incidents and People | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Sector | Rescue Incidents | | | | | People | | | | |
| | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
| Rio Grande Valley | 355 | 345 | 184 | 138 | 508 | 1,191 | 1,623 | 794 | 304 | 949 |
| Laredo | 248 | 278 | 310 | 317 | 568 | 1,242 | 1,509 | 2,453 | 3,549 | 7,109 |
| Del Rio | 50 | 60 | 108 | 104 | 906 | 99 | 114 | 480 | 202 | 2,096 |
| Big Bend | 12 | 27 | 13 | 66 | 190 | 26 | 71 | 45 | 150 | 748 |
| El Paso | 19 | 10 | 20 | 4 | 526 | 44 | 17 | 40 | 12 | 688 |
| Tucson | 476 | 574 | 570 | 423 | 164 | 757 | 926 | 930 | 774 | 233 |
| Yuma | 2 | 10 | 23 | 35 | 137 | 6 | 20 | 82 | 114 | 424 |
| El Centro | 4 | 9 | 30 | 69 | 158 | 4 | 14 | 78 | 171 | 328 |
| San Diego | 27 | 13 | 16 | 40 | 266 | 48 | 25 | 19 | 60 | 282 |
| Totals | 1,193 | 1,326 | 1,274 | 1,196 | 3,423 | 3,417 | 4,319 | 4,921 | 5,336 | 12,857 |

8

Haiti AR_000445

Table 6

| Number of Rescues by Type | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Rescue Type | Incidents | | | | | People | | | | |
| | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
| Environmental Exposure-Heat | 366 | 480 | 380 | 458 | 1,664 | 725 | 1,209 | 924 | 1,159 | 3,760 |
| Environmental Exposure-Cold | 49 | 56 | 64 | 56 | 317 | 112 | 118 | 132 | 139 | 961 |
| Water-Related | 54 | 53 | 239 | 206 | 136 | 131 | 86 | 742 | 384 | 249 |
| Other | 509 | 543 | 444 | 315 | 1,075 | 829 | 945 | 768 | 631 | 1,713 |
| Motor-Vehicle-Related | 215 | 188 | 138 | 152 | 209 | 1,620 | 1,938 | 2,343 | 2,979 | 5,999 |
| Train-Related | 0 | 6 | 9 | 9 | 22 | 0 | 23 | 12 | 44 | 175 |
| Totals | 1,193 | 1,326 | 1,274 | 1,196 | 3,423 | 3,417 | 4,319 | 4,921 | 5,336 | 12,857 |

9

Haiti AR_000446

## B.   Rescue Beacons

USBP is utilizing a rescue beacon suitability model to determine the most suitable deployment locations using spatial data science.  Data sets, such as historic trends, land access, elevation, and Agent response time, can be weighted according to criteria unique to each sector, allowing for maximum effectiveness in each operating environment.

USBP has deployed 160 rescue beacons in high-traffic areas, many with unreliable or no cellular phone coverage.  Additionally, these areas historically have been near locations where migrant remains have been discovered or multiple rescues have occurred.  The use of these beacons has proven useful over the years for providing a means of alerting USBP to migrants in distress; however, the nature of distress that led to the specific activation of a deployed rescue beacons is a data point that is not captured by USBP's systems.  USBP does have the ability to record a disposition for a rescue beacon activation.

In FY 2021, USBP reported 83 successful rescues associated with rescue beacon activations. While this number is relatively small compared to the overall number of beacons, USBP identified a technological gap where the "rescue" had to be manually entered into the system at the time of processing, and this was at times omitted.  Given the implementation of the Internal Operating Procedure and the standardization of reporting, USBP anticipates an increase in reported rescues associated with rescue beacon activations in the future.

Additionally, USBP is transitioning from the legacy, fixed rescue beacons to a mobile rescue beacon platform.  Along with the added capability of adjusting to shifts in migration patterns, mobile beacons are less expensive and have a smaller footprint, leading to more permissions from landowner access requests. Currently, 50 of the deployed beacons, or 31 percent, are mobile rescue beacons.  USBP will continue to collaborate with local stakeholders regarding rescue beacon locations and additional recommendations to reduce migrant deaths.



Fixed Rescue Beacon



Mobile Rescue Beacon

10

## C.   911 Placards

In FY 2021, USBP continued the implementation of the 911 rescue placard system.  These placards are placed in areas where rescue beacons were impractical or not able to be deployed because harsh terrain or land ownership access issues.  There are currently 2,279 rescue placards deployed in strategic locations along the southwest border.  In FY 2021, 207 recorded rescues were associated with this type of rescue equipment.



- The 911 placards are a simple and accessible rescue aid that are deployed almost anywhere there is cell phone coverage.
- If migrants have access to both a cell phone (which is common) and cellular battery life, they will be able to call 911 for help.
- The informational placards provide migrants with a unique location identifier that the migrants can use to contact emergency management services to assist with locating them.
- 911 placards are placed on existing infrastructure and do not require any changes to the landscape.
- USBP is developing a tracking mechanism for evaluating the system's effectiveness versus a rescue beacon, considering cellular network coverage.

## D.   MMP Future Requirements

The dynamic border environment requires a strategy that is adaptive and responsive.  CBP is committed to MMPs lines of effort and will evolve with the ever-changing landscape.  To that end, CBP will focus efforts on multi-platform strategic messaging to accurately highlight the dangers of irregular migration and combat the false narrative portrayed by smugglers and criminal organizations.  These efforts will include print, radio, social media, and others to properly educate the targeted population.  The criminal element uses social media very effectively to advertise their illegal services and is responsible for many of these migrant deaths.

MMP will continue to engage with foreign and regional partners to increase trust and credibility, improve feedback, and identify initiatives to partner to multiply the effectiveness of operations.  Specifically, MMP will enhance partnerships with the Office of Medical Examiners and NamUs to build situational awareness and increase program effectiveness.  MMP will promote

11

transparency to achieve the desired outcome of maximized program capabilities through mutually beneficial partnerships with internal and external stakeholders.

Technology changes fast and quickly becomes obsolete.  MMP will continue to capitalize on innovative solutions to meet program needs.  Partnering with Industry, MMP is currently in the process of piloting a Commercial Off the Shelf rescue beacon to deploy in the rugged terrain along the Southwest border.  The Commercial Off the Shelf model will reduce the construction time and resources while increasing capability standardization.  MMP is also researching drone technology to increase situational awareness on the border using limited resources.

Finally, MMP is committed to continuously evaluating program data to make sound resource and strategic decisions to improve outcomes.  This will inform resource allocation, ensure mission alignment, provide accountability to stakeholders, and influence the resource acquisition process. MMP is currently piloting a 911 Emergency Management Portal in south Texas, which is a multi-tiered system for recording and managing MMP activities within a given environment. Based on significant increases in rescue response rates and data management, CBP will determine the necessary resources for program expansion.

Haiti AR_000449

# IV.  Conclusion

CBP is unwavering in its mission and aims to rise to every challenge with which it is faced.  We are committed to these humanitarian efforts and will continue to dedicate the appropriate levels of resources to make the border region safer.  We cannot do it alone, and we welcome the opportunity to partner with our stakeholders in this shared mission to save lives.

As previously stated, CBP faced unprecedented challenges in FY 2021 but responded with equal vigor and commitment.  USBP alone conducted 12,857 successful rescues, setting an agency record.  The MMPs continue to be resourced and expanded, providing CBP with greater humanitarian capabilities to match the threat.  As the largest federal law enforcement agency in the United States, CBP will continue to meet these existing and emerging humanitarian challenges head on.

Haiti AR_000450

# V.   Appendices

## Appendix A.  List of Abbreviations

| Abbreviation | Definition |
|---|---|
| CBP | U.S. Customs and Border Protection |
| FY | Fiscal Year |
| MMP | Missing Migrant Program |
| NGO | Nongovernmental Organizations |
| USBP | U.S. Border Patrol |

Haiti AR_000451

## Appendix B.  Map of Migrant Rescues and Rescue Beacons



15

Haiti AR_000452

Appendix C.  Map of Migrant Deaths and Rescue Beacons



16

Haiti_AR_000454



SW Land Border Encounters by FY and Country Group: Production data as of 9/6/2022

| | ENCOUNTERS | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Counts | | | | Percentage | | |
| | Mexico | NCA | Other | Total | Mexico | NCA | Other |
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 | 98.4% | 1.2% | 0.4% |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 | 97.6% | 1.7% | 0.7% |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 | 97.0% | 2.3% | 0.8% |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 | 95.6% | 3.3% | 1.0% |
| 2004 | 1,074,330 | 51,462 | 14,455 | 1,140,247 | 94.2% | 4.5% | 1.3% |
| 2005 | 1,103,162 | 114,040 | 52,028 | 1,269,230 | 86.9% | 9.0% | 4.1% |
| 2006 | 1,058,026 | 89,249 | 21,034 | 1,168,309 | 90.6% | 7.6% | 1.8% |
| 2007 | 882,216 | 52,640 | 19,540 | 954,396 | 92.4% | 5.5% | 2.0% |
| 2008 | 727,494 | 46,616 | 18,299 | 792,409 | 91.8% | 5.9% | 2.3% |
| 2009 | 565,248 | 39,935 | 13,930 | 619,113 | 91.3% | 6.5% | 2.2% |
| 2010 | 467,461 | 43,590 | 16,362 | 527,413 | 88.6% | 8.3% | 3.1% |
| 2011 | 344,013 | 40,505 | 16,540 | 401,058 | 85.8% | 10.1% | 4.1% |
| 2012 | 316,890 | 88,322 | 20,893 | 426,105 | 74.4% | 20.7% | 4.9% |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 | 64.9% | 28.7% | 6.5% |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 | 50.1% | 43.5% | 6.4% |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 | 57.0% | 32.0% | 11.0% |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 | 45.8% | 40.7% | 13.5% |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 | 43.7% | 45.2% | 11.1% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | 42.6% | 49.7% | 7.7% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | 24.3% | 63.8% | 11.9% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | 65.0% | 23.3% | 11.7% |
| 2021 | 655,591 | 701,049 | 378,043 | 1,734,683 | 37.8% | 40.4% | 21.8% |
| 2022 | 807,236 | 541,088 | 1,029,008 | 2,377,332 | 34.0% | 22.8% | 43.3% |

Haiti_AR_000455

**SW Land Border Encounters by Expedited Removals and Credible Fear: 2013 -2022Q3**

| | Total Encounters | Expedited Removal | Credible Fear | As a % of ER | As a % of Encounters |
|---|---|---|---|---|---|
| 2013 | 489,612 | 236,330 | 38,981 | 16% | 8% |
| 2014 | 570,048 | 229,389 | 54,230 | 24% | 10% |
| 2015 | 444,856 | 180,679 | 50,043 | 28% | 11% |
| 2016 | 558,991 | 228,019 | 97,575 | 43% | 17% |
| 2017 | 415,199 | 160,397 | 71,121 | 44% | 17% |
| 2018 | 519,944 | 214,808 | 99,825 | 46% | 19% |
| 2019 | 977,229 | 223,291 | 101,734 | 46% | 10% |
| 2020 | 458,066 | 91,765 | 25,705 | 28% | 6% |
| 2021 | 1,734,683 | 84,707 | 69,635 | 82% | 4% |
| 2022Q3 | 1,710,734 | 84,513 | 55,119 | 65% | 3% |

Notes: Results based on source data as of June 30, 2022 and OIS Enforcement Lifecycle methodology as of May 31, 2021.
Document of Immigration Statistics Enforcement Lifecycle.

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

**From:**
**To:**
**Subject:** RE: Updated data - decompression
**Date:** Sunday, December 11, 2022 8:02:06 AM

Sorry about that, better breakdown for Nov. 2022:

Total Domestic Lateral Movement Flights = 124 (91 singe adult flights and 33 family unit flights)
Total non-citizens laterally moved, via flight, for decompression = 14,469 (9412 single adults; 5057 family units)

The MCC does not have numbers on the bus movements.

**From:**
**Sent:** Sunday, December 11, 2022 7:43 AM
**To:**

**Subject:** RE: Updated data - decompression

Thank you, ▇▇▇ Can you break down that 14,469 number a bit? Does that represent the total number of bus routes + flights, or individuals, or something else?

▇▇▇▇▇ | Acting Director, Border and Immigration Policy | DHS | ▇▇▇▇

**From:**
**Sent:** Sunday, December 11, 2022 7:38 AM
**To:**

**Subject:** Re: Updated data - decompression

The number of lateral movements of both single adults and family units via air in Nov. 2022 is 14469

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:**
**Sent:** Saturday, December 10, 2022 4:58:24 PM
**To:**

**Subject:** Re: Updated data - decompression

I have the November information for flights, if that is needed. Will have been early tomorrow morning.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** ███████████████████
**Sent:** Saturday, December 10, 2022, 4:42 PM
**To:** ████████████████
**Cc:** ███████████████
**Subject:** RE: Updated data - decompression

Looping in ███████ the MCC Section Chief.


Thank you,

████████████
National Incident Commander
Southwest Border Coordination Center
US Customs and Border Protection
Department of Homeland Security

███████████

---

**From:** ████████████████
**Sent:** Wednesday, December 7, 2022 12:04 AM
**To:** █████████████████
**Subject:** Updated data - decompression

Shane – can you point me to the right POC to update this data to reflect the month of November?



Acting Director, Border and Immigration Policy
U.S. Department of Homeland Security

Haiti AR_000458

https://www.cbp.gov/newsroom/local-media-release/cbp-law-enforcement-assist-42-haitian-migrants-after-landing-key

# CBP, Law Enforcement Assist 42 Haitian Migrants after Landing in Key Biscayne.

Release Date
Wed, 08/25/2021 - 12:00

MIAMI – U.S. Customs and Border Protection (CBP) operational components,  Air and Marine Operations (AMO), the U.S. Border Patrol, along with other law enforcement partners, responded to a maritime smuggling event on Tuesday afternoon near Key Biscayne where 42 Haitian nationals were found.  A Good Samaritan call alerted agencies to a vessel that ran aground, and migrants attempting to make their way to shore.


Miami CBP agents provide care and assistance to Haitian nationals off the coast of Florida.

"These maritime smuggling efforts are extremely dangerous.  Often, smugglers do not have life jackets, their passengers cannot swim, their vessels are not seaworthy. said Rony Chinchilla, CBP Marine Unit Supervisory Marine Interdiction Agent. "Without these strong partnerships, curbing the flow of maritime smuggling and saving lives would be nearly impossible."

When AMO agents reached the grounded vessel, 23 women and children were found below deck thirsty, tired and some overcome by the heat. All were safely transferred over to an AMO vessel.  A mother and son were transferred over to responding Emergency Medical Services at nearby Marina for care and treatment.


Miami US Coast Guard and CBP Marine  patrol off the Florida coast after maritime smuggling event.

 Collaboration from the U.S. Coast Guard, Florida Fish and Wildlife Conservation Commission, and local Florida law enforcement partners proved key to a safe outcome.

All the migrants were taken into Border Patrol custody where they will be interviewed and processed for removal proceedings. An investigation regarding the incident is ongoing.

AMO safeguards our Nation by anticipating and confronting security threats through our aviation and maritime law enforcement expertise, innovative capabilities, and partnerships at the border and beyond. With approximately 1,800 federal agents and mission support personnel, 240 aircraft and 300 marine vessels operating throughout the United States, Puerto Rico, and U.S. Virgin Islands, AMO serves as the nation's experts in airborne and maritime law enforcement.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the management, control and protection of our nation's borders at and between official ports of entry. CBP is charged with securing the borders of the United States while enforcing hundreds of laws and facilitating lawful trade and travel.*

Tags:
Border Security
,
Air and Marine Operations
,
Smuggling
,
U.S. Border Patrol

- Last Modified: November 1, 2021

 An official website of the United States government

Here's how you know

U.S. Customs and
Border Protection

MENU

**Home** » **Newsroom** » **Stats and Summaries** »  Nationwide Encounters

### Newsroom

#### Accountability and Transparency

#### Legal Notices

#### Advisories

#### Media Releases

#### Photo Gallery

#### Video Gallery

#### Press Officers

#### Publications

#### Social Media Directory

#### Speeches/Statements

#### Spotlights

#### Stats and Summaries

##### On a Typical Day

##### CBP Enforcement Statistics

##### Custody and Transfer Statistics

##### Southwest Land Border Encounters

**Nationwide Encounters**

**Border Rescues and Mortality Data**

**Trade Statistics**

**Travel Statistics**

**Web Performance Metrics**

**CBP Public Data Portal**

**COVID-19**

**Newsroom**

# Nationwide Encounters

Encounter data includes U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO) Title 8 Inadmissibles, and Title 42 Expulsions for fiscal years (FY) 2020, 2021, 2022, and 2023. Data is available for the Northern Land Border, Southwest Land Border, and Nationwide (i.e., air, land, and sea modes of transportation) encounters.

On March 21, 2020 the President, in accordance with Title 42 of the United States Code Section 265, determined that by reason of existence of COVID-19 in Mexico and Canada, there is a serious danger of the further introduction of COVID-19 into the United States; that prohibition on the introduction of persons or property, in whole or in part, from Mexico and Canada is required in the interest of public health. Under this order, CBP is prohibiting the entry of certain persons who potentially pose a health risk, either by virtue of being subject to previously announced travel restrictions or because they unlawfully entered the country to bypass health screening measures. To help prevent the introduction of COVID-19 into border facilities and into the United States, persons subject to the order will not be held in congregate areas for processing and instead will immediately be expelled to their country of last transit. In the event a person cannot be returned to the country of last transit, CBP works with interagency partners to secure expulsion to the person's country of origin and hold the person for the shortest time possible. This order does not apply to persons who should be excepted based

Haiti AR_000462

on considerations of law enforcement, officer and public safety, humanitarian, or public health interests. Expulsions under Title 42 are not based on immigration status and are tracked separately from immigration enforcement actions, such as apprehension or inadmissibility, that are regularly reported by CBP.

Demographics for USBP and OFO include:

- Accompanied Minors (AM)

- Individuals in a Family Unit (FMUA)

- Single Adults

- Unaccompanied Children (UC) / Single Minors

To access the data used to build this dashboard, please visit the **CBP Data Portal**.

***Note:*** *Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 277,991 | 284,277 | 302,046 | 208,086 | | | | | | | |
| 2022 | 187,136 | 198,553 | 205,691 | 186,808 | 190,578 | 250,404 | 262,109 | 274,992 | 247,523 | 238,929 | 251,521 |
| 2021 | 90,585 | 89,072 | 92,746 | 95,276 | 115,559 | 192,025 | 196,190 | 198,459 | 207,823 | 233,919 | 231,243 |
| 2020 | 61,159 | 57,524 | 56,186 | 52,254 | 54,884 | 51,869 | 29,743 | 39,877 | 50,086 | 53,672 | 65,707 |

**Source:** USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date, as of 2/2/2023.

Haiti AR_000464

For additional years of Southwest Land Border encounter data, visit the **Southwest Land Border Encounters** webpage.

*Note: Nationwide encounters are the sum of CBP encounters across all areas of responsibility including Northern Land Border, Southwest Land Border, OFO non-land border ports of entry (e.g., airports, seaports), and USBP sectors that do not share a land border with Canada or Mexico (e.g., Miami Sector). This data is available for further review and download on the **Nationwide Encounters Public Data Portal** page.*

**Tags: Statistics**

**Last Modified: February 6, 2023**

Click 'Share This Page' button to display social media links.

 Share This Page.

[Return to top](#)

**Travel**   **Trade**   **Border Security**   **Newsroom**   **About CBP**   **Careers**

**Employee Resources**



     



**Contact CBP**



CBP.gov

**An official website of the U.S. Department of Homeland Security**

# National Terrorism Advisory System

Accessibility

Accountability

DHS Components

FOIA

Forms

Inspector General

No FEAR Act

Privacy

Site Policies

The White House

USA.gov

# US Border Patrol Apprehends 64 Haitians Who Were Abandoned by Smugglers in Mona Island

Release Date
Wed, 10/19/2022 - 12:00

**AGUADILLA, Puerto Rico** –US Border Patrol Agents apprehended Wednesday 64 Haitian migrants who were abandoned by smugglers on Mona Island Tuesday morning.



64 haitian migrants are transferred from a US Coast Guard cutter in Mayaguez Puerto Rico

""Unscrupulous smugglers are exploiting vulnerable migrants and lying to them for financial gain," indicated Scott Garrett, Acting Chief Patrol Agent for Ramey Sector. ""Smugglers lied to these migrants leaving them on an uninhabited natural reserve with complete disregard for their safety."

On Oct. 18, Park Rangers from the Puerto Rico Department of Environmental and Natural Resources (PRDENR) contacted the Ramey Border Patrol Sector indicating that they encountered a group of 104 undocumented migrants that were abandoned in the islands early in morning.

On Oct. 19, the US Coast Guard cutter Joseph Napier transferred the 64 Haitian migrants to the custody of Ramey Border Patrol Agents at the Mayaguez Port of Entry.

Three females who are pregnant were transported to a local hospital for medical examination.

Agents transported the group to the Ramey Station for immigration processing.

Mona island is an ecological reserve held by the Puerto Rican government and is not permanently inhabited.

The Ramey Sector is one of the twenty-one Sectors spread out across the United States. Encompassing the U.S. territorial islands of Puerto Rico and the Virgin Islands, it is the only Border Patrol Sector located outside the continental United States. The Sector's entire border area is made up of coastline and its area of responsibility is made up of some 6,000 square miles of land and water area, including the twelve-mile band of territorial water surrounding the Islands.

For anonymous tips contact us at 1(800)981-1313.

Follow us on Twitter: @CBPCaribbean

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the comprehensive management, control, and protection of our nation's borders, combining customs, immigration, border security, and agricultural protection at and between official ports of entry.*

Tags:
Border Security
,
Smuggling
,
U.S. Border Patrol

- Last Modified: October 20, 2022

Click 'Share This Page' button to display social media links.
✈ Share This Page.

# Press Officer

- Name: Jeffrey Quinones

    Email:

    jeffrey.h.quinones@cbp.dhs.gov

    Phone:

**CBP Public Affairs**
**Contact Information for Media:**
Phone:(202) 344-1780
Email: CBPMEDIARELATIONS@cbp.dhs.gov
All Other Inquiries: (202) 325-8000

https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-apprehends-64-haitians-who-were-abandoned-smugglers

DHS/ICE/ERO Data on Haitian repatriations FY 2022 – FY 2023 YTD

| | Flights Completed | T-42 Expulsions | Title 8 Removals |
|---|---|---|---|
| September | 58 flights | 6,208 | 9 |
| October | 21 flights | 1,784 | 246 |
| November | 9 flights | 451 | 459 |
| December | 29 flights | 2,899 | 299 |
| January | 36 flights | 3,923 | 18 |
| February | 13 flights | 1,083 | 35 |
| March | 10 flights | 685 | 85 |
| April | 16 flights | 1,579 | 63 |
| May | 36 flights | 3,968 | 14 |
| June | 5 flights | 386 | 32 |
| July | 2 flights | 0 | 19 |
| August | 2 flights | 0 | 50 |
| September | 1 flight | 0 | 36 |
| October | 0 flights | 0 | 0 |
| November | 0 flights | 0 | 0 |
| December* | 1 flight | 0 | 20 |

* December data is updated through 12/14/2022.

An official website of the United States Government <u>Here's how you know</u>

**Home**  >   ...   > Steps to Address the Humanitarian and Security Si...

# Steps to Address the Humanitarian and Security Situation in Haiti

**PRESS STATEMENT**

**ANTONY J. BLINKEN, SECRETARY OF STATE**

OCTOBER 12, 2022

As Haiti faces a deadly resurgence of cholera, malign actors continue to fund and foment violence, as well as block the supply of fuel and humanitarian access for life-saving assistance. Today, we are announcing new measures to provide the needed support to the people of Haiti and to hold those who continue to foment violence accountable.

Right now, our staff are on the ground in Haiti, working alongside Haitian health workers and NGOs to respond to the cholera outbreak and deliver care to those who need it.  We will accelerate the delivery of additional humanitarian relief to the people of Haiti.

We are also working to increase and deploy in the coming days security assistance to the Haitian National Police to strengthen their capacity to counter gangs and re-establish a stable security environment under the rule of law.

We are also announcing a new visa restriction policy under section 212(a)(3)(C) of the Immigration and Nationality Act against Haitian officials and other individuals involved in the operation of street gangs and other Haitian criminal organizations that have threatened the livelihoods of the Haitian people and are blocking life-saving humanitarian support.  Such actions may also apply to these individuals' immediate family members.

Haiti AR_000470

Case 6:23-cv-00007   Document 93-4   Filed on 03/24/23 in TXSD   Page 95 of 729

At this time, the Department is identifying an initial group of individuals and their immediate family members who may be subject to visa restrictions under this policy.  Our intent in imposing these visa restrictions is to demonstrate that there are consequences for those instigating violence and unrest in the country, while we continue to support the citizens, organizations, and public servants in Haiti who are committed to generating hope and opportunity for a better future in their nation.

Building on UN Security Council resolution 2645, we have drafted with our close partner and co-penholder Mexico a resolution proposing specific sanctions measures to enable the international community to address the many challenges facing the people of Haiti.  We introduced this resolution last week and are negotiating with other UN Security Council members ahead of a vote.

With these actions and others, we will lay out in the days and weeks ahead, we are sending a clear message that the United States will continue to support the Haitian people during this critical time.

---

**TAGS**

Bureau of Western Hemisphere Affairs    Haiti    Humanitarian Aid

Office of the Spokesperson    The Secretary of State    Security    Visas

---

# Related Articles

—    MARCH 14, 2023

Haiti AR_000471

Case 6:23-cv-00007   Document 93-4   Filed on 03/24/23 in TXSD   Page 96 of 729

Secretary Blinken's Call with Mexican Foreign Secretary Ebrard

---

MARCH 7, 2023

## Secretary Blinken's Meeting with Trinidad and Tobago's Foreign Minister Browne

**READ MORE**

---

MARCH 7, 2023

## Secretary Antony J. Blinken and Trinidadian and Tobagonian Foreign Minister Amery Browne Before Their Meeting

**READ MORE**

White House

USA.gov

Office of the Inspector General

Haiti AR_000472

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act



# TRAFFICKING IN PERSONS REPORT
## JULY 2022



Haiti AR_000474

Haiti AR_000475

# TRAFFICKING IN PERSONS REPORT

## JULY 2022






# MESSAGE FROM **THE SECRETARY OF STATE**

Dear Reader:

Everyone should be free. And yet, through force, fraud, and coercion, human traffickers violate this most basic right. Traffickers' exploitative practices affect every country in the world, including the United States, by diminishing and destroying our communities, sense of security, and the global economy. This year's Trafficking in Persons Report turns the spotlight to more clearly illuminate the impact of human trafficking on our global community and on actions we can take as individuals, and as a society, to combat this deplorable crime everywhere it occurs, especially in the most at-risk communities.

The pages that follow highlight the incredible strides and achievements of survivor leaders and individuals with lived experience of human trafficking, including their role as valued anti-trafficking experts. They built, and continue to sustain, the movement to combat human trafficking in a manner that reflects the realities and needs of those currently experiencing exploitation. However, much work remains to create opportunities for responsibly engaging and elevating survivors' expertise. Their voices are critical to crafting successful anti-trafficking responses, and we hope the report's introduction serves as a resource for our global partners seeking to improve their anti-trafficking efforts by integrating survivors' expertise.

Through the special topic boxes in this report, we explore key issues of grave and urgent concern, including the inequitable impact of human trafficking on vulnerable and marginalized populations.

This year's report is released in the midst of an unprecedented humanitarian crisis. Russia's senseless continued invasion of Ukraine and its devastating attacks across that country have inflicted unfathomable pain and suffering and forced millions of Ukrainian citizens and others to flee seeking safety. We are deeply concerned about the risks of human trafficking faced by individuals internally displaced by the war, as well as those fleeing Ukraine, an estimated 90 percent of whom are women and children. The food insecurity and other broader effects of Russia's war exacerbate trafficking risks around the globe.

Let us stand together and press for accountability from those leaders who condone and support human trafficking, create conditions ripe for mass exploitation, and perpetuate this fundamental insult to human dignity. Those that perpetrate, condone, or support this crime must be held accountable.

Throughout the report, a unifying theme emerges—human trafficking affects us all. Its impact ripples across the fabric of our global community. We must work together, and in partnership with survivor leaders, to effectively address this crime.

Sincerely,

*Antony B. Blinken*



Haiti AR_000419



# MESSAGE FROM **THE SENIOR OFFICIAL**

Dear Reader:

As a critical means to continuously improve anti-trafficking efforts, stakeholders should engage with survivors of human trafficking; to listen to, learn from, and lift the voices of those with lived experience. This year's introduction centers on survivor engagement and highlights the vital role that survivors of human trafficking play in developing and implementing survivor-led, trauma-informed, and comprehensive victim-centered approaches to human trafficking.

The Department of State continues to prioritize the integration of survivor expertise into our work. Here, the U.S. Advisory Council on Human Trafficking has been a vital component in our ability to ensure that the strategies we put in place are victim-centered and trauma-informed. Council members come from diverse backgrounds with distinctive experiences. Their contributions and recommendations are invaluable. It is critical that survivor leaders have a seat at the table, but we need to do more. We also rely on our work with the Human Trafficking Expert Consultant Network—which consists of experts with lived experience of human trafficking. Their assistance has helped us develop survivor-informed programs, policies, and resources for our government and beyond, including the introductory essay of this report. As a movement, we must engage survivors early and often in the development of our policies and programs and learn from stakeholders who prioritize meaningful consultation with those with lived experience, to share best practices globally.

Another key priority, which also requires the counsel of survivors, is increasing our efforts to meaningfully incorporate equity in our anti-trafficking work. For example, systemic racism continues to create socioeconomic inequalities that traffickers exploit. This year's country narratives prioritize integrating an equity-based approach, including by enhancing our reporting on underserved communities and assessing delivery of justice and services to victims among these populations. We are committed to drawing attention to the vulnerabilities that human traffickers routinely exploit, especially as they pertain to individuals from marginalized or underserved communities, and ensuring governments are able to identify and assist all victims. As you read through the report, I also urge you to look closely at the special interest boxes that highlight forced labor and the transition to clean energy, how the climate crisis increases trafficking risks of people everywhere, and the harmful costs associated with the People's Republic of China's Belt and Road initiative.

Through these partnerships and listening to the expertise of those with lived experience, we can continue to improve our anti-trafficking efforts even in the face of an unconscionable war of choice placing millions at risk, historically high levels of displaced persons around the globe, economic anxiety, and the disruptions of climate change. Despite the significant challenges, the global community has been steadfast in our anti-trafficking efforts. We will press on in our efforts and look forward to doing so together.

Sincerely,

Kari Johstone



Haiti AR_000480



Migrant workers pick tomatoes on a farm in the United States. Low-wage and migrant workers face riskier employment conditions, including restricted movement, minimal oversight mechanisms, withheld wages, and increasing debts—all indicators of human trafficking.

# *Table of* Contents

SURVIVOR ENGAGEMENT IN THE ANTI-TRAFFICKING FIELD:
HISTORY, LESSONS LEARNED, AND LOOKING FORWARD                2

UNDERSTANDING HUMAN TRAFFICKING                            31

TOPICS OF SPECIAL INTEREST

Forced Labor: The Hidden Cost of China's Belt and Road Initiative        36

Forced Labor and the Clean Energy Transition: Finding A Responsible Way Forward        38

The Climate Crisis: Exacerbating Vulnerabilities and the Looming Increase of Exploitation        41

Promising Practices in Data Collection, Management, and Dissemination        44

Linking Efforts to Combat Corruption and Trafficking in Persons        46

CHILD SOLDIERS PREVENTION ACT LIST                            50

WHEN THE GOVERNMENT IS THE TRAFFICKER:
STATE-SPONSORED TRAFFICKING IN PERSONS                    51

METHODOLOGY                                                52

TVPA MINIMUM STANDARDS FOR THE ELIMINATION OF TRAFFICKING IN PERSONS        58

GLOBAL LAW ENFORCEMENT DATA                                62

2022 TIP REPORT HEROES                                    64

TIER PLACEMENTS AND REGIONAL MAPS                            69

HOW TO READ A COUNTRY NARRATIVE                            76

COUNTRY NARRATIVES                                        77

RELEVANT INTERNATIONAL CONVENTIONS                        608

STOPPING HUMAN TRAFFICKING AND SEXUAL EXPLOITATION AND ABUSE BY
INTERNATIONAL PEACEKEEPERS AND CIVILIAN PERSONNEL            609

INTERNATIONAL, REGIONAL, AND SUB-REGIONAL ORGANIZATIONS COMBATING
TRAFFICKING IN PERSONS                                    611

ANNUAL REPORT ON THE USE OF CHILD SOLDIERS                615

THIS REPORT IS AVAILABLE ONLINE

Haiti_AB_000482

*"Human trafficking is an unconscionable attack on the dignity of the most vulnerable among us. Action can't wait."*

**President  Joseph R. Biden Jr.**

# SURVIVOR ENGAGEMENT IN THE ANTI-TRAFFICKING FIELD: HISTORY, LESSONS LEARNED, AND LOOKING FORWARD

*Please note that this introduction contains substantial input from the Human Trafficking Expert Consultant Network (the Network). The purpose of the Network is to engage experts, particularly those with lived experience of human trafficking, to provide expertise and input on Department of State anti-trafficking policies, strategies, and product.*

Survivors of human trafficking play a vital role in combating this crime. Their perspective and experience should be taken into consideration to better address this crime and to craft a better response to it. They run organizations, advocate before legislatures, train law enforcement officers, conduct public outreach, and collaborate with government officials on local and national levels. They serve the anti-trafficking community and society at large as doctors, lawyers, mental health professionals, and more. Engaging survivors as partners is critical to establishing effective victim-centered, trauma-informed, and culturally competent anti-trafficking polices and strategies that address prevention, protection, and prosecution efforts. Meaningful engagement means collaborating with survivors in all aspects of anti-trafficking efforts such as developing practices, policies, and strategies, as well as prioritizing survivor leadership of those efforts whenever possible.

The goal of this introduction is to highlight and emphasize the importance of meaningful survivor engagement – specifically with experts with lived experience of human trafficking for whom sufficient time has passed since their victimization – and to share context, lessons learned, and guidance to governments, international organizations, civil society, private sector entities, and other stakeholders who wish to further their survivor engagement efforts. While many anti-trafficking stakeholders have long consulted survivors in their work, it is imperative that this engagement be done in a responsible and meaningful way and that stakeholders develop and improve upon their approaches to doing so. This effort will bolster inclusivity, help prevent sensationalism, and reduce potential re-traumatization of survivors. It will also promote more effective criminal justice responses that provide remedies for victims and survivors and help prevent trafficking crimes. This year's introduction seeks to establish a solid foundation for how to responsibly engage survivors through trauma-informed approaches that promote transparency, trust, equity, inclusivity, and commitment to collaboration.

Haiti AR_000483



Haiti AR_000484



A child's bike sits under drying clothes in one country in the East Asia and Pacific region where communities continue to face rising temperatures and heavy rains. While climate change does not discriminate, underserved and marginalized communities are more likely to experience its impacts and, consequently, are even more vulnerable to trafficking.

The background, learnings, and promising practices offered in the sections to follow are informed primarily by survivor leaders, as well as anti-trafficking practitioners and allies in the field, creating a collective basis of understanding upon which the anti-trafficking community can build.

Integrating survivors and their perspective and expertise into the development and execution of anti-trafficking policy, programming, and public awareness efforts is essential. This recognition has prompted governments and stakeholders to consider the best mechanisms to incorporate survivor input and to establish adequate support, including compensation, for survivor leaders. Solutions to combat human trafficking and serve victims are most effective when designed and informed by those who have survived it.



In Nepal, an adult domestic worker cleans a home. Domestic workers are particularly vulnerable to human trafficking because they are often isolated in the homes where they work and their employers control their access to food and transportation, as well as their identity documents.

# HUMAN TRAFFICKING DEFINED

**The Trafficking Victims Protection Act of 2000, as amended (TVPA), defines "severe forms of trafficking in persons" as:**

▸ sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such an act has not attained 18 years of age; or

▸ the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

**A victim need not be physically transported from one location to another for the crime to fall within this definition.**



## TERMINOLOGY

As noted in the 2021 report of the U.S. Advisory Council on Human Trafficking (the Council), there are myriad terms survivors use to identify themselves. While some individuals who have experienced trafficking choose to embrace the title "survivor," others do not. Terminology regarding human trafficking varies based on a country's respective laws and language(s). The word "survivor" is not generally defined by law, nor is it universally used or accepted in the context of human trafficking. In some countries, "survivor" may refer to those who have experienced historical, collective, or cultural trauma.

Within the United States, there are some widely used terms for individuals who have experienced human trafficking and subsequently decided to engage in anti-trafficking related work on a professional level. Individuals may prefer to be referred to as "survivor leaders," "survivor advocates," or "subject matter experts with lived experience of human trafficking." Some may have other titles or prefer not to identify based on this experience at all. In recognizing individuals' full life experiences, skill sets, and professional goals, it is important to always ask someone how they want to be identified. Policymakers and stakeholders should not assume that someone who identifies as a "survivor leader," "survivor advocate," or "expert with lived experience of human trafficking" should be referred to as such in a professional setting or that identification as a survivor leader makes it acceptable to inquire about someone's personal experience with human trafficking. For simplicity and consistency, the terms "survivor" and "survivor leader" are used throughout this introduction.

Other important terms used in this introduction and in country narratives within this report include:

▶ **Victim:** In the United States, the term "victim" means a person who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime. As in the United States, in some other countries "victims" are expressly afforded certain rights and services to assist during and in the aftermath of the commission of that crime. For these reasons, country narratives within this report still make extensive use of this term. Adopting survivor and trauma-informed approaches should not conflict or compete with the provision of assistance entitled to victims.

State_AR_000487



▸ **Victim-centered approach:** Stakeholders place the crime victim's priorities, needs, and interests at the center of their work with the victim; providing nonjudgmental assistance, with an emphasis on self-determination, and assisting victims in making informed choices; ensuring restoration of victims' feelings of safety and security are a priority; and safeguarding against policies and practices that may inadvertently re-traumatize victims. A victim-centered approach should also incorporate a trauma-informed, survivor-informed, and culturally competent approach.

▸ **Survivor-informed approach:** A program, policy, intervention, or product that is designed, implemented, and evaluated with intentional leadership, expertise, and input from a diverse community of survivors to ensure that the program, policy, intervention, or product accurately represents their needs, interests, and perceptions.

▸ **Trauma-informed approach:** A trauma-informed approach recognizes signs of trauma in individuals and the professionals who help them and responds by integrating knowledge about trauma into policies, procedures, practices, and settings and by seeking to actively resist re-traumatization. This approach includes an understanding of the vulnerabilities and experiences of trauma survivors, including the prevalence and physical, social, and emotional impact of trauma. A trauma-informed approach places priority on restoring the survivor's feelings of safety, choice, and control. Programs, services, agencies, and communities can be trauma-informed.

▸ **Culturally competent approach:** Cultural and linguistic competence is a set of congruent behaviors, attitudes, and policies that come together in a system, agency, or among professionals that enables effective work in cross-cultural situations. 'Culture' refers to integrated patterns of human behavior that include the language, thoughts, communications, actions, customs, beliefs, values, and institutions of racial, ethnic, religious, or social groups. 'Competence' implies having the capacity to function effectively as an individual and an organization within the context of the cultural beliefs, behaviors, and needs presented by consumers and their communities.



Boats sit at port in Taiwan. Forced labor in the fishing sector remains a significant concern. With isolated activity and vessels spending months to years at sea, it is difficult for victims of labor trafficking to leave their exploitative situation.

## Historical Background and Reflections

Over the past two decades, there have been notable developments in the anti-trafficking movement, including the ongoing elevation of survivor leaders as influential decision-makers. Survivors have been instrumental in advocating for and guiding the incorporation of victim-centered, survivor-informed, trauma-informed, and culturally competent approaches in anti-trafficking efforts on a local and global scale.

First and foremost, it is important to acknowledge and address survivors' long-term suffering and struggle to overcome exceptional challenges to establish and solidify their role as leaders in the anti-trafficking movement. When the anti-trafficking movement launched in the United States in the 1990s, trafficking survivors had few options for tailored support. Prior to the adoption of the TVPA and the UN TIP Protocol, individuals who had survived human trafficking experiences were served primarily by organizations lacking an understanding of human trafficking. The lack of dedicated and diverse services for victims of trafficking further marginalized and endangered survivors. Additionally, victims and survivors also faced stigmatization by some of the media's misleading, yet influential, portrayal of survivors as either criminals or individuals who "are damaged for life and will never recover." Furthermore, there were few opportunities for survivors who were willing to participate in the development of solutions related to service delivery, nor were there training or employment opportunities for survivor leaders. As the anti-trafficking field grew, survivors were mostly called on to share stories of their trafficking experience and faced barriers and competition to participate as legitimate partners or experts in anti-trafficking policy and programming efforts.

Haiti AR_000489

*"Our plan centers on the key pillars of U.S. and global anti-trafficking efforts: prevention, protection, prosecution, and partnerships. We are focused on the most vulnerable. And based on my experience, the most vulnerable are women and girls, racial and ethnic minorities, LGBTQI+ people, Indigenous people, people with disabilities, migrants, and children in the foster care system. When we identify who is most vulnerable, we can tailor our tactics and improve our strategy, we can look at what is putting communities at risk in order to improve our prevention efforts, and we can look at ways to reach those communities to ensure that support is trauma-informed and survivor-centered."*

**Kamala D. Harris,**
U.S. Vice President

The long-standing trend of engaging survivors solely to share their trafficking experience is not always an appropriate or meaningful way to engage survivors. Storytelling can be a powerful tool to shed light on the reality of human trafficking; however, it can easily cause survivors to relive the trauma they experienced. It can also be harmful if survivors' stories are used without their consent or a survivor feels compelled to accept a paid speaking request to share their story because of their economic situation. Survivors should not be engaged solely for storytelling purposes; yet survivors should not be dissuaded from sharing their story if they choose to do so. The recommendations in the later part of this introduction have been offered by survivors as promising practices in ethical storytelling. It is essential that in moving forward, governments, anti-trafficking organizations, the media, and private sector entities reflect on past policies, practices, and actions, as well as acknowledge unintentional harm to survivors, and commit to change for the better.

*"For those who began to identify as survivors, the feeling of being oppressed was, in essence, replicated by the very organizations that they relied on for aid, even more so for those with diverse identities. Survivors who were committed advocates were overlooked as experts and were competed against or replaced by agency endorsed non-survivor advocates causing them to lose training and employment opportunities. As Dr. Countryman-Roswurm noted, they were 'rarely genuinely lifted up, respected, treated as equal partners, or supported and followed as competent leaders.'"*

**Dawn Schiller,**
*Training Director, L.A. County Project, Coalition to Abolish Slavery and Human Trafficking (CAST),*
*Human Trafficking Lived Experience Expert and Consultant*

Haiti_AR_000490



While there is still significant room for improvement, it is important to recognize the progress made thus far. Many survivors have overcome real and serious challenges and made remarkable strides forward, such as pursuing advanced degrees and founding NGOs that advance anti-trafficking priorities. In response to survivors' advocacy efforts, the global anti-trafficking community has taken tangible steps toward more meaningful survivor engagement. Governments, anti-trafficking organizations, and private sector entities are now developing strategies and creating opportunities to build more meaningful working relationships with survivors. Though significant work towards meaningful improvement remains, efforts taken to date demonstrate survivors' role as qualified experts, leaders, and equal partners in the development and implementation of anti-trafficking efforts. Throughout the past decade in the United States, survivor leaders have developed, drafted, and shaped significant landmark legislation in support of more effective anti-trafficking efforts. One of the major accomplishments resulting from these efforts was the establishment of the United States Advisory Council on Human Trafficking, noted below. Other recently enacted U.S. legislation has explicitly recognized the necessity of survivor engagement, for example to inform development of human trafficking training requirements for health care and social service providers; to improve detection of human trafficking related financial transactions when surveilling money laundering and counter-terrorist financing activities; and to enhance efforts to combat crime, including human trafficking, affecting American Indians and Alaska Natives.

The anti-trafficking field has significantly progressed in its understanding and practice of survivor engagement. Yet, there are still important lessons to learn for any government, anti-trafficking organization, or private sector entity seeking to further their survivor engagement efforts. Some recommendations based on lessons learned thus far are highlighted below under "Considerations for Engagement."

## Models for Engagement

Now more than ever, anti-trafficking stakeholders are incorporating survivor expertise and input at all stages of developing and implementing policies, procedures, and programs. Within the government space, as well as the NGO community, various models to include survivor expertise have emerged, such as advisory councils and boards and consultant mechanisms, as well as training and technical assistance centers. Government agencies at all levels should explore formal platforms to meaningfully engage survivors as subject matter experts and equal partners to become more survivor-informed in their policies and program implementation. Regardless of the model, governments and organizations must ensure the application of a victim-centered, trauma-informed, and culturally competent approach; provide competitive compensation for survivors' expertise and contributions; and be willing to dedicate resources and explore ways to implement the changes recommended by survivor leaders. While further evaluation is needed to discover other promising initiatives globally, the following mechanisms showcase notable developments that may serve as a model to others.

*"Our narrative must not merely be inspiring, but the lessons that lie within them must be turned into solutions."*

**Honorable Shandra Woworuntu,**
Chair of the OSCE International Survivors of Trafficking Advisory Council,
CEO of Mentari Human Trafficking Survivor Empowerment Program

## Advisory Councils and Boards

▶ **United States Advisory Council on Human Trafficking (Council):** In 2015, the Survivors of Human Trafficking Empowerment Act, which was passed as part of the *Justice for Victims of Trafficking Act*, established the Council. The establishment of the Council, an idea originated by survivors and the world's first survivor engagement mechanism of its kind, created a formal platform for human trafficking survivors to provide input on federal policies and marked a significant breakthrough in the anti-trafficking movement. The Council advises and makes recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons, a cabinet-level entity created by the TVPA, which consists of 20 agencies across the federal government responsible for coordinating U.S. government-wide efforts to combat trafficking in persons. Each member of the Council is a survivor of human trafficking, and together they represent a diverse range of backgrounds and experiences. Members of the Council are appointed by the President for two-year terms. Since it was established, the Council has produced five reports containing recommendations for the U.S. government related to rule of law, public awareness, victim services, labor laws, grantmaking, survivor-informed leadership, and underserved populations. After years of advocacy from the Council and other survivor leaders, the U.S. Congress included provisions in the William M. (Mac.) Thornberry National Defense Authorization Act for Fiscal Year 2021 (P.L. 116-283) to compensate the Council for its work and contributions to federal government anti-trafficking efforts.

▶ **International Survivors of Trafficking Advisory Council (ISTAC):** Established in 2021, the ISTAC currently consists of 21 survivor leaders from across OSCE's 57 member states, representing a diverse range of expertise and backgrounds. The ISTAC provides advice, guidance, and recommendations to the OSCE Office for Democratic Institutions and Human Rights (ODIHR), and through ODIHR to the OSCE participating states, on matters pertaining to combating human trafficking, including but not limited to: draft legislation, policies, and state practices; implementation of relevant OSCE participating states' commitments; research, drafting, and reviewing of material related to the international normative framework for combating human trafficking; and educational and capacity-building efforts undertaken by ODIHR to combat human trafficking in the OSCE region. For example, the ISTAC contributed to ODIHR's updated version of its National Referral Mechanism (NRM) Handbook to provide guidance to OSCE participating states on establishing and strengthening NRMs. The ISTAC also provides guidance to survivor leaders on the tools necessary to foster the growth of national and international survivor networks and promotes the standardization of survivor-related terminology within anti-trafficking frameworks. Members are compensated for certain ISTAC-related work, including participation in trainings and speaking engagements.

▶ **Albania's Advisory Board for Victims of Trafficking:** The Coalition of Shelters for Victims of Trafficking in Albania has an Advisory Board for Victims of Trafficking composed of survivors of trafficking, with its own Regulation and Code of Conduct. The Board advises shelters on addressing the specific needs of victims in relation to identification, protection, and support and on consistently improving the shelters' policies and practices.



Fruit of the oil palm: forced labor has been documented in the production of palm oil in Malaysia and Indonesia.

Additionally, the Government of Canada, as part of its National Strategy to Combat Human Trafficking 2019-2024, committed to establishing a Survivor Advisory Committee comprising survivors of human trafficking to provide a platform in which individuals with lived experiences can inform and provide their unique and invaluable recommendations to the Government of Canada on current and future federal anti-human trafficking policies and initiatives. The Inter-Agency Coordination Group against Trafficking in Persons, composed of UN and regional organizations, released its first Plan of Action in late 2020, which includes strengthening its engagement and partnerships with survivor councils and associations, as well as among other stakeholders, to ensure a human rights-based approach.

## Consultant and Training and Technical Assistance Mechanisms

Within the United States, federal agencies have developed training and technical assistance centers and consultant mechanisms comprising survivor leaders and other relevant subject matter experts to bolster stakeholder and government efforts to combat trafficking. These mechanisms exist within the Departments of Justice, Health and Human Services, State, and Homeland Security. Additionally, the Department of Health and Human Services (HHS) created the Human Trafficking Leadership Academy (HTLA), which seeks to develop and expand survivor-informed services, offering leadership development opportunities to survivor leaders and allied professionals. The first class of HTLA fellows informed the "Toolkit for Building Survivor-Informed Organizations."

Internationally, governments have also consulted with survivor leaders to improve their anti-trafficking efforts. For example, the Governments of the Philippines and the United Kingdom sought survivor input to inform the provision of protection services. The Government of the United Kingdom engaged directly with survivors to better understand their recovery needs and experiences with the NRM. It also solicited survivor input for the creation of an inspection regime for government-commissioned victim support services. In the Philippines, the Inter-Agency Council Against Trafficking conducted virtual focus group discussions with trafficking survivors to seek feedback on protection services, case management, and challenges in the provision of services.

Haiti AR_000493



## PHILIPPINES – QATAR – UNITED KINGDOM

Malaya's husband became very sick and could not work in their home country of the Philippines, so she sought work abroad to support them both. An employment agency found her a job as a domestic worker in Qatar, where her employer paid her less than the agreed upon salary in her work contract and refused to give her time off. The employer refused to allow Malaya to leave her job and physically and emotionally abused her. Finally, her employer took Malaya to the UK to work for his sister where she was also trapped in domestic servitude, not allowed outside, and had to sleep on the floor. One day while her employer was asleep, Malaya escaped to a nearby church where members of a Filipino workers' union provided her shelter and referred her to victim services.

*"...Because this is a global problem we have to have a global coalition to confront it, one that cuts across government, business, civil society, all other parts of our society."*

**Antony J. Blinken,**
U.S. Secretary of State

The Governments of Guyana, Rwanda, and the Netherlands have consulted survivors on updates to their respective national action plans—critical to informing future whole of government approaches to address human trafficking. Additionally, the Organization of American States acknowledged the importance of survivor engagement in developing national policies and programs in its 2015-2018 Work Plan against Trafficking in Persons in the Western Hemisphere. Survivor leaders have also established their own organizations and continue work as independent contractors to advise NGOs, government agencies, and international and regional organizations on implementing survivor-informed and trauma-informed approaches in policymaking and service delivery.

## Considerations for Engagement

In the face of new and evolving challenges, survivor leaders are the most equipped to advise on adapting efforts and ensuring appropriate, effective, and uninterrupted services for victims and survivors. Learning from survivor leaders and integrating their expertise into program and policy development not only improves anti-trafficking efforts but also can help address emerging challenges and longstanding systemic issues that drive vulnerabilities and perpetuate trauma. Survivor leaders specifically can play an integral role in applying an equity lens to anti-trafficking practices to prevent and address discrimination in all its forms. Additionally, the challenges and widespread trauma associated with the ongoing COVID-19 pandemic and implications of climate-associated crises resulting from extreme weather conditions or environmental degradation have made a survivor-informed and trauma-informed approach more important than ever. Governments, private sector entities, and organizations should consider engaging survivor leaders to develop effective risk mitigation and management plans that ensure the incorporation of survivor-informed, trauma-informed, victim-centered, and culturally competent approaches; meet the needs of survivors; and minimize the chances of re-traumatization during crises.

There are several important considerations when engaging survivor leaders. Stakeholders should clearly articulate the scope and purpose of the engagement, as well as desired skills and outcomes. This will help inform how to identify potential partners. Survivors and other experienced leaders in the field recommend a trauma-informed strategy for identifying participants, whether as potential council or board members or consultants and reaching out to them to inform them of the opportunity. There must be complete transparency with the individual on how their information was obtained and why they are being contacted. Since no single individual can speak on behalf of all survivors, efforts must be made to mitigate tokenization by including individuals with a range of subject matter expertise and lived experiences (i.e., survivors of different forms of trafficking and experiences of trafficking at different ages, as well as expertise on a range of subjects). Council or board members, employees, and consultants should also represent a range of personal and professional experiences and backgrounds (i.e., sexual orientation, gender identity, expression, sex characteristics, ethnicity, race, religion, socioeconomic background, age, etc.).

Haiti AR_000495

## ISRAEL

Amira was a Palestinian transgender woman living on the streets in a city in the West Bank. She was a sex trafficking victim who had been blackmailed and threatened when she tried to leave. When she was 19 years old, she fled to Israel because of her fear of persecution as a member of the LGBTQI+ community and sought recognition as a trafficking victim. However she was deported because of her illegal immigration status. A year later, she again fled the West Bank and returned to Israel where authorities arrested her on immigration charges and detained her for three months. With the help of an Israeli NGO, authorities granted Amira a temporary stay permit, but did not give her a work permit. Officials also did not recognize her as a trafficking victim, which would have afforded her a work permit, housing, legal aid, and other forms of assistance under law. She constantly lived in fear of deportation when her residency permit would expire. After months of living in various NGO shelters without the right to legally work or make money of her own, she died by suicide. Several Israeli NGOs continue to provide assistance to Palestinian LGBTQI+ individuals who flee the West Bank, but they face challenges assisting this community because of discrimination and lack of legal protection frameworks for this vulnerable population.

When working with survivor leaders, it is key for governments and international, regional, and anti-trafficking organizations to consider financial hardships survivor leaders may face because of their trafficking experience and seek to alleviate those hardships. For example, survivors may have limited access to and complicated relationships with traditional banking institutions. If possible and appropriate, governments and stakeholders should find a way to cover upfront, reimbursable costs and determine strategies for limiting costs; they should also create a system for survivor leaders to invoice for labor fees and reimbursable expenses quickly and easily (if it is not possible to eliminate those costs). It is also necessary to build organizational capacity to be trauma-informed, ensuring all staff are familiar with trauma-informed principles and approaches, and to avoid re-traumatization of survivors during meetings, at public events, or through process-related tasks. This will also promote effective engagements and solution-oriented collaboration. Additional support can include providing access to mental health services such as counseling support or contracting an independent/third party to facilitate trauma-informed engagements and manage logistics.



A child miner displays a speck of gold in Uganda. In Uganda, children as young as seven are forced to mine for gold in harsh and dangerous conditions.

Hair_AR_000497



Two women apply their makeup. The LGBTQI+ community in South America is particularly vulnerable to sexual exploitation due to social stigma, little access to community support, and laws criminalizing same-sex relationships.

## Private Sector Partnerships and Employment Pathways

Private sector entities also benefit from incorporating survivor engagement and expertise into the development and implementation of their company policies, codes of conduct, and strategic planning; whether they seek to prevent forced labor in their global supply chains, prevent commercial sexual exploitation from occurring anywhere in their business operations, or both. Additionally, the financial sector can create an environment in which financial stability and accessibility are supported through banking systems that are accessible and navigable for survivors.

In the United States, partnerships have emerged between private sector companies and anti-trafficking service providers to create employment pathways and programs for survivors to pursue a job in a specific field or industries of interest. These innovative partnerships not only increase the availability of jobs in more industries but also create important opportunities for continuing education, professional development, financial freedom, and self-sufficiency, as well as help safeguard against revictimization.

> *"Many survivors wish to leave their trafficking experiences in the past. If organizations and service providers are only equipping survivors to work within the anti-trafficking sector, it limits the potential of survivors and may cause further harm by keeping survivors feeling trapped in a field that is tied to their trafficking experience."*
>
> **U.S. Advisory Council on Human Trafficking,** *2021 report*

*"We can't talk about partnership, collaboration, and policies as fundamental international frameworks to combat human trafficking without including survivor leaders as stakeholders."*

**Malaika Oringo,**
CEO of Footprint to Freedom and Member of the International Survivors of Trafficking Advisory Council





Critical components of these partnerships include comprehensive skills training, appropriate employment placement, trauma-informed support, and a competitive wage. For these partnerships to develop, companies must implement confidentiality policies that ensure a safe space for survivors and allow them to be treated as equals among staff, while precluding identification of survivors without their consent.

Additionally, private sector partnerships with survivor leaders can provide promising opportunities to elevate survivor expertise. Survivor leaders have long advocated for organizations to hire survivors to deliver trainings on human trafficking awareness and identification, as well as on strategies to combat the crime. Survivors can provide unique perspectives that can help companies identify how trafficking situations may present within certain kinds of systems and industries or implement organizational change to hire and better support employees with varying levels of trauma, including trauma resulting from human trafficking.

Within the private sector, survivors can also play a pivotal role with financial institutions; this is critical as such institutions are required to report on money laundering transactions and are uniquely positioned to detect and combat human trafficking. It is estimated that human trafficking, both sex trafficking and forced labor, generate more than $150 billion in illicit profit for the traffickers and those who help facilitate the crime. Those profits often pass through traditional financial institutions or are used by traffickers to purchase real property or other personal assets. Survivor leaders can advise financial institutions and train staff on how trafficking may present on bank records and credit card transactions of individuals experiencing trafficking. Financial institutions should collaborate with survivors and other institutions to share information and standardize best practices to combat human trafficking, as well as to improve survivors' access to banking and financial services.



## ESTABLISHING ADVISORY COUNCILS OR BOARDS

When establishing an advisory council or board, it is especially important to ensure it operates as an independent body, autonomous from the organization, government, or entity it is to advise. This independence enables the council or board to provide objective advice and recommendations and safeguards members from being influenced or pressured from larger organizations to make certain decisions, change priorities, or weaken recommendations. The council or board should have the authority to establish its own governing bylaws, protocols, and procedures, as well as deliver its advice and recommendations with a unified voice, having each member contribute equally and collaboratively as a voting member of the body.

A council or board should also have administrative and trauma-informed support through an independent third-party structure. This support should include staff to facilitate coordination with the entity to which it is meant to advise and support understanding of that entity's authorities, capacities, and limitations respective to its mandates and mission. In addition to providing support for members, a third party could also facilitate a grievance mechanism for both the members of the council or board and the entities for which they advise. This mechanism is especially important as it would create a channel for feedback if members of the council or board feel harmed or re-traumatized in any way, as well as for them to advocate for any needed support during their engagements.

It is also important for organizations or governments to continually evaluate, reflect, and adapt to ensure engagement with members remains respectful and positive. For example, check to make sure members are being treated as an entity of experts and that no one member is singled out in any way. Apply a trauma-informed approach to ensure that both members of the council or board and the entities for which they advise are working in ways that foster trust and collaboration. Ensure training on trauma, trauma-informed approaches, survivor leadership, and self-care is provided to all those who engage with members of a council or board.

# Recommendations and Promising Practices

It is widely acknowledged that integrating a trauma-informed approach is essential to meaningful and responsible survivor engagement. The following recommendations from survivor leaders are practical ways to implement trauma-informed approaches for all anti-trafficking stakeholders.

*"Meaningful inclusion of survivors is not simply providing services to survivors, building capacity of survivors or bringing a survivor to a meeting. Creating leadership positions for survivors is a small part of it. Meaningful inclusion requires a shift in culture."*

**Sophie Otiende,**
*Chief Executive Officer, Global Fund to End Modern Slavery*

## IMPLEMENTING A TRAUMA-INFORMED APPROACH

According to the HHS Substance Abuse and Mental Health Services Administration (SAMHSA), a program, organization, or system that is trauma-informed:

▶ realizes the widespread impact of trauma and understands potential paths for recovery;

▶ recognizes the signs and symptoms of trauma in clients, families, staff, and others involved with the system and responds by fully integrating knowledge about trauma into policies, procedures, and practices; and

▶ seeks to actively resist re-traumatization.

A trauma-informed lens upholds each person as an active agent of their own recovery process, the ability of individuals to recognize symptoms of trauma in others, and the integration of a "do no harm" approach into the creation of policies, procedures, and practices. Furthermore, trauma-informed practices build upon understanding the impact of trauma not only on individuals seeking services but also on staff members and consultants working within an organization. SAMHSA's Six Key Principles of a Trauma-Informed Approach (safety; trustworthiness and transparency; peer support; collaboration and mutuality; empowerment, voice, and choice; and cultural, historical, and gender issues) should also guide organizational responses to trauma, aiming to create and protect psychological and physical safety within the organization, foster trust through transparency, provide peer support, and level power differences through collaboration, empowerment, and cultural humility.



## MEXICO - UNITED STATES

Alejandra and Leticia left their home in Tijuana when a local recruiter promised to find them good jobs in California. The recruiter provided them with fraudulent documents and allowed the young women to stay with her for three weeks after arrival, but when the jobs never materialized, the recruiter forced them to leave her house. The women left with nothing and to survive took a loan from a local farmer in exchange for performing farm work. The employer took their identification documents until they could pay off their debt and charged them for transportation and other fraudulent fees. He threatened them with deportation if they did not work faster. The young women sought assistance from a labor organization in the community that called the local police. Eventually, authorities arrested the perpetrators, identified the two women as trafficking victims, and referred them to organizations to receive assistance and care.

## Ethical Storytelling

▶ Do not engage survivors solely to tell the story of their trafficking experience.

▶ Never share a survivors' story without their permission.

▶ Employ a robust, informed consent process when featuring a survivor's story. This means being transparent with how and in what setting a survivor's story might be used and confirming with the survivor whether they continue to consent to that use. If circumstances surrounding use of the survivor's story change, give the survivor the opportunity to approve how their story will subsequently be used and allow them to withdraw their consent at any point. Survivors should have control over their stories.

▶ If featuring a survivor's story in fundraising materials, ensure that your organization has obtained consent from the survivor to use their story for this purpose.

▶ Ensure language used in all communication material (internal and public) is both trauma-informed and survivor-informed, as well as culturally sensitive, inclusive, and empowering. Work with survivors on communication materials, especially with those whose stories you are sharing, to avoid sensationalism and re-traumatization, including in photography and graphics.

## Including Survivors in Decision-Making and Addressing Barriers to Survivor Inclusion and Leadership

▶ Give survivors the opportunity to continuously identify areas for professional development.

▶ Offer academic scholarships for continuing education and fund opportunities for professional development, leadership training, and networking so survivors can build the experience necessary to get a job or leadership position in the field of their choice.

▶ Ask individuals how they want to be introduced; do not automatically introduce someone as a survivor of trafficking. This empowers those who have experienced exploitation to identify in a manner they choose. Understand that this may change over their lifetime. Treat them as more than the traumas they experienced and foster their strengths. Many survivor leaders want to be valued as professionals separate from their lived experience.

▶ Always compensate survivors for their time, expertise, and contributions in a timely manner, whether they are participating in a focus group or providing consultant services.

▶ Continuously and appropriately access survivor expertise at all appropriate stages throughout program development, implementation, and evaluation.

Haiti AR_000503



## INDIA

Silkworm factory owners forced Aabharana and her mother to work 11 hours a day in terrible conditions to pay down a family loan while paying them only 200 rupees (US $2.69) a day. Eventually, the factory owner doubled the amount of their debt and forced them to continue working through threats and physical violence. While Aabharana and her mother were initially fearful, they shared their story with government officials and requested a certificate of release from the factory. The authorities ruled in their favor and issued the release certificate providing proof that their debt was cancelled. The officials then escorted them from the factory.

Haiti AR_000504

- Create opportunities to elevate expertise from survivor leaders in a variety of ways (i.e., panel discussions, report writing, etc.). Have them participate in the design of the engagement.

- Be as transparent as possible to foster trust and build genuine collaboration with survivor leaders. Outline clear goals, expectations, and timelines for survivor input on projects—and be clear about the ways in which their expertise is intended to be and has been utilized in shaping approaches.

## Employing Survivors and Ensuring a Trauma-Informed Work Environment

- Invite a diversity of survivor leaders to apply for positions within your anti-trafficking organization.

- Understand that not everyone who has experienced trafficking will publicly disclose their experience as a survivor. No matter the reason behind the decision, respect the individual's choice not to disclose. Individuals should have full agency in their decision to publicly disclose, when and how to share their story, and what (if any) their role is in the anti-trafficking movement.

- Acknowledge that human trafficking survivors are more likely to live with complex trauma, which can heighten their risk of re-traumatization when working on anti-trafficking issues. Create an environment of safety for all so that if a survivor is triggered and has a trauma response, they do not feel as though they must hide or that they will be looked down on or lose employment or other opportunities. There should not be any stigma or expressions of condemnation signaling that they do not belong or are not qualified for this work. If appropriate, organize optional support groups within the organizations that offer best practices for dealing with potential re-traumatization.

- Recognize that trauma is not unique to an individual who identifies as a survivor leader; nearly every individual has experienced trauma, and it affects everyone differently. The way survivors are treated should mirror the way other staff members without lived experience of human trafficking are treated, and vice versa. Provide training and resources, such as an onsite licensed clinician, on trauma and trauma-informed approaches for staff at all levels. Failing to provide adequate resources to mitigate re-traumatization and vicarious trauma can be detrimental to the mental health of all staff.

- Implement self-care as part of organizational culture to build resilience and help mitigate vicarious trauma, including executive leadership modeling self-care best practices and encouraging staff to engage in healthy coping skills and take care of their emotional and physical health. Organizations can also implement paid mental health days, self-care plans as part of employee reviews, and organization-wide education encompassing individual wellness.

- Create grievance policies for what all staff should do if they feel harmed or re-traumatized by organization policies, programs, or other staff within the organization. Ensure survivors have a role in problem-solving.



## NIGERIA - LEBANON

Chichima left her home in Nigeria when she was offered a monthly salary of US $1,000 for a teaching position in Lebanon, but the offer was a lie told by a trafficker. Upon arrival, the trafficker forced Chichima to work as a domestic worker, laboring long hours for little pay. When she tried to leave, her employer said that he had "purchased her" for US $1,000 and that she had to do what he said. Making things worse, Chichima discovered that under Lebanon's sponsorship system, she could not leave the country without her employer's consent, meaning Chichima's employer could legally restrict her freedom of movement. Chichima is among thousands of people without freedom of movement or employment due to the sponsorship system in the Middle East, which inhibits trafficking victims from leaving their exploitative situations.

*"I have put a face on a human trafficking crime and begun to shatter the stereotype that men are not for sale."*

**Jerome Elam,**
Advocate and President and CEO of Trafficking in America Task Force
and Member of the International Survivors of Trafficking Council

## Establishing Administrative Processes for a Trauma-Informed Workplace

▶ Ensure that benefits include mental health care for all staff members, regardless of survivorship status or disclosure of lived experience.

▶ Evaluate hiring practices so that survivors have equal access to employment opportunities. Consider prioritizing and institutionalizing survivor leadership by creating a budget line within the organization for consultations with and employment of survivor leaders.

▶ Establish compensation policies for subject matter experts who are either consultants or contractors, including appropriate compensation for such expert consultation (i.e., do not supplement or replace compensation for expert consultation with gift cards or vouchers unless it is preferred by the consultant). Ensure survivors in leadership positions are compensated commensurate with other leadership positions or expert consultants.

▶ Contract a third-party evaluator with lived experience of human trafficking to assess the organization's integration of survivor leadership and trauma-informed approaches.

## Addressing Mistakes

▶ Admit mistakes and make clear your organization wants to do better in this area; establish an anonymous feedback loop to give the opportunity for individuals to share feedback. Be a conscious listener and communicate updates on implementing these changes to survivor leaders and broadly throughout the organization.

▶ Assess organizational mission, vision, values, and processes. Make necessary changes and reflect feedback from survivor leaders.

▶ Become an organization that is resilient and adaptable to change as best practices for trauma-informed and survivor-centered care evolve.

Haiti AR_000507



A survivor of human trafficking in India shares her experience of debt bondage. In South Asia, bonded labor often involves using family debt as a means of coercion as part of the trafficking scheme. For this photo story, the woman shared how she would like to be photographed.

## Practices for Ensuring Inclusivity and Diversity

Ensuring inclusivity and diversity is essential to the application and success of survivor engagement practices. It is also key to share decision-making on human trafficking matters with survivors who have lived through the crime and navigated the aftermath and with those who are leaders in marginalized and vulnerable communities that traffickers often target. This means survivors of all forms of trafficking must be included in anti-trafficking efforts and should reflect the communities they serve.

### Ensuring Representation of Diverse Backgrounds and Lived Experience

▶ Understand and promote the idea that there is no 'typical' survivor or story.

▶ Given the vast array of underserved populations across the globe, a wide range of survivor leaders must be engaged, including diversity in race or ethnicity, gender identities, religion, culture, and areas of lived experience and expertise.

▶ Provide the opportunity for local survivor-led organizations and survivor leaders from marginalized groups to not only participate but also lead the process from concept to completion.

## Engaging Underrepresented Survivors

▶ Create safe spaces for survivors from marginalized and underserved populations to contribute and lead. Prioritize empowerment of and professional development for such survivors, as well as address barriers to participation for underrepresented groups.

▶ Value and seek input from survivors and survivor-led organizations that reflect underrepresented backgrounds and experiences and underserved communities, such as those from racial and ethnic minority groups, Indigenous persons, LGBTQI+ persons, persons with disabilities, immigrants and migrants, and populations experiencing housing instability or substance use, to provide insights into emerging trends and new solutions.

# Acknowledging Cultural Differences and Engaging Survivors Internationally

Promising practices identified within one context and country may not apply in another. Engaging local survivor leaders and survivor-led organizations prior to designing and implementing anti-trafficking efforts within a different country, or region within the same country, is essential. Doing this will establish trust with the community and safeguard against potential harm from culturally insensitive approaches.

▶ Always respect and acknowledge the cultural identity of every victim and survivor while reinforcing their dignity and potential. When engaging with or providing services to people of different cultures, it is essential not to assume people of the same ethnic background have the same beliefs or cultural practices.

▶ When soliciting input to inform anti-trafficking policies and strategies, ensure accessible, appropriate translation and intentional advertisement of your request to address disability and language barriers and access local expertise.

▶ Offer alternative ways to compensate survivors for their time and expertise, especially for those who may not have bank accounts and rely on cash transfers and mobile banking applications.

▶ Research survivor-led and survivor-informed programs overseas and exchange information and learnings if or when the opportunity arises. Contextualize learnings, both successes and failures, for application efforts being planned, implemented, and evaluated in other countries, as appropriate.

▶ Be aware of and unbiased to the differences in laws and government practices when looking for how promising practices vary across the globe.



## GHANA

A woman claiming to be a relative offered Kunto, a 16-year-old boy from Ghana, a trip to meet his extended family and to attend a more prestigious school in the capital city, Accra. Instead of Accra, traffickers sent Kunto to a remote fishing village on Lake Volta and sold him to work on a fishing boat. For years, the traffickers physically abused Kunto and forced him to do dangerous work, including routinely swimming to the bottom of the lake to free tangled nets. Eventually, a local NGO identified and referred Kunto to assistance. Kunto worked with local law enforcement and social workers to help identify other children exploited in the fishing industry. Although he missed years of school, Kunto was determined to continue his education and is currently pursuing his dream of becoming a doctor.

Haiti AR_009510

 

## From Survivor Engagement to Survivor Leadership

Despite significant progress, there must be continued learning on how to best recognize and engage survivor leaders as experts in anti-trafficking efforts. In partnership with survivors, anti-trafficking stakeholders should focus on strengthening trauma-informed approaches and ensuring that promising practices reflect the specific needs of a wide range of trafficking experiences; funding research and evaluation and engaging survivor leaders throughout all stages; standardizing language and definitions to allow for clear and concise understanding of terms and approaches; and prioritizing equity and meaningful inclusion so that survivors engaged are reflective of the myriad of experiences of human trafficking.

A cornerstone to implementing these recommendations is to ensure survivor leaders are at the front and center of efforts to combat this crime. This approach requires a change in mindset and culture to support, normalize, and secure the meaningful and ongoing inclusion of survivors as leaders, experts, and equal partners in decision-making processes. Many survivors advocate for a future that includes an increased focus on ensuring sustainable and empowered living and addressing the holistic and long-term needs of survivors through the creation of survivor-informed anti-trafficking initiatives and responses. By strengthening survivor engagement and making every effort to ensure survivors' full participation in the anti-trafficking movement, we can better prevent and prosecute human trafficking while also ensuring survivor prosperity.

> *"Survivor engagement is a crucial part of partnership within human trafficking prevention. Government agencies have an obligation to ensure survivor input in policy and project development, not to mention implementation and funding priorities. Knowing how to work with survivors in a respectful and equitable way is not a skill that happens overnight. We continue to learn at the Minnesota Department of Health Safe Harbor program and actively seek out survivor feedback and participation throughout all of our endeavors so we can ensure our efforts are meeting the needs of those most impacted."*
>
> ***Caroline Palmer,***
> *JD, Safe Harbor Director, Violence Prevention Programs Unit,*
> *Injury & Violence Prevention Section, Minnesota Department of Health*

# UNDERSTANDING HUMAN TRAFFICKING

"Trafficking in persons," "human trafficking," and "modern slavery" are umbrella terms – often used interchangeably – to refer to a crime whereby traffickers exploit and profit at the expense of adults or children by compelling them to perform labor or engage in commercial sex. When a person younger than 18 is used to perform a commercial sex act, it is a crime regardless of whether there is any force, fraud, or coercion involved.

The United States recognizes two primary forms of trafficking in persons: forced labor and sex trafficking. The basic meaning of these forms of human trafficking and some unique characteristics of each are set forth below, followed by several key principles and concepts that relate to all forms of human trafficking.

More than 175 nations have ratified or acceded to the UN TIP Protocol, which defines trafficking in persons and contains obligations to prevent and combat the crime.

The TVPA and the UN TIP Protocol contain similar definitions of human trafficking. The elements of both definitions can be described using a three-element framework focused on the trafficker's 1) acts; 2) means; and 3) purpose. All three elements are essential to form a human trafficking violation.



An older tuk-tuk driver waits for a client in India. Tuk-tuk and taxi drivers may be the first point of contact for victims as they transport people between airports, bus terminals, and train stations. Drivers who have received training or educational resources on human trafficking may be able to identify and help individuals at risk.

Haiti AR_000612



In human trafficking cases, the relationship between victim and trafficker may involve trauma bonding. The most common meaning of trauma bonding is when a trafficker uses rewards and punishments within cycles of abuse to foster a powerful emotional connection with the victim. This woman, a Muslim survivor of trafficking whose trafficker used a similar scheme, collaborated with the photographer and provided her consent to be portrayed in a candid snapshot.

## Forced Labor

Forced labor, sometimes also referred to as labor trafficking, encompasses the range of activities involved when a person uses force, fraud, or coercion to exploit the labor or services of another person.

The **"acts"** element of forced labor is met when the trafficker recruits, harbors, transports, provides, or obtains a person for labor or services.

The **"means"** element of forced labor includes a trafficker's use of force, fraud, or coercion. The coercive scheme can include threats of force, debt manipulation, withholding of pay, confiscation of identity documents, psychological coercion, reputational harm, manipulation of the use of addictive substances, threats to other people, or other forms of coercion.

The **"purpose"** element focuses on the perpetrator's goal to exploit a person's labor or services. There is no limit on the location or type of industry. Traffickers can commit this crime in any sector or setting, whether legal or illicit, including but not limited to agricultural fields, factories, restaurants, hotels, massage parlors, retail stores, fishing vessels, mines, private homes, or drug trafficking operations.

All three elements are essential to constitute the crime of forced labor.

*"Knowledge is the most powerful tool that we can use to fight this horrible crime. The more the wider society understands the challenges and the nature of the crime, and has access to reliable and credible information, the more likely we are to overcome it… and reduce incidence of this crime."*

**Dr. Horace Chang,**
Jamaican Deputy Prime Minister and Minister of National Security

There are certain types of forced labor that are frequently distinguished for emphasis or because they are widespread:

## Domestic Servitude

"Domestic servitude" is a form of forced labor in which the trafficker requires a victim to perform work in a private residence. Such circumstances create unique vulnerabilities. Domestic workers are often isolated and may work alone in a house. Their employer often controls their access to food, transportation, and housing. What happens in a private residence is hidden from the world—including from law enforcement and labor inspectors— resulting in barriers to victim identification. Foreign domestic workers are particularly vulnerable to abuse due to language and cultural barriers, as well as a lack of community ties. Some perpetrators use these types of conditions as part of their coercive schemes to compel the labor of domestic workers with little risk of detection.

## Forced Child Labor

The term "forced child labor" describes forced labor schemes in which traffickers compel children to work. Traffickers often target children because they are more vulnerable. Although some children may legally engage in certain forms of work, forcing or coercing children to work remains illegal. Forms of slavery or slavery-like practices—including the sale of children, forced or compulsory child labor, and debt bondage and serfdom of children—continue to exist, despite legal prohibitions and widespread condemnation. Some indicators of forced labor of a child include situations in which the child appears to be in the custody of a non-family member and the child's work financially benefits someone outside the child's family; or the denial of food, rest, or schooling to a child who is working.

# Sex Trafficking

Sex trafficking encompasses the range of activities involved when a trafficker uses force, fraud, or coercion to compel another person to engage in a commercial sex act or causes a child to engage in a commercial sex act.

The crime of sex trafficking is also understood through the "acts," "means," and "purpose" framework. All three elements are required to establish a sex trafficking crime (except in the case of child sex trafficking where the means are irrelevant).

The **"acts"** element of sex trafficking is met when a trafficker recruits, harbors, transports, provides, obtains, patronizes, or solicits another person to engage in commercial sex.

The **"means"** element of sex trafficking occurs when a trafficker uses force, fraud, or coercion. Coercion in the case of sex trafficking includes the broad array of means included in the forced labor definition. These can include threats of serious harm, psychological harm, reputational harm, threats to others, and debt manipulation.

The **"purpose"** element is a commercial sex act. Sex trafficking can take place in private homes, massage parlors, hotels, or brothels, among other locations, as well as on the internet.

Haiti AR 000514

### Child Sex Trafficking

In cases where an individual engages in any of the specified "acts" with a child (under the age of 18), the means element is irrelevant regardless of whether evidence of force, fraud, or coercion exists. The use of children in commercial sex is prohibited by law in the United States and most countries around the world.

## Key Principles and Concepts

These key principles and concepts relate to all forms of trafficking in persons, including forced labor and sex trafficking.

### Consent

Human trafficking can take place even if the victim initially consented to providing labor, services, or commercial sex acts. The analysis is primarily focused on the trafficker's conduct and not that of the victim. A trafficker can target a victim after a victim applies for a job or migrates to earn a living. The trafficker's exploitative scheme is what matters, not a victim's prior consent or ability to meaningfully consent thereafter. Likewise, in a sex trafficking case, an adult victim's initial willingness to engage in commercial sex acts is not relevant where a perpetrator subsequently uses force, fraud, or coercion to exploit the victim and cause them to continue engaging in the same acts. In the case of child sex trafficking, the consent of the victim is never relevant as a child cannot legally consent to commercial sex.

### Movement

Neither U.S. law nor international law requires that a trafficker or victim move across a border for a human trafficking offense to take place. Trafficking in persons is a crime of exploitation and coercion, and not movement. Traffickers can use schemes that take victims hundreds of miles away from their homes or exploit them in the same neighborhoods where they were born.

### Debt Bondage

"Debt bondage" is focused on human trafficking crimes in which the trafficker's primary means of coercion is debt manipulation. U.S. law prohibits perpetrators from using debts as part of their scheme, plan, or pattern to compel a person to work or engage in commercial sex. Traffickers target some individuals with an initial debt assumed willingly as a condition of future employment, while in certain countries traffickers tell individuals they "inherited" the debt from relatives. Traffickers can also manipulate debts after the economic relationship begins by withholding earnings or forcing the victim to assume debts for expenses like food, housing, or transportation. They can also manipulate debts a victim owes to other people. When traffickers use debts as a means to compel labor or commercial sex, they have committed a crime.

*"I will continue to fight against human trafficking in all its forms. All of us must remain vigilant—constantly aware that the cost of human trafficking is not just far away—across the ocean in a distant country. It's a moral crisis of international proportions that has reached our shores—right here in our own backyard."*

**U.S. Senator Bob Menendez, (D-NJ),**
Chairman of the Senate Foreign Relations Committee

## Non-Penalization

Governments should not penalize or prosecute victims of trafficking in persons for the unlawful acts traffickers compelled them to commit. This principle aims to protect victims from being held legally responsible for conduct that was not their choice, but rather was driven by traffickers. If a government has penalized or punished a victim in such a way, the government should vacate the conviction and/or expunge the victim's record.

## State-Sponsored Human Trafficking

While the TVPA and UN TIP Protocol call on governments to proactively address trafficking crimes, some governments are part of the problem, directly compelling their citizens into sexual slavery or forced labor schemes. From forced labor in local or national public work projects, military operations, and economically important sectors, or as part of government-funded projects or missions abroad, officials use their power to exploit their nationals. To extract this work, governments coerce by threatening the withdrawal of public benefits, withholding salaries, failing to adhere to limits on national service, manipulating the lack of legal status of stateless individuals and members of minority groups, threatening to punish family members, or conditioning services or freedom of movement on labor or sex. In 2019, Congress amended the TVPA to acknowledge that governments can also act as traffickers, referring specifically to a "government policy or pattern" of human trafficking, trafficking in government-funded programs, forced labor in government-affiliated medical services or other sectors, sexual slavery in government camps, or the employment or recruitment of child soldiers.

## Unlawful Recruitment or Use of Child Soldiers

Another manifestation of human trafficking occurs when government forces or any non-state armed group unlawfully recruits or uses children – through force, fraud, or coercion – as soldiers or for labor or services in conflict situations. Children are also used as sex slaves. Sexual slavery, as referred to here, occurs when armed groups force or coerce children to "marry" or be raped by commanders or combatants. Both male and female children are often sexually abused or exploited by members of armed groups and suffer the same types of devastating physical and psychological consequences associated with sex trafficking.

## Accountability in Supply Chains

Forced labor is well documented in the private economy, particularly in agriculture, fishing, manufacturing, construction, and domestic work; but no sector is immune. Sex trafficking occurs in several industries as well. Most well-known is the hospitality industry, but the crime also occurs in connection with extractive industries where activities are often remote and lack meaningful government presence. Governments should hold all entities, including businesses, accountable for human trafficking. In some countries, the law provides for corporate accountability in both the civil and criminal justice systems. U.S. law provides such liability for any legal person, including a business that benefits financially from its involvement in a human trafficking scheme, provided that the business knew or should have known of the scheme.

Haiti AB-000516



TOPICS OF SPECIAL INTEREST

# Forced Labor: The Hidden Cost of China's Belt and Road Initiative

Since 2013, the Peoples Republic of China (PRC) has been implementing the Belt and Road Initiative (BRI)—a trillion-dollar infrastructure development and economic integration strategy connecting at least 144 countries around the world with raw materials, technological and financial resources, and labor for large-scale projects in construction, mining, and manufacturing, among other sectors. Most BRI projects employ PRC nationals and are managed by PRC-owned enterprises. The program has enabled the PRC to find a home for its own excess manufacturing capacity and surplus laborers, while ensuring its continued access to invaluable raw material inputs, edging out other world powers from international development partnerships and economic cooperation, securing intelligence, and amassing political, military, and economic leverage over participating countries through the accrual and manipulation of debt.

Between the macroeconomic ripples of this system is a tragic human cost: forced labor. PRC and host country nationals employed in some BRI construction projects, mining operations, and factories in African, European, Middle Eastern, Asian, Pacific, Latin American, and Caribbean countries experience deceptive recruitment into debt bondage, arbitrary wage garnishing or withholding, contract irregularities, confiscation of travel and identity documentation, forced overtime, and resignation penalties, as well as intimidation and threats, physical violence, denial of access to urgent medical care, poor working and living conditions, restricted freedom of movement and communication, and retaliation for reported abuses. Those who escape often find themselves at the mercy of local immigration authorities, who are not always trained to receive or care for trafficking victims.

Last year, a man from a rural community in the PRC hoping to raise money for his family responded to a recruitment ad for a high-paying steel production job in Indonesia. When he arrived, his employers took his passport, told him he would be paid significantly less than he was promised, and forced him to work hours far beyond the schedule to which he had agreed. Within months, he was sneaking away from his workstation to post surreptitious pictures of himself online with handwritten notes begging for someone to help him get home. His family contacted the local PRC consular services to try and pressure the factory to return his passport, but to no avail. He and four other laborers eventually managed to pool their money to hire a PRC national broker to help them leave the country, but the broker just took their money and brought them to yet another PRC-affiliated industrial park in Indonesia where they toiled for months under similarly abusive conditions. They continued saving money until they could pay a smuggler to take them to Malaysia, but when they reached their destination, the smuggler dumped them in the water off the coast. They had to swim to shore, where they were shot at, arrested, and detained by the local authorities.

Stories like this are not uncommon in dozens of BRI countries. The PRC has not created a central governing body for the BRI, nor has it made public a full list of BRI-affiliated projects. Historically, PRC authorities have not exercised sufficient oversight of recruitment channels, contracts, or labor conditions to prevent abuses, and PRC diplomatic services have routinely failed to identify or assist those exploited within the program. Many of these vulnerabilities intensified during the COVID-19 pandemic, when local travel restrictions, slowed hiring practices, and reentry bans imposed by the PRC government prevented workers from leaving and reporting abusive conditions. For example, at one BRI project in Papua New Guinea, nearly half of PRC workers reported being unable to return home in 2021 due to the pandemic.

All countries should be able to pursue development opportunities without sacrificing their respect for human rights. Countries interested in or currently hosting BRI projects must ensure their citizens, PRC nationals, and other migrant workers are protected from human trafficking. If a BRI project employs local workers, the host government must scrutinize recruitment channels and contracts to ensure its citizens are not lured under false pretenses and exploited. Governments must enhance their physical inspection of BRI worksites to monitor working conditions and screen for forced labor indicators—especially document withholding; these inspections must be frequent and unannounced, to avoid giving project leadership time to conceal their abuses, and they must involve victim—centered interview methods that prevent retaliation against workers. Countries must also ensure PRC nationals and other migrant workers feel comfortable coming forward to report their abuses, rather than made to fear deportation due to visa irregularities. This can be achieved through outreach and awareness raising in key BRI project areas and training for immigration authorities. If forced labor is detected, countries must be prepared to receive and protect victims—be it through shelter services, medical care, or consular assistance in the case of PRC nationals and other migrant workers who wish to return home — and to initiate and support relevant criminal investigations and/or civil remediation.

Participating countries must also be aware that vigilance is crucial not only at BRI worksites but also in their surrounding communities as well. Sex trafficking, child forced labor in hazardous work, and exploitative marriages featuring elements of sex trafficking and forced labor have reportedly increased in some areas where BRI construction projects are underway. The displacement of local communities to make room for BRI projects—often carried out with little or no timely compensation for those who lose their homes—compounds many of these vulnerabilities.

Without greater attention to these details, countries may not be able to safely or ethically benefit from BRI-affiliated projects, and the implications go beyond infrastructure. The international community is paying increasingly close attention to, and making policy and investment decisions based on, the eradication of forced labor from global supply chains.

But countries do not have to face these challenges alone; to best protect against the human rights and reputational implications of forced labor in BRI projects, governments should be ready to foster and partner with a robust civil society that includes shelter organizations, direct service providers, watchdog groups, survivors, and NGOs conducting awareness raising.

Haiti AR_000518



TOPICS OF SPECIAL INTEREST

# Forced Labor and the Clean Energy Transition: Finding A Responsible Way Forward

Forced labor in supply chains is a pervasive and pernicious element of the global marketplace, affecting individuals, businesses, and governments across a variety of industries and regions of the world. Although progress toward supply chains free of forced labor has been generally slow moving in most industries, the increasing demand for clean energy technologies to address the climate crisis presents an opportunity to emphasize the importance of establishing new clean energy supply chains that uphold human rights, enable countries to meet global climate targets, and generate economic growth. The accelerating growth of renewable electricity worldwide has led to the emergence of a new global energy economy, increased demand for key mineral inputs, and expanded mining and extraction activities. Coupling respect for human rights as resources with mobilization towards accelerating the clean energy transition will reduce the number of individuals vulnerable to labor abuses, including forced labor, as well as the risk of climate disasters.

Silicon metal for solar photovoltaic (PV) modules and cobalt for electric vehicle (EV) batteries are examples of inputs needed for important clean energy technologies that are often sourced from areas with long and complicated histories of human rights abuses, including forced labor and forced child labor. Credible evidence indicates that manufacturers of silicon metal—used by the solar supply chain and other sectors—in the Xinjiang Uyghur Autonomous Region (Xinjiang) of the Peoples Republic of China (PRC)–directly engage in state-sponsored forced labor programs targeting predominantly Muslim Uyghurs and members of other ethnic and religious minority groups, amid the ongoing genocide and other crimes against humanity. Direct use of forced labor in the solar industry appears concentrated in the raw material mining and silicon metal production processes, increasing the risk that downstream component producers (e.g., solar cells and solar modules) are using tainted supplies. In the Democratic Republic of the Congo (DRC), artisanal and small-scale mining of cobalt has been associated with forced child labor and other abuses. These examples highlight the urgent need for adherence to environmental, social, and governance (ESG) standards in extractive sector supply chains to avoid labor and human rights abuses and ensure a just energy transition.

## Silica in the PRC

In the drive to decarbonize the global economy, one of the most important options for renewable power is PVs, used to convert sunlight into electricity. The PRC dominates global solar supply chains, including the supply and processing of silicon metal, solar-grade polysilicon, and the ingots, wafers, and cells that ultimately form a finished solar panel. The PRC accounts for 77 percent of global polysilicon production, 45 percent of which originates in Xinjiang, where the PRC government is carrying out a mass detention and political indoctrination campaign that subjects predominantly Muslim Uyghurs and members of other ethnic and religious minority groups to forced labor under the guise of "vocational training." The world's largest supplier of silicon metal, Hoshine Silicon Industry, has operations in Xinjiang and has been found to be directly involved in state-sponsored forced labor programs in the region.

Evidence indicates that solar products and input at nearly every step of the production process in the PRC, from raw silicon material mining to final solar module assembly, are linked to known or probable forced labor programs. Some of the world's largest suppliers of solar panel materials and components reportedly have ties to the Xinjiang Production and Construction Corp, a state-owned economic and paramilitary organization that has been sanctioned by the U.S. government for serious human rights abuses. Because nearly half of global polysilicon production occurs in Xinjiang, much of the global solar energy supply chain currently includes components likely made with forced labor from that region.

## Cobalt in the DRC

As part of the clean-energy transition, increasing demand for EVs is driving exponential increases in demand for cobalt, a key component in most rechargeable lithium-ion batteries used in EVs. Because the DRC has large cobalt reserves, the country plays an important role in EV battery supply chains. Today, about 70 percent of global cobalt is mined in the DRC, with approximately 10 to 30 percent produced by artisanal miners operating in dangerous conditions. Despite nascent efforts to formalize and regulate the artisanal mining sector, poverty-driven child labor remains prevalent. Since 2015, the TIP Report narratives on the DRC have highlighted forced labor of children in artisanal cobalt mines. Integrating artisanal and small-scale mining into mainstream economies and ensuring local communities benefit from extractive activities are central to creating sustainable supply chains. In 2020, the DRC joined the Global Battery Alliance's Cobalt Action Partnership, which is a means of fostering transparent, verifiable, and responsible artisanal and small-scale mining in cobalt supply chains.

## The Way Forward

The urgent need to tackle the climate crisis presents governments and the private sector with both a challenge and an opportunity to build new critical supply chains that incorporate human rights, transparency, and sustainability standards by design and prevent human trafficking. With the right array of coordinated and focused policies and efforts, governments, industry leaders, and civil society stakeholders can accelerate current efforts to make all supply chains more responsible, transparent, and traceable. These efforts are not only critical to support the clean energy transition, but also are vital to eliminating labor and human rights abuses and increasing the resilience and responsibility of global manufacturing chains.

Improving sector governance, including protections for labor rights, through adherence to the highest ESG standards, can help ensure stable supply chains that support the clean energy transition. Regarding the sustainable production of critical energy minerals, several public and private sector initiatives have examined mineral supply chains and can inform policy decisions regarding minerals sourcing and positive sectoral governance.

▶ The Organization for Economic Co-operation and Development's *Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Area*s promotes accountability and transparency in supply chains coming from conflict zones.

▶ The Intergovernmental Forum on Mining, Minerals, Metals and Sustainable Development's *Guidance for Governments: Managing artisanal and small-scale mining* provides guidance on sectoral management as well as supporting local communities by bringing informal mining sectors into the formal economy.

Haiti AR-000520

- The Initiative for Responsible Mining Assurance's *Standard for Responsible Mining* defines good practices for what responsible mining should look like at the industrial scale including environmental and social aspects.

- The Initiative for Responsible Mining Assurance's *Standard for Responsible Mineral Processing* defines best practices at operations beyond the mine gate and focuses on development and production of minerals.

- Government to government initiatives, such as the Department of State's Energy Resource Governance Initiative, also serve to build governance capacity in energy mineral rich developing economies to create more responsible and resilient mining sectors.

- The Department of Homeland Security's U.S. Customs and Border Protection (CBP) issued a Withhold Release Order (WRO) instructing customs officials to detain shipments containing silica-based products made by Hoshine and its subsidiaries.

Science and technology innovations can also support just and equitable supply chains. For example, evolution in battery chemistry toward lower cobalt content and/or advances in recycling provide pathways for reducing raw-material extraction and limiting associated human rights and ESG problems.

A clean energy transition is essential to combating the climate crisis; however, it is equally essential for that transition to respect human rights. Those involved at all stages of the supply chain must be provided safe and fair employment, free of exploitation. Governments and industries can leverage existing frameworks to establish and enforce a new global standard in transparent and safe supply chain operations and, in doing so, may usher in a new future not only for energy but for all stakeholders involved in the energy transition.



Haiti AR_000521



TOPICS OF SPECIAL INTEREST

# The Climate Crisis: Exacerbating Vulnerabilities and the Looming Increase of Exploitation

The climate crisis, and the many ways it will reshape the world, necessitates that governments everywhere sharpen their focus not only on taking action to limit the severity of this crisis but also on mitigating the worst outcomes for vulnerable populations. Political and civil instability and economic uncertainty exacerbate pre-existing human trafficking vulnerabilities. Crisis situations often expose deficiencies in the efforts of governments, international organizations (IOs), and the global community to protect and support vulnerable populations from human trafficking. Climate change-linked events such as wildfires, droughts, flooding, extreme weather conditions, heat waves, environmental degradation, and rapid ice loss have cost hundreds of thousands of lives and billions of dollars in damages. While climate change does not discriminate, displaced populations, vulnerable migrants, Indigenous communities, women and children, and minority populations are more likely to experience its impacts and, consequently, are likely to become even more vulnerable to exploitation. Global and government commitments to combat human trafficking and protect the world's most vulnerable from further exploitation must accelerate given such trends.

## Climate Change - A Humanitarian Crisis

Climate change is a threat multiplier. It exacerbates risks and creates numerous insecurities that place more people at risk. The UNHCR 2021 Mid-Year Trends Report estimated that by the first half of 2021, millions of people around the globe were forcibly displaced due to generalized violence, human rights violations, armed conflicts, and increasing threats caused by climate change. As environmental conditions worsen, the percentage of those vulnerable to exploitation will increase. The UN Environment Programme indicates that human trafficking has the potential to increase by 20-30 percent during humanitarian disasters due to lost livelihoods and disrupted families.



## Displaced Populations and Refugees

Asylum-seekers, IDPs, and refugees are at very high risk of trafficking due to their lack of legal, financial, and food security. Limited access to legal protections such as identity documents and citizenship rights exacerbate displaced populations' vulnerabilities to traffickers. Climate change has the potential to become one of the main drivers of population displacement, internally and across international borders. Extreme weather can cause sudden and long-term damage to homes and communities. Some studies have estimated 150 million people could be displaced due to the climate crisis by 2050. Moreover, people that are forced to leave their homes due to extreme weather events generally do not benefit from legal protections under international refugee law, leaving them particularly vulnerable. Without effective strategies, a uniform understanding of the movement of populations caused by climate change and its implications, and international mechanisms to protect these populations, a rapidly warming planet presents geopolitical risks and threatens the survival of marginalized societies.

## Women and Children

Climate variability and extreme weather impact human health and safety, food and water security, and socio-economic conditions globally, but with especially severe effects in Sub-Saharan Africa, Central America and the Caribbean, and Asia, with particularly negative repercussions on women and children. NGO studies show that drops in crop productivity or increases in pest, flood, and drought damage have a significant impact on food security and, consequently, the livelihoods of women. The International Labour Organization has reported that economic and food insecurity are directly linked to an increase of both forced child labor and child sex trafficking. Experts are concerned that rising temperatures will exacerbate women's and children's vulnerability to human trafficking. As a result of high youth populations and labor-heavy industries like agriculture, domestic services, and manufacturing, children and youth in climate-vulnerable countries are often forced to work in dangerous, vulnerable, or isolated situations. With limited options for work, women and children become more vulnerable to sexual exploitation and familial trafficking.

In addition, traffickers frequently target girls and exploit the vulnerabilities created by compounded, systemic inequalities, such as a lack of access to education, which are driven by cultural norms that undervalue women and girls. In more rural and low-income countries, social expectations often result in girls being pulled out of school to complete domestic and agricultural chores. With natural disasters, droughts, floods, extreme weather, increased exposure to zoonotic (diseases that can be transmitted naturally from animals to humans) and vector-borne diseases, and air pollution, those expectations only increase for girls, further delaying girls' return to education. The NGO Malala Fund found that four million girls in low and lower-middle income countries will be prevented from completing their education due to climate change and, consequently, will be more vulnerable to exploitation.

## Marginalized Populations, including Indigenous Populations

Racial and ethnic minority groups, the LGBTQI+ community, and Indigenous populations are extremely vulnerable to exploitation due to social, legal, and cultural marginalization. Marginalized groups are more likely to endure human rights abuses, racism, discrimination, and trauma and have limited access to job opportunities and community resources, including healthcare. These same groups are more likely to be affected by climate change as it places them in more vulnerable situations. Indigenous communities are often at additional risk due to their symbiotic relationships with the environments in which they live. Extreme weather events that are exacerbated by climate change, such as high temperatures, severe flooding, drought, tornadoes, and high-winds—and their resulting destructive impacts on land and modern infrastructure and, therefore, food and water sources—disrupt local economies and force displacement. Those inhabiting coastal regions and low-income urban communities are more likely to be affected by the damage of severe weather and, consequently, be more vulnerable to exploitation, while limited access to resources increases their vulnerability to traffickers' coercive tactics.

## Taking Action: Governments, International Organizations, and Community Activists

Significant legal and governmental action is required to protect and support those impacted by the climate crisis. Lack of action will expose an overwhelming number of people to the risk of trafficking. Climate change and its many repercussions also hinder strides that governments and the global community have undertaken to address and prevent human trafficking. Leaders, activists, governments, NGOs, and IOs are increasing efforts to protect those most vulnerable by mitigating and preparing for climate-related disasters, developing programs for those displaced by climate change, and advocating for rights of those marginalized and most vulnerable to climate change and exploitation. All such efforts should be informed not only by climate experts but also by survivor leaders and other individuals who have experienced displacement or other vulnerabilities as a result of climate change.

## EXAMPLES OF PROACTIVE ACTIONS TAKEN TO COMBAT CLIMATE CHANGE AND REDUCE EXPLOITATION INCLUDE:

▸ The UN has unveiled six key actions governments can take to prepare for the climate crisis. The actions include accelerating decarbonization, investing in green jobs and sustainable growth, further implementing sustainable solutions, confronting climate risks, and advancing cooperation, as no country can succeed alone. With these actions, governments can mitigate the impact of climate change and better protect those most vulnerable to exploitation.

▸ The NGO Refugees International created the Climate Displacement Program. The program plays an important role in advancing, developing, and promoting solutions to ensure that people displaced due to climate-related disasters receive humanitarian assistance and are not subject to human rights abuses.

▸ President Biden issued an Executive Order instructing U.S. Federal agencies to develop and work with international multi-stakeholder initiatives on protections for those displaced by climate change that will offer more legal protections and reduce exploitation.



TOPICS OF SPECIAL INTEREST

# Promising Practices in Data Collection, Management, and Dissemination

Collection and analysis of data is imperative for governments to understand the manifestation of human trafficking within its borders and among its nationals abroad, to track progress towards anti-trafficking goals, and to innovate responses to trafficking in partnership with key stakeholders. Unbiased and comprehensive data is crucial to highlighting trends, informing decision-making on domestic policies and priorities, updating anti-trafficking legislation, and appropriately allocating resources, from the local to the national level. Governments should work to attain the necessary technological tools and create data infrastructure to effectively integrate data systems across government agencies, ensuring standardized and comprehensive collection and, as appropriate, integrate civil society datasets with confidentiality policies to protect survivors. While advanced software and database systems can be helpful, they are not essential to building informative data. Instead, consistency and usability across stakeholders, integration into existing administrative data systems, and security of victims' identities are key.

When approaching data infrastructure, the following are important considerations:

▶ **Government ownership and stakeholder buy-in** are prerequisites for creating data collection infrastructure that will be fully adopted by all stakeholders, which is needed to build trafficking in persons data and integrate it within existing administrative data systems. All government agencies identifying and providing services to victims and investigating and prosecuting cases of trafficking should work to provide input on their current data practices, their interactions with victims and perpetrators, language accessibility for those collecting and entering data, and technology requirements to create adoptable systems. Incorporation of NGO data should also be considered, while being cognizant of privacy, sensitive law enforcement information, and duplicative data from multiple agencies assisting the same victims or investigating the same cases. Methods of input should be considered for all contributors to ensure the system is usable in their daily workflows.

▶ **Uniform data** is necessary to combine data across agencies to compare trends internally and, when collaborating across borders, with other governments. IOM created international trafficking data standards for governments and civil society to promote uniformity across data collection systems and facilitate sharing across governments. These data standards can be found at https://www.ctdatacollaborative.org/relatedresources/tools/htcds. Governments may consider these guidelines to ensure robust and standardized collection and adoption of appropriate confidentiality standards.

▶ **Victim identification and protection data,** or data generated from agencies working directly with victims, is crucial to understanding the following: the effectiveness of victim identification efforts across sectors; the success of law enforcement investigations, awareness, and identification efforts for the protection of victims; and the quality and effectiveness of services provided by a country's protection infrastructure. Victim identification and protection data is particularly challenging to collect and standardize given that strict confidentiality protocols must be followed to protect victims' identities and avoid re-traumatization, and data collection and standardization efforts often span several government agencies and civil society organizations.

▶ **Disaggregating prosecution data** is essential to understanding the effectiveness of anti-trafficking legislation. Since traffickers are sometimes charged, prosecuted, and convicted under other statutes, such as immigration or commercial sex-related offenses, it is key to properly classify the charges under which traffickers are convicted to assess the effectiveness and use of anti-trafficking laws to successfully prosecute sex and labor trafficking cases as trafficking in persons. Additionally, details about the crime, including the type of trafficking and demographic information of both traffickers and victims, should be collected to determine if there are gaps in application of anti-trafficking laws.

▶ **Hotline/helpline data,** collected by both government agencies and civil society, also provide critical information on trafficking trends and the needs of victims through providing a mechanism to connect victims to services and funnel information to law enforcement. Hotline operators and civil society may assist victims who do not interact with governmental systems; however, given the necessary confidentiality of hotlines, the use of anonymized and aggregated data can make preventing duplication difficult when analyzing hotline data. Civil society and governments may have different thresholds for classification of victims. Also, victims may not provide consent, and aggregation may not be possible due to small numbers. For these reasons, close collaboration is needed to standardize and reconcile information and safeguard victims' identities. Additionally, hotlines rely on public awareness, so their data may overrepresent certain populations. For this reason, hotline data cannot demonstrate prevalence, but can supplement other data sources to inform on trends and highlight gaps in services or accountability in investigations.

Finally, governments should facilitate and encourage independent research on trafficking trends. The academic community can often be a resource in establishing data collection systems, data governance, and data literacy campaigns. When governments share appropriate information with the academic community, it can result in new insights and further innovative responses to human trafficking.

## Country Examples of Innovative Human Trafficking Data Collection, Management, and Dissemination:

**Philippines.** The Government of the Philippines created the Integrated Case Management System, which is a single technology platform leveraged by several government agencies to address longstanding issues around interagency coordination needed to assist Filipino trafficking victims, who are often exploited outside the country, and to prosecute their traffickers.

**Uganda.** In partnership with an NGO, Uganda's Office of the Director of Public Prosecutions developed the Trafficking in Persons Mobile App Platform, which collects and disseminates standardized data pertaining to human trafficking investigations and prosecutions, enabling government agencies to track suspected and convicted traffickers and trends in trafficking in persons.



TOPICS OF SPECIAL INTEREST

# Linking Efforts to Combat Corruption and Trafficking in Persons

On December 6, 2021, the White House released the first United States Strategy on Countering Corruption. It outlines a whole-of-government approach that includes an emphasis on better understanding and responding to the transnational dimensions of corruption, along with steps to reduce the ability of corrupt actors to use the U.S. and international financial systems to hide assets and launder their illicit proceeds. This commitment to combat corruption supports another long-time priority of the United States: to combat trafficking in persons in all its forms; to prosecute and punish perpetrators, including by confiscating their ill-gotten gains; and to assist and protect the victims of this crime.

The U.S. Strategy on Countering Corruption highlights human traffickers among those that benefit the most from environments with endemic corruption. A 2021 research report by UNODC and the Bali Process on People Smuggling, Trafficking in Persons and Related Transnational Crime also highlights the role of corruption in facilitating trafficking in persons and perpetuating impunity for traffickers. Another paper published in 2021 by TRACE illustrates the role corruption plays in facilitating human trafficking by highlighting individual cases of trafficking victims from around the world, covering multiple sectors and contexts, including fishing, domestic service, the kafala system, and construction in advance of the FIFA World Cup, among others. The paper highlights how impunity remains the norm in many places and industries, as both human traffickers and the corrupt officials who facilitate these crimes operate with little fear of prosecution.

Trafficking-related corruption is committed by a range of government officials from junior law enforcement officers to senior officials at the highest level. Officials engage in corruption, for example, by assisting unscrupulous or unlicensed recruitment agencies during the recruitment of workers for overseas employment, providing false documentation, and enabling illegal movements across borders and immigration controls. They can also facilitate or turn a blind eye to ongoing illicit activities such as prostitution or drug cultivation or facilitate the acquisition, sale, or border crossing of goods that may have been produced by forced labor. Perhaps most perniciously, corrupt officials who accept bribes hamper criminal justice proceedings by obstructing the reporting and gathering of evidence, influencing witnesses, tipping off traffickers of pending raids and investigations, or otherwise interfering with the prosecution of perpetrators of illegal activities. Through selective law enforcement, governments may fail to investigate or prosecute traffickers, while in other cases authorities may target political opponents with unfounded trafficking allegations. Corruption by the police and the judiciary emboldens human traffickers to operate with impunity, contributes to the loss of public trust, and facilitates the further victimization of the very individuals they are supposed to protect from crime. Some government officials abuse their position of authority to extort sex or forced labor from individuals in their care in exchange for access to food, medicine, education, or other benefits or goods.

Earlier research by the UNODC points out that trafficking in persons could not occur on a large scale without corruption. It notes that "trafficking in persons and corruption are closely linked criminal activities, whose interrelation is frequently referred to in international fora;" and yet, the linkages between the two crimes are mostly overlooked in the actual development and implementation of anti-trafficking policies and programs.

The international anti-corruption framework includes several instruments and initiatives that can be used to further anti-trafficking efforts. One such instrument is the 2003 United Nations Convention against Corruption (UNCAC), which is the only legally binding and virtually universal anti-corruption instrument with 189 States Parties. While the Convention does not specifically define "corruption," it does cover different forms that corruption can take, such as bribery, trading in influence, abuse of functions, and various acts of corruption in the private sector. Most, if not all, of the mandatory provisions in the UNCAC support and complement international obligations under the 2000 United Nations Convention against Transnational Organized Crime (UNTOC) UN TIP Protocol, also widely ratified with 190 Parties to the UNTOC and 178 Parties to its TIP Protocol. Under the UNCAC, States Parties are obligated, under the fundamental principles of their legal systems, to establish public procurement systems based on transparency and competition; to criminalize forms of domestic and foreign bribery; to criminalize the laundering of proceeds of a crime; and to the greatest extent possible within its domestic legal system, to freeze, seize, and confiscate such proceeds. States Parties also are obligated to cooperate with other States Parties on criminal anti-corruption investigations, prosecutions, and judicial proceedings of Convention-related offenses; and promote the participation of civil society in the fight against corruption. Both the UNCAC and the UNTOC have peer review mechanisms that assess States Parties' compliance with the respective conventions that include recommendations and identification of specific needs for technical assistance.

The Organization for Economic Co-operation and Development's (OECD) Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (the Anti-Bribery Convention), ratified by 44 members (38 OECD countries and six non-members), is the first anti-corruption instrument to focus on the supply side of bribery, namely the persons or entities offering, promising, or giving bribes—whether directly or through intermediaries. States Parties agree to establish bribery of foreign public officials as a criminal offense under their national laws and to investigate, prosecute, and sanction this offense. The OECD Working Group on Bribery monitors the implementation and enforcement of the Convention and related instruments and recognizes that achieving progress requires efforts at the national level, as well as multilateral cooperation.

Haiti AR_000528

The United Nations Inter-Agency Coordination Group Against Trafficking in Persons (ICAT), through its November 2021 Call for Action on Trafficking in Persons, identified corruption as one of the drivers of human trafficking and called for a global government response to address the underlying social and structural inequalities that enable environments where corruption takes root; to tackle trafficking in persons in a holistic manner that also addresses corruption and impunity; and to enhance investigations of corruption and illicit financial flows associated with trafficking and the related seizure of proceeds of crime.

As the main policymaking body in Vienna on criminal justice issues, the UN Commission on Crime Prevention and Criminal Justice (CCPCJ) complements the UNTOC and its TIP Protocol. The TIP Protocol is the central international framework to prevent and combat human trafficking, and it provides a floor for government action, similar to the congressionally mandated minimum standards that are used to assess governments' efforts in TIP Report country narratives. The implementation of the TIP Protocol is often raised in the context of CCPCJ discussion, particularly through resolutions negotiated each year. Other fora such as the G7 Roma Lyon Group (RLG) also address corruption and trafficking in persons. The RLG focuses on crime and terrorism issues, including both corruption and trafficking in persons, among others.

Under U.S. law, the TVPA requires the Secretary of State to describe government efforts to combat trafficking each year and places great focus on corruption and complicity, which undermine such efforts. As part of the Minimum Standards indicia of "serious and sustained efforts," the TVPA requires an assessment of whether a government took law enforcement action against officials who participated in, facilitated, condoned, or were otherwise complicit in human trafficking crimes. Furthermore, the TVPA directs the Secretary to consider, as proof of a country's failure to make significant effort to fully meet the Minimum Standards, a government policy or pattern of trafficking; trafficking in government-funded programs; forced labor (in government-affiliated medical services, agriculture, forestry, mining, construction, or other sectors); sexual slavery in government camps, compounds, or outposts; or employing or recruiting child soldiers. Thus, concerns of official complicity in trafficking crimes weigh heavily in the TIP Report's country assessments. In cases of official complicity in trafficking crimes in a country, the relevant TIP Report narrative encourages the government, often as a top recommendation, to increase efforts to hold complicit officials accountable or reform an existing government policy or pattern of trafficking – underlining the importance of ensuring state entities and officials do not perpetrate the crime.

## Recommendations for Linking and Furthering Anti-corruption and Anti-trafficking Efforts:

The following recommendations draw from various sources and are based on a multi-sectoral approach involving government entities, multilateral institutions, the private sector, and civil society, including trafficking survivors. They aim to proactively link efforts to prevent and combat both corruption and trafficking in persons.

▸ Ensure robust, transparent criminal investigation and prosecution of government officials who allegedly facilitate or perpetrate trafficking crimes, including through corrupt practices or trafficking-related selective law enforcement.

▸ Establish comprehensive anti-money laundering laws and enforce them, monitor seizure/confiscation of proceeds—including from offshore accounts and cryptocurrency—and provide training/assistance/tools to governments, banks, etc., to enhance these efforts, in line with legislation, treating trafficking in persons as a predicate offence to money laundering, in line with the UNTOC.

▸ Conduct financial investigations. Curb illicit financing, including through enhanced investigations of corruption associated with human trafficking along with the related freezing, seizing, and confiscating of proceeds of this crime and through enhanced training of relevant public and private entities, such as law enforcement, financial intelligence units, tax authorities, and banking institutions, using red flag indicators to help identify transactions related to human trafficking.

▸ Include corruption when addressing core drivers and facilitators of trafficking in persons, and link anti-corruption efforts with those designed to tackle transnational organized crime such as human trafficking, including understanding and disrupting networks, tracking flows of money and assets, and improving information sharing with international and non-governmental partners, as appropriate.

Haiti AR_000529



- Recognize that combating corruption and transnational organized crime are mutually reinforcing by underscoring the importance of effectively implementing international obligations under the UNCAC and UNTOC in the development and execution of anti-trafficking policies and programs, as well as incorporate as relevant recommendations from the UNCAC and UNTOC COP reviews.

- Bolster the existing international anti-corruption architecture in reinforcing the approach of corruption as a global problem that also facilitates trafficking in persons by addressing the transnational aspects of corruption through human and financial resourcing, intelligence analysis, foreign assistance, and robust public-private partnerships that include the private sector, multilateral organizations, banking institutions, civil society, and media actors, with a view to eliminate safe havens for corrupt actors and their criminal proceeds.

- Increase digital expertise and appropriate usage of new technology in anti-trafficking investigations and responses, including collection of evidence, sharing of information, and presenting evidence in court.

- Establish transparent public, private, and institutional procurement and acquisition systems.

- Incorporate measures to address corruption and impunity in anti-trafficking strategies, using a multi-stakeholder approach that incorporates the expertise and recommendations from trafficking victims and survivor leaders.

- Encourage the private sector to develop effective internal controls, ethics, and compliance measures to prevent and detect bribery of foreign public officials and to prevent human trafficking, including in supply chains.

- Provide support for civil society, survivor, and media reporting on corrupt practices related to trafficking, to include anonymous reporting mechanisms and whistleblower protection.



# CHILD SOLDIERS PREVENTION ACT LIST

Section 402 of the Child Soldiers Prevention Act, as amended (CSPA) requires publication in the annual TIP Report of a list of foreign governments identified during the previous year as having governmental armed forces, police, or other security forces, or government-supported armed groups that recruit or use child soldiers, as defined in the CSPA. These determinations cover the reporting period beginning April 1, 2021 through March 31, 2022.

For the purpose of the CSPA, and generally consistent with the provisions of the Optional Protocol to the Convention on the Rights of the Child on the involvement of children in armed conflict, the term "child soldier" means:

i.   any person under 18 years of age who takes a direct part in hostilities as a member of governmental armed forces, police, or other security forces;
ii.  any person under 18 years of age who has been compulsorily recruited into governmental armed forces, police, or other security forces;
iii. any person under 15 years of age who has been voluntarily recruited into governmental armed forces, police, or other security forces; or
iv.  any person under 18 years of age who has been recruited or used in hostilities by armed forces distinct from the armed forces of a state.

The term "child soldier" includes any person described in clauses (ii), (iii), or (iv) who is serving in any capacity, including in a support role, such as a "cook, porter, messenger, medic, guard, or sex slave."

Governments identified on the list are subject to restrictions, in the following fiscal year, on certain security assistance and commercial licensing of military equipment. The CSPA prohibits assistance to governments that are identified in the list under the following authorities: International Military Education and Training, Foreign Military Financing, Excess Defense Articles, and Peacekeeping Operations, with exceptions for some programs undertaken pursuant to the Peacekeeping Operations authority. The CSPA also prohibits the issuance of licenses for direct commercial sales of military equipment to such governments. Beginning October 1, 2022, and effective throughout Fiscal Year 2023, these restrictions will apply to the listed countries, absent a presidential waiver, applicable exception, or reinstatement of assistance pursuant to the terms of the CSPA. The determination to include a government in the CSPA list is informed by a range of sources, including first-hand observation by U.S. government personnel and research and credible reporting from various UN entities, international organizations, local and international NGOs, and international and domestic media outlets.

Haiti AR_000531

**The 2022 CSPA List Includes Governments of the following countries:**

| | | |
|---|---|---|
| Afghanistan | Iran | South Sudan |
| Burma | Mali | Syria |
| Central African Republic | Russia | Venezuela |
| Congo, Democratic Republic of the | Somalia | Yemen |

# WHEN THE GOVERNMENT IS THE TRAFFICKER: STATE-SPONSORED TRAFFICKING IN PERSONS

While the TVPA and the UN TIP Protocol call on governments to proactively address trafficking crimes, some governments are part of the problem, directly compelling their citizens into sex trafficking or forced labor. From forced labor in local or national public work projects, military operations, economically important sectors, or as part of government-funded projects or missions abroad to sexual slavery on government compounds, officials use their power to exploit their nationals. To extract this work or service, governments coerce by threatening the withdrawal of public benefits, withholding salaries, failing to adhere to limits on national service, manipulating the lack of legal status of stateless individuals and other minority groups, threatening to punish family members, or conditioning services, food, or freedom of movement on labor or sex.

In 2019, Congress amended the TVPA to acknowledge that governments can also act as traffickers, referring specifically to a "government policy or pattern" of human trafficking, human trafficking in government-funded programs, forced labor in government-affiliated medical services or other sectors, sexual slavery in government camps, or the employment or recruitment of child soldiers. While the TVPA already directs the Secretary to consider the extent to which officials participated in, facilitated, condoned, or were otherwise complicit in trafficking when determining tier rankings, this new section more directly links government involvement in trafficking crimes to a Tier 3 ranking.

The 2022 Trafficking in Persons Report includes the following 11 governments with a documented "policy or pattern" of human trafficking, trafficking in government-funded programs, forced labor in government-affiliated medical services or other sectors, sexual slavery in government camps, or the employment or recruitment of child soldiers:

| | | | |
|---|---|---|---|
| Afghanistan | Cuba | Korea, Democratic People's Republic of | South Sudan |
| Burma | Eritrea | | Syria |
| China, People's Republic of | Iran | Russia | Turkmenistan |

# METHODOLOGY

The Department of State prepared this Report using information from U.S. embassies, government officials, nongovernmental and international organizations, published reports, news articles, academic studies, consultations with authorities and organizations in every region of the world, and information submitted to tipreport@state.gov. This email address provides a means by which organizations and individuals can share information with the Department of State throughout the year on government progress in addressing human trafficking.

U.S. diplomatic posts and domestic agencies reported on the human trafficking situation and governmental action to fight trafficking based on thorough research that included meetings with a wide variety of government officials, local and international NGO representatives, officials of international organizations, journalists, academics, and survivors. U.S. missions overseas are dedicated to covering human trafficking issues year-round. The 2022 Trafficking in Persons Report covers government efforts undertaken from April 1, 2021 through March 31, 2022.

## Tier Placement

The Department places each country in this Report onto one of four tiers, as mandated by the TVPA. This placement is based not on the size of a country's problem but on the extent of government efforts to meet the TVPA's minimum standards for the elimination of human trafficking (see page 58-61), which are generally consistent with the Palermo Protocol.

While Tier 1 is the highest ranking, it does not mean that a country has no human trafficking problem or that it is doing enough to address the crime. Rather, a Tier 1 ranking indicates that a government has made efforts to address the problem that meet the TVPA's minimum standards. To maintain a Tier 1 ranking, governments need to demonstrate appreciable progress each year in combating trafficking. Tier 1 represents a responsibility rather than a reprieve.

Tier rankings and narratives in the 2022 Trafficking in Persons Report reflect an assessment of the following:

▶ enactment of laws prohibiting severe forms of trafficking in persons, as defined by the TVPA, and provision of criminal punishments for trafficking crimes;

▶ criminal penalties prescribed for human trafficking crimes with a maximum of at least four years' deprivation of liberty, or a more severe penalty;

▶ implementation of human trafficking laws through vigorous prosecution of the prevalent forms of trafficking in the country and sentencing of traffickers;

▶ proactive victim identification measures with systematic procedures to guide law enforcement and



## PEOPLE'S REPUBLIC OF CHINA (PRC) - INDONESIA

PRC nationals Li Wei and Mao Chen lived in the PRC and needed work. An employment broker promised to help them get a job in rural Indonesia as part of the PRC's Belt and Road Initiative promising that the company would pay for their flight, shelter, food, and salary. But once Li Wei and Mao Chen arrived at the worksite—a smelting facility—they encountered a completely different situation than promised. The employer seized their passports and forced them to work 16-hour shifts with no pay and live in tiny quarters under the watch of armed guards. When Li Wei caught COVID-19, security guards forced him to continue working. A few months later, a subcontractor took over Li Wei and Mao Chen's contracts. This new employer also denied the men access to their passports and forced them to work long hours. Li Wei was able to escape from the facility but remains in Indonesia without money or documentation to return home. Mao Chen continues to suffer in conditions of forced labor at the hands of the subcontractor.



other government-supported front-line responders in the process of victim identification;

▶ government funding and partnerships with NGOs to provide victims with access to primary health care, counseling, and shelter, allowing them to recount their trafficking experiences to trained counselors and law enforcement in an environment of minimal pressure;

▶ victim protection efforts that include access to services and shelter without detention and with legal alternatives to removal to countries in which victims would face retribution or hardship;

▶ the extent to which a government ensures victims are provided with legal and other assistance and that, consistent with domestic law, proceedings are not prejudicial to victims' rights, dignity, or psychological well-being;

▶ the extent to which a government ensures the safe, humane, and to the extent possible, voluntary repatriation and reintegration of victims;

▶ governmental measures to prevent human trafficking, including efforts to curb practices identified as contributing factors to human trafficking, such as employers' confiscation of foreign workers' passports and allowing labor recruiters to charge fees to prospective migrants; and

▶ governmental efforts to reduce the demand for commercial sex acts and international sex tourism.

Tier rankings and narratives are **NOT** affected by the following:

▶ efforts, however laudable, undertaken exclusively by nongovernmental actors in the country;

▶ general public awareness events—government-sponsored or otherwise—lacking concrete ties to the prosecution of traffickers, protection of victims, or prevention of trafficking; and

▶ broad-based law enforcement or developmental initiatives.

# A Guide to the Tiers

## Tier 1

Countries whose governments fully meet the TVPA's minimum standards for the elimination of trafficking.

## Tier 2

Countries whose governments do not fully meet the TVPA's minimum standards but are making significant efforts to bring themselves into compliance with those standards.

## Tier 2 Watch List

Countries whose governments do not fully meet the TVPA's minimum standards but are making significant efforts to bring themselves into compliance with those standards, and for which:

▶ the estimated number of victims of severe forms of trafficking is very significant or is significantly increasing and the country is not taking proportional concrete actions; or

▶ there is a failure to provide evidence of increasing efforts to combat severe forms of trafficking in persons from the previous year, including increased investigations, prosecutions, and convictions of trafficking crimes, increased assistance to victims, and decreasing evidence of complicity in severe forms of trafficking by government officials.

## Tier 3

Countries whose governments do not fully meet the TVPA's minimum standards and are not making significant efforts to do so.

The TVPA, as amended, lists additional factors to determine whether a country should be on Tier 2 (or Tier 2 Watch List) versus Tier 3:

▶ the extent to which the country is a country of origin, transit, or destination for severe forms of trafficking;

▶ the extent to which the country's government does not meet the TVPA's minimum standards and, in particular, the extent to which officials or government employees have been complicit in severe forms of trafficking;

▶ reasonable measures that the government would need to undertake to be in compliance with the minimum standards in light of the government's resources and capabilities to address and eliminate severe forms of trafficking in persons;

▶ the extent to which the government is devoting sufficient budgetary resources to investigate and prosecute human trafficking, convict and sentence traffickers; and obtain restitution for victims of human trafficking; and

▶ the extent to which the government is devoting sufficient budgetary resources to protect victims and prevent the crime from occurring.

In addition, the TVPA directs the Secretary of State to consider, as proof of a country's failure to make significant efforts to fully meet the TVPA's minimum standards, a government policy or pattern of: trafficking; trafficking in government-funded programs; forced labor (in government-affiliated medical services, agriculture, forestry, mining, construction, or other sectors); sexual slavery in government camps, compounds, or outposts; or employing or recruiting child soldiers.

The TVPA also provides that any country that has been ranked Tier 2 Watch List for two consecutive years and that would otherwise be ranked Tier 2 Watch List for the next year will instead be ranked Tier 3 in that third year. The Secretary of State is authorized to waive this automatic downgrade only once, in that third year, based on credible evidence that a waiver is justified because the government has a written plan that, if implemented, would constitute making significant efforts to meet the TVPA's minimum standards for the elimination of trafficking and is devoting sufficient resources to implement the plan. The following year, a country must either go up to Tier 2 or down to Tier 3. Finally, the TVPA limits a country to one year on Tier 2 Watch List after that country received a waiver to stay on the Watch List and was subsequently downgraded to Tier 3.

## Funding Restrictions for Tier 3 Countries

Pursuant to the TVPA, governments of countries on Tier 3 may be subject to certain restrictions on foreign assistance, whereby the President may determine not to provide U.S. government nonhumanitarian, nontrade-related foreign assistance as defined in the TVPA. In addition, the President may determine to withhold funding for government official or employee participation in educational and cultural exchange programs in the case of certain Tier 3 countries. Consistent with the TVPA, the President may also determine to instruct the U.S. Executive Director of each multilateral development bank and the International Monetary Fund to vote against and use their best efforts to deny any loans or other uses of the institutions' funds to a designated Tier 3 country for most purposes (except for humanitarian, trade-related, and certain development-related assistance). Alternatively, the President may waive application of the foregoing restrictions upon a determination that the provision to a Tier 3 country of such assistance would promote the purposes of the TVPA or is otherwise in the national interest of the United States. The TVPA also authorizes the President to waive these restrictions if necessary to avoid significant adverse effects on vulnerable populations, including women and girls, and children.

Applicable assistance restrictions apply for the next Fiscal Year, which begins October 1, 2022.

Worldwide, governments have historically marginalized and continue to marginalize Indigenous persons economically and politically, causing Indigenous persons to become disproportionately affected by environmental degradation and armed conflict and increasing their vulnerability to sex trafficking and forced labor.



# TVPA MINIMUM STANDARDS FOR THE ELIMINATION OF TRAFFICKING IN PERSONS

## Trafficking Victims Protection Act of 2000, Div. A of Pub. L. No. 106-386, § 108, as amended.

1. The government of the country should prohibit severe forms of trafficking in persons and punish acts of such trafficking.

2. For the knowing commission of any act of sex trafficking involving force, fraud, coercion, or in which the victim of sex trafficking is a child incapable of giving meaningful consent, or of trafficking which includes rape or kidnapping or which causes a death, the government of the country should prescribe punishment commensurate with that for grave crimes, such as forcible sexual assault.

3. For the knowing commission of any act of a severe form of trafficking in persons, the government of the country should prescribe punishment that is sufficiently stringent to deter and that adequately reflects the heinous nature of the offense.

4. The government of the country should make serious and sustained efforts to eliminate severe forms of trafficking in persons.

## VENEZUELA-EGYPT

Kali grew up in Venezuela with her mother and two younger brothers. She was completing an engineering degree before her university closed due to the crisis in Venezuela. At a family party, she learned of an au pair opportunity offered through an online international hiring company, which promised to pay for the employee's travel, housing, food, and salary. Kali worked with the company to find a job and finally accepted a position with a wealthy family in Egypt that the hiring company claimed to have verified. Upon arrival, she was taken to a mansion where the employer confiscated her passport and forced her to live in the property's basement with seven other women. They held her and the women captive and forced them to work 18-hour days cleaning and providing childcare for no pay. One day while dropping off her employer's son at school, Kali met a woman who spoke Spanish. The woman introduced her to a group of Venezuelan women who agreed to help her escape. The women informed the Venezuelan embassy of Kali's domestic servitude. After three months of planning, Kali escaped. She now lives in Panama.

## Indicia of "Serious and Sustained Efforts"

1. Whether the government of the country vigorously investigates and prosecutes acts of severe forms of trafficking in persons, and convicts and sentences persons responsible for such acts, that take place wholly or partly within the territory of the country, including, as appropriate, requiring incarceration of individuals convicted of such acts. For purposes of the preceding sentence, suspended or significantly reduced sentences for convictions of principal actors in cases of severe forms of trafficking in persons shall be considered, on a case-by-case basis, whether to be considered an indicator of serious and sustained efforts to eliminate severe forms of trafficking in persons. After reasonable requests from the Department of State for data regarding investigations, prosecutions, convictions, and sentences, a government which does not provide such data, consistent with a demonstrably increasing capacity of such government to obtain such data, shall be presumed not to have vigorously investigated, prosecuted, convicted or sentenced such acts.

2. Whether the government of the country protects victims of severe forms of trafficking in persons and encourages their assistance in the investigation and prosecution of such trafficking, including provisions for legal alternatives to their removal to countries in which they would face retribution or hardship, and ensures that victims are not inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts as a direct result of being trafficked, including by providing training to law enforcement and immigration officials regarding the identification and treatment of trafficking victims using approaches that focus on the needs of the victims.

3. Whether the government of the country has adopted measures to prevent severe forms of trafficking in persons, such as measures to inform and educate the public, including potential victims, about the causes and consequences of severe forms of trafficking in persons, measures to establish the identity of local populations, including birth registration, citizenship, and nationality, measures to ensure that its nationals who are deployed abroad as part of a diplomatic, peacekeeping, or other similar mission do not engage in or facilitate severe forms of trafficking in persons or exploit victims of such trafficking, a transparent system for remediating or punishing such public officials as a deterrent, measures to prevent the use of forced labor or child labor in violation of international standards, effective bilateral, multilateral, or regional information sharing and cooperation arrangements with other countries, and effective policies or laws regulating foreign labor recruiters and holding them civilly and criminally liable for fraudulent recruiting.

4. Whether the government of the country cooperates with other governments in the investigation and prosecution of severe forms of trafficking in persons and has entered into bilateral, multilateral, or regional law enforcement cooperation and coordination arrangements with other countries.

5. Whether the government of the country extradites persons charged with acts of severe forms of trafficking in persons on substantially the same terms and to substantially the same extent as persons charged with other serious crimes (or, to the extent such extradition would be inconsistent with the laws of such country or with international agreements to which the country is a party, whether the government is taking all appropriate measures to modify or replace such laws and treaties so as to permit such extradition).

6. Whether the government of the country monitors immigration and emigration patterns for evidence of severe forms of trafficking in persons and whether law enforcement agencies of the country respond to any such evidence in a manner that is consistent with the vigorous investigation and prosecution of acts of such trafficking, as well as with the protection of human rights of victims and the internationally recognized human right to leave any country, including one's own, and to return to one's own country.

7. Whether the government of the country vigorously investigates, prosecutes, convicts, and sentences public officials, including diplomats and soldiers, who participate in or facilitate severe forms of trafficking in persons, including nationals of the country who are deployed abroad as part of a diplomatic, peacekeeping, or other similar mission who engage in or facilitate severe forms of trafficking in persons or exploit victims of such trafficking, and takes all appropriate measures against officials who condone or enable such trafficking. A government's failure to appropriately address public allegations against such public officials, especially once such officials have returned to their home countries, shall be considered inaction under these criteria. After reasonable requests from the Department of State for data regarding such investigations, prosecutions, convictions, and sentences, a government which does not provide such data, consistent with a demonstrably increasing capacity of such government to obtain such data, shall be presumed not to have vigorously investigated, prosecuted, convicted, or sentenced such acts.

8. Whether the percentage of victims of severe forms of trafficking in the country that are non-citizens of such countries is insignificant.

9. Whether the government has entered into effective, transparent partnerships, cooperative arrangements, or agreements that have resulted in concrete and measurable outcomes with -

   a. domestic civil society organizations, private sector entities, or international nongovernmental organizations, or into multilateral or regional arrangements or agreements, to assist the government's efforts to prevent trafficking, protect victims, and punish traffickers; or
   b. the United States toward agreed goals and objectives in the collective fight against trafficking.

10. Whether the government of the country, consistent with the capacity of such government, systematically monitors its efforts to satisfy the criteria described in paragraphs (1) through (8) and makes available publicly a periodic assessment of such efforts.

11. Whether the government of the country achieves appreciable progress in eliminating severe forms of trafficking when compared to the assessment in the previous year.

12. Whether the government of the country has made serious and sustained efforts to reduce the demand for –
   a. commercial sex acts; and
   b. participation in international sex tourism by nationals of the country.

Haiti_AB_000542



**Countries in the 2022 TIP Report that are not Party to the Protocol to Prevent, Suppress and Punish Trafficking In Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime**

Bhutan

Congo, Republic of the

Iran

Korea, Democratic People's Republic of

Marshall Islands

Pakistan

Papua New Guinea

Solomon Islands

Somalia

South Sudan

Tonga

Uganda

Vanuatu

Yemen

# GLOBAL LAW ENFORCEMENT DATA

The 2003 reauthorization of the TVPA added to the original law a new requirement that foreign governments provide the Department of State with data on trafficking investigations, prosecutions, convictions, and sentences in order to fully meet the TVPA's minimum standards for the elimination of trafficking (Tier 1). The 2004 TIP Reportcollected this data for the first time. The 2007 TIP Report showed for the first time a breakout of the number of total prosecutions and convictions that related to labor trafficking, placed in parentheses.

| YEAR | PROSECUTIONS | CONVICTIONS | VICTIMS IDENTIFIED | NEW OR AMENDED LEGISLATION |
|------|--------------|-------------|--------------------|----------------------------|
| 2015 | 19,127 (857) | 6,615 (456) | 77,823 (14,262) | 30 |
| 2016 | 14,939 (1,038) | 9,072 (717) | 68,453 (17,465) | 25 |
| 2017 | 17,471 (869) | 7,135 (332) | 96,960 (23,906) | 5 |
| 2018 | 11,096 (457) | 7,481 (259) | 85,613 (11,009) | 5 |
| 2019 | 11,841 (1,024) | 9,548 (498) | 118,932 (13,875) | 7 |
| 2020 | 9,876 (1,115) | 5,011 (337) | 109,216 (14,448) | 16 |
| 2021 | 10,572 (1,379) | 5,260 (374) | 90,354 (21,219) | 15 |

*The above statistics are estimates derived from data provided by foreign governments and other sources and reviewed by the Department of State. Aggregate data fluctuates from one year to the next due to the hidden nature of trafficking crimes, dynamic global events, shifts in government efforts, and a lack of uniformity in national reporting structures. The numbers in parentheses are those of labor trafficking prosecutions, convictions, and victims identified.*



A ladder descends into a mine.  Mining is a highly hazardous sector and considered a worst form of child labor.  Children are especially at risk as they are commonly used to enter narrow mine shafts where adults do not fit and are exposed to highly toxic substances that can have profound health effects.



# 2022 TIP REPORT HEROES

Each year, the Department of State honors individuals around the world who have devoted their lives to the fight against human trafficking. These individuals include NGO workers, lawmakers, government officials, survivors of human trafficking, and concerned citizens. They are recognized for their tireless efforts—despite some working in challenging environments where human trafficking concerns remain pervasive and facing resistance, opposition, or threats to their lives—to protect victims, punish offenders, and mitigate the underlying factors that cause vulnerabilities traffickers often target.

For more information about current and past TIP Report Heroes, please visit the TIP Report Heroes Global Network at **www.tipheroes.org.**

Haiti AR_000545

## MOHAMMED TARIQUL ISLAM
**BANGLADESH**



## MAJOR MOHAMMAD AL-KHLAIFAT
**JORDAN**



Mohammed Tariqul Islam is a tireless advocate for victims of human trafficking whose work has helped increase the Bangladesh government's capacity to investigate and prosecute traffickers. Mr. Islam has led anti-trafficking organizations that have facilitated assistance to more than 2,000 trafficking victims. He has worked diligently with victims of human trafficking to either provide or connect them to the services they need in many of these cases. In 2017, Mr. Islam started the Bangladesh branch of the UK-based NGO Justice & Care, where he currently serves as country director. Justice & Care's work spans almost every aspect of anti-trafficking work, including direct implementation of victim services, repatriation of survivors, and assisting law enforcement and the judiciary with trafficking cases.

Mr. Islam has also supported the Bangladeshi government's anti-trafficking efforts to achieve measurable progress in key areas, including those that address recommendations in the 2021 TIP Report. For example, Mr. Islam has organized cross-border consultations between Bangladesh and India to increase collaboration on victim repatriation efforts. Additionally, Mr. Islam's close working relationship with the Ministry of Home Affairs helped facilitate a strong partnership between the public and private sector, including by helping the Ministry draft its National Plan of Action (2018-2022) to combat human trafficking. Mr. Islam's trusted advice, authentic perspective, and frontline experiences make him a leader and respected voice in shaping Bangladesh's response to trafficking.

Major Mohammad al-Khlaifat has striven to eliminate human trafficking in Jordan by leading the Public Security Directorate's Counter Trafficking Unit (CTU), a police unit with embedded Ministry of Labor and Ministry of Health (MOH) personnel, and also by proactively identifying and supporting trafficking victims. Since becoming acting head of the CTU in July 2020, Major Khlaifat has led efforts to strengthen cooperation between Jordanian government agencies, civil society, and international NGOs. He initiated new ways to collaborate with the Ministry of Social Development and the Jordanian Women's Union (a women's shelter NGO) to ensure trafficking victims received responsive and equitable protection and support services. He also coordinated between the Public Security Directorate and Ministry of Justice to launch a new case management system that improved collaboration between investigators and prosecutors.

Major Khlaifat formalized information-sharing efforts between the CTU and the Public Security Directorate's Vice Unit, which generated a third of the CTU's trafficking cases in 2021. He leveraged relationships gained from a prior assignment as an air marshal to reach a formal agreement between the CTU and Civil Aviation Regulatory Authority that increased screening for potential trafficking victims at Jordan's airports. He also guided police liaisons in refugee camps to screen for trafficking indicators. To continue operations under pandemic conditions, he deployed COVID-19 tests with the MOH to allow CTU officers to safely address the needs of victims. Major Khlaifat has proven instrumental in collaborating with partners, including the U.S. government, to combat human trafficking.

## JUDGE CORNELIUS WENNAH
# LIBERIA



## IRENA DAWID-OLCZYK
# POLAND



In a post-conflict country facing resource challenges and weak rule of law, Judge Wennah has demonstrated tireless devotion to improve Liberia's anti-trafficking record. He was sworn in as a Residential Judge early this year. Prior to this position, he was Head of Felonious Crimes and a prosecutor in the Ministry of Justice (MOJ), investigating, prosecuting, and advising on anti-trafficking matters and other crimes. He is distinguished for developing anti-trafficking training curricula and serving as a trainer on a country-wide project.

In his last four years as a prosecutor, he prosecuted seven trafficking cases, winning five and losing one, with one remaining under appeal. These numbers are significant given Liberia's overall low number of trafficking cases prosecuted in the past few years. Judge Wennah has also advocated for the inclusion of traditional leaders and civil society organizations in Liberia's National Anti-Trafficking Task Force.

Since 2020, Judge Wennah has assisted the International Development Law Organization to develop international-standard-level human trafficking training curriculum for judges, prosecutors, and law enforcement personnel, all to raise awareness and strengthen justice sector actors' capacities to prevent and address human trafficking. Judge Wennah was instrumental in the development and adoption of a trafficking bench book for judges and a handbook for law enforcement and prosecutors—harmonizing international standards and local practice—without compromising on best practices, lessons learned, or international standards.

Ms. Dawid-Olczyk is a human rights activist and President of La Strada Poland who has devoted much of her professional life to assisting human trafficking victims. In 1995, she co-founded what is now known as the La Strada Foundation Against Trafficking in Persons and Slavery—a leading NGO based in Warsaw that provides comprehensive assistance to trafficking victims. For years, she has advocated for the creation of a strong system of assistance and support for trafficking victims. In 2009, she conceptualized and secured funding from the Ministry of the Interior and Administration for the National Intervention and Consultation Center for Victims of Human Trafficking (KCIK). Every year, La Strada has successfully competed to run KCIK, which directly assists more than 200 victims of human trafficking, providing them with safe shelter, psychological and medical care, legal counseling, and other needed services. Ms. Dawid-Olczyk also created several training programs on combating human trafficking and generated the idea to organize a Human Trafficking Film Festival in Warsaw. She is a consultant for films, theater plays, and television programs that feature human trafficking and appears in media as an expert on human trafficking.

Ms. Dawid-Olczyk has been an important partner for the Polish government for years, and her organization has been the government's primary partner in providing assistance to trafficking victims. Since the beginning of the refugee crisis on the Poland-Ukraine border, La Strada has been actively involved in prevention and public awareness activities. The organization prepared guidelines with basic safety rules for refugees from Ukraine and staffed a hotline to respond to dangerous situations that could be connected to human trafficking.

APINYA TAJIT
## THAILAND



Ms. Apinya is the Deputy Director of the Stella Maris Seafarer's Center, an NGO in Thailand. Stella Maris provides pastoral care, services, and support for workers in the Thai fishing industry. Ms. Apinya has dedicated herself for more than seven years to combating human trafficking in Thailand, and she has worked tirelessly to assist workers exploited in forced labor. She has helped hundreds of workers in the fishing sector from various countries, including Thailand, Indonesia, Cambodia, Burma, and Bangladesh, and has also played an active role in raising awareness of child trafficking. Ms. Apinya visits schools throughout the country to educate more than 10,000 students each year.

Ms. Apinya provides assistance to Thai authorities in the victim identification process, which can be especially difficult as fishing vessels are out to sea for months at a time. In one instance, authorities did not initially identify workers on a refrigerated cargo ship as victims of trafficking. Upon Ms. Apinya's request, however, authorities conducted a new round of screening for these workers and, with her assistance, identified all of the workers as trafficking victims. Her assistance often does not end when individuals are identified as victims of trafficking, however; she also helps them reintegrate into society and avoid revictimization. Using her in-depth knowledge, Ms. Apinya has helped Thai authorities understand the lives of fishermen. Through several trainings for anti-trafficking authorities, Ms. Apinya helped to improve their capacity to detect indicators of exploitation at sea.

KATERYNA CHEREPAKHA
## UKRAINE



Kateryna Cherepakha is the president of La Strada Ukraine, an NGO established in 1997 to combat trafficking in persons, gender-based violence, and domestic violence; ensure gender equality; and protect the rights of children. She spearheads the organization's strategic planning, collaborates extensively with national and international stakeholders, and is engaged in advocacy, monitoring, capacity-building efforts, training, and networking.

Ms. Cherepakha began at La Strada Ukraine as a human trafficking prevention hotline consultant in 1998. She assisted in the expansion of the hotline from a weekly service to an around-the-clock toll-free resource that supports victims of human trafficking, gender-based violence, and domestic violence daily. Since the start of Russia's war against Ukraine, the telephone and online hotline has seen a manifold increase in calls for assistance. It has remained open under her leadership and as a result, thousands of Ukrainians have been able to access crucial information, advice, and assistance to keep themselves safe from trafficking and exploitation.

Additionally, Ms. Cherepakha is an OSCE National Expert on developing and conducting training courses for emergency, police, and hotline personnel, including in addressing gender-based violence and domestic violence cases, and effectively handling calls from children. As a Council of Europe National Expert, she contributed to the development of the "Combating violence against women and domestic violence: A practical manual for police officers" in 2020. Not only has Ms. Cherepakha represented trafficking victims, but she also has been an outspoken advocate for gender equality.

A survivor of human trafficking reflects on her journey. Governments and NGOs often play an important role in providing comprehensive protective services to survivors of human trafficking. As part of a photo story, the photographer collaborated with this survivor to understand how she would like to be presented.

Haiti AR_000549

# TIER PLACEMENTS AND REGIONAL MAPS

## TIER 1

| | | | | |
|---|---|---|---|---|
| ARGENTINA | CANADA | FINLAND | LITHUANIA | SLOVENIA |
| AUSTRALIA | CHILE | FRANCE | LUXEMBOURG | SPAIN |
| AUSTRIA | COLOMBIA | GEORGIA | NAMIBIA | SWEDEN |
| THE BAHAMAS | CYPRUS | GERMANY | NETHERLANDS | TAIWAN |
| BAHRAIN | CZECH REPUBLIC | GUYANA | PHILIPPINES | UNITED KINGDOM |
| BELGIUM | ESTONIA | ICELAND | SINGAPORE | UNITED STATES OF AMERICA |

## TIER 2

| | | | | |
|---|---|---|---|---|
| ALBANIA | CROATIA | KENYA | NEPAL | SRI LANKA |
| ANGOLA | DENMARK | KOREA, REPUBLIC OF | NEW ZEALAND | ST. VINCENT |
| ARMENIA | DOMINICAN REPUBLIC | KOSOVO | NIGER | AND THE GRENADINES |
| AZERBAIJAN | ECUADOR | KYRGYZ REPUBLIC | NIGERIA | SUDAN |
| BANGLADESH | EGYPT | LAOS | NORTH MACEDONIA | SURINAME |
| BARBADOS | FIJI | LATVIA | NORWAY | SWITZERLAND |
| BELIZE | THE GAMBIA | LEBANON | OMAN | TAJIKISTAN |
| BENIN | GHANA | LESOTHO | PAKISTAN | TANZANIA |
| BOLIVIA | GREECE | LIBERIA | PANAMA | THAILAND |
| BOSNIA | GUATEMALA | MALAWI | PARAGUAY | TIMOR-LESTE |
| AND HERZEGOVINA | HONDURAS | MALDIVES | PERU | TOGO |
| BOTSWANA | HUNGARY | MALTA | POLAND | TUNISIA |
| BRAZIL | INDIA | MARSHALL ISLANDS | PORTUGAL | TURKEY |
| BURUNDI | IRAQ | MAURITIUS | QATAR | UGANDA |
| CABO VERDE | IRELAND | MEXICO | ROMANIA | UKRAINE |
| CENTRAL | ISRAEL | MICRONESIA | RWANDA | UNITED ARAB EMIRATES |
| AFRICAN REPUBLIC | ITALY | MOLDOVA | SAUDI ARABIA | URUGUAY |
| CONGO, | JAMAICA | MONGOLIA | SEYCHELLES | UZBEKISTAN |
| REPUBLIC OF THE | JAPAN | MONTENEGRO | SIERRA LEONE | VANUATU |
| COSTA RICA | JORDAN | MOROCCO | SLOVAK REPUBLIC | |
| COTE D'IVOIRE | KAZAKHSTAN | MOZAMBIQUE | SOLOMON ISLANDS | |

## TIER 2 WATCH LIST

| | | | | |
|---|---|---|---|---|
| ALGERIA | CHAD | ETHIOPIA | MALI | TONGA |
| ANTIGUA | COMOROS | GABON | MAURITANIA | TRINIDAD AND TOBAGO |
| AND BARBUDA | CONGO, DEMOCRATIC | GUINEA | PALAU | ZAMBIA |
| ARUBA | REPUBLIC OF THE | HAITI | PAPUA NEW GUINEA | ZIMBABWE |
| BHUTAN | DJIBOUTI | HONG KONG | SAINT LUCIA | |
| BULGARIA | EL SALVADOR | INDONESIA | SENEGAL | |
| BURKINA FASO | EQUATORIAL GUINEA | KUWAIT | SERBIA | |
| CAMEROON | ESWATINI | MADAGASCAR | SOUTH AFRICA | |

## TIER 3

| | | | | |
|---|---|---|---|---|
| AFGHANISTAN | CHINA, | GUINEA-BISSAU | MALAYSIA | SYRIA |
| BELARUS | PEOPLE'S REPUBLIC OF | IRAN | NICARAGUA | TURKMENISTAN |
| BRUNEI | CUBA | KOREA, DEMOCRATIC | RUSSIA | VENEZUELA |
| BURMA | CURAÇAO | PEOPLE'S REPUBLIC OF | SINT MAARTEN | VIETNAM |
| CAMBODIA | ERITREA | MACAU | SOUTH SUDAN | |

## SPECIAL CASE

| | | |
|---|---|---|
| LIBYA | SOMALIA | YEMEN |



AFRICA

Boundary representation is not authoritative.

## TIER PLACEMENTS

🟩 TIER 1   🟨 TIER 2   🟧 TIER 2 WATCH LIST   🟥 TIER 3   🟦 SPECIAL CASE

| YEAR | PROSECUTIONS | CONVICTIONS | VICTIMS IDENTIFIED | NEW OR AMENDED LEGISLATION |
|------|--------------|-------------|--------------------|----------------------------|
| 2015 | 1,517 (53) | 719 (8) | 12,125 (3,531) | 6 |
| 2016 | 1,293 (54) | 1,120 (21) | 18,296 (13,205) | 4 |
| 2017 | 1,325 (98) | 515 (34) | 26,517 (5,902) | 2 |
| 2018 | 1,253 (37) | 1,190 (29) | 24,407(3,749) | 2 |
| 2019 | 955 (71) | 2,122 (32) | 42,517 (1,284) | 2 |
| 2020 | 1,493 (251) | 382 (107) | 28,538 (6,947) | 8 |
| 2021 | 1,686 (265) | 659 (68) | 11,450 (3,643) | 3 |

*The above statistics are estimates derived from data provided by foreign governments and other sources and reviewed by the Department of State. Aggregate data fluctuates from one year to the next due to the hidden nature of trafficking crimes, dynamic global events, shifts in government efforts, and a lack of uniformity in national reporting structures. The numbers in parentheses are those of labor trafficking prosecutions, convictions, and victims identified.*

Haiti AR_000551



# EAST ASIA & PACIFIC

Boundary representation is not authoritative.

## TIER PLACEMENTS

🟩 TIER 1 🟨 TIER 2 🟧 TIER 2 WATCH LIST 🟥 TIER 3

| YEAR | PROSECUTIONS | CONVICTIONS | VICTIMS IDENTIFIED | NEW OR AMENDED LEGISLATION |
|------|--------------|-------------|--------------------|-----------------------------|
| 2015 | 3,414 (193) | 1,730 (130) | 13,990 (3,533) | 10 |
| 2016 | 2,137 (51) | 1,953 (31) | 9,989 (310) | 7 |
| 2017 | 2,949 (77) | 3,227 (72) | 4,915 (669) | 0 |
| 2018 | 2,351 (63) | 1,275 (16) | 5,466 (291) | 1 |
| 2019 | 3,276 (86) | 3,662 (20) | 14,132 (7,687) | 2 |
| 2020 | 1,838 (70) | 1,502 (12) | 2,884 (691) | 1 |
| 2021 | 1,440 (73) | 1,066 (60) | 3,348 (859) | 0 |

*The above statistics are estimates derived from data provided by foreign governments and other sources and reviewed by the Department of State. Aggregate data fluctuates from one year to the next due to the hidden nature of trafficking crimes, dynamic global events, shifts in government efforts, and a lack of uniformity in national reporting structures. The numbers in parentheses are those of labor trafficking prosecutions, convictions, and victims identified.*



# EUROPE

Boundary representation is not authoritative.

## TIER PLACEMENTS



🟩 TIER 1    🟨 TIER 2    🟧 TIER 2 WATCH LIST    🟥 TIER 3

| YEAR | PROSECUTIONS | CONVICTIONS | VICTIMS IDENTIFIED | NEW OR AMENDED LEGISLATION |
|------|--------------|-------------|--------------------|-----------------------------|
| 2015 | 4,990 (272) | 1,692 (245) | 11,112 (3,733) | 8 |
| 2016 | 2,703 (201) | 1,673 (40) | 13,349 (3,192) | 3 |
| 2017 | 2,548 (179) | 1,257 (53) | 12,750 (3,330) | 0 |
| 2018 | 2,394 (234) | 1,379 (80) | 16,838 (2,675) | 1 |
| 2019 | 2,896 (106) | 1,346 (41) | 17,383 (1,369) | 2 |
| 2020 | 2,355 (101) | 1,291 (33) | 18,173 (1,082) | 2 |
| 2021 | 3,285 (86) | 1,905 (92) | 21,347 (2,124) | 5 |

*The above statistics are estimates derived from data provided by foreign governments and other sources and reviewed by the Department of State. Aggregate data fluctuates from one year to the next due to the hidden nature of trafficking crimes, dynamic global events, shifts in government efforts, and a lack of uniformity in national reporting structures. The numbers in parentheses are those of labor trafficking prosecutions, convictions, and victims identified.*

Haiti AR_000553



# NEAR EAST

Boundary representation is not authoritative.

## TIER PLACEMENTS

■ TIER 1    ■ TIER 2    ■ TIER 2 WATCH LIST    ■ TIER 3    ■ SPECIAL CASE

| YEAR | PROSECUTIONS | CONVICTIONS | VICTIMS IDENTIFIED | NEW OR AMENDED LEGISLATION |
|---|---|---|---|---|
| 2015 | 480 (31) | 343 (31) | 6,068 (156) | 0 |
| 2016 | 996 (591) | 1,187 (582) | 3,292 (185) | 4 |
| 2017 | 974 (112) | 104 (11) | 1,834 (53) | 0 |
| 2018 | 738 (10) | 155 (7) | 2,675 (83) | 0 |
| 2019 | 788 (44) | 419 (22) | 3,619 (35) | 0 |
| 2020 | 533 (106) | 414 (84) | 3,461 (1,827) | 0 |
| 2021 | 869 (356) | 353 (88) | 3,440 (1,127) | 1 |

*The above statistics are estimates derived from data provided by foreign governments and other sources and reviewed by the Department of State. Aggregate data fluctuates from one year to the next due to the hidden nature of trafficking crimes, dynamic global events, shifts in government efforts, and a lack of uniformity in national reporting structures. The numbers in parentheses are those of labor trafficking prosecutions, convictions, and victims identified.*



## TIER PLACEMENTS

🟩 TIER 1    🟨 TIER 2    🟧 TIER 2 WATCH LIST    🟥 TIER 3

| YEAR | PROSECUTIONS | CONVICTIONS | VICTIMS IDENTIFIED | NEW OR AMENDED LEGISLATION |
|------|-------------|-------------|--------------------|-----------------------------|
| 2015 | 6,930 (225) | 1,468 (16) | 24,867 (1,191) | 0 |
| 2016 | 6,297 (72) | 2,193 (19) | 14,706 (464) | 5 |
| 2017 | 8,105 (264) | 1,063 (48) | 40,857 (11,813) | 2 |
| 2018 | 3,102 (41) | 2,465 (9) | 24,544 (1,841) | 1 |
| 2019 | 2,602 (616) | 1,156 (349) | 28,929 (3,227) | 1 |
| 2020 | 2,747 (532) | 834 (74) | 45,060 (3,275) | 3 |
| 2021 | 1,910(479) | 483 (17) | 38,426 (12,426) | 2 |

*The above statistics are estimates derived from data provided by foreign governments and other sources and reviewed by the Department of State. Aggregate data fluctuates from one year to the next due to the hidden nature of trafficking crimes, dynamic global events, shifts in government efforts, and a lack of uniformity in national reporting structures. The numbers in parentheses are those of labor trafficking prosecutions, convictions, and victims identified.*

Haiti AR_000555



# WESTERN HEMISPHERE

Boundary representation is not authoritative.

Aruba*
Curaçao*
Sint Maarten*

Islands not shown to scale or relative position.

*Aruba, Curaçao, and Sint Maarten are semi-autonomous entities within the Kingdom of the Netherlands located in the Caribbean Sea.

## TIER PLACEMENTS

🟩 TIER 1    🟨 TIER 2    🟧 TIER 2 WATCH LIST    🟥 TIER 3

| YEAR | PROSECUTIONS | CONVICTIONS | VICTIMS IDENTIFIED | NEW OR AMENDED LEGISLATION |
|------|-------------|-------------|-------------------|---------------------------|
| 2015 | 1,796 (83) | 663 (26) | 9,661 (2,118) | 6 |
| 2016 | 1,513 (69) | 946 (24) | 8,821 (109) | 2 |
| 2017 | 1,571 (139) | 969 (114) | 10,011 (2,139) | 1 |
| 2018 | 1,252 (72) | 1,017 (177) | 11,683 (2,370) | 0 |
| 2019 | 1,324 (101) | 843 (34) | 12,352 (273) | 0 |
| 2020 | 910 (55) | 588 (27) | 11,100 (626) | 2 |
| 2021 | 1,382 (120) | 794 (49) | 12,343 (1,040) | 4 |

*The above statistics are estimates derived from data provided by foreign governments and other sources and reviewed by the Department of State. Aggregate data fluctuates from one year to the next due to the hidden nature of trafficking crimes, dynamic global events, shifts in government efforts, and a lack of uniformity in national reporting structures. The numbers in parentheses are those of labor trafficking prosecutions, convictions, and victims identified.*

# HOW TO READ A COUNTRY NARRATIVE

This page shows a sample country narrative. The tier ranking justification appears in the first paragraph of each country narrative and includes language that explicitly highlights the factors supporting a given tier ranking. The Prosecution, Protection, and Prevention sections of each country narrative describe how a government has or has not addressed the relevant TVPA minimum standards (see pages 58-61), during the reporting period. This truncated narrative gives a few examples.

*The country's tier ranking is based on the government's efforts to combat trafficking as measured against the TVPA minimum standards and compared to its efforts in the preceding year.*

## COUNTRY X: TIER 2 WATCH LIST

*Synopsis of key developments that support the country's tier ranking.*

The Government of X does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included raising awareness raising efforts and reaffirming its commitment to enact anti-trafficking legislations. However, the government did not demonstrate overall increasing efforts compared to the previous reporting period. The government did not show evidence of overall progress in prosecuting and punishing trafficking offenders and identifying victims of trafficking. Therefore, X remained on Tier 2 Watch List for the second consecutive year.

*Prioritized recommendations for how the government can better meet the TVPA minimum standards.*

### PRIORITIZED RECOMMENDATIONS:
Enact the draft comprehensive anti-trafficking legislation • Significantly increase efforts to investigate and prosecute trafficking offenses, and convict and punish offenders • Institute and consistently apply procedures to identify victims of trafficking among vulnerable populations, such as those arrested for immigration violations or prostitution • Collect, disaggregate, analyze and disseminate comprehensive law enforcement data.

*TVPA Minimum Standards 1-3—whether the government prohibits all forms of trafficking and prescribes adequate criminal punishments.*

*Summary of the government's anti-trafficking laws and law enforcement efforts.*

### PROSECUTION
The Government of Country X decreased efforts to investigate and prosecute trafficking offenses during the reporting period. Country X does not prohibit all forms of trafficking, but it criminalizes slavery under Section 321 and forced labor under Section 322 of its criminal law. The prescribed penalty for forced labor—up to six months' imprisonment—is not sufficiently stringent. Article 297 prohibits forced or coerced prostitution, and the prostitution of a child below age 15 even if there was no compulsion or redress; the prescribed penalty is up to 15 years' imprisonment, which is commensurate with penalties prescribed for other serious crimes, such as rape. Draft revisions to the penal code have not yet been enacted. An unconfirmed report indicates that four traffickers were charged with fraudulently issuing visas to workers who they then exploited. Two were reportedly deported, and two were reportedly convicted. The government did not confirm nor deny the existence of this case. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking offenses.

*TVPA Minimum Standard 4(1)—whether the government vigorously investigates and prosecutes trafficking offenses; convicts and punishes trafficking offenders; and provides data on these actions.*

*Summary of the government's efforts to ensure trafficking victims are identified and provided adequate protection.*

### PROTECTION
Country X maintained minimal efforts to protect victims of trafficking during the reporting period. Although health care facilities reportedly refer suspected abuse cases to the government anti-trafficking shelter for investigation, the government continues to lack a systematic procedure for law enforcement to identify victims of trafficking among vulnerable populations, such as foreign workers awaiting deportation and women arrested for involvement in commercial sex; as a result, victims may be punished and automatically deported without being identified as victims or offered protection. The government reported that the Ministry of the Interior has a process by which it refers victims to the trafficking shelter; however, this process is underutilized in practice. The trafficking shelter assisted 24 individuals during the reporting period and provided them with a wide range of services,including full medical treatment and legal and job assistance.

*TVPA Minimum Standard 4(2)—whether the government adequately protects victims of trafficking by identifying them and ensuring they have access to necessary services.*

Country X commonly fines and detains potential trafficking victims for unlawful acts their traffickers forced them to commit, such as immigration violations and leaving from their sponsors without determining whether the individuals are victims of trafficking.

Country X sometimes offers temporary relief from deportation so that victims can testify as witnesses against their employers. However, victims were generally not permitted to leave the country if there is a pending case. The government did not routinely encourage victims to assist in trafficking investigations or consistently offer victims alternatives to removal to countries where they may face retribution or hardship.

*TVPA Minimum Standard 4(2)—whether the government ensures victims are not penalized for the unlawful acts that traffickers forced them to commit and encourages victim participation in investigations and prosecutions, including by providing legal alternatives to their removal from the country.*

### PREVENTION
Country X increased efforts to prevent trafficking in persons during the reporting period. While the government made no apparent effort to amend provisions of Country X's sponsorship law to help prevent the forced labor of migrant workers, the government did start to enforce other parts of the law to the benefit of migrant workers. One provision in the sponsorship law continues to require foreign workers to request exit permits from their sponsors in order to leave Country X. Although this may increase migrant workers' vulnerability to forced labor, the law created a new process through which a laborer who was not granted an exit permit due to a sponsor's refusal or other circumstances can seek one by other means. The Ministry of Labor sponsored media campaigns and organized informational workshops for officials, NGOs, and labor recruitment agencies. However, the government did not provide anti-trafficking training or guidance to its diplomatic personnel during the reporting period. The government has a national plan of action to address trafficking in persons, but did not publicly disseminate the plan or take steps to implement it during the reporting period. The government did not implement any public awareness campaigns aimed at reducing the demand for commercial sex acts in Country X, but it convicted two of its nationals for soliciting children for sex in other countries and sentenced them to 10 years' imprisonment.

*TVPA Minimum Standard 4(3)—whether the government is making adequate efforts to prevent human trafficking.*

*Summary of the government's efforts to prevent human trafficking.*

*TVPA Minimum Standard 4(7)—whether the government has made adequate efforts to address the involvement in or facilitation of human trafficking by government employees.*

### TRAFFICKING PROFILE
As reported over the past five years, human traffickers exploit domestic and foreign victims in Country X, and traffickers exploit victims from Country X abroad. Men and women from South and Southeast Asia, East Africa, and the Middle East voluntarily travel to Country X as laborers and domestic servants, but subsequently face conditions indicative of involuntary servitude. These conditions include threats of serious harm, including financial harm; job switching; withholding of pay; restrictions on freedom of movement, including the confiscation of passports and travel documents and physical or sexual abuse. In some cases, arriving migrant laborers have found that the terms of employment in Country X are wholly different from those they agreed to in their home countries. Individuals employed as domestic servants are particularly vulnerable to trafficking since they are not covered under the provisions of the labor law. A small number of foreign workers transit Country X and are forced to work on farms in Country Y. Country X is also a destination for women who migrate and become involved in commercial sex, but the extent to which these women are subjected to sex trafficking is unknown.

*TVPA Minimum Standard 4(12)—whether the government has made efforts to reduce the demand for commercial sex acts, and, if applicable, participation in international sex tourism by its nationals.*

*Overview of human trafficking in the country and factors affecting vulnerability to trafficking of the country's nationals abroad.*



# COUNTRY NARRATIVES

Migrant workers sit near a construction site. Workers in the construction industry are highly vulnerable to human trafficking and are typically paid low wages to do jobs often referred to as "three D" jobs for "dirty, dangerous, and difficult."

# AFGHANISTAN: TIER 3

**AFGHANISTAN**

The United States has not recognized the Taliban or another entity as the government of Afghanistan. All references to "the *pre*-August 15 government" refer to the Islamic Republic of Afghanistan. References to the Taliban reflect events both prior to and after August 15.

Afghanistan does not fully meet the minimum standards for the elimination of trafficking and, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity, is not making significant efforts to do so; therefore Afghanistan remained on Tier 3. On August 15, 2021, the Taliban culminated its takeover of Kabul. On September 7, 2021, the Taliban announced a so-called interim government made up almost entirely of male Taliban fighters, clerics, and political leaders. As of December 2021, the Taliban announced most of its "interim cabinet" but had not outlined steps or a timeline to establish a new permanent government. Substantial personnel turnover and closing of some ministries related to the August 15 Taliban takeover severely hindered Afghanistan's ability to maintain consistent anti-trafficking efforts and report on those efforts for this reporting period. Despite the lack of significant efforts, the pre-August 15 government took some steps to address trafficking, including developing awareness materials to train government officials on human trafficking. However, during the reporting period, there was a pattern of employing or recruiting child soldiers, both by the pre-August 15 government and by the Taliban after August 15. The pre-August 15 government continued a government pattern of sexual slavery in government compounds (*Bacha bazi*—a practice in which men exploit boys for social and sexual entertainment). After August 15, the Taliban did not investigate, prosecute, or convict any traffickers, nor did it identify or protect any trafficking victims or make any efforts to prevent trafficking. The Taliban shut down shelters and protective services for victims of crime, including trafficking victims—leaving vulnerable populations without support. The Taliban continued to undermine the rights of women, minorities, and other vulnerable populations, increasing internal displacement and irregular migration, further exacerbating vulnerabilities to trafficking.



## PRIORITIZED RECOMMENDATIONS:

Cease the unlawful recruitment and use of children by the Taliban and demobilize children from all armed groups with adequate protection and reintegration support. • Recognize and use existing anti-trafficking laws to combat human trafficking. • While respecting due process, investigate, prosecute, and convict perpetrators of labor and sex trafficking, including *Bacha bazi*, and the unlawful recruitment and use of child soldiers, including by Taliban members. • Ensure the re-opening of victim shelters throughout the country. • Proactively identify victims of all forms of trafficking, including victims of *Bacha bazi*, and provide them with appropriate protection services, including shelter and long-term care for demobilized child soldiers. • Designate a specific entity to coordinate inter-ministerial anti-trafficking efforts. • Draft, finalize, and implement a National Action Plan (NAP) to combat trafficking in persons.

## PROSECUTION

The Taliban decreased anti-trafficking law enforcement efforts since its August 15 takeover. Under the pre-August 15 government, the 2017 Law to Combat Crimes of Trafficking in Persons and Smuggling of Migrants criminalized sex trafficking and labor trafficking, including *Bacha bazi*. The law prescribed penalties between five and eight years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes. Aggravating factors increased the maximum sentence to 10

to 15 years' imprisonment and the imposition of the death penalty if exploitation for armed fighting resulted in the victim's death. Article 510 of the 2018 criminal code criminalized sex trafficking and labor trafficking, including *Bacha bazi*. Article 511 prescribed penalties of five to 10 years' imprisonment for trafficking offenses involving adult male victims and 10 to 16 years' imprisonment if the victim was a woman or child or exploited in *Bacha bazi*. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape. Article 512 outlined aggravating factors and increased penalties to 16 to 20 years' imprisonment for sex trafficking or forced armed fighting and between 20 to 30 years' imprisonment if the victim who was forced to fight died while subjected to trafficking. While the 2018 penal code also specifically criminalized more crimes related to *Bacha bazi*, some of which would constitute trafficking offenses, it also prescribed lower penalties for certain acts constituting *Bacha bazi* than those prescribed under Article 510. Most of these penalties were not sufficiently stringent nor commensurate with the penalties prescribed for other serious crimes, such as rape. The pre-August 15 government also used the 2009 Law on the Elimination of Violence Against Women (EVAW) to prosecute and convict sex traffickers. After the August 15 takeover, the Taliban reported prior laws remained in effect unless they violated the Taliban's interpretation of sharia, as determined by Taliban courts. The Taliban did not report by the end of the reporting period whether any laws related to trafficking would be amended or upheld and implemented. Observers reported that after August 15, the justice system became dysfunctional, without much clarity of applicable laws and change in personnel.

Insecurity across the country hindered collection of law enforcement statistics. The pre-August 15 government did not report any law enforcement efforts between the beginning of the reporting period on April 1 and August 15, compared with the previous reporting period, when it investigated 185 cases of *Bacha bazi*, investigated 50 suspects (though it was unclear how many of these suspects were involved in human trafficking or other crimes), and prosecuted an unknown number of cases. The pre-August 15 government's efforts were hindered by decades of conflict and a deteriorating security situation, widespread corruption, and the COVID-19 pandemic. The pre-August 15 government implemented awareness trainings to increase understanding of human trafficking, including the distinction between migrant smuggling and human trafficking, and developed awareness materials it planned to deliver to all government employees, with support from a foreign donor. After August 15, the Taliban did not report any investigations, prosecutions, or convictions of trafficking crimes. After August 15, the Taliban appointed personnel in the Ministry of Justice, Supreme Court, appeal courts, and at the Attorney General Office. The Taliban abolished the Ministry of Women Affairs and specialized courts addressing the elimination of violence against women. Experts reported vulnerable women were left without protection within the formal justice system.

The pre-August 15 government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes between April 1 and August 15; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action. Reports indicated that security forces and pro-government militias' recruitment of children for *Bacha bazi* continued between April 1 and August 15. Additionally, some security forces and pro-government militias—some of which may have received direct financial support from the pre-August 15 government—recruited boys specifically for the purpose of *Bacha bazi*. The pre-August 15 government did not prosecute any security officers for *Bacha bazi*—despite consistent reports of official complicity in *Bacha bazi*. Eight police officers were arrested in 2021 in connection with *Bacha bazi* incidents and were not prosecuted for perpetrating *Bacha bazi* as a separate crime but rather charged for "moral crimes," sodomy, or other crimes. Observers reported insecurity and corruption remained after the August 15 takeover. After August 15, the Taliban did not report any efforts to address *Bacha bazi*.

The Taliban created a "commission for the purification of the ranks," composed of senior Taliban members from security ministries, to address complaints of abuse of authority by Taliban members; observers reported the commission expelled 4,000 Taliban members as of February 2022. The violations committed by these individuals remain unknown.

Haiti AR_000559

Observers reported women were prevented from fleeing abusive situations by punishments imposed by the Taliban for "moral crimes," increasing their vulnerability to trafficking. Under the pre-August 15 government, security forces continued to unlawfully recruit and use children in combat and support roles. There were multiple reports of security forces and pro-government militias unlawfully recruiting children for a variety of tasks, ranging from cooking to cleaning. Before and after August 15, the Taliban recruited and used children in combat and non-combat roles. The Taliban used children in combat roles, including to plant and detonate improvised explosive devices (IEDs) and to carry out suicide and other dangerous attacks—often recruiting them through coercion, fraud, and false promises. Experts noted thousands of children may remain in the Taliban ranks. The Taliban denied its use of children, reporting their code of conduct prohibited boys with no facial hair from being allowed onto the battlefield or military bases; however, they made no use of formalized age verification mechanisms to ensure recruits were older than age 18.

## PROTECTION

The Taliban severely decreased efforts to protect victims since the August 15 takeover and continued to directly facilitate child trafficking. The Taliban did not report identifying any trafficking victims after August 15. The pre-August 15 government did not report identifying any victims between April 1 and August 15, compared with 550 potential trafficking victims in the previous reporting period. The pre-August 15 government maintained a National Referral Mechanism (NRM), but it was not clear if it was utilized. Additionally, the pre-August 15 government, in collaboration with an international organization and a foreign donor, provided training for government officials, border police, academics, community and religious leaders, and all relevant service providers on how to identify, refer, and assist victims using the NRM. The Taliban did not report by the end of the reporting period whether it would utilize the NRM maintained by the pre-August 15 government.

Prior to the August 15 Taliban takeover, NGOs, entirely dependent on foreign donor funding, provided the majority of care to trafficking victims; the pre-August 15 government reported enrolling child victims in school. An NGO provided support services and life skills training for vulnerable youth and victims of trafficking, including *Bacha bazi* victims, under the pre-August 15 government. Observers reported that among victims, it was more challenging for girls to reintegrate after trafficking compared to boys due to societal shame; girls were presumed to be complicit and "tarnished" after exploitation as a trafficking victim. The pre-August 15 government punished demobilized child soldiers by placing them in detention facilities and did not report if it had referred any child soldiers to appropriate care.

Under the pre-August 15 government, authorities penalized victims for unlawful acts that traffickers compelled them to commit, and reports indicate the Taliban routinely arrested, imprisoned, and penalized adult and child trafficking victims. Under the pre-August 15 government, authorities often placed victims of *Bacha bazi* in juvenile rehabilitation centers because they faced violence if they returned to their families, and no other shelters were available. Some female trafficking victims could not access the formal justice system because cultural norms precluded their engagement with male judicial officials. When female sex trafficking victims did access formal justice, officials penalized some of them for "moral crimes" such as sex outside of marriage. Under the pre-August 15 government, authorities sometimes detained victims of *Bacha bazi* in the absence of sufficient shelters for boys and placed them in juvenile rehabilitation centers—some victims may have been penalized rather than the perpetrators of the crime.

After August 15, protection services were mostly obsolete; NGOs were non-operational in most provinces due to lack of funding, fear of repercussions, and restrictions imposed by the Taliban. NGOs noted the Taliban closed shelters, damaging support networks for victims and vulnerable populations, and reported many shelters were looted and taken over by members of the Taliban and staff were harassed or threatened. According to experts, the majority of shelters for victims of crime remained closed at the end of the reporting period. Reportedly, some civil society actors faced killings, enforced disappearances, and detention by the Taliban. Due to a lack of formal procedures for identifying trafficking victims after August 15, the Taliban likely detained or arrested some unidentified trafficking victims.

## PREVENTION

The Taliban has made no efforts to prevent trafficking in persons since the August 15 takeover, and its actions continued to amplify the magnitude of trafficking crimes in the country. Under the pre-August 15 government, the High Commission on Combating Trafficking in Persons, the government's anti-trafficking inter-ministerial committee led by the MOJ, was responsible for implementing anti-trafficking policies. The pre-August 15 government instructed officials from various government agencies to create focal points to streamline coordination and communication on anti-trafficking efforts, to include arresting and prosecuting officials involved in *Bacha bazi* and the recruitment of child soldiers. Additionally, provincial-level anti-trafficking commissions in 16 provinces were chaired by the respective provincial governors; however, there were no reports as to how frequently these commissions met or their effectiveness. The pre-August 15 government developed and approved a new NAP to combat human trafficking; however, the NAP was not implemented prior to the Taliban takeover. The Taliban made no efforts to prevent trafficking in persons since the August 15 takeover and their actions exacerbated trafficking crimes in the country. The pre-August 15 government did not operate an anti-trafficking hotline. Since the August 15 takeover, the Taliban did not designate a lead anti-trafficking agency or entity to coordinate anti-trafficking efforts. Additionally, the Taliban did not report any activities to prevent human trafficking or raise awareness, despite a large number of vulnerable Afghans internally displaced or migrating through irregular means to other countries.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Afghanistan, and traffickers exploit victims from Afghanistan abroad. Internal trafficking is more prevalent than transnational trafficking. Traffickers exploit men, women, and children in bonded labor, a form of forced labor by which traffickers offer loans and manipulate the debts to coerce workers into continued employment. The pandemic, economic crisis, drought, and food insecurity increased the risk of exploitation by traffickers, particularly in bonded labor, as individuals took out loans to cover expenses and paid increasing prices to migrant smugglers. Since the Taliban takeover on August 15, vulnerabilities to exploitation have intensified, damaging victim support networks, limiting the freedom of movement and rights of women and girls, displacing minorities, intensifying the refugee crisis, instilling fear within the population, and increasing internal displacement, including forced displacements. Traffickers compel entire families to work in bonded labor in the brickmaking industry, predominately in eastern Afghanistan, and in carpet weaving countrywide. Former members of the Afghan National Security Forces and others associated with the Ghani government, internally displaced persons, forced deportees, voluntary refugee returnees, irregular migrants, and refugees were at a high risk of exploitation. Due to the current economic crisis, many may become dependent on the opium trade for survival, particularly as the prices have increased due to continued uncertainty in the country. Experts have noted that the opium trade has been one of the main sources of income for non-state actors in Afghanistan and the Taliban and other groups have collected taxes from farmers growing the crop in the past—many Afghans may be at risk of exploitation in the opium trade, in forced labor in the fields or as mules to transport the drugs. In previous years, NGOs confirmed reports of children used to support opium poppy cultivation and harvesting, as well as drug production and smuggling.

Most Afghan trafficking victims are children forced to work in carpet making, brick kilns, domestic servitude, sex trafficking (including *Bacha bazi*), domestic work, herding livestock, begging, poppy cultivation and harvesting, salt mining, drug smuggling, weapons trafficking, and truck driving. IO experts have indicated that child labor increased after the Taliban takeover, noting that 9 percent of children ages 5 to 17 (1.06 million) are involved in child labor and boys are more vulnerable than girls to be victims of trafficking, especially in *Bacha bazi*. High levels of debt have also driven some families to sell their children to work as

indentured servants or marry off underaged daughters in exchange for a dowry payment; some families force their children into labor with physical violence or knowingly sell their children into sex trafficking, including *Bacha bazi*. Some parents with substance use issues reportedly force their children into labor, street begging, and sex trafficking. Victims alleged some law enforcement and judiciary officials requested sexual favors in exchange for pursuing cases. In 2019, 165 boys in Logar province reported widespread sexual abuse by government teachers, principals, and local law enforcement, including requiring children to have sex in exchange for passing grades and subjecting boys to sex trafficking in *Bacha bazi*. Some boys who reported sexual abuse and sex trafficking to police reported police officers then raped them.

Prior to August 15, 2021, Afghan security forces and non-state armed groups continued to unlawfully recruit or use children in combat and support roles, as in previous reporting periods. Before and after August 15, the Taliban and other non-state armed groups continued to unlawfully recruit or use children in combat and support roles. The Taliban recruit—at times through coercion, fraud, and false promises—and use children in combat roles, including to plant and detonate IEDs and to carry out suicide and other dangerous attacks. Groups such as the Taliban and the Islamic State in Khorasan Province (ISIS-K) used children in direct hostilities, to plant and detonate IEDs, to carry weapons, to spy, and to guard bases. Child soldiers were pressed into service with the Taliban, ISIS-K, and other groups and were imprisoned without regard to their age. The Taliban recruits child soldiers from its madrassas in Afghanistan and Pakistan that provide military training and religious indoctrination, and it sometimes provides families cash payments or protection in exchange for sending their children to these schools. Armed groups target children from impoverished and rural areas—displaced children are at a higher risk for recruitment by armed groups. The Taliban abducts and coerces adult women into forced labor. The Taliban maintains detention facilities in which it compels detainees, including child and adult sex trafficking victims charged with "moral crimes," into forced labor.

Traffickers exploit children as young as 9 years old in Bacha bazi. In northern provinces, many Bacha bazi traffickers were community elders or private citizens. In southern provinces, Bacha bazi perpetrators were more commonly police, military, and local government officials under the pre-August 15 government. Bacha bazi survivors reported to NGOs an "overwhelming understanding that Bacha bazi is committed by the powerful," including military commanders (under the pre-August 15 government) and community leaders. International organizations reported cases of Bacha bazi by nearly all armed groups. Under the pre-August 15 government, perpetrators of Bacha bazi sometimes offered bribes or used relationships with law enforcement, prosecutors, and judges to evade punishment.

After August 15, restrictions on the movement of women and girls, and severely diminished access to employment and education, increased their vulnerability to trafficking. Women-headed households are at an increased risk of poverty and vulnerability to trafficking. Freedom of movement for women, including LGBTQI+ women, has been largely restricted unless accompanied by a mahram (close male relative)—the Taliban have detained women who were found without a mahram in some provinces and denied some women medical treatment because they were not accompanied by a mahram. Prior to August 15, nine out of 10 women experienced at least one form of intimate partner violence in their lifetime—many of these women have been forced to return to their families after the Taliban closed women's shelters throughout the country. Women in Afghanistan may be reluctant to seek help or escape from an abusive situation, including trafficking, due to "honor killings," which are sometimes carried out by family members. It was previously reported that women and girls have been charged for Zina (sex outside of marriage)—some women and girls have been convicted of Zina after being raped or forced into sex trafficking. International organizations reported there is an institutionalization of largescale and systemic gender-based discrimination and violence against women and girls.

According to experts, LGBTQI+ individuals are among the groups in Afghanistan most vulnerable to exploitation, particularly under the Taliban. LGBTQI+ individuals have been attacked, sexually assaulted, and directly threatened by the Taliban—many have been abused by family members and neighbors who support the Taliban or believe in

the need to act against the LGBTQI+ community for their own safety. The LGBTQI+ community faced discrimination, violence, and danger during the pre-August 15 government; according to experts, this has worsened since the Taliban took power. The Taliban reported human rights would be respected within the framework of Islamic law, which would not include LGBTQI+ rights, and that LGBTQI+ individuals are against Sharia law. This leaves LGBTQI+ individuals at a high risk of trafficking as they are left out of social services, are coerced due to their sexual orientation, or seek informal methods to escape Afghanistan—as they fear passing through checkpoints or going into a passport office. The Taliban prohibits women from traveling without a mahram, leaving lesbians and bisexual women not able to escape exploitative situations on their own.

Ethnic and religious minorities, such as Hazara Shiites, Ahmadi Muslims, Sikhs, Hindus, Baha'is, and Christians, are increasingly vulnerable to exploitation due to the threats and danger they face from the Taliban and ISIS-K. Ethnic and religious minorities are forced to hide in fear or to seek ways to leave the country, putting them at increased risk of exploitation. Muslim Shiite populations have been historically targeted by the Taliban and ISIS-K—they are at increased risk due to displacement by the Taliban and attacks by the Taliban and non-state actors, such as ISIS-K.

Afghan men, women, and children pay intermediaries to assist them in finding employment abroad, primarily in Iran, Pakistan, and Europe; some intermediaries and employers force Afghans into labor or sex trafficking. The substantial increase in the number of individuals seeking to flee Afghanistan, combined with the closure of borders and diplomatic missions and passport offices in Afghanistan, has increased the vulnerability of Afghans, as many migrate through irregular means. Many Afghans have sought refuge in neighboring countries, particularly Pakistan and Iran. Some Afghan women and girls who are sold to husbands in Afghanistan, India, Iran, and Pakistan are exploited in sex trafficking and domestic servitude by their new husbands. According to an international organization, the economic effects of the pandemic, the security situation, and political instability, as well as other factors such as drought in several provinces, exacerbated the problem of families selling girls into marriages. Some women and girls were forced into marriage to escape Afghanistan after the Taliban takeover. Some Afghan parents forcibly send boys to Iran to work to pay for their dowry in an arranged marriage. Afghan boys and men are subjected to forced labor and debt bondage in agriculture and construction, primarily in Iran, Pakistan, Greece, Turkey, and the Gulf states. Since August 15, many Afghan refugees fear being deported back to Afghanistan, which makes them less likely to report exploitation to foreign authorities—particularly in Iran, Pakistan, Turkey, Europe, and Central Asia. Traffickers in Iran, including Iranian criminal groups, exploit Afghan children in forced labor as beggars and street vendors and in forced criminality, including drug trafficking and the smuggling of fuel and tobacco. Iranian police sometimes detain, torture, and extort Afghan child trafficking victims before deportation. Turkish authorities sometimes beat Afghan asylum-seekers and push them back into Iran, where they may face deportation back to Afghanistan, and some families are separated in the process. The Iranian government and the Islamic Revolutionary Guards Corps continue to force and coerce Afghan migrants, including children as young as 12 years old, to fight in Iranian-led and -funded Shia militias deployed to Syria by threatening them with arrest and deportation to Afghanistan. Smuggling networks transport Afghan nationals living in Iran to Europe and subject them to sex trafficking and force them to work in restaurants to pay off debts incurred by smuggling fees. Some Afghan traffickers have subjected Afghan boys to Bacha bazi in Germany, Hungary, North Macedonia, and Serbia. Traffickers have subjected women and girls from the People's Republic of China (PRC), Iran, Pakistan, the Philippines, Sri Lanka, and Tajikistan to sex trafficking in Afghanistan. Under the pretense of high-paying employment opportunities, some labor recruiting agencies lure foreign workers to Afghanistan from South and Central Asia and subject them to forced labor after arrival. Afghans who resettled in Ukraine after the Taliban takeover face increased vulnerabilities as they flee the conflict caused by the Russian invasion.

## ALBANIA: TIER 2

The Government of Albania does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Albania remained on Tier 2. These efforts included investigating more cases and prosecuting and convicting significantly more traffickers. The government identified more victims and increased resources to NGO-run shelters. The government adopted the 2021-2023 National Action Plan (NAP) and allocated resources to the NAP. However, the government did not meet the minimum standards in several key areas. Official complicity in trafficking crimes remained a concern, with the government reporting no prosecutions or convictions of officials despite serious allegations and the government dismissing a police officer from his position. The government continued to inconsistently implement screening efforts for vulnerable populations—particularly undocumented migrants, asylum seekers, Romani and Balkan-Egyptian communities, and children—and mobile victim identification units (MIU) remained underfunded and understaffed despite identifying most of the victims every year. The government lacked resources for long-term care, employment, and other reintegration efforts for survivors, and the government-run hotline continued to not function.



ALBANIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers—including complicit officials—under Articles 110(a) and 128(b) of the criminal code. • Sentence convicted traffickers to prison terms consistent with prescribed penalties and train judges at all levels of the judiciary to take the severity of trafficking into account when issuing sentences. • Improve the sustainability of, and law enforcement participation in, mobile trafficking victim identification units. • Increase efforts to screen vulnerable populations and train police, labor inspectors, and other front-line officials on proactive identification of victims. • Institutionalize and provide training for law enforcement, prosecutors, and judges on investigating and prosecuting trafficking cases, including guidance on issues of consent and coercion in the context of labor and sex trafficking. • Continue to increase funding and create funding mechanisms that allocate adequate financial and other resources on a consistent and regular basis to the NGO-run shelters for trafficking victims. • Expand the jurisdiction of labor inspectors to inspect businesses that are not legally registered. • Increase reintegration services, including access to mental health services for victims and education for child victims. • Implement victim-centered approaches and victim-witness protection measures during investigation, prosecution, and court proceedings. •Train judges on restitution in criminal cases, establish procedures to seize assets from traffickers, and create effective methods to allocate restitution in a timely manner. • Integrate Romani groups into decision-making processes regarding victim protection. • Reinstate the government-run anti-trafficking hotline and incorporate hotline numbers in awareness campaigns.

### PROSECUTION

The government increased law enforcement efforts. Articles 110(a) and 128(b) of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of eight to 15 years' imprisonment for a trafficking offense involving an adult victim, and 10 to 20 years' imprisonment for an offense involving a child victim. These penalties were

sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The Albanian State Police (ASP) investigated 61 cases with 27 suspects (15 suspects for adult trafficking and 12 suspects for child trafficking), compared with 31 cases with 32 suspects in 2020. The ASP investigated no suspects for "knowingly soliciting or patronizing a sex trafficking victim to perform a commercial sex act," compared with four in 2020. The General Prosecution Office (GPO) prosecuted 60 cases with 19 defendants (six defendants for adult trafficking and 13 defendants for child trafficking), an increase compared with two cases with 12 defendants in 2020. Separately, the Special Structure against Corruption and Organized Crime (SPAK) prosecuted two new cases and continued two cases from previous years. Courts convicted 11 traffickers, a significant increase compared with no convictions in 2020; all traffickers were convicted for child trafficking. Judges sentenced five traffickers with imprisonment between eight years and 25 years and two traffickers with imprisonment between two years and eight years; four traffickers received probation. Lenient sentences, such as probation, undercut efforts to hold traffickers accountable, weakened deterrence, created potential security and safety concerns for victims, and were not equal to the seriousness of the crime. Observers reported continued delays in court proceedings due to the pandemic.

ASP's Criminal Police Department Directorate of Investigations of Narcotics and Trafficking maintained an Anti-Trafficking Unit, which investigated trafficking in persons in addition to drug and contraband trafficking. The government continued judicial reforms that changed prosecutorial jurisdiction for trafficking cases; SPAK and the Special Court of Appeals on Corruption and Organized Crime have jurisdiction over trafficking cases related to organized crime, while GPO and district courts prosecuted trafficking cases without an organized crime nexus. However, GRETA, prosecutors, and other observers reported district prosecutors did not have the specialized experience and capacity to prosecute trafficking cases successfully. GRETA and observers reported authorities confused overlapping elements of "exploitation of prostitution" and trafficking and at times applied the lesser charge because it required less specialization and time or due to the false belief that trafficking crimes required a transnational element. Limited resources, capacity, and reports of constant turnover within law enforcement created additional obstacles to maintaining capacity to investigate trafficking, including a lack of resources to investigate trafficking through virtual means. The government, mainly in cooperation with NGOs and international organizations, trained police officers, judges, prosecutors, labor inspectors, and victim coordinators on various anti-trafficking issues. The government reported permanently dismissing a police officer for "prostitution and maintaining a brothel," and in 2020, the government suspended five police officials, including the Director of the Border and Emigration Directorate of Tirana and three chiefs of units, after media reported a story alleging their complicity in an organized trafficking operation. The government conducted an investigation into the officers involved, which is reportedly still under investigation by the Tirana Prosecution Office. The government extradited a suspected trafficker from North Macedonia and appointed a liaison prosecutor to the EU. GPO sent nine rogatory letters and received four rogatory letters from foreign authorities.

### PROTECTION

The government increased victim protection efforts. The government and NGOs identified 154 potential victims and five official victims, compared with 81 potential victims and five official victims in 2020. Of these, 61 were sex trafficking victims, 65 forced labor victims, and 33 victims of multiple types of exploitation; 99 were female, and 60 were male; 112 were children, and 47 were adults; and three were foreign victims, two from Romania and one from Serbia. The government maintained a multidisciplinary national referral mechanism (NRM) with standard operating procedures (SOPs) for identifying and referring victims to services. First responders referred potential victims to law enforcement and state social services, which conducted joint interviews to officially recognize victims. The law provided equal services for both potential and officially recognized victims. MIUs in eight regions, consisting of social workers from NGOs and police officers, identified most of the

ALBANIA

victims every year, but the units' sustainability was uncertain due to the lack of permanent staff, formalization, and resources; MIUs identified 126 potential victims (45 in 2020). Experts reported police did not participate consistently in the MIUs despite signing a memorandum of understanding that formalized their participation. Experts also stated law enforcement rarely initiated cases when civil society identified a potential victim, but ASP noted that definitional differences with civil society regarding what constituted trafficking caused obstacles in identification. Observers continued to report border police lacked resources, interpreters, and knowledge to screen consistently or implement SOPs for undocumented migrants and asylum seekers. As in previous years, ASP did not screen individuals in commercial sex for indicators of trafficking during raids and investigations of commercial sex establishments, and the Labor Inspectorate lacked the training to identify victims of forced labor. Law enforcement justified cases of potential domestic servitude and forced labor in forced marriages involving Romani and Balkan-Egyptian communities as traditional cultural practices and customs.

The government operated one specialized shelter and supported three specialized NGO-run shelters. The government allocated 22 million leks ($207,650) to NGO-run shelters to support 30 staff salaries, compared with 17.6 million leks ($166,120) in 2020. The government provided an additional 6.8 million leks ($64,180) for food support to NGO-run shelters in 2021 and 2020. The government allocated 20.9 million leks ($197,260) to the government-run shelter, compared with 29.3 million leks ($276,550) in 2020. The government also transferred 10.2 million leks ($96,270) to a fund of seized criminal assets for victim support services, compared with 4.6 million leks ($43,420) in 2020. Although the government increased resources to NGO-run shelters in 2021, NGO-run shelters continued to operate under financial constraints and relied on outside sources for operating costs. NGO-run shelters reported no funding delays from the government, as in previous years. However, experts reported the bidding process for social programs with municipal governments was not transparent and that no funds were dispersed to shelters.

The four specialized shelters constituted the National Coalition of Anti-Trafficking Shelters (NCATS); victims who required services not available in one shelter were referred to another shelter within the coalition. NCATS and the government provided assistance to all official and potential victims in both 2021 and 2020, including food, mental health counseling, legal assistance, health care, educational services, employment services, assistance to victims' children, financial support, long-term accommodation, social activities, vocational training, and post-reintegration follow-up. NGO-run shelters allowed adult victims to leave the shelter voluntarily; the state-run shelter required victims to receive permission from the shelter director for their security. One NGO-run shelter provided specialized services for victims younger than the age of 18 and rented apartments for male victims, where they received assistance from NGOs. Observers reported the shelters in the NCATS had professional staff and good quality of care, and the government reported good cooperation between NCATS and government institutions. The government and NGOs provided vocational training for 109 victims; however, experts reported a lack of resources for long-term care, employment, and other reintegration efforts, particularly for child victims and victims with children. National Employment Services offices prioritized jobseekers from vulnerable groups, including trafficking victims; 43 victims registered with the employment office for employment opportunities. Foreign victims had access to the same services as domestic victims; the law provided foreign victims a three-month "reflection period" with temporary residency status and authorization to work for up to two years. The government did not provide any temporary residency statuses but repatriated two victims to Romania.

Due to a lack of formal identification procedures and as it had reported in previous years, the government may have detained or deported some potential victims, including women in commercial sex, irregular migrants, and asylum seekers. The government reported five victims cooperated in investigations and prosecutions and received legal assistance. SPAK possessed equipment that allowed testimony via video conferences, though it did not record how often it was used (one case in 2020). Victims who testified against traffickers had access to the witness protection program, though no victims participated in the program.

The government reported interviews and testimonies took place in the presence of a psychologist, and prosecutors separated victims and defendants during trials to prevent re-traumatization. The government maintained the Development Center for Criminal Justice for Minors with four part-time prosecutors and a judicial police officer responsible for child protection in criminal proceedings. The government maintained 22 victim assistance coordinators who provided legal assistance and guided victims in accessing services; the government appointed victim assistance coordinators to all victims assisting in prosecutions. Victims could obtain restitution through criminal proceedings or compensation through civil suits. However, judges generally rejected restitution in criminal proceedings, and civil suits required victims to submit new testimonies, causing re-traumatization. Additionally, civil courts dismissed or closed civil suits if criminal courts dropped the case or acquitted the defendant. Courts granted compensation to only two victims in cases from 2010 and 2018 but did not disburse compensation to the victims—the case from 2018 remained under appeal.

## PREVENTION

The government increased efforts to prevent trafficking. The national coordinator led the Office of the National Anti-Trafficking Coordinator (ONAC) and overall anti-trafficking efforts. The State Committee against Trafficking in Persons, composed of relevant ministry representatives, monitored and implemented various anti-trafficking efforts, though it did not meet in 2021. The government also maintained the National Anti-trafficking Task Force, composed of ministry officials, civil society representatives, and other participants who monitored the NRM; the NRM met once. The government drafted and adopted the NAP and allocated 412.6 million leks ($3.9 million) for its implementation. ONAC produced a report assessing the implementation of the NAP but did not publish periodic newsletters on anti-trafficking activities in 2021. Twelve regional anti-trafficking committees comprising local officials and NGOs worked on local victim assistance and referrals mechanisms. The Advisory Board of Victims of Trafficking consisted of three survivors who provided recommendations on anti-trafficking efforts and participated in awareness campaigns, but the board remained inactive due to the pandemic. The government, in cooperation with civil society, conducted awareness campaigns for schoolchildren, students, government officials, and the public. The government maintained a legal framework for regulating and licensing private sector employers and recruitment agencies, including prohibiting worker-paid recruitment fees; the labor inspectorate investigated one recruitment agency operating without a license and two foreign businesses operating without health and social insurance. However, labor inspectors did not have authority to inspect informal work activities, including unregistered businesses. Law on public procurement disqualified companies—including administrative personnel, leadership, or supervisory bodies convicted of trafficking or exploitation of children—from competition for public contracts. The government's anti-trafficking's hotline did not function in 2021 or 2020. The government did not make efforts to reduce the demand for commercial sex.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Albania, and traffickers exploit victims from Albania abroad. Traffickers exploit Albanian women and children in sex trafficking and forced labor within the country, especially during tourist season. Traffickers use false promises such as marriage or employment offers to exploit victims in sex trafficking. Traffickers commonly force children to beg or perform other types of compelled labor, such as selling small items, and also force children into criminality, including burglary and narcotics distribution. Traffickers exploit Albanian children, mainly from the Romani and Balkan-Egyptian communities, for seasonal work and forced begging. Isolated reports stated that traffickers exploit children through forced labor in cannabis fields in Albania, and some traffickers are likely involved in drug trafficking. Traffickers exploit Albanian victims in sex trafficking in countries across Europe, particularly Belgium, Germany, Greece, Italy, Kosovo, the Netherlands, North Macedonia, Norway, Switzerland, and the United Kingdom (UK). Albanian migrants who seek employment in Western Europe are vulnerable to exploitation in forced labor and forced criminality, particularly in the UK. Foreign victims from European countries, The Gambia, and the Philippines

Haiti AR_000563

are exploited in sex trafficking and forced labor in Albania. Traffickers adapt operations to the impacts of the pandemic and shift recruitment and advertisement tactics to online means, particularly social media. Undocumented migrants, asylum seekers, and refugees traveling, being smuggled, or voluntarily resettled in Albania, particularly women and unaccompanied children, are vulnerable to trafficking. Experts report children with mental and physical disabilities were increasingly vulnerable to trafficking.

## ALGERIA: TIER 2 WATCH LIST

The Government of Algeria does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government made key achievements during the reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore Algeria was upgraded to Tier 2 Watch List. These achievements included identifying more trafficking victims and increasing investigations and prosecutions, while continuing to convict traffickers. In addition, the government provided shelter to at least five potential child trafficking victims. The government also continued partnering with international organizations to train officials on trafficking and to conduct public awareness campaigns. Despite these achievements, government identification of and services for trafficking victims remained insufficient. Due to the government's ineffective screening measures for trafficking victims among vulnerable populations, such as African migrants, refugees, asylum-seekers, and individuals in commercial sex, authorities continued to punish some potential unidentified victims for unlawful acts traffickers compelled them to commit. The government's ongoing measures to deport undocumented migrants without effective screening for trafficking indicators deterred some victims among this population from reporting trafficking crimes to the police or seeking much-needed assistance. The government did not track and was unable to report if identified victims received protection services.



ALGERIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Finalize and implement standardized procedures for victim identification and screening for use by border, security, and law enforcement officials who come in contact with vulnerable populations, such as undocumented foreign migrants, asylum seekers, refugees, and individuals in commercial sex. • Increase investigations, prosecutions, and convictions of sex and labor traffickers. • Amend the trafficking provision of the penal code to remove the requirement of a demonstration of force, fraud, or coercion for child sex trafficking offenses. • Finalize and implement a formal national victim referral mechanism to refer victims to appropriate care. • Train law enforcement, judiciary, labor inspectorate, health care officials, and social workers on victim identification and referral procedures. • Create a mechanism to identify trafficking victims among vulnerable populations for unlawful acts traffickers compelled them to commit before arresting, prosecuting, deporting, or otherwise punishing them. • Ensure victims of all forms of trafficking are referred to and receive protection services, including appropriate shelter, adequate medical and psycho-social care, and legal assistance. • Ensure the safe and, to the greatest extent possible, voluntary repatriation of foreign victims, including through collaboration with relevant organizations and source country embassies, and provide foreign victims with legal alternatives to their removal to countries where they may face retribution or hardship. • Continue efforts to raise public awareness on the indicators and risks of trafficking. • Approve and dedicate resources to implement the 2022-2024 national anti-trafficking action plan. • Screen for forced

labor indicators among Cuban medical professionals, Democratic People's Republic of Korea (DPRK) workers, and People's Republic of China (PRC) nationals employed at worksites affiliated with the PRC's Belt and Road Initiative and refer them to appropriate services.

### PROSECUTION

The government increased law enforcement efforts. Algeria criminalized most forms of sex trafficking and all forms of labor trafficking under Section 5 of its penal code and prescribed penalties of three to 10 years' imprisonment and fines of 300,000 to 1 million Algerian dinar ($2,170 to $7,230). These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with international law, Section 5 required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking. Article 143 of Law 12-15 stated that crimes committed against children, including those involving sexual exploitation, would be vigorously penalized; it generally referenced other penal code provisions that could potentially be applied to child sex trafficking offenses that did not involve force, fraud, or coercion. Article 319 bis of the penal code, which criminalized the buying and selling of children younger than the age of 18, prescribed penalties of five to 15 years' imprisonment and a fine for individuals convicted of committing or attempting to commit this crime; however, this law could be interpreted to include such non-trafficking crimes as migrant smuggling or illegal adoption. Since 2018, the government has continued to coordinate with an international organization to draft a standalone anti-trafficking law that would remove the requirement of a demonstration of force, fraud, or coercion for child sex trafficking crimes and institutionalize victim protection measures. The Prime Minister's Office finalized the draft legislation and referred it to the Council of Ministers and legislature for consideration at the end of the reporting period.

The General Directorate of National Security (DGSN) maintained seven police brigades to combat human trafficking and illegal immigration; five additional brigades supported the seven specialized brigades as necessary. The Gendarmerie maintained 50 special brigades dedicated to managing children's issues, including child trafficking. In 2021, the Gendarmerie investigated 2,147 cases linked to irregular migration and migrant smuggling and reported some of these cases may have involved trafficking. The government reported investigating at least six trafficking cases (three sex trafficking cases, two forced labor cases, including one on domestic servitude, and one for an unspecified purpose of exploitation)— these were the first trafficking investigations the government reported in two years. In the reporting period, the government prosecuted 35 alleged traffickers under trafficking provisions of the penal code, three for sex trafficking crimes and 32 for unspecified forms of trafficking. This was a significant increase from zero prosecutions initiated in the previous reporting period and 13 alleged traffickers prosecuted in the reporting period before that. The government convicted three sex traffickers during the reporting period; this was similar compared with the previous reporting period when the government convicted five traffickers. Sentences ranged from three years' imprisonment and a 1 million dinar ($7,230) fine to 20 years' imprisonment; two of the convicted traffickers were convicted and sentenced in absentia, and the government issued warrants for their arrest. The government upheld two convictions on appeal. The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes. The government maintained four courts dedicated to cases involving transnational organized crime, under which it classified trafficking within the Algerian judicial system; these courts adjusted to the pandemic by at times limiting in-person participation in court processes and allowing video testimony. Officials acknowledged one of the biggest obstacles to prosecuting cases was identifying trafficking crimes, in part because of a lack of well-trained investigators and judicial officials, as well as limited public awareness. The government, at times in coordination with international organizations, conducted multiple anti-trafficking trainings for law enforcement, judicial officials, border security officials, and labor inspectors on trafficking indicators and distinguishing between migrant smuggling; identifying, assisting, and interviewing victims; financial investigative tools; and other trafficking-related topics.

ALGERIA

## PROTECTION

The government modestly increased efforts to identify victims but authorities continued to penalize unidentified victims. In the reporting period, the government identified 22 trafficking victims but did not detail whether they were sex trafficking or forced labor victims. This was an increase from both the previous reporting period, when the government did not identify any trafficking victims, and from the reporting period before that when the government identified 14 victims. The government did not consistently screen for trafficking among vulnerable individuals, including those that it deported throughout the year, nor among individuals in commercial sex, refugees, or asylum-seekers—populations highly vulnerable to trafficking. The government did not have comprehensive standard operating procedures (SOPs) or a formal mechanism to identify and refer victims to protection services; however, during the reporting period, the government partnered with an international organization to draft government-wide victim identification SOPs and an NRM. The government reported individual agencies used their own victim identification SOPs and an informal referral system to ensure victims received access to medical and psychological services and shelter. The government did not finalize the referral mechanism or the SOPs by the end of the reporting period.

Unidentified victims continued to face punishment—such as arrest, detention, prosecution, and deportation—for immigration violations, prostitution, and other unlawful acts traffickers compelled them to commit. For example, border and other security authorities continued to regularly deport African migrants—a population highly vulnerable to trafficking. Authorities also reported lacking the manpower and capability to systematically screen each migrant for trafficking indicators. As a result, reports indicate authorities sometimes expelled migrants outside of official deportation procedures, at times leaving migrants in the desert at the Mali and Niger borders. Officials continued to rely on victims to report abuses to authorities, yet civil society groups observed that most trafficking victims in Algeria were undocumented migrants who typically did not report trafficking crimes to the police or file lawsuits against their traffickers. Although public services, such as healthcare and education, were available and free for foreign nationals in Algeria, many undocumented migrants avoided seeking public services, including out of fear of deportation. The government's deportation operations further discouraged foreign trafficking victims from making their presence known to authorities.

Victim protection services remained inadequate. The government did not provide shelter or other protection services specifically tailored to the needs of trafficking victims, nor did it track the resources it allocated to protection services during the reporting period. However, the government continued to report the Ministries of Health and National Solidarity, as well as other ministries, could provide foreign and domestic trafficking victims with free services as needed, to include shelter, food, medical services, interpretation, legal consultations, psychological counseling, and repatriation assistance; the Ministry of Solidarity, Family, and Women's Affair's Child Protection Center provided shelter to at least five potential child trafficking victims. The government reported providing an unspecified number of victims medical, legal, and psychological services; the government referred some foreign victims to NGOs and international organizations for assistance. The government reported it allowed relief from deportation for identified trafficking victims for an indefinite period of time and allowed all foreign victims to stay in Algeria temporarily; however, it did not grant work permits to trafficking victims while under temporary residency status. The government reported it could provide victims with access to a lawyer, police protection, and video testimony during trial; however, it did not report providing any during the reporting period. Trafficking victims were legally entitled to file civil suits against their offenders, but the government did not report cases in which victims did so during the reporting period. Courts could order restitution for victims if the perpetrator was convicted, but the government did not provide an instance in which this occurred during the reporting period.

## PREVENTION

The government maintained efforts to prevent human trafficking. The pandemic and vacancies in the government related to political and economic uncertainties—including the presidency of the anti-trafficking committee for a significant portion of the reporting period—stalled government progress on a range of governance initiatives, including anti-trafficking efforts. The inter-ministerial anti-trafficking committee, led by the Ministry of Foreign Affairs, continued to coordinate the government's efforts during the reporting period. The government allocated the committee an annual budget of 12 million dinars ($86,780) that it could use to implement the 2019-2021 action plan, but it did not provide a breakdown of resource allocation for implementation. The presidential decree that formally institutionalized the anti-trafficking committee required it to submit a report to the president on the trafficking situation in Algeria. The 2019-2021 national action plan also required the committee to submit quarterly factsheets on activities; however, it did not provide a report or factsheets in 2021. The government drafted a 2022-2024 national action plan which was pending final approval at the end of the reporting period. The government organized multiple public awareness campaigns in Arabic and French during the reporting period, at times in coordination with an international organization, including ads on public transportation, radio campaigns, public briefings, and other events. The National Council on Human Rights, which monitored and evaluated human rights issues in Algeria, continued to lead a sub-committee dedicated to human trafficking issues. The government continued to operate three hotlines, which were operational 24 hours a day and a public website to report abuse and other crimes, including potential trafficking crimes; none of the hotlines reported receiving trafficking allegations in 2021. The government conducted 153,537 unannounced workplace inspections in 2021 and reported no cases of forced labor; however, the government acknowledged it had limited capacity to intervene in Algeria's large informal job market where most cases of forced labor occur in Algeria. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Algeria, and traffickers exploit victims from Algeria abroad. Undocumented sub-Saharan migrants, primarily from Mali, Niger, Burkina Faso, Cameroon, Guinea, Liberia, and Nigeria, are most vulnerable to labor and sex trafficking in Algeria, mainly due to their irregular migration status, poverty, and in some cases language barriers. During the reporting period, an international organization reported an increase in trafficking victims identified among undocumented migrants in Algeria. Unaccompanied women and women traveling with children are particularly vulnerable to sex trafficking and forced domestic work. Refugees and asylum-seekers are also vulnerable to trafficking either before or during their migration to Algeria. In some instances, traffickers use false promises of work, such as in a beauty salon or restaurant, to recruit migrants to Algeria where they ultimately exploit them in sex trafficking or forced labor. More often, sub-Saharan African adults, often en route to Europe or in search of employment, enter Algeria voluntarily as undocumented, frequently with the assistance of smugglers or criminal networks. Many migrants, impeded in their initial attempts to reach Europe, remain in Algeria and work in Algeria's informal job market until they can continue their journey. While facing limited opportunities in Algeria, many migrants illegally work in construction and some engage in commercial sex acts to earn money to pay for their onward journey to Europe, which increases their risk of sex trafficking and debt bondage. Traffickers often use restaurants, houses, or informal worksites to exploit victims, making it difficult for authorities to locate traffickers and victims. Some migrants become indebted to smugglers, who subsequently exploit them in forced labor and sex trafficking upon arrival in Algeria. For example, some employers reportedly force adult male and child migrants to work in the construction sector to pay for smuggling fees for onward migration, where employers restrict migrants' movement and withhold their salaries. Many female migrants in the southern city of Tamanrasset—the main transit point into Algeria for migrants—are exploited in debt bondage through domestic servitude, forced begging, and sex trafficking as they work to repay smuggling debts. Some migrants also fall into debt to fellow nationals who control segregated ethnic neighborhoods in Tamanrasset; these individuals pay migrants' debts to smugglers and then force the migrants into bonded labor or commercial sex. Tuareg and Maure smugglers and traffickers in northern Mali and southern Algeria force or coerce men to work as masons or mechanics; women to wash dishes, clothes, and cars; and

Haiti AR_000565

children to draw water from wells in southern Algeria. Victims also report experiencing physical and sexual abuse at the hands of smugglers and traffickers. Civil society and international organizations reported in 2019 that migrant women pay smuggling networks to transport them internally within the country from Tamanrasset to Algiers and they sometimes experience sexual violence during the journey; in some cases, once arriving in Algiers, the networks force the women into domestic servitude or commercial sex in informal brothels in order to pay the smuggling fees.

Foreign women and girls, primarily sub-Saharan African migrants, are exploited in sex trafficking in bars and informal brothels, typically by members of their own communities, including in cities such as Tamanrasset and Algiers. In 2019, civil society organizations reported anecdotally that criminal networks exploit young adult women from sub-Saharan Africa, ages 18-19, in sex trafficking in Algeria. Many sub-Saharan migrant women in southern Algeria willingly enter into relationships with migrant men who provide basic shelter, food, income, and safety, in return for sex, cooking, and cleaning. While many of these relationships are purportedly consensual, these women are at risk of trafficking. In 2019, an NGO reported that Algerian women and girls are also vulnerable to sex trafficking rings, often as a result of financial difficulties or after running away from their homes; these incidents are reportedly clandestine in nature and therefore difficult for authorities and civil society actors to identify.

Criminal begging rings are common and are reportedly increasing in Algeria. Media sources suggest leaders of begging networks coerce or force sub-Saharan African migrant children to beg through the use of punishment. In 2020, a civil society organization estimated criminal begging networks exploit more than 6,000 unaccompanied migrant children in Algeria. Local leaders suggest migrant children may also be coerced into work by their parents as a result of extreme economic pressures. According to credible sources in 2017, Nigerien female migrants begging in Algeria, who often carry children—sometimes rented from their mothers in Niger—may be forced labor victims. Furthermore, according to observers in 2017, Nigerien children, ranging from four to eight years old, are brought to Algeria by trafficking networks with the consent of their parents and forced to beg for several months in Algeria before being returned to their families in Niger. During the previous reporting period, media reported alleged traffickers fraudulently recruited 55 Bangladeshi workers for work in Spain and instead exploited them in forced labor in the Algerian construction sector. Cuban medical professionals and DPRK nationals working in Algeria may have been forced to work by the Cuban and DPRK governments, respectively. PRC nationals employed in Algeria at worksites affiliated with the PRC's Belt and Road Initiative were vulnerable to forced labor, including in the construction sector.

## ANGOLA: TIER 2

The Government of Angola does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Angola remained on Tier 2. These efforts included providing supportive services to all victims participating in investigations; approving the national referral mechanism (NRM) and standard operating procedures (SOPs) and funding the national action plan (NAP); convicting two traffickers; cooperating with foreign governments to successfully repatriate victims; and increasing training for front-line officials and awareness efforts to the public. However, the government did not meet the minimum standards in several key areas. Efforts to proactively identify and refer victims remained inadequate in key transit areas despite the government's development of new protocols and increased trainings of front-line officials. The government did not have regulations or oversee labor recruitment agencies beyond periodic labor inspections.



### PRIORITIZED RECOMMENDATIONS:

Implement and train front-line officials on the NRM and SOPs for the proactive identification of victims among vulnerable groups, including returned Angolans from Namibia and foreign nationals such as migrants and refugees, particularly in Lunda Norte, as well as North Korean and Cuban workers, and refer trafficking victims to appropriate services. • Increase efforts to investigate and prosecute trafficking crimes, especially sex trafficking and labor trafficking in the construction sector and in animal herding, and sentence convicted traffickers to prison terms commensurate with the severity of human trafficking crimes. • Increase efforts to provide shelter, counseling, and medical care for trafficking victims, either directly or in partnership with NGOs or international organizations. • Dedicate resources to address vulnerabilities of returned Angolan migrants from Namibia and screen for human trafficking indicators during the ongoing climate crisis in Huila, Cunene, and Namibe provinces. • Amend Article 178 to criminalize all forms of internal sex trafficking. • Establish and implement policies to formally disconnect the requirement of participation in investigations and prosecutions for victim identification and to receive official trafficking victim status. • Train and support law enforcement officials, prosecutors, and the judiciary on implementing the anti-trafficking provisions in Angolan law. • Expand the collection of law enforcement and victim protection data for trafficking cases, specifically the number of victims referred and provided protective services, and compile data from all provinces. • Support the provision of legal identity documents among vulnerable populations, including at-risk undocumented migrants, refugees, and stateless individuals.

### PROSECUTION

The government maintained anti-trafficking law enforcement efforts. In November 2020, the government amended the anti-trafficking articles of the penal code, taking effect in February 2021. Laws 38/20 and 39/20 revoked the prior anti-trafficking legislation and the 2014 Law on the Criminalization of Infractions Surrounding Money Laundering, slightly increasing the penalties for some trafficking offenses. Article 177 criminalized slavery, with penalties of seven to 15 years' imprisonment, and the buying or selling of a child younger than the age of 14 for the purpose of adoption or slavery, with penalties of five to 10 years' imprisonment. Article 178 criminalized the labor trafficking of adults and children and prescribed penalties of four to 10 years' imprisonment. Article 189 criminalized some forms of domestic adult sex trafficking and prescribed penalties of one to eight years' imprisonment. Article 190 criminalized transnational adult sex trafficking and prescribed penalties of two to 10 years' imprisonment. Article 196 criminalized child sex trafficking and prescribed penalties of five to 15 years' imprisonment. These penalties were all sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other grave crimes, such as rape. The 2020 amendment removed "sexual exploitation" as a purpose of a trafficking crime in Article 178. Because the other anti-trafficking articles did not criminalize all forms of internal sex trafficking, Angolan law no longer criminalized all forms of sex trafficking.

The government initiated 13 human trafficking investigations with 15 suspects and continued six investigations from the previous reporting period, compared with 10 investigations initiated in the previous reporting period and 15 investigations initiated in 2020. The government did not initiate any new prosecutions but continued the prosecution of five alleged traffickers from one sex trafficking case investigation initiated in 2019 and convicted two traffickers. This was a decrease from 13 traffickers prosecuted and convicted in the previous reporting period. In an investigation from 2019, one trafficker convicted of aiding illegal

ANGOLA

immigration for trafficking of children—from the Democratic Republic of the Congo (DRC) forced to perform domestic work—received a sentence of four years in prison and was ordered to pay restitution to the victims. In an investigation from 2020, one trafficker was convicted of sex trafficking and sentenced to one year and six months in prison and ordered to pay restitution. Because of the pandemic, courts remained open but operated in a limited capacity during the reporting period.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and complicity remained significant concerns, inhibiting law enforcement action during the year. The government reported that investigations initiated during the previous reporting period of several officials from the civil registration office and migration and foreigners service who were allegedly involved in trafficking crimes were ongoing. In the past, well-connected individuals confiscated land from members of the San Indigenous group, which forced many San to work as indentured servants on land they previously owned. For the second consecutive year, the government did not report whether it investigated or resolved the disputes, including whether the land was returned to the San. The government did not report any updates on two additional cases for the second consecutive year. These included the case of an Angolan border guard in Cunene province charged in 2020 for conspiracy to force a woman and five boys into exploitative labor and a second case of an Angolan army officer charged in 2020 with smuggling involving a possible trafficking nexus. Additionally, law enforcement did not consistently or effectively enforce laws against the commercial sexual exploitation of children.

Multiple law enforcement agencies were mandated to investigate human trafficking. In addition to the police, the Criminal Investigation Services and Court of Minors could investigate child trafficking. The Ministry of the Interior, as part of Humanitarian Border Management training, conducted six anti-trafficking workshops in the provinces of Luanda, Bengo, Malanje, Huambo, Cuanza Norte, and Cuando Cubango, which involved a total of 180 participants, including officials from the National Police, Immigration Services (SME), Border Guard Police, Civil Protection and Fire Service, and Criminal Investigation Service. The Ministry of Social Action, Family and Promotion of Women (MASFAMU) conducted two trainings for government officials on the systems of referral and protection for children, including trafficking in persons. The Ministry of Justice and Human Rights (MJHR) held three workshops on human trafficking and asylum law and rights in the provinces of Mexico, Lunda Norte, and Lunda Sul for 121 participants. The government also signed agreements with South Africa and DRC establishing new cooperation protocols on combatting transnational crime, including human trafficking.

## PROTECTION

The government increased its overall protection efforts. Through its investigations and identification efforts, the government reported identifying 26 trafficking victims, including adults and children and victims of sex and labor trafficking from Angola, DRC, South Africa, and Namibia, and supporting identified victims who participated in investigations, providing or coordinating shelter, basic needs, medical care, and education. Government hotlines identified 50 child trafficking victims; however, these victims may also have been counted in the government statistics, making the total number of identified victims uncertain. These efforts compared with identifying and referring to care 19 trafficking victims in the previous reporting period. The government, through the National Institute of Children (INAC), operated separate child support centers in all 18 provinces, providing food, shelter, basic education, and family reunification for crime victims younger than age 18. Additionally, MASFAMU managed a national network of safe houses for women, counseling centers, and children's centers, which trafficking victims could access. NGOs and religious organizations also operated shelters and provided services for victims, which received limited financial support by the government. The government could also provide foster care and family tracing services for child trafficking victims, as well as legal representation, social workers, and counseling to all victims.

During the reporting period, the government approved, but must still adopt, SOPs for identification of trafficking victims and a NRM for Protection and Assistance to Victims of Trafficking for their referral

to care, which were developed in partnership with an international organization. In addition, the government approved SOPs for Assistance to Child Victims of Violence. To promulgate the NRM, the government trained 41 law enforcement, border protection, customs and immigration officials, and members of local human rights committees on these victim identification and referral procedures with support from an international organization. Both the NRM and SOPs were disseminated to provincial human rights committees in all provinces; however, victims in rural communities had less access to resources and services than in urban areas.

The government encouraged victim cooperation in the investigation and prosecution of trafficking crimes; however, both access to care and immigration-related benefits were contingent upon the commencement of a criminal investigation and the victim's testimony. Angolan law permitted live teleconference testimony, allowing foreign-born victims to pursue repatriation to their home countries while still participating in trials, although the government did not report any cases warranting use of this capability during the reporting period. While foreign victims remained in the country, Angolan law provided for immigration relief, including temporary residence documents and the right to seek asylum. While cooperating with law enforcement, all victims could access government-provided legal representation, medical and mental health services, some financial support, family tracing assistance, and access to education, while having immunity from crimes committed as a result of their trafficking. In both convictions during the reporting period, judges ordered restitution paid to the victim and the State, which was an increase from no orders of restitution in the previous reporting period. The government cooperated with Congolese officials to repatriate two child trafficking victims in Uige Province to the DRC. However, despite a high prevalence of transnational trafficking, law enforcement routinely detained and deported undocumented migrants crossing the Angolan-Congolese border without screening for potential exploitation. As a result, authorities may have detained and deported trafficking victims for unlawful acts committed as a result of their trafficking, including alleged immigration violations.

## PREVENTION

The government maintained efforts to prevent human trafficking. The Inter-ministerial Commission to Combat Trafficking in Persons, led by MJHR and the National Directorate of Human Rights, met regularly. For the third consecutive year, the government funded its 2020-2025 NAP on Preventing and Combating Trafficking in Persons, which was implemented by the Commission, in collaboration with international organizations and NGOs. The government made significant progress in expanding local human rights committees—creating 90 new committees, bringing the total to 163 committees at the provincial, municipal, and commune levels; the government trained these committees to increase victim identifications and referrals and broaden awareness raising activities. The government conducted eight awareness workshops, lectures, and seminars in Luanda, Quiçama, Viana, and Cacuaco. The government conducted awareness raising programming on both human trafficking and child sex tourism through radio, television, and social media, and it updated and continued distributing its awareness raising brochure on trafficking in persons. The government did not report data collection efforts on human trafficking cases or victim identifications and referrals during the reporting period.

Systemic corruption among labor officials and lack of resources prevented effective enforcement of labor laws, including against forced labor. The government did not have procedures to oversee and regulate labor recruitment beyond periodic labor inspections. The government employed 266 labor inspectors trained on human trafficking, who conducted 9,088 inspections, which was an increase from the last reported year of 5,461 in 2020; however, no instances of forced or child labor were identified through labor inspections. Personnel and financial deficiencies hampered efforts to identify forced and child labor, with a lack of funding to cover transportation expenses for labor inspectors, and limiting inspections to the formal economy, where only one-quarter of Angolans work. In addition, despite the presence of young children in forced and child labor, labor inspectors focused on children ages 14-17 who had the legal authority to work.

The government demonstrated mixed efforts to document individuals within the country. It continued its mass registration campaign and, in 2021, issued more than one million Angolans their first identity documents. The program did not include undocumented migrants, refugees, or stateless individuals, who faced ongoing vulnerabilities to trafficking. NGOs reported some police confiscated and destroyed refugees' documents during mass arrests. The MJHR operated a hotline for potential victims of crime and public reporting, and the INAC and the Integrated Center for Public Safety operated a separate hotline for crimes against children. The Foreign Ministry, in partnership with the MJHR, integrated trafficking training into its diplomatic training program. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Angola, and traffickers exploit victims from Angola abroad. Traffickers exploit Angolans, including children as young as 12 years old, in forced labor in the brick-making, domestic service, construction, agriculture, fisheries, and artisanal diamond mining sectors. Angolan girls as young as 13 years old are victims of sex trafficking, and girls in domestic work within private homes in Angola are vulnerable to labor trafficking. Angolan adults use children younger than 12 in forced criminal activity because children cannot be criminally prosecuted. As a result of the pandemic, "handlers" increasingly bring poor children to Luanda for street work, including begging, shoe shining, car washing, and parking assistance, where they are vulnerable to forced labor from their handlers and other traffickers. Extreme poverty and economic decline in recent years have led to an increase in the number of children living on the street, especially in urban areas of the capital. The provinces of Luanda and Benguela and the border provinces of Cunene, Lunda Norte, Namibe, Uíge, and Zaire are the most high-risk areas for trafficking activities. Cunene province continued to experience widespread and severe drought, forcing children in some villages to drop out of school to gather water, dig wells, and herd cattle or relocate to urban areas where they faced increased vulnerabilities. Severe malnutrition across the southwestern provinces of Angola increased migration into Namibia in search of food.

Transnational traffickers take advantage of Angola's numerous unsecured, informal, and heavily used border crossings. Traffickers take some Angolan boys to Namibia for forced labor in cattle herding and force others to serve as couriers to transport illicit goods as part of a scheme to skirt import fees in cross-border trade with Namibia. Other recruiters take Angolan adults and children to Namibia for work in agriculture, construction, mineral extraction, and unlicensed street vending, where they may be exploited by employers. Traffickers exploit Angolan women and children in forced labor in domestic service and sex trafficking in South Africa, Namibia, and European countries, including the Netherlands and Portugal.

Trafficking networks recruit and transport Congolese girls as young as 12 years old from Kasai Occidental in the DRC to Angola for labor and sex trafficking. Undocumented Congolese migrants, including children, enter Angola for work in diamond-mining districts, where traffickers exploit some in forced labor or sex trafficking in mining camps. Traffickers also exploit adult and child Congolese economic migrants in forced labor in construction. Women from Brazil, Cuba, DRC, Namibia, and Vietnam in commercial sex in Angola may be victims of sex trafficking, including in massage businesses. People's Republic of China (PRC) national-owned companies with large construction or mining contracts bring PRC workers to Angola, which increased during the pandemic; some companies do not disclose the terms and conditions of the work at the time of recruitment. There are reports that PRC-owned and -operated construction companies exploit Brazilian, PRC, Kenyan, Namibian, Southeast Asian, and possibly Congolese migrants in forced labor, including through withholding passports, threats of violence, denial of food, and confinement. These companies also at times coerce workers to operate in unsafe conditions, which sometimes reportedly result in death. The North Korean and Cuban governments may have forced their respective citizens to work in Angola, including at least 256 Cuban doctors sent to Angola to combat the pandemic.

## ANTIGUA AND BARBUDA: TIER 2 WATCH LIST

The Government of Antigua and Barbuda does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included investigating more trafficking cases, training officials from the Family and Social Services Division for the first time, and continuing to have funding available for the National Action Plan (NAP). However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government did not identify any victims for the second consecutive year, nor did it initiate any prosecutions or convict any traffickers. Therefore Antigua and Barbuda was downgraded to Tier 2 Watch List.



ANTIGUA & BARBUDA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, convict, and punish traffickers. • Increase efforts to identify victims through proactive screening of at-risk populations, such as migrants, individuals in commercial sex, and People's Republic of China (PRC) national and Cuban workers on foreign government-affiliated programs. • Draft, fund, and implement a new anti-trafficking NAP for all agencies. • Reduce delays in court proceedings. • Implement government-wide standard operating procedures to proactively identify victims and refer them to care and train front line officials in trafficking indicators. • Increase trauma-informed training on trafficking for NGOs and service providers to improve their ability to care for potential trafficking victims. • Train police, prosecutors, and judicial officials on evidence collection and management for use in judicial proceedings. • Provide anti-trafficking training to diplomats.

## PROSECUTION

The government maintained limited prosecution efforts. The 2010 Trafficking in Persons (Prevention) Act criminalized sex trafficking and labor trafficking and prescribed penalties of up to 20 years' imprisonment and a fine for offenses involving an adult victim and up to 25 years' imprisonment and a fine for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape.

The government initiated five trafficking investigations during the reporting period, one for sex trafficking, one for labor trafficking, and three for unspecified exploitation; this compared with zero investigations during the previous reporting period and 10 in 2019. The government did not report initiating any prosecutions for the second consecutive year, compared to three prosecutions in 2019. Authorities continued to prosecute three suspected traffickers from 2018; all three were on bail. The government did not convict any traffickers for the third consecutive year. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking offenses; in past reporting periods, police officers reportedly received administrative sanctions instead of being tried under the trafficking law. Authorities directed all police units, including those investigating trafficking cases, to continue to enforce pandemic-related restrictions, including nighttime curfews and the closure of bars, clubs, and other social venues; law enforcement also experienced personnel shortages due to the pandemic.

The government reported courts experienced reduced capacity and interruptions due to the imposition of pandemic protocols, thereby limiting the number of cases of all types that could be prosecuted during

the reporting period. The Eastern Caribbean Court of Appeal in St. Lucia continued with virtual appeal hearings without disruptions and could hear trafficking and other cases. The pandemic significantly disrupted the national courts' criminal division. The government reported that serious criminal cases, including trafficking cases, required in-person jury trials unless the defendant was pleading guilty or in rare instances where the case involved no witnesses. As jury trials by law could not take place remotely, authorities prosecuted almost no trafficking or other serious criminal cases for the entire reporting period after jury trials ceased in March 2020 due to the pandemic. The government reported this led to substantial court backlogs, exacerbating already existing substantial delays.

The Trafficking in Persons Prevention Unit (TIP Unit) included four full-time staff and an unspecified number of law enforcement officers drawn from the police, immigration service, Coast Guard, and the Office of National Drug Control Policy, all of whom were knowledgeable about trafficking, victim services, and investigations. The TIP Unit served as the investigative arm of the national coordinating body, the Trafficking in Persons (Prevention) Committee (TPPC), and was solely responsible for investigating trafficking, implementing the national trafficking prevention objectives, and increasing anti-trafficking awareness efforts to improve overall efficiency. Due to the pandemic, the government suspended random inspections of businesses suspected of being involved in commercial sex.

## PROTECTION

The government maintained negligible protection efforts. The government did not identify or refer to care any victims for the second consecutive year, compared to two victims in 2019. The government had formal written procedures to guide law enforcement, immigration, and social services officials in the screening and identification of potential victims, although observers noted the government used them inconsistently with potential forced labor victims.

While the government did not identify or report providing care to victims during the year, services remained available and may have served potential victims. Under the TPPC, a senior police officer chaired the Cases Task Force, which was responsible for screening and identifying trafficking victims and referring victims to an assigned victim care officer for care and protection. The officer could establish the victim's needs, including medical, lodging, counseling, meals, and clothing. The government reported it did not have shelters for trafficking victims due to concerns about maintaining location confidentiality, but rather utilized safe spaces for adults and children on privately owned properties and manned and secured by the Cases Task Force and selected law enforcement agencies based on needs; these safe spaces were solely for trafficking victims. A child could receive additional services from the Family and Social Services Division. The government reported there was no time limit to victim care services. The Directorate of Gender Affairs reported its Support and Referral Center for victims of any form of gender-based violence could also offer services and support to trafficking victims, in some instances including legal assistance and emergency accommodation.

The government could provide temporary residency status as an alternative to removal to countries where victims may face hardship or retribution by traffickers; this assistance was not contingent on assisting law enforcement. Victims could obtain a work permit or leave the country after the Cases Task Force approved a satisfactory risk assessment. The government reported all victims who sought housing in a safe space subsequently requested to return home. In these cases, the government contacted an international organization and the relevant local trafficking unit in the country of origin for reintegration. The government informed potential victims of their rights, including that their participation in investigations and prosecutions was voluntary; victims could also decline any or all assistance offered. The government reported victims could speak to the Directorate of Gender Affairs, a social worker, or another appropriate third party, including NGOs, to report cases or access the judicial system in addition to or instead of law enforcement. The government had a policy of not disclosing a victim's location, providing security at the victim's location and in transit, allowing for testimony via video link, and not disclosing a victim's identity to the public or media. The Directorate of Gender Affairs could also assist in helping victims

obtain protection orders or advocate with relevant authorities to obtain assistance to help individuals in danger leave the country. However, the government did not report receiving any requests for or using any of these methods during the reporting period. The government did not report any cases where a victim had sought restitution, although the law allowed for a victim to do so. The government reported no cases of victims being detained, fined, or jailed for unlawful acts traffickers compelled them to commit.

The government funded and trained seven officers from the Family and Social Services Division for the first time on trafficking laws and victim protection. The government also trained police, customs, immigration, and labor officials on victim identification and referral.

## PREVENTION

The government maintained prevention efforts. The pandemic impacted the country's economy and severely limited the government's capacity to meet its commitments and obligations. The Solicitor General led the TPPC, which served as the national coordinating body for anti-trafficking efforts with representatives from across the government and one NGO; the TPPC carried out enforcement, research, and victim advocacy functions. The TPPC oversaw the TIP Unit. The TPPC met once during the reporting period, compared with monthly before the pandemic. The government revised its anti-trafficking NAP to account for the impact of the pandemic; NGOs participated in the implementation of the NAP. The government provided the TPPC with its own annual budget to facilitate its operations and activities. The government did not report specific budget data related to its anti-trafficking efforts but reported it continued to fund the NAP despite pandemic-related budget reallocations for other government activities. However, government financial resources including salaries for anti-trafficking officials were under severe strain in 2021 as a result of the pandemic, and prior to the pandemic, government agencies cited lack of funding as a key deficiency. The government postponed most of the planned activities included in the NAP due to the pandemic. The government published an annual report containing general information on trafficking and a summary of its anti-trafficking efforts as it had done in prior years.

The government continued to carry out public awareness activities. The Directorate of Gender Affairs raised awareness about trafficking through billboards, public service announcements, media appearances, workshops, and knowledge exchanges. The Directorate of Gender Affairs consulted with NGOs to avoid messaging containing stereotypes or racialized narratives. Authorities funded and carried out a broad-based anti-trafficking awareness campaign via billboards, national television, and other media, with campaign materials available in several languages. The government maintained a hotline for domestic abuse and gender-based violence that could receive calls regarding trafficking but received no such calls during the reporting period; the government could also receive anonymous calls through the crime stoppers number or via the TPPC's social media page. According to authorities, people preferred to call either emergency numbers other than the dedicated hotline or individual members of the TPPC with whom they were familiar.

The government reported the only registered labor recruitment agency was government-run and did not charge fees; the government did not recruit on a large scale. The government implemented procedures for the issuance of work permits to foreign nationals to strengthen labor laws, the economic migration process, and protection for workers, including against trafficking; foreign nationals could not enter the country until the Ministry of Labor (MOL) approved a work permit and could not start work before obtaining a permit, and MOL interviewed all applicants for renewal permits. The government reported workers involved in programs arranged through a foreign government could not switch employers but could return home. The government reported the 1975 labor code set labor monitoring standards for foreign laborers and that authorities monitored their work per the law. The government granted amnesty to all undocumented workers and reported it would not deport any. To raise awareness among migrant laborers on the risks of trafficking, the government, in coordination with an international organization, posted labor laws and regulations on government and other websites, posted signage at all ports of entry, and conducted awareness training for frontline workers (immigration, police, customs, and labor officers) on how to interview and communicate with migrant

workers. The government did not make efforts to reduce the demand for commercial sex acts. The government did not report on efforts to prevent sex tourism. The government did not provide anti-trafficking training to its diplomatic personnel. The government did not enter into any new agreements with other countries.

## TRAFFICKING PROFILE

As reported over the past five years, traffickers exploit domestic and foreign victims in Antigua and Barbuda, and traffickers exploit victims from Antigua and Barbuda abroad. Individuals from minority communities are at higher risk of trafficking. Documented and undocumented migrants from the Caribbean region, notably Jamaica, Guyana, and the Dominican Republic, were identified as victims of sex trafficking and forced labor in previous years. Authorities reported in previous years that traffickers exploited victims in multiple-destination trafficking, arriving in Antigua and Barbuda for a few months before their traffickers exploited them in other Caribbean countries such as St. Kitts and Nevis and Barbados. Intraregional air traffic stopped due to the pandemic in March 2020; the government reported fewer potential foreign victims may have arrived in the country as a result. Although travel from the United States and the United Kingdom resumed by the end of the reporting period, the government reported traffickers did not commonly exploit victims on these routes. Sex trafficking occurs in bars, taverns, and brothels, including with girls; most of these businesses were shut down for a majority of the reporting period. Forced labor, including of children, occurs in domestic service and the retail sector, particularly in family-owned businesses. Cubans working in Antigua and Barbuda may have been forced to work by the Cuban government. PRC nationals working in Antigua and Barbuda may have been forced to work on PRC-affiliated programs.

## ARGENTINA: TIER 1

The Government of Argentina fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Argentina remained on Tier 1. These efforts included prosecuting and convicting more traffickers, including a complicit official; awarding restitution to 35 victims in three cases; and identifying more trafficking victims. Although the government meets the minimum standards, it did not allocate a dedicated budget to anti-trafficking efforts and did not have specialized shelters for male victims. Official complicity in trafficking crimes remained a concern. The national anti-trafficking law considered force, fraud, or coercion to be aggravating factors rather than essential elements of the crime.



ARGENTINA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Strengthen efforts to investigate, prosecute, and convict traffickers.• Improve victim assistance to include more specialized shelters and dedicated shelters for male victims. • Sentence convicted traffickers to adequate penalties, which should involve significant prison terms.• Document and address official complicity in trafficking through prosecution and conviction. • Provide dedicated funding to fully implement the national action plan. • Strengthen coordination among the federal and provincial governments and NGOs. • Revitalize efforts to address labor trafficking, including prosecuting and convicting labor traffickers and proactively identifying victims. • Revise the human trafficking law to make force, fraud, or coercion essential elements of

the crime, rather than aggravating factors, consistent with the 2000 UN TIP Protocol. • Restructure the witness protection program to address trafficking victims' needs and prevent abuse by agents. • Increase availability of mid- to long-term assistance for victims, including legal, medical, and employment services. • Increase the number of labor inspections and ensure that inspections are conducted in informal sectors and rural areas. • Consistently implement victim restitution procedures. • Improve efforts to collect and integrate data on law enforcement statistics and victim assistance.

## PROSECUTION

The government maintained prosecution efforts. Law 26.842 of 2012 criminalized labor trafficking and sex trafficking and prescribed punishments of four to eight years' imprisonment for offenses involving an adult victim and 10 to 15 years for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the law established the use of force, fraud, or coercion as aggravating factors rather than essential elements of the crime; penalties were increased to five to 10 years' imprisonment if such factors were involved. The law also defined trafficking broadly to include facilitating or profiting from the prostitution of others and the illegal sale of organs without the use of force, fraud, or coercion. Due to these inclusions, it was unknown how many of the cases prosecuted under Law 26.842 involved trafficking offenses as defined by international law.

The special prosecutor's Human Trafficking and Exploitation Unit (PROTEX) opened 175 investigations (101 for sex trafficking, 58 for labor trafficking, six involving both sex and labor trafficking, and 10 for unspecified exploitation for other crimes of exploitation) in 2021, compared with 220 investigations (130 for sex trafficking and 90 for labor trafficking) in 2020, and 252 in 2019. The government prosecuted 107 suspected traffickers in 48 cases (24 for sex trafficking and 24 for labor trafficking) in 2021, compared with prosecuting 26 suspected traffickers in 21 cases (14 for sex trafficking, five for labor trafficking, and two for both sex and labor trafficking) in 2020. The government convicted 31 traffickers (24 sex traffickers and seven labor traffickers), compared with convicting 26 traffickers (22 for sex trafficking and four for labor trafficking) in 2020. The courts sentenced convicted traffickers to between three and 15 years' imprisonment. Prosecutors levied charges against three alleged sex traffickers, first arrested in 2019; officials reported the three defendants allegedly used their connection to the motorsports community to recruit women to work as "promoters" or models at racetracks, then forced them to engage in commercial sex. Law enforcement reported seven investigations involving religious organizations; in one such investigation, officials raided a fringe religious group that compelled its members to work for its leaders' benefit, arresting six suspected traffickers and identifying 12 victims. In an ongoing case, prosecutors levied charges against 29 alleged labor traffickers tied to an evangelical church; law enforcement identified roughly 40 additional victims during the reporting period, bringing the total number of victims associated with the case to approximately 100. Federal courts remained open throughout the reporting period, although many procedures were held virtually, in accordance with pandemic-related restrictions. PROTEX reported the government's ongoing movement restrictions and other pandemic-mitigation measures reduced its operating capacity; it minimized the impact of these policies through increased use of virtual tactics, including collecting virtual testimony. Officials reported increased difficulty in investigating instances of sex trafficking, which they attributed to the discrepancy between law enforcement officers' routine investigative tactics and traffickers' increased use of online platforms and private residences to exploit victims during the pandemic. Although the government's federal trafficking investigations database, the Integrated Criminal Information System on the Crime of Trafficking in Persons (SISTRATA), was meant to include input from nearly all provincial governments, it remained difficult to obtain comprehensive data and analyze trends across reporting periods as federal and provincial authorities still commonly compiled law enforcement statistics separately. The government continued to train law enforcement officials to use the database.

ARGENTINA

Corruption and official complicity in trafficking crimes remained significant obstacles to anti-trafficking efforts, particularly at the local and regional levels, and hindered law enforcement action during the year. The government reported opening two investigations involving public officials accused of complicity in trafficking crimes; in one of these cases, law enforcement investigated allegations of labor exploitation, which may have amounted to trafficking, against judicial sector officials. Authorities prosecuted only a small number of cases involving official complicity in trafficking. However, the government reported convicting at least three complicit officials during the reporting period—its first convictions involving officials complicit in trafficking crimes since 2018—including a municipal employee in the Buenos Aires metropolitan area, who courts sentenced to 13 years' imprisonment for complicity in sex trafficking. In one case first reported in 2019, the government convicted a military officer of sex trafficking and sentenced him to 10 years' imprisonment. In another case where authorities suspected a Buenos Aires area brothel was operating under the protection of complicit police officers, judges convicted 11 traffickers and ordered restitution to the victims; the government did not report how many, if any, of the 11 traffickers convicted were public officials. The government confirmed prosecution remained ongoing in a 2020 case against a member of the Cordoba public prosecutor's staff who allegedly exploited a young woman's drug dependence to force her into commercial sex. The government reported that the 2019 prosecution of a former police chief, indicted in 2019 for allegedly exploiting approximately 20 victims in sex trafficking, resumed in September 2021 and remained ongoing at the end of the reporting period. The government reported prosecutors awaited a trial date in the 2010 case against two public officials allegedly involved in the sexual exploitation of victims in Buenos Aires private residences. Official complicity appeared infrequently in media reporting.

The government conducted anti-trafficking trainings for prosecutors, law enforcement, and judicial officials in both virtual and in-person formats. Training covered topics such as traffickers' recruitment tactics for local law enforcement officials in Chaco province; labor trafficking indicators for provincial law enforcement officers; and application of the anti-trafficking law for officials across several agencies. PROTEX reported cooperating with Paraguayan officials in an investigation initiated based on a call to the nationwide 1-4-5 trafficking hotline; the government maintained trafficking-specific cooperation agreements with other governments in the region. Officials reported a 2019 extradition request remained pending at the end of the reporting period.

## PROTECTION

The government increased protection efforts. The Rescue Program was the government office responsible for coordinating short-term emergency victim services; a separate entity, the National Secretariat for Childhood, Adolescence, and Family (SENAF), assisted foreign victims, child victims, and victims identified in the autonomous city of Buenos Aires. The government reported identifying and assisting a total of 1,434 victims—including those assisted by SENAF and other government entities—compared with 933 victims in 2020, 1,438 victims in 2019, and 1,501 victims in 2018. The Rescue Program reported identifying 1,337 of these victims in 2021. Of the 1,434 identified victims, 945 were victims of labor exploitation, and 331 were victims of sex trafficking; the government was unable to specify a form of trafficking for the remaining 128 victims. The government provided incomplete demographic data on identified victims; there were at least 538 female, 680 male, and six transgender victims. At least 114 of the victims were children. More than 75 percent of victims in 2021 were Argentine nationals; officials also identified foreign victims, including from Bolivia, Colombia, the Dominican Republic, Paraguay, Peru, Senegal, Syria, Uruguay, and Venezuela. The government reported observing an increase in victims self-reporting their exploitation. The government funded repatriation for five Argentine victims exploited in trafficking abroad, compared with funding repatriation of at least 10 Argentine trafficking victims in 2020. SENAF coordinated an unspecified number of repatriations for foreign victims from several countries, including Brazil, Paraguay, and the People's Republic of China (PRC). The National Directorate of Migration reported training 700 public officials on the identification and referral of trafficking victims amongst migrant populations since it established its anti-trafficking unit in the previous reporting period. The government reported its new Registry for Assistance to Victims of

Human Trafficking (REDAVIT) database, developed with the support of an international organization, became operational in March 2021; the database recorded victims' biographical information and their use of applicable services.

Federal officials had formal procedures for victim identification and assistance; however, in practice, the procedures to identify victims among vulnerable populations varied by province. The government encouraged officials to add pandemic-specific steps to these procedures in 2021, requiring them to brief victims on COVID-19 and how to prevent its spread. Some front-line responders had a limited understanding of trafficking. SENAF and the provincial governments shared responsibility for mid- and long-term assistance to adult victims, overseen by provincial coordination centers; experts noted the need for more integrated and comprehensive victim assistance. Regional governments in an unspecified number of provinces operated anti-trafficking centers that provided psychological, social, medical, and judicial assistance to trafficking victims. The government reportedly had four specialized shelters for trafficking victims across various provinces. SENAF reported operating one of these shelters specifically to serve foreign victims regardless of gender or age. In 2021, the SENAF shelter served 39 foreign victims. Shelters modified their services to comply with pandemic mitigation recommendations, providing staff and residents with personal protective equipment, setting shifts for mealtimes, and converting office spaces to bedrooms to reduce crowding in sleeping areas. The government could provide services to male trafficking victims, but it often placed them in other government-funded shelters or in hotels for temporary housing, rather than specialized trafficking shelters. NGOs reported a need for specialized shelters, long-term housing, skills training and employment, childcare, legal assistance, and financial assistance for victims after testifying in court cases; some officials expressed concern that many shelters did not distinguish between trafficking victims and victims of other violent crimes, limiting access to specialized care. The Ministry of Labor launched a pilot program to encourage trafficking survivors' reentry into the labor market; the 29 survivor-participants received support in seeking employment and a monthly stipend. Certain assistance programs required victims to complete complex procedures to maintain eligibility. Foreign victims had the same access to care as Argentine nationals; however, foreign victims were sometimes unaware of available services. The national government did not report funding allocations to support victim assistance. Observers reported provincial and local governments dedicated insufficient funding to victim services.

The government encouraged victim participation in trafficking trials through an assistance framework whereby victims had access to psychological and legal support while preparing to testify. NGOs expressed concern for victims' welfare and risk of re-traumatization while supporting cases against traffickers. In particular, observers indicated the Undersecretariat of Criminal Policy's witness protection program was ill-suited to the needs of trafficking victims and posed a re-traumatization risk. The courts offered victims participating in trials the option to provide testimony via live video, recordings, or written statements; during the reporting period, all trafficking victims participating in trials delivered video or written testimonies, as required by the courts' pandemic mitigation measures. The Rescue Program provided tribunals with an assessment of victims' psychological state and ability to assist in a trafficker's prosecution, as well as what accommodations the victims might need in doing so. The government maintained a trust fund for trafficking victims, comprised of traffickers' forfeited assets and required criminal courts to award victim restitution at the time of traffickers' convictions. Victims could also file civil suits against traffickers to receive additional compensation, although victims had limited success in securing compensation through civil suits. Courts granted between 1 million and 6 million pesos ($9,280 to $55,680) in restitution to each of 35 victims in three cases ending in criminal conviction in 2021. In another, ongoing trafficking case, the courts authorized officials to auction seized assets in preparation for victim restitution at the case's conclusion. Despite these cases, observers reported prosecutors and judges still inconsistently prioritized financial restitution in trafficking cases.

The government trained inspectors and other Ministry of Labor officials on labor trafficking indicators. Labor inspectors used guidelines for the identification of trafficking during inspections; inspectors filed 31 reports of trafficking indicators during inspections in 2021, identifying 221

Haiti AR_000571

potential victims. The Ministry of Labor reported 90 percent of victims identified by labor inspectors were men and 85 percent were Argentine nationals. Civil society actors anecdotally reported observing increased inspection activity. The Executive Committee for the Fight Against Trafficking and Exploitation of People and the Protection and Assistance of Victims ("Executive Committee") coordinated with civil society and regional law enforcement to respond to reports of forced labor in rural agricultural sites, including olive processing outfits, culminating in the identification of more than 150 labor trafficking victims in 2021. In one instance, national officials identified eight potential trafficking victims, forced to eat and sleep in tents where alleged traffickers compelled them to harvest eucalyptus leaves, after a volunteer fireman observed trafficking indicators at the site and reported them to a provincial labor authority.

## PREVENTION

The government increased prevention efforts. The Federal Council for Human Trafficking and the Executive Committee oversaw the implementation of the government's 2020-2022 national action plan to combat human trafficking. The biennial plan outlined 100 specific activities to combat trafficking; the Executive Committee reported the government completed 67 of the plan's activities in 2021. Although the Federal Council incorporated three civil society organizations in its regular meetings, some observers reported the government offered limited opportunities for civil society to contribute to its efforts. The Federal Council required civil society participants to be legally recognized as NGOs in Argentina; observers noted some NGOs found the costs associated with maintaining this status prohibitive. The government did not allocate a specific budget for the plan, instead relying on ministries to support activities from their own budgets; observers remained concerned about the government's ability to fund its anti-trafficking initiatives and support civil society programs. Law 1694/06 prohibited worker-paid recruitment fees, and authorities had the ability to penalize foreign labor recruiters for fraudulent recruiting; however, the government did not report assessing any penalties during the reporting period. Given the increased vulnerability of migrants due to widespread job loss and movement restrictions during the pandemic, the government again extended expiration dates and deadlines associated with several visa categories, which decreased their vulnerability to trafficking.

The government continued to implement awareness campaigns, including one, initiated in 2016, outlining sex trafficking risks and encouraging the public to report print advertisements for commercial sex so that law enforcement can investigate. It also held several awareness workshops accessible to the general public and launched a new campaign to promote public awareness of the government's nationwide 1-4-5 trafficking hotline through signage in bus stations and other venues. PROTEX officials presented at several trafficking awareness webinars hosted by domestic and international civil society groups; these virtual events were accessible to wide audiences. NGOs and experts remained concerned by child sex tourism, although there were no reported investigations or prosecutions in the reporting period related to this crime. The Secretariat of Tourism launched a new campaign to raise awareness of sex trafficking in the tourism industry and led a regional working group on combating sex tourism. The Ministry of Justice and Human Rights operated the nationwide 1-4-5 trafficking hotline with response assistance from the Rescue Program. Fifteen provincial governments regularly publicized the national hotline in 2021. The Rescue Program trained hotline operators on application of the trafficking law and emerging trends. There were 1,624 hotline calls during the year, compared with 1,340 in 2020 and 1,809 in 2019. The government reported it investigated 1,276 of these reports, compared with 631 in 2020, although some reports described related crimes, such as sexual exploitation, rather than trafficking. In one investigation initiated by a hotline call, regional officials arrested three suspected traffickers and identified two 16-year-old girls exploited in sex trafficking. The government continued to produce several annual assessments of its anti-trafficking efforts, including PROTEX's regular evaluation of trafficking-related calls to the national hotline and the Federal Council's annual progress report on the biennial plan. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Argentina, and Argentine adults and children are victims of sex and labor trafficking in other countries. Traffickers exploit victims from other Latin American and Caribbean countries in Argentina, particularly the Dominican Republic, Paraguay, Peru, Bolivia, Uruguay, Venezuela, and Brazil. Transgender Argentines are exploited in sex trafficking within the country and in Western Europe. Officials indicate traffickers may exploit the additional vulnerabilities of individuals, especially women, with disabilities or mental illnesses. Adults and children from Argentina, particularly the northern provinces; Bolivia; Paraguay; Peru; and other countries are exploited in forced labor. Traffickers exploit victims in forced labor in the garment sector; ranching; agriculture, including the cultivation and harvest of olives, onions, and lettuce; forestry; street vending; charcoal and brick production; domestic work; and small businesses. Traffickers exploit victims from the PRC and South Korea; PRC citizens working in supermarkets are vulnerable to debt bondage. Traffickers exploited women seeking to work as models or promoters in sex trafficking at racetracks. Traffickers exploit children participating in youth sports clubs in sex trafficking. Revelations in 2018 of an active child sex trafficking ring in Argentina's minor soccer league that victimized youth athletes raised concerns about child sex trafficking in domestic sports and athletic clubs. Religious sects and other organizations serve as fronts for traffickers. Traffickers compel trafficking victims to transport drugs internally and across the country's borders. Traffickers increasingly utilize social media and other online platforms to recruit and exploit victims. Civil society reports indicate many traffickers (38 percent) are women; some of these women were themselves trafficking victims. Official complicity, mainly at the sub-national level, is pervasive and continues to hinder the government's efforts to combat trafficking.

## ARMENIA: TIER 2

The Government of Armenia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Armenia remained on Tier 2. These efforts included prosecuting more traffickers and identifying more victims. Courts convicted a labor trafficker for the first time since 2014. The government adopted screening indicators for use by social workers, amended procedures to standardize data collection and information sharing, and provided comprehensive training to relevant staff. However, the government did not meet the minimum standards in several key areas. Police continued to repeatedly interrogate victims for long hours though reportedly within legal limits. First responders did not consistently screen vulnerable populations for trafficking indicators, while police in some remote areas lacked information and training to inform victims of their rights and victims continued to face low access to justice, including an absence of victim-centered procedures and formal victim-witness protection measures. The government maintained its prior year funding level for the implementation of the 2020-2022 national action plan (NAP), but the Ministerial Council did not meet.



ARMENIA

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers under Articles 132 and 132-2. • Increase proactive identification efforts, including implementing standard operating procedures for screening trafficking victims and training officials on screening for trafficking among individuals in commercial sex, migrants, refugees, and other at-risk populations.• Implement legal authorities for labor inspectors to conduct regular inspections, including non-legal employers, and identify victims through unannounced visits. • Provide advanced training to investigators and prosecutors on trafficking investigations and prosecutions, including evidence collection and victim-centered interview techniques. • Establish and implement preventative measures for child labor and potential child trafficking in state childcare institutions. • Increase access to justice during court proceedings, such as establishing victim-centered policies to reduce re-traumatization, strengthen confidentiality, and provide victim-witness protection. • Increase resources for reintegration services for victims. • Establish formal procedures for repatriating trafficking victims from abroad. • License, regulate, and educate local employment agencies and agents so they can help prevent the forced labor of Armenians abroad. • Train judges on restitution in criminal cases, establish procedures to seize assets from traffickers, and create effective methods to allocate restitution in a timely manner.

## PROSECUTION

The government increased law enforcement efforts. Articles 132 and 132-2 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of five to eight years' imprisonment, which were sufficiently stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape. The government investigated 15 cases, compared with 16 cases in 2020; eight were sex trafficking cases, and seven were forced labor cases. The government prosecuted eight defendants, compared with two in 2020; five were prosecuted for sex trafficking, and three were prosecuted for labor trafficking. The government continued to prosecute three defendants from previous years. Courts convicted one sex trafficker and one labor trafficker, the first forced labor conviction since 2014, compared with one sex trafficker in 2020. Judges sentenced the sex trafficker to 12 years' imprisonment; the labor trafficker received a sentence of seven years' imprisonment, but it was later changed to a two-year suspended sentence after judges used the trafficker's health, age, cooperation, and guilty plea as mitigating circumstances. The government reported an ongoing investigation of a human resource officer and the head of a psychiatric institution that opened an unregistered store in the psychiatric hospital and coerced a patient to work in the store from 2002 to 2018. The government reported some delays in investigations due to pandemic mitigation measures, but courts continued to make virtual and remote trials available.

The Armenian Police (AP) maintained an Anti-Trafficking Unit (ATU) that conducted initial investigations and referred cases to the Investigative Committee (IC) for an in-depth investigation. Local police units designated an officer as the main point of contact for trafficking within their jurisdiction. The government maintained a manual for local police on monitoring businesses that were prone to exploitation and on interviewing vulnerable communities; however, law enforcement did not proactively pursue investigations and relied on victims to self-identify. Observers continued to report an absence of victim-centered approaches within law enforcement procedures, and local investigators in some remote areas lacked the skills to properly interview victims. Guidelines restricted interviews to four hours for adults, and the government adopted a law, which took effect in January 2021, that restricted interviews for children to 90 minutes in the presence of a psychologist. However, observers continued to report repeatedly interrogated victims for long hours, including children, increasing the risk of re-victimization, though NGO observers noted police complied with legal parameters regarding the length of interrogation. Additionally, investigations did not incorporate gender-sensitive approaches, such as the use of female medical professionals for invasive examinations of female victims. While the IC or PGO continued to drop or reclassify trafficking cases referred by local police due to a lack of evidence, a practice that was not unique to trafficking cases, PGO created a working group to review all trafficking cases from 2018 to 2019 to identify any legal or procedural issues. Authorities did not drop any cases due to

a lack of evidence nor reclassify any cases, compared with dropping seven forced labor cases and one sex trafficking case due to a lack of evidence and reclassifying one sex trafficking case in 2020. The Police Academy and Justice Academy maintained classes on trafficking for police, judges, prosecutors, and investigators, and the Ministry of Defense trained military police officers on anti-trafficking issues. The government did not conduct any international investigations or extraditions in 2021 or 2020.

## PROTECTION

The government increased protection efforts. The government identified 32 victims, an increase compared with nine victims in 2020. Of these, 24 were victims of sex trafficking and eight were victims of forced labor; there were 23 were women, seven boys, and two girls; and all victims were Armenians. The 2014 Law on Identification and Assistance to Victims of Human Trafficking and Exploitation prescribed identification, referral, and assistance procedures for relevant actors. In 2021, the government developed screening indicators for social workers and adopted procedures to identify child victims among children not enrolled in school. Police reported inspecting businesses involved in commercial sex, using checklists to screen individuals in commercial sex, and training officers on trafficking indicators; however, the government did not report the number of inspections nor did it identify any victims through these efforts. Experts continued to report that officials did not proactively identify victims and instead relied on victims to self-identify, and observers continued to report first responders did not consistently screen vulnerable populations for trafficking indicators, particularly individuals in commercial sex and foreign migrant workers. The government trained staff from the State Migration Service and child care institutions on identifying trafficking victims.

The government provided temporary shelter, emergency medical services, and psychological aid to potential trafficking victims during the "pre-identification phase," a stage where the government collected information on a potential victim within a maximum of 10 days. The Victim Identification Commission (VIC), which consists of representatives from the Ministry of Labor and Social Affairs (MOLSA), PGO, police, and NGOs, officially recognized victims based on information collected during the "pre-identification stage;" the VIC met six times. The government amended procedures to standardize data collection and information sharing, which allowed the VIC to fully monitor individual cases and share cases with relevant government institutions. In previous years, civil society reported the referral procedures functioned well, and they had positive cooperation with the government. However, NGOs reported one case involving 15 victims that did not fully meet the definition of trafficking, while government representatives on the VIC reported it met the definition and overruled their assessment. The case involved a trafficker that threatened to hurt family members of individuals detained or missing in the 2020 hostilities over Nagorno-Karabakh, unless the victims sent nude photos and videos; a judge convicted the trafficker under the trafficking article but the case was under review by an appeals court.

The government allocated approximately 40 million drams ($82,470) for victim protection efforts, including operational costs for an NGO-run shelter in 2021 and 2020. The government and local NGOs jointly provided legal, medical, and psycho-social support; housing; a one-time monetary compensation of 250,000 drams ($515); and access to social, educational, and employment projects. The government allowed legal guardians of child victims to also receive the one-time monetary compensation. Sixteen victims received free health care (one in 2020), and two victims received the one-time monetary compensation (one in 2020). The government maintained a cooperation agreement and partially funded one specialized NGO-run shelter to provide services to victims; the NGO-run shelter assisted three identified victims (10 in 2020). The NGO-run shelter required adult victims to notify staff when they left shelters unescorted, but victims were free to leave if they no longer wanted assistance. Additionally, the NGO-run shelter provided male victims with separate rooms or rented apartments, but there were no male victims in need of shelter in 2021, compared with one male victim receiving shelter accommodation in 2020. The NGO-run shelter provided personal protective equipment and COVID-19 tests, and it adopted social distancing measures, including a space for victims to quarantine while

Haiti AR_000573

waiting for COVID-19 test results. The government provided vocational training classes to victims, but civil society continued to provide the bulk of reintegration and long-term support services without government funding. Additionally, the government did not include trafficking victims in the list of vulnerable people eligible for state housing. The NGO-run shelter and childcare institutions accommodated child victims, but experts reported a shortage of accommodation and foster families for children, which resulted in some cases where authorities returned children to family members who were involved in their exploitation. The government allocated funds for repatriation in 2020 for the first time, although no victims required repatriation in 2021 or 2020. The government provided foreign victims the same services as Armenian victims. The law entitled foreign victims to a 30-day reflection period in which victims could recover before deciding whether to cooperate with law enforcement. The law also entitled foreign victims to receive a permanent residence permit, but applications required evidence of employment; no foreign victim required a permit in 2021 and 2020.

Due to a lack of consistent identification procedures for trafficking indicators, authorities may have detained and deported individuals in commercial sex and foreign migrant workers who were unidentified victims. According to experts, law enforcement officers in some remote areas may lack information and training to inform victims of their rights to protection or assistance. Victims hesitated to assist in prosecutions due to a lack of confidentiality in public testimonies—creating a fear of retaliation from traffickers—and stigmatization from their families and communities. Authorities did not fully protect victims' rights during court proceedings, and victims, including children, appeared in front of their traffickers in court, which may have caused re-traumatization. The government continued to lack a formal victim-witness protection program. The Criminal Procedure Code and a 2016 decree mandated some victim-witness protection measures, but none were used in 2021 and 2020. Judges did not issue restitution during criminal proceedings, and victims did not file civil suits for compensation in 2021 or 2020. In previous years, judges did not issue damages in civil suits, asserting that victims did not substantiate the financial damages they had suffered. The law allowed investigators to place defendants' property in custody to fund potential civil claims, but this rarely occurred in practice.

## PREVENTION

The government increased prevention efforts. The Anti-trafficking Ministerial Council and the Inter-Agency Working Group against Trafficking in Persons (IWGTP) monitored and carried out anti-trafficking efforts; the Ministerial Council did not meet (once in 2020) and IWGTP held two virtual meetings in 2021 (once in 2020). The government implemented the NAP and allocated approximately 40 million drams ($82,470) in 2021 and 2020. However, observers reported many of the goals and projects in the NAP depended on funding from donors and international organizations, which the government did not fund. The government did not conduct any new research on trafficking in 2021 and 2020. The government organized a country-wide awareness campaign targeting the public, students, children and their parents, first responders, and asylum seekers. The government funded an anti-trafficking website and hosted an annual award ceremony for journalists publishing trafficking stories. For the first time, MOLSA solicited feedback from trafficking survivors and victims on assistance measures to amend the 2015 law on victim assistance. The government did not regulate or monitor labor recruitment agencies. In 2020, the Health and Labor Inspection Body conducted 28 labor inspections—the first inspections since 2015—but did not have jurisdiction to conduct inspections of "non-legal" employers such as small farms or illegal businesses. AP and MOLSA both maintained a 24-hour hotline for trafficking, and the Ombudsperson operated a 24-hour hotline for human rights-related issues, including trafficking; hotlines received 202 calls, but the government did not report the number of potential victims identified or investigations resulting from calls. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Armenia, as well as victims from Armenia abroad. Traffickers exploit some of the Armenian migrants who seek employment in Russia, the United Arab Emirates (UAE), and Turkey in forced labor, often through recruitment fraud and exorbitant recruitment fees charged by labor brokers. Armenian women may also be exploited in sex trafficking in the UAE and Turkey. Armenian women may be exploited in sex and labor trafficking and forced begging within the country. Some children work in agriculture, construction, and service provision within the country, where they are vulnerable to labor trafficking. Ukrainian, Belarusian, and Russian women working as dancers in Armenian nightclubs are vulnerable to sex trafficking. Traffickers may target Iranian and Indian migrants who willingly seek employment in the informal sector for exploitation in forced labor. Men in rural areas with little education and children staying in state childcare institutions remain highly vulnerable to labor trafficking.

## ARUBA: TIER 2 WATCH LIST•

The Government of Aruba does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included identifying more potential victims, investigating more trafficking cases, and producing a new film-based awareness campaign illustrating undocumented migrants' vulnerability to trafficking. However, the government did not demonstrate overall increasing efforts compared to the previous reporting period, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity. The government did not prosecute or convict any traffickers for the third consecutive year, and officials sometimes relied on victims to self-identify as such, limiting their ability to hold traffickers accountable through criminal prosecution. Anti-trafficking efforts depended on ad hoc funding allotments, rather than a dedicated budget, limiting the long-term viability of key initiatives. In addition, working-level officials conflated trafficking in persons and migrant smuggling, hindering the effectiveness of prosecution, prevention, and protection efforts. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Aruba was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Aruba remained on Tier 2 Watch List for the third consecutive year.



ARUBA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute alleged traffickers. • Proactively identify victims among all vulnerable groups, including women in commercial sex, detained migrants, domestic workers, and migrants working in construction, supermarkets, and retail. • Train law enforcement officials, prosecutors, judges, coast guard officers, and labor inspectors on victim-centered and trauma-informed approaches to trafficking cases. • Establish dedicated funding for anti-trafficking efforts, including for full-time staff members. • Decouple victim identification and assistance procedures from the investigation and prosecution of trafficking crimes and empower non-law enforcement officials to designate trafficking

• Aruba is a semi-autonomous entity of the Kingdom of the Netherlands. For the purpose of this report, Aruba is not a "country" to which the minimum standards for the elimination of trafficking in the Trafficking Victims Protection Act apply. This narrative reflects how Aruba would be assessed if it were a separate, independent country. However, the Kingdom is an important contributor to the Government of Aruba's anti-trafficking efforts

ARUBA

victims as such. • Convict traffickers, as appropriate, and sentence them to significant prison terms. • Complete the construction of the multipurpose shelter for victims of crimes, including human trafficking. • Improve coordination and information-sharing with anti-trafficking counterparts across the Kingdom of the Netherlands. • Increase referral of possible trafficking victims among Venezuelan migrants and refugees through consistent use of guidelines for proactive identification. • Formalize agreements with local NGOs and private sector accommodations to shelter adult and child victims. • Promote awareness of human trafficking, as distinct from migrant smuggling, through trafficking-specific materials and campaigns.

## PROSECUTION

The government maintained prosecution efforts. Article 2:239 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to eight years' imprisonment or a fine for offenses involving a victim 16 years of age or older and up to 12 years' imprisonment or a fine for those involving a victim younger than the age of 16. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. The government continued to revise a draft amendment to the anti-trafficking law, initiated during the previous reporting period, to increase penalties for trafficking offenses; the amendment remained pending at the end of the reporting period.

Authorities reported conducting 17 preliminary trafficking investigations, compared with 13 preliminary investigations in 2020 and one investigation in 2019. Authorities ultimately halted or investigated, under related criminal statutes, nine preliminary trafficking investigations in 2021, compared with the same number of cases in 2020. The government sometimes halted investigations of potential trafficking crimes when victims did not self-identify as such and declined to participate. Officials did not report prosecuting or convicting any traffickers for the third consecutive year. In 2021, authorities continued to prosecute one case of labor trafficking involving two suspects, initiated in 2018. The government did not report investigating, prosecuting, or convicting any government employees complicit in trafficking offenses.

The Human Trafficking and Migrant Smuggling Unit (UMM), a joint unit comprised of law enforcement officials from the Aruban Police Force and the Royal Dutch Military Police, led trafficking investigations. Another interdisciplinary unit (JIUMM) conducted preliminary reviews of possible trafficking crimes, such as tips from the hotline or civil society; it determined whether to refer cases to UMM for full investigation, refer them to other units for investigation under a different criminal statute, or close a case. JIUMM referred seven preliminary investigations to UMM for full investigation; by contrast, UMM conducted two full trafficking investigations in 2020. The government reported it provided basic trafficking-awareness training to law enforcement officials. While senior government officials distinguished between trafficking and migrant smuggling, observers expressed concern that non-specialized officials, such as law enforcement officers and prosecutors, did not have an adequate understanding of trafficking; across the government, Aruba addressed human trafficking and migrant smuggling via the same institutions, possibly contributing to conflation of the crimes. Many officials used "Quick Reference Cards" (QRCs), supplied by the Kingdom of the Netherlands and distributed at the conclusion of trafficking awareness trainings, that included relevant criminal articles; a list of trafficking indicators; standard operating procedures to use following identification of a potential trafficking case; and contact information to use when referring victims. Aruban authorities cooperated with international law enforcement agencies on two cases, including an international investigation initiated after Aruban officials fielded a trafficking report via a reporting hotline.

## PROTECTION

The government slightly increased protection efforts. The government reported identifying seven potential trafficking victims—four potential sex trafficking victims and three potential labor trafficking victims—in 2021, compared with four victims in 2020, zero in 2019, two in 2018, and 71 in 2017. Of the seven potential victims identified, three were girls, two were women, and two were men; the government identified potential victims from Colombia, the Dominican Republic, Finland,

and Venezuela. Authorities screened seven additional individuals for trafficking indicators, compared with 10 additional individuals in 2020, but determined them to be victims of other crimes. The government indicated an international organization identified four more trafficking victims, in addition to the seven government-identified potential victims. The government classified victims as "potential," "presumed," or "confirmed" victims. The government did not provide services to potential victims, who were typically associated with early-stage investigations; the government only provided care services to presumed or confirmed victims. However, the government tied victims' status and access to services to the associated criminal case against a trafficker. If a prosecutor determined not to pursue trafficking charges, the government discontinued services for associated victims. Observers expressed concern that the link between victim assistance and the success of the criminal proceedings against traffickers limited victims' access to critical services. JIUMM assigned one potential victim status as a "presumed victim" of labor trafficking, which made her eligible to receive services. The government reported referring one presumed victim to services in 2021, compared with referring no victims in 2020. The victim declined shelter but received basic care services and an informal stay of deportation; when prosecutors determined to pursue migrant smuggling charges, rather than human trafficking charges, the government phased out assistance. Multidisciplinary teams consisting of police, labor officers, immigration officials, and civil society representatives deployed when investigations called for raids or site visits. The government had an agreement with civil society organizations to facilitate the identification of trafficking victims among vulnerable migrant groups by allowing potential victims to remain anonymous and receive services from civil society organizations during the initial investigation; no victims used the anonymous self-reporting mechanism in 2021. The anti-trafficking task force (TMMA) continued to provide law enforcement and social services officials with a checklist of the most common signs of trafficking, which they used in concert with the government's QRCs. The government reported officials screened undocumented migrants for trafficking indicators during detainment interviews. Observers, however, expressed concern detention center staff and other officials were insufficiently equipped to identify trafficking. The government reported it trained 320 detention center, Department of Integration and Management of Foreigners (DIMAS), immigration, and other officials to recognize trafficking indicators and refer victims. The government had a basic victim referral mechanism and worked with an international organization to draft an updated protocol, which remained unfinished at the end of the reporting period.

CMMA established a working group with civil society actors to coordinate on victim identification and referral; the group met monthly during the reporting period. The government maintained informal agreements with local NGOs and private sector accommodations to shelter adult and child victims of trafficking. Through these arrangements, the government could secure emergency short-term shelter for victims and longer-term shelter for adult female victims, despite a lack of trafficking-specific shelters. Authorities could place unaccompanied child victims in foster care centers or foster homes, and civil society organizations or local churches could accommodate adult male victims. Officials conducted risk assessments before deciding whether victims could leave shelters unchaperoned; they restricted victims' movement if their lives were threatened. The government reported it continued to work on a longstanding plan to expand shelter capacity for male victims and families via new facilities; in 2021, the government experienced delays in obtaining required permits for new structures but began renovating the site's existing buildings. Authorities did not report any victims assisted the government in the prosecution of traffickers.

Foreign victims were entitled to the same rights and protection as Arubans. The law authorized the extension of temporary immigration relief for foreign victims for three to six months on a case-by-case basis and allowed foreign victims to change employers if they were suspected of exploiting workers. Authorities did not report any victims received these benefits but indicated most foreign victims not participating in the trials against traffickers returned to their home countries, except when a safe return was not possible. The criminal code enabled victims to receive restitution during criminal proceedings or to file civil suits, to seek compensation not to exceed 50,000 florin ($28,090) for financial

and emotional damages, although none did so in 2021. The Bureau of Victim Assistance operated a hotline for potential victims of all crimes, including trafficking; the government reported three trafficking-related calls to the hotline, compared with eight in 2020, leading to the identification of one potential victim; by contrast, the government identified two victims via the hotline in 2020.

**PREVENTION**

The government slightly increased prevention efforts, which remained modest. The National Coordinator on Human Trafficking and Migrant Smuggling continued to lead the government's anti-trafficking efforts, with support from the TMMA and CMMA. All three entities had dual responsibility for both anti-trafficking and anti-smuggling efforts. Authorities continued to implement the 2018-2022 national action plan, which lacked dedicated resources for its implementation. Instead, authorities financed anti-trafficking activities via ad hoc allotments, including periodic infusions from the Kingdom of the Netherlands, which limited the capacity and stability of these efforts across prosecution, protection, and prevention. The government reported it funded the CMMA's project manager, the entity's only dedicated staff member, via a one-time funding extension granted by the Ministry of Justice (MOJ). The CMMA submitted a proposal to the MOJ to formalize its institutional status and obtain long-term funding for the project manager position; the proposal remained pending at the conclusion of the reporting period. The four Kingdom countries agreed to update an existing memorandum of understanding on human trafficking and migrant smuggling in 2022.

Officials raised awareness of human trafficking and the hotline in multiple languages via social media, posters, and flyers. Authorities continued to utilize awareness materials produced in a 2011 campaign intended to inform migrants of numerous risks, including trafficking. The government applied for and received funding from the Netherlands for this campaign. In 2021, CMMA created and distributed a new short film about undocumented migrants' vulnerability to trafficking via social media and its trafficking-awareness website. The government continued to administer the airport-based campaign supported by an international organization, although it noted border closures limited the campaign's visibility. The government provided trafficking-awareness training to government officials from parliament, the ministry of finance, the judiciary, and the ministry of education, as well as civil society; the CMMA also trained officials on the responsibilities of the CMMA, TMMA, and UMM. In 2021, the government primarily conducted virtual awareness-raising activities, including social media campaigns and webinars. It opened some of these events to officials from neighboring countries.

Officials had procedures to screen adult entertainers and performed inspections during the year once the government relaxed its pandemic mitigation measures, allowing adult entertainment venues to reopen; the government did not issue adult entertainment visas to foreigners in 2021. Normally, a Kingdom of the Netherlands policy required individuals on adult entertainment visas, primarily Colombian women, to meet with consular officers to ensure the applicants knew their rights and had a copy of their work agreement before picking up their in-flight letter at a Kingdom of the Netherlands embassy. Upon arrival, such visa recipients normally received information about their rights, risks, and resources. The government did not report efforts to reduce the demand for commercial sex acts.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Aruba. Traffickers exploit Venezuelan women in sex trafficking and foreign adults of all genders in forced labor in Aruba's service and construction industries. Arriving Venezuelans commonly overstay their visas, leaving many with expired documentation and a corresponding increased risk for trafficking. Families, business owners, and criminals exploit some of these Venezuelans in forced labor in domestic service, construction, and commercial sex, respectively. Supermarket managers subject People's Republic of China-national men and women to forced labor in grocery stores; business owners and families subject Indian men to forced labor in the retail sector and domestic service, respectively; and Arubans force Caribbean and South American women into domestic servitude. Officials reported increases in forced criminality, where traffickers compel victims to commit unlawful

acts, such as robberies and drug-related offenses. Women in regulated and unregulated commercial sex, domestic workers, and employees of small retail shops are most at risk of trafficking.

## AUSTRALIA: TIER 1

The Government of Australia fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Australia remained on Tier 1. These efforts included convicting more traffickers, ordering two convicted traffickers to pay restitution to a victim, increasing funding to NGOs for community prevention programs, and developing a monitoring and evaluation plan to track implementation of its 2020-2025 national action plan (NAP). Although the government meets the minimum standards, it did not adequately screen vulnerable groups traffickers may target, including domestic workers, international students, and migrant workers; this may have resulted in the government's detention or deportation of unidentified victims.



AUSTRALIA TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Continue to strengthen efforts to investigate and prosecute trafficking crimes pursuant to trafficking laws, with increased focus on pursuing labor trafficking crimes instead of labor or employment violations, and sentence convicted traffickers to significant prison terms. • Increase efforts to proactively identify trafficking victims among vulnerable groups, such as undocumented migrants, asylum-seekers, agricultural and hospitality industry workers, visa holders, and domestic workers, and refer those victims to appropriate government authorities. • Further de-link the provision of services from participation in the criminal justice process and increase services available to victims unable or unwilling to participate in the criminal justice process. • Ensure the statutory definition of trafficking under the criminal code does not require movement of the victim as an element of the crime. • Continue efforts to train police, immigration officials, and other front-line officers, both offshore and onshore, to recognize indicators of trafficking and respond to suspected cases of both sex and labor trafficking. • Establish the National Labour Hire Registration Scheme with sufficient compliance tools. • Increase training for judges, prosecutors, and law enforcement officials on the application of trafficking laws, elements of trafficking, investigative techniques, evidence collection specific to trafficking cases, and alternatives to victim testimony. • Conduct initial screening interviews with potential victims in a safe and neutral location and in the presence of a social service professional. • Establish a national compensation scheme for trafficking victims. • Continue to implement or fund awareness campaigns, particularly among rural communities and migrant populations, including international students, vulnerable to forced labor. • Continue to strengthen efforts to prosecute and convict Australian child sex tourists. • Increase efforts to investigate and hold accountable foreign diplomats posted in Australia suspected of complicity in trafficking.

**PROSECUTION**

The government increased law enforcement efforts. Divisions 270 and 271 of the Commonwealth Criminal Code, when read together, criminalized sex trafficking and labor trafficking. Inconsistent with international law, the definition of "trafficking" under Division 271 required the element of movement of a victim. However, Division 270, which criminalized "slavery," "servitude," and "forced labor" offenses, could be utilized to

prosecute trafficking crimes that did not involve victim movement. Division 271 prescribed penalties of up to 12 years' imprisonment for offenses involving an adult victim and up to 25 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Division 270 prescribed penalties of up to 25 years' imprisonment for slavery, up to 15 years' imprisonment for servitude, and up to nine years' imprisonment for forced labor. These penalties were all sufficiently stringent.

In 2021, the government referred 150 cases of suspected trafficking crimes for possible investigation, compared with 233 cases the previous year, which had included cases of exit trafficking, organ trafficking, harboring, and forced marriage. Authorities initiated prosecutions of three alleged traffickers, compared with four the previous reporting period. Authorities continued prosecutions of 19 defendants begun in previous reporting periods. Courts convicted and sentenced eight traffickers to significant prison terms, compared with two convictions the previous reporting period. Courts convicted two traffickers of slavery under section 270.3(1) of the criminal code, along with non-trafficking related charges, and two traffickers of forced labor under 270.6A of the criminal code, along with non-trafficking related charges. In one case, courts ordered two traffickers to pay 45,000 Australian dollars ($32,730) and 25,000 Australian dollars ($18,180) in restitution to the victim. In 2021, the government prosecuted 31 defendants for planning or engaging in sexual activity with children overseas; some of these cases were initiated in prior reporting periods. These efforts led to four convictions of child sex tourists, compared with 38 prosecutions with one conviction reported in 2020. Authorities continued to pursue labor, immigration, or employment violations in lieu of trafficking charges, which may have resulted in suspected traffickers receiving only fines and other civil penalties that were inadequate to deter trafficking crimes. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. The government reported pandemic-related delays in some court cases that required a jury; the courts allowed for remote court appearances and focused on facilitating early resolution of cases to address these delays. Authorities reported that despite pandemic-related restrictions, such as domestic lockdowns and border closures, law enforcement maintained dedicated staffing levels to address trafficking in persons and modern slavery crimes.

The government trained police, labor inspectors, immigration officers, prosecutors, and health care and community front-line workers on a variety of topics, including human trafficking investigations, evidence and information collection, anti-trafficking enforcement policies and laws, victim identification and referral, and victim support services. In addition, the government trained government officials to identify, assess, and mitigate modern slavery risks in procurement processes. The government also trained prosecutors and judicial officials on trafficking-related laws. Front-line officers stated that an anti-trafficking training activity designed to develop investigative skills did not contain applicable operational and practical skills, such as interviewing vulnerable witnesses and compiling evidence. In a 2021 report by the Australian Institute of Criminology, prosecutors identified explaining and proving difficult concepts at trial as one of the greatest challenges of prosecuting trafficking cases. Prosecutors raised concerns with inconsistent interpretation, understanding, and application of human trafficking and slavery crimes among prosecutorial and judicial officials. Prosecutors relied heavily on victim testimony due to the difficulty of corroborating evidence, and the average time for court proceedings was 2.5 to 3.4 years, hindering cooperation from victims. Observers reported authorities discussed measures to reduce overreliance on victim testimonies; also discussed was the lack of special investigative measures to corroborate evidence that have led to cases being investigated and prosecuted under non-trafficking statutes or dismissed.

## PROTECTION

The government maintained efforts to protect victims. Authorities identified 34 victims, compared with 25 victims the previous year; for the remainder of victims from the previous year, the form of exploitation was not reported. Four of the potential victims were younger than 18 years old. Similar to the previous reporting period, authorities referred all those identified as potential victims to the Australian government's

NGO-implemented support program. Despite pandemic restrictions on travel, the government also assisted 10 potential Australian trafficking victims abroad, compared with 11 the previous year; it was not clear how many of these individuals were victims of trafficking as defined by international law compared with victims of forced marriage or individuals vulnerable to forced marriage.

Authorities identified most victims through the efforts of joint agencies, health care facilities, task forces, and cooperative action with foreign governments. Authorities continued to utilize a list of indicators to identify trafficking victims and refer them to services. Observers reported authorities often linked trafficking to migration and continued to inadequately screen for indicators of trafficking in the agricultural and hospitality industries and among offshore migrants. Despite persistent reports of sexual exploitation, forced labor, and multiple trafficking indicators among foreign workers in Australia under the auspices of the Working Holiday Visa scheme and Seasonal Worker Program (SWP), authorities did not report proactively screening for trafficking indicators among such workers. In the Working Holiday Visa program, the government's requirement of completing 88 days to obtain a second-year or third-year visa was a key driver for why such visa recipients acquiesce to legally non-compliant or exploitative conditions. The government did not report screening seasonal workers who left their employer for trafficking indicators, which may have resulted in authorities detaining and deporting unidentified trafficking victims. Observers reported some victims may have been reluctant to communicate with law enforcement officers due to fear of detention and deportation and the existence of language barriers. Government policy sought to prevent victims from being held in immigration detention or otherwise arrested for unlawful acts traffickers compelled them to commit; however, due to a lack of formal identification procedures, authorities may have deported or detained some unidentified victims. Observers reported that publicized reports of high-level government officials' engagement in commercial sex may have discouraged sex trafficking victims from seeking support from government providers.

Authorities provided formally identified trafficking victims and potential victims with accommodation, living expenses, legal advice, health services, vocational training, and counseling through the support program. The government allocated 2.84 million Australian dollars ($2.07 million) from the federal budget to the support program in the 2021-2022 funding year, none of which was pandemic-related support, compared with 4.3 million Australian dollars ($3.13 million) during the 2020-2021 funding year, of which 1.8 million was for pandemic-related support. Only the police had the legal authority to refer victims to the support program; experts reported this requirement prevented some victims from accessing needed support services. The support program had five "streams" that were tailored to the needs of the particular victim. The assessment and intensive support stream within the support program assisted victims for up to 45 days, irrespective of whether they were willing or able to assist with the investigation or prosecution of a human trafficking or slavery-related crime. The extended intensive support stream allowed for an additional 45 days of access to the program on a case-by-case basis for victims willing to assist with investigation or prosecution but not yet able to do so for reasons including age, ill health, trauma, or a practical impediment. Children who were suspected victims of trafficking were automatically entitled to the extended support program if it was in their best interest. The temporary trial support stream assisted victims giving evidence pertaining to a human trafficking related prosecution. The justice support stream aided victims until the finalization of their case investigation and/or prosecution. The forced marriage support stream provided those in or at risk of forced marriage—who may or may not have been trafficking victims according to international standards—with up to 200 days of support without being required to participate in a criminal investigation or prosecution against perpetrators. NGOs continued to report some support services for victims were contingent on participation in law enforcement investigations and the government would cease provision of services when investigations ended. The government did not report how it provided services to adults unable or unwilling to participate in law enforcement investigations.

The government provided temporary and permanent visas to eligible victims. In 2021, the government provided 18 temporary stay visas to

foreign trafficking victims, compared with 28 victims in 2020, despite border closures that significantly reduced travel to Australia. Fewer than five individuals were granted permanent "referred stay" visas, the same as in 2020; this included victims and their immediate family members, although some of these cases may have been victims of forced marriage rather than trafficking. Courts ordered two convicted traffickers to pay restitution to one victim. The government did not have a national victim compensation system for crime victims, and victims relied on civil proceedings to access compensation. The government operated a national anti-trafficking hotline but did not report the number of cases initiated from calls to the hotline.

## PREVENTION

The government maintained efforts to prevent trafficking. The Modern Slavery and Human Trafficking Branch within the Australian Border Force (ABF) led the government's domestic response to trafficking; the ABF was the chair of the Australian Interdepartmental Committee on Human Trafficking and Slavery (IDC), which coordinated the government's anti-trafficking policy framework and led the 2020-2025 NAP implementation efforts. In addition, the Operational Working Group (OWG), a subcommittee of the IDC, focused on operational issues and information-sharing in relation to the support program; the OWG reported meeting more frequently about pandemic-related impacts on trafficking victims. The government, in consultation with NGOs, developed a monitoring and evaluation plan to measure NAP progress. The IDC drafted and delivered to Parliament a report on government anti-trafficking efforts completed in 2017 to 2020.

The government funded multiple research projects conducted by an academic institution and NGO, and it awarded 1.67 million Australian dollars ($1.2 million) to seven NGOs to implement community prevention programs in Australia, compared with 393,380 Australian dollars ($286,090) for the 2020-2021 period. NGOs implementing these programs focused on forced labor, survivor engagement to inform national policy, migrant worker rights, trafficking indicators, Modern Slavery Act reporting, and increased trafficking awareness and community collaboration of anti-trafficking activities. The government conducted awareness campaigns targeting visa holders and the public. Observers in Pacific Island Countries (PICs) reported concern that many migrant workers did not fully understand their offers or conditions of employment prior to arriving in Australia, despite receiving and reading their letter of offer and employment before arrival. Observers also noted many migrant workers did not know their workplace rights. The government conducted a campaign targeting seasonal workers, who are vulnerable to trafficking, on the consequences of absconding; the campaign warned visa holders against leaving their designated employer to find other work.

The Modern Slavery Act 2018 required businesses and entities with annual revenue of 100 million Australian dollars ($72.73 million) or greater to publish an annual modern slavery statement detailing their efforts to combat modern slavery in their supply chains and operations, among other provisions. The government published its second Modern Slavery statement, in compliance with the act, and updated the publicly available online registry of all submitted statements. The government posted more than 2,500 statements from businesses, covering nearly 6,000 entities operating in more than 23 different industries on the registry, which was the second submission period under the act. The government developed and disseminated guidance documents, including on how the pandemic may have increased forced labor risks in supply chains, to assist businesses with the implementation of the act's requirements. In addition, the government conducted 34 educational engagements with businesses to support the understanding and completion of the act's requirements. However, observers noted the act provided no financial penalty to companies for non-compliance and a majority of companies that did report failed to fully address the mandatory reporting requirements of forced labor risks in their supply chains; an NGO analyzed 102 company statements published in the first reporting cycle of the Modern Slavery Act and found that less than a third of companies took action to address modern slavery risks in their supply chains. Several NGOs urged the government to strengthen its enforcement framework of the act and require companies to take steps to prevent forced labor.

In 2021, the Australian Transaction Reports and Analysis Centre created and distributed its first written guide of financial indicators of trafficking to businesses. The government established an intergovernmental network to address labor exploitation in public procurement across state, territory, and commonwealth jurisdictions. The Fair Work Ombudsman continued to prioritize prevention of potential labor exploitation—including human trafficking—amongst migrant workers, focusing on awareness in domestic workers and among international students. In November 2021, the Fair Work Commission established a minimum wage for horticulture workers.

The government did not implement a recommendation (from the February 2019 Migrant Workers Taskforce Report) to create a national Labour Hire Registration Scheme requiring recruitment agencies in designated high-risk industries to register with the government and employers to use only these registered agencies. Similar registration schemes had been implemented in Queensland and South Australia in 2018, Victoria in 2019, and the Australian Capital Territory in 2021. In November 2021, Parliament introduced the "Protecting Migrant Workers" Bill 2021. The legislation aimed to increase protections for non-Australian workers and introduced new criminal offenses related to coercing migrant workers to accept work arrangements to fulfill visa requirements; the bill was pending at the end of the reporting period.

An NGO reported concern the government did not effectively monitor and enforce labor laws in rural parts of Australia, heightening risks of forced labor. Domestic workers within Australia—especially in the state of Western Australia, those lacking a contract, or residing within diplomatic households—remained extremely vulnerable to exploitation due to the lack of clear protective oversight mechanisms relevant to these populations. However, in December 2021, the Western Australian government changed the definition of "employee" to include domestic work as part of its industrial relations framework to bring such work under state regulation. In September 2021, the Select Committee on Temporary Migration in Parliament released a report with 40 recommendations to improve Australia's temporary visa system; one of the recommendations included the removal of the 88-day requirement with respect to farm work to be eligible for a second or third Working Holiday Visa. In June 2021, the government had removed the 88-day requirement for British citizens under the Working Holiday Visa as part of the Australia-UK Free Trade Agreement; however, the requirement remained for all other nationalities. Under the SWP, workers' employment and immigration status were tied to a specific employer; observers noted this increased migrant workers' vulnerability to forced labor.

In March 2022, the government released its second installment of its International Engagement Strategy on Human Trafficking and Modern Slavery; the update focused on increasing cooperation with international partners to address trafficking in the region. The government continued to work with other governments by engaging in anti-trafficking dialogue, sharing information, conducting trainings, and providing technical assistance. Australia maintained policy and legislative frameworks to prevent, detect, disrupt, investigate, and prosecute child sexual abuse and exploitation, including crimes that occurred online, within Australia and overseas. The government made efforts to reduce the demand for participation in international sex tourism by its citizens by publishing materials for passport applicants outlining the application of Australian child sex trafficking laws to Australians overseas and by conducting law enforcement efforts with international law enforcement partners. The government cancelled 67 passports and denied seven to child sex offenders, which was the third year the government implemented these legal authorities. In addition, authorities provided 132 notifications to foreign law enforcement regarding traveling Australian and foreign national child sex offenders. The government did not make efforts to reduce the demand for commercial sex acts within Australia.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Australia, and traffickers exploit victims from Australia abroad. Traffickers primarily exploit women and men in forced labor and, to a lesser extent, women and girls in sex trafficking. Traffickers exploit a small number of children, primarily teenage Australian and foreign girls, in sex trafficking within the country. Some women from Asia and, to a lesser extent, Eastern Europe and Africa

AUSTRIA

migrate to Australia to work legally or illegally in a number of sectors, including commercial sex. After their arrival, traffickers compel some of these women to enter or remain in commercial sex in both legal and illegal commercial sex establishments, as well as massage parlors and private apartments. Traffickers hold some foreign women—and sometimes girls—in captivity and exploit them through physical and sexual violence and intimidation, manipulate them through illegal drugs, and force them to pay off unexpected or inflated debts. Traffickers attempt to evade authorities by allowing victims to carry their passports while in commercial sex establishments and frequently moving the victims to different locations to prevent them from establishing relationships with civil society or other victims. Traffickers isolate foreign women and girls from Australian women to inhibit information sharing about rights, regulations, and work standards in commercial sex establishments; foreign women and girls are likely uninformed about legal commercial sex laws and regulations and are more vulnerable to exploitation. Some victims of sex trafficking and some women who migrate to Australia for arranged or forced marriages are exploited by their husbands or families in domestic servitude. Unscrupulous employers and labor agencies exploit some men and women from Asia and several Pacific Islands who are recruited to work temporarily in Australia to forced labor in agriculture, cleaning, construction, hospitality and tourism, and domestic service. An investigation by the Fair Work Ombudsman found that some fraudulent foreign contracting companies exploit farm workers in bonded labor. There are reported cases of forced labor and other forms of exploitation in the agriculture and horticulture sectors, where victims (often foreign migrants and often from Asia) are threatened against leaving their jobs or seeking help. Traffickers may exploit temporary migrants, including individuals on working holiday visas, and international students in forced labor, especially when based in remote regions with limited access to support. Some identified victims are foreign citizens on student visas who pay significant placement and academic fees. Unscrupulous employers may coerce students to work in excess of the terms of their visas, making them vulnerable to trafficking by exploiting fears of deportation for immigration violations. Migrant workers may have a lack of awareness of Australian workplace laws, access to health care, legal protections available to the domestic workforce, and support due to volatile employment and uncertain visa conditions, as well as language barriers; they are more vulnerable to trafficking. Some foreign diplomats allegedly exploit domestic workers in forced labor in Australia. Changes in 2019 to entitlements for diplomats in Australia may slightly reduce the overall number of foreign domestic workers in the country. Instances of forced labor in domestic service are sometimes undetected or unacknowledged by authorities and thus not captured in official statistics. Some fishing vessels that transit or dock at Australian ports use physical abuse to force men to perform labor. Victims of domestic servitude in Australia work in extremely isolated circumstances with little to no oversight or regulation. Asylum-seekers, detained for attempting to reach Australia by sea or waiting in country for application decisions, may have increased vulnerability to forced labor or sex trafficking due to displacement, economic instability, and lack of access to basic resources and community support networks. Reports show heightened risks of child sexual exploitation, some of which may be child sex trafficking, which may be due to pandemic-related economic impacts. A small number of Australian residents may facilitate and engage in commercial sex and child sex tourism abroad, including in Thailand.

## AUSTRIA: TIER 1

The Government of Austria fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Austria remained on Tier 1. These efforts included establishing comprehensive guidelines on victim identification and referral procedures for a wide range of stakeholders, including health and social service providers, and asylum and immigration authorities. Moreover, the

government provided assistance to more victims and provided funding to an NGO to launch a mentorship program for trafficking survivors. Finally, the government adopted a new national action plan (NAP) and created an awareness campaign for those fleeing Russia's war on Ukraine. Although the government meets the minimum standards, the government prosecuted fewer traffickers, and gaps remained in the identification of victims among vulnerable populations, including children and asylum-seekers. The government did not maintain a standardized law enforcement database on investigations, prosecutions, convictions, and sentencing.



### PRIORITIZED RECOMMENDATIONS:

Thoroughly investigate and prosecute alleged traffickers and sentence convicted traffickers to adequate penalties, which should involve significant prison terms, consistent with those imposed for other serious crimes such as rape. • Increase efforts to identify victims among vulnerable groups—including children, asylum-seekers, and individuals in commercial sex—and ensure all victims have access to services. • Strengthen the protection system for children, including by ensuring each unaccompanied child is quickly appointed a guardian, to prevent trafficking among this vulnerable population. • Increase efforts to identify victims of labor trafficking, such as by expanding training to help front-line responders recognize indicators of labor trafficking, including subtle means of fraud or coercion. • Strengthen efforts to guarantee effective access to compensation for victims, including by enforcing court compensation orders. • Uniformly apply the non-punishment provision for unlawful acts traffickers compel victims to commit and codify in law the non-punishment of victims. • Standardize the government law enforcement database on investigations, prosecution, convictions, and sentencing to include all cases of trafficking and disaggregate information on convictions and sentencing where defendants have committed multiple crimes. • Appoint an independent national anti-trafficking rapporteur.

### PROSECUTION

The government maintained law enforcement efforts. Article 104a of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of six months to five years' imprisonment for offenses involving an adult victim and one to 10 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. Authorities also prosecuted sex trafficking under Article 217, which criminalized all transnational prostitution and prescribed penalties of one to 10 years' imprisonment when a trafficker induced a foreign national to engage in prostitution by force, fraud, or coercion. The government conducted 61 investigations involving at least 94 suspects under Article 104a, compared with 61 investigations involving at least 102 suspects in 2020. The government initiated prosecutions under Article 104a against three defendants and continued seven ongoing prosecutions, compared with 13 total prosecutions in 2020. Courts convicted five traffickers under Article 104a, compared with four in 2020. The government prosecuted 16 defendants and convicted seven under Article 217, but it did not specify how many involved trafficking crimes. In contrast to the Austrian court register, the government statistics agency classified multi-offense convictions by the crime that carried the most severe punishment; some trafficking crimes may have been recorded as other offenses. The most recent data on prison sentences published by the government statistics agency was from 2020, when courts sentenced three traffickers under Article 104a to terms of imprisonment ranging from two to three years. Additionally, under Article 217, courts convicted three traffickers to

sentences ranging from fully suspended to three years' imprisonment. Despite the lack of comprehensive data for 2021, individual case reports provided some sentencing information. In April 2021, a court convicted two traffickers to seven and eight years' imprisonment on sex trafficking charges for forcing a relative into commercial sex, and in October 2021, a court convicted a trafficker to three years' imprisonment for exploiting foreign workers for labor at an iron forging company.

The Federal Crime Office's (FCO) human trafficking and smuggling service led the government's efforts to investigate trafficking crimes and coordinated joint investigations with foreign law enforcement when necessary. In December 2021, the FCO human trafficking and smuggling service launched a restructuring process to include in its mandate social security fraud and illegal gambling cases, in an effort to enhance coordination of cases involving all of these often interrelated crimes. Many public prosecutors' offices had specialized anti-trafficking divisions, and some courts had specialized judges. Although the judicial system was fully functioning, courts had occasional difficulties securing witness testimonies due to COVID-19 travel restrictions. An international organization expressed concern that authorities were sometimes confused about whether to charge a suspected trafficker under Article 104a or Article 217, as the transnational prostitution statute pre-dated the trafficking law but still applied to trafficking crimes. The international organization noted this confusion could lead to gaps in data collection, including with respect to data on victim identification. The government continued to jointly investigate cases with other government or law enforcement entities. In June 2021, Austrian law enforcement arrested seven suspected traffickers and identified 22 victims during Europol-led police operations focused on labor exploitation.

The government, assisted by an NGO, provided specialized training to authorities, including law enforcement, border control, labor inspectors, and diplomatic, consular, and judicial personnel. Law enforcement officials received mandatory training on trafficking as part of their basic training and had opportunities for additional training and seminars throughout their careers. The FCO conducted a training for finance police, customs, and revenue authorities focused on traffickers' exploitation of victims to fraudulently collect government social security funds. The FCO continued efforts to train law enforcement on digital methods of combating trafficking in response to a rising trend in traffickers' use of social media and online recruitment. National and provincial authorities cooperated with authorities from other countries, including neighboring EU countries, to investigate and prosecute trafficking cases. In 2021, the government requested mutual legal assistance in 28 cases and executed 16 requests for mutual legal assistance from foreign officials, whereas in 2020 there were 50 cases and 16 executed requests. Authorities reported no new cases of forced labor in foreign diplomatic households; the government did not report the status of an ongoing case from 2019. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

## PROTECTION

The government increased protection efforts. The government's victim identification statistics were the same as the number of victims that received services during the year. One government-funded NGO reported it provided services to 334 female victims and their children in 2021 (314 in 2020), of whom police referred 75 victims (24 men and 51 women). Some of these victims may have been children, as the organization provided assistance to women and girls ages 15 years and older. Another NGO, which provided government-funded services for male victims, reported assisting 61 victims in 2021 (62 in 2020). While the majority of victims were foreign nationals, the government identified 42 Austrian victims in 2021, an increase compared with 13 in 2020. Although identification statistics did not disaggregate labor and sex trafficking cases, the majority of identified victims were exploited in sex trafficking. Experts noted, however, that the relatively low number of identified forced labor cases with foreign national victims could be attributed to authorities' failure to recognize labor trafficking indicators rather than to low prevalence. The 2021-2023 NAP established comprehensive guidelines on victim identification and referral procedures for a wide range of stakeholders, including health and social service providers, and asylum and immigration authorities. Authorities used guidelines and checklists to screen potential

victims for indicators of trafficking and referred identified victims to NGOs for assistance. The government maintained a separate national referral mechanism to identify and refer child trafficking victims. Law enforcement agencies intensified efforts to monitor social media platforms to identify sex trafficking victims. Pandemic lockdowns between November 2020 and May 2021 and between November and December 2021 hampered victim identification efforts, particularly the identification of trafficking victims in the legal commercial sex industry, as the industry moved increasingly online and underground.

The government allocated €1.47 million ($1.67 million) to specialized anti-trafficking NGOs to provide shelter, services, and legal support to victims in 2021, compared with €1.43 million ($1.62 million) in 2020. Government funding accounted for the bulk of support for these organizations. Government-funded NGOs provided shelter, medical and psychological care, legal assistance, and German language classes to adult victims, including specialized services for victims with disabilities. Foreign victims had the same access to services as domestic victims. One government-funded NGO reported it increased tailored assistance for women with disabilities and transgender women and girls, offered victims the option of private accommodations, and launched a mentorship program for survivors. The city of Vienna funded a government-run center for unaccompanied migrant children, including child trafficking victims, offering legal, medical, psychological, social, and language assistance; the center reported it did not provide assistance to any child trafficking victims in 2021. The government's anti-trafficking task force published annual guidelines on child victim identification and continued distributing brochures on children's rights. An NGO reported that out of 5,770 unaccompanied children who applied for asylum in 2021, 4,489 (78 percent) went missing; observers noted these missing children were highly vulnerable to trafficking and recommended the government assign a guardian to unaccompanied children immediately upon identification. In January 2022, the Ministry of Interior submitted for inter-ministerial review a comprehensive concept for a national center for child trafficking victims. The government provided training to NGOs working with migrants and asylum-seekers to help them identify trafficking victims among these groups. The government funded NGOs to provide training on victim identification for law enforcement, labor inspectors, detention and asylum center authorities, border control, revenue officials, and military, diplomatic, and consular personnel. The FCO created online consultation hours for police officers with trafficking specialists to further improve law enforcement identification efforts and developed short videos for police officers describing the crime of trafficking and distinguishing it from human smuggling.

The law provided for the protection of victims' rights during criminal proceedings. NGOs were permitted to accompany victims to hearings and interviews. Courts provided trauma-informed methods for presenting evidence and testimony when victims needed protection from traffickers during the investigation and prosecution phases. Victim protection procedures granted victims a 30-day reflection period to decide whether to assist in the prosecution of their traffickers; some NGOs reported concerns about inconsistencies in the reflection period and noted victims were not always informed of this right. Victims' access to services was not dependent on their willingness to participate in the criminal process. Ministry of Justice (MOJ)-funded NGOs provided psycho-social and legal assistance during criminal proceedings to approximately 110 trafficking victims in 2021, compared with 150 in 2020. The provision of legal aid was constrained by gaps in the identification of victims; experts noted cases in which victims were not properly identified and therefore unable to access specialized legal assistance. Foreign trafficking victims from outside the EU had the right to temporary residency, with possible annual extensions, which allowed access to employment; victims from EU member states did not require residence permits. The government granted nine residence permits and extended 13 permits to trafficking victims in 2021, compared with seven new permits and 18 extensions in 2020. Victims who chose to return to their country of origin received repatriation assistance from government-funded NGOs.

Victims could file civil suits against traffickers for damages and compensation, even in the absence of a criminal prosecution, and could still pursue civil suits in the event of an acquittal in a criminal case. Courts could award restitution upon criminal conviction; in 2021, courts awarded restitution to nine victims in trafficking cases, compared with eight in

AUSTRIA

2020. Experts expressed concern that access to compensation and restitution remained rare in trafficking cases; furthermore, compensation awards were unevenly enforced, as it was the victim's responsibility to enforce the order through a claim with legal authorities. NGOs also documented cases where compensation was stalled by the return of the victim to their home country. The government continued to include the topic of victim compensation in its trainings and seminars for prosecutors and judges, and the MOJ increased its cooperation with the Ministry of Finance to improve law enforcement's access to financial information; prosecutors can use the information to obtain judicial orders needed for seizing assets, which can be awarded to victims as compensation in judicial criminal proceedings. Authorities forgave administrative fines for illegal commercial sex or immigration violations if the individual was found to be a victim of trafficking. However, authorities may have detained unidentified victims due to gaps in victim identification. Observers noted courts did not consistently apply the non-punishment provision for identified victims and cited the lack of a specific legal provision on the non-punishment of victims of trafficking. Experts noted gaps in the government's referral process for suspected cases of exploitation among asylum-seekers; some migrants who showed signs of trafficking may have been sent to other countries in the EU without receiving services due to the government's enforcement of EU regulations on asylum-seekers.

## PREVENTION

The government modestly increased efforts to prevent trafficking. A national anti-trafficking task force led the government's efforts and included representatives from federal ministries, provincial governments, NGOs, business and labor interest groups, and civil society. The task force met four times and included working groups to address issues of particular concern, including child trafficking, labor exploitation, and non-punishment of victims. The working group on labor exploitation created informational material for foreign childcare workers to increase their knowledge of their rights. The government adopted the 2021-2023 NAP in July 2021. Civil society representatives who were not official members of the task force were periodically invited to attend task force meetings, and regional human rights coordinators covering anti-trafficking issues were regularly represented on the task force. The government did not publish its finalized implementation report assessing its progress in combating trafficking under its 2018-2020 NAP. A senior foreign ministry official headed the task force and served as the national anti-trafficking coordinator; Austria did not have an independent anti-trafficking rapporteur to evaluate the effectiveness of government efforts.

The government organized and funded public awareness events and programs, including a hybrid virtual and in-person conference for approximately several hundred participants from civil society, international organizations, and members of the diplomatic and consular corps; the conference highlighted traffickers' use of illicit financial flows and stressed the importance of providing fair compensation to victims. In March 2022, the government initiated a prevention campaign targeting refugees fleeing Ukraine; the government created posters in English and Ukrainian with the trafficking hotline number to distribute at rail and bus stations and reception centers. The government also continued its program to raise awareness in schools, subsidized anti-trafficking publications and television programming, and funded outreach activities to individuals in commercial sex. In December 2021, a government-funded NGO launched online awareness-raising activities targeting potential foreign childcare workers. The government and government-funded NGOs continued outreach activities to migrant workers, including undocumented workers and trained labor inspectors on trafficking indicators. Authorities required a quality certificate for agencies employing nursing care personnel to prevent them from engaging in labor exploitation. Observers noted the labor inspectorate's mandate was limited to addressing health and safety conditions, which they claimed hindered inspectors' ability to respond to other exploitative work conditions; however, Austrian authorities stated human trafficking and labor exploitation are now required components of inspectors' basic training and inspectors were required to report suspected cases to police. Austrian embassies and consulates in source countries informed visa applicants of the potential dangers of trafficking. The FCO operated

a 24-hour trafficking hotline with interpretation available in multiple languages. The hotline received 650 calls and emails in 2021; the government reported these calls led to numerous investigations and the identification and referral of victims.

The foreign ministry continued efforts to prevent trafficking among employees of foreign diplomatic households by holding events to inform them of their rights and by requiring them to obtain identification cards in person. The government continued partnering with neighboring governments and regional organizations to combat transnational trafficking; the FCO continued programs with the People's Republic of China (PRC) and Nigeria to combat cross-border trafficking and improve and expand joint investigations and, in January 2022, established an exchange program with Romanian police to increase coordination on human smuggling and trafficking cases, with a focus on cases involving Romanian citizens forced into begging. The government provided funding for projects to combat trafficking in a range of countries in the EU and Africa, as well as Cambodia and Nicaragua, and signed an agreement with Israel on combating cybercrime, including combating human trafficking and sexual exploitation of children. The government maintained efforts to reduce the demand for commercial sex acts by continuing to distribute awareness materials to the public on the possibility of sex trafficking in commercial sex. The government also continued efforts to reduce the demand for participation in international sex tourism by its citizens by training law enforcement and raising awareness among travel agencies and the broader public. The government continued to enforce public procurement guidelines for the elimination of labor trafficking in the purchase of goods and services. In June 2021, the government completed a project to analyze the use of tools and initiatives to counter trafficking in international supply chains; the government used the results for training purposes and as part of new procurement guidelines. The 2021-2023 NAP prioritized combating forced labor in supply chains.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit predominantly foreign victims in Austria, although traffickers also exploit domestic victims. Traffickers exploit women and girls from Austria, Eastern Europe (especially Bulgaria, Hungary, Romania, Serbia, and Slovakia), Southeast Asia, the PRC, Nigeria, and South America in sex trafficking. More than 95 percent of identified victims are foreign women subjected to sex trafficking, and approximately 65 percent of trafficking victims come from EU member states. An increasing number of men, transgender, and transsexual persons are identified as sex trafficking victims. Traffickers exploit women from Nigeria and the PRC in sex trafficking in massage parlors and brothels; many of the Nigerian victims arrive in Austria as asylum-seekers. Traffickers use the lack of protections and stigmas of the commercial sex industry to exploit Austrian women in sex trafficking. Sex trafficking is concentrated in urban areas but also occurs in smaller towns. Traffickers working in well-developed networks recruit sex trafficking victims with fraudulent offers of employment in restaurants and domestic service or by posing as potential romantic partners. Traffickers increasingly use online recruitment and advertisements to lure victims, a phenomenon accelerated by the pandemic. Most traffickers are Austrian men or men from the same country as their victim; many are members of international organized crime groups. Observers note labor trafficking is increasing. Traffickers exploit men and women from Eastern Europe, Southeast Asia, and the PRC in forced labor, primarily in restaurants, construction, agriculture, health care, transportation, and domestic service, including in diplomatic households. Seasonal migrant workers are especially vulnerable to labor trafficking, particularly during the harvest seasons. Traffickers exploit children, persons with physical and intellectual disabilities, and Roma in forced begging. Children, especially Romani girls, are also exploited in forced criminality. Traffickers use Austria as a transit point to move victims to other European countries. Unaccompanied children, many of whom go missing each year, are vulnerable to trafficking. As of March 2022, more than 175,000 refugees from Ukraine, predominantly women and children, have crossed the Austrian border seeking sanctuary; approximately 10,000 of these refugees have remained in Austria and are vulnerable to trafficking.

# AZERBAIJAN: TIER 2

The Government of Azerbaijan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Azerbaijan was upgraded to Tier 2. These efforts included convicting slightly more traffickers and continuing to issue more significant sentences and fewer suspended sentences than in previous years. The government increased victim protection efforts, including identifying more victims and increasing funding for victim assistance and the Ministry of Internal Affairs (MIA)-run anti-trafficking shelter. The government amended laws to expand victim identification efforts to include the State Migration Service (SMS) and measures to prevent revictimization of foreign national victims. However, the government did not meet the minimum standards in several key areas. The government investigated and prosecuted fewer suspects and lacked proactive identification efforts, particularly for Azerbaijani victims of internal trafficking and victims of forced labor. While the MIA funded repairs for an NGO-run shelter and funded another NGO-run shelter to buy land for a new shelter, the government allocated fewer resources to NGOs, including operational costs for NGO-run shelters. The government continued its moratorium on scheduled and unannounced labor inspections through 2022.



AZERBAIJAN TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers. • Sentence convicted traffickers to adequate penalties, which should involve significant prison terms. • Increase proactive identification efforts, particularly for internal trafficking, forced labor, and child trafficking. • Increase and allocate adequate funding to NGO-run shelters providing victim support services. • Develop and implement standard operating procedures (SOPs) and indicators for screening trafficking victims and train officials on screening for trafficking among individuals in commercial sex, migrants, children begging, and other at-risk populations. • Train investigators, prosecutors, and judges on victim-centered approaches to trafficking cases, including for children, and provide advanced training on trafficking investigations and prosecutions. • Lift the moratorium on scheduled and unannounced labor inspections. • Strengthen the capacity of the Labor Inspectorate to identify and refer victims of forced labor. • Adopt and implement specific procedures to protect potential child victims, including identification and referral procedures, indicators, and interview questions. • Train judges on restitution in criminal cases and inform all identified victims of their right to pursue compensation and encourage them to do so. • Allow victims to enter MIA-run shelters and receive services while they are seeking all required documents.

## PROSECUTION

The government maintained prosecution efforts. The 2005 Law on the Fight against Trafficking in Persons and Article 144-1 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of five to 10 years' imprisonment for offenses involving adult victims and eight to 12 years' imprisonment for offenses involving child victims. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Law enforcement investigated 15 cases in 14 suspects, compared with 18 cases with 20 suspects in 2020; 14 were sex trafficking cases and one was a forced labor case. The government prosecuted 16 new defendants, compared with 21 defendants in 2020. The government continued to prosecute three

defendants from previous years. Courts convicted 16 traffickers, compared with 15 traffickers in 2020; 14 for sex trafficking and two for forced labor. Judges continued to issue stronger sentences with 14 traffickers receiving imprisonment of seven to 10 years. Judges also issued fewer suspended sentences; one trafficker received a suspended sentence, and another received probation, compared with three traffickers receiving suspended sentences in 2020, 28 in 2019, and 20 in 2018. Officials reported judges issued suspended sentences to traffickers due to the "2018 decree on humanization of punishment," which required judges to issue more alternative punishments to imprisonment; however, in 2020, the government disseminated additional guidelines clarifying the decree did not include trafficking. Courts conducted virtual proceedings due to the pandemic and prioritized serious crimes, including trafficking, but as a result, courts required more time to process cases.

The MIA maintained an Anti-Trafficking Department (ATD) that investigated most trafficking cases. Authorities often failed to recognize psychological coercion as a means of control or required a transnational element for trafficking, which led to internal sex trafficking cases reclassified as lesser offenses. In previous years, GRETA and international organizations reported most investigations were reactive and lacked corroborative evidence for victim testimony; law enforcement noted standard procedures required a complaint from a victim to initiate an investigation, which hindered the ability to conduct proactive investigations. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. The government trained police, prosecutors, judges, attorneys, and SMS officials on various anti-trafficking issues. The government provided information to INTERPOL but did not provide information on international investigations or extraditions. The European Court on Human Rights ruled in October 2021 that the government did not effectively investigate forced labor claims by migrant workers in 2009 and ordered the government to pay €5,000 ($5,670) to each of the 33 Bosnian victims that filed the case.

## PROTECTION

The government increased victim protection efforts. The government officially identified 95 victims, compared with 94 in 2020; 94 were adult female sex trafficking victims and one was an adult male victim of forced labor; none were foreign victims. The government lacked proactive identification efforts for Azerbaijani victims of internal trafficking, and as a result, most officially identified victims were Azerbaijani victims identified in destination countries or foreign victims exploited in Azerbaijan. Officials identified one Azerbaijani victim of internal trafficking (eight in 2020). The government did not report information on children and parents "involved in begging for the purpose of helping their parents" in 2021 or 2020, but observers reported police declined to investigate potential forced child begging cases and returned most children to their parents without investigating the role of the family in the children's exploitation, leaving these children vulnerable to further harm. The government had SOPs for victim identification and amended a law to formally expand victim identification efforts to include the SMS. The government trained law enforcement, social workers, psychologists, and shelter staff on victim identification. However, first responders, including law enforcement, immigration, and social services personnel, were either unaware of the procedures or did not consistently follow or understand them, and observers continued to report the lack of screening of vulnerable populations for trafficking indicators, including women, children, LGBTQI+ persons in commercial sex, and foreign migrant workers. Additionally, the government lacked policies tailored to children, such as interview questions, indicators, and referral procedures. SOPs required first responders to refer potential victims within 24 hours to ATD, which officially identified victims based on an investigation. NGOs and the government provided support services to some potential victims; however, individuals without official recognition did not receive the one-time government-provided allowance and did not have the ability to bring a civil claim against the alleged traffickers. Civil society referred 15 potential victims to ATD in 2021; however, only one of the potential victims was determined by ATD to be a trafficking victim.

The government allocated 124,700 manat ($73,350) for victim assistance, compared with 119,000 manat ($70,000) for victim assistance in 2020. The government also allocated 124,700 manat ($73,350) to the MIA-run

shelter, compared with 113,346 manat ($66,670) in 2020. The State Support Agency to NGOs allocated 151,500 manat ($89,120) to fund 11 NGO projects but diverted approximately 32,500 manat ($19,120) toward pandemic mitigation efforts, compared with 172,000 manat ($101,180) for 19 NGO projects in 2020. This included 19,200 manat ($11,290) for operational costs for two NGO-run shelters, a decrease compared with 30,000 manat ($17,650) in 2020. However, MIA funded repairs and improved roads for one NGO-run shelter and allocated 30,000 manat ($17,650) for the other NGO-run shelter to buy land to build a new shelter. Government funding overall was still inadequate for NGO-run shelters, which remained severely underfunded, and restrictive legislation governing foreign grants limited NGOs' ability to receive funding from external donors. Many NGO-run shelter staff who provided support services worked on a voluntary basis. The MIA operated a shelter for trafficking victims, which provided accommodation, financial assistance, legal assistance, and medical and psycho-social support. The MIA-run shelter had separate areas for women, men, and children but limited freedom of movement and required victims to submit an application to leave the shelter. The MIA-run shelter also accommodated potential victims for up to one month, but longer stays required victims to cooperate with law enforcement; 90 officially recognized victims and one potential victim received support at the shelter (80 officially recognized victims and one potential victim in 2020). The MIA-run shelter provided the only accommodation for male victims. The government provided a resettlement allowance of 700 manat ($410) for officially recognized victims; all officially identified victims received the resettlement allowance. Victim Assistance Centers (VACs) in Baku and Goychay provided legal, psychological, medical, and employment assistance to officially recognized and potential victims; VACs assisted 52 officially recognized victims and 18 potential victims (32 officially recognized victims in 2020). The government also assisted in enrolling 28 officially recognized victims in vocational courses, supported 11 with finding employment, and reunited 56 with their families. Observers reported low pay for VAC employees led to high staff turnover and decreased service quality due to inexperienced staff assisting victims. In previous years, the government awarded some contracts to organizations with no experience and jeopardized victim safety and assistance quality. The government referred 89 victims to NGO-run shelters (80 in 2020). SMS assisted two foreign national victims to obtain a temporary residence permit (none in 2020).

Observers reported law enforcement's attitude toward victims improved, but authorities may have penalized sex trafficking victims with administrative fines for alleged "prostitution" crimes due to an absence of screening efforts. In previous years, an international organization referred foreign migrant workers who displayed indicators of trafficking, but ATD did not recognize any as a victim, and authorities subsequently deported some. Authorities did not use victim-witness protection measures for trafficking victims. In previous years, GRETA and other international organizations reported prosecutors believed such measures were unnecessary for trafficking victims and noted the lack of licensed attorneys providing legal assistance to victims due to low pay. However, the government reported a licensed attorney provided legal assistance to 30 officially recognized victims in 2021. Children testified without a child psychologist or attorney to communicate legal terminology in a child-friendly manner, which may have caused further trauma to these children. The government amended a law to include measures to assess and prevent revictimization of foreign victims. Judges did not issue restitution in criminal cases, and no cases were filed for compensation in civil suits. The government reported confiscating property, cash, securities, and other assets from traffickers and transferring it to a victim assistance fund; 16 officially recognized victims and five potential victims received financial assistance from the fund.

## PREVENTION

The government maintained prevention efforts. The national coordinator (NC) led government-wide anti-trafficking efforts, but the lack of cooperation between agencies hindered interagency coordination. The NC managed a working group with relevant government ministries to coordinate anti-trafficking efforts and implement the 2020-2024 National Action Plan (NAP); the working group did not meet due to the pandemic in 2021. While civil society reported the government did not

consider trafficking as a high priority, it highlighted good communication with ATD, including responsiveness to recommendations and concerns. The ATD recognized 16 NGO leaders with monetary awards of 1,000 manat ($590) for their anti-trafficking efforts in 2021 and 2020. ATD allocated 20,000 manat ($11,760) to an NGO to create a documentary on trafficking, and the government organized awareness campaigns targeting students and the public and distributed brochures on the risks of trafficking to citizens traveling abroad and foreigners coming into Azerbaijan. The government funded an NGO to conduct research on forced labor in agriculture and publicly released an annual assessment of the country's anti-trafficking efforts, including prosecution data and protection efforts. ATD operated a trafficking hotline, which received 4,506 calls (5,705 calls in 2020); however, the calls did not initiate any trafficking investigations compared with calls helping identify 10 victims and initiating three investigations in 2020. The government did not make efforts to reduce the demand for commercial sex acts. A presidential decree in 2015 prevented the Labor Inspectorate from conducting spontaneous employment inspections, which restricted proactive investigations and victim identification efforts. In 2021, the government extended its moratorium on scheduled and unannounced labor inspections through 2022. Although inspectors were permitted to request information from employers and relevant employees in order to investigate complaints, complaint response did not include worksite inspections. The Ministry of Labor and Social Protection reported it investigated 1,508 labor violations, compared with 8,512 in 2020; the government did not report whether any cases were investigated for forced labor.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Azerbaijan, and traffickers exploit victims from Azerbaijan abroad. Traffickers exploit Azerbaijani men and boys in forced labor within the country and in Qatar, Russia, Turkey, and the United Arab Emirates (UAE). Traffickers exploit women and children from Azerbaijan in sex trafficking within the country and in Iran, Malaysia, Pakistan, Qatar, Russia, Turkey, and the UAE. Traffickers exploit victims from the People's Republic of China, Russia, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan in both sex trafficking and forced labor. In previous years, Azerbaijan has been used as a transit country for victims of sex and labor trafficking from Central Asia to Iran, Turkey, and the UAE. Within the country, some children are exploited in forced begging and forced labor as roadside vendors and at tea houses and *Wedding* facilities. Oil workers are vulnerable to forced labor with lengthy shifts and allegations of labor violations, including withheld wages and annual leave. In 2018, there were isolated reports that local officials mobilized and forced some public-sector employees to participate in the autumn cotton harvest. However, civil society and government officials reported no instances of forced labor in the 2021 and 2020 cotton harvest due to widespread use of affordable harvesting machinery. Low-level police solicit bribes from individuals in commercial sex and brothels operated under the purview of district police chiefs. NGOs report increasing online recruitment, including social media applications, for fraudulent or suspicious jobs abroad.

## BAHAMAS, THE: TIER 1

The Government of The Bahamas fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore The Bahamas remained on Tier 1. These efforts included convicting a trafficker, providing support for victims repatriated abroad, making efforts to provide compensation to a victim, increasing funding for victim services, and coordinating with governments in the region on a virtual forum to share challenges and best practices on prosecuting trafficking and improving interagency collaboration. Although the government meets the minimum standards, it did not initiate any new prosecutions, identified fewer victims, and did not comprehensively

Haiti AR_000583

implement its victim identification protocol, especially among at-risk groups including Haitian migrants.



THE BAHAMAS TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**
Increase efforts to investigate, prosecute, and convict traffickers, including officials complicit in sex or labor trafficking, and impose sufficient sentences. • Improve efforts to identify victims and refer them to services, particularly among vulnerable groups, including underserved stateless persons, migrants and asylum-seekers from Haiti and Venezuela, LGBTQI+ individuals, and Cuban nationals working on government-sponsored programs. • Reduce delays in court proceedings. • Train labor inspectors on trafficking, victim identification, and referral to services. • Raise awareness of trafficking risks among vulnerable groups in partnership with NGOs and provide migrants with information on trafficking and workers' rights. • Remove a requirement for migrants switching jobs to obtain a letter of release from their employer. • Take steps to eliminate recruitment fees charged to workers by labor recruiters and ban employee-paid recruitment fees. • Provide a dedicated shelter for trafficking victims. • Improve regular data collection and record keeping, including prosecution statistics. • Provide victims an alternative to speaking with law enforcement. • Provide vulnerable individuals with trauma-informed assistance and interpretation in their language prior to, during, and after screening for trafficking, including through the hotline. • Develop, execute, and publish a robust monitoring and evaluation framework for anti-trafficking policies and efforts. • Provide survivors who have returned home the opportunity to give input on policies.

**PROSECUTION**
The government slightly decreased law enforcement efforts. The Trafficking in Persons (Prevention and Suppression) Act 2008 (TIP Act) criminalized sex trafficking and labor trafficking and prescribed penalties up to life imprisonment. These penalties were sufficiently stringent, and with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape.

The government initiated investigation of one sex trafficking case involving two suspects, compared with 13 cases (11 for sex trafficking and two for labor trafficking) in 2020 and 16 investigations in 2019. The government did not initiate any new prosecutions, compared with two prosecutions initiated in both 2020 and 2019. The government continued prosecution of one alleged sex trafficker from a previous reporting period and imprisoned another seven suspected traffickers awaited the start of their trials. The government convicted one Bahamian female trafficker in December 2021 for the sex trafficking of two girl victims under the TIP Act and other laws, the same number as in 2020 and compared with no convictions in 2019. The Chief Magistrate sentenced the trafficker to penalties consistent with a plea agreement, including nine months and three days in prison for each of 12 counts, with concurrent sentences; three years of probation and a $5,000 fine; and 12 months of counseling; and it required the trafficker to give evidence in a related trafficker prosecution. The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes.

The National Trafficking in Persons Inter-Ministerial Committee (anti-trafficking Committee) Task Force maintained an investigative unit. The Royal Bahamian Police Force (RBPF) Missing and Exploited Section investigated sex and labor trafficking offenses; in addition, the RBPF had a specialized Sexual Offenses Unit that handled sex crimes, including sex trafficking. The RBPF representatives on the Task Force, who served as investigators, determined if there was enough evidence to pursue prosecution with the Office of the Director of Public Prosecutions. Trained prosecutors in the Office of the Director of Public Prosecutions

worked closely with RBPF investigators to prosecute cases; they also offered legal advice to the victim and the RBPF investigative team. The government reported police, defense, health, and immigration officials continued to execute the government's trafficking response despite the pandemic, including by screening potential victims. Pandemic-related lockdowns in 2020 exacerbated criminal trial delays, but the judiciary continued modernization efforts to address the backlog, including the digitization of records. While the government did not assign any courts specifically to handle trafficking cases, prosecutors brought all trafficking cases before the Magistrate's and Supreme Courts. Experts reported concerns about excessive pretrial detention due to criminal justice system delays, preventing even the most serious criminal cases from advancing in a timely manner. Observers noted the lack of judges and prosecutors in the country contributed to significant backlogs in all cases; courts easily granted bail (due in part to prison overcrowding), even to defendants accused of violent crimes, and law enforcement did not have the resources to fully uphold the law. Immigration officials may have solicited Haitian migrants for bribes to prevent detention. The government provided training to defense officials and law enforcement on case reporting, victim and perpetrator profiles, methods, victim identification, and elements of trafficking. Due to the pandemic, the government conducted most anti-trafficking training virtually. The anti-trafficking Committee participated in numerous international meetings on trafficking, both in person and virtually, which resulted in new networks for collaboration and potential future MOUs.

**PROTECTION**
The government slightly increased efforts to protect victims. The government identified one Colombian adult female sex trafficking victim during the reporting period, compared with two victims in 2020 and five victims in 2019. Authorities implemented a formal protocol to guide front-line responders in identifying both sex and labor trafficking victims and referring them to services. The protocol had a detailed, victim-centered approach to the screening process, including the use of qualified interpreters of the same gender to assure reporting and comprehension of all communication. However, observers reported uneven application of the protocol, especially with vulnerable populations such as undocumented Haitian migrants and stateless children. In addition, due to a lack of training on the protocol, authorities may have detained some unidentified trafficking victims. The government reported it screened all migrants arriving by sea for trafficking indicators and screened migrants arriving by land as they came into contact with authorities. Immigration officers referred potential victims to the RBPF for further investigation. However, observers reported authorities did not use formal protocols to screen all migrants and continued to abuse migrants—particularly those of Haitian descent. Authorities reported screening individuals for trafficking indicators during routine checks of nightclubs. The government did not report screening Cuban medical workers for trafficking indicators.

Authorities provided care including rent or accommodation, food, travel expenses, stipends, and school supplies and uniforms for four victims, including the adult Colombian female, one Bahamian female, and two Bahamian children. The government also repatriated the Colombian victim. The government's spending on trafficking victims' care and prevention activities apart from the pandemic was 48,462 Bahamian dollars ($48,462), compared with 41,351 Bahamian dollars ($41,351) in the previous reporting period. The government also provided 26,930 Bahamian dollars ($26,930) for rent and food assistance needs resulting specifically from the pandemic, compared with 47,651 Bahamian dollars ($47,651) for the provision of such care to four victims in the previous reporting period. The government had a formal process to guide officials in transferring victims to governmental or non-governmental options for short- or long-term care.

The Department of Social Services (DSS) oversaw the support for victims by service providers, attorneys, and law enforcement. The Department could also provide furniture, payment of utility bills, placement in school, medical care, psychological and psychiatric attention as needed, counseling, transportation, assistance with shopping, securing legal documents, resumé preparation, job placement assistance, facilitation of payment of stipends, and wiring of money abroad. The government provided legal aid to victims only for each victim's trafficking case.

Department of Health practitioners screened patients for trafficking indicators and could refer patients for further evaluation or care. The government typically provided most services for victims, but NGOs could also provide services to victims, including housing, food, meals and water, hygiene supplies, clothing, financial assistance, medical and psychiatric care, and a non-threatening, neutral environment for authorities to conduct interviews. Authorities placed referred child victims in a DSS childcare facility. The government did not have a dedicated shelter for trafficking victims; however, the government could provide accommodations to victims or refer them to an NGO for shelter. Authorities continued to place victims in NGO-managed shelters shared with domestic violence victims. The government considered victim preference when determining the appropriate shelter, and victims could choose not to reside in a shelter. The government did not report any cases of victims with disabilities; however, the national anti-trafficking budget included resources to make accommodations, if necessary. Shelters did not restrict the movements of victims, allowed them to leave for employment, and provided advisory services. The government provided services to victim-witnesses for the length of the trial and continued to provide services after completion of the trial until the victim was either resettled within the country or, if applicable, in the country of origin. Victims who chose to return to their country of origin also received continued financial support.

In the previous reporting period, a court awarded a Venezuelan victim 10,000 Bahamian dollars ($10,000) in compensation in a civil suit for the first time. The Task Force made multiple attempts during the reporting period to deliver the compensation payment to the Venezuelan victim in cooperation with a foreign embassy and an NGO from a different foreign country; the process was ongoing at the end of the reporting period. Victim participation in trafficking investigations and prosecutions was voluntary, though encouraged. One child victim-witness participated in the investigation of a trafficker during the reporting period. The law granted victims immunity from prosecution. Courts closed trafficking trials and—as the law mandated non-disclosure of victims' names, under penalty of prosecution—the media could not publish the identity of a victim. Bahamian law permitted victim testimony via live television links and for the reading of written statements into evidence, but this did not happen during the reporting period. Authorities advised victims of their rights with respect to the law, could appoint a designated caseworker to provide support for the victim, and could provide witness protection. The government prevented re-traumatization by limiting the scope of initial interviews and limiting contact with the trafficker. The government did not offer victims an alternative to speaking with law enforcement, such as social workers or NGOs. The government gave a police security detail for foreign victims moving to and from the airport and for victims moving to and from the designated shelter, including for court appearances, during which a police officer and a DSS representative stayed with the victim. The government encouraged victims returning from abroad for participation in a trial to bring a family member with them for additional support. The country lacked a visa classification for victims of crime, but foreign victims were entitled to the same assistance and services provided to Bahamian victims. Authorities did not tie benefits to foreign victims' willingness to cooperate with law enforcement or to testify in court, and the outcomes of legal proceedings did not affect victims' temporary immigration status. Foreign nationals had the option to remain in the jurisdiction with legal status or to return to their country of origin; the government reported it did not deport victims. Foreign victims who decided to stay in the country received assistance in obtaining legal residency for humanitarian purposes, which included a standardized certificate that resembled the asylum certificate but did not identify the holder as a trafficking victim and enabled the holder to work legally. However, foreign victims—particularly irregular migrants—may not have felt comfortable enough to report crimes to law enforcement officers who could identify them as victims. During the reporting period, there were no reported cases of Bahamians being exploited in trafficking abroad, and the Bahamian government did not identify any exploited nationals requiring funding for repatriation. The government trained DSS officials, tourism and hospitality staff, health care workers, and NGOs on victim identification and care and elements of trafficking.

## PREVENTION

The government slightly increased prevention efforts. Ministry of National Security officials led the government's overall efforts to combat trafficking and chaired the anti-trafficking Committee, whose membership included representatives from nine government agencies, three NGOs, a foreign embassy as a regular observer, and the Task Force. The Task Force comprised the same members and activated in response to individual cases; it monitored investigations and prosecutions, victim identification procedures, and victim care. The TIP Committee Secretariat consisted of three full-time, seconded government officials from the Ministry of National Security (Chair), the RBPF, and DSS. During the reporting period, the Ministry of Social Services seconded a victim care officer to work full time with TIP Committee leadership. The TIP Committee members worked on additional cases besides trafficking. The TIP Committee, which continued to meet virtually every other week during the pandemic, briefed the Minister of National Security weekly on anti-trafficking developments. The TIP Committee coordinated policy recommendations, provided advice on trafficking matters, made recommendations to strengthen national anti-trafficking initiatives, and identified opportunities for training, dissemination of information, and public awareness. Observers noted the government did not regularly collect data on investigations, prosecutions, and convictions and could not respond to requests for data information in a timely or coordinated manner. Governmental ministries, agencies, and departments had operational specialized anti-trafficking units. The government had an anti-trafficking national action plan for 2019-2023. The government pursued changes to policies based on input from trafficking survivors, including increased activities for and engagement with victims during investigations. Observers noted victims' desire to return to their home countries as soon as possible limited the effectiveness of these reforms.

The government funded anti-trafficking initiatives through the national anti-trafficking budget, which was included within the Ministry of National Security's annual budget. The Task Force had a dedicated budget of 95,000 Bahamian dollars ($95,000), which was the same budget as in 2020 and 2019; full funding remained available during the pandemic. Funding for trafficking-related work in other ministries came from the general budgets for those ministries or departments. The government did not employ any specific methodology to research and assess trafficking during the reporting year apart from information sharing within the anti-trafficking Committee. The government participated in two research projects: one in cooperation with a foreign government and another in cooperation with an international organization.

The Ministry of National Security maintained a dedicated English-speaking trafficking hotline in operation 24 hours a day, funded by the national security budget, while an NGO had its own emergency hotline to report all forms of physical, sexual, and emotional abuse. Both hotlines remained fully operational during the reporting period but did not result in the identification of any victims. The government advertised the hotline through English media and some Mandarin, Creole, and Spanish brochures placed in public spaces. The TIP Committee continued its awareness campaigns on billboards in Nassau, including at the international airport, along with virtual and in-person educational campaigns and training. In July 2021, the government recognized World Day Against Trafficking in Persons through public awareness raising activities. In May 2021, the TIP Committee, with support from a foreign government, organized the first annual Regional TIP Forum (TIPCOM) for working-level TIP committee leaders in the Caribbean, who shared challenges and best practices on prosecuting traffickers and improving interagency collaboration, among other topics.

The constitution prohibited forced labor. Bahamian trafficking and labor laws did not explicitly prohibit charging workers recruitment fees, switching contracts, and withholding wages to compel service. The Department of Labor did not train labor inspectors on trafficking or report whether surprise inspections resulted in trafficking investigations, but the trafficking screening questionnaire for labor inspectors asked them to determine if an employee's job situation was different from what was promised or expected and if payment was withheld or deducted. The government reported the Department of Immigration granted work permits that were specific in nature, and that the Immigration Board reviewed applications for every job over six months to prevent the

issuance of unqualified permits and to protect against exploitation. The government allowed migrant workers to change employers in a timely manner without special permission but required a letter of release from the previous employer, which could increase the risk for trafficking. The Department of Labor, through the Public Employment Services Unit, worked with private sector organizations to recruit Bahamians for specific projects. The Department of Labor conducted unannounced inspections to detect forced labor in domestic and global supply chains. When an employer submitted a request for a work certificate for a non-Bahamian to work in the country, authorities issued anti-trafficking brochures to the employer, but staff rarely interacted with the prospective employee prior to arrival in the country. During the reporting period, the government received no reports of workers recruited through knowingly fraudulent job offers, contract switching, and confiscating or otherwise denying workers access to their identity documents. Authorities began discussions with an international organization to establish an MOU on multiple issues relating to migration, including trafficking and its impact on immigrants. The government did not make efforts to reduce the demand for commercial sex acts. The government did not make efforts to reduce the demand for participation in child sex tourism. The government provided anti-trafficking training to its diplomats.

## TRAFFICKING PROFILE

As reported over the past five years, traffickers exploit domestic and foreign victims in The Bahamas, and traffickers exploit victims from The Bahamas abroad. Traffickers recruit migrant workers, especially those from Haiti, Jamaica, the Dominican Republic, the People's Republic of China (PRC), Costa Rica, Cuba, Colombia, Venezuela, the Philippines, and the United States through false offers of employment, through advertisements in foreign newspapers and social media; upon arrival, traffickers subject them to sex trafficking and forced labor, including in domestic service and in sectors with low-skilled labor. The profile of prosecuted traffickers has been primarily female in the past five years. Individuals born to a non-Bahamian father in The Bahamas, to a female citizen, or to foreign born parents do not automatically receive Bahamian citizenship or documentation and are at heightened risk of trafficking. Unaccompanied migrant children, individuals lured for employment, those involved in commercial sex and exotic dancing, irregular migrants, stateless persons, LGBTQI+ individuals (particularly from poor communities), and migrants displaced by Hurricane Dorian have been trafficking victims or are particularly vulnerable to trafficking. In particular, irregular migrants living in informal settlements on the Hurricane Dorian-ravaged islands of Abaco and Grand Bahama, as well as those who fled to New Providence after the storm, exist in what observers call "dark spaces," which deter reporting abuse. In January 2022, the government signed an official agreement with the Cuban government to temporarily host 50 nurses to provide medical care during the pandemic. Cuban medical professionals may have been forced to work by the Cuban government. The high unemployment rate—reported to have exceeded 40 percent—resulting from the pandemic may have increased vulnerabilities for potential victims.

## BAHRAIN: TIER 1

The Government of Bahrain fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Bahrain remained on Tier 1. These efforts included convicting labor traffickers for the first time since 2018 and increasing forced labor investigations and prosecutions. The government referred cases that originated as labor violations as potential trafficking crimes for criminal investigation and prosecution, and it launched a trafficking-specific hotline managed by the police that resulted in the identification of trafficking cases. The government also identified and referred to care more victims overall and identified forced labor victims for the first time in two years. Although the government meets the minimum standards, it did not routinely utilize its proactive identification procedures, which may have resulted in the penalization of some potential and unidentified

victims, specifically those arrested for immigration violations or engaging in commercial sex. In addition, the government did not provide adequate legal protections for domestic workers, a population highly vulnerable to exploitation, including trafficking. Finally, authorities sometimes treated forced labor—including cases of unpaid or withheld wages, passport retention, and related abuses—as labor law violations, rather than potential trafficking crimes.



## PRIORITIZED RECOMMENDATIONS:

Increase legal protections for domestic workers by including this population in all relevant articles of Bahraini labor law. • Expand visa sponsorship reform to allow domestic workers to change jobs without employer consent and allow domestic workers to self-sponsor with Flexi Permit. • Increase efforts to investigate, prosecute, and convict traffickers, particularly suspects of labor trafficking, including domestic servitude.• Increase investigations and prosecutions of potential forced labor cases involving passport retention, non-payment of wages, and other indicators as trafficking crimes by expanding training for all officials on the differences between labor violations and forced labor crimes and improving identification of forced labor victims. • Draft and adopt legislation prohibiting passport confiscation with deterrent penalties and ensure officials are trained to consider passport confiscation as a trafficking indicator. • Ensure all frontline officials—including immigration and police officers outside the specialized trafficking unit—receive adequate training on proactive victim identification and screening protocols, specifically when encountering vulnerable groups, such as domestic workers, migrant workers, undocumented workers, Cuban medical mission workers, and individuals in commercial sex. • Expand and clearly define legal protections for Flexi Permit holders to ensure they are protected from labor law violations or employer abuse and have adequate grievance mechanisms through labor courts. • Fully implement the Wage Protection System, including by holding accountable violators with deterrent penalties. • Mandate the use of the standard contract for all domestic worker recruitment—either through a regulated recruitment agency or directly by an employer and ensure the standard contract is on file with the government—to mitigate contract switching. • Ensure that victim's ability to receive shelter does not depend on confirmation of a trafficking crime from the Public Prosecutor. • Continue to conduct national anti-trafficking awareness campaigns, strategically targeting migrants, domestic workers, and employers.

## PROSECUTION

The government increased law enforcement efforts. The anti-trafficking law, No.1 of 2008, criminalized sex trafficking and labor trafficking and prescribed penalties ranging from three to 15 years' imprisonment, plus a fine and the cost of repatriating the victim(s). These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. During the reporting period, the Ministry of Interior (MOI) investigated 43 cases (98 alleged traffickers)—26 were for sex trafficking and 18 for forced labor—an increase compared with the investigation of 19 cases—15 sex trafficking and four forced labor—in the previous reporting period. Four cases, including three sex trafficking cases and one case of forced labor, remained under investigation at the close of the reporting period. Officials prosecuted 54 alleged sex traffickers and two alleged labor traffickers, an increase compared with the prosecution of 27 alleged sex traffickers the year prior. The government's prosecution of an additional four alleged sex traffickers and one alleged labor trafficker was pending at the close of the reporting period. The forced labor prosecutions—the government's first in at least five years—involved two cases of domestic workers in debt bondage after their employers forced the victims to illegitimately reimburse the employers for recruitment fees from their

wages. Courts convicted 50 sex traffickers, an increase compared with the conviction of 22 sex traffickers during the previous reporting period and sentenced them to between three and 15 years' imprisonment plus a fine in accordance with the law. For the first time since 2018, courts convicted two traffickers in one case for forced labor, which involved a female worker who was lured by false promises to leave her employer and then sold to one perpetrator who exploited the victim in sex trafficking. After refusing to work in commercial sex, the first perpetrator physically abused the victim and forced her to work in his home as a domestic worker without pay, where she was sexually abused by the second perpetrator. After escaping the first perpetrator's home, the victim was able to contact police and was subsequently referred to care. The two convicted traffickers received 10 years' imprisonment and a fine of 2,000 Bahraini dinar ($5,310). The government required convicted traffickers to pay all costs associated with the repatriation of the victims and planned to deport all non-Bahraini traffickers upon the completion of their sentences. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

MOI's Directorate of Criminal Investigation and Forensic Science (CID) maintained a police unit dedicated to trafficking investigations. The Trafficking in Persons Prosecutor's Office (PPO) prosecuted all trafficking crimes under the 2008 anti-trafficking law and ensured victims had access to legal recourse and adequate protection services and assistance. Officials reported trafficking cases were regularly fast-tracked to the High Criminal Court, bypassing the lower courts, to accelerate the justice process. In July 2021, CID established two hotlines; one for potential trafficking cases and one for cases involving employers demanding payment from workers to transfer visa sponsorship and change jobs. CID reported it would coordinate with the Labor Market Regulatory Authority (LMRA) to start legal proceedings in credible cases of an employer's extortion of a worker. The government did not identify any trafficking cases through the national anti-trafficking hotline, but four cases (including three trafficking cases and one case of passport retention) were identified through CID's trafficking-specific hotline, which received 591 calls since its launch in July 2021, and were subsequently investigated and referred for criminal prosecution during the year.

NGOs and civil society reported that although the government provided training to officials on identifying cases and victims of forced labor, frontline authorities nevertheless sometimes recorded instances of non-payment of wages and passport confiscation as labor violations and rarely referred these cases to the PPO for investigation as potential trafficking cases. The government reported workers continued to be able to file a grievance against an employer in a labor court if arbitration was unsuccessful. Migrant workers reported that the Ministry of Labor and Social Development (MOLSD)'s arbitration process often resulted in settlements in favor of the employer. The LMRA's Protective Inspection Directorate (PID) and Grievances and Protections Directorate (GPD), established in 2019 and housed within the MOJ's Labor Case Coordination section, continued to make efforts to identify and refer labor trafficking cases to criminal prosecution, specifically those that originated as labor violations. The PID had a mandate to identify, investigate, and document labor violations with a focus on those with a nexus to trafficking; it was staffed by labor inspection officers trained by two international organizations. The GPD was able to receive, register, and document all labor-related criminal cases. Both directorates were incorporated into the government's broader national referral mechanism (NRM). Officials reported all labor violations submitted to the LMRA were screened by case workers at three levels. If the GPD subsequently identified a potential trafficking crime through screening, it referred the case to the PID to conduct a full investigation. The LMRA could formally refer potential trafficking cases directly to CID for criminal investigation; however, PID's investigators could only informally refer potential trafficking cases to the PPO via email, which then sent the case back to CID to conduct a separate investigation before referring the case formally to prosecution. This procedural constraint may have hindered the government's ability to effectively prosecute potential labor trafficking crimes that originated as labor violations. Nonetheless, the LMRA referred five potential forced labor cases to the CID (through formal channels) and four potential forced labor cases to the PPO (through informal channels) during the year but did not report on the outcome of those referrals.

The government trained—directly and in partnership with Gulf states and international organizations—police and investigators from CID's anti-trafficking unit, all judges and prosecutors, and LMRA staff on topics related to trafficking, including identification of forced labor cases and victims, evidence collection in forced labor cases, policies and laws, regionally-focused training on combating trafficking in the Gulf and South East Asia, and "Train the Trainer" programs. However, police units outside of CID's anti-trafficking unit and other first responders, such as immigration officials, did not receive adequate training in identifying potential victims or screening for trafficking indicators when coming into contact with vulnerable populations, which may have left potential victims unidentified in the law enforcement system. Investigators from CID's anti-trafficking unit who were trained on screening and identifying trafficking indicators often accompanied immigration officials on raids and immigration inspection visits throughout the year to provide victim identification expertise.

## PROTECTION

The government increased overall efforts to protect victims. The government identified 33 trafficking victims, including 29 adult sex trafficking victims, two child sex trafficking victims, and two victims of forced labor, compared with the identification of 19 adult sex trafficking victims in the previous reporting period. The government did not report identifying or assisting any male victims. All the victims were from Indonesia, Thailand, and Bangladesh. The government continued to utilize its NRM to proactively identify trafficking victims, ensure proper documentation of cases, refer cases to the MOI and PPO for an official determination as a trafficking case, and provide protection services to victims until case resolution or voluntary repatriation. Officials provided 30-page, bilingual English-Arabic NRM booklets to all relevant ministries, labor-source country embassies, and NGO stakeholders. The LMRA reported their digitized case management process under the NRM continued to increase in speed and overall effectiveness in case management and coordination of support to victims. Police stations, other government entities, NGOs, and foreign embassies directly referred victims to the LMRA.

The LMRA's Expatriate Protection Center (EPC) served workers regardless of their gender or legal status in the country and sheltered presumed trafficking victims, those who experienced severe labor exploitation, and those who were vulnerable to exploitation. According to the procedures of the NRM, a victim could only become eligible for accommodation at the EPC after the PPO confirmed the individual as a trafficking victim. In instances where the PPO did not identify an individual as a trafficking victim, but rather as someone who experienced labor exploitation, the LMRA may have offered that individual shelter depending on the severity of the case. Observers expressed concern that because authorities rarely identified indicators of forced labor as a trafficking crime, some unidentified victims may have been unable to access the shelter or receive protective care. The EPC provided all 33 identified trafficking victims with shelter, food, clothing, medical care, religious support, psycho-social counseling, rehabilitation, transportation, familial reunification, translation services, legal counsel, and repatriation; the government reported it also offered job placement in Bahrain to victims, but no victims utilized this option during the reporting period. The government reported pandemic-related mitigation measures were put in place at the EPC, including the provision of personal protective equipment such as hand sanitizer, gloves, and face masks to those admitted to the shelter. Additionally, it was routine for all residents and staff to be tested for COVID-19. The government provided all confirmed trafficking victims who remained in Bahrain for the duration of their trial with monthly compensation of 93 Bahraini dinar ($250)—via its Victim Assistance Fund. LMRA provided additional funding, as needed, for victim repatriation and daily GPD expenditures, such as payroll and operational expenses. Observers expressed concern that once victims were able to return to work in Bahrain, they were again placed in a situation where their employer controlled their residence and work visa, heightening their vulnerability to exploitation and re-trafficking due to the nature of the sponsorship system. The government reported trafficking victims were eligible to sponsor themselves through the Flexi Permit program as an alternative option to remain in Bahrain to work; the government also reported it could use victim assistance funds to pay

file grievances or complaints with the labor courts as other workers covered under the law could; rather, Flexi Permit holders could only file cases against employers in civil courts. Additionally, a migrant worker could not apply for a Flexi Permit before arriving in Bahrain. A worker was only eligible for the program once their visa expired, their contract ended, or they were undocumented—which continued to put migrant workers in vulnerable situations where their sponsor or employer was tied to their legal immigration status when first arriving in the country. Since 2011, the government allowed private sector migrant workers freedom to change jobs without their employer's consent after one year of employment; during the reporting period, 14.65 percent of Bahrain's migrant worker population changed employers. However, the LMRA still had to approve the transfer. Domestic workers did not have the ability to change jobs or extend their residency visas without employer consent. The government reported all workers were able to terminate employment at any time, with a notice period according to their contract, and leave the country permanently without employer consent. However, reports that employers continued to expect employees to procure an exit permit suggested low awareness of the policy.

Articles 19 and 40 of the Labor Law established limited protections for domestic workers, which include agricultural workers, home security guards, nannies, drivers, and cooks who work for the employer or family members, requiring employers to provide a labor contract specifying annual leave and bonuses and that such workers must be paid at least monthly. However, Article 22, which prohibited contract switching or changes to preset work conditions outlined in the contract, was not applicable to domestic workers, effectively increasing their vulnerability to forced labor. Labor inspectors were unable to conduct unannounced inspections of domestic workers' accommodations and investigate allegations of abuse in the absence of an official complaint, which may have left some victims at risk of exploitation and without protection. The LMRA continued to disseminate to all registered recruitment agencies in Bahrain copies of the standard labor contract, which required domestic workers to sign, prior to their arrival, a comprehensive work agreement that outlined labor rights and employment obligations. The contract aimed to strengthen protections for domestic workers by requiring employers to disclose duties, hours to be worked, salary, rest hours, and weekly days off. Domestic workers, brought into Bahrain by recruitment agencies, were able to accept or reject an employment contract in their respective countries of origin, and the LMRA maintained copies of signed contracts to assist in any future labor disputes. The LMRA maintained streamlined processes for obtaining initial visas and visa renewals for domestic workers. The inclusion of domestic workers in the Expatriate Management System, along with all other expatriate workers, increased the LMRA's oversight capacity by standardizing the application process and retaining all worker-employee documents on the LMRA's electronic systems. However, NGOs expressed concern that the standard contract lacked mandatory working conditions as it remained up to the employer to determine working hours, minimum wage, and rest time. In contrast, title seven of the labor law stipulated a maximum daily limit of eight working hours for other private sector workers. Additionally, NGOs noted that many vulnerable domestic workers whom they encountered did not know the contents of their contract due to language barriers. Furthermore, domestic workers rarely had a copy of their contract in their possession. NGOs also reported that because it was not compulsory to use a recruitment agency to recruit a domestic worker, those who hired domestic workers directly did not need to provide a standard contract. Instead, the government required a pledge of the employer's obligations toward the domestic worker, which is not enforceable in a court of law.

Bahraini law did not explicitly prohibit passport retention, even when the employee objected from the practice. The government reported that instances of passport retention were generally prosecuted under Article 395 of the Bahraini penal code as a "breach of trust," though such prosecutions were rare. Instead, passport retention was frequently handled administratively, when migrant workers filed a grievance for passport withholding with the police, the MOLSD, or the LMRA. When handled by the LMRA, instances of passport retention were reportedly screened by trained GPD staff for indicators of trafficking. Representatives of labor-source country embassies reported cases handled by LMRA resulted in expedient and fair disposition of cases. A worker could also register a complaint to the court directly if the employer refused to return the passport; however, in most cases, once the LMRA, MOLSD, or police approached the employer, they returned the passport to the employee and the worker chose not to pursue criminal charges against the employer. The LMRA reported it received 3,899 claims of passport retention through the NRM and retrieved and returned 3,702 passports to migrant workers in 2021. Police generally did not consider passport retention to be an indicator of trafficking, instead considering it stolen property if the employer refused to return the passport. Officials stated if the employer refused to return the passport to the employee, the LMRA could prohibit it from obtaining new or renewing existing work permits and could refer the employer to law enforcement for legal action. Officials referred one case of passport retention—identified by MOI's hotline—for criminal prosecution during the year.

The government also made efforts to prevent vulnerable migrant workers, including domestic workers, from further exploitation by ensuring pandemic-mitigation measures were accessible, regardless of residency status. The government reported the LMRA's PID, the Ministry of Health (MOH), and the MOI coordinated 27 field campaigns to mitigate the spread of COVID-19 by conducting visits to migrant workers' accommodations to administer vaccinations and booster shots for workers, specifically for those who were reluctant to visit hospitals to receive vaccinations due to their legal status. In partnership with an international organization, the government announced plans to launch a campaign in 2022 to raise awareness on migrant worker rights, but it had not yet launched it by the end of the reporting period. During the previous reporting period, the LMRA launched a website (endtrafficking. bh) featuring information on trafficking and resources for foreign workers; however, NGOs reported key information on the website was only available in English, limiting its application. The LMRA continued to provide booklets outlining labor rights in 13 languages common among expatriate and migrant worker populations and distributed them to such populations upon their arrival at the Bahrain International Airport and at the LMRA when applying for initial or renewed residency cards. The EPC's trafficking hotline collected reports and educated workers about their rights and available services in nine languages 24 hours a day, seven days a week. The government advertised the hotline's number and mandate through pamphlets given to each migrant worker upon arrival in Bahrain and on the LMRA's social media platforms and website. The government reported the LMRA's trafficking hotline received 13,006 calls during the year; however, no trafficking cases or victims were identified through the hotline. The government continued to uphold memoranda of understanding with several labor source countries, including Pakistan, that focused on oversight of recruitment agencies and protection of migrant workers in Bahrain. The government reported it partnered with an international organization to create orientation programs for migrant workers but did not report if it began implementing such programs by the close of the reporting period. The government made efforts to reduce the demand for commercial sex acts by continuing to enforce the law that makes prostitution illegal. The government provided anti-trafficking training for its diplomatic personnel.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit foreign victims in Bahrain. Men and women, primarily from India, Bangladesh, Pakistan, Philippines, Nepal, Egypt, Sri Lanka, Jordan, and Yemen, among other countries, migrate voluntarily to Bahrain to work as semi-skilled or unskilled laborers in the construction and service industries and domestic work sector—including agricultural workers, home security guards, nannies, drivers, and cooks, among others. Men from India and Bangladesh account for the vast majority of Bahrain's male domestic workers. The number of migrant workers from African states, such as Senegal, Cameroon, Uganda, and The Gambia had previously increased, but observers noted pandemic impacts and difficulty in obtaining work permits have slowed the number of African workers coming to Bahrain. Furthermore, during the pandemic, the government reportedly stopped approving work permits for nationals from certain countries, citing "a record of unethical recruitment," security concerns, analysis of data from the NRM, and a lack of diplomatic representation; most African workers do not have diplomatic representation in Bahrain. Prior to the pandemic, foreigners comprised approximately 80 percent of the

total Bahraini workforce, the majority being unskilled or semi-skilled construction or maintenance workers. Likely due to pandemic-related job loss, the economic downturn, and an increased desire for workers to repatriate, Bahrain's migrant workforce decreased in 2020. The government reported there were roughly 80,000 domestic workers in Bahrain at the end of the reporting period, 85 percent of whom were female, predominantly from the Philippines, Ethiopia, India, Indonesia, Kenya, and Sri Lanka—approximately 15,000 more workers than in the previous reporting period. Domestic workers from African nations are increasingly at risk of forced labor and arrive in Bahrain via direct recruitment from local employers in which workers pay brokers or middlemen in their home country to match them with a visa sponsor in Bahrain. Some employers subject migrant workers to forced labor in Bahrain; indicators include passport retention, strict confinement, contract substitution, non-payment of wages, debt bondage, threats or intimidation, and physical or sexual abuse. NGO and labor-source countries continue to report an increase in incidents of unpaid wages and debt bondage, especially among construction and unskilled workers. Furthermore, reports of unpaid overtime pay and denied vacation time have become more frequent. Some migrant workers are not given or are not in possession of their employment contracts and are generally unfamiliar with the employment terms contained therein. Public opinion supporting the practice of employers retaining workers' passports to ensure they do not flee, coupled with the fact that passport confiscation is not explicitly prohibited by Bahraini law, enabled this pervasive practice to continue.

Nationals of countries without diplomatic or consular presence in Bahrain, most significantly from African countries, are particularly vulnerable to trafficking, as are domestic workers, who are only partially protected under Bahraini labor law and significantly isolated in their place of work. Government and NGO representatives report physical and sexual abuse of female domestic workers; controlled freedom of movement, withholding of workers' identity cards and passports, restrictions on outside communication, and employer coercion to prevent employees from reporting exploitation are significant problems in Bahrain. Since the onset of the pandemic in 2020 and subsequent movement restrictions, NGOs continue to report an increase in non-payment of wages and coercion of domestic workers who were forced to stay in their employer's home and work after completing their contracts. During the reporting period, many migrant workers returned home or sought other employment without receiving a salary from previous employment and without end-of-service payment or benefits, likely due to workers' fear of lengthy court proceedings coupled with the difficulty of receiving renumeration from a business that closed during the pandemic. Cuban nationals working in Bahrain may have been forced to work by the Cuban government.

While the government maintained regulatory authority over recruitment agencies, some migrant workers arrive in Bahrain independently of regulated agencies. Many workers are paired with employers through intermediaries in Bahrain and unlicensed recruiters in their respective countries of origin; back-and-forth movement between Saudi Arabia and Bahrain via the King Fahad Causeway also contributes to this vulnerability, as Saudi nationals are able to sponsor foreign workers in Bahrain. Local press and media report traffickers recruit women to Bahrain via social media platforms or Bahrain-based acquaintances under false pretenses of high-paying jobs in the hospitality and domestic sectors and subsequently force them into sex trafficking. Traffickers also convince other women, mostly domestic workers already in Bahrain, to leave their employers with false promises of higher paying jobs; after being recruited, traffickers exploit some women in commercial sex through physical threats and debt-related coercion. Some NGOs report that due to pandemic-related shutdowns of the service industry, workers who lose their jobs are consequently exploited in the commercial sex trade. Some unscrupulous employers bring migrant workers to Bahrain under the "free visa" scheme—whereby workers pay an employer a recurring fee to sponsor their work visa while performing work for other employers in violation of local labor law—which can render them vulnerable to trafficking due to their illegal working status. Expatriates residing in Bahrain long-term are also reportedly complicit in the "free visa" scheme. Although notable reforms are underway, Bahrain's sponsorship-based employment system continues to put some workers,

particularly domestic workers, at risk of trafficking by limiting their ability to change employers or leave the country and by giving employers the unilateral power to control the status of residency permits.

## BANGLADESH: TIER 2

The Government of Bangladesh does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Bangladesh remained on Tier 2. These efforts included increasing investigations, prosecutions, and convictions against human traffickers, including upholding the dismissal of a member of Parliament involved in a labor trafficking case. In August 2021, the seven Anti-Trafficking Tribunals resumed operations and the Rangpur and Rajshahi tribunals became the third and fourth courts to record trafficking convictions. The government also ratified the protocol to the ILO's forced labor convention as part of efforts against forced labor. However, the government did not meet the minimum standards in several key areas. The government identified fewer potential trafficking victims compared with the previous reporting period and victim care remained insufficient. The government continued to allow recruitment agencies to charge high recruitment fees to migrant workers and did not consistently address sub-agents conducting illegal recruitment operations, leaving workers vulnerable to trafficking. The government did not uniformly employ standard operating procedures (SOPs) to identify trafficking victims among vulnerable populations, resulting in the penalization of some returning migrant workers and potential sex trafficking victims. In addition, the government pursued policy changes that would force potential labor trafficking victims to go through civil arbitration prior to initiating criminal investigations.



**PRIORITIZED RECOMMENDATIONS:**
Increase prosecutions and seek convictions for trafficking crimes, particularly of labor traffickers and complicit government officials, while respecting due process. • Take steps to eliminate recruitment fees charged to workers by licensed labor recruiters and ensure employers pay recruitment fees. • Adopt formal victim identification procedures and screening processes to prevent penalization of potential victims and improve case registration. • Disseminate and implement standard guidelines for provision of adequate victim care referral to protective services and build the capacity of service providers. • Expand services for trafficking victims, especially adult male victims, foreign victims, and victims exploited abroad. • Allow NGOs improved access to trafficking victims in government shelters to provide services without a court order and improve overall collaboration with such organizations for more effective partnership on anti-trafficking efforts. • Increase investigations and prosecutions of credible allegations of trafficking of Rohingya, including cases that do not involve movement. • Continue collaboration with the Inter-Sector Coordination Group to implement measures protecting Rohingya from traffickers. • Strengthen the capacity of Anti-Trafficking Tribunal personnel to prosecute and adjudicate human trafficking cases and expand tribunals to heavy caseload areas to improve services for trafficking victims. • Enhance training for officials, including law enforcement, labor inspectors, immigration officers, and health care providers, on identification of trafficking cases and victim referrals to services. • Fully implement and monitor for compliance the registration requirements for recruitment agents, dalals, and brokers who supply labor to recruiting agencies. • Improve quality of pre-departure

Haiti AR_000590

trainings for migrant workers, including sessions on labor rights, labor laws, and access to justice and overseas assistance. • Ensure potential labor trafficking victims have the right to file complaints under the Prevention and Suppression of Human Trafficking Act (PSHTA) and seek adjudication for criminal offenses rather than restricting cases to labor dispute issues. • Enable labor inspectors to file cases in labor or criminal courts as appropriate. • Establish clear procedures for Rohingya to file complaints in the legal system and train law enforcement and camp management on the procedures. • Improve inter-ministerial coordination and increase monitoring to prevent commercial sexual exploitation of children, particularly children who are experiencing homelessness or use the streets as a source of livelihood, as well as the children of adults engaged in commercial sex in brothels. • Adopt a revised and resourced 2018-2025 National Plan of Action that incorporates greater attention to prosecution and protection efforts, including dedicating resources to enhance victim care. • Establish standard guidelines for investigating transnational trafficking cases.

## PROSECUTION

The government increased overall law enforcement efforts. The 2012 Prevention and Suppression of Human Trafficking Act (PSHTA) criminalized sex trafficking and labor trafficking and prescribed penalties of five years to life imprisonment and a fine of not less than 50,000 Bangladeshi Taka (BDT) ($581). Bonded labor was treated as a separate offense with lesser prescribed penalties of five to 12 years' imprisonment and a fine of not less than 50,000 BDT ($581). These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping.

The government increased investigations, prosecutions, and convictions against human trafficking, although it did not take adequate steps to address internal sex trafficking or official complicity, both of which remained pervasive. The government investigated 594 cases under the PSHTA, including 132 sex trafficking cases, 182 forced labor cases, and 280 cases for unspecified exploitation, and continued to investigate 449 cases from previous years. This compared with the investigation of 348 cases and continued investigation of 138 cases during the previous reporting period. The police initiated prosecution of 620 suspects (96 for sex trafficking, 166 for forced labor, and 358 for unspecified exploitation)—an increase from the 517 individuals the government prosecuted the previous reporting period, including 184 sex trafficking and 333 forced labor cases. Special tribunals enabled the government to significantly increase the disposal of human trafficking cases. The courts and the Anti-Trafficking Tribunals convicted 18 traffickers in 11 cases, including 18 people for sex trafficking and no convictions for labor trafficking or undefined trafficking crimes. This was an increase from courts convicting seven traffickers the previous reporting year. The government may have reported some non-human trafficking cases in its statistics, including potential cases of migrant smuggling. Although the courts experienced many months of lockdowns due to the pandemic, the government lifted the restrictions in August 2021. The government reported more than 5,000 trafficking cases remained pending investigation or prosecution as of September 2021 but that the case disposal rate increased considerably. The government directed limited resources toward prosecution efforts during the reporting period. The government acknowledged investigations, prosecutions, and convictions for trafficking remained inadequate compared to the scale of the problem. The government continued to train police officers through an anti-trafficking module at the police academy. The government also continued to train and provide in-kind support to international organization- and NGO-run trainings for judicial, immigration, and border officials. The government did not report whether police and other relevant officials received training on the 2017 PSHTA implementing rules.

The seven Anti-Trafficking Tribunals—judges and special prosecutors assigned to hear human trafficking cases and address the substantial case backlog—resumed operations in August 2021 after pandemic-related delays. The tribunals reportedly reduced case backlogs and achieved significant case disposal rates compared to similar periods in 2020. The Rangpur and Rajshahi tribunals became the third and fourth courts to record convictions for trafficking, following convictions in the Dhaka and Barishal tribunal courts during the previous reporting period. The government intended to expand the Anti-Trafficking Tribunals to

additional high caseload areas, including announcing plans in November 2021 to open an eighth tribunal in Cox's Bazar. Most of the tribunals had manageable caseloads compared to the wider court system. Despite the renewed tribunal activity, officials did not effectively investigate and prosecute cases, and political influence over the courts remained a concern. The government reportedly trained 16 judges and 16 public prosecutors on human trafficking. In addition, observers noted that tribunal judges, prosecutors, and staff may require further anti-trafficking training and incentives to effectively try cases while respecting due process. For cases heard outside of the tribunals, observers had previously noted the government generally did not dedicate sufficient resources to pre-trial investigations and cases languished due to a lack of evidence or case backlogs. The government continued to allow mobile courts, established under the executive branch, to adjudicate labor violations, although the courts could not address labor trafficking claims. Some village courts, five-person panels of local government officials and villagers, adjudicated trafficking cases but could only administer financial penalties.

Some officials did not understand human trafficking and at times conflated it with migrant smuggling. Some officials continued to deny the existence of internal trafficking, especially child sex trafficking, despite ongoing evidence of child sex trafficking in licensed brothels. Police and prosecutors often did not collaborate well with one another during the law enforcement process, which led to delays and the formation of weak cases for prosecution. In cross-border cases, Bangladeshi officials often did not travel abroad to collect evidence and did not know how to request international evidence. However, the Bangladesh police and prosecutors of the Anti-Human Trafficking Tribunals cooperated on transnational cases with agencies in Australia, Canada, India, and South Africa. In one notable case, the government cooperated with Indian police against a transnational group that recruited Bangladeshi girls and exploited the children in sex trafficking in India using TikTok. The government also maintained mutual legal assistance pacts with South Africa and India to support investigations of trafficking cases and maintained extradition treaties with India, South Africa, and Thailand to ensure that traffickers returned to face trial.

The government did not sufficiently investigate and prosecute trafficking cases involving the exploitation of Rohingya refugees. Despite continued reports of traffickers exploiting Rohingya in forced labor and sex trafficking within Bangladesh, most Rohingya-related cases reported by law enforcement involved movement via boat, cases that might have amounted to migrant smuggling without elements of trafficking. Although the PSHTA includes a provision for non-citizens to file trafficking cases, the government did not establish clear legal reporting mechanisms within refugee camps, which impeded Rohingyas' access to justice and increased impunity for offenders. Police and international humanitarian actors maintained multiple help desks in several refugee camps to provide legal assistance to female and child refugee crime victims, but public distrust of police and security services deterred many victims of crimes, including trafficking, from approaching law enforcement for assistance. International organizations continued to allege some Bangladeshi officials facilitated trafficking of Rohingya, including by accepting bribes from traffickers to gain access to camps.

Official complicity in human trafficking, trafficking-related corruption, and impunity for traffickers remained serious concerns, continuing to inhibit law enforcement action during the year. The government was reluctant to acknowledge or investigate such claims, claiming there was no official complicity during the reporting period. Some law enforcement officers and prosecutors allegedly decided which cases to investigate and try in court based on the political and financial connections of the accused. For example, some labor attachés, local politicians, judges, and police allegedly requested bribes from victims and their families to pursue cases. Recruitment agencies reportedly exploited official corruption to profit from overseas migration, including potential trafficking crimes. Observers alleged some officials from district employment and manpower offices facilitated human trafficking and some traffickers in rural areas had political connections that enabled them to operate with impunity. Observers also said some local politicians convinced victims to accept payment from recruitment sub-agents to not report fraudulent or exploitative labor recruitment actions to police. Other observers reported some police conducted slow and flawed investigations to allow traffickers

to evade punishment, including when suspects were fellow officers. Allegations of government corruption included officials working near international border crossings and police accepting bribes to release victims to their traffickers. In registered brothels, some police charged bribes to ignore abuse within the establishments, to forego checking for the required documentation that each individual was older than 18, and to procure fraudulent documents for girls as young as 10 years old.

Because a number of government officials, including parliamentarians, maintained close ties to foreign employment agencies, there were concerns such officials had conflicts of interest in approving migrant-friendly practices, such as allowing for prosecution of abusive recruitment agencies and increasing protections for migrant workers. In June 2021, the Bangladeshi Supreme Court upheld a High Court verdict dismissing a plea deal that attempted to preserve the parliamentary membership of a Bangladeshi parliamentarian convicted in Kuwait of bribing Kuwaiti officials to bring more than 20,000 Bangladeshi migrant workers into the country. Parliament had previously revoked the member's seat following his conviction and imprisonment in Kuwait for bribery, and it initiated an investigation into the accused's wife, also a member of parliament who was convicted in Kuwait on a related but lesser charge, and other family members. During the reporting period, police also arrested a close associate of the former parliamentarian who allegedly managed the illicit proceeds by moving funds between multiple bank accounts. Media reported that from 2015 to 2018, Malaysian employment agencies and 10 Bangladeshi recruitment agencies bribed officials and politicians in both countries to create a monopoly on recruitment of Bangladeshi workers. The monopoly increased the recruitment fees charged to workers from 37,000 BDT ($430) to more than 400,000 BDT ($4,650) per person—higher than the government's legal maximum—which increased Bangladeshi migrant workers' vulnerability to debt-based coercion. In November 2021, police arrested five staff members of recruitment agencies for bribing airport officials and sending workers abroad using false documents. Similar cases demonstrated recruiting agents were directly complicit in labor exploitation by force or deception. The government did not report any other investigations, prosecutions, or convictions of government employees complicit in human trafficking offenses.

## PROTECTION

The government decreased protection efforts. It identified fewer potential victims than in the previous reporting period and maintained severely inadequate victim protection, especially for Bangladeshi trafficking victims identified overseas. The government identified 1,138 potential trafficking victims, a significant decrease from 6,866 in the previous reporting period; however, the government did not report details of this number and, in the past, had included smuggled migrants in the overall number. In comparison, NGOs and international organizations reported identifying at least 580 sex trafficking victims, 6,378 labor trafficking victims, and 717 victims of unspecified exploitation. Among the sex trafficking victims, organizations reported 429 women, 10 men, 111 female children, 10 male children, and 20 LGBTQI+ individuals, while the labor trafficking victims included 4,328 men, 1,902 women, 93 female children, 41 male children, and 14 LGBTQI+ individuals.

The Ministry of Home Affairs (MHA), the government's lead agency for combating trafficking, had SOPs for proactive trafficking victim identification; however, the government did not report whether the SOPs were widely disseminated or used. Observers noted there was no standard victim identification procedure; many law enforcement agencies attempted to follow the PSHTA with significant misunderstandings and lacked a formal procedure for identifying victims. Some police officers used a checklist to proactively identify victims when they came into contact with individuals in commercial sex establishments; however, the government did not formally adopt or disseminate the checklist, and its use was inconsistent. The government, in partnership with an international organization, developed a rapid victim identification mobile application during the reporting period, although the application was not yet finalized or approved for official use. The government also maintained several general helplines to report crime, including human trafficking.

Law enforcement did not uniformly employ SOPs to identify trafficking victims among vulnerable populations, including individuals engaged

in commercial sex and, as a result, may have penalized sex trafficking victims for unlawful acts that traffickers compelled them to commit. Police enforcement operations on hotel-based commercial sex resulted in law enforcement filing many cases under PSHTA sections 12 and 13, accusing young women and girls of criminal behavior without attempting to screen for victimization with trafficking indicators. Similarly, NGOs previously reported law enforcement conducted operations in brothels and arrested foreign national women in commercial sex for visa violations without efforts to screen for trafficking. NGOs reported some authorities detained and fined foreign national trafficking victims in transit for failure to carry a passport and may have deported some victims without screening for trafficking; officials sometimes identified these individuals as trafficking victims and treated them as such. Law enforcement at the borders intercepted and charged at least 55 people under the penal sections of the passport control order, despite evidence that these individuals had been brought to the Indian border under fraudulent pretenses for the purpose of trafficking. The government previously penalized some returning Bangladeshi migrant workers with substantial indicators of trafficking on ambiguous charges of "damaging the image of the nation" without appropriately screening for trafficking. The government sentenced some of these potential victims to jail terms, although the government eventually granted bail to the victims. The government had previously arrested and charged 81 migrant workers, returned from Vietnam, for damaging the country's image by protesting their payment of recruitment fees for jobs that never materialized in front of the Bangladesh embassy in Vietnam. A court granted bail to the migrant workers and ordered an investigation, although the government did not report its results. The government previously arrested 219 Bangladeshi workers who had returned from Kuwait, Qatar, and Bahrain for allegedly committing similar ambiguous offenses abroad. In November 2020, authorities released the migrant workers on bail; the government did not provide updates concerning the potential victims. Previously, the government occasionally required victims of labor exploitation, including labor trafficking, to remain at embassies overseas to pursue a civil case against their employers; many victims wanted to return home and thus could not pursue cases. The government did not file any trafficking cases in destination countries but did assist with investigations in Australia, Canada, India, South Africa, and Togo.

Protective services remained strained due to the pandemic and limited government resources. The government had a standard policy to refer victims to services, although it required a court-order mechanism to do so. During the reporting period, the Department of Social Services (DSS) formally adopted comprehensive Survivor Services Guidelines and referral directories to ensure minimum standards of care in government-run shelters. Authorities commonly referred victims to government-run shelter homes for protection services, although the government occasionally referred victims to NGO-run shelters. Though the government referred 5,480 victims to shelters, it did not report how many victims it referred to government shelters versus NGO-run shelters, preventing comparison with the 126 victims referred to government shelters and 167 victims referred to NGO-run shelters in the previous reporting period. NGOs and international organizations provided referrals to 618 sex trafficking victims, 543 labor trafficking victims, and 446 victims of unspecified exploitation. The government and NGO-operated shelters decreased the services available to trafficking victims in response to pandemic restrictions. For example, social distancing requirements in a shelter in Cox's Bazar reduced the number of survivors who could be assisted to only 10 to 15 individuals at one time. With partial funding from a foreign government, the Ministry of Social Welfare (MSW) operated some longer-term shelters for women and child victims of violence, including trafficking victims, which could provide similar care. MSW shelters, however, required a court order referral. The government also required NGOs and international organizations to obtain a court order to provide additional services to victims in government shelters. Some victims reported abuse within the shelters. In addition, the government required trafficking victims without legal residence in Bangladesh to remain in shelter homes until repatriation to their country of origin. Despite legal guidelines to administer services equitably, the government did not consistently view adult men as trafficking victims, and the government did not routinely identify or provide equitable services to

**BANGLADESH**

male victims. While some NGO shelters could house male victims, the majority of both government and NGO shelters could not; however, most NGOs could provide non-shelter services to adult male victims. The government did not report how many trafficking victims its police and MSW shelters assisted during the reporting period.

The government provided services to 442 sex trafficking victims, 2,420 labor trafficking victims, and 1,410 victims of unspecified exploitation during the reporting period. In comparison, NGOs and international organizations provided services to 751 sex trafficking victims, 4,656 labor trafficking victims, and 557 victims of other exploitation. The government reported these services included eight victim support centers for women and children that provided free food, clothing, medical care, and education to 34 trafficking victims. Counter Trafficking Committee (CTC) members and police used referral directories developed by a partner organization to refer victims and at-risk individuals to services, although the absence of well-established protocols created challenges referring identified victims to appropriate services. Police operated multiple centers for women and child victims of violence, including trafficking, in each of Bangladesh's eight divisions, offering short-term shelter, medical services, and psychological care. In response to pandemic-related restrictions, the Ministry of Women and Children Affairs created psycho-social support options through cell phone and email. Government-run hospitals also had one-stop centers to assist female victims of crime, although it was unclear whether and how officials referred women to these centers. The government's NGO Affairs Bureau previously withheld approval for foreign funding to some NGOs working on some human rights or humanitarian issues, which may have affected availability and provision of services to vulnerable populations, including trafficking victims. The pandemic limited resources and strained the ability of NGOs to offer victim services. The PSHTA entitled victims to protection during judicial proceedings, including police security, and allowed victims to provide testimony via video conference. While some victims participated in the investigation and prosecution of their traffickers, the government and NGOs noted insufficient implementation of the protection provision contributed to a lack of participation by most trafficking victims. The government offered free legal services to trafficking victims through public and special prosecutors, as well as legal and financial support through the Bangladesh National Legal Aid Organization. The government allocated funding to provide legal services to trafficking victims through the district offices of the National Legal Aid Service Organization (NLASO). Government-run District Legal Aid Committees could also offer free legal services to victims, although the services were insufficiently publicized among eligible survivors. The government did not provide legal alternatives to removal of foreign trafficking victims to countries where they might face hardship or retribution. However, foreign victims of trafficking were legally entitled to the same benefits as Bangladeshi nationals under the PSHTA. In addition, NGOs and international organizations could care for foreign trafficking victims. NGOs provided temporary care to Rohingya trafficking victims in safe homes, but most returned to the refugee camps, where they remained vulnerable to re-trafficking. The government allowed some NGOs to provide shelter services without a court order in Cox's Bazar, although the organizations needed to first receive permission from officials overseeing the refugee camps.

The Ministry of Expatriates' Welfare and Overseas Employment (MEWOE) maintained 29 labor offices, or labor welfare wings, in embassies and consulates in 26 major destination countries to provide welfare services to Bangladeshi migrant workers through labor attachés trained on trafficking issues. These labor attachés were responsible for reviewing and verifying employment documents. International organizations continued to report these labor wings had neither the staffing nor the resources to assist the large number of migrant workers, especially at embassies in the Gulf with large numbers of Bangladeshi workers. MEWOE operated five safe houses abroad for workers with strong indicators of trafficking who fled abusive employers, but it did not report how many individuals or victims the shelters assisted. While the government funded some trafficking victim repatriation, it often took so long that victims funded it themselves and incurred additional debt. The government relied on NGOs to support victims upon repatriation. The government made minimal efforts to assist Bangladeshi sex and labor trafficking victims abroad, although the PSHTA included provisions for the repatriation

of foreign victims of human trafficking identified in Bangladesh. The government worked with an international organization to repatriate 35 Bangladeshi trafficking victims from Lebanon, Libya, Malaysia, Vanuatu, and Vietnam. The government formed an inter-ministerial committee to identify trafficking victims among deported returnees from Libya. Trafficking victims of Bangladeshi origin are likely to be deported or turned away without screening for trafficking in destination or transit countries, particularly India. The MHA and the Government of India continued to finalize victim identification and repatriation SOPs. The governments facilitated, and NGOs funded, repatriation of trafficking victims from India, but without a final, adopted SOP, the lengthy and complex approval system resulted in some Bangladeshi victims languishing in Indian shelters for years. Both governments coordinated several repatriation initiatives over the previous year, including a group of 21 women and children in 2022. Border closures due to the pandemic temporarily halted repatriation services, often resulting in significant distress for trafficking survivors in shelters waiting to return home from destination countries.

While the 2012 PSHTA mandated creation of a fund to assist victims in seeking compensation from their traffickers, the government had not yet created the fund. Trafficking victims were encouraged to file cases under the PSHTA, although an alternative system of arbitration existed with MEWOE. All trafficking victims could file civil suits seeking compensation, and trafficking victims had the right to pursue restitution from defendants in criminal cases, although restitution through out-of-court settlements between victims and traffickers remained more common. These settlements typically involved victims recanting their testimony, effectively eliminating the possibility of the trafficker facing a criminal conviction. Overseas Bangladeshi workers who secured their employment through MEWOE could lodge complaints with MEWOE to seek restitution for labor and recruitment violations, including allegations of forced labor, through an arbitration process. However, trafficking-related corruption impeded the process, which often yielded minimal awards. At least one NGO reported the Bureau of Manpower and Employment Training (BMET), which facilitated the arbitration, prohibited NGO advocates from accompanying migrant workers, forcing workers to arbitrate claims alone against both powerful recruitment agencies and BMET. MEWOE reported it settled 22 complaints against recruitment agents in FY 2020-2021, compelling them to pay 1.52 million BDT ($17,670) to migrant workers, compared with 424 recruitment agents compelled to pay 24.04 million BDT ($279,530) in compensation in 2020; MEWOE did not report whether any complaints involved forced labor. MEWOE also operated a desk at the Dhaka airport, providing up to 5,000 BDT ($58) and information on available NGO services to returning female migrant workers, including trafficking victims. Because the government did not consistently initiate criminal investigations into migrant workers exploited abroad and civil remedies remained inadequate, civil society organizations ran alternate dispute resolution systems to assist labor trafficking victims in obtaining some financial remedies.

**PREVENTION**
The government maintained efforts to prevent trafficking. MHA remained the focal ministry for anti-trafficking efforts and continued to lead the inter-ministerial committee for combating human trafficking, which met bi-monthly to coordinate government activities. During the reporting year, several MHA officials with responsibilities for coordinating anti-trafficking efforts transitioned to new government positions, leading to some loss of institutional knowledge and impeding long-term anti-trafficking efforts. The National Authority, an institution that serves as a government-wide supervisory body on combating trafficking, met regularly, but civil society reported the National Authority was not formally institutionalized. The government considered expanding the National Authority's membership—including to civil society participants—to improve its effectiveness. The government also did not clarify the distinct roles of the National Authority versus the inter-ministerial committee. The government began to revise its 2018-2022 anti-trafficking national action plan (NAP), including extending the NAP through 2025. The government previously harmonized NAP implementation with funded Sustainable Development Goals to cover costs associated with 95 percent of the plan. The government directed most NAP funding toward prevention efforts; thus, observers recommended officials increase the

plan's coverage of prosecution, protection, partnerships, and monitoring and evaluation. The government reported that the PSHTA and NAP were developed through a multi-stakeholder participatory process, including anti-trafficking organizations and human trafficking survivors. In addition to the National Authority, which coordinated intragovernmental efforts, the government supported several other task forces and committees to monitor progress on anti-human trafficking and to harmonize anti-trafficking efforts between government agencies, NGOs, and international organizations. These included the National Coordination Committee to Combat Human Trafficking, Committee to Monitor the National Plan of Action for Combatting Human Trafficking, and the Vigilance Task Force (VTF). The Rescue, Recovery, Repatriation, and Reintegration (RRRI) Task Force primarily focused on trafficking cases involving women and children and coordinated with Indian counterparts. Furthermore, the government continued to support counter trafficking committees (CTCs) at district, sub-district, and union levels to facilitate coordination between local governments and civil society to combat human trafficking. MHA did not make its annual reports on human trafficking public, and anti-trafficking law enforcement data was published online but did not always contain current statistics.

The government maintained 15 bilateral labor agreements, in part intended to protect Bangladeshi workers abroad, and reported that the agreements were fully implemented, although there was no evidence the government enforced the agreements. A Bangladesh and Malaysia five-year agreement, signed in December 2021, anticipates the hiring of one million Bangladeshi workers, although Malaysian authorities sought to limit recruitment to only 25 agencies. The Government of Bangladesh has urged Malaysia to keep the recruitment agency selection process fair and transparent to avoid any form of monopoly. The MEWOE also prepared a draft memorandum of understanding with the Government of Libya to facilitate labor migration following the removal of restrictions in November 2021. At the beginning of the pandemic, the government took steps to prepare for the anticipated repatriation of Bangladeshi workers, including by providing a one-time payment for returning migrant workers and encouraging destination countries to protect migrant worker jobs and provide financial support for workers who had been laid off.

For Bangladeshis who migrated during the pandemic, the government continued to require pre-departure training, including safe migration and anti-trafficking components, and a 30-day pre-departure training course for female domestic workers. The government offered safe migration information through numerous district employment and manpower offices and training centers. However, it was unclear how many migrants were aware of these services and accessed them before traveling abroad. Bangladesh Overseas Employment and Services Limited (BOESL), the government-run recruiting agency, organized district-level job fairs to increase awareness of ethical recruitment and safe migration methods among potential migrants. The District Employment and Manpower Office (DEMO) and Technical Training Centers also provided pre-departure training for migrant workers on topics such as labor rights, labor laws, and access to overseas assistance. In addition, the government made BMET-certified pre-departure orientation sessions available online for migrant workers. However, BMET reportedly allowed some recruitment agencies to prohibit briefings by NGOs on topics "against recruiting agencies' interests."

The MEWOE began the process of amending the Overseas Employment and Migration Act (OEMA), 2013—which will be known as the Overseas Employment and Migration Act, (Revised) 2022—to bring recruiting agents and representatives under greater accountability and transparency. OEMA criminalized fraudulent recruitment and unlawful recruitment fees; however, these provisions still permitted the government to set legal recruitment fees at rates between 85,000 BDT and 262,000 BDT ($990-$3,050), high enough to render many migrant workers indebted and vulnerable to trafficking through debt-based coercion, and observers noted many migrants paid more than the legally permissible rates. The government established fixed recruitment fees for 16 labor-receiving countries, with the largest number of Bangladeshi workers. However, workers continued to pay large fees that were greater than the fixed amount to pay for service charges, airfares, passports, visas, medical charges, and other expenses. A research organization reported Bangladeshi migrant workers traveling to Saudi Arabia on average paid

more than 450 percent of the government's fixed recruitment price for the total labor migration process in 2018. According to the research, the government's fixed recruitment fee for Saudi Arabia was equivalent to a Bangladeshi worker's salary for five and a half months, and workers in reality paid fees equivalent to more than two years of salary. Observers assessed the high cost of legal migration drives some prospective migrants to illegal agents who facilitate human trafficking using false promises of overseas employment. The Bangladesh Association of International Recruiting Agencies (BAIRA) acknowledged migrant workers frequently paid sub-agents—or dalals—fees in addition to the legal amount BAIRA agents charged before the workers began the formal recruitment process. Dalals also directly connected workers to overseas jobs by providing fake visas and other documentation and, in some cases, incorrect information about the migration process and the job in the destination country. Observers stated a migrant worker's financial situation, not skills or abilities, often determined job placement. Although the government did not prohibit worker-paid recruitment fees, some officials have advocated for employer-paid recruitment fee models and ethical recruitment practices.

The government required recruitment agencies or authorized representatives to receive approval to recruit workers for overseas employment. BAIRA oversaw 1,442 licensed labor recruitment agencies. MEWOE had the authority to register recruiting dalals and required brokers to register sub-agents and representatives. MEWOE suspended 183 recruitment agencies in FY 2020-2021 for operating in violation of the law, including breach of employment contracts and recruitment regulations. MEWOE did not report how it was monitoring existing or new agents for compliance. NGOs stated the government needed to do more to bring all recruiting companies into compliance with this directive. MEWOE continued to develop a classification system to rank licensed recruiting agencies into four categories based on compliance with the law, including adherence to government-fixed recruitment fees, number of branch offices, frequency of complaints, and other considerations. The government's VTF—a multiagency effort to monitor and enforce compliance of rules and regulations during the migration process and prevent irregular migration—continued operations against corrupt recruitment agencies, travel agencies, and dalals, who operated in rural locations and connected prospective migrant workers to licensed employment agencies. The VTF-operated mobile courts received complaints, took legal action against agencies and institutions, disseminated migration information to agencies, and prevented human trafficking under the pretenses of labor migration. Mobile courts prescribed fines or imprisonment; fines were inadequate penalties to deter the crime. VTF mobile courts convicted some recruitment agents and issued sentences for varying terms of imprisonment and imposed fines of 950,000 BDT ($11,050) for labor trafficking-related offenses under the 2013 OEMA, which included sending migrant workers abroad unlawfully, charging unlawful recruitment fees, and fraudulent recruitment.

In October 2021, recruiting agencies petitioned the government to amend the PSHTA to require that workers who receive clearance from BMET, the government agency responsible for preparing and certifying outbound Bangladeshi workers, and travel abroad legally must file any allegations against the recruiting agencies under the OEMA rather than the PHSTA. The home minister affirmed that trafficking complaints by migrant workers lodged with police should be referred to BMET for resolution. The revised process would prevent potential victims from filing a criminal case with police until BMET failed to resolve the complaints. The revised process would also benefit recruiting agencies because the penalties under the OEMA are less severe than those under the PHSTA. If formally adopted, the change would require handling human trafficking as a labor issue involving negotiation and arbitration rather than a criminal offense. The government's decision to restrict potential labor trafficking cases to arbitration through the BMET prevented law enforcement from arresting recruitment agents who may continue to facilitate migrant transit despite significant risks.

In January 2022, the government ratified ILO P029—Protocol of 2014 to the Forced Labour Convention, 1930, as part of its efforts to declare domestic and export-oriented sectors free of child and forced labor. In March 2022, the government submitted its ratification for the International Labor Organization's Minimum Age Convention, 1973

(No.138), which requires establishing a minimum age for employment and represented a further step to eliminate child labor. The Department of Inspection for Factories and Establishments (DIFE) is the only authority responsible for enforcing labor laws related to child labor and may file cases in labor courts regarding labor law violations, including child labor. However, DIFE only had authority to file cases in labor courts—not criminal courts—and the labor courts have never referred a case to the criminal courts. In 2020-2021, fewer than half of DIFE's positions were filled, and there were no inspectors dedicated to child labor. While international organizations estimated 93 percent of child labor—including forced child labor—took place in the informal sector, inspectors were not empowered to monitor the informal sector. NGOs estimated child labor increased by 30 to 40 percent in 2020, due to the pandemic. Staffing and resources to inspect for labor violations, including forced and child labor, remained severely inadequate, and inspectors regularly conducted announced inspections, which gave employers time to hide children or exploitative conditions. DIFE labor inspectors did not receive routine training on forced labor and labor trafficking. The government has not conducted a child labor survey since 2013. The government continued to conduct national awareness campaigns through print media, television, radio, and text messages, as well as through its sub-district level CTCs, at times in partnership with NGOs. Most campaign materials were only available in Bangla, which presented a possible barrier for foreign victims.

The government continued to allow international organizations and NGOs to provide some assistance to refugees. However, Rohingya refugees did not enjoy freedom of movement in Bangladesh, and access to education remained difficult for Rohingya youth. Though a pilot program to introduce the Burmese national curriculum in the camps to some Rohingya ages 11 to 13 resumed in September 2021 after pandemic-related closures, the government continued to bar Rohingya from Bangla language schools, closed informal schools established by the Rohingya community, prevented Rohingya from working legally, and restricted their movement, all of which increased vulnerability to trafficking. The government collaborated with the Inter-Sector Coordination Group—responsible for coordinating all activities of implementing organizations in the Rohingya camps—to disseminate TIP-related awareness raising messages among Rohingya populations and the host communities. The government facilitated access for international organizations and NGOs to conduct outreach activities, meetings, and anti-trafficking activities in Rohingya camps. However, pandemic restrictions allowed only small-scale programs to continue.

The government provided basic anti-trafficking training to military and police officers prior to their deployment as peacekeepers and provided anti-trafficking training for its diplomatic personnel. The government reported the demotion of one repatriated peacekeeper for a sexual assault involving a child in Haiti in 2017. Commercial sex is legal in registered brothels, and the individuals involved—including foreign nationals—must receive documentation from police confirming their consent and appropriate age. While the government operated a program for women from lower socioeconomic backgrounds who sought to cease participation in commercial sex, it did not make efforts to reduce the demand for commercial sex acts. The government did not make efforts to reduce the demand for child sex tourism, although the government plans to address child sex tourism in its updated National Plan of Action.

## TRAFFICKING PROFILE

As reported over the past five years, traffickers exploit domestic and foreign victims in Bangladesh, and traffickers exploit victims from Bangladesh abroad. The effects of the pandemic resulted in increased vulnerability for a wider segment of Bangladeshi society. The most at-risk groups included victims of child marriage and gender-based violence; poor and marginalized persons; people who lost jobs due to the pandemic; seasonal laborers recruited from northwest districts for destinations in India; poorly educated and unemployed youth and students; people affected by natural disasters and climate change; Rohingya refugees; and people attempting to reach other countries through irregular migration. Pandemic restrictions and revenue losses had devastating economic consequences for Bangladesh's most vulnerable families. As needs increased in both rural areas and urban slums, some families sent their children to beg or exposed them to commercial sexual exploitation.

Bangladesh is the world's sixth largest migrant-sending country and the eighth largest country receiving remittances, according to an international organization. Traffickers exploit some Bangladeshi men, women, and children who migrate willingly to work in the Middle East and Southeast Asia, especially Brunei, Malaysia, and the Maldives, in forced labor. Traffickers also exploit Bangladeshis in forced labor in South Asia, Southern and Eastern Africa, Europe, and the United States. Many Bangladeshis migrate for work each year through illegal channels, and traffickers target them. The number of migrants attempting to reach Europe via the Mediterranean increased significantly during the reporting period, and many migrants fell victim to trafficking before leaving Bangladesh or while en route to Europe. Before departure, many workers assume debt to pay high recruitment fees, imposed legally by recruitment agencies belonging to BAIRA and illegally by unlicensed sub-agents; this places workers at risk of debt-based coercion. Although one study found that the cost of migration has decreased slightly in recent years, Bangladeshi workers continue to pay the highest migration fees in the region. Some recruitment agencies, agents, and employers also commit recruitment fraud, including contract switching; this includes promising women and children jobs and exploiting them in sex trafficking upon arrival. In recent years, authorities identified more than 100 Bangladeshi male forced labor victims in construction in Vanuatu, and officials received thousands of complaints of non-payment of wages and contract switching among the 30,000 Bangladeshi migrant workers in Brunei. More than 69,000 of the 234,000 Bangladeshi workers in Maldives are undocumented, and some report passport retention, underpayment or non-payment of wages, and fraudulent recruitment. In Saudi Arabia, traffickers exploit through labor trafficking a substantial number of the hundreds of thousands of Bangladeshi female domestic workers.

Traffickers exploit Bangladeshi women and girls in forced labor and sex trafficking abroad, including in India, Pakistan, and Gulf countries. Traffickers sold some women—who migrated through Bangladeshi recruitment agencies to Lebanon or Jordan for domestic work—into forced labor. Some People's Republic of China (PRC) national traffickers force Bangladeshi women, specifically Indigenous women from the Chittagong Hill Tracts, into sex trafficking and domestic servitude through arranged marriages. Some traffickers falsify identity documents to make children appear older than age 18 to send them abroad. The bodies of many deceased Bangladeshi domestic workers have been repatriated from the Middle East, including the body of a 13-year-old girl sent to Saudi Arabia through a labor recruiter with a falsified passport listing her age as 27. A study reported that nearly all the deceased migrant workers had died of unnatural causes in destination countries, including Gulf states. During 2020, NGOs reported traffickers used promises of employment in "COVID-19 free" locations to attract victims. Traffickers have reportedly become increasingly sophisticated at deceiving the families of victims to delay filing of missing persons reports.

Traffickers continue to exploit adults and children from all regions of the country in Bangladesh's legal brothels, many illegal brothels, and private hotels. Traffickers use false promises of work to lure poor women and children into sex trafficking and fabricate exorbitant debts the women and girls as young as 10 must repay. Child sex trafficking remained widespread; one organization estimated that 30,000 girls are sexually exploited in Bangladesh. Experts estimate that 20,000 children are both growing up in and exploited in commercial sex in Bangladeshi brothels. Several women and girls reported traffickers preyed on them and sold them to brothels, after the women fled abusive child marriages. Other women reported they had grown up in brothels because their mothers were engaged in commercial sex and brothel owners forced them into commercial sex when they were children. In some registered brothels, owners force children to take steroids to appear older. In legal brothels, some police charge bribes to ignore abuse within the establishment, forego checking for required documentation that each individual is older than 18, and to procure fraudulent documentation for children as young as 10 years old. Traffickers have increasingly lured potential victims through social media, including Facebook, Instagram, TikTok, and mobile messages. Some traffickers force sex trafficking victims to become addicted to drugs and use addiction to keep them in sex trafficking and involuntary unlawful acts. Sex traffickers exploit

children experiencing homelessness or using the streets as a source of livelihood in exchange for food, shelter, protection, and money. NGOs describe increasingly widespread job losses, wage cuts, and poverty in rural areas and urban slums due to the pandemic, which forces some children into begging and commercial sex. A study found that child sex trafficking victims are forced to take more clients at lower wages and experience more violence and sickness than adults voluntarily engaged in commercial sex.

Traffickers often used debt-based coercion to compel workers into labor, exploiting an initial debt assumed by a worker as part of the employment terms. Traffickers force adults and children to work in the shrimp and fish processing industries, aluminum, tea, garment factories, brick kilns, dry fish production, and shipbreaking. Traffickers force children younger than 14 years into domestic work, including through torture and restricting their movement. In 2018, a survey by an international organization found more than 400,000 children in domestic work in Bangladesh. A 2021 report found that at least 28 children were tortured and 10 children died while working as housemaids. Bangladeshi children are at risk for forced labor in tanneries. Traffickers coerce children experiencing homelessness into criminality or force them to beg, and begging ringmasters sometimes maim children to increase earnings. Traffickers force children, especially in border areas, to produce and transport drugs, particularly a type of methamphetamine called *yaba*. A survey found that some Bangladeshi families were subject to debt bondage in shrimp farming. Another study estimated that approximately 40,000 children are enslaved for nine months at dry fish processing units, while their parents receive money advances against the children's salaries. Traffickers use coercive debts to force Bangladeshi families and Indian migrant workers to labor in brick kilns, shrimp farming, and on tea estates. One organization estimated more than 25,000 children work in deplorable conditions in the Keraniganj industrial district's garment factories, including many children who became indentured and serve as collateral for their parents' loans. NGOs allege some officials allow human traffickers to operate at India-Bangladesh border crossings and maritime embarkation points.

Bangladesh hosts nearly one million Rohingya in refugee camps and host communities in Cox's Bazar near the Burmese border and in other parts of the country, approximately 750,000 of whom arrived after August 2017. Traffickers exploit Rohingya men, women, and children from refugee camps in sex and labor trafficking both within Bangladesh and transnationally. Traffickers transport Rohingya girls within Bangladesh to Chittagong and Dhaka and transnationally to India, Malaysia, and Nepal for sex trafficking, sometimes using false promises of jobs or marriage; some traffickers "trade" these girls over the internet. As reported in previous reporting periods, local criminal networks take Rohingya women from refugee camps at night, exploit them in sex trafficking, and bring them back to the camps during the day. International organizations allege some Bangladeshi officials facilitate trafficking of Rohingya, including accepting bribes from traffickers to gain access to camps. Rohingya girls and boys are recruited from camps and forced to labor as shop hands, fishers, rickshaw pullers, and domestic workers. Some Bangladeshi fishermen use debt-based coercion to exploit Rohingya men if they place their shelter on the fisherman's land. Some Rohingya men who fled to Bangladesh from Burma decades ago have been trapped in forced labor through debt-based coercion to Bangladeshi fishermen for decades. In 2016, some traffickers sold into forced labor Rohingya and Bangladeshi migrants, who traveled by boat to Southeast Asia and could not pay ransoms. Multiple NGOs and humanitarian officials assess Rohingyas' statelessness and inability to receive formal schooling or to work legally have increased their vulnerability to traffickers. Tourists increase demand for child sex tourism, including exploitation of Rohingya girls, near Cox's Bazar.

# BARBADOS: TIER 2

The Government of Barbados does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing

efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Barbados was upgraded to Tier 2. These efforts included significantly increasing investigations; initiating two prosecutions and doing so for the first time since 2016; identifying a victim for the first time since 2013; improving victim screening, including by assessing whether authorities inappropriately incarcerated victims; making efforts to address complicity among police officers; and launching a public awareness campaign. However, the government did not meet the minimum standards in several key areas. The government has never secured a trafficking conviction under the Trafficking in Persons Prevention Act (TIPPA). The anti-trafficking law did not provide penalties that were commensurate with other serious crimes. The government did not contribute to training for any officials.



## PRIORITIZED RECOMMENDATIONS:

Proactively screen vulnerable groups, including children, migrants, and Cuban workers, for trafficking indicators beyond points of entry and identify victims among these populations. • Vigorously investigate, prosecute, and convict traffickers with adequate sentences, including substantial imprisonment, and reduce court backlog for trafficking cases. • Amend the anti-trafficking law to remove sentencing provisions that allow fines in lieu of imprisonment for sex trafficking crimes. • Finish updating victim screening and referral standard operating procedures (SOPs), regularly train frontline workers on the SOPs, and improve coordination with NGOs for victim referral. • Provide regular victim identification and referral training for law enforcement officials, prosecutors, and judges to recognize trafficking indicators, improve evidence-gathering, and implement the anti-trafficking law. • Fully implement the National Action Plan (NAP). • Provide trafficking victims, including potential victims, with adequate accommodations and access to trauma-informed service providers. • Update and modernize labor laws on recruitment and public procurement to prevent trafficking and protect victims. • Continue to increase awareness of human trafficking among the public.

## PROSECUTION

The government increased prosecution efforts. The TIPPA criminalized sex trafficking and labor trafficking. The penalties prescribed for adult trafficking were up to 25 years' imprisonment, a fine of up to 1 million Barbados dollars (BDS) ($495,050), or both. The penalties prescribed for child trafficking were up to life imprisonment, a fine of up to 2 million BDS ($990,100), or both. These penalties were sufficiently stringent. However, by allowing for a fine in lieu of imprisonment, the prescribed punishment for sex trafficking was not commensurate with those for other serious crimes, such as rape. The government continued a process, begun in the previous reporting period with the assistance of a foreign government, to revise the sentencing guidelines for human trafficking and other crimes in order to eliminate fines as an alternative to imprisonment; the process remained ongoing at the end of the reporting period.

The government reported it initiated 40 investigations during the reporting period, 25 for sex trafficking and 15 for labor trafficking, and continued three investigations from previous reporting periods. This compared with two new investigations each in 2020 and 2019. The government initiated prosecution of two Barbadian men for suspected sex trafficking. The government had not reported initiating a prosecution since 2013, and that prosecution remained pending. The government has never convicted a trafficker under the 2016 TIPPA, reflecting long lags between arrests and prosecutions across the justice system; the

closest trafficking cases pending prosecution predated the 2016 TIPPA by several years. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking offenses. In response to advocacy from civil society groups, the government implemented a new regulation that prohibited police officers from moonlighting as security officers in adult entertainment venues and bars to avoid any actual or perceived conflict of interest in the police's role in deterring, detecting, and responding to trafficking and other crimes.

The Sex Crimes and Trafficking Unit of the Barbados Police Service (BPS) investigated all potential human trafficking cases, while the Department of the Director of Public Prosecutions (DPP) was responsible for prosecuting trafficking cases. These entities had island-wide jurisdiction and their responsibilities extended beyond trafficking. There were no courts solely dedicated to hearing trafficking cases; any such cases could be heard in one of the five criminal courts. Serious criminal cases, including trafficking cases, required in-person jury trials unless the defendant was pleading guilty or in rare instances where the case involved no witnesses. By law, these jury trials could not take place remotely, and therefore authorities prosecuted few trafficking or other serious criminal cases during the reporting period due to the pandemic. The government reported this exacerbated an already substantial court backlog, including the 2013 case. The government reported the BPS, the DPP, and the courts had dedicated budgets, with the Sex Crimes and Trafficking Unit funded through the BPS budget. The government reported these entities had adequate financial resources during the reporting period. The government reported essential services, including the BPS, worked throughout the pandemic but reported authorities had to forego some operational aspects, including raids. The Sex Crimes and Trafficking Unit had fewer officers due to the pandemic. The government continued to report difficulties with evidence gathering, particularly data collection and analysis. The police began to replace paper-based records with a fully digitized case management system during the previous reporting period to comprehensively capture crime and violence data, including trafficking; the transition was ongoing at the end of the reporting period. The government included human trafficking within introductory trainings for police; the government did not otherwise fund or provide training. The government reported that if a sex tourism case was associated with human trafficking, the suspect could be tried for crimes committed abroad; but it did not report initiating any such prosecutions. The government cooperated with a foreign government on one investigation, which involved a popular social media site. The government cooperated with international partners in the investigation of two migrant smuggling operations that included potential trafficking crimes.

## PROTECTION

The government slightly increased efforts to protect victims. The government identified one child sex trafficking victim; the government had not identified a victim since 2016, when the government identified eight victims. The BPS utilized an interview checklist to screen potential trafficking victims. The Sex Crimes and Trafficking Unit and the Immigration Department worked with an international organization to update victim screening procedures; the project remained ongoing at the end of the reporting period. The BPS conducted regular surveillance of individuals in commercial sex for case intelligence and victim screening, although adult entertainment clubs were closed due to the pandemic. The government reported law enforcement screened for trafficking indicators when detaining or arresting individuals involved in commercial sex, migrants, or other vulnerable groups; however, the government reported there were few such opportunities due to the pandemic. The Sex Crimes and Trafficking Unit collaborated with the Drug Squad to screen individuals incarcerated for movement of illicit drugs for indicators of human trafficking. The government reported it did not receive any victim referrals from NGOs or civil society organizations. The government reported that Cuban medical professionals worked under a Cooperation Agreement between the two countries, for which the government provided support and funding.

Government authorities and NGOs used a formal process for victim care as required by law, by which the Sex Crimes and Trafficking Unit would identify a potential victim and then refer them to other members of

the National Task Force Against Trafficking in Persons (Task Force) for service provision. The Sex Crimes and Trafficking Unit also could place victims in protective care and refer them to an NGO-operated safe house, although it did not do so this reporting period. The government designated the Gender Affairs Bureau as the government coordinator for local NGO assistance to victims.

The government reported it provided services to the victim identified, including a child psychologist and counseling, other medical care, and financial assistance for school and day-to-day expenses. Under the TIPPA, all victims, including those with disabilities, had to be provided safe shelter, counseling, healthcare, and information regarding their rights. A foreign victim of trafficking and the victim's accompanying dependent children could receive, for the duration of their stay and at the relevant minister's discretion, support that included housing or safe shelter, education and training opportunities, psychological counseling, legal assistance, help with obtaining documents, living expenses, and medical assistance. Authorities could interview victims to ascertain their housing and general health care needs. The government had the capacity and financial resources to provide all services except housing, but reported no victims needed these services during the reporting period. There was no specialized shelter for trafficking victims. Female trafficking victims and their dependents could reside at an NGO-operated women's domestic shelter; however, this shelter did not have the resources for trafficking victims and previously provided inadequate care. The government had a separate agreement with an NGO to provide accommodations to male victims. Adult victims could leave shelters unchaperoned and could work while receiving assistance. The children's care board could provide care for any identified child victims.

The TIPPA authorized the government to provide safeguards for victims' identities and those of their families, issue work permits, and provide transportation and security during legal proceedings. Authorities allowed trafficking victims and witnesses to provide testimony virtually, including from other countries, but did not report using these measures. Prosecutors processed trafficking cases through a voluntary bill of indictment; victims provided evidence only one time to avoid re-traumatization. The government could accommodate victims who wished to be repatriated in a safe place; they could return without unreasonable delay. The government maintained an informal policy allowing foreign victims to receive temporary legal status as an alternative to their removal to countries where they would face hardship or retribution by traffickers. The Minister of National Security could authorize victims, on a case-by-case basis, to remain and work in the country; however, the government did not report granting this status during the reporting period. Government policy permitted victims to leave the country and return for hearings, but the government did not report any such instances. The TIPPA allowed courts to order restitution from a trafficker after a conviction; however, no victims received restitution. Victims could request government assistance to receive compensation. The government, in collaboration with a foreign government, trained BPS officers on trafficking crimes and victim identification.

## PREVENTION

The government increased prevention efforts. The Attorney General headed the Task Force, which included representatives from nine government entities and a non-governmental professional women's organization; the Task Force also worked with other government entities as needed. The Task Force and another NGO began to collaborate by having Task Force Public Service Announcements placed on the NGO's social media platforms. The Task Force met three times during the reporting period, and the sub-committee on prevention met bi-weekly. The government allocated 125,000 BDS ($61,880) to implement the 2021-2023 NAP for two years. The government used the results of a study on the nature and extent of trafficking in the country to launch an English-language public awareness campaign in March 2022. The campaign encompassed public service announcements, social media messaging, free memorabilia containing anti-trafficking slogans, and banners in public areas to alert the public to human trafficking. The government consulted with an international organization to avoid harmful or stereotypical messaging and ensure quality control. The prevention sub-committee also prepared and launched a six-month school, discussion series, and social media platform development

communications work plan. The pandemic continued to severely impact Barbados' ability to implement other aspects of its NAP in 2021.

The government took significant measures to mitigate the economic and social effects of the pandemic, including through economic stimulus initiatives and expanded social support programs that involved all government ministries and consumed extensive human and financial resources, including those used for anti-trafficking efforts. The Labor Department regulated recruitment agencies under the Recruiting of Workers Act; however, the law did not identify the responsible agency for the associated enforcement functions. There were no labor recruiters or brokers operating in the country during the reporting period. The Employment and Career Counseling Service offered services for workers recruited for employment overseas, including in the United States, Canada, and the United Kingdom. The government promulgated (through mass media) the Protocol to Address Migrant Labor Conditions, which described the legal framework governing employers, explained employees' rights, and served to sensitize employers, employees, and the public about possible labor violations. The government reported it drafted updated public procurement legislation to reflect current standards but did not finalize or release it during the reporting period. The government reported migrant workers could enter and leave the country at will if they observed all health protocols. The government reported it made no changes to these workers' immigration status and made pandemic-related benefits available to anyone residing in the country.

The government operated a police hotline number that could receive information on potential trafficking crimes; authorities did not report receiving any trafficking information from the hotline. The professional women's association on the Task Force and the NGO, with which the Task Force began to collaborate during the reporting period, each operated a hotline that could receive trafficking-related calls but did not receive any such calls. Authorities reported that all Barbadian diplomats received training, including on human trafficking, before taking up overseas postings. The government did not make efforts to reduce the demand for commercial sex acts. The government did not make efforts to reduce child sex tourism.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Barbados. Documented and undocumented migrants from Guyana, Haiti, Jamaica, and Venezuela are at high risk for trafficking, although individuals from Colombia, the Dominican Republic, and Saint Vincent and the Grenadines are increasingly vulnerable. The government's strict entry protocols due to the pandemic caused a significant reduction in the number of people from source countries entering Barbados in 2021. Cuban medical workers provided health services in response to the pandemic during the reporting period. Cuban athletic coaches work in the country. Cuban nationals in the country may have been forced to work by the Cuban government. Previously, traffickers operated as part of an organization; more recently, they appear to operate individually. Authorities have noted an increase in use of social media as a means of recruiting victims, which may have increased further due to the pandemic. Media reported research shared in March 2021 suggested that Barbadians are largely unaware about the extent of human trafficking in the country. However, the government reported its 2021 survey revealed a high level of public awareness regarding trafficking.

## BELARUS: TIER 3

The Government of Belarus does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Belarus was downgraded to Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including conducting trafficking-related investigations and prosecutions and identifying and referring to services more trafficking victims. However, the government did not report if it

investigated, prosecuted, or convicted any traffickers under its trafficking statute and did not provide adequate protection services to trafficking victims. Media and NGO reports indicated authorities returned many third-country migrants and asylum seekers who arrived in the country as part of the state-sponsored migration crisis to their countries of origin without comprehensively screening them for trafficking. Moreover, as part of its broader repression of civil society and independent, pro-democracy activism, the government widely limited the activities of civil society organizations, including organizations providing support to trafficking victims, and did not provide funding or in-kind assistance to NGOs. The government did not report conducting awareness raising activities, and its efforts to prevent labor trafficking remained inadequate. For the fifth consecutive year, the government did not report investigating or filing charges related to illegal recruitment of migrant workers.



BELARUS TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase resources devoted to trafficking victim assistance and protection within Belarus in such a manner that improves effectiveness, including for state-owned territorial centers for social services and for NGOs. • Vigorously investigate and prosecute cases of forced labor and sex trafficking under Articles 181 and 181-1. • Increase labor inspections to identify internal forced labor and investigate illegal recruitment practices. • Continue to proactively screen all vulnerable groups, including migrants and individuals in commercial sex, for indicators of trafficking. • Raise awareness about the voluntary nature of *subbotniks* and increase training to government officials at both the national and regional level to ensure coercive measures are not used to elicit participation. • Continue to expand trainings for all relevant officials on the national identification and referral mechanism (NRM) and allocate sufficient resources for its full implementation. • Increase funding for services that provide child sex trafficking victims with services specialized to their needs, continue to refer all identified victims to care facilities, and ensure criminal justice actors use a trauma-informed approach in child trafficking cases. • Increase victims' access to free legal aid and ensure defense attorneys receive training on trafficking and a trauma-informed approach. • Train judges on restitution in criminal cases, establish procedures to seize assets from traffickers, and create effective methods to allocate restitution to ensure victims receive restitution in a timely manner. • Amend or repeal the penal provisions in sections 193(1), 339, 342, 367, 368, and 369(2) of the criminal code to clarify that no penalties involving compulsory labor may be imposed for the peaceful expression of political views and ensure that children are not subjected to compulsory labor as punishment.

## PROSECUTION

The government decreased law enforcement efforts. Article 181 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties ranging from three to seven years' imprisonment and forfeiture of assets for offenses involving adult victims and seven to 15 years' imprisonment and forfeiture of assets for those involving child victims. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. The government reported it conducted 111 trafficking-related investigations but—contrary to previous years—did not report if any investigations were conducted under article 181 (in 2020, the government reported continuing three trafficking investigations under Article 181). For the third year in a row, the government did not report initiating any investigations under Article 181-1, which criminalized the use of forced labor. The government reported prosecuting 46 suspected traffickers but—contrary to previous years—did not report if any of these prosecutions were conducted under Articles 181 or 181-1

**BELARUS**

(the government initiated one trafficking prosecution under Article 181 in 2020 and four in 2019). The government did not report convicting any traffickers under Articles 181 or 181-1 in 2021 or 2020. Media reports indicated law enforcement investigated several sex trafficking cases; however, it is unknown if any were investigated under Articles 181 or 181-1. Observers reported some investigations and court hearings were impacted by investigators, judges, or authorities being forced to isolate for COVID-19-related mitigation; courts limited attendance during hearings and adjourned some trials or suspended proceedings due to participants' COVID-19 infections. Some court sessions used video conferencing to minimize the risk of infection.

The Main Department for Drug Control and Combating Trafficking in Human Beings led law enforcement efforts. The government did not report if it provided training to law enforcement. Law enforcement, prosecutors, and judges participated in trafficking seminars organized by an international organization. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes.

## PROTECTION

The government demonstrated uneven protection efforts; while it identified and referred to services significantly more trafficking victims, the government did not provide adequate protection services and widely limited the activities of civil society organizations, including organizations providing support to trafficking victims. The government identified 244 confirmed trafficking victims, an increase from 109 in 2020. For the second year in a row, the government did not report how many potential victims applied for official status; in 2019, the government reported 251 potential victims applied for official victim status. Of the 244 confirmed victims, 241 were exploited in sex trafficking, and three were victims of forced labor; 118 were children. Traffickers exploited 213 of the confirmed victims in Belarus and 31 abroad. Government authorities identified the majority of confirmed trafficking victims. NGOs indicated they assisted 74 trafficking victims, an increase from 44 in 2020; 39 victims were exploited abroad (including 34 in Russia, three in Poland, and two in the People's Republic of China (PRC)), and 35 victims were exploited in Belarus. Authorities and civil society followed an NRM to identify and refer victims to services. NGOs reported a variance in the degree of cooperation with regional law enforcement. The government reported referring 113 victims to NGOs and international organizations for reintegration services, compared with 55 in 2020. In prior years, the government reported some victims declined services.

The government's victim assistance services, while free, continued to be underutilized and suffered from burdensome bureaucratic requirements, delays in service delivery, and inconsistent quality of service, sometimes leading victims to choose to pay for necessary services elsewhere or find support through NGOs. The government did not have trafficking-specific facilities available to care for victims, but local authorities operated approximately 138 "crisis rooms" that offered temporary shelter, including beds, meals, and personal hygiene products, to vulnerable adults, including victims of trafficking, regardless of nationality; the government did not report if trafficking victims used these facilities in 2021. According to the law, victims' access to services was not dependent on their willingness to participate in the criminal process. Foreign victims were legally entitled to the same benefits as Belarusian victims. However, observers reported in some investigations conducted under Articles 171 and 171.1, victims were required to participate in investigations to access protection services. Observers continued to report most victims sought assistance at private shelters because the government's centers were poorly equipped and lacked qualified caregivers trained in trafficking. Moreover, observers noted that children and persons with disabilities often lacked access to government services and that some services, including medical assistance and legal aid, were not provided in remote areas. NGOs and an international organization provided the majority of victim assistance; however, the government did not provide direct financial support to NGOs. The government took politically motivated steps to limit or ban the activities and foreign funding of civil society groups, including some dedicated to anti-trafficking activities. In September 2021, the government liquidated one of the country's leading NGOs providing assistance to trafficking victims.

Vulnerable children between the ages of three and 18 could receive shelter and basic provisions at centers run by the education ministry; children could stay at these centers for a maximum of six months, after which they were returned to their family, assigned to a foster family, or transferred to an orphanage or boarding institution. The government provided child friendly rooms for interviews, the provision of assistance, and reintegration services at a select number of these centers. The government did not report if any child trafficking victims received services at these facilities. The government did not report if it implemented recommended changes issued by an NGO in 2020 to improve the use of the rooms and interviewing techniques. Although the government amended the criminal code in January 2021 to require the recording of testimony of victims and witnesses younger than the age of 14 during pre-trial investigation for later use in court, observers expressed concern that child sex trafficking victims continued to be subjected to multiple questionings, including in court hearings, and in a non-friendly environment. Observers noted authorities penalized some sex trafficking victims for unlawful acts traffickers compelled them to commit. Media and NGO reports indicated authorities returned many third-country migrants and asylum seekers who arrived in the country as part of the state-sponsored migration crisis to their countries of origin without comprehensively screening them for trafficking. Observers also reported authorities did not consistently screen individuals in commercial sex for trafficking indicators and authorities dismissed claims by Belarusians who stated they had been subjected to forced labor in Russia. Victims were entitled to free legal assistance, and victims could request protection measures to include the non-disclosure of information, exemption from attending hearings, delivering testimony remotely, and closed court sessions. However, observers noted the legal aid provided to victims was inadequate; defense attorneys able to represent victims were in short supply and many attorneys providing free legal aid were not familiar with trafficking and a victim-centered approach. Courts could grant restitution from traffickers in criminal cases, but the government did not report if victims were granted restitution in 2021.

## PREVENTION

The government decreased efforts to prevent trafficking. The minister of interior served as the national coordinator on trafficking issues and led implementation of the 2020-2022 State Program on Combating Crime and Corruption, which included anti-trafficking activities. Interdisciplinary bodies, composed of representatives from law enforcement, education, healthcare, labor, and social welfare sectors, as well as judiciary, media, clergy, and civil society, met on an annual basis to discuss implementation of the NRM. Anti-trafficking cooperation at the regional level was established through memoranda of cooperation with each region. The government did not report if regional interdisciplinary working groups convened in 2021.

The government did not report conducting any public awareness campaigns. The government did not report if it funded or provided in-kind assistance to NGOs. The Ministry of Interior continued to operate a hotline for safe travel abroad to inform potential Belarusian labor migrants, identify illegal recruitment practices, and route calls reporting potential incidents of trafficking to specialized NGOs. For the fifth consecutive year, the government did not report if it investigated or filed charges against companies related to illegal recruitment in 2021; comparatively, it charged 50 companies in 2016, the last year for which data was available. The government did not report if labor inspectors conducted inspections in 2021; efforts remained inadequate to enforce and deter violations. The government continued to participate in multilateral anti-trafficking activities to include coordinating the Group of Friends United against Human Trafficking at the UN and leading efforts to strengthen the implementation of the UN's Global Plan of Action to Combat Trafficking in Persons. Contrary to such multilateral efforts, in a politically motivated act of retaliation for European Union policy, the government orchestrated a migration crisis along its borders with Latvia, Lithuania, and Poland starting in May 2021; this significantly increased these migrants' vulnerabilities to trafficking as law enforcement did not consistently screen migrants for trafficking indicators, and in some instances, authorities forced migrants to attempt irregular border crossings. The government did not make efforts to reduce the demand

for commercial sex acts. The government did not report providing anti-trafficking training to its troops prior to their deployment as peacekeepers.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Belarus, and traffickers exploit victims from Belarus abroad. Data collected by NGOs suggests the majority of trafficking victims are men subjected to forced labor, primarily in Russia. Belarusian victims are exploited primarily in Belarus and Russia, as well as in Poland, Turkey, and other countries in Europe, Eurasia, and the Middle East. Some Belarusian women traveling for foreign employment in the adult entertainment and hotel industries are subjected to sex trafficking. The government has identified Belarusian, Moldovan, Russian, Ukrainian, and Vietnamese victims exploited in Belarus. The majority of traffickers are Belarusian citizens. Traffickers increasingly use online methods to coerce victims into forced labor and sex trafficking.

In May 2021, the government orchestrated a migration crisis along its borders with Latvia, Lithuania, and Poland. Belarusian authorities facilitated the entry into Belarus of thousands of migrants and asylum seekers, mostly from Iraq but also from other Middle Eastern nations and countries in sub-Saharan Africa and Central Asia. Belarusian authorities facilitated their onward travel to the borders of Latvia, Lithuania, and Poland; authorities encouraged and, in some instances, forced migrants to attempt irregular border crossings. Authorities reportedly did not allow international organizations comprehensive access to the migrants, and authorities did not consistently screen them for trafficking indicators. These migrants remain vulnerable to trafficking.

The government continues the practice of *subbotniks*, or voluntary service days (held on Saturdays). One national-level *subbotnik*, announced by government decree, was held during the reporting period, as were several regional, district, and local-level *subbotniks* organized by regional, district, and local authorities. As an alternative form of participation, participants can allocate a portion of a single day's salary toward government projects announced by the authorities prior to the *subbotnik*. Historically, individuals have been subjected to government reprisals for failure to participate in *subbotniks*. In past years, observers reported authorities threatened individuals who refused to work with fines or unpaid premium compensation. However, contrary to previous years, approximately 500,000 citizens abstained from participating in the national *subbotnik* in 2020. Observers did not report any retaliation for nonparticipation in 2021 or 2020. Government decrees announcing *subbotniks* are required to state their voluntary nature. The authorities have previously corrected *subbotnik* announcements that fell afoul of the law and rebuked implicated officials. In 2018, the UN Special Rapporteur on the Situation of Human Rights in Belarus reported authorities obligate—disguised as strong encouragement—some factory workers, civil servants, and school children to participate in harvesting on state-owned farms or in street cleaning. However, the UN Special Rapporteur did not report on *subbotniks* in the 2019, 2020, or 2021 reports to the Human Rights Council. Historically, sources alleged authorities sometimes required university and high school students to participate in public works projects without compensation, but no known cases were identified in the reporting period. In 2019, media reported some university students in a rural area in the Vitsebsk region claimed they were forced to participate in apple picking during the harvest season, but no similar cases were identified in the reporting period. In previous years, reports indicated some state university students who failed to participate in harvesting risked the loss of housing in subsidized dormitories or penalization during exams, but no known cases were identified. The UN Special Rapporteur noted in 2020 its continued concern over the practice of forced labor in places of detention, especially with regards to children and youth; the report generally does not provide time frames during which specific incidents of concern occurred. The ILO Committee of Experts noted its continued concern in 2018 that, although there had been no recently reported cases, some provisions of the Belarusian criminal code, which included forced labor as possible punishment, are worded broadly enough to lend themselves to application as a means of punishment for the expression of views opposed to the government. Some human rights activists also raised concerns that political prisoners (imprisoned and sentenced based on the peaceful expression of political views) performed compulsory labor at penal colonies as a part of their sentences during the reporting period.

# BELGIUM: TIER 1

The Government of Belgium fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Belgium remained on Tier 1. These efforts included increasing investigations, more than doubling the number of prosecutions, and releasing a national action plan (NAP). The government identified significantly more trafficking victims and increased funding for services. Moreover, the government funded a new residence center for unaccompanied girls who were potential trafficking victims. Although the government meets the minimum standards, courts suspended or partially-suspended the majority of convicted traffickers' sentences, which weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. The government also imposed several conditions on victims to access services, including participation in a criminal case, which constrained victim identification and limited crucial services for victims. The government continued to report inconsistent law enforcement data.



## PRIORITIZED RECOMMENDATIONS:

Increase efforts to convict traffickers and sentence convicted traffickers to adequate penalties, which should involve serving significant prison terms. • Vigorously investigate and prosecute suspected traffickers and train law enforcement on increasing trends, including the use of online platforms to recruit and exploit victims. • Train first responders on the child victim identification and referral protocol to ensure it is used effectively in practice and secure adequate funding for the provision of services for child trafficking victims. • Ensure victims have access to the full range of services regardless of whether they choose to participate in judicial processes. • Implement trauma-informed and victim-centered procedures during trial proceedings to minimize the risk of re-traumatization and ensure all victims, not just those under threat of physical violence, have access to witness protection services. • Coordinate and centralize the collection of timely trafficking data across the government to effectively analyze efforts. • Improve victims' ability to access court-ordered restitution in criminal cases and ensure victims exploited by means other than physical violence have full access to victim compensation. • Revise the definition of human trafficking under Belgian law to more closely align with the definition in the 2000 UN TIP Protocol.

## PROSECUTION

The government modestly increased law enforcement efforts. Belgium criminalized sex and labor trafficking through a 2005 amendment to the 1995 Act Containing Measures to Repress Trafficking in Persons, which prescribed penalties of one to 15 years' imprisonment and a fine for offenses involving adult victims and 10 to 20 years' imprisonment and a fine for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as kidnapping. Belgium's definition of trafficking in persons was broader than the definition in the 2000 UN TIP Protocol. Inconsistent with the definition of trafficking under international law, the law established the use of force, fraud, or coercion as aggravating factors, rather than essential

elements of the crime. Additionally, Belgian law also allowed the failure of an employer to meet the prevailing wage and working conditions to constitute "exploitation," and the government included these cases in its prosecution data. GRETA reported this overly broad definition could lead to confusion between trafficking and other criminal offenses and possible difficulties in mutual legal assistance with foreign governments that used a definition more consistent with the UN TIP Protocol.

The government did not report anti-trafficking data consistently from year to year, making it difficult to assess its law enforcement efforts. Despite recommendations from GRETA in both its 2013 and 2017 evaluation reports, the government lacked a coherent system to collect law enforcement and victim data for trafficking cases, which hindered its ability to track and evaluate its efforts. Authorities investigated 383 cases in 2021, compared with 373 cases in 2020. The government prosecuted an unknown number of defendants in 95 cases in 2021, an increase compared with an unknown number of defendants in 38 cases in 2020 and 73 cases in 2019. Authorities reported 103 convictions in 2020, the most recent year for which data was available, compared with 112 convictions in 2019. Courts sentenced 97 convicted traffickers to prison terms in 2020 (100 in 2019); however, 55 of the sentences were suspended or partially suspended (57 in 2019). Of the prison sentences issued, including those that were suspended or partially suspended, nine (19 in 2019) were for less than one year, 47 were for one to three years, 35 were for three to five years, and six were for five to 10 years. Experts attributed the high number of suspended sentences to several factors, including the law's overly broad definition of human trafficking, judges' lack of understanding of the severity of labor trafficking crimes, and application of lighter sentences for traffickers with minimal roles in an organization. The failure to sentence the majority of traffickers to significant terms of imprisonment weakened deterrence, may have undercut broader efforts to hold traffickers accountable, and did not adequately address the nature of the crime.

The government mandated trafficking trainings for judicial officials who were on the career track to become magistrates and who may eventually become judges, and trafficking was included in basic training courses for law enforcement. The government conducted a training on trafficking investigations and a training on victim identification and prosecution of trafficking cases for law enforcement and judicial authorities. A joint sex trafficking investigation with Moldovan authorities resulted in three arrests and the identification of six victims and nine potential victims. In November 2021, authorities participated in a EUROPOL operation focused on sex trafficking, forced criminality, and forced begging; the operation led to the arrest of 212 suspects, the initiation of 327 investigations, and the identification of 650 potential victims throughout the 29 participating countries. The government did not report how many, if any, arrests, investigations, or potential victims identified during these two operations occurred in Belgium or involved Belgian nationals. Authorities cooperated with foreign authorities to extradite three suspected traffickers to Belgium: two Hungarian citizens residing in Switzerland and one Indian citizen residing in Armenia. The government transferred four convicted traffickers: one to Bulgaria, one to Romania, one Thai citizen to the United States, and one Nigerian citizen to Italy. The government reported prosecuting a city council official for human trafficking for offering a homeless man shelter in a thermal spa in return for unpaid work on the property; it was unclear if force, fraud, or coercion were present in the case. The government did not report any other investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

## PROTECTION

The government increased efforts to protect victims. The government formally identified and assisted 151 victims (including 86 victims of labor exploitation, 33 victims of sexual exploitation, and 32 victims of unspecified forms of exploitation), an increase from 91 in 2020 but similar to 159 in 2019. Due to the broad definition of labor exploitation under Belgium's anti-trafficking law, data on the identification of labor trafficking victims may have included cases that do not constitute trafficking crimes under the international law definition. Law enforcement identified the majority of victims, followed by NGOs and social services. There were also many cases of victims who self-identified. The three government-funded shelters received 1,055 referrals of victims and potential victims

in 2021, compared with 820 referrals in 2020. First responders followed a national victim referral protocol to identify victims and refer them to care, and the government organized outreach activities and awareness-raising campaigns targeting frontline professionals, including hospital and social workers. The government trained immigration and asylum officers on victim identification. Observers noted that local police often struggled to identify trafficking, were overburdened by too many responsibilities, faced high rates of turnover, and lacked specialized anti-trafficking officers. Moreover, experts recommended increased training for law enforcement on the identification of trafficking on online platforms. Experts reported particular challenges in identifying child victims, in spite of a sharp increase in the number of unaccompanied migrant children entering the country in recent years. Many authorities who did not specialize in trafficking cases reportedly could not recognize trafficking indicators and confused child trafficking with other crimes such as smuggling and child abuse. Authorities sometimes failed to follow the victim referral protocol and did not properly notify child protective services when they identified an unaccompanied child victim. Gaps in identification efforts, such as with child victims, made these victims vulnerable to penalization for crimes traffickers compelled them to commit. The government reported three working groups advised service providers on the identification of child victims, and the government began conducting a comprehensive revision of the national referral mechanism, including the referral procedures for child victims.

The government funded three specialized NGO-run shelters and allocated approximately €428,000 ($485,260) for each shelter, compared with €419,000 ($475,060) in 2020; the shelters also received funding from regional and local governments. NGO-run shelters provided psycho-social, medical, and legal care and were open to all adult victims regardless of gender, immigration status, or nationality. The independent Federal Migration Centre (Myria), in its capacity as the national rapporteur, provided oversight and coordination for the shelters. Authorities placed child trafficking victims in government-funded shelters for foreign unaccompanied children; children in these centers were assigned a mentor to protect their interests. A government-funded temporary residence center for unaccompanied female potential trafficking victims between the ages of 14 and 18 began operations in January 2022. The center offered shelter, legal assistance, and tailored follow-on assistance plans; the center did not require victims to participate in the investigation of a trafficker to receive support. GRETA reported the government's child safety services lacked sufficient capacity to accommodate unaccompanied child victims. In December 2021, the government reported it was only able to accommodate 16 out of 30 unaccompanied migrant children who sought shelter at a Brussels reception center, noting that the child protection system for unaccompanied children had not been overwhelmed to this degree since 2015. Shelters for unaccompanied children reported many children went missing from the shelters each year, some of whom may have been victims of trafficking; the agency responsible for these shelters reported 2,642 children went missing between 2018 and 2020, with 583 going missing in 2020 alone.

The government conditioned its victim assistance services on three criteria: victims had to break off all contact with the trafficker, agree to counseling at a specialized shelter, and assist in the prosecution of the trafficker. Identified victims were eligible for a 45-day reflection period during which they could decide whether to assist law enforcement; foreign victims who did not agree to these conditions were repatriated to their country of origin. Potential victims had access to social services during this reflection period. The government granted foreign victims who participated in investigations and prosecutions three-month residence and work permits and protective services. If a public prosecutor confirmed the individual was a trafficking victim, they could receive a six-month residence and work permit, renewable until the end of the criminal case. Victims who were not citizens of EU member states could obtain permanent residency only upon the successful conviction and sentencing of traffickers; in the absence of a conviction, authorities could grant residence permits for indefinite lengths of time to non-EU victims if authorities were able to bring formal charges against the trafficker. Victims who chose not to accept the conditions were eligible for other types of assistance, including access to temporary housing and psycho-social care, and non-EU victims could apply for

humanitarian residency. Nonetheless, observers noted the conditions the government attached to victim assistance were difficult for many victims to meet, especially in the case of child victims. Few child victims received residence permits, and GRETA expressed concern that residency for non-EU child victims was contingent upon cooperation with law enforcement instead of factors relating to the best interest of the child. The government issued 202 residence permits for trafficking victims in 2021, compared with 174 in 2020.

During criminal proceedings, witness protection laws provided only those victims under physical threat of violence or living abroad options to testify via video. The law had a specific provision for child victims that allowed courts to permit video testimony. Prosecutors could seize assets of suspected traffickers during an investigation and could request restitution for victims in court through the confiscation of these assets; for the third consecutive year, the government did not report if courts granted restitution. Victims could claim compensation in local courts but often had to prove their case involved the intentional act of physical violence to receive compensation. Victims could also seek compensation through the Commission for Financial Assistance to Victims of Intentional Acts of Violence; in 2021, the commission awarded €12,500 ($14,170) to one trafficking victim (the same amount awarded to two victims in 2020). The high costs of legal representation discouraged victim cooperation in criminal and civil proceedings. Additionally, foreign victims were only granted relief from deportation or other penalties if they assisted in the prosecution of their trafficker.

## PREVENTION

The government increased efforts to prevent trafficking. The Interdepartmental Coordination Unit coordinated government-wide anti-trafficking efforts and monitored the implementation of the NAP; the government released the 2021-2025 NAP in June 2021. The Ministry of Justice (MOJ) chaired the unit, which included key government ministries and agencies, as well as representatives of the three government-funded shelters and Myria. Myria served as the secretariat for the unit and as the independent national rapporteur, and it produced its own annual report on government anti-trafficking efforts. The government held several awareness-raising events as part of a UN campaign in July 2021 and participated in an EU awareness campaign focused on combating sex trafficking. The MOJ created awareness-raising leaflets targeting the construction sector and beauty salons and a leaflet on the "lover-boy" phenomenon. In March 2022, the government launched an online and social media campaign to raise awareness among refugees fleeing Russia's full-scale invasion of Ukraine about the risk of trafficking and to inform them of their rights in Belgium. The three government-funded NGOs maintained a hotline available 24/7; the government did not report if any calls led to the identification of trafficking victims.

The Labor Inspectorate conducted inspections throughout the reporting period, but the government did not report the number of inspections. Labor inspectors referred 95 potential victims to authorities for further review; the government did not report if any of these referrals led to the identification of victims. The government maintained an online toolbox to provide information for businesses on how to prevent forced labor in their organizations and supply chains. Some migrant workers were not allowed to change employers without obtaining authorization from the government, increasing their vulnerability to trafficking. The government continued a widely used program that subsidized the wages of domestic workers and criminalized exploitative practices, such as the confiscation of passports and contract switching. The government maintained a system to prevent the exploitation of domestic employees of foreign diplomats by placing awareness-raising flyers in the consular sections of Belgian embassies and consulates abroad. Myria highlighted the particular vulnerability to trafficking of diplomatic domestic staff and recommended that the government systematically interview these workers when issuing or renewing special identity cards to prevent or detect possible abuses. The government did not make efforts to reduce the demand for commercial sex acts or for participation in international sex tourism by its citizens; however, the law permitted the prosecution of Belgian citizens for participating in child sex tourism.

## TRAFFICKING PROFILE

As reported over the past five years, sex and labor traffickers exploit foreign and domestic victims in Belgium. Foreign victims come primarily from Asia (including the People's Republic of China, India, and Thailand), Eastern Europe (especially Albania, Hungary, Romania, and Ukraine), and North and Sub-Saharan Africa (primarily Morocco and Nigeria). Sex traffickers exploit Belgian women and girls, some of whom are recruited by local traffickers. Sex traffickers exploit foreign children, including Romani and Nigerian girls; the latter are recruited through extensive trafficking networks in Nigeria. Thai criminal organizations exploit Thai women for sex in massage establishments that are frequently managed by Belgian citizens. Traffickers recruit girls from Eastern Europe on social media by posing as potential romantic partners. Belgian citizens participate in international child sex tourism. Labor traffickers exploit male victims in restaurants, bars, sweatshops, horticulture, fruit farms, construction, cleaning businesses, and retail shops; they exploit men and women in domestic service, including in the diplomatic community. Within the Romani community, traffickers exploit Romani children in forced begging and forced criminality. Asylum-seekers who have their applications for legal status denied, migrants transiting through Belgium to the UK, and unaccompanied migrant children are highly vulnerable to trafficking. Thousands of refugees, predominantly women and children, who are fleeing Russia's full-scale invasion of Ukraine, have crossed the Belgian border seeking sanctuary and are vulnerable to trafficking.

## BELIZE: TIER 2

The Government of Belize does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Belize was upgraded to Tier 2. These achievements included convicting two traffickers and applying adequate sentences; expanding the size of its Anti-Trafficking (A-TIP) Police Unit, which increased investigations; improving data collection and case monitoring; opening a shelter for unaccompanied children at risk for trafficking in cooperation with an international organization; and prioritizing anti-trafficking funding and implementation of the National Action Plan (NAP). However, the government did not meet the minimum standards in several key areas. The government did not adequately address official complicity in trafficking crimes, reports of which remained common; did not adequately oversee labor recruitment or investigate allegations of trafficking; and did not take measures to reduce demand for commercial sex. Authorities reportedly did not consistently screen migrants, refugees, or asylum seekers for trafficking and may have deported or arrested unidentified trafficking victims due to weak victim identification and a lack of formal identification procedures such as frontline officer guidelines.



BELIZE TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Implement the anti-trafficking law by vigorously investigating and prosecuting traffickers, including child sex tourists and officials allegedly complicit in trafficking crimes, and imposing significant prison sentences upon those convicted. • Consistently apply formal procedures to identify victims among vulnerable groups, including children at risk of familial trafficking; People's Republic of China (PRC) national and Cuban overseas workers, including medical professionals; and migrants, refugees, and asylum seekers, and refer identified victims to services. • Ensure labor and

BELIZE

liquor license inspectors comply with domestic law and policy requiring inspections of workplaces and identification of victims. • Increase efforts to identify forced labor by mandating recruiter participation in the national labor recruiter registry and conducting prevention programs with migrant workers. • Increase the A-TIP Council's engagement with survivors, including by establishing accessible mechanisms for receiving and providing compensation for survivor input when forming policies, programs, and trainings. • Ensure restitution is paid even in cases where the trafficker is indigent. • Increase efforts to investigate online trafficking. • Strengthen monitoring of alleged traffickers out on bail, reduce court delays including by having more judges to hear cases, and enable the courts to function virtually including with victim video testimony. • Provide adequate funding, including to NGOs, for specialized victim services including legal support for all victims, including men and children. • Increase training for and efforts to pursue financial crime investigations in tandem with human trafficking cases. • Improve coordination between the A-TIP Police Unit and the Department of Labor. • Take measures to reduce the demand for commercial sex.

## PROSECUTION

The government slightly increased prosecution efforts. The 2013 Trafficking in Persons (TIP) (Prohibition) Act criminalized sex trafficking and labor trafficking and prescribed penalties of up to eight years' imprisonment for offenses involving adult victims and up to 12 years' imprisonment for offenses involving child victims. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with other serious crimes, such as rape. Additionally, the 2013 Commercial Sexual Exploitation of Children (Prohibition) (CSEC) Act criminalized various offenses relating to the prostitution of anyone younger than 18. Under the TIP Prohibition Act, traffickers that were government officials and diplomats may be imprisoned for up to 15 years and must leave public office.

The A-TIP Police Unit was the police's dedicated unit for conducting trafficking investigations and operations. The A-TIP Police Unit initiated 15 trafficking investigations against 20 individuals, including six cases for potential sex trafficking, three for labor trafficking, and six for unspecified exploitation; compared with five new investigations in 2020, 10 new investigations in 2019, and three in 2018. Eight sex trafficking investigations against 19 individuals and seven labor trafficking investigations against six individuals remained ongoing from previous reporting periods. These included ongoing investigations into two high-ranking, retired government officials—a police officer and an immigration officer—under investigation for alleged labor trafficking of a Salvadoran national while in government service; the government did not initiate any new investigations or prosecutions of allegedly complicit officials during the reporting period.

Authorities initiated one new sex trafficking prosecution under the anti-trafficking laws of four Belizean adults, three men and one woman, during the reporting period. The government continued prosecution of five cases of six individuals under the anti-trafficking law, including of two men and two women for sex trafficking and one also charged with labor trafficking and two individuals, a man and a woman, for labor trafficking. Two of these cases closed during the reporting period; courts acquitted one woman, and prosecutors dropped another case after the victim declined to participate in the prosecution; three cases against four individuals, three men and a woman, remained open at the end of the reporting period. The government reported delay in initiating prosecutions due to the pandemic and the complexity of ongoing investigations. These efforts compared with prosecution of one new suspect for sex and labor trafficking crimes in 2020 and continued prosecution of five alleged traffickers from previous reporting periods.

The Supreme Court convicted two Belizean sex traffickers in one familial trafficking case from 2019, compared with no convictions in 2020 and a conviction of one trafficker for sex and labor trafficking in 2019. In September 2021, the Supreme Court convicted two child sex traffickers under the CSEC Act, the fourth conviction in the country's history. The court sentenced an adult male to 12 years' imprisonment for procuring a child for sexual exploitation and sentenced the mother of the 14-year-old victim to 10 years' imprisonment for "child prostitution." The child victim remained in the care of the Ministry of Human Development at the end of the reporting period.

One Supreme Court Justice specialized in hearing trafficking cases, which led to processing delays. The government reported retrofitting only some courtrooms with protective shields due to the pandemic, which limited the scheduling of court proceedings. The Supreme Court halted the hearing of trafficking cases twice due to the pandemic, and the judicial sector lacked the capacity and resources to adopt a virtual platform. However, the government reported trafficking cases were the first to resume after almost a year of pandemic-related court closures, and the pandemic did not affect authorities' ability to conduct investigations. The government did not reassign officers of the A-TIP Police Unit to other tasks despite additional police duties and increased workload during the pandemic.

The A-TIP Police Unit added three new police officers to assist with investigations and trafficking-related matters, nearly doubling the size of the unit to eight designated officers. The unit coordinated its trafficking investigations with officials from the Department of Immigration; the Ministry of Human Development, Families, and Indigenous Affairs and its associated departments; the Social Security Board; and the Office of the Director of Public Prosecutions. The government used Standard Operating Procedures requiring the A-TIP Police Unit agents accompany immigration officers when conducting operations to identify suspected traffickers. The A-TIP Police Unit referred (for prosecution) cases to an office of the Director of Public Prosecutions. The 2013 human trafficking law required all officials to report suspected trafficking cases to the A-TIP Police Unit for investigation. The A-TIP Police Unit had an ongoing partnership with an NGO to provide office space, a dedicated vehicle, and ongoing technical investigative assistance in trafficking cases. The NGO reported the office space provided a secure, private, and non-threatening location for interviewing trafficking victims and witnesses, collecting evidence, and planning operations. In October 2021, the Ministry of Human Development introduced a trafficking module in its legal case management system to enhance the monitoring and evaluation processes of government responses to trafficking cases. Law enforcement authorities lacked equipment and personnel to conduct large-scale trafficking investigations effectively, although the government reported improvements following the October 2021 foreign government donation of a new vehicle. In addition, the police force including the A-TIP Police Unit was spread across a large geographical area, leaving most stations and sub-stations understaffed and unable to pursue trafficking investigations adequately.

The government did not report any new investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained concerns, especially among lower-level officials. Civil society organizations reported some police officers took bribes to do the following: ignore incidents of trafficking, not report potential perpetrators and identify victims, alert establishments where trafficking was likely to occur of pending law enforcement action, and stonewall or sabotage investigations of reported cases within their jurisdiction. Bars and nightclubs were closed through most of the reporting period due to the pandemic, resulting in authorities receiving fewer reports of suspected sex trafficking from NGOs. The government continued to prohibit the practice of off-duty police officers providing security for bars and nightclubs where commercial sex occurred in order to limit police complicity in trafficking crimes that frequently took place in these establishments. The government and NGOs reported no violations of the prohibition during the reporting period. Officers caught breaching the policy were required to appear before a Police Department tribunal for internal disciplinary action. Civil society organizations also reported some illegal brothels moved out of restaurants and bars and into private residences, moving sex trafficking further underground and making reporting cases more difficult.

The A-TIP Police Unit acted as the primary provider for counter-trafficking training—including law enforcement techniques such as collecting evidence, victim screening and identification, fraudulent document detection, and cybercrime investigation—throughout the country, training prison officials, immigration officers, customs agents, and any other officials who may come in contact with potential trafficking victims. The government trained police and provided a venue and other amenities for training police and prosecutors.

Haiti AR_000603

Authorities cooperated with counterparts in neighboring countries on judicial and law enforcement efforts. In May 2021, authorities held bilateral anti-trafficking discussions with a neighboring country following an increase in the number of traffickers and women and children trafficked from the foreign country found and identified in Belize. A mutual legal assistance treaty with Taiwan for criminal cases came into effect in July 2021.

## PROTECTION

The government increased efforts to protect victims. Authorities identified three confirmed victims in 2021, compared to 20 potential victims in 2020, 24 potential victims in 2019, and 17 potential victims in 2018. The government modified and improved its victim identification and confirmation procedures during the reporting period, resulting in more accurate victim data. The victims included one Guatemalan and one Belizean girl exploited in sex trafficking and one Salvadoran man exploited in labor trafficking. NGOs identified a further six trafficking victims, including one Honduran woman exploited in labor trafficking and one Mexican man and four Colombian men exploited in unspecified trafficking. The government referred all nine victims to government services, the same as in the prior reporting period. The government did not provide repatriation support for the Honduran, Mexican, and Colombian victims because the victims' own countries repatriated them. In August 2021, during a screening of 11 women for potential immigration violations, authorities identified a foreign woman who was a trafficking victim in her country of origin. Authorities supported the female victim in testifying against her traffickers in another country while continuing to provide her victim services through the end of the reporting period. The Police A-TIP Unit screened prison inmates, to identify potential trafficking victims who may have been mistakenly penalized due to insufficient screening, and identified one victim.

The government reported, as part of the existing protocols, the A-TIP Police Unit coordinated with the Immigration Department, Public Health Department, and the Department of Human Development when planning operations to ensure services were available to potential victims. The A-TIP Police Unit trained, both jointly with an NGO and on its own, officers from each of these Departments on topics of victim identification and referral to services. Standard Operating Procedures (SOPs) required that social workers from the Department of Human Services (DHS) be available to support victims during interviews and other official interactions. The government reported the A-TIP Council regularly reviewed and updated the SOPs with assistance from an NGO. Social workers and investigators also collected victim input and provided this to DHS; the government reported DHS used this feedback to improve and adjust programs and care. Law enforcement officers, immigration, and social services agents used the SOPs when conducting interviews and screening potential victims, including migrants and individuals in commercial sex. The SOPs also outlined procedures for the identification and removal of potential victims from trafficking situations. The A-TIP Council, in coordination with an NGO and funded by a foreign donor, did not yet begin implementation of identification and referral guidelines for frontline officers, including police officers, immigration personnel, customs officers, medical officers, social workers, and private companies offering essential services such as electricity, water, telecommunications, and social security. In August 2021, the A-TIP Police Unit, with support from an NGO, hired a Victims' Services Coordinator to help police officers with victim services during investigations. The A-TIP Police Unit, under the guidance and direction of the A-TIP Council, also trained prison guards and other prison officials on victim identification. The A-TIP Police Unit provided refresher training for prison guards. The government reported the A-TIP Police Unit had trained female officers to conduct screenings for female victims. The government reported screening could occur in English or Spanish.

The government screened for trafficking victims as part of an international operation against criminal migrant smuggling networks. In July 2021, the Cabinet approved the Protocols for Accompanied and Unaccompanied Migrant Children in Belize, and the government trained frontline officers from the relevant departments as instructors. The protocols outlined how to refer migrant children, some of whom may be trafficking victims, to the appropriate authorities for care. The government did not report whether officials consistently used the new protocols; NGOs reported

authorities denied entry to several migrants and the government did not report screening these migrants. The government reported the screening process emphasized that victims could not be penalized for unlawful acts they were compelled to commit, including immigration violations. Due to a lack of formal identification procedures for the entirety of the reporting period, authorities may have detained and arrested some unidentified trafficking victims. Victims' fear of detention or deportation may have contributed to their reluctance to report trafficking to law enforcement officers. The government reported that for foreign victims, authorities contacted the relevant embassies for potential consular services. Victims identified during the screening process could also apply for refugee status. The government reported adapting several victim protection procedures due to the pandemic, including virtual communications, keeping departments on-call instead of on-site, social distancing, quarantining victims, and providing health screenings. Observers reported more consistency in victim identification than in previous years but stated gaps still existed, such as authorities failing to respond to credible reports from NGOs of potential trafficking victims, possibly leading to fewer identified victims and weak victim protection. The government did not report screening Cuban medical professionals in the country for trafficking indicators.

Pandemic-related restrictions and personnel shortages affected the delivery of social services related to trafficking. DHS was the lead agency for victim care. The law required DHS to provide victims with essential services. During the reporting period, victims and potential victims used government-funded services or NGO services the government reimbursed including housing, stipends, medical, counseling, education, food, clothing, help with legal documents, and repatriation (with the assistance of foreign diplomatic missions and an international organization). The government reported other generally available services included dental care, psychiatric services, prenatal care, placements, contact with family members (depending on risk assessment), contact with respective embassies, hygiene kits, infant care, recreational outings (depending on risk assessment), assistance with adjusting immigration status, and educational and life skills training. Children were allowed access to the educational system until 14 years old, the age limit for compulsory education. The government covered the costs for all these services, which were provided through the duration of criminal proceedings and as part of the re-integration process. The government reported that due to the scarcity of mental health services in the public system, private providers delivered medical and counseling services. Per the SOP, DHS had the ability to procure subsidized services for disabled persons, if needed, including sign language interpretation; the government did not report using this service. The government assigned two social workers, with English, Spanish, and basic sign language skills, to all trafficking cases to support victims. A DHS social worker always accompanied the A-TIP Police Unit investigators when they interviewed victims. Authorities allowed victims to speak only with a social worker until they were comfortable speaking to the A-TIP Police Unit. The A-TIP Council reported the number of certified social workers was low. Social workers chaperoned victims to medical and legal appointments. NGOs that work closely with the government noted that while gaps remained, government services have recently improved.

The government placed identified adult victims and their families in DHS's Alternative Care Unit; authorities referred unaccompanied children to the Child Protection System. The government reported a trained social worker conducted a risk assessment to determine placement and other services for potential victims; DHS placed victims into the least restrictive among the range of options. Experts expressed concerns about the lack of education on trafficking for some foster parents, uneven coordination and communication between government agencies and foster parents, and limited availability of psycho-social care in general, including for trafficking victims. The government placed adults at shelters operated by DHS and several NGOs; it placed children in the foster care system—funded by the government—or a group home, and the government reported DHS always notified shelters and homes of arriving victims. The government lacked sufficient public shelter space for all victims and partnered with two domestic violence NGOs, one of which received government funding, to provide shelter and services to adult female trafficking victims. In the previous reporting period, the Ministry of Human Development, Families, and Indigenous Affairs made

BELIZE

arrangements with an NGO to shelter male victims for the first time; the government did not report any male victims using the shelter during the reporting period. The Ministry of Human Development, in partnership with an international organization, also established a temporary shelter for unaccompanied children, many of whom were at risk for trafficking.

The government reported it did not limit protection services by time or make them conditional upon victim cooperation with law enforcement; services extended beyond the disposition of legal cases. If there were considerable safety concerns, the government would place victims in safe houses only known to social workers and police officers working on the case. The government did not provide any victims with witness protection; police could provide 24-hour security for some victims. The government reported victims could stay in separate chambers from their accused traffickers during court proceedings. The government allowed victims to provide testimony through video but lacked the equipment necessary to do so. As an interim measure, victims had the option of testifying from behind a screen in the court, protecting the victim's identity. The government reported pandemic-related social distancing impacted in-person interviews of victims, with some victims not comfortable providing detailed information under the new regulations that required victims to remain physically distanced from social workers and investigators while making their report. The law also allowed for written statements to be provided as evidence in cases where repatriated foreign victims did not wish to return. The government reported counseling was available during testimony. The government reported it encouraged victims to participate in the legal process but did not compel them; in past years, court delays and fear of retaliation by traffickers may have led foreign national victims to decline or withdraw cooperation with law enforcement and return to their home countries. Even those who wished to assist in prosecution were sometimes unavailable to do so, having chosen repatriation or onward migration in the years between. The government provided foreign victims of human trafficking with the same victim services as domestic victims. Authorities did not deport foreign victims identified in potential trafficking cases; these victims could receive temporary residency status and work permits regardless of their cooperation with investigations or prosecutions. The government would facilitate work permits free of cost and, unless there were safety concerns, it allowed adult victims to move freely and obtain employment. The government could offer repatriation assistance to victims if they chose to return to their countries of origin pending trial proceedings, although it did not do so during the reporting period; an international organization coordinated repatriation. A court could order restitution upon a trafficker's conviction through a formal request during the criminal case, but the A-TIP Council reported that the court did not award an application for restitution in the case of familial trafficking due to the indigent status of the traffickers.

The government did not allocate a specific amount within the anti-trafficking budget for victim services for the second year in a row. The government reported the Ministry of Human Development, Families, and Indigenous Peoples' Affairs purchased a van for the transportation of victims. The government waived the significant import tax for a van an NGO purchased to transport trafficking and CSEC victims.

## PREVENTION

The government increased its prevention efforts. The government continued to implement and fund a national action plan for 2021-2023. The government's national coordinating body for counter-trafficking efforts was the A-TIP Council, headed by the Ministry of Human Development, Families, and Indigenous Peoples' Affairs. The A-TIP Council chair also served simultaneously in several other official positions due to personnel and resource limitations. The A-TIP Council was composed of key ministries and two NGOs. While trafficking survivors did not participate directly in anti-trafficking efforts, they provided their experiences to DHS to improve and adapt programs and care provided to trafficking victims, as well as screening procedures, training protocols, and updated legislation. The A-TIP Council met quarterly during the reporting period. The A-TIP Council held two in-persons meetings: a high-level meeting involving cabinet ministers and a symposium with its member agencies. Despite broad budget

cuts, the government allocated 200,000 Belizean dollars ($100,000) for anti-trafficking activities, consistent with the past three years.

The A-TIP Council's Focal Point, which served as an interagency coordinator and manager, systematically documented the government's efforts on human trafficking in the areas of prevention, prosecution, protection, and partnerships and maintained an associated database. The module also included a multi-agency online platform to investigate, track, and manage cases of human trafficking and provided a platform for accurate reporting and analysis. With funding from an international organization, the A-TIP Council also created and implemented a new Human Trafficking Management Information System for law enforcement and social services. The system assisted with the data migration of trafficking cases from previous years, including the current reporting period. The A-TIP Council began development of training manuals. The government published an infographic annual report on the dynamics of trafficking in the country in March 2022. The government reported it also contributed to the regional Coalition Against Human Trafficking and Migrant Smuggling, which published data on human trafficking for Central America, Mexico, and the Dominican Republic. The government, with the financial support of an international organization, conducted a gap analysis to review the government's overall effectiveness in combating trafficking.

The A-TIP Council coordinated with a local NGO, with funding from an international organization, to build a social media page for the A-TIP Council, coordinate four awareness sessions on mainstream television shows, create trafficking indicator cards for transportation workers, and produce four informational videos. The A-TIP Council provided technical guidance for the projects, reviewed the campaign materials produced, and served as subject matter experts on television to ensure messaging did not legitimize or perpetuate harmful or racialized narratives or stereotypes about what victims, survivors, and perpetrators may look like. Campaign material was readily available to the public in both English and Spanish. The government coordinated with a neighboring country to conduct general awareness campaigns in both countries. An NGO operated a 24-hour "crime stoppers" hotline, which could receive calls on trafficking crimes and be used to reach the police; the police reported no trafficking investigations resulted from hotline calls during the reporting period. In November 2021, the A-TIP Council developed a toll-free telephone line, donated by an NGO and a telecommunication company, for the purposes of reporting suspected trafficking cases and providing information to the public on how to detect them. Printed materials for the awareness campaign included the toll-free number. The government provided awareness sessions for government officials, high school teachers, NGOs, and members of the public. The government reported the pandemic significantly impacted the ability to lead large gatherings in person, resulting in the majority of awareness activities being conducted online.

Liquor licensing boards routinely failed to conduct inspections of restaurants where commercial sex, including potential sex and labor trafficking crimes, allegedly took place. In December 2021, the A-TIP Unit hosted a human trafficking awareness session for liquor licensing board members to highlight their role in reducing trafficking. As part of its job preparedness training program for workers, the government offered worker rights sessions that included information on human trafficking and conducted quarterly labor rights workshops with entrepreneurs and small businesses. The labor code required labor recruiters to register with the national labor recruiter registry, but the government reported that none did so. Although the Department of Labor reported strengthening regulations related to recruitment and that the Ministries of Immigration and Agriculture led discussions with employers to implement the new terms, observers noted these efforts were not effective. The A-TIP Council, the Ministry of Human Development, and several NGOs and civil society partners reported conducting outreach in English and Spanish to migrant workers vulnerable to trafficking to advise them of their rights. Foreign workers must obtain a work permit from the Employment Permit Committee before they engaged in any form of paid work; this body included a social service officer responsible for identifying vulnerable groups or individuals. The government did not have defined guidelines for foreign worker recruitment; a migrant worker recruitment policy an international organization assisted to develop in

the previous reporting period remained under review. A separate draft temporary employment policy excluded foreign workers from certain job positions that were especially at risk for trafficking, including bar and nightclub waitresses, cooks, common laborers, small business clerks and managerial staff, waitresses in other establishments, supervisors, security guards, domestic workers, caregivers, and construction helpers. Labor inspectors reported a shortage of qualified personnel, vehicles, fuel, and operating funds to conduct adequate inspections for labor violations. The government was a signatory to several treaties that uphold workers' rights, including the CARIFORUM-EU Economic Partnership Agreement that included the elimination of forced labor.

The government did not make efforts to reduce the demand for commercial sex acts. The law allowed for Belizean citizens to be tried for trafficking and child sex tourism crimes committed abroad; the government did not report investigating any cases of child sex tourism during the reporting period. The government reported sponsoring billboards to combat child sex tourism at the international airport and border crossing points. The government trained diplomats posted in three foreign countries on trafficking. The government participated in a multi-country program to identify and deny tourist entry to registered sex offenders. In 2021, the government joined an international development bank project to develop a set of regional protocols for a coordinated response to trafficking including sharing technology and best practices.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Belize, and traffickers exploit victims from Belize abroad. Groups considered most at risk for trafficking in Belize include migrants, children, individuals experiencing economic difficulties including pandemic-related unemployment, and LGBTQI+ persons. Sex traffickers exploit Belizean and foreign adults and girls and LGBTQI+ persons, primarily from Central America, in bars, nightclubs, hotels, and brothels. Due to the pandemic, sex trafficking has mostly moved to more tightly controlled, illegal brothels rather than bars and clubs—which were closed from March 2020 to March 2022—and involve a network of taxi operators who provide a connection between individuals in commercial sex and patrons; the change has made reporting more difficult as the commercial sex trade moves further underground. Tourism-related industries lure laborers through the offer of legitimate service jobs and exploit them in sex trafficking. These illicit operations are typically small in scale and unconnected to organized transnational trafficking rings. Family members facilitate the sex trafficking of Belizean women and girls, including through an arrangement where a wealthy male will offer payment or gifts to a family in exchange for sex from a young, usually female, family member. This practice has expanded to Guatemalan victims unable to pay school fees in Belize. Although most victims in the country are Belizean, foreign adults and children—particularly from Central America, Mexico, Cuba, Haiti, and Asia—migrate voluntarily to Belize or stop en route to the United States in search of work, and traffickers often exploit victims using false promises of relatively high-paying jobs or take advantage of migrants' illegal status and exploit them in forced labor in restaurants, shops, domestic work, and agriculture. The law does not provide asylum seekers with work permits, placing them at constant threat of deportation that could increase their vulnerability to trafficking. The number of labor trafficking crimes and scale of labor trafficking operations likely decreased in 2021 as a result of pandemic-related border closures and increased patrols that also limited illegal crossings. PRC nationals and Indian nationals may be exploited in Belize in domestic service. PRC nationals may be vulnerable to forced labor on fishing vessels registered in Belize. PRC nationals working in construction in Belize, during previous reporting periods, may have been forced to work, including by PRC-affiliated enterprises. Cuban workers in Belize may be forced to work by the Cuban government. In tourist regions, foreign child sex tourists, primarily from the United States, exploit child sex trafficking victims. NGOs report some police and immigration officers take bribes in return for ignoring trafficking, facilitating illegal entries, failing to report suspected victims and perpetrators, and failing to act on reported cases under their jurisdiction.

## BENIN: TIER 2

The Government of Benin does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Benin remained on Tier 2. These efforts included convicting more traffickers and identifying more potential trafficking victims, including a significant increase in identification of potential child labor trafficking victims, and referring those victims to protection services. However, the government did not meet the minimum standards in several key areas. Authorities investigated and prosecuted fewer trafficking cases and did not report identifying any foreign victims of trafficking. Additionally, the government did not have adequate protection services for adults.



BENIN TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Expand training for law enforcement, prosecutors, judges, and judicial staff on the 2018 penal code articles 499-504 to increase their ability to investigate, prosecute, and convict traffickers, including fraudulent labor recruiters. • Develop an information management system for the Ministries of Justice, Interior, Labor, Foreign Affairs, and other relevant government agencies—in coordination with international organizations—to improve access and utilization of law enforcement and judicial statistics. • Seek significant prison terms for convicted traffickers in accordance with penal code articles 499-504 or the 2006 child trafficking law, while respecting due process. • Develop and implement standard operating procedures (SOPs) for proactive identification of adult trafficking victims and their subsequent referral to care or incorporate identification of adult TIP victims into existing SOPs. • Collaborate with NGOs and international organizations to increase the government's capacity to provide shelter and services to more trafficking victims, including adults. • Expand implementation of the 2011 bilateral anti-trafficking agreement with the Republic of the Congo and the multilateral agreement with Burkina Faso and Togo to increase law enforcement coordination and investigate, prosecute, and convict perpetrators of transnational trafficking cases, while respecting due process. • Finalize the multilateral agreement with Togo and Nigeria to increase information-sharing and cooperation on transnational investigations.

## PROSECUTION

The government maintained insufficient law enforcement efforts. Existing laws criminalized sex trafficking and labor trafficking. Articles 499-504 of the Penal Code criminalized all forms of labor trafficking and some forms of sex trafficking and prescribed penalties of 10 to 20 years imprisonment; these penalties were sufficiently stringent, and with respect to sex trafficking, commensurate with other grave crimes, such as rape. The 2006 Act Relating to the Transportation of Minors and the Suppression of Child Trafficking (Act 2006-04) criminalized all forms of child sex trafficking and labor trafficking and prescribed penalties of 10 to 20 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape.

The government did not report any new investigations during the reporting period, compared with investigating 49 cases during the previous reporting period. The government continued investigations of 25 cases from the previous reporting period that may have included potential trafficking crimes. The government reported prosecuting four cases of trafficking, including three adult trafficking cases and one child trafficking

**BENIN**

case, compared with prosecuting 72 cases of child trafficking during the previous reporting period. The government reported prosecuting an additional 223 cases of gender-based violence, which may have included some trafficking cases, compared with prosecuting 72 cases of child trafficking the previous reporting period and 323 cases that may have contained exploitative aspects under related statutes. The government reported convicting 11 individuals of trafficking, two of sex trafficking and nine of labor trafficking, compared with no convictions in the previous reporting period. The government also reported convicting 19 individuals originally charged with sex trafficking of lesser crimes. The government reported all 11 individuals convicted of trafficking received prison sentences but did not specify the length; in previous reporting periods, courts reportedly sentenced the majority of convicted traffickers to prison terms substantially shorter than the 10-20 years' imprisonment required by Benin's Penal Code for trafficking. Some judicial officials asserted that more stringent prison terms may exacerbate the vulnerability of some child victims when the perpetrators are relatives. Officials reported police and prosecutors often did not understand or uniformly interpret the trafficking law, which resulted in traffickers being charged with other crimes.

The Ministry of Justice (MOJ) noted the lack of an effective data collection system resulted in the need for officials to contact individual courts to obtain case details. Many police stations lacked the technology and capacity necessary to maintain electronic databases; judicial personnel and most courts continued to record cases on paper, creating challenges in compiling and sharing law enforcement statistics. The government did not report prosecuting or convicting government officials complicit in human trafficking crimes, although some civil servants may have exploited children through the traditional practice of *vidomegon.* The government reported a customs official who allegedly facilitated human trafficking was fired but did not report any action taken against the official. The government partnered with an international organization to train judges, police officers, ministry officials, and private sector actors on the 2006 Act Relating to the Transportation of Minors and the Suppression of Child Trafficking. Pandemic-related restrictions limited the government's ability to participate in some international trafficking investigations. The government cooperated with the Governments of Gabon, Togo, and the Republic of the Congo on investigations and repatriations of trafficking victims. The government did not report what actions it took under the 2011 bilateral anti-trafficking agreement with the Republic of the Congo or the multilateral agreement with Burkina Faso and Togo. The government did work with the Governments of Togo and Gabon, as well as INTERPOL, to successfully repatriate 39 Beninese minors who had been trafficked to both countries.

## PROTECTION

The government maintained overall efforts to identify and protect trafficking victims. The government reported identifying 701 trafficking victims, including 151 sex trafficking victims (111 children and 40 adults, including 25 victims who identified as LGBTQI+) and 550 labor trafficking victims, all children. This compared with identifying 363 potential victims in the previous reporting period. The government referred all 701 victims to social services, compared with providing services to all 363 potential victims identified during the previous reporting period. The government reported that in conjunction with NGOs, it identified 543 child forced labor victims and referred all identified victims to services.

The Ministry of Social Affairs and Microfinance, OCPM, MOJ, Ministry of Foreign Affairs, and various international donors and NGOs coordinated to identify, assist, and repatriate child trafficking victims. OCPM operated a temporary shelter for child victims in Cotonou with a capacity of 160 children (80 boys and 80 girls), but due to pandemic safety measures, the capacity was reduced to 120. The shelter offered child victims legal services, medical, and psychological assistance and served as a short-term shelter while officials worked to place children in long-term NGO shelters. NGOs coordinated with Ministry of Social Affairs and Microfinance representatives to reunite children with their families. Observers noted limited shelter capacity hindered service provision and access to justice for some victims. The Ministry of Social Affairs and Microfinance's network of Social Promotion Centers (*Centres de Promotion Sociale*) continued to provide basic services for adult and child trafficking victims in all of Benin's 77 communes, with additional

Social Promotion Centers in more populated communes such as Parakou, Cotonou, and Porto Novo. Victims in rural areas had limited access to services. The Ministry of Health's SOPs for providing health services to individuals in commercial sex included a presumption that any minor involved in commercial sex was a sex trafficking victim; however, victim screening was inconsistent. The government has not developed a corresponding directive or procedure for the identification of adult trafficking victims. Due to a lack of formal identification procedures, authorities likely detained some unidentified trafficking victims.

The government had procedures to provide legal aid services to victims to support their participation in criminal proceedings, but due to lack of funding, such services were rarely available. Beninese law did not provide legal alternatives to the removal of trafficking victims to countries in which victims would face retribution or hardship, although the government considered cases involving foreign child trafficking victims for immigration relief on an ad hoc basis.

## PREVENTION

The government maintained efforts to prevent trafficking in persons. The Anti-Trafficking in Persons Technical Commission coordinated the government's anti-trafficking efforts. It was chaired by the Chief of Staff of the Minister of Planning and Development and comprised the ministries of Development, Justice, Labor, and Social Affairs. The commission met on an ad hoc basis, and some efforts were limited due to the pandemic. The Minister of State in charge of Development and Coordination of Government Action's General Directorate for Evaluation and the Observatory for Social Change had working level responsibility for the government's anti-trafficking efforts. The National Monitoring and Coordination Working Group for Child Protection, which monitored child trafficking cases, met for the first time since 2015. The government reported it continued to implement the country's 2020-2024 anti-trafficking national action plan; however, it dedicated inadequate resources.

The government continued implementing its social services data management system to track child protection cases, including child trafficking. Data was publicly available yet remained incomplete as not all staff were equipped or trained to input data. Child Protection Committees, comprised of local officials, police, and NGO representatives in all of Benin's 77 communes, met regularly to discuss strategies to address child protection issues, including child trafficking. The government trained market traders on child protection issues, organized a conference on child exploitation in the construction sector, and in conjunction with an international organization, conducted an awareness raising campaign in border areas and cities where children faced a high risk of trafficking. In coordination with an international organization, the Ministry of Social Affairs ran a child protection hotline, which received 14,963 actionable calls regarding child abuse, including potential exploitation. The hotline was operational 24 hours a day and was staffed with French and local language speakers. There were no hotlines available for adult trafficking victims.

The government conducted 1,015 labor inspections, including in sectors with high instances of child labor, and reported identifying 620 instances of child labor trafficking. The government trained new labor inspectors on child trafficking. The government regulated formal recruitment agencies, but authorities did not take action against informal employment agents who facilitated trafficking. Some illicit recruiters continued to recruit Beninese victims abroad with fraudulent employment promises. The government did not report any measures to reduce the demand for commercial sex acts. The Ministry of Foreign Affairs used a code of conduct for diplomats that prohibited Beninese nationals deployed abroad from engaging in or facilitating trafficking in persons; however, it did not report providing training to officials. A foreign government provided anti-trafficking training to Beninese troops prior to their deployment as peacekeepers. Although not explicitly reported as human trafficking, there were seven open cases of alleged sexual exploitation with trafficking indicators by Beninese peacekeepers deployed to various UN peacekeeping missions. These include two allegations in 2020 and one in 2021 against Beninese military personnel deployed with the mission in the Democratic Republic of the Congo (MONUSCO); one in 2019 and one in 2020 against military and police personnel, respectively, deployed with

BHUTAN

the mission in the CAR (MINUSCA); one in 2018 against a police officer deployed to the now-closed mission in Haiti (MINUSTAH); and one in 2016 against a military officer deployed to the mission in Mali (MINUSMA). The government did not report on the accountability measures taken, if any, for these open cases by the end of the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Benin, and traffickers exploit victims from Benin abroad. Trafficking in the country is predominantly internal. The majority of child trafficking victims are from rural areas and are most often victims of labor trafficking. Children from low-income families and those without birth documents are especially at risk; officials report parent illiteracy and single-parent households also increase children's risk of exploitation. The pandemic exacerbated some risk factors for trafficking, including poverty and school absences. Some community members and relatives use the promise of education or employment to recruit Beninese children from northern rural areas to the more urban southern corridor and exploit them in forced labor in domestic servitude, markets, farming, as "apprentices" engaged in various trades, and in handicraft manufacturing. Beninese traffickers include farmers, traders, artisans, small factory owners, and civil servants; some belong to criminal networks, and others may have been former trafficking victims. Adults are exploited in sex and labor trafficking.

The government reported traffickers exploit children living in the lakeside areas of Benin—including the commune of So Ava in southeast Benin—in debt bondage. Criminal elements operate in urban areas under the guise of informal employment agents and recruit children for domestic work in private residences, where house managers and families exploit them in domestic servitude. Some parents follow a traditional practice known as *vidomegon*, which involves sending children to wealthier families for educational or vocational opportunities; some of these families then subject the children to forced labor, often in domestic service and open-air markets, or sexual exploitation. The government reported criminals exploit girls in sex trafficking in Cotonou and Malanville. Officials reported traffickers exploit boys, girls, and women from Djougou and Bassila in the northwest of the country; Parakou in the northeast; Zakpota, Djida, and Agbaizoun in the central region; in the Adja region and in Lobogo in the southwest; and in Pobe and Sakete in the southeast. Traffickers exploit these groups in labor and sex trafficking.

Beninese children are sent to Nigeria, Gabon, the Republic of the Congo, and to a lesser extent other West and Central African countries for domestic servitude and other forms of forced labor. Togolese victims increasingly transit through Benin in route to other destinations. Benin has been the largest source country for trafficking victims in the Republic of the Congo, with the department of Oueme in southeast Benin historically an area traffickers used to recruit child victims. Child marriage remains prevalent nationwide, with some families forcing girls into marriages as a result of generational poverty; these girls may then be subjected to sex trafficking or domestic servitude.

Reports indicate criminal groups fraudulently recruit young Beninese women for domestic work in Lebanon, Algeria, and Persian Gulf countries and subsequently exploit them in forced labor or sex trafficking. In past reporting periods, traffickers and their accomplices have sent child victims to their destinations alone and met the victims upon arrival. International organizations report some adult labor migrants use airports, primarily in Togo—but also in the neighboring countries of Burkina Faso and Nigeria—to circumvent anti-trafficking screening procedures put in place by the government at Cotonou's international airport, increasing the migrants' vulnerability to human trafficking.

## BHUTAN: TIER 2 WATCH LIST

The Government of Bhutan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included increasing convictions of traffickers and the number of potential trafficking victims identified and referred to services. In addition, the government drafted and launched a resourced

anti-trafficking National Action Plan (NAP). However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Bhutan's trafficking laws do not criminalize all forms of child sex trafficking. The government reported investigating one potential human trafficking case and did not initiate new prosecutions against traffickers, and overall identification efforts remained insufficient. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Bhutan was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Bhutan remained on Tier 2 Watch List for the third consecutive year.



## PRIORITIZED RECOMMENDATIONS:

Amend anti-trafficking laws to ensure that a demonstration of force, fraud, or coercion is not required to constitute a child sex trafficking offense, consistent with international law. • Vigorously investigate, prosecute, and convict traffickers and adequately sentence convicted traffickers. • Increase identification of trafficking victims. • Disseminate information and train officials on the amended Penal Code Section 154 and the implementation of anti-trafficking laws. • Train and instruct labor inspectors to screen cases of labor violations for indicators of forced labor, including nonpayment of wages, and refer to police for criminal investigation. • Take steps to eliminate all recruitment fees charged to workers by recruitment agents and investigate claims of nonpayment of wages, contract switching, and illegal fees charged by agents. • Accede to the 2000 UN TIP Protocol.

## PROSECUTION

The government maintained anti-trafficking law enforcement efforts. The law criminalized all forms of labor trafficking and some forms of sex trafficking. Section 154 criminalized all forms of adult sex trafficking, adult labor trafficking, and child labor trafficking. However, the law defined trafficking to require a demonstration of force, fraud, or coercion, which is inconsistent with international law for child sex trafficking, thereby failing to criminalize all forms of child sex trafficking. Similarly, Section 224 of The Child Care and Protection Act (CCPA) criminalized child trafficking but, inconsistent with international law, also required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking. Section 379 of the penal code defined "trafficking a person for prostitution" as selling, buying, or transporting a person into or outside of Bhutan for the purposes of prostitution. Section 154 of the Penal Code prescribed punishment ranging from three to five years' imprisonment, Section 379 prescribed from five years to life imprisonment, and Section 224 of the CCPA prescribed from five to nine years' imprisonment. These punishments were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as abduction.

The government initiated one potential trafficking investigation and continued to investigate a 2019 case involving 160 Bhutanese women exploited in domestic servitude in Iraq, compared with no new investigations initiated in the previous reporting period. The government did not report initiating any prosecutions, compared with one prosecution initiated in the previous reporting period against three suspects in a 2018 labor trafficking case involving Bhutanese nationals in Mumbai, and it continued prosecution of two cases. However, the Office of the Attorney General (OAG) initiated preliminary procedures to prosecute 15 alleged traffickers in one case, which remained pending by the end of the reporting period. In June 2021, the government convicted three

BHUTAN

traffickers following the reinvestigation and prosecution of the 2018 Mumbai case during previous reporting periods, compared with no convictions during the previous reporting period. The court sentenced one defendant to 54 months in prison for trafficking under Section 154 of the penal code and the other two defendants to 18 months in prison for attempted collusion in trafficking. The government did not report taking action against the employment agencies involved in the 2019 case of Bhutanese domestic workers in Iraq. The OAG did not pursue further appeals following the dismissal of trafficking charges in a 2018 case in which a suspect was charged with child trafficking for forced domestic labor of an 8-year-old girl. Despite indicators of trafficking, including severe physical abuse that required hospitalization and amputations, two courts acquitted the defendant of forced labor and convicted the employer of illegal transportation of a child. Royal Bhutan Police (RBP) reportedly screened for trafficking in enforcement operations, including at worksites, businesses, and border areas, but did not identify any trafficking victims. RBP maintained "women and child protection" units at three police stations and "women and child protection" desks at 11 additional police stations. RBP also maintained one "women and child protection" division at its headquarters in Thimphu. All officers and personnel in these units and offices were trained on "women and child friendly policy procedures," including a victim-centered approach during investigations of trafficking cases.

In mid-2018, some Bhutanese participants in a government-approved work-study program in Japan reported indicators of forced labor. The OAG charged the recruitment agency with 2,887 counts of forgery and 730 counts of larceny by deception, and the government charged the Director-General of the Ministry of Labor and Human Resources with four criminal offenses, including illegal issuance of a certificate of registration to an employment agency without required documentation. For the third year, the prosecution of both cases was ongoing at the close of the reporting period.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. Some officials continued to lack an understanding of human trafficking, especially internal and transnational forced labor, although recent high-profile cases have helped increased awareness. Limited police resources often hindered thorough investigations, and a lack of training for law enforcement on victim-centered investigations impeded formation of strong cases. In some cases, successful anti-trafficking law enforcement efforts relied on persistent individual officers. In partnership with an international organization, the Department of Law and Order (DLO) continued to support anti-trafficking trainings for law enforcement and prosecutors.

## PROTECTION

The government increased protection efforts during the reporting period. The government identified 22 labor trafficking victims, including eight Bhutanese women exploited in Oman and 14 Bhutanese women exploited in Iraq. This compared with no victims identified during the previous reporting period. The government funded the repatriation of at least eight trafficking victims from Oman and screened an additional 18 potential victims repatriated from Oman. The National Commission for Women and Children (NCWC) provided eight identified victims with counselling services. The government reported that it offered counselling services to 14 identified victims, although the victims did not accept these services. The government continued to provide services to 160 women who were identified as victims of domestic servitude and trafficking in Iraq in December 2019 and repatriated in the previous reporting period. A government-funded organization provided services, including shelter homes and food, for identified victims. The Ministry of Labor and Human Resources (MOLHR) and a government-funded program also provided skills training for identified victims. The government provided assistance and an employment program for nearly 25,000 vulnerable individuals experiencing pandemic-related economic needs, including monthly income support for women repatriated from Iraq and Oman and former drayang (karaoke bars) employees.

The government had SOPs on trafficking victim identification and referral to care. The NCWC also had procedures to guide labor inspectors, immigration officials, and teachers in the identification of child victims and at-risk youth and refer them to services. Although the pandemic

constrained government resources, the government conducted training on SOPs for officials, including judges, labor inspectors, and diplomatic staff. RBP also trained 514 personnel on the amended Penal Code Section 154 and the implementation of anti-trafficking laws, interviewing victims, and the government's SOP on trafficking.

When the government identified trafficking victims, RBP and other agencies could refer them to the NCWC or an NGO for care. The government financed civil society organizations to operate shelters. The NCWC and NGOs could refer men, women, and children to two NGO-run facilities that provided counseling, medical services, and long-term shelter to victims of crime. In 2020, the government expanded funding to include a second shelter in the capital and allocated an additional 100,000 Bhutanese ngultrum (Nu) ($1,300) to NGOs providing shelter services. One shelter had case management officers in five districts, and the other had the ability to assign counselors to visit crime victims outside the capital on an ad hoc basis.

Ministries did not have dedicated budgets to support trafficking victims, which created gaps in services in some reported cases. The NCWC maintained a budget to assist vulnerable women and children, including trafficking victims. The NCWC could also provide case management assistance and legal aid. The NCWC and partner organizations provided legal counseling to 42 trafficking survivors during the reporting period. The pandemic-related government lockdown and movement restrictions hampered NCWC and NGO efforts to provide some services, including requiring the government to postpone livelihood training and awareness programs. A civil society partner conducted vocational training for 16 repatriated human trafficking victims. The NCWC and NGOs provided counseling and psychological support services virtually, as well as in-person services. The NCWC and partner agencies conducted telephone counselling services with trafficking survivors in the Middle East to provide psycho-social support and prevent re-traumatization. The government continued to use its multi-sectoral response policy to guide officials referring or transferring survivors of trafficking for services. The government sought to provide services to all trafficking survivors regardless of nationality. The NCWC also launched a child protection framework to establish best practices and interagency responsibilities for addressing child protection issues, including trafficking.

The government maintained procedures, including witness protection, to support trafficking victims participating in the investigations and prosecutions of alleged traffickers. In addition, the penal code allowed human trafficking victims to file civil suits against traffickers and courts to order traffickers to pay appropriate damages and reparation for loss or injury caused to the victim. No traffickers or defendants were ordered to pay damages to a trafficking victim during the reporting period. The immigration department mandated that authorities report suspected foreign trafficking victims identified within Bhutan to the NCWC before initiating deportation for immigration violations. Bhutanese law did not provide legal alternatives to the removal of trafficking victims to countries in which victims would face retribution or hardship. The government continued to pursue a bilateral agreement, initiated in the previous reporting period, with the Government of the United Arab Emirates to combat human trafficking through an exchange of information and expertise, protection and support for victims, and cooperation during repatriations. However, the lack of formal diplomatic relationships or mutual law enforcement agreements with migrant worker destination countries hindered RBP efforts to investigate some potential trafficking cases.

## PREVENTION

The government slightly increased efforts to prevent human trafficking. The DLO led the government's anti-trafficking task force, composed of government and civil society members. In July 2021, the government published its national prevention strategy (NPS), which was developed in the previous reporting period, in collaboration with civil society and other relevant stakeholders. In July 2021, the government also published the results of a country assessment of human trafficking in Bhutan conducted during the previous reporting period. The anti-trafficking task force drafted a new NAP as part of the government's broader prevention strategy and officially launched the NAP in January 2022 with a budget of more than 1 billion Nu ($13 million). The government and civil society partners conducted awareness campaigns to combat trafficking during

Haiti AR_000609

the reporting period. In partnership with an international organization, the DLO continued to support public awareness events on human trafficking for groups including students, airport officials, local government officials, and the general public. The government funded a hotline staffed by counselors to support victims of gender-based violence, including survivors of trafficking, and established district-level helplines operated by local officials and civil society organizations; the government did not report identifying any trafficking victims through the hotlines during the reporting period.

The government closed all entertainment venues in March 2020 due to the pandemic and did not reopen any by the end of the reporting period. In January 2022, the government issued an executive order permanently closing the *Drayangs*, which involved potentially exploitative working conditions, following an extended review of proposed guidelines to provide greater oversight of the entertainment venues. The government introduced skills training and employment programs for approximately 556 former drayang employees.

The MOLHR registered foreign migrant workers in Bhutan, monitored working conditions, and produced and disseminated pamphlets advising workers of their rights. The Department of Labor (DOL), within the MOLHR, had a total of 34 labor officers, including 23 labor inspectors, but inspectors lacked adequate anti-trafficking training and sufficient funding for child labor inspections. The July 2018-June 2019 DOL annual report documented 147 complaints of nonpayment of wages, compared to 211 in the previous reporting period; the 2019-2020 report had yet to be published by the end of the reporting period. As in the previous reporting period, the government did not report the disposition of labor complaints, including whether it levied civil or criminal penalties. The DOL generally mediated claims of nonpayment of wages, and it did not report violators to police for criminal investigation of potential forced labor offenses or penalize employers if they paid the outstanding wages. The MOLHR did not have the ability to inspect private homes for labor violations and relied on the RBP to investigate or for potential victims to self-identify.

Government regulations on overseas employment allowed most agents to charge Bhutanese migrant workers a recruitment fee of one month's salary along with a limited number of recruitment expenses, except for costs associated with a visa or work permit. Recruitment fees were not charged to Bhutanese workers who travel overseas through direct placement programs or by Bhutanese companies who bring foreign workers to Bhutan. Foreign workers were required to pay fees for a work permit and medical check-up, which amounted to about 20 percent of one month's wages. The government implemented a new policy requiring Bhutanese migrant workers to receive approval from the MOLHR prior to traveling overseas. The MOLHR also required any Bhutanese traveling overseas for employment to participate in a predeparture orientation on human trafficking and the risks of overseas employment. The MOLHR posted online announcements to warn potential migrant workers of false advertisements and to encourage applicants to verify overseas job advertisements. The Department of Adult and Higher Education (DAHE) issued a notification warning job seekers and students to avoid unregistered labor and educational consultants. The Ministry of Foreign Affairs also issued a trafficking-prevention brochure for migrants planning to travel for employment. Individual police officers continued to educate migrant workers about trafficking when they applied for the mandatory police clearance. The MOLHR continued to monitor recruitment agencies that assisted Bhutanese citizens older than age 21 seeking work overseas. The MOLHR could take action against agents conducting recruitment or placements without a license. During the reporting period, the MOLHR continued to monitor five licensed agencies and one agency it had suspended during previous reporting periods. The government previously suspended registration of all new labor recruitment agencies and agents; the government did not report if it had reinstated new registrations. The MOLHR had 11 registered Bhutanese Overseas Employment Agents (BOEAs) when the Overseas Employment Program was first implemented in 2013. Only four registered agents are currently operational; six out of the total registered agents were delisted and penalized due to non-compliance of regulations, while one withdrew. The registration of new BOEAs remains on hold. Labor regulations held BOEAs responsible for supporting migrants and

fulfilling their contractual obligations even when agency registrations were suspended or terminated. The Department of Employment and Entrepreneurship monitored the registered BOEAs through site visits and written reports. In 2018, the MOLHR signed a memorandum with the Government of Japan on a technical intern training program to formalize collaboration and reduce trafficking risks. The implementation of the program was delayed due to the pandemic. The government maintained its intent to repatriate any intern participants wishing to return to Bhutan and did not receive any complaints during the reporting period.

The government did not make efforts to reduce the demand for commercial sex acts. The government reported that diplomatic personnel received anti-trafficking training prior to transferring to foreign assignments. The government reported it provided anti-trafficking training to its troops prior to their deployment as peacekeepers. Bhutan is not a party to the 2000 UN TIP Protocol; however, the government reported ongoing efforts to ratify the UNTOC and TIP Protocol, which remained awaiting parliamentary debate and confirmation at the end of the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Bhutan, and traffickers exploit victims from Bhutan abroad. Unregistered and unscrupulous foreign employment recruitment agencies and sub-agents increasingly operate through social media to target unemployed or economically disadvantaged individuals. Some traffickers posing as recruiters offer ostensibly well-paying jobs overseas but exploit Bhutanese in forced labor. Some agencies have subjected Bhutanese students in work-study programs in Japan and Malaysia with indicators of forced labor, including fraudulent contracts, nonpayment of wages, and passport retention. Bhutanese citizens continued to work in the hospitality, retail, and service sectors in the Gulf, including in Bahrain, Kuwait, Qatar, and the UAE, and in India, Thailand, and the United Kingdom through global training and placement academies. Some participants reported indicators of trafficking, including illegal recruitment fees and wage deductions, restricted movement, passport retention, and nonpayment of wages. In recent years, traffickers sent Bhutanese women to Iraq and Oman for forced labor in domestic work. Although pandemic-related restrictions temporarily reduced the number of migrant workers, a growing number of Bhutanese citizens have resumed seeking employment abroad, particularly in the Gulf states. The government reported repatriating more than 4,815 Bhutanese citizens since the start of the pandemic.

Traffickers have exploited Bhutanese women and girls in sex and labor trafficking, including in forced domestic labor and caregiving, through debt bondage and threats of physical abuse. Bhutanese women and girls, who worked as entertainers in *Drayangs* prior to the permanent closure of the businesses nationwide, were vulnerable to labor and sex traffickers. Drayang workers often came from rural areas and signed contracts they could not access; some female drayang entertainers reportedly worked in commercial sex, some of which traffickers may have facilitated. Media outlets and NGOs report an increase in commercial sex by Bhutanese and Indian women in the Bhutan-India border's growing hospitality and entertainment districts—including hotels, massage parlors, and nightclubs—some of which might be forced.

Relatives transport rural Bhutanese to urban areas for employment in domestic work, which at times may involve forced labor. Media outlets have reported instances of child labor within Bhutan's restaurant and automobile workshop industries, some of which had indicators of forced labor. Prior to the pandemic, the expanding construction sector increased the demand for low-skilled foreign labor. Male Indian migrant workers—including in the construction and hydropower sectors—often receive advances before beginning work in Bhutan. Some workers subsequently report unauthorized deductions and nonpayment of wages. Traffickers have exploited Indian child domestic workers in Bhutan. Bhutan's small stateless persons population lacks access to documentation necessary to attend school, rendering stateless children vulnerable to traffickers.

BOLIVIA

## BOLIVIA: TIER 2

The Government of Bolivia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Bolivia remained on Tier 2. The efforts included increasing trafficking investigations, convicting more traffickers, identifying more victims, and increasing training for law enforcement officers and prosecutors to combat human trafficking. Authorities adopted a new victim identification protocol and referral mechanism and trained department officials on its use. However, the government did not meet the minimum standards in several key areas. Authorities prosecuted fewer traffickers, specialized services for all victims nationwide remained scarce, and efforts to address forced labor were negligible.



**BOLIVIA TIER RANKING BY YEAR**

### PRIORITIZED RECOMMENDATIONS:

Provide victim protection services for all trafficking victims and provide services nationwide. • Increase efforts to investigate, prosecute, and convict traffickers, including perpetrators of forced labor and forced criminality. • Appoint specialized labor inspectors and train all labor inspectors on victim identification and criminal referral of forced labor cases. • Expand training of officials on the use of established protocols for the proactive identification of trafficking victims among vulnerable populations and for the referral of victims to care services. • Finalize, approve, and fund the 2021-2025 National Action Plan (NAP). • Develop and implement a centralized data collection system on trafficking to reconcile duplicative data stored across different systems. • Screen displaced Venezuelan migrants for trafficking indicators, including individuals in commercial sex and those working in high-risk sectors. • Amend the anti-trafficking law to ensure that a demonstration of force, fraud, or coercion is not required to constitute a child sex trafficking offense. • Direct Ministry of Health staff to screen vulnerable populations for trafficking indicators when conducting medical screenings. • Provide interpreters to assist law enforcement officials investigating child sex tourism cases in popular tourist locations. • Increase the time law enforcement officials serve in anti-trafficking units to preserve institutional knowledge. • Expedite the issuance of humanitarian visas for victims of trafficking. • Train officials on the difference between human smuggling and human trafficking. • Apply the anti-trafficking law apolitically and non-discriminatorily.

### PROSECUTION

The government increased prosecution efforts. Law 263 of 2012—the Comprehensive Law against Trafficking and Smuggling of Persons— criminalized labor trafficking and some forms of sex trafficking through amendments to Bolivia's Criminal Code and prescribed penalties of 10 to 15 years' imprisonment for adult trafficking and 15 to 20 years' imprisonment for child trafficking. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the definition of trafficking under Article 281-bis required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking. Article 281-bis defined trafficking broadly to include illegal adoption without the purpose of exploitation, the sale of organs, and unlawful biomedical research. Article 321 of the Criminal Code criminalized pimping using force, fraud, or coercion and was used to prosecute sex trafficking

crimes. The law prescribed penalties of 10 to 15 years' imprisonment for offenses involving adults, 12 to 18 years' imprisonment for offenses involving children ages 14 to 18, and 15 to 20 years' imprisonment for offenses involving children younger than 14, which were sufficiently stringent and commensurate with penalties prescribed for other grave crimes, such as rape. Article 321 did not require a showing of force, fraud, or coercion for victims younger than 14 years of age but did require a demonstration of such means for offenses involving children ages 14 to 17. Additionally, Article 322 criminalized the purchase of sex with a minor and prescribed penalties of eight to 12 years' imprisonment for offenses involving children 14 to 17 years of age. Penalties increased by one-third for offenses involving children younger than 14. While the Criminal Code included separate criminal offenses for trafficking in persons and migrant smuggling, one government agency was responsible for both crimes, and that agency often conflated the two crimes in its collection of data and response to perpetrators and potential victims of trafficking.

The Ministry of Justice (MOJ) reported authorities investigated 62 trafficking cases, compared with 39 cases in 2020. The national police reported 419 open complaints of potential trafficking crimes at the end of 2021, including 252 from previous years. In 2021, officials prosecuted 22 cases of trafficking (12 for sex trafficking, five for forced labor, and five for other forms of servitude) compared with 32 prosecutions in 2020 (14 for sex trafficking, 17 for labor trafficking, and four for other forms of servitude). Insufficient efforts to coordinate on data collection often led to confusing data difficult to reconcile. The government had department-level specialized prosecutors in all nine departments focused on human trafficking and migrant smuggling cases. Authorities convicted 12 traffickers (five for sex trafficking and seven for labor trafficking) compared with no convictions in 2020. Data provided was likely duplicative or contradictory, as no single agency was responsible for maintaining comprehensive protection or law enforcement data. In previous years, the majority of arrested suspects, including traffickers, served time in pre-trial detention without ever receiving a final sentence and often avoided justice by paying bribes to corrupt officials to avoid prosecution. General backlogs in the judiciary, insufficient resources and personnel, and inadequate training of law enforcement officials hindered effective law enforcement efforts. In addition, police officials rotated into new positions every three months to one year, resulting in a cyclical loss of institutional knowledge and impeding specialization in the investigation of trafficking crimes.

Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The government did not report investigating, prosecuting, or convicting any government employees complicit in human trafficking crimes. Civil society organizations reported that low-level official complicity in trafficking crimes persisted. The government trained law enforcement, prosecutors, judges, and immigration personnel on human trafficking investigations and prosecutions, including the proactive identification of victims in nightclubs and establishments where trafficking was prevalent. Authorities coordinated with foreign governments to investigate trafficking cases, assist victims, and when appropriate, repatriate them. In 2021, authorities reportedly coordinated with the Governments of Argentina, Brazil, Paraguay, and Peru to repatriate victims identified domestically and abroad, including a notable operation with Peruvian officials that led to the identification of 20 trafficking victims in the Peruvian mining town of La Rinconada.

### PROTECTION

The government increased protection efforts. Authorities reported identifying 594 trafficking victims in 2021, compared with 300 victims identified in 2020. While the government did not report how many victims it referred to services nationwide, authorities reported assisting eight victims, and an NGO in La Paz reported government officials referred 44 trafficking victims to services. NGOs noted an increase in the number of Venezuelan victims of trafficking as a result of an influx of Venezuelan migrants arriving in the country. In 2021, authorities approved and began using a victim identification protocol and referral mechanism, and MOJ officials trained several department stakeholders responsible for victim identification and protection on its use. The government's overlapping legal framework and understanding of

human trafficking and related crimes limited victim identification efforts. Authorities confused human trafficking with other crimes, such as child pornography, general labor exploitation, sexual abuse, and migrant smuggling, hindering their ability to identify trafficking victims. Authorities from the Ministry of Health did not receive training on victim identification and did not screen for trafficking indicators despite periodically administering medical tests to individuals in commercial sex, a population vulnerable to sex trafficking.

There were five specialized shelters that could assist female victims of trafficking, including three located and funded by department authorities in Cochabamba, Potosi, and Santa Cruz and two NGO-operated shelters in La Paz. There was a sixth inactive shelter in La Paz that could assist underage female victims of trafficking; however, for unknown reasons it remained non-functional. Law enforcement officials were often unable to secure safe accommodations for trafficking victims, particularly in departments without multi-use facilities. Law enforcement officers could give victims money for hotel rooms for the night in the hope victims could seek greater support from local government authorities or get back in touch with family members. The government did not report providing specialized services to adult male victims but could provide basic assistance for them at migrant shelters. Authorities could refer underage male trafficking victims to NGOs, private shelters, and religious organizations for assistance, but it did not report doing so during the reporting period.

The government had several mechanisms to encourage victims to cooperate in cases against traffickers, but officials did not report using these during the reporting period. Foreign victims who assisted in the case against their traffickers could receive a humanitarian visa, but the process often took years, and victims could not work during that time. While authorities did not report how many victims of trafficking received humanitarian visas, if any, NGOs reported authorities treated foreign victims of trafficking fairly, following legal standards, and those identified had access to the same services as Bolivian victims. According to civil society actors, government officials worked with their foreign counterparts to facilitate repatriation in a timely fashion when victims sought that remedy. The government had a protocol for the repatriation of victims identified abroad but did not report if it repatriated or provided support to the 20 Bolivian victims identified in the Peruvian mining town of La Rinconada. The government had Gesell chambers in every department, and in lieu of testifying in person, victims could provide recorded testimony or submit a written statement to the court. Under Bolivian law, victims and prosecutors could request restitution for damages from the sentencing judge. When victims did not participate in the case against the traffickers, they or prosecutors could still file restitution claims within three months of sentencing. The government did not report whether any victim or prosecutor sought restitution in trafficking cases. Authorities did not report penalizing victims for unlawful acts traffickers compelled them to commit.

**PREVENTION**
The government maintained prevention efforts. The Plurinational Council against Human Trafficking and Smuggling, chaired by the Ministry of Justice (MOJ), was responsible for coordinating anti-trafficking efforts at the national level. Two sub-ministerial units were responsible for coordinating anti-trafficking efforts at the technical level. The council convened in March, June, and December. In the past, observers noted a lack of interagency coordination, in part due to overlapping mandates. The 2016-2020 NAP expired, and authorities held some meetings for the development of a new five-year plan to combat trafficking but did not finalize or approve a new NAP by the end of the reporting period. The government had a federal registry and required all employment agencies to register and provide the Ministry of Labor (MOL) with all recruitment and job placement records; however, authorities did not report reviewing or investigating any applications that raised trafficking concerns. The MOL did not report conducting any labor inspections or training inspectors to identify human trafficking crimes in 2021. The government did not report training officials on the identification of forced labor indicators during the reporting period. Authorities in the La Paz metropolitan area maintained a hotline for citizens and victims to report trafficking crimes. However, authorities did not report identifying any victims or starting any investigations as a result of calls to this hotline.

The autonomous department of Cochabamba launched a new hotline the public could use to report trafficking crimes.

Authorities partnered with international organizations and NGOs to promote trafficking awareness and train government officials and members of the public to prevent the crime. The government did not make efforts to reduce the demand for commercial sex acts. The Institute for Normalization of Quality, a semi-autonomous government agency, operated a "triple seal" certification program for sugar producers whose final products were certified to be free of child labor, discrimination, and forced labor. In January 2022, authorities issued the triple seal to the largest sugar producer in the country responsible for 40 percent of the market. This was the second sugar producer to receive the triple seal since the certification was created. Media reporting indicated 80 percent of the exported and 60 percent of the internal sugar market were free from child labor, discrimination, and forced labor.

**TRAFFICKING PROFILE**
As reported over the past five years, human traffickers exploit domestic and foreign victims in Bolivia, and traffickers exploit victims from Bolivia abroad. Traffickers exploit Bolivian adults and children in sex trafficking and forced labor within the country and abroad. To a more limited extent, traffickers exploited women from neighboring countries, including Brazil, Colombia, and Paraguay, in sex trafficking in Bolivia. Traffickers exploit an increasing number of Venezuelan victims in sex trafficking and forced labor within the country. In 2021, authorities reported a notable surge in the number of Venezuelan and Haitian victims of sex trafficking and forced labor in the country. Traffickers subject some migrants from The Gambia, Venezuela, Chile, and the Caribbean traveling to or through Bolivia to sex trafficking and forced labor. Traffickers exploited children in sex tourism in rural Indigenous communities in the north of the La Paz department, in and around the city of Rurrenabaque, and in tourist areas in the departments of La Paz and Beni, openly advertising to tourists speaking Hebrew and Arabic. Rural and poor Bolivians, most of whom are Indigenous, and LGBTQI+ youth are particularly at risk for sex and labor trafficking. Bolivian women and girls are exploited in sex trafficking within Bolivia and neighboring countries such as Argentina, Brazil, Chile, Panama, and Peru. Within the country, traffickers exploit Bolivian adults and children in forced labor in domestic work, mining, ranching, and agriculture. Forced criminality continues to be a problem; media outlets reported cases of children forced to commit crimes, such as robbery and drug production, and others exploited in forced begging. In 2019, traffickers forced a Bolivian victim into criminality by compelling her to smuggle drugs into Malaysia. Traffickers exploit Bolivians in forced labor in Argentina, Brazil, and Chile in sweatshops, agriculture, brick-making, domestic work, textile factories, and the informal sector. Traffickers continue to use social media as the primary recruitment tool, luring vulnerable individuals with fraudulent employment opportunities and then exploiting them in forced labor or sex trafficking. Civil society organizations noted a pattern of exploitation in which older trafficking victims became recruiters of younger victims.

# BOSNIA AND HERZEGOVINA:
## TIER 2

The Government of Bosnia and Herzegovina does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Bosnia and Herzegovina remained on Tier 2. These efforts included increasing overall prosecution efforts with the state, Republika Srpska (RS), and Brcko District (BD) convicting more traffickers and the Federation of Bosnia and Herzegovina (Federation) investigating and prosecuting more suspects. Judges issued more sentences with significant prison terms, and the State Prosecutor's Office (SPO) created a specialized department and staffed the department with three prosecutors. The government updated standard operating procedures (SOPs) for victim identification and identified victims

from irregular migration flows for the first time. The Federation, RS, BD, and all 10 cantons adopted their action plans, and two cantons approved and disbursed honorariums for each member of the local coordinating teams (LCT). However, the government did not meet the minimum standards in several key areas. The government identified fewer victims, and law enforcement continued to lack capacity, resources, and technical knowledge, which hindered their ability to conduct effective and victim-centered investigations and prosecutions. Authorities did not investigate cases of potential forced child begging and forced labor involving Roma but rather justified them as traditional cultural practices and customs and returned children to their families, even when parents were involved in their exploitation. The government lacked proactive identification efforts, resulting in victims penalized for unlawful acts traffickers compelled them to commit, particularly with misdemeanor charges for petty crimes.



**PRIORITIZED RECOMMENDATIONS:**
Vigorously investigate, prosecute, and convict traffickers and impose adequate penalties, which should involve significant prison terms. • Allocate sufficient funding for NGO-run shelters and NGOs providing legal assistance. • Train first responders on victim identification and referral and increase proactive identification efforts, particularly for migrants, refugees, asylum seekers, and Roma. • Implement the law that exempts victims from penalties for unlawful acts their traffickers compel them to commit, particularly victims of sex trafficking, forced begging, and forced criminality. • Establish and implement policies to formally disconnect identification procedures and official victim status from cooperation on investigations and prosecutions. • Increase resources, personnel, and training for law enforcement to investigate complex trafficking cases. • Institutionalize and implement screening procedures for irregular migrant flows. • Train judges to understand the severity of trafficking when issuing sentences and sensitize prosecutors and judges to the issues of secondary trauma and victim-centered approaches. • Establish procedures to ensure trafficking cases are handled by trained prosecutors. • Standardize victim assistance throughout the country, including the ability to access assistance and support outside of shelters and specialized assistance for male victims. • Integrate Romani advocates into decision-making processes regarding victim protection. • Train judges on restitution in criminal cases, establish procedures to seize assets from traffickers, and create effective methods to allocate restitution in a timely manner.

**PROSECUTION**
The government increased law enforcement efforts. Bosnia and Herzegovina (BiH) consisted of two entities within the state—the Federation and RS. Each entity has political, legislative, and judicial authority. BD was a self-governing area under the jurisdiction of the state. Entity-level authorities addressed domestic trafficking offenses internal to their territories, and state-level authorities addressed cases with international aspects. Article 186 of the state-level criminal code criminalized sex trafficking and labor trafficking only in cases where the victim was exploited in a country in which he or she did not reside or have citizenship; it prescribed penalties of one to 10 years' imprisonment. Articles 210a and 210b of the Federation's criminal code criminalized sex and labor trafficking and prescribed a minimum penalty of five years' imprisonment. Article 145 of RS's criminal code criminalized sex and labor trafficking and prescribed a minimum penalty of three years' imprisonment. RS amended Article 146 to increase the minimum sentence of child trafficking from five to 20 years. Article 207a of BD's criminal code criminalized sex and labor trafficking and prescribed a minimum penalty of five years' imprisonment. These penalties were sufficiently

stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape.

SPO initiated two investigations on two suspects in both 2021 and 2020 and prosecuted two defendants, compared with one defendant in 2020. State courts convicted one trafficker, compared with no convictions in 2020. State judges sentenced the trafficker to one year of imprisonment. Federation authorities investigated 16 suspects, a significant increase compared with three in 2020. Federation prosecutors prosecuted 11 defendants, an increase compared with three in 2020. Federation courts convicted seven traffickers, compared to 10 traffickers in 2020. Federation judges issued sentences ranging from 21 months to eight years' imprisonment to four traffickers and did not report sentencing information for the other three traffickers. RS authorities investigated two suspects, compared with four in 2020. RS authorities prosecuted one defendant, compared with three in 2020. RS courts convicted two traffickers, compared with no convictions in 2020. RS judges sentenced one trafficker to five years and six months' imprisonment and did not report sentencing information for the other trafficker. BD authorities investigated three suspects in both 2021 and 2020. BD authorities prosecuted three defendants, compared with two in 2020. BD courts convicted one trafficker, compared with no convictions in 2020. A BD judge sentenced the trafficker to five years and two months' imprisonment. The government reported law enforcement personnel suffered from COVID-19 infections, including the majority of officers handling trafficking cases at the State Investigation and Protection Agency (SIPA), which delayed some investigations. While judges increasingly issued sentences with significant prison terms, court proceedings lasted many years, and in previous years, judges often issued sentences below minimum penalties by citing unreasonable "mitigating circumstances" to decrease the sentences. Additionally, the government reported traffickers avoided imprisonment by utilizing a law that allowed convicted perpetrators to buy their way out of up to one year of imprisonment for 100 convertible marks ($60) a day.

SIPA maintained an operational team with 20 officers across four regional offices, and Tuzla Canton in the Federation maintained a specialized trafficking unit in addition to trafficking liaison officers in all police units within the canton. Sarajevo Canton assigned two police officers within each of the seven police stations as liaison officers, but observers reported at least one station head was not aware of who was assigned as a liaison officer. In 2021, the SPO created the Department for Combating Trafficking in Human Beings and Illegal Migration and staffed it with three specialized prosecutors. RS, BD, and other Federation cantons did not have specialized officers, although organized crime and corruption units were designated to investigate trafficking. Authorities continued to regularly investigate and prosecute sex trafficking, forced begging, and trafficking cases involving family members under lesser crimes, such as "enticement to prostitution," "child negligence," and "enticement to child prostitution." Law enforcement continued to report that the lack of capacity, resources, and technical knowledge hindered their ability to conduct effective investigations. For example, the government reported difficulties in meeting the evidentiary requirement of trafficking due to a lack of resources and knowledge to conduct specialized investigative measures to corroborate victim testimony. Prosecutors reported they were evaluated on reaching overall monthly case quotas, which incentivized pursuing trafficking crimes as lesser offenses that are easier and faster to prosecute, while police experienced obstacles in investigating trafficking crimes involving multiple cantons or entities, due to a lack of communication and coordination with cantonal prosecutors. The Chief State Prosecutor chaired the anti-trafficking strike force (strike force) that coordinated law enforcement efforts across entities on trafficking cases. In previous years, the strike force was largely ineffective due to a lack of participation and the state failing to disburse operational funds; however, the government approved and allocated 80,000 convertible marks ($46,400) for honorariums and operational expenses in both 2021 and 2020. The strike force met monthly, and in cooperation with a foreign government in 2020, established a network of prosecutors and investigators to facilitate coordination across BiH; as a result, most prosecutors' offices, except in the RS, appointed a point of contact for trafficking cases to participate in the network. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes. The SPO cooperated with

authorities from Croatia, Montenegro, Serbia, and Slovenia on trafficking cases. Additionally, the SPO continued a joint investigative team with Swedish authorities to investigate a forced labor case; authorities charged three suspects in BiH and five suspects in Sweden for trafficking. The government continued its joint investigation with French authorities initiated in 2015 of a BiH and Croatian married couple alleged to have forced six Romani children to pickpocket in France. SPO indicted eight defendants in May 2018, but the court did not order authorities to place defendants in custody during court proceedings, and as a result, one defendant was in Turkey reportedly involved in another forced begging case, two defendants were at-large, and Italian authorities arrested one defendant. In June 2014, the SPO issued the biggest indictment for trafficking in BiH's history against 13 BiH nationals accused of exploiting 672 individuals in the construction industry in Azerbaijan in 2009; judges acquitted all defendants involved in the case in December 2019 and rejected SPO prosecutors' appeals in April 2021. The government reported the lack of bilateral agreements regarding witness protection created obstacles for witnesses and victims to participate effectively in international investigations. Police academies maintained basic courses on trafficking, and the government (with financial and technical assistance from an international organization) trained police, border police, prosecutors, and judges on various trafficking issues.

## PROTECTION

The government decreased victim protection efforts. The government identified 61 trafficking victims, a decrease compared with 80 in 2020. Of these, six were victims of sex trafficking, 54 were victims of forced labor, and one victim's exploitation was unspecified; there were six women, one man, 27 boys, and 27 girls; and five foreign national victims. Two bylaws provided SOPs for identifying and referring victims to services, including a list of general indicators, but observers continued to report some first responders did not know or consistently use the guidelines and lacked the knowledge to accurately identify trafficking victims. The government updated SOPs during the reporting period by adding the labor inspectorate, NGOs, and the education system to the list of institutions responsible for victim identification and developed new screening indicators specific to the type of exploitation. The government operated seven drop-in centers for children and a mobile team for vulnerable children in Sarajevo that conducted outreach work. The mobile team identified 150 victims (165 in 2020), and drop-in centers provided children with academic tutoring, hot meals, and laundry services (373 in 2020). The government, with financial and technical assistance from NGOs, established six new mobile teams. However, drop-in centers lacked resources, capacity, and staff and could only provide basic food, workshops, and short-term accommodation for a small number of children. Law enforcement and social workers justified cases of potential forced child begging and forced labor involving Roma as traditional cultural practices and customs and sometimes returned children to their families even when parents were involved in their exploitation; in 2021, prosecutors returned 16 children to family members who were involved in their exploitation. In previous years, first responders, including Border Police, local police, and Service for Foreigners' Affairs, lacked standard guidelines and trafficking indicators for irregular migration flows, interview questions, and interpreters, as well as general capacity to screen the large influx of migrants and refugees. However, the government, in cooperation with an NGO, trained Border Police and staff from the Service for Foreigner's Affairs on identifying victims within irregular migration flows, and as a result, authorities identified four victims within the migrant population accommodated at the temporary reception center in Blazuj—the first time authorities identified victims within irregular migration flows. First responders referred potential trafficking victims to law enforcement, which conducted an interview and had authority to officially recognize victims. However, observers reported the interview and identification procedures lacked transparency, and authorities often required victims to cooperate with investigations and prosecutions to receive assistance and support.

The government did not disburse funds to NGOs due to the lack of a state budget stemming from an extended political crisis. Despite the lack of funding, NGOs continued to provide services to victims in 2021. In 2020, the government partly funded five NGO-run shelters through a victim protection fund with 130,000 convertible marks ($75,410) administered

by the State Anti-trafficking Coordinator. The government disbursed funds to NGOs based on the number of assisted victims; however, the government amended the 2022 funding requirements to allow all allocated funds to be disbursed—regardless of the number of assisted victims—to compensate for the lack of funding in 2021, provided BiH adopts a budget sometime in 2022. The government, in cooperation with NGOs, provided accommodation, psycho-social support, medical assistance, and legal assistance; however, no mechanisms were in place to assist victims with services outside of shelters, including at centers for social welfare (CSW). While access to care was not standardized and was based on bylaws that were not legally binding, the government, in cooperation with an NGO, drafted guidelines and standards on providing assistance to victims, particularly children. NGO-run shelters allowed victims to leave voluntarily after informing the staff and law enforcement. NGO-run shelters appointed a guardian for each child victim, and one NGO-run shelter accommodated male trafficking victims but did not offer specialized services; NGO-run shelters assisted 56 victims (41 in 2020). Authorities reported developing a reintegration plan for each victim, including vocational training, but the government did not provide funding for reintegration programs, and observers reported victims spent, at times, multiple years at shelters due to slow court proceedings and a lack of reintegration opportunities. The law provided repatriation assistance to BiH citizens identified abroad and foreigners identified in BiH; one victim required repatriation assistance in 2021 and one in 2020. Foreign victims were eligible for a humanitarian visa allowing them to temporarily live and work in BiH, and victims were permitted a 30-day reflection period to determine whether they wanted to request a visa; no victims required a humanitarian visa (one in 2020).

The government penalized victims for unlawful acts traffickers compelled them to commit due to inadequate identification efforts; authorities penalized victims of sex trafficking, forced begging, and forced criminality with misdemeanor charges for petty crimes with some victims owing 10,000 to 15,000 convertible marks ($5,800 to $8,700) after receiving multiple fines. The government reported SOPs incorporated non-penalization standards but acknowledged authorities still penalized victims due to a lack of knowledge of the SOPs exacerbated by frequent rotations and turnover. Sub-state laws against "enticement to prostitution" permitted law enforcement to treat children ages 14 years and older as juveniles willingly engaged in commercial sex instead of victims of rape or sex trafficking; there were six prosecutions of enticement to prostitution in 2020. The law provided witness protection and free legal aid, but lower courts did not possess necessary technical equipment to organize testimonies with adequate protection and confidentiality measures. Additionally, the government relied on an NGO to provide free legal aid but did not disburse funding to the NGO despite an agreement to do so. The government did not consistently conduct victim-centered investigations and prosecutions. For example, prosecutors did not need certification to work with children and often interrogated child victims without a psychologist or social worker present. Police did not consistently notify victims' lawyers when conducting interviews, and some courts required victims to testify with no prior notification or preparation. Victims could obtain restitution through criminal proceedings or compensation through civil suits; in 2019, a district court awarded a victim 7,500 convertible marks ($4,350), but the victim has not received the restitution because seized properties and assets of the traffickers went toward the state budget rather than restitution. Judges generally rejected restitution in criminal proceedings and encouraged victims to seek compensation by filing civil suits, according to observers, who noted civil suits required victims to submit new testimonies and medical examinations, causing re-traumatization, despite the government convicting their trafficker in criminal proceedings.

## PREVENTION

The government increased efforts to prevent trafficking. The government continued to implement the 2020-2023 national strategy, and the State Coordinator continued to produce annual reports and organized three coordination meetings. The national strategy required the state, Federation, RS, BD, and cantonal governments to adopt their own action plans; the state, Federation, RS, BD, and all 10 cantons adopted their action plans during the reporting period. The government maintained 18 LCTs: 11 in the Federation (10 cantonal and one at the Federation entity

level); six in the RS, and one in BD. LCTs consisted of government and NGO representatives and an MOI official as the coordinator. Sarajevo Canton approved and disbursed honorariums for each LCT member of 300 convertible marks ($170) per month for an annual total of 72,000 convertible marks ($41,760). Herzegovina Neretva Canton also allocated 200 convertible marks ($120) for each LCT member for an annual total of 19,200 convertible marks ($11,140). The government, with financial and technical assistance from NGOs, trained LCT members, organized discussions with the Romani community on trafficking, and recruited and trained 25 Romani activists to join LCTs. The government, in partnership with civil society, conducted an awareness campaign targeting children, students, and the public. State-level institutions regulated recruitment agencies and required agencies to obtain a license and register, but labor inspectors lacked resources to adequately inspect recruitment agencies and did not report if they inspected any agencies during the reporting period. The government did not make efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training for its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in BiH, and traffickers exploit victims from BiH abroad. In 2020, traffickers exploited foreign victims from North Macedonia and Pakistan. In previous years, victims from Afghanistan, Cuba, Gambia, Libya, Serbia, Sri Lanka, and neighboring Balkan countries were exploited in BiH. Traffickers exploit BiH women and girls in sex trafficking within the country in private residences and motels. Romani children are exploited in forced begging, forced criminality, sex trafficking, and domestic servitude in forced marriages. Foreign women and girls from other European countries are vulnerable to sex trafficking within the country. Traffickers exploit BiH victims in sex trafficking and forced labor in construction and other sectors in neighboring Balkan countries and other countries across Europe. Thousands of migrants and refugees from Afghanistan, Bangladesh, Iraq, Morocco, Pakistan, Syria, and neighboring countries traveling through, stranded in, or being smuggled through BiH are vulnerable to trafficking, particularly women and unaccompanied children.

## BOTSWANA: TIER 2

The Government of Botswana does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Botswana remained on Tier 2. These efforts included prosecuting and convicting traffickers and courts sentencing traffickers to adequate prison terms for the first time; cooperating with foreign governments on trafficking investigations; identifying more victims and referring all victims to care; and conducting public awareness activities. However, the government did not meet the minimum standards in several key areas. Despite officials' acknowledgment of forced labor of adults and children in the San community on cattle farms, neither law enforcement nor labor inspectors made concerted efforts to investigate or address the crime. The government continued to lack formal procedures to identify and refer victims to care.



BOTSWANA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Significantly increase efforts to investigate, prosecute, and convict traffickers, and seek substantial sentences for convicted traffickers. •

Amend the anti-trafficking law to remove sentencing provisions that allow fines in lieu of imprisonment. • Create and implement standard operating procedures (SOPs) to identify trafficking victims and refer them to care, and train stakeholders on their use to increase victim identification and screening among vulnerable populations, including the San community, cattle farm workers, migrants, refugees, and Cuban medical workers. • Conduct comprehensive training for prosecutors and judges on Botswana's 2014 anti-trafficking law and workshops to foster collaboration and more effectively adjudicate trafficking cases. • Fund and implement the anti-trafficking National Action Plan (NAP). • Routinely inspect cattle farms, including in Ghanzi, to ensure children are not engaged in forced labor. • Increase access to emergency and long-term shelter, counseling, and medical care for trafficking victims by dedicating adequate funding to NGOs. • Work with NGOs to increase freedom of movement and work opportunities for trafficking victims residing in shelters. • Support the provision of legal identity documents among vulnerable populations, including Indigenous peoples, at-risk undocumented migrants, refugees, and stateless individuals. • Implement strong regulations and oversight of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable. • Conduct public awareness campaigns, particularly in rural areas.

## PROSECUTION

The government increased anti-trafficking law enforcement efforts. The 2014 Anti-Human Trafficking Act criminalized sex trafficking and labor trafficking and defined trafficking broadly to include all child labor. The law prescribed penalties of up to 25 years' imprisonment, a fine of 500,000 pula ($42,700), or both, which were sufficiently stringent; however, by allowing for a fine in lieu of imprisonment, with regard to sex trafficking, these penalties were not commensurate with those for other serious crimes, such as rape. Section 57 of the 2009 Children's Act criminalized inducing, coercing, or encouraging a child to engage in prostitution and prescribed penalties of two to five years' imprisonment or a fine of 50,000 pula ($4,270), or both, penalties which were significantly lower than those prescribed under the 2014 anti-trafficking act. The government drafted amendments to the 2014 anti-trafficking act to align with international standards; however, adoption remained pending by the end of the reporting period. The government and an international organization previously drafted implementing regulations for the 2014 act to make it easier for judges and prosecutors to use and submitted them to the Human Trafficking (Prohibition) Committee, which remained pending approval by the end of the reporting period.

The government reported investigating one sex trafficking case and continuing five case investigations from previous reporting periods, compared with initiating three labor trafficking investigations in the previous reporting period. The government prosecuted two suspects for sex trafficking and continued prosecutions against 17 suspects from previous reporting periods. This compared with two new prosecutions and 11 continued prosecutions in the previous reporting period. The government convicted four traffickers under its anti-trafficking law, two for sex trafficking, one for labor trafficking, and one unspecified, compared with no convictions in the previous reporting period. In the first conviction in two years, the government sentenced a Zimbabwean trafficker to 10 years in prison, which was the first prison sentence in several years and a shift from fines and suspended sentences imposed previously. The government did not report sentences for the other convictions. Pandemic restrictions restricted law enforcement efforts to gather evidence and collaborate with regional partners. The government also reported that border closures resulted in a smaller caseload. Courts did not operate for a significant portion of the reporting period and used virtual courts, when possible, resulting in a backlog of cases. Observers also noted the slow pace of Botswana's judicial system and the lack of qualified interpreters hindered authorities' ability to prosecute trafficking crimes.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Neither labor inspectors nor law enforcement reported investigating private farms in Ghanzi acknowledged by officials to hold San individuals in conditions indicative of forced labor. In addition, observers

reported some local governments and labor inspectors provided advance notice to the farm owners before inspection. Authorities acknowledged corruption as a general impediment to law enforcement efforts.

The Directorate of Public Prosecution (DPP) continued to support specialized anti-trafficking units and monitored the investigation and prosecution of trafficking cases. Due to restrictions on large gatherings during the pandemic, the government did not conduct training for DPP and other officials. The police academy continued to include a human trafficking module in its curriculum to educate recruits and in its in-service training for officers on the anti-trafficking law, victim identification, and investigation of human trafficking cases. The government cooperated with the Governments of South Africa, Zimbabwe, Eswatini, and Tanzania on one trafficking prosecution and five investigations during the reporting period. The government reported signing a memorandum of understanding with the Government of Zimbabwe to formalize cooperation on child trafficking cases.

## PROTECTION

The government maintained efforts to identify and protect trafficking victims. The government identified 31 trafficking victims, compared with three victims identified in the previous reporting period. The government did not have formal procedures to proactively identify trafficking victims and did not fully operationalize the 2014 law's victim referral measures; however, in the case of child trafficking, the government used existing child protection procedures to referral child victims to care. Primarily, law enforcement held responsibility for victim identification, and the Department of Social Protection administered and facilitated the provision of services. The government reported referring all identified victims to care, which was provided by a combination of government and NGO-run facilities. NGO-operated facilities provided shelter, medical care, and other services, as in previous reporting periods. The government offered shelter, necessities, counseling, and other services to trafficking victims through government-supported NGO shelters for crime victims. The government could also provide temporary shelter for adult victims in hotels. NGO shelters did not permit adult trafficking victims to work or to leave shelters without a chaperone. The government provided 2.78 million pula ($237,400) to NGOs providing care for trafficking victims. This compared with spending 650,000 pula ($55,510) in 2020 and 4.69 million pula ($400,510) in 2019 for victim care.

The government repatriated six trafficking victims who sought voluntary repatriation in the previous reporting period but could not previously be accommodated due to pandemic-related restrictions, and it repatriated three additional victims. The government reported that the case of three Zimbabwean child victims who received deportation relief while cooperating with law enforcement remained ongoing. The government did not have a formal policy of providing longer-term shelter, residency, or legal alternatives to removal to countries in which foreign trafficking victims would face retribution or hardship. To support participation in court proceedings, the government provided victims identified in previous years with transportation and protection services, and it conducted all victim testimony in closed courtrooms as requested during the reporting period. The government also cooperated with foreign governments to facilitate trafficking victims' participation in trials after repatriation. Botswana law provides for restitution for trafficking victims after conviction of their trafficker, but the government did not report any orders of restitution during the reporting period. Due to a lack of formal identification procedures, authorities may have detained some unidentified trafficking victims among vulnerable populations.

## PREVENTION

The government increased prevention efforts. The Human Trafficking (Prohibition) Committee, established under the Ministry of Justice (MOJ), coordinated the government's anti-trafficking efforts and met regularly during the reporting period. The Committee led implementation of the 2018-2022 NAP to which the government devoted 1.19 million pula ($101,370) to support district councils' anti-trafficking efforts and 622,980 pula ($53,200) for national coordination and capacity building. This compared with equivalent of approximately $92,000 towards implementation in previous reporting periods. The MOJ began development of a new NAP in conjunction with the Committee, other stakeholders, and trafficking survivors. MOJ created and distributed

a survey to NGOs and ministries to assess the effectiveness of the government anti-trafficking efforts and produce a bi-annual public report on trafficking in persons; however, the report was not released during the reporting period. The government collected and analyzed human trafficking data but did not report contributing to a centralized anti-trafficking database.

As in previous years, MOJ held a public awareness-raising event on World Day Against Trafficking in Persons in July 2021 and conducted radio programming in June and July 2021. The government trained district councils on human trafficking legal frameworks, referral processes, and the NAP, including in Kgalagadi, Chobe, North West, Francistown, Ghanzi, Kweneng, and Southern districts. The government held seven additional awareness raising events on human trafficking for job seekers, at-risk youth, university students, journalists, civil society organizations, and the public. Pandemic-related school closures hampered efforts to conduct awareness activities with students; other campaigns faced delays due to reallocation of funds.

Labor inspectors did not adequately monitor for forced labor, particularly in remote areas; pandemic-restrictions on government travel further hampered efforts. The government did not report training inspectors on identifying human trafficking. Inspectors also lacked funding and covered large swaths of territory that made routine inspections impossible. Labor inspectors reportedly did not visit Ghanzi province, where officials acknowledged private cattle farmers exploited San individuals in conditions indicative of forced labor since 2014. The government largely permitted child labor in agriculture, in some cases forced, to continue without oversight; the government did not identify any child labor victims in 2021. Enrollment in school required an identity document, usually a birth certificate or other national card known as an *omang*. Many San families did not have either document, which rendered their children unable to enroll in school and more likely to work on farms, at times in exploitative conditions. The government required licensure and standards for labor recruiters under the Employment Act; however, there were no procedures to screen for potential trafficking in the labor recruitment process. Without means for enforcement, the government relied on recruitment agencies to proactively screen and self-report. Moreover, Botswana law did not prohibit labor recruitment practices that traffickers commonly exploit, including charging of recruitment fees, confiscation of workers' passports, unilateral contract switching, and withholding of wages. The government continued collaboration with an international organization to identify foreign recruitment agencies operating within the country but did not report any progress on efforts. The Botswana Police Service operated a hotline for gender-based violence, which was equipped to accept human trafficking inquiries and make referrals. Additionally, the Ministry of Labor and Home Affairs operated a hotline for labor-related problems, including forced labor. Neither hotline reported receiving any calls related to trafficking during the reporting period. The government did not make efforts to reduce the demand for commercial sex. The government trained diplomatic personnel on human trafficking prior to deployment. The government did not report providing anti-trafficking training to its troops prior to their deployment as peacekeepers.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Botswana, and traffickers exploit victims from Botswana abroad. Many trafficking victims in Botswana are Central African economic migrants intercepted by traffickers while transiting Botswana to South Africa. Traffickers transport some child sex trafficking victims through Botswana en route to exploitation in South Africa. Within Botswana, traffickers target unemployed women, the rural poor, agricultural workers, and children. Some relatives force their family members into domestic work, cattle herding, and commercial sex. Some parents in poor rural communities send their children to work for wealthier families as domestic servants in cities or in agriculture and cattle farming in remote areas, increasing their vulnerability to forced labor. Extended family members may subject young Batswana domestic workers to conditions indicative of forced labor, including denial of education and basic necessities, confinement, and verbal, physical, or sexual abuse. Criminals exploit some Batswana girls and women in commercial sex within the country, including in bars and

along major highways. Officials acknowledged the forced labor of adults and children of the San ethnic minority group in private cattle farms in Botswana's rural west, particularly in Ghanzi district. Most cattle farm owners are white emigres from South Africa, whose relationships with local government officials allow them to avoid inspection. Restrictions on freedom of movement and inability to obtain permission to work render the approximately 800 refugees, most located in Dukwi refugee camp, vulnerable to traffickers. There are reports child refugees are exploited in sex trafficking around the camp, including by foreign truck drivers transiting Botswana. Botswana's laws allow for conviction of political prisoners, and the government may have subjected such prisoners to unlawful forced labor for private gain, including to private contractors outside of prisons.

Traffickers transport Batswana to Zimbabwe for forced labor. Organized trafficking rings subject some Batswana women to trafficking internally or transport women from neighboring areas, including South Africa, Zimbabwe, Nigeria, the Democratic Republic of the Congo, and East Africa, and subject them to sex trafficking in Botswana. Some traffickers recruit victims through social media, including through advertisements for fake employment opportunities. Traffickers exploit Zimbabwean and Namibian individuals in forced labor in agriculture in Botswana. Traffickers likely exploit some undocumented Zimbabwean children in commercial sex and forced labor in Botswana. Cuban medical personnel, working in nine cities and villages across Botswana, may have been forced to work by the Cuban government. Bangladeshi traffickers bring Bangladeshi women to Botswana for sex trafficking.

## BRAZIL: TIER 2

The Government of Brazil does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Brazil remained on Tier 2. These efforts included investigating and prosecuting more traffickers, identifying more trafficking victims, and continuing to issue regular updates to its public registry of slave labor offenders (the "dirty list"). However, the government did not meet the minimum standards in several key areas. The government did not report any final trafficking convictions, and officials continued to punish most labor traffickers with administrative penalties instead of prison, which neither served as an effective deterrent nor provided justice for victims. The government reported limited efforts to combat sex trafficking or to identify sex trafficking victims among highly vulnerable populations, such as children and LGBTQI+ persons; some officials demonstrated a flawed understanding of the human trafficking crime, leaving victims vulnerable to penalization for unlawful acts traffickers compelled them to commit. Victim protection mechanisms, including shelter services, remained inadequate and varied substantially by state.



BRAZIL TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict in cases of sex trafficking, including child sex tourism. • Increase efforts to proactively identify trafficking victims. • Provide shelter and specialized assistance to victims of sex trafficking and forced labor. • Prosecute and convict labor traffickers in criminal courts and punish traffickers with significant prison terms. • Compile comprehensive data on victim identification; victim assistance; and investigations, prosecutions, and convictions at the federal and state level, disaggregated between sex and labor trafficking cases. • Train law

enforcement officials on victim identification to prevent the penalization of victims for unlawful acts traffickers compelled them to commit. • Increase the number of specialized anti-trafficking offices, especially in Mato Grosso do Sul, Piaui, Rondônia, Roraima, and Santa Catarina. • Prosecute and convict officials complicit in trafficking. • Improve interagency, federal, and state coordination efforts to combat trafficking, including among law enforcement. • Implement a victim identification protocol for law enforcement officials on trafficking indicators and proactive identification of victims and train them on its use. • Amend the 2016 anti-trafficking law to criminalize child sex trafficking without elements of force, fraud, or coercion in accordance with the 2000 UN TIP Protocol. • Allocate resources to local guardianship councils to increase specialized services for child trafficking victims, including case management assistance. • Increase and fund efforts to raise awareness of trafficking, including child sex tourism, on television, social media, and in print form, especially in communities along highways where human trafficking is prevalent. • Implement the Third National Action Plan. • Empower the National Committee to Combat Human Trafficking (CONATRAP) to fulfill its mandate to support expansion of the anti-trafficking office network. • Implement and train officials to use the 2020 victim referral protocol.

### PROSECUTION

The government increased law enforcement efforts. Article 149a of the penal code criminalized some forms of sex trafficking and all forms of labor trafficking and prescribed penalties of four to eight years' imprisonment and a fine, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with international law, Article 149a required force, fraud, or coercion for child sex trafficking cases and therefore did not criminalize all forms of child sex trafficking. However, Article 244a of the child and adolescent statute criminalized inducing a child to engage in sexual exploitation without the need to prove the use of force, fraud, or coercion and prescribed penalties of four to 10 years' imprisonment and a fine, which were sufficiently stringent and commensurate with those prescribed for other serious crimes, such as rape. Additionally, Article 149 of the penal code prescribed penalties of two to eight years' imprisonment and a fine. It prohibited "slave labor," or reducing a person to a condition analogous to slavery, and defined forced labor to include degrading work conditions and exhausting work hours, going beyond situations in which people are held in service through force, fraud, or coercion.

Law enforcement data provided by the government reflected efforts made under federal jurisdiction. Authorities reported initiating 285 investigations (64 sex trafficking investigations and 221 slave labor investigations), compared with initiating 206 slave labor investigations in 2020 and 296 (40 for sex trafficking and 256 for slave labor) in 2019. There were 299 ongoing investigations (53 for sex trafficking and 246 for slave labor) initiated in previous years, some dating to 2013, compared with 237 ongoing investigations (all for slave labor) reported in 2020. The government prosecuted 49 new cases under the anti-trafficking law (11 for alleged sex trafficking and 38 for alleged slave labor) in 2021, compared with prosecuting 14 new cases in 2020 (all for sex trafficking) and 56 in 2019 (four for sex trafficking and 52 for slave labor). The government reported 599 ongoing trafficking prosecutions (43 for sex trafficking and 556 for slave labor) in courts of first and second instance, compared with 512 ongoing prosecutions (six for sex trafficking and 506 for slave labor) in 2020. In 2021, the government reported two initial convictions—one for sex trafficking and one for sex and labor trafficking, both subject to appeal—and no final convictions under the anti-trafficking law, compared with three final trafficking convictions under a related statute criminalizing the facilitation of human trafficking and six initial labor trafficking convictions, subject to appeal, in 2020. Media reported the Brazilian Supreme Court upheld the slave labor convictions of two traffickers who appealed their case; the court sentenced them to six and three years' imprisonment, respectively, for exploiting 26 people in conditions analogous to slavery. Brazil allowed successive appeals in criminal cases, including trafficking, before courts could issue a final conviction and sentence. Many convicted traffickers appealed their convictions several times, in both lower and appeals courts. Media reports showed that adjudication of cases could take four to 10 years. Traffickers sometimes served their sentence under house

arrest or in prison work release programs, leaving to work during the day and returning to prison overnight; these punishments were not commensurate with the serious nature of the trafficking crime and did not effectively deter traffickers. Observers reported the judicial system did not experience pandemic-related delays during the reporting period; courts remained open throughout 2021. The government reported law enforcement officials conducted anti-trafficking investigations as normal, without any pandemic-related limitations.

The government treated forced labor as a distinct crime from human trafficking. Labor inspectors and labor prosecutors had primary authority over cases of slave labor and could apply civil penalties. The federal police and public ministry handled the investigation and prosecution of severe slave labor cases and had the authority to pursue criminal charges against labor traffickers. However, the government favored administrative penalties in cases of slave labor. Authorities in populous states had a limited understanding of sex trafficking and mostly focused on cases of transnational sex trafficking. Anecdotal reports indicated some government authorities had difficulty conceptualizing individuals in commercial sex as potential trafficking victims, which inhibited law enforcement action against traffickers and likely led to authorities overlooking potential victims. When authorities identified exploitation of individuals in commercial sex, including potential victims of sex trafficking, they sometimes considered them victims of slave labor and referred them to the Public Labor Ministry (MPT) or the Special Secretariat for Social Security and Labor.

Interagency coordination and data collection efforts were inadequate. Data remained spread across multiple databases at the federal and state level, making it difficult to obtain and analyze comprehensive data. The Brazilian Federal Police (PF) was the primary law enforcement entity charged with responding to trafficking crimes. In 2021, the PF increased staffing for its central anti-trafficking units and made provisions for temporary staffing expansions during busy periods. The PF had a local unit in every state and participated in the investigation of most trafficking crimes. However, the PF's coordination with state and municipal entities varied considerably. In some states, the PF and state and municipal entities did not cooperate or communicate effectively; in others, observers reported successful coordination between local, state, and federal entities streamlined investigations and raids. Law enforcement units at all levels had insufficient funding, expertise, and staff to investigate trafficking. Observers reported police occasionally misclassified trafficking cases, suggesting such cases were under-reported.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking offenses; however, it added two former public employees, a retired public prosecutor and a former mayor, to its public registry of individuals and companies guilty of slave labor, known as the "dirty list." Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Media reported the former prosecutor co-owned a farm where, in 2018, officials identified 18 victims of slave labor; the victims lived in crude structures, which lacked running water, on the property where their employer compelled them to harvest açaí. The government did not report any additional developments related to cases of official complicity from previous years, including the October 2016 investigation of an elected official who was arrested and removed from his position in Parana state after allegations of his involvement in a child sex trafficking ring. Similarly, there were no updates on the prosecution's appeal of an inadequate sentence given to a civil police investigator in 2016 for his involvement in a sex trafficking ring involving children.

During the reporting period, the government offered limited training opportunities; it did not report anti-trafficking training for prosecutors, judges, or law enforcement officials. Civil society observers reported law enforcement and judicial sector officials demonstrated a limited, albeit improving, understanding of trafficking crimes; these observers also reported state and municipal officials were significantly less proficient than their federal counterparts. The government reportedly required new labor judges to receive training on slave labor and human trafficking, but it did not report recruiting new judges in 2021; by contrast, 76 new judges completed the training in 2019, the last year for which data was available. The government continued to participate in a U.S.

program designed to prevent suspected child sex tourists from entering the country. The government continued to coordinate with British, Portuguese, Spanish, and U.S. counterparts, as well as international law enforcement entities, on trafficking cases; in one such investigation, Brazilian officials coordinated with Portuguese and Spanish authorities to arrest seven alleged sex traffickers accused of recruiting as many as 100 Brazilian women, including children, to work for a fraudulent modeling agency, then forcing them to engage in commercial sex. The government reported extraditing one foreign suspected trafficker to face trial in another country and coordinating with the Belarusian government to extradite a Brazilian suspected trafficker to face trial in Brazil.

## PROTECTION

The government maintained protection efforts. In 2021, the government reported identifying 441 trafficking victims, compared with identifying and providing protection services to 357 potential trafficking victims in 2020. Among these victims, there were 221 men, 139 women, 51 boys, and 30 girls; the government did not specify how many were victims of sex trafficking, as opposed to labor trafficking. The government also reported identifying 1,937 victims of labor exploitation during 443 slave labor inspections; however, the government did not specify how many, if any, of these were trafficking victims, as opposed to victims of other forms of exploitation. As in previous years, the government did not report the total number of cases of forced labor as defined under international law. By comparison, authorities inspected 266 companies and identified 943 victims of labor exploitation in 2020; in a 2021 analysis, officials assessed as probable trafficking victims 223 of 936 victims of labor exploitation identified in 2020. Several government agencies at various levels collected data on victim identification and assistance; however, only the Ministry of Citizenship and Ministry of Labor reported victim identification data in 2021. Brazil's lack of a centralized database and inconsistent reporting made it difficult to analyze data, perform year-to-year comparisons, and draw conclusions. Civil society observers noted the demographic profiles of trafficking victims varied considerably across available sources, based on the variables each entity tracked, as well as the population to which it catered; the Ministry of Health's records, for example, frequently included more female victims than did law enforcement sources. In previous reporting periods, the government's reported victim identification efforts varied from state to state; select rural states, such as Parana, often identified an outsized share of the victims identified in a given year, while more populous states identified relatively few. Observers suggested the government devoted insufficient resources to identifying victims of slave labor in female-dominated areas of work, including domestic labor. Federal labor inspectors reportedly shared with victims of slave labor information on basic resources available to them. The government did not report how many slave labor victims received such information in 2021 or 2020. Many, but not all, victims of slave labor had access to three months of unemployment insurance; the government reported that 1,687 slave labor victims received unemployment insurance in 2021, compared with 713 of the 942 victims identified in 2020. The government did not report what other services, if any, slave labor victims received.

The government had an updated protocol for victim assistance and referral, developed in consultation with an international NGO in 2020. However, observers reported implementation of the 2020 protocol was incomplete and some officials at the federal, state, and local level continued to rely on victim identification guidance from 2013, which predated the 2016 anti-trafficking law. However, the government did not report training any officials to use either resource during the reporting period; there was no indication that authorities in most states consistently or consistently identified victims of sex trafficking, child sex tourism, or forced labor, especially forced criminality. Labor inspectors identified victims of slave labor while conducting impromptu inspections into businesses or employers suspected of using slave labor. According to some government officials, judges demonstrated an incomplete understanding of the irrelevance of initial consent; they inconsistently identified trafficking victims as such when the victim initially consented to perform a certain job or service in which they were later coerced or forced to provide labor or services against their will. The MOJPS maintained eight "advanced posts" at locations, such as airports and

bus stations, where authorities could screen for trafficking indicators; it operated the same number of posts in 2020 and nine in 2019.

Law 13.344 mandated the government provide victims with temporary shelter; legal, social, and health assistance; and protection against re-victimization. Implementation of the law was inconsistent across states. Authorities continued to operate 16 state-level and one municipal-level anti-trafficking offices (NETPs). NETPs operated interagency networks that could serve as the first point of contact for victims who had been identified by any means, including NGOs; however, most NETPs did not provide services to victims directly and were only open during the day. Most agencies with equities participated in the network, and NETPs could refer victims of adult sex trafficking to Specialized Social Service Centers (CREAS) serving vulnerable populations, victims of forced labor to the Secretariat of Labor Inspections (SIT), and child victims of trafficking to guardianship councils. The government did not report the number of victims NETPs assisted in 2021, compared with assisting 156 potential victims in 2020. Adult victims referred to CREAS could receive assistance from non-specialized psychologists and social workers; the government reported its network of CREAS assisted 441 victims in 2021, compared with assisting 357 potential victims in 2020. A government official indicated that the NETPs were not distributed in a balanced way across the country. Wealthier states, such as Sao Paulo, supplemented their NETPs' budgets, allowing for more effective assistance and coordination teams comprised of police officers, prosecutors, labor inspectors, labor prosecutors, and mental health professionals. Federal funding, however, was limited and insufficient to adequately fund or equip NETPs in the absence of supplemental state-level funding. Many states did not have NETPs, including border states where trafficking was prevalent. Civil society reported some regional governments diverted NETPS resources to support pandemic mitigation efforts. The government did not report whether it maintained its partnership with an LGBTQI+ organization to increase the protection of transgender trafficking victims.

Some NETPs and CREAS could provide limited short-term shelter; the federal government did not fund specialized or long-term shelters for trafficking victims. The government had a national network of non-specialized government and civil society shelters serving vulnerable populations, such as individuals experiencing homelessness, victims of domestic violence, and the elderly. Of these shelters, the government reported more than 3,700 could receive trafficking victims, although far fewer served trafficking victims in practice. In 2019, the most recent year for which data was available, 32 of these shelters reported providing services to at least one trafficking victim each. The government did not report how many trafficking victims these shelters assisted during the reporting period. There were no specialized shelters for male victims of trafficking. States did not have specialized shelters for child sex trafficking victims, and guardianship councils often lacked the expertise and resources to adequately identify, refer, and support child victims. Some states placed victims in shelters for migrants, individuals experiencing homelessness, or victims of domestic violence. The state of Sao Paulo, for example, had two main shelters where trafficking victims could receive assistance—one was a state government-funded shelter where female victims and their children could receive health benefits, education, food, and housing for three to six months; the other was an NGO-operated shelter that provided temporary assistance for refugees and trafficking victims. When space in these shelters was unavailable, Sao Paulo officials housed trafficking victims in other non-specialized shelters and, occasionally, hotels. Rio de Janeiro, Brazil's second most populous city, did not have any specialized shelters for victims of sex trafficking. Officials from the MPT used assets forfeited from traffickers to provide care to victims of slave labor. To increase and expedite access to care for forced labor victims, state governments could participate in the Integrated Action Program through MPT, which coordinated vocational training, sought restitution from traffickers, and arranged job placements. Authorities did not report providing training to any guardianship council social workers on the worst forms of child labor, including trafficking, in 2021 or 2020, compared with training 242 social workers in 2019.

Authorities sometimes penalized victims for unlawful acts traffickers compelled them to commit. Due to inadequate application of formal identification and screening procedures, officials occasionally arrested foreign women for alleged drug trafficking crimes committed under coercion and as a result of their trafficking situation. The government

had measures to encourage victims to testify in cases against traffickers, including allowing remote live video testimony. However, authorities have never reported using these measures in trafficking cases. Observers continued to express concern about the under-reporting of trafficking crimes, attributing it in part to victims' lack of awareness of protection services and fear that filing complaints would lead to further exploitation, deportation, or other harm. The law entitled foreign victims of trafficking and other rights violations to a residence permit. The government did not report issuing any residence permits under this provision in 2021, whether to trafficking victims or victims of other crimes, compared with 12 in 2020. The government could assist victims of trafficking with repatriation, but authorities have not reported assisting any victims since 2017.

## PREVENTION

The government maintained efforts to prevent trafficking. The MOJPS oversaw the inter-ministerial group responsible for the implementation of the 2016-2022 Third National Action Plan; MOJPS did not report the plan's operational budget in 2021, compared with a budget of 443,840 reais ($78,310) in 2020 and 639,246 reais ($112,780) in 2019. The MOJPS also funded the seven-member CONATRAP advisory committee, which included representatives from federal government agencies and NGOs. In 2021, CONATRAP issued updates to its committee bylaws. The MOJPS worked with an international organization and foreign government to produce and release a three-year analysis on trafficking trends. Coordination between agencies at the national and state levels remained uneven and varied in efficacy. At the state government level, officials from different agencies in 16 states coordinated to address trafficking independently from the federal government and in a decentralized manner through the state NETPs. The MPT did not report any 2021 activities related to its technical cooperation agreement with PF, focused on increasing information sharing on cases of child labor and slave labor or its working group assigned to develop standard operating procedures for government officials working with child victims of sexual exploitation, including sex trafficking.

Most awareness-raising efforts in Brazil focused on addressing child or slave labor more broadly; few campaigns attempted to raise awareness of sex trafficking and child sex tourism. Throughout the year and to commemorate World Day against Trafficking, municipal and state governments hosted workshops, trainings, performances, and roundtable discussions to raise awareness of human trafficking. Officials in Rio Grande do Sul distributed pamphlets outlining trafficking indicators and hosted trafficking awareness seminars. In the federal district, officials launched a campaign to reduce children's vulnerability to trafficking and other forms of exploitation by registering births and issuing identity documents. The government reported partnering with NGOs to produce online seminars and a range of awareness materials, including a web series on active government-funded anti-trafficking programs. PRF officials continued to operate a database to identify critical locations along highways where the commercial sexual exploitation of children was prevalent and coordinated with MPT and the Brazilian Association for the Defense of Women, Children and Youth to include human trafficking in its mapping efforts. The federal government launched a public awareness initiative to promote regularization of domestic workers' employment status, which would reduce their vulnerability to trafficking. In the first half of 2020, government-operated human rights hotlines received 156 calls related to human trafficking and 4,069 calls related to labor exploitation, including slave labor. Hotline operators could refer victims to local resources including police, state prosecutor's offices, social workers, guardianship councils, CRAS, CREAS, and the labor inspectorate. Some states, including Sao Paulo, operated their own human rights hotlines. The government did not indicate whether it initiated any investigations from calls to the hotlines.

Authorities did not make efforts to reduce the demand for commercial sex acts. However, authorities made efforts to reduce the demand for forced labor. The SIT published a "dirty list," or *Lista suja*, which made public the names of individuals and businesses found guilty of using slave labor, twice annually. In its most recent iteration, released in October 2021, the list included 66 employers, compared with 113 in October 2020. The SIT added 32 new employers to the list in 2021, compared with 44 new employers in 2020. The government acknowledged the decrease in new additions to the list in 2021 and 2020, attributing both to pandemic-related capacity reductions; officials continued to work through the backlog caused by

several months' inactivity during 2020. Individuals and companies on the list were prohibited from accessing credit by public or private financial institutions; the government reported its civil lawsuits against seven banks that continued extending credit to businesses included on the "dirty list," initiated in 2019, remained ongoing in 2021. While the "dirty list" remains one of Brazil's most effective tools to reduce the demand for slave labor, the inadequate criminalization of these crimes hindered efforts to combat labor trafficking. Officials issued administrative penalties to 266 employers guilty of slave labor in 2020, compared with 106 employers in 2019. The government indicated the government's staff of labor inspectors shrunk for at least the fifth consecutive year. Labor inspectors had access to an online course on slave labor and human trafficking, but the government did not report how many inspectors utilized this programming.

### TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Brazil, and traffickers exploit victims from Brazil abroad. Traffickers exploit women and children from Brazil and from other South American countries, especially Paraguay, in sex trafficking in Brazil. Gangs and organized criminal groups have subjected women and girls to sex trafficking in the states of Rio Grande do Sul and Santa Catarina. Traffickers also exploit Brazilian women in sex trafficking abroad, especially in Western Europe and the People's Republic of China (PRC). Traffickers lure Brazilian women abroad with false promises to exploit them in sex trafficking; traffickers have feigned offers of successful music careers to entice Brazilian women to travel to South Korea, where they are forced into commercial sex. Traffickers have exploited Brazilian men and transgender women in sex trafficking in Spain and Italy. Transgender women are one of the most vulnerable populations in Brazil. According to a study conducted in 2019, 90 percent of transgender women in Brazil are in commercial sex, and of those in Rio de Janeiro, more than half are in a situation at high risk for human trafficking. Demand for transgender women in commercial sex in Brazil is elevated relative to other countries, as are rates of violence against transgender women. Traffickers often require transgender victims to pay them for protection and daily housing fees. When they are unable to pay, traffickers beat them, starve them, and force them into commercial sex. Traffickers deceive transgender Brazilian women with offers of gender reassignment surgery, planning to exploit them in sex trafficking when they are unable to repay the cost of the procedure. Traffickers exploit children in sex trafficking along Brazil's highways, including BR-386, BR-116, and BR-285. Child sex tourism remains a problem, particularly in resort and coastal areas; many child sex tourists are from Europe and the United States.

Migrants—especially Bolivian, Filipino, Haitian, Paraguayan, and PRC national migrants—and people living near any of Brazil's border areas are vulnerable to trafficking. Traffickers have exploited PRC women in sex trafficking in Rio de Janeiro. Venezuelan migrants were highly vulnerable to sex trafficking and forced labor in Brazil. Traffickers recruit Venezuelans—those living in Brazil and those still in Venezuela—via online advertisements and social media platforms offering fraudulent job opportunities and later exploiting them in sex trafficking in major cities like Sao Paulo and Rio de Janeiro. Traffickers increasingly relied on digital means to recruit both sex and labor trafficking victims. Experts indicated the government convicted fewer than 5 percent of entities charged with slave labor.

Most identified trafficking victims are people of color, and many are Afro-Brazilian or otherwise of African descent; 63 percent of trafficking victims served at NETPs in 2020 identified as Black or Brown. Traffickers exploit Brazilian men—notably Afro-Brazilian men—and, to a lesser extent, women and children, in situations that could amount to labor trafficking in both rural areas (including in ranching, agriculture, charcoal production, salt industries, logging, and mining) and cities (construction, factories, restaurants, and hospitality). Traffickers exploit adults and children from other countries—including Bolivia, Paraguay, Haiti, and the PRC—in forced labor and debt-based coercion in many sectors, including construction, the textile industry (particularly in Sao Paulo), and small businesses. Traffickers exploit Brazilians in forced labor for some producers of sugar, coffee, garlic, charcoal, and carnauba wax. Traffickers exploit Brazilian women and children, as well as girls from other countries in the region, in forced labor for domestic servitude. Traffickers exploit Brazilians in forced labor in other countries, including in Europe. Traffickers force

Brazilian and foreign victims, especially from Bolivia, South Africa, and Venezuela, to engage in criminal activity, including drug trafficking, in Brazil and neighboring countries. Cuban medical workers who departed Brazil in 2018, after the Cuban government ended Cuban medical worker participation in Brazil's Mais Medicos program, continued to pursue a class-action lawsuit against an international organization for its role in their alleged exploitation. In the lawsuit, Cuban workers who were part of the Mais Medicos program in Brazil allege they were forced to work by the Cuban government, as part of a triangular arrangement facilitated by an international organization. NGOs and officials report some police officers ignore the exploitation of children in sex trafficking, patronize brothels, and rob and assault women in commercial sex, impeding identification of sex trafficking victims.

## BRUNEI: TIER 3

The Government of Brunei does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Brunei was downgraded to Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including initiating a labor trafficking prosecution, increasing investigations of potential trafficking crimes, and continuing construction of dedicated male and female trafficking shelters. However, for the fifth consecutive year, the government did not convict any traffickers under its trafficking statute. For the second consecutive year, the government did not identify any trafficking victims. The government continued to detain, deport, and charge potential victims for crimes without employing a victim-centered approach to discern if traffickers compelled the victims to engage in the unlawful acts.



BRUNEI TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, convict, and punish both sex and labor traffickers, including complicit government officials, with strong penalties. • Widely disseminate standard operating procedures (SOPs) for victim identification, and train all relevant officials on the procedures, emphasizing a focus on vulnerable populations, such as individuals in commercial sex, domestic workers, LGBTQI+ individuals, and migrant workers, including People's Republic of China (PRC) nationals employed at worksites affiliated with PRC-based companies. • Cease the inappropriate arrest, deportation, and punishment of trafficking victims for crimes traffickers compelled them to commit. • Train judges on accurate and effective implementation of trafficking laws, including through understanding the many ways coercion can be applied. • Train investigators and prosecutors on building trafficking cases, including collecting evidence to corroborate victim testimony. • Increase protective services to provide incentives for victims to participate in investigations and prosecutions, including by allowing at-will communication with people outside shelter facilities and issuing work permits to all victims. • Establish a formal communication mechanism to regularly collaborate and learn from foreign government embassies about suspected trafficking crimes. • Ensure migrant worker contracts and information on their rights and obligations under Brunei law are available in migrant workers' primary languages and that workers can retain a copy. • Issue guidelines on the prohibition of recruitment agencies charging or receiving worker-funded fees and enforce the prohibition. • Implement the victims' fund to allow those funds to be paid directly to victims as compensation. • Strengthen efforts to enforce laws prohibiting acts that facilitate trafficking, such as retention or confiscation of migrant workers' identity documents and

**BRUNEI**

partial or full withholding of wages. • Offer foreign victims long-term alternatives to removal from the country. • Expand comprehensive and visible anti-trafficking awareness campaigns directed at employers of foreign workers and buyers of commercial sex.

## PROSECUTION

The government increased law enforcement efforts. The 2019 Anti-Trafficking in Persons Order criminalized sex trafficking and labor trafficking and prescribed penalties of four to 30 years' imprisonment and fines of between 10,000 and 1 million Brunei dollars (BND) ($7,400 and $739,640), which were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious offenses, such as rape. The penal code also criminalized travel outside the country for commercial sex with children, prescribing a punishment of up to 10 years' imprisonment, a fine, or both. The government may have also utilized Chapter 120 Section 5 of the Women and Girls Prosecution Act, which addresses "living on or trading in prostitution," to prosecute potential sex trafficking crimes. The act prescribed penalties of up to five years' imprisonment and a fine of up to $20,000, which were significantly lower than those available under the trafficking law.

Royal Brunei Police Force (RBPF), labor, and immigration officers referred 134 suspected trafficking crimes to the human trafficking unit (HTU) for review and potential investigation, a decrease compared with 147 cases in 2020. The HTU was responsible for formally identifying trafficking cases and reviewed case reports to look for trafficking crimes, particularly in cases involving commercial sex, unpaid wages, workers fleeing their place of employment, or physical abuse of workers. The government investigated 14 cases as potential trafficking crimes, four for sex trafficking and 10 for forced labor, compared with three investigations the previous year. The government prosecuted its first labor trafficking case. Despite a 2004 law criminalizing labor trafficking and repeated reports that a significant number of migrant workers in Brunei exhibited multiple trafficking indicators, the government had never prosecuted a labor trafficking case. Authorities investigated, and the attorney general's chambers (AGC) charged, an alleged trafficker with six counts of people trafficking, and the case was ongoing at the end of the reporting period. For the fifth consecutive year, courts did not convict any traffickers under its trafficking statute; the government's most recent trafficking convictions were of three traffickers in 2016. In practice, investigators required proof of physical force, fraud, or physical coercion for a trafficking crime. As a result, and inconsistent with the 2019 law, officials did not investigate or prosecute as trafficking cases in which the alleged traffickers used non-physical forms of coercion. Observers indicated that an overreliance on victim testimony and lack of special investigative measures to corroborate evidence led to cases being investigated and prosecuted under non-trafficking statutes. Government officials ascribed poor prosecutorial efforts to high evidentiary standards, including the definition of exploitation, under the anti-trafficking law, despite the law's consistency with the 2000 UN TIP Protocol. Observers reported a fundamental lack of understanding about the pervasiveness of trafficking in Brunei and an institutional lack of understanding of labor-related trafficking indicators, including passport retention and nonpayment of wages, among government officials that hindered anti-trafficking efforts. In addition, observers reported that authorities did not investigate all alleged potential trafficking crimes and focused their efforts on crimes committed by foreign perpetrators rather than Bruneian criminals.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action. The government prosecuted government officials involved in visa fraud under non-trafficking laws. Law enforcement officials cooperated with foreign governments on ongoing international trafficking cases; however, the government reportedly did not cooperate with foreign governments on domestic trafficking prosecutions when cases involved foreign nationals. The government trained RBPF, immigration, labor, and anti-vice officers on victim identification and protective services. In addition, the NTHT provided training to law enforcement officials and employers on worker rights and employment laws.

## PROTECTION

The government decreased efforts to protect victims. The government had SOPs for victim identification, referral, and protection and reportedly used the SOPs to screen potential trafficking cases. However, for the second consecutive year, the government did not report identifying any trafficking victims. In addition, the SOPs did not contain adequate measures to screen for trafficking indicators among LGBTQI+ individuals or adults arrested for involvement in commercial sex. In some cases, authorities employed identification measures only after detaining potential victims following law enforcement operations, such as raids in which police arrested foreign women for involvement in commercial sex. Officials may have also detained and deported unidentified trafficking victims for labor or immigration violations. Observers reported authorities prosecuted seven potential trafficking victims and sentenced them for immigration violations, despite them exhibiting multiple trafficking indicators. Foreign government officials continued to report Bruneian authorities deported several of their citizens after their Bruneian employers withheld wages or medical care and then reported to immigration officials that the migrant workers had run away. Observers reported the practice of detention and deportation perpetuated victims' fear of communicating with law enforcement officers, exacerbating significant identification and service provision gaps. Observers noted a need for foreign government embassies and the government to develop a formal communication mechanism to increase collaboration on reports of suspected trafficking crimes.

The government did not report allocating any funding for or directly providing to victims protection services during the reporting period. In the previous reporting period, the government allocated 331,000 BND ($244,820) for trafficking victim protective services; 100,000 BND ($73,960) to a trafficking victim assistance fund; and 231,000 BND ($170,860) to the construction of two trafficking victim shelters to separately accommodate female and male victims, each intended to house up to 20 victims. The government reported construction of the shelters remained ongoing at the end of the reporting period. The government did not report providing any protective services. The government maintained a secure, general-purpose shelter and could provide medical care, counseling, psychological assessment, clothing, meals, and access to vocational training programs and recreational activities to female trafficking victims and male trafficking victims younger than the age of 18. The government indicated it could house adult male victims, if identified, in local hotels until the completion of the trafficking shelter. Shelter officials have permitted victims to make calls home in the presence of an official from their embassy, who could interpret the conversation for authorities. The government has allowed victims to freely leave the shelter without a chaperone and stated it could assist victims to find alternative employment. The Departments of Labor and Immigration could grant victims temporary work passes on an ad hoc basis; the government did not report granting any victims work passes. The government reported it maintained a 24-hour trafficking and labor hotline; however, the number was not included on any government online resources, and police were unaware of its existence. Law enforcement officials stated that reports of suspected trafficking crimes must be made in person at a police station, limiting reports of trafficking cases for law enforcement action. The government did not have legal alternatives to removal for victims who may face hardship or retribution upon return to their home countries.

## PREVENTION

The government decreased efforts to prevent trafficking. The government's interagency anti-trafficking committee met quarterly. The government continued implementation of its National Action Plan, developed in November 2020. Brunei's 2004 Employment Agencies Order (EAO) mandated licensing and regulation of recruitment agents. The EAO prohibited agencies from charging or receiving any form of fees, remuneration, profit, or compensation; however, the labor department still did not issue guidelines on this prohibition, and authorities did not implement oversight of this provision.

The Department of Labor required foreign workers to sign their contracts in the presence of a labor officer to prevent forgery, ensure compliance with the law, and enable the labor official to provide information to the worker on their rights and obligations. The government provided

Haiti AR_000621

sample migrant worker contracts and employment rights pamphlets in the primary languages of regional labor-source countries; however, all contracts were written the same and did not provide position descriptions or specific details based on the workers' employment. The government did not ensure the contracts were in the workers' primary language or that workers retained a copy of the contract. Although Bruneian law prohibited employers from withholding wages more than seven days or retaining employees' passports, foreign embassies continued to report their citizens commonly experienced both practices. The government reported pandemic restrictions hindered its ability to conduct anti-trafficking roadshows and awareness campaigns. However, a government-owned media outlet continued to publish articles, in English and Malay, on trafficking and labor rights to spread awareness and educate the public on the rights of foreign workers.

When labor officials inspected worksites, they only required migrant workers to show a copy of their passport and visa; authorities did not report fining any employers for not renewing expired workers' passports held by the employer, compared with 462 employers the previous year, or for labor rights violations, compared with five employers fined the previous year. The government did not take administrative or legal action against employers for passport retention. The government inspected the living conditions of 18 dormitories and required one employer to relocate workers, citing cleanliness and safety issues; the government did not report conducting any trafficking-related screening during these inspections. The government continued to oppose foreign governments' proposals to establish a minimum wage and require that each worker have a position description. Brunei did not have a minimum wage; salary payments were negotiated in individual contracts. The government did not provide labor officials with legal guidance to determine the fairness of the contracts. The 2009 Employment Order did not require employers to provide a written record of terms to employees not covered under the order, such as domestic workers and fishing crews. The government did not make efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training to its troops prior to their deployment as peacekeepers. While the government reported some diplomats attended an anti-trafficking training presented by a foreign government, it did not report whether it provided regular anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit foreign victims in Brunei. There are approximately 75,000 foreign workers in Brunei, mainly from Indonesia, the Philippines, Bangladesh, and the PRC. Men and women migrate to Brunei primarily for domestic service, retail, and construction work. Individuals from the PRC may have been forced to work in Brunei at projects run by PRC-based companies. Upon arrival, traffickers exploit some migrant workers through involuntary servitude, debt-based coercion, contract switching, non-payment of wages, passport confiscation, physical abuse, or confinement. Although it is illegal for employers to withhold the wages from their employees for more than seven days, some employers withhold wages to recoup labor broker or recruitment fees or to compel the continued service of workers. Retention of migrant workers' travel documents by employers or agencies remains a widespread practice, although the law prohibits it. Anti-LGBTQI+ laws place some LGBTQI+ individuals at higher risk of extortion and psychological coercion, while already being disproportionately vulnerable to trafficking. Traffickers may force some female migrants who arrive in Brunei on tourist visas into sex trafficking. Some traffickers who exploit migrants in Malaysia or Indonesia for sex or labor trafficking use Brunei to transit victims. Trafficking experts in Brunei receive threats from traffickers for their advocacy and involvement in anti-trafficking efforts.

## BULGARIA: TIER 2 WATCH LIST

The Government of Bulgaria does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included prosecuting significantly more suspected traffickers, ordering restitution, and drafting an annual national program for combating trafficking and victim protection with increased funding

to implement the national anti-trafficking strategy. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Authorities investigated and convicted significantly fewer traffickers, marking the lowest number of reported investigations and convictions since the government has been reporting trafficking data. Courts continued to issue suspended sentences for most convicted traffickers, which weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. Victim identification and assistance data remained unreliable and unclear and contained duplications from previous years, making it difficult to discern an accurate picture of the trafficking situation and compare annual data. Moreover, uncoordinated child protection services persisted, and although authorities identified 42 child trafficking victims, the government did not report assisting any of them. Furthermore, despite a non-punishment provision, authorities penalized trafficking victims for crimes traffickers compelled them to commit. The lack of resources, legal authority to pursue labor trafficking cases, and sufficient training impeded labor officials' ability to enforce laws effectively. Finally, corruption in law enforcement and the judiciary continued to hinder progress, and alleged complicity in trafficking crimes persisted with impunity. Therefore Bulgaria was downgraded to Tier 2 Watch List.



## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers, including complicit government officials. • Sentence convicted traffickers to significant prison terms and ensure they serve those sentences in practice. • Establish and implement a comprehensive data system for collecting and collating victim identification and assistance data and provide comparable annual data that does not include duplications from previous years. • Implement the non-punishment provision ensuring trafficking victims are not inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts traffickers compelled them to commit and provide guidance to authorities on its application. • Ensure all child victims receive assistance by significantly increasing cooperation among the various authorities engaged in child protection and the referral of child victims. • Expand labor inspectors' legal authority to identify and pursue labor trafficking cases and provide training for inspectors on recognizing trafficking indicators. • Proactively identify and refer to assistance potential trafficking victims, especially among vulnerable populations, such as asylum-seekers, individuals in commercial sex, and children in residential care, and provide training for officials on victim identification. • Issue prosecutorial guidelines redirecting more trafficking cases to the National Investigative Service (NIS) to help institute specialization at the pre-trial level. • Introduce a sustainable financial mechanism for victim services and allocate adequate funding for the victim protection program. • Increase the number of police officers and labor inspectors investigating trafficking crimes, particularly labor trafficking crimes. • Enhance efforts to train law enforcement officials, prosecutors, and judges to understand the severity of sex trafficking and labor trafficking crimes and their impact on victims. • Provide additional dedicated shelters for trafficking victims and renew contracts for existing shelters. • Provide qualified legal counsel and courtroom protections for victims assisting prosecutions. • Develop and adopt a new 2022-2026 national strategy to combat trafficking and adopt the annual national program to implement the strategy's activities. • Utilize financial assets seized from convicted traffickers to supplement victim services and victim compensation.

## PROSECUTION

The government decreased law enforcement efforts. Articles 159a-159d of the criminal code criminalized sex trafficking and labor trafficking and

prescribed penalties of two to eight years' imprisonment and a fine for crimes involving adult victims and three to 10 years' imprisonment and a fine for those involving child victims. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Overall, legislative and regulatory processes slowed in 2021 due to political instability as the country had a caretaker government for seven months, the absence of a working parliament, and the pandemic. Pandemic-related mitigation procedures and entry requirements hindered law enforcement investigations as many trafficking victims remained in their country of exploitation and traffickers' increasing use of online recruitment and encrypted communications made gathering evidence for successful prosecutions difficult. Furthermore, while courts remained open in 2021, judges routinely rescheduled cases, including trafficking cases, due to pandemic-related illnesses. During the reporting period, authorities investigated 53 cases (42 sex trafficking, seven labor trafficking, four unspecified), marking a multi-year decline from 74 in 2020 and 84 in 2019 and the lowest number of reported investigations since the government has been reporting trafficking data. Authorities prosecuted 77 alleged traffickers (71 sex trafficking, one labor trafficking, five unspecified), a significant increase from 45 in 2020 (73 in 2019). Courts convicted 27 traffickers (26 sex trafficking, one labor trafficking), a significant decrease from 42 in 2020 and 61 in 2019 and the lowest number of reported convictions since the government has been reporting trafficking data. Judges sentenced only 11 of 27 convicted traffickers to imprisonment and suspended most convicted traffickers' sentences, which weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. As in previous years, the government did not report the range of prison sentences imposed on convicted traffickers. Regional police, prosecutors, and courts handled cases that did not involve organized crime. The Specialized Criminal Court for organized crime and corruption and its prosecutors' office presided over and prosecuted trafficking cases involving organized crime. The General Directorate for Combating Organized Crime (GDBOP) maintained a specialized police unit for investigating trafficking cases involving organized crime, primarily international cases. In 2021, GDBOP participated in one new joint investigation team with France and the assistance of EUROPOL and Eurojust as well as other international cases. In one case, authorities from Bulgaria and the United Kingdom (UK) cooperated on a labor trafficking investigation that resulted in the arrest of two Bulgarian traffickers who awaited extradition to the UK. According to observers, authorities regularly seized financial assets from convicted traffickers, but the government did not utilize the proceeds from those assets to supplement victim services or victim compensation.

Corruption in law enforcement and the judiciary, impunity or lack of meaningful sentences for complicit officials, and selective prosecution impeded effective progress. NGOs reported alleged complicity in smaller towns by law enforcement officials who were reluctant to investigate trafficking cases because they either knew the traffickers or feared retaliation. Additionally, media outlets reported some police officers took payments to turn a blind eye toward women exploited in commercial sex. In 2021, authorities arrested a police chief and several subordinates for multiple crimes, including protecting traffickers; prosecutors charged the chief and one officer with non-trafficking-related crimes. In another complicity case, Spanish authorities prosecuted the mayor of a Bulgarian town and seven accomplices on sex trafficking charges, but the government did not report taking law enforcement action on the case.

Generally, the framework for anti-trafficking legislation was weak, contributed to ineffective investigations, and resulted in few convictions or convictions with lenient sentences. In 2021, the government proposed a reform that would dissolve the specialized courts and prosecutors' offices, whose mandate included trafficking cases involving organized crime. Experts were split on the merits of the closure of the specialized court system, but at least one expert prosecutor criticized the reform and lack of political will to address ways to support prosecuting trafficking cases and assisting victims, such as amending legislation to lower the burden of proof required to prosecute trafficking crimes and allow seized assets from traffickers to fund victim services. NGOs attributed the decline in prosecutions and convictions to decreased outbound

migration and socioeconomic conditions as well as the pandemic. Furthermore, problems persisted within the judicial system, such as a bureaucratic judicial process that resulted in lengthy trials and the absence of specialized trafficking prosecutors. The random assignment of cases in regional prosecutors' offices inhibited specialization. The NIS, which employed trained and experienced lawyers, retained the resources for specialization, but had limited jurisdiction over trafficking cases. Practitioners reported guidelines from the prosecutor general could redirect more trafficking cases to the NIS and help institute specialization. NGOs also reported that overall prosecutors continued to lack knowledge in handling trafficking cases and sensitivity toward trafficking victims. According to an NGO, a major challenge to investigating and prosecuting labor trafficking cases was the lack of a common understanding among law enforcement and judges about what constituted forced labor. In 2021, the National Commission for Combatting Trafficking in Human Beings (NCCTHB), the agency that coordinated the government's anti trafficking efforts, addressed knowledge gaps by training investigators, prosecutors, judges, and civil society and trade union representatives throughout the year on various topics, such as approaches to investigations and prosecutions, detecting labor trafficking cases, and victim identification, referral, and assistance.

## PROTECTION

The government decreased protection efforts. The prosecution service was responsible for formally identifying potential trafficking victims and, in 2021, reported identifying 416 victims (282 sex trafficking, 107 labor trafficking, 27 unspecified), compared with 413 in 2020. Of the 416 identified victims, 42 were child victims (18 sex trafficking, three labor trafficking, 21 unspecified), compared with 30 in 2020. Authorities identified one foreign victim (three in 2020). Statistics included victims from investigations and prosecutions initiated in previous years and remained ongoing, raising concerns that the data reported did not provide an accurate picture of the trafficking situation. The Council of Europe also noted difficulty assessing the scope of the trafficking problem as the victim data collection system was not comprehensive or coherent. The NCCTHB also informally collected data on potential victims and, in 2021, reported the same statistics as the prosecution service contrary to previous years. In the past, the NCCTHB's statistics significantly differed, calling into question why the NCCTHB changed its methodology. For instance, in 2020, the NCCTHB identified 60 potential victims, compared with 413 identified by the prosecution service, and the NCCTHB's statistics reflected a multi year decline (94 in 2019 and 130 in 2018), which directly contradicted the increase indicated by the prosecution service's statistics (340 in 2019 and 376 in 2018). Moreover, the number of victims assisted remained unclear as some victims received assistance from multiple agencies, possibly leading to double counting, and the government did not report whether the numbers were cumulative, like the statistics for identified victims, thus further complicating data consistency. In 2021, the government reported 42 adult victims out of 416 identified victims (approximately 10 percent) received assistance, compared with 26 adult and child victims in 2020. The State Agency for Child Protection (SACP) did not report assisting any child trafficking victims in 2021 despite authorities identifying 42.

The national referral mechanism (NRM) outlined the procedures for identification, referral, and victim assistance. NGOs alleged some authorities did not proactively look for trafficking indicators and could not effectively identify victims, especially among vulnerable groups such as asylum-seekers, migrants, children in residential care, individuals exploited in commercial sex, and members of the Romani community. NGOs and international organizations reported stigma and fear of isolation among migrants and cultural issues among the Romani community created extreme difficulties for all practitioners in identifying trafficking crimes. Some law enforcement officials viewed Roma as people who chose a lifestyle that included sexual exploitation and either did not need support or could not be identified as trafficking victims. Authorities, NGOs, and the NCCTHB referred victims to services. While NGOs and international organizations reported greater NRM awareness and generally good coordination, some NGOs remarked the referral process was inflexible and bureaucratic, citing different agencies' multiple and overlapping requirements. The government provided counseling, shelter, and reintegration assistance to domestic

and foreign victims. In 2021, the government paid 184,357 lev ($106,940) to NGO service providers for victim health care and psychological and social assistance, compared with 117,560 lev ($68,190). Experts noted the victim protection program was chronically underfunded, hampering implementation of a fully-fledged victim-centered approach, and the financial resources invested did not correspond with the actual needs. The government continued contracting NGOs to operate crisis centers and shelters. The government provided 27 crisis centers (eight for adults and 19 for children) for victims of violence, including trafficking. Observers noted the limited number of dedicated shelters for trafficking victims remained problematic with only three throughout the country in Burgas, Sofia, and Varna. The Burgas shelter remained open after the government extended the contract for another 12 months. The Sofia shelter contract was set to expire in November 2022. Child victims could stay in crisis centers for up to six months at which point SACP could place them with relatives, a foster family, or another residential care institution. An underdeveloped foster care system often resulted in SACP placing children in shelters for victims of trafficking or domestic violence. SACP monitored child victims for 12 months with the option to extend. A UN special rapporteur report found sexual exploitation prevalent among children in residential care, particularly children from marginalized communities, and a lack of systematic and reliable data on the scope of the problem. The report also identified insufficient cooperation among the various authorities engaged in child protection inhibited provision of assistance to child victims. NGOs also reported challenges in the coordination and referral of child victims due to an overly bureaucratic approach of child protection officials who sometimes prioritized paperwork over children's needs. SACP operated the 24-hour hotline for children. The National Council on Child Protection maintained referral services and accommodation for unaccompanied children.

Bulgarian law allowed foreign victims who cooperated with law enforcement to stay and work in Bulgaria for the duration of criminal proceedings before deportation. For foreign victims who chose not to assist in investigations, the government provided a 40-day recovery period (70 days for foreign child victims) before repatriation. Observers noted many victims did not cooperate with law enforcement because they did not believe the judicial system would protect them, effectively administer justice, or convict perpetrators with meaningful sentences. The law exempted trafficking victims from punishment for unlawful acts traffickers compelled them to commit; however, practitioners noted this law did not provide full exemption as force was not always applied. Some experts said police generally did not understand that people in commercial sex were vulnerable to trafficking or that the non-punishment provision for crime victims could apply to them. According to media outlets, authorities prosecuted at least two trafficking victims for commercial sex crimes in 2021. The government provided repatriation assistance to Bulgarian citizens but had no designated funds, relying on an international organization or institutions in the destination countries to cover costs. In 2021, the international organization repatriated 41 victims; it was unclear if any of them received government-funded services following their return to Bulgaria. While the law provided free legal assistance to victims, qualified legal aid was difficult to access, especially when victims were outside of the jurisdiction of the court reviewing the case. The process for seeking compensation remained overly bureaucratic and discouraged victims from filing civil suits. In 2021, a court ordered a trafficker to pay 20,000 lev ($11,600) in restitution.

**PREVENTION**
The government marginally increased prevention efforts. The NCCTHB continued to implement the 2017-2021 national anti-trafficking strategy and drafted the accompanying annual national program for combating trafficking and victim protection with a budget of 461,600 lev ($267,750), an increase from 440,400 lev ($255,450) in 2020. Political instability negatively impacted the work of the NCCTHB, which did not convene for more than a year under the two caretaker governments and did not execute critical functions, such as extending and renewing contracts for victim shelters. Furthermore, the NCCTHB struggled with limited financial and human resources and multiple rotations at the deputy minister level for most of 2021. NGOs expressed concerns about the lack of high-level government support and public commitment to combating trafficking and the negative impact it had on the NCCTHB staff. Despite the setbacks, in 2021, the NCCTHB funded an academic institute to

assess the implementation of the 2017-2021 national strategy. Experts interviewed government officials, NGOs, and independent observers and prepared a report with recommendations for the 2022-2026 national strategy. Additionally, the NCCTHB published an annual report of the government's anti-trafficking efforts, monitored the activities of the 10 local anti-trafficking commissions, and assessed the quality of services provided at the specialized government-run shelters and crisis centers. In 2021, the NCCTHB conducted multiple national awareness campaigns, including a campaign on sex trafficking targeting students and children. The government also participated in an international campaign led by EUROPOL and Slovakia, raising awareness of sex trafficking. The NCCTHB maintained a phone line, email, and website for the public to inquire about or report trafficking-related crimes through which it identified 129 potential trafficking victims. The Ministry of Justice continued to support an NGO-run hotline for victims of violence, including trafficking, allocating 64,980 lev ($37,690), compared with 65,000 lev ($37,700) in 2020. Separately, the government supported a dedicated NGO-run hotline through burden sharing, such as transportation costs, and consultative services, including advice on assistance and identification, and promoted the hotline through social media. The hotline referred 21 trafficking-related cases to authorities who identified 29 potential victims. The government made efforts to reduce the demand for commercial sex acts by conducting an awareness campaign aimed at buyers of commercial sex. In 2021, UNHCR reported cases of violent pushbacks of asylum-seekers and migrants along the borders with Greece and Turkey—an illegal practice under international and EU human rights laws as well as a practice that potentially increased a persons' vulnerability to trafficking, exacerbated distrust of foreign officials, and disallowed for the reporting of any exploitation experienced.

Experts noted systemic issues, such as the lack of resources, limited legal authority to identify and pursue labor trafficking cases, and insufficient training that impeded labor officials' ability to enforce laws effectively. Bulgarian labor laws prohibited employers and labor agents from charging recruitment fees, withholding identity documents, unilaterally changing employment contracts, and delaying payment of workers' wages. NGOs criticized the government for failing to identify and prosecute cases of severe labor exploitation, alleging the government focused instead on labor law violations that carried administrative sanctions. In 2021, the General Labor Inspectorate (GLI) conducted 1,035 inspections of labor recruitment firms, temporary employment agencies, overseas companies, employers sending "posted workers" to EU countries, and cases involving foreign workers in Bulgaria; it identified 3,657 violations and imposed 266 fines. In addition, GDBOP participated in international operations to combat labor trafficking, including joint days for action targeting exploitation in the agricultural industry. During the reporting period, the government continued outreach work on labor trafficking, including information sessions and workshops with vulnerable groups and the development and distribution of information brochures to foreign seasonal workers hired at Bulgarian resorts. The Ministry of Labor and Social Policy maintained labor offices in EU countries with large Bulgarian communities and considered high-risk trafficking destinations; the offices provided information and advice to job seekers on trafficking and reported cases to the NCCTHB for repatriation.

Since the start of Russia's full-scale invasion of Ukraine, more than 200,000 Ukrainian refugees arrived in Bulgaria and nearly 100,000 remained in country. The government set up a taskforce to process Ukrainian refugees and launched a website with information on legal status, employment, medical assistance, human trafficking, and temporary protection, among others. As of April 2022, the government granted temporary protection to 51,291 refugees who, in turn, received access to free emergency medical services and access to the labor market. The Ministry of Health directed the regional health administrations and the emergency centers to organize and coordinate access to healthcare for all Ukrainian refugees arriving in Bulgaria. The Ministry of Justice extended free legal aid service to Ukrainian asylum-seekers available in all regional counseling centers and presented an accelerated naturalization procedure for Ukrainians of Bulgarian heritage. With the assistance of an international organization, the government created anti-trafficking information and prevention materials targeted at Ukrainian refugees and distributed these through local anti-trafficking coordinators, partner institutions and organizations, and the NCCTHB. In coordination with an international organization, the government trained state and private

BURKINA FASO

frontline responders on victim identification. While experts commended the government for its efforts to register and accommodate refugees, they noted the need to focus on long-term contingency planning and to include comprehensive budgeting that matches resources to needs.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Bulgaria, and traffickers exploit victims from Bulgaria abroad. Bulgaria remains one of the primary source countries of human trafficking in the EU. Vulnerable groups include the unemployed, children in residential care, individuals in commercial sex, and members of the Romani community. According to the NCCTHB and shelter staff, most victims are individuals with disabilities and those with mental health conditions. Traffickers exploit Bulgarian women and children in sex trafficking throughout Western Europe and in Bulgaria, particularly in the capital, resort areas, and border towns. Bulgarians of Turkish ethnicity and Romani women and girls account for most of the sex trafficking victims identified in Bulgaria. Authorities report an increase in internal sex trafficking, which they attribute to international travel restrictions resulting from the pandemic. Also due to the pandemic, traffickers increasingly use the internet and social media to recruit victims. Traffickers typically recruit and exploit women and girls from poorer regions of the country. Family- or clan-based organizations and independent traffickers are overwhelmingly of Romani ethnicity and usually know the victims, who are also Roma. According to authorities, sex trafficking rings typically consist of Bulgarian traffickers who cooperate with foreign nationals in destination countries but have no direct ties to foreign organized crime groups. Reports indicate a rise in the number of cases of women and girls from marginalized communities forced to marry third-country nationals. Reports also indicate a growing number of cross-border labor trafficking cases. Traffickers exploit Bulgarian men and boys in forced labor across Europe, predominantly in agriculture, construction, and the service sector. Traffickers exploit Romani children in forced labor, particularly begging and pickpocketing in Austria, France, and Sweden. The majority of labor trafficking victims are of Romani origin or come from poor regions of the country with high levels of unemployment. Traffickers force Bulgarian men with disabilities into street begging abroad. Media outlets reported trafficking-related abuses in the public procurement process, including non-payment or late payment to workers hired by subcontracting companies in the agriculture, construction, and service sectors. According to NGOs, some traffickers use legitimate business structures and employ various methods for evasion, such as fake self-employment and posted work frauds. Reports indicate an increase in child trafficking cases. NGOs report the exploitation of children in small family owned shops, textile production, restaurants, and construction businesses. A UN special rapporteur report found child sexual exploitation prevalent among children living in government-run institutions, particularly children from marginalized communities. Asylum-seekers and migrants from Afghanistan, Syria, and Iraq, some of whom may be or may become trafficking victims, transit Bulgaria en route to Western Europe. Thousands of Ukrainian refugees, predominantly women and children, who are fleeing Russia's full-scale invasion of Ukraine and seeking sanctuary in Bulgaria, are highly vulnerable to trafficking. Government corruption in law enforcement and the judiciary continues to enable some trafficking crimes, and officials have been investigated for suspected involvement in trafficking.

## BURKINA FASO: TIER 2 WATCH LIST

The Government of Burkina Faso does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included establishing child protection units in law enforcement offices throughout the country, identifying potential trafficking victims, and continuing its program with Quranic teachers to prevent child forced begging. The government, in collaboration with international organizations and foreign donors, implemented a humanitarian response plan to assist vulnerable people in conflict-

affected areas, including potential trafficking victims. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity. Substantial personnel turnover related to the January 2022 coup d'état—followed by the formation of a transition government—hindered Burkina Faso's ability to maintain consistent anti-trafficking efforts and accurately report on the efforts for this reporting period. The government did not report any prosecutions or convictions for the third consecutive year and did not effectively screen vulnerable populations for trafficking indicators. Shelter and services, especially for adult victims, remained insufficient. The national anti-trafficking committee did not meet or coordinate anti-trafficking activities. The government did not adequately address complicity in trafficking crimes, including allegations local officials exploited internally displaced persons (IDPs) in sex trafficking. Therefore Burkina Faso remained on Tier 2 Watch List for the second consecutive year.



**PRIORITIZED RECOMMENDATIONS:**

Increase efforts to investigate, prosecute, and convict traffickers—including those who exploit children in forced begging and complicit officials—while respecting due process, and sentence convicted traffickers to significant prison terms, as prescribed in the 2008 anti-trafficking law. • Finalize and implement a handover protocol for children associated with non-state armed groups in collaboration with international organizations and prioritize reintegration of these children. • Develop and finalize a national action plan to combat trafficking and allocate resources to its implementation. • Increase the quantity and quality of services available to all victims, including adults, in coordination with civil society. • Increase nationwide trafficking data collection on law enforcement and victim identification efforts. • Train law enforcement and security officials on the standard operating procedures to identify victims among vulnerable populations, such as women in commercial sex, children associated with non-state armed groups, and Cuban overseas workers, including medical professionals, and refer trafficking victims to protective services. • Train law enforcement, prosecutors, and the judiciary on investigating and prosecuting trafficking cases. • Increase oversight of labor recruitment agencies and hold fraudulent labor recruiters criminally accountable. • Increase funding and resources for police and security force units charged with investigating trafficking crimes. • Strengthen the national anti-trafficking committee's authority to coordinate the government's anti-trafficking response by providing financial and in-kind resources, convening regular meetings, sharing data, and promoting coordination with regional and provincial sub-committees and the national committee on the worst forms of child labor. • Increase public awareness campaigns on all forms of trafficking, including child forced begging and trafficking that does not involve movement, in collaboration with civil society.

**PROSECUTION**

The government did not report undertaking anti-trafficking law enforcement efforts. Articles 511-1 to 511-5 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of five to 15 years' imprisonment and fines of 1 million to 5 million West African CFA francs (FCFA) ($1,720-$8,590) for offenses involving a victim older than the age of 15, and 11 to 20 years' imprisonment and a fine of 2 million to 10 million FCFA ($3,440-$17,190) for those involving a victim 15 years old or younger. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape.

Insecurity across the country hindered the government's collection of law enforcement statistics. The government did not report any trafficking

Haiti AR_000625

investigations, compared with one investigation during the previous reporting period. For the third consecutive year, the government did not report any prosecutions or convictions of traffickers. However, civil society and media reported the government prosecuted and convicted at least five traffickers. Courts reportedly sentenced three traffickers engaged in unknown forms of exploitation to two years' imprisonment and a fine; two traffickers reportedly received fully suspended sentences, which did not serve to deter or adequately reflect the nature of the crime. Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Media reported local officials involved in a humanitarian food assistance program exploited female IDPs in sex trafficking between October 2020 and May 2021; the reporting alleged local authorities and volunteers responsible for registering food aid beneficiaries solicited women for sex in exchange for registration. The Minister of Women initiated an investigation of the case but did not report any actions taken by the end of the reporting period. In the past, authorities alleged some officials exerted pressure over police and the judiciary to drop labor trafficking cases, especially in the mining sector. In July 2018, a federal court in New York entered a default judgment against a former Burkina Faso diplomat who had been assigned to Burkina Faso's Mission to the UN. In October 2019, the court awarded the plaintiff approximately $784,000. The plaintiff (the diplomat's former domestic worker) had alleged, among other things, violations of the TVPA and federal and state labor laws after his employer allegedly forced him to work long hours under intolerable conditions. The judgment appears to remain unpaid, and the government did not report taking any actions to hold the diplomat accountable for the third consecutive year. Although not explicitly reported as human trafficking, an international organization reported there were two new allegations submitted in 2021 of alleged sexual exploitation with trafficking indicators by Burkinabe peacekeepers deployed to the UN peacekeeping mission in the Democratic Republic of the Congo (DRC) in 2021. UN-led investigations into these open cases remained pending, and the government had not yet reported the accountability measures taken, if any, by the end of the reporting period.

The government established child protection units comprised of law enforcement and protection actors in offices throughout the country to identify and support vulnerable children, including child trafficking victims. Under its 2019 law enforcement cooperation agreement with Cote d'Ivoire, Burkinabe and Ivorian security forces conducted joint operations to identify potential trafficking victims. The government also signed a memorandum of understanding to enhance trafficking cooperation with Nigeria in December 2021. The government did not report providing anti-trafficking training to law enforcement or the judiciary for the second consecutive year; however, stakeholders reported the government provided some support for an NGO-facilitated training for law enforcement and social workers under the government's 2019 tripartite agreement with Togo and Benin on transnational child trafficking.

## PROTECTION

The government maintained protection efforts. The government did not report identifying any trafficking victims, but one official reported authorities identified at least 399 potential child trafficking victims in 2021. This compared with identifying 380 potential victims, including 70 children identified en route to possible exploitation in mining and 310 potential victims identified as part of the government's campaign to remove vulnerable children from the street, including *talibés* (Quranic students) exploited in forced begging, during the previous year; the government did not report continuing this campaign. The government did not report how many potential victims, if any, it referred to services. Authorities and front-line responders had standard victim identification and referral procedures in some regions. In addition, the government had a case management guide for law enforcement and social service providers to facilitate the uniform referral of child victims of crime, including trafficking victims, to care. However, the government did not report whether officials used these procedures during the reporting period. The government continued to coordinate with an international organization to screen for trafficking indicators among refugees and IDPs but did not report identifying any potential victims among these populations.

The government operated two shelters in Ouagadougou for victims of crime, including trafficking victims; the shelters were open 24 hours per day, provided food and medical assistance, and could accommodate long-term stays for both adults and children. The government did not report the number of trafficking victims, if any, it referred to the shelters. Outside of the capital, the Ministry of Women, National Solidarity, Family and Humanitarian Action (Ministry of Women) operated 34 regional centers for victims of crime that provided short-term services, including psycho-social, and food assistance. These centers operated during weekly business hours when they had sufficient funding, although the centers could provide short-term shelter to some adults and children when necessary. The centers relied heavily on local NGOs and international organizations for support. When trafficking victims outside of Ouagadougou required shelter, authorities nearly always placed victims with host families or NGOs. Outside of Ouagadougou, there were no shelters or services specifically for adults. Long-term care for all victims remained inadequate, and service providers lacked the funding and resources to support victim services and reintegration. The lack of support subsequently increased victims' vulnerability to re-trafficking. The government worked with international organizations and foreign donors to implement its humanitarian response plan, providing shelter, food, and essential supplies to millions of vulnerable people in conflict-affected areas, including potential trafficking victims. The 2015 law on the prevention and repression of violence against women and girls mandated measures for victim support, including the establishment of free emergency integrated support centers to offer comprehensive services for female victims of violence, including sex trafficking, and the creation of a government support fund for victims. The government operated four of these support centers. The government did not report how many victims, if any, it referred to the support centers or provided support from the fund.

The 2008 anti-trafficking law and 2018 penal code contained provisions to protect victims' identities and encourage their participation in prosecutions against their alleged traffickers by allowing for closed sessions to hear victim testimony, excusing victims from appearing at hearings, and allowing social workers to accompany child victims. Victims could access legal services through the government's legal aid fund for vulnerable populations. However, the government did not report utilizing these provisions during the reporting period. The law allowed victims to obtain restitution, but the government did not report pursuing restitution in any cases. In addition, victims could file civil suits against traffickers, but no victims reportedly did so, in part due to lack of awareness. Foreign victims who faced hardship or retribution in their country of origin could apply for asylum, but there were no reports trafficking victims applied for asylum during the reporting period.

Since victim identification procedures were not in use nationwide or uniformly implemented where in use, officials likely detained some unidentified victims. The government inappropriately detained 18 children ages 12 to 17 years old for alleged association with violent extremist groups, some of whom may have been trafficking victims; 15 of the children remained in detention at the end of the reporting period. Authorities held the children in a high security prison separately from adult detainees and allowed international organizations and NGOs access to provide specialized care, including legal services. In many cases, authorities held detainees, including children allegedly associated with violent extremist groups, without charge or trial for longer periods than the maximum sentence for the alleged offense; this included terrorism cases. Detainees, including children allegedly associated with violent extremist groups, faced harsh conditions, including inadequate food and water, and poor sanitation, heating, ventilation, lighting, and medical care. The government did not finalize a previously drafted protocol for the handover of children associated with non-state armed groups to civilian protection actors for the second consecutive year.

## PREVENTION

The government decreased efforts to prevent trafficking. The Ministry of Women, also responsible for the government's response to the humanitarian crisis, nominally led the government's national anti-trafficking coordination committee. The committee did not meet or conduct capacity building activities during the reporting period for the second consecutive year; it continued to lack the resources and a national

action plan to coordinate the government's anti-trafficking response and take proactive measures to combat trafficking. Some regional and provincial sub-committees coordinated local efforts and held awareness raising campaigns. However, the sub-committees also lacked resources and funding for day-to-day operations. The government's national coordination committee on the worst forms of child labor, including child trafficking, continued to implement its 2019-2023 national strategy and validated a new 2022-2023 operational action plan.

The Ministry of Women continued its program with Quranic teachers to promote child protection and prevent forced begging; to date, the government partnered with 122 Quranic teachers. The Ministry of Women operated a hotline to report child abuse and launched a new hotline to report gender-based violence, including potential trafficking cases; the hotlines received more than 436 calls and referred at least 30 individuals to services. The government did not report any policies to regulate labor recruitment or prevent the fraudulent recruitment and exploitation of Burkinabe nationals abroad. The government conducted labor inspections but could not access all regions of the country due to insecurity; the government did not report identifying any potential trafficking victims during the inspections. The Ministry of Justice, Human Rights, and Civic Promotion worked with international NGOs to deploy mobile courts to remote villages to issue birth certificates and national identity documents to local populations. The government did not report any efforts to reduce the demand for commercial sex acts. The government did not report providing any anti-trafficking training to its diplomatic personnel. The government, with funding from a foreign donor, provided anti-trafficking training to its troops prior to their deployment as peacekeepers. However, although not explicitly reported as human trafficking, there were two open cases of alleged sexual exploitation with trafficking indicators by Burkinabe peacekeepers deployed to the UN peacekeeping mission in the DRC.

**TRAFFICKING PROFILE**
As reported over the past five years, human traffickers exploit domestic and foreign victims in Burkina Faso, and traffickers exploit victims from Burkina Faso abroad. Traffickers fraudulently recruit Burkinabe children under the pretext of educational opportunities and instead exploit them as farm hands, gold panners and washers in artisanal mines, street vendors, and domestic servants. In some cases, parents knowingly allow their children to be exploited in domestic servitude to supplement family income. An international organization estimates between 200,000-300,000 children work in artisanal mining sites, some of whom may be trafficking victims. Traffickers exploit girls in sex trafficking in Ouagadougou and in mining towns. Unscrupulous Quranic teachers force or coerce *talibés* to beg in Quranic schools, sometimes with parents' knowledge. Traffickers transport Burkinabe children—including children experiencing homelessness—to Cote d'Ivoire, Mali, Senegal, and Niger for forced labor in artisanal mining, forced begging, and cocoa production, as well as sex trafficking. Traffickers recruit women for ostensibly legitimate employment in Lebanon, Qatar, Saudi Arabia, and—to a lesser extent—Europe and subsequently exploit them in sex trafficking. Traffickers also exploit Burkinabe women in domestic servitude in the Middle East. In 2018, an international organization repatriated approximately 588 Burkinabe adults from Libya, some of whom traffickers exploited in sex trafficking and forced labor in construction and agriculture.

Between September 2019 and September 2021, the number of IDPs in Burkina Faso grew from nearly 300,000 people to more than 1.4 million people, an increase of more than 350 percent. Forcibly displaced persons migrating from rural areas to urban centers are vulnerable to forced labor and sex trafficking. Violent extremist groups exploit women and children, including IDPs, in forced labor and sex trafficking, and reportedly coerce individuals to carry out attacks and otherwise act as accomplices. Violent extremist groups continued to recruit and use child soldiers during the reporting period, and observers reported instances of child soldier recruitment are increasing. School closures and regional and economic instability increase children's vulnerability to trafficking and recruitment by armed groups. Armed groups leverage economic vulnerability to recruit children, sometimes with familial support, by promising large sums of money and gifting motorcycles. Armed groups also target *talibés* due to the boys' lack of economic alternatives.

Traffickers exploit children from neighboring countries, including Cote d'Ivoire, Ghana, Guinea, Mali, Niger, and Nigeria, in forced labor and sex trafficking. Traffickers fraudulently recruit women from other West African countries for employment in Burkina Faso and subsequently exploit them in forced labor in restaurants or domestic service. Traffickers recruit Nigerian women and girls for employment in shops and salons and instead exploit them in sex trafficking in mining regions, often through the use of debt bondage. Cuban overseas workers, including medical professionals, working in Burkina Faso may have been forced to work by the Cuban government. Burkina Faso is a transit country for traffickers transporting children from Mali to Cote d'Ivoire and women and girls from Cote d'Ivoire to Saudi Arabia; it is a transit country for Ghanaian migrants traveling to Libya and Italy, some of whom are trafficking victims.

## BURMA: TIER 3

Burma does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Burma remained on Tier 3. During the reporting period, the military continued a policy or pattern of use of children and adults for forced labor. Despite the lack of significant efforts, the regime investigated only limited numbers of potential trafficking cases and identified only a limited number of victims. However, the regime did not report prosecution of any military or deposed civilian government officials involved in the use of adults and children for forced labor, and it prevented civil society organizations from providing essential services to trafficking victims. The February 2021 military coup that deposed the democratically elected government exacerbated conflict between the military and both pro-democracy People's Defense Force (PDF) groups and ethnic armed organizations (EAOs) throughout the country, dislocating hundreds of thousands of people—most of them from ethnic minority communities—and political dissidents, many of whom were at risk of trafficking as a result of their displacement. Efforts to combat trafficking declined dramatically after the coup as the military regime shifted its focus away from other justice sector priorities and toward persecution of the pro-democracy opposition. The regime also enforced policies that discriminated against its political opposition, Rohingya communities, and other religious and ethnic minorities, which further increased their vulnerability to trafficking. The regime likely penalized victims for unlawful acts traffickers compelled them to commit.



BURMA TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**
Cease official involvement in compelling civilians to perform any type of forced labor, including for the military, by enforcing existing prohibitions on forced labor and fully implementing associated military command orders against all forms of forced labor, and by prosecuting, convicting, and imprisoning any officials involved in the practice. • Cease all unlawful recruitment and use of children by armed forces, including in non-combatant roles. • Provide legal status to and facilitate high security official identity documents for stateless persons and other vulnerable populations, including children, to decrease their vulnerability to trafficking. • Eliminate restrictions on freedom of movement for all populations in Burma, including IDPs, ethnic minority groups, and political dissidents. • Restore cooperation with the United Nations (UN) to facilitate ending the unlawful recruitment or use of children by the military and relevant EAOs. • Investigate, prosecute, and convict traffickers, including civilian

brokers, military, and other officials complicit in the unlawful recruitment or use of child soldiers, and impose significant prison terms. • Proactively identify and protect all trafficking victims, especially those among communities displaced by conflict and internal migrants working in the fishing and agricultural sectors. • Train police and immigration, judicial, social service personnel on anti-trafficking laws and victim identification, referral, and assistance best practices. • Utilize, widely distribute, and train relevant authorities at the national and local levels on standard operating procedures (SOPs) on the Return, Reintegration, and Rehabilitation of Victims of Trafficking in Persons. • Prioritize and increase resources for victim protection, including victim shelters, provision of services for male victims, and reintegration support for former child soldiers. • Amend the anti-trafficking law to explicitly state that a demonstration of force, fraud, or coercion is not required to constitute a child sex trafficking crime. • Finalize implementing regulations for the Child Rights Law, and in particular those related to accountability for crimes involving the recruitment and use of child soldiers. • Reform law enforcement based on human rights principles, including prioritizing the protection of civilians and crime prevention, and human trafficking crimes.

## PROSECUTION

The regime decreased law enforcement efforts in comparison to the deposed civilian government, as it did not adequately enforce anti-trafficking laws and focused its judicial efforts on suppressing the population. The regime used the police to undermine the pro-democracy movement and arrested approximately 13,000 people, including some children, of which 9,000 remained in detention as of March 2022. As a result, the public largely feared interaction with the police and lost faith in regime law enforcement entities. Furthermore, under the regime, the Ministry of Legal Affairs (MOLA—formerly the Union Attorney General's Office) and the Myanmar Police Force (MPF) Anti-Trafficking in Persons Division (ATIPD) did not continue their respective anti-trafficking law enforcement and prosecutorial efforts or their coordination efforts as they did under the civilian government during the previous reporting period. Additionally, from June to August 2021, police and judicial offices largely closed due to the ongoing pandemic, causing delays in investigations and trials and impacting the regime law enforcement's ability to effectively enforce laws. Escalating conflict across the country from October 2021 to March 2022—due to the military coup—decreased effectiveness of regime law enforcement throughout the country.

The 2005 Anti-Trafficking in Persons Law criminalized all forms of labor trafficking and some forms of sex trafficking and prescribed penalties of five to 10 years' imprisonment and a fine for trafficking crimes involving male victims, and penalties of 10 years' to life imprisonment for trafficking crimes involving female or child victims. These punishments were sufficiently stringent and with, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with international law, the 2005 Anti-Trafficking in Persons Law required a demonstration of force, fraud, or coercion to constitute a child sex trafficking crime and therefore did not criminalize all forms of child sex trafficking. The Child Rights Law, enacted in 2019, criminalized all forms of child sex trafficking, thereby addressing this gap. The law prescribed penalties of one to 10 years' imprisonment and a fine of 1 million to 2 million kyat ($570-$1,130), which were also sufficiently stringent and commensurate with those prescribed for other serious crimes, such as rape. The regime made no progress in drafting the necessary implementing regulations for the Child Rights Law. Forced labor and the unlawful recruitment and use of children in military non-combatant roles are criminal offenses under the 2005 Anti-Trafficking in Persons Law, the 2012 Wards and Village Tracts Administration Act, Section 374 of the Penal Code, and the Child Rights Law. The deposed civilian government drafted legislation in 2019 to replace the 2005 anti-trafficking law to criminalize all forms of trafficking in accordance with international law and expand law enforcement mandates for certain interagency stakeholders; however, the regime made no attempt to finalize the draft legislation during the reporting period. The military cited provisions in military law to punish individuals who used or recruited children for forced labor in non-combat roles; punishments included demotions, pension reductions, and geographic reassignments, which were disproportionately low compared to the seriousness of the crime. The military did not adequately enforce its own command orders related to forced labor of civilians or child soldiers.

The regime did not report comprehensive law enforcement data. In 2021, ATIPD investigated 12 cases involving 39 alleged traffickers: Three cases involved forced marriage with indicators of sex or labor trafficking; two cases involved labor trafficking; three cases involved sex trafficking; and one case involved other forms of exploitation. The MOLA did not report or verify the prosecution status of cases investigated in 2021. The regime reported it convicted 158 individuals with sentences ranging from three to 20 years' imprisonment, but the regime did not disaggregate this data, and it included cases initiated in prior reporting periods. In comparison, in 2020, the civilian government initiated 93 trafficking investigations, 96 prosecutions involving 297 suspects, obtained 201 convictions, and acquitted 22 perpetrators. Unlike in 2020 under the civilian government, the regime did not report if it prosecuted brokers for crimes involving illegal recruitment practices under the Overseas Employment Act. The regime reportedly cooperated—in limited ways—with the People's Republic of China (PRC) and Thai government law enforcement agencies along their shared borders with Burma. The regime did not report conducting anti-trafficking trainings for its overseas representatives.

Prominent human rights organizations, the UN, and the pro-democracy National Unity Government (NUG) documented human rights abuses committed by the regime throughout the reporting period, including regime-condoned forced labor. Throughout the reporting period, media and other local sources reported cases of the military forcibly using adults and children in roles such as portering, cooking, farming, construction, and human shields. Additionally, international observers reported the military continued to use children in combat roles in some instances. In April and May 2021, regime-controlled media published photos showing regime security forces forcing adults and children at gunpoint to clear barricades, sandbags, and other debris from urban streets. Local media also reported in December 2021 that the military forced children of military members—some as young as 12 years old—to participate in mandatory military training, including weapons training. As in the previous reporting period under the civilian government, the regime also did not report punitive measures for military personnel who subjected adults to forced labor nor did it prosecute civilians involved in the recruitment of child soldiers. Although there were several credible allegations of sex and labor trafficking committed by complicit officials within the civilian government during the previous reporting period, the regime did not report if it continued to address these allegations.

## PROTECTION

The regime decreased victim identification and protection efforts in comparison to the deposed civilian government. Regime law enforcement authorities did not report if they screened for trafficking among vulnerable populations, including Rohingya, persons in commercial sex, and internally displaced persons (IDPs) despite the displacement of more than 525,000 as of March 2022. Furthermore, regime efforts to screen for trafficking among returning migrant workers was inconsistent and insufficient. The regime did not implement or utilize the National SOPs on the Return, Reintegration, and Rehabilitation of Victims of Trafficking, which were formally adopted during the previous reporting period under the civilian government. Nevertheless, the regime reportedly identified 15 sex trafficking victims, four labor trafficking victims, and one victim of other forms of exploitation. The regime, however, did not report referring or providing protection services to any of the identified victims. In comparison, during the previous reporting period, the police under the civilian government identified 118 trafficking victims.

Regime authorities likely arrested and detained trafficking victims for unlawful acts traffickers compelled them to commit. The regime arbitrarily arrested and detained more than 1,000 children, some of whom may have been trafficking victims or child soldiers; most of these children did not have access to a lawyer, and some experienced mistreatment or abuse in detention. The regime reversed the deposed civilian government's policy not to charge Rohingya with immigration violations; the regime also issued a directive for authorities to resume detention and legal actions against the Rohingya, including imprisonment of up to two years with hard labor, on immigration-related charges. Under this directive, the regime charged hundreds of Rohingya with such charges during the reporting period.

Unlike the deposed civilian government in the previous reporting period, the regime did not provide essential services to domestic or foreign

trafficking victims nor support civil society organizations that provided such services. Many international NGOs and civil society organizations were persecuted by the regime or could not partner with the regime, causing many programs—including provision of care for trafficking victims—to cease or experience severe resource shortages. Furthermore, after the coup, the regime threatened legal aid networks and detained lawyers who provided *Pro bono* assistance to human rights defenders and other clients—including potential trafficking victims—which forced some networks to shut down. Services for trafficking victims remained limited, including shelters and specialized services such as psychosocial counseling. Shelters operated by the Ministry of Social Welfare, Relief, and Resettlement (MSWRR) experienced staffing gaps, including lack of case managers and experienced social workers, which negatively impacted the care trafficking victims received at the shelters; some shelters closed because of expanding conflict and the pandemic. The MSWRR did not report providing direct assistance to trafficking victims, whereas during the previous reporting period it provided assistance to 331 victims. The government-maintained labor attachés in Malaysia, Republic of Korea, and Thailand whose responsibilities included assisting trafficking victims abroad. The regime did not institute measures to protect children from being used by the military in combat roles nor did it protect children and adults from being recruited and used for forced labor by military and civilian brokers and recruiters. The Central Body for Suppression of Trafficking in Persons (CBTIP)—the anti-trafficking interagency coordinating body—continued to be in charge of the Central Fund for Trafficking Victim Support to coordinate disbursement of funds for victim assistance, but it did not report how much it disbursed. The CBTIP reportedly provided approximately $5,620 to 10 trafficking victims in fiscal year 2021 (October 1, 2020-September 30, 2021), but it did not provide the details of the assistance provided. The regime did not report if the justice sector supported victim participation in the investigation and prosecution of alleged traffickers. The regime did not report if it continued to implement a court program, which was initiated in 2019, that allowed video testimony for victims. The regime—like the civilian government in the previous reporting period—did not provide legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution, nor did it provide temporary legal status to any foreign victims.

## PREVENTION

The regime decreased efforts to prevent trafficking in comparison to the civilian government. The CBTIP was largely ineffective in its anti-trafficking efforts; it did not report the number of times it met during the reporting period. The regime did not report if it implemented or provided funding for the 2017-2021 national plan of action to combat human trafficking; the plan ended in December 2021, and the regime did not report efforts to develop a new action plan. Overall awareness raising decreased under the regime compared to the previous reporting period. CBTIP reportedly posted 31 anti-trafficking billboards across 17 townships and published articles and other anti-trafficking messages in regime-controlled media. In comparison, the civilian government organized 417 awareness raising campaigns during the previous reporting period. The regime hosted the ninth annual Anti-Trafficking in Persons Day in September 2021, during which the minister for home affairs delivered public remarks. The ATIPD continued to operate nine anti-trafficking hotlines, but it did not report if calls to the hotline resulted in the identification of any victims or criminal investigations; civil society organizations reported in December 2021 that the hotlines did not function in practice. In comparison, during the previous reporting period under the civilian government, ATIPD received 1,326 calls through its hotlines, which led to one trafficking investigation. The national forced labor complaints mechanism, which went into effect in February 2020, did not function during the reporting period, and the regime stopped publishing data about complaints received through its public website. The regime did not take steps to reduce the demand for commercial sex acts or child sex tourism. It did not provide anti-trafficking training for diplomats and labor attaches.

The regime did not take efforts to prohibit or prevent the forcible use of children and adults in non-combat roles, such as portering, cooking, camp maintenance, and farming, nor did it enforce a 2014 directive prohibiting the use of children by the military. The regime ceased all cooperation and coordination with the UN to implement the UN joint action plan on the recruitment and use of children. The regime did not report on any substantive efforts to implement the deposed civilian government's National Action Plan for 2020-2021 on the prevention of death, injury, and sexual harassment of children in armed conflict. Although the deposed civilian government granted formal permission to the UN to enter into child soldier demobilization agreements with EAOs, there was little progress on implementation of a joint action plan between the UN and the EAO, the Democratic Karen Benevolent Army, in 2021.

According to the 2014 census, approximately one quarter of Burma's residents lacked access to citizenship or identity documents, significantly increasing their vulnerability to traffickers in Burma and in other countries. The regime, however, did not provide identity documents or accelerate citizenship verification processes for undocumented Rohingya—as the civilian government did during the previous reporting period—thus exacerbating their vulnerabilities to trafficking. Regime policies limiting freedom of movement in some jurisdictions continued to hinder access to employment and education for some communities, especially in IDP camps housing Rohingya and other ethnic minority groups, further aggravating economic conditions that may have contributed to individuals pursuing irregular migration and employment channels known to engender forced labor and sex trafficking. Unlike in the previous reporting period, the regime did not investigate cases involving brokers or labor recruiters suspected of illegal recruitment practices under the Overseas Employment Act. The regime outlawed most major labor unions, persecuted labor activists, and took steps to undermine the tripartite labor mechanism. The regime maintained a memorandum of understanding (MOU) with Thailand to facilitate labor recruitment into the Thai fishing sector through a formalized, government-to-government hiring process. However, official overseas recruitment agencies suspended operations due to the pandemic. Nevertheless, most vessel owners continued to staff their crews through unregulated and unlicensed Thai and Burmese intermediaries charging high recruitment fees that continued to place Burmese fishermen at risk of debt-based coercion into forced labor. The regime did not prohibit worker-paid recruitment fees, which created vulnerabilities to trafficking among migrant workers. Moreover, the regime's process to issue work certificates to Thai migrant workers required workers to pay exorbitant fees to brokers and regime representatives to renew their certificates; corruption was reportedly rampant within the program.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers subject adults and children to forced labor and women and children to sex trafficking, both in Burma and abroad. Since 2020, the pandemic continues to cause thousands of economic migrants to return to Burma from abroad, while traditional cross-border migration to Thailand and the PRC decreased because of travel restrictions and border closures, which limited irregular migration. Additionally, the economic devastation and sharply deteriorating political stability caused by the coup created new patterns of economic migration in the country, displaced hundreds of thousands of people, and increased financial hardship for a wide swath of the country, which created increasing vulnerabilities to trafficking. As of June 2021, more than 114,000 internal migrant workers left Yangon because of the conflict and loss of livelihood and returned to Rakhine State and the Ayeyarwady region. Conflict in Chin, Kayah, and Karen States led civilians to flee to Thailand and India, where they risk exploitation. Burmese economic migrants, including Rohingya, continue to migrate to Thailand and other parts of southeast Asia via irregular channels; these migrants are vulnerable to trafficking because of their irregular or illegal immigration status. Civil society partners reported in 2021 an estimated 500 Vietnamese women in commercial sex in Wa State Special Administrative Region, an area with minimal regime control; some of these women reported indicators of sex trafficking. Similar media reports involving Thai and Malaysian women continue to surface related to the Shwe Ko Ko casino on the Burmese border with Thailand.

Years of violence and ethnic conflict in Rakhine State continues to drive out migration of Rohingya, many of whom are at high risk of sex and labor trafficking—especially via transport to other countries for economic migration. Children in Kachin and northern Shan States are particularly vulnerable to sex traffickers operating near the PRC border. In Kachin, displaced women and girls are also vulnerable to sex and labor trafficking, including forced concubinism—leading to forced childbearing—via forced or fraudulent marriages to PRC nationa men arranged by deceptive or coercive brokers who use fraudulent offers of employment or promises

of a better life. Traffickers recruit victims through in-person connections, digital platforms, and—increasingly, due to the pandemic—social media. An academic study from 2019 found that 2,800 out of 5,000 Kachin and Shan women returning to Burma after experiencing forced marriage in the PRC had been subjected to forced childbearing. Migrant smuggling and human trafficking networks reportedly target girls living in Rakhine IDP camps and subject them to forced labor and sex trafficking in Malaysia. Absent oversight and enforcement measures in non-government-controlled areas, often in border zones, women and girls from these border regions and elsewhere in Southeast Asia may be vulnerable to sex trafficking in casinos and Special Economic Zones owned or operated by EAOs and PRC and Thai companies. Criminals in EAO-controlled areas reportedly force children, especially boys, to serve as drug mules in Shan, Kachin, and Karen States.

Military personnel, civilian brokers, informal civilian intermediaries, military-backed militias, border guard forces, and EAOs continue to unlawfully recruit or use child soldiers, particularly children from ethnic minority groups. International observers reported in 2021 that the military continues to use children in support roles; the formal recruitment and use of children for combat roles remains low. Civilian recruiters in some cases coerce or offer incentives to children or their families through false promises about working conditions, salary, and promotion opportunities. EAOs force men and boys to serve through intimidation, coercion, threats, arbitrary taxation, and violence. Some EAOs abduct or recruit children, including from IDP camps, to fight against the military. The military has employed the same tactics in the past, although most children identified in military service initially enter under the auspices of civilian brokers or enlist at the behest of their own families. The military, informal civilian brokers, and some EAOs also use deception and various forms of coercion, including threats of financial and physical harm, to compel adult victims into short-term forced labor. Under the auspices of the legacy counter-insurgency strategy of "self-reliance," some military authorities in areas with active conflict subject members of local populations—mostly men, but also women and children—to forced labor in portering, construction, cleaning, cooking, and public infrastructure projects. Since the February 2021 coup, similar tactics have been used across the country, including in majority Bamar regions.

Traffickers subject Burmese males transiting Thailand en route to Indonesia and Malaysia to forced labor, primarily in fishing and other labor-intensive industries. Recruitment agencies in Burma and other Southeast Asian countries lure fishermen with promises of high wages, and then charge fees, and curtailment deposits to assign them fake identity and labor permit documents while sending them to fish long hours in remote waters on vessels operating under complex multinational flagging and ownership arrangements. Senior crew aboard vessels in the Thai and Taiwanese fishing fleets subject some Burmese men to forced labor through debt-based coercion, passport confiscation, contract switching, wage garnishing and withholding, threats of physical or financial harm, or fraudulent recruitment; they also subject some to physical abuse and force them to remain aboard vessels in international waters for years at a time without coming ashore. Informal brokers also lure Burmese men onto offshore fishing and shrimping rafts in Burmese waters, where traffickers confine and physically abuse them to retain their labor for months at a time. There are some reports of boys subjected to forced labor in Burma's fishing industry as well. Companies operating under the auspices of the Japanese government's "Technical Intern Training Program" have exploited Burmese nationals in forced labor in food processing, manufacturing, construction, and fishing.

Traffickers subject members of Burma's vulnerable populations to sex trafficking and forced labor in seasonal strawberry and longan harvesting, year-round orange farming, manufacturing in registered and unregistered factories, and construction of roads and city government facilities across the border in northwestern Thailand. Traffickers use deceptive recruitment tactics and immigration status-based coercion to subject migrant workers from Shan State to forced labor on sugarcane plantations in the PRC's Yunnan Province. Illegal logging operations near the PRC border may subject local communities to forced labor. Local traffickers use deceptive tactics to recruit men and boys into forced labor on oil palm and rubber plantations; in bamboo, teak, and rice harvesting; and in riparian fishing. IDPs from the Sagaing, Bago, Irrawaddy, Mandalay, and Tanintharyi regions, as well as from Shan and Rakhine States, experience contract discrepancies,

wage garnishing and withholding, forced and arbitrary cost-sharing of pesticides, penalty fees, coerced overtime, identity document retention, and restricted freedom of movement on banana plantations in Kachin State. Communities displaced by environmental degradation resulting from the establishment and operation of these plantations, which are often PRC-owned, are also vulnerable to trafficking, including on lands they previously occupied and through internal economic migration to other parts of the country. In Kachin State, adults and children are also at risk of forced labor in jade prospecting throughout refuse areas created by larger mining operations, as well as in road and dam construction. A majority of these prospectors are reportedly addicted to opiates or methamphetamines, which some traffickers—including members of EAOs and government-supported militias—may intentionally facilitate and exploit to retain their labor. Crime syndicates subject women and girls to sex trafficking in massage parlors located in close proximity to these refuse mining areas, often in partnership with local government and law enforcement officials. Forced eviction from new mining sites and resulting economic hardships make some communities in Kachin, Shan, and Karen States more vulnerable to trafficking. The government operates as many as 47 prisons and 48 labor camps called "agriculture and livestock breeding career training centers" and "manufacturing centers," respectively. The labor camps house thousands of inmates across the country, likely including some political prisoners. Eighteen of these camps feature government-managed mining operations. According to previous limited reporting, authorities at times may subject these incarcerated populations to unlawful prison labor or conditions with indicators of forced labor for private gain.

Traffickers subject children to sex trafficking or to forced labor, at times through debt-based coercion, in teashops, small businesses, the agricultural and construction sectors, in domestic work, and in begging. A small number of foreign child sex tourists exploit Burmese children. Discriminatory enforcement of laws places some LGBTQI+ individuals at higher risk of extortion and psychological coercion by law enforcement. Discriminatory hiring practices complicate access to formal sector employment for LGBTQI+ individuals and persons diagnosed with HIV/AIDS, forcing some to seek opportunities in unregulated sectors known for trafficking vulnerabilities—particularly among transgender persons in commercial sex.

## BURUNDI: TIER 2

The Government of Burundi does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Burundi was upgraded to Tier 2. These efforts included increased investigations, prosecutions, and convictions of trafficking crimes, including investigating, and arresting allegedly complicit officials. The government established the new Consultation and Monitoring Commission on Prevention and Repression of Trafficking in Persons (National Commission on Trafficking) to lead the government's anti-trafficking efforts. It identified more trafficking victims among Burundian migrants abroad compared to the previous year and supported their repatriation, and it referred all identified victims to care. The government finalized and began to implement interim standard operating procedures (SOPs) to systematically identify and refer trafficking victims to appropriate care. It continued to operate a dedicated trafficking hotline, which led to the identification of potential trafficking cases. The government also took steps to increase protections for Burundian migrants abroad, including by establishing bilateral agreements with the Kingdom of Saudi Arabia (KSA). However, the government did not meet the minimum standards in several key areas. The government did not identify any trafficking victims in Burundi and largely relied on international and non-governmental partners to provide victim assistance. It did not develop a new national action plan (NAP). A lack of officials' awareness on the trafficking law and the difference between migrant smuggling and human trafficking continued to impede successful investigation and prosecution of trafficking crimes.

BURUNDI



BURUNDI TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Proactively identify trafficking victims by screening for trafficking indicators among vulnerable populations. • Continue increasing efforts to investigate, prosecute, and convict traffickers, including officials complicit in trafficking crimes. • Finalize and implement SOPs on victim identification and referral to care and train officials on the new procedures. • In partnership with NGOs, expand protective services for victims, including by allocating resources and providing separate shelters for children and adults. • Increase training for law enforcement and judicial officials on the trafficking law and investigating and prosecuting trafficking cases, and ensure trafficking cases are distinguished from migrant smuggling. • Develop a national-level data collection system on victim identification, protection, and referral efforts. • Develop and implement strong regulations and oversight of labor recruitment companies that are consistently enforced, including eliminating recruitment fees charged to migrant workers, and holding fraudulent labor recruiters criminally accountable. • Draft, finalize, and implement a NAP to combat trafficking. • Digitalize the Judicial Police record keeping system to better manage and follow up on trafficking cases.

## PROSECUTION

The government increased law enforcement efforts. Burundi's 2014 Counter-Trafficking Law criminalized sex trafficking and labor trafficking. The law prescribed penalties of five to 10 years' imprisonment and a fine of 100,000 to 500,000 Burundian francs ($50 to $250), and in cases involving children, the law prescribed penalties of 10 to 15 years' imprisonment and a fine of 500,000 to 2 million Burundian francs ($250 to $1,010). These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

The government investigated 92 new cases during the reporting period (72 for forced labor, eight for sex trafficking, and 12 involving unspecified exploitation), compared with 32 cases in 2020 and eight cases in 2019, and continued three investigations initiated in the previous reporting period. The government initiated prosecution of 42 new cases during the reporting period, compared with 28 cases in 2020 and 11 cases in 2019, and continued five prosecutions initiated in the previous reporting period. The government convicted nine traffickers during the reporting period compared with three in 2020. The government reported four traffickers were sentenced to seven years in prison and a fine of 200,000 Burundian francs ($100) and damages of 300,000 francs ($150), three traffickers were sentenced to five years in prison, and two traffickers were sentenced to two years' imprisonment on child trafficking charges. Law enforcement reported collaborating with foreign officials in Saudi Arabia, Tanzania, and Uganda on trafficking cases. The government collaborated with Tanzanian officials in support of a prosecution of two alleged traffickers involving two Burundian boys; the government provided accommodation and witness protection for the victims to remain in Tanzania and participate in the judicial proceedings before being repatriated. The government sent diplomatic notes to the Ugandan, Tanzanian, Rwandan, and Kenyan governments to increase screening for trafficking among Burundian migrants traveling to Gulf countries in April 2021.

The government increased criminal investigations, prosecutions, and convictions of officials complicit in trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns during the reporting period. The government reported taking disciplinary actions against five police officials suspected of providing travel documents to potential trafficking victims in June 2021. Observers reported the government charged the five officers with crimes related to trafficking and received 15 days' suspension and disciplinary transfers, although they remained free on conditional release while the investigations

remained pending. In February 2021, the government collaborated with the Kenyan government to investigate and extradite a Burundian diplomatic official accused of trafficking 89 Burundians. The government reported it dismissed, arrested, and detained the official in prison until May 2021, when conditional release was granted while awaiting trial; the case remained pending at the end of the reporting period. Observers alleged trafficking networks included officials handling passport and travel documents at the Commissary General of Migration, a division of the Ministry of Interior.

The government maintained a data collection system on law enforcement efforts to combat human trafficking, which included information compiled from courts, magistrates, and prosecutors from all 18 provinces. However, the government's capacity to update and analyze the data was limited, and observers reported additional resources and training were needed for the data collection system to be fully effective. The government reported the Ministry of Justice had 58 anti-trafficking coordinators located throughout the country to oversee communication between government agencies and coordinate law enforcement procedures on trafficking cases. The government trained 280 police officers from the Judicial Police on topics such as trafficking victim identification and investigation procedures for human trafficking cases. The government provided anti-trafficking training to government officials in partnership with an international organization, including 191 judges, 14 diplomatic staff, 34 newly nominated Burundian diplomats, and 250 police officers. The government continued to distribute the 2014 anti-trafficking law (translated into Kirundi) to law enforcement, magistrates, and judicial officials in all provinces.

Although the government increased training for law enforcement and immigration officials during the reporting period, government officials reported a lack of awareness on the trafficking law, as well as a lack of understanding on the difference between migrant smuggling and human trafficking, which impeded successful investigation and prosecution of trafficking crimes. Authorities appeared to dismiss trafficking cases on the grounds that parents of victims permitted their children to be recruited for work inside and outside the country; law enforcement often failed to recognize trafficking indicators in these instances, creating obstacles for successful convictions. Observers reported many arrests were not elevated to prosecution because of insufficient evidence, corruption, and interference of high-ranking officials. The government reported the pandemic continued to hinder law enforcement's ability to collect evidence, including victim testimony, during trafficking investigations due to limitations on in-person meetings. The government also reported limited capacity to shift meetings online due to low internet access and internet disruptions throughout the country. Additionally, the government reported that existing language barriers made participation difficult in some online trainings.

## PROTECTION

The government made mixed protection efforts. The government identified 194 human trafficking victims, all Burundi nationals identified abroad, which included 193 forced labor victims and one sex trafficking victim, compared with 174 victims, including 45 identified abroad and 129 identified in Burundi in 2021. The government did not report identifying any victims in Burundi, which was a significant decrease from those identified in the previous reporting period. The government collaborated with foreign governments to repatriate all 194 victims, including 130 from Saudi Arabia and the remains of a victim who reportedly died from mistreatment in Saudi Arabia. The government provided consular and legal assistance to these victims, including providing travel documents and facilitating their return and reintegration into their home communities. International organizations identified 1,380 potential trafficking victims during the reporting period compared with 428 in 2021. The government reported all identified victims were referred to government and NGO-run shelters for care and assistance, compared with 174 victims referred in the previous reporting period. The government continued to draft formal SOPs for victim identification and referral to care; however, in collaboration with local and international partners, the government developed interim procedures and began implementation during the reporting period.

The government provided comprehensive care services, in collaboration with international organizations and NGOs, for identified trafficking

Haiti AR_000631

victims, including temporary shelter, medical and psychosocial care, legal assistance, and education and training to victims at five centers located in Bujumbura, Muyinga, Rumonge, Gitega, and Cibitoke provinces. In addition to these five centers, the government used other centers, including IDP sites, as temporary shelters for trafficking victims repatriated from abroad. In partnership with an international organization, the government provided tailored assistance to trafficking victims ranging from immediate and basic needs to reintegration through income generating activities. Access to services were largely limited to only these five centers requiring victims to travel to the provinces where the centers are located. To offset travel expenses to the centers, the government and its partners provided financial assistance to victims. The government reported offering the option for victims to remain in shelters to ensure their security for especially sensitive cases. The government did not provide separate shelters for children and adults. The government did not operate any shelters specifically dedicated to trafficking victims; however, the government continued to operate Humura Center in Gitega, which offered protection services to foreign and domestic victims of sexual abuse, gender-based violence, and trafficking. The government collaborated with NGOs to offer temporary and long-term shelter, medical care, financial assistance, training for income-generating activities, legal assistance, family reunification, community and school reintegration, and guidance on engaging with law enforcement. An NGO-run center in Bujumbura offered medical and psycho-social assistance as well as legal assistance to victims of various abuses, including human trafficking. There were four additional NGO-run shelters that trafficking victims could utilize; all NGOs operated with little to no funding from the government.

The government reported victims were not required to participate in law enforcement investigations to access protection services and the government took steps to ensure victims' identities were held confidential during the subsequent investigation process. The government reported police and local administrators escorted victims to their respective families and provided protection on the way. In addition, the delegation provided advice to families on how to take care of the victims and mitigate potential discrimination or stigma from their communities. The government reported victims were presented with alternatives to speaking with law enforcement during investigations. The government offered limited funds to some NGOs for victims' assistance.

The 2016 law for the protection of witnesses, victims, and the vulnerable outlined provisions for the protection of witnesses and victims; the government reported providing witness protection support to 194 victims during the reporting period, compared with 123 witnesses during the previous reporting period. Labor laws continued to lack sufficient protection for domestic workers or employees in the informal economy, leaving the population vulnerable to trafficking. Burundian law allowed prosecutors to request restitution in trafficking cases. The government reported one case where restitution of an undisclosed amount was ordered; however, the government did not report if the victim received any amount of restitution by the end of the reporting period. Due to a lack of formal identification procedures, authorities may have detained some unidentified trafficking victims related to criminal acts traffickers compelled them to commit. The law provided foreign trafficking victims with legal alternatives to their removal to countries where they may face hardship or retribution, subject to judicial decision, and allowed the government to grant temporary residency. The government did not report identifying any foreign victims who could benefit from this protection during the reporting period.

## PREVENTION

The government maintained prevention efforts. The government's inter-ministerial anti-trafficking committee led anti-trafficking policy coordination and collaboration with civil society; however, its ability to drive national anti-trafficking efforts continued to be limited by resource constraints. In January 2022, the government established the National Commission on Trafficking, mandated by the 2014 Anti-Trafficking Act, and it assumed leadership over the government's anti-trafficking efforts and began convening regularly. The government continued to implement its 2019-2020 NAP through the end of the reporting period, despite its expiration in October 2020. The government reported its efforts to develop a national-level data collection system on victim identification, protection, and referral efforts were hampered by lack of funding and training.

The government continued its partnership with an international organization to implement a three-year national anti-trafficking program. The Ministry of Interior, Community Development, and Public Security conducted anti-trafficking awareness activities for local administrators. The government, in partnership with an international organization, conducted awareness campaigns in the Makamba, Rumonge, and Muyinga regions, where the majority of trafficking victims originate. The inter-ministerial anti-trafficking committee operated a dedicated hotline for human trafficking victims, which identified 33 cases involving potential victims abroad. Law enforcement operated a 24-hour hotline for potential victims of crime, including victims of human trafficking, though the government did not report whether the hotline received any calls related to suspected trafficking cases. Additionally, the government operated a hotline for victims of human rights violations, including trafficking in persons. Hotlines accommodated Kirundi, French, and Kiswahili speakers and the government advertised the toll-free numbers via media outlets, billboards, and during government workshops and training sessions.

The government, for the first time, passed a comprehensive law on immigration in November 2021, which will regulate immigration and emigration matters, including by providing protections for vulnerable migrant populations and defining government agencies' various responsibilities. In January 2021, the Ministry of Labor suspended all labor recruitment agencies in an effort to protect citizens from traffickers, which remained in effect at the end of the reporting period; however, such an approach may have increased vulnerability to trafficking for intending migrant workers by eliminating formal recruitment channels. The government did not have effective policies or laws regulating labor recruiters. Observers noted the government's ability to regulate labor recruitment companies and ensure they are not engaging in trafficking remained a significant concern. In December 2020, the Council of Ministers announced recommendations to prosecute labor recruitment agencies complicit in human trafficking; the government did not report prosecuting such agencies. The government participated in discussions with the Kingdom of Saudi Arabia to establish bilateral agreements to enhance protections for migrant workers; in October 2021, the government signed two bilateral agreements with the KSA. The government reported it began discussions with Qatar, and the United Arab Emirates (UAE) to establish similar bilateral agreements on migrant worker protections. The government increased border security and surveillance to identify and deter traffickers who cross via unofficial border crossings. The government increased efforts to reduce the demand for commercial sex acts by increasing inspections and control of documents for adults traveling with children. Additionally, the government reported that it continued to apply the 2020 law on social protection in its domestic and global supply chains, including insurance and social security provisions. The government provided anti-trafficking training to its diplomatic staff, and 34 diplomats and other staff members of Burundi's embassies. The government provided anti-trafficking training to its troops prior to their deployment.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Burundi and traffickers exploit Burundian victims abroad. Burundi continued to be a source country for victims who are subjected to forced labor and sex trafficking, both within the country and in destinations in East Africa, particularly Tanzania, Kenya, and Uganda, which can be final destinations or often serve as transit points to Gulf countries such as Saudi Arabia, Oman, the UAE, and Kuwait. Observers reported most traffickers now use land and public transport to leave Burundi and then fly from the neighboring countries to destination countries. As the result of a complex political, economic, and security crisis that began in 2015, by March 2022, more than 259,376 Burundians remained in neighboring countries as refugees, including but not limited to Tanzania, Uganda, Rwanda, and the Democratic Republic of the Congo (DRC). Throughout 2021, an international organization continued the voluntary returns and repatriation of more than 60,000 Burundian refugees, some of whom returned without formal assistance, increasing their vulnerabilities to trafficking. Returning refugees are generally required to live within camps until reintegration into their communities and have limited access to education and livelihood opportunities. An international organization reported some refugees spontaneously return to Burundi

**CABO VERDE**

without formal assistance and without adequate identity documentation, which significantly increases their vulnerability to trafficking. IDPs and returning refugees, particularly single mothers and widows, frequently lack access to basic services, food, money, and permanent accommodation, which increases their vulnerability to trafficking. Observers reported returning refugees have insufficient assistance upon arrival and most do not have families to support them or homes to return to, which increases vulnerability to exploitation.

In April 2020, Burundi experienced severe flooding that displaced more than 35,000 people; many were placed in IDP camps and did not have access to income-generating activities, increasing their vulnerability to traffickers. Observers reported traffickers increased activity due to the government's attention on the natural disaster. Observers reported an increase in fraudulent offers to work abroad. International organizations reported the pandemic-related closure of land, water, and air borders restricted trade and seasonal migration for Burundians and refugees alike, limiting economic growth and increasing their vulnerability to traffickers. Observers reported young boys and girls found work as peddlers, domestic workers, wait-staff, or construction laborers and were forced to work excessive hours, denied payment, and were sexually and physically abused. Government and NGOs reported sexual exploitation of young girls from refugee and IDP camps is common as men from host communities promise gifts, pocket money, and tuition funds in exchange for sex.

Burundi's challenging security environment, endemic poverty, and low education levels create an opportunity for criminals, including traffickers, to take advantage of Burundians in precarious or desperate situations. Due to regional instability, observers sporadically report recruitment of children as young as 15 years old by armed groups who force them to participate in anti-government activities. In 2018 and 2020, an international organization reported separating four and 10 Burundian children, respectively, from armed groups in the DRC; the international organization reported children received assistance and were repatriated.

The government and an international organization reported traffickers have changed their transportation methods, due to increased vigilance at Bujumbura's international airport. Observers noted traffickers now opted for transportation by land, usually by buses that serve the region, and then fly from neighboring countries. Additionally, the government reported traffickers are increasingly using unofficial border crossings to transit to neighboring countries. Both economic necessity and coercion push children and young adults into labor, including domestic service, forced labor on plantations or small farms throughout Burundi, in gold mines in several provinces around the country, in informal commerce in the streets of larger cities, charcoal production, manufacturing, construction, cattle herding, street vending, begging, and in the fishing industry. Traffickers operate as networks to provide successful transnational coordination and include victims' relatives, neighbors, and friends, who recruit them under false pretenses to exploit them in forced labor and sex trafficking. Traffickers increased recruitment of Burundians working in Tanzania and the DRC. Traffickers recruited victims from their hometowns and were paid commissions upon successful recruitment; recruiters often were Burundians, but handlers, guides, and receiving personnel have been foreigners. Some families are complicit in the exploitation of children and adults with disabilities, accepting payment from traffickers who run forced street begging operations. The government reported orphans are particularly at risk of trafficking for forced labor in Burundi and in neighboring countries such as Tanzania, Kenya, and Uganda. International organizations report cases of parents lying about their children's age to meet minimum age employment laws or to receive compensation for offering their children for forced labor. Traffickers fraudulently recruit children from rural areas and those separated from or unaccompanied by parents for forced labor in domestic service and sex trafficking in private homes, guesthouses, and entertainment establishments; the children frequently experience non-payment of wages and verbal and physical abuse. Observers report traffickers recruit Burundian refugees in Rwanda, Uganda, and the DRC for sexual exploitation and forced labor. NGOs report that fishermen exploit some boys in the Lake Tanganyika fisheries in forced labor and some girls and young women in domestic servitude and sex trafficking in restaurants and bars around the lake. Traffickers exploit Burundian adults and children in forced labor in agricultural work, particularly in Tanzania. NGOs reported a significant number of children

disappearing in border provinces suggesting traffickers recruited children to forced labor in cattle herding in Tanzania. NGOs reported recruiters from neighboring countries frequently visit border towns in search of Burundian child workers. Observers alleged male tourists from East Africa and the Middle East, as well as Burundian government employees, including teachers, police officers, military, and prison officials, are complicit in child sex trafficking.

International organizations report the Batwa minority, Burundians living in border provinces, and women—specifically young and Muslim women—are particularly vulnerable to forced labor and sex trafficking. Traffickers fraudulently recruit young women from poverty-stricken rural communities, particularly border provinces such as Cankuzo, Cibitoke, Kayanza, Kirundo, and Muyinga, for work in the Middle East, Tanzania, or Kenya as domestic servants, and victims may be subjected to abusive labor conditions and physical and sexual abuse. Traffickers fraudulently recruit some young adult Burundian women for jobs, but instead subject them to forced labor and sex trafficking in the People's Republic of China, Kenya, Kuwait, Saudi Arabia, Oman, Qatar, and Yemen. Observers report victims transit through Kenya and Tanzania for short-term stays before reaching their final destination. Observers noted Burundian nationals were trafficking victims in Nigeria. In 2017, Burundian and Kenyan recruitment agencies fraudulently recruited several adult Burundian women, who were identified in Kuwait, for work as domestic workers and receptionists. However, upon arrival, traffickers subjected them to forced labor and confiscated their passports, paid them less than what was agreed, restricted their movement, and forced them to work excessive hours without breaks.

## CABO VERDE: TIER 2

The Government of Cabo Verde does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Cabo Verde remained on Tier 2. These efforts included prosecuting a trafficker for the first time in three years, convicting the same trafficker, and launching standard operating procedures (SOPs) for victim identification and referral to services. The government's Institute for Children and Adolescents (ICCA) identified and referred vulnerable children, including some potential trafficking victims, to care. However, the government did not meet the minimum standards in several key areas. Government agencies charged with combating trafficking continued to lack sufficient resources and training, and overall victim identification and protection efforts remained inadequate. The Observatory for Monitoring and Rapid Identification of Situations of Trafficking in Persons (the Observatory), while intended to lead national efforts, lacked the capacity and mandate to coordinate anti-trafficking activities.



CABO VERDE TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Implement and train law enforcement, labor inspectors, child protection actors, and other officials on the SOPs to proactively identify trafficking victims, including among vulnerable populations, such as children referred to ICCA shelters, child laborers and children experiencing homelessness; individuals in commercial sex; and migrant and overseas workers (including People's Republic of China (PRC), Cuban, and ECOWAS nationals), and refer trafficking victims to care. • Increase efforts to vigorously investigate, prosecute, and convict traffickers using the anti-trafficking provision of the penal code, Article 271-A and

Haiti AR_000633

sentence convicted traffickers to significant prison terms in accordance with the law. • Increase nationwide trafficking data collection on law enforcement and victim identification efforts and develop a system to compile and share data among agencies. • Ensure all trafficking cases are prosecuted through the judicial system without political interference, rather than resolved through non-judicial means. • Train law enforcement and judicial officials on the anti-trafficking provision of the penal code, Article 271-A. • Empower the Observatory to better coordinate the government's anti-trafficking response and increase stakeholders' participation in Observatory activities. • Strengthen international law enforcement cooperation to prevent, investigate, and prosecute cases of child sex tourism. • Increase efforts to raise public awareness of human trafficking, including child sex trafficking and domestic servitude.

## PROSECUTION

The government increased law enforcement efforts. Article 271-A of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of four to 10 years' imprisonment; these penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape.

The government's capacity to collect anti-trafficking statistics and comprehensively report on law enforcement actions was limited. The government initiated one investigation into an alleged forced labor case. The government continued eight investigations from previous reporting periods and closed four others due to insufficient evidence. This compared with initiating one investigation and continuing 11 investigations during the previous reporting period. The government initiated prosecution of and convicted one Cabo Verdean child sex trafficker, compared with zero prosecutions and zero convictions during the previous reporting period. This was the first trafficking prosecution and conviction in three years. The court convicted the trafficker under penal code provisions on "pimping," sentenced her to five years' imprisonment, and ordered her to pay 400,000 escudos ($4,110) in restitution. A case involving three defendants charged in April 2019 with trafficking in persons and employment of undocumented foreign workers on the island of Sal remained pending trial. The government did not report any investigations, prosecutions, or convictions of government employees for complicity in human trafficking crimes. One contact reported a concern that some law enforcement officials failed to fully investigate potential trafficking crimes.

Some law enforcement and justice system officials lacked adequate understanding of trafficking crimes and anti-trafficking laws, and the justice system was overburdened, resulting in weak and inconsistent efforts to identify, investigate, and prosecute trafficking cases. The government made some efforts to train law enforcement on combating human trafficking. The government trained new police officers on trafficking victim identification using a training module previously developed by an international organization. The government also provided anti-trafficking training to border police (DEF) officers. An international organization trained law enforcement and justice officials on cybercrime investigations, which included a component on combating child sex tourism, with some government support. Judicial Police (PJ) presence was limited to the four islands with international airports and the most significant tourism activity, affecting the government's ability to identify trafficking victims, investigate crimes, and collect comprehensive data. Information sharing between agencies remained inadequate, and officials reported additional coordination between the PJ, National Police (PN), and prosecutors was needed. Government social service providers often resolved intra-familial abuse cases, which could include child sex trafficking, through non-judicial means.

## PROTECTION

The government maintained mixed protection efforts. Weak case management and data collection hindered the government's ability to track victim-related statistics, and as in previous years, the government did not provide comprehensive data on the number of trafficking victims it identified and referred to services. The government identified and referred one forced labor victim to an international organization for care, but the victim reportedly declined services. This compared with

identifying and referring one forced labor victim to care during the previous reporting period. The ICCA, which had personnel located on all nine islands, identified and provided assistance to at least 133 vulnerable children, which may have included potential trafficking victims, in 2021, compared with 196 vulnerable children the previous year. ICCA did not report screening victims referred to its shelters for trafficking indicators.

In September 2021, the government finalized and launched SOPs for trafficking victim identification and referral to services in partnership with an international organization and foreign donor. However, the government had not yet fully implemented the newly-adopted procedures or conducted any trainings for officials on the procedures by the end of the reporting period; therefore, victim identification and protection efforts remained limited. DEF officers had written victim identification procedures but did not consistently receive training on them. The Ministry of Justice (MJ), in collaboration with an international organization, previously developed a child protection case management system for protection actors to identify and track child victims of exploitation, including child trafficking; however, it was not operationalized for the second consecutive year.

There were no shelters or services specifically for trafficking victims, but government-funded agencies provided emergency services, shelter, and psycho-social care to at-risk populations and female and child victims of crime, including potential trafficking victims. Law enforcement and first responders could refer child victims to ICCA, victims requiring long-term care to the Public Ministry, adult female victims to the Cabo Verdean Institute for Gender Equality (ICIEG) or NGOs, and foreign victims to the High Authority for Migration (AAI) or an international organization. ICCA operated a national network to assist child victims of crime, including with referral to care and legal support, and operated 15 centers on eight of Cabo Verde's nine inhabited islands that provided care for child victims of sexual abuse, violence, and abandonment, including at least two centers located on both the islands of Santiago and Sao Vicente that provided 24-hour emergency care. The government funded and provided police security to ICCA and ICIEG shelters. AAI opened the first of five planned centers to assist and provide social services to migrants.

Law enforcement had policies to interview sex trafficking victims in collaboration with psychologists and, in cases of child victims, in collaboration with the victims' parents, as appropriate. The government did not report providing these benefits to any victims during the reporting period. Authorities noted it was difficult to provide meaningful protection to victim-witnesses due to the small population and close-knit community. The government continued providing in-kind support to an NGO project seeking to enhance the justice system's capacity to support child victims of sexual abuse, including trafficking. Cabo Verdean law provided legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution; authorities did not report providing these benefits to any victims. The law provided for restitution, and in one case noted above, the court awarded a victim 400,000 escudos ($4,110) in restitution. The government did not report if the restitution was paid by the end of the reporting period. In addition, victims could file civil suits against traffickers, but no victims reportedly did so, in part due to lack of awareness. Due to limited use of formal identification procedures and screening of vulnerable populations, including individuals in commercial sex and migrants, some victims may have remained unidentified within the law enforcement system.

## PREVENTION

The government maintained prevention efforts. The Observatory, led by MJ, coordinated the government's efforts to combat human trafficking and included officials from the PN, PJ, ICCA, ICIEG, Ministry of Family, Inclusion, and Social Development (MFIDS), other government institutions, and civil society organizations. However, it lacked the capacity and resources to effectively lead the government's efforts. The Observatory met twice during the reporting period, compared to meeting once during the previous reporting period. The government had a 2018-2021 anti-trafficking national action plan (NAP) and allocated 7 million escudos ($72,000) for anti-trafficking activities, including the implementation of the NAP, the same amount allocated the previous year. Observers reported the Observatory lacked authority and struggled

CAMBODIA

to ensure all members fully participated in meetings and met their reporting commitments. The government made minimal efforts to raise public awareness of trafficking; however, it conducted some awareness raising campaigns focused on child sexual abuse and exploitation. ICCA continued to support municipal Committees for the Defense of Children's and Adolescents' Rights to prevent child abuse, including child trafficking.

ICCA continued to operate two drop-in centers for vulnerable children through its *Nos Kaza* project, which aimed to reduce the vulnerability of children who were homeless or used the streets as a source of livelihood. ICCA operated a hotline linked to the PN hotline to report cases of violence against children, including trafficking. The government did not report training hotline workers to differentiate trafficking from similar crimes, and officials did not report identifying any trafficking victims as a result of calls to the hotline. The government made some efforts to reduce the demand for commercial sex that equated to child sex trafficking, but it did not make efforts to reduce demand for other forms of commercial sex. The government continued enforcing the Ethics Code of Conduct for Tourism, which included provisions to counter child sex tourism. The Children and Adolescent Committee to Prevent and Combat Sexual Abuse and Exploitation coordinated the government's efforts combating child sexual abuse, including child sex tourism; however, officials reported the committee did not function effectively. The government did not provide anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Cabo Verde, and to a lesser extent, traffickers exploit victims from Cabo Verde abroad. Traffickers exploit boys and girls, some of whom may be foreign nationals, in sex trafficking on Brava, Santiago, Fogo, Sal, Sao Vicente, and Boa Vista, sometimes through child sex tourism. In the past, observers reported tourists perpetrated child sexual abuse on the islands of Sal, Boa Vista, Sao Vicente, Fogo, and Maio. In some cases, parents have encouraged their daughters' exploitation in commercial sex by tourists, especially Cabo-Verdean Americans, as potential marriage could result in immigrant visas to the United States or remittances to support the family. Traffickers have exploited West African women, including Nigerians and Senegalese, in sex trafficking. Traffickers exploit West African women in domestic servitude. On Sao Vicente, traffickers have coerced girls as young as 12 years old in sexual exploitation in exchange for drugs. Cabo Verdean children engaged in begging, domestic work, street vending, car washing, construction, garbage picking, fishing, and agriculture are vulnerable to trafficking; children used in illicit activities, including drug trafficking, are also vulnerable to human trafficking. Children living in impoverished neighborhoods with little state presence are also at risk of trafficking, especially sex trafficking. West African migrants may transit the archipelago en route to exploitive situations in Europe. Cuban overseas workers, including medical professionals, working in Cabo Verde may be forced to work by the Cuban government. Some adult migrants from ECOWAS countries and the PRC receive low wages and work without contracts, rendering them vulnerable to forced labor and sex trafficking. In 2018, alleged labor traffickers exploited four PRC nationals (two girls and two men) in the retail sector; some observers suspect there may be organized syndicates engaging in similar forced labor exploitation in the country. During a previous reporting period, the government investigated a PN officer for complicity in a forced labor case; the government reported investigators found insufficient evidence to bring charges against the officer, and the case was closed. In previous reporting periods, observers reported Nigerian criminal syndicates exploited Cabo Verdean women in sex trafficking in Brazil, and labor traffickers exploited a Cabo Verdean man in Europe.

## CAMBODIA: TIER 3

The Government of Cambodia does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on

its anti-trafficking capacity; therefore Cambodia was downgraded to Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including continuing to arrest, prosecute, and convict traffickers, proactively screening for and identifying victims, and assisting in the repatriation of Cambodian trafficking victims and those vulnerable to trafficking abroad. However, endemic corruption continued to impede overall law enforcement operations, holding traffickers accountable, and victim service provision. Authorities did not investigate or hold criminally accountable any officials involved in the large majority of credible reports of complicity, in particular with unscrupulous business owners who subjected thousands of men, women, and children throughout the country to human trafficking in entertainment establishments, brick kilns, and online scam operations. Therefore, officials also failed to proactively identify trafficking victims among these highly vulnerable populations. The government did not provide adequate protection services for victims domestically or overseas and relied heavily on foreign donors and NGOs to provide much-needed care.



CAMBODIA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Investigate and prosecute trafficking offenses and convict, while respecting due process, and adequately penalize sex and labor traffickers, including complicit officials, with significant prison sentences. • Increase funding to anti-trafficking law enforcement units and disburse it in advance of investigations, rather than by reimbursement. • Fully implement victim identification guidelines and train officials in all areas of the country on its provisions. • Allocate increased resources to anti-human trafficking police to better facilitate the monitoring of defendants released under judicial supervision pending trial. • Increase or start unannounced labor inspections in high-vulnerability professions, especially at brick kilns, entertainment venues, construction sites, and plantations, with a focus on identifying debt bondage and holding business owners accountable to the law. • Increase law enforcement efforts against online scam operations, including allegations of forced labor, and against officials complicit in such operations and associated trafficking crimes. • Increase the availability of services for male victims, especially men and boys exploited in commercial fishing abroad. • Incentivize domestic and foreign victims' participation in criminal and civil proceedings, including by establishing a victim's fund and granting permission to work, temporary residency, or other relevant immigration status to foreign victims wishing to remain in country during proceedings. • Implement a system for monitoring, collecting, and reporting data on anti-trafficking prosecution and victim protection efforts and disseminate data among the relevant government agencies in a manner that protects victims' identities and privacy. • Eliminate recruitment or placement fees charged to workers by Cambodian labor recruiters and ensure they are instead paid by employers. • Increase inspection and oversight of lending institutions, including private micro-finance organizations, to reduce vulnerability to debt-based coercion among economically disadvantaged communities. • Allow restitution upon conviction of the trafficker and establish and train the relevant officials on procedures for calculating and granting restitution. • Establish and allocate resources to implement systematic procedures at diplomatic missions to assist Cambodian victims abroad, including in countries without Cambodian diplomatic representation. • Amend regulations on labor recruitment licensure and contract requirements to include strengthened language on worker protections and labor rights. • Strengthen efforts to inspect private labor recruitment agencies and their sub-licensed brokers for fraudulent recruitment and other trafficking indicators. • Incorporate NGO input into the policy for formally transferring custody of child victims.

Haiti AR_000635

## PROSECUTION

The government maintained law enforcement efforts. The 2008 Law on the Suppression of Human Trafficking and Commercial Sexual Exploitation criminalized sex trafficking and labor trafficking and prescribed penalties of seven to 15 years' imprisonment for offenses involving an adult victim and 15 to 20 years' imprisonment for those involving a child victim; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. NGOs reported that, in practice, the government did not issue criminal penalties under the anti-trafficking law for labor traffickers; instead, it utilized the labor law to issue fines and/or short jail sentences of six days to one month, which did not represent sufficient punishment to deter future crimes or provide justice for victims.

The government did not maintain a centralized record or database of investigations and judicial proceedings, therefore overall law enforcement data was incomplete, precluding the ability to compare investigations, prosecutions, and convictions from previous years. Unlike in the previous reporting period, the police did not report comprehensive data on anti-trafficking investigations conducted in 2021. According to some media reports, authorities arrested 370 suspected traffickers, which included 332 labor brokers, but the government did not report an update on these arrests. In 2021, Ministry of Justice (MOJ) personnel manually collected prosecution and conviction data from each district court throughout the country. Nevertheless, as in the prior reporting period, judicial authorities may have included cases of rape and other crimes outside the standard definition of trafficking in their reported data; therefore, the true number of trafficking prosecutions and convictions was likely lower than reported. In 2021, the government prosecuted 109 suspected traffickers involved in 64 cases under the anti-trafficking law; four of these cases involved sex trafficking, 37 involved forced labor, and 23 involved unspecified forms of exploitation. The government convicted 38 traffickers, including one for sex trafficking and 35 for forced labor. Of these cases, in April 2021, authorities arrested and convicted a two-star military general and six other traffickers for exploiting 28 nationals from the People's Republic of China (PRC); the court sentenced the military general to four years' imprisonment. In comparison to this data, in 2020 the police reported authorities arrested 94 suspects—48 suspects involved in 37 cases of "non-sexual human trafficking" and 46 suspects involved in 21 cases of sex trafficking. The government prosecuted 348 cases of trafficking in 2020, but the government did not disclose the number of individuals prosecuted; it also convicted 440 traffickers. However, some of the cases reported in 2020 likely did not meet the definition of human trafficking under international law and also accounted for cases from prior years.

The pandemic continued to hinder government efforts to prosecute perpetrators and heighten awareness of trafficking among officials. Cambodian courts shut down between April and May 2021, temporarily halting judicial activity including anti-trafficking investigations, and then resumed operations at a reduced capacity for several months afterwards. The government reported it cooperated with the governments of the United States, Thailand, and the PRC on human trafficking investigations; it also maintained memoranda of understanding (MOUs) outlining cross-border anti-trafficking investigations with Thailand and Vietnam, as well as an extradition treaty with the former. The government continued to cooperate with the United States through a law enforcement task force dedicated to combating online child sexual exploitation and other child sex crimes. In 2021, the police arrested four individuals for online child sexual exploitation under the anti-trafficking law after U.S. law enforcement referred nine potential cases.

Nationwide, law enforcement authorities often did not take appropriate action against suspected or convicted traffickers. Judicial police lacked the resources to monitor defendants released on "judicial supervision" pending trial, allowing some to flee prior to their trial dates, which only left courts the option to convict offenders in absentia. Authorities rarely issued arrest warrants for absconded defendants unless NGOs were available to assist in tracking and apprehending them. Further compounding this challenge, Cambodian criminal procedural code featured no guidelines, monitoring provisions, or language outlining specific law enforcement duties with regard to judicial supervision.

Citing resource constraints, prosecutors and investigating judges did not advance all of the trafficking cases for which police had supplied evidence. Local experts continued to report that cases involving foreign suspects were more likely to result in trafficking convictions than cases involving Cambodian suspects, for whom charges were often reduced to less serious offenses. NGOs reported law enforcement did not adequately respond to reports of trafficking allegations in remote or less developed areas of the country due to capacity limitations.

Endemic corruption at many levels of government continued to severely limit the ability of individual officials to make progress in holding traffickers accountable. In some cases, local or provincial authorities neglected cases of complicity, so national authorities intervened to investigate and prosecute such cases. During the reporting period, NGOs reported trafficking victims accused Cambodian officials of colluding with labor brokers to commit human trafficking crimes. NGOs alleged police and other officials were complicit in online scam operations that forced hundreds of PRC, Southeast Asian, and other foreign nationals to work in call centers in Sihanoukville and other locations. Observers alleged prosecutors and judges accepted bribes in return for dismissal of charges, acquittals, and reduced sentencing. Corrupt officials often thwarted progress in cases where the perpetrators were believed to have political, criminal, or economic ties to government officials. Despite consistent credible allegations of complicity in human trafficking crimes, the government did not prosecute or convict the large majority of complicit government employees. Law enforcement raids on sex trafficking establishments were sometimes unsuccessful due to advance warning from working-level police. Some police reportedly protected sex trafficking establishments in exchange for monthly payments from the business owners or sexual favors from the victims. Authorities often overlooked, denied, or downplayed labor abuses—including forced child labor—in factories and at brick kilns and colluded with brick manufacturers to arrest, jail, and return indentured laborers who had attempted to escape.

The government—in collaboration with and funding from NGOs and other donors—provided training to police, prosecutors, judges, and other government officials. These trainings included 256 sessions and workshops on anti-trafficking laws, investigative techniques, and evidence collection for 12,814 law enforcement officers and seven trainings for 286 participants on victim identification and protection guidelines. Despite these trainings, many police—particularly in rural areas—remained unaware of how to conduct anti-trafficking work, as most did not receive training on basic law enforcement techniques. Moreover, law enforcement and judicial officials lacked the necessary equipment to handle trafficking cases appropriately, including vehicles, computer and communications equipment, and forensic tools. Additionally, the government required the funding of all anti-trafficking investigative work to be conducted through reimbursement, forcing individual police units to personally cover relevant expenses. NGO contacts reported some officers waited months for this reimbursement, which was sometimes not repaid in full, and that the ensuing financial hardships made some police units more susceptible to corruption. Local organizations and some officials continued to stress an urgent need for more sophisticated evidence collection techniques—including more undercover investigations—to decrease reliance on witness testimony and improve efforts to detect and combat sex trafficking. MOJ officials reported their concern that revising the law or issuing new regulations to specifically authorize undercover investigation authority in trafficking cases could lead to abuse of power by the police.

## PROTECTION

The government maintained limited victim protection efforts. Despite having victim identification guidelines developed by the Ministry of Social Affairs, Veterans, and Youth Rehabilitation (MOSAVY) in 2017, law enforcement agencies' victim identification, referral, and repatriation efforts remained disparate and underdeveloped. Due to insufficient victim identification efforts, authorities penalized potential foreign victims for unlawful acts traffickers compelled them to commit, such as immigration violations. Nevertheless, the government identified a total of 364 trafficking victims in 2021 after screening for trafficking among 8,370 Cambodian migrants working abroad. In comparison, the government identified 417 victims in 2020. Similar to the previous

reporting period, however, overall victim identification figures may have included victims of crimes that did not meet standard definitions of sex trafficking or forced labor.

MOSAVY continued to operate a migrant transit center in the border city of Poipet where transit center officials—including trained social workers—screened for and identified an unknown number of trafficking victims among adult and child migrants at the center. After transit officials screened migrants for trafficking, they provided an unreported number of victims with reintegration services or referred them to NGO shelters. In December 2021, the government opened a new migrant transit center in Battambang Province, but officials did not report how many trafficking victims they identified or assisted in this center. Government social affairs officials regularly accompanied police during law enforcement activities, such as raids, to provide assistance to identified victims; if they were not present, police were trained to screen for victims before referring them to a social affairs office. Local police sometimes referred victims directly to NGOs, who reported the overall referral process was quick and victims could access NGO-run shelters within hours of being identified. Despite this process, the government continued to implement a regulation barring NGOs from representing individuals seeking formal recognition as trafficking victims. Under this arrangement, victims were required to approach the Ministry of Interior (MOI) for the formal identification needed to access protection services. Some anti-trafficking NGOs reported a lack of cooperation with the authorities, which hindered the operations of key anti-trafficking NGOs.

MOSAVY reported it provided services to 404 Cambodian and foreign trafficking victims, including from the PRC, Thailand, Malaysia, Vietnam, Singapore, and Indonesia. In comparison to 2020, MOSAVY referred 220 Cambodian victims and "other vulnerable migrants" to NGO services. The government could provide trafficking victims with a food allowance, living stipend for three months, job training, and reintegration assistance, but—as in the previous reporting period—MOSAVY relied heavily on financial support from NGOs to cover these services. The government did not have the capacity or resources available to provide adequate protection services, including shelter, to trafficking victims; it therefore continued to rely heavily on donor countries, international organizations, and NGOs to provide or support provision of such services to trafficking victims. MOSAVY maintained guidelines outlining minimum standards for residential care of trafficking victims. MOSAVY also managed long-term care and other assistance for child trafficking victims who could not reintegrate into their communities. The government, however, did not facilitate formal transfer of the custody of child trafficking victims to NGOs, leaving NGOs that accepted child victims into their care vulnerable to court action. Provisions allowing for financial settlements in lieu of harsher sentencing further discouraged some families from consenting to temporary guardianship at shelters; absent family consent, government officials, at times, returned children to high-risk environments, leaving them vulnerable to re-victimization. The government authorized public health facilities to provide free medical services to all migrant workers in Cambodia, including foreign trafficking victims; this policy relieved NGOs of the financial burden of providing medical care to this vulnerable population. Despite the prominence of male labor trafficking victims, government assistance for this population remained limited, including shelters. However, the government continued to cooperate with an NGO to provide services to male victims exploited in the Thai commercial fishing industry. The Ministry of Labor and Vocational Training (MOLVT) also provided vocational training and other programs to identify job opportunities for male trafficking victims from the commercial fishing industry, but it did not report how many victims benefited from these programs. Service provider NGOs noted that an acute lack of reintegration services and cultural stigma surrounding the experience of forced labor at sea catalyzed re-trafficking among fishermen returning home.

The government continued to provide basic care to or assist in the repatriation of Cambodian victims who were exploited abroad but relied on donor organizations to finance the repatriation. Cambodian diplomatic missions overseas also lacked adequate funding and capacity to provide basic assistance to or repatriate victims; some victims were reportedly unable to secure assistance from Cambodian consular services overseas due to unattended hotlines and unresponsive staff. Victims identified in countries without Cambodian diplomatic representation had access to even less support. In Malaysia, Cambodian officials repatriated 376 migrant workers back to Cambodia, 39 of whom officials identified as trafficking victims. The government finalized an agreement with Thailand to establish standard operating procedures (SOPs) on the repatriation and reintegration of Cambodian trafficking victims. In August 2021, the government—in cooperation with Thai authorities—identified and repatriated 21 Cambodian trafficking victims from Thailand; the government referred them for resettlement assistance. From January to September 2021, the Ministry of Interior (MOI) worked with PRC authorities to repatriate more than 300 Cambodian women who were recruited through false promises of work in the PRC and forced into marriages with PRC nationals; many of these women were likely trafficking victims. The Ministry of Foreign Affairs and International Cooperation (MFAIC) facilitated the return of 10,406 undocumented Cambodian migrant workers from the PRC, Indonesia, Laos, Malaysia, Singapore, Thailand, and Vietnam; this compared to 10,574 returned Cambodian migrant workers during the previous reporting period. After MOSAVY conducted preliminary interviews of these returnees, it referred all of them to local NGOs for care and reintegration assistance, but—as in the previous reporting period—it did not report identifying any trafficking victims among them. The number of Cambodian returnees who experienced forced labor and sex trafficking abroad was likely much higher than reported due to insufficient victim identification procedures, as well as an increasing tendency among these groups to return via informal migration channels.

The government did not require trafficking victims to participate in trafficking investigations or prosecutions in order to receive protection services. There were no legal provisions to offer work permits, temporary residency, or other immigration status to foreign victims wishing to remain in Cambodia to participate in civil or criminal proceedings. The government required the repatriation of foreign victims, except in rare cases, and did not provide legal alternatives to their removal regardless of whether they would face hardship or retribution upon return to their countries of origin. While awaiting repatriation, the government generally allowed foreign victims temporary residence at NGO shelters. During the previous reporting period, MOJ instructed provincial courts to implement a child-friendly judicial program allowing for video-conferencing technology as an alternative to direct cross-examination of victims in front of the accused; it did not, however, report if courts universally implemented this program in 2021. As in previous years, Cambodia's weak and corrupt judicial system and the lack of adequate victim and witness protection, exacerbated by a lengthy trial process and fear of retaliation by traffickers, hindered victims' willingness to cooperate in many cases. NGOs reported victims preferred out-of-court settlements over court proceedings as the fastest way to obtain monetary compensation. Cambodian law outlined channels for victim restitution, yet restitution through direct cash payments was commonly used as a method to settle criminal cases. However, restitution was difficult to obtain due to a legal requirement delaying payment until after the completion of a trafficker's jail term; convicted traffickers' frequent absondment further complicated this arrangement. Observers noted Cambodia lacked a standard operating procedure for determining how to calculate restitution or compensation. Victims rarely received the amount promised, and many victims' families settled out of court with traffickers or accepted bribes to drop the relevant charges. Nevertheless, the government cooperated with two NGOs to secure $83,200 in restitution for trafficking victims, including cases of child sexual exploitation, in 2021.

## PREVENTION

The government maintained prevention efforts. The National Committee for Counter Trafficking (NCCT) and its secretariat coordinated anti-trafficking activities, continued to implement a 2019-2023 national anti-trafficking action plan, and initiated a mid-year review of the action plan to evaluate its achievements and remaining challenges. The NCCT produced an annual report documenting the government's holistic anti-trafficking efforts. The NCCT chaired 274 meetings in 2021 with various ministries to elevate the importance of human trafficking within the government; it did not report how many meetings it conducted in

the previous reporting period. The NCCT regularly invited trafficking survivors to attend meetings and workshops in order to improve policies through survivors' experiences and recommendations. The secretariat of the NCCT maintained six working groups to monitor the efforts of the interagency committee, as well as those of its provincial subcommittees. Subsidiary provincial committees to counter trafficking (PCCT), four of which continued to receive modest central government funds, coordinated efforts at the local level to mirror the activities of the NAP. Each PCCT maintained customized provincial-level action plans outlining how to report cases of trafficking to police, victim protection efforts, and prevention activities. The NCCT and various PCCTs—in cooperation with relevant ministries and NGO partners—conducted 156 anti-trafficking trainings for 5,720 government officials in 2021. A Monitoring Working Group (MWG) strengthened the work of the NCCT at the provincial level by meeting with provincial officials and assessing areas of improvement, but it did not report how many times the MWG traveled to the provinces or how many officials it engaged. The Minister of Women's Affairs and the NCCT Vice Chair co-hosted a bilateral meeting on human trafficking with a foreign government in October 2021, which was attended by senior Cambodian government officials. The government provided anti-trafficking training to Cambodian diplomatic personnel as a part of their orientation prior to deploying abroad. The NCCT provided anti-trafficking training to two units of Cambodian peacekeepers before their deployment to Lebanon and the Central African Republic. The government did not report its anti-trafficking budget in 2021, unlike in 2020 when it reported a budget of approximately 2.2 billion riels ($543,080). NGOs reported the government's weak funding for anti-trafficking activities led some NGOs to cover the expenses of government activities.

The government—in collaboration with various donors and NGOs—disseminated information about trafficking laws, safe migration, child labor, and strategies to combat trafficking to law enforcement, other government personnel, and the general population. The government organized 192 anti-trafficking awareness raising campaigns across the country, incorporated anti-trafficking messaging in thousands of public events (such as town halls and community council meetings), and senior officials spoke publicly about human trafficking. In 2021, the Ministry of Education, Youth, and Sports—in cooperation with NGOs—implemented a school curriculum to educate students and teachers about human trafficking. The Anti-Human Trafficking Juvenile Police (AHTJP) and MOI continued to operate a hotline for victims and witnesses to report human trafficking crimes; the government publicized the hotline on government websites and social media sites, required guesthouses and hotels in all 25 provinces to publicize the hotline, and worked with an NGO focused on child sex trafficking to place placards of the hotline number in taxis and tuk-tuks throughout the country. The government reported the hotline received 21 calls—the same number of calls during the last reporting period—but none of them were human trafficking cases. The AHTJP also continued to utilize its social media site for the public to report suspected incidents of human trafficking, but it did not report how many cases it received. The Ministries of Labor and Foreign Affairs operated hotlines for Cambodians working abroad to seek assistance and report cases of human trafficking; the Cambodian embassy in Thailand received 1,109 calls, the embassy in South Korea received 186 calls, and the embassy in Japan received 540 calls. However, the government did not report if any of these calls resulted in the identification of trafficking victims.

The government did not have a ban on the imposition of worker-paid recruitment or placement fees. Observers noted the high costs, complex administrative requirements, and restrictive provisions inherent to the formal migration process drove a majority of Cambodian labor migrants to pursue informal pathways to working abroad. The MOLVT held 75 training sessions for recruitment agencies and labor brokers on ethical recruitment practices to protect the rights of migrant workers. The government worked in cooperation with an international organization to conduct labor inspections of garment factories, but a COVID-19 outbreak in February 2021 suspended in-person inspections, and the government had to rely on virtual assessments for the remainder of the year. Nevertheless, MOLVT and MOI officials conducted 2,966 inspections at factories and other businesses where they found 28,863 foreign workers, of whom 466 were without legal work documentation; the

government fined the businesses a total of 233 million riels ($58,520) for labor violations. The MOLVT maintained offices at the provincial level to monitor recruitment agencies and address complaints from workers, including potential incidents of trafficking; however, it did not report how many complaints these offices received in 2021. The government also did not conduct inspections of recruitment agencies that were allegedly involved in trafficking crimes.

The MOLVT did not report providing pre-departure orientation to Cambodians migrating abroad for work, unlike in 2020 when it reported providing orientation to 20,360 Cambodians. Many Cambodians were reportedly unaware of how to apply for travel documentation or how much it should cost—leaving them at higher risk of travel through informal, more vulnerable means—and the government did not take sufficient steps to publicize that information. In 2021, the NCCT reported Cambodian soldiers and police along the Thai border prevented 3,581 Cambodian migrant workers from entering Thailand, 1,325 of whom were women and 131 were children; however, the NCCT did not report if it screened these migrants for trafficking or referred them to protection services. Officials provided food to 1,270 Cambodian migrant workers at risk of or identified as trafficking victims in Thailand and helped two workers resolve a labor dispute with a foreign employer. In South Korea, Cambodian officials made 87 visits to worksites with Cambodian workers and resolved 137 labor disputes, while in Japan Cambodian officials made 27 visits to worksites with a significant number of Cambodian workers and helped resolve 74 labor disputes. The government did not report if officials identified any trafficking victims among these labor dispute cases. The government maintained two labor recruitment agreements with Saudi Arabia, a domestic worker recruitment agreement with Hong Kong, and a bilateral cooperative agreement with India. The MFAIC continued to implement consular screening measures to reduce the sex and labor trafficking of Cambodian women via forced and fraudulent marriages, including by assessing applicants against trafficking victim profiles jointly developed with the PRC in 2016. However, the MFAIC did not report identifying potential victims during these screenings. The government also continued implementing a regulation passed in 2018 requiring foreign men to pay a fee if intending to return to their home countries with a Cambodian spouse; because this regulation only applied to air travel, observers reported an increase in the number of Cambodian women traveling through unsafe overland channels for marriage migration to the PRC.

The MOLVT maintained an action plan aimed at reducing child labor and debt bondage in the service, agricultural, mining, and energy sectors by 2025 through awareness raising, legal action, and collaboration with civil society funded in part through the national budget. MOLVT officials continued to deny the existence of child labor—including forced child labor—and debt-based coercion within the brick industry. The MOLVT visited 170 brick kilns and sugar and cassava plantations where officials identified 350 cases of vulnerable children living on the kilns and plantations; it provided these children with educational opportunities and other forms of assistance, but it did not identify any trafficking victims. NGOs claimed police were often unaware that detection of crimes at brick kilns fell under their investigative purview; the AHTJP confirmed they viewed brick kiln inspections as under the MOLVT's purview and would only investigate kilns if the MOLVT referred a case to them. The AHTJP did not report any such referrals during the reporting period. Authorities often conducted inspections with advance notification to the kiln owners, enabling them to avoid fines or conceal abuses by removing children from the kilns before an inspection. In 2021, the government—in cooperation with NGOs—led a study to identify the needs of bilingual Khmer-Thai Cambodian children living in Cambodia's Koh Kong Province and Thailand's Trat Province; the goal of the study was to improve access to education for these children as they moved across the border with their migrant parents and to reduce the risk of trafficking and child labor. In July 2021, the government launched a new action plan to prevent and respond to online child sexual exploitation for 2021-2025, but the government did not report additional details about actions it took to implement the plan. The Ministry of Tourism, in collaboration with the NCCT, made efforts to reduce the demand for commercial sex acts through workshops for staff in the tourism sector and government officials on child sexual exploitation in the tourism industry; it also continued to produce

CAMBODIA

public-facing materials targeting potential consumers of commercial sex with children. However, as in prior years, the government generally focused on deterring foreign perpetrators of child sex tourism, rather than targeting the local population that constituted the main source of demand for commercial sex with children in Cambodia.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Cambodia, and traffickers exploit victims from Cambodia abroad. NGOs and labor unions reported in 2020 that foreign labor brokers are fraudulently recruiting foreign migrants, including from Bangladesh, the PRC, and Nepal, to work in PRC-invested and other construction sites in Cambodia where some are indebted to recruitment firms and experience passport confiscation. In 2021, the media reported that traffickers also subject PRC, Southeast Asian, and other country nationals to forced criminality in online scam operations run by local PRC-organized criminal groups in call centers located in Cambodia. Cambodian adults and children migrate to other countries within the region and increasingly to the Middle East for work; traffickers force many to work on fishing vessels, in agriculture, in construction, in factories, and in domestic service—often through debt-based coercion—or exploit them in sex trafficking. Migrants using irregular migration channels, predominantly with the assistance of unlicensed brokers, are at an increased risk of trafficking, although those using licensed recruiting agents also become victims of forced labor or sex trafficking. Companies operating under the auspices of the Japanese government's "Technical Intern Training Program" have exploited Cambodian nationals in forced labor in food processing, manufacturing, construction, and fishing. Children from impoverished families are vulnerable to forced labor, often with the complicity of their families, including in domestic service and forced begging or street vending in Thailand and Vietnam. Undocumented Cambodian labor migrants working in Thailand—who constituted an estimated 30-40 percent of the 1.5 to 2 million Cambodians there before the pandemic—are at high risk of trafficking due to their immigration status, as are undocumented Cambodians working in Vietnam. The pandemic affected established migration patterns and certain sectors in 2020, such as construction, which placed some vulnerable groups at greater risk of trafficking than in previous years. Between February 2020 to February 2021, more than 150,000 Cambodian labor migrants returned to Cambodia from other countries, primarily Thailand, due to industry closures caused by the pandemic.

Traffickers continue to recruit significant numbers of Cambodian men and boys in Thailand to work on fishing boats and exploit them in forced labor on Thai-owned and -operated vessels in international waters. Cambodian victims escaping from their traffickers have been identified in Fiji, Indonesia, Malaysia, Mauritius, Papua New Guinea, Senegal, and South Africa. Cambodian men working on Thai-owned and -operated fishing vessels report deceptive recruitment tactics, severe physical abuse, underpayment or nonpayment of wages, restricted access to medical care, and confinement at sea for years at a time without permission to come ashore. Traffickers recruit women and some girls from rural areas under false pretenses to travel to the PRC to enter into marriages with PRC-national men. These women incur thousands of dollars of debt to brokers facilitating the transaction; the men force some of these women to work in factories or exploit them in sex trafficking to repay this debt. Some parents reportedly receive between $1,500 and $3,000 from marriage brokers to send their daughters to the PRC for marriage. Cambodian women serving willingly as illegal surrogates for PRC families are vulnerable to confinement and domestic servitude. Stateless persons, namely in ethnic Vietnamese communities, are at higher risk of trafficking due to lack of identity documentation necessary for access to formal employment, education, marriage registration, the court system, or the right to own land.

The proprietors of brick kilns subject many of the more than 10,000 Cambodians living at such kilns, including nearly 4,000 children, to multigenerational debt-based coercion, either by buying off their pre-existing loans, or by requiring them to take out new loans as a condition of employment or to cover medical expenses resulting from injuries incurred while working. NGO reports in 2016, 2019, and 2021 have confirmed cases of child labor—including forced child labor—in brick

kilns, as children are forced to work alongside their parents through debt-based coercion. An NGO study conducted in 2017 found nearly all of brick kilns surveyed throughout the country featured indicators of forced labor via debt-based coercion. An extensive, largely unregulated network of predatory micro-finance organizations and private creditors contributes to this arrangement by proactively advertising loans to families in vulnerable communities and connecting them with the kilns. Rural farming families are at higher risk of this form of forced labor due to economic hardships ensuing from climate change; unseasonal rain patterns and subsequent loss of crops push many farmers to take out large loans for new irrigation or pesticide systems, and brick kiln owners often purchase these loans as a means of securing and retaining their labor. Extended rainy seasons also delay the brick-drying process, reducing these bonded kiln workers' pay and forcing many to become further indebted to the kiln owners. To dissuade workers from fleeing abusive conditions, some kiln owners reportedly allow only select members of family units to be absent for public holidays or to seek medical care at any given time. Some workers report continued confinement and forced labor in the kilns long after they have repaid their debts. Cambodian families may also experience conditions indicative of forced labor in the clay extraction process required for brick making. Traffickers exploit children as young as 13 in domestic servitude and in brothels to pay off family debts accrued through this system. Communities displaced by illegal logging operations supplying the brick kilns with timber for fuel may be at elevated risk of trafficking, including in logging itself and elsewhere as a result of ensuing economic hardships. In previous years, North Koreans working in Cambodia may have been forced to work by the North Korean government. Pursuant to a 2017 UN Security Council resolution requiring the repatriation of all North Korean nationals earning income overseas by the end of 2019, subject to limited exceptions, the government reportedly repatriated North Korean labor migrants covered under the relevant provision.

All of Cambodia's 25 provinces are sources for human trafficking. Sex trafficking is largely clandestine; Cambodian and ethnic Vietnamese women and girls move from rural areas to cities and tourist destinations, where criminals exploit them in sex trafficking in brothels and, more frequently, clandestine sex establishments at beer gardens, massage parlors, salons, karaoke bars, retail spaces, and non-commercial sites. In recent years, the rapidly growing and largely unregulated presence of PRC national-owned casinos, entertainment establishments, and other commercial enterprises in Preah Sihanouk Province led to an increase of local sex trafficking and forced labor among Cambodian women and girls, although Cambodia's 2020 ban on online gambling and the subsequent shuttering of many PRC national-owned casinos and other entertainment establishments has reduced such trafficking. Cambodian men form the largest source of demand for children exploited in sex trafficking; however, men from elsewhere in Asia, Australia, Europe, South Africa, and the United States travel to Cambodia to engage in child sex tourism, increasingly facilitated through social media contact. Thousands of urban children left behind by families migrating abroad for work are particularly vulnerable to sex trafficking and forced labor. The prevalence of child sex trafficking and child sex tourism reportedly declined in 2020 due to reduced international travel and pandemic-related quarantine requirements. However, NGOs and law enforcement officials reported the pandemic increased incidents of online child sexual exploitation in 2020, and incidents continued to increase through 2021. Vietnamese women and children, many of whom are victims of debt-based coercion, travel to Cambodia and are exploited in sex trafficking. NGOs report that criminal gangs transport some Vietnamese victims through Cambodia before they are exploited in Thailand and Malaysia. Traffickers in Cambodia are most commonly family or community members or small networks of independent brokers. Some Cambodian orphanages purchase local children from economically disadvantaged families and subject them to malnutrition and unclean living conditions in their facilities for the purpose of attracting and profiting from charitable donations; some of these children are at further risk of sex trafficking and domestic servitude as a result of poor government oversight of adoption processes.

Haiti AR_000639

# CAMEROON: TIER 2 WATCH LIST

The Government of Cameroon does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included prosecuting and convicting more alleged traffickers. The government extended the 2020-2021 national action plan (NAP) for an additional two years and conducted a range of trafficking awareness activities. It also launched a toll-free hotline to report human trafficking cases and established anti-trafficking committees in each of the divisions of the East Region. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity. Authorities did not report investigating allegations of security forces involvement in the sexual exploitation of women. The government investigated fewer trafficking cases and identified fewer victims. It did not pass draft anti-trafficking legislation, pending since 2012, that would remove the requirement of force, fraud, or coercion for child sex trafficking and correct the current law's confusion involving trafficking in persons and migrant smuggling. The government has not taken any action in response to reports of diplomats exploiting individuals in forced labor from previous reporting periods. Officials did not widely disseminate standard operating procedures (SOPs) on victim identification and referral to law enforcement or first responders. Because the government has devoted sufficient efforts to meet the minimum standards, Cameroon was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Cameroon remained on Tier 2 Watch List for a third consecutive year.



CAMEROON TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute trafficking crimes, including complicit officials, and adequately sentence convicted traffickers. • Disseminate and train government officials on the National Referral System and Standard Operating Procedures (NRS/SOP) on victim identification and referral and systematically and proactively identify trafficking victims. • Amend the anti-trafficking law to remove the requirement of force, fraud, or coercion for child sex trafficking crimes and to make a clear distinction between trafficking and smuggling. • Further expand training for law enforcement and judicial officials, on the anti-trafficking section of the penal code to increase the effectiveness of investigations and prosecutions while respecting the rule of law and human rights and administer sufficiently stringent sentences to those convicted. • Continue formal collaboration and coordination between government ministries and with NGOs on proactively identifying and protecting victims. • Implement a systemic victim-witness program to increase protective services for victims participating in the criminal justice process and prevent re-traumatization. • Increase financial and human resources to the government's anti-trafficking inter-ministerial committee (IMC), and regularly convene the committee in coordination with NGOs and international organizations. • Publicize information to citizens on their rights as foreign workers and sources of assistance while abroad. • Expand the investigation of labor recruiters and agencies suspected of fraudulent recruitment—including unlicensed recruiters and intermediaries—and prosecute those complicit in trafficking. • Develop a robust and comprehensive data collection system to capture government-wide anti-trafficking efforts.

## PROSECUTION

The government made mixed anti-trafficking law enforcement efforts. The 2011 anti-trafficking law criminalized some forms of sex trafficking and all forms of labor trafficking. Inconsistent with international law, Cameroon's legal framework required a demonstration of force, fraud, or coercion to constitute a child sex trafficking crime, and therefore did not criminalize all forms of child sex trafficking. The law prescribed penalties of 10 to 20 years' imprisonment and a fine of 50,000 to 1 million Central African francs (CFA) ($86 - $1,730), which were sufficiently stringent and, with respect to some forms of sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. If the trafficking crime involved a victim who was age 15 or younger, the penalties increased to 15 to 20 years' imprisonment and a fine of 100,000 to 10 million CFA ($170 to $17,300). The law prescribed separate penalties for debt bondage, which ranged from five to 10 years' imprisonment and a fine of 10,000 to 500,000 CFA ($17 - $860) and were also sufficiently stringent. The law was published in French and English, the two official languages of the government. The English version conflated trafficking in persons and migrant smuggling crimes by referring to trafficking in persons crimes, as defined under international law, as "slavery in persons," while referring to smuggling-related crimes as "trafficking in persons." Increasing the potential for conflating smuggling and trafficking in persons, Article 342 of Cameroon's 2016 Penal Code prohibited both "trafficking in persons" and "slavery in persons." Legislation drafted in 2012 to address victim and witness protection and correct inconsistencies with international law remained pending for the ninth consecutive year.

The government investigated 93 cases compared with 205 cases in 2020. The government reported prosecuting 57 suspects in 48 cases, compared with prosecuting four suspects in an unknown number of cases in 2020. Officials reported convicting at least seven traffickers under Section 342(1) of the Penal Code—sentencing them to between one and five years' imprisonment and a fine of 100,000 CFA ($170), compared with convicting 2 traffickers in 2020. Officials reported the court of appeal acquitted two traffickers sentenced to life and 15 years' of imprisonment in the previous reporting period. Additionally, regional MINAS authorities reported referral of 14 cases to the courts in the South Region in September 2021.

The government did not report any prosecutions or convictions of government officials complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action. Additionally, the government did not disclose efforts to investigate allegations of government security forces sexually exploiting women in the Southwest Region or soldiers from the 42nd Motorized Infantry Battalion who NGOs reported forcibly recruited community members in the Far North Region to stand watch against Boko Haram incursions during the previous reporting period. In June 2021, the Department of State suspended for five years the A-3 visa sponsorship privileges afforded to Cameroon bilateral mission members because the government declined to waive diplomatic immunity for U.S. criminal proceedings involving mistreatment of a domestic worker and has not initiated its own prosecution. Between 2017 and 2019, a Cameroonian diplomat posted in the United States engaged in alleged criminal violations related to human trafficking. Because of diplomatic immunity, the United States could not commence prosecution, and the Government of Cameroon declined to waive immunity to allow the case to proceed. The government did not report taking any action to hold the diplomat accountable for the second consecutive year. The diplomat left the United States in 2021. Additionally, between 2015 and 2017, a Cameroonian diplomat posted in the United States allegedly engaged in visa fraud related to a child domestic worker. Because of diplomatic immunity, the United States could not commence prosecution, nor did the government report taking any action for the fifth consecutive year to hold the diplomat accountable. The diplomat left the United States in 2018.

Ongoing insecurity in the Far North Region as well as armed violence in the Northwest and Southwest regions between the government and Anglophone separatists hindered the government's law enforcement efforts due to the closure of courts and lack of official access in some areas. In many instances, cases were settled outside of the court system to avoid lengthy and burdensome court proceedings. Over the course of the reporting period, the General Delegation for National Security

reported conducting training on the Penal Code for 154 police officers, compared with no trainings in the previous reporting period.

## PROTECTION

The government made mixed efforts to identify and protect victims. Although the government did not maintain comprehensive statistics, officials reported identifying 90 potential trafficking victims compared with 752 potential victims in 2020. The government did not report how many victims were referred to care. However, the Ministry of Social Affairs (MINAS) stated it provided assistance to an unknown number of trafficking victims during the reporting period, including shelter, basic assistance, psycho-social support, health care, as well reintegration services at five MINAS-run social centers in Yaounde and Douala; this compared with MINAS reporting assistance to all 752 victims identified in the previous reporting period. MINAS also offered livelihoods training for victims at the Betamba Childhood Institute in the country's Center Region. In January 2022, the government opened a new short-term shelter for returning adult and child migrants, including trafficking victims. The government had SOPs to guide officials in proactive identification and referral of trafficking victims. However, the government did not report implementing or widely disseminating them to law enforcement or first responders.

The government had insufficient resources to address trafficking, which hindered the government's protection services. MINAS had the authority to admit children subjected to abuse—including trafficking victims—to government institutions for vulnerable children, which offered shelter, food, medical as well as psychological care, education, vocational training, and family tracing. Private centers funded by NGOs and regulated by MINAS provided care for an unknown number of child victims. One NGO reported it identified and provided services to five victims. The government launched an initiative to return children vulnerable to trafficking in urban centers to their families or place them in MINAS-run shelters; the government did not report how many children it assisted through this program. MINAS reported providing livelihoods and basic needs support to 21,098 IDPs and 39,518 children from IDP families vulnerable to trafficking. NGOs reported thousands of Cameroonian workers remained in Middle Eastern countries, many of whom were at risk of exploitation in domestic servitude or sex trafficking.

The government did not have a formal policy to provide protections to victims participating in investigations and prosecutions. The government did not report providing protection for any victims cooperating with trafficking investigations in spite of experts claiming trafficking networks threatened victims during their trials. Victims were entitled to restitution from convicted traffickers; however, the government did not report awarding restitution. Due to the limited use of the victim identification procedures and understanding of the crime among officials, authorities may have detained or deported some unidentified victims. The government could grant temporary residency status to foreign victims who, if deported, may face hardship or retribution; however, it did not report providing this accommodation during the reporting period.

## PREVENTION

The government increased prevention efforts. The government's IMC convened regularly and extended the existing 2021-2022 NAP for two additional years. The IMC held three working sessions with local anti-trafficking NGOs to discuss recommendations for the NAP during the reporting period. MINAS continued its public awareness campaign directed toward the general public and vulnerable children to inform Cameroonians on trafficking indicators. The IMC organized awareness-raising activities in schools for students, teachers, and administrative staff. The government partnered with local NGOs and an international organization to organize three awareness raising activities in three cities focused on trafficking in persons and migrant smuggling in December 2021. In preparation for the January 2022 African Cup of Nations, MINAS organized a workshop in October 2021 to train law enforcement officials, social workers, and local representatives on human trafficking. The Minister of Social Affairs, in collaboration with an international organization, launched a dedicated human trafficking hotline on January 18, 2022. The Cameroon Human Rights Commission also operated a hotline to report human rights violations, including human trafficking. The government did not report whether any victims were identified from the hotlines during the reporting period.

NGOs stated police and immigration officials' screening efforts at Douala's international airport prevented some potential victims from traveling to the Middle East as a result of human trafficking schemes. The Ministry of Employment and Vocational Training (MINEFOP) reported auditing sixty companies and private labor placement offices compared with none during the previous year, which led to the suspension and closure of companies that were not adhering to the new regulations in April 2021. Decree No. ° 2021/2124/PM of April 14, 2021, established minimum operating requirements to establish a temporary job placement agency. Officials denied the accreditation of 10 labor recruitment firms for violations potentially related to trafficking, issued warnings to 16 temporary employment placement firms suspected of human trafficking; and suspended nine firms for trafficking-related concerns. MINEFOP officials reported publishing a list of licensed recruitment agencies annually, although the scope of dissemination was limited. MINEFOP reported it did not have a system to prevent traffickers from exploiting workers once agencies placed them in overseas employment. Increasing their vulnerability to trafficking, Cameroonians frequently used unauthorized recruiters to seek employment abroad.

The lack of birth certificates remained a factor increasing the vulnerability of individuals to exploitation. The government estimated at least 1.6 million children enrolled in schools in 2019 did not have birth certificates. An NGO attributed the lack of birth certificates to internal and external problems faced by the government such as poor record keeping, staff shortages, and violence and insecurity in the Northwest and Southwest regions. The government reported providing anti-trafficking training to its troops prior to their deployment as peacekeepers. The government did not report providing anti-trafficking training to its diplomatic personnel. The government made efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Cameroon, and traffickers exploit victims from Cameroon abroad. Pandemic-related border closures likely reduced the scale of transnational exploitation, according to experts. However, the economic impacts of the pandemic, combined with ongoing violence in the Northwest and Southwest regions, contributed to a sharp increase in the number of victims exploited domestically. According to the government study conducted during the reporting period, traffickers are using the Gulf of Guinea to move Cameroonian children to Côte d'Ivoire for exploitation in cocoa farming and Malian, Burkinabe, Beninese, or Togolese children to Cameroon for exploitation in farming in the North, West, and Northwest regions of Cameroon. High unemployment rates and economic uncertainty continued to drive many, especially women, to contemplate economic migration under questionable circumstances, leaving them vulnerable to traffickers. Government officials, NGO representatives, and media outlets stated the insecurity in some regions increased the risk of human trafficking during the reporting period due to the more than one million IDPs, diminished police and judicial presence, as well as deteriorated economic and educational conditions. The four years of intermittent school closures in the Northwest and Southwest regions have resulted in some parents sending their children to stay with intermediaries who instead of providing education and safety, exploit the children in domestic servitude.

Child traffickers often use the promise of education or a better life in urban areas to convince rural parents to entrust their children to intermediaries, who then exploit the children in sex trafficking or forced labor; parents may play an active role early in the process due to their desire to remove their children from areas impacted by violence. Criminals coerce women, IDPs, children experiencing homelessness, and orphans into sex trafficking and forced labor throughout the country. Some labor recruiters lure children and adolescents from economically disadvantaged families to cities with the prospect of employment and then subject victims to labor or sex trafficking. Traffickers exploit Cameroonian children in domestic service, restaurants, as well as begging or vending on streets and highways. Additionally, criminal elements force Cameroonian children to work in artisanal gold mining, gravel quarries, fishing, animal breeding, and agriculture (on onion, cotton, tea, and cocoa plantations), as well as in urban transportation assisting bus drivers and in construction to run errands, work, or provide security. A government study highlighted Cameroon, Equatorial Guinea, and the maritime Gulf of Guinea area are

the main channels through which traffickers move children intended for exploitation in domestic servitude in Gabon. Media reporting indicates exploitation in Cameroon's fishing sector is widespread.

Observers note pandemic travel restrictions likely decreased child sex tourism in 2020; past reports highlighted Kribi and Douala as two centers of the crime, primarily perpetrated by nationals of Belgium, Chad, France, Germany, Nigeria, Switzerland, and Uganda. Criminals exploited Cameroonians in forced labor and sex trafficking in the Bonaberi neighborhood in Douala—which hosts hundreds of IDPs, according to NGOs.

Foreign business owners and herders force children from neighboring countries including Benin, the Central African Republic, Chad, Equatorial Guinea, and Nigeria to labor in spare parts shops or cattle grazing in northern Cameroon; many traffickers share the nationality of their victims. The number of children traffickers exploit as they transit the country en route to Gabon and Equatorial Guinea decreased due to border closures related to the pandemic. Observers reported officials from the Republic of Turkey and the People's Republic of China in Cameroon may unwittingly facilitate transnational human trafficking by granting visas to Africans with little oversight. Cameroonian banks may have assisted criminal networks involved in fraudulent recruitment by validating income and employment oversight requirements, as well as opening "ghost" bank accounts for victims to demonstrate false income levels.

Observers reported there were 933,000 IDPs in Cameroon at the end of 2021, a decrease from 977,000 reported in 2019. In addition to IDPs, there were approximately 476,000 refugees in the country as of December 31, 2021. Traffickers may prey on both IDPs and refugees due to their economic instability and sometimes-limited access to formal justice. Boko Haram's activities on the border with Nigeria continued to displace many of these refugees. There continued to be reports of hereditary slavery in northern chiefdoms.

Observers previously reported government security forces engaged in commercial sex with women in the Southwest Region divisions of Ndian, Buea, Ekona, and Muyuka, using food insecurity and their authority as leverage. Some community neighborhood watch groups, known as vigilance committees, may also use and recruit children in operations against Boko Haram and other non-state armed groups, although there is no evidence to suggest the government was providing material support to these specific groups. Anglophone separatists recruited and used child soldiers in the Southwest and Northwest regions, both for fighting government forces and for gathering intelligence, according to observers.

Traffickers exploit Cameroonians from disadvantaged social strata, in particular from rural areas, in forced labor and sex trafficking in the Middle East (especially Kuwait and Lebanon), Europe (including Switzerland and Cyprus) multiple African countries (including Benin and Nigeria), the United States, and Thailand. Most Cameroonians exploited abroad are between the ages of 20 and 38, and come from the Northwest, Southwest, Littoral, Center, South, and West regions. Fraudulent labor brokers recruit some Cameroonian women for domestic work in the Middle East, where traffickers exploit them in sex trafficking or domestic servitude. Pandemic border closures diminished, but did not eliminate, the risk that criminals exploit some economic migrants in search of opportunity in Libya, or while in transit through Niger. NGOs reported Nigerians in the eastern states of that country exploited Cameroonian refugees displaced by the crisis in Cameroon's Northwest and Southwest regions in forced labor and sex trafficking.

Trafficking networks generally consist of local community members, including religious leaders and trafficking victims who have become perpetrators. These networks advertise jobs through the internet, as well as other media, and recruit and sell other Cameroonians directly to families in need of domestic workers. Traffickers used the internet to recruit victims through fake websites, highlighting opportunities in trades such as the fashion industry, modeling, entertainment, education, and information technology. Advocates working on trafficking issues report the government's awareness-raising activities targeting fraudulent recruitment have raised awareness among vulnerable populations, but have caused intermediaries to operate with greater discretion, often directing victims to travel to the Middle East through neighboring countries, including Nigeria. International organizations, NGOs, and

migrants report Cameroonian trafficking networks in Morocco coerce women into sex trafficking.

# CANADA: TIER 1

The Government of Canada fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Canada remained on Tier 1. These efforts included identifying more possible victims of forced labor among temporary foreign workers; issuing new operational guidance on detecting money laundering linked to human trafficking; and launching new government procurement guidelines for suppliers and their subcontractors to prevent forced labor from occurring in government supply chains. Although the government meets the minimum standards, it did not provide comprehensive data on victims provided with government-funded services nationwide. The government's efforts to identify victims, to provide protections to all victims—particularly forced labor victims—and to investigate and to prosecute forced labor crimes, remained inadequate. The range, quality, and timely delivery of trafficking-specific services varied nationwide, and service providers reported a shortage of victim services, including emergency shelters and longer-term housing.



CANADA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute trafficking crimes, including forced labor and child sex tourism, and seek adequately strong sentences on par with the severity of the crimes for convicted traffickers. • Increase proactive identification of victims, particularly male victims and forced labor victims, through screening among vulnerable populations and proactive outreach and assistance to migrant workers. • Significantly increase trauma-informed specialized services and shelter available to all victims, including male victims and foreign national victims, throughout the country, in partnership with civil society and through ongoing dedicated funding from federal and provincial governments. • Enact a policy protecting victims from punishment for unlawful acts traffickers compel them to commit. • Increase nationwide trafficking data collection, including timely consolidation of investigations, prosecutions, and convictions disaggregated by type of exploitation, numbers of identified victims, and assistance provided. • Enact and implement legal amendments to prohibit worker-paid recruitment fees and strengthen protections for temporary foreign workers in Canada. • Increase coordination and communication among federal, provincial, and territorial actors and strengthen provincial interagency efforts. • Establish a survivor-led advocacy council to assist in policy development and ensure members are duly compensated for their work. • Amend the criminal code and Immigration and Refugee Protection Act to include definitions of trafficking that are consistent with international law. • Increase information-sharing and cooperation with First Nations, Métis, and Inuit Indigenous communities and NGOs to address the disproportionate impact of trafficking on those communities. • Increase training for government officials, particularly prosecutors and judges, emphasizing the importance of charging and prosecuting under trafficking statutes, rather than lesser offenses, and ordering restitution upon trafficking convictions. • Increase partnerships with the private sector, including financial institutions, to prevent trafficking. • Vigorously enforce laws and policies to address trafficking in the federal supply chain.

CANADA

## PROSECUTION

The government maintained law enforcement efforts. Criminal code sections 279.01 and 279.011 criminalized sex trafficking and labor trafficking, prescribing penalties of four to 14 years' imprisonment for trafficking of adults and five to 14 years' imprisonment for trafficking of children; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the law did not establish the use of force, fraud, or coercion as an essential element of the crime. Section 279.02 also criminalized receiving financial or any other material benefit from trafficking and prescribed a maximum penalty of 10 years' imprisonment for offenses involving adult victims and a mandatory minimum of two years' to a maximum of 14 years' imprisonment for offenses involving child victims. Section 279.03 criminalized withholding or destroying documents to facilitate trafficking and prescribed a maximum penalty of five years' imprisonment in cases involving adult victims and a mandatory minimum of one year to a maximum of 10 years' imprisonment in cases involving child victims. Section 286.1 criminalized purchasing commercial sex acts from an individual under 18 years of age and prescribed a minimum penalty of six months and a maximum penalty of 10 years' imprisonment. The Immigration and Refugee Protection Act (IRPA) established a separate crime of "human smuggling and trafficking" to mean "no person shall knowingly organize the coming into Canada of one or more persons by means of abduction, fraud, deception or use or threat of force or coercion." Inconsistent with the definition of trafficking under international law, this provision did not include exploitation as an essential element of the crime.

Government officials at the federal, provincial, and municipal levels investigated and prosecuted trafficking crimes, but the government did not report comprehensive law enforcement data at each of these levels. The federal government did not maintain a national database. The Uniform Crime Reporting (UCR) system included provincial and municipal data but did not disaggregate between sex and labor trafficking. The UCR data is available each July for the previous calendar year, and for 2020, the government reported investigating a total of 515 incidents that led to 241 individuals charged with trafficking crimes; this compared with 511 trafficking incidents investigated and 270 individuals charged in 2019 and 340 incidents investigated and 236 individuals charged in 2018. Employment and Social Development Canada (ESDC) reported identifying and referring to law enforcement 115 suspected forced labor cases within the temporary foreign worker program in 2021, an increase from 45 forced labor investigations between April and December 2020 and 32 forced labor investigations between April and October 2019. Immigration, Refugees and Citizenship Canada, which conducted administrative investigations of potential human trafficking cases among immigration and refugee cases, initiated approximately 25 new large-scale investigations involving allegations of human trafficking in 2021, compared with 37 in 2020 and 20 in 2019.

Federal, provincial, and municipal authorities prosecuted 245 suspected traffickers and convicted 100 traffickers between January 1 and December 11, 2021. In 2019, authorities prosecuted 185 suspects and convicted 50 traffickers. Courts imposed sentences ranging from eight to 18 years' imprisonment for convicted child traffickers; in 2020, courts imposed sentences between seven years and eight years, six months' imprisonment for convicted traffickers. The government reported courts acquitted some defendants of trafficking charges but convicted them under other sections of the criminal code. The government reported authorities prosecuted the majority of trafficking cases at the provincial level, though it did not provide complete data on provincial-level prosecutions and convictions. Some provinces and municipalities maintained specialized anti-trafficking law enforcement units. Many courts continued to operate over virtual platforms, sometimes causing logistical challenges to ensure victims and witnesses had access to reliable equipment and internet connections.

The Financial Transactions and Reports Analysis Centre of Canada (FINTRAC) updated its Operational Alert, a resource for assisting the private sector to detect the laundering of illicit proceeds from sex trafficking, with additional money laundering and contextual indicators developed from analysis of 100,000 sampled financial transactions

linked to human trafficking. FINTRAC provided information and shared best practices with stakeholders in the private sector and NGOs, as well as across Canadian, international, and multilateral government entities. NGOs noted a continued imbalance in the government's anti-trafficking efforts, with limited attention to and understanding of forced labor. Coordination challenges among federal, provincial, territorial, and municipal authorities limited the effectiveness of anti-trafficking law enforcement efforts, particularly on cases that spanned multiple jurisdictions. The government's lack of a coordinated data collection system made it difficult for authorities to collect reliable, timely, and consolidated data to assess efforts and respond to trends.

The Canadian Police College provided a human trafficking investigators course that trained police on understanding the scope of trafficking crimes, fostering trust between law enforcement and victims, and overcoming challenges in investigating and prosecuting trafficking cases. The Royal Canadian Mounted Police (RCMP) provided an online introduction to a human trafficking course completed by law enforcement officials, including front-line police who had limited knowledge of or experience with trafficking investigations. The Canadian Border Services Agency provided an online training course on human trafficking to new recruits. The government's training academy for new police recruits included trafficking awareness in its training curriculum. FINTRAC regularly made presentations during the human trafficking investigator courses at the provincial and federal levels to educate law enforcement officials on using financial intelligence in human trafficking investigations. The RCMP's operational manual, updated in 2021, provided guidelines and procedures for investigating human trafficking cases. During the reporting period, the RCMP developed new resources for police including a trafficking victim interview guide, a police officer's handbook, and a presentation on detecting human trafficking for generalized police and traffic officials. The government reported police cooperated with foreign law enforcement officials on several open investigations during the reporting period. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking offenses.

## PROTECTION

The government maintained protection efforts; it identified more possible labor trafficking victims but did not report how many received services. The government did not report complete data on the number of victims identified. RCMP officers identified 63 victims in 2021, compared to 80 victims in 2020 and 119 in 2019. Identified victims included 46 women, two men, and 15 girls. In addition, ESDC identified 115 potential forced labor victims among temporary foreign workers, an increase from 45 potential victims identified by ESDC in the previous reporting period. The government provided several handbooks, guidelines, and other resources to front-line officials—including police, justice practitioners, and border officials—to enable them to proactively identify indicators of trafficking among the populations they served. RCMP officers followed a policy to facilitate trafficking victims' referral to services, while referral procedures for other front-line institutions varied by jurisdiction. The government provided funding to an NGO to operate a national human trafficking hotline. Hotline staff developed a national referral directory and maintained partnerships with nearly 900 service providers to facilitate victim referral to local emergency, transition, or long-term support services. Public Safety Canada (PSC) operated a toll-free number that victims of any type of crime could call to access information and service referral.

Provinces and territories were primarily responsible for the delivery of victim services, with the federal government providing funding to service providers. The government did not report complete data on victims receiving government-funded services. The federal government allocated 1.34 million Canadian dollars ($1.05 million) to Justice Canada's Victims Fund to support trafficking victims and groups at high risk of exploitation, compared with 930,200 Canadian dollars ($728,420) in 2020. Through this fund, the government provided funding to organizations implementing 10 projects to improve services for trafficking victims and develop and deliver training for law enforcement officers and service providers in the provinces and territories. Implementing organizations reported providing services to approximately 744 victims and vulnerable individuals through government-funded projects

Haiti AR_000643

between January and November 2021. In comparison, organizations estimated providing services to approximately 220 individuals during a nine-month period (April-December) in 2020.

Each province or territory provided some services for victims, often in collaboration with NGOs, though the government did not collect comprehensive data on the amount of funding or number of victims served at the provincial and territorial level. Models for service provision varied across the country in response to provincial demographics, priorities, and budgets. In some provinces, victims accessed government services through police or the courts, while other provinces offered victims more comprehensive individual support. Victims could typically access emergency housing, food, medical services, psychological care, safety planning, and court preparation and accompaniment. Some jurisdictions offered additional legal services to victims of sexual offenses, including sex trafficking, and many provinces and territories provided counseling services beyond the duration of a trial. Assistance was available for both Canadian and foreign victims, as well as male and female victims, but service providers reported they primarily served Canadian women and girls. Several provincial governments funded or implemented trafficking-specific programming. The Government of Alberta continued funding a multisectoral coalition, which included survivors, to provide services to victims and coordinate a provincial response to trafficking; the Government of British Columbia funded an office that developed and coordinated the provincial strategy and worked to enhance victims' access to services; and the Government of Ontario funded a government entity that provided coordination and services in the province. Ontario also continued implementation of a five-year, 307 million Canadian dollar ($240.41 million) strategy to combat trafficking that included committing 96 million Canadian dollars ($75.18 million) over five years to 27 community-based projects, including survivor-led programming and Indigenous-specific services. In December 2021, the Government of Québec released an action plan and announced 150 million Canadian dollars ($117.46 million) over five years toward activities combating sexual exploitation, including sex trafficking. In Manitoba, police and NGOs continued to assist victims through a collaborative response team and implement a prevention strategy funded by the provincial government. In December 2021, the Manitoba government announced 3 million Canadian dollars ($2.35 million) in funding to an Indigenous women-led organization to provide support for women trauma survivors, including trafficking victims. The Government of Nova Scotia provided 1.4 million Canadian dollars ($1.1 million) toward implementation of a provincial approach to combat human trafficking and sexual exploitation; this funding included initiatives to strengthen support for Black and Indigenous victims and the re-opening of a resource center for Indigenous women who were vulnerable to exploitation. The Nova Scotia government also funded a youth safe house with the capacity to provide specialized trafficking victim services and 24-hour support to two residents at a time for up to three months, as well as follow-up services after victims left the shelter. The Government of British Columbia administered a grant program using civil forfeiture proceeds to support community-led projects on crime prevention and victim assistance; in its 2021-2022 funding cycle, it awarded 570,000 Canadian dollars ($446,360) to 16 organizations implementing projects related to human trafficking.

NGOs operated shelters nationwide for victims of violence, mostly women and their accompanying children; the government funded some shelters, but only a few provided beds specifically for trafficking victims. Service providers reported there was an insufficient supply of emergency shelters, medium- to long-term housing, and specialized medical and psychological services to meet the needs of trafficking victims; they also reported some available shelter options were not adequate for victims to receive appropriate, trauma-informed care. Through the Victims Fund, the government continued to provide an annual allocation of more than 3.3 million Canadian dollars ($2.58 million) to support multidisciplinary, child-friendly advocacy centers that enhance trauma-informed assistance to child victims of abuse, including human trafficking, during the criminal justice process. In addition, the government provided supplemental funding to assist child advocacy centers to adapt their services and meet increased demand during the pandemic.

The pandemic continued to negatively impact the availability of and victims' access to services. A survey conducted by an NGO revealed service providers had to significantly adjust their operations during the pandemic, including by reducing hours or moving services online, and the loss of in-person services, particularly counseling, was detrimental to victims. Lack of consistent access to resources, such as a computer, reliable internet connection, and privacy, limited some victims' ability to benefit from online services, and limited options for in-person assistance may have placed victims at higher risk of re-exploitation. NGOs operating shelters in Ottawa reported a weeks-long protest in January and February 2022 caused disruptions to shelter services and effectively confined some victims to shelters to avoid harassment by protesters.

Canadians who were victims of trafficking crimes that occurred outside Canada could be eligible to receive financial assistance for travel, psychological services, and other expenses through the Victims Fund, as well as assistance from Canadian consular officials abroad, though the government did not report providing this assistance to any victims during the reporting period. Global Affairs Canada officials had procedures to proactively identify potential trafficking victims working in diplomatic households in Canada, including through verifying payroll records and conducting random and systematic interviews with domestic workers in diplomatic households, but it did not report identifying any victims during the year. The government provided alternatives to removal for foreign trafficking victims who faced danger or hardship in their home countries. Foreign trafficking victims could apply for a temporary resident permit (TRP), which allowed them to remain in Canada under regularized immigration status, receive access to healthcare, including psychological services, and in some cases apply for a work permit. Officials issued short-term TRPs for up to 180 days or long-term TRPs for three years. Authorities did not require victims to participate in an investigation or prosecution to be eligible for a TRP, and victims could apply directly without a referral from law enforcement or service providers. The government reported authorities prioritized trafficking-related TRP applications, including throughout the pandemic. Between January and November 2021, the government issued 65 TRPs to foreign trafficking victims and their dependents; this compared with 110 TRPs issued to trafficking victims in 2020. TRP holders could apply for fee-exempt work permits, and the government reported providing permits to approximately 46 trafficking victims and their dependents in 2021.

Canadian law provided various protections to victims and other witnesses participating in trials, many of which were mandatory for children and available to adults at a judge's discretion. These protections included video testimony, the presence of a support person during testimony, a ban on publishing names of or releasing identifying information about witnesses, and closing courtrooms to the public. Authorities did not report how frequently courts afforded these protections to trafficking victims during trials. Through the Victims Fund, the government funded organizations providing training on trauma-informed practices for criminal justice officials. NGOs reported a lack of victim-centered methods re-traumatized some victims during court proceedings. Courts could order traffickers to pay restitution to victims under Canadian criminal law, and the provinces of Alberta, Manitoba, and Ontario had laws allowing trafficking victims to seek civil redress. Some provinces had compensation or financial benefits programs for crime victims. The government did not report whether any victims received restitution, sought civil redress, or were awarded compensation through provincial programs in 2021. The government did not have a law or policy protecting victims from punishment for unlawful acts traffickers compelled them to commit; there were no reports, however, that authorities penalized victims for such acts.

## PREVENTION

The government increased prevention efforts. PSC continued to lead the government's federal interagency task force to combat trafficking, which oversaw implementation of federal anti-trafficking measures under the strategic framework of the government's National Strategy to Combat Human Trafficking 2019-2024. The national strategy included 57.22 million Canadian dollars ($44.81 million) in funding over five years and 10.28 million Canadian dollars ($8.05 million) annually after 2024. It created a governance structure composed of senior leaders from relevant

government agencies and coordinated government anti-trafficking and related activities, including online sexual exploitation of children, gender-based violence, and the disproportionate impact of violence on Indigenous women and girls and LGBTQI+ individuals. During the reporting period, the government convened an annual meeting of the Assistant Deputy Ministers Roundtable and a meeting of the Directors-General Steering Committee, and relevant government departments developed and implemented a system for sharing information and updates on a monthly basis. PSC published the first two annual progress reports on Canada's key results and achievements under the national strategy. The national strategy called for the establishment of a survivor-led advisory committee, though the government did not create it during the year. To facilitate coordination and collaboration among federal, provincial, and territorial governments, PSC chaired meetings of the Federal, Provincial, and Territorial (FPT) Trafficking in Persons Working Group, and Justice Canada led the FPT Coordinating Committee of Senior Officials Working Group on Human Trafficking.

The government announced a series of proposed amendments to the Immigration and Refugee Protection Regulations that would increase protections for temporary foreign workers in Canada; the proposed amendments included a new prohibition on worker-paid recruitment fees, a requirement for employers to provide an employment agreement, and increased employer responsibility for providing access to healthcare. The amendments would also add a prohibition on employer retaliation against workers who report complaints, provide greater authorities for officials to screen new employer applications for compliance, and strengthen government monitoring and oversight mechanisms for temporary foreign worker programs. These changes did not come into effect during the reporting period.

The government provided more than 6 million Canadian dollars ($4.7 million) to six community organizations across the country working to increase temporary foreign workers' knowledge of their rights, support them in navigating the impacts of the pandemic, and assist them in exercising their rights while living and working in Canada. Through this funding, the government supported activities tailored to the needs and experiences of this vulnerable population, including services and information in workers' first language; events and services during hours workers were likely to be available; free transportation or virtual or phone-based options; outreach visits to workers in isolated locations; and legal services. The government permitted temporary foreign workers, on valid employer-specific work permits and who experienced abuse or were at risk of abuse in the context of their employment in Canada, to apply for an open work permit; such permits allowed a worker to leave an abusive situation and change employers without losing status to work in Canada. The government issued new guidance on the abuse of workers in the context of the pandemic. The government reported immigration officials had guidelines for processing potential victims of trafficking who sought open work permits, though the government did not provide statistics on the number of trafficking victims or other vulnerable migrants who applied for or received open work permits. The government temporarily extended the program to agricultural workers from Trinidad and Tobago who were stranded in Canada during the pandemic. The government implemented a policy during the pandemic to allow additional time for foreign nationals to renew their temporary immigration status and to permit some work permit applicants to work legally while their applications were pending; these measures may have mitigated trafficking risks among some foreign nationals who would have lost their immigration status during the pandemic.

The government commissioned an independent organization to conduct a risk assessment of human trafficking in the government's supply chains. Public Services and Procurement Canada launched a revised Code of Conduct for Procurement that included labor and human rights standards for all suppliers, including an expectation that suppliers and their subcontractors do not engage in any form of human trafficking. The government began adding a new clause to its contracts allowing authorities to terminate contracts with a supplier engaged in forced labor. Global Affairs Canada (GAC) trained approximately 800 domestic and overseas staff in its Trade Commissioners Service on the government's responsible business conduct policies, with the intent to increase trade commissioners' capacity to engage on these issues

with businesses, local governments, and other stakeholders. During the reporting period, the Minister of Labour committed to leading an effort to introduce legislation aimed at eliminating forced labor from the global supply chains of Canadian businesses. The government began implementing a 2020 amendment to its Custom Tariff that prohibited the importation of goods produced by forced labor. In October 2021, the government seized a shipment of women and children's clothing from the People's Republic of China (PRC) on suspicion the goods were produced with forced labor; after further review of the case, authorities released the shipment and allowed it to enter Canada.

The government implemented the first phase of a five-year national awareness campaign through advertisements on social media, search engines, news websites, radio, in cinemas, and through in-person events; public surveys informed campaign materials, which the government designed to raise awareness of human trafficking, address common misperceptions of the crime, educate the public on warning signs, and provide information for reporting suspected cases. The RCMP provided virtual training on human trafficking to school resource officers across the country and distributed presentations for use in local communities.

GAC increased its efforts to prevent sexual exploitation within the delivery of foreign assistance, including by promoting internal trainings to educate staff on the issue and how to respond to abuses; updating the relevant clause in funding agreements to include stronger language on expectations of partners; and establishing a permanent unit within GAC on the prevention of sexual exploitation and abuse. The government made limited efforts to reduce the demand for participation in international child sex tourism by its citizens; some efforts included distributing publications warning Canadians traveling abroad about penalties under Canadian law and directing personnel in its overseas diplomatic missions to report suspected cases to local law enforcement and INTERPOL. The government, however, did not report any data on child sex tourism investigations, prosecutions, or convictions. The government made efforts to reduce the demand for commercial sex acts through public messaging and awareness-raising activities.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Canada, and traffickers exploit victims from Canada abroad. Women and children from Indigenous communities, migrants and new immigrants, LGBTQI+ persons, persons with disabilities, at-risk youth, runaway youth, and youth in the child welfare system are at high risk for trafficking. Traffickers lure girls and young women, including some who are not socially or economically disadvantaged, into deceptive romantic relationships or through offers of economic opportunity and exploit them in sex trafficking. Traffickers exploit Canadian victims within and across the country and sometimes abroad, mainly in the United States. Traffickers exploit foreign women, primarily from Asia and Eastern Europe, in sex trafficking in Canada. Sex traffickers exploit victims in hotels, illicit storefronts disguised as spas, massage parlors, or strip clubs, and in private residences. Trafficking operations increasingly used online payment methods and investment tools in efforts to conceal financial transactions. Traffickers exploit legal foreign workers from Eastern Europe, Asia, Latin America, the Caribbean, and Africa in forced labor in a variety of sectors, including agriculture, construction, food processing, restaurants, hospitality, and domestic service, including isolated reports of incidents in diplomatic households. Migrant workers in the caregiving and agricultural sectors were at the highest risk of forced labor due to language barriers, isolated worksites, and limited access to protections. Some foreign nationals are exploited by traffickers with ties to organized crime networks in victims' home countries. Canadians travel abroad to purchase sex acts from child victims in other countries, and foreign nationals purchase sex acts from child victims in Canada. Traffickers in Canada operate individually and via family-based connections; some are affiliated with street gangs and transnational organized crime.

# CENTRAL AFRICAN REPUBLIC:
## TIER 2

The Government of the Central African Republic (CAR) does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore CAR remained on Tier 2. The government investigated more trafficking cases, and for the first time in five years, convicted a trafficker. Officials finalized standard operating procedures (SOPs) for the identification and referral to care for trafficking victims. Additionally, the government launched a new hotline for reporting violence against women, including trafficking. However, the government did not meet the minimum standards in several key areas. Victim services remained inadequate. Central African Armed Forces (FACA) officers forcibly recruited and used at least one child during the reporting period. The national assembly did not finalize the pending anti-trafficking legislation during the reporting period, and official complicity in human trafficking remained significant concerns.



CENTRAL AFRICAN REPUBLIC TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:
Cease the recruitment and use of child soldiers by all government forces, hold complicit officials accountable, and expand efforts to sensitize all national security forces on CAR's anti-child soldiering directives. • Cease support to and coordination with armed groups—including the Kremlin-backed Wagner Group—that unlawfully recruit and use children. • Coordinate with international organizations to demobilize and provide reintegration services to child soldiers, cease detention of former child soldiers, and increase efforts to minimize their re-recruitment by armed groups. • Vigorously investigate and prosecute trafficking crimes, including complicit officials, and adequately sentence convicted traffickers. • Train officials to use the SOPs for victim identification and referral to care and proactively identify trafficking victims. • Expand anti-trafficking training for police and gendarmerie to effectively investigate trafficking cases, identify victims, and refer them to care, in partnership with NGOs. • Relevant ministries allocate additional financial and in-kind resources to support the Mixed Unit for Rapid Intervention and Repression of Sexual Violence to Women and Children's (UMIRR) operations. • Include trafficking-specific training to judges, magistrates, and prosecutors in the country's judicial academies and expand training for existing justice sector officials. • Increase the number of court hearings—separate from informal mediation—for suspected trafficking cases. • Increase referrals of victims to services in partnership with NGOs and international organizations, and ensure trafficking victims are not punished for unlawful acts traffickers compel them to commit. • Expand radio programming in French and Sangho to raise awareness of the crime in Bangui in partnership with civil society, traditional and religious leaders, as well as international organizations to enhance the public's ability to identify and refer trafficking crimes to law enforcement officers. • Provide additional staff and resources—in coordination with international organizations—to support the government's anti-trafficking focal point within the presidency as well as the Anti-Trafficking Coordination Bureau. • Strengthen coordination between civil society, NGOs, and the government on victim services.

## PROSECUTION
The government increased anti-trafficking law enforcement efforts. Article 151 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of five to 10 years' imprisonment which were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious offenses, such as kidnapping. If the crime involved a child victim of sex trafficking or forced labor similar to slavery, the prescribed penalties increased to five to 10 years' imprisonment with hard labor. The government, in collaboration with international organizations, drafted new trafficking legislation, which was pending review by the national assembly at the end of the reporting period.

The government reported initiating eight trafficking investigations and continuing 30 investigations from the previous reporting period, compared with initiating 33 investigations in the previous reporting period. The government reported prosecuting two suspects compared with none in the previous reporting period. For the first time in five years, the government convicted a trafficker for forced labor of children under Article 151 of the criminal code. The court ordered a suspended one-year sentence. The government reported court hearings were suspended for two months due to pandemic restrictions during the reporting period.

The government did not report any prosecutions or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, hindering law enforcement action during the year. The government investigated a customs agent suspected of sex trafficking 12 victims, including 11 girls and one woman; the case remained pending trial at the end of the reporting period. Individual FACA soldiers—violating command directives—forcibly recruited at least one child and used seven children in support roles to serve at checkpoints and run errands. FACA continued to collaborate and provide material support to a Kremlin-backed Wagner Group, which forcibly recruited and used children to gather intelligence and as laborers.

In partnership with international organizations, the government provided 12 trainings for government officials on trafficking indicators, trafficking penal code, and victim identification and referral. Most government officials lacked an understanding of human trafficking, hindering the government's ability to investigate trafficking crimes and identify victims. Authorities partnered with five UN Police (UNPOL) mentors to assist in law enforcement operations. Years of destabilizing conflict exacerbated by continued violence during the reporting period severely limited formal judicial capacity outside the capital, leading to the frequent use of customary dispute resolution methods through which traditional chiefs or community leaders administered punishment for criminal acts.

## PROTECTION
The government demonstrated mixed victim protection efforts. The country's anti-trafficking committee reported UMIRR officials identified 19 victims (six adult men, one adult woman, and 12 girls; 10 victims were exploited in sex trafficking and nine were exploited in labor trafficking), compared with identifying 34 trafficking victims in the previous reporting period. The government created UMIRR in 2015 and operationalized the unit in 2017 to prevent sexual violence against women and children; it serves as the lead government agency on providing protective services for trafficking victims. Observers noted that most trafficking victims were individuals predominantly living in conflict or crisis zones and overwhelmingly members of the minority Ba'Aka community. Authorities provided services to all 19 identified victims and referred all victims to government-supported NGOs for provision of services. The government continued to provide services to more than 30 victims identified in the previous reporting period. The government, in partnership with an international organization, finalized SOPs for victim identification and referral to care and conducted training for officials on the procedures. Due to limited use of formal identification procedures and a lack of anti-trafficking training, authorities may have arrested or detained some unidentified victims.

UMIRR continued to provide services to trafficking victims, including medical and psycho-social support in partnership with NGOs and UN organizations. The government reported legal aid services were provided by donor-funded organizations. While foreign national victims and CAR citizens are entitled to the same services, UMIRR officials reported long-term assistance was not available to foreign national victims. The government repatriated two victims from Cameroon during the reporting period. Additionally, international organizations aided in the

Haiti AR_000646

voluntary return of one trafficking victim. Officials reported that some safe housing options for victims were not available due to pandemic restrictions to reduce overcrowding, which created difficulty finding shelters for some victims.

The Ministry for the Promotion of Women, Families and Children partnered with a local organization to assist 33 child sex trafficking victims in Bangui and provided them with counseling, health education, and life-skills and vocational training. During the reporting period, the government assisted MINUSCA in screening 134 children (117 boys and 17 girls) used by armed groups to facilitate their enrollment in demobilization programs and demobilized 78 children (64 boys and 14 girls) used by armed groups. In coordination with an international organization, the government provided an unknown number of children (some of whom were identified in previous reporting periods) shelter, psycho-social services, and reintegration assistance, compared with demobilizing 855 child soldiers in 2020. Government and international organizations reported five former child soldiers remained in detention in the Ngaragba prison due to a lack of alternative placement options for their referral and care (two were detained in 2019, one in 2020, and two in July and August 2021).

The government reported adult victims supported law enforcement efforts against alleged traffickers; courts held closed door trials for cases involving children. The government did not provide witness protection to victims but collaborated with local organizations to provide legal aid. Authorities did not report providing legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution. The law allowed victims to file civil suits against the government or their alleged traffickers for restitution; however, the government did not report any victims filing civil suits during the reporting period.

## PREVENTION

The government maintained efforts to prevent trafficking. The government's inter-ministerial National Committee for Trafficking in Persons (National Committee), led by a presidentially appointed advisor, continued to coordinate government anti-trafficking efforts and convened regularly. The National Committee drafted and finalized a 2022-2023 national action plan to combat human trafficking. The government, in coordination with local NGOs, trained journalists, social workers, and parliamentarians on trafficking. In partnership with NGOs, the government also trained local authorities and officials from the Ministry of Territorial Administration in March and developed plans to expand these trainings to provinces. The government continued to carry out awareness-raising campaigns in collaboration with local NGOs and funded a weekly radio program on countering human trafficking. The government continued to collaborate with UNPOL on its annual awareness campaigns against sexual exploitation and abuse. UMIRR continued to operate its hotline dedicated to gender-based violence staffed by French and local-language speakers. In partnership with international organizations, the government launched a hotline for violence against women, including trafficking. Officials did not report taking any measures to reduce the demand for commercial sex acts, nor providing anti-trafficking training for its diplomatic personnel. An international organization also worked in coordination with local authorities on awareness campaigns against sexual exploitation and abuse, including among its own staff, through its conduct and discipline unit. In September 2021, the UN secretary-general withdrew 450 Gabonese peacekeepers serving in the UN Multidimensional Integrated Stabilization Mission in the CAR (MINUSCA) following allegations against the contingent of widespread, systematic sexual exploitation.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in CAR, and traffickers exploit victims from CAR abroad. Observers report traffickers primarily exploit CAR nationals within the country and in smaller numbers in Cameroon, Chad, Nigeria, Republic of the Congo, Democratic Republic of the Congo, Sudan, and South Sudan. Perpetrators—including transient merchants, herders, and non-state armed groups—exploit children in domestic servitude, sex trafficking, as well as in forced labor in agriculture, artisanal gold and diamond mines, shops, restaurants and bars, and street vending within CAR. Also, within the country, some relatives exploit children in domestic

servitude, and community members exploit *Aka (pygmy)* minorities in domestic servitude, especially in the southwest of the country. Authorities' prejudice against individuals in commercial sex—despite its prevalence—hinders victims' access to justice and assistance. Some government workers reportedly coerced women into sex in exchange for government employment or documents and services to which they were entitled. Fraudulent labor recruiters attract foreigners from nearby countries such as Chad and Libya to enter the country undocumented to work in CAR's mining sector; armed groups capture and exploit some of these economic migrants in forced labor.

Some relatives or community members coerce girls into forced marriages and subsequently exploit the girls in domestic servitude or sex trafficking. Stemming from severe poverty throughout the country, a government official stated husbands may coerce their wives to engage in commercial sex to cover household expenses, with little recourse from authorities. Officials note family members also exploit children in forced labor and sex trafficking to supplement family income.

Observers reported Central African criminal elements engage in the sex trafficking of girls as young as 13 in *maisons de joie* (houses of joy) throughout Bangui. *Maisons de joie* are private residences with little official oversight where CAR nationals serve alcohol and food to middle- and upper-class customers as a cover to exploit girls and women in commercial sex. Criminals reportedly take advantage of abject poverty across the country to recruit women and girls with the promise of money for their children or families.

Violent conflict since 2012 has resulted in chronic instability and the internal displacement of 632,240 people, increasing the vulnerability of adults and children to forced labor and sex trafficking. Observers noted individuals or communities living in conflict, crisis, or post-disaster settings, minorities, and undocumented migrants are at particular risk of sex trafficking and forced labor. Observers also reported 2.8 million people were in need of humanitarian assistance and more than 717,000 people were internally displaced as of June 2021.

Escalating pre- and post-election violence resulted in armed groups recruiting and using more child soldiers, with nearly 3,000 recruited into combat since the country's December 2020 elections. The coalition of six armed groups (*Mouvement Patriotique pour la Centrafrique* [MPC], Return, Reclamation, and Rehabilitation [3R], *Union pour la Paix en Centrafrique* [UPC], *Front Populaire pour la Renaissance de la Centrafrique* [FPRC], Anti-Balaka Mokom, and Anti-Balaka Ndomate), intent on overthrowing the democratically elected government—the Coalition of Patriots for Change (CPC)—continued to recruit child soldiers during the reporting period. Additionally, individual militias associated with Anti-Balaka; Ex- Seleka; FPRC; Lords Resistance Army; 3R; UPC; and other armed groups continued to forcibly recruit and use child soldiers in CAR before and after the creation of the CPC. Multiple sources alleged armed groups in southeastern CAR—areas outside of governmental control—kidnapped children and coerced them into serving as child soldiers, in addition to forcing community members into forced labor as porters, cooks, and other support roles, or in illegal mining operations. International organizations reported armed groups recruited children to serve as combatants, servants, child brides, and sex slaves in 2020; armed groups also subjected children to forced labor in the mining sector. Additionally, observers reported FACA forcibly recruited at least one child and used seven children in support roles to man checkpoints, run errands, and gather information in 2021; forces from a Russia-backed group forcibly recruited a child in CAR to gather intelligence during the reporting period.

Since the conflict began in 2012, armed groups have recruited more than 17,000 children. Militias primarily recruited and used child soldiers from the prefectures of Vakaga, Haute-Kotto, Haut-Mbomou, Nana-Grebizi, Nana-Mambere, and Basse-Kotto; these areas were under intermittent government control during the reporting period. Although some children may initially join locally organized community defense groups to protect their families from opposing militias, many commanders maintain influence over these children even after they are demobilized, increasing their risk of re-recruitment. Inadequately funded reintegration programming, continuing instability, and a lack of economic opportunity throughout the country exacerbate the risks of re-recruitment among

Haiti AR_000647

former child soldiers. Some demobilized child soldiers face violent—and at times deadly—reprisals from their communities following reintegration.

# CHAD: TIER 2 WATCH LIST

The Government of Chad does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included investigating trafficking cases and finalizing a one-year National Action Plan (NAP) for 2021-2022. The government, in collaboration with an international organization, finalized and began implementation of its standard operating procedures (SOPs) and a National Referral Mechanism (NRM) for victim identification and referral to care. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Substantial personnel turnover related to the April 2021 death of the former President and subsequent formation of the transition government hindered Chad's ability to maintain consistent anti-trafficking efforts and accurately report on those efforts for this reporting period. Authorities did not report prosecuting or convicting any traffickers and did not report identifying any trafficking victims. The government did not report conducting any awareness campaigns. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Chad was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Chad remained on Tier 2 Watch List for the third consecutive year.



## PRIORITIZED RECOMMENDATIONS:

While respecting due process, increase efforts to investigate and prosecute trafficking crimes, including complicit officials, and adequately sentence convicted traffickers. • Train officials to use the SOPs and NRM for victim identification and referral to care and proactively identify trafficking victims, including among vulnerable populations such as Cuban healthcare professionals and People's Republic of China (PRC) nationals employed at worksites affiliated with the PRC's Belt and Road Initiative. • Formally inaugurate and staff the National Committee to Combat Trafficking in Persons (NCCTIP) and include civil society in its activities. • Provide specific anti-trafficking training to law enforcement officials to improve case investigation and victim identification and referral to appropriate care and training on the distinctions between human trafficking and migrant smuggling. • Incorporate human trafficking awareness into basic training for law enforcement and judicial officials, in coordination with international organizations and donors. • Establish a specialized anti-trafficking unit in the Judicial Police to ensure officers effectively investigate suspected trafficking crimes under the country's 2018 trafficking law. • Include anti-trafficking training for all new magistrates and prosecutors attending the Ministry of Justice's training college in N'Djamena. • Increase the provision of shelter and protective services to all trafficking victims, in coordination with NGOs and international organizations. • Implement and consistently enforce strong regulations and oversight of labor recruitment companies and hold fraudulent labor recruiters criminally accountable. • Beginning in N'Djamena, use local community radio stations to raise public awareness of human trafficking and incorporate the High Islamic Council, tribal leaders, and other members of the traditional justice system into sensitization campaigns. • Establish a mechanism for the collection or storage of anti-trafficking law enforcement data.

## PROSECUTION

The government decreased overall law enforcement efforts. Law 006/PR/2018 on Combatting Trafficking in Persons criminalized sex trafficking and labor trafficking. Article 7 of Law 006/PR/2018 prescribed penalties of four to 30 years' imprisonment and a fine of 250,000 to 5 million Central African CFA francs (CFA) ($432 to $8,650); these penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape.

The Ministry of Justice reported initiating the investigation of 41 alleged labor traffickers during the reporting period. The government did not report any prosecutions or convictions of traffickers. This compared with investigating, prosecuting, and convicting three traffickers in the previous reporting period. Observers noted magistrates often do not have access to the internet, electricity, or telephones, making it difficult to compile and report law enforcement data. Observers noted some communities resolved issues—including criminal offenses—through traditional or Islamic courts as opposed to the codified judicial system.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, hindering law enforcement action during the year. Reports of complicity from previous reporting periods included government-affiliated security forces profiting from illicit activity such as forced labor in cattle herding throughout the country's rural areas and along its borders, as well as officials forcing prisoners to work on private enterprises separate from their legal sentences being served. Observers reported some local government officials and security forces may cover up allegations of trafficking crimes or not pursue cases to protect suspected traffickers, and reported complicit officials intimidate victims from pursuing criminal cases. In September 2021, the Ministry of Justice, in collaboration with an international organization, conducted anti-trafficking trainings for judicial officials in N'Djamena and Moussoro.

## PROTECTION

The government maintained insufficient efforts to protect victims. Authorities did not report identifying any potential trafficking victims, compared with 19 potential victims identified in the previous reporting period. An international organization reported the Chadian Special Anti-Terrorism Unit (DGSAT) intercepted 23 potential child trafficking victims in northern Chad and referred them to care. The Association for the Reintegration of Children and the Defense of Human Rights (ARED) reported 60 complaints of potential human trafficking through its 20 focal points nationwide. Additionally, local NGOs identified 48 labor trafficking victims (all boys younger than the age of 18) and referred them to care. Authorities did not proactively screen vulnerable populations for trafficking indicators. In September 2021, the government, in collaboration with an international organization, finalized and began implementation of SOPs and an NRM for victim identification and referral to care.

The Ministry of Women, Family, and National Solidarity, in partnership with an international organization and local NGOs, continued to operate transit centers that served as temporary shelters throughout the country. These transit centers provided temporary housing, food, and education to victims of gender-based violence and other crimes, including potential victims of trafficking. Officials did not report providing services to trafficking victims in these facilities during the reporting period. Privately-run orphanages may have provided assistance to child trafficking victims, although these organizations did not report details. Services continued to be limited to urban areas and were largely inaccessible to much of Chad's rural population.

The government did not have a formal policy to offer temporary or permanent residency for foreign victims of trafficking and did not report identifying any foreign victims. Due to limited use of the new formal identification procedures, authorities may have arrested, detained, and penalized some unidentified victims.

## PREVENTION

The government increased efforts to prevent trafficking. Law 06/PR/2018 designated NCCTIP as the government's inter-ministerial entity to coordinate anti-trafficking efforts, and in February 2021, the Minister of Justice signed a decree formally establishing the NCCTIP. However, the

CHILE

government did not officially inaugurate or staff the NCCTIP by the end of the reporting period. In July 2021, the Minister of Justice launched a Multisectoral Technical Committee (MTC) to conduct the government's anti-trafficking activities in the interim. The government implemented its 2021-2022 anti-trafficking NAP and allocated resources to implement the plan. In September 2021, the Ministry of Justice in collaboration with an international organization, trained local media organizations on the trafficking in persons law and how to accurately cover human trafficking cases in their reporting. The pandemic's deleterious impact on government budgets, as well as overall operations, impeded authorities' implementation of anti-trafficking initiatives.

The government did not report conducting or contributing in-kind resources for any awareness-raising activities during the reporting period. National radio stations such as FM Liberté (FM Liberty) continued to raise awareness on human trafficking. Observers reported high illiteracy rates among the population hindered the government's ability to increase awareness of human trafficking.

The government had laws and regulations on labor recruitment; however, the government did not conduct inspections or screen intending migrants for trafficking indicators in the labor recruitment process. The government ratified the International Convention on the Protection of Rights of All Migrant Workers and Members of Their Families in February 2022 to increase protections for migrant workers. The government did not make efforts to reduce the demand for commercial sex acts. A lack of identity documentation remained a risk factor for trafficking in Chad, and the government did not report whether it continued to implement the 2013 birth registration policy requiring universal issuances of uniform birth certificates. The government, in collaboration with a foreign donor, provided anti-trafficking training to some of its troops prior to their deployment as peacekeepers. Authorities did not provide anti-trafficking training for its diplomatic personnel.

## TRAFFICKING PROFILE
As reported over the past five years, human traffickers exploit domestic and foreign victims in Chad, and traffickers exploit Chadian victims abroad. Families frequently entrust their children to relatives or intermediaries to receive education, apprenticeship, goods, or money; some relatives or intermediaries subsequently force or coerce children to work in domestic service or cattle herding. Individuals associated with small- and medium-scale enterprises force children to beg in urban areas and exploit them as agricultural laborers on farms; in northern gold mines and charcoal production; and as domestic workers across the country. In the Lake Chad region, community members exploit some children in catching, smoking, and selling fish. Elders of some traditional Quranic schools known as *mouhadjirin* coerce children from small rural villages into begging, street vending, or other forms of forced labor throughout the country.

Cattle herders force some children to work along traditional routes for grazing cattle and, at times, cross ill-defined international borders into Cameroon, the Central African Republic, Sudan, and Nigeria. Traffickers in rural areas sell children in markets for use in cattle or camel herding. In some cases, military or local government officials exploit with impunity child herders in forced labor. Additionally, experts allege officials force prisoners to work on private enterprises separate from their legal sentences. Criminal elements exploit some rural Chadian girls, who travel to larger towns in search of work, in child sex trafficking or domestic servitude. According to observers, Chadian mercenaries—recruited to Libya to take up arms in the conflict—facilitated human trafficking.

Chad hosts more than one million refugees, internally displaced persons, and asylum seekers as of January 2022; these populations may be vulnerable to trafficking based on their economic instability and lack of access to support systems. While many individuals crossing clandestinely into Libya for economic reasons initially used the services of smugglers, traffickers exploit some of these irregular migrants in commercial sex or forced labor. Terrorist groups Boko Haram and the Islamic State West Africa Province (ISIS-WA) forcibly abducted children to serve as child soldiers, suicide bombers, child brides, and forced laborers. Community-based armed groups tasked with defending people and property in rural areas likely recruit and use children in armed conflict. PRC nationals employed in Chad at worksites affiliated with the PRC's

Belt and Road Initiative may have been vulnerable to forced labor. Cuban nationals working in Chad on medical missions may have been forced to work by the Cuban government

# CHILE: TIER 1

The Government of Chile fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Chile remained on Tier 1. These efforts included awarding restitution to three trafficking victims, amending the penal code to increase the maximum penalty for trafficking crimes, contracting an NGO to oversee services for child trafficking victims during a period of bureaucratic transition, and issuing residency permits to 16 trafficking victims. Although the government meets the minimum standards, Chilean courts issued lenient sentences to convicted traffickers, resulting in a pattern of suspended sentences that could undercut nationwide efforts to fight trafficking. Victim services provision remained uneven, with limited access to care for male victims and victims outside the capital.



CHILE TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:
Sentence traffickers to adequate penalties, which should include significant imprisonment, as required by Articles 411 and 367 of the penal code. • Vigorously investigate, prosecute, and as appropriate, convict traffickers, including domestic child sex traffickers, under Article 411 of the penal code. • Provide suitable, safe shelter for child and male trafficking victims as required by law and expand access to specialized shelters for all victims, including outside the capital. • Increase training on application of Article 411 for judges and prosecutors. • Actively screen for trafficking victims among vulnerable migrant groups. • Continue efforts to disrupt systematic child abuse, including trafficking, in care facilities serving trafficking victims and hold violators accountable. • Provide victims access to a full range of services, including long-term rehabilitation. • Develop guidelines for officials to screen for trafficking indicators for children involved in illicit activities to ensure the government does not penalize trafficking victims for unlawful acts traffickers compelled them to commit. • Consistently support victim efforts to seek restitution.

## PROSECUTION
The government maintained prosecution efforts. Article 411-quater of the penal code criminalized sex trafficking and labor trafficking, prescribing penalties ranging from five years and one day to 20 years' imprisonment and a fine for offenses involving an adult victim and 10 years and one day to 20 years' imprisonment and a fine for those involving a child. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Chilean officials continued to investigate and prosecute many internal child sex trafficking cases under Article 367 of the penal code, which penalized "promoting or facilitating the prostitution of minors." Although Article 367 prescribed penalties ranging from three years and one day to 20 years' imprisonment, many child sex trafficking crimes were subject to penalties of only three years and one day to five years' imprisonment under this provision, significantly lower than the penalties available under Article 411-quater. Under mandatory sentencing laws, judges frequently suspended or commuted sentences of less than five years' imprisonment, even when adjudicating cases of human trafficking and other serious crimes. During the reporting period, the government

Haiti AR_000649

approved an amendment raising the maximum penalty for trafficking offenses involving adult or child victims under Article 411-quater from 15 to 20 years' imprisonment.

Law enforcement initiated 184 trafficking investigations in 2021 (120 child sex trafficking investigations under Article 367, 32 sex trafficking investigations under Article 411, and 32 labor trafficking investigations under Article 411), compared with 193 investigations initiated (136 child sex trafficking investigations under Article 367, 39 sex trafficking investigations under Article 411, and 18 for labor trafficking under Article 411) in 2020 and 171 in 2019. Authorities prosecuted 10 alleged traffickers in 2021 (four for child sex trafficking under Article 367 and two for sex trafficking and four for labor trafficking under Article 411), compared with seven alleged traffickers in 2020 (two for child sex trafficking under Article 367 and five for labor trafficking under Article 411) and 22 in 2019 (four under Article 367 and 18 under Article 411). There were five ongoing labor trafficking prosecutions initiated in previous reporting periods. The government convicted seven traffickers in 2021 (two child sex traffickers under Article 367 and three sex traffickers and two labor traffickers under Article 411), compared with six traffickers in 2020 (one child sex trafficker under Article 367 and three sex traffickers and two labor traffickers under Article 411) and six in 2019 (two under Article 367 and four under Article 411).

Judges issued sentences ranging from five to 12 years' imprisonment for the five traffickers convicted under Article 411; courts sentenced the two traffickers convicted under Article 367 to 18 months' overnight imprisonment and four years' continuous imprisonment, respectively. Courts also levied fines against six of the convicted traffickers. Two traffickers convicted under Article 411 received suspended sentences, compared with four traffickers (three convicted under Article 411 and one under Article 367) in 2020. In general, most convicted traffickers in Chile ultimately served parole or probation without post-trial imprisonment. In the past five years, judges sentenced 11 of 57 convicted traffickers to penalties above the mandatory minimum. Judges suspended the sentences of more than 55 percent of traffickers convicted since 2017, which weakened deterrence. Judges often held accused traffickers in pretrial detention. The government continued to investigate and prosecute individuals that engaged in commercial sex with children, resulting in four convictions in 2021, compared with two convictions in 2020 and eight in 2019. Judges convicted and sentenced three of these individuals to periods of probation; in one case, the courts sentenced the convicted individual to 541 days' conditional imprisonment, allowing him to serve probation in lieu of imprisonment.

The national investigations police (PDI) had three specialized anti-trafficking units operating in Arica, Iquique, and Santiago. The government continued to use special pandemic-mitigation measures, allowing prosecutors to work remotely and courts to hold most hearings via videoconference; the national prosecutor's office (MP) noted most criminal trials proceeded with modest delays throughout the reporting period. The government exchanged nine cooperation requests with Argentina, Colombia, Mexico, Peru, and Venezuela. Authorities' use of electronic transmission of cooperation requests facilitated the continuation of these exchanges during the pandemic. The government's interagency task force on trafficking (MITP) provided specialized training to investigators, attorneys, advisors, and staff on a range of trafficking issues; it delivered most trainings virtually in 2021. Law enforcement could use a software system to search for evidence of official complicity in trafficking cases. The government continued to investigate two cases of alleged official complicity: a 2020 case involving a law enforcement officer accused of obstructing a sex trafficking investigation and another case involving a National Service for Minors (SENAME) care facility director allegedly involved in the commercial sexual exploitation of two children under her supervision—allegations which, if proven, would amount to sex trafficking under the international law definition.

## PROTECTION

The government maintained victim protection efforts. MITP coordinated the government's anti-trafficking efforts, including victim assistance. The government identified 49 adult trafficking victims in 2021, compared with 47 adult victims (21 men and 26 women) in 2020 and 37 in 2019. The government did not report victims' gender or specify how many traffickers exploited in sex trafficking, as opposed to labor trafficking.

The government did not report how many child trafficking victims it identified in 2021, compared with two each in 2020 and 2019; the government instead reported identifying 30 child victims of commercial sexual exploitation—a broader categorization that included victims of trafficking, as well as certain non-trafficking crimes. The government reported all adult victims identified in 2021 were foreign citizens, primarily from Bolivia, Colombia, Haiti, and Venezuela. The government had a uniform reporting mechanism and a set of internal resources on trafficking indicators to guide public agencies' efforts to identify potential trafficking; it provided additional support for agencies reporting potential victims for the first time.

The MP's Regional Victims and Witness Assistance Unit (URAVIT) provided assistance to all 49 identified adult trafficking victims in 2021. The National Service of Women and Gender Equality (SERNAMEG) reported it provided shelter services to 10 adult women victims in 2021, compared with 16 in 2020. The MITP's protocol on victim assistance entitled victims to safe housing, health services, psychological services, legal assistance, education, employment assistance, and regularization of migratory status. The Ministry of Interior's Victim Assistance Network (RAV) and URAVIT coordinated housing for victims; the government could place up to 10 female trafficking victims at a time in SERNAMEG's specialized shelter for trafficking victims. The government placed most female victims, including those located outside the capital, in SERNAMEG's domestic violence shelters or NGO-run shelters. URAVIT could arrange housing in hotels for male victims on a case-by-case basis; however, there were no shelters for male victims. The provision of victim services remained uneven across the country, and NGOs reported funding was inadequate to provide necessary services, especially adequate shelter for children and male victims. The government did not fund most NGOs that provided victim assistance; most agencies did not have specific line items in their budgets for victim assistance. Reintegration services, such as education and job placement assistance, were insufficient, and officials reported victims had limited access to adequate mental health services.

URAVIT budgeted 35.4 million Chilean pesos ($42,020) to provide housing and other basic needs for trafficking victims and potential victims in 2021, down from approximately 84 million Chilean pesos ($99,700) in 2020. SERNAMEG allocated 129.7 million Chilean pesos ($153,950) in funding for its NGO-operated shelter for women victims of trafficking, smuggled women, and their children, compared with allocating 136 million pesos ($161,420) in 2020 and 127 million pesos ($150,740) in 2019. The government provided victims legal representation under the victim assistance protocol; the Ministry of Justice provided legal representation to child victims, SERNAMEG provided it to women victims, and MITP's civil society members provided representation for male victims.

The government restructured and renamed its child protection agency, which was responsible for most services for child trafficking victims; in 2021, SENAME became Better Childhood. Better Childhood, like SENAME, was responsible for providing basic services to child trafficking victims through a network of programs for child victims of commercial sexual exploitation and care facilities; during the transition, Better Childhood contracted an NGO to ensure child trafficking victims received care without interruption. Better Childhood did not report its budget allocation for child and adolescent victim services in 2021, compared with 3.26 billion pesos ($3.87 million) in 2020, 3.37 billion pesos ($4 million) in 2019, and 3 billion pesos ($3.56 million) in 2018. Better Childhood assisted 1,417 children in 2021 and 1,371 children in 2020, compared with 1,477 children in 2019, 1,459 children in 2018, and 1,350 children in 2017; Better Childhood did not track how many of the children it assisted were trafficking victims. The government did not report the number of child or adolescent victims of commercial sexual exploitation included in the worst forms of child labor registry in 2021, compared with 80, eight of whom were sex trafficking victims, in 2020. Better Childhood continued to decommission the agency's Specialized Redress Centers under Direct Administration (CREADs), the facilities that served most child trafficking victims under SENAME's care, replacing them with smaller "family-style residences." According to government reports, children in CREADs were at severe risk of rights violations and sexual abuse. The government closed one CREAD in 2021, leaving three of the original 11 facilities operational.

The government issued 16 no-fee visas for foreign trafficking victims, compared to 11 in 2020. These visas were valid for up to one year and renewable for up to two additional years if the victim reported the trafficking crime to the prosecutor's office. Foreign victims received the same victim services and courtroom accommodations—such as teleconference, witness protection, and video testimony—as Chilean victims. URAVIT continued to use a video interpretation service, adopted as a pandemic-mitigation measure, to facilitate safe exchanges between law enforcement and victims of all crimes, including trafficking victims, providing access to interpretation in sign language, regional Indigenous languages, Haitian Creole, and Chinese. Despite these efforts, the government reported challenges in encouraging victims to participate in a full trial. The government had until 2022 to gradually implement a 2019 law to reduce re-traumatization of child and adolescent victims through required video testimony facilitated by an expert intermediary; six regions operated under the new requirement in 2021. The government provided an intensive training course on video testimony to 26 PDI officials. Victims could receive restitution or compensation through criminal or civil cases, respectively; in 2021, the courts awarded three victims 10 million pesos ($11,870) each in restitution upon the conviction of the trafficker who exploited them in sex trafficking.

## PREVENTION

The government maintained modest prevention efforts. The Ministry of Interior continued to lead the MITP, which included government agencies, international organizations, and local NGOs. The task force met more frequently than in the previous reporting period, holding two general meetings during the reporting period; its subcommittee on victim assistance met separately seven times. The MITP continued informal implementation of a draft 2019-2022 national action plan, which had not been approved at the ministerial level and was not public. There was no federal allocation to fund the implementation of the draft plan; instead, each agency contributed to implementation from its own budget. Personnel and budget constraints affected several agencies with victim protection and trafficking prevention responsibilities. Observers noted a need for more robust coordination and data-sharing among government agencies.

The government held awareness-raising events throughout the year, targeting the general public and officials who might encounter trafficking victims in the course of their duties; the majority of these events took place online. Several agencies operated hotlines that could take calls on trafficking victims. The government reported operators received trafficking-related calls to these hotlines but did not report the number of investigations initiated from hotline calls during the reporting period, compared with at least 15 investigations in 2020. Labor inspectors were trained to identify trafficking indicators and conducted more than 75,000 worksite inspections, during which they identified 218 child labor violations, some of which may have constituted trafficking offenses; this compares with 65,000 inspections and identification of 66 child labor violations in the previous reporting period. The labor inspectorate imposed sanctions and levied fines against offenders. The national tourism service, in collaboration with Better Childhood, continued its certification of tourism organizations and establishments that adhere to best practices for the prevention of child sex trafficking; businesses participated in an anti-trafficking training during the certification process. The government did not make efforts to reduce the demand for commercial sex acts during the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Chile and, to a lesser extent, traffickers exploit Chilean victims abroad. Chilean women and children are exploited in sex trafficking within the country, as are women and girls from Asia and other Latin American countries, particularly Colombia. Government reporting indicates Bolivian, Colombia, Paraguayan, and Thai migrants are especially vulnerable to trafficking. Children staying in child protection centers are at risk of potential abuse, including trafficking. Some traffickers may recruit children staying in child protection centers. Traffickers exploit adults and children—primarily from other Latin American countries, as well as Asia—in forced labor in Chile in mining; agriculture; construction; street vending; the hospitality, restaurant, and

garment sectors; and domestic service. Traffickers subject Chinese and Haitian immigrants to sex trafficking and forced labor and Colombian women to sex trafficking. Chilean authorities identified a significant number of children involved in illicit activities, including drug trafficking and theft; some of these children may have been trafficking victims. Traffickers subject Chilean men to labor trafficking in Peru and Chilean women to sex trafficking in Argentina, as well as other countries. Foreign traffickers worked in tandem with Chilean traffickers to exploit victims. Most convicted traffickers were Chilean, Ecuadorian, or Bolivian citizens; men and women were equally represented among convicted traffickers. An international organization expressed concern striking workers in certain industries could be imprisoned and forced to work. Police often frequent brothels in small towns, and labor inspectors in rural areas maintain relationships with local businesses, dissuading potential trafficking victims from reporting exploitation and fueling perceptions of complicity.

Officials recognize growing migrant communities, especially irregular Venezuelan migrants, as increasingly at risk of trafficking. Migrants' vulnerability to trafficking increased during the COVID-19 pandemic, with more than 30 percent experiencing job loss with limited alternatives amid regional movement restrictions. Due to the pandemic, the government closed national borders to non-resident foreign nationals from March 2020 until October 2021; land borders remained closed through December 2021. With official crossings closed, officials continued to detect large numbers of irregular migrants entering Chile, primarily Venezuelans via northern land borders. Stricter immigration laws also contributed to heightened vulnerability in migrant populations, especially Venezuelans. Under its new immigration framework, effective April 2021 but retroactive to the March 2020 border closure, the government did not permit irregular migrants or those entering the country on a tourist visa to alter their residency status in-country; undocumented migrants present in Chile before March 2020 could regularize their status, reducing their vulnerability to trafficking, via a special dispensation through January 2022. Civil society actors and government officials both expressed concern the confluence of increased irregular arrivals and the new regulations would increase migrants' vulnerability to trafficking. The same immigration reform law included a provision to expressly prohibit the deportation of identified trafficking victims.

## CHINA, PEOPLE'S REPUBLIC OF: TIER 3

The Government of the People's Republic of China (PRC) does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the PRC remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including by initiating its first reported prosecution of a domestic case of trafficking without transnational elements since 2017; approving a new national action plan for 2021-2030; and co-sponsoring and participating in anti-trafficking training symposia. However, during the reporting period there was a government policy or pattern of widespread forced labor, including through the continued mass arbitrary detention of Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and members of other Turkic and/or Muslim minority groups in the Xinjiang Uyghur Autonomous Region (Xinjiang) under the guise of "vocational training" and "deradicalization." Authorities continued to implement these policies in other provinces; targeted other religious minorities under their auspices; and sought the coerced repatriation and internment of religious and ethnic minorities living abroad through the use of surveillance, harassment, threats against them and their family members, and extradition requests. The government also reportedly continued to place ethnic Tibetans in vocational training and manufacturing jobs as part of an ostensible "poverty alleviation" and "labor dispatch program" that featured overt coercive elements. PRC nationals reportedly suffered forced labor in several countries in Asia, the Middle East, Africa, and Europe hosting Belt and Road Initiative (BRI)

projects, within which PRC authorities exercised insufficient oversight of relevant recruitment channels, contracts, and labor conditions, and PRC diplomatic services routinely failed to identify or assist those exploited. For the fifth consecutive year, the government did not report complete law enforcement data, nor did it report identifying any trafficking victims or referring them to protection services.



CHINA (PRC) TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Abolish the arbitrary detention and forced labor of persons in internment camps and affiliated manufacturing sites in Xinjiang and other provinces and immediately release and pay restitution to the individuals detained therein. • End forced labor in government facilities, in nongovernmental facilities converted to government detention centers, and by government officials outside of the penal process. • Cease all coercive labor transfer and compulsory vocational training programs, as well as discriminatory hiring and targeted urban resettlement displacement policies, that place Uyghurs, Tibetans, and members of other ethnic and religious minority groups at risk of trafficking. • Cease the use of harassment, threats, and illegal discriminatory immigration policies as measures to coerce the return to Xinjiang and subsequent forced labor of PRC ethnic and religious minorities living abroad. • In conjunction with receiving countries, increase oversight of recruitment, contracts, and working conditions associated with BRI project worksites; enforce bans on the imposition of worker-paid recruitment fees and security deposits; and train PRC consular services to identify and assist PRC national victims of forced labor abroad, including in BRI projects. • Amend legislation to criminalize all forms of sex trafficking and forced labor as defined under international law and, respecting due process, vigorously investigate, prosecute, and impose prison sentences on perpetrators of forced labor and sex trafficking, including complicit government officials. • Institute and systematize proactive, formal procedures to identify trafficking victims throughout the country—including male victims, labor trafficking victims, PRC victims returning from abroad, and victims among vulnerable groups, such as migrant workers, PRC and foreign fishermen, foreign women, North Korean workers, and PRC women and children arrested on "prostitution" charges—and train front-line officers on their implementation. • Increase oversight of seafarer labor conditions in the PRC fishing industry, including by banning illegal and unregistered recruitment agencies; mandating international vessel registration; collecting and publishing information on vessel licensure, registered operating areas, and crew manifests; conducting random onboard inspections; and working with port country authorities to investigate and criminally prosecute distant water fleet (DWF) forced labor crimes. • Cease penalization of victims for unlawful acts that traffickers compelled them to commit and ensure authorities do not subject trafficking victims to extended detention, punishment, or deportation, including by immediately screening individuals suspected of "prostitution" offenses for sex trafficking indicators and referring identified victims to protection services. • Expand victim protection services, including comprehensive counseling and medical, reintegration, and other rehabilitative assistance for male and female victims of sex and labor trafficking. • Provide legal alternatives to foreign victims' removal to countries where they would face hardship or retribution, particularly North Korea. • Increase the transparency of government efforts to combat trafficking and provide disaggregated data on investigations and prosecutions, victim identification, and service provision, including by continuing to share relevant data with international partners; and apply the 2000 UN TIP Protocol to Hong Kong.

**PROSECUTION**

The government decreased law enforcement efforts, including by continuing to apply extensive law enforcement and paramilitary resources toward the mass detention and forced labor of members of ethnic and religious minority groups. The criminal code criminalized some forms of sex trafficking and labor trafficking. Various provisions of the criminal code could be used to prosecute sex trafficking crimes. Article 240 criminalized "the abduction and sale of women or children," which included abduction by deceit, kidnapping, purchasing, selling, sending, receiving, and transferring for the purpose of sale; however, unlike the definition of trafficking in persons under international law, Article 240 did not explicitly link these acts to a purpose of exploitation. Article 240 prescribed penalties of five to 10 years' imprisonment and fines for the abduction and sale of women and children. If an abducted woman was then forced into "prostitution," the penalties increased to 10 years' to life imprisonment, fines, and confiscation of property. These penalties were sufficiently stringent and commensurate with the penalties prescribed for other serious crimes, such as rape. Article 241 criminalized the purchase of abducted women or children and prescribed a maximum penalty of three years' imprisonment, short-term detention, or controlled release; like Article 240, it did not require that the purchase be for the purpose of exploitation. Penalties under this provision were not alone sufficiently stringent; however, Article 241 stipulated that if an individual purchased an abducted woman or child and then subjected them to "forcible sexual relations," they would face additional penalties under the criminal code's rape provisions. Article 358 criminalized forced prostitution and prescribed penalties of five to 10 years' imprisonment; if the crime involved a child younger than the age of 14, the penalties increased to 10 years' to life imprisonment in addition to fines or confiscation of property. These penalties were sufficiently stringent and commensurate with the penalties prescribed for other serious crimes, such as rape. Article 359 criminalized harboring prostitution or luring or introducing others into prostitution, and it prescribed a maximum of five years' imprisonment and a fine; if the crime involved a girl younger than the age of 14, it prescribed a minimum of five years' imprisonment and a fine. These penalties were sufficiently stringent; however, the penalties prescribed for crimes involving girls ages 14 to 17 were not commensurate with the penalties prescribed for other serious crimes, such as rape. Labor trafficking crimes could be prosecuted under Article 244, which criminalized forcing a person "to work by violence, threat, or restriction of personal freedom" and recruiting, transporting, or otherwise assisting in forcing others to labor, and prescribed three to 10 years' imprisonment and a fine. These penalties were sufficiently stringent.

Although the central government continued to prosecute and convict PRC nationals for trafficking crimes, authorities did not collect or report comprehensive law enforcement data. Partial public records of anti-trafficking enforcement continued to feature crimes outside the definition of trafficking according to international law (including migrant smuggling, child abduction, custody disputes, forced marriage, and fraudulent adoption), making it difficult to assess progress. The government continued to handle most cases with indicators of forced labor as administrative issues through the Ministry of Justice (MOJ) and seldom initiated prosecutions of such cases under anti-trafficking statutes; observers noted authorities were more likely to persecute human rights advocates and organizations drawing attention to forced labor than to enforce labor laws. Some courts likely continued to prosecute trafficking crimes under laws pertaining to domestic violence, labor contract violations, and child abuse, all of which prescribed lesser penalties. In prior years, authorities did not disaggregate conviction data by the relevant criminal code statutes, and courts reportedly prosecuted the vast majority of these cases under Article 358—especially for those involving commercial sexual exploitation—rather than under Article 240.

For the fifth consecutive year, the Ministry of Public Security (MPS) did not report the number of investigations initiated of possible trafficking cases (1,004 in 2016), but it claimed 700 cases from prior years remained under investigation. Eighty-six prosecutions initiated in prior years also remained in process (unreported in 2020); authorities did not provide further information on the status of these cases or the nature of the relevant alleged crimes. Authorities did not report data on prosecutions initiated in 2021. However, an early 2022 case involving the forced

CHINA, PEOPLE'S REPUBLIC OF

concubinage and childbearing of a PRC woman in Jiangsu province garnered widespread coverage in state-controlled media, generating rare public outrage that culminated in the PRC's first prosecution of a trafficking case without transnational elements since 2017; the case, which involved two alleged traffickers, was ongoing at the end of the reporting period. It led to a new national MPS campaign to address backlogged abduction and trafficking cases, as well as an interagency policy coordination process to consider increasing the penalties for trafficking crimes. Media reports indicated at least one PRC court prosecuted and convicted a trafficker for luring PRC nationals abroad with false promises of high-paying employment at BRI worksites; no further information on this case was available. Unlike in 2020, the government did not provide data on the number of cases of "women trafficking and child abduction," "forced prostitution," or forced labor it concluded in 2021 (compared with 546 cases, 475, and 38, respectively, in 2020). Courts reported convicting nine traffickers, although none of the criminal code articles applied were trafficking-specific (unreported in 2020; 2,355 convictions in 2019); further information on case specifics was unavailable. The government again did not provide complete sentencing information, but penalties imposed in the aforementioned nine cases ranged from one to 15 years' imprisonment with fines ranging from 5,000 to 50,000 renminbi ($780 -$7,850), compared with at least one conviction ranging from five to three years' imprisonment in 2020.

Authorities engaged in law enforcement cooperation with European, Central Asian, and Southeast Asian governments to investigate cases of PRC citizens subjected to trafficking abroad, as well as cases involving foreign nationals subjected to trafficking within the PRC. The government maintained anti-trafficking agreements with the five other Lower Mekong countries to jointly address trafficking via the forced and fraudulent marriage of their citizens to PRC-based individuals; some provincial governments maintained their own similar agreements with counterpart entities in bordering countries. Authorities also reported maintaining coordinative anti-trafficking mechanisms with law enforcement and interior ministry counterparts in 34 countries. Some law enforcement personnel in neighboring countries continued to report their PRC counterparts were unresponsive to requests for bilateral cooperation on cross-border trafficking cases, while others reported the PRC's cumbersome law enforcement bureaucracy hindered joint operations. Some foreign officials noted jurisdictional challenges when attempting to pursue trafficking investigations inside of special economic zones operated by PRC national-owned companies in Lower Mekong countries.

For the first time since 2017, the government reported allocating funding to support capacity-building training for law enforcement on prosecuting trafficking cases. PRC media outlets occasionally published accounts of corrupt officials arrested for allegedly shielding or profiting from criminal organizations engaged in commercial sex rings known to perpetrate sex trafficking. In previous years, officials found guilty of these crimes reportedly faced expulsion from the Chinese Communist Party, termination of their official positions, fines, and referral to the judicial system. However, authorities did not provide statistics on the number of investigations, prosecutions, or convictions resulting from these efforts. Despite continued reports of law enforcement officials benefiting from, permitting, or directly facilitating sex trafficking and forced labor, the government did not report any investigations, prosecutions, convictions, or administrative fines or demotions of law enforcement officials allegedly involved in the crime. Officials at multiple levels, including central party-state officials, were also complicit in state-sponsored forced labor by directing the PRC's mass detention, political indoctrination, and labor dispatch campaign against members of Turkic and/or Muslim minority groups, and some officials reportedly profited directly from this system. Authorities reportedly subjected Tibetans and members of other ethno-religious groups to similar abuses. Xinjiang officials continued to obstruct meaningful access for international observers to sites across the province that would otherwise facilitate investigations into credible allegations of forced labor.

## PROTECTION

The government decreased efforts to protect victims, including by continuing to facilitate the forced labor of its citizens domestically, and by failing to identify or provide services to PRC citizens subjected to forced labor abroad. In conjunction with international organizations, PRC authorities co-hosted, supported, and participated in several training symposia on victim identification, referral, and service provision in 2021—while continuing to demonstrate significant shortcomings in all three areas. For the fifth consecutive year, the government did not report how many victims it identified or referred to protection services, although media reports indicated authorities continued to remove some victims from their exploitative situations. The government delayed or altogether ceased the identification and repatriation of foreign trafficking victims while diverting law enforcement resources to pandemic mitigation measures in 2021. Based on media and NGO reports, authorities continued to prioritize the identification of women and girls in sex trafficking to the near total exclusion of efforts to identify forced labor victims. The overly narrow definitions inherent to the PRC's anti-trafficking statutes significantly limited the scope of victim identification among key demographics; in practice, authorities did not screen men or boys older than the age of 14 for any signs of exploitation in sex trafficking or forced labor. Authorities claimed to have used an app-based system to track and remove more than 4,300 missing children from exploitation in the first nine months of 2021 (compared with 4,600 in 2020), some of whom were likely victims of trafficking; like the previous year, authorities did not provide relevant statistics or information on identification or referral measures (compared with 120 victims identified among more than 4,000 children in 2019). The Ministry of Human Resources and Social Services (MOHRSS) operated and publicized three 24-hour hotlines that could benefit potential trafficking victims—one for labor issues, one for child protection, and one for gender-based violence—but authorities did not provide statistics on their use.

The PRC lacked a standardized national referral mechanism, but MPS maintained written instructions promulgated in 2016 for law enforcement officers throughout the country aiming to clarify procedures for identifying trafficking victims among individuals in commercial sex and forced or fraudulent marriage. MPS officials reportedly maintained a procedure to screen for trafficking indicators among individuals arrested on suspicion of "prostitution" crimes. Authorities reportedly worked with an international organization to begin formulating new victim identification guidelines in 2020 but did not report on the status of this work for the second consecutive year. A 2016 policy limiting the detention of individuals arrested for alleged criminal sex to 72 hours remained in place. Despite the existence of these procedures, law enforcement officials in prior years arrested and detained foreign women on suspicion of "prostitution" crimes without screening them for indicators of sex trafficking—sometimes for as long as eight months—before deporting them for immigration violations; observers noted this likely continued in 2021. Because authorities did not universally implement identification or referral procedures across law enforcement efforts, it was likely police arrested and detained unidentified PRC trafficking victims for unlawful acts traffickers compelled them to commit. Authorities may have detained some victims of sex trafficking—alongside individuals with drug addictions and men arrested for commissioning sex acts—in government "rehabilitation camps" known to feature forced labor conditions.

The government did not provide data on victim service provision in 2021. The government previously reported maintaining at least 10 shelters specifically dedicated to care for PRC trafficking victims, as well as eight shelters for foreign trafficking victims and more than 2,300 multi-purpose shelters nationwide that could accommodate trafficking victims; it did not provide any information on these shelters for the third consecutive year. The Ministry of Civil Affairs, the All-China Women's Federation, and community-based NGOs could provide victims with shelter, medical care, counseling, legal aid, and social services. Access to specialized care depended heavily on victims' location and gender; experts noted ad hoc referral procedures and an acute lack of protection services in the south, and that male victims were far less likely to receive care nationwide. The law entitled foreign victims to the same benefits as PRC nationals, but this varied significantly in practice. In previous years, rural border officials received reports involving the sex trafficking and forced labor of some foreign women and girls via force and fraudulent marriage to PRC men, and officials provided them with temporary shelter and helped to fund and escort their repatriation. However, this assistance was reportedly ad hoc, often heavily bureaucratic, and less prevalent among front-line officers working

farther inland, where some foreign victims escaped, reported these abusive circumstances to the authorities, and were summarily arrested and forcibly returned to their PRC "husbands"—sometimes in exchange for bribes from the men's families. Widespread stigma against victims of sex trafficking likely continued to discourage many from accessing protection services. MOHRSS reportedly could provide compensation and some protection services to labor trafficking victims, but authorities did not report information on the number of victims MPS referred for these services. Implementation of a law placing foreign NGOs in the PRC under MPS supervision continued to impose burdensome requirements and restrictions on the activities of civil society organizations, including those able to provide services for trafficking victims and communities vulnerable to the crime. Foreign embassies in the PRC could provide shelter or other protection services to victims, but pandemic mitigation measures likely limited these services in 2021.

Authorities did not condition access to victim care on cooperation with law enforcement, but they did require victims to provide information to police. The law entitled victims to request criminal prosecution and claim compensation through civil lawsuits against traffickers; the government did not report whether any victims benefited from this provision in 2021, and observers assessed authorities likely did not apply this benefit equitably across all cases. Some forced marriage cases, many of which continued to demonstrate corollary indicators of sex trafficking and forced labor, were mediated at the village collective level; these proceedings rarely culminated in a guilty verdict through which to grant restitution to the victims. In prior years, MOJ officials reportedly provided some *Pro bono* legal assistance to trafficking victims, but government-affiliated NGO observers noted some victims faced difficulties accessing these services or paying for their own representation. The judicial system did not require victims to testify against traffickers in court and allowed prosecutors to submit previously recorded statements as evidence; however, authorities required some foreign victims to stay in the PRC to assist in police investigations until their conclusion.

The government's previously reported victim assistance abroad—including its eight border liaison offices with Burma, Laos, and Vietnam, along with victim funds, hotlines, and government-to-government agreements to assist victims—was not efficacious. The government did not report data on victim repatriation in 2021, but an international organization confirmed authorities assisted in the repatriation of some Southeast Asian victims to their countries of origin. PRC officials operating in other countries may have facilitated the sex trafficking of PRC nationals abroad through lax visa and immigration procedures. PRC authorities reportedly harassed, threatened, attempted to discredit, and sought the extradition of Uyghur and ethnic Kazakh forced labor survivors seeking asylum abroad in retaliation for their contact with foreign media outlets.

The government did not report any measures to screen for, or identify, forced labor indicators among the thousands of vulnerable migrant seafarers employed on PRC national-owned DWF vessels, nor within its extensive coastal offshore fishing fleet. The government did not report conducting any training on victim identification or assistance for its diplomatic services abroad. PRC consular officials often did not take steps to proactively identify, respond to, or assist PRC nationals subjected to forced labor under the auspices of BRI projects overseas, including when victims reported abuses to local PRC diplomatic missions. PRC municipal authorities were sometimes responsive to BRI-related complaints filed in conjunction with an international organization, including by requiring foreign-based PRC-run companies to follow victim protection, compensation, and repatriation protocols in some cases. PRC fishermen subjected to forced labor were generally unable to report abuses to local authorities or access protection services when returning to the PRC. The government did not undertake efforts to identify trafficking victims within the PRC's highly vulnerable North Korean migrant population, nor did it provide suspected North Korean trafficking victims with legal alternatives to repatriation. Although significantly fewer North Korean nationals transited the PRC while seeking asylum in third countries due to pandemic-related border closures, authorities continued to detain North Korean asylum-seekers and forcibly return some to North Korea, where they likely faced severe punishment or death, including in forced labor camps; the government did not report screening these individuals for indicators of trafficking.

The government continued to restrict access of UN agencies attempting to monitor and assist refugees near the PRC's border with the DPRK.

## PREVENTION

The government decreased efforts to prevent trafficking. PRC authorities continued to amplify the magnitude of trafficking crimes in the country and abroad, including by perpetrating genocide and continuing to use emerging technologies to carry out discriminatory surveillance and ethno-racial profiling measures designed to subjugate and exploit minority populations in forced labor in internment camps under the pretext of combating violent extremism and other social ills. The PRC continued its policies of mass detention and political indoctrination against more than one million Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and members of other Turkic and/or Muslim minority groups in Xinjiang, and it continued to expand these policies through the transfer of thousands of detainees into forced labor in dozens of other provinces, according to NGO estimates and media reports. Authorities forcibly transferred thousands of Uyghur youth into manufacturing jobs throughout the PRC to fill labor shortages in quarantine zones. National policies officially imposed deradicalization duties on Xinjiang-based commercial entities and trade unions, further cementing their role in state-sponsored forced labor under the guise of public security measures. Local governments and businesses received tax breaks and financial subsidies for establishing new manufacturing sites and accepting or transferring detainees for these purposes, and officials reportedly received promotions and other benefits for their role in the process. According to official PRC government documents, local governments at times arrested Muslims arbitrarily or based on spurious criminal charges and administrative violations—including violation of birth restrictions—in order to meet detention quotas established specifically for this internment system. Reports indicate authorities partially staffed internment camp facilities using forced labor, including among vocational and language instructors. Authorities sent many detained individuals approved to "graduate" from these facilities to external manufacturing sites in close proximity to the camps or in other provinces and subjected them to forced labor; authorities transferred others and likely subjected them to forced labor within a separate—and growing—formal prison system. The government continued to transfer some members of non-interned minority communities designated arbitrarily as "rural surplus labor" to other areas within Xinjiang as part of a "poverty alleviation" program and exploit them in forced labor. Authorities also used the threat of internment to coerce members of some Muslim communities directly into forced labor in manufacturing. The government continued to subject Xinjiang's ethnic minority communities to severe travel restrictions, including through prohibitions on access to passports, which compounded their vulnerability to arbitrary detention and state-sponsored forced labor. The Ministry of Foreign Affairs continued to confiscate, cancel, or refuse to renew the PRC passports of Uyghurs and other Muslims living abroad, including those with legal permanent resident status or citizenship in other countries, as a coercive measure to lure them back to Xinjiang and likely detain them within the camps. There were also reports that authorities threatened, detained, and forcibly hospitalized these individuals' family members in Xinjiang in an attempt to silence them and/or coerce their return. The PRC continued to seek the extradition of Muslim individuals who sought asylum abroad after fleeing exploitation in forced labor, among other human rights abuses, in Xinjiang. Nationwide, some school districts continued to compel ethnic Han students to participate in internship programs featuring forced labor indicators, including compulsory factory labor.

Authorities reportedly continued to place thousands of rural Tibetan herders and farmers in "military-style" vocational training and manufacturing jobs around the country under the auspices of a quota-based "surplus labor" transfer program ostensibly intended as a "poverty alleviation" measure. Although the program did not feature overt arrests or enforced disappearances, observers noted the system was likely highly coercive, given individuals' relative inability to refuse participation amid the central government's pervasive system of social control in Tibetan areas. Some of these Tibetans were subsequently subjected to forced labor in manufacturing. Authorities also exacerbated Tibetans' vulnerability to trafficking by systematically dismantling the Tibetan rural economy through mass enforced relocations, and by forcing those who sought work in the state sector to renounce all ties to the Dalai Lama as a condition of employment.

Haiti AR_000654

CHINA, PEOPLE'S REPUBLIC OF

The PRC government did not report continuing to implement or expand pilot programs initiated in prior years to reduce vulnerabilities among foreign seafarers hired informally or illegally to work onboard vessels in the PRC's global fishing fleet. PRC-owned and affiliated companies continued to employ PRC and foreign nationals at BRI project worksites abroad; the government did not exercise adequate oversight of recruitment procedures, which often featured worker-paid fees driving indebtedness to unregistered brokers, nor did it take steps to ensure worker contracts were free of abusive contract provisions. Many PRC nationals employed at BRI worksites abroad initially entered destination countries on tourist visas and were forced to work without contracts. In recognition of this insufficiency, authorities maintained policies and regulatory standards issued in 2017 barring the collection of recruitment fees or security deposits from job applicants, banning the use of tourist visas for travel to work in BRI destination countries, and instructing companies on safeguarding labor rights; however, these were largely nonbinding, and the government did not report efforts to enforce them. International visibility into BRI recruitment processes, labor contracts, and working conditions was constrained in part due to the PRC government's failure to establish a single governing entity for the program or to publish a list of worldwide BRI projects, bilateral negotiations for which were kept secret. In recent years, NGOs in countries receiving PRC migrant workers through other bilateral agreements reported the PRC government ignored abusive and potentially illegal contract stipulations, including fees and provisions requiring immediate repatriation for pregnancies or illnesses, which placed some PRC workers at higher risk of debt or punitive deportation as coercive measures to retain their labor; the government did not take steps to address these vulnerabilities during the reporting period. The PRC government's exertion of political pressure and operating restrictions on NGOs in Hong Kong had a negative impact on anti-trafficking coordination with the local authorities there.

The PRC government did not report holding an annual inter-ministerial meeting to coordinate anti-trafficking efforts for the second consecutive year. In April 2021, the State Council published its Action Plan against Trafficking in Persons (2021-2030), developed under the guidance of MPS and in consultation with academic and juvenile protection experts. The new action plan focused on preventing fraudulent adoption, combating cyber-facilitated sex trafficking crimes, and improving labor recruitment procedures, with an emphasis on women and girls; it contained no explicit mention of men or boys and few mentions of forced labor. For the fifth consecutive year, the government did not report its funding for anti-trafficking activities in furtherance of the action plan (more than 55 million renminbi, or $8.63 million, in 2016). In September, the State Council also launched a National Program for Women's Development (2021-2023) that included trafficking prevention elements, but authorities did not report information on implementation activities in 2021. The All-China Women's Federation, which was designated to lead or support dozens of workstreams in the national action plan, maintained provincial chapters; one such chapter drew criticism in 2021 for allegedly misappropriating more than $1.5 million—a quarter of its annual budget—for "personal expenses." National and local authorities conducted media outreach campaigns on some forms of trafficking, although the content thereof generally focused on child abduction and forced and fraudulent marriage. Officials co-sponsored and participated in trafficking prevention training activities in conjunction with international organizations. Observers noted the government's construction of border fences as a pandemic mitigation strategy may have curbed transnational trafficking between Guangxi and Vietnam in 2021. PRC peacekeepers participated in a brief UN training course on the risks of human trafficking prior to deployment to Sudan, South Sudan, and Cyprus.

PRC authorities did not take any steps to alter course in response to mounting public concern regarding Xinjiang abuses and the contamination of international supply chains with goods produced by state-sponsored forced labor there in 2021. To the contrary, the government and affiliated commercial entities engaged in a concerted campaign to dispel these accusations through vehement denial in public messaging; state-ordered politically motivated academic research; falsified cotton production and harvest mechanization data; localized propaganda campaigns targeting consumers in trade partner countries; the establishment of false supply chain policy initiatives as alternatives to preexisting international monitoring and compliance programs; new

sanctions on foreign government officials critical of PRC abuses; and pressure on international companies. Authorities publicly reported instituting new inspection protocols in Xinjiang in an effort to further dispel allegations of forced labor in the region; observers assessed these protocols as neither credible nor sufficient to meaningfully deter state-sponsored forced labor there.

Academics and experts noted the gender imbalance created by the previous One-Child Policy likely continued to contribute to trafficking crimes in the PRC. The government *hukou* (household registration) system continued to contribute to the vulnerability of internal migrants by reducing access to social services, particularly for PRC victims returning from exploitation abroad, and by driving hundreds of millions of individuals to live and work illegally outside the jurisdiction of their registration. The government continued to address some of these vulnerabilities by requiring local governments to provide a mechanism for migrant workers to obtain residency permits. However, these residency permits were disproportionately unavailable to rural ethnic Han migrants and members of ethnic minority groups, exacerbating their constrained access to employment and social services. The government did not make efforts to reduce the demand for commercial sex acts. The government did not report investigating or prosecuting any PRC citizens for child sex tourism, despite widespread reports of the crime. While the PRC government included Macau in its succession to the 2000 UN TIP Protocol in 2010, it stated the protocol "shall not apply" to Hong Kong.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the PRC, and they exploit victims from the PRC abroad. Traffickers also use the PRC as a transit point to subject foreign individuals to trafficking in other countries throughout Asia and in international maritime industries. Highly organized criminal syndicates and local gangs subject PRC women and girls to sex trafficking within the PRC. Traffickers typically recruit them from rural areas and take them to urban centers, using a combination of fraudulent job offers and coercion by imposing large travel fees, confiscating passports, confining victims, or physically and financially threatening victims to compel their engagement in commercial sex. The PRC's national household registry system (*hukou*) continues to restrict rural inhabitants' freedom to legally change their residence, placing the PRC's internal migrant population—estimated to exceed 169 million people—at high risk of forced labor in brick kilns, coal mines, and factories. Some of these businesses operate illegally and take advantage of lax government enforcement. PRC nationals in several countries are subjected to conditions indicative of forced labor at BRI worksites owned, managed, and/or operated with partial or full investment by PRC-based companies, PRC nationals, or the PRC government. African and Asian men reportedly experience conditions indicative of forced labor aboard PRC-flagged and PRC national-owned, foreign-flagged fishing vessels operating worldwide in the PRC's DWF; men from other regions may be in forced labor aboard these vessels as well. Women and girls from South Asia, Southeast Asia, and several countries in Africa experience forced labor in domestic service, forced concubinage leading to forced childbearing, and sex trafficking via forced and fraudulent marriage to PRC men. Traffickers target adults and children with developmental disabilities and children whose parents have left them with relatives to migrate to the cities—estimated at 6.4 million—and subject them to forced labor and forced begging. State bodies reportedly subject members of Muslim minority groups and Tibetans to forced labor as part of arbitrary mass detention, political indoctrination, and labor transfer schemes.

State-sponsored forced labor is prevalent in the PRC. In 2013, the National People's Congress ratified a decision to abolish "Re-education through labor" (RTL), a punitive system that subjected individuals to extra-judicial detention involving forced labor, from which the government reportedly profited. The government closed most RTL facilities by October 2015; however, the government reportedly converted some RTL facilities into state-sponsored drug rehabilitation facilities or administrative detention centers where, according to civil society and media reports, forced labor continues. State-sponsored forced labor persists under the government's mass detention and political indoctrination campaign against predominantly Muslim and/or Turkic minorities in the Xinjiang Uyghur Autonomous Region (Xinjiang).

Haiti AR_000655

Authorities have utilized discriminatory surveillance technologies, including facial recognition and DNA sequencing technology, and arbitrary administrative and criminal provisions to detain more than one million ethnic Muslims, including Uyghurs, ethnic Hui, ethnic Kazakhs, ethnic Kyrgyz, ethnic Tajiks, and ethnic Uzbeks in as many as 1,200 "Vocational Skills Education and Training Centers"—internment camps designed to erase ethnic and religious identities under the pretext of "deradicalization." Camp authorities reportedly force some individuals to work in staff positions within the camps, including in sewing and Mandarin language instruction. During detention within—and following "graduation" from—these facilities, government authorities and/or authorized commercial entities subject many of these individuals to forced labor in adjacent or off-site factories producing garments, automotive components, footwear, carpets, yarn, food products, construction materials, holiday decorations, building materials, solar power equipment, polysilicon and other renewable energy components, consumer electronics, bedding, hair products, cleaning supplies, personal protective equipment face masks, chemicals, pharmaceuticals, and other goods for domestic and international distribution. Coercive conditions reportedly include threats of physical violence, confiscation of travel and identity documents, forcible drug intake, physical and sexual abuse, and torture, among others. Local governments have reportedly used the threat of internment to coerce some members of these communities directly into forced labor. A small number of ethnic Han individuals and members of other religious minority groups, including Jehovah's Witnesses, are also reportedly in detention within this system. Authorities offer tax breaks and other financial subsidies incentivizing PRC national-owned companies to open factories in close proximity to the internment camps and to receive transferred detainees at satellite manufacturing sites in other provinces, and local governments receive additional funds for each inmate forced to work in these sites at a fraction of minimum wage or without any compensation. The government has transported at least 80,000 of these individuals to other provinces for forced labor under the guise of poverty alleviation and industrial aid programs; authorities have formally convicted many more, perhaps hundreds of thousands, under spurious criminal charges and transferred them to more than 100 urban prisons throughout the country, where they suffer additional forced labor conditions. In total, the PRC has reportedly placed 2.6 million members of minority communities in agricultural and manufacturing jobs within Xinjiang and across the country through state-sponsored "surplus labor" and "labor transfer" initiatives featuring overt forced labor indicators.

Authorities in some localities also subject the families of men arbitrarily detained in Xinjiang to forced labor in their absence. Internment of these communities in false vocational training centers excludes them from genuine educational and vocational training and opportunities, thereby exacerbating survivors' poverty and subsequent vulnerability to trafficking. Contacts report families separated by this system are also more likely to fall below the poverty line and are therefore at higher risk of sex trafficking and forced labor. Authorities place the young children of interned individuals in Xinjiang in state-run boarding schools, orphanages, and "child welfare guidance centers," and force them to participate in political indoctrination activities and report on their families' religious activities. Authorities reportedly place older children among these groups in vocational schools, where some may be victims of forced labor. Authorities have arbitrarily detained some Kazakhstani and Kyrgyzstani citizens visiting family in Xinjiang; their children, now unaccompanied abroad, are also at elevated risk of trafficking. NGOs report ethnic Han men may be increasingly able to force Uyghur and other Muslim women into marriages under the government's discriminatory ethnic assimilation policies, placing them at higher risk of forced labor in domestic service and other forms of exploitation. Members of these Muslim minority groups attempting to seek asylum abroad are vulnerable to immigration-related administrative and criminal charges in destination countries, as well as to PRC extradition and refoulement.

Xinjiang authorities issued a notice in 2017 abolishing rural obligatory labor under the *Hashar* system, in which they had reportedly subjected thousands of Uyghur adults and children to forced labor in government infrastructure projects and agriculture each year. Despite this policy change, similar forms of state-sponsored forced labor continue in Xinjiang, including under the auspices of the Xinjiang Production

and Construction Corps (Bingtuan)—an economic and paramilitary organization with administrative control over several areas in the region comprising approximately 2.8 million personnel. According to NGO reports, Bingtuan regiments manage at least 36 agricultural prison farms throughout Xinjiang; unlike the aforementioned mass detention campaign, this system primarily subjects ethnic Han inmates—many of whom may be victims of arbitrary detention—to forced labor. Bingtuan authorities also force inmates to build new prison facilities in several areas of the province and may subject inmates to forced labor in coal, Uranium, and asbestos mining, as well as in lead and zinc smelting and fertilizer production. Authorities also subject some Xinjiang residents to forced labor in silica mining and processing for use in solar components, aluminum alloy, and silicone. The Bingtuan reportedly forces half a million Uyghur adults and children to pick and process cotton, tomatoes, sugar beets, and possibly apples and peanuts. The impact of formal discriminatory employment policies barring Uyghurs from jobs in many sectors—including in the annual cotton harvest—reportedly drives thousands of Uyghur farmers out of their communities in search of alternative work, placing them at higher risk of forced labor. The same is true of the government's targeted forced displacement programs, including the Bingtuan's construction of new settlements designated for ethnic Han internal migrants, as well as its seizure of land from small-scale and subsistence farmers in Uyghur communities. This calculated land expropriation makes Uyghur farmers more likely to fall victim to coercive labor transfer programs; some are even subjected to forced labor on the land they had previously occupied. In some instances, the government reportedly relocates entire Uyghur farming communities to areas without agricultural prospects and in close proximity to factories in order to facilitate their forced labor in textile production. Observers note many Uyghur communities remain vulnerable to trafficking in other, ostensibly voluntary labor transfer situations, given the PRC government's comprehensive control over nearly all aspects of life in Xinjiang.

The government subjects some Tibetans to arbitrary detention featuring similar political indoctrination and forced prison labor practices in the Tibet Autonomous Region (Tibet) and in neighboring provinces. Authorities have placed thousands of rural Tibetans in "military-style" vocational training and manufacturing jobs around the country under the auspices of a quota-based "surplus labor" transfer program ostensibly intended as a poverty alleviation measure. Although the program does not feature arrests or enforced disappearances, observers note the system is likely highly coercive, given individuals' relative inability to refuse participation amid the central government's pervasive system of social control in Tibetan areas. Reports indicate companies subject some of these Tibetans to forced labor in factories. Authorities also reportedly subject some Buddhist clerics to political indoctrination activities and forced labor in monasteries repurposed as factories. The government's forced urban resettlement programs require Tibetans to bear a large portion of resettlement costs, placing many of them in debt and consequently at higher risk of forced labor. Elsewhere, religious and political activists held in legal education facilities continue to report forced labor occurring in pretrial detention and outside of penal sentences. The government subjects Christians and members of other religious groups to forced labor as part of detention for the purpose of ideological indoctrination; survivors report having been forced to work in brick kilns, food processing centers, and factories manufacturing clothing and housewares. Law enforcement officials detain some PRC and foreign women on "prostitution" charges without due process in "custody and education" centers, where they are subjected to forced labor. International media report local authorities force children in some government-supported work-study programs to work in factories. Some school districts compel students into forced labor in manufacturing under the guise of mandatory internships. Although information is limited, PRC nationals may experience conditions indicative of forced labor at large-scale rare earth mining operations within the PRC, and rural communities displaced by these activities and by concomitant environmental contamination may themselves be vulnerable to sex and labor trafficking.

Some host country nationals, PRC nationals, and other migrant workers employed at large-scale BRI and other PRC-affiliated construction projects, mining operations, and factories in African, European, Middle Eastern, Asian and Pacific, and Latin American and Caribbean countries

experience conditions indicative of forced labor. These include deceptive recruitment into debt bondage; arbitrary wage garnishing or withholding; contract irregularities, including absence of contracts; confiscation of travel and identity documentation; forced overtime; resignation penalties; false promises of payment for return flights, which traffickers then use as collateral to retain their labor beyond the length of the original contracts; intimidation and threats; physical violence; denial of access to urgent medical care; poor working and living conditions; restricted freedom of movement and external communication; and retaliatory firings, including after refusing to have sexual relations with employers and reporting sexual abuse. Pandemic-related travel restrictions in many of these countries and reentry restrictions imposed by the PRC government compound these vulnerabilities. In particular, the PRC government's constrained ability to send new workers overseas for BRI projects during the pandemic may have incentivized some companies to confine PRC nationals at BRI worksites beyond the length of their contracts under the pretext of public health restrictions. Some PRC nationals reportedly recruit local children from the communities in which BRI projects are underway and subject them to forced labor in hazardous work.

Traffickers, including those working for PRC national-run crime syndicates and with facilitation from PRC national-owned businesses, subject PRC men, women, and children to forced labor and sex trafficking in more than 80 other countries. They force PRC men, women, and girls to work in restaurants, shops, agricultural operations, and factories in overseas Chinese diaspora communities. Traffickers promise some PRC nationals jobs abroad and then force them to engage in online gambling, internet, and telephone scams. Traffickers also reportedly subject some PRC nationals to forced criminality in cryptocurrency mining and in the cultivation, processing, and distribution of recreational drugs. PRC men in Africa, Europe, Maritime Southeast Asia, the Middle East, and South America experience conditions indicative of forced labor in factories, construction sites, and logging and mining operations; these conditions include non-payment of wages, restrictions on movement, withholding of passports, and physical abuse. PRC national-owned manufacturing facilities in South Africa have reportedly subjected PRC nationals to forced labor in the manufacturing of pandemic-related medical protective garments. Traffickers subject PRC women and girls to sex trafficking throughout the world, including in major cities, construction sites, remote mining and logging camps, and areas with high concentrations of PRC migrant workers. Companies operating under the auspices of the Japanese government's "Technical Intern Training Program" have subjected PRC nationals to forced labor, often through debt bondage, in food processing, manufacturing, construction, and fishing. Traffickers also subject PRC seafarers to forced labor on board fishing vessels in Taiwan's highly vulnerable DWF, in Papua New Guinea's exclusive economic zone and surrounding maritime territories, and on foreign-flagged cargo vessels operating in the Pacific Ocean.

PRC traffickers operating abroad subject local populations to sex trafficking in several countries in Africa, the Mediterranean region, and South America. PRC traffickers also subject women and girls in other Asian countries to sex trafficking and forced labor in sham businesses and entertainment establishments, including PRC national-owned casinos, constructed near large-scale PRC-affiliated infrastructure and investment projects—at times under the auspices of the BRI—and in special economic zones with limited local government oversight. PRC national-owned factories and agricultural plantations in Burma reportedly subject local and internal migrant populations to forced labor; the same may also be true for PRC-owned logging operations there. Crime syndicates headed by PRC nationals reportedly assist traffickers in Southeast Asian countries in the production of counterfeit travel documents to facilitate trans-border trafficking. PRC national-owned companies operating under the auspices of the BRI also subject Southeast Asian migrant workers to forced labor at manufacturing facilities throughout the Balkan region. Congolese men and boys experience conditions indicative of forced labor in PRC national-owned mining operations in the Democratic Republic of the Congo.

Many men from countries in Africa, Asia (especially Indonesia and the Philippines), and other regions employed on many of the 2,900 PRC-flagged DWF fishing vessels operating worldwide experience contract discrepancies, excessive working hours, degrading living conditions,

severe verbal and physical abuse, denial of access to healthcare, restricted communication, document retention, arbitrary garnishing or nonpayment of wages, and other forced labor indicators, often while being forced to remain at sea for months or years at a time. This statistic does not include PRC national-owned DWF vessels that are flagged or registered through front companies in other countries; the true number of DWF vessels with PRC national beneficial ownership may therefore be much higher than reported. Many DWF crewmembers are recruited through unlicensed or poorly regulated informal brokerage networks within the PRC and abroad, exacerbating their risk of indebtedness through the imposition of unregulated hiring fees, commissions, and expenses accrued while being forced to reside in dormitories in the months leading up to their deployment. PRC fishing operators in turn require DWF crewmembers to pay "guarantee money" that places them at further risk of debt-based coercion. Some DWF senior vessel crew members also subject these fishermen to forced criminality in illegal, unreported, and unregulated (IUU) fishing and smuggling—including in areas under the jurisdiction of other coastal states—making them vulnerable to unjust civil and criminal liabilities in port countries. Some PRC national-owned fishing vessels reportedly operate in violation of UN sanctions off the coast of North Korea and in the Indian Ocean while evading detection by maritime authorities, including by falsifying vessel registration numbers; the crew members aboard these ships are also vulnerable to forced labor in IUU fishing.

PRC traffickers subject women and children from neighboring Asian countries, Africa, and the Americas to forced labor and sex trafficking within the PRC. Traffickers promise African and South American women legitimate jobs in the PRC and force them into commercial sex upon arrival. The PRC government's birth-limitation policy and a cultural preference for sons created a skewed sex ratio of 105 boys to 100 girls in the PRC, which observers assert continues to drive the demand for commercial sex and for foreign women to enter or be deceived into brokered marriages with PRC men—both of which may be procured and retained by force or coercion. Traffickers kidnap or recruit women and girls through marriage brokers and transport them to the PRC, where some are subjected to sex trafficking or forced labor. Illicit brokers increasingly facilitate the forced and fraudulent marriage of South Asian, Southeast Asian, Northeast Asian, and African women and girls to PRC men for fees of up $30,000. The men—sometimes in partnership with their parents—often incur large debts to cover these fees, which they attempt to recover by subjecting the women and girls to forced labor or sex trafficking. Some PRC men reportedly circumvent this brokerage system by traveling to Southeast Asian capitals and entering into legal marriages with local women and girls, then return to the PRC and compel them into commercial sex. There are also reports of PRC men and their parents deceiving local and Southeast Asian women and girls into fraudulent marriages in the PRC, then confining them in forced concubinage involving rape leading to forced pregnancy. In cases where this forced pregnancy leads to childbirth, the men and their parents sometimes use the child as collateral to retain the women's forced labor or sexual slavery, or use the women's immigration status as coercion to dissuade them from reporting their abuses to the authorities. Traffickers also reportedly lure women from Burma, Vietnam, and Cambodia to the PRC under similar false pretenses, blindfold and transport them, then subject them to forcible artificial insemination in unregulated hospital facilities; they confine groups of these women in private residences until they give birth and then drive them across international borders to their home countries with impunity. A small number of PRC women are reportedly subjected to sex trafficking and forced labor via forced or fraudulent marriages to Taiwanese men. Exploitative marriages featuring elements of sex trafficking and forced labor have reportedly increased in some foreign countries where BRI construction projects are underway. Mongolian boys are at high risk of forced labor and sex trafficking under visa regimes that enable them to work indefinitely as herders, horse jockeys, and circus performers across the PRC border, provided they return with a chaperone once a month. African residents of the PRC, displaced through discriminatory eviction policies related to the pandemic, may be at higher risk of sex trafficking and forced labor due to ensuing homelessness and other economic hardships.

Many North Korean refugees and asylum-seekers living without formal immigration status in the PRC are particularly vulnerable to trafficking.

Haiti AR_000657

Traffickers lure, drug, detain, or kidnap some North Korean women upon their arrival in the PRC and compel them into commercial sex in brothels and bars, through internet sex sites, or in relation to forced marriage. Traffickers—often North Korean "minders"—also subject these women to forced labor in agriculture, in domestic service, and at restaurants, karaoke bars, coffee shops, and factories; the "minders" reportedly restrict their freedom of movement and communication, garnish their wages, and at times force them to engage in commercial sex with PRC customers. According to media and NGO reports, the DPRK government subjects North Korean citizens to forced labor in the PRC as part of its proliferation finance system, likely with the knowledge of PRC officials; this includes forced labor in hotels, restaurants, and in remote cyber operations. PRC national-owned manufacturing facilities reportedly also subject North Korean workers to forced labor in the production of protective medical garments for international export.

## COLOMBIA: TIER 1

The Government of Colombia fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Colombia remained on Tier 1. These efforts included increasing investigations, identifying more victims, adopting a new victim identification protocol for labor inspectors, and improving the existing centralized system for victim referral. In addition, the government announced the creation of a special law enforcement unit for the investigation of forced recruitment of child soldiers and increased prevention efforts to mitigate child sex tourism. Although the government meets the minimum standards, trafficking convictions decreased significantly, and authorities did not criminally prosecute or convict cases of official complicity. Proactive victim identification efforts were generally insufficient, particularly among migrants, and services for forced labor and adult victims were inadequate. The government did not make efforts to criminally investigate, prosecute, and convict cases of forced labor, resulting in impunity for labor traffickers and leaving unidentified victims without protection in critical sectors.



COLOMBIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:
Make efforts to combat forced labor by enhancing proactive victim identification and increasing criminal investigations, prosecutions, and convictions of labor traffickers. • Vigorously investigate, prosecute, and convict traffickers, including complicit officials. • Take steps towards amending policies to fund civil society actors to increase specialized services for all victims of trafficking, including shelter care for adult victims of trafficking and victims of forced labor. • Draft a victim identification protocol for law enforcement and border officials and train authorities on its use. • Develop a record-keeping system to track anti-trafficking investigations, prosecutions, convictions, and sentencing data. • Train prosecutors on the elements of human trafficking and the use of Article 188A of the penal code to investigate and prosecute all trafficking crimes, such as child sex tourism, forced criminality, forced labor, and the unlawful recruitment or use of child soldiers under trafficking provisions. • Increase efforts to combat child sex trafficking in the tourism sector, especially in coastal cities. • Revise the definition of human trafficking under Colombian Law to align more closely with the 2000 UN TIP Protocol definition.

### PROSECUTION
The government maintained mixed prosecution efforts for sex trafficking cases and did not investigate, prosecute, or convict any cases of forced labor, despite the identification of victims of such crimes. Article 188A of the penal code criminalized sex and labor trafficking and prescribed punishments of 13 to 23 years' imprisonment plus fines between 800 and 1,500 times the monthly minimum salary. Penalties under Article 188A were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Article 188A of the penal code is inconsistent with the definition of trafficking under international law as the law did not include force, fraud, or coercion as an essential element of a trafficking crime. The law criminalized forced child recruitment and forced criminal activity by illegal armed groups under separate statutes, and authorities did not view these crimes as human trafficking. Child sex trafficking and child sex tourism crimes were most often investigated and prosecuted under the induction into prostitution law, which prescribed penalties that were not commensurate with those of human trafficking and other serious crimes.

Authorities did not provide sufficient details on the cases investigated, prosecuted, or convicted and, because Colombia's law was broad, it was unclear if the cases reported constituted trafficking as defined in international law. In 2021, law enforcement officials arrested 132 suspects for possible trafficking crimes, compared with 38 in 2020, 40 in 2019, and 85 in 2018. The attorney general's office (AGO) investigated 226 possible cases of trafficking, compared with 185 in 2020, 203 in 2019, and 180 in 2018. The government reported prosecuting 36 cases of sex trafficking, involving 70 defendants, compared with 65 cases in 2020, 75 in 2019, and 88 in 2018. There was a notable decrease in the number of convictions. Authorities reported convicting eight traffickers—four whose cases were under appeal at the end of 2021—compared with 22 in 2020, 36 in 2019, and 34 in 2018. Authorities did not prosecute or convict any new cases of forced labor. Authorities did not have a protocol to connect labor inspectors with police and, although officials identified victims of forced labor, authorities did not criminally investigate cases of forced labor. Prosecutors' inability to increase convictions for trafficking crimes may be related to an absence of adequate protection mechanisms, which can affect victims' willingness to cooperate with law enforcement in cases against their traffickers. The AGO did not keep a record of sentences prescribed for trafficking crimes and, as a result, it was difficult to assess whether traffickers received punishment stringent enough to deter the crime. There were numerous laws criminalizing trafficking crimes, which likely created confusion among prosecutors and judicial officials and led to a disjointed and ineffective law enforcement and prosecutorial response. In 2021, the Constitutional Court ruled in favor of a trafficking survivor who, with the support of NGOs, filed a case against the state after officials from the AGO inaccurately classified the case as induction into prostitution instead of human trafficking, which left her and her family unprotected, vulnerable, and unable to access to services available to victims of human trafficking under Colombian law.

Illegal armed groups and criminal organizations continued to forcibly recruit and use child soldiers for armed conflict and exploit them in forced labor and sex trafficking. In August, the Special Jurisdiction for Peace (JEP) presented a strategy to prioritize an inquiry into crimes involving the forced recruitment of child soldiers that took place between 1996 and 2016 as part of "macro case 07." In 2021, the JEP called 26 former members of the Revolutionary Armed Forces of Colombia (FARC-EP) to testify on the recruitment of child soldiers, compared with 15 in 2020. The government created a special task force against the recruitment of children and indicated it would deploy 2,200 police officers to support the armed forces in the protection of children and criminal investigation of child recruiters. As part of that initiative, authorities released a list of the 30 most-wanted child soldier recruiters. In 2020, an NGO reported impunity in cases of forced child recruitment and ongoing concern that Colombian illegal armed groups continued to strengthen their operations using children in Colombia and nearby Venezuela. Authorities conducted operations to disrupt the illicit activities of illegal armed groups, including several airstrikes that led to the death of approximately six child soldiers. In response, when discussing the event with media outlets, a high-level official deemed child soldiers recruited by armed groups as "war machines," which demonstrated a complete disregard

COLOMBIA

for the need to treat such children primarily as victims. Authorities did not acknowledge that forcible recruitment of children by illegal armed groups is a form of human trafficking.

Corruption and official complicity in trafficking crimes remained significant concerns. Officials reported opening 40 investigations into official complicity in trafficking crimes between 2010 and 2021; this included the 2021 case of a prosecutor and a law enforcement official indicted for trafficking crimes. Authorities did not indicate how many of the 40 investigations led to prosecutions or convictions. Last year, officials from the inspector general's office noted judicial leniency toward public officials involved in trafficking crimes. While the government investigated and frequently arrested complicit officials, authorities often opted for disciplinary measures in lieu of prison time, a response that was not commensurate with the severity of the crime and hindered efforts to combat trafficking. Authorities did not provide updates to the complicity cases reported last year, including the investigation of a local government official from the Engativa neighborhood of Bogota for complicity in a transnational sex trafficking case; the case of officers from the national police who were allegedly notifying traffickers of upcoming raids; or the case of the public servants who knowingly falsified documentation for underage victims who were later exploited in Mexico and Spain. Sources reported there was complicity in the police department and the attorney general's office in the city of Cartagena, in which child sex trafficking, including child sex tourism, involving both Colombian and foreign exploiters was prevalent. Authorities provided training—in some cases with the support of international organizations—to immigration officials, police, and members of the AGO on the law, understanding trafficker recruitment tactics, and the investigation and prosecution of trafficking crimes. The ombudsman's office trained approximately 1,100 public officials, including military and police, on the proactive identification of victims. Authorities collaborated with many countries in the region and international organizations on trafficking-related law enforcement operations. In 2021, civil society organizations from Ecuador recommended updating bilateral agreements between the two countries to improve law enforcement cooperation in cases of trafficking.

## PROTECTION

The government maintained protection efforts. As in previous years, services remained cursory and efforts insufficient. The government identified more victims, but it did not make efforts to provide shelter or adequate care for adults and victims of forced labor. The government identified 181 victims of trafficking, of whom 112 were exploited in sex trafficking, 18 in forced labor, two in forced begging, eight in indentured servitude, and 32 unknown. In addition, the government reported identifying nine individuals in servile marriage, but it was unclear if these individuals were forced or coerced to marry for the purposes of exploitation. Of these victims, 39 were men, and 14 identified as LGBTQI+. This compared with 100 victims identified in 2020, of whom 71 were exploited in sex trafficking, four in forced labor, nine in forced begging, two in indentured servitude, four in servile marriage, and 14 unknown. Immigration authorities identified 21 victims of trafficking. In addition, the Ministry of Defense (MOD) identified 170 child soldiers, compared with 63 in 2020. Other government entities and stakeholders also reported work with this population, and there may be overlap within this data. Some data was duplicative or contradictory, as no single agency was responsible for maintaining comprehensive protection or law enforcement data, and because Colombia's law was broad, it was unclear if the cases reported constituted trafficking as defined in international law.

In previous years, the government reported that law enforcement officials used a victim identification protocol developed by an international organization; however, many law enforcement officials working on trafficking cases were unaware of any protocol to identify victims. Experts indicated that in some cases, law enforcement officials retrieved data from victims' phones for evidentiary purposes and did not refer the victims to adequate services. In July 2021, the constitutional court ordered the government to develop a victim identification protocol to help officials identify victims, including among migrants. However, authorities did not report finalizing the victim identification protocol by the end of the year.

In 2021, the Operating Center for the Fight Against Human Trafficking (COAT) began operating as a centralized entity to refer cases involving children using the existing protocol developed by the Colombian Institute for Family Wellbeing (ICBF). The government did not have referral protocols in cases involving adult victims or anyone exploited in forced labor. In 2020, authorities adopted victim referral protocols in 13 departments but did not indicate how many officials the government trained or how many victims it referred to services using these protocols. With the support of an international organization and a foreign government, authorities finalized the victim identification protocol for labor inspectors that was pending since 2016. The MOL disseminated the protocol to 136 labor inspectors in seven regions but did not train the labor inspectors to use it, despite the government's concern with forced labor in sectors such as legal and illegal mining, emerald extraction, coal, domestic service, agriculture near the coffee belt, cattle herding, and crop harvesting. The protocol did not include a referral mechanism for criminal prosecution if inspectors detected indicators of forced labor. In addition, the government offered some training on victim identification and assistance as part of its prevention campaigns.

Authorities provided emergency assistance to the 181 victims identified, including 54 who received temporary shelter. Of the 181 victims identified, 158 received at least one service from the available medium-term assistance provisions. Immigration officials did not report referring the 21 victims they identified to care, and it was unclear what services were provided to the 170 child soldiers identified by the MOD. The government did not provide shelter to forced labor victims or adult trafficking victims. The ICBF reportedly assisted 158 child soldiers in 2021, compared with 144 in 2020, 180 in 2019, and 196 in 2018. An international organization verified 106 children were recruited by illegal armed groups, compared with 66 in 2020, 99 in 2019, and 292 in 2018. To the same international organization, ICBF officials reported assisting 77 demobilized children that separated from illegal armed groups between January and September 2021, compared with 192 in 2020, 180 in 2019, and 196 in 2018. The ICBF did not provide details of the assistance provided to victims of child sex trafficking or forced child labor.

The Ministry of Interior (MOI) and the ICBF were responsible for victim protection; the former was responsible for protecting adult victims, and the latter was responsible for protecting and assisting child victims. Victim services included emergency assistance, including medical and psychological examination, clothing, hygiene kits, issuance of travel and identity documents, and shelter for five days with a maximum extension of five additional days. In fewer cases, and after administrative approval, authorities provided medium-term assistance, including educational services, job skills training, assistance with job placement, economic support, and legal assistance, including witness protection. Year to year, authorities allocated funding for victim protection and assistance under the national budget and mainly used it for victim repatriation and technical assistance for regional and municipal trafficking in persons committees. Funding was not used to provide shelter or meaningful care directly to victims, given that by decree, national authorities relied solely on individual departments and municipalities for the provision of services. This led to an inconsistent approach across the country that often left victims unprotected and unable to navigate access to adequate and necessary services for their recovery.

ICBF authorities did not fund physical spaces where child victims could go and, as a result, coordination for services was left to the last minute, making it unreliable and difficult to obtain. The ICBF partially funded two shelters for child victims, at least one of which had a multi-disciplinary team trained to work with victims of sexual abuse, including sex trafficking; however, funding was insufficient to provide the comprehensive assistance victims needed. Local ICBF officials in Bogota operated a shelter for underage victims of commercial sexual exploitation that could provide care for trafficking victims but did not report how many victims received care in 2021. Authorities sometimes placed victims in hotels on a case-by-case basis. Lack of funding for civil society organizations hindered the government's ability to mitigate the crime; victims who did not receive adequate care were less able and willing to assist authorities in the case against their traffickers and less likely to provide input for the improvement of the overall response. The government did not have shelter services for adult victims or anyone exploited in forced labor.

Haiti AR_000659

Government officials did not report deporting trafficking victims during the reporting period. In 2021, immigration authorities reported screening migrants for trafficking indicators; however, the absence of a formal victim identification protocol to screen migrants for trafficking indicators, particularly near border crossings, could have led to the deportation of unidentified victims. Venezuelan women in commercial sex—many of whom may have been victims of trafficking—were not screened for trafficking indicators, and if believed to be working in the country illegally, authorities often deported them back to Venezuela, punishing them for immigration violations and crimes that their traffickers may have compelled to commit. The Ministry of Foreign Affairs (MFA) received 31 requests for repatriation but did not indicate how many it approved. This compared with 17 repatriations in 2020, 33 in 2019, and seven in 2018. MFA officials did not indicate how much funding the government provided for the repatriation of victims.

## PREVENTION

The government increased prevention efforts. The Interagency Committee for the Fight Against Trafficking in Persons (ICFTP), chaired by the MOI and comprising 16 government entities, conducted four virtual technical advisory meetings, compared with five meetings in 2020, three in 2019, and two in 2018. All departments had territorial plans to combat trafficking. In 2021, the MFA defined and updated the territorial plans to improve coordination with the tourism, hotel, and services sector to amplify an ongoing prevention campaign, which reached employees, clients, and hotel guests. Authorities continued using the 2020-2024 national action plan. In 2021, officials appropriated some funding from the total 3.11 billion Colombian pesos ($770,980) the government allocated for all anti-trafficking efforts. The government continued with the implementation of previously established awareness campaigns, and as focus increased to reduce child sex trafficking in the tourism sector, many efforts centered around amplifying such campaigns in key locations, such as Cartagena. In 2021, the Ministry of Commerce (MOC) adopted a national action plan to increase crime prevention efforts—including for human trafficking—in the tourism sector. As part of this initiative, authorities trained public servants, tourism service providers, unions, and service providers, among others. In addition, the MOC launched an awareness campaign through local media, government social media pages, and tourist information stands to educate tourists on ways to prevent and eradicate commercial sexual exploitation of children in the tourism sector. The national police conducted an awareness campaign against child sex tourism that included a mobile information booth and a robust educational campaign. In 2021, the Ministry of Labor (MOL) indicated inspections remained virtual, which likely limited their ability to identify indicators of trafficking.

Colombia continued to operate a 24-hour anti-trafficking hotline, which in 2021 received 1,382 calls, of which 116 were possible cases of trafficking that were referred to the COAT for further action. Officials did not report how many led to criminal investigations or prosecutions. The AGO monitored a general hotline for citizens to report crimes (Line-122), and authorities indicated 21 calls were for trafficking crimes in 2021. The government operated a cellphone app where the public could report cases of trafficking in 2021; authorities identified Venezuelan victims in the country and Colombian victims in Mexico, Turkey, and Turks and Caicos. Reporting via the app was not anonymous and may have hindered reporting of crimes due to fear of reprisal.

In response to the influx of more than 1.8 million Venezuelans into the country since 2016, in February 2021, the government granted temporary protected status (TPS) to migrants who arrived before January 2021, likely reducing their vulnerability to trafficking. TPS increased access to financial assistance for Venezuelan households, access to the education system for school-aged children, health insurance, access to employment, and immediate help to cover basic needs. By November 2021, authorities had pre-registered 1.5 million people. The government had policies to regulate recruitment agencies, including those placing workers abroad, and had regulations that prohibited worker recruitment fees. In 2021, the MOL reported conducting nine investigations into recruitment agencies for fraudulent employment claims and finalized one investigation, compared with 18 investigations and five finalized in 2020 and 17 investigations and 29 finalized in 2019. Investigations into fraudulent activity could carry over from previous years. Officials could fine recruitment agencies for fraudulent employment opportunities once cases were finalized; only three finalized investigations since 2019 have resulted in fines. Authorities did not report if any finalized case in 2021 was referred for criminal investigation. Authorities cooperated with foreign governments to investigate cases of trafficking, including a case with Ecuador that led to the arrest of six individuals for trafficking crimes. The government did not make any efforts to reduce the demand for commercial sex during the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Colombia, and traffickers exploit victims from Colombia abroad. Traffickers exploit Colombian adults and children in sex trafficking and forced labor in Colombia and Latin America, Asia, and Europe. Traffickers exploit Colombians in Israel and the United Arab Emirates, mainly Dubai. According to a Colombian government agency, in 2019, nearly 55 percent of transnational trafficking cases with a Colombia nexus involved Colombian victims exploited in trafficking in Turkey. Traffickers lured victims with fraudulent employment opportunities later to exploit them in sex trafficking and forced labor. In 2019, 38 percent of victims in domestic trafficking cases were from Bogotá and Antioquia Department, and 44 percent of domestic cases were identified in Bogotá. Government reports released in 2019 indicate that since 2013 roughly 90 percent of victims identified in Colombia were adults. Groups at high risk for trafficking include displaced Venezuelans, LGBTQI+ individuals, Afro-Colombians, members of Indigenous communities, individuals with disabilities, internally displaced persons, and those living in areas where illegal armed groups and criminal organizations are active. An international NGO interviewed 2,216 Venezuelan migrants who arrived in Colombia between 2019 and 2021, of which 907 reported experiencing trafficking or exploitation—324 of those in 2021. Sex trafficking of Colombian women and children occurs within the country and around the world. Colombian women and children are victims of sex trafficking within Colombia in areas with tourism and large extractive industries. Transgender Colombians and Colombian men in commercial sex are vulnerable to sex trafficking within Colombia and Europe. Traffickers exploit Colombian nationals in forced labor, mainly in mining to extract coal, alluvial gold, and emeralds; agriculture in coffee harvesting and palm production; begging in urban areas; and domestic service. Traffickers exploit Colombian children working in the informal sector and street vending in forced labor. Illegal armed groups, particularly in the departments of Choco, Norte de Santander, Córdoba, Nariño, and Cauca, forcibly recruit children, including Venezuelan, Indigenous, and Afro-Colombian youth, to serve as combatants and informants, to harvest illicit crops, and to exploit in sex trafficking. In 2021, JEP officials announced that between 1996 and 2016, 18,677 children were recruited and used by the FARC-EP for the armed conflict, with the majority of cases taking place between 1996 and 2016. Between 2017 and 2019, early alert systems identified 182 municipalities where children were vulnerable to forced recruitment by illegal armed groups. Several illegal armed groups, including ELN, Segunda Marquetalia, FARC-D, Clan del Golfo, are known to operate in areas where vulnerable people may be exploited through human trafficking and other illicit activities. Women, children, and adolescents who separate from the ranks of illegal armed groups are vulnerable to trafficking. Traffickers recruit vulnerable women and girls in dire economic circumstances, mostly Colombians and displaced Venezuelans, into "webcam modeling," a phenomenon that grew due to the pandemic. In some cases, traffickers drugged women and girls using fear and coercion through debt and extortion to force victims to perform live streaming sex acts. Government officials and civil society organizations have expressed concern about the burgeoning webcam industry and its ties to sex trafficking. Displaced Venezuelans, including women, children, transgender individuals, and undocumented migrants, were the most vulnerable to sex trafficking and forced labor. Traffickers target impoverished women and girls to exploit them in sex trafficking; this vulnerable population represented 80 percent of sex trafficking cases. In 2021, more than 130,000 migrants—mostly Haitians—transited the town of Necoclí intending to cross the Darién gap, many of whom were highly vulnerable to human trafficking. Youth living under poor social and economic conditions are at a high risk of human trafficking. The pandemic led to an economic contraction of 6.8 percent, creating hardships and likely increasing the vulnerability to trafficking of LGBTQI+

individuals, undocumented migrants, and Indigenous communities that relied on the informal sector.

# COMOROS: TIER 2 WATCH LIST

The Government of Comoros does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government made key achievements during the reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Comoros was upgraded to Tier 2 Watch List. These achievements included investigating trafficking crimes (for the first time since 2014) and initiating the country's first trafficking prosecution. The government identified trafficking victims for the first time since 2013 and referred all victims to protective services. The government, in partnership with an international organization, developed and implemented standard operating procedures (SOPs) for victim identification and provided training on the procedures to officials on all three islands (Grande Comore, Anjouan, and Mohéli). The government also conducted anti-trafficking awareness campaigns for the first time in three years. Despite these achievements, the government has never reported convicting a trafficker; remained without a national referral mechanism (NRM) to refer victims to appropriate care; did not finalize a multi-year national action plan (NAP) to combat trafficking; and did not allocate specific funding for anti-trafficking efforts, including activities conducted by the Anti-Trafficking Task Force.



COMOROS TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute alleged traffickers, including any complicit officials, and sentence convicted traffickers to penalties as prescribed in the penal code. • Systematically and proactively identify trafficking victims by screening for trafficking indicators among vulnerable populations, including children in domestic work, children attending Quranic schools, and Comorians repatriated from the French Department of Mayotte, and refer all victims to appropriate services. • Finalize and implement a formal NRM to refer victims to appropriate care. • Amend trafficking provisions in the penal code to prescribe penalties for adult sex trafficking that are commensurate with penalties prescribed for other grave crimes, such as rape. • Allocate dedicated funding for the Anti-Trafficking Task Force to fully implement its activities. • Increase anti-trafficking training to all front-line officials, including law enforcement, social workers, health service providers, prosecutors, judges, and civil society. • Finalize, implement, and fund a multi-year NAP to combat trafficking.• Increase collaboration with French officials to address the trafficking of Comorians on Mayotte. • Implement and consistently enforce strong regulations and oversight of labor recruitment companies, including eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable. • Expand anti-trafficking public awareness campaigns to all three islands, specifically targeting vulnerable populations on Anjouan and Mohéli. • Develop national-level data collection on trafficking crimes, including anti-trafficking law enforcement efforts and trafficking victims identified.

## PROSECUTION

The government increased anti-trafficking law enforcement efforts. February 2021 amendments to the criminal code criminalized sex trafficking and labor trafficking. Article 266-11 of the new criminal code prescribed penalties of seven to 10 years' imprisonment and a fine of 30 million Comorian francs ($69,000) for crimes involving an adult victim, and 10 to 20 years' imprisonment and a fine of 30 million Comorian francs ($69,000) for those involving a child victim. These

penalties were sufficiently stringent. However, the penalties prescribed for adult sex trafficking were not commensurate with those prescribed for other grave crimes, such as rape. The government coordinated with an international organization to draft the country's first standalone anti-trafficking law; the draft was pending approval by the National Assembly at the end of the reporting period.

The government investigated four trafficking cases— three for forced labor and one involving both sex and labor trafficking—during the reporting period, compared with zero investigations since 2014. The government initiated one trafficking prosecution—the country's first—involving a French-Comorian man accused of exploiting a Malagasy girl in forced labor in Comoros. The government has never reported convicting a trafficker. The government did not report any investigations, prosecutions, or convictions of government employees allegedly complicit in human trafficking offenses. The police lacked basic resources, including vehicles, fuel, and equipment, which limited their ability to investigate trafficking cases. While discouraged by the government, families or village elders continued to settle many allegations of sexual violence, possibly including sex trafficking and child domestic servitude, informally through traditional means without recourse to the formal court system. For the second consecutive year, the government increased law enforcement training efforts. The government, both independently and in partnership with international organizations, trained police, gendarmerie, immigration authorities, and other officials on anti-trafficking enforcement, policies, and laws. Comorian authorities collaborated with Ivorian authorities to investigate a forced labor case. The government also pursued collaboration with French authorities to investigate a forced labor case on Mayotte; however, due to local inaction on the case, Comorian authorities attempted to have the suspect extradited to Comoros.

## PROTECTION

The government increased victim protection efforts. The government, in partnership with an international organization, identified eight trafficking victims—the first victims identified since 2013—and referred all victims and their dependents to care. Of the eight victims identified, traffickers exploited six in forced labor and two in both forced labor and sex trafficking; three were exploited in Comoros, and five were exploited abroad in Cote d'Ivoire, Oman, Tanzania, and on Mayotte; two were male, and six were female; six were adults, and two were children; and four victims were Comorian nationals, while the other four were foreign nationals from Burundi and Madagascar. The government, in partnership with an international organization, developed the country's first SOPs for victim identification, which included a manual and questionnaire. The government disseminated the SOPs and provided training to law enforcement authorities and listening centers (*Service d'ecoute*) on all three islands in late 2021. Using the newly established SOPs, the government increased efforts to screen vulnerable populations, including foreign migrants and victims of abuse, for trafficking indicators; in previous years, the government regularly deported potential victims without screening for trafficking indicators. The government remained without an NRM to refer victims to protection services; however, officials, in partnership with an international organization, began drafting an NRM to complement the new victim identification SOPs.

The government partnered with international organizations and local NGOs to offer assistance to all eight identified victims, including temporary housing, medical care, counseling, job training, and voluntary repatriation for foreign victims; however, the services on Anjouan and Mohéli were limited compared with services available on Grand Comore. The government continued to provide financial support, including salaries for employees and office space, to the listening centers. For the first time, the government provided anti-trafficking training to listening center staff. The listening centers, with assistance from civil society, provided temporary housing to one trafficking victim and continued to offer medical care, psycho-social counseling, and legal assistance mostly to women and children who were victims of abuse and violence, including potential trafficking victims. The government continued operating listening centers in four locations—two on Grande Comore, one on Anjouan, and one on Mohéli. In 2021, the listening centers reported providing assistance to at least 186 women and children on Grande Comore, compared with at least 256 in 2020. The listening centers recorded these persons as victims of abuse; however,

Haiti AR_000661

some of these victims may have been trafficking victims. There were no trafficking-specific shelters available to victims in the country. Due to the recent development of victim identification SOPs in late 2021, some victims may have remained unidentified within the law enforcement system during the reporting period. Comorian law allowed victims of crime, including trafficking, to receive restitution from the government or from traffickers through civil suits; however, there were no reports that trafficking victims received restitution. Despite requirements of the 2015 child labor law, the government did not establish a support fund for children vulnerable to trafficking.

**PREVENTION**

The government maintained efforts to prevent trafficking. The Secretary General continued to oversee the interagency Anti-Trafficking Task Force, composed of representatives of relevant government agencies, the listening centers, and international organizations, to lead the government's anti-trafficking efforts. The task force met regularly in 2021 to plan awareness campaigns, coordinate on trafficking cases, and develop plans to establish an anti-trafficking department within the government. The federal budget did not include a dedicated allocation for anti-trafficking programs led by the task force; however, the task force received funds on an ad hoc basis from the Ministry of Foreign Affairs and international organizations to conduct anti-trafficking activities. The government did not have a long-term, multi-year anti-trafficking NAP; however, the task force continued to implement the 2020 NAP, which delegated specific, short-term actions to relevant government agencies. The task force reported drafting an updated multi-year NAP but did not complete a final version by the end of the reporting period. For the first time in three years, the government, in partnership with international organizations, conducted awareness campaigns targeting local authorities, religious leaders, and the general public on Grand Comore; however, the government did not report conducting awareness campaigns targeting vulnerable populations on Anjouan or Mohéli. The government continued to fund two toll-free emergency lines for all three islands, which were used to report crimes to the listening centers; however, the government did not track call data related to potential victims of human trafficking.

The Ministry of Labor employed four labor inspectors who were responsible for implementing the 2015 child labor law prohibiting child trafficking; however, they did not receive training on the relevant trafficking laws and did not receive operational resources to conduct labor inspections of informal work sites, where children were especially vulnerable to forced labor. The government did not have effective policies or laws to govern labor recruiters and did not report holding anyone civilly or criminally liable for fraudulent recruitment. In 2016, the labor ministry signed an agreement with several labor recruitment agencies to facilitate review of the transnational recruitment processes and monitor job advertisements in an effort to identify recruitment activities that might endanger Comorians seeking overseas employment; however, the government has made minimal efforts to regulate labor recruitment agencies since then. In February 2022, the government established an informal task force to oversee working conditions of Comorians living and working abroad. The government did not provide anti-trafficking training to its diplomatic personnel, nor did it make efforts to reduce demand for commercial sex acts.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Comoros, and traffickers exploit victims from Comoros abroad. Traffickers exploit women and children from rural areas in urban cities, such as Moroni, in forced labor; these individuals may also be vulnerable to sex trafficking. Traffickers exploit Comorian adults in forced labor in agriculture, construction, and domestic work on Mayotte, a French department, and continental Africa. Traffickers exploit Comorians in domestic servitude in the Middle East. Traffickers and employers on Anjouan may subject children, some of whom were abandoned by parents who left to seek economic opportunities in other countries, to forced labor in domestic service, roadside and market vending, baking, fishing, and agriculture. Poor rural families, often on Anjouan and Mohéli, frequently send their children to live with wealthier relatives or acquaintances in urban areas or on Grande

Comore for access to schooling and other socio-economic benefits; these children are vulnerable to physical and sexual abuse and forced labor in domestic servitude. Most Comorian children ages 3 to 7 (and some as old as 14) study at informal neighborhood Quranic schools headed by private instructors, where they may be vulnerable to exploitation through coercion and forced labor as field hands or domestic servants as payment for instruction. These children may also be subject to physical and sexual abuse. The estimated 3,000-4,000 unaccompanied Comorian children on Mayotte are especially vulnerable to domestic servitude and sex trafficking. Comorians may be at high risk for transnational trafficking due to a lack of adequate border controls, corruption of government officials, and the existence of international criminal networks involved in migrant smuggling. Traffickers exploit Malagasy girls in domestic servitude in Comoros; these individuals often also experience sexual abuse and may be vulnerable to sex trafficking. Economic migrants and asylum-seekers attempting to reach Mayotte from other African countries, primarily Madagascar, Burundi, and the Democratic Republic of the Congo, are increasingly transiting Comoros; traffickers may exploit these irregular migrants in forced labor or sex trafficking in various transit points.

# CONGO, DEMOCRATIC REPUBLIC OF THE: TIER 2 WATCH LIST

The Government of the Democratic Republic of the Congo (DRC) does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included finalizing standard operating procedures (SOPs) for victim identification and referral to services and partnering with NGOs to identify more trafficking victims. The government investigated, prosecuted, and convicted traffickers, including complicit officials. The government's Agency for the Prevention and the Fight Against Trafficking in Persons (APLTP)-led inter-ministerial committee and technical working group continued coordinating the government's anti-trafficking response. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Congolese National Army (FARDC) officers continued coordinating with an armed group, despite allegations that it has previously forcibly recruited and used children. Authorities penalized victims for unlawful acts traffickers compelled them to commit, and corruption and official complicity in trafficking crimes remained significant concerns. The government did not adopt comprehensive anti-trafficking legislation for the third consecutive year. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, the DRC was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore the DRC remained on Tier 2 Watch List for the third consecutive year.



CONGO (DRC) TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Expand efforts to enforce the law and to sensitize all FARDC officers on the need to cease the unlawful recruitment and use of children and hold accountable officials who recruit or use children. • Increase efforts to investigate and prosecute suspected traffickers and—if convicted in a transparent trial—adequately sentence traffickers in accordance with the law, including complicit officials. • Finalize pending legislation that

criminalizes all forms of trafficking and prescribes penalties that are sufficiently stringent, and with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes. • Implement and train front-line officials on the SOPs to proactively identify trafficking victims, including among vulnerable populations, such as individuals in commercial sex, street begging, and artisanal mining, and refer victims to appropriate care in coordination with civil society and international organizations. • Allocate sufficient financial and human resources, including dedicated personnel, for the APLTP to execute its mandate fully. • Improve efforts to collect and share comprehensive data on sex trafficking—as distinct from other sexual violence crimes—and forced labor. • Increase public awareness of human trafficking and enhance the public's ability to identify and report trafficking crimes, including by using radio in French and local languages and increasing engagement with civil society.

## PROSECUTION

The government maintained mixed law enforcement efforts. Congolese law criminalized all forms of sex trafficking and some forms of labor trafficking. However, the lack of a comprehensive anti-trafficking legal framework continued to exacerbate officials' limited understanding of trafficking and their conflation of the offense with other crimes, such as illegal international adoption. Article 174(j) of the 2006 Sexual Violence Law criminalized child sex trafficking and prescribed penalties of 10 to 20 years' imprisonment. Section 174(e) criminalized sexual slavery and prescribed penalties ranging from five to 20 years' imprisonment and a fine of 200,000 Congolese francs ($100). These penalties were sufficiently stringent and commensurate with those prescribed for other serious crimes. Article 174(c), which criminalized the "forced prostitution" of adults, prescribed penalties of three months to five years' imprisonment; these penalties were sufficiently stringent but not commensurate with those prescribed for other serious crimes, such as rape. Articles 182 and 183 of the 2009 Child Protection Law 09/001 also criminalized the "procurement" of children and child sexual slavery and prescribed penalties of five to 20 years' imprisonment and 10 to 20 years' imprisonment with a fine between 8,000 and 1 million Congolese francs ($4-$503), respectively; these penalties were sufficiently stringent and commensurate, with respect to sex trafficking, with other serious crimes, such as rape. Article 187 criminalized child labor, including forced child labor, and prescribed penalties of one to three years' imprisonment and a fine between 100,000 and 200,000 Congolese francs ($50 to $100); these penalties were not sufficiently stringent with respect to forced child labor. Article 326 of the 2002 Labor Code criminalized adult forced labor and prescribed penalties of up to six months' imprisonment or a fine of 30,000 Congolese francs ($15); this penalty was not sufficiently stringent. Congolese law also criminalized the enlistment of persons younger than 18 years old into the armed forces and the police, which carried penalties of 10 to 20 years' imprisonment. The comprehensive trafficking legislation—drafted by the APLTP and the Ministry of Human Rights in partnership with an international organization—remained pending for the third consecutive year.

Courts and police units operated at a reduced capacity due to the pandemic. The government reported investigating at least five trafficking cases, initiating prosecution of at least one alleged trafficker, and convicting four traffickers and one complicit official in 2021. This compared with investigating six cases, initiating prosecutions of 13 alleged traffickers, and convicting four traffickers during the previous year; the government did not report how many prosecutions it continued from 2020. Courts sentenced one police officer to five years' imprisonment for child sex trafficking. In November 2021, the court convicted two sex traffickers from the People's Republic of China (PRC), sentencing one to three months and the other to 10 years' imprisonment. As part of this case, the government investigated, prosecuted, and convicted one complicit government employee who forged legal documents allowing the trafficking victims to remain in the DRC, and the court sentenced him to 10 years' imprisonment; however, the government also fined eight of the victims 1.99 million Congolese francs ($1,000) each for illegal stay in the country. In September 2021, a military court convicted and sentenced an ex-rebel leader to life imprisonment for crimes against humanity, including child soldiering, and ordered him to pay 596.34 million Congolese francs ($300,000) to 87 trafficking victims in restitution. In the previous reporting period, the military initiated

prosecutions of two FARDC soldiers accused of kidnapping children for the purpose of sexual enslavement and arrested an officer for his alleged role in a child trafficking ring; both cases remained pending at the end of the reporting period.

Although the government investigated, prosecuted, and convicted government officials complicit in human trafficking crimes, corruption and complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Observers reported widespread government complicity, including allegations government officials directly engaged in trafficking, helped facilitate the crime, and obstructed justice. Although not explicitly reported as human trafficking, the UN reported there was one new allegation, submitted in 2021, of alleged sexual exploitation with trafficking indicators by Congolese peacekeepers deployed to the UN peacekeeping mission in the Central African Republic (CAR). There were also pending allegations of sexual exploitation against Congolese peacekeepers deployed to CAR reported in previous years, including four reported in 2019, one in 2017, and one in 2016. The government had not yet reported the accountability measures taken, if any, for the open cases at the end of the reporting period.

The FARDC unlawfully recruited at least six children formerly associated with an armed group and used them as informants and combatants during the reporting period. The FARDC continued to collaborate and provide material support to NDC-Renove (NDC-R), despite allegations that it had previously forcibly recruited and used child soldiers.

During the reporting period, an international organization issued a report finding more than 80 of its staff members, including national and international workers, allegedly sexually abused and exploited victims, which at times included sex trafficking—soliciting sex in exchange for jobs or promotions, while working as part of an international mission responding to the Ebola outbreak between 2018 to 2020. The government did not report initiating any investigations or prosecutions of the alleged perpetrators by the end of the reporting period. For the third consecutive year, the government did not report investigating 142 cases involving sexual slavery NGOs reported to provincial courts in Ituri province in 2019.

Limited information management and data collection capabilities, poor understanding of the crime, weak judicial systems, and broad government corruption hindered law enforcement efforts. The government, in collaboration with international organizations and foreign donors, trained law enforcement, social workers, labor inspectors, and security agents on human trafficking legal frameworks, identifying and protecting victims, data collection, and investigative techniques. The Congolese National Police (PNC) incorporated human trafficking training in its community policing program curriculum. Observers reported limited understanding of trafficking among local officials impeded law enforcement efforts and likely led to underreporting of trafficking crimes. During the previous reporting period, APLTP launched a judicial training program on prosecuting trafficking cases in coordination with an international organization. The APLTP and the Ministry of Interior collaborated with an international organization to begin implementing an anti-trafficking law enforcement data collection program. The government did not report cooperating with foreign counterparts on law enforcement activities but regularly cooperated with INTERPOL on trafficking investigations. The government had a bilateral agreement with the Republic of the Congo but did not report conducting activities as part of the agreement.

## PROTECTION

The government maintained protection efforts. The government reportedly identified 256 victims, including 155 forced labor victims, 86 sex trafficking victims, and 15 victims where the form of trafficking was unknown, and referred them to care in coordination with NGOs. This compared with 207 victims identified and referred to care during the previous reporting period. The government, in collaboration with international organizations, finalized SOPs to systematically identify and refer trafficking victims to appropriate care and began disseminating the procedures to relevant stakeholders to initiate their implementation. The PNC's Child Protection and Sexual Violence Directorate also had a formal mechanism in place with local NGOs to screen for possible trafficking victims among vulnerable groups, and the PNC, in collaboration with civil society, followed screening procedures to identify child labor and trafficking victims at mining sites.

The Ministry of Social Affairs was the primary government agency responsible for coordinating provision of victim services, including medical care, psycho-social support, legal aid, and socioeconomic reintegration services. The government did not report the total number of victims it provided these services. The government did not provide specialized services to trafficking victims as distinct from other vulnerable groups, and there were no government-run shelters for trafficking victims. As such, officials usually referred victims to NGO-run shelters. NGOs also provided victim services, including vocational and educational training, medical and psycho-social care, and legal support. Due to pandemic-related mitigation measures, NGOs, at times, limited their services and could not always provide shelter for victims. The government reported it provided financial assistance for one victim but did not report providing other financial or in-kind assistance to NGOs caring for victims during the reporting period. The government provided repatriation support to foreign national victims, including to at least 12 potential trafficking victims during the reporting period. Foreign and Congolese victims were eligible for the same services. The government did not report providing legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution. As part of its national disarmament, demobilization, and reintegration plan, the government continued partnering with an international organization and NGOs to identify and remove child soldiers from armed groups operating in eastern DRC. Officials referred children separated from armed groups to international organizations for services, including psycho-social, medical, and reintegration support. However, rising insecurity hindered officials' access to these areas and subsequently limited screening and demobilization efforts.

Officials afforded protections to victims testifying in legal proceedings on an ad hoc basis. Courts were authorized to provide measures concealing witnesses' identities, such as using physical screens, testifying in adjacent rooms, or submitting written testimony in lieu of appearing in person. However, these protections were only available if specifically requested by a victim's lawyer, and infrastructure challenges and severe resource constraints limited their availability and effectiveness. NGOs reported defendants' family members frequently intimidated witnesses and victims. Victims often lacked transportation, lodging, psychological, or medical support during legal proceedings. Victims could file civil suits against traffickers, but none reportedly did so, and victims rarely received compensation. The law allowed victims to obtain restitution, but in practice, defendants rarely paid it. In September 2021, a military court ordered the leader of an armed group to pay 596.34 million Congolese francs ($300,000) in restitution to 87 trafficking victims, but the government did not report whether the restitution was paid.

Authorities penalized victims for unlawful acts traffickers compelled them to commit. Due to a lack of training on victim identification and screening procedures and the frequency of arbitrary arrest in the country, authorities detained unidentified victims. During the reporting period, authorities fined eight PRC national trafficking victims 1.99 million Congolese francs ($1,000) each for illegal stay in the country. Authorities, at times, remanded sex trafficking victims in custody during investigations. In 2021, authorities detained 160 children as young as 3 years old, including potential trafficking victims, for alleged association with armed groups, compared with 85 children in 2020; five children remained in detention at the end of the year. Authorities held children in local detention cells—which suffered from overcrowding, lack of food and health services, and poor sanitation—for periods ranging from two days to four months before releasing them to child protection actors. Local authorities usually, but not uniformly, granted international child protection actors access to the detained children.

## PREVENTION

The government increased efforts to prevent trafficking. The APLTP coordinated the government's anti-trafficking efforts and led the interagency trafficking in persons committee, as well as a technical working commission, and both bodies met regularly. The government increased the APLTP's 2022 budget by 66 percent, allowing it to hold regular technical committee meetings and cover its operating expenses.

The government continued implementing its 2020-2024 anti-trafficking national action plan; while it allocated resources to implement the

plan, these were not sufficient for its full implementation. The APLTP continued its national awareness-raising campaign consisting of three tracks focused on educating the general population about the dangers of human trafficking; establishing a national hotline; and training government authorities on identification and referral procedures, as well as identifying strategies for prosecuting trafficking cases under existing legal frameworks. It conducted public campaigns and held trainings for journalists, community leaders, social workers, and labor inspectors to raise awareness of human trafficking. The Ministry of Interior produced an annual report on the country's anti-trafficking efforts. An APLTP delegation traveled to Niger to meet with the National Agency for the Fight against Trafficking in Persons and the Illicit Transport of Migrants and share best practices in combating trafficking.

The government continued efforts to prevent FARDC recruitment and use of children. The FARDC, in collaboration with an international organization, screened new recruits to verify their ages; authorities identified and prevented 62 children from entering basic training. The FARDC separated and reintegrated the children with their families and issued administrative punishments to the recruiters. In collaboration with an international organization, the government's Joint Technical Working Group (JTWG)—comprised of government ministries, NGOs, and international organizations—continued implementing its national action plan to end child recruitment and met monthly. The government continued collaborating with an international organization to train security and law enforcement officials on age verification and care procedures. In the previous reporting period, the Ministry of Defense—in close coordination with an international organization—engaged directly with armed group commanders to end and prevent the recruitment and use of child soldiers.

The government did not effectively regulate foreign labor recruiters and did not report taking measures to hold fraudulent labor recruiters accountable. The government did not report continuing investigations of Indian and Pakistani labor recruiters initiated in 2020. The government continued to uphold standards for labor recruitment and placement agencies, which required agencies to have a National Business Identification Certificate, a business license, and a tax ID number and to be officially recognized by the Ministry of Labor. However, Congolese law does not criminalize fraudulent labor recruitment, thereby limiting the government's ability to penalize agencies for such actions and deter future violations.

The Minister of Human Rights continued implementing an August 2020 decree to increase oversight of mining communities, including a zero-tolerance policy for forced child labor in the mining sector. As part of this effort, the government, in cooperation with an international organization, continued certifying artisanal mining sites in eastern DRC as conflict-free and child labor-free. Ministry of Mines officials visited and screened 700 mines for labor violations, including trafficking; this was a significant increase from 125 mines during the previous year, in part due to the Ministry's hiring and training of 63 new mine site inspectors. The Minister of Mines, after a review process conducted by government officials and civil society stakeholders to ensure the mine was not subject to labor violations, validated 238 mining sites in 2021. As part of the certification process, the APLTP and PNC, in collaboration with civil society, screened for child labor and child trafficking victims, and when victims were identified, referred them to care. The government did not report how many trafficking victims, if any, it identified and referred to care as a result of the inspections, but it did report closing an unknown number of mines to deter unlawful practices related to trafficking. Observers reported limited administrative capacity and funding hindered provincial departments' ability to monitor mining sites; informants, including government officials, allegedly warned companies about upcoming inspections, allowing miners to hide child laborers.

The government operated a hotline for reporting sexual and gender-based violence, and as a result of calls to the hotline, identified and referred an unknown number of trafficking victims to care. In January 2022, the government began providing anti-trafficking training to diplomats prior to their departure. The government did not provide anti-trafficking training for FARDC troops prior to their deployment abroad as part of international peacekeeping missions; although not explicitly reported as human trafficking, there were seven open cases

CONGO, REPUBLIC OF THE

of alleged sexual exploitation with trafficking indicators by Congolese peacekeepers deployed to the UN peacekeeping mission in CAR. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the DRC, and traffickers exploit victims from the DRC abroad. Most trafficking is internal and involves forced labor in artisanal mining sites, agriculture, domestic servitude, or armed group recruitment of children in combat and support roles, as well as sex trafficking. As in years past, traffickers took advantage of families eager to lessen economic costs and seek opportunities for their children. Some traffickers were individuals or family members who promised victims or victims' families educational or employment opportunities but instead exploited victims in forced labor as domestic workers, street vendors, and gang members or exploited them in sex trafficking. The capital region serves as a source for sex trafficking victims, with criminal networks and community members facilitating the movement of women and girls. In urban centers such as Kinshasa, Lubumbashi, and Goma, some foreign workers in the beauty industry reported employers failed to honor contracts, controlled their passports, and forced workers to pay exorbitant fines to leave the country before their contracts expired.

Decades-long instability in eastern DRC—notably North Kivu, Ituri, South Kivu, and Tanganyika provinces—continued, resulting in armed groups and criminal networks engaging in unlawful child soldier recruitment and use, forced labor in artisanal mining, and sex trafficking and slavery-like practices. In 2020, experts reported there were more than 500,000 refugees and five million IDPs—the largest IDP population in Africa; these individuals are vulnerable to trafficking due to their lack of economic stability and access to justice. Children in the Kasai region are vulnerable to forced begging schemes facilitated by criminals in Kasai and Kinshasa; victims reported traffickers drugged them and forced them to beg. The APLTP and NGOs reported years of cyclical displacement stemming from escalating insecurity in Ituri Province (bordering South Sudan and Uganda) has increased the vulnerability of thousands of children experiencing homelessness without support networks who criminal elements—including armed groups and community members—coerce into sex trafficking or forced labor. Community and family members, as well as loosely organized illicit networks, force children across the border into the Republic of the Congo where criminal actors coerce the children to commit theft.

Armed groups (most egregiously Mai Mai Mazembe, Mai Mai Nyatura, and Mai Mai Apa na Pale; NDC-R, Alliance des Forces de Resistance Congolaise [AFRC]; Kamuina Nsapa; Raia Mutomboki; Democratic Forces for the Liberation of Rwanda [FDLR]; ISIS-DRC, known locally as Allied Democratic Forces [ADF]; and Cooperative for Development of the Congo [CODECO]) continue to abduct and forcibly recruit Congolese adults and children as combatants and human shields. Additionally, armed groups forcibly recruit adults and children to serve in support roles, such as guards, porters, cleaners, cooks, messengers, spies, and tax collectors at mining sites; some armed groups also force women and girls into marriage or sexual slavery. Child soldiers, separated from armed groups and reintegrated into society, remain vulnerable to re-recruitment as rehabilitation services for children suffering severe psychological trauma remain inadequate and stigmatization may interfere with community reintegration. Some FARDC officers continue to recruit and use children, mainly in espionage or support roles. In 2021, the FARDC recruited at least six children formerly associated with an armed group and used them as informants and combatants. The military continued to coordinate with NDC-R; observers report NDC-R continues to recruit and use child soldiers.

Traffickers—including mining bosses, other miners, family members, government officials, and armed groups—force or coerce some adults and children to work in artisanal mines in eastern DRC, including through debt-based coercion. Individuals associated with the extractive sector abuse some children in forced labor in the illegal mining of diamonds, copper, gold, cobalt, tungsten ore, tantalum ore, and tin, as well as the smuggling of minerals to Uganda, Burundi, Rwanda, the United Arab Emirates, and Tanzania. An NGO reported children traveling long distances to smuggle minerals are vulnerable to trafficking and

recruitment by armed groups. Observers noted children in mining areas are vulnerable to sexual violence, including sex trafficking, in part due to traditional and religious beliefs correlating harming children and sex with protection against death or successful mining. Congolese workers in PRC national-owned cobalt mines may be exploited in forced labor; observers reported workers faced wage violations, physical abuse, employment without contracts, and restricted movement—all potential indicators of forced labor. Children are vulnerable to forced labor in small-scale agriculture, domestic work, street begging, vending, and portering. Children from the Republic of the Congo may transit through the DRC en route to Angola or South Africa, where traffickers may exploit them in domestic servitude. Undocumented Congolese migrants, including children, enter Angola for work in diamond-mining districts, where traffickers exploit some in forced labor or sex trafficking in mining camps. Congolese migrants expelled from Angola are also vulnerable to trafficking. Some criminal elements coerce Congolese women and girls into forced marriages, where they are highly vulnerable to domestic servitude or sex trafficking.

Congolese women and children migrate to other countries in Africa, the Middle East, and Europe, where traffickers exploit them in sex trafficking or forced labor in agriculture, diamond mines, or domestic service. Illicit labor recruiters may fraudulently recruit women and force or coerce them into domestic work abroad through false promises of education or employment opportunities. During the previous reporting period, individuals associated with a construction company in Kinshasa may have exploited Indian and Pakistani workers in forced labor in the DRC; authorities reported the suspects confiscated the workers' passports, controlled their movements, and withheld their salaries. International health workers and UN peacekeepers allegedly sexually exploited victims while deployed in the DRC. Although not explicitly reported as human trafficking, the UN reported there were 13 new allegations submitted in 2021 of sexual exploitation with trafficking indicators by UN peacekeepers from Benin, Burkina Faso, Malawi, Peru, Tanzania, and Uruguay deployed to the DRC.

## CONGO, REPUBLIC OF THE: TIER 2

The Government of the Republic of the Congo does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore the Republic of the Congo remained on Tier 2. These efforts included finalizing an updated national action plan (NAP) for the Ministry of Social Affairs (MSA) for 2022-2023, initiating investigations of trafficking cases, and providing care to the majority of identified victims. The government also identified potential victims among the Indigenous population in Betou. However, the government did not meet the minimum standards in several key areas. The government did not screen proactively for trafficking among vulnerable populations and did not report identifying any victims during the reporting period. The government did not take any proactive measures to address official complicity. The lack of a standardized and centralized filing system for hard copy trafficking case dossiers continued to create a backlog in court cases and hinder countrywide efforts.

Haiti AR_000665



CONGO (ROC) TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers, including officials complicit in trafficking, and impose adequate penalties. • Train officials, NGOs, and civil society on implementing regulations to identify trafficking victims proactively, including by screening for trafficking indicators, especially among vulnerable populations, including child laborers, women and girls exploited in commercial sex, unaccompanied children, Indigenous persons, undocumented migrants, and Democratic People's Republic of Korea (DPRK) workers. • Improve the provision of protective services to trafficking victims to provide appropriate care to victims nationwide. • While respecting due process, expedite hearings and consider prosecuting trafficking cases in the low court, while maintaining stringent sentencing according to the country's anti-trafficking law. • Increase anti-trafficking training for all law enforcement, prosecutors, and judges. • Increase law enforcement and first responders' capacity to collect data on trafficking. • Further expand anti-trafficking efforts to identify victims and prosecute traffickers beyond Pointe-Noire and Brazzaville. • Finalize and implement the interagency NAP to combat trafficking in persons and dedicate resources to support its implementation. • Formally establish the inter-ministerial anti-trafficking task force and designate an office to lead the government's anti-trafficking efforts. • Bolster anti-trafficking law enforcement cooperation with other governments in the region, especially Benin and the Democratic Republic of the Congo (DRC). • Conduct awareness campaigns for government officials and the public. • Accede to the UN Convention Against Transnational Organized Crime and the 2000 UN TIP Protocol.

## PROSECUTION

The government maintained overall anti-trafficking law enforcement efforts. The 2019 Combating Trafficking in Persons Law criminalized sex trafficking and labor trafficking. The related provisions in Congolese criminal law prescribed penalties of five to 10 years' imprisonment, which are sufficiently stringent and, with respect to sex trafficking, commensurate with the penalties prescribed for other grave crimes, such as kidnapping.

Following referral from an NGO, the government reported initiating investigations of five new suspected trafficking cases involving seven alleged traffickers, compared with zero investigations in the previous reporting period. The government reported one new prosecution, compared with six prosecutions in the previous reporting period, and one conviction for labor trafficking with a sentence of three years in prison, compared with four convictions in the previous reporting period. Due to the pandemic, some traffickers convicted previously were released from prison for medical reasons. The MSA identified four cases of alleged forced labor in Betou, in the north of the country, as part of the first child labor trafficking survey conducted in the region, which resulted in the arrest of one individual. Illicit recruiters frequently operated from other West African countries, and Congolese officials did not report taking significant actions to hold domestic criminals accountable for exploiting victims within the country.

Authorities continued an investigation into a 2020 allegation of judicial corruption in a trafficking case. The government did not report initiating any new investigations, prosecutions, or convictions of government employees complicit in trafficking crimes. Low-level corruption and limited intragovernmental coordination constrained officials' ability to investigate, prosecute, and convict suspected traffickers, inhibiting law enforcement action during the year. The court system remained dysfunctional, and many criminal cases continued to languish due to significant backlogs in the high court as a result of irregular court sessions, lack of centralized record keeping, limited legal statistics, and

pandemic-related court closures and restrictions on in-person meetings, which have since been lifted.

The government continued to include anti-trafficking training in the standard academy training for new police and immigration officers. The government regularly coordinated with source countries including Benin, the Central African Republic (CAR), the DRC, and Cameroon, to share law enforcement information. The government did not report extraditing any suspects during the reporting period.

## PROTECTION

The government maintained inadequate efforts to protect victims. For the second consecutive year, officials did not report identifying any victims. A local NGO identified 11 potential Beninese victims (five adults and six children) in 2021. A government-funded NGO provided shelter and psychosocial services to nine victims. The MSA reported identifying potential trafficking victims among the Indigenous population in Betou, in the north of the country, and provided basic humanitarian assistance. A government-run center in the Moungali neighborhood of Brazzaville could provide victims water, food, clothes, education, security, and psycho-social counseling; however, authorities did not report assisting any trafficking victims at this shelter during the reporting period.

The government's implementing regulations for the anti-trafficking law provided formal written procedures for proactive victim identification, although officials did not report using these procedures to identify any victims. In Pointe-Noire, the government continued to focus the majority of its efforts on West African children in forced labor, including those in domestic service. Congolese authorities signed a bilateral agreement with the DRC government to fully implement and formalize anti-trafficking efforts in December 2021. In past reporting periods, law enforcement generally assisted in removing victims from NGO-identified exploitative situations if the NGO could provide funding for transportation. Police did not report screening DPRK workers for indicators of sex trafficking. Instead, the government traditionally relied on NGOs and international organizations to assist with the identification, referral, assistance, investigation, and negotiation of compensation for the majority of trafficking victims. The government did not fund these NGOs despite relying heavily on their victim assistance programs and services. Observers noted that child trafficking victims often did not go to school, lacked basic amenities including food and healthcare, and were at risk of sexual assault.

The Trafficking in Persons Coordinating Committee in Pointe-Noire, which was responsible for assigning identified West African child trafficking victims to foster homes and conducting family tracing, did not report the number of trafficking victims referred to the five available foster families or funding the foster homes. The government continued to fund three public shelters that at-risk victims, including child trafficking victims, could access. The government provided the same availability of care to both national and foreign victims and provided temporary residency status to foreign trafficking victims during judicial proceedings. Authorities provided foreign adult trafficking victims a choice between repatriation to their country of origin or reintegration into the local community. Congolese law did not provide legal alternatives to the removal of trafficking victims to countries where they would face retribution or hardship.

## PREVENTION

The government marginally increased efforts to prevent trafficking. Despite pandemic restrictions on in-person meetings, the government's federal inter-ministerial committee convened two times during the reporting period, compared with four meetings during the previous reporting period. The MSA finalized a NAP to inform its anti-trafficking efforts. In October 2021, the government drafted and disseminated for comment a new interagency NAP for 2022-2023; the action plan remained pending at the end of the reporting period. While the government drafted and distributed for review an executive order to legally establish an inter-ministerial task force, it remained without a national entity to lead the government's efforts, which continued to hinder the effectiveness of the country's anti-trafficking response. Officials held public awareness campaigns in northern cities, targeting Indigenous populations at a higher risk of trafficking. The Ministry of

CONGO, REPUBLIC OF THE

<div style="vertical-text">COSTA RICA</div>

Social Affairs drafted and distributed for review an executive order that would legally establish a permanent inter-ministerial task force.

The government operated an emergency assistance hotline for victims of crime; however, officials did not report whether it received any calls related to human trafficking during the reporting period. The government did not have effective laws or policies regulating labor recruiters. Additionally, officials coordinated with the Government of Benin to implement the countries' 2011 bilateral anti-trafficking agreement. The government has signed but not acceded to the Convention Against Transnational Organized Crime and the 2000 UN TIP Protocol. Although officials did not report any working-level meetings on new repatriation with the Beninese government, the newly appointed MSA minister met twice with Beninese counterparts during the reporting period. The government made some efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training to its diplomats.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the Republic of the Congo, and traffickers exploit victims from the Republic of the Congo abroad. Forced labor involving adults and children continues to be the primary type of trafficking within the Congo. Most trafficking victims in the Congo originate from Benin and the DRC and, to a lesser extent, from Gabon and other neighboring countries. Beninese networks with representatives in the Congo target destitute families in their country of origin, promising parents they will provide children an education in the Congo before exploiting them in domestic servitude or sex trafficking. Congolese authorities and civil society representatives report fraudulent employment agents located in Benin, CAR, the DRC, and Gabon recruit victims into exploitative conditions in the Congo. Foreign business owners and Congolese exploit most foreign victims in forced labor in domestic service, market vending, and the fishing sector. Some hotel owners and other criminal actors exploit adults and children, including both girls and boys, in commercial sex in the Congo, with the most common victims being Congolese from the DRC. Parents in foreign countries, mostly West African countries, sometimes send their children to the Congo with the expectation that the child will send remittances or receive an education, but instead criminals exploit the children in sex trafficking or forced labor. Experts report COVID-19-related economic hardships during the reporting period increased the vulnerability of individuals working in the informal sector, although border closures beginning in March 2020 may have decreased cross-border trafficking in persons.

Internal trafficking primarily involves recruitment from remote rural areas for exploitation in cities. Individuals in the fishing industry and market shop owners were the primary exploiters of victims within the country. Traffickers—including members of the majority Bantu community—exploit some members of the Indigenous populations for forced labor in the agricultural sector, with Indigenous persons being the majority of internal trafficking victims in the country; reports suggest that some servitude involving Congolese might be hereditary. DPRK nationals working in the Republic of the Congo may have been forced to work by the DPRK government.

## COSTA RICA: TIER 2

The Government of Costa Rica does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Costa Rica remained on Tier 2. These efforts included prosecuting more traffickers, implementing a new national action plan to combat trafficking, and establishing new regional task forces to promote law enforcement coordination on trafficking cases. However, the government did not meet the minimum standards in several key areas. The government did not adequately fund its anti-trafficking efforts, reducing the allocation for victim services and not providing funding for campaigns to raise

awareness of trafficking. The government investigated far fewer trafficking cases than in the previous reporting period and did not prosecute or convict any labor traffickers for the second consecutive year.



## PRIORITIZED RECOMMENDATIONS:

Increase victim identification and referral, particularly in coordination and collaboration with local and civil society partners. • Increase funding for victim services and provide specialized shelter and services for trafficking victims in partnership with civil society organizations. • Intensify efforts to investigate and prosecute trafficking offenses and convict and punish traffickers, including child sex tourists. • Reduce bureaucratic obstacles to the disbursement of funds allocated to anti-trafficking efforts. • Fund and implement the judicial action plan to improve the investigation and prosecution of trafficking cases. • Further reduce the backlog of trafficking cases in the judicial system.• Conduct thorough and transparent criminal investigations of alleged government complicity in trafficking offenses and prosecute, convict, and punish complicit officials. • Provide increased anti-trafficking training for police, prosecutors, judges, and municipal officials. • Improve data collection on judicial, law enforcement, and victim protection efforts.

## PROSECUTION

The government maintained law enforcement efforts. Article 172 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of six to 10 years' imprisonment for offenses involving an adult victim and eight to 16 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape. The law defined trafficking broadly to include illegal adoption without the purpose of exploitation, inconsistent with the definition of trafficking under international law. In addition to Article 172, officials used trafficking-related offenses to prosecute trafficking cases, including aggravated pimping (Article 170) and coerced pimping (Article 171), both of which prescribed penalties ranging from two to 10 years' imprisonment. Article 189 criminalized forced labor or services and prescribed penalties of six to 10 years' imprisonment.

Costa Rica had two police forces involved in trafficking investigations—the Judicial Investigation Police (OIJ) and the Migration Authority's (DGME's) Professional Migration Police. The Attorney General's anti-trafficking office (FACTRA) supervised both investigative units. FACTRA reported investigating 70 cases—including 42 trafficking cases under Article 172, 23 child sex trafficking cases (Article 170), and five cases of forced labor or services (Article 189). This compared with 103 cases in 2020—including 68 trafficking cases (Article 172), 28 cases of child sex trafficking (Article 170), and seven cases of forced labor or services (Article 189)—and 69 cases in 2019. The government initiated prosecutions against nine accused sex traffickers under Article 172, compared with prosecuting four accused traffickers in 2020 and seven in 2019. Courts convicted one sex trafficker in 2021, compared with convicting five traffickers in 2020 and 15 in 2019. Judges sentenced the trafficker, convicted under Article 172, to 18 years' imprisonment. The government reported prosecutors filed an appeal in a trafficking case where the court convicted the alleged trafficker of rape under Article 156 but dismissed trafficking charges. In one case ending in conviction, prosecutors supported the victims' choice not to participate in the trial against the trafficker by constructing a successful prosecution using evidence gathered via surveillance and mobile device extraction, rather than victim testimony. Courts reaffirmed 2018 convictions against a sex trafficker who forced a girl into commercial sex and against the man who paid to engage in commercial sex acts with the victim, increasing their sentences to nine and six years' imprisonment, respectively. The government did

not prosecute or convict any labor traffickers in 2021 or 2020; in 2019, the government prosecuted only one labor trafficker, under Article 189.

Officials reported pandemic-related mitigation measures continued to strain law enforcement capacity and limit resources available for anti-trafficking efforts. The government tasked law enforcement officials, including trafficking investigators, with enforcing vehicle use restrictions, capacity limits, and business closures in effect during the reporting period. Law enforcement officials reported pandemic-related restrictions on bars and brothels drove traffickers to increasingly exploit sex trafficking victims in private residences, complicating investigations and surveillance. Additionally, generalized funding shortages restricted law enforcement activity, including regular monitoring and anti-trafficking patrols. The government reported it began investigating one public official in relation to a trafficking case but did not provide further details into the investigation. Officials continued to support two ongoing prosecutions involving potentially complicit officials; courts denied the government's appeal in another case involving a public official accused of complicity in trafficking but convicted in 2019 of a lesser crime. The government did not provide updates on a third ongoing case, first investigated in 2011, involving a local mayor indicted in 2016 for establishing a trafficking ring. The government continued to investigate and prosecute individuals who paid child trafficking victims for commercial sex, resulting in three prosecutions—but no convictions—under Article 160 in 2021, compared with 10 prosecutions and one conviction in 2020.

Courts resumed normal case processing in 2021, after the government lifted judicial sector pandemic-mitigation measures, implemented in 2020, which had limited courts to emergency case reviews only. The judicial sector's chronic backlog of cases continued to delay processing for all cases, including trafficking cases; officials reported the backlog worsened under the courts' modified activity during the pandemic. FACTRA created nine new provincial task forces to promote coordination between local and national prosecutors and facilitate trafficking casework; including new units, there were 13 active task forces at the end of the reporting period. Officials reported the task forces in Puntarenas province collaborated on at least two trafficking investigations in 2021. The Supreme Court had a judicial branch action plan with a dedicated budget, developed in 2018, to build capacity and raise public awareness on how to identify trafficking, but the government again failed to implement the plan. The government provided five virtual trainings on identifying and investigating human trafficking cases to law enforcement officials and prosecutors, including one training for municipal police officers in the city of Desamparados. Costa Rican law enforcement officials, including those supporting anti-trafficking efforts, served short rotational assignments; limited training opportunities during the pandemic may have reduced new officials' familiarity with trafficking indicators and other critical information. Institutional capacity to combat human trafficking varied across the country, with national-level officials demonstrating greater familiarity with trafficking than municipal counterparts. FACTRA reported collaborating with Mexican and Panamanian officials on two sex trafficking cases.

## PROTECTION

The government decreased victim protection efforts. The government identified 21 trafficking victims (six women, one boy, and 14 girls), compared with 50 in 2020 and 35 in 2019. Traffickers exploited eight of these victims in sex trafficking and three in labor trafficking; the government did not specify the form of trafficking of the remaining 10 victims. Of the 21 identified victims, 14 were Costa Rican nationals, three were Nicaraguan, and four held unspecified foreign nationalities. The government reported NGOs separately identified eight additional victims (five sex trafficking victims and three labor trafficking victims). Government officials expressed concern that increased poverty and unemployment during the pandemic contributed to heightened vulnerability to trafficking.

Through the Immediate Response Team (ERI), a specialized inter-institutional body within the National Coalition against Illicit Smuggling and Trafficking of Migrants (CONATT), the government provided initial services to all 21 reported victims and one victim's dependent. The Office of Attention and Protection of Crime Victims, which served victims of all

crimes, reported providing services to 41 trafficking victims, including several victims identified in previous years, compared with serving 75 victims in 2020 and 48 victims in 2019. The National Women's Institute (INAMU) provided services to 20 female victims of trafficking in 2021, compared with providing care to 47 victims in 2020 and 31 in 2019. The national child welfare institution (PANI) provided services and placed the boy victim in an NGO shelter. Some victims may have received services from more than one provider. Specialized law enforcement units and national immigration authorities used written procedures for identifying victims among vulnerable groups, such as migrants and individuals in commercial sex, and referred identified victims to CONATT to coordinate service provision. Public officials used the "Institutional Protocol for the Care of Minors and Survivors of Trafficking in Persons" and the "Interagency Manual of Attention of Minors in Sexual Trafficking, Child Labor, and Dangerous Work," which established the steps officials must take when identifying a possible case of trafficking. The Ministry of Public Security updated its "Protocol for Detection and Referral of Possible Trafficking Cases" in September, with support from an international organization, and distributed pocket references of the new protocol to law enforcement officials. The government reported it identified victims through its routine screenings of vulnerable populations, including individuals in commercial sex and women heads of households below the poverty line, for trafficking indicators but did not report how many victims it identified through these efforts.

The government could provide victims with access to health care providers, psychological services, legal counsel, financial aid, law enforcement liaisons, and other services, including detoxification treatment, for up to three years. CONATT coordinated emergency, short-term, and long-term assistance for victims. ERI arranged short-term services for newly identified victims, including shelter, food, and medical care. There was one trafficking-specific shelter in the country, an NGO-run emergency facility capable of housing victims for up to 30 days. The government reported it could refer victims to the emergency shelter; however, authorities infrequently referred victims to NGO facilities. CONATT favored housing victims in a network of government safe houses, but it also placed victims in a civil society-operated safe house or a longer-term shelter for women and children. The government did not have shelter options for male or LGBTQI+ victims; authorities housed male and LGBTQI+ trafficking victims in hotels on a case-by-case basis. The government assisted child victims through PANI, which had a network of shelters for children and could place girl victims at an NGO facility able to provide long-term shelter. CONATT designated one of its constituent agencies to oversee victims' service provision on a rotating basis. The designated agency had the discretion to refer victims to services based on individual needs; not all victims received the same level of protection. Civil society organizations reported authorities did not always implement referral mechanisms in an effective or timely manner and recommended the government provide transportation for victims to institutions providing assistance; civil society observed slower provision of victim services in rural areas. The National Anti-Trafficking in Persons and Smuggling of Migrants Fund (FONATT) disbursed 71.6 million colones ($112,180) to provide services for identified victims, an increase relative to the 7.41 million colones ($11,610) disbursed in 2020, but notably less than the 172 million colones ($269,480) disbursed for victim services in 2019. DGME allocated an additional 35.4 million colones ($55,460) in one-time funding for victim services to offset decreased FONATT funding. The government did not report making a separate allocation to cover emergency services and initial care for potential victims; in 2020, it allocated 7.42 million colones ($11,630) in additional funding for this purpose. FONATT funding was tied to a tourism tax; the government attributed its reduced expenditure on anti-trafficking efforts to decreased tourism and government-wide financial austerity measures linked to the pandemic. PANI continued to provide direct funding and a per-victim subsidy for identified victims to an NGO-run shelter for child victims. The government allocated 1.25 million colones ($1,960) to two NGOs providing services to trafficking victims, compared with 171.5 million colones ($268,700) in 2019; data for 2020 was not available. Observers reported that failure to disburse all of the allocated resources hindered the country's ability to address its trafficking problem, despite dedicated government resources to anti-trafficking efforts, including victim services.

Costa Rican law allowed victims to obtain temporary residency status and work permits, leave the country, file civil suits against traffickers, and provide testimony outside of court proceedings. The government issued 58 new or renewed temporary residence permits to trafficking victims in 2021; by comparison, it issued 11 new and an unknown number of renewed permits in 2020. Officials reported one foreign national trafficking survivor became a Costa Rican citizen in 2021. Victims could testify outside of court proceedings; the government did not report any victims utilizing this provision in 2021, compared with two in 2020. Officials coordinated with Panamanian law enforcement to facilitate transit for a Costa Rican victim testifying in the Panamanian trial against a trafficker. The government coordinated with an NGO to facilitate the repatriation of one foreign national trafficking victim in 2021, compared with no repatriations in 2020 and two in 2019. The government reported offering two virtual training opportunities, open to officials in a range of agencies, on identifying trafficking victims; an international organization provided educational materials or otherwise supported one of these trainings.

## PREVENTION

The government maintained prevention efforts limited by government-wide reductions in funding. CONATT, chaired by DGME, integrated and coordinated anti-trafficking efforts among 22 public institutions, key NGOs, and international organizations, and it maintained sub-commissions focused on attention to victims, prevention, justice, investigation and analysis, and project management. CONATT met periodically to review progress in the areas of research, protection, prevention, and prosecution; in 2021, it continued to rely on virtual meetings to maintain interagency coordination. CONATT presented a quarterly public report on its accomplishments. The government approved its 2020-2030 national action plan in November 2021 and began implementing it soon thereafter. Through the FONATT and DGME, the government reported a total of 107 million colones ($167,640) in anti-trafficking expenditures, compared with 620.45 million colones ($972,080) in FONATT funding in 2020 and 1.4 billion colones ($2.2 million) in 2019. The government primarily financed its anti-trafficking activities through the FONATT, but bureaucratic hurdles continued to stymie execution of these funds. In 2021, the government disbursed 64 percent of allocated FONATT funds, an increase compared with 13 percent in 2020 and roughly on par with the 77 percent disbursement reported in 2019; however, the government continued to report limited anti-trafficking funding due to pandemic-related austerity measures, such that funding in 2021 remained considerably below 2019 levels, despite similar disbursement by percentage. The government funded the FONATT primarily through a national exit tax; consequently, funding for anti-trafficking efforts fluctuated with travel to and from Costa Rica, which remained reduced due to the pandemic. The government did not allocate any prevention programming for the second consecutive year, compared with 171.5 million colones ($268,700) for prevention programming and 1.37 billion colones ($2.15 million) for other anti-trafficking events and projects in 2019. The government reported it cut funding for prevention programming due to financial austerity and government-wide resource limitations; it noted, however, that anti-trafficking officials continued to promote trafficking awareness through low-cost social media posts. Funding shortages also prevented the government from making trafficking-specific allocations to DGME, the Ministry of Public Education, and other agencies. Observers reported awareness-raising programming remained limited, also attributing the reduction to pandemic-related funding limitations. OIJ operated two hotlines to receive confidential criminal complaints; it reported receiving 153 calls related to potential trafficking cases in 2021; there were approximately 100 such calls in 2018, the most recent year for which data was available for comparison. The Judiciary Police also operated the 9-1-1 hotline available for general crime reporting, which fielded four trafficking-related calls in 2021.

In past years, the government educated labor recruiters for international and domestic businesses about the consequences of violating the anti-trafficking regulations but did not report doing so, or investigating or penalizing any labor recruiters for illegal practices that contribute to trafficking, in 2021 or 2020. The government promoted an international code of conduct related to commercial sexual exploitation in the travel and tourism industry; 409 tourist sector businesses adhered to the code.

The government collaborated with civil society to offer four training sessions for tourism sector staff on identifying and referring trafficking victims. The government did not report efforts to reduce the demand for commercial sex acts in 2020. In addition to prosecuting individuals that paid child trafficking victims for commercial sex, the government made efforts to reduce the demand for participation in international sex tourism by working with international partners to deny entry to 75 foreign-registered sex offenders who attempted to travel to Costa Rica as tourists in 2021.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Costa Rica, and traffickers exploit victims from Costa Rica abroad. Traffickers subject Costa Rican women and children to sex trafficking within the country, with those living in the Pacific coastal zones and near the northern and southern borders being particularly vulnerable. Government officials report many traffickers operate independently, without a connection to organized crime, to exploit Costa Rican victims. Many victims are related to or otherwise know their traffickers. Authorities suspect that adults use children to transport or sell drugs; some of these children may be trafficking victims. Traffickers exploit LGBTQI+ persons, including transgender persons, in sex trafficking. Women and girls from Nicaragua, the Dominican Republic, and other Latin American countries have been identified in Costa Rica as victims of sex trafficking and domestic servitude. Traffickers subject migrant adults and children, primarily from Nicaragua, to forced labor in agriculture and domestic service or to sex trafficking. Criminal organizations recruit and coerce individuals experiencing homelessness to smuggle contraband into prisons for the purpose of further criminal activity. Traffickers prey on migrants, some en route to the United States, from other Central American countries, the Caribbean, the People's Republic of China, and South America. Child sex tourism is a serious problem, with child sex tourists arriving mostly from the United States and Europe.

## COTE D'IVOIRE: TIER 2

The Government of Cote d'Ivoire does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Cote d'Ivoire remained on Tier 2. These efforts included prosecuting and convicting more traffickers and identifying significantly more victims. The government developed a draft national referral mechanism (NRM) and provided anti-trafficking training to law enforcement and judicial officials. However, the government did not meet the minimum standards in several key areas. Law enforcement lacked the specialized training and resources to investigate trafficking cases and identify victims. The interagency anti-trafficking committee (CNLTP) did not meet or coordinate anti-trafficking activities, and the government did not allocate a dedicated budget for the CNLTP's operations for the third consecutive year. Shelter and services, especially for adult victims, remained inadequate.



## PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers, including complicit officials, and sentence convicted traffickers to significant prison terms as prescribed by law. • Increase efforts by law enforcement and judicial officials on investigating and prosecuting

trafficking cases under the 2016 anti-trafficking law, including specialized investigative and prosecutorial techniques, and enhance coordination of law enforcement efforts across agencies. • Increase funding and in-kind resources, as feasible, for the anti-trafficking law enforcement units to investigate trafficking cases nationwide and delineate responsibilities between the units. • Develop and implement standardized procedures to identify human trafficking victims, including among vulnerable populations such as Ivoirian labor migrants, foreign migrants, child laborers, and individuals in commercial sex and train law enforcement, service providers, labor inspectors, and other officials on the procedures. • Finalize and implement the NRM and train law enforcement, judicial officials, service providers, and civil society on its implementation. • Strengthen the CNLTP's authority to coordinate the government's anti-trafficking response across agencies conducting anti-trafficking work. • Adopt and implement a new national action plan (NAP) and allocate dedicated resources to its implementation. • Increase availability of shelter and services, especially for adult trafficking victims. • Increase efforts to prevent exploitation of Ivoirian migrants abroad by extending labor protections to workers in the informal sector, especially domestic work, increasing oversight of labor recruitment agencies and holding fraudulent labor recruiters criminally accountable and banning worker-paid recruitment fees. • Improve nationwide data collection on anti-trafficking law enforcement and victim identification efforts.

## PROSECUTION
The government increased law enforcement efforts. Law No. 2016-111 on the Fight Against Trafficking in Persons criminalized sex trafficking and labor trafficking and prescribed penalties of five to 10 years' imprisonment and a fine of 5 million to 10 million West African CFA francs (FCFA) ($8,590-$17,190) for adult trafficking and 20 to 30 years' imprisonment and a fine of 10 million to 50 million FCFA ($17,190-$85,930) for child trafficking. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The 2010 Child Trafficking and Child Labor Law was also used to prosecute child trafficking, and it criminalized child sex trafficking and labor trafficking with 10 to 20 years' imprisonment and a fine of 5 million to 20 million FCFA ($8,590-$34,370). The government used penal code provisions on illegal mining and "pimping" to prosecute trafficking cases. The penal code prescribed penalties of one to five years' imprisonment and a fine of 1 million to 10 million FCFA ($1,720-$17,190) for "pimping" and penalties of two to five years' imprisonment and a fine of 50 million to 100 million FCFA ($85,930-$171,870) for illegal mining. These penalties were significantly lower than those prescribed under the trafficking law.

Authorities initiated at least 11 case investigations and continued three case investigations, compared with investigating 18 cases in the previous reporting period. The government initiated prosecution of 83 alleged traffickers and continued prosecution of six alleged traffickers, and courts convicted 43 traffickers during the reporting period. Judges sentenced all 43 convicted traffickers to between five years and 20 years' imprisonment. This compared with prosecution of 25 alleged traffickers and conviction of 12 traffickers in the previous reporting period. In one case investigated by the Sub-Directorate in the Fight against Trafficking and Child Labor (SDLTEDJ), law enforcement arrested 24 alleged traffickers and identified 68 child victims, most of whom were from Burkina Faso, exploited in forced labor in cocoa; courts convicted and sentenced five traffickers under Law No. 2016-111 and 17 traffickers under penal code provisions on child labor. The government continued collaborating with foreign counterparts, including from Burkina Faso and Nigeria, on law enforcement activities.

The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes; however, official corruption and complicity in trafficking crimes remained concerns, inhibiting law enforcement action during the year. Some observers alleged low-ranking police on the borders with Mali and Ghana facilitated smuggling, including potential trafficking cases, and organized a system to collect bribes at checkpoints and along bus routes. In 2018, five gendarmes and two military firefighters allegedly abducted a trafficking victim from an NGO shelter; a military tribunal sentenced four of the gendarmes and the military firefighters to 50 days in military jail in August 2019 as an administrative sanction for

unbecoming conduct. Following the 50-day detention, the officials returned to their military duties. A subsequent prosecution of four of the gendarmes and one of the military firefighters for kidnapping of a minor, forced confinement, and attempted rape remained pending before a military investigative judge at the end of the reporting period. Although not explicitly reported as human trafficking, the UN reported there was one new allegation, submitted in 2021, of alleged sexual exploitation with trafficking indicators by Ivoirian peacekeepers deployed to the UN peacekeeping mission in Haiti between 2010 and 2012. The UN investigation into the allegation was pending, and the government had not yet reported the accountability measures taken, if any, for the open case by the end of the reporting period.

The SDLTEDJ bore primary responsibility for enforcing anti-trafficking laws and investigating cases throughout the country. Six special police units established under the SDLTEDJ in the previous reporting period continued to investigate child labor and child trafficking cases. These units operated out of SDLTEDJ branch offices in the six cities in which they were based. The gendarmes under the Ministry of Defense were responsible for investigations in rural areas where the SDLTEDJ was not present. Resource limitations constrained the Brigade Mondaine—the unit responsible for investigating prostitution and sex trafficking—to Abidjan and a few regional precincts. The Transnational Organized Crime Unit (UCT) had national jurisdiction over transnational organized crime, including a specialized human trafficking department. The SDLTEDJ was responsible for child trafficking cases, UCT for transnational trafficking cases, and Brigade Mondaine for sex trafficking cases; however, the units lacked coordination, and no unit had a clear responsibility for internal adult labor trafficking cases. Limited funding and resources significantly hindered law enforcement's ability to identify and investigate human trafficking cases.

In August 2021, the Ministry of Justice and Human Rights issued a directive creating new prosecutorial teams within the appeals courts in four cities focused on combating human trafficking to accelerate the procedural process and support the public prosecutor's office in prosecuting trafficking cases. Although not yet operational, the government, in partnership with a foreign donor, began providing anti-trafficking training to the units. The government, in collaboration with international organizations and foreign donors, trained judicial officials, law enforcement, and civil society organizations on human trafficking laws and regulations, victim protection during criminal proceedings, investigative and prosecutorial techniques, and cross-unit collaboration. Observers reported additional anti-trafficking training for law enforcement and judicial officials was needed. Some judges and prosecutors remained unaware of the 2016 law and continued to use the 2010 law and illegal mining and "pimping" statutes to prosecute trafficking cases, which carried lesser penalties.

## PROTECTION
The government increased efforts to identify and protect victims. During the reporting period, the government identified 1,190 trafficking victims, the majority of whom were children, including 437 sex trafficking and 753 forced labor victims, compared with identifying 302 trafficking victims during the previous reporting period. The majority of identified victims were Ivoirian; foreign national victims were from Nigeria, Mali, Guinea, Burkina Faso, Niger, Togo, and Benin. Due to the lack of a centralized data collection system and conflation of trafficking with other crimes, victim identification data likely included child labor and sexual abuse cases. The government referred most identified victims to services.

The government did not have standardized procedures to proactively identify trafficking victims and refer them to care; however, the UCT, Brigade Mondaine, and SDLTEDJ each had operational victim referral procedures. The government developed an NRM, in collaboration with an international organization, which remained pending final approval at the end of the reporting period. Despite the lack of a formal NRM, in practice, officials referred adult trafficking victims to NGOs or host families and child victims to NGO and government-run shelters or foster families when necessary. Officials could also refer trafficking victims to government-run centers for victims of abuse for psychological care and NGOs for shelter and services. The government provided food, medical care, and psycho-social support to victims. The government, in partnership with an NGO, operated three shelters for child labor

and child trafficking victims, including a new shelter opened during the reporting period. There was no government-run shelter that could accommodate adult victims. Government ministries lacked coordination, which in some cases hindered the provision of services. The Ministry of Women, Children, and Families (MWCF) provided some in-kind support to NGOs caring for victims, including food, hygiene products, and other supplies, but did not report providing any direct financial support. Observers reported government support for victim protection and services remained inadequate, and in many cases, NGOs funded and provided the majority of trafficking victim care. Observers also noted social workers lacked the resources and personnel to effectively care for and monitor the reintegration of victims. The lack of services, especially for adults, and lack of reintegration assistance rendered many victims vulnerable to re-victimization. Foreign victims had the same access to care as Ivoirian victims. The government did not have a formal policy providing temporary or permanent residency to foreign victims who faced hardship or retribution in their countries of origin. In some cases, the government depended on foreign trafficking victims' home embassies to provide shelter and care prior to repatriation. In at least one case, authorities coordinated with a foreign government and international organization to repatriate a foreign national trafficking victim.

Access to victim services was not dependent on cooperation with law enforcement proceedings. Ivoirian law required the government to provide protection and assistance to victims who participated in investigations or trials against alleged traffickers, but the government did not report providing this assistance to any victims. The law also called for creation of a national office for the protection of witnesses and victims; however, the office was not yet operational. Observers reported the government did not provide or refer trafficking victims to legal aid, which hindered victims' ability to press charges against their alleged traffickers and, for foreign victims, to address immigration issues. Trafficking victims could file civil suits, but none reportedly did so, and many victims were not aware of this option. Ivoirian law allowed victims to obtain restitution, and in one case, the court ordered a convicted trafficker to pay 10 million FCFA ($17,190) in restitution. Due to the lack of standardized victim identification procedures, some victims may have remained unidentified within the law enforcement system. International organizations reported border agents sometimes denied entry to foreign nationals, including potential victims, without screening for human trafficking. Law enforcement officials reportedly only screened individuals in commercial sex for trafficking when detaining or arresting them.

## PREVENTION

The government maintained efforts to prevent trafficking. The CNLTP, while intending to lead the government's anti-trafficking prevention efforts, did not meet, and the government did not report allocating dedicated funding for its operations for the third consecutive year. The government drafted a NAP for 2021-2025 that remained pending at the end of the reporting period. The government continued implementing its 2019-2021 NAP to combat child labor and trafficking, which had a three-year budget of more than 76 billion FCFA ($130.62 million). The Oversight Committee to Combat Child Trafficking and the Worst Forms of Child Labor (CNS) and the Inter-Ministerial Committee in the Fight Against Child Trafficking, Child Exploitation, and Child Labor (CIM) continued to coordinate efforts to combat child labor and child trafficking. CNS oversaw CIM and conducted monitoring and evaluation activities. Observers reported dedicated resources and more collaboration between the three committees were still needed for the CNLTP to be fully effective. The government held public awareness campaigns focused on child labor, which included some anti-trafficking components. It also collaborated with international organizations to produce pamphlets, t-shirts, and video content to raise awareness of the dangers of human trafficking and migrant smuggling. Observers reported campaign materials were almost exclusively produced in French, rather than local languages and dialects. The labor code regulated labor recruitment and labor migration in the formal sector, but it did not extend to the informal sector, including domestic work, which increased some migrant workers' vulnerability to trafficking. The government did not report efforts to hold fraudulent labor recruiters accountable. The law did not prohibit worker-paid recruitment fees. The government trained labor inspectors on identifying child labor

and trafficking victims. However, despite conducting more than 2,800 inspections in 2021, labor inspectors did not identify any child labor or child trafficking cases during the inspections. The Ministry of Water and Forests, responsible for surveilling the country's natural resources, also monitored for child labor or trafficking violations during regular patrols of the forests; ministry personnel referred potential child labor or trafficking cases to law enforcement for criminal investigation. The MWCF continued operating a hotline to report child protection and human rights violations, and officials reported identifying 27 potential child trafficking victims as a result of calls to the hotline.

In September 2020, the government established two inter-ministerial commissions to adjudicate claims for statelessness, intending to process status for approximately 16,000 people living in the country without identity documents who are therefore vulnerable to trafficking. The commissions began adjudicating claims but lacked capacity and resources to process claims expeditiously. The government did not demonstrate efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training to its diplomatic personnel. The government did not report providing anti-trafficking training to troops prior to their deployment as peacekeepers; although not explicitly reported as human trafficking, there was one open case of alleged sexual exploitation with trafficking indicators by Ivoirian peacekeepers deployed to the UN peacekeeping mission in Haiti.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Cote d'Ivoire, and traffickers exploit victims from Cote d'Ivoire abroad. The majority of victims identified are children; due to a stronger emphasis on combating internal child trafficking, the prevalence of adult trafficking may be underreported. Traffickers exploit Ivoirian women and girls in forced labor in domestic service and restaurants and in sex trafficking. Traffickers also exploit Ivoirian boys in forced labor in the agricultural and service industries, especially cocoa production. West African boys, especially Burkinabe, are exploited in forced labor in agriculture (on cocoa, coffee, pineapple, cashew, and rubber plantations and in animal herding), mining, carpentry, construction, and begging in Cote d'Ivoire. Observers reported the pandemic's economic impacts, as well as insecurity in neighboring countries, have increased child labor and forced child labor, especially on cocoa farms. Traffickers exploit migrant workers, including Malian, Burkinabe, and internal Ivoirian migrants, in the cocoa sector in forced labor and debt bondage; observers reported recruiters deceive workers about working conditions, including wages, hours, and length of contracts—indicators of forced labor. These recruiters charge worker-paid recruitment fees, including for transportation costs; some employers pay the fees and subsequently exploit the workers in debt bondage, reportedly charging them up to five times the original cost of transportation. Traffickers often operate in well-established networks consisting of both Ivoirians and foreigners and, in cases of transnational trafficking, use social media, making networks difficult for law enforcement to detect. In 2018, authorities estimated there were more than 2,000 Ivoirian, Burkinabe, Malian, Nigerien, and Senegalese *talibés* (students in Quranic schools) in northern and central Cote d'Ivoire and that corrupt teachers force many of them to beg. NGOs and officials report drug traffickers use children—some of whom may be forced—to sell and transport drugs in restaurants and nightclubs. Some Beninese and Togolese workers migrate to Cote d'Ivoire for construction and carpentry work and bring children, whom they exploit in domestic servitude. Traffickers—commonly distant relatives—bring girls from rural Cote d'Ivoire and other West African countries to Abidjan ostensibly to go to school or receive professional training but subsequently exploit them in domestic servitude. Ghanaian, Moroccan, and Nigerian traffickers recruit women and girls from Ghana, Morocco, and Nigeria for waitressing jobs and subsequently exploit them in sex trafficking in restaurants or massage parlors; some victims believe they are transiting Cote d'Ivoire en route to Europe. Nigerian traffickers increasingly exploit Nigerian women and girls in sex trafficking in Cote d'Ivoire's northern and western mining regions, including near gold mines in Tengrela. An international organization noted cultural beliefs correlating sex with increased chances of finding gold have increased the demand for sex trafficking in mining communities. Nigerian traffickers bring Nigerian children to

CROATIA

northern Cote d'Ivoire for domestic servitude. Nigerian victims transit Cote d'Ivoire en route to exploitation in sex trafficking in Asia, the United Arab Emirates, and North Africa. In past years, People's Republic of China (PRC) national traffickers have exploited PRC national women in sex trafficking in Cote d'Ivoire. Returning refugees and individuals living in Cote d'Ivoire without identity documents are at risk of statelessness, increasing vulnerability to trafficking.

Some Ivoirian community and religious leaders, possibly working with others abroad, reportedly recruit Ivoirian women and girls for work in the Middle East and Europe; some women and girls are then exploited in forced labor in Europe, North Africa, and Gulf countries, primarily Lebanon, Morocco, Saudi Arabia, and Tunisia. Ivoirian migrants in Libya and Tunisia are vulnerable to trafficking. Migrants commonly depart from Daloa and proceed via airplane to Tunisia or travel overland via Mali and Algeria to Libya or via Niger to Libya. In Tunisia, intermediaries confiscate migrants' identity documents until they can pay for the next part of their journey, increasing vulnerability to trafficking. In 2021, Tunisian authorities identified an estimated 417 Ivoirian potential trafficking victims, approximately 64 percent of the total trafficking victims identified in Tunisia. International organizations and Ivoirian law enforcement agencies reported Ivoirian migrant smuggling networks based in Tunisia increasingly became involved in trafficking as European governments blocked migration inflows and that these networks also coerced Ivoirians to engage in unlawful acts, including drug smuggling. Traffickers exploit men and boys in forced labor on farms in Tunisia, often promising the men well-paying jobs and the boys the opportunity to play soccer. Ivoirian undocumented migrants in Algeria are vulnerable to trafficking due to their undocumented status. An international organization reported an increase in Ivoirian migrant women and unaccompanied children arriving in Italy; an NGO reported traffickers sexually exploited many of the women in Libya prior to their arrival in Italy. In 2018, French authorities disbanded an Ivoirian trafficking network linked to Daloa that provided Ivoirian children with fake documents and facilitated their travel to France through Libya and Italy. Authorities have also noted an increase in male trafficking victims among migrants traveling to Europe. Ivoirian domestic workers in Kuwait are vulnerable to domestic servitude. Authorities have previously identified Ivoirian trafficking victims in Cyprus, France, Iraq, Israel, Italy, Morocco, and the United Kingdom.

## CROATIA: TIER 2

The Government of Croatia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Croatia remained on Tier 2. These efforts included convicting more traffickers, not issuing any suspended sentences, and identifying more victims. The Office for Human Rights and Rights of National Minorities (OHRRNM) reimbursed mobile teams for travel costs, and coordinating bodies consistently met and reported good collaboration. The government established the first Independent Monitoring Mechanism (IMM) to provide oversight for police conduct at borders and ensure compliance with human rights, an action that may help potential victims self-identify to authorities and reduce future opportunities for traffickers to exploit migrants and asylum-seekers. However, the government did not meet the minimum standards in several key areas. The government investigated fewer cases and indicted fewer defendants compared with the previous year. Observers reported a lack of adequate screening efforts for undocumented migrants and asylum seekers, which discouraged victims from cooperating and self-identifying. Some judges continued to require victims to provide multiple statements or testimonies causing re-traumatization, while prosecutors sometimes charged traffickers with lesser offenses.



**CROATIA TIER RANKING BY YEAR**

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers, and sentence convicted traffickers to significant prison terms. • Train judges at all levels of the judiciary to take the severity of trafficking into account when issuing sentences and sensitize judges on victim-centered approaches and restitution. • Train prosecutors on trafficking, victim's rights, and victim-centered approaches, and refer trafficking cases to trained or experienced prosecutors. • Continue to encourage victim participation in investigations and prosecutions by providing alternative methods to testify, including remote testimony or funding for travel and other expenses for victims to attend court hearings. • Reduce the judiciary's overall backlog of cases, including trafficking cases. • Continue to inform all identified victims of their right to pursue compensation and encourage them to do so. • Strengthen rules and regulations to ensure immigration enforcement does not hinder human trafficking detection, criminal law enforcement, or victim protections. • Further increase capacity and training to accurately screen for victims and continue to consistently implement screening procedures for vulnerable populations, particularly undocumented migrants, refugees, asylum seekers, and seasonal workers. • Continue to allocate and disburse sufficient resources to NGO-run shelters and NGOs participating in the mobile identification teams.• Increase funding to the NGO-run hotline, so it can operate for more hours of the day and incorporate hotline numbers in more robust public awareness campaigns.

## PROSECUTION

The government increased law enforcement efforts. Article 106 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of one to 15 years' imprisonment, which were sufficiently stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape. Law enforcement investigated seven cases with 17 suspects, compared with 15 cases with 29 suspects in 2020. Prosecutors indicted four defendants, compared with eight defendants in 2020. Courts convicted two labor traffickers and one sex trafficker, an increase compared with zero convictions in 2020. First instance courts sentenced each of the two labor traffickers to one year and eight months' imprisonment and the sex trafficker to three years and three months' imprisonment. The government reported 19 cases remained pending for rulings, compared with 16 cases in 2020. The government used child pandering (Article 162 of the criminal code) to convict some suspected traffickers but did not report the number of perpetrators convicted for child pandering. Some court proceedings lasted years contributing to a substantial but decreasing backlog of criminal cases, including trafficking cases dating as far back as 2013. Judges reported both an increased influx of cases to the existing backlog and delayed court proceedings from the government closing courts from March to June 2020 due to pandemic lockdown measures and two earthquakes in 2020 that destroyed or damaged multiple courts.

The government did not operate specialized law enforcement units, but police designated officers for trafficking cases in all jurisdictions. Law enforcement personnel under the Ministry of Interior (MOI) conducted proactive investigations of commercial sex establishments and cooperated with the State Labor Inspectorate to jointly inspect 132 employers in the agriculture, construction, hospitality, and service industries (144 in 2020). However, most inspection violations were administrative labor violations involving contracts, permits, and salaries rather than labor trafficking prosecutions. Group of Experts on Action against Trafficking in Human Beings (GRETA) and other sources reported some judges and prosecutors lacked an understanding of trafficking and often prosecuted traffickers using offenses with lesser sentences, such as "prostitution," "assault," "sexual abuse," and "pandering." Similarly,

some prosecutors charged individuals suspected of trafficking with other or lesser crimes that were easier to prove to decrease their large caseloads. Independent experts assessed that prosecutors heavily relied on victim testimony and did not often use special investigative measures to corroborate evidence, while some judges in past years issued lenient sentences by liberally applying mitigating circumstances. The government maintained institutionalized training programs on various trafficking issues at the Police Academy, Police College, Judicial Academy, and Border Police Directorate. The government could not share details on international investigations due to confidentiality protections. The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes.

## PROTECTION

The government slightly increased victim protection efforts. The government identified 19 victims, compared with 17 victims in 2020. Of these, six were victims of sex trafficking, five of forced labor, seven of forced criminality, and one victim of all three types of exploitation; there were four women, five men, five girls, and five boys; and four were foreign victims from Nepal. The government maintained standard operating procedures (SOPs) for screening and identifying victims and a protocol on identification, assistance, and protection of victims. Civil society representatives and government officials reported the MOI accurately and consistently identified victims and noted good cooperation. However, civil society, media, and the Council of Europe continued to report a lack of government efforts to adequately screen undocumented migrants and asylum seekers, including unaccompanied children.

A multi-disciplinary national referral mechanism (NRM) provided SOPs for identifying and referring victims to services. According to the NRM, first responders carried out the preliminary identification of potential victims and contacted one of four regional mobile teams, consisting of social workers from a Center for Social Work and NGO representatives, who travelled to assess potential adult victims in person and coordinated victim care and placement. For child victims, first responders contacted the Ministry of Labor, Pension System, Family and Social Policy (MLPSFSP), who dispatched a mobile team of specialized social workers. MOI cooperated with mobile teams to officially identify victims and included specialized police officers for potential child victims. While in previous years, NGOs participating in the mobile team for adults had not been reimbursed for expenses related to the use of their private vehicles for official travel, officials reported the mobile team functioned well and the OHRRNM reimbursed costs in 2021. In previous years, sources reported difficulties in recruiting new mobile team members due to annual budgets that allocated inconsistent funding and said a one-day training for new team members was inadequate to learn the complex process of identifying victims; however, OHRRNM provided 130,000 kunas ($20,160) to host a three-day training for new mobile unit volunteers in 2021.

The government and NGOs provided protection and assistance to victims, including shelter, medical assistance, legal assistance, psycho-social support, rehabilitation, reintegration services, and, during the pandemic, personal protective equipment and COVID-19 tests; six adults and 10 children received assistance (three adults and five children in 2020). The government funded two NGO-run shelters based on the number of assisted victims and allocated 257,741 kunas ($39,960) to the NGO-run shelter for adults, compared with 216,593 kunas ($33,580) in 2020. It allocated 162,331 kunas ($25,170) for the NGO-run shelter for children, compared with 441,692 kunas ($68,480) in 2020. Additionally, the Center for Missing and Exploited Children (CMEC) provided a range of educational and psycho-social services for unaccompanied or exploited children, including child trafficking victims; these shelters accommodated four adults and no children (two adults and three children in 2020). The government-funded NGO-run shelter for adults allowed freedom of movement and provided separate accommodation for men and women, where they could stay for up to one year with the possibility of an extension. The government-funded NGO-run shelter for children had the capacity to accommodate five child victims and could enroll children into school, including distance learning. The government continued its efforts to implement foster care for the custody of children instead of using state child care institutions. MLPSFSP organized three foster families for five child victims (none in 2020) and appointed special

caregivers for three children (three children in 2020). MDFYSP organized trainings for foster families and special caregivers and required them to maintain a license, but officials reported a shortage in the number of foster families and special caregivers to fully support the increasing number of child victims. The Croatian Employment Bureau (HZZ) maintained special coordinators in regional and branch offices, who coordinated roundtables and presentations to encourage employers to hire trafficking victims; HZZ assisted one victim in securing employment in 2021 (none in 2020).

The government did not report penalizing victims for unlawful acts traffickers compelled them to commit; however, due to a lack of consistent screening efforts for trafficking indicators in irregular migration flows, authorities likely detained and deported some unidentified victims among undocumented migrants and asylum seekers. Foreign victims had access to the same services as domestic victims, but foreign victims without work permits at the time of their exploitation could not receive compensation for lost wages. Foreign victims could receive a temporary residence permit after a 60-day reflection period for adults and 90 days for children; the government issued four victims residence permits (one in 2020). Seven out of the 15 county courts had Victim and Witness Support Offices (VWSO) that provided assistance during criminal proceedings, including requests to testify via video link, referrals to specialized institutions, legal and logistical assistance, and measures to prevent re-traumatization. The government also funded a civil society network to provide legal and psychological assistance and logistical support in the eight county courts without VWSOs. While observers reported courts with VWSOs offered assistance consistently, the other eight county courts assisted by civil society did not have the capacity or resources to provide victim-centered approaches. Civil society reported the judiciary was not always familiar with legal protections available for trafficking victims and some judges lacked sensitivity and an understanding of the impact of psychological trauma, and they required victims to provide statements or testimonies multiple times, causing re-traumatization. For example, judges allowed victims to testify remotely but required victims to do so at the courthouse, which forced victims to travel from a different city. Children could provide testimonies to specialized professionals in child interview rooms, but observers reported, in 2019, a judge required a child to testify in court for seven hours. The law provided witness protection, but the government reported no victims required witness protection in 2021 or 2020. Authorities reported difficulties in encouraging victims to cooperate with investigations, particularly sex trafficking cases or cases involving potential foreign victims due to fear of retaliation, stigma, re-traumatization, or logistical challenges. The law entitled victims to restitution in criminal cases, but judges most often rejected claims for restitution and directed victims to file civil suits to request compensation. Experts reported the lack of indemnification guidelines, training for judges, bureaucratic procedures, and inadequate mechanisms perpetuated the absence of restitution in criminal sentences. Judges in civil courts were sometimes better positioned to assess emotional pain, but civil suits were expensive, lengthy, and required victims to re-testify about their exploitation, causing re-traumatization. Judges did not award restitution in 2021, but compensation awarded in 2020 to a victim for 143,650 kunas ($22,270) became final in 2021.

## PREVENTION

The government maintained prevention efforts. The head of OHRRNM served as the national anti-trafficking coordinator and the secretariat for the senior-level national coordinating committee; the national committee met once in 2021 and 2020. In 2020, the government adopted a decision to include representatives from the judiciary in the national committee, appointed two judges from the Supreme Court, and appointed the Deputy Prime Minister to chair the committee. The committee's working-level operational team held monthly virtual meetings and monitored the implementation of the 2018-2021 national action plan (NAP), and members of the team, including civil society, reported good cooperation. The government allocated 117,209 kunas ($18,170) for the implementation of the NAP and also allocated 292,620 kunas ($45,370) to OHRRNM in 2021 and 265,120 kunas ($41,100) for 2022. The government organized awareness campaigns in areas with high tourism targeting individuals who can come into contact with a victim,

including public transport workers, restaurant and bar staff, and port and airport employees. Additionally, the government organized awareness campaigns for the public, students, and the Romani community. The government allocated 4,706 kunas ($730) for the NGO-run hotline, but observers reported the NGO-run hotline operated only from 10:00 a.m. to 6:00 p.m. due to inadequate financial support and difficulties in finding the hotline number; the hotline received 678 calls leading to six investigations. The government maintained a legal framework for regulating and licensing private sector employers, including foreign employment agencies. The law prohibited charging workers recruitment fees with fines for a violation ranging from 4,000 to 100,000 kunas ($620 to $15,500); the government did not report if such fines were issued during 2021. Labor inspectors could issue administrative fines and/or file criminal charges against employers for nonpayment of salaries. Labor inspectors conducted 8,247 inspections in a variety of sectors, such as agriculture, construction, elderly care, forestry, and service; most infractions involved improper labor contracts, work permits, and salary issues. The government did not make significant efforts to reduce the demand for commercial sex acts.

International organizations criticized the government for continued violent pushbacks of undocumented migrants and asylum seekers into Bosnia and Herzegovina (BiH), while civil society and media alleged border police abused undocumented migrants and asylum seekers, including allegations of sexual abuse. International and civil society organizations claimed these practices strongly discouraged victims from self-identifying or cooperating with authorities. UNHCR reported accusations were hard to verify as migrants wanted to move quickly through Croatia and were inaccessible for follow-up investigations, but civil society recorded approximately 8,800 pushbacks to BiH from January 2021 to November 2021 and 30,309 pushbacks to BiH from June 2019 to September 2021. In June 2021, the government established the IMM to provide oversight for police conduct at borders and ensure compliance with human rights and international law. IMM released a six-month report of their findings, which reported poor records and unclear procedures, but police were generally well-trained and followed regulations, and border abuse and mistreatment were isolated instances. However, NGOs criticized the lack of independence of IMM and transparency of the report.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Croatia, and traffickers exploit victims from Croatia abroad. Women and girls from the Balkans and Central Europe are exploited in sex trafficking in Croatia. Traffickers exploit Croatian women and girls in sex trafficking within the country and elsewhere in Europe. Traffickers exploit Croatian, Bosnian, and Romanian women and some Afghan, Filipino, Nepali, Pakistani, Taiwanese, and Thai men in forced labor in the Croatian agricultural sector. Men also are exploited in forced begging and forced criminality, including theft and fraud. Traffickers increasingly use the internet, in particular social media platforms, to recruit children for sex trafficking. Undocumented migrants and asylum seekers from Afghanistan, Iraq, Syria, and neighboring countries traveling or being smuggled through Croatia are vulnerable to trafficking, particularly women and unaccompanied children. In 2018, Taiwanese women and men were exploited in forced labor and forced criminality in an illegal call center. Individuals experiencing homelessness, children in the social welfare system, and persons with mental and physical disabilities are particularly vulnerable to trafficking.

## CUBA: TIER 3

The Government of Cuba does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Cuba remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including investigating, prosecuting, and convicting traffickers, and identifying victims. However, during the reporting

period, there was a government policy or pattern to profit from labor export programs with strong indications of forced labor, particularly its foreign medical missions' program. The government continued to deploy Cuban workers to foreign countries using deceptive and coercive tactics and failed to address labor violations and trafficking crimes despite an increasing number of allegations from credible NGOs, former participants, and foreign governments of Cuban officials' involvement in abuses. The government failed to inform participants of the terms of their contracts, which varied from country to country; confiscated their passports, professional credentials, and salaries; and threatened medical professionals and their family members if participants left the program. In addition, Cuban law did not explicitly prohibit labor trafficking as defined in international law, and the government did not report having procedures to identify victims of forced labor.



CUBA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Ensure government-sponsored labor export programs comply with international labor standards or end them—specifically ensure participants receive fair wages that are fully paid into bank accounts the workers can control; retain passports, contracts, and academic credentials in their possession; assure a work environment safe from violence, harassment, and intrusive surveillance; and have freedom of movement to include leaving the program or refusing an assignment without penalties, such as being threatened, imprisoned, harmed, or banned from returning to Cuba. • Vigorously investigate and prosecute sex trafficking and forced labor crimes and convict offenders. • Implement formal policies and procedures to identify trafficking victims proactively, including among vulnerable populations, refer those identified to appropriate services, and train officials, including first responders, in their use. • Draft and enact a comprehensive anti-trafficking law that criminalizes all forms of trafficking, including the explicit prohibition of labor trafficking, and ensures that the use of force, fraud, or coercion is considered an essential element of adult trafficking. • Adopt policies and programs that provide trafficking-specific, specialized assistance for male, female, and LGBTQI+ trafficking victims. • Screen individuals charged or detained for commercial sex-related crimes for trafficking indicators and refer identified victims to care. • Allow an independent international commission to monitor the government-sponsored labor export program. • Train those responsible for enforcing the labor code to screen for trafficking indicators and educate all Cuban workers about trafficking indicators and how to report trafficking-related violations. • Establish a permanent inter-ministerial anti-trafficking committee. • Create a new national anti-trafficking action plan in partnership with international organizations. • Provide specialized training on trafficking indicators for hotline staff and interpretation for non-Spanish speakers.

## PROSECUTION

The government did not report making law enforcement efforts to combat trafficking in persons. Authorities in the Ministry of Justice continued to be complicit in state labor export schemes by prosecuting people who abandoned the government-sponsored labor export programs due to abuses and exploitative practices that could amount to human trafficking. The Cuban penal code criminalized some forms of sex trafficking and labor trafficking. Article 302 ("procuring and trafficking in persons") criminalized inducing another person to engage in prostitution or cooperating, promoting, or benefiting from such an act and prescribed penalties of four to 10 years' imprisonment. These penalties were sufficiently stringent and commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the law established the use of force, fraud, or coercion as aggravating factors, rather than essential elements

CUBA

of the crime. Article 310 ("corruption of minors") criminalized the use of a person younger than the age of 16 for sexual purposes and prescribed penalties of seven to 15 years' imprisonment, which were sufficiently stringent and commensurate with those prescribed for other serious crimes, such as rape. Article 312 ("corruption of minors") criminalized the use of a person younger than the age of 16 for begging and prescribed penalties of two to five years' imprisonment or a fine; these penalties were sufficiently stringent. Article 316 ("sale and trafficking of minors") criminalized the sale or illegal adoption of a person younger than the age of 16 for "international trafficking relating to corrupting or pornographic conduct, the practice of prostitution, trade in organs, forced labor, or activities linked to narcotics trafficking or illicit drug use," and prescribed penalties of seven to 15 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with other grave crimes, such as rape. Inconsistent with international law, these provisions defined a minor as younger than the age of 16 instead of 18. Provisions relating to adult and child trafficking did not explicitly criminalize the acts of recruitment, transport, and receipt of persons for these purposes. Cuban law did not explicitly prohibit labor trafficking as defined in international law. The government did not make efforts to amend the criminal code to address trafficking in line with international law.

In December 2021, the government published official data for calendar year 2020 on prosecutions and convictions, the most recent data available. The government's annual report was the primary source of information on its efforts. The government suppressed independent domestic sources, and some independent sources provided information on trafficking efforts and trends. Authorities did not indicate how many trafficking cases they investigated, prosecuted, or convicted in 2021. The government did not report investigating cases in 2020 and prosecuted 17 suspects for possible trafficking crimes (16 for sex trafficking and one for forced labor), compared with 15 prosecutions in 2019, 20 in 2017, and 21 in 2016. Officials reported convicting 18 potential traffickers (17 for sex trafficking and one for forced labor), compared with 24 in 2019; however, because Cuba's law was broad, it was unclear if the cases reported constituted trafficking as defined in international law. Sentences ranged from five to 17 years' imprisonment.

The government organized and sponsored training for law enforcement officers, prosecutors, and judges on investigating and prosecuting sex trafficking crimes, as well as analytical techniques for addressing complex cases. The government cooperated with INTERPOL and the Government of Ecuador to investigate a transnational trafficking case involving 10 alleged Cuban traffickers. Officials did not report if authorities prosecuted or convicted these individuals during the reporting period. Authorities had 20 bilateral cooperation agreements or memoranda of understanding that included trafficking; however, the government did not report tangible results associated with these agreements. Authorities did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking, despite persistent allegations that officials threatened and coerced some participants to remain in the government-sponsored labor export program.

## PROTECTION

The government decreased efforts to identify or protect trafficking victims and continued to coerce individuals—using deceptive and exploitive tactics—to participate and remain in government-sponsored labor export programs. Authorities identified 18 victims (17 for sex trafficking and one for forced labor) in 2020, compared with 25 in 2019. In previous years, the government reported having procedures to proactively identify and refer sex trafficking victims to care; however, the government lacked formal procedures to identify victims in police raids and relied on victims to self-identify. The government did not report having procedures to identify victims of forced labor, and no information was available about the number of labor trafficking victims. NGOs organized by the government or Communist Party of Cuba, such as the Federation of Cuban Women (FMC), the Prevention and Social Assistance Commission, and the Committees for the Defense of the Revolution (CDRs), could identify and refer trafficking victims to state authorities and provide some victim services, including psychological treatment, health care, skills training, and assistance in finding employment; however, these services were often politicized and unavailable to people the government

and/or Communist Party deemed subversive. In 2020, the government provided general support to 16 victims, which included medical and psychological care, school reintegration assistance, and some financial support. Neither the government nor the government-organized NGOs operated shelters or provided services specifically for adult male or LGBTQI+ victims. Police encouraged child sex trafficking victims younger than the age of 16 to assist in prosecutions of traffickers by gathering testimony through psychologist-led videotaped interviewing, usually removing the need for children to appear in court. The government did not report using these tools during the reporting period. Observers reported law enforcement did not proactively screen for indicators of trafficking as police may have detained individuals in commercial sex or charged them with crimes such as "social dangerousness," thereby potentially penalizing some victims for unlawful acts traffickers coerced them to commit. The government did not report identifying any foreign trafficking victims in Cuba in 2020.

## PREVENTION

The government made some efforts to prevent sex trafficking, particularly child sex tourism, but did not make any efforts to prevent forced labor. The government continued to use the expired 2017-2020 national anti-trafficking action plan, which included some efforts to prevent trafficking, protect victims, investigate and prosecute traffickers, and promote international cooperation. Authorities did not make any efforts to revise or approve a new national action plan. The government published its annual report of anti-trafficking efforts in December 2021, covering 2020. Officials held training sessions for government employees, students, and tourist industry employees on the prevention and detection of trafficking crimes. The government and the FMC continued to operate a 24-hour telephone line for individuals needing legal assistance, including sex trafficking victims; none of the 129,020 calls to this hotline were in reference to trafficking in persons.

State media continued to produce newspaper articles and television and radio programs, including public service announcements, to raise public awareness about sex trafficking. The FMC raised public awareness through workshops and training with government officials, social workers, educators, and students, as well as the distribution of materials explaining trafficking and its risks; however, there were no publicly available materials that showed the effectiveness or impact of these programs. Authorities maintained an office within the Ministry of Tourism charged with monitoring Cuba's image as a tourism destination, combating sex tourism, and addressing the demand for commercial sex acts. The government did not report efforts to reduce its nationals' participation in child sex tourism but reported coordinating with a foreign government to prevent the entry of convicted sex offenders into the country.

The Ministry of Labor and Social Security (MOL) trained organizations working with disabled individuals on the identification of cases of human trafficking cases. In addition, the MOL conducted 4,246 labor inspections but did not identify any cases of forced labor. Authorities reported taking steps to identify and prevent young people who might be vulnerable to traffickers from traveling abroad, and in 2020, they prevented four individuals from traveling after officials identified concerns with the employment contracts. Authorities may have used these authorities to target those who might want to leave the country. The government did not implement policies to prohibit force, fraud, or coercion by foreign labor recruiters and state-owned or controlled enterprises in recruiting and retaining employees, despite persistent allegations Cuban officials threatened and coerced some participants to remain in government-sponsored labor export programs. The government did not explain international labor standards to members of its labor export schemes working in conditions that might be considered trafficking.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Cuba, and traffickers exploit victims from Cuba abroad. Human trafficking concerns in Cuba fall under two broad categories: sex trafficking and forced labor, and government-sponsored labor export programs. Sex trafficking and sex tourism, including of child victims, occur within Cuba. Traffickers exploit Cuban citizens in sex trafficking and forced labor in Africa, Asia, the Caribbean, the Mediterranean, Latin America, and the United States. Traffickers exploit

foreign nationals from Africa and Asia in sex trafficking and forced labor in Cuba to pay off travel debts. The government identified children, young women, elderly, and disabled persons as the most vulnerable to trafficking. Experts raised concerns about Cuba's LGBTQI+ population and its vulnerability to sex trafficking and the increasing vulnerability of Cuban economic migrants, including cases of professional baseball players, to labor and sex trafficking. The government uses some high school students in rural areas to harvest crops and does not pay them for their work but claims this work is voluntary.

International observers and former participants reported government officials force or coerce individuals to participate and remain in the Cuban government's labor export programs, particularly the foreign medical missions program, managed by the Unidad Central de Cooperación Médica (UCCM), the Ministry of Health, and the Ministry of Foreign Trade and Investment. The government has not addressed its exploitative, deceptive, and coercive policies in these missions, which are clear indicators of human trafficking. According to a government report, by the end of 2020, there were 56 brigades of the "Henry Reeve" contingent in 40 countries with 4,941 medical workers, included in the 30,407 workers in 66 countries. The labor export program employed or currently employs professionals in Algeria, Angola, Antigua and Barbuda, The Bahamas, Bahrain, Barbados, Belize, Bolivia, Botswana, Brazil, Burkina Faso, Cabo Verde, Chad, Djibouti, Dominican Republic, Ecuador, Equatorial Guinea, Eswatini, Ethiopia, The Gambia, Ghana, Guatemala, Guinea, Guinea Bissau, Guyana, Haiti, Honduras, Italy, Jamaica, Kenya, Kuwait, Lesotho, Liberia, Maldives, Mauritania, Mexico, Mozambique, Namibia, Niger, Nicaragua, Palau, Panama, Peru, Portugal, Qatar, St. Lucia, St. Vincent and the Grenadines, Saudi Arabia, Seychelles, Sierra Leone, South Africa, Suriname, Tanzania, Timor-Leste, Togo, Trinidad and Tobago, Uganda, United Arab of Emirates, Uruguay, Venezuela, and Zimbabwe. Some overseas departments or territories, such as the British Virgin Islands, French Guiana, Grenada, Montserrat, Martinique, and Turks and Caicos, may have Cuban workers who may have been forced to work by the Cuban government. Authorities employ workers through contracts with foreign governments and, in some countries, with international organizations serving as intermediaries or providing funds for their work. According to the government, 75 percent of its exported workforce are medical professionals. Experts estimated the Cuban government collected $6 billion to $8 billion annually from its export of services, namely the foreign medical missions program. The government has stated the postings are voluntary, and some participants have also stated the postings are voluntary and better-paid compared to low-paying jobs within Cuba, where basic wages for a doctor are $55 a month. In almost all accounts, workers receive only a portion of their salary ranging from 5 to 25 percent, and these funds are retained in Cuban bank accounts—often in Cuban pesos rather than the hard currency the government is paid for their services, which are relinquished if the participant leaves the program.

In 2021, and with the support of an international NGO, 1,111 alleged victims of trafficking filed a complaint with the International Criminal Court and the UN, claiming the Cuban government was responsible for exploiting them and forcing them to work in Cuba's labor export programs. The complaint stated that 75 percent of participants reported not volunteering for the missions, 33 percent never saw a contract, 69 percent did not know their final destination, 38 percent had their passport taken away by Cuban officials once they arrived at their destination, 76 percent had "minders," 76 percent could not freely befriend locals, 79 percent had restrictions of movement, 91 percent were told they could not return to Cuba if they defected, 75 percent suffered threats or witnessed coworkers be threatened, and 40 percent were separated from minor children as punishment for defecting. The Cuban government acknowledges that it withholds passports of overseas medical personnel in Venezuela; the government provided identification cards to such personnel. Many Cuban medical personnel claim they work long hours without rest and face substandard and dangerous working and living conditions in some countries, including a lack of hygienic conditions and privacy,

and are forced to falsify medical records. Many medical professionals reported being sexually abused by their supervisors. While the medical missions remain the most prevalent, the government profited from other similarly coercive labor export programs, including teachers, artists, athletes, sports coaches, engineers, forestry technicians, and nearly 7,000 merchant mariners across the world.

# CURAÇAO: TIER 3†

The Government of Curaçao does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Curaçao was downgraded to Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including providing pre-trial support to three victims participating in legal proceedings against traffickers, awarding restitution to two sex trafficking victims, and extending the use of the national action plan (NAP) that expired in December 2021. However, the government did not convict any traffickers, it did not identify any victims, and it continued to condition foreign victims' assistance, including residency, on cooperation with law enforcement in cases against traffickers. Lack of funding remained a primary obstacle to robust anti-trafficking efforts. Officials conflated human trafficking with migrant smuggling, hindering the effectiveness of prosecution, prevention, and protection efforts. The judiciary's limited familiarity with trafficking contributed to frequent acquittals in trafficking cases.



CURAÇAO TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:
Increase efforts to identify victims, including through proactively screening vulnerable populations, such as migrants and individuals in commercial sex. • Provide potential victims, including those who choose not to cooperate with law enforcement in cases against traffickers, with services and legal alternatives to deportation, especially where victims face harm or abuse in their home country. • Routinely screen detained migrants for trafficking indicators and train detention center staff on victim identification procedures. • Uphold the reflection period and refer victims to protection services without requiring them first to commit to assist a criminal investigation. • Improve coordination and information-sharing with anti-trafficking counterparts across the Kingdom of the Netherlands. • Vigorously prosecute and convict traffickers, including complicit officials, sentencing them to significant prison terms. • Disseminate to law enforcement and detention facility staff standard operating procedures for victim identification and referral and train officials on their use. • Provide specialized care and assistance for trafficking victims, including male victims. • Allocate and disburse sufficient resources for anti-trafficking efforts, including protection services and funding for full implementation of the NAP. • Provide targeted resources and training for local officials to conduct outreach to vulnerable communities through awareness campaigns on workers' rights, trafficking indicators, and available resources.

## PROSECUTION
The government decreased prosecution efforts. Article 2:239 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to nine years' imprisonment or a fifth category fine of

---

† Curaçao is a semi-autonomous entity within the Kingdom of the Netherlands. For the purpose of this report, Curaçao is not a "country" to which the minimum standards for the elimination of trafficking in the Trafficking Victims Protection Act apply. This narrative reflects how Curaçao would be assessed if it were a separate, independent country. However, the Kingdom is an important contributor to the Government of Curaçao's anti-trafficking efforts.

up to $56,000 for offenses involving a victim 16 years of age or older, and up to 12 years' imprisonment or a fine for those involving a victim younger than 16. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping.

The Curaçao Police Force's organized crime unit (DGC) was the lead agency for law enforcement efforts to combat trafficking. Authorities initiated one investigation in 2021, compared with one in 2020 and one in 2019. The government did not report any ongoing investigations from previous years. The government prosecuted one alleged trafficker for sex and labor trafficking in 2021, compared with no prosecutions in 2020 and prosecuting four traffickers (in one case) in 2019. Judges did not convict any traffickers in 2021, compared with convicting five traffickers (three for sex trafficking and two for sex and labor trafficking) in 2020 and eight traffickers in 2019. Curaçaoan prosecutors defended the 2019 convictions of five sex traffickers in a Netherlands-based appellate court; the court ruled to reaffirm the convictions. The courts ruled to acquit six alleged traffickers of trafficking charges—four in a labor trafficking case initiated in 2017, one in a labor trafficking case initiated in 2019, and one in a sex and labor trafficking case initiated in 2021. Observers reported the judiciary's limited familiarity with trafficking led prosecutors to charge traffickers with related crimes carrying lighter sentences—such as migrant smuggling and labor code violations—instead of trafficking to secure a conviction; courts often convicted suspected traffickers of these related crimes in lieu of trafficking, even when prosecutors levied trafficking charges. Prosecutors reported there were no ongoing trafficking prosecutions or appeals related to trafficking cases at the end of the reporting period. The government did not report any new investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, appellate courts ruled in two cases involving police officers allegedly complicit in trafficking crimes. In the first case, the court acquitted the official of labor trafficking charges, instead sentencing him to a six-month suspended sentence and 240 hours of community service for facilitating migrant smuggling and violating labor regulations. In the second, the court reaffirmed the complicit official's sex trafficking conviction.

Law enforcement suffered from budget and personnel shortages across all units. Officials typically requested funding from the central Ministry of Justice (MOJ) budget on a case-by-case basis, but the government did not fill all trafficking-related funding requests, citing funding limitations. Some officials reported the lack of funding and lengthy request process disincentivized investigation of trafficking crimes. MOJ reported it sometimes directed law enforcement officers away from routine duty, including anti-trafficking efforts, to enforce curfews and mandatory closures or cover staffing gaps attributable to the pandemic. The government did not provide trafficking-related investigative training opportunities for law enforcement. The government continued to address human trafficking and migrant smuggling with the same resources and procedures, frequently charging traffickers with smuggling crimes; officials often conflated the two crimes.

## PROTECTION

The government maintained inadequate protection efforts. Authorities did not identify any victims for the second consecutive year, compared with identifying three victims in 2019 and 44 victims in 2018. Officials reported a civil society organization identified one potential sex trafficking victim, a Colombian woman; however, the government did not identify her as a trafficking victim after officials interviewed her and could not substantiate reports of her exploitation. Officials did not regularly perform proactive screenings among vulnerable groups, such as individuals in commercial sex, construction, supermarkets, and catering, despite a Kingdom-wide requirement to do so. Similarly, the government did not report screening other vulnerable groups, such as Venezuelans, for trafficking indicators.

The government provided some pre-trial support to three trafficking victims participating in ongoing prosecutions against traffickers (two sex trafficking victims and one labor trafficking victim, all identified in previous reporting periods), compared with providing shelter and healthcare services to one victim, also supporting a trafficking prosecution, in 2020 and 12 victims in 2019. In practice, assistance for

victims was contingent upon cooperation with law enforcement efforts to prosecute traffickers. The government's procedures outlined standard services for trafficking victims, including shelter, meals, medical attention, and psychological services, and assigned an agency to provide each service; however, officials did not report providing such services to any victims during the year. The agencies responsible lacked dedicated funds to furnish these services; consequently, service provision was inconsistent, and the costs often fell to the DGC or international organizations. Civil society organizations provided most requisite services, such as housing and medical care, to the three victims participating in trials against traffickers during the reporting period.

Trafficking victims willing to participate in trials against traffickers could apply for a temporary residence permit valid for six months. Officials could renew the permit if the criminal investigation or prosecution of the trafficker continued; however, authorities canceled residence permits upon the conclusion or dismissal of these criminal proceedings. In practice, funding shortfalls delayed processing of permit applications, creating uncertainty for foreign trafficking victims otherwise vulnerable to deportation. Foreign victims who did not participate in investigations against traffickers were not eligible for temporary residence permits and could not legally remain in Curaçao; due to inconsistent application of victim identification protocols and conflation between trafficking and smuggling, authorities likely deported some mis- or unidentified trafficking victims, including Venezuelan nationals. Observers reported the pandemic likely contributed to fewer deportations during the reporting period. Through a separate administrative process, some victims were eligible to apply for temporary work permits; however, many victims could not afford the costs related to the application. The government reported the courts awarded 3,000 Antillean guilder ($1,690) in restitution to two sex trafficking victims in 2021; in another case, the courts referred a victim and his spouse to civil court to seek compensation after acquitting the suspected trafficker.

The government had a handbook outlining the procedure for identifying trafficking victims and referring them to services, developed in coordination with an international organization in 2020; in January 2021, the government expanded use of these procedures to assist male trafficking victims, as well as female victims. The government worked with the organization again in 2021 to train officials from the police force, Ministry of Labor, and other ministries on the handbook. The government handbook for victim identification and referral stipulated officials would refer all potential trafficking victims to the victim support bureau (SSHC) and the DGC. The government did not operate any specialized shelters for trafficking victims. The government could place some trafficking victims—adult women and their children up to 12 years of age—in an NGO shelter for victims of domestic violence that could accommodate up to eight individuals; increased domestic violence cases meant the shelter had reduced capacity to accommodate trafficking victims. The government could refer child trafficking victims to guardianship councils for placement in boarding school or foster care; the government did not assist any child trafficking victims in 2021. There were no government or NGO shelters equipped to serve male victims; authorities reported difficulty arranging housing for male trafficking victims in rented accommodations due to budget constraints. Authorities required victims to check in with shelter staff when leaving the facility. When existing shelter facilities reached maximum capacity, the government placed victims in short-term government-funded accommodations.

Under the 2017-2021 NAP, victims could reflect for 30 days before deciding to participate in the trial against the trafficker; however, the government reported it shortened the reflection period in January 2021 to 15 days. The government did not report implementing the 15-day reflection period in 2021 or the 30-day reflection period in 2020 or 2019. The government did not report any trafficking victim assistance expenditures in 2021, compared with 8,000 Antillean guilder ($4,490) in 2020. Similarly, the government did not report the operating budget for the SSHC, which supported victims of all crimes; in 2020, the SSHC operated with a budget of 307,000 guilder ($172,470). Foreign victims were entitled to similar care as domestic victims. The government's policies included providing no-cost medical insurance, funded by the Ministry of Social Services and Labor, to foreign trafficking victims; because officials required victims to demonstrate adequate medical coverage to apply for residency, this new policy eliminated one barrier to

obtaining a residence permit. Kingdom evaluators determined officials inconsistently informed victims of their rights as trafficking victims, especially foreign victims, and lacked written resources enumerating these rights in common languages.

## PREVENTION

The government maintained insufficient prevention efforts. The national coordinator nominally led the interagency anti-trafficking task force and oversaw the government's efforts to combat trafficking; however, the coordinator had other full-time duties. The government reported allocating dedicated funds, 131,500 Antillean guilder ($73,880), for anti-trafficking efforts in the national budget for the first time; however, due to government-wide austerity measures, it may not have disbursed all funds outlined in the budget. The task force met frequently in 2021, and a separate inter-ministerial group met monthly to coordinate anti-trafficking efforts across the government. The government began drafting a 2022-2026 NAP to guide anti-trafficking efforts; during the reporting period, it extended the 2017-2021 NAP to remain in effect until replaced. The national coordinator continued to participate in radio and television programming. The government launched a new trafficking-awareness website and shared awareness materials on social media. MOJ reported it allocated 91,000 Antillean guilder ($51,120) to fund the website's upkeep and other awareness-raising efforts over three years; the Netherlands contributed an unspecified share of this funding. The SSHC operated a victim assistance hotline, which received one trafficking-related call; calls to the hotline were not toll-free. The government did not confirm whether it continued a public awareness campaign informing the public that women, especially foreign women, employed in Curaçaoan bars could be sex trafficking victims. The government did not make efforts to reduce demand for commercial sex. The Ministry of Foreign Affairs did not report whether it continued to coordinate with airport administration to monitor ticketing and passenger logs for patterns indicative of human trafficking.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Curaçao. Undocumented migrants in Curaçao, especially the substantial population of Venezuelan nationals, are vulnerable to both sex and labor trafficking. In 2020, pandemic-related movement restrictions prevented migrants from departing Curaçao, creating new trafficking risks for migrants who lost work during the economic downturn associated with the pandemic; traffickers may have exploited some of these individuals, taking advantage of their vulnerable position. Officials reported traffickers' activity increased during the pandemic, especially individual traffickers acting independently. Traffickers exploit women and girls from Curaçao, Dominican Republic, and Venezuela, among other countries, in sex trafficking. Bar owners recruit women and girls to work as waitresses or "*trago* girls" and subsequently force them into commercial sex. Traffickers exploit migrant workers from other Caribbean countries, South America, China, and India in domestic servitude, as well as forced labor in construction, landscaping, minimarkets, retail, and restaurants. Venezuelan migrants are vulnerable to exploitation by Spanish-speakers purporting to offer employment assistance in Curaçao. Recent research suggests traffickers in Curaçao may exploit more domestic and more male victims than previously understood.

## CYPRUS: TIER 1

The Government of the Republic of Cyprus fully meets the minimum standards for the elimination of trafficking. The government made key achievements to do so during the reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Cyprus was upgraded to Tier 1. These achievements included convicting traffickers for the first time in three years. The government hired additional social workers and created a new Deputy Ministry of Social Welfare Services (SWS), which will help coordinate and strengthen victim protection. The Minister of Justice signed an MOU with the new Deputy Minister of Social Welfare to streamline cooperation between

the Anti-Trafficking Unit (ATU) and SWS officers on the national referral mechanism (NRM). Civil society reported the implementation of the NRM improved and the service quality at the government-run shelter was appropriate. The government arranged for foreign national victims to return to Cyprus to testify and paid accommodation and travel expenses for family members to support a victim during the trial. The government launched an anti-trafficking hotline and formed a sub-committee on creating awareness campaigns on demand reduction for commercial sex. Although the government meets the minimum standards, it prosecuted fewer suspects and identified fewer victims. Judges issued suspended sentences or a fine to half of the convicted traffickers, which was not equal to the seriousness of the crime, undercut efforts to hold traffickers accountable, and weakened deterrence. SWS continued to not respond to referrals of some potential victims in a timely manner and failed to refer all potential victims to police for official identification procedures.



### CYPRUS TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers under Law 60(I), including complicit officials. • Sentence convicted traffickers to prison terms consistent with prescribed penalties and train judges at all levels of the judiciary to take the severity of trafficking into account when issuing sentences. • Allocate sufficient resources to enable police to effectively investigate all offenses and SWS to refer all potential victims in a timely manner. • Reduce delays in providing victim assistance, including access to health care, rental disbursements, and financial assistance. • Increase training for government personnel, particularly SWS officials, on victim identification, assistance, and referral. • Proactively identify victims among vulnerable populations, including migrants, asylum seekers, and agricultural workers. • Reduce delays in court proceedings. • Strengthen the capacity of the Labor Inspectorate to identify and refer victims of forced labor. • Improve victim-centered investigations and prosecutions and implement witness protection measures when necessary. • Implement recommendations made by the Ombudsman and other entities that monitor and evaluate anti-trafficking policies and efforts. • Train judges on restitution in criminal cases, establish procedures to seize assets from traffickers, and create effective methods to allocate restitution in a timely manner. • Inform all identified victims of their right to pursue compensation and encourage them to do so.

## PROSECUTION

The government increased prosecution efforts. Laws 117(I)/2019 and 60(I)/2014 criminalized sex trafficking and labor trafficking and prescribed penalties up to 25 years' imprisonment for offenses involving an adult victim and up to life imprisonment for offenses involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape. Police investigated 22 suspects in 11 cases, compared with 18 suspects in seven cases in 2020; 11 suspects were investigated for sex trafficking, seven for forced criminality, and four for forced labor. The government prosecuted 21 defendants in 12 new cases in 2021, compared with 23 defendants in 2020; 14 defendants were prosecuted for sex trafficking, four for forced labor, and three for forced criminality. The government continued to prosecute 71 defendants in 26 cases, compared with 86 defendants in 27 cases. The government convicted 10 traffickers under the trafficking law, four for sex trafficking and six for forced labor; these were the first trafficking convictions in four years. Judges sentenced one trafficker to eight years' imprisonment, two traffickers to two years' imprisonment, and two traffickers to one year and eight months' imprisonment. However, judges sentenced four traffickers with only a three-year suspended sentence and one trafficker with a fine of €14,950 ($16,950). Such lenient sentences undercut efforts to hold traffickers accountable, weakened deterrence, created potential

CYPRUS

security and safety concerns for victims, and were not equal to the seriousness of the crime. Courts also convicted three perpetrators, initially prosecuted under the trafficking law for lesser offenses, compared with two in 2020; the offenses included possession and supply of narcotics, assault, and fraudulent registration of a foreigner. The government reported occasional personnel shortages and delays in investigation and prosecutions due to the COVID-19 pandemic.

The Ministry of Justice and Public Order maintained the ATU, which conducted proactive investigations and used special investigative techniques, including surveillance, undercover operations, informants, and wire-tapping. However, observers reported that inadequate staffing and growing responsibilities outside of ATU's mandate limited the number of proactive investigations. For example, ATU spent much of its time helping victims with issues under the mandate of SWS, including assisting victims with administrative forms, applying for jobs on their behalf, and supporting victims with drug rehabilitation. GRETA and OSCE reported cases relied heavily on victim and witness testimonies, and the government often did not provide or seek corroborating evidence. In previous years, court proceedings lasted up to three years, and the government did not consistently ensure the continued inclusion of victim testimony after foreign national victims and witnesses returned to their countries of origin, resulting in lenient sentences, cases tried under lesser crimes, and acquittals of suspects on trafficking charges due to a lack of other evidence. The government did not report any new investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, the government reported prosecuting a contractor working for the Ministry of Education for sex trafficking-related crimes. In September 2018, the ATU and the Internal Affairs Unit arrested and prosecuted four immigration police officers on suspicion of aiding a criminal network involved in trafficking; the trial was ongoing at the end of the reporting period. The ATU and the Police Academy continued to train police officers and prosecutors on trafficking issues, including new recruits and immigration officers. The government, in cooperation with civil society, also trained police officers on various anti-trafficking issues. The government executed three European arrest warrants, issued one European arrest warrant, and extradited a suspect from an EU country. The government started a joint investigation with Greek authorities and participated in a EUROPOL operation on forced labor with 24 countries.

## PROTECTION

The government maintained victim protection efforts. The government identified 22 victims, compared with 25 victims in 2020. Of these, nine were sex trafficking victims, eight were forced labor victims, and five were victims of multiple types of exploitation, including forced criminality; 13 were women, seven were men, and there was one boy and one girl; and 15 were foreign victims. A multi-disciplinary NRM provided standard operating procedures for identifying and referring victims to services, including an operational manual, written guidance for first responders, and guidelines specifically for children. The police conducted proactive identification efforts, including in apartments, pubs, and agricultural establishments; but GRETA and other observers reported the ATU lacked sufficient resources to effectively investigate all referrals of potential victims, particularly among the increasing number of asylum seekers. The NRM required first responders to conduct preliminary identification of potential victims and refer potential victims to SWS. SWS officers provided potential victims with information and notified the ATU, which officially identified victims. The government hired additional social workers and a new Deputy Minister in SWS to coordinate trafficking cases and strengthen victim protection. Additionally, the Minister of Justice signed an MOU with the Deputy Minister for Social Welfare to streamline cooperation between the ATU and SWS officers on the NRM. Civil society and ATU reported the implementation of the NRM improved, but SWS continued to respond slowly to some referrals of potential victims and failed to refer all potential victims to ATU for official identification procedures. For example, trafficking victims exploited prior to arriving in Cyprus and/or applying for asylum at immigration offices and reception centers may not be identified, according to GRETA and other observers, who documented SWS failing to refer some potential victims among asylum seekers to ATU. Additionally, SWS continued to lack the capacity to maintain contact with potential victims, and some

potential victims did not have access to adequate accommodations and financial assistance. SWS maintained 42 officers dedicated to assisting newly arrived asylum seekers and implementing a screening system, including screening for indicators of trafficking. However, observers reported SWS deployed only a small number of the 42 officers to reception centers. SWS assigned an on-call officer outside of working hours and on weekends to provide emergency accommodation and financial support to potential victims, but observers noted that at times the NRM was not fully functional on weekends, and in previous years, the on-call SWS officer did not deem potential trafficking cases an emergency. The ATU interviewed 101 potential victims referred by SWS, compared with 196 in 2020. The government trained SWS officers on various victim protection efforts.

The law entitled officially identified victims to psycho-social services, health care, translation and interpretation services, education, vocational training, and financial assistance. Once ATU officially identified a victim, SWS evaluated the needs of victims and referred them to the appropriate government agencies and NGOs for assistance. SWS operated a specialized shelter for female sex trafficking victims with the capacity to accommodate 15 victims; the SWS-run shelter accommodated 33 victims in 2021 (50 in 2020). Victims may stay in the shelter for one month or longer, as appropriate, for a reflection period. The SWS-run shelter allowed adult victims to leave the shelter voluntarily after an assessment conducted by the ATU. The government allocated €459,100 ($520,520) to operate the SWS-run shelter in addition to staff salaries, compared with €494,008 ($560,100) in 2020. GRETA reported "a high standard of accommodation" in the SWS-run shelter, including living conditions, protections, and reintegration programs. NGOs reported the overall quality of SWS services improved significantly after the establishment of the new Deputy Ministry of Social Welfare and also reported appropriate service quality at the health care services and labor office. The government maintained a memorandum of cooperation with an NGO to manage transitional housing for female sex trafficking victims, which accommodated sex trafficking victims searching for permanent residence after leaving the state-run shelter, and to provide longer-term accommodation for female victims in apartments. The government also partnered with an NGO to provide apartments for male victims. The government allocated €145,000 ($164,400) to the two NGOs providing shelter and accommodation, compared with €164,985 ($187,060) in 2020. The government provided a rent subsidy and a monthly allowance for all victims, but victims faced obstacles to secure adequate accommodations due to increasing housing costs and greater demand for low-cost housing. The government did not report the amount allocated for rent allowances and financial assistance to trafficking victims through a public benefit scheme known as Guaranteed Minimum Income, compared with €213,622 ($242,200) in 2020.

The government prioritized public benefit applications from trafficking victims over all other beneficiaries, but observers continued to report long delays, which were prolonged from reduced staff due to pandemic mitigation efforts, and victims waited several months to receive benefits with no retroactive payments. SWS provided emergency financial assistance to victims facing delays in receiving monthly allowances, but the amount was insufficient to cover basic necessities. The government allocated €52,500 ($59,520) for emergency rent and assistance to cover urgent needs, compared with €36,404 ($41,270) in 2020. The government continued to fund an NGO-run children's house to provide education, placement into foster homes, and specialized medical and psycho-social care for child victims of sexual abuse and exploitation, including trafficking. Victims could access free health care at public hospitals but did not have access to the General Healthcare System, established in 2019, which allows free access to participating private sector healthcare providers. Employment counselors trained to handle sensitive cases sought suitable employment for each victim, and benefits to victims did not discontinue until a SWS officer and an employment counselor examined each case.

The government maintained a referral system to identify potential victims among people in detention facilities. In 2021, authorities dropped drug possession charges after identifying a suspect as a trafficking victim, but due to delays in formal identification procedures, other victims may have been detained in reception centers while waiting for their interviews. The government repatriated or granted residence permits

and work authorization to foreign national victims, including those who decided after their reflection period not to cooperate with the police. The government granted five requests for residence and work permits (eight in 2020) and granted refugee or international protection status to six victims (three in 2020). However, in November 2020, the Ministry of Interior (MOI) informed a foreign labor trafficking victim—identified in 2015—that his residence and work permits would not be renewed and that he would be processed for repatriation due to the absence of a criminal court case against his traffickers. Prosecutors reportedly declined to prosecute his case due to a lack of corroborating evidence, and police arrested and detained the trafficking victim on March 14, 2021. After the international community inquired about the case, authorities released the victim on March 31, but his residency and work permits were still pending. Specialized personnel in the ATU, including a forensic psychologist, conducted interviews with victims before taking an official statement; 22 victims assisted law enforcement investigations (22 in 2020). Police permitted victims to leave Cyprus and return for trial after assessing the potential risks. ATU and SWS arranged for one victim to return to Cyprus to testify and covered accommodation and travel expenses for a victim's family member to emotionally support the victim. The government also covered the expenses for two victims to visit their families in their home country and return to Cyprus to serve as witnesses in the trial. However, victims and witnesses often left the country and did not return before trial due to long delays, hindering prosecution efforts. The law entitled victims to witness protection through a request made by the police to the Attorney General; no requests were made in 2021 or 2020. Police officers escorted victims to court proceedings, and the law allowed courts to hold closed-door trials, provide a partition to separate victims from their traffickers, use remote testimony, and use video-recorded testimonies for children; the government reported trials did not require these methods in 2021. Authorities provided victims' family members living abroad protection measures from intimidation and retaliation by arranging travel to Cyprus through diplomatic channels. The law allowed restitution through criminal cases and compensation through civil suits, but judges have never issued restitution, and authorities only approved two applications to date from victims for legal aid to pursue compensation.

## PREVENTION

The government increased prevention efforts. The Multidisciplinary Coordinating Group (MCG) to combat trafficking, composed of relevant government agencies and NGOs, implemented and monitored anti-trafficking efforts. The MCG met three times in 2021 and twice in 2020. The government launched a new anti-trafficking hotline and advertised the number in government offices, in police stations, and on NGO premises. The hotline received eight calls, none of which led to a trafficking prosecution. In 2020, the Ombudsman produced two public reports on the government's anti-trafficking policies in response to civil society concerns. One report concluded government services did not fully implement provisions of the victim protection law because authorities did not renew the residence permits of victims exploited abroad; civil society filed a complaint stating authorities had not fully implemented the Ombudsman's recommendations. NGOs reported the government had not issued the recommended residency permits by the end of the reporting period. The law required employment agencies to acquire a permit and prohibited withholding payment, confiscating passports, and charging workers for job searches, placement, and maintenance of employment. In 2021, the Ministry of Labor (MOL) inspected 154 employment agencies, revoked the licenses of 15 agencies, and fined one agency for fraud. MOI maintained a contract for employment of domestic workers and defined the process by which the employee or the employer could terminate the contract. In addition, the contract set a €309 ($350) minimum monthly salary for domestic workers and required employers to be responsible for accommodation, medical insurance, meals, visa fees, travel expenses, and a repatriation ticket. The MCG formed a sub-committee on creating awareness campaigns focused on demand reduction; the subcommittee met twice. The government made additional efforts to reduce the demand for commercial sex acts, including by criminalizing the demand and purchase of commercial sex from a trafficking victim.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Cyprus. Foreign victims identified in Cyprus in 2021 were from the Democratic Republic of the Congo, Egypt, Nigeria, Romania, Russia, and Syria. In previous years, victims were also from Cameroon, China, Czechia, Ethiopia, Greece, India, Moldova, Nepal, the Philippines, Sri Lanka, Ukraine, Uzbekistan, and Vietnam. Traffickers subject women, primarily from Eastern Europe, South and Southeast Asia, and sub-Saharan Africa, to sex trafficking. Sex trafficking occurs in private apartments and hotels, on the street, and in bars, pubs, coffee shops, massage parlors, and cabarets known for the availability of commercial sex. Traffickers exploit short-term tourist visas available to Ukrainian and Russian nationals to recruit young women for sex trafficking in bars and private establishments and recruit some female sex trafficking victims with false promises of marriage or work as barmaids or hostesses. Traffickers subject foreign migrant workers—primarily from North Africa but also from South and Southeast Asia—to forced labor in agriculture. Employment agencies recruit and exploit migrant workers who enter the country on short-term work permits in labor trafficking; after the permits expire, traffickers use debt-based coercion, threats, and withholding of pay and documents. Domestic workers from India, Nepal, the Philippines, and Sri Lanka are vulnerable to forced labor. Traffickers subject asylum seekers from Southeast Asia, Africa, and Eastern Europe to forced labor in agriculture and domestic work. Unaccompanied children, children of migrants, Roma, and asylum seekers are especially vulnerable to sex trafficking and forced labor. Romani children are vulnerable to forced begging. Traffickers exploit Cypriots addicted to drugs and young women with disabilities to commit criminal offenses such as distributing illegal substances and committing welfare benefits fraud.

## AREA ADMINISTERED BY TURKISH CYPRIOTS

The northern area of Cyprus is administered by Turkish Cypriots. In 1983, the Turkish Cypriots proclaimed the area the independent "Turkish Republic of Northern Cyprus" ("TRNC"). The United States does not recognize the "TRNC," nor does any other country except Turkey. If the "TRNC" were to be assigned a formal ranking in this report, it would be Tier 3. "TRNC" does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Despite the lack of significant efforts, "TRNC" took some steps to address trafficking. In April 2018, "Parliament" passed the 2000 UN TIP Protocol and in March 2020, "Parliament" amended the "TRNC criminal code" to include trafficking for the first time. However, Turkish Cypriot representatives did not investigate, prosecute, or convict any traffickers. Turkish Cypriot representatives did not identify any trafficking victims and provided no victim protection, including shelter and social, economic, and psychological services. Turkish Cypriot representatives did not allocate funding, provide training, or implement prevention efforts to combat trafficking.

The "Nightclubs and Similar Places of Entertainment Law of 2000" stipulated nightclubs may only provide entertainment such as dance performances, but Turkish Cypriot representatives rarely enforced this "law," and observers continued to report the 28 nightclubs in "TRNC" employing 617 women acted as brothels where sex trafficking commonly occurred. Police confiscated passports of foreign national women working in nightclubs and issued them identity cards. "TRNC" representatives did not permit women to change location once under contract with a nightclub and routinely deported victims who voiced discontent about their treatment; Turkish Cypriot representatives deported 322 women who curtailed their contracts without screening for indicators of trafficking (255 in 2020). The "law" prohibited living off the earnings of prostitution or encouraging prostitution, but nightclub bodyguards accompanied female nightclub employees to their weekly health checks for sexually transmitted infections, ensuring the women did not share details about potential exploitation in commercial sex with police or doctors in order to facilitate continued illegal activity. The "law" that governed nightclubs prohibited foreign women from living at their place of employment; however, most women lived in dormitories adjacent to the nightclubs or in other accommodations arranged by the owner, a common indicator of trafficking.

Haiti AR_000680

The "Nightclub Commission," composed of police and "government officials" who regulate nightclubs, met monthly and made recommendations to the "Ministry of Interior" regarding operating licenses, changes to employee quotas, and the need for intervention at a particular establishment. The "Nightclub Commission" reportedly inspected approximately five nightclubs every two weeks and followed up on complaints. However, in practice, inspections focused on the sanitation of kitchens, and interviews with women working in nightclubs always took place in front of nightclub bodyguards or staff, preventing women from speaking freely. Nightclubs provided a source of tax revenue for the Turkish Cypriot administration with media reports in 2015 estimating nightclub owners paid between 20 million and 30 million Turkish lira ($1.54 million and $2.32 million) in taxes annually, presenting a conflict of interest and a deterrent to increased political will to combat trafficking. Additionally, observers alleged complicit "government officials" were involved in organized criminal groups associated with nightclubs and alleged that some "parliament" members were among the nightclubs' clientele. Despite business closures due to pandemic mitigation measures, night club owners continued to force victims into sex trafficking.

"TRNC" representatives issued 617 six-month hostess and barmaid "work permits" for individuals working in nightclubs and pubs, compared with 942 six-month "work permits" issued between April 2019 and January 2020. Nightclub owners hired female college students to bypass the cap on the number of employees legally permitted in each club and to avoid taxes and monitoring. Most permit holders came from Belarus, Kyrgyzstan, Moldova, Morocco, Russia, Ukraine, and Uzbekistan, while others came from Armenia, Azerbaijan, Kazakhstan, Kenya, Paraguay, Tajikistan, Tanzania, and Turkmenistan. "TRNC" issued 574 "work permits" to domestic workers in 2021, but did not provide the number of "work permits" for 2020 or 2019. Turkish Cypriot representatives did not encourage potential victims to assist in prosecutions against traffickers and deported all potential victims. "TRNC" representatives did not enforce labor "laws," and observers reported Turkish Cypriot representatives made little effort to investigate employers and recruitment agencies charging high recruitment fees, confiscating passports, and withholding salaries, which were common practices. Turkish Cypriots made no efforts to reduce demand for commercial sex acts. The "Social Services Department" in the "Ministry of Labor" continued to run a hotline for trafficking victims; however, it was inadequately staffed and not always operational, and experts reported trafficking victims were afraid to call the hotline because they believed it was linked to "TRNC" representatives. NGO-run hotlines reported 77 calls from potential trafficking victims and, in 2020, reported a 400 percent increase in requests for psychological assistance and a 300 percent increase in requests for legal assistance from potential victims.

As reported over the past five years, human traffickers exploit domestic and foreign victims in the "TRNC." Traffickers exploit women from Central Asia, Eastern Europe, and Africa in sex trafficking in nightclubs licensed and regulated by Turkish Cypriot representatives. Men and women are exploited in forced labor in the industrial, construction, agriculture, domestic work, restaurant, and retail sectors. Traffickers control victims of forced labor through debt-based coercion, threats of deportation, restriction of movement, and inhumane living and working conditions. Labor trafficking victims originate from Eastern Europe, sub-Saharan Africa, Central Asia, and South and Southeast Asia. Migrants, especially those who cross into the area administered by Turkish Cypriots after their work permits in the Republic of Cyprus have expired, are vulnerable to labor trafficking. Romani children and Turkish seasonal workers and their families are also vulnerable to labor exploitation and trafficking. Foreign university students, many of whom were recruited with false promises of scholarships, free housing, and employment, are vulnerable to both sex and labor trafficking. Traffickers force female students into sex trafficking in apartments and male students into forced labor or coerce students to commit crimes such as transporting or selling drugs. Students who drop out of school or engage in irregular work, many from sub-Saharan African countries, are particularly vulnerable. As in previous years, observers report that a number of women, some of whom are trafficking victims, entered the "TRNC" on three-month tourist or student visas and engaged in commercial sex in apartments

in north Nicosia, Kyrenia, and Famagusta. Migrants, asylum seekers, LGBTIQ+ persons, refugees, and their children are also at risk for sexual exploitation. Observers report traffickers shifted tactics during the pandemic, forcing female sex trafficking victims to visit clients' homes due to the drop in demand at nightclubs and often marketed home visits to potential clients under the guise of massage services. Civil society reports traffickers allegedly facing financial hardship due to the pandemic act with increased aggression towards victims.

# CZECH REPUBLIC: TIER 1

The Government of the Czech Republic fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the Czech Republic remained on Tier 1. These efforts included prosecuting and convicting more traffickers, requiring human trafficking training for all entry-level police officers, and increasing funding for victim services. Additionally, a new law entered into force and introduced fines for employers who outsourced hiring to illegal employment agencies. Although the government meets the minimum standards, it consistently identified a low number of "official" trafficking victims due to the government only counting victims who entered the governmental program for trafficking victims and the lack of other unified data collection that could capture accurate victim numbers and trafficking trends. Furthermore, observers expressed concern authorities did not effectively screen vulnerable populations for trafficking, particularly among asylum-seekers, migrant workers, and detainees in immigration detention facilities. The government had an official program to provide services to victims but did not maintain comprehensive assistance statistics.



CZECH REPUBLIC TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Proactively identify victims and increase efforts to effectively screen vulnerable populations, including children in institutional care, asylum-seekers, migrant workers, and detainees in immigration detention facilities. • Increase training for labor inspectors on labor trafficking victim identification criteria, recognizing subtle forms of coercion, and evolving trends in labor trafficking. • Improve and reform law enforcement data collection efforts, including by disaggregating sex and labor trafficking case data and comprehensively reporting victim data, particularly on those who do not participate in the Ministry of Interior (MOI) program. • Streamline identification procedures and specialized crisis and long-term case management for child victims. • Increase training for local and regional police on victim identification and the non-punishment of victims for unlawful acts traffickers compel them to commit. • Train a wider range of prosecutors and judges, including civil and administrative judges, on the severity of the crime, on recognizing subtle forms of coercion, on the irrelevance of a victim's initial consent when proving a trafficking crime, and on how to utilize victim protection programs for trafficking victims. • Enhance collaboration between the labor inspectorate and police to effectively identify potential labor trafficking cases. • Improve victims' ability to access court-ordered restitution in criminal cases and compensation through civil proceedings.

## PROSECUTION

The government increased law enforcement efforts. Section 168 of the criminal code criminalized sex trafficking and labor trafficking and prescribed punishments of two to 10 years' imprisonment. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. In 2021, police initiated 13 trafficking investigations involving 21 suspects, similar to 18 investigations involving 20 suspects in 2020. Authorities prosecuted 21 suspected traffickers under Section 168 (nine in 2020 and 21 in 2019), nine for sex trafficking, eight for labor trafficking, and four unspecified. Courts convicted 16 traffickers—13 for sex trafficking and three for labor trafficking, an increase compared with eight convictions in 2020. Courts sentenced six traffickers to up to five years' imprisonment and eight traffickers to prison terms ranging from five to 15 years. Judges suspended the prison sentences of two convicted traffickers. One of these traffickers was a child when she exploited another girl for commercial sex, and one was a woman who had lived under institutional care as a child. The government reported screening both of these individuals for trafficking indicators before proceeding with the prosecutions. In May 2021, an appeals court upheld the conviction of multiple traffickers from a November 2019 case regarding a Czech trafficking operation in the United Kingdom (UK) involving both sex and labor trafficking. The court confirmed the 18-year sentence for one of the traffickers, the highest trafficking sentence ever issued in the Czech Republic, and upheld the award of 5 million koruna ($233,460) in restitution, the highest amount ever granted in a trafficking case. The government did not seize any assets from convicted traffickers and reported the seizing of assets was difficult because the majority of traffickers used cash payment and did not own traceable property.

Authorities collaborated with foreign governments on four transnational investigations (two new and two ongoing). In one ongoing case in which suspected traffickers exploited Czech victims in the food service industry in the UK, Czech authorities charged four Czech suspects in April 2021; additional suspects in the UK were awaiting trial at the end of the reporting period. In another case in which traffickers exploited multiple victims from the Czech Republic in the UK from 2009 to 2017, Czech police recommended in October 2021 that a regional prosecutor file an indictment against seven suspects. This case represented the first time police had charged suspects for trafficking for the purpose of slavery; the suspected traffickers had allegedly exploited a relative with disabilities from Slovakia, who they moved to the UK after he was required to leave an institutional care center upon turning 18. A liaison police officer assigned to the Czech Embassy in London continued to collaborate closely with UK officials on several trafficking cases involving Czech citizens, including an investigation that led to charges filed against five suspects for labor and sex trafficking. The liaison officer also trained and assisted consular officers in screening for trafficking indicators among Czech citizens being assisted by the Czech Embassy.

Police data collection generally focused on perpetrators rather than victims; an overly broad definition of a victim according to police regulations further hindered data accuracy. During the reporting year, the government took steps to fulfill its data collection reform objective in its 2020-2023 national strategy and initiated an analysis of all available statistical systems across ministries and launched technical, legislative, and financial analyses to explore the creation of a unified database. The Trafficking in Human Beings Division was the lead investigative agency for trafficking within the national police and oversaw trafficking cases involving organized crime; regional police were responsible for other trafficking cases. The Supreme Public Prosecutor Office's prosecutor for trafficking and domestic violence oversaw specialized trafficking prosecutors in the regional prosecutorial offices. Regional police directorates sometimes chose to devote their limited resources to fighting other types of crime, especially crimes deemed easier to solve and achieve a conviction, as well as crimes related to the pandemic or the enforcement of state of emergency rules. Law enforcement officials said they more easily identified sex trafficking cases than labor trafficking cases. Judges and prosecutors continued to report it was difficult to prove some instances of labor trafficking were more than cases of simple fraud, as traffickers often used subtle coercive practices. Observers

reported prosecutors and judges pursued trafficking cases unevenly, at least in part due to lack of familiarity with the elements of the crime; GRETA noted Article 168 did not explicitly state the irrelevance of the victim's initial consent to the subsequent exploitation, which may have led to uneven implementation of the law.

The government provided training for law enforcement officials, labor inspectors, consular officers, prosecutors, and others in investigating and prosecuting trafficking cases and identifying victims. The government mandated trafficking training for entry-level police officers and in January 2022, all such officers joined a one-day training. Police and prosecutors began creating a specialized training for prosecutors and judges on labor exploitation to ensure greater consistency among judicial outcomes. Observers noted the Judicial Academy focused on providing anti-trafficking training to criminal judges, leaving civil and administrative judges with little training, even though civil and administrative judges made decisions affecting the status and rights of potential trafficking victims, particularly with regards to foreign victims' legal status and right to remain in the country. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes.

## PROTECTION

The government maintained victim protection efforts. The MOI's Program of Support and Protection of Victims of Trafficking in Human Beings (the Program) remained the only official source of data on victim identification and protection and was conditioned on a victim's cooperation with the criminal justice process. The government did not officially recognize victims who did not participate in the Program, although it provided support to NGOs that identified and helped potential or unidentified victims or victims who preferred not to cooperate with police. In 2021, 11 new victims (six men and five women) entered the Program, compared with 13 in 2020, 15 in 2019, and 17 in 2018. Five of the victims were Czech nationals who were exploited in the UK, and six were Mongolian nationals. Police concluded there was insufficient evidence to refer the Mongolian victims' case to prosecution and removed the victims from the Program after two months, although the government continued to fund their care. Police referred three victims to the Program, and NGOs referred eight; one victim was reported jointly. In 2021, government-funded NGOs provided services or other support to 250 victims or potential victims—some of whom had received services for a year or more (compared with 317 in 2020 and 259 in 2019). Observers noted the high level of cooperation between the authorities and civil society on victim identification and protection efforts; in February 2021, the police created a trafficking liaison position to coordinate efforts among law enforcement and other government authorities, as well as with international organizations and NGOs. The MOI continued distributing an electronic manual that described trafficking indicators among vulnerable populations to assist officials in identifying victims and collaborated with representatives from localities with large minority populations to draft a new, more inclusive, list of trafficking indicators. However, observers noted the manual lacked a clear systematic procedure for identifying victims or referring them to the correct services. The MOI also continued distributing a card-sized version and a manual outlining best practices in handling child trafficking cases to regional police. Observers expressed concern that many victims and potential victims went unidentified, attributing this to authorities' difficulty in identifying labor trafficking victims among migrant workers or detainees in immigration detention facilities; the government's strict anti-migration policies and insufficient screening of asylum-seekers; and inadequate training and high levels of turnover of front-line responders, particularly local police. Observers reported some police officers were not aware that traffickers often compelled victims to commit unlawful acts, leading officers to mistakenly identify victims as criminals. Moreover, experts reported that the commercial sex industry's operational shift in the last five years from clubs to private residences and online had hindered law enforcement's identification efforts.

The Program provided medical care, psychological and crisis counseling, housing, legal representation, vocational training, and other specialized services to officially recognize foreign and Czech adult victims of sex and labor trafficking, regardless of their immigration status. The MOI provided

funding and administrative oversight and selected one NGO to be the primary implementing partner and to manage subcontracts to other NGOs for additional specialized services. Victims were generally placed in an NGO-run shelter or into other MOI-funded housing. Participants in the Program were granted a 60-day reflection period, after which they were required to assist law enforcement if they wanted to stay in the Program, unless subject to a serious health issue. Victims unwilling to assist law enforcement through the Program and victims whose cases authorities did not pursue were eligible to access comparable Ministry of Labor and Social Affairs (MLSA)-funded welfare benefits, including housing, in-person and telephone crisis help, counseling and social rehabilitation, drop-in centers for children, and social services for families with children; all victims in the Program during 2021 chose to cooperate with law enforcement. Victims could voluntarily withdraw from the Program at any time and would remain eligible for services under the MLSA. Victims in the Program were eligible for a free legal advocate and, in some cases, the option to choose the gender of the judge or to testify via videoconference. MOI-drafted procedures to allow victims to remain in the Program even after termination of the criminal process against the trafficker remained under inter-ministerial review during the reporting period; this change would grant victims easier access to free legal representation in civil compensation proceedings. Foreign victims accepted into the Program could receive temporary residence and work visas for the duration of relevant legal proceedings. Victims could receive assistance to return to their country of origin at any time or, upon completion of the Program, could apply for permanent residency. The government extended seven long-term residence permits to Program participants and reported there were no requests for new permits as all new victims were Czech nationals or legally present in the country. The government did not repatriate any trafficking victims in 2021.

Although the government did not provide specialized centers specifically for child trafficking victims, there was a separate national referral mechanism for child victims, and social workers developed individualized support plans for potential child trafficking victims, who received welfare benefits such as shelter, food, clothing, and medical and psychological counseling. Observers reported the government had paid significant attention to combating child trafficking in recent years, especially to prevent trafficking among children from institutional care. Nonetheless, observers reported identification procedures, crisis support, and long-term services for child trafficking victims remained insufficient. The 2020-2023 national strategy included a plan to study child trafficking in the Czech Republic and to create educational materials for first responders on the identification of and assistance to child victims; the government did not report progress on completing this study.

The MOI allocated approximately 1.6 million koruna ($74,710) for the Program, the same annual amount since 2018; the Program did not spend the full allotment. The MLSA increased its funding to NGOs to provide social services, including to trafficking victims not in the Program. In 2021, the MLSA increased funding for the main NGO providing services to trafficking victims by 6.2 percent compared with the previous year. Another NGO reported a 16.7 percent increase in MLSA funding from 2020 to 2021. NGOs reported sufficient funding for short- and long-term activities and believed the ability to use MLSA funds for purposes other than the standard social services they already provided, such as public transportation tickets, telephone, medical checks, and psychological therapy, allowed them to offer more holistic services, which were limited in previous years due to regulations on use of these funds. Nevertheless, NGOs reported the MLSA's funding structure inhibited long-term planning, as funds were only allocated one year at a time and did not arrive until after the beginning of the fiscal year.

Border police and asylum and migration officials occasionally were unable to recognize trafficking indicators among asylum-seekers and did not always proactively screen migrants, including those in detention, for indicators of trafficking. Experts noted some courts declined to recognize victims in migration detention facilities as such if they did not self-identify as victims in their initial asylum claims. Moreover, observers expressed concern the Foreigners' Residence Act, which regulated the detention of foreigners prior to deportation did not define a "vulnerable person," leading authorities to occasionally detain potential

foreign national trafficking victims. Some experts criticized the Refugee Facility Administration (RFA) for charging a daily fee to some migrants for stays in transit zones; such fees could increase the vulnerability of potential victims to debt-based coercion. The RFA maintained a system where potential victims and other members of at-risk groups could be voluntarily housed in a guarded facility or, if in immediate danger, referred to NGOs for services. However, observers noted that due to data privacy regulations, the MOI office in charge of assessing asylum applications did not share with the RFA information that could identify potential victims; the RFA only learned of this information through victim self-disclosure. The government reported MOI officials advised potential victims of available resources and their right to report trafficking to the RFA. The RFA did not identify any victims in the transit zones in 2021, nor in recent prior years.

Victims and witnesses were granted short-term protection when needed, including physical protection, access to safe houses, and security monitoring for up to 60 days; this protection could be extended with approval from the regional police director. The government funded an NGO's website and chat room revisions to better protect victims during counseling sessions. Victims had the legal option of seeking court-ordered compensation from traffickers through civil suits; however, compensation was rare, as many victims could not afford attorney fees for a civil suit. To seek civil damages, the law required a finding of criminal misconduct against the defendant. An NGO reported a court awarded a victim 100,000 koruna ($4,670) in civil court for trauma-related health injuries. The law also allowed victims to obtain restitution in criminal proceedings, although courts did not consistently issue restitution to victims in criminal cases. In May 2021, an appeals court confirmed the November 2019 court judgment awarding a record 5 million koruna ($233,460) to the victims in a case involving a transnational trafficking operation.

## PREVENTION

The government increased prevention efforts. The MOI chaired the Inter-Ministerial Coordination Group (IMCG), which included representatives from various government ministries and agencies, as well as three NGOs and an international organization. In 2021, the IMCG met twice virtually to coordinate national efforts and accepted the State Labor Inspection Office (SUIP) as a new permanent member. The government continued implementing the 2020-2023 National Strategy Against Trafficking. The inter-governmental Committee for the Rights of Foreigners also included trafficking prevention in its mandate. The MLSA led an interagency coordination group focused on combating illegal employment of foreign nationals; the group's efforts included collecting and sharing information on potential labor exploitation. A unit in the MOI served as the national rapporteur and prepared a comprehensive annual report on trafficking patterns and programs. The government funded several NGO-run multilingual hotlines to identify and assist both potential and officially recognized victims; NGOs reported an increased number of calls in 2021 compared to pre-pandemic levels, although the number of calls decreased from 2020 to 2021. One NGO reported receiving 1,444 calls and chats on its hotline in 2021, a decrease from 1,700 in 2020. Hotlines operated on weekdays, and the government provided training to operators on how to advise victims. Funds from the Program were available for prevention campaigns and fieldwork; the MOI funded one NGO to conduct 41 monitoring and awareness trips to areas with a high potential for labor trafficking and exploitation. The government provided funding for the development of a smartphone application containing trafficking information and resources for professionals working with vulnerable populations. The government and the EU continued to provide funding for an NGO to conduct a research project exploring ways to more effectively assist victims; the project was scheduled to be completed in 2022. The government and the EU also provided funding to NGOs from the Czech Republic, France, Italy, Ireland, and Belgium to create a toolbox with best practices on victim identification and referral and protection measures for authorities who may encounter trafficking victims during the asylum process.

The MLSA and SUIP websites published information in multiple languages about foreign workers' rights, laws governing the employment of

foreigners, and information on the Czech labor system and requirements for work permits. In 2021, the MLSA initiated several awareness raising campaigns and joined an EU campaign to inform seasonal workers of their rights and ensure fair labor conditions. The law did not specifically criminalize confiscation of workers' passports. The labor code prohibited charging workers recruitment fees. Section 342 of the criminal code criminalized the illicit employment of foreign workers under especially exploitative conditions. Labor inspectors had dedicated staff to focus on illegal employment and verify requirements for conditions of work. They conducted inspections of employment agencies and identified 199 illegal "pseudo-agencies" in 2021, a significant increase from 98 in 2020; most suspected cases of labor trafficking were arranged via these types of agencies. In August 2021, a new law entered into force, introducing fines of up to 10 million koruna ($466,920) for employers who allowed or benefitted from "disguised employment," a system in which companies outsourced hiring to a "pseudo-agency;" the government did not report if any such fines were issued before the close of the reporting period. Due to the pandemic, SUIP did not hold its annual seminar for inspectors specializing in foreign employment, nor did labor inspectors conduct large routine inspections. Labor inspectors did not identify any potential trafficking victims in 2021. Experts reported inconsistent collaboration between regional police and labor inspectors, as well as a need for enhanced training for inspectors on labor trafficking indicators. In 2021, the SUIP conducted three "extraordinary" inspections aimed at detecting illegal employment; law enforcement used information collected to conduct further preliminary investigations but did not identify any victims of trafficking.

In 2021, the government supported an EU project in Niger focused on counterterrorism and the prevention of migrant smuggling and human trafficking, and it continued to contribute to an EU regional program that provided assistance to trafficking victims in Algeria, Chad, Egypt, Libya, Morocco, Niger, and Tunisia. To safeguard against exploitation, the MFA and SUIP interviewed domestic employees of accredited diplomatic personnel in the Czech Republic upon registration and reviewed documents for compliance with Czech labor laws; labor inspectors also had the authority to conduct random checks of the employee's workplace, and the MFA limited the number of domestic workers per foreign diplomat. The government did not make efforts to reduce the demand for commercial sex acts.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in the Czech Republic, and traffickers exploit Czech victims abroad. Traffickers exploit women, girls, and boys from the Czech Republic, Slovakia, Ukraine, Romania, Bulgaria, Nigeria, the Philippines, and Vietnam in sex trafficking in the Czech Republic and also transport victims through the Czech Republic to other European countries for sex trafficking. The UK has been a significant destination in recent years for Czech female and male victims of trafficking. Men and women from the Czech Republic, Slovakia, Ukraine, Romania, Bulgaria, Moldova, Mongolia, Nepal, Nigeria, the Philippines, Vietnam, and former Soviet countries are exploited in forced labor in the Czech Republic, typically through debt-based coercion or exploitation of other vulnerabilities, in the construction, agricultural, forestry, manufacturing, food processing, and service sectors, including in domestic work. NGOs report labor trafficking is more prevalent than sex trafficking. Many victims of forced criminal activity are Vietnamese nationals exploited in cannabis production. Most identified victims in the country are Czech; however, law enforcement reported an increase in non-EU victims. One NGO reported an increase in the number of LGBTQI+ victims. Traffickers exploit Romani men from the Czech Republic in forced labor and Romani women from the Czech Republic in sex trafficking and forced labor internally and in destination countries, including the UK; many such traffickers operate as family groups. Most traffickers are Czech citizens; foreign traffickers often recruit victims from their home countries and work in cooperation with local Czech citizens. Traffickers target individuals with drug dependencies, debts, and criminal records, as well as individuals experiencing homelessness, children in foster care, and senior citizens. More than 300,000 refugees from Ukraine, predominantly women and children, have crossed the Czech border seeking sanctuary and are

vulnerable to trafficking. Traffickers increasingly use online platforms to recruit victims. The commercial sex industry increasingly operates out of private residences, complicating efforts to identify sex trafficking victims. Private, unregistered labor agencies often use deceptive practices to recruit workers from abroad as well as from inside the country. Some agencies sell their registration to unqualified recruiters.

# DENMARK: TIER 2

The Government of Denmark does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Denmark remained on Tier 2. These efforts included investigating more trafficking cases, approving six additional investigator positions within the police to investigate forced labor and sexual exploitation, and establishing a new national unit with specialized police and prosecutors to investigate economic and organized crime, including trafficking. Additionally, authorities identified significantly more male labor trafficking victims and provided services to all identified victims. Furthermore, for the first time in four years, the government granted trafficking victims temporary residence permits and extended the 30-day reflection period to up to eight months because of the pandemic, allowing victims to remain in Denmark to recover and receive government assistance. The government also adopted a new three-year national action plan (NAP) to combat trafficking, allocated significant funding toward the proposed initiatives, and updated guidance on responsible business conduct with a focus on human and labor rights in supply chains. However, the government did not meet the minimum standards in several key areas. The government continued to focus on the undocumented status of some foreign victims rather than screening for trafficking indicators. Moreover, the government did not adequately encourage victims' assistance with investigations, and its practice to move toward repatriating victims inhibited successful prosecutions and left victims vulnerable to re-trafficking and reluctant to come forward and work with police. Additionally, the criminal code lacked a non-punishment provision, resulting in authorities prosecuting some victims, including children, for unlawful acts traffickers compelled them to commit. Finally, the government lacked clear procedures for identifying child victims, especially among unaccompanied children who continued to be exploited in commercial sex, forced labor, and petty criminality while living in asylum centers and often went missing from those centers.



DENMARK TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Significantly increase efforts to convict suspected traffickers. • Proactively screen all vulnerable individuals, such as migrant workers, asylum-seekers, and unaccompanied children, for trafficking indicators and stay deportation of potential victims prior to identification and assistance. • Develop clear procedures for identifying child trafficking victims and train relevant workers to recognize indicators. • Bolster efforts to safeguard unaccompanied children from going missing from asylum centers and against trafficking by developing a specialized framework for assisting children. • Amend the law to include a non-punishment provision ensuring trafficking victims, including children, are not inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts traffickers compelled them to commit. • Vigorously investigate and prosecute trafficking cases under the trafficking

statute. • Grant and renew residence permits to asylum-seekers. • Increase incentives for all victims to cooperate in the prosecution of traffickers, including by granting longer-term residency, work permits, and reparation. • Amend the law to prohibit worker-paid recruitment fees. • Increase the number of law enforcement officials, prosecutors, and judges who specialize in trafficking cases. • Expand efforts to expeditiously transfer potential trafficking victims from police or immigration custody to crisis centers or care providers.

## PROSECUTION

The government marginally increased law enforcement efforts. Section 262(a) of the criminal code criminalized sex trafficking and labor trafficking and prescribed punishments of up to 10 years' imprisonment; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. At the end of the reporting period, the government passed a new provision to the criminal code, Section 262(b), which criminalized the exploitation of a person in labor under manifestly unreasonable conditions and prescribed penalties of up to six years' imprisonment. Observers were optimistic the provision could be used to more easily prosecute trafficking cases and for its potential impact on convicting traffickers. However, observers noted the provision only addressed labor trafficking victims, and even though exploitation for commercial sex was already punishable under another section of the criminal code, observers recommended the government include sex trafficking victims, particularly those in commercial sex who typically represent the majority of identified victims in Denmark, in the new provision to ensure broad protection for all victims.

In 2021, authorities investigated 15 trafficking cases (10 sex trafficking, four labor trafficking, one unspecified), an increase from six in 2020. Officials prosecuted three suspects for sex trafficking, compared with two suspects for labor trafficking in 2020. Courts did not convict any traffickers for the third consecutive year but convicted one individual, who was involved in a trafficking crime, for "pimping." The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes. Danish authorities cooperated with their foreign counterparts on two extraditions and multiple trafficking-related investigations. Authorities of Denmark, Finland, Norway, and Sweden facilitated international policing efforts and information-sharing, including on trafficking-related issues, through Nordic liaison officers stationed at 20 Nordic embassies and consulates around the world. The Danish Tax Agency (DTA) assessed the risk of trafficking in tax-related criminal cases, and in cases involving trafficking, DTA participated in police inspections and provided police and prosecutors with information on citizens' and companies' tax and value added tax payments. Local police in collaboration with regional departments investigated trafficking cases. However, overextended police officers managed multiple responsibilities, redirecting a significant amount of their attention and time from trafficking and limiting the number of officers available to conduct investigations. For instance, the Copenhagen Police's homicide division maintained responsibility for anti-trafficking investigations as one of its many responsibilities, despite Copenhagen being the primary location for trafficking crimes, and an investigation unit within the National Police worked on trafficking investigations among other crimes, such as human smuggling. In an effort to address staffing issues, in 2021, the government approved hiring six additional police officers by 2023 to investigate forced labor and sexual exploitation. Furthermore, the government established a new national unit in January 2022 with specialized police and prosecutors investigating economic and organized crime, including trafficking. The unit would also support police districts in their efforts to combat trafficking. The National Police continued to allocate approximately 18 million Danish krone (DKK) ($2.75 million) through 26 full-time staff to combat and investigate trafficking cases throughout 2021. The National Police maintained trafficking coordinators in each of the country's 12 districts. According to regional experts, however, the level of expertise varied by district and there were no specialized police investigators outside of the National Centre of Investigation, which had no jurisdiction but assisted local and regional police in trafficking investigations. Additionally, there were no specialized prosecutors or judges in the country. Reports

indicated limited resources, an overreliance on victim testimony, and a high burden of proof led to cases being investigated and prosecuted under non-trafficking statutes, such as "pimping." Experts continued to express concern with the low number of prosecutions and convictions over the previous years. Several NGOs criticized police, prosecutors, and judges for their lack of sensitivity, particularly during criminal proceedings, which sometimes led to the dismissal of trafficking cases. The government's Center against Human Trafficking (CMM)—which coordinated interagency engagement on trafficking issues, collected and disseminated data, and developed nationwide social services for victims—trained judges, prosecutors, police, and frontline personnel throughout the year on various topics, such as identifying trafficking victims and referral procedures.

## PROTECTION

The government marginally increased efforts to protect trafficking victims. In 2021, authorities identified 68 trafficking victims (26 sex trafficking, 31 labor trafficking, 11 other or unspecified), compared with 64 in 2020. Of these victims, 34 were female, 33 were male, and one identified as transgender. The vast majority of identified victims were adult foreign nationals; five were children (11 in 2020). Previously, the government's perspective that trafficking was a sex-based phenomenon with primarily female victims limited the number of identified adult male victims in forced labor; however, in 2022, labor trafficking victims outnumbered sex trafficking victims, and men represented nearly half of all identified victims. Experts noted the trend toward online advertisement of commercial sex made identifying sex trafficking victims more difficult. For years, NGOs reported the identification process was complicated and involved multiple government and law enforcement agencies, requiring several interviews of victims, who at times remained in detention before referral to NGOs. In an effort to streamline the process, in January 2022, the Department for Gender Equality assigned CMM and the Danish Immigration Service (DIS) as the only authorities with responsibility to formally identify trafficking victims—an initiative outlined in the new NAP to ensure uniform case management and data protection. Several NGOs worried the new process was not victim-centered, lacked continuity, and limited their role working with victims as they could no longer conduct interviews to formally identify trafficking victims. In March 2022, CMM hosted a workshop for NGOs to discuss the new process and ways to share information. CMM was responsible for formal identification of victims of Danish or EU origin or who were documented migrants, and the DIS was responsible for formal identification of undocumented immigrants and asylum-seekers. DIS screened potential victims during the asylum interview; however, according to NGOs, the DIS interview was often too brief to make an accurate identification. CMM, DIS, and the courts assessed whether a victim was eligible for assistance, which was not conditional on cooperation with law enforcement or whether there was an ongoing investigation.

In 2021, all 68 identified trafficking victims received some form of government assistance (64 in 2020). As a standard practice during reflection periods, CMM assigned a contact person to identified victims to inform them of relevant services and coordinate assistance. As part of the new NAP and to ensure safety and quality services, the Ministry of Social Affairs and Senior Citizens approved accommodations for trafficking victims and conducted inspections of shelters for adequate services. Victims under DIS' care received accommodations in asylum centers, shelters, or safe houses based on their individual needs. Asylum centers provided health care services, social services, educational activities, and vocational training for trafficking victims throughout the duration of their stay. CMM and the Ministry of Immigration and Integration's Return Agency offered financial and legal counseling and reintegration assistance. CMM also offered educational activities, health care, and psychological care through private clinics and received 10.8 million DKK ($1.65 million) from the government. A government-funded NGO provided two shelters for female trafficking victims and received 19 million DKK ($2.9 million) for operational expenses over the course of four years. There was no specialized shelter for male victims, but accommodation was available if necessary. Municipal child protection authorities assisted child victims and placed them in municipal accommodation or in residential care institutions. The

Danish Red Cross assisted unaccompanied children in facilities partially funded by the government and screened all unaccompanied children in asylum centers for trafficking indicators. Observers continued to express concern over the disappearance of unaccompanied children from asylum centers and reports of unaccompanied children, particularly Moroccan boys living in asylum centers, being forced into commercial sex, forced labor, and petty criminality. Regional experts reported shortcomings, such as a lack of clear procedures, in the identification of child victims, especially among unaccompanied children, and recommended developing a specialized framework for identifying and assisting children and providing safe accommodations.

Stricter immigration policies and guidelines increased vulnerability among asylum-seekers and refugees, particularly those the government returned to their country of origin who could face retribution or hardship. The Aliens Act allowed the government to grant residence permits to refugees and family members, including trafficking victims, for temporary stay only, and to revoke residence permits if the need for protection no longer existed, contrary to Denmark's international obligations. For the first time in four years, the government granted two trafficking victims temporary residence permits. Regional experts reported it was "nearly impossible" for victims to receive a residence permit, noting since 2015 the government had granted only six new residence permits. Experts also reported the difficulty for victims to receive work permits. NGOs contended authorities primarily treated victims as undocumented immigrants subject to arrest or deportation, especially if victims were previously detained by law enforcement. Officials had the authority to detain potential victims for 72 hours and could extend this period when they needed more time to determine victim status or immigration status or to identify traffickers. As part of procedure, the government granted identified, undocumented trafficking victims a 30-day reflection period to stay in Denmark and receive support and assistance—regardless of their cooperation with police—with the potential to extend another 90 days. The government required victims who accepted the subsequent 90 days extended departure deadline to leave voluntarily within 120 days. As a result of the pandemic and related movement restrictions, the government extended the 30-day reflection period up to eight months. Nonetheless, regional anti-trafficking experts, including the Council of Europe, contended this period did not refer to a period of reflection and recovery necessary to determine whether victims would cooperate in the investigation of their cases; rather, it was a period of time the victims had to cooperate in their repatriation. The Return Agency processed voluntary returns of foreigners who received rejected residency requests, including trafficking victims, to their country of origin. Predictably, some victims chose not to participate in a voluntary return because they viewed it as preparation for deportation. Additionally, traffickers' use of debt-based coercion and victims' lack of protection in their home countries served as significant deterrents from accepting the return. The government allowed victims who assisted in the prosecution of a trafficker to remain in Denmark for the duration of the investigation or court proceedings. However, NGOs reported the threat of deportation prevented victims from coming forward and led some identified victims to leave shelters before the conclusion of police investigations or court proceedings in order to evade deportation. Additionally, observers noted that many victims saw no benefit to being identified and that there was little to no incentive for victims to serve as witnesses since there were limited long-term residency options, the compensation process remained complex, and above all else, the government prioritized returning victims to their countries of origin. In 2021, NGOs reported multiple instances when DIS officials responded to trafficking reports, which typically fall within the National Police's jurisdiction, to intimidate and ultimately repatriate foreign nationals, including trafficking victims, to their home countries.

While the government provided guidelines on not imposing penalties upon trafficking victims, Danish law lacked a non-punishment provision ensuring victims were not inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts traffickers compelled them to commit. Observers noted incidents in which authorities prosecuted victims, including children, for crimes their traffickers compelled them to commit. Courts issued reduced sentences in cases where evidence was found proving victims were compelled to commit crimes by their

traffickers. In 2021, authorities charged 11 victims for criminal activities who served time in prison before being deported. For victims who testified in court, the government did not offer witness protection but assigned a contact person, typically a police officer, to provide guidance and information about the case. Danish law entitled trafficking victims to request restitution from traffickers as part of criminal proceedings, as well as file civil suits for financial compensation.

## PREVENTION

The government increased prevention efforts. During the reporting period, the government adopted a new four-year NAP to combat trafficking and allocated 118.2 million DKK ($18 million)—a significant increase from 63 million DKK ($9.61 million) for the duration of its previous three-year NAP—to the proposed initiatives, including strengthening victim services. The Department for Gender Equality led an inter-ministerial working group that coordinated the government's anti-trafficking efforts and implementation of the NAP. In September 2021, the working group conducted interviews with several government-funded NGOs and anti-trafficking stakeholders and, subsequently, published an in-depth analysis of the identification process, services offered during the recovery and reflection period, outreach work, and the coordination, information-sharing, and monitoring of government efforts. Separately, CMM published an annual report on government anti-trafficking efforts and statistics. As one of the NAP's new initiatives, the government allocated 1 million DKK ($152,530) to the Danish Institute of Human Rights to conduct a study in 2024-2025 analyzing Denmark's efforts to protect trafficking victims in the context of international conventions. Through another NAP initiative, starting in January 2022, CMM transferred outreach responsibilities to NGOs and subsequently allocated 30 million DKK ($4.58 million) to NGOs to expand and strengthen their outreach work to potential trafficking victims. Since many potential victims did not speak Danish and struggled to access and understand information on assistance, CMM provided translated health guidelines and information on the pandemic through its mobile health clinics, which focused primarily on raising awareness among individuals in commercial sex. In 2021, CMM relaunched an anti-trafficking awareness campaign that challenged trafficking stereotypes and documented various forms of exploitation through photography exhibits to educate the general public. CMM operated a hotline for reporting trafficking cases in Danish and English; in 2021, the hotline identified 32 victims. The government did not make efforts to reduce the demand for commercial sex acts.

As a member of the Council of the Baltic Sea States' taskforce on trafficking, Denmark continued to participate in a regional project to support stakeholders in combating and disrupting labor trafficking by analyzing and consolidating information, improving assistance to victims, and increasing the prosecution of traffickers. As part of the project, in 2021, researchers from a Danish university conducted two studies—the first on the challenges in prosecuting labor traffickers and the second on exploitation among migrant workers in Denmark. CMM provided guidelines to companies and employers on identifying trafficking risks and preventing forced labor in businesses and supply chains. Additionally, the Mediation and Complaints-Handling Institution for Responsible Business Conduct updated its guidance on responsible business conduct with a focus on human and labor rights in supply chains. A group of governmental and law enforcement agencies cooperated on issues related to forced labor, including coordinating and executing multi-agency inspections and control operations in which CMM participated. Danish law did not prohibit worker-paid recruitment fees.

In response to the inflow of Ukrainian refugees fleeing Russia's full-scale invasion of Ukraine, CMM distributed information to arriving refugees on available resources for potential trafficking victims at Danish borders, employment centers, and asylum centers throughout the country. The government also distributed information in English and Ukrainian on refugees' labor rights and working conditions in Demark and provided frontline personnel with guidelines on identifying trafficking indicators. In addition, CMM participated in an anti-trafficking working group with the Danish National Cyber Crime Center to address the risk of online trafficking recruitment in connection with refugee flows. Furthermore, the government passed a special law providing temporary residence

permits for arriving Ukrainian refugees, giving them access to the labor, education, and health care systems for at least two years. As of April 2022, 20,832 Ukrainians applied for a temporary residence permit, and 3,683 Ukrainians applied for asylum. Despite Ukrainian refugees threatening Denmark's stringent hardline migration policy, the government remained focused on receiving and integrating Ukrainian refugees and providing counseling and support.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Denmark, and to a lesser extent, traffickers exploit victims from Denmark abroad. Vulnerable groups include undocumented migrants and asylum-seekers, young men, unaccompanied children, individuals in commercial sex, and members of the LGBTQI+ community, particularly those with non-traditional gender identities. NGOs express concern immigration policies exacerbate the risk to trafficking among asylum-seekers. Reports indicate victims without EU citizenship or residency experience increased vulnerability throughout the pandemic due to domestic lockdowns and international border closures. The most prevalent changes to demographics during the reporting period include the increased number of identified male trafficking victims and labor trafficking cases. Reports note a rise in exploitation in the private delivery industry, such as messengers and food delivery drivers, who work under conditions that violate Danish labor laws. Traffickers exploit migrants, typically men who come to Denmark from Africa and Southeast Asia, in labor trafficking, specifically trucking, construction, agriculture, domestic service, restaurants, hotels, and factories, through debt-based coercion, withheld wages, abuse, and threats of deportation. According to NGOs, traffickers exploit unaccompanied children, particularly Moroccan boys, in sex trafficking and forced labor, including drug trafficking, theft, and other forms of forced criminality. Vietnamese men are vulnerable to forced criminal activity, such as cannabis cultivation. Traffickers exploit men, women, and children from Eastern Europe, Africa, and Southeast Asia in forced labor and sex trafficking in Denmark. The majority of women exploited in commercial sex originate from Nigeria and Thailand. Reports indicate an increasing number of sex trafficking victims coming from African countries, Eastern Europe, and South America. NGOs report an increasing trend toward online advertised commercial sex rather than in established locations. Thousands of Ukrainian refugees, predominantly women and children, who are fleeing Russia's full-scale invasion of Ukraine and seeking sanctuary in Denmark, are highly vulnerable to trafficking.

The Kingdom of Denmark includes the semi-autonomous territories of Greenland and the Faroe Islands. The Danish National Police are responsible for law enforcement services in all regions governed by the Kingdom of Denmark, including Greenland and the Faroe Islands. The Danish Prosecution Service meets regularly with prosecutors, including representatives from both territories, to discuss potential trafficking issues, such as working with victims who are participating in criminal proceedings. In 2021, there were no reports of trafficking cases or identified trafficking victims in Greenland or the Faroe Islands.

## DJIBOUTI: TIER 2 WATCH LIST

The Government of Djibouti does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included partnering with international experts to expand training to stakeholders on the distinction between human trafficking and migrant smuggling; formalizing standard operating procedures (SOPs) for victim identification by Coast Guard officials; enhancing partnership with an international organization to develop victim referral procedures for transiting migrants and to identify a space for the country's first trafficking specific shelter; appointing a new government focal point and an inter-ministerial task force to combat human trafficking; and conducting awareness campaigns on trafficking vulnerabilities. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic, if any, on its anti-

trafficking capacity. The government did not convict any traffickers for the fifth consecutive year, and some judges continued to use outdated versions of the penal code that did not include the 2016 anti-trafficking law. The government did not formally identify any trafficking victims for the third consecutive year and remained without formal specialized services for victims. Despite training on trafficking crimes, limited understanding of trafficking indicators among some front-line officials continued to inhibit law enforcement and victim identification efforts. For the seventh consecutive year, the government only partially implemented its 2015-2022 national action plan (NAP) to combat trafficking. Therefore, Djibouti remained on Tier 2 Watch List for the second consecutive year.



## PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers and sentence convicted traffickers, including complicit officials, under the 2016 anti-trafficking law. • Using the established SOPs, systematically and proactively identify trafficking victims and refer all identified victims to appropriate care using the established national referral mechanism. • Strengthen protection services for trafficking victims, including by providing specialized services to trafficking victims and providing funding or in-kind assistance to NGOs and international organizations providing protection services. • Adopt an updated NAP for 2023 and beyond and allocate resources devoted to its implementation. • Provide specific anti-trafficking training, including on established SOPs, to law enforcement officials, labor inspectors, social workers, prosecutors, and magistrates to improve case investigation, victim identification, and referral to appropriate care. • Increase judicial officials' awareness of the 2016 anti-trafficking law, including by providing regular training for judges on trafficking crimes. • Increase efforts to screen vulnerable populations for trafficking indicators, including refugees, asylum-seekers, individuals involved in commercial sex, and foreign nationals, such as transiting migrants and Cuban medical professionals. • Ensure the penal code on the judges' bench includes the 2016 anti-trafficking law. • Increase awareness of trafficking among the public, especially transiting migrants, through government-run campaigns or financial or in-kind support for NGO-run campaigns. • Improve nationwide data collection and coordination on anti-trafficking law enforcement and victim identification efforts.

## PROSECUTION

The government maintained minimal anti-trafficking law enforcement efforts. The 2016 Law No. 133, On the Fight Against Trafficking in Persons and Illicit Smuggling of Migrants, criminalized sex trafficking and labor trafficking; it prescribed penalties of five to 10 years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape. The law considered the involvement of a child or forcing a victim into "prostitution" as aggravating circumstances for which the penalties increased to 10 to 20 years' imprisonment. Law No. 111, Regarding the Fight Against Terrorism and Other Serious Crimes of 2011, also prohibited sex trafficking and labor trafficking and prescribed penalties of 10 to 15 years' imprisonment. Definitions and penalties in these two laws diverged, but the extent to which this hampered law enforcement, prosecutorial, and judicial officials' ability to prosecute suspected traffickers effectively was indeterminable.

The government investigated 16 potential trafficking crimes, compared with 13 investigations in 2020. The government initiated prosecutions against eight alleged traffickers in three cases under the 2016 anti-trafficking law, compared with 21 suspected traffickers in 13 cases in the prior year. For the fifth consecutive year, officials did not convict any traffickers. Officials reported that the requirement for law enforcement

to present an investigative report and evidence to the court within three days of a suspect's arrest (two days for crimes committed in Djibouti City) inhibited law enforcement's ability to fully investigate all crimes, including trafficking, and judges often dismissed cases on procedural grounds. As in prior years, criminal courts authorized to hear trafficking cases only convened twice during the year. The government and NGOs also reported the hard copy of the penal code used by some judges was out of date and did not include the 2016 anti-trafficking law; therefore, in practice, some judges did not use the 2016 anti-trafficking law to convict alleged traffickers and instead relied on older provisions of the law, such as kidnapping or abuse of power. Additionally, front-line officials' propensity to conflate human trafficking and migrant smuggling made it likely that some reported cases involved individuals seeking to illegally cross international borders via irregular migration (migrant smuggling) and other crimes not involving exploitation through forced labor or sex trafficking; analogous to previous years, most potential trafficking crimes moved forward as smuggling charges. Severe resource and capacity limitations also impeded officials' ability to develop comprehensive investigations of trafficking crimes. Observers reported families or village elders often settled allegations of forced labor informally through traditional arrangements between religious and community leaders, without recourse to the formal court system. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking offenses; however, corruption and official complicity in trafficking crimes remained significant concerns, potentially inhibiting law enforcement action during the year. Observers reported that security forces, especially at lower levels, were susceptible to bribes and may have ignored trafficking crimes.

The National Police maintained a unit focused on vulnerable children that had a mandate to investigate and arrest traffickers. The Ministry of Justice (MOJ) had two dedicated prosecutors for cases involving trafficking or vulnerable children. The MOJ, in partnership with international organizations, continued to provide anti-trafficking training seminars to judges, prosecutors, clerks, and advisors, including integrating anti-trafficking training into the curriculum at the newly-established National School for Judicial Studies (ENEJ). In 2021, the Coast Guard established a training program on the identification of potential trafficking victims among migrants at sea. The National Police, the Gendarmerie, and the Coast Guard continued to implement training on detection and identification of trafficking crimes for all new recruits in police academies in Djibouti City and in rural areas of the country. The government reported nascent cooperation with the Government of Ethiopia on trafficking cases.

## PROTECTION

The government maintained inadequate victim protection efforts. For the third consecutive year, the government did not report formally identifying any trafficking victims. Similar to previous years, the government quickly repatriated potential victims—most of whom were Ethiopian—to their home countries without screening for trafficking indicators in some instances. Although the government had formal SOPs to guide officials in the proactive identification of trafficking victims and their subsequent referral to care, relevant officials did not consistently use these procedures. In practice, officials routinely called upon prominent points of contact for assistance in determining care options for potential victims rather than consulting the written procedures. In 2021, the Coast Guard formalized SOPs to screen migrants and refugees found at sea for trafficking indicators; however, a lack of resources hampered full implementation of the new SOPs.

The government had a national referral mechanism that outlined guidelines for victim referral to services. In 2021, the government, in partnership with an international organization, developed a trafficking victim referral procedure targeting migrants transiting Djibouti. Additionally, the police updated its procedures to require officers to take identified trafficking victims to the nearest medical center, if needed, where they could receive free medical services. The government, in partnership with an international organization, identified a site for the country's first trafficking-specific shelter. While the government did not formally identify any trafficking victims, the government, in partnership with international organizations and NGOs, continued to provide services to thousands of individuals among vulnerable populations, which may

have included trafficking victims. The government continued to assist potential trafficking victims through programming targeting refugees or migrants more broadly, rather than providing specialized services. The government continued to grant authority to an international organization to conduct trafficking screenings of all transiting migrants—including an unknown number of potential trafficking victims—and provide water, food, medial support, temporary shelter, and repatriation assistance. The government and international organizations reported the provision of services to vulnerable populations—including potential victims—during the ongoing pandemic was difficult, especially in crowded migrant response centers (MRCs) and refugee camps, some of which regularly accommodated double the intended capacity during the year. Observers also reported since November 2020, the ongoing conflict in Ethiopia further exacerbated the strain on the MRCs' limited resources as many voluntary returnees were unable to return to Ethiopia. With governmental authorization, a locally-operated NGO continued to host unaccompanied migrant children and vulnerable children living on the streets in Djibouti's first shelter that could appropriately house trafficking victims; police and judges reported referring children to the shelter but did not report how many children were referred or if any were victims of trafficking. In prior years, the Ministry of Women and Family Affairs provided social workers to offer psychosocial support at the shelter; however, the government did not provide this service in 2021. Separately, the Coast Guard provided clothing and food to vulnerable migrants stranded at sea and transported them to care provided by an international organization, typically in Khôr 'Angar or Obock. The government continued its administration of one MRC in Obock, which was operated by an international organization, and other transit or processing centers along routes heavily traversed by migrants; however, unlike previous years, the government did not report providing funding to the MRC. An international organization closed one MRC in Aour Aoussa, which the government previously supported, during the reporting period due to lack of funding from pandemic-related budget re-allocations. The National Union of Djiboutian Women (UNFD) and the Ministry of Health established new procedures to provide free medical services to victims of gender-based violence (GBV), including potential trafficking victims, identified at the UNFD's counseling center. The MOJ continued to provide a *Pro bono* prosecutor liaison to the UNFD counseling center to provide legal assistance to potential victims. Health officials, in partnership with an international organization, continued to operate five mobile clinics along dangerous migration routes that could provide vulnerable migrants with medical assistance.

Key ministries that supported groups vulnerable to trafficking reportedly continued to provide resources to support various protection services for potential victims. However, the government did not report the funding amount allocated in 2021, compared with more than 109 million Djiboutian francs ($615,820) allocated in 2020 to relevant ministries, MRCs, transit centers, and local NGOs, which operated counseling centers and other programs—including a hotline—that assisted potential trafficking victims. The 2016 anti-trafficking law included provisions allowing trafficking victims temporary residency during judicial proceedings and permanent residency, as necessary, as a legal alternative to removal to countries where victims might face hardship or retribution. Additionally, the 2016 law directed the government to provide victims legal assistance and an interpreter, in addition to psychological, medical, and social assistance; the government did not report whether it applied these provisions. Due to inconsistent implementation of formal identification procedures, trafficking victims, particularly vulnerable migrants and individuals involved in commercial sex, may have remained unidentified within the law enforcement system.

## PREVENTION

The government maintained efforts to prevent trafficking. In July 2021, the MOJ convened a high-level focus group on human trafficking and migrant smuggling and appointed the Director of the ENEJ as the government focal point for anti-trafficking efforts. The new focal point identified government stakeholders to become potential members of an ongoing task force; however, the final approval of the task force and its members was awaiting a presidential decree at the end of the reporting period. In previous years, the Ministry of Interior (MOI) was responsible for coordinating government efforts to monitor mixed migration and

combat human trafficking. The National Directorate of the Police, which sits within the MOI, maintained a specialized office to coordinate migration issues, including those involving human trafficking. The government continued to partially implement its 2015-2022 NAP; however, the government did not report providing a specific anti-trafficking budget allocation for the NAP's activities. In 2021, the government, in partnership with an international organization, launched the country's first national strategy for migration, which included procedures to screen migrants for trafficking indicators. In partnership with civil society, the government held awareness campaigns targeting local government officials and vulnerable migrants on trafficking indicators and potential vulnerabilities; the government did not conduct awareness campaigns in the previous year. The UNFD operated two 24-hour hotlines to report cases of GBV and refer victims to services, which could be utilized by trafficking victims; the government continued to publicize hotline information on its website and local radio and television stations. The UNFD reported the hotline received more than 1,200 calls in 2021; however, the hotline did not report identifying any trafficking victims. Labor recruitment and placement companies were subject to random inspections by the inspector general; however, the government did not report how many inspections of these companies it conducted or if any inspections led to potential trafficking investigations. The government continued to conduct labor inspections, particularly in the construction sector, to enforce laws against forced labor; however, the government did not report identifying any trafficking victims during these inspections or investigating any potential violations. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Djibouti, and to a lesser extent, traffickers exploit victims from Djibouti abroad. Adults and children, primarily economic and often undocumented migrants from Ethiopia and Somalia, transit Djibouti voluntarily en route to Yemen and other locations in the Middle East, particularly Saudi Arabia. Traffickers, often outside of Djibouti, exploit an unknown number of these migrants in forced labor and sex trafficking in their intended destinations; this population is also vulnerable to trafficking in various transit points, particularly Yemen. Economic migrants who transit Djibouti to return to their respective countries of origin are vulnerable to trafficking. An international organization observed an increase in returning migrants due to travel restrictions or economic impacts of the ongoing pandemic in the Middle East. According to government estimates and an international organization, approximately 90,000 migrants—predominantly Ethiopian—transited Djibouti (population of less than one million) in 2021, including both land and sea crossings, putting a significant strain on the government's already limited resources. The civil war in Yemen continued to generate a reverse flow of persons from Yemen to Djibouti; migrants voluntarily fled or were illegally or forcibly deported from Aden, and many of them reported suffering physical abuse and may have been trafficking victims. As of April 2022, Djibouti hosts more than 35,000 refugees and asylum-seekers; some individuals in this population may have endured exploitation before their arrival in Djibouti and remained vulnerable to trafficking. Given the protracted political instability in Ethiopia's Oromia region, many Ethiopian nationals, including unaccompanied children, continued to journey on foot from Ethiopia to Djibouti either to claim asylum with their families or to continue onward to destination countries in Gulf states; this population remains vulnerable to trafficking. Since November 2020, ongoing conflict in northern Ethiopia has left Ethiopians of Tigrayan ethnicity in Djibouti unable or unwilling to return to Ethiopia; many of these migrants reported abuses and may have been trafficking victims at various points on their journey, particularly in Yemen and Saudi Arabia.

Migrant and local children in Djibouti City, particularly along the Siesta Beach road, may be vulnerable to sex trafficking. Traffickers may exploit Djiboutian and migrant women and children living on the street in sex trafficking or forced labor in Djibouti City, the Ethiopia-Djibouti trucking corridor, and Obock, the main departure and arrival point for Yemen. Traffickers may exploit migrant women in sex trafficking at truck stops and in restaurants and guest houses in Balbala, one of Djibouti's poorest neighborhoods. Traffickers, including family members, may exploit

local and migrant children in forced begging. Traffickers may exploit foreign workers—including Ethiopians, Yemenis, Indians, Pakistanis, and Filipinos—in forced labor in domestic servitude, construction, and food service sectors. Cuban medical professionals working in Djibouti may have been forced to work by the Cuban government. In 2021, Tunisian officials reported identifying one Djiboutian victim of forced labor in Tunisia.

## DOMINICAN REPUBLIC: TIER 2

The Government of the Dominican Republic does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the Dominican Republic remained on Tier 2. These efforts included convicting more traffickers; opening a trafficking-specific shelter; improving victim screening, referral to care, and data collection; assisting foreign governments in trafficking cases; and registering and documenting Venezuelan migrants vulnerable to trafficking. However, the government did not meet the minimum standards in several key areas. Efforts to identify and assist trafficking victims appeared inequitable, with the government not providing justice for or screening and assisting Haitians and Dominicans of Haitian descent. The government did not pass a revised trafficking law to remove the requirement to prove force, fraud, or coercion of sex trafficking victims younger than 18 years of age; did not adequately fund anti-trafficking efforts; did not provide sufficient training, resources, and technology to officials, especially outside of the capital; and did not complete a new National Action Plan (NAP). Government services available for victims, particularly male victims, remained inadequate.



DOMINICAN REPUBLIC TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Proactively and consistently screen Haitians and Dominicans of Haitian descent, particularly pregnant women, migrants, and those in the sugar industry, for trafficking indicators and refer them to care. • Develop, implement, and fund a new National Action Plan, and ensure the Inter-institutional Commission against Trafficking in Persons and Smuggling of Migrants (CITIM) meets regularly to carry out its anti-trafficking functions. • Amend the 2003 anti-trafficking law to remove the requirement to prove force, fraud, and coercion of sex trafficking victims younger than 18 years of age to be consistent with international law. • Issue or re-issue identity documents to Haitians in border communities, Haitians in the country, and Dominicans of Haitian descent. • Vigorously investigate, prosecute, and convict traffickers, and apply appropriate sentences as ordered by law. • Provide adequate human and financial resources and training to law enforcement, prosecutors, and judges to combat trafficking, particularly in areas outside of Santo Domingo, and ensure the National Police can routinely connect with other source or destination countries, including Haiti. • Ensure potential child trafficking victims involved in gangs and drug trafficking are not penalized for unlawful acts traffickers compel them to commit, and ensure they are screened, identified, and referred to care. • Expand consistent access to care, including a dedicated shelter, for male trafficking victims. • Increase the number of translators, especially in Haitian Creole, to assist in victim identification and referral to care. • Improve legal representation for victims, including by strengthening the Service for Legal Representation of Victims' Rights (RELEVIC). • Increase criminal investigations and prosecutions of government officials allegedly complicit in trafficking and impose stronger sentences. • Fully

implement the Electronic Investigations Module as an official tool both in investigations and in official communications between the National Police and the Public Ministry.

## PROSECUTION

The government increased prosecution efforts. Dominican law criminalized sex trafficking and labor trafficking. The 2003 Law on Human Smuggling and Trafficking (Law 137-03) criminalized all forms of labor trafficking and some forms of sex trafficking and prescribed penalties of 15 to 20 years' imprisonment and fines. Inconsistent with international law, the law required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking. Article 25 of the Child Protection Code of 2003 criminalized the offering, delivering, or accepting, without regard to means used, anyone younger than 18 years of age for the purpose of sexual exploitation, forced labor, or any other purpose that demeaned the individual, for remuneration or any other consideration, and prescribed a penalty of 20 to 30 years' imprisonment and a fine. All these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. During the previous reporting period, the government drafted legislation to remove the provision requiring a demonstration of force, fraud, or coercion to constitute a child sex trafficking crime; the legislation remained pending at the end of the reporting period.

The Attorney General's Office and the police anti-trafficking unit (ATU) reported jointly initiating 53 trafficking investigations involving 76 people (47 cases of 69 people for sex trafficking and six cases of seven people for labor trafficking). The Attorney General's Office and the ATU reported initiating 107 investigations in 2020. The government continued investigations in 15 cases (six for sex trafficking, three for labor trafficking, and six cases for unspecified exploitation including pandering and procuring) from previous reporting periods. The government reported initiating prosecutions of 46 alleged traffickers (41 for sex trafficking and five for labor trafficking), compared with initiating prosecutions against 42 defendants in 2020 (36 for sex trafficking and six for labor trafficking). The government continued prosecutions of 52 suspects (42 for sex trafficking, four for labor trafficking, and six for pandering and procuring). Of the total prosecutions, the government prosecuted 92 alleged criminals under the anti-trafficking laws and six people under other laws. Courts convicted 10 traffickers (six for sex trafficking under the trafficking law and four for pandering and procuring under the penal code), compared with four traffickers in 2020. The government cooperated with four foreign governments on trafficking investigations. During the reporting period, 10 new or ongoing investigations and one conviction resulted from this international cooperation, as well as the identification of at least six trafficking victims. The government reported it enforced the law equitably; however, an international organization reported the government sometimes chose not to pursue cases when victims were migrants or undocumented Haitian women.

The Specialized Prosecutor's Office against the Smuggling of Migrants and Trafficking in Persons (PETT) and the ATU were the principal law enforcement bodies pursuing trafficking cases, with police units in Santo Domingo, Punta Cana, San Cristóbal, Puerto Plata, and Boca Chica. An NGO and other observers reported the ATU was fully operational until the government changed its command in November 2021, after which it slowed its anti-trafficking activities while the new staff learned their responsibilities; the national police worked with provincial police units to continue investigations. The PETT had established liaisons in each of the 35 district attorney's offices nationwide. An NGO reported authorities almost exclusively dedicated their anti-trafficking efforts to addressing sex trafficking and the government did not make efforts or provide funding to combat labor trafficking. NGOs reported that Dominican authorities often lacked the training and technology for the identification, investigation, prosecution, and sentencing of both traditional and online trafficking crimes, sometimes favoring the rights of the defendant over those of the victim. The National Police, in cooperation with an NGO, developed an Electronic Investigation Module. The tool could expedite and improve the quality of investigations carried out by the National Police and the Attorney General, but a change in command at the Department of Investigations delayed its full implementation. An NGO

reported that although the National Police and Public Ministry carried out investigations, the budget allocation for the specialized trafficking units in these institutions was insufficient, and civil society actors continued to be the primary funders of these efforts. An NGO reported the National Police largely prioritized internal trafficking cases because the police lacked the capacity and technological tools to routinely connect with other source or destination countries, including Haiti. The National Police, in cooperation with an NGO and supported by a foreign donor, carried out their Second National Operation Against Trafficking in Persons and Commercial Sexual Exploitation of Children (CSEC), during which multiple institutions worked together in a collaborative planning process; the NGO reported that such collaborative efforts were rare. Observers noted staffing changes in the PETT reportedly caused a significant loss of institutional knowledge on trafficking during the reporting period and some loss of coordination at the working level as the new staff learned their responsibilities. However, observers reported the PETT subsequently increased its interagency collaboration on investigations. An NGO reported it was common for officials to incorrectly perceive a trafficking victim as being a voluntary participant or complicit actor in a migrant smuggling business. The government also reported a lack of understanding of the nature of trafficking among the Dominican population hindered effective identification and investigation of the crime.

Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The government reported it filed a disciplinary action against the former head of the PETT for obstruction of justice; he was undergoing disciplinary hearings in court at the end of the reporting period. There were no other reports of official complicity during the reporting period, but an international organization noted there was limited data available on investigations and their results, particularly during the pandemic. The government did not report the status of a 2017 sex trafficking case involving police officers and members of the military. The government reported that in order to reduce official complicity, it rigorously screened and supervised security personnel providing services in border areas; it also increased salaries and training to officers. The government did not have courts specifically for trafficking cases, nor was there a separate judicial budget for trafficking. Courts used a virtual hearing system until mid-December 2021. The government also reported that experienced law enforcement personnel were insufficient at times due to COVID-19 cases and mitigation policies, which shifted personnel to enforcing curfews and other pandemic policies.

The National Migration Institute (INM) reported it trained a total of 155 people during the reporting period, including employees of the Directorate General of Migration on detecting the crime of trafficking and employees at the Ministry of Defense on the identification of fraudulent documents and imposters. An international organization funded the majority of the workshops. The National School of the Judiciary trained its personnel on trafficking. The National Police, in partnership with an NGO and an international organization, carried out training for 300 investigators including police officers, prosecutors, other public servants, as well as members of civil society on trafficking and CSEC investigations.

## PROTECTION

The government maintained victim protection efforts. Authorities reported identifying 65 victims (29 of sex trafficking, eight of labor trafficking, and 28 of unspecified exploitation including pandering), compared with 95 potential victims (82 of sex trafficking and 13 of labor trafficking) in 2020, 195 potential victims in 2019, and 96 potential victims in 2018. Of the sex trafficking victims, six were women, including four Dominicans and two Colombians, 21 were girls, including 18 Dominicans and three Haitians, and two were Dominican boys. Of the labor trafficking victims, one was a Venezuelan woman, one was a U.S. citizen man, four were Dominican girls, and two were U.S. citizen boys. Of the other victims, 11 were women, 15 were men, and two were girls, all of whom were Dominican. NGOs initially identified and referred to authorities three of the child sex trafficking victims. Observers noted data collection improved somewhat during the current reporting period as the number of reported sex trafficking victims in previous reporting periods may have included individuals in commercial sex who were not victims present

during raids of nightclubs. In current and previous reporting periods, statistics may not have included potential Haitian victims not screened or referred before deportation, despite the known prevalence of trafficking among Haitian migrants. The government reported it referred all 65 victims to government or government-supported NGO services and all received services, compared with 12 confirmed victims referred to care in the previous reporting period, but it did not specify which services the victims received. Observers also noted data collection improved with respect to the government's reporting of individuals referred to care.

The government largely relied on NGOs and religious-based organizations to provide accommodations for foreign and Dominican trafficking victims in addition to psychological, reintegration, repatriation, and medical assistance and services. These organizations had limited technical skills and resources and lacked capacity to provide for the large number of victims in country. An NGO reported the National Council for Children and Adolescents (CONANI) experienced two changes in leadership during the reporting period, neither of which improved the performance of the agency, which still struggled to provide emergency care for child victims and psychotherapeutic treatment for victims. The government reported implementing health protocols for victim services in response to the pandemic. The Tourist Police identified child victims during patrols or from public calls at tourist attractions, such as parks and clandestine privately-owned hostels; other tourist areas such as beaches and spas were closed due to the pandemic. The Tourist Police provided personal protective equipment kits with gloves, masks, and hand sanitizer to child victims.

The government reported PETT's investigations department identified victims or possible victims during operations. When carrying out an operation or investigation, the government reported using screening and referral protocols. However, government and outside observers noted authorities did not consistently or effectively implement the protocols, particularly with regard to screening detained migrants. The government reported that, when detaining or arresting individuals in commercial sex, migrants, or other at-risk groups, law enforcement, immigration, and social services personnel conducted an assessment to determine if they were trafficking victims; however, it did not identify any victims as a result of these assessment. Police may have penalized child trafficking victims, particularly those involved in robbery gangs or illicit narcotics, for unlawful acts traffickers compelled them to commit. An NGO also reported the lack of interpreters, particularly for Haitian nationals, continued to hinder victim identification efforts. With the support of an international organization and an NGO, the Directorate General of Migration, the Security Department (CSEC), and the two specialized departments of the Attorney General and the National Police signed an MOU in March 2022 to improve the airport screening process for trafficking victims. Authorities likely detained, arrested, and deported some unidentified trafficking victims, including Venezuelan migrants. The government and an international organization developed and used standard operating procedures for children recovered in international waters.

The government reported it referred all child victims to the National Directorate for Children, Adolescents, and Family to coordinate victim services. CONANI provided protection both in its shelters and in residential programs run by NGOs for as long as required. The Central Directorate of the Tourism Police arranged lodging for potential child victims in conjunction with CONANI and NGOs. The government opened a permanent shelter for trafficking victims run by the Ministry of Women in July 2021 with capacity for 24 adult victims; the government sheltered five victims there during the reporting period. The Ministry of Women reported it opened an additional 15 shelters for victims of gender-based violence including trafficking victims during the reporting period. The trafficking shelter reportedly provided psychological and legal assistance, immigration support, comprehensive health care, food, education, and job training. An NGO reported the government continued to offer victims services on a temporary basis and government funding and service quality was inadequate. RELEVIC could also provide public lawyers to represent victims. The government reported it also provided legal assistance for victims who wished to file civil suits for compensation against the traffickers; NGOs reported prosecutors did not always pursue restitution for victims and without public legal assistance victims were often unable to afford to pursue the case. The government reported

the Department of Mental Health provided psychological assistance to victims. The National Health Service could conduct medical evaluations of trafficking victims at hospitals in Santo Domingo. The government reported it worked with the embassies and consulates of the country of origin of foreign victims to provide consular and repatriation services and represent their interests as necessary. The government reported it tailored services according to the victims' needs. An international organization reported the government did not refer or provided delayed or insufficient services for female Haitian trafficking victims.

An international organization reported finalizing a joint project with the judiciary to develop an interview protocol for child victims and witnesses of crimes of sexual violence that established guidelines for abiding by applicable human rights concerns and intended to avoid re-traumatizing the victims and witnesses; the government did not report implementing the protocol by the end of the reporting period. The government reported providing support to 56 victims in the investigation or prosecution of their alleged traffickers and conducting interviews of victim-witnesses in a Gesell Chamber to avoid re-victimization of survivors. The trafficking law did not provide immigration protections for trafficking victims whether or not they assisted with court cases. However, the government reported it did not detain or deport trafficking victims and that if victims wished to return to their country of origin, the government would forgive the overstay fee they may have incurred. Local NGOs stated that although the government did not deport foreign trafficking victims, it also did not offer temporary residence or work permits or take constructive steps to regularize a victim's immigration status after a short period of time. As a result, foreign victims may have found themselves without legal status, which increased their vulnerability to trafficking. The government permitted victims to work. An NGO reported judges could limit victims' movement, disincentivizing their participation in judicial actions. The government reported training officials on legal support and protection systems and assistance for victims and the identification and protection of child victims. The government reported no Dominican trafficking victims were identified abroad.

## PREVENTION

The government maintained prevention efforts. CITIM, the national coordinating body responsible for efforts against trafficking chaired by the Ministry of Foreign Affairs, met twice. The government reported it held six joint meetings between the National Steering Committee to Combat Child Labor and the Commission against Abuse and Commercial Sexual Exploitation. The government reported it delayed passage of the draft trafficking legislation in order to seek input from survivors in December 2021. The government did not complete its development of a new NAP to address trafficking. The government did not allocate specific funds for implementation of its existing 2018 NAP beyond the standard operating budgets for CITIM institutions. However, it allocated funds to the Ministry of Women for new shelters. The Ministry of Foreign Affairs did not publish on its website an annual evaluation of anti-trafficking efforts of each CITIM member institution as it had done in prior years. INM reported it implemented a research project on trafficking with funding from a foreign donor from 2018 to 2021; it studied trafficking among unaccompanied migrant children and adolescents and researched Dominican women exploited in trafficking abroad and their relationships with family members in the Dominican Republic, through case studies in Spain, Switzerland, and Costa Rica. INM shared the results of its studies with experts and made the results available to the public.

The government, in collaboration with an NGO, raised public awareness of trafficking and sexual exploitation in high tourist areas. The Ministry of Labor (MOL) carried out, in cooperation with an international organization and with funding from a foreign donor, an awareness campaign in Spanish against child labor. The government continued to disseminate material on billboards and to the local press and radio through the "Ojo Pelao" ("Eyes Peeled") awareness and prevention campaign for potential victims, focusing particularly on those individuals in commercial sex. PETT held awareness-raising roundtables with community leaders and members in partnership with NGOs. The government promoted the opening of the trafficking shelter. The government continued the national "No Hay Excusas" ("No Excuses") campaign against child sexual exploitation. The government conducted an awareness campaign for the Tourism Police on trafficking and child labor in coordination with an

**ECUADOR**

international organization and trained officials on Dominican passport security measures. The government provided teaching facilitators, transportation, facilities and equipment, and refreshments.

PETT operated a dedicated 24/7 national trafficking hotline and reported it received calls on 16 trafficking cases during the reporting period. Four other general hotlines and a new email address could also receive human trafficking calls in Spanish, English, French, and Haitian Creole. In addition, CONANI operated a hotline for the referral of children without appropriate care during the pandemic.

The government made some efforts to address vulnerabilities among migrant populations. Starting in April 2021, approximately 43,000 Venezuelans with irregular migratory status registered to normalize their status with the possibility to work or study until the Maduro regime declared an end to the current situation in the country. The government reported that although this program was not directly related to trafficking, it nonetheless provided a preventive measure for a group at high risk of trafficking. Media reported the government suspended a plan in January 2022 to provide Haitians in border areas with identification cards to facilitate commercial exchange. The Ministry of Interior also refused to process Dominican citizenship to 50 persons of Haitian descent granted via presidential decree and continued to decline to renew work permits for more than 200,000 immigrants and Dominicans of Haitian descent who obtained documentation after a 2014 law. Observers noted that barring residency permits to Haitians and their descendants—including those born in the Dominican Republic who had never been to Haiti—caused a lack of access to the formal labor sector, secondary and post-secondary education, and medical care and caused risks of deportation to Haiti at any time, leaving them vulnerable to trafficking. In spite of the government's obligations to enforce its labor laws under the Central American Free Trade Agreement, observers noted the lack of documentation faced by most workers in the sugar industry left them at risk for abuse, including trafficking. In January 2022, the government announced a new policy for agricultural and construction companies to register undocumented workers, who were primarily Haitian, through a temporary work permit program valid for one year at a time; however, registration would begin with Haitian citizens who had a passport, a national identity card, or a birth certificate, and beneficiaries under the law would be required to have some form of valid identification.

The labor code prohibited the charging of fees for the recruitment of workers; the recruitment of workers through fraudulent offers of employment; misrepresentation of wages, working conditions, location, or nature of work; and the confiscation or denial of workers' access to identity documents. The MOL reported working with a foreign government to review regulations on supervision and protection for workers and those seeking employment with the goal of improving the National System for the Regulation of Employment Agencies. The government drafted revised public procurement legislation that would change awards criteria from the lowest price offer to that with the highest value for money, prevent abnormally low offers from being awarded, and incorporate and implement the Regulatory Compliance Program in public procurement; the legislation remained pending at the end of the reporting period. The government reported 56,938 labor inspections, compared with 41,953 labor inspections in 2020; the government trained all labor inspectors on trafficking in September 2021. Complaints about child labor could be made electronically, by telephone, or in person at any of the 40 offices of the MOL. The government did not make efforts to reduce the demand for commercial sex. The government carried out child sex tourism awareness-raising activities in main tourist areas. The government continued to participate in a multi-country operation to identify and investigate individuals traveling overseas who had been convicted of sexual crimes against children and may engage in sex tourism. The government reported it denied entry to more than 270 individuals during the reporting period as being potential sex tourists. Laws provided for the prosecution of Dominican citizens who engage in child sex tourism abroad; the government did not report any prosecutions for child sex tourism. The Ministry of Foreign Affairs trained diplomats through six virtual trainings. The government trained army personnel prior to their participation in overseas peacekeeping missions.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the Dominican Republic, and traffickers exploit victims from the Dominican Republic abroad. Dominican women and children, particularly from impoverished areas, were sex trafficking victims throughout the Dominican Republic, the Caribbean, South and Central America, Europe, the Middle East, and the United States. Foreign victims especially from Haiti, and from other parts of the Caribbean, Asia, and Latin America, were trafficking victims in the Dominican Republic. The Dominican Republic has the largest stateless population in the Western Hemisphere; a 2014 law created a mechanism to provide citizenship papers or a naturalization process to stateless persons, but the law has not been properly implemented, leaving at least 135,000 Dominicans of Haitian descent effectively stateless and vulnerable to trafficking. Experts noted an increase in the number of Venezuelan trafficking victims in the Dominican Republic since the onset of Venezuela's economic and political crisis. Cuban nationals working as doctors in prior reporting periods and baseball players may have been forced to work by the Cuban government. The Dominican Republic is a destination for sex tourists primarily from North America and Europe for child sex trafficking. Sex trafficking of 15- to 17-year-old girls occurs in streets, in parks, and on beaches. Traffickers operating in networks continue to employ methods to mask their activities, including the use of catalogs to sell victims to potential clients, using private homes, rented private apartments, or extended stay hotels to house victims. The government reported its research in 2021 showed that during the pandemic, traffickers increasingly used online platforms for recruitment and exploitation. In cases of sexual exploitation of children, WhatsApp chats and social media are used to attract children and exploit them. NGOs report police complicity in areas known for child sex trafficking. Government officials and NGOs report an increase in traffickers recruiting Colombian and Venezuelan women to dance in strip clubs and later coerce them into sex trafficking. Traffickers lure Dominican women to work in nightclubs in the Middle East, Africa, the Caribbean, and Latin America and subject them to sex trafficking. The pandemic forced many companies to idle workers at partial salaries or lay them off entirely, increasing their vulnerability to trafficking. The government offered unemployment benefits, but many households sought informal labor opportunities. The government reported an increase in child labor in 2021 due to the pandemic. Dominican officials and NGOs documented cases of children forced into domestic service, street vending, begging, agricultural work, construction, robbery gangs, and moving illicit narcotics. In 2020, the government described an increase in Dominican trafficking victims, specifically children, brought from the interior of the country to coastal tourist areas. There are reports of forced labor of adults in construction, agricultural, and service sectors. The precarious legal situation for Dominicans of Haitian descent, the fear of deportation, and the discrimination they face increases their risks for trafficking and labor abuses, including in the sugar industry. Haitian women report smugglers often become traffickers for the purpose of sexual exploitation along the border, and observers note traffickers operate along the border with impunity and sometimes with the assistance of corrupt government officials who accept bribes to allow undocumented crossings. Unofficial border crossings remain unmonitored and porous, leaving migrants, including children, vulnerable to trafficking. In December 2021, media reported statements by senators that the Haitian-Dominican border lacked official control, thereby facilitating trafficking. LGBTQI+ individuals experience high levels of violence, which may include trafficking. An increased number of unaccompanied children at risk for trafficking were interdicted and returned from the high seas surrounding Puerto Rico during the reporting period.

## ECUADOR: TIER 2

The Government of Ecuador does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Ecuador

**ECUADOR**

remained on Tier 2. These efforts included increasing prosecutions and convictions of traffickers, investigating forced labor cases, prosecuting three individuals in a high-profile case involving forced labor allegations, and coordinating with foreign governments to repatriate victims and bring traffickers to justice. However, the government did not meet the minimum standards in several areas. Authorities continued to make insufficient efforts to prosecute or convict labor traffickers. The government did not fund civil society organizations in a timely and consistent manner, which left victims vulnerable to re-trafficking and also led to the closure of a critically important shelter for victims in the witness protection program. In addition, specialized services for all victims remained unavailable in most of the country, including adults who made up the majority of the victims identified.



ECUADOR TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**
Improve efforts to address forced labor, including criminally prosecuting labor traffickers and complicit officials, training labor inspectors on indicators of forced labor, and conducting proactive and unannounced labor inspections in sectors vulnerable to exploitation, such as banana plantations, floriculture, hemp (abaca), and mining. • Fund and increase support for NGOs that provided victim services. • Provide specialized services for victims of forced labor and sex trafficking, including adults, boys, and girls younger than 12. • Vigorously investigate, prosecute, and convict traffickers, including public officials complicit in trafficking. • Establish systems to protect workers from labor trafficking, including amending legal provisions to prohibit employers from withholding passports or travel documents from workers, collecting worker-paid recruitment fees, and allowing foreign workers to change employers without facing penalties or deportation. • Appoint a specialized prosecutor to focus solely on trafficking crimes. • Adopt comprehensive stand-alone anti-trafficking legislation that criminalizes all forms of trafficking in line with international definitions and stipulates protection measures and preventive techniques to combat trafficking. • Increase proactive identification of and services for trafficking victims among vulnerable populations, such as irregular migrants, Indigenous communities, LGBTQI+ individuals, some foreign workers, and individuals in commercial sex. • Increase victim-centered anti-trafficking training for labor inspectors, police officers, judges, immigration officials, social workers, and other government officials, particularly to enhance victim identification.

**PROSECUTION**
The government maintained prosecution efforts. Articles 91 and 92 of the 2014 Criminal Code (COIP) criminalized all forms of labor trafficking and some forms of sex trafficking and prescribed penalties ranging from 13 to 16 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as kidnapping. Article 91 defined trafficking broadly to include all labor exploitation, child pornography, child labor, illegal adoption, and the sale of tissues, fluids, and genetic materials of living persons. In 2020, the government amended the definition of trafficking within Article 91 to better align with the definition of trafficking under international law. The amendment correctly established the use of force, fraud, or coercion as an essential element of an adult trafficking offense. However, the amendment did not include a necessary provision indicating that the element was unnecessary in the case of sex trafficking offenses involving child victims. Therefore, all forms of child sex trafficking were no longer explicitly criminalized under Article 91. Observers indicated that the absence of comprehensive anti-trafficking legislation remained a challenge in the fight against trafficking, due to confusion over the fact that different legal provisions, including the Human Mobility Law,

the penal code, and the labor code, cover different aspects of the government's response to trafficking.

The Directorate for the Prevention of Trafficking in Persons and Migrant Smuggling, the lead anti-trafficking office within the Ministry of Government (MOG), reported authorities initiated 93 investigations into alleged trafficking crimes, including 15 cases of forced labor, compared with 126 investigations in 2020 and 132 in 2019. Police arrested 65 individuals suspected of trafficking crimes (18 for sex trafficking and 47 for unspecified exploitation), compared with 22 in 2020 and 25 in 2019. In 2021, authorities prosecuted 17 sex trafficking cases involving 47 individuals, compared to seven trafficking cases and eight individuals in 2020 and eight trafficking cases involving 12 individuals in 2019. During the reporting period in a notable and high-profile case involving allegations of forced labor in an abaca hemp plantation, the Specialized Prosecutor's Office in Transnational and International Organized Crime (FEDOTI) charged the current CEO and two of his predecessors with human trafficking crimes for the alleged forced labor of 123 victims. The case remained pending at the end of the reporting period. In 2021, the government convicted 13 traffickers, of which 10 were sentenced to a minimum of 13 years in prison and a fine of 150 times the statutory minimum wage ($63,750); courts subsequently acquitted two traffickers on appeal, and there were no additional details on the last case. This compares to eight traffickers convicted in 2020 and nine in 2019. Because the criminal code's definition of trafficking under Article 91 was broader than the definition of trafficking under international law, some of the investigations, prosecutions, and convictions reported under this law may not have been trafficking cases.

The Anti-Trafficking Unit (ATU), under the National Police Unit for Crimes against Children and Adolescents, was the primary law enforcement unit responsible for investigating trafficking cases. The ATU remained understaffed and under-resourced. The frequent rotation of staff for mandatory police training reduced the number of operational staff at a given time, likely affecting their readiness. In 2021, stakeholders reported the pandemic severely affected the ATU and its ability to conduct anti-trafficking operations, mostly due to mitigation measures that reduced staffing even further. ATU officials reported a 40 percent decrease in cases reported, which authorities attributed to possible victims' fear of contagion. The MOG also reported being understaffed due to illness and other impacts of the pandemic. FEDOTI had responsibility for trafficking cases at the national level; however, due to its broad mandate, most of its work focused on the prosecution of non-trafficking crimes. Authorities recognized sex trafficking was most prevalent in coastal provinces; however, government efforts to investigate and prosecute traffickers, and identify and protect victims in major port cities such as Guayaquil, were deficient. The MOG—in some cases with the support of international organizations or foreign governments—trained 2,189 government officials, including police officers, community police chiefs, prosecutors, and judges, in victim identification, victim-centered engagement, and investigating and prosecuting trafficking crimes, compared with 1,092 in 2020 and 605 trained in 2019.

The government did not report any investigations, prosecutions, or convictions of any government employees complicit in trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year, and cases from previous years remained mostly unresolved. NGOs reported immigration officials at border crossings allowed alleged traffickers to transport potential sex trafficking victims to neighboring countries. During the reporting period, a government official reported possible corrupt practices at the labor inspectorate, highlighting that labor inspectors often accepted bribes to overlook violations. With support from an international organization, the MOG, the national police, and the Attorney General's Office (AGO) finalized a guide to help law enforcement officials identify, handle, and use evidence in trafficking cases, but authorities did not report relevant officials received any training on its use. The government cooperated with Peruvian authorities on a case involving two Ecuadorian victims identified in Peru. Jointly, law enforcement authorities arrested four individuals, three in Ecuador and one in Peru, for their alleged involvement in this case. Similarly, the government cooperated with Colombian authorities to repatriate two Ecuadorian victims identified in Colombia; however, civil society

Haiti AR_000693

organizations reported insufficient coordination between Colombian and Ecuadorian authorities on trafficking prosecutions.

## PROTECTION

The government decreased protection efforts. In 2021, authorities identified 51 victims of trafficking, 31 for sex trafficking (17 girls, 13 women, and one boy) and 20 for forced labor (nine girls, three women, five boys, and three men), compared with 2020 when the government identified 140 victims, among whom an NGO identified 10 and assisted 23. Civil society organizations reported providing shelter to 66 victims, including 51 victims of sex trafficking, four victims of forced labor, and 11 victims of both sex and labor trafficking (58 Ecuadorian and eight Venezuelan). Separately, an international organization reported assisting 79 victims, including 69 women, four men, and six girls (61 foreign nationals and 18 Ecuadorians); one of the victims identified as LGBTQI+. The government had a victim identification manual to aid with the proactive identification, and authorities regularly referred victims to services. In 2021, NGOs noted a decrease in the number of cases referred by police given insufficient staffing at the NIU as a result of the pandemic. Authorities did not report how much money had been dedicated for victim protection services, compared with 2020 when the government dedicated $1.45 million for victim protection and assistance. NGOs relied on international support to maintain shelter operations given significant delays in government funding for services. The government—in some cases with the support of international organizations—trained NGOs, public officials, and teachers in victim protection measures.

The Human Rights Secretariat (SDH) was the entity responsible for assisting adult victims of trafficking. It operated five non-specialized shelters and 46 care centers where trafficking victims had limited options for general ambulatory services by interdisciplinary teams that comprised psychologists, social workers, and attorneys. The Ministry of Social and Economic Inclusion (MIES) was responsible for assisting child trafficking victims; however, the government did not have specialized services for child victims of forced labor, boy victims of sex trafficking, and girl sex trafficking victims younger than the age of 12. Three specialized shelters provided services to female adolescent sex trafficking victims. Civil society organizations noted government assistance for victims was good but limited in most parts of the country. Police reported challenges finding shelters for victims, particularly in provinces outside the capital; thus, police sometimes placed victims in non-specialized shelters until space in a specialized shelter became available. The government had two separate assistance protocols to outline minimum standards of care given to female adult and adolescent trafficking victims in specialized and non-specialized shelters. Authorities did not report providing specialized care for victims in non-specialized shelters during the reporting period. During the pandemic, government officials reported identifying and assisting victims but noted measures taken to mitigate the spread of the virus, such as lockdowns and travel restrictions, hindered these efforts. International organizations expressed concern over the lack of protection for all victims, including victims of forced labor, boys, adults, individuals with disabilities, and girls younger than 12. NGOs continued to play a crucial role in helping the government carry out victim protection services during the pandemic.

The Office of the Prosecutor General's formal witness protection program (SPAVT) could provide immediate support to victims, allowing them a 30-day reflection period before deciding whether to participate in the penal process against their traffickers. If victims chose to assist in the prosecution of their traffickers, the government continued to provide services through SPAVT; otherwise, officials referred child victims to MIES and adult victims to SDH to help with their reintegration. During the reflection period, services offered by the SPAVT usually included shelter, medical assistance, legal support, psychological care, job placement, and assistance with school or university admissions. The SPAVT program assisted 10 victims during the year but did not provide shelter to any, as the shelter closed due to lack of funds for necessary facility repairs. Foreign victims had access to the same services as Ecuadorian victims, and in 2021, at least eight Venezuelan victims were assisted in government-funded shelters. The government had mechanisms to repatriate victims, and Ecuadorian diplomatic and consular missions abroad had funding to provide food, lodging, and airplane tickets to

Ecuadorian victims seeking repatriation. In 2021, officials repatriated 15 Ecuadorian victims identified abroad, one in Chile, two in Colombia, six in Peru, and six in Uruguay. Authorities did not report if any of the foreign victims identified requested temporary residency status. The Human Mobility Law guaranteed protection against refoulement to countries where the lives of victims' or their relatives were at risk, including foreign victims of trafficking. Authorities reported they could grant temporary or permanent residency to foreign victims, and in cases where the victims wished to repatriate, the government assisted.

## PREVENTION

The government maintained prevention efforts. The MOG chaired the Inter-Institutional Committee for the Prevention of Trafficking in Persons. In 2021, the national coordinating body met three times and the committee's four sub-working groups met twice each. The government continued implementing the 2019-2030 national action plan for the elimination of trafficking (PACTA) but did not report funding the interagency members of the anti-trafficking committee responsible for the implementation of PACTA-mandated activities. This contrasted with the previous year, when authorities reported funding and implementing 90 percent of committee members' activities under PACTA, despite the pandemic. Officials launched an interactive map displaying trafficking crimes nationwide to understand trends better and inform policymaking. In 2021, the ATU opened permanent offices in Quito and Guayaquil airports to monitor and respond to international trafficking crimes. Authorities conducted some public awareness campaigns but did not provide details on the targeted audiences or the effectiveness of such campaigns. Officials—in some cases with the support of international organizations—provided training for teachers, civil servants, and youth in the prevention of trafficking crimes. The criminal code prohibited sex tourism. The government did not report investigations of child sex tourism, prosecutions, or convictions of child sex tourists. Authorities did not provide an update on the status of the protocol developed in 2020 by the Ministry of Tourism to help hotels detect cases of sexual exploitation of children, including trafficking.

Authorities did not make sufficient efforts to address forced labor. The Ministry of Labor (MOL) did not have a victim identification protocol for labor inspectors or trained dedicated staff that could identify forced labor. According to government officials, the pandemic impacted their ability to conduct in-person labor inspections. In 2021, officials reported the MOL conducted 415 labor inspections and identified one case of sex trafficking in Guayaquil and no cases of forced labor. The MOL reported conducting labor inspections but did not report screening for trafficking indicators or conducting inspections in sectors with vulnerable workers, such as banana plantations, abaca hemp, flower farms, mining, and palm plantations. NGOs and some government officials expressed concern the MOL did not make sufficient efforts to investigate forced labor. The MOL required employers to register the contracts of all foreign workers so authorities could verify they had adequate work conditions and salaries. Ecuadorian law did not prohibit labor recruitment practices that traffickers commonly exploit, such as charging worker recruitment fees, confiscation of workers' passports, or allowing migrant workers to change employers without obtaining special permissions or losing their work permit. The absence of specific prohibitions against these practices increased the vulnerability of workers to exploitation. The government did not report efforts to reduce the demand for commercial sex acts. The government operated a hotline for the public to report crimes. In 2021, calls to the hotline led to an investigation that concluded with the arrest of four traffickers and the identification of three victims.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Ecuador, and traffickers exploit victims from Ecuador abroad. Traffickers exploit Ecuadorian adults and children in sex trafficking and forced labor within the country, including in domestic service; begging; banana, abaca hemp, and palm plantations; floriculture; shrimp farming; fishing; sweatshops; street vending; mining; and other areas of the informal economy. In 2019, the ombudsman's office released a report on behalf of hundreds of agricultural workers and their families accusing a multinational corporation of child labor, forced labor, and practices analogous to slavery. According to sources,

EGYPT

including the ombudsman's office, abaca hemp workers, mostly Afro-Ecuadorians, lived in plantations under tin roofs in subhuman conditions without running water or electricity. Workers' housing was in remote locations inside the plantations, and access roads were often locked to prevent the workers' freedom of movement. Most of the workers at the start of the supply chain did not have labor contracts in place and had to provide between three to five tons of abaca hemp to receive payment for their work. Women and girls worked as camp cooks and did not receive payments for their work. In 2021, a judge ruled in favor of the workers and ordered the company to pay compensation; however, the company continued to contest the ruling. The judge also noted institutional abandonment by the government, specifically the MOG and the MOL, noting authorities had knowledge of concerning violations dating back to 2018 and did not make resolute efforts to protect the victims and bring those responsible to justice, allowing them to operate with impunity. In early 2022, the AGO indicted the current and two former CEOs for human trafficking. This is the largest criminal case in terms of victims of alleged human trafficking crimes in Ecuador's history.

Sex trafficking is most prevalent in coastal provinces, including El Oro, Guayas, Manabí, Los Ríos, and northern border provinces including Carchi, Esmeraldas, Loja, and Sucumbíos. Sixty percent of child female sex trafficking victims, whom one of the specialized shelters identified and assisted, originate from Quevedo, Los Ríos province. Indigenous and Afro-Ecuadorians, Colombian refugees, and Venezuelan migrants are particularly vulnerable to trafficking. Women, children, LGBTQI+ individuals, refugees, and migrants continue to be the most at risk for sex trafficking; Indigenous persons and People's Republic of China national workers are vulnerable to forced labor. Traffickers promising a better life to migrants from South and Central America, the Caribbean, and to a lesser extent, Africa and Asia, confiscate documents, impose debts, and threaten or force migrants into commercial sex upon the victims' arrival in Ecuador. Traffickers exploit Colombian, Peruvian, Venezuelan, and to a lesser extent, Central American women and girls in sex trafficking and domestic servitude and forced begging. Traffickers increasingly use social media networks to recruit and groom individuals to later exploit them in sex and labor trafficking. Traffickers use Ecuador as a transit route for trafficking victims from Colombia, Venezuela, and the Caribbean to other South American countries and Europe. In 2021, an international organization and other observers noted migrants, unable to enter the country legally, opted for illegal border crossings, which significantly increased their vulnerability to gender-based violence, exploitation, and human trafficking crimes. Traffickers recruit children from impoverished Indigenous families under false promises of employment and subject them to forced begging, domestic servitude, or forced labor in sweatshops and street and commercial vending in Ecuador and other South American countries. Ecuadorian children are subjected to forced labor in illicit activities, such as drug trafficking and robbery. Traffickers exploit Ecuadorian adults and children in sex trafficking and forced labor abroad, including in the United States and other South American countries, particularly Chile and Colombia. Traffickers exploit Ecuadorian children in sex trafficking and forced labor in Chile, Colombia, Peru, and to a lesser degree in Argentina, Spain, and Suriname. Some Ecuadorian trafficking victims are initially smuggled and later exploited in commercial sex or forced labor in third countries, including forced criminality in drug trafficking. Allegedly, some corrupt Ecuadorian officials have alerted traffickers to law enforcement operations or labor inspections, and some local authorities assisted traffickers in procuring falsified identity documents, resulting in victims' lack of confidence in the police and a reluctance to report potential cases. Colombian illegal armed groups target and forcibly recruit Ecuadorian children living along the northern border. Traffickers lure vulnerable, displaced Venezuelans with fraudulent employment opportunities, particularly those in irregular status, and later exploit them into sex trafficking and forced labor.

## EGYPT: TIER 2

The Government of Egypt does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Egypt remained on Tier 2. These efforts included increasing prosecutions and fully operationalizing a specialized trafficking shelter. In addition, the government established eight specialized prosecution offices to manage trafficking and irregular migration cases and acquitted 120 trafficking victims wrongfully charged with prostitution and other crimes. However, the government did not meet the minimum standards in several key areas. Courts decreased convictions, and the government identified fewer victims. In addition, the government used trafficking charges to prosecute politically-motivated, non-trafficking cases thereby undercutting the government's efforts to hold sex and labor traffickers criminally accountable. Police reportedly arbitrarily arrested and subjected at least 30 refugees and asylum seekers to forced labor during the reporting period. While the government drafted a new national referral mechanism (NRM), it remained unimplemented, and at times authorities penalized potential victims for unlawful acts traffickers compelled them to commit, such as immigration and prostitution violations.



EGYPT TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Finalize, disseminate, implement, and utilize country-wide procedures and guidelines for law enforcement, judicial, and other relevant officials to proactively identify and refer trafficking victims to appropriate care. • Increase investigations, prosecutions, and convictions of sex and labor trafficking, and punish offenders—including complicit officials and child sex tourists—with sufficiently stringent sentences. • Expand protection services and shelters to victims of all forms of trafficking—including male and foreign victims—and allocate adequate resources and staffing for these services. • Increase efforts to ensure authorities do not penalize trafficking victims for unlawful acts traffickers compelled them to commit, such as immigration or prostitution violations. • Cease targeting of non-traffickers through non-germane, politically-motivated trafficking charges. • Fully utilize specialized trafficking courts and continue to train judicial officials in these courts on a victim-centered approach for the treatment of victims and witnesses of trafficking crimes during investigations and court proceedings. • Continue to train government officials, including police, security officials, judges, prosecutors, and social workers, on implementation of the anti-trafficking law, victim identification techniques, and victim referral procedures. • Provide a legal and regulatory environment that allows NGOs to provide services to trafficking victims and populations vulnerable to human trafficking. • Increase efforts to address and reduce the demand for "summer marriages" and commercial sex acts. • Amend the labor law to include labor protections for Egyptian and foreign domestic workers and increase overall efforts to improve protections for domestic workers.

### PROSECUTION

The government maintained uneven law enforcement efforts. The 2010 anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed penalties from three to 15 years' imprisonment and a fine for offenses involving an adult victim and up to life imprisonment and a fine for those involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The government

reported that although courts and government bodies were able to remain fully open, the pandemic continued to impact the government's law enforcement efforts. Some witnesses were reluctant to testify in courts for fear of infection despite precautionary health measures, and traffickers rapidly shifting to online methods of recruitment and exploitation challenged investigators' ability to collect evidence. In 2021, the government investigated 149 cases of alleged sex and labor trafficking crimes involving 535 suspects, compared with 259 cases involving 373 suspects for investigations initiated in 2020. The 149 investigated cases included 23 sex trafficking cases, 103 forced labor cases, and 23 cases involving an unspecified form of trafficking; the government also continued investigations into three forced labor cases and one case involving an unspecified form of trafficking begun in previous years. The government prosecuted 77 alleged perpetrators (nine for sex trafficking, 51 for forced labor, and 17 for an unspecified form of trafficking) in 2021, an increase from the 41 alleged perpetrators the government prosecuted in 2020. Courts convicted 22 perpetrators (seven perpetrators for sex trafficking, 13 perpetrators for forced labor, and two perpetrators for unspecified forms of trafficking) in 11 cases in 2021, a significant decrease from 67 traffickers convicted in 11 cases in 2020. Sentences ranged from three years' imprisonment, seizure of assets, cost of expenses, and a fine of 100,000 Egyptian Pounds ($6,380) to 15 years' imprisonment, seizure of assets, cost of expenses, and a fine of 100,000 pounds ($6,380).

Although not explicitly reported as human trafficking, the government investigated multiple cases of Egyptian peacekeepers serving in the UN peacekeeping operation in the Central African Republic for alleged sexual exploitation involving transactional sex and exploitative relationships in incidents with trafficking indicators from 2019, 2020, and 2021; the investigations were ongoing at the end of the reporting period. Aside from these cases, the government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes. However, an NGO reported police arbitrarily arrested at least 30 Sudanese refugees and asylum seekers in December 2021 and January 2022, beat them, and forced them to perform physical labor at a security facility before releasing them; the government did not report holding the officers involved accountable. During the reporting period, the government convicted five female social media "influencers" on charges of trafficking, "recruiting young women to share inappropriate content online," and publishing inappropriate content. Multiple NGOs and international observers commented the charges and convictions were inappropriate, undercut the government's efforts to hold sex and labor traffickers criminally accountable, and confused the public on the meaning of human trafficking.

In September 2021, the Prosecutor General's Office announced the establishment of eight specialized prosecution offices, one in each appellate court district, to manage trafficking and irregular migration cases. The Ministry of Justice (MOJ) maintained eight specialized judicial circuits in the courts of appeal with 30 judges assigned to prosecute human trafficking cases. During the reporting period, the National Coordinating Committee for Combating and Preventing Illegal Migration and Trafficking in Persons (NCCPIM & TIP), in partnership with international organizations, organized anti-trafficking training sessions, capacity-building workshops, and international exchanges on victim identification, referral, and protection; the anti-trafficking law; and other anti-trafficking topics for officials, including prosecutors, judges, labor inspectors, hotline operators, law enforcement, diplomats, social workers, and aviation officials.

## PROTECTION

The government maintained overall victim protection efforts. Services remained insufficient for male and foreign victims, and unidentified victims continued to be penalized for unlawful acts traffickers compelled them to commit. The government reported identifying 272 potential trafficking victims (30 sex trafficking victims, 209 forced labor victims, and 33 victims of unspecified forms of exploitation) in 2021; this was a decrease compared with the 519 trafficking victims identified in 2020. Of the 272 victims, at least 270 were Egyptian and one was a foreign national; at least 130 were adults (109 men and 21 women), and at least 142 were children (91 boys and 51 girls). The government reported referring 95 identified victims to shelter and services, compared with

all 519 victims in 2020, but did not specify what types of assistance were provided or whether the other 177 identified victims received any assistance. Although NCCPIM & TIP reported providing victim identification training to officials, the government did not report having comprehensive standard operating procedures (SOPs) to identify trafficking victims. The government reported that individual agencies used their own victim identification SOPs. Although the government maintained an NRM, authorities reportedly did not use it consistently throughout the reporting period. While some NGOs reported they received victim referrals from various governmental entities, NGOs continued to report the NRM was ineffective and underutilized, and various government stakeholders were unaware of its existence. To address these deficiencies, NCCPIM & TIP drafted an updated NRM and socialized the updated NRM with relevant government agencies; the updated NRM was pending finalization and implementation at the end of the reporting period. The National Council for Childhood and Motherhood (NCCM) also maintained 361 child protection committees and sub-committees in 27 governates around the country and worked with 15 NGOs to identify potential child trafficking cases.

Authorities typically relied on NGO referrals or for victims to self-identify; however, NGOs reported that Egyptian and foreign female victims—particularly those among African migrants and refugees—were hesitant to report or file criminal complaints against traffickers or speak to interpreters due to fear of social stigmas. Although an international organization reported improvements in the government's ability to identify trafficking victims, inconsistent victim identification and referral procedures continued to contribute to authorities potentially punishing or penalizing unidentified victims for illegal acts traffickers compelled them to commit, such as immigration violations and prostitution. For example, NGOs reported police arrested and detained female victims of sex trafficking on wrongful charges of prostitution or debauchery; judges typically released these victims due to insufficient evidence to support the charges of the crimes. During the reporting period, the government sentenced two child sex trafficking victims to prison sentences on prostitution charges. However, the government acquitted 120 trafficking victims wrongfully charged with prostitution and other crimes. Foreign female trafficking victims reported the government required them to pay overstay fees, thus preventing them from leaving the country and potentially hindering them from leaving trafficking situations.

In November 2021, the government fully operationalized the specialized trafficking shelter in Qalyoubia governorate inaugurated in November 2020, which the NCCPIM & TIP opened in cooperation with the Ministry of Social Solidarity (MoSS), NCCM, an NGO, an international organization, and a foreign government; the shelter assisted at least three female victims during the reporting period. The shelter could accommodate 28 women and girls and was staffed by female psychologists, social workers, and medical staff. The government allocated 1 million pounds ($63,780) for annual shelter operations. Foreign victims could not access the shelter, despite recommendations from stakeholders to allow foreign victims to have access; the government reported it was planning to open the shelter for foreign victims in the future. Ten shelters (in nine governorates) for violence against women (VAW), run by the MoSS, could receive female and child trafficking victims; foreign victims could access all 10 VAW MoSS shelters; and male victims could access the remaining 45 MoSS shelters throughout the country. NGOs stated that MoSS shelters were not appropriate for some trafficking victims due to concerns about security, privacy, and a lack of adequately-trained staff. MoSS bylaws stated victims were able to access the shelters without identification documents for up to three days. The government's ability to provide services to trafficking victims, especially foreign and male victims, remained limited, and the government was dependent on international organizations and NGOs to provide some victim services, including repatriation.

The government continued to mainly rely on international and civil society organizations to provide and fund victim assistance, but it did not provide financial assistance to these organizations, which affected their ability to offer protective services to victims. The government provided training to partner NGOs. The government supported victim assistance in investigations and prosecutions by offering legal assistance to all victims, protecting victims' identities, and providing physical protection when necessary. To prevent re-traumatization, the government reported

**EGYPT**

prosecutors and law enforcement interviewed victims in the presence of social workers and psychologists and prosecutors could request to hear victims' testimony in closed court sessions. In the previous reporting period, the government piloted a courtroom in Giza specialized for child victims of crime, including trafficking, which included video conferencing, separate waiting rooms for child victims, and a barrier allowing children to give testimony while protecting their identity and privacy. However, female victims of domestic servitude or sex trafficking reported a reluctance to cooperate in pursuing charges against their traffickers due to the fear of social stigma and retaliation. In a high-profile case involving an influential defendant, an NGO reported the government released photos and audio recordings of child sex trafficking victims to the media that could have exposed the victims to retaliation and psychological harm. Article 27 of the 2010 anti-trafficking law provided for a victim compensation fund, but the government did not report establishing the fund. Prosecutors could pursue restitution in trafficking cases and victims could file civil suits against their traffickers; however, the government did not report whether any victims received restitution through criminal proceedings or damages from civil suits during the reporting period. The government did not report whether it had legal alternatives to removal to countries in which victims would face retribution or hardship. During the reporting period, an NGO reported the government forcibly deported Eritrean asylum seekers, including children, without assessing protection needs; the Government of Eritrea had a government policy or pattern of human trafficking exploiting its nationals in forced labor in its compulsory national service and citizen militia by forcing them to serve for indefinite or otherwise arbitrary periods.

## PREVENTION

The government maintained efforts to prevent human trafficking. The government continued to implement the 2016-2021 National Strategy for Combating and Preventing Trafficking in Persons; the strategy was implemented using the budget allocated to NCCPIM & TIP and the 29 member agencies of NCCPIM & TIP. The government drafted a 2022-2026 national anti-trafficking strategy, which was pending approval at the end of the reporting period. NCCPIM & TIP continued to coordinate inter-ministerial anti-trafficking efforts throughout the reporting period. NCCPIM & TIP and other governmental entities continued to conduct multiple awareness-raising activities throughout the reporting period, which included some campaigns in partnership with international organizations. NCCPIM & TIP submitted semi-annual reports on its anti-trafficking efforts to the Prime Minister during the reporting period. The National Council for Human Rights, the National Council for Women, NCCM, and Administrative Control Authority continued operating hotlines to which the public could report trafficking cases. NCCPIM & TIP reported the hotlines referred 14 potential trafficking cases to prosecutors, resulting in investigations, and that NCCM's hotline received 66 trafficking calls that it processed appropriately but did not report if any victims were identified or referred to protection services as a result. The government did not report whether Egyptian law prohibited employers, recruiters, or labor agents from switching contracts without workers' consent or withholding wages, or whether worker-paid recruitment fees were prohibited. Egyptian labor law did not include specific protections for domestic workers, which continued to create greater vulnerabilities to trafficking among this population. Throughout the reporting period, the legislature continued reviewing labor legislation drafted during the previous reporting period to improve protections for Egyptian and foreign domestic workers; the bill was pending at the end of the reporting period. In the absence of labor law protections for domestic workers, the NCCPIM & TIP continued to promote a voluntary labor contract that employers of domestic workers could choose to use, which offered some protections for Egyptian domestic workers but did not provide protections for foreign domestic workers. The government did not make adequate efforts to reduce the demand for commercial sex acts or child sex tourism. The government reported providing anti-trafficking training to its troops prior to their deployment as peacekeepers. Although not explicitly reported as human trafficking, the government investigated multiple cases of Egyptian peacekeepers serving in the UN peacekeeping operation in the Central African Republic for alleged sexual exploitation involving transactional sex and exploitative relationships in incidents with trafficking indicators

from 2019, 2020, and 2021; the investigations were ongoing at the end of the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Egypt, and traffickers exploit victims from Egypt abroad. Traffickers subject Egyptian children to sex trafficking and forced labor in domestic service, street begging, drug trafficking, quarrying, and agricultural work in Egypt. Traffickers, including some parents, force Egyptian children to beg in the streets or exploit girls in sex trafficking. NGOs report the lack of economic and educational opportunities causes family members, including parents, husbands, and siblings, to subject women and girls to sex trafficking or domestic servitude to supplement family incomes. Child sex tourism occurs primarily in Giza, Cairo, and the Delta. Individuals from the Arabian Gulf, including Kuwait, Saudi Arabia, and United Arab Emirates, purchase Egyptian women and girls for "temporary marriages" or "summer marriages" for the purpose of commercial sex, including cases of sex trafficking, as well as forced labor; the victims' parents and marriage brokers, who profit from the transaction, often facilitate these arrangements. An NGO reported some parents forced underage girls in poor areas into permanent marriages where they were coerced into domestic servitude or commercial sex; an international organization also reported some husbands coerced their adult wives into sex trafficking or domestic servitude. Traffickers reportedly exploit Egyptian children in sex trafficking and forced begging in Europe. Traffickers subject Egyptian adults to forced labor in construction, agriculture, domestic work, and low-paying service jobs in the region. Due to pandemic-related restrictions, an international organization reported an increase in the use of online methods to recruit trafficking victims; during the reporting period, media reported a Saudi recruitment agency coordinated with an Egyptian marketing company to use a social media site to fraudulently recruit women into domestic servitude in other parts of the Middle East.

Traffickers subject men and women from South and Southeast Asia and East Africa to forced labor in domestic service, construction, cleaning, and begging, as well as sex trafficking. Male refugees and migrants are vulnerable to exploitative labor practices, including forced labor. Foreign domestic workers—who are not covered under Egyptian labor laws—primarily from Syria, Yemen, Bangladesh, Eritrea, Ethiopia, Indonesia, the Philippines, Nigeria, Sudan, South Sudan, Sri Lanka, and parts of West Africa are highly vulnerable to forced labor; employers at times require them to work excessive hours, confiscate their passports, withhold their wages, deny them food and medical care, refuse to provide them with work visas, and subject them to physical, sexual, and psychological abuse. Some employers file false claims of theft to further exploit domestic workers. Traffickers subject women and girls, including refugees and migrants from Asia, Sub-Saharan Africa, and the Middle East to sex trafficking in Egypt. In 2018, an international organization reported Colombian nationals were smuggled into Egypt to work in the entertainment industry, and in 2019, an NGO reported that employers in resort towns, such as Sharm El Sheikh, sexually exploit dancers from Colombia. Refugees from Syria, Sudan, South Sudan, and Yemen who live in Egypt are at risk of trafficking. For example, NGOs reported traffickers target Syrian refugees who have settled in Egypt for forced child labor, sex trafficking, and transactional marriages of girls that can lead to sexual exploitation, including sex trafficking, and forced labor. NGOs reported in January 2020 that unaccompanied children (UACs) among the African migrant population are at risk of trafficking in Egypt; Sudanese gangs reportedly target UACs to force or coerce the children to sell drugs or commit other petty crimes. Undocumented migrants and asylum-seekers from the Horn of Africa, who transit Egypt en route to Europe, are at risk of trafficking along this migration route. During the previous reporting period, there were reports trafficking networks fraudulently recruited women from Guinea for employment in Egypt; traffickers then exploited the women in domestic servitude or sex trafficking. Between 2017-2019, NGOs reported the government deported at least 21 Uyghur Muslims, the majority of whom were students at Al-Azhar University, back to the People's Republic of China (PRC) where they were vulnerable to arbitrary detention, harassment, and forced labor.

# EL SALVADOR: TIER 2 WATCH LIST

The Government of El Salvador does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included convicting more traffickers and identifying more victims. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government significantly reduced its number of specialized prosecutors. Fewer than half of all identified victims received government services or referral to outside care providers. The government did not implement procedures to identify potential trafficking victims among children apprehended for illicit gang-related activity or persons forcibly displaced from their homes. The government did not initiate any investigations, prosecutions, or convictions of officials allegedly complicit in human trafficking crimes or report progress on investigations from previous years. The government's anti-trafficking council was inactive and did not draft a new national anti-trafficking action plan (NAP), publish a report on the government's 2021 efforts, or compile data from across different agencies. Therefore El Salvador was downgraded to Tier 2 Watch List.



## PRIORITIZED RECOMMENDATIONS:

Increase specialized services for all identified trafficking victims, including shelters and access to services for adults, boys, and LGBTQI+ victims. • Develop and implement procedures to proactively identify and refer to service providers victims from at-risk groups—including individuals in commercial sex, children apprehended for illicit gang-related activities, forcibly displaced persons, and irregular migrants returning to El Salvador. • Strengthen and improve the specialized anti-trafficking prosecution unit, including by addressing staffing challenges and providing training. • Increase and institutionalize anti-trafficking training for police, immigration officials, municipal security personnel, prosecutors, and judges, with a focus on applying trauma-informed, victim-centered procedures. • Strengthen efforts to investigate, prosecute, and convict traffickers, including complicit officials and perpetrators of forced labor. • Develop a mechanism to enforce payment of court-ordered restitution to victims. • Allow authorities and the public to refer potential victims directly to government or NGO service providers, without first referring to police or prosecutors. • Provide reintegration and livelihood support services for victims' long-term wellbeing and extend witness protection services beyond the duration of a trial, particularly for victims who testify against members of organized criminal groups. • Amend the 2014 anti-trafficking law to include a definition of human trafficking consistent with international law. • Draft, allocate resources for, and implement a new NAP to combat trafficking. • Develop a case management system to improve data collection, sharing, security, and analysis related to trafficking cases. • Expand prevention measures, including through raising awareness of fraudulent recruitment for employment in El Salvador and abroad and by holding accountable employers or recruiters who commit fraudulent practices that facilitate trafficking.

## PROSECUTION

The government maintained law enforcement efforts. The 2014 Special Law Against Trafficking in Persons criminalized sex trafficking and labor trafficking and prescribed penalties of 10 to 14 years' imprisonment; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the law considered the use of force, fraud, or coercion as an aggravating factor rather than an essential element of the crime; the penalties increased to 16 to 20 years' imprisonment for trafficking offenses involving these factors. The law defined trafficking broadly to include fraudulent adoption without the purpose of exploitation, which was inconsistent with international law.

Police investigated 45 suspected trafficking cases (40 for sex trafficking and five for forced labor) involving 32 suspects in 2021, compared with 30 cases investigated in 2020 and 80 cases investigated in 2019. The government prosecuted 31 individuals in 12 cases, some of which continued from previous years. Authorities convicted 29 traffickers, including 27 for sex trafficking and two for forced labor, and acquitted two defendants. In comparison, in 2020 authorities initiated prosecution of 39 sex trafficking cases involving 31 suspects and convicted 12 traffickers. The government did not report sentences for convicted traffickers. The government did not report any new investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes nor progress in investigations from previous years. Endemic corruption and complicity, including within law enforcement, the judiciary, the prison system, and local government, remained significant obstacles to anti-trafficking law enforcement efforts. An international investigation revealed government officials in 2020 pursued political gains through collusion with financial and other incentives to gangs known to have committed trafficking crimes.

The government maintained specialized anti-trafficking police and prosecution units. Both units lacked sufficient human and material resources to effectively investigate and prosecute all cases, and the absence of an electronic case-management system limited efforts to collect, share, and analyze law enforcement information. For a second year, the government directed most law enforcement officials to focus on pandemic-related support tasks, severely limiting resources dedicated to identifying and investigating suspected cases of trafficking. In 2021, many prosecutors in the anti-trafficking unit were reassigned and not replaced, precipitating a decline from 23 prosecutors to only nine by the close of 2021.

Observers noted the attorney general's office frequently assigned different prosecutors to handle different phases of a single criminal case, which hampered its ability to prosecute cases in an efficient and cohesive manner and provide consistency to victims. They further reported prosecutors outside San Salvador lacked the autonomy to pursue investigations and were required to refer their cases to the unit's leadership in the capital. Experts noted some police used harsh questioning during victim interviews, leading to re-traumatization. Observers reported judges did not have an adequate understanding of the complexity of trafficking crimes or sufficient expertise in evidentiary processes and victim-centered procedures for trafficking cases, including the use of non-testimonial evidence to corroborate victim testimony. The government provided training workshops for prosecutors on vital topics, including victim psychology, trauma, and protecting the rights of at-risk LGBTQI+ individuals, and some officials benefitted from additional donor-funded trainings. However, overall training for law enforcement and criminal justice officials was insufficient. The government reported coordinating on investigations with the Government of Guatemala, under the auspices of a 2021 agreement signed by the Governments of El Salvador, Honduras, and Guatemala to enhance cooperation against trafficking; however, it did not provide details on victims assisted or suspects prosecuted because of these efforts.

## PROTECTION

The government decreased victim protection efforts. Although authorities identified more victims, they did not provide direct services or referral to the majority of identified victims. The government identified 95 sex trafficking victims, 60 women and 35 girls, and two forced child labor victims, gender not specified. In comparison, authorities identified 37 victims in 2020 and 124 victims in 2019. Three female victims were from Colombia, one was from Guatemala, and the remainder of identified victims were from El Salvador. NGOs identified two additional sex trafficking victims, both girls. The government provided services to 24 victims (12 women, 10 girls, and two men) and referred 11 additional child sex trafficking victims, all girls, to NGOs for

support. In 2020, the attorney general's office provided psychological care to 27 victims and collaborated with NGOs to provide financial assistance for lodging, food, basic necessities, and job placement to 36 victims; in 2019, the government assisted 111 victims. The government maintained one trafficking victims' shelter, which had the capacity to house 12 girls between the ages of 12 and 18, and provided services to 11 residents in 2021. Officials required residents to quarantine for 15 days in a general-purpose shelter before they could be admitted to the trafficking victim shelter. The government repatriated two foreign victims to their home countries.

The government's 2018 Inter-Institutional Action Protocol for the Immediate Comprehensive Care of Victims of Trafficking in Persons outlined the roles and responsibilities of government agencies in responding to trafficking victims. The protocol required all initial referrals to be made to police or prosecutors, without an option to refer potential victims directly to government or private sector service providers. In 2021, officials from the Protection Boards of Childhood and Adolescence, the National Hospitals of the Ministry of Public Health and Social Assistance, and the Directorate General for Migration and Foreigners identified and referred nine suspected trafficking cases to the anti-trafficking unit of the attorney general's office. Police received 20 trafficking-related calls to the 911 emergency division but did not report whether they identified any victims through these calls. Immigration agents had a manual to guide identification and referral of possible trafficking victims in border regions. However, the government lacked formal procedures to identify and refer trafficking victims among most vulnerable groups, including individuals in commercial sex and children apprehended for gang-related activity. Local experts reported police, immigration agents, and other first responders lacked sufficient training to properly identify, interact with, and protect victims, who were often mistaken for criminals and may have been punished for unlawful acts their traffickers compelled them to commit. In addition, experts reported authorities did not screen for indicators of human trafficking among families fleeing gang-controlled communities or other forced displacement victims; trafficking victims and at-risk persons among this population, particularly children exploited by gangs, remained uncounted in official statistics and without access to justice and specialized services.

The government provided limited assistance to victims. The government shelter provided residents with education and recreation, psycho-social care, and protective materials to prevent COVID-19 transmission. The government did not report the shelter's budget for 2021. In comparison, the government allocated a budget of $167,375 to the shelter in 2020. There were no trafficking shelters that accepted victims who were adults, boys, and/or transgender individuals; women could access shelter and services designed for domestic violence victims, while male and/or transgender victims had little to no access to government services. The government offered few long-term support or reintegration services to trafficking victims following the conclusion of investigations, leaving them at risk of re-trafficking. Although judges ordered convicted traffickers to pay restitution to victims, the government did not effectively enforce these orders, and no victims received restitution or compensation payment in 2021. The government reported providing witness protection, relative to individual safety risks, for victims participating in prosecutions. Such measures included disguising victims' identities in court and allowing victims to provide testimony by deposition or via teleconference, but this support was only available through the duration of a trial. Local experts reported a lack of adequate security measures and lengthy investigations and prosecutions led many victims to cease participation before the conclusion of criminal justice processes. Inadequate economic and livelihood assistance led victims and witnesses to leave the country in search of economic opportunity before authorities completed investigations; authorities reported the pandemic exacerbated this situation. LGBTQI+ individuals experienced discrimination within the law enforcement and judicial systems, which limited their access to justice.

Due to a lack of formal victim identification procedures for members of at-risk groups, authorities may have prosecuted or punished some unidentified victims for unlawful acts traffickers compelled them to commit. In 2021, authorities detained, jailed, prosecuted, and sentenced children for unlawful gang-related activity, including drug possession,

aggravated homicide, and illegal firearms possession without screening for indicators of trafficking. The 2014 trafficking law provided foreign victims the right to seek residency status, which would allow them to work legally. A 2019 immigration law granted foreign victims the right to obtain residency—with multiple entry and exit permission and the ability to work—for an initial period of up to two years with the option to extend; no foreign victims received residency benefits during the year.

## PREVENTION

The government decreased prevention efforts. The national anti-trafficking council, led by the Ministry of Public Security and Justice and charged with coordinating anti-trafficking efforts among 12 government institutions, met four times in 2021 but was otherwise dormant. For a second year, the council failed to draft a new national anti-trafficking action plan, as required by law, following the previous plan's conclusion in 2019. The council did not produce or share information on its legally required annual report on anti-trafficking efforts for 2021. It shared an overdue report on 2020 efforts but did not make this information available to the public. The government's data collection was unreliable, and methods varied among agencies; the council failed to fulfill its role to reconcile the data.

Officials from several government institutions and local municipalities, in coordination with an international organization, held community events to raise awareness about the dangers of irregular migration, fraudulent recruitment, and human trafficking. With support from foreign donors, the government opened five Urban Opportunity and Wellness Centers providing educational and recreational opportunities in high crime areas for children at-risk of exploitation by gangs.

The Ministry of Labor primarily managed El Salvador's recruitment process for temporary workers on H-2A visas to the United States and maintained a website, which included information on Salvadoran workers' rights and warnings against fraudulent recruitment tactics. The Ministry of Foreign Affairs partnered with the United States on additional awareness efforts targeted against fraudulent practices, such as charging workers recruitment fees. The government reported prosecutors in multiple jurisdictions pursued investigations of businesses attempting to charge fees to workers applying for H-2A visas, but it did not report prosecuting or punishing any businesses for violations. The government did not provide warnings or information against fraudulent recruitment practices for employment within El Salvador. The Labor Code prohibits withholding pay, but the government did not effectively enforce this provision. Neither the Labor Code nor the Penal Code specified fines or punishment for fraudulent recruitment of workers. The government did not issue an executive decree, as required by a 2020 supreme court decision, to establish and implement a minimum wage for domestic workers. Salvadoran law criminalized sex tourism and prescribed penalties of four to 10 years' imprisonment, but authorities did not report any investigations or prosecutions of sex tourism crimes. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in El Salvador, and traffickers exploit victims from El Salvador abroad. Traffickers exploit adults and children in sex trafficking within the country; children without parents, adolescent girls, and LGBTQI+ persons, especially transgender persons, are at particular risk. NGOs reported sex trafficking occurs in the tourism industry. Traffickers often exploit victims within their own communities or homes, sometimes their own children or other family members. Traffickers exploit Salvadoran adults and children in forced labor in agriculture, domestic service, and begging. Traffickers exploit adults and children from neighboring countries—particularly Honduras, Guatemala, and Nicaragua—in sex trafficking and forced labor in construction, domestic service, or the informal sector. Traffickers recruit victims in regions of the country with high levels of violence and capitalize on existing fears to coerce victims and their families through threats of violence. Limited government presence in gang-controlled territory exacerbates trafficking risks among vulnerable groups and limits their access to justice and protection. Many victims of forcible displacement are families fleeing the exploitation of children by gangs in their communities.

Gangs that have appropriated Indigenous land threaten Indigenous children for crossing gang territory, compelling them to drop out of school or leave home and increasing their vulnerability to exploitation. Gangs use the pretense of domestic employment to lure women into forced labor. Transnational criminal organizations and gangs including MS-13 and Barrio 18 recruit, abduct, train, arm, and subject children to forced labor in illicit activities, including assassinations, extortion, and drug trafficking—often within children's own communities. These groups subject women and children, including LGBTQI+ children, to sex trafficking and forced labor in domestic service and child care.

Traffickers exploit Salvadoran men, women, and children in sex trafficking and forced labor in Belize, Guatemala, Mexico, and the United States. Traffickers exploit some Salvadorans who irregularly migrate to the United States in forced labor, forced criminal activity, and sex trafficking en route or upon arrival. Traffickers exploit some Central and South American, African, and Asian migrants who transit El Salvador to Guatemala, Mexico, the United States, and Canada in sex and labor trafficking. Individuals without personal identification documents are highly vulnerable to trafficking. Traffickers increasingly use social media and messaging platforms to lure victims, including through false employment or educational opportunities abroad, and facilitate their exploitation; traffickers accelerated this trend as a means to reach potential victims in their own homes during the pandemic. Endemic corruption and complicity, including within law enforcement, the judiciary, the prison system, and local government, remained significant obstacles to anti-trafficking law enforcement efforts.

## EQUATORIAL GUINEA: TIER 2 WATCH LIST

The Government of Equatorial Guinea does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included increasing anti-trafficking awareness campaigns, as well as finalizing and beginning implementation of an updated 2022-2024 national action plan (NAP) and standard operating procedures (SOPs) on victim protection and care. The government improved coordination efforts among the members of the anti-trafficking Interagency Coordinating Committee (TICC). It also trained local leaders on trafficking indicators and law enforcement officials on trafficking investigations and victim identification. However, the government did not demonstrate overall increased efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government has never convicted a trafficker under its 2004 anti-trafficking law, and authorities did not prosecute alleged traffickers or identify any victims during the reporting period. The government's anti-trafficking law did not criminalize all forms of trafficking. Further, there were allegations that senior government officials were complicit in trafficking crimes. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Equatorial Guinea was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3; therefore Equatorial Guinea remained on Tier 2 Watch List for the third consecutive year.



EQUATORIAL GUINEA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Significantly increase efforts to investigate and prosecute traffickers, including allegedly complicity officials. • Prioritize the proactive identification of victims of trafficking—separate from fraudulent adoptions or other forms of abuse—including by screening vulnerable communities, such as child laborers in markets; women in commercial sex; domestic and construction workers; undocumented immigrants; North Korean and the People's Republic of China (PRC) national workers; and Cuban overseas workers, including medical professionals. • Amend the 2004 anti-trafficking law—or pass amendments to the penal code—removing the requirement of a demonstration of force, fraud, or coercion in child sex trafficking cases. • Form and provide resources to an independent agency mandated to improve the government's capacity to investigate and prosecute traffickers and identify victims. • Implement the updated anti-trafficking NAP to enhance governmental coordination. • Continue to expand training for law enforcement and judicial officials to increase their capacity to investigate, prosecute, and—following a fair and transparent trial—sentence convicted traffickers under the anti-trafficking law. • Continue to train social workers, law enforcement, labor inspectors, and immigration officials on trafficking indicators, including the difference between trafficking and migrant smuggling victims. • Increase funding for victim services and coordinate with civil society and NGOs to provide shelter for all identified trafficking victims. • Continue to include local officials in the nation-wide anti-trafficking public awareness campaigns to educate more individuals on trafficking indicators and enhance their ability to report potential victims to first responders using the government's hotline or web-based portal. • Further research the extent and nature of human trafficking within the country according to the NAP and draft an annual public report describing the government's efforts. • Screen all individuals in immigration detention or custody for indicators of human trafficking.

### PROSECUTION

The government maintained limited anti-trafficking law enforcement efforts. The 2004 Law on the Smuggling of Migrants and Trafficking in Persons criminalized some forms of sex trafficking and all forms of labor trafficking and prescribed penalties of 10 to 15 years' imprisonment and a fine of at least 50 million Central African francs (CFA) ($86,470) if the crime involved an adult victim; an additional five years would be added to the principal penalty for offenses involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with international law, Equatorial Guinea's legal framework required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense, and therefore, it did not criminalize all forms of child sex trafficking. Additionally, the law defined trafficking broadly to include illegal adoption without the purpose of exploitation. The government continued efforts to draft new penal code articles with increased victim protection requirements; however, parliament had not approved the articles by the end of the reporting period.

The government did not make comprehensive law enforcement statistics easily accessible and had limited information management capabilities and data collection. However, authorities added the National Institute of Statistics as an integral member of the anti-trafficking committee to improve the government's efforts to collect data on trafficking trends and to assess its own efforts to combat human trafficking. Media reports noted the government initiated the investigation of three Beninese women for child labor trafficking crimes in November 2021. However, officials did not report investigating any other cases or prosecuting any suspected traffickers during the reporting period. The government has never convicted a trafficker under its 2004 trafficking law. The government did not provide an update on cases reported in the previous reporting period, including the investigations into two cases of illegal sale of a child that may have included aspects of human trafficking in 2020; a possible trafficking case involving an Equatoguinean national suspect abroad; and the results of the commission of inquiry into reports of soldiers sexually exploiting minors. Judicial officials noted a lack of training resulted in authorities frequently prosecuting and convicting potential trafficking cases under related statutes, such as kidnapping, illegal adoption, or physical abuse. The government did not report cooperating with foreign counterparts on any law enforcement activities.

The government organized training in Batra for approximately 50 border agents and military personnel stationed in Equatorial Guinea's continental region. The Ministry of Social Affairs and Gender Equality (MSA) also reportedly trained community leaders, police officers, and

MSA delegates throughout the country on strategies for identifying trafficking victims. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and alleged official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Multiple credible sources alleged senior officials were involved in human trafficking, particularly in the recruitment of domestic workers in their own households or by exploiting workers in forced labor in their private businesses. Additionally, reports alleged high-level officials were involved with sex trafficking of women from countries including Brazil, the PRC, and Venezuela. Authorities at airports reportedly took bribes from foreign nationals who overstayed their visas, and judges were also accused of taking bribes and other goods in exchange for favorable rulings. Additionally, military service members at the border with Cameroon reportedly accepted bribes to let people enter the country during pandemic-related border closures between December 2021 and January 2022. Spanish authorities formally dismissed the charges against seven suspected traffickers, including Equatoguinean nationals, due to lack of evidence in a case involving a network exploiting women and girls in Spain, allegedly perpetrated with assistance from Equatoguinean military officials who may have falsified the victims' identity documents.

## PROTECTION

The government maintained limited efforts to identify victims. In 2021, the government did not report identifying any trafficking victims, compared with identifying and providing services for one potential trafficking victim in 2020. The government finalized two SOPs for victim protection and care; one for government agencies and the other for consular officers to use abroad. Pandemic-related movement restrictions affected the government's protection efforts by limiting officials' ability to inspect key sectors for trafficking victims. The government reported it suspended some services due to the pandemic. Officials continued to designate government housing as temporary shelters for victims of trafficking and domestic violence, although authorities did not report referring any victims to these shelters. The government decreased its allocated budget for anti-trafficking efforts to 75 million CFA ($129,700), compared with $566,829 in 2020, to provide services to trafficking victims and to raise awareness of the crime among vulnerable populations. The government had no formal policies to provide foreign trafficking victims legal alternatives to their removal to countries where they might face retribution or hardship.

Due to a lack of widely used formal victim identification procedures, authorities may have deported or arrested some unidentified trafficking victims. During the reporting period, government officials in Spain provided assistance to Equatoguinean victims identified in a case that allegedly involved complicity by some members of the military.

## PREVENTION

The government increased efforts to prevent trafficking. The government finalized an updated 2022-2024 NAP during the reporting period. Per the country's updated NAP, the government maintained its anti-trafficking interagency committee, which includes representatives from the Office of the Third Vice Prime Minister in charge of Human Rights, multiple ministries, and several NGOs. The government reported the committee held six meetings during 2021. The government reported it included a line item for each ministry for anti-trafficking efforts in its fiscal year 2022 budget request; however, the budget only included one trafficking line item totaling 50 million CFA ($86,470) for the Ministry of Justice, Worship, and Penitentiary institutions by the end of the reporting period. In June 2021, the Ministry of Foreign Affairs and Cooperation (MFA) reported drafting a roadmap document to address anti-trafficking gaps highlighted in previous reporting periods; observers reported there were no additional resources, if any, dedicated to the roadmap implementation. The Ministry of Interior, in collaboration with a local NGO and local corporations, hosted 10 seminars for local authorities and community leaders on human trafficking in urban districts in Malabo and Bata, reportedly training 810 local leaders. The government partnered with the same NGO to hold additional seminars to raise awareness of human trafficking among civil society and health care workers. Observers reported a public service announcement on human trafficking created

by the Ministry of National Security in 2020 continued to air on national TV stations.

The Ministry of Labor's web-based reporting platform and hotline remained active and available for individuals to anonymously report potential trafficking cases, as did the Ministry of National Security's hotlines for reporting crimes to the police. The government did not report any trafficking-related calls during the reporting period. Additionally, observers noted that the government's ongoing focus on pandemic prevention and mitigation put vulnerable populations at risk of trafficking and emboldened traffickers to operate with less risk of detection and conviction.

The Ministry of Labor continued to implement regulations requiring all companies to sign formal labor contracts with their employees. During the reporting period, Ministry of Labor officials conducted inspections; however, the government did not report identifying any trafficking victims.

Border security officials stated they increased cooperation with Gabonese and Cameroonian counterparts on screening for potential victims of trafficking; however, they did not report identifying any victims. The government did not make efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training for diplomats but reported it began developing a new training for diplomats that remained pending at the end of the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Equatorial Guinea, and traffickers exploit victims from Equatorial Guinea abroad. Despite continued education and awareness-raising efforts by the government, many civil society members and government officials still lack an understanding of human trafficking, hindering the country's ability to identify victims and address the crime. Observers reported traffickers are adjusting their tactics to increasingly use online platforms to recruit and exploit victims.

Observers reported Equatoguineans exploit the majority of trafficking victims in forced labor in domestic service and commercial sex in the cities of Malabo, Bata, Mongomo, and Ebebiyin, where relative wealth and security attracts Central and West African migrant workers. Equatoguinean traffickers exploit local and foreign women in commercial sex in these cities, with the Malabo neighborhoods of Banapa and Paraiso and the city center primary areas of concern. Foreign national men were susceptible to deceptive employment offers and forced labor in construction, agriculture, domestic work (security guards), and other low-skill jobs.

Observers noted that the sustained economic downturn due to decreasing oil prices and oil production—exacerbated by the global economic contraction caused by the pandemic—resulted in Equatoguineans in urban centers replacing some foreign domestic workers with children from rural areas in Equatorial Guinea, whom they then exploited in forced labor. Some business owners involved in the hospitality and restaurant sectors exploit hotel and bar workers in forced labor and commercial sex within the country's urban centers. Observers report LGBTQI+ youth are often left homeless and stigmatized by their families and society, increasing their vulnerability to trafficking. Measures to control the pandemic's spread—including border closures and mandatory curfews—may have increased the vulnerability of migrants and informal sector workers by reducing their ability to maintain a stable income.

Equatoguinean business owners reportedly exploit children from nearby countries—primarily Benin, Cameroon, Gabon, Nigeria, and Togo—in forced labor as domestic workers, market laborers, vendors, and launderers. Over the past five years, observers reported Equatoguinean traffickers, some of whom may be associated with the country's elites, may exploit women from Brazil, Cuba, Dominican Republic, Venezuela, and the PRC in commercial sex at nightclubs, bars, and brothels in the country. Traffickers may exploit Equatoguineans in Spain. During the reporting period, there were reports alleging members of the Equatoguinean military falsified identity documents to facilitate a sex trafficking ring in Menorca, Spain, involving women and girls.

Some business owners recruit women from Benin, Cameroon, Ethiopia, and other African countries for work in Equatorial Guinea and exploit them in forced labor or sex trafficking in markets, hair salons, or commercial sex. PRC national-owned firms recruit PRC nationals to migrate to

Equatorial Guinea for work or to engage in commercial sex; some of these businesses then confiscate workers' passports, which increases their vulnerability to forced labor or sex trafficking. Observers noted the government contracted highly-skilled professionals, such as Cuban doctors and teachers, to work in its public schools and hospitals. A small number of North Koreans working in Equatorial Guinea may have been forced to work by the North Korean government. Companies in the construction sector, among others, also sometimes held the passports of foreign workers, increasing their vulnerability to forced labor. Observers reported some corrupt and complicit government workers, including senior officials and elected representatives, participated in trafficking-related crimes during the reporting period.

# ERITREA: TIER 3

The Government of Eritrea does not fully meet the minimum standards for the elimination of trafficking and, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity, is not making significant efforts to do so; therefore Eritrea remained on Tier 3. During the reporting period, there was a government policy or pattern of human trafficking. The government continued to exploit its nationals in forced labor, via its compulsory National Service and citizen militia, by forcing them to serve for indefinite or otherwise arbitrary periods. Officials did not demobilize most individuals from government work units after their mandatory period of service, but rather it forced citizens to serve indefinitely under threats of detention, torture, or familial reprisal. The government did not demonstrate any efforts to address human trafficking.



ERITREA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Enforce existing limits on the length of active National Service to 18 months (as set forth in the Proclamation of National Service 11/199) and demobilize individuals who have exceeded the service limit. • Enact and implement an anti-trafficking law that criminalizes all forms of trafficking and prescribes penalties that are sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other grave crimes. • Develop and implement procedures to identify trafficking victims and refer all victims to services. • Extend existing labor protections to persons performing National Service and other mandatory citizen duties. • Allow Eritreans to choose their form of work and leave their employment at will. • Train government officials at all levels to identify, investigate, and prosecute trafficking crimes. • Partner with international organizations and NGOs to combat human trafficking.

## PROSECUTION

The government did not report any anti-trafficking law enforcement efforts. The Eritrean Penal Code of 2015 criminalized some forms of trafficking in persons. Article 315 criminalized trafficking in women and young persons for sexual exploitation, which was punishable by up to seven years' imprisonment; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with punishments prescribed for other serious crimes, such as kidnapping. The law did not criminalize sex trafficking of adult men. Article 297 criminalized enslavement and prescribed penalties of seven to 16 years' imprisonment, which were sufficiently stringent. Article 299 criminalized forced labor and prescribed penalties from six to 12 months' imprisonment or a fine of 20,000 to 50,000 nakfa ($1,330 to $3,330). These penalties were not sufficiently stringent. The government did not make efforts to amend its law during the reporting period.

The government has not reported investigating, prosecuting, or convicting any traffickers for the last 14 years. The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes; however, official complicity in trafficking crimes remained a significant concern, inhibiting law enforcement action during the year. The government continued to enforce arbitrary limits on the compulsory National Service. Reports alleged some partially or wholly government-funded enterprises employed National Service workers. For the second consecutive reporting period, the government did not report on efforts to train law enforcement.

## PROTECTION

The government did not report any victim protection efforts. The government has not reported any efforts to identify victims or provide services for the past seven years. The government did not report having formal procedures to proactively identify and refer trafficking victims to care. The government did not report information on services provided to trafficking victims. Individuals in rural communities generally lacked access to services of any kind. Observers reported due to a lack of formal identification procedures, authorities likely detained and arrested some unidentified trafficking victims. In some cases, the government purposefully arrested and prosecuted Eritreans fleeing the National Service. The government did not report providing foreign victims with legal alternatives to their removal to countries where they faced retribution or hardship; however, Eritrea maintained a policy against forced deportations. Eritrean law required offenders in all crimes to pay restitution, although victims had the option of suing for such in civil court rather than have the criminal court impose it. If an offender's assets are too limited to pay both restitution and the associated fines, the government mandated restitution be paid first. There were no reports that courts imposed this penalty for trafficking crimes.

## PREVENTION

The government did not report any efforts to prevent trafficking. The government reportedly maintained an interagency steering committee on trafficking and migration issues; however, the government did not report any action taken by the steering committee for the second consecutive year. The government did not report efforts to raise awareness of human trafficking. The government did not report efforts to reduce the demand for commercial sex acts or provide anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic victims in Eritrea, and traffickers exploit victims from Eritrea abroad. Proclamation 82 of 1995 requires all persons ages 18 to 40 years to perform compulsory active National Service ostensibly for a period of 18 months—six months of military training followed by 12 months of duty in a variety of military, security, or public service positions. However, since the 1998-2000 Eritrean-Ethiopian border conflict, the 18-month limit has been suspended; most individuals are not demobilized from government work units after their mandatory period of service but rather are forced to serve indefinitely under threats of detention, torture, or familial reprisal. National Service takes a wide variety of forms, including office work in government agencies and enterprises (functions ranging from lawyers, diplomats, and mid-level managers to skilled technicians and mechanics, to clerical, maintenance, and janitorial work); medical professionals; elementary and secondary school teachers; construction or other types of physical labor; and active military duty, which constitutes a small and diminishing percentage. Reports also allege officials force National Service workers to work in mining enterprises partially owned by the government; specific instances alleged to date have involved white collar occupations in mine management, technical analysis, and/or government oversight responsibilities. Conditions are often harsh for those in military service or physical labor, although some National Service members experience normal, civilian workplace conditions, albeit with low pay and, in many cases, negligible to complete lack of freedom to pursue alternative employment opportunities. International organizations report the government often subjects conscripts in the National Service to inhumane and degrading punishment, including torture, without recourse and punishes individuals that conscientiously object to service; the government continues to force conscripts to serve for

indefinite or otherwise arbitrary periods. Additionally, the government broadly restricts recruitment of Eritreans to work abroad, denying travel to most Eritreans, including those enrolled in National Service and those who have not yet performed National Service. Eritreans may be released from National Service after an indefinite number of years by petitioning the government based on criteria that shift periodically and are not fully transparent; policies and practices for obtaining release from National Service are inconsistent across organizations and job fields, but officials generally release expectant mothers and individuals who can show they have become the sole or primary source of familial support. Certain professions (e.g., medicine and teaching) exist almost exclusively within the ranks of the National Service. National Service workers without educational or vocational qualifications continue to be paid extremely low wages, and the government often substitutes food or non-food rations for wages. In addition to National Service, the government instituted a compulsory citizen militia in 2012, requiring medically fit adults, up to age 70 and not currently in the military, to join their local militia. This requirement compels individuals to carry firearms and attend military training. Local militia leaders also assign individuals to additional unpaid forced labor in agriculture work, guard duties, or national development programs, such as soil and water conservation projects on a part-time basis.

All 12th-grade students are required to complete their final year of high school education at the *Warsay-Yikealo* Secondary School, which is embedded within the *Sawa* military and training academy; those who refuse to attend cannot receive high school graduation certificates, attain higher education, or be offered some types of jobs. The program comprises seven months of academic instruction, followed by five months of basic military training. Upon graduation from *Sawa*, the government requires all students to participate in National Service in either civilian or military roles. Although it remains likely some of the students are age 17 at the time of their participation in the military training component of the *Warsay-Yikealo/Sawa* academy, there are no confirmed reports anyone younger than age 18 began military service. Government policy bans persons younger than 18 from military conscription; however, as National Service is mandatory starting at age 18, the government does not report recruiting any members of the armed forces, and it remains unclear if there is an age verification procedure that is consistently applied prior to it sending new *Sawa* graduates to active military service. Some officials detain or force into military training children who attempt to leave Eritrea, including unaccompanied children, despite some of them being younger than the minimum service age of 18. An international NGO reports that officials exploit some *Sawa* students in forced labor on either privately-owned, commercial farms or *Sawa*-owned farms. NGOs also report military commanders regularly commit gender-based violence, including sexual abuse and potential sex trafficking crimes, against girls during military training or service.

Perennially, thousands of Eritreans who flee the country are smuggled migrants seeking to be reunited with family members already overseas; escaping human rights abuses, including arbitrary arrest and detention, lack of due process, and religious persecution; searching for better economic opportunities; or hoping to avoid indefinite periods of service in the government's National Service program. Most Eritreans consensually commence their outbound journeys by paying smugglers, with the ultimate goal of seeking asylum in Europe or, at a minimum, obtaining refugee status in Ethiopia, Kenya, Egypt, Israel, or Uganda; some also strive to reach the United States. An international organization assesses that many Eritrean asylum seekers, particularly those who flee the National Service, express well-founded fears of persecution in Eritrea. Eritreans fleeing the country and Eritrean refugees in neighboring countries remain particularly vulnerable to the government indiscriminately arresting, detaining, harassing, or forcibly recalling them into the National Service. Eritrea's strict exit control procedures and limited issuance of passports compel those who cannot obtain exit visas or passports to travel clandestinely and increase their vulnerability to trafficking abroad, primarily in Sudan and Ethiopia. In 2019, an international organization assessed that traffickers exploited Eritreans in forced labor and sex trafficking primarily in Sudan, Ethiopia, and Libya. Previous reports allege international criminal groups kidnap vulnerable Eritreans living inside or in proximity to refugee camps, particularly in Sudan, and transport them to Libya, where traffickers subject them to human trafficking and

other abuses, including extortion for ransom. Some Eritreans report traffickers forcing them to work as cleaners or on construction sites during their captivity. International organizations report Eritrean Defense Forces (EDF) officials, alongside Ethiopian federal and regional forces, committed widespread human rights abuses and gender-based violence against women and girls in Tigray, including potential trafficking crimes, during the conflict in northern Ethiopia that began in November 2020. Observers report unspecified military personnel, which may have included the EDF, and other officials forced women to have sex in exchange for basic commodities and humanitarian assistance.

## ESTONIA: TIER 1

The Government of Estonia fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore Estonia remained on Tier 1. These efforts included ordering convicted traffickers to pay restitution and approving a four-year violence prevention agreement, which included several anti-trafficking activities. In addition, the government participated in a European study aimed at exploring the national practices of detecting, identifying, and protecting potential foreign trafficking victims through national policy and legislative developments. Furthermore, in response to the influx of Ukrainian refugees and foreign nationals fleeing Russia's war on Ukraine and arriving in Estonia, the government developed materials raising awareness about sex and labor trafficking and outlining the steps to report suspected trafficking and receive victim support services. Although the government meets the minimum standards, authorities prosecuted and convicted fewer traffickers under the anti-trafficking provision, specifically Section 133, of the penal code and continued to prosecute and convict traffickers under non-trafficking statutes, which weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. According to the government, there was no available exact figure for the total number of labor trafficking cases investigated; therefore the government estimated the number, rendering the data unreliable. Moreover, data for victim identification and assistance did not accurately reflect the trafficking situation in country. Finally, officials ceased funding an NGO for victim support services.



ESTONIA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Proactively investigate, prosecute, and convict traffickers under the anti-trafficking provision, specifically Section 133, of the penal code. • Develop and implement a reliable comprehensive statistical system for collecting and collating data on investigations, prosecutions, convictions, and victim identification and assistance and ensure the data reported is accurate, official, and comparable to previous years. • Ensure adequate financial support for victim support services, including funding NGOs for victim assistance. • Train relevant authorities to recognize trafficking indicators and understand different types of trafficking. • Increase efforts to proactively identify potential child trafficking victims. • Establish a specialized unit within the police to collect and verify information on trafficking-related crimes and allocate funding for investigations. • Broaden public awareness efforts to educate at-risk communities, such as children and migrant workers, on the risks of trafficking.

## PROSECUTION

The government decreased law enforcement efforts. Sections 133, 133[1], and 175 of the penal code criminalized sex trafficking and labor trafficking. Section 133 (trafficking in human beings) criminalized

Haiti AR_000703

placing a person in a situation of exploitation through force, fraud, or coercion and prescribed penalties of between one and seven years' imprisonment for offenses involving an adult victim, and three to 15 years' imprisonment for those involving a child victim. Section 133[1] (support to human trafficking) separately criminalized the transportation, delivery, escorting, acceptance, concealment, or accommodation of an individual into a situation of exploitation through force, fraud, or coercion and prescribed penalties of up to five years' imprisonment for offenses involving an adult victim, and between two and 10 years' imprisonment for those involving a child victim. Section 175 (human trafficking in order to take advantage of minors) criminalized inducing a child to engage in a criminal offense, begging, prostitution, or the production of pornography without requiring a demonstration of force, fraud, or coercion and prescribed penalties of two to 10 years' imprisonment. Authorities most often used Section 175 to prosecute child pornography cases involving no element of commercial sex. The penalties under Sections 133, 133[1] and 175 were sufficiently stringent and, with respect to sex trafficking, commensurate with the penalties prescribed for other serious crimes, such as rape.

The government included calls from the anti-trafficking hotline with any presumed element of trafficking as investigations in their 2021 data totals, before police determined the circumstances of the crime; these cases included potential crimes under Sections 133, 133[1] and 175. During the reporting period, the government began direct data collection that resulted in new categories for collecting statistics, intended to more accurately report on and inform national anti-trafficking efforts. Prior to 2021, government data regarding Section 175 did not differentiate between cases exclusively related to trafficking or cases related to other crimes, such as child pornography, which Estonian law classified as a trafficking crime, making it difficult to compare data on investigations from previous years. Moreover, according to the government, there was no exact figure available for the total number of labor trafficking cases investigated; therefore, the government estimated the number, rendering the data unreliable. In 2021, police investigated approximately 78 cases (28 sex trafficking, approximately 50 labor trafficking), compared with 35 in 2020. Of the 28 sex trafficking cases investigated, authorities found no evidence of trafficking and, therefore, pursued either child pornography or "pimping" charges. Of the approximately 50 labor trafficking cases reported, authorities confirmed one as trafficking and forwarded the case to the prosecutor's office. Under Section 133, authorities prosecuted and convicted two traffickers, a significant decrease from prosecuting 15 cases, involving 10 suspected traffickers, and convicting 14 traffickers in 2020. Courts sentenced the two convicted traffickers to three years' imprisonment and four years and one month's imprisonment, respectively, and ordered them to pay restitution to their victims. Data on prosecutions and convictions under Section 175 was not comparable to previous years. Authorities continued to prosecute and convict traffickers under non-trafficking statutes, thus weakening deterrence, not adequately reflecting the nature of the crime, and undercutting broader efforts to fight trafficking. Under non-trafficking statutes, authorities prosecuted one trafficker and convicted two traffickers for forced criminality in which a 16-year-old girl was forced to steal. Separately, while prosecutors charged a man with child sex trafficking for exploiting children in commercial sex, courts convicted him of child pornography. The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes. The Ministry of Justice (MOJ) noted difficulty prosecuting international labor trafficking cases, citing cases involving Estonian companies hiring Ukrainian or Polish temporary workers as particularly complex. As part of a regional project to enhance law enforcement cooperation and training on trafficking, Estonian, Finnish, and Latvian authorities collaborated to strengthen capacity to investigate and prosecute trafficking cases, disrupt the financial gains of traffickers, and help victims access justice.

Overextension of personnel remained the government's primary constraint, limiting specialization and knowledge of trafficking. Nationally, approximately 10 specialized investigators and four specialized prosecutors worked on trafficking cases. There was no dedicated unit within the police responsible for investigating trafficking cases; specialized investigators were part of the Drug and Organized Crime Division within each prefecture. As a result, no separate budget line

item existed for trafficking investigation efforts. Police expressed the need to establish a centralized unit that would collect and verify information on trafficking-related crimes and allocate funding for investigation efforts. Observers agreed a dedicated unit could yield successes and added it could improve the quality of cases presented to prosecutors and prioritize trafficking cases. Experts reported the need for increased training for law enforcement, prosecutors, judges, and front-line personnel on understanding different forms of exploitation and identifying trafficking victims. In 2021, the MOJ and the Ministry of Social Affairs (MSA) organized a two-day seminar for police, prosecutors, labor and custom inspectors, and victim support personnel on psychological first aid and trauma awareness; victims' support services; prosecuting trafficking crimes under the trafficking statute; and projected changes to the Victim Support Act, including creating qualification requirements for victim support personnel and updating conditions determining who receives victim support services. The police included a trafficking module, covering national and international law, forms of exploitation, and protecting victims, as part of the curriculum for future officers.

## PROTECTION

The government marginally maintained protection efforts. Data for 2021 victim identification included calls to the anti-trafficking hotline that, during initial screening, the government presumed to have some element, however slight, of force, fraud, or coercion and, in turn, considered as potential trafficking victims. In previous years, the government did not report potential trafficking victims who were involved in cases that were initially investigated but ultimately determined non-trafficking. This methodological change in reporting made it difficult to compare data from previous years and raised concerns the data reported did not provide an accurate picture of the trafficking situation. In 2021, authorities identified 417 potential victims (28 sex trafficking, 389 labor trafficking), compared with 34 in 2020. Police referred 28 identified potential sex trafficking victims to support services under the assumption that they might be trafficking victims and simultaneously conducted investigations to determine the circumstances of the crimes. Upon further investigation, police determined none of the 28 were trafficking victims. Of the 389 identified potential labor trafficking victims, authorities identified only one as a labor trafficking victim, but all 389 received government services, including assistance from the Social Insurance Board (SIB) and Labor Inspectorate (LI) to help file civil claims against employers. The vast majority of the identified potential victims were males and foreign nationals; authorities did not identify any child trafficking victims. The Police and Border Guard utilized a questionnaire and checklist to identify trafficking indicators among asylum-seekers. The government reported authorities actively screened vulnerable populations for trafficking indicators and increased resources to help screen Ukrainian refugees who were fleeing Russia's war on Ukraine and arriving in Estonia. Authorities considered individuals in commercial sex as potential victims until proven otherwise through an investigation.

The government provided identification and referral guidelines, outlining all relevant authorities' and actors' responsibilities. The Victim Support Act and the penal code allowed multiple actors, including NGOs, to identify victims and refer them to the SIB, the agency responsible for victim support services. In 2021, the government allocated €350,656 ($397,570) toward victim support services. The government utilized an information and data sharing system to expedite the exchange of information from the police to social services, ensuring potential victims received immediate assistance. Under the Victim Support Act, victims received comprehensive, government-funded, trafficking-specific services, such as counseling, accommodation, and psychological, medical, and legal assistance, without first requiring victims' cooperation with police or the commencement of criminal proceedings. Victims who cooperated with law enforcement received services for an unrestricted period, while victims who did not participate in criminal proceedings could receive government-funded services for up to 60 days. In previous years, an NGO served as the contracted partner for victim support services. In May 2021, the government ceased contracting the NGO and moved the responsibility to the SIB's Trafficking Victim Support Unit. Observers criticized the move, raising concerns that the change would lower the quality of victim services. While initially the government released a public tender for providers, there were no bidders because, according

to observers, the funding ceiling in the contract was too low to meet the minimum standard for victim services—€15,000 ($17,010), compared with €62,000 ($70,290) in previous years. Authorities placed child trafficking victims and unaccompanied children in three dedicated centers for child victims of abuse, including trafficking, offering specialized services for up to 60 days. Local government funding covered services beyond 60 days. The government based the three centers on the Barnahus method—a multidisciplinary and interagency model offering a coordinated and effective response based specifically on a child victim's needs. Officials noted the need to increase procedural capacity regarding child sex trafficking victims, and experts reported the need to improve the identification of child trafficking victims, particularly as identification had declined over the years. The Aliens Act enabled foreign victims to receive temporary residence permits, accommodation, and education; the government did not grant any temporary residence permits to foreign victims, the same as in 2020. The government disseminated NGO-developed guidance on assisting trafficking victims with disabilities. The MOJ provided €50,000 ($56,690) in funding for legal aid for victims with low incomes and people with special needs, such as psychological or physical impairments. The law allowed victims to obtain restitution from traffickers in criminal cases and file civil suits against traffickers for compensation. In the two 2021 convictions, courts ordered traffickers to pay victims' restitution in the amount of €21,790 ($24,710).

## PREVENTION

The government increased prevention efforts. The MOJ maintained responsibility as the national trafficking coordinator, monitored implementation of anti-trafficking policies and plans, and led domestic and international cooperation. During the reporting period, the government approved the 2021-2025 Violence Prevention Agreement, which focused on combating various forms of violence and included several anti-trafficking activities, such as legislative changes, training, and awareness programs. The government started developing an annual action plan for 2022, detailing resources for implementation of the activities in the Violence Prevention Agreement, as well as additional anti-trafficking programs. In 2021, the government proposed significant budget cuts across all areas of government spending, which observers raised concerns would affect anti-trafficking programs and law enforcement efforts. The anti-trafficking working group, comprising 35 government agencies and NGOs, published an annual report of its activities. As a member of the European Migration Network, Estonia participated in a study aimed at exploring the national practices of detecting, identifying, and protecting potential foreign trafficking victims. The study consisted of national policy and legislative developments and measures to detect, identify, and protect third-country nationals; challenges and best practices; and cooperation mechanisms with other Member States, EU agencies, international organizations, and third countries of origin. In collaboration with other Baltic Sea Region countries, the government participated in a project establishing long-term cooperation between stakeholders and academia to educate future journalists on trafficking issues through workshops, panel discussions, and competitions. The government managed an anti-trafficking hotline, which received 505 calls from potential trafficking victims, of which authorities began investigations into 28 sex trafficking cases and 389 labor trafficking cases; the hotline provided counseling and services in Estonian, Russian, and English. The government made efforts to reduce the demand for commercial sex acts by creating a program aimed to change the behavior of sex buyers through social measures.

In 2021, the government participated in a new regional project aimed at strengthening the knowledge of and approach to trafficking, particularly in an international context. The project advanced the work of the online trafficking identification tool for labor inspectors that launched in 2020 by coordinating training and enhancing cooperation among Finnish, Estonian, and Latvian authorities. Also, in 2021, the government conducted an awareness-raising event consisting of two live streams on social media for entrepreneurs, informing them of the dangers of trafficking and free services offered by the state. The SIB maintained a podcast, in Estonian and Russian languages, with a new topic focusing on labor exploitation, including trafficking, and services. Several agencies organized a four-day seminar to educate employers on the use of migrant labor, work authorization requirements, and trafficking prevention. Estonian law prevented the misuse of employment regulations and ensured enterprises paid taxes and migrant workers the average monthly salary required by the law. Additionally, the law prohibited recruitment agencies from charging fees to job seekers for placement services and required the LI to monitor agencies for compliance. The LI provided migrant or local workers with free legal services regarding work-related problems, such as unpaid salary, and maintained an informational phone line and website on workers' rights. In 2021, the LI created a new portal available in Estonian, English, and Russian with information on labor trafficking. In an effort to decrease the number of undocumented foreign workers, reduce cases of delayed or under payment, and improve occupational safety and health, the government continued to establish a new electronic registration system for construction site employees to provide insight into subcontracting relationships and working hours; projected implementation is in 2023.

In response to the influx of Ukrainian refugees and foreign nationals who were fleeing Russia's war on Ukraine and arriving in Estonia, the government developed information resources in Ukrainian, Russian, and Estonian advising on safe travel, rights to temporary protective status, finding legitimate work, and available benefits. The police, LI, and SIB developed printed and online materials raising awareness about sex and labor trafficking and outlined the steps to report suspected trafficking and receive support services. Additionally, the MOJ developed a new training program for government and private sector officials on recognizing indicators of trafficking; the program targeted government contractors providing temporary housing and job placement services to refugees and volunteers working with vulnerable communities.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Estonia, and, to a lesser extent, traffickers exploit victims from Estonia abroad. Traffickers tend to recruit and exploit their victims, including children with promises of money or video games, via the internet and social media. Authorities report a rise in the number of traffickers from foreign countries who recruit victims online. Trafficking victims originate from Eastern Europe, Asia, and Africa. In general, women and children are mainly at risk of sex trafficking and men of labor trafficking. The majority of trafficking cases in Estonia are labor trafficking cases that involve male foreign nationals. Migrant workers, most of whom are Ukrainian and Polish, are vulnerable to labor exploitation within Estonia, particularly in the construction and manufacturing sectors. A common scheme involves an Estonian company subcontracting with a Ukrainian or Polish company to provide temporary workers; the Estonian company pays salaries, sometimes below market rate, to the foreign company, which withholds the money from the workers. Citizens of Pakistan, India, and Bangladesh arrive in Estonia to work in the food sector where they are vulnerable to exploitation by their fellow countrymen. Citizens of Ukraine, Belarus, and Moldova are at risk of labor trafficking in the cleaning sector. The government reports an increase in the number of individuals from Central Asia who come to Estonia for employment and are forced to pay high recruitment fees to recruiters who are typically from the same country as the victims and have ties to organized crime. Officials noted foreign "posted workers," hired by temporary agencies and placed in Estonian companies, and their family members are especially vulnerable to trafficking. Thousands of foreign nationals and Ukrainian refugees, predominantly women and children, who are fleeing Russia's war on Ukraine and seeking sanctuary, are highly vulnerable to trafficking.

# ESWATINI: TIER 2 WATCH LIST

The Government of Eswatini does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included convicting more traffickers and identifying more victims. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The lack of government coordination, leadership by the Inter Agency Task Force for the Prevention of People Trafficking and People Smuggling (Task Force) and the Prevention of People Trafficking and People Smuggling Secretariat (Secretariat), dedicated funding, and

specialized anti-trafficking training for front-line officers continued to hamper anti-trafficking efforts. Serious allegations of trafficking and abuse of trafficking victims against senior government officials in protection roles have remained pending for multiple years. The government did not refer all identified victims to services. The first shelter for victims of trafficking and gender-based violence (GBV), refurbished in a collaborative effort with foreign donor support, remained inoperable. Therefore Eswatini was downgraded to Tier 2 Watch List.

ESWATINI TIER RANKING BY YEAR
1
2
2WL
3
2015
2016
2017
2018
2019
2020
2021
2022

## PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers, including allegedly complicit officials. • Launch and operationalize the refurbished shelter dedicated to providing care for victims of trafficking and GBV, including by utilizing shelter guidelines, management plans, and government resources. • Appoint a new magistrate to fill the vacancy of the lead magistrate on trafficking in persons to adjudicate trafficking cases and issue protection orders for victims. • Appoint a new protection officer in the Secretariat to ensure trafficking victims are appropriately identified and referred to services. • Train law enforcement, social workers, and other front-line officials to proactively identify trafficking victims among vulnerable populations, including at-risk children, migrants, and Cuban medical workers, and refer all identified trafficking victims to appropriate protection services. • Implement the National Strategic Framework and Action Plan (NSFAP) to Combat People Trafficking (2019-2023). • Increase coordination and adequately fund mandated activities of the Secretariat and the Task Force to enable the Task Force to fulfill its statutory responsibilities. • Identify key NGO partnerships for protective services and strengthen coordination on victim protection. • Improve trafficking data collection and analysis of anti-trafficking law enforcement efforts. • Conduct anti-trafficking public awareness campaigns. • Amend the Employment Act to create strong regulations and oversight mechanisms of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable.

## PROSECUTION

The government maintained minimal anti-trafficking law enforcement efforts. The 2009 People Trafficking and People Smuggling (Prohibition) Act criminalized sex trafficking and labor trafficking and prescribed penalties of up to 20 years' imprisonment for offenses involving an adult victim and up to 25 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The Sexual Offences and Domestic Violence Act prescribed penalties of up to 20 years' imprisonment, a fine of up to 100,000 emalangeni ($6,300), or both for the commercial sexual exploitation of an adult and up to 25 years' imprisonment with no option of a fine if the offense involved a child.

The government initiated two human trafficking investigations and continued at least one investigation from the previous reporting period, compared with three investigations initiated in the previous reporting period. The government reported initiating three prosecutions, two for sex trafficking and one for labor trafficking, and continuing at least one prosecution from the previous reporting period, compared with two prosecutions initiated in the previous reporting period. Reportedly, the government convicted five traffickers, compared with one conviction in the previous reporting period. One conviction was brought under the anti-trafficking law; charges were not reported for the other convictions. The government did not provide any information on sentencing. Both the pandemic and civil unrest diverted law enforcement and judicial resources away from efforts to combat trafficking in persons during the reporting period. Court closures due to the pandemic and civil unrest caused significant delays in the judicial process. The government imposed a pandemic-related curfew for most of the reporting period, which negatively impacted efforts of government officials.

Corruption and official complicity in trafficking crimes remained significant concerns. In recent years, senior government officials were investigated, prosecuted, and convicted for trafficking crimes or the abuse of trafficking victims under the care of the government; however, these cases faced significant delays due to a backlog of court cases. For the third consecutive year, a criminal prosecution remained pending against the government's senior protection officer employed in the Secretariat, who allegedly threatened and assaulted three foreign trafficking victims residing in the government's temporary shelter in 2019. For the second consecutive year, criminal prosecution remained pending against the Director of the National Children's Coordination Unit in the Deputy Prime Minister's office for allegedly kidnapping, trafficking, and sexually assaulting a child from 2017 through 2019. Both officials remained employed but suspended with full pay at the end of the reporting period. Additionally, there were reports from prior reporting periods of immigration officials soliciting bribes to issue government documents, such as visas.

Systemic judicial issues, including a weak case management and coordination system; a shortage of judges, magistrates, prosecutors, and courtrooms; and a lack of access to legal representation for crime victims contributed to delays in all cases, including trafficking. The sole magistrate, responsible for issuing victim protection orders required for victim identification under the NRM and for hearing cases against traffickers, retired during the reporting period without completing active prosecutions, which were placed on hold. Observers commented that the lengthy appointment process for a new magistrate may cause significant delays and inhibit victim protection. Rural women often faced substantial obstacles obtaining relief for various crimes because communities pursued family intervention first and then used traditional courts, which viewed female victims of crime as "unruly" and "disobedient." In previous reporting periods, observers reported that the lack of collaboration of leadership at the Secretariat impeded anti-trafficking law enforcement efforts, resulting in some officials circumventing the Secretariat to facilitate initiatives and communication between members of the Task Force. It was not reported if this changed during the reporting period. The government did not report providing anti-trafficking training for law enforcement or criminal justice professionals during the reporting period.

## PROTECTION

The government decreased victim protection efforts. The government identified seven trafficking victims, all girls, including six from Eswatini and one from Mozambique. Government officials reportedly referred one victim to services provided by NGOs; the victim was repatriated in cooperation with an international organization and the Government of Mozambique. This compared with four victims identified and referred to care in the previous reporting period. The government reported using the NRM to identify and refer victims; however, due to the vacancy of the magistrate responsible for trafficking victims' access to services, it was unclear if implementation was successful. The government reported that both the government and NGOs provided care for victims, both foreign and Swati, including shelter, necessities, counseling, and medical care. Most protection services for trafficking victims were also shared with victims of GBV and other crimes. The government operated one shelter that provided short-term care for up to 24 crime victims and a second training facility with a residential component that could house victims; however, these shelters were of insufficient quality to house victims, particularly for longer stays. When the government shelter was full, the government placed victims with family members or in NGO-operated shelters. Through a multi-stakeholder approach, an international organization assisted the government to refurbish a shelter to house victims of trafficking and GBV with funding from a foreign donor. During the reporting period, the government assumed responsibility to operationalize the shelter through approving shelter guidelines, conducting routine building maintenance, providing furnishings, and dedicating resources for day-to-day operations. The government purchased some furnishings; however, these works remained incomplete, leaving the shelter inoperable at the end of the reporting period. The

Secretariat finalized and endorsed the shelter policies and guidelines but awaited adoption. Government officials continued to proactively screen for trafficking at the airport, although they did not identify any victims for the second consecutive year.

The government had procedures to assist victim-witnesses during the court process, including court preparation, translation services, counseling, and use of recorded video testimony. The government did not report providing any protection services to trafficking victim-witnesses during the reporting period and demonstrated an inconsistent understanding of victim rights. The government did not have formal procedures to provide residency to foreign trafficking victims but could do so on an ad hoc basis. The government continued to allocate 80,000 emalangeni ($5,040) annually to a victim protection fund. While Eswatini law allowed judges to order restitution for trafficking victims, none did so during the reporting period.

## PREVENTION
The government decreased efforts to prevent trafficking. The Task Force, which is composed of government ministries and NGOs and is mandated to coordinate anti-trafficking efforts, met twice during the reporting period; however, the Secretariat, housed within the Prime Minister's office, led efforts. The government continued to implement its NSFAP (2019-2023) but only through awareness-raising efforts during the reporting period. It was not reported if funding was devoted to its implementation for the reporting period. Long-standing bureaucratic delays and communication gaps within the Task Force and Secretariat continued to hamper coordination efforts. In addition, while Task Force member agencies had individual mandates to address trafficking, they did not receive funding to implement such efforts. The Secretariat had an allocated budget; however, the funding disbursement was delayed during the reporting period, which hindered coordination efforts.

The government, in partnership with an international organization, held seven events in four provinces to raise public awareness, targeting religious institutions, traditional gatherings, and childcare providers in rural community centers, and it held a weekly radio program. The Secretariat continued using anti-trafficking posters at various land borders and the airport. While the government had a trafficking-specific hotline, it had limited operations for the second consecutive reporting period due to lack of funding. The government did not report collecting, analyzing, or contributing human trafficking data, as reported in previous years. The government did not have policies and procedures to regulate labor recruiters and brokers, and it permitted charging fees to workers. Labor inspectors received training on identifying forced and child labor; however, the labor inspectorate had an insufficient number of inspectors to monitor for forced and child labor. It did not have any funds dedicated for inspections and had to request funds from the general Department of Labor budget. In addition, when it did receive funds, it focused nearly all efforts on the formal sector, while forced labor almost exclusively occurred in the informal sector. The government did not make efforts to reduce the demand for commercial sex. The government did not provide anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE
As reported over the past five years, human traffickers exploit domestic and foreign victims in Eswatini, and traffickers exploit victims from Eswatini abroad. Traffickers target vulnerable communities, particularly those with high HIV/AIDS prevalence rates. Traffickers exploit Swati girls, particularly orphans, in sex trafficking and domestic servitude, primarily in Eswatini and South Africa. Some Swati girls in forced domestic work are physically and sexually abused by their employers. Sex traffickers exploit orphaned Swati girls in "survival sex" in exchange for food and money. Traffickers force Swati boys and foreign children to labor in agriculture, including cattle herding, and market vending within the country. Swati boys, particularly in rural areas, who work on small marijuana ("*Dagga*") farms, are vulnerable to exploitative employers. Swati children may face difficulties in accessing assistance due to the lack of citizenship documentation. Mozambican boys migrate to Eswatini for work washing cars, herding livestock, and portering; traffickers exploit some of these boys in forced labor. Cuban nationals working on medical missions in Eswatini may have been forced to work by the Cuban government. Traffickers use Eswatini as a transit country to transport foreign victims,

primarily Mozambicans, to South Africa for forced labor. Traffickers reportedly force Mozambican women into commercial sex in Eswatini or transport them through Eswatini to South Africa. Traffickers entrap Swati victims with promises of economic opportunities in Eswatini or abroad, particularly South Africa. Some traffickers exploit Swatis in sex trafficking, including orphaned girls and girls from poor families, who voluntarily migrate in search of work, particularly in South Africa. Reports suggest labor brokers fraudulently recruit and charge excessive fees to Swati nationals for work in South African mines, which are common tactics used by traffickers. Traffickers recruit Swati men in border communities for forced labor in South Africa's timber industry. Previous reports indicate Swati students were fraudulently recruited for educational opportunities in Taiwan and coerced to work in exploitative conditions in chicken factories.

## ETHIOPIA: TIER 2 WATCH LIST

The Government of Ethiopia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included prosecuting more potential trafficking crimes; convicting more traffickers; increasing training for law enforcement officials on the distinctions between human trafficking and migrant smuggling; drafting regulations to create a victim protection fund; and conducting awareness campaigns at the federal and regional levels on trafficking indicators and reporting mechanisms. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity. Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action. Protection services for victims remained limited and inconsistent in quality, particularly outside of Addis Ababa; additionally, the government continued to rely on civil society organizations to provide most victim services, but it did not provide in-kind or financial support to these efforts. The government continued to disproportionately focus on transnational trafficking crimes and did not take adequate action to address internal trafficking crimes, including domestic servitude and child sex trafficking, despite the scale of the problem. Despite increased trainings, many officials continued to conflate human trafficking and migrant smuggling, hindering the effectiveness of overall anti-trafficking efforts. Government efforts to protect Ethiopian trafficking victims abroad, particularly migrant workers, remained minimal, and protection services for potential victims returning to Ethiopia were inadequate. Therefore Ethiopia remained on Tier 2 Watch List for the second consecutive year.



ETHIOPIA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:
Continue to increase efforts to investigate and prosecute alleged traffickers, including for both transnational and internal trafficking crimes, and seek significant prison terms for convicted traffickers. • Expand training to all levels of government, including regional officials outside of Addis Ababa, on implementation of the standard operating procedures (SOPs) for victim identification and the national referral mechanism (NRM) to refer all victims to appropriate care. • Using the established SOPs, systematically and proactively identify trafficking victims by screening for trafficking indicators among vulnerable populations, including individuals in commercial sex, Ethiopian migrant workers returning from overseas, unaccompanied children, and foreign nationals such as Eritreans, Somalis, South Sudanese, and Cuban medical workers, and refer all trafficking victims to appropriate services. • Develop, adopt,

and implement a comprehensive national action plan (NAP). • Continue to increase training for police, prosecutors, judges, immigration officials, and service providers to differentiate between human trafficking and migrant smuggling. • Collaborate with NGOs and international organizations to increase the government's capacity to provide long-term shelter and protective services to all trafficking victims, including adult males and foreign nationals. • Increase protections for Ethiopian trafficking victims exploited abroad, including by providing pre-departure training to all migrant workers, training Ethiopian embassy staff to identify and assist victims, establishing and implementing additional bilateral labor agreements with destination countries, and assigning labor attachés to Ethiopian embassies to monitor migrants abroad. • Consistently enforce strong regulations and oversight of labor recruitment agencies, including by eliminating recruitment fees charged to migrant workers, holding fraudulent labor recruiters criminally accountable, and training inspectors to report potential violations to the appropriate officials. • Develop and implement a comprehensive and centralized database to accurately report the government's anti-trafficking statistics and disaggregate data on trafficking crimes and migrant smuggling. • Improve screening procedures in the distribution of national identification cards and passports to prevent their fraudulent issuance to children.

## PROSECUTION

The government increased anti-trafficking law enforcement efforts but did not take adequate steps to address official complicity in trafficking crimes. Proclamation 1178/2020, Proclamation to Provide for the Prevention and Suppression of Trafficking in Persons and the Smuggling of Persons, as amended by Corrigendum 11/2013, effective as of December 2020, criminalized sex trafficking and labor trafficking. The law prescribed penalties of seven to 15 years' imprisonment and a fine of 20,000 to 100,000 Ethiopian birr (Br) ($407 to $2,040) for labor trafficking and adult sex trafficking and 10 to 20 years' imprisonment and a fine of 30,000 to 100,000 Br ($610-$2,040) for child sex trafficking. These penalties were sufficiently stringent and, with regards to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

In 2021, the government provided data from the federal level and six regions, compared with providing data from the federal level and three regions in 2020. The government reported investigating 495 potential trafficking cases—487 for sex trafficking and eight for forced labor—in 2021, compared with 172 investigations in 2020; the government did not disaggregate by type of trafficking in the previous reporting period. Of these 495 case investigations, officials investigated 127 at the federal level and 368 at the regional level, compared with 27 at the federal level and 145 at the regional level in 2020. The government reported prosecuting 387 individuals—353 for sex trafficking, five for forced labor, and 29 for unspecified exploitation—in 2021, compared with 108 prosecutions in 2020. Of the 387 individuals prosecuted, 98 occurred at the federal level, and 289 occurred at the regional level, compared with five prosecutions at the federal level and 103 at the regional level in 2020. Officials prosecuted 267 of these individuals under the anti-trafficking proclamation and 120 under the criminal code. Courts convicted 296 traffickers—289 for sex trafficking and seven for forced labor—in 2021, compared with 48 convictions in 2020. Of the 296 convictions, 190 were under the 2020 anti-trafficking proclamation, and 106 were under the criminal code. The government did not report sentencing data. Courts acquitted eight suspected traffickers during the reporting period for unspecified reasons. For all prosecutions and convictions under the criminal code, the government reported using Article 243 related to unlawful departure, entry, or residence, rather than trafficking provisions. As reported in prior years, officials' propensity to conflate human trafficking and migrant smuggling made it probable that some reported cases involved individuals seeking to illegally cross international borders via irregular migration and other crimes not involving exploitation through forced labor or sex trafficking. Additionally, financial and capacity constraints continued to impede data collection by regional police, and ineffective coordination between the regions and the federal government hindered law enforcement efforts.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during

the year. Corruption among police and judicial officials, especially the solicitation of bribes, remained a significant concern. Since the Tigray conflict began in November 2020, international organizations reported armed actors, including Eritrean forces, regional forces, the Ethiopian National Defense Force (ENDF), and the Tigrayan People's Liberation Front (TPLF), were reportedly responsible for committing human rights abuses and gender-based violence (GBV) in Tigray and other northern regions, including potential trafficking crimes. Observers reported unspecified military personnel and other officials forced women to have sex in exchange for basic commodities and humanitarian assistance. Observers reported officials subjected detained Tigrayan returnees to abuse, forced disappearance, and forced labor upon their return to Ethiopia.

The government maintained the Migration and Human Trafficking Crime Team, which was established in 2019 with 35 investigators and six prosecutors to address both human trafficking and smuggling crimes. The government, in partnership with an international organization, published SOPs for the investigation of human trafficking and migrant smuggling cases to complement the 2020 anti-trafficking proclamation. The government, in partnership with civil society organizations, provided trainings to several thousand prosecutorial and judicial officials, border guards, police officers, and immigration agents on the distinction between human trafficking and migrant smuggling, anti-trafficking laws, victim identification, and international cooperation on investigations. The government reported cooperating with an international law enforcement organization and foreign governments, including Djibouti, Israel, Kenya, Tanzania, and South Africa, on trafficking investigations.

## PROTECTION

The government maintained victim protection efforts. The government reported identifying 329 trafficking victims, compared with zero in the previous reporting period. Of the 329 victims identified, traffickers exploited 289 in sex trafficking and 40 in forced labor; the government reported 191 of the sex trafficking victims and 36 of the forced labor victims were girls, and the remaining 102 victims were unspecified. In previous years, the government reported the number of individuals returning to Ethiopia it considered to be vulnerable to trafficking; the government did not report this number in 2021, compared with more than 14,518 vulnerable migrants in 2020. The government maintained SOPs for proactive victim identification and provided regular trainings on its use; however, officials' dissemination and implementation of the SOPs remained limited.

The government had an NRM outlining guidelines for victim referrals to services; however, its use remained limited, particularly outside of Addis Ababa. In 2021, the government developed a memorandum of understanding (MOU) with regional states to expand the NRM's use across the country; the MOU was awaiting regional officials' signatures at the end of the reporting period. The government, in partnership with civil society organizations, reported providing 256 victims—all women and girls—with various services, including medical care, psycho-social counseling, shelter, family reunification, legal aid, and economic assistance; the government did not report protection data related to the remaining 73 identified victims. There continued to be a dearth of care available for male trafficking victims. Despite reliance on civil society organizations to provide most victim services, the government did not report providing financial or in-kind support to such organizations. Officials continued to jointly operate five migration response centers (MRCs), in partnership with an international organization, in Dire Dawa, Metema, Moyale, Semera, and Togochale; the government supported the MRCs in various ways, including by donating land for infrastructure, providing rent-free usage of government facilities, participating in MRC management committees, and facilitating referral linkage with front-line agencies. The government reported providing services to 199 trafficking victims at the MRCs during the reporting period. The government maintained operation of child protection units in Addis Ababa and several major cities. The units reportedly provided protection services to child trafficking victims and vulnerable children intercepted or identified en route from rural to urban areas. The 2020 anti-trafficking proclamation established a fund to support victim protection and care, which could receive funding through a government budget allocation; through fines imposed on, and the sale of, confiscated property from

traffickers; and from foreign donors. In 2021, the government drafted regulations to initiate creation of the fund; the regulations were awaiting ministerial-level approval at the end of the reporting period.

To protect Ethiopian nationals exploited abroad, some Ethiopian diplomatic missions in Gulf states continued to provide temporary shelter and facilitate repatriation flights for victims. The government and civil society continued to report that Gulf states conducted mass deportations of Ethiopians—rather than coordinated repatriations—due to pandemic-related stigmatization of migrants and economic impacts among employers. The number of deportations continued at a significant rate, hindering the Ethiopian response system; protection services for returnees, including potential trafficking victims, also remained limited. Officials at Bole International Airport and at land border crossings coordinated with an international organization to screen Ethiopians returning from abroad for trafficking indicators. Observers noted the time allotted for screening interviews—approximately five minutes—was insufficient to identify potential victims, especially amidst the high number of returnees, which an international organization reported was more than 155,000 individuals in 2021.

The 2020 anti-trafficking proclamation provided protections to victims participating in investigations and prosecutions as outlined under the Witness and Whistleblowers Protection Proclamation (No. 699/2010), which included protection from prosecution for crimes committed as a direct result of unlawful acts traffickers compelled them to commit. The government reported most victims participated in criminal proceedings against traffickers, noting that officials received victims' informed consent. Officials maintained an MOU with NGOs to improve coordination between law enforcement agencies and service providers intended to ensure officials referred victims to appropriate care, including shelter, counseling, and legal assistance, throughout the course of legal proceedings. Courts allowed children to testify against traffickers via video or in child-friendly interviewing rooms. Despite these protections, observers reported, in some cases, victims chose not to testify due to fear of reprisal or lack of funding to travel to court. The government reported the specialized witness protection unit, established in 2018, provided some protection services to victims-witnesses; however, the government did not provide information on specific actions taken by the unit. Proclamation 1178/2020 allowed foreign national victims to receive temporary residence permits or repatriation assistance on an as-needed basis, but the government did not report whether any victims received deportation relief. The anti-trafficking proclamation entitled victims to restitution from convicted traffickers; however, the government did not report awarding restitution during the reporting period. Due to disparate implementation of identification procedures, authorities may have detained or deported some unidentified trafficking victims.

## PREVENTION

The government maintained efforts to prevent trafficking. The senior-level National Council (NC), chaired by the Deputy Prime Minister, maintained responsibility for the creation of policies and strategies for the prevention of migrant smuggling and human trafficking, and it was mandated to meet twice per year; the NC met once in 2021. The working-level National Partnership Coalition (NPC), which was led by the Ministry of Justice and composed of members from relevant government ministries, religious institutions, civil society organizations, and media, continued to serve as the government's primary coordinating body for issues related to human trafficking and migrant smuggling. The NPC established six working groups, which met regularly throughout the year, related to the following topics: awareness raising and overseas employment, crime prevention and law enforcement, victim protection, data collection, diaspora engagement, and research. The government remained without a comprehensive anti-trafficking NAP for the sixth consecutive year. The NPC launched a 2021-2025 strategic plan, which included activities related to the prevention of human trafficking and migrant smuggling among Ethiopian overseas workers. The government reported seeking input from survivors—including women, children, and persons with disabilities—in developing new anti-trafficking laws, policies, and programs. The government, in partnership with international organizations and foreign donors, conducted various awareness campaigns at the federal and regional levels on trafficking indicators and reporting mechanisms, primarily targeted toward schools,

rural communities, religious institutions, and media. The government, in partnership with an international organization, conducted awareness activities related to the prevention of the unlawful recruitment and use of child soldiers in Tigray. The government did not operate a trafficking-specific hotline; however, the government reported referring 151 potential trafficking cases identified through police hotlines to law enforcement and service providers. The government remained without a coordinated national data collection system, resulting in disorganized reporting on information related to trafficking.

In June 2021, the government amended the 2016 employment proclamation through Proclamation No. 1246/2021 Ethiopian's Overseas Employment (Amendment). The revised proclamation newly required the establishment of an employment board, composed of representatives from relevant government agencies, to oversee the implementation of the proclamation, including by facilitating bilateral labor agreements (BLA), protecting migrant workers abroad, and raising awareness of overseas employment processes and risks. The government did not operationalize the board by the end of the reporting period. The employment proclamation continued to require employment agencies to deposit 1 million Br ($20,350) in a bank as insurance, which officials would use to assist and repatriate trafficking victims; however, the government did not report enforcing this requirement for the third consecutive reporting period. Proclamation No. 1426/2021 newly required migrant workers, not including those employed in domestic work, to pay employment agencies the amount of one month's salary over four payment periods.

The then-Ministry of Labor and Social Affairs, now the Ministry of Labor and Skills, trained 13 labor officers in 2019 to serve abroad as foreign service officers and represent Ethiopians working in Qatar, Saudi Arabia, and the United Arab Emirates (UAE); however, the government had not yet deployed the labor officers due to pandemic-related travel restrictions. The government reported an international organization provided continued training to the labor officers as deployment remained delayed. The government maintained BLAs with Jordan, Qatar, Saudi Arabia, and the UAE to commit to ethical recruitment, legal remedies against those who violated the law, and equal protection of Ethiopian workers, to include equal wages for equal work and reasonable working hours. Ethiopian officials maintained efforts to implement a 2012 law requiring registration of all births nationwide; however, the lack of a uniform national identity card continued to impede implementation of the law and allowed for the continuous issuance of district-level identity cards, which were subject to fraudulent production to exploit potential trafficking victims, including children. The government cooperated with a foreign donor to provide Ethiopian troops with anti-trafficking training prior to their deployment abroad on international peacekeeping missions. Although not explicitly reported as human trafficking, the UN reported one allegation of sexual exploitation with trafficking indicators by one Ethiopian peacekeeper serving in the UN peacekeeping operation in Abyei in 2020; the government did not report investigating the allegation for the second consecutive reporting period. Investigation and accountability actions remained pending for a similar allegation against one Ethiopian peacekeeper serving in the UN peacekeeping mission in Liberia in 2018. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Ethiopia, and traffickers exploit victims from Ethiopia abroad. Traffickers exploit girls from Ethiopia's impoverished rural areas in domestic servitude and sex trafficking within the country and boys in forced labor in traditional weaving, construction, agriculture, forced begging, and street vending. Brothel owners exploit girls in sex trafficking in Addis Ababa's central market. Labor recruiters frequently target young people from Ethiopia's vast rural areas with false promises of a better life in urban areas; increasingly, traffickers are replicating legitimate app-based recruitment tools to fraudulently recruit vulnerable populations and exploit them in forced labor. Local NGOs assess the number of internal trafficking victims, particularly children exploited in sex trafficking and domestic servitude, likely exceeds that of external trafficking. As of February 2022, an international organization reported there were more than 4.5 million IDPs in Ethiopia as a result of internal

conflict and drought, a substantial increase compared with 1.5 million IDPs in the previous year. Individuals in resettlement camps or otherwise affected by internal conflict and drought are increasingly vulnerable to trafficking due to a lack of access to justice and economic opportunity.

Since November 2020, internal conflict in Ethiopia's northern regions, including Tigray, Afar, and Amhara, has resulted in almost 60,000 Ethiopians seeking asylum in Sudan and other neighboring countries, where protection services are limited; this population is increasingly vulnerable to trafficking as displacement, food insecurity, and lack of economic opportunity persists. International organizations report armed actors, including Eritrean forces, regional forces, the ENDF, and the TPLF, have committed human rights abuses and GBV against women and girls in Tigray, including potential trafficking crimes. Observers report unspecified military personnel and other officials force women to have sex in exchange for basic commodities and humanitarian assistance. Unaccompanied children in conflict areas are vulnerable to unlawful recruitment or use by armed groups.

Trusted community members, known as *manamasas*, recruit and groom vulnerable youth on behalf of local and international human trafficking syndicates by exaggerating the advantages of working abroad. Scarce economic opportunities and poverty, coupled with familial encouragement, compel thousands of Ethiopians, including a substantial percentage of unmarried individuals younger than age 30, to transit out of Ethiopia via three main routes, where they are vulnerable to trafficking. Undocumented economic migrants primarily take the northeastern route, via Djibouti or Somalia, to Yemen and onward to Saudi Arabia and Europe. The southern route often involves individuals transiting through Kenya and onward to South Africa in hopes of finding work or to connect to onward flights. The northwestern route, the most dangerous and least common, has traditionally been taken by men through Sudan to Libya and onward to Europe; however, observers report an increase in women using this route to reach Khartoum, where they apply for and receive visas to Lebanon. Observers have not been able to discern how these women acquire visas or if the process is legitimate. Across all three of these migration routes, traffickers exploit Ethiopian migrants in sex trafficking or forced labor in transit countries and in their intended destinations. Families often finance irregular migration flows, and parents may force or coerce their children to go abroad. An international organization assesses most traffickers are small local operators, often from the victims' own communities, but well-structured, hierarchical, organized crime groups also facilitate irregular migration flows and likely exploit individuals in forced labor or sex trafficking. International organizations report the number of Ethiopian returnees continues to significantly increase due to pandemic-related economic impacts; more than 155,000 Ethiopians returned in 2021, many of whom likely faced increased trafficking vulnerabilities in their destination country, along their route, and once back in Ethiopia. Observers highlight concerns that officials subject detained Tigrayan returnees, who represented approximately 40 percent of all returnees in 2021, to abuse, forced disappearance, and forced labor upon their return to Ethiopia.

Saudi Arabia remains the primary destination for economic migrants, representing 80-90 percent of Ethiopian labor migration; observers report approximately 400,000-500,000 Ethiopians reside there without valid travel documentation, which increases their vulnerability to traffickers exploiting them in forced labor or sex trafficking. Some Ethiopians arrive in Saudi Arabia through licensed Ethiopian employment agencies but are susceptible to trafficking by employers or illegal employment agencies. The visa sponsorship system—common in Bahrain, Jordan, Kuwait, Lebanon, Saudi Arabia, and the UAE—binds domestic workers to one employer and prevents their freedom of movement. Some families in Lebanon, Saudi Arabia, and other Middle Eastern countries exploit Ethiopian women working in domestic service and subject them to physical and emotional abuse. Ethiopian women who migrate for work or flee abusive employers in the Middle East are also vulnerable to sex trafficking. Ethiopian men and boys migrate to Gulf states and other African nations, where traffickers exploit some in forced labor. As a result of the pandemic, Ethiopians abroad—especially in Lebanon and Saudi Arabia—face increased stigmatization and abuse, leading to loss of employment and potential deportation. In Lebanon, employers forcibly removed Ethiopian domestic workers from their

homes, leaving them trapped in the country due to pandemic-related travel restrictions, border closures, and economic scarcity; unable to find new work or a safe way home, these individuals are increasingly vulnerable to trafficking. Thousands of Ethiopians—including domestic workers and migrant laborers who lost their employment due to the pandemic, and migrants pushed out by Houthi attacks in Yemen—faced increasing vulnerabilities to trafficking after being placed in abusive detention centers in southern Saudi Arabia. Traffickers exploit Ethiopian girls in domestic servitude and sex trafficking in neighboring African countries, particularly Djibouti and Sudan. Traffickers exploit Ethiopian boys in forced labor in Djibouti as shop assistants, domestic workers, and street beggars, in addition to forcing children to take part in criminal activities. Traffickers exploit Ethiopian women and children in forced begging, sometimes via organized begging rings, in Saudi Arabia. Traffickers exploit Ethiopian woman in forced labor in the hotel industry in Romania.

Ethiopia hosts more than 840,000 refugees and asylum-seekers, the majority of whom are from South Sudan, Somalia, and Eritrea. Refugees without education and economic opportunity and those further displaced by conflict are increasingly vulnerable to trafficking. Cuban medical professionals working in Ethiopia may have been forced to work by the Cuban government.

## FIJI: TIER 2

The Government of Fiji does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Fiji remained on Tier 2. These efforts included identifying more victims than in the previous reporting period following improved screenings, securing the second conviction of a trafficker since 2014, and improving coordination between immigration officials and police, as well as between government officials and NGOs. However, the government did not meet the minimum standards in several key areas. The government initiated fewer investigations than in the previous reporting period, only initiated one prosecution, and did not provide services to any trafficking victims. The government did not prosecute or convict any suspected complicit officials despite reports that official complicity impeded anti-trafficking efforts.



FIJI TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Finalize and implement formal victim identification and referral procedures for police, immigration, customs, and labor officials. • Proactively screen groups vulnerable to trafficking, including persons in commercial sex, migrant workers, and child laborers. • Increase efforts to prosecute trafficking crimes and convict and punish traffickers, including those complicit in child sex trafficking on private yachts and in hotels. • Amend trafficking-related provisions of the Crimes Act to criminalize all forms of trafficking. • Provide services to victim and ensure victims are referred to the Case Management Coordinator Office. • Improve collaboration between police and prosecutors working trafficking cases to improve the success of prosecutions. • Proactively investigate potential official complicity in trafficking-related crimes. • Draft, finalize, and implement standard operating procedures (SOPs) for the Police Human Trafficking Unit. • Increase the oversight of the working conditions of foreign construction workers and increase investigation of labor violations involving children and migrant workers for forced

FIJI

labor. • Enable identified foreign victims to work and earn income while assisting with investigations and provide a legal alternative to victims' removal to countries in which they would face retribution or hardship. • Increase dissemination of labor and sex trafficking awareness campaigns, including to raise awareness of sex trafficking laws among foreign tourists.

## PROSECUTION

The government maintained anti-trafficking law enforcement efforts. The 2009 Crimes Act criminalized some forms of labor trafficking and all forms of sex trafficking. Sections 112-117 criminalized trafficking in persons but, inconsistent with international law, required either transnational or domestic movement to constitute a trafficking offense. These articles prescribed penalties of up to 20 years' imprisonment for movement-based trafficking offenses involving adult victims and up to 25 years' imprisonment for those involving child victims; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with other serious crimes, such as kidnapping. Sex trafficking offenses that did not involve movement could be prosecuted under Sections 106, 107, 226, and 227 of the Crimes Act. Section 106 criminalized sexual servitude by means of force or threat and prescribed penalties of up to 15 years' imprisonment if the offense involved an adult victim and up to 20 years' imprisonment if the offense involved a child victim. Section 107 criminalized "deceptive recruiting for sexual services," including inducing and maintaining individuals in prostitution through deceptive means, and prescribed penalties of up to seven years' imprisonment if the offense involved an adult victim and up to nine years' imprisonment if the offense involved a child victim. Sections 226 and 227 criminalized the buying or selling of children for "immoral purposes," which included prostitution, and prescribed penalties of up to 12 years' imprisonment. The penalties prescribed under these sections were sufficiently stringent and commensurate with the penalties prescribed for other grave crimes, such as rape. While Sections 103 and 118 criminalized slavery and debt bondage respectively, all forms of labor trafficking were not criminalized under the Crimes Act. The law prescribed penalties of up to 25 years' imprisonment for slavery, and it prescribed penalties of up to one year's imprisonment for debt bondage involving an adult victim and up to two years' imprisonment for those involving a child victim; the penalties for slavery were sufficiently stringent, while the penalties for debt bondage were not. The government's National Anti-Human Trafficking Sub-Committee on Legislative Desktop Review continued to review the governments trafficking legal framework.

Police initiated investigations of three trafficking cases, including two sex trafficking cases and one involving an unspecified form of exploitation, a decrease compared to 10 investigations initiated in the previous reporting period. The government initiated prosecution of one suspected sex trafficker and convicted one child sex trafficker who was sentenced to 30 months' imprisonment, compared with two prosecutions and no convictions during the previous reporting period. The Police's Human Trafficking Unit (HTU) led the government's anti-trafficking law enforcement efforts. However, police did not proactively investigate trafficking cases consistently, and the government has only convicted two traffickers since 2014. The government did not report efforts to investigate child sex tourists or facilitators who transported child sex trafficking victims to hotels or private yachts, despite reporting that this practice increased during the year. HTU assigned an officer to be embedded within the Immigration Department (FID), which improved information sharing and coordination between the two agencies. The government reported that under Fiji's legal system, the prosecutor's office acted independently from law enforcement investigations, including in cases involving human trafficking; however, a lack of communication and coordination between police and prosecutors continued to impair the government's pursuit of trafficking cases. Officials cited inadequate resources for victim-witness support as weakening the success of prosecutions. Authorities collaborated with foreign government officials on a suspected trafficking case.

HTU continued to conduct anti-trafficking trainings for police recruits; however, observers reported the one-day anti-trafficking trainings provided to police recruits were insufficient. FID collaborated with a foreign government and international organization to provide trafficking training for immigration officials. Law enforcement officials were often

not aware of the definition of trafficking, procedures for interviewing victims, or how to proactively identify victims. HTU did not complete SOPs for investigating trafficking cases, which it began drafting in the previous reporting period. In February 2021, the Fiji Independent Commission Against Corruption initiated an investigation of alleged official complicity by an immigration official in a suspected trafficking case who was suspended without pay while the investigation remained ongoing at the end of the reporting period. However, the government did not report any prosecutions or convictions of government employees complicit in trafficking crimes.

## PROTECTION

The government slightly increased protection efforts. The government identified more victims but did not provide services to any victims. The government reported identifying 11 trafficking victims (two sex trafficking victims and nine unspecified form of exploitation), compared to three victims identified in the previous reporting period. Government officials increased efforts to proactively screen vulnerable populations, including children, for trafficking; for example, a police children's unit and the Department of Social Welfare (DSW) screened children referred to their services for trafficking indicators, which resulted in the identification of victims. In addition, improved coordination among government authorities, NGOs, and faith-based organizations increased referrals to government services. The government's national anti-trafficking strategy included indicators of trafficking for frontline officials, but the government did not have formal victim identification procedures for all relevant agencies; however, in consultation with NGOs, an international organization, and other civil society organizations, the government began work to develop a national referral mechanism in March 2022. The Ministry of Defense, National Security, and Policing operated a Case Management Coordinator office (CMC), as well as a case management mechanism that created formal procedures for officials to refer victims to the CMC. The CMC assumed responsibility of coordinating victim support and overseeing the progression of investigations and prosecutions. However, the CMC did not oversee any cases or coordinate victim services during the reporting period, and the case management mechanism was not implemented in practice.

The government made available to victims accommodation, legal aid, medical care, interpreters, and allowances for basic necessities; authorities provided an unspecified number of victims with shelter and access to basic essentials, as well as repatriation assistance. The government did not allocate funds specifically for trafficking victims, and the law did not specifically mandate the provision of services to victims of trafficking, which meant victims often relied on NGOs, with whom the government had informal partnership, for services. In addition, a lack of resources for interpretation services for foreign victims impeded their access to psycho-social care. FID operated safehouses for foreign individuals awaiting deportation, including trafficking victims. The government could shelter victims younger than 21 under the custody of DSW, which operated four children's homes. Due to a lack of formal identification procedures, authorities may have detained and deported some unidentified victims. The government did not offer permanent legal alternatives to foreign victims' removal to countries in which they would face retribution or hardship but could issue renewable six-month work visas to victims assisting with investigations. During the reporting period, the government granted a work permit to one foreign victim to enable them to remain in Fiji and serve as a witness.

## PREVENTION

The government maintained efforts to prevent trafficking. The government allocated funds and personnel to implement the 2021-2026 anti-trafficking national action plan. The Interagency National Trafficking Committee, composed of government officials, international organizations, and civil society organizations, coordinated the government's anti-trafficking efforts. HTU was unable to conduct its public awareness campaigns and seminars aimed at children and young adults at learning institutions, which were closed due to pandemic restrictions. However, the government reported it coordinated with an international organization to host virtual awareness raising workshops.

Authorities did not adequately monitor the labor conditions of worksites, including construction sites, of companies with foreign

owners or that had connections to foreign investors and employed migrant workers. Immigration authorities conducted a week-long operation to inspect construction companies across the country and issued letters to 30 businesses found to employ migrant workers with irregular visa conditions; however, authorities did not identify any potential victims of trafficking during these inspections. The Ministry of Employment, Productivity, and Industrial Relations employed labor inspectors dedicated to identifying labor law violations, including wage violations. Inspectors reportedly did not have an adequate understanding of forced labor, and the government did not provide training on the enforcement of laws related to child labor. The government did not report how many labor inspections were conducted in 2021, compared to 843 inspections in 2020, and did not identify any child labor violations (41 identified in 2019). The Permanent Secretary for Labor issued certificates of authorization for employment agencies, which required agencies meet standards under the Employment Relations Regulations of 2008; agencies convicted of operating without authorization could be fined 20,000 Fijian dollars ($9,510), imprisoned for up to four years, or both; however, authorities did not convict any agencies during the reporting period. The government did not prohibit worker-paid recruitment fees. The government did not make efforts to reduce the demand for commercial sex acts. The government trained some diplomatic personnel on trafficking. The government incorporated training on sexual exploitation into pre-deployment training but did not provide trafficking-specific training to Fijian military personnel prior to their deployment abroad as part of international peacekeeping missions.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Fiji, and traffickers exploit victims from Fiji abroad. Family members, taxi drivers, foreign tourists, businessmen, crew on foreign fishing vessels, and other traffickers have allegedly exploited victims from Thailand and the People's Republic of China (PRC), as well as Fijian women and children, in sex trafficking. Traffickers exploit victims in illegal brothels, local hotels, private homes, and massage parlors, and traffickers sometimes utilize websites and cell phone applications to advertise victims for commercial sex. Some Fijian children are at risk of sex and labor trafficking as families follow a traditional practice of sending them to live with relatives or families in larger cities, where they may be subjected to domestic servitude or coerced to engage in sexual activity in exchange for food, clothing, shelter, or school fees. Fijian children were at risk for forced labor in agriculture, retail, or other sectors. Rising levels of poverty also contributed to increased risks of Fijian children being exploited in commercial sex and forced labor. The economic crisis related to the pandemic, as well as recent natural disasters, increased the number of children using the streets as a source of livelihood or compelled to seek incomes to sustain their families; these children are at risk of being exploited in sex trafficking or forced labor. Reports indicated children as young as 12 years old were exploited in sex trafficking, including to purchase food and other essentials for their families. Traffickers exploit Fijian and PRC national women and children in PRC national-operated massage parlors and brothels, particularly in Suva. In some cases, massage parlor owners arrange for female Fijian employees to engage in commercial sex acts with clients in local hotels and brothels. Foreign yacht owners and foreigners hiring locally-owned yachts dock in rural Fijian islands and seek young women, usually children, for marriage; some of these women and children subsequently become at risk to forced labor or sex trafficking. Taxi drivers or other facilitators transport Fijian child sex trafficking victims to hotels in popular tourist areas or to private yachts at the request of foreign tourists seeking commercial sex acts.

Some Fijian men reportedly marry women from Nepal and Pakistan and subject them to domestic servitude in Fiji. Labor traffickers exploit workers from South and East Asian countries in small, informal farms and factories, and in construction. Recruitment agencies operating in victims' home countries, vessel owners, and other crew exploit migrant fisherman from Southeast Asian countries, especially Indonesia, in forced labor on Fijian-flagged fishing vessels or foreign-flagged fishing vessels (mainly PRC- and Taiwan-flagged) transiting Fijian ports and waters. Victims of forced labor experience threats of violence, passport confiscation, debt-based coercion, excessive working hours, and abusive

living and working conditions. Fijian workers in Australia and New Zealand are at risk of labor trafficking. Reports indicated low-level official complicity impeded anti-trafficking efforts. Corruption among some officials prevented the investigation of trafficking, including in PRC national-operated brothels. In addition, immigration officials allegedly took action that indirectly facilitated or enabled human trafficking.

# FINLAND: TIER 1

The Government of Finland fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, while considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Finland remained on Tier 1. These efforts included investigating more trafficking cases, convicting more traffickers, and hiring 13 new labor inspectors to focus specifically on monitoring for forced labor. The government also hired three new investigators within the National Bureau of Investigation (NBI), which subsequently operationalized a dedicated human trafficking and illegal immigration intelligence unit. Additionally, the government approved a new three-year national action plan (NAP) to combat trafficking and financially committed to several anti-trafficking activities. The deputy chancellor of justice opened an inquiry into police efforts to investigate trafficking and other forms of exploitation and published a report revealing shortcomings in identifying trafficking cases and unjustified delays in pre-trial investigations. Furthermore, the government entered into force a new law strengthening worker protection rights for foreign workers in the berry picking and wild produce industry and an amendment expanding the obligation of the Occupational Safety and Health Agency (OSHA) to report suspected labor trafficking violations to the police for a preliminary investigation. Although the government meets the minimum standards, authorities prosecuted fewer traffickers and continued to use laws against pandering, discrimination, and usury, among others, to investigate and prosecute some suspected traffickers, which weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. Assistance to victims was conditional on police investigating a case as trafficking, thereby denying services to victims who did not want to pursue criminal cases or those who were exploited outside of Finland and where lack of jurisdiction made an investigation unlikely. Moreover, reports persisted that police penalized trafficking victims for unlawful acts traffickers compelled them to commit. Finally, municipalities continued to lack the capabilities to address the needs of victims.



## PRIORITIZED RECOMMENDATIONS:

Investigate and prosecute sex trafficking and labor trafficking cases using the trafficking statute and sentence convicted traffickers to significant prison terms. • Enforce the non-punishment provision and cease prosecuting victims for unlawful acts traffickers compel them to commit. • Ensure all victims have full access to services, such as residence permit applications, shelters, and health and social services, regardless of whether and under which statutes a suspected trafficker is investigated or prosecuted. • Ensure all municipalities have policies and procedures consistent with national standards and allocate resources so that regional service providers and municipal government officials are familiar with victims' rights to assistance and know how to offer high-quality services. • Train regional authorities, particularly in north and northeast Finland, on identifying and enforcing trafficking crimes, specifically sex trafficking crimes. • Develop clear guidance for national

FINLAND

victim assistance system personnel on treating victims who do not choose to involve the police. • Train judges, law enforcement officials, and prosecutors on applying the trafficking law. • Conduct public awareness campaigns targeting vulnerable populations.

## PROSECUTION

The government increased law enforcement efforts. Chapter 25, Section 3 of the penal code criminalized sex trafficking and labor trafficking and prescribed sentences of between four months and six years' imprisonment for offenses involving an adult victim and between four and 10 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The government continued to use laws against pandering, discrimination, and usury, among others, to investigate and prosecute some suspected traffickers; the penalties for these crimes were generally far less severe than those for trafficking crimes. Pandemic-related judicial delays in processing trafficking cases continued. In 2021, the NBI investigated 129 cases, a significant increase from 87 cases in 2020. Authorities prosecuted six cases, a decrease from 14 in 2020. Courts convicted five traffickers, an increase from one in 2020. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes. The NBI and regional police departments cooperated with foreign governments on transnational investigations, including a joint investigation team with the Czech Republic on a sex trafficking case. The NBI, however, noted difficulty conducting trafficking investigations when crimes occurred abroad. The government deployed police liaison officers and a liaison prosecutor to Estonia, as well as customs and border guards to all Baltic States. As part of a regional project to enhance law enforcement cooperation and training on trafficking, Estonian, Finnish, and Latvian authorities collaborated to strengthen capacity to investigate and prosecute trafficking cases, disrupt the financial gains of traffickers, and help victims access justice.

In 2021, the National Police Board established three new investigator positions within the NBI, which subsequently operationalized its dedicated human trafficking and illegal immigration intelligence unit composed of 18 investigators who focused on coordinating with regional police departments, improving police understanding of trafficking, supporting a standard procedure for investigating trafficking cases across the country, and raising awareness of trafficking crimes. The unit also produced a monthly and annual national situation report on trafficking issues and worked to strengthen international cooperation. The prosecutor's office of Southern Finland, which included Helsinki—the primary location for trafficking crimes—maintained a parallel anti-trafficking unit composed of 10 specialized prosecutors. As in previous years, experts raised concerns that police prioritized other types of conventional cases and crimes and prosecutors were often unwilling to pursue trafficking charges due to the high legal standard for trafficking-related convictions. Civil society representatives and the national rapporteur for trafficking—who acted as an independent advocate for victims, coordinated the drafting and implementation of the new NAP, and monitored and assessed the government's actions to combat trafficking—noted increased efforts by authorities to equitably enforce trafficking laws but recognized regional variances, particularly in north and northeast Finland, in resources and subject matter expertise in identifying and enforcing trafficking crimes, specifically sex trafficking.

During the reporting period, a Finnish newspaper published an investigative report on the deficiencies in investigating and prosecuting trafficking cases in Finland, citing examples over the past four years, such as the failure to investigate trafficking claims, the decision to pursue trafficking cases as lesser crimes, the inability for victims to pursue legal action, and officers and prosecutors routinely failing to question or involve victims in investigations. As a result of the article, the deputy chancellor of justice opened an inquiry into police efforts to investigate trafficking and other forms of exploitation and published a report acknowledging "serious shortcomings in the identification of trafficking in human beings by the police and the prompt conduct of pre-trial investigations." The report reviewed more than 50 investigations, issued 12 reprimands to the police concerning unlawful delays, flagged 15 cases to be reviewed by the chief investigator or police, and remarked

on the conduct of one prosecutor. In addition, the report revealed unjustified delays occurred in almost every police station in the country with some pre-trial investigations lasting longer than four years. The deputy chancellor chided investigators for assessing cases too narrowly and failing to recognize elements of trafficking in their investigations and pointed out, as a result, victims could be denied free legal assistance that they would otherwise be entitled to if the crime was correctly investigated as trafficking. In addition, the deputy chancellor stated that lasting improvements required police to implement a review of internal processes and hold officers accountable for the identification and prompt investigation of trafficking crimes. Finally, the deputy chancellor tasked the National Police Board to provide information on the duration of trafficking investigations and on all pre-trial investigations lasting more than 12 months, with a deadline of July 2022. After the report's release, Southwest Finland Police Department re-opened eight investigations and increased officer training on trafficking.

In 2021, the government established a new national anti-trafficking competence group with participation from all 12 regional police departments, NBI, and the Border Guard. As the lead of the group, the NBI trafficking unit added a new training program for Border Guard officers on working with traumatized victims. Additionally, the government provided a range of trafficking-related trainings for police, immigration officers, and prison and probation services authorities, including recognizing trafficking indicators among vulnerable populations, and the prosecutor's office held trainings for prosecutors throughout the country. The government developed and organized a two-year training program for pre-trial and judicial authorities on identifying all forms of trafficking to improve authorities' basic expertise and competence and, in turn, the criminal justice process. Finally, the police university college led a working group responsible for strengthening multi-authority cooperation in combating trafficking.

## PROTECTION

The government maintained protection efforts. Multiple actors within the government and civil society were empowered to identify and refer trafficking victims. Police and immigration officials used written guidelines for identification and referral, which, in 2021, the National Police Board updated, conducted mandatory training on, and incorporated into a special course for law enforcement on identifying trafficking victims. The national assistance system was the main channel for identifying victims via referrals and, through it, the government provided both direct care and funding for third-party care. The assistance system admitted 243 trafficking victims (28 children), compared with 247 (10 children) in 2020. The assistance system reported 28 percent of new recipients were sex trafficking victims, 43 percent were labor trafficking victims, and the remaining 29 percent were victims of forced marriage or other crimes classified as trafficking under Finnish law. Finnish law required police to pursue cases specifically as trafficking crimes in order for victims to receive services through the assistance system; emergency care was available regardless. In cases where victimization occurred outside of Finland and the conditions of the relevant jurisdiction made law enforcement cooperation unlikely, police did not open a criminal investigation. The government did not provide guidance to assistance system personnel regarding referrals of victims who were exploited within Finland and did not wish to contact the police.

Residence status of an individual affected the scope of assistance received by trafficking victims. Overall, victim assistance was good, although there were large variations in quality between services offered through the national assistance system, which encompassed various Finnish Immigration Services (FIS) programs, and services offered through municipalities. A 2021 Finnish Institute for Health and Welfare report examined the disparity in the provision of services between foreign nationals, who received housing and welfare services from the national assistance system, and Finnish citizens, who received benefits from municipal social health and welfare programs. While observers broadly agreed with some of the study's findings, they raised concerns about how municipal social welfare service boards would be able to meet the needs of trafficking victims and provide assistance uniformly. Observers noted the national assistance system had the expertise and capabilities to provide services that municipalities lacked, and municipalities often did not understand how services

would be reimbursed. Observers also noted municipalities experienced difficulties with victim service provision because they functioned under the general framework of social welfare and did not have sufficient resources to deal with crime-related issues such as trafficking or victims of trafficking. Since the national assistance system was able to provide more suitable assistance than municipalities, the standard of service, in some incidences, deteriorated as an individual's residence status changed. Helsinki's head of adult social work noted the legislation concerning benefits for victims was unclear and originally intended to assist undocumented victims and not citizens of Finland. As a result, municipal social services referred few victims, which experts attributed to a lack of experience in identifying victims and a poor understanding of the referral process. Subsequently, the Ministry of Social Affairs and Health tasked a working group to examine changes to victim referral processes and establish a national referral mechanism as proposed in the NAP. Furthermore, according to some anti-trafficking advocates, the placement of the assistance system within immigration services could misrepresent trafficking as a crime requiring migration and reduce the focus on trafficking committed within Finland. The working group considered the transfer of the victim assistance system to the Ministry of Social Affairs and Health to address this concern and to weaken the link between the provision of assistance to victims and their participation in the justice process, which acted as an obstacle to victims' willingness to come forward, but efforts stalled due to non-consensus among members of the working group and concerns about the lack of trafficking-related expertise outside the assistance system.

Once victims were referred to the assistance system, consultants evaluated the case and decided on the victim's course of care, which could include transportation to a safe house; psychological, medical, and legal assistance; or shelter. There was one government-funded shelter specifically for trafficking victims, though it accepted only women and their children; there were no shelters dedicated to male victims. Care providers sheltered most trafficking victims in private accommodations. The Joutseno Reception Center was both an FIS agency and the name of a physical center that could temporarily house up to 300 trafficking victims, when necessary, and provide social and health services. Social welfare, immigration, labor, and medical personnel staffed the center and provided assistance to victims. As an agency, the center developed, coordinated, and maintained assistance for all trafficking victims nationally, including children, and helped place victims in housing across the country. Authorities placed unaccompanied foreign child trafficking victims in a migrant reception center specifically for children, and Finnish child trafficking victims, who could not return to their families, in foster care. Child services assigned Finnish child victims a guardian to serve as a legal representative. In 2021, the government incorporated specific information on the exploitation of children, including trafficking, into an online learning program for professionals who came across potential child victims. The government spent €1 million ($1.13 million) on trafficking victim assistance and protection, approximately the same as in 2020. In addition, the government allocated €240,000 ($272,110) to NGOs for victim support services, approximately the same amount as in 2020. During the reporting period, the government in partnership with NGOs, the private sector, and other organizations implemented a pilot project to provide training and full-time jobs to trafficking victims residing in Finland. The project aimed to improve working life skills and competence of trafficking victims, develop employment services offered to victims, and increase the involvement of the private sector in combating trafficking.

FIS conditioned eligibility to receive a specialized residence permit on the victim's cooperation with police to commence a criminal investigation. Delayed investigations and police failure to submit the appropriate paperwork requesting victims to remain in the country, left victims susceptible to deportation. Finnish law allowed foreign victims a six-month reflection period during which they could receive care and services while considering whether to assist law enforcement, and the law allowed legal residents a recovery period of up to three months. According to the assistance system, the government granted 16 victims a reflection period in 2021. Victims could receive renewable temporary residence permits, which were valid for six to 12 months and allowed victims to seek employment. Authorities provided residence permits to 13 victims and renewed 15 permits in 2021. To promote the detection

of work-related exploitation and trafficking, in 2021, the government amended the Aliens Act, broadening the rights of exploited employees to apply for an extended residence permit or for a certificate of expanded right to work and change employers; however, eligibility depended on employees already holding a residence permit in Finland that included the right to work. Finnish police were not prohibited from prosecuting victims who, as a result of their trafficking, committed acts that violated national law. Observers continued to point out that the non-punishment provision existed in theory, but in practice, the detaining or prosecuting of trafficking victims for committing unlawful acts traffickers compelled them to commit continued to be a problem, particularly with police treating users of illegal drugs, potential victims who had been forced into criminality, and foreign nationals in commercial sex as perpetrators of crimes. The government identified several such victims in Finnish prisons and noted foreign-born children committing theft as a group particularly misunderstood by law enforcement. Subsequently, the government tasked the Ministry of Justice to provide training and relevant information to authorities to ensure victims were not penalized for unlawful acts traffickers compelled them to commit.

## PREVENTION
The government increased prevention activities. The national anti-trafficking coordinator oversaw all aspects of the country's anti-trafficking efforts, including the development of the NAP. In 2021, the government approved a new three-year NAP to combat trafficking, the first update since 2016. The government consulted survivors, experts, and civil society representatives during the drafting process. The NAP identified several action items and outlined the government's financial commitment to combat trafficking, which included €300,000 ($340,140) to develop tools to better reach and identify victims, €15,000 ($17,010) to review government-level coordination structures for anti-trafficking action, €15,000 ($17,010) for increasing awareness among business and labor market organizations, and €240,000 ($272,110) for data-driven, anti-trafficking actions. As a result of the NAP, the national anti-trafficking coordinator oversaw training development and organization for occupational safety and health authorities, social welfare and health care professionals, immigration service authorities, authorities in public employment and business services, and all airport border control staff. Similar to the previous reporting period, the national assistance system did not conduct or fund any domestic anti-trafficking awareness campaigns. However, the Ministry of Social Affairs and Health funded €1.6 million ($1.8 million) for outreach to individuals engaged in commercial sex through its sponsorship of an NGO. Globally, the government continued to fund a wide range of anti-trafficking programs, including training in Laos and a prevention project in Burundi, investing more than €85,000 ($96,370) in 2021. In response to an inflow of Ukrainian refugees who were fleeing Russia's war on Ukraine and arriving in Finland, the government appointed a cross-sectoral group to coordinate issues related to trafficking and the impact of the situation on Ukrainian seasonal workers, a group previously identified as vulnerable to trafficking. In addition to following the EU agreement on providing temporary protection to people leaving Ukraine, Finland offered temporary protection to Ukrainian nationals and their family members who fled Ukraine before Russia's full-scale invasion and non-EU nationals who had resided legally in Ukraine and could not return to their home country. The Ministry of Interior operated a 24-hour hotline and website in multiple languages exclusively for trafficking victims. The government did not make efforts to reduce the demand for commercial sex acts.

To improve the legal position of seasonal berry pickers and combat labor abuse and trafficking, the government entered into force a new law strengthening worker protection rights for foreign workers in the berry picking and wild produce industry. The new law outlined in more detail the monitoring, compliance, and associated penalties for negligence and prohibited companies from charging for recruitment services, such as fees, and job training. OSHA monitored compliance with occupational safety and health legislation, including overseeing the employment terms for workers, and conducted workplace inspections, including related to the use of foreign labor and proper payment to foreign workers. During the reporting period, the government also entered into force an amendment to the law on occupational safety and health, expanding

the obligation of OSHA to report suspected labor trafficking violations to the police for a preliminary investigation. In 2021, the government hired 13 new labor inspectors to focus specifically on monitoring forced labor. The government participated in a new project aimed at strengthening the knowledge of and approach to human trafficking, particularly in an international context. The project advanced the work of the online trafficking identification tool for labor inspectors that launched in 2020 by coordinating training and enhancing cooperation among Estonian, Finnish, and Latvian authorities. The Ministry of Social Affairs and Health drafted a report on the occupational safety concerns of domestic workers and established a working group with the Ministry of Economic Affairs and Employment to improve labor enforcement in the domestic work sector. Multiple agencies developed and conducted training and webinars on the structures and practices of employment services with an eye toward trafficking.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Finland, and to a lesser extent, traffickers exploit victims from Finland abroad. Victims primarily originate in Eastern Europe, Africa, South and Central Asia, and the Middle East. The national assistance system notes most identified victims were subjected to trafficking before their arrival in Finland. The national assistance system also notes an increase in child trafficking victims in recent years. Traffickers operate from abroad using threats of violence, debt leverage, and other forms of coercion. Authorities express concern about Romanian criminal organizations exploiting individuals from their home countries in Finland. Experts note most labor trafficking involves small-scale operations in businesses, rather than larger criminal syndicates. Authorities report asylum-seekers and other migrants, many of whom continue to reside in Finland for years after receiving a negative decision on their asylum claim, are the two groups most vulnerable to trafficking. Traffickers threaten to expose their unlawful residency if they complain of their exploitation in sex or labor trafficking. A Finnish newspaper reports an emerging scheme involving cleaning companies misrepresenting asylum-seekers as entrepreneurs, who have different work parameters than foreign workers, to avoid paying them overtime and holiday pay. Foreign-born workers and immigrants, many of whom arrive in Finland legally, are especially vulnerable to exploitation in the construction, restaurant, agriculture, and transport industries and as cleaners, gardeners, and domestic workers. The government identifies domestic workers at a particularly high risk for labor exploitation, including trafficking. Staff at the Ombudsman for Nondiscrimination report traffickers force victims to pay for jobs and unpaid internships, particularly in the construction industry, before transporting them to Finland. Authorities report the recruitment and exploitation of foreign workers from Nepal in the restaurant sector. According to media reports, traffickers extort, charge illegal recruitment fees, and subject Vietnamese immigrants and temporary workers to exploitation in vegetable farms in Western Finland; civil society contacts identify this community as especially vulnerable to trafficking crimes. Seasonal berry pickers continue to be especially vulnerable to labor exploitation and trafficking. Foreign nationals and Ukrainian refugees, predominantly women and children, who are fleeing Russia's war on Ukraine and seeking sanctuary in Finland, are highly vulnerable to trafficking. Southern Finland, which includes Helsinki, remains the primary location for trafficking crimes. The national assistance system reports identifying one trafficking victim from Åland, an autonomous, demilitarized, and predominantly Swedish-speaking region of Finland. Experts working in victim services identify a lack of understanding of trafficking as a significant barrier to victim identification in Åland, as well as in north and northeast Finland.

## FRANCE: TIER 1

The Government of France fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore France remained on Tier 1. These efforts included opening

a new children's shelter that could accommodate trafficking victims and adopting a national action plan (NAP) for children exploited in commercial sex, including child sex trafficking. The government established a new unit of eight investigators specializing in the exploitation of children in commercial sex, which included child sex trafficking, as well as a cooperation mechanism for victim assistance on police operations with a civil society network. Although the government meets the minimum standards, it investigated and prosecuted fewer suspects and convicted fewer traffickers compared with the prior year. The government continued to lack a national victim identification and referral mechanism (NRM) to ensure proactive referral to care, and it did not increase its efforts to address labor trafficking. The government continued to lack legal safeguards to protect victims from prosecution for unlawful acts traffickers compelled them to commit and did not report awarding compensation or restitution to any victims in 2021. Police continued to arrest and prosecute child victims of forced begging and forced criminality and deport undocumented migrants from Mayotte, an overseas French department, without screening for trafficking indicators. Funding for victim assistance decreased compared with the prior year and was generally insufficient. Furthermore, the government again did not take effective steps to address the 3,000 to 4,000 unaccompanied Comorian children at risk for sex and labor trafficking in Mayotte. Furthermore, the government did not sufficiently disaggregate data between trafficking and other forms of exploitation or between sex and labor trafficking, which resulted in unclear trends and statistics.



FRANCE TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Coordinate and centralize the timely collection of trafficking data across the government, including sufficiently disaggregating data between trafficking and other forms of exploitation, as well as between sex and labor trafficking. • Create an NRM for all forms of trafficking. • Increase efforts to proactively identify and provide assistance to trafficking victims in all regions and departments, both domestic and overseas, including for vulnerable populations like asylum-seekers. • Vigorously investigate, prosecute, and convict traffickers and sentence those convicted to significant prison terms. • Increase funding and resources specifically for anti-trafficking coordination and victim assistance, including adequate funding for NGOs providing assistance. • Increase interagency coordination to investigate and prevent labor trafficking. • Ensure adequate training for law enforcement investigators on techniques to dismantle human trafficking organizations operating on the internet and other technologies. • Systematically train all front-line officials, including labor inspectors, police, prosecutors, and judges, on a victim-centered approach to investigating and prosecuting labor trafficking and identifying victims. • Vigorously investigate labor trafficking and prosecute these crimes as trafficking rather than labor code violations. • Allow formal victim identification without requiring cooperation or interaction with law enforcement and by entities other than law enforcement officials, including by civil society, social workers, and healthcare professionals. • Consistently screen all migrants for trafficking indicators, including unaccompanied children in Mayotte. • Enact a legal provision on the non-punishment of victims to ensure that trafficking victims are not inappropriately penalized for unlawful acts traffickers compelled them to commit. • Implement the second NAP and include a defined timeframe and dedicated budget, as well as other recommendations from the national rapporteur. • Provide adequate resources for child victims, including improving the quality of shelters and specialized assistance, especially of forced begging and criminality. • Increase trafficking survivor access to damages and restitution and increase prosecutor's efforts to systematically request restitution for survivors during criminal trials, including for victims lacking legal status. • Offer the reflection period to all victims,

Haiti AR_000715

including migrants and victims of forced begging and criminality. • Strengthen international law enforcement cooperation to prevent and investigate child sex tourism and continue to prosecute and convict perpetrators. • Ensure sufficient resources are provided to the national rapporteur and the anti-trafficking coordinator. • Establish a witness protection program trafficking victims can use and improve assistance provided during court trials. • Increase worker protections by prohibiting recruitment or placement fees charged to workers by labor recruiters and ensuring employers pay any recruitment fees. • Establish adequate accommodation centers dedicated to adult male trafficking victims that take into account the specific needs of these trafficking victims. • Increase survivor engagement, including by establishing accessible mechanisms for receiving and providing compensation for survivor input when forming policies, programs, and trainings. • Increase efforts to pursue financial crime investigations in tandem with human trafficking cases.

## PROSECUTION

The government decreased law enforcement efforts. Article 225-4 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to 10 years' imprisonment and a fine. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious offenses, such as rape. The increased occurrence of other crimes, notably domestic violence, during the pandemic lockdowns caused a shift in government priorities and resources away from human trafficking—although NGOs asserted the government had prioritized other crimes for many years prior to the pandemic.

The government did not report comprehensive and disaggregated law enforcement data but provided information from all French departments and territories, including those overseas. The government reported conducting 127 investigations ("procedures") related to human trafficking in 2020, a decrease compared with 235 in 2019 and 196 in 2018. In 2020, the government reported investigating and dismantling 53 networks involved in facilitating human trafficking and commercial sex crimes, leading to the arrests of 875 suspects; compared with 58 networks dismantled and 339 suspects identified in 2019. The government reported that pandemic-related restrictions decreased the capacity of investigators and resulted in fewer investigations, which also affected the number of prosecutions. Beginning in 2019, the government changed its methodology for reporting prosecutions, and statistics for prior years have been updated to reflect this change. The government reported prosecuting 244 trafficking suspects in 2020, the most recent year data was available, a decrease compared with 339 suspects in 2019 but similar to 252 suspects in 2018. Of the prosecutions, at least two were for labor trafficking in 2020, but the government remained without adequate data disaggregation between sex and labor trafficking for most trafficking indictments. The government reported convicting 66 traffickers in 2020, the most recent year for which data was available; a significant decrease compared with 91 in 2019 and 104 in 2018. The pandemic caused courts to shut down for two months in 2020, which delayed the processing of all cases. While the government did not report comprehensive and specific sentencing data in a format that allowed for an accurate assessment of significant sentencing, it provided a five-year average (2015-2020) of 3.4 years' imprisonment with 78 percent of convicted traffickers serving some amount of prison time. NGOs reported that trafficking sentences were not a sufficient deterrent, especially in cases of labor trafficking.

The government did not report any new investigations, prosecutions, or convictions of officials complicit in human trafficking crimes. The National Consultative Commission for Human Rights (CNCDH), which functioned as the independent national rapporteur, urged courts to issue more consistent and stringent penalties to convicted human traffickers, and NGOs expressed concerns about the inconsistency of anti-trafficking prosecutions across the country, which could vary depending on the level of engagement of local prosecutors. In its 2022 report, GRETA noted that many investigators, prosecutors, and judges believed transnational networks or border crossing were necessary elements of human trafficking and therefore did not pursue cases without these elements as trafficking cases. Trafficking victims were not afforded the same rights and entitlements, such as residence permits and full compensation, if their cases were pursued as other

crimes. GRETA expressed concern that trafficking crimes were being convicted under other statutes and urged the government to rectify this, including through further trafficking specialization for investigators, prosecutors, and judges.

The government had several bodies that were responsible for investigating trafficking crimes: the Ministry of Interior's Central Office for the Suppression of Trafficking in Human Beings (OCRTEH), comprising 25 investigators, was responsible for cases of sex trafficking, and the Central Office for Combatting Illegal Labor and the Central Office for the Suppression of Irregular Migration and the Employment of Irregular Migrants were responsible for labor trafficking cases. In 2021, a new unit of eight investigators specializing in the exploitation of children in commercial sex, to include child sex trafficking, was established in Paris. The government and government-funded NGOs continued anti-trafficking training programs, both in person and virtually, some of which included training for magistrates, prosecutors, police, social workers, civil servants, and NGOs. The CNCDH and several other government bodies raised concerns regarding the lack of adequate training for many police investigators on techniques to dismantle human trafficking organizations that operated on the internet and other technologies—a trend that rapidly increased during the pandemic. During the reporting period, the government provided training to investigators to increase efforts to dismantle trafficking on the internet. A June 2020 government report asserted law enforcement also lacked sufficient awareness of trafficking organizations that exploited male and transgender victims, despite the extreme violence often used by these criminal organizations; however, the government did not report whether additional training was provided to law enforcement. Furthermore, an NGO asserted police sometimes recorded sex and labor trafficking complaints as lesser crimes that did not necessitate an official investigation or failed to register the complaint at all. NGOs also observed that judges and prosecutors were sometimes reluctant to formally certify forced labor victims because of the protections subsequently granted to them and recommended judges and prosecutors take additional targeted training, which the government reported providing.

In 2021, the government collaborated in international investigations, including with EUROPOL, INTERPOL, Bosnia-Herzegovina, Italy, Madagascar, Moldova, Paraguay, Romania, and Spain, which resulted in the identification of at least 697 victims and 143 trafficking suspects both in France and cooperating countries. To foster increased cooperation with civil society, in 2021 the government proposed and, in collaboration with Ac-Se—an anti-trafficking NGO-network—established a cooperation mechanism to inform, assist, and protect victims of trafficking by including Ac-Se in several police operations throughout the year. This close coordination with civil society and multidisciplinary approach resulted in seamless assistance to trafficking victims identified during operations and allowed NGOs to accompany victims to interviews with law enforcement and to ensure local shelters were prepared ahead of time to receive victims. French law enforcement had 15 joint investigation teams related to human trafficking to facilitate international law enforcement cooperation, including with Belgium, Bosnia-Herzegovina, Bulgaria, Hungary, Moldova, Romania, and Spain, and maintained a police liaison in Nigeria. However, due to the inaction of local French law enforcement on a forced labor case involving a Comorian trafficking victim in Mayotte, an overseas French Department, Comorian law enforcement noted difficulty cooperating with French law enforcement; Comorian law enforcement reported that the trafficking victim was ultimately deported from Mayotte to Comoros and that officials requested extradition of the suspect.

## PROTECTION

The government maintained insufficient victim identification and protection efforts, and victim identification decreased compared with the prior year. The government remained without an NRM and comprehensive, centralized, or sufficiently disaggregated data, making victim identification difficult to assess. The government did not adequately disaggregate data between trafficking and other forms of exploitation or between sex and labor trafficking. In 2020, police identified 197 trafficking victims, including at least five forced labor victims; a decrease compared with 235 in 2019 but more than 187 in 2018. In 2020, police also identified 786 victims of commercial

sexual exploitation, some of whom may have been victims of sex trafficking; of these victims, 493 were French, and 217 were children. This compared with 785 victims of commercial sexual exploitation in 2019 (187 children) and 849 in 2018. Gaps in victim identification remained, and the government did not report the specific number of French nationals, children, asylum-seeking, or labor trafficking victims it identified in 2020; however, French nationals tended to be the majority of identified victims in prior years, and identified child victims continued to increase. Experts, NGOs, and GRETA expressed concerns regarding the government's national statistics on victim identification and asserted the scale of human trafficking in France was likely much higher. Victim protection data included all French departments and territories, including those overseas. Pandemic lockdowns led to the decreased use of bars and nightclubs and the increased use of private locations and the internet as venues for exploitation, which exacerbated vulnerabilities for sex trafficking victims and decreased victim visibility to authorities. The pandemic also exacerbated vulnerabilities for labor trafficking victims through increased insolation of migrant and domestic workers, which complicated detection by officials and NGOs.

The government remained without an NRM to ensure uniform and equal treatment of victims; however, the government established an interdepartmental working group, which included NGOs, that submitted a draft mechanism for review in January 2022. In its 2013, 2017, and 2022 reports, GRETA urged the government to adopt an NRM. Most ministries and regions had formal procedures for identifying victims, including a new mechanism in Marseille in 2021, and authorities continued to use an NGO-run referral mechanism. GRETA noted the government remained without a formal identification process for victims who were nationals of France or a European Economic Area country. Experts, NGOs, and the national rapporteur reported gaps in authorities' proactive victim identification efforts persisted; they called for improving victim identification as a top priority in the NAP. The government assumes the majority of individuals in commercial sex and all foreign adult individuals in commercial sex are trafficking victims, and the government systematically screens this population for trafficking indicators. However, this assumption could have led to a misunderstanding of sex trafficking amongst front-line officials and conflation with commercial sex. Authorities also often mischaracterized victims of forced criminality as delinquents or illegal workers and consequently excluded them from assistance. Victims of forced labor experienced difficulty in formal recognition as victims. Given the significant increase in children exploited in commercial sex in the past few years, which NGOs estimated to be between 10,000 and 15,000 predominantly French girls, in April 2021, the national rapporteur publicly urged the government to adopt a clear criminal policy against the sexual exploitation of children. The rapporteur recommended improving the identification of child trafficking victims by increasing training and data collection, targeting online platforms, and increasing national awareness campaigns.

The government provided funding for the Ac-Se system, an NGO-managed network of 88 partners, including 58 reception facilities, five NGOs that act as both reception facilities and specialized service providers, two combined reception and advice centers, one host family, and 22 specialized service providers assisting adult victims of sex and labor trafficking. The Ac-Se NGO network provided victims with shelter, legal, medical, and psychological services. However, GRETA reported that the network did not cover the entire country or overseas French Departments. Both police and NGOs referred victims to Ac-Se. However, only the police, gendarmerie, and judiciary could formally identify victims; formal identification required victims to cooperation with law enforcement. NGOs reported formal official recognition as a trafficking victim was difficult to achieve and such status offered additional protections and in practice was necessary to obtain asylum or a residence permit, residency papers, healthcare, and housing. While labor inspectors could refer potential cases of labor trafficking to law enforcement authorities, in its 2022 report, GRETA recommended authorizing labor inspectors to formally identify victims as well. The CNCDH urged the government to allow formal victim identification without a requirement to cooperate with law enforcement and also by entities other than law enforcement, including by civil society, healthcare workers, and social workers; however, the government did not report efforts to allow other entities to formally identify victims

during the reporting period. The government provided Ac-Se with €523,000 ($592,970) in 2021, in addition to an unreported amount of funding it dispersed to individual NGOs supporting the Ac-Se network. This amount was a decrease compared with €797,000 ($903,630) in 2020. NGOs criticized the amount of funding generally provided by the government to all NGOs for victim assistance as insufficient and asserted the government often funded anti-trafficking efforts from the women's rights budget with little transparency into how much it allocated specifically to human trafficking. NGOs also raised concerns pertaining to the lack of a dedicated budget allocation to NGOs providing victim assistance to trafficking victims, forcing NGOs to rely on donations from private entities. In its 2022 report, GRETA urged the government to increase funding and resources dedicated to combatting human trafficking. In addition to victims identified by the government, NGOs reported identifying at least 6,457 human trafficking victims and assisting 2,573 in 2020, but many of the NGOs did not receive government funding, and the government did not provide further details. While only partial data on victim assistance was available, government-funded NGOs reported assisting a total of 260 trafficking victims, including shelter for 48 victims and nine child dependents in 2020; this was similar to 264 in 2019, including shelter for 45 victims and 12 child dependents.

Victims were entitled to a 30-day reflection period during which they could decide whether to lodge a complaint or participate in criminal proceedings against a trafficker; however, some authorities were not familiar with the reflection period and did not offer it. Although formal victim identification required law enforcement cooperation, victims who chose not to cooperate could still receive free medical attention. Not all trafficking victims were eligible for admittance into Ac-Se's shelter program, unless they were in immediate danger or in a highly vulnerable situation that required geographic relocation; NGOs observed that migrants without legal status often struggled to find housing, which increased their risk of exploitation. The central and municipal governments continued to partially fund the operation of a shelter in Paris that could accommodate 12 victims, as well as a small number of emergency apartments external to the Ac-Se system. There were no accommodation centers dedicated to adult male trafficking victims, but communal homes or homeless shelters were sometimes used; however, these accommodations did not take into account the specific needs of trafficking victims. Police referred child trafficking victims to the Child Welfare Services (ASE) system, which provided the children with shelter. In October 2021, the government funded an NGO-run shelter for up to 12 children, which could include trafficking victims; the shelter offered health, psychological, and judicial support. Authorities noted a significant increase in children exploited in commercial sex over the past five years, with traffickers targeting girls in government children's shelters. GRETA and the national rapporteur reported a lack of adequate resources for the special assistance needs of child trafficking victims, especially considering the increase in victims in recent years. GRETA noted reports that unaccompanied children at airports or immigration reception centers sometimes disappear or are picked up by traffickers. While GRETA noted improved assistance to victims in recent years, it expressed concern regarding the persistent insufficient number of shelters and funding for NGOs who provided victims with care.

The law entitled trafficking victims to free legal aid, subject to meeting a number of requirements, and victims who did not meet the requirements for legal aid could receive assistance from NGOs; however, in its 2022 report, GRETA asserted lawyers were often unfamiliar with trafficking and urged the government to ensure all victims, regardless of the victim's immigration status, had systematic early access to legal assistance. GRETA expressed concern legal aid was unavailable for undocumented migrants and may have restricted the rights of some victims to access justice. Local governments provided French language classes to victims, and some victims could qualify for subsidized housing and job training programs, but the government did not report the number of victims provided with these benefits. The national employment agency provided some foreign victims with an initial stipend of €350 ($397) a month but did not report the number of victims that received this stipend during the reporting period; civil society organizations reported the conditions for being granted a stipend were not uniform and varied by region. Judges heard criminal trials for trafficking in private at the victim's request, and remote testimony, including by video, was also

available. Although NGOs sometimes provided psychological support to victims, the government did not fund this service, and NGOs and GRETA asserted psychological counseling to victims was insufficient. However, victims usually had access to a psychologist during court proceedings, which was a legal requirement for children. The government took additional precautions to prevent re-traumatizing children: the law limited the interview of child victims to one time, law enforcement used child-friendly procedures, and the government had specialized law enforcement officials and courts for child victims. The government had specialized private victim interview rooms for children, but GRETA and NGOs reported law enforcement was often unaware of them or did not use them. NGOs and GRETA noted, despite the legal entitlement, the government did not consistently provide interpreters to victims during trials or information in a language they understood, the responsibility of which would then pass to NGOs, often without available government funding. In its 2022 report, GRETA noted front line officials were not adequately trained on human trafficking and could not inform trafficking victims of their rights or trafficking procedures, despite the availability of a standard form on victim rights; GRETA urged the government to address these gaps. Law enforcement did not have a witness protection program that trafficking victims could use, which may have decreased the willingness of some victims to cooperate with law enforcement. The CNCDH urged the government to improve assistance provided to victims during their trials, but the government did not report making efforts to do so. In its 2022 report, GRETA urged the government to ensure trafficking victims could access the witness protection program and increase their usage of audio-visual equipment to interview victims and specialized interview rooms, especially for children.

The government issued permits only when victims cooperated with police investigations or enrolled in the government's reintegration program, which required ceasing engagement in commercial sex and often required paperwork victims could not obtain. Authorities generally offered permanent residency to trafficking victims following a successful conviction of their trafficker. The government reported issuing or renewing 293 temporary residence permits (313 in 2019) and 25 permanent residence permits (41 in 2019) to trafficking victims in 2020, the most recent year data was available. In its 2022 report, GRETA noted that while trafficking survivors with residence permits were permitted to work, they often faced language barriers, lacked necessary training, and were in need of further psychological assistance due to trauma suffered; GRETA urged the government to address these issues. Trafficking victims were also eligible for international protection under refugee status or subsidiary protection status in cases where victims had a credible fear of retaliation, including from public authorities in their country of origin, if returned; however, the government did not report the number of victims granted such status. The government offered a specialized support program for asylum-seekers who were also victims of violence or human trafficking, but it required the victims to be formally recognized; the program provided secure lodging, psychological support, and a path to request asylum, but the government did not report how many asylum-seekers utilized this program during the reporting period. The government had internal guidelines to evaluate and process asylum claims on the basis of labor trafficking. GRETA and a large collective of anti-trafficking NGOs believed the new law on asylum and immigration, which eased restrictions on migrant deportation, limited victims' ability to receive temporary residence due to new time-bound restrictions on permit applications and more stringent approval criteria. In its 2022 report, GRETA cited instances where trafficking victims in the asylum system had numerous interactions with law enforcement but were never identified as a victim, as well as where NGOs had identified trafficking victims but law enforcement disagreed or deported the victim, despite the victim having lodged a complaint against the trafficker; GRETA recommended increased training on human trafficking for front-line officials.

In its 2017 and 2022 reports, GRETA expressed concern that police continued to arrest and prosecute child victims of forced begging and forced criminality without screening for trafficking indicators. In 2021, the government did not report uniformly screening undocumented migrants, who were vulnerable to trafficking, in Mayotte for trafficking indicators prior to their deportation, which could have left some trafficking victims unidentified. Of the 3,000-4,000 unaccompanied Comorian children at

risk for sex and labor trafficking in the French department of Mayotte, the government reportedly provided approximately 40 children per year with accommodation and education, though it did not report taking effective steps to address the protection needs, including medical care, shelter, or education, of the remaining 3,000 to 4,000 children.

The government continued to lack comprehensive statistics on compensation, restitution, and damages awarded to trafficking victims. Trafficking victims could obtain compensation for personal injuries from the government through the commission for the compensation of victims of criminal offences (CIVI). GRETA reported that the CIVI often waited to make decisions until prosecutors made official indictments; with regard to labor trafficking, if prosecutors charged the perpetrator for a less severe labor law violation vice trafficking, victims would receive less compensation. The government did not report granting compensation to any trafficking victims for 2021, compared with seven victims from 2020 who received between €5,000 ($5,670) and €10,000 ($11,340) each. While not systematic or mandatory, criminal courts could order traffickers to pay restitution to victims who were citizens of France or when the act was committed on French territory, the European Economic Community (ECC), or had legal immigration status; the government did not report awarding restitution to any victims in 2021, compared with three in 2020. Victims who were citizens of France, the ECC, or had legal immigration status could also bring a civil suit against a trafficker for damages; however, authorities did not report any victims filing suits or awarding damages to any victims during the reporting period. GRETA and NGOs reported victim restitution was rare and amounts for compensation, restitution, and damages were small. GRETA reported in 2022 that even when traffickers were ordered to pay restitution or damages, victims often did not receive payment because enforcement was difficult, and traffickers often declared bankruptcy. Victims of sex trafficking may have had difficulty in claiming restitution or damages because they did not have a legal form of employment. Victims lacking legal status were ineligible for restitution or damages, potentially increasing their vulnerability to exploitation. The government did not report the amount of assets confiscated from convicted traffickers in 2020 or 2021 or whether any was awarded to victims for restitution or damages; however, in its 2022 report, GRETA highlighted that between 2017 and 2019, authorities seized €26 million ($29.48 million) from traffickers. Victims could also receive backpay from the Labor Court, as one such victim did in 2021. In its 2022 report, GRETA urged the government to better guarantee effective access to compensation, restitution, and damages, increase training for frontline officials, and use the confiscated assets from traffickers for victims. GRETA reported that the lack of a specific provision in French law protecting victims from prosecution for unlawful acts traffickers compelled them to commit could leave victims vulnerable to penalization, especially child victims of forced criminality and forced begging. In February 2021, the Minister of Justice requested prosecutors avoid prosecuting children for forced criminality, but this continued to leave adult victims vulnerable, and this request was not codified in the law. GRETA and NGOs expressed concern that the convictions for formally recognized trafficking victims could not be expunged, which could prevent some victims from accessing employment.

## PREVENTION

The government maintained prevention efforts. The Inter-ministerial Mission for the Protection of Women against Violence and the Fight against Human Trafficking (MIPROF) continued to coordinate government-wide efforts on anti-trafficking and the prevention of violence against women; however, NGOs and GRETA urged the government to increase personnel and resources allocated to the office. MIPROF's anti-trafficking steering committee included national, regional, and local governments, as well as NGOs; it met once during the reporting period, but NGOs noted an overall decrease in the government's engagement with NGOs. The CNCDH continued to serve as the independent national rapporteur for trafficking, but resources remained insufficient. The government had a NAP; however, the rapporteur criticized the plan, noting obstacles and deficiencies, including the absence of a defined timeframe or budget. Furthermore, the national rapporteur noted the action plan did not address the flaws of the first plan, which included prioritizing sex trafficking over labor

**FRANCE**

trafficking, unequal efforts that varied by region, and the continued conflation of commercial sex and human trafficking by authorities. The national rapporteur recommended annual plans incorporating specific deadlines, detailed measures, monitoring indicators, separated costs, and a dedicated source of funding; however, the government did not report taking any concrete steps on these recommendations. MIPROF met with CNCDH twice during the reporting period to discuss the recommendations from the NAP. In November 2021, the government adopted a NAP specifically for children exploited in commercial sex, including child sex trafficking, with a dedicated budget of €14 million ($15.87 million) for implementation.

The continued prioritization of sex trafficking led to insufficient efforts to combat labor trafficking, and the CNCDH recommended increased training on labor trafficking for all front-line officials, as labor trafficking was often categorized as labor code violations, undeclared work, undignified work conditions, or employing illegal migrants. The tendency for authorities to categorize labor trafficking as lesser crimes resulted in decreased deterrence. In 2022, GRETA recommended the government increase its efforts to combat labor trafficking, including by increasing labor inspections of high-risk sectors and raising awareness among migrant worker populations. The government continued to make limited efforts to raise national awareness of human trafficking; efforts included participation in an awareness campaign, launched by NGOs, to raise awareness of the sexual abuses committed against children on Mayotte. In partnership with a civil society organization, the Ministry of Economy and Finance distributed pocket-sized cards on trafficking victim identification to border police and NGOs. In early 2022, the government focused awareness raising efforts on refugees fleeing Russia's full-scale invasion of Ukraine by establishing a website, dedicating emergency shelter for refugees, and requiring citizens to register with the government before hosting Ukrainian refugees.

The government did not report having a licensing or accreditation process for labor recruiters, and there was no law prohibiting or criminalizing recruitment companies from charging recruitment or placement fees to workers. Passport withholding, contract switching, and wage withholding were illegal, and workers could pursue legal recourse. Fraudulent labor recruitment remained a concern during the reporting period. In 2021, the government conducted 132,000 labor inspections; however, unlike prior years, the government did not report whether any potential victims were referred to police or whether any investigations were initiated as a result of the inspections. Labor inspectors lacked the authority to identify trafficking victims but could refer potential victims to police. Law enforcement, immigration guards, and labor inspectors, both domestically and in Mayotte, participated in joint inspections that focused on the agricultural sector, which resulted in the identification of at least 27 suspected traffickers and the arrest of eight, as well as the identification of at least 91 victims of trafficking in France; however, the government did not report any results from Mayotte. French law required large companies (with more than 5,000 employees) to enact due diligence measures to identify risks and prevent serious harm to human rights, including labor exploitation, by subcontractors and suppliers. In its 2022 report, GRETA encouraged increased implementation of the due diligence law. During the reporting period, prosecutors initiated an investigation into four major retailers that allegedly continued to purchase cotton from the People's Republic of China (PRC), which was potentially harvested with forced labor. The government made efforts to reduce the demand for child sex tourism by funding programs to raise awareness in airports and with tourism operators of the illegality of and penalties associated with child sex tourism, as well as requiring students to complete an awareness course on sex tourism prior to their departure abroad. For destinations with higher incidences of child sex tourism, like Cambodia, Indonesia, Laos, Madagascar, and the Philippines, the government included warnings on its website for travelers. The government made efforts to reduce the demand for commercial sex by fining approximately 1,300 purchasers of commercial sex, though efforts were inconsistent throughout the country.

The government also continued to station liaison officers and judges abroad, including in Romania, Cote d'Ivoire, Nigeria, and Southeast Europe, who helped coordinate law enforcement efforts against traffickers, including a June 2021 online training for specialized Romanian prosecutors on interview techniques for child victims of trafficking. In 2021, the

government continued to fund anti-trafficking capacity-building programs across Africa's Gulf of Guinea region and victim support operations in Libya, and it helped organize and fund several international workshops on human trafficking. Ac-Se continued to operate a hotline for trafficking victims, as well as a hotline for children in abusive situations, including trafficking; however, neither hotline reported the number of trafficking-related calls received. GRETA recommended the government establish a dedicated national human trafficking hotline. The government continued to host an online platform that allowed citizens to flag inappropriate content, which led to several human trafficking investigations. The government did not provide systematic anti-trafficking training for its diplomatic personnel, although consular officials received training on identifying forced domestic servitude. NGOs also noted there was insufficient follow-up by the government regarding domestic workers who were employed by diplomats in France and that little could be done to assist victims because of the diplomatic immunity of the trafficker. Labor inspectors continued to lack the authority to inspect private homes, thereby limiting their identification of domestic servitude.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit foreign victims, and to a limited extent, domestic victims in France. The pandemic exacerbated vulnerabilities for trafficking victims, including increasing the isolation of migrant and seasonal workers, as well as sex trafficking victims, which complicates detection by officials and NGOs. Pandemic-related closures and restrictions caused additional vulnerability for individuals in commercial sex. Sex and labor traffickers exploit foreign victims from Eastern Europe, West and North Africa, Asia, and the Caribbean. Authorities noted an increase in French girls as sex trafficking victims, as well as a general increase in child victims since 2016; NGOs estimate that between 10,000 and 15,000 French teenagers are victims of child sex trafficking—a significant increase compared with previous estimates of between 6,000 and 8,000. In suburban areas, there has been a sharp rise in sex traffickers known as "lover boys" coercing vulnerable girls into sex trafficking, often through a sham romantic relationship. Traffickers target girls in government-funded shelters for children. Nigerian females make up a significant portion of sex trafficking victims. During the pandemic, sex traffickers increased the usage of online platforms to recruit and exploit victims and abuse apartment rentals to make their illicit operations difficult to track; in 2020, government officials estimated that 87 percent of commercial sex encounters were organized online. Authorities report traffickers encourage Nigerian victims to claim asylum to obtain legal residency and facilitate their continued exploitation; French authorities have also noted trafficking victims from Bangladesh, the Democratic Republic of the Congo, Guinea, Ivory Coast, Russia, Vietnam, and Ukraine have claimed asylum for this purpose. Sex trafficking networks, controlled by Bulgarian, PRC national, French, Hungarian, Nigerian, Romanian, and South American traffickers, exploit women through debt bondage, physical force, and psychological coercion, including the invocation of voodoo and drug addiction. Nigerian gangs associated with sex trafficking and linked to the Black Axe, Arobaga Vikings, the Maphite, and the Eiye syndicate continue to grow more sophisticated, organized, and violent. PRC-national criminal networks also use as many as 400 massage parlors as fronts for the purchase of commercial sex, raising concerns about sex trafficking. The government estimates the majority of the 40,000-50,000 individuals in commercial sex in France, about 90 percent of whom are foreign, are likely trafficking victims. Members of the LGBTQI+ community, especially from South America, are vulnerable to trafficking, and traffickers increasingly exploit transgender victims in sex trafficking. Traffickers exploit children, primarily from Romania, West and North Africa, and the Middle East, in sex trafficking in France. Traffickers often lure victims with fraudulent offers of economic opportunities and target undocumented workers already in France. French citizens sometimes engage in child sex tourism abroad. In 2022, refugees, predominantly women and children, fleeing Russia's full-scale invasion of Ukraine, are vulnerable to trafficking.

Labor trafficking most frequently occurs in domestic work, followed by construction, small commerce, agriculture, fishing, and livestock; the majority of identified labor trafficking victims are women. Expansive criminal networks force children to commit crimes; most victims are from Romania and North Africa, many of whom are addicted to controlled substances. Seasonal migrant workers are vulnerable to labor trafficking

Haiti AR_000719

while harvesting grapes for winemakers in the Champagne region are often hired through subcontractors using fraudulent job descriptions and wages. Traffickers exploit the large influx of unaccompanied children who have entered France in recent years. Roma and unaccompanied children in France are at risk of forced begging and forced theft. The families of Roma children are often also their traffickers. In 2020, the government found that immediate or extended family members are the traffickers for 88 percent of victims of forced crime and forced begging; 62 percent of sex trafficking victims knew their traffickers beforehand. Traffickers exploit victims with intellectual disabilities in forced labor in agriculture and begging. The estimated 3,000-4,000 unaccompanied Comorian children on the island of Mayotte, a French department, remained at risk for labor and sex trafficking. Protection services, such as medical, shelter, and education, are not available to unaccompanied children on Mayotte, and previous efforts of the Comorian National Human Rights Commission to investigate further were denied by the French embassy in Comoros. Unaccompanied Moroccan children are vulnerable to forced begging in France. In 2020, the government, through Operation Barkhane, provided support to Malian armed groups who used and recruited child soldiers. Labor traffickers exploit women and children in domestic servitude—the most frequent case being when families exploit relatives brought from Africa to work in their households; according to a 2020 report, domestic servitude makes up approximately 10 percent of all trafficking in France. Nigerian trafficking networks use migrant and drug trafficking routes through Niger, Libya, and Italy to transport women and girls to France, where they exploit them in trafficking and debt bondage. Cuban medical professionals working in Martinique, a French department, in 2020 may have been forced to work by the Cuban government.

## GABON: TIER 2 WATCH LIST

The Government of Gabon does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included investigating more trafficking crimes and convicting more traffickers. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. For the third consecutive year, the government did not adopt its anti-trafficking national action plan (NAP) and continued to lack a functioning national inter-ministerial commission to coordinate anti-trafficking efforts. The government identified fewer potential trafficking victims and efforts to provide justice for, identify, and protect adult trafficking victims remained inadequate. The government did not amend its law to ensure penalties for adult sex trafficking where commensurate with penalties for other grave crimes. Further, authorities did not report investigating allegations of judicial corruption related to trafficking crimes. Therefore Gabon was downgraded to Tier 2 Watch List.



GABON TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Finalize, resource, and implement the NAP and create a national inter-ministerial anti-trafficking commission to coordinate government efforts. • Increase efforts to proactively identify adult and child victims of trafficking, including among key sectors such as domestic service, markets, and individuals in commercial sex, and refer victims to care. • Increase efforts to investigate and prosecute trafficking crimes, including complicit officials, and adequately sentence convicted traffickers. • Amend the penal code to define trafficking in line with the international definition and ensure penalties for adult sex trafficking are commensurate with penalties for

other grave crimes, such as rape. • Provide training for law enforcement officers, prosecutors, and judges on the penal code and victim-centered, trauma-informed investigations. • Increase financial or in-kind support to government and NGO shelters. • Develop and implement standard operating procedures for identifying and referring adult trafficking victims to care. • Regularly convene the Special Criminal Session to increase the number of trafficking cases heard. • Develop and institute a course on victim-centered trafficking investigations in Gabon's National Magistrate School to increase judicial officials' ability to prosecute trafficking cases. • Conduct a nationwide campaign to raise awareness of trafficking in markets and domestic service. • Develop an information management system to capture nationwide investigation and victim identification data in partnership with international organizations.

## PROSECUTION

The government made mixed law enforcement efforts. Articles 225 to 225-7 of the 2020 revised penal code criminalized sex trafficking and labor trafficking, prescribing penalties of up to seven years' imprisonment and a fine of 100 million Central African francs (CFA) ($172,940) for trafficking crimes involving adult victims, and up to 15 years' imprisonment and a fine of up to 100 million CFA ($172,940) for those involving child victims. These penalties were sufficiently stringent, but with respect to adult sex trafficking, not commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the penal code established the use of force, fraud, or coercion as aggravating factors rather than essential elements of the crime; penalties were increased to up to 10 years' imprisonment and a fine of 100 million CFA ($172,940) if such factors were involved. Finally, the penal code conflated the crimes of migrant smuggling and trafficking in persons.

A lack of high-level coordination between ministries exacerbated the government's limited capacity to collect and manage anti-trafficking law enforcement data. The government reported initiating 10 investigations, compared with zero investigations in 2020 and three in 2019. The government initiated prosecution of seven alleged traffickers, compared with 16 alleged traffickers in 2020. Courts convicted six traffickers, compared with three in 2020 and one in 2019; while all but one of the convicted traffickers received partially suspended sentences, all received a sentence of at least one year imprisonment even accounting for the period of suspension. The more lenient sentences weakened deterrence and undercut broader efforts to fight trafficking. Only the country's Special Criminal Session court was authorized to hear trafficking cases. The court only met once during the reporting period, as the planned second session was postponed because of lack of funding.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Due to alleged corruption and a lack of training, prosecutorial judges tasked with investigating trafficking cases did not always investigate cases brought to their attention. Experts alleged some traffickers bribed judges to actively delay or dismiss trafficking cases, while the government stated delays were the result of insufficient knowledge of trafficking laws. The government reported pandemic restrictions hindered law enforcement operations and courts operated at reduced capacity. The government did not have a victim-centered approach to investigations. Officials did not report providing any anti-trafficking training for law enforcement officials during the reporting period.

## PROTECTION

The government made negligible efforts to identify and protect victims. The government reported identifying and referring to care seven potential child trafficking victims, compared with 41 child trafficking victims identified and referred to care during the previous reporting period. The government used a Trafficking in Persons Procedural Manual, developed in coordination with an international organization, that defined standard operating procedures (SOPs) for child trafficking victim identification and referral to care. Additionally, the Ministry of Health and Social Affairs had a referral process to transfer child trafficking victims to government and NGO-run shelters for assistance. While the government referred children to care, NGOs had inadequate funding to effectively care for

these victims. The government did not have SOPs for the identification and referral to care for adult trafficking victims.

The government did not report whether it contributed any funding to NGOs providing shelter and services to victims; a lack of shelter space to accommodate trafficking victims persisted. Observers reported limited shelter space may have hindered support for some law enforcement investigations due to concerns victims would not have access to long-term shelter. The government continued to fund two NGO-run shelters offering holistic services to child trafficking victims, orphans, and children experiencing homelessness, providing financial and in-kind support, including funding for social workers, medical support, psychological services, legal assistance, and tuition. In partnership with local NGOs, the government funded a shelter with the capacity to care for 80 children. Some shelter and law enforcement personnel used their own money to fill gaps in government funding to assist victims. The same services were available for male, female, foreign national, and Gabonese victims, including those repatriated from abroad. There were no government- or NGO-run shelters specifically designated for adult trafficking victims, although adult victims could potentially access government services for victims of domestic abuse or other forms of maltreatment. The pandemic reduced staff capacity to operate the shelters. Officials permitted adult male victims to leave shelters unchaperoned, but not adult female victims, based on concerns related to safety and a risk of re-trafficking.

The Gabonese government, foreign governments, and local NGOs reported repatriating 33 trafficking victims during the reporting period. Victims were eligible for immigration relief to remain in Gabon if they faced threats to their safety in their country of origin; officials did not report any victims utilizing this legal alternative during the reporting period. While the government previously sought restitution for trafficking victims, it did not report doing so during this reporting period. Victims could file civil suits against their traffickers, but there were no known cases of such action, in part due to lack of knowledge of the option. Due to a lack of formal identification procedures for adults, authorities may have detained some unidentified trafficking victims.

### PREVENTION

The government maintained insufficient prevention efforts. The government's anti-trafficking inter-ministerial committee has not met since 2019. For the third consecutive year, the government did not finalize the pending NAP, which among other things, would designate the Ministry of Justice as the lead agency to coordinate the inter-ministerial committee. The government did not conduct any public awareness raising campaigns during the reporting period. Officials did not disclose funding levels for Gabon's anti-trafficking programming. Pandemic-related constraints on convening in person, state budgetary impacts resulting from decreasing oil revenue, and multiple ministerial reshuffles in 2020 contributed to a lack of high-level coordination, which hindered the government's ability to support law enforcement officers, social welfare officials, and civil society representatives.

The government did not make efforts to reduce the demand for commercial sex acts. Although not explicitly reported as human trafficking, there were 20 open cases of alleged sexual exploitation by Gabonese peacekeepers deployed to UN peacekeeping missions (with the dates of the incidents as follows: seven in 2021, nine in 2020, three in 2019, and one in 2018. All of these allegations concerned Gabonese peacekeepers deployed to the UN Multidimensional Integrated Stabilization Mission in the Central African Republic (MINUSCA), leading the Secretary-General to repatriate the entire Gabonese contingent in MINUSCA in September 2021. Investigations remained open and the government had not yet reported accountability measures taken, if any, at the end of the reporting period. The government did not provide training specifically on human trafficking for its diplomatic personnel, although it does explicitly require diplomats to adhere to the local laws of their assigned countries.

### TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Gabon, and traffickers exploit victims from Gabon abroad. Gabon is a primary destination and transit country for West and Central African men, women, and children subjected to forced labor and sex trafficking. Intended to slow the spread of the pandemic,

travel restrictions, lockdowns, and school closures likely increased the vulnerability of Gabonese children, informal sector workers, and immigrants to exploitation. Poverty continues to represent a key risk factor in forced labor and sex trafficking in the country.

Traffickers exploit girls in forced labor in domestic service, markets, or roadside restaurants; force boys to work as street vendors, mechanics, microbus transportation assistants, and laborers in the fishing sector; and coerce West African women into domestic servitude or commercial sex within Gabon. Criminals may exploit children in illegal gold mines and in wildlife trafficking in the country's interior. NGOs reported Cameroonian and Gabonese labor recruiters associated with large agricultural firms exploit English-speaking Cameroonians displaced by the Anglophone crisis. The recruiters force some Cameroonians to labor on rubber and palm oil plantations around Bitam in northern Gabon. West African traffickers reportedly exploit children from their countries of origin to work in Libreville markets, such as N'Kembo, Mont Bouët, and PK7, as well as in other urban centers, including Port-Gentil. In Gabon's eastern provinces, shopkeepers force or coerce Gabonese children to work in markets. In some cases, smugglers who assist foreign adults migrating to Gabon—or through the country to Equatorial Guinea—subject those economic migrants to forced labor or commercial sex after they enter the country via plane or boat with falsified documents. In some cases, families willingly give children to intermediaries who fraudulently promise education or employment and instead subject the children to forced labor through debt bondage. Roadside bars—or "*Macquis*"—are a common sector where traffickers sexually exploit women, and the Libreville neighborhood of Lalala is an area where some brothel owners reportedly exploit children in child sex trafficking. NGOs reported illicit actors operate "baby factories," which recruiters work with enforcers to control women through childbirth; traffickers then sell the children. Some criminals procure falsified documents for child trafficking victims identifying them as older than 18 years of age to avoid prosecution under the child trafficking law. Traffickers often operate outside the capital to avoid detection by law enforcement and take advantage of Gabon's porous borders and unguarded beaches to import victims by car or boat, often using falsified identity documents.

## GAMBIA, THE: TIER 2

The Government of The Gambia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore The Gambia was upgraded to Tier 2. These efforts included implementing the national referral mechanism (NRM) and continuing to train officials on its procedures, increasing trafficking investigations and prosecutions, and adopting a new anti-trafficking national action plan. However, the government did not meet the minimum standards in several key areas. Government authorities identified fewer trafficking victims and victim services remained inadequate. Government agencies charged with combating trafficking continued to lack resources and training, and some officials conflated trafficking in persons and migrant smuggling.



THE GAMBIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate and prosecute trafficking crimes, separate from migrant smuggling, and sentence convicted traffickers, including fraudulent labor recruiters, to significant prison terms. • Direct and fund law enforcement to investigate all reported trafficking cases, including

Haiti AR_000721

those brought forward by civil society. • Ensure human trafficking cases are resolved through the judicial system rather than extra-judicial or administrative means. • Train law enforcement, diplomatic personnel, service providers, and civil society on the NRM. • Proactively screen vulnerable populations, including Gambian migrants, individuals in commercial sex, and foreign workers, including Cuban overseas workers, for trafficking indicators and refer trafficking victims to appropriate care. • Provide resources, including funding and in-kind support, for victim services and training of social workers. • Ensure access to a child-friendly and confidential reporting mechanism that allows victims to report abuse without fear of intimidation, stigmatization, or re-victimization. • Increase labor migrant protections and reduce risks for trafficking by consistently implementing the national migration policy and pre-departure procedures and eliminating worker-paid recruitment fees. • Regulate and monitor labor recruitment agencies and investigate entities suspected of fraudulently recruiting workers for exploitation abroad. • Train law enforcement, prosecutors, and judges to investigate and prosecute all forms of trafficking using the 2007 Trafficking in Persons Act. • Strengthen international law enforcement cooperation to prevent and investigate child sex tourism. • Amend the labor law to extend protections to domestic workers and regulate labor recruiters.

## PROSECUTION

The government increased law enforcement efforts. The 2007 Trafficking in Persons Act, as amended in 2010, criminalized sex trafficking and labor trafficking and prescribed penalties of 50 years to life imprisonment and a fine of between 50,000 and 500,000 *Dalasi* ($960-$9,620). These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. The Tourism Offences Act additionally criminalized some child trafficking crimes and, during the reporting period, the government increased the penalties for a tourist's commission of child trafficking to a fine of between 100,000 and 500,000 *Dalasi* ($1,920-$9,620) and life imprisonment.

The government initiated investigations of 14 suspects (eight for alleged forced labor and six for alleged sex trafficking) and continued investigations of 51 suspects (39 for alleged forced labor and 12 for alleged sex trafficking), compared with investigating at least 20 suspects in the previous reporting period. Courts operated at a reduced capacity due to the pandemic. Authorities initiated prosecutions of three alleged traffickers and continued prosecutions of six alleged traffickers, compared with initiating prosecutions of two alleged traffickers and continuing prosecutions of three alleged traffickers in the previous reporting period. The court convicted three defendants under the anti-trafficking law. However, the court's judgment did not include information on the intended victims' exploitation in the destination or clearly distinguish the case from migrant smuggling. The court sentenced all three defendants to 15 years' imprisonment and a fine. This compared with zero convictions during the previous reporting period. Authorities cooperated with foreign governments on law enforcement investigations and were seeking the extradition of three suspected traffickers.

Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Observers alleged some border authorities did not follow anti-trafficking procedures, and in past years, that some police officers requested bribes to register trafficking complaints. Observers also alleged some government officials were involved in networks fraudulently recruiting Gambian workers for exploitation abroad. In December 2021, the Truth, Reconciliation, and Reparations Committee (TRRC) issued its final report, which found that former government officials had procured women through fraud and coercion to engage in sex acts with former president Jammeh while he was in office from 1997 until 2017. Although the report recommended Jammeh's prosecution for sexual violence, it did not recommend prosecuting other government officials involved, including Jammeh's relative and deputy chief of protocol who served as a principal recruiter. The report also concluded Jammeh exploited government employees and citizens in forced labor on his farm, and high-ranking officials coerced some of the victims to engage in sex acts. The allegedly complicit officials were no longer in The Gambia, nor was Jammeh. The government had not yet released its official response to the TRRC's recommendations. The government did not report any

criminal investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

The government coordinated with an international organization to train police, immigration, and airport authorities on trafficking victim identification and the NRM; it also trained the Tourism Security Unit on identifying trafficking cases within the tourism sector and interviewing techniques. Designated child welfare and gender units within the police force and immigration department received anti-trafficking training; however, frequent turnover, lack of resources, and limited capacity to monitor regions outside of the capital limited their effectiveness. General case backlogs, weak case management infrastructure, and low judicial capacity inhibited prosecutions and convictions, and training and resources for law enforcement and judicial officials remained severely inadequate. Law enforcement units were often dually assigned to enforce other security priorities. The pandemic further reduced law enforcement's capacity to conduct investigations, and some units were reassigned to enforce public health measures. Defendants accused of trafficking were eligible for bail and sometimes absconded. NGOs and international organizations attributed underreporting of sexual crimes, including sex trafficking and child sex tourism, to cultural taboos and a reliance on informal resolution mechanisms rather than the formal justice system; in some cases, the police or judiciary encouraged parties to settle child sexual exploitation cases privately. Low confidence in the justice system, lengthy investigations and court proceedings, and a lack of meaningful protection, including accessible, child-friendly reporting channels, also led to underreporting of child trafficking. An international organization reported that low awareness of anti-trafficking laws, limited government capacity, and inadequate specialized victim services further impeded law enforcement efforts to combat child sex trafficking.

## PROTECTION

The government maintained mixed efforts to identify and protect trafficking victims. The government identified eight victims from The Gambia, Liberia, Nigeria, and Sierra Leone, compared with 18 victims identified in the previous reporting period. An international organization reported identifying an additional 10 victims, including two sex trafficking and eight forced labor victims. The government formally launched its NRM, adopted in the previous reporting period, with standard operating procedures to identify and refer trafficking victims to care; the NRM included mechanisms to screen vulnerable populations, including child migrants and individuals in commercial sex, for trafficking indicators. Under NRM provisions, front-line officials referred trafficking cases to the Department of Social Welfare, which assigned a case manager and worked with partner service providers in the referral directory to conduct an assessment and develop an individual case plan. In one case, law enforcement intercepted 37 vulnerable individuals en route to the Canary Islands for potential exploitation; consistent with NRM procedures, authorities referred all 37 individuals to an international organization for trafficking screening and services. The National Agency Against Trafficking in Persons (NAATIP), in collaboration with an international organization, trained law enforcement, social and medical service providers, and media on the NRM. However, coordination among law enforcement, prosecutors, and social service providers remained limited.

The government operated one short-term shelter for vulnerable persons, including both Gambian and foreign national trafficking victims, vulnerable children, the elderly, and victims of domestic violence. The shelter generally had an 80-person capacity, offered basic services such as medical care, and provided limited counseling to children and women; adult victims could leave the shelter unchaperoned. The pandemic reduced the shelter's capacity to allow for social distancing, and observers reported the pandemic's strain on the healthcare system reduced victims' access to medical care. The government allocated 600,000 *Dalasi* ($11,540) to the shelter in 2021, the same amount provided in 2020. NAATIP referred at least two victims to the shelter and three victims to an international organization for care; the government did not report what services, if any, it provided to the remaining three victims. The government and civil society jointly operated daytime centers providing services, including psycho-social, food, and medical assistance, to trafficking victims and vulnerable children. Shelter services were concentrated around the capital, leaving some victims in rural areas without access to assistance. NAATIP operated an anti-trafficking hotline,

and caseworkers identified five trafficking victims; authorities referred all five victims to services. The government continued collaborating with an international organization to repatriate and provide care for Gambian trafficking victims identified abroad, including victims identified in Lebanon and the United Arab Emirates (UAE). A committee led by the National Human Rights Commission and NAATIP investigated a case in which the Gambian Honorary Consul in Lebanon denied assistance to 38 Gambian trafficking victims exploited in domestic servitude. The commission released its final report and found fraudulent recruitment agents provided the women with false contracts in a different language and facilitated their travel to Lebanon. Upon arrival in Lebanon, traffickers seized their documents, exploited them in domestic servitude, and physically abused them, resulting in one victim's death. The Gambian Honorary Consul reportedly returned the women to their traffickers repeatedly when they sought the government's assistance. Gambian authorities provided some assistance to the victims in collaboration with an NGO that facilitated their repatriation to The Gambia in September 2020. NAATIP subsequently released its own report responding to the commission's findings and recommendations. The government did not report taking further action on the committee's recommendations or instituting accountability measures to address the honorary consul's actions.

Authorities did not condition access to victim services on cooperation with law enforcement. The government provided legal aid and transportation to victims who chose to cooperate with law enforcement proceedings, and at least two victims reportedly did so. The government offered some protection to victims participating in proceedings against their alleged traffickers, including psychological support; however, officials did not always keep victims' identities confidential during law enforcement proceedings, and victims, at times, were reluctant to cooperate in investigations due to fear of retaliation by their traffickers. The government allowed victims to provide testimony via video or written statements but did not report any victims doing so. The government did not provide legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution; however, the 2007 anti-trafficking law allowed foreign victims to obtain temporary residence visas during legal proceedings. Courts could grant restitution to victims, and victims could file civil suits against their traffickers; however, neither reportedly occurred, in part due to lack of awareness. Due to inconsistent application of victim identification procedures, some victims may have remained unidentified in the law enforcement system. Authorities used provisions in the NRM to screen vulnerable populations, including individuals in commercial sex, for trafficking indicators. However, the screening mechanisms did not include LGBTQI+ persons among vulnerable populations; due to social stigmatization and lack of screening, LGBTQI+ persons remained vulnerable to trafficking.

## PREVENTION

The government increased prevention efforts. NAATIP, a unit with the Ministry of Justice, coordinated the government's anti-trafficking response; NAATIP convened quarterly task force meetings with support from an international organization. The government adopted a new 2021-2025 anti-trafficking national action plan and allocated 3.6 million *Dalasi* ($69,230) for its implementation. The government allocated the same amount in 2020 to support NAATIP efforts. NAATIP, in coordination with civil society, organized awareness-raising and community outreach campaigns. NAATIP continued its awareness campaign targeting minibus drivers, passengers, and community members; minibuses were the primary method of transportation in the country and a critical link in trafficking networks. In partnership with an NGO, the Ministry of Education continued its program with reputable Quranic school teachers to increase awareness of trafficking and prevent forced begging.

Despite reports of fraudulent labor recruiters exploiting women in domestic servitude, the government did not effectively regulate foreign labor recruiters or penalize them for fraudulent recruitment. There were no laws regulating recruitment agencies or international labor recruitment. The government did not license recruitment agencies or require registration, making it difficult for authorities to estimate how many agencies operated in the country. An international organization reported informal recruitment agencies used fraudulent or predatory contracts; due to the lack of regulations, agents charged migrant workers

en route to the Gulf recruitment fees between 5,000 and 40,000 *Dalasi* ($96-$769). The government implemented its national migration policy to protect Gambian labor migrants and reduce vulnerability to trafficking; the policy acted in conjunction with the NRM and set standard procedures for investigating potential trafficking cases. In collaboration with civil society, the Ministry of Trade, Regional Integration, and Employment's migration working group validated its new pre-departure training manuals, ethical recruitment materials, and other resources for Gambian migrant workers. Domestic workers were not protected under the national labor law, rendering them vulnerable to exploitation. Although tourism was largely absent due to the pandemic, the government made efforts to reduce the demand for commercial sex acts and child sex tourism by providing anti-trafficking training to hospitality sector employees and posting Tourism Security Unit officers in the Tourism Development Area. As a small country with few overseas diplomatic missions, the government provided anti-trafficking training to some of its diplomatic personnel; however, the government did not uniformly implement the training, and diplomatic missions' ability to identify and assist trafficking victims, especially among honorary consuls, remained limited. The government provided anti-trafficking training to its troops prior to their deployment as peacekeepers. However, although not explicitly reported as human trafficking, there was one open case (submitted in 2018) of alleged sexual exploitation with trafficking indicators by Gambian peacekeepers deployed to the UN peacekeeping mission in Liberia from 2013 to 2015. As of the end of the reporting period, the government had not yet provided the UN the information it needed to complete its investigation.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in The Gambia, and traffickers exploit victims from The Gambia abroad. Within The Gambia, traffickers subject women, girls, and boys to sex trafficking and forced labor in street vending and domestic work. Although the pandemic drastically reduced tourism activity during the last two years, there have been anecdotal reports of European tourists, primarily from the United Kingdom, traveling to The Gambia for the purpose of exploiting children in sex trafficking. An international organization reported organized sex trafficking networks use European and Gambian travel agencies to promote child sex tourism. Some families encourage their children to enter the tourism industry or seek relationships with tourists for financial gain. Observers have reported sex traffickers host child sex tourists in private residences outside the commercial tourist areas of Banjul, making the crime harder to detect. Gambian boys attend Quranic schools in The Gambia, Guinea-Bissau, and Senegal, and some boys from Guinea, Guinea-Bissau, Mali, and Senegal attend Quranic schools in The Gambia; some corrupt teachers exploit students in forced begging, street vending, and agricultural work. NGOs identified Gambian children in forced labor in neighboring West African countries and Mauritania. Individuals without birth registrations, especially children of single mothers and those in rural areas, are vulnerable to exploitation. Traffickers recruit women and girls from West African countries, especially Nigeria, and exploit them in sex trafficking in The Gambia. Cuban nationals working in The Gambia may have been forced to work by the Cuban government.

Traffickers exploit Gambians in forced labor abroad; authorities have identified Gambian male and female trafficking victims recruited by agents and exploited in Egypt, Kuwait, Lebanon, and the UAE in domestic work, hospitality, construction, and mining. Private and often informal, recruitment agencies place many Gambian workers abroad, including in the Gulf and sometimes in coordination with agents in the destination countries. Informal agents recruit workers through social and family networks, or they pose as tourism or human resource agencies. Traffickers posing as labor recruiters fraudulently recruit Gambian workers for employment in Europe or the Gulf, and subsequently exploit them in domestic servitude or sex trafficking. Traffickers are increasingly recruiting victims using social media and messaging platforms for domestic servitude in the Middle East. Gambian authorities have identified Sierra Leonean victims en route to exploitation in the Middle East. Gambian migrants, particularly young men from impoverished backgrounds, attempting to travel to Europe through irregular routes, known as "the Backway," are vulnerable to trafficking

and abuse. One study of more than 500 returning Gambian migrants found that female migrants and migrants who were forcibly returned experienced lower economic, social, and psychosocial reintegration outcomes compared with male migrants and voluntarily returning migrants. Authorities have identified potential Gambian trafficking victims in Algeria, Cyprus, Finland, and Italy.

## GEORGIA: TIER 1

The Government of Georgia fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Georgia remained on Tier 1. These efforts included providing comprehensive victim assistance, including robust pandemic mitigation efforts at government-run shelters. The government increased the number of labor inspectors, developed guidelines for labor inspectors to screen for indicators of forced labor, and updated a memorandum of understanding (MOU) to conduct joint inspections with law enforcement. The government created a new mobile group and crisis center in the Adjara region for identifying potential victims among vulnerable children and amended the criminal code to allow the Ministry of Internal Affairs (MOIA) to assign victim-witness coordinators to trafficking victims. Although the government meets the minimum standards, it convicted fewer traffickers and identified the lowest number of victims since 2016. Police conducted some ad hoc raids on commercial sex establishments without a clear strategy on victim identification, and authorities continued to lack the knowledge to investigate and collect evidence in complex cases involving financial crimes, organized crime, and digital evidence. Law enforcement required victims to remain in country through the end of the trial, likely hindering victim cooperation from foreign victims wanting to repatriate, and judges have never awarded restitution in criminal cases. The government did not adequately publicize public assessments or information on its efforts and did not establish a work permit system for migrant workers.



GEORGIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers under Articles 143-1 and 143-2 of the criminal code. • Increase efforts to identify victims proactively, particularly individuals in commercial sex, child laborers and/or children experiencing homelessness, and Georgian and foreign victims in vulnerable labor sectors. •Increase resources to plan intelligence and evidence-led law enforcement operations with victim-centered approaches. • Encourage victims' participation in investigations and prosecutions through victim-centered court procedures, including remote testimony or funding for travel and other expenses for victims to attend court hearings. • Implement procedures to improve the Permanent Group's ability to identify victims consistently and accurately. • Improve law enforcement's capacity to investigate complex cases, including advanced training on money laundering, organized crime, and digital evidence. • Further incorporate the Labor Inspectorate into anti-trafficking efforts and increase its capacity and training to identify victims. • Improve measures to order restitution for victims, including training prosecutors and judges on asset seizure, and legal assistance. • Establish procedures to license and monitor recruitment agencies and create a work permit system for foreign migrant workers to prevent recruitment fees and other trafficking vulnerabilities. • Increase the capacity and knowledge of civil society to identify and

refer trafficking victims. • Increase awareness-raising campaigns about the existence of trafficking, legal recourse, and available protection services to vulnerable groups. • Develop guidelines and procedures for victim-witness coordinators and other victim assistance providers to strengthen coordination. • Increase transparency of the inter-ministerial trafficking coordination council and regularly publish information on the government's anti-trafficking efforts.

### PROSECUTION

The government maintained law enforcement efforts. Articles 143-1 and 143-2 of the criminal code criminalized sex trafficking and labor trafficking, and prescribed penalties ranging from seven to 12 years' imprisonment for offenses involving an adult victim, and eight to 12 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape. Law enforcement investigated 18 new cases, compared with 13 in 2020. Law enforcement also continued to investigate five cases from previous reporting periods. The government initiated the prosecution of five defendants and continued to prosecute five defendants from the previous reporting period, compared with the government initiating prosecution of eight defendants in 2020. Courts convicted five traffickers for forced labor, compared with 26 traffickers for child sex trafficking in 2020—stemming from a law enforcement operation in 2019—and three traffickers in 2019. Judges issued sentences from eight years' imprisonment to 15 years' imprisonment to three traffickers and sentenced two traffickers from one year and four months' to one year and six months' imprisonment with a 20,000 lari ($6,500) fine. The criminal code criminalized "abuse of services of a victim of human trafficking" but authorities had never investigated a suspect, particularly due to the difficulty in proving a suspect reasonably knew or suspected a person was a trafficking victim.

The government maintained several specialized trafficking units, including the Anti-Trafficking and Illegal Migration Unit within the Central Criminal Police Department (CCPD) and six mobile units under MOIA. The Prosecutor General's Office (PGO) maintained five specialized prosecutors dedicated to trafficking cases and operated a task force with MOIA in the Adjara region with specialized investigators and prosecutors. Mobile units and the task force proactively investigated trafficking and inspected hotels, bars, bathhouses, nightclubs, casinos, and other high-risk businesses; mobile units and the task force inspected 130 businesses (67 in 2020) which resulted in six criminal investigations, including two forced labor cases. CCPD updated an MOU between mobile units and labor inspectors to conduct joint inspections to identify forced labor. The Tbilisi City Court maintained seven specialized judges and the Tbilisi Court of Appeals maintained seven specialized judges assigned to handle "crimes against human beings," which included trafficking, but the remaining 27 courts did not have specialized judges. In response to the pandemic, courts continued a small number of remote hearings and PGO equipped all offices with appropriate technical equipment and software. Despite several convictions of labor traffickers, observers reported the government lacked the knowledge and capacity to investigate forced labor; and authorities continued to require training on corroborating victim testimonies and evidence collection in complex cases involving financial crimes, organized crime, and digital evidence. Police raided some commercial sex establishments randomly rather than conducting intelligence-led operations and observers reported a lack of transparency following police raids, including information on what happened to the individuals in commercial sex. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. All police cadets received basic training on trafficking issues and the government, with financial and technical support from international organizations, trained investigators, mobile unit members, border patrol, prosecutors, labor inspectors, and witness and victim coordinators on various anti-trafficking issues. The government submitted one mutual legal assistance request to Russia and received two mutual legal assistance requests from Kazakhstan.

### PROTECTION

The government slightly increased protection efforts. The government identified four victims, compared with seven victims in 2020. All were

victims of forced labor with two adult male victims, one boy, and one girl. First responders used standard operating procedures (SOPs) for victim identification, including the proper treatment of victims, screening for indicators, and victim-centered interview practices. The government also developed new guidelines and screening indicators for labor inspectors on identifying victims of forced labor. Mobile units and the task force screened 444 individuals in commercial sex, begging, or employed in vulnerable sectors for trafficking indicators (467 individuals in 2020). Authorities interviewed an additional two individuals deemed "high-risk" due to work at businesses that violated labor standards (two in 2020). Authorities screened 624 Georgian nationals deported from other countries for trafficking indicators at the international airport and border crossings (1,177 in 2020). The Agency for State Care (ASC) also operated seven mobile groups responsible for identifying potential victims among vulnerable children who were homeless or used the streets as a source of livelihood, including a new mobile group created in November 2021 in the Adjara region; mobile groups assisted 245 children. While the government reported fewer inspections and interviews because of business and border closures in response to the pandemic, observers reported a lack of government capacity to identify forced labor victims, and alleged that victim identification efforts, particularly raids on commercial sex establishments, were proven ineffective by the low number of identified victims. Observers reported most identification efforts were led by the government as civil society mostly did not work in anti-trafficking due to a lack of grants and programs.

A multi-disciplinary national referral mechanism (NRM) provided SOPs for official identification and referral of victims to services. Law enforcement officially recognized victims who participated in investigations and the Permanent Group assessed and officially recognized victims who declined to participate in investigations; both recognitions granted victims access to the same protection and assistance services. The Permanent Group, composed of a five-member board of NGO and international organization representatives, was required by statute to convene and assess a potential victim within 48 hours. Law enforcement officially recognized four victims (seven in 2020) and the Permanent Group did not recognize any victims (three victims in 2020). GRETA, OSCE, and other experts reported the threshold to obtain official victim status through the Permanent Group was high and shifted the burden of proof to victims. Nonetheless, an international organization reported the work of the Permanent Group improved after the government amended its procedures in 2019.

ASC-run crisis centers in five cities and NGOs provided initial psychological care, medical assistance, legal support, and temporary shelter for potential victims awaiting official victim status. Additionally, ASC operated anti-trafficking shelters in Tbilisi and Batumi and other victim assistance programs for official victims. The government allocated 400,000 lari ($130,080) to the government-run anti-trafficking shelters, compared with 760,746 lari ($247,400) in 2020. ASC-run shelters provided medical aid, psycho-social support, legal assistance, childcare services, reintegration support, and a one-time financial payment of 1,000 lari ($325) to victims; five received support and two received 1,000 lari ($325) in cash assistance. In April 2021, the government amended the law to remove a clause that denied victims the 1,000 lari ($325) cash assistance if they received restitution. Child victims received the same specialized assistance, in addition to custodial care, education, and family reintegration programs. ASC-run shelters were staffed by a nurse and psychologist and offered separate areas for men, women, and children. Victims can initially stay at the shelter for three months, which authorities may extend upon the victim's request; the government-run shelters accommodated nine victims (nine in 2020). Shelter staff chaperoned victims when leaving the shelter, but victims could request to leave the shelter unchaperoned. ASC-run shelters provided personal protective equipment, disinfectants, and COVID-19 tests, and adopted social distancing measures, including a space for victims to quarantine for 14 days before moving to the shelter. ASC-run shelters also organized an epidemiologist to train staff members on victim assistance during the pandemic and created an online platform to offer virtual legal and psychological assistance. In previous years, experts reported an inability to assess the quality of services at ASC-run shelters due to a lack of independent evaluations

of the operations and conditions, but experts reported that ASC-run shelters focused more on victims of domestic violence due to the low number of identified trafficking victims. ASC also operated six shelters and seven crisis centers for vulnerable children who were homeless or used the streets as a source of livelihood, including a new crisis center established in Batumi in October 2021.

The government provided equal services for Georgian citizen and foreign national victims and granted foreign victims renewable one-year residence permits with the ability to seek legal employment; no victims required residence permits (five in 2020). The government could provide repatriation assistance to Georgian victims returning to Georgia and foreign victims wishing to leave Georgia; no victims required repatriation assistance in 2021 or 2020. The law required closed-door sessions for court proceedings and allowed victims to leave the country pending trial; however, experts reported in practice, law enforcement required victims to remain in country through the end of the trial, likely hindering victim cooperation, particularly from foreign victims wanting to repatriate, due to slow court proceedings. Nine victims assisted law enforcement in 2021 (six in 2020). PGO's victim-witness coordinators supported victims during proceedings, including legal and logistical assistance, and measures to prevent re-traumatization. Additionally, the government amended the criminal code in June 2021 to allow investigators to assign MOIA's victim-witness coordinators to victims from the onset of an investigation; PGO and MOIA victim-witness coordinators assisted eight victims and ten witnesses (12 victims and six witnesses in 2020). However, an international organization reported the lack of standardized interactions between MOIA and PGO victim-witness coordinators, ASC, and other interlocutors likely created coordination issues. The law allowed recorded testimony or testimony by other technological means; seven witnesses testified remotely (one victim and three witnesses in 2020). The law also allowed the possibility of placing a victim into the state's witness protection program; no victims required the use of witness protection in 2021 or 2020. Victims could obtain restitution through criminal proceedings or compensation through civil suits; however, judges have never awarded restitution in criminal cases and only awarded compensation in civil suits to three victims to date. Observers highlighted the failure to freeze and seize criminal assets as an obstacle to pursuing restitution from traffickers.

## PREVENTION

The government maintained prevention efforts. The Inter-Agency Council on Combatting Trafficking in Persons (TIP Council) composed of representatives from various ministries, the international community, and civil society, worked and met virtually, and monitored the implementation of the 2021-2022 National Action Plan. The TIP Council published information and statistics on anti-trafficking efforts on the Ministry of Justice's website; however, observers continued to report the TIP Council did not provide public assessments of government efforts and lacked transparency. PGO managed a working group on forced labor, which met once in both 2021 and 2020. While the government organized a mock court competition for students and awareness campaigns targeting students and the public, an international organization continued to report Georgian authorities were reluctant to implement large-scale awareness campaigns in major cities due to the negative impact they believed it would have on the tourism industry. MOIA continued to operate an anti-trafficking hotline and the State Fund also operated an anti-trafficking hotline; the MOIA hotline received 22 calls related to trafficking (46 in 2020) and the State Fund hotline received 24 calls (32 in 2020).

The Law on Labor Safety entered into force in September 2019 and expanded occupational safety and health standards and regulations, including unannounced inspections. In January 2021, the government established the Labor Inspection Service with 60 labor inspectors, including a special unit for forced labor and labor exploitation, and increased the number of inspectors to 78 by the end of 2021. Labor inspectors inspected 140 businesses (120 in 2020) and referred one case of alleged forced labor to CCPD (none in 2020). The government did not have a work permit system for migrant workers nor did it license and monitor recruitment agencies. The Ministry of Internally Displaced Persons, Labor, and Health and Social Affairs required intermediary companies in Georgia, assisting Georgian citizens in finding employment

abroad, to submit annual reports and register activities. The government issued intermediary companies that did not register an activity a fine of 1,000 lari ($325) and a fine of 300 lari ($98) for failing to submit an annual report; 11 companies were fined (five in 2020). Due to the pandemic, the government chartered flights to help return stranded Georgian migrant workers and extended the right to legal stay for all foreign migrants legally in Georgia until July 30, 2021. The government did not reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Georgia, and traffickers exploit victims from Georgia abroad. Traffickers recruit victims with false promises of well-paying jobs in tea processing plants, hospitals, salons, restaurants, and hotels. Traffickers exploit women and girls from Georgia in sex trafficking within the country, and in Cyprus, Egypt, Turkey, and the United Arab Emirates (UAE). Georgia is also a transit country for women from Kyrgyzstan, Tajikistan, and Uzbekistan exploited in Turkey. Traffickers exploit women from Central Asia, particularly Kyrgyzstan and Uzbekistan, in sex trafficking in the tourist areas of the Adjara region and larger cities like Tbilisi and Batumi in saunas, brothels, bars, strip clubs, casinos, and hotels. Georgian men and women are exploited in forced labor within Georgia and in Cyprus, Egypt, Turkey, and UAE. Georgian, Romani, and Kurdish children are subjected to forced begging and sometimes coerced into criminality in Georgia. Traffickers adapt operations to the impacts of the pandemic and shift recruitment and advertisement tactics to online means, such as communicating through chats, and establishing websites and advertisements for escort services. Additionally, traffickers exploit victims in private apartments rather than public facilities, such as brothels and strip clubs due to pandemic mitigation measures. People's Republic of China (PRC) national women in commercial sex and Southeast Asian women working in massage parlors are vulnerable to sex trafficking. Georgian, Romani, and Kurdish children, in addition to children of Armenian refugees and children of internally displaced persons (IDPs) from South Ossetia and Abkhazia, who were homeless or used the streets as a source of livelihood are vulnerable to trafficking, particularly forced begging.

## RUSSIA-OCCUPIED REGIONS OF ABKHAZIA AND SOUTH OSSETIA

Russia-occupied regions of Abkhazia and South Ossetia remained outside of Georgian government control and de facto authorities were supported by Russian forces. Russia and Abkhaz de facto authorities limited the ability of international organizations to operate in Abkhazia, although international organizations had greater ability to operate there than in South Ossetia. As a result, no information was available about the presence of trafficking and the Abkhaz and South Ossetian de facto authorities' efforts to combat trafficking. However, NGOs consider IDPs from these occupied territories particularly vulnerable to trafficking. Separately, some observers report anecdotal evidence of migrants being subjected to forced labor and DPRK workers in Abkhazia may have been forced to work by the DPRK government.

# GERMANY: TIER 1

The Government of Germany fully meets the minimum standards for the elimination of trafficking. The government made key achievements to do so during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Germany was upgraded to Tier 1. These achievements included prosecuting and convicting more traffickers, as well as increasing law enforcement efforts on labor trafficking compared with the prior year. With the opening of an additional counseling center in 2021, trafficking-specific NGO service providers operated in all 16 states. In 2021, one state established a new trafficking-specific authority's office, and another state opened two new safe houses for male victims, although accommodations overall remained inadequate. The government increased funding for victim services and established an inter-ministerial framework on labor trafficking with NGO-run victim care providers. The government also

established a voluntary certificate program for private health care recruitment agencies that required labor law compliance. Although the government meets the minimum standards, judges continued to issue lenient sentences, resulting in 66 percent of convicted traffickers receiving fully suspended sentences, fines, or less than one year's imprisonment, which undercut efforts to hold traffickers accountable, weakened deterrence, created potential security and safety concerns for victims, and was not equal to the seriousness of the crime. The government remained without a national victim identification and referral guideline for all forms of trafficking, which may have hindered victim identification, particularly of refugees and asylum-seekers. The government did not report awarding compensation to any victims during the reporting period, and restitution for victims remained rare. Shelter and NGO funding for victim care and assistance remained insufficient, and the government did not report whether it provided sufficient training to judges who adjudicated trafficking cases.



## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute suspected labor and sex traffickers and sentence convicted traffickers to adequate penalties, which should involve serving significant prison terms. • Ensure equitable treatment of victims by creating a national identification and referral guideline for all forms of trafficking across all states. • Increase awareness and availability of robust human trafficking training courses for judges that adjudicate trafficking cases in order to sensitize judges to the severity of trafficking crimes. • Ensure systematic and continuous anti-trafficking training for immigration officers to increase proactive victim identification among foreign migrants and asylum-seekers. • Ensure systematic provision of care for child victims and extend more specialized care, services, and sufficient accommodations for male victims. • Increase awareness of and trafficking survivor access to damages and compensation and increase prosecutor's efforts to systematically request restitution for survivors during criminal trials. • Adopt a national anti-trafficking action plan (NAP) for all forms of trafficking. • Increase the capacity of investigators, prosecutors, and courts with specific expertise on trafficking cases to minimize delays in bringing cases to trial and consider additional dedicated human trafficking units. • Increase prioritization of labor trafficking, including victim identification and investigation and prosecution of labor traffickers. • Increase worker protections by eliminating recruitment or placement fees charged to workers by German labor recruiters and ensuring employers pay any recruitment fees. • Implement effective regulations and oversight of recruitment companies and industries comprised predominantly of migrant workers, which are consistently enforced, including prosecution for fraudulent labor recruitment and labor trafficking. • Appoint a national rapporteur to provide independent review of government efforts on both labor and sex trafficking. • Establish a uniform and comprehensive data collection system, including publicly available disaggregated data on sentencing where courts convict defendants of both trafficking and one or more other serious crimes. • Appoint a national coordinating body, responsible for both sex and labor trafficking, to increase harmonization of the institutional framework and coordination structures at the federal and state levels. • Increase survivor engagement, including by establishing accessible mechanisms for receiving and providing compensation for survivor input when forming policies, programs, and trainings. • Increase efforts to pursue financial crime investigations in tandem with human trafficking cases.

## PROSECUTION

The government increased law enforcement efforts, although judges' sentencing of convicted traffickers remained lenient. The criminal code

criminalized sex trafficking and labor trafficking under Sections 232, 232(a), 232(b), 233, and 233(a) and prescribed punishments of six months to 10 years' imprisonment, which were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. The law did not require proof of force or coercion to prosecute suspected sex traffickers when victims were younger than 21. State law enforcement completed 325 pre-trial trafficking investigations of 421 suspects in 2020, the most recent year for which the government had comprehensive statistics; this was similar to 313 investigations into 472 suspects in 2019 but less than 386 investigations into 602 suspects in 2018. Of the 2020 investigations, there were 291 for sex trafficking and 34 for labor trafficking, including four for forced begging and eight for forced criminality. In 2021, German law enforcement and international partners (including Europol and Slovakia) conducted at least six targeted operations against Vietnamese criminal organizations involved in human trafficking and smuggling, resulting in the arrest of at least six suspects and the identification of at least 13 victims.

For each case in which a court convicted a defendant of multiple crimes, the government recorded it only under the charge with the highest statutory sentence; therefore, reported statistics did not include cases in which the court convicted a defendant of trafficking and where that defendant received an aggregate sentence for another crime that carried a higher statutory sentence. Current data collection classification and procedures, in addition to strict privacy laws, continued to result in incomplete data and underreporting. This likely lowered both the reported number of trafficking convictions and the average length of sentences. To obtain a more complete understanding of its efforts, the government provided prosecution and conviction statistics for trafficking cases when it was both the primary charge as well as cases when it was the secondary charge. Total prosecutions for 2020 were at least 262, an increase compared with at least 215 total prosecutions for 2019. In 2020, state prosecutors prosecuted 128 defendants with trafficking as the primary charge and at least 139 suspects with trafficking as the secondary charge. The total number of convictions for 2020 was 224, an increase compared with 195 in 2019. Courts convicted 85 traffickers with trafficking as the primary charge and 139 traffickers with trafficking as the secondary charge of 2020.

The government only provided sentencing statistics for convictions with trafficking as the primary charge. Of the 85 traffickers convicted in 2020 with trafficking as the primary charge, 66 percent (56 traffickers) received either a fully suspended sentence (33 traffickers), a fine (15 traffickers), or less than one year of imprisonment (eight traffickers), compared with 72 percent of traffickers convicted with trafficking as the primary charge receiving such lenient sentences in 2019. Only 34 percent of convicted traffickers (29) received significant prison sentences of more than one year imprisonment (compared with 28 percent in 2019). Judges typically suspended sentences under two years for most crimes, including human trafficking, particularly for first-time offenders. However, this practice weakened deterrence, potentially undercut efforts of police and prosecutors, and created potential security and safety concerns, particularly for victims who cooperated with investigations and prosecutions.

Prioritization of labor trafficking remained a concern during the reporting period, and law enforcement efforts remained low compared with the suspected scale. However, according to the data available for 2020, under Section 232 (b) for forced labor, there were 34 investigations, 14 prosecutions, and five convictions for forced labor, an increase compared with 26 investigations and zero prosecutions or convictions for forced labor in 2019. However, sentences for labor trafficking remained lenient, and convicted traffickers only received fines or suspended sentences in 2020. The Ministry of Justice (MOJ) funded a study of criminal code Sections 232 to 233a, as amended in 2016, which was published in September 2021. The study concluded that to effectively address forced begging and criminality, law enforcement would need additional specialized training and an agency would need to be assigned specific responsibility; it also found that, in general, there was an insufficient amount of trafficking-specialized professionals. Notable cases during the reporting period included the 2021 convictions, with significant sentences, of five Islamic State members accused of enslaving Yezidi women and children; the trials and convictions conducted in Germany

are considered the first in the world for international crimes committed against the Yezidi population. An additional trial of another suspect began in January 2022, and an arrest of another Islamic State member charged with trafficking among other crimes occurred in March 2022. The government did not report any investigations, prosecutions, or convictions of officials complicit in human trafficking crimes.

The complex wording and scope of the trafficking and exploitation sections in the criminal code (Sections 232 to 233a) reportedly resulted in state prosecutors sometimes charging suspected traffickers with offenses considered easier to prove than coercion in labor and sex trafficking. Furthermore, the MOJ-funded study concluded the amended Sections 232 to 233(a) had not achieved the desired impact on the criminal prosecution of human trafficking. Specifically, the study found the following results: there was no significant increase in prosecutions or convictions compared with previous trafficking statutes, the provisions were confusing and relied almost exclusively on victim testimony, and the government had not introduced sufficient structural changes to effectively enforce the expanded provisions, resulting in prosecutors charging and convicting traffickers for other crimes. As a federal system, jurisdictions for criminal prosecutions in Germany rested with state courts and, consequently, procedures, staffing, and funding varied from state to state. The government reported some investigations and court hearings were delayed in 2020 due to pandemic-related restrictions, staff shortages, and capacity issues. Law enforcement also reported some cases were hindered because victims were unwilling to testify in person during the pandemic.

Frequent turnover, insufficient personnel, and limited dedicated trafficking resources hindered law enforcement efforts, sometimes leading to protracted court cases that were ultimately dismissed due to the statute of limitations or the unwillingness of victims to participate in prolonged proceedings. NGOs asserted that in some cases, it took police five to eight years to address cases reported to them; furthermore, slow law enforcement proceedings often had a negative impact on witness testimony. The federal criminal police (BKA) had dedicated human trafficking investigators. Most, but not all, states had dedicated anti-trafficking investigation units, and a couple of states had specialized prosecutors; in August 2021, an additional state, Munich, established a specialized prosecutor's office for human trafficking. Prosecutors with experience assisting victims through trial processes frequently led sex trafficking cases; however, labor trafficking cases were more often assigned to financial, economic, or organized crime sections that lacked similar experience. Through a public-private partnership, a working group focused on financial flows related to human trafficking and developed a handbook on trafficking, but it did not report any investigations or concrete results stemming from this partnership.

The government and state-funded NGOs continued to organize and provide training to law enforcement officials, although civil society recommended increased labor trafficking training, specifically with regard to identifying migrant workers as trafficking victims. The NGO-run Service Center against Labor Exploitation, Forced Labor and Trafficking in Human Beings (*Servicestelle*) reported providing 16 trainings to 300 participants and the BKA, and various government-funded NGOs reported delivering extensive trainings, both online and in-person, to a variety of officials, including for asylum-center workers, law enforcement officers, immigration officers, Federal Custom's Financial Control of Illegal Work Directorate (FKS) officials, shelter staff, and prosecutors. The German Judicial Academy, a national advanced training facility for judges and public prosecutors, reported offering an advanced human trafficking course in 2021 but did not report how many judges or prosecutors attended. The BKA maintained an information portal for federal and state police forces with information on current trends, guidelines, and investigative tools for combating trafficking. The *Servicestelle* also maintained an online platform that provided access to information on guidelines, agreements, and counseling centers for victims. Federal and state-level police continued to collaborate with EUROPOL on joint action days and in EU-funded programs, as well as bilaterally with Hungary, Kosovo, Poland, Romania, Slovakia, Spain, and Turkey on international trafficking investigations, which resulted in the arrest of 400 suspects and identification of 187 potential trafficking victims both in Germany and in participating countries across Europe. The government also reported hosting a workshop on assisting victims, investigating, and prosecuting

Haiti AR_000727

labor trafficking in the Baltic Sea Region, which was attended by 40 professionals from eight countries.

## PROTECTION

The government increased protection efforts. In 2020, the most recent year for which comprehensive statistics were available, state government authorities, who are responsible for protection efforts, identified 494 trafficking victims, the same as in 2019 and similar to 503 identified victims in 2018. Government-funded NGOs identified 820 trafficking victims from January 2020 to June 2021 (compared with 987 in 2019); however, these victims may also have been counted in the government statistics, making the total number of identified victims uncertain, and the timeframe did not allow for a comparison to prior year efforts. Of the government-identified victims, 406 were victims of sex trafficking (427 in 2019), and 88 were victims of labor trafficking (67 in 2019), which included four forced begging victims (one in 2019) and 11 forced criminality victims (23 in 2019). Almost all sex trafficking victims were female (94 percent), and of those whose age was known, 42 percent were younger than 21. The majority of identified sex trafficking victims were from Germany (131), Romania (68), and Bulgaria (56). In 2020, the majority of labor trafficking victims were from Romania and Zimbabwe, eight were younger than 21, and most labor trafficking victims were identified in the construction sector. Police continued to proactively identify the majority of trafficking victims. In its 2019 report, GRETA noted that the official figures of identified trafficking victims did not reflect the true scale of human trafficking in Germany due to the absence of a comprehensive and coherent approach to detecting and identifying victims, including among migrants and asylum-seekers, problems with data collection, and insufficient prioritization of labor trafficking. Some NGOs reported the number of sex trafficking victims increased following the implementation of the 2016 commercial sex law, while other NGOs continued to express concern that trafficking victims would either not register or register without disclosing trafficking crimes; despite this, sex trafficking victim identification did not correspondingly increase.

The government did not have a single national victim identification or referral guideline to address all forms of trafficking, and both children and adults remained without systematic provision of care. At the federal level, there were procedures in place to identify and refer victims to care, but most victim care was handled at the state level. NGOs noted a national mechanism did not appear to be as high a priority for the government compared with other issues. However, there was a national identification and cooperation strategy for children and plans to establish national referral procedures for labor trafficking, though the government did not report any outcomes by the end of the reporting period. The government continued to fund an NGO charged with the implementation of the cooperation strategy for children, which reported establishing a total of eight networks in six states and providing training to government officials and practitioners to establish anti-trafficking and exploitation roundtables. Each state had a separate system to refer victims to either state-run support or NGOs, and several states had written identification guidelines. Several government-funded NGOs continued to distribute trafficking identification and indicator brochures, one of which included specific indicators for forced begging and forced criminality. Thirteen of 16 states also had formal cooperation agreements in place between police and NGOs for various purposes, but not all included all forms of trafficking, such as labor trafficking, forced begging, and forced criminality. Authorities reported pandemic-related restrictions and staff shortages in 2020 made identifying sex trafficking victims particularly difficult, as many traffickers adapted and moved to online platforms. Workplace closures and further physical isolation due to the pandemic also made the identification of labor trafficking victims more difficult. Requests for assistance and instances of labor exploitation and trafficking, especially in agriculture, significantly increased; however, NGOs reported continued difficulty accessing workers in factories and on farms due to pandemic-related restrictions.

While the government did not report comprehensive data or the total number of victims that received care, it did report that of the 406 identified sex trafficking victims, at least 130 received care, including 92 from specialized counseling centers and 38 from youth welfare offices, similar to 116 assisted in 2019. In 2021, the government-funded Network against Trafficking in Human Beings (KOK) published its first report,

collated via a government-funded data tool, evaluating victims' access to government-sponsored services and benefits based on information received from 16 of its 39 member organizations. The KOK reported that from January 2020 to June 2021, government-funded counseling centers provided victims of trafficking and exploitation a variety of services: psycho-social support (613), information on victim rights (588), crisis intervention (424), support during asylum proceedings (421), assistance with documentation (360), support during residence permit proceedings (346), assistance accessing a means of subsistence (323) and obtaining compensation or back wages (86), referral and accompaniment to medical appointments (253), support during criminal proceedings (75), and referral to training and education (104), literacy and language courses (265), and employment (49). In 2021, due to the pandemic, some shelters and counseling centers operated at limited capacity, and NGOs noted difficulty in finding open spaces for victims at shelters, especially with the increased occurrence of domestic violence during the pandemic. NGOs reported moving some victim assistance services to a virtual platform to adapt to the pandemic; however, this may have limited access for some victims without internet or who did not speak German, especially when victims were also required to submit paperwork online.

The government provided victim services primarily through the state-funded and NGO-operated *Servicestelle* and its affiliated counseling centers and advice centers, which specialized in assisting labor trafficking victims, foreign migrants, and refugees. The KOK comprised 42 member organizations, including specialist counseling centers, migrant projects, and women's shelters; KOK acted as a convening and coordinating entity for anti-trafficking NGOs. This model allowed victims to obtain support without the need to interact with law enforcement, which officials found increased the likelihood victims would seek assistance. In 2021, national government funding for the KOK's management operations was €506,000 ($573,700), similar to €500,000 ($566,890) in 2019 and 2020, and an additional €199,600 ($226,300) went to an NGO for anti-trafficking projects. The government also allocated approximately €271,000 ($307,260) to the NGO that operated the *Servicestelle*, the same as in 2020. State governments supported trafficking victims and, in 2021, allocated at least €5.91 million ($6.70 million), including some additional funding for pandemic-related costs, to human trafficking NGOs, compared with €3.3 million ($3.74 million) in 2020. However, civil society reported staffing and funding were insufficient for their operational needs and were further exacerbated by pandemic-related expenses, requiring a dependence on private donations; the expansion of trafficking-specific mandates without allotting additional resources created challenges for adequate victim care. Civil society noted many rural areas continued to lack trafficking-specific resources. Government-funded NGO counseling centers served both labor and sex trafficking victims, although many centers only had a mandate to work with female sex trafficking victims. With the opening of a government-funded counseling center in Thuringia, trafficking-specific NGO service providers operated in 45 cities and in all 16 states, providing shelter, medical and psychological care, legal assistance, vocational support, and assistance acquiring residence permits. Beginning in 2021, victims were entitled to between 15 and 18 sessions of emergency aid in outpatient trauma clinics. However, a civil society organization reported many trafficking victims were not covered by the government's health care system and those who were covered typically received treatment by health care workers who were not trained to identify trafficking victims. Furthermore, civil society noted that shelter for all trafficking victims was severely deficient and lacked national harmonization. There was limited long-term or comprehensive support, including shelter, within these centers for children, transgender females, and male trafficking victims; civil society noted, while there was more availability for female victims, accommodation for men was ad hoc and children lacked specialized shelter that catered to the needs of trafficking victims. Overall availability of services and shelters was inconsistent or inadequate depending on the state. While North Rhine-Westphalia opened two new safe houses for male victims in 2021 and several states increased funding for additional shelters, NGOs continued to note they had to deny shelter to some male victims in 2021 due to capacity constraints. A 2021 KOK study analyzed court rulings from 2017 to 2021, including trafficking cases, and concluded that access to social benefits and assistance was

**GERMANY**

strongly correlated with preventing re-trafficking of victims, which the pandemic made more apparent.

The Federal Agency for Migration and Refugees (BAMF) continued to utilize its standard operating procedures and trafficking indicator lists to identify potential victims in the asylum protection system and made referrals to counseling centers, though NGOs continued to suggest needed improvements in victim identification. Each BAMF branch office included at least one representative to assist in identifying and supporting potential trafficking victims. A November 2020 NGO policy paper concluded that BAMF officers required additional training and resources to manage their workloads. While the government reported screening foreign migrants and asylum-seekers for trafficking indicators, and identified victims were entitled to social benefits and deportation relief, unidentified victims remained vulnerable and could be deported to their first country of EU entrance without first receiving protection services. The government occasionally returned trafficking victims seeking to transfer asylum claims to Germany to their original arrival country, which sometimes included their traffickers. NGOs reported that sometimes potential labor trafficking victims were treated like criminals based on their lack of documentation or deported prior to being screened or given the opportunity to claim compensation for lost wages. Counseling centers reported specialized trafficking BAMF officers were not always involved or included in deportation hearings. Civil society noted non-specialized immigration and police officers rarely identified trafficking victims among the asylum-seeking and migrant populations, even when victims directly referenced trafficking experiences, especially if NGOs or counseling centers were not involved. NGOs reported pandemic-related hearing delays for asylum and refugee cases in 2020 caused a backlog for 2021 and delays in benefits for applicants; NGOs also reported pandemic restrictions prevented them from accompanying some victims to their hearings. Counseling centers could identify and refer trafficking victims to services; however, they continued to report that BAMF officers often disagreed with their identifications and deported the victim anyway. Similar to prior years, federal courts continued to overturn BAMF's deportation decisions, including at least one case for deporting an individual to an unsafe country of origin and another case for failure to provide entitled services. A government-funded, but civil society-led, working group endeavored to create and implement measures to identify vulnerable migrants and refugees at the earliest point and reported field testing its measures at two reception centers and two psychological centers, but results were not available by the end of the reporting period. Prosecutors, together with other authorities, offered undocumented victims a reflection period of three months to decide if they would testify in court. However, NGOs noted the reflection period was not uniformly or adequately applied and urged investigators to increase efforts to inform victims of their rights. Victims who agreed to testify were eligible for temporary residence permits, which allowed them to remain and work in Germany through the duration of the trial; however, the government did not report how many victims received permits. The law provided legal alternatives to removal to countries in which victims would face retribution or hardship. After the completion of their trafficker's trial, the law granted officials the authority to issue residence permits to victims in cases of humanitarian hardship, for public interest, or for those who faced injury or threats to life or freedom in their countries of origin; however, GRETA noted there were significant discrepancies from state to state in the application of the law. Family members of foreign trafficking victims were eligible for residency in certain circumstances.

The law entitled victims to an interpreter and a third-party representative from a counseling center to accompany them to all interviews. Subject to certain requirements, victims could join criminal trials as joint plaintiffs and were entitled to free legal counsel, a psychological assistant, an interpreter, and the pursuit of civil remedies as part of the criminal proceeding. In November 2021, the government released a guide for child-friendly criminal proceedings and interactions. The law allowed victims to submit video testimony; however, NGOs reported not all states had the required equipment for video testimony. The government took measures to lessen the burden on victims and their potential re-traumatization by trying to reduce the number of times they had to testify in trials and, sometimes, not requiring them to testify at all. However, civil society noted that these victim protections were not

implemented uniformly and sometimes judges did not dismiss suspects from the courtroom before victim testimony. NGOs also reported instances of law enforcement and judges lacking a victim-centered and trauma-informed approach, where victims were interrogated like criminals or judged for becoming trafficking victims. Furthermore, the 2021 MOJ-funded study concluded that the 2016 changes to the criminal code, which were partially intended to decrease the importance of victim and witness testimony, were largely unsuccessful. State prosecutors remarked that an understanding of trauma, trafficking-specific victim interviewing training, protection from deportation, and early access to a psychologist and legal assistance were necessary for successful prosecution of trafficking cases.

While the law allowed for compensation from the government, it could only be awarded to victims who had experienced direct physical violence, and the government did not report awarding compensation to any victims during the reporting period. Though the government amended the Victims of Crime Act in November 2019 to address the requirement of physical violence and expand protections to include psychological violence, the amendments will not enter into force until January 2024. The government continued to lack comprehensive statistics on restitution and damages awarded to victims and did not require prosecutors to systematically request restitution during criminal trials; despite this, it reported awarding restitution to between two and five trafficking victims during the reporting period (compared with two victims awarded restitution in the prior reporting period). NGOs and GRETA reported victims were not systematically informed of their rights. Despite the government's law enforcement action against Vietnamese criminal organizations and focus on identifying Vietnamese trafficking victims during the reporting period, civil society reported assisting few Vietnamese victims and questioned whether victims were systematically informed of their rights. Section 154(c) of the German Code of Criminal Procedure exempted victims from prosecution for minor criminal offences that traffickers compelled them to commit; however, the 2021 MOJ-funded study concluded prosecutors rarely used section 154(c) because they preferred to use more familiar sections of the criminal code, which lacked the trafficking-specific language of 154(c). The report recommended required mandatory use of Section 154(c) when interacting with trafficking victims. NGOs reported that undocumented victims often fear obtaining medical care or submitting a claim for lost wages because Section 87 of the German Residency Act required public entities to report undocumented persons. The government offered witness protection as needed, and police would accompany witnesses to trials; in 2021, the government provided a total of eight trafficking victims witness protection, compared with 13 in 2020.

## PREVENTION

The government increased efforts to prevent trafficking. Germany remained without a NAP for all forms of trafficking; however, the government had a draft strategy to combat labor trafficking, which it continued to implement. The government had three federal-state interagency working groups that coordinated with each other and addressed all forms of trafficking. The Federal Ministry for Families, Seniors, Women, and Youth (BMFSFJ) coordinated human trafficking efforts at the international level and national efforts on sex trafficking, while the Federal Ministry of Labor and Social Affairs coordinated efforts on labor trafficking. The government working groups met six times in 2021 to discuss a variety of anti-trafficking efforts, including anti-trafficking legislative priorities, increasing high-level prioritization of labor trafficking, and improving identification and specialized assistance for child trafficking victims. In July 2021, the government reported establishing a framework agreement between certain Federal Ministries, law enforcement agencies, and social partners. The framework agreement focused on labor trafficking prevention, establishing a referral mechanism, and improving access to services for labor trafficking victims. NGOs provided trainings under the auspices of the framework and noted improved coordination and increased identification of labor trafficking victims as a result of the closer working relationship with law enforcement. The government finalized the concept for a national rapporteur—a key recommendation of GRETA's 2019 and 2015 reports; however, it was not yet operational. Civil society recommended increased high-level prioritization of all forms of trafficking.

The Youth Protection Act became effective in May 2021, which increased preventative protections for children against cyber grooming and potential sex trafficking. The government continued to publish its annual report on human trafficking and funded several studies, conducted by NGOs over the reporting period; studies included topics like the forced labor of Vietnamese victims, trafficking victims' rights in criminal proceedings, the implementation of the reflection and stabilization period, non-penalization legislation, the impact of the pandemic on sex trafficking, and others. In 2021, the federal government continued awareness campaigns, some of which were launched in prior years: one campaign focused on violence against women but included information on sex trafficking, one focused on various forms of child exploitation, and another focused on trafficking in the asylum system. At least three states conducted regional campaigns: one was a sex trafficking campaign continued from the prior year and included the distribution of 1,700 posters and advertising on public transportation and at schools; one was a new campaign on women in commercial sex but included sex trafficking survivors as well; and one was a new campaign that organized awareness raising events at refugee reception centers. The federal government, through NGOs, co-funded various awareness events, lectures, webinars, online panel discussions and seminars, press releases, and conferences on trafficking in 2021. The *Servicestelle* created and distributed pamphlets to educate both practitioners and the public about signs of labor exploitation and forced labor in the parcel and meat industries. In early 2022, the government focused awareness-raising efforts on refugees fleeing Russia's war on Ukraine by establishing a website and displaying posters, in Ukrainian, at public transportation locations on trafficking vulnerabilities. NGOs and the media reported several instances where potential sex traffickers may have targeted Ukrainian refugees upon their arrival in Germany—due to awareness raising efforts in this area, at least three suspicious incidents were reported to the police. The federal government did not have a trafficking-specific hotline but continued to fund a 24/7 hotline in 19 languages for women affected by violence; in 2020, the hotline received calls from 93 potential trafficking victims (compared with 96 in 2019), but no further information was available. Additionally, the government had several other national and regional hotlines for sexual violence and male victims of violence, including trafficking, in addition to a government-funded, NGO-operated national helpline for migrant workers; however, statistics on trafficking victims were unavailable for these hotlines. In March 2022, the government announced it would no longer commit to training the Libyan Coast Guard, due to concerns about their treatment of migrants. NGOs have criticized Europe's coordinated effort with Libya, as it often resulted in the occupants of vessels rescued in the Libyan search and rescue area being returned to Libyan shores; NGOs cited severe security and human rights conditions inside Libya and Libyan detention centers and a heightened risk of trafficking for the more than 12,000 undocumented migrants forced to remain in the detention centers.

The law prohibited recruitment fees for temporary workers, but non-temporary foreign migrants could be charged a fee up to €2,000 ($2,270), though au pairs could only be charged a maximum of €170 ($193). There were also reports from NGOs that German agricultural companies continued to withhold identification documents from migrant workers and were not complying with regulations regarding minimum wage, working hours, and hygiene conditions—authorities reported forwarding several cases to prosecutors. NGOs noted the pandemic also increased the need for labor rights counseling. Foreign workers needed prior government permission, via a new residence permit, prior to changing employers, which may have increased their vulnerability to trafficking. Civil society continued to express concern regarding the recruitment of foreign nurses, asserting that their working conditions, especially in private homes, was exploitative and in some cases may have amounted to labor trafficking. While inadequate oversight, fraudulent labor recruitment, and the continued vulnerability of migrant and seasonal workers remained concerns, the government reported several efforts to deter fraudulent labor recruitment, exploitation, and trafficking. Workers organizations and government-funded NGOs coordinated 44 field campaigns that reached more than 2,500 seasonal workers in 2021 in a campaign to inform workers of their rights. In 2021, the FKS conducted 13 investigations relating to human trafficking or labor exploitation and

reported identifying trafficking victims in each instance. In January 2021, a new law came into force prohibiting short-term contracts for migrant workers in the meat industry; while its goal was to increase migrant worker protections, civil society reported some exploitation structures remained. Additionally, in June 2021 the government signed a bilateral labor agreement with the Government of Moldova, which focused on the protection of seasonal agricultural workers and prohibited employers from charging recruitment fees to workers, as well as included detailed plans for oversight. Private labor recruiters did not require a license to operate. However, in June 2021, the government established a voluntary certificate that health care recruiting companies could obtain if they complied with all labor and employment laws. The government reported that of the approximately 150 eligible private recruitment agencies in Germany, 130 participated in the certificate process and 27 had already been licensed. Licensed companies were obliged to comply with the quality certificate, which was monitored, and fines could be issued for noncompliance. The government had two other agreements with the Governments of Georgia and Moldova that focused on fair recruitment but did not report any trafficking-prevention related outcomes.

Authorities and government-funded NGOs usually conducted annual in-person interviews of domestic workers employed by embassies in Berlin, without employers present, to inform workers of their rights but did not report doing so in 2021 due to pandemic-related restrictions. The government previously extended the mandate of FKS to include trafficking, thereby increasing staff who could potentially identify forced labor victims. However, FKS did not have the authority to perform labor inspections within private households without the home-owners' consent, thereby limiting their identification of domestic servitude. In June 2021, the government passed the Human Rights Due Diligence in Supply Chains Act—though not effective until 2023—requiring companies to exercise due diligence to ensure their supply chains did not use forced labor; the Federal Office for Economic Affairs and Export Control was appointed as the competent authority and granted enforcement measures that included inspections, document retrieval, and fines for non-compliance. In June 2021, media reported a human rights group filed a criminal complaint in Germany against five major retailers that purchased cotton from the People's Republic of China (PRC) allegedly harvested with forced labor; prosecutors declined to pursue the matter due to insufficient factual indications under current criminal law. The government provided funding to several anti-trafficking programs abroad, including in Burkina Faso, several countries in the Horn of Africa, Mauritania, Niger, and the Western Balkans. The government did not make efforts to reduce the demand for commercial sex acts. During the reporting period, the government demonstrated efforts to reduce the demand for international sex tourism by German nationals through an awareness campaign; the government reported that its joint investigation with the Government of Brazil regarding a suspected German sex tourist initiated in the prior year was ongoing.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Germany. The pandemic exacerbated vulnerabilities for trafficking victims, including increased isolation of migrant and seasonal workers and sex trafficking victims. Sex traffickers increasingly use online platforms to recruit, exploit victims, and book apartment rentals to make their illicit operations difficult to track, in part because of the pandemic. Pandemic-related closures and restrictions caused additional vulnerability for individuals in commercial sex. Most identified sex trafficking victims in Germany are EU citizens, primarily German citizens, Bulgarians, and Romanians (of which a significant percentage are ethnic Roma). Victims also come from most other regions of the world, particularly the PRC, Thailand, Nigeria, and other parts of Africa. Transgender women from Thailand are particularly vulnerable to sex trafficking and are often misled regarding their working conditions and wages prior to their arrival. Similarly, Romani families sometimes force their children, both boys and girls, into commercial sex on the streets. Sex traffickers use fraudulent recruitment, force, and debt bondage to exploit Venezuelan women and LGBTQI+ persons fleeing the collapsing social and economic conditions at home. Authorities continue to report the prevalence of young male traffickers, known as "lover boys," coercing

**GHANA**

girls and women into sex trafficking, often through a faux romantic relationship; in 2020, approximately 25 percent of sex trafficking victims were coerced using this method. Additionally, in 2020, the government reported approximately 40 percent of traffickers were acquainted with their victim prior to exploiting them in sex trafficking.

Traffickers continued to target migrants and refugees upon arrival. In 2022, Ukrainian refugees, predominantly women and children, fleeing Russia's war on Ukraine are vulnerable to trafficking. Traffickers, namely Nigerian "madams," continue to fraudulently recruit and later coerce Nigerian women and girls to stay in exploitative situations using a "voodoo oath" they are forced to swear, while Nigerian "fraternities" increasingly recruit victims through force. The Nigerian and European mafias increasingly cooperate to facilitate human trafficking from Africa. Several foreign governments continue to report German citizens engage in sex tourism abroad. Labor trafficking victims are predominantly male and European, including from North Macedonia, Latvia, Ukraine, Bulgaria, Poland, and Romania but also from Afghanistan, Pakistan, and Vietnam. Organized Vietnamese criminal groups exploit Vietnamese victims in labor trafficking. Traffickers exploit victims of forced labor primarily at construction sites but also in hotels, seasonal industries like agriculture, entertainment, and restaurants, and in private homes, with reported increases in the number of child victims. Foreign workers are vulnerable to labor trafficking, particularly in meat processing plants, and especially when companies hire employees through subcontractors, who may have used fraudulent practices to recruit workers to the jobs. Traffickers with labor recruitment companies fraudulently recruit artists and musicians from Zimbabwe and Ethiopia with offers of fake jobs but instead force them to perform on the street and collect their earnings. Traffickers subject Roma and foreign unaccompanied children to sex trafficking, forced begging, and other coerced criminal behavior.

## GHANA: TIER 2

The Government of Ghana does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Ghana remained on Tier 2. These efforts included identifying significantly more trafficking victims and increasing trafficking investigations. The government provided anti-trafficking training to law enforcement, judicial officials, community leaders, and service providers, and it held numerous public awareness raising activities. However, the government did not meet the minimum standards in several key areas. The government prosecuted fewer alleged traffickers and continued its 2017 ban on labor migration to Gulf states, which increased vulnerability to trafficking. Despite reports of fraudulent labor recruiters exploiting Ghanaian victims abroad, the government did not report holding any fraudulent recruiters accountable. A lack of adequate resources for law enforcement continued to hinder investigations and prosecutions, and shelter capacity for all victims remained insufficient. The government did not adequately address corruption in trafficking crimes, and it did not amend the anti-trafficking act regulations to remove the option of a fine in lieu of imprisonment in cases where the trafficker was a parent or guardian of a child victim.



GHANA TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**
Increase efforts to investigate, prosecute, and convict traffickers under the 2005 human trafficking law—including complicit officials and recruitment agents facilitating trafficking—and apply significant prison

terms as prescribed by law. • Amend the 2015 implementing regulations for the 2005 human trafficking law to remove the option of a fine in lieu of imprisonment in cases where the trafficker is a parent or guardian of a child victim. • Train law enforcement and judicial officials on identifying, investigating, and prosecuting trafficking cases under the 2005 human trafficking law. • Increase efforts to prevent exploitation of Ghanaian workers abroad, including by ending the ban on labor migration to Gulf states, implementing the 2020 National Labor Migration Policy, and ensuring workers do not pay any recruitment fees. • Increase funding and resources for law enforcement and streamline cooperation with the Department of Social Welfare to enable criminal investigations and victim identification. • Train law enforcement and service providers on the standard operating procedures (SOPs) to identify victims and refer them to services; implement the procedures in all regions. • Increase the quantity and quality of care available to victims, including by providing financial and in-kind support to civil society providing victims shelter and services. • Proactively screen for trafficking indicators among vulnerable populations—including Ghanaian women traveling abroad for domestic work, returning migrants, domestic and foreign workers on People's Republic of China (PRC) national-operated fishing vessels, and PRC national and Cuban overseas workers—and refer trafficking victims to services. • Increase cooperation between law enforcement and prosecutors on case development. • Improve data collection on law enforcement statistics and victim identification.

**PROSECUTION**
The government maintained anti-trafficking law enforcement efforts. The 2005 Human Trafficking Act, amended in 2009, criminalized sex trafficking and labor trafficking. The Human Trafficking Act prescribed penalties of a minimum of five years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. However, the 2015 regulations for this Act, which are non-discretionary and have the force of law, provided specific guidance on sentencing depending on the circumstances; in general, the term is not less than five years' imprisonment and not more than 25 years' imprisonment, but if a parent, guardian, or other person with parental responsibilities facilitates or engages in trafficking, they are liable to a fine, five to 10 years' imprisonment, or both. By allowing for a fine in lieu of imprisonment, these penalties were not commensurate with those for other serious crimes, such as rape.

Authorities initiated investigations of 108 trafficking cases in 2021, including 60 labor trafficking cases, 42 sex trafficking cases, and six cases where the form of exploitation was unknown, and continued investigating one sex trafficking case from the previous reporting period, compared with investigating 87 cases in 2020. In 2021, the government initiated prosecutions of 13 alleged traffickers and continued prosecution of one alleged trafficker. Courts convicted 14 traffickers under its anti-trafficking law, including two sex traffickers and 12 labor traffickers, with 11 traffickers (79 percent) receiving a sentence of at least one year of imprisonment. In some cases, the government prosecuted alleged traffickers under the Children's Act when there was insufficient evidence to attain a conviction under the anti-trafficking law. Courts prosecuted and convicted three defendants for exploitative child labor under the Children's Act of 1998; two of the three defendants were fined and did not receive prison sentences, and one defendant received the option for a fine in lieu of six months' imprisonment, which did not serve to deter the crime or adequately reflect the nature of the crime. This compared with prosecutions of 22 alleged labor traffickers and convictions of 13 labor traffickers in 2020. Despite reports of fraudulent labor recruiters exploiting Ghanaian victims abroad, the government did not report investigating or prosecuting any fraudulent recruitment cases. The government did not report cooperating with foreign counterparts on law enforcement activities.

The government did not report any investigations, prosecutions, or convictions of government employees allegedly complicit in human trafficking crimes; however, official corruption and complicity in trafficking crimes remained concerns, inhibiting law enforcement action during the year. Observers alleged that some traffickers operated with the support or acquiescence of law enforcement or justice officials and that some officials interfered in law enforcement proceedings, refused

to take action without a bribe, or attempted to intimidate civil society's reporting of trafficking cases. Some airport staff allegedly facilitated the transit of victims en route to exploitation.

The Ghana Police Service (GPS) and Ghana Immigration Service (GIS) had specialized anti-trafficking units. Government officials and NGOs reported the government did not provide sufficient funding and resources, facilities, or land and marine vehicles for anti-trafficking law enforcement operations. This, combined with a lack of shelter facilities in most regions, delayed investigations and operations to remove potential victims from exploitative situations. Inadequate evidence collection, weak collaboration between police and prosecutors, and a lack of experienced state attorneys further hampered prosecution of suspected traffickers. Judicial resources were concentrated in urban areas, leaving some victims in rural communities with limited access to the formal justice system. In collaboration with NGOs and foreign donors, the government provided extensive training to law enforcement, judicial officials, and frontline workers on trafficking definitions and legal concepts, investigative techniques, and victim protection. The government continued providing introductory anti-trafficking training for GPS and GIS recruits.

## PROTECTION

The government increased victim protection efforts. The government reported identifying and referring 727 trafficking victims to services in 2021, a significant increase compared with identifying 391 victims in 2020. This included 657 victims of labor trafficking, 64 victims of sex trafficking, and six victims where the form of exploitation was unknown. A majority of identified victims were children (578), and a majority were Ghanaian (577). Of the 150 foreign national victims, most were Nigerian, followed by Burkinabe and Ivorian nationals. NGOs identified an additional 94 trafficking victims, including 87 labor trafficking victims and seven sex trafficking victims, compared with 108 victims in 2020.

The government had SOPs to identify trafficking victims and refer them to services. However, officials did not consistently apply the SOPs, and observers reported limited resources and a lack of coordination between the government and civil society at times hampered implementation. District Department of Social Welfare (DSW) personnel accompanied local law enforcement on anti-trafficking operations and screened for potential victims; however, these teams reported to local governments rather than a centralized government entity. As a result, observers reported decentralization, lack of funding, and poor management impeded the DSW's effectiveness and sometimes resulted in inadequate and inconsistent treatment of victims. Officials referred all 727 victims to government shelter services or NGOs for care. The government operated one shelter for adult female trafficking victims, which provided care for 150 trafficking victims in 2021. The government, with an international organization's support, maintained a dedicated shelter for child trafficking victims, which provided care for 78 children. A government-run shelter for victims of child abuse could also accommodate child trafficking victims. There were no shelters for adult male victims, and most men received short-term housing and some medical and psychological assistance, followed by reintegration support. Government services for women and children included shelter, medical care, needs assessments, psycho-social care, education and skills training, interpretation for foreign national victims, assistance obtaining identity documents, registration with the national health service, and assistance during legal proceedings. Through its Human Trafficking Fund (HTF), the government expended 650,000 Ghanaian cedis ($107,440) for victim services in 2021, compared with 590,000 cedis ($97,520) for victim services and shelter renovations in 2020. Relying on private facilities operated by NGOs and faith-based organizations, the government referred most child trafficking victims to one of 11 privately-operated shelters that provided or coordinated provision of services. However, overall shelter capacity for child trafficking victims remained insufficient. Observers reported the government reintegrated child victims without conducting extensive home assessments. Foreign victims had the same access to care as Ghanaian victims. Foreign victims could seek temporary residency during legal proceedings and, with the Interior Minister's approval, permanent residency if deemed to be in the victim's best interest; officials did not report how many, if any, foreign victims it granted temporary or permanent residency. The government, often

in collaboration with NGOs and foreign donors, trained government and civil society protection workers on topics ranging from trafficking indicators and trends to case management and trauma-informed care.

Victim services were not dependent on cooperation with law enforcement proceedings. The government, in cooperation with NGOs, assisted victims who chose to participate in law enforcement proceedings against their traffickers by providing legal services, funding for lodging, transportation, and psycho-social support. Victims could provide video or written testimony, and some courts had child-friendly spaces that allowed child victims to testify from a separate room via video. Officials and NGOs reported that prolonged adjournments slowed prosecutions and impeded victims' participation, and officials did not always protect victims' confidentiality. Ghanaian law allowed trafficking victims to obtain restitution, and in one case, the court awarded two victims 1,000 cedis ($165) each. Victims could file civil suits against their traffickers, but none reportedly did so.

## PREVENTION

The government modestly increased anti-trafficking prevention efforts. The Human Trafficking Management Board—the inter-ministerial committee mandated to administer the HTF, advise the Ministry of Gender, Children and Social Protection (MOGCSP) on anti-trafficking policy, promote prevention efforts, and facilitate the protection and reintegration of trafficking victims—met periodically. The Human Trafficking Secretariat, which coordinated anti-trafficking efforts under the MOGCSP, also met regularly with stakeholders on information sharing and implementation of the 2017-2021 anti-trafficking national action plan (NAP). The government drafted an updated 2022-2026 NAP and an accompanying communications strategy, which were both pending adoption at the end of the reporting period. The government allocated 1 million cedis ($165,290) to the HTF for the government's anti-trafficking activities, including the NAP's implementation in 2021, the same amount allocated in 2020, and increased the 2022 HTF budget to 2 million cedis ($330,580).

The government conducted trainings and public awareness-raising activities with government officials, civil society stakeholders, and community leaders at the national, regional, district, and local levels, often in collaboration with NGOs and international organizations. The government had a standardized trafficking data collection system in five regions, developed with an international organization's support; however, the system was not widely used. The MOGCSP operated a hotline in English and six local languages for victims of abuse, and it launched a mobile application for reporting gender-based violence crimes, including human trafficking; the government did not report identifying any trafficking victims or initiating any trafficking investigations as a result of the hotline or mobile application. The government did not report labor inspectors identifying any trafficking victims nor removing any children from exploitative labor situations, despite receiving training on child labor and trafficking. Insufficient funding, facilities, and transportation impeded labor inspectors' efforts to identify victims. The government had not yet implemented a forced labor training manual for labor inspectors, which was drafted with donor support during the previous reporting period.

The government regulated formal labor recruitment and required private employment agencies to register; it also provided pre-departure trainings for migrant workers, and the Ministry of Employment and Labor Relations and GIS screened for trafficking indicators. However, the government did not report investigating any labor recruiters for fraudulent recruitment or revoking agencies' registration for recruitment violations. The law did not prohibit worker-paid recruitment fees. Informal recruitment agencies continued to operate and facilitate recruitment through informal channels, and some agents used predatory tactics, including high recruitment fees and fraudulent job advertising. The government continued its 2017 ban on labor migration to Gulf states; the policy restricted Ghanaians' access to safe and legal migration, subsequently increasing their vulnerability to trafficking. The government's 2020 National Labor Migration Policy and its 2020-2024 implementation plan included provisions to prevent labor exploitation and increase Ghanaian embassies' capacity to assist migrant workers abroad and protect foreign workers in Ghana; the government's labor migration

technical working group held workshops and trainings to sensitize local government employees and social workers on the policy. The government did not make efforts to reduce the demand for commercial sex acts. The government provided anti-trafficking training to its troops prior to their deployment as peacekeepers; although not explicitly reported as human trafficking, there was one open case (submitted in 2018) of alleged sexual exploitation with trafficking indicators by Ghanaian peacekeepers deployed to the UN peacekeeping mission in South Sudan. The government did not provide the accountability measures taken, if any, by the end of the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Ghana, and traffickers exploit victims from Ghana abroad. Traffickers exploit Ghanaian children in forced labor within the country in inland and coastal fishing, domestic service, street hawking, begging, portering, artisanal gold mining, quarrying, herding, and agriculture, especially in the cocoa sector. Traffickers exploit children as young as four in forced labor in Lake Volta's fishing industry and use violence and limited access to food to control their victims. Traffickers force boys to work in hazardous conditions, including in deep diving, and girls perform work onshore, such as preparing the fish for markets. Traffickers, including middlemen and relatives, recruit girls from other communities and subsequently exploit them in domestic servitude in the Lake Volta region, sometimes with parents' knowledge. Relatives often send girls via intermediaries to work in harsh conditions in forced labor in domestic work. Children in northern regions of Ghana, whose parents use intermediaries or relatives to send them to work in agriculture in the south during school breaks or the dry season, are at increased risk for forced labor. Ghanaian children who do not have access to school or who can attend only intermittently due to limited space and the double-track school schedule are also vulnerable to sex and labor trafficking. Observers noted the pandemic's impact on the economy and subsequent school closures increased child labor in Ghana, including in exploitative conditions. An NGO reported climate change has exacerbated vulnerability of Ghanaians migrating from northern farming communities to urban centers throughout the country in search of employment; girls and young women who work as kayayie (head-porters) are exploited in sex trafficking and forced labor, often through debt bondage, and men work in exploitative conditions as farm laborers and in mining, including in bonded labor. Women and girls who migrate to southern Ghana also reportedly do so to escape repressive cultural norms, including female genital mutilation and child and forced marriages, increasing vulnerability to trafficking. Traffickers subject Ghanaian girls, and to a lesser extent boys, to sex trafficking in urban areas and mining regions across Ghana.

Observers allege PRC national-owned and -operated industrial vessels flagged to Ghana, often through shell companies, exploit Ghanaian workers in forced labor; one organization documented cases of abuse, including physical abuse, underpayment or nonpayment of wages, restricted medical care, and poor living conditions, against Ghanaian men aboard these fleets. An NGO estimated 90 percent of fishing vessels operating in Ghana are owned by PRC-based companies. Traffickers operating fishing vessels flagged to Ireland and the United Kingdom also exploit Ghanaian workers in forced labor, allegedly in cooperation with some Ghanaian recruitment agencies. Cuban nationals, including medical professionals, working in Ghana may have been forced to work by the Cuban government. PRC nationals working in Ghana may be in forced labor in the formal and informal mining sectors and in fishing. Traffickers exploit Ghanaian and Nigerian women and girls in sex trafficking in Ghana, including in mining regions, border towns, and commercial centers. Traffickers lure Nigerian women and girls to Ghana with the promise of good jobs and coerce them into commercial sex to pay exorbitant debts for transportation and lodging. Traffickers also exploit some Ghanaian and Nigerian labor migrants in commercial sex and demand more money for transit and documentation costs.

Traffickers exploit Ghanaian women and children in forced labor and sex trafficking in the Middle East, Europe, and other parts of West Africa. Unscrupulous agents recruit Ghanaian men and women seeking employment, transport them through North Africa, and exploit them in sex and labor trafficking in Europe and the Middle East. In one research study, an international organization reported the majority of Ghanaian

migrants recruited for employment in the Middle East are female domestic workers. Of the 113 returning Ghanaian domestic workers surveyed in the study, most reported their contracts lacked worker protection provisions, or in some cases, the contracts were verbal, vague, or contained false information. Nearly all of the Ghanaian domestic workers were employed directly by families, rather than through a company, and most reported the work did not match the recruiters' descriptions; workers reported traffickers seized their passports and physically and sexually abused them. Observers have reported registered and unregistered agents recruit Ghanaian workers and, with the assistance of some immigration or airport officials, facilitate their travel out of the country without the required exit documents. Ghana is a transit point for West Africans subjected to sex trafficking in Europe, particularly in Italy and Germany.

## GREECE: TIER 2

The Government of Greece does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Greece remained on Tier 2. These efforts included prosecuting and convicting more traffickers and amending the trafficking law to again include forced begging as a form of exploitation. The government amended standard operating procedures (SOPs) for asylum claims to include specialized procedures for trafficking victims and provided robust training to first responders on victim identification and referral. The government established financial incentives for businesses to hire vulnerable individuals, including trafficking victims, and created a working group to simplify procedures to grant compensation to victims. The government increased overall prevention efforts, including partnering with civil society on multiple research projects. However, the government did not meet the minimum standards in several key areas. The government identified fewer victims and did not consistently screen asylum-seekers and undocumented migrants for trafficking indicators. Numerous, sometimes violent, pushbacks against undocumented migrants and asylum seekers discouraged potential victims from self-identifying or cooperating with authorities, according to reports from numerous credible sources. Anti-trafficking police and social workers did not conduct any joint inspections with labor inspectors in 2021. Government-run shelters continued to limit access to some victims for needed support, due to a lack of resources and space to provide assistance and accommodation from an increase in domestic violence victims during the pandemic. Court proceedings lasted two to six years, and the government did not provide services to mitigate this burden on victims or witnesses, thereby hindering their cooperation. Additionally, judges did not allow remote testimony and examined victims in person, even in cases where testimony could cause re-traumatization, and courts have never granted restitution or compensation to victims to date.



**GREECE TIER RANKING BY YEAR**

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers, including complicit officials. • Increase proactive identification efforts for victims of forced labor and victims among vulnerable populations, such as unaccompanied children, undocumented migrants, refugees, and asylum seekers. • Conduct an independent investigation into allegations of forced returns of asylum-seekers to Turkey, some of whom were likely trafficking victims. • Strengthen rules and regulations to ensure immigration enforcement does not hinder human trafficking detection,

criminal law enforcement, or victim protections and institutionalize and implement robust screening procedures for migrant flows, including asylum seekers and unaccompanied children. • Strengthen specialized services including shelter and psycho-social support for all victims, including children, adult males, and victims in rural areas. • Decrease the length of court proceedings for trafficking cases and encourage victims' participation in investigations and prosecutions. • Reduce the burden of lengthy proceedings by providing alternative methods to testify, such as offering remote testimony or funding for travel and other expenses for victims to attend court hearings. • Take concrete steps to expedite the victim certification process irrespective of victim cooperation in law enforcement efforts. • Allocate sufficient resources to implement the national action plan (NAP) for combating trafficking. • Develop policies for victim-centered prosecutions and implement witness protection provisions already incorporated into law. • Provide training to judges, prosecutors, and law enforcement on trafficking investigations and prosecutions, particularly in rural areas and for non-specialized staff. • Improve measures to order restitution and compensation for victims, including training prosecutors and judges, asset seizure, and legal assistance. • Improve data collection of trafficking statistics for analysis.

## PROSECUTION

The government increased law enforcement efforts. Article 323A of the criminal code criminalized sex and labor trafficking and prescribed penalties of up to 10 years' imprisonment and a fine. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape. In November 2021, the government amended Article 323A to include begging as a form of exploitation. Police investigated 20 cases with 60 suspects, compared with eight cases with 15 suspects in 2020. The government prosecuted 342 defendants, compared with 16 defendants in 2020. Courts convicted 116 traffickers, compared with 19 in 2020. Judges issued sentences ranging from one to 28 years' imprisonment, with fines ranging from €360 ($410) to €100,000 ($113,380). Courts also acquitted 42 individuals, compared with seven in 2020. The Anti-Trafficking Unit (ATU) reduced unannounced inspections on brothels, bars, and massage parlors due to lockdown measures, and the government tasked police and labor inspectors with enforcing public health measures, which limited the number of officers available to investigate trafficking cases. Courts experienced severe administrative and judicial delays due to the pandemic, with the government closing courts from November 2020 to May 2021 and partially closing courts from August 2021 to September 2021. Judges prioritized cases with expiring statutes of limitations and/or cases with defendants about to complete the maximum duration of pre-trial detention. Additionally, social distancing measures restricted the number of people in court rooms, while positive COVID-19 cases among staff and reduced capacity due to other pandemic mitigation efforts further exacerbated delays.

The Hellenic Police maintained an ATU within the Organized Crime Division, composed of two units with 37 officers in Athens and 10 officers in Thessaloniki, who investigated trafficking and vice crimes, and 12 smaller units across municipalities that investigated trafficking and organized crime. ATU officers did not conduct joint inspections with labor inspectors and social workers from the National Solidarity Center (EKKA) due to limited economic activity from lockdown measures and increased responsibilities to enforce pandemic mitigation efforts (347 joint inspections in 2019). In previous years, observers reported ATU's 12 smaller units often consisted of three or four officers to handle trafficking cases among many other duties and lacked the resources and staff to conduct proactive investigations. NGOs continued to report good cooperation with law enforcement and excellent cooperation with ATU. While the government maintained trained prosecutors in Athens and Thessaloniki to handle trafficking cases, observers reported that non-specialized police, prosecutors, and judges, particularly in rural areas and islands, lacked an understanding of trafficking. In 2019, the government removed "pimping" from the criminal code, which police, prosecutors, and judges reported using to justify inspections on brothels and to prosecute traffickers when stronger evidence was unavailable; subsequently, some possible trafficking cases may not have been investigated or prosecuted at all. However, in November 2021, the government reinstated "pimping" as a crime with a minimum

sentence of 18 months' imprisonment with a fine. The government maintained institutionalized training programs on trafficking at the Police Academy, the Coast Guard Academy, Academy of Judges, the Greek Asylum Service, and the Reception Identification Service. In addition, the government, in cooperation with NGOs and international organizations, trained police, asylum officers, and labor inspectors on various anti-trafficking issues. Prosecutors charged a police officer with 14 various offenses, including trafficking, and authorities separately arrested a navy officer for sex trafficking. In 2020, media reported authorities investigated 15 police officers affiliated with a gang that provided protection for brothels, casinos, and massage parlors. The government signed a bilateral agreement with Albania to establish a security center focusing on organized crime, including trafficking.

## PROTECTION

The government maintained victim protection efforts. The government identified 130 victims, compared with 167 victims in 2020. Of these, 59 were sex trafficking victims, 49 were forced labor victims, two were victims of forced criminality, and 20 victims fell into more than one category of exploitation; 80 were women, and 11 were men; 18 were girls, and 21 were boys; and 118 were foreign victims. Observers commended ATU's ability to consistently identify victims but noted other government efforts were largely reactive and reliant on self-identification. The Hellenic National Public Health Organization and regional reception service and asylum officers screened undocumented migrants, asylum seekers, and unaccompanied children for trafficking indicators at island Reception and Identification Centers (RIC) and respectively identified 20 and 44 possible cases involving abuse and exploitation in the country of origin or transit countries (10 in 2020). EKKA and the Asylum Service updated SOPs for asylum claims to include specialized procedures if a case officer identified an asylum seeker as a trafficking victim; however, observers reported assessments in the registration stage were too quick to identify a victim. The government expedited the registration and screening process of undocumented migrants and asylum seekers at the RICs, but in some cases, unidentified trafficking victims stayed in the same facility with their traffickers or were re-victimized due to pandemic-related restriction measures preventing movement between facilities and regions. Additionally, positive COVID-19 cases among staff and reduced capacity due to pandemic mitigation efforts occasionally exacerbated delays in identification procedures. Each RIC designated a trafficking focal point who collected information on potential trafficking cases, but many staff working at RICs were on short-term contracts, which limited their experience and training to identify victims. International organizations, NGOs, and media continued to report a serious lack of government efforts to screen undocumented migrants and asylum seekers, including unaccompanied children, at border crossings. Reports documented violent pushbacks of undocumented migrants and asylum seekers into Turkey, while civil society and media reported allegations that border police assaulted and harassed undocumented migrants and asylum seekers, including women and children, which strongly discouraged victims from self-identifying or cooperating with authorities. In previous years, observers reported a lack of identification efforts for victims of forced labor, particularly in the agriculture sector, cleaning and domestic service, and the tourism industry; however, labor inspectors reported difficulties in conducting inspections in rural areas and on islands due to the community receiving prior notice before inspections from local citizens. Civil society reported some first responders, who could not distinguish between sex trafficking and commercial sex, rejected sex trafficking victims who self-identified and, at times, sent them back to the traffickers.

The government maintained a multi-disciplinary national referral mechanism (NRM), including appropriate SOPs and referral forms. The NRM required first responders to inform and coordinate with EKKA when potential victims were identified for victim care and placement; government entities referred 37 victims (39 in 2020), and civil society organizations referred 73 victims (113 in 2020). Trafficking victims return to their home country quickly after being freed from traffickers. In addition, some potential trafficking victims are forcibly returned to Turkey before they can be screened. EKKA trained first responders, immigration officers, social service workers, hospital staff, and asylum officers on victim identification and referral procedures. The law

authorized public prosecutors to officially recognize victims based on information collected by law enforcement or by a psychologist and social worker if a victim did not want to cooperate with law enforcement. In 2020, a prosecutor officially recognized a victim for the first time based solely on the recommendations of NGO experts, social workers, and psychologists; however, observers reported inconsistent use of psychologists and social workers for identification procedures, and procedures were lengthy and sometimes took years for victims to receive. Certified victim status entitled foreign victims to a renewable one-year residence and work permit, but victims without this status still had access to immediate support and assistance. Additionally, the government did not recognize victims who were exploited abroad but identified in Greece. Of the 156 victims identified by the government, public prosecutors granted official victim status to only seven victims (four in 2020), while one victim was in the process of receiving official victim status (six in 2020) and another 40 were waiting for the process to start. Fifteen victims were EU citizens, and nine were Greek citizens who did not need a residence and work permit.

The government, in cooperation with NGOs, provided shelter, psycho-social support, medical care, legal aid, and reintegration support. While the government provided personal protective equipment and virtual assistance to victims, observers reported virtual assistance for victims was nonexistent or not effective. The government was unable to determine how much total funding was spent on victim protection and did not allocate funding to civil society, with the exception of projects co-financed by the EU and state budget funds. EKKA secured €631,840 ($716,370) from EU security funds to support the NRM from 2018 to 2022 and maintained a memorandum of understanding (MOU) with an NGO to host a legal consultant and two anti-trafficking advisors. Two agencies provided general shelter and support services to trafficking victims: the General Secretariat for Family Policy and Gender Equality (GSFPGE) operated 21 shelters and 40 counseling centers for female victims of violence, and EKKA operated two long-term shelters, an emergency shelter, and two Social Support Centers for vulnerable populations in need of assistance. GSFPGE and EKKA shelters assisted 37 victims (22 in 2020). However, EKKA and GSFPGE shelters continued to reject some victims from accessing support due to the lack of capacity, resources, and space to provide assistance and accommodation. For example, government-run shelters did not have space to accommodate some trafficking victims due to an increase in domestic violence cases during the pandemic. Experts reported the government did not transfer trafficking victims, identified at RICs, to the mainland for victim assistance due to the lack of accommodation and housing. As in previous years, victims in rural areas and islands had little access to support services and often were accommodated in police stations or hospital wards, or they received no assistance. Observers reported a lack of specialized shelters for victims with only one NGO-run shelter providing specialized assistance for female trafficking victims and an NGO-run shelter for sexually exploited men. Government-run shelters, NGO-run shelters, and facilities for unaccompanied children accommodated child victims but did not provide specialized support. Central and local governments maintained cooperation agreements with some NGOs to house, protect, and assist vulnerable children, including trafficking victims, and allocated buildings to use as shelters. The government added trafficking victims into a category of vulnerable unemployed individuals and provided financial incentives to businesses to hire 800 individuals from this category, including subsidies for salaries and social welfare that was renewable for an additional year. Victims who did not apply for certified victim status could receive a residence and work permit by applying for asylum or for a residence permit on humanitarian grounds. In 2021, the government processed 16 residence permits for trafficking victims, 12 residence renewal permits, and two newly-issued residence permits. The process to receive residence permits was difficult without an attorney and took time.

Due to a lack of consistent screening efforts for trafficking indicators in migrant flows, authorities likely detained and deported some unidentified trafficking victims among undocumented migrants and asylum seekers. While courts prioritized cases with child victims, court proceedings for cases with adult victims often lasted two to six years, and the government did not provide services to mitigate this burden on victims or witnesses, thereby hindering their cooperation. Prosecutors relied heavily on victim testimony without corroborating evidence, and the government did not provide funding for travel and other expenses for victims to attend court hearings. Some suspected traffickers intentionally postponed court appearances to increase the chances of victims being unwilling to testify in court and/or may have paid bribes to repatriated victims to preclude them from testifying. The law entitled victims to mental health professionals during court proceedings and the use of audiovisual technology for remote testimony, but many courts lacked the capabilities to deploy these resources. Additionally, some judges did not allow remote testimony because they wanted to examine the victim and the witnesses in person, even in cases where testimony could cause re-traumatization. The law provided for witness protection and non-disclosure of the witness' personal information; however, no trafficking victims received full witness protection privileges to date, police only escorted victims during trials, and courts revealed victims' identities during proceedings. Judges have not ever issued restitution for victims in criminal proceedings. Greek law entitled victims to file civil suits against traffickers for compensation; however, no victims to date had filed for or subsequently received compensation from their traffickers in part due to their reluctance to wait for the case to obtain a decision in a lengthy court process. The government established a working group to simplify the procedure of granting compensation to trafficking victims.

## PREVENTION

The government increased efforts to prevent trafficking. The Office of the National Rapporteur on Human Trafficking (ONRHT) continued to coordinate government-wide anti-trafficking efforts despite lacking sufficient resources. The position of the National Rapporteur remained vacant after the government appointed the previous rapporteur to another position in December 2021. The government continued to implement the NAP for 2019-2023, monitored anti-trafficking efforts, and made assessments publicly available; however, experts reported the government did not allocate sufficient resources to anti-trafficking efforts and implementation of the NAP. OHRHT, in partnership with a university, launched a pilot project to use technology to remotely monitor working conditions of agricultural workers to prevent forced labor. Additionally, the government, in partnership with a think tank, conducted research to assess investigations and prosecutions on trafficking cases and created a working group with legal and criminal justice professionals to identify gaps in implementation of anti-trafficking legislation. ONRHT, in cooperation with international organizations and NGOs, organized awareness campaigns targeting children, migrants, parents, the public, and seasonal workers. The government operated four hotlines, one for female victims of violence, one for individuals in vulnerable situations, one for unaccompanied children, and another for labor infringement and undeclared work complaints; hotlines received no calls related to trafficking in 2021 and 2020. ONRHT signed an MOU with UNICEF to strengthen efforts to combat child trafficking and maintained an MOU with two regional governments to strengthen cooperation on various anti-trafficking efforts, including preventing forced labor in public procurement supply chains. The Hellenic Public Procurement Authority terminated contracts when it identified child labor, forced labor, and/or other forms of trafficking in public procurement. The government provided free airtime for public service announcements for NGOs and agencies on trafficking issues. The government certified and licensed private labor recruitment agencies and prohibited recruitment fees. Labor inspectors conducted inspections of businesses and issued fines for various labor-law violations to 4,892 businesses as a result of inspections from January 1 to September 21, 2021. As restriction measures for the pandemic were eased, inspections in the first quarter of 2022 intensified with labor inspectors conducting 6,722 checks and issuing 567 fines totaling €623,548 ($706,970) for labor-related violations. The government allowed migrant workers with a work permit of one year or longer to change employers, but migrant workers could not change their job specialization and social security provider. The government also allowed seasonal workers to sign a new contract with a different employer or renew their contract. The government signed an agreement with the Government of Bangladesh to allow 4,000 seasonal work permits for the next five years to Bangladeshi citizens to work in the agricultural sector. It also provided temporary residence and work permits to Ukrainian nationals fleeing the war in Ukraine. The government made

efforts to reduce the demand for commercial sex acts by conducting awareness campaigns targeting potential purchasers of commercial sex.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Greece, and traffickers exploit victims from Greece abroad. Traffickers operating in Greece are primarily Greeks and other Western and Eastern Europeans, but some are also from the Caucasus and Central Asia. Traffickers subject some women and children from Eastern and Southern Europe, South and Central Asia, Cameroon, Georgia, Iraq, Nigeria, and Russia to sex trafficking in unlicensed brothels, on the street, in strip clubs, in massage salons, and in hotels. Victims of forced labor in Greece are primarily children and men from Africa, Eastern Europe, South Asia, and Syria. Traffickers exploit migrant workers from Afghanistan, Bangladesh, Iran, and Pakistan to debt bondage and forced labor in agriculture. Traffickers force marginalized Romani children from Albania, Bulgaria, and Romania to sell goods on the street, beg, or commit petty theft. Unaccompanied children, primarily from Afghanistan, engage in survival sex and are vulnerable to trafficking. Refugee and migrant women, especially those living in the island RICs, are highly vulnerable to trafficking. NGOs report rapes of migrant women in migrant and refugee camps and allege organized criminal groups in camps use tents and shipping containers as brothels. Most migrants and asylum seekers are believed to rely on smugglers at some point during their journey and in some instances are forced into exploitation upon arrival in Greece.

## GUATEMALA: TIER 2

The Government of Guatemala does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Guatemala remained on Tier 2. These efforts included prosecuting and convicting more sex and labor traffickers, expanding justice sector presence and educational outreach for underserved communities, referring more victims to public and NGO shelters, and increasing training for frontline officials to identify and assist trafficking victims. However, the government did not meet the minimum standards in several key areas. The government did not provide sufficient specialized victim services given the scope of the problem, and monitoring and oversight in government shelters remained weak. Some criminal justice officials outside urban areas lacked sufficient knowledge of human trafficking elements and indicators or victim-centered methods. The government arrested officials suspected of complicity in trafficking crimes but did not prosecute or convict any complicit officials.



GUATEMALA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate cases, prosecute trafficking crimes, and convict traffickers with increased focus on suspected cases of forced labor. • Increase efforts to proactively identify victims of forced labor, particularly in the agricultural sector and domestic service. • Increase efforts to screen for indicators of trafficking among migrants, including unaccompanied migrant children and all returning migrants, and provide victims with comprehensive services. • Increase funding for and access to victim protection, particularly shelters and specialized services, to include LGBTQI+ victims, male victims, and victims who have young children. • Investigate and hold government officials criminally accountable for

complicity in trafficking. • Increase training efforts to identify trafficking victims, particularly among vulnerable populations, such as working children, migrants and returnees, individuals in commercial sex, and children apprehended for illicit gang-related activities. • Improve the monitoring, oversight, and capacity of shelter operations for child trafficking victims nationwide to address overcrowding, abuse, and neglect. • Given significant concerns about forced labor indicators in Cuban medical missions, screen Cuban medical professionals and refer them to appropriate services. • Amend the 2009 anti-trafficking law to include a definition of human trafficking consistent with international law. • Increase efforts to investigate, prosecute, and convict child sex tourists and others engaged in sex trafficking of children. • Develop a mechanism to ensure victims receive court-ordered restitution payments. • Expand training for judges and prosecutors to include training on the use of forensic and other evidence to ensure trafficking cases are investigated and prosecuted as such, rather than as lesser offenses. • Provide reintegration and witness protection support, including immigration relief for irregular migrant victims, to victims once they leave shelters to prevent re-trafficking. • Expand prevention measures, including through raising awareness of fraudulent recruitment for employment in Guatemala and abroad, implementing new recruiter registration requirements, punishing employers or recruiters who commit fraudulent practices that facilitate trafficking, and eliminating worker-paid recruitment fees.

## PROSECUTION

The government increased law enforcement efforts. The anti-trafficking law of 2009 criminalized sex trafficking and labor trafficking and prescribed penalties from eight to 18 years' imprisonment and a fine. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. However, inconsistent with the definition of trafficking under international law, the law did not consider the use of force, fraud, or coercion as an essential element of an adult trafficking offense. The law defined trafficking broadly to include all labor exploitation and illegal adoption without the purpose of exploitation.

Authorities opened investigations into 386 criminal complaints involving suspected trafficking crimes (71 involving sex trafficking, 182 involving forced labor, and 133 not specified) opening investigations into 164 suspected trafficking crimes (38 involving sex trafficking, 85 involving forced labor, and 41 not specified). In comparison, the government investigated 165 trafficking complaints in 2020 and 211 in 2019. The Human Rights Ombudsman (PDH) reported receiving nine complaints of potential trafficking, which it referred to the Public Ministry (MP), compared with 16 complaints in 2020 and 24 complaints in 2019. Police received 70 trafficking-related calls to the crime hotline, and authorities initiated five investigations from information received in these calls. Authorities reported initiating prosecutions of 71 defendants (46 accused of sex trafficking, 13 accused of forced labor, and 12 not specified) and continuing prosecutions of 59 defendants (41 for sex trafficking, 12 for forced labor, and six unspecified) in cases ongoing from previous years. The government prosecuted ten suspects in absentia. In comparison, authorities prosecuted 37 defendants for trafficking crimes in 2020 and 71 in 2019. Some prosecutions may have been for crimes that did not meet the definition of trafficking according to international law. The government reported courts convicted 30 traffickers, 25 for sex trafficking crimes and five for forced labor, and acquitted one suspect. This was an increase from two convictions in 2020 and 25 convictions in 2019. One convicted labor trafficker received a fine of 300,000 quetzals ($38,960) and no jail time, while the other 29 traffickers received prison sentences ranging from eight to 13 years and fines up to 300,000 quetzals ($38,960).

• The National Civil Police maintained the Special Directorate for Criminal Investigation (DEIC), which had a unit assigned specifically to combat trafficking. With international donor support, the government opened an office of the anti-trafficking police unit in Quetzaltenango, with jurisdiction to investigate trafficking crimes across eight departments. The government developed and began implementing a new protocol containing detailed guidance on the various stages of conducting police investigations of trafficking and related crimes. The government assigned 10 additional officers to DEIC and extended the length of

officers' assignments in the anti-trafficking unit, in an effort to increase police knowledge and capacity for investigating trafficking crimes. Observers indicated that National Civil Police officers across the country had a lack of understanding of human trafficking. The government had specialized prosecutors to handle cases of human trafficking, including forced labor, although local experts reported some prosecutors lacked adequate training. Observers indicated prosecutors did not utilize the criminal charge of trafficking in some parts of the country, resulting in some cases being prosecuted as other crimes. The government opened new prosecutorial offices in Chiquimula and Alta Verapaz, each covering multiple departments in areas underserved by the justice sector, expanding access to justice for trafficking victims in these areas. Two specialized first instance criminal courts for prosecuting trafficking-related crimes, in Guatemala City and Quetzaltenango, had jurisdiction in central, eastern, and southern departments, as well as seven western departments. A judge's approval was required for prosecutorial investigations, but the judicial system lacked adequate capacity to process cases in a timely manner. Insufficient Public Ministry resources and a lengthy appeals process caused further delays, with many cases taking longer than a year and appeals lasting two to three years. Judicial officials had difficulty applying a victim-centered approach, and some lacked adequate training to apply forensic evidence in prosecutions. Some officials, especially outside the major urban areas, had an inadequate understanding of the elements and indicators of trafficking crimes and tried many cases as labor exploitation or sexual assault rather than trafficking.

Corruption in trafficking crimes remained a significant concern, inhibiting law enforcement action during the year; this problem was especially acute in border zones where government presence and rule of law were weak. The government investigated several cases of allegedly complicit public officials and made one arrest. In one case, authorities investigated and arrested a municipal mayor for alleged involvement in sex trafficking of a kidnapped 13-year-old girl. Prosecutors investigated mid-level police officials for participation in a criminal operation involving money laundering and sex trafficking of women from Colombia, Venezuela, Brazil, and Central America at a spa in the capital; authorities arrested and charged one police officer in this case. In addition, prosecutors investigated soldiers in the Guatemalan army who were allegedly complicit in sharing pornographic material depicting children who may have been sex trafficking victims. The government did not provide an update to the 2018 case of two government officials charged with trafficking crimes. The government reported prosecutors coordinated with their foreign counterparts on six trafficking investigations opened by officials in the Dominican Republic, El Salvador, Honduras, and Panama and five investigations within Guatemala. In 2021, the Secretariat against Sexual Violence, Exploitation, and Trafficking in Persons (SVET) organized several trainings for police on investigating trafficking crimes, and the Public Ministry trained 57 officials on human trafficking and related crimes. With donor support, the anti-trafficking prosecutor's office held a four-day training workshop for officials in Guatemala City's municipal government and courts.

## PROTECTION

The government maintained protection efforts. Authorities identified 92 victims (67 exploited in sex trafficking, 13 in forced labor, and 12 not specified), and NGOs identified an additional 333 victims (153 exploited in sex trafficking, 88 in forced labor, and 92 not specified). The total number of victims identified, 425, was similar to 439 victims identified in 2020; however, comparable data was not available for the number of victims identified by the government. Among the identified victims of sex trafficking, there were 183 girls, eight boys, 26 women, one man, and two LGBTQI+ individuals whose age and gender were not specified. Victims of forced labor included 45 girls, 42 boys, and 14 women. The additional victims included 75 girls, 21 boys, seven women, and one man. Thirty-seven identified victims were foreign nationals (23 exploited in sex trafficking, 13 in forced labor, and one not specified), and the remainder were Guatemalan. In 2021, the government referred 218 victims to NGO and government shelters, where they received services including psycho-social support, medical care, legal assistance, and/ or educational and vocational training, an increase from 170 victims referred to shelters in 2020. There were two government-run shelters and four main NGO-run shelters with specialized services for trafficking victims. The government served 92 victims in government-run shelters during the reporting period. In comparison, government shelters served 83 residents in 2020. Government agencies and NGOs cooperated to provide services to victims such as food, housing, psychological care, healthcare, education, and apprenticeships. The government did not report its expenditures for shelter and specialized services. In 2020, it provided 9 million quetzals ($1.17 million) in funding for government-run shelters and specialized services, compared with 7.04 million quetzals ($914,290) in 2019, 19.4 million quetzals ($2.52 million) in 2018, and 17.6 million quetzals ($2.29 million) in 2017.

Officials followed an inter-institutional protocol to coordinate victim identification, referral, and service provision among relevant institutions. The Public Ministry's Immediate Response Team employed social workers who conducted individual needs assessments and referral to services for victims. The government began a process to update its victim identification guide with contributions from both government and civil society experts; however, it did not make any changes during the year. With assistance from international organizations, SVET developed and implemented an online training course to guide front-line officials in identifying and assisting possible trafficking victims. The government held numerous sessions of the virtual workshop reaching more than 400 Ministry of Public Health and Social Assistance participants from across the country, and it later expanded the course to the public, reaching more than 200 private citizens. Immigration officials identified a foreign victim who had been deceived by a false job offer in Guatemala's agricultural sector and forced to beg on the street after his arrival in the country. Officials followed the inter-institutional protocol to provide the victim referral and services. The government screened returning unaccompanied migrant children for trafficking indicators using Secretariat of Social Welfare (SBS) protocols for the attention and reception of such children in two government shelters, and an NGO maintained a specialized shelter for unaccompanied migrant children that assisted with repatriation, discouraged irregular migration, and screened for trafficking. However, authorities returned the majority of unaccompanied children to their families without taking steps to decrease their vulnerability to exploitation. The government did not have a trafficking-specific hotline but encouraged the public to call three hotlines operated by the National Civil Police, the Attorney General's office, and the human rights ombudsman (PDH), which operated 24 hours a day year-round, were available in Spanish and Mayan languages, and accepted reports anonymously. In addition, the Public Ministry launched a platform for crime victims to file complaints electronically, allowing authorities to immediately refer victims via email to relevant institutions for assistance and services. The government did not report whether any trafficking victims benefitted from this new system.

Judges in Child and Adolescent Courts referred child trafficking victims to shelters. Guatemalan law required all referrals for children to public or private shelters be made by these courts; however, judges often did not make timely referrals, delaying access to needed assistance. Judges placed some child victims with family members, at times leaving them vulnerable to re-trafficking, as family members often were involved in their exploitation. Experts noted there was a shortage of shelters for male and LGBTQI+ trafficking victims and additional services were needed for trafficking victims with young children. Local observers noted challenges in interagency coordination affected shelter functioning and complicated victim care processes. The government made efforts to improve operations at its shelters, but overall monitoring and oversight, especially for facilities serving children, remained weak. The government still had not implemented structural changes to overhaul the system in the aftermath of the March 2017 fire in an overcrowded government-managed shelter, which resulted in the deaths of 41 girls and injuries to others. The shelter had previously faced allegations of corruption and sexual exploitation, and it was the subject of a UN investigation into the shelter's management. Six former government officials remained in pretrial detention on multiple criminal charges related to the lethal fire.

The government provided few services to Indigenous victims and others in rural locations where government presence was limited, but it made efforts to improve outreach and assistance to these communities. SVET partnered with international organizations to launch UNIVET, a program deploying five mobile units across 17 rural departments, to provide information and service referral for victims and at-risk individuals in

remote and underserved locations. The government provided only limited services for adult victims of trafficking and no shelters or services for adult men. SVET operated a repurposed and renovated shelter in Cobán for adult women trafficking victims, including transgender women, but the government did not report the number of victims it assisted. The government did not provide sufficient long-term care and reintegration support to victims, and case follow up was inadequate, leaving victims vulnerable to further exploitation.

The government had policies and procedures to support victims during the criminal justice process; however, resources were insufficient to extend access to these measures to all victims. The government permitted some victims to give testimony either via video, in a Gesell Chamber, or from behind a partition in the courtroom to protect the victim's identity and privacy; some victims could also participate in a witness protection program. The government opened a new Gesell Chamber for use in the specialized first instance court in Guatemala City, and both specialized courts offered psychological services for some victims and procedures to ensure confidentiality for victim-witnesses, who might be traumatized and/or intimidated, to testify. The Public Ministry employed social workers and psychologists to serve as liaisons between the office and victims, accompany victims through the proceedings against their traffickers, and assist victims in accessing medical services. The PDH's office focused on ensuring the rights of trafficking victims were not violated. In 2021, ongoing political disputes and congressional attempts to replace the PDH ombudsman put its capacity and anti-trafficking activities at risk. The law required judges to order restitution when sentencing traffickers, but the government did not have a mechanism to ensure victims received court-ordered payments. The government did not report that any victims received restitution in 2021 and has not done so since 2016. Guatemala's anti-trafficking law provided legal alternatives to the removal of foreign victims who may face hardship or retribution upon return to their home countries. However, the government did not report whether any foreign victims received immigration relief. The Ministry of Foreign Affairs held 18 workshops—training 446 officials—on the government's international coordination protocol for repatriating trafficking victims. The government did not provide information on the number of victims it repatriated to their home countries or assisted with obtaining temporary or permanent immigration status in Guatemala. Lengthy criminal justice processes, coupled with a lack of assistance to find legal employment, posed a disincentive to foreign adult victims to remain in the country for the duration of trials. Civil society expressed concern some adult foreign victims chose to leave shelters and return to their home countries due to the lengthy investigation processes. There were no reports the government punished identified victims for unlawful acts traffickers compelled them to commit. However, the government lacked formal procedures to proactively identify victims among some vulnerable groups, such as children apprehended for gang-related criminal activity.

**PREVENTION**

The government maintained prevention efforts. SVET served as the secretariat for the Interinstitutional Commission Against Trafficking-in-Persons (CIT), coordinated government efforts against trafficking, and implemented the national anti-trafficking action plan for 2018-2024. SVET published its work plans and statistics on trafficking cases and government responses on its public website; SVET and PDH published their annual trafficking reports. In four departments, the government operated local commissions, composed of government, NGO, and other local stakeholders, designed to raise awareness and prevent sexual violence, exploitation, and sex trafficking. The government continued implementation of its multi-year national anti-trafficking awareness campaign, establishing new partnerships with Indigenous leaders and municipal authorities for the prevention of trafficking in priority regions. The PDH, with international donor support, implemented a campaign in Spanish and local languages to educate the public on reporting suspected trafficking cases. SVET developed new trafficking prevention materials in Braille and distributed written materials in six local languages to reach vulnerable Indigenous communities. The government reported SVET and other institutions trained 996 government officials on trafficking prevention and detection. UNIVET's mobile units, funded by international donors, trained an additional 1,470 local government officials on trafficking awareness. Several agencies cooperated on a

campaign to promote the government's hotline for reporting child labor complaints. The government did not report whether it received any complaints involving forced child labor or if it referred any cases to law enforcement for criminal investigation. Ministry of Labor and Social Welfare (MINTRAB) inspectors identified 13 trafficking victims in 2021. However, the pandemic exacerbated existing shortcomings in human and financial resources, hindering MINTRAB's ability to conduct effective labor inspections and identify forced labor cases. MOL officials reported being overwhelmed with other responsibilities, such as the number of unemployment and worker compensation requests. The government did not prohibit employers or recruiters from charging workers recruitment fees. The Ministry of Labor published new regulations that required private recruiters to register and receive permission to operate and strengthened the government's monitoring and oversight of recruitment practices. The government participated in a program with authorities in the United States to limit the entry into Guatemala of sex offenders convicted in the United States; in 2021, authorities denied 13 sex offenders entry into Guatemala through this program.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Guatemala, and traffickers exploit victims from Guatemala abroad. Traffickers exploit Guatemalan adults and children in sex trafficking within the country and in Mexico, the United States, Belize, and other foreign countries. LGBTQI+ persons are at particular risk of sex trafficking. Foreign child sex tourists, predominantly from Canada, the United States, and Western Europe, as well as Guatemalan men, purchase commercial sex acts from child trafficking victims. Traffickers exploit women and children from other Latin American countries and the United States in sex trafficking in Guatemala. Traffickers exploit Guatemalan adults and children in forced labor within the country, often in agriculture or domestic service. Traffickers subject Guatemalan adults to forced labor in other countries, including Mexico and the United States, in the garment industry and domestic service. Experts identified the coffee, broccoli, sugar, stone quarry, and fireworks manufacturing sectors as at risk for the potential use of forced child labor. Some women in forced marriages are subjected to domestic servitude. Traffickers particularly target Indigenous Guatemalans, including children, for forced labor, including in tortilla-making shops in Guatemala and foreign countries. Traffickers exploit Guatemalan children in forced labor in begging, street vending, and as street performers, particularly within Guatemala City and along the border with Mexico. Child victims' families are often complicit in their exploitation. Criminal organizations, including gangs, exploit girls in sex trafficking and coerce and threaten boys and young men in urban areas to sell or transport drugs or commit extortion. Traffickers exploit some Latin American migrants transiting Guatemala en route to Mexico or the United States in sex trafficking or forced labor within the country or upon arrival at their destination. Traffickers increasingly used online recruitment methods to reach victims, particularly children, in their own homes during the pandemic. Traffickers have exploited victims in migrant shelters. Authorities have investigated police, military, and elected officials for paying children for sex acts, facilitating child sex trafficking, accepting bribes from traffickers, or protecting venues where trafficking occurs. Government officials in the national banking system allegedly assisted traffickers in committing money laundering crimes. The government reported 416 Cuban medical workers in the country; these individuals may have been forced to work by the Cuban government.

## GUINEA: TIER 2 WATCH LIST

The Government of Guinea does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included initiating more investigations, identifying and referring more victims to services, and issuing an emergency anti-trafficking national action plan (NAP) to supplement the 2020-2022 NAP. The government established a hotline and allocated resources to the anti-trafficking committee (CNLTPPA). However, the government did not demonstrate overall increasing efforts compared to the previous reporting period, even considering the impact of the COVID-19 pandemic

on its anti-trafficking capacity. Substantial personnel turnover related to the September 2021 coup d'état and subsequent formation of the transition government hindered Guinea's ability to maintain consistent anti-trafficking efforts. The government did not provide data on its prosecution of trafficking cases and did not amend its penal code to remove sentencing provisions that allow fines in lieu of imprisonment for sex trafficking, unlike other grave crimes. While the government convicted more traffickers than during the previous reporting period, traffickers received sentences that did not serve to deter the crime or adequately reflect the nature of the offense. Shelter services for victims remained insufficient, and the government did not support NGOs providing care to victims. Despite the prevalence of forced child begging in Quranic schools, Guinean authorities have never prosecuted a Quranic teacher for forced begging. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Guinea was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Guinea remained on Tier 2 Watch List for the third consecutive year.



GUINEA TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Increase efforts to investigate, prosecute, and convict suspected traffickers and complicit officials and sentence convicted traffickers to significant prison terms. • Amend the penal code to remove sentencing provisions that allow fines in lieu of imprisonment and ensure penalties prescribed for forced begging are commensurate with those prescribed for other serious crimes. • Significantly increase efforts to identify trafficking victims among vulnerable populations, including children in Quranic schools, workers in artisanal mining sites, women traveling to the Middle East in potential fraudulent recruitment schemes, Cuban medical professionals, and North Korean workers, and refer trafficking victims to appropriate services. • Allocate dedicated funding to the Office for the Protection of Gender, Children, and Morals (OPROGEM) to enable criminal investigations. • Increase funding and in-kind support for NGOs to ensure all identified trafficking victims receive services. • Train law enforcement and service providers on standard procedures to identify trafficking victims and refer them to services. • Provide OPROGEM and labor inspectors the resources and training necessary to monitor recruitment agencies and investigate forced labor cases. • Establish a uniform and comprehensive data collection system on anti-trafficking efforts, distinguishing human trafficking from other crimes. • Increase efforts to raise public awareness of trafficking, including internal trafficking, child forced labor, and forced begging, including in Quranic schools. • Strengthen the CNLTPPA's authority to implement anti-trafficking policy and coordinate activities and information sharing among agencies conducting anti-trafficking work. • Develop and implement extradition agreements for traffickers with countries in Africa and the Middle East.

**PROSECUTION**

The government maintained mixed anti-trafficking law enforcement efforts. Article 323 and 324 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of three to seven years' imprisonment, a fine, or both for trafficking offenses involving an adult victim, and five to 10 years' imprisonment, a fine, or both for those involving a child victim. These penalties were sufficiently stringent; however, by allowing for a fine in lieu of imprisonment, the penalties for sex trafficking were not commensurate with those prescribed for other serious crimes, such as rape. Under Article 893 and 894 of the children's code, child trafficking crimes were prescribed penalties of five to 10 years' imprisonment and a fine of 50 million to 100 million

Guinean francs ($5,410-$10,830); these penalties were commensurate with those prescribed for other grave crimes, such as rape. Article 343 of the penal code separately criminalized forced begging and prescribed penalties of one to three years' imprisonment and a fine; these penalties were not sufficiently stringent.

Insecurity across the country hindered the government's collection of law enforcement statistics. The government did not report comprehensive law enforcement data, and due to poor record keeping and the conflation of trafficking with other crimes, law enforcement data on trafficking likely included migrant smuggling or child labor cases. In 2021, the government reported initiating investigations into 46 trafficking cases, compared with one investigation in 2020, and continued investigations of 11 trafficking cases initiated in the previous reporting period. The government reported prosecuting trafficking cases during the reporting period but did not provide details on the cases prosecuted, compared with prosecuting 45 alleged traffickers the previous year. Courts convicted 24 traffickers and acquitted one trafficker, compared with 20 convictions during the previous reporting period. Of the 24 convictions, 23 traffickers received a sentence of one year or less, and one trafficker received a fine, which did not serve to deter the crime or adequately reflect the nature of the offense. The Special Brigade for the Protection of Vulnerable Persons (BSPPV) and OPROGEM were the lead government entities responsible for investigating trafficking cases, and the General Secretary for Special Services, Counter-Narcotics, and Combating Organized Crime could investigate transnational trafficking cases. Designated magistrates in the Ministry of Justice prosecuted trafficking cases. Despite the prevalence of Guinean children exploited in forced begging in Quranic schools in Guinea and surrounding countries, the government has never prosecuted a Quranic teacher for forced child begging.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The lack of extradition agreements with countries in Africa and the Middle East impeded prosecutions of traffickers from those countries. The government cooperated with Sierra Leonean officials on the arrest and prosecution of a Sierra Leonean woman arrested for trafficking 11 children in Guinea.

The government dedicated a budget to OPROGEM for the first time since 2016 and also dedicated land and funding to construct a new headquarters location for the agency. Police resources normally dedicated to anti-trafficking efforts were diverted to pandemic safety protocols enforcement. Officials reported that a lack of general knowledge about trafficking and trafficking provisions under the 2016 penal code persisted among government officials, especially judges and prosecutors in lower courts. The government, in partnership with a foreign government and NGOs, trained police cadets, gendarmes, and judicial police on anti-trafficking enforcement procedures, victim referral, and investigative techniques related to human trafficking. The government reported one training for prosecutors and judges on trafficking and trafficking networks, compared with no trainings the previous year. The government provided anti-trafficking training manuals to both the police and gendarme academy staff.

**PROTECTION**

The government increased protection efforts. The government reported identifying 291 trafficking victims—225 forced labor trafficking victims, including 72 children, and 66 sex trafficking victims, including 20 children. The government reported NGOs identified an additional 128 forced labor trafficking victims, 20 of whom were children. This compared with the government identifying 212 trafficking victims in the previous reporting period: 200 forced labor victims and 12 sex trafficking victims. The government referred 220 potential victims to services—176 sex trafficking victims, including 36 children, and 44 labor trafficking victims, all children—compared with no victims referred to care in the previous year. Lack of training and coordination between ministries, as well as inconsistent and sometimes unavailable government services, continued to inhibit victim identification and assistance efforts.

The government had standard operating procedures (SOPs) for victim identification and referral to services developed in collaboration with an

international organization. In October 2021, the government developed a standardized victim referral manual for vulnerable populations, including trafficking victims, seeking legal and judicial assistance. The government reported offering trafficking victims psychosocial assistance, legal services, and economic support for income generating activities; however, the government continued to rely on NGOs and foreign donors to provide and fund the majority of victim care. NGOs lacked adequate resources for victim services, and observers reported there were not enough shelters to support victims. Observers reported LGBTQI+ persons and individuals engaged in commercial sex faced challenges in accessing services.

An international organization-funded transit center for returning migrants and child trafficking victims was the only available shelter to host trafficking victims at the end of the reporting period; the Ministry of Women's Promotion and Childhood provided social workers who ran the shelter in collaboration with the international organization. The center could provide emergency and short-term services before referring children for long-term care. The government did not report referring any victims to the shelter during the reporting period. Government health facilities and social workers could provide medical and psycho-social services. In response to the pandemic, the government provided the reception center with protective kits, including masks and handwashing liquid. NGOs reported law enforcement referred child trafficking victims to NGOs on an ad hoc basis. If NGO shelters were unavailable, the Ministry of Social Action could place child victims with host families. The government reported pandemic-related travel restrictions hindered victim protection efforts and made it more difficult for victims to access services.

The government did not have a formal policy to encourage victims to assist in investigations and prosecutions against their alleged traffickers. Reports indicated victims and their parents were reluctant to file claims against traffickers due to a lack of confidence in the judicial system. Judges could allow victims to provide testimony via video or written statements; however, no victims reportedly did so during the reporting period. The government partnered with a law firm to offer legal assistance to women and child trafficking victims and provided assistance to 22 victims. NGO-operated legal clinics and the national human rights association provided advice and support to victims of crime, including trafficking victims. Officials reported victims underutilized the legal clinics due to lack of awareness. The 2016 penal code allowed NGOs to become plaintiffs on behalf of victims; the government did not report if NGOs utilized this provision during the reporting period. Victims could legally obtain restitution from the government; the government reported courts ordered restitution but did not provide details. Victims could file civil suits against their traffickers; however, no victims pursued this option, largely due to lack of awareness. The government did not have formal policies to provide temporary or permanent residency to victims from countries where, if repatriated, they would face hardship or retribution, but it could provide work and residency permits to victims on an ad hoc basis; ECOWAS nationals did not require special status to remain in Guinea. The government did not report any victims requesting these services during the reporting period. Due to weak victim identification efforts, authorities may have detained some unidentified trafficking victims.

**PREVENTION**
The government maintained efforts to prevent trafficking. The CNLTPPA, the government's anti-trafficking coordinating body, met regularly during the reporting period. The Ministry of Women, Children, and Vulnerable Persons led the committee, which included the ministries of Justice, Security, Labor, Foreign Affairs, and Defense. For the second time in six years, the government allocated funds for equipment, supplies, and a dedicated communications budget to the CNLTPPA to support implementation of the 2020-2022 anti-trafficking NAP. The government issued an Emergency Action Plan, which supplemented the existing NAP and assigned agency leads. Despite this, lack of personnel and coordination, social unrest, and the pandemic hindered the government's efforts to combat trafficking, conduct trainings, and hold public awareness raising events during the reporting period. Observers noted the CNLTPPA lacked authority to effectively implement anti-trafficking policy and coordinate government activities.

The CNLTPPA, in partnership with civil society and foreign donors, organized several awareness campaigns on trafficking prevention and visited rural villages to discuss trafficking. In December, the government established a hotline run by the gendarmerie to field calls concerning violence, abuse, labor violations, and trafficking. The government did not report statistics for how many calls the new hotline received. A separate, NGO-run hotline for victims of gender-based violence has existed since 2005; it fielded 850 calls in 2021. According to an NGO evaluation, 68 percent of the hotline's calls had trafficking indicators. The government had policies to regulate foreign labor recruiters and hold them civilly and criminally liable for fraudulent recruitment; however, neither OPROGEM nor the Ministry of Labor had the resources or the trained personnel to monitor and enforce these policies consistently and did not report referring any potential cases for investigation. The government prohibited recruitment agencies from assessing recruitment fees. Despite the prevalence of child forced labor, labor inspectors conducted 120 inspections and did not report finding any child labor violations. The government did not report providing training on child labor laws. The government did not report if the Ministry of Social Action continued coordinating interagency border control units to ensure children crossing international borders were traveling with their families. The government did not report making efforts to address forced begging in Quranic schools in Guinea or neighboring West African countries. The government did not make efforts to reduce the demand for commercial sex.

The government did not report providing anti-trafficking training to its diplomatic personnel. The government provided human rights training, including anti-trafficking training, to its troops prior to their deployment as peacekeepers; international and Guinean officials provided this training to 800 Guinean MINUSMA personnel during the reporting period. Although not explicitly reported as human trafficking, there was one open case of alleged sexual exploitation with trafficking indicators by a Guinean peacekeeper deployed to the UN peacekeeping mission in the Democratic Republic of the Congo in 2019; the UN substantiated the allegations and repatriated the offender. The government had not yet reported the accountability measures taken, if any, by the end of the reporting period.

**TRAFFICKING PROFILE**
As reported over the past five years, human traffickers exploit domestic and foreign victims in Guinea, and traffickers exploit victims from Guinea abroad. Populations vulnerable to sex and labor trafficking in Guinea include individuals in commercial sex, including those from ECOWAS and other nations, adults and children working in the informal labor sector, homeless and orphaned children, artisanal miners, children and adults with albinism, and persons suffering severe mental illnesses. Traffickers exploit boys in forced labor in begging, street vending, shoe shining, mining for gold and diamonds, herding, fishing, and agriculture, including farming and on coffee, cashew, and cocoa plantations. Some government entities and NGOs allege that within Guinea, forced labor is most prevalent in the mining sector. Traffickers exploit adults and children in forced labor in agriculture. Reports indicate children are sent to the coastal region of Boke for forced labor on farms. Children from villages in Middle and Upper Guinea may be more vulnerable to trafficking due to the region's lack of schools and economic opportunities. Due to pandemic-related economic disruptions in the informal sector and school closures, observers reported an increase in Guinean adults and children seeking employment in artisanal gold mines and subsequently being exploited in forced labor and sex trafficking. Government officials recognize the town of Koundara in northwestern Guinea as a transit point for traffickers.

Traffickers, often distant relatives, promise to care for or provide an education to poorer relatives' children and instead exploit them in domestic servitude or forced begging. There are reports of Quranic schools in which teachers force or coerce *talibes* to beg, sometimes with their parents' knowledge. Some traffickers fraudulently recruit children under the pretext of educational opportunities and instead exploit them in forced begging in Quranic schools in Senegal—via the town of Koundara, Guinea. Students are trafficked along routes through Mali and Guinea-Bissau. Traffickers exploit Guinean children in forced labor in Cote d'Ivoire. Guinea is a transit country for West African

children subjected to forced labor in artisanal gold mining throughout the region. A small number of girls from West African countries migrate to Guinea, where traffickers exploit them in domestic service, street vending, and—to a lesser extent—sex trafficking. Child sex trafficking is prevalent in Conakry and in mining towns and camps in Lower and Upper Guinea. North Koreans working in the mining, construction, fishing, and health sectors and in commercial sex may have been forced to work by the North Korean government. Cuban medical professionals working in Guinea may have been forced to work by the Cuban government. Guinean authorities alleged traffickers coerce People's Republic of China (PRC) women into commercial sex in PRC national-owned bars and restaurants in Conakry.

Traffickers exploit Guinean women and girls in forced labor for domestic service and sex trafficking in West Africa, Europe, and the Middle East, as well as the United States. During a previous reporting period, there were reports Guinean-Egyptian trafficking networks fraudulently recruit women for domestic work in Egypt and exploit them in commercial sex. Irregular migrants traveling to Europe are vulnerable to trafficking networks facilitating travel by land from Guinea to North Africa and subsequently exploiting migrants in forced labor or sex trafficking. Reports indicate that trafficking networks fraudulently recruit Guinean, Liberian, and Sierra Leonean women for work abroad, using the Conakry airport to transport victims to exploitative situations in Kuwait and Qatar. In a previous reporting period, an international organization reported an increase in fraudulent recruitment for forced labor in domestic service in the Middle East, especially Egypt and Kuwait. There have been reports some Guinean men marry Guinean girls, take them to Angola, and sell the girls to local brothels while the men work in diamond mines. In previous years, authorities identified Guinean forced labor victims in Finland.

## GUINEA-BISSAU: TIER 3

The Government of Guinea-Bissau does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Guinea-Bissau remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including investigating trafficking cases, identifying potential victims, launching a national referral mechanism, and continuing to convene its anti-trafficking inter-ministerial committee. However, the government has never convicted a trafficker, and authorities did not prosecute any alleged traffickers for the third consecutive year. Victim identification and services remained inadequate. The government continued to lack resources and political will to comprehensively combat human trafficking.



GUINEA-BISSAU TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers, including corrupt Quranic teachers who subject boys to forced begging and hotel staff who facilitate child sex tourism in the Bijagos, and sentence convicted traffickers to adequate prison terms, as prescribed in law. • Cease using extra-judicial or administrative remedies to resolve human trafficking cases. • Hold government officials accountable for trafficking-related complicity, including failure to investigate alleged trafficking crimes and interference in ongoing investigations. • Finalize and implement standard procedures to identify trafficking victims and refer them to care, including among vulnerable populations such as children exploited in forced begging, individuals in commercial sex, and Cuban overseas workers. • Provide resources to the Judicial Police

to expand its area of operation, including in Bijagos and Catió. • Fully implement the national referral mechanism and train government officials, including local police, the National Guard, and the judiciary, on the procedures. • Train law enforcement and judicial officials on the 2011 anti-trafficking law and procedures to refer trafficking cases to the Judicial Police. • Provide funding or in-kind support for NGOs to ensure all identified victims—especially child victims of forced begging—receive services. • Allocate financial or in-kind resources to implement the anti-trafficking national action plan (NAP). • Increase efforts to coordinate repatriation of trafficking victims with the Government of Senegal and effectively monitor the return and reintegration of victims, especially child victims. • Significantly increase efforts to raise public awareness of human trafficking, especially forced begging and child sex trafficking. • In collaboration with NGOs, allocate adequate space and facilities for a victim shelter in Bissau and expand shelter services for adults. • Strengthen international law enforcement cooperation to prevent and investigate cases of child sex tourism.

### PROSECUTION

The government maintained inadequate law enforcement efforts. Public Law 12/2011 criminalized sex trafficking and labor trafficking and prescribed penalties of three to 15 years' imprisonment and the confiscation of any proceeds from the crime. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Draft amendments to the Code of Child Protection that would harmonize it with international law on human trafficking remained pending before the legislature for the third consecutive year.

The government did not report the total number of investigations initiated but did report investigating cases involving 92 potential trafficking victims, all suspected forced begging cases, during the reporting period, compared with 34 case investigations, including eight forced begging and 26 sex trafficking cases, during the previous reporting period. The government did not report any prosecutions for the third consecutive year. The government has never convicted a trafficker under the anti-trafficking law. Despite the prevalence of Bissau-Guinean boys exploited in neighboring countries for forced begging, the government did not cooperate with foreign counterparts on law enforcement activities. The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes; however, official corruption and complicity in trafficking crimes remained concerns, inhibiting law enforcement action during the year. The judicial system lacked sufficient human and physical capital to function effectively, and corruption remained pervasive. Observers alleged municipal and provincial government officials interfered in cases and derailed prosecutions of traffickers in exchange for a bribe. The government did not demonstrate political will at the highest levels of government to address human trafficking.

The Judicial Police had a specialized unit that investigated trafficking cases; however, it had limited coverage outside the capital and did not have a dedicated budget. The National Guard patrolled Guinea-Bissau's borders and had a unit dedicated to investigating crimes involving women and children, including trafficking; however, it also did not have a dedicated budget. The National Guard and local police in rural areas lacked training to investigate human trafficking crimes and did not always refer cases to the Judicial Police, which impeded investigations. The Public Ministry did not have specialized prosecutors for trafficking cases; the ministry's child protective services enforced court decisions in trafficking cases involving children but did not have coverage outside of the capital. The police, National Guard, judiciary, and prosecutors lacked funding, which hindered their efforts to combat human trafficking. Police and judges often resolved intra-familial labor and abuse cases—which could include forced child labor and child sex trafficking by family members—through non-judicial means or tried them as domestic violence cases. When parents broke non-judicial agreements and police transferred the cases to court, officials noted community leaders often pressured courts to drop the cases. The government did not provide anti-trafficking training to law enforcement or judicial officials or support NGOs conducting anti-trafficking training for the second consecutive year, and some law enforcement and judicial officials remained unaware of the 2011 anti-trafficking law.

## PROTECTION

The government maintained insufficient protection efforts. The government identified 92 child forced begging victims and 33 child victims of sexual exploitation during the reporting period, compared with identifying 99 vulnerable children during the previous reporting period. Authorities referred the children to civil society organizations for care. The government did not have formal procedures to identify trafficking victims; draft procedures compiled in a previous reporting period with the assistance of an international organization remained unfinished. However, officials utilized ECOWAS procedures for the protection and reintegration of children and young migrants. The Institute for Women and Children (IMC) previously developed a victim identification form with an international organization but did not use it to identify victims during the current reporting period. High illiteracy rates, including among security services, hampered the government's ability to finalize and implement written victim identification procedures. The government began implementing a national referral mechanism developed with funding from a foreign donor and the assistance of local facilitators; the inter-ministerial committee disseminated the procedures to stakeholders.

The IMC was responsible for victim services and coordination of services among various entities; however, it had no operating budget or vehicles and could not provide sufficient assistance to victims. The government did not have a specific fund for victim services and relied on international organizations and local NGOs to provide nearly all victim services, including family identification and reintegration, shelter, medical services, and legal assistance; these NGOs subsequently relied on international donors for funding. The government did not provide financial or in-kind support to NGOs assisting trafficking victims for the third consecutive year. Three NGO shelters were accessible to child trafficking victims but were severely overcrowded and underfunded; some shelter volunteers used their own homes to house victims temporarily. Shelter was only available for child victims, and only one NGO shelter provided trafficking-specific services. The government did not have formal procedures to encourage victims to participate in investigations or prosecutions against their alleged traffickers. Victims could not obtain restitution or file civil suits against their traffickers. The government did not provide legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution. Due to a lack of formal identification procedures, authorities may have detained some unidentified trafficking victims. Observers noted more coordination was needed between the Governments of Guinea-Bissau and Senegal in repatriating child forced begging victims.

## PREVENTION

The government maintained minimal efforts to prevent trafficking. The inter-ministerial committee, led by the IMC and including government agencies, NGOs, and religious groups, met regularly. However, the committee lacked funding for anti-trafficking activities, which weakened its capacity to respond to trafficking and coordinate national anti-trafficking efforts. The government had a national action plan to address human trafficking but did not report allocating any resources to its implementation. The government did not report conducting or providing support to NGO-facilitated awareness campaigns for the second consecutive year. The IMC and the Ministry of Tourism had a code of conduct against sexual exploitation in the tourism sector in the Bijagos islands, Bubaque, Sao Domingos, and Bissau. The code included provisions for raising public awareness of child sex trafficking and increasing awareness of hotel workers and tourism labor inspectors to combat these crimes; although the code remained in effect, the government did not report conducting any of the activities described, in part due to the pandemic's impact on the tourism sector and gathering restrictions. The labor inspectorate, housed within the Ministry of Labor, Civil Service and Public Administration, lacked funding, personnel, material resources, and training to investigate cases of forced labor nationwide. The government did not inspect local *daaras* (Quranic schools) to ensure they did not force children to beg. Amendments to the labor code that would extend labor protections to domestic workers have remained pending in the national assembly since 2015. The government issued birth registrations to trafficking victims and child victims' parents with support from an international organization. The government did not make efforts to reduce the demand for commercial

sex. The government did not provide anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Guinea-Bissau, and traffickers exploit victims from Guinea-Bissau abroad. Forced child begging is the most prevalent form of human trafficking. Some corrupt Quranic teachers force or coerce students, called *talibés*, to beg and do not provide an education. The traffickers are principally men from the Bafata and Gabu regions—often former *talibés* or men who claim to be working for a Quranic teacher—and are generally well-known within the communities in which they operate. Corrupt Quranic teachers force Bissau-Guinean, and increasingly Guinean, Gambian, and Sierra Leonean, boys to beg in Bissau and exploit Guinea-Bissau's weak institutions and porous borders to transport large numbers of Bissau-Guinean boys to Senegal—and to a lesser extent Mali, Guinea, and The Gambia—for forced begging in exploitative *daaras*. Due to border closures as a result of the pandemic, observers reported traffickers exploited more children in forced begging in Bissau rather than abroad.

Traffickers exploit Bissau-Guinean boys in forced labor in street vending and in the agricultural and mining sectors in Senegal, especially in the southern cities of Kolda and Ziguinchor. Traffickers force West African boys to harvest cashews during Guinea-Bissau's annual harvest, and some boys recruited for work in the harvest are then forced to beg. Traffickers exploit some Guinean boys for forced labor in shoe shining in Guinea-Bissau. Traffickers exploit Bissau-Guinean girls in sex trafficking and forced labor in street vending and domestic work in Guinea, The Gambia, and Senegal, as well as in Spain. Senegalese trafficking networks recruit Bissau-Guinean girls for modeling jobs or traveling football clubs but subject them to sex trafficking. Bissau-Guinean girls are exploited in domestic servitude and in sex trafficking in bars, nightclubs, and hotels in Bissau. Bissau-Guinean women are fraudulently recruited and exploited in domestic servitude abroad. Bissau-Guinean girls from the Bijagos—and to a lesser extent mainland girls and boys—are exploited in child sex tourism in the Bijagos, an archipelago off the coast of Guinea-Bissau that is far from the mainland and largely devoid of government and law enforcement presence. Although the extent of child sex tourism is unknown, it is widely acknowledged among civil society, NGOs, and mid-level government officials. In most cases, French nationals own hotels on the islands and use Bissau-Guinean intermediaries to exploit island girls 13-17 years old for French and Belgian child sex tourists. International sources report these same hotel owners provide jobs and significant support to the island community, wielding influence that can deter victims from reporting to law enforcement. Some families may encourage their children to endure such exploitation for financial gain. Bissau-Guinean men from the mainland fuel local demand for commercial sex on the islands. During previous reporting periods, there were reports of official complicity in human trafficking among island officials and in the judiciary. According to an international organization, Guinea-Bissau's birth registration rate is less than 25 percent, increasing vulnerability to trafficking, especially among children. Cuban nationals working in Guinea-Bissau may have been forced to work by the Cuban government.

# GUYANA: TIER 1

The Government of Guyana fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Guyana remained on Tier 1. These efforts included identifying more victims and referring them to services, increasing investigations and prosecutions, drafting and funding a National Action Plan (NAP) for 2021-2025 with input from survivors, training diplomats, and conducting a campaign to inform migrants of the Spanish-language hotline. Although the government meets the minimum standards, it did not convict any traffickers for the first time in four years. It did not formally approve standard operating procedures (SOPs) to identify victims, provide enough sufficient security for trafficking victims at shelters, provide enough

GUYANA

Spanish-language interpreters, identify any victims among the vulnerable Haitian population, or adequately oversee recruitment agencies.



GUYANA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase prosecutions and convictions in sex and labor trafficking cases and pursue them under the Combating Trafficking in Persons Act of 2005, including for cases involving child victims. • Ensure security for victims, especially those residing in government shelters, and their relatives. • Proactively screen vulnerable populations, including Haitian migrants and Cuban medical workers, for trafficking indicators, refer them to services, and ensure potential victims are not deported without screening. • Formally approve and implement victim SOPs and fund specialized victim services, particularly for child, adult male, and Venezuelan victims in their native language, including for Indigenous populations. • Increase the number of Spanish speakers supporting anti-trafficking efforts. • Reduce delays in investigations, court proceedings, and pretrial detention of suspects. • Reduce the reliance on victims to serve as witnesses in prosecutions. • Ensure migrants wishing to change jobs are able to do so without relying on their previous employer. • Formally approve and fund the 2021-2025 National Action Plan. • Reduce police abuses during raids and hold officers accountable. • Investigate trafficking cases in remote regions of the country and trafficking using online platforms. • Hold convicted traffickers, including complicit officials, accountable by pursuing significant sentences in court. • Prohibit recruitment and placement fees charged to workers. • Increase the number of labor inspectors and fines for labor violations. • Enforce restitution judgments for trafficking victims. • Undertake systemic monitoring of anti-trafficking efforts and publish the results. • Renew implementation of a data-sharing system in coordination with an international organization.

## PROSECUTION

The government maintained law enforcement efforts. The Combating Trafficking of Persons Act of 2005 (Act) criminalized sex trafficking and labor trafficking and prescribed penalties of three years to life imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

The government reported initiating investigations in 38 cases involving 57 suspects, 46 for sex trafficking and 11 for labor trafficking, compared with 31 new cases (23 for sex trafficking and eight for labor trafficking) in 2020. The government continued one sex trafficking investigation from the previous reporting period. The government reported it initiated prosecutions against three suspected traffickers, one for sex trafficking and two for labor trafficking, compared with one new prosecution for sex trafficking in 2020 and three prosecutions in 2019. Authorities ceased prosecution of one alleged sex trafficker following the suspect's death. Authorities continued prosecutions against two defendants, one for sex trafficking and one for labor trafficking; courts dismissed the labor trafficking case in December 2021 for insufficient evidence. Authorities did not convict any traffickers, compared with convicting one trafficker for each of the past three years. The government did not report any new investigations, prosecutions, or convictions of government employees complicit in trafficking offenses. In February 2022, media reported accusations from 20 Venezuelan women that police had assaulted and robbed them during a raid on a hotel where police suspected trafficking was taking place. The government did not report on the appeal of a former police officer convicted of sex trafficking and released on bail in 2016; the appeal was still pending at the end of the reporting period.

The government reported conducting surveillance and several raids of commercial sex establishments and bars during the reporting period, primarily in interior mining areas. The Guyana Police Force (GPF) Counter-Trafficking Unit did not have a fixed, discrete budget. Two key entities prosecuted criminal matters in Guyana: the office of the Director of Public Prosecutions (DPP) prosecuted felonies such as murder and rape at High Court trials, and the GPF prosecution unit prosecuted hybrid offenses, including trafficking, in the Magistrates Court. The government did not have a specialized trafficking court. Police prosecutors were not licensed attorneys, but some had law degrees and received specialized training in legal procedure. The government advised GPF prosecutors to request the advice and guidance of the DPP to strengthen cases for prosecution before initiating legal proceedings, but the government reported this was not often done. The Act also required witness testimony of victims in order to prosecute trafficking cases. The government reported both of these factors contributed to the low prosecution rate. The government also stated that victims' distrust in law enforcement, prosecutors, and the judicial system; the inability to guarantee the safety of victims and their relatives; language barriers; and delays in investigations were challenges in prosecuting trafficking. The judicial process remained slow, with trafficking and other major criminal trials taking an average of two years and up to three years to complete due to shortages of trained court personnel, postponements at the request of the defense or prosecution, allegations of bribery, poor case tracking, and delays in preparing cases for trial. The government temporarily shifted some court proceedings to virtual hearings due to the pandemic. The government trained law enforcement, military, and labor officials in calendar year 2021 but did not disaggregate the data for the current reporting period. In March 2022, the government agreed to a protocol to accede to the Caribbean Regional Security System, which provides mutual assistance and a collective response to security threats. The government reported that the Ministry of Home Affairs and the GPF were assisting officials in a neighboring country with information for one of the new investigations still underway at the end of the reporting period.

## PROTECTION

The government maintained protection efforts. The government screened 288 potential victims and identified 216 victims; NGOs identified 15 victims. Of the identified victims, 193 were women and 14 were girls exploited in sex trafficking; five women, 10 men, six girls, and three boys were exploited in labor trafficking. The sex trafficking victims included 22 Guyanese, 166 Venezuelans, five Jamaicans, two Cubans, and one Indian; the remaining victims were from unspecified countries. The labor trafficking victims included six Guyanese, 10 Venezuelans, three Cubans, two Brazilians, two Jamaicans, and one Indian national. This compared with the identification of 199 victims by the government and an additional five victims by NGOs in 2020 (127 sex trafficking victims and 77 labor trafficking victims). The Ministry of Human Services and Social Security's (MHSSS's) Counter-Trafficking in Persons (C-TIP) Unit identified victims in cooperation with the GPF and provided social welfare and assistance to victims. The C-TIP Unit had five staff members; the government reported this was insufficient to effectively undertake its work. In August 2021, the government publicly stated it planned to expand the C-TIP Unit but had not done so by the end of the reporting period. The government reported allocating the C-TIP Unit in 2021 a budget of 52.44 million Guyanese dollars (GYD) ($243,900). In fiscal year 2020, the government reported the C-TIP Unit received a budgetary allocation of 25.86 million GYD ($120,270). In cooperation with an international organization and a foreign donor, authorities developed and began use of, but did not finalize, SOPs for victim identification. The international organization also reported police did not adhere to a requirement to give potential victims a reflection period, and in some cases, officials interviewed potential victims at police stations near the alleged perpetrators.

The government and NGOs reported they each referred all victims identified to available services, compared with the government referring 100 victims in 2020 and 99 victims in 2019. The informal referral procedures used by the GPF, Ministry of Labor inspectors, and the Ministry of Natural Resources required these entities to involve the C-TIP Unit in all suspected trafficking cases. The government reported the MHSSS monitored and evaluated its victim care services to ensure it administered them equitably but did not provide reports of these evaluations. The government reported all 216 victims it identified received some form of assistance. The government reported available services

victims used included counseling and guidance, medical services, legal aid services, shelter, food, clothing, translation, education and training opportunities, facilitation to employment if available, and repatriation and reintegration. The government reported it repatriated one Venezuelan, one Jamaican, and one Indian national, all of whom were sex trafficking victims. The government reported it provided free or subsidized legal advice and representation to people unable to afford an attorney, including trafficking victims. The government additionally reported it provided victims with legal assistance. NGOs provided translation and reported that a lack of Spanish-language speakers across all government agencies negatively impacted the government's ability to engage and serve trafficking victims and vulnerable communities.

For the second consecutive year, the government operated and fully funded three shelters for trafficking victims that offered specialized care, including food, training, translation, legal services, medical services, and psychological therapy. Of these, there was one shelter dedicated for male victims. The government also continued to subsidize two shelters run by NGOs, including one for child trafficking victims. For child victims, the MHSSS provided intake counseling and then placed victims either in the shelter or in children's homes operated by the government. The government reported it provided 62.43 million GYD ($290,370) in subsidies to an NGO-managed shelter providing housing for adult female trafficking and gender-based violence victims and another for child trafficking victims, a slight increase from 62.35 million GYD ($290,000) in 2020. The NGO shelters provided victims with the same range of services as the government-operated shelters. The government reported shelter services were not time-limited; victims staying at shelters remained between one week and three years. The government reported at least 32 victims chose to stay in a shelter; the government offered alternative housing for other victims. The government reported social workers maintained contact with those victims who declined to stay in shelters. The government reported it tested victims for COVID-19 prior to entry and gave them personal protective equipment. Victims could leave shelters at will and choose between shelter options, although shelters had curfews and other security measures. However, some NGOs reported authorities did not allow victims to leave the shelters at will. The government encouraged foreign and Guyanese victims to move into government-provided shelters to reduce the chance of witness intimidation and also encouraged NGO chaperones in cases where there was a suspected security threat to the victims. In addition, although the MHSSS reported government-run shelters were safe with the GPF providing security, some NGOs reported the government-run shelters did not have police or other security guards and victims had fled shelters due to security concerns. Foreign and Guyanese victims received the same access to care and assistance. Victim assistance—including shelters—and a lack of trauma-trained staff remained serious concerns, especially in areas outside the capital and for Venezuelan, child, and male victims.

According to authorities, law enforcement officials and social workers screened all individuals for trafficking indicators during raids of adult entertainment venues for commercial sex violations, and authorities did not arrest victims identified during such operations. The government reported it added immigration officers at transit points during the reporting period. However, press reports in March 2022 indicated potential Haitian victims illegally in the country may have been arrested, fined, and deported without screening for trafficking indicators; officials also did not screen sufficiently for trafficking indicators among other at-risk populations, including Venezuelans, Cubans, and those working in the mining sector. Media also noted the discriminatory nature of the government's treatment of Haitian migrants as compared with those of other nationalities. By the end of the reporting period, the government had not renewed a data sharing agreement with an international organization to collect data from at-risk populations, including migrants. The government reported it did not require victims to participate in investigations or prosecutions in order to access protection services. The Witness Protection Act of 2018 provided a legal framework for the protection of witnesses in trafficking investigations and prosecutions. In previous reporting periods unaffected by the pandemic, courts ordered some trafficking hearings or trials to be partially closed to the public to protect victims' privacy and identities, and the government strongly advised the media to avoid taking photos of victims. The MHSSS funded

transportation costs and police escorts for victims staying outside a shelter who were willing to attend court proceedings. The government reported victims provided testimony via video or recorded statements during the reporting period due to the pandemic. The government reported the quality of saved video recordings was generally poor and often compromised the viability of video evidence in trafficking prosecutions. Authorities offered victims psychological therapy before and after trial proceedings to help prevent re-traumatization. Some NGOs reported authorities re-traumatized some victims during questioning. The government reported it provided legal support for six victims during the prosecution of traffickers. The government reported the remaining 225 victims chose to participate minimally in the investigation process and those investigations were unable to proceed to prosecution; NGOs noted some victims may have declined to participate after receiving a pay-off from the trafficker. Although the law provided for restitution, the government reported a trafficker ordered to pay restitution in the previous reporting period did not do so; the law did not provide a mechanism to enforce the judgment. The government reported that the appeal of a 2017 case in which the government required the trafficker to pay restitution without imprisonment, a penalty inconsistent with the law, was still pending at the end of the reporting period. The government could grant foreign victims temporary residence status and work permits but received no requests for such benefits during the reporting period. Authorities offered deportation relief to eight foreign victims—three Jamaicans and five Cubans—compared with 10 in 2020 and significantly fewer than the 135 foreign victims in 2019. Deportation relief allowed a victim to remain in the country regardless of being in breach of immigration laws; Venezuelans have been allowed to remain automatically since 2018. Foreign victims received services irrespective of their cooperation with law enforcement, their participation in a trial, or conviction of the trafficker. The government regularly screened foreign potential victims for trafficking indicators before deportation.

**PREVENTION**

The government maintained efforts to prevent trafficking. The Ministerial Taskforce on Trafficking in Persons (the Task Force), co-chaired by the Minister of Home Affairs and the MHSSS, coordinated national interagency anti-trafficking efforts. The Task Force also included four NGOs. The government reported it consulted with trafficking survivors as it formulated and implemented its law, regulations, policies, and programs. The technical arm of the Task Force included representatives (technical advisors, legal assistants, social workers) of the Ministers who sat on the task force and suggested anti-trafficking activities and engagements, including trainings. Observers reported the Task Force was effective in coordinating anti-trafficking efforts. The Task Force met monthly during the reporting period, in addition to emergency meetings as needed, while the action sub-committee met frequently to review operations.

The government drafted and began to implement a NAP for 2021-2025; however, the NAP remained pending with the Cabinet for final approval at the end of the reporting period. The government allocated approximately 18.5 million GYD ($86,050) in 2021 for the implementation of activities outlined in the draft NAP. The government reported it allocated separate budgets for operations, awareness campaigns, and other activities outlined in the NAP for other agencies, such as the GPF and Guyana Geology and Mines Commission. The Task Force implemented a Code of Conduct of ethical standards for its members, including law enforcement officers. The government operated three 24/7 hotlines, two in English and one in Spanish, to report human trafficking. The hotlines received 21 reports during the reporting period that led to the identification of victims, their referral to care, and criminal investigations of traffickers. The government reported calls to the Spanish hotline were infrequent and concluded that Spanish-speaking migrants were unaware of this hotline; the government launched an information campaign in the city of Bartica—a primary corridor to mining areas in which human trafficking frequently occurs—to advise migrants of the Spanish hotline, increasing the number of calls from 20 prior to the establishment of the Spanish hotline to 39 afterwards. Observers noted that cell phone coverage in many mining areas was poor. The government did not undertake any systemic evaluations or research to assess the impact of its anti-trafficking efforts; it published a press release highlighting its efforts and progress.

**HAITI**

The Task Force reported it planned and executed several sensitization and awareness sessions across the country. The government reported it collaborated with several NGOs and some private sector companies to conduct awareness campaigns that targeted government workers, NGOS, IOs, the private sector, and members of the general public. The government undertook extensive consultations to ensure content portrayed a diverse cultural background. The government reported campaign materials were readily available, cost-free, and published in English, Spanish, French, Haitian Creole, and Portuguese. The government reported it also contributed to NGOs and international organizations' awareness campaigns, including for foreign government officials. The government reported it conducted outreach missions to regularize the immigration status of migrant communities at risk of trafficking, especially Venezuelans and Cubans, through registration or extensions of stay. The government reported it provided training to its diplomats. The government reported it reduced demand for commercial sex by educating the public about the illegality of commercial sexual activities. The Sexual Offences Act criminalized sexual contact with a child younger than 16 years old. The government reported there were no reports of child sex tourism in the country or by its nationals abroad during the reporting period.

The Recruitment of Workers Act and the Employment Exchanges Act provided the legislative framework for labor recruitment, but the government did not have any laws prohibiting employers, recruiters, or labor agents from charging workers recruitment fees, switching contracts without the workers' consent, or withholding wages as a means of keeping workers in a state of compelled service, despite an influx of in-country recruitment agencies targeting the domestic labor force for the country's burgeoning oil sector. The government also reported migrant workers who wished to change employers needed to first obtain a new work permit from the Ministry of Home Affairs; the previous employer had to officially inform the Ministry of Home Affairs Immigration Support Services that the employee was no longer employed and requested the cancellation of the work permit or visa before the new employer could submit an application. Labor officers trained on trafficking frequently conducted impromptu visits to work sites and business premises in the mining and logging districts and in the capital city to investigate suspect labor practices and possible violations of these acts. However, observers noted the fines for labor violations were low and the number of labor inspectors was insufficient to adequately carry out inspections. The government reported it had a NAP for the Elimination of Child Labor 2019-2025 to combat child forced labor. The government also reported it conducted awareness campaigns in the 10 administrative regions to encourage the reporting of forced labor and promoted public messaging on the dangers of child labor.

**TRAFFICKING PROFILE**

As reported over the last five years, human traffickers exploit domestic and foreign victims in Guyana, and traffickers exploit victims from Guyana abroad. Traffickers exploit victims in labor trafficking in mining, agriculture, forestry, domestic service, and in shops. The government reported 78 percent of traffickers in 2020 were men, predominantly Guyanese; 14 percent of traffickers were from Venezuela, while less than 3 percent were Dominican and Haitian. NGOs reported traffickers are often middle-aged men who own or operate nightclubs. Some traffickers are also family members of the victims. Migrants, young people from rural and Indigenous communities, children, and those without education are the most at risk for human trafficking. Women and children from Guyana, Brazil, Cuba, the Dominican Republic, Haiti, Suriname, and Venezuela become sex trafficking victims in mining communities in the interior and urban areas. An NGO reported in 2021 an increasing number of young, Indigenous girls are being taken from Bolívar state in Venezuela to Guyana, where traffickers exploit them in commercial sex. NGOs also reported trafficking networks operated by illegal armed groups known as "sindicatos" in Delta Amacuro state in Venezuela; NGOs reported these groups lead members of the Indigenous Warao community into Guyana to work long shifts in illegal mines with no medical care despite experiencing curable common health issues. Warao women are recruited to work as cooks in the mines but are often forced into commercial sex or exploited by illegal armed groups. While both sex trafficking and labor trafficking occur in remote interior mining communities, limited government presence in the country's interior

renders the full extent of trafficking there unknown. The government reported most Cuban workers in the country were medical doctors who were paid by the Cuban government, while the government provided housing and airfare. Some Cuban nationals working in Guyana may have been forced to work by the Cuban government. Traffickers exploit Guyanese nationals in sex and labor trafficking in Suriname, Uruguay, Jamaica, and other Caribbean countries.

## HAITI: TIER 2 WATCH LIST

The Government of Haiti does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included adopting national standard operating procedures (SOPs) for victim identification and support, improving oversight of vulnerable children in orphanages, completing a new national action plan (NAP), conducting extensive anti-trafficking trainings, and collaborating with NGOs on victim identification. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Impunity and complicity, particularly in high-profile cases, remained serious problems. The government did not report anti-trafficking law enforcement or victim protection efforts apart from those involving children. The government did not provide funding for the National Committee for the Fight Against Human Trafficking (CNLTP) or adult victim services in fiscal year 2021. The government did not make sufficient efforts to combat situations of child domestic servitude (*restavek*). Therefore Haiti remained on Tier 2 Watch List for the second consecutive year.



HAITI TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Vigorously investigate, prosecute, and convict traffickers, including complicit officials and those responsible for domestic servitude—including situations involving children—and child sex trafficking. • Fund and implement the national anti-trafficking action plan, including funding the CNLTP, providing victim assistance, establishing victim shelters, and improving law enforcement and victim case tracking and documentation. • Develop, fund, and implement a NAP for 2022 onwards to combat trafficking. • Improve evidence-gathering. • Train police, prosecutors, judges, and victim service providers on the new SOPs; refer trafficking victims to appropriate shelters and services; and ensure a victim-centered approach for the treatment of victims and witnesses of trafficking crimes during investigations and court proceedings, especially to ensure they are not coerced into testifying. • Educate the public with traditional and social media about children's rights to freedom and education and ban domestic servitude. • Implement measures to address the vulnerabilities leading to domestic servitude, including establishment of a minimum age for domestic work and protecting child victims from neglect, abuse, and violence. • Develop Haiti's nascent foster care system and alternative residential care for children, and ensure orphanages are properly accredited and registered. • Fully implement the national ID program and expand it to cover children. • Ensure hotlines to report trafficking crimes are functioning. • Regularly screen Cuban medical workers for trafficking indicators and refer victims to services. • Implement a witness protection program. • Train more labor inspectors in trafficking indicators, increase worksite inspections for indicators of labor trafficking, and increase collaboration with law enforcement to prosecute labor trafficking cases. • Develop laws or policies to regulate foreign labor recruiters, ensure workers

Haiti AR_000745

are not required to pay recruitment fees, and raise awareness among potential migrant laborers.

## PROSECUTION

The government decreased law enforcement efforts. The 2014 Anti-Trafficking (Anti-TIP) Law (No.CL/20140010) criminalized sex trafficking and labor trafficking and prescribed penalties of seven to 15 years' imprisonment and a fine ranging from 200,000 to 1.5 million Haitian gourdes (HTG) ($2,000 to $15,030), which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The law provided for increased penalties of up to life imprisonment when the victim was a child.

The government did not report law enforcement or judicial statistics for the reporting period apart from those involving children. The government reported the Brigade for the Protection of Minors (BPM) conducted 466 investigations in 2021 of crimes against children, but it did not disaggregate the data or specify how many of these investigations involved potential child trafficking crimes. This compares with 585 investigations in 2020 for crimes against children, which BPM reported led to opening 424 cases related to children in forced labor, trafficking, and illicit activities, without disaggregating the trafficking cases. The investigations included unannounced site visits and closures of nightclubs, residences, and orphanages in cooperation with the Haitian Social Welfare Agency (IBESR). The government did not report other investigation efforts, compared with investigations initiated for three cases during the previous reporting period, 42 cases in 2019, and nine in 2018. The government did not report arresting any suspected traffickers in 2021. An NGO reported the government arrested one individual after an NGO's identification of a victim following the government's training of NGOs on the new SOPs. The Haitian National Police (HNP) border patrol unit (POLIFRONT) and authorities with the CNLTP reported the arrest of six alleged traffickers during the previous reporting period and 51 individuals arrested in 35 trafficking cases in 2019.

The government did not initiate any new prosecutions, compared to initiating two prosecutions of an unknown number of defendants during the previous reporting period, one in 2019, and seven in 2018. Authorities continued prosecution of 13 cases involving an unknown number of defendants from prior reporting periods, down from 21 cases at the end of the previous reporting period; however, the government did not report on the status of the continuing cases or the outcome of the other eight prosecutions observers noted likely closed. BPM reported the government prosecuted 24 traffickers for crimes related to forced child labor but did not report the status of those cases or whether they involved other crimes. The government did not report convicting any traffickers, compared with two convictions during the previous reporting period, none in 2019, and one in 2018. Courts sentenced a man to 15 years in prison for child trafficking crimes committed in 2016.

Impunity and complicity in high-profile trafficking cases continued to be significant concerns. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. Government and civil society experts reported the judicial system appeared incapable of delivering justice to victims in trafficking cases, although outside observers noted that trafficking was not unique among crimes in this respect. Experts consistently alleged that employees within the Ministry of Justice were complicit in human trafficking crimes and that cases did not proceed to conviction as a result. Outside observers also reported police and immigration officials were complicit in human trafficking at the Haiti-Dominican Republic border; IBESR reported traffickers often avoided screening by crossing at unofficial points, noting that official complicity and corruption greatly exacerbated the problem. Observers reported allegations that judicial officials in border jurisdictions, such as justices of the peace, sometimes took bribes to free detained suspected traffickers, which contributed to an environment in which traffickers largely operated with impunity.

Authorities took no action against the former president of the Haitian Football Federation, banned for life by the International Federation of Football Association (FIFA) and fined 1 million Swiss francs ($1.09 million) and produced costs for the rape and sexual abuse—at times including sex trafficking—of up to 34 females, including at least 14 girls, between 2014 and 2020 in a decision by the FIFA Ethics Committee,

which was referred for review to the FIFA Appeal Committee at the end of the reporting period. Authorities also had not acted against 10 other perpetrators and accomplices in the case, including the head of the Haitian National Referees Committee who FIFA provisionally suspended for 90 days as part of its ongoing investigation. In March 2022, a popular Haitian athlete filed a criminal complaint with the HNP that, beginning at age 11, a former Minister of Youth, Sports, and Civil Actions had repeatedly raped him from approximately 1986 to 1988, while the accused was a teacher at the individual's school. There were reports that other victims filed civil suits against the accused claiming similar abuse. Over the past 40 years, there have been consistent reports against the same individual of rape, child rape, pedophilia, systemic child abuse, and child sex trafficking, including in connection with the 2014-2020 FIFA abuse. When prosecutors brought charges in response to the prior allegations, judges dismissed every case for lack of evidence. By the close of the reporting period, the HNP had not reported taking steps to investigate the latest complaint. At the end of the reporting period, an investigative judge had not determined what charges to bring, if any, regarding two August 2020 raids of the La Mansion brothel in which authorities identified 12 female Venezuelan sex trafficking victims. The media reported high-level government officials had patronized the brothel before the raid and some of those involved had political influence. Authorities arrested a driver of the main suspected trafficker but subsequently released him; the judge issued a travel ban against the facility's owner. An NGO reported the judicial police officers at the crime scene failed to gather sufficient evidence, the investigative judge had not subsequently acted, and the alleged perpetrators were granted a provisional release in direct contradiction of the 2014 anti-trafficking law. The government did not take steps to prosecute anyone in the 2017 Kaliko Beach Club case in which authorities identified 31 trafficking victims, including children. An NGO reported that the decision to immediately release nine of the 12 alleged traffickers without charging them with any offense revealed that the commissioners purposely ignored the law. The CNLTP reported some judges did not explain why they did not process some cases, including a case where a justice of the peace investigated an orphanage suspected of sexual abuse and child trafficking but never questioned the suspects.

Natural disasters, the pandemic, and a presidential assassination during the reporting period significantly impacted the capacity of the government to implement successful anti-trafficking activities. The pandemic exacerbated a backlog in court cases that already existed due to general inefficiency. The assassination of the president in July led to lack of government action on many fronts, including anti-trafficking efforts. An earthquake and a tropical storm in August, and another earthquake in January, led to the destruction of the southern peninsula's critical infrastructure and rendered many areas physically unreachable by the government. Widespread gang violence impeded police efforts to investigate trafficking crimes. While the CNLTP had cross-sectoral anti-trafficking task forces established in all 10 geographical departments in 2020, it could not access areas controlled by gangs, including in Port-au-Prince, resulting in the closure of the task force in one geographical department and limited law enforcement action in many regions.

Due to the presidential assassination, the government halted efforts to update its outdated and complex penal and criminal procedural codes. According to outside experts, the abandonment of the penal code reforms was a positive development because authorities were considering weakening many provisions related to trafficking. However, the outdated and overly complex existing codes continued to delay prosecution of trafficking cases. The Superior Council of the Judiciary (CSPJ), charged with independently overseeing the judiciary, did not adequately promote prosecution of trafficking cases. Government officials rarely used the anti-trafficking law to prosecute and convict the perpetrators of child domestic servitude.

The government, in collaboration with civil society actors (and frequently with donor funding), conducted training and awareness-building for law students, lawyers, judges, POLIFRONT agents, and members of the regional task forces. An NGO reported the CNLTP trained seven regional task forces out of the country's 10 regional departments with facilitation from the NGO; the other three departments in the southwestern peninsula received written training materials due to access challenges caused by

**HAITI**

the earthquake and increased gang violence and control of the primary national road heading to the southern departments. The CNLTP and the National Council of Legal Assistance signed a memorandum of understanding to ensure trafficking victims had access to legal assistance.

## PROTECTION

The government slightly increased protection efforts. Outside observers and government interlocutors noted the government provided limited services to victims of trafficking and largely depended on partners to fund and provide services. The government identified 190 Haitian victims of child labor trafficking, although these may have included non-trafficking victims of child exploitation and abuse. NGOs identified 13 victims of sex or labor trafficking who were likely children; some were identified in situations of domestic servitude and others in cross-border trafficking. The government reported it referred all 190 victims to services, including medical, psychosocial, and legal assistance. The NGOs reported providing care to the 13 victims they identified and referring the cases to relevant government agencies as directed by the SOPs. The government identified 16 confirmed adult trafficking victims and 53 possible adult and child victims and referred all to care during the previous reporting period; the government and an NGO identified 27 victims in 2019. The government reported it included children in forced labor in domestic service (*restavèk* situations) among these identified cases. The government and outside observers reported that a lack of awareness of and training on the new SOPs (adopted on July 1, 2021) hindered the tracking of victim statistics by the SOPs' victim protection categories.

In coordination with NGOs and an international organization, and with funding from foreign donors, in July 2021 the government finalized the SOPs, which created a national protocol for victim identification, referral, and care for the first time in Haiti's history. The SOPs detailed separate screening measures for adults (men and women); children; children in forced labor in domestic service (*restavèk* situations); children in orphanages; potential victims of labor trafficking; potential victims of sex trafficking; migrants; medical personnel; and foreigners. Under the SOPs, individuals in commercial sex must be screened for trafficking indicators as a matter of procedure before taking any punitive action due to their involvement in commercial sex, which is illegal in the country. The SOPs mandated that responsible parties—government agencies or NGOs to whom the government has delegated responsibility—conducting anti-trafficking screenings must both follow the general procedures and account for specific considerations, including sex, age, nationality, disability, and other such factors. The SOPs also updated the procedures for victim referral, formally codifying the process for the first time. Referral procedures stated that responsible parties must adhere to and protect the following when referring trafficking victims to services: human rights, human dignity, non-discrimination, confidentiality, and the best interests of the victim. Mechanisms existed in the SOPs to administer victim referrals equitably.

The law required the government to provide protection, medical, legal, and psychosocial services to victims and to create a government-regulated fund to assist victims, but in the continued absence of a national budget for part of the reporting period, the government remained reliant on international organizations and NGOs to provide most adult care. The new SOPs detailed procedures for responsible parties to follow when providing victim services, which included: medical services; temporary and safe accommodation; gender conscious services; psychosocial services; disability accommodation services; professional services; and legal services. BPM and an NGO reported BPM stayed in close contact with CNLTP and IBESR to provide child victim services.

IBESR reported it screened Haitian children for trafficking indicators before they entered the Dominican Republic at all four Haitian-side official crossing points and reported officials did so despite not receiving salaries. CNLTP and IBESR reported they focused on maintaining trafficking screening in border regions, training responsible parties, and collaborating with Dominican Republic authorities on training and awareness-building. The Ministry of Public Health provided free health services, including HIV post-exposure prophylaxis, to victims of sexual violence and trafficking as part of its action plan against sexual and gender-based violence. The Ministry of Social Affairs and Labor offered

temporary shelter, meal kits, and medical aid to trafficking victims via the National Migration Office and the government's Social Assistance Fund. The CNLTP indicated the police provided victims physical security and IBESR also assisted with family tracing and pre-return assessments before returning children to families. IBESR operated a single transitional facility. Children were typically in this facility until placed with a family member, foster family, or a registered and accredited private orphanage. IBESR reported children did not live in this facility for more than 90 days. The government required all privately run orphanages to be licensed, but in practice some were not. IBESR reported insecurity limited its ability to enforce closures of orphanages and foster care homes that were not in compliance with the 2014 anti-trafficking law. However, IBESR officially registered 129 of 754 institutions, the most it had ever registered, by the end of the reporting period. NGOs provided most funding for shelter services, including for the first shelter and social services organization for transgender youth that opened in Port au Prince during the reporting period, which could assist those at risk of abuse or crime among this population; it housed 10 individuals during the reporting period, including some potential trafficking victims. However, the government did not contribute to the shelter. The anti-trafficking law stipulated money and other assets seized during trafficking investigations should fund services for trafficking victims and the CNLTP; however, there was no evidence this occurred. There was no government agency with overall responsibility for providing care for adult trafficking victims, and the lack of resources and a system for tracking meant the government failed to identify some victims.

The government did not have a formal program to assist victims who returned to Haiti, but authorities worked with other countries' maritime and airline services to receive and screen returned Haitians for trafficking indicators and facilitated their reintegration with family members. The government reported it undertook new efforts during the reporting period to ensure its migration policies did not facilitate trafficking. For example, it collaborated with a foreign government and an international organization to ensure the safe repatriation of more than 18,000 Haitians from the United States-Mexico border. The government screened these returnees for labor trafficking upon arrival and conducted trainings to improve the preparedness of officials. These actions enabled an international organization—with funding from a foreign donor—to distribute food, water, healthcare, hygiene kits, cash transfers, and phone cards to returnees upon arrival, in addition to evaluating the returnees to see if they required further care. The government also referred returned migrants to psychosocial, medical, and legal assistance services upon return. The government did not identify any trafficking victims from these groups of returnees. The government, supported by an international organization, also screened and provided services to potential trafficking victims identified during migrant interdictions at sea.

The government did not report any instances in which victims took part in the investigations or prosecutions of their traffickers during the reporting period. Authorities did not require victims to participate in the investigation or prosecution of their traffickers in order to access protection services. BPM reported it took steps to avoid the re-traumatization of child trafficking victims by offering to refer them to medical and psychosocial care after interventions. BPM retained one social worker on staff, who served as an alternative to speaking to law enforcement, and recognized it needed more such workers. NGOs reported that victim protections codified within the law were extensive and robust. For foreign victims, the law included provisions for voluntary repatriation, temporary residency during legal proceedings, and permanent residency if the country of origin could not ensure victims' safety or well-being; the government did not report receiving any requests for application of these provisions. The law mandated that legal assistance be provided to trafficking victims. The law also provided protections for victims from liability for unlawful acts their traffickers compelled them to commit. The law allowed prosecutors to pursue claims even if victims withdrew their complaints or refused to cooperate with an investigation or prosecution. Judges could mandate restitution for related crimes under Haiti's civil code without a separate civil process, but there were no awards for restitution made during the reporting period. There were no facilities for video deposition or child-friendly facilities during legal proceedings. Experts noted the lack of government-run child shelter facilities impeded prosecution because

the government's policy of returning child victims to their families made it difficult to locate witnesses to testify against the accused. The government may have failed to identify some victims and may have penalized some victims due to incomplete training on the new SOPs. Approximately 253 Cuban medical personnel were active in Haiti in mid-August 2021 following the earthquake and tropical storm; additional Cuban medical specialists arrived later in August 2021. The government did not oversee the contractual agreements between the workers and the Cuban government, screen Cuban medical workers for trafficking indicators, or provide protection services for potential victims, despite recognized trafficking risks among this population and the inclusion of medical personnel as a special screening category in the SOPs.

In collaboration with civil society and international partners, CNLTP trained labor inspectors, attendees at the SOP launch event, judicial actors, regional anti-trafficking taskforces, non-profit organizations, Haiti-Dominican Republic binational committee members, and local authorities on both sides of the border on the implementation of the SOPs; vulnerabilities of migrants, children in orphanages, and those in informal work; and cross-border child trafficking. An NGO noted the NGOs that identified the 13 confirmed victims did so following one of the SOP trainings.

## PREVENTION

The government maintained efforts to prevent trafficking. The president appointed members of the CNLTP, which included representatives from nine agencies, two "counselors" from civil society organizations, and one representative from the Office of the Human Rights Ombudsman. CNLTP and IBESR met weekly, in person and virtually. Outside experts reported CNLTP and IBESR were effective at their missions of leading and coordinating anti-trafficking activities and noted improved technical coordination under difficult circumstances. Government, civil society, and international partner interlocutors were aware of their activities and often referred trafficking questions to them.

The government lacked a national, centralized database, and though it began developing one with the assistance of an NGO and a foreign donor in the previous reporting period, the project remained incomplete. Despite the legal mandate to adequately fund the government's anti-trafficking institutions, the government reduced the CNLTP's budget to zero in fiscal year 2021 (October 1, 2020-September 30, 2021). The Fiscal Year 2022 national budget allocations remained undetermined at the end of the reporting period. MAST had the responsibility to fund the CNLTP. Four of the 12 CNLTP committee members left their posts due to lack of funds, resulting in a lack of experience on CNLTP. The CNLTP last received funding in fiscal year 2020, receiving an allocation of 20 million HTG ($200,460). Observers noted the government expected to rely on foreign donors for funding. MAST funded IBESR and disbursed IBESR's full national budget allocation of 94.75 million HTG ($949,650) for Fiscal Year 2021, which was similar to Fiscal Year 2020. Many government officials, including those conducting screening at border crossings, worked without pay.

The government completed a new NAP for 2021-2022. It focused on raising awareness; law enforcement case management; implementing SOPs and improving victim services; training; developing and regulating Haiti's orphanage and foster care system and combating children in forced labor in domestic service (*restavek* situations); and interagency collaboration. Outside observers reported the NAP successfully identified key shortcomings and developed targeted institutional capacity-building initiatives—including directives on better documenting cases—to address those areas, but in only focusing on awareness raising among judicial actors, it failed to address all gaps in improving overall prosecution efforts. The NAP replaced a previous one for 2017-2022, which was underfunded. As the CNLTP did not receive any actual funding, it instead relied on non-governmental partners to fund its activities. Observers in past years reported the government generally underfunded anti-trafficking efforts. The CNLTP did not have permanent office space, equipment, or vehicles to conduct work; CNLTP instead conducted business at IBESR, MAST, or virtually. Foreign donors, international organizations, and NGOs provided the committee most logistical support, including transportation, during field visits, although the government reported IBESR was able to support some activities of the CNLTP. The

government remained without a special fund for trafficking as stipulated in the 2014 anti-trafficking law. The fund would support anti-trafficking initiatives and assist victims from the sale of assets seized from traffickers.

The government supported an NGO's study on the implementation of the 2014 anti-trafficking law that observers noted was the most comprehensive assessment undertaken to date. In partnership with the government—which coordinated and helped design the debate—and other NGOs and with funding from a foreign donor, a foreign NGO organized a human trafficking awareness campaign at universities and law schools for faculty and students. Eight educational institutions had participated in the campaign as of January 2022. As part of the same campaign, the NGO organized debates on human trafficking, between four law school faculties from different regions of the country. Following training by the CNLTP, an NGO conducted an awareness-building campaign focused on labor trafficking and domestic servitude including situations of forced child domestic servitude among merchants in Port-au-Prince. In the two previous reporting periods, BPM and an international organization each operated trafficking hotlines. No trafficking hotlines functioned during this reporting period, but the police maintained a general emergency phone line. The government published illicit migrant deterrent messaging via public radio and other media platforms that contained information on dangers, including trafficking, migrants could face.

The continued dysfunction of the civil registry system and weak consular capacity to provide identification documentation left many Haitians at risk of remaining undocumented in the Dominican Republic and subject to deportation—recognized risk factors for vulnerability to trafficking. As of March 2022, the government had registered nearly 5.4 million (approximately one million from this reporting period) out of an estimated six million citizens older than the age of 18 and issued more than 4.3 million ID cards (approximately 1.2 million this reporting period) under a biometric ID card program begun during the previous reporting period. The government required the card in order to vote in elections, occupy a public service position, register for school, obtain a passport, and access financial services. However, the government reported that a lack of funding to expand the program to those older than the age of 13 negatively impacted the ability to prevent child trafficking.

The government had no clear strategy for conducting labor inspections. Although the labor code required recruiters and businesses to obtain a license and did not allow them to charge fees, Haiti did not have effective laws or policies to regulate foreign labor recruiters, prevent fraudulent recruiting, or have plans to raise awareness of the risks for potential migrant laborers. The government lacked sufficient staff and resources to inspect worksites for indicators of labor trafficking, although the government reported it certified 29 new labor inspectors following their anti-trafficking training and reported carrying out inspections for child labor and identifying trafficking cases. The lack of a minimum age for domestic work and exceptions in the laws governing child labor hindered investigations and prosecutions of child domestic servitude. The government reported IBESR staff and labor inspectors had not received sufficient training on child labor issues, despite a study indicating that more than 286,000 children were working in domestic service, some of whom were victims of forced labor. CNLTP canceled planned trainings on forced labor due to the natural disasters. The government did not report or publish data on child work, child labor, or the worst forms of child labor. The government did not report proactive measures to prevent trafficking by its diplomats, although the 2014 anti-trafficking law provided strict sanctions for public officials complicit in trafficking. The government did not make efforts to reduce demand for commercial sex acts. IBESR led efforts to combat child sex tourism; the law required resorts, restaurants, and bars to report any suspected incidents of child sex tourism to IBESR and BPM. No explicit prohibition existed in Haitian law against Haitian nationals engaging in sex tourism abroad.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Haiti, and traffickers exploit victims from Haiti abroad. Most of Haiti's trafficking cases involve children in forced labor and sex trafficking in domestic service, commonly called *restavek* situations, in which children are often physically abused, receive no

payment for services rendered, and have significantly lower school enrollment rates. In 2022, an NGO estimated that of those children in forced labor in domestic service (*restavek* situations), two-thirds are girls, mostly victims of sex trafficking, and one-third boys, mostly victims of labor trafficking. In 2021, NGOs estimated between 150,000 and 300,000 children worked in domestic servitude. Many children, and a majority of the boys, flee or are cast out of these situations and begin to live and/or work on the street, facing further risk of re-trafficking. The number of children in this situation likely increased in 2020. "Orphanage entrepreneurs" operate unlicensed orphanages that exploit children in trafficking. In October 2021, an NGO estimated that 30,000 children were in approximately 750 orphanages, of which the government had at the time only licensed 35-50. Approximately 80 percent of children in orphanages have at least one living parent, who may place children in an institution deemed more likely to be able to care for them, and almost all have other family members.

Female foreign nationals, especially citizens of the Dominican Republic and Venezuela, are particularly at risk for sex and labor trafficking in Haiti, including on social media. Commercial sex typically takes place in upscale neighborhoods and resort areas to cater to foreigners. Sex trafficking also takes place at the Haiti-Dominican Republic border as Haitians, especially women and girls, seeking job opportunities are instead exploited in commercial sex in the Dominican Republic or for sex tourism. According to NGOs, international child sex tourism also occurs in Haiti, with the primary tourists being from the United States, Canada, and Europe. Emerging practices include "bride-buying," in which men pay between $100 to $200 to the families of girls as young as 14. Traffickers also target children in private and NGO-sponsored residential care centers; Haitian children working in construction, agriculture, fisheries, domestic work, begging, and street vending in Haiti and the Dominican Republic; internally displaced persons (IDPs), including those displaced by natural disasters and gang violence; those who are stateless or at risk of becoming stateless; Haitian migrants, including those traveling to or returning from the Dominican Republic, The Bahamas, Turks and Caicos, Brazil, Mexico, or the United States; and LGBTQI+ youth often left homeless and stigmatized by their families and society. Risks to migrants significantly increased in 2021 as a function of mass repatriations and increased movement across the Haiti-Dominican Republic border and the high number of migrants attempting to journey to the United States from departure points in South America. Haitian adults and children are at risk for fraudulent labor recruitment and forced labor, primarily in the Dominican Republic, other Caribbean countries, South America, and the United States. Cuban medical workers have had a continuous presence in the country since 1998 and may have been forced to work by the Cuban government. With less than 1 percent of Haiti's population vaccinated against COVID-19; hospitals closed due to violence, the fuel crisis, or both; and the COVID-19 testing infrastructure either inaccessible or too expensive for average Haitians, the true impact of the pandemic on Haiti is unknown. However, the temporary closure of schools and pressure due to economic difficulties exacerbated vulnerability. A 2022 NGO study concluded that the implementation of the 2014 anti-trafficking law was inadequate and offered several key recommendations, including to train judges and police officers; strengthen the operational capacity of CNLTP by funding it as legally mandated; make legal progress on key cases; investigate cases, and raise public awareness about trafficking. A December 2020 survey found that many Haitians lacked basic knowledge about human trafficking and the resources available to get help; 71 percent of respondents were unable to differentiate between human trafficking and gender-based violence, only 18 percent knew of a phone number to report a suspected trafficking crime, and just 3 percent had heard of the CNLTP.

## HONDURAS: TIER 2

The Government of Honduras does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Honduras

remained on Tier 2. These efforts included amending the penal code to increase penalties for trafficking crimes, identifying more victims, and nearly doubling funding to an NGO that provides shelter for victims. The government increased efforts to identify victims of forced labor and prosecute suspected perpetrators of forced labor crimes. The government approved a new victim assistance manual and standard operating procedures (SOPs) to strengthen victim identification and referral to services, and the Inter-institutional Commission to Combat Commercial Sexual Exploitation and Trafficking in Persons (CICESCT) sustained its efforts to provide immediate protection and coordinate among other providers for additional care. However, the government did not meet the minimum standards in several key areas. The government did not allocate adequate financial or human resources to effectively respond to trafficking crimes and provide comprehensive victim support throughout the country. The government did not report holding any employers or employment agencies criminally accountable for fraudulent recruitment practices or charging recruitment fees to workers.



HONDURAS TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase investigations, prosecutions, and convictions of traffickers, including complicit officials and perpetrators of forced labor crimes. • Increase training for front-line officials on implementing new SOPs for victim identification and referral, including screening for indicators of trafficking among migrants and returnees, forcibly displaced persons, and children apprehended for illicit gang-related activities. • Increase government funding for CICESCT and other agencies responsible for implementing anti-trafficking activities in support of the national action plan (NAP). • Raise awareness of fraudulent recruitment for employment in Honduras and abroad and punish employers or employment agencies for illegal practices that facilitate trafficking, such as fraudulent offers of employment or illegal fees for migration or job placement. • Amend the 2014 anti-trafficking law to include a definition of human trafficking consistent with international law. • Increase and institutionalize anti-trafficking training for police, prosecutors, judges, and CICESCT's immediate response team (IRT). • Draft a new NAP to take effect in 2023 and secure resources for its implementation.

### PROSECUTION

The government increased prosecution efforts, although it made amendments to its anti-trafficking law that reversed progress to align the definition of trafficking with international law. The government amended the anti-trafficking provisions of the Honduran penal code. Amendments to Article 219, which went into effect in November 2021, criminalized sex and labor trafficking and increased penalties from five to eight years' imprisonment to 10 to 15 years' imprisonment. The new penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. However, the new provisions amended the definition of trafficking; inconsistent with international law, the law established the use of force, fraud, or coercion as aggravating factors rather than essential elements of the crime.

The government reported investigating 148 trafficking cases—64 cases for sex trafficking and related crimes, five cases for forced labor, and 79 cases of unspecified exploitation. This compares with 82 cases investigated for sex trafficking and related crimes in 2020 and 91 in 2019. Authorities initiated prosecutions of 43 suspects (27 for sex trafficking and 16 for forced labor), compared with nine initiated in 2020 (seven for sex trafficking and two for forced labor) and 55 in 2019 (53 for sex trafficking, including procuring commercial sex acts, and two for forced labor). The government convicted 18 sex traffickers, compared with 14 traffickers convicted in 2020 (10 for sex trafficking, two for forced labor) and two for both sex trafficking and forced labor) and 34 traffickers

convicted in 2019 (33 for sex trafficking/procuring commercial sex acts and one for forced labor). Courts issued prison sentences ranging from three years and nine months to 21 years and four months for convicted traffickers and ordered some of them to also pay monetary fines to the government. The government investigated a Ministry of Labor employee for involvement in a case that included money laundering and forced labor of 32 victims in a restaurant; authorities charged the official with disclosure of privileged information, which facilitated trafficking crimes. The government did not provide updates on investigations of official complicity in trafficking crimes opened in previous years. Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year.

The government maintained a specialized anti-trafficking prosecution unit, which included investigative police officers, with offices in Tegucigalpa and San Pedro Sula. However, experts observed the unit remained understaffed and lacked sufficient resources to investigate and prosecute trafficking crimes, particularly throughout other regions of the country. COVID-19 infections among police, judges, prosecutors, defense attorneys, witnesses, and defendants caused staffing shortages in enforcement agencies and disrupted the pace of justice proceedings. An NGO noted courts continued to delay trafficking cases despite a requirement in the anti-trafficking law to process such cases in a timely manner, an issue further exacerbated by the pandemic. Experts observed that judges' lack of specialized knowledge and limited experience in handling trafficking cases impeded successful prosecution and conviction of traffickers. The Government of Honduras cooperated with the Government of the United States to investigate one suspected trafficking case.

## PROTECTION

The government maintained strong protection efforts, with CICESCT's IRT providing robust assistance to victims throughout the year. The government identified 101 trafficking victims in 2021, including 48 exploited in sex trafficking and 53 exploited in forced labor. In comparison, the government identified 42 victims (31 in sex trafficking and 11 in forced labor) in 2020; the government identified 75 victims (66 in sex trafficking and nine in forced labor), and NGOs identified 78 victims in 2019. Government-identified sex trafficking victims included 35 girls, 11 women, and two boys, while forced labor victims included 22 women, 14 men, nine boys, six girls, and two LGBTQI+ persons whose gender and age were not specified. These data may have included some victims of related crimes such as child pornography. NGOs identified three additional women exploited in sex trafficking.

First responders referred trafficking victims to CICESCT's IRT, composed of two psychologists and two social workers, for immediate support; in January 2022, CICESCT hired an attorney to join the IRT. The IRT provided all 101 victims with assistance, including legal advice, immediate protection, and psychological services. CICESCT coordinated with relevant government institutions and NGOs to provide additional services to victims, including mental health counseling, legal services, medical care, lodging, food, family reintegration, and repatriation. Officials reported CICESCT met with other agencies more than 120 times to coordinate services for victims. CICESCT coordinated with the Ministry of Health to provide COVID-19 testing and vaccination to victims. CICESCT referred 12 sex trafficking victims (eight girls and four women) and 29 labor trafficking victims (15 women, eight men, two girls, two boys, and two LGBTQI+ individuals whose gender and age were not specified) to government and NGO shelters for additional care. Child victims could receive care from government or NGO shelters, and women had the option to receive assistance from NGO shelters. At times, the government or NGOs arranged lodging in hotels for adult male victims. There were no specialized shelters for trafficking victims in Honduras, men were not accepted in any shelters, and services for victims in rural areas were limited in quality and availability.

With support from a donor-funded NGO and input from survivors, the government developed and began implementing a victim assistance manual with SOPs for the proactive identification of victims among members of at-risk groups and interagency coordination procedures for referring victims to services. To supplement the manual, authorities created an assistance plan that detailed victims' basic and urgent needs,

including specialized assistance and support for healing from trauma. These resources supplemented the government's intersectoral protocol on victim protection and existing written procedures for identifying victims and referring them to care. The new victim assistance manual included strengthened procedures to screen for indicators of trafficking among underserved populations, including individuals with disabilities, Indigenous and Afro-descendant persons, LGBTQI+ individuals, and persons forcibly displaced due to violence or environmental disasters. CICESCT and the anti-trafficking prosecution unit each operated trafficking-specific hotlines. The CICESCT hotline received 32 reports of suspected trafficking cases and 286 calls requesting information, and NGOs reported two cases directly to CICESCT.

With funding from international organizations, the Government of Honduras' National Directorate for Child and Family Services (DINAF) employed 13 child protection officers, working across six land border ports of entry and the child and family migrant reception center in San Pedro Sula, to interview all returning migrant children and their families. Child protection officers followed procedures to assist children determined to be at-risk of exploitation and to refer potential trafficking cases to law enforcement officials for investigation. The government did not report whether officials identified any trafficking victims among returning migrants during the year. The government followed a regional protocol to facilitate the repatriation of victims identified abroad and funded food, transportation, and lodging for such victims through a fund administered by the Secretariat of Foreign Affairs and International Cooperation. In 2021, the government repatriated and assisted 20 Honduran victims identified in other countries.

The government initially allocated 6.74 million lempiras ($277,890) to CICESCT but later redirected some funds to pandemic relief efforts, decreasing its actual disbursement to 6.13 million lempiras ($252,540). This amount was comparable to 6.18 million lempiras ($254,800) provided in 2020 and an increase from the pre-pandemic budget allocation of 5.53 million ($228,000) in 2019. CICESCT provided 150,000 lempiras ($6,180) to an NGO operating a shelter that accommodated women, girls, and boys up to the age of 12; this amount was nearly double the funding it provided in 2020 (77,000 lempiras or $3,170). Nonetheless, officials reported that donor assistance was integral to their efforts, as government funding was insufficient to provide comprehensive victim care, purchase personal protective equipment for victims, and implement the NAP.

The government provided witness protection services to some victims participating in investigations or prosecutions. Authorities permitted victims to provide testimony through written statements or pre-recorded interviews in one of its four secure Gesell chambers. IRT members accompanied victims throughout their participation in the criminal justice process and referred some victims to legal aid services for additional assistance. Honduran law prohibited the prosecution of victims for unlawful acts traffickers compelled them to commit. However, the government lacked formal procedures for identifying victims among children apprehended for gang-related criminal activity. NGOs reported authorities did not properly identify children forced to engage in illegal activities by criminal groups, reporting that the government may have inappropriately treated such children as criminals instead of victims. Honduran law allowed foreign victims to receive temporary or permanent residency status, including authorization to work, though the government did not identify any foreign victims in 2021.

## PREVENTION

The government-maintained prevention efforts and robust interagency coordination. CICESCT convened a network of 32 government agencies and NGOs and took an active role in coordinating the government's anti-trafficking efforts, including through supporting local committees in each of Honduras' 18 departments. The government continued implementation of its 2016-2022 NAP through activities to improve victim identification and raise public awareness of the risks of trafficking. The government allocated insufficient funds for implementation of the plan, and relevant agencies relied on additional support from foreign donors to implement its activities. CICESCT maintained a public website and social media accounts to share information on human trafficking with the public and encourage reporting of suspected trafficking crimes.

HONG KONG

Government agencies, including CICESCT and the Public Ministry, conducted both online and in-person training and information events on trafficking prevention for police, lawyers, judges, labor inspectors, teachers, health officials, victim service professionals, immigration officials, and representatives of NGOs. CICESCT tailored some events to at-risk groups—including children and students, individuals with disabilities, migrants, Indigenous persons, and members of the LGBTQI+ community—and conducted activities to raise awareness of cybercrime and human trafficking. The government made campaign materials available in Honduran Sign Language.

Labor inspectors did not identify any suspected trafficking cases in 2021. The Secretariat of Labor and Social Security monitored and regulated compliance with labor laws and policies that could decrease workers' vulnerability to trafficking, including those regulating private employment agencies, recruitment and contracting of Honduran workers abroad, and employment of at-risk groups, such as domestic workers and seafarers. Honduran regulations prohibited charging recruitment fees to workers, but the government did not report enforcement of these regulations in 2021. CICESCT and the Honduran Tourism Institute coordinated with their regional counterparts to conduct awareness raising activities aimed at the prevention of child sex tourism. The government did not report efforts to reduce the demand for commercial sex acts.

### TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Honduras, and traffickers exploit victims from Honduras abroad. Traffickers exploit Honduran women and children in sex trafficking within the country and in other countries such as Belize, El Salvador, Guatemala, Mexico, Spain, and the United States. Traffickers particularly target LGBTQI+ Hondurans, migrants, IDPs, persons with disabilities, children in child labor, children whose parents have migrated, and individuals living in areas controlled by organized criminal groups. Officials report the pandemic worsened numerous issues that exacerbate these risks, such as family problems, unemployment, and lack of access to healthcare. Traffickers exploit victims within their own homes or communities, including sometimes their own family members or friends. Traffickers exploit Honduran adults and children in forced labor in street vending, forced begging, domestic service, drug trafficking, and the informal sector in their own country, as well as forced labor in other countries, particularly Guatemala, Mexico, and the United States. Children, including from Indigenous and Afro-descendant communities, particularly *Miskito* boys, are at risk for forced labor in the agricultural, construction, manufacturing, mining, and hospitality industries. Children who are homeless are at risk for sex and labor trafficking. Criminal organizations, including gangs, exploit girls in sex trafficking, force children into street begging, and coerce and threaten children and young adults to transport weapons, sell drugs, commit extortion, or serve as lookouts; these acts occurred primarily in urban areas, but one NGO reported an increase in gang activity in rural areas. Criminals expanded the use of social network platforms to recruit victims, often with false promises of employment, and continued to target vulnerable populations. Honduras is a destination for child sex tourists from Canada and the United States. Migrants from Africa, Asia, the Caribbean, Central America, the Middle East, and South America who transit Honduras en route to the United States are vulnerable to being exploited in trafficking. Corruption and official complicity helped facilitate trafficking crimes.

## HONG KONG: TIER 2 WATCH LIST

The Government of Hong Kong does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included increasing screening of vulnerable populations for trafficking indicators and meeting with civil society organizations to consider recommendations to improve the effectiveness of victim identification procedures. The government trained more officials than the previous year and prosecuted an increased number of

employers of foreign domestic workers for crimes including assault and causing bodily harm. The government reported conducting increased law enforcement actions against illegal brothels and perpetrators who solicit commercial sex acts from child sex trafficking victims, however, the government did not identify any sex trafficking victims during these operations. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity. The government did not prosecute or convict any labor traffickers and sentenced criminals convicted for crimes related to sex trafficking to inadequate penalties. Despite the government screening thousands of vulnerable persons for trafficking indicators, it identified only one victim, a decrease compared with identifying three victims during the previous reporting period. Ineffective implementation of victim identification procedures continued to result in inadequate victim identification and contributed to authorities penalizing victims for unlawful acts traffickers compelled them to commit. The government did not enact legislation to fully criminalize all forms of trafficking. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Hong Kong was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Hong Kong remained on Tier 2 Watch List for the third consecutive year.



### PRIORITIZED RECOMMENDATIONS:

Improve the quality of screenings conducted to identify trafficking victims, increasingly screen individuals in commercial sex for trafficking, and ensure children in commercial sex are identified as trafficking victims and refer them to services. • Cease penalization of victims for unlawful acts traffickers compel them to commit and increase interagency coordination to ensure authorities do not punish victims through immigration proceedings, including before investigating the traffickers. • Vigorously investigate and prosecute suspected sex and labor traffickers and sentence convicted traffickers to significant prison terms. • Enact legislation that criminalizes all forms of trafficking in accordance with the definition set forth in the 2000 UN TIP Protocol. • Engage in continuous and regular collaboration with NGOs and social welfare experts to update anti-trafficking policies; review victim-centered interview processes and investigations; establish improved services for trafficking victims; and create in-depth training programs for the judiciary, labor tribunal, and other task force stakeholders. • Ensure authorities offer and refer trafficking victims to services. • Provide adequate services in Hong Kong to non-resident victims, including children, including before their repatriation. • Allow foreign victims to work and study in Hong Kong while participating in judicial proceedings against traffickers. • Increase protections for foreign domestic workers to reduce their vulnerability to trafficking, including by prohibiting worker-charged recruitment fees, permanently eliminating the "two week rule," affording workers an option to live outside their place of employment and creating legal maximum working hours. • Proactively investigate unscrupulous employment agencies and money lenders for their complicity in labor trafficking and penalize convicted agency operators.

### PROSECUTION

The government maintained anti-trafficking law enforcement efforts; the absence of laws that fully criminalize trafficking made it difficult both to accurately assess the government's prosecution efforts compared with the previous year and to determine which law enforcement actions involved human trafficking as defined by international law. Hong Kong law did not criminalize all forms of human trafficking, and the government relied on various provisions of laws relating to prostitution,

Haiti AR_000751

immigration, employment, and physical abuse to prosecute trafficking crimes. Inconsistent with international law, Section 129 of the Crimes Ordinance, which criminalized "trafficking in persons to or from Hong Kong," required transnational movement and did not require the use of force, fraud, or coercion. Section 129 prescribed penalties of up to 10 years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with punishments prescribed for other serious crimes, such as rape. Section 130 criminalized the harboring, controlling, or directing of a person for the purpose of prostitution and prescribed penalties of up to 14 years' imprisonment. Section 131 criminalized procuring a person to engage in commercial sex acts and prescribed penalties of up to 10 years' imprisonment. Section 137 criminalized living on the earnings of commercial sex acts of others and prescribed penalties of up to 10 years imprisonment.

The government initiated an investigation of one potential labor trafficking case, compared to three in 2020, but did not report prosecuting or convicting any cases of labor trafficking for the third consecutive year. The government did not report the number of sex trafficking investigations or prosecutions initiated in 2021, but it reported arresting 20 suspects (27 in 2020) during investigations for offenses related to sex trafficking, including for violations of Sections 130 and 137 of the Crimes Ordinance. Courts convicted four criminals for sex trafficking-related crimes in 2021 (one conviction in 2020) and sentenced two of the criminals to four and eight months' imprisonment. Such short sentences did not serve to deter trafficking crimes or adequately reflect the nature of the offense. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking offenses.

Law enforcement officials often did not adequately investigate trafficking cases, sometimes closed cases with clear indicators of trafficking, and did not employ a victim-centered, trauma-informed approach when interviewing victims. The government reported using a "joint investigative process" in trafficking cases to coordinate interviews of victims among law enforcement agencies; however, in previous reporting periods, observers reported limited coordination between law enforcement agencies in practice, which resulted in agencies separately investigating different aspects of cases. Law enforcement did not adequately prosecute operators of unscrupulous employment agencies or money lenders for their roles in facilitating labor trafficking through debt-based coercion. The absence of laws criminalizing all forms of trafficking impeded officials' ability to investigate or charge suspected traffickers. This also resulted in the prosecution of trafficking crimes under laws with weak penalties. Well-founded fears of penalization and the absence of adequate services resulted in many victims choosing not to report their exploitation or declining to cooperate with authorities in investigations. Inadequate victim identification led to victims identified by NGOs pursuing justice in civil tribunal courts and the government did not pursue criminal cases against the traffickers. NGOs previously reported judicial officials lacked an awareness of trafficking.

The government provided trafficking-related training to approximately 1,700 officials from various agencies in 2021, compared with 880 trained in 2020. Adjusting to pandemic-related travel restrictions, which prevented their ability to attend overseas trainings, officials also joined online workshops and webinars. The Security Bureau cosponsored its sixth joint anti-trafficking training program with the EU in January 2022 for officials from various agencies and civil society organizations. The police force employed dedicated teams for investigating trafficking and the exploitation of foreign domestic workers. The government also reported having designated points of contact for trafficking issues within relevant agencies since 2018. Nonetheless, civil society organizations continued to report being unable to reach these designated contacts and teams, including when attempting to refer victims to police, and some reported government officials could not direct them to a person responsible for trafficking in their agency.

## PROTECTION

The government maintained inadequate efforts to protect victims. Police, immigration, and customs officials used a two-tiered identification mechanism to screen vulnerable populations for indicators of trafficking. Through this mechanism, officials referred potential victims for a full identification "debriefing" after determining whether an individual

met at least one of seven indicators listed on the standard screening form of the first tier of the identification mechanism. Officials screened 7,678 individuals in 2021, compared to 6,912 screened in 2020, but only identified one victim (exploited in labor trafficking); this was a decrease compared with identifying three victims in 2020. Authorities' implementation of the screening mechanism and victim identification was ineffective and inconsistent, and they lacked understanding of psychological trauma associated with trafficking. The government's anti-trafficking task force met with civil society organizations to receive feedback on the screening process and accepted proposals for improving the process; however, the government did not report making any adjustments to the identification process by the end of the reporting period. Law enforcement often did not use a trauma-informed approach while interviewing potential victims during the identification process, which exacerbated victims' emotional distress and, since authorities conducted interviews over many hours without adequate breaks, often did not successfully identify indicators of trafficking. The standard screening form listed the vulnerable populations authorities were required to screen, but it did not list any groups that included Hong Kong citizens. Although the government reported expanding screening of foreign domestic workers in 2021 to include all workers who applied for a new or to renew an existing worker visa, authorities did not routinely screen individuals in commercial sex for trafficking indicators. Hong Kong's low age of consent, 16, further complicated efforts to identify child victims exploited in commercial sex as trafficking victims. Despite media reports indicating officials identified children in commercial sex during police raids on brothels, government authorities did not identify them as victims of trafficking or refer them to services. The failure to consistently provide potential victims with immediate stabilizing care upon their initial contact with authorities, as well as a lack of legal assistance for victims, also likely impeded officials' ability to effectively interview victims and identify trafficking indicators. In previous years, authorities failed to identify mainland People's Republic of China (PRC) national child victims of sex trafficking who were found during anti-vice operations, and authorities deported them without providing adequate assistance; however, in 2021, authorities did not report finding any such victims during anti-vice operations.

The government did not report providing services to any victims. The government reported agencies could refer potential victims to anti-trafficking teams and provide them services; however, authorities did not refer any victims to services, and the government lacked a formal referral process and clear guidance for officials to inform victims of available services. Victims commonly preferred to receive services provided by foreign consulates or NGOs, rather than services offered by the government. The government partially subsidized six NGO-operated and three government-operated shelters that served victims of violence, abuse, and exploitation, including trafficking victims. These shelters could provide temporary accommodation, counseling, and medical and psychological services to local and foreign victims, regardless of gender or age. However, some services were not available to foreign victims, including welfare and social services provided by the Social Welfare Department.

The government could assist foreign victims, including domestic workers, to return to Hong Kong to serve as witnesses in trials by providing financial assistance but did not report doing so during the reporting period. To enable foreign victims to temporarily remain in Hong Kong, the government could provide visa extensions with fee waivers and could provide victims who were foreign domestic workers with permission to change their employer. Inconsistent coordination between immigration officials and police made it difficult for victims to obtain visa extensions in practice. Authorities generally did not permit foreign victims, including those given visa extensions, to work or study while they remained in Hong Kong, unless an exception was granted; this likely deterred some victims from remaining in Hong Kong to participate as witnesses in investigations against traffickers. Hong Kong law allowed victims to seek compensation from traffickers through civil suits and labor tribunals. Nonetheless, a shortage of interpretation services, lack of trained attorneys, inability to work while awaiting a decision, and judges' inexperience with forced labor cases sometimes impaired victims' attempts to claim back wages or restitution through labor tribunals and deterred some from bringing claims forward.

Due to a lack of effective identification procedures, authorities likely detained, arrested, and deported some unidentified trafficking victims. Authorities penalized victims for unlawful acts traffickers compelled them to commit. During police raids in brothels, authorities arrested individuals in commercial sex, did not screen them for indicators of trafficking, and deported foreign individuals without screening. The government typically initiated immigration proceedings against victims, rather than referring them to services and investigating or prosecuting the traffickers. In addition, anecdotal reporting suggested authorities continued to penalize victims of forced criminality, specifically those coerced to carry drugs into Hong Kong, without screening them for trafficking indicators. The government could grant immunity from prosecution to victims identified through the screening mechanism, as well as exploited foreign domestic workers, and reported granting immunity to two individuals in 2021.

## PREVENTION

The government maintained efforts to prevent trafficking. The government continued to publicly deny that trafficking is a prevalent crime in Hong Kong, undercutting the anti-trafficking efforts of government officials and the NGO community. A governmental anti-trafficking steering committee led by the Chief Secretary for Administration and the inter-departmental working group led by the Security Bureau continued to meet. The government allocated 62.23 million Hong Kong dollars ($7.98 million) in its annual budget to continue implementation of the 2018 anti-trafficking action plan, the same amount it allocated the previous year. In addition, following the imposition of the National Security Law by the Chinese National People's Congress on Hong Kong in June 2020, under which any speech critical of the government or its policies could be construed as pro-secession, subversive, or inciting hate against the government, along with increased restrictions to freedom of expression, NGOs and other civil society organizations reported they were more cautious in their engagement with the government, including on human trafficking. The government passed legislation in October 2021 that prohibited the "publication or threatened publication of intimate images without consent," which could target those who coerce victims into commercial sex acts through threats of online distribution of photographs.

The government reported conducting 60 raids on illegal brothels in 2021, an increase compared to 41 conducted in 2020. The government did not conduct campaigns to raise awareness of sex trafficking. To improve awareness of the rights of foreign domestic workers and the responsibilities of employers, the government continued to distribute information packets to workers and employers, publish advertisements in Filipino and Indonesian language newspapers, work with the Philippine and Indonesian consulates to provide briefings to newly arriving domestic workers, and publish translated versions of standard employment contracts in 11 foreign languages. The government continued to distribute information cards created by an international organization that listed information on support services available to foreign domestic workers and trafficking victims.

The government's process for evaluating non-refoulement claims, which did not allow claimants to legally work in Hong Kong, made some refugees vulnerable to trafficking. In addition, the government's policies requiring foreign domestic workers to live with their employer and previous requirement to return to their home countries within two weeks after their contracts' termination ("two-week rule") increased workers' vulnerability to exploitation by abusive employers and unscrupulous employment agencies. The requirement that workers live with their employers enabled exploitative employers to limit workers' freedom of movement and communications, and sometimes employers required workers to live in inadequate conditions. The lack of regulations setting a maximum number of legal working hours for foreign domestic workers also contributed to their vulnerability. Throughout the pandemic, the live-in requirement increased workers' workloads and daily work hours, and some employers denied workers the ability to take their mandated day off. Previously, the "two-week rule" likely deterred workers from reporting or exiting exploitative conditions. Due to travel restrictions related to the pandemic in both Hong Kong and workers' home countries, the government temporarily suspended the "two-week rule," allowing workers to remain in Hong Kong and seek new employment after their contracts ended. NGOs reported this suspension, as well as domestic

workers' increased bargaining power with employment agencies due to a decrease in available foreign domestic workers in Hong Kong, contributed to a decrease in workers' risk of exploitation and debt-based coercion. One NGO study found that fewer employment agencies charged workers illegal fees during the year. Although the government requested employers pay the costs associated with quarantine requirements for workers entering Hong Kong during the pandemic, it did not require it, and NGOs reported some employment agencies charged both employers and workers, who incurred additional debt from employment agencies from these expenses, further increasing their vulnerability to debt-based coercion.

The government prosecuted 20 employers of foreign domestic workers (8 in 2020) and convicted five for offenses such as assault, causing bodily harm, and criminal intimidation; courts imposed sentences ranging from fines to 30 months' imprisonment. The government also reported convicting 16 employers of foreign domestic workers for illegally using workers to perform duties outside their contracts (18 in 2020); sentences included community service and up to three months' imprisonment. The government allowed employers previously convicted of exploiting foreign domestic workers to continue to hire workers. Hong Kong law permitted employment agencies to charge job seekers, including foreign domestic workers, up to 10 percent of their first months' salary in recruitment fees. Since authorities did not enforce this rule, agencies often charged much higher fees and confiscated workers' passports and/or contracts as collateral, practices that perpetuated debt-based coercion. The government requested employment agencies comply with a code of practice covering statutory requirements and standards for Hong Kong-based employment agencies. Despite being a violation of the code of practice, observers reported money lenders and employment agencies often operated at the same address without consequence; this enabled employment agencies complicit in labor trafficking to indebt workers through loans for recruitment fees that were often beyond the legal limits. The Employment Agencies Administration (EAA) conducted cursory inspections of some employment agencies. The EAA increased staffing and resources during the reporting period, but previous reports indicated its inspections of agencies were ineffective and often only consisted of cursory reviews of documentation. In addition, the EAA did not proactively investigate unscrupulous agencies and typically required a victim to make a complaint against an agency before initiating an investigation. The EAA was not regularly open on Sundays—the only non-work day for most foreign domestic workers—preventing some workers from filing complaints; however, the EAA increasingly opened during weekends during the reporting period. To facilitate the ability of foreign domestic workers to make inquiries and complaints, the Labor Department (LD) operated an online portal as well as a 24-hour hotline with interpretation available in seven languages. In 2021, LD prosecuted five agencies for overcharging workers, operating without a license, or other violations but did not report the number convicted (11 agencies prosecuted in 2020). LD cited non-compliance of the code of practice in decisions to revoke or reject the renewal of licenses of seven employment agencies in 2021 (seven in 2020). A study found that while the EAA increased investigations of employment agencies, the number of prosecutions for non-compliance of the code of practice remained low. In addition, previous reports indicated some employment agencies reportedly continued to operate—and unlawfully retain workers' passports with impunity—after losing their licenses, sometimes operating while their conviction was under appeal or reopening under different names. Despite having the legal discretion to revoke agency licenses administratively, observers reported the EAA over-relied on criminal convictions of agencies to do so. In addition, fines and other penalties given to employment agencies exploiting foreign domestic workers were not significant enough to act as a deterrent. The government did not make efforts to reduce demand for commercial sex acts. The government did not provide anti-trafficking training to its personnel posted overseas. While the PRC included Macau in its accession to the 2000 UN TIP Protocol in 2010, it stated the Protocol "shall not apply" to Hong Kong.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Hong Kong, and traffickers exploit victims from Hong Kong abroad. Victims include citizens from mainland PRC,

Haiti AR_000753

Indonesia, Kenya, the Philippines, Thailand, Uganda, and other Southeast Asian countries, as well as countries in South Asia, Africa, and South America. Traffickers exploit foreign women, including from Eastern Europe, Africa, and Southeast Asia in sex trafficking. There were reports that some women in Hong Kong—often with the assistance of their families—deceive Indian and Pakistani men into arranged marriages that involve domestic servitude, bonded labor in construction and other physically demanding industries, and other forms of abuse via exploitative contracts. Traffickers exploit migrant workers in shipping, construction, electronic recycling facilities, nursing homes, and private homes. Drug trafficking syndicates coerced foreign women, including through the use of physical violence, to carry drugs into Hong Kong.

Traffickers recruit victims from the Philippines, South America, and mainland PRC using false promises of lucrative employment and force them into commercial sex. Pre-pandemic, some foreign victims entered Hong Kong on two-week tourist visas, as part of a circuit of major cities in the region used by traffickers, including Bangkok and Taipei, and were coerced into commercial sex through debt-based coercion. Following increased travel restrictions related to the pandemic, there were fewer foreign individuals in commercial sex in Hong Kong throughout 2020 and 2021, including trafficking victims. However, NGOs reported increasing occurrences of online solicitation of commercial sex acts, which reduced their access to individuals in commercial sex and may have increased individuals' vulnerability to coercive tactics. Traffickers use coercive methods, such as threats of reporting victims to police or immigration authorities, withholding of identification documents, and blackmailing victims with threats of online distribution of photographs to coerce them to engage in online commercial sex acts. Brothel operators and others exploit Hong Kong children in sex trafficking. "Compensated dating" also continues to facilitate commercial sexual exploitation of Hong Kong children and adults, making them vulnerable to trafficking. Traffickers have exploited victims from Hong Kong in North America in commercial sex.

Approximately 400,000 foreign domestic workers, primarily from Indonesia and the Philippines, work in Hong Kong. Some foreign domestic workers become victims of debt bondage in the private homes in which they are employed. A 2018 NGO task force survey of migrant workers found that one-third of Indonesian workers in Hong Kong were asked to sign debt agreements as conditions of their employment. In addition, 56 percent of surveyed workers reported having to pay illegal recruitment fees, and 24 percent had their personal documents withheld by employment agencies or employers. Recent estimates suggest that as many as one in six foreign domestic workers are victims of labor exploitation in Hong Kong. Some operators of employment agencies subject victims to labor trafficking through debt-based coercion by charging workers job placement fees above legal limits and sometimes withholding their identity documents. The accumulated debts sometimes amount to a significant portion of a worker's first-year salary, and unscrupulous agencies sometimes compel workers to take loans from money lenders to pay excessive fees. However, the reduced availability of foreign domestic workers in Hong Kong as a result of the pandemic resulted in some employment agencies reducing placement and other fees charged to workers. Some employers, money lenders, and employment agencies illegally withhold passports, employment contracts, or other possessions until the debt is paid. Some workers are required to work up to 17 hours per day; experience verbal, sexual, or physical abuse in the home; live in inadequate conditions; and/or are not granted a legally-required weekly day off. Throughout the pandemic, many workers faced increased workloads and daily work hours, and some employers denied workers the ability to take their mandated day off. In addition, many workers incurred additional debt from employment agencies for expenses related to quarantine requirements, further increasing their risk of experiencing debt-based coercion. Observers also reported brothels, bars, and clubs increasingly recruited foreign domestic workers to engage in commercial sex acts, sometimes through fraudulent recruitment methods. Some foreign domestic workers sign contracts to work in Hong Kong, but upon arrival, traffickers coerce or lure them to work in mainland PRC, the Middle East, or Russia. As demand for foreign domestic workers in Hong Kong increased, NGOs reported workers from countries other than Indonesia and the Philippines were increasingly vulnerable to exploitation. Some employment agencies

reportedly hired foreign domestic workers under false pretenses and forced them into commercial sex.

# HUNGARY: TIER 2

The Government of Hungary does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore Hungary remained on Tier 2. These efforts included investigating more trafficking cases, convicting more traffickers, and funding programs in orphanages aimed at the prevention of child sex trafficking and treatment of its victims. Additionally, provisions to the Act of Criminal Procedures and related sectoral legislation entered into force, modifying the conduct of proceedings involving children, including child trafficking victims, to prevent re-traumatization during investigations and court proceedings. Furthermore, the government amended the Victim Support Act to allow victims of violent crimes, such as trafficking, to receive compensation regardless of the victim's income level, and it extended the deadline for claiming compensation from three months to one year. Moreover, the government and an international organization implemented a one-year return and reintegration project aimed at improving the provision of victim assistance for voluntary returns, sustainable reintegration, and preventing re-victimization. However, the government did not meet the minimum standards in several key areas. Authorities identified and assisted fewer trafficking victims. The government's trafficking victim identification mechanism did not apply to foreign victims without legal residency. As a result, government officials did not adequately screen for trafficking indicators or identify victims among third-country nationals, such as asylum-seekers, as well as other vulnerable populations, including domestic workers or children in state-run institutions. The government did not have a specialized framework for identifying, referring, or assisting child victims. Overall services for victims remained scarce, uncoordinated, and inadequate, especially for foreigners and children, for whom there were no dedicated shelters; these gaps left victims at risk of re-trafficking. Finally, the government re-extended the "crisis situation due to mass migration," authorizing police to automatically remove third-country nationals intercepted for unlawfully entering and/or staying in Hungary without screening for trafficking indicators; some of these third-country nationals could be or could become trafficking victims.



HUNGARY TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Screen for trafficking indicators and proactively identify potential victims, especially among vulnerable populations, such as migrants and asylum-seekers, unaccompanied children, and children in state-run institutions and orphanages. * Significantly increase the quality and availability of specialized victim services for adults and children, including by expanding the national referral mechanism (NRM) to formally include foreign victims without legal residency and allocating funding to additional NGOs for victim care. * Cease the abrupt and violent removal of third-country nationals who could be or could become trafficking victims and train authorities to recognize indicators of trafficking among vulnerable groups. * Bolster efforts to protect children residing in state-run institutions and of individuals who leave these institutions against trafficking. * Implement the non-punishment provisions to ensure trafficking victims are not inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts their traffickers

compelled them to commit. * Amend the anti-trafficking law to ensure that force, fraud, or coercion are not required for sex trafficking crimes involving child victims. * Enhance the collection and reporting of reliable prosecution data. * Increase the number of police officers investigating trafficking crimes and train them to understand, recognize, and address all aspects of trafficking. * Develop a clear framework for and allocate dedicated resources to regulate foreign labor recruitment in Hungary. * Empower the labor authority to regulate labor recruitment agencies and impose fines or punishments on agencies that commit trafficking crimes. * Increase victim-centered, trauma-informed training for law enforcement, prosecutors, judges, and front-line workers.

## PROSECUTION

The government increased prosecution efforts. Section 192 of the criminal code criminalized all forms of labor trafficking and some forms of sex trafficking. Section 192 prescribed penalties of one to 10 years' imprisonment for crimes involving an adult victim and five to 20 years' or life imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Legislative amendments from 2020 helped align the Hungarian definition of trafficking with the international definition by more precisely defining exploitation and including force, fraud, or coercion as an essential element of the base crime of adult trafficking. However, inconsistent with international law, the amended Section 192 required a demonstration of force, fraud, or coercion to constitute all child sex trafficking crime, thereby not criminalizing all forms of child sex trafficking. Judicial officials continued to assert the law implicitly established that force, fraud, or coercion were not required to constitute child sex trafficking and that this therefore was not a barrier in successfully prosecuting and obtaining convictions in child sex trafficking cases.

Section 203 of the criminal code, which criminalized crimes relating to the "exploitation of child prostitution," could be utilized to prosecute some child sex trafficking crimes that did not necessarily involve force, fraud, or coercion. Section 203 prescribed penalties of up to three years' imprisonment, which were not sufficiently stringent nor commensurate with penalties prescribed for other grave crimes, such as rape. Penalties under this provision increased only if a person was "supported partly or wholly by profiting" from such exploitation of a child or for maintaining or operating a brothel for the purposes of such exploitation of a child. Additionally, Section 193 criminalized forced labor, with sentences ranging from one to five years' imprisonment for crimes involving an adult victim and two to eight years' imprisonment for those involving a child victim. The 2020 amendments criminalized all forms of labor trafficking, including forced labor, under Section 192, thus superseding Section 193. However, authorities continued to prosecute and convict traffickers under Section 193 in 2021. Observers noted a gap in the law remained that could allow the prosecution of a victim if that victim consented to the crime without coercion. The Office of the Prosecutor General (PGO) instructed prosecutors not to prosecute such victims.

The government reported the number of registered crimes rather than the number of closed investigations because the data on closed investigations provided in previous years contained possible duplications. Despite the data on prosecutions also containing duplications, the government reported all prosecutions, thereby misrepresenting the number of suspected traffickers in the criminal justice system and making it difficult to assess efforts. Additionally, the government noted prosecutorial guidelines issued in 2018 resulted in a number of pandering cases reclassified as trafficking cases. In 2021, police registered 132 trafficking crimes (115 sex trafficking, 13 labor trafficking, four unspecified), an increase from 95 registered in 2020. Officials prosecuted 255 suspected traffickers (210 under Section 192, 45 under Sections 193 and 203), compared with 209 in 2020. Courts convicted 17 traffickers (15 under Section 192, two under Sections 193 and 203), an increase from 10 in 2020. All 17 convicted traffickers received prison sentences ranging from two years' to 12 years' imprisonment; courts suspended three of those sentences. In 2021, prosecutors investigated a police officer for labor trafficking; the investigation found no evidence of trafficking. The National Bureau of Investigations (NNI) maintained a specialized unit for investigating trafficking cases with an international or organized crime connection. NNI cooperated with foreign law enforcement agencies on

six investigations, participated in two Joint Investigation Teams (one ongoing from 2020), and extradited two suspected traffickers in 2021. In one investigation, Hungarian and German authorities cooperated on a sex trafficking case involving a suspected trafficker of Mozambican origin who allegedly forced a victim also of Mozambican origin into commercial sex in Hungary, Germany, Cyprus, Italy, and France. Under the auspices of an EU security initiative to identify, prioritize, and address threats posed by organized and serious international crime, including trafficking, in November 2021, NNI coordinated a joint action day focused on detecting and prosecuting trafficking cases, which resulted in the apprehension of 12 suspected traffickers and the identification of 17 Hungarian victims.

Authorities noted numerous positive impacts from recent legal and operational reforms aimed at combating trafficking and enhanced government trainings but acknowledged that challenges, such as personnel shortages and pandemic-related restrictions, continued to limit progress. Recent criminal code amendments allowed authorities to confiscate traffickers' property, enabling more successful investigations and deterring convicted traffickers from continuing criminal activities. Additionally, the changes allowed prosecutors to pursue stronger punishments against traffickers. Prosecutors appealed for harsher sentences for 33 defendants in eight first-instance rulings, including a case in which a child sex trafficker's prison sentence was increased from eight to 11 years. Furthermore, police credited enhanced training to shifting how officers viewed and approached trafficking, stating that police began to approach individuals in commercial sex as potential trafficking victims instead of suspects or criminals. Educational efforts supported by the government included trainings on detecting trafficking cases and victim identification and protection for probation officers, investigators, prosecutors, and judges. Despite the noted progress, police stressed the need for more resources, such as surveillance tools and personnel. National and local authorities reported police forces were stretched beyond capacity and did not have adequate personnel for all functions, including addressing trafficking. Moreover, media outlets reported significant dissatisfaction among police and emergency workers over more restrictive work conditions, partially due to the pandemic, including a ban on resignation or retirement, long hours, rotations at the Hungary-Serbia border to stem migrant flow, and noncompetitive wages. To address some personnel gaps, in 2020, NNI approved four additional investigative positions to the 11-person trafficking unit, but some of the positions remained vacant at the end of the reporting period. Observers continued to underscore the government needed more experts working on trafficking cases and a sophisticated perspective on addressing all aspects of trafficking.

## PROTECTION

The government maintained protection efforts despite notable gaps. The government identified 171 victims (78 sex trafficking, 39 labor trafficking, 54 unspecified), a decrease from 188 in 2020. Of these victims, 24 were children (21 in 2020), and eight were foreign nationals (four in 2020). Government Decree no. 354/2012 on the trafficking victim identification mechanism, which established the NRM, regulated the identification of victims and their referral to assistance. Experts expressed concern that the decree did not apply to foreign victims without legal residency. The decree listed the authorities responsible for identifying victims, such as police, border guards, and health professionals; the questionnaire to be completed with suspected victims; and procedural protocols. In 2021, the government amended the decree to include an updated list of trafficking indicators and a flowchart to assist with the identification of trafficking victims and management of trafficking cases. The government also amended the Victim Support Act, which required the provision of services to all victims of a crime, increasing the number of victims who benefited from victim support services. However, under those amendments, which entered into force in 2021, victims automatically received access to support services unless they explicitly asked the authorities responsible for identification not to record their personal data into the government's digital victim support system (EKAT), which provided victims with information on support services, such as placement in shelters. At the beginning of 2021, only three institutions responsible for identification could access EKAT. As a result, by the end of 2021, authorities only identified seven cases.

NGOs said identification, referral, and assistance for the majority of victims took place on an ad hoc basis, and NGOs and social service providers mainly based the process on their personal networks and connections, while the Ministry of Interior (MOI) reported most referrals were made by the police. NGOs expressed the need for the government to allocate more effectively its resources, particularly in the identification and referral of victims. They also continued to criticize the law that required the State Audit Office to report on organizations that were "capable of influencing public life" and had a certain budget as it negatively impacted state funding for victim assistance. Overall, victim assistance remained scarce and uncoordinated—especially for foreigners and children—and exposed survivors to the risk of re-victimization. In 2021, government-funded NGOs reported assisting 91 trafficking victims, an increase from 80 in 2020, of which three were children, a notable decrease from 13 in 2020. The vast majority of the victims were Hungarian citizens; five were foreign nationals.

While the NRM did not apply to foreign victims without legal residency, the government granted ad hoc approval to a government-funded NGO to provide services, such as financial support, shelter, and health care, in cases when the NGO requested it. Foreign victims could receive a 30-day reflection period to decide whether to assist law enforcement, during which they were eligible for a certificate of temporary stay for up to six months. Those who cooperated with authorities were entitled to a residence permit for the duration of their cooperation. In 2021, one Mozambican woman and her child held a humanitarian residence permit. The law required the government to provide 22,800 Hungarian forint (HUF) ($70) per month for one year to third-country nationals who were trafficking victims. The law also required the government to provide trafficking victims who were identified during the asylum process with immediate psychological or psychiatric assistance through its reception facility and, if necessary, accommodation through victim support services. However, the government did not screen or adequately identify victims among vulnerable populations, such as asylum-seekers and unaccompanied children.

The Ministry of Justice (MOJ) oversaw the victim support system, which included victim support services, centers, and a hotline, and it allocated 934 million HUF ($2.86 million) toward the system. These expenditures were for victims of domestic violence and other crimes, including trafficking. All Hungarian and EU victims were eligible for support services, including government-provided financial support, psychological services, legal assistance, witness care, and shelter. Amendments in 2021 to the government decree revised the criteria for the provision of victim financial assistance by extending the deadline to apply for immediate assistance from three to eight days from the date of the crime and lifted the maximum time limit that victims could stay in shelters, allowing social workers to determine victims' length of stay on a case-by-case basis. In 2021, a government-funded NGO operated three shelters that provided accommodation, transportation, reintegration assistance, family care, financial management advice, and aftercare. The Ministry of Human Capacities funded a separate NGO and church to establish a new shelter for trafficking victims and their families; the shelter provided victims with accommodation and support services for up to three years. In December 2021, to help families reintegrate after moving out of temporary shelters, the Ministry of Human Capacities created accommodations at an existing facility for six parents who were victims of crimes, including trafficking, and their children.

The Prime Minister's Office funded two NGOs to operate protected shelters that provided secure accommodations and a range of services, including medical assistance and transportation, to victims. The MOJ continued to build a nationwide network of victim support centers by opening three more in 2021 with the goal to open three centers per year until 2025, and it trained workers on identifying and registering trafficking victims. In areas where the centers were unavailable, the MOJ opened victim support "hot-spots" (two in 2021) to facilitate implementation of victim support. The centers and "hot-spots" assisted victims of domestic abuse and other crimes, including trafficking. Observers reported most staff working in the centers had a legal background but lacked social care skills and experience with victim support. Observers also reported staff allegedly misrepresented individuals with intellectual disabilities and those who were homeless as trafficking victims in order to justify the

centers' existence and reach target numbers. In 2021, the government and an NGO continued to implement a two-year pilot project aimed at providing 50 potential trafficking victims with reintegration support. The government partially funded the project, contributing 25 million HUF ($76,610). Under the auspices of the project, each victim was eligible for up to 500,000 HUF ($1,530) in financial support; during the reporting period, 14 victims received payments. Additionally, in 2021, the government and an international organization implemented a one-year return and reintegration project co-financed by the Internal Security Fund of the European Union and the Hungarian MOI. The project aimed at improving and consolidating the provision of assistance to victims for their voluntary returns and sustainable reintegration and preventing re-victimization. Further amendments to the Victim Support Act allowed victims of violent crimes, such as trafficking, to receive compensation regardless of the victim's income level and extended the deadline for claiming compensation from three months to one year. In 2021, the MOJ reported victims received 11.5 million HUF ($35,240) in state compensation; however, the statistics included victims of all types of crimes, including trafficking.

Provisions to the Act of Criminal Procedures and related sectoral legislation entered into force in 2021, modifying the conduct of proceedings involving children—including child trafficking victims—by strengthening cooperation between child protective services and the judiciary. The government based this new approach on the Barnahus method—a multidisciplinary and interagency model offering child victims a coordinated and effective response to prevent re-traumatization during investigations and court proceedings. The government maintained two interdisciplinary centers based on the Barnahus method for child victims and witnesses. To implement the general protection measure authorizing police to place child trafficking victims in designated shelters for up to 60 days, the government maintained an intersectoral working group among stakeholders, such as police and designated children's homes. There were five such shelters (one exclusively for boys) for the reception of child trafficking victims; the working group referred 10 child victims. Perennial issues persisted with protecting and providing assistance to child victims. Experts criticized the chronic lack of assistance and specialized services for child trafficking victims. The government lacked a framework for identifying, referring, or assisting child victims other than the general child protection system and state-run homes, which had insufficient staff and resources to provide appropriate care or security, leaving victims at risk for re-trafficking. Experts continued to express concern that children in state-run homes and orphanages, especially children with disabilities, such as girls with special needs or dual needs, were particularly vulnerable to sex trafficking—approximately 23,000 children lived in state-run institutions, including 300 younger than three years of age. EU and national requirements required child protection institutions and state-run homes to report all suspected cases of children exploited in sex trafficking; however, according to observers, some law enforcement did not treat them as victims. Unlike previous years when authorities penalized child trafficking victims for unlawful acts their traffickers compelled them to commit, in 2021, authorities implemented the non-punishment provision for child victims; however, in one instance, authorities reported issuing a warning to a girl for a commercial sex crime. Experts questioned the accuracy of government data on the penalization of children, noting children were most likely detained by authorities for short periods of time. Through the Ministry of Human Capacities, child protection professionals received a 30-hour vocational training on child trafficking and recent legislative changes. Additionally, the Ministry of Human Capacities provided 16.6 million HUF ($50,870) to an NGO to provide programs in orphanages for the prevention and treatment of child sex trafficking. The government operated a 24-hour child protection hotline, which received three alerts in connection with a potential child sex trafficking victim in state care.

In response to the inflow of Ukrainian refugees fleeing Russia's full-scale invasion of Ukraine, the MOI printed and distributed 90,000 flyers in Ukrainian and Hungarian at border crossings, shelters, major train stations, and municipal governments, as well as online, raising awareness about potential schemes by traffickers and risks of trafficking. Additionally, the government launched a new hotline with information in Hungarian, English, and Ukrainian on the application process for temporary protected status. In the three counties along the border,

**ICELAND**

the government set up temporary shelters capable of accommodating 28,000, with backup capacity for up to 120,000. To provide healthcare, the government designated nine hospitals with capacity to care for 11,300 patients, including pandemic isolation. The Budapest Municipality set up accommodations for refugees who decided to remain in Budapest, converting two homeless shelters and a retirement home into refugee reception centers with a total capacity of 440 beds. However, observers reported the lack of Ukrainian-speaking social workers hindered the municipality's ability to properly assist with the psychosocial needs of the many children staying at the shelters. Furthermore, several NGOs raised concerns about registration and assistance, particularly for unaccompanied children and other vulnerable populations, and noted a lack of translated outreach materials, limited access to forms and instructions, and difficult to impossible requirements, such as needing a registered address in Hungary to access assistance or educational services. Ukraine's ambassador to Hungary asserted in an April 2022 interview that the Hungarian government was not providing regular updates about Ukrainian refugees arriving to the country and had no information on the whereabouts of 53 Ukrainian unaccompanied children who had crossed the Hungarian border. As of April 2022, authorities issued approximately 100,000 30-day temporary residence permits to Ukrainian citizens. As of March 2022, the MOI reported that it had identified no trafficking victims among refugees.

## PREVENTION

The government maintained prevention efforts. The National Anti-Trafficking Coordinator facilitated anti-trafficking efforts domestically and internationally and chaired the National Coordination Mechanism, which monitored the implementation of the national anti-trafficking strategy. The government continued to implement the 2020-2021 national action plan for the 2020-2023 national anti-trafficking strategy. In 2021, the prime minister's office provided 5 million HUF ($15,320) to support a research project aimed at assessing whether shelters, support services, and social institutions could provide effective assistance to trafficking victims and prepared the findings for incorporation into the national strategy. The MOI cooperated with Hungarian universities to integrate trafficking into their social work curricula, and as a result, in the fall semester, systematic education on trafficking began at several universities. The police continued to conduct an awareness campaign designed to educate children about the dangers of trafficking. The government supported the operation of an NGO-run, 24-hour national hotline, allocating approximately 202.5 million HUF ($620,560). The hotline provided services in Hungarian and English and assisted victims of domestic violence and trafficking. In 2021, the hotline assisted 55 potential victims and referred 24 victims to shelter (51 and 19, respectively, in 2020). The government did not make efforts to reduce the demand for commercial sex acts. The MOI concluded a research project on the effectiveness of victim assistance among male labor trafficking victims and published a handbook on the findings.

In 2021, the government introduced temporary legislation for the employment of foreign nationals, allowing them to work in a broad range of jobs without a permit, including architectural engineers, chefs, social workers, service staff, and bus drivers, for the duration of the pandemic. While the law prohibited recruitment fees by private employment agencies, the government did not have a clear framework and dedicated resources to regulate foreign labor recruitment, which exposed foreign nationals to the risk of exploitation. In 2021, the government adopted new legislation to regulate employers' compliance with labor laws; a separate decree detailed the law's enforcement by the labor inspection authority, including punitive administrative sanctions prohibiting the further employment of workers and fines. Moreover, the labor authority did not have the competency to inspect labor recruitment agencies or impose fines or punishment on foreign labor exchange agencies that committed trafficking crimes, but it could assess agencies' compliance with regulations concerning temporary work. According to a 2021 cooperation agreement between the Ministry for Innovation and Technology and the National Police targeting the identification of labor trafficking victims, the police and labor inspectors conducted an average of one joint unannounced inspection per month in each of Hungary's counties. Additionally, in June 2021, labor inspectors and

officials of the Alien Policing authority conducted joint inspections in each county aimed at identifying all forms of labor exploitation.

Media and international organizations alleged authorities indiscriminately and often violently deported asylum-seekers; a 2021 report on protecting rights at borders criticized the government for violent pushbacks of refugees and migrants into Serbia. The European Court of Human Rights ruled that automatic pushbacks of asylum-seekers carried out by the Hungarian authorities were in breach of the prohibition of collective expulsion enshrined in the European Convention on Human Rights. Furthermore, UNHCR "deplored" the government's decision to extend the "crisis situation due to mass migration," which authorized police to automatically remove third-country nationals who had been intercepted for unlawfully entering and/or staying in Hungary; these individuals could be or could become trafficking victims due to their increased vulnerability. Experts expressed concern the decision denied people—already in the country and in need of international protection—access to asylum. After the closure of the transit zones in 2020, the government required asylum-seekers to submit asylum requests through its embassies in Belgrade or Kyiv; requests required asylum-seekers to submit a statement of intent with answers to general questions that did not include trafficking-specific questions. NGOs expressed concern that the system restricted access to asylum and exacerbated the risks of trafficking among asylum-seekers.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Hungary, and traffickers exploit victims from Hungary abroad. Vulnerable groups include Hungarians in extreme poverty, undereducated young adults, single mothers, asylum-seekers, people with disabilities, children living in state-run institutions, homeless men, and Roma. Roma, the country's largest ethnic minority, make up a significant proportion of those identified as trafficking victims. During the second half of 2021, police reported an increase in cross-border organized trafficking activity, suggesting that traffickers adapted to work under pandemic-imposed circumstances. Traffickers exploit Hungarian women, boys, and girls in sex trafficking within the country and abroad, mostly within Europe, with particularly high numbers in Austria, Germany, the Netherlands, Switzerland, and the United Kingdom. Sex trafficking remains the most common form of trafficking in Hungary. Traffickers exploit Hungarians in labor trafficking in agriculture, construction, hospitality, and factories. NGOs report domestic labor trafficking remains a concern, particularly in rural areas, among Ukrainians and other third-country nationals who come to Hungary to assist with the country's labor shortage. While seasonal workers are at risk for labor trafficking in the agriculture and construction sectors, the majority of victims are Hungarian citizens, particularly adult men who are exploited by family members and acquaintances in domestic servitude and agricultural work, such as cleaning, landscaping, and farming. Approximately 23,000 Hungarian children live in state-run childcare institutions, including 300 children younger than three years of age, who are vulnerable to trafficking. A large number of child sex trafficking victims exploited within the country and abroad come from state-run institutions, orphanages, and correctional facilities, and traffickers recruit them when they leave these institutions. The government reports adolescent girls with mild intellectual disabilities and/or special needs, including dissocial behavior, psychoactive substance abuse, or psychiatric conditions, who are living in state-run institutions, are the most vulnerable to sex trafficking. Trafficking victims from Eastern European countries, as well as asylum-seekers and undocumented migrants, some of whom may be or may become trafficking victims, transit Hungary en route to Western Europe. Thousands of foreign nationals and Ukrainian refugees, predominantly women and children, who are fleeing Russia's full-scale invasion of Ukraine and crossing the Hungary border seeking sanctuary, are highly vulnerable to trafficking.

## ICELAND: TIER 1

The Government of Iceland fully meets the minimum standards for the elimination of trafficking. The government made key achievements to do

so during the reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Iceland was upgraded to Tier 1. These achievements included prosecuting and convicting one trafficker, marking the government's first prosecution and conviction in 12 years. In addition, the government identified and assisted more potential trafficking victims and funded a new counseling and support center for victims of gender-based violence, including trafficking victims. The government also established a law enforcement advisory panel that worked with foreign law enforcement agencies and anti-trafficking organizations and cooperated with international organizations on data collection regarding trafficking trends and responses. Furthermore, the government funded and published a new online emergency services portal with information on trafficking indicators and assistance, developed standard operating procedures (SOPs) for emergency services operators responding to suspected trafficking cases, and financed production of educational videos to help workplace inspectors detect potential incidents. Although the government meets the minimum standards, it continued to charge suspected traffickers under non-trafficking statutes, such as smuggling, that carried more lenient penalties. Moreover, the government did not have a formal identification and referral process for child trafficking victims.



**PRIORITIZED RECOMMENDATIONS:**
Significantly increase efforts to convict suspected traffickers and sentence them to significant prison terms. • Investigate and prosecute trafficking cases under the trafficking statute. • Enhance training for investigating cases and collecting evidence against suspected traffickers. • Establish a formal identification and referral process for child trafficking victims. • Proactively identify trafficking victims and refer them to care facilities for assistance. • Screen all vulnerable individuals for trafficking indicators. • Increase training for police, prosecutors, judges, and other officials on all aspects of trafficking, particularly on proactive identification of victims among migrant workers, asylum-seekers, and children.

**PROSECUTION**
The government increased law enforcement efforts. Article 227a of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to 12 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. During the reporting period, the government amended Article 227a to define expressly additional forced labor acts as forms of trafficking, which more closely aligned Article 227a with the international definition of trafficking. Observers commended the amendments, which helped lower the burden of proof required for a trafficking charge under the law and its potential impact on prosecuting alleged traffickers. The Reykjavik Metropolitan Police maintained a three-person unit for combating trafficking and commercial sex supported by a cyber-crime unit that monitored the internet for trafficking activity. The North Iceland Police maintained a two-person team focused on commercial sex and labor violations, and the Southwestern District Police, which covered the border police at Keflavik International Airport, operated a unit specializing in major crime investigations, including trafficking. In 2021, authorities investigated five trafficking cases (four sex trafficking and one unspecified), compared with four cases in 2020. For the first time in more than a decade, authorities prosecuted one alleged trafficker. Authorities referred another trafficking case to prosecution but ultimately prosecuted the case under a non-trafficking statute. Similarly, for the first time in more than a decade, courts convicted one trafficker. The convicted trafficker received a sentence of four years

in prison and paid damages to the victims. The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes. The National Commissioner of the Icelandic Police (NCIP) maintained responsibility for international law enforcement cooperation, including with Europol and Interpol, on international investigations. In 2021, the NCIP and Iceland's EUROPOL liaison joined the Nordic law enforcement group on combating trafficking and assigned police and customs officials as liaisons to the Nordic Police and Customs Cooperation. Furthermore, in 2021, a Ministry of Justice (MOJ) task force established a law enforcement advisory panel that worked with foreign law enforcement agencies and anti-trafficking organizations and collected data and information regarding trafficking trends and responses from international organizations. The panel relayed information to Icelandic police districts and assisted those districts in determining whether a case should be considered as trafficking and how it should be investigated. In addition, the task force developed a new process for registering trafficking cases into law enforcement databases.

Experts noted that limitations of a small government administration, structure across government institutions, and resources restricted progress and coordination. For instance, lengthy investigations and inadequate evidence collection led prosecutors to charge suspects under non-trafficking statutes, such as smuggling, that carried more lenient penalties and were easier to convict. However, local experts expected the amendments to the trafficking law to result in increased prosecutions in the coming years. In an effort to ensure successful implementation, the government conducted five training sessions for prosecutors and law enforcement on the amendments, as well as on investigation methodologies and prosecuting trafficking cases. In recent years, reports indicated a rise of organized crime and associated violence; the government reported trafficking was often one component of larger prosecutions linked to organized crime. In December 2021, the NCIP released a report on organized crime, which included a comprehensive analysis on trafficking, noting trends, drivers, and methods utilized by traffickers in Europe and Iceland, and implicated criminal organizations connected to nationals from the Middle East and southeastern Europe in organized trafficking.

**PROTECTION**
The government increased victim protection efforts. The government identified 46 potential trafficking victims, a significant increase from nine potential trafficking victims in 2020. The majority of potential victims were adult foreign nationals; however, authorities identified three potential victims younger than 15 years old. Of the 46 potential victims, authorities confirmed five as trafficking victims; all were female. The Bjarkarhlid Family Justice Center maintained responsibility for the national referral mechanism (NRM) and continued to serve as a "one stop shop" for victims of violence, including trafficking. The government allocated 3 million Icelandic krona (ISK) ($23,080) for the NRM, the same amount as in 2020. Through the NRM, the center coordinated social services and law enforcement involvement, provided victims with assistance, and compiled victim information and case history into a centralized database. Furthermore, the center utilized a standardized questionnaire for victims to better quantify and identify vulnerable groups. In 2021, the center developed a tool with indicators for identifying victims and distributed it in locations where victims received assistance, such as health clinics. The police maintained identification and referral procedures requiring them to contact welfare services in the municipality and the Ministry of Social Affairs to coordinate victim care and placement. The Directorate of Immigration (DOI) provided staff with comprehensive SOPs for screening asylum-seekers for potential trafficking; SOPs also dictated referral paths for and processes applying to potential unaccompanied child trafficking victims. A team of experts referred victims to relevant NGOs or institutions providing short- or long-term care.

Overall, the government maintained a well-managed social welfare system with robust protections. All victims had access to free legal, medical, psychological, and financial assistance, whether or not they stayed at a shelter or cooperated with authorities. In 2021, six trafficking victims received assistance from social services, compared with three victims in 2020. Municipal social service agencies provided services and financial assistance to victims, and the Ministry of Welfare (MOW)

ICELAND

reimbursed the municipalities for all associated expenses. In 2021, the government allocated 15 million ISK ($115,400) toward the Bjarkarhlid Center for housing, counseling, health care, and financial assistance. The MOW's action plan on preventing violence and its consequences, which included action items to combat trafficking and provide services for victims, called for the creation of standardized guidance for all anti-trafficking service providers and allocated 15 million ISK ($115,400) annually until 2023 to ensure the implementation of the guidance, as well as all action items, no later than 2022. Moreover, the government allotted 234 million ISK ($1.8 million) for service agreements with various shelters that provided assistance to victims. The government in partnership with an NGO maintained a women's shelter in Akureyri, the largest town in northern Iceland. In southern Iceland, the government provided 1.5 million ISK ($11,540) for a new counseling and support center for victims of gender-based violence, including trafficking victims. There were no accommodations available for male victims, although they could access general municipal social services and receive referrals to NGOs providing food, shelter, legal advice, and health care. Under the Child Protection Act, all children dwelling in Iceland had the same right to protection and services from child welfare. Municipal and national child protection services were responsible for assisting unaccompanied children, including child trafficking victims. Observers noted shortcomings in the assistance process for unaccompanied children, noting that the DOI placed such children in an unsupervised reception center with no child protection staff, only one security guard, and free access from other residents, putting them at risk to trafficking. Additionally, experts reported there was no formal identification and referral process for child trafficking victims. If authorities came across a case involving a potential child trafficking victim, they contacted local child protection authorities who were responsible for ensuring accommodation and other services. Child trafficking victims received support, including interviews and medical examinations, at Barnahus—a multidisciplinary and interagency center offering child victims, including child trafficking victims, a coordinated and effective response to prevent re-traumatization during investigations and court proceedings. All three child trafficking victims identified received services from the municipality and from Barnahus. Icelandic law allowed foreign trafficking victims to obtain either a nine-month residence permit or a one-year renewable residence permit, which was available to victims who faced retribution or hardship in their home countries or cooperated with law enforcement. Officials noted, in most instances of suspected trafficking, foreign victims opted to leave the country instead of cooperating with investigations. Police took official reports for all victims, except in cases involving children, in which a specialized psychologist took their statements. In accordance with the NRM, victims could receive a state-appointed and state-funded attorney, as well as social workers and psychiatric services. While there was no specific restitution program for trafficking victims, such a program existed for victims of violence and could be applicable for trafficking victims. Under the Icelandic judicial system, if a legal proceeding yielded a conviction, the court could order restitution as part of sentencing.

## PREVENTION

The government increased prevention efforts. The government continued to implement the MOW's 2019-2022 action plan on preventing violence and its consequences, and it allocated 10 million ISK ($76,930) in 2021, a considerable increase from 6 million ISK ($46,160) in 2020, for implementation of its action items, including anti-trafficking activities. Separately, the government continued to implement its national action plan (NAP), which included action items focused on bolstering public awareness, education, and institutional knowledge. Three task forces comprised the MOJ-led national steering group, which coordinated interagency anti-trafficking efforts. The task forces, which focused on prosecution, protection, and prevention, respectively, incorporated a range of government and non-government stakeholders, including a survivor, and developed specific policy proposals to implement the NAP. The protection task force published a new online emergency services portal for trafficking victims with information available in English, Icelandic, and Polish on trafficking indicators and assistance, and it provided a quick response code directing the public to the portal. The government allocated approximately 800,000 ISK ($6,150) to promote the portal. The task force also developed SOPs for emergency hotline operators responding to suspected trafficking cases outside of

the law enforcement process and financed production of educational videos to help workplace inspectors detect potential incidents. The prevention task force worked on a project focused on corporate social responsibility and chain of responsibility revolving around public procurement. The task force met with government parties responsible for implementation of directives relating to public procurement in the NAP to conceptualize user-friendly materials explaining how to apply legal provisions and including a summary on chain of responsibility. Supply chain responsibility provisions in the Public Procurement Act stipulated the liability of principal contractors to ensure all sub-contractors were paid in accordance with collective bargaining agreements. The Act also stipulated if a bidder or a participant was a convicted trafficker, they were barred from procurement bids for a minimum of three years. In cooperation with EU countries, the Directorate of Labor (DOL) continued to participate in a two-year project aimed at reducing labor violations and labor trafficking, by combating unregulated employment and social dumping, whereby workers were given pay or living or working conditions that were sub-standard compared to the law. The DOL maintained a three-person team to respond to suspected trafficking cases and educate government employees on trafficking and identifying potential victims. The DOL also maintained a website providing information on the rights of foreign workers in Iceland and the resources available to them. While the government did not require recruitment agencies to be licensed or registered in Iceland, the DOL required all companies contracting workers in Iceland to register with the DOL and provide information on business activities and workers; breaches of these requirements resulted in fines. Icelandic law prohibited companies, including recruitment agencies, from charging recruitment or hiring fees.

In response to an inflow of Ukrainian refugees who were fleeing Russia's full-scale invasion on Ukraine and arriving in Iceland, the government developed trafficking guidelines for border control and published informational brochures on common trafficking indicators and local anti-trafficking resources for law enforcement and airport authorities, among others. Additionally, the MOJ lowered barriers for Ukrainians to seek asylum or refugee status in Iceland, and the government processed more than 1,000 Ukrainians for humanitarian protection. While the government did not operate a trafficking-specific hotline, the country's general emergency telephone number provided information to victims on services and directed callers to appropriate responders. Government efforts to combat sexual abuse, including trafficking, extended abroad with the allocation of 20 million ISK ($153,870) to a project in South Sudan. The government did not make efforts to reduce the demand for commercial sex acts. The government did not report providing anti-trafficking training to its diplomatic personnel but noted the Ministry of Foreign Affairs maintained a code of conduct for diplomats.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Iceland, and to a lesser extent, traffickers exploit victims from Iceland abroad. Authorities report that most trafficking cases involve small businesses or individual traffickers, who are foreign nationals living legally in Iceland and engaging in other criminal activities. Reports indicate a recent increase in organized crime and its association with organized trafficking. A 2021 police report on organized crime raises concern about trafficking in Iceland and implicates nationals from the Middle East and southeastern Europe operating criminal organizations in sex trafficking. Traffickers exploit women from Africa, Eastern Europe, the Baltics, and South America in sex trafficking and men and women from Asia, the Baltics, Eastern Europe, and West Africa in forced labor. Labor trafficking continues to be the largest concern in Iceland, with migrant workers in the construction, tourism, and restaurant industries, as well as domestic service, particularly vulnerable. However, labor union officials report fewer migrant workers in Iceland due to the pandemic. Foreign "posted workers" are at particular risk of forced labor as the traffickers pay them in their home countries and contract them to work for up to 183 days in Iceland to avoid taxes and union fees, limiting tax authorities' and union officials' ability to monitor their work conditions and pay. Asylum-seekers and foreign students in Iceland are especially vulnerable to trafficking. A police threat assessment report notes a nascent nexus between asylum abuse and organized crime through which traffickers seek to manipulate the asylum system. Traffickers reportedly exploit the visa-free regime in the Schengen Zone and the European

Haiti AR_000759

Economic Area to bring victims to Iceland for up to three months and move them out of the country before they must register with local authorities. Foreign nationals and Ukrainian refugees, predominantly women and children, who are fleeing Russia's full-scale invasion on Ukraine and seeking sanctuary in Iceland, are highly vulnerable to trafficking; Icelandic authorities confirm more than 50 Ukrainian citizens have applied for asylum in Iceland since the war began.

## INDIA: TIER 2

The Government of India does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore India remained on Tier 2. These efforts included identifying more trafficking victims, primarily victims of bonded and forced labor. States such as Maharashtra and Odisha provided funding to existing Anti-Human Trafficking Units (AHTUs), and Andhra Pradesh issued orders to establish additional AHTUs. Indian law enforcement collaborated with foreign government officials from Bangladesh, the Gulf states, and Nigeria on trafficking investigations. In response to the trafficking risks associated with the pandemic, the government provided support and guidance to state governments to combat trafficking, and states including Karnataka, Kerala, and Tamil Nadu held virtual trainings on human trafficking for officials. However, the government did not meet the minimum standards in several key areas. Although law enforcement investigated more bonded labor crimes, anti-trafficking efforts against bonded labor remained inadequate. Twenty-two of India's 36 states and union territories did not report identifying any bonded labor victims or filing a case under the Bonded Labor System (Abolition) Act. The government conducted fewer investigations and prosecutions and achieved fewer convictions. The acquittal rate for traffickers remained at 89 percent. The government did not report investigating, prosecuting, or convicting government officials for alleged involvement in trafficking crimes. Efforts to audit government-run or -funded shelters remained inadequate, and shortcomings in protection services for victims, especially children, remained unaddressed. The government detained some foreign trafficking victims in state-run shelters for extended periods due to lengthy or non-existent repatriation processes. Many victims waited years to receive central-government mandated compensation, and often state and district legal offices did not proactively request the compensation or assist victims in filing applications. The government did not update its national action plan (NAP) to combat trafficking in persons nor amend Section 370 of the Penal Code to remove the requirement of force, fraud, or coercion to prove a child sex trafficking crime.



INDIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase investigations, prosecutions, and convictions of all forms of trafficking, including bonded labor. • Investigate allegations of official complicity in human trafficking and sentence perpetrators to significant prison terms. • Significantly increase efforts to identify and refer trafficking victims, including disseminating standard operating procedures (SOPs) and training officials on their use. • Develop and implement regular monitoring and auditing mechanisms of government-run and -funded shelters to ensure adequate care, and promptly disburse funding to shelters that meet official standards for care. • Harmonize central and state government mandates for and implementation of protection programs and compensation programs for trafficking

victims, especially children, and ensure immediate access to care. • Train prosecutors and judges to increase the number of restitution orders for trafficking victims and urge legal aid offices to routinely inform trafficking victims of available compensation mechanisms. • Eliminate the condition of a trafficking conviction as a prerequisite for bonded labor victim compensation. • Cease penalization of trafficking victims. • Cease detention of adult trafficking victims in government-run and government-funded shelters. • Strengthen existing AHTUs through increased funding and trainings of staff and ensure newly created AHTUs are fully operational. • Establish fast-track courts to address human trafficking cases. • Implement and consistently enforce regulations and oversight of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable. • Amend the definition of trafficking in Section 370 of the Penal Code to include labor trafficking and ensure that force, fraud, or coercion are not required to prove a child sex trafficking crime. • Increase oversight of, and protections for, workers in the informal sector, including home-based workers. • Lift bans on female migration through agreements with destination countries that protect Indian workers from human trafficking. • Update and implement a NAP to combat trafficking. • Provide anti-trafficking training for diplomatic personnel.

### PROSECUTION

The government decreased anti-trafficking law enforcement efforts. Indian law criminalized sex trafficking and some forms of labor trafficking. Section 370 of the Indian Penal Code (IPC) criminalized trafficking offenses that involved exploitation that included any act of physical exploitation or any form of sexual exploitation, slavery or practices similar to slavery, and servitude. The law did not explicitly address labor trafficking. Section 370 prescribed penalties ranging from seven to 10 years' imprisonment and a fine for offenses involving an adult victim, and 10 years' to life imprisonment and a fine for those involving a child victim; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. Inconsistent with international law, Section 370 required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking. However, Sections 372 and 373 of the IPC criminalized the exploitation of children through prostitution without requiring a demonstration of such means, thereby addressing this gap. These sections prescribed penalties of up to 10 years' imprisonment and a fine, which were also sufficiently stringent and commensurate with those prescribed for other serious crimes, such as kidnapping. Bonded labor was specifically criminalized in the Scheduled Castes and Scheduled Tribes (Prevention of Atrocities) Act and the Bonded Labor System (Abolition) Act (BLSA), which prescribed penalties of up to five years' imprisonment and up to three years' imprisonment, respectively. The penalties prescribed under the BLSA were not sufficiently stringent. Police continued to file trafficking cases under the Juvenile Justice Act and other sections of the IPC, which criminalized many forms of forced labor; however, these provisions were unevenly enforced, and some of their prescribed penalties were not sufficiently stringent, allowing for only fines or short prison sentences. Additionally, the government prosecuted sex trafficking crimes under other laws like the Protection of Children from Sexual Offenses Act (POCSO) and the Immoral Traffic Prevention Act (ITPA), which criminalized various offenses relating to commercial sexual exploitation. The recruitment of children younger than age 18 by non-state armed groups was criminally prohibited by Section 83 (1) of the Juvenile Justice Act. The government continued to draft an anti-trafficking bill; the legislation was not presented to Parliament by the close of the reporting period. The government solicited input from civil society, legal experts, and trafficking survivors on the draft legislation. Government officials acknowledged the Prevention of Atrocities Act was useful for prosecution efforts, although alleged victims must belong to one of the affected communities to qualify under the legislation. Poor inter-state coordination between state government agencies impeded trafficking investigations and victims' ability to obtain services, including participation in civil and criminal cases in their home states.

INDIA

During the reporting period, the National Crime and Records Bureau (NCRB) issued its 2020 Crime in India Report. In 2020, the government reported investigation of 1,714 trafficking cases under the IPC, compared with 2,088 trafficking cases in 2019 and 1,830 trafficking cases reported in 2018. The government did not report what sections of the IPC were included in the data. In 2020, the government completed prosecution in 463 trafficking cases, convicted 101 traffickers in 49 cases, and acquitted 715 suspects in 414 cases. The acquittal rate for trafficking cases was 89 percent in 2020. These statistics were compared with the government completing prosecution in 600 cases, convicting 306 traffickers in 160 cases, and acquitting 1,329 suspects in 440 cases in 2019, with 73 percent of cases resulting in acquittal. The convictions included a Hyderabad judge sentencing two traffickers to 42 months' imprisonment for a 2016 case, and an Uttar Pradesh court sentencing 15 traffickers to 14 years' imprisonment and 26 traffickers to 10 years' imprisonment following a police operation in May 2016. Three of India's 36 states and territories reported a third of all trafficking cases, most likely due to more sophisticated reporting in those states and territories rather than larger trafficking problems. State and local officials continued to focus resources to contain the spread of COVID-19, which subsequently reduced some trafficking enforcement operations. The government ordered a nationwide lockdown due to the pandemic from March to May 2020; subsequently, regular court proceedings and law enforcement efforts were suspended. Courts resumed trials using video conferencing and online applications after some of the lockdown restrictions were removed in the summer of 2020. India's Supreme Court encouraged courts across the country to utilize online technologies to continue to hear trafficking cases virtually during the pandemic. Some district courts operated virtually until September 2021 and focused on urgent criminal matters or bail petitions. Bonded labor hearings did not resume until October 2021. Although sex trafficking cases proceeded virtually, officials did not record victim testimonies during the pandemic, resulting in challenges for prosecutors and further acquittals.

Overall law enforcement efforts across the country, especially against bonded labor, remained inadequate compared to the scale of the problem. The law required police to file a First Information Report (FIR) upon receipt of information about the commission of a cognizable offense, such as forced labor or sex trafficking, which legally bound police to initiate a criminal investigation. Police did not always arrest suspected traffickers, file FIRs to officially register a complaint, or file FIRs under trafficking crimes; officials often settled cases at the complaint stage. The National Investigation Agency (NIA) continued to investigate and file charges in cross-border trafficking cases, including those involving Bangladeshi and Sri Lankan nationals; civil society credited the NIA's actions as deterrents to potential traffickers. In recent years, Assam, Jharkhand, and West Bengal state authorities allegedly ordered police to register trafficking cases as kidnapping or missing persons to reduce the number of trafficking cases in official statistics. During the pandemic-related lockdown, district courts granted bail to some alleged traffickers without serving notification of bail hearings to prosecutors or victims, including child victims, in contravention of the POCSO Act. In addition, law enforcement agencies were regularly re-assigned to public health operations and unable to conduct routine operations and investigations of trafficking crimes. Karnataka and Tamil Nadu state officials reported efforts to sustain progress against bonded labor were hindered as government resources were diverted to address the pandemic and heightened economic pressures increased the risk of re-trafficking for survivors. In southern India, some vigilance committee inspections to identify bonded labor victims at the district level reportedly ceased during the pandemic, reducing the overall number of people freed from bonded labor. The National Human Rights Commission (NHRC) released two advisories on prevention, identification, and reintegration measures for bonded laborers and prosecution of traffickers. The bonded labor advisory, developed in consultation with civil society organizations, issued specific recommendations to district magistrates, including instructions to form teams for twice monthly inspections in certain industries, expeditiously complete bonded labor investigations within 24 hours of receiving a complaint, and provide immediate assistance of 20,000 Indian rupees (INR) ($269) to each identified bonded laborer. In response to increased use of social media platforms to lure victims during the pandemic, state and local law enforcement emphasized cybercrime

investigation training, and some police departments published manuals on cyber security to raise awareness.

The lack of sufficient political will across many states to address bonded labor stymied efforts nationwide. NGOs previously estimated police did not file FIRs in at least half of bonded labor cases nationally, especially in Bihar and Rajasthan. Some police allegedly did not file cases to shield traffickers or to avoid paying compensation to victims. In 2020, law enforcement reported 1,231 cases of bonded labor under the BLSA, an increase from 1,155 cases in 2019. In 2020, officials convicted 17 persons in 16 cases under the BLSA and acquitted 69 persons in 40 cases, an approximately 80 percent acquittal rate. These statistics represented a decrease, compared with 2019, when officials convicted 52 persons in 33 cases under the BLSA and acquitted 90 persons in 38 cases, an approximately 63 percent acquittal rate. Twenty-two of India's 36 states and union territories did not report identifying any bonded labor victims or filing any cases under the BLSA in 2020, compared with 21 states and territories in 2019, despite ongoing reports of bonded labor victims in many of those states. Similar to 2019, Uttar Pradesh accounted for more than 80 percent of all cases under the BLSA, but the evidence did not suggest it had a disproportionately large problem. Some district magistrates dissuaded bonded labor victims from pursuing cases against their traffickers and mediated cases in lieu of criminal prosecution. State government labor ministries enforced labor laws while state police agencies enforced criminal law; labor ministries and law enforcement agencies often coordinated on operations to free child laborers who may have been victims of trafficking.

AHTUs, legally established by state governments and partially funded by the ministry of home affairs (MHA), served as the primary investigative force for human trafficking crimes. In 2019, the government announced it would expand the number of AHTUs from 332 districts to all of India's 732 districts; in February 2022, the MHA stated that 696 AHTUs had been created across India as of 2020. The MHA allocated $13.3 million to state and union territories to support district-level AHTUs. Uttar Pradesh, India's most populous state, had AHTUs in all 75 districts. Maharashtra increased the number of anti-human trafficking cells (AHTCs)—similar to AHTUs—from 36 to 45 AHTCs. In January 2022, the Maharashtra government approved the disbursement of approximately 50 million INR ($672,560) provided by the central government to establish and strengthen AHTCs and appointed a special inspector general of police as the nodal officer to streamline intelligence gathering. The government of Odisha allocated $544,795 to procure computers and vehicles for the state's 37 integrated AHTUs, one in each of the 36 police districts and one in the headquarters of the state crime investigation department. In May 2021, the government of Andhra Pradesh also issued an order establishing 10 new AHTUs, staffed by inspectors and constables, with legal jurisdiction to register and investigate all trafficking cases, including bonded labor.

Although the government created new AHTUs, some officials expressed concern that state governments had not given AHTUs the authority to register human trafficking cases independently. State governments and civil society nationwide agreed the majority of active AHTUs were not sufficiently funded or trained, nor solely dedicated to trafficking. Additionally, AHTUs were frequently regarded as less favorable assignments for police officers and officials at times assigned positions within them to officers as a reprisal for poor performance. Some NGOs reported good working relationships and effective coordination with local AHTUs.

In August 2021, the government allocated an additional 1 billion INR ($13.45 million) to support state and union territory law enforcement agencies to establish and resource "women help desks" in local police stations across the country to address issues related to human trafficking. Although "women help desks" cannot initiate TIP investigations, police staffed the desks and, in coordination with lawyers, psychologists, and NGOs, facilitated legal aid, counseling, shelter, and other services for victims of crime, including human trafficking. Criminal Investigation Divisions (CID) within state-level police also investigated human trafficking cases. States were empowered to dedicate courts to hearing cases under the POCSO Act, including child sex trafficking; as of February 2022, the country had 712 POCSO courts. In some states, however, authorities reported the judges and prosecutors at POCSO courts had no training or expertise in POCSO crimes. Pandemic disruptions further exacerbated already significant case delays at POCSO courts, which in some states amounted to several years. Law enforcement prioritized

Haiti AR_000761

other crimes, such as murder and drug crimes, which increased the length of trials for trafficking cases and in some cases led to acquittals. State and local governments were responsible for training personnel, including law enforcement officials, on anti-trafficking laws and policies, and the governments of Andhra Pradesh, Assam, Odisha, Tamil Nadu, Telangana, and West Bengal reported conducting trainings for officials. In response to the pandemic, states including Karnataka, Kerala, and Tamil Nadu held virtual trainings on human trafficking and other issues. NGOs reported all police and judicial academies had human trafficking in their course curriculum. The MHA conducted trafficking-related trainings for police officers, investigators, and prosecutors during the reporting period. The central government sponsored online trainings for deputy superintendents of police focused on human trafficking and crimes against women and children. Indian law enforcement cooperated with foreign counterparts on several cases during the reporting period. Law enforcement and AHTU personnel in Uttar Pradesh worked with foreign officials to repatriate 12 Indian women exploited in Oman, Qatar, Kuwait, and Saudi Arabia. In May and June 2021, Karnataka state police arrested 12 Bangladeshi nationals following the sexual assault of a human trafficking victim on social media. In January 2022, Indian police collaborated with Nigerian officials to arrest an alleged trafficker in New Delhi and assist three Nigerian sex trafficking victims.

The government did not report any prosecutions or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity remained significant concerns, inhibiting law enforcement action during the year. According to media reports, two police officers allegedly exploited a child sex trafficking victim in Maharashtra. In previous reporting periods, police arrested a Chhattisgarh party official for involvement in a sex trafficking case, and police arrested a government engineer in Uttar Pradesh for sexually abusing more than 50 children and selling the images of the abuse online. The government did not report further action on any of these allegations of official complicity by the end of the reporting period. In November 2021, West Bengal police arrested 11 individuals and investigated a state civil servant in connection with a child trafficking ring allegedly operated from an NGO-run shelter home. A continued lack of investigations into suspected trafficking crimes and broader physical and sexual abuse of trafficking victims at some government-run and government-funded shelters, due to widespread negligence, created an atmosphere of impunity for shelter employees to engage in trafficking. Some state-owned tea estates in Assam continued to hold workers in bonded labor by creating recurring debt by underpaying wages and overcharging for daily living expenses. Some law enforcement officials reportedly received bribes from sex trafficking establishments and sexual services from victims in exchange for alerting traffickers of forthcoming enforcement operations. A lack of accountability for misconduct and corruption persisted at various levels of government, contributing to the perception of widespread impunity for trafficking crimes. Local law enforcement and public prosecutors sometimes accepted bribes to influence investigations and arrests in criminal cases, including in human trafficking. Caste discrimination by some police and administration officials impeded identification and investigation of cases. NGOs across multiple states reported politically connected individuals, including local and state politicians who held workers in bonded labor in agriculture and at brick kilns, successfully avoided prosecution. Civil society reported instances in which police refused to register FIRs against officials who were alleged perpetrators. Some land and business owners reportedly attempted to exert influence on elected officials and law enforcement in criminal matters. In addition, some officials reportedly alerted recruitment agents to labor inspections.

## PROTECTION
The government maintained overall victim identification and protection efforts. In 2020, the government reported identifying 6,622 trafficking victims and 694 potential trafficking victims compared with 5,145 trafficking victims and 2,505 potential victims identified in 2019. In 2020, authorities identified 5,156 victims in labor trafficking, including 2,837 in bonded labor, and 1,466 in sex trafficking; authorities did not report the type of trafficking for the 694 potential victims. Nearly 99 percent of trafficking victims identified were Indian; approximately 53 percent were adults, and 47 percent were children; and 59 percent were

female and 41 percent were male. Despite some estimates of eight million Indians in bonded labor, the Ministry of Labor and Employment's annual report stated that the government had identified and released 313,962 since 1976. Karnataka, Tamil Nadu, and Uttar Pradesh states accounted for the majority of bonded labor victims identified in 2020, with 1,291, 289, and 1,026 victims identified respectively, overall accounting for 92 percent of the country's total identification of bonded labor victims.

Although the MHA created standard procedures for trafficking victim identification in 2009, the government did not report how many states had adopted them. The government previously developed protocols for victims of sexual assault, including trafficking survivors, to prevent re-traumatization in their referral to care. Delhi, Karnataka, and Tamil Nadu had SOPs to address bonded labor cases and other forms of human trafficking. The government did not report whether any other states had bonded labor SOPs. Law enforcement and railway authorities worked with NGOs, child protection committees, and the private sector to identify potential victims of trafficking. The national Railway Protection Force and Bihar state police collaborated with an international organization and an NGO to identify and refer 178 abandoned children and child trafficking victims to care. In August 2021, Assam police and a border guard unit freed 22 people and arrested one person on trafficking charges in a Rangia railway station. The Railway Protection Force of the Northeast Frontier Railway intervened to free 83 potential trafficking victims and detained more than 24 potential traffickers between April 2021 and March 2022, according to media reports.

The government did not report how many trafficking victims it assisted or referred to care. In May 2021, the NHRC issued guidelines to the states and union territories advising authorities to increase protections for trafficking victims through use of recorded video testimony, virtual training for law enforcement, and virtual counseling services for victims. In addition, the government's Victims of Trafficking and Commercial Sexual Exploitation program provided legal services and economic opportunities for victims of trafficking and marginalized groups. The government had shelter and services for child and adult female trafficking victims, although the quality and availability varied. The government did not operate or fund shelters that could accommodate adult males. Police could refer all adult and child trafficking victims, except bonded labor victims, to state judiciaries and Child Welfare Committees (CWCs) to determine appropriate care. CWCs could refer minors to state welfare departments for care in shelter homes or return children to family members. CWCs generally returned child trafficking victims to their parents, some of whom had subjected their children to trafficking. When CWCs did refer child trafficking victims to care, it placed them in privately run shelters, government-run juvenile justice homes, or government-run women and children's homes, some of which allowed routine abuse in previous reporting periods. Some child protection committees noted childcare institutions experienced long delays waiting to receive government funding for the restoration and reintegration of human trafficking victims. While judges could reportedly refer bonded labor victims to care, there were no reports officials did so in practice. Judges could require all adult trafficking victims identified under the ITPA to stay in government- or NGO-run shelters for up to three weeks, and victims who were part of an ongoing legal case as a witness or victim could not leave shelters without a magistrate's order.

Government-run and -funded shelters remained insufficient, facing serious shortages of space, financial resources, and trained personnel. NGOs relied primarily on donor contributions, although some received government funds. The disbursal of government funding to NGOs was sometimes delayed for multiple years. In 2020, an amendment to the Foreign Contribution Regulation Act prevented the sub-granting of foreign contributions from the original Indian NGO recipient to other NGOs, preventing collaboration and coordination and severely affecting their activities, including anti-trafficking NGOs; this remained in effect by the end of the reporting period. The Ministry of Women and Child Development (MWCD) continued to provide state governments with funding for NGO- and government-run shelter and support through the *Ujjawala* program for female sex trafficking victims in 107 homes and the *Swadhar Greh* program for vulnerable women in approximately 361 homes. The central government allocated 250 million INR ($3.36 million) to the *Swadhar Greh* and *Ujjawala* programs in the 2020-2021 budget but did not include separate allocations for the 2021-2022

INDIA

budget. The MWCD ran One-Stop Centers (OSCs) for female victims of all crimes, including sex trafficking. There were 704 OSCs operating across India in 2021, compared with 700 in 2020. The MWCD did not report if the centers assisted any trafficking victims, and some NGOs previously reported the centers were ineffective and difficult to access.

Media, NGOs, and authorities continued to document a lack of oversight and negligence in government-run, government-funded, and privately run shelters that sometimes resulted in abuse and trafficking of residents. In several cases, such homes continued to operate despite significant gaps in mandatory reporting and allegations of abuse, at times due to alleged political connections. CWCs were designed to routinely monitor victim shelters and provide updates on victims' cases, although their efficacy varied across states. CWCs promoted interagency collaboration to prevent trafficking during the pandemic. *Ujjawala* and *Swadhar Greh* program homes also lacked oversight. Due to a reported loophole in the law, if the government did not act on a shelter's application in a prescribed timeframe, the organization was automatically licensed. Whenever a license application is accepted, the home must go through several inspections, but it was unclear whether authorities conducted these inspections in practice. Allegedly, some corrupt officials purposely missed the licensing deadline to allow inadequate but politically connected organizations to gain licensing. In the states that allowed audits of *Ujjawala* and *Swadhar Greh* homes, previous audits documented that some homes violated minimum hygiene and safety standards, did not provide psycho-social support or educational opportunities, and operated without proper registration. Moreover, in some instances the shelters functioned as hostels and charged non-victim residents for accommodation. Due to unsafe conditions and abuse by caretakers, authorities reported multiple cases in which residents, including children, ran away from these shelters during previous reporting periods. The MWCD did not report an update on its drafting of a child protection policy to prevent abuse in government-run and -funded shelter homes that the Supreme Court had ordered it to create in September 2018.

Four states had child-friendly courtrooms or procedures, including some that allowed victims to testify via video conference. In February 2022, the Indian Supreme Court directed the government to implement national video conferencing facilities for child witnesses, including trafficking victims, in response to victims traveling long distances to participate in court hearings. Victims are not required to cooperate with law enforcement to access protection services. In some cases, inadequate implementation of victim protection measures and legal assistance provisions, including witness protection, led victims to decline to participate in trials. Moreover, NGOs reported that judges closed many cases because the government did not provide adequate financial assistance to enable victims to participate in trials. While victims could obtain restitution from their traffickers in criminal cases, courts rarely awarded it. Judges could order compensation to trafficking victims through a variety of government programs, usually funded by the central government and administered at the state level, but rarely did so. NGO analysis of historical government crime data showed that among 38,503 trafficking victims identified between 2010 and 2018, judges only proactively awarded compensation to 102 (less than 1 percent) although there have been some minor improvements in compensation in more recent years. In addition, state and district legal offices did not regularly inform trafficking victims that they were eligible to receive compensation; when victims did pursue this benefit, payments were often delayed due to lack of state funds. The pandemic hindered the operations of district administrators and labor departments, resulting in delays releasing documents required for survivor compensation. In January 2022, the Bihar state government reportedly paid 300,000 to 900,000 INR (approximately $4,000 to 12,100) per victim as compensation to the 49 victims of sexual abuse and child trafficking in a Muzaffarpur shelter home.

The central government reported it had adequate funding to provide initial compensation to all identified bonded laborers, and the 2016 scheme required each state to have a permanent fund with at least 1 million INR ($13,450) at all times for district magistrates to use exclusively for bonded labor victims. However, many states did not have an established fund, which delayed compensation to victims. The central government funds a program through which district officials identified bonded labor victims and issued release certificates that provided access to non-monetary

assistance and, upon conviction of their trafficker, to compensation. In 2016, the government amended the program to include female sex trafficking and child forced labor victims as recipients and mandated local district authorities to provide immediate monetary assistance—up to 20,000 INR ($269)—to a victim within 24 hours of identification, regardless of the status of the related court case. The release of the overall compensation amounts (between 100,000 and 300,000 INR ($1,350-$4,040) based on the victim's demographics) remained contingent upon conviction of the trafficker or conclusion of magisterial processes, which could take several years. The government did not adequately implement any stage of this program, and when states did implement the program, it was often due to sustained NGO advocacy. Some states, as allowed in the central government's 2016 bonded labor scheme, controlled how victims could use their compensation. The Kolkata High Court ruled against West Bengal's policy of limiting victims to small, monthly withdrawals over 10 years. The Ministry of Labor and Employment distributed 10 million INR (approximately $134,500) among seven states for services for freed bonded laborers from April 2020 to March 31, 2021. State revenue officers had the responsibility for identifying bonded labor victims, yet NGOs identified most cases. The government did not report how many release certificates it provided during the reporting period, compared with approximately 2,300 provided between March 2018 and March 2019. The issuance of mandatory release certificates varied greatly between states, but in many states, officials did not issue release certificates without significant advocacy from NGOs, which could take years. Observers reported that compensation schemes were too slow in providing victims with funding—survivors waited years to testify in court to determine how much they would be awarded, and state authorities at times delayed payment due to limited funds. During the pandemic, these delays were exacerbated. State authorities rarely classified children as victims of bonded labor due to what appeared to be inconsistent testimony and a lack of identity documents or proof of enslavement, denying government compensation to child victims. In Tamil Nadu, by contrast, some NGOs reported success collaborating with the government and securing release certificates. Authorities continued to misidentify bonded labor or treat it as labor exploitation, child labor, or minimum wage violations, and officials did not provide victims the mandatory immediate assistance of 20,000 INR ($269) upon identification. The NHRC ordered law enforcement and district officials to provide release certificates to bonded labor victims. The NHRC was often effective in securing release certificates when NGOs or bonded labor victims requested its assistance, although it sometimes required persistent engagement from NGOs to complete necessary action. The NHRC could issue orders to state and local officials to provide release certificates to individuals, but there was no penalty for noncompliance. Due to a lack of proactive victim identification, the widespread tendency to handle bonded labor cases administratively in lieu of criminal prosecution, and stalled bonded labor prosecutions, victims infrequently received full compensation. While the 2016 scheme also required states to provide non-cash benefits, including employable skills training, provision of such services remained limited or nonexistent.

Foreign victims had the same access to shelter and services as Indian nationals. Government policy on foreign victims dictated returning survivors to their country of origin at the earliest possible time. Authorities detained foreign sex trafficking victims in shelters until deportation, and both repatriation of foreign victims seeking to return home and deportation of victims could take years due to bureaucratic constraints. Some officials refused to repatriate victims until they had provided testimony in prosecutions against their traffickers. The government continued to finalize a 2015 memorandum of understanding (MOU) with the Government of Bangladesh on identification and repatriation of Bangladeshi trafficking victims. The lengthy and complex repatriation process forced some Bangladeshi victims to languish in Indian shelters for years before repatriation. The government provided some funding to NGOs to repatriate child trafficking victims but did not offer financial assistance for the repatriation of adults. Indian embassies abroad provided assistance to Indian citizens identified as trafficking victims. The MHA facilitated repatriation of Indian women located in the Middle East, including trafficking victims, through the Indian Community Welfare Fund. Six Indian embassies abroad, primarily in the Gulf, had shelters that could temporarily house female migrant workers with indicators of forced labor. However, suspected trafficking victims previously reported

Haiti AR_000763

some shelters did not provide adequate food, basic amenities, or allow the victims to contact family.

Government officials and NGOs often worked together to screen victims of trafficking, and SOPs mandated that NGOs or social service officials accompany police during operations. State-level human rights commissions and the NHRC provided templates to guide law enforcement efforts in a fair and non-discriminatory manner. However, due to insufficient use of identification procedures, authorities may have detained, arrested, and deported some unidentified trafficking victims. State and local police conducted screenings for trafficking and penalization of trafficking victims was not systematic, but most often occurred against sex trafficking victims for immigration violations and prostitution offenses. The government required Indians who received a visa from a foreign government indicating the person was a trafficking victim in the foreign country, or was a family member of a victim, to provide documentation of the trafficking experience in order to renew their passports or travel. In 2016, the government began to include a stamp in the passports of some recipients of the foreign government's visas, for both trafficking victims and their eligible family members, identifying them as trafficking victims involved in a particular investigation or civil or criminal case. While the stamp requested authorities to permit the visa holder to travel without hindrance, some NGOs familiar with this practice noted it made some victims fearful of reprisal and penalization and served as a deterrent to victims interacting with authorities.

## PREVENTION

The government increased efforts to prevent human trafficking. The MHA and MWCD continued to lead government anti-trafficking efforts; the MHA directed the national response to public safety issues while the MWCD managed prevention and reintegration aspects. In May 2021, the MHA issued an advisory instructing all states and union territories to provide support and assistance to groups considered vulnerable to human trafficking—including women, children, older persons, and members of marginalized groups—in response to the pandemic. The advisory highlighted the 1.07 billion INR ($14.39 million) released to states and union territories to set up or strengthen "women help desks" in local police stations. The advisory also recommended utilizing the Crime Multi Agency Center, a national-level communication platform, to share information on missing persons and trafficking cases. The government maintained an inter-ministerial committee, chaired by the MWCD, to meet to discuss trafficking-related issues. While the government reported it continued to rely on a 2012 NAP to combat sex trafficking of women and children, it did not report its implementation efforts or convening any meetings to coordinate action. Since 2016, the central government has offered reimbursement of 450,000 INR ($6,050) to any district that conducted a census of bonded labor, available once every three years, and additional funding for evaluation studies. The Tamil Nadu Labor and Employment Department accepted funding in 2019 and began development of a bonded labor database to identify the number of bonded laborers and the industries in which they are exploited in 11 districts; NGOs contributed data, which the state government committed to use data contributed by civil society organizations to conduct operations against trafficking. Government agencies regularly issued advisories and SOPs designed to combat trafficking, including in response to pandemic conditions, as well as awareness campaigns to prevent trafficking.

Anti-trafficking preventative measures varied widely by state. Some state governments conducted anti-trafficking awareness campaigns, although NGOs reported local officials, migrant workers, and agricultural workers often still lacked awareness of human trafficking and their legal rights. In April 2021, the government of Andhra Pradesh distributed handbooks on human trafficking and training manuals to state government officials, members of the judiciary, civil society, and other stakeholders in Andhra Pradesh, Odisha, and Telangana. State legal services in Bihar and Delhi collaborated with an NGO to develop public awareness programs on human trafficking. AHTUs collaborated with civil society to commemorate "Children's Day" with a child trafficking awareness campaign along the India-Nepal border. In addition, officials in Himachal Pradesh conducted awareness campaigns on trafficking of women and children in multiple districts while Telangana police operated an informational website on

human trafficking. The Ministry of Labor and Employment civil service training institute conducted trainings for AHTUs, labor administrators, child welfare committee members, and other officials on topics such as bonded labor and child labor. Government officials noted child trafficking and child labor increased during the pandemic. The Minister of State for Labor and Employment reported that the government removed 58,289 children from child labor situations in 2020-2021, an increase from approximately 54,894 children in 2019-2020. Several state governments maintained suspensions or modifications to labor laws to boost economic activity after the initial pandemic-related lockdown. The changes included higher limits of maximum work hours for certain industries, reduced social security payments, suspension of industrial dispute resolutions, and the suspension of the right to strike. Trade unions and labor advocates have criticized the changes, noting the potential negative effect on vulnerable groups. State governments emphasized the economic recovery measures did not circumvent bonded labor, POSCO, or any other anti-trafficking law. The MWCD continued to support some broad national child protection mechanisms, including a hotline for children, and protocols to identify missing children and remove them from exploitative situations. In addition, the state of Tamil Nadu established a toll-free hotline for cases related to trafficking, migrant labor, and bonded labor, while the state of Bihar operated a helpline to support female trafficking victims.

The government registered foreign recruitment agencies and Indian migrant workers through the eMigrate system. The government required migrant workers going to 16 specific countries to receive emigration clearance before departure; it did not allow emigration to Iraq. The government maintained its ban on females younger than age 30 and older than 50 from working in 17 countries, mostly Gulf states. Observers reported any ban on migration increased the likelihood of unauthorized migration and heightened vulnerability to traffickers. The Ministry of External Affairs' (MEA) Division of Overseas Indian Affairs oversaw registered recruiting agents and operated five national centers and a 24/7 helpline to provide counseling and other resources to those considering migrant work. MEA's Indian Community Welfare Fund, accessible to all Indian missions abroad and funded primarily via overseas consular fees, offered shelter, legal assistance, and repatriation for vulnerable migrant workers and operated hotlines for migrant workers overseas. The MEA has not reported on the level of utilization of this fund in several years. The government permitted licensed foreign employment recruiters to charge migrant workers up to 30,000 INR ($404) for recruitment fees and costs. However, observers stated employers frequently charged migrant workers more than the maximum. Unregistered sub-agents often operated online and operated widely without oversight. Every month, the Ministry of Overseas Indian Affairs released a list of unregistered agents reported to the ministry from the Overseas Indian Help Desk and sent the list to state governments for investigation and prosecution. According to the latest 2019 data, the central government referred 769 cases against unregistered agents to respective states. The MEA conducted awareness campaigns encouraging prospective migrants to use the services of registered recruiting agents. The MEA also offered pre-departure orientations for migrants, including material on trafficking risks, labor laws and regulations in destination countries, and government protection programs. Indian diplomatic missions and posts reportedly conducted some inspections of work sites with Indian migrant workers. In May 2021, the Governments of India and the United Kingdom signed an MOU on migration with provisions to prevent trafficking in persons. In June 2021, the Governments of India and Kuwait signed an MOU concerning the recruitment and protection of domestic workers.

In June 2019, the labor ministry drafted a national domestic worker policy to regulate placement agencies and allow domestic workers to formally register for worker benefits, including the right to minimum wage and access to the justice system; however, the document remained in draft form for the third consecutive year by the end of the reporting period. State government labor inspectors planned and conducted labor inspections, including child labor inspections. Civil society organizations reported the state governments of Rajasthan, Tamil Nadu, and Telangana conducted proactive inspections. Some states had action plans to combat bonded labor, although the government did not report if they successfully implemented the plans. The government did not report efforts to reduce the demand for commercial sex. Despite India being

**INDIA**

a destination for child sex tourism, the government did not report measures specifically to reduce demand for child sex tourism. Indian nationals could be charged for child sex tourism committed outside of India, although the government did not report any prosecutions. The government did not provide information about training provided to its diplomatic personnel. The government operated a center to conduct pre-deployment training for peacekeepers on topics including human trafficking, sexual exploitation and abuse, and child protection.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in India and traffickers exploit victims from India abroad. Internal forced labor constitutes India's largest trafficking problem; traffickers use debt-based coercion (bonded labor) to compel men, women, and children to work in agriculture, brick kilns, rice mills, embroidery and textile factories, and stone quarries. Traffickers promise large advances to manipulate workers into accepting low-paying jobs, where traffickers then add exorbitant interest rates; create new deductions for items such as lodging, health care, or wage slips; or fabricate the amount of debt, which they use to coerce workers into continuing to work for little or no pay. One study estimated the presence of at least eight million trafficking victims in India, the majority of whom are bonded laborers. Intergenerational bonded labor continued, whereby traffickers transfer the outstanding debts of deceased workers to their parents, siblings, or children. Traffickers often target those from the most disadvantaged social strata. The scheduled castes and scheduled tribes as well as the children of migrant laborers are particularly vulnerable to trafficking and bonded labor.

The increase in economic insecurity and unemployment due to the pandemic placed substantial burdens on economically vulnerable communities in meeting daily food and shelter requirements, thereby increasing their vulnerability to trafficking. The absence of work opportunities in rural areas forced some laborers to work for less than 50 percent of the minimum wage. Women and children reportedly experienced re-trafficking in some jurisdictions with increased frequency due to economic hardship. Traffickers offered cash advances to attract workers who were unemployed, thus increasing the likelihood of debt bondage among economically vulnerable groups. Civil society reported that the children of economically distressed families faced increased risk of labor or sex trafficking largely due to pandemic-related loss of parental employment and school closures. Economic hardship also resulted in more child marriages; Telangana reported a 27 percent increase in cases from April 2020 to March 2021 compared to the previous year.

Traffickers force entire families into work in brick kilns, including children younger than 6 years old. In a 2017 study of brick kiln workers in Rajasthan state, researchers found more than 40 percent of seasonal workers from Uttar Pradesh, Chhattisgarh, Bihar, and Rajasthan states owed manipulated debts to kiln owners that were greater than the amount workers earned over the entire season. In some states, the exploitative contractors that trap workers in bonded labor are local government officials or politically influential. Some traffickers severely abused bonded laborers, including those who asked for their rightful wages, and some bonded laborers died under traffickers' control. Traffickers exploit adults and children, including entire families, into bonded labor in carpet production and textiles in Jharkhand and Uttar Pradesh states, sometimes requiring adults to leave children behind as collateral when they leave the premises for any reason. Children become trapped in debt bondage while working alongside their families in agriculture, cotton farms, home-based embroidery businesses, mica mining, and roadside restaurants. Child bonded laborers also work in the brick kilns of Punjab, Uttar Pradesh, and elsewhere. State officials observed that human trafficking increased significantly in Assam due to heightened economic vulnerability, and cases of missing children in the tea garden areas nearly doubled. A study found that 37 percent of workers across 50 tea estates in Assam had daily expenditures that exceeded their daily income, making workers extremely vulnerable to debt-based coercion. In some cases, the "Provident Funds" or *Sumangali* scheme in which employers pay young women a lump sum for education or a dowry at the end of multi-year labor contracts, often in Tamil Nadu's spinning mill industry, may amount to bonded labor, and some employers subject these women to sex trafficking. Traffickers exploit children as young

as eight in forced labor in agriculture (coconut, eucalyptus, ginger, and sugarcane); construction; domestic service; garment, steel, and textile industries (tanneries, bangle, and sari factories); begging; criminality; food-processing factories (biscuits, bread-making, meat-packing, and pickling); floriculture; cotton; ship breaking; and manufacturing (wire and glass). Multiple organizations note physical violence against trafficking victims—in both forced labor and sex trafficking—is particularly prevalent in South Asia, including India. Some traffickers force women and girls to conceive and deliver babies for sale.

Non-state armed groups continued to recruit and use children as young as 14 years old in direct hostilities against the government in Jammu and Kashmir. Maoist groups, particularly in Chhattisgarh and Jharkhand, forcibly recruited children as young as 12 to cook, carry materials, collect information on security forces, handle weapons and improvised explosive devices, and in some cases serve as human shields. Several women and girls formerly associated with Maoist groups reported that sexual violence, including practices indicative of sexual slavery, was a practice in some Maoist camps. Non-state Naxalite groups continued to systematically recruit and use child soldiers. An international organization reported allegations that Indian security forces unlawfully used three children for unknown purposes for less than 24 hours in 2020.

Traffickers exploit millions of people in commercial sex within India. The pandemic reportedly disrupted sex trafficking associated with massage parlors and the tourism industry, resulting in more online recruitment with traffickers using social media platforms to lure victims, including children. Media reported that the pandemic and its subsequent economic insecurity led some individuals in commercial sex, including sex trafficking victims, to turn to brothel owners, and others for loans, increasing their risk of debt bondage. A study by one organization reported more than 95 percent of those in commercial sex in India were willing to leave commercial sex but felt unable to do so due to debt bondage. NGOs observed that some trafficking survivors returned to the red light district in Maharashtra due to economic necessity, and there was an increase in sex trafficking. Police officials observed a corresponding rise in cases of sex trafficking in Maharashtra. NGOs reported that internal trafficking victims in western India came from almost every state. In addition to traditional red light districts, dance bars, spas, and massage parlors, traffickers increasingly exploit women and children in sex trafficking in small hotels, vehicles, huts, and private residences. Officials acknowledged some registered and unregistered spas exploited females in sex trafficking and officials lacked sufficient oversight of all such establishments. Law enforcement sometimes shut down unregistered spas and initiated criminal investigations, while in other cases, law enforcement shut down spas without further action. Civil society organizations report female victims as young as 14 years old, mostly from the scheduled castes and tribes, are transported from Chhattisgarh and Jharkhand to other states for sex trafficking. Scheduled caste females were sometimes exploited through the traditional *Jogini* system, in which Dalit women and girls are ceremoniously "married" to a local temple deity but in practice are used as sex slaves for higher caste villagers. Traffickers exploit women and children in sex trafficking in religious pilgrimage centers and in tourist destinations. Traffickers target Indian women and girls, but also fraudulently recruit significant numbers of Nepali and Bangladeshi women and girls to India for sex trafficking. Additionally, traffickers exploit women and girls from Central Asian, European, and African countries in commercial sex, especially in Goa state. A study of sex trafficking victims in Goa found a significant number traveled from Central Asia to New Delhi prior to exploitation in Goa's casinos, massage parlors, private apartments, and clubs. Traffickers posing as entertainment industry agents in Mumbai reportedly lured Eastern European and Colombian women with false promises of acting or modeling careers. Media outlets report the recruitment of women and children for commercial sex increasingly took place through social media platforms, including mobile dating applications and websites. Traffickers use encrypted digital communication applications to conduct transactions, enabling them to evade law enforcement. In addition, traffickers increasingly utilize digital payment applications in place of cash to evade suspicion. Traffickers exploit Rohingya and Sri Lankan Tamil refugee populations in sex and labor trafficking. India is a source for child sex tourists and a destination for child sex tourism.

INDONESIA

Traffickers kidnap and force Indian and Nepali women and girls to work as "orchestra dancers" in India, especially in Bihar state, where girls perform with dance groups until they have repaid fabricated debts. Some traffickers kidnap children from public places, including railway stations, entice girls with drugs, and force girls as young as 5 years old to take hormone injections to appear older in sex trafficking. Some law enforcement officers allegedly protect suspected traffickers and brothel owners from law enforcement efforts and take bribes from sex trafficking establishments and sexual services from victims. According to one report, police have accepted bribes to release child sex trafficking victims back into traffickers' custody. Traffickers arrange sham marriages within India and Gulf states to subject females to sex trafficking. There have been isolated reports of physical and sexual abuse in some government-, NGO-, and privately run shelter homes, including of trafficking victims, and compelling shelter residents into forced labor and sex trafficking in previous reporting periods. The National Commission for Protection of Child Rights reported that 88 percent of the 7,163 childcare institutions in India are managed by non-governmental entities. The report noted 40 percent of all shelters did not have adequate measures in place to prevent physical or sexual abuse of children. In addition, staff members were not properly trained to recognize the signs of abuse or raise alarm to proper authorities.

Internal migration from poorer to wealthier states involved millions of people in seasonal or temporary employment as unskilled day laborers, domestic servants, and brick kiln workers. Bihar, Chhattisgarh, Jharkhand, Odisha, and Uttar Pradesh were major source states for economically vulnerable workers potentially exposed to labor trafficking. Traffickers force many Indian migrants who willingly seek employment abroad into construction, domestic work, factories, and other low-skilled sectors in many regions, especially Gulf countries and Malaysia, often following recruitment fraud and exorbitant recruitment fees. Indian female domestic workers in Gulf countries, particularly Kuwait and Saudi Arabia, consistently report strong indicators of forced labor, including non-payment of wages, refusal to allow workers to leave upon completion of their contracts, and physical abuse. In the United Arab Emirates, labor traffickers bring Indian workers overseas on tourist visas, withhold their identity documents and wages, and force them to work, especially in construction. Authorities have identified Indian forced labor victims in Armenia, Portugal, Gabon, and Zambia, and Indian female sex trafficking victims in Kenya. Traffickers subject some boys from Assam, Bihar, and Uttar Pradesh states to forced labor in Nepal.

## INDONESIA: TIER 2 WATCH LIST

The Government of Indonesia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included supporting the repatriation of Indonesian migrant workers, some of whom were exploited in trafficking abroad, referring some trafficking victims to social services, implementing the 2017 Protection of Indonesian Migrant Workers law, concluding a memorandum of understanding (MOU) with Malaysia on worker protections, and increasing funding for victim and witness protection services. However, the government did not demonstrate overall increasing efforts compared to the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Investigations of trafficking crimes decreased for the fifth consecutive year, and convictions decreased for the fourth consecutive year. Official complicity in trafficking crimes remained a concern, which the government did not take steps to address. The lack of robust, systematized victim identification procedures continued to hinder the proactive identification of victims overall, particularly male victims, while the government's protection services remained inadequate as they did not specifically address the needs of trafficking victims. Despite taking some action in individual cases of forced labor in fishing and Indonesian migrant workers abroad, the government did not fully prioritize the staffing or funding for effective oversight of these sectors with long-standing, pervasive trafficking problems. Coordination between the national anti-trafficking task force and its provincial and local-level

counterparts was insufficient to translate central government policies into nationwide implementation. The 2007 anti-trafficking law was inconsistent with international law by requiring a demonstration of force, fraud, or coercion to constitute a child sex trafficking crime. Therefore Indonesia was downgraded to Tier 2 Watch List.



### PRIORITIZED RECOMMENDATIONS:

Increase efforts to vigorously investigate, prosecute, and convict traffickers under the 2007 law, including complicit officials who ignore, facilitate, or engage in trafficking crimes. • Amend the 2007 law to remove the required demonstration of force, fraud, or coercion to constitute child sex trafficking. • Develop, finalize, disseminate, and train all relevant officials, including law enforcement, foreign affairs, marine, and labor ministry staff, on comprehensive standard operating procedures (SOPs) for proactive victim identification. • Enforce implementing regulations of the 2017 law on migrant worker protection. • Increase resources for and proactively offer all victims, including male victims, comprehensive services using a victim-centered and trauma-informed approach. • Allow victims in government shelters freedom of movement. • Increase efforts to effectively monitor labor recruitment agencies, including in the fishing sector, and take action against entities guilty of illegal conduct that contributes to the forced labor of migrant workers, including charging placement fees, deceptive recruitment practices, contract switching, and document forgery. • Institutionalize and regularly provide anti-trafficking training for judges, prosecutors, police, and social workers. • Develop and implement mandatory pre-departure and post-arrival orientation and training for Indonesian and migrant fishermen, respectively, in order to provide information on labor rights and safety at sea, and ensure employers cover the orientation and training costs. • Increase resources for the anti-trafficking task force and improve its coordination across ministries. • Finalize and implement a national action plan to combat trafficking. • Establish a data collection system to track anti-trafficking efforts at all levels of law enforcement. • Increase awareness of trafficking trends and vulnerabilities among local village leaders. • Create a national protocol that clarifies roles for prosecuting trafficking cases outside victims' home provinces.

### PROSECUTION

The government decreased law enforcement efforts. The 2007 anti-trafficking law criminalized all forms of labor trafficking and some forms of sex trafficking and prescribed penalties of three to 15 years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with international law, the 2007 law required a demonstration of force, fraud, or coercion to constitute a child sex trafficking crime and therefore did not criminalize all forms of child sex trafficking. However, judicial officials at the national and provincial level continued to assert the law implicitly established that force, fraud, or coercion were not required to constitute child sex trafficking, and that this therefore was not a barrier in successfully prosecuting and obtaining convictions in child sex trafficking cases. Nevertheless, observers continued to note that low awareness of trafficking crimes and relevant legislation among local law enforcement and judicial authorities impeded case detection and prosecutorial progress.

Ineffective coordination among various agencies throughout the country hindered the government's ability to investigate, prosecute, and convict traffickers and collect comprehensive data on such efforts, especially when cases involved multiple jurisdictions. As in previous years, the attorney general's office (AGO) and the Indonesian National Police (INP) Criminal Investigative Division (CID) in Jakarta—responsible for investigating criminal cases that crossed multiple local jurisdictions—

did not have a mechanism or central database to track trafficking investigations, prosecutions, convictions, and sentencing data at all levels of government; therefore, as in previous years, law enforcement data was incomplete. The INP CID reported it investigated a total of 24 trafficking cases—eight for sex trafficking and sixteen for labor trafficking involving migrant workers—under the anti-trafficking law in 2021; this demonstrated a decrease from 38 investigations it initiated in the previous reporting period. The government prosecuted 167 alleged trafficking cases under the anti-trafficking law and convicted 178 traffickers in 2021, representing a decrease from 259 traffickers convicted in 2020. One of those cases involved the forced labor of 12 Indonesian fishermen aboard a People's Republic of China (PRC)-flagged fishing vessel; the government convicted five traffickers and sentenced them each to three and a half years in prison under the anti-trafficking law in April 2021.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes; however, corruption and official complicity in trafficking crimes remained a concern, inhibiting law enforcement action during the year. The INP reported it investigated an ongoing case from 2019 involving an Indonesian labor official in Singapore who allegedly accepted bribes from migrant worker insurance companies to illegally authorize the companies to hire Indonesian migrant workers. Although the Ministry of Manpower (MOM) removed the official from his position in Singapore, he continued to work for the MOM at the end of the reporting period, and the INP did not refer the case for criminal prosecution. Civil society alleged some law enforcement officials and politicians organized raids on entertainment venues to extort financial kickbacks from adults in commercial sex, which may have included sex trafficking victims. Corrupt officials reportedly continued to facilitate the issuance of false documents, accept bribes to allow brokers to transport undocumented migrants across borders, protect venues where sex trafficking occurred, engage in witness intimidation, and intentionally practice weak oversight to insulate recruitment agencies from liability.

The government, through the AGO, Indonesian Migrant Worker Protection Agency (BP2MI), and some local government officials in North Sumatra, provided anti-trafficking training to officials in 2021 but these trainings did not cover all judicial, law enforcement, and other relevant authorities. The INP CID received 298 million Indonesian Rupiah (IDR) ($20,990) for national anti-trafficking investigations in 2021.

## PROTECTION

The government maintained inadequate protection efforts. The government did not fully collect comprehensive data on the number of victims it identified. Several government agencies continued to utilize comprehensive or systematized SOPs for proactive victim identification or referral to protection services. Some observers expressed concern that the lack of SOPs and the government's anti-trafficking infrastructure, which was under the purview of local-level police units and protection agencies who focused primarily on women and children, hindered the identification of victims overall and of rural and male victims specifically. In October 2021, the government enacted regulation No. 8/2021 on SOPs of Integrated Services for Witnesses and/or Victims of Trafficking, but it did not fully implement this regulation during the reporting period. The government did not report specific instances in which authorities arrested, detained, fined, or otherwise punished trafficking victims for crimes traffickers compelled them to commit. However, due to lack of formal identification procedures, authorities may have arrested or deported some unidentified trafficking victims, particularly among vulnerable groups.

Disparate government entities sometimes reported their own statistics, making aggregate data incomparable to data reported in previous years and possibly double-counting victims as they came into contact with different government agencies. The Witness and Victim Protection Agency (LPSK) received 252 referrals of trafficking victims from government ministries and agencies and NGOs in 2021 and provided shelter and security protection services to these victims. MOSA also received 1,082 victim referrals from government ministries, NGOs, and international organizations; of these referrals, MOSA referred 555 of them to government social centers and the rest to NGOs for assistance. The victim referrals reported by LPSK and MOSA likely reflected double-counting of some victims.

For a second year in a row, the National Commission for Indonesian Child Protection did not report identifying any child trafficking cases in 2021. However, NGOs and past government reports indicated child sex trafficking likely continued and previously estimated the number of victims to be many thousands. In August 2021, the government issued regulation No. 78/2021 on Special Protection for Children—an implementing regulation of the Child Protection Law No. 35/2014—to protect and provide services to several categories of children whose safety and lives are under threat, including child trafficking victims. The government did not report how many child trafficking victims received protection services through this regulation. The government did not report the number of foreign trafficking victims it identified or assisted in 2021, if any.

The MFA continued to identify Indonesian trafficking victims exploited abroad, and it maintained an online portal and mobile application available through its embassies for individuals to report exploitation and access services. Some Indonesian consular authorities overseas had labor attaches that could identify and refer Indonesian trafficking victims to care, including embassy-run shelters. In 2021, the MFA provided protective services to and managed 391 cases of Indonesian trafficking victims exploited abroad, and it received 256 trafficking complaints through its online portal. In comparison, the MFA received 383 cases of migrant worker complaints in 2020, some of whom may have been trafficking victims. The government did not report the number of trafficking victims it identified or assisted among Indonesian fishermen exploited on foreign-flagged fishing vessels in 2021. In comparison to the previous reporting period, in 2020 the government repatriated 589 Indonesian fishermen who complained about working conditions from 98 PRC-flagged fishing vessels. The MFA funded or facilitated the repatriation of 75,591 overseas Indonesian workers in 2021, which included trafficking victims. The government did not report how much funding it allocated to the MFA for repatriation, maintenance of Indonesian shelters abroad, provision of legal aid, and training for its officials in 2021; in 2020, it allocated 43 billion IDR ($3.03 million) to the services.

The government continued to operate several shelters and service centers for victims of crimes, including trafficking, but the government did not report how many trafficking victims received assistance at any of these facilities in 2021. The government coordinated assistance for victims of abuse, including trafficking victims, through local integrated service centers—semi-governmental institutions—for women and children (P2TP2A), which were located in all 34 provinces and approximately 436 districts. Services at these centers included medical care, legal aid, and reintegration; however, in practice, services varied based on local leadership and funding. LPSK continued to operate six shelters for victims and witnesses to crimes who faced threats or intimidation—including trafficking victims—but residents of these shelters did not have full freedom of movement once placed in a shelter and could not seek employment for security reasons. MOSA also operated 41 shelters—funded by the national budget—that were available for victims of crimes, including human trafficking. MOSA allocated $5 million to three of its shelters in 2021, which was a substantial increase from the $156,830 it allocated to its shelters in 2020. According to MOSA's SOPs on victim services, shelters could only receive and release victims with approval of another government agency. Police required victims to stay in government shelters until the completion of relevant investigations, but victims were only able to stay in the shelters for an average of two weeks due to government budget constraints and reduced capacity. In some cases, once the government released a victim from care, authorities did not track the victim, including for purposes of gathering testimony for traffickers' prosecution; instead, authorities relied on an international organization to remain in contact with victims and provide follow-up assistance, if necessary. A general lack of adequate protection and reintegrative care, coupled with low awareness among village and local leaders, increased many victims' risk of re-trafficking, particularly among fishermen returning to their communities after experiencing forced labor at sea. The government did not provide legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution. In 2021, the government provided healthcare, food, and temporary shelter—with support by an international organization—to Rohingya refugees, a population highly vulnerable to trafficking.

The INP estimated that 81 trafficking victims participated in trafficking investigations or prosecutions in 2021. Although a 2017 supreme court regulation stipulated that judges could allow female victims of crimes to provide video testimony during legal processes, the government did not report if it offered such protection to female trafficking victims in 2021. LPSK sought $283,073 in restitution for 177 trafficking victims and witnesses in 2021, a slight decrease from restitution sought in 2020, but it did not report how much—if any—was ultimately paid to victims. The government increased LPSK's budget to $5,563,380 in 2021 from $4,011,673 in 2020.

## PREVENTION

The government maintained efforts to prevent trafficking. The government had a national anti-trafficking task force, coordinated by the ministry of women empowerment and child protection (MOWECP) and chaired by the ministry of human development and culture, that led anti-trafficking efforts across 21 ministries. In April 2021, the government enacted Presidential Decree No. 22/2021, which expanded the national task force's membership, streamlined coordination between members, and outlined its budgetary process. The national task force met once in 2021 and continued to develop, but did not finalize, a draft 2020-2024 national anti-trafficking action plan, reportedly due to pandemic-related restrictions that limited in-person meetings and other government activities. The national task force maintained 32 provincial-level task forces, one in every province except Papua and West Papua, and 242 municipal and district-level task forces. These task forces continued to suffer from insufficient funding, lack of coordination within and between the local task forces and the national task force, and lack of understanding of trafficking among members. The national task force, in coordination with an international organization, provided anti-trafficking training to 292 officials from more than 50 national and provincial governments and NGOs in August 2021. The government did not report its budget allocation to MOWECP's trafficking office, unlike in the previous reporting period.

The government continued to implement the 2017 Protection of Indonesian Migrant Workers law, which mandated that provincial governments—instead of private companies—oversee the provision of pre-departure vocational training and the placement of workers. In 2021, the government began enforcing a 2020 regulation of the migrant workers law that defined and exempted Indonesian migrant workers from placement fees. Some observers reported the government was not fully effective in protecting migrant workers from expenditures higher than the government-set recruitment fee, and many migrant workers still remitted their first year of wages to their recruiters or employers to repay the initial costs of recruitment and placement, which traffickers used to coerce and retain victims' labor. In addition, a 2020 implementing regulation of the migrant workers law required married male and female migrant workers to obtain permission from their spouse to work abroad. That requirement increased the probability that women would migrate through illicit channels, which increased vulnerability to traffickers. In 2021, MOM temporarily suspended the licenses of 11 recruitment agencies, but it did not revoke any or report if it referred any of the 11 companies to the police for investigation of human trafficking crimes. While the suspension of these licenses demonstrated an increase from the five suspensions in 2020, it was a substantial decrease from the 111 licenses it revoked in 2020. As in the previous reporting period, the reasons for the suspended licenses included cramped or unsafe accommodations in dormitories, document forgery, coercive or deceptive recruitment practices and contract signings, underage recruitment, illegal fees, and sending workers to Middle Eastern countries that Indonesia's moratorium on the placement of domestic workers prohibited. In November 2021, MOM's Migrant Worker Protection Task Force conducted a national coordination meeting for several ministries underscoring the importance of holding migrant worker placement agencies accountable for trafficking crimes.

The government continued its ban on overseas placement of migrant workers to 21 Middle East and North African nations, yet the number of migrant workers circumventing the ban through the use of illegal recruiters continued. The UN, other international organizations, and NGOs continued to argue any ban on migration increased the likelihood that workers would migrate illegally, heightening their risk of human

trafficking. The government confiscated the passports of any Indonesians repatriated with government assistance if they had violated an overseas placement ban, which could have further exacerbated irregular migration through unsafe channels. The government maintained MOUs with nine countries in the Asia-Pacific and Middle East regions for the recruitment, placement, and protection of Indonesian migrant workers. It continued to negotiate an additional MOU with the Government of Brunei and completed an MOU with the Government of Malaysia on migrant worker protections in April 2022. Nevertheless, there was no mechanism by which the MOM could ensure compliance with the protections stipulated in the MOUs, thus abuses against migrant workers, including forced labor, persisted.

The government did not effectively implement regulations over the fishing sector, which allowed forced labor to persist. For the third consecutive year, the president did not sign implementing regulations required to solidify the roles and responsibilities of the ministry of maritime affairs and fisheries and other ministries, which hampered coordination efforts to effectively oversee recruitment and labor practices in the fishing sector. Civil society groups noted many Indonesian and migrant fishermen were unaware of their rights and responsibilities and unprepared for the work in the absence of standardized, employer-paid pre-departure and post-arrival orientation and training. The government continued to implement a ban—instituted in 2020—on Indonesian fishermen working aboard PRC-flagged vessels, vessels operated by PRC-state owned companies, and South Korean- and Taiwanese-flagged vessels operating outside of their Exclusive Economic Zones. The government continued to operate two Fishers Centers—established in 2020—to handle complaints from fishermen; however, unlike in the previous reporting period, it did not report how many complaints of labor exploitation the centers received in 2021. In 2021, the MFA established an Indonesian Seafarer Corner (ISC) in Kaohsiung, Taiwan, to provide shelter and repatriation services to Indonesian fishermen; however, the government did not report if it identified or provided services to any trafficking victims at the ISC.

Several ministries and agencies, including MOWECP, MOSA, and BP2MI, continued to operate hotlines on a range of issues inclusive of, but not limited to, trafficking. In 2021, BP2MI's complaint system received 1,702 complaints from workers placed overseas, of which 59 were deemed potential trafficking cases; this was a slight decrease from the 89 potential trafficking cases among the 1,812 complaints from workers overseas in 2020. Of the 59 cases, BP2MI referred to the police an unspecified number related to recruitment licenses, but it did not report if police took any action on those referrals. The LPSK maintained a hotline and mobile application to provide information to all victims of crimes on filing complaints and available protection services; however, it did not report the number of trafficking victims identified through these mechanisms. The government continued to conduct some public awareness events on trafficking, including by conducting awareness-raising activities that highlighted the legal procedures to migrate for work and migrant workers' rights. Local government officials in Nunakan Regency and Aceh conducted some anti-trafficking awareness campaigns in 2021. The MFA provided anti-trafficking training for 111 diplomatic personnel deployed overseas. To reduce the vulnerability to child and forced labor, the Ministry of Education, Culture, Research, and Technology established 96 new community learning centers and deployed 703 teachers to continue to educate children of Indonesian migrant palm oil laborers in Sarawak and Sabah where Malaysian palm oil plantations were located. The government did not make efforts to reduce the demand for commercial sex acts, but it continued to make efforts to reduce the demand for child sex tourism by coordinating with foreign governments to deny entry to known child sex offenders. In June 2021, the government of Cianjur Regency in West Java passed Regent Regulation No. 38/2021 to prevent foreigners from exploiting Indonesian women and girls in "contract marriages" for the purpose of commercial sex, including cases of sex trafficking and forced labor; it did not report if it punished any traffickers or identified any sex trafficking victims through this regulation.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Indonesia and exploit victims from Indonesia

abroad. Each of Indonesia's 34 provinces is a source and destination of trafficking. The government estimates that more than two million of the six to eight million Indonesians working abroad—many of whom are women working in the domestic sector—are undocumented or have overstayed their visas, increasing their risk to trafficking. In 2020, nearly 200,000 Indonesian migrant workers returned to Indonesia due to the pandemic. Labor traffickers exploit many Indonesians through force and debt-based coercion in Asia (particularly PRC, South Korea, and Singapore) and the Middle East (in particular Saudi Arabia) primarily in domestic work, factories, construction, and manufacturing, on Malaysian oil palm plantations, and on fishing vessels throughout the Indian and Pacific Oceans. Hong Kong, Malaysia, Singapore, and the Middle East host many Indonesian domestic workers who are unprotected under local labor laws and often experience indicators of trafficking, including excessive working hours, lack of formal contracts, and unpaid wages; many of these workers come from the province of East Nusa Tenggara. NGOs estimate unscrupulous labor recruitment agents and sub-agents are responsible for more than half of Indonesian female trafficking cases overseas. To migrate overseas, workers often assume debt that both Indonesian and overseas recruitment agents exploit to coerce and retain their labor. Additionally, some companies withhold identity documents and use threats of violence to keep migrants in forced labor. Sex traffickers exploit Indonesian women and girls primarily in Malaysia, Taiwan, and the Middle East. In previous years, there were reports that for-profit universities in Taiwan aggressively recruited Indonesians and subsequently placed them into exploitative labor conditions under the pretense of educational opportunities.

In Indonesia, labor traffickers exploit adults and children in fishing, fish processing, and construction; on oil palm and other plantations; and in mining and manufacturing. Sources reported in 2021 that a nickel mining company affiliated with the PRC's Belt and Road Initiative allegedly recruited PRC national workers through unlicensed PRC-based labor contractors and subjected them to forced labor through passport confiscation, wage garnishing and withholding, forced overtime, and physical beatings, among other abuses. Traffickers exploit women and girls in forced labor in domestic service. Traffickers may subject children to forced criminality in the production, sale, and transportation of illicit drugs. Government regulations allow employers in certain sectors, including small and medium enterprises and such labor-intensive industries as textile manufacturing, an exemption from minimum wage requirements, thereby increasing the risk of workers in those sectors to debt-based coercion. More than 1.5 million Indonesian children between ages 10 and 17 work in agriculture, including on tobacco plantations, without gear to protect them from the sun and chemicals; working without proper protective gear can be an indicator of forced labor. NGOs report that in the city of Bima, on the island of Sumbawa, some professional horse racers use child jockeys, some of whom may be forced. Early marriage practices push many children—especially in poorer rural communities—into employment as new primary earners for their households, driving a high incidence of child labor migration through channels known for deceptive recruitment practices, debt bondage, and other forced labor indicators.

According to an international organization, up to 30 percent of individuals in commercial sex in Indonesia are female child sex trafficking victims. Sex traffickers often use debt or offers of jobs in restaurants, factories, or domestic service to coerce and deceive women and girls into exploitation in commercial sex across Indonesia, and notably in Batam and Jakarta. Sex traffickers use spas, hotels, bars, karaoke establishments, and other businesses to facilitate sex trafficking. Traffickers also exploit women and girls in sex trafficking near mining operations in Maluku, Papua, and Jambi provinces. Since the start of the pandemic, traffickers increasingly use online and social media platforms to recruit victims, primarily children, for commercial sexual exploitation. Child sex tourism is prevalent in the Riau Islands bordering Singapore. Bali is a destination for Indonesians and foreign tourists engaging in child sex tourism. Middle Eastern tourists come to Indonesia, particularly Puncak district in Bogor, and pay more than $700 for a "contract marriage," usually up to one week in duration, that allows them to have extramarital sex without violating Islamic law. The girls are as young as age nine, and some of the women that the tourists "marry" are sex trafficking victims. While this is a religious practice, there is tacit government acceptance. Indonesian women are

recruited abroad for ostensibly legitimate employment and are exploited in sex trafficking abroad, including in Timor-Leste.

Indonesians, including children, whose homes or livelihoods were destroyed by natural disasters in 2020 are vulnerable to trafficking. Four million children deemed by the government to be "neglected" and approximately 16,000 children estimated to be experiencing homelessness and living in urban environments are also vulnerable to trafficking. Government failure to prevent companies from encroaching on Indigenous communities' land, sometimes in collusion with the military and local police, contribute to displacement that also leaves some ethnic minority groups vulnerable to trafficking. Endemic corruption among government officials facilitates practices that contribute to trafficking vulnerabilities in the travel, hospitality, and labor recruitment industries. Widespread social stigma and discrimination against members of Indonesia's LGBTQI+ communities and persons living with HIV/AIDS complicated their access to formal sector employment, placing them at higher risk of human trafficking through unsafe employment in the informal sector.

Senior vessel crew on board PRC, Korean, Vanuatuan, Taiwan, Thai, Malaysian, Italian, and Philippines-flagged and/or owned fishing vessels operating in Indonesian, Thai, Sri Lankan, Mauritian, and Indian waters subject Indonesian fishermen to forced labor. In 2020, several Indonesian forced labor victims aboard PRC-flagged fishing vessels sent a plea for assistance over social media, detailing persistent exploitation that included physical violence and the vessel crew's refusal to feed workers until they completed their daily 20-hour shifts. Authorities secured the release of 157 Indonesian fishermen from the vessels, with strong indicators of forced labor, and confirmed that 12 Indonesian workers had died aboard the vessels between November 2019 and August 2020. Some trafficking victims reported the PRC-flagged vessels had initially recruited them under the guise of well-paying jobs on Korean-flagged vessels. Traffickers recruited many fishing forced labor victims from Java, where they targeted poor farm workers, fraudulently recruited them with promises of high salaries and good working conditions, provided illicit travel documents, and made workers sign contracts so hard to break that experts refer to them as "slavery contracts." Some PRC-, Korean-, and Taiwanese-flagged vessels force Indonesian workers to remain on the vessel and work after the conclusion of their contract until the company secures replacement workers. Some of the traffickers promised to send the workers' salaries directly to their families, but after several months at sea, many workers discovered the vessels had not sent any payments.

Dozens of recruitment agencies in Burma, Indonesia, and Thailand lure fishermen with promises of high wages, charge fees and curtailment deposits to assign them fake identity and labor permit documents, and then send them to fish long hours in waters on vessels operating under complex multinational flagging and ownership arrangements. Some fishermen are unaware their recruitment agencies continue to withhold or withdraw funds from their salary for years. Crew on board these vessels have reported low or unpaid salaries and coercive tactics such as contract discrepancies, document retention, restricted communication, poor living and working conditions, threats of physical violence, and severe physical and sexual abuse. Boat captains and crews prohibit fishermen from leaving their vessels and reporting these abuses through threats of exposing their fake identities to the authorities, threats of blacklisting them from future fishing employment, and, in previous years, by detaining them on land in makeshift prisons. Forced to sail longer distances to adjust to dwindling fish stocks, some crews remain at sea for months or even years without returning to shore, compounding their invisibility and preserving abusive senior crews' impunity. Most Indonesian fishermen work aboard vessels operating in Taiwan's highly vulnerable distant water fleet; many are also fishing in Korea's distant water fleets. In Indonesian waters and elsewhere, some senior vessel crew force fishermen to engage in illegal fishing, poaching, smuggling, and illegal entry into national territories, making them vulnerable to criminalization. Indonesian nationals who participate in the Japanese government's "Technical Intern Training Program" are vulnerable to forced labor.

# IRAN: TIER 3

The Government of Iran does not fully meet the minimum standards for the elimination of trafficking and, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity, is not making significant efforts to do so; therefore Iran remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including forming an anti-trafficking committee within the Ministry of Interior (MOI) to develop strategies and programs to combat the crime. However, there was a government policy or pattern of employing or recruiting child soldiers and the deception or coercion of adults to fight in Iranian-led militias operating in Syria. Officials continued to perpetrate and condone trafficking crimes with impunity, both in Iran and overseas, and did not report law enforcement efforts to address the crime. Reporting on official complicity in human trafficking and child soldiering crimes was limited due to the hesitancy of former victims to come forward for fear of reprisal and the government's restrictions on media and non-governmental organizations (NGOs). In previous reporting periods, the government forced or coerced children and adults to fight for Iranian-led militias operating in Syria and provided financial support to militias fighting in armed conflicts in the region that recruited and used child soldiers. Despite such reports, the government has never reported efforts to disarm, demobilize, and reintegrate child soldiers, nor has it reported investigating, prosecuting, or convicting officials complicit in the recruitment or use of child soldiers. The government continued to deceptively recruit Afghan men to fight in militias operating in Syria with promises of residency in Iran and money but instead deported them back to Afghanistan after they returned to Iran. In addition, the government failed to identify and protect trafficking victims among vulnerable populations and continued to treat trafficking victims as criminals, including child sex trafficking victims. Victims continued to face severe punishment, including death, for crimes traffickers compelled them to commit, such as engaging in commercial sex and immigration violations.



IRAN TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Cease the forcible and otherwise illegal recruitment of adults and children for combat in Syria and cease support for armed militias that recruit and use child soldiers in Iraq, Syria, and Yemen. • Cease punishing trafficking victims for unlawful acts traffickers compelled them to commit, such as engaging in commercial sex and immigration violations. • Amend the 2004 law to bring the definition of trafficking in line with international law. • While respecting due process, investigate, prosecute, and convict sex trafficking and forced labor perpetrators—particularly complicit government officials—and sentence convicted traffickers to significant prison terms. • Institute nationwide procedures to proactively identify trafficking victims, particularly among vulnerable populations such as persons in commercial sex, children who were homeless or used the streets as a source of livelihood, and undocumented migrants. • Offer specialized protection services to victims of all forms of trafficking, including shelter and medical, psycho-social, and legal assistance. • Develop partnerships with and allow for the registration of civil society and international organizations to combat trafficking and to help provide essential protection services to victims. • Increase transparency of anti-trafficking policies and activities. • Become a party to the 2000 UN TIP Protocol.

## PROSECUTION

The government did not report anti-trafficking law enforcement efforts, and officials continued to perpetrate trafficking crimes with

impunity, including sex trafficking of adults and children and the coerced recruitment and use of adults in armed conflict in the region. Iranian law did not criminalize all forms of trafficking. A 2004 law criminalized trafficking in persons by means of threat or use of force, coercion, abuse of power, or abuse of a victim's position of vulnerability for purposes of prostitution, slavery, or forced marriage. Inconsistent with the definition of trafficking under international law, the law required movement to constitute a trafficking offense and required a demonstration of force, fraud, or coercion in child sex trafficking cases. The law did not encompass all forms of labor trafficking. The prescribed penalty under this law included up to 10 years' imprisonment if the trafficking offense involved an adult victim and a penalty of 10 years' imprisonment if the offense involved a child victim. Both penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with the penalties prescribed for kidnapping. The 2002 Law to Protect Children and Adolescents criminalized buying, selling, and exploiting children; the punishments for such crimes were six months to one year of imprisonment and a fine, which were neither sufficiently stringent nor commensurate with other serious crimes, such as kidnapping. The labor code criminalized forced labor and debt bondage, but the prescribed penalty of a fine and up to one year of imprisonment was not sufficiently stringent. In November 2021, the government reported drafting an amendment to the 2004 anti-trafficking law and submitting the legislation to Parliament for adoption. The amendment reportedly focused on the definition of trafficking and included aggravating punishments for crimes against women and children; the government did not report if the amendment passed Parliament by the end of the reporting period.

Officials continued to conflate human trafficking and migrant smuggling, and the government did not report providing anti-trafficking training to its officials. Efforts to address sex trafficking and forced labor were either nonexistent or not widely publicized. Courts accorded legal testimony by women only half the weight accorded to the testimony by men, thereby restricting female trafficking victims' access to justice. The government did not report any statistics on investigations, prosecutions, convictions, or sentences of traffickers. In December 2021, Iranian media reported police arrested 11 alleged traffickers during an operation; however, the government did not report if they investigated or prosecuted the case. In the previous reporting period, Iranian media reported the government, with assistance of an international organization, arrested an Iranian national for suspected sex trafficking of Iranian girls in Malaysia over a three-year period. Iranian police reportedly extradited the alleged trafficker from Malaysia and arrested an unknown number of accomplices in Iran. Influential Iranian officials reportedly guaranteed the safety of these alleged traffickers by helping them avoid earlier arrest and secured the release of some of the victims being detained by the Iranian police and returned them to the traffickers over the three-year period. In September 2021, media reported the Iranian national was sentenced to death on charges of international human trafficking by a branch of the Revolutionary Court. In addition, one other defendant was sentenced to death, while five other defendants involved in the case were sentenced to 15 years' imprisonment.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Reports of Iran's Islamic Revolutionary Guard Corps (IRGC) and the Iranian Basij Resistance Force (Basij), a paramilitary force subordinate to the IRGC, actively recruiting—through coercion and deception—Afghan migrants and refugees for combat in IRGC-led and commanded militias in Syria, continued during the reporting period. In previous reporting periods, observers reported the IRGC and the Basij forces—through force or coercive means—recruited and used migrant and refugee children, as well as Iranian children, for combat in IRGC-led and commanded militias in Syria. Despite such reports, the government has never reported investigating, prosecuting, or convicting officials complicit in the recruitment or use of child soldiers. According to a statement made by an IRGC official in October 2019, the IRGC may have recruited child soldiers from 3,700 student Basij bases in Khuzestan province, and these child soldiers were likely still engaged with the IRGC during the reporting period. In general, reporting on official complicity in human trafficking crimes was limited due to the hesitancy of former victims

Haiti AR_000770

**IRAN**

to come forward for fear of reprisal and the government's restrictions on media and NGOs. Neither the government nor media reported if the government had taken any action on past allegations of official complicity in condoning and facilitating commercial sex involving both adults and children, including cases of sex trafficking.

## PROTECTION

The government did not report efforts to identify or protect any trafficking victims. Official government involvement in trafficking crimes and authorities' abuse of trafficking victims continued unabated. The government reportedly continued to punish sex and labor trafficking victims for unlawful acts traffickers compelled them to commit, such as engaging in commercial sex and immigration violations. Female victims of sexual abuse, including sex trafficking victims, faced prosecution for adultery, defined as sexual relations outside of marriage and punishable by death. As in previous years, the government also continued a pattern of human rights abuses of punishing potential adult and child sex trafficking victims through lashings, public shaming, forced confessions, imprisonment, and the death penalty. The government also continued to detain and deport Afghan migrants who did not comply with Iranian officials who recruited them—through coercive means—to fight for Iranian militias abroad. While in government custody, some detained migrants experienced severe physical abuse, including sexual abuse of young girls, which at times resulted in lack of food and water for extended periods of time and extortion. In October 2021, an international organization reported that approximately one million Afghans had returned from Iran in 2021, the majority of whom were deported by Iranian authorities; the government did not make efforts to screen for or identify trafficking victims among this highly vulnerable population prior to detainment or deportation. Furthermore, in the previous reporting period, the government introduced legislation to impose fines and severe prison terms—up to 25 years—on undocumented migrants and allow security officers to open fire on vehicles suspected of transporting them, an approach that would harm potential victims among this vulnerable population and disincentivize their consultation with law enforcement to report trafficking crimes or seek assistance.

In December 2021, Iranian media reported a police operation that identified 48 potential victims, most of whom were foreign nationals; however, the government did not report whether the potential victims were referred to care. The government did not provide protection services specifically for trafficking victims. Iran's state welfare system did not provide adequate coverage or protection to the most vulnerable populations in the country, including children and persons engaged in commercial sex. One media report alleged that some children experienced harassment and sexual abuse when placed in welfare centers. Foreign trafficking victims were unable to access assistance from the welfare system. The government did not report providing support to or partnering with NGOs that offered limited services to populations vulnerable to trafficking. Furthermore, the government harassed some NGOs working with vulnerable populations, and it arrested and imprisoned some activists under national security charges or for "spreading propaganda against the system." According to a media report, in 2021, the government shut down a prominent children's rights NGO, providing services to orphans, child laborers, and child victims of abuse, following a dubious complaint from a government agency related to security concerns. The government did not encourage trafficking victims to assist in the investigation or prosecution of traffickers and did not provide witness support services. The government did not provide foreign trafficking victims legal alternatives to their removal to countries in which they may face hardship or retribution.

## PREVENTION

The government maintained inadequate efforts to prevent trafficking. The government's persistent lack of efforts to prevent official complicity in trafficking crimes further exacerbated trafficking in the country and the region. The government did not make efforts to reduce the demand for commercial sex acts in Iran or child sex tourism by Iranian citizens traveling abroad. The government did not report efforts to prevent the IRGC's recruitment and use of children to fight in the Iranian-led and funded Fatemiyoun Brigade deployed to Syria. The government has never reported efforts to disarm, demobilize, and reintegrate child

soldiers. Furthermore, the government did not take action to hold officials accountable, including the former Minister of Education, who in previous reporting periods promoted the recruitment and use of children to fight for Iran in Iraq.

While the government publicly reported the Ministry of Interior established an anti-trafficking commission to lead development of policies, strategies, and programs while monitoring activities related to trafficking, it did not report whether the commission was operational or what actions it took, if any, during the reporting period. The government did not report dedicating resources to address human trafficking or the provision of anti-trafficking training to its diplomatic personnel. The government did not improve transparency on its anti-trafficking policies or activities, nor did it organize anti-trafficking awareness campaigns. Hardline elements within the regime routinely stymied efforts to amend relevant existing laws or introduce new measures to improve the government's ability to prevent or address the country's pervasive trafficking problems. Children of undocumented Afghans continued to have difficulty obtaining legal documentation, which increased this population's vulnerability to trafficking. In the previous reporting period, a nationality law entered into force that stated Iranian women married to foreign men were able to transmit citizenship to their children; this was not automatic, however, as it required the mother to submit an application on behalf of her children. Human rights activists reported concerns, however, that the nationality law required the Intelligence Ministry and the Intelligence Organization of the IRGC to certify that no "security problem" existed before approving citizenship for children born to Iranian mothers with non-Iranian fathers; this vaguely-defined security provision could have been used to arbitrarily disqualify applicants if they or their parents were seen as critical of the government, further increasing this population's vulnerability to trafficking due to lack of citizenship documentation. Iran is not a party to the 2000 UN TIP Protocol.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Iran, and traffickers exploit victims from Iran abroad. The continuing decline of the Iranian economy, as well as serious and ongoing environmental degradation, have significantly exacerbated Iran's human trafficking problem, particularly for vulnerable and marginalized communities such as ethnic minority groups, refugee and migrant populations, and women and children. Iranian and some foreign women and girls, as well as some men, are highly vulnerable to sex trafficking in Iran. Although commercial sex is illegal, a local NGO estimated in 2017 that commercial sex and sex trafficking are endemic throughout the country, and reports estimate sex traffickers exploit children as young as 10 years old. The government reportedly condones and, in some cases, directly facilitates the commercial sexual exploitation and sex trafficking of adults and children throughout the country; Iranian police, IRGC, Basij, religious clerics, and parents of victims are allegedly involved in or turn a blind eye to sex trafficking crimes. The demand for commercial sex reportedly occurs in large urban centers, including the major pilgrimage sites of Qom and Mashhad; reportedly Iranian, Iraqi, Saudi, Bahraini, and Lebanese women in these locations are highly vulnerable to sex trafficking. Poverty and declining economic opportunities lead some Iranian women to enter the commercial sex industry, where traffickers subsequently force or coerce these women to remain. Some Iranian women who seek employment to support their families, as well as young Iranian women and girls who run away from their homes, are vulnerable to sex trafficking. "Temporary" or "short-term" marriages—for the purpose of commercial sexual exploitation known as "*sigheh*"—lasting from one hour to one week are reportedly widespread in Iran and take place in so-called "chastity houses," massage parlors, and private homes. These arrangements are reportedly tightly controlled, condoned by the state, and regarded highly by religious leaders to allow men to sexually exploit female and male Iranians, as well as Chinese, Thai, and other victims, including children. Afghan girls are vulnerable to forced marriage with men living in Iran, which frequently leads to their victimization in sex trafficking and forced labor, including domestic servitude. Child marriage of Iranian and some foreign girls is reportedly increasing in Iran and is most widespread among communities in lower-income areas of large cities, often with the consent of parents;

girls in these marriages may be at risk of sex trafficking or domestic servitude. One report noted 7,323 marriages of girls 10-14 years of age were registered in the Spring of 2020—and had increased by 23 percent by the Summer of 2020, reporting 16,381 marriage registrations of girls younger than 15 years of age. DPRK nationals working in Iran may have been forced to work by the DPRK government.

Iranian women, boys, and girls are vulnerable to sex trafficking abroad, including in Afghanistan, Armenia, Georgia, Iraq, the Iraqi Kurdistan Region (IKR), Pakistan, Turkey, and the United Arab Emirates (UAE). In 2018, a prominent Iranian NGO reported an increase in the number of Iranian nationals in commercial sex in nightclubs in Tbilisi, Georgia, including some child sex trafficking victims; traffickers operating the nightclubs reportedly confiscate victims' passports and physically abuse and threaten victims. Similarly, in 2018, the media continued to report an increase in young Iranian women in commercial sex in Dubai; some of these women are trafficking victims, whose traffickers confiscate their passports and threaten them with violence or execution if they return to Iran. Some reports also suggest collusion between traffickers in Dubai and Iranian police, the IRGC, and the Basij. Nationals from Saudi Arabia, Kuwait, and Qatar reportedly purchase sex from Iranian women in Dubai, including trafficking victims. Reports suggest that Iranian women are also vulnerable to sex trafficking in Turkey, particularly in Turkish cities close to the Iranian border. According to press reports, more than 2,000 young Iranian women and girls entered the IKR in 2018, many of whom are victims of sex trafficking in cafes, hotels, and massage centers. According to a regional scholar, traffickers reportedly use Shiraz, Iran, as a transit point to bring ethnic Azeri girls from Azerbaijan to the UAE and exploit them in sex trafficking operations.

Iranian and Afghan refugee and migrant children, orphans, and children who are homeless or use the streets as a source of livelihood in Iran are highly vulnerable to forced labor, and experts suggest child trafficking is increasing. An Iranian official stated that the number of child laborers has increased significantly due to the pandemic and the related economic downturn, and that some of the children are forced to work for profiteers and traffickers. Official Iranian statistics indicate there are three million children working in Iran, but media suggest there are approximately seven million children "sold," "rented," or sent to work in Iran. Most of these children are reportedly between the ages of 10-15 years old, and the large majority are foreigners with no official identification documents. The number of children working in transport, garbage and waste disposal, "dumpster diving," car washing, brick factories, construction, and the carpet industry reportedly continues to increase; these children experience abuse and withheld wages and may be exposed to infectious diseases—all indicators of forced labor. Young Afghan children, mainly boys, are forced to perform cheap labor and domestic work, which often involves debt-based coercion, restriction of movement, non-payment of wages, and physical or sexual abuse. Criminal groups kidnap or purchase and force Iranian and migrant children, especially undocumented Afghan children, to work as beggars and street vendors in cities, including Tehran. These children, who may be as young as three years old, are routinely subjected to physical and sexual abuse and drug addiction. Orphaned children are vulnerable to criminal begging rings that maim or seriously injure the children to gain sympathy from those passing on the street. Poor families "rent" their children by the day to criminal groups that force the children, some as young as five years old, to beg in the street; if the children do not collect a specified amount of money by the end of the day, the groups force children to work in illegal workshops or exploit them in commercial sex. Reports indicate that organized gangs force some children, including Afghan children, to engage in crimes, such as drug trafficking and smuggling of fuel and tobacco. Some Afghan children, ranging from ages 14-17, use smugglers to transport them from Afghanistan to Iran in search of work; once in Iran, smugglers turn the children over to employers who force them to work. The increase in Afghan migrants entering Iran, following the Taliban's takeover in August 2021, likely includes a greater number of unaccompanied and undocumented Afghan children seeking employment in Iran, which may increase their vulnerability to exploitation.

Foreign workers, Pakistani migrants, and Afghan migrants and refugees are highly vulnerable to forced labor and debt-related coercion in Iran. In the wake of the Taliban seizing control of Afghanistan in August 2021,

reports indicate an increase in the number of undocumented Afghans entering Iran. At the end of 2021, the UN estimates as many as 3.5 million Afghans live in Iran and reports there are 780,000 Afghans registered as refugees in Iran. In addition to registered refugees, the government hosts an estimated 586,000 Afghans who hold Afghan passports and Iranian visas and an estimated 2.6 million undocumented Afghans. Undocumented Afghans face increased vulnerability to economic and social hardships and exploitation, including trafficking. Afghan refugees and migrants frequently travel illegally through Iran en route to Turkey, making them ineligible to receive state assistance and vulnerable to abuse and exploitation. Organized trafficking groups subject Pakistani men and women migrants in low-skilled employment, such as domestic work and construction, to forced labor using debt-based coercion, restriction of movement, non-payment of wages, and physical or sexual abuse. Increasingly, employers seek adjustable work contracts for registered foreign workers where employers deny workers their benefits and coerce them to work overtime, increasing the workers' vulnerability to forced labor. Traffickers subject Afghan migrants, including children, to forced labor in construction and agriculture in Iran.

Iranian authorities continue to force and coerce Afghan migrants, including children, as well as some Pakistani migrants and Iranian children, into armed groups in the region. Several credible sources continue to widely report the IRGC and Basij coerce Afghan men and boys residing in Iran, including boys as young as 13 years old, to fight in the Iranian-led and funded Fatemiyoun Brigade deployed to Syria. Officials threaten these individuals with arrest and deportation to Afghanistan. In 2021, media sources continued to report Afghan migrants in Iran were deceived by the IRGC to join the Fatemiyoun Brigade through promises of a monthly salary and an Iranian residency permit and were subsequently sent to Lebanon for military training upon recruitment. However, Afghans who return from war are refused residency in Iran and remain undocumented or return to Afghanistan, where they fear persecution by the Taliban for alleged association with the Fatemiyoun Brigade. The Basij also reportedly recruits and trains Iranian children who are deployed to Syria. Sources also indicate the government exploits undocumented and impoverished Pakistani adults living in Iran to fight for the IRGC-led Zaynabiyoun Brigade in Syria. According to a November 2020 media report, the IRGC reportedly established three centers located in Al Mayadin to facilitate recruitment and training of Syrian youth from Dayr az Zawr to fight in the IRGC and affiliated militias in Syria. Established in 2019, the largest center reportedly houses 250 children between the ages of 13-18 years; the children undergo three months of training in preparation for combat. In addition, the Iranian government provides funding to militias operating in Iraq, and to Asa'ib Ahl al-Haq (AAH) and Harakat Hezbollah al-Nujaba (HHN), which recruit, train, and use child soldiers in combat in Iraq, Syria, and Yemen.

## IRAQ: TIER 2

The Government of Iraq does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Iraq remained on Tier 2. These efforts included prosecuting more traffickers and continuing to investigate allegedly complicit officials; the Kurdistan Regional Government (KRG) convicted traffickers under its anti-trafficking law for the first time and added additional specialized anti-trafficking units to two new independent administrations in the autonomous Iraqi Kurdistan Region (IKR). The government also identified more victims and continued to refer some victims to NGOs for care. Additionally, the government took action to lessen the vulnerability to trafficking of Iraqi migrants en route to Europe, as well as Iraqi refugees residing in camps in Syria, and finalized an action plan to prevent the forced recruitment and use of child soldiers in armed conflict. However, the federal government and KRG did not meet the minimum standards in several key areas. Deficiencies in identification and referral procedures, coupled with authorities' lack of understanding of trafficking, continued to prevent many victims from receiving appropriate protection services.

IRAQ

Authorities did not proactively identify trafficking victims among vulnerable populations, which resulted in the continued punishment of some victims for unlawful acts traffickers compelled them to commit, such as immigration and "prostitution" violations. The government also lacked adequate protection services for victims of all forms of trafficking and did not have any shelter for adult male and LGBTQI+ victims. Lastly, the government investigated fewer trafficking cases and convicted fewer traffickers compared with previous years.



IRAQ TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Ensure trafficking victims are not punished for unlawful acts traffickers compelled them to commit, such as "prostitution" and immigration violations. • Develop and institute guidelines for proactive victim identification and referral to protection services for all relevant officials and train officials on these procedures. • Allow all relevant authorities to officially identify potential trafficking victims and refer them to care, not solely investigative judges via a court order. • Ensure victim identification and protection measures are provided independent of the prosecution of a trafficker. • Significantly increase unhindered access to adequate protection services for victims of all forms of trafficking and their children, including trauma and psycho-social counseling, medical care, long-term shelter, legal aid and support, translation and interpretation services, reintegration services, employment training, and financial assistance. • Protect victims from re-traumatization during trial, including by allowing alternative means for victim and witness testimony. • Increase efforts to investigate, prosecute, convict, and stringently sentence traffickers, including complicit government officials and staff and guards at government-run shelters, even when victims do not participate in legal proceedings against their trafficker(s). • Establish a legal framework for NGOs to operate shelters for victims and provide financial resources, facilities, and trained personnel to such organizations. • Prevent the unlawful recruitment or use of child soldiers by all armed groups under its control, including units of the Popular Mobilization Forces (PMF), and provide appropriate protection services to demobilized child soldiers. • Amend the anti-trafficking law to ensure that a demonstration of force, fraud, or coercion is not required to constitute a child sex trafficking offense, in accordance with the 2000 UN TIP Protocol. • Finalize regulations to enable full implementation of the anti-trafficking law.

## PROSECUTION

The Iraqi government increased overall law enforcement efforts. Iraq's 2012 anti-trafficking law criminalized forced labor and some forms of sex trafficking. Inconsistent with the definition of trafficking under international law, the anti-trafficking law required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking. The anti-trafficking law prescribed penalties of up to 15 years' imprisonment and a fine for trafficking offenses involving adult male victims and up to life imprisonment and a fine if the offense involved an adult female or child victim. These penalties were sufficiently stringent, and with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Article 399 of the penal code criminalized "the prostitution of a child" and provided a penalty of up to 10 years' imprisonment, which was sufficiently stringent, although not commensurate with the penalties prescribed for rape. The government continued to lack implementing regulations for the anti-trafficking law, hindering its ability to enforce the law, bring traffickers to justice, and protect victims. The KRG has not yet developed the regulatory and enforcement framework required to fully implement the 2012 Iraqi anti-trafficking law, which the IKR's regional parliament approved in 2018. Further, NGOs noted that the KRG's insufficient knowledge of the law,

particularly in the judiciary, continued to hamper its implementation. In December 2020, the Ministry of Interior (MOI) submitted a draft amendment to the 2012 anti-trafficking law that included provisions to establish a specialized court in each appellate jurisdiction, establish a legal defense fund to assist victims, require referral of all victims to state-run shelters, allow for issuance of residency visas to all trafficking victims, prohibit penalization of victims for any criminal charges resulting from their trafficking, and strengthen legal penalties for trafficking offenses to allow for seizure of perpetrator's assets. At the close of the reporting period, the draft amendment was under consideration by the Council of Ministers for review and revision before it would be reviewed by the Council of Representatives (COR).

For the first time, the Iraqi government reported the type of trafficking crimes for which alleged perpetrators were investigated and prosecuted. In 2021, the government's anti-trafficking unit initiated investigations of 183 individuals; 169 were investigated for sex trafficking, and 14 were investigated for forced labor. The anti-trafficking unit also continued investigations of 119 individuals for sex trafficking and 10 individuals for forced labor in ongoing cases from the previous reporting period. In total, the government investigated 312 individuals during the year, a decrease compared with the investigations of 394 alleged traffickers during the previous reporting period. Authorities referred 184 individuals for prosecution under the 2012 anti-trafficking law, including 163 alleged sex traffickers and 21 alleged labor traffickers; this was a large increase from 35 individuals referred for prosecution in 2020. The government convicted 83 traffickers under the anti-trafficking law and additional trafficking-related laws, a decrease compared with 127 traffickers convicted during the previous reporting period. Of the 83 convictions, 77 individuals were convicted for sex trafficking, and six individuals were convicted for forced labor. Courts sentenced the traffickers from six years to life imprisonment, while an unknown number of traffickers in two cases received the death penalty. As in the previous reporting period, the KRG did not report the number of individuals investigated during the year. However, during the year, one NGO reported the KRG prosecuted 12 sex traffickers, including two ongoing cases from the previous reporting period. The KRG did not report achieving any prosecutions in the previous reporting period. The KRG had historically not reported any convictions under its anti-trafficking law; however, for the first time, the government convicted six sex traffickers; of the six, two were Iraqi nationals, and four were foreign nationals. The Iraqi nationals received sentences of six months' imprisonment, while the foreign nationals received the same sentence and extradited to their country of origin.

Serious concerns of alleged official complicity in trafficking crimes remained, although the government continued to take some action to address such reports. During the year, the MOI investigated 12 cases in which members of the Iraqi Security Forces (ISF), specifically MOI police officers, were investigated for sex trafficking; the government did not report the outcome of these investigations at the close of the reporting period. In previous reporting periods, observers and an international organization reported official complicity in the recruitment or use of child soldiers by non-compliant militia units affiliated with the Popular Mobilization Forces (PMF) that operated under the Popular Mobilization Committee (PMC), a component of the ISF. In 2021, there were no reports of official complicity in the recruitment or use of child soldiers. Some NGOs continued to report that government officials in key positions protected traffickers from investigation and prosecution or avoided prosecution themselves due to their positions of power and political connections. For example, NGOs reported at least one government official from KRG Ministry of Labor and Social Affairs' (KMOLSA) Directorate of Labor was allegedly bribed to authorize the establishment and licensing of recruitment agencies and companies to bring in foreign workers to the IKR and authorize work permits for individual workers; the companies and recruitment agencies allegedly exploited foreign workers by refusing to issue valid residency documents, threatening workers and their families in cases where a worker filed a complaint against the company or raised issues about work conditions and prevented workers from obtaining legal counsel in disputes. The KMOLSA official allegedly helped previously blacklisted companies re-open under new names and took action to prevent the companies from financial penalties. NGOs reported the KRG was investigating the

Haiti AR_000773

case and it remained ongoing at the close of the reporting period. The government did not report efforts to investigate or prosecute continued allegations that security and camp management personnel in IDP camps were complicit in the sexual exploitation and trafficking of women and girls, particularly those with ties to alleged ISIS members.

The MOI's anti-trafficking directorate continued to report that its many responsibilities limited its ability to conduct trafficking investigations; lack of resources, budgetary constraints due the country's financial crisis, ongoing government formation following October 2021 elections and weak coordination among governmental ministries also hindered overall law enforcement efforts. Additionally, Iraqi government and KRG officials—including police officers and investigative judges—continued to lack a general understanding of trafficking and the ability to recognize trafficking indicators. Local NGOs also reported KRG law enforcement lacked a clear reporting system for trafficking crimes, and many government actors tasked with handling trafficking lacked specialized training for identifying and investigating potential cases. Despite these limitations, the Iraqi government and the KRG took steps to address some of these shortfalls during the reporting period. In August 2021, the KRG Ministry of Interior (KMOI) changed the title of the Directorate to Combat Trafficking in Persons (DCTIP) to the Directorate of Combating Organized Crimes (DCOC) via Ministerial Decree no. 29 of 2021; the KRG asserted that restructuring the DCOC signaled the exertion of greater efforts to address trafficking by giving the new office a broader mandate for related crimes, such as money laundering and terror financing. However, NGOs and other activists expressed concern that this change could further undermine an already under-staffed specialized trafficking office with additional responsibilities. During the previous reporting period, the KRG established fully operational anti-trafficking police units in all four governates of the IKR, as well as in the two independent administrations of Garmiyan and Raparin. In 2021, the KRG approved two new DCOC units for the newly independent administrations in Soran and Zakho, adding to the six units which operated under the newly-created DCOC. However, due to budgetary constraints and pandemic-related delays, the KRG was unable to open a specialized court to handle trafficking-related cases as planned in 2021. The Iraqi government also continued to utilize MOI's anti-trafficking directorate; which received additional resources and staffing in the previous reporting period, including the addition of several specialized units—one that focused on professional training for all staff, run by specialized investigators and educators with expertise in trafficking crimes, and another focused on tracking potential trafficking crimes perpetrated through social media, a trend that increased due to the pandemic.

An international organization reported the Iraqi government did not provide specialized training to officials on trafficking policies, enforcement, or laws due to limited funding and resources. The MOI's Training and Rehabilitation Directorates routinely delivered training to police officers that included modules on anti-trafficking. Otherwise, the Iraqi government received extensive support for training and capacity-building from NGOs and international organizations; this included training for lawyers, law enforcement officials, judges, and prosecutors on victim-centered approaches in legal proceedings. As part of its renewed partnership with an Erbil-based NGO to continue shelter operations, the KRG funded training on victim identification that was facilitated by the NGO. Additionally, in the IKR, several NGOs and an international organization conducted trainings and capacity-building programs for staff of the DCOC through funding by KMOI and other foreign governments. KRG officials also received extensive and in-depth training from an Erbil-based NGO on victim identification, screening, referral to shelter, providing access to justice for victims, and overall protection needs; members of DCOC's anti-trafficking police, the Erbil Residency Directorate, KMOLSA, Department of Foreign Relations (DFR), and the Independent Human Rights Commission (IHRC) participated in the trainings. An NGO noted this was the first time DFR and IHRC staff participated in an anti-trafficking training.

## PROTECTION

The government increased overall efforts to protect victims. The MOI reported it identified 81 trafficking victims, which included 38 victims of sex trafficking (16 adult female, three adult male, four adults who identified as LGBTQI+ persons, and 15 children), 17 victims of forced

labor, (including two children), and 26 victims of unspecified exploitation (two adult males, seven adult females, and 17 children). This was an increase from the previous reporting period when the MOI identified 58 trafficking victims. Of the 81 identified victims in this period, the Iraqi government referred 27 victims to the MOLSA-run trafficking shelter in Baghdad. The government also referred 35 foreign trafficking victims to an NGO for shelter. The remainder of the identified victims were referred to healthcare facilities or requested to stay with family. For the first time, the KRG reported victim identification and referral data; the KRG identified 77 victims, including 34 labor trafficking victims (32 females and two males) and 43 foreign national victims of an unspecified exploitation. The KRG reported that of the 77 victims, it referred 72 victims to protective services.

The Iraqi government remained without systematic victim identification guidelines for all officials, including first responders, who came in contact with potential trafficking victims among vulnerable groups, including undocumented foreign migrants and persons in commercial sex. The Iraqi government also did not have a national referral mechanism (NRM); the government continued to have an ad hoc referral process. However, during the reporting period, an international organization coordinated with the Ministry of Migration and Displacement (MOMD) to address capacity gaps in referral mechanisms; with support from an international organization, the MOMD piloted an NRM in Ninewa governate in 2020 and Al Anbar governate in 2021. Civil society organizations reported some Iraqi officials, including district-level police officers, did not proactively identify trafficking victims because officials lacked a general understanding of the crime. NGOs reported some police officials proactively identified foreign labor trafficking victims, but they did not adequately screen for victims among Iraqi citizens, including those that were internally displaced, or during investigations of commercial sex crimes. Investigative judges were the only officials who could officially identify and refer a trafficking victim to protection services via a court order, including the government-run shelter in Baghdad; however, because judges required victims to testify in front of their perpetrators in court, many victims did not come forward due to fear of retaliation. Because of this requirement and the resulting absence of victim witnesses, judges determined in many cases there was insufficient evidence to officially classify a person as a trafficking victim, thereby denying victims' access to protection services. An international organization noted successful victim identification was strongly linked to the capacity and experience of individual investigative judges. Furthermore, the Iraqi government did not have specialized judges or courts that were trained or dedicated to handling trafficking cases; both NGOs and international organizations continued to report that the lack of specialized investigative judges hindered the official determination of trafficking victims, and so some victims may have been unidentified and unable to receive protection services. NGOs and an international organization continued to report authorities frequently held trafficking victims in detention facilities while an investigative judge determined their status as a victim; due to pandemic-related postponed court proceedings, authorities held some victims for extended periods of time without the ability to receive protection services. The KRG reported victims could be identified through management offices at refugee and IDP camps, hotlines, foreign embassies and the public and then referred to the appropriate law enforcement agency, including the specialized anti-trafficking police in IKR. However, just as in Federal Iraq, in the IKR, specialized judges also retained the authority to refer victims to shelter, and IKR NGOs reported similar concerns that some victims may have been unable to receive access to the shelter and protective services during the year if they were not recognized as a victim by a judge.

Some officials continued to criminalize and punish trafficking victims. Authorities arrested, imprisoned, deported, and financially penalized trafficking victims in Iraq, including in the IKR, for unlawful acts traffickers compelled them to commit, such as "prostitution" and immigration violations. Foreign migrant workers, including foreign labor trafficking victims, faced regular discrimination in the criminal justice process, revictimization, and retaliation from traffickers. During the reporting period, NGOs noted that even in cases where victims were correctly identified as such after being screened for trafficking indicators, some continued to be detained for engaging in commercial sex, begging, pursuing unauthorized work, or for having an irregular status. For

**IRAQ**

example, one NGO reported assisting at least seven individuals who had been screened and identified as trafficking victims by authorities and subsequently deported rather than referred to care and assisted in their voluntary repatriation. Police at times inappropriately arrested and detained foreign trafficking victims, rather than the perpetrators, after employers and recruitment agents filed false claims of theft against the victim in retaliation for the victim reporting allegations of trafficking to the police. Although employers were legally responsible to pay immigration fees or expenses related to foreign worker recruitment under Iraq's sponsorship system, in practice authorities penalized workers, including identified and unidentified trafficking victims, for failing to pay. An international organization reported officials sometimes waived residency fines, but the decision-making process appeared arbitrary and highly dependent on the individual official. In March 2020, the Higher Judicial Council (HJC) advised its judges to waive all fines for trafficking victims who were in violation of Iraq's residency laws; however, the Iraqi government did not report if any trafficking victims who had violated residency laws had fines waived. Another NGO reported that within IKR, KRG authorities also improved the process for waiving fines that trafficking victims would otherwise be subject to for working in Kurdistan without legal documentation; however, as this process was informal, some trafficking victims may not have benefitted from the change. In 2021, 32 potential trafficking victims in the IKR had fines waived or adjudicated through comprehensive case management and legal support from a local NGO. NGOs continued to report the Iraqi government and KRG increasingly recognized that people arrested for "prostitution" crimes could be victims of trafficking and should be treated as such; however, despite these improvements, other NGOs reported authorities continued to charge sex trafficking victims on "prostitution" violations. In April 2021, Kurdish security forces arrested 15 individuals suspected of being LGBTQI+ persons for "immorality" and on "prostitution" charges but failed to screen for trafficking indicators and therefore may have penalized potential sex trafficking victims. In addition, Iraqi and KRG authorities continued to inappropriately detain and prosecute without legal representation children allegedly affiliated with ISIS—some of whom were victims of forcible recruitment and use—and used abusive interrogation techniques and torture to obtain confessions; the Iraqi government did not report screening these children as potential trafficking victims or referring them to protection services. As of December 2021, an international organization reported at least 1,267 children, some as young as nine years of age, remained in detention in Iraq for periods ranging from three to five years, including for alleged association with armed groups, primarily ISIS.

The Iraqi government provided limited protection services to trafficking victims and did not operate shelters specifically for male trafficking victims. By law, the Iraqi government was the only authority permitted to provide shelter to trafficking victims; its shelter served women and children, including victims of trafficking and survivors of gender-based violence. However, NGOs reported the shelter lacked capacity to care for child trafficking victims, who were instead sent to the MOLSA orphanage, and minority communities, including those who identified as LGBQTI+ persons. In 2021, a local NGO reported the Iraqi government relied on donations from civil society and international organizations to fund the government shelter; in the previous year, the government allocated funds from MOI and MOLSA accounts to support protections service. MOLSA continued to operate a trafficking shelter in Baghdad for female and child trafficking victims; during the reporting period, 27 trafficking victims utilized the shelter, an increase from 18 victims that were assisted at the shelter in the previous reporting period. MOLSA—in coordination with the Ministry of Health (MOH)—reported it provided victims at the shelter with psycho-social, trauma, and reintegration services; medical care; and long-term shelter; MOH reported it dedicated two doctors for trafficking victims at the shelter. NGOs and an international organization reported that overall services fulfilled victims' basic physical needs, but a lack of resources, staffing, and case management training limited shelter staff's ability to provide psycho-social and medical care and vocational training specifically for trafficking victims. Furthermore, an international organization reported the MOLSA shelter only provided basic services and referred cases to other organizations for specific protection needs. Moreover, foreign trafficking victims were frequently referred to an international organization for assistance, including shelter

and facilitating repatriation to the victims' countries of origin. In 2020, MOLSA reportedly developed a distinct case management system and clinical psychology tracks for different categories of trafficking victims and provided vocational training to trafficking victims. Although it did not report the extent to which the case management system was utilized, MOLSA reported victims were provided vocational training at the shelter during the year. In most cases, officials did not allow female victims to freely enter and exit shelters because they were referred via a court order, and officials limited victims' ability to communicate with anyone outside of the shelters. An international organization reported foreign victims could not easily access services outside of the shelter while they awaited repatriation; instead, foreign victims often relied on their embassies for support. The embassies of the Philippines, Bangladesh, and Indonesia reportedly provided shelter for their nationals while they awaited repatriation. In contrast, the government reported foreign victims and Iraqi victims were legally entitled to the same benefits, and the MOI reported providing identical physical and mental services and legal assistance to both Iraqi and non-Iraqi citizen trafficking victims.

During the previous reporting period, an NGO reported allegations that staff and guards at Iraqi government-operated shelters abused trafficking victims; to address this, MOLSA installed a monitoring system to prevent any violations by shelter staff against victims—in addition to conducting physical checks when the victims were admitted to the facility and discharged—in order to detect and document any potential abuse against the shelter occupants. No allegations of abuse by staff or guards were reported during the year, and MOLSA reported the monitoring system continued to be utilized. The Iraqi government did not provide specialized care for rape victims, including trafficking victims who were also victims of rape. The government reported that in cases of Iraqi victims of rape or sexual exploitation, due to social norms, victim's family members often attempted to convince them to leave the MOLSA shelter and drop any charges to avoid shame. For such cases, the government continued to operate 16 Family Protection Units across federal Iraq that focused on family reconciliation for victims of trafficking or other abuse, such as rape. NGOs continued to report that the largest gap in victim service provision was the lack of specialized trafficking shelters in the country. The Iraqi government did not report providing funding or in-kind assistance to NGOs that provided victim care; however, NGOs and international organizations reported the government fully cooperated with civil society actors, especially regarding victim services for foreign trafficking victims. In 2021, the Iraqi government repatriated 338 Iraqi refugee families from al-Hol camp in Syria to a transit camp in Iraq; the government ensured the repatriated families received humanitarian assistance, case management, and psycho-social support, including family tracing and reunification services for unaccompanied and separated children, all who were vulnerable to trafficking. The Iraqi government did not report efforts to provide protection services to demobilized child soldiers of ISIS, the PMF, or other armed groups, thus failing to prevent revictimization or re-recruitment of these children. However, in June 2021, the Iraqi Council of Ministers submitted a draft law on child protection to the COR, which aimed to protect children from all forms of violence and exploitation, in addition to criminalizing enslavement, coercion to work, or involvement in armed conflict, and outlined protection services for children who were victims of such situations. The law had not been finalized at the close of the reporting period.

The KRG continued to operate four domestic violence shelters in the IKR for women; the shelters could provide limited services to female trafficking victims. Victims needed to obtain a court order to leave the shelters, which significantly restricted their movement, and shelter space was limited. The KRG did not report how many trafficking victims received services at these shelters during the reporting period. Since November 2019, the KRG allowed an Erbil-based NGO to operate the first and only trafficking shelter in the IKR. In December 2021, the KRG renewed its partnership with the NGO to operate the shelter through December 2022; the renewed partnership continued to support comprehensive case management, as well as legal, health, and mental health services, and expanded psycho-social support programming. The shelter could house as many as 38 victims at one time and was almost always at capacity; during the reporting year, 58 trafficking victims received shelter services. The KRG continued to facilitate the release of Yezidis

Haiti AR_000775

held captive by ISIS, most of whom were likely trafficking victims, and reported it coordinated with NGOs and an international organization to provide essential psycho-social and protective services to these victims.

Neither the Iraqi government nor the KRG provided adequate protections to victims or witnesses to encourage their assistance in investigations and prosecutions of traffickers. However, the MOI reported 19 identified victims voluntarily assisted law enforcement authorities during the investigation and prosecution of their traffickers. Civil society organizations, including the Iraqi Bar Association, reported they provided free attorneys to represent foreign workers in court proceedings. The Iraqi government did not allow trafficking victims to work, move freely, or leave the country during trials. The MOI reported any foreign or Iraqi trafficking victim could file a civil lawsuit against a trafficker but did not report if any victims filed during the reporting period. NGOs reported government compensation was available to victims but took an extended period of time to obtain and, likely due in part to authorities' poor investigative techniques and overall lack of protections provided to victims during trial, was almost impossible for victims to pursue successfully. Courts did not protect the privacy or identity of victims when testifying against the trafficker; NGOs reported courts required victims to testify in front of their traffickers, as well as, at times, in front of an entire courtroom of other people waiting for their cases to be heard. Iraqi courts also did not provide translation and interpretation services for foreign trafficking victims, which delayed cases for months; in some cases, courts used unqualified interpreters, which harmed the credibility of victims' testimonies. Furthermore, NGOs reported that even when a victim did not want to pursue legal proceedings against a trafficker, some victims could be required by the government to participate by providing testimony or serving as a prosecution witness in other trafficking cases, possibly contributing to further trauma for the victim. Labor and criminal courts in the IKR did not provide translation and interpretation services for foreign workers, including foreign labor trafficking victims, creating difficulties for victims suing abusive employers or filing criminal charges. Although the Iraqi anti-trafficking law allowed for the government to provide special residency status benefits to foreign trafficking victims, the government did not report offering this assistance to any victims. The KRG did not offer special residency status to victims during the reporting period either, but it reportedly continued to refrain from deporting victims. The Iraqi government and the KRG provided foreign victims relief from deportation or offered legal alternatives to their removal to countries in which they may have faced hardship or retribution. NGOs reported that repatriation efforts for trafficking victims continued to be impacted by the pandemic; complex and expensive testing and quarantine requirements delayed repatriation and some countries required their nationals to be fully vaccinated prior to returning home. Despite these obstacles, the Iraqi government and KRG reportedly cooperated with an international organization and NGOs to repatriate around 125 foreign trafficking victims and more than 3,000 vulnerable Iraqi migrants returning from the Belarusian-Polish border and the Belarusian-Lithuanian border following an outflow of migrants from the country attempting to travel to Europe during the reporting period.

## PREVENTION

The government increased efforts to prevent human trafficking. The government's Central Committee to Combat Human Trafficking (CCCT) continued to be led by MOI and included representatives from the MOH, Ministry of Foreign Affairs, Ministry of Finance, Ministry of Displacement and Migration, MOLSA, Ministry of Justice, the HJC, the Council of Ministers General Secretariat (COMSEC), and Iraq's Independent High Commission for Human Rights (IHCHR), as well as three representatives from the KRG; the committee met three times during the reporting period. The KRG's anti-trafficking committee—established in 2016—which was led by the KMOI and included 17 government ministries and an international organization as an observer, met at least once during the reporting period. The KRG reported the newly created DCOC was also represented in the committee. The Iraqi government maintained a 2019-2021 national action plan (NAP) but acknowledged that the pandemic delayed its implementation. However, the CCCT actively increased its engagement and coordination with civil society organizations in an effort to advance the NAP; including meeting with an NGO to discuss

ways to advocate for policies and procedures to improve protection of victims and increase the prosecution of traffickers. During the year, an NGO facilitated the committee's first meeting in 18 months and reported working with the committee to draft a 2022-2025 NAP. The CCCT also worked closely with an NGO to create a network of local NGOs, lawyers, and social workers in each Iraqi governate and connected with the MOI's anti-trafficking directorate to establish and refine referral mechanisms, improve service provision for victims, and empower local civil society organizations to combat trafficking.

During the reporting period, the MOI's anti-trafficking directorate and the CCCT conducted a nationwide awareness campaign that included publishing stories about trafficking on national media outlets and government-run radio to highlight the warning signs of the crime; it also advertised its anti-trafficking hotline and posted information at hospitals, markets, border crossings and security checkpoints, airports, police stations, and transportation hubs. As in the previous reporting period, the Ministry of Transportation reported it continued to work with bus companies and airlines to raise awareness about trafficking. In the IKR, the DCOC used its specialized trafficking unit to provide seminars, campaigns, and sessions for community members and foreign workers to raise awareness of trafficking; an NGO reported that the Residency Directorate in Erbil developed awareness materials to be distributed to foreign workers upon arrival at the airport warning of the signs of trafficking. The MOI continued to operate a 24-hour anti-trafficking hotline, and the MOI continued to use a public email address, launched in the previous reporting period, to receive trafficking tips; the government did not report how many inquiries the hotline or the email address received nor if any resulted in investigations or prosecutions of trafficking crimes. In the previous reporting period, the MOI's hotline received 169 calls, which resulted in 35 alleged trafficking cases and 10 convictions. An international organization also reported the MOI's hotline was only available in Arabic, which limited its accessibility for foreign trafficking victims. The KRG operated its own service line in the IKR where trafficking victims could theoretically seek assistance and report labor abuses, but it did not report how many alleged trafficking cases it received through the service line during the reporting period. However, an NGO reported that this service line was not public or publicized and no hotline existed specifically for trafficking victims. An Erbil-based NGO also operated a general service line, available for victims of trafficking and gender-based violence and other vulnerable populations; 20 victims were identified and referred to care via the NGO's hotline.

The Iraqi government and the KRG continued to cooperate with each other to maintain an online visa system to track migrant workers and their sponsoring companies to prevent employers from committing labor abuses; the government reported the system could automatically block any single individual or company from sponsoring more than 50 foreign laborers. In June 2021, MOLSA referred 400 private sector companies to the labor courts for violating the allowed percentage of hired migrant workers; however, the ministry also deported thousands of workers associated with these companies and did not report screening them for trafficking indicators prior to deportation, which may have penalized some unidentified victims. The KRG reported challenges tracking migrant workers hired by employers and companies that used fake or fraudulent registrations and others who acted as agents, sponsoring foreign labor visas before ultimately hiring the workers to third party companies for profit. Although the KRG prohibited "pre-payment employment," recruitment agencies were able to deduct up to 25 percent of a worker's first paycheck as a service fee for facilitating employment, which may have increased the vulnerability of workers to exploitation and debt bondage. The Iraqi government reported it regulated labor recruitment and placement of foreign workers through MOI's Residency Office and MOLSA, where recruitment agents or private citizens working as lawyers licensed by the government sponsored workers. Under this sponsorship system, a worker could not change employers until completing two years of work with a sponsor, unless the worker had a complaint of poor treatment or abuse. However, even in cases where an employee had a legitimate complaint, NGOs and an international organization reported the employee was often relocated to a new employer and authorities rarely held the abusive employer accountable. An international organization also reported

IRAQ

agencies that the government backlisted changed names frequently to enable them to continue to operate, and in cases where an employer was punished for abuse, it was common for a single perpetrator to be penalized rather than the entire company or agency. In the previous reporting period, in an effort to improve the identification of potential trafficking cases in instances of abuse or labor law violations, the HJC allocated judges with greater knowledge and experience of trafficking crimes in Iraqi labor dispute courts. NGOs also raised concerns the KMOLSA's regulation on foreign labor conflicted with its 2018 anti-trafficking law, particularly in the case of exploited workers who may be potential trafficking victims and, although they may be recognized as victims under the anti-trafficking law, they could be punished for having an irregular status under the foreign worker regulations in the IKR. Furthermore, NGOs reported regulations for recruitment agencies and employers were weak in the current law, which hindered KMOLSA from enforcing requirements and holding agencies and employers accountable for violations, including those that amount to trafficking crimes. In an effort to improve the two laws, the KRG sought technical assistance from an Erbil-based NGO to analyze the government's proposed amendments to the law to ensure protection of the rights of foreign workers and agency and company accountability. At the close of the reporting period, the draft amendments were pending MOLSA's legal advisor for review. The government reported it made efforts to reduce the demand for commercial sex acts by continuing surveillance on social clubs, hotels, and massage parlors; increasingly, MOI also conducted surveillance on coffee shops and cafeterias. In the IKR, KMOI and Asayish security forces continued to monitor message centers, cafes, bars, and hotels, locations often used for commercial sex. The government did not make efforts to reduce the demand for child sex tourism. In the previous reporting period, the HJC directed courts to use the anti-terrorism law to counter some forced marriage practices, including *fasliya* and nahwa—a practice in which a family forces a woman to marry one of her father's cousins—which placed women and girls at increased risk of trafficking. Unlike previous years, the government did not report investigating or prosecuting any individuals for nahwa or *fasliya*. Neither the Iraqi government nor the KRG provided anti-trafficking training to its diplomatic personnel.

During the reporting period, a large outflow of migrants, predominately from the IKR, attempted to migrate to Europe via transit countries, primarily Turkey and Belarus. Some migrants were reportedly lured by government-controlled Belarusian travel agencies that promised travel to Minsk and ultimately access to the Belarusian-Polish border or Belarusian-Lithuanian border to enter the EU. After arriving in Minsk via plane, these migrants paid €15,000–€20,000 ($17,010–$22,680) to be transported to border areas; hotels managed by the Belarusian government hosted migrants before they were loaded onto buses or taxis and brought to the border. Once at the border, media reports allege the migrants were left to cross the border into Poland or Lithuania; in some instances, migrants attempted to cross the border into Europe multiple times without success and remained stranded between borders with few resources, heightening their vulnerability to exploitation and abuse. To address this increased vulnerability and prevent additional migrants from entering such situations, the Iraqi government closed the Belarusian consulates in Erbil and Baghdad to reduce the issuance of visas to Iraqis for entry into Belarus, canceled flights between Iraqi airports and Minsk, and coordinated repatriation flights for any Iraqi nationals stranded on the border or in Belarus, Lithuania, or Poland to return home voluntarily. Between October and December 2021, the Iraqi government, with an international organization, facilitated the return of more than 3,000 Iraqi nationals from Belarus to Iraq. Once Iraqi migrants returned to Iraq, an international organization observed that many of them faced situations of violence, abuse, and exploitation. In 2021, the Iraqi government repatriated 338 Iraqi refugee families from al-Hol camp in Syria to a transit camp in Iraq. The government ensured the repatriated families received humanitarian assistance, case management, and psychosocial support, including family tracing and reunification services for unaccompanied and separated children, all who were vulnerable to trafficking.

Iraqi law prohibited compulsory or voluntary recruitment of any person younger than age 18 into the government armed forces, including governmental paramilitary forces, militia groups, or other armed groups.

There were no reports the Iraqi military or KRG security forces unlawfully recruited or used children in combat or support roles during the reporting period. However, the Iraqi government did not exercise complete control over certain units of the PMF, which sometimes undertook operations independent of political leaders or military commanders. The Iraqi government's inter-ministerial senior committee—first established in 2019 to monitor, evaluate, and report on children's rights violations in conflict zones in Iraq—continued to closely coordinate with an international organization during the reporting period but did not report on actions by the committee during the reporting period. MOLSA, in coordination with an international organization, the government's inter-ministerial committee, and the PMC, developed and finalized a new action plan to address the recruitment and use of children in armed conflict; implementation of the plan was scheduled to begin in January 2022.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Iraq, and traffickers exploit victims from Iraq abroad. The violent conflict with ISIS exacerbated the population's vulnerability to trafficking, in particular women and children, although the government's territorial defeat of the terrorist group, announced in December 2017, has improved conditions for Iraqi civilians. However, insecurity remained in many areas, including those liberated from ISIS rule. As of December 2021, nearly five million Iraqis displaced as a result of ISIS have returned to their areas of origin, whereas approximately 1.2 million remain in protracted displacement; about 80 percent have been displaced for more than three years, placing them at continued risk of exploitation. As of February 2022, more than 180,000 IDPs were living in 26 formal camp locations in Iraq, and more than 100,000 are in informal settlements. Many of those that are displaced are female heads of households vulnerable to sexual exploitation and abuse due to their perceived affiliation with ISIS and lack of Iraqi identification documentation. In addition, more than 245,000 Syrian refugees remained displaced in Iraq, the vast majority in the IKR. With the defeat of the ISIS physical caliphate, the reported incidence of these violations has diminished. Between 2014 and 2018, ISIS militants kidnapped and held captive thousands of women and children from a wide range of ethnic and religious groups, especially Yezidis, and sold them to ISIS fighters in Iraq and Syria, where ISIS fighters subjected them to forced marriage, sexual slavery, rape, and domestic servitude. ISIS maintained an organized system to buy and sell women and girls for sexual slavery, including sales contracts notarized by ISIS-run courts. Media have reported ISIS sold some captives to wealthy individuals in Gulf countries, and reports suggested some Yezidi captives were moved to Syria, Turkey, and Saudi Arabia. IKR-based civil society organizations also reported in 2018 that ISIS members and supporters kidnapped Yezidi children for exploitation in Turkey. ISIS reportedly kidnapped 120 Turkmen children in 2014; they have reportedly been sold multiple times for the purpose of sexual exploitation, and only 20 of the kidnapped children were rescued by the end of 2018. Throughout 2015-2019, thousands of women and children escaped ISIS captivity—many of whom were pregnant as a result of rape, forced marriage, and sex trafficking; these women and girls, including IDPs among this population, remain highly vulnerable to various forms of exploitation, including re-trafficking. Some Yezidi women and girls reside in Iraqi IDP camps or al-Hol camp in Syria, where many reportedly continue to live with or near individuals that formerly exploited them under ISIS rule. As of early 2022, the KRG reported 2,763 Yezidis—including adults and children—remain missing. Some reports indicate the missing women and girls remain held by ISIS in northeastern Syria and Turkey or have been exploited in other parts of the region, Europe, or Asia.

Children remain vulnerable to forcible recruitment and use by multiple armed groups operating in Iraq, including—but not limited to—ISIS, the PMF, tribal forces, the Kurdistan Worker's Party (PKK), and Iran-backed militias. Despite the defeat of the physical caliphate, ISIS continues to abduct and forcibly recruit and use children in combat and support roles, including as human shields, informants, bomb makers, executioners, and suicide bombers; some of these children were as young as eight years old, and some were children with intellectual disabilities. Multiple sources report the PKK and People's Protection Units (YPG) operating in the IKR and Sinjar continued to recruit and use children. In 2021, an unverified source reported that the PKK recruited dozens of children

Haiti AR_000777

to prepare them for combat, including children from Kirkuk, Iraq. Furthermore, unverified reports in 2021 alleged that Yezidi Resistance Forces and Yezidi Women's Protection Units' militias employed Yezidi minors and teenage recruits in paramilitary roles in Sinjar. Local NGOs reported in 2018 that Yezidi militias in Sinjar recruited approximately 10 to 20 Yezidi boys, and NGO and local government contacts confirmed in 2018 that hundreds of Yezidi children had been recruited by the PKK-aligned Yezidi Civil Protection Units (YPS) and other PKK-affiliated militias. In 2018, civil society organizations reported the PKK recruited and trained children from Sinjar, Makhmour, and other locations and then sent them to bases in Sinjar, Turkey, and the Qandil Mountains between Iraq and Iran.

Since 2015, NGOs have reported some non-compliant, Iran-aligned PMF units recruit, use, and provide military training to children, though the incidence of these reports has declined with the defeat of ISIS' territorial presence in Iraq. In 2021, there were no reports of children being recruited and used by the Iraqi government or the KRG. In 2018 and 2019, NGOs alleged that some PMF-affiliated militias, including Iranian-backed Harakat Hezbollah al-Nujaba (HHN) and Asaib Ahl al-Haq (AAH), recruited boys younger than the age of 18 to fight in Syria and Yemen. In 2017, reports also indicated both the AAH and Kata'ib Hezbollah (KH) militias recruited and used child soldiers. Some of the forces in the HHN, AAH, and KH militias operated under the umbrella of the PMF, but they generally operate outside of the command and control of the Iraqi government. Civil society organizations and local contacts reported in 2017 that posters commemorating children who died while fighting for Shia militias were commonplace in Shia-majority areas of Baghdad and throughout southern Iraq. Most of the children who were celebrated for fighting allegedly fought for brigades of the AAH and KH militias. Credible reporting in 2017 indicated Sunni tribal militias recruited boys out of IDP camps, some of whom received military training. In addition, international observers reported the ISF used three children at a checkpoint in early 2019.

Refugees and IDPs face heightened risk of forced labor and sex trafficking due to their economic and social vulnerability and lack of security and protections. Between 2015 and 2018, NGOs reported trafficking networks in the IKR targeted refugees and IDPs, operating with assistance from local officials, including judges, officials from the Asayish forces, and border agents. Women and girls in IDP camps whose family members have alleged ties to ISIS may continue to be exposed to a complex system of potential sexual exploitation, sex trafficking, and abuse by security and military officials. Criminal gangs continued to reportedly force women into "prostitution" and boys and girls to beg, especially IDP and refugee children and children with disabilities, primarily in urban areas; criminal gangs also force children to sell and transport drugs and weapons. In 2021, observers reported an increase in the use of children 8-15 years old by criminal gangs to distribute narcotics. Civil society organizations also reported children, including IDP children, were forced to work in chemical factories in Erbil and mining shops in Sinjar in IKR. In October 2020, the Iraqi government announced its decision to begin to close all IDP camps across the country. NGO and media reports alleged government officials forced thousands of civilians, mostly women and children, out of camps with very little notice. NGOs and an international organization expressed concern that many of the camps' residents did not have anywhere to return to as their homes were destroyed during the conflict with ISIS or they feared retaliation and violence if they returned home because of real or perceived affiliation with ISIS. Furthermore, NGOs reported other camp residents experienced challenges obtaining civil documentation and security clearance to travel to other parts of the country, resulting in secondary displacement and exacerbating the risk of exploitation and trafficking in a highly vulnerable population. An international organization reported tens of thousands of IDP children lacked civil documentation, particularly those born or formally residing in areas under ISIS control, and could not access basic services, including enrolling in school, and in May 2022, the UNHCR reported that approximately one million displaced Iraqis lacked civil documentation. In 2021, an international organization reported that children, mostly among IDPs and refugees, were directly impacted by the sudden closure of IDP camps; children were forced to work by their families for survival. Observers noted that forced labor was often seen among Iraqi IDP children, as well as Syrian refugee children, between

the ages of 10-18 who were exploited in street-selling and hospitality, including girls who were predominantly forced into domestic work. Iraqi refugees in Jordan are vulnerable to labor trafficking in Jordan's informal labor sector, in part due to employers paying them less than market wages and expecting them to work excessively long hours.

Iraqi, Iranian, and Syrian women and girls, as well as LGBTQI+ persons in the IKR and Federal Iraq, are particularly vulnerable to sex trafficking. LGBTQI+ individuals across all ethnic and religious groups remained at risk of sex trafficking primarily because of cultural stigmas. According to IKR press reports, the collapse of Iran's currency and economic slowdown spurred an influx of more than 2,000 young Iranian women and girls into the IKR in 2018, many of whom were victims of sex trafficking in cafes, hotels, and massage centers. According to KRG law enforcement in 2018, IKR-based taxi drivers allegedly facilitate the transportation of these women and girls from Iran to the IKR under the cover of tourism. Numerous media reports from 2018 claim girls as young as 11 years old are observed in night clubs and casinos in Baghdad as waitresses, dancers, and in commercial sex; some militia groups, including AAH, reportedly provided security at these establishments and relied on them for income. NGOs reported in 2018 and 2019 that male sex traffickers in the IKR use the threat of publicizing compromising photos of women to sexually exploit or force them into commercial sex. The media reported in 2018 trafficking gangs increasingly use social media sites, particularly Facebook, to buy and sell women and girls for sex and labor exploitation. Reports from 2014-2017 suggested some Iraqi law enforcement officials have allegedly frequented brothels known for sex trafficking or accepted bribes to allow sex trafficking. Foreign media reports from 2018 suggested a growing trend of child sex trafficking of Iraqi girls ages 11-16 in Syria, Jordan, Saudi Arabia, Lebanon, and the UAE.

Traditional practices, including *fasliya*—the exchange of family members to settle tribal disputes—and child-forced and "temporary" marriages, place women and girls at increased risk of trafficking within the country. In 2019, an international media outlet reported clerics operated "marriage offices" in areas outside of important shrines in Iraq, which advertised "temporary marriages" with girls as young as nine years old for the purpose of sex trafficking. Some militia groups, such as AAH, reportedly provided security for these "offices" and relied on them for income. Additionally, a local NGO disclosed in early 2021 that reports from local partners in southern Iraqi border provinces noted Saudis and Kuwaitis exploited children in sex trafficking during hunting trips in areas inhabited by Kawalyah, nomadic tribesman without civil documentation. As reported in previous years, traffickers forced Syrian girls from refugee camps in the IKR into early or "temporary marriages" with Iraqi or other refugee men; some KRG authorities allegedly ignored, or may have accepted bribes to ignore, such cases, including those in which girls are sold multiple times. An NGO reported in early 2022 that traffickers continued to open massage parlors in five-star hotels in Iraq as a cover for commercial sex and sex trafficking; some of these hotels are owned by state entities, which allow the traffickers to operate with impunity. The Iraqi government further confirmed in 2022 that massage parlors, coffee shops, bars, and nightclubs were locations for sex trafficking. Additionally, according to the Iraqi government, traffickers use social media to operate their networks and recruit victims, such as by advertising fake job offers.

Some men and women from throughout Asia and Africa who migrate—both legally and illegally—to Iraq are subjected to forced labor as construction workers, security guards, cleaners, handymen, and domestic workers. In May 2021, COR Committee on Labor and Social Affairs reported Iraq hosted approximately one million foreign workers, including those with both legal and non-legal status; reportedly, only 10 percent had officially registered with the government. In early 2020, observers reported an increase in trafficking victims from Ghana, Kenya, and Sierra Leone; furthermore, in 2021, NGOs noted an increase in victims from Cameroon, India, Indonesia, Sudan, and Syria. In particular, observers noted an increase of Ghanian domestic workers referred to NGOs as trafficking victims during the year. In addition, NGOs noted an increase in Indonesian trafficking victims being transported through Turkey to the IKR, then working in Turkey for around a month, before being told to renew their work permits in Kurdistan and then forcibly made to remain and work. NGOs reported some employers and recruitment agents exploit

**IRELAND**

workers' illegal status by withholding salaries and subjecting workers to substandard living conditions. Some foreign migrants are recruited for work in other countries in the region but are forced, coerced, or deceived into working in Iraq and the IKR. In 2021, NGOs reported migrants in the IKR receive harsher treatment by their employers, including physical and emotional abuse, and continue to be vulnerable to nonpayment or under-payment of wages and food deprivation, both of which have increased during the pandemic. In 2018, the KMOI reported 22 workers from the Philippines legally entered the IKR under the sponsorship of a labor contracting company but were subsequently forced to work in Baghdad. In early 2020, NGOs reported smugglers in the IKR promise some sub-Saharan African workers better work opportunities in Baghdad, but upon arrival, traffickers exploit the workers in forced labor. An international organization reported in 2018 that if a foreign worker had a complaint of abuse about an employer, recruitment agents moved the worker to a different employer and did not report the employer to the police. Recruitment agencies reportedly operate clandestinely without permits and beyond the control of the government.

## IRELAND: TIER 2

The Government of Ireland does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Ireland was upgraded to Tier 2. These efforts included increasing convictions compared with the year prior—including two convictions under the anti-trafficking law for the first time since at least 2013—and consequently assigning significant sentences. The government formally recognized seven sea fishers as trafficking victims and identified potential trafficking victims during inspections, which was an increase compared with prior year reporting. The government also expunged more than 600 prior convictions for commercial sex offenses, many of which may have involved prior sex trafficking victims, and launched an awareness campaign in partnership with an international organization. Furthermore, the government increased funding for victim assistance and for public awareness and prevention efforts compared with the prior year. However, the government did not meet the minimum standards in several key areas. The government prosecuted fewer suspected traffickers than the prior year and did not prosecute any labor traffickers. Systemic deficiencies in victim identification, referral, and assistance persisted, and services for victims remained inadequate. The government did not uniformly screen for trafficking in vulnerable populations, like sea fishers, before referring them to immigration authorities for deportation, even when victims self-identified. The government did not adopt an updated national anti-trafficking action plan (NAP), amend its national referral mechanism, or overhaul its accommodation framework for trafficking victims, which continued to leave victims with inadequate and unsuitable accommodations. The government did not report providing trafficking-specific training to any judges, remained without legal safeguards to protect victims from prosecution for unlawful acts traffickers compelled them to commit, and did not report awarding restitution or compensation for trafficking to any victims in 2021.



### PRIORITIZED RECOMMENDATIONS:
Increase efforts to identify and protect all victims, especially Irish citizens, victims of labor trafficking and forced criminality, and vulnerable populations like children, sea fishers, and asylum-seekers. • Improve

victim identification and referral by issuing a revised national referral mechanism in coordination with NGOs; providing victim identification training for all front-line officials, including labor inspectors; and offering formal identification, a recovery and reflection period, and services to all victims. • Allow formal victim identification by entities other than the police, including civil society, labor inspectors, social workers, and health care professionals. • Vigorously investigate, prosecute suspects, and convict traffickers of both sex and labor trafficking using the trafficking law. • Enforce the amended rules for the working scheme for sea fishers, consider additional measures of protection to reduce their risk of labor trafficking, and improve coordination with civil society working in this sector. • Offer specialized accommodations to trafficking victims that are safe, appropriate, and trauma-informed. • Continue to systematically train law enforcement, prosecutors, and judges on a victim-centered, trauma-informed approach to law enforcement efforts and trials and sensitize judges to the severity of trafficking crimes. • Allow all victims to access the national referral mechanism without requiring cooperation with law enforcement. • Adopt a legal provision to exempt victims from penalization for the unlawful acts traffickers compelled them to commit. • Update and adopt a national anti-trafficking action plan with a clear timeline for implementation, responsible ministries, and resources for implementation. • Continue to train law enforcement and prosecutors on developing cases with evidence to corroborate victim testimony. • Increase resources for legal assistance to trafficking victims, as well as the legal services provided, including assistance to victims through investigations and court proceedings, which can be accessed at the earliest opportunity and prior to engaging with police. • Establish a national hotline to report all forms of trafficking crimes, including labor trafficking, and provide victim assistance and referral. • Increase awareness of and trafficking survivor access to damages and increase prosecutor's efforts to systematically request restitution for survivors during criminal trials, particularly for undocumented workers or victims of sex trafficking. • Continue regular liaison between investigators and prosecutors on evidentiary standards and legal matters that arise during investigations in trafficking cases. • Prioritize investigating fraudulent labor recruitment and ensure cases found to be labor trafficking are prosecuted as trafficking rather than labor code violations. • Expand government authorities to ensure the effective regulation and monitoring of agencies that recruit domestic workers and au pairs.

### PROSECUTION
The government increased law enforcement efforts. The 2008 Human Trafficking Act, amended in 2013, criminalized sex trafficking and labor trafficking and prescribed penalties up to life imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with punishments prescribed for other serious crimes, such as rape. The law broadly defined sexual exploitation to include the sexual abuse of children. The Criminal Justice (Sexual Offences) Act of 2017 criminalized the purchase of sexual services and prescribed more severe penalties for the purchase of sex from a person subjected to trafficking. In such cases, the burden of proof shifted to the accused, who had to prove they were unaware the victim was exploited in trafficking.

The national police anti-trafficking unit reported investigating 44 new cases of trafficking in 2021 (25 for sex trafficking and 19 for labor trafficking), compared with 38 investigations in 2020 and 41 in 2019. The number of investigations correlated to the number of identified victims, as law enforcement opened a new case for each individual victim. Police continued investigating 20 trafficking cases initiated in prior years—13 for sex trafficking and seven for labor trafficking, including one case for forced criminality. Although courts remained open in 2021, pandemic-related court closures in 2020 caused delays; investigations and prosecution decisions were largely unaffected. The government initiated the prosecution of one sex trafficking suspect in 2021, a decrease compared with three in 2020 and five in 2019. The government did not initiate any prosecutions for labor trafficking in 2020 or 2021. The government continued to pursue two sex trafficking prosecutions initiated in prior years. For the first time since at least 2013, the government convicted two sex traffickers under the amended anti-trafficking law; judges sentenced them to five years and eight months' and five years and one month's imprisonment. Prosecutors filed an appeal for the sentences being unduly lenient. Additionally,

in 2021, another trafficker pled guilty to false imprisonment instead of trafficking; sentencing remained pending at the end of the reporting period. These three convictions in 2021 were an increase compared with the conviction of one trafficker under a non-trafficking statute in 2020. Prior to the June 2021 convictions, the government had not convicted any traffickers under the anti-trafficking law for at least seven years, despite formally identifying more than 500 trafficking victims during that time. In its 2017 report, GRETA expressed concern about the inadequate criminal justice response in Ireland, noting that the failure to convict traffickers and the absence of effective sentences could contribute to impunity and undermine efforts to support victims to testify.

The Office of the Director of Public Prosecutions (ODPP) had a specialized team responsible for prosecuting trafficking crimes. The government also had a specialized police unit, the Organized Prostitution Investigation Unit (OPIU), which focused primarily on vulnerable populations within the commercial sex industry and links to organized crime, and it included identifying trafficking victims as an area of priority. However, the government did not have specialized judges or courts that could hear trafficking cases, and judges often had little understanding of trafficking crimes or familiarity with the effects of trauma on trafficking victims. Civil society continued to express concern regarding the lack of judicial training, and the government did not report providing any such training. NGOs recommended training for law enforcement, prosecutors, and the judiciary regarding the complexities of commercial sex and sex trafficking, as well as non-punishment of trafficking victims for unlawful acts traffickers compelled them to commit. The government reported providing training to its officials; specifically, the ODPP participated in both virtual and in-person trainings, provided lectures on trafficking to 60 legal practitioners, and helped organize two conferences attended by 300 law enforcement officials and prosecutors, which included a section on prosecuting human trafficking cases. In partnership with international organizations, the government also reported funding anti-trafficking training to the port authorities, members of trade unions, and the Legal Aid Board (LAB). Since 2019, the government reported an improvement in coordination between law enforcement and the ODPP. The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes. International law enforcement cooperation between the United Kingdom (UK) and the OPIU resulted in the screening of 11 women in commercial sex, but authorities did not report identifying any trafficking victims. In 2021, the government received four European arrest warrants for suspected human traffickers, which resulted in the arrest of all four suspects.

## PROTECTION

The government slightly increased victim protection efforts compared with the previous year; however, systemic deficiencies in victim identification, referral, and assistance continued. The police identified 18 trafficking victims, while other government departments or government-funded NGOs initially identified and referred 26 victims to police for formal identification, resulting in a total of 44 victims identified, compared with 38 identified in 2020 and 42 in 2019. Of the 44 victims, 25 were exploited in sex trafficking and 19 in labor trafficking; all victims were adults; 28 were female, and 16 were male. Of the 44 victims identified, 43 were foreign nationals and were predominantly from Nigeria (17), Slovakia (6), Ghana (5), and Egypt (3). Some gaps in victim identification remained, and similar to 2020, the government did not identify any child trafficking victims; but unlike prior years, the government identified one Irish sex trafficking victim and four trafficking victims among asylum-seekers. While every formally identified trafficking victim had access to the government's National Referral Mechanism (NRM), only 33 of the identified victims entered the NRM to receive assistance and care, and of these victims, 17 were referred to legal aid; however, the government did not report how many victims accessed other available services under the NRM. The government reported screening 130 children for trafficking indicators with a child sexual exploitation victim identification tool, which included referral protocols, but it did not identify any child victims in 2021. The ODPP's 2018 decision to reclassify child trafficking victims as victims of sexual exploitation consequently excluded children from trafficking statistics. The media reported that the national rapporteur, the Irish Human Rights and Equality Commission, highlighted the lack of

identified children could also be a result of insufficient expertise among social workers regarding the identification of child trafficking victims. Some experts raised concerns that the number of victims formally identified by police did not represent the true scale of trafficking in Ireland, and many unidentified victims faced penalization or deportation. The government funded a comprehensive 2021 study that concluded the probable number of trafficking victims was likely to be 38 percent higher than the official national statistics from 2014-2019.

While gaps and serious concerns remained, the government made some progress providing assistance to sea fishers—workers in the Irish fishing industry—during the reporting period. The government had not recognized any sea fishers as trafficking victims since 2018; however, in 2021, the government resumed identification and formally recognized seven victims of human trafficking in the fishing industry. The seven sea fisher trafficking victims, from Egypt and Ghana, were either self-identified or referred by NGOs to police for formal victim identification; all seven were offered victim assistance through the NRM, but only three accepted. In 2021, four Ghanaian sea fishers decided to leave government-provided accommodation in Ireland and cooperate with UK law enforcement, which resulted in the arrest of the alleged trafficker in the UK. This alleged trafficker reportedly kept the victims' identification documents in Ireland at a seafood processing facility owned by another alleged trafficker, whose case was dismissed by Irish courts in 2021, in part due to the government's failure to inform the four victims of their opportunity to testify, as reported by the media. Although the government identified 23 victims (36 percent of the total victims identified) among sea fishers in 2018, following the government's 2019 amendment to its atypical working scheme (AWS) for sea fishers, it did not identify any victims in the fishing sector in 2019 or 2020. Civil society raised serious concerns regarding the absence of any identified victims for several years in an industry inherently vulnerable to forced labor. Civil society asserted foreign national sea fishers, especially those from outside of the European Economic Area (EEA), were at even greater risk following the 2019 amendment of the scheme because the government failed to enforce the amended rules, stopped identifying victims for several years, and had revoked the status and associated protections against previously identified trafficking victims within this sector. However, failure to uniformly screen all trafficking victims—before referring them to immigration authorities for deportation—persisted, and in May 2021, the police declined to interview an undocumented sea fisher and self-identified trafficking victim, who had reportedly recorded the trafficker confessing, and instead referred the case to immigration authorities. In 2021, government officials raised concerns the workplace relations commission (WRC) did not sufficiently understand its role in identifying trafficking victims or have adequate trafficking training, and the separation between immigration, labor, and trafficking enforcement was unclear to all officials. An NGO reported that WRC had insufficient personnel and training.

In 2021, a university published a report, which featured in-depth interviews with 24 male non-EEA sea fishers in the Irish fishing industry, some of whom were undocumented. The report concluded that labor exploitation was still prevalent in the Irish fishing industry and that the overall conditions in the sector had worsened since the implementation of the AWS in 2016, echoing the conclusions of another NGO report published in 2017. More than half of the participants interviewed said that they had been subjected to verbal and racial abuse, and less than half recalled boats being inspected by the WRC or other authorities asking about work-related issues. Several descriptions from the 24 interviewed sea fishers could meet the threshold for trafficking, including the use of fraudulent recruitment and non-violent psychological coercion via threats of permit revocation and subsequent deportation, which coerced sea fishers into less pay, longer hours, more dangerous situations, and the endurance of racial and verbal abuse, as well as several instances of forced criminal activity by coercing sea fishers to hide fish, in contravention of quota regulations. Fear of reprisal and permit revocation, as well as language barriers, were obstacles for victims to engage with inspectors. The report made a number of recommendations, including revising the model contracts, de-coupling work permits from individual employers to eliminate the use of permits to control the labor of sea fishers, and increasing the use of professional interpreters for private interviews with sea fishers away from their employers.

**IRELAND**

Experts continued to raise concerns regarding the government's inability to identify trafficking victims due to shortcomings in its identification mechanism and limiting identification of victims solely to police. While the government had national formal procedures for victim identification, they were valid only for victims lacking legal residency in Ireland, namely foreign nationals from outside the EEA who were not asylum-seekers. The formal identification scheme excluded EEA-nationals, including Irish nationals, and asylum-seekers with pending applications. GRETA reported in 2017 that, as a result, the government did not formally identify such persons as suspected trafficking victims, with negative implications for their access to social welfare and other specialized victim services. However, despite gaps in the NRM, in 2021, the government reported identifying four trafficking victims in the asylum system; victims were referred either by a government-funded NGO or Health Services Executive (HSE) or through government offices responsible for reviewing asylum applications and government-funded accommodations. The government reported that, in practice, domestic and foreign victims had equal access to all state services. GRETA and NGOs, however, asserted EEA-national victims could be excluded from accessing general social welfare, housing support payments, and other state support until they satisfied or were granted an exemption from the Habitual Residence Condition, which some victims may not have been able to satisfy because of an inability to prove a documented work history. The government maintained it assessed suspected victims on a "reasonable grounds" basis to allow them access to support and services; victims that cooperated with law enforcement were often referred to services, but referral was not systematic throughout the country. A 2021 academic study concluded the government did not have a formal victim identification process due to a lack of specific criteria for "reasonable grounds" decisions. NGOs and lawyers asserted the national police lacked consistent standards when assessing victims; anti-trafficking efforts varied widely from urban to rural areas; and there was no consistently used formal referral mechanism for all police units for sex trafficking victims. NGOs and other front-line responders did not have a formal role in the identification of victims, although police could receive victim referrals from any source. In its 2017 report, GRETA criticized the exclusive police authority to identify victims, asserting it created a potential conflict of priorities between law enforcement efforts and victim assistance. Experts echoed GRETA's criticism and urged the government to allow formal victim identification by entities other than the police, including civil society, labor inspectors, social workers, and health care professionals.

The government provided €689,938 ($782,240) to NGOs for victim assistance and legal services, including both sex and labor trafficking, a significant increase compared with €452,988 ($513,590) in 2020. The government required a formal victim statement to police and a law enforcement referral for potential victims to access the NRM; victims unwilling to go to the police could access emergency accommodation, counseling, medical care, and legal services from NGOs that received government funding but not through the referral mechanism. Through the NRM, which was administered at government-run assistance centers (direct provision centers), the government provided victims with voluntary access to legal aid service, direct provision accommodation (government-funded accommodation), welfare and rent allowance, police assistance, repatriation, translation and interpretation assistance, education for dependent children, a recovery and reflection period, temporary residence permits, and medical care, including individual care plans by HSE within three days of referral. Victims who did not cooperate with law enforcement did not have access to statutory care or the sexual health screenings available to victims that did cooperate. In 2017, the government reported plans to institute a new and revised NRM and reaffirmed and approved those plans in 2021, which reportedly included proposals to expand formal victim identification by and referral from entities other than the police, including social workers, health care professionals, and partner NGOs, as well as allow all victims to access the NRM without requiring cooperation with law enforcement. However, the government reported that the adoption of a revised NRM would require a legislative change, and the revision remained pending. While experts welcomed ongoing government plans to develop the new NRM, they expressed concern with the slow pace and lack of clarity surrounding its development.

Due to the pandemic, the caseworkers for trafficking victims within HSE, were seconded to COVID-19 contact tracing roles until October 2021; subsequently, case management of trafficking victims and referral to services may have been diminished. Furthermore, civil society continued to raise concerns regarding the government's ongoing, chronic deficiencies in providing assistance and protection to trafficking victims. While there were no dedicated services or accommodations for child trafficking victims, children were usually placed in children's residential centers or in approved foster care and had access to social workers and one psychologist from the anti-trafficking team at the HSE. However, there was no legally mandated psychological assistance for victims, and NGOs continued to report a lack of specialized services to address the physical and mental health needs of victims. According to experts, the lack of clear rights and legal protections for victims often required NGOs to use the legal system to ensure victims' rights were protected, which only benefited a limited number of victims. Access to legal services was limited, as resources were insufficient for demand and delays in application processing resulted in some victims becoming undocumented, thereby reducing their access to care and assistance. Services available from the government's Legal Aid Board were inadequate for victims' needs, as the board only provided information to potential victims referred by police but did not provide legal assistance or support to victims during investigations or trials. Two government-funded NGOs provided legal representation for labor trafficking victims in 2021. GRETA and NGOs urged the government to ensure victims had early access to legal practitioners with specialized knowledge of trafficking who could represent them.

The government did not offer trafficking-specific shelter or services for trafficking victims. However, the government provided accommodation arrangements for victims and potential victims through the government-funded direct provision system, which housed asylum-seekers, refugees, and trafficking victims in centers and temporary accommodation facilities across the country. Victims were not required to stay in the direct provision accommodation, originally established for asylum-seekers, although the government did not otherwise offer dedicated shelters for victims of trafficking. NGOs stated the mixed-gender housing in the direct provision system had inadequate privacy, was unsuitable and potentially unsafe for traumatized victims, could expose them to greater exploitation, and undermined victim recovery. Experts also noted a lack of specialized services in the centers for all victims, but especially for female victims who had been traumatized due to psychological, physical, or sexual violence. Experts noted that accommodation in direct provision was inappropriate and unacceptable for emergency or long-term stays. NGOs raised concerns that the placement of trafficking victims in direct provision accommodation isolated victims from other available services and exposed them to re-trafficking and re-traumatization. Potential victims who were in the asylum process remained in direct provision accommodation while a determination was being made in relation to their claim for international protection, which could continue for years. For several years, the government, including a parliamentary committee, an Advisory Group, and Ireland's Ombudsman acknowledged the lack of adequate accommodation.

In February 2021, the Department of Children, Equality, Disability, Integration and Youth published a white paper with plans to overhaul and phase out the direct provision system by 2024 and replace it with a victim-centered accommodation and social support system called the International Protection System. The 2021 implementation of the plan included the appointment of a transition team and an external advisory group, as well as the establishment of oversight structures, initiative planning processes for projects, building capacity for NGOs to provide services, interagency working groups, and a computer system for bed management. In 2020, the government announced plans to open an accommodation center for 8-10 female trafficking victims, but the shelter remained non-operational during the reporting period. Other than the appointment of the transition team, the government did not report taking any further actions to effectively address inadequate shelter; the original direct provision accommodation framework remained in effect.

The government could give potential foreign trafficking victims temporary relief from deportation by issuing temporary residence permits, contingent upon cooperation with an ongoing investigation;

permits could be extended by police request to the Department of Justice (DOJ). The government also provided legal alternatives to removal to countries in which victims would face retribution or hardship. Immigration permissions were granted through a 60-day recovery and reflection period, a six-month temporary residence permission, or a two-year residence permission that allowed the holder to engage in legal employment. The government issued some form of immigration permission, including renewals, to 57 trafficking victims in 2021. However, trafficking victims could not work for the first 60 days during their recovery and reflection period. NGOs reported the six-month work permits acted as a barrier to work because of the government's slow renewal rate and the recovery and reflection period was not uniformly granted to victims. The temporary residence permission could evolve into permanent residency, and residency benefits were not linked to a conviction. However, the government precluded victims who sought asylum from obtaining six-month renewable residence permits, which limited their access to certain benefits, such as work permits.

The government did not provide state compensation to victims of trafficking, as there was no mechanism to do so. The law did not require prosecutors to systematically request restitution for victims for trafficking crimes, though courts could order restitution for victims, and victims could also obtain restitution and damages for lost wages through a criminal trial, a civil suit, state bodies dealing specifically with work-related rights, and the criminal injuries compensation tribunal. The media reported that in November 2021, the WRC awarded €20,000 ($22,680) in backpay to one sea fisher. However, in another 2021 case, the media reported four sea fishers, who were potential trafficking victims, did not receive back wages because the WRC failed to complete its investigation prior to the expiration of the statute of limitations, did not inform the victims, and the sea fishers received no restitution. The victims of the two convicted traffickers in 2021 applied to the criminal injuries compensation tribunal, but the government did not report making a decision regarding their compensation applications or whether prosecutors requested restitution during the trial. Historically, the government did not award restitution to victims for the crime of human trafficking, only for lost wages. Some NGOs reported victims infrequently received payment in the past, as the court did not have enforcement authority and employers would frequently close down, transfer directorship, leave the country, or claim inability to pay. The Minister of Justice could decide to order restitution for unpaid labor of foreign trafficking victims, but the Minister never utilized this authority. NGOs criticized the lack of viable avenues for victim restitution, particularly of cases that involved sex trafficking and undocumented workers. Victims of sex trafficking had no verifiable expenses or employment losses, and the Labour Relations Committee was unavailable to undocumented workers, who could only pursue civil suits if they could prove they took all reasonable steps to rectify their irregular working status. However, NGOs stated that no case like this has previously been brought before the courts and that high legal costs often functioned as a deterrent to victims. Officials also noted that because there was no viable avenue for undocumented workers to recover wages, this could have incentivized employers to exploit workers and may have increased their vulnerability to trafficking.

In 2021, DOJ announced plans to improve its victim-centered approach with its 'Supporting a Victim's Journey,' program and secured €2.3 million ($2.61 million) in the 2021 budget to fund the reforms for all victims, including trafficking victims. The program would include legal aid for victims, ensure victims understood their rights, improve interagency coordination and services to victims, and train officials; however, the government did not report any impacts specifically for trafficking victims as a result of the program. The law protected the privacy and identity of victims in court proceedings and allowed victims to testify via video link at the discretion of the judge; however, this was not always uniformly granted, and NGOs were concerned that victims were not always informed of these protections. The government had a witness protection program but did not report how many trafficking victims were provided this service during the reporting period.

The government remained without a specific legal provision on the non-punishment of victims of trafficking, and GRETA urged adoption of such a provision in both its 2013 and 2017 reports. Furthermore, in 2015, the Irish High Court found a need for protocols or legislation to dictate what happens when a victim is suspected of criminal activity;

however, the government took no action to rectify this gap, and the existing trafficking law did not include a provision to protect victims from prosecution for unlawful acts traffickers compelled them to commit. However, in practice, prosecutors sought to avoid victim prosecution and utilized internal guidelines that instructed prosecutors to consider the public interest and mitigating factors, such as coercion, when deciding whether to charge an individual with a crime. The government reported the national police also collaborated with ODPP to ensure victims were not prosecuted, but that decision rested entirely with the ODPP and was not subject to scrutiny. NGOs noted the process for victims to seek immunity from punishment for criminal activity as a result of trafficking was complex and required early legal representation. If authorities prosecuted an individual before they were formally identified as a trafficking victim, their criminal record could not be expunged. In recognition of this issue and in an effort to avoid victim penalization, in April 2021, the DOJ expunged 607 prior convictions for commercial sex offenses; many of the convicted individuals may have been sex trafficking victims. NGOs continued to report instances of potential victims detained in prison for cannabis production prior to assessing whether they were trafficking victims and urged the government to complete the identification process first. The media reported that in 2021, two Albanian trafficking victims were released from prison after their arrest at a cannabis factory in 2020; the two victims had pled guilty to drug-related charges and remained in prison until the government identified them as labor trafficking victims.

## PREVENTION

The government maintained modest prevention efforts. The DOJ's criminal justice policy unit functioned as the national coordinating body and was responsible for coordinating interagency efforts, raising awareness, providing funding to anti-trafficking civil society organizations, collecting data, and publishing an annual trafficking report. The DOJ's national anti-trafficking forum comprised interagency and civil society stakeholders; the forum did not meet in 2021, and some NGOs expressed frustration at the government's inconsistent responses to their recommendations. However, the forum's subgroups met four times in 2021 to discuss the revised NRM and review the NAP. The government's independent national rapporteur was the Irish Human Rights and Equality Commission, which was responsible for monitoring human trafficking policy and data collection. It was uncertain whether the government followed its 2016 NAP; the plan had no end date, timeframe, budget allocation, or indication of agencies responsible for its implementation. NGOs described the 2016 NAP as outdated; the new anti-trafficking committee stated its intention to draft an updated plan but did not do so. The government continued efforts to raise awareness of trafficking by launching a national anti-trafficking public awareness campaign, similar to another campaign in 2020, in partnership with an international organization. The WRC continued to raise employment rights awareness among seasonal workers via social media posts, the display of 1,000 posters, and the distribution of leaflets on victims' rights in several languages and also provided employment rights information to 58,735 telephone callers in 2021. The government also maintained a website that provided information on human trafficking and encouraged the public to report possible cases of trafficking to authorities. In partnership with trafficking survivors, in November 2021, a government-funded NGO launched an awareness campaign on the prevalence of sex trafficking. In 2021, the government provided €280,000 ($317,460) to NGOs for anti-trafficking public awareness campaigns and victim assistance training, an increase compared with €137,700 ($156,120) in 2020. In 2021, the government funded a cultural mediation project, implemented by an international organization, which built capacity and provided training for professionals who worked with vulnerable populations like Roma, refugees, undocumented migrants, and asylum-seekers; the program trained officials how to identify and address the needs of trafficking victims more effectively and empower survivors through a victim-centered approach with a particular focus on cultural competency, sensitivity, and awareness. The government reported training 11 cultural mediators, 20 police officers, 25 front-line officials, and 83 service providers through the project in 2021, with at least 12 victims benefitting from assistance. In early 2022, the government established three city centers to support refugees fleeing Russia's unjust war in Ukraine; the centers assisted refugees with obtaining social

welfare income support and referrals to available services. The national rapporteur called on the government to undertake more prevention efforts regarding Ukrainian refugees, including information on trafficking risks and employment rights.

Fraudulent recruitment by labor recruitment and employment agencies remained a concern; however, the government did not report effective law enforcement measures taken to deter traffickers. Such agencies were required to have a license, and passport withholding was illegal. The WRC did not have the authority to regulate agencies that recruited au pairs, who were allowed to work up to 20 hours per week without the need for a work permit. NGOs reported employers regularly paid au pairs less than minimum wage and forced them to work more than the maximum of 20 hours per week, creating vulnerability to labor trafficking; however, the government did not report any steps taken to address this during the reporting period. Furthermore, an NGO also raised concerns regarding the lack of jurisdiction for WRC inspectors to address violations regarding the number of hours worked on fishing vessels. While the WRC referred these cases to the Marine Services Office, with 15 referrals in 2021, sea fishers were still left with little recourse for recovering unpaid wages. The WRC reported conducting more than 4,400 inspections and recovering nearly €1 million ($1.13 million) in non-payment of wages. Although no trafficking-related law enforcement efforts were undertaken as a result of inspections, labor inspectors did report referring five potential trafficking victims to the police in 2021. Multiple law enforcement agencies, including OPIU, immigration, and WRC, participated in a joint action day in June 2021 that focused on labor trafficking, targeting industries with a higher likelihood of labor trafficking, such as massage parlors and nail salons, and resulted in screening 53 individuals for trafficking indicators and the provision of accommodation for two potential trafficking victims. The government also participated in an additional joint action day in November 2021, which focused on 58 establishments with a higher likelihood of indicators of sex trafficking and resulted in the identification of one potential trafficking victim. Of the 171 fishing vessels under the scope of the amended AWS, in 2021, the WRC conducted 14 desktop inspections and 37 on-board inspections, identifying zero trafficking victims. WRC inspectors reportedly found several violations of employment and labor law in the fishing sector and referred several employers for prosecution; however, it did not report law enforcement actions against any companies for labor trafficking in 2021. Some experts raised concerns that inspectors viewed possible cases of labor trafficking as administrative employment law violations and did not pursue them as trafficking crimes.

In an effort to address vulnerabilities created by the pandemic when migrant workers became unable to travel or physically apply to extend their immigration status, the government permitted those that became undocumented to access unemployment payments and ensured officials did not report undocumented workers to immigration authorities. The government prohibited convicted human traffickers from being selected for public contracts. The government made efforts to reduce the demand for commercial sex acts by questioning and investigating at least 77 alleged procurers of commercial sex and by providing €106,050 ($120,240) for awareness raising projects, an increase compared with €96,050 ($108,900) in 2019 and 2020. The government continued to provide funding to several anti-trafficking programs abroad. The government did not fund the operation of a dedicated national trafficking hotline assisting all trafficking victims but did operate a hotline that catered to sex trafficking victims and individuals in commercial sex. The government also promoted a general crime hotline for anonymously notifying police about various crimes; police officers staffed the hotline, which was available for 12 hours daily. The government did not report the number of calls received for trafficking-related cases. The national police also had a dedicated email address for reports of trafficking.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Ireland, and traffickers exploit victims from Ireland abroad. Traffickers subject Irish children to sex trafficking within the country. The prevalence of human trafficking in Ireland is likely higher than official statistics report; a comprehensive 2021 study found that from 2014 to 2019, the true number of trafficking victims was likely 38 percent higher than official national statistics. Foreign trafficking

victims identified in Ireland are from Africa, Asia, Eastern Europe, and South America. In recent years, authorities and media have reported an increase in suspected victims from Brazil, Indonesia, Nigeria, Pakistan, and Romania. Brazilian women are vulnerable to fraudulent recruitment and promises of employment in cafes and massage parlors or as au pairs only to be forced into commercial sex upon arrival in Ireland. Traffickers exploit victims of forced labor in domestic work, the restaurant industry, cannabis cultivation, nail salons, food processing, waste management, fishing, seasonal agriculture, hospitality, and car washing services. In March 2022, a human rights group filed a petition with the U.S. government requesting the banning of any seafood imports from Ireland to the United States that were caught or produced using forced labor, specifically highlighting four Irish fishing companies. Lithuanians affected by poverty or substance abuse issues are vulnerable to forced criminality by organized human trafficking networks. In 2022, Ukrainian refugees, predominantly women and children, fleeing Russia's full-scale invasion of Ukraine, are vulnerable to trafficking. Undocumented workers in the fishing industry and domestic workers, particularly au pairs, are vulnerable to trafficking. Migrant workers from Ghana, Egypt, and the Philippines are vulnerable to forced labor on fishing vessels. Women from Eastern Europe who are forced into marriage in Ireland are at risk for sex trafficking and forced labor.

# ISRAEL: TIER 2

The Government of Israel does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Israel remained on Tier 2. These efforts included continuing to operate shelters and other facilities and providing victims a wide variety of immediate and long-term care and rehabilitative services. The government also continued investigating, prosecuting, and convicting officials complicit in trafficking-related crimes. In addition, the government began revising victim recognition procedures to streamline processes and reduce the risk of re-traumatization. However, the government did not meet the minimum standards in several key areas. The government's efforts to investigate and hold labor traffickers criminally accountable remained inadequate, and the government did not consistently investigate labor trafficking cases referred by NGOs. The government recognized fewer trafficking victims and relied on NGOs to initially identify victims, rather than proactively identifying victims. Despite adding an additional officer, the Police Anti-Trafficking Coordinating Unit (PTC), which remained the only authority to officially recognize victims of trafficking, remained severely understaffed for the sixth consecutive year, which further hindered the efficiency of victim identification procedures and referral of victims to protection services. The government maintained inadequate oversight over foreign labor recruitment outside of bilateral work agreements (BWAs), including through foreign contracting companies ("*Hevrot Bitzua*"), to prevent forced labor and exploitative labor practices.



ISRAEL TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Continue expediting processes to proactively identify and refer trafficking victims to appropriate care without re-traumatizing victims, including those referred by NGOs, and ensure victim identification procedures take a trauma-informed approach. • Authorize more government officials, including throughout the country, to identify trafficking victims to allow

Haiti AR_000783

for more efficient access to protection services. • Significantly increase investigations, prosecutions, and convictions of labor traffickers, including potential trafficking cases referred by NGOs, and sentence convicted traffickers to significant prison terms. • Ensure all potential victims have full access to services while their case is being reviewed for official victim recognition. • Proactively screen vulnerable populations, including undocumented African migrants, foreign workers, Palestinian workers, and LGBTQI+ individuals, to ensure trafficking victims among these populations are not penalized for unlawful acts traffickers compel them to commit, such as immigration and "prostitution"-associated violations. • Increase enforcement of foreign worker and Palestinian labor rights, including by establishing systems to ensure workers have valid and fair labor contracts, eliminating all worker-paid recruitment fees for all foreign and Palestinian workers, ensure any recruitment fees are paid by employers, and ensure any employer-paid recruitment fees are not passed onto workers. • Substantially increase anti-trafficking awareness and victim identification trainings for law enforcement and front-line officials, including police officers, border officials, and prison officials, at regional and local levels. • Increase the number of labor inspectors, social workers, and interpreters in the agricultural, construction, and caregiving sectors and provide them with training on victim identification procedures. • Expand resources and officials allocated to the National Anti-Trafficking Unit (NATU) and PTC to ensure NATU and the PTC are able to adequately perform their duties. • Allocate resources and fully implement the 2019-2024 national action plan (NAP) to combat trafficking. • Amend the 2006 anti-trafficking law to include a definition of human trafficking consistent with international law. • Transparently share information on government anti-trafficking efforts with civil society. • Designate a Knesset committee or subcommittee to address sex and labor trafficking.

## PROSECUTION

The government decreased overall law enforcement efforts, and law enforcement actions against labor traffickers remained inadequate. The 2006 anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed penalties of up to 16 years' imprisonment for the trafficking of an adult and up to 20 years' imprisonment for the trafficking of a child. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the law did not establish the use of force, fraud, or coercion as an essential element of the crime.

In 2021, police initiated eight total investigations, including three sex trafficking cases involving nine suspects and five forced labor cases involving three suspects; the government also investigated 33 cases involving 43 individuals suspected of engaging in commercial sex acts with a child. In addition, the government investigated 118 sex trafficking-related crimes but determined all were "prostitution"-related offenses. This was a slight decrease compared with 11 total investigations (one sex trafficking, eight forced labor, and two child sex trafficking investigations), in addition to 91 sex trafficking-related investigations, in 2020. In 2021, the government initiated six new prosecutions, three for child sex trafficking and three for attempted solicitation of commercial sex with a child; this was a decrease compared with nine total prosecutions (three adult sex trafficking, one forced labor, and five child sex trafficking) in 2020. The government continued prosecuting 24 alleged traffickers in cases initiated in previous reporting periods: 13 for sex trafficking, one for forced labor, and 11 for unspecified forms of trafficking. In 2021, courts convicted two traffickers, one for adult sex trafficking and one for attempted child sex trafficking; this was a decrease compared with convicting 12 traffickers (nine for adult sex trafficking, two for forced labor, and one for child sex trafficking) in 2020. Of the two sentences issued during 2021, including cases convicted in previous reporting periods, only one trafficker received a sentence greater than one year imprisonment. Judges sentenced one convicted trafficker to four months' imprisonment and probation and ordered them to pay restitution to the victim; and sentenced the other trafficker to 13 months' imprisonment and probation. Such lenient sentencing undercut efforts to hold traffickers accountable and did not serve to deter the crime or adequately reflect the nature of the offense. The government continued to report law enforcement efforts to address government officials allegedly complicit in trafficking-related crimes. In

2021, the government investigated four cases and prosecuted six allegedly complicit officials, and courts convicted two officials in trafficking-related crimes; prosecutors also appealed the lenient sentencing of an official convicted in 2020. In 2021, the Israeli National Police (INP) investigated and referred to the State Attorney's Office a Population and Immigration Authority (PIBA) official who allegedly coerced asylum-seekers to perform sex acts in exchange for permits. The government coordinated with a foreign government to investigate an alleged child sex trafficking case involving foreign and Israeli suspects and coordinated with other foreign governments to extradite suspected traffickers.

The INP assigned a second officer to the PTC in 2021. However, NGOs continued to report the government was, at times, reluctant to investigate complex trafficking cases due to lack of dedicated staff and resources. NGOs also alleged that despite sharing evidence of potential forced labor cases, the government often did not investigate them, especially those involving foreign workers, in a timely manner. The government reported difficulties gathering victim and witness testimony, which was exacerbated by foreign victims' desire to return to their home countries during the pandemic. To address this gap, the government continued implementing guidelines on early testimony in cases involving foreign victims to create a standard approach. To address challenges in reporting trafficking crimes during the pandemic, the INP established an online system to file police complaints for all offenses, including trafficking complaints, for victims hesitant to meet with law enforcement officials, including undocumented migrant workers. During the reporting period, the government appointed police focal points in all districts to lead all trafficking investigations and to perform initial identification screening to refer victims to the formal recognition procedure. As in previous years, the government provided extensive anti-trafficking training, awareness-raising workshops, and seminars, at times in coordination with NGOs, to law enforcement, judicial officials, social workers, medical staff, labor inspectors, and other officials on victim identification and referral, investigating trafficking cases, and providing trauma-informed care to victims.

## PROTECTION

The government decreased overall victim identification and protection efforts, recognizing fewer victims. In 2021, the government reported receiving 58 victim referrals from NGOs and government sources, compared with 74 referrals in 2020. Of the 58 referrals, the government granted official trafficking victim status to 51 individuals, a decrease from the 69 victims recognized in 2020. Of the 51 recognized victims, 17 were victims of sex trafficking, and 34 were victims of forced labor. The government recognized two male victims exploited in the Sinai prior to arriving in Israel, compared with one victim exploited in the Sinai recognized during the previous year. The government continued to circulate trafficking victim identification guidelines widely to relevant ministries. However, NGOs remained critical of the government's ability to proactively identify victims and reported more than half of all victims recognized by the government during the reporting period were initially identified by NGOs; of the 51 recognized victims, NGOs referred 31, and government sources referred 20 to the PTC. The PTC was the only government entity with the authority to grant individuals official trafficking victim status, which allowed a victim full access to protection services. NGOs continued to report that the government's inaction to investigate labor trafficking cases deterred potential forced labor victims from reporting their exploitation. While NGOs reported improvement in the PTC's ability to recognize victims referred by NGOs with the addition of a second officer during the reporting period, NGOs reported the PTC continued to suffer from delays recognizing trafficking victims due to understaffing. Because the government only authorized two PTC officers to review victim applications throughout the country, the victim recognition process was significantly delayed for months and at times inhibited victims' access to much-needed protection services during the delay. To address these delays and other issues during the victim recognition process, the government held consultations with NGOs, academics, and government stakeholders to revise victim recognition procedures and developed a plan for phased implementation during the reporting period. As part of the revision process, in October 2021, the PTC published new procedures for applying for victim status, clarifying recognition criteria and establishing an appeal process. PTC's new

ISRAEL

procedures also limited the need for extensive victim interviews as a last resort to reduce re-traumatization; previously, NGOs reported the PTC's high evidentiary standard re-traumatized victims, as they recounted and "proved" their exploitation. The remaining victim recognition procedure revision steps, including plans to transfer recognition authority from the PTC to NATU, were pending at the end of the reporting period.

The government continued to provide a wide range of protective services for victims of all forms of trafficking. The government continued to operate a 35-bed shelter for female trafficking victims, a 35-bed shelter for male trafficking victims, and transitional apartments with 18 beds for female victims. In response to the pandemic, the government divided shelter residents into "bubbles" to limit transmission, and each shelter designated quarantine areas for isolating residents potentially exposed to COVID-19. Shelter residents could leave freely. These shelters offered one year of rehabilitation services, including job training, psycho-social support, medical treatment, language training, and legal assistance. In 2021, the women's shelter assisted 47 adult victims, the men's shelter assisted 43 victims, and the transitional apartments assisted seven women and 18 children accompanying their mothers; in 2020, the women's shelter assisted 40 adult victims and three children of victims, the men's shelter assisted 32 victims, and the transitional apartments assisted nine women and 18 children accompanying their mothers. Shelter staff could adjust operations to accommodate deaf and deaf-mute victims, including by contracting an interpreter. The Ministry of Labor, Social Affairs, and Social Services (MLSS) continued to operate the National Center for Survivors of Slavery and Trafficking in Persons, formerly known as the "day center," in Tel Aviv for male and female trafficking victims who were waiting for a space at a shelter, chose not to reside at a shelter, or had completed one year at a shelter. The center provided psycho-social services and food aid, with social workers trained to identify individuals at risk of re-trafficking. In 2021, the center provided services to 113 male and 99 female victims, as well as 168 children; this is compared to 2020 when the center provided services to 133 male and 106 female victims, as well as 160 children. The government also operated 14 "*HaLev*" (Heart) centers for girls and young women exploited in commercial sex throughout the country, which provided psycho-social services, medical assistance, vocational training, and other assistance; the Tel Aviv-Jaffa center was open 24/7 and the Tel Aviv and Haifa centers catered to all genders including nonbinary individuals. The government continued to provide free medical treatment for one year at various government-funded health facilities for recognized trafficking victims living outside of shelters.

The government continued to encourage victims to assist in the investigation and prosecution of traffickers but did not require their participation in court cases as a condition for receiving visas and protective assistance; victims could opt to leave the country pending trial proceedings. The government continued implementing policy guidance established during the previous reporting period for collecting early testimony in cases involving foreign victims if foreign victims requested repatriation before the conclusion of their case. In December 2021, the government fully approved and published an amendment to its Procedures (Examination of Witnesses) Law to allow victims or witnesses to provide testimony not in the presence of the defendant but, rather, in the presence of the defense attorney in specific offenses including trafficking. The government continued implementing new procedures established in March 2021 for managing sex crimes, including sex trafficking, by designating a contact person at every court to coordinate victims' security during proceedings, arranging private waiting rooms, and enabling video testimony. The Legal Aid Administration (LAA) continued to provide free legal aid to trafficking victims to assist in civil procedures, immigration procedures, and—in sex trafficking cases—criminal proceedings; forced labor victims did not have automatic access to LAA assistance in criminal proceedings. During the reporting period, the government drafted an amendment to the Legal Aid Law to expand legal aid in criminal proceedings to all victims of trafficking, including labor trafficking victims; the amendment was pending at the end of the reporting period. In 2021, the LAA received 135 legal aid requests to assist potential trafficking victims, compared with 76 legal aid requests in 2020. The government allowed trafficking victims to work during the investigation and prosecution of traffickers. The government provided all recognized victims with work

visas. Following the conclusion of criminal proceedings, trafficking victims could request a "rehabilitation" visa for an additional year; the government extended "rehabilitation" visas on an ad hoc basis. The government forfeiture fund, which used property and money confiscated from traffickers to assist victims, allocated 937,190 shekels ($302,420) to 89 applicants for the provision of various protection services, including housing, counseling, and vocational training for victims, monetary compensation ordered by courts, and funding for NGOs in 2021; no funds were allocated in 2020 due to insufficient resources. The anti-trafficking law dictated the court must explain any decision to abstain from awarding restitution in its verdict, making restitution the default; in 2021, the government did not report the amount awarded in restitution. The government maintained guidelines discouraging the prosecution of trafficking victims for unlawful acts traffickers compelled them to commit. However, the government did not systematically screen for trafficking among the undocumented African migrant population, foreign workers employed by foreign construction companies, or individuals in commercial sex, and as a result, authorities may have penalized unidentified and some identified victims for immigration violations or "prostitution"-associated offenses. The government continued a program to expunge the records of individuals convicted of "prostitution"-associated offenses for individuals not sentenced to prison terms, including potential sex trafficking victims; the government fully or partially expunged five records in 2021.

## PREVENTION

The government maintained efforts to prevent trafficking; however, government policies towards many foreign workers were insufficient to address their vulnerability to trafficking. NATU within the Ministry of Justice continued to coordinate anti-trafficking efforts among relevant ministries and NGOs during the reporting period; NATU had nine staff members in 2021, including the national coordinator, two legal advisors, an intern, three law students, one secretary, and one national service volunteer. NGOs reported that while NATU demonstrated political will and was knowledgeable about trafficking, it was not always effective influencing other parts of the government and lacked the resources to fully meet its mandate. The government maintained its 2019-2024 NAP to combat human trafficking. However, for the third consecutive year, the government did not finalize its implementation plan nor allocate additional funds for the NAP. Throughout 2021, the four inter-ministerial teams, each focusing on key objectives outlined in the NAP, held discussions with NGOs, civil society organizations, and government stakeholders; the teams presented their recommendations to the Committee of Directors General for approval in September 2021. One of the four inter-ministerial teams was tasked with conducting research on the scope and characteristics of trafficking in Israel; the government approved the team's research plan during the reporting period and provided a budget. Unlike previous years, the Knesset did not re-establish the Subcommittee on Trafficking in Women and Prostitution; however, the Knesset established a committee on migrant workers, which discussed labor trafficking, among other issues. While the government produced an annual report on its anti-trafficking efforts and regularly updated information on NATU's website, the report was not publicly available; NGOs reported difficulty obtaining information on the government's anti-trafficking efforts, and the government did not respond to most information requests from NGOs. The government conducted various national awareness-raising campaigns, including education programs for students, national television commercials, radio broadcasts, and lectures for government officials, shelter staff, and academics. In May 2021, Israel acceded to the Council of Europe Convention on Action Against Trafficking in Human Beings.

376A of the Penal Law 5737-1977 prohibited holding a person's passport against their will and carried a penalty of three to five years' imprisonment; the government did not report specific law enforcement action under this law during the reporting year. In 2021, the Ministry of Economy and Industry (MOEI), which employed 210 labor inspectors, issued 196 administrative warnings, imposed 45 fines totaling 5.27 million shekels ($1.7 million), and filed two indictments for labor violations involving child labor that resulted in five convictions; in 2020, the MOEI issued 196 administrative warnings, imposed 66 fines totaling 9.96 million shekels ($3.2 million), and filed two indictments for labor violations. In addition, through MOEI inspections, employers

Haiti AR_000785

returned 829,120 shekels ($267,540) of withheld wages to foreign workers in 2021. Authorities opened 489 criminal investigations and filed 114 indictments against employers of foreign workers for suspected violations of labor laws; courts rendered 69 sentences with sanctions and compensation totaling approximately 5.35 million shekels ($1.73 million). This represented an increase from 2020 when the government opened 1,145 criminal investigations for suspected violations of labor laws, filed 94 indictments, and rendered 77 sentences with sanctions and compensation totaling 3.7 million shekels ($1.19 million). NGOs continued to report there were not enough labor inspectors, especially in the construction and agricultural sectors, to sufficiently monitor and enforce labor laws. Additionally, NGOs reported the government did not effectively regulate foreign contracting companies ("*Hevrot Bitzua*"), nor did it effectively prevent the exploitation of foreign workers in the construction and agriculture sectors recruited outside of established BWAs. In 2021, the government implemented new BWAs with the Philippines and Sri Lanka in home-based long-term care sectors and with Nepal and Georgia in the institutionalized long-term care sector. The government maintained BWAs with 10 other countries for agriculture, construction, caregiving, and domestic work sectors; in 2021, 9,387 of the 31,370 foreign workers who arrived in Israel did so through these agreements. Foreign workers recruited under BWAs had triplicate standardized labor contracts held by the worker, employer, and the government. Private Israeli recruitment agencies could not charge worker-paid recruitment fees in the domestic caregiving sector, and worker-paid recruitment fees were capped at 2,814 shekels ($910) in the agricultural sector; the government did not report other actions to prohibit worker-paid recruitment fees. While Israeli law required employers of foreign workers to provide detailed labor contracts in a language the worker understands, there was not adequate government oversight to ensure contracts for workers not covered by BWAs met labor standards, which left workers vulnerable to exploitative employment practices, including long work hours, violations of work and living conditions, and exploitative promissory notes. NGOs reported foreign workers often paid exorbitant fees to recruitment agencies in their country of origin or the Israeli manpower agency; NGOs reported many foreign workers financed the fees through high interest rate loans from informal or illicit lenders in Israel, further increasing workers' vulnerability to trafficking.

While most foreign workers could change employers without their previous employers' permission, foreign construction workers were limited to being able to change employers on a specified date each quarter and otherwise required employers' permission to change employers. However, workers employed by foreign contracting companies ("*Hevrot Bitzua*"), primarily in the construction sector, were not authorized to change employers unless it was to another foreign contracting company. PIBA procedures for recruitment agencies in the caregiving sector continued to require every agency to hire a licensed social worker responsible for supervising the conditions of foreign caregivers, including home visits, and for informing relevant authorities about labor violations. While the government contended that workers' visas were not tied to a specific employer, government policies restricted foreign caregivers' ability to change employers by allowing them to work only in a specific geographical area, preventing them from changing employers more than three times, and preventing them from changing employers after being in Israel for 63 months. In 2021, the government reported 13,734 requests to change employers in the caregiving sector were denied due to technical reasons including those previously outlined. NGOs also reported that if a foreign caregiver abruptly left their employer, including due to physical or sexual violence, government policy allowed employers to unilaterally revoke their visa, and foreign caregivers were not entitled to an immigration hearing. PIBA continued implementing a new policy regarding Palestinian work permits in the construction, industry, and service sectors to allow Palestinian workers to change employers more easily; however, NGOs reported the new policy did not take sufficient steps to inform Palestinian workers about the policy change or implement mechanisms to facilitate the job search process and left Palestinian workers vulnerable to labor violations.

The government continued returning deducted wages to workers after the Supreme Court declared unconstitutional in April 2020 the "Deposit Law" (article 4 of the Prevention of Infiltration Law), which required employers to deposit a certain percentage of undocumented migrants' wages—including those of identified trafficking victims—into a fund that migrant workers could not access until they departed the country. Workers could request their deducted wages be returned through PIBA's website. As of December 2021, the government returned more than 212 million shekels ($68.41 million) to 14,712 workers; the government coordinated with an international organization to advertise the website to encourage an additional 3,070 workers to request the return of their funds. However, the government did not report whether any investigations were opened during the reporting period into employers who deducted funds from 231 workers but did not deposit funds. In October 2020, the MLSS rejected proposals by Knesset members to require the government to repay money owed to workers or to provide workers with legal assistance to sue their employers; for the second consecutive year, the government did not address how to return money owed to this group of workers. The government continued to incentivize undocumented African migrants to "voluntarily" depart Israel to third countries in Africa, which included a paid plane ticket in most cases and a $3,500 stipend in some cases; however, NGOs and an international organization confirmed that migrants who arrived in a third country in Africa did not receive residency or employment rights upon arrival.

The government did not have a trafficking-specific hotline. PIBA, in collaboration with an NGO, continued to operate a 24-hour hotline to assist foreign workers who were in Israel under bilateral agreements. The hotline employed 13 interpreters in seven languages: Chinese, Thai, Russian, Nepali, Sinhalese, Ukrainian, and Tagalog. In 2021, the hotline received 3,603 calls; similar to previous years, the majority of calls were from People's Republic of China (PRC) national construction workers (2,323 calls). In 2020, the hotline received 2,874 calls including 1,828 calls from PRC national construction workers. There was no comparable hotline for documented migrant workers who worked in Israel through private recruitment, nor for Palestinian workers in Israel and Israeli settlements in the West Bank. The Child Protection Bureau Hotline, which handled online offenses against children, reported addressing 11,771 cases in 2021, an increase from around 10,000 in 2020; however, the hotline did not report identifying any suspected cases of trafficking. The government made efforts to reduce demand for commercial sex acts by coordinating an online awareness campaign stating consumption of commercial sex is illegal in Israel, in both Hebrew and Arabic. In addition, courts could sentence individuals found guilty of purchasing commercial sex to participate in educational workshops instead of paying a fine. The government did not report efforts to prevent child sex tourism.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Israel. Palestinians and foreign workers, primarily from South and Southeast Asia, Eastern Europe, and the former Soviet Union, migrate to Israel for temporary work in construction, agriculture, and caregiving; traffickers exploit some of these workers in forced labor. As of March 2021, data from the Israeli government and NGOs indicated there were approximately 203,000 legal foreign workers and 183,000 non-citizens present in Israel, many of whom are without legal status, including Palestinian workers, in Israel and Israeli settlements in the West Bank. As pandemic-related travel restrictions eased in 2021, 31,370 foreign workers entered Israel in 2021, compared with 10,662 in 2020 and approximately 23,138 in 2019. Israeli and foreign employers exploit foreign workers, particularly Turkish, PRC national, Palestinian, Russian, Ukrainian, and Serbian men, in the construction sector where they suffer from labor abuses and violations and labor trafficking. Some employers or intermediaries illegally charge Palestinian workers monthly commissions and fees, and in many cases, employers illegally hire out Palestinian workers to other workplaces; these workers are vulnerable to forced labor. The employer-based work permit system for Palestinians—except those working in the construction sector and select other sectors—binds Palestinian workers to specific employers, which enables some employers to exploit workers in forced labor. Furthermore, as a condition of their overnight permits, employers retained identity documents of some Palestinian workers, effectively restricting their movement in Israel. The approximately 1,500 Jordanian day workers are vulnerable to forced labor in construction, agriculture, and other

sectors, primarily in the resort city Eilat, due to limits on entry permits and the geographic isolation of Eilat. Traffickers subject some Thai men and women to forced labor in Israel's agricultural sector by imposing conditions of long working hours, no breaks or rest days, withheld passports, poor living conditions, and difficulty changing employers due to limitations on work permits. Some traffickers in the agricultural sector recruit agricultural students to take part in an agricultural study program on student visas and force them to work in the industry upon arrival, effectively circumventing the BWA process; observers reported the programs contain no academic content and students are bound by tuition fees—which NGOs reported were de facto recruitment fees—of up to 11,000 shekels ($3,550), effectively creating situations of debt bondage. Over the past three years, trafficking victims were identified in four of the six academic agriculture programs in Israel, including a group of Guatemalan and Honduran agricultural engineering students in 2020. In 2021, the government recognized 10 Vietnamese agricultural students as trafficking victims after they were forced to endure 14-16 hour work days, were confined to company-controlled housing, and had their passports confiscated; participants were also under a threat of a $30,000 promissory note for breaching their contract. Another 30 students were offered recognition but declined due to fear of retaliation upon their return to Vietnam. Caregivers are highly vulnerable to forced labor due to their isolation inside private residences and their lack of protection under the labor law; local NGOs report traffickers subject caregivers to excessive recruitment fees, fraudulent work contracts, long work hours, confiscation of passports, underpayment of wages, physical violence, sexual harassment and abuse, denial of severance pay, and poor housing, including—in some cases—living in the same room as their employer. Foreign caregivers constitute the second largest share of all legal foreign workers in the country; the vast majority of these workers are women. During the reporting period, NGOs continued reporting foreign contracting companies ("*Hevrot Bitzua*"), primarily PRC- and Turkish-owned construction companies, in Israel compelled PRC and Turkish nationals to work under the threat of debt bondage or coercive promissory notes. Foreign workers who entered Israel on "expert" visas—a visa procedure intended to facilitate the recruitment of highly skilled workers to fill hard-to-fill jobs—are vulnerable to trafficking as the construction and manufacturing sectors increasingly use the visa system to recruit workers for low-wage jobs. In 2021, an estimated 13,148 foreign workers entered Israel on "expert" visas, primarily from the PRC and low-income countries, and paid recruitment fees as high as 98,350 shekels ($31,740). Networks of workforce agencies recruit workers to Israel through a fraudulent asylum-claim process, charge workers high facilitation fees, and sell them fake documents; these workers are vulnerable to exploitation. The government's policy of refusing fast-track asylum claims has resulted in fewer claims from Ukrainian and Georgian applications; however, they were replaced by increased numbers of Russian and Moldovan workers following the same pattern. Some Bedouin Israeli children are reportedly vulnerable to forced labor, experiencing long working hours and physical violence. Traffickers exploit Palestinian children in forced begging in the Northern District of Israel and Jerusalem. NGOs also reported large numbers of Arab children in Israel exploited in various forms of labor exploitation during the reporting due to pandemic-related school closures.

Eritrean and Sudanese male and female migrants and asylum-seekers are highly vulnerable to sex and labor trafficking in Israel. As of March 2022, there were approximately 27,000 African migrants and asylum-seekers in Israel, most of whom were from Eritrea or Sudan. Asylum-seekers received temporary stay permits but did not have the explicit right to work in Israel and routinely worked low-wage jobs in unsafe environments. According to NGOs, these migrants and asylum-seekers were increasingly vulnerable to trafficking due to the government's implementation of the Deposit Law that reduced net wages for this population; the government repealed this law in April 2020, but the government was not able to return all funds to workers due to fraudulent practices by employers. NGOs reported nearly 80 percent of this population experienced some type of unemployment at the peak of the pandemic in 2020, further increasing their risk to exploitation. Economic distress among women in this population, especially Eritrean women, greatly increases their vulnerability to sex trafficking. Approximately 400 female asylum-seekers engaged in survival sex prior to the pandemic;

the government estimates that figure tripled during 2020. Since 2007, thousands of African migrants entered Israel via the Sinai Peninsula. The flow of these migrants arriving in Israel, peaking at more than 17,000 in 2011, dramatically decreased to zero in 2017. Many of these migrants were kidnapped by criminal groups in the Sinai and subjected to severe abuse, including forced labor and sex trafficking, before reaching Israel. In 2020, an NGO reported that of the approximately 4,000-5,000 of these migrants still present in Israel, the government had only recognized approximately 400-500 as trafficking victims but that the actual number was much higher.

Israeli children, Israeli Bedouin and Palestinian women and girls, foreign women, and transgender adults and children are vulnerable to sex trafficking in Israel. Traffickers use social media websites, including dating apps, online forums and chat rooms, and Facebook groups to exploit girls in sex trafficking. Israeli Bedouin and West Bank Palestinian women and girls are vulnerable to sex and labor trafficking after family members force them into marriages with older men; these women and girls experience physical and sexual abuse, threats of violence, and restricted movement. Russian, Ukrainian, Eritrean, and Ethiopian women are also vulnerable to sex and labor trafficking through online-facilitated forced marriages. NGOs report some Palestinian LGBTQI+ men and boys and Palestinian transgender women in Israel are vulnerable to abuse and sexual exploitation due to their lack of legal status and restrictions on work eligibility for Palestinian nationals in Israel. Some Israeli transgender women and girls are sexually exploited in commercial sex to be able to afford gender-affirming care. Some transgender children as young as 13 years old, many of whom ran away from home, come under the mentorship of transgender women in commercial sex; sometimes these "mentors" then exploit these transgender children in commercial sex. Traffickers subject women from Eastern Europe and the former Soviet Union, PRC, and Ghana, as well as Eritrean women, to sex trafficking in Israel; some women arrive on tourist visas to work willingly in commercial sex—particularly in the southern coastal resort city of Eilat—but sex traffickers subsequently exploit them. Some traffickers reportedly recruit sex trafficking victims with false, fraudulent, or misleading job offers on the internet, sometimes through legitimate employment websites. During the previous reporting period, Israeli authorities indicted a suspect for allegedly holding people in conditions of slavery while operating a religious cult by allegedly forcing women and children to provide any earnings to the suspect and to perform involuntary domestic work; media reporting also alleged the suspect sexually exploited the victims.

## ITALY: TIER 2

The Government of Italy does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Italy remained on Tier 2. These efforts included increasing prosecutions and convictions compared with the prior year. The government continued to implement its three-year plan to combat labor exploitation in agriculture by increasing training for labor inspectors and informing vulnerable populations, like foreign workers in agriculture, of their rights. The government approved its first national referral mechanism (NRM) for the identification and assistance of labor trafficking and exploitation victims in the agricultural sector. However, the government did not meet the minimum standards in several key areas. The government reported fewer trafficking investigations compared with the prior two years and remained without a national action plan (NAP) or national rapporteur, hindering efforts to coordinate national and local anti-trafficking actions. The government assisted fewer victims compared with the prior year and did not report awarding compensation or restitution to any victims. Gaps in victim identification systems persisted, and the government again did not identify any Italian nationals as victims and very few children, despite high estimates by civil society. The government also continued to lack legal safeguards to protect victims

against potential penalization for unlawful acts traffickers compelled them to commit, which resulted in the conviction and punishment of several trafficking victims.



ITALY TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase proactive victim identification by improving and consistently implementing the national identification referral mechanism across the country, including for Italian nationals and vulnerable populations such as foreign migrants and children. • Vigorously investigate and prosecute trafficking cases and convict and sentence traffickers with adequate sentences. • Intensify efforts to effectively screen for labor trafficking through increased inspections and improved training of labor inspectors to spot trafficking indicators and refer victim for services. • Strengthen interagency coordination and partnership with civil society. • Adopt a NAP. • Continue to increase migrant worker protections by consistently enforcing strong regulations and oversight of labor recruitment agencies and labor brokers, including investigating and prosecuting for labor trafficking. • Ensure labor trafficking is investigated and prosecuted as a trafficking offense and not pursued as an administrative labor code violation or other lesser crime. • Consolidate data among different ministries and make public a database on investigations, prosecutions, and convictions, including sentencing data. • Implement a licensing and accreditation process for massage parlors and increase oversight. • Increase awareness of and trafficking survivor access to compensation and increase prosecutors' efforts to systematically request restitution for survivors during criminal trials. • Continue to increase international cooperation with source and transit countries on information sharing and countering trafficking rings. • Improve security standards in and around reception centers to limit contact between traffickers and victims or potential victims. • Continue to strengthen international law enforcement cooperation to prevent and investigate child sex tourism. • Amend the law on the non-punishment of victims to ensure that trafficking victims could not be inappropriately penalized for unlawful acts traffickers compelled them to commit. • Appoint a national rapporteur to provide an independent review of government efforts. • Increase survivor engagement, including by establishing accessible mechanisms for receiving and providing compensation for survivor input when forming policies, programs, and trainings. • Increase efforts to pursue financial crime investigations in tandem with human trafficking cases.

## PROSECUTION

The government made uneven law enforcement efforts. Article 601 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of eight to 20 years' imprisonment, which increased by one third to one half if the offense involved a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious offenses, such as rape. Additional penal code provisions were utilized to prosecute trafficking crimes. Article 600 criminalized placing or holding a person in conditions of slavery or servitude, and Article 602 criminalized the sale and purchase of slaves—both prescribed the same penalties as Article 601. Additionally, Article 600-bis criminalized offenses relating to child sex trafficking and prescribed punishments of six to 12 years' imprisonment and a fine.

The pandemic decreased the capacity of law enforcement to conduct trafficking investigations, and courts reported a delay in judicial proceedings for all crimes due to its increased workload adjudicating pandemic-related infractions during the prior year. The government did not disaggregate between sex and labor trafficking for investigations, prosecutions, or convictions for Articles 600, 601, or 602, making law enforcement efforts on labor trafficking indeterminate. In 2021, the

Ministry of Justice (MOJ) reported investigating 214 persons under Articles 600, 601, and 602, a decrease compared with 254 in 2020 and 323 in 2019. The government prosecuted 121 suspects under articles 600, 601, and 602, an increase compared with 106 in 2020, but significantly fewer than 202 in 2019. In 2021, trial and appellate courts convicted 204 traffickers under articles 600, 601, and 602, an increase compared with both 175 in 2020 and 198 in 2019. While the government did not report comprehensive sentencing data in a format that allowed for an assessment of the significance of sentencing, it reported the average sentence for convicted traffickers was 9.2 years in 2021. The government also confirmed that at least 51 percent of the convicted traffickers in 2021 were sentenced to significant sentences of one year or longer imprisonment.

The government did not maintain a consolidated database on investigations, prosecutions, convictions, and sentencing of traffickers, or of their victims, a deficiency noted by GRETA. Specialized anti-mafia units of prosecutors and judiciary police handled trafficking prosecutions. Whenever investigators found clear evidence of trafficking, they referred the case to an anti-mafia unit, which relaunched the investigation and consequently extended the timeframe for prosecution and trial. To avoid delays, non-specialized investigators and prosecutors sometimes charged perpetrators with crimes other than trafficking. Anti-mafia units continued to prioritize investigations of criminal networks over individual cases, citing limits on available resources. Lack of a sufficient number of interpreters, especially for West African dialects, continued to limit law enforcement arrests and investigations, as well as diminish the benefits of investigators' wiretapping capability. Italian prosecutors and police continued to cite insufficient cooperation in investigations from officials in source and transit countries; with many transnational cases, this hindered prosecutions and convictions.

Law enforcement agencies received training on victim identification and investigation of trafficking crimes within their standard curriculum. In 2021, the government did not report details on training efforts for law enforcement or front-line officials. The government cooperated in international law enforcement investigations with Bosnia and Herzegovina, France, and Moldova through a cooperative partnership, which resulted in the identification of 25 suspects and 148 victims. The government continued to provide funding to an international organization for an anti-trafficking project across Africa, part of which focused on improving international judicial cooperation between Italy and Nigeria; although the exchange program with Nigeria was suspended due to the pandemic, in 2021, a prosecutor exchange program was established with Niger, in which one prosecutor was hosted by Italy. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

## PROTECTION

The government maintained uneven protection efforts. In 2021, authorities reported pandemic-related restrictions and the increased use of private residences and online platforms continued to hinder their identification of sex trafficking victims, while workplace closures and further isolation made the identification of labor trafficking victims more difficult. The government identified 463 new victims in 2021, similar to 470 in 2020 but less than 657 in 2019. Of the victims identified, 255 were sex trafficking victims, and 192 were labor trafficking victims, which included 169 victims of forced labor, nine victims of forced criminality, seven victims of domestic servitude, and seven victims of forced begging. Sixteen of the 463 victims were exploited in trafficking abroad or in transit to Italy. The government also identified 201 persons at migration centers whom the government believed were likely to become victims of trafficking but had not yet been exploited in Italy. All newly identified victims were foreign nationals and undocumented migrants, and asylum-seekers continued to make up the majority of identified trafficking victims, with most victims originating in Nigeria and a smaller percentage from Pakistan and Morocco. NGOs reported gaps in authorities' proactive victim identification efforts persisted during the reporting period. The government again did not identify any Italian nationals as victims and very few children (less than 1 percent despite prior year high estimates of such victims by civil society); experts raised concerns about this potential gap in victim identification. Furthermore, NGOs reported police forces in some provinces did not fully cooperate

Haiti AR_000788

with civil society organizations focused on undocumented migrants, due to a lack of understanding or mutual distrust, which subsequently limited the ability of local authorities to identify victims among this population.

The government cooperated with NGOs and international organizations to provide shelter and services to victims. In 2021, the government provided victim assistance through 12 projects submitted by regional and local authorities and nine submitted by NGOs from across Italy and allocated €24 million ($27.21 million) to these projects; the same as in 2020 and 2019. NGOs reported high standards of assistance programs across regions, with occasional localized differences in quality. NGOs reported the Department of Equal Opportunity (DEO), which coordinated protection efforts, was not sufficiently funded or staffed to consistently monitor assistance programs nationally. In 2021, the DEO reported government-funded NGOs assisted 1,347 trafficking victims, including 907 sex trafficking victims, 406 labor trafficking victims (including 350 forced labor victims, 27 forced criminality victims, 15 forced begging victims, and 14 domestic servitude victims), and 34 victims exploited in trafficking abroad or in transit to Italy. This was a decrease compared with 1,444 trafficking victims assisted in 2020 and 1,877 assisted in 2019. The government also assisted 16 witnesses and 490 persons at migration centers whom the government believed were likely to become trafficking victims but had not yet been exploited in Italy. Statistics pertaining to the number of victims assisted by the government included victims assisted for the first time in 2021, as well as ongoing assistance to victims identified in prior years. While the government had a formal and comprehensive national identification and referral mechanism that addressed all forms of trafficking, it was implemented unevenly throughout Italy during the reporting period. Both NGOs and the government could identify trafficking victims. NGOs and the DEO recognized inconsistencies in the efficiency and effectiveness of the current referral process between regions and found that quality standards were lower in the south. In October 2021, the government approved its first national identification and referral mechanism specifically for labor trafficking and exploitation in agriculture, which included minimum standards, standard procedures, and available assistance for victims. Insufficient availability of interpretation services for lesser-known African dialects, with victims coming from as many as 15 different language groups, remained a significant challenge. Trustworthy interpreters were also difficult to secure, as reportedly many interpreters came from the same communities as the accused traffickers.

While the government had a victim identification and referral mechanism for some forms of child trafficking and children within the asylum system, it remained without a separate national mechanism that included all forms of trafficking. In its 2019 report, GRETA recommended establishing a separate NRM specifically for the specialized needs of children. NGOs estimated there were several thousand children in Italy who were victims of trafficking in 2021. Many unaccompanied Nigerian child victims misrepresented their age to gain placement in adult reception centers, giving them greater freedom to leave the center unnoticed with their trafficker. NGOs, however, welcomed increased scrutiny by authorities of these age-claims, and authorities more often sent victims into child protection if unable to confirm adult age-status. Foreign child victims automatically received a residence permit until age 18 and accommodations in a general children's center or a designated center for trafficking victims who were also asylum-seekers. Children received counseling and were enrolled in public schools with the support of mentors. The government reported, by March 2022, approximately 300 unaccompanied children sought refuge in Italy after fleeing Russia's full-scale invasion of Ukraine; the government reported identifying all unaccompanied children as they crossed the border and subsequently provided them with accommodation and access to educational facilities.

The government reported observing standard UNHCR procedures to screen for trafficking victims among the approximately 67,500 asylum-seekers, unaccompanied children, and undocumented migrants that arrived by sea in 2021. Civil society coordinated with law enforcement and immigration officials at both the arrival points and the longer-term reception centers, and an international organization reported providing information on potential trafficking victims to local officials responsible for assigning migrants to migration centers and trafficking victims to shelters. However, NGOs continued to assert authorities did not properly

identify many trafficking victims upon arrival, potentially leaving some victims unidentified within the system and classified them instead as asylum-seekers or undocumented migrants and therefore subject to deportation. NGOs continued to stress the need for more time to screen refugees and migrants at arrival ports to more accurately ascertain victim status, but they acknowledged conditions were not conducive to a stay at the ports beyond one or two days. During the reporting period, regional committees continued to utilize national guidelines for asylum-seekers to adjudicate asylum applications to identify trafficking victims among applicants; however, inconsistencies in implementation persisted. In 2021, the number of asylum applications doubled to approximately 56,000, with 42,000 pending at the end of the reporting period. The government processed 53,000 applications during the year, including applications from previous years, and granted asylum status or subsidiary protections to roughly 56 percent of the applicants.

The law allowed for an initial three to six months of government assistance to all trafficking victims. After initial assistance, foreign victims were eligible to obtain temporary residency and work permits and had a path to permanent residency; additionally, foreign victims were eligible for six months of shelter benefits, renewable for an additional six months only if the victim obtained a job or enrolled in a training program. However, in some cases, the government housed victims and potential victims with undocumented migrants, and such housing lacked adequate security against traffickers seeking to recruit victims or remove those already under their control. Between January and June 2021, the MOI reported identifying 493 potential trafficking victims and providing them with either a temporary residence permit, refugee status, or subsidiary and special protection. This compared with 108 temporary residence permits in 2020 and 155 permits in 2019. The government reported that foreign and Italian nationals were entitled to the same benefits and that the law entitled all crime victims to free legal assistance. Italian criminal law lacked a provision specifically prohibiting punishment of trafficking victims for unlawful acts traffickers compelled them to commit, but rather prosecutors and judges had discretion on whether to prosecute a trafficking victim based on the principle of the "state of necessity." Current law required proof of exploitation in a criminal action against the perpetrator, which left victims and potential victims at risk of prosecution and conviction when a court did not first convict the perpetrators. Experts and GRETA urged the government to adopt a legal provision explicitly preventing inappropriate penalization of victims for unlawful acts traffickers compelled them to commit, which would also prevent unfair application of the principle of the "state of necessity." During the reporting period, NGOs reported several instances where authorities penalized victims for unlawful acts traffickers compelled them to commit. NGOs reported a case in which Nigerian trafficking victims in migration centers were forced to commit drug-related crimes but initially remained unidentified as trafficking victims; however, once authorities recognized them as victims, prosecutors continued to pursue the case, and courts ultimately convicted the trafficking victims, but with reduced sentences. The government did not require victims to cooperate with law enforcement to obtain assistance like shelter, medical care, or a residence permit, although NGOs and international organizations reported authorities did not consistently implement this policy and sometimes gave preference to those who cooperated. The government reported it often had difficulty prosecuting trafficking cases because victims were often unwilling to cooperate with law enforcement, and in a March 2021 document, NGOs urged the government to adopt a victim-centered approach. The government had a witness protection program but did not report whether any trafficking victims were able to access this protection during the reporting period.

The government continued to lack comprehensive statistics on restitution and damages awarded to victims and did not require prosecutors to systematically request restitution during criminal trials. The government could offer a single payment of €1,500 ($1,700) to victims for compensation, although GRETA and NGOs noted the application was overly complex, the amount insufficient, and very few victims ever received compensation. The government did not report granting compensation to any victims during the reporting period. GRETA further recommended the government increase the use of existing legal remedies to provide restitution to victims and more proactively seize assets and pursue forfeiture against perpetrators. The government did

not award restitution from criminal cases or damages from civil suits to any trafficking victims.

## PREVENTION

The government maintained prevention efforts. The DEO, as coordinator of the interagency steering committee on trafficking, was responsible for drafting the national anti-trafficking action plan, coordinating programs for prevention and victim assistance, and submitting a biannual anti-trafficking report. The government remained without a national rapporteur to provide independent analysis of government efforts to combat human trafficking; in a March 2021 document submitted to the government, several NGOs urged the government to establish such a body. The interagency steering committee met once in 2021 and tasked a technical committee with drafting a new NAP, as the prior plan expired in 2018; however, the government did not adopt a new plan during the reporting period. Civil society reported that the DEO was not effective at steering and coordinating national anti-trafficking efforts. NGOs urged the government to strengthen interagency coordination and partnership with civil society and adopt a victim-centered approach. The inter-ministerial working group on labor exploitation, which focused on the agricultural sector and illicit labor brokers and aimed to prevent exploitation and offer legal alternatives to illegal employment, met an unknown number of times and continued to implement its three-year plan (2020-2022) to combat labor exploitation in agriculture. In 2021, under its three-year plan, the government continued to contribute trained cultural mediators to inform vulnerable populations of their rights and raise awareness among refugees, migrants, and victims, especially in the agricultural sector. This awareness campaign among migrant workers and refugees resulted in authorities identifying a total of 62 labor trafficking victims among foreign workers between June 2020 and June 2021; authorities referred 28 to assistance services and reported that 104 workers filed suits for back wages. The government did not report any national-level public awareness campaigns.

The government continued to provide funding to international organizations for anti-trafficking related projects, primarily in Africa. In March 2022, the government approved a decree allocating €428 million ($485.26 million) to assist and integrate up to 75,000 Ukrainian refugees fleeing Russia's full-scale invasion of Ukraine by increasing space in migrant centers and funding for NGOs to provide psychological assistance and legal counseling. The government continued to cooperate with Frontex, the European Border and Coast Guard Agency, and the Government of Libya to reduce the number of undocumented migrants entering Italy from Libya. However, many NGOs criticized this coordinated effort because it often resulted in the occupants of vessels identified in the Libyan search and rescue area being returned to Libyan shores; NGOs cited severe security and human rights conditions inside Libya and Libyan detention centers—including sex and labor trafficking—for the more than 12,000 undocumented migrants forced to remain in the detention centers. In March 2022, the Government of Germany announced it would no longer commit to training the Libyan coast guard, due to concerns about their treatment of migrants and NGOs.

Labor inspectors did not have the authority to identify trafficking victims but could refer them to police and NGOs. In 2021, the government reported labor inspectors conducted 117,600 inspections but did not report referring any trafficking victims to police as a result of these inspections. Law enforcement, immigration guards, and labor inspectors participated in joint inspections that focused on the agricultural sector, which resulted in the identification of at least 21 suspected traffickers and the identification of at least 134 victims of trafficking. In 2021, in partnership with an international organization, the Ministry of Labor and the National Labor Inspectorate reported training 2,400 participants, most of whom were labor inspectors. The international organization and the government created a labor exploitation working group at the national level and local task forces in various regions to address labor exploitation. Experts estimated that in 2021, as many as 200,000 agricultural workers, especially seasonal workers, and 500,000 undocumented migrants were at risk of labor trafficking and exploitation in Italy. In May 2020, the government adopted a decree allowing for the regularization of workers informally employed in the agricultural, fishing, home care, and domestic-work sectors; of the 230,000 applicants, the government had only interviewed one-third and granted permits to

38,000 foreign care providers and farmers by October 2021. In December 2021, the government adopted another decree, which granted temporary residence permits to an additional 69,700 seasonal and permanent foreign workers. Fraudulent labor recruitment and passport retention remained concerns. Although illegal, employers or labor recruiters sometimes charged a placement fee to employees, which increased their risk of trafficking. The government had a licensing and accreditation system for labor brokers and labor recruitment agencies. However, there was a lack of regulation, including a licensing or accreditation system, and oversight on massage parlors, which remained likely locations for sex trafficking. In 2021, the government continued efforts to hold labor recruiters accountable for illicit labor mediation by arresting 48 suspects, prosecuting 523 suspects, and convicting 163 criminals. Illicit labor mediation did not meet the threshold for labor trafficking; however, law enforcement efforts in this sector helped prevent and reduce the demand for forced labor. While authorities often arrested many suspects for crimes that could potentially reach the threshold of labor trafficking, the government did not report investigating or prosecuting any recruiters or companies for fraudulent recruitment or labor trafficking, but instead it arrested suspects for other related crimes. GRETA recommended the government intensify efforts to more effectively screen for trafficking victims through increased labor inspections and expanded training of inspectors and in monitoring of recruitment practices including in agriculture, domestic labor, hospitality, and food service.

The law required businesses to submit reports on their actions to minimize the risk of forced labor and prohibited the purchase of products made with forced labor. In 2021, the government signed a multilateral labor rights agreement with the Government of Moldova, which included major trade unions in both countries, to protect migrant workers in both countries. The government also signed another bilateral agreement with the Government of Cote d'Ivoire in 2021, with a focus on law enforcement cooperation on trafficking investigations and prosecutions; however, the government did not report further trafficking-related results for either agreement. The DEO continued to operate its 24-hour hotline for victims of human trafficking, available in 12 languages, which reported receiving 1,507 relevant calls 2021, but the government did not report the number of potential trafficking victims identified as a result. Of the relevant calls, operators provided 19 percent of callers with information on available assistance and 45 percent of callers with shelter information; 53 percent of the calls pertained to sexual exploitation, 34 percent pertained to labor exploitation, and the remainder were unspecified. In June 2021, the government also established a help desk dedicated to victims of labor exploitation, including trafficking; the help desk included a hotline, social media accounts, a website, and a chat function, and the government reported identifying 37 labor exploitation victims during the reporting period. The government did not report national efforts to reduce the demand for commercial sex. The government did not report making efforts to reduce the demand for participation in international sex tourism by its citizens and did not report further efforts regarding the two investigations initiated in 2020.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit foreign and, to a lesser degree, domestic victims in Italy. Victims originate primarily from Bulgaria, the People's Republic of China (PRC), Cote d'Ivoire, the Gambia, India, Nigeria, Pakistan, and Romania, including ethnic Roma. The pandemic exacerbates vulnerabilities for sex trafficking victims through the increased use of private residences—instead of brothels or clubs—and online recruitment. Sex traffickers are increasingly use online platforms, like social networks, mobile applications, and the dark web, to recruit, exploit victims, and book apartment rentals to make their illicit operations difficult to track; this was exacerbated by the pandemic. During the pandemic, sex traffickers left thousands of Nigerian women and children trafficking survivors destitute and without basic needs, such as food, during the national lockdowns; many anti-trafficking NGOs raised concerns that travel restrictions and limited social and public services make it more difficult for trafficking victims to escape and return home. In 2022, Ukrainian refugees, predominantly women and children fleeing Russia's full-scale invasion of Ukraine, are vulnerable to trafficking. LGBTQI+ individuals, many from Brazil and other Latin American countries, are vulnerable to sex trafficking in Italy. Traffickers,

JAMAICA

often part of criminal networks run by PRC nationals, systematically exploit women from the PRC in sex trafficking in apartments, beauty centers, clubs, and massage parlors, as well as labor trafficking in a variety of PRC national-owned businesses, sometimes forcing drug addiction on victims. Massage parlors are frequently used as fronts for the purchase of commercial sex, raising concerns about sex trafficking. Of an estimated 40,000 to 45,000 individuals involved in commercial sex on the streets, NGOs reported approximately 60 percent (or 24,000 to 27,000) are trafficking victims or at risk of trafficking and between 5 and 8 percent are children (or approximately 2,000 to 3,600). The government and civil society maintain that Nigerian women and unaccompanied children remain extremely vulnerable to trafficking because of the continued operation of organized Nigerian trafficking networks. Trafficking networks and gangs continue to grow more sophisticated, organized, and violent, particularly Nigerian gangs linked to the Black Axe, Supreme Viking Confraternity, and the Eiye syndicate. Several Nigerian trafficking networks have expanded operations across Italy and reportedly receive protection from Italian crime syndicates. International organizations estimated up to 75 percent of the Nigerian women and unaccompanied children who arrived in 2018 were trafficking victims. Traffickers subject Nigerian women and girls to sex trafficking through debt-based coercion and voodoo rituals. Authorities report traffickers encourage Nigerian victims to claim asylum to obtain legal residency and facilitate their continued exploitation. Traffickers sometimes exploit migrant women in sex trafficking in and around migration centers. The Government of France reports receiving Nigerian victims who were exploited in trafficking while awaiting legal residency in Italy. Italian citizens will sometimes engage in child sex tourism abroad. Children are exploited in child sex trafficking, forced to commit crimes or beg, and forced to work in the agricultural sector, shops, bars, restaurants, and bakeries. Ethnic Roma children are at risk for trafficking, including forced begging and child sex trafficking. Traffickers frequently target unaccompanied children, who are especially vulnerable to trafficking. International organizations reported the number of seaborne, unaccompanied children increased in 2021 to approximately 10,000, predominantly from Bangladesh, Egypt, and Tunisia; compared with 4,631 in 2020, 1,680 in 2019, 3,534 in 2018, and 15,731 in 2017. NGOs reported that most unaccompanied minors identified among seaborne arrivals were younger than 15.

Labor traffickers operate in agriculture, predominantly in southern Italy, construction, household labor, hospitality, and restaurants. The pandemic exacerbated vulnerabilities for trafficking victims, including increased isolation of migrant and seasonal workers. Traffickers use fraudulent recruitment, passport retention, and debt-based coercion to control trafficking victims; traffickers also extort payments from the victim's family in the source country. Cuban medical professionals working in Italy during the pandemic in 2020 may have been forced to work by the Cuban government. Italy has an estimated 1.5 million unregistered workers and 3.7 million undocumented workers in the informal market who are at risk for labor trafficking. Specifically for the agricultural sector, experts estimated that as many as 200,000 workers in 2021, particularly seasonal workers, are at risk for forced labor and exploitation in Italy. Employers in the agricultural sector will sometimes submit falsified forms pertaining to their workers, which impedes labor inspections and the potential identification of trafficking victims. Italy had approximately 500,000 undocumented migrants in 2021, many of whom are at risk for trafficking. Italy received approximately 67,500 undocumented migrant arrivals by sea in 2021—a significant increase compared with 34,154 in 2020 and 11,471 in 2019—many through Libya, where victims reported experiencing extortion, torture, human trafficking, and rape by militias or traffickers while awaiting passage to Italy. In 2019, of the roughly 31,000 persons requesting asylum, authorities estimate up to 30 percent were at risk for sex trafficking or forced labor while waiting for adjudication of their petitions. Traffickers target migrant centers to recruit and later exploit asylum-seekers, sometimes claiming to be family members to gain access to the centers. Asylum-seekers may legally work beginning two months after filing their applications, although many seek illegal employment immediately in informal sectors, increasing their risk for trafficking. Many also attempt passage to other European countries; under the European Commission's Dublin Regulation, countries have six months to repatriate victims to the EU country of their arrival but must accept their asylum claim if they fail to transfer them in due time. This regulation likely increased the number of asylum-seekers or trafficking victims forced to remain in Italy or return to Italy from another country.

# JAMAICA: TIER 2

The Government of Jamaica does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the pandemic on its anti-trafficking capacity; therefore Jamaica remained on Tier 2. These efforts included identifying more victims, including survivors of labor trafficking; formally launching a national referral mechanism (NRM) for child victims; expanding training for officials on victim identification and referral; opening a child-friendly space for interviewing and providing immediate assistance to child victims; and making arrests for the illegal operation of private employment agencies. However, the government did not meet the minimum standards in several key areas. Convicted traffickers received suspended prison sentences and fines, penalties that were not on par with the severity of their crimes. Unlike last year, no victims were awarded restitution. The government did not provide adequate funding for trafficking victim protection services. Although the government provided some training for law enforcement and criminal justice officials, these efforts were ad hoc, and the government did not provide consistent, standardized anti-trafficking training for officials.



JAMAICA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Fully implement the screening tools and NRM to increase proactive identification and referral of suspected trafficking victims among vulnerable groups, and provide consistent training for officials on implementing these tools. • Increase efforts to provide more victims, whether identified in Jamaica or repatriated from abroad, with comprehensive services, including legal, medical, psycho-social, shelter, case management, educational/vocational, and reintegration assistance, for the full length of any legal proceedings. • Increase efforts to investigate, prosecute, and convict traffickers, including officials who are complicit in human trafficking and foreign tourists or Jamaicans who exploit child sex trafficking victims. • Strengthen and institutionalize training on human trafficking and victim-centered procedures for police, prosecutors, and judges and assign cases to trained personnel. • Amend the anti-trafficking law to prescribe penalties for sex trafficking that are commensurate with penalties for other serious crimes by increasing the available maximum imprisonment term. • Screen Cuban medical professionals for indicators of human trafficking and refer potential victims to service providers for assistance. • Allow adult victims greater independence to make informed choices about their own security needs and do not impose restriction of movement on adult victims while in the government's care. • Provide all victims with the necessary long-term protection and reintegration assistance to safely transition to living outside shelters. • Strengthen the role of government or NGO service providers when conducting victim interviews, formally identifying victims, and assessing victims' needs. • Allow authorities and the public to refer all potential victims directly to government or NGO service providers and make victims eligible to receive formal identification and trafficking-related services, without police referral. • Increase funding and human resources to ministries, departments, and agencies responsible for trafficking victim protection services. • Allocate sufficient resources to the Office of the National Rapporteur on Trafficking in Persons (ONRTIP) to conduct an independent assessment of the government's victim identification efforts, including systematic implementation of the screening tools and NRM.

## PROSECUTION

The government slightly increased law enforcement efforts but failed to impose stringent penalties on convicted traffickers. The government criminalized sex trafficking and labor trafficking through its Trafficking in Persons (Prevention, Suppression, and Punishment) Act. The government passed amendments to this law that removed the option of monetary fines in lieu of imprisonment as a penalty for convicted traffickers; these changes came into effect in November 2021. The amended legislation prescribes penalties of up to 20 years' imprisonment for offenses involving an adult victim and up to 30 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent; however, with respect to sex trafficking, by prescribing a lower maximum imprisonment term, these penalties were not commensurate with those for other serious crimes, such as rape. The 2021 amendments made corresponding changes to the Child Care and Protection Act, removing the option of fines as penalties for child trafficking crimes defined in section 10 of that law.

Officials investigated 53 potential trafficking cases, 51 involving sex trafficking and two involving forced labor, compared with 43 potential cases, 42 for sex trafficking and one for forced labor, investigated in the previous reporting period. Authorities prosecuted four sex trafficking suspects and convicted two sex traffickers, a slight increase from three suspects prosecuted and one sex trafficker convicted during the previous reporting period. Both convictions were from a retrial of a 2010 child sex trafficking case that had resulted in a hung jury—prior to amendments to Jamaica's anti-trafficking law that directed such cases be tried by a judge rather than a jury. Authorities negotiated a plea bargain, and the traffickers each received a three-year suspended prison sentence and were ordered to pay fines. Unlike last year, courts did not order convicted traffickers to pay restitution to any victims. The slow pace at which cases moved through the courts hampered efforts to hold traffickers criminally accountable and deterred victims from serving as witnesses. The government did not report investigations, prosecutions, or convictions of government employees suspected of complicity in trafficking offenses. Endemic corruption and complicity, including within law enforcement, remained significant obstacles to anti-trafficking law enforcement efforts.

The government maintained a specialized police unit with island-wide jurisdiction to investigate human trafficking and vice crimes, as well as a team of prosecutors specialized in human rights, intellectual property, and sexual offenses. Anti-trafficking police conducted 36 surveillance operations of locations believed to be high-risk for trafficking, including truck stops, construction sites, and resorts; independently initiated 25 investigations; and investigated 28 suspected cases referred from other agencies. The pandemic constrained law enforcement efforts, as high infection rates among officers created staffing shortages and caused disruptions in investigations. Police reportedly screened for victims of trafficking during raids on venues where commercial sex occurred, although it was unclear whether these operations were effective in identifying victims. Some individual judges had specialized trafficking experience, but there was no mechanism to assign trafficking cases to these judges. Though courts generally remained open, pandemic-related infections caused staffing shortages, and some courts briefly suspended operations following suspected outbreaks of the virus. The government's training efforts for law enforcement and criminal justice officials continued to be ad-hoc and largely dependent on foreign donors, rather than sustained year-to-year through consistent government delivery mechanisms. Jamaican police apprehended a Canadian man wanted in Canada for sex trafficking and other crimes; the government extradited the suspect to Canada where he was indicted on numerous charges. The government reported police continued to cooperate with law enforcement in the Cayman Islands on a suspected case of child trafficking, and authorities engaged with officials from the Bahamas and India regarding cases in progress in Bahamian and Jamaican courts.

## PROTECTION

The government maintained efforts to protect victims; while it strengthened policies and procedures for identifying and assisting victims, it provided few details about services provided to victims identified during the year. The government formally identified 10 trafficking victims, a slight increase from eight victims identified during the previous reporting period. Identified victims included six Jamaican girls and one Jamaican

woman, who were survivors of sex trafficking, and three Colombian men, who were survivors of forced labor. The government did not report whether it referred any victims to government-run shelters or other forms of lodging. During the previous reporting period, the government referred three victims to government shelters. The government reported providing all identified victims with care and services that may have included accommodation, food and clothing, medical care, counseling and psycho-social support, legal and immigration assistance, training and educational support, or employment assistance, but it did not provide additional details on the specific services provided or the scope and duration of this assistance. The government did not report funding for protection and assistance to victims, which had decreased significantly in the previous reporting period. Local experts reported the government likely provided shelter or other services to some child trafficking victims it did not formally identify and classified them as victims of other crimes.

The Child Protection and Family Services Agency (CPFSA) launched a new three-digit hotline replacing its previous number for reporting cases of child abuse, including human trafficking, and it expanded the hotline's operations to 24 hours per day, seven days per week, including public holidays. To respond to conditions imposed by the pandemic, CPFSA provided hotline personnel the necessary equipment to operate the hotline while working remotely and hired additional staff to sustain the hotline's expanded hours. CPFSA identified 25 cases of suspected child trafficking, including 14 through calls to its hotline, and referred all 25 cases to the specialized police unit for investigation. In addition, the Office of the Children's Advocate launched a 24 hours per day, seven days per week phone line and messaging platform to provide immediate psycho-social support directly to children. Authorities reported one suspected trafficking victim contacted the helpline but disengaged before authorities could make a referral.

The government continued to use its 2013 victim management guidelines and several ministry-specific SOPs for identifying victims, but these tools were not comprehensive, and local experts could not verify how consistently officials applied them. Police reported screening for indicators of trafficking among individuals arrested for "prostitution"-related violations but did not identify victims through this method. In December 2021, the government officially launched and began standardized implementation of a set of tools, developed in partnership with an NGO during the previous reporting period, to strengthen victim identification and referral procedures for child victims. These resources included ministry-specific screening tools to guide officials in assessing behavioral, situational, health, and other factors to identify potential child trafficking victims among vulnerable groups; victim intake and case management forms; and an NRM to standardize procedures for victim referral and management of care. CPFSA established an internal technical advisory committee that oversaw efforts to pilot the screening tools and NRM, including through training to 83 child protection staff. The government held numerous training sessions on identifying and referring child trafficking victims using the NRM, reaching more than 300 customs officers, labor officials, justices of the peace, NGO staff, and tourism industry professionals. Also, in December 2021, the government launched a new human trafficking handbook (developed with technical assistance from an NGO) to improve anti-trafficking knowledge and expertise across government sectors. The handbook was disseminated across various ministries and made available online. The NRM established a stronger role for service providers in conducting needs assessments and providing case management to child victims; however, it continued to require all reports of suspected trafficking to go through the JCF's anti-trafficking and vice crimes unit for formal identification and investigation. The government reported contracting Cuban medical professionals during the year, but authorities did not acknowledge these workers as being at high risk for forced labor, despite ongoing concerns by international experts that the Government of Cuba may have compelled some of them to work.

JCF, NATFATIP, and in the case of child victims, the Child Protection and Family Services Agency (CPFSA) worked in consultation to arrange accommodation and other services to formally-identified victims on a case-by-case basis. In March 2022, the government opened a new child-friendly space for interviewing and assisting child victims, operated by the JCF's Centre for the Investigation of Sexual Offences and Child Abuse (CISOCA) in Trelawny Parish. This multidisciplinary space, developed with donor funding and technical assistance from an NGO, was designed to

provide child victims with a safe and private location to access local law enforcement and medical attention, as well as referral to additional services in a trauma-informed setting. NATFATIP operated a shelter exclusively for trafficking victims, which could accommodate 12 female victims, and arranged private lodging for some victims, including men; in addition, authorities could place child victims in CPFSA facilities or female victims in NGO-operated shelters that were not exclusive to trafficking victims. The government did not report how many victims received services in government shelters. As part of a new initiative, CPFSA collaborated with an NGO to provide training on trauma-informed care to 60 potential foster parents. The government reported adult victims had the option of residing in the government's specialized shelter or in private accommodation; in practice, however, authorities limited some victims' options based on an independent police assessment of the victim's security risks. Authorities placed victims deemed to be at high risk in private accommodations, guarded by police, and they were unable to move freely. The government closely monitored, and sometimes restricted, victims' movement while residing in the specialized shelter. These high security measures may have re-traumatized some victims. CPFSA had a protocol for providing services to child trafficking victims under the agency's care, and the government had victim management guidelines for facilities that provided care to victims of trafficking in Jamaica.

The government took measures to adapt protection services during the pandemic, including through providing staff and victims in government facilities with personal protective equipment and designating quarantine and isolation areas in all residential facilities for children. Nonetheless, because of the pandemic's constraints on space and resources, child victims' placement into shelters was sometimes delayed, and transfers of children into foster care or reintegration with their families may have been completed prematurely. Some facilities struggled to maintain adequate stock of food and supplies.

The government provided few long-term services to support victims' reintegration, prevent re-exploitation, or sustain protection throughout the duration of lengthy court cases. The government continued to fund training for a Haitian woman who has been a resident of the NATFATIP shelter since 2013, but authorities did not take steps to assist her in safely transitioning to long-term independence outside the shelter. Foreign victims were able to access the same services as Jamaican victims. The government did not have a formal policy to provide residency to foreign victims who faced hardship or retribution upon return to their home countries, but authorities could provide this assistance to victims on a case-by-case basis. No victims received residency during the reporting period. The government repatriated three Colombian victims.

The Ministry of Justice's Victim Service Division (VSD) offered court orientation sessions for victims participating in the judicial process, including children, and officers from VSD or CPFSA accompanied victims testifying in court. The government provided witness protection services to three victims. In certain instances, justice officials permitted victims to provide testimony through video or written statements, and authorities reported using a system of referral documents to minimize the need for victims to recount the details of their experiences. However, the government did not allocate adequate human or financial resources to provide victims with sustained support during legal processes, and authorities did not always employ victim-centered procedures. Years-long court cases, re-traumatization during the criminal justice process, and fear of reprisal further disincentivized victims from reporting cases or participating in trials. The government reported several ministries coordinated to assist a Jamaican victim to provide witness testimony in a case in Bahamian court.

Jamaica's anti-trafficking law directed the court to order restitution to victims, but unlike last year, courts did not order any convicted traffickers to pay restitution to victims. Jamaican law protected trafficking victims from prosecution for immigration or prostitution-related offenses traffickers compelled them to commit, but it did not provide immunity for other unlawful acts traffickers may have compelled victims to commit. Due to inadequate screening for indicators of potential trafficking among vulnerable populations, including children apprehended for gang-related criminal activity, authorities may have penalized some victims. In February 2022, authorities shot and killed a 15-year-old boy when he attempted to escape the juvenile facility where he was in custody for his involvement

in a 2021 robbery; in news reports, the boy's family has alleged that he was forced at gunpoint to participate in the robbery.

## PREVENTION

The government maintained efforts to prevent trafficking. NATFATIP, which was chaired by the Ministry of National Security and included representatives from relevant government institutions and select NGOs, met bi-monthly to coordinate implementation of the 2018-2021 national action plan. The government drafted updates that would extend the plan through May 2023 and submitted it for cabinet approval. The government did not provide updates on the status of a draft national policy to combat trafficking in persons developed during the previous reporting period. NATFATIP conducted educational sessions for 150 parents, teachers, and students at high schools, and it partnered with a media company to expand its awareness campaigns for the public through radio, television, and print media. Public officials utilized television, radio, newspaper, social media, and other online platforms to disseminate messages on the risks of human trafficking—including pandemic-related trends—and encourage the public to identify and report suspected cases.

The government did not share information on the amount of funding it provided to NATFATIP or on amounts from individual ministries' budgets used to fund anti-trafficking activities. Officials reported the pandemic strained government resources and reduced revenue, resulting in decreased funding for anti-trafficking efforts. In the previous reporting period, the government decreased its funding for NATFATIP by nearly 75 percent. NATFATIP maintained a database to collect information on traffickers and victims provided in monthly reports from its member institutions, and ONRTIP provided independent oversight of the government's anti-trafficking efforts. ONRTIP has reported shortcomings in data entry and insufficient access to the data across government sectors. During the year, a number of key government institutions signed an MOU on data sharing to allow more timely and comprehensive access to data on anti-trafficking efforts. The government did not use information from the database to support development of its policy and programming.

The Employment Agencies Regulation Act set guidelines for the licensing of employment agencies and prohibited charging some workers recruitment fees, but this only applied to participants in overseas programs in which host governments had prohibited such fees. Separate laws prohibited fraudulent recruitment practices such as contract switching. Ministry of Labor and Social Security (MLSS) officials coordinated with police to investigate private employment agencies suspected of operating illegally, leading to the arrest of five individuals whose cases were in progress at the close of the reporting period. MLSS conducted pre-departure orientation sessions for migrant workers in the hospitality and agricultural sectors in the United States and Canada, reaching more than 12,000 individuals during the year; these sessions included information on types of human trafficking, identifying and avoiding potential risks, and who to contact for assistance. The government maintained liaison officers in Canada, under the auspices of a bilateral MOU, to protect the interests of overseas workers. These officials were available to workers 24 hours per day, seven days per week, but the government did not report whether they made efforts to prevent trafficking. The government operated a liaison service in the United States, but only certain groups of Jamaican temporary workers were eligible for this assistance. The government did not report any investigations, prosecutions, or convictions of foreign tourists for the purchase of commercial sex acts from child trafficking victims. The government reported it conducted awareness-raising activities on the criminal penalties for purchasing commercial sex acts to deter potential buyers, including foreign tourists, and held training sessions on human trafficking within the tourism sector for industry stakeholders.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Jamaica, and traffickers exploit victims from Jamaica abroad. Sex trafficking of Jamaican women and children, including boys, reportedly occurs on streets and in nightclubs, bars, massage parlors, hotels, and private homes, including in resort towns. Local observers believe sex trafficking operations have become more clandestine as a result of the pandemic. Traffickers increasingly use social media

Haiti AR_000793

platforms and false job offers to recruit victims; local experts report the pandemic has accelerated this trend, as traffickers have adapted by seeking methods to recruit individuals, especially children, in their own homes. Communities vulnerable to sex trafficking and forced labor include young women and children from poor households, child victims of sexual abuse, LGBTQI+ youth experiencing homelessness, residents of Jamaica's poverty-stricken areas effectively controlled by criminal "dons," migrant workers, and workers in the informal sector, particularly on family farms and in markets and shops. Traffickers subject children and adults to forced begging and women and children to domestic servitude. Girls, sometimes coerced by family members, are subjected to sex trafficking by men who provide monetary or material payment to the girls or their families in exchange for sex acts; local observers report this form of child sex trafficking may be widespread in some communities. Many LGBTQI+ children face persecution and bullying in their homes or communities; those who flee these abusive conditions are highly vulnerable to sex trafficking. Children from rural Jamaica, and possibly from other Caribbean countries, who are sent to live with more affluent family members or acquaintances sometimes become exploited in forced labor in private households, markets, or shops. Gang members may exploit children in forced begging or in forced criminal activity including as lookouts, armed gunmen, or couriers of weapons and drugs; there were reports that criminal organizations exploited children in forced criminal activity in lotto-scamming. Local observers identified increased risks of forced criminal activity for boys during the pandemic. Many children are reported missing in Jamaica; traffickers exploit some of these children in forced labor or sex trafficking.

Traffickers have exploited Jamaican individuals in sex trafficking and forced labor abroad, including in other Caribbean countries, Canada, the United States, and the United Kingdom. NGOs and government officials report poverty-stricken families, or parents of children with behavioral problems, often send children to live with relatives or acquaintances overseas in order to access additional opportunities or to avoid the juvenile justice system; some of these children become victims of sex trafficking or forced labor, including domestic servitude. Jamaican women have reported being charged high recruitment fees, misled about their terms of employment, and compelled through threats to continue working in the United States' hospitality industry. Traffickers exploit foreign nationals, including migrants from South and East Asia, in forced labor and sex trafficking in Jamaica. There have been reports of forced labor of foreign nationals aboard foreign-flagged fishing vessels operating in Jamaican waters. Among the Cuban medical professionals the government contracted, some may have been forced to work by the Cuban government. NGOs and other local observers report children are subjected to sex trafficking in Jamaica's resort areas frequented by tourists. Endemic corruption and complicity, including within law enforcement, remain significant obstacles to anti-trafficking law enforcement efforts.

## JAPAN: TIER 2

The Government of Japan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Japan remained on Tier 2. These efforts included identifying more trafficking victims and continuing to implement public awareness campaigns. The government also officially recognized four Technical Intern Training Program (TITP) participants as trafficking victims, the first time the government has recognized TITP participants as trafficking victims. However, the government did not meet the minimum standards in several key areas. Continued lack of political will to address all forms of trafficking and identify and protect trafficking victims contributed to the government's overall lack of progress. Authorities continued to prosecute and convict traffickers under laws prescribing insufficiently stringent penalties and delivered suspended sentences in nearly half of all cases, while some traffickers received only fines. These actions significantly weakened deterrence, undercut efforts to hold traffickers

accountable, and did not adequately address the heinous nature of the crime. Law enforcement bodies continued to identify hundreds of children exploited in the commercial sex industry without screening them for trafficking indicators and did not formally designate them as trafficking victims, hindering their access to protection services and judicial recourse, and allowing child sex traffickers to operate with impunity. Reports of forced labor among labor migrants working in Japan under TITP persisted in much higher numbers than that which the government identified during the reporting period. Within TITP, the government's memoranda of cooperation with sending countries remained ineffective in preventing foreign-based labor recruitment agencies from charging excessive fees—a key driver of debt-based coercion among TITP participants—and the government did not take any measures to hold recruiters and employers accountable for labor trafficking crimes under this system. Authorities continued to rely on disparate, ineffective identification and referral procedures, which did not cover all forms of trafficking, therefore officials continued to punish unidentified victims for unlawful acts traffickers compelled them to commit. The government did not provide specific protection services appropriate for victims of all forms of trafficking.



JAPAN TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute sex and labor trafficking cases, and hold convicted traffickers accountable by imposing strong sentences. • Develop, systematize, and implement standard interagency procedures for the identification of, and referral to protective services for, victims of labor trafficking among migrant workers, including those in Japan under the auspices of the TITP and other visa-conferring statuses, and among those in immigration detention. • Enhance victim screening to ensure victims—including children exploited in commercial sex without third party facilitation, migrant workers under the TITP, and migrant workers entering Japan under the Specified Skilled Worker Visa—are properly identified and referred to services, and not detained or forcibly deported for unlawful acts traffickers compelled them to commit. • Increase efforts to identify male victims of sex trafficking and labor trafficking. • Increase resources for specialized care and assistance to trafficking victims, including designated shelters for trafficking victims, and ensure these services are also available to both foreign and male victims. • Increase implementation of the TITP reform law's oversight and enforcement measures, including by training Organization for Technical Intern Training (OTIT) personnel and immigration officials on victim identification, improving OTIT coordination with NGOs, reviewing all contracts prior to approval of TITP work plans, increasing employer inspections, and terminating contracts with foreign recruitment agencies charging excessive worker-paid commissions or fees. • Establish formal channels allowing all foreign workers to change employment and industries if desired. • Amend anti-trafficking laws to remove sentencing provisions that allow fines in lieu of imprisonment and increase the penalties for trafficking crimes to include a maximum of no less than four years' imprisonment. • Enact legislation banning employers from retaining foreign workers' passports or other personal documents. • Reduce migrant workers' vulnerability to debt-based coercion by amending relevant policies to eliminate the imposition of all worker-paid recruitment and service fees. • Increase enforcement of bans on "punishment" agreements, passport withholding, and other practices by organizations and employers that contribute to labor trafficking. • Aggressively investigate, prosecute, convict, and punish Japanese citizens who engage in child sex tourism overseas.

**JAPAN**

**PROSECUTION**

The government decreased inadequate law enforcement efforts. Japan did not have a comprehensive anti-trafficking statute that included definitions in line with international law. It criminalized sex trafficking and labor trafficking crimes through disparate penal code laws pertaining to prostitution of adults and children, child welfare, immigration, and employment standards. Article 7 of the "Prostitution Prevention Law" criminalized inducing others into prostitution and prescribed penalties of up to three years' imprisonment or a fine of up to 100,000 Japanese yen ($870) if fraudulent or coercive means were used, and up to three years' imprisonment and a fine of up to 100,000 yen ($870) if force or threats were used. Article 8 of the same law increased penalties to up to five years' imprisonment and a fine of up to 200,000 yen ($1,740) if the defendant received, entered into a contract to receive, or demanded compensation for crimes committed under Article 7. The "Act on Regulation and Punishment of Activities Relating to Child Prostitution and Pornography and the Protection of Children" criminalized engaging in, acting as an intermediary for, and soliciting the commercial sexual exploitation of a child and prescribed penalties of up to five years' imprisonment, a fine, or both. The act also criminalized the purchase or sale of children for the purpose of exploiting them through commercial sex or the production of child pornography, and it prescribed a maximum penalty of 10 years' imprisonment. The government also prosecuted trafficking-related crimes using the Child Welfare Act, which broadly criminalized transporting or harboring children for the purpose of causing them to commit an obscene or harmful act and prescribed penalties of up to 10 years' imprisonment, or a fine of up to 3 million yen ($26,080), or both. The Employment Security Act (ESA) and the Labor Standards Act (LSA) both criminalized forced labor and prescribed penalties of up to 10 years' imprisonment or a fine not exceeding 3 million yen ($26,080). However, the Ministry of Health, Labor and Welfare (MHLW) reported the definition of "forced labor" under the LSA was narrower than the definition of human trafficking under international law and—in practice—rare cases charged as "forced labor" under the LSA were not treated as human trafficking crimes. Inconsistent with the definition of trafficking under international law, the LSA did not include exploitation as an essential element of the crime. As in the previous reporting period, many prosecutors reportedly avoided using the ESA and LSA due to a perception that the relatively high penalties were more likely to trigger appellate processes that would decrease their overall conviction rates and negatively affect their professional standing. When penalties allowed for fines in lieu of imprisonment for sex trafficking, they were not commensurate with penalties prescribed for other serious crimes, such as rape. Civil society organizations reported reliance on these overlapping statutes continued to hinder the government's ability to identify and prosecute trafficking crimes, especially for cases involving labor trafficking with elements of psychological coercion. The government did not have any laws that prohibited employers, recruiters, or labor agents from confiscating either Japanese or foreign workers' passports, travel, or other identity documents, except for TITP participants, for whom passport or residential identification confiscation was prohibited. However, as in the previous reporting period, the government did not report if it enforced this law or penalized any employers or agencies for withholding TITP participants' documents in 2021. Japanese law—enacted in 2017—contained a provision that criminalized bribery of witnesses, which would allow authorities additional grounds to pursue obstruction of justice charges against some traffickers. However, for the fourth consecutive year, the government did not report to what extent it implemented this for trafficking cases. The government continued to provide anti-trafficking trainings to various ministries, including OTIT, National Police Agency (NPA), and MHLW. Contacts continued to report an acute need for additional training to address the lack of awareness among key law enforcement officials and judicial stakeholders.

From January to December 2021, the government investigated 44 trafficking cases: 39 sex trafficking cases involving 59 suspects and five labor trafficking cases involving three suspects. This was a decrease from the government's investigation of 55 trafficking cases in 2020: 40 sex trafficking cases involving 48 suspects and 15 labor trafficking cases involving 10 suspects. In 2021, the government initiated the prosecution of a total of 37 alleged traffickers, 33 for sex trafficking and four for labor trafficking; it also continued the prosecution of six

alleged sex traffickers and two labor traffickers that were ongoing from the previous reporting period. This demonstrated a decrease compared with the prosecution of a total of 50 alleged traffickers in 2020: 42 for sex trafficking and eight for labor trafficking. In 2021, the government convicted 29 total traffickers, 20 for sex trafficking and four for labor trafficking. This demonstrated a decrease compared with the conviction of 50 perpetrators in 2020. Of the 29 convicted traffickers, 21 received prison sentences ranging from 10 months to three years, 12 of which were fully suspended sentences that resulted in the traffickers serving no prison time; eight of the remaining 29 received sentences of a financial penalty only. Sentencing of convicted traffickers was similar to 2020 when courts fully suspended 26 of 50 prison sentences and sentenced 14 of 50 traffickers to financial penalties only. Also similar to the previous year, the government convicted the 29 traffickers under a range of laws pertaining to adults and children in commercial sex, kidnapping, rape, child welfare, immigration, and employment standards, including—but not limited to—the "Prostitution Prevention Law," the Child Welfare Act, and the "Act on Regulation and Punishment of Acts Relating to Child Prostitution and Child Pornography and the Protection of Children." The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

Despite the known prevalence of labor trafficking indicators within the TITP program, the government has never reported holding traffickers who exploit TITP participants criminally accountable or sentenced them with adequate penalties that include terms of imprisonment. For example, in 2021 the government reported it prosecuted and convicted one perpetrator within the TITP program for labor violations under the LSA, who received a sentence of a fine in lieu of imprisonment, which was inadequate compared to the gravity of the crime. Service provision NGOs reported repeated attempts to draw attention to specific allegations of labor trafficking occurring within TITP worksites, and despite the government conducting thousands of inspections of these worksites throughout the year, authorities generally did not proactively investigate these allegations for potential trafficking crimes. NGOs reported courts set prohibitively high evidentiary standards for labor trafficking cases involving foreign victims, including overreliance on physical indicators of abuse in lieu of evidence supporting psychological coercion, thereby stymying appropriate law enforcement action.

In a failure to address the pervasive problem of child sex trafficking, the government did not investigate or prosecute cases involving child commercial sexual exploitation under trafficking statutes because Japanese law did not consider children in commercial sexual exploitation as sex trafficking victims unless a third-party facilitated the commercial sex acts. In 2021, the government reported 627 cases of "child prostitution" involving at least 540 perpetrators and 408 victims, but the government did not prosecute or convict the perpetrators for potential trafficking crimes—including whether or not they involved a third-party facilitator—and it failed to identify the vast majority of the children involved in these cases as trafficking victims. In previous years, authorities also processed hundreds of such cases involving children in commercial sexual exploitation without formally investigating them as trafficking crimes (more than 600 cases in 2020; 784 cases in 2019; more than 700 cases in 2018; 956 cases in 2017). For the fourth consecutive year, the government did not report law enforcement action taken against child sex trafficking in *Joshi kosei* or "JK" businesses—dating services connecting adult men with underage high school girls—and in coerced pornography operations. Eight major prefectures maintained ordinances banning "JK" businesses, prohibiting girls younger than 18 years of age from working in "compensated dating services," or requiring "JK" business owners to register their employee rosters with local public safety commissions. Authorities did not report how many such operations they identified or shuttered for violating the terms of the ordinances (unreported in 2020 and 2019; 137 identified and none closed in 2018), nor did they report arresting any individuals alleged to have been engaged in criminal activities surrounding the "JK" business (unreported in 2020 and 2019; 69 arrested in 2018). Some authorities were reportedly unaware of the crime or unsure how to prosecute it, often citing prohibitively high evidentiary standards. Experts noted the lack of efforts by law enforcement to treat child sex trafficking cases appropriately was permissive of and perpetuated the continued

commission of the crime; it continued to minimize the prevalence of the crime; and it resulted in weak—if any—efforts to hold traffickers accountable and to protect victims.

## PROTECTION

The government maintained insufficient efforts to protect victims, including by consistently failing to formally identify trafficking victims within the TITP and among children in commercial sexual exploitation. In 2021, the government identified 47 total trafficking victims, which included 31 sex trafficking victims—only one of which was a foreign national and 18 were children—and 16 labor trafficking victims; 10 of the total number of victims were Filipina who were forced to work as "hostesses" at bars and who the government identified as victims of labor trafficking. This compared with 38 total trafficking victims identified in 2020, which included seven Filipina victims forced to work as "hostesses." However, lack of standardized guidelines, poor coordination among ministries, and misunderstanding of sex and labor trafficking crimes among all relevant agencies contributed to the government's inadequate efforts to identify and protect victims. The government did not have nationwide standard operating procedures or guidelines for officials to identify victims, even for victims that reported a crime themselves, which thereby impeded their access to care. Interagency stakeholders followed disparate, insufficient victim identification procedures, which did not incorporate all forms of trafficking, especially child sex trafficking and labor trafficking of migrant workers. Observers further reported police and immigration officials lacked awareness of trafficking indicators especially in cases involving foreign nationals, which prevented foreign trafficking victims from receiving appropriate protection. Due to the limited scope of laws prohibiting commercial sex, widespread exploitation of children and adults took place within a legalized but largely unregulated range of "delivery health service" and commercial sex acts in urban entertainment centers. Because of the government's insufficient victim screening and identification procedures, coupled with authorities' misunderstanding of sex and labor trafficking and child sex trafficking, the government continued to arrest, detain, or deport unidentified victims among vulnerable groups for unlawful acts traffickers compelled them to commit, such as immigration violations.

In 2021, 7,167 TITP participants disappeared from their jobs, some of whom likely fled because of exploitative or abusive conditions and were unidentified trafficking victims. Authorities continued to arrest and deport TITP participants who escaped labor trafficking and other abusive conditions in their contracted agencies; some labor contracts featured illegal automatic repatriation clauses for interns who became pregnant or contracted illnesses while working in Japan. During the reporting period, some TITP participants lost their jobs because of pandemic-related business closures, which caused them to find a new employer to pay off their outstanding debts to the sending organization; however, authorities arrested some TITP participants for illegally changing jobs without screening them for trafficking. The government reported it did not forcibly deport any TITP participants in 2021. Unlike in the previous reporting period, the MOJ reported immigration authorities conducted 12,865 screening interviews of TITP participants departing Japan prior to the end of their contracts, yet it did not identify any trafficking victims among them. Furthermore, the government did not have a procedure for screening foreign nationals—including TITP participants—in immigration detention for possible trafficking indicators. In 2021, observers reported authorities arrested 14 trafficking victims for immigration violations and deported some of them without screening them for trafficking indicators.

Authorities did not identify children as victims of sex trafficking unless a third party mediated the commercial sex acts, preventing hundreds of children from formal designation. The government also reported it did not treat cases of children in commercial sex as child sex trafficking cases because—contrary to definitional standards under the 2000 UN TIP Protocol—it required the perpetrator to exercise "control over the victim." Some provincial law enforcement officials noted in previous reporting periods that Japan's unusually low age of consent, 13, further complicated efforts to formally identify children exploited in commercial sex as trafficking victims. The government did not report identifying any trafficking victims among the 408 children involved in the 627 cases of "child prostitution"—a form of sex trafficking—reported by

the police in 2021. Therefore—as in the previous reporting period—the government did not provide essential victim protection services to any of the children involved in the hundreds of incidents of child sexual and commercial sexual exploitation during the reporting period, nor did it refer them to NGOs for assistance. Police continued to treat some potential child sex trafficking victims, including LGBTQI+ children, as delinquents and counseled them on their behavior instead of screening them for trafficking, investigating their cases, or referring them to specialized services.

As in prior years, the government failed to provide overall adequate protection services, such as trafficking-specific shelters, psycho-social care, and legal aid, to victims of all forms of trafficking including Japanese and foreign victims. The government reported police referred four sex trafficking victims and 11 labor trafficking victims to Women's Consultation Offices (WCO) shelters or child guidance centers for services; none of these referrals were men. This compared with eight trafficking victims who received assistance at WCO shelters in 2020, but the government did not previously report how many victims it referred to Child Guidance Centers. An international organization also reported police referred 11 trafficking victims, who it identified during raids of commercial sex establishments, to the organization for protection services. The government continued to contribute funding for WCOs and child guidance centers, both of which could provide shelter for trafficking victims alongside victims of domestic violence and other crimes. WCO shelters provided food and other basic needs, psychological care, and coverage of medical expenses, and shelter residents were free to leave the facilities. However, some NGOs continued to allege the physical conditions and services in these facilities were poor, overly restrictive, and insufficient to provide the specialized care required for trafficking victims. Government-run protection options focused on victims of other crimes, and the government did not equip relevant staff to provide the specific services required to accommodate victims of all forms of trafficking. The availability and quality of government-run services that could be provided to victims varied widely according to prefecture-level officials' ad-hoc experience with trafficking cases. The government continued to operate "one-stop assistance centers" in each prefecture for victims of sexual abuse, including some forms of sex trafficking, but—as in the previous reporting period—the government did not report if any trafficking victims received services at these centers in 2021. Unlike the previous reporting period, the government did not report how much funding it allocated for sheltering trafficking victims; in 2020, the government allocated more than 3.5 million yen (approximately $30,420) for sheltering trafficking victims in fiscal year 2020. Civil society providers reported that if a trafficking victim sought assistance from a provider, it could not assist a victim until the government formally identified the victim as such, which significantly delayed essential services given to victims.

Foreign trafficking victims had limited or no access to other government-provided social services from which legal resident victims could benefit. In 2021, the immigration services agency (ISA) allowed 11 foreign trafficking victims to remain in Japan, but it did not report if it provided or referred these victims to essential care. In comparison, in 2020, the ISA allowed eight victims to remain in Japan. The government, however, did not uniformly allow foreign trafficking victims to work in Japan. NGOs also highlighted a lack of government-provided language interpretation services as a particular challenge to the protection of foreign victims. The government relied on and expected foreign embassies to provide protection services to their nationals whom traffickers exploited in Japan. Temporary, long-term, and permanent residence benefits were reportedly available to foreign victims who feared the repercussions of returning to their countries of origin, but the government did not report how many—if any—victims received these benefits.

Victims had the right to file civil suits to seek compensation from traffickers, but—like the previous reporting period—the government did not report cases in which victims did so. Moreover, the owners of abusive supervising organizations and subsidiary businesses employing TITP participants frequently filed for bankruptcy or falsified administrative changes to shield themselves from civil or criminal liability, enabling labor trafficking to continue throughout the program with impunity. Some employers pressured TITP participants to leave their labor unions to reduce their chances of seeking recompense for labor abuses committed

**JAPAN**

against them. Receipt of compensation awards was therefore nearly impossible in practice. For the fourth consecutive year, authorities did not report any instances of court-ordered restitution for victims. In previous years, civil society organizations reported some victims of coerced pornography chose not to participate in court proceedings against their traffickers due to fear that doing so would create stigma-based challenges to their reintegration.

## PREVENTION

The government maintained insufficient efforts to prevent trafficking, including by continuing to demonstrate a lack of political will to adequately do so among highly vulnerable migrant worker populations. The government maintained a national-level interagency coordinating body and it met once in 2021; however, it did not effectively coordinate among relevant ministries to combat trafficking. The government continued to rely on a 2014 national anti-trafficking action plan. The government produced its seventh annual report on government actions to combat trafficking and tracked measures against the stated goals of its 2014 action plan. The government held four conferences with civil society organizations to discuss its anti-trafficking measures, but it did not report if any tangible results came from these meetings. Authorities continued to raise awareness of trafficking by disseminating information online—including on the NPA's public website—and through radio programs, posters, and brochures, as well as through leaflets distributed to NGOs, immigration and labor offices, and diplomatic missions in Japan and abroad. The government did not make significant efforts to reduce the demand for commercial sex acts, as most of its awareness-raising targeted victims, rather than the demand source. The government had extraterritorial jurisdiction to prosecute Japanese nationals who engaged in child sexual exploitation abroad, but—for the second consecutive year—it did not report investigating or prosecuting any cases of child sex tourism under this jurisdiction in 2021. Several ministries continued to operate hotlines that could identify potential trafficking cases, including MHLW, ISA, and NPA, but none of these ministries reported if these hotlines identified any victims in 2021. An NGO observed NPA's anti-trafficking leaflet advertising its hotline was unclear and difficult for trafficking victims to understand.

The government continued to implement the 2016 Act on Proper Technical Intern Training and Protection of Technical Intern Trainees (TITP reform law). The TITP reform law mandated the MHLW approve work plans outlining living conditions, working hours, and other factors developed jointly by incoming TITP participants and their employers. The government did not report the number of TITP participants it allowed entry into the program in 2021; however, from November 2020 through mid-January 2021, the government allowed the entry of 55,754 TITP participants. However, authorities did not fully implement oversight procedures to ensure unity among sending and receiving organizations' contracts nor among these contracts and the participants' work plans, resulting in discrepant language that left many participants vulnerable to labor abuses, including labor trafficking. OTIT conducted on-site inspections of implementing and supervising organizations, as it did the previous year, as did MOJ. OTIT reported it conducted inspections of 21,833 implementing organizations and 3,950 inspections of supervising organizations in 2021, while MOJ reported OTIT conducted 10,954 inspections of implementing organizations and 2,120 of supervising organizations. This data compared with 15,318 inspections of implementing organizations and 2,983 inspections of supervising organizations in 2020. The government did not report if these inspections resulted in the identification of a trafficking victims or criminal investigation for potential trafficking crimes. According to the MOJ, in 2021 the government revoked the licenses of 19 supervising organizations, a slight increase from the 11 licenses revoked during the previous year. Authorities also revoked the accreditations of MHLW-approved work plans of 157 implementing organizations for violations of the Technical Intern Training Act, an increase from 91 revoked the previous year. Some observers expressed these work plans lacked enforceability due to the high number of TITP employers and participants relative to the small number of inspectors. As of August 2021, OTIT suspended the acceptance of new technical intern trainees from sending organizations from which there were multiple cases of disappeared trainees; in particular, OTIT reported five sending organizations to Vietnam and

did not accept the applications for accreditations of technical intern training plans or the applications for licenses of these supervising organizations. Civil society groups continued to express concern the OTIT was too understaffed to adequately investigate allegations of abuse, including labor trafficking, within such a large program—particularly as the number of participants continued to grow. Some participants reported the OTIT and the MHLW were unresponsive to their request for mediation when their employers suddenly changed or terminated their contracts. In April 2021, OTIT established a hotline for technical intern trainees to respond to emergency cases such as violence or intimidation by their employers; between April to November 2021, the government reported it received 69 anonymous calls to this hotline, but it did not report if any of these calls resulted in authorities identifying any labor trafficking victims.

The government-maintained memoranda of cooperation (MOC) pertaining to the TITP with Bangladesh, Bhutan, Burma, Cambodia, India, Indonesia, Laos, Mongolia, Pakistan, the Philippines, Sri Lanka, Thailand, Uzbekistan, and Vietnam as sending countries of TITP participants. MOCs remained the Japanese government's primary tool to regulate recruitment practices, but they remained largely ineffective because the government failed to hold the governments of the sending countries accountable for abusive labor practices and labor trafficking crimes by recruiters and sending organizations. The MOCs affirmed the government would accept TITP trainees only from state-approved organizations that would not charge participants "excessive fees" known to place workers in high debt. However, some sending organizations in these countries circumvented the fee restrictions and secured their respective governments' approval by charging high "commissions" in lieu of fees; trainees from these countries therefore remained at risk for debt-based coercion once in Japan. This was especially true for Vietnamese participants, who constituted the highest proportion of TITP trainees, and were required to pay commissions to sending organizations in Vietnam. Some Japanese TITP employers forced participants to remit portions of their salaries into mandatory savings accounts as a means to prevent their absconderment and retain their labor. The MOJ, MOFA, and MHLW could request that sending countries investigate allegations of recruitment fee violations, but the decision to penalize or ban sending organizations for the practice was at the discretion of sending country authorities. Over the last four years, the government reported to sending countries the alleged misconduct committed by 100 sending organizations, but it did not report how many it reported to sending countries in 2021 alone. The government eliminated 23 of these organizations from the list of approved sending organizations, but it did not report investigating them for committing potential trafficking crimes.

The government continued to implement its Special Skilled Worker visa program—established in 2018—to fill positions in construction, shipbuilding, nursing care, and 10 other sectors with known labor shortages over a five-year period. Although there were no reported cases of labor trafficking within this system in 2021, observers continued to express concern it would engender the same vulnerabilities to labor abuses, including labor trafficking, as those inherent to the TITP and the government's oversight measures were similarly lacking. The program reportedly permitted qualifying individuals already participating in the TITP to switch their visas to the newly created categories, allowing them to extend their stay in Japan and change jobs within the same sector; the government did not report how many—if any—TITP participants changed their employers in 2021. Japanese law also enabled for-profit employment agencies and individuals to become "registered support organizations"—with no licensing requirements—to liaise between labor recruitment brokerages and employers for a fee. Observers reported these service fees could create additional risks for debt-based coercion among migrant workers entering under the auspices of the regime. Under this program, the government maintained MOCs with 14 governments that provided a framework for information-sharing to eliminate malicious brokers and recruitment agencies.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers subject Japanese and foreign men and women to labor and sex trafficking, and they subject Japanese children to sex trafficking. Traffickers also transport victims from elsewhere in the region through Japan before exploiting them in

onward destinations, including East Asia and North America. Traffickers subject male and female migrant workers, mainly from Asia, to conditions of labor trafficking, including at companies participating in Japanese government-run programs, such as TITP. Japan's fast-growing foreign student population is at risk for trafficking in the unskilled labor sector due to abusive and often deceptive work-study contract provisions. Men, women, and children from Northeast Asia, Southeast Asia, South Asia, Latin America, and Africa travel to Japan for employment or fraudulent marriage and are subjected to sex trafficking. Traffickers use fraudulent marriages between foreign women and Japanese men to facilitate the entry of women into Japan for sex trafficking in bars, clubs, brothels, and massage parlors. Traffickers keep victims in forced labor or commercial sex using debt-based coercion, threats of violence or deportation, blackmail, confiscation of passports and other documents, and other psychologically coercive methods. Employers require many migrant workers to pay fees for living expenses, medical care, and other necessities, leaving them vulnerable to debt-based coercion. Brothel operators sometimes arbitrarily impose "fines" on victims for alleged misbehavior, thereby extending their indebtedness as a coercive measure.

Traffickers also subject Japanese citizens and foreign nationals—particularly runaway teenage girls and boys—to sex trafficking. *Enjo kosai* or "compensated dating" services and variants of the "JK" business, often with ties to organized crime, continue to facilitate the sex trafficking of Japanese children; children from the People's Republic of China (PRC), the Republic of Korea, Laos, the Philippines, Singapore, and Vietnam are also reportedly exploited in these establishments. The pandemic caused a surge in unemployment and domestic violence, which increased the risk of some Japanese women and girls—especially runaway children—to enter into "compensated dating;" NGOs reported traffickers increasingly use social media sites to contact women and girls for this purpose. "JK" bar owners may subject some underage boys and girls, including LGBTQI+ youth, to labor trafficking as hostesses and club promoters. Highly organized commercial sex networks target vulnerable Japanese women and girls—in some instances those living in poverty or with cognitive disabilities—in public spaces such as subways, popular youth hangouts, schools, and online, and subject them to sex trafficking in commercial sex establishments, small musical performance venues, retail spaces, and reflexology centers, often through debt-based coercion. Some groups posing as model and actor placement agencies use fraudulent recruitment techniques to coerce Japanese men, women, boys, and girls into signing vague contracts and then threaten them with legal action or the release of compromising photographs to force them to participate in pornographic films. Some transgender youth seek employment in unregulated urban entertainment districts as a means of financing their gender-affirming care and are subsequently exploited in commercial sex and possibly labor trafficking. Private Japanese immigration brokers help Japanese-Filipino children, and their Filipina mothers move to Japan and acquire citizenship for a significant fee, which the mothers often incur large debts to pay; upon arrival, some of these women and their children are subjected to sex trafficking to pay off the debts. Organized crime syndicates posing as immigration brokers also lure these families to Japan with deceptive job offers, and then subject the women to labor and sex trafficking in the nightlife industry. Japanese men remain a source of demand for child sex tourism in other countries in Asia.

Cases of labor trafficking continue within the TITP, a government-run program originally designed to foster basic technical skills among foreign workers that has effectively become a guest-worker program. TITP participants from Bangladesh, Bhutan, Burma, Cambodia, the PRC, India, Indonesia, Laos, Mongolia, Pakistan, the Philippines, Thailand, Turkmenistan, Uzbekistan, and Vietnam pay sending organizations in their home countries thousands of dollars in excessive worker-paid fees, deposits, or vague "commissions"—despite bilateral agreements between sending countries and Japan aimed at curbing the practice—to secure jobs in fishing, food processing, shellfish cultivation, ship building, construction, textile production, and manufacturing of electronic components, automobiles, and other large machinery. TITP employers place many participants in jobs that do not teach or develop technical skills, contrary to the program's stated intent; others place participants in jobs that do not match the duties they agreed upon beforehand. Some of these workers experience restricted freedom of movement

and communication, confiscation of passports and other personal and legal documentation, threats of deportation or harm to their families, physical violence, poor living conditions, wage garnishing, and other conditions indicative of labor trafficking. Some sending organizations require participants to sign "punishment agreements" charging thousands of dollars in penalties if they fail to comply with their labor contracts. Participants who leave their contracted TITP jobs fall out of immigration status, after which some are reportedly subjected to labor and sex trafficking. Some foreign workers within the Specified Skilled Worker visa program—including former TITP participants—may be at risk for trafficking. An NGO noted more than 90 percent of the migrant workers in Japan under the auspices of this visa regime were former TITP interns in vulnerable sectors prior to 2019.

# JORDAN: TIER 2

The Government of Jordan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Jordan remained on Tier 2. These efforts included identifying and referring to care twice as many victims as the previous reporting period and nearly doubling prosecutions of trafficking cases. In addition, the government enacted amendments to the 2009 anti-trafficking law, increasing penalties for traffickers, allowing prosecutors to seek restitution in trafficking cases, formalizing the use of specialized prosecutors and judges, and establishing a donations-based victims' assistance fund. The government also drafted a new national referral mechanism (NRM) and trained officials on implementation of the amendments and NRM. However, the government did not meet the minimum standards in several key areas. Lenient sentencing (resulting in more than 88 percent of sentenced traffickers receiving fines in lieu of imprisonment) undercut efforts to hold traffickers accountable, weakened deterrence, did not adequately reflect the nature of the crime, and increased potential security and safety concerns. Authorities continued to arrest, detain, and deport some victims for unlawful acts traffickers compelled them to commit, such as immigration violations and fleeing abusive employers. Jordan's visa sponsorship system, which placed a significant amount of power in the hands of employers of foreign workers, continued to create vulnerabilities for the exploitation of migrant workers and remained a significant impediment to authorities identifying and protecting trafficking victims.



## PRIORITIZED RECOMMENDATIONS:

Increase efforts to reduce lenient sentencing of convicted traffickers, including seeking penalties with significant prison terms consistent with the amended anti-trafficking law. • Increase efforts to proactively screen for and identify trafficking victims among vulnerable populations, such as detained foreign migrants, domestic workers, workers in the agricultural sector, refugees, children who were homeless or used the streets as a source of livelihood, and persons in commercial sex. • Ensure victims are not inappropriately punished for unlawful acts traffickers compelled them to commit, such as immigration or prostitution violations or escaping from an abusive employer. • Continue increasing efforts to investigate, prosecute, and convict sex trafficking and labor trafficking crimes. • Train law enforcement officers, judges, prison officials, and labor inspectors throughout the country to screen for, identify, and refer

**JORDAN**

to protection services trafficking victims, including among vulnerable populations such as foreign workers and refugees. • Reform the visa sponsorship system by enforcing labor law protections for all workers in Jordan, including domestic workers, and allow workers to freely change employers. • Regulate and investigate fraudulent labor and recruitment practices.• Allocate adequate funding for operation of the government's trafficking shelter, and train shelter staff to identify and provide specialized care to victims. • Investigate and punish individuals for withholding workers' passports under Jordan's passport law. • Fully implement labor regulations governing work in the agricultural sector and increase labor inspections in this sector.

## PROSECUTION

The government increased overall law enforcement efforts but sentenced convicted traffickers to insignificant penalties. The 2009 Law on the Prevention of Trafficking in Human Beings criminalized sex trafficking and labor trafficking. During the reporting period, the government enacted amendments to the law. As amended, the law prescribed penalties of imprisonment and a fine for adult labor trafficking. The amended law did not provide a range for the sentence of imprisonment, but in such cases, the penal code provided a default sentence of between three- and 15-years' imprisonment. The amended law prescribed penalties of at least seven years' imprisonment, and a fine for adult and child sex trafficking and child labor trafficking. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as kidnapping.

The Public Security Directorate (PSD) and Ministry of Labor (MOL) joint counter-trafficking unit (CTU) remained the national lead on anti-trafficking investigations and continued to investigate potential trafficking crimes. During the reporting period, CTU investigated 214 potential trafficking cases, similar to 206 investigations of potential trafficking crimes in 2020. Of the 214 potential cases, CTU determined 36 cases involving 63 suspects met the criteria to be classified as trafficking cases and referred these to prosecutors; 10 of the 36 investigated cases were ongoing from the previous reporting period. These 36 cases included 12 sex trafficking cases, 12 domestic servitude cases, 11 forced labor cases, and one forced begging case. The Ministry of Justice (MOJ) initiated the prosecution of 23 trafficking cases involving 35 defendants and continued prosecuting 11 cases involving 24 defendants initiated in the previous reporting period; this was an increase compared with 22 defendants prosecuted in 2020. The government convicted nine traffickers under the trafficking law, compared to 12 convictions secured in 2020. Sentences ranged from a fine of 1,000 dinar ($1,410) to 1.5 years' imprisonment and a fine. Only one convicted trafficker received a prison sentence greater than one year, which did not serve to deter or adequately reflect the nature of the crime; during the previous reporting period, eight of the 12 convicted traffickers received sentences greater than one year of imprisonment. Legal experts continued to report that some judges remained hesitant to convict perpetrators for human trafficking, preferring to pursue other charges such as labor violations that carried lesser penalties than the anti-trafficking law, due to the complexity of cases, lack of judicial experience and expertise, and the cultural acceptance of some forms of the crime such as forced labor in domestic work. The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes.

Jordan's overcrowded and underfunded judicial system continued to lack a sufficient number of trained judges and prosecutors who could specialize in trafficking cases. However, beginning in 2018, the MOJ began assigning specialized prosecutors and judges to criminal cases, including trafficking; in accordance with the amendments to the anti-trafficking law, the Judicial Council appointed a total of 41 specialized public prosecutors and judges to ensure each court had at least one specialized judge and prosecutor in each governorate between June 2021 and January 2022. Previously, officials reported poor communication between CTU investigators and prosecutors contributed to weak prosecution of trafficking cases. During the reporting period, CTU continued implementing new case management procedures to allow CTU investigators to follow trafficking investigations through prosecution to improve the classification of trafficking cases. The government rotated specialized investigators out of CTU into other assignments every two years or less, which hindered the work of the unit; however, NGOs

reported this also increased the overall number of PSD officers familiar with trafficking as new officers were consistently trained on trafficking. The government—at times in cooperation with international organizations and NGOs—trained law enforcement, prosecutors, judges, labor inspectors, social workers, healthcare providers, provincial and district governors, and other frontline officials on trafficking indicators, victim identification, investigation procedures for trafficking cases, and related topics such as collecting digital evidence. To address an acknowledged lack of judicial experience and expertise, the Judicial Institute partnered with NGOs to train judges on trafficking-specific courses.

## PROTECTION

The government increased efforts to identify and provide services to trafficking victims. In 2021, the government identified and provided various services to 61 trafficking victims (15 were victims of sex trafficking, 36 of forced labor, and 10 of an unspecified form of trafficking), which was an increase compared with 25 identified victims in 2020. Of the 61 victims, 14 were male and 47 female; 58 were adults and 3 children; 45 were foreign citizens and 16 Jordanian. During the reporting period, the government collaborated with civil society to draft new victim identification standard operating procedures (SOPs) and a national referral mechanism (NRM). In November 2021, the Attorney General endorsed the SOPs and NRM, and they entered a three-month trial period; at the end of the reporting period, the inter-ministerial National Committee for Countering Human Trafficking (NCCT) compiled input from government stakeholders and civil society, updated the NRM, and sent it to the Minister of Justice for final approval. Although CTU was headquartered in Amman, it used specialized liaison officers in police stations across the country to identify trafficking victims outside of the capital. CTU also relied on additional liaison officers in Syrian refugee camps; in September 2021, CTU also assigned liaison officers with the Civil Aviation Regulatory Authority. During the reporting period, the Ministry of Social Development's (MOSD) anti-vagrancy department continued a campaign (begun in October 2020) to remove vulnerable children, including forced begging victims, from the streets of Amman. Joint patrols by teams of MOSD social workers, PSD investigators, and female police officers screened children for trafficking indicators and referred potential trafficking victims to MOSD juvenile assistance centers to receive medical assistance and social services like family reintegration efforts. In 2021, authorities referred 1,000 vulnerable children, including potential trafficking victims, to MOSD shelters; in September 2021, authorities recognized three girls as forced begging victims and referred them to the government's Dar Karama shelter, dedicated to protecting trafficking victims, for specialized services.

The government continued to refer identified victims to multiple care shelters, including shelters run by an NGO and MOSD, and referred cases to CTU for investigation. MOSD continued to operate and fund the Dar Karama shelter, which provided psycho-social care, medical treatment, legal assistance, vocational training, and specialized services for children. It also continued to offer computer classes, a book club, and religious services for both Muslim and Christian shelter residents. The shelter's staff included lawyers and specialists in psychology, social work, nursing, and education. The PSD, including both gendarmerie and police officers, provided shelter security outside of the shelter. The provision of shelter services was not conditional upon a victim's cooperation with law enforcement or judicial authorities, and victims could freely and willingly leave the shelter. Victims were allowed to stay at the shelter for as long as two months, but victims' stay in the shelter could be extended through a process requiring MOSD approval; during the reporting period, MOSD drafted a shelter bylaw that would allow victims to stay the length of an investigation and prosecution without additional approvals. The shelter had the capacity to serve a total of 35 victims, both Jordanian citizens and foreign nationals, with space for 20 women, five children, and 10 men. The shelter had a separate wing and entrance for male victims, and it was the only shelter in the country available to men; the shelter assisted 13 male victims. In 2021, the shelter served a total of 37 victims, which represented an increase compared with 14 victims served in 2020. The government referred three identified victims to an NGO shelter, six identified victims to their respective embassies, and 11 victims (five Jordanians, two Egyptians, and eight Kuwaitis) declined shelter services. Shelter staff cooperated with the embassies of Bangladesh, Ethiopia, Philippines, Sri Lanka, and

Haiti AR_000799

Sudan to provide assistance to their nationals. Although the Dar Karama shelter was authorized to admit self-referrals to the shelter pending a subsequent formal CTU referral, NGOs and other stakeholders reported this process was confusing and the shelter's admittance rules needed clarification; in January 2022, the MOJ established a committee with relevant government stakeholders to amend the shelter's bylaws and clarify admittance rules. The government reported the Dar Karama shelter lacked funds to purchase return flights for foreign trafficking victims who wished to voluntarily return to their home country and did not have regular access to interpretation services for languages other than English; the government reported relying at times on embassies, NGOs, and international organizations to provide repatriation and interpretation assistance. The amended anti-trafficking law requires the creation of a donations-based victims' fund, which the government intends to use to finance protection services, plane tickets for voluntary repatriation, and other needs that are currently underfunded; the government was reviewing guidelines to permanently finance the fund at the end of the reporting period. Because the government shelter was located in Amman, victim services were difficult to access for victims outside of the capital.

The government encouraged victims to assist in the investigation and prosecution of their traffickers; PSD accompanied victims to court, and officials assigned all victims a lawyer throughout judicial proceedings to ensure protection of their rights. The 2009 anti-trafficking law, as amended, extended witness protections to trafficking victims, and trafficking victims were able to provide court statements electronically to prevent re-traumatization. Foreign victims also had the option to provide a deposition prior to being repatriated. The amended anti-trafficking law requires authorities to provide victims legitimate means to obtain compensation for damages through restitution or civil suits; however, these provisions were not implemented by the end of the reporting period. The government provided foreign victims with legal alternatives to their removal to countries where they faced retribution or hardship. In addition, the new NRM required the government to waive fees and assist foreign victims—who wished to remain in Jordan—with obtaining residency and finding employment. The amended anti-trafficking law also allowed foreign victims to seek temporary residence in Jordan until the completion of their cases' investigation and prosecution; as a result of the amendments and NRM, NGOs observed an increase in judicial officials offering victims immigration relief, including waiving overstay fees and work permit violations during the reporting period. Authorities continued to punish some potential foreign trafficking victims for unlawful acts traffickers compelled them to commit—such as immigration violations—including through fines, arrest, detention, and deportation; an NGO reported working on cases of nine potential trafficking victims whom the government detained because of fraudulent theft charges, absconding from abusive employers, and visa overstay fees. Furthermore, bureaucratic and financial barriers and detention prevented some victims from repatriation, even if a worker left an employer because of exploitation. Some foreign workers, including potential trafficking victims, remained in Jordanian detention due to pending criminal charges against them or their inability to pay for overstay penalties or plane fare home. NGOs reported foreign labor trafficking victims were less likely to report abuses to the authorities because of fear of deportation or detention.

## PREVENTION

The government maintained prevention efforts. The NCCT, chaired by the Minister of Justice and comprising relevant ministries, met regularly (virtually and in person), at times with NGO participation. The government continued to implement its 2019-2022 national anti-trafficking strategy in partnership with NGOs and international organizations. During the reporting period, the government began assessing the 2019-2022 strategy to prepare drafting the 2023-2025 national anti-trafficking strategy. The NCCT published quarterly reports on its efforts. The government continued to raise awareness about trafficking crimes throughout the country through workshops, television broadcasts, and other means. The government continued distributing anti-trafficking information to all foreign migrant workers entering Jordan and at inspected work sites. The MOL and CTU continued to operate a hotline to receive complaints of labor violations and potential

trafficking crimes; the hotline offered interpretation services in some source-country languages. However, due to overall budget shortfalls, the government did not consistently maintain interpreters of some Asian languages at the hotline, which led to challenges in identifying potential trafficking victims and referring them to protection services. The MOL also operated an online complaint mechanism on its website for reporting child labor and trafficking cases.

Jordan's visa sponsorship system continued to prevent foreign workers from switching employers without a letter of release from their sponsor or receiving adequate access to legal recourse in response to abuse; the government reported granting ad hoc permission to allow domestic workers to change employers in an unspecified number of cases. Migrant workers, including potential trafficking victims, who left their place of employment prior to fulfilling their work contract, were considered illegal residents and subjected to fines and detention for their irregular presence in the country; loss of legal status created greater vulnerabilities to trafficking. Jordan maintained several bilateral labor agreements with other countries detailing recruitment procedures, working conditions, and wages; however, some of the bilateral labor agreements exacerbated vulnerabilities to trafficking. For example, a labor agreement between the Jordanian and Egyptian governments specified that an Egyptian national cannot leave Jordan without permission from his or her employer, even if the employer was convicted of trafficking crimes. Similarly, although the Ugandan government signed a labor agreement with Jordan, there was no Ugandan embassy or diplomatic representation in Jordan for Ugandan nationals, including potential trafficking victims, to seek assistance. The government worked with countries with diplomatic representation in Jordan to verify migrant workers' age, approve work permits, and translate work contracts into workers' native languages.

In October 2021, the government issued regulations requiring recruitment agencies to provide migrant domestic workers with insurance covering medical care and workplace accidents. The regulations also authorize the MOL to publicly rate recruitment agencies based on compliance with the labor law—including provisions prohibiting fraudulent recruitment practices, worker-paid recruitment fees, and contract switching—and to close and withdraw licenses from poorly ranked agencies; the MOL did not report if it had implemented these regulations. Jordanian law prohibits recruitment agencies and employers of foreign workers from charging workers recruitment fees or deducting recruitment costs from wages; however, some Egyptian workers reported being pressured to pay their own recruitment fees. Through regular labor inspections, the MOL referred 22 recruitment agencies and 11 domestic worker complaints to CTU for further investigation during the reporting period; however, the government did not report further outcome of these cases. Jordan's passport law criminalized the withholding of passports by an employer, carrying penalties of six months to three years' imprisonment and fines. During the reporting year, CTU referred six cases of passport confiscation and 25 cases of unlawful wage withholding to the MOJ. The judiciary prosecuted six passport confiscation cases, but no individuals were convicted. The judiciary prosecuted 25 cases of unlawful wage withholding; nine individuals were convicted and received fines, while 10 cases remained pending. The government began implementing a new law approved in March 2021 to regulate the agricultural sector, which gave workers the right to file lawsuits, submit complaints to labor inspectors, and be exempt from work- or residency-permit fees; however, NGOs reported the changes did not address abuses of the visa sponsorship system for migrant workers who comprise the majority of the agricultural sector's workforce.

The government did not make efforts to reduce the demand for commercial sex acts or child sex tourism. In 2021, the government continued to take steps to reduce the vulnerability of Syrian refugees to trafficking. The government issued 59,108 work permits to Syrians from host communities and refugee camps in 2021, an increase compared with 38,756 distributed in 2020, which helped reduce this population's vulnerability to forced labor; however, overall meaningful economic opportunities for Syrian refugees were limited, especially for women, because of the instability of the job market due to the pandemic and because 94 percent of permits were issued to men. The MFA continued to report its finance department directly paid locally-hired, domestic staff of Jordanian diplomats posted abroad, in accordance with labor laws and wage rates in the host country.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Jordan, and traffickers exploit victims from Jordan abroad. Trafficking victims in Jordan are primarily from South and Southeast Asia, East Africa, Egypt, and Syria. In 2018, an NGO reported a large increase in Ugandan trafficking victims following the implementation of a 2016 bilateral labor agreement between the Ugandan and Jordanian governments. Jordan relies on foreign migrant workers—many of whom are undocumented—in several sectors, including construction, agriculture, textiles, and domestic work; according to an NGO in 2018, workers in these sectors are the most vulnerable to trafficking because of informal work agreements. According to a 2020 study, officials estimate the total number of foreign workers in Jordan could be as high as 1.5 million, while the MOL estimates the number of irregular foreign workers in Jordan to be as high as 500,000. Jordan's visa sponsorship system increases foreign workers' vulnerability to trafficking by preventing them from switching employers without the initial employer's consent. Because work permits are linked to a specific employer, when a worker quits one job before securing another, the worker loses legal status increasing vulnerability to trafficking. Unscrupulous employers exploit the non-transferability of work visas to control or manipulate workers. Some recruitment agencies fraudulently recruit victims from labor-source countries to Jordan using false promises of money or other benefits. Forced labor victims in Jordan experience withheld or non-payment of wages, confiscation of identity documents, restricted freedom of movement, unsafe living conditions, long hours without rest, isolation, and verbal and physical abuse. For example, adults from South and East Asia migrate to work in factories in Jordan's garment industry, some of whom experience withholding of passports, restricted movement, and unsafe living conditions. Traffickers exploit some migrant workers from Egypt—the largest source of foreign labor in Jordan—in forced labor in the construction, service, and agricultural sectors. During the reporting period, civil society reported an increase in Ethiopian domestic workers exploited in forced labor in Jordan. In 2017, the government estimated there were 82,643 foreign female domestic workers in Jordan, primarily from South and Southeast Asia and East Africa, who are highly vulnerable to forced labor. Some out-of-status domestic workers from Bangladesh, Indonesia, the Philippines, and Sri Lanka have been reportedly exploited in sex trafficking while looking for an employer or after fleeing their previous employers.

Refugees from Iraq, the West Bank and Gaza, Syria, and other countries are highly vulnerable to trafficking in Jordan, especially women and children working illegally or informally. Jordan is host to approximately 753,282 UNHCR-registered refugees from more than 55 countries, including 664,414 Syrians and 66,760 Iraqis. Non-Syrian and non-Palestinian refugees are vulnerable to labor exploitation due to the Jordanian government's restrictions on their ability to work in most formal employment sectors; non-Syrian refugees, including refugees from Iraq, Somalia, Sudan, and Yemen, do not have access to the formal labor market or are required to renounce their UNHCR registration to obtain work permits. In 2019, Iraqi refugees reported they are vulnerable to exploitation in the informal sector because employers pay them below-market wages and expect them to work excessively long hours. NGOs continue to observe an increase in child labor and potential forced child labor among Syrian refugee children working alongside their families in the agricultural and service industries, as well as peddling goods and begging. There have been reported cases of Syrian refugee women and girls sold into forced marriages in Jordan. Refugee boys and young men, in particular, often work illegally and informally in the Jordanian economy, which puts them at risk of trafficking.

Some Jordanian and Syrian girls are forced to drop out of compulsory school to perform domestic service in their families' homes; some of these girls are vulnerable to trafficking. Jordanian boys employed within the country in the service industry, agricultural sector, and as mechanics, street vendors and beggars may be victims of forced labor. NGOs and an international organization reported in 2018 an estimated 3,000 children begging in the streets in Jordan, some of whom are highly vulnerable to trafficking. Traffickers exploit Lebanese, North African, and Eastern European women in sex trafficking who have migrated to Jordan to work in restaurants and nightclubs; some Jordanian women working in nightclubs may also be exploited in sex trafficking. As reported by an NGO in 2016, some Egyptian women are exploited in forced begging or sex trafficking by their Jordanian husbands. Individuals from the Dom community, an Indo-Aryan people also known as the Bani Murra, are also vulnerable to forced labor and forced begging in Jordan due to a lack of access to social and education services and employment opportunities in Jordan.

# KAZAKHSTAN: TIER 2

The Government of Kazakhstan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Kazakhstan remained on Tier 2. These efforts included increasing the number of trafficking convictions for a second consecutive year and sentencing a complicit official for sex trafficking. The government increased funding to support shelters and continued to increase collaboration with NGOs and international organizations, including in awareness campaigns throughout the country. However, the government did not meet the minimum standards in several key areas. It identified far fewer victims and investigated significantly fewer traffickers than the previous year; and civil society and government interlocutors reported that legislative insufficiencies continued to hinder effective anti-trafficking enforcement and victim identification. Authorities continued to identify few foreign victims and to maintain obstacles for their access to protection services; foreign victims could not access services unless a criminal case had been initiated against the traffickers. The government's efforts to address forced labor remained inadequate.

## PRIORITIZED RECOMMENDATIONS:

Approve and implement policies allowing formal recognition of foreign nationals as trafficking victims and their referral to robust protection services, including shelter, irrespective of whether criminal cases have been initiated against their traffickers. • Amend trafficking laws to align the definition of trafficking with international standards and train law enforcement officers and labor inspectors on their application, particularly in the detection of cases involving psychological coercion and other less overt trafficking indicators. • Vigorously investigate, prosecute, and convict suspected trafficking cases on an ongoing basis, including allegedly complicit government officials. • Increase investigations and prosecutions of potential forced labor cases, especially in remote areas. • Sufficiently increase the number of labor inspectors and provide them with systemic, specialized training to identify victims of forced labor and report potential trafficking cases to the police, including by allowing unfettered access to factories, construction sites, and farms for unannounced inspections. • Significantly increase efforts to identify trafficking victims among vulnerable populations and refer these victims for assistance, with an emphasis on foreign forced labor victims. • Ensure victims are aware of their right to seek compensation and train attorneys and law enforcement officials on how to assist in the process. • Establish and implement a centralized anti-trafficking data collection system. • Enhance oversight and regulation of labor recruitment agencies. • Continue to provide legal alternatives to deportation, especially when foreign trafficking victims may face hardship, abuse, or re-trafficking in their countries of origin.

## PROSECUTION

The government maintained anti-trafficking law enforcement efforts but increased convictions for a second consecutive year. Articles 128, 134, 135, 308, 125(3.2), and 126(3.2) of the penal code criminalized sex trafficking and labor trafficking. However, inconsistent with the definition of trafficking under international law, the law did not include force, fraud, or coercion as an essential element of the crime but rather considered them an aggravating circumstance. NGO observers and government officials alike noted this was particularly illustrative in Article 128 (Trafficking in Persons) and Article 135 (Trafficking in Minors), which criminalized the purchase or sale of persons under certain circumstances; its lack of specificity reportedly prevented authorities from properly investigating or prosecuting some cases involving psychological coercion or other more complex trafficking indicators. The law, as amended in 2019, prescribed penalties of four to seven years' imprisonment for adult trafficking and five to nine years' imprisonment for child trafficking; the penalties could be increased to up to 18 years' imprisonment under aggravated circumstances. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Article 134 was amended in 2021 to increase penalties for child sex trafficking to three to six years in prison (previously three to five years). Kazakhstani officials reportedly continued consultations with international organizations and foreign governments on the creation of new legislation, which would create a national referral mechanism and delineate responsibilities for government agencies to identify and provide services to trafficking victims and investigate and prosecute traffickers.

Police initiated investigations in 20 trafficking cases in 2021 (16 for sex trafficking and four for forced labor), compared with 72 in 2020, and continued 47 investigations initiated in the previous reporting period. The government prosecuted 49 human trafficking cases in 2021, compared with 45 prosecutions in 2020, and it convicted 23 sex traffickers, compared with 11 sex traffickers in 2020 and eight in 2019. Of the 23 convictions, courts convicted four traffickers under cases initiated in 2021 and 19 traffickers under cases from previous years. From the 23 convictions, 16 traffickers received sentences ranging from seven to 18 years' imprisonment, and seven traffickers received sentences ranging from one to five years (compared with nine sentences ranging from seven to 17 years, a four-year sentence, and a three-year sentence in 2020); three traffickers were acquitted. As in previous years, many of the trafficking cases were the result of three multi-day special anti-trafficking police operations, called "Stop Trafficking," in which police conducted enforcement operations with local authorities in brothels, massage parlors, construction sites, and farms and collaborated with NGOs to interview potential victims. NGOs noted some police lack the understanding of the criminal code, the trafficking law, and trafficking in persons necessary to effectively investigate cases, mainly due to staffing rotations in law enforcement agencies, and reported victims were often seen as violators of migration laws or as individuals experiencing homelessness. NGOs continued to report investigators closed or decided not to open some criminal cases due to a perceived lack of evidence, despite the available testimony from trafficking victims, and that they continued to focus on investigating sex trafficking cases to the exclusion of those involving forced labor. Kazakhstani law enforcement continued to cooperate with foreign governments (Uzbekistan, Moldova, and Bahrain) on the investigation of trafficking crimes, which resulted in four extraditions (three to Uzbekistan and one to Moldova); 13 sentences (including two Russian citizens) to prison terms between 15 months and 14 years; three Kazakhstani citizens extradited back to Kazakhstan; and the repatriation of 23 Kazakhstani victims from Bahrain.

In previous years, NGOs reported traffickers bribed low-ranking police officials to avoid charges and alleged that some police officers facilitated forced labor or sex trafficking crimes. The Ministry of Internal Affairs (MIA) investigated a border guard employee who facilitated activities of a criminal group operating a brothel in the Atyrau region, which coerced women, including migrants from Uzbekistan, in sex trafficking. On October 20, 2021, the Military Court of Aktobe convicted the border guard and sentenced him to four years in prison. Observers reported investigative, prosecutorial, and judicial authorities have significant leeway in how to categorize crimes under Kazakhstan's

anti-trafficking prohibitions, leading to corruption and misclassification of trafficking cases.

The government continued to train police, prosecutors, and judges on the identification, investigation, and prosecution of trafficking crimes; these activities were mostly conducted online due to the pandemic. Law enforcement agencies and courts adapted to pandemic lockdowns by processing cases online, including conducting many court hearings online during lockdown periods. The Supreme Court trained 143 judges, compared with 36 judges in 2020. Like in the previous reporting period, these trainings were primarily government funded. The Prosecutor General's Office assigned 51 specialized prosecutors, and the Supreme Court assigned 17 specialized judges to prosecute trafficking cases.

## PROTECTION

The government made mixed protection efforts; however, efforts to identify and protect forced labor and foreign national victims remained inadequate. The government identified 20 trafficking victims, compared with 88 in 2020 and 40 in 2019. Of the victims identified, 16 were sex trafficking victims (14 citizens from Kazakhstan and two from Uzbekistan), including one sex trafficking victim exploited in Georgia, and four were forced labor victims (three Kazakhstani citizens and one from Uzbekistan). Law enforcement units dedicated to migration and trafficking issues operated under standard guidelines for the identification of victims among vulnerable populations, including undocumented migrant communities and individuals in commercial sex. The government amended these guidelines to implement a victim-centered approach to investigations, including by recording victim testimonies to reduce the need for multiple interviews and enabling criminal cases to move forward in the absence of victim testimony. Separate referral procedures were outlined under the 2015 Special Social Services Standards, which instructed law enforcement agencies on effective coordination with NGOs to connect victims with protection services. Police also maintained a formal referral mechanism for victims initially arrested or detained during police operations. The PGO and the MIA each had a memorandum of understanding (MOU) with an international organization, and the MIA had memoranda of cooperation between police departments and 17 NGOs across the country to provide assistance with trafficking cases. Victims identified by government authorities are referred to government-funded NGO-run shelters; however, the government did not report the number of victims it referred to NGOs for assistance this year. Reports indicate NGOs continued to provide shelter, legal assistance, and other services to hundreds of victims. One NGO reported it identified 200 victims (193 victims of forced labor, six victims of sex trafficking, and one victim of both sex trafficking and forced labor, including 166 men and 34 women) and provided assistance to 193 victims, which included 161 victims from Uzbekistan, 24 victims from Kazakhstan, and 12 victims from Russia, Tajikistan, and Ukraine; the citizenship of three victims was unknown.

NGOs continued to report regional anti-trafficking units, composed of one or two police officers, effectively referred victims to the NGOs for care and facilitated strong cooperation. NGOs reported an unknown number of forced labor victims may remain unidentified and without access to services due to the remote location of farms throughout the country. Law enforcement units mandated to address migration or trafficking issues had a formal system to identify trafficking victims among at-risk persons, such as undocumented migrants or individuals in commercial sex. However, although the government improved efforts to identify foreign victims and expanded the mandate of the labor inspectorate to require monitoring for trafficking indicators, officials' efforts to identify foreign victims and labor trafficking victims remained inadequate.

The government allocated 148.9 million tenge ($340,830) for 2021-2023 to support 17 shelters in 17 regions (compared with nine regions in 2020); from this amount, NGOs received 107 million tenge ($244,920) in 2021 (an increase from $164,740 in 2020 and $180,880 in 2019). These trafficking shelters offered legal, psychological, and medical assistance and were accessible to all Kazakhstani trafficking victims. Although authorities previously extended the length of NGO service providers' local government contracts from one to three years to reduce administrative burdens on organizations providing essential services to trafficking victims, some NGOs reported funding delays. The government encouraged victims—including foreign nationals—to

participate in investigations and prosecutions by providing witness protection during court proceedings, access to pre-trial shelter services, and basic provisions such as food, clothing, transportation, and medical and legal assistance. These and other protection services were not conditional upon Kazakhstani victims' cooperation with law enforcement, but foreign national victims could not access services unless a criminal case had been initiated against the traffickers. The Law on State Protection of Participants of Criminal Proceedings from 2000 enables foreign national victims to receive assistance, including short-term housing and financial support for basic needs during criminal investigations. In cases where law enforcement identified foreign national victims, victims often refused to cooperate due to lack of trust in authorities, feeling unsafe, long criminal procedures, and sometimes not being able to work during the process, especially considering the government's failure to effectively encourage them to so do by preventing their access to services unless a criminal case had been initiated against the traffickers. According to experts, foreign national victims frequently reported their exploitation to local police upon return to their home country, where they felt safer. In 2020, the government started drafting amendments to the Social Code that would extend protection services to foreign national victims irrespective of the initiation of criminal cases; these draft amendments remained pending at the end of this reporting period. The Ministry of Foreign Affairs (MFA) reportedly utilized other channels to provide protection services to an unspecified number of foreign national victims in the interim. While victims were able to receive compensation by filing civil suits in conjunction with the criminal cases, many victims and their attorneys continued to be unaware of the right to seek compensation, and high legal fees continued to dissuade some victims from doing so. The government could provide *Pro bono* attorneys to trafficking victims, although statistics on provision of legal services were unavailable for the reporting period, and NGOs reported these attorneys were often inexperienced.

The MIA allocated 1 million tenge ($2,290) to assist seven victims, including five citizens of Kazakhstan and two citizens of Uzbekistan, for participating in investigations—the victims were provided with housing, food, and witness protection. Some victims were unwilling to cooperate out of fear of reprisal or desire to avoid involvement in any law enforcement activity. The Administrative Code of Kazakhstan, under which the government imposes non-criminal punishments, protects foreign national victims from deportation if a criminal case is initiated. The government deported undocumented migrants for violation of labor and migration legislation—it is not clear whether undocumented migrants were screened for trafficking indicators prior to deportation. Experts noted that some victims were not allowed to work in Kazakhstan during the period of criminal investigation, which could last for months or even a year, and preferred to settle outside of court rather than initiating a case. NGOs reported foreign national victims sometimes were unable to access medical care due to a lack of health insurance and/or residence permits or financial strain generated by loss of employment during the pandemic. Although Kazakhstan's 2021-2023 TIP National Action Plan (NAP) included provisions outlining a reflection period in lieu of statutory deportation for foreign national victims, these provisions did not come into effect by the end of the reporting period. NGOs continued to report a shortage of lawyers authorized to participate in administrative deportation cases.

The government at times penalized foreign nationals for unauthorized entry after they fled exploitation abroad and sought refuge in Kazakhstan, including those from the People's Republic of China (PRC), where they could face retribution or hardship. This reportedly had the potential to disincentivize some victims from accessing asylum and protection services. Civil society contacts continued to report that some foreign trafficking victims, including ethnic Kazakh survivors of Xinjiang detention camps and Turkmen victims in southern Kazakhstan, were hesitant to report their abuses to local authorities due to distrust of law enforcement, perceived corruption, and fear of punitive deportation or other punishments. Some NGOs reported a slight increase of Turkmen migrants in border regions who could be vulnerable to forced labor. Authorities at times committed politically-motivated harassment against activists attempting to raise awareness and advocate for the human rights of ethnic Kazakhs in Xinjiang, who in some cases are subjected to forced labor conditions. Enduring insufficiencies in victim identification procedures placed some

unidentified foreign national victims—especially those exploited in forced labor—at risk of penalization for unlawful acts traffickers compelled them to commit. Some NGOs reported police and migration officers detained victims for immigration violations.

Nearly 600 women and children have been repatriated from conflict zones in Syria since 2019 (37 men, 157 women, and 413 children). Experts have noted that the reintegration program has been highly successful and is well resourced and staffed to provide services in government-run rehabilitation centers. Birth certificates were given to the children born in conflict zones, and their mothers were provided with identification documents to facilitate integration.

## PREVENTION

The government maintained overall prevention efforts. The Interagency Trafficking in Persons Working Group, led by the MIA, held three virtual sessions in 2021 to discuss implementation of the 2021-2023 NAP. Some anti-trafficking NGOs noted increased political will, more proactive efforts, and enhanced coordination with NGOs on the part of the government. The government continued to fund anti-trafficking information and education campaigns targeting potential trafficking victims, including children, migrants, and Kazakhstani citizens traveling abroad. The government collaborated with international organizations and NGOs on awareness campaigns, which included distributing awareness materials in multiple languages through media and in public places, and placed awareness materials in airports and border crossing checkpoints. The government also continued its media outreach plan, which included press tours, briefings, press conferences, roundtables, and seminars to raise awareness of human trafficking, and as a result, local and national media published or produced 573 materials. The government continued to advertise and fund an NGO-operated migration and trafficking hotline, in conjunction with an international donor—which received 2,066 calls in 2021, eight of which were referred to anti-trafficking police units (compared to 1,341 phone calls in 2020, culminating in 21 referrals). Per MIA's request, an international organization organized trainings for hotline operators and management on assessing cases of trafficking, service provision, and a victim-centered approach.

The MIA signed MOUs with two business associations to increase collaboration with civil society and the private sector to raise awareness of forced labor and prevent human trafficking. During the previous reporting period, the government formally amended the position descriptions of labor inspectors to include responsibility for the identification of trafficking victims and subsequent notification to law enforcement; the inspectors' inspection checklist was amended during the reporting period to include specific indicators for the identification of forced labor. However, authorities did not report if the labor inspectors' new mandate resulted in the referral of cases to law enforcement. In 2021, state labor inspectors carried out 4,300 inspections, compared to 3,982 inspections in 2020 and 6,681 in 2019; however, the government did not report if any inspections led to the opening of criminal case investigations. These violations were predominately for wage irregularities, contract violations, and labor without proper employment agreements—all of which were common labor trafficking indicators. Authorities identified nine cases of child labor in 2021, involving 14 children found to be working without employment agreements either at construction sites or in cafes. Authorities reported providing trainings for labor inspectors on trafficking risks and prevention. The number of labor inspectors employed under the Ministry of Labor and Social Protection (MLSP) decreased from 274 to 256 during the reporting period; the inspectorate remained inadequate to effectively enforce labor regulations across the country. In previous years, migrant workers reported using unofficial third-party intermediaries to find employment and meet Kazakhstani migration registration requirements; these intermediaries often circumvented the law and could facilitate the trafficking of foreign national victims with relative impunity due to their unofficial status. The government did not make efforts to reduce the demand for commercial sex acts. The MIA and the MFA reported holding online trainings on trafficking awareness, identification, and reporting procedures for diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Kazakhstan, and traffickers exploit victims from

Kazakhstan abroad. Domestically, the relative economic prosperity in the capital Nur-Sultan, the financial center Almaty, and the western oil cities of Aktau and Atyrau attracts large numbers of rural Kazakhstanis, some of whom traffickers lure through fraudulent offers of employment and then exploit in sex trafficking and forced labor in agriculture, construction, and other sectors. Traffickers force some children to beg and may also coerce adults and children into criminal behavior. The most vulnerable groups at risk of trafficking include undocumented migrants, persons without identity documents, unemployed individuals, individuals experiencing homelessness, and disabled persons.

Members of Kazakhstan's LGBTQI+ communities are at risk of police abuse, extortion, and coercion into informant roles; LGBTQI+ individuals, particularly transgender persons required to undergo invasive and bureaucratic processes for gender-affirming care, are vulnerable to trafficking amid widespread social stigma and discrimination that often jeopardizes their employment status or prospects in the formal sector and complicates their access to justice. Domestic violence may also drive many Kazakhstani trafficking victims to seek and accept unsafe employment opportunities in which traffickers may exploit them. Kazakhstani and foreign national victims of forced labor may go unidentified in farms located in remote rural areas, such as in Karaganda. An increasing number of Turkmenistani citizens entering Kazakhstan without proper documentation are vulnerable to forced labor on farms.

Women and girls from neighboring East Asian, Central Asian, and Eastern European countries, as well as from rural areas in Kazakhstan, are exploited in sex trafficking in Kazakhstan; in most cases, traffickers target young girls and women, luring them with promises of employment, including through social media, as waitresses, models, or nannies in large cities. Traffickers increasingly exploit Central Asian citizens, in particular Uzbekistani men and women and lesser numbers from Tajikistan and Kyrgyzstan, in forced labor in domestic service, construction, bazaars, and agriculture in Kazakhstan. Many Central Asian migrant workers that were subjected to Russia's 2014 re-entry ban have subsequently sought temporary work and residence in Kazakhstan, where traffickers exploit them. Thousands of undocumented Uzbekistani migrants transit into Kazakhstan each day via informal border crossings for seasonal labor in construction, agriculture, retail, hospitality, and commercial sex; these individuals are particularly vulnerable to trafficking by virtue of their irregular immigration status, as are their accompanying children, who often do not attend school despite their eligibility to do so. NGOs have reported an increase in traffickers' use of debt-based coercion in the exploitation of migrants in recent years. Traffickers capitalize on tough law enforcement policies to coerce migrants to remain in exploitative situations and leverage these policies to threaten victims with punishment and deportation if they notify authorities, fostering distrust in law enforcement.

Traffickers coerce or force Kazakhstani men and women into labor, mostly in Russia, but also in Bahrain, Brazil, the Republic of Korea, Turkey, and the United Arab Emirates. Sex traffickers exploit Kazakhstani women and girls in the Middle East, Europe, East Asia, and the United States. Chinese authorities arbitrarily detain some Kazakhstani citizens visiting family in Xinjiang and subject them to forced labor; their children, subsequently unaccompanied, are also at elevated risk of trafficking at home in Kazakhstan. Organized crime groups and small trafficking rings with recruiters operate in conjunction with brothel operators in Kazakhstan and abroad. Kazakhstani men who traveled to Syria, Iraq, and Afghanistan to fight alongside or seek employment within armed groups brought their families with them. The few Kazakhstani citizens left in these conflict zones, including their children, may be at risk of trafficking, including in refugee camps in Syria.

## KENYA: TIER 2

The Government of Kenya does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Kenya remained on Tier 2. These efforts included investigating more trafficking crimes, prosecuting and convicting significantly more traffickers, and identifying more trafficking victims. The government provided limited services to significantly more victims through partnerships with NGOs and reported dispersing more funds from the National Assistance Trust Fund for Assisting Victims of Trafficking to provide victim protection services and support an NGO-owned shelter. The government also reported increasing services for victims participating in the criminal justice process, such as the ability to provide written testimonies, to prevent re-traumatization. However, the government did not meet the minimum standards in several key areas. Protection services for victims, particularly adults, remained limited and inconsistent in quality. The government continued to rely on civil society to provide most victim services, including all shelter services, and did not provide adequate in-kind or financial support to these efforts. Due to the lack of screening among vulnerable populations, including foreign migrants and individuals in commercial sex, and inadequate shelter availability, authorities sometimes detained or deported potential trafficking victims. Despite sustained concerns of official complicity in trafficking crimes, which hindered both law enforcement efforts and victim identification, the government did not report any law enforcement action against allegedly complicit officials. Government efforts to protect Kenyan trafficking victims abroad, particularly migrant workers, remained minimal, and the government did not report any efforts to hold fraudulent recruitment agencies criminally accountable for facilitating trafficking crimes.



KENYA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Continue to increase efforts to investigate, prosecute, and convict traffickers, including complicit officials, and seek significant prison terms for convicted traffickers. • Fully implement the national referral mechanism (NRM) by encouraging law enforcement officials to formally refer trafficking victims for assistance and ensuring protection services are available for all victims, including adults, foreign nationals, and Kenyans exploited abroad. • Systematically and proactively identify trafficking victims by screening vulnerable populations, such as refugees, asylum-seekers, individuals in commercial sex, and all foreign national workers, including those from the People's Republic of China (PRC) and Cuba, for trafficking indicators and refer all trafficking victims to appropriate services. • Establish a shelter dedicated for trafficking victims to receive specialized care or increase funding or in-kind resources to NGO-run shelters. • Amend the anti-trafficking law to remove sentencing provisions that allow fines in lieu of imprisonment for sex trafficking offenses. • Continue to increase protective services for victims participating in the criminal justice process to prevent re-traumatization. • Develop, adopt, and implement an updated national action plan (NAP) to combat trafficking. • Consistently enforce strong regulations and oversight of labor recruitment agencies, including by eliminating recruitment fees charged to migrant workers, holding fraudulent labor recruiters criminally accountable, and training inspectors to report potential violations to the appropriate officials. • Expand training to all levels of the government, specifically to law enforcement personnel and local authorities in rural and coastal regions, on identifying, investigating, and managing trafficking cases. • Increase data collection and data sharing among relevant agencies to synthesize and analyze nationwide law enforcement and victim protection data related to trafficking crimes.

### PROSECUTION

The government increased overall anti-trafficking law enforcement efforts. The Counter-Trafficking in Persons Act of 2010 criminalized

sex trafficking and labor trafficking and prescribed penalties of 30 years to life imprisonment, a fine of not less than 30 million Kenyan shillings (Ksh) ($265,370), or both. These penalties were sufficiently stringent. However, by allowing for a fine in lieu of imprisonment for sex trafficking, these penalties were not commensurate with those for other serious crimes, such as rape. Sections 14 and 15 of the Sexual Offenses Act of 2006 criminalized the facilitation of child sex tourism and "child prostitution" and prescribed punishment of no less than 10 years' imprisonment and a fine of 2 million Ksh ($17,690). The government, in partnership with an international organization, reportedly drafted an amendment to the 2010 anti-trafficking act to remove the option of a fine in lieu of imprisonment; however, the amendment had not been sent to Parliament at the end of the reporting period.

The government's overall data collection and reporting on anti-trafficking law enforcement efforts remained weak; additionally, the government provided some data outside of the current reporting period without a mechanism to disaggregate. In 2021, the government investigated 47 trafficking cases, including five child sex trafficking cases, 17 child labor trafficking cases, and 25 cases where the exploitation was unknown, a significant increase compared with 18 investigations in 2020. The government reported 26 trafficking investigations from previous years remained ongoing; however, the government did not provide an update on these cases. The government reported prosecuting at least 115 individuals from July 2020 to June 2021, a significant increase compared with at least 46 individuals prosecuted from July 2019 to June 2020; however, some of the prosecution data provided fell outside of the current reporting period. The government reported at least 11 prosecutions from previous reporting periods remained ongoing; however, the government did not report updates on these cases. Courts convicted 32 traffickers, 30 under the 2010 anti-trafficking law and two under the 2011 immigration act, a significant increase compared with six total convictions in 2020. Courts sentenced convicted traffickers to varying degrees of punishment but did not provide sentencing data for all convictions; in one sex trafficking case, courts sentenced a trafficker to 30 years' imprisonment, while in another sex trafficking case, a judge issued a ruling of a fine of 3.5 million Ksh ($30,960) to be deposited in National Assistance Trust Fund for Assisting Victims of Trafficking in lieu of the initial sentence of three years' imprisonment, citing pandemic-related health concerns in prisons. Courts acquitted six suspected traffickers during the reporting period for unspecified reasons. While anti-trafficking specific law enforcement units continued to operate throughout the pandemic, the government reported that pandemic-related restrictions, such as office closures, national curfews, and social distancing requirements, created operational challenges to law enforcement actions.

In 2021, NGOs and international organizations provided regular trainings to several hundred prosecutorial and judicial officials, border guards, police officers, and immigration agents on how to detect and respond to trafficking crimes in their respective capacities; the government provided varying degrees of logistical support for these trainings. The government, in partnership with an international organization, developed standard operating procedures (SOPs) on investigations and prosecutions involving Kenyans exploited in forced labor in Gulf states; the government also developed a reference guide for prosecutors to use when prosecuting cases under the 2010 anti-trafficking act. In December 2021, the government cooperated with the Government of the Netherlands and INTERPOL to arrest and extradite an Eritrean-Dutch alleged trafficker.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking offenses; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Police officers continued to accept bribes to warn traffickers of impending operations and investigations, particularly along the coast, and officials reported perpetrators sometimes escaped conviction by bribing magistrates and court officials or intimidating or paying witnesses to make false statements. Observers alleged that criminal syndicates colluded with various law enforcement and immigration departments to transport trafficking victims within Kenya. Traffickers continued to easily obtain fraudulent identity documents from complicit officials, particularly at border checkpoints. Civil society

reported one case in which officials permitted a Kenyan police officer, originally identified as a perpetrator in a potential trafficking case, to testify as a witness against foreign national perpetrators in the case; the government did not report any action taken against the allegedly complicit police officer.

## PROTECTION

The government maintained victim protection efforts. The government identified 482 victims of trafficking—45 adult females, 111 boys, and 326 girls—compared with 383 victims identified in 2020. Of the 482 victims identified in the country, traffickers exploited 217 in forced labor and 265 in unspecified exploitation; 398 were Kenyan, while 84 were foreign nationals primarily from neighboring countries and South Asia. The government identified only one Kenyan victim exploited abroad, compared with 150 in the previous reporting period. The government continued to use its SOPs for victim identification, and the Counter Trafficking in Persons Secretariat (CTiP Secretariat) reported partnering with immigration officers to screen for trafficking indicators among foreign migrants involved in migrant smuggling cases.

The government had an NRM that outlined guidelines for victim referral to services; however, the government did not fully implement the NRM, and local authorities continued to bypass the NRM and directly contact NGOs to provide victim assistance. The government reported partnering with various NGOs to offer routine assistance to 350 victims (45 adults and 305 children), including medical care, psycho-social counseling, legal assistance, and repatriation for foreign victims, compared with providing services to 134 victims in 2020. The government also reported referring 85 victims (45 adults and 40 children) to shelter, compared with 112 victims referred to shelter in 2020. The government did not operate any trafficking-specific shelters and continued to rely on NGOs to provide shelter to victims. The Department of Children's Services continued to operate five centers—located in Garissa, Kisumu, Machakos, Nairobi, and Thika—used to house potential child trafficking victims; the government reported providing temporary shelter to 47 potential victims. Protection services for adult victims remained scarce, and NGOs reported that the government's overall victim assistance remained limited and inconsistent in quality. In response to the ongoing pandemic, some NGO shelters and government-run centers acted as quarantine or testing centers or had limited capacity due to social distancing measures; the government reported this decreased its ability to refer all victims to care. The government also reported pandemic-related measures, such as travel restrictions, mandatory quarantine and testing, social distancing, work-from-home orders, and curfews, continued to hamper the ability of the government to provide in-person care. However, NGOs sustained concerns over long-standing protection gaps further exacerbated by the pandemic, inhibiting the government from providing appropriate care to victims. Despite reliance on civil society organizations to provide victim services, the government provision of financial or in-kind support to such organizations remained minimal. Officials reported overall funding to combat trafficking remained inadequate, noting that government officials sometimes used their personal funds to provide support to victims. During the 2021-2022 fiscal year, the National Treasury allocated 20 million Ksh ($176,910) to the National Assistance Trust Fund for Assisting Victims of Trafficking, the same amount as the previous fiscal year. The government reported dispersing more than 10.3 million Ksh ($91,110) from the fund to repatriate foreign victims identified in Kenya and to purchase supplies for one NGO-run shelter; this was a significant increase compared with 1.8 million Ksh ($15,920) dispersed from the fund in the previous reporting period. The CTiP Secretariat began drafting new guidelines for the disbursement of these funds to enhance its use.

To address the exploitation of Kenyan nationals abroad, the Ministry of Labor and Social Protection's National Employment Authority (NEA) continued to employ labor attachés in Kenyan diplomatic missions in Qatar, United Arab Emirates (UAE), and Saudi Arabia. Reportedly, the attachés advocated for Kenyan workers' rights with host governments, screened workers for trafficking indicators, resolved workplace disputes, provided identity documents, and partnered with licensed employment agencies to find legitimate work opportunities for Kenyans; the government did not report specific actions taken by the attachés during the reporting period. The NEA added a feature on its

website for overseas workers to report exploitation, including potential trafficking crimes, and request assistance. In 2020, media reported that numerous Kenyan women employed as domestic workers in Lebanon may have been victims of trafficking; the Ministry of Foreign Affairs reportedly sent a fact-finding mission to investigate the allegations, but the government did not report any findings or specific actions taken for the second consecutive year.

The government maintained its Witness Protection Agency (WPA) that offered protection to victims participating in investigations and prosecutions; however, officials reported WPA remained without sufficient staffing or funding to provide adequate assistance to victims. Some courtrooms had facilities or equipment that allowed victims to provide testimony via video, one-way glass, or written statements; however, these services were not available in all courtrooms. Foreign national victims had the ability to leave the country, seek employment, and move freely within the country pending trial proceedings. The government provided these options to victims during the reporting period; in one case involving Nepali victims, courts allowed the victims to provide written testimony and return to their home country prior to the end of the trial to avoid re-traumatization. Even though victims' benefits were not linked to law enforcement participation or whether the trafficker was convicted, officials noted the lack of long-term victim services was a barrier to participation in court cases, and due to frequent repatriation or deportation, victims often could not serve as witnesses. The law allowed officials to grant permission for foreign national trafficking victims to remain indefinitely in Kenya if they would face hardship or retribution upon repatriation; however, senior officials and NGOs previously reported that authorities often quickly returned trafficking victims to their countries of origin due to the limited availability of shelters and other services. Under the Employment Act and the 2010 anti-trafficking law, trafficking victims could file civil suits against traffickers for damages; however, the government did not report any civil suits filed in 2021. NGOs reported the government sometimes placed victims in refugee camps, where their freedom of movement was restricted.

Authorities reportedly penalized victims for unlawful acts traffickers compelled them to commit. NGOs across Kenya continued to report officials sometimes charged potential trafficking victims within vulnerable groups, particularly adults in commercial sex, with commercial sex crimes or labor violations. Authorities reportedly punished foreign national trafficking victims for violating immigration laws, often detaining or deporting them without screening for trafficking indicators. NGOs reported witnesses appeared to have been intimidated, disappeared, or did not appear in court for fear of re-victimization. Officials and NGOs reported the government often placed adult trafficking victims in prisons or detention centers due to the lack of shelters available for adult victims; authorities sometimes placed child victims in centers for juvenile offenders until officials found a shelter or safe house with space available. In 2020, an independent institution reported that authorities detained more than a third of migrants for being in the country without proper documentation; under this approach, officials sometimes detained potential trafficking victims without proper screening or provision of assistance. The same report alleged the government regularly held potential victims awaiting repatriation in detention.

## PREVENTION

The government maintained efforts to prevent trafficking. The CTiP Secretariat, the operational arm of the Counter Trafficking in Persons Advisory Committee, continued to spearhead government efforts to combat trafficking. In October 2021, oversight of the CTiP Secretariat shifted from the Ministry of Labor and Social Protection to the Ministry of Public Service, Gender, Senior Citizen Affairs, and Special Programs. Despite the change in oversight, observers reported the CTiP Secretariat was still staffed by children's officers, which may have limited its focus to address trafficking of adults. The CTiP Secretariat reportedly had dedicated funding in the national budget, but the government did not provide the total amount of anti-trafficking funding allocated for the second consecutive year. Civil society and other stakeholders reported the CTiP Secretariat continued to engage them more regularly than in prior years; however, observers noted that the CTiP Secretariat did

not have sufficient staffing or funding, hindering progress on new anti-trafficking efforts and publication of required reporting on government efforts. The National Coordination Mechanism on Migration (NCM), chaired by the Department of Immigration, maintained responsibility for managing national coordination on migration issues, including addressing allegations of forced labor of Kenyans abroad. While the CTiP Secretariat and NCM regularly coordinated, some stakeholders reported the two groups had overlapping mandates, which created confusion and discrepancies on which mechanisms were most effective. Officials continued to operate under the 2013-2017 NAP, although it formally expired in 2018. The government did not operationalize its draft 2019-2022 NAP for the third consecutive year. The government continued to implement the National Plan of Action Against Sexual Exploitation of Children 2018-2022, which included efforts to prevent child sex trafficking, by conducting awareness campaigns targeting hotel operators in tourist destinations. In partnership with civil society, the government held awareness campaigns targeting populations vulnerable to trafficking at border crossings and in coastal areas. The government, in partnership with an NGO, continued to operate a 24-hour hotline to report child abuse and exploitation, including child trafficking. In 2021, the government reported identifying at least 12 cases of suspected child trafficking through the hotline, compared with 16 cases identified in 2020.

The NEA continued to regulate labor migration and other labor-related matters, including labor trafficking; however, officials noted a lack of leadership, uneven regulation enforcement, and corruption hindered NEA operations. The NEA had a total of 504 registered private employment agencies, compared with 320 registered agencies at the end of the previous reporting period. Although the government made efforts to vet recruitment agencies, NEA officials reported more unregistered agencies remained in operation than registered agencies. The NEA continued to require recruitment agencies to pay into a security fund intended to cover airfare for Kenyan migrant workers, including potential trafficking victims, in need of repatriation due to exploitative situations. NGOs reported the use of the security fund was minimal and migrant workers regularly sought other means of assistance due to the government's lengthy process to address complaints. Government regulations continued to allow recruiting agencies to charge migrant workers a recruitment fee of up to one month's salary. As in previous years, NEA utilized an e-platform for recruitment and placement of Kenyans migrating to Saudi Arabia to promote a safe migration process; however, observers continued to report that Kenyan officials negotiated a pay rate lower than the Saudi Arabian minimum wage, making Kenyan migrant workers vulnerable to trafficking. The government required migrant workers to attend a pre-departure training course that included information on human trafficking and migrant rights; it also included specific homecare management training for domestic workers. NGOs reported recruitment agencies bribed labor officials to bypass required procedures, including allowing recruitment agents to sign the contract on the worker's behalf when the worker did not appear in person. The government did not provide anti-trafficking training to its diplomatic personnel or make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Kenya, and traffickers exploit victims from Kenya abroad. Traffickers exploit children in forced labor in domestic service, agriculture, fishing, cattle herding, street vending, and forced begging. Traffickers exploit women and children in sex trafficking, often facilitated by family members in informal settings, throughout Kenya, including in sex tourism in Nairobi, Mombasa, and Kisumu. In 2020, an international NGO reported there are between 35,000 and 40,000 victims of sex trafficking, including child sex tourism, in Kenya, of which approximately 19,000 are children; most perpetrators are Kenyan and, to a lesser extent, foreign tourists. Government officials and NGOs report traffickers increasingly exploit children in sex trafficking in private villas and vacation homes to avoid law enforcement detection in hotels. Workers in *Khat* cultivation areas and near gold mines in western Kenya, truck drivers along major highways, and fishermen on Lake Victoria also exploit children in sex trafficking.

During the pandemic, traffickers increasingly exploited children in sex trafficking, including using online recruitment tactics, and in forced labor in domestic work and forced begging. Employment agencies, both legal and fraudulent, recruit Kenyans to work in the Middle East (particularly Saudi Arabia, Lebanon, Kuwait, Qatar, UAE, Bahrain, Iran, Iraq, and Oman), Central and Southeast Asia, Europe, Northern Africa, and North America, where traffickers exploit them in massage parlors, brothels, domestic servitude, or manual labor; Kenyans who voluntarily migrate in search of employment opportunities are also vulnerable to exploitative conditions. Observers report foreign employers often hold migrant workers' salaries until the completion of their contract period to coerce them to stay longer, and in some cases, employers sell migrant workers to another employer without a legal change in the employment contract, increasing their vulnerability to trafficking. Criminals involved in terrorist networks lure and recruit Kenyan adults and children to join non-state armed groups, primarily al-Shabaab, in Somalia, sometimes with fraudulent promises of lucrative employment.

Kenya hosts more than 500,000 refugees and asylum-seekers, primarily located in Kakuma Refugee Camp, Kalobeyei Integrated Settlement, and Dadaab Refugee Complex. Refugees are generally required to live within the camps with restricted movement and limited access to education and livelihood opportunities, increasing their vulnerability to labor and sex trafficking; children and LGBTQI+ persons in refugee camps are especially vulnerable. Nairobi-based labor recruiters maintain networks in Uganda and Ethiopia that recruit Burundian, Ethiopian, Rwandan, and Ugandan workers through fraudulent offers of employment in the Middle East and Asia. Kenya continues to serve as a transit point for migrants seeking work in South Africa, leaving these populations vulnerable to exploitation; traffickers exploit transient Ethiopians in forced labor and Burundian and Rwandan women in domestic servitude. Ugandan and Nigerian traffickers exploit Kenyan women in sex trafficking in Thailand. Authorities reported business owners and employers exploit Ugandan girls, particularly from the Karamojong region, in sex trafficking and forced labor in Nairobi's Eastleigh neighborhood. NGOs reported that during the pandemic, employers forcibly removed foreign national domestic workers from their homes, leaving them trapped in the country due to pandemic-related travel restrictions and border closures; unable to find new work due to economic scarcity or a safe way home; these individuals are increasingly vulnerable to trafficking. Recruiters use debt-based coercion to force South Asian women, primarily from Nepal, India, and Pakistan, to work in *mujra* dance clubs in Nairobi and Mombasa, where traffickers force them to pay off debts by engaging in commercial sex. Traffickers exploit Somali women and girls in sex trafficking in brothels in Nairobi and Mombasa. Increasingly, traffickers bring children and individuals with physical disabilities from Tanzania and other neighboring countries to exploit them in forced begging; traffickers often coerce foreign victims to serve as facilitators to further such trafficking schemes. Cuban medical professionals working in Kenya may have been forced to work by the Cuban government. PRC nationals employed in Kenya at worksites affiliated with the PRC's Belt and Road Initiative were vulnerable to forced labor, particularly in construction.

## KOREA, DEMOCRATIC PEOPLE'S REPUBLIC OF: TIER 3

The Government of the Democratic People's Republic of Korea (DPRK) does not fully meet the minimum standards for the elimination of trafficking and, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity, is not making significant efforts to do so; therefore the DPRK remained on Tier 3. The government did not demonstrate any efforts to address human trafficking. During the reporting period, there was a government policy or pattern of human trafficking in prison camps as part of an established system of political repression, in labor training centers, in the mass mobilizations of adults and children, and through its imposition of forced labor conditions on DPRK overseas workers. The government used proceeds from

state-sponsored forced labor to fund government functions, as well as other illicit activity.



DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

End the use of state-sponsored forced labor, including among DPRK workers abroad, in prison camps, and through mass mobilizations of adults and children. • End the practice of summary executions and other harsh punishments, including forced labor, for victims who are forcibly returned from other countries. • Eliminate coercion tactics used to monitor and limit the movements and communications of workers overseas. • Cease the garnishing of wages of overseas workers for the purposes of furthering forced labor. • Provide assistance to victims exploited in the DPRK and to victims returned from abroad. • Criminalize sex trafficking and labor trafficking. • Investigate and prosecute trafficking cases and convict traffickers in accordance with the rule of law. • Increase transparency by allowing international human rights monitors to evaluate living and working conditions of workers, both domestically and abroad. • Forge partnerships with international organizations and NGOs to combat human trafficking. • Allow all North Koreans to choose their form of work and leave their employment at will. • Accede to the 2000 UN TIP Protocol.

### PROSECUTION

The government did not report any law enforcement efforts. It is unclear whether DPRK laws criminalized sex trafficking or labor trafficking. Fair trials did not occur in the DPRK, and the government did not explain what provisions of law, if any, it used to prosecute trafficking crimes, if it did so. The government did not provide law enforcement data; there were no known investigations, prosecutions, or convictions of traffickers, including government employees complicit in forced labor or other trafficking crimes.

### PROTECTION

The government did not report any protection efforts. Government authorities did not report identifying any victims or providing protective services, nor did they permit NGOs to provide these services. Authorities penalized victims for unlawful acts traffickers compelled them to commit. Authorities treated returning victims as criminals for crossing the border. The government sent North Koreans, including potential trafficking victims, forcibly returned by People's Republic of China (PRC) authorities to detention and interrogation centers, where the government subjected them to forced labor, torture, forced abortions, and sexual abuse by prison guards; in some cases, authorities allegedly sent them on to prison camps. DPRK defectors previously reported instances of the government executing trafficking victims forcibly returned from the PRC.

### PREVENTION

The government did not report any efforts to prevent trafficking. Government oppression in the DPRK prompted North Koreans to flee the country in ways that heightened their risk of trafficking in destination countries. The government made no efforts to raise awareness of human trafficking. The government did not make efforts to reduce the demand for commercial sex acts, nor did it provide anti-trafficking training to its diplomatic personnel. The DPRK is not a party to the 2000 UN TIP Protocol.

### TRAFFICKING PROFILE

As reported over the past five years, human traffickers—including government officials—exploit North Koreans in the DPRK and abroad. Within the DPRK, women and children are exploited in sex trafficking.

Haiti AR_000807

Female college students unable to pay fees charged to them by universities to meet demands set by the government were vulnerable to sex trafficking. Forced labor is part of an established system of political repression and a pillar of the economic system in the DPRK. The government subjects its nationals to forced labor in DPRK prison and labor camps, through mass mobilizations, and in overseas work. The law criminalizes defection, and individuals, including children, who cross the border for the purpose of defecting or seeking asylum in a third country are subject to a minimum of five years of "reform through labor." In "serious" cases, the government subjects asylum-seekers to indefinite terms of imprisonment and forced labor, confiscation of property, or death.

The DPRK holds an estimated 80,000 to 120,000 persons in political prison camps and an undetermined number of persons in other forms of detention facilities, including "re-education through labor" camps. In many cases, these prisoners have not been charged with a crime or prosecuted, convicted, and sentenced in a fair judicial hearing. In prison camps, all prisoners, including children, are subject to forced labor, including in logging, mining, manufacturing, or farming for long hours under harsh conditions. In many cases, the government also detains all family members if one member is accused or arrested. Authorities subject children to forced labor for up to 12 hours per day, do not allow them to leave the camps, and offer limited access to education. The government subjects prisoners to unhygienic living conditions, beatings, torture, rape, a lack of medical care, and insufficient food. Many prisoners do not survive. Reporting indicates the government utilized the COVID-19 pandemic to increase the number of political prisoners, thereby expanding its existing capacity to subject North Koreans to forced labor. Authorities allegedly treat individuals who do not wear face masks or who are found to violate quarantine rules as criminals guilty of political crimes and send them to political prison camps where they are subjected to a minimum of three months' forced labor. In 2020, the government reportedly created new, and expanded existing, political prison camps to accommodate the resulting increased prison populations. In addition, following the enactment in December 2020 of a "Law on Rejecting Reactionary Ideology and Culture," the government subjects children and adults to sentences that include forced labor in re-education through labor camps for consuming or distributing media from South Korea, the United States, or Japan. For example, in November 2021, authorities sentenced six high school students to five years' hard labor for watching a South Korean drama series.

The DPRK government also operates regional, local, and sub-district level labor camps and forces detainees to work for short periods doing hard labor while receiving little food and being subjected to abuse, including regular beatings. Authorities reportedly send people to these camps if they are suspected of engaging in simple trading schemes or are unemployed; North Koreans who were not officially registered as being employed for longer than 15 days were at risk of being sent to labor camps for a minimum of six months.

Officials forcibly mobilize adults and school children to work in various sectors, including in factories, agriculture, logging, mining, infrastructure work, information technology, and construction. The government reportedly withholds food rations or imposes taxes against adults who do not participate in these forms of forced labor. There were reports that in 2020 government officials required all women in the area of Hyesan to work daily on construction and other projects; those physically unable to work had to pay a fine, and security forces arrested evaders. In 2021, the government forced nearly 14,000 married women from across the country to perform farm work in the South Hwanghae province to increase food production following a bad harvest and the 2020 trade suspension with the PRC, which cut off food imports. In October 2021, an international organization also reported that the government mobilized urban residents, discharged military personnel, and orphans to work on farms. The law requires all citizens of working age to work and "strictly observe labor discipline and working hours." There are numerous reports that some farms and factories do not pay wages or provide food to their workers. During the implementation of short-term economic plans, factories and farms increase workers' hours and ask workers for contributions of grain and money to purchase supplies for renovations and repairs. By law, failure to meet economic plan goals may result in two years of "labor correction." Schools receive

compensation from the government for labor conducted by children, and officials occasionally sent schoolchildren to work in factories or fields for short periods to complete special projects such as snow removal on major roads or meeting production goals. Schools also require students younger than the minimum working age to work to raise funds for faculty salaries and maintenance costs for school facilities. In addition, school principals and teachers exploit students for personal gain by forcing them to work on farms or construction sites. The government mobilizes children, including orphans, those who are unable to join the military, or those whose families are unable to bribe authorities, to participate in military-style shock brigades. They are forced to work for extended periods without pay and subjected to long working hours and hazardous work in construction, coal mines, farms, and factories. Authorities also sometimes subject children to mass mobilizations in agriculture away from their families, with excessive daily working hours, sometimes for periods of a month at a time.

DPRK workers sent by the government to work abroad, including through bilateral agreements with foreign businesses or governments, also face conditions of forced labor. Credible reports show many North Koreans working overseas are subjected to working excessive hours, sometimes in hazardous conditions, with restricted pay for up to three years at a time. They reportedly work on average between 12 and 16 hours a day, and sometimes up to 20 hours per day, and are allowed only one or two rest days per month. North Koreans work in a range of industries overseas, including but not limited to apparel, construction, footwear manufacturing, hospitality, information technology services, logging, medical, pharmaceuticals, restaurant, seafood processing, textiles, and shipbuilding. NGOs report the government manages these workers as a matter of state policy and that they were under constant and close surveillance by government security agents. Workers often reside in shared dormitories and have very limited freedom of movement. These workers face threats of government reprisals against them or their relatives in the DPRK if they attempt to escape or complain to outside parties. In light of border closures related to the pandemic which prevent workers from returning home and require they remain abroad for extended periods, the government ordered harsher and strengthened control and surveillance over workers to prevent defections, including through threats of physical injury. Workers' salaries are appropriated and often deposited into accounts controlled by the DPRK government, which justifies its retention of most of the money by claiming various "voluntary" contributions to government endeavors. Workers receive only a fraction of the money paid to the DPRK government for their work and face punishment if they fail to meet production or work targets. The government withholds up to 90 percent of wages from overseas workers, who generate an annual revenue to the DPRK government of hundreds of millions of dollars. Wages of some DPRK workers employed abroad reportedly are withheld until the workers return home, increasing their vulnerability to coercion and exploitation by authorities. Some female North Koreans in the PRC working in restaurants or coffee shops are forced by their minders to engage in commercial sex acts with PRC national customers.

In 2017, UN Security Council resolutions prohibited UN Member States from issuing new or renewed work authorizations to DPRK overseas workers and required States to repatriate DPRK nationals earning income overseas by December 22, 2019, subject to limited exceptions. The vast majority of North Koreans employed outside the country continue to be in Russia and the PRC. There are an estimated 20,000-100,000 North Koreans working in the PRC, primarily in restaurants and factories. The Government of Russia allowed many North Korean workers to continue to enter Russia via fraudulent channels to work informally, for example by issuing tourist or student visas. In 2021, workers were also reportedly in Georgia (in Abkhazia, a Russia-occupied region), Algeria, Benin, Cameroon, Equatorial Guinea, Guinea, Indonesia, Iran, Laos, Mozambique, Republic of the Congo, South Sudan, Syria, and Tanzania. While some removed most or all of these workers during the year, reports suggested that some places either took no action or issued work authorizations or other documentation, allowing these individuals to work.

North Koreans seeking to leave the DPRK due to the government's egregious human rights violations are vulnerable to sex and labor trafficking in the PRC. Many of the DPRK refugees and asylum-seekers living irregularly in the PRC are particularly vulnerable to traffickers

who lure, drug, detain, or kidnap some DPRK women upon their arrival. Traffickers also operate networks spanning from the PRC into the DPRK to recruit women and girls to smuggle into the PRC. For example, in border towns traffickers approach women with false promises of profitable employment that would enable them to pay broker fees associated with being smuggled to the PRC. These women are subjected to physical abuse and sexual exploitation by their traffickers, forced into commercial sex in brothels or through internet sex sites, or compelled to work as hostesses in nightclubs or karaoke bars. Traffickers also sell DPRK women to PRC national men for forced marriages, whereby they are subsequently forced into commercial sex, domestic service, agricultural, or other types of work. These victims often lack identification documents and bear children with PRC national men, which further hinders their ability to escape. As many as 30,000 children born in the PRC to DPRK women and PRC national men have not been registered upon birth, rendering them stateless and vulnerable to possible exploitation. If found by PRC authorities, trafficking victims are often forcibly returned to the DPRK, where they are subject to harsh punishment, including forced labor in labor camps, torture, forced abortions, or death.

## KOREA, REPUBLIC OF: TIER 2

The Government of the Republic of Korea (ROK) does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included creating a new training course for prosecutors, training seafarers' labor inspectors on trafficking, and initiating the process to draft new victim identification guidelines and a national anti-trafficking action plan. However, these efforts were not serious and sustained compared with the efforts during the previous reporting period, even considering the impact of the COVID-19 pandemic, if any, on the government's anti-trafficking capacity. The government initiated fewer prosecutions than in 2020, did not take steps to address longstanding concerns that government officials penalized foreign sex trafficking victims for unlawful acts traffickers compelled them to commit, and sometimes deported victims without providing them adequate services or investigating traffickers. Despite reports of the prevalence of labor trafficking among migrant workers in Korea, especially in Korea's fishing fleet, the government did not report identifying any foreign forced labor victims. Officials did not consistently utilize victim identification guidelines, and courts sentenced the majority of criminals convicted for trafficking-related crimes to less than one year's imprisonment, fines, or suspended sentences. Therefore South Korea was downgraded to Tier 2.



REPUBLIC OF KOREA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Ensure police, immigration, labor, and social welfare officials consistently use victim identification guidelines to increase identification of victims of labor and sex trafficking. • Proactively screen for victims among vulnerable populations, including individuals in commercial sex, fishermen, and migrant workers. • Ensure implementation of the 2021 anti-trafficking legislation continues to (effectively) criminalize all forms of trafficking in persons, in line with the definition of trafficking under the 2000 UN TIP Protocol, and prescribes penalties that are sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other grave crimes. • Increase efforts to investigate, prosecute, and convict traffickers, particularly for labor trafficking, including for those who use forced labor on South Korean-flagged fishing vessels. • Cease the penalization of victims for unlawful acts traffickers compelled them to commit, including by improving

coordination between police and immigration in cases involving foreign victims. • Sentence traffickers to adequate penalties, which should include significant imprisonment. • Provide trauma-informed training to law enforcement to ensure they use victim-centered approaches in investigations and victim protection. • Establish and implement formal procedures for police, immigration, labor, and social welfare officials to refer both sex and labor trafficking victims to support services. • Increase efforts to train law enforcement officers, prosecutors, judicial officials, and social service providers to better understand trafficking as defined by international law. • Take steps to increase and enforce protections for migrant fishermen, including by enforcing prohibitions against document confiscation, and develop a more consistent and effective system for inspecting the labor conditions of fishing vessels. • Improve the quality of specialized services provided to trafficking victims, especially male, child, foreign, and disabled victims. • Establish a system to collect trafficking law enforcement and victim protection data that distinguishes trafficking from other crimes such as commercial sex. • Increase interagency coordination on efforts to combat both sex and labor trafficking. • Take steps to eliminate recruitment and/or placement fees charged to workers by labor recruiters in the ROK and workers' home countries and ensure any recruitment fees are paid by employers.

### PROSECUTION

The government maintained its anti-trafficking law enforcement efforts; however, it did not increase prosecutions nor adequately penalize most traffickers. Various articles under Chapter 31 of the Criminal Act, when read together, criminalized sex trafficking and labor trafficking and prescribed penalties of up to 15 years' imprisonment for trafficking crimes, which were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, Article 289 ("trafficking in persons") limited the definition of trafficking to require the buying or selling of another for exploitation and did not include a demonstration of force, fraud, or coercion as an essential element of the crime. However, Articles 288 ("kidnapping, abduction, etc. for the purpose of indecent acts, etc.") and 292 ("receiving, harboring, etc. of person kidnapped, abducted, trafficked or transported") could apply to trafficking offenses not covered under Article 289. Similarly, Article 12 of the Act on the Protection of Children and Juveniles Against Sexual Abuse incorrectly defined child sex trafficking to require transnational movement of the victim. However, various other articles under the law could be applied to child sex trafficking offenses that did not involve such movement. The absence of a criminal offense that defined trafficking consistent with international law resulted in varying understanding of the crime among law enforcement and prosecutors and may have led officials to conflate trafficking with related crimes such as commercial sex, kidnapping, domestic violence, and other forms of sexual abuse. The Prevention of Trafficking in Persons, Etc. and Victim Protection Act, promulgated in April 2021 and which will come into effect in January 2023, included a definition of "trafficking in persons, etc..." that aligned more closely with the international definition of trafficking, but it did not include penalty provisions. The government stated penalty provisions were unnecessary because officials could prosecute traffickers under various statutes in the existing legal framework and a new criminal statute could harm existing efforts to prosecute traffickers. Numerous NGOs and anti-trafficking experts said the government had not effectively used the existing legal framework in recent years to prosecute traffickers and many traffickers often go unpunished and were skeptical this new law will result in increased trafficking prosecutions and convictions.

While the government maintained general statistics on victims and offenders across all subsections of the criminal code, it did not adequately distinguish trafficking cases from related crimes, such as commercial sex. This made it difficult to determine which law enforcement actions reported by the government involved human trafficking as defined by international law. The government reported investigating at least 64 potential cases of trafficking in 2021; it did not report the number of cases investigated in 2020. The government initiated prosecutions of 297 suspects (332 in 2020) and convicted 226 offenders (229 in 2020) for crimes related to trafficking, including 258 prosecutions and 212 convictions of traffickers who purchased commercial sex acts

from children. The government reported sentencing 28 traffickers to at least one year's imprisonment (28 in 2020). Courts sentenced the vast majority of those convicted for trafficking-related crimes to less than one year's imprisonment, suspended terms of imprisonment, or fines. This weakened deterrence, undercut the government's overall anti-trafficking efforts, and likely created security and safety concerns, particularly for victims who cooperated with investigations and prosecutions. Observers reported the government's failure to sentence the majority of traffickers to significant terms of imprisonment resulted in impunity for traffickers and some instances of previously convicted offenders resuming trafficking activities.

The Ministry of Employment and Labor (MOEL) and provincial police investigated allegations of exploitation of individuals with intellectual disabilities working on salt farms, which included indicators of trafficking such as nonpayment of wages and excessive working hours; however, NGOs reported officials did not employ trauma-informed procedures during the investigation of these allegations, and the government reported it did not identify evidence of trafficking crimes. NGOs reported the government did not implement adequate or frequent inspections of fishing vessels, which reportedly resulted in minimal regulation and impunity for boat captains and others who exploited migrant workers, including in forced labor. The government did not report prosecuting any cases involving the exploitation of migrant workers in forced labor, despite reports from NGOs that this continued to occur. NGOs working with labor trafficking victims reported that immigration officials and labor inspectors treated some potential labor trafficking cases as administrative labor violations.

The Ministry of Justice (MOJ) collaborated with the Korea Institute of Criminology and Justice to research the status of recent trafficking prosecutions and utilized findings to inform trainings for investigators. The government reported the study determined the Criminal Act and Prevention of Trafficking in Persons, Etc. and Victim Protection Act will provide an adequate legal framework to prosecute and punish traffickers. The Korean National Police Agency (KNPA) trained 180 officers on sex trafficking during a 12-session course and developed a guide for identifying victims of sex trafficking, which it distributed it to police stations in October 2021. The government did not report providing official anti-trafficking trainings that included components on trauma-informed procedures and care. MOJ reported it created a course for new prosecutors on trafficking and provided anti-trafficking training for veteran prosecutors; the Ministry of Oceans and Fisheries (MOF) reported providing training to seafarers' labor inspectors on identifying trafficking. In the past, victim-support NGOs reported instances of police, prosecutors, and government-provided interpreters not using trauma-informed practices when interviewing victims, which inhibited their ability to effectively collect evidence and testimony from victims to pursue charges against their traffickers. Previous reports also indicated law enforcement did not proactively investigate trafficking cases and declined to pursue charges in some suspected trafficking cases for unclear reasons, sometimes due to a lack of understanding of tactics used by traffickers. Officials often did not prosecute cases involving debt-based coercion due to a perceived lack of jurisdiction over recruitment that generally originated in a victim's home country. The lack of an option to provide foreign trafficking victims with long-term or permanent residency discouraged victims from participating as witnesses in investigations of traffickers. The government investigated one working-level court official allegedly complicit in sex trafficking; the government did not report prosecuting any officials allegedly complicit in trafficking crimes.

## PROTECTION

The government maintained efforts to identify and protect trafficking victims. Officials continued to be unable to track or provide the total number of trafficking victims identified or referred to services, thereby making some aspects of their overall protection efforts unclear. Law enforcement referred individuals in commercial sex to support facilities operated or funded by the Ministry of Gender, Equality, and Family (MOGEF), but the government did not identify how many were victims of sex trafficking; MOGEF provided services to 6,311 individuals in its support facilities in 2021, compared to 6,743 in 2020. MOGEF established 17 support centers for child sex trafficking victims, which provided

assistance to 3,964 victims in 2021. MOEL reported identifying 10 labor trafficking victims (including one female and nine male victims, and nine adults and one child), compared to 11 labor trafficking victims identified in 2020. Despite ongoing concerns that traffickers exploited migrant workers in forced labor in various industries, the government did not identify any migrant workers exploited in labor trafficking (six in the previous reporting period) and it did not report identifying any migrant fishermen exploited in labor trafficking.

The government continued to distribute victim identification guidelines created by the National Human Rights Commission of Korea (NHRCK) to police, prosecutors, and coast guard officials; however, the government lacked formal procedures to refer victims to care. The Ministry of Gender, Equality, and Family (MOGEF) provided training to its staff on the NHRCK guidelines and procedures for supporting victims and convened advisory meetings to develop new victim identification guidelines in preparation for implementation of the March 2021 anti-trafficking law; these guidelines had not yet been finalized by the end of the reporting period. Law enforcement often did not take steps to proactively identify victims, failed to identify many victims, and many officials did not adequately implement identification procedures. Despite the existence of the NHRCK guidelines, labor, immigration, and law enforcement officials reportedly did not use them in practice. MOJ officials interviewed entertainment visa holders to screen for sex trafficking indicators and referred identified victims to services; however, the government did not report how many victims were identified through these interviews, and NGOs reported the government did not establish adequate guidelines for immigration officials on what steps they should take if a visa holder reported any indicators of trafficking. The national police agency operated teams responsible for guiding all crime victims, which could include trafficking victims, from the initial point of contact with law enforcement to protection and support systems. However, the government did not have a formal referral process to guide officials in referring trafficking victims to services, some authorities reportedly only referred victims to services in extreme cases, and some victims did not receive timely support.

Through its cooperation with the Korean Crime Victims Support Association, MOJ reported assisting 380 trafficking victims in 2021, including through financial assistance, medical and psychological support, and legal assistance. In addition, MOJ-funded Smile Centers also included highly trained social workers, psychiatrists, and clinical psychiatrists who could provide post-trauma support for victims of crime; the government did not report whether it trained these workers on trauma-informed care specific to trafficking victims. MOGEF supported more than 100 facilities that provided services to victims of crime and were available to assist trafficking victims through counseling services, psycho-social support, shelter, education, and rehabilitation support; however, the government did not report providing any services designed specifically for trafficking victims. While these facilities primarily served female victims of crime, the government made some services, such as counseling, medical, and legal assistance, available to male victims. Nonetheless, NGOs continued to report the quality of victim care was insufficient, particularly for male, disabled, foreign, and child victims, and that authorities did not provide consistent or accessible service for foreign victims. The government only permitted foreign victims to stay in shelters for three months; however, authorities could extend this period of stay if victims were participating as witnesses in prosecutions against traffickers. The government did not provide undocumented foreign victims some services unless they cooperated with law enforcement in the investigation of traffickers. Victims could file civil suits to receive compensation; the government did not report whether any victims received such compensation. The government issued G-1 visas to foreign victims of crimes, which allowed victims to stay and work in South Korea for up to one year while cooperating in investigations and prosecutions; because the government did not track identified victims, it was unable to provide the number, if any, of trafficking victims issued G-1 visas. MOJ previously reported foreign victims of sexual violence and trafficking were exempt from immigration penalties for remaining in the country beyond the permitted period of stay; however, it did not report how many victims, if any, benefited from this provision during the reporting period. Despite these benefits, the government did not provide legal alternatives to foreign victims' removal to countries where

KOREA, REPUBLIC OF

they face retribution or hardship. Some NGOs alleged that authorities sometimes detained or deported foreign victims but did not report any specific cases during the reporting period.

Although the law prohibits punishment for illegal acts that individuals were coerced to commit, the government did not take steps to address longstanding concerns that government officials often arrested, detained, and deported victims for unlawful acts traffickers compelled them to commit. Authorities did not conduct screenings for indicators of trafficking when arresting individuals for commercial sex acts, and NGOs reported some instances in which authorities deported potential foreign trafficking victims without screening them for trafficking or providing services. In addition, NGOs reported authorities deported some foreign sex trafficking victim-witnesses who participated in prosecutions against traffickers.

KNPA reportedly had a policy to not inform immigration officials of the illegal status of victims who self-reported their exploitation to authorities; however, KNPA did not extend this policy to victims who did not self-identify or were not accompanied by legal counsel or other service providers.

## PREVENTION

The government maintained efforts to prevent trafficking. MOGEF assumed the role as the government's central coordination body for anti-trafficking and held interagency meetings during the reporting period. As mandated by the 2021 anti-trafficking legislation, MOGEF began drafting the first national action plan but had not completed it by the end of the reporting period. The government continued efforts to raise awareness of sex trafficking through public broadcasting programs and ad campaigns on social media and reported it mandated one hour of education per year on sex trafficking prevention for all public sector workers. However, the government did not make sufficient efforts to raise awareness of labor trafficking. Anti-trafficking NGOs reported there were low levels of public awareness of human trafficking. To reduce the demand for commercial sex acts, officials provided schools, government agencies, and other public organizations with anti-commercial sex and trafficking education programs, and it publicized the illegality of child sex tourism in airports. The government did not operate a hotline specifically for reporting potential trafficking crimes, but MOGEF continued to operate hotlines in 13 languages that were accessible to trafficking victims. The government did not report the number of calls related to trafficking but reported receiving 3,048 calls involving individuals in commercial sex exploitation in 2021. MOF operated two call centers to provide counseling for migrant seafarers, with interpreting services in Indonesian, Vietnamese, Chinese, and Burmese languages. Out of thousands of calls received in 2021, MOF reported 32 cases that were flagged for further investigation by labor inspectors for potential violations of the Seafarers Act.

NGOs continued to report traffickers exploited migrant workers through the government's Employment Permit System (EPS). MOEL provided interpretation, medical treatment, and counseling services to migrant workers through 44 support centers that were partially funded by the government. MOEL inspected workplaces that employed groups at risk of trafficking, including migrants and individuals with disabilities. While the government recognized the practices of unscrupulous recruitment agencies by stipulating in its bilateral Memoranda of Understanding (MOUs) that only public sector entities can be involved, the government did not report investigating unscrupulous recruitment agencies. MOEL also stated it required dispatch agencies to publicly list the costs they charged to foreign workers on their webpages, and it facilitated foreign worker labor management education for Korean employers. Media reports alleged that in one case, local MOEL labor inspectors reportedly ignored violations of EPS, including indicators that employers forced some migrant workers to engage in work in violation of the law. Following these reports and a National Assembly inquiry, MOEL re-investigated six workplaces and conducted 143 unannounced inspections in the agricultural sector in the first three months of 2022 and issued corrective orders and employment restrictions to offending employers. The government's restrictions on the ability of migrant workers employed under EPS to change employers increased their vulnerability to exploitation. The government asserted it permitted

workers who reported exploitation or labor violations to MOEL to change their employers while MOEL investigated their claims. According to NGOs, however, MOEL reportedly did not adequately investigate workers' claims and instead workers spent months attempting to prove their exploitation to MOEL before receiving permission to change their place of employment. In addition, employers who exploited their workers often only received small fines or suspended sentences. Addressing concerns of inadequate housing of migrant workers, beginning in July 2021, MOEL ceased the issuance of employment permits to employers in the agriculture and fisheries industries who housed migrant workers in makeshift structures, although NGOs said the government granted some employers a grace period until September.

Traffickers capitalized on gaps in Korean labor laws to exploit foreign fishermen in forced labor. The Seafarers Act exempted migrant workers from the legal working and rest hours, overtime pay, and paid holidays prescribed for Korean fishermen. While MOF issued rules in January 2021 to better regulate the recruitment system, prevent excessive working hours, set a minimum salary, and ensure the provision of clean drinking water for migrant seafarers, NGOs continued to raise concerns these rules were not adequately implemented and called for stricter punishment of violators. NGOs reported some migrant fishermen continued to work long hours, sometimes more than 18 hours per day. The minimum wage for migrant fishermen was reportedly one-fifth less than the minimum wage of Korean fishermen, and migrant workers often did not receive holiday or overtime pay. The government amended the Seafarers Act in July 2021 to prohibit the confiscation of migrant seafarers' passports; however, observers noted only ship owners were subject to the prohibition, and therefore skippers or manning agencies, who frequently withhold workers' identify documents, could continue this practice with impunity. In addition, surveys conducted in September 2021 revealed the majority of migrant fishermen still did not maintain control of their identity documents. The government did not adequately regulate the recruitment process for migrant fishermen and instead a cooperative of private agencies regulated this process and charged standard recruitment fees of approximately $5,000 to workers, and many paid more than that. While the government reported conducting inspections of 177 fishing vessels in 2021, it did not mandate fishing vessels return to ports for routine labor inspections; NGOs reported that unless they required maintenance, vessels could avoid returning to port and many vessels remained at sea for more than a year at a time, increasing risks for forced labor. MOF reported conducting a survey of migrant seafarers working on longline fishing vessels to ask if the workers wished to disembark; however, NGOs observed fears of losing employment in the future deterred workers from agreeing to disembark, and the ministry did not report screening for indicators of trafficking during these surveys. The law also did not prohibit exploitative wage deductions or prohibit worker-charged recruitment fees, which enabled traffickers to use debt-based coercion to exploit migrant fishermen, as well as workers in other industries; MOEL reported it required recruiting agencies to publicly list the costs they charged to foreign workers on their webpages. To address the issue of recruitment agencies in source countries charging workers recruitment fees that contribute to debt-based coercion, the government signed an MOU with the government of Indonesia in May 2021. Local governments encouraged and provided financial assistance to South Korean farmers to pursue marriages to foreign women through brokers; some of these women were exploited in sex trafficking and domestic servitude.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in South Korea, and traffickers exploit victims from South Korea abroad. Traffickers exploit South Korean women and children, including children who run away from home and victims of domestic violence, in commercial sex, including in bars, night clubs, and other entertainment establishments, or through internet-advertised escort services. Traffickers increasingly utilized online platforms to recruit and coerce victims to engage in commercial sex acts and to facilitate trafficking by communicating with purchasers of commercial sex. Chat room operators recruit Korean women and children, including child sex trafficking victims, and threaten them with the release of compromising photographs to coerce them to participate in the

Haiti AR_000811

KOSOVO

production of pornographic materials. Traffickers exploit South Korean women overseas, including in the United States, in sex trafficking in massage parlors, salons, bars, and restaurants, or through internet-advertised escort services, often through debt-based coercion. Traffickers subject men and women, primarily from the People's Republic of China (PRC), Thailand, Russia, the Philippines, Vietnam, Indonesia, Morocco, and other countries in Asia, the Middle East, and South America, to forced labor and sex trafficking in South Korea. Traffickers force victims who owe debts to entertainment establishment owners or loan sharks into commercial sex. Sex traffickers exploit some foreign women on E6-2 entertainment visas—many from the Philippines and Thailand—in bars and clubs, including "foreigners only" bars near ports and U.S. military bases. However, many of the clubs that catered to U.S. military personnel remained closed since early 2020 due to the pandemic. Job brokers, unscrupulous recruitment agencies, and managers or owners of bars and clubs recruit foreign women under false promises of jobs as singers or performers but instead coerce victims to work excessive hours selling juice and alcohol and to engage in commercial sex acts in clubs. Recruiters and owners of massage parlors fraudulently recruit women for work as professional masseuses in Korea but force them to engage in commercial sex acts, sometimes through passport confiscation, physical violence, and threats of deportation or violence. Some victims are not provided an adequate number of days off, face harassment, verbal and physical abuse, and are paid below the minimum wage or have their wages withheld to discourage them from leaving Korea or seeking new employment. Some bar managers reportedly confiscate victims' passports or alien registration cards and restrict their ability to go outside their workplace. Women from the Philippines and other countries in Asia enter Korea on tourist visas after receiving false promises of short-term work in factories or other industries but then have their passports confiscated by traffickers who force them to work in clubs and engage in commercial sex acts. Some women from the PRC, Vietnam, Thailand, the Philippines, and Cambodia, who are recruited for marriages to South Korean men through international marriage brokers, are vulnerable to sex trafficking and forced labor after their arrival. Some South Korean men reportedly engage in child sex tourism in other Asian countries; however, this likely occurred less frequently during the reporting period due to the pandemic. Travel restrictions and quarantine requirements related to the pandemic prevented traffickers from recruiting some foreign trafficking victims during the reporting period, leaving women in Korea more at risk to exploitation. As the entertainment industry experienced a loss of business, some traffickers also used increased various forms of exploitation to force victims into commercial sex. Some brokers also force Korean women who worked in clubs prior to the pandemic into commercial sex. North Korean defectors living in South Korea often faced economic hardship that increased their risks to trafficking, and traffickers subjected North Korean women to sex trafficking. KNPA, MOJ, and MOF previously acknowledged instances of deportation of foreign trafficking victims, including some who self-reported, and attributed it to a breakdown in communication between investigators and immigration authorities.

Traffickers have forced some physically or intellectually disabled South Korean men to work on fishing vessels and fish, salt, and cattle farms. Unscrupulous labor recruiters contribute to the forced labor of migrant workers, especially those from Vietnam, the Philippines, Thailand, Cambodia, Indonesia, and Mongolia, through debt-based coercion by charging workers excessive fees, sometimes leading to thousands of dollars of debt. Approximately 200,000 migrant workers employed under the government's EPS work in fishing, agriculture, livestock, restaurants, and manufacturing. Undocumented workers are also employed in these sectors, though there are no official statistics on their numbers. NGOs reported that there were fewer migrant workers in the country due to pandemic-related travel restrictions. Some workers, both documented and undocumented, face conditions indicative of forced labor. Migrant workers in the agriculture sector are sometimes forced to live in inadequate housing, sometimes in greenhouses, shipping containers, or dormitories. South Korea is a transit point for Southeast Asian fishermen subjected to forced labor on fishing ships bound for Fiji and other ports in the Pacific. There are ongoing reports of abuse, including forced labor, of migrant workers in the Korean fishing fleet, one of the world's largest distant-water fishing fleets. Recruiters, boat

owners, captains, and job brokers often use debt-based coercion to exploit migrant fisherman in forced labor on Korean-flagged or -owned vessels. Reports estimate that nearly 4,000 migrant workers, mainly from Indonesia, are employed on these vessels. Korean distant-water fishing vessels frequently use at-sea trans-shipment of catches and can often stay at sea for a year or longer without visiting a port, limiting the ability of workers to report exploitation to authorities or to safely leave their exploitation. According to one study, Korean longline fishing vessels spend the longest amount of time at sea, travel the furthest distances, and have the longest daily fishing hours compared with the world's 25 largest longline fishing fleets. Recruitment agencies and job brokers often charge fishermen excessive recruitment fees, sometimes as much as $13,000 for Indonesian and Vietnamese fisherman working on vessels in coastal waters, increasing their vulnerability to debt-based coercion. Migrant fishermen on distant-water vessels often have the first three months of their wages withheld to serve as a "deposit" they are unable to receive back until the completion of their contract. Although the government has undertaken some efforts to address problems in this sector, trafficking vulnerabilities remain. Such workers can be forced to work excessive hours, up to 20 hours per day with limited rest hours or days off, abused physically and verbally by boat captains, subjected to salary deductions, provided inadequate food and water, or forced to live and work in unsanitary conditions. It is common for recruitment agencies, captains, and skippers to retain coastal and distant-water fishermen's passports to prevent them from leaving their employment.

Traffickers reportedly utilized partnerships with some law enforcement authorities to threaten victims with penalization and deportation. In previous reporting periods, NGOs reported some government employees, including police, sexually exploited children and solicited individuals in commercial sex, some of whom may have been sex trafficking victims.

## KOSOVO: TIER 2

The Government of Kosovo does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Kosovo remained on Tier 2. These efforts included prosecuting and convicting more traffickers and identifying more victims. The Chief State Prosecutor's Office (CSPO) established local multi-disciplinary teams to improve coordination on trafficking cases in three regions, and the government increased funds to NGO-run shelters. The government organized a robust awareness campaign, and coordinating bodies met and produced quarterly reports. However, the government did not meet the minimum standards in several key areas. Judges continued to impose lenient sentences on convicted traffickers, and the government did not adopt the 2020-2024 Anti-trafficking National Strategy and Action Plan. Law enforcement continued to classify forced begging of children by their parents as parental neglect or abuse rather than trafficking and, because of inadequate identification procedures for forced begging, authorities likely deported some unidentified trafficking victims.



KOSOVO TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers, including complicit officials. • Sentence convicted traffickers to prison terms consistent with prescribed penalties. • Develop written guidance and enhance efforts to identify and assist children exploited in forced begging.

331

**KOSOVO**

• Adopt, resource, and implement the 2020-2024 Anti-trafficking National Strategy and Action Plan. • Continue providing advanced training to judges, prosecutors, and law enforcement on trafficking investigations and prosecutions. • Strengthen victim confidentiality and privacy measures and ensure private information is not shared. • Further reduce the judiciary's backlog of cases, including trafficking cases. • Allocate sufficient resources to Centers for Social Welfare to fully fulfill their responsibilities. • Designate trained prosecutors and judges in every region to handle trafficking cases. • Strengthen victim confidentiality measures. • Increase government support for comprehensive vocational training and reintegration services for victims. • Standardize data collection and create a database that disaggregates statistics for trafficking and trafficking-related prosecutions and convictions. • Provide hotline operators training on handling trafficking cases.

## PROSECUTION

The government increased law enforcement efforts. Article 165 of the criminal code criminalized sex trafficking and labor trafficking and prescribed punishments of five to 12 years' imprisonment and a fine for offenses involving adult victims and five to 15 years' imprisonment and a fine for offenses involving child victims. These punishments were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Police, prosecutors, and courts maintained different methods for counting cases, resulting in inconsistent statistics across databases. Police investigated 17 new cases with 43 suspects, compared with 62 new cases in 2020. Police also investigated seven additional suspects for "utilizing sexual services from a trafficking victim," compared with nine suspects in 2020. Authorities prosecuted 35 new cases with 60 defendants, compared with 20 new cases with 32 defendants in 2020. Courts convicted seven traffickers, compared with three traffickers in 2020. Courts did not charge or convict any perpetrator who "utilized sexual services from a trafficking victim," compared with one perpetrator in 2020. Judges continued to issue sentences below the minimum penalty of five years' imprisonment. While a judge sentenced one trafficker to five years' imprisonment, four convicted traffickers received sentences of three years' imprisonment, one received a two-year suspended sentence, and one received a €300 ($340) fine. Suspended sentences and those of fines alone undercut efforts to hold traffickers accountable, weakened deterrence, created potential security and safety concerns for victims, and was not equal to the seriousness of the crime. Courts did not reduce the overall backlog of trafficking cases; 70 cases remained open from previous years, compared with 68 in 2020.

The Trafficking in Human Beings Directorate (THBD) within the Kosovo Police (KP) investigated all trafficking cases through its eight regional units, and it also maintained a unit in the predominantly ethnic Serb northern municipalities. CSPO continued to designate a special coordinator for trafficking and also maintained a trafficking point of contact in all seven basic prosecution offices. The special coordinator for trafficking monitored cases, provided guidance, participated in the anti-trafficking law enforcement task force, and organized trainings and workshops for prosecutors. THBD cooperated with the Labor Inspectorate, Ministry of Trade and Industry, and Tax Administration to conduct 168 joint inspections of bars, nightclubs, restaurants, and massage parlors (77 in 2020), which led to the closure of 55 premises (39 in 2020). GRETA and other observers reported that a lack of training and experience among most prosecutors and judges resulted in weak sentences or cases that were charged as a lesser crime, especially forced labor cases or cases involving emotional control or psychological coercion of a victim. The government, in cooperation with a foreign donor, trained police and maintained institutionalized training programs at the Justice Academy and CSPO, which trained prosecutors, judges, and victim's advocates on various trafficking issues. The government exchanged information with foreign governments on 20 trafficking-related cases (18 cases in 2020), cooperated with authorities from Albania and Montenegro on child trafficking cases, and worked with German authorities to extradite one suspect to Kosovo. THBD, CSPO, and the KP Inspectorate cooperated to investigate government employees potentially complicit in trafficking offenses but did not report any new cases.

## PROTECTION

The government increased victim protection efforts. The government identified 22 victims, compared with 17 victims in 2020. Of these, 19 were victims of sex trafficking, and three were victims of forced begging; 16 were girls, four women, and two boys; and one was a victim from Albania. First responders used standard indicators to screen vulnerable populations; however, GRETA and other observers reported a lack of guidance and proactive identification efforts for victims of forced begging, especially children. KP and border police continued to classify forced begging of children by their parents as parental neglect or abuse rather than trafficking, stating that children accompanied by their parents did not meet the definition of trafficking. A multi-disciplinary national referral mechanism (NRM) provided standard operating procedures (SOPs) for identifying and referring victims to services. The NRM required an investigator from the THBD and a victim's advocate from the Victim's Assistance and Advocacy Office to convene and assess the victim as low-, medium-, or high-risk of danger and coordinate victim care and placement. The NRM also required a social worker for child victims to participate in the assessment.

The government licensed and partially funded two NGO-run shelters to provide services to victims, along with the specialized state-run Interim Security Facility (ISF). The government annually allocated €100,000 ($113,380) to the ISF, and the Ministry of Labor and Social Welfare (MLSW) allocated €56,000 ($63,490) to one NGO-run shelter and €63,000 ($71,430) to the other, compared with €50,000 ($56,690) and €55,000 ($62,360) respectively in 2020. The Pristina municipal government also provided €14,000 ($15,870) to one of the NGO-run shelters, compared with €13,000 ($14,740) in 2020. In addition, the Pristina municipal government funded the renovation of one NGO-run shelter with €33,000 ($37,410). NGO-run shelters reported government funding in 2020 was satisfactory but reported delays in receiving funds. The three shelters provided legal assistance, medical and psychological services, counseling, education, recreational services, and reintegration support. ISF temporarily accommodated victims assessed as high-risk, such as victims of cases with the trafficker still at large, victims testifying in court proceedings, or those awaiting repatriation; ISF accommodated 14 victims (nine victims in 2020). Authorities required victims to have a police escort outside of the ISF while court proceedings were ongoing and required an approval from a prosecutor and the KP for victims assessed as high-risk to permanently leave the ISF. The facility had the capacity to shelter 40 individuals for up to 90 days with separate rooms for females, males, and families. Eleven staff members worked at ISF, including the director, victim advocates, nurses, and a teacher, but it did not employ an in-house psychologist. The shelters also administered COVID-19 tests to victims immediately after arrival and ensured COVID-positive victims received medical attention and safety precautions. Centers for Social Welfare (CSW) appointed case managers who prepared care plans in cooperation with the victim and shelter staff. CSW provided services to child victims and also acted as legal guardians, but observers reported CSW did not have enough staff to handle all their responsibilities. Civil society reported good quality of care for victims, but reintegration programs had limited success due to a lack of resources and high overall unemployment.

GRETA reported representatives from THBD and CSPO had a good understanding of the principles surrounding non-penalization of trafficking victims. However, due to a lack of consistent screening and identification procedures for forced begging, authorities likely deported some unidentified trafficking victims. The law entitled foreign national victims to a 90-day reflection period in which victims could recover before deciding whether to cooperate with law enforcement. Authorities afforded foreign victims the same rights and services as internal victims and the law entitled foreign victims to a temporary residence permit for at least six months; no foreign victims requested a permit in 2021 or 2020. All 22 victims participated in investigations by providing statements to THBD, prosecutors, and pre-trial judges (17 in 2020). The government updated SOPs and required a psychologist and prosecutor to attend interviews with victims in addition to a victims advocate and police. The government reported suspected traffickers were not present when victims provided statements and foreign victims could return to their countries of origin after testifying without waiting for the conclusion of the trial. The government assisted in repatriating

one victim (three in 2020). The law provided witness protection, free legal aid, and confidentiality of a victim's identity; no victims required witness protection, but KP reported a municipal official unknowingly provided a victim's birth certificate to a suspected trafficker. The law allowed judges to grant a victim restitution in criminal cases or to receive compensation from a government financed compensation program if the victim was unable to obtain restitution from the traffickers; no victims received restitution or compensation in 2021, compared with one victim receiving €3,000 ($3,400) in 2020.

## PREVENTION

The government maintained efforts to prevent trafficking. The National Authority Against Trafficking in Persons (NAATIP) composed of representatives from eight government ministries, the judiciary, municipal offices, victim advocates, NGOs, and international observers, coordinated interagency efforts; NAATIP held quarterly meetings in addition to ad hoc meetings and produced quarterly reports. In 2019, the government, in consultation with civil society, drafted the Anti-trafficking National Strategy and Action Plan for 2020-2024; however, its approval remained pending at the close of the reporting period. CSPO established local multi-disciplinary teams comprising a prosecutor, police, victim advocates, social workers, and shelter representatives to improve coordination on trafficking cases in three regions. The government organized an annual month-long awareness campaign on child begging, produced an anti-trafficking video, and organized meetings and distributed leaflets for students and youth. Separately, the government distributed leaflets on victim identification to health professionals, and THBD distributed leaflets at border points and held lectures and roundtables on anti-trafficking efforts. For the first time, the government facilitated the participation of a survivor in an awareness campaign by having read aloud to an audience a letter they prepared, in lieu of their physical presence. The MLSW maintained a legal framework for the registration and licensing of private sector employers, including foreign employment agencies. The law prohibited agencies from charging recruitment fees, but the government did not report its efforts to monitor recruitment agencies. The government-operated hotline for victims of domestic violence and other crimes received 327 calls including two potential trafficking cases, compared with 650 calls and six potential trafficking cases in 2020. In previous years, observers reported operators needed training to respond properly to trafficking-related calls. The government aired a public service announcement to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Kosovo, and traffickers exploit victims from Kosovo abroad. Criminal networks exploit victims in sex trafficking internally. Many sex trafficking victims in Kosovo are girls, although traffickers also force women from Albania, Moldova, Montenegro, Romania, Serbia, and other European countries into sex trafficking. Traffickers recruit women and girls with promises of marriage or employment as dancers and singers and force victims into sex trafficking in private homes and apartments, nightclubs, and massage parlors. Children from Kosovo, Albania, and other neighboring countries are forced to beg within the country. Traffickers subject Kosovo citizens to sex trafficking and forced labor throughout Europe. Marginalized Roma, Ashkali, and Egyptian communities, particularly children, are vulnerable to forced begging and sex trafficking, including by traffickers, who are sometimes their parents or relatives. LGBTQI+ persons, migrants, asylum seekers, and refugees also experience a higher risk to trafficking.

## KUWAIT: TIER 2 WATCH LIST

The Government of Kuwait does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included reporting disaggregated data for the first time, which highlighted a forced labor conviction under the anti-trafficking law and the identification of male victims. The government also continued to implement the "Tamkeen" program to increase oversight

over foreign worker recruitment and provide greater protections to vulnerable migrants through the labor recruitment process. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government investigated fewer alleged trafficking crimes and prosecuted and convicted significantly fewer traffickers than in previous years; it also identified fewer victims compared with the previous reporting period. The government decreased funding for trafficking victim and domestic worker protection programs for the second consecutive year. Additionally, the government did not take any new steps to reform its visa sponsorship system, which continued to render migrant workers highly vulnerable to exploitation, specifically trafficking. Some officials continued to routinely use arbitration and administrative penalties to resolve grievances filed by migrant workers, including domestic workers, instead of investigating such cases as human trafficking crimes; protracted litigation and subsequent appeals processes led most potential victims to decline to file court cases. Finally, the government did not regularly use standard procedures for proactively identifying victims by all front-line officials and referring them to protection services; it continued to detain, prosecute, and deport potential or unidentified trafficking victims, including those fleeing forced labor, without screening for trafficking indicators. Therefore Kuwait was downgraded to Tier 2 Watch List.



KUWAIT TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Continue to increase law enforcement efforts to investigate, prosecute, and convict traffickers, including Kuwaiti citizens and allegedly complicit officials, under the 2013 anti-trafficking law rather than other criminal laws, when applicable. • Proactively screen for trafficking indicators among vulnerable populations, including those in government and embassy shelters and those arrested for immigration violations or "prostitution," or those who flee abusive employers and face countercharges, to ensure victims are not wrongfully penalized or deported for unlawful acts traffickers compelled them to commit. • Institute reforms to the visa sponsorship-based employment system, including allowing all workers at any time to change employers and leave the country without requiring employer approval, ensuring no recruitment fees are charged to workers and increasing oversight of recruitment agencies and companies. • Increase the amount of training for all relevant officials and NGOs on the national referral mechanism (NRM) to strengthen proactive identification and referral procedures and ensure official guidelines are accessible to all frontline responders to routinely employ these procedures. • Ensure unhindered access to the government shelter for victims who self-refer and do not require a complaint on file with authorities to be granted access at the shelter and provide adequate funding for shelter operations. • Create protection services specifically for male victims, including accommodation and specify procedures for their access to care. • In adherence to Kuwaiti labor law, increase the number of investigations and prosecutions of employers who illegally confiscate migrant workers' passports and strengthen penalties for passport confiscation to deter potential future perpetrators. • Strengthen efforts to prosecute potential forced labor crimes criminally instead of administratively and refer cases with trafficking indicators, such as complaints of non-payment of wages, passport confiscation, and restriction of movement, for investigation as potential trafficking crimes. • Continue to strengthen enforcement of the domestic worker law to ensure domestic workers' rights are protected by increasing access for domestic workers to file a grievance with authorities and increase inspections of registered and fraudulent recruitment agencies. • Resume convening the full Permanent National Committee for the Implementation of the National Strategy for the Prevention of Trafficking and strengthen implementation of the national

anti-trafficking strategy. • Expand efforts to raise awareness on existing protections for workers and penalties for traffickers, particularly among vulnerable populations, including migrant workers and domestic workers, as well as employers, company owners, and recruitment agencies. • Given important concerns about forced labor indicators in Cuban Medical Missions, screen Cuban medical professionals and refer them to appropriate services.

## PROSECUTION

The government decreased law enforcement efforts; it reported significantly fewer trafficking investigations, prosecutions, and convictions than in previous years and continued to convict traffickers, including allegedly complicit officials, under other criminal laws instead of the anti-trafficking law. However, the government reported disaggregated law enforcement data for the first time, which highlighted a forced labor conviction under the anti-trafficking law. The 2013 anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed penalties of up to 15 years' imprisonment for offenses involving an adult male victim and up to life imprisonment for those involving an adult female or child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. In April 2019, the Constitutional Court annulled an article from the 2013 anti-trafficking law that required judges to issue a verdict in trafficking cases, arguing the stipulation undermined judicial independence and precluded judges from exercising discretion. As a result, judges retained broad discretion to defer and delay issuance of verdicts in trafficking cases, as they did in other cases. The Public Prosecutor's Office (PPO) and the Ministry of Interior (MOI) continued to require all cases of buying and trading of fraudulent visas, withholding of salaries and passports in excess of three months, or forcing individuals into jobs different from those contractually agreed upon be prosecuted under the anti-trafficking law rather than the labor law.

The MOI and PPO continued to maintain specialized trafficking units within their respective organizations, and for the first time, the government provided disaggregated law enforcement data by type of trafficking. In 2021, the government investigated 23 potential trafficking cases, compared with 46 in the previous reporting period. Of these 23 cases, one was for sex trafficking involving one suspect, and 22 were forced labor cases, involving 29 suspects. Fourteen forced labor cases involving 21 suspects remained under investigation at the close of the reporting period. During the reporting period, officials initiated the prosecution of two forced labor cases involving eight suspects, compared with 35 cases involving 109 suspects in 2020. The government convicted two traffickers in one forced labor case under the anti-trafficking law, compared with convicting 28 traffickers in 2020 under unspecified laws. The Criminal Court convicted and sentenced a Kuwaiti woman to 10 years' imprisonment with hard labor and her husband to one year of imprisonment for assaulting and torturing a domestic worker to death. The court charged both individuals with forced labor under the anti-trafficking law and assault under the penal code; this was the first time the government reported a forced labor conviction under its 2013 anti-trafficking law. In previous years, the government did not specify which laws it used to convict traffickers. Separately, two defendants were originally prosecuted under the anti-trafficking law for forced labor but were instead convicted under the penal code, labor law, and foreigner's residency law and sentenced to 3.5 years' imprisonment and hard labor. The government also overturned seven convictions in one case on appeal and acquitted 42 defendants in 2021, compared with acquitting 13 defendants in 2020.

Corruption and official complicity in trafficking and trafficking-related crimes remained a significant concern during the reporting period. While the government made law enforcement efforts on cases involving allegedly complicit officials in trafficking-related crimes, it did not report any new investigations, prosecutions, or convictions of government employees under the 2013 anti-trafficking law. Some government officials allegedly sold work visas to illegal recruiters or directly to migrant workers, potentially facilitating trafficking. In May 2021, the government reported it upheld a conviction through a final ruling in the Court of Cassation from the previous reporting period with a sentence of three years' imprisonment with hard labor for a former MOI police colonel and his Egyptian partners for illegally facilitating the

entry of hundreds of workers into Kuwait. The MOI colonel reportedly operated a front company that brought to Kuwait approximately 1,200 migrant laborers who did not have valid residence permits and were vulnerable to trafficking. The court upheld the ruling that the colonel and his accomplices violated the residency law—but it acquitted the defendants for human trafficking and money laundering for lack of sufficient evidence. In a separate case from the previous reporting period involving a former Bangladeshi MP and several Kuwaiti officials, media sources reported the Court of Cassation upheld the conviction of the former MP for bribing Kuwaiti officials to issue work visas and issued a final ruling in November 2021, increasing the sentence for the MP from four years to seven years' imprisonment and from a fine of 1.9 million Kuwaiti Dinar (KD) ($6.29 million) to 2.7 million KD ($8.94 million). According to media, the Criminal Investigative Department (CID) had originally charged the former Bangladeshi MP with human trafficking, money laundering, and torturing employees of his company, based on complaints from five Bangladeshi migrant workers. Media sources also reported that the court upheld the convictions for bribery and issued similar sentences to a top Kuwaiti official at the Public Authority for Manpower (PAM) and a former MOI Assistant Undersecretary, in the same case related to the Bangladeshi MP. The Bangladeshi MP's company bribed Kuwaiti officials to bring in thousands of Bangladeshi workers on fake or expired government contracts, making them vulnerable to labor trafficking; victims paid up to 3,000 KD ($9,930) each in exchange for visas, only to find they had no job upon arriving in Kuwait. The final ruling also included the conviction and sentencing of a former Kuwaiti MP, who was originally acquitted of all charges, to seven years' imprisonment and a fine of 740,000 KD ($2.45 million).

Kuwaiti authorities did not routinely categorize or investigate labor violations as potential trafficking crimes and typically treated such cases as administrative infractions. During the reporting period, the MOI established a hotline specifically to receive trafficking-related complaints. Although the hotline received 95 calls since its establishment in October 2021, officials did not refer any complaints to the PPO for criminal proceedings. Moreover, officials reported that most calls received were regarding labor law violations that did not meet the threshold to qualify as a potential trafficking case. If a complaint involved severe abuse, such as assault or domestic worker abuse, authorities transferred the case directly to the PPO. The government did not prosecute some domestic worker abuse cases due to lack of evidence or witness testimony; further, some domestic workers who were victims of abuse ultimately chose not to move forward with court proceedings due to inadequate government support and prolonged trials periods. As a result, only severe cases of domestic worker abuse—usually involving significant bodily injury or death—were prosecuted as violations of other criminal laws, and sometimes, under the anti-trafficking law as forced labor. One labor-source country reported that some domestic worker sexual abuse cases were dropped due to insufficient evidence collection by the MOI's Forensic Evidence Department. Moreover, one NGO reported in cases where trafficking charges were accompanied by other criminal charges, the government would choose to pursue other criminal charges against the defendants instead of the trafficking charge.

As of November 2021, the MOI reported it conducted two training courses for officers at the CID. It also included trafficking topics in its general quarterly training, including on the anti-trafficking law, victim identification, and evidence collection strategies. Furthermore, the MOI reported that some police academy training included trafficking and human rights focused topics. As of November 2021, PAM conducted seven training courses in cooperation with two international organizations, funding trainings specifically on ethical recruitment, trafficking terminology, and the government's responsibility to protect trafficking victims. At the request of the government, members of the Permanent National Committee for the Implementation of the National Strategy for the Prevention of Trafficking (National Committee) and the Supreme Council for Planning and Development (GSSCPD) participated in two international organization-led workshops on victim identification, Kuwait's anti-trafficking law, the international legal framework for trafficking, the NRM, and techniques for victim interviewing. Due to the pandemic, the Kuwait Institute for Judicial and Legal Studies within the Ministry of Justice did not conduct any trainings during the reporting period. The Domestic Workers Employment Department (DWED)

reported that it requested trafficking-related training to improve its staff and investigators' skills on victim identification, but the training was not implemented during the reporting period.

## PROTECTION

The government decreased efforts to protect trafficking victims; it identified significantly fewer victims compared with the previous reporting period and decreased its funding to support the shelter and protection services. However, the government reported disaggregated victim identification data by gender for the first time, which highlighted the identification of male victims. The government identified 17 trafficking victims during the reporting period, including 11 adult males and six adult female victims; this was a significant decrease from its identification of 103 trafficking victims during the previous reporting period. The government referred two of these female victims to the government shelter, and three female victims were identified through the government shelter's screening process after admission into care. The government did not report if the remaining 12 identified victims received services; as the shelter was only available for vulnerable female migrants, observers noted that in most cases, identified male victims sought assistance from their respective embassies or other support groups. As of November 2021, the government reported it assisted 160 vulnerable female workers at the government shelter, a decrease compared to 641 during the previous reporting period. This included 138 vulnerable female domestic workers referred to shelter by DWED; the other 22 vulnerable female workers either self-referred or were referred by NGOs. NGOs reported the majority of those admitted to the shelter were potential victims of forced labor and had filed poor working conditions, including excessive hours and delayed payment of wages, or desired to return to their respective countries of origin. The shelter employed a screening process to identify and categorize types of abuse and determine whether a resident was a trafficking victim; during the reporting period, the government reported that of the 160 women admitted into the shelter, three potential trafficking victims were identified through this screening process and were referred to MOI's anti-trafficking unit for further investigation. In contrast, an international organization identified 24 trafficking victims during the reporting year.

The National Committee implemented the NRM, adopted in 2019, to identify and prevent cases of trafficking; the mechanism contained six stages ranging from proactive identification of victims to their safe repatriation. Although the government reported that front-line officials and investigators continued to follow prescribed procedures regarding victim identification and used the NRM to refer abused workers and possible trafficking victims to the shelter, an international organization reported that the mechanism was not systematically utilized by all officials. Furthermore, the government noted the NRM was not a publicly accessible document, likely limiting its use for stakeholders outside of the government. During the reporting period, the government-run shelter reported it received referrals from embassies, NGOs, international organizations, churches, private citizens, and other migrant workers. The shelter served as a one-stop facility, providing medical and psychological care, food, rehabilitation support, and access to officials from various ministries to facilitate legal and repatriation assistance. International organizations and NGOs continued to have access to victims and reported the shelter assisted workers with repatriation or finding new employment. Residents at the shelter had access to cell phones and legal assistance, as well as freedom of movement. Shelters were staffed by supervisors, medical staff, and investigators 24 hours per day. An international organization reported the average number of residents in the shelter had decreased significantly over the last few years, from 200-250 daily residents to approximately 20-40 residents during the reporting period. Furthermore, one NGO reported the government shelter did not allow domestic workers who were potential victims to self-refer without filing a complaint with DWED first, which may have left some unidentified trafficking victims without adequate care during the reporting period. During the previous reporting period, the Minister of Economic Affairs and Social Affairs announced that companies referred to the PPO on charges of visa trading, whereby a company fraudulently hires a worker for a fake position, would be required to cover all costs associated with sheltering and repatriating their registered employees; however, the government did not report if this announcement was

implemented or if any companies referred to the PPO paid for shelter and repatriation costs of their employees during the reporting period.

From January to November 2021, the government spent 77,017 KD ($255,020) on domestic worker shelter operations and protection programs for trafficking victims; this was compared with 100,370 KD ($332,350) in 2020 and 2 million KD ($6.62 million) in 2019, although the government did not report whether these amounts were allocated as the total budget for shelter operations and protection programs or solely the amount spent during the year on such initiatives. Embassies of the Philippines and India maintained their own domestic worker shelters and worked with the Kuwaiti government to seek compensation and legal redress for their nationals subjected to exploitative working conditions in the country. International organizations and civil society reported other embassies had unofficial shelters for their nationals and reported allegations remained that embassy staff inappropriately facilitated the employment of workers from these shelters by providing the worker new employment through illegal channels and receiving kickbacks, which rendered an unknown number of workers vulnerable to trafficking or re-trafficking. In cooperation with international organizations and foreign embassies, the government could assist victims in retrieving documentation and funding for repatriation. In the case of administrative deportation of vulnerable migrant workers, officials provided airline tickets and worked to recoup associated costs from accused employers. The government allowed victims residing in its shelter to either change their employers and visa sponsors or be repatriated to their country of origin once their residency status was resolved or pending the resolution of a legal case or unpaid bills, without approval by their former visa sponsor. Also, once the shelter admitted a victim, employers could not press "absconding" charges. The government did not report deporting those who faced retaliation or retribution in their respective home countries. Rather, the government allowed all trafficking victims to change employers and maintain residency in Kuwait or otherwise be resettled to a third country at the victims' request; however, most shelter residents chose to be repatriated to their home country. As of November 2021, the government repatriated 185 vulnerable migrants to their respective countries of origin and, as of March 2022, in cooperation with two international organizations, provided repatriation, reintegration support, and transition assistance to 115 vulnerable domestic workers from nations without diplomatic representation in Kuwait who needed to procure travel documentation. In comparison, during the previous reporting period, the government repatriated 617 shelter residents to their respective countries of origin.

Authorities continued to arrest, detain, and administratively deport some workers who fled their employers without permission. The risk of penalization, coupled with protracted litigation processes and exorbitantly high legal fees, discouraged workers from appealing to police or other authorities for protection and adequate legal redress for their exploitation. In addition, it was not uncommon for sponsors to file counter-grievances, such as "absconding," against their employees, including trafficking victims who reported abuse. This sometimes resulted in administrative deportation or detention of the employees and victims. According to the Domestic Workers Law (68/15), the government could charge a domestic worker with absconding seven days after the employer's registration of the charge, unless the worker notified DWED or presented themselves at the government shelter. During the reporting period, one NGO and a labor-source country reported domestic workers had difficulty physically reaching the DWED to file a complaint or seeking assistance, and some workers were denied access to the government shelter without first filing a complaint with the DWED. For domestic workers who did not or were not able to notify the government that they had left their employer, the worker was subject to arrest, detention for up to six months, payment of fines, and deportation; deportation was usually accompanied with at least a six-year entry ban to Kuwait. Within worker communities, there existed a persistent fear that confiding in authorities would result in deportation, imprisonment, or forced return to their employers. The government reported public prosecutors willingly tried cases on victims' behalf using their oral and written statements; however, the government did not have privacy laws to protect victims against potential retribution and often did not provide adequate care for victims throughout the duration of legal proceedings. The government reported victims could obtain restitution from defendants in criminal

cases and file suits against traffickers for damages, but most chose instead to settle their claims and return to their country of origin. Media reported the government directed settlements in response to individual civil suits against employers, but the government did not report the amount in civil damages or restitution paid out during the reporting period.

## PREVENTION

The government maintained efforts to prevent human trafficking, although it did not take any new steps to reform the visa sponsorship system, which continued to render migrant workers highly vulnerable to exploitation, including trafficking. The National Committee, established in 2018, did not convene during the reporting period; however, the working group within the committee tasked with implementing the government's anti-trafficking strategy and the NRM convened three times during the reporting period. The National Committee included representatives from the Ministry of Justice, Ministry of Foreign Affairs, Ministry of Information, Ministry of Awqaf and Islamic Affairs, Ministry of Social Affairs, Ministry of Education, Ministry of Health, MOI's Anti-Trafficking Department and Residency Affairs Division, PAM, and the PPO. The government reported that agencies tasked with combating trafficking, including those on the National Committee, continued to operate during the reporting period, although their operations were limited by pandemic restrictions, as most government entities remained staffed at only 30 to 60 percent capacity. The government, in collaboration with an international organization, financially supported and conducted public awareness campaigns at shopping malls and the international airport to raise awareness of trafficking and warn against using illegal labor recruitment companies. Various officials also took part in anti-trafficking awareness messaging on local television, radio, and social media platforms. The government continued to disseminate pamphlets to educate migrant workers on their rights, which were published in seven languages and disseminated in airports, embassies, and labor-recruitment agencies. In July 2021, the government, in coordination with an international organization, reported it organized a campaign to raise awareness on trafficking during World Day Against Trafficking in Persons through an SMS campaign and questionnaire contest.

In the last reporting period, PAM announced a collaborative program with the GSSCPD and two international organizations, entitled "Tamkeen," which included the creation of an International Recruitment Integrity System (IRIS), a voluntary accreditation mechanism that connects employers, employees, and recruiters to promote ethical recruitment. The government reported it continued to implement the Tamkeen initiative with the aim to digitize PAM's labor files in order to make the files trackable to prevent trafficking-related corruption and bribes by government officials and increase the transparency of the government's regulation of foreign worker recruitment. An international organization reported it provided training to the five private sector recruitment agencies licensed by PAM on ethical recruitment and IRIS. In December 2021, PAM announced a new initiative to regulate the licenses and files of recruitment companies under the auspices of a specialized team within PAM. PAM planned to screen commercial licenses to regulate the number of workers companies were allowed to hire—including for government contracts—to prevent companies from fraudulently hiring large numbers of workers for fake positions or positions different than contractually agreed upon. If violations occurred, PAM planned to suspend the company and refer it to court for legal action; however, PAM did not report what action it had taken to implement the new initiative by the end of the reporting period.

Authorities continued to employ the services of the government's Mobile Labor Disputes Office to help workers in remote areas of the country file complaints against employers for labor law violations. The mobile unit was run by an emergency team of investigators, inspectors, interpreters, lawyers, and volunteers. Officials also advertised to migrant laborers online services that allowed workers and employers to dock and track workplace issues electronically, receive alerts if an employer filed an "absconding" charge, notify the respective source country embassy, and challenge legal settlements incurred. PAM maintained a hotline and social media accounts to receive general workplace grievances and potential trafficking cases, while DWED had an email address for the same purpose. Both hotlines remained operational

during the year, and PAM reported it received 53 complaints through its hotline from January 2021 to November 2021, although it did not report if it referred any calls for criminal investigation or prosecution as a potential trafficking crime. In comparison, one NGO also ran its own hotline focused on labor exploitation, which received 4,808 calls and 391 inquiries through its online platform. In 2021, the NGO reported it received a call from a female worker who stated that a relative of her employer raped her and allegedly sold her to different employers; the NGO coordinated with MOI's anti-trafficking department to refer the worker to her embassy for care.

In the previous reporting period, the Minister of the Interior announced the formation of an interagency task force to investigate employers and recruiting companies that use deceptive techniques to lure migrant workers to Kuwait through unenforceable contracts, fraudulent visas, and nonexistent positions, leaving these workers highly vulnerable to trafficking; however, the government did not report on the actions of the task force during the current reporting period. Officials commonly used arbitration, which resulted in monetary compensation and repayment of back-wages to victims, administrative fines, and closure of recruitment firms to resolve such cases. If a settlement could not be agreed upon, officials referred the case to the labor courts. Although the withholding of workers' passports was prohibited under Kuwaiti labor law and the domestic worker law, the practice remained commonplace among visa sponsors and employers of foreign workers. During the year, DWED received 1,170 complaints of passport confiscation, resolved 407 complaints by returning the passports, blacklisted 29 employers, and referred the remaining 734 to the labor courts; as of November 2021, 189 cases of passport confiscation remained under review by the courts, and the government did not report on the verdicts of these cases at the close of the reporting period. PAM did not report how many complaints of passport confiscation it received, resolved through arbitration, and referred to the labor courts or if any cases were referred to MOI for further investigation as a potential trafficking crime. The domestic worker law did not specify penalties for passport confiscation; however, DWED continued to treat the practice as a contractual violation and a violation under the domestic workers law, which imposed penalties that blacklisted an employer for six months and referred the complaint to the courts. However, the domestic worker law allowed employers to take a worker's passport with the approval of the domestic worker, which limited the effectiveness of the prohibition. Experts noted that because the anti-trafficking law did not include any article prohibiting passport confiscation with criminal penalties, instances of this practice remained pervasive in Kuwait and rendered many workers vulnerable to exploitation, specifically trafficking.

The domestic worker law (Law 68/15) guaranteed domestic workers one day off per week, a maximum 12-hour workday with rest, minimum wages paid per month, paid annual leave, end-of-service benefits, and access to file formal grievances at the MOI, among other protections. The 2016 bylaws regulated implementation of this law. Amendments to the ministerial resolution of the 2010 labor law, passed in 2016, increased penalties for non-payment of wages, made mandatory documentation of all paid wages, and required prison time and fines for employers and government officials who failed to adhere to provisions of this law. Authorities continued to apply the amended provisions of the domestic worker law by building a monetary reserve to adjudicate cases of labor law violations to pay unpaid wages and cover the costs of repatriation. In November 2021, DWED reported it collected a total of 42,216 KD ($139,790) from employers to pay unpaid or delayed wages back to workers since January 2021. For issuance or renewal of a license for a domestic worker recruitment firm, it enforced the rule that single offices must submit financial deposits of 40,000 KD ($132,450) with a two-year validity and larger companies to present a letter of guarantee worth 100,000 KD ($331,130). The DWED continued to investigate domestic worker recruitment agencies to ensure compliance with the 2015 domestic worker law. In addition, it initiated investigations based on grievances filed by domestic workers, employers, recruitment offices and companies, and embassies of labor-source countries. The government arbitrated such grievances either through extrajudicial administrative proceedings or through the labor courts. The DWED also reported it could refer suspected trafficking cases to the MOI for further investigation but did not report doing so during the reporting period. From January to

November 2021, DWED officials received 2,533 work-related complaints, resolved 1,154 in extrajudicial administrative proceedings, and referred 1,307 to the labor courts, while 72 remained pending. As of November 2021, the DWED conducted seven inspection campaigns of domestic worker recruitment firms that resulted in two violations against registered recruitment agencies, which were subsequently suspended from one to three months. DWED also reported identifying 17 fake recruitment offices (compared with six in 2020) and referred them to MOI for criminal investigation. Additionally, DWED suspended 13 recruitment firms for three to six months for violation of the domestic worker law, compared to 37 suspensions the previous year; officials did not report referring any of these for criminal investigation or prosecution. DWED was not permitted to inspect the conditions inside employers' homes and could only inspect recruitment offices and companies, which limited the enforcement of the domestic workers law. An NGO noted that accessibility to the DWED for domestic workers was limited, as there was an expectation a worker needed to physically travel to the department to file a complaint. Domestic workers who did not have the freedom to leave their employer's home may not have been able to file a complaint with the government against their employer during the reporting period, rendering them vulnerable to further exploitation, including trafficking.

Separately, as of November 2021, PAM received 21,473 official grievances from foreign migrant workers, the most common of which included pay discrepancies, denied requests to transfer employers after the required three years with a visa sponsor, and disputes regarding overtime pay issuances, a significant increase compared with 10,498 complaints received in 2020. Authorities reported they resolved 412 cases directly through arbitration, referred 6,139 complaints to the courts, referred 119 companies to either the PPO or MOI, and issued administrative penalties to 2,929 companies for committing labor violations. Additionally, PAM identified hundreds of companies that engaged in fraudulent practices by sponsoring workers yet failed to provide legitimate employment. Local media reported from March 2020 to September 2021, the government closed 800 fake companies for visa trading, but the government did not report whether it referred any of the company owners for criminal investigation or prosecution. However, in June 2021, media reported the Court of Appeals sentenced a business owner to seven years' imprisonment for bringing migrant workers from abroad to work on a fraudulent government project. PAM continued to utilize the crisis and emergency teams in addition to the existing inspection teams to monitor the conditions of expatriate workers during the pandemic. In December 2020, PAM announced that it would no longer conceal the types of violations and crimes by companies found guilty of trafficking by removing obscure codes for 10,000 companies' files and replacing the codes with clear information on their violations and crimes, such as violating workers' rights, failure to pay salaries, and visa trading. The government reported that this information would eventually become accessible to the public via a website.

In adherence to the labor law regulating employment of domestic workers, the government's centralized recruitment company, *Al-Durra*, worked to reduce recruitment costs, curb illegal recruitment fees, provide greater oversight of recruiting practices, hire male domestic workers, and secure labor agreements for female employees. However, *Al-Durra* stopped recruiting domestic workers in early 2020 due to pandemic-related shutdowns and had not resumed recruiting at the close of the reporting period. In 2019, *Al-Durra* stopped working with expatriate employers after complaints suggested the mechanism was established to help Kuwaitis and was subsequently made available for Kuwaiti citizens only. The most common nationalities hired previously through *Al-Durra* included those from the Philippines, India, Sri Lanka, and Burkina Faso; *Al-Durra* only recruited domestic workers from countries with which it had a memorandum of understanding (MOU). *Al-Durra* reported in cases where a domestic worker suffered abuse or maltreatment from an employer, the agency filed a complaint against the employer and reported the complaint to the "competent authorities." Kuwait maintained its agreement with the Philippine government to regulate the recruitment and employment of Filipino domestic workers in Kuwait to better safeguard their legal protections. Separately from *Al-Durra*, private recruitment agencies operated in Kuwait, and the government also maintained agreements with several other labor-source

countries specific to domestic worker recruitment. The Commerce Ministry capped employer-paid recruitment fees to agencies to recruit domestic employees at 890 KD ($2,950); a portion of the fee was frequently illegally transferred from the employer to the domestic worker through salary deduction or debt bondage. The government made efforts to reduce the demand for commercial sex acts by continuing to enforce the law that makes prostitution illegal and by carrying out raids on entities allegedly engaged in commercial sex practices. The government provided annual anti-trafficking training for most of its diplomatic personnel, but not all diplomats received training during the reporting period.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit foreign victims in Kuwait. Men and women migrate primarily from Bangladesh, Egypt, India, Pakistan, the Philippines, Sri Lanka, and other countries in South and Southeast Asia and the Middle East to work predominantly in the service, sanitation, construction, transportation, hospitality, and domestic service sectors, with the vast majority arriving voluntarily. Unskilled laborers and female domestic workers are especially vulnerable to forced labor and physical and sexual abuse as they often have limited access to assistance outside their worksite or employer's home. In some cases, limited access to assistance is due to the absence of diplomatic representation in Kuwait, especially for undocumented workers who need consular services. In October 2018, Kuwait and India signed an agreement on broader protections for domestic workers that resulted in the end of India's 2014 ban on Indian female domestic workers working in Kuwait. However, as conditions for many remain perilous, numerous labor-source countries, including Bhutan, Burundi, Burkina Faso, Cameroon, Chad, Cote d'Ivoire, Democratic Republic of the Congo, Djibouti, Ethiopia, Ghana, Guinea, Guinea-Bissau, Indonesia, Kenya, Madagascar, Malawi, Niger, Nigeria, Senegal, Sierra Leone, Tanzania, Togo, Uganda, and Zimbabwe, continue to restrict their female nationals from domestic employment in Kuwait. The Kuwaiti government has continued its recruitment of domestic workers from African labor-source countries, and many workers continue to defy the respective bans by transiting through third countries before arrival in Kuwait.

Upon arrival, some visa sponsors subject migrants to forced labor and, to a much lesser extent, sex trafficking, through the following illegal measures: non-payment of wages, protracted working hours contrary to contractual agreements, deprivation of food, substandard housing, threats or harassment, physical or sexual abuse, and restrictions on movement, such as confinement to the workplace and passport confiscation. Although unlawful under Kuwaiti private sector labor law and the domestic worker law, passport withholding by employers is pervasive in Kuwait and is usually undertaken to prevent a worker from fleeing to another position, exercise control over an employee's conduct, or compel a worker to remain in a job through coercive conditions that may violate contract terms, such as working long hours without rest days or adequate breaks. Furthermore, many migrant workers pay exorbitant fees to recruiting agents in their countries of origin and/or are coerced into paying labor broker fees in Kuwait in contravention of Kuwaiti law stating fees should be paid by the recruitment agency or employer in Kuwait, thereby plausibly rendering workers vulnerable to forced labor, including debt bondage. Visa trading continues to be a common manifestation of trafficking in Kuwait, and illicit visa trading markets increasingly expanded into social media in 2020 and continued during the current reporting period. In 2021, local media reported nursing companies traded residency permits of dozens of nurses without their approval and required the nurses to pay upwards of 4,530 KD ($15,000) to remain in Kuwait. In some cases, officials do not provide workers copies of their contracts, or the contracts are not written in a language they can read. Some illegal labor recruiting companies facilitate trafficking through the use of deceptive techniques to bring in migrant workers on the basis of unenforceable contracts, fraudulent visas, and nonexistent positions. Some officials allegedly take bribes or overtly sell work permits to illegal labor recruiting companies or directly to migrant workers. Civil society groups, press outlets, and members of parliament called for the government to increase its efforts to protect victims and punish traders and their enablers. As in most countries, Cuban nationals working in Kuwait may have been forced to work by the Cuban government.

KYRGYZ REPUBLIC

Kuwait's sponsorship law, which ties a migrant worker's legal residency and valid immigration status to their employer, restricts workers' movements and penalizes them for leaving abusive workplaces. Despite a 2016 reform that allows private sector workers to transfer visa sponsors without employer permission after three years of consecutive service and with three months' notice to the employer, employers and recruiters are also known to illegally charge workers for transferring a visa or residency permit from one sponsor to another. Moreover, workers routinely leave their original sponsors and take other jobs without transferring sponsorship, risking being fined, deported, or blacklisted for falling out of legal residency status, increasing their vulnerability to trafficking. During the reporting period, reports of employers allegedly selling their workers to other employers on social media and online platforms like Instagram, Twitter, Facebook, WhatsApp, and Haraj increased. Domestic workers are particularly vulnerable to forced labor inside private homes. Many workers report experiencing work conditions substantially different from those described in the contract. In addition, sources report domestic workers who flee their abusive employers are sometimes exploited in sex trafficking by recruitment agents or criminals, who utilize the worker's undocumented status to ensure workers will not report illegal activity to authorities. Due to the pandemic, many migrant workers were dismissed from employment and temporarily stranded in Kuwait due to travel restrictions and expensive flights without any means of support, rendering them undocumented and heightening their risk to trafficking. Others faced increased risk of abuse by employers as curfews and lockdowns left them confined to their employer's homes. In the previous reporting period, the government established two separate amnesty campaigns for undocumented workers between March and May 2020 and between December 2020 and February 2021. The first campaign allowed residency violators to return home without paying overstay fines and provided free airline tickets, and the second allowed undocumented workers the opportunity to legalize their stay or leave the country (by paying fines for both options) without being blacklisted in the future if the worker wanted to return to Kuwait. Since March 2020, the government halted the issuance of new work permits of domestic workers, and in January 2021, the MOI announced it would begin issuing new work permits to domestic workers; however, most new work permits were issued only to workers from India, the Philippines, and Sri Lanka. At the close of the reporting period, the government had not yet begun issuing new domestic worker permits to other countries' nationals. The governments' amnesty campaigns, coupled with the limited number of new domestic worker permits being issued and the outflow of documented and undocumented workers due to the pandemic, caused a domestic worker shortage in Kuwait. Between December 2020 and December 2021, the government reported at least 60,000 domestic workers departed the country. Furthermore, due to shortages in the domestic labor market, the last two reporting periods have seen an increase in press reports in which employers physically prevented their domestic workers from leaving the country or transferring to another employer. The use of fraudulently obtained visas and fake work permits remains common. The current reporting period saw more sit-ins and protests by employees who had been subcontracted to work for Kuwaiti ministries or companies than in 2020, but not as many as prior to the pandemic. These employees alleged their wages were withheld for up to several months by contractors and the respective officials and company representatives ignored their grievances.

## KYRGYZ REPUBLIC: TIER 2

The Government of the Kyrgyz Republic (or Kyrgyzstan) does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the Kyrgyz Republic remained on Tier 2. These efforts included identifying more victims than the previous reporting period; updating the criminal code to state that victims should be released from criminal liability from minor crimes committed as trafficking victims; finalizing and adopting standard operating procedures (SOPs) for the

majority of ministries responsible for implementing the national referral mechanism (NRM); continuing efforts to repatriate dozens of vulnerable Kyrgyzstani children from potentially exploitative circumstances in armed conflict zones in Iraq and Syria; and with support from an international organization, developing and conducting anti-trafficking training for police and prosecutors. However, the government did not meet the minimum standards in several key areas. The government decreased investigations and prosecutions and did not secure convictions of any traffickers—including cases that involved complicit officials. Authorities relied heavily on international organizations for victim identification and service provision.



**KYRGYZ REPUBLIC TIER RANKING BY YEAR**

### PRIORITIZED RECOMMENDATIONS:

Respecting due process, investigate and, when sufficient evidence exists, criminally prosecute, convict, and sentence traffickers with adequate prison terms, including complicit government officials. • Increase trafficking-specific training for law enforcement, including in properly charging crimes that meet that trafficking definition—including by contributing to the efforts of international organizations to train police, prosecutors, and judges. • Continue to finalize, approve, train officials on, and implement SOPs for the NRM. • Increase efforts to proactively identify trafficking victims, particularly among such vulnerable groups as individuals in commercial sex; LGBTQI+ individuals; women and girls subjected to traditional forced marriage practices and who are victims of violence; Kyrgyzstani migrant workers (returned and abroad), including their families; and People's Republic of China (PRC) nationals employed at worksites affiliated with the PRC's Belt and Road Initiative (BRI), as well as within increasingly vulnerable internet recruitment channels. • Develop mechanisms to prevent trafficking of returned migrants and families that depend on remittances, including by coordinating with international organizations and civil society. • Ensure foreign victims of trafficking are identified and referred to victims' services. • Continue to collaborate with, and provide financial or in-kind support to, civil society organizations assisting victims. • Implement child-sensitive investigation and prosecution procedures for cases in which children may be human trafficking victims. • Establish and implement a comprehensive anti-trafficking data collection system for use by law enforcement and inter-ministerial coordinating bodies. • Eliminate the imposition of all employee-paid recruitment fees on Kyrgyzstani migrant workers.

### PROSECUTION

The government decreased law enforcement efforts. Articles 166 and 170 of the new criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of three to five years' imprisonment, which were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. During the reporting period, Article 167 on trafficking of children was added to the criminal code, and it prescribed imprisonment for a term of five to eight years. Prosecutors could also charge traffickers using Article 159 for engaging a person in prostitution through the use of force or the threat of force or fraud, which was punishable by a fine or imprisonment of up to five years if the victim was an adult and five to 10 years' imprisonment under aggravating circumstances, including the involvement of children. It had been previously reported that investigators frequently downgraded trafficking crimes to lesser charges to ease investigation and prosecution, which lead to lesser penalties.

During the calendar year, the government initiated investigations of six trafficking cases, including one sex trafficking case and five forced labor cases under Articles 166 and 170—compared with 40 cases in 2020, including 24 sex trafficking cases and 16 forced labor cases, and eight cases in 2019, including one sex trafficking case and seven forced

Haiti AR_000819

labor cases. The government also reported the continuation of seven ongoing investigations from the previous reporting period (two for sex trafficking and five for forced labor). As in prior years, courts continued to investigate trafficking cases under statutes for lesser crimes. The government did not prosecute or secure convictions in any sex trafficking or forced labor cases during the reporting period, compared with three prosecutions and convictions in the previous reporting period. In previous years, some prosecutions initiated under Articles 166 and 170 featured elements that were inconsistent with the definitions of trafficking as established in international law, such as the sale of infants. In June 2021, authorities conducted an operation that investigated saunas in Bishkek and Osh to address sex trafficking; authorities reported that 63 different crimes were uncovered during the enforcement operations but did not indicate if human trafficking was included.

The Kyrgyz Republic's NRM, promulgated in 2019, allowed civil society and international organizations to file criminal complaints on behalf of victims; however, the government did not report if this provision was implemented during the reporting period. In previous years, victim advocates reported a general lack of proactive investigation, particularly of cases in which the victims did not self-report specific complaints. NGO contacts reported that trafficking laws were not equitably enforced and noted that there was no practical mechanism to ensure foreign victims could report trafficking cases to law enforcement. In previous years, civil society continued to report the need for systemic training for law enforcement, prosecutors, and judges, particularly on how to identify victims, work with them as witnesses, and gather evidence beyond victim testimony. According to authorities, inexperienced and poorly trained investigators charged crimes that met the definition of trafficking as lesser crimes in the past. Courts may have improperly dismissed some trafficking cases on the basis of insufficient evidence, including several cases of child sex trafficking. The government, in conjunction with international donors and civil society partners, continued to conduct and participate in training sessions on improving international anti-trafficking cooperation, investigative and prosecutorial best practices, and provision of legal assistance to victims. Authorities did not provide data on the total number of officials participating in these training events, but at least 150 prosecutors and investigators benefited from joint Prosecutor General's Office (PGO) and Ministry of Internal Affairs (MVD) trainings funded by an IO. During the reporting period, the government, with support from an IO, assigned judges to serve as trainers for adjudication and sentencing in mock-trials. In collaboration with an IO, the government conducted training for law enforcement, prosecutors, labor inspectors, and social service providers on the NRM and improving coordination in anti-trafficking efforts. Authorities partnered with an international organization to develop online courses on detection, investigation, prosecution, and adjudication of cases and treatment of victims. The government made revisions to the Criminal Procedure Code to include Article 520 on conducting procedural actions by means of video and Article 521 on the establishment and activities of joint investigative and operational groups, which became effective in December 2021, to facilitate international cooperation on joint investigations regarding transborder crimes.

Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year, with law enforcement officials and judges accepting bribes to drop cases and, at times, warning suspects prior to law enforcement operations in recent years. Media reports noted that stigmatization and a corrupt law and justice system were the main reasons individuals did not seek assistance from or report to authorities. International organization experts have noted widespread impunity and lack of effective prosecution. Traffickers were reportedly also able to avoid punishment by offering victims payment to drop cases in prior years. The PGO reported that some cases initiated in the preceding reporting period were closed during this reporting period because victims did not want to cooperate with law enforcement and the PGO, due to mistrust and fear of repercussions. The judicial system continued to feature widespread corruption; during the previous reporting period, the government began investigating two law enforcement officials for potentially facilitating an unspecified trafficking crime; the MVD reported no progress on the investigations. The government did not report any

prosecutions or convictions of government employees complicit in trafficking crimes.

## PROTECTION

The government increased efforts to protect victims. The government reported identifying five victims during the reporting period—four female victims of sex trafficking and one male victim of forced labor. In addition, an NGO reported identifying, in cooperation with the government, ten orphans who became victims of forced labor; of these, all victims received services from the NGO, and three victims were referred to *Pro bono* legal services. This compared with the government not reporting any victims identified during the previous reporting period. International organizations and NGOs reported identifying 42 victims—seven sex trafficking victims and 35 forced labor victims. International organizations and NGOs reported providing services to 35 victims—eight women and 27 men.

The NRM was adopted in 2019, and it established formal policies on victim identification and referral to care, provision of social services, and protection of victims' personal data, and it did not require victims to participate in a criminal case to receive assistance. It also included provisions that addressed the treatment and proper provision of assistance to children. The government diverted attention and resources to address the pandemic, which contributed to delays in efforts to finalize and implement SOPs for the NRM. Despite these delays, five out of eight ministries responsible for implementing the NRM, the Ombudsman's Office, Border Guard Services, and some local administrations finalized and adopted SOPs during the reporting period, which include victim referral procedures in line with the NRM. According to an IO, victim identification procedures were implemented in accordance with the NRM during the reporting period, such as screening of vulnerable populations, including members of underserved communities. However, civil society reported the NRM lacked specific measures outlining assistance for foreign victims and did not feature language explaining how NGOs could appeal in instances when the government failed to properly identify victims; foreign nationals, such as Tajiks and Uzbeks, were less likely to be identified as victims of forced labor and referred for services. Authorities did not take steps to monitor PRC workers for forced labor indicators that are common at BRI infrastructure and mining projects. The government trained law enforcement officials on the 2019 NRM during the reporting period, but NGOs have ascribed the government's insufficient victim identification to enduring capacity constraints. Absent sufficiently systematized procedures, some police demonstrated ad hoc efforts to screen and refer potential victims identified in enforcement operations, but they did not provide relevant data. The government continued to grant limited financial and in-kind support to two NGO-run crisis centers that provided services for trafficking victims in Bishkek and Osh; the crisis center in Bishkek provided services to two trafficking victims during the reporting period (compared to zero in 2020 and nine in 2019). The government did not have a policy to provide long-term shelter or residency options for foreign victims. Authorities did not report providing any consular or repatriation assistance to Kyrgyzstani victims identified abroad. The government did not report any repatriations of foreign trafficking victims during the reporting period, compared with one foreign victim repatriated in 2019 and 29 in 2018. The government took steps to repatriate 79 highly vulnerable children born to Kyrgyzstani nationals who had traveled alongside relatives to armed conflict zones in Iraq and Syria; however, observers noted authorities at times did not demonstrate sufficient political will to repatriate adult Kyrgyzstani nationals (including ethnic Uzbek Kyrgyzstani nationals), some of whom reportedly experienced conditions indicative of sex trafficking or forced labor, from refugee camps in these and other conflict areas. Kyrgyzstani consular authorities in Russia reportedly identified two potential Kyrgyzstani trafficking victims detained by Russian law enforcement for drug crimes; the potential victims remained in detention at the end of the reporting period.

Victims remained highly vulnerable to pressure from traffickers to withdraw their complaints or settle cases informally; MVD's witness protection unit reported assisting trafficking victims but provided no additional details. Since 2019, investigative judges have had the ability to receive victim testimony outside of court, or electronically over video calls; however, there was no evidence that victims benefitted from this

provision in the last two reporting periods, despite an increase in the use of remote technologies for judicial processes during the pandemic. Government-provided attorneys reportedly lacked knowledge on handling trafficking cases. The government did not maintain or implement child-sensitive procedures for the investigation or prosecution of cases involving child victims. Reports indicate female victims of violence faced multiple barriers to accessing services and justice due to lack of response from authorities, shame, and harmful stereotypes and practices, which were compounded by a lack of shelters and other services. The government reported that individuals convicted of involvement in child sex trafficking were ordered to compensate a victim during the reporting period. A note was added into Article 166 of the criminal code during the reporting period explicitly exempting victims from criminal liability for low-level criminal acts they committed as trafficking victims. Due to a lack of formal identification procedures as part of law enforcement operations on commercial sex establishments, authorities may have detained, arrested, or deported some unidentified victims.

## PREVENTION

The government increased efforts to prevent trafficking. The State Migration Service (SMS), which formerly led the anti-trafficking interagency working group and served as the national prevention coordinating body, was disbanded in February 2021 as part of a government restructuring initiative. In November 2021, the government designated the Ministry of Labor, Social Welfare and Migration (MOL) as the anti-trafficking national coordinating body. However, trafficking experts noted that the MOL lacked capacity to carry out these responsibilities; the MOL hired the former SMS trafficking in persons lead to continue serving in the same role. The MOL finalized the 2022-2025 National Action Plan (NAP) and sent it to the Cabinet of Ministers for review and consideration for adoption, which remained pending by the end of the reporting period. The government reported there were delays in finalizing the NAP due to disruptions between the disbanding of the SMS and designating the MOL as the new anti-trafficking lead. The government received input from international organizations and NGOs while drafting of the NAP. The interagency working group, established in 2019 to bring local state, non-state, and international actors together to accelerate implementation of the NRM and improve law enforcement investigations of trafficking cases, did not report meeting during **the** reporting period. The government cooperated with international organizations and NGOs and continued to conduct awareness campaigns that reached thousands of people throughout the country, including vulnerable youth. In July 2021, the government, in cooperation with civil society and an international organization, launched the annual "100 days against Trafficking in Persons" campaign, which promoted the implementation of the NRM. The government lacked a uniform system of collecting data on its anti- trafficking efforts, which continued to hinder effective self-evaluation. According to a labor union representative, the government continued politically-motivated harassment of labor union activists.

The government, with the support of an IO, continued to operate the Center for Employment of Citizens Abroad, under MOL, that provided an unknown number of individuals with information on employment services, vacancy advertisements, and licensed foreign labor recruitment agencies; it carried out awareness-raising activities on safe migration and legal employment of citizens abroad and offered pre-departure orientation—which included trafficking prevention—for jobseekers. The government maintained a publicly available database of private employment agencies with information on agencies licensed by the government. By law, recruitment agencies could charge a maximum pre-departure fee of 1,000 Kyrgyzstani soms ($12) to Kyrgyzstani migrant workers seeking employment overseas. The government maintained a safe migration and counter-trafficking hotline that received 15,000 calls from January 2021 to January 2022, but it did not report how many calls were related to trafficking, though one call resulted in the identification of a trafficking victim. The hotline is staffed by two operators and one lawyer who provides legal advice to migrants. The government reported conducting 39 labor inspections, including some unannounced inspections; however, officials did not report that these inspections resulting in the identifications of trafficking crimes. NGOs noted the government did not prioritize labor inspections during 2021. The government continued to run, with the support from an IO,

a mobile phone application for Kyrgyzstani migrants with information on workers' rights and contact telephone numbers, including anti-trafficking hotlines and local Kyrgyzstani embassies. The Ministry of Foreign Affairs maintained satellite offices in Russia, which continued to be the primary destination country for Kyrgyzstani labor migrants. During the reporting period, and consistent with previous years, the government worked with international donors to create online awareness materials and hold consultations on the risks of irregular migration for thousands of prospective Kyrgyzstani migrant workers. Unlike the previous year, the government did not report providing anti-trafficking guidance for its diplomatic personnel. The government did not train its nationals deployed abroad on peacekeeping or other similar missions on trafficking. The government did not report making efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the Kyrgyz Republic, and they exploit victims from the Kyrgyz Republic abroad. Adult male labor migrants working abroad are reportedly at the highest risk of trafficking. Kyrgyzstani men, women, and children are exploited in forced labor in Russia and Kazakhstan, and to a lesser extent in Turkey, Ukraine, Georgia and other European countries, as well as within the Kyrgyz Republic—specifically in agriculture, construction, textiles, domestic service, and childcare. As a result of a Russian labor migrant re-entry ban applicable to migrants who allegedly violated Russian laws, currently 76,000 thousand Kyrgyzstani migrants are unable to return legally to Russia for work. Kyrgyzstani families on the Russian blacklist often send their children to work in Russia, where they are vulnerable to trafficking. Fearing this blacklist, some unemployed Kyrgyzstani migrant workers likely remain in Russia under irregular immigration status rather than returning home; traffickers may then be able to leverage threats of deportation as a coercive tool to secure and retain their forced labor or to compel them into sex trafficking. Young men and women from rural areas and poor families, children in the child welfare system, and orphans are at high risk for sex trafficking. As Russia's economic situation continues to deteriorate, Kyrgyzstani migrants in Russia (more than half of whom are women) may be left vulnerable to trafficking, and some may be compelled to return to the Kyrgyz Republic, primarily to the country's poorest regions, or potentially be encouraged to seek job opportunities in other countries, increasing their risk for trafficking. Widespread unemployment and economic hardship among Kyrgyzstani migrant workers in Russia following the pandemic-related closure of businesses and work sites have led to a significant drop in earned income and remittance transfers, leaving these migrant workers and their families in the Kyrgyz Republic more vulnerable to trafficking—the fluctuations in the value of the ruble and the current economic crisis in Russia have continued to exacerbate these vulnerabilities.

Observers noted a pronounced increase in the use of online recruitment channels by trafficking syndicates during the pandemic. International organizations have expressed concern with victims forced to perform sex acts on webcams; webcam workers sometimes become victims of blackmail, rape, and doxing, which puts them at high risk of trafficking. Sex traffickers exploit Kyrgyzstani women and girls abroad, reportedly in India, Kazakhstan, Russia, South Korea, Turkey, the United Arab Emirates (UAE), and within the country. Women and underage teenaged girls from Uzbekistan and Tajikistan may be exploited in sex trafficking; the southern region of the Kyrgyz Republic is increasingly becoming a destination area for Uzbekistani and Tajikistani citizens who are exploited by sex and labor traffickers. Some men and women from Uzbekistan, Tajikistan, and Turkmenistan transit the country as they migrate to Russia, Kazakhstan, the UAE, and Turkey, where they may be exploited in sex and labor trafficking. PRC nationals employed at mining and construction projects under the auspices of the BRI within the Kyrgyz Republic experience conditions indicative of forced labor.

Within the Kyrgyz Republic, the practice of "bride kidnapping" by Kyrgyzstani men continues to place women and girls at risk of forced marriage that may subsequently lead to sex trafficking and forced labor. Cases of violence against women have drastically increased in the Kyrgyz Republic—along with obstacles to accessing justice and services—and may drive victims to seek and accept unsafe employment opportunities,

which can then be exploited by traffickers. Unaccompanied children who engage in begging and children engaged in domestic work—often in the homes of extended family members—are vulnerable to traffickers. Some Kyrgyzstani children are vulnerable to forced labor in agriculture and animal husbandry; NGOs noted that the number of children working in agriculture increased with weak economic conditions due to the pandemic in 2021. Children with disabilities are at high risk of trafficking. Kyrgyzstanis were forced to smuggle drugs, as revealed by an ongoing case in Russia reported by the Kyrgyz government, and according to local NGOs. Some members of the Kyrgyz Republic's LGBTQI+ communities may be more vulnerable to trafficking. Pervasive social stigma and reports of police brutality against LGBTQI+ individuals attempting to report crimes may also dissuade LGBTQI+ trafficking victims from accessing justice. International organizations and NGOs report some Kyrgyzstani men and boys who travel to Syria, Iraq, and Afghanistan to fight alongside or seek employment within armed groups—including some who are recruited with false promises of job offers in Turkey or elsewhere—are subsequently compelled to remain against their will; are subjected to forced labor in cooking, cleaning, and portering, as well as combatant roles; and/or are forced to suffer sexual slavery. Kyrgyzstani women and children traveling with these individuals, at times under deception, are also vulnerable to sex trafficking and forced labor on arrival; some are reportedly placed alongside other Central Asian family members in makeshift camp communities, where their travel and identity documentation is confiscated and their freedom of movement is restricted. Some of these women report having lost their husbands to armed conflict, after which their economic hardships and confinement in the camps make them vulnerable to coercive local marriages that may subsequently lead to sex trafficking or forced labor.

## LAOS: TIER 2

The Government of Laos does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Laos remained on Tier 2. These efforts included investigating and referring to prosecutors significantly more suspected traffickers and training more law enforcement officers on anti-trafficking laws than in 2020; conducting new awareness-raising activities in areas with high trafficking prevalence; increasing victim repatriation among both Lao and foreign nationals; and initiating and implementing new oversight and protection measures within highly vulnerable special economic zones (SEZs). However, the government did not meet the minimum standards in several key areas. Authorities did not evenly apply victim identification and referral procedures when conducting health screenings for the many thousands of Lao migrant workers who returned from abroad during the pandemic or among vulnerable workers at foreign-owned rubber and banana plantations, foreign-invested infrastructure construction sites, or garment factories known for trafficking indicators. Victim protection services were disproportionately unavailable to male victims of trafficking and members of LGBTQI+ communities. Anti-trafficking awareness and capacity among border officials in key transit areas remained low despite ongoing government training initiatives.



**PRIORITIZED RECOMMENDATIONS:**
Continue to increase efforts to disseminate, implement, and train police and border officials on the national victim protection and referral guidelines. • Proactively screen for trafficking indicators among vulnerable groups, including Lao and foreign workers on large infrastructure, mining, and agricultural projects, to include projects affiliated with the People's Republic of China (PRC) Belt and Road Initiative (BRI), as well as Lao communities displaced by these projects; Lao and foreign nationals employed in SEZs; Lao labor migrants returning from work abroad through border crossings; and Lao and foreign women and girls discovered during police raids of nightclubs, karaoke bars, and other establishments that facilitate commercial sex. • Increase efforts to proactively identify and provide protection services to men, boys, and LGBTQI+ victims of forced labor and sex trafficking. • Train members of the central and provincial COVID-19 Task Forces, especially personnel involved in processing returning migrants, on victim identification and referral procedures. • Further train law enforcement officials at the national and local level on the Lao Penal Code to improve their ability to investigate, prosecute, and convict traffickers, including complicit officials, those operating within SEZs, and child sex tourists. • Publicize and adequately staff all available government anti-trafficking hotlines and train staff on victim identification and referral. • Increase trafficking investigations, prosecutions, and convictions. • Further reduce barriers to formal labor migration to reduce the vulnerability of migrant workers, including by eliminating worker-paid recruitment fees. • Continue to strengthen efforts at diplomatic missions overseas to identify and assist Lao victims of sex and labor trafficking.

**PROSECUTION**
The government increased law enforcement efforts. Article 215 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of five to 15 years' imprisonment and a fine of 10 million to 100 million Lao kip ($899 to $8,970); if the crime involved a child victim, the fine range increased to 100 million to 500 million Lao kip ($8,970 to $44,850). These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

The closure of many courts and judicial offices during a series of national pandemic-related lockdowns constrained the government's ability to carry out some investigative and enforcement work in 2021. Despite these obstacles, the Anti-Trafficking Department (ATD) within the Ministry of Public Security investigated 39 potential cases of trafficking involving 77 suspected perpetrators from January to December 2021 (compared with 21 cases involving 43 perpetrators in 2020). Of these 39 cases, police completed the investigation of and referred to the Office of the Supreme People's Prosecutor (OSPP) 25 cases involving an unspecified number of suspected traffickers (compared with 10 cases involving 20 suspected traffickers in 2020). Unlike the previous year, none of these cases appeared to involve fraudulent marriage; authorities did not provide further disaggregated case information on types of trafficking. The OSPP submitted 21 of the 25 cases for prosecution, returned one case to provincial security officials for further investigation, and rejected one case; two cases remained with investigators. Authorities initiated court proceedings in 13 of the cases, seven of which culminated in the conviction of 10 traffickers (compared with 11 traffickers convicted in five cases in 2020); the government did not disaggregate convictions by type of trafficking or provide sentencing data, unlike in 2020.

Authorities noted difficulties conducting investigations at worksites affiliated with the BRI, under which Lao workers remained vulnerable to forced labor in 2021. However, the government took some initial steps to hold potential traffickers accountable in response to public outcry over working conditions in at least one such site. In April 2021, authorities arrested and charged the absconded PRC national owner of a local cement plant for refusing to pay months' worth of contractual wages to hundreds of Lao employees—a common forced labor indicator among BRI employees. Further information on specific charges or the status of his case were unavailable. The government increased oversight of some SEZs and cooperated with foreign governments on removing potential trafficking victims from exploitative conditions therein. Unlike in 2020, and despite ongoing jurisdictional challenges, provincial officials reported initiating an investigation into labor trafficking allegations in the

LAOS

Golden Triangle SEZ in Bokeo in early 2022; however, they did not report whether the investigation was criminal in nature. The government did not report any investigations, prosecutions, or convictions of officials for complicity in trafficking or trafficking-adjacent crimes during the year.

Authorities provided training on anti-trafficking laws to at least 300 police officers in 2021, along with regional workshops on transnational crime and trafficking, in several provinces nationwide (compared with 129 officers trained in 2020). They also maintained Anti-Trafficking Units within provincial and district police departments to coordinate with the ATD, which disseminated National Plan of Action implementation guidelines tailored for provincial- and district-level anti-trafficking law enforcement activities in early 2022. The government continued to cooperate with the PRC, Thailand, Vietnam, and international organizations pursuant to existing bilateral agreements and memoranda of understanding (MOUs) on information sharing, case investigation and prosecution, and victim repatriation. Several provinces and districts maintained and at times updated formal anti-trafficking cooperation agreements with Thai counterparts. However, pandemic-related border closures often impeded Laos' international anti-trafficking law enforcement cooperation; Thai authorities cancelled at least one pending court case involving an alleged Lao victim during the year.

## PROTECTION

The government increased some victim protection efforts, including by taking unprecedented action to work with international partners to remove Lao and foreign nationals from exploitation in sex trafficking and forced labor in jurisdictionally complex SEZs. The government continued to disseminate among officials victim identification and referral guidelines created in consultation with civil society groups in the prior reporting period, and officials continued to identify and refer trafficking victims to protection services in 2021; however, the lack of consistent identification and referral practices throughout the country remained an obstacle to providing sufficient protection services to all victims, particularly amid pandemic-related challenges. The government identified 110 trafficking victims in 2021, including 30 adult women, 62 girls, five adult men, and 13 boys. Unlike in prior years, authorities did not further disaggregate data by type of trafficking; given the government's tendency to include forced and fraudulent marriage cases with victim identification data in past years, this figure likely included forced and/or fraudulent marriage cases that featured corollary sex or labor trafficking indicators. Traffickers exploited the majority of these victims abroad, mostly in the PRC and Thailand. Eighteen of the identified victims were foreign nationals (compared with no foreign nationals identified in 2020). The total marked a slight decrease from 142 victims identified in 2020 (21 victims of sex trafficking, 39 victims of labor trafficking, 66 victims of fraudulent marriage, and 16 victims of other forms of exploitation), likely attributable to the pandemic-related closure of international borders, bars, restaurants, and other entertainment sites known for trafficking vulnerabilities and a downturn in some domestic and joint bilateral law enforcement activities. The central ATD was the sole authority able to formally identify trafficking victims. In practice, provincial police, immigration police, village-level authorities, the government-funded Lao Women's Union (LWU), and NGOs could also screen for and identify victims and refer them to the ATD for formal identification. ATD and other police and border officials—including those stationed near or in at-risk communities, the LWU, and the Ministry of Foreign Affairs (MOFA)—continued to use a victim identification manual created in a prior year in conjunction with an international organization. The government identified numerous cases of forced labor within SEZs after formal victim data collection had concluded; as such, the true number of victims identified was higher than reported. The ATD did not report if it counted or tracked victims who declined official assistance. The government maintained a series of hotlines for incidents of trafficking, domestic abuse, gender-based violence, child protection, and various forms of labor exploitation; these connected more than 4,000 individuals with assistance in 2021, but authorities did not provide disaggregated information on trafficking victims identified or referred through these hotlines (unreported in 2020). All hotlines experienced staffing shortages during the pandemic, and public awareness of their existence remained limited. Officials and

NGO experts noted authorities were less likely to identify men and LGBTQI+ individuals as victims of trafficking.

Government officials continued conducting and participating in victim protection training despite pandemic-related challenges, although some activities were delayed. The Ministry of Labor and Social Welfare (MLSW) reported providing training on child protection, including with anti-trafficking equities, to district- and village-level authorities. The LWU trained at least 318 provincial- and district-level officials in six provinces on victim identification, referral, and other protection-related topics. Ministry of Justice officials held multiple training sessions on legal aid provision for trafficking victims. Officials from health, education, defense, and tourism ministries also conducted provincial- and national-level symposia on victim identification. However, the government continued to demonstrate inconsistent victim identification measures in certain parts of the country and within specific sectors. Citing jurisdictional and public health-related challenges, authorities did not proactively screen for or identify trafficking victims in foreign-owned rubber and banana plantations, garment factories, or foreign-funded infrastructure projects—all locations that presented some indicators of trafficking. Officials reported plans to establish victim screening checkpoints along the recently completed Lao-China Railway by December 2021 but did not provide updates to the process. Authorities did not report conducting raids of establishments facilitating commercial sex in 2021; most of these sites were closed as a public health measure during the pandemic. There were limited media reports of police intervening in unsanctioned social gatherings in violation of lockdown orders and placing some individuals in quarantine centers, but information on potential victim screenings was unavailable. In prior years, central and provincial-level police often failed to proactively screen for trafficking indicators during these raids and therefore may have arrested some adult and child sex trafficking victims for "prostitution" violations. The government's National Task Force for COVID-19—a multi-sector committee led by the Ministry of Health (MOH)—screened all Lao migrants returning to the country through formal border checkpoints and oversaw quarantine centers; however, the task force focused primarily on health examinations for the large volume of returnees and did not consistently screen this vulnerable population for trafficking. The LWU reported some Lao nationals were screened for trafficking indicators when returning through formal checkpoints, including through close coordination between NGO service providers and the ATD. Border officials continued to demonstrate low capacity to detect incidents of trafficking. Authorities trained Lao diplomatic officials to identify victims and report cases to the ATD or MOFA; however, the government did not report if these officials continued to employ victim identification measures during the reporting period. In 2021, the government established a committee to revise the country's primary child rights law, but authorities did not report whether pending changes would include specific anti-trafficking equities.

The government reported directly providing only 15 of 110 victims identified—including eight girls and six boys—with shelter, medical care, education, vocational training, financial assistance, and community reintegration support through the LWU's Counseling and Protection Center for Women and Children (compared with 60 referrals to unspecified LWU services in 2020). This indicated a slight improvement in the referral and protection of male victims, but officials continued to acknowledge male and LGBTQI+ survivors of trafficking faced relative difficulties accessing protection services. Only one adult victim benefitted from government protection services during the reporting period. Observers ascribed the overall decrease in victim referrals to the closure of the government-run shelter for much of the year as a public health measure; quarantine centers provided protection services to trafficking victims among returning migrants during the reporting period, but official statistics were unavailable. The provision of shelter or other protective services was not contingent upon victims' cooperation with law enforcement or testimony in court. LWU officials reported finalizing construction of a new shelter in Luang Namtha—a border area known for high incidence of trafficking via forced and fraudulent marriage—that included designated space for men, women, and transgender survivors; it was not yet fully operational by the end of the reporting period.

The OSPP reported victims could testify behind a curtain to protect their privacy and ensure their safety, and that it was working to expand availability of this service nationwide, but it did not report how many

victims benefitted from the option while testifying against traffickers in 2021. The OSPP reportedly collaborated with an international organization to provide judges and prosecutors with new victim-centered trial guidelines, which were under judicial review at the end of the reporting period. The government reported victims could request civil compensation, including in conjunction with a criminal trial. Despite widespread closures during the pandemic, courts ordered nine defendants to pay 65.5 million Lao kip ($5,880) to 11 victims in 2021 (compared with nine defendants ordered to pay 78 million Lao kip ($7,000) to four victims in 2020). Observers noted a trend in which Thai authorities were increasingly prosecuting forced labor crimes under lesser "labor exploitation" charges, thereby constraining Lao victims' access to compensation in many transnational cases.

Unlike the previous year, in 2021, Lao authorities reported working with international counterparts to repatriate 37 Thai, 12 Vietnamese, and six Russian workers from the Golden Triangle SEZ following allegations of forced labor and sex trafficking; this work continued into 2022, particularly through cooperation with the Thai government. Authorities separately repatriated 14 Vietnamese victims from Vientiane with cooperation from the Vietnamese government. Notably, authorities reported repatriating and providing reintegration services to 220 Lao women and girls whom PRC nationals had subjected to forced or fraudulent marriage—which often included corollary sex trafficking and/or forced labor indicators—in the PRC (unreported in 2020). They also worked with the Governments of Malaysia and Thailand to return at least seven Lao survivors (five victims of forced labor and at least two victims of unspecified trafficking crimes, respectively) but did not provide further information on their cases or status, including whether they received protection services. The LWU and the MLSW were responsible for providing reintegration services for trafficking victims but relied heavily on NGOs to offer such assistance. The government did not report providing legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution.

## PREVENTION

The government increased prevention efforts, including by taking steps to improve oversight of labor recruitment and conditions within highly vulnerable SEZs. The government provided an unspecified amount of funding for anti-trafficking activities on a case-by-case basis, rather than allocating a set budget to each ministry (compared with 300 million Lao kip ($26,910) allocated to each ministry during the previous reporting period). The ministerial-level National Steering Committee on Anti-Human Trafficking and the working-level National Secretariat on Anti-Human Trafficking continued to meet virtually during the pandemic to coordinate Laos' trafficking prevention activities. Government coordination with civil society organizations also continued in 2021 through the multisector Human Trafficking Working Group, which convened virtually to share best practices and maintain partnerships at national and sub-national levels, including as related to challenges and opportunities in anti-trafficking enforcement in the SEZs. In May 2021, the government approved a new national action plan for the 2021-2025 period. The government did not make publicly available its annual progress report on implementation of the action plan.

The government continued to conduct a range of anti-trafficking education and outreach efforts for officials, tourism industry representatives, and local communities through public posters, radio segments, and television, including a nationally broadcast weekly television program on trafficking issues. This also included training sessions targeting migrant workers, communities in areas with foreign agricultural land concessions, and vulnerable border areas with a high prevalence of trafficking via forced and fraudulent marriage in the PRC. MLSW continued to conduct some skills training and job placement services for Lao workers in an effort to discourage returned migrants from illegally seeking employment abroad, but some of this work suffered pandemic-related delays. In 2021, authorities also initiated efforts to train local communities in new agricultural techniques in an attempt to reduce their income dependence on vulnerable foreign-owned banana plantations. Officials reported consulting with civil society groups to establish COVID-19 mitigation strategies in order to continue anti-trafficking training activities during the pandemic.

The formal migration process remained insufficient to prevent exploitation in sex trafficking or forced labor for many Lao migrant workers. However, the government slightly improved its oversight and regulation of labor recruitment in 2021. MLSW continued to oversee 34 recruitment agencies authorized to recruit for jobs abroad, although most of these agencies were closed during the reporting period. These agencies acted as gatekeepers to the formal migration process in Laos, and the law allowed them to charge workers various recruitment fees, some of which continued to contribute to indebtedness that placed Lao workers at risk of trafficking abroad. In early 2022, officials reportedly began consultations with an international organization to reduce recruitment brokerage fees; authorities did not provide further information on the status of this process. The government also opened two new recruitment centers in Bokeo to support legal and regulated employment in the Golden Triangle SEZ. Following forced labor allegations in the SEZ, its leadership released new rules guaranteeing specific labor conditions and other preventative measures in contracts between workers and companies therein; the quasi-governmental Lao Federation of Trade Unions also began negotiating MOUs with the central government to establish labor advocacy representation in all companies employing more than 10 workers within Laos, including in the SEZs. Officials and NGO representatives reportedly worked throughout 2021 to terminate work contracts for SEZ employees who filed formal and informal complaints of labor abuses. No further information on these initiatives was available at the end of the reporting period, and some observers predicted difficulties in implementation; others considered them a significant improvement to legacy shortcomings in oversight measures for the highly vulnerable areas, given the widespread fraudulent recruitment of Lao and foreign nationals into sex and labor trafficking there.

The government maintained bilateral labor agreements with several common destination countries, including the PRC, Cambodia, Japan, South Korea, and Vietnam. Lao authorities renegotiated their bilateral anti-trafficking agreement with the Government of Thailand in 2021 and reported a series of unspecified improvements on prior insufficiencies, but they did not provide further information. The prior agreement outlined a formal labor migration process that was costly to workers, overly complex, and dissuasively time-consuming in a manner that reportedly caused many Lao migrants to opt for irregular and far more vulnerable migratory channels. Once in Thailand, these workers were further vulnerable to passport retention, wage and contract irregularities, physical abuse, and many other forced labor indicators. The MLSW continued to employ a labor attaché in Thailand who could register employment grievances of Lao workers in the country. The labor attaché received training from international organizations and the Government of Thailand before and during his assignment, but authorities did not report if the attaché formally identified any trafficking victims there during the reporting period. Government capacity to register births and issue family books and other civil documents, particularly in remote areas of the country, remained limited and contributed to general trafficking vulnerability. The government began to modernize civil registration systems in 2021 but did not provide updates to this process, which likely suffered delays during the pandemic. The government did not make efforts to reduce the demand for commercial sex, although the enforced closure of entertainment sites as a pandemic mitigation measure significantly impeded the commission of commercial sex acts in 2021.

## TRAFFICKING PROFILE

As reported over the last five years, human traffickers exploit domestic and foreign victims within Laos, and traffickers exploit victims from Laos abroad; traffickers also make use of Lao territory to transport foreign victims to other countries in the region. Laos is primarily a source country for human trafficking. NGOs estimated in 2018 that 13,000 individuals in Laos are in commercial sex in established businesses and are potentially vulnerable to sex trafficking, with as many as three times that figure operating independently throughout the country. Lao farmers growing maize and cassava are reportedly more vulnerable to forced labor through indebtedness to local community leaders. With no oversight by local authorities, foreign and Lao workers at or near foreign-owned or foreign-operated agricultural operations, including banana and rubber plantations; transportation infrastructure construction sites, including those affiliated with the PRC's BRI; and SEZs are extremely vulnerable to forced labor and sex trafficking. Pandemic-related restrictions on freedom

of movement have significantly compounded these vulnerabilities, particularly in remote agricultural areas. A study conducted by an international organization in 2019 reported the presence of women in commercial sex and children in sex trafficking near PRC-financed railway construction sites affiliated with the BRI. Lao communities displaced by frequent natural disasters; foreign-invested mining and construction operations, including those affiliated with the BRI; and foreign agricultural land concessions may be vulnerable to trafficking amid ensuing economic hardships.

Since March 2020, hundreds of thousands of Lao migrants formally and informally working in Thailand and other countries, including Malaysia and the PRC, have returned to Laos, culminating in widespread unemployment within the country and increased economic hardship for families dependent on foreign remittances. These conditions have placed many Lao workers in potentially exploitative situations as they travel domestically within Laos in search of low-salary jobs—including at PRC-managed land concessions and SEZs—or illegally migrate for work abroad, particularly back to Thailand. Police observed that the closure of the Laos-Thailand border created a local demand for commercial sex, which, following the closure of bars and nightclubs as a pandemic mitigation measure, in turn may have led to a spike in sex trafficking in hotels and private residences.

The pandemic-related closure of garment factories in 2021 and a significant downturn in the tourism industry led to widespread disproportionate unemployment among Lao women, who are increasingly vulnerable to predatory recruitment practices as a result. Against this backdrop, SEZ casinos have used social media to lure hundreds of Lao women to work as "chat girls"—online representatives selling casino stock to male customers—with false promises of high salaries, free meals, and free accommodations. Many of these women do not meet the unattainably high sales quotas set by the casino managers and are forced to incur debt to pay the difference, as well as to pay for meals and accommodations; casino managers then leverage this debt to confine them and subject them to forced labor and sex trafficking. Traffickers operating in Laos and Dubai lure young Lao men and women into fraudulent online cryptocurrency sales operations and "resell" those who cannot meet their quotas to other criminal networks for forced labor in similar fraud schemes, domestic servitude, or sex trafficking. Reports indicate child sex tourists from the United Kingdom, Australia, and the United States have traveled to Laos for the purpose of exploiting child sex trafficking victims.

Some Burmese, PRC, Russian, Thai, and Vietnamese nationals are reportedly subjected to sex trafficking in the Golden Triangle SEZ located at the intersection of the Lao, Burmese, and Thai borders, where thousands of undocumented migrant workers are also vulnerable to forced labor in debt-based coercion. Other reports indicate Burmese nationals working as manual laborers or involved in commercial sex near the Lao portion of the Golden Triangle may be victims of trafficking. Lao and foreign nationals, including migrant workers from the PRC, experience conditions indicative of forced labor at PRC-owned mining companies. Traffickers also exploit Vietnamese, PRC national, and Lao women and children in sex trafficking in larger Lao cities and in close proximity to national borders, casinos, and other SEZs, reportedly to meet the demand of international tourists and migrant workers.

Observers report new costs related to COVID-19 testing required by formal labor agreements with key destination countries have catalyzed an increase in the irregular migration of Lao nationals through informal channels known for trafficking vulnerabilities. During pandemic-related border closures, traffickers have deceived some local communities into believing that Laos' international borders had reopened in order to lure them into sex trafficking and forced labor abroad. Traffickers have targeted Lao migrants from the southern part of the country in particular. Some victims migrate with the assistance of legal or illegal brokers charging fees; this is increasingly occurring under the direction of Lao intermediaries working with foreign traffickers. Others move independently through Laos' 27 official border crossings using valid travel documents. Many of these border crossings are managed by provincial- or district-level immigration authorities with less formal training and limited hours of operation, making them easier transit points for traffickers to facilitate the movement of Lao victims into neighboring

countries. Traffickers in rural communities often lure Lao women and girls with false promises of legitimate work opportunities or promises of marriage—typically through the use of marriage brokers—to nationals in neighboring countries, primarily the PRC, and then subject them to sex trafficking, forced labor, and forced concubinage leading to forced childbearing. This trend reportedly increased following completion of the Lao-China Railway but fluctuated during pandemic-related travel restrictions and border closures; traffickers also use other methods to transport Lao victims overland through Thailand en route to the PRC for these purposes. Brokered marriages between rural Lao women and PRC men employed at SEZs known for trafficking vulnerabilities also increased during the pandemic. Children from economically disadvantaged rural areas are especially vulnerable to trafficking, given the legal work age of 14, the widespread closure of schools during the pandemic, and the lure of higher wages abroad. Traffickers exploit a large number of Lao women and girls in Thailand in commercial sex and forced labor in domestic service, factories, or agriculture. According to Thailand-based public health organizations, traffickers take advantage of the undocumented immigration status of some Lao men and boys to subject them to sex trafficking. Traffickers exploit Lao men and boys in forced labor in Thailand's fishing, construction, and agricultural industries. Lao men are also subjected to forced labor on fishing vessels operating in Indonesian territorial waters. Companies operating under the auspices of the Japanese government's "Technical Intern Training Program" have exploited Lao nationals in forced labor in agriculture and several other sectors. Lao women and girls are reportedly vulnerable to forced labor and sex trafficking at "girl bars"—entertainment sites advertising paid "accompaniment" services often involving sex acts with young women and girls—in urban areas in Japan.

## LATVIA: TIER 2

The Government of Latvia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Latvia remained on Tier 2. These efforts included prosecuting more suspected traffickers, identifying and referring more trafficking victims, and approving a new two-year national action plan (NAP). Furthermore, the government introduced a new interviewing methodology to offer a coordinated and effective child protection and criminal justice response and prevent further traumatization during investigations and court proceedings. In addition, the government conducted an examination into the limited number of criminal investigations initiated despite the growing number of labor trafficking cases reported every year. However, the government did not meet the minimum standards in several key areas. Authorities investigated fewer trafficking cases. Officials continued to identify few child trafficking victims even though children in state social care centers, such as orphanages, remained vulnerable to sex trafficking. Moreover, many judges and prosecutors lacked a sufficient understanding of all forms of trafficking and how to apply anti-trafficking laws. The development and implementation of the national referral mechanism (NRM) remained at a standstill.



LATVIA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Investigate, prosecute, and convict traffickers under the trafficking statute (Section 154-1 of the criminal law) rather than for lesser crimes and issue significant sentences. • Proactively identify trafficking victims,

particularly children in social care centers induced into commercial sex and victims of sex trafficking in Latvia's legal commercial sex industry. • Train relevant authorities, such as staff at state social care centers, on understanding trafficking risks and identifying trafficking victims. • Develop and implement an NRM to include guidance on identification, referral, and information exchange among stakeholders. • Expand efforts to educate officials involved in judicial proceedings, particularly prosecutors and judges, to understand all forms of trafficking and apply anti-trafficking laws. • Increase anti-trafficking training for law enforcement, particularly regional police officers, on working with victims, collecting evidence, and understanding all forms of trafficking and psychological coercion. • Increase access to shelters and specialized services for male trafficking victims. • Provide long-term assistance, such as housing, to victims after completion of the state-funded assistance program. • Issue a new mandate for the anti-trafficking working group to continue its work. • Conduct national awareness campaigns on trafficking targeting vulnerable populations.

## PROSECUTION

The government marginally increased law enforcement efforts. Sections 154-1 and 154-2 of Latvia's criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to eight years' imprisonment for offenses involving adult victims and between three and 12 years' imprisonment for offenses involving child victims. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Judges and prosecutors had the power to reclassify cases from Section 154-1 to other crimes. Prosecutors could charge trafficking crimes under Section 164, which criminalized exploiting vulnerability or using deceit to involve individuals in commercial sex, some provisions of which prescribed penalties as lenient as community service or a fine. Additionally, law enforcement officials reportedly were more likely to investigate and charge suspected traffickers for crimes other than trafficking, such as "pimping" and "transfer for sexual exploitation." Authorities used Section 165-1, which prohibited the transfer of individuals for the purpose of sexual exploitation, to prevent potential cases of trafficking by charging perpetrators who attempted to recruit individuals for sexual exploitation schemes abroad.

The State Police's anti-trafficking unit in Riga, comprising 18 officers and specializing in investigating trafficking, brokered marriages, and related crimes, investigated most trafficking cases in the country. Additionally, each of the five regional police boards employed anti-trafficking specialists. In 2021, the unit investigated three new cases (all labor trafficking), compared with seven cases (one sex trafficking and six labor trafficking) under Section 154-1 in 2020. In one investigation, police arrested five suspects for labor trafficking at three NGO-run addiction prevention centers. The NGO forced residents with addiction and mental health conditions into heavy labor in the agricultural and forestry industries without pay and under the guise of "work therapy." The investigation found inadequate living conditions and medical care; as a result, the state closed two of the three centers, with the third still under investigation. Observers noted unlike past trafficking cases, in which law enforcement charged suspects with lesser crimes, authorities opened criminal proceedings related to organized trafficking and money laundering. Due to the rise in labor trafficking cases, the government provided guidelines for authorities to use in identifying such cases, particularly cases combining economic crime and illicit financial flows. In addition, based on a regional project to support stakeholders in combating and disrupting labor trafficking, the government conducted an examination into why authorities initiated a limited number of criminal investigations despite the growing number of labor trafficking cases every year. A specialized prosecution office reviewed, monitored, and managed all Riga District Court trafficking-related cases pertaining to Section 154-1. In the rest of the country, regional prosecution offices investigated and prosecuted trafficking cases. Authorities prosecuted four suspects (all labor trafficking) under Section 154-1, compared with two in 2020, and courts convicted one trafficker for sex trafficking, the same as in 2020. The convicted trafficker received a three-year prison sentence, whereas in 2020 the convicted trafficker received a suspended sentence with no jail time. Under Section 165-1, authorities investigated two new cases, prosecuted one suspect, and convicted four traffickers

(sentences included imprisonment, suspension, reversal, and cancelation due to death). By comparison, in 2020, authorities investigated one new case, prosecuted one suspect, and convicted zero traffickers. In 2021, the anti-trafficking police unit seized approximately €329,749 ($373,870) in assets from suspected traffickers. Latvian authorities cooperated with their European counterparts on several trafficking-related investigations, judicial assistance requests, and one extradition. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

Perennial issues within the judicial system, such as lengthy trials and lenient sentences, which often resulted in no jail time for convicted traffickers, remained the government's greatest deficiency—providing limited deterrence, contributing to the underreporting of trafficking crimes, and undermining defendants' rights to a fair trial within a reasonable time. For instance, the trial for a 2014 case involving two Riga police officers charged with "facilitating pimping" remained ongoing at the end of the reporting period. Similarly, the trial for a 2017 labor trafficking case against seven individuals remained ongoing. Adequate evidence collection remained a problem in investigating and prosecuting trafficking cases; in 2021, authorities terminated five investigations due to a lack of evidence or statute of limitations. Additionally, NGOs reported police outside of Riga had limited motivation to pursue trafficking cases and difficulty identifying victims. NGOs also reported regional police began investigating trafficking-related crimes only after involving Riga's anti-trafficking unit. Observers warned such a passive approach could lead to the re-victimization of victims. Furthermore, reports persisted that police, prosecutors, and judges retained a limited understanding of trafficking. Experts noted the need for more training for authorities, particularly on applying anti-trafficking laws, working with victims, and understanding psychological coercion. The government addressed knowledge gaps by requiring trafficking-specific training for judges and court administration officials and allocating €6,020 ($6,830) from the state budget toward it. The government supported additional educational efforts by providing training for police on the different types of trafficking and recruitment methods and front-line workers on victim identification. Experts noted, though, that a lack of interest in training among law enforcement officials often led to poor attendance at international and local seminars. To enhance law enforcement's response to trafficking and authorities' collaboration with other stakeholders, the government participated in a project with the Governments of Estonia and Finland to strengthen law enforcement's knowledge of and approach to trafficking.

## PROTECTION

The government increased efforts to protect victims. In 2021, the government identified 60 trafficking victims (seven sex trafficking, 53 labor trafficking), an increase from 47 in 2020. Police, immigration, and social services utilized written procedures for identifying victims. Authorities referred victims to the state-funded assistance program based on decisions by either law enforcement or an NGO-led panel of experts. Experts raised concerns that the lack of a centralized referral mechanism hindered coordination among stakeholders and the facilitation of care for all potential victims. Subsequently, in 2020, the prime minister directed the Ministry of Interior (MOI) to develop an NRM to include guidance on identification, referral, and information exchange. As of the end of the reporting period, however, the MOI had not completed drafting the NRM. Identifying child trafficking victims internally remained a challenge; authorities identified zero child victims in 2021 (two in 2020) even though government officials cited children housed in state social care centers, such as orphanages, as vulnerable and reported an increase in recent years in potential sex trafficking cases involving such children. Observers maintained the crime remained underreported and stated further education of staff at state social care centers could lead to increased understanding of trafficking risks and identification of child trafficking victims. In addition, experts reported the need for an improved child protection system to increase the identification of and assistance for child trafficking victims, particularly children with behavioral conditions and children in state social care centers. In 2021, the Ministry of Welfare (MOW) introduced a new interviewing methodology—the "Barnahus" multidisciplinary and interagency model—to respond to witnesses of violence, particularly children, with the goal to offer a coordinated and

effective child protection and criminal justice response and prevent further traumatization during investigations and court proceedings. The MOW planned to introduce the model in all state institutions by 2023. Furthermore, child protection maintained a helpline and website with information about safety measures for child victims of abuse, including trafficking.

The government continued to contract two NGOs to assist victims in the state-funded, NGO-run assistance program, allocating €224,560 ($254,600), compared with €201,000 ($227,890) in 2020. The government allocated additional assistance to the NGOs due to the increased number of identified victims. Starting in 2021, NGOs could spend 20 percent of the allocated funds for administrative expenditures, an increase from 10 percent in previous years. Local governments did not have separate budgetary funds to assist trafficking victims but could provide help to victims within their jurisdictions. The NGO-run assistance program offered victims medical and psychological assistance, legal representation, housing, psychotherapy, and reintegration services. Shelters were available to trafficking victims throughout the country. Following the increased number of male labor trafficking victims who were living with mental health conditions or addictions, NGOs reported the need for a specialized shelter for men. In 2021, the program assisted 55 victims, of which the vast majority were labor trafficking victims, an increase from 44 in 2020. Two of the 55 victims were foreign nationals, a significant change from 31 in 2020; all other victims in the program were Latvian nationals. Experts attributed the significant decrease in the number of foreign national victims identified to an increase in domestic labor trafficking of Latvian citizens. Experts expressed concern about human trafficking in Latvia's legal commercial sex industry and the potential penalization of victims, noting law enforcement's focus on fining potential victims who were not in compliance with regulations or statutes, rather than on identifying victims. NGOs emphasized the need for long-term assistance, such as housing, to vulnerable victims after completion of the program. Government regulations on assistance to trafficking victims limited state-funded services to six months, although victims whose cases went to trial received assistance, mostly legal counseling, for the duration of the legal proceedings. Latvian law allowed foreign victims to receive residence permits and a 30-day reflection period to consider claiming formal status as a trafficking victim. Most victims were open to cooperation with law enforcement. In 2021, 26 victims cooperated with law enforcement. Latvian courts could apply legal provisions, such as closed court hearings, to protect victims and witnesses who agreed to provide testimony. Additionally, courts had digital video capabilities and audio recording equipment to protect victims and witnesses from trafficker-victim confrontation. However, experts reported traffickers continued to intimidate victims, and authorities provided uneven levels of protection during court proceedings. Trafficking victims were eligible to receive restitution from the trafficker in a criminal case, file a civil suit against the trafficker, or receive compensation from the government, but the government deducted any debts owed to the state from compensation amounts. In 2021, 14 victims received compensation (two in 2020) from the State Agency for Judicial Assistance, which administered the victims' compensation program, totaling €29,295 ($33,210). Despite the increased number of victims who received compensation, some experts expressed concerns that access to compensation remained sporadic with a complex application process that often required legal assistance.

## PREVENTION

The government maintained prevention efforts. In 2021, the government approved a new two-year NAP, which included more training for investigators, prosecutors, and labor inspectors. Several ministries published quarterly and annual reports on trafficking, including a study on strengthening the capacity of social workers and the role they play in preventing trafficking. Although the mandate for Latvia's anti-trafficking working group expired in December 2020 and the Cabinet of Ministers did not issue a new mandate, the group, which comprised representatives from the government and civil society, continued to monitor domestic and international developments, facilitate information exchange, and coordinate the government's response. While anti-trafficking activities did not have a single national funding source, each state institution's structure and budget included funding for such activities. In 2021, the MOI secured funding for various international

anti-trafficking projects. In collaboration with other Baltic Sea Region countries, the government participated in a project establishing long-term cooperation between stakeholders and academia to educate future journalists on trafficking issues through workshops, panel discussions, and competitions. Domestically, the government conducted several trainings and informative events to raise public awareness on trafficking issues and maintained public facing websites with trafficking information. However, the government did not conduct any national public awareness campaigns. The government maintained emergency helplines, and in 2021, three calls resulted in investigations of potential trafficking crimes. The State Police participated in an international project aiming to combat sexual exploitation among children by addressing trafficking risks and victim vulnerability. A special police unit focused on preventing child sex tourism and the sexual abuse of children. The government did not make efforts to reduce the demand for commercial sex acts. However, government representatives, legislators, and NGOs examined the issue of liability for consumers of commercial sex, including through legislative changes holding consumers criminally accountable.

In accordance with European Parliament directives, Latvian labor law required employers to regulate working conditions for employees posted abroad. The law also required employers to provide a written contract and minimum wage to employees or face penalties. The State Police monitored job advertisements and responded when employment offers suggested potential trafficking. Legislation prohibited recruitment fees; however, recruitment agencies often imposed legally permissible fees for document preparation. In 2021, the government monitored the activities of licensed employment agencies and canceled 46 licenses for agencies in violation (zero in 2020). With the rise of third country nationals arriving in Latvia for employment in recent years, labor regulations required agencies to provide job-related information to employees in a language they understood. Latvian embassies abroad distributed informative brochures on labor exploitation risks in seven languages.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Latvia, and traffickers exploit victims from Latvia abroad. Traffickers exploit Latvian women and girls in sex trafficking in Latvia and other European countries. However, the government reports a decrease in international trafficking cases involving Latvians in 2021 with only one sex trafficking victim identified in The Netherlands. In contrast, government officials note an increase in domestic labor trafficking of Latvian citizens. Traffickers target marginalized communities, single women with limited education, children from disadvantaged families, students, and unemployed adults by word-of-mouth and through social media. Children in state social care centers, including orphanages, are particularly vulnerable to sex trafficking. Police report a growing number of children recruited for commercial sex from state social care centers and disadvantaged families. However, there have been no documented sex trafficking cases involving children living in state social care centers. Latvian women coerced into brokered marriages in Western Europe are vulnerable to sex trafficking, domestic servitude, and forced labor; the husbands in these brokered marriages are third country nationals from India, Pakistan, and Nepal who use these marriages to obtain EU residency benefits. Government reports indicate a rise in traffickers, especially from Russia, exploiting individuals experiencing mental health conditions, addiction, and homelessness. Guest workers, particularly men, from India, Kyrgyzstan, Pakistan, Tajikistan, Uzbekistan, and Ukraine, most of whom arrive in Latvia legally with Schengen or student visas, and mainly work in the agriculture, construction, food, and forestry industries, are also vulnerable to labor trafficking. The State Labor Inspectorate reports that increasing numbers of illegal workers in the construction and transportation industries, including taxi drivers from Uzbekistan and Tajikistan who receive work contracts from Polish recruitment agencies, are at risk to trafficking. As a result of the Lukashenka regime facilitating illegal migrant flows across the Latvia-Belarus border, hundreds of migrants from the Middle East, Africa, and Asia remain detained near the border and vulnerable to trafficking. Separately, undocumented migrants from Algeria, Pakistan, Russia, and Vietnam, some of whom may be or may become trafficking victims, transit Latvia en route to Western Europe. Foreign nationals and Ukrainian refugees, predominantly women and children, who are

fleeing Russia's full-scale invasion of Ukraine and seeking sanctuary, are highly vulnerable to trafficking.

# LEBANON: TIER 2

The Government of Lebanon does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Lebanon remained on Tier 2. These efforts included implementing changes to reporting processes to prevent automatic penalization of migrant workers leaving abusive employers and adopting a screening tool developed with an international organization to better identify trafficking victims among vulnerable populations, including migrant workers. The government also continued to temporarily waive requirements for employer approval to allow migrant workers to change employers and waived most overstay fines incurred by migrant workers during the pandemic. However, the government did not meet the minimum standards in several key areas. Lebanon had a caretaker government for 13 months, including five months of the reporting period until September 2021, which limited the government's ability to establish effective anti-trafficking policies for part of the reporting period. For the second consecutive year, the government did not report initiating any new prosecutions and did not convict any traffickers. The government did not approve the labor law amendment extending legal protections to all foreign workers that has been pending since 2009 or approve the draft standardized contract for migrant workers for the second consecutive year. Despite adopting a new screening tool, the government did not implement formal victim identification and referral procedures, which resulted in the potential for unidentified victims to face arrest, detention, or deportation for unlawful acts traffickers compelled them to commit. Lebanon's visa sponsorship system continued to create vulnerabilities for the exploitation of migrant workers and remained a significant impediment to authorities identifying and protecting trafficking victims.



LEBANON TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Finalize and implement government-approved procedures for officials to identify trafficking victims among vulnerable populations, such as undocumented or detained migrants, women holding *artiste* visas, domestic workers, and Syrian refugees, for referral to protection services. • Increase efforts to ensure trafficking victims are not arrested, detained, or deported for unlawful acts traffickers compelled them to commit, such as immigration or "prostitution" violations. • Enact the labor law amendment extending legal protections to all foreign workers, including domestic workers and *artiste* visa holders, and approve the draft standardized contract for migrant workers as initially submitted to the State Shura Council in 2020. • Strengthen and expand efforts to reform the visa sponsorship system to ensure all foreign workers, including domestic workers and *artiste* visa holders, are not bound to abusive employers, and allow workers full freedom of movement, including by permanently waiving previous employer approval requirements for workers to change employers. • Increase investigations, prosecutions, and convictions of perpetrators of all forms of trafficking under the anti-trafficking law and investigate for potential trafficking crimes employers and recruitment agents who withhold workers' passports, travel documents, or wages. • Ensure provisions are available to victims for legal alternatives to their removal to countries in which they would face retribution and hardship. • Increase efforts to train judges, prosecutors,

law enforcement officials, and diplomatic personnel on trafficking and application of the anti-trafficking law. • Screen all domestic workers in detention centers for trafficking indicators and refer victims to care. • Take concrete steps to improve oversight of *artiste* visas, a program that contributes to the vulnerability of women to sex trafficking. • Ensure the judiciary coordinates with the Directorate of General Security (DGS) to consistently apply the anti-trafficking law by granting temporary residency permits for trafficking victims and allowing victims to work. • Continue to work in partnership with NGOs to screen for, identify, and provide protection services, including witness support during criminal proceedings, for all victims. • Increase efforts to raise public awareness of trafficking, including exploitation of migrant domestic workers. • Formally establish the victim assistance fund. • Adopt and implement the national anti-trafficking action plan (NAP). • Improve the judiciary's capacity to collect, compile, and track data and outcomes of trafficking cases from all courts.

## PROSECUTION

The government decreased overall law enforcement efforts. The 2011 anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed penalties of five to seven years' imprisonment and fines if the offense involved an adult victim and 10 to 12 years' imprisonment and fines for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The pandemic, compounded by ongoing financial, economic, and political crises, continued to affect law enforcement's ability to investigate trafficking cases and compile data. Due to the ongoing economic and financial crisis, the Ministry of Interior (MOI), Ministry of Justice (MOJ), and other law enforcement agencies reduced their workforce to only come to work one or two days per week, limiting the government's ability to respond to information requests. In addition, the MOJ did not have a centralized data collection system, impeding the government's ability to report data on prosecutions and convictions. As a pandemic mitigation measure, law enforcement worked on a rotational basis, reducing the normal number of officers on duty, and most offices did not have basic supplies including electricity or fuel for vehicles or generators. Despite the relaxation of some pandemic mitigation measures, courts only partially re-opened with reduced hours of operation. In addition, strikes closed the courts from May to September 2021, and an ongoing public sector labor curtailment resulted in most government offices only being open once a week. In 2021, the Internal Security Forces (ISF) investigated 21 potential sex trafficking cases. Additionally, DGS investigated 102 cases of suspected trafficking involving migrant domestic workers and adult nightclub workers holding *artiste* visas. DGS reported it determined 35 of the 102 cases met the criteria for trafficking cases; 32 cases involved labor exploitation, and three cases involved sexual exploitation. The 123 total investigations in 2021 represented a significant decrease from 218 initiated in 2020. For the second consecutive year, the government did not report any new prosecutions or convictions. The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes. In a notable February 2022 case, prosecutors, for the first time, brought criminal charges of slavery and forced labor against the former employer and recruitment agency of a migrant domestic worker; the case was ongoing at the end of the reporting period. Separately, the MOI investigated a Lebanese national employed by the Kenyan consulate for allegedly further exploiting potential trafficking victims in forced labor who had come to the consulate for assistance; the government did not report the status of the case at the end of the reporting period.

Due to courts' reduced capacity, all but emergency trials were suspended, and the government prioritized completing investigations that would allow the release of pre-trial detainees to reduce overcrowding in prisons. The ISF anti-trafficking unit remained understaffed and underfunded, with only 22 officers covering all of Lebanon, and no field offices outside of Beirut; this continued to limit the ISF's work. Additionally, government officials and NGOs continued to report some judges lacked understanding of the anti-trafficking law and knowledge of best practices for handling trafficking cases. Officials generally sought to resolve trafficking cases involving foreign workers through mediation between the employer and worker, rather than referring them for criminal prosecution. Government

officials continued to report security forces were reluctant to arrest parents for subjecting their children to trafficking, usually in forced begging, due to a lack of social services available should the child be removed from the family. The ISF, DGS, and MOJ occasionally included specialized anti-trafficking training as a part of their curriculum for personnel. The government also continued to encourage officials to participate in anti-trafficking trainings provided by NGOs but did not report providing financial or in-kind support to those trainings.

## PROTECTION

The government maintained inadequate victim identification and protection efforts, and the government remained dependent on NGOs to provide most victim services. The government did not formally adopt procedures drafted in 2014 for the identification and referral of victims to NGO services. In practice, officials continued to identify and refer trafficking victims to care on an ad hoc basis. During the reporting period, the government coordinated with an international organization to draft new standard operating procedures (SOPs) for victim identification, but the government did not finalize nor implement the SOPs by the end of the reporting period. The Ministry of Social Affairs (MOSA) continued to work with an international organization to develop a digital tool to better identify trafficking victims among vulnerable populations, including migrant workers; at the end of the reporting period, MOSA adopted the tool, but it had not yet been digitized and fully operationalized. The government identified at least 70 sex and labor trafficking victims through the course of investigations and referred all of them to NGO protection services in 2021. The number of victims identified and referred to services in 2021 represented a decrease from the 156 victims the government identified in 2020 but an increase from 63 identified victims in 2019. During the reporting period, an NGO reported identifying at least 163 trafficking victims. The government did not report whether a DGS-operated hotline remained operational during the reporting period. The Ministry of Labor's (MOL) complaints office and 24-hour hotline received 250 trafficking-related complaints; the government reported resolving the majority of these complaints but did not report further details. An NGO identified 26 victims through calls to the hotline it operated.

The government did not directly provide protection services to trafficking victims, nor funding for services for adult victims, but it continued to work in partnership with NGOs to provide essential victim services. NGO-run victim care facilities in Lebanon were dedicated only to female and child trafficking victims; there were no services available or government resources dedicated to male trafficking victims, even though forced labor of men in construction reportedly continued. As in previous reporting periods, an NGO reported referring male victims to their embassy or consulate for accommodation. The government and an NGO renewed a longstanding memorandum of understanding whereby DGS referred female victims to an NGO-run safe house and provided security for the location; the government did not allow victims to work while receiving assistance at the safe house. In response to pandemic-related mitigation measures, the NGO continued to provide single-occupant rooms for quarantine purposes. During the reporting period, the safe house assisted 183 trafficking victims. Victim services were not time-limited or conditional upon victims' cooperation with law enforcement. MOSA also continued to coordinate and fund the provision of protection services to child trafficking victims through contractual agreements with NGOs. Foreign embassies that provided shelter to nationals when NGO shelters were full reported providing accommodation to an increased number of their nationals, including domestic servitude victims, due to the economic crisis. For the third consecutive year, MOSA coordinated with an international organization to provide technical support for the development of an implementation decree to create a victim assistance fund; the decree remained in draft form at the end of the reporting period.

The government continued to arrest, detain, and deport unidentified victims for unlawful acts traffickers compelled them to commit, such as domestic workers who fled abusive employers, out-of-status or undocumented migrant workers, women holding *artiste* visas, and persons in commercial sex. NGOs reported some foreign victims, including migrant domestic workers, sometimes refused to file complaints or retracted testimony due to fear of reprisal or deportation. Under the

visa sponsorship system, foreign workers—including foreign trafficking victims who left their place of employment without permission from their employer—forfeited their legal status, thereby increasing the risk of arrest, detention, and deportation. DGS continued using new administrative procedures adopted in February 2021 for employers to inform DGS about domestic workers who have left the workplace; the new procedures replaced previously used employer complaint systems that automatically launched prosecutions of migrant workers who left their workplace. In addition, the new procedures prohibited the use of certain language in official reports, such as language implying domestic workers violated employment conditions like "fled" or "ran away," replacing them with the phrasing "left the workplace." Authorities could subject foreign workers without valid residence and work permits to detention for one to two months—or longer in some instances—followed by deportation; due to the pandemic, authorities did not exercise this authority during the reporting period. Furthermore, authorities could immediately deport women holding *artiste* visas upon arrest for "prostitution" violations; however, DGS reported it did not deport any *artiste* visa holders during the reporting period and no *artiste* visas were issued in 2021 due to the ongoing pandemic, economic, and financial crises.

DGS continued to operate a 750-person detention center where authorities detained foreign domestic workers for violating the terms of their work contracts or visas. As in past years, DGS allowed an NGO to operate a permanent office inside the detention center with unhindered access to detainees to provide medical and psycho-social services. However, due to a decrease in government funding to the NGO over the past three reporting periods, the NGO was unable to continue providing health services to detainees—including trafficking victims—and was only able to provide social and legal services. DGS also continued to permit the NGO to interview detainees to identify trafficking victims among the detention center population, although interviews were limited due to pandemic-related mitigation measures; NGOs identified 130 trafficking victims in the detention center during the reporting period, compared with 16 victims the NGO identified in 2020. In response to the pandemic, DGS announced only detainees with pending judicial action would be held at the detention center and other detainees would be released with the option of temporary residency or repatriation assistance. DGS reported that as of September 2020, DGS had released and repatriated 600 of the 700 detainees who had been at the center at the start of the reporting period. The NGO continued to report high levels of professionalism, sensitivity, and awareness among DGS officials and investigators, which allowed the NGO to more effectively identify victims among detainees.

Victims could file civil suits to obtain compensation; however, the government did not report whether courts awarded compensation to victims through civil suits during the reporting period. Investigative judges could exclude the identity of a victim from official reports if there was a concern that providing information about the crime could result in a threat to the life or safety of the victim or their family. In addition, victims could provide testimony via video or written statement. The government did not report whether any of these safeguards were invoked or provided during the reporting period. Judges could allow foreign victims to reside in Lebanon during the investigation, but the government did not report any judges issued such a decision. NGOs continued to report foreign victims preferred quick administrative settlements followed by repatriation rather than long criminal prosecutions because of the lack of protection services or resettlement options during criminal proceedings. An international organization reported pandemic-related lockdowns and airport closures further encouraged victims to return home rather than remain in Lebanon under severe lockdown measures and poor economic conditions. Therefore, authorities faced challenges pursuing potential cases of trafficking when victims chose voluntary repatriation, as they were not present in the country to testify against their traffickers. The government did not provide temporary or permanent residency status or other relief from deportation for foreign trafficking victims who faced retribution or hardship in the countries to which they would be deported. During the reporting period, an NGO reported Lebanese authorities deported or otherwise created coercive environments that pushed Syrian refugees to return to Syria without assessing protection needs; the Government of Syria had a government policy or pattern of human trafficking, exploiting its nationals in forced labor in compulsory

military service by forcing them to serve for indefinite or otherwise arbitrary periods and recruiting or using child soldiers.

## PREVENTION

The government maintained weak efforts to prevent trafficking. The national anti-trafficking commission under the National Human Rights Committee continued to coordinate anti-trafficking efforts during the reporting period. The government did not adopt its 2013 draft NAP, but relevant ministries continued to implement portions of the plan. During the reporting period, MOSA worked with an international organization to develop a plan to protect vulnerable migrants; the plan was pending finalization at the end of the reporting period. The government did not report conducting any public awareness campaigns during the reporting period. DGS and the MOL continued to operate hotlines to receive reports of abuse and migrant worker complaints, including suspected trafficking crimes. The MOL hotline received 250 trafficking-related calls, but the government did not report how many calls the DGS hotline received during the reporting period. The government did not report whether the government identified any victims or initiated any investigations as a result of these calls. DGS continued a program to inform *artiste* visa holders about restrictions and obligations of their visa status upon arrival to Beirut Rafik Hariri International Airport. Under the program, if the visa holder objected to the visa's terms, they were free to return to their home country. DGS reported that no *artiste* visas were issued during the reporting period. Under a directive from DGS, airport officers continued to return passports directly to foreign domestic workers upon their arrival in Lebanon, but NGOs reported that many employers ultimately confiscated workers' passports in private. The government did not have a law that prohibited or penalized confiscation of workers' passports or travel documents by employers or labor agents.

Lebanon's labor law excluded migrant domestic workers, denying them protections such as a minimum wage, limits on working hours, and other labor protections. In September 2020, the caretaker Minister of Labor attempted to introduce an amendment to the draft labor law extending legal protections to foreign workers, including domestic workers; however, the State Shura Council determined a minister in caretaker status could not submit an amendment to a law, and the draft labor law remained pending at the end of the reporting period. The standardized work contract for migrant domestic workers drafted by a joint government and international organization working group to reform the visa sponsorship system and approved by the caretaker Minister of Labor during the previous reporting period remained suspended at the end of the reporting period. An NGO reported the MOL circulated, in February 2022, a new draft standardized contract that failed to meet basic international labor standards; the MOL denied issuing such a draft. Because many domestic workers became unemployed due to the economic crisis in Lebanon, DGS for the second consecutive year waived requirements for notarized employer approval for workers to change employers; the government did not report for how long these requirements would be waived. DGS also continued a program begun in March 2020 to waive most overstay fines and provided plane tickets for an unspecified number of migrant workers, including potential trafficking victims; although the program still required out-of-status migrants to pay one year's worth of fees—between 300,000 and 400,000 lira ($200-$270)—DGS waived all fees when NGOs or foreign embassies requested. A 2015 ministerial decree prohibited recruitment agencies from requesting or receiving any worker-paid recruitment fees, but the government acknowledged numerous unregistered recruitment agencies operated illegally and may have charged migrant workers recruitment fees. In 2021, the MOL closed three recruitment agencies for labor violations or complaints of mistreating migrant domestic workers. The MOL also maintained a list of an unknown number of recruitment agencies that had committed fraudulent recruitment practices; however, owners of blacklisted recruitment agencies reportedly opened new agencies registered under the names of new partners. The government, however, did not report prosecuting any recruitment or employment agencies for potential trafficking crimes during the reporting period. The government did not take steps to reduce the demand for commercial sex acts or address child sex tourism by Lebanese nationals abroad. The government did not provide anti-trafficking training for its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Lebanon, and traffickers exploit victims from Lebanon abroad. Women and girls from South and Southeast Asia and an increasing number from East and West Africa are subjected to domestic servitude in Lebanon. According to an international organization, 250,000 migrant domestic workers were in Lebanon in 2019. Lebanese government officials and NGOs report most employers withhold their domestic workers' passports and some employers also withhold workers' wages, force them to work excessive hours without rest days, restrict their freedom of movement, and physically or sexually abuse them. NGOs report that such abuse of domestic workers is typically underreported. Many migrant workers arrive in Lebanon through legal employment agencies but are subsequently exploited or abused by their employers, and some employment agencies recruit workers through fraudulent or false job offers. The prolonged economic crisis exacerbated by the pandemic prompted approximately 30,000 migrant workers to leave Lebanon in 2020. The government issued 23,036 visas for migrant workers in 2021, compared to 9,409 in 2020, and 33,075 in 2019. NGOs reported employers continued dropping domestic workers off at their embassies during the reporting period because they were unable to continue paying salaries, and an international organization reported renewals of migrant domestic worker contracts decreased from 151,121 in 2019 to 109,672 in 2020. There continued to be an increase in cases of victims exploited by nationals of their own country of origin, particularly among migrant workers. Traffickers among the same nationality coerce migrant workers who have been fired or abandoned by their Lebanese employer into domestic servitude or sex trafficking. NGOs reported demand for domestic workers already in Lebanon continued during the reporting period due to pandemic-related travel restrictions and the economic crisis. NGOs reported the combined impact of the economic and financial crises and pandemic restrictions increased vulnerability of Lebanese nationals to trafficking. NGOs and international organizations reported an increase in exploitation of Lebanese adults by Lebanese nationals—particularly in industries such as custodial services—and similar to migrant workers previously filling the same jobs; these Lebanese workers were subjected to abuses, such as nonpayment of wages, poor working conditions, and excessive hours.

Women, primarily from Russia, Ukraine, Belarus, Moldova, Morocco, and Tunisia, legally enter Lebanon to work as dancers in nightclubs through Lebanon's *artiste* visa program. An *artiste* visa is valid for three months and can be renewed once. The terms of the *artiste* visa prohibit foreign women working in these nightclubs to leave the hotel where they reside, except to work in the nightclubs that sponsor them, and nightclub owners withhold the women's passports and wages and control their movement. Traffickers also exploit these women through physical and sexual abuse and domestic servitude. The government and NGOs reported the number of migrant domestic workers and *artiste* visa holders entering Lebanon was significantly lower in 2021; the government reported no *artiste* visa holders entered Lebanon in 2021, compared with 774 in 2020 and 3,376 in 2019. The government reported 29 out of 42 adult nightclubs closed permanently due to the economic crisis and pandemic-related shutdowns, after which *artiste* visa holders either returned to their home countries or stayed in Lebanon if they found work at a different nightclub.

Adults and children among the estimated more than 1.5 million Syrian refugees in Lebanon are at high risk of sex trafficking and forced labor. Restrictions on Syrians' ability to work legally in Lebanon and the enforcement of visa and residence permit laws increase this population's vulnerability to trafficking. Syrians are commonly involved in the exploitation of other Syrians in Lebanon, particularly targeting refugees fleeing the conflict. For example, Syrian traffickers hold Syrian refugee adults and children in bonded labor to pay for food, shelter, and transit to Lebanon, and they contract out groups of refugees to work in the agricultural sector in the Bekaa Valley. Similarly, an international organization reports evidence of bonded labor within refugee communities, where child labor is used in exchange for living in informal tented settlements. Child labor and forced child labor among the Syrian refugee population continues to increase, particularly in agriculture, construction, and street vending and begging. These children are at high risk for labor trafficking, especially on the streets of main

LESOTHO

urban areas such as Beirut and Tripoli, as well as in the agricultural sectors of Bekaa and Akkar. For example, in 2019, international organizations reported the presence of children working in illegal cannabis farms in the Bekaa. NGOs report that some Syrian refugee children are forced or coerced to conduct criminal activity. Syrian refugee LGBTQI+ persons, women, girls, and some men are highly vulnerable to sex trafficking. Many women and girls who were recruited from Syria with false promises of work were subjected to commercial sexual exploitation in which they experienced mental, physical, and sexual abuse and forced abortions. Family members or powerful local families forced some Syrian refugee women and girls into commercial sex acts or early marriage to ease economic hardships; these women and girls are highly vulnerable to trafficking. Lebanese nationals fleeing the economic crisis reportedly joined Syrian refugees to migrate irregularly from north Lebanon to Cyprus and Turkey, and an international organization reported organized trafficking networks fraudulently offered Lebanese nationals false or misleading job opportunities. Syrians and Lebanese nationals traveling through these channels are vulnerable to sex trafficking in Turkey.

## LESOTHO: TIER 2

The Government of the Kingdom of Lesotho does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Lesotho was upgraded to Tier 2. These efforts included identifying more trafficking victims and increasing investigations and prosecutions. The government launched its national action plan and allocated funding for implementation; finalized and implemented guidelines for victim identification and referral to care; and increased its anti-trafficking training and awareness-raising efforts for law enforcement, diplomats, and the public. However, the government did not meet the minimum standards in several key areas. Several investigations and prosecutions from the previous reporting period, including cases of alleged official complicity, were still pending. The government did not amend existing laws that created jurisdictional issues that prevent magistrate courts from issuing the maximum penalty for trafficking crimes. The government continued to rely on one NGO to provide all services to trafficking victims in the country with nascent government funding, and shelter options remained limited.



LESOTHO TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers, including officials complicit in trafficking crimes, and impose sufficiently stringent penalties. • Amend the Subordinate Court Act to fix jurisdictional issues preventing magistrate courts from issuing the maximum penalty for trafficking crimes. • Adequately fund the Anti-Trafficking and Migrant Control Unit and establish focal points with training on human trafficking investigations for all 10 districts of Lesotho to ensure effective responsiveness to all potential trafficking cases. • Institutionalize specialized trafficking in persons training to police investigators, prosecutors, magistrates, judges, immigration officials, social service personnel, and health care professionals. • Fully fund the Victim of Trafficking Trust Fund, establish reporting requirements for transparency, and ensure appropriate allocations for victim protection, including shelter. • Establish a confidential human trafficking hotline for victims to access referrals to services and to facilitate reports of human trafficking, including official complicity. • Increase joint

operations between law enforcement and labor inspectors to increase identification of victims of forced labor, particularly in manufacturing and agriculture sectors, and facilitate effective criminal investigations against traffickers. • Institutionalize and consistently enforce strong regulations and oversight of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable. • Formalize cross border collaboration with regional governments through developing effective professional relationships with judiciaries and law enforcement agencies to increase information sharing and coordination on transnational trafficking investigations. • Systematically collect and analyze anti-trafficking law enforcement and victim protection data.

### PROSECUTION

The government increased anti-trafficking law enforcement efforts, although serious allegations of official complicity in trafficking remained significant. The 2011 Anti-Trafficking in Persons Act, as amended, criminalized labor trafficking and sex trafficking. The law prescribed penalties of up to 25 years' imprisonment for the trafficking of adults and up to life imprisonment for the trafficking of children. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape.

The government initiated 10 investigations into potential human trafficking—five for labor trafficking and five for unspecified exploitation—and continued three investigations from previous reporting periods, compared with four investigations initiated during the previous reporting period. The government prosecuted 16 trafficking cases, compared with four previously, and convicted one trafficker, which is the same as the previous reporting period. Of the 16 prosecutions, six cases involved forced labor, and 10 cases involved sex trafficking, all of which involved Basotho victims. The government convicted and sentenced one trafficker to 10 years in prison and a fine for forced labor; however, the sentence was suspended on the condition that the trafficker return to their home country within two months of release. The government appealed the suspended sentence; however, the appeal did not proceed since the trafficker returned to their home country. In 2020, South African officials deported a Nigerian victim of labor trafficking exploited in Lesotho. The trafficker was permitted to continue operating his business in Lesotho for two years with impunity; however, during the reporting period, the government opened an investigation and arrested the trafficker, who was released on bail. The case remained ongoing at the end of the reporting period.

For the seventh consecutive year, the government did not address a jurisdictional issue impeding efforts to hold traffickers accountable, although officials drafted and submitted to parliament an amendment to the Subordinate Court Act, which would address the issue, but it remained pending approval at the end of the reporting period. The magistrate courts, which are the court of first instance for trafficking cases, lacked authority to impose the maximum penalties allowed in trafficking crimes. For a majority of the reporting period, courts adopted an abbreviated schedule due to pandemic-related public health restrictions; however, they continued to hear cases and introduced online hearings to continue deliberations without physical attendance at court houses. Additionally, due to a shortage of magistrates and a large backlog of criminal cases, only three magistrates were assigned to hear trafficking cases. However, 10 magistrates received training during the reporting period to hear trafficking cases in their respective jurisdictions. The government appointed seven high court judges to ameliorate the backlog of criminal cases.

The Lesotho Mounted Police Service's (LMPS) Anti-Trafficking and Migrant Control (ATMC) Unit was responsible for all trafficking-related investigations. The ATMC Unit added four new specialized trafficking in persons focal points, comprised of three to four investigators, in Butha-Buthe, Leribe, Mafeteng, and Mohale's Hoek, in addition to one already established in Maseru. The ATMC focal points received some logistical and administrative support from LMPS; however, they lacked a dedicated budget. Members of each focal point received basic training on trafficking in persons but lacked specialized training on victim identification, trauma-informed interviewing, and investigating human

Haiti AR_000831

trafficking. The ATMC Unit held monthly meetings with the Office of the Director of Public Prosecutions (DPP) to conduct joint case reviews and facilitate prosecution-led investigations. The LMPS, Ministry of Labor and Employment (MOLE), and Ministry of Home Affairs (MHA) with support from an international organization, formed a joint task force to conduct joint inspections targeting forced labor; the task force identified several cases involving potential foreign national victims. The LMPS developed relationships and informal platforms to enable coordination between LMPS and the South African Police Service to expedite investigations and prosecutions; however, LMPS reported difficulty engaging with their South African counterparts due to strict border restrictions and corruption. Lesotho and South African governments collaborated on the ongoing prosecution of two trafficking cases involving Basotho victims in South Africa.

Corruption and official complicity in trafficking crimes remained significant concerns. Two investigations into officials allegedly complicit in trafficking-related offenses, initiated in the previous reporting period, remained ongoing. In one case, a senior government official allegedly assisted third-country nationals with illegal entry into South Africa via Lesotho by circumventing South African entrance requirements. The case was investigated as a trafficking crime, but elements of human trafficking could not be established to prosecute under the human trafficking law. The official was placed on administrative leave pending the outcome of the investigation. The LMPS also initiated an investigation into the potential trafficking of a child transported to South Africa under the promise of employment with implications of official complicity. The government implemented a rotational system for immigration officials to deter participation in illicit activities, including human trafficking. In an effort to enforce accountability, observers reported law enforcement required training on appropriate conduct and mechanisms to ensure victims are treated respectfully during investigations.

## PROTECTION

The government increased victim identification and protection efforts. The government identified 24 trafficking victims, including 10 labor trafficking victims and 14 sex trafficking victims, compared with two victims during the previous reporting period. The government referred all identified victims to care. The government finalized, with support from an international organization, and launched its standard operating procedures (SOPs) for victim identification and national referral mechanism (NRM) and began implementation. The government appointed a Trafficking in Persons Coordinator to supervise district social workers handling trafficking cases and train social workers on human trafficking. NGOs and international organizations identified 60 potential victims of trafficking through transit monitoring at airports and border crossings.

An NGO had a memorandum of understanding (MOU) with the government to provide emergency shelter to both foreign and Basotho female and child victims of trafficking, sexual assault, and domestic violence, as well as their dependent children. The NGO provided medical care, counseling, job skills training, and legal assistance. For the first time in several years, the government paid for the shelter's utilities, totaling 50,000 maloti ($3,150) during the reporting period, and contributed 32,500 maloti ($2,050) to cover legal fees, counseling, school fees, and other expenses. Additionally, the government paid for security and medical care for victims. However, the shelter requires significant external funding to maintain operation. While trafficking victims had a choice to enter the NGO shelter, it was the only residential assistance available. At the shelter, victims had freedom of movement and could terminate their residency at will. The NGO provided supportive services to male trafficking victims; however, there were no shelters equipped to house male victims. The government donated a building in Maseru to an NGO for additional shelter space once renovations are completed. Observers expressed a need for shelters countrywide since victims of human trafficking are identified in all districts. NGOs and international organizations provided care to 55 trafficking victims, including six sex trafficking victims, 32 labor trafficking victims, and 17 victims of unspecified exploitation. The government facilitated virtual court proceedings in cases where victims experienced fear or intimidation by the accused trafficker. The government provided trafficking victims with legal representation at no cost. Observers reported the need for

additional training for law enforcement and frontline workers on the SOPs for victim identification and the NRM and to increase accessibility by translating both into other languages.

For the first time, the government allocated funding for efforts to combat trafficking in persons through a dedicated bank account, which was created instead of the required Victim of Trafficking Trust Fund, as stipulated under the anti-trafficking law, for reasons of expediency. The bank account included no reporting mechanism to ensure accountability. The MHA approved 500,000 maloti ($31,480) for the reporting period and 2 million maloti ($125,930) for the following year; however, funding allocations were not provided. While Lesotho law provided restitution in trafficking cases, no judges ordered it during the reporting period. The anti-trafficking act and its implementing regulations prohibited the prosecution of victims for unlawful acts traffickers compelled them to commit, allowed foreign victims to elect permanent residency as a legal alternative to their removal, and encouraged victims to assist in the investigation of traffickers. For foreign victims, provision of care beyond a 60-day reflection period was dependent on their cooperation with law enforcement; authorities repatriated victims who did not cooperate with law enforcement after the reflection period. The Ministry of Foreign Affairs (MFA) was responsible for coordinating with the victim's home country for the issuance of travel documents within 60 days of victim identification if the victim no longer had possession of their travel documents. If a foreign national victim cooperated with law enforcement, they could remain in Lesotho for the duration of the criminal case; however, barring safety concerns or qualifications of other immigration benefits, the victim had to return to their home country following the conclusion of any criminal proceedings. For citizens of Lesotho exploited abroad, the government facilitated repatriation and coordination of services for two Basotho victims identified abroad in collaboration with the local government.

## PREVENTION

The government increased anti-trafficking prevention efforts. The Prime Minister's cabinet subcommittee to combat trafficking in persons convened regularly—setting the agenda for the government's anti-trafficking efforts—and launched the National Strategic Framework and Action Plan (NFSAP) to Combat Trafficking in Persons for 2021-2026, with assistance from international partners. The NSFAP provided a roadmap for anti-trafficking efforts that delineated responsibilities among government ministries and included dedicated resources for implementation. The government's multi-sectoral committee (MSC), led by MHA and charged with implementing the government's anti-trafficking efforts, met regularly in Maseru and held additional meetings across the country with support from an international organization. The government partnered with an international organization through a donor-funded program to update and launch the MSCs' SOPs for victim identification. Training was conducted by an international organization on the NRM and SOPs to 160 government and NGO participants, including at least 20 government officials from each district representing the Ministry of Social Development, LMPS, Magistrates, the Crown Counsel, the Ministry of Education, the Ministry of Health, and the District Administrators Office. The MFA, with support from an international organization, conducted pre-departure training on trafficking in persons for all diplomats and launched a trafficking in persons handbook for diplomats. The MFA also appointed focal points based in all 20 of Lesotho's foreign missions and consulates to respond to cases of human trafficking of Lesotho citizens identified abroad.

The government increased efforts to raise awareness, especially in outreach efforts to vulnerable communities, and continued its participation in NGO-led activities. Government officials participated in prevention education activities organized by an NGO, consisting of 306 campaign events in five districts, increasing awareness of trafficking in persons to more than 17,490 Lesotho citizens. Campaign materials were printed in Sesotho and English, with picture illustrations for illiterate community members, and a video screening of a film was conducted in Sesotho with English subtitles. Beginning in August 2021, the government conducted awareness raising activities on trafficking in persons for communities in the 10 districts of the country; the program was ongoing at the end of the reporting period. The government also targeted outreach and awareness efforts to Basotho diaspora

communities accompanied by NGOs serving Lesotho citizens abroad. MHA, in collaboration with the Lesotho Consulates in South Africa, NGOs, and taxi operators' associations, embarked on roadshows in South Africa to raise awareness of human trafficking. Additionally, LMPS conducted 220 public gatherings, 46 school visits, 109 orientations, and 32 radio and TV programs to raise awareness of trafficking in persons.

The MHA and Department of Immigration collaborated with NGOs and international organizations to increase proactive identification of potential trafficking victims through transit monitoring at key border crossings and airports. The government had an agreement with the Government of South Africa aimed to increase protections for Basotho employed in South Africa, including in domestic work. The agreement authorized the issuance of long-term work permits, required signed employment contracts, and allowed Basotho to register for unemployment insurance in South Africa; despite this agreement, Basotho remained vulnerable to trafficking. The government did not make efforts to reduce the demand for commercial sex acts. Labor inspectors conducted 500 inspections in 2021, primarily in textile factories, and identified one case of forced child labor, compared with 70 inspections with no cases identified in 2020. MOLE reported holding monthly forced labor awareness campaigns for workers in formal economy businesses. The government continued to implement its labor migration policy focused on recruitment malpractice during the reporting period and incorporated screening for trafficking indicators into labor inspectors' interviews with migrants. The government also continued to discuss trafficking in persons in pre-departure sessions for migrant workers and conducted inspections to confirm licensure of recruitment agencies and their compliance with labor code provisions. The Ministry of Police and Public Safety, through the financial and technical support of a foreign government and an international organization, held a one-day workshop on human trafficking, vulnerabilities, and identification of victims for 50 labor inspectors, migrant liaison officers, and recruitment agency staff. The Immigration Department within the MHA conducted trainings for 59 border officials on assessing fraudulent documents, identifying human trafficking, and referring victims to services using the NRM. Pandemic-induced restrictions on gatherings hampered government efforts to provide additional training.

The government did not operate a hotline for trafficking victims to locate services or for public reporting of the crime. Through support from an international organization, the government operated a child protection hotline. Law enforcement operated a hotline for reporting all crimes, including human trafficking. During the reporting period, MHA established a general hotline, which identified and referred four victims of trafficking to services using the NRM. With support from an international organization, the government contributed information to a centralized anti-trafficking database that collected national data on criminal cases and victims identified and shared it with countries in the region. During the reporting period, MHA commissioned a study by an NGO to examine trends and patterns of human trafficking in Lesotho. Starting in the last reporting period, MOLE continued an assessment of child labor, including child trafficking, in Lesotho, and allocated 2 million maloti ($125,980) to the study.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Lesotho, and traffickers exploit victims from Lesotho abroad. Traffickers increasingly use social media to identify and recruit victims into forced labor and sex trafficking. Limited economic opportunities, exacerbated by the pandemic, resulted in vulnerable populations, including women and orphaned children, enticed by traffickers with false promises of legitimate employment or educational opportunities, to migrate from rural into urban areas, South Africa, or the Middle East. In Lesotho, traffickers exploit Basotho children in domestic servitude and animal herding; traffickers also exploit children, especially orphans who migrate to urban areas, in sex trafficking. Young girls, especially orphans, regularly engaged in domestic work in exchange for room and board; such informal, imbalanced, and private arrangements render these children vulnerable to forced labor and abuse from employers. There were anecdotal reports that "workshop masters" force children to produce and sell arts and crafts in market vending. There were reports of rampant sexual harassment in Taiwanese-,

People's Republic of China- (PRC), and South Asian-owned textile factories in Lesotho, including widespread reports that managers and supervisors coerced female workers into sexual relationships in exchange for maintaining employment, receiving better working conditions, and avoiding further sexual harassment. Pandemic-induced layoffs increased vulnerabilities of the predominantly female textile workforce, resulting in some engaging in commercial sex.

Basotho women and girls seeking work voluntarily migrate to South Africa, where traffickers detain some in prison-like conditions and exploit others in sex trafficking. Traffickers exploit some Basotho men who migrate voluntarily, although unauthorized and often without identity documents, to South Africa for work in agriculture and mining in forced labor; many of these men work for weeks or months before their employers report them to South African authorities for deportation on immigration violations to avoid paying earned wages. Traffickers connected to organized crime syndicates operating in South Africa allegedly exploit and sometimes kill Basotho men in derelict and ownerless gold mines. Traffickers also compel Basotho to commit crimes in South Africa, including theft, drug trafficking, and smuggling under threat of violence or through forced drug use.

The pandemic increased vulnerability of migrant workers returning to Lesotho after losing employment in South Africa. Increased unemployment due to the closure of factories drives some Lesotho citizens to enter South Africa while undocumented in search of work, which may increase their vulnerability to trafficking. COVID-19 testing requirements for entry caused some migrants entering Lesotho from South African border crossings to seek alternative routes. Foreign nationals, including PRC nationals, Pakistanis, and Nigerians, subject their compatriots to sex trafficking in Lesotho. Cuban nationals working in Lesotho may be forced to work by the Cuban government.

# LIBERIA: TIER 2

The Government of Liberia does not fully meet the minimum standards for the elimination of trafficking, but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Liberia was upgraded to Tier 2. These efforts included passing and enacting a new trafficking law with provisions that removed the means element for child sex trafficking crimes; increasing investigations, prosecutions, and convictions; and allocating more funding to NGOs to conduct awareness-raising campaigns. The police established a new anti-trafficking unit, and for the first time, the Ministry of Labor hired lawyers dedicated to prosecuting trafficking cases. However, the government did not meet the minimum standards in several key areas. Shelter services for victims remained insufficient, and the government did not support NGOs providing care to victims. Law enforcement officials continued to lack adequate resources and understanding of trafficking to effectively investigate and prosecute trafficking crimes.



LIBERIA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Expand victim services—particularly for victims outside the capital, males, and victims requiring long-term care. • Increase efforts to investigate and prosecute trafficking cases, including internal trafficking cases and officials accused of complicity. • Train labor inspectors and social workers on standard victim identification procedures and the national referral mechanism. • Improve collaboration between anti-trafficking police

units, immigration, labor, and judicial authorities and allocate financial and in-kind resources, as feasible, dedicated to anti-trafficking law enforcement activities. • Increase financial or in-kind support to NGOs that support trafficking victims. • Train law enforcement and judicial officials on identifying, investigating, and prosecuting trafficking cases under the revised 2021 anti-trafficking law. • Increase labor inspections in the informal sector and mining regions to improve identification of trafficking cases, including child forced labor. • Increase efforts to raise public awareness of human trafficking, including internal trafficking. • Allocate financial and in-kind resources, as feasible, to the anti-trafficking task force. • Screen foreign workers, including Cuban overseas workers and People's Republic of China (PRC) nationals employed at PRC national-run worksites, for forced labor indicators and refer identified forced labor victims to appropriate services.

## PROSECUTION

The government increased anti-trafficking law enforcement efforts. The government passed and enacted the Revised Act to Ban Trafficking in Persons Within the Republic of Liberia, in September 2021, which amended the 2005 Act to Ban Trafficking in Persons and brought Liberia's trafficking laws in line with international law. The Revised Act criminalized all forms of sex and labor trafficking and prescribed minimum sentences of 20 years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. Article 1-104(f) defined "exploitation" broadly to include child pornography, which was inconsistent with international law.

The government investigated 13 trafficking cases, initiated prosecution of 12 defendants, and continued prosecuting nine defendants, an increase compared with seven case investigations and prosecutions of two defendants in the previous reporting period. The courts convicted eight traffickers, compared to zero convictions during the previous reporting period, with one trafficker sentenced to six years' imprisonment and seven traffickers whose sentences were pending. The government sometimes prosecuted and convicted crimes as human trafficking which lacked a clear element of exploitation. As of January 2021, Ministry of Labor (MOL) lawyers had the authority to prosecute trafficking and child labor cases, and MOL hired eight lawyers to prosecute trafficking cases; MOL prosecuted five trafficking cases, compared to one case during the previous reporting period. Officials continued to lack understanding of internal trafficking, and some continued to view forms of trafficking, especially forced labor of children in domestic servitude, as a community practice rather than a crime. Prosecutors may have pursued other charges, including rape and child endangerment in lieu of sex trafficking or child forced labor, due to a lack of understanding of human trafficking.

For the second consecutive year, the government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking offenses; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year.

The Liberian National Police (LNP) established a new Anti-Trafficking in Persons Unit in December 2021. The LNP's Women and Children Protection Section (WACPS) also bore primary responsibility for investigating trafficking cases, while the Liberian Immigration Service (LIS) and Liberia Drug Enforcement Agency investigated transnational trafficking cases. The LIS Anti-Human Trafficking and Migrant Smuggling Unit, comprising 14 officers, stationed at least one officer at each of Liberia's five major ports of entry and other minor ports of entry. The government did not provide the LNP with dedicated anti-trafficking funding or in-kind support, and it lacked basic resources and equipment to fully respond to and investigate allegations of trafficking, especially outside the capital. Courts operated at reduced capacity and processed fewer cases due to pandemic-related restrictions. The pandemic also reduced law enforcement's capacity to conduct investigations; authorities reassigned law enforcement officers to enforce public health measures, diminishing police presence at stations, depots, and border posts.

The government coordinated with an international organization to incorporate training on human trafficking into the National Police Academy's basic training course and to roll out new training curricula

and a legal handbook on human trafficking for prosecutors and judges. The government provided some support to an international organization to train law enforcement and judicial officials on conducting trafficking investigations and identifying victims. Nonetheless, officials and NGOs reported many labor inspectors, police, prosecutors, and judges remained unable to identify trafficking and lacked sufficient resources, impeding trafficking investigations and prosecutions. The government cooperated with an international organization to train judges, prosecutors, defense attorneys, and law enforcement on the newly-passed TIP law.

## PROTECTION

The government increased efforts to identify and protect trafficking victims. The government reported it identified 35 trafficking victims, compared with identifying 29 during the previous reporting period. Of the 35 victims, authorities identified four victims from Nigeria and two from Sierra Leone; the government provided shelter and basic necessities to the six victims while they waited to testify in a trafficking case. In addition, the government reported that it provided short-term accommodation in a government-run shelter to the 27 Liberian victims among the 35 identified. The government had standard operating procedures and a national referral mechanism to identify trafficking victims and refer them to care. However, law enforcement, immigration, and social services personnel lacked training on such procedures and, at times, misidentified trafficking victims as victims of other crimes. The government did not report training officials on the national referral mechanism, in part due to pandemic-related gathering restrictions.

Police and community members generally referred trafficking victims to the Ministry of Gender, Children, and Social Protection (MOGCSP). The anti-trafficking task force working group, which included the MOGCSP, was responsible for coordinating victim care. The MOL operated two shelters for child labor and child trafficking victims; however, poor maintenance and lack of staff training and capacity reportedly created inhospitable living conditions, which caused some victims to leave the shelter. In cooperation with an international organization, the government began rehabilitating the shelters and training staff during the reporting period. The government arranged for an international NGO to provide shelter and services for child victims of neglect and abuse, which could also provide short-term shelter to child trafficking victims. The MOGCSP operated shelters in Lofa and Nimba for gender-based violence victims that female trafficking victims could access; the shelters provided long-term care and social services. However, an international organization noted that the shelters were overcrowded and lacked funds. Additionally, the MOGSCP operated several transit centers that provided medical services and short-term accommodation. Each transit center should have had at least one social worker, one nurse trained in sexual-and gender-based violence cases, and one police officer on staff; however, resources allocated to each center varied. Most of the transit centers operated only during the daytime and did not provide short-term accommodations. Twelve LNP WACPS facilities could provide short-term accommodations to child victims of crime, and occasionally adult victims, but lacked basic amenities; an international organization renovated six of the centers during the reporting period. Two MOGCSP social workers continued to work within the WACPS to assist women and children, including trafficking victims, and visit police precincts to coordinate cases.

Resource constraints limited services for trafficking victims. The government relied heavily on NGOs and private shelters when government shelters were unavailable but did not report providing financial or in-kind assistance to those shelters. Shelter and services were available to both domestic and foreign victims. There was no shelter available specifically for adult male victims, although some MOGCSP and private shelters could accommodate young boys, and one shelter occasionally housed male and female victims together. Adult victims were only allowed to leave the shelters at will on an ad hoc basis. Shelters sometimes could not protect victims' identities, and victims could usually stay only three to six months due to capacity limitations. MOGSCP could arrange foster care for victims requiring longer-term care. The MOGSCP continued collaborating with NGOs through regular meetings of the Child Protection Network. The government assisted in repatriating potential Liberian trafficking victims from Oman.

The government did not systematically encourage victims to participate in investigations and prosecutions of their traffickers, but at times provided victim-witnesses support to offset the costs of participating in a trial; during the reporting period, the government provided some funding for transportation and lodging to assist victims' participation in prosecutions. The anti-trafficking law allowed victims to obtain restitution, but courts did not issue restitution in any cases during the reporting period. Victims could file civil suits against their traffickers; no victims filed civil suits during the reporting period, largely due to lack of awareness of this option. The government did not have a formal policy that provided alternatives to removal to countries in which victims would face retribution or hardship, but could offer alternatives, including temporary residency, on a case-by-case basis. There were no reports the government detained or otherwise penalized trafficking victims for unlawful acts traffickers compelled them to commit; however, due to a lack of training, insufficient resources, and inconsistent application of victim identification procedures, authorities may have detained unidentified victims.

## PREVENTION

The government increased efforts to prevent human trafficking. The MOL coordinated the government's anti-trafficking efforts and co-chaired the anti-trafficking task force with the Ministry of Justice. The task force also included representatives from the Ministry of Foreign Affairs, Ministry of Health, Ministry of Internal Affairs, and MOGCSP; it continued to meet regularly during the reporting period. The government allocated $275,000 to combat human trafficking in the 2022 budget, substantially more than the $50,000 allocated in the 2020-2021 budget. The government allocated $15,000 to 10 local NGOs conducting awareness raising campaigns on trafficking and child labor and to distribute copies of the newly-amended trafficking law in all of Liberia's 15 counties to local officials, an increase from $5,000 allocated to five NGOs in 2021. The government continued implementing the 2019-2024 action plan to combat trafficking in persons. In April 2021, Labor Minister Gibson convened simultaneous trafficking task force meetings in 14 of Liberia's 15 counties with support from an international organization. Local officials around the country provided updates from their respective regions.

The MOL continued to operate an anti-trafficking hotline during business hours and hired two additional staff members to manage the calls. The government received 2,679 calls and identified six victims whose cases were referred to the LNP for investigation. The government conducted 556 labor inspections, including 43 inspections specifically focused on child labor. Despite this, labor inspectors did not report identifying any child labor or trafficking victims. Labor inspectors were not trained on laws related to child labor nor on their enforcement. The government did not conduct labor inspections or victim screening measures among PRC or other foreign nationals employed at PRC national-run worksites. During the previous reporting period, LNP visited popular beaches and entertainment centers in Monrovia known to have high instances of child sex trafficking, spoke with community groups, and distributed fliers to sensitize citizens on child protection issues; the government continued these activities on a limited basis during the reporting period due to the pandemic's impact on tourism and strained law enforcement resources. The government did not make efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Liberia, and traffickers exploit victims from Liberia abroad. Trafficking within the country is more prevalent than transnational trafficking, and the majority of victims are children. Traffickers recruit and exploit most trafficking victims within the country's borders in domestic servitude, forced begging, sex trafficking, or forced labor in street vending, gold and alluvial diamond mines, and on small-scale rubber plantations. Traffickers typically operate independently and are commonly family members who promise poorer relatives a better life for their children or promise young women a better life for themselves. They take the children or women to urban areas and exploit them in forced labor in street vending, domestic service, or sex trafficking. Traffickers are also often well-respected community members who exploit the "foster care" system common across West Africa. Liberian law requires parents to register children within 14 days of birth; while about two-thirds of children younger than the age of five are registered, only about 30 percent have obtained a birth certificate. Although the government has expanded birth registration accessibility, continued lack of birth registration and identity documents increases individuals' vulnerability to trafficking.

Traffickers exploit orphaned children in street vending and child sex trafficking. Some parents encourage their daughters' exploitation in commercial sex to supplement family income. Liberian nationals and—to a lesser extent—foreigners exploit children in sex trafficking in Monrovia. Traffickers allegedly compel children to sell illicit drugs. Cuban nationals working in Liberia may have been forced to work by the Cuban government. PRC nationals employed in Liberian worksites managed by PRC nationals were vulnerable to forced labor. In the past, officials have identified trafficking victims from the PRC, Malaysia, and India. Sierra Leonean traffickers operate in Liberia. Traffickers exploited a small number of Liberian men, women, and children in other West African countries, including Cote d'Ivoire, Guinea, Mauritania, Nigeria, Senegal, and Sierra Leone. In the past, traffickers exploited Liberian victims in Thailand, Lebanon, and Finland. Some government employees may have been directly complicit in child trafficking, including for domestic service and street vending, and reports indicate law enforcement occasionally accept bribes from suspected traffickers.

# LITHUANIA: TIER 1

The Government of Lithuania fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Lithuania remained on Tier 1. These efforts included convicting significantly more traffickers; allocating more funds to NGOs for victim assistance and toward implementation of the national action plan (NAP); and identifying and assisting more trafficking victims. Furthermore, the government adopted a law on assistance to victims of crime, including trafficking, ensuring victims received assistance before, during, and after criminal proceedings. In addition, the government trained child rights specialists on identifying child trafficking victims. Although the government meets the minimum standards, authorities prosecuted fewer suspected traffickers and inconsistently implemented victim identification and referral mechanisms throughout the country, especially in rural areas. Additionally, authorities did not proactively identify and screen for trafficking indicators among vulnerable populations, such as children and migrants. Moreover, shortcomings in victim protection during the investigation and trial process, which allowed traffickers to intimidate victims into not cooperating with authorities, continued to hamper law enforcement efforts.



## PRIORITIZED RECOMMENDATIONS:

Proactively identify victims and screen for trafficking indicators, particularly among vulnerable groups, such as children and migrants, through enhanced training for authorities on recognizing indicators of exploitation. • Implement formal victim identification and referral mechanisms for victim assistance throughout the country, especially in rural areas. • Increase efforts to vigorously investigate and prosecute sex trafficking and labor trafficking cases and convict traffickers. •

Expand efforts to protect victims from threats and re-victimization during the investigation and trial of trafficking cases, including by developing clear procedures on how to protect victims. • Train investigators and prosecutors on a victim-centered approach and building trafficking cases, including collecting evidence to corroborate victim testimony. • Provide specialized services to child victims in foster care homes and mixed-use shelters. • Ensure victims have access to appropriate mental health professionals during the interrogation process. • Provide knowledgeable legal counsel for victims assisting prosecutions. • Develop a more comprehensive data collection system that disaggregates data, including by type of trafficking.

## PROSECUTION

The government maintained law enforcement efforts. Articles 147 and 157 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties ranging from two to 12 years' imprisonment, which were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Five specialized prosecutors led the investigation and prosecution of trafficking cases in country. In 2021, authorities investigated seven trafficking cases (one sex trafficking, three labor trafficking, and three unspecified), compared with eight in 2020. The government initiated prosecutions of 33 suspected traffickers, compared with 40 in 2020; statistics included data from ongoing prosecutions from previous years. Courts convicted 30 traffickers, a significant increase and nearly double from 16 in 2020. All convicted traffickers received sentences with prison terms ranging from one to nine years; however, four traffickers received suspended sentences. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes.

Government officials reported that collecting adequate evidence remained a problem in prosecuting trafficking cases, particularly since trafficking activity recently shifted online to methods that did not include physical coercion. As a result of the pandemic, remote court hearings became the main litigation tool, which according to law enforcement posed challenges. In addition, the pandemic compounded the already existing difficulties associated with communication and cooperation between law enforcement officials in Lithuania and other countries. Furthermore, the government reported that prosecuting criminal acts, including trafficking, that occurred outside Lithuania and obtaining evidence from abroad involved a lengthy and complicated process. Nonetheless, Lithuanian authorities cooperated with their European counterparts on several trafficking-related investigations, two joint investigation teams, and one extradition. A police officer served as an attaché in the Lithuanian embassy in the United Kingdom (UK) to assist in international criminal investigations, including by ensuring cooperation in preventing, investigating, and solving trafficking crimes that involve Lithuanian citizens in the UK and Ireland. In 2021, the Ministry of Interior (MOI) commissioned the National Police to conduct a study on the decline in trafficking investigations and related crimes from 2018 to 2020; the study remained ongoing at the end of the reporting period. Additionally, in cooperation with the General Prosecutor's Office, the MOI launched an anti-trafficking online training platform, including topics on identifying indicators and victims, understanding risk factors, conducting investigations, collecting evidence, assisting and protecting victims, and compensation. Professionals who were in contact with victims, including police, judges, and medical and social workers, received training through the platform. In addition, the government supported several other educational efforts for police, border guards, prosecutors, and judges on various topics, including trafficking trends, identifying victims, and investigating trafficking crimes.

## PROTECTION

The government increased protection efforts. Authorities identified 26 victims (three sex trafficking, 10 labor trafficking, 13 unspecified), compared with 24 in 2020, of which three were foreign nationals (11 in 2020). As in previous years, experts expressed concern that the data collected across government agencies was inconsistent and did not provide a comprehensive picture of the trafficking situation. Law enforcement, immigration, and social services personnel applied formal written recommendations for victim identification. According to NGOs,

the recommendations did not always work effectively in practice and were not informed by best practices for how to interview victims, especially children. Furthermore, observers reported authorities in some parts of the country underutilized the recommendations and had less experience identifying victims. In 2021, authorities received training on victim identification; however, NGOs noted officials still did not have the skills and experience required to conduct screening for trafficking among migrants and other vulnerable groups. A formal mechanism existed between police and NGOs to refer victims to NGO facilities.

Care facilities provided short- or long-term assistance, such as health care, psychological and social counseling, and shelter, to trafficking victims. In 2021, the government adopted the Law on Assistance to Victims of Crime, which ensured all victims of all crimes, including trafficking, received assistance before, during, and, if necessary, after criminal proceedings. Lithuanian law also entitled all crime victims, including trafficking victims, access to assistance, including counseling, regardless of whether victims sought assistance from law enforcement. The government allocated €300,000 ($340,140) to NGOs for victim assistance, a substantial increase from €245,000 ($277,780) in 2020. Government-funded NGOs supported 247 trafficking victims, compared with 208 in 2020. This number included "at risk" individuals and identified victims from previous years who continued to receive assistance. Individuals had the right to receive assistance without reporting the crime, and some chose to do so. Authorities placed Lithuanian female trafficking victims in municipal and NGO-facilitated shelters for victims of domestic violence and had the option to place foreign victims at a refugee reception center in Rukla. Five crisis centers provided assistance to male victims, including finding accommodations. Authorities could place child victims in foster care homes or mixed-use shelters, as there were no shelters specifically for child trafficking victims. Child sexual abuse victims, including trafficking victims, could seek assistance in the government-operated national support center in Vilnius. Experts raised concerns about inadequate assistance and protection measures for child victims. According to observers, child protective services struggled to identify child victims and refer them to care, especially in rural areas. In 2021, authorities identified one child victim, the same as in 2020. The Ministry of Social Security and Labor funded a training on identifying child trafficking victims for child protection specialist; the topics included recognizing forms of trafficking, emotional and physical impacts of exploitation, assistance to child victims, and the analysis of child trafficking cases. In addition, the Support Center for Child Victims of Sexual Abuse organized a series of trainings on protecting children against sexual violence, including trafficking, for child protection specialists. Municipalities continued to finance and implement reforms to the institutional child care system with the goal to move all children from institutions to families. As part of the reforms, municipalities converted large institutions into community houses, which accommodated up to eight children each. In 2021, 679 children lived in community homes, and 1,468 children remained in state care homes. The minister of social affairs and labor prohibited the placement of new children into care at orphanages as of January 1, 2020. Foreign trafficking victims had the same access to care as Lithuanian victims. Legislation allowed foreign victims a 30-day reflection period to decide whether to cooperate with law enforcement; foreign victims cooperating with law enforcement could receive temporary residency.

While the government encouraged victims to cooperate in investigations and prosecutions, the absence of clear policy on how victims would be adequately protected and law enforcement's shortcomings in this area contributed to victims' reluctance to assist in cases. In particular, traffickers sometimes threatened victims to intimidate them into not cooperating with the authorities, and victims lacked access to mental health professionals during or after their interviews by law enforcement. According to NGOs, law enforcement still did not utilize a victim-centered approach, contributing to a lack of trust on the part of victims toward officers. To address some deficiencies, courts frequently interviewed victims remotely and allowed victims to appoint individuals to serve as their representatives so their rights were defended without having to participate directly in court proceedings. Although the government provided legal representation to victims, observers reported attorneys had little experience with trafficking issues; as a

result, NGOs often hired private attorneys for victims. Lithuanian law entitled trafficking victims to apply for financial compensation from their traffickers, but there were no state-run victim compensation programs. In most cases, courts ordered restitution, and it was awarded. In 2021, courts awarded more than €56,000 ($63,490) for non-material damages to trafficking victims.

In response to an inflow of Ukrainian refugees who were fleeing Russia's war in Ukraine and arriving in Lithuania, the government adopted laws and regulations to provide temporary protection status for one year and expand assistance, including financial aid. The government also opened six registration centers across the country, providing food, medical care, and short-term lodging to refugees. Despite the government's response to address the immediate needs of refugees, observers raised concerns about medium- and long-term support. Officials underscored challenges, such as limited resources and long-term housing, noting accommodation for the refugees could be limited to "simple conditions," and the government may have no choice but to house some refugees in tents. To address this concern, in March 2022, the government announced a compensation program for households hosting refugees, in which volunteers had the option to receive a monthly stipend of €150 ($170) for the first refugee they host and €50 ($57) for each subsequent refugee, for a maximum of three months.

**PREVENTION**

The government increased prevention efforts. The government continued to implement the NAP for 2020-2022 and allocated approximately €416,000 ($471,660), compared with €375,000 ($425,170) in 2020. The NAP focused on strengthening interagency coordination; improving prevention work; strengthening the pre-trial investigations process; and improving assistance to trafficking victims. The Anti-Trafficking Coordination Commission, the lead coordinating body for anti-trafficking efforts, met twice a year and provided government institutions and NGOs with anti-trafficking guidance and training. The government participated in a range of awareness-raising activities, including producing and distributing pamphlets containing information on trafficking in Lithuania, indicators of potential victims, and a QR code directing professionals to the victim referral mechanism. In collaboration with other Baltic Sea Region countries, the government participated in a project establishing long-term cooperation between stakeholders and academia to educate future journalists on trafficking issues through workshops, panel discussions, and competitions. Additionally, the MOI published guidance on its website for journalists on how to report trafficking cases and avoid stereotypes, such as including sexually explicit images and photographs that reinforce misperceptions and myths about trafficking. The police advertised and managed an email account that the public could use to report potential trafficking situations and solicit advice. The government maintained a 24-hour national hotline available in multiple languages to assist trafficking victims via NGOs; the hotline received 44 trafficking-related calls. The government did not make efforts to reduce the demand for commercial sex acts.

In 2021, Lithuania experienced a surge in irregular migrant flows, which the Lukashenka regime facilitated, across the border with Belarus; in November, the State Border Guard Service circulated recommendations to its units to help identify trafficking victims and provide information on available resources to assist them. Due to the increase in Vietnamese citizens fleeing Russia and migrating through Lithuania, the State Border Guard Service, in collaboration with a foundation, organized three distance trainings on Vietnamese culture and how to prevent trafficking. In 2021, Lithuania hosted an international conference on capacity building, assistance, and prosecution of forced labor in the Baltic Sea Region. The MOI organized a virtual seminar on best practices to combat labor trafficking in the Baltic Sea Region. In cooperation with Poland and Sweden, the MOI conducted a study aimed at identifying recruitment methods and tools used by employment agencies to recruit Lithuanians to work under exploitative conditions. The State Labor Inspectorate maintained a special group of inspectors to analyze forced labor cases, collect information, and forward evidence to law enforcement. To prevent labor trafficking among foreign nationals, the inspectorate provided information on identifying illegal work and trafficking through its website and the

distribution of leaflets at workplaces. The inspectorate cooperated with the Ukrainian State Labor Service to prepare and publish information on employment opportunities, defending worker rights, and preventing labor trafficking. Lithuanian law specified foreign nationals—issued a visa or temporary residence permit—could only work with the employer who had undertaken to employ them and perform only the job function for which they were employed; if foreign workers wished to change employer or job function with the same employer, the law required they submit an application to the Migration Department for approval. Additionally, Lithuanian law prohibited worker-paid recruitment fees.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Lithuania, and traffickers exploit victims from Lithuania abroad. Law enforcement reports most trafficking cases involve Lithuanian trafficking networks that prey on Lithuanian victims. As a result of the pandemic, traffickers have shifted recruitment methods from in-person to online settings, mainly through social media, hindering authorities' ability to locate victims and identify traffickers. Traffickers exploit Lithuanian men and boys in criminal activities, such as shoplifting, and Lithuanian women and children in commercial sex in Scandinavia and Western Europe, particularly Spain and the UK. They also continue to exploit women and girls in sex trafficking within the country. NGOs report the majority of trafficking cases occur within Lithuania. Experts expressed concern that individuals with intellectual disabilities, psychological conditions, and/or alcohol or drug addiction are particularly vulnerable to trafficking. Many adult and teenage victims are survivors of sexual abuse and/or violence or grow up in orphanages, placing them at greater risk for trafficking. Traffickers also target the unemployed or individuals from low-income and at-risk families. Authorities report women are recruited for brokered marriages abroad; these women are vulnerable to sex trafficking, domestic servitude, and forced labor. Reports indicate a rise in the exploitation of foreign workers from Ukraine, Russia, and Belarus. Foreign workers are at risk of labor trafficking as long-haul truck drivers, builders, ship hull assemblers, and welders. The 1,468 children institutionalized in approximately 46 child care institutions are vulnerable to trafficking. As a result of the Lukashenka regime facilitating illegal migrant flows across the Lithuania-Belarus border, thousands of migrants from Africa, Asia, and the Middle East remain detained near the border and vulnerable to trafficking. Separately, Vietnamese citizens fleeing Russia and migrating through Lithuania to Western Europe are at risk to trafficking. Foreign nationals and Ukrainian refugees, predominantly women and children, who are fleeing Russia's full-scale invasion on Ukraine and seeking sanctuary in Lithuania, are highly vulnerable to trafficking. As of April 1, 38,539 Ukrainian refugees have registered in Lithuania; more than 15,000 of the registered refugees are minors.

## LUXEMBOURG: TIER 1

The Government of Luxembourg fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Luxembourg remained on Tier 1. These efforts included investigating, prosecuting, and convicting more traffickers; identifying more than double the number of trafficking victims; and providing shelter to significantly more trafficking victims. The government also added one additional staff member to a unit in the Judicial Police focused on victim protection and granted restitution to a victim in a criminal case. Moreover, the government significantly increased funding for awareness raising activities. Although the government meets the minimum standards, the government decreased funding for victim services, and judges continued to issue lenient sentences to convicted traffickers, creating potential safety concerns for trafficking victims, weakening deterrence, and undercutting nationwide efforts to fight trafficking.



LUXEMBOURG TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Sentence traffickers to significant prison terms and ensure convicted traffickers serve those sentences in practice. • Develop safeguards for victims to protect them against traffickers freed on suspended sentences. • Revise the trafficking law to clarify that force, fraud, or coercion are core elements of the crime of trafficking of adults rather than aggravating factors. • Increase training for judges on the severity of the crime and the impact on victims and ensure convictions result in significant sentences. • Increase worker protections by eliminating recruitment fees charged to workers by labor recruiters and ensuring employers pay any recruitment fees. • Promote a victim-centered approach in child victim identification procedures. • Include measurable outcomes in the national action plan (NAP) to assess its progress. • Coordinate trafficking data collection and fund, maintain, and conduct trafficking research to create an evidence base for future policy decisions.

## PROSECUTION

The government increased law enforcement efforts. Luxembourg criminalized sex trafficking and labor trafficking through Articles 382-1 and 382-2 of the criminal code and prescribed penalties of three to 10 years' imprisonment and a fine for trafficking offenses involving adult victims and 10 to 15 years' imprisonment and a fine for offenses involving child victims. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the law established the use of force, fraud, or coercion as aggravating factors rather than essential elements of the crime.

In 2021, the government initiated 20 investigations, an increase from 11 in 2020. The government prosecuted 19 suspected traffickers in 2021, an increase from five in 2020. Judges convicted two traffickers for labor trafficking in 2021 (one conviction in 2020) and sentenced the two traffickers to 12 months' imprisonment in addition to partially-suspended sentences. The issuance of weak sentences for trafficking convictions was a perennial problem that undercut efforts to hold traffickers accountable and protect victims. In 2020, judges partially suspended the convicted trafficker's 18-month prison sentence, and in 2019, judges fully suspended the two convicted traffickers' sentences. Law enforcement officials reported the law hindered investigators' ability to search private homes suspected of being used for commercial sex and illicit activities; authorities noted commercial sex moved increasingly to private homes and online platforms during the pandemic. The national rapporteur expressed concern the Judicial Police was understaffed; the police organized crime unit responsible for investigating trafficking comprised only 13 investigators. The police added one additional person to the victim protection and fugitive research unit; this unit ensured separation between victim assistance and investigations. The government's national institute of public administration provided anti-trafficking training to prosecutors, judges, law enforcement, and immigration officials. Law enforcement coordinated with authorities in Belgium, the Netherlands, and Germany on trafficking investigations. The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes.

## PROTECTION

The government increased overall efforts to protect victims. Authorities identified 17 trafficking victims (15 forced labor victims and two sex trafficking victims), an increase from seven in 2020. All were foreign citizens, including 13 men and four women. Any person or organization could report a suspected trafficking victim to the police, but the police had the sole authority to officially identify a victim and refer them to

government assistance. Immigration officials used a specific victim identification protocol, based on the national referral mechanism, that included instructions on identifying victims among unaccompanied children.

Government-funded victim services included housing, psychological support, medical, legal, and financial assistance. The government provided €412,870 ($468,110) in 2021 to the two NGOs responsible for coordinating trafficking victim care, a decrease from €461,500 ($523,240) in 2020. Government-funded NGOs provided shelter to 26 trafficking victims in 2021 (two government-funded NGOs provided shelter to 16 victims in 2020). The two government-funded anti-trafficking NGOs created a combined name and logo to improve visibility and access to services and promoted a new single contact number in January 2022. Limited business hours continued to cause delays in victim assistance and hindered proactive operations. When the government identified victims outside operational hours, police could directly refer adult female and child victims to shelters; adult male victims could be housed temporarily in hotels until longer-term housing could be identified. Adult male victims could receive the same access to long-term accommodation and other victim services as adult female and child victims. Victims could leave the shelters unchaperoned and at will during business hours of their respective shelter. Observers noted good cooperation between the two government-funded anti-trafficking NGOs and the shelters, however, they expressed concern that the shelters were often operating at full capacity. The government provided €8.3 million ($9.4 million) to NGO-run centers that provided shelter and assistance to victims of crime, including trafficking victims, compared with €8.4 million ($9.5 million) in 2020. The government also allocated €102,560 ($116,280) to an NGO responsible for providing shelter to male trafficking victims, an increase from €96,960 ($109,930) in 2020.

Foreign victims were entitled to a 90-day reflection period to decide whether they wanted to testify, during which EU citizen victims could work. Upon expiration of the reflection period, the government could issue a foreign victim either temporary or permanent residency status if the victim chose to cooperate with law enforcement, during which time all victims could work. In June 2021, the government amended the Immigration Law to clarify that residence permits granted to trafficking victims were renewable throughout the judicial process, each time for a six-month period. The government assessed on a case-by-case basis the residency status of victims who did not participate in an investigation. Victim assistance was not contingent on cooperating with an investigation, but victims who declined to cooperate with police did not benefit from a temporary authorization to stay. The government provided legal alternatives to removal to countries in which victims would face retribution or hardship and provided relief from deportation for medical reasons. The government trained immigration officials on trafficking indicators, and officials used a questionnaire to proactively screen asylum-seekers for trafficking; however, the government did not detect potential trafficking victims among asylum-seekers in 2021 or 2020. The government provided protection to victims throughout the judicial process and took measures to avoid re-traumatization, including by limiting the number of victim interviews and allowing the recording of testimony of child victims. Courts could grant restitution, and victims could claim compensation through civil suits against traffickers. A court granted €27,470 ($31,150) in restitution to one victim in 2021 (courts did not grant restitution or provide compensation in civil suits in 2020).

## PREVENTION

The government maintained prevention efforts. The government's inter-ministerial trafficking committee, chaired by the Ministry of Justice, met three times in 2021 to coordinate anti-trafficking efforts and NAP implementation. Some observers noted the government siloed responsibilities within numerous ministries with little centralized communication, however, the government did not report synchronization issues. For example, three separate ministries coordinated funding for male, female, and child shelters. GRETA reported the NAP, endorsed in 2016, was vague, lacked a timeframe on meeting objectives, and did not allocate any resources. The government's work on a new NAP was ongoing at the end of the reporting period. The Consultative Commission on Human Rights continued to serve as the national rapporteur; it published its third biannual report in December 2021.

not report how much it allocated for victim protection services in 2021, compared to approximately 1.74 million patacas ($217,770) allocated in 2020. The government operated and publicized a trafficking hotline, as well as a hotline for reporting labor exploitation, for the public and potential victims to seek assistance. Due to a lack of proactive identification efforts, authorities may have detained or deported some unidentified trafficking victims. The government did not report the status of a standard operating procedure—for ensuring safe repatriation of PRC national child sex trafficking victims—drafted during the previous reporting period. The law permitted migrant victims to remain in Macau temporarily and seek employment while authorities pursued cases against traffickers. In cases in which a victim faced retribution or hardship in their home country, authorities reported a policy allowed for permanent residency on the basis of "well-founded humanitarian reasons," although no victims benefited from this policy.

## PREVENTION

Authorities decreased efforts to prevent trafficking. The interagency Human Trafficking Deterrent Measures Concern Committee, led by the security bureau, coordinated Macau's anti-trafficking efforts, but the government did not report if the committee met or how much it allocated for its activities in 2021, compared to 3.44 million patacas ($430,540) allocated in 2020. The government disseminated television commercials, radio broadcasts, and online videos, as well as pamphlets and posters in several different languages, to raise awareness of trafficking. The government did not report holding labor rights seminars for workers in high-risk industries during the reporting period, which it had held in previous years. Standard labor laws did not apply to domestic workers, and while there was a required minimum income threshold for employers to be able to sustain at least a 3,000 patacas ($375) monthly wage, there was no minimum wage for foreign domestic workers, a situation which may have increased their vulnerability to trafficking. Legislation passed in March 2021 established regulations for employment agencies, such as limiting the amount of fees agencies could charge migrant workers to 50 percent of the first months' salary and prohibiting the withholding of workers' identity documents or other personal belongings. Violations were subject to a fine of 20,000 to 50,000 pacatas ($2,500-$6,260) and license revocation; however, the government did not report identifying any violations during the reporting period. The government adjudicated 1,758 labor dispute cases in 2021 (1,519 adjudicated in 2020) but did not report how many inspections it conducted at constructions sites or employment agencies for labor violations (72 construction sites and 209 employment agencies inspected in 2020). The government did not make efforts to reduce the demand for commercial sex acts or provide anti-trafficking training to its personnel posted overseas.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit foreign victims in Macau. Traffickers recruit victims, primarily from mainland PRC, Russia, and Southeast Asia, using false advertisements for jobs, such as singing and modeling, or work in casinos. Adult and child victims are compelled into commercial sex in massage parlors, illegal brothels, nightclubs, entertainment establishments in casinos, hotels, and private homes, where they are closely monitored, are threatened with violence, are forced to work long hours, and sometimes have their identity documents confiscated. Casinos and other entertainment establishments reportedly allow staff to partner with criminal networks to allow illegal commercial sex activities within their establishments, likely facilitating sex trafficking. The government's pandemic-related mitigation efforts, including travel and quarantine restrictions, disrupted Macau's tourism industry, and as a result, illegal activities in casinos, including commercial sex, declined compared to previous years. Migrant construction and domestic workers, primarily from mainland PRC, Indonesia, and the Philippines, may be vulnerable to forced labor in Macau. Some employment agencies overcharge workers recruitment fees of approximately two to three months' salary and withhold workers' passports, potentially leading to debt-based coercion. Some brokers bring migrant workers to Macau to renew work visas for other countries, while restricting their movement and withholding their passports.

# MADAGASCAR: TIER 2 WATCH LIST

The Government of Madagascar does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included investigating slightly more trafficking crimes; cooperating with foreign governments on a trafficking investigation; and establishing a new mechanism for potential migrant workers from the Diana region to promote fair recruitment abroad and raise awareness of potential trafficking indicators. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government did not report prosecuting or convicting any traffickers. Despite continued reports of alleged complicity, the government did not hold any complicit officials accountable and did not investigate reports of officials facilitating child sex trafficking. The government identified the fewest number of trafficking victims since 2016 and only provided services to half of the victims identified. The government remained without official standard operating procedures (SOPs) to proactively identify trafficking victims and refer them to care. Overall efforts to address internal trafficking crimes, including domestic servitude, forced begging, and child sex trafficking, remained inadequate. The government failed to allocate adequate resources to the National Office to Combat Human Trafficking (BNLTEH) and other agencies responsible for anti-trafficking efforts and remained without a national action plan (NAP) to combat trafficking, hindering overall progress and coordination. Therefore Madagascar was downgraded to Tier 2 Watch List.



MADAGASCAR TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate and prosecute trafficking crimes, including complicit officials and perpetrators of internal trafficking crimes, and adequately sentence convicted traffickers. • Systematically and proactively identify trafficking victims by screening for trafficking indicators among vulnerable populations, including child laborers, women exploited in commercial sex, returning Malagasy migrant workers, and People's Republic of China (PRC) nationals employed at worksites affiliated with the PRC's Belt and Road Initiative. • Refer all identified trafficking victims to appropriate protection services, including victims of internal trafficking, such as domestic servitude, forced begging, child sex trafficking, migrant workers, and PRC national overseas workers. • Amend the 2014 anti-trafficking law to ensure the penalties prescribed for adult sex trafficking are commensurate with those prescribed for other serious crimes, such as rape and/or kidnapping. • Institutionalize the training of front-line officials on victim-centered, trauma-informed trafficking investigations and the use of SOPs for the identification and referral of victims to appropriate services. • Finalize, adopt, and provide appropriate funding to implement an anti-trafficking NAP. • Strengthen the partnership between police and prosecutors to more efficiently and effectively prosecute trafficking cases, including regular case conferencing and training on strong evidence gathering. • Implement and consistently enforce strong regulations and oversight of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable. • Improve the national identification system, including establishing a database and anti-fraud features, to prevent child sex trafficking and reduce trafficking vulnerabilities of overseas Malagasy workers based on issuance of fraudulent documentation. • Improve nationwide data collection on anti-trafficking law enforcement

**MADAGASCAR**

and victim identification efforts, including information sharing among relevant government agencies. • Conduct community-level outreach campaigns to raise public awareness of all forms of trafficking, particularly child sex trafficking in tourist destinations.

## PROSECUTION

The government decreased anti-trafficking law enforcement efforts. Law No.2014-040 criminalized sex trafficking and labor trafficking and prescribed penalties ranging from two to five years' imprisonment and a fine of 1 million to 10 million Malagasy ariary (MGA) ($260 to $2,560) for offenses involving an adult victim, and five to 10 years' imprisonment and a fine of 2 million to 20 million MGA ($510 to $5,130) for those involving a child victim. These penalties were sufficiently stringent. For offenses involving children, with respect to sex trafficking, these penalties were commensurate with those prescribed for other serious crimes, such as rape; however, offenses involving adult sex trafficking were not commensurate with those prescribed for other serious crimes. The government did not make efforts to amend its law during the reporting period.

BNLTEH maintained a national database for the collection of trafficking-related information; however, not all relevant ministries regularly contributed to the national database and fewer stakeholders provided data than in previous years, causing national law enforcement statistics to remain difficult to obtain and verify. The government reported investigating 30 trafficking cases—24 for adult sex trafficking and six for unspecified exploitation—during the reporting period, compared with 24 investigations in the previous reporting period. Additionally, the government reported investigating 59 individuals for potential trafficking crimes; however, the government did not report details in these cases to determine if the crimes involved exploitation through forced labor or sex trafficking. The government did not report prosecuting or convicting any traffickers, compared with eight prosecutions and two convictions during the previous reporting period. A media outlet reported that the Anti-Corruption Court of Antananarivo heard a case involving a Malagasy national exploiting a girl in both sex trafficking and domestic servitude and that the Court of First Instance in Antananarivo heard a case involving a foreign national exploiting Malagasy women and girls in sex trafficking. An NGO reported the government prosecuted one case of child trafficking involving seven suspects in Toliara, initiated in 2020. According to the NGO, courts convicted one Malagasy national and two foreign nationals for pedophilia in this case and sentenced them to three years' imprisonment and a 2 million MGA ($510) fine; courts acquitted the other four defendants. Malagasy authorities cooperated with the Governments of the United States and France to investigate, arrest, and initiate prosecution against a Malagasy national allegedly facilitating online sex trafficking of women and girls to foreign customers. Overall, efforts to investigate and prosecute internal trafficking crimes, including domestic servitude, forced begging, and child sex trafficking, remained inadequate compared to the scale of the problem, and officials continued to frequently conflate human trafficking and migrant smuggling.

The government did not report any investigations, prosecutions, or convictions of government officials complicit in trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Furthermore, procedures stating that a government official cannot be arrested without authorization from the official's supervisor impeded holding complicit officials accountable for trafficking crimes. Observers reported a network of government officials continued to produce false identity documents used to facilitate child sex trafficking, especially in coastal areas like Nosy Be and Toliara. Observers also alleged some government officials continued to help Malagasy nationals obtain fraudulent travel documentation to circumvent a 2013 travel ban to certain Middle Eastern countries where traffickers have exploited Malagasy laborers. In previous years, judges released accused sex offenders, some of whom may have been traffickers and often were foreign citizens, allegedly at the request of senior government officials.

Due to lengthy judicial processes and a lack of implementation for victim protections in criminal proceedings, families often chose to settle conflicts, including trafficking crimes, informally through traditional means without recourse to the formal court system. Observers report victims were often reluctant to file charges due to fear of reprisals.

The government, in partnership with an international organization, trained law enforcement officials on victim-centered investigation strategies in child sex trafficking cases. Despite training efforts, the government did not institutionalize anti-trafficking training, and some police, immigration officers, prosecutors, and judges continued to lack a clear understanding of trafficking, which hampered law enforcement and victim identification efforts. Coordination and information sharing between the public prosecutor's office and police were inadequate and continued to hinder case progression. In December 2019, the government, in partnership with an international organization, approved an interagency agreement between the justice system, the national police, and the national gendarmerie to establish a protocol for effective coordination on trafficking cases; however, the different agencies had not signed the agreement and did not report cases of its implementation for the third consecutive reporting period.

## PROTECTION

The government decreased victim protection efforts. Due to a lack of coordinated data collection at the national level, the government did not report comprehensive data. The government reported identifying 72 victims of trafficking, compared with 175 victims identified in the previous reporting period and the lowest number of victims identified since 2016. Of the 72 victims identified, traffickers exploited nine in forced labor, 18 in sex trafficking, and 45 in unspecified exploitation; 61 were female and 11 were male; 48 were adults, 20 were children, and the age of four victims was unknown; and all 72 victims were Malagasy. The government provided various services, including medical care and education assistance, to 37 trafficking victims, a significant decrease compared with at least 117 victims assisted last reporting period. In addition to victims identified by the government, NGOs and international organizations reported identifying and assisting at least 769 potential victims, providing them with services, including medical care, social reintegration assistance, school support, and repatriation assistance for Malagasy nationals potentially exploited in domestic servitude abroad. The government remained without official SOPs to proactively identify trafficking victims and refer them to care; instead, there were disparate SOPs across different ministries that were used to varying degrees. Government officials continued to have access to a victim identification and referral manual developed by an international organization; however, the government did not actively distribute the manual, and use of the procedures outside of Antananarivo remained minimal. The government did not proactively screen vulnerable populations, including child laborers, women exploited in commercial sex, returning Malagasy migrant workers, and foreign workers, for trafficking indicators.

The Ministry of Population (MOP), in collaboration with an international organization, continued to coordinate more than 700 child protection networks across the country to assist children following abuse and exploitation and ensure access to medical and psychological services for victims of crime, including trafficking. Due to lack of resources, only about 450 child protection networks provided basic assistance through public hospitals and health units, and most of the networks referred the victims to international organizations and NGOs for additional assistance; this was a decrease compared with 600 networks operating in the previous reporting period. Through referral from the child protection networks, an international organization assisted 630 children (361 girls and 269 boys), including victims of sexual exploitation and the worst forms of child labor, both including child trafficking. The Mitsinjo Center, a government-owned, trafficking-specific temporary shelter for repatriated adult victims, continued to operate with a capacity to house 22 occupants; however, the government did not report the number of victims assisted at the shelter, compared with one potential victim assisted during the previous reporting period. Six government hospitals, in partnership with an international organization, maintained "one-stop" victim support centers that offered assistance to child victims of various abuses, including sex trafficking; the one-stop support centers—located in Antananarivo, Mahajanga, Nosy Be, Toamasina, Tolagnaro, and Toliara—offered victims medical assistance and psychological support through social workers, and they provided access to police to file complaints. The government reported assisting 1,351 children (including 16 boys) at these facilities; however, the government did not report the number of identified trafficking victims assisted.

Haiti AR_000841

The MOP, in partnership with an international organization, continued to operate a foster care program for exploited children in Nosy Be; the government did not provide statistics on the number of children assisted through the program for the third consecutive reporting period. The government continued to operate and fund the Manjary Soa Center in Antananarivo, which received 35 children who had been removed from situations of forced labor in domestic work or street vending. This center provided vocational training or reintegration into the public school system and allowed victims to stay at the center for one school year. The city of Antananarivo continued to manage an emergency center for child victims of crime, including domestic servitude and forced begging victims, who were frequently referred by the Morals and Protection of Minors Police Service. The city government, in partnership with an international organization, provided food, lodging, psychological and medical aid, and educational services to victims; however, the government did not report the number of victims served at the center. The government, in partnership with an international organization, operated two specialized centers for gender-based violence victims, including potential trafficking victims, in Antananarivo. These centers provided free psychological support, medical care, and legal assistance; the government did not report the number of trafficking victims assisted during the reporting period.

Due to a lack of formal identification procedures, some potential trafficking victims may have remained unidentified within the law enforcement system. Police sometimes arrested girls for "prostitution" without screening or identifying them as trafficking victims and would sometimes temporarily keep potential transnational labor trafficking victims in police stations due to a lack of alternative accommodations. Observers reported employers often sued former child domestic workers to avoid paying accumulated unpaid salaries in cases where victims may have reported their abuse; despite documenting 55 such cases where employers sued child domestic workers, the government did not report investigating these incidents for potential trafficking crimes or screening the children for trafficking indicators. To prevent retaliation from suspected traffickers, trafficking trials could be held in private or by video conference to ensure witness confidentiality and privacy; however, the government did not report doing so. While the 2014 anti-trafficking law entitled victims to restitution, for the eighth consecutive year, the government did not implement this provision. Observers reported courts in Toliara denied child sex trafficking victims' request for compensation because the victims lacked birth certificates and national identity cards. The 2014 anti-trafficking law required authorities to consider legal alternatives for foreign trafficking victims who believe they may face hardship or retribution if returned to their country of origin.

## PREVENTION

The government maintained minimal efforts to prevent trafficking. BNLTEH, under the prime minister's office, continued to lead the government's national anti-trafficking efforts. The 2021 federal budget legislation provided a dedicated budget of 410 million MGA ($105,070) for anti-trafficking programs led by BNLTEH; however, for the second consecutive year, the government did not disburse any funding to BNLTEH, attributing the decision to the strain on the national budget during the pandemic. The lack of funding led to the cancellation of most of BNLTEH's planned activities. The government did not have an anti-trafficking NAP; BNLTEH finalized an updated draft NAP during the previous reporting period, which was awaiting approval by the prime minister for the second consecutive year. In partnership with international organizations, the government held awareness campaigns targeting government ministries, religious leaders, potential migrant workers, and the general public on trafficking indicators. BNLTEH maintained a hotline to report human trafficking and dedicated staff to receive incoming calls; however, calling the hotline was not free of charge, and its publicization was limited. In 2021, the hotline received 18 calls and identified two potential trafficking victims. In partnership with an international organization, the police and MOP social workers continued to operate a national toll-free hotline to report child abuse. The government reported identifying and referring to care 12 victims of child forced labor in domestic servitude from the hotline, compared with 37 victims identified in the previous reporting period. Despite the

identification of potential trafficking victims through the various hotlines, the police did not initiate investigations in these cases.

A 2013 ban on migrant worker travel to Middle Eastern countries the government considered high-risk remained in place; however, illicit recruitment agencies circumvented the ban by sending workers through other African countries, including Comoros, Ethiopia, Kenya, Mauritius, and Seychelles. In an attempt to address this issue and identify agencies involved in fraudulent recruitment, the government continued its suspension of all existing accreditations for placement agencies and, thus, its prohibition of recruitment of workers for employment abroad. These prohibitions on migrant workers continued to leave Malagasy people with no legal means to travel abroad for work and, therefore, without access to protection mechanisms available through authorized travel, subsequently increasing their vulnerability to trafficking and blackmail. Suspending accreditation of placement agencies has led to employers and traffickers increasingly targeting migrant workers for blackmail or solicitation of bribes. Due to pandemic-related travel restrictions, the government suspended all commercial flights from March 2020 to November 2021; these restrictions may have exacerbated pre-existing trafficking vulnerabilities among migrant workers. The Ministry of Labor, Employment, Civil Service, and Social Laws (MOL) continued to oversee the process of migrant workers traveling to non-Gulf countries by requiring contract approval by the relevant Malagasy embassy. The MOL, in partnership with an international organization, established a new initiative in its Antsiranana regional office to provide information to Malagasy citizens in the Diana region seeking employment abroad to promote fair recruitment, including raising awareness of potential trafficking indicators.

The government maintained efforts to reduce the demand for commercial sex acts, including child sex tourism. Local officials in Toliara continued to investigate child sex tourism suspects, including those purchasing sex from children. The Ministry of Tourism (MOT), in partnership with international organizations, continued to monitor the commitment of the approximately 1,000 tourism operators in 12 regions who had previously acceded to the tourism code of conduct against commercial child sexual exploitation and sex tourism. The MOT conducted an unknown number of hotel compliance inspections to remind hotels of their obligation to display posters in their reception areas publicizing the prohibition of commercial child sexual exploitation; the government also maintained such billboards at airports as a warning for tourists. The MOT, in partnership with NGOs and an international donor, continued to disseminate pamphlets to tourists to remind them that child sex trafficking was illegal and provide steps on how to report a trafficking crime. The government did not provide anti-trafficking training to diplomats.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Madagascar, and traffickers exploit victims from Madagascar abroad. Traffickers exploit Malagasy children, mostly from rural and coastal regions and from impoverished families in urban areas, in child sex trafficking and forced labor in domestic service in homes and businesses, mining, street vending, agriculture, textile factories, and fishing across the country. The prevalence of child forced begging continues to increase in Antananarivo; reports indicate that traffickers force children, including those with disabilities, to work for long hours and in dangerous conditions, frequently at the behest of their parents. Most child sex trafficking occurs in tourist destinations, urban cities, vanilla-growing regions, and around formal and informal mining sites with the involvement and encouragement of family members; however, tourist operators, hotels, taxi drivers, massage centers, and local adults involved in commercial sex also facilitate this crime. Traffickers continue to exploit girls as young as 13 years old in child sex tourism in Nosy Be, Toliara, and other coastal areas, often openly in bars, nightclubs, massage parlors, hotels, and private homes. Malagasy men exploit the majority of child sex trafficking victims. Although tourist arrivals declined during the pandemic, historically most foreign sex tourists in Madagascar are French and Italian nationals, and, to a lesser extent, other Westerners and Comorians. In coastal areas like Nosy Be, Toliara, Mahajanga, and Toamasina, parents encourage girls as young as 15 years old to become financially independent by engaging in commercial sex with foreign

MALAWI

tourists; traffickers use this cultural norm as an opportunity to exploit girls in child sex trafficking. Traffickers fraudulently recruit some children for work in Antananarivo and Mahajanga as waitresses and masseuses before exploiting them in child sex trafficking. Traffickers continue to abuse traditional practices of arranged marriage, bride purchasing, and girl markets to exploit girls in child sex trafficking. Government officials are reportedly complicit in providing falsified national identity cards and birth certificates to traffickers that facilitate child sex trafficking in Madagascar and forced labor in domestic service of Malagasy women abroad. During the pandemic, sex traffickers increasingly exploited women and children online; in some cases, traffickers lured women from rural provinces to Antananarivo with the promise of employment, often via false job advertisements on social media, but then forced them to perform online sex acts for foreign customers. Police report traffickers are increasingly using centralized locations known as "call centers" to simultaneously exploit multiple women and girls online; traffickers regularly change the locations of "call centers" to avoid law enforcement detection. Previous reports indicated child sex trafficking of boys was becoming more prevalent. Forced labor persisted in the context of *Dinas*, which were informal arrangements for payment or in response to wrongdoing and a way of resolving conflicts or paying debt.

Many Malagasy women are employed as domestic workers in the PRC, Lebanon, Kuwait, and Saudi Arabia, and media sources report that informal placement agencies are still attempting to circumvent a 2013 ban against sending workers to the Middle East by routing them via Comoros, Ethiopia, Kenya, Mauritius, and Seychelles using legitimate tourist visas to avoid declaring travelers as migrant workers. Reports indicate traffickers and employers exploit Malagasy workers in Gulf States using various forms of abuse, such as physical violence, salary withholding, and confiscation of passports. An international organization reports pandemic-related restrictions abroad, particularly in Gulf states, may increase vulnerabilities to trafficking among Malagasy migrant workers due to work overload, salary reductions, job loss, and limited access to social services. Traffickers acting as agents in labor recruitment agencies send Malagasy women to the PRC with falsified identity cards, where they are exploited in forced labor in agriculture or domestic servitude. Traffickers and employers may exploit Malagasy men in forced labor in the services and construction industries in the Middle East and in domestic servitude in the PRC. PRC nationals employed in Madagascar at worksites affiliated with the PRC's Belt and Road Initiative were vulnerable to forced labor, particularly in construction.

## MALAWI: TIER 2

The Government of Malawi does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Malawi remained on Tier 2. These efforts included investigating and prosecuting trafficking cases, including investigations of allegedly complicit officials; increasing collaboration with NGOs to identify potential victims; and increasing awareness efforts and screening for trafficking in refugee camps. However, the government did not meet the minimum standards in several key areas. The government did not report training law enforcement or social workers on identifying, referring, and providing services to trafficking victims. Due to the lack of shelters and other protections, police often detained victims during the investigation process and did not take adequate measures to prevent the re-traumatization of victims participating in criminal proceedings. Credible reports of official complicity continued to impede the government's efforts to carry out anti-trafficking law enforcement efforts and proactively identify trafficking victims.



MALAWI TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Expand training on and usage of standard operating procedures (SOPs) and the national referral mechanism (NRM) to identify trafficking victims systematically and proactively by screening vulnerable populations, including individuals involved in commercial sex, refugees, and foreign workers, and refer all trafficking victims to appropriate services. • Continue increasing efforts to investigate and prosecute sex and labor trafficking crimes and sentence convicted traffickers to adequate penalties under the 2015 anti-trafficking law, including complicit government officials. • Collaborate with NGOs and international organizations to increase the government's capacity to provide shelter and protective services to more trafficking victims. • Increase protective services for victims participating in the criminal justice process to prevent re-traumatization, including establishing child-friendly interviewing spaces and ensuring victims receive basic needs. • Expand the collection of law enforcement and victim protection data for trafficking cases, specifically the number of victims referred and provided protective services, and compile data from all districts. • Disperse funds allocated to the Anti-Trafficking Fund to provide care to victims and to expand training for law enforcement and protection officers on investigating trafficking crimes, identifying trafficking victims, and providing adequate protection services. • Strengthen district coordination committee anti-trafficking efforts through developing district-level action plans and increasing coordination on victim services and investigations. • Train labor inspectors to identify potential forced labor victims during routine inspections and to report potential trafficking violations to appropriate officials. • Develop and institutionalize mandatory pre-departure anti-trafficking training for all Malawian diplomats. • Increase awareness and monitoring of trafficking crimes, as well as efforts to identify traffickers and victims at border crossings and internal police checkpoints.

### PROSECUTION

The government maintained anti-trafficking law enforcement efforts. The 2015 Trafficking in Persons Act criminalized sex trafficking and labor trafficking, and it prescribed punishments of up to 14 years' imprisonment for offenses involving an adult victim and up to 21 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with punishments prescribed for other serious crimes, such as kidnapping.

The Malawi Police Service (MPS) increased reporting capacity from five district-level police stations during the previous reporting period to 10 out of Malawi's 44 district-level police stations in 2021. The government reported investigating 82 trafficking cases and 82 suspects in 2021, compared with investigating 44 cases and arresting 54 suspects in 2020. The government reported prosecuting 27 cases involving an unknown number of suspects and convicting seven traffickers, compared with prosecuting 33 cases involving 39 suspects and convicting 29 traffickers in 2020. At the end of the reporting period, 39 prosecutions remained ongoing. Sentences for convicted traffickers ranged from fines of $100 with no prison time to prison terms up to six years; therefore some sentences did not serve to deter the crime or adequately reflect the nature of the crime. Courts dismissed a number of trafficking prosecutions for lack of evidence and certification of victim status by law enforcement at the time of identification, which is required to confirm an individual is a victim of trafficking. Due to conflation between migrant smuggling and human trafficking, the government may have prosecuted migrant smuggling crimes under its anti-trafficking law. The government reported pandemic-related restrictions hampered investigations and redirected resources to enforcing public health lockdown measures. Courts introduced virtual hearings to address

the slow judicial processing of cases; however, a significant backlog of cases remained ongoing.

During the reporting period, the government did not report if it provided anti-trafficking training to police and social welfare officers, compared with at least 247 officials trained on investigations, victim identification, and data collection in the previous reporting period. The MPS retained anti-trafficking training in its curricula for the Limbe, Mtakata, and Mlangeni Police Training Schools and Zomba Police College; however, the government did not report the number of recruits trained during the reporting period. The government maintained intelligence sharing agreements with the Governments of Zambia and Mozambique and collaborated with the Government of Zambia on an ongoing trafficking investigation and repatriation of two Zambian trafficking victims.

The government did not report any prosecutions or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The government continued an investigation from 2020 of 12 local police officers in Mzuzu for allegedly facilitating an organized trafficking operation. The government also investigated 10 police officers from the Professional Standard Unit in Kasungu for accepting bribes from traffickers. In both cases, the officers were suspended from duty pending investigation; however, courts dismissed all charges due to lack of evidence. Malawian officials allegedly received payment to recruit and facilitate transport of Malawian adults and children to South Africa for forced labor in businesses privately-owned by nationals of the People's Republic of China (PRC). In April 2019, the Department of State suspended for two years the A-3 visa sponsorship privileges afforded to Malawi bilateral mission members as a result of an unpaid final judgment rendered by a federal district court in a civil human trafficking case involving a domestic worker who sued her former employer, a former Malawian diplomat, for trafficking. The former diplomat left the United States in 2012. For the sixth consecutive year, the government did not report taking any further action to hold the diplomat accountable.

## PROTECTION
The government maintained victim protection efforts. The government identified 145 trafficking victims, compared with 199 victims identified in the previous reporting period. The government did not report the victims' demographics or whether the victims were exploited in sex trafficking or forced labor. Consequently, some of the victims reported may have been the dependents of identified adult victims, as in previous reporting periods. The government reported referring identified victims to the Social Welfare Office, part of the Ministry of Gender, Community Development and Social Welfare, but did not specify the number of victims referred or services provided. As reported, all victims were identified through law enforcement activity. Separately, MPS collaborated with an NGO to identify more than 500 potential victims of trafficking through transit monitoring at airports and border crossings, resulting in several prosecutions and convictions. The government reported using the SOPs and NRM for victim identification and assistance; however, observers noted government officials frequently misidentified sex and labor trafficking as other crimes, and cultural acceptance of domestic servitude hindered proactive victim identification and referral efforts. In partnership with an international organization, the government trained Dzaleka Refugee Camp staff to use the SOPs and a case reporting form to increase screening for trafficking victims. In cases involving child victims, the Child Protection Technical Working Group (TWG), composed of government officials, international stakeholders, and NGOs, assisted with coordination of victim services.

Both observers and the government reported that efforts to provide protection services to trafficking victims remained minimal and inaccessible to some communities, particularly in the northern region. The government accredited four NGO-operated shelters to support identified victims of trafficking in Limbe, Lilongwe, Mchinji, and Zomba during the reporting period; however, some did not meet minimum standards. The government reported a lack of shelter capacity to serve all trafficking victims, and services for victims residing outside shelters remained limited. The government operated one center in Lilongwe that provided counseling and specialized care for vulnerable children, which included potential

trafficking victims. The government did not report the number of victims referred to shelters or protection services. Some of the approximately 300 police sub-stations at the village-level housed victim support units (VSUs) to respond to gender-based violence and trafficking crimes; however, the VSUs lacked capacity to respond adequately, and the quality of services varied throughout the country. The government and civil society reported pandemic-related restrictions, such as limitations on gatherings, travel restrictions, border closures, curfews, and reallocation of donor-funding, limited victim care during the reporting period.

Despite the government's reliance on civil society organizations to provide care to trafficking victims, it did not report providing financial or in-kind support to such organizations or its allocation to the anti-trafficking fund during the reporting period. In 2020, the government allocated 150 million Malawian kwacha ($163,040) to the anti-trafficking fund, the same amount allocated in 2019 and 2018; the government utilized the fund for various activities during the reporting period, including support for victim repatriation and capacity building for protection service providers. A significant lack of resources, capacity, and anti-trafficking training among law enforcement and social welfare officers led to ad hoc assistance, a lack of victim-centered approaches, and potential re-traumatization of victims. Observers reported police often transported victims, particularly children, with their suspected traffickers in the same vehicle, resulting in potential intimidation and further traumatization of victims. Officials occasionally placed victims in detention, due to a lack of shelter space; and in some cases, victims reportedly ran away from detention after officials failed to provide them basic needs, such as food. The 2015 anti-trafficking law allowed courts to provide immunity to victims for crimes their traffickers compelled them to commit, including potential immigration violations; however, previous reports alleged foreign victims faced deportation unless they challenged their immigration status in court. Foreign victims can receive temporary residency status while cooperating with law enforcement; trafficking victims were not eligible for any permanent immigration status. The government did not report if any foreign victims received temporary status during the reporting period. While the government reported offering victim-witness support during participation in prosecutions, NGOs reported the government could not provide any support due to lack of funding, resulting in most foreign national victims declining to pursue criminal proceedings and returning to their home country. Despite allowing restitution for victims in cases against traffickers, no courts ordered restitution during the reporting period.

## PREVENTION
The government maintained efforts to prevent trafficking. The Secretariat of the National Coordination Committee Against Trafficking in Persons, led by the Ministry of Homeland Security and charged with overseeing national anti-trafficking efforts, met regularly during the reporting period. The government maintained district coordination committees in six districts, including Dedza, Karonga, Mangochi, Mzimba, Mchinji, and Phalombe. District coordination committees focused on victim identification but did not effectively coordinate on providing services or investigating cases. In the previous reporting period, the government reported developing district-level action plans for each committee; however, no progress was reported. Members of the informal Malawi Network Against Trafficking (MNAT), comprising government officials, religious leaders, NGOs, and international stakeholders, also continued to meet. The government continued to implement its 2017-2022 anti-trafficking national action plan, including by developing a data management system, conducting a baseline survey on evaluating awareness raising, and conducting interventions, such as victim protection. As part of the implementation plan finalized in the previous reporting period, the government, in partnership with an international organization, launched an awareness campaign in the Dzaleka Refugee Camp, which included the installation of billboards with victim referral and support information. Refugees in the camp were vulnerable to potential exploitation due to the lack of legal work authorization. The government conducted awareness-raising activities on human trafficking to 118 traditional leaders, 35 representatives of faith-based organizations, 112 journalists, and 25 health care workers. MNAT met with 34 judges and magistrates to raise awareness of human trafficking during the reporting period.

MALAYSIA

The government collaborated with an NGO-operated hotline to assist victims and track trafficking crimes. The hotline registered 119 potential cases of trafficking, with 51 cases pertaining to children and 68 cases involving adults, during the reporting period. The government reported contributing information on trafficking cases identified to a national centralized anti-trafficking data collection and reporting tool. From July 2020 to June 2021, the Ministry of Labor (MOL) conducted 481 inspections for child labor; however, the government did not report identifying any trafficking victims. The government did not report training labor inspectors on identifying human trafficking; however, the MOL had a memorandum of understanding with three tobacco companies that supported trainings for labor inspectors on identifying forced and child labor. The total number of trainings conducted was not reported. In 2019, the government approved the Prevention of Exploitative Labor Recruitment Regulations for the Trafficking in Persons Act, which required no fees charged to migrant workers, clarity and transparency of worker contracts, non-retention of identity documentation, and safe and decent working and living conditions; however, the government did not report enforcing these regulations. The government did not make efforts to reduce the demand for commercial sex acts. The government developed an anti-trafficking training program for diplomats during the previous reporting period but reported delays in implementation.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Malawi, and traffickers exploit victims from Malawi abroad. Traffickers exploit most Malawian victims within the country, generally lured from the southern part of the country to the central and northern regions for forced labor in agriculture (predominantly the tobacco industry), goat and cattle herding, and brickmaking. Many cases of child labor external to the family involve fraudulent recruitment and physical or sexual abuse, indicative of forced labor. Traffickers—primarily facilitators, family members, or brothel owners—lure children in rural areas by offering employment opportunities, clothing, or lodging, for which they are sometimes charged exorbitant fees, resulting in sex trafficking. Traffickers exploit teenage boys in forced labor on farms and girls in sex trafficking or other forms of sexual exploitation in nightclubs or bars. As a result of restaurant and bar closures during the pandemic, observers report that private homes, especially in Lilongwe and Blantyre, have started operating as illegal brothels and bars; operators of these establishments exploit girls in sex trafficking. Traffickers exploit children in forced labor in begging, domestic servitude, small businesses, and potentially in the fishing industry; in past years, some children were coerced to commit crimes. During the pandemic, school closures increased children's vulnerability to exploitation and resulted in some students, especially girls, failing to reenroll in school. Adult tenant farmers are at risk for exploitation, as they incur debts to landowners and may not receive payment during poor harvests. Traffickers exploit adults and children from Mozambique, Zambia, the Great Lakes region, the Horn of Africa, and Nepal in labor and sex trafficking in Malawi. In response to the pandemic, traffickers began using unmonitored and irregular border crossings to facilitate transnational trafficking, avoiding traditional border crossings requiring COVID-19 test certificates; observers also report traffickers' increasing use of smaller, less obvious transportation methods, such as bicycles and motorbikes, versus trucks or buses to transport potential trafficking victims.

Malawi hosts more than 52,000 refugees and asylum-seekers, primarily from the Democratic Republic of the Congo, Rwanda, Burundi, Ethiopia, and Somalia, with a majority living in the Dzaleka Refugee Camp. Severe weather events internally displaced more than 100,000 Malawians in January 2022, which increased vulnerabilities to potential trafficking; some Malawians crossed into Mozambique seeking shelter in provisional camps. Traffickers exploit men in forced labor and women and girls in sex trafficking both inside and via the camp. Criminal networks facilitate sex trafficking and forced labor, primarily in farming and domestic servitude, of refugees in Malawi or the transportation of refugees and vulnerable migrants for the purpose of sexual exploitation to other countries in Southern Africa. Malawian victims of sex and labor trafficking have been identified in Kenya, South Africa, Tanzania, and Zambia, as well as in Iraq, Kuwait, and Saudi Arabia. Malawian and Zambian potential victims were identified at a Malawian airport en route to Qatar.

Some girls recruited for domestic service are instead forced to marry and are subsequently exploited in sex trafficking. Traffickers lure women and girls from Mangochi province with promises of scholarships or lucrative employment in South Africa for exploitation in sex trafficking. Fraudulent employment agencies lure women and girls to Gulf states, where traffickers exploit them in sex and labor trafficking. PRC workers may be exploited on worksites owned by PRC-owned companies.

## MALAYSIA: TIER 3

The Government of Malaysia does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Malaysia remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking. The government amended its anti-trafficking law and Employment Act to include a more expansive definition of forced labor; convicted more traffickers than the previous reporting period; issued more freedom of movement passes for identified victims in government-funded shelters; increased the number of interpreters and victim assistance specialists (VAS) to assist victims through the judicial process; and adopted a five-year national action plan (NAP) against forced labor. However, the government continued to conflate human trafficking and migrant smuggling crimes, which impeded law enforcement and victim identification efforts. Anti-trafficking investigations declined, and the government did not prosecute or convict government officials allegedly complicit in trafficking crimes. As in previous years, the government did not adequately address or criminally pursue credible allegations from multiple sources alleging labor trafficking in the rubber manufacturing industry and palm oil sector, with the government owning 33 percent of the third-largest palm oil company in the world. Its failure to address trafficking in these sectors allowed for abusive employers to sometimes operate with impunity. The government identified fewer victims, and it did not systematically implement standard operating procedures (SOPs) countrywide to proactively identify victims during law enforcement raids or among vulnerable populations with whom authorities came in contact. Because of inconsistent identification efforts, authorities continued to inappropriately penalize trafficking victims for immigration and "prostitution" violations. Poor interagency coordination and overall inadequate victim protection services, which discouraged foreign victims from remaining in Malaysia to participate in criminal proceedings, continued to hinder successful anti-trafficking law enforcement efforts.



MALAYSIA TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Increase efforts to identify trafficking victims among vulnerable populations, including household workers and workers in the palm oil and rubber manufacturing sectors. • Train relevant officials, including police, labor inspectors, and immigration officials, on SOPs for victim identification that include information on trafficking indicators. • Increase efforts to investigate, prosecute, and convict more trafficking cases—as distinct from migrant smuggling—including those involving complicit officials and forced labor crimes. • Expand labor protections for domestic workers and investigate allegations of domestic worker abuse. • Make public the results of investigations involving corrupt officials to increase transparency and deterrence and hold officials criminally accountable when they violate the law. • Increase law enforcement capacity to investigate and prosecute trafficking cases, including by improving interagency coordination. • Effectively enforce the law prohibiting

employers from retaining passports without employees' consent, including by increasing resources for labor inspectors, and include language explicitly stating passports will remain in the employee's possession in model contracts and future bilateral memoranda of understanding (MOU) with labor source countries. • Improve case management and communication with trafficking victims, including the consistent use of interpreters and the VAS program. • Expand efforts to inform migrant workers of their rights and Malaysian labor laws, including their rights to maintain access to their passports at any time, as well as opportunities for legal remedies to exploitation. • Create a system for access to timely and accurate interpretation in victims' primary languages available to law enforcement, the court system, and shelters. • Expand cooperation with NGOs, including through financial or in-kind support to NGOs to provide some victim rehabilitation services. • Eliminate recruitment or placement fees charged to workers by recruiters and ensure recruitment fees are paid by employers. • Increase the number of trafficking victims who obtain approval for freedom of movement from shelters, expand freedom of movement to include unchaperoned movement, and increase victims' access to communication with people outside shelter facilities. • Reduce prosecution delays, including by providing improved guidance to prosecutors on pursuing trafficking charges, and increase judicial familiarity with the full range of trafficking crimes, particularly forced labor. • Increase efforts to identify trafficking victims among People's Republic of China (PRC) workers on PRC government-affiliated infrastructure projects.

## PROSECUTION

The government increased law enforcement efforts. The 2007 Anti-Trafficking in Persons and Smuggling of Migrants (ATIPSOM) Act criminalized labor trafficking and sex trafficking and prescribed punishments of three to 20 years' imprisonment and a fine, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious offenses, such as rape. In December 2021, Parliament passed a third amendment to ATIPSOM—previously amended in 2010 and 2015—which increased the penalties for some offenses and expanded the definition of trafficking to include other means. Nevertheless, officials did not consistently understand the definition of trafficking. Prosecutors often interpreted the definition of trafficking under ATIPSOM to require the physical restraint of a victim to pursue trafficking charges, which meant prosecutors did not pursue many potential trafficking cases—especially in cases where coercion was a primary element used by traffickers. The government also continued to conflate human trafficking and migrant smuggling, which impeded overall anti-trafficking law enforcement and victim identification efforts.

During the reporting period, law enforcement authorities conducted 108 human trafficking investigations, while other ministries referred 17 investigations to the Attorney General's Chambers (AGC), which included cases of sex trafficking, forced labor, child exploitation, and domestic servitude, all of which the police referred to the AGC for prosecution. This data compared with 118 human trafficking investigations and 109 referrals to the AGC for prosecution in the previous reporting period. The AGC initiated the prosecution of 31 cases of human trafficking, a decrease from 79 initiated prosecutions the previous year. During the reporting year, the courts convicted 55 human traffickers and migrant smugglers—though it did not disaggregate the data—under a range of laws, including the ATIPSOM Act, Immigration Act, and the Penal Code; sentencing of traffickers ranged from three to 18 years' imprisonment under ATIPSOM, restitution of 10,000 Malaysian ringgit (RM) ($2,400) under the Immigration Act, and one to six years' imprisonment under the Penal Code. This data compared to the conviction of 25 human traffickers and migrant smugglers in the previous reporting period. The government convicted five individuals for withholding the passports of employees under the Passport Act of 1966, but it did not report sentencing details for those convicted nor did it prosecute or convict these individuals for potential trafficking crimes; this demonstrated a decrease compared to the conviction of 26 individuals under this act during the previous reporting period. The government sometimes pursued cases of forced labor as disparate labor law violations instead of criminal cases of human trafficking or failed to investigate them at all. In March 2022, Parliament passed an amendment to the Employment Act, which added a definition of forced labor for employers that used threats

of intimidation, restriction of movement, and fraud; the amendment also included penalties for forced labor offenses under the act that ranged from a fine of $25,000 to a maximum prison sentence of two years. The government did not report efforts to coordinate with foreign law enforcement to investigate or prosecute trafficking cases. However, the government's child exploitation unit continued to cooperate with a foreign government on cases of online child sexual exploitation, including child sex trafficking cases, but pandemic-related restrictions hampered the unit's overall capacity.

The government did not adequately address or criminally pursue credible allegations—during this reporting period and prior years—of labor trafficking in the rubber manufacturing and palm oil sectors, including inhumane living conditions for foreign workers made by international media, NGOs, and foreign governments. The government's inaction to address these crimes and hold traffickers accountable in these sectors continued to create an environment in which labor trafficking flourished with impunity and trafficking victims remained vulnerable to abuse without protection. Furthermore, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The government did not report initiating any new prosecutions or convictions of government employees allegedly complicit in trafficking crimes. Although law enforcement agencies continued to arrest officials for complicity in trafficking, insufficient evidence collection hindered bringing these officials to justice, and authorities only transferred or demoted them, allowing impunity for complicity in human trafficking crimes to persist. During the reporting period, the Royal Malaysian Police (RMP) arrested six officials for involvement in trafficking crimes, but it did not report the details of these cases. The immigration department separately arrested 40 officials on trafficking-related charges, but the government did not prosecute them; it demoted or removed 29 of these officials from their jobs while it continued to investigate 11 of them at the end of the reporting period. The government continued to prosecute the former deputy prime minister, who also served as minister of home affairs, on 40 counts of corruption—charges brought in 2019—for allegations of receiving kickbacks in visa issuance contracts for foreign workers. The RMP arrested three officials for involvement in "baby selling" and charged them under the ATIPSOM Act; however, this case may not have met the definition of human trafficking under international law.

Malaysia's criminal justice system continued to suffer resource constraints and uneven application of basic investigative and prosecutorial skills, which prevented judicial authorities from following through on trafficking cases at times. The pandemic further delayed or slowed criminal justice and law enforcement operations, including those related to human trafficking crimes, due to movement restrictions, social distancing, and court capacity requirements. The RMP continued to serve as the lead enforcement agency and assigned 248 officers to its specialized anti-trafficking unit. The Labor Department similarly had a specialized trafficking enforcement team with 42 officers. Although the government continued to operate an interagency anti-trafficking law enforcement task force under the Anti-Trafficking in Persons and Anti-Smuggling of Migrants Council (MAPO council), which met virtually on a bi-weekly basis, coordination among agencies remained insufficient. The AGC increased the number of trafficking-specialist deputy public prosecutors from 73 to 79. Only two judges in the country specialized in the anti-trafficking law. The government continued to operate one special trafficking court in Selangor, but it did not implement plans to expand special trafficking courts around the country. The government conducted 79 anti-trafficking trainings for law enforcement and other government officials. It also conducted two trainings with an international organization and Malaysian businesses on fair recruitment practices and six trainings for private industry on forced labor in supply chains.

## PROTECTION

The government maintained mixed protection efforts. In 2021, the government identified and confirmed 96 trafficking victims among 373 potential victims, which represented a decrease from the previous reporting period when the government identified and confirmed 119 victims among 487. The government had victim identification SOPs—formally adopted in April 2020—to guide law enforcement officers to identify victims during official duties. However, the government did not

systematically implement these SOPs nationwide, especially in rural areas and in the eastern states of Sabah and Sarawak, which resulted in officers' failure to refer some victims to shelter and other protection services. The government continued to focus most of its identification efforts on the use of large-scale police raids of suspected commercial sex establishments and factories suspected of forced labor, the more prevalent trafficking problem in Malaysia; NGOs reported some police units continued to conduct these raids during the reporting period. The government, however, did not place adequate attention on the identification of victims of forced labor; officials often relied on reports of abuse from embassies representing foreign workers, victims to "self-identify," or workers' complaints of non-payment of wages and other violations. During large-scale operations to detect undocumented migrants, NGOs reported police and immigration officers inconsistently applied victim identification procedures or were slow to identify victims, ultimately preventing some foreign victims from receiving protection services. The government also did not adequately screen asylum-seekers and refugees for indicators of trafficking. Because of officials' inconsistent use of victim identification SOPs, authorities may have detained, arrested, and deported some unidentified trafficking victims for immigration or "prostitution" violations. NGOs continued to report authorities treated potential victims identified during police or immigration raids like criminals; this treatment and the raid environment were not conducive to victims speaking candidly to law enforcement and consequently contributed to the government's insufficient identification of victims.

ATIPSOM required the government place victims who were granted a court-ordered 21-day interim protection order (for potential trafficking victims) or a subsequent 90-day protection order (for certified trafficking victims) at a "place of refuge," designated by the Minister of Home Affairs. During the reporting period, the government granted all 96 certified victims with full protection orders and housed them in government-operated shelters where they had access to food; some medical care; social, religious, and income-generating activities; and security. While the law permitted authorities to place victims who were Malaysian citizens or permanent residents in the care of family members or a guardian, as opposed to a government shelter or other designated place of refuge, the law required foreign victims to remain in government shelters for the duration of their protection orders. The government typically renewed protection orders for certified victims until the completion of the trial associated with their case; this resulted in some victims remaining in the shelters for more than six months. NGOs reported investigative authorities sometimes did not allow sufficient time to appropriately interview potential victims in shelters in order to certify them as victims and grant 90-day protection orders, which prevented some victims from obtaining protection services. Undocumented foreign trafficking victims had a considerably lower chance of obtaining protection orders compared with foreign victims who had valid immigration papers. Moreover, officials' interpretation that ATIPSOM required a trafficking victim to be subjected to physical restraint prevented the government from identifying some victims and issuing protection orders to many potential victims.

The Ministry of Women, Family, and Community Development (MWFCD) continued to fund shelters for trafficking victims: eight government-operated and two NGO-operated. In 2021, MWFCD collaborated with civil society organizations to develop a training manual for protection officers and shelter personnel on victim-centered approaches to protecting trafficking victims. The government allocated 785,000 RM ($188,020) to two shelters operated by local NGOs that could assist potential and certified victims, an increase of RM 30,000 compared with its allocation of 755,000 RM ($180,840) to two shelters in 2020. However, the government reported it was unable to utilize allocated funds to NGO-operated shelters due to pandemic-related restrictions limiting in-person activities. NGO-operated government shelters continued to suffer staffing shortages and struggled to maintain adequate resources to consistently provide services, including interpreters, medical staff, and mental health counselors. Although the government continued to place translated shelter rules and regulations in five languages in some government shelters, language barriers continued to impact the government's victim services in shelters and during the judicial process, as it did not have an institutionalized way to ensure timely and accurate communication with potential trafficking victims who

did not speak Bahasa Malaysia or English. Shelter staff expanded victims' communication, including with family members in their home countries, and while the government did not permit victims to possess personal phones in shelters, the Malaysian government expanded capacity to allow weekly internet calls to family from shelters, including video calls. Authorities did not permit victims to leave shelters unless immigration authorities granted them a freedom of movement pass; however, the government was less likely to approve these passes for female victims of sex trafficking. Although the government reported freedom of movement passes allowed victims to leave the shelters unchaperoned, in practice, a victim's movement outside of shelters remained restricted to chaperoned trips. NGOs reported these shelter conditions resulted in victims feeling as though they were detained. The government issued 102 freedom of movement passes to potential and confirmed victims in 2021, an increase from the 66 passes issued in 2020. The government also granted 11 victims continued permission to work, which also demonstrated an increase from the one work visa it granted to a victim in the previous reporting period.

The government reported 55 victims participated in 110 investigations or prosecutions in 2021; it did not report how many victims participated in investigations or prosecutions in the previous reporting period. A 2014 directive required prosecutors to meet with victims at least two weeks prior to the start of a trial to prepare victims to record their statements and to help them understand the judicial process. Prosecutors reported they engaged with victims; however, limited availability of interpretation services made effective communication difficult. NGOs reported cases in which public prosecutors did not appropriately interview victims to ensure courts granted them protection orders. In 2021, the MAPO Council established a roster of volunteer interpreters, who spoke 16 languages and received anti-trafficking training from NGOs, to be available for victims who participated in investigations or prosecutions; during the year, interpreters assisted 32 victims at various stages of the legal process. Despite the availability of interpreters, observers reported victims still did not fully understand their rights during the judicial process, contributing to stress and reluctance to participate in investigations and prosecutions, particularly in rural areas where victim services were harder to access. Furthermore, the absence of shelters in northern Malaysia hindered the ability of prosecutors to meet with victims who were relocated to Kuala Lumpur for services. Some foreign victims reported a reluctance to stay in Malaysia to participate in prosecutions due to fears of extended shelter stays, unappealing shelter conditions, and intimidation from traffickers; some victims further reported authorities treated them like criminals, including taking victims to court in handcuffs for a trafficker's trial. Although the law permitted victims to testify remotely, authorities generally expected victims to remain in-country pending trial proceedings. To address this challenge, the 2021 amendment to ATIPSOM granted magistrates the authority to extend protection orders for victims to record testimony, which could be used in lieu of in-person testimony, thereby allowing a foreign victim to return to their home country ahead of a trial. Labor trafficking victims could file civil suits against their employers to obtain compensation or recoup unpaid wages; however, the government did not provide restitution for sex trafficking victims. For labor trafficking victims who participated in court proceedings, the government instructed prosecutors to request restitution in each case; during the reporting period, prosecutors requested restitution in 13 cases and secured $25,000, which demonstrated an overall increase from $21,450 secured for five cases in 2020. The MAPO council conducted a 12-month pilot project—initiated in March 2021—to assess the government's process for victims of labor trafficking to seek legal redress and to study the feasibility of an alternative referral system for labor trafficking cases; the government did not release the results of the project by the end of the reporting period.

The government added four additional officers to the VAS program under which a total of six appointed specialists provided services to trafficking victims from the time authorities identified them, through the judicial process, and during their repatriation to their home country. NGOs reported cases of authorities not allowing VAS specialists to join law enforcement during investigations or raids, which negatively impacted law enforcement's ability to appropriately screen for and identify victims. The VAS specialists worked with and provided assistance to 66 victims

during the reporting period, a substantial increase from the 15 victims they assisted in 2020. As in past years, many identified foreign victims preferred to return immediately to their home countries. The government worked with foreign diplomatic missions to fund and provide repatriation assistance for victims to return to their home countries. The government continued to give monthly allowance payments of 120 RM ($29) to victims for incidental expenditures. The government did not always disburse the funds on a monthly basis; some victims received the allowance as a lump sum when they repatriated home. The government did not provide legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution. ATIPSOM required that foreign victims without legal residence in Malaysia be referred to immigration authorities for repatriation upon the revocation of their protection order.

## PREVENTION

The government increased efforts to prevent trafficking. The MAPO council—which included five enforcement bodies, other government entities, and three NGOs—continued to meet on a quarterly basis and coordinated interagency anti-trafficking efforts to implement the government's 2021-2025 anti-trafficking NAP. The 2021 amendment to ATIPSOM increased the number of NGO members who were allowed to participate in the MAPO council from three to five. In 2021, the government maintained the allocated budget of 4 million RM ($958,080) to operate the MAPO council secretariat. In alignment with the goals of the NAP, in November 2021 the Ministry of Human Resources (MOHR) released and began to implement its National Action Plan Against Forced Labor (NAPFL) for 2021-2025, which the government wrote in close collaboration with the International Labor Organization and other non-governmental actors. The NAPFL included actions for the government, employers, workers, and civil society to collaborate to improve migration management, protect victims, and raise awareness about forced labor. The government did not have a central database to track or compile nationwide anti-trafficking law enforcement activities, victim identification statistics, or data on trafficking trends; individual ministries compiled anti-trafficking statistics, which they typically did not share widely with other ministries or with the public.

The government broadcasted 1,344 public service announcements on television stations and 120,462 on national radio networks, an increase from those it broadcasted in the previous reporting period. It also maintained 11 anti-trafficking television programs and increased radio programs from 10 to 16. The government created 10 anti-trafficking billboards and continued to distribute 200,000 brochures, raising trafficking awareness in multiple languages. Labor officials continued to provide banners and other signage at the Kuala Lumpur International Airport in holding lounges for newly-arrived migrant workers (in a range of languages) to help educate foreign workers about their rights in Malaysia. The Department of Labor continued to operate a radio campaign promoting a program under which migrants could report labor abuses. Similar to the previous reporting period, the government hosted two public sessions for foreign workers in the palm oil industry about their legal rights and for employers on indicators of forced labor. The government continued to operate an anti-trafficking hotline; however, it was attached to a general government hotline staffed by operators who were not trained to work on human trafficking cases. The hotline reportedly received seven calls during the reporting period, which resulted in the initiation of seven law enforcement investigations and the identification of five potential trafficking victims. In May 2021, MOHR announced the implementation of a smartphone app for migrant workers to file labor complaints, which were referred to labor inspectors who were required to inspect an allegation within 10 days of a complaint. MOHR reported the app received approximately 50 complaints per day, most of which were complaints of withheld or late wages, but it did not report if inspectors identified any of these cases as labor trafficking.

The government continued to enforce its ban of Malaysia-based outsourcing companies, which often used practices that perpetuated debt-based coercion among migrant workers. The government's Private Employment Agency Act (PEAA) required all private recruitment agencies to secure a license with the Ministry of Human Resources to recruit foreign workers, including domestic workers. The PEAA capped employee-paid "placement" fees at 25 percent of the first month's basic wages for Malaysian workers employed within or outside of

Malaysia and one month's basic wages for non-citizens employed within Malaysia. The law did not define what comprised a "placement fee," and enforcement of this rule was lacking; the majority of migrant workers in Malaysia paid much higher fees to recruitment agents, including in their home country, which contributed to the workers' vulnerability to debt-based coercion. The government also mandated employers pay the foreign worker levy, a one-time cost paid to the government for any non-Malaysian the company hired, instead of forcing workers to bear the cost. The government did not report investigating any employment agencies for violating the PEAA during the current or previous reporting period. The government continued to use an online application system for employers to renew their workers' temporary work permits without using a broker. The government re-signed a bilateral MOU with Bangladesh to allow migrant workers to work in Malaysia, which stipulated that all travel expenses including visa requirements were the responsibility of the Malaysian employer. However, observers reported concerns the MOU did not address the responsibilities of recruitment agencies in Bangladesh, which sometimes demanded additional fees from workers that contributed to debt-based coercion. In April 2022, the government officially signed an updated MOU with the Indonesian government on the recruitment of domestic workers, which expired in 2016. Malaysian employment law continued to exclude domestic workers from a number of protections, including maximum working hours and the country's minimum wage.

Civil society continued to observe a lack of adequate efforts to inform migrant workers of their rights and Malaysian labor regulations. The government reported it employed 44 labor inspectors who focused on human trafficking for the entire country—a decrease from the 94 inspectors employed in the previous reporting period; the government assigned 30 of these inspectors to peninsular Malaysia, seven to Sarawak, and seven to Sabah where a large number of Malaysia's palm oil plantations were located. The lack of adequate resources, including for additional labor inspectors, hindered the government's efforts to adequately identify labor trafficking and enforce the prohibition on employer-perpetrated passport retention, which remained widespread. The government conducted 27,836 labor inspections during the reporting period, an increase from 24,294 inspections in the previous year. In 2021, labor courts resolved 7,515 labor disputes, ordered employers to provide workers back wages amounting to $5 million, and levied fines against employers who violated labor laws in the amount of $1 million; this compared with 10,465 labor disputes resolved, 18.06 million RM ($4.36 million) in back wages ordered to workers, and 499,570 RM ($119,660) in fines levied against employers in 2020.

Malaysian birth registration policies have left more than an estimated 500,000 individuals—including children—stateless and therefore unable to access some government services, including legal employment and public schools, increasing their vulnerability to trafficking. The law did not permit the government to grant stateless persons asylum or refugee status, which left more than 180,000 refugee-status-seekers and asylum-seekers in Malaysia, including more than 100,000 Rohingya, unable to obtain legal employment, which increased their vulnerability to exploitation. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Malaysia, and to a lesser extent, traffickers exploit victims from Malaysia abroad. The overwhelming majority of victims are among the estimated 1.4 million documented and an even greater number of undocumented migrant workers in Malaysia. Foreign workers constitute approximately 20 percent of the Malaysian workforce and typically migrate voluntarily—often through irregular channels—from Bangladesh, Burma, Cambodia, PRC, India, Indonesia, Laos, Nepal, the Philippines, Thailand, and Vietnam. More than one-third of all foreign workers are employed in the manufacturing sector, with others employed in construction, agriculture, and domestic work. Employers, employment agents, and illegal sub-agents exploit some migrants in labor trafficking primarily through debt-based coercion when workers are unable to pay the fees for recruitment and associated travel. Some agents in labor source countries impose onerous fees on workers before they arrive in Malaysia, and Malaysian agents administer additional fees after arrival—

MALDIVES

in some cases leading to forced labor through debt-based coercion. Large organized crime syndicates are responsible for some instances of trafficking. Employers utilize practices indicative of forced labor, such as restrictions on movement, violating contracts, wage fraud, assault, threats of deportation, the imposition of significant debts, and passport retention—which remained widespread—to exploit some migrant workers in labor trafficking on oil palm and agricultural plantations; at construction sites; in the electronics, garment, and rubber-product industries; and in homes as domestic workers. Malaysian law allows employers to hold workers' passports with the workers' permission, but it is difficult to determine if workers have freely given permission, and some employers retain the passports to prevent workers from changing jobs. According to a Malaysian government-funded survey from June 2018-January 2019 on the prevalence of forced and child labor in the palm oil sector, eight out of every 1,000 palm oil plantation workers were in situations of forced labor, with the prevalence rate considerably higher in Sarawak than in Peninsular Malaysia and Sabah. Furthermore, a 2018 NGO report documented multiple indicators of forced labor associated with the production of palm oil in Malaysia, including coercive practices such as threats, violence, lack of clarity of employment terms and conditions, dependency on the employer, lack of protection by police, debt bondage, high recruitment fees, and involuntary overtime. Traffickers use large smuggling debts incurred by refugees to subject them to debt-based coercion. PRC nationals working for PRC state-affiliated construction projects in Malaysia are vulnerable to forced labor.

Traffickers recruit some young foreign women and girls—mainly from Southeast Asia, although also recently from Nigeria—ostensibly for legal work in Malaysian restaurants, hotels, and beauty salons, or for brokered marriages, but instead compel them into commercial sex. Refugees, asylum-seekers, and stateless individuals who lack the ability to obtain legal employment in Malaysia are also vulnerable to sex and labor trafficking. Traffickers use false or fraudulent offers of assistance to recruit Rohingya asylum-seekers out of refugee camps in Bangladesh and Indonesia to exploit them in Malaysia, including women and girls coerced to engage in commercial sex. Traffickers also exploit some men and children, including Malaysians, into commercial sex. The Malaysian government has reported, since 2020, that children are vulnerable to online sexual exploitation, including some instances of child sex trafficking. Traffickers exploit Malaysian orphans and children from refugee communities in forced begging. Traffickers increasingly exploit Malaysian women and children in forced labor. Stateless children in Sabah were especially at risk of forced labor in palm oil production, service industries, and in forced begging. Media report young male and female Malaysians pay recruitment fees for promised high-paying jobs, but traffickers transfer them to Cambodia and exploit them and authorities arrest them for immigration violations. In order to circumvent the Indonesian government's ban on Indonesian migration to 21 countries, some Indonesian workers transit Malaysia legally en route to Middle Eastern countries, where traffickers exploit some in forced labor.

Ongoing corruption related to processes for foreign nationals to work in Malaysia increases the cost of migration and consequently increases migrant workers' vulnerability to trafficking through debt-based coercion. Corrupt immigration officials facilitate trafficking by accepting bribes from brokers and smugglers at border crossings, including at airports. Some government officials profit from bribes and direct involvement in extortion from and exploitation of migrants.

## MALDIVES: TIER 2

The Government of Maldives does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Maldives remained on Tier 2. These efforts included amending the Prevention of Human Trafficking Act (PHTA) to criminalize all forms of sex and labor trafficking and remove a transportation requirement to constitute a trafficking

offense. The government increased the number of prosecutions and charged a senior government official allegedly complicit in trafficking crimes under the PHTA for the first time. However, the government did not meet the minimum standards in several key areas. The government decreased overall trafficking investigations and did not report any convictions for the second consecutive year. Victim identification and protection efforts remained weak, and officials continued to identify only a small number of human trafficking victims. A government shelter for trafficking victims—completed during the previous reporting period—was inoperable, leaving no facility to support survivors. The government remained without official standard operating procedures (SOPs) to refer victims to care and support services, and it did not effectively identify indicators of human trafficking among Maldives' large migrant worker population or consistently screen potential human trafficking victims for indicators. Similarly, the government did not hold employers or recruitment agencies accountable by filing any charges despite reports of labor violations.



### MALDIVES TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:
Significantly increase investigations, prosecutions, and convictions for all forms of trafficking, including officials complicit in trafficking-related crimes, while respecting due process. • Increase efforts to identify victims and screen migrant workers, particularly undocumented individuals, for human trafficking. • Train officials on the government's victim identification SOP and finalize and formally adopt SOPs for victim referrals and support services. • Significantly increase oversight of labor recruitment agencies and employers and refer trafficking indicators, such as non-payment of wages and passport retention, to police for criminal investigation. • Increase cooperation with migrant source-country governments through memoranda of understanding (MOUs) and other measures to improve labor conditions for migrant workers. • Increase anti-trafficking training for front-line officials and train immigration officials and labor inspectors to identify and refer suspected trafficking cases to police. • Increase training for law enforcement and judges on investigation of trafficking crimes and application of the anti-trafficking law. • Allocate resources for proactive monitoring of resorts and guest homes for labor violations and child exploitation. • Open the trafficking victim shelter, establish consistent protection services, including psycho-social support, and provide support for foreign victims. • Increase public awareness of human trafficking—especially among migrant workers—through widespread media campaigns. • Re-establish regular anti-trafficking training for diplomats. • Ensure anti-trafficking materials are available in appropriate languages for migrant workers and provide access to adequate interpretation and translation services for trafficking victims.

### PROSECUTION
The government maintained anti-trafficking law enforcement efforts. During the reporting period, the government enacted amendments to the Prevention of Human Trafficking Act (PHTA), which aligned the Maldives' definition of human trafficking with the 2000 UN TIP Protocol. As amended, the PHTA criminalized sex trafficking and labor trafficking. The PHTA prescribed penalties of up to 10 years' imprisonment for trafficking offenses involving an adult victim ("human trafficking") and up to 15 years' imprisonment for those involving a child victim ("child trafficking"). These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The PHTA amendment added a clause allowing the government to seize assets used in trafficking or gained through the profits of trafficking and defined the parameters under which courts can rule regarding human trafficking victim compensation.

The government investigated one trafficking case, compared with two trafficking cases investigated in the previous reporting period. The government prosecuted three alleged traffickers for forced labor, compared with no prosecutions initiated during the previous reporting period. It continued to prosecute trafficking cases initiated in prior reporting periods involving five alleged suspects, including three for sex trafficking and two for unspecified exploitation. For the second consecutive year, the government did not convict any traffickers during the reporting period. The government continued to reallocate a significant amount of financial and personnel resources away from nearly all aspects of its law enforcement operations to focus on the pandemic, affecting the ability of law enforcement to report and investigate cases and delaying the prosecution of all criminal cases. Maldives Police Service (MPS) and the Anti-Corruption Commission (ACC) continued to investigate 27 recruitment agencies from the previous reporting period on criminal and civil violations and suspended the licenses of all 27 agencies. Although the investigations—which began in 2019—remained ongoing, MPS forwarded four cases to the Prosecutor General's Office (PGO) in January 2022 seeking charges against several current and former Maldives Immigration (MI) officials and officials from several labor recruitment agencies for alleged collusion in manipulating the foreign worker recruitment quota system to facilitate fraudulent recruitment practices and potential trafficking. MPS sought charges of abuse of authority against the MI officials. The Ministry of Gender, Family, and Social Services (MOGFSS) did not report any cases of child sex trafficking during the reporting period. MPS did not report any investigations of "child commercial sexual exploitation," compared to investigating 291 incidents of child commercial sexual exploitation in the previous reporting period, including referring 115 cases for prosecution. Although the courts reopened in April 2021, they alternated between in-person sessions and virtual hearings due to the ongoing pandemic. To adapt to pandemic-related restrictions, MPS continued to use special investigative guidelines that included virtual meetings with witnesses and an online portal for MPS to submit cases electronically to the PGO.

The government took steps to investigate select reports of trafficking-related corruption, though corruption and official complicity in trafficking crimes remained significant concerns. The government did not report any convictions of government employees complicit in human trafficking crimes. In August 2021, PGO filed human trafficking charges under the PHTA against a ruling Parliamentarian for the first time, who was the managing director of a construction company contracted to develop a resort, alleging non-payment of salaries and intimidation, as well as exploitation of two labor trafficking victims among 200 migrant workers at a resort construction site who protested over these conditions, common indicators of forced labor. In addition, Sri Lankan police arrested a former senior Maldivian government official in July 2021 for alleged involvement in a child sex trafficking ring in Sri Lanka; the government did not report an investigation of the case. In January 2022, MPS arrested a police officer involved in a potential trafficking case. Civil society alleged labor inspectors accepted bribes to not report labor violations. Private employers held foreign employees' passports. Observers assessed that some traffickers operated with impunity due to connections with influential Maldivians. Observers reported some officials warned businesses in advance of planned raids to investigate labor violations.

The MPS Anti-Human Trafficking Department conducted trainings on human trafficking for MPS South, South Central, and Upper South Police Division staff, although travel restrictions due to the pandemic prevented trainings from occurring outside Malé. MI continued to implement a mandatory trafficking training for new recruits. Despite these trainings, officials continued to conflate human trafficking with migrant smuggling. Government officials previously acknowledged the need for increased training on identifying and investigating trafficking cases, especially among Ministry of Economic Development (MED), MPS, and Labor Relations Authority (LRA) personnel. Some officials reportedly stated that because trafficking in Maldives involved primarily Bangladeshi migrant workers, it had therefore diminished following the return home of the majority of these workers due to the pandemic. Civil society reported law enforcement and judges' lack of awareness and training on the PHTA likely contributed to the dearth of successful prosecutions. The government did not report conducting human trafficking trainings or capacity-building programs for judges or other judiciary figures during the reporting period. MPS, in partnership with an international organization, maintained a trafficking case management system that allowed potential victims to submit cases to the police online; however, it was only available in English, which limited its utility, and no cases have been received through the system. Authorities recognized the lack of cooperation with source-country governments as an obstacle to investigating cases with foreign victims or perpetrators. The government did not report cooperating with foreign officials on anti-trafficking activities. The absence of dedicated foreign language interpreters for victims and witnesses among law enforcement and social service providers continued to hamper law enforcement and victim protection efforts.

## PROTECTION

The government made insufficient protection efforts. Officials identified three trafficking victims, compared with two during the previous reporting period. All three victims were women from Thailand exploited in sex trafficking. The three victims received repatriation assistance to Thailand, per their request. The government had a formal SOP for victim identification but lacked an SOP for referring identified victims to care. The government continued to utilize victim identification guidelines passed in 2016, which provided basic instructions for identifying potential victims and referring victims for care. The government continued to revise its draft victim assistance and shelter service regulation to establish SOPs on shelter operations and provision of victim services; these SOPs remained under technical review at the end of the reporting period. NGOs reported the lack of cohesive victim identification and referral SOPs describing specific roles for agencies may have resulted in a lack of referrals and the possibility that victims were not identified. While all agencies could screen for trafficking, only the Anti-Human Trafficking Department could officially declare an individual a trafficking victim. Although MPS had disseminated the victim identification SOP from 2016 to its officers in the past, government agencies did not uniformly employ them. MPS and MI conducted regular joint inspections at guesthouses and spas in Malé and reported screening vulnerable groups such as female migrant workers suspected to be involved in commercial sex. However, in May and June 2021, MPS and MI reportedly placed more than 300 undocumented migrant workers experiencing homelessness in a temporary facility in Hulhumalé prior to deportation without conducting any screening for trafficking. MPS and social service providers did not have a clear understanding of the differences between sex trafficking and sexual abuse, especially in cases of children; this made the true number of sex trafficking victims unknown.

Although the government completed construction of a shelter for trafficking victims in February 2021, the facility was unable to house trafficking victims during the reporting period following structural damage from rain; the government was still identifying a more viable location for a permanent shelter at the end of the reporting period. The Anti-Trafficking in Persons Office (ATO) provided temporary shelter in guesthouses to three victims, in addition to food and medical care. Article 32 of the PHTA provided a 90-day reflection period during which victims could receive services while deciding whether to assist authorities in a criminal case. PGO provided victim support to trafficking victims if their cases went to prosecution. The judiciary could provide protections for child trafficking victims who participated in trials against their alleged traffickers. Although the amended PHTA allowed the state to seize assets used in trafficking or gained through the profits of trafficking, there were no reports of victims filing suits against traffickers for damages.

MED continued its re-registration and regularization program initiated in September 2019, which aimed to provide temporary documentation and legalize undocumented foreign migrant workers and repatriate both documented and undocumented workers wishing to return to their home country. MED reported the program slowed due to the pandemic and the government eventually suspended its activities in December 2021, although MED restarted the program in February 2022. MED registered approximately 1,700 migrant workers as part of this initiative since March 2021; however, the government did not report whether it screened any of these workers for human trafficking indicators. Separately, MI reported screening 1,577 migrant workers for trafficking indicators during operations with police from March to September

MALDIVES

2021, including undocumented migrant workers who applied for the government's voluntary repatriation program and workers who lodged complaints with MI—mostly concerning non-payment of salaries, withheld passports, or inadequate housing—against their employers. However, no victims were identified through these screening measures during the reporting period. Observers reported the government's screening processes may be inadequate given the limited number of trafficking victims identified in recent years, despite the significant proportion of undocumented workers among the large migrant laborer population in the country. NGOs reported concerns that the government was able to identify only two potential victims among 200 expatriate workers at a resort during the previous reporting period.

There were reports the government penalized potential labor and sex trafficking victims. In the case involving a resort construction site, MPS arrested 19 potential trafficking victims who participated in a protest in 2020 with approximately 200 foreign migrant workers; although the government identified two labor trafficking victims among the workers, officials charged 13 workers with various crimes related to property damage but later revoked charges against two workers. The court found the 11 migrant workers guilty and issued sentences of various lengths. The government repatriated most of the approximately 200 migrant workers and initiated proceedings to deport the 11 recently-convicted migrant workers. MPS reported they screened the 200 workers for signs of trafficking and identified only two victims. While the government screened for physical confinement before arresting foreign national women in commercial sex, it did not adequately screen for fraud or coercion. Foreign national trafficking victims could receive a special visa allowing them to remain in Maldives and work during the investigation and prosecution. However, the PHTA permitted the deportation of trafficking victims who entered Maldives without authorization.

## PREVENTION

The government maintained anti-trafficking prevention efforts. The National Anti-Human Trafficking Steering Committee (NAHTSC), composed of senior government officials and overseen by the ATO, remained the lead interagency committee responsible for coordinating the government's efforts to combat human trafficking and held several virtual meetings during the reporting period. The NAHTSC continued to focus on five key areas of the Anti-Human Trafficking National Action Plan (NAP), adopted in March 2020, to adapt to reduced resources due to the pandemic. The Ministry of Defense continued to allocate a dedicated office space for the ATO staffed by the director of anti-trafficking and a consultant for policy and outreach. The 2022 State Budget allocated 1 million Maldivian rufiyaa (MVR) ($64,850), a decrease from the 1.99 million MVR ($129,050) in the 2021 budget, to fund the work of the ATO and the implementation of the NAP. A baseline study to collect data throughout the country's atolls to inform anti-trafficking priorities for 2021 remained postponed due to pandemic-related travel restrictions.

The sixth amendment to the Employment Act, ratified during the previous reporting period, continued to regulate the presence of foreign workers. The act limited the number of foreign workers that can enter Maldives from any single country to 100,000 and included provisions for prioritizing Maldivians for employment. In addition to limiting the number of migrant workers coming from any one country, the quota was intended to help the government better track the number of current migrant workers and reduce opportunities to manipulate the recruitment system. The policy outlined procedures for worker recruitment and employers providing accommodation for workers, among other policies related to recruitment. MED continued to issue employment agency permits according to the Employment Agency Regulations issued in 2016. The regulations included expatriate workers regulations, allowed blacklisting of agencies in violation of the Employment Act, prohibited the withholding of foreign worker passports subject to a penalty of 5,000 MVR ($324), and prohibited work outside the scope of the approved work permit. In addition, the regulations prohibited charging workers recruitment fees subject to a penalty of 5,000 MVR ($324) and suspension of the agency's license to operate in Maldives. During the reporting period, MED fully automated the work permit process to reduce the risk of recruitment agencies submitting fraudulent documents. MED also maintained a process for foreign migrant workers to change employers by submitting an online employer change request to obtain a

new work permit. The government proposed an MOU with Bangladesh regarding Bangladeshi migrant workers in Maldives; however, for the fourth consecutive year, the draft remained pending. The government reported no new action to prevent forced labor in supply chains.

LRA had the authority to inspect all worksites, including private homes, and it carried out 124 inspections in 2021, compared with approximately 70 inspections in 2020 and 200 in 2019. LRA identified 23 potential cases of child labor, including 14 child labor violations, although it did not report any cases of forced child labor or child commercial sexual exploitation during the reporting period. LRA lacked the resources, staff, and training necessary to fulfill its mandate, and anti-trafficking training remained inconsistent. It did not report providing any anti-trafficking training for inspectors during the reporting period. LRA generally received numerous complaints of non-payment of wages and mediated such claims with the employer or issued fines against the employer if mediation failed or the employer committed repeated violations. Neither LRA nor the tribunal referred labor violations to police for criminal investigation. Observers reported tribunal delays resulted in some labor trafficking victims being pressured to settle out of court rather than pursuing charges before a tribunal. LRA could request to MED that it blacklist foreign recruitment agencies and employers with repeated or serious labor violations. MED did not always implement LRA's recommendations, and despite repeated recommendations from LRA to blacklist certain agencies and employers, those agencies and employers continued to operate. MI also inspected establishments that employed migrant workers. LRA continued to use an online portal for island councils to report the number of individuals, including migrant workers, on each island, however implementation was inconsistent as some councils did not push businesses to register their employees with the portal.

Civil society reported a continued lack of significant efforts to raise awareness of trafficking among the most vulnerable groups. In July 2021, the government launched a month-long social media awareness campaign. The government issued campaign material targeting Maldivians and migrant workers through social media platforms in Bangla, Hindi, Sinhala, English, and Dhivehi. The ATO ensured Maldivians were included in awareness campaign posters to prevent the stigmatization of foreign migrant workers and reduce racialized perceptions of trafficking victims. The government did not make efforts to reduce the demand for commercial sex acts or for child sex tourism. While anecdotal reports suggest that there have been cases of children being exploited for commercial sex acts or child sex tourism, there were no confirmed cases during the reporting period. The government previously reported increased concerns that traffickers could use resorts and guesthouses to facilitate child sex tourism, in part because no government agency had the authority or resources to monitor these establishments for such crimes. The dedicated TIP hotline operated by the government remained suspended during the reporting period due to a lack of dedicated staff. The MPS Anti-Human Trafficking Department operated a 24-hour helpline, although the hotline did not identify any victims. Civil society reported that the lack of Bengali-speaking hotline operators could have been a barrier to the large number of suspected Bangladeshi trafficking victims. The government did not report any anti-trafficking training for diplomats during the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Maldives. There have been no recent reports of traffickers exploiting victims from Maldives abroad. Foreign migrants, especially from Bangladesh, India, and Sri Lanka, continued to experience particular risk of labor and sex trafficking during the reporting period. Foreign migrant workers comprise approximately one-third of the population of Maldives, including at least 60,000 undocumented workers. Traffickers subject an unknown number of foreign workers—primarily Bangladeshi and Indian men in the construction and service sectors—to practices indicative of forced labor, including fraudulent recruitment, confiscation of identity and travel documents, withholding or non-payment of wages, and debt-based coercion. Despite prohibitions on worker-paid recruitment fees, migrant workers may pay approximately $2,500 to $4,000 in recruitment fees to work in Maldives, contributing to their risk of debt-based coercion upon arrival. In recent years, officials

reported an increasing number of Bangladeshi workers fraudulently obtained 12-month work visas while only possessing the requirements for three-month visas. In addition to Bangladeshis and Indians, some workers from Sri Lanka, Pakistan, and Nepal reportedly experience recruitment fraud before arriving in Maldives. Recruitment agents in source countries collude with employers and agents in Maldives to facilitate fraudulent recruitment and forced labor of migrant workers. The government reported that withholding passports and non-payment or under-payment of wages to migrant workers remained the most common trafficking indicators in Maldives. Civil society reported labor traffickers target Bangladeshi children who enter the country on work visas and falsified passports. Police reported an increase in Bangladeshi nationals living in Maldives who pose as labor agents and fraudulently recruit migrant workers from Bangladesh, facilitate their travel to Maldives, and abandon them upon arrival without documentation, rendering them vulnerable to traffickers. South Asian women may be victims of forced labor in domestic service in Maldives. Traffickers may have targeted migrant workers on fishing and cargo boats in Maldivian waters for forced labor. Traffickers use Maldivian children in forced criminality, including the transportation of drugs for criminal gangs. In December 2021, Cuba's Ministry of Public Health announced the two countries signed a medical collaboration agreement and a brigade of Cuban doctors would depart for Maldives. The Department of State has previously identified indicators of forced labor in Cuba's medical missions overseas.

Sex traffickers exploit women and girls from Maldives and other South Asian countries and—to a lesser extent—women from Africa, Asia, and Eastern Europe in Maldives. Some impoverished parents act as traffickers, allowing sex traffickers to exploit their children in exchange for financial assistance. Some traffickers bring women from South Asia into Maldives under the guise of tourism or under the pretext of employment as massage therapists and then force them into commercial sex. Specifically, police reported an increase in traffickers bringing Bangladeshi women into Maldives on tourist visas and exploiting them in commercial sex. Some employers transport Maldivian children to the capital from other islands for domestic work, where employers sexually abuse some, and others are vulnerable to labor traffickers. Traffickers have exploited Maldivian children in child sex tourism.

## MALI: TIER 2 WATCH LIST

The transition government of Mali does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included adopting a national referral mechanism (NRM) with standard procedures to identify and refer trafficking victims to care; increasing efforts to prevent signatory armed groups from recruiting and using children, including potential trafficking victims; and allocating more funding for anti-trafficking efforts. It partnered with an international organization to identify children recruited and used by armed groups, including potential trafficking victims, and referred most of those children to international organizations for care. However, the transition government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity. Substantial personnel turnover related to the May 2021 consolidation of military power that resulted in the upheaval of the previous transition government hindered Mali's ability to maintain consistent anti-trafficking efforts and accurately report on those efforts for this reporting period. For the third consecutive year, the government did not take steps to amend the anti-trafficking law to explicitly define hereditary slavery as a form of human trafficking. The transition government reported minimal law enforcement action to address hereditary slavery, and observers reported officials continued prosecuting hereditary slavery cases as misdemeanor crimes. Its efforts to identify or protect hereditary slavery victims, including from acts of violence and retribution, were severely inadequate, and officials reportedly detained anti-slavery activists. Despite widespread allegations of complicity, the transition government did not investigate any law enforcement or government officials for

complicity in trafficking crimes, including hereditary slavery and the forced recruitment or use of child soldiers. The transition government continued providing support to and collaborating with the Imghad Tuareg and Allies Self-Defense Group (GATIA), a pro-government militia, despite allegations that GATIA has forcibly recruited and used children. Law enforcement continued to lack resources and understanding of human trafficking, which impeded law enforcement efforts. Shelter and services for victims, especially male victims, remained insufficient and was primarily restricted to Bamako. Because the transition government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Mali was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Mali remained on Tier 2 Watch List for the third consecutive year.



### PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute trafficking crimes, and sentence convicted traffickers, including slaveholders and complicit officials, and those who recruit and use children, to significant prison terms. • Cease prosecuting hereditary slavery as a misdemeanor crime and amend the 2012 anti-trafficking law to effectively investigate and prosecute trafficking crimes involving hereditary slavery. • Increase efforts to identify victims of hereditary slavery and refer them to protective services in collaboration with civil society. • Implement the NRM and train criminal justice officials and social service providers on the procedures. • As part of the peace process, continue engaging signatory armed groups to prevent recruitment and use of children and cease support to armed groups that unlawfully recruit and use children. • Expand and strengthen reintegration programs for former child soldiers that address specific needs of child ex-combatants, including psycho-social care, family reintegration, education, and vocational training, and automatically refer all children associated with armed groups to care. • Screen vulnerable populations, including children associated with armed groups, individuals in commercial sex, and communities historically exploited in hereditary slavery, for trafficking indicators and refer them to appropriate services. • Cease targeting non-traffickers through spurious trafficking charges and the detention and harassment of anti-slavery activists. • Allocate dedicated budgets, resources, and personnel to the anti-trafficking committee and strengthen its authority to coordinate the government's anti-trafficking response. • Train law enforcement on effective, victim-centered investigation techniques and trauma-sensitive approaches when interviewing victims. • Regularly train judges and prosecutors on the 2012 anti-trafficking law. • Provide financial and in-kind support to NGOs that identify and assist trafficking victims. • Adopt a new national action plan and allocate resources to its implementation.

### PROSECUTION

The transition government maintained insufficient law enforcement efforts. Law 2012-023 Relating to the Combat against Trafficking in Persons and Similar Practices, as amended, criminalized sex trafficking and labor trafficking. The law prescribed penalties of five to 10 years' imprisonment for trafficking crimes, except forced begging for which it prescribed lesser penalties of two to five years' imprisonment and a fine of 500,000 to 2 million West African CFA francs (FCFA) ($860-$3,440). These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape. Transition government officials and NGOs reported that the law did not precisely define hereditary slavery and therefore could not be effectively implemented to prosecute trafficking cases involving hereditary slavery. Draft legislation that would revise the anti-trafficking law to explicitly define hereditary slavery as a form of human trafficking

remained pending before the Ministry of Justice (MOJ) for the third consecutive year.

The transition government continued to lack a centralized data collection mechanism and did not systematically report law enforcement actions, making comprehensive statistics difficult to obtain. The transition government reported initiating at least 29 case investigations and continuing 50 case investigations, compared with investigating 59 cases, including at least 17 new case investigations, during the previous reporting period. The transition government prosecuted at least 41 alleged traffickers, compared with 78 during the previous reporting period, which included 22 alleged traffickers and 56 alleged slaveholders. During the reporting period, courts convicted 14 traffickers under the 2012 anti-trafficking law and sentenced each to at least two years' imprisonment; six of the traffickers, all Nigerian nationals, were convicted in absentia. The transition government did not report issuing extradition requests during the reporting period. This compared with convictions of nine traffickers under the 2012 anti-trafficking law and 31 slaveholders of misdemeanors under penal code provisions during the previous reporting period. The transition government did not report the number of slaveholders prosecuted and convicted during the reporting period. However, observers reported officials continued prosecuting most hereditary slavery cases as misdemeanors under discrimination, destruction of crops, or burglary statutes, which prescribed significantly lower penalties than those available under the anti-trafficking law; as a result, the majority of slaveholders received a fully suspended prison sentence and a fine, which did not serve to deter or adequately reflect the nature of the crime. The transition government reported minimal law enforcement action to address hereditary slavery. However, in November 2021, the Minister of Justice issued a letter urging prosecutors to initiate criminal proceedings against all persons involved in hereditary slavery using penal code provisions; the Minister also ordered an assessment of the Kayes judiciary's actions on hereditary slavery cases and strengthening measures to combat slavery. In February 2022, authorities arrested 34 suspects accused of torturing individuals who refused to submit to slavery in the Kayes region; 27 suspects remained in detention during the investigation. In addition, authorities arrested 50 suspected slaveholders and sympathizers in November 2021 following a series of attacks on anti-slavery activists. Both cases remained pending before an investigative judge at the end of the reporting period.

The Brigade de Moeurs (a brigade charged with investigating crimes related to morality) was the primary law enforcement agency investigating sex trafficking and cases involving children, and the Specialized Judiciary Brigade and Specialized Investigative Brigade investigated and prosecuted transnational trafficking. The Migrant Smuggling and Trafficking Brigade, created in October 2019 with the assistance of a foreign donor, investigated illicit migration and migrant smuggling, including potential trafficking cases. These units were not dedicated solely to human trafficking, lacked adequate resources and training, and could not access portions of the country due to insecurity. International organizations, with some transition government support, trained judges, prosecutors, law enforcement, and other transition government stakeholders on investigating and prosecuting human trafficking and migrant smuggling cases. Despite these efforts, continued lack of awareness of the 2012 anti-trafficking law and frequent turnover and transfers of officials stymied law enforcement action. Additionally, law enforcement's system-wide lack of training, funding, and resources, including vehicles and equipment to investigate crimes, impeded anti-trafficking efforts. The transition government had limited or no judicial presence outside of Bamako and some regional capitals in Mali, primarily in the north and center of the country, due to continuing security challenges. Insufficient funding and judicial staffing levels limited regular sessions of the Court of Assizes—which heard all serious criminal felony cases, including trafficking—and caused significant judicial delays. Insecurity and instability limited court sessions outside of Bamako and some regional capitals and further exacerbated judicial delays.

The transition government did not report any investigations, prosecutions, or convictions of transition government officials complicit in human trafficking crimes, including hereditary slavery, or unlawful child soldiering; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action. Reports of complicity allegations included traffickers paying bribes to security agents, corrupt law enforcement agents returning victims to their traffickers or alerting traffickers to law enforcement presence, and law enforcement agents coercing victims to pay bribes to avoid fines or obtain fraudulent identity documents. According to NGO reports, the Mali Basketball Federation attempted to cover up allegations the head coach of the national girls basketball team, comprised of children, sexually abused at least three players, which at times included sex trafficking—soliciting sex in exchange for playing time, money, and equipment and threatening imprisonment if the girls reported the abuse; authorities arrested and indicted him for sexual abuse in July 2021. International observers reported signatory armed groups receiving government support—such as GATIA, a pro-government militia and subsidiary of armed group Platform, a signatory to the 2015 Algiers Accord—continued recruiting and using child soldiers.

## PROTECTION

The transition government maintained insufficient efforts to identify and protect all trafficking victims. The transition government identified 130 trafficking victims, including 55 sex trafficking victims, 33 labor trafficking victims, 26 children recruited and used by armed groups, and 16 victims where the form of trafficking was unknown, compared with 73 trafficking victims identified during the previous reporting period. As in past years, the transition government did not report identifying any victims of hereditary slavery during the reporting period. The transition government referred the majority of identified victims to NGOs for care. Additionally, the transition government and an international organization identified at least 153 children associated with armed groups, compared to at least 230 children in 2020; authorities separated and referred 110 of the children for care, while 43 children remained unaccounted for.

The transition government, in coordination with an international organization and foreign donor, adopted and validated an NRM with standard operating procedures to identify and refer victims to care in September 2021. The transition government did not begin implementing the NRM during the reporting period, but it worked closely with the Fodé and Yeguine Network for Action (RAFY), a national network composed of NGOs, international organizations, and transition government ministries, including the Ministry for the Advancement of Women, Children, and the Family (MFFE), to refer identified trafficking victims to service providers. Officials reported the network did not adequately function due to poor coordination between members. RAFY and other NGOs assisted 104 identified trafficking victims by providing shelter, referring victims to NGOs for services, or assisting with repatriations; the transition government provided 157 million FCFA ($269,830) in in-kind and financial support for their operations. An international organization assisted an additional 187 trafficking victims, including 160 women, two men, 18 girls, and seven boys; the majority of victims were Nigerian (170), followed by nine Cameroonians, six Nigeriens, and two Guineans. The transition government relied on NGOs to provide the majority of services, funded by private and international donors. NGOs operated 10 transit centers for adult and child victims of crime, including one specialized shelter for female adult trafficking victims in Bamako. Services varied by location but generally included short-term shelter, food, counseling, transportation, repatriation, and reintegration assistance. MFFE's general care facilities also assisted some trafficking victims. Shelters and services for victims outside the capital remained limited, especially in the north. Foreign and domestic victims received the same services, and services were not contingent upon cooperation with law enforcement. While some facilities offered specialized services for female victims, there were no such services for male victims. The transition government continued collaborating with international organizations to repatriate Malians exploited abroad and foreign victims exploited in Mali. An international organization assessed victim services remained inadequate. An international organization opened a transit center for migrants in the capital, providing voluntary return and reintegration services for both men and women. A local NGO screened and provided services to child victims of hereditary slavery; two others provided assistance such as legal and psychosocial support to victims of hereditary slavery. In 2021, there were at least eight attacks on slavery victims and anti-slavery activists in the Kayes region, killing one and injuring 77.

The transition government did not offer legal alternatives to removal to countries in which victims would face retribution or hardship; however,

most identified victims were ECOWAS nationals who did not require special status to remain in Mali. Officials reported law enforcement lacked facilities to conduct interviews that allowed for separation between victims and alleged perpetrators; however, victims could provide written testimony to law enforcement. Sources reported authorities pressured victims to provide rushed statements for fear that victims would be unavailable or unwilling to provide future statements once they entered NGO and international organization shelters. Victims could file civil suits against their traffickers; however, no victims reportedly used this provision, and many victims were unaware of the option. There were no reports the transition government detained or otherwise penalized trafficking victims for unlawful acts traffickers compelled them to commit; however, due to a lack of formal identification procedures, authorities may have detained some unidentified trafficking victims. Officials reportedly imprisoned four anti-slavery activists in the Kayes region, including the founder of an anti-slavery organization; the transition government did not report whether the activists remained detained at the end of the reporting period. Authorities had previously arrested and imprisoned activists on spurious child trafficking charges; authorities had released all 13 activists by the end of the reporting period, while the charges against them still stood, and the case remained under investigation.

Authorities continued following the government's 2013 inter-ministerial protocol requiring them to direct former child soldiers to rehabilitation centers, and observers reported officials had a better understanding of the protocol. The handover protocol required authorities to immediately transfer children identified within Bamako; outside of the capital, authorities must notify child protection actors within 24 hours and transfer the children within 48 hours. However, observers reported authorities continued to inappropriately detain some children for alleged affiliation with signatory and non-signatory armed groups. Of the 15 children detained during the previous reporting period, the transition government determined six were younger than the age of 18; authorities released three of the children to child protection actors and continued detaining the remaining three. An international organization reported concerns the transition government held some children, including potential trafficking victims, with adults in central prison, which increased their vulnerability to further exploitation.

## PREVENTION

The transition government increased efforts to prevent trafficking. The transition government continued implementing the 2018-2022 National Plan of Action (PAN) to combat trafficking in persons and regularly convened its national anti-trafficking committee (CNCTLPA), chaired by the MOJ. However, the lack of coordination and ownership for activities in the PAN among committee members continued to impede its effectiveness. The transition government lacked dedicated staff to work on trafficking, including the role of chairman of the anti-trafficking committee, which severely impeded the transition government's efforts to consistently coordinate anti-trafficking activities. The transition government allocated 226 million FCFA ($388,420) for the PAN's implementation, including anti-trafficking trainings and support for NGOs, an increase from 220 million FCFA ($378,110) allocated the previous year. The National Unit to Fight Against Child Labor (CNLTE), chaired by the Ministry of Labor, coordinated transition government efforts to combat child labor and included dedicated child labor inspectors; the transition government allocated 32 million FCFA ($55,000) to the CNLTE in 2021. In partnership with civil society, the transition government held awareness campaigns and trainings on child forced begging for community leaders and Quranic teachers. It also provided some support to an NGO training on human trafficking in artisanal gold mines. The transition government made limited efforts to raise awareness of and address hereditary slavery. The Kayes regional government adopted a charter to end hereditary slavery practices and held public awareness raising events.

The Ministry of Defense continued implementing its edict banning children from all deployed military camps, and it had a designated child soldier focal point to coordinate with international organizations when allegations of child soldiering arise. In August 2021, both factions of signatory armed group Platform, of which GATIA is a member, signed UN action plans designed to prevent the recruitment and use of child soldiers; international organizations began working with the group's

two factions to operationalize the plans. In September 2021, the Ministry of Foreign Affairs completed a draft child soldiers prevention plan with international actors and referred it to the Office of the Prime Minister for review; the draft plan included measures to sensitize transition government officials and signatory armed group members on child soldier issues and increase coordination when cases are identified.

The transition government did not make efforts to address fraudulent recruitment of Malians abroad. Labor inspectors lacked sufficient capacity or resources to regulate the informal sector, where most cases of forced labor occurred. The transition government did not report efforts to implement provisions prohibiting child labor and child trafficking in gold mines and quarries under its 2019 mining law. The transition government did not make efforts to reduce the demand for commercial sex acts. The transition government did not systematically train its diplomatic personnel on human trafficking, but the CNCTLPA reported it provided one diplomatic training for some diplomats in coordination with an international organization during the report period. The transition government did not provide anti-trafficking training to its troops prior to their deployment as peacekeepers. The police operated a hotline for crimes against women and children, although it did not report receiving any trafficking calls.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Mali, and traffickers exploit victims from Mali abroad. Internal trafficking is more prevalent than transnational trafficking. Some families sell their children into domestic servitude or forced labor in gold mines. Labor traffickers exploit boys from Mali, Guinea, and Burkina Faso in agriculture—especially rice, cotton, dry cereal, and corn cultivation—artisanal gold mines, domestic work, transportation, begging, and the informal commercial sector. Corrupt Quranic teachers exploit boys from Mali and neighboring countries, including Burkina Faso, Cote d'Ivoire, and Senegal, in forced begging or other forms of forced labor, and corrupt Quranic teachers exploit Malian boys in forced begging in neighboring countries. Slaveholders subject some members of Mali's Black Tuareg community to slavery practices rooted in traditional relationships of hereditary servitude. An NGO noted hereditary slavery practices in Mali differ from surrounding countries, as communities—rather than individuals or families—exploit victims of slavery. An international organization report estimates there are 300,000 victims of hereditary slavery in Mali. Traffickers exploit men and boys, primarily of Songhai ethnicity, in a long-standing practice of debt bondage in the salt mines of Taoudeni in northern Mali. Traffickers exploit Malian children in forced labor on cotton and cocoa farms in Cote d'Ivoire. Traffickers exploit Malian women and girls in sex trafficking in Gabon, Libya, Lebanon, and Tunisia and in domestic servitude in Lebanon, Saudi Arabia, and Tunisia. Traffickers recruit women and girls from other West African countries, particularly Nigeria and Benin, with promises of jobs as nurses or waitresses in Bamako or beauty parlors in Europe or the United States but instead exploit them in sex trafficking throughout Mali, especially in small mining communities. In January 2019, Nigerian authorities estimated more than 20,000 Nigerian girls are victims of sex trafficking in Mali, although this data has not been corroborated. An NGO reported sex trafficking of girls in Mali has steadily increased since 2005.

Traffickers compel women and girls into sex trafficking and forced labor in domestic work, agricultural labor, and support roles in artisanal gold mines. An NGO report attributes some of the increased demand for sex trafficking in mining communities to cultural and religious beliefs, correlating sex with increased chances of finding gold, and it also noted corruption schemes involving complicit officials and community authorities perpetuated trafficking.

Traffickers exploit boys in forced labor in informal gold mines, particularly in Gao and Kidal; third parties sometimes "financed" transportation to mining sites, requiring them to work for an unspecified time to pay off the debt. An international organization reported armed groups exploit children in forced labor in gold mines and extort adults operating in the mines via a "tax" to finance their activities. Africans transiting Mali to Europe, primarily via Algeria and Libya and less so via Mauritania, are vulnerable to trafficking, and Nigerian traffickers exploit Nigerian

MALTA

women in sex trafficking in Mali en route to Europe. There are widespread reports of corruption and complicity among officials, including official interference in trafficking and hereditary slavery cases; allegations law enforcement agents accepted bribes from traffickers or coerced victims to pay bribes and returned victims to traffickers; and reports Malian armed forces (FAMa) personnel engaged in child sex trafficking.

In 2021, an estimated 7.1 million people were in need of humanitarian assistance, and there were more than 400,000 IDPs. The transition government did not exercise control over the majority of its territory and lost ground it had previously regained. Justice officials had no or an extremely limited presence in much of Mali, particularly in the northern and central regions, limiting the transition government's ability to administer justice, provide victim services, and gather data. Since early 2012, rebel and Islamic extremist groups have occupied parts of northern Mali. Terrorist organizations and armed groups continue to recruit and use children, mostly boys, in combat, requiring children to carry weapons, staff checkpoints, guard prisoners, and conduct patrols; some groups use boys for running errands and spying. Some of these groups use girls in combat, support roles, and for sexual exploitation, including sexual slavery through forced marriages to members of these armed groups. In 2020, authorities identified at least one girl held in sexual slavery by armed groups. Armed groups purportedly coerce some families to sell their children to the groups or compel communities to give up teenage boys to the groups for "community protection." An international organization reported traffickers fraudulently recruit some children for education in Quranic schools but force them to fight with armed groups. Some families reportedly insert their children into the ranks of armed groups because parents believe they will benefit from Disarmament, Demobilization, and Reintegration assistance. According to an international organization, insecurity, the pandemic, and deteriorating socioeconomic conditions are leading to a rise in child trafficking, forced labor, and forced recruitment by armed groups in Mali. International observers reported artisanal gold mines controlled by armed groups remain a concern for trafficking, child labor, and child soldiering. In 2017, a Malian armed group forcibly recruited Malian refugees in Mauritania to be child soldiers in Mali. Unaccompanied children among IDPs are at heightened risk of recruitment by armed groups inside of Mali.

Malian security forces cooperated with a signatory armed group that recruited and used children, sometimes through force, fraud, or coercion. The transition government provided in-kind support to and collaborated with GATIA, a pro-government militia (affiliated with Platform, a signatory armed group), which recruited and used children during the reporting period. Malian security forces allegedly cooperated in past reporting periods with other non-government armed groups that recruited and used children. The transition government appointed members of signatory armed groups to cabinet positions; it is unclear to what extent, if any, these individuals remain engaged in the armed groups. In August 2021, both factions of signatory armed group Platform, of which GATIA is a member, signed UN action plans designed to prevent the recruitment and use of child soldiers, and Coordination of Movements of Azawad (CMA) began working with international actors to implement its UN Action Plan signed in 2017. However, both GATIA and CMA continue to recruit and use children. In 2020, an international organization reported CMA used children younger than the age of 18 to manage checkpoints at gold mines under its control. From 2014 to 2019, FAMa recruited and used at least 47 children between the ages of 9 and 14 years old in support roles in Gao region as couriers and domestic help. An international organization reported FAMa personnel committed acts of conflict-related sexual violence, including sexually exploiting girls in exchange for food and other goods, in 2019.

## MALTA: TIER 2

The Government of Malta does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore

Malta remained on Tier 2. These achievements included opening a new safe house for trafficking victims and establishing a vulnerability assessment team to help screen asylum-seekers. The government also increased victim protection funding and the number of potential trafficking victims it identified and assisted compared with the prior year. However, the government did not meet the minimum standards in several key areas. Investigations decreased compared with the prior year, and the government continued to lack coordination among ministries. The government did not report prosecuting or convicting any traffickers in 2021, a decrease compared with the prior year. The 17-year delay of a trial of a government official who was accused of and publicly admitted to the facilitation of sex trafficking concluded with an acquittal; and trafficking convictions continued to get overturned due to technicalities. The government did not effectively enforce labor recruitment regulations or monitor massage parlors where there was a higher incidence of trafficking indicators. Gaps in victim identification and protection continued and the government lacked legal safeguards to protect trafficking victims against potential prosecution for unlawful acts their traffickers compelled them to commit and has never awarded restitution or compensation to any trafficking victim.



### PRIORITIZED RECOMMENDATIONS:

Increase efforts to vigorously and expeditiously investigate and prosecute trafficking crimes. • Increase efforts to convict traffickers, including complicit officials, and sentence convicted traffickers to significant prison terms. • Ensure relevant staff and officials proactively identify trafficking victims, including Maltese nationals, among vulnerable populations, particularly children, migrant workers, asylum-seekers, and individuals in commercial sex. • Institutionalize victim-centered and trauma-informed anti-trafficking training for front-line officials, police officers, prosecutors, and judges with a focus on the use of psychological coercion and fraud as means of trafficking. • Improve sentencing norms by sensitizing judges to the severity of trafficking crimes and the full range of penalties available. • Allow formal victim identification without requiring law enforcement interaction. • Allow formal victim identification by and referral from entities other than the police, including by labor inspectors, asylum case workers, health care professionals, social workers, and NGOs. • Improve effective leadership and prioritization of human trafficking, as well as streamline anti-trafficking coordination and communication efforts among ministries. • Enact a legal provision on the non-punishment of victims to ensure that trafficking victims are not inappropriately penalized for unlawful acts traffickers compelled them to commit. • Increase migrant worker protections by implementing strong regulations and oversight of recruitment companies that are consistently enforced, including prosecuting for fraudulent labor recruitment. • Implement license controls and oversight of massage parlors and increase screening for trafficking victims. • Improve efforts to proactively inform foreign worker groups of worker rights and responsibilities and victim assistance resources in their native languages. • Ensure consistent early access to free legal aide. • Enforce the law prohibiting recruitment fees charged to workers and ensure any recruitment fees are paid by employers. • Increase collaboration between police and other stakeholders during investigations to decrease the length of investigations and prosecutions and enhance the likelihood of successful convictions. • Increase awareness of and trafficking survivor access to damages and compensation, regardless of their nationality or residence status. • Increase prosecutor awareness of and efforts to systematically request restitution for survivors in criminal trials. • Consider removing the maximum limits for compensation and damages and allowing confiscated assets from traffickers to be awarded to victims. • Consider establishing a specialized police unit and specialized prosecutors dedicated to human trafficking

and consider prosecution-assisted investigations on trafficking cases. • Increase training for and efforts to pursue financial crime investigations in tandem with human trafficking cases.

## PROSECUTION

The government decreased law enforcement efforts. Article 248A-G of the criminal code criminalized sex trafficking and labor trafficking, and it prescribed penalties of six to 12 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The government took preventative health measures to ensure law enforcement efforts continued unimpeded and courts remained opened and at standard capacity, despite the ongoing pandemic. In 2021, the police vice squad, responsible for investigating human trafficking and other crimes, initiated nine new investigations—seven for sex trafficking and two for labor trafficking. This was a decrease compared with 16 new investigations in 2020. The government reported that it did not identify any trafficking victims as a result of its investigations initiated in 2021. Seven investigations remained ongoing from prior years, including four for sex trafficking and three for labor trafficking. The government did not report initiating any new prosecutions of suspected sex traffickers in 2021, a decrease compared with two in 2020 and zero in 2019. The government did not report convicting any traffickers in 2021, a decrease compared with the convictions of three traffickers in both 2019 and 2020, which included significant prison sentences. Perennial issues with rule of law, corruption, slow court proceedings, and an understaffed police force continued to hamper prosecutions and convictions. Trafficking convictions were often overturned on appeal for administrative technicalities. In February 2022, a judge annulled the prison sentence for a 2020 sex trafficking conviction based on a technicality in court formalities. The media reported on an alleged case of forced labor through the non-violent coercion of a victim with intellectual disabilities for nine years; however, the case was not prosecuted as human trafficking, and courts sentenced the perpetrator to a suspended sentence with the rationale that physical violence and injuries were not sustained by the victim. Experts urged the government to increase training for judges on psychological coercion as a means of trafficking. There were no new investigations, prosecutions, or convictions of government employees allegedly complicit in trafficking crimes. An investigation initiated in 2004 of a former police officer who had allegedly acted as an accomplice to a convicted sex trafficker through the falsification of visa documents and had admitted to the procurement of a victim, ultimately ended in an acquittal 17 years later in June 2021. Prosecutors applied for an appeal, but courts denied this petition. In its 2021 report, the Group of Experts on Action against Trafficking in Human Beings (GRETA) stressed that the government's failure to convict traffickers and the absence of effective, proportionate, and dissuasive sanctions undermined efforts to combat human trafficking and victims' access to justice. GRETA also expressed concern that the length of criminal proceedings negatively impacted victims who could experience re-victimization through repeated confrontations with their alleged trafficker. GRETA also noted the government lacked specialized prosecutors and judges for trafficking cases and did not pursue financial crime investigations in tandem with human trafficking cases; ultimately, GRETA recommended the government consider addressing both deficiencies.

The government, in partnership with a university and several international organizations, provided extensive anti-trafficking training to 40 new police recruits on victim identification, trafficker profiling, and an overview of the victim referral mechanism; immigration police and border control officers, as well as 300 police sergeants and majors, on anti-trafficking more broadly; and social workers on trafficking among asylum-seekers. The government specifically targeted training for police vice squad officials, who were provided approximately five anti-trafficking trainings throughout the reporting period. The government reported cooperating with United States law enforcement officials on an international trafficking investigation.

## PROTECTION

The government slightly increased protection efforts. Agenzija Appogg, a government office within the Foundation for Social Welfare Services (FSWS) that provided national assistance to trafficking victims, identified 18 potential foreign trafficking victims. This compared with six in 2020 and 11 in 2019, though these identifications were still fewer than 24 in 2018, 30 in 2017, and 35 in 2016. Of the potential victims identified, 11 were victims of labor trafficking, (including four victims of domestic servitude and one victim of forced criminality), five were victims of sex trafficking, and two were victims of both sex and labor trafficking. Two potential victims were male, and 16 were female. Potential trafficking victims identified in 2021 were from approximately 13 countries, with the majority originating from the Philippines. While the government had a national victim identification and referral mechanism from 2014, gaps in victim identification remained, and the government did not report identifying any Maltese or child victims in 2021 and only one potential victim among asylum-seekers, despite the documented vulnerability of this population to trafficking. GRETA reported that many front-line officials remained unaware of the national victim identification and referral mechanism, and civil society highlighted a need to ensure wide dissemination of the mechanism to ensure uniform implementation. Trafficking victims could only be "officially" identified by the police vice squad, and the vice squad determination on whether someone was a victim of trafficking or not could not be challenged. In its 2021 report, GRETA noted that contrary to the national identification mechanism, civil society reported that official identification of victims was sometimes dependent on the possibility to institute criminal proceedings against the trafficker. The government funded an international organization to update its trafficking victim screening tool to improve victim identification. Victim identification among asylum-seekers was conducted by officials from the Ministry for Home Affairs and National Security and Law Enforcement (MHSE), in partnership with civil society. In partnership with the EU and an international organization, the government formed a vulnerability assessment team where asylum-seekers were screened for trafficking indicators and vulnerabilities; however, in its 2021 report, GRETA noted the preliminary assessment conducted was limited to the identification of cases where vulnerability was immediately obvious, such as with unaccompanied children. With consent, potential trafficking victims were referred to victim protection services with a new referral form for asylum-seekers, which was adopted in March 2021 for both government and civil society use. Separately, the government reported that trained officials systematically screened undocumented migrants for trafficking indicators with updated guidelines at detention centers; however, they did not report identifying any victims among this population. The need for sufficient resources to streamline all procedures, create a systematic workflow, and build capacity at migrant detention centers may have affected the quality of victim screening. During the reporting period, police continued to screen for sex trafficking indicators among individuals in commercial sex. In its 2021 report, GRETA noted the lack of a multi-disciplinary approach to the identification process of trafficking victims and the need for additional personnel resources and training for the police vice squad.

The national Foundation for Social Welfare Services continued to coordinate effectively with the police, legal aid, and health services to provide quality care to victims and met virtually with stakeholders every two months. Government officials continued to work closely and collaboratively with NGOs. Agenzija Appogg conducted several trafficking identification training sessions to frontline officials in 2021. The government provided €172,166 ($195,200) for victim care in 2021, including salaries for social workers and safe housing for victims; an increase compared with €102,229 ($115,910) in 2020. The government also provided €16,399 ($18,590) to an international organization to update its trafficking victim screening tool and provide victim assistance. To improve coordination of victim protection for children, in 2021, the Child Protection Agency was designated as the responsible agency for vulnerability assessment and interagency coordination for child victims. The national welfare agency continued to operate a 24-hour hotline for individuals in need of social services support and referral to care, including potential trafficking victims; operators had received training in trafficking victim identification. The government identified two potential adult trafficking victims through the hotline during the reporting period.

Police continued to utilize the national standard referral procedures to systematically refer victims to Agenzija Appogg. Fourteen potential victims were referred to Agenzija Appogg, where they received individual

MALTA

assistance plans and psychological assistance; at least six victims were provided with shelter, and social workers helped several victims with medical appointments and employment. Protection services to victims continued uninterrupted in 2021, and the government instituted several pandemic-related safety protocols, including requiring proof of a COVID-19 vaccine or a negative test result prior to shelter admittance; victims were provided short-term emergency shelter until they could provide the required proof. The government had dedicated services available to both foreign and domestic trafficking victims, and once victims were referred to care, specialized social workers at FSWS assessed the long-term needs of each trafficking victim; assistance reportedly included shelter, food, psychological counseling, interpreters, and medical and legal aid appointments, as well as assistance with obtaining legal status and job searches. In 2021, the government opened a new safehouse, which sheltered three trafficking victims in 2021, and was staffed by social service workers during the day and security at night. The government also launched a Victim Support Agency in April 2021 for all victims of crime who cooperated with law enforcement, including trafficking victims; services included confidential emotional support and legal advice. The government did not report the number of trafficking victims that received services through this agency. GRETA's 2021 report, noted that per the government's 2014 Legal Aide law, legal assistance should have been available to all victims of crime; however, to date, all trafficking victims have been represented by NGO lawyers funded through projects instead of the established Legal Aid Agency. GRETA urged the government to increase their efforts to ensure that victims of trafficking received legal assistance and free legal aid at an early stage. The government reported that victims could receive protection services regardless of their agreement to cooperate with law enforcement. While there was no time limit for victims to access some services, such as services from social workers, their stay in a shelter or safe housing could not exceed 180 days, with some exceptions. Victims had freedom of movement in government shelters, and both men and women had access to three shelters.

The government encouraged but did not require victims to assist in the investigation and prosecution of their alleged traffickers. Law enforcement endeavored to conduct discreet interviews with potential trafficking victims to protect their identities and ensure their safety. To avoid re-traumatization, the government provided victims with protective support, including the option to testify via video, accompaniment to court by a social worker, and victim support sessions before and after court hearings. The government had a witness protection program and reported providing services to one victim in 2021. The law provided victims a two-month reflection period to recover and contemplate cooperation with law enforcement. Foreign victims who decided to assist police in prosecuting trafficking cases were reportedly entitled to a renewable six-month temporary residence permit free of charge, police protection, legal assistance, and the right to obtain flexible work permits; the government did not report granting residence permits to any trafficking victim. The government could grant refugee status to victims as an alternative to removal to countries where they may face hardship or persecution, though the approval rate for all asylum applications was low at 8 percent, and the government did not report providing this status to any victims during the reporting period.

The government could grant a maximum of €23,300 ($26,420) of compensation to some victims from state funding; however, the government has never reported issuing compensation to any victims of trafficking to date; the few requests brought by NGO lawyers were ultimately denied. Legal aid was not available for victims seeking compensation from the government, and government compensation was not available for foreign trafficking victims without residency. Furthermore, GRETA reported that the law did not allow assets confiscated from traffickers to be used as compensation or restitution for victims. In its 2021 report, GRETA urged the government to adjust or remove the maximum limits for compensation and restitution; allow confiscated assets from traffickers to be awarded to victims; and ensure state compensation was available to all trafficking victims, regardless of their nationality or residence status. Additionally, prosecutors could file for restitution from traffickers in criminal cases; however, courts have never reported awarding restitution to any victims to date, and GRETA noted limited awareness of the possibility of restitution by lawyers

and judicial authorities. Victims could also file a civil suit to receive a maximum of €10,000 ($11,340) in damages, but the government has never reported awarding damages to any trafficking victims to date. Victims could also receive back-payment of wages earned by filing a complaint through the Department for Industrial and Employment Relations; the government reported awarding back-payment three times in the past but did not report doing so during the reporting period. GRETA urged the government to review the eligibility criteria for state compensation and add the concept of trafficking survivor restitution to training programs for judges and prosecutors. The government did not have a legal provision on the non-punishment of victims to ensure that trafficking victims are not inappropriately penalized for unlawful crimes traffickers compelled them to commit, including immigration violations. GRETA recommended the enactment of such a provision and the dissemination of the non-punishment principal to not only judges, but all law enforcement to prevent victim penalization as early as possible.

## PREVENTION

The government maintained prevention efforts. In 2020, the Human Rights Directorate (HRD) assumed responsibilities for coordinating national anti-trafficking and commercial sex efforts and reforms. In September 2021, the HRD dissolved the inter-ministerial anti-trafficking committee and assumed most of its responsibilities, which included implementing the national action plan (NAP), coordinating data collection, and reviewing policy and practice. However, by the end of the reporting period, the government did not report which entity took on the role of the national rapporteur. The term for the previously non-operational anti-trafficking stakeholder task force was renewed under a new chairperson in August 2021, but the task force, responsible for operational coordination of trafficking efforts, still had not met with stakeholders or taken any concrete actions by the end of the reporting period. The government reported that the HRD did not meet during the reporting period. In its 2021 report, GRETA again recommended the government consider establishing an independent national rapporteur to ensure an impartial review of government anti-trafficking efforts. In 2020, the government allotted €300,000 ($340,140) to improve coordination among relevant ministries, and in 2019, it launched a reform on human trafficking and prostitution to enhance multi-agency cooperation, improve the coordination of existing processes, and take an active approach in combating all forms of trafficking, though no results were reported to date. The government continued to implement their 2020-2023 anti-trafficking NAP, which focused primarily on coordination and prevention efforts, but it did not address key gaps in prosecution or victim identification and assistance. Authorities and NGOs continued to report a lack of effective leadership, corruption allegations, and insufficient prioritization of human trafficking, as well as a need to streamline anti-trafficking coordination and communication efforts among ministries, which hinder progress. The government maintained its anti-trafficking training budget at €16,000 ($18,140) in 2021, the same as 2020. The government conducted anti-trafficking awareness campaigns by publishing an article in the newspaper, sharing information on social media, and multiple appearances by various government officials on national television targeting the general population as well as vulnerable groups like individuals in commercial sex. One anti-trafficking awareness campaign the government organized in Valletta used anonymous statements from trafficking survivors in a visual display. The government funded two research projects in 2021, including a project that analyzed root causes of trafficking in supply chains and available legal instruments, as well as a project on human trafficking legislation and strategies; however, neither project had yet been published.

The government continued to cooperate with Frontex, the European Border and Coast Guard Agency, and the Government of Libya to reduce the number of undocumented migrants entering Malta from Libya. NGOs criticized this coordinated effort, however, because it often resulted in the occupants of vessels rescued in the Libyan search and rescue area being returned to Libyan shores; NGOs cited severe security and human rights conditions inside Libya and Libyan detention centers and a heightened risk of trafficking for the more than 12,000 undocumented migrants forced to remain in the detention centers. Despite government efforts to the contrary, approximately 830 undocumented migrants arrived in Malta in 2021, a significant decrease compared with 2,300 in 2020 and 3,100 in 2019, and they were placed in one of four government-run detention

centers. GRETA urged the Maltese authorities to ensure asylum-seekers were provided with information materials on the rights of trafficking victims, as well as the services and assistance measures available and how to access them. Civil society reported a new government policy prevented asylum-seekers from Bangladesh from obtaining a work permit for nine months and may have increased their vulnerability to trafficking.

In 2021, the national employment authority reported conducting 1,400 routine inspections of employers, which focused on employment contracts and basic employment conditions. However, the government did not report whether labor inspectors received specialized training to identify trafficking victims, identified any trafficking victims, or referred any cases for investigation. Fraudulent labor recruitment remained a significant concern. The Employment Agencies Act (EIRA) regulated labor recruiters and required recruiters to have a license. The EIRA did not allow workers to be charged recruitment fees by employment or recruitment agencies. However, this practice continued to occur, and the government did not report effective law enforcement measures taken to deter agencies from continuing the practice. Foreign workers and asylum-seekers could not leave their employers without prior government permission, as work permits were tied to a specific employer, which may have increased their vulnerability to trafficking. GRETA and NGOs continued to report a lack of oversight and regulation on the licensing of massage parlors, which had a higher likelihood of indicators of sex trafficking. In its 2021 report, GRETA relayed the concerns expressed by civil society that police did not proactively identify trafficking victims in massage parlors. The government did not make efforts to reduce the demand for commercial sex acts. The government did not report providing anti-trafficking training to its diplomatic personnel or to its troops prior to their deployment as peacekeepers during the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Malta. Sex traffickers exploit foreign national and Maltese women and children, and labor traffickers exploit foreign men and women. Labor trafficking victims originate from the People's Republic of China, Eastern Europe, Central America, and Southeast Asia, with increasing numbers from the Philippines. Women from Southeast Asia working as domestic workers, foreign women working in massage parlors, and women from Central and Eastern Europe, Russia, and Ukraine working in nightclubs represent populations vulnerable to trafficking. The approximately 9,000 refugees and 4,000 asylum-seekers residing in Malta are vulnerable to trafficking in the country's informal labor market, including within the construction, hospitality, and domestic work sectors. Cooperation with the Government of Libya prevents thousands of undocumented migrants and refugees from arriving at Maltese ports; however, occupants of vessels rescued in the Libyan search and rescue area are returned to Libya, where NGOs cite severe security and human rights conditions and a heightened risk of trafficking for undocumented migrants. Fraudulent labor recruitment continues to occur; traffickers replace the originally signed contract with a less favorable one upon arrival in Malta or force victims to perform a completely different job than what was agreed upon. Though illegal, traffickers often confiscate the passports of victims upon arrival. Co-nationals of trafficking victims and Maltese citizens frequently work together to exploit victims.

## MARSHALL ISLANDS: TIER 2

The Government of Marshall Islands does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Marshall Islands was upgraded to Tier 2. These efforts included establishing a specialized anti-trafficking unit within the Attorney General's office to oversee anti-trafficking efforts and an anti-trafficking working group to implement the national action plan (NAP). The government continued an investigation into a government official allegedly complicit in trafficking crimes and conducted awareness campaigns for school-aged children

and the public. However, the government did not meet the minimum standards in several key areas. For the fourth consecutive year, the government did not identify any confirmed trafficking victims and did not utilize proactive procedures to identify trafficking victims. The government did not conduct timely victim assessments or provide protective services to potential trafficking victims while their cases were under investigation. The government did not prosecute any traffickers and has not convicted any traffickers since 2011.



## PRIORITIZED RECOMMENDATIONS:

Increase efforts to vigorously investigate, prosecute, and convict traffickers, including complicit officials, and sentence traffickers to adequate penalties, which should involve significant prison terms. • Disseminate and employ proactive procedures to identify trafficking victims among all vulnerable groups, such as individuals in commercial sex, undocumented migrant workers, foreign fishermen, and victims of gender-based violence, and train officials on their use. • Train law enforcement and prosecution officials to implement the anti-trafficking laws. • Strengthen efforts to administer and fund protective services for victims in cooperation with NGOs and international organizations and ensure potential victims are proactively offered services while their case is investigated. • Dedicate funding and resources to implement the NAP. • Eliminate recruitment or placement fees charged to workers by labor recruiters and ensure any recruitment fees are paid by employers. • Develop and conduct public anti-trafficking education and awareness-raising campaigns, including in outer island communities. • Increase access to and knowledge of protective services for outer island community residents and dedicate funding towards assisting with travel costs to receive assistance. • Undertake research to study human trafficking in the country and make the findings publicly available. • Accede to the 2000 UN TIP Protocol.

## PROSECUTION

The government maintained minimal law enforcement efforts. The Prohibition of Trafficking in Persons Act of 2017 criminalized sex trafficking and labor trafficking and prescribed penalties of up to 15 years' imprisonment, a fine of up to $10,000, or both if the victim was an adult and up to 20 years' imprisonment, a fine of up to $15,000, or both if the victim was younger than age 18. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with other serious crimes, such as rape.

For the second consecutive year, the government did not report any new prosecutions, and the government has not convicted any traffickers since 2011. Authorities continued the investigation, begun in 2020, of the former Director of Immigration for alleged complicity in trafficking crimes; the investigation remained ongoing. The government did not report any other investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. In connection with the above case, the government opened a potential trafficking investigation involving six alleged traffickers; the case was ongoing. Authorities did not report an update to an investigation of a suspected commercial sex establishment opened the previous year. Government officials' limited understanding of trafficking indicators and the perceived requirement of movement for trafficking crimes hindered progress.

The government established a specialized anti-trafficking unit within the Attorney General's office criminal division to oversee anti-trafficking law enforcement efforts. The unit was composed of two full-time positions, one funded by the government and the other donor-funded; the donor-funded position remained open at the end of the reporting period. In March 2022, the government hired a new chief prosecutor to address

prosecutorial gaps, such as lack of case management, strategy and policy development, and funding and resources. The government, in partnership with an international organization, trained national and local law enforcement officials on victim identification, evidence collection, and the victim identification and referral standard operating procedures (SOPs). In addition, the government provided trauma-informed response training to front-line responders, including law enforcement and health care professionals. The government reported it redirected or limited resources and institutional capacity among law enforcement and other government agencies as a result of the pandemic; this may have adversely affected the government's ability to detect and address trafficking. The government reported a reduction in court cases heard, which may have been due to the pandemic and the adjustments of the courts to pandemic-related restrictions. The government lacked technical capacity for law enforcement to employ investigative and surveillance techniques and for prosecutors to use effective case management and court filing procedures. In addition, the government lacked sufficient institutionalized law enforcement training, recruitment of officers, law enforcement facilities, and funding to combat trafficking.

## PROTECTION

The government maintained efforts to protect victims. The government did not report implementing SOPs, developed in 2016 in partnership with an international organization, for the identification and referral of victims. The government did not report identifying any trafficking victims, compared with identifying one potential trafficking victim during the previous reporting period. The government did not report conducting victim assessments during the reporting period for six potential trafficking victims involved in an ongoing trafficking investigation. Due to the requirement to be officially classified as a victim before receiving protective services and services being contingent on authorities initiating a prosecution, authorities did not provide the potential victims with protective services while it investigated their case during the reporting period. The government, in partnership with nongovernmental, faith-based, and international organizations, could provide protective services to victims; but it did not report providing any services. Government-provided services could include counseling, legal assistance, testing for sexually transmitted diseases, and accessible services for victims with disabilities. Authorities could provide protective services only in urban centers, which hindered the ability for residents of outer island communities to receive assistance. The government maintained a memorandum of understanding with an NGO to refer female victims between ages 14 and 18 to survivor-support services and place them in a network of approved safe houses. The Ministry of Internal Affairs continued to assume supervision of all other child victims; three social workers coordinated assistance to trafficking victims. NGOs could provide shelter for adult victims, and the victims could leave safe houses or shelters unchaperoned unless authorities determined that doing so might put them in danger. The government reported providing $125,000 of funding to an NGO to provide free legal advice and support to victims of crime, including trafficking victims, compared with $100,000 provided in the previous reporting period for such services. The government reported its ability to ensure that victims had a temporary right of stay but did not provide long-term alternatives to removal to countries where victims may face hardship or retribution. The government did not have an anti-trafficking hotline.

## PREVENTION

The government increased efforts to prevent trafficking. The National Task Force on Human Trafficking (NTHT) led the government's anti-trafficking efforts. The NTHT encompassed a wide array of voluntarily assigned government, NGO, and international organization members and reported meeting three times, compared with none reported the previous year. The government reported pandemic activities took precedent over other matters, which may have hindered prevention measures. The government continued implementation of its NAP, developed in March 2021. The NTHT created a NTHT working group, in November 2021, to ensure continual implementation of the NAP and provide quarterly implementation updates to the NTHT. In partnership with an international organization, the government held awareness campaigns and workshops targeting school-age children and the general public. The government reported conducting immigration and labor inspections.

Authorities charged one employer with 14 fines for illegal employment and visa violations, compared with 22 fines the previous year. Authorities closed a labor law violation investigation and an employee-initiated civil lawsuit against an employer for passport withholding, initiated the previous year, because the employee dropped charges and departed the country; the government reported the employee and employer settled out of court.

The government continued to take measures to prevent the commercial sexual exploitation of women and girls by prohibiting unauthorized visitors onboard licensed foreign fishing vessels docked in Majuro; unlike prior reporting periods, the government did not issue immigration day passes for crewmembers due to pandemic restrictions. The government, in partnership with an NGO, supported the start of a five-year research and programs project to assess and address the scope of trafficking in Marshall Islands. The government reported using a digital registry system, developed in 2018, to track the movement of passengers from the country's main ports, increasing oversight of individuals entering and exiting the country. The government did not provide anti-trafficking training to its diplomatic personnel. The government did not regulate recruitment fees, which continued to contribute to debt-based coercion among foreign workers. The government did not take steps to reduce the demand for commercial sex acts. Marshall Islands was not a party to the 2000 UN TIP Protocol.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Marshall Islands, and traffickers exploit Marshallese victims abroad. Traffickers exploit Marshallese women and girls, and may also exploit East Asian women and girls, in sex trafficking in the Marshall Islands; some of these women and girls have also been confined and subjected to forced childbearing as part of international fraudulent adoption schemes. Hotel and bar staff and family members recruit and transport women and girls and exploit them in sex trafficking with foreign construction workers and crewmembers of foreign fishing and transshipping vessels that dock in Majuro. Observers report commercial sexual activity involving foreign fishermen has increasingly moved from fishing vessels to local bars, hotels, and suspected commercial sex establishments. Traffickers also exploit some of these foreign fishermen in conditions indicative of forced labor on ships in Marshallese waters. Traffickers compel foreign women, most of whom are long-term residents of the Marshall Islands, into commercial sex in establishments frequented by crewmembers of People's Republic of China (PRC)-affiliated and other foreign fishing vessels; some traffickers recruit PRC national women with the promise of other work and, after paying large recruitment fees, they force them into commercial sex. Marshallese residents of outer island communities may experience increased vulnerability to trafficking due to limited economic opportunities, geographic location, and the cost to travel to urban centers to seek assistance. Some wealthier or more powerful family members use traditional cultural practices to exploit impoverished Marshallese from outer islands to serve as indentured labor on their property. Limited reports indicate some Marshallese searching for work in the United States experience indicators of trafficking, such as passport confiscation, excessive work hours, and fraudulent recruitment. Some Marshallese children are transported to the United States, where they are subjected to situations of sexual abuse with indicators of sex trafficking.

## MAURITANIA: TIER 2 WATCH LIST

The Government of the Islamic Republic of Mauritania does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included implementing the Law on Associations ("NGO Law"), which allowed anti-slavery NGOs to operate more freely following a simplified registration process, establishing a permanent coordinating committee for anti-trafficking efforts, significantly increasing funding for the anti-trafficking national action plan (NAP), and initiating three hereditary slavery investigations.

Haiti AR_000859

The government conducted public awareness campaigns and outreach to vulnerable populations, and it co-organized a sub-regional symposium on combating slavery. The Minister of Justice issued a judicial circular reiterating the importance of prosecuting slavery cases and awarding restitution to victims. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Although the government demonstrated some commitment to address human trafficking and hereditary slavery, it did not implement existing measures to hold traffickers and slaveholders accountable or protect victims, and its efforts did not yield tangible results. The government did not prosecute or convict any alleged traffickers, and courts dismissed or reclassified all pending cases against alleged slaveholders from the previous reporting period. Officials did not identify any trafficking victims for the fourth consecutive year, and observers alleged that some officials had detained or harassed anti-slavery activists. Government agencies charged with combating trafficking and hereditary slavery continued to lack resources, training, and personnel; and reports of officials refusing to investigate or prosecute perpetrators persisted. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Mauritania was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Mauritania remained on Tier 2 Watch List for the third consecutive year.



**PRIORITIZED RECOMMENDATIONS:**

Increase efforts to investigate and prosecute cases of human trafficking and hereditary slavery and sentence convicted traffickers and slaveholders to appropriate prison terms in accordance with the 2015 anti-slavery and 2020 anti-trafficking laws; refer all human trafficking and hereditary slavery cases to the anti-slavery courts. • Direct law enforcement to investigate all allegations of hereditary slavery and human trafficking and hold government officials accountable for failure to investigate such cases and for interference in ongoing investigations. • Develop standard procedures to identify and refer human trafficking and hereditary slavery victims to care, and train authorities on the procedures' implementation. • Proactively screen for trafficking indicators among vulnerable populations, including irregular migrants, communities historically exploited in hereditary slavery, sexual abuse victims, women in commercial sex, and children exploited in forced begging; cease detaining, deporting, or otherwise penalizing potential victims. • Significantly increase training for law enforcement, prosecutors, and judicial officials on both the 2015 anti-slavery and 2020 anti-trafficking laws. • Provide adequate funding and dedicated prosecutors (*procureurs*), investigating magistrates, and trial judges for each of the anti-slavery courts. • Partner with NGOs to provide shelter and services to all trafficking victims, including adults. • Implement procedures to support human trafficking and hereditary slavery victims during investigations, including by ensuring access to legal assistance and protection from intimidation from alleged traffickers. • Increase protections for labor migrants and reduce risks to trafficking by regulating labor recruitment, enforcing provisions banning worker-paid recruitment fees, and investigating and prosecuting individuals accused of fraudulently recruiting Mauritanians for exploitation abroad. • Implement the anti-trafficking NAP to address human trafficking and hereditary slavery with input from civil society; and, as part of this effort, empower the Instance Nationale to act as the government's permanent coordinating committee for anti-trafficking efforts.

**PROSECUTION**

The government decreased already insufficient anti-trafficking law enforcement efforts. The 2020 Law on the Prevention and Punishment of Trafficking in Persons criminalized sex trafficking and labor trafficking, and it prescribed penalties of 10 to 20 years' imprisonment and a fine of 250,000 to 500,000 Mauritanian ouguiya (MRU) ($6,760 to $13,510). These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The 2015 anti-slavery law criminalized hereditary slavery and prescribed sufficiently stringent penalties of five to 20 years' imprisonment and a fine of 250,000 to 500,000 MRU ($6,760 to $13,510).

As in previous years, the government did not report comprehensive law enforcement data. Due to the pandemic, courts were closed for four months of the reporting period. The government reported initiating three hereditary slavery investigations, compared with no investigations in the previous reporting period. Courts did not prosecute or convict any traffickers, compared with four prosecutions and convictions of three traffickers in absentia during the previous reporting period. None of the three traffickers convicted in absentia were serving their sentences, and authorities issued arrest warrants for all three traffickers during the previous reporting period. Pending cases before the anti-slavery courts were reclassified as non-slavery crimes, settled outside of the courts (a practice forbidden according to the law), or dismissed by authorities.

Three regional anti-slavery courts had exclusive jurisdiction over hereditary slavery cases; however, the courts lacked adequate staff, funding, and resources to investigate and prosecute hereditary slavery crimes throughout their regions. In practice, authorities did not automatically refer slavery cases to the anti-slavery courts. Rather than prosecuting alleged slaveholders, the courts continued to prosecute slander-related cases. The three courts received a total of 1.8 million MRU ($48,650), the same amount allocated the previous reporting period. The government opted not to rotate any of the existing anti-slavery court judges for the third consecutive year. Appointed judges received minimal specialized training on the 2015 anti-slavery and 2020 anti-trafficking laws. Unlike other topical courts, the anti-slavery courts did not have specialized prosecutors. The appeals court lacked training on the anti-slavery and anti-trafficking laws, impeding the anti-slavery courts' effectiveness. The Commissariat of Human Rights (Commissariat) had the authority to introduce cases on behalf of victims of hereditary slavery but reportedly did not do so. The Ministry of Interior created the Central Office for the Suppression of Migrant Smuggling and Human Trafficking, a unit responsible for actively screening migrants for trafficking indicators. The government trained administrative, judicial, and security authorities on legal and institutional frameworks for combating human trafficking; it also held a roundtable with government and civil society stakeholders in collaboration with an international organization on the anti-slavery law and implementation barriers. However, an international organization reported the government did not adequately disseminate information or train judges, police, social services personnel, or NGO stakeholders on the 2020 anti-trafficking law. Law enforcement officials continued to lack sufficient understanding of human trafficking and hereditary slavery.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Some police, prosecutors, and investigative judges reportedly refused to investigate and try cases of hereditary slavery, and courts sometimes relied on lesser statutes to punish slavery crimes due to a lack of training. NGOs reported some local authorities encouraged victims and their families to resolve trafficking and hereditary slavery cases through social mediation rather than through the criminal justice system. Although prosecutors had a legal obligation to transfer hereditary slavery cases to the anti-slavery courts, some prosecutors encouraged victims to withdraw their complaints in exchange for a small amount of financial compensation. However, in October 2021, the Minister of Justice issued a judicial circular reiterating the importance of prosecuting slavery cases and awarding restitution to victims. Corrupt *marabouts* (Quranic teachers), suspected of exploiting *talibés* (Quranic students) in forced begging, were rarely prosecuted and usually entered agreements with prosecutors to drop cases. Although not explicitly reported as human

Haiti AR_000860

trafficking, the UN organization reported there were two new allegations submitted in 2021 of alleged sexual exploitation with trafficking indicators by Mauritanian peacekeepers deployed to the UN peacekeeping mission in the Central African Republic (CAR). There were also pending allegations of sexual exploitation against Mauritanian peacekeepers deployed to CAR reported in previous years, including two reported in 2020, one in 2019, and one in 2017. The government had not yet reported the accountability measures taken, if any, for the open cases at the end of the reporting period.

## PROTECTION

The government maintained negligible efforts to identify and protect trafficking victims. The government did not report identifying any trafficking victims for the fourth consecutive year. The government did not have formal procedures to identify trafficking victims or refer them to care, but the Ministry of Social Affairs (MASEF) continued using existing referral procedures for child victims of crime. Border agents were provided a manual, produced by an international organization that detailed victim identification procedures, but agents did not consistently use it. An NGO reported identifying and providing care to 1,881 vulnerable children and adults, which may have included some trafficking victims. NGOs noted government-employed social workers lacked training to identify trafficking victims, including in domestic work and commercial sex, and did not know where to refer identified victims for care.

NGOs continued to provide the majority of protective services to trafficking victims, including shelter, medical, psychological, legal, social, and educational assistance, without government financial or in-kind support. MASEF managed seven centers nationwide for the short-term protection and social integration of vulnerable children, including potential trafficking victims, with financial support from an NGO; one of the centers in Nouakchott provided overnight care for child victims of crime. MASEF operated six regional centers that provided short-term care to vulnerable children with disabilities, including potential trafficking victims. MASEF centers provided care to 860 vulnerable children, including some potential trafficking victims. The MASEF generally referred victims to NGOs for long-term care. MASEF centers resumed daytime services for vulnerable families, including psycho-social, food, and vocational assistance, which it had previously suspended due to the pandemic. The government operated one day center in Nouadhibou for adult female victims of sexual violence, including potential trafficking victims, and placed them with host families at night; the center also accommodated migrant and refugee women and girls. However, shelter and services for adult victims remained severely inadequate. Foreign nationals and Mauritanian victims were eligible for the same services. Foreign national victims who faced hardship or retribution in their country of origin could apply for asylum or refugee status, but authorities did not report granting these protections to any victims.

The government did not have a formal policy to encourage victims to assist in investigations and prosecutions against their alleged traffickers, nor did it report providing any services, including witness protection or confidentiality protocols, to protect victims from threats or intimidation from their traffickers. NGOs reported the government often brought victims and accused traffickers together when conducting interviews, which placed enormous pressure on victims to change their testimony. Pursuant to existing laws, access to victim services was not conditioned on cooperation with law enforcement; however, this provision was not always respected, and officials sometimes required victims to participate in law enforcement proceedings to receive services. The 2015 anti-slavery law called for comprehensive legal assistance for victims of hereditary slavery and the creation of support centers in each province. The government operationalized legal aid offices, which were available to all victims of crime, in all regions and allocated 10 million MRU ($270,270) to their operation, the same amount allocated the previous year. It also allocated an additional 3.6 million MRU ($97,300) for legal assistance to trafficking victims. However, the government did not report providing such legal assistance to any victims. The law allowed victims to obtain restitution, although the complex and opaque legal system made such efforts extremely difficult. Courts did not award restitution to any victims, compared with awarding 500,000 MRU ($13,510) in restitution to four victims during the previous reporting period; the government did not report whether the previously awarded restitution was paid. Victims

could also file civil suits against their traffickers, although victims lacked awareness of this option. According to an NGO, victims filed two civil suits against their traffickers during the previous reporting period but have not yet received compensation.

Due to a lack of formal identification procedures, authorities may have detained or deported some unidentified trafficking victims, including victims of domestic servitude and sex trafficking under fornication and adultery charges. Law enforcement officials jailed women suspected of engaging in commercial sex and held irregular migrants in detention until their refugee status was resolved without screening for trafficking.

## PREVENTION

The government maintained efforts to prevent human trafficking. The Commissariat, under the direction of the prime minister's office, coordinated the human rights inter-ministerial committee, which was responsible for implementing the government's anti-trafficking NAP and met twice. Additionally, the Ministry of Justice, Commissariat, and an international organization created a sub-committee to coordinate anti-slavery efforts in collaboration with the human rights inter-ministerial committee. The government allocated 10 million MRU ($270,270) to implement the NAP, a significant increase from 5.4 million MRU ($145,950) allocated the previous year. In March 2022, the government adopted the implementing decree establishing the Instance Nationale, a designated committee charged with coordinating the government's nation-wide anti-trafficking response, as called for in the 2020 anti-trafficking law.

The government, in collaboration with civil society, held awareness campaigns and workshops to engage local and civil society leaders and increase public awareness of the anti-slavery and trafficking laws, particularly among vulnerable communities. In March 2022, the government co-chaired a sub-regional symposium on slavery. The symposium marked the first of its kind to take place in Mauritania and included civil society actors from Europe, Burkina Faso, Chad, Mali, Niger, Ghana, Guinea, Senegal, and the United States. The Agency for National Solidarity and the Fight Against Exclusion (Taazour) provided substantial socioeconomic support to vulnerable populations, including communities traditionally subjected to hereditary slavery. The government made some efforts to combat child forced begging, including conducting visits to some *mahadras* (Quranic schools) and working with religious leaders to raise awareness of child protection issues. The government provided financial support to an NGO hotline for victims of crime, including trafficking; the hotline assisted 336 victims of sexual violence, including some potential trafficking victims. Despite efforts to raise awareness, some local officials reportedly denied the existence of slavery, and some high-level officials claimed NGOs and anti-slavery activists fabricated or overstated the number of cases.

The government adopted the NGO Law implementing decree, allowing all NGOs, including anti-slavery NGOs, to legally operate in the country following a simplified registration process. In December 2021, several NGOs, including anti-slavery NGOs, registered and began operations. Some critics reported the law contained administrative barriers that may have been burdensome to smaller NGOs and permitted the government to suspend NGOs engaged in activities that "threaten the country's morals." There were no reports the government prevented anti-slavery activists from operating in Mauritania; however, authorities allegedly harassed and detained some activists. Observers claimed officials retaliated against an NGO worker after the organization criticized the government's handling of a slavery-related investigation. Authorities also detained four individuals—including NGO activists, a survivor of slavery, and a journalist—while they were investigating an alleged slavery case. The government made efforts to reduce the demand for commercial sex acts by arresting and convicting buyers of commercial sex; however, officials also arrested potential trafficking victims during these operations.

Under a 2003 agreement with Spain, Mauritania received deported migrants, including its citizens and third-country nationals presumed to have transited Mauritania en route to Spain. According to international organizations, the government processed and transported these migrants to the Senegal and Mali borders, within hours of arriving in Nouadhibou, without systematically screening for trafficking or allowing international

organizations to offer protective services. Authorities were, however, reportedly responsive to international organization requests for screening when civil society actors identified potential trafficking victims among the migrants. NGOs and media reports alleged officials detained some migrants without due process, placed unaccompanied children in detention with adults, abused migrants during arrest and detention, and failed to provide access to adequate facilities, including food and sanitation.

The Ministry of Labor hired 15 new labor inspectors and provided some training on child trafficking and child labor. However, the government lacked the capacity to regulate the large informal sector, where most cases of forced labor occurred. Despite reports of labor abuses, including potential indicators of trafficking, the government rarely inspected fishing vessels, processing plants, and boat factories. The government did not effectively regulate foreign labor recruiters or penalize them for fraudulent recruitment. Although the law prohibited worker-paid recruitment fees, the government's limited capacity hindered its ability to enforce this provision. The government continued working with an international organization to study the scope of forced labor in Mauritania. In 2021, the government lifted identity documentation requirements for secondary school that had previously restricted access to education, especially among communities traditionally exploited in hereditary slavery. In partnership with an international organization, officials continued to issue identification cards to Malian refugees—as well as birth certificates to Malian refugee children born in Mauritania—in Mbera camp. The government signed a memorandum of understanding with an international organization to formalize the organization's role in facilitating and accelerating issuance of refugee documentation in urban areas. The government collaborated with the same organization to register vulnerable refugees in its national social protection program. The government provided peacekeepers with pre-deployment briefings on human rights, including trafficking, prior to their deployment. Although not explicitly reported as human trafficking, there were six open cases of alleged sexual exploitation with trafficking indicators by Mauritanian peacekeepers deployed to the UN peacekeeping mission in CAR.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Mauritania, and traffickers exploit victims from Mauritania abroad. Adults and children from traditional slave castes in the Haratine (Black Moor) and Afro-Mauritanian (Halpulaar, Soninke, and Wolof) communities are subjected to hereditary slavery practices rooted in ancestral master-slave relationships, where they are often forced to work without pay as cattle herders and domestic servants. Although reliable data on forced labor and hereditary slavery do not exist, local and international experts state hereditary slavery continues to affect a small, but not insignificant, portion of the country's population in both rural and urban settings. Many survivors of slavery and their descendants remain in dependent relationships with the family of their former slaveholders due in part to cultural traditions as well as a lack of skills and alternate economic opportunities; some survivors reportedly continue to work for their former masters or others under exploitative conditions to retain access to land they had traditionally farmed. Corrupt *marabouts* force boys from Mauritania and other West African countries who study at *mahadras* to beg for food and money; boys from low-income families in the Halpulaar community and increasingly children with disabilities are particularly vulnerable. According to a 2018 survey, more than 50 percent of Mauritanian children younger than the age of five lack birth certificates. It is especially difficult for children of Haratine and Afro-Mauritanian descent to obtain birth certificates, resulting in their denial of services, education, and assistance, and increasing vulnerability to trafficking. Fraudulent recruiters promise Mauritanian women and girls—especially those from the traditional slave castes and Afro-Mauritanian communities—shelter and education but force them into domestic servitude, especially in larger cities such as Nouakchott, Nouadhibou, and Rosso. Children of Haratine and Afro-Mauritanian descent working in the fisheries sector are vulnerable to forced labor. Traffickers reportedly coerce some women and children to smuggle illicit drugs.

West African women and girls, especially Senegalese and Ivoirians, are vulnerable to domestic servitude and sex trafficking in Mauritania.

Traffickers also exploit Senegalese children in fishing, domestic work, drug production, and sex trafficking. Migrants and refugees in Nouadhibou have reportedly engaged in commercial sex due to their dire financial situations, increasing their vulnerability to sex trafficking. Mauritanian, Nigerian, and Senegalese traffickers in the port city of Nouadhibou exploited Sub-Saharan African migrants transiting Mauritania en route to Morocco and Europe in forced labor and sex trafficking. Foreign agencies and Mauritanian intermediaries fraudulently recruit Mauritanian women for nursing and teaching jobs abroad and subsequently exploit them in domestic servitude and sex trafficking in the Gulf, including Saudi Arabia. Traffickers from Middle Eastern and North African countries fraudulently enter into marriages with Mauritanian girls and young women, facilitated by brokers and travel agencies in both Mauritania and the Middle East; the traffickers promise substantial payments to the family and subsequently exploit the girls and women in sex trafficking in Saudi Arabia and other Gulf countries.

# MAURITIUS: TIER 2

The Government of Mauritius does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Mauritius remained on Tier 2. These efforts included providing services to all identified child victims; working with an international organization to renovate a shelter and repatriate foreign victims identified in previous years; conducting awareness raising activities to educate the migrant worker population on trafficking indicators; and reconvening the Inter-Ministerial Committee on Trafficking in Persons (IMCTIP) after it was inactive for two years. However, the government did not meet the minimum standards in several key areas. The continued absence of standard operating procedures (SOPs) for victim identification and referral for adult trafficking victims led to ad hoc assistance, a lack of victim-centered approaches, and potential re-traumatization of victims. Courts continued to provide lenient sentences to first-time offenders of many crimes, including trafficking; this approach weakened deterrence and did not adequately address the nature of the crime. Despite documented vulnerabilities of forced labor within the migrant worker population, the government did not investigate or prosecute traffickers exploiting individuals in forced labor, nor did it identify any victims of forced labor. The judicial process continued to be prohibitively long—frequently many years—and the government lacked adequate support for victim witnesses, which at times dissuaded victims from seeking legal redress.



**PRIORITIZED RECOMMENDATIONS:**

Improve comprehensive protection services for adult trafficking victims by developing and implementing SOPs for proactive victim identification and referral to protective services—especially among vulnerable populations, including individuals in commercial sex and migrant workers—and by ensuring provision of adequate assistance to all victims identified regardless of immigration status or willingness to participate with law enforcement. • Vigorously increase efforts to investigate and prosecute trafficking crimes and sentence convicted traffickers to penalties as prescribed by the 2009 anti-trafficking law. • Implement a victim witness program to increase protection for victims participating in criminal proceedings and prevent re-traumatization, including receiving victims' consent to willingly participate in law enforcement procedures. • Implement and consistently enforce strong

MAURITIUS

regulations and oversight of labor recruitment companies, including eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable. • Strengthen the partnership between police and prosecutors to more efficiently and effectively prosecute trafficking cases and increase training on strong evidence gathering and victim-centered investigations. • Finalize and adopt a national action plan (NAP) to combat trafficking and allocate funding for its implementation. • Designate a lead agency responsible for the protection of adult trafficking victims. • Provide specific anti-trafficking training to law enforcement officials, labor inspectors, social workers, prosecutors, and magistrates to improve victim identification and referral to appropriate care.

## PROSECUTION

The government maintained anti-trafficking law enforcement efforts. The Combating of Trafficking in Persons Act of 2009 criminalized sex trafficking and labor trafficking of adults and children and prescribed penalties of up to 15 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The Children's Act of 2020 also criminalized child sex trafficking and prescribed penalties of up to 10 years' imprisonment.

The government reported initiating four investigations into seven suspects, compared with four investigations into 11 suspects in 2020. Specifically, authorities investigated one adult sex trafficking case and three child sex trafficking cases; the government did not report any law enforcement efforts related to forced labor. All four investigations remained ongoing at the end of the reporting period. The government initiated one prosecution from a 2014 sex trafficking case, compared with two prosecutions initiated in 2020. The government reported at least 21 investigations and 17 prosecutions remained ongoing from previous reporting periods; however, the government did not provide updates on these cases. The government convicted two traffickers in three cases, compared with one conviction in 2020. Courts sentenced one trafficker to six months' imprisonment for adult sex trafficking. Courts also sentenced one trafficker in two separate child sex trafficking cases to five years' imprisonment in one case and six months' imprisonment for the other. Courts ordered the trafficker, who was already in prison serving a four-year sentence for a previous child sex trafficking conviction, to serve part of the sentence concurrently for a total of seven years' imprisonment. The government continued to provide lenient sentences to first-time offenders of many crimes, including trafficking; this approach weakened deterrence and did not adequately address the nature of the crime. The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes. In response to the pandemic, the government issued stay-at-home orders for a small segment of the reporting period; during this time, all police officers, including those mandated to investigate trafficking crimes, were assigned to oversee pandemic-related guidelines and procedures, such as mask wearing, curfews, social distancing, and mandatory quarantines. Courts continued to experience a backlog of cases, which was exacerbated by pandemic-related court closures in 2020.

The Mauritius Police Force (MPF) maintained an ad hoc internal coordination committee to combat trafficking, as well as a "human rights desk," which employed two police officers trained on trafficking crimes, that served as a resource for other police units. The Mauritius Police Training School continued to provide anti-trafficking courses to new law enforcement officers and trafficking-specific training modules to mid-level officers. Despite these training efforts, some law enforcement officers continued to lack an understanding of the anti-trafficking law. Similar to previous years, proper investigations, including collection of evidence and adequate witness testimony, remained difficult for law enforcement to conduct, often leading to lengthy and poor investigations and prosecutions. While law enforcement and prosecutors reported continued case conferencing, coordination required further improvement; additionally, the judicial process continued to be prohibitively long—frequently many years—which at times dissuaded victims from seeking legal redress through civil suits.

## PROTECTION

The government maintained overall victim protection efforts, but those related to adult trafficking victims remained inadequate. The government identified six potential victims, compared with 18 victims identified in 2020 and six in 2019. Of the six victims identified, all were victims of sex trafficking; two were adults, and four were children; and five were Mauritian nationals, while one was a foreign national from Bangladesh. For the second consecutive year, the government did not report identifying any adult victims of labor trafficking, despite migrant workers' continued vulnerability to trafficking. The Ministry of Gender Equality, Child Development, and Family Welfare's (MWFWCD's) Child Development Unit (CDU) systematically employed standard identification and referral procedures for child trafficking victims; however, the government continued to lack standard identification and referral procedures for adult trafficking victims. The absence of standard procedures for adult trafficking victims led to ad hoc assistance, a lack of victim-centered approaches, and potential re-traumatization of victims. The government provided medical assistance and counseling to the four child victims identified in 2021 and referred the two adult victims to NGO-run services. The government continued to operate a shelter for female child sex trafficking victims that could host up to 32 children. Officials reported providing services to 23 children at the shelter, compared with 34 children during the previous reporting period. The government allocated 13.2 million Mauritian rupees ($301,710) to the shelter in 2021, compared with 11 million rupees ($251,430) in 2020. An international organization reported partnering with the government to repatriate at least five foreign victims identified in previous reporting periods. The MPF in Vacoas continued to oversee the country's only trafficking-specific adult shelter; while the shelter was dedicated to male victims, police reportedly allowed for the accommodation of female victims on an ad hoc basis. The government, in partnership with an international organization, began renovations to the shelter. Despite remaining operational during the renovations, the government has not reported assisting any victims at the shelter since it opened in 2019. In practice, the government referred adult female victims to NGO-run shelters for victims of domestic violence or adults involved in commercial sex with drug addictions, where the NGOs provided shelter, medical assistance, and psychosocial services. The government continued to require some adult foreign victims to participate in investigations, denying their requests for repatriation; observers reported police sometimes held victims' passports until completion of the investigation. Due to a lack of formal identification procedures and gaps in understanding of human trafficking among some law enforcement officers, authorities may have detained, arrested, and deported some unidentified trafficking victims, particularly women involved in commercial sex or foreign nationals who had overstayed their visas.

The 2009 anti-trafficking law provided victims limited legal alternatives to removal to countries in which they would face hardship. The law authorized the Minister of Home Affairs to allow a foreign trafficking victim to remain in the country for up to 42 days before deportation and to issue a temporary residence permit if the victim agreed to cooperate with the investigation and prosecution of the trafficking case. The law also separately allowed the Minister of Home Affairs to extend the trafficking victim's permit on humanitarian grounds. The Ministry of Home Affairs did not report issuing any such permits during the reporting period. Since July 2021, the Ministry of Labor (MOL) was able to grant migrant workers a "special open permit" to allow victims to continue working in Mauritius during ongoing trafficking investigations; the government provided one "special open permit" during the year. The government lacked formal policies and procedures to provide protective services for and encourage trafficking victims' participation in investigations and prosecutions, and there was no witness protection program for victims. Courts reportedly allowed victims to provide testimony via video or written statement, and if a victim was a witness in a court case against a former employer, they could obtain employment, move freely within the country, or leave the country pending trial proceedings; however, in practice, government officials expected victims to testify against their trafficker in-person. The anti-trafficking law allowed the courts to award a victim up to 500,000 rupees ($11,430) in restitution from the convicted trafficker; however, courts did not award restitution to victims. The law also allowed victims to file civil suits against their alleged traffickers for

compensation for damages exceeding the amount of restitution awarded during criminal proceedings; however, civil suits could be prohibitively expensive and lengthy, and no victims filed such suits.

## PREVENTION

The government maintained efforts to prevent trafficking. The Prime Minister's Office led government anti-trafficking efforts. The Inter-Ministerial Committee on Trafficking in Persons, chaired by the attorney general's office and designed to coordinate interagency policies to combat trafficking, met for the first time since 2019. The National Steering Committee on Trafficking in Persons, a working-level technical committee under the senior-level inter-ministerial committee, continued to meet regularly to coordinate daily operations on anti-trafficking efforts. The MWFWCD, including the National Children's Council and the CDU, led government efforts to combat child trafficking; there continued to be confusion within the government on which department was responsible for addressing adult sex trafficking. The government, in partnership with an international organization, began drafting an updated NAP to combat trafficking; the government has not had a NAP since 2013, which continued to hinder progress among various agencies mandated to work on anti-trafficking efforts. The government held awareness campaigns targeting frontline workers, local committees, and migrant workers on recognizing trafficking indicators and reporting potential trafficking crimes. The government reported that pandemic-related closures of schools and community centers limited in-person awareness campaigns, typically run by the MWFWCD, targeting students, parents, and teachers. The MWFWCD continued to operate a 24-hour hotline to report child abuse, including potential trafficking crimes; however, it did not report call data related to trafficking.

The MOL continued to conduct individual sessions with foreign workers upon arrival to Mauritius to inform them of their rights, including producing relevant documents in their native language. The MOL's Special Migrant Workers Unit, responsible for monitoring and protecting all migrant workers and conducting routine inspections of their employment sites, responded to complaints from migrant workers and conducted routine onsite labor inspections; however, the unit was not trained on trafficking and did not report identifying any trafficking victims during these inspections or referring any potential violations for further investigation. Although the MOL was required to approve all employment contracts before migrant workers entered the country, some migrant workers reportedly continued to enter the country with contracts that were incomplete or had not been translated into languages the workers could read. The Recruitment of Workers Act and Regulations allowed recruiting agencies to charge recruitment fees ranging from 100 to 200 rupees ($2 to $5) and a commission of not more than 10 percent on the first month's earnings of persons placed in employment. In response to the pandemic, the government closed the country's borders for a portion of the reporting period; during the lockdown, the MOL extended the work visas of migrant workers who had reached the end of their stay and allowed migrant workers employed by companies that permanently closed to transition to other jobs. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Mauritius. Peers, significant others, family members, or businessmen offering other forms of employment exploit girls from across the country in child sex trafficking. Taxi drivers knowingly transport child sex traffickers to their victims with whom they engage in commercial sex acts; taxi drivers also transport victims to traffickers. Traffickers exploit girls from poor neighborhoods, an especially vulnerable population, in sex trafficking. Increasingly, guesthouse owners exploit Malagasy women, recruited under false pretenses of employment or tourism, in sex trafficking. Traffickers may also exploit children in sex trafficking on Rodrigues Island, an autonomous territory of Mauritius. Traffickers, in partnership with criminal networks in Russia and Kazakhstan, recruit Belarusian, Russian, and Ukrainian women to move to Mauritius, under the guise of a marriage agency, then subsequently exploit them in sex trafficking. Traffickers exploit Malagasy women who transit Mauritius in forced labor, primarily in domestic servitude and sex trafficking in the Middle East. Mauritius' manufacturing and construction sectors employ approximately 35,550 foreign migrant workers—primarily

from Bangladesh, India, Madagascar, Sri Lanka, and Nepal—some of whom traffickers subject to forced labor. Employers operating small- and medium-sized businesses employ migrant workers, primarily from Bangladesh, who have been recruited through private recruitment intermediaries, usually former migrant workers now operating as recruiting agents in their country of origin; labor trafficking cases are more common in these enterprises than in larger businesses, which recruit directly without the use of intermediaries. Despite Mauritian law prohibiting the practice, employers routinely retain migrant workers' passports to prevent them from changing jobs, enhancing vulnerability to forced labor.

# MEXICO: TIER 2

The Government of Mexico does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Mexico remained on Tier 2. These efforts included prosecuting and convicting more traffickers; identifying more victims; and arresting two former public officials for allegedly running a sex trafficking operation. Courts convicted more labor traffickers, including some who exploited children by forcing them to transport illegal substances. However, the government did not meet the minimum standards in several key areas. The government failed to allocate funds to a legally-required victim assistance fund; authorities did not consistently employ a victim-centered approach; and overall services for victims were inadequate. The government did not improve efforts to screen for indicators of trafficking among vulnerable populations and refer possible victims to service providers. Fraudulent recruitment practices continued to be widespread, but the government did not take steps to hold recruiters or labor agents accountable.



MEXICO TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Develop, implement, and fund a national strategic action plan on victim services, in consultation with international organizations and NGOs, to include shelters, comprehensive services, and reintegration support for all victims, including men and boys, LGBTQI+ individuals, and Indigenous persons. • Develop and implement standardized operating procedures (SOPs) for front-line officials to proactively identify victims among vulnerable groups in Mexico and overseas—including individuals in commercial sex, children apprehended for illicit gang-related activities, Cuban medical professionals, and migrants, including migrant workers—and refer them to service providers for assistance. • Increase efforts to investigate and prosecute trafficking crimes, including forced labor and those involving complicit officials, at both the federal and state levels. • Increase and institutionalize anti-trafficking training for police, prosecutors, judges, immigration authorities, and service providers, with a focus on applying trauma-informed, victim-centered procedures. • Provide improved security to victims and witnesses testifying against traffickers, and ensure victims are not unlawfully detained, coerced into testifying, or otherwise re-traumatized. • Allocate funds to a legally-required victim assistance fund to cover restitution payments convicted traffickers are unable to pay and develop a mechanism to ensure victims receive court-ordered payments. • Strengthen the labor law to adequately criminalize and establish stringent penalties for recruitment practices that facilitate trafficking, and increase enforcement to punish employers and labor recruiters for violations. • Enact anti-trafficking legislation and establish specialized anti-trafficking prosecution units in

all states. • Enact, implement, and allocate sufficient resources toward a new national action plan (NAP) that is coordinated across federal, state, and local authorities. • Conduct culturally-relevant awareness campaigns in local languages targeted for rural and Indigenous communities. • Strengthen data collection efforts.

## PROSECUTION

The government increased law enforcement efforts, but it did not provide complete data on investigations, prosecutions, and convictions at the federal and state levels. The 2012 anti-trafficking law criminalized sex trafficking and labor trafficking, prescribing penalties of five to 30 years' imprisonment and fines for sex trafficking crimes and five to 20 years' imprisonment and fines for labor trafficking. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The law defined trafficking broadly to include illegal adoption without the purpose of exploitation. Federal officials had jurisdiction over all international trafficking cases, all cases that took place on federally administered territory involving organized crime, and all cases involving allegations against government officials. States investigated other internal trafficking cases. Thirty states had trafficking laws. The 2012 law obligated states to have a dedicated human trafficking prosecutor; 31 of 32 states had established specialized anti-trafficking prosecutors or units. Local experts reported prosecutors sometimes charged suspects with crimes they believed were easier to prove, such as homicide or kidnapping, particularly in states where prosecutors' offices were underfunded. The 2019 Asset Forfeiture Law allowed authorities to seize traffickers' assets. In July 2021, the Supreme Court denied a request for an injunction filed by suspects who argued that the separate charges they faced for sex trafficking and sexual exploitation amounted to being judged twice for the same crime. The court deemed that each charge involved separate actions and upheld the government's ability to prosecute suspects for both crimes.

Authorities initiated at least 35 federal investigations and 621 state investigations in 2021, compared with 55 federal investigations and 550 state investigations in 2020, and 133 federal investigations and at least 544 state investigations in 2019. Federal investigations included 23 sex trafficking cases, five labor trafficking cases, and seven cases involving unspecified exploitation. Federal authorities initiated prosecution of 31 suspected traffickers and continued 45 prosecutions opened in previous years for a total of 76 federal prosecutions in 2021. In comparison, authorities initiated prosecutions of 40 suspects and continued prosecutions of 35 suspects in 2020. The government reported state-level prosecutions in 22 states for a total of 95 suspects prosecuted. In comparison, the government reported state-level prosecutions in 14 states for a total of 51 suspects prosecuted in 2020. Although federal authorities did not issue any convictions in 2021, state authorities convicted 75 traffickers, including 65 sex traffickers and 10 labor traffickers, two of whom forced children to transport illicit substances. This was an overall increase from 49 traffickers convicted in 2020 and 29 traffickers convicted in 2019. Nonetheless, a lack of coordination among labor inspectors, criminal justice authorities, and service providers hampered efforts to hold labor traffickers criminally accountable and provide comprehensive assistance for labor trafficking victims. The government issued sentences for convicted traffickers ranging from 3 years to 135 years' imprisonment, and also ordered many to pay fines and restitution. The Secretariat of Finance's Financial Intelligence Unit (UIF) reported suspicious financial transactions and its intelligence uncovered 201 possible cases of trafficking in 2021, compared with 230 reports of suspicious financial transactions allegedly related to trafficking in 2020. Over the three-year period 2019-2021, UIF froze 1,617 bank accounts and more than $52 million in funds connected to human trafficking crimes.

Mexican prosecutors collaborated on 13 cases with authorities from other countries. State-level specialized prosecution units, whose capacity levels, staffing, and funding varied widely, had the primary responsibility for enforcing anti-trafficking laws throughout the country. Prosecutor offices in rural and Indigenous communities were particularly understaffed and lacked sufficient resources to effectively prosecute trafficking crimes. Coordination across state and federal levels continued to be slow. Authorities from the four states of Mexico City, State of Mexico, Baja California, and Nuevo Leon conducted more than half of all investigations in 2020, while authorities in Durango, Guanajuato and Colima did not investigate any suspected cases. The government identified the states of Veracruz, Tlaxcala, and Guerrero as having a high trafficking prevalence, but authorities in these states did not convict any traffickers for at least the second consecutive year. Local experts reported insufficient funding for prosecutors in these states led them to charge suspects with crimes they believed easier to prove. The government trained 820 state and local police officers across ten states on anti-trafficking protocols. The Special Prosecutor for Violence Against Women and Trafficking in Persons (FEVIMTRA) held four virtual anti-trafficking training sessions for 749 of its employees.

Corruption and official complicity in trafficking crimes remained concerns, inhibiting law enforcement action during the year. Some government officials facilitated or participated in trafficking crimes. The government operated a hotline and website open to the public for the anonymous reporting of suspected corruption involving public officials, but it did not report receiving any trafficking-related tips. In 2021, authorities investigated and detained a public servant for alleged involvement in child sex trafficking crimes, but they did not provide details on the status of the investigation or whether charges had been filed. During the reporting period, authorities arrested and charged two former employees of a national political party, including its former leader, for allegedly running a sex trafficking operation with party resources; one additional suspect apprehended in the prior reporting period remained in custody and two other suspects were not apprehended. The government did not provide updates in the case of the former governor of Puebla, arrested in February 2021 for ordering the 2005 torture and illegal arrest of a journalist who exposed the official's alleged involvement in a child sex trafficking ring. The government did not convict any officials for complicity in trafficking crimes.

## PROTECTION

The government maintained protection efforts, identifying more victims; however, it did not provide adequate services to victims. The government reported identifying 744 victims in 2021, compared with 673 victims in 2020, and 658 victims in 2019. The government provided only partial disaggregated data on the identified victims: in the first eight months of 2021, identified victims included 392 individuals subjected to sex trafficking, 56 subjected to forced labor, and 66 not specified and at least 15 victims were from other countries. An NGO that operated a national hotline dedicated to human trafficking reports received 1,864 trafficking-related calls—originating from throughout the country—and identified more than 196 victims from these calls; 43 investigations resulted from calls to the hotline. In 2021, Mexican consular officials identified and assisted 1,352 Mexican nationals who were in vulnerable situations or victims of crimes including human trafficking in other countries; 86 were victims of forced labor. In comparison, authorities abroad identified and assisted 313 Mexican victims of human trafficking in the first six months of 2020.

Immigration officials implemented a formal screening, identification, and care protocol to identify and refer potential trafficking victims during initial immigration verification, and immigration officials identified 15 trafficking victims during the year. In the previous reporting period, authorities agreed to modify this protocol to require screening among migrants in detention centers and requested assistance from an international organization in drafting updated guidance; however, authorities did not complete these revisions during the year. Consular officials followed a protocol for identifying and providing assistance to Mexican victims abroad, and some other agencies followed informal victim referral procedures. Labor inspectors had a protocol for identifying suspected forced labor victims during routine inspections of formally-registered businesses and farms, but local observers reported a lack of coordination with other secretariats to facilitate criminal investigations and victim assistance. Across the government, victim referral from first responders was largely ad hoc and procedures varied from state to state, with most shelters relying on prosecutors to identify and refer victims. Most government officials lacked SOPs to proactively identify potential victims of trafficking within vulnerable groups and systematically refer them to service providers. NGOs reported authorities at all levels of government lacked sufficient understanding of trafficking laws and failed

to effectively identify and refer potential victims. In Puebla, a state the government identified as among those with the highest prevalence of trafficking, state authorities referred only three victims to the state's only trafficking victim shelter in 2021. The government provided training on identifying and assisting trafficking victims to officials from several agencies including 800 staff from state attorneys general offices; 487 Department for Family Development (DIF) officers; 2,100 immigration officials; and 1,465 additional government officials.

Federal and state agencies generally offered victims emergency assistance such as medical care, food, and housing in temporary or transitional homes, and other services such as psychological care, legal assistance, and access to education or employment opportunities, often in partnership with NGOs. However, victim services varied throughout the country; were unavailable in some regions; and were particularly inadequate for male victims, forced labor victims, and victims in rural areas. NGOs reported the government provided insufficient funding for critical victim services and victims in most states did not receive sufficient government assistance. Medical and psychological support often did not extend beyond cursory evaluations; shelters at both the state and local levels typically housed victims only for the duration of a criminal trial; and long-term reintegration services were very limited, leaving victims highly vulnerable to re-exploitation.

The government did not provide complete data for victims receiving services. FEVIMTRA continued to operate a high-security shelter in Mexico City that could accommodate 50 female victims and their children for up to three months while victims participated in legal processes; the shelter served 79 trafficking victims during the year. NGOs expressed concerns the high security measures, including victims' inability to leave the shelter unaccompanied, may have re-traumatized some victims. The states of Mexico, Chiapas, and Mexico City continued operating six government-funded trafficking shelters. In total, seven states had specialized government or NGO shelters for trafficking victims, and four states had agreements in place that allowed them to refer trafficking victims to shelters in another state. The government and NGOs operated additional shelters that served other vulnerable populations and could accept trafficking victims but did not provide specialized services. There were no government or NGO trafficking shelters available for male victims older than 13, and 12 states lacked any shelters that accepted trafficking victims. NGOs operated the majority of shelters that served trafficking victims. Most shelters offered medical, psychological, and legal assistance for victims, but the level of care and quality of services varied widely. Government officials provided services such as security or transportation to some NGO shelters. Government centers for crime victims provided some trafficking victims with emergency services, as did state-level prosecutorial, social service, and human rights offices. Many NGOs continued to alter or limit their operations in response to pandemic-related funding cuts from donors or necessary isolation measures. Shelters reported assisting fewer victims due to limited staffing and to limit the spread of the COVID-19 virus. The National Institute of Social Development provides funding to women's shelters, including shelters that accept victims of trafficking; in 2021, three NGOs operating trafficking shelters submitted requests for funding and received approximately 11 million pesos ($535,780) through this program.

The government reported providing temporary immigration relief through humanitarian visas to 13 trafficking victims in 2021. Humanitarian visas enabled foreign trafficking victims to legally remain and work in the country up to one year, and could be extended; this benefit was not dependent on a victim's willingness to participate in a criminal trial. Government officials and NGOs acknowledged barriers to victims receiving humanitarian visas, including authorities' failure to identify eligible foreign trafficking victims, insufficient efforts to make victims aware of the process for obtaining such relief, and the lengthy wait times for processing requests. FEVIMTRA coordinated with local embassies to provide legal, administrative, and consular assistance to victims from Brazil, Colombia, Honduras, Paraguay, and Venezuela and repatriated six victims to their home countries.

The law provided victims with protection from punishment for unlawful acts traffickers compelled them to commit. However, the government lacked formal procedures to identify victims among vulnerable groups, including children apprehended for alleged gang-related criminal activity

and migrants in detention facilities. NGOs reported authorities sometimes unlawfully detained victims on trafficking charges and some officials utilized shelters as detention facilities for victims until their cases were completed. Trafficking victims among migrants and asylum-seekers were often fearful of reporting abuses due to a mistrust of authorities and fears of punishment or other repercussions. Authorities initially charged a child sex trafficking victim in Queretaro with sex trafficking crimes, but later withdrew the charges and filed a new case naming her as a victim; in October 2021, courts convicted the sex trafficker who exploited her and several other victims. The government did not report whether it complied with a CNDH recommendation, issued in January 2021, to provide compensation to a sex trafficking victim whose human rights authorities violated by detaining her in a migrant detention center in 2018.

The anti-trafficking law stipulated authorities must apply the principle of "maximum protection" to victims and witnesses, including protecting individuals' identities and providing name and residence changes to victims affected by organized crime. Nonetheless, identifying information sometimes became publicly available in high-profile cases and many victims feared identifying themselves or testifying against traffickers in court under the accusatorial system. Courts permitted victims to provide testimony via closed circuit television. NGOs reported officials often re-traumatized victims through a lack of sensitivity, victim shaming, and the lack of adequate protection for victims during criminal proceedings. Experts expressed concern prosecutors coerced some victims to testify during judicial proceedings. Authorities' failure to employ victim-centered procedures, combined with an overall lack of specialized services and security, disincentivized victims from filing complaints or participating in investigations and prosecutions. Women, Indigenous persons, LGBTQI+ individuals, and migrants experienced discrimination within the judicial system that limited their access to justice.

The Secretariat of the Interior (SEGOB) had a unit responsible for supporting access to justice and compensation for victims of federal crimes, but the government did not provide it with sufficient funding and trained personnel, limiting its ability to provide this support to trafficking victims. The national-anti trafficking law required judges in criminal cases at both the state and federal levels to order traffickers to pay restitution to victims. One victim received 57,500 Mexican pesos (USD 2,800) in restitution. However, the majority of victims who were awarded restitution did not receive these funds, and the government did not create a legally-required fund to cover restitution payments perpetrators could not pay. The government anti-trafficking commission continued funding an international organization to develop a national information system to track the number of victims identified, referred, and assisted across the country, but the pandemic delayed the system's implementation.

## PREVENTION

The government maintained prevention efforts. The anti-trafficking commission, led by SEGOB, coordinated efforts among government agencies and civil society organizations. Local experts reported the commission was effective in promoting participation of stakeholders from academia, NGOs, and international organizations, and it encouraged transparency at its regular meetings and in its five permanent working groups. The government lacked a national anti-trafficking action plan (NAP) for a third year, following the previous plan's expiration in 2018. The anti-trafficking commission drafted a new NAP and submitted it to the Secretariat of Finance for approval. In December 2021, the government approved the Comprehensive Program to Prevent, Address, Punish and Eradicate Violence against Women 2021-2024; the program includes activities to combat trafficking crimes against women, including harmonizing state and municipal regulations to strengthen coordination between police and commercial establishments and implementing campaigns to identify and prevent risk factors in areas with high trafficking prevalence.

The government conducted a variety of anti-trafficking training and awareness programs for government officials and members of the public. The National Human Rights Commission (CNDH) held 63 virtual and in-person training events for 11,800 government officials across sectors including health and child services, tourism, state and municipal

MEXICO

government, state human rights commissions, state police, and other first responders. The Secretariat of Welfare conducted a series of in-person and online events to raise awareness of trafficking, reaching one million people across the country. Several government entities conducted campaigns on social media to educate members of the public on trafficking and encourage victims and witnesses to report possible cases to authorities. Nonetheless, awareness and understanding of trafficking, particularly forced labor, remained low among the public. Experts noted prevention campaigns insufficiently reached high-risk groups such as children, rural and Indigenous communities, and non-Spanish speakers.

The government did not allocate sufficient resources or personnel to the Secretariat of Labor and Social Welfare to effectively enforce labor laws, although it significantly increased the budget for labor law enforcement. Furthermore, labor inspectors had a limited mandate for conducting oversight of working conditions in informal businesses and farms—which employed more than half of Mexican workers—and a 24-hour advance notice requirement for routine inspections hampered their effectiveness when they did occur. Authorities conducted very few inspections in major farming states where abuses allegedly were rife, investigated few complaints, and lacked effective coordination mechanisms to provide identified victims with appropriate services and access to criminal justice. The labor law lacked provisions criminalizing fraudulent recruitment and contract practices that made many workers vulnerable to trafficking. The law prohibited recruiters and labor agents from charging fees to workers and employers from passing agency fees to workers in the form of wage deductions; however, the law did not establish penalties for these practices and recruiters and employers continued to commit them with impunity. The law required employers to pay wages weekly, but the government did not effectively enforce this provision against employers who withheld wages to compel workers to meet certain quotas or continue working for a certain length of time. Civil contract law covered some fraudulent recruitment practices, but there was no evidence the government used these or other statues to hold recruiters or employers accountable.

A reform to Mexico's Migration and Refugee Law came into effect in January 2021, requiring authorities to issue temporary documents to undocumented migrant children and their adult caregivers, granting legal presence in Mexico while the government conducted a best interest determination for the child. Local observers expressed concerns that the law did not protect unaccompanied children from exploitation, as it did not require adults to prove their relationship to the child. The government did not enact a prohibition against the importation of goods produced by forced labor, as required by a trade agreement ratified by the Mexican legislature. The Secretariat of Tourism collaborated with an NGO to hold 19 virtual and in-person trainings on a public-private code of conduct on the protection of children in the tourism sector, reaching more than 10,000 employees of 148 hotels nationwide. NGOs reported the government's lack of follow-up and enforcement efforts limited the effectiveness of the code of conduct. The government participated in a program with authorities in the United States to limit the entry into Mexico of sex offenders convicted in the United States, but it did not report whether it denied entry to any sex offenders during the year. The government did not investigate or prosecute any suspected child sex tourists. The government made efforts to reduce the demand for commercial sex acts by prosecuting and convicting individuals who purchased commercial sex acts from child trafficking victims.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Mexico, and traffickers exploit victims from Mexico abroad. Groups considered most at risk for trafficking in Mexico include unaccompanied children, Indigenous persons, persons with mental and physical disabilities, asylum seekers and migrants, IDPs, LGBTQI+ individuals, informal sector workers, and children in gang-controlled territories. Traffickers recruit and exploit Mexican women and children, and to a lesser extent men, in sex trafficking in Mexico and the United States through false promises of employment, deceptive romantic relationships, or extortion. The majority of trafficking cases occur among family, intimate partners, acquaintances on social media, or through employment-related traps. The online sexual exploitation

of children reportedly increased during the year. Transgender persons are particularly vulnerable to sex trafficking. Traffickers increasingly use the internet, particularly social media, to target and recruit potential victims. Traffickers exploit Mexican adults and children in forced labor in agriculture, domestic service, child care, manufacturing, mining, food processing, construction, tourism, begging, and street vending in Mexico and the United States. Traffickers commonly exploit day laborers and their children in forced labor in Mexico's agricultural sector, with most victims coming from economically vulnerable and Indigenous populations. Individuals migrate from the poorest states to the agricultural regions to harvest vegetables, coffee, sugar, and tobacco; many receive little or no pay or time off; endure inhumane housing conditions without access to adequate food, clean water, or medical care; and are denied education for children. Some employers withhold weekly wages to compel agricultural workers to meet certain harvest quotas or continue working until the end of the harvest. Recruiters frequently employ deceptive recruitment practices and charge unlawful fees to place agricultural workers in Mexico and the United States; many workers are promised decent wages and a good standard of living, then subsequently compelled into forced labor through debt bondage, threats of violence, and non-payment of wages. NGOs estimated traffickers increasingly exploited individuals in forced labor in Mexico. The vast majority of foreign victims of forced labor and sex trafficking in Mexico are from Central and South America, particularly El Salvador, Guatemala, Honduras, and Venezuela—with Venezuelan victims increasing in recent years; traffickers exploited some of these victims along Mexico's southern border. NGOs and the media report victims from the Caribbean, Eastern Europe, Asia, and Africa have also been identified in Mexico, some en route to the United States. Among the Cuban medical professionals the government contracted to assist during the pandemic, some may have been forced to work by the Cuban government. Thousands of Ukrainian refugees, predominantly women and children who are fleeing Russia's war on Ukraine, have arrived in northern Mexican border cities seeking sanctuary in the United States and are vulnerable to trafficking.

Organized criminal groups profit from sex trafficking and force Mexican and foreign adults and children to engage in illicit activities, including as assassins, lookouts, and in the production, transportation, and sale of drugs. Experts expressed particular concern over the forced recruitment of Indigenous children by organized criminal groups, who use torture and credible threats of murder to exploit these children in forced criminality. Criminal groups exploit thousands of children in Mexico to serve as lookouts, carry out attacks on authorities and rival groups, or work in poppy fields. Observers also expressed concern over recruitment of recently deported Mexican nationals and foreign migrants by organized criminal groups for the purpose of forced criminality. Migrants and asylum seekers in or transiting Mexico are vulnerable to sex trafficking and forced labor, including by organized criminal groups; this risk is particularly high for migrants who rely on smugglers. Observers, including Mexican legislators, noted links between violence against women and girls and between women's disappearances, murders, and trafficking by organized criminal groups. Observers reported potential trafficking cases in substance abuse rehabilitation centers, women's shelters, and government institutions for people with disabilities, including by organized criminal groups and facility employees. Trafficking-related corruption remains a concern. Some government officials collude with traffickers or participate in trafficking crimes. Corrupt officials reportedly participate in sex trafficking, including running sex trafficking operations. Some immigration officials allegedly accept payment from traffickers to facilitate the irregular entry of foreign trafficking victims into Mexico.

NGOs reported child sex tourism remains a problem and continues to expand, especially in tourist areas and in northern border cities. Parents are sometimes complicit in exploiting their children in child sex tourism, and children experiencing homelessness are believed to be at high risk. Many child sex tourists are from the United States, Canada, and Western Europe; Mexican men also purchase sex from child trafficking victims. Authorities reported trafficking networks increasingly used cryptocurrencies to launder proceeds from their crimes. Economic hardship resulting from the pandemic led some workers to accept loans from their employers that left them highly vulnerable to debt bondage.

# MICRONESIA, FEDERATED STATES OF: TIER 2

The Government of the Federated States of Micronesia (FSM) does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore FSM remained on Tier 2. These efforts included identifying more trafficking victims, allocating funding for its third trafficking victim shelter, conducting trafficking awareness activities for the public, and providing an annual budget to its anti-trafficking office. Furthermore, the government increased investigations, prosecutions, and convictions of trafficking crimes, including initiating a prosecution of a government official. However, the government did not meet the minimum standards in several key areas. The government remained without comprehensive standard operating procedures (SOPs) for proactive victim identification and referral to protection services, which may have resulted in the penalization of unidentified victims. Despite some judicial officials' limited understanding of the trauma victims experienced, the government did not report providing any trauma-informed training activities for judicial officials.



MICRONESIA (FSM) TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers and sentence convicted traffickers to significant prison terms, including victims' family members and complicit officials who facilitate or directly benefit from trafficking. • Finalize, disseminate, and train officials on procedures for the proactive identification and referral of trafficking victims to protective services. • Increase resources for protection services for trafficking victims. • Screen for trafficking indicators among vulnerable groups, including individuals in commercial sex. • Increase and institutionalize anti-trafficking training for police, prosecutors, and judges, including on how to implement a victim-centered approach. • Provide legal alternatives to the removal of foreign trafficking victims to countries where they may face hardship or retribution. • Strengthen efforts to implement the national action plan (NAP) and state-level plans, including through staffing a governmental anti-trafficking secretariat. • Take steps to eliminate recruitment or placement fees charged to workers by labor recruiters and ensure any recruitment fees are paid by employers. • Monitor foreign labor recruitment for trafficking indicators, including the coercive use of debt. • Strengthen efforts to conduct anti-trafficking awareness campaigns targeted to traditional leaders, health care professionals, and the public, including those citizens of FSM who might migrate for work overseas. • Allocate funding to the trafficking hotline, including for a trafficking victim psychologist.

## PROSECUTION

The government increased law enforcement efforts. The national anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed penalties of up to 15 years' imprisonment, a fine of $5,000-$25,000, or both for offenses involving adult victims, and up to 30 years' imprisonment, a fine of $5,000-$50,000, or both for offenses involving child victims. These penalties were sufficiently stringent and, with regards to sex trafficking, commensurate with penalties for other serious crimes, such as rape. Each of Micronesia's four states had its own laws that criminalized trafficking crimes; however, Pohnpei and Chuuk States did not explicitly prohibit adult sex trafficking. Cases prosecuted at the state level may be heard subsequently at the national level, under national anti-trafficking law, depending on which court hears a case.

The government investigated eight suspected trafficking crimes and prosecuted nine alleged traffickers, compared with no investigations and four prosecutions the previous year. Media reported that the October 2019 murder of the acting Attorney General of Yap may have been related to her prosecution work, including on human trafficking. The prosecution of the two defendants, begun in 2019, remained ongoing at the end of the reporting period.

Courts convicted nine sex traffickers and sentenced five of them during the reporting period, compared with four traffickers convicted the previous year. Courts sentenced three traffickers to significant prison terms, for a total of 60 percent of traffickers serving significant prison time of one year or longer. While the length of some sentences increased, approximately 40 percent of all trafficking convictions resulted in fines, probation, or prison sentences of less than one year, which did not serve to deter the crime or adequately reflect the nature of the offense. Observers reported that longstanding concerns about lenient sentences of a year or less, or sentences that were not served on consecutive days, created potential safety problems for trafficking victims and weakened deterrence. The four other convicted traffickers' sentences were pending in the Pohnpei State court. Authorities charged a government official with sex trafficking under the anti-trafficking law, as well as other crimes under other laws. Authorities removed the official from duty while pending trial. The government did not report any other investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

The Department of Justice (DOJ) assigned a full-time assistant attorney general to prosecute all human trafficking cases. In addition, DOJ had three dedicated investigators who specialized in human trafficking: one in Chuuk, one in Pohnpei, and one in Kosrae. The government, in partnership with an international organization, trained law enforcement officials on victim identification and victim assistance. Compared with the previous reporting period, the government did not report providing training activities to judicial officials or health care providers. Judges lacked specialized training and, consequently, some judges lacked sensitivity to trafficking issues and the trauma victims experienced, resulting in judges sentencing traffickers to penalties that were disproportionately low to the severity of the crime. The government's police academy training for new cadets included mandatory training on investigating trafficking cases and how to interview potential victims. Observers stated police still required additional training on sex trafficking and investigation techniques. Police frequently did not investigate or charge those who abetted trafficking crimes, such as hotel owners, taxi drivers, and family members. Government officials reported the lack of personnel, resources, and funding impaired anti-trafficking monitoring efforts of forced labor or sex trafficking on vessels in Micronesian waters. The insular nature of the small island communities at times protected traffickers and impeded investigations.

## PROTECTION

The government increased efforts to protect victims. The government identified 13 sex trafficking victims, compared with four victims in the previous reporting period. In 2018, the government, in partnership with an international organization and State governments, finalized and approved SOPs for victim assistance and referral for state law enforcement; however, the national government remained without comprehensive SOPs to proactively identify trafficking victims and refer them to services. Due to a lack of formal identification procedures, authorities may have deported some unidentified trafficking victims. In addition, the current SOPs did not contain measures to screen for trafficking indicators among LGBTQI+ individuals, who were vulnerable to trafficking.

The government referred all 13 victims, including seven children, to an international organization for shelter and protective services. The government, in partnership with an international organization, provided counseling services and legal assistance to all 13 victims. The government allocated $15,000 to provide victim services to one victim, compared with no funding reported the previous year. The government, in partnership with an international organization, provided one child victim with shelter, clothing, counseling, and food. In the previous reporting period, the government provided food, clothing, medical services, psychological

evaluation, counseling services, and academic and social integration support to two victims.

The government operated two shelters for victims of crime, including trafficking victims: one in Pohnpei and another in Chuuk. The government allocated funding for a third shelter in Kosrae and was planning for a fourth shelter in Yap, which was not yet operational by the end of the reporting period. Observers noted a need for the government to train shelter staff on shelter management, victim care, shelter security, and trafficking indicators. The government, in partnership with an international organization, developed a "Service Provider" directory of civil society organizations that could provide protective services to victims. During the previous reporting period, an international organization facilitated a port security project that included a component on gender-based violence and trafficking victim identification and protection procedures; DOJ helped facilitate the project and was the lead agency for implementing victim-centered processes. In the same year, DOJ, with assistance from an international organization, finalized a needs assessment and action plan for the implementation of the project. The government reported pandemic restrictions delayed implementation of the project. The government funded a trafficking victim psychologist for the trafficking hotline; the government last allocated funding for this in 2019. The trafficking hotline continued to operate 24 hours a day in English and local languages. Courts ordered convicted traffickers to pay restitution to three victims. The government did not provide legal alternatives to the removal of foreign trafficking victims to countries where they may face hardship or retribution.

## PREVENTION

The government-maintained efforts to prevent trafficking. The Anti-Human Trafficking Office within the DOJ coordinated the government's anti-trafficking efforts. The office had a lead coordinator and dedicated staff. The office conducted public awareness campaigns, developed anti-trafficking training programs, provided victim protection services, and assisted in investigations. The government provided the office with an annual budget of $350,000 for operations and to implement the NAP, compared with $150,000 the previous year. The government reported it continued to implement its 2014 NAP and three of the four states had action plans linked to the NAP. Each of the four states had an anti-trafficking task force composed of members of state and national law enforcement, the legal community, medical and mental health professionals, immigration officials, and women's empowerment and faith-based groups.

In partnership with an international organization, the government held awareness campaigns targeting the Filipino community, women groups, and youth groups. The government established a policy that required labor recruiters to register with the government before conducting recruitment. The government did not report any efforts to monitor foreign labor recruitment or provide information on safe migration and human trafficking indicators to Micronesian nationals leaving to work in other countries. Furthermore, the government did not report its regulation of recruitment fees. While the government continued to report conducting awareness campaigns focused on destigmatizing individuals in commercial sex and closing known commercial sex establishments, it did not report efforts to reduce the demand for commercial sex.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in FSM, and traffickers exploit victims from FSM abroad. Sex traffickers exploit Micronesian women and girls through commercial sex with the crewmembers of docked Asian fishing vessels, crewmembers on vessels in FSM territorial waters, or foreign construction workers. Some family members exploit Micronesian girls in sex trafficking. There are reports of children exploited in commercial sex facilitated by taxi drivers. Local authorities claim many sex trafficking cases are unreported due to social stigma and victims' fear of possible repercussions in their home communities. LGBTQI+ individuals are vulnerable to trafficking. Foreign and domestic employers in FSM exploit low-skilled foreign migrant workers in forced labor, including in restaurants. Foreign migrants from Southeast Asian countries report working in conditions indicative of human trafficking on Asian fishing vessels in FSM or its territorial waters. Traffickers recruit FSM women

and men with promises of well-paying jobs in the United States and its territories but upon their arrival they are subsequently forced into commercial sex, domestic servitude, or forced labor.

## MOLDOVA, REPUBLIC OF: TIER 2

The Government of the Republic of Moldova does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Moldova remained on Tier 2. These efforts included convicting more traffickers, identifying significantly more victims, and approving a new national action plan (NAP) with dedicated funds for implementation. The government provided more victims witness protection services and established bilateral work agreements with European counterparts to support Moldovan workers abroad, including protecting workers' rights and prohibiting recruitment fees, under government-sponsored frameworks. However, the government did not meet the minimum standards in several key areas. Authorities investigated fewer trafficking cases and prosecuted fewer suspected traffickers. Corruption, particularly in law enforcement and the judiciary, impeded prosecutions and influenced the outcomes of cases, including cases against complicit officials, who often acted with impunity. Persistent gaps in victim protection remained, including a limited number of identified victims receiving state-funded assistance. In addition, traffickers continued to intimidate victims, and authorities provided uneven levels of protection during court proceedings. Finally, the lack of long-term reintegration support left victims susceptible to re-victimization.



MOLDOVA, REPUBLIC OF TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers, including complicit officials. • Eliminate selective prosecution and hold corrupt officials accountable by sentencing complicit officials to significant prison terms and ensure they serve those sentences in practice. • Implement measures to address corruption in the judicial sector and law enforcement community. • Proactively identify victims, particularly among vulnerable groups, such as children in state institutions. • Implement formal victim identification and referral mechanisms for victim assistance throughout the country, especially in rural areas. • Ensure all identified victims receive state-funded assistance, including long-term assistance, regardless of their participation in court proceedings, particularly long-term reintegration support, such as education, counseling, and job-placement. • Exempt all victims from the requirement of in-person confrontations with their accused traffickers and ensure specially equipped interview rooms for child victims align with international standards. • Ensure consistent use of laws and regulations designed to protect victims during trial and prosecute perpetrators of witness tampering and intimidation to the full extent of the law. • Adopt and implement the new National Referral Mechanism (NRM). • Empower authorities to conduct onsite announced and unannounced labor inspections, regardless of whether authorities receive written complaints or a risk assessment that indicates an emergency or imminent threat. • Amend the law to allow authorities to inspect facilities when they have suspicions or visual evidence of businesses' involvement in child labor, including forced child labor. • Correctly and fully inform all victims about the assistance available at

the national and local levels. • Train police, judges, and prosecutors on a victim-centered approach to investigations and prosecutions. • Train relevant authorities, particularly social workers in regions outside of the capital, on understanding trafficking and assisting victims. • Formalize government oversight of private employment agencies, including monitoring for and penalizing any recruitment fees charged to applicants. • Conduct national awareness campaigns targeting vulnerable populations.

## PROSECUTION

The government maintained law enforcement efforts. Articles 165 and 206 of the criminal code criminalized sex trafficking and labor trafficking. The law prescribed penalties of six to 12 years' imprisonment for trafficking offenses involving an adult victim and 10 to 12 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape. Article 168 of the criminal code also criminalized forced labor and imposed penalties of up to three years' imprisonment. The NAP stipulated the Supreme Court of Justice explain its application of the law when deciding trafficking cases.

The pandemic continued to limit the capacity of anti-trafficking efforts. The government implemented movement-restriction lockdowns and other social distancing measures, constraining the activity of law enforcement. Furthermore, while courts remained open, they operated in a limited capacity and reported decreased function as a result of high infection among employees, thus delaying proceedings, including for trafficking trials. According to an NGO, the government's pandemic-related practices negatively affected the capacity of relevant authorities, impeding the progress of overall prosecution efforts. Consequently, in 2021, authorities investigated 57 trafficking cases (24 sex trafficking, 33 labor trafficking), compared with 65 in 2020. The government prosecuted 37 suspected traffickers and convicted 44 traffickers (46 and 32, respectively, in 2020). Sentences for convicted traffickers ranged from six years to 20 years. Moldovan authorities cooperated with their European counterparts on several trafficking-related investigations, judicial assistance requests, and extraditions. In one investigation, authorities from Moldova and Italy cooperated on a labor trafficking case that resulted in the identification of 48 victims, detainment of 13 suspects, and seizure of approximately 630,000 Moldovan lei (MDL) ($35,720) in assets.

Perennial problems, including high turnover within the police and prosecutor's office, corruption in law enforcement and the judiciary, impunity or lack of meaningful sentences for complicit officials, and lengthy trials, undermined government efforts. The Center for Combating Trafficking in Persons (CCTIP), the lead anti-trafficking investigative and police agency, and the Organized Crime Prosecution Office (PCCOCS) continued to suffer from high turnover of experienced staff, limiting the agencies' ability to investigate complex cases, including transnational criminal organizations or complicit government employees. While authorities investigated reports of corruption committed by officials, they rarely prosecuted and punished them. Impunity remained a major problem. Corruption in the judicial system remained an acute impediment to bringing traffickers to justice with prosecutors, members of the judiciary, and members of law enforcement implicated in corrupt practices. In 2021, prosecutors indicted the acting head of a district police inspectorate for labor trafficking and, separately, indicted a police officer, who resigned from the force, for labor trafficking. The government reported an integrity investigation of a lawyer, who represented a suspected trafficker, for allegedly attempting to influence the prosecution. The government also reported two labor trafficking cases involving border police from previous reporting periods remained ongoing. Courts frequently reversed convictions on appeal, sometimes without explanation or on weak grounds. Judges tended to re-qualify cases from trafficking crimes to crimes with lesser penalties, such as "pimping," or postpone hearings—a practice common among judges suspected of corruption. In an attempt to provide transparency in the assignment of judges to cases, the government newly implemented an electronic case management system that, according to observers, was flawed and misused in some cases. Nonetheless, selective justice swayed by corruption continued to be a problem, and lawyers complained of violations of defendants' rights to a fair trial. Furthermore, observers

noted prosecutors sent trafficking cases to court without sufficient evidence collection and withheld case files from lawyers representing victims. Moreover, lengthy trials impeded justice and often led to the acquittal of traffickers. Since final verdicts could take years, and by law, authorities could only detain suspects for 12 months, authorities released suspected traffickers before trials concluded, enabling them to flee the country or retaliate against witnesses.

Prosecutors at every level, from the Prosecutor General's Office (PGO) to regional territorial prosecution offices, were responsible for prosecuting trafficking crimes. The PGO maintained a unit with specialized prosecutors, who coordinated anti-trafficking prosecution policies and supervised the work of regional territorial prosecutors when working on trafficking cases. The PGO also investigated child sexual exploitation cases, including trafficking cases, involving information and communication technologies and provided guidelines for identifying, investigating, and prosecuting such cases. Additionally, the PGO introduced legislation focusing on establishing prescriptive sentences for trafficking-related offenses and reviewing appropriate penalties, including new provisions for aggravating circumstances. PCCOCS also had a specialized unit for prosecuting trafficking cases initiated by CCTIP, as well as cases involving criminal organizations. However, prosecutors assigned to PCCOCS lacked experience handling trafficking cases, and PCCOCS did not require them to meet any specific qualifications for investigating and prosecuting trafficking crimes. The Chisinau Prosecutor's Office maintained an Anti-Trafficking Bureau and conducted the prosecution of trafficking cases from Chisinau municipality; at the district level, specialized prosecutors conducted the prosecution of trafficking cases. Within the judiciary, there were specialized judges trained specifically to handle trafficking cases. These judges maintained five-year mandates, which increased their experience and understanding of trafficking and created a judicial environment more sensitive to victims' needs. In 2021, the government provided training for prosecutors and judges, such as a seminar on victims' rights, including rehabilitation and compensation. Additionally, the Ministry of Interior organized a five-day training course for law enforcement officials on online recruitment of trafficking victims. Overall, the government's ability to fund key law enforcement and social protection institutes remained limited. As a result, the government relied on donor funding to train police, border guards, prosecutors, and judges.

## PROTECTION

The government marginally increased victim protection efforts. In 2021, the government identified 312 trafficking victims (35 sex trafficking, 277 labor trafficking), a significant increase from 138 in 2020 but proportionate with previous years. All identified victims were Moldovan citizens. Thirty-two of the identified victims were children (11 sex trafficking, 20 labor trafficking, one both sex and labor trafficking); the vast majority were girls. In response to the influx of Ukrainian refugees who fled Russia's full-scale invasion of Ukraine and arrived in Moldova, the Ministry of Interior trained and instructed Moldovan-Ukrainian border checkpoint officials to screen refugees for trafficking indicators and set up a mobile task force to patrol the border checkpoints and monitor for signs of trafficking among the refugee population. The National Referral Strategy (NRS) governed identification and referral procedures but expired in 2016. Thus, in cooperation with civil society, the Ministry of Health, Labor, and Social Protection (MLSP) developed a new NRM in 2020, although the government did not adopt it during the reporting period. Therefore, authorities continued to utilize the current NRS, which observers reported as obsolete. Observers noted the government designed the NRS's guidelines to identify Moldovan citizens exploited in other countries; however, the guidelines did not include third-country nationals and Moldovans exploited in Moldova. Moreover, the guidelines were not obligatory for relevant state bodies working with immigrants. Under the terms of the NRS, teams of local officials and NGOs in all regions of Moldova coordinated victim identification and assistance. While the law permitted the local teams to identify victims and provided access to services irrespective of their willingness to participate in criminal proceedings, according to civil society, in practice, victims received assistance only after law enforcement identification and if they participated in criminal proceedings. According to an NGO, individuals previously arrested for commercial sex, previously incarcerated, or those with drug addiction were less likely to be identified as victims. Although

national-level implementation of the NRS was mostly uniform, regional implementation varied widely. Observers reported police only referred the most vulnerable victims, including children, individuals experiencing homelessness, and victims who needed protection in order to participate in criminal proceedings. Observers also reported law enforcement did not correctly and fully inform all victims about the assistance available at the national and local levels. Similar to previous years, a limited number of identified victims received assistance—23 percent (70 victims) in 2021, a decline from 37 percent (51 victims) in 2020.

Observers noted overall inadequate resources, including insufficient funding, hampered government efforts. The government often relied on NGOs and international organizations to supplement government funding. Adult victims received assistance in seven government-funded centers and shelters across the country, offering medical, legal, and psychological assistance, regardless of their cooperation with law enforcement. Male victims received specialized services, including social and rehabilitation services, and accommodation at a dedicated center. Overall, victims received short-term assistance (30 days) from two specialized shelters operated by MLSP in partnership with an international organization. Observers reported long-term assistance for victims, particularly long-term reintegration support, such as education, counseling, and job-placement, remained a challenge, leaving victims at risk of re-victimization. Additionally, medical and psychological assistance was limited because many victims did not have medical insurance. Civil society psychologists and attorneys remained the most qualified to assist victims, especially in the regions outside of the capital where government social workers frequently lacked trafficking-specific training. Foreign victims received the same access to care as Moldovan citizens; however, refugees and asylum-seekers received assistance in specialized centers under the Migration and Asylum Bureau. Observers noted a lack of adequate and immediate social support, including shelter, medical care, and counseling, for foreign victims before determination of their legal status. Moldovan law permitted foreign victims a 30-day reflection period, during which they could receive assistance and protection while determining whether to cooperate with law enforcement. Foreign victims who chose to cooperate with law enforcement received temporary residency. Observers pointed out foreign victims did not have the right to social integration assistance and were expected to return to their country of origin at the conclusion of criminal proceedings.

There were two referral mechanisms to support child victims: the NRS and the Inter-sectorial Collaboration Mechanism for the Protection of Children. The former referred child trafficking victims to NGOs that provided medical, psychological, social, and legal aid. The Ministry of Education, Culture and Research maintained a mechanism for identifying and reporting child abuse, including trafficking, in state institutions. Nonetheless, reports persisted of management in state institutions participating in the exploitation of children. The Center for Assistance and Protection of Victims of Human Trafficking (CAP) assisted child trafficking victims and offered legal, social, and psychological assistance, as well as accommodation to child victims. In 2021, CAP assisted 19 child victims in the shelter in Chisinau, an increase from 10 in 2020. The CAP shelter in Chisinau remained the only facility for child victims and provided limited social services for 30 days followed by placement into permanent housing and continued counseling and assistance. Authorities also placed child victims in foster care, orphanages, state residential schools, group homes, or other types of temporary residential facilities due to the lack of dedicated facilities. However, during the previous reporting period, the government began construction of one of three new regional centers for integrated assistance for child victims and witnesses of crime, including trafficking, designed to provide specialized medical, psychological, and social care and allow for forensic medical examinations and interviews with trained specialists in a safe environment. The government envisioned the first center, located in Balti, to serve children from 12 cities and districts across northern Moldova and operate under the management of the National Center for Prevention of Child Abuse. The government planned for the remaining two centers in Chisinau and Cahul to serve the central and southern part of the country. In 2021, the government repatriated 16 children under the government decision that regulated repatriation of trafficking victims, individuals in crisis, and unaccompanied children, but it did not confirm how many were trafficking victims. Civil society reported the

lack of services for resocialization and reintegration for child victims of sexual exploitation put them at a higher risk for institutionalization and further trauma. Civil society also reported the need for increased cooperation between social protection, health, and law enforcement. In 2021, CCTIP and other law enforcement agencies facilitated trainings for its officers on trafficking, child pornography, child online sexual exploitation, and child protection. The government financed a 24-hour, NGO-run hotline for children who experience violence, neglect, or exploitation and provided psychological counseling and information to parents and children. The hotline received seven trafficking-related calls—six led to investigations of child labor and one to a potential case of unspecified child trafficking.

Overall, the government did not adequately protect victims participating in investigations and prosecutions. Authorities seldom fully informed victims of their rights or about court proceedings. In addition, law enforcement did not routinely provide victims with status updates of their cases, leaving many victims unsure if their traffickers had been identified, arrested, or charged. The law required adult victims to confront their alleged traffickers in person, putting victims at risk for re-traumatization and likely deterring victims from reporting crimes. Although the criminal code allowed children younger than 14 to be interviewed in specially equipped rooms, observers reported the rooms did not correspond to international standards and were usually located in the courts. Moreover, judges permitted traffickers to be present during child interviews. Judges frequently disregarded laws and regulations designed to protect victims during trial proceedings, thereby violating victims' rights and allowing traffickers to intimidate some victims in the courtroom such that the victims felt pressured to change their testimony. Authorities could fine or imprison victims for making false statements if they changed their testimony, whether unintentionally due to the trauma experienced or deliberately due to bribes or intimidation. In 2021, two trafficking victims, however, benefited from witness protection programs (zero in 2020). The government issued protective orders for a male labor trafficking victim, and, separately, the government relocated a victim for security reasons. The law allowed trafficking victims access to free legal assistance without providing proof of indigence; 29 victims benefited from public legal representation in 2021. However, the quality of legal assistance provided by public lawyers was not sufficient. Public lawyers did not receive special training to assist victims and did not always understand a victim-centered approach to criminal justice. Victims continued to rely mostly on NGOs for legal assistance, and NGOs relied on donors to fund the services. The State Guaranteed Legal Aid Council, in partnership with an international organization, provided a trafficking guide with recommendations for legal aid lawyers on how to better assist victims. The law allowed victims to file for compensation for material damage, such as medical treatment costs or destruction of property, but only if prosecutors filed charges against traffickers or cases ended in convictions. The criminal code exempted trafficking victims from criminal liability for committing offenses because of their exploitation. However, when authorities classified cases under related statutes, such as the article criminalizing forced labor, victims were no longer exempt from criminal liability. Similarly, when authorities reclassified sex trafficking cases to "pimping" cases, victims were no longer exempt from punishment and could be charged with commercial sex offenses.

## PREVENTION

The government maintained prevention efforts. The government approved a new one-year NAP as part of the 2018-2023 national strategy, allocating 140.1 million MDL ($7.94 million) toward implementation in 2021. While the government allocated financial and human resources to the NAP, in practice, it was dependent on assistance from international partners for many of its training and support activities. The Directorate for Coordination in the Field of Human Rights and Social Dialogue monitored implementation of the NAP and ensured the activity of the Permanent Secretariat, which oversaw the coordination, monitoring, and evaluation of all anti-trafficking policies. Each municipality and Gagauzia—a Turkic-speaking autonomous territorial region—maintained a Territorial Commission for Combatting Trafficking to coordinate efforts at the local level. The commissions encompassed local elected officials, law enforcement, prosecutors, and social service providers. In 2021, the government did not execute any national awareness campaigns but

participated in other campaigns organized by international partners. The government delivered information to partners and the public on statistical observation and impacts to survivors. During the reporting period, the government initiated a research project on existing social services on integration and reintegration of trafficking victims within Moldova's social security framework. Several agencies and offices operated trafficking hotlines available in Romanian and Russian; the PGO's hotline referred nine calls to law enforcement for investigation, two of which led to prosecutions. The State Chancellery's anti-trafficking hotline operated 24-hours a day to assist, as necessary, Ukrainian refugees arriving in Moldova. The government did not make efforts to reduce the demand for commercial sex acts.

Under the law, the State Labor Inspectorate (SLI) oversaw the occupational safety and health inspections. However, the SLI noted insufficient financial and human resources to conduct inspections. Moreover, the law limited unannounced labor inspections, which were the country's main mechanism to identify child labor, including forced child labor, by only allowing such inspections based on a risk assessment that indicated an emergency or immediate threat to the environment, life, health, or property. Furthermore, the law permitted authorities to conduct onsite inspections provided they received written complaints and gave businesses five days' notice, serving as a de facto advance notice of an inspection and giving traffickers the opportunity to evade detection. During inspections, authorities could only focus on the alleged violation outlined in the complaint, even if they identified other egregious violations, such as forced child labor. The law prohibited authorities from inspecting facilities even when they had suspicions or visual evidence of businesses' involvement in child labor, including forced child labor. Due to these restrictions, government and NGO sources reported the child labor violations identified by the government did not reflect the scale of the country's problem. In 2021, the SLI did not identify any cases of forced labor but identified 31 labor violations involving children. Private employers could only be inspected upon referrals from law enforcement bodies or complaints received from private citizens. A report based on a national information campaign on the risks of labor trafficking noted law enforcement was slow to investigate private employment agencies.

Observers noted the government's general lax oversight and control of private recruitment agencies, particularly those offering foreign job opportunities, as a key trafficking vulnerability. Under the law, SLI regulated employment agencies, recruiters, and unlicensed labor agents and required recruiters to provide transparent, legally binding contracts for prospective workers. Agencies in violation faced criminal charges for trafficking, among other penalties. However, SLI could only recommend penalties be assessed for labor law violations; the authority to impose and collect these penalties remained with the courts. Moldovan law prohibited agencies from charging prospective workers fees or taxes as part of the recruitment process. In 2021, the government amended the regulation on job placement and employment abroad, permitting collection of payment for additional services from Moldovan citizens seeking jobs but forbidding charges to job seekers for services performed by recruiters. While the regulation prohibited providing additional services as an obligatory condition to obtain labor intermediation services, it remained difficult to monitor in part as it did not define or categorize "additional" or "labor intermediation services." If private employment agencies did not have a list of such additional services and their estimated cost, firms could require high sums from job seekers in the process of intermediation for employment abroad. Moldova's public procurement law banned government agencies from contracting with any person or company convicted of trafficking crimes or child labor violations in the previous five years. The Ministry of Finance provided guidance on public tenders that included a mechanism to exclude any economic agent involved in trafficking or child labor. The criminal laws against trafficking included penalties for individuals or companies profiting from trafficking. During the reporting period, Moldova signed a memorandum of cooperation with Germany to support employment of seasonal agriculture workers; the memorandum detailed conditions for the oversight of employment, including equal treatment of Moldovan and German workers and the prohibition of recruitment fees. A supplementary cooperation agreement between MLSP and a German institution designated the latter to consult and inform Moldovan agencies about German regulations for seasonal labor

migration and assist in the protection of Moldovan workers' rights. In addition, the Moldovan and Italian governments signed a new bilateral cooperation agreement to support fair and effective labor rights and social protection for Moldovan labor migrants in Italy and Italian labor migrants in Moldova.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Moldova, and traffickers exploit victims from Moldova abroad. Traffickers typically recruit victims through personal contacts but increasingly use the internet and social media. Most victims are unemployed, from rural areas, and have received little education. Traffickers exploit Moldovan citizens in sex trafficking and labor trafficking within Moldova and in other parts of Europe, including Austria, Poland, and Russia. Victims of sex trafficking are overwhelmingly women and girls. Traffickers operating in Romania and Moldova exploit Moldovan women and girls through Romania with fraudulent passports in trafficking operations across Europe. Government representatives note social norms create a permissive environment for violence against children, including trafficking. Child trafficking victims are mostly from rural areas and poor families. Moldovan authorities report an increase in recent years of children exploited in online child pornography, which experts note is used as a grooming method for sex trafficking; in some cases, parents exploited their children. Cases involving child victims were mostly sex trafficking cases occurring in Chisinau. Traffickers exploit children, some as young as five, in commercial sex and child labor, mostly in agriculture, construction, service, and industrial sectors. The vast majority of child laborers worked in family businesses or on family farms. Children, living on the street or in orphanages or abandoned by parents migrating abroad, remain vulnerable to exploitation. Children from Roma communities are more vulnerable to child labor and trafficking. Observers express concern that corrupt management in state institutions exploit children in domestic services or on farms. Labor trafficking remains the most prevalent form of exploitation among adult male victims. Internal labor trafficking, particularly in the agriculture and construction sectors, and forced begging is steadily on the rise, including among labor migrants. The undocumented or stateless population, including the Romani community, within Moldova are at risk of exploitation, primarily in the agricultural sector. Traffickers disproportionately target people with mental disabilities. Reports indicate cases of labor trafficking in residential institutions for persons with disabilities, such as personnel assigning housekeeping duties to patients in lieu of hiring staff. Women from the Gagauzia Autonomous Territorial Unit are vulnerable to sex trafficking in Turkey. Thousands of foreign nationals and Ukrainian refugees, predominantly women and children, who are fleeing the war in Ukraine and crossing the Moldova border seeking sanctuary, are highly vulnerable to trafficking. Reports indicate more than 100,000 refugees have stayed in Moldova as of the end of March 2022. Russian courts have convicted 10 Moldovan citizens for drug-related crimes their traffickers forced them to commit. Official complicity in trafficking crimes continues to be a significant problem with complicit officials rarely prosecuted and punished.

## THE BREAKAWAY REGION OF TRANSNISTRIA

Although Transnistria declared independence in 1990, no United Nations member recognizes its sovereignty. The breakaway region of Transnistria remains outside the administrative control of the Government of the Republic of Moldova; therefore, Moldovan authorities are unable to conduct trafficking investigations or labor inspections, including for child labor and forced child labor, in the region. Furthermore, de facto authorities in Transnistria do not communicate their law enforcement efforts to authorities in Moldova. A Transnistrian NGO reports identifying eight trafficking victims and 13 potential victims in 2021. Victims in Transnistria do not have access to Moldovan legal protections or social services. Moreover, observers note insufficient victim assistance, including immediate and long-term reintegration, and protection leaves victims vulnerable to re-victimization. Presently, the toll-free, NGO-run hotline represents the main tool for addressing trafficking implemented in the region and is one of the few anti-trafficking initiatives supported by the de facto authorities. The hotline estimates the scale and dynamics of trafficking and determines the profile of potential victims. Observers note, over the last 10 years, a decline in de facto authorities' efforts to

**MONGOLIA**

prevent and combat trafficking, and multiple reports express concern with systematic human rights violations in the region. Transnistria remains a predominate source for sex trafficking victims in neighboring countries. Children, particularly those suffering from familial neglect, continue to be vulnerable to trafficking. Traffickers exploit victims within Transnistria, in Poland and Russia, and over the Ukrainian border and through Odesa. Thousands of Ukrainian refugees, predominantly women and children, who are fleeing the war in Ukraine and crossing the Transnistria segment of Moldova's border seeking sanctuary, are highly vulnerable to trafficking. Reports indicate more than 9,000 are staying in Transnistria.

## MONGOLIA: TIER 2

The Government of Mongolia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Mongolia remained on Tier 2. These efforts included investigating more traffickers and identifying more victims than the previous reporting period; improving information sharing and coordination among ministries and with international partners, including through the establishment of Mongolia's first trafficking-specific Multidisciplinary Task Force (MDTF); creating and staffing a new prosecutor position to specialize in trafficking cases; and enacting a new labor law that addressed several longstanding vulnerabilities in the labor recruitment process. However, the government did not meet the minimum standards in several key areas. For at least the 10th consecutive year, the government did not formally identify any male victims. Overlapping and at times conflicting criminal code articles complicated anti-trafficking judicial processes and continued to incentivize prosecutions and convictions under lesser charges.



MONGOLIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase efforts to train officials on and implement Articles 12.3 and 13.1 of the criminal code to investigate and prosecute sex trafficking and forced labor crimes—including those allegedly committed or facilitated by law enforcement officials, detected through child labor inspections and hotlines, and handled in partnership with law enforcement counterparts in common destination countries—rather than under alternative administrative or criminal provisions that prescribe lower penalties. • Clarify anti-trafficking judicial procedures by reviewing and amending anti-trafficking legislation to eliminate conflicting or overlapping penalty provisions. • Systematize and fully implement formal procedures to guide government officials, including police, immigration officers, child rights officers, and labor authorities, in victim identification and referral to protective services—especially among men and boys, foreign workers, domestic and foreign nationals transiting major border crossing areas, domestic coal transport workers exploited or abused by People's Republic of China (PRC)-based employers, women and children living in mining communities, and LGBTQI+ persons. • Amend relevant laws to ensure victims' access to protection services, regardless of whether officials initiate formal criminal proceedings against the alleged traffickers. • Enact policies to fully institutionalize, make permanent, and allocate resources for the MDTF. • Amend Articles 16.1 and 16.4 of the criminal code to increase prescribed penalties such that they are in line with penalties for other child trafficking crimes. • Amend Article 8 of the Labor Law to align its definitions with preexisting anti-trafficking laws, including by eliminating exemptions for compulsory labor in basic

landscaping and cleaning. • Allocate increased funding to support and expand both government and NGO-run shelters and other forms of tailored victim assistance and protection, including for male victims and children. • Strengthen efforts to monitor the working conditions of foreign laborers employed in Mongolia and screen them for labor trafficking indicators, including by increasing funding, resources, and training for labor inspectors and allowing them to conduct unannounced inspections.

### PROSECUTION

The government increased law enforcement efforts. Article 13.1 of the criminal code criminalized sex trafficking and labor trafficking; it prescribed penalties of two to eight years' imprisonment for offenses involving an adult victim and five to 12 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other grave crimes, such as rape. Other provisions of the criminal code additionally criminalized some forms of labor and sex trafficking. Article 13.13 separately criminalized forced labor and prescribed fines, community service, probation, and/or one to five years' imprisonment. Article 12.3 of the criminal code criminalized sexual exploitation offenses, including some forms of sex trafficking; penalties ranged from two to eight years' imprisonment for trafficking offenses involving individuals older than the age of 14 and 12 to 20 years' imprisonment for those involving children younger than the age of 14. As in prior years, authorities sometimes prosecuted trafficking crimes under statutes carrying lesser penalties. Articles 16.1 and 16.4 criminalized "inducing a child to the committing of a crime" and "forcing a child into begging," respectively; they both prescribed penalties of a travel ban for one to five years or one to five years' imprisonment. In previous years, some prosecutors reportedly charged child forced begging cases as misdemeanors, rather than as more serious offenses. Observers noted complex case initiation and referral procedures, restrictions on contact between anti-trafficking police and prosecutors, judicial officials' general unfamiliarity with anti-trafficking laws, rapid turnover of investigators, and criminal code articles with overlapping and often conflicting definitions and penalty provisions at times hindered investigations and prosecutions. In 2021, the government enacted a new labor law with a definition of forced labor that appeared to be narrower than the definition in Article 13.13 of the criminal code in that it only criminalized forced labor through force, the threat of force, or financial coercion. Separately, the labor law exempted from the definition of forced labor "basic landscaping and cleaning works performed by residents of certain regions, villages, habituated areas or cities," which observers noted could be interpreted as allowing compulsory labor in public works.

The government initiated 45 sex trafficking investigations involving at least 51 alleged perpetrators (compared with 36 investigations involving 49 alleged perpetrators in 2020). Seven of these investigations involving 32 women resulted from police raids on saunas, massage parlors, hotels, karaoke bars, and other venues suspected of facilitating commercial sex (11 investigations resulting from raids in 2020), and 23 resulted from police monitoring of sex solicitation on social media (unreported in 2020). The National Police Agency (NPA) maintained an anti-trafficking unit, which conducted 15 of these investigations (compared with eight in 2020). Authorities also initiated a new investigation into a case of alleged forced labor; the case involved at least one alleged perpetrator and at least three victims from Fiji, the Philippines, and Burma (compared with one investigation involving three victims in 2020). Although officials reported detecting one instance of forced child labor in hazardous work, they did not initiate a criminal investigation into the case or seek accountability for the alleged perpetrator. Authorities investigated an additional 41 cases of unspecified exploitation, some of which may have included definitional trafficking elements, involving 51 individuals. Authorities newly prosecuted 21 cases involving 32 defendants for alleged sex trafficking crimes, including four defendants under Article 12.3, eight defendants under 12.6, and 10 under Article 13.1 (compared with four under Article 12.3 and 17 under Article 12.31 in 2020); however, they prosecuted 11 of these cases under Articles 16.8 and 16.9 ("Advertising and dissemination of pornography or prostitution, inducement to a child" and "Advertising and dissemination of pornography or prostitution involving a child"), which carried lesser penalties. Proceedings against

19 defendants whose prosecutions began in 2020 were ongoing at the end of the reporting period. Unlike the previous year, there was one prosecution of an alleged forced labor crime under Article 13.13. Courts convicted 27 individuals for trafficking-related crimes in 2021—an increase from 18 in 2020—but this included fewer cases convicted under specific anti-trafficking criminal code articles. Courts convicted 13 individuals under anti-trafficking articles, including three under Article 12.3 and 10 under Article 13.1, compared to one and 17, respectively, in 2020; they did not convict any labor traffickers for the second consecutive year (three in 2019). Courts also convicted 10 individuals under Articles 16.8 and 16.9; authorities did not provide sufficient detail to ascertain whether these cases featured trafficking elements according to international definitional standards. Authorities reportedly sentenced three traffickers to terms ranging from three to eight years' imprisonment under Article 12.3; 10 traffickers to terms ranging from six months to 20 years' imprisonment under Article 13.1; and four traffickers to terms ranging from six months to five years' imprisonment under Articles 16.8 and 16.9 (compared with 17 traffickers sentenced to terms ranging from five to 26 years' imprisonment under Article 13.1 and one trafficker to seven years' imprisonment under Article 12.3). One individual convicted under Article 13.13 faced only a fine. Courts ordered a total of 3.6 million Mongolian tugrik (MNT) ($1,260) as restitution payments to three victims as part of sentencing, but no victims were recompensated under Article 13.1 (compared with 798,400 MNT, or $280, under unspecified articles to at least one victim in 2019). There were unverified allegations of police complicity in trafficking crimes leading to an investigation that was ongoing at the end of the reporting period. In prior years, officials who facilitated or abetted forced labor crimes received administrative sanctions in lieu of criminal penalties.

Authorities continued to categorize certain crimes as trafficking based on Mongolia's more expansive legal definitions, culminating in law enforcement data that at times included cases involving child pornography, sexual extortion, and "organizing prostitution"; some of these cases also included trafficking elements in line with international definitional standards. In recent years, due to the misconception among many government officials that traffickers only exploit women and girls crossing borders, authorities rarely used Articles 12.3 or 13.1 to prosecute cases in which traffickers targeted male victims and instead used provisions with less stringent penalties. Civil society representatives reported various judicial entities often maintained conflicting or incomplete data on anti-trafficking case registration and history. The government frequently redirected law enforcement resources and personnel to contain the pandemic, at times interrupting certain anti-trafficking efforts.

The government continued organizing, facilitating, and providing funding and in-kind support for specialized training courses for law enforcement officers and social workers on trafficking. Observers continued to describe an acute need for additional training, resources, and dedicated personnel to properly handle trafficking cases; in an attempt to address this need, in 2021, the government designated the country's first special prosecutor for trafficking crimes. Mongolia maintained mutual legal assistance agreements with the PRC, Hong Kong, Macao, Thailand, the Republic of Korea (South Korea), and Malaysia but did not provide data on their implementation.

## PROTECTION

The government slightly increased efforts to protect victims. NPA investigators reported using a trafficking risk assessment checklist containing 11 questions to identify victims; however, use of this checklist was sporadic, and the process did not include screening of vulnerable groups. According to available data, police identified 45 female trafficking victims—an increase from 40 female victims identified in 2020—but this figure only included 14 girls younger than the age of 18, marking a decrease in the identification of child victims (24 girls younger than the age of 18 identified in 2020). Observers ascribed this to the closure of businesses traditionally associated with commercial sex as a public health measure during the pandemic, which complicated law enforcement detection of some trafficking crimes. Police reportedly identified one case of forced child labor in hazardous work, but they did not report directly providing or referring the child to any protection services. Neither the government nor the primary service provider

NGO identified any male victims for the 10th consecutive year, despite continued NGO reports of the prevalence of trafficking among men and boys. Authorities identified foreign victims of forced labor for the second consecutive year but did not report initiating or jointly conducting any subsequent criminal investigations. A portion of government funding for the primary service provider NGO supported the maintenance of a hotline system; the NGO identified two victims through the hotline, and the calls resulted in an unspecified number of trafficking investigations (compared with none in 2020 and one in 2019). The Family, Child, and Youth Development Agency (FCYDA) ran another 24-hour hotline that received five calls on possible cases of child sex trafficking and 108 calls on cases of hazardous child labor, ultimately facilitating assistance to 114 child laborers nationwide; some of these cases could have featured forced labor indicators. In furtherance of a 2020 child welfare budget resolution, the government newly appointed 53 police personnel to serve as child rights officers throughout the country. However, authorities reportedly did not train the officers on how to detect or respond to cases involving the forced labor of children. In practice, NGOs indicated victim identification and referral procedures were vague, not sufficiently systematic, and often depended largely on the awareness and initiative of individual officers. Authorities at times collected discrepant data based on conflicting definitions of trafficking according to overlapping criminal code provisions, which in turn created bureaucratic challenges to supporting survivors. Redirection of human and financial resources to the pandemic response at times negatively affected the capacity of front-line officers to identify victims of trafficking, particularly among child victims of forced labor.

The FCYDA hotline coordinated referrals to special welfare and protection, emergency response, and shelter services for child victims. Authorities referred eight Mongolian victims to NGO shelter services through this hotline—a decrease from 41 referrals in 2020, likely attributable to a significant reduction in certain enforcement activities and in the movement of Mongolian nationals across international borders during the pandemic. Police separately referred at least three victims to witness protection services and other forms of assistance but did not provide further details (compared with three children referred to government shelter services in 2020). Civil society contacts expressed concern that Mongolia's complex referral system could have re-traumatized some victims due to the requirement that they repeatedly recount their abuses at various stages. NGOs continued to provide the vast majority of Mongolia's limited victim services, in some cases with government assistance. Two shelters run by an NGO were the main victim service providers in the country; only one could accommodate male victims, and neither was accessible to persons with disabilities. The government ran at least two shelters that housed trafficking child victims alongside victims of domestic violence and other forms of abuse. Observers reported 10 child sex trafficking victims experienced further sexual abuse within two of these shelters due to poor oversight and lack of specialized care; the government investigated and prosecuted the alleged offenders in at least some of these cases but did not provide further information.

The government allocated 30 million MNT ($10,530) to fund the primary service provider NGO's activities in shelter provision, psycho-social and medical care, and legal assistance. With funding from the government and other resources, the NGO reported assisting 41 Mongolian sex trafficking victims, including 31 women and 10 girls younger than the age of 18, and two Mongolian sex trafficking victims repatriated from Malaysia (compared with 43 Mongolian sex trafficking victims and three Burmese forced labor victims in 2020); the NGO provided shelter to seven of these victims. The NGO did not report providing any victims with pro-bono legal assistance in 2021 (compared with 24 in 2020). The same NGO in turn formally supplied information on seven cases involving 15 of the victims to the NPA for criminal investigations into the relevant suspects (compared with 13 cases involving 39 victims in 2020). Another shelter that had previously supported Mongolian victims of trafficking in the PRC did not assist any victims in 2021 due to pandemic-related border closures. NPA's Victim and Witness Protection Department reportedly staffed psychologists who were equipped to handle domestic violence cases, but they did not relay information on services provided to trafficking victims in 2021.

Article 8.1 of the criminal procedural code included language that reportedly denied trafficking victims' access to protective services until

MONGOLIA

prosecutors had initiated cases against their alleged traffickers, thereby potentially obstructing access to protective services for some victims. In prior years, some officials claimed victims could still access protection services regardless of whether relevant prosecutions had begun. In an effort to address this ambiguity in 2018, the Ministry of Justice and Home Affairs created a working group and instituted an intra-governmental comment period to consider amendments to the Law on Victim and Witness Protection. Draft amendments under review at the end of the reporting period did not include language addressing this concern. As in the previous year, trafficking victims may have experienced delays in or denials of access to protection services while awaiting the results of mandatory COVID-19 screening procedures. Article 15 of the anti-trafficking law entitled victims to compensation for damages wrought by traffickers, but officials and NGOs agreed inconsistencies between the criminal code and the civil code made this provision impossible to fully implement. Mongolia's Immigration Agency, the General Authority for Border Protection, and the Consular Department within the Ministry of Foreign Affairs shared responsibility for handling cases involving Mongolian trafficking victims abroad. The latter maintained a fund to assist Mongolian victims, but it was only available in cases involving organized crime syndicates or "grave harm"—a distinction that was unclear in application. In 2021, authorities partnered with NGOs to repatriate two Mongolian victims from Malaysia, compared with 15 Mongolian victims repatriated from Malaysia in 2020. Authorities also repatriated at least one victim each to Fiji, the Philippines, and Burma in 2021 (unreported in 2020; one victim each to the PRC, Kyrgyzstan, and the Philippines in 2019).

Unlike in 2020, there were no specific reports of victim penalization in 2021 (compared with two girls fined under "prostitution" provisions of the Law on Petty Offenses in 2020 and 2019, respectively). However, NGO representatives continued to express broad concern that, due to a lack of formal screening procedures, authorities may have detained some unidentified trafficking victims. Mongolia's Law on Petty Offenses, which allowed authorities to detain anyone apprehended on suspicion of commercial sex crimes for seven to 30 days, also reportedly continued to place some victims at risk of penalization for unlawful acts traffickers compelled them to commit. Observers noted some victims were hesitant to self-report or testify due to fear that they could face prosecution for such crimes. Mongolian law did not provide legal alternatives to the removal of foreign victims to countries in which they could face retribution or hardship. The Immigration Agency did not provide comprehensive deportation statistics for 2021 (no data in 2020; more than 1,500 foreign nationals deported to 26 countries in 2019), but the number of deported individuals was likely significantly lower given pandemic-related travel restrictions and border closures. The adequacy of screening procedures was difficult to gauge amid limited deportations in 2021, but screening procedures in previous years were neither universally implemented nor sufficient to detect all forms of trafficking.

## PREVENTION

The government increased efforts to prevent trafficking. The National Anti-Trafficking Program (2017-2021) aimed to provide technical guidance on trafficking prevention and coordinate interagency efforts to implement relevant legislation, for which the government budgeted 432 million MNT ($151,650) and spent approximately 336 million MNT ($117,950) for planned activities. The remaining funds were again redirected to respond to the pandemic. The government did not update this action plan for the next five-year cycle. The National Sub-Council, which directed the Program, met quarterly to assess its progress and continued close coordination with international donors and NGOs. One outcome of this coordination was the establishment and convening of the MDTF—a body comprising 18 representatives from key government ministries and one NGO aiming to enhance Mongolia's efforts to combat child trafficking. Civil society observers lauded the creation of the MDTF but continued to call on the government to issue policy guidance or enact legislation making it a permanent entity, rather than a temporary body limited to the duration of international donor assistance supporting it or subject to dissolution upon key ministry personnel turnover. In conjunction with international organizations, the government conducted four research programs to inform its anti-trafficking coordination and assess prior efforts (compared with three studies in 2020). Officials continued to disseminate a daily trafficking-themed public service announcement

on social media and television; this included a Coordination Council for Crime Prevention-directed public awareness campaign that received more than 26 million views on social media. In partnership with the Government of South Korea, the Ministry of Labor and Social Protection (MLSP) continued to produce materials raising awareness on trafficking. Authorities postponed or curtailed some elements of anti-trafficking training, funding, and general interagency coordination as a result of the pandemic.

The MLSP's General Agency for Labor and Social Welfare had the authority to monitor labor agreements for foreign nationals working in Mongolia, as well as those for Mongolians working in countries that had bilateral work agreements with Mongolia. The government maintained such agreements with South Korea and Japan; observers noted authorities did not always sufficiently implement these agreements to prevent labor abuses, including trafficking. The General Authority for Specialized Investigation (GASI) had the authority to inspect labor contracts, monitor compliance with the law for all workers in Mongolia, and conduct inspections of working conditions in Mongolian formal sector establishments. Redirection of human and financial resources in response to the pandemic fully precluded inspection activities in 2021. NGOs noted funding and resources for the inspectors were too low to provide comprehensive oversight, and the government did not report statistics on, or the outcomes of, these inspections. After two years of deliberation on amendments intended to provide for unannounced inspections, the government passed a new labor law establishing that inspectors had "unrestricted access to legal entities, organizations, and workplaces which are subject to inspection without prior notice." However, the law still required GASI to give employers two days' advance notification before conducting an inspection in some cases, raising concerns that employers could conceal violations in the interim. It was therefore unclear if the new labor law fully corrected this longstanding insufficiency. Constituting a significant improvement from the previous reporting period, the new labor law contained provisions explicitly prohibiting labor agents from charging workers recruitment fees, confiscating workers' identity or travel documentation, switching their contracts without consent, or garnishing or withholding their wages as collateral; authorities did not report information on their implementation. The NPA organized public awareness campaigns for television, internet, and print media designed to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Mongolia, and they exploit victims from Mongolia abroad. Traffickers may also use Mongolia as a transit point to exploit foreign individuals in sex trafficking and forced labor in Russia and the PRC. Most sex trafficking of Mongolian victims from rural and poor economic areas occurs in Ulaanbaatar, provincial centers, and border areas. A 2018 civil society survey found domestic violence drives the vast majority of Mongolian trafficking victims to seek and accept unsafe employment opportunities on which traffickers prey; this vulnerability has reportedly increased as a result of state-ordered residential quarantines amid the pandemic. During periods of pandemic-related business closures, clandestine sex trafficking in private residences is reportedly increasing, including through the use of blackmail on social media as a coercive method. Traffickers exploit women and girls in sex trafficking in Mongolian massage parlors, illegal brothels, hotels, bars, and karaoke clubs, as well as in outdoor urban areas, sometimes through the permissive facilitation of local police. Traffickers often utilize online platforms to lure, groom, or blackmail Mongolian children into domestic sex trafficking. LGBTQI+ individuals are vulnerable to trafficking amid widespread discrimination that often jeopardizes their employment status and complicates their access to justice. Transgender women in particular are at higher risk of sex trafficking due to pervasive social stigma barring them from employment in the formal sector. Mongolian communities experiencing widespread unemployment due to the pandemic—especially women and informal sector workers—are more vulnerable to sex trafficking and forced labor. Tourists from Japan and South Korea reportedly engaged in child sex tourism in Mongolia in prior years; some civil society groups believe this practice persists.

Haiti AR_000875

The ongoing development of the mining industry in southern Mongolia continues to drive growing internal and international migration, intensifying trafficking vulnerabilities—especially along the PRC-Mongolia border. Truck drivers transporting coal across the PRC border in Omnogovi Province are often more vulnerable to labor traffickers due to an arrangement under which employers confiscate their passports as collateral for their vehicles. These drivers often wait in truck lines with minimal sleep, heating, or access to basic needs for weeks or months at a time until they receive permission to cross and make deliveries in the PRC, where PRC national employers and customers impose wage deductions for the delays; this loss of income reportedly makes them further vulnerable to labor exploitation. The families of coal transporters who are delayed at the border, who are injured, or who die as a result of the poor working conditions may also be vulnerable to sex trafficking due to ensuing economic hardships. Traffickers exploit women and girls in sex trafficking in these border crossing truck lines, along the coal transport roads connecting mining sites to the PRC border, at nightlife establishments in mining towns, and at entertainment sites across the border in Inner Mongolia. Mining workers sometimes leave their children at home alone while on extended shift rotations, during which time the children are at elevated risk of sex trafficking. Sex trafficking and child forced labor also occur in connection with artisanal mining. Some men in predominantly ethnic Kazakh regions of western Mongolia subject local women and girls to abduction and forced marriage as part of a cultural practice known as Ala kachuu, or "grab and run"; some of these forced marriages may feature corollary sex trafficking or forced labor elements. Traffickers force some children to beg, steal, or work in other informal sectors of the Mongolian economy, such as horseracing, herding and animal husbandry, scavenging in garbage dumpsites, and construction. Some Mongolian families are complicit in exploiting children in sex trafficking and forced labor.

Traffickers exploit Mongolian men, women, and children in forced labor in the PRC, Czech Republic, Hungary, India, Kazakhstan, Norway, Sweden, South Korea, Turkey, and the United Arab Emirates and in sex trafficking in Belgium, Cambodia, the PRC, Germany, Hong Kong, Hungary, Japan, Macau, Malaysia, the Philippines, South Korea, Sweden, Turkey, and the United States. Officials believe Turkey may be rising in prevalence as a destination country due to visa-free travel regimes, the availability of direct flights, and shifts in migration trends following the pandemic-related closure of the PRC border. Traffickers sometimes use drugs, fraudulent social networking, online job opportunities, or English language programs to lure Mongolian victims into sex trafficking abroad. Traffickers have forced Mongolian girls to work as contortionists—often under contractual agreements signed by their parents—primarily in Mongolia and Turkey and to a lesser extent in Hong Kong and Singapore. Mongolian boys are at high risk of forced labor and sex trafficking under visa regimes that enable them to work indefinitely as horse jockeys and circus performers across the PRC border, provided they return with a chaperone once a month; this frequent facilitated transit also makes them more vulnerable to trafficking. Traffickers compel women and girls to work in domestic service and engage in commercial sex acts after entering into commercially brokered marriages with men from the PRC and, to a lesser extent, South Korea. Mongolians stranded abroad as a result of pandemic-related travel restrictions may have been at elevated risk of sex trafficking and forced labor due to immigration statuses that prevent them from seeking employment in host countries' formal sector economies. PRC-based companies hire Mongolian men and boys to work at agricultural operations for compensation far below minimum wage and under ambiguous immigration status, placing them at high risk of trafficking. Some micro-lending institutions in the PRC reportedly retain Mongolians' passports as a form of collateral, leaving them vulnerable to immigration status-related coercion.

PRC national workers employed in Mongolia are vulnerable to trafficking as contract laborers in construction, manufacturing, agriculture, forestry, fishing, hunting, wholesale and retail trade, automobile maintenance, and mining. Some of them experience contract switching when they enter the country, making them especially vulnerable to coercion due to ensuing immigration violations. Some Russian and Ukrainian women entering Mongolia through PRC border crossings for short periods under visa-free regimes may be sex trafficking victims. Observers report corruption

among some Mongolian officials facilitates sex trafficking in illicit establishments and impedes the government's anti-trafficking efforts.

# MONTENEGRO: TIER 2

The Government of Montenegro does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Montenegro remained on Tier 2. These efforts included providing comprehensive training on victim identification and assistance to relevant officials and adapting procedures at the anti-trafficking shelter to mitigate the spread of COVID-19. The government adopted the national action plan (NAP) for 2021, and government coordinating bodies met consistently. However, the government did not meet the minimum standards in several key areas. The government investigated fewer cases and prosecuted fewer suspects. The government decreased victim protection efforts, including allocating fewer resources to the NGO-run shelter, identifying fewer victims, and lacking efforts to proactively identify victims among asylum-seekers, irregular migrants, and seasonal workers.



**PRIORITIZED RECOMMENDATIONS:**
Vigorously investigate, prosecute, and convict traffickers under Article 444 of the criminal code. • Increase proactive identification efforts for trafficking victims and screen for trafficking among individuals in commercial sex, irregular migrants, asylum-seekers and refugees, seasonal workers, and other at-risk populations. • Allocate sufficient resources to the anti-trafficking shelter. • Establish victim confidentiality and privacy measures at the shelter and ensure the shelter adheres to high victim protection standards. • Provide advanced training to judges, prosecutors, and law enforcement on trafficking investigations and prosecutions, including collecting evidence on subtle forms of coercion or the use of specialized investigative techniques. • Increase access to justice and victim-witness protection for victims, including access to experienced attorneys and Romani interpreters. • Integrate Romani groups into decision-making processes regarding victim protection. • Create and finance an accessible compensation fund and inform victims of their right to compensation during legal proceedings. • Regulate and monitor labor recruitment agencies.

**PROSECUTION**
The government maintained law enforcement efforts. Article 444 of the criminal code criminalized labor trafficking and sex trafficking and prescribed penalties ranging from one to 10 years' imprisonment, which were sufficiently stringent and commensurate with those prescribed for other serious crimes, such as rape. Law enforcement investigated two cases, compared with four cases in 2020. The government prosecuted three defendants, compared with prosecuting five defendants in 2020. Courts convicted one sex trafficker, compared with one one trafficker in 2020. The judge sentenced the trafficker to one year and two months' imprisonment, compared with a trafficker receiving 10 years' imprisonment for forced begging in 2020. An appeals court reversed two acquittals of alleged traffickers and returned the case for retrial. The government reported the pandemic reduced judicial and prosecutorial staff and delayed trials, which was exacerbated by attorneys going on strike and further suspending and/or delaying courts from May to July 2021.

The government maintained a multi-disciplinary task force to proactively investigate trafficking. The Department of the Suppression of Criminal Offenses of Trafficking in Persons and Smuggling (DSCOTPS) within the Police Directorate (PD) conducted proactive investigations. Law enforcement conducted raids on bars, nightclubs, commercial sex sites, escort agencies, and businesses suspected of illegal employment practices, but these raids did not result in any trafficking investigations in 2021 or 2020. According to authorities, they prosecuted possible sex trafficking cases under other offenses, such as brokering in prostitution (Article 210), due to a lack of sufficient evidence. In previous years, Basic State Prosecutor's Offices (BSPO) stopped some potential trafficking investigations when they secured enough evidence to prosecute under Article 210 and did not investigate for more subtle forms of coercion or seek additional evidence through specialized investigative techniques; however, case referral procedures required the Higher State Prosecutor's Office (HSPO) to initially review all trafficking-related cases and refer cases not deemed as trafficking to BSPO. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes. The government, in cooperation with international organizations, provided training to police, prosecutors, and labor inspectors, and also maintained institutionalized training programs for police, prosecutors, and judges on various anti-trafficking issues. The government signed a protocol of cooperation with Slovenian authorities to fight trafficking but did not report further efforts to implement the protocol.

## PROTECTION

The government decreased victim protection efforts. The government officially identified three victims, compared with 48 in 2020, 39 in 2019, zero in 2018, and one officially identified victim in 2017. Of these, one girl was a victim of sex trafficking, and a boy and a girl were victims of forced labor. First responders carried out the preliminary identification of possible victims and then contacted police who recognized the individuals as potential victims. Police officers proactively screened foreign nationals and individuals in commercial sex for indicators of trafficking; however, police did not identify any victims through these efforts in 2021 or 2020. GRETA reported continuing gaps in screening and identifying victims among asylum-seekers and irregular migrants. Similarly, according to observers, police did not make identification efforts during the summer tourism season to screen the influx of seasonal workers from neighboring countries and did not consistently investigate information submitted by NGOs. The government maintained the Team for Formal Identification of Trafficking Victims (TFITV) to assess and officially recognize potential victims and coordinate victim care and placement. TFITV used standard operating procedures (SOPs) for identifying and referring victims to services, which eliminated the requirement for victims to cooperate with law enforcement in order to receive services. TFITV comprised a doctor, a psychologist, an NGO, police, a social worker from the Center for Social Work, and a representative from the Office for the Fight against Trafficking in Persons (TIP office); TFITV met 15 times and conducted eight field missions, compared with meeting 19 times and conducting eight field missions in 2020. The government provided training on victim identification and assistance to police, labor inspectors, health workers, social workers, and municipality representatives. In 2020, observers reported an NGO worker identified a potential foreign victim, but police refused to initiate the referral process without an approval from a health and sanitation inspector and threatened the victim and NGO worker with charges for not complying with pandemic mitigation measures. A health and sanitation inspector subsequently required the potential foreign victim and NGO worker to quarantine for 28 days, during which the potential foreign victim faced domestic violence. During the reporting period, an NGO-run shelter housed the potential foreign victim, and after persistent advocacy, DSCOTPS started an investigation and transferred the victim to the shelter.

In 2020, the Ministry of Finance and Social Welfare (MFSW) opened a call for proposals to establish a new anti-trafficking shelter (the shelter) and selected an NGO with the necessary licenses. The MFSW allocated €50,000 ($56,690) to the shelter for operational costs, compared with €67,530 ($76,560) in 2020. Centers for Social Work also allocated €250 ($280) per month for each victim accommodated at the shelter.

However, GRETA reported that government funding for the shelter was not sufficient to cover operational costs that were approximately €70,000 ($79,370). The shelter provided specialized services for both potential and officially recognized trafficking victims, including immediate needs, health care, psycho-social support, legal assistance, and reintegration assistance; the shelter housed eight potential victims (14 victims in 2020). The shelter could accommodate up to six victims at a time including adult males, adult females, and children, in separate living quarters. Adult victims could leave the shelter after a security and psycho-social evaluation by shelter staff. The shelter purchased personal protective equipment (PPE) and COVID-19 tests for staff and victims and adopted social distancing measures, including separate rooms for victims awaiting COVID-19 test results. The shelter reported experiencing further financial strain as a result of these purchases. MFSW operated local social and welfare centers and two regional institutions, which provided general services for victims of abuse, including trafficking victims. In 2020, a self-administered evaluation of the shelter's support services concluded beneficiaries and visitors of the shelter were satisfied with the quality of care, staff, and facility. However, other experts reported concerns with the shelter staff's lack of experience in victim protection, including unnecessary operational costs, cooperation issues, and victim confidentiality concerns. For example, the shelter published photos of victims on social media with censored faces but identifiable characteristics, such as clothes and location. Observers reported facing cooperation and collaboration issues specifically with the director of the shelter.

The law allowed foreign victims to acquire temporary residence permits from three months to one year with the ability to extend; no victims applied for temporary residence permits in 2021 or 2020. The law provided witness protection, free legal aid, and a psychologist to participate in prosecutions; no victims participated in prosecutions during 2021. However, observers continued to report the government assigned lawyers with little or no experience to victims, including lawyers with experience in only civil proceedings and not criminal proceedings. In 2020, prosecutors implemented victim-centered approaches for victims who participated in court proceedings, particularly child victims. For example, a child victim testified in the presence of a social worker with audio/visual equipment, while in a separate room from their perpetrator. The government operated support services for victims and witnesses in 15 first instance courts and two high courts that provided assistance during proceedings, including legal and logistical assistance, and measures to prevent re-traumatization. Authorities hired interpreters when necessary from an official list of court interpreters, although the list did not include a Romani interpreter. Judges did not issue restitution in criminal cases or seize assets and property from traffickers towards restitution and/or compensation. Similarly, courts have not awarded any victims compensation in civil proceedings, partly due to civil proceedings lasting two to five years, discouraging victims from seeking compensation. The law on compensation of victims intended to provide financial assistance to victims of violent crimes will not go into effect until Montenegro becomes a member of the EU.

## PREVENTION

The government maintained prevention efforts. The government implemented the national anti-trafficking strategy for 2019-2024 and adopted the NAP for 2021. The government maintained a coordination body for monitoring the implementation of the strategy and NAP, which is composed of PD, HSPO, the Ministry of Interior (MOI), and the Ministry of Justice, Human, and Minority Rights; the coordination body met six times with additional online meetings. The national coordinator led the TIP office and overall anti-trafficking efforts and chaired the trafficking in persons working group, which consisted of government agencies, civil society organizations, and the international community. The government allocated €96,102 ($108,960) to the TIP office within the MOI, compared with €152,000 ($172,340) in 2020. The TIP office published limited information on anti-trafficking efforts, but in previous years, experts reported difficulties in sharing and obtaining information from relevant government actors. The government maintained a cooperation agreement signed in 2020 between law enforcement, relevant ministries, and six NGOs to strengthen anti-trafficking efforts. The TIP office, with financial support from a foreign donor, organized

an awareness campaign in eight cities and all border crossings for the general public. The MOI monitored implementation of six NGO projects to raise public awareness on trafficking after awarding approximately €40,000 ($45,350) to these NGOs in 2020. The government continued to finance an NGO-run hotline for trafficking victims; the hotline received 2,961 calls, but most calls focused on obtaining information or reports of other forms of violence (1,657 calls, including five from potential trafficking victims in 2020). The Labor Inspectorate, which was trained on indicators of trafficking, inspected businesses and identified 945 workers with contract violations (351 in 2020) and resolved contract violations for 234 workers (97 in 2020). The government did not make efforts to reduce the demand for commercial sex acts. The government did not have procedures in place to regulate labor recruitment agencies.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Montenegro, and traffickers exploit victims from Montenegro abroad. Traffickers are predominantly men between ages 25 and 49 and members of organized criminal groups that operate in the Western Balkans. Victims of sex trafficking identified in Montenegro are primarily women and girls from Montenegro, neighboring Balkan countries, and, to a lesser extent, other countries in Eastern Europe. Traffickers exploit victims in the hospitality industry, including bars, restaurants, nightclubs, and cafes. Children, particularly Romani, Ashkali, and Balkan Egyptian children, are exploited in forced begging. Romani girls from Montenegro reportedly have been sold into marriages and forced into domestic servitude in Romani communities in Montenegro and, to a lesser extent, in Albania, Germany, and Kosovo. Migrants from neighboring countries are vulnerable to forced labor, particularly during the summer tourism season. International organized criminal groups exploit some Montenegrin women and girls in sex trafficking in other Balkan countries. In 2020, traffickers recruited Taiwanese workers, confiscated their passports and restricted their movement, and set up a call center where they forced the Taiwanese victims to make fraudulent calls.

## MOROCCO: TIER 2

The Government of Morocco does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Morocco remained on Tier 2. These efforts included increasing trafficking prosecutions. Courts sentenced traffickers to significant prison terms. The government also continued partnering with international organizations to train government officials. However, the government did not meet the minimum standards in several key areas. The government identified the fewest number of trafficking victims since 2018 and remained without comprehensive victim identification and referral procedures, which were pending government approval for the third consecutive year. Lack of proactive screening and identification measures continued to leave populations such as migrants vulnerable to penalization for unlawful acts traffickers compelled them to commit, such as immigration violations. The government did not report referring any labor trafficking or male victims to care despite identifying 12 labor trafficking victims and 54 male victims.



MOROCCO TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Finalize, approve, and systematically implement procedures to proactively identify trafficking victims, especially among vulnerable populations such as undocumented migrants. • Create and implement a national victim referral mechanism (NRM) and train judicial and law enforcement authorities on its application. • Investigate, prosecute, and convict traffickers using the anti-trafficking law, including forced labor cases. • Train law enforcement and judicial officials, child labor inspectors, and healthcare personnel on awareness of the anti-trafficking law, victim identification, non-penalization of victims, and referral best practices using current mechanisms with the NGO community to increase officials' ability to identify internal trafficking cases, as well as cross-border trafficking cases, as distinct from migrant smuggling crimes. • Provide adequate protection services for victims of all forms of trafficking, including but not limited to shelter, psycho-social services, legal aid, and repatriation assistance. • Disaggregate law enforcement data on human trafficking and migrant smuggling crimes. • Increase provision of specialized services for populations vulnerable to trafficking and increase financial or in-kind support to NGOs that provide these services. • Ensure that victims are not punished for unlawful acts traffickers compelled them to commit, such as immigration and prostitution violations. • Implement nationwide anti-trafficking awareness campaigns.

## PROSECUTION

The government maintained overall anti-trafficking law enforcement efforts. Law 27.14 criminalized sex trafficking and labor trafficking and prescribed penalties of five to 10 years' imprisonment and a fine for offenses involving adult victims and 20 to 30 years' imprisonment and a fine for those involving child victims. These penalties were sufficiently stringent, and regarding sex trafficking, commensurate with penalties for other serious crimes, such as rape.

To adjust to the pandemic, the Moroccan court system transitioned to virtual operations for most of 2021; however, the government reported this led to significant backlogs in the judicial system and reported the number of pending cases in the court system increased 34 percent in 2021 compared to 2020. The government reported the pandemic and related challenges hindered its ability to comprehensively collect and report law enforcement data on trafficking. Despite improvements in data collection during the reporting period, authorities did not always disaggregate between human trafficking and migrant smuggling crimes; thus, the government's reporting of trafficking investigation, prosecution, and conviction data may instead include other crimes such as migrant smuggling. Cultural acceptance of trafficking and low understanding of the difference between trafficking and smuggling among law enforcement officials impeded law enforcement efforts. In 2021, the government investigated 85 new trafficking cases involving 116 sex trafficking suspects, 10 labor trafficking suspects, and 20 suspects involved in unspecified forms of trafficking, although these unspecified cases may have included smuggling cases. This was similar compared with 79 investigations in 2020. Despite reduced in-person court appearances during the pandemic and challenges adapting to digital processes and reduced staff, the government initiated the prosecution of 111 alleged traffickers, an increase compared with the prosecution of 69 alleged traffickers in 2020. Of the 111 prosecutions in 2021, 89 were for alleged sex trafficking, nine for forced labor, and 13 for unspecified forms of trafficking. The government convicted 54 traffickers during 2021, a decrease from the conviction of 69 traffickers in 2020, including 48 sex traffickers and four labor traffickers. The government reported sentencing data for the first time since 2020, and courts issued 51 sentences in 2021, which ranged between five and 20 years' imprisonment. Courts upheld 26 convictions and overturned five

convictions upon appeal in 2021; such data was not available for 2020. The government did not report initiating any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes. In December 2019, a diplomat posted to the Moroccan Mission to the United Nations in New York, his ex-wife, and her brother were indicted for, among other crimes, conspiring to commit visa fraud from 2006 to 2016 to exploit foreign domestic workers from the Philippines, Morocco, and other countries. U.S. authorities arrested the former diplomat's ex-wife in March 2019; she died in 2021 prior to trial. The other two defendants remained at large. For the fourth consecutive year, the government did not report completing any action to hold the former diplomat accountable. The General Prosecutor continued to ensure there were two prosecutors specialized in handling trafficking cases in every court of appeal across the country. The government coordinated trainings, at times in cooperation with international organizations, for prosecutors, border officials, law enforcement, labor inspectors, and other officials on trafficking indicators, trafficking investigations, and related topics during the reporting period.

## PROTECTION

The government maintained overall efforts to identify and protect trafficking victims. The government did not have formal comprehensive victim identification standard operating procedures (SOPs) or a national victim referral process but continued to collaborate with an international organization to establish standard procedures and a draft NRM; the draft SOPs and NRM remained pending government approval for the third consecutive year. The government and civil society organizations reported pandemic-related mitigation measures continued to limit authorities' ability to identify trafficking victims due to movement restrictions. In addition, the government reported the change to remote court proceedings restricted the ability of the points of contact stationed at courts to refer victims to support services. In 2021, the government identified 169 trafficking victims, which was a significant decrease compared with the government's identification of 441 victims in 2020, although this number may have included victims of other crimes, including smuggling. Of the 169 victims, 116 were exploited in sex trafficking and 12 in forced labor; 115 were female, and 54 were male; 167 were Moroccan, and two were foreign nationals; 90 were adults, and 79 were children. Despite the lack of comprehensive SOPs and an NRM, the Ministry of Interior used standard procedures for the reception, orientation, and care of undocumented migrants and trafficking victims encountered during border management activities. In the absence of a formal referral mechanism, the government continued to informally refer victims to services. The government referred 20 sex trafficking victims to government shelters and provided 54 victims with services including legal aid, housing assistance, medical care, foreign residence permits, and family reunification; the government did not report whether the remaining 95 identified victims received any assistance. The government did not report how many victims, if any, it referred to services in the previous reporting period. In addition, the Ministry of Family, Solidarity, Equality, and Social Development continued implementing a December 2019 initiative to combat forced child begging; the initiative aimed to strengthen child protection systems, focus interagency field teams in different regions, and improve protection services for child forced begging victims. Between the launch of the program in December 2019 and May 2021, the program assisted 142 potential child trafficking victims and provided shelter, education, psychological support, and additional services as necessary. Through this program, the government provided mobile social assistance, including reintegration, to potential child trafficking victims living on the streets of Casablanca, Menes, and Tangier; the government reported 910 children received assistance in 2021. Each branch of the National Security Directorate maintained a support unit for women victims of violence to ensure a more victim-centered approach to sensitive cases, including cases involving female trafficking victims.

The government did not provide shelter or psycho-social services specific to the needs of victims of all forms of trafficking. However, it continued to provide services to female and child victims of violence, including potential trafficking victims, at 40 reception centers staffed by nurses and social workers at major hospitals, as well as in Ministry of Justice (MOJ) protection units in Moroccan courts. Moroccan law

enforcement agencies reportedly continued to utilize focal points to work directly with these reception centers and MOJ units, and they continued to use a list of NGO service providers to whom authorities could refer trafficking victims for care. The government reported these services were available to adult male victims but acknowledged they were more difficult to access. Prosecutors in the courts of first instance and the courts of appeal—in coordination with the Ministry of Health—had the authority to order trafficking victims to be removed from exploitative situations and to place them in the care of a hospital or civil society organization. The government also reported it placed an unknown number of officials in courts throughout the country, who were responsible for identifying and referring trafficking victims to psycho-social support, medical services, and legal aid. The government, however, did not report how many—if any—victims these officials or prosecutors referred to protection services. The government continued to rely heavily on NGOs and international organizations to provide assistance to trafficking victims but did not report providing financial resources. NGO service providers noted pandemic-related lockdown measures impeded their ability to assist trafficking victims and reported trafficking victims were stranded for extended periods of time in unsanitary locations or temporary shelters. The government continued to encourage victims to cooperate in investigations against traffickers, but it did not report the number of victims who did so during the reporting period or if it took measures to protect witness confidentiality, nor did it report if victims received restitution from traffickers. The government organized the voluntary repatriation of 2,376 foreign nationals between January and November 2021 but did not report how many were trafficking victims. The government provided legal alternatives to the removal of foreign victims of trafficking to countries where they might face retribution or hardship.

The Ministry Delegate in charge of Moroccans Residing Abroad and Migration Affairs continued to lead the government's National Strategy for Immigration and Asylum, which aimed to regularize the legal status of migrants, refugees, and asylum-seekers, including trafficking victims. Under this strategy, foreign trafficking victims could benefit from various services, including reintegration assistance, education, vocational training, social services, and legal aid. However, the government did not report proactively identifying potential trafficking victims during these regularization efforts or how many foreign trafficking victims—if any—benefited from these services during the reporting period. Due to the lack of proactive screening and identification measures, some foreign trafficking victims remained unidentified. Furthermore, foreign trafficking victims—especially among the sub-Saharan African migrant population—remained vulnerable to penalization for unlawful acts traffickers compelled them to commit, such as immigration violations. Foreign migrants reported they feared arrest and deportation, thereby deterring them from reporting trafficking or other types of crimes to the police.

## PREVENTION

The government maintained efforts to prevent human trafficking. The national inter-ministerial anti-trafficking committee, which was led by the MOJ and included two representatives from civil society, oversaw the government's national strategy for immigration and asylum, which included efforts to manage irregular migration, combat trafficking, and organize training sessions for security services on asylum, migration, and trafficking issues. However, the government reported the anti-trafficking committee was only able to meet once in person during the reporting period due to pandemic-related mitigation measures and most coordination was done via written correspondence, which delayed the coordination process. The government also continued to implement a national anti-trafficking action plan, which included coordination across relevant ministries. The government conducted public awareness campaigns, at times in coordination with an international organization, during the reporting period. The government continued operating a digital portal to field trafficking complaints and outline resources available to trafficking victims; seven complaints received through the portal were referred to the Public Prosecutor's Office.

The government reportedly continued to implement Law No. 19.12, adopted in October 2018, which provided protections for foreign domestic workers, including requiring valid work contracts that meet

national labor standards for the granting of a work visa. Law 19.12 also bans the use of intermediaries to negotiate the recruitment of domestic workers on behalf of the employer and recruitment agency to reduce vulnerability to fraudulent recruitment. The government continued to operate a hotline through the National Observatory for the Rights of the Child for the public to report abuse and crimes against children, but the government did not report if the hotline received any reports of potential child trafficking crimes. The Ministry of Labor and Professional Integration continued to conduct child labor inspections in the formal economy across the country, but the government reported it remained concerned about child labor violations in the informal sector, including potential forced child labor crimes. The government continued coordinating with an international organization to spread public awareness to prevent child labor in domestic work—a sector vulnerable to forced child labor—during the reporting period. Aside from implementing a national policy for the protection of children, including preventing exploitation of children through online sexual exploitation, the government did not report efforts to reduce the demand for commercial sex acts or child sex tourism. The government provided anti-trafficking training to its diplomatic personnel. Moroccan peacekeeping forces received anti-trafficking training and operated under a "no tolerance" standard for troops involved in UN peacekeeping missions. Although not explicitly reported as trafficking, an international organization reported receiving two allegations—one in 2021 and one in 2020—of sexual exploitation with potential trafficking indicators by Moroccan peacekeepers deployed to UN peacekeeping missions in the Democratic Republic of the Congo; the government's investigations into the allegations were pending at the end of the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Morocco, and traffickers exploit Moroccan victims abroad. Documented and undocumented foreign migrants, especially women and children, are highly vulnerable to forced labor and sex trafficking in Morocco and as they transit through Morocco to reach Europe. Traffickers exploit many migrants who voluntarily use smugglers to enter Morocco. In 2020, the number of sub-Saharan migrants clandestinely entering the country—the majority of whom intend to transit Morocco on their way to Europe—decreased by an estimated 30 percent in comparison to 2019; this trend reportedly continued in 2021, but data was unavailable. However, the number of migrants departing from Morocco for Europe reportedly increased eight-fold due to migrants making the dangerous ocean crossing to the Canary Islands in 2020, compared to 2019. The Spanish government and international organizations estimate that 38,000 people, including Moroccan citizens, crossed clandestinely from Morocco to Spanish territory in 2020 either by sea or over land; the majority, approximately 21,000, arrived in the Canary Islands. Both sub-Saharan and Moroccan migrants making this journey to Spain and further into Europe are at risk of trafficking in Morocco and Europe. For example, traffickers exploit some female migrants while seeking assistance at "safe houses" in Morocco, which usually are run by individuals of their own nationality. Some female undocumented migrants, primarily from Sub-Saharan Africa and a small but growing number from South Asia, are exploited in sex trafficking and forced labor in Morocco. Criminal networks operating in Oujda on the Algerian border and in northern coastal cities, such as Nador, exploit undocumented migrant women in sex trafficking and forced begging; networks in Oujda also reportedly exploit children of migrants in forced begging. Some female migrants, particularly Nigerians, who transit Oujda are exploited in sex trafficking once they reach Europe. Furthermore, some contacts claim that entrenched Nigerian networks, working with Moroccan criminal elements, exploit primarily Nigerian women in sex trafficking and retain control over these victims when they arrive in Europe. International organizations, local NGOs, and migrants report women and unaccompanied children from Cote d'Ivoire, the Democratic Republic of the Congo, Nigeria, and Cameroon are highly vulnerable to sex trafficking and forced labor in Morocco. Some reports suggest Cameroonian and Nigerian networks exploit women in sex trafficking, while Nigerian networks also exploit women in forced begging in the streets by threatening the victims and their families; the victims are typically the same nationality as the traffickers. Some women from the Philippines, Indonesia, and francophone sub-Saharan Africa are

recruited for employment as domestic workers in Morocco; upon arrival, employers force them into domestic service through non-payment of wages, withholding of passports, and physical abuse.

Traffickers, including parents and other intermediaries, exploit Moroccan children in Morocco for forced labor, domestic work, begging, and sex trafficking. Some Moroccan boys endure forced labor while employed as apprentices in the artisanal, textile, and construction industries and in mechanic shops. Although the incidence of child domestic workers has reportedly decreased in Morocco since 2005, girls are recruited from rural areas for work in domestic service in cities, and some become victims of forced labor. NGOs and other observers anecdotally reported in 2018 that a significant number of girls work as domestic help in Moroccan households, but it is difficult to determine the extent of the problem because of authorities' inability to access this population. Drug traffickers reportedly compel children to participate in drug production and trafficking in Morocco. Some family members and other intermediaries exploit Moroccan women in sex trafficking. Some foreign nationals, primarily from Europe and the Middle East, engage in child sex tourism in major Moroccan cities; these cases reportedly decreased during 2020 due to pandemic-related travel restrictions. Traffickers exploit Moroccan adults and children in forced labor and sex trafficking, primarily in Europe and the Middle East, particularly in the Gulf states. Traffickers force Moroccan women into commercial sex abroad, where they experience restrictions on movement, threats, and emotional and physical abuse. As in past years, media continued reporting Moroccan workers in Spain's agricultural sector were subjected to forced labor and, at times, sexual abuse. Swedish authorities reported that, since 2016, traffickers force boys and young men from Morocco experiencing homelessness to deal drugs, carry out thefts, and perpetrate other criminal activities in Sweden; however, these cases have reportedly decreased since 2019.

## MOZAMBIQUE: TIER 2

The Government of Mozambique does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Mozambique remained on Tier 2. These efforts included prosecuting and convicting traffickers, collaborating with international organizations to train front-line officials on trafficking, creating and strengthening cross-border reference groups, and launching an initiative to prevent trafficking in emergencies. However, the government did not meet the minimum standards in several key areas. The government did not proactively identify trafficking victims. The government did not finalize a draft national referral mechanism (NRM), which limited victims' access to protective services and left potential victims unidentified. The government did not finalize implementing regulations and, as a result, did not operationalize the protection provisions within the 2008 anti-trafficking act. The government also did not adopt a national action plan (NAP), limiting overall anti-trafficking efforts. Mozambican officials remained without effective policies or laws that would regulate foreign labor recruiters and hold them civilly and criminally liable for fraudulent recruiting.



## PRIORITIZED RECOMMENDATIONS:

Finalize, approve, implement, and train officials to use standard operating procedures (SOPs) for victim identification and the NRM to refer all trafficking victims to appropriate care. • Systematically and proactively identify trafficking victims by screening vulnerable populations—including victims of child abuse, victims of trafficking by extremist groups including child soldiers, individuals in IDP and resettlement camps, and foreign nationals, such as migrants from neighboring countries and North Korean and Cuban workers—for trafficking indicators and refer them to appropriate services. • Vigorously investigate and prosecute trafficking crimes and sentence convicted traffickers, including complicit officials, to adequate penalties. • Increase provision of comprehensive services, including medical care, psycho-social counseling, and shelter, to all victims, including males and foreign nationals, and expand the availability of protective services for all victims, including long-term shelter and reintegration assistance. • Amend the anti-trafficking law to bring the definition of trafficking in line with the definition of trafficking under international law. • Finalize, adopt, and dedicate funds to implement the NAP. • Increase coordination among district, provincial, and national stakeholders to bolster reporting on the government's anti-trafficking efforts. • Build the capacity of the labor inspectorate and the Women and Children's Victim Assistance Units to identify potential trafficking victims, investigate trafficking cases, and refer victims to care. • Implement and consistently enforce strong regulations and oversight of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable.

## PROSECUTION

The government maintained minimal anti-trafficking law enforcement efforts. The 2008 Law on Preventing and Combating the Trafficking of People criminalized sex trafficking and labor trafficking and prescribed penalties of 16 to 20 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with international law, the law did not establish the use of force, fraud, or coercion as an essential element of the crime. The government continued to work with an international organization to review draft amendments to bring the 2008 anti-trafficking law in line with international standards; however, draft amendments remained awaiting approval by various stakeholders for the third consecutive reporting period.

The government investigated two human trafficking cases in 2021, compared with six case investigations in 2020. The government prosecuted and convicted two traffickers in 2021, compared with two suspects prosecuted and one trafficker convicted of forced labor in 2020. Judges sentenced the convicted traffickers to two years and 16 years in prison, respectively. One investigation remained ongoing at the end of the reporting period. Due to conflation between migrant smuggling and human trafficking, the government may have prosecuted migrant smuggling crimes under its anti-trafficking law. With support from an international organization, the government contributed information on trafficking case investigations to a national centralized anti-trafficking data collection and reporting tool. The government reported that pandemic restrictions limited law enforcement's ability to detect, prevent, and respond to human trafficking and collaborate with neighboring countries on cross border investigations.

Official complicity in human trafficking crimes remained a significant concern and inhibited law enforcement action during the year. An investigation by an anti-corruption NGO led the government to appoint a Commission of Inquiry and open a criminal investigation into human trafficking at Ndlavela Women's Prison, where prison guards allegedly forced inmates through violence and intimidation to engage in commercial sex both inside and outside the prison. The Commission confirmed prison guards brought sex buyers into the prison, allegedly including high-ranking officials, but disagreed with some key details of the NGO's report, including the claim that female inmates were removed from the prison for exploitation. Civil society expressed serious concerns about the investigation's validity and independence, suggesting the Commission withheld details to shield government officials from liability. The government suspended prison personnel and opened a criminal investigation, which remained ongoing at the end of the reporting period. The victims interviewed reported experiencing serious psychological distress; however, the government did not report providing appropriate services to victims. Subsequent media reports alleged similar and widespread sexual abuse and potential sex trafficking of female inmates throughout the country. Similar to previous years, traffickers commonly bribed police and immigration officials to facilitate trafficking domestically and transnationally, especially to South Africa.

The government, in partnership with an international organization, trained 141 front-line officials in four provinces on draft revised SOPs for victim identification and referral and trained 30 customs and border officers and investigators on trafficking in persons, child protection, and irregular migration in Tete Province. In partnership with the Maputo and Cabo Delgado Province Reference Groups and support from an international organization, the government trained 49 individuals, including law enforcement and anti-corruption officials, religious leaders, NGO representatives, and tour operators. The government reported working with civil society to establish and strengthen existing cross-border reference groups with neighboring countries to improve coordination on law enforcement operations, prevention efforts, and victim protection. Police stations throughout the country had specialists, trained by the Office of Assistance to Women and Children Victims of Domestic Violence, available to respond and provide support to potential trafficking cases. The government continued to offer victim support in more than 215 police stations and 22 "Victims of Violence" centers throughout the country, offering temporary shelter, food, limited counseling, and monitoring following reintegration for victims of crime. The government did not, however, provide specific numbers of trafficking victims who benefited from these services for the prior two years.

## PROTECTION

The government maintained minimal victim protection efforts. The government identified 15 victims in 2021, compared with two victims identified in 2020 and 22 identified in 2019. However, all victims identified in 2021 were associated with one investigation and, for the second consecutive year, the government did not identify any victims outside those identified through law enforcement activity. The government reported voluntarily repatriating 13 of the foreign national victims identified; however, for the second consecutive year, the government did not report providing any services to victims. The government continued to lack adequate procedures to screen vulnerable populations for trafficking, including foreign migrants and child abuse victims. Additionally, front-line officials lacked a general understanding of trafficking, which hampered victim identification efforts. Officials and civil society organizations reported the actual number of trafficking victims in Mozambique was likely significantly higher than the number represented by criminal cases. Although the draft NRM and SOPs for victim identification continued to be informally distributed to officials to identify and refer victims, the government did not finalize and fully implement the NRM or SOPs for the fifth consecutive year. Observers reported the lack of a formal NRM, and SOPs hampered community-level officials' efforts to identify victims, and many potential trafficking cases went unidentified during the reporting period. The government did not report progress in finalizing implementing regulations for trafficking victim and witness protection, hindering the government's provision of protection services for trafficking victims for the seventh consecutive reporting period.

Despite government-provided care reportedly being available for trafficking victims, the government did not report providing these services for the past three years. The government generally relied on civil society organizations to identify victims of trafficking and refer them to care but did not report providing financial or in-kind support to such organizations. The Ministry of Gender, Children, and Social Action operated three centers that could provide short-term shelter, medical and psychological care, family reunification, and legal assistance to trafficking victims; however, the government did not detail the scope of the services provided during the reporting period. The government did not have a long-term shelter for trafficking victims or an alternative for those in need of long-term shelter. While the government specified that it occasionally could provide shelter for adult male victims, it did

not report providing services for adult male victims identified during the year. The anti-trafficking law required police protection for victims who participated as witnesses in criminal proceedings against traffickers, but the government did not report providing these services to any victims. Mozambican law provided for temporary residency status or legal alternatives to the removal of foreign victims to countries where they might face hardship or retribution, but the government did not report granting status to foreign victims during the reporting period. Authorities may have penalized trafficking victims for crimes traffickers compelled them to commit; observers reported some potential victims, particularly irregular migrants, may have been deported or remained unidentified in the law enforcement system. International organizations indicated that women and children exploited by extremist groups in Cabo Delgado province may not be appropriately screened by the government for trafficking indicators and, therefore, may not have received necessary services.

## PREVENTION

The government maintained overall efforts to prevent trafficking. The National Reference Group (NRG), under leadership of the attorney general's office, convened regularly during the reporting period to coordinate on national anti-trafficking efforts, and members at the national, provincial, and district levels met regularly as working groups to address specific trafficking cases and concerns. The NRG established a Reference Group in Pemba district in Cabo Delgado province to prevent and respond to human trafficking. The NRG also engaged with the Ministry of Justice to push for adoption of the NAP, which remained in draft form since 2017. The NRG reported the pandemic hampered progress towards adoption of the NAP during the reporting period; the government remained without a NAP since 2012. The NRG collaborated with the Ministry of State Administration's National Institute of Disaster Management to reduce the risks of trafficking and child labor in emergencies, such as terrorist-related conflict and natural disasters. The government did not have a dedicated budget to combat trafficking, which hindered overall anti-trafficking efforts.

The government reportedly began implementation of SOPs in IDP camps in northern and central provinces to screen for trafficking indicators. An international organization, in partnership with the government and Rwandan security forces, launched a program to strengthen the capacity of Mozambican security forces to respond to child soldiering and gender-based violence by violent extremists. The government established or expanded efforts with cross-border reference groups for improved coordination with other countries, including South Africa and Tanzania. In July 2021, the government hosted a joint webinar with the Governments of Angola and Portugal on combating human trafficking during the pandemic, which included minimizing vulnerability and strengthening cooperation. Pandemic-related restrictions on travel and in-person gatherings significantly hampered the government's awareness-raising efforts. The government and an international organization collaborated on one awareness campaign on World Day Against Trafficking with prominent public figures to raise public awareness of trafficking in persons through television, radio, and social media.

The government did not report operating or providing support to a hotline exclusively available for adult trafficking victims; however, the government publicized two crime hotlines equipped to receive reports of human trafficking and refer victims. It was not reported if these hotlines handled trafficking-related calls during the reporting period. The government continued providing in-kind support for an NGO-run hotline that was available to report crimes against children, including trafficking, and respond to callers in local languages. In 2021, this hotline opened a new office in Cabo Delgado and received 18 reports of child trafficking and 111 reports of child labor, and it made 363 referrals to law enforcement and service providers. The government did not report opening investigations or assisting victims following these reports. The government reported training labor inspectors to screen for forced child labor during inspections; however, inspectors did not identify forced child labor during the 8,650 inspections conducted in 2021. Mozambican officials remained without effective policies or laws regulating labor recruitment and holding recruiters civilly and criminally

liable for fraudulent recruiting. The government did not provide anti-trafficking training to diplomats. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Mozambique, and traffickers exploit victims from Mozambique abroad. Forced child labor occurs in agriculture, mining, and market vending in rural areas, often with the complicity of family members. Traffickers lure vulnerable migrants, especially women and girls from rural areas, from neighboring countries, such as Malawi, to cities in Mozambique, Eswatini, or South Africa with promises of employment or education, and then they exploit those victims in domestic servitude and sex trafficking. Some traditional healers target individuals with albinism, who may be vulnerable to both sex and labor trafficking. Traffickers exploit Mozambican girls in bars, roadside clubs, overnight stopping points, and restaurants along the southern transport corridor that links Maputo with Eswatini and South Africa. Traffickers in and around mining worksites in Cabo Delgado province exploit girls in sex trafficking. Increasingly, traffickers recruit women and girls via the internet with promises of employment using fake business profiles on social media, then subsequently exploit them in sex trafficking or forced labor. Child sex trafficking is prevalent in the cities of Maputo, Beira, Chimoio, Tete, and Nacala, which have highly mobile populations and large numbers of truck drivers. The government reported that the pandemic increased vulnerability to trafficking, especially for children targeted through social media.

An international organization reported there were more than 153,000 IDPs in Mozambique as a result of natural disasters, including tropical cyclones in 2019 and 2022; individuals in displacement camps or otherwise affected by cyclones were vulnerable to trafficking. Additionally, an international organization reported in February 2022 there were approximately 735,000 IDPs in northern and central Mozambique as a result of violent extremism and instability in the region; non-state armed groups exploited women and children in forced labor and sex trafficking. In addition, non-state armed groups recruited and/or used child soldiers.

Traffickers exploit Mozambican men and boys in forced labor on South African farms and mines, where victims often work for months without pay under coercive conditions before being turned over to police for deportation as undocumented migrants. Mozambican boys migrate to Eswatini to wash cars, herd livestock, and sell goods; some subsequently become victims of forced labor. Traffickers exploit Mozambican adults and girls in forced labor and sex trafficking abroad, including in Angola, Italy, Portugal, Germany, Cyprus, and Hungary. Informal networks typically are composed of Mozambican or South African traffickers. Reports allege traffickers bribe officials to move victims within the country and across national borders to South Africa and Eswatini. At a cement factory owned by a PRC-based company in Matutuine, PRC national managers subjected approximately 300 Mozambiquans to forced labor, according to media reports. Cuban medical professionals working in Mozambique may have been forced to work by the Cuban government.

## NAMIBIA: TIER 1

The Government of Namibia fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Namibia remained on Tier 1. These efforts included referring all identified victims to care; training port employees on trafficking victim identification; and opening eight government-operated shelters and funding three NGOs to provide shelter and care to victims. Although the government meets the minimum standards, it identified fewer victims and initiated fewer investigations and prosecutions. The government did not provide specialized human trafficking training to law enforcement

NAMIBIA

or protection officers. Occasional breakdowns in communication between government officials and civil society and within government ministries led to a lack of coordination among members of the National Coordinating Body (NCB).



**PRIORITIZED RECOMMENDATIONS:**
Conduct trainings and multi-sector information sharing workshops for criminal justice and social welfare professionals on implementing the Trafficking in Persons Act of 2018. • Train law enforcement, immigration officials, healthcare workers, social workers, and other front-line responders on using the national referral mechanism (NRM) and standard operating procedures (SOPs) to proactively screen vulnerable populations, including individuals in commercial sex, migrants, refugees, and Cuban medical workers, appropriately identifying and referring trafficking victims to services, especially in rural and border regions. • Strengthen coordination and collaboration mechanisms across government ministries and with civil society partners to ensure clear roles and responsibilities, effective anti-trafficking policies, and increased communication. • Increase funding to civil society partners that provide accommodation and care to trafficking victims. • Vigorously investigate and prosecute sex and labor trafficking crimes and sentence convicted traffickers to sufficiently stringent sentences. • Adopt the National Plan of Action (NAP) for Trafficking in Persons 2022-2027. • Expand efforts to raise public awareness of human trafficking indicators and risks through sensitization campaigns and community outreach, especially in rural areas. • Implement and consistently enforce strong regulations and oversight of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable.

**PROSECUTION**
The government maintained anti-trafficking law enforcement efforts. The Combating of Trafficking in Persons Act of 2018, which came into effect in November 2019, criminalized sex trafficking and labor trafficking and prescribed penalties of up to 30 years' imprisonment, a fine not exceeding 1 million Namibian dollars ($62,960), or both. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with punishments prescribed for other serious crimes, such as kidnapping. Courts operated at a reduced capacity due to the pandemic, creating judicial backlogs during the reporting period.

Despite the pandemic's impact, the government initiated two and continued 16 case investigations, compared with 10 case investigations initiated and 16 continued in 2020. Of the two new investigations, the government initiated one forced labor investigation and one sex trafficking investigation. The government initiated prosecutions of seven defendants, continued prosecutions of 32 defendants, and reported no convictions in 2021; compared with no new prosecutions, continued prosecutions of 18 defendants, and conviction of one trafficker in 2020. The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes.

Specialized prosecutors within the Office of the Prosecutor General's Sexual Offenses Unit prosecuted all trafficking cases in the High Court and worked closely with prosecutors on cases indicted outside of the High Court. The pandemic diverted law enforcement resources away from anti-trafficking efforts during the reporting period, resulting in reduced capacity. Trainings were cancelled due to pandemic-related restrictions on in-person gatherings for the past two reporting periods. This was a decrease compared with training 35 criminal justice practitioners and 166 immigration officials in 2019. The government jointly hosted a multi-day training with an international organization funded by a foreign government to train front-line officials on identifying trafficking victims

among vulnerable Angolan migrants fleeing drought in Southeastern Angola. The government used its agreement for mutual legal assistance with the Government of Angola to trace and extradite an alleged trafficker and maintained bilateral law enforcement cooperation agreements with the Governments of Zimbabwe and Angola. The Directors General of the Namibian and Zambian Departments of Immigration met to increase future collaboration on human trafficking.

**PROTECTION**
The government maintained overall protection efforts. The government identified seven trafficking victims, compared with 19 victims in 2020. This included one Namibian child exploited in sex trafficking, two female adults from Namibia and Zambia exploited in labor trafficking, one adult male from South Africa whose exploitation was unspecified, and three additional unspecified trafficking victims. The government reported referring victims to government or NGO-operated temporary shelters, providing assistance to all seven identified victims, and continued to provide care and assist 18 victims identified in the previous reporting period. The government continued implementing SOPs for victim identification and the NRM for referral and provision of services. Police and immigration officials used anti-trafficking pocket manuals outlining the SOPs and NRM. The government did not report providing training to social welfare professionals during the reporting period due to pandemic-related restrictions. Observers reported some government and civil society front-line responders still did not fully understand their roles within the procedures. In practice, labor inspectors and immigration officials contacted the Namibian Police Force (NamPol) when they identified a potential trafficking victim; however, no referrals were reported.

The government and NGOs jointly provided shelter, psycho-social services, medical care, and provision of other basic needs to victims of trafficking, gender-based violence (GBV), and child abuse. The government opened eight shelters available to trafficking victims during the reporting period. Three NGO shelters cared for men, women, and children, although observers noted it was sometimes difficult to find shelter for male victims. Child victims were placed in government residential childcare facilities and provided access to education. Foreign victims had access to the same shelter and services as domestic victims. Shelter staff did not permit victims, including adults, to leave unchaperoned. The government allocated 6 million Namibian dollars ($377,790) to three NGO shelters supporting trafficking victims in 2021, the same as the previous reporting period. Seventeen GBV Protection Units nationwide offered initial psycho-social, legal, and medical support to victims of crime, in coordination with the police, the Ministry of Gender Equality, Poverty Eradication, and Child Welfare (MGEPECW), the Ministry of Health and Social Services, and NGOs. Adult victims were able to seek employment and work while receiving assistance, although it is unknown how many victims did so during the reporting period.

All 25 victims identified or assisted during the reporting period voluntarily assisted law enforcement with investigations and prosecutions. Authorities did not condition access to victim services on cooperation with law enforcement; the government provided legal aid, transportation, and witness protection to all victims. The government assigned victim advocates to victims testifying and allowed victims to testify in rooms separate from the courtroom when such rooms were available. Foreign victims could obtain temporary residence visas during legal proceedings. The law allowed victims to obtain restitution and file civil suits against their traffickers; however, no victims to date had received restitution or compensation. Authorities screened vulnerable populations, including irregular migrants, refugees, and individuals in commercial sex, for trafficking indicators.

**PREVENTION**
The government maintained prevention efforts. The NCB, chaired by the MGEPECW, coordinated the government's anti-trafficking efforts. The NCB met quarterly during the reporting period, compared with twice during the previous reporting period. The MGEPECW worked collaboratively with other stakeholders to draft a five-year NAP on Trafficking in Persons (2022-2027) to align and fund mandated responsibilities, which remained pending adoption at the end of the reporting period. However, coordination issues remained at the

Haiti AR_000883

operational level due to the lack of designated authority. The government continued implementing its 2019-2023 NAP on GBV, which addressed all forms of human trafficking. Due to pandemic restrictions on in-person gatherings, the government conducted fewer public awareness raising activities. The MGEPECW held an in-person event to commemorate World Day against Trafficking in Persons, and officials distributed brochures on trafficking as part of the MGEPECW's national awareness raising campaign. The MGEPESW, in collaboration with the Ministry of Works and Transport, Namibia Airports Company, and Namibian Ports Authority, trained port and airport employees on trafficking victim identification and distributed awareness raising materials. The government reported conducting public awareness raising through radio and television programming, and the NCB circulated awareness raising materials electronically.

The government provided in-kind support to an NGO-operated hotline for GBV, child abuse, and human trafficking; the hotline operated daily from 8:00 a.m. to 10:00 p.m. Authorities did not report identifying any trafficking victims from the hotline. With support from an international organization, the government contributed information to a centralized anti-trafficking database that collected national data on cases and victims identified and shared it with countries in the region. The Ministry of Labor, Industrial Relations, and Employment Creation employed an unknown number of labor and occupational health and safety inspectors responsible for enforcing laws against child labor; the government did not report identifying any victims during inspections. The law regulated recruitment agencies and banned employee-paid recruitment fees. The Ministry of Labor, Industrial Relations, and Employment Creation oversaw recruitment agency licensing and managed a database registering job seekers, coordinating overseas job placements, and monitoring employees' arrival in their intended destinations. However, the government did not report identifying any victims or initiating any investigations into fraudulent recruitment for the second consecutive reporting period. The government did not make efforts to reduce the demand for commercial sex acts. The government provided pre-deployment training to its diplomatic corps on identifying, and appropriately referring to care, trafficking victims.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Namibia, and traffickers exploit victims from Namibia abroad. Some victims are initially offered legitimate work by recruiters for adequate wages, but then traffickers subject them to forced labor in urban centers and on commercial farms. Traffickers subject Namibian children to sex trafficking and forced labor in agriculture, cattle herding, and domestic service. With the influx of more than 7,000 Angolan migrants fleeing severe drought and malnutrition in Southeastern Angola, Namibians increasingly employ Angolan children as domestic workers and cattle herders, who may be vulnerable to exploitation. Traffickers bring children from Angola and neighboring countries and subject them to sex trafficking and forced labor, particularly in agriculture, cattle herding, domestic servitude, street vending in Windhoek and other urban centers, and in the fishing industry. Zambian children migrate to work as cattle herders but may be subjected to forced labor. Namibians commonly house and care for children of distant relatives to provide expanded educational opportunities; however, in some instances, traffickers exploit these children in forced labor. Among Namibia's ethnic groups, San and Zemba children are particularly vulnerable to forced labor on farms or in homes. Traffickers exploit individuals from Angola, Kenya, Zambia, Zimbabwe, and South Africa in sex trafficking and forced labor. An NGO noted an increase in exploitation of Namibians seeking economic opportunity abroad and an increase in labor trafficking of adult male victims in Namibia's agricultural sector, in part due to the pandemic. Traffickers increasingly use social media to advertise false jobs and groom potential victims, in part due to pandemic movement restrictions. Cuban nationals working in Namibia on medical missions may have been forced to work by the Cuban government. Traffickers allegedly operate at the international airport.

# NEPAL: TIER 2

The Government of Nepal does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Nepal remained on Tier 2. These efforts included increasing investigations and identifying more trafficking victims. The government also approved a new regulation to increase protections for victims of crime, including human trafficking survivors. However, the government did not meet the minimum standards in several key areas. The government's laws do not criminalize all forms of labor trafficking and sex trafficking, and the government did not finalize its long-pending draft amendments. Officials' identification of, and protection for, male trafficking victims and transnational labor trafficking victims remained inadequate compared to the size of the problem. The government initiated fewer prosecutions and convicted fewer traffickers, and official complicity in trafficking crimes remained a problem, both direct complicity and negligence. The government continued to allow Nepali migrant workers to pay recruitment fees and related expenses with few measures to protect migrants from exploitation.



**PRIORITIZED RECOMMENDATIONS:**

Amend the Human Trafficking and Transportation (Control) Act (HTTCA) to criminalize all forms of sex trafficking and labor trafficking, in line with the 2000 UN TIP Protocol. • Increase investigations, prosecutions, and convictions of all trafficking offenses, including allegedly complicit officials, labor recruiters, and sub-agents for labor trafficking. • Finalize standard operating procedures (SOPs) for victim identification and referral, train front-line responders on SOPs, and increase referrals of trafficking victims to services. • Establish SOPs for law enforcement to investigate human trafficking cases, including referrals between agencies. • Expand availability and capacity of victim care, including shelter and repatriation, for all victims, especially men and boys and workers exploited overseas. • Increase staff, training, and resources to the Department of Foreign Employment (DoFE) to facilitate full implementation and monitoring of the low-cost recruitment policy. • Take steps to eliminate recruitment or placement fees charged to workers by Nepali labor recruiters and ensure any recruitment fees are paid by employers. • Implement the victim-witness protection provisions of the HTTCA. • Significantly increase monitoring of children's homes and orphanages and hold accountable those that do not meet the government's minimum standards of care. • Authorize labor inspectors to monitor the adult entertainment sector (AES) establishments for labor violations. • Remove the HTTCA provision that allows the judiciary to fine victims if they fail to appear in court and hold them criminally liable for providing contradictory testimony. • Lift current conditions and restrictions on female migration and engage destination country governments to create rights-based, enforceable agreements that protect Nepali workers from human trafficking. • Finalize and implement a revised National Action Plan (NAP). • Provide documentation to stateless individuals, internationally-recognized refugees, and asylum-seekers to allow them to work, attend school, and access social services.

**PROSECUTION**

The government slightly increased anti-trafficking law enforcement efforts. The 2007 Human Trafficking and Transportation (Control) Act (HTTCA) criminalized some forms of sex trafficking and labor trafficking. The HTTCA's definition of trafficking was inconsistent with the international definition of trafficking. It limited the definition of "human trafficking" to the purchase or selling of a person and to causing another person to

go into prostitution; did not include a demonstration of force, fraud, or coercion as an essential element of the base offense; and did not explicitly address forced labor. The law separately defined "human transportation" as the taking of a person from their home or place of residence through force, fraud, or coercion for the purpose of prostitution or the keeping a person as a slave or bonded labor. The HTTCA prescribed penalties ranging from five to 20 years' imprisonment and a fine, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The 2017 Labour Act, which is enforced by specialized labour courts, criminalized forced labor and prescribed penalties of up to two years' imprisonment, a fine of up to 500,000 Nepali rupees (NPR) ($4,190), or both. Additionally, the 2002 Bonded Labor (Prohibition) Act abolished bonded labor and prescribed civil penalties of a fine between 15,000 and 25,000 NPR ($126-$209). The 2000 Child Labour Act criminalized forced child labor and prescribed penalties of up to one year's imprisonment, a fine of 50,000 NPR ($419), or both. None of these laws prescribed sufficiently stringent penalties. The 2007 Foreign Employment Act (FEA) criminalized fraudulent and deceptive labor recruitment of Nepalese workers for employment abroad and was often utilized in labor trafficking cases in lieu of the HTTCA. Penalties prescribed under this law were significantly lower than those available under the HTTCA. For the seventh consecutive year, the government's National Committee for Controlling Human Trafficking (NCCHT) continued to work on revisions to the HTTCA. The pandemic impacted the ability of the NCCHT to finalize the revisions during the reporting period. The National Human Rights Commission worked to align the country's laws with the Palermo Protocol following accession in June 2020.

During the Nepali fiscal year from July 16, 2020, to July 15, 2021, police conducted 134 investigations involving 162 suspects and the District Government Attorney initiated prosecution against 300 suspects in 146 cases. District courts convicted 164 traffickers in 72 cases and acquitted 189 individuals in 87 cases under the HTTCA. A total of 214 cases involving 501 defendants remained ongoing. This compared with police initiating 97 investigations involving 240 suspects and the District Government Attorney initiating prosecution of 415 suspects in 170 cases, which resulted in the conviction of 202 traffickers in 88 cases during the previous reporting period. The government did not report the sentences prescribed to convicted traffickers or disaggregate data on sex and labor trafficking cases. Some police and prosecutors previously investigated and prosecuted suspected sex traffickers and facilitators for rape and public offenses. Some officials reported trafficking decreased during the pandemic and dismissed the prevalence of human trafficking in districts, although civil society organizations continued to report concerns about human trafficking and issues such as gender-based violence, caste-based discrimination, and child sexual abuse. Although courts reopened in August 2021 following more than five months of pandemic closures, NGOs reported that restrictions on transportation and pandemic testing requirements made it difficult to obtain victims' statements and testimony.

The government had standard training for labor, immigration, judicial, law enforcement, and foreign employment officials that included general definitions of human trafficking. International donors provided anti-trafficking trainings for the Nepal Police Anti-Human Trafficking Bureau (AHTB), a specialized police unit dedicated to trafficking crimes created in 2018. Due to the pandemic, the AHTB conducted online training for its personnel; however, most police lacked specialized training and resources to interact with trafficking survivors in a victim-centered way. In addition, the dearth of investigators and prosecutors trained to work on trafficking cases, coupled with frequent personnel turnover, further hampered efforts. The AHTB had 82 Kathmandu-based staff as well as additional staff in all seven provinces at the end of the reporting period. The Nepal Police Women's Cells (NPWC) had female officers in all 77 districts to investigate crimes against women and girls, including trafficking, but not all district offices had units that were fully operational. NPWC had internal guidelines on the identification and treatment of victims. While investigative capacity was improving, Nepali law enforcement did not proactively identify trafficking cases and often relied on referrals from civil society, some of which occurred more than one year prior, thereby undermining evidence collection and prosecution efforts. Moreover, police and prosecutors remained overly reliant on victim testimony for successful investigations and prosecutions. Victims often did not want to assist in cases against their perpetrators because the perpetrators

were family friends or relatives. Traffickers often bribed victims and their families not to provide testimony in trafficking cases. The AHTB and other law enforcement units often lacked the resources to effectively coordinate with NGOs and victims to register cases against traffickers. Pandemic-related lockdowns and court closures further exacerbated these issues during the reporting period. Police and the judiciary did not always collaborate, which led to police submitting incomplete cases that prosecutors could not pursue in court. Many district courts did not comply with the 2013 Supreme Court directive to adopt a "fast-track" system for human trafficking cases. This was at times due to stipulations of the law that did not allow a fast-track court case, delays related to the pandemic, and non-trafficking caseloads. As a result, the government reported that most trafficking cases heard at district courts take one year. The National Judiciary Academy had SOPs on investigation and prosecution of trafficking cases; however, implementation of the SOPs varied. Nepal Police coordinated on international investigations of trafficking-related crimes through INTERPOL and with other foreign governments.

NGOs noted that although there was increased willingness to take action against the operators of unregistered children's homes, which exploited children in forced begging, prosecution remained inadequate. Many of the individuals running these exploitative institutions were politically connected and viewed favorably within their community. NGOs stated that even when arrested, they were almost never prosecuted and often used political connections to thwart child protective agencies. Prior to the pandemic-related lockdowns, the government directed children's homes to return children to their families. The government did not report screening the children for trafficking indicators before they were sent home. The government reported approximately 11,000 children reside in 489 children's homes, while another 1,000 children live in children's correction homes.

The government did not make sufficient efforts to actively investigate or prosecute suspects for bonded labor and did not provide any data on bonded labor cases. The government continued to misidentify the majority of transnational labor trafficking cases as labor violations and resolved most cases administratively through the Ministry of Labor, Employment, and Social Security (MoLESS) in lieu of criminal investigation, with inadequate sentences for perpetrators. Legal experts stated prosecutors could pursue a case under both the HTTCA and the 2007 FEA for transnational labor trafficking and foreign employment fraud, respectively; however, prosecutors regularly refused to do so, believing such action would violate the prohibition against double jeopardy.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. In November 2017, the Commission for the Investigation of Abuse of Authority arrested the Director General of DoFE and two DoFE officials for allegedly attempting to collect a bribe from a foreign employment agency. In December 2020, the former Director General and two DoFE officials were convicted and sentenced to one and a half years in prison and a 1 million NPR ($8,380) fine. The defendants filed an appeal, and the cases remained pending in the Supreme Court at the end of the reporting period. Officials called on the government to investigate allegations that Department of Immigration officials were complicit in the transportation of potential trafficking victims at the Kathmandu international airport, although the government did not report any action by the end of the reporting period. During previous reporting periods, NGOs reported traffickers bribed government officials to include false information in genuine Nepali passports and provide fraudulent documents to prospective labor migrants or foreign employment agents. NGOs reported concerns that because a number of government officials, including parliamentarians, maintained close ties to foreign employment agencies, such officials might have a conflict of interest in approving policies that increase protections for migrant workers. NGOs alleged some police and political party leaders were complicit in sex trafficking in conjunction with their financial involvement in the AES. Some traffickers, including owners of AES establishments and exploitative orphanages, enjoyed impunity due to personal connections with politicians and by bribing police to avoid raids or procure fraudulent identity documents; one alleged trafficker reportedly led a local coordination committee on human trafficking (LCCHT). The UN Human Rights Committee previously heard two cases against Nepali

Haiti AR_000885

military officials who allegedly forced one boy and one girl into labor in 2010 and 2002; the government has not reported initiating any criminal investigation or victim compensation procedures.

## PROTECTION

The government maintained efforts to identify and protect trafficking victims. The government identified 187 victims compared with 141 victims the previous year. Of the 187 victims, traffickers exploited 99 in sex trafficking, 64 in labor trafficking, and 24 in unspecified exploitation; 97 victims were exploited in Nepal while 90 victims experienced transnational trafficking. The 187 victims included 80 children and 107 adults, including 183 female victims and four male victims, compared with 62 children and 79 adults, including 133 female victims and eight male victims, identified the previous year. Authorities did not systematically track the total number of victims identified. The government did not have formal SOPs for victim identification and referral to services, impeding proactive identification efforts; the Ministry of Women, Children, and Senior Citizens (MoWCSC) previously drafted SOPs that remained pending final approval at the end of the reporting period. Police did not always recognize that children in commercial sex were sex trafficking victims and sometimes removed girls 16-17 years old from commercial sex, sent them home, and did not refer them to services or file criminal charges against the client. The pandemic continued to impact anti-trafficking efforts, including reducing resources and capacity to provide services to survivors. Additionally, the government's pandemic restrictions continued through June 2021, which limited the government's ability to identify and assist trafficking victims.

Although the government had national standards for care of trafficking victims, referral efforts remained ad hoc and inadequate. The government did not report how many victims it referred for care. NPWC typically referred trafficking victims to government-run, one-stop emergency centers located within hospitals or to NGOs, both of which could provide shelter, medical, and legal services. Public hospitals charged NGOs for medical assistance to trafficking victims. The government reported it provided psycho-social counseling to an unknown number of victims to assist in the investigation and prosecution of cases, up to three months of shelter, and police security if a victim required protection. The MoWCSC, in partnership with NGOs, provided shelter services to 2,628 trafficking victims in 10 shelters and two long-term rehabilitation centers that offered counselling, health services, legal support, and employment programs. The government allocated 8.26 million NPR ($69,170) through the NCCHT for victim services during fiscal year 2020 to 2021. While the shelters assisted 2,628 victims of crimes— including trafficking victims—during the fiscal year, the shelters had to restrict or halt several services due to pandemic-related restrictions. MoWCSC and NGOs operated 123 community service centers across 36 districts for female victims of gender-based violence, including trafficking. MoWCSC paid for victims' basic needs, including lodging, food, health services, psycho-social counseling, and capacity building, while NGOs covered other administrative and staff costs. The NCCHT monitored the 10 shelters and required NGOs running government-funded shelters to periodically submit details of their operations. Similarly, district anti-trafficking committees were required to conduct at least one monitoring visit to government-funded shelters every six months; the NCCHT could conduct additional inspections as needed. MoWCSC provided shelter and services to men and women, including trafficking victims, through the Victim Assistance Rehabilitation Fund. The government reported male trafficking victims of all ages were eligible for placement in government-funded shelters, and the NCCHT could reallocate funds if male victims sought services. Nevertheless, international organizations reported labor trafficking victims and men and boys frequently did not receive services. FEB and MoLESS continued to finalize an SOP to improve shelter referral services for both male and female trafficking survivors and returning migrant workers. The current SOP and government practices focus on gender-based violence and trafficking of women and girls, potentially creating challenges for male victims attempting to access shelters. Victims could obtain restitution from traffickers through criminal proceedings, or if the government was unable to collect the fines imposed on traffickers, the government could provide back wages from an HTTCA rehabilitation fund. The government did not adequately compel perpetrators to pay compensation because officials did not investigate property holdings and could not assess values for victim compensation. As in prior reporting periods, the government

did not report if any victims obtained restitution or if the government provided any compensation from the fund.

The pandemic slowed physical monitoring of children's homes. The National Child Rights Council, which monitored childcare homes remotely and with NGO assistance, previously removed 84 children from exploitation in abusive and unregistered children's homes, although the number of removals during this reporting period is unknown. Unregistered or fraudulent orphanages and children's homes had forced some children into labor making handicrafts and begging and had sexually abused other children. The government estimated at least one-third of the total registered orphanages did not meet government standards and did not have regular oversight.

In June 2021, the government approved the Crime Victim Protection Regulation 2021 to increase protections for victims of crime, including the right to claim compensation. However, overall victim-witness protection mechanisms and the practices of police and justice officials remained insufficient. In civil suits, most victims remained unaware of the HTTCA provision granting the right to private representation. Even in cases where victims had private representation, the attorneys often could not build strong cases because law enforcement and the judiciary denied them access to critical case files and the dates of hearings. Police continued efforts to pay for some victim and witness transportation and lodging during judicial hearings; authorities did not report whether they provided these services to any trafficking victims. Victims could provide testimony via video or written statement; however, most courts did not have facilities for video conferences, and even when they did, officials often did not make victims aware of the option. Victims continued to report challenges in providing testimony, including threats from perpetrators, and the lack of compensation and lack of ability to collect compensation when awarded. Notably, resource limitations impeded authorities' provision of a victim's right to police protection, and observers stated victims were reluctant to file criminal complaints under HTTCA in part because of stigma, greater ease pursuing compensation through the FEA, and personal or family safety concerns. The HTTCA authorized the judiciary to fine victims who failed to appear in court and hold victims criminally liable for providing testimony contradicting their previous statements. Due to a lack of formal identification procedures, authorities arrested, detained, and fined adult and child sex trafficking victims for crimes their traffickers compelled them to commit. The government did not have legal alternatives to the deportation of foreign victims. The Department of Immigration continued to deport foreign nationals who overstayed their visas; the government did not report whether the department screened for trafficking among those deported.

Government services for Nepali nationals exploited abroad remained inadequate. The 2007 FEA required the government to appoint labor attachés in countries with more than 5,000 registered Nepali migrant workers to facilitate claims of abuse, exploitation, and repatriation. In February 2022, the government had seven labor attachés and five labor counselors deployed in eight countries. Although MoLESS assigned labor attachés and counselors in diplomatic missions with a high volume of migrant workers, limited resources prevented attaché presence in all required countries. The number of labor counselors and attachés remained nominal compared to the large number of workers and growing number of complaints. While some embassies could provide temporary shelter and repatriate trafficking victims, officials acknowledged inadequate staffing and resources created large delays in provision of assistance, and the quality of the government-run shelters abroad was poor. Nepali embassies in Bahrain, Kuwait, Malaysia, Oman, Qatar, Saudi Arabia, South Korea, and the UAE could provide emergency shelter for approximately 25 female migrant workers each, some of whom were trafficking victims; embassies did not report the number of workers assisted. The Foreign Employment Board (FEB), which is responsible for protecting migrant workers and maintains a welfare fund to support labor migrants registered with the DoFE, acknowledged shelters lacked sufficient space, staff, and resources to meet the high demand for assistance.

FEB collected fees from departing registered migrant workers for a welfare fund to provide repatriation and one year of financial support to families of injured or deceased workers, which could include trafficking victims. During the fiscal year, the fund repatriated 413 migrant workers

compared with 1,398 in the previous year. Additionally, 892 bodies of Nepalis who had died while employed abroad were repatriated, compared with repatriation of 413 bodies the previous year. The government did not report identifying any trafficking victims among those repatriated or initiating any criminal investigations into their exploitation. MoWCSC allocated funds to Nepal's embassies in India, Sri Lanka, Thailand, and the UAE, as well as the consulate in Kolkata, for repatriating trafficking victims. MoWCSC funded Nepali embassies to repatriate 138 Nepali trafficking victims during the reporting period. FEB could also repatriate undocumented migrant workers, including trafficking victims, by requesting funds through the finance ministry on an ad hoc basis, but it could not provide any other financial support or services. NGOs bore the primary cost of repatriating Nepali trafficking victims from India and noted that due to the lack of formal repatriation procedures between countries, repatriation could take up to two years. DoFE maintained an online migrant worker portal that allowed migrant workers facing abusive or untenable situations overseas, or someone on the migrant worker's behalf, to file a request for repatriation. Since the site's introduction, DoFE has received increasing online requests for repatriation, the majority from workers in Kuwait, Malaysia, Saudi Arabia, and the UAE. The DoFE did not provide data indicating the percentage of those who filed requests that were successfully repatriated. In addition, NGOs reported many migrants lacked the requisite computer access or skills to use the site. NGOs reported coordination between the labor ministry and MoWCSC remained weak, and labor officials did not routinely inform labor trafficking victims about the services MoWCSC and NGOs could provide.

## PREVENTION

The government maintained overall efforts to prevent human trafficking. The NCCHT, headed by the MoWCSC, continued to lead interagency efforts on human trafficking. The government continued to operate and fund 732 local anti-trafficking committees (LCCHTs) through the district anti-trafficking committees (DCCHTs); the government did not report how much funding was allocated during the reporting period. The NCCHT regularly met with and trained DCCHTs to enhance coordination between central and district-level civil society organizations and government officials. While the NCCHT continued to meet with and train officials from the DCCHTs, observers noted the need for improved coordination between the NCCHT, DCCHTs, and LCCHTs. NGOs reported that lack of resources for LCCHTs and DCCHTs limited sub-national anti-trafficking efforts, which delayed reforms planned for DCCHTs. While the NCCHT continued to meet with and train officials from the DCCHTs, observers noted the need for improved coordination between the NCCHT, DCCHTs, and LCCHTs. In 2020, the MoWCSC formed a task force to revise the NAP and continued to finalize the revised NAP, which remained pending by the end of the reporting period. The government continued to conduct public awareness campaigns throughout the country, sometimes in partnership with NGOs or international organizations, and produced a radio program to raise awareness and disseminate information about trafficking. Observers noted frequent personnel turnover among the committees continued to hamper efforts and federal and provincial governments sometimes provided conflicting messaging that impeded anti-trafficking efforts. Officials observed the lack of trafficking data and insufficient resources were significant challenges to combating trafficking.

The Department of Immigration lacked effective processes for detecting potential victims of trafficking as well as a mechanism for coordinating victim identification among intergovernmental agencies and civil society. Border checkpoints were not operational, and pandemic mitigation measures reduced formal interactions with potential victims. Police lacked the staff, resources, and training required to patrol Nepal's nearly 1,100-mile border with India, which Nepalis and Indians could cross without visas or passports. Significant transnational trafficking reportedly occurred along the border; however, officials did not report identifying any victims. NGOs conducted some checkpoint inspections along the border focused almost entirely on intercepting female travelers. Police reported NGOs did not always refer potential trafficking victims to law enforcement. The Metropolitan Police Crime Division in Kathmandu continued to operate an anti-trafficking hotline; the government reported it operated other hotlines to report cases involving women, children, or gender-based violence, including human trafficking. The FEB also operated a hotline to receive complaints concerning migrant workers, including human trafficking incidents.

The DoFE maintained offices in all seven provinces to increase prospective migrant workers' access to foreign employment-related services. The FEB also operated approximately 41 migrant resource and information centers at the district level, which provided information on authorized recruitment agencies, maximum fees the agencies could charge workers, and information on the risks and challenges of working abroad and potential ways to minimize the risks. However, lengthy pandemic-related lockdowns, as well as closures of the national airport and border with India, limited the government's trafficking prevention screening efforts. The government continued to use a revised two-day, pre-departure orientation curriculum for migrant workers; however, the course was not mandatory. Some NGOs also provided training to migrant workers. The government offered free certifications for skills obtained abroad for migrant workers; it did not report how many workers utilized these services. The government updated its Foreign Employment Information Management System platform to record data on returning migrant workers in addition to offering services such as applying for labor permits and paying insurance and other fees. During the previous reporting period, Nepal signed a labor recruitment memorandum of understanding (MOU) with the Government of Israel to provide employment for migrant workers in the fields of agriculture, construction, and hospitality. Inconsistent with the international best practice of employer-paid fees, the agreement required migrant workers to pay recruitment fees and related migration costs, although the government has taken steps to reduce some of these fees, including by negotiating some air travel costs.

The government's labor migration policies remained lengthy, costly, and sometimes discriminatory against women. Although the Parliamentary Committee for Industry, Commerce, Labour and Consumer Welfare in 2020 revoked its previous recommendation to ban the migration of female domestic workers younger than age 24 to Gulf States and Malaysia, the government maintained strict pre-conditions. Observers have expressed concern that outright bans on migration may increase the likelihood of migration through irregular means and trafficking risks. Migrant rights activists expressed concern the government continued to send Nepali female domestic workers abroad to countries without bilateral agreements to protect workers' rights.

The government's 2015 labor migration guidelines included a policy requiring foreign employers to pay visa and transportation costs for Nepali migrant workers bound for Malaysia and the Gulf and restricted agency-charged recruitment fees to 10,000 NPR ($84). Among the 859 licensed manpower agencies in Nepal in 2022, 832 agencies were functional and only 15 had authorization to recruit domestic workers (compared with 24 in the last reporting period). The government did not report if it initiated any civil or criminal investigations into fraudulent recruitment agents or agencies. Both NGOs and government officials noted the government's monitoring mechanism of employment agencies was ineffective to address non-compliance; agencies regularly charged migrant workers fees higher than the 10,000 NPR ($84) government-set limit. Many migrant workers remained unaware of the process for obtaining redress, including in cases of trafficking. The DoFE regulates and monitors recruitment agencies and pre-departure orientation centers for migrant workers and handles complaints of exploitative labor by returning migrant workers. DoFE officials continued to advise abused migrant workers to register complaints under the 2007 FEA rather than notify police. In January 2020, DoFE and the police signed an MOU to allow labor trafficking victims to file complaints at local police stations instead of requiring them to travel to Kathmandu. Although the pandemic hindered the effective implementation of the provision, the DoFE reportedly began to refer labor trafficking cases to police but did not report how many cases were referred. Many labor trafficking victims preferred to submit claims for restitution through the 2007 FEA in lieu of lengthy criminal prosecutions under the HTTCA, citing the desire to avoid the stigma associated with trafficking, the higher potential for compensation through the 2007 FEA, and the lack of time and funding to access the centralized institutions charged with providing redress. An international organization reported DoFE continued regular monitoring

and inspection of recruitment agencies suspected to be conducting irregular activities during the pandemic; however, FEB did not report if it identified or referred any non-compliance cases during the reporting period. Observers reported DoFE settled the vast majority of labor complaints administratively and did not refer violators to the FET for civil penalties nor to police for criminal investigation. DoFE officials stated employment agencies continued to regularly charge Nepali workers during the reporting period for visas, airplane tickets, and/or service fees above the cap, and added that they believed bilateral labor agreements with destination countries would be essential for enforcing labor rights. DoFE required additional staff, training, and resources to fully implement and monitor the government's 2015 low-cost recruitment policy.

While the informal sector employed more than 70 percent of workers in the country, including nearly all child laborers, inspectors did not regularly inspect the informal sector for violations, including forced labor. The government continued to fund and conduct inspections focused specifically on child labor; however, the Department of Labor (DOL) did not report referring any employers for criminal investigation or issuing any administrative penalties. NGOs reported the DOL did not take meaningful action against perpetrators of child labor and forced child labor and did not undertake many unannounced inspections. DOL did not report how many child laborers it identified or removed from exploitative conditions during the reporting period, and it typically only removed children whom employers physically or sexually abused. While civil society reported forced and bonded labor at carpet factories, labor inspectors—who received training on forced labor, although no training on trafficking more broadly—did not regularly monitor the factories, and police did not report investigations into allegedly exploitative employers. NGOs reported DOL encouraged mediation over prosecution, including in cases of forced child labor. DOL previously passed a guideline to declare child labor-free municipalities and set criteria for all local governments to maintain a child labor-free environment. The government set a target to declare at least 25 municipalities child labor-free by July 2021 and sent more than 30 million subscribers text messages to raise awareness. However, implementation of the project stalled due to the pandemic. Civil society organizations reported the pandemic increased the number of children working in agriculture, domestic employment, and on the streets; a recent study concluded child labor in the carpet and garment industries gradually declined. The government organized media campaigns and workshops to hold discussions on child labor; however, these were limited due to pandemic restrictions. The government did not make efforts to reduce the demand for commercial sex acts. Despite reports of foreign nationals involved in child sex tourism, the government did not make efforts to prevent child sex tourism. The government did not provide anti-trafficking training to its diplomatic personnel.

The government had special committees led by chief district officers to monitor the AES to mitigate regulatory gaps; however, they remained highly dependent on individual officers and did not have a comprehensive regulatory framework for monitoring such establishments. Existing laws did not permit labor inspectors to monitor AES establishments for labor violations, which NGOs reported allowed many establishments to use children and adult trafficking victims with impunity. Observers estimated only half of AES establishments had valid registration. NGOs raised concerns that victims may have had even less chance of being identified when, due to the government's pandemic-related restrictions, the AES shut down for most of the reporting period and may have moved operations to unmonitored private residences.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Nepal, and traffickers exploit Nepali victims abroad. Nepal is a source, transit, and destination country for men, women, and children subjected to forced labor and sex trafficking. In 2019, the National Human Rights Commission estimated that 1.5 million Nepalis are vulnerable to human trafficking. Sex traffickers exploit Nepali women and girls in Nepal, India, the Middle East, Malaysia, and—to a lesser extent—other Asian countries and Sub-Saharan Africa. Traffickers use Nepal's open border with India to transport Nepali women and children to India for sex trafficking. Unregistered

migrants—including the large number of Nepalis who travel via the open border with India en route to third country destinations and those who rely on unregistered recruiting agents—are particularly vulnerable to forced labor and sex trafficking. Traffickers continue to target young, poorly educated people from traditionally marginalized castes and ethnic minority communities with limited economic opportunities and increasingly utilize social media and mobile technologies to lure their victims. Civil society organizations noted the economic impact of the pandemic increased vulnerability among at-risk groups such as day laborers, AES employees, women, and children. Many Nepalis whose homes or livelihood were destroyed by the 2015 earthquakes—especially women and children—remain vulnerable to trafficking.

Labor traffickers exploit Nepali men, women, and children in Nepal, India, the Middle East, and East Asia in construction, factories, mines, domestic work, begging, and the adult entertainment industry. The government estimates approximately 1.5 million Nepalis work in the Middle East, with the vast majority of men in construction in Saudi Arabia, Qatar, and the UAE. Nepalis work under oppressive conditions, which include forced labor, and continuing reports indicate employers retain their passports and sometimes do not pay them for months at a time. Foreign employment is often regarded as a respectable way to earn money to support families, but many migrant workers are not well-informed about their rights or applicable laws. Due to the government's restrictions on female domestic workers to Gulf countries, many Nepali domestic workers in Iraq, Kuwait, and Saudi Arabia do not have valid work permits and migrate through irregular channels, increasing their vulnerability to trafficking. Traffickers lure women with the promise of work as domestic servants or in the entertainment sector in the Middle East, Sub-Saharan Africa, and Malaysia. Labor traffickers exploit Nepali men, women, and children in East Asia, including in Japan, Malaysia, and the People's Republic of China (PRC), and in Europe, including Portugal, on farms and in construction, factories, mines, begging, and the adult entertainment industry. Trafficking of unemployed residents in districts of the northern Nepal-PRC border for manual labor and commercial sex was prevalent prior to the border closure due to the pandemic. Traffickers bring Nepali victims to European countries and Australia on tourist, student, marriage, and work visas. An international organization reported a rise in Nepalis using tourist visas for foreign employment due to pandemic restrictions and the temporary suspension of work visas in destination countries.

Some recruitment agencies and agents engage in fraudulent recruitment practices and impose high fees to facilitate forced labor. Migrant workers reported that recruitment agencies sometimes provided inaccurate information about the nature and conditions of work abroad, and migrants often discovered they were required to work in jobs that differed from what they had been promised. Traffickers target unregistered migrants, including the large number of young Nepali women who transit India or men and women who rely on unregistered recruitment agents. Some Nepali women who agree to arranged marriages—through Nepali companies—to men in the PRC and South Korea are forced into domestic servitude. Traffickers subject some migrants who transit Nepal en route to the Middle East to human trafficking, including Bangladeshis and Sri Lankans who use falsified Nepali travel documents. Some government officials allegedly accept bribes to include false information in Nepali identity documents or provide fraudulent documents to prospective labor migrants, which allows recruiters to evade recruitment regulations. The lack of a birth registration system and database in Nepal further contributed to the production of fraudulent identification documents. Traffickers reportedly take advantage of more relaxed pre-departure screenings at Kolkata and Chennai airports or bribe Indian officials in New Delhi and Mumbai to fly Nepali migrant workers to third countries without proper documentation, which increases the workers' vulnerability to trafficking. Labor traffickers also transport Nepali victims through Sri Lanka and Burma en route to destination countries. Traffickers increasingly used social media and mobile technologies to lure and deceive victims during the government's pandemic-related lockdown.

Within Nepal, forced labor, including through debt-based bondage, of adults and children exists in agriculture, brick kilns, the stone-breaking industry, and domestic work. For example, traffickers use debt to coerce a community of landless Dalit known as Haruwa-Charuwa into forced

labor in the agricultural sector in certain districts of the eastern Terai region of Nepal. Agricultural bonded labor in Nepal has historically affected the Haruwa-Charuwa, the Haliya, and the Kamaiya communities disproportionally. High-interest loans, landlessness, discrimination, limited livelihood opportunities, and inadequate government policies contribute to intergenerational bonded labor. Households frequently take on high-interest loans for healthcare expenses, funeral costs, and other necessities while earning low wages, resulting in debts passed from one generation to the next. A 2021 study estimated that 1.1 million children are engaged in child labor—compared to 1.6 million children in 2008—with 87 percent of cases occurring in the agriculture sector. In addition, approximately 74 percent of children engaged in the informal sector worked in hazardous conditions. A government study documented more than 61,000 Nepalis—including approximately 10,000 children—in forced labor over the past five years, especially in agriculture, forestry, and construction. NGOs continued to report some children worked in brick kilns, including carrying loads, preparing bricks, and performing other tasks at kilns for extended periods. A 2021 international organization report estimated 17,000 children worked in brick kilns. Traffickers subject Nepali and Indian children to forced labor in domestic work, brick kilns, the embroidered textile (*Zari*) industry, as well as in carpet factories and stone quarrying. According to the government's 2017-2018 labor survey, traffickers force children younger than 15 into labor in agriculture, forestry, and construction. Some Nepali brick kilns employ Indian migrant laborers, including children, who take out large advances that require them to work for subsequent seasons. Traffickers exploit debts to compel adults and children into labor in carpet factories. Parents sometimes force their children to work in carpet factories to repay family debts. Some Nepali parents give their children to brokers, who promise education or work opportunities but instead take them to frequently unregistered children's homes and force them to pretend to be orphans to garner donations from tourists and volunteers, and, where some force children into manual labor or begging, force them to entertain visitors for donations and sexually abuse them. International organizations and NGOs estimated that 80 to 85 percent of children in "children's homes" and orphanages had at least one living parent at home. Recruitment agents promise Bangladeshi workers well-paying jobs in Nepali carpet factories but exploit them, including by obtaining tourist visas for them instead of work visas and paying less than the agreed wages. Traffickers use children to transport drugs across the Indian-Nepali border.

Traffickers subject Nepali girls, boys, and transgender persons to sex trafficking in Nepal on the streets and in the AES, including dance bars, massage parlors, and cabin "restaurants," a type of brothel. A study focused on the Kathmandu Valley determined approximately 17 percent of workers in the AES are minors and 62 percent of adult women in the AES had commenced work while a minor, including as young as 7 years old. Many women reported a family or friend had connected them to the establishment, where they voluntarily agreed to waitress-like positions. Their employers then exploited them in forced labor or sex trafficking. The study estimated nearly 30 percent of all minor workers in AES establishments are victims of forced labor, usually as restaurant staff, and employers later subject many to sex trafficking. Police report an increasing trend of AES businesses recruiting Nepali female employees for work abroad in the same sector, which increases vulnerability to sex trafficking. NGOs alleged some police and political party leaders are complicit in sex trafficking because of their financial involvement in the AES. Only about 25 percent of the adult entertainment venues in Kathmandu and other major cities were operational in 2021 due to the government's prohibitory orders and social distancing. NGOs reported that pandemic-related closures increased strain on individuals working in the AES, and some women were forced into sex trafficking. NGOs reported that businesses increasingly moved into residential and underground areas. A study on commercial sexual exploitation of children found that children living on the street were highly vulnerable to trafficking. Researchers estimated that there are approximately 2,000 to 3,000 child victims of commercial sexual exploitation outside the adult entertainment sector. NGOs reported girls in early and forced marriages, especially in the Terai region among Dalit and Madhesi communities, were vulnerable to sex traffickers.

Under false promises of education and work opportunities, some Nepali parents give their children to brokers who instead take them to frequently unregistered children's homes and force them to pretend to be orphans to garner donations from tourists and volunteers. The government instructed childcare homes to return children to their families prior to the government's pandemic-related lockdown; approximately 1,500 children were reunited with their families or returned home in 2020. However, NGOs estimate more than 11,000 children remain in registered children's homes and "orphanages," and international organizations and NGOs approximate 80 to 85 percent have at least one living parent. Seventy-five percent of registered Nepali orphanages and children's homes are located in the country's five main tourist districts, out of 77 national districts. Some of the orphanages and homes force children into manual labor or begging, force them to entertain visitors for donations, and sexually abuse them. Since 2016, police have identified and arrested at least 12 tourists or international volunteers, all men older than 50, mostly from Western countries (Austria, Canada, Denmark, France, Germany, India, Netherlands, the United Kingdom, and the United States), for sexual abuse of Nepali children, including child sex trafficking. Although there is increased will to act against the traffickers operating these children's homes, NGOs reported some owners of exploitative child institutions, including fake orphanages, use political connections to thwart child protective agencies and prosecution. In addition, some child-care homes register as educational hostels to avoid government monitoring.

The government recognized Bhutanese and Tibetans as refugees but regarded refugees and asylum seekers of other nationalities as irregular migrants. The government provided registered Bhutanese refugees an identification card that was renewed periodically and provided to children upon reaching 16 years of age. The government has not issued new refugee cards for Tibetan refugees since 1995 nor recognized any Tibetans who arrived after 1990, leaving most of the government-estimated 12,540 Tibetan refugees in the country undocumented, which prevents them from legally working, studying, traveling, and accessing public services. According to a local NGO, upwards of 6.7 million individuals—one-quarter of Nepal's population—lack citizenship documentation, rendering them de facto stateless. Legal requirements on transferring citizenship continue to impose hardships on children whose fathers are deceased, abandoned, or departed the country to work abroad. Some women are also unable to obtain citizenship due to formal attestation requirements from a male family member. Lack of documentation precludes the participation of all these groups in the formal economy and increases their vulnerability to traffickers.

## NETHERLANDS: TIER 1[‡]

The Government of the Netherlands fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the Netherlands remained on Tier 1. These efforts included more than doubling the number of traffickers the government prosecuted and convicted; dedicating funding, for the first time, for the country's next national action plan (NAP); and launching an awareness campaign targeting consumers of commercial sex in advance of the implementation of legislation criminalizing the knowing solicitation of a sex trafficking victim. Moreover, the government took several measures to increase child trafficking prevention and protection efforts, including initiating a regional pilot program focused on increasing child victims' confidence in the criminal justice system and taking measures to avoid their re-traumatization during criminal proceedings. Although the

---

‡ *The Netherlands, along with the Dutch Caribbean islands of Aruba, Curacao, and Sint Maarten form the Kingdom of the Netherlands. Although semi-autonomous entities, Aruba, Curacao, and Sint Maarten rely on the Kingdom for certain authorities. The Kingdom is an important contributor to these islands' anti-trafficking efforts. The BES islands are special municipalities of the Netherlands and are fully under the authority of the Dutch government.*

government meets the minimum standards, it identified fewer victims and did not provide support services for foreign victims without legal residency who did not cooperate with law enforcement investigations. Anti-trafficking efforts on the Dutch Caribbean islands remained weak, and the government did not report complete victim statistics for the reporting period.



NETHERLANDS TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase efforts to proactively identify victims, including victims of forced labor. • Provide all potential trafficking victims, including foreign nationals without legal residency, with care services, regardless of their ability to cooperate with an investigation. • Increase efforts to sentence traffickers to significant prison terms. • Improve coordination and information-sharing with anti-trafficking counterparts across the Kingdom of the Netherlands, including in Aruba, Curaçao, and Sint Maarten. • Establish and implement policies to formally disconnect identification procedures and official victim status from investigations and prosecutions. • Improve data collection quality for law enforcement and ensure the timely release of victim identification data for policy evaluation. • Continue efforts to strengthen the child protection system to protect against vulnerability to trafficking. • Incorporate measurable goals into the NAP. • Implement results-based training and mentoring of officials in the islands of Bonaire, Sint Eustatius, and Saba (BES) to increase identification of victims and prosecution of traffickers. • Expand the rapporteur's mandate or assign another independent body to evaluate anti-trafficking efforts and assess trafficking prevalence in the BES islands.

## PROSECUTION

The government increased law enforcement efforts. Article 273f of the criminal code criminalized sex trafficking and labor trafficking and prescribed punishments of up to 12 years' imprisonment or a fine for trafficking offenses involving an adult victim and up to 15 years' imprisonment or a fine for those offenses in which the victim was a child. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. The BES criminal code criminalized sex and labor trafficking under article 286f and prescribed penalties ranging from six to 15 years' imprisonment. In January 2022, the government enacted a law criminalizing knowingly soliciting a sex trafficking victim, with penalties of up to four years' imprisonment or a fine for soliciting an adult sex trafficking victim and up to six years' imprisonment or a fine for soliciting a child sex trafficking victim.

Police initiated 178 trafficking investigations, compared with 187 in 2020. The government initiated prosecutions of 201 alleged traffickers and continued ongoing prosecutions of 41 alleged traffickers, a significant increase from 120 prosecutions of alleged traffickers in 2020. A new prosecutorial directive, stressing human trafficking investigations and prosecutions were a high priority, went into effect in November 2021. Courts convicted 205 traffickers, a significant increase from 53 traffickers convicted in 2020. Courts sentenced traffickers to less than one year imprisonment in 23 cases, to one to three years' imprisonment in 39 cases, to three to five years' imprisonment in three cases, and to more than five years' imprisonment in eight cases. Law enforcement efforts remained weak in the BES islands. The Dutch Caribbean Police Corps, which operated exclusively in Bonaire, Sint Eustatius, and Saba, initiated one trafficking investigation in Bonaire; the investigation was ongoing

at the end of the reporting period. Authorities in Bonaire prosecuted and convicted one defendant for smuggling a victim into Bonaire for the purpose of labor trafficking; courts sentenced the individual to 30 days' imprisonment and a fine. For the fourth consecutive year, authorities in Sint Eustatius and Saba did not investigate, prosecute, or convict any traffickers.

Regional police units maintained specialized teams with trained anti-trafficking detectives and experts, and the national police had dedicated anti-trafficking officers. Specialized anti-trafficking prosecutors and judges tried and heard cases. The government allocated €10 million ($11.3 million) to combat trafficking (the same as in 2020) and added an additional 40 police officers, detectives, and cyber specialists to the regional police anti-trafficking teams. Observers previously reported the police did not allocate sufficient resources to anti-trafficking efforts, as the government shifted funding to counterterrorism and organized crime investigations. The government continued to deliver anti-trafficking training to law enforcement; training remained institutionalized as part of the standard professional curriculum across agencies. All new police recruits received a human trafficking module as part of basic training, and anti-trafficking police officers were required to pass examinations in a training course focused on policing commercial sex, including identifying trafficking indicators. Judges, prosecutors, and defense attorneys continued to receive specialized training in applying the anti-trafficking law and trauma-informed care for victims. Local governments on the BES islands ran multidisciplinary anti-trafficking teams, which cooperated with each other and with Dutch counterparts; however, there was little evidence of their effectiveness. Authorities in Bonaire maintained a trafficking database, which served as a repository for future leads on trafficking cases. Dutch authorities trained customs and coast guard officials in the BES islands and seconded Dutch law enforcement staff to the BES islands and Aruba, Curaçao, and Sint Maarten; observers reported many law enforcement officials were unfamiliar with the seconding system and the countries did not take full advantage of this program.

The government continued to participate in international investigations and led one joint investigation team with other EU nations. The government led EUROPOL's European Multidisciplinary Platform Against Criminal Threats (EMPACT) program on human trafficking; through EMPACT, the government worked in cooperation with Vietnam to investigate organized criminal groups involved in exploiting Vietnamese children for sex and labor trafficking in the Netherlands. The Ministry of Justice and Security (MJS) maintained police liaison officers in Croatia, Italy, and Poland to monitor migrants vulnerable to trafficking and to share investigative information with host government law enforcement authorities. The government maintained a 2016 memorandum of understanding on law enforcement cooperation, including anti-trafficking cooperation, with Aruba, Curaçao, Sint Maarten, and the United States. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. The government frequently did not charge child sex traffickers under the trafficking law but under a sexual abuse law (article 248b), which carried lesser penalties.

## PROTECTION

The government maintained efforts to protect victims. In 2020, the most recent year for which official data was available, the government-funded national victim registration center and the assistance coordinator registered 984 possible trafficking victims, compared with 1,334 in 2019. Of the 984 victims, 408 were victims of sex trafficking, 603 were victims of labor trafficking, including 154 subjected to forced criminality, and 38 were victims of uncategorized trafficking; these numbers reflect that several individuals were victims of multiple forms of trafficking. The majority of victims were women (547), and 68 victims were children. In 2020, the top five countries of origin of victims were Poland, Nigeria, the Netherlands, Bulgaria, and Hungary; the majority of victims were foreign nationals. Authorities in Bonaire identified two victims in 2021. Authorities and first responders followed government-established

NETHERLANDS

identification and referral procedures; the government continued funding a website with identification and referral information for first responders and other professionals who may encounter a victim. The government supported an initiative by victim care organizations to develop best practices for prevention and protection of male victims of sexual exploitation. In January 2022, the national police reported an ongoing shortage of law enforcement officers, due in part to the increased workload of officers responding to protests, particularly those against government pandemic restrictions. Observers reported the shortage of officers and the government's guidance for many employees to work from home to mitigate the spread of COVID-19 likely contributed to the lower number of victims identified in 2020. Observers noted that while officials received training on victim identification, effective victim screening was dependent on officers' familiarity with trafficking; authorities' contact with trafficking victims varied widely among regions. Aruba, Curaçao, and Sint Maarten relied heavily on the Netherlands for funding local anti-trafficking efforts. Observers assessed these funding levels as sporadic and insufficient. The Kingdom of the Netherlands funded a training on the anti-trafficking legal framework for border protection officials in Sint Maarten.

First responders, including law enforcement, were required to immediately refer victims to the NGO officially tasked and funded by the government to register victims and coordinate their care; other organizations and private citizens could also refer victims to the NGO. Upon registration, the NGO referred the victim to a shelter, if desired, and advised victims on available services. Observers continued to report the EU's General Data Protection Regulation (GDPR), which required non-law enforcement organizations to obtain consent from the victim before official registration unless a "justified interest" existed, continued to deter some victims from registering. Nevertheless, experts agreed it was not the GDPR itself that caused victims to fear stigmatization as a trafficking victim and withdraw from the victim process; rather, it was the strict interpretation of the regulation by many non-law-enforcement organizations out of fear of being non-compliant with EU privacy regulations. Observers noted that a November 2020 MJS manual with guidance to stakeholders on the GDPR failed to clarify how to report potential victims. Non-registered victims could access services from non-government funded NGOs. MJS provided awareness training to the Immigration and Naturalization Services to identify potential trafficking indicators among asylum-seekers. However, an NGO previously noted that some non-EU third country nationals seeking asylum had difficulty accessing victim care services.

Local governments funded an extensive network of care facilities for Dutch victims and foreign victims with legal residency status; the local shelters provided accommodation to trafficking victims and victims of other crimes. Victims without legal residency status were provided a three-month reflection period in one of three NGO-managed specialized trafficking shelters, during which time they could choose to press charges against their trafficker; victims were not allowed to work during this time. After the reflection period, victims who agreed to assist police could continue to stay in shelters. Observers expressed concern that the granting of a reflection period was at authorities' discretion and there was no mechanism to appeal a decision. The government fully funded the three NGO-managed specialized shelters for victims without legal residency status; the government provided €1.5 million ($1.7 million) to these shelters in 2021, an increase from €1.44 million ($1.6 million) in 2020. In January 2022, the government decreased the number of spaces for victims in the three specialized shelters from 58 to 40 (30 for women, 10 for men) but allowed for a 10 percent increase above this capacity, if needed. Observers claimed that the government's decision to reduce capacity based on decreased victim numbers in 2020 was misguided, as the reduction in victim numbers was likely due to challenges in identification caused by the pandemic. Both the NGO-managed shelters and local shelters provided medical and psychological care, schooling, language and skills training, and legal assistance; some also provided self-defense classes, and most had facilities accessible to individuals with disabilities. In addition to the general funding of local shelters, local governments allocated €2 million ($2.27 million) to fund specialized care for up to 36 trafficking victims who also had a psychological disorder, developmental limitations, or "substance abuse disease;" this care was provided across six local shelters. Shelters created separate quarantine

locations for victims who tested positive for COVID-19, ensuring safe shelter for victims who needed to self-quarantine.

Child victims were placed in specialized shelters for children or in screened foster homes, or they were returned home when deemed safe. Children remained vulnerable in the protection system; civil society reported care workers were not sufficiently trained to identify child trafficking victims and the level of specialized services children received varied widely by municipality. In June 2021, the government initiated a regional pilot program establishing a coordinator to increase protection for child trafficking victims by increasing victims' confidence in the criminal justice system and taking measures to avoid victims' re-traumatization during criminal proceedings. The national rapporteur and civil society agreed the government was actively engaged in addressing the issue of children leaving Dutch asylum centers to unknown destinations, including through law enforcement cooperation via the EMPACT project; the government also established interagency working agreements delineating the roles and responsibilities of law enforcement and government agencies when responding to a case of a missing unaccompanied child.

Thirty-three of the country's 35 health care regions had a trafficking victim coordinator, the same number as in 2020; the government funded an NGO to assist the two regions without a coordinator. The November 2021 prosecutorial directive instructed prosecutors to take several measures to prioritize victims' privacy, safety, and health, including limiting the number of interviews and conducting interviews without delay; avoiding visual contact between the victim and suspect; and allowing victims not to testify as a witness during public trials. Although victims could request physical separation from a suspect during court proceedings, observers previously expressed concern that lengthy trials re-traumatized victims. Judges often awarded restitution to victims, and if the perpetrator did not pay the court-ordered amount within eight months, the government assumed responsibility for collecting the payment from the perpetrator. Courts ordered significant restitution awards in several cases in 2021, including a case in which a judge awarded €220,480 ($249,980) to a victim of sex trafficking. Victims could also claim compensation through the Violent Offenses Compensation Fund or by filing a civil suit. As of 2019, victims in the BES islands could also apply for compensation from the Violent Offenses Compensation Fund.

Non-EU victims without legal residency status, who were willing to press charges, were eligible for a short-term residence permit (B-8 permit), valid for a maximum of five years; the B-8 permit allowed non-EU victims to seek employment. If authorities decided to prosecute the suspected trafficker, the victim was eligible to receive permanent B-8 legal residency. The government did not report how many foreign victims applied for the permanent B-8 permit (333 applied in 2018, the most recent year data was available). According to civil society, foreign victims who obtained a B-8 permit but ultimately ceased cooperation with authorities lost their residence permits and consequently all government-sponsored support services. Moreover, some NGOs noted law enforcement could quickly drop a case if it did not immediately find sufficient potential evidence for a successful prosecution, leading to victims potentially being excluded from services. A victim could apply for asylum if their case closed without a conviction or they declined to assist in an investigation. The government did not report the number of potential victims who applied for asylum. A procedure also existed to grant victims residency, separate from B-8 eligibility, in cases where they were seriously threatened or had serious medical or psychological conditions. Authorities worked with civil society to repatriate foreign victims unable to acquire residence permits; the government did not report how many victims were repatriated (approximately 10 in 2020).

The government continued to implement a European Commission "Dublin" regulation of transferring asylum claimants to their original country of asylum registration, including claimants who had potentially been subjected to trafficking in another EU country. Civil society observed this policy led to the deportation of some victims who were in need of support. Authorities noted that when a "Dublin" asylum claimant was returned to a "Dublin" country of origin, Dutch law enforcement shared all investigation data with their counterparts in the country of origin to facilitate the investigation and prosecution of a case. The government extended immigration relief to victims facing deportation or repatriation

Haiti AR_000891

to countries with a high rate of COVID-19 infections and to victims who could not return to their home countries due to travel restrictions; the government allowed identified victims to stay two to six weeks beyond the three-month reflection period in specialized shelters for trafficking victims or in asylum centers.

## PREVENTION

The government increased efforts to prevent trafficking. The Human Trafficking Task Force, chaired by the chief national prosecutor and composed of local and national government authorities, the private sector, and NGO representatives, set long-term anti-trafficking policies, while MJS led the implementation and coordination of anti-trafficking efforts; the task force met four times. The government continued implementing the 2018 NAP, focused on improving information sharing among stakeholders, identifying more victims, strengthening local governments' anti-trafficking programs, and increasing efforts against labor trafficking. Several NGOs criticized the NAP for its lack of measurable goals and monitoring tools, although the government issued a report in November 2021 on its progress implementing the NAP. In December 2021, the government committed €2 million ($2.27 million) to fund the 2023-2027 NAP, the first time the government dedicated money directly to NAP implementation. The four Kingdom countries agreed to update an existing memorandum of understanding on human trafficking and migrant smuggling in 2022. The government began drafting a NAP to protect children on online platforms, including to prevent child trafficking. The national rapporteur, tasked with monitoring policy implementation, gathering and reporting statistics, and making recommendations to the government, published a report that analyzed victim statistics from 2016-2020 and a 2015-2019 report on sexual violence against children. The mandate of the national rapporteur did not extend to the BES islands; therefore, the office could not conduct research there. Observers reported the government increasingly sought survivor input in crafting anti-trafficking laws, regulations, policies, and programs. A December 2021 study by the Dutch Association of Local Governments found that approximately 60 percent of municipalities were developing or implementing an existing anti-trafficking policy; the government worked with several municipalities to launch a pilot program to develop and share innovative best practices at the local level.

The government continued multiple awareness campaigns, some of which were conducted by local governments or through NGOs. The government funded an awareness raising roadshow focused on the exploitation of youth. More than 50 percent of municipalities conducted inspections of commercial sex establishments, which included screening for trafficking indicators; the government did not report the number of inspections conducted nor if it identified any trafficking victims as a result of these inspections. Although legalized, the government prohibited commercial sex for multiple months in 2021 due to pandemic-related restrictions, leading those organizing commercial sex to shift to online platforms and into private residences; this change made it more challenging for authorities to conduct inspections. The government continued supporting two "innovation field labs" in cooperation with a foreign university to bring together stakeholders to develop new methods to counter trafficking. The government provided assistance and training overseas, and it funded anti-trafficking programs in victim source countries, including campaigns in Africa and the Middle East to raise awareness about the risks of human trafficking and smuggling when migrating. The government, in cooperation with an international organization, launched a program to improve anti-trafficking law enforcement coordination in Niger and Nigeria.

Although observers noted the government's increased focus on labor exploitation, in particular the government's attention to the living situation and labor conditions of migrant workers during the pandemic, experts expressed concern that ambiguity regarding the legal distinctions between labor trafficking and poor labor practices made it difficult to effectively tackle labor trafficking. The labor inspectorate implemented a new data processing mechanism to share information with the police to increase coordination on potential labor trafficking cases. In November 2021, the government amended the Foreign Nationals Employment Act to increase the duration of work permits for foreign nationals from non-European Economic Area countries from one year to a maximum of three years. The same month, following media reports of possible human

trafficking among Asian migrant cooks, the government terminated the special work permit scheme for the Asian hospitality sector. Eight industries were actively involved in the government's Covenant on Reducing Human Rights Violations in Supply Chains, and two industries (wind energy and agriculture/horticulture) were in the process of joining. The government began developing corporate social responsibility legislation to ensure Dutch companies incorporate human rights and environmental due diligence throughout their supply chains. In advance of the implementation of legislation criminalizing the solicitation of a sex trafficking victim, the government launched an awareness campaign in December 2021 targeting consumers of commercial sex. The government continued to implement a national plan against child sex tourism, screened for potential child sex tourists at airports in cooperation with foreign governments, and maintained a police liaison at the Dutch embassy in Thailand, a position responsible for monitoring criminal activities in the region, including human trafficking. The government supported NGO-conducted projects to counter child sex tourism and funded an NGO-operated reporting center to encourage travelers and flight staff to file reports of suspected child sex tourism. The government continued training immigration, hotel, aviation, customs, and labor inspection staff in methods to identify victims and child sex tourists. The government continued its collaboration with Liechtenstein, Australia, and the UN to explore methods to detect and disrupt financial flows associated with trafficking. The foreign ministry continued to conduct outreach to domestic workers associated with foreign diplomats, without their employers present, on how to report cases of abuse. A government-funded NGO maintained a victim assistance hotline during regular business hours. The hotline received 2,130 calls in 2021, compared with 3,782 calls in 2019; the government did not report if any of these calls resulted in trafficking investigations.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the Netherlands. In contrast to previous years, stakeholders identified more labor trafficking cases than sex trafficking in 2020. Labor traffickers exploit adults from Eastern Europe, Africa, and South and East Asia, and Latin America in industries such as catering, retail, inland shipping, leisure river cruises, agriculture, horticulture, hospitality, domestic servitude, and forced criminal activity. There has been a notable increase in victims from Africa, particularly Nigeria and Uganda. The number of European victims, particularly from Eastern Europe, rose sharply in 2020. Thousands of Ukrainian refugees, predominantly women and children fleeing Russia's war on Ukraine, have crossed European borders, including those of the Netherlands, seeking sanctuary and are vulnerable to trafficking. For the first time in several years, Dutch nationals were not the leading nationality of victims in 2020 or 2019. Refugees and asylum-seekers, including unaccompanied children and children in government-run asylum centers, are vulnerable to labor and sex trafficking. Over the last five years, more than 1,600 foreign children have left refugee centers to unknown destinations and remain highly vulnerable to exploitation. Criminal groups force Romani children into pickpocketing and shoplifting rings. The Netherlands is a source country for child sex tourists. Traffickers are overwhelmingly male and almost half of trafficking suspects are Dutch; the average trafficker is younger than 35 years old.

Human traffickers exploit foreign victims in the BES islands. Increasingly, traffickers exploit Venezuelan women in sex trafficking on the BES islands. Local authorities believe labor traffickers also exploit adults in domestic servitude and in the agricultural, retail, and construction sectors. Women in commercial sex and unaccompanied children are highly vulnerable to trafficking on the islands, and some migrants in restaurants and local businesses may be vulnerable to debt bondage.

## NEW ZEALAND: TIER 2

The Government of New Zealand does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact

of the COVID-19 pandemic on its anti-trafficking capacity; therefore New Zealand remained on Tier 2. These efforts included investigating three potential cases of trafficking, finalizing new training modules, and creating a new visa category and reporting mechanisms for exploited migrant workers. However, the government did not meet the minimum standards in several key areas. The government did not initiate any prosecutions, convict any traffickers, or identify any victims. Officials did not have written procedures for victim identification, and the government has never reported identifying an adult victim of sex trafficking.



NEW ZEALAND TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase efforts to identify victims through proactive screening of vulnerable populations, including by drafting and finalizing appropriate victim identification guidelines for government officials. • Increase efforts to proactively investigate and prosecute sex and labor trafficking cases and sentence convicted traffickers to adequate penalties, which should involve significant prison terms. • Establish a national referral mechanism to ensure victims—including New Zealand citizens—are appropriately identified as trafficking victims and referred to services and track the number of victims identified by authorities. • Amend the trafficking statute to explicitly define the sex trafficking of children as not requiring the use of deception or coercion. • Take steps to improve potential victims' access to services and ensure government-funded services are suitable for trafficking victims. • Distribute materials to raise public awareness of all forms of human trafficking. • Increase resources for anti-trafficking law enforcement. • Improve the content and distribution of materials explaining migrant workers' rights and mechanisms for reporting exploitation. • Increase coordination with NGOs, social service providers, and other civil society stakeholders on anti-trafficking efforts, including victim identification and assistance. • Provide anti-trafficking training to diplomatic personnel.

## PROSECUTION

The government maintained inadequate anti-trafficking law enforcement efforts. The Crimes Act of 1961, as amended in 2015, criminalized sex trafficking and labor trafficking. Section 98D (trafficking in persons) criminalized all forms of labor trafficking and some forms of sex trafficking and prescribed penalties of up to 20 years' imprisonment, a fine not exceeding 500,000 New Zealand dollars ($342,470), or both; these penalties were sufficiently stringent and, with respect to the forms of sex trafficking covered under the provision, commensurate with the penalties prescribed for other serious crimes, such as rape. Inconsistent with international law, Section 98D required a demonstration of deception or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking. However, Section 98AA criminalized all forms of child sex trafficking under its "dealing in persons" provision and prescribed penalties of up 14 years' imprisonment, which were sufficiently stringent and commensurate with the penalties prescribed for other serious crimes, such as rape. The government sometimes utilized the Prostitution Reform Act (PRA) to prosecute child sex trafficking crimes, including Sections 20 and 21 which criminalized the facilitating, assisting, causing, or encouraging a child to provide commercial sex acts, in addition to receiving earnings from commercial sex acts provided by a child. These sections of the PRA prescribed penalties of up to seven years' imprisonment, which were significantly lower than those available for trafficking offenses under Section 98D and 98AA of the Crimes Act.

The government initiated investigations of three potential cases of trafficking but did not initiate any prosecutions or convict any traffickers; this was compared with eight investigations, two sex trafficking prosecutions, and conviction of seven sex traffickers in the previous reporting period. Following the enactment of the trafficking law in 2015, the government has exclusively used Section 98D to prosecute labor trafficking crimes and has never prosecuted a sex trafficking crime or a case of internal trafficking under Section 98D. The government required the Attorney General to approve any charges under Section 98D before authorities could initiate court proceedings.

An anti-trafficking operations group, composed of immigration authorities, police, the children's ministry, and other agencies, continued to meet to increase law enforcement coordination. The Labour Inspectorate (LI) investigated forced labor complaints but worked mainly within the civil legal system, which may have contributed to the lack of criminal prosecution of forced labor crimes when authorities did not refer cases for criminal investigations. Immigration New Zealand's (INZ) serious offences unit investigated trafficking cases that involved immigration violations; however, according to some observers, there was a reluctance within INZ to pursue trafficking charges and the agency did not consistently coordinate with prosecutors before deciding to pursue charges. In addition, LI and INZ reportedly did not consistently respond to or investigate complaints made by exploited migrant workers, and despite finalizing a strategy in early 2021 to formalize their collaboration, the agencies reportedly did not effectively coordinate to investigate potential trafficking cases. INZ and New Zealand Police (NZP) completed a protocol in October 2021 aimed to improve coordination between the agencies during joint investigations, including on trafficking cases. Police reportedly did not proactively pursue trafficking cases due to capacity constraints, indicating that police did not understand the gravity of the crime and failed to hold traffickers accountable. In addition, the government did not adequately train police officers to identify indicators of trafficking among victims of domestic or family violence, including in cases where traffickers forced adult victims into commercial sex, and therefore the crime often went unnoticed by authorities. Some experts previously noted that the lack of efforts by law enforcement to treat sex trafficking cases appropriately minimized the prevalence of the crime and resulted in weak efforts to hold traffickers accountable and protect victims.

The Ministry of Business, Immigration, and Employment (MBIE) finalized new training modules for immigration officers, labor inspectors, and other frontline officials on identifying and investigating trafficking, interviewing victims, and processing visas for victims; the government delivered the training to INZ staff during the reporting period. NZP continued to require anti-trafficking training for all detectives and included a trafficking and smuggling chapter in its police manual. The government also provided anti-trafficking training to police child protection specialist teams and criminal investigations branch managers; Employment New Zealand conducted "train the trainer" sessions for six officials. The government did not report training prosecutors or judiciary officials, and one observer reported the government did not adequately train labor inspectors to investigate potential trafficking crimes. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking offenses.

## PROTECTION

The government maintained insufficient victim identification and protection efforts. For the second consecutive year, the government did not formally identify any victims of trafficking. Although the government delivered training to some officials that included guidance on victim identification, government agencies did not have formal written procedures for victim identification. The government used a process to formally certify a foreign person as a trafficking victim, enabling their access to a specific visa category for victims of trafficking and basic services such as health care; however, the government did not certify any victims using this process. The government lacked a system to formally recognize all trafficking victims, including victims from New Zealand. One NGO reported the government's criteria for the certification of victims was not publicly available and it was unknown if or how victims could appeal a decision. While the government did not require victims to be certified or formally identified as trafficking victims to access support services, a lack of recognition by the government that traffickers had exploited them may have inhibited victims' ability to obtain specialized services. The absence of a system to formally recognize all victims of trafficking and track the number identified by authorities may have

impeded the government's ability to identify trafficking trends and develop effective responses. The government has never certified a foreign victim of sex trafficking. Despite evidence that traffickers have forced adults, particularly female victims of family violence, into commercial sex in New Zealand, the government has never identified an adult New Zealander as a victim of sex trafficking. NZP had legal limitations on its ability to proactively screen for sex trafficking victims, including among New Zealand citizens, within the legal commercial sex industry, which was primarily regulated by the Ministry of Health (MOH). For example, due to regulations prohibiting police from inspecting legal brothels without a complaint, police relied on MOH officials and an organization that works closely with individuals in commercial sex to report potential criminal violations; however, the government did not report providing training to the organization's or MOH's staff on definitions or indicators of sex trafficking or procedures for the referral of trafficking victims to services. The government delivered training to INZ airline liaison officers posted overseas to improve their ability to identify suspected trafficking victims among persons traveling to New Zealand.

The government allowed for a reflection period, the length of which depended on the individual needs of each victim, for victims to recover before deciding whether to cooperate with law enforcement. The government did not allocate funding specifically to assist trafficking victims or provide services designed for trafficking victims. However, trafficking victims were eligible to receive government-funded services available for all victims of serious crimes provided through arrangements with local community groups, and the government provided temporary housing, medical services, employment assistance, and other social services, as well as emergency grants in cases involving debt-based coercion.

Observers reported a lack of adequate services available for child sex trafficking victims, services were not easily accessible for victims of both labor and sex trafficking, and officials did not provide clear guidance to some NGO service providers seeking government assistance. The government could fund travel and accommodation expenses for victims who had returned to their home countries to travel to New Zealand and participate in court proceedings, but it did not report funding such expenses for trafficking victims during the year. The law authorized the extension of temporary residence visas to certified foreign trafficking victims for up to 12 months, which also made them eligible for legal employment, and foreign victims facing hardship or retribution in their home countries could apply for a residency visa. During the reporting period, INZ granted residency visas to 13 trafficking victims and their family members, as well as up to five work visas. INZ updated its trafficking website to include information on visas for trafficking victims and brochures in nine languages; however, the updated page included an incorrect definition of trafficking that required the movement of a person. The law allowed victims to receive restitution from criminal proceedings, and victims could seek compensation from assets forfeited in criminal cases through civil claims; however, the government did not report if any victims received restitution or compensation during the reporting period.

## PREVENTION

The government increased efforts to prevent trafficking. INZ chaired the government's interagency working group on trafficking and operated a team responsible for coordinating government anti-trafficking efforts. In January 2022, the government published the first report documenting its efforts to implement the March 2021 "Plan of Action against Forced Labor, People Trafficking and Slavery." INZ held an observatory role within an anti-trafficking advisory group co-chaired by two civil society organizations. The government established an advisory group composed of government officials, NGOs, businesses, academics, and trade unions to consider legislation addressing human trafficking in supply chains. The government did not report sufficient efforts to raise awareness of sex trafficking, although it continued to maintain webpages and distribute pamphlets to raise awareness of trafficking indicators and the availability of support services. There remained a lack of sufficient efforts to increase public awareness of trafficking, with low levels of understanding of the crime across New Zealand, including among social service providers and the general public.

The government initiated a review of intercountry adoption legislation seeking to, in part, mitigate risks related to trafficking and other forms of exploitation. New Zealand's Parliament also solicited civil society input on the prevalence of migrant exploitation and gaps in legislation to address migrant exploitation. INZ held virtual meetings with leaders of migrant communities to raise awareness of migrant workers' rights in New Zealand. The government distributed guides for employers recruiting migrant workers, published information on the rights of migrant workers on government websites in 13 languages, and sent welcome emails with workers' rights information to all approved residence, work, and student visa holders. MBIE continued to distribute pamphlets, in five languages, listing who was able to legally engage in commercial sex and it provided information on how to report exploitation; however, these materials did not specifically address trafficking. In addition, many of the materials on migrant workers' rights and employment laws were not clear or distributed effectively, and some workers were unaware of their rights or how to report exploitation. The government did not operate a trafficking specific hotline; however, workers could make complaints through MBIE's employment rights hotline, which referred cases involving worker exploitation to the labor inspectorate. In addition, the government created a new migrant exploitation hotline and online reporting application in July 2021. However, there were reports that this system was ineffective, authorities did not investigate urgent complaints in a timely manner, authorities did not refer some cases to investigators, and individuals were left uncertain if authorities took their claims seriously or would provide support. Immigration authorities' delays in processing migrant workers' applications to change conditions of their visas, including changing employers, increased trafficking risks and prevented some workers from leaving exploitative conditions for extended periods of time.

In July 2021, the government introduced a new six-month migrant exploitation protection visa (MEPV) to enable exploited workers—whose visa was tied to their employer—to obtain alternative employment and remain in New Zealand while authorities investigated their cases; the government issued 87 MEPVs between July 2021 and March 2022. Nonetheless, advocates said the MEPV did not fully address exploitation facilitated by employer-linked visas and some workers may have been deterred from seeking a MEPV if they held a visa longer than six months. Government regulations banned employers who breached employment standards from recruiting migrant workers for periods of six to 24 months, and the government published a list of all offending employers on its website. Immigration officials and labor inspectors inspected legal brothels to ensure conditions complied with the law and conducted investigations and routine audits in workplaces that employed migrant workers. The law prohibited individuals or companies from charging employment premiums, such as recruitment fees; labor inspectors could initiate proceedings in the Employment Relations Authority to recover premiums and seek a penalty against violators, although authorities did not report if this occurred during the reporting period. Some sources believed the labor inspectorate was understaffed and under-resourced, which they felt limited its ability to carry out effective inspections and adequately investigate exploitative employment, including potential cases of trafficking. Observers reported penalties proscribed to unscrupulous employers in employment courts were often not significant enough to deter exploitative practices and the employers could continue operating under a new company. The government did not make efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in New Zealand. Foreign men and women from South and East Asia, the Pacific, and some countries in Latin America are vulnerable to forced labor in New Zealand's agriculture, dairy, construction, viticulture, food service, liquor retail, technology, hospitality, transport, and domestic service sectors. Unregulated and unlicensed immigration brokers operating in New Zealand and source countries, particularly in India and the Philippines, facilitate trafficking by assisting in the process to issue visas to victims. Some foreign workers are charged excessive recruitment fees and experience unjustified salary

## NICARAGUA

deductions, non- or under-payment of wages, excessively long working hours, restrictions on their movement, passport retention, and contract alteration. Some employers force migrants, whose visas are often tied to their employer, to work in job conditions different from those promised during recruitment and use intimidation tactics and false information about immigration laws to prevent victims from seeking assistance. The pandemic increased the reluctance or ability of many foreign nationals to leave New Zealand, and those who became undocumented as a result were increasingly vulnerable to exploitation. Furthermore, temporary migrant workers in sectors most negatively affected by the pandemic, such as tourism and hospitality, were increasingly vulnerable to exploitation.

While experts assessed the Prostitution Reform Act, which decriminalized commercial sex for New Zealand residents, overall increased protections for those who willingly engaged in commercial sex, traffickers continue to target vulnerable populations, such as children, migrants, and adult victims of domestic and family violence for exploitation in sex trafficking. Foreign women from Asia and South America in commercial sex are at risk of sex trafficking, especially those who do not speak English and who work in private homes and informal or suburban environments, where they are more isolated from service providers. Some international students and temporary visa holders are at risk of sex and labor trafficking. Immigration brokers and unscrupulous brothel owners subject some migrants to conditions indicative of sex trafficking, including non-payment of wages, withheld passports, physical or sexual abuse, threats of deportation, monitored movements, limited access to medical care or other social services, and excessive working hours. Some migrants are required to pay fines, bonds, and recruitment and other fees to brothel operators or brokers, which make them vulnerable to debt-based coercion. Traffickers utilized Section 19 of the PRA, which prohibited non-residents from legally working in the decriminalized commercial sex industry, to use threats of deportation or other adverse action from law enforcement to deter migrants in commercial sex from reporting verbal or physical abuse, unwanted or unsafe sexual practices, or non-payment of wages. Some gang members, boyfriends, family members, or others exploit young children and teenagers in sex trafficking by facilitating, purchasing, or forcing them to engage in commercial sex acts. Some adult women, often those who face domestic or family violence, are forced by partners to engage in commercial sex acts. Some victims are coerced into commercial sex through drug dependencies or threats by family members. One service provider reported a notable proportion of its clients reported being forced into commercial sex by their partners in order for their partners to purchase or obtain drugs and other substances. However, experts suggest the prevalence of forced commercial sex among New Zealand women is significantly under-reported and under-detected.

## NICARAGUA: TIER 3

The Government of Nicaragua does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Nicaragua remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including prosecuting eight alleged traffickers and convicting four sex traffickers. However, the government continued to downplay the severity of the trafficking problem in Nicaragua, contradicting civil society reports of increased cases during the pandemic; it did not have shelters or allocate funding for specialized victim services; the government made negligible efforts to address labor trafficking, although it remained a serious concern; and victim identification efforts remained inadequate. The government denied that traffickers exploited Nicaraguans in foreign countries, despite media reports that foreign officials identified several Nicaraguan victims. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking offenses, despite endemic corruption and widespread official complicity. The government did not cooperate with NGOs to provide protection services or include civil society in the national anti-trafficking coalition. Prosecution, protection, and prevention

efforts in the two Caribbean autonomous regions of Nicaragua continued to be much weaker than in the rest of the country.



### PRIORITIZED RECOMMENDATIONS:

Significantly increase efforts to identify trafficking victims, especially labor trafficking victims and foreign national victims. • Investigate, prosecute, and convict traffickers, including complicit officials. • Vigorously implement the National Strategy for Comprehensive Attention to Victims of Trafficking in Persons by identifying victims, including among vulnerable populations, and effectively referring victims to appropriate services. • Partner with NGOs to provide victims short- and long-term care and reintegration services. • Increase funding for victim protection, finance the trafficking fund, and provide specialized services for trafficking victims. • Fulfill the requirement under Law 896 to include the Nicaraguan Coordinating Federation of NGOs Working with Children and Adolescents (CODENI) to represent NGOs in the National Coalition against Human Trafficking (NCATIP). • Increase training for government officials—including social workers, labor inspectors, and law enforcement officials—to facilitate increased victim identification and assistance, including securing restitution. • Strengthen law enforcement and victim protection efforts in the Caribbean autonomous regions, especially through increased staff and funding. • Amend the 2014 anti-trafficking law to include a definition of trafficking in persons consistent with international law. • Annually report on progress in implementing the national action plan.

### PROSECUTION

The government increased law enforcement efforts. The Law against Trafficking in Persons of 2015 criminalized sex trafficking and labor trafficking and prescribed penalties ranging from 10 to 15 years' imprisonment; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, the law established the use of force, coercion, or deceit as an aggravating factor rather than an essential element of the crime; the penalties increased to 16 to 18 years' imprisonment for trafficking offenses involving these factors. The penalty for child trafficking increased to 19 to 20 years' imprisonment. The law also defined trafficking broadly to include all labor exploitation and illegal adoption without the purpose of exploitation.

Observers questioned the validity of government reporting on human trafficking, including law enforcement statistics; some alleged the government obscured or intentionally misclassified trafficking cases to minimize trafficking statistics. The government reported initiating four sex trafficking investigations in 2021, compared with one investigation in 2020 and six in 2019. The government prosecuted eight alleged sex traffickers in 2021, compared with prosecuting four alleged sex traffickers in 2020 and one in 2019. The government held seven of eight accused traffickers in pre-trial detention; it levied charges against the eighth in absentia. The government convicted four sex traffickers, compared with not convicting any traffickers in 2020, 2019, and 2018. The court sentenced one of the convicted traffickers to eight years and six months' imprisonment; it sentenced the remaining three traffickers, also convicted of money laundering, to 20 years' imprisonment plus a fine.

The government did not report any law enforcement efforts to combat labor trafficking for the second consecutive reporting period, nor did it report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes. However, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Civil society made reports indicative of official complicity in trafficking crimes, including

Haiti AR_000895

association between public officials and brothels where child sex trafficking may have occurred. Although corruption was endemic, the government did not have policies to prevent official complicity in trafficking, contributing to an environment of impunity and potentially decreasing the likelihood of victims reporting trafficking crimes. The government did not report any instances of international coordination or cooperation on trafficking cases.

## PROTECTION

The government maintained minimal protection efforts. The government's reporting on victim identification and protection was unreliable and often varied from source to source. The government reported identifying two sex trafficking victims, both girls, in 2021, compared with one victim in 2020 and eight in 2019. In a separate forum, the government reported identifying six child trafficking victims in 2021. The government reported NGOs and other organizations did not identify any additional victims; however, civil society reported their organizations continued to identify and support victims. Both identified victims were Nicaraguan nationals; the government did not identify or support any foreign trafficking victims exploited in Nicaragua or Nicaraguans exploited abroad, despite media reports of several cases where Costa Rican and Spanish officials identified Nicaraguan victims exploited in sex and labor trafficking. The government did not report implementing or training officials to use protocols it reportedly developed in 2019 to facilitate identifying child and adolescent trafficking victims among vulnerable populations. Officials did not identify any victims in the Caribbean autonomous regions, where endemic poverty and limited official presence contributed to significant trafficking vulnerability.

Despite identifying two child sex trafficking victims, the government did not report providing medical or psychological care to any trafficking victims in 2021. The government reported it provided unspecified support for six trafficking victims—a figure that may have included victims reflected in the government's official statistics for 2021 or identified in previous reporting periods—aiding law enforcement investigations or prosecutions. The government reported agencies had allocations for trafficking victim protection in the national budget, but these did not provide for specialized services or shelters, nor did the government disclose figures for the allocations. The government did not indicate whether it could provide appropriate services to male victims, victims with disabilities, or LGBTQI+ victims. Government entities did not coordinate or collaborate with civil society organizations on victim identification or assistance. NGOs reported there had been minimal, if any, communication with the government on victim services since 2018; observers indicated the government's restrictive relationship with civil society significantly worsened during the reporting period. The government continued its practice of revoking the registration of civil society organizations, forcing the closure of at least one shelter providing a range of services to women victims of violence, including trafficking, in 2021.

The government did not fund or support NGOs providing the majority of available victim protection services in the country, leaving victims without vital assistance. The government did not provide shelter or housing support to any trafficking victims in 2020. There were no trafficking-specific shelters in Nicaragua and, in general, capacity for long-term services was minimal; the government did not provide extended shelter, and NGOs had a limited ability to provide such care. The government's unofficial policy of placing victims with family members, in the absence of shelter options, put trafficking victims at risk of re-victimization by family members who may have been complicit in their exploitation. There were no shelters available for men. The Ministry of Family coordinated services for child trafficking victims, including medical and legal services and access to education; officials could refer child trafficking victims to "special protection centers," but the government often returned child victims to their families' care, despite risk of re-victimization. Observers identified a lack of adequate services across the entire country.

Law 896 established a dedicated fund for victim protection and prevention activities to be financed through budget allocation, donations, and assets seized from traffickers. However, for the seventh consecutive year, there was no indication that the government made the fund operational. Law 896 provided victims the ability to testify in advance

of the trial and allowed testimony via video or written statement to encourage participation and protect a victim's identity; however, the government did not report using these provisions. Victims could obtain compensation by filing civil suits against traffickers; however, NGOs reported the lack of streamlined procedures for trafficking victims and lengthy case timelines made the process unduly burdensome. There was no record that victims had ever exercised this right. Due to frequent misclassification of trafficking cases and a lack of formal identification procedures, authorities likely detained, arrested, and deported some unidentified trafficking victims. The government did not report efforts to screen for or identify trafficking victims among migrant populations or individuals in commercial sex. Nicaraguan law provided for humanitarian visas for foreign trafficking victims, but the government had not identified any foreign victims since 2018.

## PREVENTION

The government decreased its already minimal efforts to prevent trafficking. The government reported the NCATIP led 17 working committees and met monthly, although civil society reported the coalition and its committees made little contribution to capacity building and awareness raising on trafficking. While the government reported the NCATIP engaged with a select group of international civil society organizations, it excluded local organizations, including CODENI, from the coalition's activities; Law 896 required the NCATIP to include CODENI in its proceedings. Observers considered the NCATIP to be ineffectual as an anti-trafficking entity and reported the apparent dissolution of most of its regional bodies; only three or four regional committees remained. The government had a national action plan for 2018-2022, which focused on awareness raising; increasing technical capacity to investigate, prosecute, and sentence traffickers; protecting the rights of victims and witnesses and providing assistance; and monitoring and implementing the plan. The government did not report, and civil society did not observe, efforts to research or monitor trafficking in the country. The government reported it conducted trafficking awareness events through the NCATIP's working committees but did not specify the focus or format of these events; however, civil society organizations were not aware of any government awareness campaigns conducted during the reporting period. The government continued to maintain two 24-hour crime hotlines that could process trafficking complaints and provide information on trafficking and gender-based violence, but it did not initiate any investigations or identify any victims based on hotline calls.

During the reporting period, Nicaraguans continued to encounter problems obtaining national identification cards, which increased their vulnerability to trafficking and limited their ability to access public services. The government required private employment agencies to register to permit government oversight and established minimum wages and maximum hours for adult and adolescent domestic workers; it did not report identifying forced labor in these sectors. The government did not report any efforts to inspect bars or nightclubs suspected of engaging in trafficking or any efforts to reduce demand for commercial sex. The government reported it took no action to reduce demand for child sex tourism, suggesting the government may have discontinued a previously reported Ministry of Tourism program to increase awareness of child sexual exploitation in the tourism industry. NGOs reported ongoing concerns about child sex tourism in the country; however, authorities did not investigate, prosecute, or convict any tourists for child sex trafficking. The government did not provide anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Nicaragua, and traffickers exploit victims from Nicaragua abroad. Women, children, and migrants in Nicaragua are especially vulnerable to trafficking. Traffickers subject Nicaraguan women and children to sex trafficking within the country and in other Central American countries, Mexico, Spain, and the United States. Victims' family members are often complicit in their exploitation. Traffickers take advantage of Nicaraguans' desire for economic opportunity through fraudulent offers of higher pay outside the country for work in restaurants, hotels, domestic service, construction, and security. More than half of Nicaraguans who migrate to—or are forcibly displaced to—other Central

**NIGER**

American countries and Europe are reportedly vulnerable to and have been victims of sex and labor trafficking, both in transit and after they reached their destinations. Traffickers increasingly use social media sites to recruit their victims. Traffickers often recruit their victims in rural areas or border regions with false promises of high-paying jobs in urban centers and tourist locales, where they subject them to sex or labor trafficking. Nicaraguan women and children are subjected to sex and labor trafficking in the two Caribbean autonomous regions, where the lack of strong law enforcement institutions, rampant poverty, a higher crime rate, and lingering impacts of hurricanes Eta and Iota increase the vulnerability of the local population. In addition, experts report traffickers often target (for sex and labor trafficking) Nicaraguan children whose parents leave the country to work abroad. Traffickers exploit Nicaraguan adults and children in labor trafficking in agriculture, construction, mining, the informal sector, and domestic service within the country and in Costa Rica, Panama, Spain, the United States, and other countries. Traffickers force some children to work in artisanal mines and quarries. Observers report traffickers exploit children through forced participation in illegal drug production and trafficking. Children and persons with disabilities are subjected to forced begging, particularly in Managua and near tourist centers. Traffickers subject some male migrants from Central American countries transiting Nicaragua en route to Costa Rica and Panama to labor trafficking. Cuban nationals working in Nicaragua may have been forced to work by the Cuban government. Nicaragua is a destination for child sex tourists from the United States, Canada, and Western Europe.

## NIGER: TIER 2

The Government of Niger does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Niger remained on Tier 2. These efforts included increasing trafficking investigations, prosecutions, and convictions and implementing the national referral mechanism (NRM). The government referred all identified victims to care, including to the government-operated trafficking shelter. However, the government did not meet the minimum standards in several key areas. The government reported minimal law enforcement action to address hereditary slavery and child forced begging. The government identified fewer trafficking victims. Niger's law did not include penalties for adult sex trafficking commensurate with those for other serious crimes, such as rape.



NIGER TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:
Increase efforts to investigate and prosecute trafficking crimes and sentence convicted traffickers, including individuals who exploit victims in traditional forms of hereditary slavery and child forced begging, to significant prison terms. • Train judicial, law enforcement, and front-line officials on the 2010 anti-trafficking law and Article 270 of the penal code. • Amend the 2010 anti-trafficking law to increase the base penalties for adult sex trafficking so they are commensurate with those for rape or kidnapping. • Disseminate and train officials on the NRM to increase proactive victim identification and referral to services. • Proactively screen for trafficking indicators among vulnerable populations, including migrants, IDPs, communities historically exploited in traditional slavery, children exploited in forced begging, children associated with armed groups, and Cuban overseas workers. • Increase

availability of comprehensive victim services in coordination with civil society. • Increase coordination with regional, sub-regional, and international law enforcement organizations to investigate and prosecute transnational trafficking cases, separate from smuggling cases. • Continue to fund and empower the National Coordinating Commission for the Fight against Trafficking in Persons (CNCLTP) and the National Agency for the Fight against Trafficking in Persons and the Illicit Transport of Migrants (ANLTP/TIM) to execute their mandates.

### PROSECUTION
The government increased prosecution efforts. Order No. 2010-86 on Combating Trafficking in Persons, enacted in 2010, criminalized sex trafficking and labor trafficking. The law prescribed penalties of five to 10 years' imprisonment for trafficking offenses involving an adult victim, and 10 to 30 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent. Penalties for sex trafficking of children were commensurate with those prescribed for other serious crimes, such as rape, although the penalties for sex trafficking of adults were not. Article 270 of the penal code also criminalized slavery and prescribed penalties of 10 to 30 years' imprisonment and a fine.

The government reported investigating 33 suspects during the reporting period, including 10 for sex trafficking, seven for forced labor, and 16 unspecified. Despite court closures and case backlogs due to the pandemic, the government prosecuted 21 alleged traffickers, including nine defendants for sex trafficking, seven for forced labor, and five unspecified. This was an increase compared with investigating 17 suspects in nine cases and prosecutions of 17 alleged traffickers during the previous reporting period. Courts convicted eight traffickers (including two for sex trafficking and six unspecified), compared with four traffickers in 2020; courts sentenced four convicted traffickers to sentences between one year and five years' imprisonment and had not sentenced the remaining four traffickers by the end of the reporting period. Despite continued reporting that such practices remained prevalent, the government reported minimal law enforcement action to address hereditary slavery practices, including the enslavement of children, and child forced begging. The government did not report law enforcement statistics on investigations, prosecutions, or convictions of traffickers exploiting victims in hereditary slavery, traditional chiefs who perpetuated hereditary slavery practices, or corrupt *marabouts* (Quranic teachers) who forced children to beg. Officials reported some slavery victims refused to testify against their traffickers due to fear of retribution and cultural stigma, which may have impeded law enforcement efforts. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained concerns, and may have inhibited law enforcement action during the year. Some border officials were complicit in migrant smuggling, which may have included human trafficking operations. Some law enforcement, prosecutors, and judicial officials may have declined to investigate or prosecute hereditary slavery or forced begging crimes involving traditional chiefs or *marabouts*. Media reported a Nigerien descendent of slavery filed a suit during the reporting period with the ECOWAS Court of Justice on behalf of 260 families against the Nigerien government for tolerating slavery and serfdom and for inaction in stopping practices preventing survivors of slavery and their descendants from owning land; the case remained pending at the end of the reporting period.

The government, through the ANLTP/TIM and in collaboration with civil society, trained judicial officials, law enforcement, front-line protection workers, consular officials, and other stakeholders on the 2010 anti-trafficking law, proactive victim identification and referral, and investigative procedures. Observers reported increased awareness of trafficking among law enforcement across Niger's migration corridor, including the Maradi, Zinder, and Agadez regions; however, limited resources restricted officials' ability to identify trafficking cases and effectively monitor the country's porous border. The government signed a memorandum of understanding with the Government of Nigeria to formalize and operationalize law enforcement and intelligence sharing of trafficking cases. The two governments, with support from a foreign donor and international organization, formed a joint technical working group to coordinate interventions of transnational trafficking cases.

## PROTECTION

The government maintained protection efforts. The government did not compile comprehensive victim identification statistics. Pandemic-related border closures impacted security force and law enforcement mobility and consequently reduced their ability to proactively identify victims. The government identified 52 trafficking victims, compared with 95 victims identified the previous reporting period. The government referred all 52 identified victims to care. An international organization identified and assisted an additional 75 trafficking victims. The same international organization, with some government support, provided support and reintegration services to thousands of Nigerien and foreign national migrants expelled from Libya and Algeria, including potential trafficking victims.

The government coordinated victim identification and protection efforts through its NRM, which identified roles for prosecutors, judges, law enforcement, labor inspectors, diplomats, international organizations, NGOs, and union actors. The ANLTP/TIM, in collaboration with an international organization, trained front-line law enforcement and protection actors on the NRM and conducted quarterly reviews to assess its implementation and areas for improvement. The government continued to operate a trafficking-specific shelter in Zinder; the shelter, in coordination with an international organization, provided medical, psycho-social, and legal services, as well as reintegration and repatriation assistance, to 114 victims, including victims identified during the reporting period. This included 69 women, 25 men, and 20 children; the majority of victims were from Nigeria and were exploited in sex trafficking. International organizations operated additional shelters and transit centers, which trafficking victims could access. Foreign and domestic victims received the same services. Foreign victims who faced hardship or retribution in their country of origin could apply for legal residency, including the ability to obtain employment, but authorities did not report granting these protections to victims during the reporting period.

The government provided pro-bono legal services for victims who could not afford legal representation. Access to victim services was not conditioned on cooperation with law enforcement proceedings. The law allowed victims to obtain restitution, and victims could file civil suits against traffickers; however, there were no reports this occurred during the reporting period. Some victims continued to lack access to justice, as many were uninformed about their legal rights; fear of social stigma also deterred some victims from seeking punitive action against traffickers. Due to a lack of formal victim identification procedures, authorities may have detained some unidentified trafficking victims. The government's 2017 protocol directed authorities to transfer children allegedly associated with armed groups to an international organization for care. There were no reports the government detained children for alleged association with armed groups. The government previously detained 10 children, including three boys detained for 11 months, in 2020; a juvenile judge released the children to an international organization for care and family reintegration services.

## PREVENTION

The government maintained efforts to prevent trafficking. The CNCLTP continued to serve as the ministerial coordinating task force for the government's anti-trafficking efforts, and the ANLTP/TIM was the CNCLTP's implementing body to address trafficking in persons; both convened regularly during the reporting period. In 2021, the government increased the budget for the ANLTP/TIM, allocating 32 million West African CFA francs (FCFA) ($55,000), compared with 22 million FCFA ($37,810) during the previous reporting period, and maintained the CNCLTP budget, allocating 12 million FCFA ($20,620) in 2021. The CNCLTP drafted a new 2022-2026 anti-trafficking national action plan, which remained pending adoption by parliament.

The government held some awareness raising campaigns in collaboration with civil society and distributed materials in local languages and French. The ANLTP/TIM hosted a delegation from the Democratic Republic of the Congo's Agency for the Prevention and Fight Against Trafficking in Persons to share best practices in combating trafficking, including Niger's legal and institutional model. The government did not make efforts to reduce the demand for commercial sex acts. The government, with support from a foreign donor, provided anti-trafficking training to

troops prior to their deployment as peacekeepers. Although not explicitly reported as human trafficking, there were five pending cases of alleged sexual exploitation with trafficking indicators by Nigerien peacekeepers deployed to the UN peacekeeping missions between 2015 to 2018. In two cases, the government had not yet provided the UN the information it needed to complete its investigation. The UN substantiated allegations in three cases, but the government had not reported the accountability measures taken, if any, by the end of the reporting period.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Niger, and traffickers exploit victims from Niger abroad. Hereditary and caste-based slavery practices perpetuated by politically influential tribal leaders continued. Some Arab, Zjerma, and Tuareg ethnic groups propagate traditional forms of caste-based servitude in the Tillaberi and Tahoua regions, as well as along the border with Nigeria. Slaveholders exploit victims of hereditary slavery in animal herding, small-scale agriculture, or domestic servitude; experts assert victims of hereditary slavery frequently do not self-identify or file complaints against the traffickers due to a lack of support services and ingrained dependency on the trafficker. Another form of traditional bondage known as "passive" slavery consists of powerful community members preserving complete control of former servants' individual freedoms. Estimates of the numbers of persons exploited in traditional slavery vary widely, but one report estimates it is as high as 800,000. In the Tahoua region, influential chiefs facilitate the transfer of girls from impoverished families to men as "fifth wives" for financial or political gain. This practice—known as *wahaya*—results in some community members exploiting girls as young as nine in forced labor and sexual servitude; *wahayu* children are then born into slave castes, perpetuating the cycle of slavery. Girls fleeing these forced marriages are vulnerable to traffickers, who exploit them in commercial sex due to a lack of support services exacerbated by continued discrimination based on their former status as *wahayu*.

Traffickers in Niger predominantly exploit Nigerien children and women, as well as West and Central African victims, in sex and labor trafficking. Some Quranic teachers (*marabouts*) exploit boys (*talibés*) in forced labor and begging within Niger and in neighboring countries, at times with parents facilitating the trafficking. Nigerien women recruit *talibés* for domestic labor, often leading to exploitation. Traffickers also exploit women and girls in forced begging, including in neighboring countries. Semi-organized transnational criminal groups exploit children from Niger and neighboring countries in sex trafficking and forced labor in gold, salt, trona, and gypsum mines; agriculture; forced begging; stone quarries; markets; bus stations; and manufacturing within the country. Community members working in the artisanal gold mines in Komabangou, Tillaberi, use boys and some girls in potentially exploitative conditions. Traffickers exploit girls in sex trafficking near the border with Nigeria and along the main east-west highway, primarily between the cities of Birni n'Konni and Zinder. Traffickers transit Nigerian women through Niger and exploit them in sex trafficking in neighboring countries, and traffickers exploit Nigerian and Nigerien women in sex trafficking in northern mining cities and transportation centers in Niger.

Some Nigeriens exploit young girls from impoverished families in domestic servitude through a system known as *confiage*. This system consists of parents entrusting children to a near relative or a friend of the family with the expectation the child will receive an education. However, some children are exploited in domestic servitude or sex trafficking. The ANLTP/TIM reported some parents "rent" out their children for the purposes of forced begging, as guides for vision-impaired individuals, or in domestic servitude in a phenomenon called *location d'enfant* (child rental) in the Kantche Department in Zinder. NGO and government entities note that school closures and economic vulnerability resulting from instability and the pandemic have increased children's vulnerability to recruitment by armed groups. Boko Haram and ISIS-West Africa forcibly recruit Nigerien boys to serve as child soldiers. Jama'a Nusrat ul-Islam wa al-Muslimin (JNIM), a militant jihadist organization, uses children in combat and support roles and exploits women and girls as young as 13 in forced marriage, sometimes through abduction and for the purpose of exploitation.

**NIGERIA**

Niger is a transit country for adults and children from West and Central Africa migrating through Algeria, Libya, and Morocco to southern Europe, where some duplicitous transporters—or *passeurs*—exploit migrants in forced labor or sex trafficking. European support for the government's implementation of its 2015 anti-smuggling law, intended to limit irregular migration through Niger, has forced previously open and undocumented migration underground and increased migrants' vulnerability to forced labor or sex trafficking by criminal networks. Smugglers use unpaid transportation fees as a form of debt bondage, subsequently coercing some migrants who cannot pay into forced labor or commercial sex. Illicit labor recruiters facilitate the transport of Nigerien women and children to Nigeria, North Africa, the Middle East, and Europe where traffickers then exploit victims in sex trafficking or forced labor in domestic service and the agricultural sector. Some border officials are complicit in smuggling, which may include trafficking operations. In one NGO survey of smugglers operating in Niger, almost 70 percent reported having contact with state officials to facilitate smuggling, including obtaining documents and receiving information on patrols. In the past, media noted some law enforcement and border officials reportedly accepted bribes from traffickers to facilitate the transportation of victims through the country.

Sustained mass expulsions from Libya and Algeria increased migrants' vulnerability to trafficking. In 2021, Algeria expelled more than 25,000 refugees and migrants, including Nigerien and foreign nationals, to Niger. Nigeriens comprise more than 20 percent of international migrants in Libya, where there are widespread reports of officials subjecting detained migrants to violence and abuse, including trafficking. Impoverished seasonal migrants, commonly from the Zinder region, traveling to Algeria for work remain vulnerable to forced labor and sexual exploitation. Criminal groups consisting of Algerians and Nigeriens force some Nigerien children to beg in Algeria.

Observers report poverty and lack of economic opportunity, exacerbated by climate change's effect on agricultural production and animal husbandry, are primary driving factors of human trafficking. During the previous reporting period, pandemic-related border closures resulted in an estimated 25,000 migrants stranded throughout Burkina Faso, Mali, and Niger without access to economic or social support services, which increased their vulnerability to trafficking. Additionally, experts shared anecdotal reports of an increase in unaccompanied children in Agadez during the reporting period due to pandemic-related travel restrictions. Cuban nationals working in Niger on medical missions may have been forced to work by the Cuban government.

## NIGERIA: TIER 2

The Government of Nigeria does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Nigeria remained on Tier 2. These efforts included investigating more traffickers, including two members of the Civilian Joint Task Force (CJTF) involved in alleged sex trafficking; investigating officials allegedly complicit in trafficking crimes; identifying and providing more services to victims; and developing and implementing a rapid assessment form to identify trafficking victims. However, the government did not meet the minimum standards in several key areas. The government has not prosecuted any members of the CJTF for prior child soldier recruitment or use, potential sex trafficking in government-run IDP camps remained a concern, and officials removed fewer children from conditions of forced labor. Further, corruption remained a significant concern in the judiciary as well as immigration services, and the Ministry of Defense did not finalize its handover protocol to refer child soldiers to care for the seventh consecutive year.



NIGERIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Hold complicit officials as well as individuals affiliated with the government—including security officials and CJTF members—criminally accountable for trafficking offenses, including for the sex trafficking of IDPs and past unlawful recruitment and use of child soldiers. • Enhance coordination between National Agency for the Prohibition of Trafficking in Persons (NAPTIP) and Nigeria Police Force (NPF) on law enforcement efforts—including investigating illicit centers exploiting women in forced surrogacy—and prosecute suspects while respecting the rights of the accused. • Finalize the draft protocol to refer children identified in armed conflict to civilian authorities, screen for trafficking among those detained, and provide appropriate care for all those identified as victims. • Strengthen efforts to identify trafficking victims among vulnerable groups, such as children in religious schools, IDPs, returning migrants, and children in domestic service. • Increase public awareness programming to educate more of the population on human trafficking indicators. • Expand shelter capacity for identified victims in coordination with other government entities, civil society, NGOs, international organizations, and the private sector. • Increase efforts to investigate, prosecute, and convict traffickers—including labor traffickers and those who force children to beg—and impose sufficiently stringent sentences involving imprisonment. • Work with CJTF and the UN to fully implement the child soldier action plan and confirm all children have been removed from the CJTF's ranks. • Facilitate training for local, state, and federal judges on the 2015 law, specifically the provision prohibiting the issuance of fines in lieu of imprisonment in collaboration with international partners.

### PROSECUTION

The government maintained law enforcement efforts. The Trafficking in Persons Law Enforcement and Administration Act (TIPLEAA), as amended in 2015, criminalized sex trafficking and labor trafficking and prescribed a minimum penalty of two years' imprisonment and a fine of 250,000 naira ($617) for both sex and labor trafficking; the minimum penalty for sex trafficking involving a child was seven years' imprisonment and a fine of 1 million naira ($2,470). These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping.

The government initiated investigations into 852 cases, including 323 sex trafficking cases, 168 labor trafficking cases, and 361 unspecified cases. The government continued investigating 663 cases initiated in previous reporting periods, including 416 sex trafficking cases and 247 labor trafficking cases. This compared with initiating investigations into 381 cases and continuing investigations into 452 cases during the previous reporting period. The government initiated prosecutions in 30 cases, including 14 for sex trafficking, three for labor trafficking, and 13 unspecified cases. The government continued prosecution from previous reporting periods of an additional 64 cases, for a total of 94 prosecuted during the reporting period, and 30 of the cases were prosecuted under the 2015 Trafficking Law. This compared with prosecuting 49 suspects the previous reporting period. The government secured 13 convictions, seven for sex trafficking and six unspecified, compared with convicting 36 individuals the previous reporting period. Eleven of this year's convictions were secured under the 2015 Trafficking Law and two under the 2015 Violence Against Persons Prohibition Act. The government did not report comprehensive sentencing data, but according to media reports, sentences for seven of the cases ranged from four to 14 years. Government data may have included crimes outside the international definition of trafficking.

Haiti AR_000899

Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The government reported investigating four officials for involvement in trafficking crimes—a member of the Correctional Service, one member of the Immigration Service, and two members of the CJTF. The members of the CJTF were both investigated for sex trafficking of IDPs. The government reported one case initiated against a government official during the previous reporting period was adjourned and the other was dropped after the complainant withdrew the charges. Pandemic-related court closures and a judiciary strike limited overall judicial activity. Local judges did not have the same standardized training requirements as federal and state judges, which contributed to corruption and misapplication of the law. Some judges were unfamiliar with the anti-trafficking law, which hindered the government's ability to hold traffickers accountable.

The UN delisted the government-supported CJTF as an armed group using and recruiting child soldiers, citing a "significant decrease" in child soldier recruitment. In cooperation with an international organization, the CJTF established child protection units in its forces. Despite numerous allegations, the government has not reported investigating any CJTF members for child soldiering recruitment or use. The government did not report prosecuting or convicting any suspects for sex trafficking of IDPs, though as noted above the government initiated investigations of two CJTF members for such crimes. Terrorist and other illegal armed group activity hindered law enforcement and judicial officials' actions, especially in the Northeast and Borno State. Community defense groups played a substantial role in judicial service delivery and dispute resolution.

The Nigerian army trained members of the military on sexual exploitation, human rights, and disarmament and demobilization. The government trained justice officials on justice access issues for women and girls with disabilities, a group at risk of trafficking. The government also cooperated with a local NGO to train civil society on trafficking issues. In partnership with international organizations, the government trained NAPTIP officials, law enforcement, prosecutors, judicial actors, immigration officials, and civil society on topics including drafting international anti-trafficking MOUs, shelter standards, identifying trafficking victims, and conducting victim-centered investigations. NAPTIP's Judicial Research Center in Abuja provided NAPTIP officers access to resources to strengthen trafficking cases and enhance prosecution efforts.

The Nigerian-United Kingdom Joint Border Task Force (JBTF) carried out several international counter-trafficking operations focused on disrupting, identifying, apprehending, and prosecuting members of organized crime groups within Nigeria and abroad. NAPTIP collaborated with German, Spanish, and Italian authorities on several trafficking cases, including by responding to Mutual Legal Assistance Requests. In addition, NAPTIP collaborated with the Indian government to arrest a Nigerian sex trafficker in India and repatriate the victims, who were also Nigerian. The government signed Memoranda of Understanding on counter-trafficking issues with the governments of Burkina Faso, Cote d'Ivoire, and Niger. The government also created a counter-trafficking Joint Technical Working Group with the government of Niger, which met several times.

## PROTECTION

The government increased efforts to identify victims, although services for many victims remained insufficient. The government identified 935 trafficking victims, including 521 sex trafficking victims, 129 labor trafficking victims, and 285 victims of unspecified exploitation, compared with identifying 499 victims and 812 potential victims the previous reporting period. Of the 521 sex trafficking victims, 158 were children, all girls, and the rest were women. Of the 129 labor trafficking victims, 26 were men, 37 were women, 11 were boys, and 55 were girls. The victims of unspecified exploitation included four men, 29 women, 71 boys, and 181 girls. NGOs identified an additional 52 trafficking victims, of which 43 were sex trafficking victims, including eight girls; six labor trafficking victims, including four girls; and three victims of unspecified exploitation, all children. The government and government-supported NGOs provided services to 987 individuals, including 564 sex trafficking victims, including 172 children; 135 labor trafficking victims, including 70 children; and 288 victims of unspecified exploitation, including 255 children. This compared

with providing services to 434 victims and 321 potential victims during the previous reporting period.

NAPTIP, in partnership with an international organization, developed and implemented a rapid assessment form to help NAPTIP officers identify trafficking victims and refer them to appropriate services. The government's existing national referral mechanism provided formal guidelines for law enforcement, immigration officials, and service providers. The government worked in partnership with the Network of Civil Society Organisations Against Child Trafficking, Abuse and Labour (NACTAL) to ensure appropriate referral of victims. Observers reported victim identification and referral to services remained a gap in the government's efforts.

NAPTIP's 10 zonal commands, including the Abuja headquarters, each operated a victim shelter during the reporting period, for a total of 10 shelters for trafficking victims with a total capacity of 334. A new shelter building with a proposed capacity of 96 individuals is currently being renovated. NAPTIP shelters offered six weeks of initial care, although officials often allowed victims to stay longer if they desired to do so; access to the shelters was not based on victims' cooperation with law enforcement. The government provided access to legal, medical, and psychological services, as well as vocational training, financial empowerment, family reunification, and business management skills to victims while in government shelters. If there was not space in NAPTIP shelters, agency officials referred the victim to NGOs for care. Nigerian trafficking victims exploited abroad were able to stay in shelters upon repatriation. NAPTIP had agreements with certain hospitals and clinics to provide additional medical and psychological treatment for victims, as needed. Additional government and NGO shelters provided services, including long-term shelter, to vulnerable children and victims of crime, including trafficking; authorities sometimes assigned child trafficking victims to foster homes or orphanages for care. Foreign victims had the same access to services as domestic victims. In a previous reporting period, an NGO reported some trafficking victims were held at shelters against their will and that some private shelters had substandard conditions.

NAPTIP continued to partner with an international organization and a foreign donor to implement a screening and sensitization campaign to identify sex trafficking victims in IDP camps. NAPTIP reached an unreported number of camps in the Kano area with screening, sensitization, or both. Additionally, NAPTIP officials reported coordinating with the Ministry of Defense's zonal commanders on protection issues pertaining to IDP camps by funding social workers, raising awareness of the crime among camp residents, and identifying victims.

The anti-trafficking law prohibited the penalization of trafficking victims for unlawful acts traffickers, including armed groups, compelled them to commit. However, due to a lack of consistent screening, authorities may have detained, arrested, and deported some unidentified trafficking victims. Reports from past reporting years alleged the government arrested and, in some cases, inappropriately detained for prolonged periods—reportedly for a security screening and perceived intelligence value—women and children removed from or allegedly associated with Boko Haram and ISIS-WA, including women and girls who insurgents had forcibly married or sexually enslaved.

The military released 294 children from detention between March 2021 and September 2021. For the seventh consecutive year, the government did not officially adopt the handover protocol to refer children identified in armed conflicts to civilian care providers. After release from detention, the military generally referred women and children classified through a security screening process as "low risk" or "inactive" in the conflict to a government-run rehabilitation center. Previous reports noted some trafficking victims—including women and children whom non-state armed groups forced to be combatants or exploited in sexual slavery—likely remained in detention and subject to criminal prosecution for unlawful acts traffickers compelled them to commit. The government collaborated with donors to continue the "Operation Safe Corridor" de-radicalization and rehabilitation program for combatants formerly associated with terrorist organizations. Due to poor screening procedures, noncombatants, who may have included trafficking victims, fleeing the conflict were wrongly labeled militants and detained. Previous reports alleged there were serious abuse and poor conditions in the program's detention centers.

**NIGERIA**

The government encouraged victims to assist in the investigation and prosecution of trafficking cases by providing security to victims; the government did not report how many victims assisted in investigations and prosecutions during the reporting period. In response to the pandemic, courts sometimes used video to collect testimony and allow witnesses in other jurisdictions to give evidence in criminal trials. NAPTIP, in collaboration with an international organization, the Ministry of Justice, and NGOs, ran legal hubs in Edo, Delta, and Lagos states, with the aim of enhancing victims' access to justice through legal aid counseling and representation in court. Several Nigerian embassies, particularly within West Africa, provided funding or in-kind support to repatriate Nigerian trafficking victims exploited abroad.

The government did not have a formal policy to prevent the removal of victims to countries where they would face hardship or retribution. It could grant temporary residence visas to a trafficking victim who had a pending criminal, civil, or other legal action; the government did not report any foreign victims requested this relief. In a previous reporting period, observers reported the government forcibly returned some Nigerian refugees from Cameroon.

The victims' trust fund, financed primarily through confiscated assets of convicted traffickers, was available to all victims, but the government did not allocate any funds from the trust fund to victims during the reporting period. The anti-trafficking law provided for victim restitution. The government reported its courts had awarded restitution but did not provide details. Victims could also file civil suits against their traffickers.

## PREVENTION

The government maintained efforts to prevent human trafficking. NAPTIP continued to lead the federal government's efforts to combat trafficking, although officials from the ministries of Defense, Justice, Foreign Affairs, Labor and Productivity, and Women Affairs and Social Development all had responsibilities in supporting the country's response to human trafficking. Numerous changes in NAPTIP leadership hindered the agency's effectiveness, but following the September appointment of the most recent director, the agency's efficacy improved. NAPTIP did not have resources to carry out sufficient proactive anti-trafficking operations in much of the country, and the agency's officers remained concentrated in state capitals, hindering identification and investigation of trafficking in many rural areas.

NAPTIP finalized, and the Federal Executive Council approved, the National Action Plan 2022-2026. NAPTIP inaugurated and trained four new state task forces and conducted coordination meetings with existing state task forces in the north central and southwest regions of the country. Inadequate information management technology—including basic infrastructure such as computers and internet services, especially in zonal commands outside Abuja—hindered data collection, dissemination, and research; many offices continued to use paper-based systems for case management.

NAPTIP conducted awareness raising campaigns in border communities, with a focus on communities bordering Niger, in addition to continuing its awareness-raising campaigns in schools and religious organizations. NAPTIP also began a monthly social media program to discuss trafficking topics with targeted audiences, produced an anti-trafficking television program, and, in coordination with an international organization, continued a community awareness-raising campaign. Awareness campaigns were conducted in all three major Nigerian languages and used print, electronic, and social media. The government had all campaign materials reviewed by trafficking experts.

The Ministry of Labor and Employment (MLE) conducted 10,526 labor inspections, found 3,234 violations of child labor laws, and removed 1,193 children from potential trafficking conditions; this compared with conducting 9,877 inspections and removing 2,996 children from potential trafficking conditions during the previous reporting period. Of the children removed from trafficking conditions, the government referred 120 to social services. The government trained labor inspectors on child trafficking. The government required labor inspectors were required to work from home due to the pandemic, severely limiting their ability to conduct inspections in informal work settings where child and forced labor is predominant. International observers reported the government deployed 130 officers to airports throughout the country during the reporting period to assist with screening for trafficking indicators, building on NAPTIP's

past sensitization programs at transportation hubs. The government regulated private employment agencies and had a licensing requirement for labor recruiters; the government did not report revoking any licenses for exploitative recruitment practices during the reporting period. The government prohibited worker-paid recruitment fees. Despite allegations in prior years that Nigerians traveled to Togo for child sex tourism, the government did not report efforts to address this crime. The government did not report efforts to reduce the demand for commercial sex.

The government ran a trafficking-specific hotline, which was available nationwide. The government hotline received 618 calls, 172 of which had a trafficking nexus. This compared with receiving 12,000 calls and identifying 145 potential victims the previous reporting period. The government did not report whether any of the calls led to trafficking investigations. In addition, NGO members of NACTAL took reports of trafficking, but no statistics were available.

The government provided anti-trafficking training to its troops prior to their deployment as peacekeepers. The government demoted and jailed an officer deployed on a peacekeeping mission in 2019 against whom there were substantiated charges of sexual exploitation with trafficking indicators. Government action in a similar case involving an officer in 2017 remained pending. The government provided pre-departure training to ambassadors, chiefs of mission, and deputy chiefs of mission on human trafficking principles.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Nigeria, and traffickers exploit victims from Nigeria abroad. Internal trafficking is prevalent with Nigerian perpetrators recruiting victims from rural areas, especially the country's southern regions, for exploitation in commercial sex and forced labor in domestic work in cities such as Aboekuta, Calabar, Ibadan, Kaduna, Kano, Lagos, and Port Harcourt. Traffickers exploit victims in sex trafficking, as well as in forced and bonded labor in street vending, domestic service, artisanal mining, stone quarrying, agriculture, textile manufacturing, begging, and in the tie-dye sector in the northwest and southwest of the country. Those most vulnerable to trafficking include people from rural communities, IDPs, irregular migrants, those working in the informal economy, and those with disabilities. Extreme poverty, lack of economic opportunity, corruption, insecurity throughout the country, as well as climate change-related pressure to migrate increase Nigerians' vulnerability to trafficking. Highly-organized criminal groups, sometimes linked to Nigerian cult organizations or confraternities, are responsible for most trafficking for sexual exploitation to Europe. Criminal elements recruit foreigners for labor trafficking within the country.

There are reports that teachers in Quranic schools coerce students to beg and sometimes subject them to sexual slavery. In the latest available estimate from 2010, the government estimated as many as 9.5 million boys, often from impoverished homes, were studying in Quranic schools. Observers report worsening poverty related to the pandemic's economic impacts may increase the enrollment of these schools, as well as the risks of exploitation of the children by teachers, businesses, and local community members seeking labor.

Illicit actors operate "baby factories," which the government and NGOs describe as a widespread criminal industry in the country most prevalent in the south. Experts state the phenomenon is driven by poverty and a lack of opportunity for young girls as well as the demands of the illegal adoption market and cultural pressure for large families in Nigeria. Recruiters operating out of unregulated clinics work with enforcers to control the women through childbirth. The traffickers then sell the children, sometimes with the intent to exploit them in forced labor and sex trafficking. In southern Nigeria, especially Lagos, some women drug and "rent" their infants out to street beggars to increase the beggars' profits.

Traffickers exploit children in forced labor, including in granite quarries and artisanal mines, construction, agriculture, transportation, street hawking and begging, and domestic service. Observers in previous reporting periods stated agricultural firms in rural Nigeria force Togolese to work in palm wine production in rural Nigeria. Nigeria's ports and waterways around Calabar remain transit points for West African children subjected to forced labor in Cameroon, Equatorial Guinea, and Gabon. During a previous reporting period, NGO and media sources reported

Haiti AR_000901

Nigerian traffickers compelled Cameroonian child refugees, displaced by Cameroon's Anglophone crisis and staying in camps in Nigeria, to work in forced labor in domestic service and, in some cases, into sex trafficking; there were allegations some parents were involved in selling their children.

Authorities identified Nigerian trafficking victims—often exploited by Nigerian traffickers—in countries in Africa, Europe, and the Middle East during the reporting period. Criminal groups and brothel owners exploit Nigerian women and girls in sex trafficking within Nigeria and throughout Europe, including in France, Italy, Spain, and Austria. Traffickers commonly send victims to Italy, Spain, and the United Kingdom for sexual exploitation. According to reports, 80 percent of women in Spain's unlicensed brothels are victims of sex trafficking, with Nigerians forming a large percentage of that population. While some sex trafficking victims arrive in Europe believing they will be in commercial sex, traffickers coerce them to stay in commercial sex by altering working conditions and increasing victims' travel debts. Traffickers often threaten victims' families in Nigeria to maintain control; illicit recruiters generally target women and girls from impoverished families and require them to take a loyalty oath to their traffickers. Some victims' parents encourage them to obey their traffickers and endure exploitation to earn money.

Trafficking victims originate from throughout Nigeria, with Edo, Delta, Kano, Abia, Ebonyi, Imo, and Kogi among the most common origin states. During a previous reporting period, an international organization noted cases of labor trafficking involving domestic workers to Turkey, the Middle East, and Gulf States increased. Reports of men coerced into sexual exploitation and drug running to Europe also increased. In a previous reporting period, an international organization reported traffickers recruited women and girls from IDP camps in Northeast Nigeria for ostensibly legitimate jobs in Europe but exploited them in commercial sex in North Africa, the Persian Gulf, and Europe. Experts stated traffickers recruit victims directly from asylum or migrant reception centers in Italy and elsewhere in Europe.

Before departure for work abroad, or upon arrival in Europe, many Nigerian women participate in a traditional ceremony with a *juju* priest; some traffickers exploit this tradition and tell the women they must obey their traffickers or a curse will harm them, which prevents victims from seeking assistance or cooperating with law enforcement. Although the Oba of Benin—the religious leader of Benin City—revoked all previously administered *juju* spells and publicly renounced sex traffickers in 2018, reports continued to note traffickers performed the *juju* ceremonies in neighboring states, such as Delta.

Traffickers transport women and children to other West and Central African countries—including Cabo Verde, Cote d'Ivoire, Mali, and Senegal— as well as to South Africa, where they exploit them in forced labor and sex trafficking; experts report mixed migration networks were well organized and involved in both smuggling and trafficking operations. Traffickers also exploit irregular migrants in forced labor and sexual exploitation at multiple stages of their journey through Northern Africa to Europe. Libyan and Nigerian illicit actors exploit Nigerians in Libya in forced labor in construction and agriculture and in commercial sex in Benghazi, Misrata, Sabha, and Tripoli; traffickers keep victims in "control houses" or "prostitution camps" near Tripoli or Misrata until they can repay travel debts.

There are approximately three million IDPs in the country and more than 337,000 Nigerian refugees in other countries; many of these IDPs and refugees are vulnerable to traffickers due to their limited access to economic opportunity and formal justice. Increasing violence stemming from expanding terrorist threats exacerbated the vulnerability of many IDPs and limited the government's ability to respond to the trafficking threat throughout much of the north. Reports indicate other IDPs, aid workers, government officials, and security forces have committed sexual exploitation—including sex trafficking—in government-run IDP camps, informal camps, and local communities, including around Maiduguri, the Borno State capital. Additionally, there were reports from previous reporting periods traffickers exploited IDPs moving to cities such as Gombe and Kano and to neighboring countries such as Niger in forced labor.

Boko Haram and ISIS-WA continued their practice of forcibly recruiting, abducting, and using child soldiers as young as 12 years of age as cooks, spies, messengers, bodyguards, armed combatants, as well as suicide bombers in attacks in Nigeria, Cameroon, and Chad. The groups continue to abduct women and girls in the northern region of Nigeria, some of whom they subject to domestic servitude, sexual slavery, and forced labor. Boko Haram routinely forces girls to choose between forced marriages for the purpose of sexual slavery to its fighters and becoming suicide bombers, with the terrorist organization frequently using drugs to control victims' behavior. An NGO reported in prior reporting periods children detained for association with armed groups in Maiduguri Maximum Security Prison in Borno state were confined with adult inmates who allegedly exploited the children in commercial sex rings in the prison.

The Nigerian military coordinated some operations with the CJTF to combat Boko Haram and ISIS-WA in northeastern Nigeria. Worsening insecurity in northeast Nigeria, as well as pandemic-related movement restrictions, prevented observers from accessing many areas in Borno State and other regions of concern to investigate allegations of child soldier recruitment or use. During the previous reporting period, an NGO alleged soldiers in Giwa Barracks sexually exploited female detainees. Despite authorities releasing some individuals from detention, the government continued to detain children as young as five years old whom authorities suspected of being associated with Boko Haram or ISIS-WA.

## NORTH MACEDONIA: TIER 2

The Government of North Macedonia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore North Macedonia remained on Tier 2. These efforts included prosecuting more defendants and implementing victim-centered approaches to reduce re-traumatization for child victims. The government identified significantly more victims and increased overall prevention efforts, such as adopting the 2021-2025 National Strategy and National Action Plan (NAP) and soliciting feedback and recommendations from trafficking survivors on the NAP and other anti-trafficking efforts. However, the government did not meet the minimum standards in several key areas. The government convicted fewer traffickers, and police continued to lack adequate funding and equipment to conduct proactive investigations. Similarly, the Organized Crime and Corruption Prosecution Office (OCCPO) did not have sufficient resources, including staff and a digital case management system, to handle all cases under its jurisdiction. While the government reactivated mobile teams, which identify most potential victims each year, it did not allocate funding to the mobile teams despite promising to do so. Local police and some border agents did not consistently screen for indicators of trafficking and, as a result, authorities likely deported some unidentified trafficking victims without referral to appropriate services or safeguards to prevent re-trafficking.



**PRIORITIZED RECOMMENDATIONS:**

Vigorously investigate, prosecute, and convict traffickers, including complicit officials, and seek adequate penalties with significant prison terms. • Allocate sufficient resources to the police and prosecutors to proactively investigate trafficking. • Allocate sufficient resources for victim protection, including to the mobile identification teams, to the shelter for trafficking victims, and in support of specialized services for adult male victims. • Increase proactive identification

**NORTH MACEDONIA**

efforts for trafficking victims and consistently screen for trafficking among individuals in commercial sex, irregular migrants, refugees, and other at-risk populations. • Train first responders on standard operating procedures (SOPs) for identifying and referring victims and consistently include social workers in all potential trafficking cases. • Fully implement written guidance to prevent penalization of trafficking victims for crimes their traffickers compelled them to commit. • Provide accommodation to potential foreign trafficking victims in safe and appropriate settings and allow victims to leave shelters at will. • Establish access to alternative housing to accommodate victims when the shelter is full. • Institutionalize advanced training for judges, prosecutors, and law enforcement on trafficking investigations and prosecutions. • Improve victim compensation mechanisms for victims, including by adopting a specific law and informing victims of their right to seek compensation.

## PROSECUTION

The government decreased law enforcement efforts. Articles 418(a) and (d) of the criminal code criminalized sex trafficking and labor trafficking and prescribed a minimum penalty of four years' imprisonment, which was sufficiently stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape. The government investigated one case with three suspects, compared with six cases with 13 suspects in 2020. The government prosecuted two defendants in two cases for child sex trafficking, compared with none in 2020. Courts convicted one trafficker in absentia for child sex trafficking and forced labor, a significant decrease compared with nine traffickers convicted for child sex trafficking and two for child sex trafficking and forced labor. The judge sentenced the trafficker to 12 years' imprisonment, compared with judges issuing sentences between four and seven years' imprisonment to 11 traffickers in 2020. Appellate courts upheld two convictions and overturned one conviction, compared with upholding three convictions in 2020. Authorities operated with limited capacity due to the pandemic, including infections and quarantine procedures causing personnel shortages.

The Combatting Trafficking in Human Beings and Migrant Smuggling Unit's Anti-Trafficking Task Force (task force) within the Ministry of Interior (MOI) led specialized investigations. OCCPO prosecuted trafficking cases and, in previous years, reported a lack of adequate personnel and delayed cases, but the government increased the number of prosecutors from 10 to 13 to handle all cases under its jurisdiction. Despite not having a specifically earmarked budget, the task force conducted proactive investigations but continued to report a lack of adequate personnel. Prosecutors did not routinely grant specialized investigative measures, such as wiretapping, for trafficking investigations. As a result, authorities relied almost exclusively on victim testimony with little corroborating evidence. Local police officers lacked an understanding of trafficking and did not consistently notify the task force of potential trafficking cases, and observers reported cases languished or were mishandled due to the absence of a digital case management system to transfer trafficking cases between different police and prosecutors' offices. The government, with technical and financial support from donors, international organizations, and NGOs, trained judges, prosecutors, and officers in the task force on various anti-trafficking issues. The government started joint investigations with Greek and Serbian authorities and cooperated with an INTERPOL investigation. The government charged a civil servant with complicity in trafficking in 2017 and a municipal inspector for trafficking in 2016; the OCCPO reported that both individuals were standing trial before the Skopje Criminal Court. The government did not report any new investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

## PROTECTION

The government increased victim protection efforts. The government identified 48 victims, compared with seven victims in 2020; 40 were victims of forced labor, two of sex trafficking, two were victims of sex trafficking and forced labor, and four were victims of forced labor through forced marriage. Of these, 36 were men, six were women, five were girls, and one was a boy; 39 were victims from

Taiwan and one from Russia. The Ministry of Labor and Social Policy (MLSP) maintained mobile teams composed of social workers, law enforcement officers, NGO staff, and psychologists in five regions to detect and identify vulnerable populations, including trafficking victims. In August 2021, the government reactivated the mobile teams after allocating the teams' resources to pandemic response efforts in 2020. From August 2021 to January 2022, mobile teams assisted 260 vulnerable people (362 children who were homeless or used the streets as a source of livelihood in 2020), including 68 potential trafficking victims (six potential victims in 2020). Mobile teams identified the majority of potential victims every year, and experts viewed the teams as a best practice in proactive identification and cooperation between civil society and government; however, the government did not dedicate specific funding to the mobile teams causing the sustainability of the mobile teams to remain in doubt. MLSP continued to dispatch social workers to screen vulnerable populations at border crossings and transit centers, and MLSP social workers and police continued to identify potential forced labor victims among predominately Romani children engaged in begging and street vending. Police, in cooperation with labor inspectors, conducted 32 inspections and identified two trafficking victims and one potential victim. Government and civil society actors continued to raise concerns that some government agencies lacked coordination mechanisms to ensure proactive identification efforts. For example, local police did not consistently screen for indicators during raids in casinos, nightclubs, and bars. Similarly, some border agents did not consistently screen for trafficking indicators at border crossings, and reports continued to document some police abuse of migrants and authorities conducting illegal pushbacks to Greece. The government maintained SOPs for the identification and referral of victims, and the Office of the National Referral Mechanism (NRM) within MLSP remained responsible for coordinating the identification and referral procedures. First responders referred potential victims to the Anti-Trafficking Unit and/or the NRM, which had authority to officially identify victims. NRM officials and social workers participated in interviews with potential victims, but law enforcement did not consistently include NRM officials and social workers at the outset of identifying potential trafficking cases.

The government allocated 1.2 million denars ($22,180) to the MOI for protection and security of trafficking victims, particularly those staying at the shelter for trafficking victims, a decrease compared with 1.76 million denars ($32,390) in 2020. However, in 2021 the government also allocated 480,000 denars (8,850) to MLSP for social services, NGO activities, mobile teams, and other types of victim protection efforts—funds the government previously diverted in 2020 to pandemic response efforts. The government also provided 465,984 denars ($8,590) for direct victim assistance at the shelter for trafficking victims, compared with 810,000 denars ($14,940) in 2020; however, this covered only a small percentage of the shelter's operating expenses, and the shelter relied heavily on funding from the international community to continue operations. The government and NGOs provided potential and officially recognized victims with protection and assistance, including food, clothing, medical assistance, psycho-social support, legal assistance, and reintegration services. In 2021, 10 official and potential victims received support (14 in 2020), including medical assistance for three victims with COVID-19. MLSP assigned a guardian from a social welfare center to victims while they were at the shelter, and MLSP-run social service centers maintained one social worker at each of the 30 centers that offer assistance to trafficking victims, including psycho-social support, reintegration assistance, education, and job placement; social service centers helped five victims enroll into school and assisted five families of victims with food and hygiene. The government did not provide specialized assistance for adult male victims. The government donated personal protective equipment and disinfectants to the shelter and accommodated victims in temporary housing while awaiting COVID-19 test results. The shelter for trafficking victims accommodated female and child victims with the capacity to house six victims, but the government did not have additional capacity to accommodate victims if the shelter was full, and it lacked longer-term housing options. The government placed identified Romani child victims in daycare centers and warned or fined their parents; in cases where courts deemed parents unfit to care for their children, the state placed the

Haiti AR_000903

children in orphanages. In 2018, the government amended legislation to accommodate domestic and foreign potential trafficking victims at the shelter; however, the transit center continued to accommodate most foreign potential victims. The shelter allowed victims freedom of movement, but the transit center did not permit foreign potential victims to leave without a temporary residence permit. In 2021, the shelter housed four victims and three potential victims (five victims in 2020), and the transit center housed 39 foreign victims (none in 2020).

Due to a lack of consistent screening efforts, authorities likely arrested, detained, and deported some unidentified trafficking victims. For example, local police detained individuals in commercial sex without screening for trafficking indicators or notifying the task force, according to experts and government officials, who also reported local police deported foreign potential victims before their two-month reflection period expired. The law permitted foreign victims a two-month reflection period to decide whether to testify against their traffickers, followed by a six-month temporary residence permit, regardless of whether they testify; no foreign victims requested residence permits in 2021. The law provided witness protection, legal aid, and 24-hour police protection; no victims required witness protection services in 2021 and 2020. In practice, courts required victims, who were voluntarily cooperating with proceedings, to remain in North Macedonia until they testified in court. However, prosecutors, with the consent of the defense, had authority to make exceptions and allow a victim to leave the country prior to testifying in court, upon giving testimony before a prosecutor, and in some cases, before a pre-trial procedure judge; two child victims testified before their alleged traffickers before a prosecutor (six victims in 2020). Prosecutors protected the identities of the two child victims and recorded the testimony in private to prevent the need to testify multiple times. Courts rarely issued restitution as part of criminal sentences, but a judge issued restitution to one victim for 400,000 denars ($7,380). While victims can claim compensation through civil proceedings, the complexity of the process often dissuaded victims from pursuing action. The government and civil society continued efforts to develop a victim compensation fund, which would allow authorities to allocate compensation to victims from seized criminal assets.

**PREVENTION**
The government increased prevention efforts. The government maintained the National Commission (NC), composed of 12 government agencies led by the national coordinator, which held bi-monthly meetings. The NC drafted its 13th annual report on government anti-trafficking efforts and adopted the 2021-2025 NAP. For the first time, the NC solicited feedback from trafficking survivors on the NAP, and separately, MLSP identified areas for improvement in the government's anti-trafficking efforts based on recommendations from survivors. The NC also supported seven municipal-level anti-trafficking commissions in implementing their local action plans. The Anti-Trafficking Secretariat, composed of government ministries, the international community, and civil society, operated under the NC and also held bi-monthly meetings. The national anti-trafficking rapporteur within the Ombudsman's Office conducted four research projects on trafficking, including monitoring trafficking cases in court. The government, in cooperation with international organizations, implemented awareness campaigns for youth, students, and the public on trafficking.

The law prohibited illegal and unreported employment and set out criteria for labor recruitment, defining the terms of employment, employer obligations, and employees' rights. However, work permits for foreigners were tied to a specific employer, and a new work permit was required to change jobs, thereby increasing a migrant workers' vulnerability to coercion and forced labor. The NC trained labor inspectors on indicators of trafficking, and the Labor Inspectorate conducted regular inspections to verify compliance with labor laws and issued fines and sanctions against those companies and owners who were out of compliance, with the ability to press charges for criminal acts. Labor inspectors, in cooperation with police, conducted 32 inspections and identified two trafficking victims and one potential victim. Labor inspectors also independently inspected 30,155 businesses for a wide range of labor law violations. The NC maintained

a "Codex of Cooperation" with hospitality and hotel companies to prevent forced labor in the tourism industry. The government informed citizens traveling abroad about potential risks of labor exploitation and fraudulent offers of employment abroad. The government did not operate a hotline, but MOI managed an application to report various crimes, including trafficking; the application received no trafficking-related reports (three trafficking-related reports in 2020). Observers reported cases of Romani children not registered at birth, and their parents lacked the registration and identification documents to access health care, social protection, and education. The government did not make efforts to reduce the demand for commercial sex.

**TRAFFICKING PROFILE**
As reported over the past five years, human traffickers exploit domestic and foreign victims in North Macedonia, and traffickers exploit victims from North Macedonia abroad. Women and girls in North Macedonia are exploited through sex trafficking and forced labor within the country in restaurants, bars, and nightclubs. Sex traffickers recruit foreign victims typically from Eastern Europe and the Balkans, including Albania, Bosnia and Herzegovina, Kosovo, Moldova, Romania, Russia, Serbia, and Ukraine. Citizens of North Macedonia and foreign victims transiting North Macedonia are exploited for sex trafficking and forced labor in construction and agricultural sectors in Southern, Central, and Western Europe. Traffickers, who are often relatives or close friends, exploit Romani children through forced begging and sex trafficking within forced marriages. In 2021, Taiwanese traffickers recruited Taiwanese workers with false promises of work in North Macedonia for the purpose of forced labor. Traffickers confiscated passports, withheld wages, restricted movement, and set up a call center where they forced the Taiwanese victims to make fraudulent calls.

Irregular migrants and refugees traveling or being smuggled through North Macedonia, particularly women and unaccompanied children, are vulnerable to trafficking by their smugglers or other migrants. NGOs report children with mental and physical disabilities were increasingly vulnerable to trafficking. Officials and observers continued to report low-ranking police officers may be complicit in trafficking, including hiding evidence, bribery, changing patrol routes to benefit perpetrators, tipping off perpetrators before raids, and/or direct involvement in organized crime.

## NORWAY: TIER 2

The Government of Norway does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Norway remained on Tier 2. These efforts included prosecuting and convicting significantly more traffickers and ordering traffickers to pay victim compensation. Additionally, the government passed a new law to allow for more accountability and transparency among medium- to large-sized companies operating in Norway, requiring those companies to conduct due diligence assessments for human rights issues and labor conditions in their supply chains. However, the government did not meet the minimum standards in several key areas. For the fifth consecutive year, the government did not report an official number of identified and assisted victims and continued to delay development of formal identification procedures, a national referral mechanism (NRM), and a comprehensive statistical system for collecting data. The government continued to focus on the undocumented status of some foreign nationals rather than screen them for trafficking indicators, subsequently some victims were penalized for unlawful acts traffickers compelled them to commit rather than identified as victims and given care. Authorities did not consistently identify potential child trafficking victims. Moreover, when authorities investigated and prosecuted a trafficking crime as another crime, victims were unable to access assistance granted to trafficking victims under Norwegian law, leaving them susceptible

NORWAY

to re-victimization. Authorities investigated fewer trafficking cases and continued to charge traffickers under non-trafficking statutes.



NORWAY TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Report annual data on the number of victims identified and assisted by the government. • Establish an NRM and victim identification procedures that receive adequate input from NGOs, define processes and roles of all relevant government agencies and front-line actors, and train those actors to ensure uniform implementation across the country. • Enhance efforts to proactively identify and assist trafficking victims, particularly children, by training relevant workers on procedures for identifying child victims and recognizing indicators. • Ensure all trafficking victims receive access to assistance regardless of whether authorities investigate and prosecute a trafficking crime as another crime. • Increase efforts to investigate trafficking cases under the trafficking statute and prosecute and convict suspected traffickers. • Screen all foreign nationals and asylum-seekers for indicators of trafficking and stay deportation of potential victims prior to screening. • Develop and implement a reliable comprehensive statistical system for collecting and collating data, including on child trafficking, victim identification and assistance, and investigations, prosecutions, and convictions. • Enhance training for investigating cases and collecting evidence against suspected traffickers. • Improve efforts to understand the demand for forced labor and identify victims of labor trafficking and refer them to assistance. • Increase training for investigators, prosecutors, and judges on applying trafficking laws and understanding different aspects of trafficking.

## PROSECUTION

The government increased law enforcement efforts. Sections 257 and 258 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to six years' imprisonment for crimes involving adult victims and up to 10 years' imprisonment for those involving child victims. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties for other serious crimes, such as rape. Police investigated 29 trafficking cases (14 sex trafficking, 10 labor trafficking, five unspecified), compared with 38 in 2020. Authorities prosecuted six alleged traffickers, an increase from zero in 2020. Courts convicted 12 traffickers (five for sex trafficking, seven for labor trafficking), a significant increase from one conviction in 2020. Sentences ranged from one year imprisonment to eight years' imprisonment and a fine. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. The Norwegian government regularly collaborated with other European governments at national and local levels to pursue investigations and prosecutions of alleged traffickers. On one joint investigation team, authorities from Norway and Romania cooperated on a sex trafficking case involving Romanian women forced into commercial sex in Norway. Authorities of Denmark, Finland, Norway, and Sweden facilitated international policing efforts and information-sharing, including on trafficking-related issues, through Nordic liaison officers stationed at 20 Nordic embassies and consulates around the world.

During the reporting period, all 12 police districts maintained anti-trafficking units. According to the Ministry of Justice (MOJ), the anti-trafficking units were vulnerable to temporary staffing gaps when districts reallocated personnel to address other priorities, such as narcotics. The MOJ noted the siloed organization of the police force was problematic in addressing trafficking because investigators in districts did not always use the same criteria to identify trafficking cases. In addition, experts reported that limited investigative capacity and knowledge of trafficking in some districts and staffing changes among police negatively impacted cooperation. The Oslo Public Prosecutors' Office reported

police investigated and referred fewer trafficking cases to prosecutors in 2021. Although officials noted an overall better understanding of forced labor, particularly forced criminality, they highlighted the need to increase efforts to investigate and prosecute forced labor cases. Most forced labor cases resulted in prosecutions on lesser charges of social dumping—whereby workers were given unacceptably low wages or unreasonable working conditions, such as long hours or inadequate living quarters, that are sub-standard compared to the law—because the burden of proof was difficult and officials did not have a good understanding of forced labor. As in previous years, investigators and prosecutors continued to charge traffickers with non-trafficking crimes, such as narcotics and "pimping," which subsequently barred victims from access to specific rights and weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. Officials noted charging traffickers as such when it was difficult to meet the burden of proof for a trafficking charge under the law, citing cases of online exploitation as particularly difficult to prosecute because traffickers hid traces of their crime via anonymous servers and other technological defenses. Experts attributed charging traffickers with non-trafficking crimes to authorities' lack of expertise, knowledge, and evidence collection and assessed more systematic training could enhance competence among investigators and prosecutors. Experts also recommended increased training for prosecutors and judges on understanding trafficking, including the different types. The National Criminal Investigation Service maintained a national police group of experts aimed at increasing the understanding and knowledge about trafficking within the Norwegian Police Authority. The group's responsibilities included knowledge-sharing between police and prosecutors, development of working methods and anti-trafficking efforts, and advancing cooperation with relevant stakeholders. The Coordination Unit for Victims of Trafficking (KOM), which coordinated the government's anti-trafficking efforts, organized several seminars for various stakeholders from national and municipal levels, as well as civil society and academia, on detecting trafficking, ensuring victims' rights, and strengthening coordination.

## PROTECTION

The government minimally maintained protection efforts. In 2021, the government continued to delay development of a comprehensive countrywide statistical system on trafficking, including victim identification and assistance data, which originally commenced in 2017. Since then, KOM and the MOJ have decided to withhold the number of identified and assisted victims until after a more formal and reliable system is in place. Subsequently, for the fifth consecutive year, the government did not report an official number of victims identified or assisted but noted identifying one potential child trafficking victim (the last reported official statistic was 262 victims identified and assisted in 2016). NGOs reported identifying 82 potential adult victims in 2021; the majority were foreign nationals. Although the government had neither an NRM nor formal identification procedures, authorities utilized informal guidelines to identify and refer potential victims. Despite these guidelines, authorities and NGOs sometimes operated under different criteria for identification and registered potential victims multiple times, leading to inaccurate and duplicative statistics. The government also implemented pandemic-mitigating restrictions, such as lockdowns and border closures, which reduced its ability to identify and refer potential victims to NGOs and other actors that provided assistance; experts noted this impact underscored the need for an NRM. NGOs reported the pandemic intensified the shift toward online commercial sex and made identifying and assisting sex trafficking victims more difficult. Furthermore, experts noted deficiencies in identifying labor trafficking victims, citing the government's lack of understanding of the demand in certain sectors for forced labor. Experts raised concerns authorities did not screen for trafficking indicators during investigations, further raising concerns authorities did not implement the non-punishment provision and instead penalized victims for unlawful acts traffickers compelled them to commit. Experts reported police did not always view criminals as potential victims. In 2021, an NGO identified one trafficking victim in prison, whom authorities released as a result of the NGO's efforts. During the reporting period, the MOJ and KOM continued to develop an NRM and maintained a working group to facilitate the process, which began in 2018. The working group's initial proposal received wide

Haiti AR_000905

criticism from various stakeholders expressing concern the proposed NRM would reduce the reflection period for victims from six months to 45 days, which could result in fewer victims assisting authorities in investigations and authorities deporting more victims while they were still recovering from their abuse. In 2021, the working group submitted a new proposal to the MOJ recommending different NRM models for strategic and operational collaboration, highlighting the pros and cons of implementing each model, and identifying areas of further assessment.

The government provided victim assistance through municipal crisis centers and government-funded NGOs. These NGOs provided foreign and domestic victims with financial, legal, and medical assistance; shelter; psychological care; and Norwegian language classes. In 2021, NGOs reported assisting 82 victims who received accommodation and follow-up support, such as counseling. Parliament allocated 35 million Norwegian kroner (NOK) ($3.99 million) to NGOs specifically for assistance services, the same amount as in 2020. NGOs reported social distancing regulations due to the pandemic dissuaded victims from seeking assistance, particularly sex trafficking victims, for fear that violating those regulations would result in deportation or imprisonment. Civil society reported that when authorities investigated and prosecuted a trafficking crime as another crime, victims were unable to access assistance granted to trafficking victims under Norwegian law. Oslo's Labor and Social Affairs Department maintained Human Trafficking Support Oslo to assist and support adult victims, including foreign victims in a reflection period and allocated 3 million NOK ($341,760) in 2021, compared with 4 million NOK ($455,680) in 2020. The Directorate for Children, Youth, and Family Affairs maintained a coordinating unit for service and assistance to child trafficking victims. The unit worked to improve procedures to identify child victims, provide training and capacity building activities, and support coordination between government authorities. Child Welfare Service was responsible for providing child trafficking victims with assistance; in 2021, it assisted one child victim, compared with zero in 2020. Authorities placed identified child victims in state-run institutions, such as orphanages, or foster care for up to six months. According to officials, authorities did not consistently identify child victims and maintain statistics. An NGO expressed concern statistics did not accurately reflect the number of child trafficking victims. To assist with the identification and investigation of trafficking cases involving children, the government maintained procedures for cooperation among police, immigration authorities, and child welfare authorities. An NGO that provided assistance to individuals in commercial sex ran a program offering training and work experience to trafficking victims through internships.

Victims under a reflection period received legal assistance, health care services, shelter, and other necessary support. In 2021, authorities granted a six-month reflection period to eight victims and limited residence permits of up to 12 months to eight victims, compared with 16 and three in 2020. Authorities granted two possible victims residence permits due to compelling humanitarian considerations (six in 2020) and one permit based on protection status. Observers raised concerns police focused more on an individual's lack of residence permit or immigration documentation than screening them for trafficking indicators, resulting in the deportation of potential victims. Despite the Directorate of Immigration maintaining written guidelines for the identification and referral of potential victims, a 2021 inspection report criticized authorities for failing to screen immigrants during deportation proceedings and for deporting potential witnesses of trafficking crimes. A public prosecutor also criticized the police for showing more concern with fulfilling deportation quotas than investigating trafficking cases. Furthermore, the continued pandemic-related closure of the Storskog border crossing with Russia in 2021 to anyone seeking protection prevented the screening of trafficking victims along the northern border. The border crossing closed again in 2022 in line with sanctions responding to Russia's further invasion of Ukraine. Sixteen centers provided victims participating in criminal proceedings with guidance and support, including legal advice and assistance applying for compensation. The law entitled trafficking victims to financial compensation from traffickers. In 2021, traffickers paid five victims compensation, totaling 446,000 NOK ($50,810). The law allowed trafficking victims from countries within the European Economic Area (EEA) candidacy for full financial reintegration support to their

country of origin. However, NGOs expressed concern that ineligibility for financial support to victims from outside the EEA, such as asylum-seekers who received rejected asylum applications, exposed them to the risk of re-victimization.

**PREVENTION**

The government increased prevention efforts. During the reporting period, the government continued to implement measures from the national action plan. Various government agencies and ministries responsible for implementation provided financial resources toward the plan's activities but did not report the amount of funding allocated in 2021. KOM published an annual report providing an overview on victim identification, challenges relating to trafficking, and relevant agencies' anti-trafficking activities. The MOJ, KOM, and UNODC coordinated on a project aimed at more accurately estimating the prevalence of trafficking in Norway; the government contracted an independent social science research foundation to lead the project, which predictably encountered various challenges due to the limited availability of statistics. The foundation projected publishing a report in 2022 documenting challenges and providing recommendations on how to obtain more reliable trafficking statistics. The MOJ funded information campaigns run by youth organizations totaling 700,000 NOK ($79,740), including one campaign targeting 13-26 year-old children and young adults on the correlation between consumption and human trafficking, as well as exploitation into sex trafficking. An NGO managed a 24-hour hotline for potential trafficking victims, available in Norwegian, English, Spanish, Arabic, and Thai. The government allocated 1.6 million NOK ($182,270) for the hotline, a decrease from 3 million NOK ($341,760) in 2020. In collaboration with other Baltic Sea Region countries, the government participated in a project establishing long-term cooperation between stakeholders and academia to educate future journalists on trafficking issues through workshops, panel discussions, and competitions. In response to an inflow of Ukrainian refugees fleeing Russia's full-scale invasion of Ukraine and arriving in Norway, the government headed a regional anti-trafficking task force through its presidency of the Council of the Baltic Sea States, with a special focus on preventing Ukrainian citizens from being exploited and developing partnerships between governments and local organizations to identify trafficking risks in local communities. During the reporting period, the government launched a new strategy to combat modern slavery, including trafficking, focused on leveraging development assistance globally. Some international projects led by Norway included decreasing the scale of prevalence, especially forced labor in the agriculture sector, with a focus on women and children in Ghana and eradicating child labor in Uganda. Norway also provided core support to Alliance 8.7 and maintained anti-trafficking grants, totaling approximately between 96.6 million and 131.7 million NOK ($11 million-$15 million). The government did not make efforts to reduce the demand for commercial sex acts.

To allow for more accountability and transparency among medium- to large-sized companies operating in Norway, Parliament passed a new Transparency Act in 2021. The act required companies that produce goods and services domestically and abroad to conduct due diligence assessments for human rights issues and labor conditions in their supply chains and ensure the public had access to information on how those companies handled adverse impacts on human rights and decent working conditions. The government continued to implement its strategy against work-related crime, including labor trafficking, by regularly conducting workplace inspections, especially at construction sites and car washes, which were known to be frequently noncompliant with the law. According to authorities, inspections have led to detecting forced labor cases in the past. The government raised awareness of Norwegian laws and regulations related to labor violations, including by hosting a seminar for the national police group of experts that focused on forced labor issues. Norwegian law prohibited recruitment agencies from charging fees to job seekers for placement services and required the labor inspectorate to monitor agencies for compliance. The Norwegian Agency for Development Cooperation (NORAD) contributed 31.6 million NOK ($3.6 million) in 2021 to the Global Fund to End Modern Slavery to combat trafficking, with a particular focus on Bangladesh and India on securing trafficking-free supply chains in selected industries and preventing trafficking in connection with migration. Additionally,

OMAN

NORAD granted funding agreements worth 190 million NOK ($21.65 million) for its Development Program to End Modern Slavery, which sought to reduce the prevalence and scope of trafficking in selected partner countries and sectors and to cooperate with multilateral and civil society organizations. Separately, NORAD pledged 190 million NOK ($21.65 million) for a three-year project (2020-2023) targeting countries in the Sub-Saharan region of Africa, with a focus on forced labor and child labor. The government also participated in a regional project to support stakeholders in combating and disrupting labor trafficking by analyzing and consolidating information, improving assistance to victims, and increasing prosecution of traffickers.

## TRAFFICKING PROFILE
As reported over the past five years, human traffickers exploit domestic and foreign victims in Norway, and to a lesser extent, traffickers exploit victims from Norway abroad. As a result of the pandemic, traffickers increasingly shifted recruitment methods from in-person to online settings, mainly through social media. Trafficking victims identified in Norway primarily originate from Eastern and Southern European countries, such as Albania, Bulgaria, Romania, and Ukraine, with the vast majority being adult women, often in their 30s with some intellectual disabilities, exploited in sex trafficking. Additional reports indicate an increase in victims from Thailand who come to Norway to reunite with their Norwegian spouses, and once in the country, traffickers exploit them in labor or commercial sex. Police report foreign organized networks exploit third-country national women, who stay in Norway for short periods of time before they are transported to other European countries, in commercial sex. Traffickers exploit women and girls in sex trafficking in massage parlors and men and women in labor trafficking, specifically in domestic service, as well as in restaurants, grocery stores, car repair shops, and the construction, fishing, and transportation industries. Traffickers subject children to forced criminal activities and other forms of forced labor, including illegal employment in car washes and private housekeeping. In recent years, authorities and civil society representatives report an increase in labor trafficking cases. In all known labor trafficking cases, potential victims are foreign workers whose traffickers are either their employers or other employees who act as facilitators. Traffickers are typically the same ethnic background as their victims. Foreign nationals and Ukrainian refugees, predominantly women and children, who are fleeing Russia's full-scale invasion of Ukraine and seeking sanctuary in Norway, are highly vulnerable to trafficking.

## OMAN: TIER 2

The Government of Oman does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Oman remained on Tier 2. These efforts included establishing a specialized court for trafficking cases, investigating more alleged trafficking crimes, and prosecuting and convicting more traffickers than in previous years. For the first time, the government identified male victims and expanded shelter services to accommodate them. The government also continued to implement its decision to eliminate the "no objection certificate" (NOC), which allowed all workers to change jobs without employer permission at the end of a contract. However, the government did not meet the minimum standards in several key areas. The government did not investigate, prosecute or, for the fourth consecutive year, convict any traffickers of forced labor of migrant workers, including domestic servitude. It continued to routinely use arbitration and administrative penalties to resolve grievances filed by migrant workers, including domestic workers, instead of investigating such cases as human trafficking crimes. The government also continued to require potential trafficking victims to have active trials to remain in the government's shelter. Despite continued reports that Omani employers' subject migrant workers to conditions of forced labor, authorities did not convict any Omani nationals for trafficking crimes during the year.

Finally, although it developed a national referral mechanism (NRM) during the year, the government had not yet operationalized the NRM at the close of the reporting period.



OMAN TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:
Significantly increase efforts to investigate, prosecute, and convict traffickers, including Omani nationals, of forced labor crimes, specifically of migrant workers, including domestic servitude. • Increase use of specialized trafficking units within the Ministry of Labor (MOL), the Royal Oman Police (ROP), and the Public Prosecutor's Office (PPO) to investigate indicators of potential trafficking crimes, specifically those that originate as labor violations. • Impose dissuasive penalties on employers who withhold their employees' passports. • Expand labor law protections to, and enforce legal protections for, domestic workers. • Operationalize the newly developed NRM and train officials on the procedures to proactively identify and refer to care both male and female trafficking victims among vulnerable populations, such as migrant workers (including domestic workers), persons in commercial sex, and those who flee abusive employers and situations of forced labor, and prevent the penalization of unidentified victims by utilizing formal screening protocols. • Ensure effective implementation of recent reforms to the sponsorship-based employment system by increasing awareness of reforms among migrant worker population and employers. • Disseminate to stakeholders the decision that allows potential victims the option to self-refer to protective services and amend the provision that stipulates they can only reside in the shelter long-term if they file charges against, or there is a corresponding prosecution of, an alleged trafficker. • Continue to expand trainings for officials involved in criminal investigations and for hotline operators to ensure accurate characterization of trafficking crimes. • Fully implement the national action plan (NAP) for 2021-2023. • Continue to conduct country-wide public awareness campaigns on all forms of trafficking, specifically targeted to vulnerable populations, including domestic workers.

## PROSECUTION
The government increased law enforcement efforts overall, but it continued to take inadequate law enforcement actions on forced labor, specifically of migrant workers, including domestic servitude. Oman's 2008 anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed punishments of three to seven years' imprisonment and a fine for offenses involving adult victims and seven to 15 years' imprisonment and a fine for offenses involving child victims. These punishments were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. In the previous reporting period, the government retained a foreign law firm to review Oman's existing anti-trafficking law and submit recommendations for improvement to the National Committee to Combat Human Trafficking (NCCHT). The government reported that it drafted new anti-trafficking legislation, focused on increasing penalties for traffickers and greater protections for victims, but that it had not yet been approved by the close of the reporting period.

The ROP and PPO continued to maintain specialized anti-trafficking units in their respective organizations. During the reporting period, the government established its first specialized court for trafficking cases; the government reported the court was staffed with judges with trafficking-specific expertise but could also handle other types of cases—including labor exploitation cases, if necessary. In 2021, the government investigated 55 alleged human trafficking cases, including 47 cases of sex trafficking and eight cases of forced begging, resulting in the arrest of 97 suspects. This was a large increase compared with the previous reporting period when the government investigated seven

alleged sex trafficking cases. Authorities prosecuted 28 alleged suspects under the anti-trafficking law for sex trafficking and eight alleged suspects under the penal code for forced begging; the government has not reported any forced labor of migrant workers, including domestic servitude, prosecutions in the last three years. This was a large increase compared with the government's prosecution of two suspects for sex trafficking in 2020. In 2021, courts convicted six sex traffickers under the anti-trafficking law and one trafficker for forced begging under the penal code; this was an increase compared with courts convicting two sex traffickers in the previous reporting period. Judges sentenced all six sex traffickers to three years' imprisonment, a fine of 10,000 Omani rials (OMR) ($25,970), and confiscation of personal assets used to facilitate each crime. The government did not provide sentencing details for the trafficker convicted of forced begging. All of the convicted traffickers were foreign nationals, and the government planned to deport and impose reentry bans on them upon completion of their sentences. Twenty prosecutions remained pending verdicts at the close of the reporting period. The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes. The government reported the PPO initially considered labor cases involving foreign workers as trafficking cases until proven otherwise but did not prosecute and convict any perpetrators for forced labor of migrant workers or domestic servitude since 2018. Instances of migrant workers subjected to conditions indicative of forced labor remained common during the year—as reported by media, NGOs, and labor-source governments, suggesting that some trafficking cases were treated as administrative, immigration, or labor law violations without investigation, particularly in the case of domestic workers. For example, during the reporting period, media reported several Zimbabwean domestic workers were subjected to conditions of forced labor by their employers in Oman; Omani officials investigated these reports but found no evidence of trafficking.

During the year, the government participated in INTERPOL's Operation Liberterra, which resulted in the apprehension of 286 suspects of human trafficking and migrant smuggling; the government provided information on at least 15 suspects during the operation. In addition, the PPO coordinated with the Government of Egypt for judicial assistance in obtaining the testimony of an unknown number of Egyptian nationals identified as trafficking victims in Oman but who were repatriated to Egypt before court proceedings commenced. The government conducted anti-trafficking training for graduating female ROP officers at the police training academy in May 2021, which focused on the legal framework for trafficking and related crimes, victim identification, and mechanisms for transferring potential cases to court; the government also returned to in-person training on trafficking topics for the ROP and other officials in November 2021. The Ministry of Foreign Affairs (MFA) continued to fund an international trafficking expert to advise and assist interagency entities in conducting training on victim-centered investigations and enhancing information-gathering techniques, as well as devising legislative improvements. The government directly facilitated and funded five trainings for officials from the MFA, ROP, and MOL on topics including the anti-trafficking law and recognizing indicators of the crime. In partnership with the national worker's union, the General Federation for Oman Workers (GFOW), the government conducted an anti-trafficking training related to trade unions' responsibility to combat the crime. The government noted the number of participants in overall trainings remained low during the year due to pandemic-related travel restrictions and social distancing measures.

## PROTECTION

The government made uneven efforts to protect victims; for the first time, it identified two boys as victims and referred them to care at the government shelter, but it identified fewer victims overall compared with the previous reporting period. In the previous reporting period, the government created and disseminated a formal screening questionnaire for officials to use in identifying potential trafficking victims among those arrested for commercial sex, labor violations, and fleeing their employer who was also their visa sponsor. ROP and PPO officials, shelter staff, heath workers, and the NCCHT used this questionnaire during the year to screen vulnerable populations for trafficking indicators; the government reported the screening questionnaire was used to screen 25 individuals,

all of whom originally called into the government's main trafficking hotline. Out of the 25 individuals screened, the government identified 16 as trafficking victims; a decrease from 29 female victims identified during the previous reporting period. Of the 16 identified victims, 13 were adult female sex trafficking victims, and three were children—one girl was a victim of sex trafficking, and two boys were victims of forced begging. The government did not identify any foreign victims of forced labor, including domestic servitude. All 16 victims were foreign nationals. No victims self-referred to the Ministry of Social Development (MOSD) shelter during the year, compared with three victims who self-referred in the previous reporting period. Previously, the MOSD shelter formally was available only for female victims; however, during the year, the government permanently expanded the shelter to provide access to male victims and subsequently allocated a separate area at the shelter for males. All 16 victims, including the two boys, received services at the government-operated shelter in Muscat during the year.

The government remained without formal referral procedures. In 2020, the government included the development and operationalization of an NRM in its most recent 2021-2023 NAP. The government completed its development of the NRM but did not launch it by the close of the reporting period. Officials continued to reactively refer some victims identified as part of ongoing police investigations to MOSD for shelter placement and medical and psychological services. Officials often referred self-identified victims to the police rather than directly to the MOSD for shelter placement. The government continued to allow potential victims to self-refer to the shelter following a policy change in 2020 that no longer required victims to file a case with the PPO for an official referral to shelter. Once a potential victim self-referred to the shelter, MOSD reported it alerted the PPO, which would formally begin an investigation to determine whether the individual was a trafficking victim. However, the government continued to stipulate that a victim had to have an active trafficking investigation in order to remain at the shelter long-term. Some source-country embassies in Oman reportedly offered victim services for their nationals but could not operate formal shelters without approval from the government, which it did not provide.

During the reporting period, the government allocated 1.79 million OMR ($4.65 million) for accommodation and victim care at its permanent shelter, which could lodge up to 50 female, male, and child victims of trafficking or other types of abuse. The shelter provided room and board, psychological counseling, legal support, monetary stipends, recreational opportunities, rehabilitation activities, resiliency training, and medical care to victims. In February 2022, MOSD signed a memorandum of understanding (MOU) with a local NGO to assist vulnerable individuals residing at the government shelter, including trafficking victims; among other services, assistance included providing airline tickets home for victims when court proceedings ended and facilitating training workshops for victims to learn new skills. During the reporting period, the government put pandemic-related mitigation measures in place at the shelter, including the provision of personal protective equipment such as face masks. MOSD, in coordination with the Ministry of Health (MOH), administered COVID-19 vaccinations to all victims residing at the shelter, and upon repatriation, it ensured testing requirements were completed per the victim's home country's regulations. Shelter administrators interfaced with judicial officials to keep victims regularly informed of the status of their legal cases. Shelter policy dictated victims could depart the premises only with a chaperone and victims were not able to work during their stay at the shelter. The government offered complimentary repatriation services to victims who did not want to remain in-country or could facilitate new sponsorship for foreign workers if they chose to stay in Oman to work after departing the shelter. The government provided foreign victims with legal alternatives to removal to countries in which they may face retribution or hardship, to include alternate employment under another sponsor; during the reporting period, the government assisted two victims in obtaining new job opportunities following their stay at the shelter, as the two individuals chose to remain in Oman to work following the end of their court proceedings. Officials permitted and encouraged some victims to stay in Oman for the duration of court proceedings; the government reported all 16 victims cooperated in criminal cases. Officials at times reportedly encouraged other victims to reach extrajudicial settlements for the sake of expediency. The government did not allow victims

**OMAN**

participating in trials the opportunity to work or leave the shelter and, therefore, victims likely experienced prolonged unemployment; this, coupled with protracted court cases, disincentivized some victims from participating in trials. Sources reported some cases ended with aggrieved workers unable to switch employers, reaching administrative settlements with their former employers, and subsequently returning to their home countries. The NCCHT upheld the tenets of its MOU with a local association to provide *Pro bono* assistance to trafficking victims involved in court proceedings, to include seeking damages on behalf of victims and pursuing labor claims via MOL mediation.

The government reported it did not arrest any undocumented workers or those fleeing their employer during the year; however, other observers noted officials detained some workers for "absconding" who intended to file grievances against abusive employers and did not consistently screen for trafficking indicators among vulnerable populations. Some employers could compel foreign workers, whose legal status remained tied to their employers, to work for lower or no wages under the credible threat of deportation. Authorities also continued to treat some potential domestic servitude cases as labor violations and did not report identifying potential victims of domestic servitude. Because authorities did not universally employ the screening mechanism among vulnerable groups, such as undocumented migrant workers—including those who fled their employer—domestic workers, and individuals in commercial sex, some potential victims may have remained unidentified in the law enforcement system.

## PREVENTION

The government maintained efforts to prevent trafficking. The NCCHT was composed of members from the MFA, PPO, ROP, Ministry of Justice and Legal Affairs, MOH, Ministry of Education, MOSD, MOL, Ministry of Information, Council of Administrative Affairs for the Judiciary, Oman Human Rights Commission, Oman Chamber of Commerce and Industry, and the General Federation of Oman Workers. In the previous reporting period, the committee adopted a NAP to Combat Trafficking for 2021-2023. In 2021, the committee actively worked to achieve the NAP's goals, which included developing the NRM, among other activities. The NCCHT did not hold a formal meeting during the reporting year due to the pandemic but reported that several members met frequently to advance counter-trafficking policies, per the NAP.

In January 2021, the government's decision to eliminate the NOC—that previously required employees to receive permission from their employers to seek new employment—entered into force. With the elimination of the NOC, the government allowed migrant workers, including domestic workers, to change employers upon completion or termination of their employment contract without employer approval. However, workers who fled allegedly abusive employers could not utilize the reform if their contract had not expired or been terminated. Additionally, the MOL General Directorate of Labor had to approve the contract with the new employer, at times delaying transfer. Anecdotal reporting suggested low awareness of this reform among migrant workers, as many workers attempted to change employers prior to the completion or termination of their employment contract; in those instances, employers could prohibit employees from leaving until their contract ended. Per Labor Law No. 35 of 2003, migrant workers could terminate a contract after providing a 30-day notice to their employer, and domestic workers could also terminate a contract with a 30-day notice period; however, domestic workers could also terminate their contract without notice in the case of abuse by the employer or a member of the employer's family, per the 2004 decision regulating domestic workers. The government reported 82,211 workers were approved to transfer jobs in 2021 without employer permission. The government reported expatriate workers could depart the country without permission at any time, but a worker's ability to do so was contingent on physically possessing a passport, having sufficient travel funds to return home, and not facing any charges, including "absconding" charges. An international organization noted that although the government allowed workers to terminate their employment and change employers without a previous employer's permission, the sponsorship system would continue to persist as long as both the employee's work and residence visas were tied to an employer. MOL circular No. 2/2006 prohibited employers from withholding migrant workers' passports but did not specify penalties for noncompliance. MOL

reported investigating 17 total passport retention complaints in 2020, compared with 82 cases the year prior; 15 complaints were resolved, and two remained under investigation by the ROP at the close of the reporting period, although the government did not report whether any of the cases were considered potential trafficking crimes.

A 2018 MOL ministerial decision stated a company must prove it has paid the past three months of an employee's salary before filing a complaint to charge a migrant worker with "absconding." Additionally, if a company filed more than five complaints in a month or more than 10 in a year, MOL would increase inspections to ensure the company complied with labor laws. If the company was not compliant, MOL would suspend its ability to operate, including the ability to receive services from MOL, for one year. The ministerial decision also created protections to prevent employers from firing employees while on leave or otherwise absent from work. During the reporting period, MOL increased inspections from 5,629 to more than 8,000 establishments to screen for trafficking indicators and build awareness against forced labor and exploitative practices among the migrant workforce. However, it did not report whether it referred any findings to the courts for administrative or criminal proceedings or referred any potential trafficking victims to care. The MOL also investigated 24,220 labor disputes, resolved 12,175, and referred 7,794 cases to authorities for adjudication; 4,251 cases remained pending at the close of the reporting period. In 2020, MOL established a dedicated counter-trafficking unit within its Inspection Department; during the reporting period, the unit conducted 880 workplace and recruitment agency inspections, and out of these inspections, officials referred four potential trafficking cases to the PPO for further investigation. Additionally, the unit received 274 complaints against recruitment agencies during the reporting year. Of the 274 complaints, it reached settlements in 85 cases and referred 116 to authorities for adjudication; 59 cases remained pending at the close of the reporting period, and 14 had an unknown status.

The labor law did not adequately include domestic workers, and the 2004 Ministerial Decision regulating their employment did not provide effective rights protections or adequate complaint mechanisms for this population. This decision established broad regulations related to monthly wages; adequate room, board, and medical care; return airfare when the employer terminates the contract; and airfare to and from the worker's home country during approved vacation days. However, the decision did not provide standards on working hours, weekly rest days, annual vacation, overtime compensation, and penalties for employers who breach provisions. The government's 2011 standard employment contract for domestic workers included provisions from the 2004 decision, and required one weekly rest day, 30 days of leave, and return flights every two years, but it had no limit on working hours or provisions for overtime pay. Some domestic workers experienced non-payment of wages, excessive work hours, passport confiscation, and physical and sexual abuse during the reporting period. In 2021, the government reported it drafted a new labor law, which reportedly included additional protections for domestic workers and victims of trafficking; the new law remained under review at the close of the reporting period.

The ROP maintained the government's central trafficking hotline and displayed its phone number on social media posts, news articles pertaining to trafficking, and the NCCHT website. The NCCHT also was able to receive notifications through its website, which provided communications in 14 languages. Separately, MOL operated a labor violation hotline, which it promoted in its video on workers' rights and responsibilities, and the MOSD operated an all-purpose helpline that also assisted potential victims in accessing the government shelter. All hotlines reportedly remained active year-round, 24 hours per day, and staffed with Arabic and English interpreters; Urdu, Hindi, and Bengali-speaking contractors were available. For the first time, officials reported the number of hotline calls received; ROP's hotline received 62 calls, MOL's hotline and website received approximately 1,200 inquiries, and the NCCHT website received 32 notifications during the reporting year. At the end of the last reporting period, the government initiated a three-month national trafficking awareness campaign entitled *Insan* (human being), that ended in May 2021. The campaign, which specifically targeted workers, victims, and offenders, educated the general community on trafficking, outlined protective services, and provided information about prevention. During the three-month campaign, the NCCHT

reported advertising and media activities featured artwork to convey trafficking indicators, such as passport confiscation. Online, print, and broadcast media advertisements also featured media personalities, Omani officials, and sports stars to call attention to trafficking indicators. In addition, the NCCHT coordinated with telecommunications companies to send awareness materials through SMS messages to the public and launched a new social media account to raise awareness, available in both Arabic and English. The government reported having bilateral labor MOUs regarding migrant workers with Bangladesh, Egypt, India, Iran, Morocco, Pakistan, the Palestinian Authority, Sri Lanka, Syria, and Vietnam; some included articles prohibiting unlawful labor recruitment and trafficking. Oman was signatory to a Gulf Cooperation Council-wide labor agreement with the Philippines. Representatives of labor-source country embassies that had labor-related agreements with the government reported they experienced good cooperation with MOL and ROP on labor issues involving their respective nationals. In November 2021, the NCCHT held a meeting with the ROP and representatives of major labor-source country embassies, including Bangladesh, India, Nepal, Pakistan, the Philippines, Sri Lanka, Tanzania, and Thailand, to discuss human trafficking trends in the country and explore potential bilateral agreements. The government did not make efforts to reduce the demand for commercial sex acts. The government provided anti-trafficking training to diplomatic personnel.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit foreign victims in Oman. Oman's migrant worker community comes primarily from South East and South Asia and, more recently, from African countries, including Ghana, Lesotho, Liberia, Nigeria, Sierra Leone, South Africa, Zambia, and Zimbabwe. For example, in March 2022, media reported several Zimbabwean domestic workers had been subjected to conditions of forced labor in Oman; the workers were lured through fraudulent recruiters and, upon arriving to Oman, experienced longer than agreed upon working hours, passport confiscation, and non-payment of wages. In 2020, the government implemented pandemic-related travel restrictions that limited migrant workers' ability to enter and exit the country; between March and October 2020, the government closed airports and land borders, limiting workers' capacity to travel to Oman while stranding others within the country who may have experienced increased risk of exploitation due to pandemic-related job loss or non-payment of wages. Observers noted that due to "Omanization," a series of labor-related policies designed to prioritize Omanis for employment over expatriates, and continued pandemic-related economic downturn, the number of migrant workers in Oman declined in 2020 and further declined in 2021, effectively reducing the number of third-country residents in Oman and possibly increasing their vulnerability to exploitation given demand for labor. Foreign workers typically migrate to Oman willingly and legally. Men generally seek employment in construction, agricultural, and service sectors, while women often seek domestic worker jobs. Male migrant workers are typically from South Asia and are vulnerable to forced labor. Traffickers exploit female victims, predominantly from Africa and South, Southeast, and East Asia, in forced labor and sex trafficking. Domestic workers who flee their employers are also vulnerable to sex trafficking. Some employers reportedly "kick out" their domestic employees, who are consequently forced into commercial sex. Additionally, terminated migrant workers who are unable to depart the country are at risk of exploitation, while others who contract COVID-19 and require quarantine experience wage reduction because they cannot work.

Migrant workers seeking low-wage jobs continue to be at risk for trafficking under the visa-sponsorship employment system in Oman, which grants recruitment agencies and/or Omani visa sponsors significant control over workers' residency and work visas and, therefore, their legal status in the country. Although the government instituted initial reforms of the sponsorship system during the previous reporting period, this system continues to give employers the power to dictate the status of residency permits. Some unscrupulous recruitment agencies in Oman and their sub-agents in labor-source countries mislead migrant workers by providing fraudulent contracts with fictitious wages and charging exorbitant recruitment fees. Some victims face working conditions significantly worse than recruiting agencies promised. Traffickers subject some of these workers to employment practices that constitute

forced labor, to include excessive work hours, passport confiscation, non-payment of wages, food deprivation, and psychological and sexual abuse. Conversely, other workers enter Oman with full knowledge of their work obligations, but sponsors ultimately coerce them to work for little or no pay or in dire conditions under the credible threat of deportation. In previous reporting periods, some workers arrived in Oman on tourist visas or by first traveling to the United Arab Emirates (UAE) while willing employers secured their Omani work visas, thereby circumventing oversight of some workers' home governments. Additionally, some victims originally intended to travel to the UAE but were subsequently compelled to accept work in Oman, or vice-versa. Traffickers often began recruitment in labor-source countries with some promising retail jobs in well-known areas, such as Dubai. After arriving in the UAE, traffickers transport migrant workers into Oman and force them to work for lower wages and in austere conditions in the absence of legal contracts. Informal labor intermediaries operate legally but without regulation in Oman, communicating anonymously via social media platforms to promise Omani sponsors inexpensive domestic labor at a fraction of the cost stipulated by the formal, well-established recruitment agencies.

## PAKISTAN: TIER 2

The Government of Pakistan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Pakistan was upgraded to Tier 2. These efforts included increasing investigations, prosecutions, and convictions, including increasing investigations and prosecutions under the 2018 Prevention of Trafficking in Persons Act (PTPA). The government referred more victims for protection services. The government's provincial departments increased implementation of standard operating procedures (SOPs) on victim identification and referral and trained more stakeholders. The government allocated resources for the implementation of the National Action Plan (NAP) and amended the PTPA to remove provisions that allowed fines in lieu of imprisonment for sex trafficking crimes with women and children as victims. However, the government did not meet the minimum standards in several key areas. The PTPA continued to allow a fine in lieu of imprisonment for sex trafficking crimes that involve male victims; law enforcement efforts against labor trafficking remained inadequate compared to the scale of the problem; victim identification remained inadequate; and for a third year, the government did not take adequate action against credible reports of official complicity in trafficking. There are reports of victims being re-victimized soon after rescue, and corruption continued to hinder anti-trafficking efforts. In Sindh, local officials continued to perpetrate bonded labor with impunity in brick kilns and on farms.



PAKISTAN TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

At both the federal and provincial levels, increase prosecutions and convictions of all forms of trafficking, including bonded labor and sentence perpetrators to significant prison terms, including cases allegedly involving complicit officials. • Instruct labor departments to refer all suspected bonded labor cases to police for criminal investigation and increase training on the identification of bonded labor cases. • Vigorously increase the number of bonded labor victims identified and referred to services through training of provincial police, labor inspectors, and social services on SOPs. • Prevent support to non-state armed groups that unlawfully recruit or use child soldiers. • Amend the PTPA to remove penalty

provisions that allow fines in lieu of imprisonment for sex trafficking crimes that involve male victims. • Continue to train officials on the implementing rules for the PTPA and increase registration of trafficking related cases under the PTPA. • Ensure victims are not penalized for acts traffickers compelled them to commit. • Increase the quality and availability of trafficking-specific services, including for males. • Designate specialized prosecutors and judges to hear trafficking cases, including bonded labor. • Ensure there is clarity on central and state government mandates in dealing with trafficking cases. • Expand services for bonded laborers, including shelter, identity documents, and legal assistance, and ensure they are informed of the law that discharges all bonded laborers from any obligations to render such labor through awareness campaigns. • Implement measures to address corruption in law enforcement and take steps to shield trafficking investigators and prosecutors from external influence. • Inspect brick kilns in accordance with relevant laws regulating factories, refer suspected bonded labor to law enforcement, and prevent any loopholes that may be used to avoid inspection. • Take steps to eliminate all recruitment fees charged to workers, lift restrictions on female migrants, and increase protections of migrant workers in destination countries. • Improve efforts to collect and accurately report anti-trafficking data, including by province. • Establish a national hotline to report trafficking crimes and provide victim assistance and referral. • Accede to the 2000 UN TIP Protocol.

## PROSECUTION

The government increased law enforcement efforts. Various Pakistani laws criminalized sex and labor trafficking. The 2018 PTPA as amended, criminalized sex and labor trafficking and prescribed penalties of up to seven years' imprisonment, a fine of up to 1 million Pakistani rupees (PKR) ($5,620), or both, for trafficking crimes involving an adult male victim and penalties of up to 10 years' imprisonment and a fine of up to 1 million PKR ($5,620) for those involving adult female or child victims. These penalties were sufficiently stringent. By allowing for a fine in lieu of imprisonment for sex trafficking involving adult male victims, however, these penalties were not commensurate with those for other serious crimes, such as rape. The government continued to use other sections of the Pakistan Penal Code (PPC) that criminalized some forms of human trafficking. For example, Section 371A and 371B criminalized the buying and selling of a person for prostitution and prescribed penalties of up to 25 years' imprisonment and fines. Section 374 criminalized unlawful compulsory labor and prescribed penalties of up to five years' imprisonment, a fine, or both. Section 366A criminalized procuration of a girl younger than 18 and prescribed penalties of up to 10 years' imprisonment and a fine. Section 370 criminalized buying or disposing of any person as a slave and prescribed penalties of up to seven years' imprisonment and a fine, and Section 371 criminalized habitual dealing in slaves and prescribed penalties of up to life imprisonment and a fine if the imprisonment was less than 10 years. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other grave crimes, such as rape. The federal Bonded Labor System Abolition Act (BLSA) criminalized bonded labor, with prescribed penalties ranging from two to five years' imprisonment, a fine, or both; these penalties were sufficiently stringent. The provincial governments have adopted their own labor laws, including anti-bonded labor laws, under a devolution process that began in 2010, and federal laws apply until provinces enact corresponding laws.

The government did not report law enforcement data by province, unlike in previous years. The government reported investigating 498 trafficking cases under the PTPA (130 for sex trafficking and 368 for forced labor)—compared with 21 total in the previous reporting period. Authorities prosecuted 282 individuals for trafficking under the PTPA (39 for sex trafficking and 243 for forced labor)—compared with 20 total in the previous year. Authorities did not convict any trafficking cases under the PTPA during the reporting period, same as the previous year. The government reported investigating (1,831), prosecuting (1,254), and convicting (542) cases under the PPC; however, the government did not report which provisions were used, resulting in the possibility that some cases contained elements inconsistent with the international definition of trafficking. The government did not report any sentencing information for the convictions under the PPC. Seventy-one individuals that were formerly convicted in the previous reporting period under the PTPA were acquitted. Civil society noted concerns that perpetrators of sex trafficking and forced labor are not punished rigorously. According to experts, victims often do not trust law enforcement and decide not to cooperate in investigations. Civil society experts have noted that victims are often blamed by law enforcement for their situations and their vulnerability is overlooked. The Federal Investigative Agency (FIA) and provincial law enforcement agencies allocated a total of 1.1 billion PKR ($6.2 million) for human trafficking investigations, including 21 million PKR ($118,000) for the FIA, 500 million PKR ($2.81 million) for Sindh police, 231 million PKR ($1.3 million) for Punjab police, 169 million PKR ($949,600) for Khyber Pakhtunkhwa (KP) police, and 173 million PKR ($972,070) for Balochistan police. The FIA reported approximately 781 personnel are deployed in field units dedicated to human trafficking and migrant smuggling investigations across Pakistan. Despite the existence of the BLSA and increased forced labor investigations, bonded labor persisted, largely due to ineffective enforcement of the law and powerful local officials as perpetrators. The government did not report any investigations, prosecutions, or convictions under the BLSA. International organizations previously stated authorities did not adequately enforce the BLSA primarily due to police inaction on complaints and lack of understanding of the law by lower court judges. Moreover, in many provinces, including Sindh, the Department of Labor (DOL) handled bonded labor cases and could at most administer financial penalties. Traditionally, Punjab authorities have reported the majority of law enforcement efforts to address bonded labor. While the BLSA mandated the creation of District Vigilance Committees (DVCs) in each province to ensure implementation of the BLSA, including reporting and filing cases, DVCs have limited capacity to fulfill their mission. In Sindh province, DVCs are led by district deputy commissioners, who are responsible for several administrative functions in addition to reducing bonded labor. It was previously reported that the government relied on often illiterate bonded labor victims to have knowledge of the BLSA, proactively leave their landowners, and file their own cases in court. Even when bonded laborers did so, the courts either did not act on the claims or handled them administratively. As a result, trafficking victims who came forward often faced retaliation from their exploitative employers.

The FIA remained the government's lead reporting and coordinating entity on human trafficking. The agency focused on transnational crimes, while provincial police generally investigated domestic human trafficking cases. FIA investigated human trafficking and migrant smuggling cases through its 24 anti-trafficking law enforcement joint task forces at the federal, provincial, and local levels. FIA officials, including all newly inducted officers, received regular training on trafficking, including differentiating between human trafficking and migrant smuggling, although civil society noted stakeholders continued to conflate both crimes. Civil society experts noted the number of cases registered under the PTPA remained low due to a lack of understanding of trafficking laws and of trafficking to identify and report the crime. The government continued collaboration with international organizations and other international partners on trainings for officials on investigations and prosecutors on trafficking laws and on the recently enacted rules. The FIA continued to work closely with provincial police, police training colleges, federal and provincial departments, and judicial academies for awareness and capacity building on the implementation of trafficking laws and the implementing rules for the PTPA; 920 officials from various departments were trained by the FIA in 2021. Provincial governments also reported continuing training for officials on trafficking laws. FIA operated satellite offices at three embassies abroad in Greece, Iran, and Oman to coordinate law enforcement efforts. NGOs previously noted provincial police were reluctant to file First Information Reports, which are required to launch criminal investigations into many crimes, including trafficking. Civil society noted stakeholders, particularly police, are not aware of their mandate to address trafficking under the relevant legislation and continue to register and investigate trafficking cases under different sections of the PPC or previous legal provisions. Consequently, these cases are not officially reported as trafficking and the victims are not provided assistance; provincial labor departments reportedly do not refer suspected bonded labor cases to police for criminal investigations as trafficking cases. Furthermore, overburdened prosecutors and judges, who frequently lacked adequate training, contributed to lengthy

trafficking trials and low conviction rates, a problem endemic throughout the justice system. The government maintained bilateral law enforcement cooperation mechanisms, including information sharing, with multiple countries and worked closely with INTERPOL.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Civil society reported several officials from different districts in Punjab faced inquiries by the provincial labor department on alleged complicity in trafficking in persons after failing to take appropriate action regarding trafficking cases; the process remained ongoing at the end of the reporting period. During the previous reporting period, the government provided material support to non-state armed groups that recruited or used child soldiers. The government did not report investigating, prosecuting, or convicting individuals for child soldiering crimes. In July 2019, a 14-year-old child domestic worker reported substantial indicators of trafficking by her employer, a parliamentarian in Punjab, including sexual abuse and torture. Although police registered the charges, they did not arrest the parliamentarian, allegedly because the provincial government did not allow them to do so. The government did not report taking any action on the case during the reporting period. In October 2018, police removed a 10-year-old child domestic worker from the house of a Pakistani army major after allegations of torture and domestic servitude and arrested the army major's husband. The government did not report whether the case against the employers continued or whether it began investigating an assistant sub-inspector of police, whom it had initially suspended for failing to file a police report in the case.

The government did not report any efforts to address local government officials' reportedly endemic perpetuation of bonded labor, which created a culture of impunity for criminals. Experts have estimated that 4.5 million workers nationwide were trapped in bonded labor, primarily in Sindh and Punjab provinces, and more than 70 percent of bonded laborers were children. In Sindh province, a feudal system persisted, where bonded laborers experienced exploitation and traffickers continued to act with impunity as many landlords have political connections. Some landlords use their influence to prohibit policies in favor of laborers, who reportedly are paid very little or not at all; a significant number of women and girls subjected to bonded labor are also victims of sex trafficking. In some cases, when bonded laborers attempted to escape or seek legal redress, police refused to file a case and returned bonded laborers to their traffickers. NGOs previously reported some police colluded with farm and brick kiln owners to create fake criminal cases against victims who attempted to escape from situations of bonded labor. Some landowners restricted the movement of victims with armed guards or sold bonded laborers for the price of their debts. Some police reportedly assisted employers in kidnapping bonded laborers that authorities or NGOs had previously removed from exploitation. Police were reluctant to investigate cases of potential bonded labor when wealthy and influential individuals, such as local politicians, were the alleged perpetrators. Some police reportedly acted against trafficking cases only when pressured by media and activists. Observers alleged police accepted bribes to ignore prostitution crimes, some of which may have included sex trafficking, and border officials might have facilitated human trafficking. NGOs also reported police refused to register cases of child sexual exploitation, including sex trafficking, unless victims paid a bribe. Some garment factories reportedly paid monthly bribes to DOL officials to avoid inspections; some factories in Sindh prevented government officials from conducting inspections.

## PROTECTION

The government slightly increased protection efforts overall. Provincial police reported identifying 21,253 trafficking victims, compared with 32,022 trafficking victims in 2020 and 19,954 in 2019. This included 190 for sex trafficking, 536 for forced labor, and 20,527 for unspecified exploitation –16,950 women, 2,918 men, 1,310 boys, and 50 girls. The government did not report the number of bonded labor victims identified, compared with 30 identified in the previous reporting period. The government did not have uniform SOPs for victim identification and referral but reported 35 provincial departments, including law

enforcement, labor inspectors, child protection bureaus, and social welfare departments had SOPs to identify and assist victims of human trafficking and coordinate with relevant government departments, NGOs, and other stakeholders. The government reported 1,960 individuals were trained on the SOPs. Sindh, Punjab, Balochistan, Azad Jammu and Kashmir, and KP province reported providing training to inspectors on trafficking laws and SOPs on victim identification, and inspection of bonded labor and child labor. Some SOPs lacked procedures to identify forced labor victims or were missing key indicators of bonded labor in the screening checklists. The government reported stakeholders are trained by the FIA, in collaboration with international organizations on the procedures under the rules for the 2018 PTPA, which outlines procedures for investigations of cases and identification and referral of victims.

Provincial police referred 18,543 trafficking victims to the government or NGOs for care, including 2,316 men, 14,607 women, and 1,595 boys—a significant increase from 11,803 trafficking victims referred to care in the previous reporting period. The government reported foreign victims are legally entitled to the same benefits as Pakistani citizens. Authorities reported identifying and referring 25 child victims from Afghanistan and referred them for services from government-supported NGOs. The government reported that 2,544 victims received services from the government or government-supported NGOs. Police reported some victims declined government services. Victim services were not available for many trafficking victims, with a lack of available shelter and services in many regions, particularly for male victims. Government-run shelters for vulnerable women, including trafficking victims, were the most predominately available service. The government reported 103 shelters, welfare homes, and child protection units operated across the country, including for males and transgender individuals, compared with 64 noted in the previous reporting period. NGOs and local politicians continued to note the low quality of victim care at many of the shelters, including lack of basic resources, such as showers. Sindh provincial government opened a shelter for children in Karachi in 2021, including for child victims of a local forced begging ring. The Child Protection Welfare Bureau (CPWB) removed 1,054 children (933 boys and 121 girls) from begging across Punjab in 2021 and referred the children to protection services. Observers reported victims of bonded labor have limited access to services, including shelter and legal assistance, as they are often not considered trafficking victims. Due to limited availability of services, some victims are re-victimized and may also return to their exploitative situation. Child trafficking cases in which parents might have been complicit were of particular concern, since authorities often returned potential child trafficking victims to their families immediately following identification without effective methods to ensure families would not subject their children to trafficking again. Boys could access government shelters in many provinces, and the government had several victim shelters in the country that could house male victims of trafficking. The government also had shelters that could house victims of crime of all genders, including trafficking victims. Both government and NGO contacts noted that, due to cultural norms, male victims were less likely to seek or accept assistance. Civil society continued to provide victim services without government support. In part due to cultural sensitivities, authorities may have penalized unidentified victims of sex trafficking with moral crimes for unlawful acts traffickers compelled them to commit. Section 6 of the PTPA protects victims from being punished for unlawful acts committed as a result of being trafficked. The government allocated 52 million PKR ($292,180) for projects aimed at providing access to education and services for youth at risk of child trafficking. Provincial Child Protections Units (CPUs) did not report identifying and referring any children in exploitative or vulnerable situations to NGO and government care, compared with an unspecified number of victims identified in the previous reporting period. In KP, CPUs remained unstaffed and non-functioning due to lack of funding and hiring delays due to the pandemic.

The BLSA required districts to establish DVCs to ensure implementation of the BLSA and provide assistance to bonded labor victims; Punjab had DVCs in all 36 districts, Sindh reported it had 29 DVCs (compared with 14 in 2021), and no information was provided for KP and Balochistan. Some officials previously noted DVCs frequently lacked the motivation, information, and resources necessary to combat bonded labor and

**PAKISTAN**

failed to prioritize bonded labor. Punjab and KP offered free legal aid to bonded laborers who requested assistance. Provincial Labor Departments reportedly referred 233 victims to services in 2021. NGOs previously reported that because provincial DOLs, including in Sindh, have not registered hundreds of brick kilns, the corresponding thousands of brick kiln workers could not receive the social welfare benefits guaranteed under provincial laws. KP, Punjab, and Sindh initiated a program in collaboration with an international organization for registration of brick kilns, a total of 10,900 were registered by the end of the reporting period. However, brick kilns in KP often employed fewer than 10 workers to avoid registration. NGOs noted most cases of bonded labor ended with financial settlement in lieu of criminal prosecution, in part because police and the judiciary often ceased support for victims after authorities had removed the victim from exploitation and did not guide them through the process of pursuing a formal civil or criminal case. Bonded laborers whom authorities had released from exploitation frequently had no alternative employment or housing and sometimes returned to brick kilns or farms and assumed more debt. Those who lacked identity documents were even more vulnerable since they could not access government services, such as health care and food stipends. Some NGO-run shelters could accommodate bonded laborers, including entire families, but often had insufficient resources to provide long-term housing.

Government policy included witness protection for those cooperating in trafficking-related investigations; however, the government did not report how often it provided this support. Victims were not obligated to participate in investigations in order to receive protective services. KP province reported enacting a Witness Protection Act in 2021 that includes trafficking victims. The FIA introduced an e-investigations system during the reporting period, which will allow witnesses to record their statements. Victims expressed reluctance to testify against their traffickers due to threats of violence against them and their families. The PTPA and sections of the PPC allow courts to provide trafficking victims with restitution, but the government did not report any court orders during the reporting period. The provinces of Punjab, Sindh, and KP reported allocating free legal aid for victims; however, the province did not report whether any victims received this assistance. The FIA, in collaboration with an international organization and funding from a foreign donor, launched a victim reception and facilitation center in Taftan, Balochistan, to receive irregular migrants; 19,575 migrants from Iran were provided services, including medical, food, and shelter, at the center. Authorities reported the FIA screened migrants—no trafficking victims were identified at the center. The FIA conducted trafficking screening of Pakistani and foreign national migrants at airports and borders; the FIA did not report identifying any trafficking victims.

**PREVENTION**

The government maintained efforts to prevent trafficking. The FIA convened regular meetings with each province on implementation of the NAP; the government, including at the provincial level, provided funding and resources for its implementation. Some provincial and district Anti-Human Trafficking and Anti-Bonded Labour Monitoring Committees became operational during the reporting period to coordinate anti-trafficking efforts; increase general public awareness; collect data on law enforcement efforts and victims identified and referred; and provide recommendations to inform future legislation. The government developed, with support from an international organization, and approved a National Action Plan on Business and Human Rights to prevent human rights violations in business. This included several recommendations to address bonded labor. While experts agreed bonded labor remained a significant problem in Pakistan, outside of Punjab, provincial governments lacked accurate data of the problem, which hampered targeted efforts to address key exploitative districts and industries. Labor inspectors remained the front-line officials to inspect and identify forced labor—including bonded labor—in several sectors, including brick kilns, farms, and factories. The FIA, in collaboration with international organizations, conducted trainings for labor inspectors on SOPs for victim identification. Punjab reported 35,291 labor inspections from January 2021 through October 2021, including brick kilns and some unannounced inspections, which resulted in 455 cases filed and 156 arrests. Punjab reportedly conducted 49,363 child labor inspections; 1,029 violations were found, which resulted in 982 referred for investigation. Labor inspectors received

inadequate training to identify indicators of trafficking and insufficient funding to conduct inspections; the number of inspectors remained insufficient to enforce labor laws effectively and access was limited. In Sindh province, the labor department employed 120 inspectors to cover 30 districts and the department did not provide inspectors with funding to travel outside Karachi and Hyderabad to conduct inspections. Observers reported inspectors often used their own personal resources to carry out inspections and factory owners often denied inspectors access to enter facilities. Experts reported the number and quality of inspections remained inadequate. Moreover, inspectors did not have the authority to remove children or bonded laborers from exploitative situations. Despite high incidences of child and forced labor in agriculture and domestic work, the majority of provincial labor laws did not allow labor inspectors to inspect these worksites for infractions. Inspectors are not authorized to assess labor law infraction penalties—they take note of the infractions, and labor courts assess the penalties. Despite estimates of more than 264,000 child domestic workers in Pakistan and commonplace reports of physical abuse, sexual abuse, and forced labor by employers, provincial labor laws and protections did not extend to adult or child domestic workers. In April 2021, Balochistan province passed the Balochistan Forced and Bonded Labor System Abolition Act 2021 and the Balochistan Employment of Children Prohibition & Regulation Act 2021, which banned hazardous work for children younger than age 14 and provided a two-to-five years' imprisonment and fine as punishment for forced labor. KP province passed the KP Home Based Workers Welfare and Protection Act 2021, setting the minimum age at 14 for domestic workers.

Provinces continued to use labor laws to investigate, prosecute, and convict offenders for child and exploitative labor crimes at brick kilns. However, because such laws only prescribed fines and authorities did not refer these cases to police for criminal investigations, suspected traffickers did not receive sufficiently stringent sentences. The federal and provincial governments continued their nationwide child labor survey for a second year—the first since 1996—that will reach approximately 250,000 households.

The Bureau of Emigration and Overseas Employment (BEOE) issued licenses to private employment promoters and monitored workers who migrated through licensed agencies. The Emigration Ordinance of 1979 prohibited the role of unregulated and unregistered sub-agents; however, sub-agents continued to operate widely with impunity. The government allowed licensed employment promoters to charge migrant workers a service fee of 6,000 PKR ($33.71) for a welfare fund to compensate workers' families in case of the workers' death abroad, and workers to pay all costs associated with overseas employment. While the government stipulated employers should provide workers with a receipt for these costs, the government did not specify any cost limit and did not consistently review migrant workers' receipts. The government continued to ban female migrant workers younger than 35 from migrating for domestic work. Observers reported any ban on female migration increased the likelihood such women would migrate illegally and therefore heighten their vulnerability to human trafficking.

The government operated a center in Swat, KP province, to provide services to former child soldiers—the number of children assisted was not reported by the government. The government continued to host approximately 1.3 million officially-registered refugees and as many as 3.5 million Afghans in total. According to media reports, some Afghans who entered the country without a visa have been deported and many have been turned back from borders since the Taliban takeover of Afghanistan—it is not known if these Afghans were screened for trafficking indicators before being sent back to Afghanistan. Some Afghans opt for informal border crossings and hire the services of smugglers, which puts them at severe risk of trafficking. Afghans without formal documentation often rely on informal networks in the communities they settle in to meet their basic needs since they have limited access to work, housing, and education and lack legal protections, putting them at risk of trafficking. There is no law that allows refugees to work, but there is also no law prohibiting them from working—many refugees work in the informal economy and risk exploitation by employers. Between April and December 2021, with support from UNHCR, the government verified the identities of 1.28 million existing Afghan refugees who arrived in the country before 2007 and provided them

Haiti AR_000913

with new smart ID cards, which facilitate access to health, education, and financial services. The government, in collaboration with international organizations, implemented human trafficking awareness campaigns on social media and public service announcements, which featured survivors. KP province organized three awareness sessions for police and inspectors on trafficking laws and victim protection. The Sindh province labor department organized awareness programs for brick kiln workers, agriculture workers, employers, and labor federations on the Sindh Bonded Labor Abolition Act. The Migration Resource Center (MRC) conducted awareness campaigns on safe migration and the dangers of irregular migration, including the promotion of the MRC hotline; the center also conducted pre-departure training for outgoing migrants. The FIA reported an inter-agency task force intercepted 1,292 cases of border crossings involving potential trafficking victims. Civil society noted that the FIA was an effective institution but questioned its ability to gather data. Pakistan does not have a national human trafficking hotline. The Ministry of Human Rights maintained a hotline to provide legal support for victims of human rights abuses, including trafficking; it reported providing legal support to one victim of trafficking. Some provinces reported hotlines where gender-based violence, worker complaints, or child protection issues could be reported; no trafficking cases were reported. The government, including at the provincial level, conducted research, in collaboration with international organizations, to assess capacity gaps in victim protection and assistance, improve data management, and conduct child labor surveys in Punjab and KP. The government did not make efforts to reduce the demand for commercial sex acts. The government reported providing pre-departure briefings on human trafficking to all its peacekeeping officers. The government reported providing anti-trafficking training to its diplomatic personnel. Pakistan is not a party to the 2000 UN TIP Protocol.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Pakistan, and traffickers exploit victims from Pakistan abroad. The country's largest human trafficking problem is bonded labor, in which traffickers exploit an initial debt assumed by a worker as part of the terms of employment and ultimately entrap other family members, sometimes for generations. The practice remained widespread. Traffickers, including local government officials, force men, women, and children to work primarily in bonded labor in Sindh in agriculture and in both Sindh and Punjab in brick kilns. Traffickers also force men, women, and children to work to pay off exaggerated debts in other sectors in Sindh, Punjab, Balochistan, and KP in agriculture and brick kilns and, to a lesser extent, in fisheries, mining, and textile-, bangle-, and carpet-making. In agriculture, traffickers force workers to labor in the agricultural sectors of wheat, cotton, and sugarcane, among other areas. Traffickers often did not provide workers with access to their expenditure and earnings receipts, so traffickers control how much money they earn, the accrual of interest on their debt, and when they have repaid the debt. Landlords exploit widespread illiteracy among workers and manipulate accounting records to continue the cycle of bonded labor. Many feudal landlords and brick kiln owners, who are traffickers that employ bonded laborers, are local government officials or use their affiliation with political parties to protect their involvement in bonded labor. Some landlords use armed guards to restrict bonded laborers' movements, and others buy and sell workers among one another. In some kilns that employ entire families, kiln owners have sold bonded laborers to repay a family member's outstanding debt. Observers reported employers in Sindh are moving carpet- and bangle-making productions into private homes to further increase the difficulty in monitoring labor conditions. Reports estimate more than 70 percent of bonded laborers in Pakistan are children. Traffickers also target lower-caste Hindus, Christians, and Muslims specifically for forced and bonded labor.

Traffickers buy, sell, rent, and kidnap children for forced labor in begging, domestic work, work in small shops, and child sex trafficking. According to an international report, there are 8.5 million domestic workers in Pakistan, including many children. Media reports cases of employers forcing children as young as age 7 into domestic work, where they are often subjected to severe physical abuse, including torture, and sexual abuse; several government officials were among the suspected perpetrators. According to a prominent child rights

NGO, the majority of children working in the streets of Pakistan are subjected to forced begging and are vulnerable to sexual exploitation, including sex trafficking. According to media estimates, there are 1.5 million children who are homeless in Pakistan, with a third of those in Sindh province that are often forced to beg by organized criminal groups. Begging ringmasters sometimes maim children to earn more money and sometimes force children to steal. Organized criminal groups force children into drug trafficking in Sindh and Balochistan. Due to the consistent lack of law enforcement efforts against those who exploited children experiencing homelessness, including in forced labor and sex trafficking, traffickers operated openly and with impunity. Traffickers subject boys to sex trafficking around hotels, truck stops, bus stations, and shrines. NGOs reported the pandemic increased vulnerabilities of children to sex trafficking. Traffickers have forced Afghan, Iranian, and Pakistani children into drug trafficking in border areas and Karachi. In previous years, widespread sexual exploitation of boys in one coal mining community in Balochistan was reported. Boys as young as 6 years old from Balochistan, KP, and Afghanistan, are purportedly lured to work in the mines but subjected to sex trafficking; in some cases, parents are complicit in sending their children to the mines for sex trafficking. Within Pakistan, NGOs and police report some employers, including in restaurants and factories, require boy child laborers to provide sexual favors to obtain a job with the employer, to keep the job, and/or for accommodation. An NGO previously reported multiple cases of forced labor of students in government-run schools.

Some factories pay monthly bribes to labor department officials to avoid inspections. Illegal labor agents charge high recruitment fees to parents in return for employing their children, some of whom are subjected to forced labor and sex trafficking. Some police accept bribes to ignore prostitution crimes, some of which may include sex trafficking, and some police may have refused to register cases of child sexual exploitation, including sex trafficking, without a bribe, according to NGOs. Some Pakistani traffickers lure women and girls away from their families with promises of marriage, create fraudulent marriage certificates, and exploit women and girls in sex trafficking, including in Iran and Afghanistan. Traffickers target impoverished Christian communities to send women and girls to the People's Republic of China (PRC) for arranged marriages. Upon arrival in the PRC, hundreds of Pakistani women reported their "husbands" forced them into commercial sex. PRC nationals employed in Pakistan at worksites affiliated with the PRC's Belt and Road Initiative are vulnerable to forced labor. In other cases, traffickers, including some extra-judicial courts, use girls as chattel to settle debts or disputes. Some traffickers force victims to take drugs and exploit the drug addiction to keep them in sex trafficking.

Past reporting indicates the government provided material support to non-state armed groups that operated in Pakistan and Afghanistan and recruited or used child soldiers. Non-state militant groups have kidnapped children as young as 12, purchased them from destitute parents, coerced parents with threats or fraudulent promises into giving their children away, or recruited children from *madrassas*, and have forced children to spy, fight, and conduct suicide attacks in Pakistan and Afghanistan. Traffickers have promised Pakistani boys admittance to Afghan religious schools but sold them to members of the Afghan security forces for *Bacha bazi*, a practice in which men exploit boys for social and sexual entertainment.

Pakistani men and women migrate overseas voluntarily, particularly to Saudi Arabia, the United Arab Emirates (UAE), other Gulf states, and Europe, for employment. The majority of Pakistani employees labor in fields including agriculture, domestic service, driving, and construction work. Traffickers exploit some of them in labor trafficking, including via false or misleading job offers, such as sham recruitment agencies, falsely advertised terms or conditions of employment, fake modeling advertisements, and high recruitment fees charged by illegal labor agents or sub-agents of licensed Pakistani overseas employment promoters, who in several instances have entrapped Pakistanis in bonded labor or sex trafficking, including in the Gulf countries. In 2021, foreign countries had thousands of Pakistanis detained abroad, a large number of them in Saudi Arabia, for criminal or immigration violations. In many cases, observers alleged foreign law enforcement had arrested workers for fraudulent documents procured by recruitment agents or for lack of documents

PALAU

because their employers had withheld them—indicators of forced labor. Traffickers have exploited Pakistani girls in sex trafficking in Kenya and have forced Pakistani adults, including those with disabilities, to beg in the UAE. Pakistani boys are vulnerable to sex traffickers in Greece. Some traffickers, including organized criminal groups, subject Pakistani adults and children to forced labor in domestic work, construction, and begging in Iran; some traffickers have targeted Pakistanis with disabilities for forced begging. Pakistan is a destination country for men, women, and children subjected to forced labor, particularly from Afghanistan, Bangladesh, and Sri Lanka. Traffickers exploit women and girls—and, to a lesser extent, boys—from Afghanistan, Iran, and other Asian countries in sex trafficking in Pakistan. LGBTQI+ individuals face violence and discrimination, as the law criminalizes same-sex conduct, which increases their risk of trafficking. Refugees and stateless persons from Afghanistan, Bangladesh, and Burma, as well as religious and ethnic minorities such as Christians, Hindu Dalits, and Hazaras, are particularly vulnerable to traffickers in Pakistan. The government does not recognize the existence of stateless persons. Traffickers have exploited a small number of Rohingya refugees in forced labor in Pakistan.

## PALAU: TIER 2 WATCH LIST

The Government of Palau does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included convicting a trafficker for the first time since 2018, convicting a government official for corruption in trafficking-related crimes, initiating two labor trafficking prosecutions, establishing an interagency working group, and conducting public awareness campaigns. In addition, the government finalized and implemented a national action plan (NAP) and hired an investigator and victim advocate for its Anti-Human Trafficking Unit. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government remained without standard operating procedures (SOPs) for victim identification and referral to services, leading to insufficient identification and protective services. A court issued a lenient sentence to a convicted trafficker, weakening deterrence, undercutting nationwide efforts to fight trafficking, and creating potential security and safety concerns for trafficking victims—particularly for victims who cooperated with the investigation and prosecution. Therefore Palau remained on Tier 2 Watch List for the second consecutive year.



PALAU TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers, including complicit officials, under trafficking laws and seek sentences with significant prison terms for traffickers. • Develop, disseminate, and train officials on SOPs for the proactive identification of trafficking victims and their referral to protection services. • Increase efforts to identify victims through proactive screening of vulnerable populations, such as migrant workers and individuals in commercial sex. • Amend anti-trafficking laws to remove sentencing provisions that allow fines in lieu of imprisonment for sex trafficking crimes and allow the prosecution of victims for unlawful acts traffickers compelled them to commit. • Enforce the anti-trafficking laws punishing recruiters, employment agents, and labor officials for illegal practices that facilitate trafficking. • Increase resources for and develop victim protection services, including long-term shelter options, interpretation services, and medical and psychological care. • Create and implement a system to proactively offer foreign trafficking victims job placements and work visa extensions. •

Establish and implement witness confidentiality procedures. • Increase anti-trafficking awareness among vulnerable populations, including foreign migrant worker communities. • Establish a mechanism for the systematic monitoring of government anti-trafficking efforts.

### PROSECUTION

The government increased law enforcement efforts. Sections 2106-2108 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to 25 years' imprisonment, a fine of up to $250,000, or both if the victim was an adult and up to 50 years' imprisonment, a fine of up to $500,000, or both if the victim was younger than age 18. These penalties were sufficiently stringent, but by allowing for a fine in lieu of imprisonment for sex trafficking crimes these penalties were not commensurate with penalties prescribed for other serious crimes, such as rape.

The Ministry of Justice's Anti-Human Trafficking Unit (AHTU) investigated three forced labor cases, compared with three potential trafficking case investigations (one of forced labor and two of sex trafficking) in the previous reporting period. Authorities determined two of the three cases did not meet trafficking standards and proceeded with either closing the case or investigating non-trafficking related charges. In addition, the government continued four case investigations initiated in prior years. Authorities closed three of the four cases due to insufficient evidence or expired statute of limitations; the fourth case was ongoing. The Attorney General's Office prosecuted two alleged labor traffickers, compared with no prosecutions in the previous reporting period. Courts convicted one labor trafficker during the reporting period, the first trafficking conviction since 2018. Courts convicted a former president of a state legislature on labor trafficking for non-payment of wages under Section 2006 of the Penal Code, violation of the Code of Ethics and the Unified Tax Act, and terroristic threatening and sexual harassment under the Penal Code. Courts sentenced the trafficker to six months' incarceration, seven years' probation, and a $28,000 fine and ordered the trafficker to pay $2,516.40 in restitution; these penalties were well below those allowed under the criminal code. Lenient sentences of a year or less created potential safety problems for trafficking victims and weakened deterrence. In 2020, the government charged a former state governor with trafficking-related charges, including "promoting prostitution" for operating a massage parlor for commercial sex purposes. In January 2022, courts convicted the former official on non-trafficking related charges, including misconduct in public office and violations of the Code of Ethics, Foreign Investment Act, and the Unified Tax Act. Courts sentenced the former official to five years' probation, suspended 18 months' incarceration, $13,500 in criminal fines, and $1,246 in civil penalties and ordered the defendant to pay for the return flight of an individual suspected of being involved in commercial sex at the massage parlor. Observers noted official complicity continued to play a significant role in facilitating trafficking crimes, hindering law enforcement efforts to combat trafficking. The government did not report any other investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

Authorities cooperated with foreign governments on ongoing international trafficking cases. The government, in partnership with an international organization, developed anti-trafficking training curriculum for police cadets and trained police officers on how to identify and investigate cases of child exploitation. In addition, the government provided specialized human trafficking investigation training to police officers assigned to the AHTU. The government reported providing trauma-informed training to the Victims of Crime Advocate (VOCA), AHTU, law enforcement officials, and other stakeholders who were actively involved in providing support to victims. Despite these trainings, observers stated officials generally continued to lack an understanding of trafficking. The government reported it redirected or limited resources among law enforcement as a result of the pandemic; this may have adversely affected the government's ability to investigate or prosecute trafficking crimes.

### PROTECTION

The government maintained inadequate efforts to protect victims. The government identified one female foreign victim of forced labor, compared with identifying one victim of labor trafficking the previous

Haiti AR_000915

reporting period. The AHTU, with assistance from an international organization, continued to develop SOPs for victim identification and referral but reported pandemic-related travel restrictions delayed progress; consequently, the government remained without SOPs for victim identification and referral to services. Authorities reported using an interview guide designed to assist in interviewing and avoid re-traumatizing trafficking victims. Due to a lack of formal identification procedures, authorities likely detained or deported some unidentified trafficking victims. Observers reported only the most egregious cases of trafficking were likely to come to the attention of authorities because of the lack of proactive identification procedures and foreign migrant workers' reluctance to complain to authorities out of fear that such complaints would result in job termination and deportation. The government reported, due to the pandemic and lack of employment in Palau, an increase in foreign migrant workers who returned to their countries of origin; some of these migrants may have been unidentified trafficking victims. While the 2005 Anti-Smuggling and Trafficking Act granted victims immunity from prosecution for the "act of people trafficking," the vague language permitted prosecution for unlawful acts traffickers compelled victims to commit, such as commercial sex or petty crime. In the previous reporting period, the government prosecuted and convicted potential victims for commercial sex acts, violation of work permits, and immigration violations.

The government could provide medical treatment, counseling, temporary job placement, transportation, and temporary shelter accommodation to trafficking victims; the government reported providing a temporary job placement permit for one victim, compared with providing temporary employment and shelter services to one victim in the previous reporting period. AHTU investigators could employ local interpreters as needed in Bengali, Mandarin, and Tagalog. As in prior reporting periods, the lack of support services reportedly led some victims to leave the country rather than pursue legal recourse. The government funded an NGO to assist trafficking victims with legal counseling and representation before labor and immigration hearings, compared with no funding provided the previous reporting period; the government last provided approximately $15,000 to an NGO for these purposes in 2018. The government did not report allocating any additional funding for victim assistance, compared with spending $500 on victim assistance to remove an identified victim from an outer island in the previous reporting period.

The Office of Labor Compliance (Labor Compliance) could provide victims with temporary employment placements; the government reported assisting one victim with obtaining new employment, compared with assisting one identified victim the previous reporting period. Labor Compliance conducted labor inspections to ensure compliance of labor laws and anti-trafficking provisions; the government did not report opening any investigations as a result of the labor inspections. In December 2021, the government established a memorandum of understanding between Labor Compliance and AHTU to ensure the agencies shared trafficking information; in addition, Labor Compliance reported all trafficking-related information to an interagency Anti-Human Trafficking Working Group (Working Group). The VOCA, who reported directly to the Minister of Justice, could provide support to victims of serious crime, including human trafficking, and liaise with investigators on behalf of the victim to negotiate the victim's participation in the investigation. In addition to the VOCA, the AHTU employed a dedicated victim advocate who worked to assist trafficking victims. The VOCA and victim advocate cooperated and coordinated to provide assistance to trafficking victims. The government did not require participation of victims in trafficking investigations; however, authorities reported one victim participated in an investigation during the reporting period. The judicial system did not keep victim identities confidential due to the requirement to testify in court rather than utilizing written or video-recorded testimonies. In prior reporting periods, alleged traffickers threatened witnesses.

The AHTU continued to staff a trafficking hotline with the VOCA and with on-call AHTU lead investigators who spoke Palauan and English; the government did not report how many calls the hotline received or if any calls led to investigations. In addition, Labor Compliance operated a dedicated 24-hour hotline that workers could call with concerns about their employment situation. Courts ordered one convicted trafficker to pay restitution to one victim, compared with none the previous reporting

period. The government could offer ad hoc short-term legal alternatives to the removal of foreign victims to countries where they might face hardship or retribution; the attorney general or the special prosecutor prosecuting the case could designate victims as "vulnerable," making them eligible for alternate employment and accommodation assistance.

## PREVENTION

The government increased efforts to prevent trafficking. The AHTU, a unit within the Ministry of Justice's Bureau of Public Safety's Division of Transnational Crime, coordinated all national efforts to combat human trafficking. The government, with assistance from an international organization, finalized and enacted a new 2022-2025 Anti-Human Trafficking NAP; the government dedicated funding and resources to the implementation of the NAP. The AHTU was responsible for the implementation of the 2022-2025 NAP, identifying and supporting victims, investigating alleged human trafficking crimes, liaising with prosecution authorities, and data collection; the AHTU received funding from the National Congress. In August 2021, the government hired an investigator and a victim advocate for the AHTU. In January 2022, the government established the interagency Working Group to share information regarding human trafficking cases, identify systemic issues and government policies that may inadvertently benefit traffickers, and coordinate the collection of human trafficking data. The Minister of Justice served as the chair of the Working Group, which included representatives from 11 government agencies and an international organization. In February 2022, the Working Group invited four NGOs and community organizations to join.

In partnership with an international organization, the government held awareness campaigns targeting school-aged children and the public. The government did not report conducting educational or public awareness campaigns for employers or labor recruiters. The government reported a reduction in radio airtime availability for trafficking awareness campaigns and a decrease of in-person outreach campaigns due to the pandemic. The government could track trafficking data in a spreadsheet provided by an international organization; however, the government was unable to collect and collate the data due to redirected or limited resources caused by the pandemic. The government authorized workers to move to different employers and granted temporary placement permits for workers experiencing hardship, problems with legal due process, abuse, or other extenuating circumstances. In response to the pandemic, the government implemented an employment assistance program that allowed foreign workers who had lost employment to find new employment and obtain a work permit and legal residency status. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Palau. Palau's foreign population, about one-third of the country's population of 18,000, is especially at risk for trafficking. According to an NGO, only one-third of male respondents to a survey believe that trafficking takes place in Palau. Undocumented immigrants and migrant workers with low levels of education and English language proficiency have an increased vulnerability to trafficking. Filipino, Bangladeshi, Nepali, Thai, Korean, and the People's Republic of China (PRC) national adults pay thousands of dollars in recruitment fees and willingly migrate to Palau for jobs in domestic service, agriculture, restaurants, or construction; upon arrival, traffickers exploit some in conditions substantially different from what had been presented in contracts or recruitment offers, and some become trafficking victims. Women from the Philippines and the PRC are recruited to work in Palau as waitresses or clerks, but traffickers exploit some in sex trafficking in karaoke bars or massage parlors. Foreign workers on fishing boats in Palauan waters also experience conditions indicative of human trafficking. Cuban nationals working in Palau may have been forced to work by the Cuban government. Natural disasters and climate-induced displacement significantly increases Palauans' vulnerability to trafficking due to a loss of livelihood, shelter, or family stability. Official complicity plays a role in facilitating trafficking. Authorities have investigated government officials—including labor, immigration, law enforcement, and elected officials—for complicity in trafficking crimes.

PANAMA

# PANAMA: TIER 2

The Government of Panama does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Panama remained on Tier 2. These efforts included identifying more victims; convicting and stringently penalizing two traffickers under the anti-trafficking statute; seeking survivor input in victim protection efforts; supporting victims' right to restitution from their traffickers; undertaking a cumulative review of its own anti-trafficking efforts; and providing additional food and hygiene support to trafficking victims during the pandemic. However, the government did not meet the minimum standards in several key areas. Authorities investigated fewer traffickers, and, despite proactive screening efforts, government statistics indicated most trafficking victims self-reported their exploitation. The government did not amend the anti-trafficking law to remove the requirement of movement to constitute a trafficking crime, which perpetuated misconceptions about trafficking and conditioned the government's anti-trafficking efforts, such that law enforcement inadequately investigated internal trafficking cases and plausibly mis- or under-identified internal trafficking victims.



PANAMA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Remove the requirement of movement from the statutory definition of trafficking in persons under the criminal code. • Proactively identify trafficking victims, including among Panamanians exploited within the country, migrants, Indigenous communities, domestic workers, and other vulnerable groups. • Vigorously investigate and prosecute and, as appropriate, convict traffickers, including those involved in child sex tourism. • Amend the anti-trafficking law to include force, fraud, or coercion as essential elements of the crime rather than aggravating factors. • Allocate dedicated funding for specialized victim services, including through the special fund for trafficking victims and monetary support for civil society organizations. • Train law enforcement and prosecutors to investigate and prosecute traffickers using the trafficking offense rather than a lesser offense. • Establish and fund a specialized trafficking shelter. Increase training for government officials in victim identification and referral, including proactive screening of vulnerable populations and individuals in commercial sex. • Sentence convicted traffickers to adequate penalties consistent with the law, which should involve significant prison terms. • Inform foreign victims of their rights as trafficking victims, including access to temporary residency permits and services. • Develop and disseminate a procedural manual to guide prosecutors and judges in trafficking cases. • Train judges to understand the importance of financial restitution in trafficking cases. • Use existing laws and regulations to revoke the licenses of fraudulent recruiters.

## PROSECUTION

The government slightly decreased prosecution efforts. Article 456 of the penal code did not criminalize all forms of sex trafficking and labor trafficking because it required movement to constitute a trafficking offense. It prescribed penalties of 15 to 20 years' imprisonment for trafficking offenses involving an adult victim and 20 to 30 years' imprisonment for those involving a child victim or other aggravating circumstances; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with international law, the law established the use of force, fraud, or coercion as aggravating factors rather than essential elements of the crime. The law defined

trafficking broadly to include illegal adoption without the purpose of exploitation, inconsistent with international law. The government charged some sex traffickers with non-trafficking offenses, which carried lighter sentences. Article 180 criminalized commercial sexual exploitation with penalties of seven to nine years' imprisonment and a fine of 5,200 balboas ($5,200). Article 186 criminalized purchasing commercial sex acts from a child and prescribed penalties of five to eight years' imprisonment.

Authorities initiated 10 trafficking investigations (five for sex trafficking, three for labor trafficking, and two for unspecified exploitation) involving four suspects, compared with initiating 29 trafficking investigations (21 for sex trafficking and eight for labor trafficking) involving 16 suspects in 2020 and five trafficking investigations (four for sex trafficking and one for labor trafficking) involving 12 suspects in 2019. Officials reported ongoing investigations in five cases from previous reporting periods. The government prosecuted two alleged sex traffickers, compared with prosecuting three alleged traffickers in 2020, 10 in 2019, and 12 in 2018. One accused trafficker awaited trial in a prosecution initiated prior to 2021. The government convicted two sex traffickers, compared with convicting three traffickers in 2020, 13 in 2019, and eight in 2018. The courts convicted both traffickers under the anti-trafficking law—rather than under related statutes carrying lesser penalties, as occurred in two of three convictions secured in 2020—and sentenced one sex trafficker, convicted of trafficking, kidnapping, and extortion, to 23 years' imprisonment; the other convicted sex trafficker received a sentence of 20 years' imprisonment.

Observers reported that a lack of procedural guidelines for judges and prosecutors unfamiliar with trafficking casework occasionally hindered successful convictions. Officials reported that courts were open during the reporting period, but, as a pandemic-mitigation measure, they conducted a mix of in-person and virtual hearings; in November, courts returned fully to in-person hearings. However, the government continued to divert officers and other staff from regular duties, including investigating trafficking crimes, to enforce curfews and other restrictions. The government's pandemic-mitigation measures, including mandatory curfews, remained in place until November. Periodic media reports continued to cite previously reported allegations of sex trafficking in National Secretariat for Children, Adolescents, and the Family (SENNIAF) shelters; the government reported it investigated these allegations and found no evidence to support them. The government did not report further investigations, prosecutions, or convictions of government employees complicit in human trafficking offenses.

The government cooperated with Colombian officials on one trafficking investigation and two information exchanges. Panamanian officials collaborated with their Colombian counterparts to trace a trafficking suspect who fled from Panama to Colombia in 2018; this joint investigation culminated in the arrest of six alleged traffickers operating in Colombia, Ecuador, and Panama. Panama and Colombia maintained joint mechanisms for investigating trafficking cases and providing services to victims under a 2018 anti-trafficking memorandum of understanding (MOU); officials held one coordination meeting under the MOU in 2021. The government offered several trainings for law enforcement and other officials, on par with the trainings offering in previous years, including instructions on victim identification for border and customs officials and workshops on investigative techniques applicable to trafficking case work for National Police officials. The government funded most trainings but accepted financial support from international organizations for some offerings; due to the pandemic, the government conducted a mix of virtual and in-person trainings in 2021.

## PROTECTION

The government increased protection efforts. Law enforcement and other entities could identify potential trafficking victims; separately, the government's National Anti-Trafficking Commission ("the commission") determined whether potential victims should be considered "preliminary" or "confirmed" victims. The commission reported there were 16 confirmed trafficking victims identified in 2021, compared with six victims in 2020 and 34 in 2019. Of the 16 confirmed victims identified in 2021, seven were sex trafficking victims and nine were labor trafficking victims. Despite the existence of trafficking internal to Panama, authorities identified

just one Panamanian victim; most of those identified were foreign nationals from Colombia, Costa Rica, Nicaragua, and Venezuela. All seven victims of labor trafficking were Nicaraguan. The government reported it could take several months for the commission to confirm potential victims' status. Victims could access shelter and other services while their status was pending. In 2021, the commission ruled on the status of 23 victims, including some identified in previous reporting periods; it granted 19 potential victims, including three identified in previous reporting periods, full status as trafficking victims.

Officials reported challenges in identifying victims under the government's pandemic-mitigation measures, including strict curfews that limited victims' freedom of movement. Officials also noted bar and brothel closures spurred traffickers to exploit sex trafficking victims in private residences and other settings; as the government relaxed these policies, traffickers used both old and new tactics, broadening the scope of officials' investigative work. The commission proactively supplied an identification form to assist officials who encountered potential trafficking victims, including law enforcement, border officials, and healthcare workers; however, observers noted the form's distribution was incomplete, leaving some potential victims vulnerable to misidentification. The government reported screening vulnerable populations, including irregular migrants, for trafficking indicators but did not identify any trafficking victims during routine screenings in 2021. Despite screening efforts and law enforcement investigations, the government did not proactively identify most victims; instead, government statistics suggested officials relied on victims to report their own exploitation in roughly 50 percent of cases. Observers suggested officials under-identified Indigenous trafficking victims due to the remote location and limited services within semi-autonomous Indigenous communities. Further, officials likely under- or mis-identified internal trafficking victims while operating under a legal framework that required movement to constitute a trafficking crime. The government had guidelines for victim identification and protection, which outlined the formal procedures, internal processes, and training materials used by referring officials and the Technical Unit for Attention and Protection of Victims and Witnesses (UPAVIT).

Officials referred all victims to UPAVIT, which provided immediate care, including shelter, medical care, and legal assistance, to victims of all crimes and physical protection to victims, witnesses, and experts. In 2021, UPAVIT provided services to 19 victims, including several victims identified in previous reporting periods, as well as 15 dependents of victims; by contrast, UPAVIT provided services to 25 victims in the previous reporting period. Based on victim circumstances, UPAVIT could provide shelter, food, clothes, health services and medication, and psychological and social assistance; separately, the commission could provide victims with career training and assistance in changing migratory status. Thirteen victims received therapy and counseling services. The government trained representatives from the Public Ministry and civil society on victim protection and services; it also trained government sign language interpreters to recognize trafficking indicators and identify and refer victims to services.

The government maintained the Special Fund for Victims of Trafficking in persons, as mandated by the anti-trafficking law, to subsidize victim services provision with assets seized from traffickers; a commission sub-unit had responsibility for managing the fund. However, seized assets were insufficient to fully fund victim service provision, and the government did not otherwise allocate funding specific to the anti-trafficking commission or victim services. As a result, agencies drew from their general budgets to fund the anti-trafficking commission and the provision of food, shelter in hotels, transportation, and psychological and legal services for potential victims. During the reporting period, the commission consulted with the Ministry of Economy and hired an accountant to monitor seized assets and streamline mechanisms to operationalize them for commission use. The government-funded, NGO-administered program providing hospitality sector vocational training to trafficking victims remained dormant; eight victims participated in the program in 2020 before it was suspended due to the pandemic. As a special measure during the pandemic, the government continued to provide additional support to victims in the form of food or hygiene deliveries. In 2021, UPAVIT reported further decreases in expenditures

for services to trafficking victims: $1,500, compared with $3,800 in 2020 and $54,540 reported in 2019.

There were no dedicated shelters for trafficking victims. As a result, authorities commonly placed victims in hotels and covered the cost of the hotel rooms. The government could also refer victims to migrant or women's shelters run by NGOs. In 2021, the government reported providing shelter to one labor trafficking victim through UPAVIT, compared with two victims provided shelter in 2020. Victims frequently elected to return to their home countries or reside with family or friends rather than stay in hotels, potentially inhibiting victim-witness support in pending trafficking cases. The government could refer child trafficking victims to SENNIAF and its network of shelters administered by NGOs and religious organizations. However, there were credible allegations, substantiated by independent investigation, of abuse and low standards of care in SENNIAF facilities. The Attorney General's office reported 26 ongoing investigations into abuse in SENNIAF shelters at year's end. Although the government approved new measures to guarantee children's right to adequate care, observers expressed concerns SENNIAF's budget was insufficient to support restructuring or other largescale efforts to improve the overall provision of care and reduce residents' risk of suffering abuse, which heightened their vulnerability to trafficking. However, officials reported there were no allegations of abuse levied against the shelter most commonly serving child trafficking victims.

Foreign national victims were eligible for short-term humanitarian visas, temporary residency permits extendable up to six years, and work permits. The government issued 22 provisional humanitarian visas and seven work permits to trafficking victims, compared with 17 visas and 11 work permits in 2020. Officials also renewed work permits for 12 additional victims but did not report issuing any permanent residency permits to trafficking victims for the second consecutive year, compared with 13 in 2019. The government began drafting an executive decree to establish a visa category allowing foreign national trafficking victims to petition for their dependents to immigrate to Panama; commission officials reported input from trafficking survivors spurred the initiative. The government helped repatriate one victim exploited in Panama, compared with supporting the repatriation of one victim in 2020. The government made available specialized interview rooms to allow victims to provide testimony privately to minimize the risk of re-traumatization and allowed prosecutors to request hearings be closed to the public. Prosecutors utilized these specialized interview rooms and other accommodations to facilitate several victims' testimonies during the reporting period. Officials funded and coordinated with Costa Rican law enforcement to facilitate a foreign national victim's testimony in the case against her trafficker. The government seized assets derived from human trafficking activities and allocated the proceeds to services for trafficking victims. In one case, authorities seized $19,742 in assets, to be set aside for victim compensation. The law allowed victims to request restitution from their traffickers during criminal cases or to file civil suit to obtain compensation; lawyers from the commission were available to assist victims seeking restitution or compensation. Labor trafficking victims could also claim compensation from their traffickers through a separate administrative process overseen by the Ministry of Labor. The government reported no victims made new requests for restitution or compensation in 2021, compared with eight victims who filed for restitution in criminal cases in 2020. Courts ordered compensation for one Costa Rican trafficking victim in a civil case; at the conclusion of the reporting period, the judge had not announced the final amount the trafficker would be ordered to pay. The government reported prosecutors continued to support seven victims' petition for compensation in an ongoing case from 2019. No labor trafficking victims claimed compensation via the Ministry of Labor's administrative process, compared with 16 victims who did so in 2020. The commission's on-staff lawyers could also support trafficking victims in other legal matters; during the reporting period, commission lawyers helped a trafficking victim fight an eviction and advised another on migratory status.

## PREVENTION

The government maintained prevention efforts. The anti-trafficking commission was the lead entity responsible for coordinating the government's anti-trafficking efforts; the Ministry of Security's

anti-trafficking office led the commission's day-to-day activity. The commission hosted 17 interagency coordination meetings, and its sub-units met frequently throughout 2021, compared with holding no coordination meetings in 2020. The commission was responsible for implementing the 2017-2022 national anti-trafficking action plan, which expired during the reporting period; the commission began drafting, but did not finalize, a 2022-2027 action plan. The commission produced, with the support of an international organization, a cumulative review of the government's anti-trafficking efforts based on archival records, allowing it to quantify key statistics such as trafficker characteristics. The government carried out awareness campaigns outlined in the action plan with the assistance of international organizations. In 2020, these campaigns included distributing flyers in public venues, a series of virtual awareness seminars targeting teachers and students, and numerous anti-trafficking spots on television and radio channels. The government operated several hotlines, including a national police hotline to receive tips and a 311 number for the public to report possible cases or request inspections of businesses, but it did not report the number of trafficking-related calls received. The government did not report whether the online anonymous portal for reporting criminal activity, including trafficking, remained active.

The Ministry of Labor collected regular reports from all registered recruitment agencies; the ministry launched a digital platform for recruitment agency licensing, which included a public registry where workers could verify an agency's licensure. National laws and regulations provided the authority to revoke the licenses of fraudulent recruiters and those using recruitment fees; in practice, the government did not proactively enforce these regulations, instead relying on formal complaints from workers to prompt investigations into unlawful recruitment practices. The National Migration Service did not respond to a 2020 Public Ministry recommendation to update standard operating procedures to ensure border officials verify the validity of overseas adoptions to detect traffickers using fraudulent documentation to pose as the adoptive parents of child trafficking victims. The government did not make efforts to reduce the demand for commercial sex acts. Panamanian schools continued to rely on virtual instruction as a pandemic-mitigation measure, curtailing school-based trafficking awareness programs. The Ministry of Education conducted a series of virtual trafficking awareness events for teachers in 2021. The government reported the Ministry of Education's in-person anti-trafficking "liaison" program remained dormant in 2021 and 2020. By comparison, officials conducted 49 anti-sexual exploitation workshops and several anti-trafficking seminars for teachers through these programs in 2019.

**TRAFFICKING PROFILE**
As reported over the past five years, human traffickers exploit domestic and foreign victims in Panama, and, to a lesser extent, traffickers exploit victims from Panama abroad. Most identified trafficking victims are foreign adults exploited in sex trafficking, especially women from South and Central America. However, traffickers also exploit Panamanians in sex trafficking in Panama, the Caribbean, and Central and South America. Government reporting indicates more than two-thirds of convicted traffickers are foreign nationals, primarily from the People's Republic of China (PRC), Colombia, and Venezuela; roughly half of traffickers are men. Cuban nationals working in Panama may have been forced to work by the Cuban government. Traffickers exploit children in forced labor, particularly domestic servitude, and sex trafficking in Panama. Children living in shelters are vulnerable to recruitment by traffickers. Traffickers take advantage of transgender individuals' increased vulnerability—stemming from limited economic opportunity, entrenched discrimination, and demand for commercial sex acts from this population—to exploit them in commercial sex. Limited economic opportunity and entrenched discrimination also contribute to increased vulnerability to labor trafficking for the wider LGBTQI+ community.

Venezuelan and Nicaraguan migrants are increasingly at risk for both sex and labor trafficking. Traffickers exploit some adults from Central America who transit Panama en route to the Caribbean or Europe in sex trafficking or forced labor in their destination countries. Traffickers exploit Indigenous women from rural, impoverished border areas of the country in forced labor. Traffickers exploit men from Central and South America, the PRC, and Vietnam in forced labor in construction,

agriculture, mining, restaurants, door-to-door peddling, and other sectors using debt bondage, false promises, exploitation of migratory status, restrictions on movement, and other means. Traffickers have forced victims to consume illegal drugs as a coercive measure. Traffickers typically exploit sex trafficking victims in bars and brothels; however, they increasingly exploit these victims in beauty parlors, spas, houses rented by traffickers, and private homes. Traffickers utilize social media and messenger apps to recruit victims. Men from the United States have been investigated as child sex tourists in Panama. Government officials have been investigated and arrested for alleged involvement in trafficking.

## PAPUA NEW GUINEA: TIER 2 WATCH LIST

The Government of Papua New Guinea does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included identifying a child sex trafficking victim and referring the victim to protective services; for the first time in four years, the government initiated new prosecutions against four alleged traffickers. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government did not convict any traffickers, and it did not directly provide shelter or services to victims or support NGOs that did so. Endemic corruption and complicity among officials, particularly in the logging and fishing sectors, continued to facilitate vulnerability to sex trafficking and forced labor among foreign and local populations. Despite limited understanding of trafficking among law enforcement officials, the government did not report any anti-trafficking training activities. A lack of financial and human resources dedicated to anti-trafficking efforts, as well as very low awareness among government officials and the public, continued to hinder progress. The government did not update existing victim identification standard operating procedures (SOPs) or allocate dedicated funding and resources to its national action plan (NAP). Therefore Papua New Guinea remained on Tier 2 Watch List for the second consecutive year.



**PRIORITIZED RECOMMENDATIONS:**
Update, disseminate, and systematically implement existing SOPs for victim identification, referral, and protection and widely train police, immigration, and customs enforcement officers on the SOPs. • Investigate and prosecute trafficking crimes and sentence convicted traffickers to significant prison terms, including victims' family members and officials who facilitate or directly benefit from trafficking. • Develop and finalize an anti-trafficking NAP for 2022-2023 and allocate dedicated funding and resources to its implementation. • Allocate resources, including dedicated staff, to government agencies to finalize and implement SOPs. • Amend the criminal code to criminalize child sex trafficking without elements of force, fraud, or coercion, consistent with international law. • In collaboration with civil society, screen for trafficking indicators and prevent penalization for crimes committed as part of their trafficking by victims among vulnerable groups, including internally displaced persons, People's Republic of China (PRC) nationals employed at worksites affiliated with PRC-based companies, communities located near commercial forestry operations, children in communities marked by inter-tribal conflict, and individuals—including children—apprehended for illegal fishing, desertion from foreign-registered fishing vessels, illegal logging, illegal gold panning, or immigration crimes, and ensure all

identified victims are referred to appropriate services. • Institute a policy framework recognizing that traffickers often compel victims to commit crimes and increase intra-governmental coordination to protect victims from arrest, deportation, or other punishment for crimes their traffickers compelled them to commit. • Ensure all identified victims receive state-funded assistance, regardless of their participation in prosecution proceedings, and include long-term assistance, particularly long-term reintegration support, such as education, counseling, and job-placement. • Increase coordination and collaboration between Immigration and Citizenship Authority (ICA) and the Department of Justice and Attorney General (DJAG) to investigate and prosecute trafficking cases. • Increase oversight and regulation of the logging and fishing sectors, including by dedicating funding and resources to increasing manpower and surveillance monitoring equipment and penalizing government officials for taking bribes, which hinder anti-trafficking efforts in these sectors. • Increase protective services for victims of trafficking in partnership with NGOs and international organizations. • Educate government stakeholders on the process to designate an individual as a trafficking victim and simplify the process for doing so. • Increase collaboration with civil society groups, the private sector, and religious and community leaders to raise awareness of and reduce demand for commercial sex acts and forced labor, especially of children. • Take steps to eliminate recruitment or placement fees charged to workers by labor recruiters and ensure any recruitment fees are paid by employers. • Strengthen the National Anti-Human Trafficking Committee (NAHTC) by regularizing its meetings and functions, designating senior officials to represent their agencies, increasing awareness of and participation in the committee by civil society and protection stakeholders, and allocating resources for its activities. • Accede to the 2000 UN TIP Protocol.

## PROSECUTION
The government slightly increased enforcement efforts. The Criminal Code Amendment of 2013 criminalized most forms of sex trafficking and all forms of labor trafficking and prescribed penalties of up to 20 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with international law, the law required a demonstration of force, fraud, or coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking.

In August 2021, authorities conducted raids on seven suspected commercial sex establishments and, as a result, detained three alleged traffickers and charged them with child sex trafficking crimes under Sections 208C and 229 of the Criminal Code. The government also initiated an investigation and prosecution of one suspected trafficker in a separate case. This compared with no new investigations in the previous reporting period. For the first time in four years, the government initiated prosecutions against these four alleged traffickers. The government did not provide an update to an ongoing prosecution of an alleged trafficker begun in the previous reporting period. The government did not report any trafficking convictions, compared with one the previous year. The government did not report on sentences handed down to a trafficker convicted of six counts of trafficking and one count of rape in the previous reporting period. Authorities reported detaining 15 foreign nationals, from Bangladesh and the PRC, for allegedly owning and running commercial sex establishments; however, the government did not report conducting further investigations into the commercial sex establishments or whether their operation involved the commission of potential trafficking crimes, and it deported the foreign nationals. The government did not report any new investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes but did investigate officials for crimes that increased foreign nationals' vulnerability to trafficking. Authorities arrested six suspended ICA officers, three from the visa and passports division, who allegedly engaged in misconduct regarding visa applications. Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Government officials reported that law enforcement accepting bribes from incoming vessels in Papua New Guinea waters and logging companies has greatly hindered anti-trafficking efforts in those industries. Logging companies bribed officials to bypass inspections and not take law enforcement

action against employees accused of crimes, such as sexual abuse and exploitation. Customs officials reported that lack of manpower, monitoring and surveillance equipment, and funding impaired anti-trafficking monitoring efforts of forced labor or sex trafficking on vessels in Papua New Guinea waters.

Observers reported the government redirected resources and had reduced institutional capacity among law enforcement and other government agencies as a result of the pandemic, which may have adversely affected the government's ability to detect and address trafficking. The government reported a reduction in the number of cases heard by the courts because of interruptions in regular operations due to the pandemic. National and provincial officials' limited understanding of trafficking, including anti-trafficking legislation, trafficking indicators, and investigative techniques for trafficking crimes, continued to hinder effective law enforcement activity. Enforcement agencies and most government offices remained weak as a result of underfunding, corruption, cronyism, lack of accountability, and a promotion system based on patronage. Observers reported an underfunded and undertrained police force exacerbated the country's pervasive threat of violence and lawlessness. In addition, observers ascribed poor prosecutorial efforts to widespread observance of customary justice practices, fear of retribution, distrust of law enforcement among victims, and insufficient resources and political will among law enforcement to conduct investigations, particularly in rural areas. The government did not report any anti-trafficking training activities.

## PROTECTION
The government maintained inadequate efforts to protect victims. The government had SOPs for victim identification and referral and reported their modest implementation, but authorities continued to lack a written procedural guide for implementation as recommended in the NAP, and general awareness of the SOPs among front-line officers remained limited. In addition, the SOPs did not contain adequate measures to screen for trafficking indicators among LGBTQI+ individuals or adults arrested for commercial sex. The government reported movement restrictions, and the closure of government offices due to the pandemic hindered its efforts to collect victim information and conduct screening.

Authorities identified one child sex trafficking victim, compared with three potential trafficking victims in the previous reporting period. Authorities arrested a second potential trafficking victim in connection with an ongoing suspected trafficking prosecution; the government did not report conducting a victim assessment. The government did not report providing any protective services compared with providing limited medical and child protective services to three children in the previous reporting period. An NGO provided the child victim with shelter and counseling services; civil society organizations, without financial or in-kind support from the government, could provide medical and short-term shelter services to victims. Women and child victims could receive services through NGO-run gender-based violence programs, and while male victims could receive ad hoc services through NGOs, there were no government or NGO services specifically tailored to the needs of trafficking victims.

The government did not have a structured plan to identify or refer victims among vulnerable communities or among communities displaced as a result of conflict or natural disasters. Logging and mining sites primarily operated in remote regions with limited or no government oversight. ICA reported allegations of mistreatment and pay discrepancies among workers while conducting immigration enforcement spot checks at logging camps; however, the government did not report taking action against illegal logging sites or make information available on any efforts to identify sex or labor trafficking victims at such sites. In previous reporting periods, the government provided law enforcement agencies rapid screening forms and related victim identification training; the government did not report continuing this practice during the current reporting period, and police continued to rely upon foreign expert assistance to identify victims.

The government did not operate or support an anti-trafficking hotline, and reports of suspected trafficking crimes had to be made either in person at a police station or emailed to the NAHTC and the Department of Justice and Attorney General; therefore, the ability to report trafficking

**PAPUA NEW GUINEA**

cases for law enforcement action was limited. The victim identification procedures included guidance for protecting foreign victims from punishment for immigration crimes the victims' traffickers compelled them to commit; however, authorities likely punished or deported some victims for such crimes due to ineffective victim identification, poor interagency coordination, and the requirement for a court to formally determine an individual as a victim of trafficking. In prior years, authorities arrested and prosecuted children who were forced to pan for gold in areas where this activity was illegal; the government last reported efforts to screen these children for trafficking indicators in 2017. Observers reported that a law allowing officials to apprehend foreign fishermen for desertion in port may have dissuaded some victims of forced labor from escaping and reporting their abuses. The law provided legal alternatives to the removal of foreign victims to countries where they may face hardship or retribution, but the government did not report offering this protection to any victims in 2021. The law lacked provisions for victims to seek compensation through civil suits.

## PREVENTION

The government maintained inadequate efforts to prevent trafficking. In March 2022, the NAHTC met once and continued to lack sufficient resources and commitment from the government. As in past years, the government did not appoint specific committee members to represent relevant agencies and effectively excluded non-governmental stakeholders. Some key interagency stakeholders and responsible senior government officials were unaware of its existence. The government reported updating the dates of its expired NAP but did not report reviewing or modifying the plan; in addition, the government did not report allocating dedicated funding or resources to its implementation. The government did not report conducting any anti-trafficking awareness campaigns.

The government continued to lack effective policies to regulate foreign labor recruiters or hold them liable for fraudulent recruitment practices. With no more than two labor inspectors per province, inadequate resources, and endemic corruption, the government continued to not take adequate steps to prevent forced labor in the logging industry. Authorities reportedly issued forestry permits in violation of preexisting land ownership rights and without further oversight, leading to the displacement and heightened vulnerability of Indigenous communities and to increased risk of labor trafficking among forestry workers. The government did not report providing anti-trafficking training to its labor inspectors. Furthermore, the government did not report its regulation of recruitment fees, which continued to contribute to debt-based coercion among foreign workers. The government did not provide anti-trafficking training to its diplomatic personnel. The government did not provide anti-trafficking training to its troops prior to their deployment as peacekeepers. The government did not make efforts to decrease the demand for commercial sex acts. Papua New Guinea was not a party to the 2000 UN TIP Protocol.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Papua New Guinea, and traffickers exploit victims from Papua New Guinea abroad. Traffickers use Papua New Guinea as a transit point to exploit foreign individuals in other countries. Traffickers exploit foreign and local women and children in sex trafficking and in forced labor in domestic service, the tourism sector, manual labor, forced begging, and street vending. According to international NGO research conducted in previous years, approximately 30 percent of Papua New Guinean sex trafficking victims are children younger than the age of 18, with some as young as 10 years old. Immediate family or tribe members reportedly exploit children in sex trafficking or forced labor. Some parents force children to beg or sell goods on the street, and some sell or force their daughters into marriages or child sex trafficking to settle debts, resolve disputes between communities, or support their families. The closing of traditional travel routes due to pandemic-related border control restrictions and the imposition of new and complex requirements for entry may have increased vulnerability to trafficking among foreign migrant workers. Anecdotal reports show an increase in online child sexual exploitation, some of which may be child sex trafficking, in connection with an increased use of the internet during the pandemic.

Marriages in Papua New Guinea commonly involve a "bride price" of money or chattel paid to the wife's family by the husband's family, who use the bride price as debt to compel the woman to remain in abusive or servile marriages. Some parents reportedly transfer their children—some as young as 12—to other families via informal paid adoption arrangements that, absent monitoring or registration practices, increase their risk of trafficking; this is particularly prevalent among girls, whom adoptive families often seek out as potential sources of future bride-price income. Young girls sold into polygamous marriages may be forced into domestic service for their husbands' extended families or exploited in sex trafficking. Within the country, traffickers lure children and women with promises of legitimate work or education to travel to different provinces, where they are exploited in sex trafficking or domestic servitude. Men reportedly engage in transactional sex with girls as young as 15 in exchange for money, gifts, or mobile phone credits. Tribal leaders reportedly trade the exploitative labor and service of girls and women for guns, to forge political alliances, and to settle disputes with one other. Traffickers subject Papua New Guinean children to forced criminality in illegal gold panning. Boys as young as 12 reportedly experience conditions indicative of forced labor as porters. Adolescent boys are also increasingly involved in inter-tribal and intercommunal armed conflict, possibly via forcible recruitment by local leadership. Individuals—particularly women and girls—displaced as a result of frequent natural disasters and communal conflict, are at higher risk of trafficking due to poor or nonexistent IDP camp security and loss of livelihoods. Asylum-seekers detained in Papua New Guinea for attempting to reach Australia by boat may have increased vulnerability to forced labor or sex trafficking due to displacement, economic instability, and lack of access to basic resources and community support networks. International observers report increasing intercommunal tensions resulting from displacement have led to more Papua New Guinean women and girls facing "sorcery" accusations from men in an attempt to psychologically coerce them into forced labor or sex trafficking.

Malaysian and PRC-based logging companies arrange for some foreign women to enter the country voluntarily with fraudulently issued tourist or business visas; this practice may also be present at other internationally owned logging sites. After their arrival, many of these women—from countries including Indonesia, Malaysia, Thailand, People's Republic of China (PRC), and the Philippines—are turned over to traffickers who transport them to logging and mining camps, fisheries, and entertainment sites and exploit them in sex trafficking and domestic servitude. Sex traffickers also reportedly exploit foreign children in Papua New Guinea. Men from the PRC may have been forced to work in Papua New Guinea at projects run by PRC-based companies. Traffickers force PRC national, Malaysian, and local men to work at commercial mines and logging camps. Burmese, Cambodian, PRC national, Malaysian, Vietnamese, and local men and boys seeking work on fishing vessels go into debt to pay recruitment fees, which vessel owners and senior crew manipulate to coerce them to continue working indefinitely through debt bondage in Papua New Guinea's exclusive economic zone and in other maritime territories, particularly in tuna fishing. These fishermen may face little to no pay, contract switching, wage garnishing or withholding, harsh working and living conditions, restricted communication, and threats of physical violence as coercive tactics to retain their labor. Often with direct government support, companies reportedly compel these workers to carry out illegal logging and fishing activities, making them vulnerable to arrest. Government officials reportedly facilitate trafficking by accepting bribes to allow undocumented migrants to enter the country or ignore trafficking situations, and some may exploit sex trafficking victims or procure victims for other individuals in return for political favors or votes. Corruption among forestry officials in particular may abet forced labor among loggers and sex trafficking in communities situated near logging sites; some of these officials reportedly accept bribes to issue logging permits in violation of environmental standards and land ownership rights, leading to displacement and concomitant loss of livelihood that make some communities more vulnerable to exploitation.

# PARAGUAY: TIER 2

The Government of Paraguay does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Paraguay remained on Tier 2. These efforts included identifying more than 150 trafficking victims; coordinating with foreign counterparts to arrest traffickers and identify victims; formalizing a screening protocol to identify child trafficking victims at international border crossings; and continuing to grow a grant program supporting trafficking survivors. However, the government did not meet the minimum standards in several key areas. The government did not establish the dedicated anti-trafficking agency or funding source required by law and reported limited efforts to implement the national action plan (NAP) to combat trafficking. Victim services remained inadequate; there were no shelter options for male victims, and due to capacity limitations and lack of funding, the government only provided shelter to a subset of female trafficking victims. Cooperation with civil society remained inconsistent, use of the identification protocol and referral mechanism was ad hoc, and the police anti-trafficking unit was under-resourced. The anti-trafficking law did not align with international law, which stymied efforts to effectively hold traffickers accountable.



PARAGUAY TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:
Fund and expand access to adequate specialized victim services, including for male victims. • Investigate and prosecute alleged traffickers, including complicit officials, and sentence convicted traffickers to significant prison terms. • Fund and fully implement the 2020-2024 NAP. • Train officials to consistently utilize victim identification protocols and referral mechanisms to increase proactive identification of trafficking victims, including among minority and Indigenous populations. • Increase engagement with civil society actors to complement the government's efforts to prevent trafficking and protect victims; encourage regular civil society participation in the interagency roundtable. • Establish the national anti-trafficking secretariat, as required by law. • Establish the national anti-trafficking fund, as required by law. • Increase funding and staffing for the Paraguayan National Police Anti-Trafficking Unit (PNPTU). • Revise the definition of human trafficking under Law 4788/12 to ensure force, fraud, or coercion are essential elements of the crime as established under the 2000 UN TIP Protocol. • Adopt reforms to eliminate abusive practices and working conditions that may amount to trafficking in *criadazgo* (child domestic servitude). • Train law enforcement officials to understand, investigate, and prosecute child sex tourism cases under the anti-trafficking law. • Improve interagency coordination and develop a case management database for trafficking cases. • Establish adequate penalties to deter child labor violations.

## PROSECUTION
The government decreased prosecution efforts. The Comprehensive Anti-Trafficking Law 4788 of 2012 criminalized sex trafficking and labor trafficking and prescribed penalties of up to eight years' imprisonment for cases involving adult victims and two to 20 years' imprisonment for those involving child victims; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Inconsistent with international law, Law 4788/12 established the use of force, fraud, and coercion as aggravating factors rather than essential elements of the crime; penalties were increased to two to 15 years' imprisonment

under such circumstances. Article 139 of the penal code, which relates to pimping crimes, could be used to prosecute child sex trafficking offenses; it prescribed penalties of eight years' imprisonment for offenses involving children, which are significantly lower than the penalties described under the anti-trafficking law.

The PNPTU and the Anti-Trafficking Unit (ATU) shared responsibility for investigating trafficking crimes; the ATU also acted as the lead prosecuting agency. In 2021, authorities initiated 53 trafficking investigations—24 for sex trafficking, 24 for forced labor, and five for undefined exploitation—compared with 106 investigations in 2020 and 141 in 2019. Officials continued to investigate 196 ongoing cases initiated in previous years. Authorities filed preliminary charges against four suspected sex traffickers, compared with 21 in 2020 and 53 in 2019. There were 25 ongoing prosecutions initiated in previous reporting periods, involving 16 accused traffickers, compared with 105 ongoing prosecutions in 2020. Judges convicted three traffickers, one for sex trafficking and two for labor trafficking. This compared with three trafficking convictions in 2020. These traffickers received sentences ranging from two to 10 years' imprisonment.

Anti-trafficking law enforcement operated with low budgetary allocations for a fourth consecutive reporting period. The PNPTU operated with 41 specialized trafficking officers in 2021; this compared with the same number of officers in 2020, 36 officers in 2019, and 38 in 2018. Observers indicated the unit needed more staff and additional offices in high-risk areas, such as the international airport, to adequately perform its duties. In 2021, the ATU cooperated with authorities from Argentina, Brazil, Chile, France, and Spain on 29 suspected trafficking investigations, resulting in the arrest of 13 alleged traffickers (five in Paraguay, eight in other countries) and the identification of 40 Paraguayan trafficking victims exploited abroad. The government reported pandemic funding reallocations created additional obstacles for anti-trafficking efforts; lack of transportation and travel funding, for example, limited anti-trafficking officials' mobility, curtailing investigations, access to training opportunities, and other law enforcement activity.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; although there were no actionable reports, corruption and complicity in trafficking crimes remained concerns, and observers continued to allege some officials displayed complicity indicators, particularly border agents. Such allegations included officials intentionally overlooking trafficking indicators, especially along the border with Brazil, accepting bribes from businesses where trafficking may have taken place, and facilitating sex trafficking of women and girls on barges operating along the Paraguay River. The government trained police and members of the Paraguayan Navy on investigative techniques for trafficking cases and trafficking indicators.

## PROTECTION
The government maintained protection efforts. The government lacked a centralized database to aggregate efforts across ministries and could not provide comprehensive data on victim protection. There were three agencies involved in victim identification: the ATU, the Ministry of Women's Affairs (MWA), and the Ministry of Children and Adolescents (MINNA). These agencies reported identifying 166 trafficking victims in 2021. By comparison, the government reported identifying 299 victims in 2020—a notable increase over previous years, attributable to screening returning migrant workers during a required quarantine—and 86 in 2019. Traffickers exploited 74 of these identified victims in sex trafficking and 86 in forced labor; the government did not report the form of trafficking experienced by the remaining six victims. Among the 166 victims identified, there were 72 women, 46 girls, nine men, and 33 boys. The government's interagency anti-trafficking roundtable directed a national referral mechanism for prosecutors, police, labor inspectors, and border officials; in 2021, the government updated this referral process to encompass pandemic measures, such as quarantine requirements. Some government entities, such as the National Migration Office and Ministry of Health, had victim identification protocols, but there was no universal protocol to facilitate the proactive identification of victims. Use of available referral and identification resources was inconsistent and ad hoc. Civil society

organizations reported the government applied the identification protocols less consistently among minority and Indigenous populations; as a result, authorities may have disproportionately penalized minority and Indigenous trafficking victims for crimes their traffickers compelled them to commit. MINNA developed and implemented new standard operating procedures (SOPs) for the identification of child trafficking victims at national borders. Under these new SOPs, border officials and MINNA coordinated to screen children traveling alone for trafficking indicators, codifying the screening process which contributed to the identification of 256 child trafficking victims during the period of increased border crossings in 2020.

There were three dedicated shelters with capacity for up to 38 female trafficking victims, one managed by the MWA for adults and two shelters for child victims managed by MINNA; one of MINNA's shelters was co-managed by an NGO. MWA could also serve female trafficking victims at its two domestic violence shelters. The government reported providing some form of support services to 160 trafficking victims; it reported referring 45 victims to shelter services—it referred 22 women victims to an MWA shelter and 23 children to MINNA shelters. In the absence of sufficient shelter capacity, most victims returned to their homes, where they may have struggled to access other support services; returning home also increased victims' vulnerability to re-trafficking, as victims' families may have been involved in their exploitation. By comparison, MINNA provided shelter to 26 child victims in 2020 and 44 in 2019. Observers reported pandemic-related safety protocols contributed to limited capacity in shelters. MINNA coordinated direct cash transfers for 39 victims in 2021, compared with the ATU and MWA providing transfers for 50 victims in 2020. In addition to shelter and food, the government had a limited ability to provide psychological support, social assistance, legal advice, and reintegration programs for some victims. The ATU, MINNA, and MWA collaborated to prioritize victims most in need of these services. The government continued its entrepreneurial program for trafficking survivors, awarding small business seed grants to 36 victims (32 women and four men) in 2021, compared with six such grants in 2020. The government did not have a shelter to assist male trafficking victims; however, the ATU could provide psychological assistance, food, and immediate shelter at hotels on an ad hoc basis before facilitating the return of male victims to their community of origin. An interagency working group—created to support provision of services to trafficking victims outside of government shelters—met several times during the year but did not report any substantive outcomes. Aside from some funding provided to the NGO operating the MINNA shelter, the government did not provide assistance to NGOs providing victim services. Lack of substantive cooperation with civil society limited the government's ability to provide comprehensive care. The overall quality of care for victims, particularly in rural areas, was inadequate due to limited resources and the lack of qualified personnel.

The ATU continued to provide basic assistance to trafficking victims due to insufficient victim services provision by other parts of the government. However, the ATU did not receive government funding for victim assistance and relied on occasional allocations from an NGO-managed victims' services fund. This funding supported the government's case-by-case provision of food assistance, direct cash transfers, and reintegration programming for trafficking victims. Government officials reported funding was insufficient to assist victims adequately. The government's 2020 emergency budgetary reallocation measures—which redistributed funding from across the government, including anti-trafficking funding, to support pandemic measures—remained in effect until December 31, 2021. In addition to shelter capacity limitations, government entities reported pandemic restrictions interrupted in-person services; MWA used virtual consultations to minimize disruption. MINNA provided approximately $38,500 in 2021 to the NGO that operated the specialized shelter for underage victims, compared with the same amount in 2020 and approximately $50,000 in 2019. Foreign trafficking victims were eligible for residence permits to remain in Paraguay; however, civil society reported high administrative fees made the application process burdensome for victims. The government helped repatriate one victim in 2021, compared with one in 2020 and five in 2019. Law 4788/12 outlined a procedure to award victims restitution when the courts convicted their traffickers;

victims could also file civil suits with the support of a government attorney to obtain compensation. The government did not report any trafficking cases where victims received restitution or compensation. MINNA provided training for its officials on safe repatriation for child trafficking victims; otherwise, the government did not train officials on victim identification, referral, or care.

## PREVENTION

The government slightly decreased its prevention efforts. The Directorate for the Attention of the Overseas Paraguayan Community (DACPE) was the government entity responsible for coordinating anti-trafficking programs and convening an ongoing interagency roundtable that included intermittent participation from 16 government agencies. In 2021, the roundtable held three sessions, compared with 14 in 2020 and six in 2019. Law 4788/12 did not require participation of civil society in the roundtable, and authorities provided such stakeholders only a limited role. Although the roundtable's plenary sessions were officially open to civil society, a number of NGOs reported they did not receive consistent notification of meetings. Poor and informal interagency coordination continued to limit the government's ability to monitor, collect, and report statistics. The 2020-2024 National Plan for the Prevention of Trafficking guided the government's anti-trafficking efforts. However, officials reported poor coordination and funding limitations hindered efforts to implement the plan, which included a measure to establish the dedicated anti-trafficking secretariat mandated under Law 4788/12. Observers reported that the absence of a dedicated agency or secretariat continued to limit the effectiveness of the government's national anti-trafficking efforts. Law 4788/12 also required the government to have an anti-trafficking fund, but the government reported the account—the intended funding source for the plan's implementation—did not exist. Two NGOs served as liaisons between the roundtable and civil society, although government engagement with civil society remained minimal.

The government did not allocate funds for public awareness campaigns; instead, it relied on civil society, businesses, and trade unions to run campaigns in high-risk areas. However, the government continued to distribute brochures and posters in bus terminals, airports, border crossings, and on social media to promote awareness of trafficking. The government maintained hotlines to report crimes against women and children, including trafficking, as well as a webpage for filing trafficking and exploitation complaints. Authorities did not provide a comprehensive report on trafficking calls received via these sources but suggested the government identified at least one victim via the hotline during the reporting period. The government did not report identifying victims through its trafficking-specific email inbox and hotline web application, meant to facilitate reporting of trafficking crimes, since their creation in 2019. The Ministry of Labor's 25 labor inspectors were trained to identify trafficking victims during inspections and could refer them to care services through the interagency roundtable. Although the 296 labor inspections conducted in 2021 focused heavily on pandemic sanitation protocols, inspectors identified nine child labor violations, some of which may have amounted to trafficking. The Ministry of Labor levied fines for violations in four of these cases and referred one case to the ATU for criminal prosecution. In four cases, the offenders and victims settled privately. Observers noted the monetary fines commonly levied against employers for child labor violations were not sufficient to discourage the practice. The government remained without effective approaches to tackling the abusive practices and working conditions common in situations of *criadazgo*, which amount to child domestic servitude. The government did not make efforts to reduce the demand for commercial sex acts. The government continued to grant certifications to hotels and other tourism-sector companies that complied with certain anti-trafficking measures; however, the government did not identify or investigate crimes of child sex tourism in Ciudad del Este and the Tri-Border area as trafficking crimes. The Ministry of Foreign Affairs trained diplomatic staff to recognize trafficking indicators in a consular setting; however, the government did not provide anti-trafficking training for all diplomats deployed abroad.

Haiti AR_000923

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Paraguay, and traffickers exploit victims from Paraguay abroad. The practice of compelling children to labor as domestic workers, *criadazgo*, is perhaps the most common form of trafficking in the country. Middle- and upper-income families in urban and rural areas take on children, almost exclusively from impoverished families, as domestic workers and provide varying compensation that may include room, board, money, a small stipend, or access to educational opportunities. An estimated 47,000 Paraguayan children work in situations of *criadazgo*; many of these children are highly vulnerable to sex and labor trafficking. Although *criadazgo* mainly affects young girls, boys are increasingly at risk; government sources estimate 30 percent of children in *criadazgo* are boys. Traffickers exploit children from rural areas in sex trafficking and forced labor in urban centers. Boys are often victims of forced labor in agriculture, domestic service, criminality, and in some cases as horse jockeys. Children engaged in street vending, begging, and working in agriculture, mining, brick making, and ranching are vulnerable to trafficking. Traffickers exploit Paraguayan children in forced labor in the cultivation and sale of illicit drugs. In the Chaco region, traffickers exploit adults and children in debt bondage.

Traffickers increasingly utilize social media to recruit victims. Indigenous persons are particularly vulnerable to trafficking. Traffickers exploit Paraguayan women and girls in sex trafficking within the country, including aboard ships and barges navigating the country's major waterways. Transgender Paraguayans are vulnerable to sex trafficking. Paraguayan victims of sex trafficking and forced labor have been identified in Argentina, Brazil, Chile, PRC, Colombia, Germany, Mexico, Spain, France, and other countries. Traffickers move female trafficking victims regionally and to Europe via transit countries including Argentina, Bolivia, Brazil, and Spain. Traffickers also recruit Paraguayan women as couriers of illicit narcotics to Europe and Africa, where they subject them to sex trafficking. Foreign victims of sex and labor trafficking in Paraguay are mostly from other South American countries. The lack of regulatory measures, insufficient transnational cooperation, and fluidity of illicit goods and services contributed to increased trafficking risk in and around the Tri-Border Area between Argentina, Brazil, and Paraguay. Civil society and victims reported instances of officials—including police, border guards, judges, and public registry employees—facilitating sex trafficking, including by taking bribes from brothel owners in exchange for protection, extorting suspected traffickers to prevent arrest, and producing fraudulent identity documents.

## PERU: TIER 2

The Government of Peru does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Peru remained on Tier 2. These efforts included prosecuting and convicting more traffickers, adopting the National Policy Against Human Trafficking and its Forms of Exploitation, and expanding the anti-trafficking hotline to accommodate Quechua speakers. The government adopted new guidelines for providing mental health care to child trafficking survivors and for introducing evidence of psychological trauma into court proceedings on trafficking cases. However, the government did not meet the minimum standards in several key areas. Services for adult victims, boys, LGBTQI+ individuals, and labor trafficking victims remained inadequate. Although authorities opened several investigations into public officials for alleged complicity in trafficking crimes, the government did not prosecute or convict any complicit officials. Government funding for combating trafficking was severely inadequate.



PERU TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase overall resources to fund implementation of the National Policy Against Human Trafficking and allocate dedicated anti-trafficking budgets for member entities of the national multisectoral commission, as called for in law. • Increase funding for comprehensive victim services, including training and capacity-building for staff, and provide services to more Peruvian and foreign victims. • Increase the availability of services to meet the needs of adult victims, boys, LGBTQI+ individuals, and labor trafficking victims. • Amend the anti-trafficking law to prescribe penalties for sex trafficking that are commensurate with the penalties prescribed for other grave crimes, such as rape. • Employ trauma-informed methods and proactive screening measures for trafficking indicators during interactions with members of vulnerable groups—including individuals in commercial sex, LGBTQI+ persons, and displaced Venezuelans—and refer potential victims to comprehensive protection services. • Increase and institutionalize reintegration services for child victims transitioning out of shelter care and other victims who decline or lack access to shelter accommodation. • Increase efforts to prosecute both sex and labor trafficking crimes, convict and punish traffickers, including complicit officials, and apply adequate sentences to convicted traffickers. • Dedicate more resources to planning multisectoral, intelligence-driven law enforcement operations that include arrangements for prompt removal of victims to secure locations segregated from traffickers, victim-centered interviews, quick transition to care and shelter for identified victims, and contingency planning to avoid holding victims in police stations. • Strengthen and institutionalize training for police, prosecutors, and judges on enforcing anti-trafficking laws and employing victim-centered, trauma-informed procedures and assign cases to trained personnel. • Ensure officials consistently apply a definition of trafficking consistent with international law so that all victims exploited in sex or labor trafficking receive access to appropriate justice and protection. • Improve data collection systems to collect and report comprehensive, harmonized, and disaggregated data on anti-trafficking law enforcement and victim protection efforts. • Conduct outreach and prevention programs targeted to at-risk populations, including rural Indigenous communities, using culturally appropriate methods and local languages. • Enforce laws against crimes that facilitate trafficking, such as fraudulent job recruitment, recruitment fees, illegal mining and logging, and counterfeit operations.

## PROSECUTION

The government increased prosecution efforts during the reporting period. Article 129 (previously Article 153) of Peru's penal code criminalized sex trafficking and labor trafficking and prescribed penalties of eight to 15 years' imprisonment for offenses involving adult victims, 12 to 20 years' imprisonment for offenses involving victims between the ages of 14 and 18, and a minimum of 25 years' imprisonment for offenses involving victims younger than 14. These penalties were sufficiently stringent; however, with respect to sex trafficking, these penalties were not commensurate with those prescribed for other serious crimes, such as rape. The law defined trafficking broadly to include all forms of labor exploitation and illegal adoption or child selling without the purpose of exploitation. The penal code also included 15 separate offenses for different forms of exploitation including "forced labor," "slavery and other forms of exploitation," and 10 crimes involving sexual exploitation. Officials often classified trafficking victims and charged trafficking cases under exploitation laws, many of which overlapped significantly with one another and with Article 129 (previously 153). Many officials only applied trafficking statutes to crimes that occurred prior to exploitation. In 2021, the government introduced the new Criminal Procedure Code in the two remaining judicial districts, completing its years-long transition to a nationwide oral, accusatory

PERU

system that allowed authorities to initiate trafficking prosecutions without a victim complaint.

Anti-trafficking police reportedly conducted 116 operations in the first nine months of 2021, resulting in 604 individuals detained or arrested for trafficking crimes, an increase from 65 operations and 214 detentions in the same period of 2020 and 186 operations and 364 detentions in all of 2019. The government continued to direct police, including anti-trafficking units, to enforce pandemic mitigation and public health measures. The pandemic had a particularly negative impact on police, with high rates of sickness and death diminishing the capacity of its already limited staff. Specialized prosecutors reported opening 354 trafficking investigations in 2021—336 for sex trafficking and 18 for forced labor, some of which may have also been counted in police data. In 2020, prosecutors participated in 214 anti-trafficking operations and detained 179 suspects, and in 2019, they participated in 252 operations and detained 209 suspects. In 2021, authorities initiated prosecutions of 121 suspects, and courts convicted 233 defendants for trafficking and related crimes. In comparison, authorities prosecuted at least 44 suspects and convicted 29 traffickers in 2020 and prosecuted 67 suspects and convicted 55 traffickers in 2019; however, prosecution data from previous years may have been incomplete. Prosecutors reported 165 sex trafficking prosecutions and 12 forced labor prosecutions were ongoing at the end of the year. The government did not report sentencing data for convicted traffickers. Prosecutors in Lima, Loreto, Madre de Dios, and Puno initiated the majority of prosecutions in 2021, and more than 80 percent of convictions were issued by courts in Lima, Madre de Dios, and Puno. In June 2021, police carried out a successful operation in Lima province targeting members of a criminal network that allegedly lured children with false job offers through social media, kidnapped them, and then subjected them to sex trafficking. Police arrested the suspected ringleader and 22 of his associates. In February 2022, authorities successfully raided an establishment near a mining area in Madre de Dios, leading to the identification of four sex trafficking victims and the arrest of two suspected traffickers. Public health measures limited prosecutors' access to case files and related documents, which were often available only in hard copy, and high infection rates among public officials—including specialized prosecutors—further diminished the government's capacity to prosecute traffickers. The judiciary developed a system to hear cases online but struggled to operate at full capacity.

The government maintained specialized anti-trafficking police units, with 474 officers assigned to regional units across 23 of Peru's 24 regions; this was an increase from 448 specialized police officers in 2020. The size, capacity, and budget of these units varied widely across regions, and some regions with a high prevalence of trafficking had few specialized officers. The government increased the number of specialized officers assigned to Madre de Dios and Cusco, regions considered to have high trafficking risks, from five in each region in 2020 to nine and 17, respectively, in 2021. The government did not assign specialized police to Amazonas. In December 2021, an Indigenous leader in the Amazonas region, known for his public advocacy denouncing local human traffickers and calling on the government to hold them criminally accountable, was murdered. Media reports alleged members of a local trafficking syndicate killed him in retaliation for his advocacy; the government did not make any arrests in this case during the reporting period. The government did not report its budget for specialized police units in 2021. The government did not enforce a ministerial resolution requiring anti-trafficking police to remain in their units for at least two years, and frequent turnover among police severely limited specialized units' effectiveness in investigating trafficking. Local experts reported officers often transferred twice a year and the pandemic precipitated even faster changes in police assignments, resulting in a lack of institutional knowledge and continuity of operations. The government had 39 specialized anti-trafficking prosecutors across 12 regions of the country, with jurisdiction to prosecute cases under the penal code's trafficking, forced labor, slavery, and sexual exploitation statutes. In partnership with an international organization, the government held several joint training workshops between police and prosecutors to improve coordination. NGOs and government officials reported judges often considered recruitment to be an essential element of a trafficking crime; required proof of force, fraud, or coercion for child sex trafficking crimes; or reduced trafficking charges to lesser crimes. In December 2021, the government adopted guidelines to improve the Public Ministry's Institute for Legal Medicine and Forensic Sciences' ability to conduct

forensic evaluations of trafficking victims. These guidelines aimed to strengthen forensic medical professionals' ability to recognize and document psychological trauma and coercion among trafficking victims, leading to more robust prosecutions in court. The government continued partnering with an international organization to deliver in-depth training through certification programs for judges to improve their capacity to implement trafficking laws; 135 judges completed the certification in 2021. The government provided training on judicial resolutions related to trafficking for 132 criminal judges, with jurisdiction over trafficking and related crimes, and training in criminal law and criminal procedure code for specialized prosecutors in Lima. Although several ministries collected data to track their anti-trafficking law enforcement and victim protection efforts, the government lacked a coordinated data collection system, making it difficult for authorities to verify statistics, assess efforts, and respond to trends. Peru's overlapping legal framework further complicated data collection efforts as authorities often charged trafficking cases as other offenses.

The government acknowledged that official complicity in trafficking crimes and corruption at all levels of the Peruvian law enforcement and criminal justice systems hampered efforts to hold traffickers accountable. Police officers, including members of specialized anti-trafficking units, allegedly accepted bribes from traffickers to avoid conducting investigations. The alleged complicity of some police, along with poor communication between police and prosecutors, bred mistrust among these officials at both the national and regional levels and undermined the effectiveness of anti-trafficking law enforcement efforts. The government opened several investigations of government employees for alleged trafficking crimes and continued investigating cases from previous years, but it did not prosecute or convict any officials for trafficking-related complicity in 2021. In November 2021, Bolivian authorities apprehended and extradited to Peru a former Peruvian police officer allegedly involved in two murders and sex trafficking crimes in Tacna; he remained in pretrial detention at the close of the reporting period. Media reports alleged approximately 40 police officers in Tacna and Moquegua led a sex trafficking operation in which one of the murder victims, a 14-year-old girl, had been exploited. Reports indicated authorities were investigating alleged trafficking crimes and police corruption related to this case but did not make additional arrests during the year. In a separate case in Tacna, authorities apprehended two police officers and an immigration official during a large-scale law enforcement operation against a cross-border smuggling network allegedly involved in human trafficking crimes; the officials remained in pretrial detention at the close of the reporting period. A 2020 case that included arrests of seven police officers for alleged involvement in a child sex trafficking operation run by a well-known singer remained ongoing. The government did not report progress on a 2020 case involving two anti-trafficking police officers and two other government officials apprehended for providing protection to alleged traffickers and allowing them to operate with impunity. It also did not report progress in the case of a former police chief and noncommissioned officer, arrested in 2019 for human trafficking and corruption. Prosecutors in Cusco cooperated with authorities in Argentina to achieve a labor trafficking conviction in a case involving a Peruvian citizen exploited in Argentina.

## PROTECTION

The government maintained efforts to identify and protect trafficking victims, although services for some groups remained limited. Police reported identification of 428 potential victims in 2021, compared with 640 potential victims in 2020 and 1,054 in 2019. These victims included 261 women, 77 girls, 57 men, and 33 boys. The identification of adult male victims was noteworthy, as police did not identify any men exploited in trafficking in 2020. Police identified at least 54 women (49) and girls (5) from Venezuela, Ecuador, Colombia, Brazil, Bolivia, and Spain who were exploited in trafficking in Peru. Specialized prosecutors identified 373 victims in 2021, compared with 470 in 2020 and 1,266 in 2019. The government did not report the extent to which victim identification statistics overlapped between police and prosecutors. Police received 68 complaints of alleged trafficking crimes to the government's trafficking hotline during the first six months of 2021; the Ministry of Interior (MOI) reported the complaints included seven cases of alleged forced labor, 35 of alleged sex trafficking, and 26 where the type of exploitation was not specified. Two Peruvian victims of trafficking were identified in Ecuador

and one in Chile; Peruvian officials provided support to these victims abroad and assisted with their repatriation to Peru.

The anti-trafficking law required the government to proactively identify victims among high-risk populations and provide services including temporary lodging, transportation, medical and psychological care, legal assistance, and reintegration support. The government had an intersectoral protocol for providing protection to trafficking victims, and multiple ministries had protocols for victim identification and care, but authorities implemented them unevenly due to insufficient financial and human resources and coordination challenges. Police and prosecutors did not effectively identify indicators of trafficking among women in commercial sex. With support from an international organization, Lima's municipal public security forces developed standardized procedures for identifying and referring potential trafficking victims to services. The government offered specialized trafficking victim services for girls exploited in sex trafficking, while other victims could access services for victims of gender-based violence or other forms of government and NGO support. Authorities referred all child victims to the Ministry of Women and Vulnerable Populations (MIMP), which coordinated shelter or family care and provided legal, social services, psychological, and limited reintegration assistance to victims. MIMP operated specialized units in all regions of the country for assisting children in need of special protection, including all child trafficking victims; in 2020, MIMP created new regional units, bringing the total to 26 across Peru. The government did not report the number of trafficking victims these units assisted or the number of victims referred to specialized shelters in 2021. In 2020, these units assisted 223 child victims (204 Peruvian, 15 Venezuelan, two Ecuadorian, and two Colombian), including 96 girls authorities referred to specialized trafficking victim shelters, and in 2019, the units assisted 130 child victims, including 114 girls authorities referred to specialized shelters. With support from an international organization, the Ministry of Health developed and approved new guidelines for providing comprehensive mental health care to child trafficking survivors.

The Public Ministry's Victim and Witness Assistance Unit (UDAVIT) provided short-term care and essential supplies for victims immediately following some law enforcement operations and coordinated with other government agencies to provide medical, legal, and social services to victims. Insufficient funding and a lack of training on victim-centered methods limited UDAVIT's capacity to provide consistent, high-quality care to victims, and NGO assistance was needed to supplement UDAVIT's efforts. Local experts reported UDAVIT sometimes made services contingent on victims providing statements to investigators or questioned children without the presence of legal or social support personnel. In some regions, UDAVIT operated emergency spaces that could provide short-term accommodation to women and children who were participating in investigations and prosecutions.

MIMP operated seven specialized shelters exclusively for girls exploited in sex trafficking (including some whom authorities classified as sexual exploitation victims) in five regions (Cusco, Lima, Loreto, Madre de Dios, and Puno); in total, these facilities could accommodate 130 children. However, the government temporarily converted one facility into a shelter for victims of other crimes, decreasing the overall shelter capacity for child trafficking victims to approximately 120. Services and staffing in the shelters were generally robust, with the inclusion of a full-time attorney, medical personnel, and psychologist. Due to the pandemic, however, shelters restricted access to non-residents, which limited the in-person services available to victims. Shelter staff facilitated counseling sessions, legal services, and victims' communication with families via phone or online platforms. In coordination with an NGO, the government provided several mentoring and training sessions for staff in specialized shelters. MIMP also operated 52 residential centers for children that could accommodate child trafficking victims, including boys, but these shelters were not exclusively for human trafficking victims, and they were not equipped to provide specialized psychological and protection services to meet the needs of child trafficking survivors. Women could access legal, psychological, and social services—but not overnight accommodation—through MIMP's nationwide network of 429 Emergency Centers for Women, but the government did not collect data on the number of trafficking victims the centers assisted. Numerous civil society organizations provided assistance to trafficking victims, including two NGOs that were members

of the government's multisectoral commission against trafficking, and approximately 70 private shelters accepted trafficking victims.

Adult victims, labor trafficking victims, and male victims had few shelter options; there were no shelters that accepted adult men. A lack of services meeting the needs of adult victims, such as open shelter facilities or livelihood development support, led many adult victims to decline services. The government provided limited access to services for LGBTQI+ victims; authorities frequently discriminated against LGBTQI+ individuals and typically did not admit transgender victims to government shelters. The government acknowledged inequity in service provision to LGBTQI+ victims, particularly transgender children. Foreign victims were generally eligible for the same services as Peruvian victims, but the government did not specify whether it referred any foreign victims to government shelters. The Ministry of Foreign Affairs held a seminar on protection for national and foreign trafficking victims for staff posted in Peru and in more than 70 Peruvian foreign missions around the world. Government presence remained weak or absent in large parts of Peru where trafficking risks were high, including in the Loreto, Madre de Dios, and Puno regions, as well as the Valley of the Apurímac, Ene, and Mantaro Rivers (VRAEM), leaving victims with limited access to justice or protection.

Criminal justice officials often did not employ victim-centered methods, and at times, they conducted anti-trafficking operations without adequate resources, such as vehicles to transport victims or safe places to screen potential victims, isolate them from suspects, and provide immediate care. Police and prosecutors reported many victim services were not available following law enforcement operations on nights and weekends. At times when shelters were not immediately available, authorities placed child victims in police stations among children apprehended for crimes, where victims faced conditions similar to detention while waiting for referral to shelter. However, the government made meaningful efforts to incorporate trauma-informed and victim-centered principles into its policy and procedural documents and to seek training for its officials to improve their knowledge and response to providing victim care.

The government assigned victims a legal advocate from the Ministry of Justice and Human Rights to safeguard their legal rights and guide them through the legal system after authorities initiated a prosecution. The government had 336 legal advocates, including nine that specialized in trafficking. LGBTQI+ individuals experienced discrimination from law enforcement and were often re-victimized during the criminal justice process. Law enforcement officials utilized secure Gesell chambers to conduct a single interview for sex trafficking victims. During the pandemic, authorities created a system to adapt the protection measures provided by Gesell chambers to online platforms, and officials used this system during virtual proceedings. A lack of incentives to participate in investigations and limited access to practical services, such as alternative livelihood development, led many adult victims to decline government services. Officials cited the lack of adequate protective services as a key impediment to their ability to effectively combat trafficking in Peru, and insufficient services left some groups at high risk of re-trafficking.

The March 2021 updates to the penal code established minimum criteria a judge should consider when awarding compensation to trafficking victims and granted authority for the government to confiscate a trafficker's property to fulfill payment obligations. However, the government did not report whether any courts ordered, or victims received, compensation in 2021. The government reported assisting foreign trafficking victims in the removal of fines or other penalties they may have incurred from undocumented entry. However, due to inadequate victim identification procedures, particularly among individuals involved in commercial sex, authorities may have penalized some unidentified trafficking victims for unlawful acts traffickers compelled them to commit. Foreign victims were eligible for temporary and permanent residency status under Peruvian refugee law, but the government did not report whether it granted any trafficking victims residency during the year.

## PREVENTION

The government increased prevention efforts. The government's multisectoral commission against trafficking, led by the MOI and composed of 13 government agencies and two NGOs, continued to coordinate the government's anti-trafficking response, and it finalized the National Policy Against Human Trafficking and its Forms of Exploitation

(2021-2030). The government adopted the national policy in July 2021, replacing its previous national action plan (NAP). Pandemic-mitigation measures, political instability, and insufficient funding continued to hamper implementation of anti-trafficking activities during the year. The government did not submit an annually mandated report to congress on its progress toward implementation of the NAP, due each September. However, the MOI launched an interactive website whereby members of the public could access detailed regional and sub-regional data on anti-trafficking efforts over the last five years, as well as recent government publications on trafficking. The government did not report the amount of funding it allocated to the MOI for anti-trafficking efforts in 2021. In 2020, the government allocated a line-item budget of 2.35 million soles ($592,090) to the MOI for anti-trafficking efforts, a significant decrease from approximately 4 million soles ($1.01 million) allocated in 2019, and other ministries funded anti-trafficking activities through their general budgets. All regional governments conducted some anti-trafficking activities, and the regions of Ayacucho, La Libertad, and Pasco each allocated a designated budget to anti-trafficking efforts. A 2019 law required the commission to prepare, and the Ministry of Economy and Finance (MEF) to prioritize, a multisectoral budget request that included dedicated anti-trafficking budgets for member entities of the multisectoral commission; the commission submitted an updated request, which MEF did not approve. Officials reported inadequate funding hindered their ability to effectively combat human trafficking, especially victim protection efforts.

The government operated two 24-hour telephone hotlines and several electronic platforms for the public to report suspected cases of trafficking. The MOI expanded hotline services to accommodate Quechua speakers in addition to Spanish speakers. Several ministries held events and disseminated materials through digital and other media platforms to raise awareness of trafficking, educate members of the public on identifying and reporting possible trafficking crimes, and promote the new national policy. The MOI organized a virtual dialogue with regional government institutions designed to strengthen anti-trafficking efforts in the context of the pandemic, and it coordinated with civil society organizations to host a three-day forum on the pandemic's impact on fulfillment of the previous NAP. The Ministry of the Environment conducted virtual awareness-raising activities to educate staff from affiliate agencies on the prevention of forced labor. The specialized prosecutors' office in the Loreto region encouraged members of the public to tag its social media account on suspicious online job offers to help verify their legitimacy. Specialized police units implemented a campaign to educate members of the public on the experiences of forced child labor victims; the campaign aimed to reduce social tolerance and foster a culture of public reporting around suspected forced child labor crimes. Digital awareness campaigns were limited in reaching vulnerable remote communities without reliable internet connectivity.

The government maintained a separate governance infrastructure, led by the Ministry of Labor (MOL), on combating forced labor. The MOL conducted virtual awareness-raising sessions on forced labor for officials in 22 regional labor departments. The government required private employment agencies to train their personnel in the detection of job offers that could be linked to human trafficking, migrant smuggling, or child labor and prohibited them from charging workers recruitment fees or retaining workers' identity documents or personal items. Labor inspectors had a mandate to monitor employment agencies for compliance, but they lacked adequate case management systems to effectively classify and refer suspected criminal cases to appropriate authorities. Due to the pandemic, the government conducted labor inspections virtually. The government maintained labor inspection units that specialized in forced and child labor, but it did not report whether these units identified any trafficking victims in 2021. The government partnered with an international organization to launch a program giving workers the ability to verify their employment registration status and confidentially report noncompliant employers to authorities, facilitating workers' entry into the formal workforce. In total, the government formalized the status of 308,835 workers, decreasing the risks of exploitation inherent in the informal economy.

The government continued strong efforts to issue national identity documents to all Peruvian citizens, including through programs designed to reach remote, Indigenous communities where trafficking risks were high. In February 2022, the government opened its first bilingual civil registry office in Cusco, designed to further improve access to documentation for communities whose primary language is not Spanish. The government issued 112,000 temporary stay permits to migrants who entered Peru irregularly, and authorities continued to confer a special humanitarian immigration status for Venezuelan asylum applicants, decreasing these groups' vulnerability to exploitation. The government did not permit transgender individuals to change their gender on identity documents; this lack of access to accurate documentation increased their vulnerability to exploitation. The Ministry of Foreign Trade and Tourism, through its program to promote awareness and prevention of child sex tourism, hosted numerous educational sessions for tourism industry professionals, government officials, students, and members of the public; developed a prevention guide for tourism industry professionals; and created a poster campaign to raise awareness. In addition, the regional government and civil society organized awareness campaigns in Loreto to discourage child sex tourism. Authorities reported investigating suspected sex tourism operations in Loreto and Lima regions but did not provide additional details about possible cases. The government conducted law enforcement operations and made arrests for illegal mining and logging, crimes which fueled the demand for sex and labor trafficking.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Peru, and traffickers exploit victims from Peru abroad. Traffickers exploit Peruvian and foreign women and girls, and to a lesser extent boys, in sex trafficking within the country; traffickers increasingly recruit victims through social media platforms, often through false employment offers or deceptive romantic relationships. Traffickers lure Peruvian, Venezuelan, and Bolivian women and girls to remote communities near mining and logging operations through false promises of lucrative employment opportunities then exploit them in sex trafficking after arrival. Tourists from the United States and Europe purchase sex from child trafficking victims in areas such as Cusco, Lima, and the Peruvian Amazon. In the Loreto region, criminal groups facilitate transportation of foreign tourists by boat to remote locations where traffickers exploit women and children in sex trafficking in venues on the Amazon River. Pandemic-related travel restrictions halted most tourism to Peru in 2021; while the lack of tourism may have decreased some forms of trafficking, local NGOs report other forms of exploitation increased as traffickers shifted operations online. Traffickers exploit Peruvian and foreign adults and children in forced labor in the country, principally in illegal and legal gold mining and related activities, logging, agriculture, brick-making, unregistered factories, counterfeit operations, organized street begging, and domestic service. Traffickers subject Peruvians to forced labor in gold mines and service jobs in nearby makeshift camps; traffickers compel victims through deceptive recruitment, debt-based coercion, isolation and restricted freedom of movement, withholding of or non-payment of wages, and threats and use of physical violence. Traffickers subject children to forced labor in begging, street vending, domestic service, cocaine production and transportation, and other criminal activities. Local observers report the isolation and quarantine measures imposed to curb the pandemic brought greater public attention to abusive working conditions in domestic service. Remaining members of the narcoterrorist organization Shining Path use force and coercion to subject children and adults to forced labor in agriculture, cultivating or transporting illicit narcotics, and domestic servitude, as well as to carry out terrorist activities, and at times recruit children using force and coercion to serve as combatants or guards.

Indigenous Peruvians, many of whom live in remote areas with limited access to government services, are particularly vulnerable to trafficking. LGBTQI+ Peruvians are vulnerable to trafficking, including re-exploitation. Transgender individuals are at particularly high risk, and traffickers seek to exploit their need to finance gender-affirming medical care. Venezuelan migrants and refugees fleeing the humanitarian crisis in their country continued to enter Peru, with more than 1.32 million Venezuelans residing in Peru under permanent, temporary, or irregular migration status by the end of 2021. Venezuelan adults and children are vulnerable to sex and labor trafficking en route to or after arrival in Peru, often lured into exploitation through false employment offers.

Haiti AR_000927

Pandemic-mitigation measures increased risks among children who did not attend school in person during the year, especially LGBTQI+ children or others who ultimately fled abusive or difficult situations in their homes. Local experts report an increase in online sexual exploitation of children, in which traffickers sexually exploit children in live internet broadcasts in exchange for compensation. Illicit activity, including sex and labor trafficking, is common in regions of the country with limited permanent government presence, including remote mining and logging areas and the VRAEM. Illegal mining and logging operations fuel the demand for sex and labor trafficking in Peru.

Traffickers exploit Peruvian women and children in sex trafficking in other countries, particularly within South America. Also, they exploit women and girls from neighboring countries in Peru. NGOs and foreign authorities report traffickers exploit transgender Peruvians in sex trafficking in Argentina, Italy, and Sweden. Traffickers subject Peruvian adults and children to forced labor in other South American countries, the United States, and other countries. An NGO reported the massive prevalence of human trafficking of children and young adults near Peru's border with Ecuador. NGOs and government officials reported that official complicity in trafficking crimes and widespread corruption in Peruvian law enforcement and judicial systems continue to hamper anti-trafficking efforts.

## PHILIPPINES: TIER 1

The Government of the Philippines fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the Philippines remained on Tier 1. These efforts included identifying more victims than in 2020, drafting standard operating procedures (SOPs) on the identification and monitoring of trafficking-related corruption cases, sentencing nearly all traffickers to significant prison terms, and creating an executive-level Department of Migrant Workers. Victim-witness coordinators supported more victims participating in the criminal justice process than in the previous reporting period, and the government increased funding to the interagency anti-trafficking council. Although the government meets the minimum standards, it did not report vigorously investigating labor trafficking crimes that occurred within the Philippines or take adequate steps to investigate and arrest individuals suspected of purchasing commercial sex from trafficking victims, nor did it provide training for labor inspectors on indicators of human trafficking. The government prosecuted and convicted fewer traffickers, and it did not report holding accountable officials allegedly complicit in human trafficking crimes.



PHILIPPINES TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:
Increase efforts to investigate, prosecute, and convict complicit officials and labor traffickers. • Strengthen the capacity of local government units to provide reintegration services for trafficking survivors, including trauma-informed care, job training, and in-country employment. • Increase support to government and NGO programs that provide specialized care for trafficking victims, including child victims of online sexual exploitation. • Establish and implement a process to ensure systematic and ongoing input from a diverse community of survivors on the design, implementation, monitoring, and evaluation of anti-trafficking policies and programs. • Increase efforts to ensure victims receive court-ordered restitution and compensation ordered

through civil judgments. • Increase resources for anti-trafficking task forces to conduct timely investigations, coordinated operations, and prosecutions while providing robust victim and witness assistance services. • Increase efforts to identify and assist labor trafficking victims, including by providing training to law enforcement, social service providers, and labor inspectors on indicators of trafficking. • Increase resources for law enforcement units designated to investigate all forms of trafficking. • Consistently implement the coordinated interagency response to providing services to returning Filipinos exploited in sex and labor trafficking overseas. • Create a central database for information on illegal recruiters and human trafficking cases to facilitate interagency coordination in detecting, investigating, and prosecuting traffickers.

### PROSECUTION
The government slightly decreased anti-trafficking law enforcement efforts. The 2003 and 2012 anti-trafficking acts criminalized sex trafficking and labor trafficking and prescribed penalties of up to 20 years' imprisonment and fines of between 1 million and 2 million pesos ($19,600 to $39,190). These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

The government did not report the total number of anti-trafficking operations and investigations of illegal recruitment as it did in prior years; however, it reported 168 law enforcement-led anti-trafficking investigations, compared with 248 anti-trafficking operations and 233 investigations of illegal recruitment in the previous reporting period. The government initiated prosecution of 298 alleged traffickers (377 in the previous reporting period); these included 62 labor trafficking defendants, 224 sex trafficking defendants, and 12 defendants for unspecified exploitation. The government reported 1,297 prosecutions remained ongoing from previous reporting periods. The government convicted 56 traffickers—46 for sex trafficking, five for forced labor, and five for unspecified forms of exploitation—compared with 73 convictions in the previous reporting period. Courts sentenced nearly all traffickers convicted under the anti-trafficking act to significant prison terms, ranging from four years to life imprisonment, and fines ranging from 500,000 to 10 million pesos ($9,800 to $195,960). Courts continued to use plea bargaining in human trafficking cases, particularly in those involving the online sexual exploitation of children (OSEC), which significantly decreased the time to reach case resolution and further reduced the potential for re-traumatizing child witnesses in trials, many of which involved traffickers who were family members. In response to the pandemic-related restrictions in 2020, the Supreme Court continued to facilitate the court filings and proceedings through email and video conferencing as authorized in a circular issued in 2020, which enabled the government to secure some trafficking convictions through video conferencing; however, equipment and stable internet connections were not consistently available, especially for victim-witnesses. Additionally, pandemic-related lockdowns at various points of the reporting period delayed in-person law enforcement actions due to personnel shortages, increased health protocols, and mandatory quarantines.

A prosecution of a police officer investigated for cyber-facilitated sex trafficking remained ongoing during the reporting period. The Department of Justice (DOJ) continued an investigation of nine Bureau of Immigration (BI) officers for facilitating the illegal airport departure of potential trafficking victims. The prosecution of a police officer who allegedly aided a suspected trafficker to avoid prosecution, remained pending at the end of the reporting period. The government did not report any convictions of government employees complicit in human trafficking crimes during the reporting period. Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Observers reported police and immigration officials, especially at lower levels, accepted bribes to facilitate or ignore trafficking crimes, including tampering with or producing fraudulent travel documents. An international organization reported the Armed Forces of the Philippines (AFP) unlawfully recruited and used one child soldier in a support role during the reporting period. The Inter-Agency Council Against Trafficking (IACAT) drafted SOPs on the identification and monitoring of trafficking-related corruption

cases, which included reporting mechanisms and employee suspension guidelines.

The DOJ continued to oversee and support operations and training for 24 interagency anti-trafficking task forces (a DOJ-led task force, a national interagency task force, 16 regional task forces, and six air and seaport task forces). Designated prosecutors led the task forces with the assistance of prosecutors who worked on trafficking cases in addition to their regular workloads; they were responsible for enhancing law enforcement efforts and ensuring the reporting, referring, and filing of trafficking cases. IACAT continued to use the prosecutor's trafficking case management system to monitor case progress and outcomes. Through continued operation of the Philippine Internet Crimes Against Children Center, the Philippines National Police (PNP) Women and Children's Protection Center (WCPC) and the National Bureau of Investigation Anti Human Trafficking Division partnered with foreign law enforcement agencies and an international NGO to improve the effectiveness of investigations of OSEC. The PNP led the investigation of most OSEC cases and operated regional WCPC cyber protection units focused specifically on OSEC crimes. The government reported cooperating with the several foreign governments—including Australia, Ireland, Malaysia, the United Kingdom, and the United States—on trafficking investigations, primarily involving OSEC.

Government agencies continued to report the need for additional anti-trafficking law enforcement personnel, funds for operations, and equipment for forensic analysis of digital evidence due in part to the extremely high volume of cybercrime tips related to child sexual exploitation the DOJ Office of Cybercrime received, totaling more than 3 million in 2021. Slow moving courts, the need for additional training on handling digital evidence in hearings and trials, and too few prosecutors also hindered the effective and timely prosecution of trafficking crimes. NGOs reported police did not take sufficient steps to investigate and arrest purchasers of commercial sex, including foreign sex tourists and those who purchased commercial sex acts from trafficking victims, and often did not question customers who were present during operations in entertainment establishments. The government (both independently and in partnership with civil society organizations) trained police, prosecutors, judges, immigration officers, and other officials on various topics, including anti-trafficking laws, proactive investigation strategies, and identification of trafficking victims.

## PROTECTION

The government increased victim protection efforts. The government lacked a reliable mechanism to consolidate statistics on the total number of victims identified and assisted. The government reported identifying 1,802 victims, compared with 1,534 potential victims identified in the previous reporting period. Of the 1,802 victims identified, traffickers exploited 535 in sex trafficking, 501 in forced labor, and 766 in unspecified exploitations; 551 were male and 1,251 were female. The Department of Foreign Affairs (DFA) reported identifying 248 potential Filipino trafficking victims abroad from July to December 2021, primarily in the Middle East and Asia, compared to 2,429 in the previous reporting period. In addition to victims identified by the government, NGOs and an international organization reported identifying 985 sex trafficking victims (228 men, 742 women, 197 boys, and 545 girls) and six adult female labor trafficking victims during the reporting period.

The government reported providing all identified victims with direct services or referrals to various protection services, including shelter provisions of basic needs, medical care, education assistance, psycho-social counseling, and livelihood assistance. The Department of Social Welfare and Development (DSWD) continued to implement the national referral system, maintained the national recovery and reintegration database, and operated 44 residential care facilities that provided services to victims of trafficking and other forms of exploitation. Of these facilities, 24 served children, 13 served women, four served older persons, one served men, and two operated as temporary processing centers. The government allocated 24.8 million pesos ($485,990) to implement DSWD's recovery and reintegration program for trafficking victims, compared with 22.9 million pesos ($448,760) in 2020.

ICACT continued to operate a center in metro Manila that served as a specialized shelter for trafficking survivors and a one-stop service center for reporting potential cases of trafficking and providing referrals without the need for victims to contact multiple agencies. In 2021, the center provided 482 potential victims, including 83 children, with temporary accommodation prior to their referral to other shelters pending the results of COVID-19 testing. The government continued efforts to finalize the construction of a shelter for men in region nine, where armed conflict continued. DSWD referred trafficking survivors to the local social welfare and development office in their community for follow-up services, which observers noted often lacked the personnel and resources to provide individualized case follow-up. Staff permitted adult victims residing in shelters to leave unchaperoned, provided there were no threats to their personal security or psychological care issues. DSWD assisted foreign national victims, including through temporary shelter and psycho-social intervention, and coordinated repatriation with the relevant foreign embassies. Such specialized assistance services, as well as reintegration follow-up services and job training and placement, remained inadequate to address the needs of adult trafficking victims.

The government continued to support victims who served as witnesses during trials and hired three additional victim-witness coordinators during the reporting period. Seven regional task force victim-witness coordinators provided trauma-informed support and assistance, including by providing continuous support throughout the criminal justice process, to 476 victims (130 in 2020). One trafficking victim entered the witness protection program in 2021 (11 in 2020), which included housing, livelihood and travel expenses, medical benefits, education, and vocational placement. In addition, DOJ operations center personnel continued to provide transportation and security protections for victims to participate in case conferences and hearings. Police and prosecutors continued the use of recorded child victim interviews at the inquest stage and in some trials, which reduced the number of times officials interviewed victims and the potential for re-traumatizing children who served as witnesses. The government also reported increasing the use of financial and digital evidence to prove trafficking and OSEC crimes in court, reducing the reliance on victim testimony and decreasing potential re-traumatization of child victims. The government did not report any orders of restitution paid by traffickers to victims of trafficking, and NGO observers reported that although judges continued to award victims compensation for damages, victims almost never received damages in practice and courts lacked effective mechanisms to collect damages from traffickers.

DFA, in collaboration with the IACAT and its member agencies, implemented whole-of-government procedures to ensure interagency coordination of services for repatriated Filipino trafficking victims. The government continued to deploy DSWD social workers in Philippine diplomatic missions in Hong Kong, Kuwait, Malaysia, Qatar, Saudi Arabia, South Korea, and the United Arab Emirates (UAE). DFA allocated 1 billion pesos ($19.6 million), similar to the amount allocated in 2020, for the Assistance to Nationals Fund (ATN), which covered assistance such as airfare, meal allowance, shelter, medical care, and other needs of overseas Filipino workers (OFWs). DFA reported dispersing 62.8 million pesos ($1.23 million) from the ATN, compared with 28.38 million pesos ($556,140) in the previous reporting period. DFA provided nine Philippine overseas missions with funds to support shelters or temporary accommodations for Filipino trafficking victims awaiting the resolution of their cases or their repatriation. In 2021, DFA reported assisting 431 potential victims of human trafficking identified by overseas missions (2,575 in 2020), of which the majority experienced illegal recruitment. DSWD social workers, responsible for assisting distressed overseas Filipinos and their families, assisted 536 victims of trafficking or illegal recruitment, compared with 1,133 in 2020. Social services provided to OFW trafficking victims included coordination with the host government, contract buy-out, shelter, provision of personal necessities, medical aid, financial assistance, payment of legal fees, repatriation, and referral to appropriate agencies. With donor support and in cooperation with an NGO, the IACAT operated the Task Force Against the Trafficking of Overseas Filipino Workers, which assisted 248 Filipino domestic workers repatriated from the

Middle East, from July to December 2021, who reported experiencing indicators of trafficking.

## PREVENTION

The government slightly increased efforts to prevent trafficking. IACAT, the lead coordinating body responsible for overseeing and monitoring implementation of the government's anti-trafficking efforts and which the secretaries of DOJ and DSWD chaired and co-chaired respectively, met regularly to share information and coordinate policies. Three NGOs participated as members of IACAT, which also involved additional NGOs, private sector representatives, and survivors in technical working groups and other fora. In partnership with an NGO, IACAT created a working group that met to consider the creation of a formal council for trafficking survivors to advise and make recommendations to the government on anti-trafficking policies. The government allocated 68.4 million pesos ($1.34 million) to the IACAT Secretariat's budget, compared with to 65.2 million pesos ($1.28 million) in 2020. IACAT reported creating 76 permanent staff positions for the Secretariat's staff; approval of these positions was pending at the end of the reporting period. The government continued to implement its 2017-2021 national action plan (NAP), which expired in December 2021; the government began developing an updated NAP at the end of the reporting period. NGOs noted insufficient resources within the government's anti-trafficking structures, especially for law enforcement, specialized trainings, and support services, and for ensuring local government units implemented trafficking laws.

The government—including IACAT, its member agencies, and anti-trafficking regional task forces—both independently and in partnership with civil society, held national, regional, and local-level trafficking awareness-raising campaigns targeting community leaders, local officials, potential migrant workers, and the general public on human trafficking indicators, potential risk factors, and the various forms of trafficking. The government conducted a series of orientation meetings reaching more than 3,000 child protection actors in the public and private sectors, as well as a social media awareness campaign, on the Special Protection of Children in Situations of Armed Conflict (CSAC) Act, which prohibited the recruitment of children in armed conflict. The government also held a webinar attended by 450 participants from government agencies, including the PNP and AFP, covering the CSAC Act. The AFP and UNICEF approved a Strategic Plan to End Recruitment of Children and other Grave Violations in June 2021; the plan supports the implementation of the CSAC Act.

IACAT continued to operate and fund a 24/7 hotline dedicated to assisting trafficking victims; the hotline identified 36 potential trafficking cases in 2021 and referred all cases to law enforcement and all victims to services. PNP and the Commission on Filipinos Overseas (CFO) also continued to operate hotlines, and the DFA Office of Migrant Workers Affairs maintained a HELP Facebook page for Filipinos working abroad who were in distress and their families to request assistance. In partnership with an international organization and an NGO, IACAT began developing an online mechanism to provide migrant workers with access to frequently asked questions to help triage claims and link migrants with existing grievance mechanisms.

The Department of Labor and Employment (DOLE) overseas labor officers continued to review overseas Filipino workers' labor contracts and assist them with labor contract violations and allegations of abuse. The Philippines Overseas Employment Administration (POEA) filed 868 administrative charges against licensed recruitment agencies for disallowed practices and cancelled 18 agencies' licenses, compared with 508 charges and 22 cancellations of agencies' licenses in the previous reporting period. In December 2021, the president signed Department of Migrant Workers (DMW) Act, which elevated POEA to an executive department. The government officially formed DMW in February 2022 and mandated it to oversee law enforcement action against illegal recruitment agencies, create a database to track recruiters involved in trafficking crimes, and raise awareness of trafficking indicators among migrant workers. The government maintained bilateral labor agreements with various destination countries on the recruitment of migrant workers and the protection of their rights. International organizations continued to report that the high volume of employment contracts requiring verification by POEA and the Philippine Overseas Labor Office often

caused delayed in the issuance of overseas employment certificates required for departures. The BI Travel Control and Enforcement Unit continued to screen departing passengers and deferred the departure of 13,805 passengers (11,706 in 2020), including 683 potential victims of trafficking, due to incomplete or suspicious travel documents or misrepresentation. BI stopped six foreign registered sex offenders from entering the country.

The lack of a centralized database tracking illegal recruitment and human trafficking continued to hamper the government's efforts to prevent trafficking and hold traffickers accountable. Observers stated the government did not adequately fund and staff the labor inspectorate, and the government did not report providing training for labor inspectors to identify indicators of trafficking, which may have impeded the government's ability to identify potential cases of forced labor. The government did not prioritize identifying forced labor on fishing vessels and employed notably few inspectors dedicated to conduct inspections on fishing vessels. Despite conducting more than 59,100 labor inspections, the government reported identifying only six child labor violations in 2021. The government did not make efforts to reduce the demand for commercial sex acts. DOJ continued to introduce government officials to initiatives aimed at addressing human trafficking in public procurement and supply chains.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the Philippines, and traffickers exploit victims from the Philippines abroad. Traffickers exploit women and children from rural communities, conflict- and disaster-affected areas, and impoverished urban centers in sex trafficking, forced domestic work, forced begging, and other forms of forced labor in tourist destinations and urban areas around the country, and traffickers exploit men in forced labor in the agricultural, construction, fishing, and maritime industries, sometimes through debt-based coercion. NGOs and government officials continue to report cases in which family members sold children to employers for domestic labor or sexual exploitation, and there are reportedly hundreds of thousands of children involved in selling and begging on the streets at risk to trafficking. One study found that approximately 50,000 Filipino children are employed as domestic workers in the Philippines, including nearly 5,000 who are younger than the age of 15. A significant percentage of working children faced hazardous working conditions, including in mines, factories, and farms, where they likely experienced indicators of forced labor. Indigenous persons and many of the approximately 340,000 internally displaced persons in Mindanao are at risk of trafficking, including through fraudulent promises of employment. Non-state armed groups operating in the Philippines, including the New People's Army, Maute Group, Moro National Liberation Front, Abu Sayyaf Group, and Bangsamoro Islamic Freedom Fighters, unlawfully recruit and use child soldiers, at times through force, for combat and noncombat roles. In 2021, reports also indicate the AFP unlawfully recruited and used child soldiers. Non-state supporters of ISIS reportedly subject women and girls to sexual slavery in the Philippines. NGOs report orphans and unaccompanied children are vulnerable to recruitment by armed forces and nonstate groups.

The government processes approximately 2.3 million new or renewed contracts for Filipinos to work overseas in nearly 170 countries each year; however, temporary travel restrictions related to the pandemic prevented many Filipino workers from departing for overseas employment. A significant number of Filipino migrant workers become victims of sex trafficking or labor trafficking in numerous industries, including industrial fishing, shipping, construction, education, home health care, and agriculture, as well as in domestic work, janitorial service, and other hospitality-related jobs, particularly in the Middle East and Asia but also in all other regions. Traffickers, typically in partnership with local networks and facilitators and increasingly using social networking sites and other digital platforms, recruit unsuspecting Filipinos through illegal recruitment practices, such as deception, hidden fees, and production of fraudulent passports, overseas employment certificates, and contracts, to exploit migrant workers in sex and labor trafficking. In January 2021, media reported traffickers fraudulently recruited dozens of Filipino domestic workers to work in the UAE but instead transported them to Damascus for forced domestic work. Using tourist visas available in Middle East

**POLAND**

countries where many Filipinos work in household service jobs, traffickers lure children from remote areas of Mindanao and other regions then sell them to employment sponsors who exploit them. Traffickers also use student and intern exchange programs and fake childcare positions, as well as porous maritime borders, to circumvent the Philippine government and destination countries' regulatory frameworks for foreign workers and evade detection. Traffickers exploit Filipinos already working overseas through fraudulent employment offers to work in another country. Traffickers sometimes take advantage of the absence of adequate immigration personnel at smaller airports in the Philippines. Observers report traffickers are increasingly using "intra-company transferee" and "short-term visitor" visas—both legitimate and fraudulent—to facilitate the travel of Filipino engineers and undergraduate students to Japan, where traffickers subsequently exploit them in forced labor in factories.

Sex trafficking occurs in tourist destinations, such as Boracay, Angeles City, Olongapo, Puerto Galera, and Surigao, where there is a high demand for commercial sex acts. Although the availability of child sex trafficking victims in commercial establishments declined in some urban areas, child sex trafficking remains a pervasive problem, typically abetted by taxi drivers who have knowledge of clandestine locations. Many sex tourists in the Philippines are convicted or charged sex offenders or pedophiles in their home countries and are most commonly citizens of Australia, Japan, New Zealand, the United Kingdom, and the United States, with an increasing number of reports from Canada, Morocco, Iraq, and Denmark. Filipino men also purchase commercial sex acts from child trafficking victims. Law enforcement information indicates that the Philippines is one of the largest known sources of online sexual exploitation of children, in which traffickers sexually exploit children, individually and in groups, in live internet broadcasts in exchange for compensation wired through a money transfer agency by individuals most often in another country, including the United States, Australia, Canada, and the United Kingdom. The traffickers are often parents or close relatives who operate in private residences or small cyber cafes, and many child victims, girls and boys, are younger than 12 years. Identified hotspots for this form of sex trafficking in Luzon and Visayas include Iligan, Lapu-Lapu, Pampanga, Quezon City, Malabon, Pasig, Taguig, and Caloocan. Reports cited a nearly 265 percent increase in unconfirmed reports of online child sexual abuse during the pandemic. Economic impacts of the pandemic, combined with an increased amount of time children spent at home, resulted in an increasing number of families forcing their children into online sexual exploitation. Traffickers exploit PRC national and other Asian women in commercial sex in locations near offshore gaming operations that cater to PRC nationals; however, in 2020 the pandemic resulted in a massive departure of PRC nationals employed in offshore gaming operations, resulting in decreased reports of sex trafficking among this community. PRC nationals employed in the Philippines at worksites affiliated with the PRC's Belt and Road Initiative were vulnerable to forced labor.

Officials, including those in diplomatic missions, law enforcement and immigration agencies, and other government entities, allegedly have been complicit in trafficking or allowed traffickers to operate with impunity. Some corrupt officials allegedly accept bribes to facilitate illegal departures for overseas workers, operate sex trafficking establishments, facilitate production of fraudulent identity documents, or overlook illegal labor recruiters. Reports in previous years asserted police conduct indiscriminate or fake raids on commercial sex establishments to extort money from managers, clients, and victims. Some personnel working at Philippine embassies reportedly withhold back wages procured for their domestic workers, subject them to domestic servitude, or coerce sexual acts in exchange for government protection services. There were anecdotal reports that police and local government units subjected individuals—who have voluntarily surrendered to officials in relation to the government's anti-drug campaign—to forced labor.

## POLAND: TIER 2

The Government of Poland does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared

to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Poland remained on Tier 2. These efforts included investigating and prosecuting more suspected traffickers. The government adopted a new national action plan (NAP), and the government's first procurement strategy requiring authorities to ensure forced labor was not used in government contracts. The government identified and assisted more victims, enacted legislation increasing the penalties for trafficking crimes committed against those fleeing Russia's war on Ukraine, and enhanced protections for unaccompanied children. However, the government did not meet the minimum standards in several key areas. Labor inspectors did not identify any trafficking victims, and overall victim identification efforts remained inadequate. The government also did not increase resources for victim services, thereby constraining overall protection efforts. Authorities lacked a central mechanism to cross-reference and consolidate law enforcement statistics, which may have hindered the government's ability to track trafficking trends and effectively adapt policy.



POLAND TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase efforts to identify trafficking victims, particularly among vulnerable populations, including unaccompanied children and migrants. • Proactively identify labor trafficking victims, including by strengthening the capacity of the Labor Inspectorate to identify victims of forced labor and refer them to services. • Vigorously investigate and prosecute alleged trafficking crimes, particularly forced labor cases, and seek significant prison terms for convicted traffickers. • Increase funding for comprehensive victim services, including specialized accommodation for child and male victims. • Increase training for prosecutors and judges on the importance of prosecuting under the anti-trafficking statute, the severity of trafficking crimes, and a trauma-informed, victim-centered approach to conducting trials. • Increase training for law enforcement on the element of coercion in trafficking crimes to ensure that victims are not penalized for crimes their traffickers compelled them to commit. • Improve central operational coordination and data collection for anti-trafficking activities. • Increase worker protections by eliminating recruitment fees charged to workers by labor recruiters and ensuring employers pay any recruitment fees. • Establish procedures or specialized units to ensure trafficking cases are handled by trained prosecutors. • Appoint trauma-informed officials to conduct child victim witness interviews in a child-friendly manner. • Improve victims' ability to access court-ordered restitution in criminal cases and compensation through civil proceedings.

## PROSECUTION

The government increased law enforcement efforts. Article 189a of Poland's penal code criminalized sex trafficking and labor trafficking and prescribed penalties of three to 15 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Article 189a replaced Article 253 of the criminal code, which prosecutors could still use in cases that started when Article 253 was in effect. Article 253 of the criminal code also prescribed penalties of three to 15 years' imprisonment. In addition, Article 203 criminalized inducing an adult into prostitution through force, fraud, or coercion, and Article 204.3 criminalized inducing a child into prostitution; both articles prescribed penalties of one to 10 years' imprisonment. As a result of Russia's full-scale invasion of Ukraine and the resulting refugee crisis and refugees' heightened vulnerability to trafficking, in March 2022, the government enacted legislation increasing the penalties under Article 189a for trafficking crimes committed during Russia's war on Ukraine

to between 10 to 15 years' imprisonment or 25 years' imprisonment for severe cases.

The government lacked a central mechanism to cross-reference and consolidate law enforcement statistics and did not consistently disaggregate sex and labor trafficking data. Law enforcement authorities initiated 32 investigations under Article 189a (22 in 2020); nine were for sex trafficking, 11 for forced labor (including two for forced begging), and 12 were for unspecified forms of exploitation. Prosecutors initiated 57 investigations from cases referred by police and border guards (46 in 2020) and prosecuted 25 defendants under Article 189a (20 in 2020); 21 were for sex trafficking, one was for forced labor, and three were for unspecified forms of trafficking. The government also investigated 16 cases and prosecuted 16 defendants under Article 203 or Article 204.3, compared with 16 cases investigated and four defendants prosecuted in 2020. The National Prosecutor's Office (NPO) reported courts convicted 25 traffickers under Article 189a (compared with an unknown number of traffickers in 12 cases in 2020). Eleven were sentenced to less than three years' imprisonment, seven to three were sentenced to five years, and seven were sentenced to more than five years. The NPO reported the majority of victims identified in investigations were Polish citizens (318 out of 447), largely due to three new investigations authorities initiated, in cooperation with the United Kingdom (UK), focused on Polish citizens exploited in the UK for forced labor and social welfare fraud. The Border Guard launched an investigation that led to the identification of 40 victims from Colombia, Mexico, and Venezuela who were exploited for labor in the food and agriculture processing industry and in manufacturing. The government reported law enforcement efforts were not impacted by the pandemic; however, training opportunities for police were reduced due to pandemic-related restrictions.

The National Police maintained an anti-trafficking department with 11 officers, along with 17 regional offices, each with three to eight officers investigating trafficking, child pornography, and child sexual abuse. The Central Bureau of Investigations maintained an anti-trafficking coordinator at its headquarters and in each of its 17 regional branches, and the Border Guard operated a specialized central team and had 10 regional anti-trafficking coordinators. Each regional prosecutorial office had a trafficking expert to assist local prosecutors and who could assume responsibility for more complex cases. During the reporting period, a working group of the national anti-trafficking advisory body created a manual for law enforcement and the judiciary with detailed information on the law's definition of trafficking, indicators and trends, and best practices for prosecuting traffickers. The government continued to provide institutionalized training programs for police, border guards, prosecutors, judges, consular officers, asylum officers, and labor inspectors on various anti-trafficking issues, fully or partially online due to the pandemic. In May 2021, the Ministry of Interior (MOI) organized two workshops on illicit financial activity related to human trafficking for police and Border Guard officers. Observers reported prosecutors and judges lacked familiarity with victim-centered approaches, the impact of trauma on victims, and the severity and complexity of the crime; observers reported the frequent rotation of officials focused on trafficking, both at the national and provincial levels, negatively impacted the government's understanding of the complexity of the crime. Observers reported, despite the continued increase in labor trafficking in Poland, the government rarely prosecuted forced labor cases due to the difficulty in collecting evidence in these cases, the low number of victims who self-identify as forced labor victims, and a lack of political will to prioritize a form of trafficking that largely affects non-Polish migrants or Polish citizens residing abroad. Moreover, the law did not have a clear definition of what constitutes forced labor in the criminal code, which contributed to law enforcement's under-identification of labor trafficking, and prosecutors and judges often lacked expertise in labor trafficking cases.

The NPO monitored all trafficking cases throughout the country that were classified as trafficking in the investigation stage. However, experts reported district prosecutors often qualified trafficking as lesser offenses, such as pimping or violation of workers' rights. Observers noted it was difficult to meet the evidentiary threshold to prosecute a crime under the trafficking statute. The NPO continued using a formal mechanism

for law enforcement to refer discontinued or dismissed trafficking investigations and prosecutions for review to the prosecutor responsible for coordinating trafficking investigations. However, an NGO reported there was no formal mechanism for civil society to refer cases to the NPO for reconsideration. Police referred four discontinued or dismissed cases, and the Border Guard referred one to NPO (11 total in 2020); NPO agreed with authorities that three cases potentially involved trafficking (five in 2020), and two cases were dismissed. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes. Authorities collaborated with Romanian authorities on a case involving Romanian children of Roma origin forced to beg in Poland. Authorities also coordinated with counterparts in other EU countries, including Germany, Lithuania, and the Netherlands, and with law enforcement in the UK. In late 2021, the National Police joined a European Multidisciplinary Platform Against Criminal Threats operation focused on an organized criminal group suspected of exploiting women, mainly from PRC, for commercial sex. The government obtained the extradition of two suspected traffickers residing in Germany.

**PROTECTION**
The government increased protection efforts. The government identified 94 victims (70 for labor trafficking, including one for forced begging, and 24 for sex trafficking), an increase from 82 in 2020 but still far less than the 221 victims identified in 2019. Authorities referred 61 to care facilities, compared with 39 in 2020; the government reported all victims were offered services, but some chose not to accept them. The National Intervention-Consultation Center for Victims of Trafficking (KCIK), run by two government-funded NGOs, provided assistance to 210 potential victims (166 in 2020), including 52 victims of sex trafficking, 87 victims of forced labor (including two for forced begging, two for forced criminal activity, and one for domestic servitude), and 71 victims of other types of exploitation related to trafficking; 115 were female, and 95 were male; and 159 were foreign victims, an increase from 109 in 2020. Due to pandemic-related restrictions, authorities conducted fewer operations to screen workplaces and commercial sex operations for potential victims, and training for police officers was limited. The National Police and Border Guard began using standard operating procedures (SOPs) to identify and refer victims that had been revised during the previous reporting period; these SOPs included tools to identify child victims and potential victims during the asylum process and a list of vulnerable groups that border guard officers should screen for trafficking. In response to an influx of third country nationals attempting to cross the border from Belarus, the government issued a regulation in August 2021 permitting the Border Guard to return to Belarus any migrants who crossed the border irregularly. In October 2021, the government legalized the practice of these "push-backs," allowing the government to withhold international protection for asylum-seekers; observers expressed concern this law violated asylum seekers' right to protection and authorities may have deported unidentified trafficking victims. During 2021, the Border Guard identified three potential trafficking victims attempting to enter Poland through the border with Belarus. The government signed an agreement with an international organization to implement a government- and EU-funded project to build capacity within the Border Guard to identify trafficking victims, particularly labor trafficking victims. Police and prosecutors had previously acknowledged that authorities lacked the expertise to identify forced labor and child victims, particularly among unaccompanied children. As in the previous three years, labor inspectors did not identify any victims in 2021. Observers previously noted labor inspectors' challenges in determining whether an offense constituted a violation of workers' rights or forced labor. One working group of the national anti-trafficking advisory body developed SOPs for labor inspectors on the identification and referral of labor trafficking victims; in December 2021, the government distributed the SOPs to all district labor inspection offices. The MOI funded training for Polish national airline crews on trafficking indicators and a reporting mechanism developed by the airline. The Ministry of Family and Social Policy conducted two virtual training sessions for social workers focused on the identification of trafficking victims, crisis intervention, and cooperation with other institutions on victim protection. Civil society representatives reported

effective cooperation with the national police and Border Guard on victim referral procedures during the reporting period.

KCIK provided Polish and foreign national adult and child victims with medical and psychological care, shelter, legal counseling, welfare support, reintegration services, and referrals to orphanages and foster care for child victims. Observers expressed concern the national system for child victim assistance did not properly address the needs of unaccompanied children and noted the government placed unaccompanied child victims in foster families or orphanages unprepared to assist child victims. Legislation passed in March 2022 mandated that all unaccompanied children entering Poland from Ukraine be provided a court-appointed temporary guardian authorized to represent the child and exercise custody over the child and the child's property; the legislation also required the government to create a register of all unaccompanied children coming from Ukraine, to be run by the Ministry of Family and Social Policy. KCIK operated two shelters for adult female victims, including one for women with children and a small shelter for men, and it rented apartments for victims who did not prefer shelters. The government allowed victims to seek employment and work while receiving assistance and to leave the shelters unchaperoned and at will; shelters and housing were available for victims with disabilities. Observers noted shelter capacity for male victims was insufficient given the increasing number of male labor trafficking victims. The government provided specialized shelter and housing to 54 victims in 2020 (42 in 2020). Victims also could receive general assistance (social, medical, psychological, and legal) in 171 crisis intervention centers operated and funded by local governments, 17 of which maintained staff trained on assisting trafficking victims; KCIK arranged accommodations for 65 victims using crisis centers and other locations (23 in 2020).

The government allocated 1.1 million zloty ($271,400) to two NGOs that run KCIK for victim services; funding has remained stagnant since 2015. The government also allocated 80,000 zloty ($19,740) to train welfare assistance personnel on identification of victims and provision of assistance to trafficking victims and witnesses, the same amount as in 2020. Experts said limited government funding for victim assistance constrained service provision, particularly outside of Warsaw and Katowice. All non-European Economic Area (EEA) victims were entitled to social welfare benefits, including crisis intervention assistance, shelter, meals, necessary clothing, and financial assistance; in the first six months of 2021, 21 non-EEA national victims received assistance, compared with 16 in the first six months of 2020 (26 total in 2020). Victims from the EEA had access to the full scope of welfare benefits offered to Polish citizens if they could prove habitual residency. NGOs had previously reported some victims, particularly from Romania and Bulgaria, were unable to prove this through the required documentation. Legislation went into effect in January 2021 allowing law enforcement to issue certificates to potential victims from EEA countries, facilitating their access to welfare benefits; in 2021, KCIK provided assistance to 13 EEA nationals (10 Bulgarians, one Romanian, and two Slovakians), compared with six in 2020.

Authorities reported screening individuals in vulnerable populations, including individuals in commercial sex and migrants, during law enforcement operations. Foreign victims were entitled to a three-month reflection period, during which they could stay legally in Poland to decide whether to assist in the criminal process; 61 victims used this benefit in 2021, compared with 11 in 2020. Foreign victims were eligible for a residence permit valid for up to three years, which entitled them to work, and could apply for permanent residency; authorities granted residence permits to 16 foreign victims in 2021, compared with 15 in 2020. The government repatriated one foreign victim to Bulgaria and coordinated with an international organization to repatriate 15 foreign victims (two in 2020); a government-funded NGO repatriated one foreign victim. Polish law permitted victims to provide testimony via video or written statements; audio-video recording of testimony was obligatory for victims younger than 15 years of age and for victims of sexual crimes, including sex trafficking. A government-funded NGO provided legal assistance to 100 victims in 2021. The government reported the majority of victims identified by prosecutors agreed to cooperate in investigations of their traffickers. However, experts

noted law enforcement and prosecutorial interview techniques lacked a trauma-informed approach, hindering opportunities to build rapport with traumatized victims, who then were less likely to provide reliable testimony. NGOs reported judges interviewed children and did not receive training on child-friendly, victim-centered, or trauma-informed interviewing techniques, which re-traumatized victims. Courts did not award restitution in 2021, compared with one case in 2020. Victims also could receive compensation in civil suits; the government did not report if any victims filed such suits.

## PREVENTION

The government increased prevention efforts. The MOI maintained an advisory body, chaired by the Minister of Interior and including interagency and civil society representatives, tasked with evaluating the implementation of anti-trafficking efforts and projects, including the NAP, and preparing annual reports. Civil society continued to express concern that this body lacked authority and could not compel government agencies to provide resources for anti-trafficking efforts. The advisory body met once, and its four working groups met regularly. The government reported, due to pandemic-related restrictions, internal reorganization of the MOI's anti-trafficking office, and the migration crisis on the border with Belarus, the government only organized one meeting of provincial-level interagency anti-trafficking teams during the reporting period. In November 2021, the Council of Ministers adopted a new NAP for 2022-2024. For the fourth consecutive year, the government allocated 135,000 zloty ($33,310) for the implementation of the NAP. The MOI published an annual implementation report and maintained a web portal with relevant statistics, publications, and information on victim assistance. The government lacked a central mechanism to cross-reference and consolidate trafficking-related statistics, hindering officials' ability to assess the scope of trafficking and the efficacy of law enforcement efforts.

The government conducted an awareness campaign targeting migrants at risk of being exploited in Poland; the government distributed leaflets and posters in four languages to 60 sites around the country and displayed anti-trafficking messages on screens in airports and on the government's online visa application portal. Provincial-level interagency anti-trafficking teams in all 16 regions continued prevention and public awareness campaigns, including by distributing leaflets and showing a mobile exhibition on forced labor. Observers noted these provincial-level anti-trafficking teams were uncoordinated and inconsistent in their effectiveness. A government-funded NGO operated a 24-hour hotline for trafficking victims and witnesses, which received 7,923 calls (9,504 in 2020). The government reported calls to the hotline led to victim identification; however, the hotline did not maintain statistics on how many calls were trafficking-related or resulted in investigations and victims identified. An NGO reported a growing number of potential victims contacted the hotline directly through social media or private messaging applications. To prevent trafficking among those fleeing Russia's war on Ukraine, the government worked with an international organization to limit border access to credentialed humanitarian actors and local authorities, created and distributed informational leaflets with the hotline number, and provided anti-trafficking information on a government website.

Local authorities could ban employers—previously convicted of trafficking—from hiring foreign nationals; the government did not report whether any entities were banned. The law prohibited recruitment fees for employment within Poland, but recruitment agencies could charge fees for four categories of expenses to secure work abroad: to cover transportation, visas, medical examinations, and translation of documents. The National Labor Inspectorate (NLI) reported 81 job recruitment agencies to local authorities for operating illegally (54 in 2020); the government removed 33 job recruitment agencies from the official registry of legally operating recruitment agencies (19 in 2020). Due to pandemic-related restrictions, non-emergency NLI inspections were carried out remotely or via a hybrid format from January to May 2021. The NLI conducted 495 inspections of job recruitment agencies (429 in 2020) but did not identify any potential trafficking victims. The NLI participated in an EU information campaign focused on raising

awareness about the rights of seasonal workers, obligations of employers, and counseling services for seasonal workers; several NLI regional branches operated a hotline to provide advice on seasonal work. In January 2022, the Council of Ministers adopted its first Government Procurement Strategy for the years 2022-2025; the strategy included prioritizing sustainable and innovative public procurement, under which the government must consider whether forced labor was used when deciding to grant a contract. The government promoted its 2020 manual for employers on identifying and preventing forced labor in businesses and supply chains, and the Ministry for Funds and Regional Policy published a special toolkit on its website with questionnaires to assist employers in identifying potential cases of forced labor. The government revised the law to allow workers from Armenia, Belarus, Georgia, Moldova, Russia, and Ukraine to work in Poland without a work permit for up to two years (previously six months); experts predicted this change would provide stability for migrant workers from these countries and lessen their vulnerability to trafficking. In 2021, the government passed legislation allowing foreign nationals with a combined residence and work permit to change employers or positions within a company without seeking a new permit; the law entered into force in January 2022. However, observers reported authorities took six to 12 months to issue combined residence and work permits to migrants, who often worked illegally during this time and were vulnerable to exploitation. In March 2022, the government granted Ukrainian citizens fleeing Russia's war on Ukraine 18-month residence permits; however, the law excluded individuals who had refugee status in Ukraine, stateless persons, and other third country nationals who fled Ukraine and could not return to their countries of origin. The MOI participated in a Council of the Baltic Sea States project to combat labor trafficking through various efforts, including by strengthening institutional frameworks and introducing relevant legislation, enhancing cooperation with the private sector, and promoting labor protection in key sectors and industries. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Poland, and traffickers exploit Polish victims abroad. Traffickers exploit Polish women and children in sex trafficking within Poland and other European countries, notably France and Germany. Traffickers exploit men and women from Poland for forced labor in Europe, primarily Western and Northern Europe and in particular Germany, Norway, Sweden, and the UK. Traffickers exploit women and children from South America and Eastern Europe—particularly Bulgaria, Romania, and Ukraine—in sex trafficking in Poland. Labor trafficking is the predominant form of trafficking in Poland, and traffickers increasingly use coercion and fraud instead of physical violence or threats of violence; victims originate from Europe, Asia, Africa, and increasingly from South America. Traffickers exploit migrants in forced labor among Poland's growing Ukrainian, Belarusian, Filipino, and Vietnamese populations, particularly in agriculture, restaurants, construction, domestic work, and the garment and fish processing industries. Observers reported the pandemic increased migrant workers' vulnerability to trafficking; the number of potential Ukrainian victims exploited in trafficking in Poland and seeking assistance upon their return to Ukraine increased twofold in 2020. More than three million refugees from Ukraine, predominantly women and children who are fleeing Russia's war on Ukraine, have crossed the Polish border seeking sanctuary and are vulnerable to trafficking. Traffickers recruit Romanian men, women, and children, particularly from the Roma population, for forced begging in Poland; persons with disabilities are particularly vulnerable.

## PORTUGAL: TIER 2

The Government of Portugal does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Portugal remained on Tier 2. These efforts included adopting a national identification and referral mechanism specifically for child trafficking victims and simplifying documents for trafficking victims to make them easier to understand. The government also launched a human trafficking awareness campaign for children and established two working groups focused on human trafficking in the fishing sector, while courts awarded restitution to more victims than the year prior. However, the government did not meet the minimum standards in several key areas. The government decreased investigations and prosecutions of alleged traffickers compared with the prior year and did not provide full sentencing data to demonstrate judges were sentencing traffickers with significant penalties. The government identified and assisted fewer victims for the second consecutive year and did not identify any victims among the asylum-seeking population as a result of ongoing gaps in victim identification. The government also continued to lack legal safeguards to protect victims from prosecution for unlawful acts traffickers compelled them to commit and did not report providing compensation to any trafficking victims in 2020.



PORTUGAL TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Improve efforts to proactively identify victims within the country, including Portuguese nationals, children, and sex trafficking victims, by systematically training government officials, particularly immigration police, labor inspectors, and law enforcement, on proactive victim identification among vulnerable groups. • Vigorously investigate, prosecute, and convict traffickers, including complicit officials, and sentence those convicted to significant prison terms. • Enact a legal provision on the non-punishment of victims to ensure that trafficking victims are not inappropriately penalized for unlawful acts traffickers compelled them to commit, including administrative and immigration-related offenses. • Increase trafficking survivor access to damages and compensation and increase prosecutor's efforts to systematically request restitution for survivors during criminal trials, including by training police, prosecutors, and magistrates on victims' right to restitution. • Allow formal victim identification and referral from entities other than the police, including civil society, social workers, and health care professionals. • Implement strong regulations and oversight of labor recruitment companies that are consistently enforced by investigating fraudulent labor recruitment and ensuring cases with indicators of labor trafficking are prosecuted under the trafficking statute. • Allocate additional resources and capacity for labor inspectors to detect labor trafficking. • Utilize the witness protection program for trafficking victims. • Enforce the law prohibiting recruitment fees charged to workers and ensure any recruitment fees are paid by employers. • Increase survivor engagement, including by establishing accessible mechanisms for receiving and providing compensation for survivor input when forming policies, programs, and trainings. • Increase efforts to pursue financial crime investigations in tandem with human trafficking cases.

## PROSECUTION

The government decreased law enforcement efforts. Article 160 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of three to 10 years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape. Some child sex trafficking crimes could also be prosecuted under Article 175, which addressed "pimping" crimes; it prescribed penalties of one to 10 years' imprisonment. Article 159 prohibited slavery and prescribed penalties of five to 15 years' imprisonment. In response to the pandemic, the government ordered a national lockdown for three months in 2020, and although some procedural changes were required, the government reported that anti-TIP officials, units, and coordinating bodies continued

to operate in 2020, allowing anti-trafficking efforts to continue unimpeded, including investigations and criminal proceedings in courts.

In 2020, the most recent year available for finalized and published government statistics, the Foreigner and Borders Service (SEF) and Criminal Investigation Police (PJ) initiated 94 human trafficking investigations (at least 42 for sex trafficking and at least 40 for labor trafficking) with an additional 97 ongoing cases from prior years. This was a decrease compared with 121 in 2019. Prosecutors initiated legal proceedings against 34 defendants in 2020, a decrease compared with 45 in 2019 but more than 27 in 2018. In 2020, courts convicted 24 traffickers compared with 26 in 2019 and nine in 2018. The government did not provide comprehensive sentences imposed by courts on traffickers in 2020; however, it reported that judges sentenced at least seven traffickers to one year or longer imprisonment, while one trafficker received a fully suspended sentence. The government did not disaggregate between sex and labor trafficking for prosecutions and convictions. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

In 2021, the Prosecutor General released a directive that provided guidelines for the implementation of the Law on Criminal Policy, including specific guidance for investigating and coordinating trafficking cases, victim interviewing, avoiding re-traumatization of victims, and working with vulnerable groups like children and undocumented migrants. The SEF had a specialized trafficking unit, and there were several teams within the PJ who had received special training to investigate trafficking. The SEF reported cooperating in several international investigations through joint action days in 2020, including with Austria, Belgium, Croatia, Cyprus, Europol, Germany, Lithuania, the Netherlands, Romania, Slovenia, Spain, and the United Kingdom, and while there were no trafficking-related results reported in Portugal, there were 346 potential victims identified and 223 suspects arrested in other participating countries. The SEF reported screening for potential trafficking victims at the Lisbon airport in 2020 and reported identifying several potential trafficking victims, at least three suspects, and at least two trafficking networks through this proactive approach. While pandemic-related restrictions hindered many in-person trainings, the government adapted to virtual platforms and reported the ability to reach more officials in doing so. In 2021, the Observatory on Trafficking in Human Beings (OTSH), in collaboration with other governmental entities and government-funded civil society organizations, organized and delivered 20 training activities to approximately 1,950 law enforcement officers, multidisciplinary teams, health care workers, and officials working with children and refugees.

## PROTECTION

The government decreased protection efforts. To offer additional protections to trafficking victims during the pandemic, the government categorized actions related to anti-trafficking as an essential activity, absolved trafficking victims of orders mandating restricted movement in emergency situations, and created a website where victims could access services available to them during the pandemic. In 2020, authorities and government-funded NGOs initially classified 228 individuals as possible victims of trafficking (219 in Portugal and nine abroad); however, authorities only "confirmed" 13 as trafficking victims after the conclusion of a criminal investigation. This compared with 44 confirmed victims in both 2019 and 2018 and three in 2017. Of the confirmed victims in 2020, five were female sex trafficking victims, eight were male labor trafficking victims, all were adults, and they were predominantly from Pakistan and Romania. Front-line responders, including police and NGOs, could identify and refer presumed victims to services, but only law enforcement officials or the National Rapporteur could formally "confirm" an individual as a trafficking victim. Law enforcement officials were the primary body responsible for formal confirmation of trafficking victims, while identification by the National Rapporteur was typically only used in exceptional circumstances. The government reported that police, judges, and prosecutors determined whether to confirm a victim by analyzing evidence and the presence of trafficking indicators. However, experts argued that, in practice, formal identification of trafficking victims depended on the initiation of an investigation and the outcome of criminal proceedings. GRETA reported there was no timeline for authorities to confirm official victim status; the process depended on the duration of the related prosecution. While presumed

victims could receive assistance from government-funded NGOs, such as shelter, they were not entitled to all of the same benefits as confirmed victims, including entitlement to a residence permit. Furthermore, if during legal proceedings, law enforcement re-classified the crime as a non-trafficking crime, victims would remain "presumed" rather than confirmed. Since 2013, GRETA has urged the government to ensure the formal identification of trafficking victims did not depend, in practice, on their cooperation with law enforcement and on the presence of sufficient grounds to initiate a criminal case. In 2020, of the original 228 possible victims, NGOs identified 13 "presumed" victims, while an additional 79 victims with continuing investigations continued as "presumed" victims, and the remaining victims were determined not to be trafficking victims—this totaled 92 presumed victims. Of the 92 presumed victims, at least 69 were presumed victims of labor trafficking, mostly in agriculture; six were Portuguese; and five were children. Thirteen confirmed victims and 92 presumed victims in 2020 was a decrease compared with 44 confirmed victims and 130 presumed victims in 2019 and 44 confirmed victims and 67 presumed victims in 2018. Experts raised concerns regarding gaps in the government's efforts to proactively identify trafficking victims, as the government has not reported identifying any victims among the asylum-seeking population—presumed or confirmed—and there were no Portuguese or children among the confirmed victims.

The government continued to utilize its national victim identification and referral mechanism, which was widely used and distributed to all relevant front-line officials, including NGOs, social service workers, and health care workers. In May 2021, the government adopted a national identification and referral mechanism specifically for child trafficking victims; the mechanism was developed by a multidisciplinary group composed of various ministries, NGOs, and international organizations. The OTSH continued to distribute checklists to law enforcement, NGOs, health care professionals, labor inspectors, and social workers on identifying victims of sex trafficking and forced labor, including victims of forced begging and criminality. The government continued to provide a victim identification handbook to labor inspectors. Upon encountering a potential victim, law enforcement personnel conducted an initial standardized risk assessment and systematically referred individuals deemed vulnerable or at risk to one of five regional government-funded multidisciplinary NGO teams to receive specialized shelter and assistance. The multidisciplinary NGO teams included psychologists and social workers.

In 2021, the government maintained its 2019 and 2020 funding amounts for trafficking shelters, victim repatriation, and the multidisciplinary regional teams at €1.5 million ($1.7 million), with €1.5 million ($1.7 million) earmarked each year through 2022. Adult victims and their minor children had the right to shelter; health care; psycho-social, legal, and translation and interpretation services; a reintegration program; and education and employment training. The government provided 23 presumed victims (17 men and six women) with shelter, medical, and psychological services in 2020, a decrease compared with 57 in 2019 and 36 in 2018. Fifteen victims received legal services, eight received training and education, and seven received support with labor market integration in 2020. The government also enrolled four trafficking victims in its reintegration program in 2020, which included accommodation in an independent apartment. The government had five government-funded NGO-operated shelters exclusively for trafficking victims—two for adult female victims and their minor children, two for adult male victims, and one for children. In response to the pandemic, the government implemented additional protective measures for human trafficking victims in shelters, including social distancing and quarantine rooms, which may have reduced overall capacity. Adult victims could leave the shelters at will unless authorities determined victims' safety was at risk. Child victims received care under Portugal's child protection system or through its shelter for child trafficking victims, which could accommodate up to seven children.

The government offered victims a recovery and reflection period of 30 to 60 days, during which they could recover before deciding whether to cooperate with law enforcement. During the recovery and reflection period, victims were entitled to emergency medical treatment, psychological assistance, protection, interpretation, and legal assistance. The government provided funding to assist victims with voluntary

Haiti AR_000935

repatriation, which it provided to several victims in 2020. The law also entitled victims to a one-year residence permit if they cooperated with law enforcement or had a personal situation regarding their security, health, family situation, or vulnerability; authorities could renew this permit indefinitely. In 2022, the Council of Ministers passed a resolution that granted temporary protection in the form of one-year residence permits to refugees fleeing Russia's full-scale invasion of Ukraine, which included social benefits, and established a reception and integration mechanism. Of the 25 permits requested by trafficking victims in 2020, 20 temporary residence permits were issued to victims; an increase compared with 16 residence permits issued in 2019. Under Article 109 of the Law 23/2007, presumed victims could obtain a residence permit even if they did not cooperate with law enforcement, but the process was complex, and there were more stipulations. Furthermore, waiting periods for obtaining a residence permit could be a year or longer, which could result in victims missing important judicial deadlines in the meantime. The government reported that presumed and confirmed victims had access to services regardless of cooperation with law enforcement; however, civil society noted that outside the recovery and reflection period, access to legal aid, health services, and work permits without a residence permit, which could sometimes take a year to obtain, was particularly challenging for undocumented presumed trafficking victims.

Courts permitted some victims of crime to testify by deposition or video conference, and the law entitled victims to psychological assistance during interviews. The government reported informing victims of their right to legal aid, to claim damages or request compensation, and to interpretation. In July 2021, the government also reported issuing a directive, initially proposed by a multisectoral working group to promote victim empowerment, which required documents to be easily understood by victims; consequently, specialized services revised the documents to simplify legal and procedural technical language. The government had a comprehensive witness protection program that could be utilized by trafficking victims, but it did not report whether any were afforded this protection during the reporting period. The government continued to lack comprehensive data on restitution, damages, and compensation awarded to victims. While prosecutors were not required to systematically request restitution during trials, courts awarded restitution to at least seven victims in 2020. Portuguese law allowed victims to file civil suits against their traffickers, but the government did not report whether any victims filed suits or if it awarded damages to any victims during the reporting period. Victims could seek compensation from the government if the convicted trafficker was unable to pay the awarded damages; however, the government did not report providing any such compensation to trafficking victims, and GRETA noted this rarely occurred. GRETA reported the lack of a specific provision in Portuguese law protecting victims from prosecution for unlawful acts traffickers compelled them to commit could leave victims vulnerable to individual prosecutors' decisions to bring charges. NGOs reported many victims were unwilling to come forward and cooperate with authorities for fear of prosecution.

## PREVENTION

The government increased prevention efforts. The government's multi-stakeholder anti-trafficking network, the Support and Protection Network for Victims of Trafficking (RAPVT), met once in 2021 and was led by the national rapporteur on trafficking; RAPVT included representatives from various central and local government agencies and three NGOs. The government had a national anti-trafficking action plan for 2018-2021, which the National Rapporteur, under the auspices of the Commission for Citizenship and Gender Equality, monitored and coordinated. The government reported drafting but not adopting a new national action plan during the reporting period. In 2021, the government reported establishing two sub-working groups focused on human trafficking in the fishing industry around the Tagus River. In 2021, the government launched a one-day national awareness campaign by featuring a documentary film on the trafficking of women to all secondary schools in the country. One government-funded NGO launched 92 training sessions, reaching 1,897 beneficiaries, including police forces, social workers, health professionals, and the general public, and developed six awareness raising campaigns via social media; while another government-funded NGO developed an awareness campaign implemented in the central and northern region of Portugal. The government had several

websites dedicated to trafficking, including one specifically for children and one for migrants. The government reported funding several anti-trafficking studies in 2021, but results were not available by the end of the reporting period. In early 2022, the SEF focused its efforts on refugees fleeing Russia's full-scale invasion of Ukraine by distributing trafficking awareness leaflets in Ukrainian, increasing patrols at the borders with Spain and at airports, and requiring all children entering as refugees to register with SEF to prevent cases of human trafficking. The government also formed an inter-ministerial committee to coordinate efforts regarding Ukrainian refugees.

The government required temporary employment agencies to obtain a license to operate and prohibited them from charging a recruitment or placement fee to workers. Though illegal, the immigration and border service asserted that this practice still frequently occurred; recruitment companies would charge foreign workers for the issuance of employment contracts, social security registration, transportation, lodging, gas, water, and electricity, deducting funds directly from their salaries, which could increase vulnerability to debt bondage. Portuguese law criminalized passport withholding and contract switching. The government reported that foreign workers were able to change employers without prior government permission, which may have decreased their vulnerability to trafficking. However, fraudulent labor recruitment remained a concern during the reporting period. GRETA noted a need to strengthen monitoring and regulation of temporary employment and recruitment agencies, especially those employing and recruiting domestic workers. The government continued to make efforts to raise awareness among labor recruiters and brokers during the reporting period, including through the continued offering of workshops on corporate social responsibility pertaining to the prevention of human trafficking. Labor inspectors did not have the authority to identify trafficking victims, a dedicated budget, or staff to detect labor trafficking cases, but they could refer suspected labor trafficking cases to the police. The government did not report the number of labor inspections conducted in 2021 nor if any labor trafficking victims were identified as a result. Labor inspectors frequently conducted joint inspections with the immigration and border service when foreign workers were present, which may have intimidated undocumented victims and created a barrier to the identification of victims. The government signed bilateral work and recruitment agreements with India in September 2021 and with Morocco in January 2022, which set out legal guidelines for Indian and Moroccan migrants working in Portugal; however, no trafficking-related results were reported by the end of the reporting period. Each of the five multidisciplinary government-funded NGO teams operated a hotline available 24 hours a day and in several languages. Additionally, there was a shelter and protection center phone line also operated by a government-funded NGO and a government hotline for children in danger; however, the government did not report how many calls any of these hotlines received in 2021 or how many, if any, trafficking victims were identified as a result. The government reported it did not provide anti-trafficking training to its troops in 2021 prior to their deployment as peacekeepers due to pandemic-related restrictions. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Portugal, and traffickers exploit victims from Portugal abroad. The majority of trafficking victims are from India, Moldova, Pakistan, and Romania, but victims also originate from West Africa, Eastern Europe, Asia, and Latin America, specifically Brazil. Labor traffickers exploit foreign victims in agriculture, construction, and domestic service; seasonal migrant workers are especially vulnerable. Traffickers transport victims to farms located in the interior of the Alentejo region or western Portugal, where they are comparatively isolated. Cubans working in Portugal may have been forced to work by the Cuban government before the Government of Portugal ended the use of Cuban medical professionals in December 2019. Traffickers often use fraudulent recruitment methods to exploit Portuguese victims in restaurants, agriculture, and domestic service, primarily in Portugal and Spain. In 2022, Ukrainian refugees, predominantly women and children, fleeing Russia's full-scale invasion of Ukraine are vulnerable to trafficking. Sex traffickers exploit foreign women and children, mostly from Africa and Eastern Europe, and Portuguese women and children

within the country. Sex traffickers exploit Portuguese citizens in other countries, mostly in Europe. Traffickers exploit children from Eastern Europe, including Romani children, for forced begging and forced criminal activity in Portugal. Authorities report traffickers facilitate the transfer of asylum-seeking women and children, many from West Africa, to Portugal; traffickers obtain false documents before moving them to other European countries for sex trafficking. Sub-Saharan trafficking networks sometimes use Portugal as a route into the Schengen area to exploit children for both sex trafficking and forced labor.

# QATAR: TIER 2

The Government of Qatar does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Qatar remained on Tier 2. These efforts included investigating more forced labor cases, continuing to prosecute labor traffickers, and convicting more labor traffickers compared with previous years, although it did not report case details for the convictions. It also staffed and resourced the specialized trafficking police unit and adopted a revised standard employment contract for domestic workers that aligned with private sector worker protections. Additionally, three more Qatar Visa Centers (QVCs) in critical labor-source countries began to process domestic worker visa applications to minimize contract switching for foreign workers vulnerable to trafficking and were mandated to use the revised domestic worker contract when processing such workers. The government also launched its first trafficking-specific hotline and email address and a separate hotline to receive public complaints related to non-compliant conduct of recruitment agencies. However, the government did not meet the minimum standards in several key areas. The government reported identifying and referring to care significantly fewer trafficking victims compared with the previous year and the trafficking-specific shelter also remained closed for the entire reporting period due to the pandemic. Some officials continued to routinely use arbitration and administrative penalties to resolve grievances filed by migrant workers, including domestic workers, instead of investigating such cases as human trafficking crimes. Although the government had formal victim identification procedures, not all officials systemically used them, which may have left trafficking victims unidentified and unable to receive protection services. Authorities also reportedly arrested, detained, and deported potential trafficking victims for immigration violations, "prostitution", or fleeing their employers or sponsors. Finally, some workers continued to face obstacles when attempting to change jobs without employer permission under the most recent reform to Qatar's visa sponsorship system, and while the government announced efforts to address employers' retaliatory actions that could prevent workers' from exercising their rights under the reform, it did not report implementing such efforts.



## PRIORITIZED RECOMMENDATIONS:

Undertake serious efforts to prevent penalization of trafficking victims by screening for trafficking indicators among those arrested for immigration violations or prostitution, or those who flee abusive employers and face counter-charges—such as absconding—and deportation. • Routinely apply and widely disseminate formal procedures to proactively identify victims of all forms of trafficking, including Cuban medical professionals and People's Republic of China (PRC) overseas workers, and institute

regular trainings for all officials on how to employ these procedures systematically. • Reopen the specialized trafficking shelter and ensure the shelter is fully funded and staffed so it can receive potential victims. • Draft and finalize official victim referral procedures and widely disseminate such procedures to all officials. • Increase efforts to prosecute trafficking offenses, particularly forced labor crimes, and to convict and punish traffickers under the 2011 anti-trafficking law, rather than other criminal laws, when applicable. • Expand training on the application of the anti-trafficking law to judicial authorities to ensure courts do not drop trafficking charges against defendants, when applicable. • Increase the number of trafficking investigations, especially by investigating passport retention, withholding of wages, labor violations, and complaints of abuse as potential trafficking crimes. • Expand training for law enforcement to better identify potential trafficking crimes, specifically the Ministry of Interior (MOI)'s specialized trafficking unit staff. • Continue to implement reforms to the sponsorship system by streamlining transfer procedures and disseminate clear guidance on the legal requirements to change jobs to mitigate the burden on workers. • Prohibit employers from filing absconding charges or canceling residency permits in retaliation for workers utilizing these reforms and hold non-compliant employers accountable with adequate penalties. • Increase capacity of Labor Dispute Resolution Committees (LDRCs) to refer suspected trafficking cases for criminal investigative proceedings and ensure verdicts rendered by the committee can be enforced without worker's filing a civil court case. • Ensure the Wage Protection System covers all companies and individuals and provide domestic workers equal protections.

## PROSECUTION

The government demonstrated mixed law enforcement efforts as it staffed and resourced the MOI's new specialized trafficking unit, reported more forced labor investigations, and convicted more labor traffickers, but it did not report the number of sex trafficking cases investigated or prosecuted during the reporting year. The 2011 anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed penalties of up to seven years' imprisonment and a fine for offenses involving adult male victims and up to 15 years' imprisonment and a fine for offenses involving adult female or child victims. Managers of recruiting agencies found guilty of trafficking faced up to five years' imprisonment and a fine. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

During the reporting period, the government investigated eight forced labor cases; of those eight cases, the Public Prosecutors Office (PPO) prosecuted two cases with an unknown number of defendants but did not prosecute two other alleged forced labor cases as trafficking due to a lack of evidence; the other four cases remained under investigation at the close of the reporting period. The government reported investigating 55 cases involving "prostitution and incitement of prostitution" and reported prosecuting 20 cases involving the same charge, but it did not report whether these cases involved trafficking. The government reportedly convicted 10 labor traffickers; however, it did not report case details, what laws traffickers were convicted under, nor sentencing details. Courts did not convict any sex traffickers. In the previous reporting period, the government investigated and prosecuted two sex trafficking cases and convicted two individuals for forced labor crimes and one individual for violating the domestic worker law.

The government continued to utilize its specialized trafficking unit with the PPO during the year; however, prosecutors almost universally used the Qatari penal code to address trafficking crimes rather than the anti-trafficking law due to perceived swiftness and higher likelihood of successful prosecutions under charges that were easier to prove and more straightforward. Consequently, authorities rarely punished traffickers with dissuasive penalties, and this weakened deterrence of the crime. The government lacked a clear and efficient judicial process to prosecute trafficking crimes or enforce labor law violations, and its primary solution for resolving labor violations continued to be transfer of the employee to a different employer, mandated back payment of wages, fines, and blacklisting of companies. Observers noted even in cases where prosecutors brought trafficking charges against alleged perpetrators and referred the case to court, judges reserved the right

to re-categorize cases, which meant that trafficking charges could be dropped; alleged traffickers were often convicted of violating the residency or labor law instead. For example, in December 2021, the PPO referred a forced labor case to the First Instance Court involving a Bangladeshi national as the defendant; prosecutors charged the defendant with human trafficking and visa fraud. In January 2022, the court convicted the defendant of violating the residency law and subsequently dropped the human trafficking charge, sentencing the defendant to two years' imprisonment, a fine of 10,000 Qatari riyal (QR) ($2,750), and deportation after serving the prison sentence. The government did not report investigations, prosecutions, or convictions of government officials for complicity in human trafficking crimes.

In 2020, the government established a specialized trafficking police unit, and in 2021, it dedicated resources and staffed the unit with 50 personnel. As in previous years, the National Committee to Combat Human Trafficking (NCCHT) alongside other government entities financed and conducted specialized, extensive trainings on trafficking issues. The Ministry of Labor (MOL) and MOI coordinated with an international organization to provide three two-day trainings to 71 QVC staff; the training focused on providing accurate information on the rights and responsibilities of workers in Qatar and explaining the terms and conditions of employment contracts to prospective workers at the centers; the training also focused on how to document cases of contract switching reported by workers. The NCCHT cooperated with Hamad bin Khalifa University to send several Qatari officials to a week-long human trafficking seminar at a foreign university; members of the PPO, the Ministry of Foreign Affairs, and MOI participated in the seminar. During the reporting period, the NCCHT organized and coordinated two training sessions and workshops on trafficking issues with a foreign embassy in Doha, an NGO, and an international organization on investigative techniques and best practices for interviewing potential trafficking victims and securing prosecutions in trafficking cases without victim testimony; staff from MOL, PPO, MOI, and the Supreme Judiciary Council participated in the trainings.

## PROTECTION

The government decreased protection efforts. During the reporting period, the government reported identifying and referring five trafficking victims to care, compared with 35 victims identified and referred to care in the previous reporting period. The government had a trafficking-specific shelter, designated for both male and female victims and consisting of six refurbished villas with a maximum capacity of 200 residents. The shelter was managed by the Qatari Red Crescent Society (QRCS) through an agreement with the government, had a budget of nearly 3 million QR ($824,180) per annum, and was equipped with a health center, computer lab, dining facility, and laundry room. Victims could receive counseling and leave freely; officials assisted them with repatriation, if desired. However, the government closed the shelter from March 2020 through September 2020 to use it as a quarantine site and for accommodations for medical staff during the pandemic; furthermore, the government reported the shelter remained closed at the end of the reporting period due to the pandemic. In February 2022, the government and QRCS signed a new agreement and reported the shelter would reopen once renovations were completed. The government-funded Aman Protection and Social Rehabilitation Center continued to provide basic medical care, social services, psychological treatment, housing, repatriation assistance, and reintegration for female and child victims of domestic abuse, including female workers who fled abusive employers. The Aman Center could host victims of trafficking in coordination with the NCCHT, but the government did not report whether it did so during the reporting period. Aman provided repatriation assistance to those who wished to return to their home countries. Aman had a budget of approximately 9 million QR ($2.47 million) in 2021, a decrease from 13.8 million QR ($3.79 million) allocated in prior years. Residents had the right to leave of their own volition without supervision, although chaperones were on-call in the event security was needed; residents also could access the shelter even if their employers' filed charges against them. Several foreign diplomatic missions ran all-purpose shelters for their female nationals, including Indonesia, Kenya, Sri Lanka, and the Philippines. Of the five trafficking victims identified by the government, four were nationals of the Philippines, and one was a Sri Lankan national;

the government referred all five victims to their respective embassies for care during the year.

The government had formal written victim identification procedures, and some officials systematically followed these procedures to identify potential trafficking victims; however, law enforcement personnel and other government entities did not proactively screen for trafficking indicators among vulnerable populations, including domestic workers, as well as migrant workers who fled abusive employers. Generally, some government agencies did not categorize the abuse of a domestic worker as a potential trafficking indicator due to lack of evidence or witnesses and therefore sometimes failed to identify victims; in other cases, some domestic workers voluntarily left the country in lieu of filing complaints or pursuing charges against traffickers. The NCCHT was reportedly responsible for referring identified victims to law enforcement and to protection services, which included the provision of shelter, health care, and legal assistance, but the government remained without official referral procedures. The government reported the recently created specialized trafficking unit within MOI aimed to formalize victim referral procedures. MOL worked with embassies of labor-source countries on an ad hoc basis to determine which cases it should refer to the trafficking shelter. In addition, during the reporting period, the NCCHT and MOL worked with an international organization to produce a handbook for law enforcement officers and frontline workers to identify potential victims and detect trafficking crimes; the handbook was publicly available, highlighted ways to discern labor violations from forced labor crimes, and outlined the NCCHT's strategy to combat trafficking. However, because officials did not widely use formal identification procedures, some unidentified trafficking victims may have been detained and deported for contravening Qatari labor and immigration laws—unlawful acts traffickers compelled them to commit. The legal system lacked adequate privacy laws to protect potential victims against retribution and often did not provide adequate assistance or protection for victims during legal proceedings. Potential victims who lodged complaints were sometimes the subject of spurious counter-charges from their employers that resulted in administrative deportation proceedings. Officials reported they did not consider "absconding" charges until after the resolution of existing labor disputes or criminal proceedings, including trafficking crimes, although labor attachés and worker advocates noted that in practice it was often difficult for workers to overcome the burden of such charges; in 2021, the MOI reported receiving 16,217 charges of "absconding." Police often detained workers without legal status for immigration violations and fleeing their employers or sponsors, including potential trafficking victims. Police sometimes detained workers for their sponsors' failure to register them or renew their residency documents as required by Qatari law. However, during the year, the PPO's specialized trafficking unit reported it received requests to remove individuals from MOI's absconding "watchlist" who were identified as potential victims of trafficking or trafficking-related crimes and therefore advocated to legalize such individual's residency status. In previous years, authorities sometimes charged potential sex trafficking victims with *Zina* (sex outside of wedlock) and subsequently deported them; in February 2022, media reported a World Cup worker who had endured years of sexual violence was charged with *Zina* after she reported her experience to Qatari authorities. Media reported the victim left the country but could be convicted in absentia.

The government generally encouraged victims to testify against traffickers by providing legal counseling, ensuring their safety, and allowing them to pursue financial compensation. However, authorities did not offer such protections in all cases, and many workers still opted to return home rather than remain in the country to assist prosecutors in convicting traffickers. Through the MOI, victims could change employers in cases of violated contractual terms, such as employers not paying the victim or forcing them to work excessive hours. The government did not report how many victims received legal support or were granted transfer-of-employer approval during the reporting year; however, MOI transferred 23,135 workers who were not being paid to new employers in 2021, compared to the transfer of 2,902 workers who suffered some form of abuse or violation of their contracts in 2020. MOI did not report whether any workers it transferred were identified trafficking victims. MOI officials had the authority to extend the residency of a domestic

QATAR

worker pending the resolution of a case but did not report if it provided any workers this service during the reporting period. The law stated the complaining party could reside in Qatar pending resolution of legal proceedings. The government reported it did not deport those who faced retaliation or retribution in their country of origin. The government reported victims could obtain restitution from defendants in criminal cases but did not report if any victims did so during the reporting period.

## PREVENTION

The government increased overall efforts to prevent trafficking, although workers continued to face obstacles when attempting to change jobs without employer permission under the most recent reform to Qatar's visa sponsorship system. The NCCHT met monthly to implement its 2019-2022 National Action Plan to combat trafficking, which focused on prevention, protection, prosecution, and regional and international cooperation. The government continued its technical cooperation program with the ILO's Doha office during the reporting period, and in July 2021, the government and ILO agreed to launch a second phase of the program through December 2023 to continue to build the government's anti-trafficking capacity and generate sustainable labor reform efforts.

Article 33 of Qatari Labor Law No. 14 of 2004 prohibited recruitment agencies from receiving recruitment or placement fees from workers. In 2017, in an effort to address reports that workers supporting infrastructure projects for the 2022 FIFA World Cup had paid exorbitant recruitment fees to come to Qatar to work, the Supreme Committee for Delivery and Legacy (SCDL), the lead Qatari agency for preparation for the event, began requiring companies and contractors to reimburse workers for recruitment fees paid by workers in their home country. However, employees under SCDL oversight only made up approximately 50,000 out of a total of two million low-wage migrant workers in Qatar. Furthermore, media and NGOs continued to report migrant workers in Qatar frequently paid illegal recruitment fees to unregulated agents in labor-source countries; in March 2022, one media outlet reported Bangladeshi and Nepali migrants typically paid up to $4,000 in recruitment fees to secure a job in Qatar. Migrant workers who incurred debt to pay recruitment fees remained vulnerable to conditions of forced labor, as they may have stayed longer in exploitive situations to pay off that debt. In the previous reporting period, the government opened 14 QVCs in eight critical labor source countries (providing 80 percent of the total workforce in Qatar), to include Bangladesh, India, Nepal, Pakistan, the Philippines, and Sri Lanka. The centers were responsible for finalizing all procedural elements pertaining to labor recruitment, including fingerprinting, medical examinations, verifying educational certificates, signing contracts in local languages, issuing Qatari residency permits prior to source country departure, opening bank accounts for workers, and attempting to ensure Qatari employers paid all recruitment fees. Although QVCs reduced instances of contract-switching, rights groups and NGOs noted QVCs did not address workers who paid recruitment fees to brokers prior to visiting the centers, as QVCs handled only the end of the recruitment process. In the previous reporting period, the QVC in Dhaka, Bangladesh, began to process work visas for domestic workers, and in 2021, QVCs in India, Pakistan, and Sri Lanka began processing applications for domestic workers and were mandated to use the recently revised domestic worker standard employment contract. Previously, the QVCs did not accommodate domestic worker applications.

MOL made progress monitoring Qatari recruitment agencies' interactions with labor-source intermediaries, despite its first priority being to address problematic working conditions and payment issues for workers already in Qatar. In 2021, the government blacklisted 87 recruitment agencies and revoked licenses of an additional 46 for violating the labor law. Furthermore, in February 2022 and March 2022, MOL blacklisted an additional 35 agencies and revoked the license of one other; the government released the names of the agencies to the public with the intent to advise against conducting business with such agencies. Additionally, in February 2022, MOL launched a hotline and dedicated email address to receive public complaints related to non-compliant conduct of recruitment agencies. As of October 2021, the government also conducted 15,327 workplace and accommodations visits, which resulted in 4,026 violation reports and referrals to the PPO, up from

2,553 reported violations during the previous reporting period. It also fined 393 worksites for violation of summer work hours during the year. However, analogous to previous years, the government did not provide a breakdown of the kinds of violations found via inspections, and neither MOL nor PPO reported investigating any of these violations as potential trafficking crimes.

MOL also continued to handle worker complaints; between October 2020 and October 2021, MOL received more than 24,650 complaints from workers in-person and online; nearly 75 percent of these complaints were settled amicably, while the remainder were referred to the LDRCs to be handled in court. MOL would only refer worker complaints to the LRDC if they could not be resolved within one week. As of October 2021, the LDRCs received 4,315 labor-related complaints and issued 3,983 judiciary verdicts; the government did not report the outcome of the remaining 332 complaints. The government reported it mostly issued verdicts in favor of the employees and not their employers; in 2021, the government reported 84 percent of verdicts issued were in favor of workers. The law mandated the LDRCs reach resolution within three weeks for any contract or labor dispute; however, NGOs and media sources consistently reported cases took significantly longer to resolve in practice, and in many instances of non-payment or delayed payment of wages, the worker did not receive the wages they were owed because the verdict rendered by the LDRC could not be enforced unless the worker filed a separate case in civil court. In an effort to overcome this problem and provide compensation to workers in such cases, the government established a Worker's Support Fund; employers were required to pay 120 QR ($33) per worker per year into the fund, which became operational in 2020. In 2021, the government provided 55 million QR ($15.11 million) to 3,082 workers from the fund; this was a significant increase compared with 2020 when the fund distributed 14 million QR ($3.85 million) to 5,500 workers. Despite the goal of the fund, NGOs and rights groups reported that in order to be eligible to compensated by the fund, workers still had to obtain a civil court ruling, which rendered workers vulnerable to exploitation while they waited for compensation. Additionally, the government did not report if the LDRCs were able to refer cases with trafficking indicators to the MOI for investigation despite the committees almost exclusively handling cases of non- or delayed-payment of wages, a significant trafficking indicator.

The government continued to utilize its Wage Protection System (WPS), which required employers to pay workers electronically on a timely basis in accordance with the labor law and automatically alerted officials to instances of wage abuse. The government reported 97 percent of migrant workers in Qatar were registered in the WPS at the close of the reporting period; however, it reported that only 84 percent of migrant workers actually received payments via the system, while more than 65,500 companies were registered for wage disbursements through this mechanism during the reporting year. The WPS continued to exclude workers not covered by the labor law, including domestic workers, sea and agricultural workers, government employees, casual workers, and workers in the petroleum sector. In the previous reporting period, MOL and the Qatar Central Bank adopted measures to promote and facilitate domestic workers' access to bank accounts, thereby enhancing their wage protection and reducing their risk to exploitation; an international organization also reported that a proposal to extend coverage of the WPS to domestic workers was under deliberation at the close of the previous reporting period. However, the government did not report taking any new actions in 2021 to include domestic workers into the WPS. MOL's WPS Unit worked to detect non-compliance in the system and subsequently penalize companies and employers; however, MOL's enforcement efforts depended on the PPO and lacked the formal authority to issue fines or other stringent penalties. Accordingly, during the reporting year, MOL blacklisted 38,314 companies for non-compliance with the WPS, which barred the companies from placing public bids, applying for bank loans, seeking new projects, or recruiting new employees and transferring employees. MOL could refer companies to the PPO for criminal proceedings, and in severe cases of non-compliance, the PPO could penalize a company through fines. However, referrals to the PPO were rare, as wage abuse cases could be very lengthy in court. Nonetheless, during the year, the government reported it referred 1,994 companies that violated the

WPS to the PPO for criminal prosecution but did not report whether it classified any as potential trafficking cases. In August 2020, the government announced a non-discriminatory minimum wage through Law No. 17 of 2020, which came into force in March 2021, applying to all workers in all sectors, including domestic workers. In addition to the basic minimum wage, the law required employers to ensure that workers have decent accommodations and food, and the law stipulated allowances employers must provide for those provisions. Between February 2021 and September 2021, an international organization reported more than 280,000 (13 percent of the total workforce) had their basic wage increase to the new minimum wage; in addition, the international organization reported an unknown number of workers benefited from the stipulated accommodations and food allowances. Moreover, in conjunction with Law No. 17 of 2020, an international organization reported the WPS could also detect violations of payment below the minimum wage and food and accommodation allowances. However, despite measures to monitor payments and help workers seek remedy for wage theft, NGOs reported non-payment or delayed payment of wages continued to be one of the most common abuses of migrant workers.

Under Law No. 4 of 2009, the government criminalized the confiscation of workers' passports by a sponsor, punishable by a maximum fine of 25,000 QR ($6,870). The PPO prosecuted a variety of cases exhibiting trafficking indicators under the labor laws, residency laws, or penal code; these cases included three instances of violence against domestic workers, 47 cases of passport confiscation, and 45 cases of visa fraud; the government did not report if any of the prosecuted cases received verdicts at the close of the reporting period, in previous years defendants found guilty of such crimes were administered fines. The government continued to implement its January 2020 decision to extend the abolishment of the exit permit requirement to additionally allow workers not protected under the labor law, including domestic workers, workers of ministries and other government entities, workers in public institutions, sea and agriculture workers, and workers employed in casual work, to depart Qatar without employer approval at any time during the course of an employment contract. Employers still had the right to designate as "critical" 5 percent of their workforce, who required employer approval prior to exiting the country; domestic workers could not be deemed "critical." Workers deemed "critical" could submit a petition to the exit grievances committee if their employer denied their exit permit request; in 2021, MOL approved 38 petitions in favor of the worker, and one petition was denied. Since the reforms' inception, worker's rights organizations and labor-source embassy representatives continued to report that, in general, migrant workers who desired to leave Qatar did so successfully without former employer approval. However, some NGOs continued to express concern that domestic workers were still required to inform their employer in person 72 hours prior to their departure, as this requirement could give time to an abusive employer to use retaliatory measures against a worker to stop them from leaving Qatar. Furthermore, reports of employers refusing to provide a worker's air ticket fare to return home, filing an "absconding" or theft charge against a worker, purposely failing to renew a workers' residence permit, or refusing to provide the worker's passport after illegally retaining it all continued during the reporting period.

In August 2020, through the amendment of the labor law by Law No. 18 of 2020 and the amendment of the visa sponsorship law by Law No. 19 of 2020, the government announced the abolishment of the No Objection Certificate (NOC), which allowed all workers, including domestic workers, to change jobs without the permission of their employers after fulfilling certain conditions—including completing a probationary period and serving notice. Workers could electronically notify their employers of their desire to quit, giving them the notice period mandated by the law before moving to a new job and then initiate a transfer through MOL's digital system, which notified the employer of the transfer and through which the worker could submit the required documents to begin the process. Once MOL approved the transfer, the new employer would initiate a digital employment contract for the new job for the worker to sign; MOL reported a decision on the application to change employers was made within seven to 10 working days. Upon authentication of the digital contract, the worker could begin working for the new employer. The government included a provision in these amendments to ensure all workers could change jobs without the notice period if the employer did not fulfill their legal obligations to the worker, such as endangering the worker's health, assaulting the worker, or misrepresenting contract terms. However, NGOs continued to report several obstacles during implementation of the reform that limited workers' job mobility. In 2021, NGOs noted an increase in reports of MOL rejecting a worker's request without explanation, significant delays in the government's decision on the transfer, and the rise of a "de facto NOC." Although neither a resignation letter, signed and stamped by a former employer, nor an NOC were required by the law, observers noted that some new employers still required it to be considered for a job and workers who requested to change jobs without their current employer's permission faced delays in the process—increasing the chance the new employer would withdraw their job offer due to delays in the governments' decision and an increased likelihood that their application would be rejected by MOL. In other cases, employers illegally requested between 5,000 and 15,000 QR ($1,370-$4,120) from workers to "release" them to a new job, even in cases where the worker had completed their contract. Reports continued of employers retaliating against an employee who initiated a transfer by canceling their visa or filing an absconding charge prior to the transfer being completed—rendering the worker illegal and at increased risk of trafficking, detention, or deportation. Domestic workers faced the greatest obstacles when attempting to change jobs—most worker's new employers still required an NOC or "release paper"; because most former employers refused to provide this, domestic workers may have been forced to remain in exploitive situations. Some workers did not seek transfers for fear of threats and retaliation from their employer. NGOs reported officials of labor-source country embassies advised workers, especially live-in domestic workers, to continue in their current employment if they were paid on time and there was no threat to life. Between October 2020 and October 2021, MOL reported more than 242,870 workers transferred employment after receiving approval from the government (includes 3,674 domestic workers who changed jobs); in total, the government received 344,774 requests to change jobs and rejected 99,814, and the remaining 2,090 remained pending. NGOs noted this total number of approved transfers did not disaggregate how many workers managed to do so without securing the permission of their employer. Furthermore, the government reported receiving 3,237 complaints from workers whose current employers objected the transfer request; out of those, 1,074 transfers were approved, while the remainder remained under review at the close of the reporting period. In July 2021 the government announced employers would no longer receive notification of their worker's request to transfer and once workers submitted a transfer request, employers could no longer cancel their visas or file "absconding" changes against the worker. However, the government did not report implementing these changes at the close of the reporting period. Overall, NGOs reported that although the removal of the exit permit and the abolishment of the NOC were improvements, the sponsorship system would continue to persist as long as both the employee's work and residence visas were tied to an employer and employers could continue to take retaliatory actions against a worker as a means of unilaterally controlling their workforce without being held accountable or penalized.

The March 2018 domestic worker law stipulated domestic workers were required to have government-verified contracts; to receive adequate employer-provided food, accommodation, medical benefits, one day off per week, limited 10-hour workdays, sick leave, return flight tickets once each year, three weeks paid vacation per year, and full end-of-service payments; to be guaranteed access to the dispute resolution committees to resolve workplace grievances; and to be allowed to leave their employers in cases of exploitation or violation of contract terms. NGOs reported concerns the 2018 law left several provisions vague, including mechanisms to ensure employers actually paid workers or provided entitled annual leave; additionally, details on the allotted weekly day off and food and accommodation standards were limited. The law did not refer to paid overtime and allowed for a workday that exceeded the 10-hour limit if there was an agreement between the employer and employee. According to the law, employers who breached their obligations on key provisions related to working

ROMANIA

hours, living conditions, weekly rest day, annual leave, and end of service benefits should receive a fine, which could be doubled if the employer failed to pay the worker on time. In 2021, in partnership with an international organization, the government adopted a revised standard employment contract for domestic workers; the revised contract specified additional rights for workers and provided clarity on the terms and conditions of their employment. The new standard employment contract aligned domestic workers' rights with those of private sector workers, specifically in overtime payment, termination of employment, and sick leave entitlements. The government reported both private recruitment agencies and QVCs had begun using the revised domestic worker contract. MOL inspectors remained without authority to conduct inspections in private residences without written permission from the PPO, limiting their ability to enforce protections outlined in the law and identify key trafficking indicators or potential trafficking victims from inspections. Although domestic workers have been able to file grievances with the LDRCs since 2018, workers rarely filed complaints due to prolonged court proceedings, the uncertainty the employee would receive the wages they were owed even if the dispute ended in the employee's favor, fear of retaliation from employers, and the limited scope in types of complaints the committees handle.

During the reporting period, the government worked with an international organization to disseminate infographics and frequently asked questions for both workers and employers on the most recent sponsorship reforms to clarify requirements and procedures for requesting a transfer or terminating a contract; materials were circulated through MOL and an international organization's social media platforms and through labor-source embassies, domestic worker community groups, recruitment agencies, and QVCs. MOL collaborated with an international organization and the International Domestic Worker's Federation (IDWF) in conjunction with International Domestic Workers' Day in June 2021 to organize a panel discussion with representatives of the domestic worker community in Qatar, IDWF, MOL, and MOI to highlight the impact of newest labor reforms on domestic workers and the role of employers in promoting decent work conditions for this population. In addition, MOL, in partnership with an NGO, published revised versions of two informational booklets aimed at raising awareness of domestic worker rights; the booklet aimed at workers was disseminated in 12 languages while the booklet targeting employers was disseminated in two languages. In February 2022, the NCCHT organized an art exhibition on trafficking, targeted at the public, to raise awareness of the crime; during the exhibition, flyers and brochures in Arabic and English, which included information on the anti-trafficking statute and ways to report the crime to authorities, were distributed to visitors. Officials maintained multiple hotlines for use by vulnerable migrant workers, including trafficking victims. In February 2022, MOL launched the government's first hotline and email address specifically to report trafficking and trafficking-related crimes. However, as in the previous years, the government did not report how many calls any of the hotlines received or if any calls were referred to law enforcement for criminal investigation as potential trafficking crimes. The government maintained 50 bilateral agreements and five memoranda of understanding with labor-source countries that addressed recruitment issues and worker rights, and it worked with individual countries to certify vetted labor recruitment offices to reduce fraud or excessive debts that could facilitate labor trafficking. The government did not make efforts to reduce the demand for commercial sex acts. The government provided anti-trafficking training to its diplomatic personnel.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit foreign victims in Qatar. Men and women from Bangladesh, Cameroon, India, Indonesia, Kenya, Nepal, Nigeria, Pakistan, the Philippines, Sri Lanka, Sudan, Uganda, and other countries voluntarily migrate to Qatar as unskilled laborers and domestic workers, often paying illegal and exorbitant fees to unscrupulous recruiters in their home countries, thereby increasing their vulnerability to debt bondage. Many migrant workers subsequently face conditions indicative of labor trafficking, to include restricted movement, delayed salaries or payment withholding, denial of employment-associated benefits, passport confiscation, and threats of deportation; in a small number of cases, migrant workers

face physical, mental, and sexual abuse, as well as threats of serious physical or financial harm. Anecdotally, sex traffickers force some women who migrate for legitimate employment offers to engage in commercial sex. Cuban nationals working in Qatar may have been forced to work by the Cuban government. The government reported approximately 400 Cuban medical workers were in Qatar in 2021; an additional 200 workers, who arrived in 2020 to support Qatari hospitals during the pandemic, reportedly returned to Cuba in August 2021. Per a 2008 agreement between the Cuban and Qatari governments, Cuban health workers receive wages from the Cuban government, rather than directly from their Qatari employers. During the year, an NGO reported Cuban workers employed in Qatar were vulnerable to abuses, including sexual harassment, forced enrollment into the medical mission program, surveillance, exploitation, restriction of movement, and passport confiscation. PRC nationals employed in Qatar at worksites affiliated with the PRC's Belt and Road Initiative experienced forced labor indicators such as deceptive recruitment, contract irregularities, passport retention, and arbitrary wage garnishing or nonpayment of wages.

Qatar's unskilled migrant workers are the largest group at risk of trafficking; those employed as domestic workers remain the most vulnerable. Unscrupulous recruiters in source countries and employers in Qatar exploit economic migration to prey on prospective workers. Predatory recruitment agencies in labor-source countries extract inflated fees from aspiring migrant workers or lure them to Qatar with fraudulent employment contracts, rendering workers vulnerable to forced labor once in the country. Among foreign workers, female domestic workers are particularly vulnerable to trafficking, as they work in isolation in private residences. Awareness and enforcement of the labor law providing rights to migrant and domestic workers remain limited. Additionally, individuals in Qatar sell illegal "free" visas to migrants, leaving migrant workers without legal recourse against their respective sponsors who also occasionally demand regular payments. Many businesses reportedly fail to pay their expatriate employees in a timely manner or at all, forcing workers to choose between leaving the country with heavy debts or staying in Qatar with the hope of eventually being paid. Systemic hurdles continue to limit victim protection and access to justice, especially for domestic workers, who remained highly vulnerable to forced labor.

Qatar's visa employment-based sponsorship system, while undergoing significant reform, continues to place control disproportionately in the hands of employers, who have unilateral power to cancel residence permits or file counter-charges against workers to prevent them from exercising their rights under the most recent reforms. Until August 2020, employers were able to prevent workers from changing employers and deny permission for them to leave the country. Debt-laden migrants who face abuse or are misled often avoid reporting their exploitation due to fear of reprisal or deportation, the protracted recourse process, or lack of knowledge of their legal rights, thereby exacerbating or prolonging their forced labor situation. Many migrant workers often live in confined, unsanitary conditions, and many complain of excessive working hours and hazardous working conditions. Reports allege the vast majority of expatriate workers' passports were in their employers' possession, despite laws against passport confiscation.

## ROMANIA: TIER 2

The Government of Romania does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impacts of the COVID-19 pandemic on its anti-trafficking capacity; therefore Romania was upgraded to Tier 2. These efforts included investigating more trafficking cases, prosecuting and convicting more traffickers, and implementing a pilot program that authorized funding at the local level to an NGO for victim services. Additionally, amendments to the criminal code entered into force, eliminating the statute of limitations for trafficking crimes and thereby giving the government additional time to prosecute such crimes. Furthermore, the government adopted an emergency ordinance and an action plan aimed at improving its capacity to assist vulnerable

children and other at-risk populations and investigate various crimes against children, including trafficking. The government also adopted procedures for identifying victims among asylum-seekers and migrants and referring those victims to assistance. Moreover, the government amended the labor law on the protection of Romanian citizens working abroad to include a broader definition of temporary and seasonal workers and workers' rights, additional regulations for recruiting agencies, and increased fines for labor law violations. However, the government did not meet the minimum standards in several key areas. Alleged complicity in trafficking crimes persisted, particularly with officials exploiting children in the care of government-run homes or placement centers. Many convicted traffickers received either suspended sentences or sentences that did not meet the minimum prescribed penalty under Romanian law, which weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. Authorities identified fewer trafficking victims and did not screen for trafficking indicators or identify victims among vulnerable populations, such as asylum-seekers, migrants, individuals in commercial sex, or children in government-run institutions. Moreover, the government did not provide sufficient funding to NGOs for assistance and protection services, leaving most victims without services and at risk of re-trafficking.



### PRIORITIZED RECOMMENDATIONS:

Proactively identify potential victims, especially among vulnerable populations, such as asylum-seekers, migrants, individuals in commercial sex, and children in government-run institutions, through enhanced training for police officers on recognizing indicators of exploitation. • Sentence convicted traffickers to significant prison terms, as prescribed under Articles 210 and 211, and ensure they serve those sentences in practice. • Significantly increase the quality and availability of specialized victim services for adults and children, such as improved access to medical assistance and psychological counseling. • Vigorously investigate allegations of complicity—including of complicity in childcare institutions—and prosecute and convict complicit officials under the trafficking statute; hold them accountable by issuing significant prison sentences. • Adopt legislation to allow for financial support to NGOs for victim services and develop and institute a formal mechanism for administering the funds. • Increase the number of police officers investigating trafficking crimes and financial investigators specializing in trafficking cases. • Increase efforts to enforce child labor laws, especially in rural areas and where social welfare services lacked personnel and capacity to address violations. • Sanction recruiting agencies with criminal penalties for practices contributing to trafficking, such as charging workers with recruitment fees. • Provide knowledgeable legal counsel and courtroom protections for victims assisting prosecutions, including exempting victims from in-person confrontations with their accused traffickers. • Train labor inspectors to detect labor trafficking and grant them the legal authority to conduct unannounced inspections at all worksites. • Expand efforts to train officials involved in judicial proceedings, particularly judges, on working with trafficking cases and victims, sensitivity to trafficking issues, and understanding all forms of trafficking. • Train law enforcement officials on working with victims, evidence collection, and understanding psychological coercion and integrate that understanding into government-wide responses.

### PROSECUTION

The government increased law enforcement efforts. Articles 210 and 211 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of three to 10 years' imprisonment for crimes involving an adult victim and five to 10 years' imprisonment for those involving a child. These penalties were sufficiently stringent and, with

respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. In 2021, the government enacted amendments to the criminal code that criminalized the acts of becoming aware of certain forms of trafficking and not immediately notifying the authorities. The amendments also eliminated the statute of limitations for trafficking crimes, thereby providing authorities with additional time to investigate and prosecute such crimes; previous amendments to the criminal code inadvertently shortened the statute of limitations for all child trafficking crimes committed and impeded authorities' ability to prosecute cases. The new amendments addressed direct concerns from the Council of Europe and civil society that the length of court proceedings, often due to delays, were deliberate attempts by corrupt officials to reach the statute of limitations, which in some cases led to impunity for traffickers.

The Organized Crime and Terrorism Investigation Directorate (DIICOT) and the Department for Combating Organized Crime (DCCO) were responsible for investigating and prosecuting trafficking cases. In 2021, DIICOT established a dedicated anti-trafficking unit with seven prosecutors for prosecuting trafficking crimes and providing training and support to prosecutors in DIICOT's regional offices. With the addition of the unit, both DIICOT and DCCO operated dedicated teams of anti-trafficking police officers and prosecutors. DIICOT prosecutors reported the need for legislative amendments to deconflict elements of the criminal code. Currently, the authority to investigate "trafficking in persons, trafficking in minors, and pimping committed by organized crime groups" remained with DIICOT, while other prosecutors were responsible for "regular pimping," "pimping through use of coercion," and "the exploitation of minors in forced begging and theft." These often overlapping elements of the criminal code and insufficient coordination in the prosecution service led to duplication of efforts, confusion, and subsequent inefficiency in the disposal of cases. Civil society experts agreed and advocated for a change, noting the overlap between the definitions led to some trafficking investigations being moved to a different department within the police, which did not maintain such expertise, and to more lenient penalties for perpetrators. During the reporting period, DIICOT and DCCO reported pandemic-related restrictions and COVID-19 infections among police and prosecutors constrained their ability to advance investigations in a timely manner. Nonetheless, in 2021, authorities opened 628 new trafficking cases (571 sex trafficking, 35 labor trafficking, 22 unspecified), an increase from 552 in 2020. Authorities prosecuted 522 suspected traffickers (506 sex trafficking, six labor trafficking, 10 unspecified), a significant increase from 234 in 2020. Courts convicted 162 traffickers (127 sex trafficking, 35 labor trafficking), an increase from 142 in 2020. The majority of convicted traffickers received sentences ranging from three to 12 years' imprisonment. However, 39 convicted traffickers (24 percent) received sentences of less than three years' imprisonment, which did not meet the minimum prescribed penalty under Articles 210 and 211, and 30 convicted traffickers (19 percent) received suspended sentences. Such lenient sentences issued to convicted traffickers weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. In 2021, DIICOT and DCCO participated in 20 joint investigative teams with European counterparts (35 in 2020). In one case, authorities from Romania and Northern Ireland cooperated on a sex trafficking investigation involving more than 20 Romanian women forced into commercial sex in Belgium, Germany, Romania, Spain, and the United Kingdom (UK), which resulted in authorities prosecuting 11 suspected traffickers. In another case, known as Operation Bear, Romanian, Scottish, and EUROPOL authorities cooperated on a sex trafficking investigation involving an organized crime group operating in Scotland, England, and Romania. The investigation resulted in the arrest of 27 Romanian nationals, who faced prosecution in Romania, and the identification of more than 30 trafficking victims across Europe.

Persistent, low-level official complicity in trafficking crimes remained a significant concern, undermining law enforcement action. Government efforts to investigate, prosecute, and convict allegedly complicit officials remained inadequate. In 2021, authorities prosecuted a member of the gendarmerie for alleged sex trafficking crimes involving four child victims. Additionally, courts issued a three-year suspended sentence against a former chief of police, who, according to media reports, ignored criminal complaints submitted by families of child trafficking victims

and attempted to reconcile the victims with traffickers. Separately, the United Nations reported that an investigation into allegations of sex trafficking by a Romanian peacekeeper, originally reported in 2017, remained ongoing. Several NGOs continued to express suspicion that staff working in government-run institutions for children and residential centers for persons with disabilities facilitated trafficking. Experts reported Child Protection Services (CPS) employees who oversaw children in government-run institutions not only did not proactively try to prevent trafficking but sometimes encouraged girls to become involved in sex trafficking or knowingly tolerated the exploitation of child trafficking victims. NGOs noted in certain counties' CPS officials acted as accomplices to traffickers. The government did not report investigating such allegations. Experts stated the government did not adequately discipline child welfare officials who abused children in their care and lacked expertise among police to proactively identify trafficking victims. In the previous reporting period, the General Police Inspectorate and the National Authority for the Rights of Persons with Disabilities, Children and Adoption (ANDPDCA) established an identification and referral mechanism for trafficking cases among children in government-run institutions. Additionally, to address the significant number of child sexual abuse cases, including potential child sex trafficking cases, the police maintained a unit dedicated to investigating such crimes.

Deficiencies within law enforcement, such as staffing shortages and unsustainable workloads, as well as knowledge gaps, continued to limit progress despite positive developments. According to NGOs, in trafficking cases involving foreign migrant victims, law enforcement did not effectively implement the law. Law enforcement often charged suspected traffickers for crimes other than trafficking, such as pandering, to avoid lengthy, expensive, and time-consuming investigations. DIICOT and DCCO continued to operate with limited staff and resources. DIICOT reported investigators and prosecutors avoided specializing in trafficking because of the complexity of the crime and the trauma and burnout associated with handling trafficking cases. As a result, overextended investigators and prosecutors handled multiple cases simultaneously, which resulted in difficulty building strong cases for prosecution within the six month period allowed for a suspect to be held in pre-trial detention. DIICOT also reported one specialized anti-trafficking prosecutor and investigator regularly covered regions with approximately one million residents and concurrently oversaw 100 investigations. To help address staffing shortages, in 2021, DIICOT added 11 new positions. Furthermore, NGOs noted the government employed a limited number of dedicated financial investigators—eight covering the entire country—which restricted financial investigations and asset seizures, inhibiting evidence collection in trafficking cases to corroborate witness testimony. In 2021, the government submitted a request to the Ministry of Interior (MOI) to hire 42 financial investigators nationwide; the request remained pending at the end of the reporting period. To assist in financial investigations, the government passed an executive order in August 2021 allowing prosecutors access to the country's internal revenue service database to investigate the bank accounts of criminal suspects. The government also adopted a national strategy in August 2021 on the recovery of criminal assets to operationalize a national fund that would confiscate assets to provide compensation and protection to victims. In 2021, prosecutors in DIICOT's specialized anti-trafficking unit confiscated approximately 213,000 Romanian lei (RON) ($48,840) in assets. Reports indicated the shift to online recruitment of victims remained a serious problem, which the government addressed by allocating 13 million RON ($2.98 million) in 2021 to equip the police with a computer forensics system for detecting online sex trafficking and performing faster and more effective online investigations. NGOs reported, while law enforcement authorities developed some sensitivity to trafficking victims' situations, some police officers and judges continued to lack specialized training and a weak understanding of trafficking crimes and victim trauma. Judges agreed with the need for training for law enforcement officers, prosecutors, and judges, specifically on trauma-informed, victim-centered interviewing. The government, in partnership with other governments, NGOs and international organizations, addressed knowledge gaps by training investigators, prosecutors, judges, labor inspectors, and other front-line workers throughout the year on various topics, such as trauma-informed

and victim-centered approaches to investigations, trafficking indicators, and the country's legal framework on trafficking. The government supported additional educational efforts by introducing, as part of the mandatory curricula for all local and central police, lessons on preventing and combating trafficking.

## PROTECTION

The government increased protection efforts, although significant gaps remained. Authorities used the existing national victim identification and referral mechanism to identify victims and refer them to care. Under the mechanism, any entity, including diplomatic missions, NGOs, and other organizations, could identify victims. In 2021, the government reported 488 identified victims (378 sex trafficking, 42 labor trafficking, 68 unspecified), a decrease from 596 in 2020. Of the 488 victims, 171 were children (255 in 2020). Authorities identified one foreign victim, the same as in 2020, but observers estimated there were numerous unidentified foreign victims, particularly among asylum-seekers. NGOs reported authorities did not screen asylum-seekers and foreign migrants for trafficking indicators and were reluctant to identify them because of the significant time and resources that an investigation would entail. In 2021, the General Inspectorate for Immigration adopted procedures for identifying victims among asylum-seekers and migrants and referring those victims to the National Agency against Trafficking in Persons (ANITP), the government's lead agency for coordinating anti-trafficking efforts. Furthermore, the government did not provide specialized training on the psychological trauma of trafficking on victims, which hindered authorities' ability to correctly identify potential victimization among individuals in commercial sex. According to NGOs, authorities continued to fine persons in commercial sex, without screening for trafficking indicators. However, authorities typically dropped charges or fines once investigators and prosecutors realized a suspect was a trafficking victim. Authorities identified most victims after a criminal investigation started. After identification, authorities informed victims of the services available to them and subsequently referred adult victims to ANITP and child victims to CPS for assistance.

The government made recent reforms and regulations that officials noted bolstered assistance, particularly for child trafficking victims. However, officials also acknowledged challenges, such as access to assistance and protecting children in government institutions, remained. Assistance was conditional upon a person's status as an identified trafficking victim. Two-thirds of identified victims received assistance. In 2021, approximately 64 percent (313) of identified victims received assistance from public institutions, public-private partnerships, and NGOs, compared with 48 percent in 2020. The government provided emotional support, psychological counseling, legal assistance, and career counseling to domestic and foreign victims. Victims received protection and assistance services in government-run facilities for victims of crime, including trafficking, and in NGO-run trafficking shelters. The government maintained a limited number of government-run shelters designated for vulnerable adults, including trafficking victims. Authorities placed child victims in specialized facilities for child trafficking victims, general child facilities, or facilities for children with disabilities run by CPS. County-level CPS allocated 55 million RON ($12.6 million) to services for child trafficking victims, which included emergency accommodation, counseling, social and psychological assessment, and other types of services. CPS in each county received some funding from local governments to maintain multi-disciplinary teams composed of social workers, psychologists, legal advisors, and pediatricians, who were responsible for providing services to child victims. In 2021, the government continued to establish these teams across the country, and by the end of the reporting period, there were 23 county-level directorates for child protection and social assistance with multi-disciplinary teams that could provide support to trafficking victims, including some adult victims. However, these teams utilized the same methodology regardless of the type of abuse identified. In 2021, ANDPDCA initiated amending the methodology that the multi-disciplinary teams used to address child trafficking, including crisis intervention trainings and developing practices specific to regional challenges. NGOs reported county-level CPS did not have adequate expertise in trafficking and resources to provide quality care. ANDPDCA also reported local CPS lacked the necessary knowledge that would allow them to justify funding requests

for specialized services. In an effort to provide consistent quality care to all child victims, the government implemented a 2020 regulation requiring minimum standards of assistance for child victims of crime, including trafficking. Under the regulation, licensed service providers offering shelter and assistance to identified child victims followed a set of specific requirements, including providing safe environments, specialized psychological counseling, and visitations with families. The regulation also required local governments to include training programs for staff involved in providing services to child victims of crimes, including trafficking, in their annual budget requests. Nonetheless, perennial problems of abuse and neglect of children in government-run institutions, coupled with the lack of proactive identification and assistance in government facilities, left children in placement centers vulnerable to trafficking. Experts reported CPS employees who oversaw children in government-run institutions not only did not proactively try to prevent trafficking but were sometimes complicit in the trafficking. The 2021 identification and referral mechanism established by ANDPDCA and the General Police Inspectorate mandated county-level CPS and police inspectorates to cooperate and exchange information on a regular basis to help identify vulnerable children in government-run institutions who were at risk of trafficking.

The government implemented new initiatives that addressed limited resources and inadequate services. Government funding for NGO assistance and protection services remained limited. While the government relied on NGOs to accommodate and assist victims, it did not allocate grants directly to NGOs due to legislation precluding direct funding. Civil society emphasized the need for a funding mechanism for service providers and other NGOs in the anti-trafficking space. To address this need, in 2021, the government coordinated a pilot program authorizing the city of Bucharest to fund an NGO for victim services; however, during the reporting period, no NGOs were able to take advantage of the program. The government proposed extending the program to other cities and providing training to NGOs on applying for local government grants, thus, establishing a framework for public funding to NGOs at the local level. In addition, the Ministry of Labor and Social Protection estimated allocating 1.75 million RON ($401,280) for services for adult trafficking victims and 6.26 million RON ($1.44 million) for child trafficking victims. NGOs continued to report the quality of care was overall inadequate, especially medical services and psychological counseling. Despite Romanian law entitling all victims to psychological and medical care, the government did not provide more than one mental health counseling session and did not finance medical care costs. NGOs paid all psychological services costs for victims due to the government's refusal to reimburse psychologists who assisted victims. NGOs also covered victims' emergency medical care costs because the government did not provide financial assistance and medical care required payment upfront. Moreover, access to medical care required Romanian victims to return to their home districts to obtain identity documents. The process presented logistical and financial hurdles for many trafficking victims; NGOs also covered these associated costs. In 2021, the government established a working group on increasing the quality of medical assistance for trafficking victims composed of public and private healthcare providers and Ministry of Health officials and created an action plan for providing tailored medical services to trafficking victims and for training medical service providers to identify victims.

In general, victims lacked adequate support during criminal cases; however, the government instituted some protections during the reporting period. Reports of victim intimidation during and after court proceedings persisted. NGOs reported many courts did not impose sanctions on traffickers' lawyers when they harassed and mocked the victims during proceedings. Judges relied heavily on the victim's in-person testimony, preferably in front of the trafficker, further traumatizing victims. The Council of Europe found Romanian courts lacked national practices to protect child victims of sexual assault. To address these concerns, the government introduced regulations mandating each county establish private hearing rooms for child victims of crime and standardized child-friendly questioning methodologies; there were 11 such rooms available in 2021. The government also established interdisciplinary teams, consisting of psychologists, social workers, police officers, and prosecutors, to coordinate the participation

of children in legal proceedings and prevent re-traumatization. In 2021, the government provided 427 trafficking victims participating in criminal proceedings physical protection and transportation services. While the government offered free legal aid to victims, court appointed lawyers often lacked experience working with trafficking victims; in 2021, the Ministry of Justice (MOJ) worked with the National Bar Association to provide trafficking-related training to lawyers. Also, courts did not always grant free legal aid to victims, particularly if they were not sex trafficking victims, and access to free legal aid was contingent on proof of indigence. Furthermore, court appointed lawyers were not aware of the special laws on compensation for trafficking victims and did not inform victims, who could unknowingly renounce compensation claims during proceedings. The law allowed trafficking victims to receive restitution from the trafficker in a criminal case, file a civil suit against the trafficker, or receive compensation from the government. If victims did not obtain restitution in court, the government could reimburse them for expenses related to hospitalization, material damage caused by the traffickers, and income lost. In the event traffickers' assets were not seized but a guilty verdict was reached, the government could pay material damages for documented expenses such as medical bills. Throughout 2021, courts granted compensation to 235 victims who filed civil claims within criminal lawsuits. The total amount of compensation for moral and material damage granted to victims was approximately 3.63 million RON ($832,380). In 2021, the MOJ conducted an assessment on the compensation and restitution mechanisms to identify possible areas of improvement. Romanian law permitted foreign victims who cooperated with authorities to receive a renewable, six-month temporary residence permit. Additionally, the law permitted foreign victims "tolerated status" for up to six months and granted asylum-seekers the right to work after three months.

## PREVENTION

The government increased prevention efforts. The government continued to implement the 2021-2022 anti-trafficking national action plan (NAP) as part of the 2018-2022 national strategy and dedicated financial resources to all of its proposed activities. The NAP assigned financial and operational responsibility to various government agencies and ministries, which allocated approximately 41.2 million RON ($9.45 million) toward the proposed activities, such as the repatriation of Romanian victims abroad. In September 2021, the government adopted an emergency ordinance and an action plan aimed at improving assistance to vulnerable children and other at-risk populations and the investigations of various crimes against children, including trafficking. The ordinance established a missing child alert system and a national hotline focused on consolidating the government's capacity to identify child abuse, including trafficking. During the reporting period, the government transferred responsibility of the inter-ministerial committee, which monitored implementation of the strategy and comprised representatives from several agencies, DIICOT, and the police, to the Department for Vulnerable Groups and Community Social Responsibility in the Prime Minister's Office to improve interagency coordination and elevate efforts to combat trafficking. In addition, the government established a Department for Community Social Responsibility and Vulnerable Populations within the Prime Minister's Office to monitor implementation of the recently adopted action plan and coordinate interagency cooperation focused on expanding protection efforts for victims of trafficking, child abuse, and domestic violence. ANITP continued to publish yearly reports and statistics on trafficking and organized 153 educational events for middle school and high school students and 26 awareness campaigns (94 in 2020), including educating the public on responding to trafficking situations and recognizing trafficking indicators. In addition, ANITP, an NGO, and the Romanian Orthodox Church worked to raise awareness throughout the Church's vast community and to provide guidance on how to report trafficking cases. Furthermore, ANITP managed a 24-hour hotline and staffed an operator during regular business hours. The hotline provided services in Romanian and English and primarily focused on informing Romanians about working abroad safely. The hotline received 16 calls that led to criminal investigations (seven in 2020). A 2021 report on protecting rights at borders criticized the government for continued violent pushbacks of asylum-seekers and migrants into Serbia, a practice that potentially increased a persons' vulnerability to

trafficking, exacerbated distrust of foreign officials, and disallowed for the reporting of any exploitation experienced. In 2021, Romanian and UK officials cooperated to develop strategic approaches on combating trafficking, including a project bringing together prevention efforts, victim protection, and prosecuting criminals. The government made efforts to reduce the demand for commercial sex acts by investigating 13 individuals suspected of purchasing commercial sex.

During the reporting period, ANITP conducted a campaign raising awareness on labor trafficking among Romanians seeking jobs abroad. After an incident involving thousands of Romanian workers traveling to Germany to harvest asparagus during the pandemic with few protections in place, members of Parliament examined the enforcement of labor protections for Romanian citizens working abroad. As a result, in 2021, the government amended the labor law on the protection of Romanian citizens working abroad to include a broader definition of temporary and seasonal workers, clarification of workers' rights, additional regulations for recruiting agencies, and increased fines for labor law violations. According to an official, enforcement, however, remained the biggest hurdle to improve protections for Romanian workers abroad. The law prohibited Romania-based recruitment companies from charging recruitment fees and facilitating the exploitation of citizens abroad; violations were considered a misdemeanor and punishable by a civil fine. The law required employers of foreign workers to submit applications for work permits. Observers reported this practice left foreign workers vulnerable to abuse, including trafficking, and sometimes working without appropriate documentation because work permits were a requirement to obtaining or extending residence permits. Observers also reported the government tolerated practices through which employers confiscated foreign workers' residence permits and travel documents to limit their freedom and facilitate potential deportations. The law required the General Inspectorate for Immigration to issue work permits within 30 to 45 days of receiving an application; before issuing work permits, the General Inspectorate verified job offers and employers' profiles to prevent fraud. In 2021, the General Inspectorate and the Labor Inspectorate conducted a campaign to inform employers who hired or were interested in hiring foreign workers about their rights and responsibilities and the risks of illegal work and exploitation. The General Inspectorate also implemented awareness activities aimed at foreign students in Romania to inform them about their rights as employees. According to some NGOs, police remained unresponsive to reports of labor trafficking, and labor inspectors lacked the competency for detecting trafficking and the legal authority for unannounced inspections to several categories of worksites. ANDPDCA monitored and coordinated all programs for the prevention and elimination of child labor and investigated child labor abuse reports, some of which may have been forced child labor. The government did not effectively enforce child labor laws, especially in rural areas and where social welfare services lacked personnel and capacity to address violations. Experts noted a continued lack of awareness about labor trafficking among stakeholders and insufficient attention to identifying cases among labor law violations.

According to the minister of foreign affairs, nearly half a million refugees had entered Romania since the start of Russia's further invasion of Ukraine in February 2022. In response to this inflow of Ukrainian refugees, the government adopted several measures to counter trafficking, including enhancing border security, training border agents to screen for trafficking indicators, credentialing NGO staff who were assisting refugees at border crossings, and providing transportation from the border to shelters. Additionally, the government partnered with UNHCR and a local software company to design verification software to establish registries and vet individuals who were hosting and providing transportation to refugees. Furthermore, the government developed a set of procedures for registering and tracking unaccompanied children and established county-level task forces composed of representatives from the General Directorates of Social Assistance and Child Protection, NGOs, and international organizations, as well as school and public health officials. Although most NGOs and civil society representatives commended the government for its response to address the immediate needs of refugees, some raised concerns about medium- and long-term planning, particularly for vulnerable populations. NGOs stated a better process was needed at the border to identify the medical, social,

and psychological needs of refugees and to assess their vulnerability, including screening for indicators of trafficking or exploitation. NGOs also highlighted the need for better information and legal counseling to lessen the possibility of trafficking, especially in a country with known criminal trafficking networks. While civil society representatives and government officials assessed trafficking cases were likely to be few and isolated, despite inherent risk of underreporting given language barriers and refugees' overall vulnerability, police identified one potential trafficking victim crossing the border, who received assistance from an international organization.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Romania, and traffickers exploit victims from Romania abroad. Romania remains a primary source country for sex trafficking and labor trafficking victims in Europe. The vast majority of identified victims (77 percent) in 2021 are sex trafficking victims. Traffickers are typically Romanian citizens working as part of an organized crime group based on family and ethnic ties, who exploit Romanian women and children in sex trafficking in Romania and other European countries, including the Czech Republic, Finland, France, Spain, and the UK. Experts continue to report Romanian women recruited for sham marriages in Western Europe; after entering these marriages, traffickers force the women into commercial sex or labor. Children represent more than a third of identified trafficking victims in Romania. Government officials and NGOs report increased recruitment of children via the internet and social media as a result of the pandemic. Media outlets allege the online sexual exploitation and abuse of girls as young as 12 years old. Children in government-run institutions, particularly girls living in homes and placement centers for persons with disabilities, remain vulnerable to sex trafficking. Several NGOs note former residents of government-run homes or residential centers serve as recruiters of underage girls from the same facilities. Traffickers exploit Romani children in sex trafficking and forced begging. Child labor abuse continues to be underreported, with children as young as five exploited in child labor. Traffickers subject Romanian adults and children to labor trafficking in agriculture, construction, hotels, manufacturing, and domestic service, as well as forced begging and theft in Romania and other European countries. Some reports suggest traffickers operating in Romania and Moldova exploit Moldovan women and girls from Romania in operations in Europe; the extent of the trafficking is unknown. Romania is a destination country for foreign migrants from Africa, Europe, and South and Southeast Asia, exploited in the construction, hotel, and food-processing industries. Migrants from East Asia, who work in the construction and hospitality industries, are at a particular risk of trafficking due to the lack of access to information in their native language and deceptive practices by employers. NGOs report a recent rise in the number of foreign migrants, citing an unusually high number from the Middle East and South and Central Asia entering Romania at the Serbia border and a record number of them—approximately 9,590—submitting applications for asylum in 2021. While their main goal is to continue their path toward Western and Northern Europe, many of these migrants may be or may become trafficking victims while in Romania. Nearly half a million foreign nationals and Ukrainian refugees, predominantly women, children, and the elderly, who are fleeing Russia's further invasion of Ukraine in February 2022 and crossing the Romania border seeking sanctuary, are highly vulnerable to trafficking; approximately 80,000 are staying in country, and more than a third are children. Since Russia's further invasion of Ukraine, Romanian border authorities have admitted approximately 460 children who had been in Ukrainian institutions; approximately 168 Ukrainian children remain in Romanian child protection centers around Romania. Government corruption in law enforcement and the judiciary continues to enable trafficking crimes, and officials have been investigated for suspected involvement in trafficking.

## RUSSIA: TIER 3

The Government of Russia does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Russia remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including by prosecuting and convicting more traffickers, extending work and residence permits for foreign workers in response to the pandemic, and facilitating the return of Russian children from Iraq and Syria, some of whom may have been trafficking victims. However, during the reporting period, there was a government policy or pattern of trafficking. The government was actively complicit in the forced labor of North Korean workers. The government did not screen North Korean workers for trafficking indicators or identify any North Korean trafficking victims, despite credible reports in previous years that the Democratic People's Republic of Korea (DPRK) operated work camps in Russia and exploited thousands of North Korean workers in forced labor. Citizens from the DPRK continued to arrive throughout the year, many of whom likely engaged in informal labor; the government issued 4,093 visas to North Koreans in 2021 in an apparent attempt to circumvent UN Security Council resolutions (UNSCRs). The government did not report how many North Korean workers remained in Russia in 2021. Separate from this complicity, the government did not report identifying any trafficking victims, and efforts to prosecute and convict traffickers remained weak compared with the estimated scope of the problem. Authorities continued to lack a process for the identification of victims and their referral to care, and the criminal code did not establish a definition for a victim of trafficking, hindering identification efforts and limiting access to victim services. The government's full-scale invasion of Ukraine in February 2022 created significant vulnerabilities to trafficking for the millions of refugees fleeing Ukraine. The government offered no funding or programs to provide services for trafficking victims and took steps to limit or ban the activities of civil society groups, including some dedicated to anti-trafficking activities. Authorities routinely penalized potential victims, including by detaining and deporting potential forced labor victims for immigration violations, and prosecuted sex trafficking victims for commercial sex crimes, without screening for trafficking indicators. As in previous years, the government did not draft a national strategy or assign roles and responsibilities to government agencies to combat human trafficking.



### PRIORITIZED RECOMMENDATIONS:

Investigate and prosecute trafficking crimes and convict traffickers under the trafficking statutes, including complicit officials and suspected trafficking cases related to North Korean workers in Russia, respecting due process. • Allocate funding to state bodies and anti-trafficking NGOs to provide specialized assistance and care to victims. • Implement a formal policy to ensure identified trafficking victims are not punished or deported for unlawful acts traffickers compelled them to commit. • Develop and implement formal national procedures to guide law enforcement, labor inspectors, and other government officials in identifying and referring victims to service providers, particularly among labor migrants and individuals in commercial sex, and screen for trafficking indicators among individuals arrested for commercial sex or immigration violations. • Given significant concerns that the DPRK forces its citizens to work abroad, screen North Korean workers, students, and tourists for trafficking indicators and refer them to appropriate services. • Create a national anti-trafficking action plan and establish a central

coordinator for government efforts. • Ensure victim identification and protection measures are not tied to the prosecution of a trafficker and allow all first responders to officially identify potential trafficking victims and refer them to care. • Take all necessary steps to allow those forcibly relocated to Russia to travel freely and avoid falling victim to traffickers. • Ensure screening of children returned from Iraq and Syria for child soldiering indicators and provide them with rehabilitation and reintegration support. • Provide victims access to legal alternatives to removal to countries where they face hardship or retribution. • Amend the criminal code to include a definition of human trafficking that is consistent with the definition under international law. • Amend or repeal penal provisions of the criminal code to clarify that no penalties involving compulsory labor may be imposed for the peaceful expression of political views. • Create a central repository for publicly available information on investigation, prosecution, conviction, and sentencing data for trafficking cases. • Increase efforts to raise public awareness of both sex and labor trafficking, including among children.

### PROSECUTION

The government maintained minimal law enforcement efforts. Articles 127.1 (trafficking in persons) and 127.2 (use of slave labor) of the criminal code criminalized sex trafficking and labor trafficking. Article 127.1 prescribed penalties of up to five years' prison labor or up to six years' imprisonment for crimes involving an adult victim and three to 10 years' imprisonment for those involving a child victim. Article 127.2 prescribed penalties of up to five years' prison labor or up to five years' imprisonment for crimes involving an adult victim, and up to five years' prison labor or three to 10 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with punishments prescribed for other serious crimes, such as kidnapping. However, inconsistent with the definition of trafficking under international law, these articles established the use of force, fraud, or coercion as an aggravating factor, rather than an essential element of the crime. There were reports authorities often prosecuted trafficking crimes under related statutes, including Articles 240 (involvement in prostitution), 240.1 (receiving sexual services from a minor), and 241 (organization of prostitution), the penalties for which were generally lower than the penalties prescribed for trafficking crimes. The government did not report comprehensive data on trafficking criminal cases, making it difficult to assess the adequacy or effectiveness of law enforcement efforts. Media reports and publicly available data revealed some details on trafficking cases investigated and prosecuted, including some conviction information, although the limited number of cases reported did not constitute an adequate law enforcement response compared with the scale of human trafficking in Russia. Publicly available data was also likely duplicative or contradictory of information from other sources, as no single agency was responsible for maintaining comprehensive law enforcement statistics.

Russia's federal-level Investigative Committee and media publicly reported the government conducted four labor trafficking investigations in 2021 (the government initiated four investigations in 2020). The government and media publicly reported authorities conducted 13 prosecutions under Articles 127.1 and 127.2, compared with zero prosecutions in 2020. The government reported convicting five traffickers (four for forced labor and one for sex trafficking and slavery), compared with one conviction in 2020. The government reported judges sentenced the traffickers to four and a half to seven years' imprisonment. The government reported investigating and prosecuting several cases involving baby-selling and surrogacy as trafficking, both crimes that without an element of exploitation fall outside the international definition of trafficking. In previous years, authorities prosecuted suspected traffickers under commercial sex and "pimping" statutes; the government did not report trafficking cases under these statutes in 2021. NGOs noted that hundreds of trafficking-related cases were reported to authorities, but the government processed most under other administrative or criminal codes, which suppressed statistics and masked the scale and scope of the problem. The government did not report if it trained law enforcement or judicial authorities on trafficking. Russian authorities did not report cooperating in any new or ongoing international investigations in 2021. In February 2022, the government signed a declaration with Azerbaijan to jointly combat several crimes, including human trafficking.

Official complicity in trafficking crimes remained a significant concern. NGOs reported government officials and police regularly accepted bribes in exchange for not pursuing trafficking cases and officials often benefitted financially or materially from trafficking crimes. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. However, in prior years, civil society reported that the government intentionally investigated official complicity cases under non-trafficking statutes, such as Article 290 (bribery) of the criminal code. In the years following Russia's 2014 invasion of Ukraine, Russia-led forces reportedly used children to perform armed duty at checkpoints and to serve as fighters, guards, mailpersons, and secretaries, as well as informants and human shields. Following Russia's full-scale invasion of Ukraine in 2022, media highlighted new uncorroborated reports of Russian forces using children as human shields. Persistent and widespread but unconfirmed reports indicated Russia-led forces attempted to conscript or force many Ukrainians in eastern Ukraine to fight against their own country or engage in forced labor, such as to clear rubble and dispose of corpses. Observers reported Russia-associated military associations and clubs, registered as non-profit organizations, continued to routinely prepare youth in Russia-controlled areas of Ukraine for conscripted service in Russia's armed forces. Multiple reports indicated Russia-led forces forcibly moved thousands of Ukrainians, including children, to Russia through "filtration camps" in Russia-controlled areas of Ukraine, where they were deprived of their documents and forced to take Russian passports. Once in Russia, widespread reports indicated thousands of Ukrainians were forcibly transported to some of Russia's most remote regions, and Russian authorities reportedly forcibly separated some Ukrainian children from their parents and gave the children to Russian families. Ukrainians forcibly displaced to Russia were highly vulnerable to trafficking. During the reporting period, there were reports a Russia-backed armed group unlawfully recruited or used children in the Central African Republic.

Despite credible reports of the forced labor and slave-like conditions perpetuated by the DPRK government on North Koreans working in Russia, the Russian government did not report any investigations into those conditions. In violation of UNSCRs 2375 and 2397, migrant laborers from the DPRK continued to work in Russia, especially in the Far East, often under conditions of forced labor. The government previously reported approximately 500 DPRK workers remained in the country at the onset of the pandemic in March 2020; the government did not report how many North Korean workers remained in 2021. Despite the government claiming it would cease issuing new work permits to North Korean laborers, observers noted many laborers continued to enter the country via fraudulent channels to work informally, for example by obtaining tourist or student visas. The government issued 4,093 visas to North Korean citizens in 2021, roughly 2,600 of which were student visas (the government issued 2,609 student and 256 tourist visas to North Korean citizens in 2020); experts noted that many of these visa holders worked illegally in Russia, making them vulnerable to trafficking. Authorities did not report screening North Korean workers for trafficking indicators or offering victims options to legally remain in the country. A February 2016 agreement between Russia and the DPRK enabled Russian authorities to deport North Koreans residing "illegally" in Russia, possibly even those with refugee status. Observers noted this may increase the risk of labor trafficking for North Koreans working in Russia and might subject victims to grave harm, as DPRK authorities reportedly arrested, imprisoned, subjected to forced labor, tortured, and sometimes executed repatriated trafficking victims.

## PROTECTION
The government decreased already negligible efforts to protect victims. The government did not develop or employ a formal system to guide officials in proactive identification of victims or their referral to available services. The law did not specifically define who was a trafficking victim or differentiate trafficking victims from victims of other crimes; experts noted this hindered identification measures and limited access to victim services. The government did not report identifying any trafficking victims in 2021, compared with 52 in 2020. NGOs estimated the actual number of victims to be in the thousands; they reported a significant number of cases go unreported due to the lack of a formal

referral mechanism, victims' credible fears of authorities, and the lack of government assistance to victims. Observers noted police regularly avoided registering victims in criminal cases that were unlikely to be solved in order not to risk a lower conviction rate. The government also did not have a program to protect or support victims who participated in the investigation or prosecution of their alleged traffickers. In recent years, authorities reportedly pressured some victims to cooperate in investigations without any offer of protection. The government did not report if it repatriated trafficking victims to Russia under a previously established readmission agreement with the EU, which was intended to assist in the repatriation of Russian citizens.

As in previous years, the government did not provide funding or programs for protective services dedicated to trafficking victims. NGOs provided all protection services, including shelter, food, legal services, basic medical and psychological support, interpretation, facilitating the return of documents or wages, and assisting in the resettlement or repatriation of victims, though few were able to provide specialized assistance for trafficking victims; an NGO also ran a 24/7 hotline. While in prior years government-funded homeless shelters provided medical and psychiatric aid and referred trafficking victims to international NGOs and other homeless shelters located in many of Russia's regions, NGOs reported they no longer sent victims to these shelters because of their poor conditions, the lack of screening for trafficking indicators, and the risk that victims may be vulnerable to further trafficking; as in previous years, there were no reports of victims assisted in these shelters in 2021. The government did not report if courts ordered compensation to victims; publicly available data showed that trafficking victims did not receive compensation in civil suits in 2021. The government continued the repatriation of Russian children, including potential trafficking victims, whose parents were alleged fighters with ISIS. ISIS was known to use child soldiers and perpetrate other forms of trafficking. The government did not report screening specifically for indicators of trafficking, but past media reports indicated the children received counseling. In July 2021, the government reported it had repatriated 341 children from Syria and Iraq since the start of its repatriation program in 2017, including all Russian children who had been held in prisons in Damascus, Syria.

The government did not actively cooperate with civil society. Similar to previous reporting periods, the government took steps to limit or ban the activities of civil society groups, including some dedicated to anti-trafficking activities, through measures such as "foreign agent" laws. In March 2021, the government stripped a prominent migrant rights activist of his Russian citizenship and deported him to Tajikistan, where he was sentenced to nine years' imprisonment on fraud charges; observers dismissed his expulsion and subsequent conviction as politically motivated. In September 2021, another prominent migrant rights activist was arrested at the airport upon returning to Russia, was threatened with deportation, and subsequently voluntarily departed the country. Additionally, the Yarovaya package of anti-terror laws made it a crime for individuals or organizations to provide material assistance to people considered to be in Russia illegally; authorities could prosecute NGOs that assisted undocumented victims of trafficking. Authorities also penalized victims for unlawful acts traffickers compelled them to commit. Authorities treated foreign victims as illegal migrants and criminally charged them with "prostitution" or "unlawful presence in country;" many victims were detained or deported without being screened for trafficking indicators. Authorities frequently prosecuted Russian and foreign victims of sex trafficking for engaging in commercial sex and did not take proactive measures to identify victims during raids on brothels. Authorities punished child victims of forced criminality, often together with the traffickers who forced them to commit these crimes. Authorities did not screen other vulnerable populations, such as migrant workers or foreign women entering Russia on student visas, despite evidence of their intention to work or other vulnerabilities to trafficking. In prior years, authorities reportedly prosecuted Russian citizens returning from Syria and Iraq, where some were subjected to trafficking, under anti-terror laws, without screening them for indicators of trafficking. The ILO Committee of Experts again noted its deep concern in 2020 that some provisions of the Russian criminal code, which include compulsory labor as possible punishment, are worded broadly enough to lend themselves to application as a means of punishment for the expression of views opposed to the government.

Haiti AR_000947

## PREVENTION

The government maintained negligible efforts to prevent trafficking. The government had neither a designated lead agency to coordinate its anti-trafficking efforts nor a body to monitor its anti-trafficking activities or make periodic assessments measuring its performance. Russia did not have a national action plan. The government continued to operate regional migration centers where foreign migrants who did not need visas to enter the country could obtain work permits directly from the government; however, an international organization estimated only half of eligible migrants obtained these permits as they entailed large upfront and monthly fees and sometimes required multiple time-consuming trips to the center. The international organization noted migrants who were not able to complete the permit process were increasingly vulnerable to labor exploitation and trafficking due to their lack of proper documentation. In March 2021, the government reported it would create a unified information platform to register foreign citizens with the stated intent to promote employee-employer relations and facilitate job training and access to information. In August 2021, the government reported it would simplify the procedure for migrant workers to obtain a social security number, facilitating legal employment in the country. In June 2021, the government issued a decree extending through September 2021 the pandemic-related ban on deporting undocumented foreign nationals; foreign nationals from Eurasian Economic Union countries could work during this time. The decree also extended foreign nationals' legal status by not counting time in the country from June 2021 through December 2021. Recruitment agencies that sought to employ Russians overseas were required to obtain a license from the Ministry of Internal Affairs, but no such requirement existed for agencies recruiting foreign workers, which increased the vulnerability of such workers to forced labor. In previous years, authorities conducted scheduled and unannounced inspections of businesses employing foreign workers to check for violations of immigration and labor laws—with penalties in the form of fines and/or revocation of foreign worker permits; the government did not report conducting inspections in 2021. In spite of frequent inspections in past years, the use of undocumented or forced labor remained widespread due to complacency and corruption. The government provided no funds to NGOs to carry out prevention and awareness campaigns. Prevention campaigns were hampered by a law that made it a crime to talk to children younger than 16 about sexual issues and exploitation. The government did not make efforts to reduce the demand for commercial sex acts. The government did not make efforts to reduce the demand for participation in international sex tourism by its citizens, despite allegations of such actions by its citizens. The government did not report providing anti-trafficking training to its troops prior to their deployment as peacekeepers.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Russia, and victims from Russia are exploited abroad. Although labor trafficking remains the predominant form of human trafficking in Russia, sex trafficking also occurs. Traffickers exploit workers from Russia and other countries in Europe, Central Asia, Southeast Asia, the People's Republic of China (PRC), and the DPRK in forced labor in Russia. Instances of labor trafficking have been reported in the construction, manufacturing, logging, textile, transport, and maritime industries, as well as in sawmills, agriculture, sheep farms, grocery and retail stores, restaurants, waste sorting, street sweeping, domestic service, call centers, and begging. Labor traffickers also exploit victims in criminal activities, such as drug trafficking, facilitation of illegal migration, and the production of counterfeit goods. According to an NGO, foreign nationals increasingly enter the country illegally with the help of criminal groups, which subsequently increases the migrants' vulnerability to trafficking. In previous years, there were reports of widespread forced labor in brick factories in the Dagestan region. After a sharp decrease at the onset of the pandemic, labor migration to Russia began to increase in 2021; media reported more than 7.8 million migrants from the Kyrgyz Republic, Tajikistan, and Uzbekistan entered Russia in 2021. Many migrant workers experience exploitative labor conditions characteristic of trafficking cases, such as withholding of identity documents, non-payment for services rendered, physical abuse, lack of safety measures, or extremely poor living conditions. To offset the shortage of labor migrants, the government increased the use of convict labor, particularly for large construction projects; observers expressed concern that prisoners working for private businesses may not be doing so voluntarily in spite of government claims that its correctional labor programs comply fully with its international obligations. According to an international organization, children of migrant workers are vulnerable to forced labor in informal sectors. Prior to Russia's full-scale invasion of Ukraine in 2022, media reported more than two million Ukrainians resided in Russia, including more than one million who escaped Russian aggression in Ukraine. Many of these migrants work unofficially and are vulnerable to both forced labor and sex trafficking; most identified victims of forced begging in recent years are Ukrainian. Subcontracting practices in Russia's construction industry result in cases of non-payment or slow payment of wages, which leave workers at risk of labor trafficking. Organized criminal groups often recruit victims from within their own ethnic communities. Traffickers have been known to pose as landlords renting rooms to migrant laborers to recruit victims and coerce them into forced labor. Traffickers lure children from state and municipal orphanages into forced begging, forced criminality, child pornography, sex trafficking, and use by armed groups in the Middle East. Organized criminal groups recruit victims for forced begging from state institutions for the elderly and people with disabilities; these institutions are not trained on how to identify trafficking and sometimes facilitate the exploitation.

Women and children from Europe (predominantly Ukraine and Moldova), Southeast Asia (primarily PRC and the Philippines), Africa (particularly Nigeria), and Central Asia are victims of sex trafficking in Russia. NGOs report an increasing number of sex trafficking victims are from Africa, arriving either illegally or legally as students. Sex trafficking occurs in brothels, hotels, and saunas, among other locations. During the 2018 World Cup, Russia relaxed its visa requirements, allowing all Fan ID holders to enter and exit Russia without a visa through December 31, 2018. Traffickers exploited this system to bring foreign sex trafficking victims into the country, especially from Nigeria; NGOs report many victims remain in Russia. Observers note migrant workers are also vulnerable to sex trafficking. Children experiencing homelessness are exploited in sex trafficking. Russian women and children are reportedly victims of sex trafficking in Russia and abroad, including in Northeast Asia, Europe, Central Asia, Africa, the United States, and the Middle East. Traffickers use social media to recruit, monitor, and control victims. Russian criminal groups threaten family members to coerce women into commercial sex in Russia and abroad. Women from Russia's North Caucasus region and women from Central Asia residing in Russia have been recruited to join ISIS through online romantic relationships and are then subjected to exploitation. Wives and children of foreign fighters are sold after their spouse or father is killed in action.

Corruption among some government officials and within some state agencies creates an environment enabling trafficking crimes. In recent years, criminal cases have involved Russian officials suspected of allegedly facilitating trafficking by enabling victims' entry into Russia, providing protection to traffickers, and returning victims to their exploiters; in some instances, officials have engaged directly in trafficking crimes. Employers sometimes bribe Russian officials to avoid enforcement of penalties for engaging illegal workers. Prior to 2018, the DPRK sent approximately 20,000 North Korean citizens to Russia annually for work in a variety of sectors, including logging in Russia's Far East. An estimated 500 North Korean workers remained in Russia as of March 2020, as did approximately 4,093 North Korean citizens who entered with visas in 2021; observers note a growing trend in the use of non-labor visas to bring DPRK workers to Russia. Many of these North Korean citizens are subjected to conditions of forced labor by the North Korean government. Following Russia's full-scale invasion of Ukraine in 2022, multiple reports indicate Russia-led forces have forcibly moved thousands of Ukrainians, including children, to Russia through "filtration camps" in Russia-controlled areas of Ukraine, where they are deprived of their documents and forced to take Russian passports. Once in Russia, widespread reports indicate thousands of Ukrainians have been forcibly transported to some of Russia's most remote regions and Russian authorities have reportedly forcibly separated some Ukrainian children from their parents and given the children to Russian families. Ukrainians forcibly displaced to Russia are highly vulnerable to trafficking.

RWANDA

Russia-led forces reportedly recruit Syrian children to guard installations and fight in Libya. In the years following Russia's 2014 invasion of Ukraine, persistent and widespread but unconfirmed reports indicate Russia-led forces have attempted to conscript or force many Ukrainians in eastern Ukraine to fight against their own country, and following Russia's full-scale invasion in 2022, Russian forces have reportedly forced many Ukrainians in eastern Ukraine to engage in forced labor, such as to clear rubble and dispose of corpses. Since 2014, Russia-led forces have reportedly used children to perform armed duty at checkpoints and to serve as fighters, guards, mailpersons, and secretaries; uncorroborated reports indicate Russia-led forces have used children as informants and human shields. Following Russia's full-scale invasion of Ukraine in 2022, media highlighted new uncorroborated reports of Russian forces using children as human shields. Observers report Russia-associated military associations and clubs, registered as non-profit organizations, continue to routinely prepare youth in Russia-controlled areas of Ukraine for conscripted service in Russia's armed forces. During the reporting period, there were reports a Russia-backed armed group unlawfully recruited or used children in the Central African Republic.

## RWANDA: TIER 2

The Government of Rwanda does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Rwanda remained on Tier 2. These efforts included victim identification and referral to care, in partnership with an international organization; finalizing the updated national action plan (NAP); and implementing two ministerial orders establishing interagency responsibilities for responding to trafficking crimes against Rwandans overseas and providing them with protection services. The government also increased trafficking investigations and prosecutions. However, the government did not meet the minimum standards in several key areas. The government did not convict any traffickers during the reporting period. The government lacked a proactive standardized mechanism to adequately screen for potential trafficking victims among vulnerable populations and refer them to protective services.



RWANDA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Systematically and proactively screen and identify trafficking victims, especially among vulnerable populations, including among gender-based violence (GBV) victims, persons in commercial sex, those from the LGBTQI+ community, children experiencing homelessness, and those at government transit centers. • Increase effective trafficking investigations and prosecutions and adequately sentence convicted traffickers. • Institutionalize the training of front-line officials on the new standard operating procedures (SOPs) for the identification and referral of victims to appropriate services. • Strengthen coordination of government agencies contributing to Rwanda's counter trafficking efforts. • Expand victim witness support programs and training for law enforcement and legal professionals working with victim-witnesses. • Expand victim and shelter services, including for male victims. • Expand trafficking identification and protection measures for Rwanda's refugee population. • Conduct additional training and capacity building to law enforcement agencies on recognizing and combating internal forms of trafficking. • Ensure underserved communities are provided with adequate victim identification and protection measures. • Develop and

implement a centralized data system of trafficking crimes, with data disaggregated by type of trafficking, and train law enforcement and immigration officials in relevant ministries on its use.

### PROSECUTION

The government maintained anti-trafficking law enforcement effort. The 2018 anti-trafficking law criminalized sex trafficking and labor trafficking. The law prescribed penalties of 10 to 15 years' imprisonment and a fine of 10 million to 15 million Rwandan francs ($10,000 to $15,000), which increased to 20 to 25 years' imprisonment and a fine of 20 million to 25 million Rwandan francs ($20,000 to $25,000) if the crime was transnational in nature. The law prescribed penalties of five to 10 years' imprisonment and a fine of 5 million to 10 million Rwandan francs ($5,000 to $15,000) for forced labor trafficking crimes. These penalties were sufficiently stringent, and with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. However, the law defined trafficking broadly to include illegal adoption without the purpose of exploitation, sexual intercourse for the purpose of exploitation, as well as the sale of organs and other body parts.

The government initiated 142 trafficking case investigations (15 sex trafficking cases, 125 labor trafficking cases, two unspecified exploitation cases), compared with 35 case investigations in the previous reporting period. The government prosecuted 12 defendants—one suspect in one sex trafficking case and 11 suspects for unspecified exploitation in eight cases—compared with prosecution of two defendants in two labor trafficking and one sex trafficking case in 2020. The government did not report convicting any traffickers, compared with conviction of two traffickers in the previous reporting period. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. Prolonged pandemic-related lockdowns, limited staffing capacity, and other workplace disruptions in 2021 impeded the government's progress on implementing policies and efforts to investigate and prosecute trafficking crimes. Pandemic-related challenges significantly affected the government's anti-trafficking efforts, with government offices operating at reduced staffing capacity.

Scarce resources, lack of training, and limited capacity inhibited law enforcement efforts to investigate trafficking cases, prosecute suspected perpetrators, and convict traffickers. Observers reported continued challenges in officials' ability to distinguish trafficking from other crimes and reported a need for Rwanda's law enforcement agencies to conduct additional training and capacity building on recognizing and combating internal forms of trafficking. The government focused on transnational trafficking cases which were more easily identified at border crossings while it faced challenges investigating internal trafficking crimes. Although the government reported sharing information with other governments, international cooperation to combat trafficking remained limited particularly in jurisdictions where Rwanda lacked a diplomatic presence or law enforcement mutual assistance agreements.

In partnership with an international organization, authorities provided anti-trafficking training to district government officials in Huye, Rubavu, and Rusizi districts, regions at high risk of trafficking because of cross-border movement to and from Burundi and the Democratic Republic of the Congo (DRC). The Rwanda Development Board (RDB) in collaboration with an international organization hosted a workshop on human trafficking issues for government officials. The government trained 18 investigators on victim assistance and referral procedures. The government did not report making any changes to its routine trainings and professional development for police, investigators, prosecutors, or social workers assigned to counter GBV, which incorporated components on anti-trafficking laws and procedures.

### PROTECTION

The government made mixed protection efforts. The government identified and referred fewer potential trafficking victims to care, and it did not effectively screen or assist victims among underserved communities. The government identified 110 trafficking victims (39 for sex trafficking, 67 for labor trafficking, and four for unspecified exploitation) during the reporting period, compared with 131 victims identified in the previous reporting period. Officials referred one sex trafficking victim to government and NGO shelters for assistance, compared with 48 victims

Haiti AR_000949

referred in the previous reporting period. The government was beginning to implement procedures from the new National Action Plan (NAP) related to victim identification and referral at the end of the reporting period. NGOs raised concerns that there was a need for gender-specific identification protocols and guidance on how to collect evidence for use in prosecuting cases. Additionally, NGOs reported a lack of proactive screening measures for identifying and referring potential trafficking victims from underserved communities to protected services. Observers also reported fluctuating staffing throughout the pandemic made it more difficult to coordinate among agencies to identify and refer potential trafficking victims to care, which reduced capacity to track those who received services. Additionally, the government in collaboration with an international organization trained protection actors and counselors at government-run Isange One Stop Centers on the identification of trafficking victims and how to refer them for services.

The government decreased funding for victim care due to pandemic-related budget constraints; it dedicated 181.3 million Rwandan francs ($181,300) compared with 206 million Rwandan francs ($206,000) for victim care in 2020 and 233 million Rwandan francs ($233,000) in 2019. The government continued to operate its network of 44 one-stop centers to assist GBV and trafficking victims. Observers reported four shelters affiliated with NGOs and 17 government-affiliated safe houses also offered services. The government opened its first child-friendly space in coordination with an international organization in September 2021, which offered services for juvenile suspects, victims, and witnesses, including victims and witnesses of trafficking crimes. Observers reported the government planned to establish several more of these spaces, funding permitting. The government's one-stop centers—located in hospitals and district capitals—provided short-term shelter and psycho-social, medical, and legal services to victims. The government did not report how many trafficking victims it assisted at the one-stop centers during the reporting period. NGOs reported the one-stop centers primarily focused on the needs of female victims, while assistance for male victims remained insufficient. The government reported victims generally stayed at Isange One-Stop Centers for three days, after which victims could choose between longer-term shelter or independent living options, depending on their situations. The long-term government shelters provided up to six months of shelter services for human trafficking and GBV victims. The extent and quality of services varied between locations, particularly regarding the provision of adequate psycho-social counseling, and social workers did not always screen and identify trafficking victims as distinct from GBV victims. The government and NGOs reported adult victims residing at shelters had freedom of movement and could participate in support programs on their own accord. The government reported having available temporary shelter services if victims were unwilling to return to their places of origin. NGOs reported foreign victims had the same access to services as Rwandan victims. The government reported providing and funding counseling services, medical care, literacy and numeracy education, and vocational training for the reintegration of identified former child soldiers—both boys and girls. NGO service providers offered general assistance and support in refugee camps, but a lack of capacity and resources inhibited the implementation of effective procedures, screening, and assistance to trafficking victims in refugee camps.

The 2018 anti-trafficking law stated that trafficking victims should not be detained, charged, or prosecuted for their involvement in any unlawful activity that was a direct consequence of being exploited. However, due to a lack of formal identification procedures through most of the reporting period, authorities sometimes penalized victims for forced begging and other unlawful acts their traffickers compelled them to commit. The government continued operating transit centers that advocacy groups and NGOs reported detained vulnerable persons and potential trafficking victims—including those in commercial sex, adults and children experiencing homelessness, members of the LGBTQI+ community, foreign nationals, and children in street vending and forced begging—and did not adequately screen for trafficking indicators among them. The government held many potential victims of trafficking in these centers, which functioned as de facto detention facilities, for up to six months. Observers further noted that authorities often released detainees back on the streets abruptly and without notice, thereby exposing them to possible revictimization. While some centers provided detainees and

identified victims with psychological counseling, education, vocational training, and reintegration services, not all transit centers offered the same services. NGOs reported officials did not effectively use identification and screening mechanisms to screen for trafficking indicators among underserved communities such as those engaged in commercial sex, adults and children experiencing homelessness, and children in street vending and forced begging who were also denied access to protection measures. Observers reported officials did not follow victim referral procedures with respect to the LGBTQI+ community and individuals in commercial sex due to widespread cultural prejudice. Officials were less likely to refer members of the LGBTQI+ community for services, if at all.

The government supported the repatriation of one Rwandan victim from Oman. The government identified two trafficking victims in Uganda. The anti-trafficking law also required the government to provide support to identified trafficking victims abroad by covering the cost of transportation and repatriation to Rwanda. In July 2021, the government approved two ministerial orders to clarify responsibilities for interagency coordination to support the repatriation of victims and coordination of efforts to identify and assist internal victims. NGOs applauded this action, which explained clear policies and provided a budget to support their anti-trafficking efforts. The government reported having a dedicated budget to repatriate Rwandan nationals from trafficking situations overseas, and diplomats and immigration officials worked to facilitate repatriations, especially from Gulf states. However, observers noted Rwanda's relatively limited diplomatic footprint often made it difficult for Rwandan officials abroad to provide first-hand assistance to trafficking victims overseas. Media and NGOs reported victims continued to receive support packages of 250,000 Rwandan francs ($250) upon reintegration into their home communities. The 2018 anti-trafficking law called for the government to provide legal assistance and information to victims in a language they understood; however, the government did not report the number of potential victims to whom it provided such assistance. The anti-trafficking law also protected the identity of victims by allowing court proceedings to be conducted by camera and permitting the use of a video link, but the government did not report providing any victims with these protections during the reporting period. The anti-trafficking law permitted trafficking victims to obtain employment and remain in Rwanda (or leave Rwanda) pending trial proceedings. The government did not report whether it granted this immigration relief to any victims during the reporting period. The anti-trafficking law continued to allow victims to file civil suits against traffickers for restitution and civil damages and stated that victims were exempt from paying any associated filing fees, but the government did not report any suits filed or courts ordering restitution for trafficking victims during the reporting period.

## PREVENTION

The government maintained efforts to prevent trafficking. The government finalized an updated NAP in July 2021 after consulting with survivors and including their input when developing it. The interagency anti-trafficking technical committee continued to lead coordinated national anti-trafficking efforts despite insufficient funding and pandemic-related closures. The government adjusted anti-trafficking interagency coordination and in-person engagements to accommodate pandemic restrictions. The government reported holding two major meetings on trafficking issues during the reporting period and conducting regular informal coordination beyond those meetings. Observers noted the anti-trafficking committee held fewer activities during the reporting period. Observers noted the government continued to display political will to combat trafficking, but they assessed the technical committee was not an effective coordinating body. The government did not have a central repository of trafficking data from all law enforcement agencies, which hindered coordination on trafficking issues.

The government conducted national and local awareness-raising campaigns during the reporting period. The government conducted targeted awareness raising campaigns in November and December 2021. The government conducted, in collaboration with an international organization, awareness raising activities at all of Rwanda's refugee camps to reduce the risk of trafficking. In partnership with an international organization, the government also conducted awareness raising activities in Rubavu, Rusizi, and Huye districts. Adapting to the challenges of the pandemic, the government used media and radio programs to increase

SAINT LUCIA

community awareness of trafficking risks. The Rwanda Directorate General for Immigration and Emigration (DGIE), Ministry of Justice (MINIJUST), Rwanda Investigation Bureau (RIB), Rwanda National Police (RNP), and other government agencies, in coordination with an international organization, continued to work together to target leaders in higher-risk communities. The RIB, RNP, and other government agencies continued to operate national hotlines for reporting crimes; they reported receiving 15 calls related to trafficking. These hotlines accommodated speakers in English, French, Kinyarwanda, and Kiswahili, advertised in public awareness campaigns on TV, radio, and social media, and were available 24 hours a day. The government made efforts to reduce the demand for commercial sex acts.

The government had policies to regulate labor recruitment companies. These policies required their registration with the Rwanda Development Board, licensing from the Ministry of Labor, submission of monthly reports to the government, writing labor contracts in one of the official languages and in a language that both the employee and employer understand, and including salary, date of payment, and dispute settlement procedures in employment contracts. The government did not permit international labor brokers to operate in Rwanda. The government reported labor inspectors and local authorities were trained to identify forced labor; however, NGOs reported the limited number of inspectors and insufficient funds hindered the government's labor inspections. Despite limited labor inspectors and funds, the government prevented 115 cases of forced labor in which individuals were planning to travel to the Middle East to perform domestic work. The government did not disclose how it regulated, oversaw, and screened for trafficking indicators in the labor recruitment process during the reporting period. The government sought coordination with other governments on transnational labor issues.

**TRAFFICKING PROFILE**
As reported over the past five years, human traffickers exploit domestic and foreign victims in Rwanda, and traffickers exploit victims from Rwanda abroad. Traffickers subject Rwandan men, women, and children to sex trafficking and forced labor in domestic work, and in the agricultural, mining, industrial, and service sectors in Rwanda. Traffickers exploit Rwandan women and girls in forced labor, specifically in domestic service, bars, and restaurants, and exploit men and boys in forced labor in mines and plantations. Traffickers sometimes exploit Rwandan children and young adults, including secondary school students between the ages of 13 and 18, in commercial sex in hotels, at times with the cooperation of hotel owners. Traffickers subject Rwandan adults and children to sex trafficking and forced labor in domestic work, agricultural, industrial, and service sectors abroad, including in East Africa, Southern Africa, the Middle East, and Asia. NGOs reported cultural norms minimized laborers' rights and consequently made identifying forced labor difficult. The free movement of citizens of the East African Community made it easier for traffickers to move victims across borders within the region. Traffickers transited victims through Uganda and Tanzania before reaching final destinations that included African, East Asian, and Middle Eastern countries.

International organizations reported increased vulnerability to trafficking among Rwandans due to the pandemic's impact on the economy. Migrant workers in search of job opportunities became vulnerable to traffickers. Observers reported pandemic-related border closures reduced the number of victims transiting out of the country. Traffickers target vulnerable populations such as youth experiencing homelessness, orphaned children, children with disabilities, young women and girls, unemployed adults, and internally displaced persons. The vast majority of female victims have been single women younger than 30 years old. International organizations reported traffickers entice young girls into domestic servitude and in some cases force them into sex trafficking. In October 2020, an NGO reported forced street begging as a new form of trafficking exacerbated by the pandemic. Observers report parents receive compensation for allowing traffickers to exploit their children in forced begging during the day. An international organization reported that 43 percent of children with disabilities did not attend school, increasing their vulnerability to being targeted by traffickers. In previous years, international organizations reported concerns that children in refugee camps were vulnerable to recruitment by armed groups operating in the DRC and noted Rwandan children were among those

demobilized from armed groups in the DRC. Traffickers in neighboring countries continue to pose as labor recruitment agents to recruit and transport small numbers of victims through the country. A study found that most victims were Rwandan or Burundian in origin. Victims tend to know their traffickers and recruiters; researchers report parents of victims occasionally were complicit in trafficking. Traffickers tend to be male, but females increasingly make up a substantial percentage of traffickers. Sometimes parents send their children to live with relatives to improve their economic situation, but the children become victims of domestic servitude or child sex trafficking. Traffickers deceive guardians and victims with false promises of better opportunities for employment in neighboring countries. Greater access to the internet and social media platforms continues to create new and easier opportunities for traffickers to access and recruit victims. Observers report traffickers employ coercive means to control and keep their victims in their exploitive positions; coercive tactics include isolating and restricting victims' movements, depriving them of money, restricting their ability to communicate, threat and use of violence, drugs, debt bondage for children of victims, and retaining identity or travel documents.

Sources report traffickers move victims more easily across borders due to a trilateral agreement among the governments of Kenya, Rwanda, and Uganda that allows foreign nationals to use national identification in lieu of a passport. In 2019, sources reported a new migration pattern developed by traffickers transiting victims through each of these countries on their way to Ethiopia and Kenya before they embark on their journey to the Middle East. In 2022, Rwanda hosted 127,000 refugees and asylum seekers from the DRC and Burundi. Refugees fleeing conflict and political violence in Burundi and the DRC remain highly vulnerable to trafficking in Rwanda due to an inability to secure legitimate employment, and some are exploited by traffickers in other countries after transiting Rwanda. Sources reported that refugee children, particularly girls, orphans, and young people were at greater risk of exploitation. Researchers have reported some parents in refugee camps receive money in exchange for their daughters' work in domestic service or in the commercial sex industry. Researchers reported Burundians and Congolese were at risk for trafficking. There were no reports of forcible or coerced recruitment out of the Mahama refugee camp by Rwandan government officials since 2015.

## SAINT LUCIA: TIER 2 WATCH LIST

The Government of Saint Lucia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included passing an amendment to remove the option for a fine in lieu of imprisonment; increasing public awareness of the hotline to report trafficking; and working with an international partner to investigate a potential child sex trafficking case. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government has not initiated a prosecution since 2015 and has never convicted a trafficker. The government did not identify any victims for the second consecutive year or report providing any services to victims. The government did not enact or fund a new national action plan (NAP). Therefore Saint Lucia was downgraded to Tier 2 Watch List.



## PRIORITIZED RECOMMENDATIONS:

Increase efforts to identify vulnerable individuals, especially children, migrants, and Cuban medical professionals, screen them for trafficking indicators, and refer identified victims to services. • Investigate, prosecute, convict, and punish perpetrators of sex trafficking and labor trafficking under the Counter-Trafficking (Amendment) Act. • Amend trafficking provisions in the 2021 Counter-Trafficking (Amendment) Act to prescribe penalties for sex trafficking that are commensurate with penalties prescribed for other serious crimes, such as rape. • Develop a NAP for 2022 and onwards. • Reduce court backlog and pretrial detention delays affecting trafficking cases. • Implement a process to share trafficking law enforcement cases across government agencies and provide a mechanism for civil society to report law enforcement cases and potential victims to the anti-trafficking task force. • Develop and implement labor recruitment policies, hire and train more inspectors for labor trafficking inspections, and improve interagency coordination on labor issues. • Implement standard operating procedures (SOPs) on a victim-centered approach to guide police, immigration, labor, child protection, judicial, and social welfare officials on victim identification and referral. • Continue to train law enforcement officials to gather evidence of trafficking cases appropriate for prosecution. • Provide legal mechanisms for all victims to work and receive temporary formal residency status.

## PROSECUTION

The government maintained minimal law enforcement efforts. The government enacted amendments to the Counter-Trafficking Act during the reporting period. The Counter-Trafficking Act, as amended, criminalized sex trafficking and labor trafficking and prescribed penalties of up to five years' imprisonment. These penalties were sufficiently stringent but, with respect to sex trafficking, were not commensurate with penalties prescribed for other serious crimes, such as rape.

The government conducted one trafficking investigation under the Counter-Trafficking (Amendment) Act during the reporting period, compared with none in 2020 and three in 2019. The case involved two Saint Lucian children taken to France; the government requested France's cooperation with the investigation, which remained ongoing at the end of the reporting period. The government has not initiated a trafficking prosecution since 2015. The government has never convicted a trafficker, and courts have closed trials or dismissed charges in all trafficking prosecutions since 2016.

The police force suffered significant personnel shortages, with many officers in quarantine or ill with COVID-19; some active duty police officers died from the virus. Despite this, police continued routine operations and conducted investigations. Criminal trials stopped at the beginning of the pandemic and did not restart during the current reporting period because the law required proceedings include an in-person jury and the country lacked courtrooms large enough to accommodate jurors and other trial participants during the pandemic. Observers reported significant court backlogs and pretrial detention of defendants for all serious crimes, including trafficking cases, which could last as long as six years. There was no separate budget for trafficking cases, and court resources remained limited. The RSLPF had three officers in the Major Crimes Unit dedicated to trafficking investigations, and its Vulnerable Persons Unit could also investigate potential trafficking cases involving children or sexual exploitation. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking offenses. The government joined the EU's SEACOP V project in May 2021 and began to improve maritime intelligence-sharing and cooperation against organized criminal groups, including trafficking.

## PROTECTION

The government maintained minimal protection efforts. The government did not identify any potential trafficking victims for the second consecutive year. The government did not report providing services to any trafficking victims during the reporting period. Authorities used SOPs for victim identification, referral, and protection updated in March 2021; the SOPs included an international organization's victim screening form. The government had a cooperation agreement with the Government of Cuba for Cuban workers in the country; the government reported

it screened the workers for trafficking indicators and that the workers remained in possession of their passports. The government reported that it directly paid the Cuban medical workers a monthly stipend and additionally provided them furnished housing or rental expenses, internet, property maintenance, transportation, and international airfare to and from the country; the workers were allowed 34 days leave after 11 months of service. Specially trained police officers interviewed potential trafficking victims and reported generally screening for trafficking indicators when detaining or arresting individuals involved in commercial sex, migrants, and those in other vulnerable groups. The government did not detain or arrest any individuals involved in commercial sex during the reporting period. Police generally lacked sensitization and training on sex trafficking and sex tourism, particularly involving children.

The government worked with NGOs and encouraged them to report cases. The government did not maintain a dedicated shelter for trafficking victims and had an agreement with NGOs to provide shelter for victims when the need arose; the government did not report referring any victims to NGO shelters during the reporting period. The government did not have a specific funding allocation for victim care, but the Minister of Home Affairs could request the Prime Minister provide financial support for victims as needed. The Division of Human Services could provide victims with counseling, meals, accommodation, medical care, toiletries, clothing, and in some cases, allowances; the government did not report providing these services during the reporting period. The Office of Gender Relations could refer trafficking victims to NGOs for legal, health, advocacy, and crisis services. Adult victims could leave shelters at will, but the government did not allow foreign victims to work or receive formal residency status because it considered victims wards of the state; although, the government could permit victims who were material witnesses in a criminal case to remain and work in the country. The Counter-Trafficking Act mandated special provisions for child victims that could include understanding of their rights, respect for privacy, housing, care, reunification with family in the country or abroad if safe and possible, specialized mental and physical care, and education. The Division of Human Services could place child victims in one of two children's homes but did not report doing so during the reporting period.

The Counter-Trafficking (Amendment) Act contained victim protection provisions, such as privacy measures, the ability to testify via video link, and witness protection, to encourage victims to participate in the investigation and prosecution of traffickers. Children could also testify via video and have a guardian or social worker present during testimony and court proceedings. The Counter-Trafficking (Amendment) Act also provided that judges could, upon conviction of a trafficker, order the trafficker to pay victim restitution. The government did not report using these provisions during the reporting period. Foreign victims had the same access to care as domestic victims, and the government could assist foreign victims seeking repatriation.

## PREVENTION

The government maintained minimal efforts to prevent trafficking. With the support of the Prime Minister, the Ministry of Home Affairs and the Ministry of National Security led the task force consisting of relevant agencies and NGOs. Due to pandemic-related restrictions, the task force coordinated via telephone. In response to the pandemic, authorities diverted government resources—including those for trafficking and the task force—to its pandemic response. In addition, government personnel focused primarily on the pandemic response and worked from home due to social distancing requirements, inhibiting the government's ability to implement anti-trafficking efforts. The government official in charge of drafting the new NAP was seconded to the Ministry of Education as it began to implement virtual public education efforts in response to pandemic-related restrictions. The task force hosted an online meeting in June 2021 for the public sector to examine its response to child sex trafficking, especially among those economically disadvantaged by the pandemic. The task force continued a media campaign by issuing trafficking-related press releases and public service announcements promoting trafficking awareness and the hotline. The public could still make referrals through a police command center control room and toll-free 24-hour hotline launched in 2019, which handled calls in English and Saint Lucian Creole French; the government did not report

ST. VINCENT AND THE GRENADINES

any trafficking-related referrals from the hotline during the reporting period. In 2020, the government started a comprehensive study to provide recommendations on targeting economic development plans to reduce the vulnerability of economically disadvantaged populations to trafficking and other crimes; the study remained ongoing at the end of the previous reporting period.

The government did not report any changes to its regulations and oversight of labor recruitment or efforts to regulate recruitment practices. Foreign nationals coming to work in the country had to complete a work permit application process that included a certificate of character obtained from the Police Records Unit. While labor laws prohibited most forms of forced or compulsory labor, the government did not enforce them effectively. Expert observers noted there were not enough trained labor inspectors to monitor all sectors for labor trafficking and that inspectors usually visited suspect areas only after receiving a complaint. In addition, coordination between ministries and departments dealing with labor issues was poor, hindering enforcement efforts. In 2020, the government reviewed the Labor Act, which specified the Labor Department's authorities; the Attorney General was reviewing the revised draft legislation at the end of the reporting period. Authorities reported all inspections looked for child labor, but they did not conduct child labor-specific inspections; inspectors did not receive child labor-specific training. The government did not identify any cases of child sex tourism during the reporting period, nor did it take measures to reduce the demand for commercial sex acts. The government did not provide training to its diplomats.

**TRAFFICKING PROFILE**
As reported over the past five years, human traffickers exploit domestic and foreign victims in Saint Lucia, and traffickers exploit victims from Saint Lucia abroad. Government officials, civil society, and educators reported Saint Lucian children from economically disadvantaged families are at risk of child sex trafficking, often encouraged or forced by parents and caretakers in exchange for goods or services. The pandemic increased vulnerability—including for children—for those negatively impacted economically. Civil society has also reported women, or in some cases older teenagers, recruit younger children to provide commercial sex to adults at street parties. Documented and undocumented migrants from the Caribbean and South Asia, including domestic workers, are vulnerable to trafficking. Foreign women who work in strip clubs and in commercial sex are at risk of sex trafficking. NGOs report that disadvantaged young women from rural areas are vulnerable to sex trafficking, and children from poor communities are also vulnerable to sexual exploitation. According to the government, business owners from Saint Lucia, India, the People's Republic of China (PRC), Cuba, and Russia are the most likely traffickers in the country. The government reported 80 Cuban medical workers assisted in the pandemic response during the reporting period. Cuban medical professionals working in Saint Lucia may have been forced to work by the Cuban government.

## ST. VINCENT AND THE GRENADINES: TIER 2

The Government of St. Vincent and the Grenadines does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore St. Vincent and the Grenadines remained on Tier 2. These efforts included increased investigations and increased training for frontline health workers attending to newly vulnerable internally displaced persons (IDPs), as well as additional awareness raising efforts among this population. However, the government did not meet the minimum standards in several key areas. Authorities have not prosecuted a trafficking case since 2015 and have never convicted a trafficker. The government's anti-trafficking law, which allowed for fines in lieu of imprisonment, was not commensurate with penalties for other serious crimes. Victim identification and services remained weak, and

government agencies cited a lack of resources for anti-trafficking efforts.



**PRIORITIZED RECOMMENDATIONS:**
Vigorously prosecute and enable successful convictions of traffickers and sentence convicted traffickers to significant prison terms. • Increase investigations of suspected sex and labor trafficking cases, particularly cases involving children. • Amend the trafficking law to remove sentencing provisions allowing fines in lieu of imprisonment for sex trafficking. • Increase government funding and resources across all relevant agencies to combat trafficking. • Improve the quality and specialization of victim services. • Consistently screen both domestic and foreign at-risk populations, including internally displaced persons, economically disadvantaged children, and Cuban medical workers, for trafficking indicators and refer victims to care. • Increase training for police, prosecutors, and the judiciary on improved evidence collection in trafficking cases, ensuring evidence presented meets applicable legal standards. • Increase the capacity of labor inspectors to identify and refer to care victims of labor trafficking, including children. • Continue to raise awareness about labor trafficking and sex trafficking and the need for public cooperation in law enforcement investigations in traditional and social media.

**PROSECUTION**
The government maintained minimal law enforcement efforts. The Prevention of Trafficking in Persons Act of 2011 criminalized sex trafficking and labor trafficking and prescribed punishments of up to 15 years' imprisonment, a fine of 250,000 Eastern Caribbean dollars ($92,590), or both. These penalties were sufficiently stringent. However, by allowing for a fine in lieu of imprisonment, the penalties for sex trafficking offenses were not commensurate with those for other serious crimes, such as rape.

The Anti-Trafficking in Persons Unit (ATIPU) investigated three trafficking cases in 2021: one case of sex trafficking, one case of labor trafficking, and one unspecified. This compared with investigating one case of labor trafficking in 2020, five suspected cases in 2019, and four cases in 2018. Authorities did not prosecute any alleged traffickers under the Trafficking Act during the reporting period, with the last prosecution in 2015, and the government has never convicted a trafficker. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking offenses.

The lack of prosecutions and convictions and dismissal of past trafficking cases over several years indicated shortcomings in the government's ability to acquire sufficient evidence to bring cases to trial. Authorities indicated that police needed additional personnel and resources to investigate and collect evidence effectively in trafficking cases. The ATIPU reported it needed additional staff, computer and office equipment, office space, and a dedicated vehicle to combat human trafficking more effectively. During the previous reporting period, the ATIPU had to request vehicles on an ad hoc basis from the police force's general motor pool; the government reported it successfully sought foreign donations during the reporting period to expand motor pool resources. The government reported the pandemic and other emergencies, including a volcanic eruption and a hurricane, severely impeded law enforcement efforts, especially in the northeast and northwest parts of the multi-island country. The government partially suspended court proceedings for four months due to the pandemic and other emergencies, eventually resuming virtually.

The ATIPU conducted surveillance at the airport and seaports of entry, marinas, bars, nightclubs, entertainment spots, restaurants, beaches, and social events to identify possible trafficking crimes. The government reported a lack of awareness about human trafficking impeded the public from reporting suspected trafficking crimes and cooperating on

Haiti AR_000953

trafficking investigations. The ATIPU funded and conducted specialized anti-trafficking training for police recruits. The ATIPU cooperated with the government of a neighboring country on a trafficking case in that country that included a Vincentian victim.

## PROTECTION

The government maintained minimal victim protection efforts. Authorities screened potential victims but did not formally identify any victims during the reporting period, compared with screening eight potential trafficking victims in 2020; the government last identified a victim in 2019. The government reported it disseminated a formal screening and referral procedure for potential trafficking victims, in which the immigration and labor departments, or NGOs, had responsibility to identify potential victims and refer them to the ATIPU for interviews and formal identification.

If it formally identified victims, the ATIPU could refer them to a crisis center the government funded and operated in collaboration with NGOs for victims of domestic violence and trafficking; the center offered shelter, social care, and medical, psychological, and financial assistance. The government reported adult victims had the option to leave the shelter at will. Some observers in previous reporting periods noted the government's victim referral process kept potential victims in law enforcement custody instead of moving them to the crisis center. The government did not provide shelter facilities for male victims. During the reporting period, the government provided funding to the Ministry of National Security, which oversaw the ATIPU, but did not report the specific amount provided for trafficking victim services, as it was allocated through existing budgets of different ministries. The government reported victims could speak to social services or an NGO that completed ATIPU anti-trafficking training, instead of law enforcement prior to deciding whether to file a police report. Provisions in the anti-trafficking act called for protections for victims before, during, and after a trial, such as keeping the names of victims and their families confidential, witness protection programs, and facilities for victims to testify via video; however, the government did not use these provisions for any trafficking victims during the reporting period. The government reported no cases of victims being detained, fined, or jailed for unlawful acts traffickers compelled them to commit.

The anti-trafficking act provided foreign victims with the possibility of temporary and permanent residence permits and protected victims from immediate deportation; authorities did not link victim benefits to cooperation with law enforcement. Authorities did not grant temporary or permanent residency to any victims during the reporting period. The government allowed foreign victims who remained in the country to work but did not make use of this provision during the reporting period. The government reported it screened all individuals before deportation; outside observers noted the country's border controls included an exit interview with an immigration officer. The government did not report any cases where the courts ordered restitution paid to trafficking victims; it also did not report any situations where victims required government assistance with repatriation. Authorities did not report specifically screening Cuban medical workers for trafficking indicators beyond general entry and exit screening or implementing measures to ensure workers kept their wages apart from general monitoring of foreign workers. The government trained frontline health workers and volunteers. Observers noted the tailored training regime focused primarily on teaching frontline healthcare and social workers how to identify and care for newly vulnerable potential victims among those internally displaced by the volcanic eruption.

## PREVENTION

The government maintained efforts to prevent trafficking. The national task force, led by the prime minister, coordinated the anti-trafficking efforts of its members, including government agencies and an NGO. The government did not report how often the national task force met during the reporting period. The government reported continuing to provide financial, material, technical, and human resources for the country's anti-trafficking National Action Plan (NAP) for the period 2021-2025 but did not report if its budget was sufficient. The government reported the pandemic did not prevent members of the national task force from continuing to implement the NAP.

The ATIPU operated three 24-hour English-speaking hotlines, including a dedicated trafficking hotline, an emergency number, and a police operator, and monitored an email address for reporting suspected trafficking cases; authorities reported they initiated criminal investigations from calls to the hotlines in the reporting period but did not report whether the investigations were of trafficking crimes. In comparison, authorities identified eight potential victims via the hotline in 2020 and no actions in 2019. The government submitted an Annual Trafficking in Persons Report to the Parliament, which the government reported providing the opportunity for national debate and public education on the contents of the document and government's overall anti-trafficking policies. Although the document was not made public, observers noted citizens may have been able to request the document in person. The government distributed anti-trafficking brochures to newly vulnerable evacuees placed in shelters during the volcanic eruption. The government raised awareness via a country-side radio program. The ATIPU continued its awareness-raising campaign by disseminating posters, stickers, and brochures at the international airport and other popular sites; it also partnered with an NGO to place anti-trafficking banners in the arrivals and departures areas of the international airport. The prime minister explicitly warned citizens to be aware of potential trafficking cases in extensive media commentary in February 2022. Observers reported the task force raised awareness of trafficking in schools, religious organizations, and businesses. The government reported training its diplomats; in previous reporting periods, the government provided such training on a biannual basis to coincide with the return of accredited diplomats for consultations in Kingstown.

The government routinely conducted both planned and unannounced labor inspections of hotels, farms, stores, bars, industries, security workplaces, and domestic work locations, although their stated lack of personnel and funding may have prevented coverage of work sites with the most vulnerable workers. Labor department officials reported conducting periodic inspections of an unspecified number in 2021, compared with 37 inspections in 2020 and 42 inspections in 2019. The 1940 Recruiting of Workers Act remained in force and banned recruitment fees; observers noted the government regulated overseas labor programs for its citizens by serving as an intermediary. The government reported having bilateral agreements with several countries regarding oversees recruitment and employment and using resources in its embassies overseas to ensure that its citizens did not become victims of trafficking. The government did not train labor inspectors specifically on child labor, although the government reported labor inspectors screened for indicators of child labor and trafficking and police received training to investigate child labor crimes. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in St. Vincent and the Grenadines, and traffickers exploit victims from St. Vincent and the Grenadines abroad. Foreign women in commercial sex in the country may have been exploited in sex trafficking, and foreign workers from South America, the Caribbean, and Asia may have been exploited in forced labor both in the country and while in transit. The government invited Cuban medical workers in the country to assist in the pandemic healthcare response in the previous reporting period and signed a bilateral agreement with Cuba governing the work and living arrangements for the medical professionals. The government reported in the previous reporting period that the Cuban medical workers retained their passports. Cuban nationals working in St. Vincent and the Grenadines may have been forced to work by the Cuban government. Foreign workers employed by small, foreign-owned companies may be vulnerable to labor trafficking. Men, women, and children have been victims of forced labor, primarily in agriculture; government officials and civil society suspect drug traffickers exploit workers in forced labor in the production of marijuana. In previous reporting periods, outside experts indicated that adults might have exploited their children in sex trafficking to generate income, while others purchased commercial sex from children. In April 2021, the La Soufriere volcanic eruption and a subsequent hurricane destroyed a third of the country's arable land; made almost all arable land inaccessible, leading to massive crop failure and cutting off the main source of revenue and

**SAUDI ARABIA**

employment; and internally displaced a sixth of its population, making this group newly vulnerable to trafficking. International air travel in the Eastern Caribbean, the main mode of transportation in pre-pandemic reporting periods for foreign trafficking victims in the region, collapsed during the pandemic. While air travel resumed in a limited way during the reporting period, the main routes were to the United States, not a traditional source market for trafficking victims in St. Vincent and the Grenadines.

## SAUDI ARABIA: TIER 2

The Government of Saudi Arabia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Saudi Arabia remained on Tier 2. These efforts included drafting and approving a 2021-2023 National Action Plan (NAP) in coordination with international organizations and actively revising and updating National Referral Mechanism (NRM) guidelines and victim assistance policies following assessments of trafficking trends and lessons learned from a high-profile case involving domestic workers. The government continued to utilize existing mechanisms to refer cases of labor violations exhibiting trafficking indicators for criminal investigation and prosecution, and it supported the establishment of an NGO to specialize in combating trafficking. It also continued to implement its most recent visa sponsorship system reforms, first implemented in March 2021, and worked to address employers' retaliatory actions that could prevent workers' from exercising their rights under the reforms. However, the government did not meet the minimum standards in several key areas. Domestic workers remained excluded from labor law protections and the most recent sponsorship reforms, which perpetuated the high risk of this population to forced labor. The government also identified and referred to care significantly fewer trafficking victims and did not consistently screen vulnerable populations for trafficking indicators, which may have resulted in the penalization of some victims for unlawful acts traffickers compelled them to commit, such as immigration or "prostitution" violations, and the deportation of other unidentified victims, some to countries where they faced persecution. Finally, authorities did not consistently seek significant sentences, with prison terms of one year or more, for all convicted traffickers, especially Saudi Arabian nationals; this undercut efforts to hold traffickers accountable, weakened deterrence, and increased potential security and safety concerns.



SAUDI ARABIA TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Provide protections to domestic workers that are equal to those private sector workers receive under the labor law and recent labor reforms to ensure domestic workers' freedom to change jobs or obtain an exit visa without employer consent. • Undertake serious efforts to prevent penalization of trafficking victims by proactively screening for trafficking among those arrested for immigration violations or commercial sex crimes or those who flee abusive employers and face countercharges and deportation. • Regularly use and train officials on the NRM to ensure victims among vulnerable populations, including domestic workers, undocumented foreign workers, deportees, and the People's Republic of China (PRC) and Cuban overseas workers, including medical professionals and persons in commercial sex, receive proper care and

are not wrongfully penalized. • Ensure border guards and police are adequately trained to proactively identify potential victims and continue to improve screening protocols, specifically at detention and deportation centers • Ensure alternatives to deportation for vulnerable migrants to countries where they might face retribution or hardship. • Continue to increase efforts to prosecute, convict, and sentence all convicted traffickers to significant prison terms under the anti-trafficking law. • Support establishment of NGO-administered specialized trafficking shelter to ensure victims of all types of trafficking receive adequate care. • Pursue criminal investigations against all officials allegedly complicit in trafficking crimes, including foreign diplomats posted in Saudi Arabia. • Amend the anti-trafficking law to remove sentencing provisions that allow fines in lieu of imprisonment for sex trafficking offenses. • Expand implementation of electronic contracts so that workers can utilize the new labor reforms and include or develop similar initiatives for domestic workers. • Continue to investigate as potential trafficking crimes (not just as administrative issues) indicators of trafficking, such as passport retention, withholding of wages, labor violations, and complaints of abuse. • Institute regular trainings for government officials on identifying cases of both labor and sex trafficking and differentiating between forced labor and labor-related crimes.

### PROSECUTION

The government maintained law enforcement efforts. The 2009 anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed punishments of up to 15 years' imprisonment, a fine or both; penalties increased under aggravating circumstances, including trafficking committed by an organized criminal group or against a woman, child, or person with disabilities. These penalties were sufficiently stringent; however, by allowing for a fine in lieu of imprisonment, the penalties for sex trafficking were not commensurate with those prescribed for other serious crimes such as kidnapping, false imprisonment, or sexual abuse. During the previous reporting period, the government established a committee advised by an international organization and composed of the Ministry of Interior (MOI), Ministry of Foreign Affairs (MFA), Ministry of Justice (MOJ), the Public Prosecutors Office (PPO), the Ministry of Human Resources and Social Development (MHRSD), and the Saudi Human Rights Commission (HRC) to consider amendments to the 2009 anti-trafficking law. In 2021, the committee created a review of seven suggested amendments to the law, which included penalties that combined imprisonment and fines for convicted traffickers and criminalization of personal document confiscation, such as passports. The amendments remained under review by the Council of Ministers at the close of the reporting period.

For the first time, the government reported comprehensive data on its law enforcement efforts, suggesting increased interagency coordination, compared even with recent years where the government newly reported disaggregated data. During the reporting period, the government investigated 346 potential trafficking cases, involving 377 alleged traffickers. Of the 377 individuals investigated, 18 were for sex trafficking, 162 were for forced labor, and 197 were for forced begging and "slavery-like practices;" this was compared with 775 cases in 2020 and 320 cases in 2019. The government prosecuted 90 individuals in 64 cases, compared with the prosecution of 127 individuals in 52 cases during the previous reporting period. Of the 90 individuals prosecuted, 58 were prosecuted for forced labor crimes, 26 for forced begging and "slavery-like practices," and six for sex trafficking. Of those prosecuted, courts convicted 64 traffickers under the 2009 law, compared with the conviction of 62 traffickers in 2020 and 46 traffickers in 2019. Courts acquitted 38 traffickers in 15 cases, compared with an unknown number of traffickers in 22 cases in 2020. Of the 64 traffickers convicted, 30 were for forced labor, 19 were for sex trafficking, 13 were for forced begging and two were for "slavery-like practices." Of the three forced labor cases that remained in the prosecution stage at the close of the previous reporting period, one trafficker was convicted for forced labor crimes in one case, while two individuals involved in two cases were acquitted. Judges sentenced most convicted traffickers to terms of imprisonment ranging from 50 days to 10 years (with 53 percent receiving one year or more), plus fines, travel bans, and confiscation of personal assets used to facilitate each crime; however, one foreign trafficker was solely sentenced a fine of 10,000 Saudi Arabian riyal (SAR)

($2,670). While the government did not report the nationality of each trafficker, of those reported as foreign nationals, most (68 percent) received imprisonment of one year or more. Judges sentenced most Saudi nationals (10) to penalties ranging from fines to eight months' imprisonment, while one Saudi national received imprisonment of two years and two months. Such lenient sentences undercut efforts to hold traffickers accountable, weakened deterrence, and increased potential security and safety concerns for victims. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes, including through inaction, remained significant concerns, inhibiting law enforcement action during the year. During the year, a U.S-based NGO reported at least 28 Vietnamese domestic workers had been subjected to conditions of forced labor by Vietnamese recruiters and labor export companies, Saudi Arabian employers, and Vietnamese embassy officials in Riyadh, including a Vietnamese labor attaché. Once the victims had been admitted to a shelter in the Kingdom, the Vietnamese labor attaché allegedly removed at least four victims from the shelter and sold them to another employer; victims were reportedly told by the labor attaché they would be repatriated to Vietnam but instead were forced to work for a new employer. Although Saudi authorities intervened and referred the victims to government shelters for care, the Government of Saudi Arabia did not report formally investigating or charging the Vietnamese labor attaché for crimes or requesting he be dismissed from his post; at the close of the reporting period, the labor attaché remained at his post at the Vietnamese embassy in Riyadh.

The government continued using electronic communications—first implemented in 2020 in response to the pandemic through its *Najiz* platform—to investigate, prosecute, and convict criminal cases, including cases of trafficking, and deliver memoranda, court documents, and judgments digitally. The MOJ was able to receive written pleadings, hold virtual hearings, and issue judgments through this platform. It also continued to hold remote trials in courts and prisons across the Kingdom; it held more than two million remote trials during the reporting period, including 30 trafficking cases. Some government officials continued to misclassify trafficking cases as administrative immigration or labor violations without routinely undertaking criminal investigations or prosecutions against traffickers. The PPO maintained 17 trafficking-specific, operational investigative sub-units within branch offices (two in Riyadh and the remainder in the capital of each province) to identify potential trafficking cases among existing criminal cases. The PPO continued to have a panel of five human trafficking experts, who informed anti-trafficking policy and served as resources at the PPO headquarters and for circuit offices. Throughout the reporting period, the Kingdom's human trafficking entities conducted 24 anti-trafficking trainings, some in close partnership with two international organizations and others conducted solely by MHRSD and MOI; the trainings reached more than 3,500 private and public sector representatives, civil society representatives, and diplomats from labor-source embassies in the Kingdom. The programs covered topics such as victim identification and referral, specifically for labor inspectors and police; trauma-informed victim protection and assistance; victim-centered interviewing techniques; financial and electronic investigations for trafficking cases; inspection procedures; evidence collection; and criminal investigative procedures during trial for trafficking crimes, specifically for judges. Trainings also focused on the PPO's role in identifying and interviewing victims in trafficking cases and combating trafficking on online platforms.

## PROTECTION

The government demonstrated overall uneven efforts to protect trafficking victims. During the reporting period, the government identified 1,175 potential victims and referred 185 to government shelters for care, a decrease compared with its identification and referrals of 1,255 trafficking victims to government-run shelters in 2020. The government did not report whether the other 990 potential victims it identified during 2021 received any services. NGOs and international organizations identified and referred 105 potential victims to care. Of the 1,175 potential victims identified by the government, 505 were for forced labor, 54 for sex trafficking, and 616 for forced begging and "slavery-like practices." Of the 105 potential victims identified and referred to care by NGOs and international organizations, all were female foreign nationals, including

43 victims of forced labor, 60 victims of forced begging and "slavery-like practices," and two victims of sex trafficking. The victims were nationals of Bangladesh, Burkina Faso, Burma, Burundi, Egypt, Ethiopia, Ghana, India, Indonesia, Kenya, Kuwait, Lebanon, Morocco, Nepal, Nigeria, Pakistan, the Philippines, Saudi Arabia, Somalia, Sri Lanka, Sudan, Syria, Uganda, Vietnam, and Yemen.

The government continued to utilize its NRM, first launched in March 2020, to identify potential victims and refer them to care. Following the dissemination of the hard-copy NRM to front-line officials, government agencies, NGOs, civil society, and other stakeholders in 2020, the government developed an electronic version of the NRM to better coordinate agencies and track and input data on identification and referrals in real-time. However, due to the pandemic, the electronic NRM had not yet been launched. In 2021, the government actively updated and amended NRM guidelines based on lessons learned from a high-profile case involving 28 Vietnamese domestic workers who were identified as potential trafficking victims by an NGO and unable to leave their employers' residences to seek assistance. The government located the potential victims and referred them to care at government shelters, and in a change from previous policy, the National Committee to Combat Human Trafficking (NCCHT) convinced the Ministry of Health (MOH) and Red Crescent Authority to treat all potential trafficking victims (including the 28 domestic workers) as emergency cases to enable victims to receive priority medical treatment. The NCCHT also worked with the Saudi Bar Association to provide *Pro bono* legal services to the victims and secured access to the shelter for the victims' attorneys to discuss the criminal and civil cases; the government reported that all but one of the 28 potential victims provided statements to the PPO and signed legal representation agreements so that criminal or civil cases could continue in their absence once they were repatriated. In addition, the HRC incorporated feedback from other stakeholders and updated the NRM's identification and referral section to add additional detail on the alleged perpetrator and developed a comprehensive initial screening form that included all required information in one document for first responders. The government also established a new procedure within the NRM requiring police to allow potential victims to spend at least three days at the shelter before a statement could be taken to begin a formal criminal investigation.

MHRSD operated shelters across the country for vulnerable populations and abuse victims, and it reported the government allocated approximately 25 million SAR ($6.67 million) to specifically support trafficking victims during the year. MHRSD operated shelters for child victims of forced begging in Mecca, Jeddah, Dammam, Medina, Qassim, and Abha, in addition to welfare centers for vulnerable female domestic workers and trafficking victims in 13 locations throughout the Kingdom. Each shelter provided accommodation, social services, health care, psychological counseling, education, and legal assistance. The government offered these services to all 173 victims it referred to care during the reporting period. Diplomats from labor-source countries had regular access to their nationals residing in government-run shelters and reported conditions and quality of services in the shelters varied slightly across the Kingdom but were overall satisfactory and safe. Some embassies and consulates—including those of Bangladesh, India, Indonesia, Nigeria, the Philippines, Sri Lanka, and Uganda—also operated shelters for their respective nationals. Foreign diplomats noted that Saudi officials frequently left potential trafficking victims at their respective embassies rather than referring them to Saudi shelters and noted that Saudi government shelters accepted only female domestic workers. The government did not have shelters to accommodate male victims or females from other employment sectors. In 2020, the government reported plans to gradually shift shelter responsibilities to NGOs and open a dedicated trafficking shelter for all potential victims of trafficking in coordination with an NGO, but it did not report further progress on this plan in 2021. During the reporting period, the government supported the establishment of an NGO intended to specialize in combating trafficking. One of its main objectives was to provide a dedicated shelter for all trafficking victims; however, construction on the shelter had not begun at the close of the reporting period, so it was unable to provide services to victims during the year.

Migrant workers continued to document and assert they were subjected to unpaid wages, passport retention, physical or sexual abuse, or

substandard working conditions, many of which were trafficking indicators. In June 2021, international NGOs and media sources reported increasing numbers of immigration raids and arrests of both undocumented and documented Ethiopian migrants by Saudi officials; the Ethiopian government obtained the release of approximately 700 documented migrants following the raids. During the two-week crackdown by Saudi police, an NGO reported more than 30,000 undocumented migrants were deported; a significant portion were Tigrayan and at heightened risk for trafficking upon their deportation. Reasons for deportations by the government included alleged violations of work, residence, and entry rules. Although the government reported it screened all migrants in detention centers prior to their departure for trafficking indicators through forms developed by MOI, observers stated the large number of migrants deported in a short time frame suggested authorities did not consistently and systematically screen individuals for trafficking indicators and, therefore, they likely deported some unidentified victims. In January 2022, media sources and rights groups reported that following detention in the Kingdom and subsequent deportation, those that had returned to Ethiopia—specifically Tigrayans—were being ethnically profiled and sent to internment camps across Ethiopia, where abuse, forced labor, and forced disappearances had been reported. In an effort to increase capacity to screen for potential trafficking victims, the PPO continued to direct all its branches and law enforcement agencies to cease deportation of any potential trafficking victims or anyone involved in an active trafficking case without the PPO's prior approval. During the previous reporting period, the NCCHT formed a subcommittee of MOI, MHRSD, PPO, and HRC staff to ensure proper procedures for screening and identifying potential victims of trafficking were in place at detention centers; through Circular No. 4535, the government established screening teams comprised of staff from the agencies on the subcommittee in every region of the country where detention centers existed to screen the files of all detainees to ensure potential victims were identified promptly. In 2021, the NCCHT's subcommittee reported further updating that screening mechanism for undocumented migrants at detention centers to better specify the trafficking indicators officials should be looking for while screening. Furthermore, the government, in coordination with an international organization, developed guidelines for working with interpreters when screening vulnerable populations for trafficking, which established requirements to ensure interpreters were unbiased and adequately trained; the HRC also developed an interpreter confidentiality agreement to protect potential victims during identification and referral procedures. The government continued to instruct each circuit court to screen defendants for potential trafficking indicators and to drop pending charges against identified trafficking victims. However, diplomats from several labor-source countries continued to report Saudi authorities regularly detained, fined, and/or jailed their nationals, including some unidentified trafficking victims, for immigration violations as a result of having been subjected to forced labor or sex trafficking. Furthermore, since the government may have not routinely screened for potential trafficking indicators among vulnerable populations, and police frequently arrested and/or deported undocumented migrant workers, authorities likely arrested and deported unidentified victims during the year. The government also did not consider certain populations' vulnerability to forced labor if they were deported; NGOs reported four ethnic Uyghur Muslims, including a child, remained in detention without charge or trial in Saudi Arabia and were facing immediate deportation to the PRC, where they would be vulnerable to arbitrary detention, harassment, and forced labor.

The government extended to all identified trafficking victims the option of remaining in the country—either in a shelter or via transfer to a new employer—through judicial proceedings, or alternatively an immediate exit visa; these benefits did not require a successful prosecution or cooperation with law enforcement personnel. The government reported it also provided legal alternatives to the removal of foreign victims of trafficking to countries where they might face retribution or hardship. During the reporting period, one potential victim requested asylum, and following discussions with two international organizations, the victim chose to be relocated to a third country. In addition, the government, along with other labor-source embassies, NGOs, and international organizations, repatriated 75 individuals to their countries of origin,

including the 28 Vietnamese domestic workers. In previous years, diplomatic representatives from labor-source countries reported trafficking victims were not permitted to seek employment while residing in government-run shelters. In 2020, the MHRSD implemented a policy issued under Circular No. 65551, granting work permits and temporary residence to potential trafficking victims so they could work, if they so chose, while their labor dispute or criminal case was adjudicated; this included potential victims whose work permits had expired. The government developed this policy after soliciting input from potential trafficking victims and stated an individual could receive this benefit regardless of whether they resided in the shelter. The government reported it allowed victims to submit testimony in written form or remotely via recording as they preferred, and it ensured victims' identities remained confidential. In contrast, diplomats from several labor-source countries reported the government advised some victims to testify in-person. The government reported that a potential victim's testimony was only taken if the potential victim provided informed consent, in adherence with the NRM. In 2021, the government amended existing policy to allow all potential trafficking victims who desired to proceed with a legal case pursuant to the NRM but also wanted to voluntarily return to their country of origin, to be assigned a *Pro bono* attorney to their case; the MOJ extended notary services during the year to facilitate the assignment of a lawyer as a proxy for potential victims. The law entitled trafficking victims to legal assistance, security protection, translation services, and the right to immediate repatriation or continued residence in Saudi Arabia until resolution of the case, in addition to medical and psychological care, shelter, and rehabilitation. The government provided victims legal services in 21 cases, all involving Vietnamese nationals, during the year. In 2020, the government activated the Unified Translation Center Initiative to provide translation services to the courts and judicial facilities to protect the rights of non-Arabic speaking victims in court proceedings. The initiative, which had 22 interpreters covering 20 languages, handled approximately 800 cases each month and, during the reporting period, provided services in 23 trafficking cases. Officials permitted victims to obtain restitution directly from the government and/or by filing civil suits against traffickers; however, such settlements rarely took place and reportedly generally occurred outside of civil court proceedings through government-supported mediation efforts. These proceedings often did not entail criminal prosecution, and officials preferred to reimburse back-wages informally and/or assist in repatriating the victims. If victims sought to obtain restitution from defendants in criminal cases, victims often experienced delays in receiving it. In 2021, the government reported it worked with an international organization to develop a more effective process to ensure victims receive restitution in criminal cases but did not report outcomes of these efforts at the close of the reporting period.

## PREVENTION

The government demonstrated increased efforts to prevent trafficking, although domestic workers remained excluded from the most recent sponsorship reforms, implemented in March 2021, which continued to render this population vulnerable to conditions of forced labor. The government developed a new 2021-2023 NAP in coordination with two international organizations, and in August 2021, the government finalized and adopted the NAP; the plan set priorities within four pillars: prevention, protection and assistance, prosecution, and partnership. The NCCHT met 10 times during the reporting period; it completed a review of an MHRSD study on labor recruitment regulations and practices; prepared a study and recommendations to ensure trafficking victims were exempt from fees, fines, or other sanctions; and updated the screening mechanism for undocumented migrants at detention centers, among other activities. The government also approved a National Policy to Prevent Child Labor and a corresponding NAP that included efforts to create a database to track child labor prevalence in the Kingdom with the support of an international organization, adopting a list of types of work prohibited for those younger than 18 years of age, improving social work and social protection mechanisms by building capacity of specialists in the field, promoting quality educational opportunities for all children, and raising awareness of child labor. In November 2021, the Kingdom hosted the third annual Governmental Forum against Trafficking in Persons in the Middle East, which focused on efforts of

participating governments on international and national coordination in anti-trafficking efforts during the pandemic.

The government continued to operate and utilize its online domestic labor portal known as *Musaned*, meaning "support" in Arabic. This system consisted of a website and smartphone application that allowed potential employees in various sectors and individual employers to verify the license of a recruitment agency, review materials on employee and employer rights and responsibilities, complete and electronically sign contracts, and request a visa. The system was intended to eliminate unregulated brokers, increase transparency and accountability of recruitment agencies and work contracts, and reduce the risk of forced labor. It also included a complaints resolution mechanism and served as a way to authenticate contracts for domestic workers in their home countries. Diplomats from multiple labor-source countries reported *Musaned* enhanced the ability of embassies to monitor newly arrived nationals. However, in some cases, embassies found some information entered in the platform, such as address of residence and place of work, was either missing or incorrect following a transfer, which impeded efforts to track reported victims of abuse and trafficking. The application was also only available in English and Arabic, and therefore of limited use to potential domestic workers who did not speak, read, or understand such languages; in addition, an international organization noted that in cases where language barriers were present, a foreign domestic worker was unlikely to access the system and instead relied on recruitment agencies in their home country to provide and interpret the recruitment process. MHRSD reportedly fully implemented a program called *Weddi* ("friendly" in Arabic), which was an alternative dispute resolution mechanism whereby a worker could electronically submit a labor complaint and supporting documentation. If either the employee or employer rejected the proposed resolution via arbitration, officials would automatically transfer the case to the MOJ labor courts for administrative settlement.

The government continued to make efforts to prevent forced labor through its Single Electronic Contract and the Wage Protection System (WPS), both implemented through the *Mudad* electronic platform. In November 2020, MHRSD instituted the Single Electronic Contract, which made inclusion of information such as contract data, type of work, salary, duration of contract, working hours, weekends, and annual leave mandatory for all private sector companies. The initiative obligated companies to sign contracts with their employees enabling MHRSD to electronically account for, authenticate, and monitor all employment contracts in the private sector; each contract was verified by both the employer and employee and filed through the *Mudad* electronic platform. The platform also provided employees access to their contract and ensured MHSRD could impose sanctions on establishments that contravened the terms contained therein; the contract on file could also be used in a potential labor dispute. Representatives from labor-source countries reported the e-contract was a helpful tool that enhanced transparency and accountability for their nationals who raised labor disputes against an employer during the reporting year. The government reported that if an employer did not have an e-contract on file that an employee could approve electronically, the employer could be fined up to 3,000 SAR ($800), multiplied by the number of employees at the company. At the end of the reporting period, MHSRD reported 2.9 million ratified expatriate contracts existed within the *Mudad* system, out of a total of 6.8 million expatriate employee contracts in the Kingdom; however, the government did not report the number of violations recorded against employers for not having electronic contracts on file during the year. The government's WPS continued to require employers to pay foreign workers by electronic transfer via a Saudi bank, thereby permitting the government to track disbursements and non- or delayed payment of wages. In December 2020, the government extended the WPS and required 100 percent of private sector companies to register, including those with just one employee. The government also used the *Mudad* platform to track WPS compliance in real-time, and through this electronic platform, a notification of payment was sent to the employee. The government reported that in instances where employers withheld wages from the employee, the system required the employer to explain the reason for non-payment; the explanation would be sent to the employee for approval. If approval was not given, the MHSRD reported it would investigate the employer and screen for other potential trafficking indicators. For any employer or firm who failed

to maintain at least 80 percent compliance on a monthly basis or failed to submit monthly WPS data, the government could impose penalties, including suspension of government services and recruitment privileges. The government reported a 2021 compliance rate of 72.5 percent for companies with 30 or more workers and a 25 percent compliance rate for companies with 11-29 workers The WPS was not available for domestic workers; however, the government continued to mandate employers of domestic workers issue prepaid payroll or salary cards as soon as the worker arrived in the Kingdom. During the year, the government reported it was considering how to mandate electronic payments for domestic workers but did not report new efforts to do so.

In March 2021, as part of the Labor Reform Initiative (LRI), implemented through Ministerial Resolution No. 51848/1442, the government mandated private sector workers no longer needed their employer's permission to travel abroad (obtain an exit and re-entry visa), obtain final exit visas, or change employers at the conclusion of their contract or after one year; this provided increased freedom of movement and therefore may have reduced the risk of forced labor for seven million private sector workers in the Kingdom. Workers could use electronic applications to automate the process for transferring employment, notify an employer of an employee's departure and re-entry, and receive a final exit visa. Between March 2021 and December 2021, the government reported 147,878 foreign workers changed employers without the consent of their current employer and 1,107,747 foreign workers obtained final exit permits without employer consent. Several NGOs continued to express concern these reforms did not include the 3.7 million domestic workers employed in Saudi Arabia, a group highly vulnerable to trafficking and other abuse. The government reported it was considering ways to ensure domestic workers would receive similar protections in the near future but did not report any action to include this population within the reforms. NGOs also reported concerns the visa sponsorship system would persist as long as both the employee's work and residence visas were tied to an employer. Additionally, these organizations noted the reforms did not abolish the exit permit entirely—as a worker still submitted a request to MHRSD for an exit permit, and the ministry notified the employer electronically of the worker's request. The employer, subsequently, had 10 days to lodge an inquiry into the worker's exit permit request, and an employer's inquiry could potentially be used to deny the worker an exit permit. During the reporting period, labor-source embassy representatives raised concerns that although the LRI had reduced the number of complaints from their citizens regarding labor abuses, some employers filed absconding charges as a retaliatory measure against their employees to prevent them from changing employers or obtaining a final exit visa. MHRSD reported it was studying a proposal to modify the employee-employer contractual relationship to address employers pursuing retaliatory actions to prevent their employees from exercising their rights under the reforms; however, MHRSD did not report taking action on the proposal by the close of the reporting period. The Council of Ministers' Decision 166 prohibited withholding workers' passports as a violation punishable by fines, but the government did not report if it issued any such fines during the reporting period.

The labor law does not encompass domestic work; therefore its protections do not extend to such workers. However, Decision No. 310/1434 of 2013 granted some protections for this population through regulations on working hours, rest periods, annual leave, end of service benefits, written employment contracts, and payment of wages on a monthly basis. Under this decision, domestic workers included both male and female household workers, private drivers, gardeners, and security guards. International NGOs continued to express concern that gaps in the law left domestic workers vulnerable to passport confiscation or being charged recruitment fees. Additionally, the law did not require compensation for overtime, nor did it limit the workday to eight hours (domestic workers could work up to 15 hours a day including breaks). The law also included vague provisions on suitable accommodation, paid sick leave, and healthcare. NGOs reported domestic workers experienced non-payment of salaries, forced confinement, food deprivation, excessive workloads, and severe psychological, physical, and sexual abuse. Authorities only sought authorization to enter a home if there was overwhelming evidence of a crime, which may have left some unidentified victims at risk of exploitation and without protection, especially if a domestic worker could not leave their employer's home to

report abuse. However, during the reporting year, in the case involving 28 Vietnamese domestic workers identified as potential trafficking victims, PPO representatives issued search warrants for the suspected residences earlier in the investigative process, which allowed police to question the potential victims and refer them to shelter for care more quickly. Domestic workers could change employers with their sponsor's permission at any time and without sponsor permission after two years of employment; a transfer of sponsorship could be made at any time without the employer's permission in several circumstances, including if the employer failed to pay the salary of the worker for three consecutive months, failed to obtain a residency permit or renew an expired permit, abused the worker, or filed a false absconding charge against the worker. In December 2019, the government removed the requirement for employer approval to receive a final exit visa for domestic workers whose sponsors failed to pay required fees or renew a worker's status or were absent. In practice, however, international NGOs reported in some cases domestic workers who experienced such circumstances were not able to change employers or obtain exit permits. In one example, when a domestic worker attempted to contact police to change sponsors after she experienced non-payment of wages, extremely long working hours, and physical abuse, the police located her and transferred her to a detention center.

During the reporting period, the government continued to raise awareness of trafficking, targeting employers; migrant workers, including domestic workers; labor-source country embassies; and the general public. The NCCHT continued to use its Twitter accounts in both Arabic and English to raise awareness on trafficking. The HRC also continued to make awareness materials accessible in English and Arabic through its website and Twitter accounts and, during the reporting period, met with representatives from labor-source embassies to cooperate in the translation and dissemination of trafficking-related materials into other languages. In conjunction with World Day against Trafficking in Persons on July 30, 2021, the HRC launched a week-long social media campaign that included statements from the NCCHT, PPO, and MOI to raise awareness of trafficking; simultaneously, MHRSD conducted a two-week awareness campaign focused on indicators of the crime and utilized videos, infographics, and media appearances by ministry representatives on television and radio. In August 2021, MHRSD conducted a month-long awareness campaign on trafficking indicators and worker's rights, which included billboards and signs, in both Arabic and English, in airports and along major highways throughout the country. Additionally, also in August, the MHRSD conducted a social media campaign to raise awareness of the rights of domestic workers. The HRC collaborated with the Saudi Telecom Company to send text messages to the public to raise awareness of the anti-trafficking law and its provisions and penalties imposed on perpetrators. In 2022, MHRSD conducted one additional campaign in Arabic and English that targeted embassies of labor-source countries, focusing on trafficking indicators, workers' rights, and methods to report labor violations. Lastly, in February 2022, a sermon at the Grand Mosque condemned human trafficking as a violation of Islamic values and asserted Islamic law protected human dignity and banned forced labor; the sermon was broadcast internationally and called on the public to report suspected trafficking cases. In the previous reporting period, MHRSD officials launched a program to send labor attachés to key labor-source countries to enhance coordination on suspected trafficking cases and ensure workers from labor-source countries were adequately informed of their rights before arriving in Saudi Arabia. In September 2020, the first Saudi representative arrived in the Philippines, and in March 2021, the second Saudi representative arrived in Egypt; five additional attachés for Bangladesh, India, Indonesia, Pakistan, and Sri Lanka had not reported to their respective countries by the close of the reporting period.

MHRSD officials operated a 24-hour call center that could receive calls in six major labor-source country languages: Arabic, English, Filipino, French, Hindi, and Indonesian. The call center received approximately 280 calls per day on average. The MHRSD hotline was included in pamphlets given to all foreign workers who entered the Kingdom during the year. The MOI's crime reporting app, *Koolna* ("All of Us"), continued to have a feature that allowed users to report trafficking crimes as a standalone option. The HRC continued to operate a separate center to receive calls, texts, and WhatsApp messages; it was staffed with operators

trained on identifying potential trafficking cases and could receive calls in English and Arabic. The NCCHT continued to allow individuals to submit information on potential trafficking crimes through its website but did not report if it received such information during the year. The government regularly shared all hotline numbers on social media platforms; furthermore, all hotline operators had standard checklists to screen calls for trafficking indicators, and if a potential case was identified, operators referred the case to the applicable points of contact per the NRM. The government identified 207 potential trafficking cases via its hotlines, including 81 cases from the HRC's call center and 126 from the MHRSD call center; it referred all 207 cases to MOI for further investigation. Some workers and labor-source country officials continued to report impracticalities and technical difficulties getting through to call center operators, citing poorly trained and under-resourced staff.

The government deployed labor inspectors and HRC officials—400 of whom specialized in trafficking crimes—to conduct 1,321,963 labor inspections to monitor the application of employment and recruitment laws; 92,296 inspections were conducted in response to worker complaints and resulted in the identification of 179,844 violations. The government identified 28 potential trafficking cases during these inspections and referred them to MOI for further investigation, compared with 17 potential trafficking cases referred in 2020 from inspections. Diplomatic representatives from several countries continued to report improvements in Saudi government oversight of labor recruitment and the proper implementation of labor contracts. The government continued to provide a questionnaire for labor inspectors to complete for situations where they suspected a trafficking crime; inspectors sent completed forms following an inspection to MHRSD's anti-trafficking department to be referred for criminal investigation. The HRC Secretariat reported receiving 271 general complaints from workers during the reporting period; 218 of those complaints were referred to MHRSD, which then referred the complaints to MOI and PPO for further investigation. MHRSD reported processing 24,136 complaints filed through its Domestic Labor Dispute Committee and Trafficking Hotline Program but did not report if it referred any of these complaints to MOI or PPO for further investigation. The government had several bilateral labor agreements with labor-source countries, including Ethiopia and Indonesia, which set minimum wage standards and regulated protections and benefits for migrant workers, such as hours, mandatory time off, and overarching conditions. The government did not report efforts to reduce the demand for commercial sex acts. The government provided anti-trafficking training to its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Saudi Arabia. Adults—primarily from South and Southeast Asia and East Africa—voluntarily migrate to Saudi Arabia to work in a variety of sectors, including construction, agriculture, and domestic service. Many of these low-skilled workers are employed in substandard conditions that heighten their risk of forced labor. Some traffickers or unscrupulous labor brokers illegally recruit migrants to work in Saudi Arabia and subsequently force them to work in domestic service. Undocumented entry across the Kingdom's southwestern border serves as a key gateway for vulnerable Yemeni, Ethiopian, and Somali workers, in particular. The Kingdom's migrant worker population continued to be the largest group at risk of human trafficking, particularly female domestic workers due to their isolation inside private residences and vulnerability to employer abuse. The pandemic increased the vulnerability of trafficking among domestic workers, as the related regional and nationwide curfews created obstacles to reach assistance from police stations, hospitals, or NGOs. Labor-source countries also reported increased work hours and complaints of abuse among domestic workers due to the pandemic. Non-payment or late payment of wages remain the prominent complaint from foreign workers in the Kingdom; this concern was further exacerbated during 2020 by the pandemic, as the unemployment rate among foreign workers increased significantly and heightened this group's vulnerability to trafficking. Instances of employers withholding workers' passports also remains a significant problem. Trafficking perpetrators include businesses of all sizes, private families, recruitment agencies in both Saudi Arabia and labor-source countries, gangs, and organized criminal elements, to include third-country nationals.

Haiti AR_000959

According to the General Authority for Statistics, there are approximately 9.6 million foreign workers in Saudi Arabia; the largest populations during the reporting period were from Bangladesh, Egypt, Ethiopia, India, Indonesia, Pakistan, the Philippines, Sudan, and Yemen. In 2021, reports of racial and religious discrimination against African migrants—specifically domestic workers—increased. NGOs and media sources reported increasing concerns about harassment and discrimination among Christian African migrant workers in the Kingdom, rendering them vulnerable to abuse, exploitation, and trafficking. Furthermore, a recent media report noted an increasing number of Kenyan domestic workers in the Kingdom who died during their time working in the country; in 2019, 883 cases of Kenyans in distress in the Kingdom were reported, and in 2020, 1,035 cases were reported; rights groups suggest the increase in reports was due to increasing abuse and exploitation of workers. In January 2022, media sources and rights groups reported that following harsh conditions in detention in the Kingdom and subsequent deportation, Ethiopian returnees, specifically Tigrayans, were being ethnically profiled and sent to internment camps across Ethiopia, where abuse, forced labor and forced disappearances have been reported. In July 2021, rights groups reported Saudi Arabian employers began to terminate or not renew contracts of Yemeni professionals in the country following a MHRSD policy change that required businesses to limit the percentage of their workers from certain nationalities, including Yemen. Workers must find another employer to act as a sponsor to avoid leaving the country or risk detainment and deportation and increased vulnerability to trafficking if found to be residing illegally. PRC nationals employed in Saudi Arabia at worksites affiliated with the PRC's Belt and Road Initiative are vulnerable to conditions of forced labor, including debt bondage, restriction of movement, passport confiscation, excessive overtime, lack of adequate healthcare, and being sold to other employers for which they did not have signed contracts. Separately, NGOs reported the government deported at least five Uyghur Muslims, some while performing religious pilgrimage, back to PRC between 2017 and 2019, where they were vulnerable to arbitrary detention, harassment, and forced labor; during the reporting period, several Uyghur Muslims faced imminent deportation to the same conditions. Cuban nationals working in Saudi Arabia may have been forced to work by the Cuban government. While the Saudi government reported more than 200 Cuban medical professionals present in Saudi Arabia operate under contracts between the worker and the Saudi MOH, in 2021, one Cuban doctor working in Saudi Arabia alleged 70 percent of the salary earned by Cubans employed on medical missions—or roughly $2,000 per month—is taken by the Cuban government. Furthermore, an NGO reported that while the Kingdom paid Cuban workers a salary, workers are forced to deliver between 75 and 90 percent of their salary to the Cuban government. Additionally, an NGO reported Cuban workers employed in Saudi Arabia were vulnerable to other abuses, including sexual harassment, forced enrollment into the medical mission program, surveillance, exploitation, restriction of movement, and passport confiscation.

Some migrant workers are forced to work beyond their contract term because their Saudi employers refuse to grant exit permission or pay the exit fee required by Saudi law. Domestic workers lack protections under the labor law and other initiatives, continuing to place this group, which makes up 30 percent of migrant workers in the Kingdom, at higher risk of trafficking. Although most migrant workers sign contracts delineating their rights, some report work conditions substantially differ from those outlined in their contracts. Other workers never see their work contracts, heightening their risk of forced labor and debt-based coercion. Additionally, some migrant workers voluntarily enter into illegal arrangements where they seek freelance work while concurrently paying a Saudi national to sponsor their initial residency permit, thereby becoming vulnerable to extortion and debt-based coercion by their sponsors. Some migrants from Yemen and the Horn of Africa, who enter Saudi Arabia illegally via the Yemeni border—involuntarily or through consented smuggling—may be trafficking victims. Previous reports alleged some Saudi citizens engaged in sex tourism abroad, where they engaged in temporary or seasonal nonbinding "marriages," which included payment for short-term sexual access to children and adults whom the purchaser then abandoned. In Saudi Arabia, begging by women and children is prevalent and a significant vulnerability to forced labor, with reported upticks in forced begging during the holy month of Ramadan and the Muslim pilgrimages of Hajj and Umrah.

The child beggar population is composed primarily of unaccompanied migrant children, primarily from Yemen and Ethiopia, but approximately 5 percent are Saudi national children. Traffickers compel some of these women and children to work as part of organized begging rings.

As the leader of a multi-nation coalition that commenced military operations against Houthi rebel forces in Yemen in 2015, Saudi Arabia paid, materially supported, trained, and commanded Sudan's Rapid Support Forces (RSF). Media alleged in a previous reporting period that families bribed Sudanese officers associated with RSF to unlawfully recruit and use children to serve as combatants in Yemen, but there were no similar allegations during the current reporting period. Saudi Arabian officers trained and exercised tactical control over some RSF units. Past reporting claimed that in some instances Saudi Arabia-funded Yemeni militias that hired children in combatant roles and that the Saudi Arabian government had provided salaries, uniforms, weapons, and training to Sudanese combatants (which included children ages 14 to 17 years old) in Yemen, but there were no similar allegations during the current reporting period. During the current reporting period, the Saudi-led coalition in Yemen reportedly established a "Child Protection Unit" that worked with the UN to provide care to Houthi-recruited child soldiers. Since 2016, the Saudi-funded King Salman Humanitarian Aid and Relief Center facilitated programs to rehabilitate child soldiers in Yemen.

# SENEGAL: TIER 2 WATCH LIST

The Government of Senegal does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included increasing trafficking investigations, prosecutions, and convictions and providing anti-trafficking training to judicial and law enforcement officials. The Minister of Justice released a judicial circular urging prosecutors to seek harsher penalties consistent with the 2005 anti-trafficking law. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity. The government did not investigate, prosecute, or convict traffickers exploiting children in forced begging consistent with the 2005 anti-trafficking law for the second consecutive year. Officials did not consistently use the 2005 anti-trafficking law to prosecute alleged traffickers and continued applying penalties inconsistent with the law. The government identified significantly fewer trafficking victims, and it made minimal efforts to identify and refer adult trafficking victims to services. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Senegal was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Senegal remained on Tier 2 Watch List for the third consecutive year.



PRIORITIZED RECOMMENDATIONS:

Increase efforts to use the 2005 anti-trafficking law to investigate and criminally prosecute trafficking crimes, especially child forced begging cases, and sentence convicted traffickers to significant prison terms. • Increase efforts to proactively identify trafficking victims among vulnerable populations, including children exploited in forced begging and women in commercial sex, as well as other at-risk populations—for example, women traveling abroad for domestic work, returning migrants, and domestic and foreign workers on People's Republic of China (PRC) national-operated fishing vessels—and refer trafficking victims to services. • Finalize and implement standard operating procedures

SENEGAL

to ensure police or judicial investigations of alleged traffickers when potential trafficking victims are identified, especially child forced begging victims. • Strengthen efforts to ensure trafficking crimes are tried under the 2005 anti-trafficking law and not as misdemeanor crimes, and ensure cases are referred to investigative judges in the criminal courts. • Increase oversight of *daaras* (Quranic schools) to prevent forced begging. • Increase technical and financial support to local governments seeking to combat human trafficking, including child forced begging, and regulate *daaras*. • Continue providing training for investigators, magistrates, prosecutors, and judges on application of the 2005 anti-trafficking law. • Increase trafficking data collection on law enforcement and victim identification efforts. • Strengthen the anti-trafficking task force's (CNLTP) authority to coordinate anti-trafficking activities among agencies conducting anti-trafficking work. • Increase oversight of overseas labor recruitment, including by prohibiting work-paid recruitment fees, and awareness of exploitation of labor migrants and the rights of Senegalese workers abroad. • In partnership with NGOs, expand access to protective services for trafficking victims outside of Dakar and for adults. • Increase efforts to raise public awareness of trafficking.

## PROSECUTION

The government maintained mixed anti-trafficking law enforcement efforts. Senegal's 2005 Law to Combat Trafficking in Persons and Related Practices and to Protect Victims criminalized sex trafficking and labor trafficking. The law prescribed penalties of five to 10 years' imprisonment and a fine for sex trafficking and labor trafficking—except forced begging—and prescribed lesser penalties of two to five years' imprisonment and a fine for forced begging. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. While the 2005 anti-trafficking law criminalized forced begging, provisions in the penal code that allowed seeking of alms under certain conditions may have hampered law enforcement officials' ability to distinguish traditional alms-seeking from exploitation through forced begging. Revised anti-trafficking legislation, drafted in collaboration with an international organization, remained pending before the Ministry of Justice for the third consecutive year.

In data collected from five of Senegal's 14 regions, the government reported initiating 24 investigations, compared with 14 during the previous reporting period; prosecuting 29 alleged traffickers, compared with 19 during the previous reporting period; and convicting 20 traffickers, compared with 12 during the previous reporting period, with data collected from the same number of regions. Courts sentenced 14 out of the 20 convicted traffickers to at least one year imprisonment, compared with 11 out of 12 convicted traffickers during the previous reporting period; only six traffickers received sentences in compliance with penalties prescribed in the 2005 anti-trafficking law and courts issued fully suspended sentences to at least four traffickers, which did not serve to deter or adequately reflect the nature of the crime. The government prosecuted potential trafficking crimes under other penal code statutes, which often resulted in cases being heard by correctional courts rather than criminal courts and their prescribing significantly lower penalties for misdemeanor crimes with trafficking indicators, such as "pimping." In at least seven cases, the government did not pursue trafficking convictions—either by dismissing the cases or issuing administrative fines for other crimes. One official noted over-crowded prisons posed a significant challenge to the judicial system, sometimes resulting in courts issuing fines for lower-level offenses in trafficking cases. In November 2021, the Minister of Justice released a judicial circular urging prosecutors to seek harsher penalties consistent with the anti-trafficking law, appeal court decisions and sentences not in line with the law, and increase data collection and reporting on such efforts.

The government did not prosecute or convict any traffickers for child forced begging for the second consecutive year. When officials identified a child forced begging victim, they often issued administrative penalties to the alleged perpetrators instead of criminally investigating and prosecuting the case, in part due to public pressure associated with the social influence of Quranic teachers, which failed to deter future exploitation. Officials previously observed children being sent back in the streets to beg after authorities returned them to their families. The

government reportedly prosecuted and convicted at least two Quranic teachers in 2021 for non-trafficking-related misdemeanor crimes related to child abuse or negligence, including a case involving a child's death, and issued suspended sentences to both perpetrators. In July 2021, a Quranic student in Touba died from injuries sustained while trying to escape his school after he was allegedly abused; the case remained under investigation and authorities had not filed any charges against his teachers by the end of the reporting period.

The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Observers alleged officials sometimes refused to investigate trafficking cases or pressured the judiciary to drop cases, especially cases involving Quranic teachers, and some security officials allegedly facilitated illegal border crossings of migrants. Although not explicitly reported as human trafficking, an international organization reported there were five new allegations submitted in 2021 of alleged sexual exploitation with trafficking indicators by Senegalese peacekeepers deployed to the UN peacekeeping mission in the Central African Republic (CAR) between 2017 to 2021. There were also two similar accusations—one from the peacekeeping operation in the Democratic Republic of the Congo (DRC) and another from the now-closed operation in Haiti—reported in 2020 concerning events alleged to have taken place between 2009 and 2015. UN and Government of Senegal investigations remained pending, and the government had not yet reported the accountability measures taken, if any, for the open cases at the end of the reporting period.

The CNLTP, in collaboration with an international organization and foreign donor, began developing standard operating procedures for law enforcement and front-line officials on the identification and investigation of trafficking cases, including screening procedures for identifying victims and, within the Dakar region, procedures for referring victims to services; the draft procedures remained pending at the end of the reporting period. The government collaborated with international organizations to provide specialized training to law enforcement and judicial officials on identifying, investigating, and prosecuting human trafficking cases, investigative techniques, and victim protection; this compared with no specialized trainings held during the previous reporting period. Many law enforcement and judicial personnel remained unaware of the provisions of the 2005 anti-trafficking law, which, coupled with limited institutional capacity, inhibited efforts to prosecute and convict traffickers and collect data on such efforts. Observers reported investigative magistrates lacked training to identify trafficking cases, leading to potential misclassification of trafficking crimes and application of lower penalties than those prescribed in the anti-trafficking law. The government previously developed an anti-trafficking database ("Systraite") in collaboration with an international organization to collect law enforcement and victim protection data and implemented it in four regions; however, the government's ability to collect comprehensive law enforcement statistics remained limited. The government did not report cooperating with foreign counterparts on any law enforcement activities.

## PROTECTION

The government significantly decreased efforts to identify and protect trafficking victims. The government identified and referred to services at least 37 adult trafficking victims from Sierra Leone, six child trafficking victims, and 418 vulnerable children, including potential trafficking victims. The majority of children identified were from Senegal and Guinea-Bissau. This compared with identifying and referring to care 129 adult trafficking victims, and 6,187 vulnerable children, including potential child trafficking victims, identified during its "*Le retrait des enfants de la rue*" campaign to remove children from the streets in Dakar, in the previous reporting period; the government did not continue this campaign during the reporting period. Media reported the government identified an additional 23 potential trafficking victims from Niger, including 17 children and six adults, and airport authorities reportedly screened and identified 17 Sierra Leonean women suspected to be en route to exploitation in Lebanon. One NGO reported identifying and caring for an additional 43 potential child trafficking victims.

Law enforcement, immigration, and social services personnel had procedures for proactively identifying trafficking victims among vulnerable populations and referring them to services. However, authorities inconsistently applied the procedures and they were not used in all regions of the country. Authorities generally referred victims identified along Senegal's borders to an international organization and government center for victim interviews before referring them to NGO or government protective services. In Dakar and rural areas, law enforcement, civil society, and community protection groups generally referred children to the government or NGOs for social services, including repatriation assistance for foreign child victims. The government referred foreign adult victims to their respective embassies and provided repatriation support, including to Sierra Leonean victims identified during the reporting period. Authorities were not always aware of the shelters and services available, especially for adult victims, which at times caused delays in the provision of services.

The Ministry of Women, Family, Gender, and Child Protection (MWFGCP) referred 524 children to its shelter (the Ginddi Center) for care, compared with referring 598 children in the previous reporting period. The government provided 269.8 million West African CFA francs (FCFA) ($463,700) to the Ginddi Center in 2021, the same amount provided in 2020. The center provided meals, shelter, psycho-social care, clothing, and vocational training; two staff nurses provided basic medical care. The Center also operated a hotline for cases involving child victims of crime in three languages and received 7,124 calls during the reporting period; for calls regarding child protection issues, staff brought children requiring assistance to the center for care. The Ginddi Center continued to lack sufficient space, limiting the number of victims authorities could assist and their length of stay. As a result, the government sometimes sent victims to the center for immediate services, and then to NGOs or to partner *daaras*—which the government had certified met capacity, hygiene, and security standards and did not engage in forced begging— that provided children with follow-on support services until family reunification. The Ministry of Justice operated three shelters (CPAs) for child victims of crime, child victim-witnesses, and children in emergency situations, which child trafficking victims could access. Outside of Dakar, international observers reported NGOs often provided critical shelter and trafficking victim services due to a lack of government resources. Shelter and services for adult victims remained severely inadequate. Several NGOs operated shelters for trafficking victims throughout the country; however, only one private shelter located in Dakar could accommodate female adult victims, while no shelters were available for male adult victims.

Foreign national and Senegalese victims were eligible for the same services. Foreign victims who faced hardship or retribution in their country of origin could apply for temporary or permanent residency, but authorities did not report granting these protections to any victims. Access to victim services was not conditioned on cooperation with law enforcement proceedings. The government provided support to victims who chose to cooperate in prosecutions against the alleged traffickers, including food assistance and psycho-social services. The 2005 anti-trafficking law included provisions for victim protection during trials, such as allowing video-taped testimony; the government did not report using these provisions. Victims could legally obtain restitution; the government did not report requesting restitution during the reporting period. Victims could file civil suits against their traffickers; however, no victims reportedly used this provision and many victims were unaware of the option. Due to inconsistent application of victim identification procedures, authorities may have detained some unidentified trafficking victims. Authorities reportedly detained and fined individuals participating in commercial sex for lack of required documentation without screening for sex trafficking.

## PREVENTION

The government maintained prevention efforts. The CNLTP coordinated the government's anti-trafficking response and implementation of its 2021-2023 anti-trafficking national action plan, and met twice during the reporting period. The government allocated 60 million FCFA ($103,120) to the CNLTP in 2021, the same amount allocated the previous year. The government made minimal efforts to raise awareness of human trafficking, in part due to pandemic-related public gathering

restrictions. The government began working with an NGO and foreign donor to study the prevalence of sex trafficking in the gold mining area of Kedougou and, as part of this initiative, cohosted a virtual roundtable for stakeholders focused on combating sex trafficking.

Four municipal governments within Dakar continued implementing regulations prohibiting child begging, as well as provisions developed with an international organization to increase oversight of *daaras* and provide food, hygiene, and medical services to children. Unlike the previous year, the government did not report closing any unsafe *daaras* for health and safety violations. The government did not effectively regulate *daaras* to prevent child forced begging, and it did not have the oversight or authority to approve or deny the opening of new *daaras* and to close *daaras* based on child protection standards. The CNLTP continued to participate in the West Africa Network for the Protection of Children, a sub-regional referral mechanism for vulnerable children, including trafficking victims, comprising of NGOs and officials from neighboring countries; the network met to discuss protection and reintegration strategies for migrant children within the ECOWAS region.

The government regulated labor recruiters and brokers but did not report any investigations into fraudulent recruitment. The law did not prohibit worker-paid recruitment fees, which increased labor migrants' vulnerability to trafficking. The government made some efforts to reduce the demand for child sex trafficking, but it did not make efforts to reduce demand for commercial sex in general. The task force's tourism police forces continued to monitor the resort areas of Saly and Cap Skirring for indicators of child sex tourism and other abuses, although they did not report identifying any cases of child sex tourism. The government provided anti-trafficking training to its troops prior to their deployment as peacekeepers; however, an international organization reported there were seven open allegations of sexual exploitation with trafficking indicators by Senegalese peacekeepers deployed to UN peacekeeping missions in Haiti, CAR, and Democratic Republic of the Congo between 2009 to 2021.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Senegal, and traffickers exploit victims from Senegal abroad. Forced begging is the most prevalent form of trafficking in Senegal. Some corrupt Quranic teachers and men who claim to be Quranic teachers force children to beg in Dakar and other major cities in Senegal; many set daily begging quotas enforced by beatings. In 2019, an NGO estimated 100,000 children living in residential *daaras* across Senegal are compelled to beg. The same NGO estimated that traffickers coerce nearly 30,000 children to beg in Dakar alone. In addition, a 2017 NGO-led study identified more than 14,800 child forced begging victims in Saint-Louis and reported that 187 of the city's 197 *daaras* send children to beg for at least part of the day. Traffickers fraudulently recruit victims through the pretext of traditional cultural practices called *confiage*, in which parents send children to live with family or acquaintances in order for the child to have better access to education and economic opportunities; traffickers subsequently exploit the children in forced labor and sex trafficking. Traffickers subject Senegalese children and women to sex trafficking and forced labor in domestic servitude and gold mining. Internal trafficking is more prevalent than transnational trafficking, although traffickers exploit boys from Burkina Faso, The Gambia, Guinea, Guinea-Bissau, and Mali in forced begging in Senegalese cities as well as in forced labor in Senegal's artisanal gold mines.

Traffickers exploit women in sex trafficking throughout the southeastern gold mining region of Kedougou; most victims are from Nigeria, but traffickers also exploit victims from Senegal, Ghana, Mali, and Sierra Leone. Trafficking rings fraudulently recruit these women and use false documents to transport them to Mali and then across the border into Senegal's mining regions. Traffickers then confiscate the victims' identification documents and coerce them into sex trafficking through debt bondage, charging them travel fees ranging from 1.57 million FCFA to 2.15 million FCFA ($2,700 to $3,700). An NGO report attributes some of the increased demand for sex trafficking in mining communities to cultural and religious beliefs correlating sex with increased chances of finding gold. PRC national-owned and operated vessels flagged to Senegal may exploit West African men, including

**SERBIA**

Senegalese, and PRC nationals in forced labor. The pandemic's impact on Senegal's economy, particularly the informal sector, and foreign vessels' decimation of its fishing stock, are causing a surge in irregular migration to Europe, including Spain; these migrants are vulnerable to trafficking. In 2018, authorities identified Ukrainian and PRC women exploited in sex trafficking in bars and nightclubs. West African women and girls are subjected to domestic servitude and sex trafficking in Senegal, including for child sex tourism for tourists from Belgium, France, Germany, and other countries. Child sex tourism primarily occurs in the cities of Dakar and Saint Louis, and to a lesser extent in Cap Skirring and La Petite Côte, in traditional tourist areas, and increasingly in private residences. Traffickers exploit Senegalese women and girls in domestic servitude in neighboring countries, Europe, and the Middle East. In 2018, a government and international organization report alleged some Saudi diplomats in Senegal are complicit in fraudulently recruiting and exploiting some Senegalese women in domestic servitude in Saudi Arabia. In 2017, an international organization identified more than 1,100 Senegalese migrants in Libya who were vulnerable to trafficking.

## SERBIA: TIER 2 WATCH LIST

The Government of Serbia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included investigating more suspects and revising indicators to identify trafficking victims among schoolchildren. The government increased resources to the Center for Protection of Trafficking Victims (CPTV), which established agreements with companies to secure food, hygiene products, and other donations for victims. The government developed a coordination body to support victims during criminal proceedings, formed four Special Workings Groups on various anti-trafficking issues, and designated the Ombudsman as the National Rapporteur on trafficking. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government did not make proactive efforts to identify victims, and the implementation of standard operating procedures (SOPs) for identification remained inadequate. CPTV continued to lack the staff, skills, and resources necessary to consistently assess victims and coordinate care placement; the CPTV-run shelter remained closed due to its inability to obtain a license. The Anti-Trafficking Council did not meet, and the government did not adopt the 2021-2022 national action plan (NAP). Official complicity in trafficking crimes remained a concern. The government did not fully protect victims or fully investigate credible allegations that approximately 500 Vietnamese workers were subjected to forced labor at a People's Republic of China (PRC)-owned factory. Therefore Serbia was downgraded to Tier 2 Watch List.



SERBIA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers, including complicit officials, and impose adequate penalties. • Fully investigate allegations of forced labor in the PRC-owned tire manufacturing plant in Zrenjanin and provide assistance and protection to the Vietnamese workers. • Increase efforts to proactively identify victims, including among undocumented migrants, individuals in commercial sex, refugees and asylum seekers, and unaccompanied children engaged in street begging. • Allocate sufficient resources to enable the Center for the Protection of Trafficking Victims to officially identify victims, implement

victim protection efforts, and reopen the shelter for trafficking victims. • Allocate adequate funding to NGOs providing victim support services. • Implement access to justice measures and victim-centered approaches, such as protecting victim confidentiality, providing legal representation, and preventing re-traumatization and intimidation. • Train investigators, prosecutors, and judges on victim-centered approaches and establish mechanisms to refer cases to trained prosecutors and judges. • Fully implement written guidance to prevent penalization of trafficking victims for crimes committed as a direct result of being subjected to trafficking. • Establish transparent standards and procedures for NGOs to obtain licenses for providing support services. • Update the national referral mechanism by formalizing cooperation with NGOs and delegating specific roles and responsibilities to government agencies. • Improve training for government personnel on victim assistance and referral and ensure foreign victims have access to assistance. • Provide labor inspectors the resources and training necessary to regulate recruitment agencies and investigate cases of fraudulent recruitment. • Integrate Roma groups into policies and programs on regarding victim protection. • Consistently assemble coordinating bodies and adopt the 2021-2022 NAP. • Standardize data collection and create a database to collect statistics for sentencing and victim protection measures.

## PROSECUTION

The government maintained some law enforcement efforts. Article 388 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties ranging from two to 12 years' imprisonment for offenses involving an adult victim and three to 12 years' imprisonment for those involving a child victim. These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape. Police filed criminal complaints on 63 suspects, compared with 57 in 2020. The Public Prosecutor's Office (PPO) investigated 35 suspects, compared with 22 in 2020. PPO prosecuted 26 defendants, compared with 42 defendants in 2020. Courts convicted 16 traffickers, compared with 18 traffickers in 2020. All 16 traffickers received imprisonment, but the government did not collect or report information on the length of sentences. Courts also acquitted 10 individuals, compared with seven individuals in 2020. Observers reported judges often issued light sentences for traffickers and some judges displayed victim-blaming biases against vulnerable populations, particularly the Romani community.

The Criminal Police Directorate (CPD) maintained an Anti-Trafficking Unit within the Directorate to Combat Organized Crime. Separately, the Ministry of Interior (MOI) maintained a labor division to investigate forced labor and specialized units in Belgrade, Niš, and Novi Sad and appointed at least two officers to investigate trafficking in the 27 regional police administrations. The government continued to use a trafficking task force to coordinate efforts to proactively investigate cases and maintained a separate human smuggling and trafficking task force that also investigated trafficking. PPO maintained specialized prosecutors for trafficking cases, who provided operational guidance and acted as single points of contact for investigators and care providers; however, the government did not have a system to consistently refer trafficking cases to these prosecutors or to judges trained or experienced on trafficking issues. Prosecutors did not effectively distinguish between labor violations and forced labor and often charged or offered plea deals in sex trafficking cases for "mediating prostitution," including cases with child victims. The government, at times in cooperation with international organizations, provided trainings for police and MOI representatives on various anti-trafficking issues. The government shared information on trafficking-related cases through INTERPOL and EUROPOL but did not report the number of cases.

Despite ongoing and repeated allegations of official complicity, especially in sex trafficking, the government did not report any new prosecutions or convictions of government employees complicit in human trafficking crimes. Observers alleged a police officer provided protection to an organized criminal group and forced one woman into sex trafficking and unlawful acts. Observers reported PPO and the police officer's superiors took no action after other officers intimidated and pressured the victim not to participate in the investigation, and authorities dismissed or transferred police and prosecutors willing to further investigate the case. In 2020, authorities investigated two cases with multiple allegedly

complicit police officers in Sabac and Presevo who may have solicited sexual services from trafficking victims. In 2018, law enforcement charged a police officer involved in sex trafficking; the trial was ongoing.

The government did not fully investigate allegations that 500 Vietnamese workers endured forced labor, including inhumane working and living conditions and passport confiscation at the construction site of a PRC-owned factory in Serbia. The European Parliament adopted a joint resolution calling for an investigation into forced labor at the factory, and the UN and civil society organizations similarly urged the government to take immediate action. Observers alleged police officers intimidated whistleblowers trying to collect additional information on the living and working conditions of the Vietnamese workers, and other credible sources alleged the government prioritized PRC investments and, as a result, dismissed the allegations and delayed government responses. While the National Rapporteur on Trafficking visited the factory and called for an investigation, the government was slow to respond to the allegations of forced labor and did not fully adhere to its own protocols. The investigation of the allegations remained ongoing at the end of the reporting period, yet the government maintained that the Vietnamese workers were not trafficking victims.

## PROTECTION

The government decreased victim protection efforts. The government maintained SOPs for the identification, referral, and support of trafficking victims, including standardized indicators and guidelines to identify victims in irregular migration flows and high-risk sectors. The government, in cooperation with civil society, revised indicators for identifying victims among schoolchildren. However, the SOPs did not provide clear roles and responsibilities for relevant institutions, lacked proactive efforts, and implementation remained "recommended" rather than required. In previous years, some first responders, particularly at Centers for Social Work (CSW), justified cases of potential forced child begging and forced labor involving Roma as traditional cultural practices and customs. CPTV assessed and officially identified adult victims and developed a protection and assistance plan for each victim, while CSW assessed and officially recognized child victims. In 2021, first responders referred 127 potential victims to CPTV, compared with 130 in 2020; law enforcement referred 59 potential victims, social welfare organizations referred 28 potential victims, NGOs and international organizations referred 14 potential victims; five potential victims self-identified, and private citizens and other institutions referred 21 potential victims. The government identified 43 victims from the 127 potential victims, compared with 48 victims in 2020; 23 were victims of sex trafficking, nine of forced labor, two of forced criminality, and nine of multiple types of exploitation. Overall, 21 were women, eight men, 13 girls, and one boy, and one foreign victim. GRETA and other experts reported CPTV lacked the staff to review cases in a timely manner and resources to travel to the location of potential victims and interview them in person. Experts continued to report the lack of transparency regarding the official victim assessment and CPTV's inability to assess potential victims consistently. For example, CPTV did not provide information or notify relevant stakeholders on whether it interviewed the Vietnamese workers in the PRC-owned factory or conducted an official victim assessment in this case. Additionally, the National Rapporteur responded to an NGO complaint and concluded that CPTV and CSW failed to identify and provide assistance to a child victim. CPTV reported staff occasionally tested positive for COVID-19, while CSW staff were heavily burdened due to an increased workload and at times limited staff stemming from the pandemic and could not support all victims.

The government allocated approximately 35.2 million dinars ($339,830) to CPTV for victim assistance, compared with 23 million dinars ($222,050) in 2020. The government did not provide funding to NGOs despite relying heavily, and at times solely, on their victim support and reintegration services. The government and NGOs provided the following assistance to victims: psycho-social, legal, educational, medical, financial, and reintegration support; personal protective equipment; and necessary medical assistance for COVID-19. All victims in 2021 and 2020 received some form of government assistance. The government reported providing equal protection to foreign national and Serbian citizen victims, but foreign victims faced obstacles in accessing support, according to experts, who noted some local communities limit shelter accommodation

to Serbian nationals. Although the government required victims to be referred only to licensed service providers, licenses were difficult to obtain because of a lack of official standards and criteria to approve licenses. CPTV opened a shelter for trafficking victims in February 2019 with the capacity to accommodate six victims; however, the CPTV-run shelter remained closed since September 2020 due to its inability to obtain a license. As a result, an NGO-run shelter operated the only specialized shelter for trafficking victims. Before the closure of the CPTV-run shelter, CPTV reported difficulties in fulfilling their expanded responsibilities from a coordinating body to one that also provided direct assistance at the shelter due to a continued lack of capacity, resources, and staff, including technical staff to provide support to victims. In previous years, civil society reported CPTV relying on its scarce resources to support the shelter with food, toiletries, and access to vehicles, but CPTV reported establishing agreements with companies to secure food, hygiene products, and other donations for victims.

CSW operated shelters for domestic violence victims that also accommodated female trafficking victims. The government maintained a drop-in shelter for homeless children, and CSW returned child victims to their families, referred them to foster care, or placed them in one of the two Centers for Children without Parental Care; three child victims were accommodated in general shelters (17 in 2020), seven were placed in foster families (21 in 2020), and none were accommodated in shelters for asylum seekers and migrants (seven in 2020). The government did not provide specialized accommodation for male victims. An NGO rented accommodation for male victims as needed, and male victims could access all other rehabilitation services offered to female victims. CPTV maintained a protocol with the National Employment Service (NES) to assist victims in finding employment and, in cooperation with the Association of Business Women, referred nine victims for training to NES (none in 2020). The government provided foreign victims temporary residence permits, renewable up to one year, and allowed potential foreign victims to stay for three months; no victims required a temporary residence permit (one victim in 2020). The government did not repatriate any victims (10 victims to Serbia in 2020). Observers reported the lack of a standardized database to collect information on trafficking victims created obstacles in managing cases and monitoring access and quality of support services.

Authorities penalized victims of sex trafficking, forced begging, and forced criminality with imprisonment, probation, and fines. Victims' ability to access support services and assistance was not contingent on cooperating with law enforcement investigations, but once a case was reported to police, authorities required victims to cooperate with investigations and testify during trials, including children; the government did not report the number of victims that cooperated with prosecutions (68 victims in 2020). The law designated officially recognized victims as a "particularly vulnerable group" eligible for the status of an "especially vulnerable witness" and/or "protective witness" with special assistance and procedural considerations, such as testifying without the defendant present or via video link and access to witness protection. However, observers reported most courts did not have the technical capacity to offer testimony via video link and victims frequently appeared in front of the alleged trafficker during trial, causing re-traumatization. The government granted the status of an "especially vulnerable witness" to 33 victims (20 in 2020) but did not grant "protective witness status" to any victims (none in 2020). In previous years, observers reported an absence of victim confidentiality measures; one example included the MOI publishing information on a trafficker who was the victim's father, and as a result, media organizations easily identified the victim. The government established a coordination body to support victims and witnesses during criminal proceedings. The government provided free legal aid to victims, but it did not collect information on how many victims received assistance, and observers reported local governments did not advertise the service and only a few victims received free legal aid. Judges rarely issued restitution in criminal cases and encouraged victims to seek compensation by filing civil suits; judges granted restitution to one victim for 1.12 million dinars ($10,780), but it has not yet been paid out. Civil suits were lengthy, expensive, and required the victim to face the trafficker multiple times; only one victim received compensation to date. The Constitutional Court ruled that the PPO and High Court in Belgrade failed to fulfill their obligations to conduct a fair

**SEYCHELLES**

trial and protect a victim's rights in a child trafficking case and awarded compensation to the child victim for €5,800 ($6,580).

## PREVENTION
The government maintained prevention efforts. The government maintained the Anti-Trafficking Council composed of relevant government ministries, but it did not meet in 2021 or 2020. The government implemented the anti-trafficking strategy for 2017-2022 but did not adopt the NAP for 2021-2022. The government formed four Special Working Groups (SWG): one SWG to draft the NAP, one to monitor and implement the NAP, one SWG to strengthen proactive investigations, and one to improve prosecutions and legal protections. Each SWG held two online meetings and added NGO representatives after requests to include civil society. The government did not include NGOs in the preparation of the draft NAP but solicited feedback during a public discussion. The National Coordinator led government-wide anti-trafficking efforts, and the government adopted an amendment to officially designate the Ombudsman as the National Rapporteur on trafficking to independently monitor and assess anti-trafficking efforts. Nineteen municipal governments maintained multidisciplinary anti-trafficking teams to implement local efforts. The National Coordinator allocated €30,000 ($34,000) for awareness campaigns, including creating videos and informational materials. The government operated three hotlines that received calls for trafficking, domestic violence, and other crimes but did not report the number of trafficking-related calls. The government licensed and regulated private employment agencies; however, the government did not prohibit recruitment fees, and observers reported that tourist agencies also performed labor recruitment and were largely unregulated. Additionally, civil society reported recruitment agencies re-formed under different names after authorities revoked their licenses and reported instances of the translations of contracts into English and/or Serbian being substantively different from the original contract in the origin country's language. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE
As reported over the past five years, human traffickers exploit domestic and foreign victims in Serbia, and traffickers exploit victims from Serbia abroad. Traffickers exploit Serbian women in sex trafficking in Serbia, in neighboring countries, and throughout Europe, particularly Austria, Germany, Italy, and Turkey. Traffickers exploit Serbian nationals, primarily men, in forced labor in labor-intensive sectors, such as the construction industry, in European countries (including Austria, Belgium, Croatia, France, Germany, Italy, Luxembourg, Montenegro, Russia, and Switzerland) and the United Arab Emirates. Traffickers exploit Serbian children, particularly Roma, within the country in sex trafficking, forced labor, forced begging, and petty crime. Foreign victims identified in Serbia were from Albania, Cameroon, Croatia, Denmark, Germany, Mali, Nigeria, North Macedonia, and Pakistan. Traffickers adapt operations to the impacts of the pandemic and shift recruitment to online means, such as social media outlets. Thousands of migrants and refugees from the Middle East, Africa, and Asia transiting through or left stranded in Serbia are vulnerable to trafficking within Serbia.

Credible allegations indicate Vietnamese workers face forced labor at a construction site for a PRC-owned tire manufacturing plant in Zrenjanin. Recruitment agencies in Vietnam organized transportation, visas, and accommodation, and they charged the Vietnamese workers an exorbitant recruitment fee between $2,000 to $4,000 for their services. In March 2021, approximately 500 Vietnamese workers came to Serbia with expectations to work in a factory producing aircraft parts for €775 ($880) per month. Local NGOs and media outlets reported indicators of forced labor starting in November 2021, including passport confiscation, restriction of movement and communication, threats and intimidation, denial of repatriation requests, withholding salary, forced overtime, inadequate housing, and insufficient food. The government has not reported fully investigating these credible allegations of forced labor and instead continues to state the Vietnamese workers are not trafficking victims.

## SEYCHELLES: TIER 2

The Government of Seychelles does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Seychelles remained on Tier 2. These efforts included increasing investigations of trafficking crimes; developing a new victim identification and referral procedure; establishing the country's first trafficking-specific shelter; hiring personnel to establish an anti-trafficking secretariat to support the National Coordinating Committee against Trafficking in Persons (NCCTIP); and establishing the country's first anti-trafficking hotline. However, the government did not meet the minimum standards in several key areas. The government did not initiate any trafficking prosecutions. Officials did not proactively screen vulnerable populations, such as migrant workers or individuals in commercial sex, for trafficking indicators and generally relied on victims to self-report. Implementation of the new victim identification and referral procedure was inconsistent, and some stakeholders continued to use ad hoc procedures. Despite training efforts, the government did not institutionalize anti-trafficking training; some police, immigration officers, prosecutors, and judges continued to lack a clear understanding of trafficking, which hampered law enforcement and victim identification efforts. The lack of anti-trafficking training among labor inspectors may have left some victims among the vulnerable migrant worker population unidentified.



SEYCHELLES TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:
Using the newly established victim identification and referral procedure, systematically and proactively identify trafficking victims by screening for trafficking indicators among vulnerable populations, including individuals involved in commercial sex, migrant workers in the international trade zone, and Cuban medical professionals, and referring all trafficking victims to appropriate services. • Vigorously investigate and prosecute trafficking crimes and sentence convicted traffickers, including complicit officials, to penalties prescribed under the 2014 anti-trafficking law. • Allocate adequate funding and resources for victim services, including to the Trafficking in Persons Fund and the newly established trafficking shelter. • Train labor inspectors to identify potential forced labor victims during routine inspections, including in the international trade zone and migrant workers' work sites, and to report potential trafficking crimes to appropriate officials. • Finalize, adopt, and implement a national action plan to drive national efforts to combat all forms of trafficking. • Remove the required fee for migrant workers to file a complaint with the Labor Tribunal. • Adopt a law prohibiting the retention of passports by employers of migrant workers. • Conduct anti-trafficking awareness campaigns to increase the understanding of the crime among the local population and the large number of foreign tourists and migrant workers entering the country.

## PROSECUTION
The government maintained anti-trafficking law enforcement efforts. The Prohibition of Trafficking in Persons Act of 2014 criminalized sex trafficking and labor trafficking. The law prescribed penalties of up to 14 years' imprisonment and a fine up to 500,000 Seychelles rupee (SR) ($37,510) for offenses involving adult victims, and a maximum of 25 years' imprisonment and a fine up to 800,000 SR ($60,020) for those involving child victims; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as rape. Although the anti-trafficking law criminalized child

sex trafficking, unclear and conflicting statutes in the penal code did not clearly define the ages of consent, causing confusion between the traditionally understood age of consent (15 years of age) and the legal age of majority (18 years of age). In 2017, the government, in collaboration with an international organization, began development of implementing regulations for the 2014 anti-trafficking law to address protective measures for trafficking victims; however, the government did not finalize these regulations for the fourth consecutive year. In 2020, the Child Law Reform Committee drafted new legislation that reportedly expands protections for child sex trafficking victims and increases law enforcement's obligation to investigate and prosecute cases of child sex crimes, including trafficking; however, the new legislation was not presented to the National Assembly for the second consecutive reporting period.

The government investigated 24 potential trafficking cases—three for sex trafficking, 11 for forced labor, and 10 involving unspecified exploitation—in 2021, compared with three investigations in the previous reporting period. The government did not initiate any prosecutions, compared with 12 prosecutions in 2020 and none in 2019, and reported 18 prosecutions remained ongoing from previous reporting periods. The government convicted two traffickers, which was the same number of convictions as the previous reporting period. Courts sentenced a Seychellois national to 14 years' imprisonment for sex trafficking under the 2014 anti-trafficking law. Courts also sentenced a Seychellois national to three years' imprisonment and a fine for labor trafficking involving three Bangladeshi migrant workers; courts also ordered the trafficker to pay each victim 10,000 SR ($750). In response to the pandemic, police officers, including those mandated to investigate trafficking crimes, were diverted from enforcement duties and assigned to oversee pandemic-related guidelines and procedures, such as mask-wearing, curfews, social distancing, and mandatory quarantines, for a portion of the reporting period. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. For the first time in three years, the government, in partnership with international organizations, trained officials on anti-trafficking enforcement, policies, and laws. Despite training efforts, the government did not institutionalize anti-trafficking training, and some police, immigration officers, prosecutors, and judges continued to lack a clear understanding of trafficking, which hampered law enforcement and victim identification efforts. The government reported cooperating with foreign governments on trafficking investigations.

## PROTECTION

The government increased victim protection efforts. The government reported identifying four trafficking victims, compared with 14 victims identified in 2020 and none in 2019. Of the four victims identified, two were Seychellois girls exploited in sex trafficking and two were adult males, one exploited in forced labor and one Seychellois male whose exploitation was unknown. The government, in partnership with an international organization, developed a new victim identification and referral procedure to replace standard operating procedures established in 2015. In late 2021, the anti-trafficking secretariat disseminated the new procedure to police, social welfare officers, immigration officials, and civil society and trained stakeholders on its use; however, implementation of the new procedure remained inconsistent, and some stakeholders continued to use ad hoc procedures independent from the national SOPs. The government did not proactively screen vulnerable populations, such as migrant workers or individuals in commercial sex, for trafficking indicators and generally relied on victims to self-report. NCCTIP reported spending 148,281 SR ($11,120) for victim care in 2021, a decrease compared with 498,480 SR ($37,400) in 2020. The government reported providing various services, including medical care, shelter, and repatriation for foreign victims, to all four victims identified during the reporting period, and to some victims identified in previous years. The government, in partnership with a religious organization, established the country's first trafficking-specific shelter in late 2021. Although the shelter had not begun accepting survivors at the end of the reporting period, the government worked with the religious organization to renovate the space to accommodate 15 individuals. As in prior years,

the Social Affairs Department of the Ministry of Health and Social Affairs provided foreign victims who were waiting to give testimony in court with accommodation in private guesthouses, homeless shelters, or a facility previously used to hold suspected criminals, where they had freedom of movement.

The 2014 anti-trafficking law allowed the government to place witnesses under protection and, if the court found it necessary, to hold trafficking trials in private to protect witness confidentiality and privacy; the law also ensured witnesses could testify through closed circuit television and that courtroom accommodations could be made for the psychological comfort of the witness. The 2014 anti-trafficking law also allowed for limited legal alternatives to victim removal to countries in which they would face hardship; the law permitted the Minister of Home Affairs to decide whether to allow a foreign victim to stay in the country for 30 days, issue a permit allowing the victim to stay in the country for a set period until the completion of legal proceedings, or deport the victim. The government provided 11 victims of forced labor with new work permits, allowing them to begin working with a new employer, compared with five in the previous reporting period. The anti-trafficking law allowed the government to provide restitution to victims from the fine imposed on the accused or from the Trafficking in Persons Fund; however, the government has never allotted resources to the Trafficking in Persons Fund or provided restitution to any victims. The law protected trafficking victims from detention or prosecution for unauthorized entry into Seychelles, but it did not protect victims from prosecution for other unlawful acts traffickers compelled them to commit. Due to limited implementation of the government's new formal identification procedures, authorities likely arrested or deported some unidentified trafficking victims for prostitution or immigration violations.

## PREVENTION

The government slightly increased efforts to prevent trafficking. NCCTIP met regularly to direct anti-trafficking efforts across government agencies and drive national policy. During the reporting period, the government hired two personnel to establish an anti-trafficking secretariat, as required under section IV of the 2014 anti-trafficking act, to support NCCTIP; observers reported the establishment of the secretariat enhanced inter-ministerial coordination of anti-trafficking efforts. The government allocated 148,281 SR ($11,120) for committee operations and programming, such as victim assistance and prevention efforts, compared with 1.18 million SR ($88,620) in the previous reporting period. The government remained without a national action plan (NAP); however, NCCTIP, in partnership with an international organization, drafted an updated 2022-2025 NAP, which was awaiting final approval by the Cabinet of Ministers at the end of the reporting period. The government held awareness campaigns targeting frontline officials, journalists, and populations vulnerable to trafficking, including migrant workers and individuals from low-income communities. The anti-trafficking secretariat began operating the country's first trafficking-specific hotline. The secretariat reported the hotline was available 24 hours a day, seven days a week, to provide referrals for services, and at least one case reported to the hotline resulted in an investigation. The Ministry of Employment (MOE) maintained a hotline to address concerns about forced labor; the government did not report identifying any trafficking victims via the employment hotline.

Trafficking vulnerabilities in labor recruitment and monitoring persisted throughout the country. The MOE and the inter-ministerial Special Task Force, which had a mandate to address the living and working conditions of migrant workers, regularly inspected work sites for indications of trafficking; however, the government did not report identifying any forced labor victims or referring any potential trafficking crimes to law enforcement as a result of the inspections, likely due to lack of training on trafficking indicators. The MOE continued to lack jurisdiction in the Seychelles International Trade Zone (SITZ), where migrant workers were especially vulnerable to forced labor, as it was considered ex-territorial and managed by the Financial Services Authority (FSA); this limited its ability to screen migrant workers for trafficking. The government did not report conducting inspections in the SITZ during the reporting period, despite the FSA no longer requiring special permission to visit businesses in the SITZ. The MOE reported delaying or canceling some planned inspections due to pandemic-related

movement restrictions during the reporting period. In accordance with the Employment Act, the MOE reviewed all contracts for migrant workers to ensure compliance with its provisions, including acceptable accommodations; however, the government did not have effective policies or laws regulating or providing oversight for labor recruiters. Seizure and retention of passports by employers remained legal under Seychellois law, unless proven it was specifically for the purpose of further trafficking a person; however, in 2019, the government drafted an amendment to the immigration bill that reportedly prohibits passport retention of foreign workers. The government did not report sending the bill to parliament for the third consecutive reporting period. The government continued to utilize the labor tribunal for labor-related complaints and continued to require a fee for migrant workers to file a complaint. In 2021, the government amended the immigration act to reportedly require the provision of work permit cards for all citizens and foreign workers that includes anti-trafficking information and contact information for assistance; however, the government did not report providing updated work permit cards during the reporting period. The government did not provide anti-trafficking training to its diplomatic personnel or make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Seychelles. Traffickers exploit Seychellois girls and boys in child sex trafficking, particularly on the main island of Mahé; in some cases, peers and family members exploit children in bars, guest houses, hotels, brothels, private homes, and on the street. Traffickers also exploit Seychellois addicted to substances or from low-income households in sex trafficking. Traffickers exploit Malagasy women who transit Seychelles in forced labor, primarily in domestic servitude, and sex trafficking in the Middle East. Nearly 17,000 migrant workers—including individuals from Bangladesh, India, China, Kenya, Madagascar, and other countries in South Asia—make up approximately 20 percent of the working population in Seychelles and are primarily employed in fishing, farming, and construction; credible reports indicate traffickers subject migrant workers to forced labor in these sectors. Labor recruitment agents based in Seychelles exploit migrant workers in labor trafficking, often with the assistance of a local Seychellois accomplice. Migrant workers often sign their employment contracts upon arrival in the Seychelles and frequently cannot read the language, which traffickers exploit in fraudulent recruitment tactics. There were reports of employers routinely retaining migrant workers' passports to prevent them from changing jobs prior to the expiration of their two-year contracts, increasing their vulnerability to forced labor. Observers report some employers in the SITZ may not allow migrant workers to leave their residential premise outside of working hours, creating further vulnerabilities to trafficking. Traffickers exploit migrant workers aboard foreign-flagged fishing vessels in Seychelles' territorial waters and ports using abuses indicative of forced labor, including nonpayment of wages and physical abuse. Cuban medical professionals working in Seychelles may have been forced to work by the Cuban government.

## SIERRA LEONE: TIER 2

The Government of Sierra Leone does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, therefore Sierra Leone remained on Tier 2. These efforts included signing a memorandum of understanding (MOU) with Guinea on anti-trafficking coordination, convicting more traffickers, launching a nationwide trafficking hotline, and ratifying the ECOWAS Convention on Mutual Assistance in Criminal Matters, intended to facilitate cross-border law enforcement anti-trafficking efforts. However, the government did not meet the minimum standards in several key areas. The government investigated fewer cases; shelter and services, especially for male victims, remained inadequate and limited to Freetown; and the government did not

report providing any funding to support NGOs providing the majority of victim shelter and services.



SIERRA LEONE TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Expand victim shelter and services, including for male victims, outside of Freetown. • Increase efforts to investigate, prosecute, and convict traffickers, following due process, and sentence convicted traffickers with significant prison terms in accordance with the law. • Train police, prosecutors, and judges to investigate and prosecute trafficking cases. • Train all officials on the standard victim identification measures and national referral mechanism to ensure trafficking victims receive timely services. • End policies that encourage labor migration to occur through informal channels, increasing migrants' vulnerability to trafficking. • Implement the new Labor Migration Policy, including pre-departure education about labor rights, improving recruitment agency licensing procedures, and increasing the capacity of Sierra Leonean missions to support victims. • Amend the 2005 anti-trafficking law to remove sentencing provisions that allow for a fine in lieu of imprisonment for sex trafficking offenses. • Proactively screen for trafficking indicators among vulnerable populations, including Sierra Leonean women traveling abroad for domestic work, women in commercial sex, irregular migrants, children in informal foster care arrangements, and Cuban overseas workers. • Coordinate with the Governments of Liberia and Guinea to prosecute transnational cases, coordinate victim protection, and prevent trafficking. • Improve data collection on anti-trafficking law enforcement and victim assistance efforts.

## PROSECUTION

The government made mixed anti-trafficking law enforcement efforts. The 2005 anti-trafficking law criminalized sex trafficking and labor trafficking and prescribed penalties of up to 10 years' imprisonment, a fine, or both. These penalties were sufficiently stringent; however, by allowing for a fine in lieu of imprisonment, the penalties for sex trafficking were not commensurate with the penalties for other grave crimes, such as rape. The Sexual Offences Act criminalized sex trafficking under its "forced prostitution" and "child prostitution" provisions and prescribed penalties of up to 15 years' imprisonment; these penalties were sufficiently stringent and commensurate with penalties for other grave crimes, such as rape. Draft legislation to replace the 2005 anti-trafficking law to remove the possibility of a fine in lieu of imprisonment for convicted traffickers, increase penalties, and improve victim protection measures remained pending at the close of the reporting period.

The government reported investigating 43 cases, compared with investigating 72 cases the previous reporting period. The government reported prosecuting an unknown number of defendants in nine cases, which resulted in the conviction of three traffickers, compared with prosecuting at least 30 defendants in 33 cases and convicting one trafficker during the previous reporting period. Judicial inefficiencies, general corruption, and procedural delays hindered courts from holding traffickers accountable and diminished confidence in the judicial system. As a result, victims' families often accepted payments from traffickers rather than pursue cases in court, and families sometimes exerted pressure on victims to not participate in investigations and prosecutions against their alleged traffickers due to security concerns, community ties to alleged traffickers, and the high cost and travel required to participate in such cases. In many cases, victims either did not agree to testify against their traffickers and prosecutors dropped the charges, or victims could not meet the travel requirements for court appearances and judges dismissed their cases.

The government could expedite trafficking cases by referring trafficking prosecutions directly to the High Court, bypassing the preliminary investigation stage, which sometimes was a three-year process. In addition, there was a dedicated judge and special prosecutors for trafficking cases. In previous years, traffickers reportedly bribed prosecutors not to prosecute cases and bribed judges to dismiss cases. In a previous reporting period, an NGO alleged police officers raped potential child trafficking victims and, in some cases, transported victims to police stations where they were sexually abused. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes, particularly in the judiciary, remained significant concerns, inhibiting law enforcement and judicial action during the year.

The government, in collaboration with an international organization and NGOs, trained magistrates and High Court judges on prosecuting trafficking cases and trained district task force members on victim identification, referral, and case management. Police officers did not receive training on human trafficking while at the police academy. The government continued to cooperate with the Government of Guinea, including signing an MOU on trafficking issues. The government also met with the Government of The Gambia and began discussions on drafting an MOU. The government cooperated with the Governments of Senegal and Guinea on the repatriation of an unspecified number of Sierra Leonean victims. The government ratified the ECOWAS Convention on Mutual Assistance in Criminal Matters, which provides a framework for international cooperation on investigations, including of trafficking cases.

## PROTECTION

The government maintained efforts to identify and protect victims. The government identified 43 trafficking victims during the reporting period, compared with 73 victims identified in the previous reporting period. NGOs identified an additional 59 female victims, five adult victims of sex trafficking, five adult victims of unspecified exploitation, 26 child victims of sex trafficking, and 23 child victims of unspecified exploitation. Officials referred women and child victims to NGOs for shelter services, while authorities temporarily sheltered male victims at law enforcement facilities. The government had standard procedures to identify trafficking victims, including victims among vulnerable populations, and refer them to services; however, inconsistent application and lack of training on the procedures prevented some victims from receiving services. The government relied heavily on NGOs to identify victims. In some cases, victims slept at police stations due to a lack of appropriate housing authorities, especially for male victims, and Ministry of Social Welfare (MSW) officials did not uniformly implement the standard protocols for referring victims to NGOs for specialized care.

The government relied on NGOs to care for trafficking victims. During the reporting period, one NGO-operated shelter for female and child trafficking victims provided medical, psycho-social, educational, legal, vocational, family tracing, and reintegration support to at least 31 labor trafficking victims, 26 of whom were children; adult victims were permitted to leave the shelter unchaperoned. Unlike the previous reporting period, the government did not provide financial or food assistance to the shelter. Another NGO operated a shelter for vulnerable children, including trafficking victims. No shelters could accommodate adult male victims. The government sometimes would provide adult male victims with funds to rent housing during investigations, but often male victims slept at police stations while investigations were ongoing. Some victims stayed at Transnational Organized Crime Unit (TOCU) facilities during investigations, and the government did not refer them for additional services. TOCU officials paid for food for these victims out of their personal funds, as they did not have a budget for providing victim services. In some cases, law enforcement temporarily sheltered child victims in their own homes during investigations. The government assisted in the repatriation of two Sierra Leonean children who may have been trafficking victims in Guinea. An international organization identified and assisted at least 27 Sierra Leonean trafficking victims exploited in the Middle East.

The government could support victims participating in trials against their traffickers by providing immigration relief, legal services, transportation, and lodging. In addition, prosecutors could request closed court sessions to protect victims' identities and prevent re-traumatization during trials. The government did not report how many victims, if any, voluntarily participated in investigations and prosecutions during the reporting period. An international organization reported that limited victim assistance, lack of legal representation, and fear of retaliation resulted in many victims fearing to report their cases to law enforcement. The law allowed victims to obtain restitution, but the government did not report any cases in which courts awarded restitution. While victims could file civil suits against their traffickers, none did so during the reporting period. The law provided legal alternatives to removal of trafficking victims to countries in which victims would face retribution or hardship; the government did not report providing these services to any victims during the reporting period. Due to inconsistent application of victim identification procedures, authorities may have detained or otherwise penalized trafficking victims for unlawful acts traffickers compelled them to commit.

## PREVENTION

The government increased efforts to prevent trafficking. The anti-trafficking task force, chaired by the Ministry of Social Welfare and Ministry of Justice, was responsible for coordinating the government's anti-trafficking efforts. The task force, in partnership with ECOWAS and an international organization, began work developing an MOU with Guinea to enhance anti-trafficking coordination. The government provided 700 million leones ($62,380) for anti-trafficking activities, including for implementing provisions of the 2021-2023 national action plan, compared with 500 million leones ($44,560) the previous year. The central task force provided training and support to regional task forces. The government held a nationwide anti-trafficking conference, which brought together government, civil society, and international actors to discuss trafficking issues. The government maintained a nationwide trafficking hotline run by the police. In partnership with NGOs and international organizations, the government trained members of the task force on trafficking issues. The government also conducted awareness-raising campaigns on trafficking topics on radio and television. In addition, the government, in partnership with international organizations, carried out several studies on the scope of the trafficking prevalence, including a needs assessment on law enforcement training.

The government lifted its moratorium, imposed in 2019, on recruitment of Sierra Leoneans for employment abroad. The government enacted a strict recruitment policy which had the effect of driving Sierra Leoneans to migrate through informal channels, subsequently increasing their vulnerability to trafficking. The government did not report whether it implemented existing MOUs on safe labor recruitment with the Governments of Kuwait and Lebanon. MLSS had strict licensing procedures for new recruitment agencies to prevent exploitation of migrant workers, including required vetting by the TOCU. The MLSS launched a new Labor Migration Policy to improve protections for migrant workers in Sierra Leone and Sierra Leoneans working abroad by ensuring greater cooperation among government stakeholders. In August 2021, the government ratified the 2014 ILO Protocol on Forced Labor along with eight ILO conventions. The MLSS did not report how many labor inspections it carried out and did not report identifying any cases of forced labor. Labor inspectors conducted most inspections in the formal sector in the Freetown area, with most inspections dedicated to factories, quarries, and mining operations. Labor inspectors did not have sufficient resources to effectively monitor and investigate labor violations; there were no dedicated child labor inspectors, which limited efforts to identify cases of forced child labor. Due to pandemic-related budget constraints, labor inspectors did not conduct monitoring in the provinces. Labor inspectors received training on child labor from two international organizations but had not been trained on human trafficking. The government did not make efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training to its diplomatic personnel or peacekeepers.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Sierra Leone, and traffickers exploit victims from Sierra Leone abroad. Traffickers recruit victims largely from rural provinces to urban and mining centers for exploitation in sex trafficking and forced labor in domestic service, artisanal diamond and granite mining, petty trading, portering, making ceramics, rock breaking, quarrying, street crime, and begging. Traffickers exploit victims in fishing and agriculture and in sex trafficking or forced labor through customary practices, such as forced marriages. The government reported child sex trafficking—especially of children from poor homes—was a serious problem, including at beaches and in nightclubs. Local demand fuels the majority of child sex trafficking, although foreign tourists are also clients at beaches and nightclubs. Some parents sold their children in commercial sex. In 2018, an NGO reported People's Republic of China (PRC) national-owned companies helped to fuel child sex trafficking in Freetown, citing specifically workers on PRC national-owned fishing vessels who bring girls to their boats at night for commercial sexual exploitation. Traffickers exploit traditional foster care practices called "*menpikin*" to convince parents to hand over their children by promising to provide an education or better life but instead exploit the children in various forms of forced labor, including domestic servitude, street vending, mining, agriculture, scavenging for scrap metal, *okada* (motorbike taxi) driving, and sometimes commercial sex. Economic vulnerability due to the pandemic increased children's susceptibility to exploitation, including in commercial sex and forced marriage.

Traffickers exploit victims from neighboring West African countries in forced begging, forced labor, and sex trafficking in Sierra Leone, and traffickers exploit Sierra Leoneans in neighboring countries, including Mali, Niger, Liberia, and Guinea, for forced labor and sex trafficking. According to an international organization, there has been an increase in parents selling children into forced labor and sex trafficking in Guinea and Liberia. In previous years, traffickers exploited PRC national, Indian, Lebanese, Kenyan, Pakistani, and Sri Lankan men in forced labor in Sierra Leone. Cuban nationals working in Sierra Leone may have been forced to work by the Cuban government. Traffickers have exploited boys and girls from Sierra Leone reportedly as "cultural dancers"—and possibly also for sexual exploitation—in The Gambia. Sierra Leonean adults voluntarily migrate to other West African countries, including Mauritania and Guinea, as well as to the Middle East and Europe, where traffickers exploit some into forced labor and sex trafficking. Traffickers also exploit Sierra Leonean women in domestic servitude in Middle Eastern countries, including Oman, Iraq, Egypt, Qatar, Kuwait, and Lebanon. Since 2017, an international organization repatriated at least 1,500 Sierra Leoneans from Libya and other Middle Eastern countries, some of whom were victims of slavery and sex trafficking. In previous reporting periods, an international organization reported some Libyan soldiers sold stranded Sierra Leonean migrants in their custody to Libyan and Middle Eastern traffickers.

## SINGAPORE: TIER 1

The Government of Singapore fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Singapore remained on Tier 1. These efforts included convicting two sex traffickers; conducting awareness campaigns; increasing checks on newly arriving migrant workers; and training law enforcement, immigration, and Ministry of Manpower (MOM) officials on victim identification, legislation enforcement, and trafficking indicators. Although the government meets the minimum standards, the government did not initiate any prosecutions for the second consecutive year under the trafficking law. The government investigated fewer trafficking crimes and did not identify any potential labor trafficking victims. While the government mandated new policies to detect the abuse of foreign domestic workers, it did not report identifying more

trafficking victims or referring trafficking cases to law enforcement as a result. The government did not report providing services to any of the 26 potential victims. Some NGOs continued to express concern that authorities may penalize or deport some unidentified victims due to their lack of understanding of the impact indebtedness and psychological coercion have on a trafficking victim. The government did not take steps to eliminate all recruitment fees charged to workers by Singaporean labor recruiters and ensure any recruitment fees were paid by employers.



SINGAPORE TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Using the 2014 anti-trafficking law, increase investigations and prosecutions, particularly of labor trafficking, including cases involving domestic workers, debt manipulation, or psychological coercion, and convict and sentence convicted traffickers to penalties proportionate to the seriousness of the crime. • Increase resources for investigative and prosecutorial training on trafficking for MOM officials who handle labor violations. • Increase efforts to proactively identify trafficking victims, particularly among vulnerable populations, including individuals in commercial sex and People's Republic of China (PRC) nationals employed at PRC-affiliated company worksites. • Conduct training for front-line law enforcement officials with a focus on screening for psychological coercion among individuals in commercial sex and individuals in debt. • Continue to implement reforms to the work permit sponsorship system so it does not provide excessive power to sponsors or employers in granting and maintaining the legal status of migrant workers. • Take steps to eliminate all recruitment fees charged to workers by Singaporean labor recruiters and ensure any recruitment fees are paid by employers. • Train judges, prosecutors, and law enforcement officials on the application of trafficking legislation, elements of trafficking, investigative techniques, and evidence collection specific to trafficking cases. • Strengthen the legal framework to enhance protection for victims from punishment for unlawful acts traffickers compel them to commit. • Refer all identified victims to protection services, including PRC national overseas workers, and develop formal policies to provide all victims the right to robust protective services. • Continue to strengthen cooperation and dialogue with NGOs for developing and implementing anti-trafficking policies and assisting victims.

## PROSECUTION

The government maintained law enforcement efforts during the reporting period, even though investigations and prosecutions under the trafficking law decreased. The 2014 Prevention of Human Trafficking Act (PHTA) criminalized sex trafficking and labor trafficking and prescribed penalties of up to 10 years' imprisonment and fines up to 100,000 Singapore dollars (SGD) ($73,960), which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. In addition, Article 140 of the Women's Charter criminalized "forced prostitution" involving detention or physical force, and Article 141 criminalized the movement of women and girls for "trafficking" but did not define this term. Penalties prescribed for these offenses included a maximum of seven years' imprisonment and a fine of up to 100,000 SGD ($73,960). The government investigated most suspected labor trafficking cases as labor law offenses under the Employment of Foreign Manpower Act (EFMA), or the Employment Act, which carried lower penalties than the anti-trafficking law.

In 2021, authorities investigated 11 sex trafficking cases, a decrease compared with 12 cases in 2020. MOM did not investigate any labor trafficking cases, compared with seven cases in 2020. MOM determined none of the suspected sex trafficking cases in 2021 violated the PHTA and proceeded with charges under either the Women's Charter or the

Penal Code. The government reported pandemic-related restrictions, including border closures, led to fewer trafficking investigations but did not affect the government's ability to prosecute trafficking crimes. For the second consecutive year, authorities did not initiate any prosecutions under the PHTA. Authorities continued one labor trafficking prosecution initiated in an earlier reporting period. Courts convicted one trafficker under the PHTA and one trafficker under the Penal Code, compared with one trafficker convicted under the PHTA in 2020. In June 2021, courts sentenced the convicted sex trafficker under the PHTA to 35 months' imprisonment and a fine of 1,000 SGD ($740), following a case investigation initiated in 2018 involving a child victim. In December 2021, courts sentenced the other sex trafficker under the Penal Code to 15 months' imprisonment for commercial sex with a child. In August 2021, courts amended a 2020 conviction under the PHTA of one trafficker to attempted trafficking and upheld the three non-PHTA charges against the trafficker, which reduced the sentence from 30 months' imprisonment and a fine of 3,000 SGD ($2,220) to 19 months' imprisonment and a fine of 2,500 SGD ($1,850) due to insufficient evidence to prove all required elements of the PHTA. In September 2021, courts concluded a 2016 labor trafficking case involving two defendants; courts acquitted one defendant and withdrew charges from the other due to insufficient evidence. Authorities reported investigating and prosecuting potential trafficking crimes under non-trafficking statutes due to difficulties proving elements of trafficking required by the PHTA beyond a reasonable doubt. While the government had yet to prosecute or convict any cases of domestic servitude under the PHTA, courts convicted and imprisoned several employers of foreign domestic workers under non-trafficking laws for cases involving abuse, physical assault, and/or sexual assault. In one case, courts convicted and sentenced an employer for the starvation, torture, and culpable homicide of a foreign domestic worker to 30 years' imprisonment, the longest sentencing in Singapore's history for the abuse of a foreign domestic worker. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes.

Some NGOs continued to believe authorities set unreasonably high standards for crimes to qualify as trafficking and lacked an understanding of trafficking indicators such as indebtedness, psychological coercion, and deception, which continued to hamper proper victim identification. The government continued to research and increase awareness on the issue of psychological coercion. The government trained police, immigration, and MOM officials on victim identification, legislation enforcement, and trafficking indicators. Authorities cooperated with foreign governments on ongoing international trafficking cases. The government transitioned some court cases to an internet-based video software program to avoid court delays due to pandemic-related restrictions.

## PROTECTION

The government decreased protection efforts. The government identified 26 potential trafficking victims, all sex trafficking victims, compared with 23 potential victims (16 sex trafficking victims and seven labor trafficking victims) in 2020. Police, labor, and immigration officials had standard operating procedures for identifying victims, and other government officials, civil society organizations, and foreign embassies could refer potential victims to MOM and the Singapore Police Force. Several NGOs continued to report government officials failed to recognize key indicators of trafficking when interviewing potential victims, particularly in cases involving psychological coercion or debt bondage, and among migrant workers. NGOs voiced concern police did not consistently screen for trafficking indicators during raids on unlicensed commercial sex establishments. In July 2021, authorities raided 27 karaoke bars operating illegally under pandemic restrictions and arrested and charged 29 women with crimes under the Women's Charter, the Immigration Act, and the EFMA and deported 10 of them; the government reported screening the women for trafficking indicators but did not identify any victims. An NGO reported that two cases they encountered exhibited possible trafficking indicators and that authorities may have penalized or deported numerous unidentified labor trafficking victims. The government reported screening PRC nationals for trafficking indicators in the onboarding centers upon arrival in Singapore and conducting labor inspections at worksites of PRC-affiliated companies.

The government did not report providing assistance to any of the 26 potential trafficking victims, compared with providing assistance to 24 potential trafficking victims, including shelter services for 16, in 2020. The government continued to provide assistance, including shelter, to seven trafficking victims from previous years. The government, in partnership with NGOs, could provide food, temporary shelter, counseling, and other protective services to trafficking victims; as outlined in section 19 of PHTA. Potential trafficking victims could receive assistance before authorities established an investigation as a trafficking case. These services were not contingent on a victim's assistance in the investigations but are assessed by the Director-General of Social Welfare whether they are considered practicable and necessary in the circumstances of the case; the government reported that so far no identified potential trafficking victim has been refused services. The government funded four shelters with a total capacity of 234 for female victims of crime, including trafficking, and their children. The government offered shelter services to all 26 potential trafficking victims; however, the government reported none of the potential victims used shelter services, as they stayed at other accommodations. The pandemic temporarily reduced the total capacity until December 2021; the Ministry of Social and Family Development opened an additional temporary shelter to ensure sufficient capacity. MOM funded two additional shelters, with a total capacity of 68 individuals, for male foreign workers, one of which was specifically designated for use by male trafficking victims. The government also provided partial funding and oversight to 21 homes serving vulnerable children, including child trafficking victims. Authorities permitted freedom of movement outside of the shelter for most shelter residents but restricted movement for residents deemed to be under physical threat. Several other NGOs and two foreign government embassies could also provide shelter to trafficking victims.

The government, in partnership with NGOs, could provide additional support measures, customized to victims' needs, including interpreters, medical services, skill development, temporary work permits, legal support, and resettlement assistance. Some victims may not have received all services necessary for rehabilitation as the government lacked a formal policy mandating the provision of services to all victims and instead provided some services on a case-by-case basis. Some NGOs noted the interpreters provided did not receive training to work with trafficking victims and were usually from the victim's home country, which put additional pressure on the victim. The government reported spending approximately 66,000 SGD ($48,820) to provide care and support services for trafficking victims, compared with 156,000 SGD ($115,380) in 2020. An NGO continued to support 10 foreign trafficking victims referred by the government in prior reporting periods. The government reported four victims continued to utilize short-term work permits, available for the duration of the investigation and prosecution of the alleged trafficker; compared with five victims in the previous reporting period.

Courts did not provide restitution to any trafficking victims during the reporting period, and the government reported no victims sought restitution in 2021. NGOs offered trafficking victims *Pro bono* legal assistance to pursue compensation in civil court. The government, in partnership with two NGOs, created a legal toolkit for victims of crime, including trafficking victims, to navigate the criminal justice system. The government issued special immigration passes that allowed foreign victims to remain and work in the country for the duration of investigations and legal proceedings. However, an NGO reported that contrary to current policy, which would allow a foreign victim to apply for new employment and a work permit after the proceedings completed, authorities most likely required foreign victims to leave the country in practice. The government could provide protective measures for victims who participated in prosecutions, including in-camera court proceedings for child victims, protection of the victim's identity, and media gag-orders for all sex trafficking cases. The government reported one victim participated as a witness in a child sex trafficking prosecution; court proceedings were ongoing, and authorities referred the victim to protective services.

In 2020, the government established an interagency team of officers to manage the risk and outbreaks of the COVID-19 virus among migrant workers and address workers' issues, including employment, within migrant worker dormitories. However, NGOs reported front-line officers

deployed to migrant worker dormitories focused primarily on pandemic-mitigation efforts and did not proactively screen for trafficking indicators; as a result, some victims may have remained unidentified. In 2021, the government expanded a phone application's ability, previously created for pandemic-related health tracking purposes, to be used to report employer related issues, including trafficking, to MOM directly; NGOs welcomed this expansion of reporting as it increased interactions and reporting options. MOM continued to publicize its phone number and a mobile phone application, as well as three NGO-operated 24-hour hotlines, for migrant workers who experience problems; the government did not report any trafficking-related cases resulting from the hotlines.

## PREVENTION

The government maintained efforts to prevent trafficking. The interagency task force, co-chaired by the Ministry of Home Affairs and MOM, coordinated anti-trafficking efforts through its "National Approach against Trafficking in Persons, 2016-2026." In December 2021, the task force virtually held its annual stakeholder consultation with NGOs, businesses, and academia to review the implementation of the national plan. The government continued to budget 80,000 SGD ($59,170) to provide grants to civil society for anti-trafficking awareness-raising campaigns. In addition, the government held awareness campaigns targeting migrant workers and the public. Singapore's Employment Agencies Act (EAA) mandated licensing and regulation of recruitment agents. The government did not take steps to eliminate all recruitment fees. The EAA rules capped the maximum recruitment fee a worker may pay an agent at one month's salary for each year of a valid work permit or the period of the employment contract, whichever was shorter, and subject to an overall maximum of two months' salary. The majority of migrant workers in Singapore paid fees to agents in Singapore as well as to recruitment agents in their home country, which contributed to the workers' vulnerability to debt bondage. MOM prosecuted 12 recruitment agencies and issued warning letters or fines to another 44 recruitment agencies for not being licensed, compared with the prosecution of five unlicensed recruitment agencies and warning letters sent to 53 agencies in 2020.

MOM managed the work permit process for foreign workers; Singaporean employers applied to MOM to sponsor skilled and semi-skilled workers whose employment and legal immigration status was tied to that specific employer. However, government policy allowed workers to change their employment without their previous employer's consent in limited circumstances when workers had employment-related claims, such as salary delays, that MOM deemed valid. Some observers noted this restriction made migrant workers vulnerable to forced labor. NGOs stated this restriction on job mobility, coupled with the ability of employers to terminate a worker's employment at any time without the need to show cause, created a form of "structural coercion" that prevented some foreign migrant workers from resisting and contesting exploitation. The government established a new retention program focused on facilitating job-matching and retaining workers after their work permits expired. The government also changed the time window for foreign construction workers to transfer their work permits to a new employer; an industry association had 30 days from when the work permit expired or was cancelled to find a new employer for the worker without needing consent from the current employer, compared to the previous 20-day window before the work permit expired when the employee could find a new employer. If the worker and the previous employer agreed, authorities could extend the work permit for the 30-day period, and the worker could continue to work while the association found a new employer. NGOs welcomed the extended time window but criticized the limitations on worker's freedom to work and look for a new employer simultaneously without consent from their current employer and that workers were forced to be placed in the job-matching retention system in which they were not allowed to find an employer on their own. In addition, NGOs raised concerns that the previous employer still had the right to renew or terminate the worker's work permit, limiting the employee's ability to find new employment. NGOs had encountered cases of early work permit cancellation and cases of employers trying to recover pandemic-related quarantine costs from the employee, sometimes not allowing them to transfer otherwise, despite government prohibitions on this practice. The government

introduced a pilot program where quarantine costs could be shared between employers of certain workers if the employee transferred within the first 12 months.

In 2021, the government eased regulations that had allowed employers to limit the movement of migrant workers living in dormitories during the pandemic. However, NGOs reported migrant workers' freedom of movement continued to be restricted and limited to a greater extent than the general population during the pandemic. From September 2021, the government gradually eased restrictions in practice that allowed migrant workers to visit pre-identified community locations for six hours if pandemic precautions were met; later the criteria for exits were further eased and hours and locations increased. In September 2021, the government reported implementing improved living standards within the dormitories, but in October 2021, migrant workers reported poor living conditions, including improper isolation measures and lack of timely medical assistance, in one of the new dormitories.

Singapore law did not prescribe a minimum wage. Under the Employment Act, wages were negotiated and outlined in individual contracts of service. The law did not detail requirements for foreign domestic workers and fishing crews employed locally, who were covered under the EFMA and for whom the law required employers to provide a document containing employment terms such as monthly salary, number of rest days, and agency fees. The government mandated new policies to detect signs of abuse of foreign domestic workers, including more comprehensive health checks without the employer present, increased random house checks, and two interviews, instead of one, during the first year of employment. In criminal cases of abuse of foreign domestic workers, the High Court previously stipulated that courts should consider compensation for pain and suffering, as well as restitution for wages. In July 2021, MOM passed regulations that, by the end of 2022, employers must provide foreign domestic workers one rest day per month. MOM continued to implement a policy requiring employers to notify MOM if they reduce a migrant worker's salary from what was stated on the application for the employee's work permit and after both the employer and employee had agreed to the change in writing. An NGO continued to note this policy did not address the unequal power dynamic between employer and employee, given the vulnerability of those who paid recruitment costs to be coerced to sign a new salary agreement through the threat of termination and repatriation. The government convicted 21 employers for making false declarations of higher salaries to obtain employee work passes, compared with 11 the previous year. MOM allowed employers or recruitment agents to open a fee-free bank account on behalf of the employee as part of the recruitment process so the worker's salary could be electronically paid; due to the pandemic, the government required employers of migrant workers living in dormitories to open bank accounts for their workers and pay them electronically. Since the introduction of the accounts, two NGOs estimated that more than 840,000 migrant workers had bank accounts in 2021. NGOs reported that despite these efforts, employers still paid some of the workers in cash, did not provide workers with their full base salaries, or illegally deducted expenses from workers' pay. MOM prohibited employers of foreign domestic workers from retaining any wages or money belonging to the domestic worker; however, NGOs reported employers still did so.

The government mandated foreign migrant workers in the construction, manufacturing, marine shipyard, and processing industries complete the one-day Settling-in-Program (SIP), delivered entirely by an NGO, within 14 days of arriving in Singapore. One of the five modules covered employment rights and information on how to receive assistance; the module included one section on trafficking. An NGO reported that after completing the SIP many migrant workers were still unaware of their rights or whom to reach out to for help. In addition to worker programs, an employer program was mandatory for first-time employers of foreign domestic workers to review their responsibilities; an NGO reported that over time employers likely forgot many of the rules and regulations because they only had to complete the program once and could complete the program online. The government continued to air a pre-departure video at overseas testing centers for construction workers to explain foreign workers' employment rights in Singapore. The government built new onboarding centers for migrant workers arriving in the country to work in the construction, marine shipyard,

and process sectors. These centers were one-stop service centers for workers to complete their medical examinations and SIP. Front-line MOM workers stationed at the center had training on trafficking indicators. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Singapore. Some of the 849,700 foreign work permit holders who comprise almost one-quarter of Singapore's labor force are at risk of trafficking. Most victims migrate willingly for work in construction, domestic service, performing arts, manufacturing, the service industry, or commercial sex but may later face exploitation in these sectors. To migrate, many workers assume large debts to recruitment agents in their home countries and sometimes in Singapore, placing them at risk for debt bondage. Foreign women who arrive in Singapore to work in the entertainment sector, including nightclubs and bars, may be vulnerable to sex and labor trafficking. Traffickers compel foreign workers into sex trafficking or forced labor through threats of forced repatriation without pay, restrictions on movement, physical and sexual abuse, and withholding wages and travel documents, such as passports. Some recruitment agencies illegally engage in contract switching and charge workers fees more than the legal limit. Foreign workers have credible fears of losing their work visas and being deported, since employers have the ability to repatriate workers legally at any time during their contracts with minimal notice. Unscrupulous employers exploit the limited transferability of low-skilled work visas to control or manipulate workers. PRC nationals employed in Singapore at PRC-affiliated company worksites were vulnerable to forced labor. Foreign women sometimes arrive in Singapore with the intention of engaging in Singapore's regulated commercial sex sector, but under the threat of serious harm or other forms of coercion, they become victims of sex trafficking. Foreign women employed as domestic workers are vulnerable to trafficking. Foreign workers from countries with a small presence in Singapore can experience language barriers that increase their isolation. Anecdotal reports show an increase of locals, permanent residents, and long-term pass holders working in the regulated commercial sex sector, some of whom may be vulnerable to sex trafficking, in connection with a decrease of foreign workers entering the country due to pandemic-related border restrictions. Reports indicate that some fishing vessel captains of long-haul boats that transit or dock at Singaporean ports use physical abuse to force men to perform labor. A small number of Singapore residents facilitate and engage in child sex tourism abroad.

## SINT MAARTEN: TIER 3§

The Government of Sint Maarten does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Sint Maarten was downgraded to Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including investigating a potential trafficking case. However, the government did not report prosecuting or convicting any traffickers or identifying any trafficking victims for the second consecutive year. Further, the government was not equipped to provide services to trafficking victims; it did not have shelters, did not allocate funding, and did not have formal arrangements with service providers. The government did not update its national action plan (NAP), which expired in 2018, and interagency coordination was severely lacking. Officials consistently conflated human trafficking and migrant smuggling, hindering the effectiveness of the government's meager anti-trafficking efforts.



SINT MAARTEN TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Significantly increase efforts to investigate, prosecute, and, as appropriate, convict human traffickers as distinct from migrant smugglers. • Proactively identify trafficking victims, such as by screening migrant workers for trafficking indicators; provide adequate protection to identified trafficking victims; and cease the deportation of victims. • Train law enforcement and other officials to recognize human trafficking as a crime distinct from migrant smuggling and correct institutional conflation of the crimes. • Improve coordination and information-sharing with anti-trafficking counterparts across the Kingdom of the Netherlands. • Increase the availability of protection services, including shelters, in partnership with NGOs, the Kingdom of the Netherlands, and international organizations. • Re-establish the central reporting bureau to improve coordination of victim protection and prevention efforts. • Train law enforcement officials, prosecutors, and judges on proactive victim identification and victim-centered approaches to trafficking cases. • Adopt and implement formal standard operating procedures (SOPs) to guide officials, including health workers, on victim identification and referral. • Inform victims and potential victims of their rights. • Increase outreach to all incoming migrants, including domestic workers and individuals with temporary entertainment visas, to ensure they are informed of their rights and ways to seek assistance. • Raise awareness among the general public and vulnerable groups about human trafficking in Sint Maarten.

## PROSECUTION

The government further decreased its minimal prosecution efforts. Article 2:239 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to nine years' imprisonment or a fine for offenses involving a victim 16 years of age or older, and up to 12 years' imprisonment or a fine for those involving a victim younger than the age of 16. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as kidnapping.

The government reported initiating one trafficking-related investigation in 2021, which concluded when officials determined the case was not a trafficking crime. Otherwise, the government did not report additional investigations, prosecutions, or convictions related to trafficking in 2021; this was compared with no investigations, prosecutions, or convictions in 2020 and one investigation, one prosecution, and one conviction in 2019. Severe, prolific conflation of human trafficking and migrant smuggling obstructed attempts to investigate, prosecute, or convict traffickers; promoted harmful misconceptions about trafficking; and limited law enforcement officials' capacity to recognize trafficking indicators and identify trafficking victims.

Sint Maarten assigned a police unit to combat both trafficking in persons and human smuggling (the anti-HTHS unit), consisting of seven officers. The anti-HTHS unit operated with limited resources and without a dedicated budget; observers reported the unit frequently prioritized operations to counter migrant smuggling over trafficking investigations. The anti-HTHS unit collaborated with other agencies, including the Royal Netherlands Marechaussee and the joint Dutch Caribbean Coast Guard, but this coordination was not formalized, and observers reported interagency communication was inefficient. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. The Kingdom of the

§Sint Maarten is a semi-autonomous entity within the Kingdom of the Netherlands. For the purpose of this report, Sint Maarten is not a "country" to which the minimum standards for the elimination of trafficking in the Trafficking Victims Protection Act apply. This narrative reflects how Sint Maarten would be assessed if it were a separate, independent country. However, the Kingdom is an important contributor to the Government of Sint Maarten's anti-trafficking efforts.

Haiti AR_000972

491

SINT MAARTEN

Netherlands funded a training on the anti-trafficking legal framework for border protection officials. The government did not report any substantive collaboration with foreign governments on trafficking cases.

## PROTECTION

The government maintained inadequate protection efforts. Authorities did not identify any trafficking victims in 2021, compared with identifying no victims in 2020, and 29 in 2019. For the fourth consecutive year, the government did not report providing any protection services to victims, including to victims identified in past years. The government did not have SOPs for the identification or referral of victims and, instead, relied on informal arrangements between government agencies. Government officials could use an NGO-developed checklist of trafficking indicators to facilitate victim identification; the government reported it distributed pamphlets featuring the checklist to immigration officials and other government stakeholders who might encounter potential victims. However, the government did not report efforts to proactively screen vulnerable populations, such as individuals in commercial sex and undocumented migrants, using the checklist, as it had in past years.

The government did not have a lead agency responsible for victim protection; this role was previously held by the National Reporting Bureau on Human Trafficking, which ceased operations in 2016. Officials reported the government's victim support agency served victims of all crimes; however, the government did not allocate funding to provide services for trafficking victims, instead relying on civil society organizations to provide care services such as shelter, counseling, and medical attention. The government did not report providing financial support to shelters or other organizations equipped to support trafficking victims. There were no dedicated shelters for trafficking victims, but the government reported it could, on a case-by-case basis, refer victims to an international organization or NGOs for shelter. An NGO-run shelter for victims of domestic violence could sometimes accommodate female trafficking victims. The government did not report any victims receiving shelter in 2021. Observers reported the government failed to adequately inform potential victims of their rights as trafficking victims. Foreign victims could apply for temporary residency status, but this status was only valid for the duration of criminal proceedings against their trafficker. The government considered residency status to be a temporary measure to facilitate victim cooperation in the trial against their traffickers, rather than a means of ensuring victims have legal alternatives to removal to countries where they would face retribution or hardship; the government last reported granting a residence permit to a trafficking victim in December 2015. When trafficking victims or potential victims did not have residence permits, the government returned them to their home countries. Due to a lack of formal identification procedures and widespread conflation of human trafficking and migrant smuggling, authorities likely deported and otherwise penalized unidentified trafficking victims for unlawful acts their traffickers compelled them to commit. The anti-trafficking law allowed victims to request restitution as part of criminal cases or file a civil suit against traffickers to obtain compensation; however, the government did not report whether any victims pursued this action.

## PREVENTION

The government maintained inadequate efforts to prevent trafficking. The national anti-trafficking coordinator nominally led efforts to combat human trafficking but had no budget or staff in this capacity and had other full-time law enforcement duties. The government did not have an anti-trafficking body. Officials reported no efforts to draft a NAP to combat trafficking; the previous NAP expired in 2018. An existing border security agreement between the Netherlands, Curaçao, and Sint Maarten (the *Onderlinge Regeling Vreemdelingenketen*) purportedly included trafficking. The government did not report any new or ongoing efforts to raise awareness of trafficking in the general public. The government demonstrated an injurious misunderstanding of human trafficking; in an effort to prevent trafficking, its officials advocated for the government to reduce or eliminate visas for individuals seeking work in certain "vulnerable sectors"—an action that could increase these individuals' vulnerability to trafficking by preventing them from legally migrating and working in these sectors. The government did not make efforts to reduce the demand for commercial sex acts. The government did not report whether it continued the practice of informing employers

of migrant workers about applicable laws. The government did not have a trafficking-specific hotline to receive public reports of trafficking; however, it reported that police emergency hotline operators could provide callers with a contact number for the anti-HTHS unit. The border control agency maintained an immigration hotline. The government did not report receiving any trafficking-related information from any hotlines.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Sint Maarten. Some brothel and dance club owners exploit women and girls from Latin America, the Caribbean, Eastern Europe, and Russia in sex trafficking. Illicit recruiters reportedly target foreign women in Sint Maarten's commercial sex industry through debt-based coercion; women from Haiti, Dominican Republic, and Venezuela are especially vulnerable to sex trafficking in Sint Maarten. Government officials report a significant number of migrant workers are vulnerable to traffickers' coercive schemes in domestic service, construction, People's Republic of China national-owned markets, retail shops, food service, landscaping, and housekeeping. The government's reduction of visas for foreign workers in certain sectors, including adult entertainment, increased their vulnerability to trafficking. Authorities report traffickers may coerce Asian and Caribbean workers in exploitative conditions indicative of forced labor. Criminal actors, including smugglers, subject migrants—specifically Cuban and Brazilian nationals—who transit Sint Maarten en route to the United States and Canada to forced labor or sex trafficking. There are indications traffickers exploit, under false pretenses, Colombian and Venezuelan women traveling to the islands in forced labor or sex trafficking.

## SLOVAK REPUBLIC: TIER 2

The Government of the Slovak Republic, or Slovakia, does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Slovakia remained on Tier 2. These efforts included prosecuting and convicting more traffickers than the prior year. The government also operationalized 15 victim interview rooms across the county and approved an additional national action plan to implement GRETA's trafficking recommendations. However, the government did not meet the minimum standards in several key areas. Judges continued to issue lenient sentencing, resulting in 71 percent of convicted traffickers receiving fully suspended sentences in 2021, which undercut efforts to hold traffickers accountable, weakened deterrence, created potential security and safety concerns for victims, and was not equal to the seriousness of the crime. The government also decreased investigations and victim identification compared with the prior year. Gaps in victim identification continued, and the government did not adequately and proactively identify foreign national or Slovak trafficking victims within the country. The government also continued to lack legal safeguards to protect victims against potential penalization for unlawful acts traffickers compelled them to commit. Furthermore, the government did not report adequately training prosecutors and judges on trafficking and did not report awarding restitution to any trafficking victims and rarely awarded compensation.



SLOVAK REPUBLIC TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Continue to vigorously investigate, prosecute, and convict traffickers and sentence those convicted to significant prison terms. • Continue to increase training for judges and prosecutors with a focus on a victim-centered, trauma-informed approach to law enforcement efforts and trial, as well as on the use of psychological coercion and fraud as means of trafficking. • Continue to improve sentencing norms by sensitizing judges to the severity of trafficking crimes and the full range of penalties available. • Improve efforts to proactively identify victims within the country, especially foreign nationals and Roma, and include training to government officials, particularly border police, labor inspectors, and municipal law enforcement, on proactive victim identification among vulnerable groups. • Allow formal victim identification by and referral from entities other than the police, including civil society, social workers, and healthcare professionals. • Improve the quality of human trafficking training courses available to prosecutors and judges. • Increase awareness of and trafficking survivor access to damages and compensation and increase prosecutor's efforts to systematically request restitution for survivors during criminal trials. • Ensure labor trafficking is investigated and prosecuted as a trafficking crime and not pursued as an administrative labor code violation. • Increase migrant worker protections by increasing efforts to monitor labor recruitment companies, including prosecutions for fraudulent labor recruitment. • Amend the law on the non-punishment of victims to ensure that trafficking victims are not inappropriately penalized for unlawful acts traffickers compel them to commit. • Continue efforts to inform foreign worker groups of worker rights and responsibilities and victim assistance resources in their native languages. • Streamline definitions and methodologies for gathering law enforcement and victim data. • Update public awareness campaigns to portray human trafficking in a more realistic manner. • Effectively implement formal written procedures for a victim referral mechanism that outline roles for all officials and stakeholders in order to improve victims' access to and the quality of assistance. • Improve the coordination of protection services to children. • Explore utilization of the witness protection program for trafficking victims. • Enforce the law prohibiting recruitment fees charged to workers and ensure any recruitment fees are paid by employers. • Continue to pursue financial crime investigations in tandem with human trafficking cases. • Ensure consistent early access to free legal aid.

## PROSECUTION

The government maintained law enforcement efforts. Section 179 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of four to 10 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. In November 2021, the Ministry of Justice (MOJ) submitted for Parliamentary review a draft amendment proposing an increase in penalties for human trafficking and criminalizing the knowing use of services from a trafficking victim; at the close of the reporting period, the amendment was not yet adopted.

Though some pandemic-related delays continued to occur throughout the reporting period, law enforcement efforts largely continued unencumbered. Government officials initiated investigations of 20 new cases in 2021, a decrease compared with 28 investigations in 2020; 24 investigations initiated in prior reporting periods remained ongoing. Of the 20 investigations, 10 cases were for sex trafficking, eight were for labor trafficking (two for domestic servitude and one for forced criminality), and two were combinations of multiple forms of trafficking. Prosecutors indicted 21 alleged traffickers in 2021, an increase compared with 14 in 2020, but less than the 38 indictments in 2019. Courts convicted 21 traffickers in 2021, a significant increase compared with nine in 2020 and 11 in 2019. However, the government did not adequately disaggregate data between sex and labor trafficking for prosecutions or convictions. Of the convicted traffickers, 14 were male, seven were female, and all were Slovak nationals. Of the 21 convictions, six traffickers (29 percent) received significant sentences of one year or longer imprisonment. However, 15 (71 percent) received fully suspended sentences and served no jail time. Three cases from prior reporting periods were upheld on appeal, but judges reduced the penalties in two. Lenient sentencing, specifically fully suspended sentences, remained a

serious concern; over the past eight years, approximately 69 percent of all trafficking convictions resulted in fully suspended sentences or a fine. In March 2021, the Information Center (IC) within the Ministry of Interior (MOI) published an extensive and comprehensive report. The report included the analysis of previous sentences for traffickers from 2015 to 2020, with a specific emphasis on the use of section 39 of the criminal code, which permitted judges to reduce sentences below minimum sentencing thresholds. The report asserted that because judges applied section 39 to 77 percent of all trafficking cases, almost 70 percent of convicted traffickers received a sentence lower than the prescribed four-year minimum for conviction under Article 179; 64 percent of convicted traffickers received a suspended sentence; and even for those traffickers who received prison sentences, at least 10 traffickers (13 percent) were released from prison early. Lenient sentencing undercut efforts to hold traffickers accountable, weakened deterrence, created potential security and safety concerns—particularly for victims who cooperated with investigations and prosecutions—and was not equal to the seriousness of the crime. In comparison, of the 27 convicted rapists in 2021, 52 percent were sentenced to one year or longer imprisonment.

Corruption, inefficiency, and lack of accountability within the judicial branch remained concerns during the reporting period and may have hindered law enforcement efforts. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes. Civil society and a government-funded NGO, which served as the national victim-care service provider, continued to express concern that many prosecutors and judges assigned to trafficking cases were not adequately trained on victim-centered and trauma-informed approaches or on the specificities of trafficking crimes. Civil society noted that judges often failed to factor in how trauma could impact victim testimony. Experts noted that the inadequate quality and availability of anti-trafficking training courses offered to prosecutors and judges at the Judicial Academy may have contributed to their continued misunderstanding of the crime. While the government and government-funded NGOs continued to make efforts to institutionalize human trafficking training among law enforcement officials, despite the conclusions of the IC report, the participation of judges in these trainings remained low. Some prosecutors and judges continued to misunderstand non-violent, psychological coercion and fraud as means for the crime, had not used either in any recent trafficking cases, and continued to rely predominately on evidence of force and physical limitations on victims' liberty in trials. Experts asserted a lack of expertise and understanding of the severity of the crime, the limited use of corroborating evidence, and an overreliance on the testimonies of traumatized victims contributed to lenient sentences for convicted traffickers. Further, racial bias, particularly for cases involving victims from underserved Romani communities, may have contributed to more lenient sentences.

Police and prosecutors continued to cooperate on several ongoing international investigations with Europol, Eurojust, Frontex, the United Kingdom (UK), Germany, and the Netherlands and in 2021 reported the identification of an additional eight Slovak trafficking victims in the UK, asset forfeiture for a convicted trafficker, and the conviction of five Slovak traffickers in the UK as a result of this cooperation. In 2021, the government provided comprehensive anti-trafficking training—both in-person and virtually due to the pandemic—to a variety of civil society stakeholders and government officials; the training focused on improving the identification and assistance of trafficking victims, especially among the foreign national population, the Roma, and children, upholding victim rights, and outlining available assistance programs.

In September 2021, the government renamed the police anti-trafficking department of the Irregular Migration Unit within the Bureau of Border and Alien Police (BBAP) as the Coordination Department. Reportedly, the department still maintained responsibility for coordinating national anti-trafficking law enforcement efforts; however, experts highlighted concerns regarding prioritization of trafficking and the department's capacity for victim identification domestically as in past years. Although there was no dedicated trafficking unit within the prosecution service, cases were usually assigned to those with experience prosecuting trafficking, and prosecutors followed written guidance to provide victims with information on the prosecution process and resources available to them. Each of the eight regional prosecutorial offices had

a human trafficking lead who could provide guidance and oversight on trafficking-related cases. Law enforcement officers and prosecutors reported coordination between them remained effective. However, prosecutors and some front-line officials continued to view possible cases of labor trafficking as administrative labor code violations and did not prosecute as trafficking crimes. The national police continued to cooperate with the police financial intelligence unit to uncover suspicious transactions indicative of trafficking but did not report uncovering any trafficking cases as a result of the cooperation. While the MOI and police enhanced coordination and cooperation on gathering law enforcement and victim identification statistics, differences in how government and non-governmental actors gathered victim statistics continued to hinder effective comparison and monitoring of trafficking-related efforts.

## PROTECTION

The government maintained insufficient protection efforts. The government identified 34 victims in 2021 (compared with 50 in 2020 and 53 in 2019), and an additional eight victims (compared with 11 in 2020) were either self-identified or identified by the victim-care service provider—bringing the total to 42 victims, a decrease compared with 61 in 2020 and 66 in 2019. Of the victims identified, 23 were female (10 girls), and 19 were male (two boys). Of the victims identified by police, 15 were sex trafficking victims, two were victims of both sex and labor trafficking, and 17 were labor trafficking victims, including at least one forced begging victim, one forced criminality victim, and two domestic servitude victims. Of the victims identified, 32 were Slovak nationals, and two were Vietnamese nationals transiting Slovakia to Germany. Children comprised approximately 30 percent of the total victims identified. Officials attributed lower victim identification in 2021 to the pandemic and a shift to online platforms making victim identification more difficult, but they did not provide further details. Gaps in victim identification remained a concern: despite the large number of non-EU nationals present in Slovakia (approximately 111,500 in December 2021) and increased vulnerability to trafficking, no non-EU foreign nationals were identified as trafficking victims exploited in Slovakia, and 21 of 34 victims (62 percent) were identified abroad by other entities—a long-standing pattern in Slovakia. The government continued to utilize its national referral mechanism (NRM) for victim identification and referral. However, prior concerns remained unaddressed, including the continued lack of clear roles and tailored guidelines to improve victims' access to and quality of assistance for all front-line officials and stakeholders who were most likely to encounter trafficking victims—including, health care specialists, employees of foster homes, and counselors of offices of labor, social affairs, and family—though targeted training mitigated some concerns. Additionally, the NRM focused heavily on describing the potential trafficking situations of foreign nationals in Slovakia or Slovak nationals abroad, but it included little on trafficking situations Slovak nationals could experience within Slovakia. Law enforcement officials were the exclusive entities with authority to formally identify victims. However, experts have previously criticized the exclusive law enforcement authority to formally identify victims, asserting it created a potential conflict of priorities between law enforcement efforts and victim assistance.

In 2021, the government provided €208,274 ($236,140) to an NGO that operated the national victim assistance program, voluntary repatriation, and national trafficking hotline, similar to €212,451 ($240,870) allocated in 2020. The government-funded, NGO-run victim assistance program provided Slovak and foreign victims with shelter, financial support, repatriation to Slovakia, health care, psycho-social support, legal assistance, interpretation, and job training. However, the contract with the current service provider was scheduled to end in October 2022, and by the end of the reporting period, the government had not yet selected a service provider for the new contract. Of the 42 total victims identified, only 11 decided to enter the government-funded victim-care program in 2021, all of whom were Slovak nationals (compared with 12 of 61 in 2020, 17 of 66 in 2019, and 16 of 56 in 2018); the two potential foreign trafficking victims were not enrolled in the program but rather referred to German authorities. The program continued to assist an additional 12 victims enrolled from previous years. The victim-care service provider continued to note persistent concern that after deciding to leave the victim-care program, survivors remained in poor mental

states and frequently ended up homeless. In its June 2020 Report, GRETA noted concern regarding the traditionally low participation in the victim-care program and urged the government to investigate further. The government reported foreign victims, including both EU nationals and third-country nationals, had access to the same scope and quality of victim care and support. All potential victims were eligible for at least 90 days of crisis care; victims enrolled in the assistance program were eligible for up to 180 days of care without having to participate in an investigation. However, victims who chose to cooperate with law enforcement were eligible to access victim care for the duration of the investigation and trial, which was often much longer than 180 days; all but one victim cooperated with police and prosecutors during the reporting period. Foreign victims, including trafficking victims, who had been granted temporary residency, were included under the general government-funded healthcare insurance scheme, which improved the provision of healthcare services to potential foreign trafficking victims who chose not to enroll in the victim-care program. The government did not have dedicated shelters for trafficking victims but rather accommodated victims in domestic violence shelters, with men and women housed separately, or in homeless shelters; experts urged the government to ensure specialized accommodations to address the unique needs of trafficking victims were available. There were limited accommodations for victims with families. Children were not usually assisted through the national victim-care program, rather authorities placed unaccompanied child trafficking victims in the care of child protective services in a government-run children's home or an NGO-run crisis home for children. However, if a child trafficking victim required additional services, it was possible to utilize trafficking-specific services through the national victim-care program. The government-run children's home was officially designated as responsible for child trafficking victims, among other child victims, and could accommodate up to eight victims. Referral of child victims to care was not systematic, and officials noted that coordination between these two victim-care regimes required improved streamlining.

Due to gaps in victim identification, trafficking victims may have remained unidentified in asylum-seeker and detention facilities for undocumented migrants. GRETA continued to express concerns related to the ability and willingness of labor inspectors and the Border and Alien Police to thoroughly screen undocumented migrant workers or asylum-seekers for trafficking indicators and refer them to assistance before deporting them. Asylum-seekers could be kept in detention for up to six months per Slovak law; the Center for Legal Aid visited detention centers during the reporting period, but the staff was not trained to identify human trafficking victims and did not report identifying any victims in 2021. A government-funded NGO, responsible for administering the victim-care program and monitoring asylum-seeker and detention facilities for undocumented migrants, reported its ability to visit facilities was limited due to the pandemic; it had not reported identifying any victims since at least 2018. In its June 2020 Report, GRETA urged the government to increase the quality of screening for trafficking victims by ensuring officials were adequately trained in victim identification at asylum-seeker and undocumented migrant detention facilities. It was unnecessary for the government to grant work permits, as foreign victims received subsidiary protection and could work legally, although NGOs noted obstacles, including length of stay, sometimes precluded this. The law authorized permanent residency for foreign victims who would face hardship or retribution if returned to their country of origin; authorities issued no such residence permits during the reporting period. The government did not report granting asylum to any trafficking victim in 2021.

The pre-trial and trial process was lengthy and not always adapted, nor prosecutors or judges sufficiently trained, to avoid re-traumatization of victims. The 2017 crime victim's protection act provided psychological assistance to victims in pre-trial proceedings, banned direct cross-examination of victims, and allowed recorded testimony as official trial evidence, among other protections. However, civil society reported pre-recorded testimony was rarely used and, in at least one case in 2021, a judge specifically forbid it. To improve its victim-centered approach and decrease the possibility of re-traumatization, the government established 15 victim interview rooms across Slovakia for vulnerable victims, including

trafficking victims, during the reporting period. Police received training on how to use the rooms and interview victims, record victim testimony for use in court, and it minimized the number of people in the room by allowing additional experts and officials to observe the interview from a separate room. The government reported using the interview rooms for 13 trafficking cases in 2022. Experts expressed concern that the law's limit of one victim interview may have hindered opportunities to build rapport with traumatized victims, who are unlikely to provide reliable testimony in a single interview session. Though not systematic, judges were generally willing to accommodate requests to provide a separate waiting area for victims and to remove the suspected trafficker from the courtroom during victim testimony. Furthermore, a 2020 guideline required investigators to invite the government-funded NGO administering the victim-care program to victim interviews, to ensure victims knew their rights regarding the victim-care program, free legal advice, and restitution. Witness protection programs existed, but the government has never utilized these programs for any trafficking victim; in its June 2020 report, GRETA continued to urge the government to utilize its witness protection programs for trafficking victims.

Restitution from criminal cases, compensation from the government, and damages from civil suits were all available to trafficking victims, but courts rarely ordered or awarded any of these. The March 2021 IC report found that between 2015 and 2020, the court awarded restitution or government compensation to victims in only six of 39 cases. The report stated that of 39 cases, the court did not mention the injured parties' claim for compensation at all in 19 cases (49 percent), and the court referred the injured parties to civil proceedings in 14 cases (36 percent). The IC report did not have the exact number of trafficking victims who had received damages through civil suits but concluded that it was reasonable to assume that the number was low. Prosecutors could file for restitution from traffickers in criminal cases; however, courts did not report if prosecutors filed such claims or awarded restitution to any victims in 2021. Civil society and the March 2021 IC report concluded prosecutors did not pursue a victim's right to restitution in an attempt to avoid prolonging proceedings; experts encouraged the government to pursue a more streamlined mechanism for victims to obtain restitution, while not impeding trial proceedings. The 2017 crime victim's protection act enabled the government to grant between €6,230 ($7,060) and €31,150 ($35,320) in compensation to victims from state funding, if filed within one year. The amendment to the 2017 crime victim's protection act, effective July 2021, simplified the process to receive compensation, enabling victims to claim compensation after the start of the criminal proceedings, as opposed to after completion; civil society welcomed this change. The government provided compensation to one trafficking victim in 2021 after a request was filed by the victim-care provider on behalf of the victim. Additionally, victims could seek damages through civil suits, but it was unclear if victims filed any suits and, unlike prior years, no victims were awarded damages in 2021. NGOs continued to argue excessive legal costs and lengthy proceedings discouraged many victims from filing civil suits. The March 2021 IC report found the national victim-care provider was unaware of most cases in court proceedings, despite its responsibility to provide legal advice to trafficking victims. The report concluded that most trafficking victims had not received pre-trial legal counseling or been made aware of their rights, including for compensation and restitution; the report recommended increased access to free legal counseling as early as preparatory proceedings. In July 2021, an amendment went into effect to increase victims' access, including trafficking victims, to government compensation; however, though the government did not report if the law has been implemented. Under the 2017 crime victim's protection act, victims who opted to seek compensation from their traffickers through a civil suit could not also request restitution through criminal proceedings. Section 215(2) permitted, but did not require, prosecutors to drop criminal prosecutions against trafficking victims for unlawful acts traffickers compelled them to commit. Slovak laws did not seem to require or permit district officials and police from dropping misdemeanors filed against trafficking victims for unlawful acts traffickers compelled them to commit.

## PREVENTION

The government maintained prevention efforts. The State Secretary of the MOI was the national coordinator for the fight against trafficking. The

Expert Group within the MOI's Crime Prevention Department was led by the MOI State Secretary and functioned as the national anti-trafficking coordination committee; it met twice in 2021 and was responsible for coordinating policy documents, implementing and evaluating anti-trafficking programs with civil society, organizing trainings, and coordinating awareness-raising campaigns. The Expert Group comprised 29 members, including both government ministries and NGOs. The IC also contributed to national coordination by administering contracts for the victim-care program, gathering trafficking data, publishing an annual human trafficking report, and functioning as the national rapporteur. However, the IC continued to face challenges reconciling the data from different institutions, particularly data on prosecutions and convictions, and GRETA questioned whether the IC was sufficiently independent to critically monitor national efforts. The government continued to fund and implement its 2019-2023 anti-trafficking national action plan and in June 2021 approved an additional action plan to implement GRETA's recommendations from its 2020 report. The MOI maintained staff at 16 local and regional information centers throughout Slovakia who could offer information and assistance on all crimes, which included human trafficking; services included prevention, victim identification, and assistance such as psychological counseling and legal advice. In 2021, five trafficking victims were identified by the information centers (three men and two women) and referred to the police for formal identification and to other relevant agencies for services.

The government launched extensive trafficking prevention and public awareness campaigns to engage the public, though trafficking was sometimes portrayed in a sensationalized manner. The government published an article, continued to operate a website and mobile app in several languages, and continued to use media platforms, including social media, and physical materials, to raise awareness. The police and the MOI's Crime Prevention Department conducted a survey and delivered at least 123 awareness-raising lectures, both in-person and virtually, for at least 22 schools. Police also delivered lectures for job-seekers, teachers, children in foster care, and an NGO. The government and government-funded NGOs specifically targeted vulnerable groups, like Romani women and children who were vulnerable to domestic servitude through forced marriage, for their awareness campaigns and continued coordination with the government office responsible for Romani communities. With funding from the Governments of Slovakia and the UK, an NGO launched an awareness campaign in 2021, which involved videos featuring social media influencers, a trafficking survivor, and a song by a popular Romani band.

The MOI reported distributing trafficking awareness leaflets, in Ukrainian, at its eastern border to refugees fleeing Russia's unjust war against Ukraine, working closely with specialized trafficking international organizations and stationing plainclothes officers at the border to search for trafficking indicators, issuing media broadcasts on trafficking risks, and including trafficking information on its website as a central information point for arriving refugees, available in eight languages. Authorities reported extended police hours to assist refugees and established formal protection measures, including the issuances of temporary protection status to approximately 58,300 refugees by the end of the reporting period, as well as offering financial reimbursement to citizens willing to accommodate refugees. The labor ministry continued to distribute a brochure to foreign workers on trafficking indicators, the labor code, and the rights and obligations of foreign employees in eight languages, and the MOI distributed informational brochures on trafficking and fraudulent employment offers. Concerns regarding foreign worker vulnerability to fraudulent labor recruitment and labor trafficking, as well as low victim identification within this population, remained significant. The 2004 law on employment services prohibited labor recruiters from charging a recruitment fee to workers, and employment agencies were required to register with the government. However, the government did not report law enforcement measures taken to enforce the prohibition of charging fees to workers or fraudulent labor recruitment. In its June 2020 report, GRETA urged the government to strengthen monitoring of recruitment and temporary work agencies. Experts and civil society continued to urge the government to increase efforts to inform foreign worker populations of their rights; lack of awareness of the availability of services, language barriers, and fear of immigration officials continued to prevent some foreign victims from seeking help from authorities.

SLOVENIA

Foreign workers were able to change employment without requiring prior approval from the government, which may have decreased their vulnerability to trafficking.

In 2021, police reported conducting inspections for forced labor indicators of 55 businesses and 340 individuals, 274 of whom were foreign workers, but officials did not identify any trafficking victims. Separately, in 2021, labor inspectors conducted 16,918 inspections, which included 353 non-EU workers, but also did not report referring any potential trafficking victims to police, as they lacked the authority to identify victims. Civil society recommended increased victim identification training for labor inspectors to improve referrals to police. Despite the large foreign-worker population in Slovakia with an increased risk of trafficking, the government has not reported identifying any trafficking victims through joint inspections between law enforcement and labor inspectors for at least the last five years, continuing to raise concerns regarding the government's ability to identify trafficking victims, despite specific training. GRETA noted that joint inspections tended to focus on immigration enforcement rather than take a victim-centered approach and continued to recommend anti-trafficking training for all labor inspectors, especially on victim identification and referral. Foreign trafficking victims without legal employment status may have been reluctant to discuss their trafficking situation with labor inspectors for fear of deportation, as it is regular practice for labor inspectors to contact the immigration officials if illegally employed foreign workers are identified. A government-funded anti-trafficking hotline, operated by an NGO, took calls for 12 hours a day in five languages, and identified four potential trafficking victims from calls in 2021. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Slovakia, and traffickers exploit victims from Slovakia abroad. Traffickers exploit Slovak men and women in labor trafficking in agriculture, manufacturing, and construction in Western Europe, increasingly in German-speaking countries. Traffickers exploit Slovak women in sex trafficking in Austria, Denmark, Germany, Switzerland, the UK, and other European countries. With the departure of the UK from the European Union, including new restrictions on freedom of movement, authorities have noted the UK is a less frequent destination for traffickers. Increasingly, traffickers exploit victims domestically within Slovakia, a recent development that was exacerbated by pandemic-related border closures. Hundreds of thousands of Ukrainian refugees, predominantly women and children, fleeing Russia's war against Ukraine, have crossed the Slovak border seeking sanctuary and are vulnerable to trafficking. Irregular migration increased by nearly 50 percent since 2020; undocumented migrant workers are vulnerable to human trafficking. Some temporary workers from non-EU European countries, recruited for the manufacturing and construction industries, are subjected to conditions indicative of forced labor, including non-payment of wages or extended working hours. NGOs report men and women, mostly from the Balkans and South-East Asia, are vulnerable to forced labor in Slovakia and may be unable or afraid to seek assistance from authorities. Women from South-East Asia are vulnerable to sex trafficking and forced labor in domestic service, restaurants, massage parlors, or spas. Slovak women of Romani descent are particularly vulnerable to sex trafficking; traffickers transport them to the UK by force or deception in sham marriages for the purpose of sex trafficking or forced labor. Roma girls are vulnerable to forced traditional Romani marriages, which often includes the transfer of the girl into the care of her new "husband," where she is forced or coerced into domestic service. In some cases, parents of Slovak Roma children exploit their children in forced criminal activity in the UK. Traffickers force Slovak men, women, and children of Romani descent and Slovaks with disabilities and mental health conditions to beg throughout Western Europe. Traffickers exploit children without family or support structures who leave institutional care facilities in sex and labor trafficking.

## SLOVENIA: TIER 1

The Government of Slovenia fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Slovenia remained on Tier 1. These efforts included investigating and prosecuting more alleged traffickers and assisting more trafficking victims compared with the prior reporting period. The government also made several policy changes that improved victims' access to medical care, accommodation, and temporary residence permits and hired an employee dedicated to systematically raising trafficking awareness among children and adolescents. Although the government meets the minimum standards, the government did not convict any traffickers, a significant decrease compared with the prior reporting period. Investigations and prosecutions for labor trafficking remained low. Victim identification and funding for victim assistance decreased, and continued gaps in victim identification resulted in the government not identifying any child or asylum-seeker trafficking victims and very few labor trafficking victims. The government did not report awarding restitution or compensation to any victims.



SLOVENIA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute both sex and labor trafficking crimes and impose on all convicted traffickers adequate penalties that involve significant prison terms. • Improve efforts to proactively identify victims, especially children, males, and victims of labor trafficking. • Prioritize investigation and prosecution of labor traffickers and improve coordination between labor inspectors and police. • Ensure labor trafficking is investigated and prosecuted as a trafficking crime and not pursued as an administrative labor code violation. • Increase training to all front-line officials on victim identification for labor trafficking and consider a partnership with NGOs for labor trafficking victim identification. • Increase efforts of prosecutors to systematically request restitution for victims in criminal trials, including for both EU and non-EU citizen victims, and increase victim access to the state fund for crime victims. • Allow formal victim identification by and referral from entities other than the police, including civil society, social workers, and health care professionals. • Amend the definition of trafficking under Slovenian law to align more closely with the definition under international law. • Enforce the elimination of recruitment fees charged to workers and ensure any recruitment fees are paid by employers. • Establish a process to ensure systematic provision of care and designated facilities for child victims of trafficking, including enhanced training of caregivers and foster care parents. • Appoint a national rapporteur to provide independent review of government anti-trafficking efforts. • Establish a specialized police unit dedicated to investigating human trafficking, with sufficient resources, to ensure the prioritization of trafficking investigations. • Utilize the witness protection program for trafficking victims. • Increase survivor engagement, including by establishing accessible mechanisms for receiving and providing compensation for survivor input when forming policies, programs, and trainings. • Increase efforts to pursue financial crime investigations in tandem with human trafficking cases.

## PROSECUTION

The government maintained uneven law enforcement efforts; while investigations and prosecutions increased, the government did not convict any traffickers. Article 113 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties ranging from one to 10 years' imprisonment for offenses involving an adult victim

Haiti AR_000977

and three to 15 years' imprisonment for those involving a child victim or other aggravating factors. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. However, inconsistent with the definition of trafficking under international law, Article 113 established the use of force, fraud, or coercion as an aggravating factor rather than an essential element of the crime. Police conducted investigations involving 23 sex trafficking suspects and two legal entities, a significant increase compared with investigations involving 12 trafficking suspects in the prior reporting period. Prosecutors initiated criminal proceedings against 32 sex trafficking suspects and four legal entities, an increase compared with six prosecutions initiated during the previous reporting period but the same as 32 prosecutions initiated in the reporting period before that. The government did not report investigating or prosecuting any suspects for labor trafficking during the reporting period. Courts did not convict any traffickers during the reporting period, a significant decrease compared with seven convictions in the prior period and five in the period before that. Pandemic-related prevention measures caused delays in judicial proceedings and court hearings. The government did not report any investigations, prosecutions, or convictions of officials complicit in human trafficking offenses.

The government reported providing extensive training on victim identification, available assistance programs for victims, and the importance of working with civil society to 58 police officers; investigation strategies for cases of sex trafficking for 19 investigators; and a victim-centered approach to victim stabilization, victim protection and trial preparation, recognizing trauma, and victim identification for 42 officials at the social work centers. The government maintained police attachés in Austria, Bosnia and Herzegovina, Croatia, North Macedonia, and Serbia to assist in coordination of international cases. Authorities reported cooperating with the Government of Kosovo on one case of trafficking involving a victim from Kosovo. While the government did not have a specialized anti-trafficking investigation unit, each of the eight police districts had at least one officer responsible for coordinating trafficking investigations, creating a de facto nationwide coordination network. However, NGOs expressed concern the police units responsible for investigating human trafficking were overburdened and understaffed; NGOs urged the government to establish dedicated police units to investigate and prioritize human trafficking. Several NGOs noted concerns regarding poor coordination between labor inspectors and police, which may have hindered the identification of labor trafficking cases. NGOs continued to assert the government did not prosecute labor traffickers because authorities instead pursued cases as administrative labor code violations, resulting in lesser consequences and decreased deterrence.

## PROTECTION

The government maintained uneven victim protection efforts; while victim identification and funding for assistance decreased, victim assistance increased, and several policy changes improved victims' access to care. The government identified 45 sex trafficking victims, a decrease compared with 65 in the prior reporting period but more than 31 victims identified in the reporting period prior to that. Of the identified victims, 44 were victims of sex trafficking, and one was a victim of labor trafficking; all victims were adults; 43 were women, and two were men. Most victims were from Dominican Republic, Romania, or Serbia. Experts raised concerns regarding gaps in victim identification as the government again did not identify any child or asylum-seeker trafficking victims during the reporting period. The government referred and provided assistance to 12 victims during the reporting period, including entrance into its crisis housing program for six victims and entrance into its safe accommodation program for another six victims. This compared with two victims assisted in the safe housing program in the prior reporting period. The government decreased its allocation for housing victims in 2021 to €119,208 ($135,160), compared with €145,515 ($164,980) in 2020. Government officials continued to utilize the national Manual for Identification of Victims of Trafficking in Persons. The majority of victims continued to be proactively identified by police, and coordination between police and NGOs was strong; however, observers reported ongoing concerns regarding the under-identification of labor trafficking victims and the tendency for officials to overlook cases of labor trafficking. While both government officials and civil society could "detect" trafficking victims, only the police could formally identify victims, and formal identification was required for long-term care.

Victims could request interviews with NGOs prior to meeting with law enforcement, and NGOs could accompany victims to interactions with law enforcement. Following victim identification, government regulations required police to refer victims to one of two government-funded NGOs that had formal cooperation agreements with the government to ensure adequate provision of care to the victims. However, experts noted that victim referral procedures may not have always been implemented uniformly for some vulnerable groups like undocumented migrants and asylum-seekers. NGOs noted continued strong cooperation with police on the identification of sex trafficking victims, as police continued to invite NGO care providers to police interactions with commercial sex establishments to assist in victim identification; however, authorities did not report taking similar steps regarding NGO requests to cooperate on identification of labor trafficking victims.

The government continued to partially fund two NGOs, supplemented by private donations, which provided trafficking-specific crisis and safe housing for victims. Both NGOs were among a wider range of organizations providing services such as counseling, psycho-social support, legal representation during investigations and court proceedings, and filing of documentation for residency status. In July 2021, the government's anti-trafficking interdepartmental working group (IWG) issued a policy change to ensure all trafficking victims identified by the police were entitled to supplemental, comprehensive medical care and medication. Non-EU trafficking victims had a 90-day reflection period during which they could remain in Slovenia while recovering and considering whether to participate in an investigation. All victims, both citizens and foreign nationals, could receive crisis housing for a maximum of 30 days, after which they could enter safe accommodation for 60 days, regardless of cooperation with law enforcement. Officials prepared individual assistance and protection programs for victims admitted into the safe housing accommodation. However, after 90 days, to continue to receive safe accommodation and long-term care, victims required a temporary residence permit, which required either law enforcement cooperation in criminal proceedings or, as of March 2021, qualification under the "personal circumstances" amendment. A temporary residence permit for "personal circumstances" could be issued for a maximum of one year, with an option for a one-year extension. However, the government did not allow victims to work during this period. Victims cooperating in criminal proceedings could temporarily stay for 180 days or longer, if needed, for the trial of the trafficker but had limited options to extend their stay after the conclusion of criminal proceedings. In March 2021, the government passed an amendment that intended to enable faster decision-making in the registration procedure for temporary stay permits for foreign nationals. However, the government did not report issuing any temporary residence permits during the reporting period.

The IWG made a policy change in 2021 to ensure more sex trafficking victims received the requisite accommodation benefits afforded to trafficking victims. Both Slovenian and foreign victims had access to the same protection services and had free movement in and out of shelters. Although the government did not identify any child trafficking victims during the reporting period, child trafficking victims continued to lack adequate assistance, as there were no designated facilities for unaccompanied child trafficking victims. If identified, child trafficking victims could be sheltered with unaccompanied migrant children and receive care through the Center for Social Work. GRETA highlighted a concern over unaccompanied child victims disappearing from public care, urging the development of more suitable accommodations for children with fully trained staff or foster parents. In response to these concerns, in 2021, the government established a children's shelter, which included a location for the shelter, the appointment of an acting director, and planned trainings for conducting a forensic interview and psycho-social assistance for children; however, the home was not yet operational by the end of the reporting period.

When participating in pretrial and criminal proceedings, victims had a right to interpretation services and a protective escort, though the government did not report how many victims received these services. All victims that entered the government's crisis and safe accommodation program could apply for free legal aid. While awaiting case adjudication, asylum-seekers were unable to legally work, though many did so illegally, which NGOs stated could increase their vulnerability to labor trafficking due to their illegal status, lack of knowledge of local labor laws, and

SOLOMON ISLANDS

language barriers. The 2018 GRETA report urged improving the process of providing comprehensive information to victims in a language they could understand to assess their options, including participation in programs to resist re-victimization. NGOs also noted there were insufficient professional interpreters fully trained in translating the details of rights of potential trafficking victims for asylum intake proceedings. Some victims were reluctant to speak with social workers and counselors about their situations, given the same interpreters assisted in the different contexts of law enforcement investigations and court proceedings on their case.

Only citizens of EU countries were eligible to apply for compensation from the state fund for crime victims; however, the government did not report awarding compensation to any victims. During the reporting period, prosecutors did not request restitution for any victims in criminal proceedings; historically, prosecutors typically did not do this, though there were no legal barriers to prevent it, instead requiring victims demand compensation for themselves in a separate civil court case. Experts urged prosecutors to systematically request restitution for victims at criminal trials. All victims could seek damages by filing a civil suit, though due to legal costs, victim re-traumatization, and the desire to avoid additional court proceedings, most victims did not pursue compensation, and the government did not report awarding compensation during the reporting period. Upon government seizure of a trafficker's assets, victims could file a claim for restitution or damages; however, if the victim failed to file the claim, the trafficker's assets were subsumed into the government's budget. The government had a witness protection program that trafficking victims could utilize, but it did not report using the program to protect any victims during the reporting period. Under the witness protection act, victims could provide testimony via video or written statements, and courts kept victim identities confidential.

## PREVENTION

The government maintained prevention efforts. The Ministry of Interior's (MOI) national coordinator for counter trafficking in persons continued to head the IWG. The IWG included NGO representatives and met three times during the reporting period to organize and coordinate awareness efforts; the IWG produced an annual report on human trafficking in Slovenia. In 2021, the IWG also worked to ensure all trafficking victims identified by the police were entitled to supplemental comprehensive medical care, made a policy change to ensure more sex trafficking victims received the requisite accommodation benefits afforded to trafficking victims, and also decided to expand IWG membership to additional stakeholder ministries. The Anti-Trafficking Service Office within the MOI continued to provide comprehensive support for investigators and victim service providers. The government had a comprehensive national anti-trafficking action plan for 2021-2022, which included benchmarks and an allocated budget. Slovenia remained without an official independent national anti-trafficking rapporteur, a key GRETA recommendation. Unlike 2020, the government did not provide any funding specifically for awareness raising projects in 2021; however, the MOI instead hired an employee dedicated to systematically raising awareness among children and adolescents by continuously providing workshops held in all primary and secondary schools. In partnership with two NGOs, the government conducted one awareness raising campaign focused on impunity in relation to human trafficking, as well as 44 in-depth and comprehensive workshops reaching roughly 750 primary and secondary school children.

The government continued to host a website, in both English and Slovenian, which raised awareness of forced labor and labor exploitation through its manual for companies and employers; provided information on investigations and prosecutions; included a mechanism for contacting NGOs; and provided a portal for anonymous reporting of potential trafficking victims. In early 2022, the government issued warnings to refugees fleeing Russia's full-scale invasion of Ukraine regarding their vulnerability to human trafficking, and police established checkpoints on the border with Hungary; authorities reported suspicions that sex traffickers were targeting girls at a Ukrainian refugee reception center but had not identified any trafficking victims by the end of the reporting period. The government also continued to fund two NGO hotlines, available in several languages, offering assistance to both domestic violence and trafficking victims; the hotlines did not report the number of trafficking-related calls received but did report referring 16 potential victims to police, two of whom were later officially recognized as trafficking victims.

Slovenian law prohibited contract switching and the charging of placement or recruitment fees to workers, as well as passport and wage withholding. Migrant workers were able to change employers without delay or prior government permission, which may have decreased their vulnerability to trafficking. However, NGOs noted labor trafficking received insufficient attention and resources to conduct adequate investigations. While the law allowed employers to pay recruitment fees, in practice, NGOs assessed the government did not effectively enforce the law and employers frequently passed these fees on to workers through salary deductions and other means. NGOs continued to assert that authorities pursued many labor trafficking cases as administrative labor code violations, resulting in lesser consequences and decreased deterrence. Furthermore, authorities often prosecuted and shut down the legal entity or company rather than the perpetrator responsible; the perpetrator would then establish another company under a new name and continue to exploit victims in labor trafficking. While labor inspectors did not have the authority to identify trafficking victims, following the completion of 105 inspections in 2021, inspectors referred three potential victims to prosecutors. In partnership with Europol, the government held three separate joint action days (JAD) with police, labor inspectors, and a trade union working together; the JADs were held in June, July, and November 2021, with each JAD targeting specific types of trafficking victims—one focused on identifying victims of forced labor, one on child trafficking, and one on forced criminality, begging, and sex trafficking. However, the government did not report identifying any trafficking victims through any of the JADs. The government drafted, but did not finalize or distribute, a manual for labor inspectors on trafficking victim identification and referral to assistance. Asylum centers and an NGO funded by the MOI continued to screen all new migrant and asylum arrivals for trafficking indicators, but the government did not report identifying any trafficking victims. The government signed an anti-trafficking cooperation agreement with the Government of Montenegro in December 2021, which focused primarily on victim identification and assistance, prevention, and law enforcement cooperation; however, implementation and concrete action had yet to occur. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Slovenia, and to a lesser extent, traffickers exploit victims from Slovenia abroad. Slovenes, as well as foreign workers and undocumented migrants from countries such as Albania, Bosnia and Herzegovina, Kosovo, North Macedonia, Romania, Serbia, Slovakia, and Ukraine, are vulnerable to labor trafficking, including forced begging or domestic servitude, in a variety of sectors including construction, transportation, hospitality, and domestic service. In 2022, Ukrainian refugees, predominantly women and children, fleeing Russia's full-scale invasion of Ukraine are vulnerable to trafficking. Sometimes these persons are in transit to Western Europe, particularly Austria, Germany, or Italy, where traffickers exploit them in forced labor. Temporary work agencies continue to exploit workers, which sometimes amounts to labor trafficking. While awaiting case adjudication, asylum-seekers are legally unable to work, increasing their vulnerability to labor trafficking. Traffickers exploit women and children from Slovenia and Eastern European, Western Balkan, Southeast Asian, and Latin American countries in sex trafficking within Slovenia, and many also transit to Western Europe, primarily Germany and Italy, where they are at risk of sexual and labor exploitation. Ethnic Roma are particularly vulnerable to trafficking, especially forced begging, in Slovenia.

## SOLOMON ISLANDS: TIER 2

The Government of Solomon Islands does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Solomon Islands remained on Tier 2. These efforts included initiating a new prosecution for the first time in four years and formally adopting its

Haiti AR_000979

2020-2025 national action plan (NAP). The government, in partnership with international organizations, developed and began implementing a new policy with terms and conditions for workers on licensed foreign and domestic-flagged fishing vessels in Solomon Islands' waters, intended to reduce their risks of exploitation. However, the government did not meet the minimum standards in several key areas. Protection services remained inadequate and, due to a lack of formal identification procedures, authorities may have inappropriately detained unidentified victims. General lack of awareness of trafficking and applicable laws among front-line officers, coupled with under-resourced protection services and widespread observance of informal justice models, adversely affected the government's ability to respond effectively to trafficking cases. The government did not provide anti-trafficking training to police or judicial officials. The Labor Division did not conduct systematic monitoring and inspection activities at logging sites or in the fishing or mining sectors.



SOLOMON ISLANDS TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:
Draft, enact, and implement a stand-alone human trafficking law prohibiting all forms of the crime, proscribe dissuasive penalties, and remove sentencing provisions under current laws that allow fines in lieu of imprisonment for sex trafficking crimes occurring outside of Solomon Islands. • Investigate and prosecute both sex trafficking and labor trafficking crimes and convict and punish traffickers, including complicit officials, with significant prison sentences. • Increase efforts to identify Solomon Islander and foreign victims of sex trafficking and labor trafficking within the country, including in agriculture; the fishing, logging, and mining industries; and in relation to illicit commercial activities. • In collaboration with civil society, screen for trafficking indicators and prevent penalization of victims for unlawful acts traffickers compelled them to commit among individuals in commercial sex, People's Republic of China (PRC) nationals employed at worksites affiliated with PRC-based companies, communities located near mining and logging camps, and individuals—including children—apprehended for illegal fishing, desertion from foreign-registered fishing vessels, illegal logging, or immigration crimes and ensure all identified victims are referred to protective services. • Provide comprehensive training on all relevant trafficking laws and victim identification procedures to immigration officials, law enforcement officers, and social service providers, including at the provincial level. • Increase government support for victim protection, including through the allocation of funding to specialized shelter services and benefiting both male and female victims. • Improve data collection on trafficking trends in Solomon Islands and disseminate among interagency anti-trafficking stakeholders. • Institute a campaign to raise public awareness of trafficking, including among remote logging and mining communities in all provinces. • Implement and fund the 2020-2025 NAP on human trafficking and people smuggling. • Eliminate recruitment or placement fees charged to workers by labor recruiters and ensure any recruitment fees are paid by employers. • Ratify existing forestry laws to include minimum social safeguards and child protection policies. • Accede to the 2000 UN TIP Protocol.

### PROSECUTION
The government increased its law enforcement efforts. The penal code, together with the Immigration Act, criminalized sex trafficking and labor trafficking. Article 143 of the penal code criminalized child sex trafficking under its "child commercial sexual exploitation" provision and prescribed penalties of up to 15 or 20 years' imprisonment, based on the child's age. Article 145 of the penal code criminalized sex trafficking and labor trafficking when the offense occurred within the country. Article 145(2) applied to trafficking offenses involving an element of force, fraud, or coercion; it prescribed penalties of up to 20 years' imprisonment for

offenses involving adult victims and up to 25 years' imprisonment for offenses involving child victims. Article 145(3) prescribed penalties of up to 15 years' imprisonment for offenses that did not involve an element of force, fraud, or coercion. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. The Immigration Act criminalized other forms of trafficking, including crimes in which the recruitment, transportation, harboring, or receipt of the trafficking victim occurred outside Solomon Islands. The Immigration Act prescribed penalties of up to five years' imprisonment, a fine of up to 45,000 Solomon Islands dollars ($5,710), or both for the trafficking of adults; it prescribed a penalty of up to 10 years' imprisonment, a fine of up to 90,000 Solomon Islands dollars ($11,410), or both for the trafficking of children. These penalties were sufficiently stringent, but with respect to sex trafficking, by allowing for a fine in lieu of imprisonment, they were not commensurate with penalties prescribed for other serious offenses. Authorities continued to charge some trafficking cases under criminal statutes carrying lesser penalties. In coordination with a regional body, the government continued to review the Immigration Act to identify gaps in trafficking-specific provisions, among others. The government allocated 920,000 Solomon Islands dollars ($116,660) in the previous reporting period to support the development of a comprehensive human trafficking statute and accede to the UNTOC and its supplementary protocols, including the TIP Protocol; the government did not report adopting the statute, and it did not accede to the TIP Protocol.

Authorities initiated three sex trafficking investigations, compared with two investigations in 2020. Authorities initiated one prosecution of an alleged sex trafficker with charges under the penal code; this was the first trafficking prosecution since 2017. For the second consecutive year, the government did not convict any traffickers. Observers noted the government prosecuted and convicted some potential trafficking cases under non-trafficking statutes. The government trained immigration officers on human trafficking, migrant smuggling, and trafficking-related laws; the government did not report providing anti-trafficking training to police or judicial officials. Geographic challenges, insufficient funding of enforcement agencies, lack of technical expertise, low judicial and police capacity, and a lack of awareness of the crime and of the relevant laws among front-line officers, particularly in remote areas of the country, adversely affected the government's ability to respond effectively to trafficking cases. In addition, observers ascribed a higher likelihood of acquittals and dismissals of such cases to backlogs in court, incomplete investigations, insufficient evidence or lack of testimony, and safety concerns among victims and their families. Traditional justice practices involving retribution or informal compensation arrangements between victims' families and traffickers, continued to supplant formal law enforcement efforts and further complicated victims' access to justice. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. Observers reported a national state of emergency due to the pandemic restricted movement among locals, which may have limited the reporting of trafficking crimes; observers reported the government redirected resources, including those related to anti-trafficking efforts, among government agencies as a result of civil unrest in November 2021 and the pandemic, which may have adversely affected the government's ability to detect and address trafficking.

### PROTECTION
The government decreased efforts to protect trafficking victims. The government identified three Solomon Islander child trafficking victims, compared with four victims in 2020. The government did not report implementing its updated victim identification, referral, and protection SOPs and coordination mechanisms developed in partnership with an international organization during the previous reporting period. Authorities and civil society protection partners continued to rely on disparate victim identification and referral processes that they applied unevenly to potential trafficking cases. Due to a lack of formal identification procedures, authorities may have detained unidentified trafficking victims. Authorities did not report efforts to screen for or identify trafficking victims among individuals in commercial sex; observers reported in prior years that authorities may have arrested and

prosecuted sex trafficking victims for alleged "prostitution" violations without screening to determine whether they were trafficking victims.

Authorities referred the three identified child victims to general protective services; however, the government did not provide trafficking-specific protective services. The government did not report allocating resources to fund investigations, public awareness, and victim protection or assistance from the Immigration Division's budget, compared with 380,000 Solomon Islands dollars ($48,190) in 2020. The Royal Solomon Islands Police Force operated a domestic violence shelter in Honiara that could provide services to women and child sex trafficking victims; however, most trafficking victims came from the provinces, making services exclusively located in Honiara difficult to access. The government could not provide shelter for adult males or victims of labor trafficking. Due to lengthy legal processes, fear of retaliation by traffickers or prosecution by police, and a lack of incentives to remain and participate in cases, some unidentified foreign victims may have opted to return to their home countries. Observers noted these insufficiencies in protection services likely discouraged some victims from testifying in court proceedings, thereby hindering prosecutorial progress. The Immigration Act granted the government authority to provide temporary residence permits for foreign victims to assist police with investigations, and it insulated foreign victims against prosecution for suspected immigration-related crimes traffickers compelled them to commit. However, the government did not report providing these or other services to any foreign victims, as it did not report identifying any during the reporting period. The government did not report if it would extend these protections to foreign victims whose cases authorities investigated under the penal code.

In the previous reporting period, the government developed a victim protection policy in connection with the newly adopted NAP focused on provisions to encourage victims' voluntary participation in investigations and prosecutions; the government did not report an update to its implementation. The government reported trafficking victims could seek compensation from their employers through civil suits, although it reported that no victims had ever filed such suits. The government did not provide legal alternatives to the removal of foreign trafficking victims to countries where they might face retribution or hardship. Observers reported the government redirected resources, including those related to anti-trafficking efforts, among government agencies as a result of civil unrest in November 2021 and the pandemic and did not prioritize trafficking efforts throughout the reporting period.

## PREVENTION

The government slightly decreased efforts to prevent trafficking. The Anti-Human Trafficking Advisory Committee (AHTAC), which included government agencies and members of civil society, led the country's anti-trafficking efforts. The government adopted its NAP against Human Trafficking and People Smuggling 2020-2025, developed in partnership with an international organization. The government reported it was unable to hold anti-trafficking programs planned by the AHTAC due to the pandemic. Unlike the previous reporting period, the Immigration Division did not report conducting awareness-raising campaigns targeting communities near logging and mining operations; the government did not report conducting any awareness campaigns during the reporting period. The government did not operate or support an anti-trafficking hotline.

Labor inspectors conducted routine inspections; however, the government did not report providing anti-trafficking training to its inspectors. For the third consecutive year, the Labor Division did not report conducting any monitoring and inspection activities at logging operations or in the fishing or mining sectors. Forestry officials stated a lack of industry regulation or laws outlining child protection and social safeguards prevented them from detecting and investigating potential abuses, including trafficking, related to logging operations' impact on local communities. In November 2021, the government, in partnership with international organizations, developed a policy framework to set minimum terms and conditions for crewmembers working on licensed foreign and domestic-flagged fishing vessels operating in Solomon Islands' waters in an effort to address trafficking risks among crewmembers. The interagency Business Monitoring Joint Agency Committee (BMJAC) monitored, inspected, and investigated breaches of labor laws. Unlike the previous reporting period, the government did not report funding BMJAC inspections and monitoring activities. The government did not report taking comprehensive measures to assess or address forced labor in supply chains or enforce its labor laws. Furthermore, the government did not prohibit worker-paid recruitment fees.

The government did not make efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training to its diplomatic personnel. In partnership with an international organization, the government prepared to accede to the UNTOC and its supplementary protocols, including the TIP Protocol, through a series of consultations and sensitization workshops; however, border closures due to the pandemic and domestic policy priorities focused on the pandemic and civil unrest reportedly delayed the process. The government funded an additional sensitization workshop to increase local-level awareness of the benefits of accession; but the government did not accede by the end of the reporting period. Solomon Islands was not a party to the TIP Protocol.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Solomon Islands, and traffickers exploit victims from Solomon Islands abroad. Traffickers exploit local, South Asian, and Southeast Asian men and women in forced labor and sex trafficking in Solomon Islands, and local children are especially vulnerable to sex trafficking and labor trafficking. Women from the PRC, Indonesia, Malaysia, and the Philippines often pay large recruitment fees for jobs in Solomon Islands and upon arrival are forced or coerced into commercial sex. Labor traffickers exploit men from Indonesia and Malaysia in the logging, fishing, palm oil, and mining industries. Fishermen from Indonesia, the Philippines, Vietnam, Sri Lanka, Democratic People's Republic of Korea (DPRK), and Fiji report situations indicative of labor trafficking, including non-payment of wages, dire living conditions, violence, and limited food supply, on Taiwan-flagged fishing vessels in Solomon Islands' territorial waters and ports. Individuals from the PRC may have been forced to work in Solomon Islands at projects run by PRC-based companies. Traffickers exploit Solomon Islander children in sex trafficking and forced labor within the country, sometimes in exchange for money or goods, particularly near foreign logging camps, on foreign and local commercial fishing vessels, and at hotels, casinos, nightclubs, and other entertainment establishments. The inflow of a cash economic system, coupled with the continuation of an unregulated logging industry, has increased vulnerability to trafficking in remote communities, specifically for women and children. Contacts have observed a recent increase in commercial sex—and a concomitant uptick in sex trafficking—resulting from certain economic changes. Family members are often the facilitators of such transactional agreements. Natural disasters significantly increase Solomon Islanders' vulnerability to trafficking; Solomon Islanders affected by a cyclone in 2020 may be at higher risk of trafficking due to the economic hardships caused by the destruction. Anecdotal reporting showed an increase in the sexual exploitation of girls, some of which may have been sex trafficking, as many returned to remote villages as a result of the pandemic.

Some official corruption—especially in relation to facilitating irregular migration and involvement in the fishing and forestry sectors—may enable trafficking. Some boys, girls, and young women are recruited for domestic work and subsequently exploited in commercial sex at logging camps. Under informal or traditional justice practices, parents frequently receive payments for sending young women and girls into forced marriages with foreign workers at logging and mining companies, where many of them are exploited in domestic servitude or sex trafficking. Often these payments are rendered after the victims escape or are returned home as informal compensation brokered by local leadership. In this way, local community leaders may also benefit financially from these arrangements. Mining and logging camp leadership reportedly force boys to serve as *solaris*—illicit brokers procuring girls for sexual and domestic service in worker lodging facilities—and logging camp personnel force young males to work as domestic servants and cooks. Following the government's decision to cease issuance of new logging licenses, a decline in the industry has contributed to an increase in internal economic migration of communities located in former logging areas; these displaced communities may be at higher risk of sex trafficking and

forced labor. Elsewhere, Solomon Islander children may be subjected to forced labor in the agricultural sector, forced harvesting of seafood, and forced criminality in the manufacturing and transportation of drugs and in pickpocketing. Anecdotal reports show an increase in children involved in street vending, begging, and pickpocketing during the pandemic. To pay off debts, some parents reportedly sell their children to other families via "informal adoption" that often involves forced labor or sexual servitude. Traffickers also use Solomon Islands as a transit point to subject foreign individuals to trafficking in other countries.

# SOUTH AFRICA: TIER 2 WATCH LIST

The Government of South Africa does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included convicting and sentencing traffickers to substantial terms of imprisonment, including government officials complicit in human trafficking. The government re-appointed the Chair of the National Inter-ministerial Committee for Trafficking in Persons (NICTIP). It also increased the number of victims identified and the number of accredited shelters. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. Agencies responsible for identifying, referring, and certifying trafficking victims lacked coordination, resulting in victims unable to access emergency services. Law enforcement continued to lack the necessary training to avoid victim re-traumatization. For the ninth consecutive year, the government did not promulgate implementing regulations for the 2013 Prevention and Combating of Trafficking in Persons (PACOTIP) Act's immigration provisions, resulting in foreign victims unable to access immigration remedies. Therefore South Africa remained on Tier 2 Watch List for the second consecutive year.



## PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict officials complicit in trafficking crimes and traffickers within organized crime syndicates, including cases of online exploitation. • Increase training for South African Police Service (SAPS) officers on trauma-informed interviewing techniques, as well as victim identification and referral standard operating procedures (SOPs), and train specialized investigators on human trafficking investigations and computer forensics to investigate online exploitation. • Increase resources and training for front-line responders to effectively use victim identification and referral SOPs to identify trafficking victims, including by screening for trafficking indicators among vulnerable populations, such as individuals engaging in commercial sex, children, LGBTQI+ persons, refugees, migrants, and Cuban medical workers, and systematically refer trafficking victims to care. • Pass, promulgate, and implement the Department of Home Affairs (DHA) immigration provisions in Chapters 3 and 7 of PACOTIP, including Sections 15, 16, and 31(2)(b)(ii), and ensure the issuance of appropriate immigration status and identification documents for trafficking victims. • Increase collaboration between NICTIP, Provincial Task Teams (PTTs), and civil society to integrate referral and response systems and include all stakeholders, including civil society and survivors, in the renewal of the National Policy Framework (NPF). • Implement policies to disconnect the requirement for victims to participate in investigations and prosecutions in order to be formally identified and receive trafficking victim status. • Increase outreach and awareness efforts to vulnerable populations, especially for

those engaging in commercial sex, in rural and agricultural communities, and foreign migrants. • Formalize a confidential reporting mechanism for civil society to safely report allegations of official corruption and complicity in trafficking crimes directly to the government for vigorous investigation. • Extend the availability of drug rehabilitation services to trafficking victims and increase the length of treatment beyond the current limit of six weeks to facilitate recovery. • Accredit or establish additional trafficking-specific shelters for male, transgender, and child trafficking victims. • Amend the anti-trafficking law to remove sentencing provisions that allow fines in lieu of imprisonment for sex trafficking.

## PROSECUTION

The government maintained anti-trafficking law enforcement efforts. PACOTIP criminalized sex trafficking and labor trafficking and prescribed penalties of up to life imprisonment, a fine of up to 100 million South African rand ($6.3 million), or both. The penalties were sufficiently stringent; however, with regard to sex trafficking, by allowing for a fine in lieu of imprisonment, the prescribed punishment was not commensurate with those for other serious crimes, such as rape. The implementing regulations for PACOTIP's immigration provisions found in Sections 15, 16, and 31(2)(b)(ii) have not been promulgated; therefore, critical sections of the act remained inactive for the ninth consecutive year. The Criminal Law (Sexual Offenses and related matters) Amendment Act of 2007 (CLAA) also criminalized the sex trafficking of children and adults and prescribed penalties of up to life in prison; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with other serious crimes, such as rape. The Basic Conditions of Employment Act of 1997 (BCEA), amended in 2014, criminalized forced labor and prescribed maximum penalties of three to six years' imprisonment. In addition, the Children's Amendment Act of 2005 prescribed penalties of five years to life imprisonment or fines for the use, procurement, or offer of a child for slavery, commercial sexual exploitation, or to commit crimes. Prosecutors sometimes relied on the Prevention of Organized Crime Act of 1998 in combination with CLAA, which added additional charges—such as money laundering, racketeering, or criminal gang activity—and increased penalties of convicted defendants.

The Directorate for Priority Crime Investigation (DPCI, or Hawks), a division of SAPS, initiated 18 trafficking case investigations involving 27 suspects and continued 73 case investigations from previous reporting periods. This compared with initiating 31 case investigations in the previous reporting period. The National Prosecuting Authority (NPA) initiated nine prosecutions of 16 suspects and continued 32 prosecutions of 108 suspects from prior reporting periods, compared with 31 suspects prosecuted for trafficking crimes in an unknown number of cases and continuing 14 prosecutions during the previous reporting period. The government convicted 11 traffickers—including two complicit officials—in 10 cases under trafficking charges, compared with convicting seven traffickers in the previous year. Judges sentenced five traffickers to life imprisonment, one trafficker to 20 years' imprisonment, and five awaited sentencing at the end of the reporting period. In the previous year, judges sentenced two traffickers to life imprisonment and five traffickers to between 22 and 25 years' imprisonment. The government reported 13 trafficking prosecutions withdrawn, acquitted, or declined to prosecute, and one not guilty verdict that was appealed.

The government recognized official complicity as a key challenge in addressing all transnational crime, including human trafficking, and investigated, prosecuted, and convicted government officials during the reporting period. The government prosecuted and convicted two high-ranking government officials for child sex trafficking, including a Police Superintendent and a former Chair of a PTT. The government investigated two SAPS officers for complicity in human trafficking; the case remained ongoing at the end of the reporting period. Civil society continued to report widespread corruption, particularly among the Department of Social Development (DSD), DHA, SAPS, and DPCI. Observers reported in exchange for bribes, lower-level officials warned traffickers of operations by law enforcement, immigration officials facilitated undocumented entry for traffickers at land and air border points, and DSD returned survivors to traffickers instead of referring them to care. NGOs reported some SAPS officers were unwilling to investigate cases and relied on NGOs to obtain victims' statements and build cases. Civil society reported cases of sex trafficking of Basotho women from Lesotho in South African brothels;

however, due to alleged official complicity of both Basotho and South African officials linked to the brothels, they continued to operate with impunity. Given mistrust in law enforcement, civil society reported the need for a trusted, high-level government contact to receive reports of officials complicit in human trafficking crimes, to facilitate investigations and to avoid retribution. However, while the government recognized the need to establish confidential channels to receive such information, the government did not report any action to establish a reporting mechanism.

Law enforcement agencies had insufficient resources, lacked necessary training to adequately and appropriately investigate all reported trafficking cases, and continued to rely heavily on victim testimony for prosecutions. Observers reported law enforcement lacked training in trauma-informed interviewing and victim care, resulting in cases of DPCI investigators taking victims to locations of previous exploitation to provide statements or victims' statements not being taken at all. The lack of clarity on case status, low prospect of success, sometimes years-long delays in cases, coupled with feelings of shame dissuaded victims from participating in trials. Approximately 50 DPCI investigators nationwide conducted trafficking investigations, among other duties; there were no dedicated officers to investigate human trafficking crimes. Observers reported a slight increase in law enforcement responsiveness to investigate potential trafficking cases compared to previous reporting periods. Western Cape province had "Vice Squads" to proactively identify sex trafficking within commercial sex establishments; however, observers reported these squads did not proactively conduct such investigations. SAPS did not collaborate with civil society and were reportedly slow to investigate leads generated by other law enforcement agencies. NPA permitted virtual court appearances in some cases to overcome pandemic-related restrictions.

Due to the pandemic, the government provided limited training to law enforcement during the reporting period. DPCI and SAPS supported a workshop at a university for 300 students, also attended by 34 DPCI and SAPs officers, on PACOTIP and referring victims to care. NPA's Sexual Offenses and Community Affairs (SOCA) Unit trained 132 SAPS officers and NPA prosecutors on investigating sex crimes. The government reported coordinating with the Government of Botswana on a trafficking investigation and collaborated with the Government of Eswatini and an NGO on an investigation and repatriation of one victim during the reporting period.

## PROTECTION

The government maintained mixed victim identification and protection efforts. The government identified 83 trafficking victims and referred 74 victims to care, compared with identifying 16 victims in the previous reporting period. NGOs identified and referred to care an additional 24 child trafficking victims and identified 62 potential victims through transit monitoring. The government's ongoing investigations and prosecutions involved 426 survivors, including those identified in previous reporting periods, compared with 226 survivors in 2020, 377 survivors in 2019, and 260 survivors in 2018. NGOs reported the official statistics did not reflect the scope of trafficking, since institutional problems resulted in many victims remaining unidentified by the government. Conflation between gender-based violence (GBV) and human trafficking also led to the misidentification of victims. Most agencies, including SAPS, DSD, NPA, and the Department of Justice and Constitutional Development (DOJCD), used SOPs to identify and refer trafficking victims to care, in accordance with PACOTIP; however, agencies and provinces implemented the SOPs inconsistently. Additionally, SAPS officers sometimes lacked basic understanding of human trafficking as a crime, which impeded efforts.

The government reported providing trafficking victims with temporary emergency shelter, food assistance, interpreters, specialized medical care, psycho-social support, and transportation. NGOs reported the lack of training, awareness of agency responsibilities, and coordination by government officials resulted in victims facing delays in receiving care and increased the potential for victims returning to or being located by their traffickers. By law, trafficking victims were not required to participate in the investigation and prosecution of traffickers; however, in practice, to access services, many victims had to report to law enforcement. For certification as a trafficking victim—the process that permitted victims to access government services and benefits—victims must report their case

to SAPS; SAPS was then required to confirm the trafficking allegations, file human trafficking charges within 48 hours, and coordinate with the provincial DSD representative. DSD was responsible for certifying trafficking victim status by issuing a letter of recognition, authorizing and monitoring the provision of protective services, preparing victim-witnesses for court, and accompanying victims through trial and repatriation, if applicable. NGOs reported DSD and SAPS failed to coordinate and were often unreachable to certify victims' status, resulting in victims unable to access emergency shelter and services. Observers reported instances of SAPS officers leaving trafficking victims at shelters without coordinating with DSD and, when this occurred in Gauteng and Western Cape, DSD refused assistance to victims until confirmation from SAPS was obtained. As reported by observers, in numerous instances, SAPS, DPCI, and DSD left victims at police stations overnight if their case was opened at the end of or after business hours. Additional reports of officers leaving trafficking victims unattended at police stations during transport for medical care resulted in victim harassment and re-traumatization. After reporting to SAPS, within the same 48-hour time period, victims had to decide whether to serve as victim-witnesses. Reportedly, victims willing to participate in investigations and prosecutions received certification and services faster than those unwilling to cooperate. To circumvent the existing process in Western Cape, DSD and the Department of Health (DOH) collaborated with civil society to amend existing SOPs, permitting medical and psychological assessments for victims before certification to access more immediate mental health care.

The government continued oversight of 18 accredited NGO-run multipurpose shelters and newly accredited one government-operated multipurpose shelter during the reporting period, bringing the total to 19 shelters accredited to serve trafficking victims. Each province had at least one accredited shelter. Additionally, the government oversaw 88 semi-accredited shelters that provided emergency care to victims for up to 72 hours and operated a network of 55 Thuthuzela Care Centers—full-service crisis centers to assist victims of GBV, including trafficking victims. Additional NGO-operated shelters, unaccredited by the government, also provided care specifically to trafficking victims. The government provided NGO shelters a stipend on a per person, per night basis; however, NGOs reported funds were generally inaccessible after business hours, due to unresponsiveness by SAPS and DSD. In previous reporting periods, observers reported some DSD shelters occasionally refused to accept trafficking victims due to security concerns or drug addiction. NGOs reported that government shelter staff sometimes failed to inform victims of the status of criminal cases against their traffickers. LGBTQI+ persons, particularly transgender persons and migrants, were especially at high risk for trafficking due to social stigmatization; in Western Cape, there was one shelter dedicated solely for victims from the LGBTQI+ community. Shelters accessible to persons with disabilities provided limited services; it was unknown if trafficking victims received these services during the reporting period. In Gauteng, trafficking victims received substance abuse rehabilitation through five accredited treatment centers; however, treatment was provided for only six weeks. Few shelters accepted victims with their children. Gauteng, KwaZulu-Natal (KZN), and Western Cape generally offered adequate standards of care in both rural and urban areas. Care in other provinces was sometimes inadequate. Foreign victims, both undocumented and with legal authorization, were fearful of accessing services at government facilities. Undocumented victims could not legally seek employment, even when cooperating with law enforcement, and their trials extended several years. In response to the pandemic, NGOs reported that government shelters remained open, but pandemic-related mitigation approaches limited capacity, sometimes preventing the intake of new victims. The government allocated additional personnel to assist with long-term service provision, which was shifted to predominantly at-home care because of pandemic-related restrictions.

The government did not report if victims were referred to the DPCI Coordinator for Trafficking, who ensured assigned officers received training to handle trafficking investigations. Through the NPA's Court Preparation Program, the government provided victims with the option to testify via video conference and enhanced shelter and witness protection if the victim faced danger due to participation in the case. NGOs emphasized the critical need for SAPS to issue Police Inquiry Numbers and CAS numbers to victims to facilitate follow-up on victim referrals and to track progress in their cases. PACOTIP allowed judges to order victim

restitution in trafficking cases, but the government did not report any orders during the reporting period.

Foreign victims faced additional barriers to access care and justice. PACOTIP authorized trafficking victims to receive relief from deportation; however, the government did not promulgate regulations to implement this provision or guide the handling of trafficking cases for the ninth consecutive year; the draft regulations remained pending approval by the DHA Minister for the third consecutive year. Reportedly, no trafficking victims were deported; however, reports from civil society confirmed vulnerable foreign migrants seeking entry at airports and land border crossings were not screened for indicators of trafficking before they were denied entry. As proscribed under PACOTIP, foreign trafficking victims are entitled to a visitor's visa for 30 days, which can be extended if cooperating in an investigation or prosecution or if danger to the victim exists in their home country; however, the government did not report whether these visas have ever been issued. DHA had a policy to issue temporary identification documentation for foreign trafficking victims, requiring renewal every two weeks and continued cooperation with SAPS; however, DHA did not report issuing such documentation to any trafficking victims during the reporting period.

## PREVENTION

The government maintained mixed efforts to prevent trafficking. The government coordinated anti-trafficking efforts through NICTIP, which was chaired by DOJCD, with representatives from DHA, DSD, SAPS, NPA, DOH, Department of Employment and Labor (DOEL), Department of International Relations and Cooperation, and civil society; NICTIP met regularly. DOJCD also chaired the National Rapid Response Team, which coordinated the response to trafficking investigations and victim identifications and referrals. The government continued to implement the 2019-2022 NPF to improve capacity and coordination to combat trafficking among government agencies and began procedures for renewal in 2022. The government reappointed the previous Chair of NICTIP, who was removed in the previous reporting period. The Chair directed all governmental trafficking efforts and implementation of the NFP. Established in all nine provinces, PTTs coordinated provincial policies, and Provincial Rapid Response Teams (PRRTs) facilitated local responses to trafficking cases and victim identifications. Some PTTs met regularly during the reporting period, including in KZN, Western Cape, and Mpumalanga, while others met sporadically. Representatives on both NICTIP and PTTs shared duties on multiple task teams for other crimes, such as GBV, which limited capacity and resources to address human trafficking. Coordination and communication challenges between national and provincial teams were exacerbated by the lack of consistent NICTIP leadership, commitment by government agencies, and limited capacity. SAPS, DHA, and DOEL were often absent from PTT and PRRT meetings. Lack of technology access prevented some members from attending virtual PTT meetings, which limited PTTs' engagement and effectiveness.

In part due to the pandemic, the government did not comprehensively monitor or investigate forced labor of adults or children in the agricultural, mining, construction, and fishing sectors. In 2021, the DOEL employed 1,853 labor inspectors, conducted 296,904 inspections, and detected 41,710 violations, an increase from 227,990 inspections in 2020; forced and child labor violations were not specified. Due to pandemic restrictions, many inspections were conducted virtually, which limited detection of potential forced labor-related violations. In three sessions, DOEL trained 68 labor inspectors and managers from Northern Cape, Eastern Cape, and Gauteng on employment laws, human trafficking, and child exploitation. While inspectors had the legal authority to investigate private farms, they reported difficulty in securing access. For the past two years, DHA did not provide vulnerable migrant populations with proper immigration documentation, resulting in children denied entry to schools, which increased vulnerabilities for trafficking. SAPS operated a hotline that could receive reports of potential trafficking cases and a mobile app that led to four human trafficking investigations. The government and civil society directed most trafficking-related calls to the NGO-operated National Human Trafficking Hotline (NHTH), which the government advertised. In cooperation with PRRTs, NHTH received 2,146 calls pertaining to human trafficking in 2021 and successfully removed 20 trafficking victims from exploitation. Reportedly, most calls

to the NHTH from victims occurred after police neglected to take their reports seriously or alleged police complicity was involved. An NGO-operated national social justice hotline also received calls concerning human trafficking.

The government increased awareness-raising activities in KZN, Gauteng, Eastern Cape, and Northern Cape, reaching more than 11,500 individuals during the reporting period, although pandemic restrictions limited efforts. On World Day Against Trafficking, DOJCD held a public awareness event with an international organization. NPA trained DOH School Coordinators and Department of Economic Development, Tourism, and Environmental Affairs officials on victim identification. The NPA SOCA Unit launched an internet cartoon circulated through social media to raise awareness of human trafficking; with academic partners, held a webinar for students and the public on online recruitment tactics used by traffickers; and trained attorneys on trafficking in persons facilitated by a university in KZN. PTTs held a series of webinars with civil society support, hosted a social awareness campaign for hospitality employees on indicators of human trafficking, and drafted a nationwide communication strategy. DPCI Provincial Units conducted 18 awareness events, with at least one featuring a trafficking survivor speaker, and contributed to workshops to raise awareness of child trafficking for government officials, civil society, and the media. SAPS and DSD supported awareness efforts in local communities. With the support of an NGO, DSD trained more than 296 stakeholders from Gauteng and Western Cape provinces on preventing child exploitation and human trafficking. One PTT conducted a social media campaign that included aspects aimed at targeting consumers to reduce the demand for commercial sex.

In the previous reporting period, DOJCD reported developing an integrated information system to collect data on, and improve responses to, trafficking but did not report any efforts to finalize or begin use of the system during the reporting period. The government reported, in previous years, contributing human trafficking data to a regional data collection system but did not report doing so in the reporting period. Department of Science and Innovation collaboratively funded a landscape study with a foreign government donor to understand the scope and prevalence of human trafficking in South Africa, which concluded during the reporting period. Nevertheless, some officials publicly downplayed the existence of trafficking, which stymied public awareness and data collection efforts. The South African National Defense Forces maintained a hotline for reports of sexual exploitation by armed forces but did not report whether it received any calls regarding such exploitation during the reporting period. Since 2015, 39 allegations of sexual exploitation and abuse were made against 45 South African peacekeepers; of these, the government has taken accountability measures in 22 cases and continued investigating six other cases. The Generic and Sector Specific Training Manual on the PACOTIP Act, launched two years ago, contained a training plan for peacekeepers; however, the government did not report providing anti-trafficking training to its troops prior to deployment as peacekeepers. The government reported training its diplomatic personnel on the anti-trafficking law, but not specifically on identifying trafficking indicators.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in South Africa, and traffickers exploit victims from South Africa abroad. Traffickers recruit victims from neighboring countries and rural areas within South Africa, particularly Gauteng, and exploit them in sex trafficking locally and in urban centers, such as Johannesburg, Cape Town, Durban, and Bloemfontein. Traffickers force both adults and children, particularly those from poor and rural areas and migrants, into labor in domestic service, mining, food services, construction, criminal activities, agriculture, and the fishing sector. Traffickers may exploit South Africans in forced labor on vineyards and fruit and vegetable farms across the country.

High unemployment, low wages, and pandemic-related restrictions increased vulnerability of exploitation, particularly of youth, Black women, and foreign migrants. Traffickers recruit victims who lack employment and struggle with substance addiction, and commonly use substance addiction to control victims, including children. Parents with substance

SOUTH SUDAN

addiction sometimes exploit their children in sex trafficking to pay for drugs. Traffickers increasingly entice foreign and South African women and girls with the promise of marriage and then force them into labor after marriage. Abuse of the custom of *ukuthwala*, a cultural norm that can manifest into forced marriage, may contribute to vulnerability of girls and women to exploitation, particularly in Eastern Cape and KZN. According to a study, in 2021, approximately 500,000 children had dropped out of school, resulting in a total of 750,000 children not enrolled in school; high death rates from the pandemic increased the orphan population, leaving more children vulnerable to exploitation. There were some reports of boys lured out of the country for fake sports scholarships and then forced into exploitation.

Traffickers recruit both foreign and South African victims through fake job advertisements on social media and classified advertisement forums, which proliferated during the pandemic, including advertisements for webcam modeling, hospitality, mining, and domestic work. Some fake advertisements, particularly for domestic work, specifically request Zimbabwean or Malawian applicants. Because domestic workers may not have formal contracts, employers fired many without notice or pay during the pandemic, rendering them vulnerable to potential exploitation. Some employers restricted workers' movements and forced them to remain at worksites during the pandemic, which increased the workers' vulnerability to forced labor and abuse by employers. Despite high unemployment, migrants travel from East and Southern Africa to South Africa looking for economic opportunity or fleeing conflict, particularly from Ethiopia, Eritrea, and Mozambique, and are vulnerable to exploitation. Due to the pandemic, the government issued a blanket extension of refugee and asylum certificates, but many employers and banks failed to recognize the extensions, resulting in loss of employment and frozen back accounts, rendering asylum seekers increasingly vulnerable to traffickers. Local refugee rights groups reported that, due to the pandemic, DHA shuttered its offices in 2020, resulting in asylum seekers unable to obtain asylum seeker certificates. The lack of valid documentation limited asylum seeker's ability to access protection and services.

Official complicity in trafficking crimes, especially by police, facilitated the operation of traffickers and organized syndicates engaging in trafficking. Syndicates, often dominated by Nigerians, force women from Nigeria and countries bordering South Africa into commercial sex, primarily in brothels and other commercial-front establishments. South African trafficking rings exploit girls as young as 10 years old in sex trafficking. Some well-known brothels, previously identified as locations of sex trafficking, continue to operate with officials' tacit approval. In some cases, traffickers exploit women in brothels disguised as bed and breakfasts. Syndicates also recruit South African women to Europe and Asia, where traffickers force some into commercial sex, domestic service, or drug smuggling. Mozambican crime syndicates use the eastern border of Kruger National Park in Mpumalanga to transport South African men to other parts of the country for forced labor, through the same routes used by syndicates to facilitate other crimes. Syndicates also exploit miners, both South African and foreign migrants, sometimes known as zama zamas, in illegal gold, diamond, and coal mining. Traffickers operating in South Africa are mostly from Nigeria and South Africa; however, there were reports of traffickers from Bangladesh, Tanzania, Malawi, Mozambique, Pakistan, Zimbabwe, Ethiopia, and the People's Republic of China (PRC).

Undocumented children, including many child trafficking victims from Mozambique, the Democratic Republic of the Congo, and Zimbabwe, are unable to access education and government services, which increases their risk of statelessness and vulnerability to trafficking. Recruiters entice women from the Middle East, Asia, and countries bordering South Africa with offers of legitimate employment, but upon arrival, some subject the women to domestic servitude or forced labor in the service sector. Traffickers exploit Basotho women in sex trafficking and domestic servitude and men in labor trafficking, particularly in the mining sector, in South Africa. Traffickers exploit foreign male victims aboard fishing vessels in South Africa's territorial waters. Asian workers may travel to South Africa via commercial flights to disembark on fishing vessels where they are exploited. Traffickers subject Pakistanis and Bangladeshis to forced labor through debt-based coercion in businesses owned by their co-nationals. In one case, a Nepali trafficker fraudulently recruited a Nepali man to South Africa and exploited him in forced labor. Traffickers

exploit young men from neighboring countries who migrate to South Africa for farm work; some are subsequently arrested and deported as undocumented immigrants. Owners of privately-owned PRC businesses exploit PRC national, South African, and Malawian adults and children in factories, sweatshops, and other businesses. The Cuban government may have forced 187 Cuban medical workers to work in South Africa, operating in all provinces to combat the pandemic. These agreements typically require payment directly to the Government of Cuba, which gives the medical workers between 5 and 15 percent of the salary only after they complete the mission and return home.

## SOUTH SUDAN: TIER 3

The Government of the Republic of South Sudan does not fully meet the minimum standards for the elimination of trafficking and, even considering the impact of the COVID-19 pandemic, on the government's anti-trafficking capacity, is not making significant efforts to do so; therefore South Sudan remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including convening its anti-trafficking inter-ministerial task force, finalizing the 2021-2023 National Action Plan (NAP) to Combat Trafficking, and conducting awareness activities. However, during the reporting period, there was a government policy or pattern of employing and recruiting child soldiers. Government security and law enforcement officers continued to forcibly recruit and use child soldiers and did not hold any members of the South Sudan People's Defense Forces (SSPDF) or South Sudan National Police Services (SSNPS) criminally accountable for these unlawful acts. Authorities did not report investigating or prosecuting any forced labor or sex trafficking crimes for the 10th consecutive year. The government did not report identifying or assisting any victims and continued to penalize victims for unlawful acts their traffickers compelled them to commit.



SOUTH SUDAN TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Cease all unlawful recruitment and use of children by government forces and associated militias and immediately demobilize all child soldiers under the command or influence of government forces and affiliated militias and, in partnership with international organizations, provide adequate protection and reintegration support for child victims. • Vigorously investigate and prosecute suspected traffickers, including complicit government officials. • Train law enforcement and social workers to identify trafficking victims, particularly among vulnerable groups such as children, individuals in commercial sex, internally displaced persons, and North Korean overseas workers. • Provide additional financial and staffing support to the SSPDF's Directorate of Child Protection to facilitate efforts to identify perpetrators of child soldiering and refer cases to civilian courts. • Draft, finalize, and implement victim identification screening and referral procedures in partnership with international organizations and civil society. • Train law enforcement officers, prosecutors, and judges—including officials serving on the Gender Based Violence and Juvenile Court—on the 2008 Child Act, 2008 Penal Code, and 2018 Labor Act. • Increase funding and resources for the anti-trafficking inter-ministerial taskforce. • Amend the 2008 Penal Code or pass a comprehensive anti-trafficking law to criminalize adult sex trafficking and prescribe penalties that are sufficiently stringent and commensurate with other grave crimes, such as rape. • Accede to the 2000 UN Convention Against Transnational Organized Crime and its TIP Protocol.

## PROSECUTION

The government continued to demonstrate negligible law enforcement efforts. The 2008 Penal Code, 2008 Child Act, and 2018 Labor Act criminalized some forms of sex trafficking and labor trafficking. Article 277 of the penal code prohibited forced labor and prescribed penalties of up to two years' imprisonment, a fine, or both; these penalties were not sufficiently stringent. Article 276 criminalized buying or selling a child for the purpose of prostitution and prescribed a punishment of up to 14 years' imprisonment and a fine, which was sufficiently stringent and commensurate with punishment prescribed for other serious crimes, such as rape. Articles 254 and 258 criminalized the procurement of a child for prostitution and the facilitation of the prostitution of a child by the child's parent or guardian and prescribed penalties of up to 10 years' imprisonment and a fine; these penalties were also sufficiently stringent and commensurate with those prescribed for other serious crimes, such as rape. The criminal code did not explicitly criminalize adult sex trafficking and, inconsistent with international law, required movement across borders to establish the crime. Article 282 prohibited and prescribed a sufficiently stringent punishment of up to seven years' imprisonment for the sale of a person across international borders. Articles 31 and 32 of South Sudan's 2008 Child Act prohibited the recruitment and use of children for military or paramilitary activities and prescribed punishments of up to 10 years' imprisonment for such crimes. The 2018 Labor Act prohibited forced labor and prescribed penalties of up to five years' imprisonment, a fine, confiscation of property, cancellation of a business license, or closure of business, or a combination thereof; these penalties were sufficiently stringent.

For the first time, the government reported investigating three possible trafficking cases—involving 28 victims: 13 men, 12 women, and three children—and arresting four possible traffickers. The government has not reported prosecuting or convicting any suspected traffickers for the 10th consecutive year. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained a significant concern, inhibiting law enforcement action during the year. Government authorities cooperated with two foreign governments to investigate two possible trafficking cases. Despite the ongoing unlawful recruitment and use of child soldiers by the SSPDF, SSNPS, and allied militias, the government has never held an offender criminally or administratively accountable for such crimes. Law enforcement officials reported that the economic effects of the pandemic reduced resources available for investigations and also limited efforts throughout much of the country. The lack of resources for basic operations, a dearth of trained judicial officials, and corruption throughout the justice sector continued to impede law enforcement efforts.

The government continued to contribute logistical support for two international organizations to provide training on identifying trafficking victims and referral mechanisms for judges, prosecutors, police, immigration officials, and members of the human trafficking task force. However, most police and judicial officials continued to lack a basic understanding of trafficking and frequently conflated human trafficking and migrant smuggling. Officials estimated customary courts handled 80 percent of all cases due to capacity limitations of statutory courts, further limiting accountability for accused sex and labor traffickers. The government continued operation of its specialized Gender Based Violence and Juvenile Court to expedite trials for gender-based violence and juvenile cases, which may have included cases involving human trafficking. The taskforce continued its review of South Sudan's legal framework to identify areas for alignment with the 2000 UN Convention Against Transnational Organized Crime and its TIP Protocol.

## PROTECTION

The government maintained inadequate protection efforts. Officials did not report identifying any victims during the reporting period. The government did not report having formal procedures to proactively identify and refer victims to care. Members of the National Disarmament, Demobilization, and Reintegration Commission (NDDRC) and other government officials reported demobilizing and releasing 20 child soldiers in cooperation with an international organization, compared with 189 child soldiers demobilized and released during the previous

reporting period. Observers noted the decrease in demobilizations was likely due to a lack of resources. Government officials noted many SSPDF officers did not meet their annual training requirements to increase awareness of international standards and obligations around child soldier recruitment and use due to ongoing conflict, poor communication, and general lack of capacity. The SSPDF's Directorate for Child Protection, headed by a brigadier general, maintained responsibility for investigating allegations of child soldiering. Despite ongoing reports that government forces continued to recruit and use child soldiers, officials did not report opening any inquiries into complicit officers.

The government did not report providing services to any victims of trafficking. Social stigma and fear of punitive law enforcement actions continued to discourage victims—particularly those subjected to sex trafficking—from reporting crimes to law enforcement officers. The government has not passed any laws or policies to protect victims from prosecution for unlawful acts traffickers compelled them to commit. Due to a lack of formal identification procedures, authorities likely arrested some unidentified trafficking victims, including children. The government did not provide foreign victims with legal alternatives to their removal to countries where they faced hardship or retribution, nor did it offer legal assistance or other mechanisms to encourage victims to assist in the investigation and prosecution of trafficking crimes.

## PREVENTION

The government maintained efforts to prevent trafficking. In coordination with an international organization, the government regularly convened its anti-trafficking inter-ministerial taskforce. However, for the third consecutive year, the taskforce did not accomplish its primary objectives of ratifying the Palermo Protocol and enacting the country's migration policy, which intends to improve the country's ability to manage migration flows, including increased identification of potential trafficking victims and smuggling clients. In December 2021, the government began drafting its 2021-2023 NAP to Combat Human Trafficking. Trafficking awareness remained low among officials and the public, hindering the government's anti-trafficking efforts. During the reporting period, the taskforce conducted awareness activities, including a radio campaign for the public, and other events targeting government officials, law enforcement, community leaders, and law students.

Government security forces actively continued to recruit child soldiers, at times by force, and did not implement the existing action plan to demobilize child soldiers currently within the forces. In addition, poor command and control among SSPDF units and ongoing instability throughout the country hindered implementation. To address the labor exploitation of South Sudanese nationals working abroad, the government began drafting a bilateral agreement with a foreign government, conducted a study on best practices for such agreements with another government, and in collaboration with an international organization, organized trainings for private businesses on ethical recruitment. The government did not make efforts to reduce the demand for commercial sex acts or provide anti-trafficking training for its diplomatic personnel. South Sudan is not a party to the 2000 UN TIP Protocol.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in South Sudan, and traffickers exploit victims from South Sudan abroad. South Sudanese women and girls, particularly those from rural areas or who are internally displaced, are vulnerable to domestic servitude throughout the country; male occupants of these households sexually abuse some of these women and girls and may exploit some of them in commercial sex. Prominent South Sudanese individuals in state capitals and rural areas sometimes force women and girls into domestic servitude. South Sudanese and foreign businesspeople exploit South Sudanese girls in sex trafficking in restaurants, hotels, and brothels in urban centers—at times with the involvement of local law enforcement officials. South Sudanese individuals coerce some children to work in construction, market vending, shoe shining, car washing, rock breaking, brick making, delivery cart pulling, gold mining, begging, and cattle herding. South Sudanese and foreign business owners recruit men and women from neighboring countries—especially the Democratic Republic of the Congo, Eritrea, Ethiopia, Kenya, Republic of the Congo,

and Uganda—as well as South Sudanese women and children, with fraudulent offers of employment opportunities in hotels, restaurants, and construction and force them to work for little or no pay or coerce them into commercial sex. An international organization reported Eritrean, Ethiopian, and Kenyan business owners recruit their compatriots, who enter South Sudan with valid visas and travel documents, and exploit them in forced labor or sex trafficking. Traffickers sexually exploit women most frequently in the country's capital, Juba, and in Nimule, a city located on the border with Uganda. North Korean nationals working in South Sudan may be forced to work by the North Korean government.

Child, early, and forced marriage remains a nationwide problem, with families forcing some girls into marriages as compensation for inter-ethnic killings; husbands and their families may subsequently subject these girls to sex trafficking or domestic servitude. East African migrants transiting through South Sudan to North Africa remain vulnerable to forced labor and sex trafficking. Observers report traffickers exploit individuals along the country's borders with Uganda and Kenya where economic activities are concentrated, as well as in artisanal mining operations along South Sudan's border with the Democratic Republic of the Congo.

Violent conflict continued throughout the year, resulting in approximately 1.3 million internally displaced persons (IDPs) as of December 2021 and 2.3 million South Sudanese refugees living in neighboring countries as of October 2021. These groups, including orphaned children, are at increased risk of trafficking and other forms of exploitation within South Sudan and neighboring countries due to sometimes limited access to formal justice and support networks. Unaccompanied children in camps for refugees or IDPs are particularly vulnerable to abduction by sex or labor traffickers. Inter-ethnic abductions and abductions by external criminal elements and armed groups remain common, especially in Jonglei, Unity, and Upper Nile states; traffickers exploit some abductees in forced labor or sex trafficking.

An international organization reported the recruitment and use of 119 children from January to November 2021 by parties in conflict, compared to 62 in 2020. Experts assess there were currently between 7,000 and 19,000 child soldiers within South Sudan as of February 2021. An international organization also estimated government and opposition-affiliated forces have recruited more than 19,000 child soldiers since the start of the conflict in 2013, and armed groups continue to recruit and use children. Both the SSPDF and the SPLA-In Opposition signed or recommitted to action plans for child soldier demobilization and reintegration, but implementation remains incomplete. Government forces—including SSNPS—use children to fight and perpetrate violence against other children and civilians, serve as bodyguards, and staff checkpoints, as well as in other support roles. According to the Comprehensive Action Plan to Prevent All Grave Violations Against Children in South Sudan signed in 2020, the parties committed to refrain from the recruitment or use of child soldiers by armed forces or militias in contravention of international conventions. The government's enlistment procedures required an age assessment, usually done through a dental exam, as many South Sudanese do not have access to birth registration documents. Governmental and non-governmental groups continued to retain, recruit, and use child soldiers during the reporting period. Experts note more children fight on behalf of locally organized armed groups rather than formally organized groups with centralized command and control structures. International observers report groups recruit and use child soldiers in Central and Western Equatoria, Unity, Western Bahr el Ghazal, and Jonglei. Observers report armed groups use boys for manual labor and odd jobs.

## SPAIN: TIER 1

The Government of Spain fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Spain remained on Tier 1. These efforts included increasing prosecutions and convictions compared with the year prior and courts

continuing to issue significant prison terms for convicted traffickers. The government also adopted two anti-trafficking national action plans (NAPs), opened a new shelter for sex trafficking victims, increased funding for victim assistance, and provided more trafficking victims with services compared with the prior year. Judges also awarded significant restitution amounts to most survivors following convictions of traffickers. Although the government meets the minimum standards, investigations decreased compared with the year prior. Gaps remained in victim identification protocols, including a continued lack of adequate mechanisms for identifying potential trafficking victims among the asylum-seeker and undocumented migrant population, and contributed to the government identifying significantly fewer victims for the second consecutive year.



### PRIORITIZED RECOMMENDATIONS:

Increase implementation of national victim identification and referral protocols and training for front-line officials on proactive victim identification, in particular among vulnerable populations such as children, undocumented migrants, asylum-seekers, and workers in industries and agricultural regions with high incidences of labor exploitation. • Increase investigations, prosecutions, and convictions of trafficking crimes, particularly for forced labor. • Allow formal victim identification without requiring law enforcement interaction. • Allow formal victim identification by and referral from entities other than the police, including by labor inspectors, asylum case workers, health care professionals, social workers, and NGOs. • Expand victim service centers to all autonomous communities. • Increase worker protections by implementing strong regulation and oversight of recruitment companies that are consistently enforced with effective law enforcement measures. • Continue to increase witness protection resources available to victims and expert witnesses, including increasing safety and security measures and considering measures to protect their identities. • Increase resources, including personnel, to the office of the national rapporteur and consider making it independent. • Increase protection and security of unaccompanied children in immigration detention centers or government shelters from recruitment by traffickers. • Systematically train prosecutors and judges on human trafficking and a victim-centered approach to law enforcement. • Improve state compensation mechanisms, including re-distribution of confiscated traffickers' assets to victims. • Increase survivor engagement, including by establishing accessible mechanisms for receiving and providing compensation for survivor input when forming policies, programs, and trainings. • Improve the government's inter-ministerial coordination with an effective multidisciplinary response to combat trafficking.

### PROSECUTION

The government increased law enforcement efforts. Article 177 bis of the criminal code criminalized sex trafficking and labor trafficking, prescribing penalties from five to eight years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those for other serious crimes, such as kidnapping. The rapporteur, NGOs, and Group of Experts on Action against Trafficking in Human Beings (GRETA) reported the penal code did not clearly define forced labor, which made prosecution difficult. Since at least 2018, civil society noted the need for a stand-alone, comprehensive anti-trafficking law; in March 2021, the government began drafting the law but did not pass it during the reporting period. The government continued to receive stakeholder input on the draft law from a working group of local, regional, and national stakeholders, as well as a diverse group of trafficking survivors, through NGOs. Law enforcement officials adapted to pandemic-related restrictions by holding meetings virtually.

According to provisional data for 2021, law enforcement initiated 55 human trafficking investigations (46 sex trafficking and nine labor trafficking), a significant decrease compared with 83 in 2020 and 103 in 2019. In addition to law enforcement investigations, the Office of the Prosecutor initiated 115 investigations into an unknown number of suspects, similar to 119 investigations of 530 suspects in 2020. From the investigations, law enforcement arrested 173 suspects in 2021, compared with 235 suspects in 2020. Law enforcement conducted targeted operations against 55 criminal organizations involved solely in human trafficking in 2021; compared with 66 for both human trafficking and a different crime of "exploitation" in 2020. Law enforcement also reported that the increased use of the internet and social networks to recruit trafficking victims during the pandemic presented challenges as officials tried to gain expertise in combating online recruitment and exploitation. The National Police created a Cyber-trafficking Investigative Group to address this new challenge, and the Civil Guard reported regularly monitoring online platforms frequently used by traffickers. The judiciary initiated prosecutions for 64 suspects—40 for sex trafficking, 20 for labor trafficking (including five for forced criminality and three for forced begging), and four for combinations of multiple types of trafficking—this was an increase compared with 52 in 2020 but a decrease compared with 127 in 2019. In 2021, courts convicted 43 traffickers—38 for sex trafficking and five for labor trafficking—an increase compared with 32 in 2020 but similar to 44 in 2019. Most convicted traffickers were from Nigeria, Colombia, and Romania. Courts sentenced traffickers to significant sentences; all terms of imprisonment were more than one year with the longest being 103 years (however, the law prescribed a maximum of 20 years' actual prison time). Separately, courts convicted 11 defendants in trafficking cases under other laws—illegal immigration, money laundering, and commercial sex related crimes—and sentenced them to between six and 18 months' imprisonment. Eighty-six victims received restitution in 2021.

The Ministry of Interior (MOI) coordinated law enforcement efforts and had specialized law enforcement units to address human trafficking. In 2021, the National Police published an operational manual to combat labor trafficking, including forced criminality. In collaboration with prosecutors, judges, and NGOs, a technical body within the Catalan regional government published a guide, which would act as a framework for judges and attorneys dealing with trafficking cases. The guide provided resources and recommendations using a victim-centered approach, identified procedurally decisive points in cases, and provided sentencing recommendations. In 2021, the government adapted to pandemic-related restrictions by holding some trainings virtually and some in-person; the government reported providing anti-trafficking training to some of the 68 coordination units of the Anti-Gender-Based Violence (GBV) Delegation, as well as an unknown number of staff in the MOI's Office of Asylum and Refugees. The Civil Guard reported organizing several conferences that covered human trafficking and included training for 70 new officers from all over the country; the Civil Guard also reported developing its first extensive e-learning course on human trafficking. In partnership with several civil society organizations and academic institutions, the government reported developing an expert course on violence against women with sections that covered trafficking, as well as at least 35 training sessions that were attended by more than 2,000 officials, including judges, magistrates, prosecutors, forensic experts, officials from the Ministry of Equality, Intelligence Center Against Terrorism and Organized Crime (CITCO) staff, civil servants, NGO personnel, and police. In 2021, law enforcement reported conducting at least 57 international investigations and operations, including 20 in South America, with Colombia, Czech Republic, Europol, France, Germany, INTERPOL, Morocco, Paraguay, Romania, and Uruguay, which resulted in the identification of at least 37 victims and the arrest of at least 85 suspected traffickers. Spanish law enforcement reported in-person information and best practice exchanges with law enforcement from Paraguay and Uruguay, as well as assistance with two active operations and future plans to create a joint investigative team (JIT) with Colombian law enforcement. The government did not have judges or courts that specialized in trafficking, but with regard to sex trafficking, cases could be heard in courts dedicated to crimes related to GBV. Experts concluded, however, that judges often lacked adequate training on human trafficking cases and had limited access to specialized trafficking training.

Coordination between law enforcement, NGOs, and specialized trafficking prosecutors continued to be strong and effective, though this varied by region. In 2021, the prosecutor's office worked to ensure continued effective case coordination by holding weekly meetings with NGOs and law enforcement to coordinate victim identification and assistance, resulting in a significant prison sentence for a convicted trafficker. The prosecutor's office also established two police liaison positions, one with the national police and one with the civil guard, to ensure close coordination with law enforcement, close monitoring of human trafficking cases, and an increase of convictions, especially considering the additional investigative obstacles created by the pandemic. The government did not report any new investigations, prosecutions, or convictions of government officials complicit in trafficking crimes.

## PROTECTION

The government increased overall protection efforts but significantly decreased victim identification for the second consecutive year. In 2021, authorities reported that pandemic-related restrictions continued to hinder identifying sex trafficking victims as the majority of inspections were traditionally conducted in clubs, most of which were closed during part of the year, while workplace closures resulted in the identification of fewer labor trafficking victims. In 2021, authorities reported identifying 114 victims (93 sex trafficking and 21 labor trafficking). Compared with 226 trafficking victims in 2020 and 467 victims in 2019; this was a significant decrease for the second consecutive year. Law enforcement continued efforts to identify trafficking victims, but gaps remained, and the government did not report identifying any child, Spanish national, asylum-seeker, or undocumented migrant victims in 2021. In 2021, victims predominantly came from Colombia, Bulgaria, Romania, Nigeria, and Venezuela. The government continued to utilize its national victim identification and referral protocols, but NGOs reported they were not uniformly implemented across the country and protocols for asylum seekers were inadequate. In November 2021, Andalusia adopted its own trafficking protocol, resulting in 15 of 17 autonomous communities employing their own protocols for trafficking victims, which were reportedly implemented simultaneously with the national protocol. The two communities without their own protocols continued to use the national protocol. The government continued to implement victim identification protocols at the Madrid and Barcelona airports in 2021 but did not report how many victims were identified as a result.

Law enforcement officials were the sole entity that could identify victims. While formal victim identification was not tied to a victim's cooperation on criminal proceedings, victims were still required to interview with law enforcement to formally establish themselves as victims—which also entitled victims to specific benefits. Victim interviewing for formal identification was usually coordinated with an NGO, which would subsequently assume care of the victim. NGOs often accompanied law enforcement into the field to provide assistance and information to identified victims. Victims identified by NGOs or other entities outside of law enforcement were not included in national statistics; according to NGOs, this, coupled with continued gaps in victim identification among children, Spanish nationals, undocumented migrants, and asylum-seekers, resulted in probable underreported official victim statistics. During the reporting period, NGOs criticized the required interaction with law enforcement for victim identification and advocated for unconditional access to assistance. However, the government reported that victims who chose not to cooperate with law enforcement had the same rights and access to victim assistance. Experts and government officials estimated that 80 to 90 percent of the 500,000 individuals in the commercial sex industry in Spain could be unidentified sex trafficking victims within the decriminalized industry, and GRETA concluded victim identification statistics did not reflect the scale of trafficking. The national Ombudsman recognized the discrepancy between Spain and neighboring countries with regard to its infrequent identification of child trafficking victims and, in September 2021, a government-funded NGO launched a specialized observatory on child trafficking with plans to establish guidelines for the identification of child sex trafficking victims and to train professionals on specialized care. In 2021, law enforcement noted an increase in identification of trafficking victims between the ages of 18 and 22, and authorities recognized many of these victims likely became trafficking victims as children but remained unidentified. In July 2021, the national

SPAIN

Ombudsman publicly called for improved victim identification, specifically improved victim identification and referral protocols, and noted the pandemic exacerbated the isolation of many victims.

The government reported that the Civil Guard deployed Immigrant Assistance Teams to coastal regions associated with high rates of irregular migration to advise and protect newly arrived, undocumented migrants, especially those identified as victims of trafficking. However, the government lacked systematic victim identification protocols at temporary reception centers for undocumented migrants and asylum-seekers. With nearly 42,000 migrant arrivals along irregular migration routes in 2021, GRETA, the Ombudsman, and several civil society organizations expressed concern over the lack of adequate mechanisms for identifying potential trafficking victims in areas with large numbers of migrant arrivals, including the Canary Islands, the southern coast, and the autonomous cities of Ceuta and Melilla. The Ombudsman and civil society noted that some undocumented migrants likely had been subjected to sex trafficking in their countries of origin or en route to Spain. An NGO reported working with law enforcement to secure official recognition of trafficking victims even if they had been exploited by traffickers outside of Spain, which resulted in the recognition of at least one victim. Law enforcement reported that some undocumented migrants were later identified as trafficking victims in asylum interviews, but may have been subjected to immigration enforcement penalties, including deportation proceedings, before they were identified. Upon arrival, the government screened undocumented migrants for indications of trafficking in temporary reception centers, but the centers were overcrowded, and given the lack of an adequate trafficking victim identification mechanism and protocol for asylum seekers, law enforcement did not report identifying any trafficking victims among this vulnerable group. The government took efforts to protect refugees fleeing Russia's war against Ukraine by opening four reception centers and processing temporary protection paperwork. Additionally, in March 2022, the Council of Ministers adopted specific measures to protect possible Ukrainian trafficking victims by adopting a unified model of accreditation for trafficking victim status; accredited victims were then given access to services, secure housing, and a stipend, as well as additional grants to public and private institutions for the prevention, detection, care, and protection of potential trafficking victims.

Government-funded NGOs reported assisting an estimated 8,240 potential victims in 2021, including 20 children and five Spanish nationals. Government-funded NGOs reported providing at least 105 potential trafficking victims with workforce re-entry training, four with legal assistance, 121 with shelter, and 29 with asylum and residence permit application assistance. This was an increase compared with government-funded NGO assistance to 1,468 victims and 4,661 potential victims in 2020. In 2021, the government allocated €7.6 million ($8.62 million) to NGOs providing victim assistance, an increase compared with €6.5 million ($7.37) in 2020. Additionally, in 2021, the autonomous communities received €100 million ($113.38 million) from the central budget to combat gender violence, which included female sex trafficking victims but was not solely dedicated to trafficking, the same as in 2020. However, the municipalities did not receive any funding in 2021, a decrease compared with €20 million ($22.68 million) in 2020. The government, through victim service offices, referred victims to government-funded NGOs which provided legal assistance, shelter, social welfare benefits, language training, psychological services, funds for repatriation to victims, and full health care services through the national health system. However, not all regions and cities had victim service offices; GRETA reported victim services were available in all regions except Castile-La Mancha, La Rioja and the autonomous cities of Ceuta and Melilla. In December 2021, the city of Madrid opened its first 24/7 short-term emergency shelter for up to 15 female sex trafficking victims and their children, which assisted at least three trafficking victims. The shelter provided psychological assistance and legal advice; law enforcement and specialized trafficking NGOs could refer victims to the shelter from anywhere in the country. While receiving assistance in shelters, victims had the freedom to come and go, and foreign victims could receive voluntary repatriation assistance. During the pandemic, the government declared all shelters for trafficking victims as essential services to ensure continued access to housing and also enacted a pandemic contingency plan that extended through 2021, which included additional grants

to NGOs for the provision of accommodation and a daily subsidy for trafficking victims. However, civil society noted many victims continued to experience difficulty accessing this assistance due to their lack of internet access or a bank account; they also noted poorly coordinated accommodation services in some regions. There were specialized centers for child victims of crime, and seven NGO-run trafficking shelters assisted child victims; children were guaranteed legal assistance. GRETA cited NGO reports that unaccompanied migrant children in Ceuta and Melilla were vulnerable to trafficking in immigration detention centers, with reported cases of children disappearing from these centers. In January 2022, the media reported that an extensive police investigation resulted in the dismantling of a sex trafficking network that was exploiting children living in government shelters; 10 child trafficking victims were identified, nine of whom lived in government shelters. Services and shelters for male and labor trafficking victims remained limited, and officials reported difficulty locating assistance for these victims. In June 2021, the government passed a comprehensive law on the protection of children and adolescents from violence; the law provided additional protections to child trafficking victims, including requiring child shelters to adopt protocols established by the child protection agency, to include prevention, early detection, and intervention measures for victims.

Prosecutors were required to seek restitution from defendants during all criminal proceedings unless the victims expressly waived that right. In 2021, courts granted 86 victims of convicted traffickers monetary restitution from their traffickers ranging from €9,000 ($10,200) to €60,000 ($68,030) each. The crime victim statute provided victims with the right to state compensation, but authorities have not reported awarding any state compensation to date. Assets seized from convicted defendants supported a fund used to fight trafficking and assist victims; however, victims rarely received these assets as the process remained complicated. Law 4/2000 exempted victims from administrative liability for unlawful acts traffickers compelled them to commit. In September 2021, though the victim was initially charged with drug trafficking and put through a trial, for the first time courts acquitted the victim on the basis of being a trafficking victim who was compelled to commit the crime. NGOs reported that potential trafficking victims sometimes may have been subjected to deportation proceedings before they were identified. NGOs continued to report inconsistent application of victim protections by judges and called for legal reform to better protect witnesses, including permitting video testimony in all cases and increasing measures to protect the identity of NGO expert witnesses, whose testimony could not be anonymous under current law. The government allowed non-EU victims to apply for reflection periods of 90 days, during which they were protected from deportation and could recover while deciding whether to assist law enforcement; the government reported offering this protection to all non-EU trafficking victims in 2021. Foreign victims could request a renewable residence permit for up to five years based on their cooperation with law enforcement, but most usually received a permit for one year and could apply for permanent residency after that five-year period. The government did not report how many victims received asylum, five-year residence permits, or temporary protection; however, one NGO reported the government granted asylum to five trafficking victims it had assisted in 2021. In both of its evaluations, GRETA expressed concern that reflection periods for non-EU citizens were contingent upon an application to the immigration police. Citizens of EU member states, however, were not limited to the 90-day reflection period and faced no deadline for claiming social services or cooperating with authorities.

## PREVENTION

The government increased prevention efforts. The national rapporteur, a politically-appointed deputy ministerial position within the MOI, was responsible for coordination, analysis, and assessment of efforts across the government, with CITCO providing support and technical assistance. The rapporteur reported holding two coordination meetings with representatives from the government, a formal NGO group, and law enforcement in 2021, as well as several bilateral meetings with various stakeholders. Civil society reported the rapporteur and the government actively included NGOs and stakeholders in proceedings and coordination efforts, but some NGOs recommended an improved multidisciplinary approach. Despite the large scope of work, the rapporteur's office had a very limited staff. GRETA criticized the office of the rapporteur's

Haiti AR_000989

ability to evaluate government efforts due to its prominent inter-ministerial coordination function and asked the government to consider creating a fully independent evaluation body. At the provincial level, the government had 17 regional delegates and 50 deputy delegates who helped manage human trafficking, and in addition to the national rapporteur, the government also had an independent Ombudsman who was responsible for reporting and advocating on behalf of trafficking victims. Furthermore, the government's Delegation Against GBV continued to play a central role in coordinating efforts pertaining to sex trafficking, including monitoring efforts on implementation as outlined in the NAP and leading an interagency working group on sex trafficking and exploitation. In January 2022, the government adopted a 2021-2023 NAP to combat both sex and labor trafficking, which included civil society input. However, it did not include a dedicated budget for implementation, continued to prohibit entities other than police from identifying victims, covered a very short timeframe, and did not include any monitoring and evaluation measures. In December 2021, the government also adopted an additional NAP on forced labor, valid for three years, with NGO input; the government established an inter-ministerial working group to monitor the plan's implementation. The NAP focused on victim protection and improving government coordination and policies for the prevention and detection of labor trafficking, but it did not include a dedicated budget for implementation. The government continued to publish data on its law enforcement efforts and victims identified.

The government, as well as the governments of several autonomous communities, reported raising awareness on trafficking through social media platforms and newsletters; the government also disseminated anti-trafficking awareness materials, in several languages, to health, education, social services, and other professionals. Law enforcement reported conducting a labor trafficking awareness campaign in partnership with a well-known activist and another campaign, in partnership with an NGO, targeting online child trafficking and exploitation. Three government-funded NGOs also reported conducting trafficking awareness campaigns, including with workshops, cinema sessions, and at festivals. In cooperation with an NGO, the civil guard continued to distribute an unknown number of anti-trafficking awareness brochures, available in nine languages, at airports and seaports, including the Canary Islands, which received approximately 22,300 undocumented migrants in 2021. The Spanish national police supported a hotline that operated 24/7 and an email address, which could be used for all crimes, including for reporting suspected trafficking cases. In 2021, calls to the hotline resulted in 325 trafficking-related investigations, and an anonymous email led to the dismantling of a trafficking network, the arrest of 26 suspects, and the identification of 19 potential trafficking victims. Several NGOs also ran trafficking-specific hotlines; one government-funded NGO reported receiving 264 calls in 2021, of which 130 included trafficking indicators and 21 resulted in official identifications of trafficking victims by law enforcement.

Fraudulent labor recruitment remained a concern and may have increased worker vulnerabilities to forced labor. The government recognized the increased vulnerability to trafficking, especially in the agricultural sector, and increased its budget to conduct additional inspections in 2022. Additionally, foreign workers did not require the government's prior approval before changing employers, which may have decreased their vulnerability to labor trafficking. The law prohibited recruitment or job placement fees charged to foreign workers, though some labor recruitment companies and intermediaries likely charged such fees which could increase vulnerability to debt bondage. Additionally, labor officials noted concerns regarding the practice of companies sub-contracting or illegally seconding their employees to other companies—all of which may have increased worker vulnerabilities to exploitation. The government did not have robust licensing or accreditation requirements for labor recruiters to operate, other than being subject to inspection and a requirement for a "responsible declaration;" though law enforcement action was taken against several criminal organizations, the government did not report comprehensive law enforcement measures taken to prevent and deter fraudulent recruitment by labor recruiters. By the end of the reporting period, Spanish authorities did not report the number of labor inspections they conducted in 2021, and labor inspectors did not report identifying any trafficking victims, as they did not have

the authority to do so. Trafficking victims could only be identified through joint inspections between labor inspectors and law enforcement officers. Spanish authorities reported participating in a joint action day focused on labor trafficking organized by Europol and led by France; law enforcement targeted the agricultural sector, identified 24 potential trafficking victims, and arrested four suspects. Labor inspectors were unable to conduct unannounced inspections of domestic workers' accommodations and investigate allegations of abuse in the absence of an official complaint; given the large number of domestic and care workers in Spain, this may have left some victims at risk of exploitation and without protection. The government had at least 24 labor attaches at Spanish embassies abroad who reported labor trafficking cases to the government. The government continued to make efforts to reduce the demand for commercial sex acts through several public awareness campaigns against soliciting commercial sex.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit foreign victims in Spain and, to a lesser extent, Spanish victims in Spain and abroad. Labor trafficking is under-identified in Spain. Authorities report the pandemic increased worker vulnerabilities and contributed to the rise in labor trafficking in 2020 and 2021, especially in agriculture, domestic work, and cannabis cultivation in Catalonia. In 2022, Ukrainian refugees, predominantly women and children fleeing Russia's war against Ukraine, are vulnerable to trafficking. Labor traffickers continue to exploit men and women from Eastern Europe and South and East Asia, particularly Pakistan, in the textile, construction, industrial, beauty, elder care facilities, and retail sectors. Traffickers from Romania, Spain, Nicaragua, and Honduras often exploit their own family members in labor trafficking. Mafia groups run by Vietnamese and People's Republic of China (PRC) nationals increasingly exploit Vietnamese victims in labor trafficking in agriculture and on illegal cannabis plantations. Migrant workers from Morocco are vulnerable to labor exploitation on fruit farms and can sometimes be misled and fraudulently recruited. Women from the PRC are vulnerable to fraudulent recruitment and debt bondage. Mafia groups run by Nigerian and PRC nationals commonly work with a local Spanish collaborator. Civil society reported victims' debts to their traffickers—and subsequently the traffickers' control over the victim—increased during the pandemic because victims were sometimes unable to work and earn money. Sex traffickers exploit women from Eastern Europe, South America, Central America, Vietnam, the Dominican Republic, PRC, and Nigeria. Authorities report Colombian, Paraguayan, and Venezuelan women now make up the largest demographic of sex trafficking victims. Sex traffickers use fraudulent recruitment, force, and debt bondage to exploit women and LGBTQI+ persons fleeing the collapsing social and economic conditions in Venezuela. Spanish law neither permits nor prohibits prostitution, and NGOs believe 80 to 90 percent of the 500,000 individuals in the commercial sex industry in Spain are unidentified trafficking victims. The pandemic has exacerbated vulnerabilities for sex trafficking victims through the increased use of private residences, instead of brothels or clubs, and online recruitment. Sex traffickers are increasingly using online platforms, like social networks, mobile applications, and the dark web, to recruit, exploit victims, and book apartment rentals to make their illicit operations difficult to track; this was exacerbated by the pandemic. The rising numbers of newly arrived undocumented migrants, including 22,300 to the Canary Islands in 2021, are vulnerable to trafficking. Unaccompanied migrant children continue to be vulnerable to sex trafficking and forced begging. Roma girls are vulnerable to labor trafficking in Spain.

## SRI LANKA: TIER 2

The Government of Sri Lanka does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Sri Lanka was upgraded to Tier 2. These efforts included slightly increasing investigations, including of several Sri Lankan officials

allegedly involved in child trafficking, and establishing a specialized unit to strengthen trafficking investigations. The government identified more victims, including among migrant workers exploited abroad. The government also increased coordination among agencies to further implementation of the 2021-2025 national action plan (NAP). The government expanded its trafficking hotline services to include online support for referrals. In addition, the government secured a new shelter location to accommodate victims of crime, including trafficking victims. However, the government did not meet the minimum standards in several key areas. The government prosecuted fewer trafficking cases, and sentences for convicted traffickers remained inadequate. Law enforcement efforts against labor trafficking were disproportionately low compared with the number of identified labor trafficking victims. The capacity of local officials to identify trafficking victims remained low, especially among women in commercial sex. The government did not effectively address vulnerabilities to trafficking faced by migrant workers, including high worker-paid recruitment fees, largely unregulated sub-agents, and policies and procedures that undermined safe and legal migration.



SRI LANKA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Improve efforts to vigorously investigate and prosecute suspected traffickers, including labor traffickers and isolated reports of officials allegedly complicit in trafficking, and adequately sentence convicted traffickers. • Increase efforts to proactively identify trafficking victims, including among undocumented migrant workers abroad and women in commercial sex. • Ensure victims are not penalized for unlawful acts traffickers compel them to commit, including through increased training of law enforcement and the judiciary. • Provide support to victims who participate in trials against their traffickers, including the cost of lodging and travel expenses during trials. • Use Section 360C of the penal code to prosecute child sex traffickers. • Improve victim services, including their quality and accessibility, and ensure shelter and specialized services are available for all identified victims, including men and victims exploited abroad. • Increase regular monitoring of licensed recruitment agencies and refer allegations of criminal violations to law enforcement. • Vigorously improve efforts to address child sex tourism, including proactive identification of victims, engagement with hotels and tourism operators, and investigation of establishments and intermediaries who allegedly facilitate the crime. • Eliminate all recruitment fees charged by labor recruiters to workers. • Expand the foreign employment bureau's mandate to include regulation of sub-agents. • Promote safe and legal migration, ensure migration regulations do not discriminate based on gender, and increase awareness among prospective migrants of the steps necessary for safe migration and resources available abroad. • Through the anti-trafficking task force, continue to institutionalize sustained government coordination efforts.

## PROSECUTION

The government maintained anti-trafficking law enforcement efforts. Section 360C of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of two to 20 years' imprisonment and a fine, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious offenses, such as rape. The government also used other sections of the penal code to investigate and prosecute sex trafficking crimes. Section 360B criminalized offenses relating to the sexual exploitation of children and prescribed penalties of five to 20 years' imprisonment and a fine. Additionally, Section 360A criminalized offenses relating to procurement and prescribed penalties of two to 10 years' imprisonment and fines, significantly lower than those available under the trafficking provision.

The Criminal Investigation Department's (CID) anti-trafficking unit and police initiated 16 trafficking investigations (13 sex trafficking, two forced labor, and one unspecified case), compared with 14 investigations (six sex trafficking and eight forced labor cases) during the previous reporting period. The government initiated 16 prosecutions, including 13 for sex trafficking (five under procurement, 360A; five under the sexual exploitation of children statutes, 360B; and three under the trafficking statute, 360C) and three for labor trafficking (all under Section 360C), compared with 27 prosecutions (16 under the procurement statute) during the previous reporting period. The courts also issued three indictments against four accused traffickers under Section 360C. The Attorney General's Department (AGD) reported 96 trafficking cases from previous reporting periods, including 95 sex trafficking cases (four under trafficking, 79 under procurement, and 12 under sexual exploitation of children statutes) and one labor trafficking case remained pending prosecution. The government convicted three sex traffickers under Section 360A, the procurement statute, compared with the conviction of three traffickers for procurement and acquittals in three cases during the previous reporting period. Courts sentenced the three traffickers to pay a fine or face three months' imprisonment compared to sentencing two traffickers to two years' imprisonment and suspending one trafficker's sentence during the previous period. By issuing lenient sentences to convicted traffickers, courts created potential safety problems for trafficking victims and weakened deterrence. Due to the pandemic, government offices and courts closed for an extended period, and some offices were not fully functional due to pandemic-related lockdown and health guidelines, which hindered law enforcement efforts. Despite these limitations, the National Anti-Human Trafficking Task Force (NAHTTF) used online platforms to continue investigations and prosecutions. Additionally, the National Child Protection Agency (NCPA) referred 86 cases of possible child sexual exploitation, including potential trafficking, to police. The government established a new Human Trafficking, Smuggling Investigation and Maritime Crimes Investigation Division within the CID to investigate and combat human trafficking crimes; the new division is reportedly more accessible and accommodating for potential victims to report complaints.

Prosecutors' reliance on victim testimony, difficulty securing evidence from victims, and judges' issuance of suspended sentences contributed to both the government's general reliance on procurement charges and the lenient sentences applied under Section 360A. Prosecutors could pursue procurement cases without the cooperation of the victim. However, lengthy trials—a problem endemic throughout the criminal justice system—and stigma faced by victims deterred many from participating in trials. Most Sri Lankan diplomatic missions did not refer witness and victim affidavits from abroad to CID for investigation, although one mission referred a case involving unclear indicators of labor exploitation to the Attorney General of Police. The government allocated 1.1 million Sri Lankan Rupees (LKR) ($5,430) to the Sri Lankan Bureau of Foreign Employment's (SLBFE) Counter Human Trafficking Unit, compared with 6.1 million LKR ($30,090) allocated to the unit in the previous year, largely due to the reduced number of migrant workers. The government trained ministry officials on anti-trafficking laws, trafficking investigations, and prosecutions. Police continued to conduct anti-trafficking training for new recruits. NCPA began to train its staff on child trafficking using a tri-lingual training manual for law enforcement and child protection officers developed in collaboration with an NGO and an academic institution. Members of the NAHTTF—including the Department of Labor, Ministry of Justice, Bureau for the Prevention of Abuse of Children and Women, and other ministries—conducted numerous anti-trafficking trainings for officials and civil society members. In response to increasing use of fake social media accounts and online platforms to fraudulently recruit victims, the NAHTTF provided training to the Telecommunications Regulatory Commission. The government also implemented a special case system that prioritized child abuse and human trafficking cases when scheduling hearing dates. The Department of Immigration and Emigration's Border Surveillance Unit finalized standard operating procedures (SOPs) to increase identification of trafficking cases; immigration officers identified 46 violations of human trafficking, migrant smuggling, and irregular migration using the procedures at designated ports.

Concerns about official complicity persisted, and the government did not make sufficient efforts to investigate all allegations or report any prosecutions or convictions of allegedly complicit officials. The government maintained a telephone hotline and online platform for public reporting of complaints directly to the Inspector General of Police. In July 2021,

Haiti AR_000991

authorities arrested a local divisional council member, two police officers, and one Naval officer in a child sex trafficking case. The court released the four officials on bail, and the case remained pending at the end of the reporting period. In the previous reporting period, the government investigated allegations of sexual exploitation of children at a state-run orphanage and found no elements of sex trafficking during the investigation; however, in June and November, officials referred the 19 cases to the Attorney General on sexual abuse charges, which remained ongoing by the end of the reporting period. The government did not report efforts to investigate past allegations that some male and female Sri Lankan trafficking victims who fled abusive employers overseas and sought refuge at Sri Lankan embassies reported certain Sri Lankan consular officers sent female trafficking victims back to their exploitative employers and "sold" other women back to their exploitative employment agencies or new employers for financial gain. The same organization noted that embassy staff were able to facilitate new contracts for workers overseas upon consent of the worker and new employer, provided there were no other restrictions, which further contributed to perceptions of complicity between employers and embassies—especially when workers were exploited or otherwise dissatisfied with the new workplace. According to a July 2019 international organization report, some migrant workers bribed officials to obtain fraudulent "family background reports" and pre-departure training certificates required for legal migration.

## PROTECTION

The government slightly increased protection efforts. The government identified 28 female victims and no male victims, compared with 20 victims identified during the previous reporting period. Of the 28 victims, traffickers exploited 14 in sex trafficking, 13 in labor trafficking, and one for unspecified exploitation. The government referred 27 victims to government agencies and an international organization for services, including shelter, psycho-social care, and educational services, and collaborated with an NGO to support the repatriation of one individual to Uzbekistan. The SLBFE referred two Sri Lankan trafficking victims in the United Arab Emirates and one victim in Kuwait to the CID for assistance. Civil society organizations reported an increase in government agencies identifying and referring more trafficking victims for care.

The government had SOPs for the identification and referral of potential victims to services, and the government endorsed SOPs for the identification, protection, and referral of child trafficking victims in 2021. Victim identification procedures included step-by-step guidelines for short-term assistance available to all victims of trafficking. However, the government reportedly did not implement the SOPs uniformly; both government representatives and members of civil society stated the capacity of local officials to identify trafficking victims remained low, especially among women in commercial sex. Officials and NGOs on occasion did not identify forced labor and sex trafficking that did not involve transnational movement, especially of children, and categorized those cases as other crimes. The government partnered with an international organization to establish anti-trafficking forums in seven districts that served to convene local government officials with the community to enhance collaboration on anti-trafficking efforts and increase victim identification. NAHTTF members screened some migrants and other at-risk groups for indicators of trafficking and referred cases to police and CID for further investigation or support services.

The government provided 12.44 million LKR ($61,360) in assistance to the State Ministry of Women and Child Development to operate a shelter for female victims of domestic violence and trafficking. However, a magistrate's order is required for victims to receive services at the shelter, which trafficking victims who did not seek assistance from law enforcement could not access. No government shelter could accommodate adult male victims, although the government stated it could provide shelter for male victims, if needed; the government did not identify any male victims during the reporting period. The National Authority for the Protection of Victims of Crime and Witnesses secured a site for a new government shelter to support victims of crime, including trafficking victims, and continued work with civil society to develop operational guidelines. The government reported it did not provide shelter services to the identified victims. The government partnered with

international organizations to provide medical, psycho-social, legal, and reintegration support to victims with court orders, regardless of their decision to cooperate with law enforcement. NCPA conducted routine monitoring of 369 childcare institutions using a new digital platform during the reporting period, given previous reports that shelter workers and older residents in some government- and privately-run homes sexually exploited child residents, possibly including trafficking victims. The Department of Probation and Child Care Services provided access to computers, textbooks, and school tutoring to two child trafficking victims during the reporting period. The government cooperated with foreign governments, including providing support for five female Indonesian victims of sex trafficking.

Civil society noted that, at the local level, a lack of capacity and sensitization among police, immigration officials, and judges remained an impediment to proper screening for trafficking victims. Additionally, lack of awareness and misunderstanding led some local authorities to penalize sex trafficking victims for unlawful acts committed as a direct result of trafficking, including officials arresting or detaining sex trafficking victims without proper screening. Some trafficking victims did not participate in the law enforcement process due to financial constraints and requirements that victim-witnesses travel to courts; however, the Victim Protection Act of 2015 entitled victims to financial support to testify or appear in court, and the government reported it provided some assistance, including food, accommodation, and transportation to victims. The 2015 SOP on the identification, protection, and referral of victims stated that foreign trafficking victims who do not cooperate with a criminal complaint can receive repatriation assistance and support services if a court order is granted. Law enforcement reported many victims were reluctant to pursue cases against their alleged traffickers due to the social stigma attached with trafficking. While Sri Lankan law has established a victim and witness compensation fund, the government did not provide any funding to trafficking victims during the reporting period. The government allowed victims to transfer court houses, provided transportation for court cases, and offered relocation services during pending trials. The NAHTTF coordinated trafficking victim interviews to reduce the need for repetitive testimony and reduce re-traumatization, and the government began allowing testimony through audio and video links in certain cases. When authorities officially identified foreign victims of trafficking, the victims had the same access as Sri Lankan citizens to services. Foreign victims who cooperated in prosecutions could receive a visa extension until the end of the trial, although the government did not report issuing visa extensions during the reporting period. Sri Lankan law did not provide foreign victims with legal alternatives to deportation to countries where they might face hardship or retribution after trial completion or for victims who did not cooperate in the prosecution of traffickers.

SLBFE operated short-term shelters and safe houses at Sri Lankan diplomatic missions in 10 countries for migrant workers in distress. However, the government reduced the number of labor attachés serving in Sri Lankan embassies and at the SLBFE, due to budget shortfalls related to the pandemic response, reduced human and financial resources previously available for assistance and protection of migrant workers abroad. During the reporting period, Sri Lankan missions abroad assisted 226 migrant workers with shelter, including potential trafficking victims. According to an international organization, when carrying out screening and despite their training, some labor attachés often did not know what questions to ask migrant workers, what evidence to look for, or whom to contact in other agencies to refer potential cases. Sri Lankan diplomatic missions continued to provide funding and logistical support to international organizations that repatriated Sri Lankan migrant workers exploited abroad. Officials did not consistently screen migrant workers who traveled abroad without documentation or who possessed expired work permits for indicators of trafficking, raising concerns some officials might be conflating human trafficking with migrant smuggling. However, the government continued training officials to improve victim identification. In one instance, the Department of Immigration and Emigration screened two potential Thai victims of trafficking and referred the case to CID for further investigation upon identifying elements of exploitation. Embassy shelters could only accommodate females, so it was unclear where exploited male

migrant workers stayed before repatriation. Some migrant workers at the shelters reported poor conditions, including inadequate food, unsanitary living conditions, and insufficient legal assistance. Only Sri Lankan workers who had registered with SLBFE prior to departure could access legal assistance from Sri Lankan embassies, including assistance securing back wages from employers. However, due to the pandemic, SLBFE made resources from the Worker's Welfare Fund, including legal services, medical care, accommodation, and food, available to migrant workers regardless of their registration status. Although SLBFE maintained district-level offices, it usually required repatriated migrant workers to visit the main office in Colombo to launch an investigation into recruitment and labor violations, including trafficking, which many of the indebted and daily wage workers could not afford. As a result, trafficking victims continued to withdraw complaints or not come forward. Some officials at SLBFE reported in 2019 that, contrary to the SOPs, they only referred potential trafficking victims to services after initiating a police investigation.

SLBFE continued to operate a transit shelter near the Colombo airport, primarily for returned migrant workers who suffered abuse abroad. During the reporting period, the SLBFE airport unit reported providing 200 migrants with food, accommodation, and bus fare, although it did not report identifying any trafficking victims among those assisted. As in previous years, the lack of government identification of trafficking victims contrasted with the number of complaints from workers abroad. In 2018, the most recent year for which such data was available, 3,809 Sri Lankan migrant workers in more than 19 countries reported labor-related complaints to SLBFE, including with indicators of trafficking. The vast majority of complainants were females in domestic work in Saudi Arabia, Kuwait, Oman, and the United Arab Emirates; male migrant workers in Saudi Arabia also reported many labor violations.

## PREVENTION

The government slightly increased its prevention efforts. The NAHTTF continued to meet regularly under the new leadership of the Ministry of Defense and worked to increase coordination among government and civil society organizations to implement the 2021-2025 NAP. The NAHTTF organized its efforts by prosecution, protection, prevention, and partnership functions with designated ministry points of contact. The government trained thousands of ministry officials—including the SLBFE, Department of Immigration and Emigration, National Authority for the Protection of Victims of Crimes and Witnesses, CID, Ministry of Justice, Bureau for the Prevention of Abuse of Children and Women of the Police, Department of Labor (DOL), NCPA, Attorney General's department, and the foreign ministry—on victim identification, victims assistance, and anti-trafficking laws. The government, in coordination with an international organization, conducted awareness campaigns through billboards and radio, television, and social media programs. The campaigns targeted potential victims, prospective migrant workers, and first responders, as well as the general public; the Ministry of Justice also conducted an awareness campaign that incorporated the input of trafficking survivors. In addition, SLBFE conducted awareness raising programs for prospective migrant workers within Sri Lanka and at some embassies abroad, particularly in the Middle East. The government also completed an assessment on the outcomes of awareness programs, and SLBFE began to update pre-departure training programs for prospective migrant workers. In addition, the State Ministry of Foreign Employment Promotion and Market Diversification (SMFEMD) conducted more than 200 awareness programs for aspiring migrant workers and communities across Sri Lanka.

DOL conducted information campaigns on eliminating child and hazardous forms of labor, including child forced labor, and held more than 100 awareness programs targeting fishing communities. DOL conducted 64 enforcement operations at 318 establishments in an effort to disrupt forced labor supply chains. In 2021, DOL conducted 38,280 labor inspections, received 204 child labor complaints, concluded 178 child labor investigations, and imposed penalties for child labor violations in one case. Labor inspectors, who received training on trafficking during the reporting period, identified three incidents of child labor—including cases in the construction, domestic work, and service sectors—out of six cases investigated in 2021; however, inspectors did not report identifying any suspected trafficking cases. In addition, the government removed

one child in a case of hazardous child labor in the forestry sector. Labor inspectors only had the authority to inspect private residences for violations against child domestic workers if a complaint was received. Additionally, pandemic-related movement restrictions adversely impacted the ability of DOL to conduct inspections and collect evidence regarding complaints and led to a brief suspension of routine inspections, although child labor inspections continued.

A ban on migration remained in place for male and female domestic workers younger than 21 and 25 years, respectively, to Saudi Arabia, and male and female domestic workers younger than 18 and 23 years, respectively, to other parts of the Middle East. SLBFE also required all female migrant workers younger than 45 to submit a "family background report" to ensure they did not have children younger than 5 years old and obtained either a spousal or guardian's consent to work abroad; authorities did not require spousal or guardian consent for male migrant workers. Observers reported the ban on migration continued to leave Sri Lankans with no legal means to travel abroad for work and therefore without access to protection mechanisms available through authorized travel, subsequently increasing their vulnerability to human trafficking. Agencies and individual sponsors were also required to obtain a "No Objection Certificate" (NOC) from the Sri Lankan embassy for any female domestic worker migrating to Oman; this also required the worker to register with SLBFE. According to this procedure, the Oman Police only issued employment visas to Sri Lankan female domestic workers who submitted both the NOC and an employment contract. All licensed foreign employment agencies were required to submit a semi-annual report confirming the whereabouts of female domestic migrant workers in an effort to mitigate the risk of exploitation while abroad; however, the government did not provide any information by the end of the reporting period.

The government did not make efforts to eliminate legal fees recruitment agencies are allowed to charge migrant workers, which increased workers' vulnerability to trafficking. SLBFE reported monitoring the costs charged to migrant workers, although fees varied by destination country, employer, and job category. SLBFE required each migrant worker to pay a registration fee equivalent to more than one month's salary that required renewal every two years. Additionally, an international report published in 2019 noted some workers reported recruitment agencies charged an additional 8,000 to 150,000 LKR ($39-$740). Some officials reported SLBFE's lack of close monitoring enabled agencies to charge fees in excess of the legal amounts; some workers paid as much as 1 million LKR ($4,930) for the entire recruitment process, including fees charged by illegal sub-agents. However, SLBFE reported that no recruitment fees are charged for the domestic work sector in Middle Eastern countries and professional categories in which employers bear recruitment costs. SLBFE's unit at the main international airport in Colombo detected migrant workers who attempt to leave the country for employment abroad without proper registration; from March 1 to October 30, 2021, the unit detected 2,632 individuals who attempted to go abroad for employment using tourist visas. According to observers, during the pandemic, the government limited outward migration and only permitted migration to a few countries involving a few licensed agents. For those Sri Lankan migrant workers overseas, the government negotiated with immigration authorities to waive penalties and other violations of immigration laws caused by the pandemic, facilitated free legal service, and secured general amnesty for migrant workers out of immigration status.

SLBFE maintained an online system for registering and responding to migrant worker complaints. Civil society and exploited migrant workers abroad continued to report cases of exploitative labor to SLBFE, including non-payment of wages, contract fraud, and document retention. SLBFE officers in the conciliation division do not always recognize elements of trafficking and may handle cases administratively, rather than referring the case to police. During the reporting period, SLBFE cancelled the licenses of six recruitment agencies and took action in 35 cases against malpractice and irregularities in the labor recruitment process. This compared with 30 cases and the suspension of three foreign recruitment agencies for illegal practices in the previous reporting period. SLBFE Act Section 62 states that operating a recruitment agency without a valid license is an offense punishable with four years' imprisonment and a fine. Although the government reported that a legislative framework to

address sub-agents existed, SLBFE did not have the legal authority to regulate sub-agents, which officials recognized contributed to trafficking. The government continued to seek approval for an amendment to the Foreign Employment Act to address the oversight of sub-agents and the investigative authority of MFE officials, including SLBFE.

The government did not report efforts to reduce the demand for commercial sex. NCPA continued awareness campaigns targeted to parents and children on child abuse, including child sex tourism, in Sri Lanka's Coastal Belt. The government did not report efforts to reduce the demand for child sex tourism, although the government worked with civil society and an international organization to research causes of sex tourism in Sri Lanka. Foreign tourism has remained low since 2020. The NCPA continued to run a hotline to report child abuse and expanded its services to include online support for referrals via email and text messages. The hotline received 79 reports of alleged child trafficking from April to October 2021, with police investigating the referrals. SLBFE conducted anti-trafficking trainings for personnel at 16 diplomatic missions, and the Foreign Ministry held anti-trafficking trainings in missions facilitating significant labor migration. The government continued to provide anti-trafficking training to its troops prior to their deployment as peacekeepers.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Sri Lanka, and traffickers exploit victims from Sri Lanka abroad. The majority of Sri Lankan trafficking cases involve traffickers forcing Sri Lankan migrant workers into labor overseas. Traffickers exploit Sri Lankan men, women, and children in forced labor in the Middle East, Asia, Europe, and the United States in the construction, garment, and domestic service sectors. Approximately 1.5 million Sri Lankans work in the Middle East, predominately in construction and domestic work, as well as in professional services. The majority of Sri Lankan female migrant workers seek employment in Saudi Arabia, Kuwait, Qatar, Japan, and South Korea, and authorities have identified labor trafficking victims among these workers. Over the past five years, thousands of Sri Lankan female migrant workers—especially from Nuwara Eliya, Ampara, and Batticaloa—reported employers exploited them in forced labor in domestic work in the Gulf. Before leaving Sri Lanka, many migrant workers accumulate debt to pay high recruitment fees imposed by unscrupulous labor recruitment agencies—most of them members of Sri Lanka's association of licensed foreign employment agencies—and their unlicensed sub-agents. For labor trafficking in domestic work, some traffickers target Sri Lankan women with existing debts and use promises of a large advance to defraud them into accepting positions. Some Sri Lankan migrant workers in the Gulf report employers retained their identity documents, including passports and work permits, which restricts freedom of movement and is a common means of coercion for labor and sex trafficking. Some recruitment agencies commit fraud by changing the agreed upon job, employer, conditions, or salary after the worker's arrival. Some recruitment agencies lure workers with promises of work abroad but send them with fraudulent or incorrect documents—including tourist visas instead of work visas—so victims are subject to penalization, including jail time and deportation, if they seek assistance abroad. An international organization reported in 2019 that sub-agents colluded with officials to procure fake or falsified travel documents to facilitate travel of Sri Lankans abroad. According to 2018 media reporting, at least six government-licensed recruitment agencies in Sri Lanka admitted that, if prospective Middle Eastern employers request, they force female migrant workers to take contraceptives before departure to provide a "three-month guarantee" maids will not become pregnant after arrival. Per the same 2018 reporting, sources alleged this was also used to cover up sexual exploitation by recruitment agents and employers, including sex trafficking. Traffickers have forced Sri Lankan women into commercial sex in South and Southeast Asian countries, among other countries. During the reporting period, traffickers increased their use of social media to fraudulently recruit victims due to pandemic-related restrictions in mobility. Sri Lanka is a transit point for Nepali women subjected to forced labor in the Middle East.

Within Sri Lanka, traffickers exploit men, women, and children in forced labor and sex trafficking, although women, children, ethnic minorities, and older individuals are often most at risk. Ethnic minorities such as the Malayaha Tamils, whose ancestors migrated from India to work

on plantations, continue to experience marginalization and forms of discrimination that heighten vulnerability to trafficking. Traffickers recruit women from rural areas with promises of urban jobs in the hospitality sector, salons, spas, and domestic work but exploit some in forced labor or commercial sex. Due to the pandemic, observers report increasingly unethical labor recruitment practices within the local labor market, especially targeting women, as illegal sub-agent recruiters shift their focus from overseas jobs. The socio-economic impact of the pandemic and related restrictions have contributed to an increase in cybersex crimes and increased the risk of low-income individuals and other vulnerable groups to sex trafficking. One local NGO estimated that cybersex crimes, including sex trafficking, against women and children have increased as much as 300 percent since the onset of the pandemic.

Additionally, observers stated they believe more young women were engaged in commercial sex due to pandemic-related economic hardships. Traffickers reportedly exploit boys and girls in sex trafficking, including in coastal areas for child sex tourism, and in hotels, on beaches, and during annual festivals, though tourism volumes fell substantially due to the pandemic. One report found that many child trafficking victims traveled to coastal tourist locations from Anuradhapura district. Reports allege some hotels allow clients to book "services" with children for child sex tourism, and some hotels use intermediaries to provide their guests with males and females—including children—for commercial sex. In addition to foreign tourists—including from Germany, Russia, India, and the People's Republic of China (PRC)—researchers report significant local demand driving child sex trafficking in country. In recent years, traffickers have subjected women from other Asian countries to sex trafficking in Sri Lanka. Traffickers may have exploited migrant workers brought to Sri Lanka on tourist visas and foreign women in commercial sex in Sri Lanka. In addition, some micro-finance companies targeted women with predatory loans and contracts written in English, resulting in debts that forced women to resort to commercial sex or subject their children to sex trafficking in order to pay off the debt.

Some observers have long reported that some local government and security sector officials forced women who asked for information about their missing husbands or widows who attempted to claim government benefits from their deceased husbands' military service, to perform commercial sex acts in exchange for information and/or government benefits. Officials and NGOs reported some workers and residents in government and private shelters that care for trafficking victims sexually abused and exploited some of the institutionalized children.

Sri Lankan children work in the domestic sector, service industry, and more hazardous occupations, such as the industrial sector. Child labor is also significant among ethnic minority Tamils on tea and rubber plantations. Some children and women domestic workers in Colombo are subjected to physical, sexual, and psychological abuse, non-payment of wages, and restrictions of movement—indicators of labor trafficking. Labor traffickers exploit children in small boutiques and informal markets. Traffickers reportedly exploited children as part of the drug trade in prior years.

## SUDAN: TIER 2

The Government of Sudan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Sudan remained on Tier 2. These efforts included convicting more traffickers, updating its national action plan, and providing training on the illegality of child soldier recruitment and use to civilian protection and military forces. However, the government did not meet the minimum standards in several key areas. Substantial personnel turnover related to the October 2021 military takeover hindered Sudan's ability to maintain consistent anti-trafficking efforts. Authorities continued to conflate human trafficking with migrant smuggling, hindering law enforcement efforts. For the third consecutive year, the government did not disseminate or implement standard operating procedures (SOPs) for victim identification and referral to care for child trafficking victims developed in partnership

**SUDAN**

with an international organization. For the third consecutive year, there were allegations officials may have sexually exploited refugees in government-run camps. The government has yet to investigate or prosecute any officials for forced recruitment or use of child soldiers.



SUDAN TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate and prosecute traffickers as well as complicit officials, including distinguishing those allegedly responsible for labor and sex trafficking as distinct from migrant smuggling or kidnapping crimes. • Increase efforts to investigate and prosecute officials who were complicit in child soldier recruitment and use. • Coordinate with civil society and international organizations to disseminate and implement SOPs for authorities and first responders to identify child sex and labor trafficking victims and develop SOPs for adult trafficking victims. • Ensure all identified trafficking victims are referred to appropriate protective services. • While respecting fair trial guarantees, sentence convicted traffickers to adequate penalties according to the country's anti-trafficking law. • Increase training for security and judicial officials on distinguishing trafficking from other crimes, such as migrant smuggling and kidnapping for ransom, and ensure recipients use this guidance to train other officials. • Ensure authorities do not penalize trafficking victims for crimes committed as a direct result of unlawful acts traffickers compelled them to commit, such as women coerced into commercial sex acts. • Provide sufficient human and material resources to the National Committee to Combat Human Trafficking (NCCHT). • Implement and dedicate adequate resources to the 2021-2023 national anti-trafficking action plan. • Partner with civil society, international organizations, and the private sector to establish additional shelter options for trafficking victims. • Develop a data collection and information management system in collaboration with international organizations to more effectively organize law enforcement data. • Draft and finalize a standalone smuggling law to enhance judicial officials' ability to prosecute migrant smuggling crimes separate from human trafficking crimes.

### PROSECUTION

The government maintained anti-trafficking law enforcement efforts. The 2014 Anti-Human Trafficking Law, as amended, criminalized sex trafficking and labor trafficking. The law prescribed between three and 10 years' imprisonment for base offenses involving adult male victims and between five and 20 years' imprisonment for offenses involving adult female and child victims or involving additional aggravating circumstances; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with the penalties prescribed for other serious crimes, such as rape. Article 14 of the Sudan Armed Forces Act of 2007 criminalized the recruitment of children younger than 18 years old by state armed forces, the enslavement of civilians, sexual slavery, and coercing civilians into prostitution, and it prescribed penalties between three years' imprisonment and death.

Authorities continued to conflate migrant smuggling and human trafficking crimes; thus, the government's reported data likely included cases that did not involve trafficking elements in line with international definitional standards. The government reported investigating 26 cases, involving an unknown number of suspects, compared with an unknown number of cases that involved 118 suspects in the previous reporting period. The government reported prosecuting eight cases, involving an unknown number of suspects, compared with 36 cases involving 80 suspects in the previous reporting period. The government reported convicting 32 traffickers compared with convicting eight defendants of trafficking-related crimes in the previous reporting period. Two additional cases resulted in acquittals, and five cases were dismissed. In prior

years, insufficient sentencing of traffickers weakened deterrence and was not in line with sanctions required by the country's anti-trafficking law. Courts were intermittently closed during the year due to strikes and pandemic restrictions.

The government did not report providing anti-trafficking training to law enforcement, prosecutors, or judges. Authorities continued to conflate human trafficking, migrant smuggling, and kidnapping for ransom, which impeded accurate assessment of Sudan's anti-trafficking law enforcement data. Experts noted the lack of a standalone smuggling law impeded judicial officials' efforts to prosecute migrant smugglers separate from human traffickers. In a previous reporting period, law enforcement officers stated potential foreign victims declining to cooperate with investigators impeded prosecutions of transnational cases.

Authorities did not report the results of investigations into allegations of sexual exploitation and abuse—which may have included aspects of sex trafficking, to include transactional sex—by officials from the Commission of Refugees and General Intelligence Services. Experts noted some law enforcement and border officers were complicit in or otherwise profited from trafficking crimes specifically related to exploiting migrants along Sudan's borders. During the reporting period, an international organization reported on the abduction and detention of a girl on a Sudanese Armed Forces (SAF) base in sexual slavery for an extended period, which meets the legal standards for recruitment and use of a child soldier by the SAF. The government did not report efforts to investigate complicit officials.

### PROTECTION

The government maintained inadequate efforts to identify and protect victims. The government reported identifying 633 potential trafficking victims, 400 men and 233 women, compared with identifying 494 potential victims during the previous reporting period. Due to a dearth of training and ongoing conflation between migrant smuggling and human trafficking, the government did not always distinguish between trafficking victims and individuals who purchased the services of smugglers to cross international borders illegally and were not exploited in forced labor or sex trafficking. The government reported providing food, psycho-social services, and basic medical services at two government-run shelters. The government reported referring an unspecified number of potential victims to shelters. Officials reported existing shelters were in dire need of refurbishment and a dearth of trained mental health professionals to provide care to trafficking victims. The lack of shelters adversely affected the country's ability to protect victims once identified.

For the third consecutive year, officials did not report disseminating or implementing child trafficking victim identification SOPs developed in 2018 in partnership with an international organization. The government did not have SOPs for victim identification and referral to care for adults. The government's past denial of sex trafficking occurring within Sudan, coupled with authorities' inconsistent screening of vulnerable populations, likely resulted in the arrests and detention of women whom traffickers compelled into commercial sex. Sudan's Domestic Workers Act of 2008 provided a legal framework for employing and registering domestic workers with limited labor rights and protections; however, the government did not report registering or protecting any domestic workers under the law during the reporting period.

### PREVENTION

The government maintained efforts to prevent trafficking. The NCCHT led the government's anti-trafficking efforts, including implementing the 2021-2023 national action plan, which launched in August. The NCCHT, which included subcommittees in the states of Gedaraf, Kassala, North and West Darfur, and Northern State, convened regularly. Observers noted that a lack of human and material resources—as well as a limited presence outside the capital—hindered the NCCHT's ability to execute its mandate. The Ministry of Interior's Department of Combating Human Trafficking is responsible for anti-trafficking law enforcement and would provide services to identified trafficking victims, including maintaining one shelter which was in need of repairs.

The government reported it conducted awareness raising campaigns about the 2021 amendments to the anti-trafficking law and the national action plan. Additionally, trafficking was covered in primary

Haiti AR_000995

and secondary school curricula. The government provided training to recruitment agencies and prepared informational material on the risks of exploitation for Sudanese seeking work abroad. The government reported it ran a hotline but did not provide information on the hotline's purpose or utility. Ministry of Labor inspectors were responsible for providing oversight of recruitment agencies, but they did not report investigating or sanctioning fraudulent recruiters during the reporting period. The government did not report providing anti-trafficking training for its diplomatic personnel. Officials did not report efforts to reduce the demand for commercial sex.

SAF officials continued to staff the Child Rights Unit (CRU), established in 2019, which led the government's child protection efforts in conflict areas. The government reported the CRU provided training focused on the rights of the child in conflict—including sensitization on the illegality of child soldier recruitment and use—to civilian protection and military forces. The government did not report inspecting Rapid Support Forces (RSF) or SAF units to ensure there were no cases of child soldier recruitment or use. For the second consecutive year, the government did not report finalizing the military's training manual on child rights, including child soldier prevention and referral. The Sudanese Joint Chiefs of Staff continued to issue and disseminate command orders every three months during the reporting period, directing military officials to follow the government's ban against recruiting or using individuals younger than 18 years of age in support or combat roles.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Sudan, and traffickers exploit victims from Sudan at home and abroad. Traffickers exploit children experiencing homelessness in Khartoum—including Sudanese and unaccompanied migrant children from West and Central Africa—in forced labor for begging, public transportation, and large markets and in sex trafficking. Business owners, informal mining operators, community members, and farmers exploit children working in brick-making factories, gold mining, collecting medical waste, street vending, and agriculture; the traffickers expose the children to threats, physical and sexual abuse, and hazardous working conditions with limited access to education or health services. Criminal groups exploit Sudanese women and girls—particularly internally displaced persons (IDPs) or those from rural areas—in domestic work and in sex trafficking.

Due to regional instability and conflict, there are more than three million IDPs and 1.1 million refugees in Sudan—populations with increased vulnerability to forced labor or sex trafficking. Observers reported concerns that government officials from the Commission of Refugees and General Intelligence Service were potentially sexually exploiting refugees—including newly arrived Ethiopians—in Sudan. Additionally, due to the government's refugee encampment policy that restricts refugees from moving freely within the country, some refugees utilized migrant smugglers inside Sudan, which further increased their risk of exploitation. Additionally, reports alleged corrupt RSF officials financially benefited from their role as border guards and took a direct role in human trafficking. In past years, the non-governmental armed groups Sudanese People's Liberation Movement-North (SPLM-N) al-Hilu and SPLM-N Malak Aga conscripted child soldiers from refugee camps in South Sudan and brought them into Sudan. The Sudanese Alliance recruited and used child soldiers in Darfur. An international organization reported there were at least 300 child soldiers in Darfur being used by unidentified armed groups.

Sudan is a primary transit point for irregular migrants and refugees from the Horn of Africa seeking to reach Europe. Large populations of Eritrean, Ethiopian, and other African asylum-seekers, as well as some Syrians—all populations vulnerable to trafficking due to their economic fragility and lack of access to justice—resided in Khartoum while planning to travel to Europe. Sudanese traffickers compel Ethiopian women to work in private homes in Khartoum and other urban centers. Well-organized and cross-border criminal syndicates force some Ethiopian women into commercial sex in Khartoum by manipulating debts and other forms of coercion. Attempting to escape conflict and poverty, many East African victims of trafficking initially seek out the services of migrant smugglers, who coerce the migrants into forced labor or sex trafficking. Egyptian government forces allegedly exploit some Sudanese migrants in forced labor in Egypt. Sudanese transiting the Sinai on their way to Israel are at risk of kidnapping and exploitation by Bedouins and at further risk of trafficking when they arrive in Israel.

Due to the years of conflict in South Sudan, the South Sudanese refugee population in Sudan was more than 800,000 in 2021; many of these refugees remain vulnerable to forced labor and sex trafficking. In 2018, an international organization documented cases of traffickers exploiting West and Central African nationals—primarily from Chad, Mali, and Niger—arriving in Sudan via irregular migratory routes.

Darfuri armed groups exploit some migrants in forced labor or sex trafficking. Smugglers linked to the Rashaida and Tabo tribes abduct Eritrean nationals at border crossings, extort them for ransom, and subject them to abuse, including trafficking. Other cross-border tribes also force abductees to perform domestic or manual labor and abuse them in other ways, including exploiting them in forced labor or sex trafficking.

## SURINAME: TIER 2

The Government of Suriname does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Suriname remained on Tier 2. These efforts included prosecuting more alleged traffickers and doing so for the first time since 2017, prosecuting three police officers for suspected complicity in trafficking crimes, identifying more victims, hiring additional officers for the Police Trafficking in Persons Unit (TIP Unit), implementing a formal victim identification and referral process, adopting a new National Action Plan (NAP), and expanding the interagency Trafficking in Persons Working Group (TIP Working Group). However, the government did not meet the minimum standards in several key areas. Authorities did not convict any traffickers, did not provide adequate services for victims, and did not sufficiently fund anti-trafficking efforts.



SURINAME TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Increase efforts to convict traffickers, following due process, and sentence convicted traffickers to significant prison terms. • Increase efforts to investigate and prosecute alleged traffickers, including officials complicit in trafficking crimes. • Provide vulnerable individuals with trauma-informed assistance, reintegration support, and interpretation in their language prior to, during, and after screening for trafficking. • Provide adequate and dedicated funding for the NAP and government departments carrying out anti-trafficking activities. • Prosecute child sex and labor trafficking cases under the trafficking statute and provide specialized child protection services with trained providers. • Fully implement the victim identification and referral protocol and train officials in its use to identify trafficking victims, especially among at-risk groups. • Train judges at all levels of the judiciary in human trafficking and the trafficking law and sensitize judges and prosecutors to the issue of secondary trauma. • Support NGOs and foreign embassies on victim identification and service provision. • Incorporate survivor input into anti-trafficking policies, develop and execute a robust monitoring and evaluation framework, and publish the results. • Refer to care victims identified through the hotline and report on the hotline's effectiveness.

## PROSECUTION

The government increased prosecution efforts. Article 334 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to nine years' imprisonment and a fine of 100,000 Surinamese dollars (SRD) ($5,120) for offenses involving a victim 16 years of age or older, and up to 12 years' imprisonment and a fine of 100,000 SRD ($5,120) for those involving a victim younger than the age of 16. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

Police initiated eight investigations (six for sex trafficking and two for labor trafficking), of 19 individuals, compared with six investigations (four for sex trafficking and two for labor trafficking) in 2020, eight investigations in 2019, and three in 2018. Police referred six cases and 17 defendants for prosecution, compared with one sex trafficking prosecution in 2020 that authorities later dropped due to insufficient evidence after the victim chose not to cooperate with the prosecution. Two cases involving four defendants were closed due to lack of evidence. The government prosecuted seven individuals in five of the cases under the trafficking law and eight individuals in the sixth case under other laws. The prosecutions under the trafficking law were the first since 2017. Authorities prosecuted three police officers for suspected complicity in child sex trafficking. Authorities released eight alleged traffickers on bail while their trials were pending. In the previous reporting period, authorities prosecuted as other crimes two cases initially investigated for trafficking. The government reported one ongoing investigation against an offender still at large from the previous reporting period. In addition to the cases above, the TIP Unit investigated several other potential trafficking crimes involving Haitian migrants. The government did not convict any traffickers in 2021 or 2020, compared to 18 in 2019 and seven in 2018.

The TIP Unit was the sole agency responsible for the investigation of sex trafficking, forced labor, and migrant smuggling cases throughout the country. During the reporting period, the government appointed a new head and additional members of the TIP Unit. The TIP Unit reestablished interagency cooperation on trafficking investigations with the Military Police's immigration office, the Alien Affairs Office, and the Ministry of Social Affairs. The Police Youth Affairs Department also investigated any case involving persons younger than 18; the two units collaborated closely. The TIP Unit referred trafficking investigations to prosecutors trained in handling such cases. The anti-trafficking funding for these bodies was part of their overall budgets. The TIP Unit lacked sufficient funding and resources and some officers required further training on investigative techniques and victim identification. The TIP Unit adopted a strategic plan. As a result of the pandemic, the Maritime Authority, the military, the maritime police, and the Coast Guard increased inspections of vessels entering the country, to identify suspicious activities, including trafficking. In 2022, the TIP Unit began weekly patrols with the Maritime Police.

The pandemic significantly impacted the government's efforts to coordinate, execute, and monitor its anti-trafficking law enforcement efforts for the second year. Numerous police officers including officers in the TIP Unit tested positive for the COVID-19 virus or had to quarantine, and several police stations closed due to lack of staff. The court system also shut down on several occasions, with some operations moving to digital platforms due to the pandemic; a large backlog of cases, including trafficking cases, continued despite the return to more normal operations by the end of the reporting period.

The government screened for trafficking crimes as part of an international operation that carried out targeted, coordinated enforcement actions against criminal migrant smuggling networks. The government signed a bilateral cooperation agreement with Brazil in January to improve cooperation against different transnational crime threats, including human trafficking. The TIP Unit collaborated with the Cuban embassy on a case involving Cuban nationals. The government also continued to collaborate on trafficking cases with neighboring Guyana and French Guiana. The government provided multiple in-person and online refresher courses on anti-trafficking enforcement, victim identification, and victim handling for members of the police, including the TIP Unit, and members of the Prosecutors' Office. Other officials, including immigration

officials and those from Alien Affairs and Social Affairs, did not receive trafficking training.

## PROTECTION

The government increased protection efforts. The government identified 15 victims, compared with one victim in 2020 and three victims in 2019. Of the total victims identified, 11 women and two girls (eight Venezuelan and five Surinamese) were victims of sex trafficking and two People's Republic of China (PRC) national men were victims of labor trafficking. The government identified two of the 15 victims at illegally-operated commercial sex establishments. The government referred all victims to government-funded non-shelter services and two of the Venezuelan victims to the two open shelter spaces in the TIP Unit office building; the others stayed in places they deemed safe and checked in with the police. The TIP Working Group's constituent agencies fully implemented the First Response to the Victim of Trafficking in Persons Protocol, resulting in increased efforts to identify victims among constituent agencies. The Protocol outlined procedures for interacting with potential trafficking victims, the process from identification to providing essential services, and the rights of victims. The government reported police and immigration officials screened at-risk populations, including migrants and those in commercial sex, for trafficking. The TIP Unit and the Military Police, in charge of immigration services, agreed to reintroduce trafficking screening by the TIP Unit on incoming international flights instead of by members of the immigration services only; the TIP Unit began to do so daily in January 2022. The government reported the last Cuban medical workers departed the country in September 2021. The government reported it did not screen Cuban medical workers for trafficking indicators.

No NGOs in the country specifically worked on human trafficking, although an international organization and other NGOs included trafficking victim protection in their activities. The Ministry of Justice and Police used a process by which they referred victims to the Bureau of Victim Services for food, shelter, medical care, counseling, and other care funded out of its regular budget. The government continued to make available basic services despite the pandemic and offered them to foreign and national victims and those with disabilities. The government also gave victims basic personal protective equipment due to the pandemic. The Bureau of Legal Aid could provide victims with legal assistance, if necessary. Under the new protocol, officials offered these services to potential victims upon first encounter with them. Government agencies did not have victim assistance funds specifically allocated but made resources available as needed from the general budget. The government did not place time limits or conditions upon services, except for the government shelter, which could be used for up to three months; authorities did not require victim cooperation with law enforcement in order to receive care. The government funded and operated a trafficking shelter for women and children; it was in the same complex as a shelter for domestic violence victims. The trafficking shelter was normally the only facility the government had available for human trafficking victims; it was closed for part of the reporting period due to pandemic-related staffing shortages and complete renovation of the buildings. However, the TIP Unit provided two victims with accommodations within its own office building, which was originally a home, when the shelter was closed. There were no specialized shelter services for child or adult male trafficking victims. Children who did not want to return to their homes had the option of entering a childcare facility or staying with a foster family. Special counseling was available for child victims along with their families. All victims were free to leave the shelter, but only with a chaperone. Due to a lack of adequate shelter services, the TIP Unit also allowed victims who had a safe place to stay to remain out of shelter; however, authorities required the victims to periodically check in with the police. The government reported being willing to assist foreign victims to apply for temporary or permanent residency and a work permit, but there were no longer term shelter options available for foreign victims. Victims could apply for temporary or permanent residency whether or not they assisted with trials, although there were no reported cases of victims using either of these provisions. Victim-witnesses could move freely within the country or travel abroad. If a victim returned to the country after leaving, the victim would be under the same conditions as other travelers to the country; the government did not offer victims

a special category of visa. There was no witness protection program, although victims in shelters received police protection. Authorities provided counseling and legal support to victims in judicial processes and strongly encouraged victims to participate; courts could obtain testimony from victims in the early stages of judicial investigations in case victims were not available during the trial process, although this could weaken testimony in cases where authorities did not provide victims time for recovery and reflection before giving testimony. Victims could speak directly to a counselor or a member of the Prosecutors' Office instead of to the police. In the case of foreign victims, prosecutors usually used a victim's initial report as a formal criminal complaint and testimony in the case, as victims often returned to their countries of origin before a trial was completed; in almost all cases courts lost contact with the victim once the victim departed the country. Victims could refuse to have their initial report used in this way, but observers noted there were no reports of this. However, victims continued to have the right to testify after providing an initial statement and/or after receiving counseling. The defense attorney also continued to have the right to question the victim. Testimony via video or written statements was possible. Victims had the right to seek compensation through a civil process, though no such case has ever been filed.

Observers noted that gaps in government policies and regulations, as well as a lack of oversight and implementation, enabled traffickers to exploit victims. The government did not report deporting any victims. The government failed to effectively repatriate victims; outside observers noted, given limited flights out of the country due to the pandemic, in most cases victims who opted to leave did so through their own mechanisms. The government reported it did not knowingly detain, fine, or jail potential trafficking victims for unlawful acts their traffickers forced them to commit. However, in previous reporting periods, outside organizations reported the government jailed human trafficking victims under the Alien Act for having been in the country illegally after being referred to the TIP Unit for assistance. The government reported it coordinated with the Cuban embassy and the Maduro regime in Venezuela on victim support after it identified victims from these countries. Outside observers reported the process for collaboration between the TIP Unit and embassies on victim support was cumbersome and bureaucratic, impacting the response time of embassies to provide essential support to their citizens.

## PREVENTION

The government increased prevention efforts. The government adopted a new annual NAP for 2021-2022. The TIP Working Group was the primary interdepartmental group responsible for monitoring and implementing the NAP, coordinating government efforts to combat trafficking, and making recommendations to the government, including on legislation. The TIP Working Group, coordinated by the Director of Operations of the Ministry of Justice and Police, reported to the Minister of Justice and Police on the activities of the NAP and addressed emerging issues on a whole of government basis. Alien Affairs and Human Rights, which provide victim services, joined the TIP Working Group during the reporting period. Observers reported the TIP Working Group resolved issues that impacted the execution of policy related to human trafficking, including approving budgets and action plans; communicating across the interagency, including ministries not part of the Working Group such as the Ministry of Health; identifying resources; and collecting data from the Prosecutors' Office and the Court of Justice. A core group within the Working Group was also responsible for day-to-day issues that required immediate higher-level attention, as this core group had direct contact with the Minister of Justice and Police. The Director of Operations of the Ministry of Justice and Police chaired the Working Group. The TIP Working Group met in whole and in part several times during the reporting period. The TIP Working Group's mandate was renewed in November 2021 for one year. The government did not seek input from survivors or NGOs in drafting the annual NAP or for other laws or policies; the government did incorporate input from international organizations. The government did not allocate funding specifically for human trafficking included in the NAP; funding for such activities came from the overall budgets of the respective agencies, with the Ministry of Justice and Police undertaking the most activities. The government implemented anti-trafficking activities with available non-reallocated

funding from the Ministry of Finance; lack of sufficient funding due to generally low funds, budget deficit restrictions, and the pandemic significantly impacted the ability of the TIP Working Group to implement the activities included in the NAP. The government reported low-cost activities and those in advanced stages of implementation progressed; for example, the full implementation of the First Response to Victims of Trafficking Protocol progressed, after having been delayed during the previous reporting period due to the pandemic.

The government continued to operate a 24-hour anti-trafficking hotline in the interagency National Command Center. The hotline primarily operated in Dutch, English, and Sranan Tongo. The government did not keep statistics on calls or victims identified through the hotline. The government made informational flyers and brochures in different languages with the anti-trafficking hotline number and posted the flyers at multiple entry points into the country, police stations, doctors' offices, and other locations. One member of the TIP Working Group presented to the PRC Embassy and the PRC national community on labor trafficking. The government halted other awareness campaign activities, particularly in schools, because of the pandemic. The government did not conduct formal research on trafficking during the reporting period. The TIP Unit, along with the Youth and Morals Division, polled visitors to police stations on their awareness of human trafficking; the TIP Unit used the poll results to inform its workplan and website. The government partnered with a university on a course on trafficking to raise awareness among students and spur interest in research. The government did not publicly post an assessment of its anti-trafficking efforts but made the information available upon request.

Labor laws prohibited employers, recruiters, and labor agents from charging workers recruitment fees, confiscating workers' passports or travel documents, switching contracts without workers' consent, or withholding wages as a means of keeping workers in a state of compelled service. Labor laws required all employment agencies to be licensed before recruiting either national or foreign employees, and they had to receive permission from the Ministry of Labor before entering into work mediation with employees. The government reported the Labor Inspectorate regularly checked the paperwork of foreign workers, who were vulnerable to labor trafficking, at job sites and fined employers for violations; half of inspectors received training on child trafficking in previous reporting periods. The government assigned the Labor Inspectorate as the lead agency responsible for overseeing the implementation of pandemic protocols in different business sectors, which significantly increased its reach to conduct regular inspections, although the government did not provide sufficient funding, staffing, or equipment to cover all tasks. Most inspections were unannounced, but the law did not allow labor inspectors to inspect private homes or farms, and police had to be escorted and have a special warrant for any inspections on private property. The government reported fining businesses up to 250 SRD ($12.80) for each foreign worker employed without having the proper registration paperwork. Labor inspectors also screened for trafficking indicators but did not report identifying any labor trafficking cases through such measures during its increased inspections during the reporting period. No inspectors were solely dedicated to child labor, but the government trained all inspectors to identify child labor and instructed them how to handle suspected cases. The government warned businesses against hiring foreign workers without proper documentation and provided information on employment scams and fraudulent job offerings to businesses and workers through print, social media, and on television, including public service announcements with contact information for questions or concerns. Authorities also could accept information on labor violations reported by the public. Authorities, including the TIP Unit, suspended all flights to and from Haiti during the reporting period following concerns about the vulnerability of Haitians to trafficking and questions about the legality of Haitians' paperwork to enter the country, as well as concerns over possible onward destinations. Limited unemployment benefits only went to citizens. The TIP Working Group trained newly appointed diplomats on human trafficking. The government did not make efforts to reduce the demand for commercial sex acts. The government did not make efforts to reduce participation in international and domestic child sex tourism.

**SWEDEN**

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Suriname, and traffickers exploit victims from Suriname abroad. Reported cases of trafficking in Suriname's remote jungle interior, which constitutes approximately 80 percent of the country, have increased in recent years; limited government presence in the interior renders the full scope of the problem unknown. Weak immigration policies, difficulty in controlling Suriname's borders, and the draw of the gold and timber trade have led to an influx of immigrants from different countries entering Suriname legally and remaining in country after their legal stay expires. These persons become particularly vulnerable to sex and labor trafficking. Traffickers target the increasing influx of migrants into Suriname, particularly those from Haiti and Venezuela, as well as those from Brazil, Cuba, the Dominican Republic, and Guyana. Migrant women and girls are especially at risk for sex trafficking in Suriname, including in brothels, massage parlors and hair salons, and illegal gold mining camps in Suriname's interior. Individuals involved in commercial sex offered through newspaper ads and social media are also at risk for trafficking. Adult and child migrant workers in agriculture, retail shops, construction, and on fishing boats off Suriname's coast are at risk of trafficking, as are children working in agriculture, small construction, gold mines, and informal urban sectors. Given their irregular status, migrant groups avoid seeking assistance from the authorities for fear of criminalization or deportation, making them vulnerable to traffickers. In March 2020, authorities signed an agreement with the Cuban government to allow 120 Cuban medical workers to help combat the pandemic; 51 Cubans came to the country during the previous reporting period, joining approximately 50 already in the country. Cuban medical workers may have been forced to work by the Cuban government prior to their departure. PRC national-run associations, and allegedly some Hong Kong traffickers, recruit and exploit PRC national immigrants in sex and labor trafficking in the mining, service, and construction sectors. Surinamese women in neighboring countries are at risk of sex trafficking. Some Surinamese parents exploit their daughters in sex trafficking, a trend exacerbated by the pandemic. Traffickers may transport victims through routes in Suriname's interior that bypass official checkpoints. There are reports of corruption and local official complicity in trafficking crimes that may impede anti-trafficking efforts. While traffickers are predominantly male, authorities have also prosecuted and convicted women who trafficked individuals. Traffickers may exploit victims from the same migrant populations. In previous reporting periods, authorities could deport at-risk individuals who violated the terms of their stay before being screened for trafficking, but in the previous reporting period the government reported it stopped all deportations as part of its pandemic response measures unless the deportation involved persons suspected of committing a crime apart from having an irregular status. Trafficking across the eastern, western, and southern borders remained possible despite pandemic-related border closures. The pandemic exacerbated trafficking risks after the government shut down clubs and brothels in April 2020 and individuals engaged in commercial sex began to do so online, in private homes, or in more poorly protected clubs in the interior, making them vulnerable to trafficking. Organizations representing the HIV positive and LGBTQI+ communities also reported that these groups became particularly at risk as they faced increased poverty due to the pandemic. The pandemic also increased the risk for lower-skilled individuals unable to find work.

## SWEDEN: TIER 1

The Government of Sweden fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore Sweden remained on Tier 1. These efforts included identifying more potential trafficking victims; allocating more funds to a women's helpline that supported victims of violence, including trafficking; and funding the digitalization of the national referral mechanism (NRM), the development of guidelines for authorities and frontline professionals, and improvements to the identification and investigative processes. In

response to the inflow of Ukrainian refugees fleeing Russia's full-scale invasion of Ukraine, the government established protocols to screen for potential trafficking victims on public transportation; developed a manual for border police including information on temporary residency, victim assistance, recognizing trafficking indicators, and identifying potential victims; and provided financial support to mitigate trafficking risks among those fleeing Ukraine. Furthermore, the government launched a new web-based training on the sexual exploitation of children, including trafficking, and an information campaign to combat work-related crimes, including forced labor. The government also cooperated with regional partners in conducting a study aimed at identifying methods and tools used by employment agencies to recruit individuals to work under exploitative conditions. Although the government meets the minimum standards, authorities investigated, prosecuted, and convicted fewer trafficking cases. Courts issued most convicted traffickers sentences of less than one year imprisonment, which weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. Additionally, authorities identified significantly fewer potential trafficking victims among asylum-seekers and unaccompanied children. Moreover, the government continued to provide inconsistent funding to NGOs for assistance to victims hindering their ability to comply with obligations and demand. Finally, the level of assistance to victims was conditional on their cooperation with investigations and prosecutions.



SWEDEN TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers under the trafficking statute and punish them with significant prison terms. • Proactively identify trafficking victims, including among asylum-seekers and unaccompanied children. • Provide clear procedures for identifying child victims and train relevant workers to recognize trafficking indicators. • Ensure all victims have full, unconditional access to assistance, regardless of whether they cooperate with authorities. • Introduce a sustainable financial mechanism for consistent funding to NGOs and the national support program (NSP). • Provide adequate assistance and opportunity for recovery to all foreign victims by allowing additional government actors, including municipal social services, to apply for residence permits. • Increase efforts to identify labor trafficking victims and investigate, prosecute, and convict labor traffickers. • Train officials involved in judicial proceedings, particularly judges, on all aspects of trafficking and understanding current anti-trafficking laws. • Increase the number of prosecutors who specialize in trafficking cases. • Enhance awareness efforts to educate asylum-seekers and unaccompanied children on the risks of sexual exploitation, forced criminality, and forced begging. • Establish specialized housing for trafficking victims, including for male victims. • Strengthen international law enforcement cooperation to prevent and investigate child sex tourism.

## PROSECUTION

The government decreased law enforcement efforts. Chapter 4 Section 1a of the Penal Code criminalized sex trafficking and labor trafficking and prescribed penalties of two to 10 years' imprisonment, which were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Chapter 4 Section 1b criminalized a lesser crime of "human exploitation," which included the exploitation of individuals for labor or begging, and prescribed penalties of up to four years' imprisonment; these penalties were also sufficiently stringent. Chapter 6 Section 9 criminalized the purchase of commercial sex acts from a child and prescribed penalties of up to four years' imprisonment. Pandemic-related entry restrictions significantly reduced the inflow of asylum-seekers into Sweden, hindering

investigations, prosecutions, and convictions. In 2021, police investigated 141 trafficking cases (67 sex trafficking, 24 labor trafficking, 50 unspecified) and 78 human exploitation cases, compared with 191 and 80, respectively, in 2020. Authorities prosecuted 12 alleged traffickers and convicted eight traffickers (four sex trafficking, four labor trafficking), a decrease from 21 prosecutions and 12 convictions in 2020. Sentences ranged from two months' imprisonment and a fine to three years' and nine months' imprisonment and a fine. The majority of sentences issued to convicted traffickers (63 percent) were less than one year imprisonment; such lenient sentences weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes. In 2021, Swedish authorities collaborated with foreign governments on transnational investigations and continued cooperation within the European Multidisciplinary Platform Against Criminal Threats. Authorities of Denmark, Finland, Norway, and Sweden facilitated international policing efforts and information-sharing, including on trafficking-related issues, through Nordic liaison officers stationed at 20 Nordic embassies and consulates around the world.

The Gender Equality Agency (GEA), which managed anti-trafficking efforts for the government, maintained regional coordinators throughout the country who assisted police and judicial authorities with trafficking cases, implemented training, and conducted outreach work. In addition, the National Police and the Migration Agency maintained coordinators focusing exclusively on leading their respective agencies' anti-trafficking efforts. In 2021, the police trafficking rapporteur and agency coordinator conducted online training for police, judges, and agency staff. The National Police offered trafficking training for police officers, including new recruits, and an annual advanced training course for all police officers and prosecutors working on trafficking cases. The Migration Agency provided guidance to migration agents on how to detect potential trafficking cases. The national courts offered training for judges and lawyers that included sections on sex trafficking and child victims; however, NGOs reported some judges continued to lack a sufficient understanding of trafficking cases and current trafficking laws. NGOs also reported the need for specialized prosecutors working on trafficking cases. The Prosecutor's Office offered online education on trafficking issues with the goal to train all personnel to identify trafficking violations and enhance their ability to engage with victims. Additionally, the office's educational center developed new methods for working on trafficking cases and monitoring the standards of current methods. The Swedish Coast Guard, police, and customs officials participated in joint regional intelligence operations in trafficking cases involving travel by sea.

## PROTECTION

The government maintained victim protection efforts. In 2021, the GEA regional coordinators identified 481 potential victims (244 sex trafficking, 189 labor trafficking, 47 unspecified, one forced military service), an increase from 320 in 2020 and 404 in 2019. Of the 481 potential victims, 53 were children, and one was a Swedish citizen. Separately, the Migration Agency maintained statistics on identified victims; double counting likely occurred across agencies. In 2021, the Migration Agency identified 261 potential trafficking victims among asylum-seekers, a decrease from 366 in 2020. Of the 261 potential victims, 21 were children—a significant decrease (more than 50 percent) from 48 in 2020. Experts noted the police did not proactively identify potential victims among unaccompanied children and expressed concern that the number of reported cases misrepresented the real scale of child trafficking in Sweden. Authorities and frontline professionals utilized the existing NRM to identify victims and refer them to protection services. However, only authorities involved in legal investigations, such as police, could officially identify trafficking victims. NGOs asserted the police needed further training on identifying potential victims and on the subsequent implementation of victim protection services. In 2021, the GEA funded and collaborated with an organization to digitize the NRM, develop a manual with relevant information for authorities and frontline professionals, and improve processes to identify victims and apprehend traffickers by outlining responsibilities of each authority throughout the various phases of the case process and training frontline professionals on recognizing trafficking indicators and responding accordingly.

Municipalities, in collaboration with NGOs and other government agencies, were the primary providers of victim services, including medical and psychological care, shelter, and social assistance. While undocumented migrants, who made up the vast majority of identified victims, could obtain emergency medical care, additional assistance opportunities to victims and their families through municipalities were conditional on victims cooperating with authorities. Municipalities funded assistance and appropriate services, and the government subsequently reimbursed the expenses. However, statistics on the costs incurred by the municipalities were unavailable. Although the country lacked shelters dedicated solely to trafficking victims, some municipalities ran shelters offering services to sex trafficking victims. Adult female trafficking victims could receive services at women's shelters for victims of domestic and honor-related violence. Authorities referred child victims to social services officials, who placed them in foster care or group housing. There was no separate dedicated protected housing available solely for male trafficking victims, but male trafficking victims were eligible for group protected housing. The GEA led a network of approximately 40 NGO-run safe houses. NGOs reported insufficient funding and the pandemic hindered the ability to assist victims. Furthermore, social distancing protocols to contain the spread of the pandemic contributed to victims staying at shelters for longer periods than anticipated, thereby unintentionally preventing other victims from receiving accommodation when shelters had reached maximum capacity. In 2021, the government allocated 13 million Swedish krona (SEK) ($1.44 million) to strengthen the GEA's efforts to combat trafficking, including for regional coordinators, an international organization's return program, and the national support program (NSP)—a civil society platform representing 20 NGOs that provided assistance to victims. The NSP offered the only effective unconditional assistance provided to victims and complemented the support services offered under the NRM. The program focused on victims who in their current state did not have a right to assistance through the formal system and provided a 30-day reflection period to encourage victims to report crimes to police. Over the years, funding for the NSP fluctuated—2.04 million SEK ($226,040) in 2021, 2.1 million SEK ($232,690) in 2020; zero in 2019; 800,000 SEK ($88,640) in 2018; and zero in 2017. NGOs criticized the government for providing inadequate funds to the NSP to comply with obligations and demand.

The Aliens Act entitled foreign victims to a 30-day reflection period to contemplate cooperation with law enforcement, during which they were eligible for assistance and emergency financial aid; however, only an investigating police officer or prosecutor could file an application for residence permits, limiting availability to victims already in contact with law enforcement. In an effort to ensure availability of adequate assistance and opportunity for recovery to all foreign victims regardless of their cooperation with authorities, the government proposed allowing additional government actors, including municipal social services, to apply for residence permits on behalf of victims. Pending parliament's approval, the government projected implementation in 2023. Foreign victims who cooperated with authorities received temporary residence permits, which allowed them to seek employment; 63 trafficking victims received permits in 2021 (60 in 2020). The government assigned a legal representative to provide victims with support and assistance throughout criminal proceedings. However, legal aid was only available to individuals whose annual income did not exceed 260,000 SEK ($28,810) and did not already have insurance that covered the dispute in question. Swedish law entitled trafficking victims to request restitution from traffickers as part of criminal proceedings as well as file civil suits for financial compensation. In 2021, six victims received 469,704 SEK ($52,040) in restitution, compared with 10 victims who received 773,505 SEK ($85,710) in 2020.

In response to the inflow of refugees fleeing Russia's full-scale invasion of Ukraine, the government established protocols to screen for potential trafficking victims on public transportation and developed a manual for border police including information on temporary residency, victim assistance, recognizing trafficking indicators, and identifying potential victims. Additionally, the police and the national rapporteur produced pamphlets in English and Ukrainian with information on recognizing and reporting suspicious individuals and criminal behavior to the police. Authorities distributed the pamphlets at all border crossings, ferries, airports, and train stations. Furthermore, the GEA provided 4 million

**SWEDEN**

SEK ($443,210) for mitigating trafficking risks among those fleeing Ukraine. In April 2022, NGOs and police identified sex trafficking victims among Ukrainian women, who upon arriving in Sweden were exploited in commercial sex. Authorities initiated a preliminary investigation into one potential sex trafficking case and filed four additional reports for potential trafficking-related crimes. The Migration Agency expressed concern about potential trafficking cases among a small number of Ukrainian children, who arrived in Sweden with guardians other than their parents; in some cases, the guardian certificates could not be confirmed. The agency also expressed concern about some women arriving alone and women with children, who left their agency-assigned accommodation without providing any contact details or information. According to the agency, nearly 25,000 Ukrainian citizens applied for temporary protection as of March 2022; the Migration Agency approved more than 10,000 temporary residence permits for Ukrainians, including 120 unaccompanied children, and processed the remaining 15,000 applicants. To meet the immediate needs for incoming refugees, the government converted sports halls and vacant hotels into temporary housing and provided 2,000 SEK ($222) per month to Ukrainian refugees along with the right to employment and education. Children could receive full medical care, while adults could access medical care for urgent needs.

## PREVENTION

The government increased prevention efforts. The GEA was responsible for implementation of the national action plan (NAP), which focused on combating and preventing commercial sex and trafficking and providing better protection and support for those vulnerable to trafficking. NGOs raised concerns about the lack of resources dedicated to the plan, citing funding of the NSP as unsustainable for the demand. Furthermore, NGOs recommended the government update the NAP to better include labor trafficking and establish strategic objectives with specific assignments, budgets, and deadlines. In addition to the NAP, the government continued to implement its comprehensive action program to prevent and combat men's violence against women, including trafficking. The GEA continued conducting a three-year study on the scope of sex trafficking in Sweden, focusing on children exploited in commercial sex. As part of the study, the agency collected and disseminated educational materials to professionals on responding to sex trafficking cases and mapped local and regional support initiatives. In collaboration with other Baltic Sea Region countries, the government participated in a project establishing long-term cooperation between stakeholders and academia to educate future journalists on trafficking issues through workshops, panel discussions, and competitions. National and regional authorities conducted training for workers in the hotel, restaurant, and taxi sectors on how to detect potential trafficking victims. Furthermore, in 2021, the GEA launched a new web-based training on the sexual exploitation of children, including trafficking, and continued its online campaign on safe travel abroad with new brochures for vulnerable populations. A national anti-trafficking taskforce, which comprised about 20 representatives from authorities on trafficking issues, including the National Police Board, the Migration Agency, and the Prosecutor's Office, functioned as a strategic resource to develop and streamline cooperation between government agencies and other stakeholders; created relevant educational material and conducted training; managed, in cooperation with an international organization, a program for the safe return of trafficking victims; and operated a helpline for potential trafficking victims to receive support and advice. Separately, a Swedish university operated a 24-hour national women's helpline that supported victims of violence, including trafficking, and received 20 million SEK ($2.22 million) from the government in 2021, an increase from 10 million SEK ($1.11 million) in 2019 and 2020. Sweden and France continued to conduct a joint campaign raising awareness on sex trafficking.

The National Police's Department of National Operations handled investigations involving Swedish citizens suspected of child sex tourism and assisted police departments throughout Sweden on matters of child sex trafficking. The National Police's specialized cybercrime unit maintained a child protection team that trained travel agencies to detect and report child sex tourism. The government did not make efforts to reduce the demand for participation in international sex tourism by its citizens, despite allegations of such actions by its citizens. The

government maintained a website with information on child sexual exploitation, resources available to victims, and a way to report suspected child trafficking cases. The government made efforts to reduce the demand for commercial sex acts by continuing to implement its law criminalizing the purchase of sexual acts from a child (Chapter 6, Sections 9 and 11). The government also continued to perform an assessment of the law examining its effectiveness and application with the goal to reveal how the judicial system handled such crimes from investigation to sentencing. The assessment also analyzed the nexus between the purchase of commercial sex and trafficking and the role of social services.

Authorities and NGOs acknowledged labor trafficking was an increasing problem, especially for seasonal workers and vulnerable migrants. Experts recommended better interagency coordination to facilitate the identification of labor trafficking cases and increased awareness among the public. In 2021, the GEA launched an information campaign with films about four different industries to combat work-related crimes, including trafficking. In cooperation with Lithuania and Poland, the government conducted a study aimed at identifying recruitment methods and tools used by employment agencies to recruit individuals to work under exploitative conditions. Subsequently, the government proposed improved labor protections for third-country nationals working in Sweden to strengthen regulations that would ensure employers fulfilled worker agreements and did not charge illegal recruitment fees. Additionally, in September 2021, the government established a national taskforce to address work-related crimes, including labor trafficking, that contributed to the opening of regional centers that specialized in combating work-related crime, through conducting workplace inspections, collaborating with unions and trade organizations, providing training on how to recognize trafficking victims, and conducting educational outreach. Furthermore, in 2021, the GEA and the Council of Baltic Sea States announced plans to launch a project to educate potential labor migrants arriving in Sweden, or planning to arrive, about the risks of labor trafficking via a public-service announcement video to appear on social media platforms and websites. Authorities continued to conduct mandatory interviews with foreign workers employed in at-risk sectors who were seeking to extend their work permits. The Migration Agency conducted background checks on companies employing foreign workers and occasionally denied work visas in cases where employment contracts did not meet the necessary requirements. Additionally, the agency provided training on trafficking and a manual to assist migration agents in detecting trafficking cases. Multiple agencies carried out joint workplace inspections as part of a major EU effort against labor exploitation. The government commissioned multiple agencies to develop joint processes to counter fraud, rule violations, and labor-related crimes, including forced labor. The government participated in a multi-country anti-trafficking taskforce that evaluated trafficking related to migration flows.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Sweden, and, to a lesser extent, traffickers exploit victims from Sweden abroad. Most traffickers are the same nationality as their victims and are often part of criminal networks engaged in multiple criminal activities, although an increasing number of reported cases involve traffickers who are family members or have no ties to organized crime. Most sex and labor trafficking victims originate from Eastern Europe, Africa, East Asia, and the Middle East. Sex trafficking remains the most prevalent form of trafficking in Sweden with most cases involving women and children from West Africa and Eastern Europe. Authorities and NGOs report Swedes traveling abroad, primarily to East Asia, for the purpose of child sex tourism is prevalent. Victims of labor trafficking, who largely originate from Eastern Europe, East Asia, and West Africa, face exploitation in the service, cleaning, private delivery, and construction industries. In some cases, employers or contractors providing labor seize the passports of workers and withhold their pay. Other reported incidents include deteriorated conditions for foreign workers in the construction sector, such as low salaries, lack of official employment contracts, and poor living situations. Since 2010, there has been an increase in labor trafficking cases, including during the pandemic as the country's borders remained open most of that time, which led individuals to move to Sweden for work. The Migration Agency notes increased exploitation in the private delivery industry, such as

Haiti AR_001001

messengers and food delivery drivers, who work under conditions that violate Swedish labor laws. Police report citizens of Thailand working in nail salons and massage parlors are exploited in trafficking. Cases among seasonal berry pickers have decreased significantly in recent years; however, individuals mostly from Asia and Bulgaria, continue to face exploitation in the agricultural sector. Roma, primarily from Bulgaria and Romania, remain vulnerable to forced begging and criminality and, to a lesser extent, sex trafficking. The Migration Agency reported a substantial reduction in the number of asylum cases as a consequence of the pandemic, receiving approximately 11,500 applications (523 from unaccompanied children), compared with 13,000 (492) in 2020, marking the lowest recorded number in the last 20 years. Asylum-seekers, particularly those from Africa, Eastern Europe, Central Asia, and South America, as well as many stateless individuals, are at risk of trafficking. In recent years, traffickers subjected Moroccan boys and young men to forced criminal activity, though reports indicate a decline in the number of victims in 2021. Unaccompanied children are especially vulnerable to trafficking, with a majority of suspected child trafficking victims arriving in Sweden primarily from Africa and the Middle East. Thousands of refugees, predominantly women and children, who are fleeing Russia's full-scale invasion of Ukraine and seeking sanctuary in Sweden, are highly vulnerable to trafficking. Reports indicate several identified sex trafficking victims among Ukrainian women who, upon their arrival in Sweden, were exploited in commercial sex.

## SWITZERLAND: TIER 2

The Government of Switzerland does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Switzerland remained on Tier 2. These efforts included opening a new specialized counseling service for trafficking victims and launching an awareness campaign across seven cantons, in collaboration with civil society. Government-funded NGOs provided services to significantly more victims, a canton established a joint inspection team between labor inspectors and police, and a government-funded NGO established a trafficking hotline for police referrals to victim assistance. However, the government did not meet the minimum standards in several key areas. Lenient sentencing, resulting in 63 percent of traffickers receiving fully suspended sentences or sentences of less than one year imprisonment, undercut efforts to hold traffickers accountable, weakened deterrence, created potential security and safety concerns for victims, and was not equal to the seriousness of the crime. Law enforcement efforts on labor trafficking remained low, and the government continued to lack comprehensive and sufficiently disaggregated data on trafficking. The government continued to lack consistent and uniform victim identification and access to adequate care across the country, as well as legal safeguards to specifically protect trafficking victims against potential prosecution for unlawful acts traffickers compelled them to commit. The government did not report awarding compensation or restitution to any victims during the reporting period.



SWITZERLAND TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Vigorously investigate and prosecute suspected labor and sex traffickers and sentence convicted traffickers to adequate penalties, which should involve serving significant prison terms. • Increase victim identification

and training for all front-line officials, with increased focus on identifying labor trafficking. • Increase law enforcement efforts for labor trafficking and provide sufficient resources, personnel, and training. • Coordinate and centralize the collection of trafficking data across the government, including continuing to make progress on sufficiently disaggregating data between trafficking and other forms of exploitation, as well as between sex and labor trafficking. • Provide sufficient personnel and funding to specialized anti-trafficking police units and the Specialist Unit Against the Trafficking in Persons and Smuggling of Migrants (FSMM) to coordinate national anti-trafficking efforts. • Adopt a national anti-trafficking action plan (NAP) to effectively and efficiently coordinate national efforts across all cantons. • Increase awareness of and trafficking survivor access to damages and compensation and increase prosecutor's efforts to systematically request restitution for survivors during criminal trials. • Expand authorities for labor inspectors to allow for the identification of trafficking victims. • Increase efforts to pursue financial crime investigations in tandem with human trafficking cases. • Increase access to specialized services, especially for labor trafficking victims, asylum-seekers, male, child, and transgender victims. • Amend the anti-trafficking provision of the criminal code to include force, fraud, or coercion as an essential element of the crime in accordance with international law and ensure the criminal code clearly defines labor exploitation. • Ensure labor trafficking is investigated and prosecuted as a trafficking crime and not pursued as an administrative labor code violation. • Enact a legal provision, in addition to the existing non-punishment legal provision, to specifically protect trafficking victims from prosecution for unlawful acts traffickers compelled them to commit. • Strengthen international law enforcement cooperation to prevent and investigate child sex tourism. • Appoint a national rapporteur to provide independent review of government anti-trafficking efforts. • Increase worker protections by codifying in law the elimination of recruitment or placement fees that could potentially be charged to workers by Swiss labor recruiters and ensure employers pay any recruitment fees. • Increase survivor engagement, including by establishing accessible mechanisms for receiving and providing compensation for survivor input when forming policies, programs, and trainings. •Improve law enforcement coordination between cantons, specifically to combat organized human trafficking networks. • Increase cooperation with civil society regarding victim identification assistance, especially for asylum hearings for potential victims.

### PROSECUTION

The government maintained law enforcement efforts. Article 182 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of up to life imprisonment and/or a fine; the penalties included prison sentences of no less than one year for crimes involving a child victim and those where the trafficker acted for commercial gain. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. Inconsistent with the definition of trafficking under international law, Article 182 does not include a demonstration of force, fraud, or coercion as an essential element of the crime. NGOs stated the lack of an explicit legal definition for labor exploitation under Article 182 complicated labor trafficking investigations and limited data collection necessary for prevention efforts. In March 2022, the lower chamber of parliament approved a motion to draft a law making labor trafficking a federal offence.

In 2021, cantonal authorities reported investigating 46 cases with 57 suspects under Article 182, compared with 55 cases with 61 suspects in 2020 and 58 cases with 59 suspects in 2019. While the government reported investigations were largely unimpeded by the pandemic in 2021, non-urgent questioning, some court hearings, and other procedural actions were postponed. In 2021, the government recorded 31 offenses related to sex trafficking and 40 for labor trafficking; however, the number of offenses did not directly correlate to the number of suspects or cases under investigation and could be duplicative. In Switzerland, convictions are recorded in the year the prosecution was initiated and only recorded when all appeals are finalized, which can cause prior year prosecution and conviction statistics to increase slightly as cases are finalized. Furthermore, the government did not collect national statistics on the total number of prosecutions initiated in a given year

**SWITZERLAND**

under Article 182, necessitating an assessment of only successful prosecutions that resulted in conviction. Based on unfinalized data, in 2020, the most recent year available, cantonal authorities and courts reported successfully prosecuting and convicting at least eight traffickers under Article 182. This was similar to nine in 2019 but an increase compared with four in 2018 and six in 2017; however, compared with convictions from 2012 to 2016, statistics show an overall long-term downward trend (11 in 2016, 21 in 2015, 15 in 2014, 13 in 2013, and 13 in 2012). The government did not report whether any prosecutions or convictions involved labor trafficking as it did not disaggregate data between sex and labor trafficking under Article 182, but in 2020, it reported that at least five of eight convictions were for sex trafficking. Historically, prosecutions and convictions for labor trafficking were low, while NGOs continued to assert many labor trafficking cases were instead pursued as administrative labor violations, resulting in lesser consequences and decreased deterrence. Of the eight convictions in 2020, courts issued fully suspended prison sentences or assigned a sentence of less than one year's imprisonment to five traffickers (62.5 percent). Courts sentenced three traffickers (37.5 percent) to significant prison terms of one year or longer, with the longest sentence being 10 years and 6 months' imprisonment. The court's lenient sentencing practices weakened deterrence, potentially undercut efforts of police and prosecutors, and created security and safety concerns, particularly for victims who cooperated with investigations and prosecutions. NGOs urged the government to enact a minimum sentence for all convicted traffickers—not just trafficking crimes involving children—to address issues with lenient sentencing. As a comparison, in 2020, of the 113 convicted rapists, 63 (56 percent) were sentenced to significant prison sentences of one year or longer in prison. In 2020, court proceedings were postponed while courts closed due to the pandemic. Federal courts and the prosecutor's office both closed for one month and cantonal courts may have been closed longer as directives varied by canton; however, most courts adapted by utilizing virtual platforms to continue processing cases. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. Authorities continued to report the prevalence of "lover boy" traffickers, which was a method of trafficking that involved young male traffickers who coerce girls and women into sex trafficking, often through a sham romantic relationship. This method of trafficking affects both Swiss nationals and foreign nationals, and while authorities reported the initiation of at least one investigation, NGOs noted that "lover boy" traffickers continued to flout trafficking laws.

As a federal system, jurisdiction for investigations and criminal prosecutions in Switzerland rested with the 26 cantons, except for cases involving organized criminal networks, which fell under federal police (FedPol) jurisdiction. Consequently procedures, staffing, and funding varied from canton to canton; officials noted that some of the smaller cantons did not have sufficient resources to gather evidence to prove trafficking crimes. At least six of 26 cantons had their own specialized anti-trafficking police units, but NGOs raised concerns that these units lacked sufficient funding and personnel, given the government's competing priorities with other crimes. The government had specialized prosecutors, with trauma-informed training, who usually handled human trafficking cases; however, NGOs recommended increased trauma-informed training for prosecutors. Civil society continued to report the government's predominant focus on sex trafficking hindered the identification of labor trafficking cases and their prosecution. NGOs also reported that insufficient coordination between cantons hindered law enforcement efforts against organized human trafficking networks, with frequent duplication of efforts. The government and government-funded NGOs provided trafficking-related training to law enforcement, immigration officials working with asylum-seekers, border guards, prosecutors, labor inspectors, hospital staff, and NGO staff in 2021. However, civil society raised concerns regarding the continued lack of institutionalized training for prosecutors at the national level and the postponement of a training curriculum for immigration officials in the asylum sector. Law enforcement reported assisting in 29 new and ongoing international trafficking cases in 2021, compared with 24 in 2020. Switzerland continued to maintain a network of at least 10 police attachés posted abroad, who provided support to government prosecution authorities in combating trans-border crime, and police

cooperation agreements with Albania, Bosnia and Herzegovina, Czech Republic, France, Hungary, Italy, Latvia, Macedonia, Nigeria, Serbia, and Slovenia.

**PROTECTION**

The government increased victim protection efforts. Pandemic-related restrictions and business closures, along with the increased use of private locations and the internet as venues for exploitation, exacerbated vulnerabilities for sex trafficking victims and decreased victim visibility to authorities. NGOs reported that law enforcement had a decreased capacity to identify trafficking victims because the pandemic necessitated police prioritize the enforcement of pandemic-related health restrictions. In 2021, cantonal authorities identified 62 victims under article 182, an increase compared with 53 in 2020 but still less than 83 in 2019 and 64 in 2018. The government did not report the number of labor trafficking victims it identified, as it did not adequately disaggregate data. Of the 62 trafficking victims identified by the government in 2021, eight were children, and four were Swiss. Unlike prior years, the government did not report identifying any trafficking victims within the asylum system in 2021. The federal government had a national victim identification mechanism and standardized questions, as well as a regional referral mechanism, though implementation was inconsistent and varied canton by canton. NGOs continued to express concern that officials prioritized the identification of sex trafficking victims over labor trafficking, although one NGO indicated that the majority of the victims it identified and assisted were labor trafficking victims. Law enforcement authorities acknowledged this issue and noted that additional resources and specialization across all cantons would allow law enforcement to better address labor trafficking within the country. The canton of Bern passed a specific law on labor trafficking and established a joint inspection team between labor inspectors and police, and as a result, authorities reported the increased identification of labor trafficking victims in 2021.

Victim care varied across the cantons, and civil society continued to criticize the absence of a national victim protection program to ensure uniformity in victim assistance across the country, asserting this could lead to re-traumatization for victims. Cantonal authorities maintained jurisdiction on providing protection for victims, and trafficking victims were entitled to utilizing free and immediate assistance centers that varied from canton to canton. In 2021, the government granted 518,599 Swiss francs ($567,390) to nine NGOs for victim assistance, which included some public awareness activities as well; an increase compared with 401,694 Swiss francs ($439,490) granted in 2020. Civil society continued to express concern that funding was insufficient and short-term funding resulted in ineffective program implementation. Government-funded NGOs provided assistance to 458 potential trafficking victims in 2021, including at least 324 potential sex trafficking victims, 81 potential labor trafficking victims, and seven children. This was a significant increase compared with 184 in 2020 and 169 in 2019. NGOs reported that in 2021, assisted victims were most often from Hungary, Brazil, Romania, and Nigeria; most frequently assisted in Zurich or Bern; and most often referred by civil society, medical staff, or police. Additionally, the government provided trafficking-specific counseling for 254 potential trafficking victims in 2020, the most recent year data was available; an increase compared with 193 in 2019 and 186 in 2018. Eighteen of 26 cantons had roundtables, which functioned as victim referral mechanisms; roundtables included police, prosecutors, and NGOs. NGOs highlighted that eight cantons remained without roundtables for victim identification and referral. NGOs noted improved victim referral during the reporting period, which was attributed to increased government-funded training and roundtable events. Victim assistance was available in at least 24 out of the 26 cantons, providing a wide-ranging network of care facilities mainly tailored to the needs of women and children; however, trafficking specific services varied significantly from canton to canton. The two cantons without victim assistance would reportedly transfer identified victims to larger cantons with the capacity to provide assistance, though they remained responsible for providing the funding to do so. The government reported a new specialized counseling service for trafficking victims opened in one canton in August 2021. NGOs continued to raise concerns about the discrepancies between cantonal efforts to identify, assist, and protect victims, noting smaller cantons

did not have the resources or means to properly assist victims, which could result in re-traumatization. At least 13 cantons maintained formal referral and cooperation agreements with NGO-operated victim assistance facilities that specialized in trafficking. One NGO noted establishing cooperation agreements with an additional seven cantons in 2021.

The Swiss Victim Assistance Law entitled all adult trafficking victims access to the government-funded women's shelters or assistance centers for victims of abuse and to special safeguards during criminal proceedings; however, the government did not report how many trafficking victims received shelter or special safeguards during the reporting period. At least four government-funded and NGO-operated shelters continued to provide specialized assistance for victims of trafficking, two of which provided services to children. However, according to GRETA and civil society, the government did not have specialized shelters or assistance for child victims of trafficking and standardized identification procedures for children were used inconsistently. With the noted variances, most cantons generally provided victims with a minimum of four weeks of emergency lodging and living allowance, several hours of consultations with a lawyer, mental health counseling and medical treatment, transportation, and translation services. If recovery required more time, the victim assistance law obligated the government to assume the additional cost of longer-term care. Victims had free movement in and out of shelters. While victim assistance was not dependent on cooperation with law enforcement, some NGOs asserted that authorities sometimes used victim penalization to pressure victims into cooperating with law enforcement. Civil society reported decreased capacity and available services for victims due to pandemic-related prevention measures. A variety of sources referred victims to NGO services, including other NGOs, government-operated counseling centers, government offices, foreign consulates, police and judicial authorities, health care sector employees, lawyers, and family. Civil society stated services for labor trafficking victims were limited. According to NGOs, services for child and male victims were inadequate, especially counseling and victim referral resources. The government provided male victims temporary shelter in hotels or government-funded NGO-operated shelters in at least five cantons. The government had a witness protection program that trafficking victims could utilize, but the government did not report how many victims it provided this protection to due to privacy concerns. While NGOs confirmed trafficking victims had access to witness protection if the government referred them, they noted victims were sometimes unaware of their entitlement or it was unavailable to them if they were exploited in trafficking in another country. To encourage victims' cooperation with law enforcement, the law allowed victims to keep their identities confidential if they were in danger and to testify in a separate room from the defendant. The government prohibited cross-examinations for child trafficking victims, testimonies were videotaped, and authorities were limited to two interviews to minimize re-traumatization.

The government also facilitated additional assistance to foreign victims of trafficking, which included financial support and residence permits; however, authorities granted few long-term residence permits and instead provided victims with repatriation assistance. Cantonal immigration authorities were required to grant victims a minimum 30-day reflection period to decide whether to participate in judicial proceedings against their traffickers, but longer stays generally required cooperation with law enforcement. During the reflection period, victims were able to obtain victim protection and assistance services from NGOs. Foreign victims who were willing to cooperate with law enforcement could be granted a six-month residence permit, renewable for the duration of the investigation and criminal proceedings, after which, victims were required to depart the country. NGOs stated that victims who gave unclear statements to law enforcement—due to trauma suffered—were often denied residence permits. The government could also grant short-term residence permits based on hardship that victims might face upon return to their country of origin. While the government had a national guideline to ensure uniformity in the granting of residence permits across the country, in practice, the approval of the permits varied by canton.

While authorities continued to note the growing number of potential trafficking victims among asylum-seekers during the reporting period, they officially identified relatively few victims. The State Secretariat for Migration (SEM) did not report officially identifying any trafficking victims in 2021, compared with four in 2020 and one in 2019. However, NGOs stated that implementation of the 2019 asylum law, which ensured early access to legal aid, increased successful victim identification. SEM reported providing potential trafficking victims with a pamphlet on their rights, redesigned in 2021, during their hearing to determine if they were victims. The government's border police screened newly arrived asylum-seekers alone to eliminate the potential influence of traffickers operating within migrant camps, and specialists at SEM ensured identification and coordination practices remained consistent across the federal asylum reception centers. FedPol reported asylum hearings for potential trafficking victims, though more difficult to conduct, continued despite pandemic-related restrictions. In May 2021, the Asylum and Human Trafficking working group published its recommendations for improving the identification of trafficking victims in the asylum system—many of which the government undertook, including the new 30-day reflection period to decide whether to cooperate with law enforcement—and a special hearing for suspected victims. The working group also recommended that an independent body be responsible for victim identification and that an option for appealing hearing decisions should exist. Civil society expressed concern that the government remained without a national victim identification mechanism for trafficking victims in the asylum system and urged national coordination and for law enforcement to take a more victim-centered and trauma-informed approach to victim interviews. Trafficking victims often remained unidentified by the government within the asylum system, and civil society urged the government to involve them at the earliest stage possible and at asylum hearings to ensure victims of trafficking avoided deportation. Civil society also highlighted a tendency for officials to misidentify unaccompanied asylum-seeking children as adults, which allowed authorities to transfer the children back to their country of first entrance and into accommodation facilities for adults. Civil society noted an increasing number of unaccompanied children continued to disappear from asylum centers. GRETA also noted the lack of adequate accommodation and supervision for unaccompanied children and lack of a systematic approach; GRETA urged the government to address these issues in its 2019 report. Civil society criticized the government for not systematically referring foreign victims to services once identified and often shifting responsibility to the legal advisor. The victim's legal advisor could refer victims to NGOs for assistance, but the government did not offer financial support for victim assistance, according to an NGO. NGOs and GRETA continued to report asylum accommodations and psychological counseling in asylum centers were inappropriate and insufficient for assisting trafficking victims, all of which were exacerbated by the pandemic. NGOs reported asylum-seekers experienced destabilization because many were transferred to different accommodations throughout the pandemic and some accommodations were no longer gender-sensitive, leading to increased harassment and a decreased freedom of movement, particularly for female and LGBTQI+ individuals. The guide on accommodation requirements for asylum-seekers at federal asylum centers remained pending during the reporting period. The government reported that victim services were only available to victims who experienced trafficking within Switzerland; however, NGOs argued there were exceptions to this policy under Article 17 of the Swiss Victim Aid Act, which were not uniformly applied. NGOs urged the government to enact improved protections and assistance for victims who experienced trafficking abroad. The practice of deporting asylum-seekers back to their first country of entrance was suspended during the pandemic. GRETA noted cantons often did not transfer victims detected in the asylum system to specialized trafficking victim support centers because of financial constraints and instead continued to host them in asylum centers.

The government continued to lack comprehensive statistics on restitution and damages awarded to victims and did not require prosecutors to systematically request restitution during criminal trials. Trafficking victims could receive restitution from the trafficker through

criminal proceedings; however, unlike prior years, the government did not report awarding restitution to any victims in 2021, 2020, or 2019, compared with 25 victims in 2018 and 31 victims in 2017. GRETA and civil society noted restitution amounts were insufficient, especially compared with other serious crimes, such as rape. NGOs reported it was often a difficult and lengthy process for victims to obtain restitution from traffickers and few victims received the full amount. NGOs also reported instances of the government denying restitution for formally recognized labor trafficking victims because they were undocumented and lacked the required permits. GRETA criticized the lack of viable avenues for victim restitution when victims had no verifiable expenses or employment losses because the courts found it difficult to quantify the specific amount of lost income. NGOs reported a lack of uniformity in the court's determination for sufficient restitution, noting very small amounts awarded to severely traumatized victims. Trafficking victims could also pursue damages through a civil case, but the government did not report whether any victims brought suits and were consequently awarded damages in 2021. Victims could seek a maximum of 120,000 Swiss francs ($131,290) in compensation from the government if the crime took place in Switzerland and the convicted trafficker was unable to pay the awarded restitution or damages; however, the government did not report awarding compensation to any victims in 2021. While the government had a legal provision prohibiting the punishment of victims of crimes, it did not specifically address human trafficking or the criminal coercion often experienced in trafficking cases. The decision to prosecute a trafficking victim was left to prosecutors, who did not always apply the principle in trafficking cases to prevent the defense from perceiving the prosecution as biased. Although the government continued to screen for trafficking victims, NGOs asserted penalization of unidentified victims was common, with victims frequently charged with petty crimes, violation of local commercial sex regulations, or immigration and labor laws. NGOs reported improvements in non-penalization of victims when the government increased its cooperation with civil society, as civil society reported helping identify victims the government did not, intervening on behalf of victims, and building greater trust. Civil society urged the government to involve them at the earliest stages possible, as screenings by law enforcement, immigration, and social services remained an issue, particularly in cases of labor exploitation. NGOs and GRETA urged the government to adopt a provision on the non-punishment of trafficking victims, and GRETA encouraged additional training of public prosecutors in this regard.

## PREVENTION

The government maintained prevention efforts. Under FedPol, FSMM coordinated national efforts, including anti-trafficking policies, information exchange, cooperation, and training. Following a 2018 restructuring of FSMM, civil society and GRETA continued to express concerns regarding a decrease in a victim-centered, multidisciplinary, and collaborative approach to trafficking; civil society continued to report that the coordinating body within FSMM, the National Expert Group to Combat Trafficking in Persons, was ineffective and had yet to convene any meetings. NGOs and experts continued to assert that the government provided insufficient personnel and funding to FSMM, which hindered their ability to coordinate national anti-trafficking efforts for all 26 cantons. In 2020 and 2021, due to pandemic-related restrictions, FSMM canceled its national meeting of the heads of the cantonal anti-trafficking roundtables; the government reported holding cantonal roundtables but did not report the number held. NGOs reported many of FedPol's initiatives were postponed due to the pandemic. The government remained without an official independent national anti-trafficking rapporteur. The government did not adopt a new NAP after the expiration of its 2017-2020 plan, and while the government reported plans to draft a new NAP, the government did not begin drafting it during the reporting period. NGOs expressed interest in the new NAP including a clarification of roles and responsibilities, including for FedPol. In 2021 and 2022, the government continued to provide funding to an NGO to operate the national anti-trafficking hotline, 51,600 Swiss francs ($56,460) in 2021 and 53,125 Swiss Francs ($58,120) allocated in 2022; the NGO reported receiving 79 calls pertaining to 99 victims and referring 40 victims to police. In 2021, another NGO began operating a 24-hour hotline that police could use to refer trafficking victims to shelter and other victim protection services. Civil society reported that

FedPol commissioned an independent study on the effect of FedPol's grants for law enforcement measures to combat trafficking and crimes related to commercial sex; the study found that while FedPol's grants were effective, more funding was needed for prevention, and FedPol announced plans to increase funding in 2023. In collaboration with an international organization and with the participation of seven NGOs, several trade unions, and multiple government agencies, the government launched a labor trafficking awareness campaign for one week in 2021 across seven cantons and virtually, which included panel discussions, conferences, film screenings, trainings, lectures, radio broadcasts, and podcasts. Government-funded NGOs also reported hosting several labor trafficking awareness workshops and NGOs reported the government produced a trafficking awareness video specifically targeting the Nigerian population.

Insufficient personnel and resources hampered in-depth labor inspections; additionally, civil society reported labor inspectors frequently regarded foreign victims as criminals working illegally. Labor inspectors lacked a specific mandate to identify trafficking victims; however, if inspectors did identify any potential victims, they were required to refer potential trafficking cases to police. A government-funded NGO signed an agreement with the government in 2021, which formalized a procedure for potential victims referred to police by labor inspectors and would ensure the NGO was involved to assist in victim identification. In recognition of the critical role labor inspectors had in identifying trafficking victims and as a follow-on to the awareness campaign in 2020, government-funded NGOs organized two workshops for nearly 70 labor inspectors across 17 cantons to raise awareness of human trafficking. In 2021, the government, including law enforcement, labor inspectors, and EUROPOL, participated in three joint action days (JAD): one targeting labor exploitation, one targeting child trafficking, and one targeting sexual exploitation, forced begging, and forced criminality; the JADs resulted in the inspection of 238 establishments and locations, the identification of 11 potential victims, and the arrest of three suspects—an increase compared with results from 2020. Swiss labor recruitment agencies required a license and were liable if foreign recruitment agencies did not uphold Swiss recruitment regulations. Although there were no such cases reported, Swiss employers could legally charge a registration or placement fee to workers, which could put them at risk of debt bondage. Third country nationals required prior approval from the government before changing employers, which may have increased their vulnerability to trafficking. In 2021, the government launched the Swiss Forum on Business and Human Rights where the government agreed to provide support to small-to-medium enterprises regarding human rights due diligence; the government organized multistakeholder events and conducted training courses on business and human rights throughout the year with a focus on forced labor in supply chains. In January 2021, the government passed a law allowing the government contracting authority to require suppliers to comply with provisions related to the protection of employees, labor conditions, equal pay, and environmental regulations prior to awarding public procurement contracts; if suppliers failed to comply, they could be excluded from obtaining future contracts for five years.

The government continued to provide funding to foreign countries for anti-trafficking efforts, including an awareness raising campaign in Nigeria and funding for an international organization working in Lebanon and Jordan. The government also continued to fund the Better Work and the Sustaining Competitive and Responsible Enterprises programs, which aimed to improve working conditions, including forced labor, around the world. The government did not make efforts to reduce the demand for commercial sex. While the government participated in several international law enforcement efforts to increase government and law enforcement collaboration on child sex tourism, the government did not demonstrate overall efforts to reduce the demand for international child sex tourism by Swiss nationals.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Switzerland. The pandemic exacerbated vulnerabilities for trafficking victims, and sex traffickers are increasingly using online platforms to recruit, exploit victims, and book apartment rentals to make their illicit operations difficult to track. Victims' debt

to their traffickers, and subsequently the traffickers' control over the victims, increased during the pandemic because victims were sometimes unable to work and earn money. Victims' access to services was limited due to pandemic-related restrictions in 2020, which increased isolation and vulnerabilities to trafficking. In 2022, refugees, predominantly women and children, fleeing Russia's full-scale invasion of Ukraine, are vulnerable to trafficking. Traffickers are frequently family members, friends, or romantic partners, as well as agencies offering fraudulent employment, travel, and marriage. Traffickers are both Swiss and international; foreign traffickers typically have the same nationality as their victims. Although the vast majority of traffickers are male, female traffickers are not uncommon, especially women from Nigeria and Thailand. Traffickers are increasingly mobile and adaptable, switching industries and locations frequently. Sex traffickers exploit both foreign and domestic women, transgender individuals, and children. Traffickers, often involved with criminal networks, increasingly exploit female and transgender victims from Thailand. Swiss nationals continue to engage in child sex tourism abroad. Authorities report an increase in young male traffickers, known as "lover boys," coercing vulnerable Swiss girls and women into sex trafficking, often through a sham romantic relationship. The majority of sex trafficking victims identified by the government are from Eastern Europe, West Africa, notably Nigeria, and Asia, particularly Thailand. Traffickers continue to fraudulently recruit and later coerce Nigerian women and girls to stay in exploitative situations using a "voodoo oath" they are forced to swear. Foreign trafficking victims originate primarily from Central and Eastern Europe (particularly Bulgaria, Hungary, and Romania), with increasing numbers from Asia and Africa (especially from the People's Republic of China, Nigeria, and Thailand), but also from Latin America (Brazil and the Dominican Republic). Traffickers often force female victims among asylum-seekers from Angola, Eritrea, Ethiopia, and Nigeria into commercial sex and domestic servitude. More than one-third of female trafficking victims are asylum-seekers who sought protection after arriving in Switzerland. Labor traffickers exploit men, women, and children in domestic service, health care, agriculture, hospitality, catering, postal courier services, construction, tourism, and in forced criminal activity. Male victims among asylum-seekers come primarily from Afghanistan and Eritrea and are exploited in forced labor. Forced begging, especially among the Roma communities, has increased in recent years.

## SYRIA: TIER 3

The Government of Syria does not fully meet the minimum standards for the elimination of trafficking and, even considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity, is not making significant efforts to do so; therefore Syria remained on Tier 3. During the reporting period, there was a government policy or pattern of human trafficking and employing or recruiting child soldiers. The government exploited its nationals in forced labor in its compulsory military service by forcing them to serve for indefinite or otherwise arbitrary periods. Officials did not demobilize most individuals from military service after their mandatory period of service; rather, they forced citizens to serve indefinitely under threats of detention, torture, familial reprisal, or death. The government did not hold any traffickers criminally accountable, nor did it identify or protect any trafficking victims. The government's actions directly contributed to the population's vulnerability to trafficking, and it continued to perpetrate human trafficking crimes routinely. The pandemic, security situation, and the government's restriction on freedom of movement, press, and internet access limited reporting, including on official complicity on human trafficking and child soldiering crimes. In previous reporting periods, the government and pro-Syrian regime-affiliated militias forcibly recruited and used child soldiers, resulting in children facing extreme violence and retaliation by other warring parties. Despite such reports, the government has never reported efforts to disarm, demobilize, and reintegrate child soldiers, nor has it reported investigating, prosecuting, or convicting officials complicit in the recruitment or use of child soldiers. Pro-Syrian regime-

affiliated militias continued to forcibly recruit and use child soldiers during the reporting period; the government also did not protect and prevent children from recruitment and use by armed opposition forces and designated terrorist organizations. The government continued to arrest, detain, and severely abuse trafficking victims, including child soldiers, and punished them for unlawful acts traffickers compelled them to commit.



### PRIORITIZED RECOMMENDATIONS:

Criminalize all forms of human trafficking. • Stop the forcible recruitment and use of child soldiers by government forces and pro-government militias. • Enforce limits on the length of compulsory military service, demobilize individuals who have exceeded the service limit, and cease the deceptive and coercive recruitment of returning refugees. • Proactively identify victims of all forms of trafficking and provide them with appropriate protection services, including long-term care for demobilized child soldiers from government forces and non-state armed groups. • Ensure trafficking victims are not punished for crimes traffickers compelled them to commit, such as child soldiering. • Investigate, prosecute, and convict perpetrators of sex and labor trafficking and the unlawful recruitment and use of child soldiers, including complicit officials. • Given significant concerns that North Korea forces its citizens to work abroad, screen North Korean workers for trafficking indicators and refer them to appropriate services.

### PROSECUTION

The government made no discernible anti-trafficking law enforcement efforts. Violent conflict continued to amplify the magnitude of human trafficking crimes occurring within Syria. Decree No. 3 of 2010 appeared to criminalize some forms of sex trafficking and labor trafficking, but it did not include a clear definition of human trafficking. This decree prescribed a minimum punishment of seven years' imprisonment and a fine between 1 million and 3 million Syrian pounds ($400 and $1,190), a penalty that was sufficiently stringent but, with respect to sex trafficking, not commensurate with those prescribed for other serious crimes, such as rape. The government did not report investigating, prosecuting, or convicting suspected traffickers. During the reporting period, the National Defense Forces (NDF), a pro-regime militia organized by and in close collaboration with the Syrian government, recruited and used children in combat roles. During the reporting period, an international organization reported regime forces recruited or used 43 children at checkpoints but did not report further details. In previous reporting periods, the government and pro-Syrian regime-affiliated militias forcibly recruited and used child soldiers, resulting in children facing extreme violence and retaliation by other warring parties. Military service was compulsory for Syrian men between the ages of 18 and 42 for 18 to 21 months; however, the government forced soldiers and reservists to serve an indefinite period of time, and some draftees were not discharged even after nine years of military service. NGOs reported the government, including commanding officers, detained, tortured, and at times killed conscripts if they were suspected to be anti-government, refused an order, or deserted; there were also reports the government harassed, detained, and in some cases, tortured the families of draft evaders and deserters. In addition, there were reports the regime deceived and potentially coerced returning refugees into military service. The government has never reported investigating, prosecuting, or convicting government officials complicit in human trafficking, including child soldiering crimes. The government did not provide anti-trafficking training for officials.

**SYRIA**

## PROTECTION

The government did not identify or protect trafficking victims. The government did not protect children from forcible recruitment and use as soldiers and in support roles by government forces and pro-government armed groups, armed opposition groups, and terrorist organizations. The government continued to severely punish victims for crimes that traffickers compelled them to commit, such as child soldiering and prostitution. The government routinely arrested, detained, raped, tortured, and executed children for alleged association with political opponents, armed groups, and terrorist organizations and made no effort to offer these children any protection services. During the reporting period, there continued to be isolated reports of the government detaining women and children—including unaccompanied children—across Syria for suspected family ties to foreign ISIS fighters; some of these individuals may have been unidentified trafficking victims. The government neither encouraged trafficking victims to assist in investigations or prosecutions of their traffickers nor provided foreign victims with legal alternatives to their removal to countries in which they may face hardship or retribution.

## PREVENTION

The government made no effort to prevent human trafficking. Law No. 11/2013 criminalized all forms of recruitment and use of children younger than the age of 18 by the Syrian armed forces and armed groups; however, the government made no efforts to prosecute child soldiering crimes perpetrated by government and pro-regime militias, armed opposition groups, and designated terrorist organizations. The government also did not implement measures to prevent children from unlawful recruitment and use as combatants and in support roles by pro-regime militias, armed opposition groups, and terrorist organizations. The government did not raise awareness of human trafficking among the general public or officials. The government did not report efforts to reduce the demand for commercial sex acts, nor did it prevent child sex tourism by Syrian nationals abroad. The government did not provide anti-trafficking training for its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Syria, and traffickers exploit Syrian victims abroad. Conditions in Syria continue to deteriorate amid the ongoing conflict between the regime and its Russian and Iranian allies and non-state armed groups of varying ideologies exerting control over wide geographic swaths of the country's territory. Military service is compulsory for Syrian men between the ages of 18 and 42 for 18 to 21 months; however, since the start of the conflict in 2011, officials do not demobilize most individuals from military service after their mandatory period of service; rather, they force citizens to serve indefinitely under threats of detention, torture, familial reprisal, or death.

More than half of Syria's pre-war population of 23 million have been displaced; as of September 2021, the UN High Commissioner for Refugees reported there were 6.7 million internally displaced persons (IDPs), 2.6 million of whom were children, and more than 5.6 million Syrian-registered refugees outside the country. Syrians displaced in the country and those living as refugees in neighboring countries are extremely vulnerable to traffickers. Syrian children are reportedly vulnerable to forced early marriages, including to members of terrorist groups such as ISIS—which can lead to sexual slavery and forced labor—and children displaced within the country continue to be subjected to forced labor, particularly by organized begging rings. Armed groups, community members, and criminal gangs exploit women, girls, and boys in Syria—particularly underserved populations such as IDPs and individuals with disabilities—in sex trafficking in exchange for food or money. Traffickers subject foreign domestic workers from Southeast Asian countries such as Indonesia and the Philippines to forced labor in Syria. In several cases, traffickers fraudulently recruited Filipina domestic workers for employment in the United Arab Emirates before transporting them to Syria where they are exploited in forced labor.

Despite the territorial defeat of ISIS at the beginning of 2019, the group continued to force local Syrian girls and women in ISIS-controlled areas into marriages with its fighters, and it routinely subjected women and girls from minority groups into forced marriages, domestic servitude, systematic rape, sexual slavery, and other forms of sexual violence. Incidents of human trafficking increased, and trafficking victims were trapped in Syria in 2014 when ISIS consolidated its control of the eastern governorates of Raqqa and Deir al-Zour. ISIS publicly released guidelines on how to capture, forcibly hold, and sexually abuse women and girls as "slaves." As reported by an international organization, ISIS militants' system of organized sexual slavery and forced marriage is a central element of the terrorist group's ideology and systemic means of oppression. ISIS subjected girls as young as nine years old, including Yezidi girls abducted from Iraq and brought to Syria, to sexual slavery and other forms of sexual violence. Although as of 2021, ISIS no longer controlled territory, according to an NGO, approximately 2,700 Yezidi women and girls remain unaccounted for; reports indicate some of these women and girls remain with ISIS in eastern Syria or in Al-Hol camp.

The recruitment and use of children in combat in Syria remains common, and since the beginning of 2018, international observers reported a continuation in incidents of recruitment and use by armed groups. Syrian government forces, pro-regime militias, and armed non-state actors, including the Syrian National Army (SNA) and SNA-affiliated groups, Syrian Democratic Forces (SDF)-affiliated groups, ISIS, Hayat Tahrir al-Sham (HTS), al-Qa'ida, and Jabhat al-Nusra—the al-Qa'ida affiliate in Syria—recruit and use boys and girls as child soldiers. Jabhat al-Nusra and ISIS also have used children as human shields, suicide bombers, snipers, and executioners. Militants also use children for forced labor and as informants, exposing them to retaliation and extreme punishment. Some armed groups fighting for the Syrian government, such as Hezbollah, and the NDF, or "shabiha," forcibly recruit children as young as six years old. During previous reporting periods, there were reports armed groups abducted or recruited children to be used in hostilities outside of Syria, in particular in Libya. ISIS forces continue to deploy children—some as young as eight years old—into hostilities. Despite the territorial defeat of ISIS, it continues to target children for indoctrination at schools and camps for IDPs, endangering children and preventing their access to education.

The Kurdish People's Protection Units (YPG and YPJ) in northwest Syria continue to recruit, train, and use boys and girls as young as 12 years old. Since 2017, international observers reported that YPG and YPJ recruited—at times by force—children from displacement camps in northeast Syria. During the reporting year, the SDF, and by association the YPG and YPJ, continued to implement the UN Security Council resolution-mandated action plan to end the recruitment and use of children and demobilize children within SDF ranks. The SDF identified 908 minors seeking to join its ranks and continued to develop and refine an age screening mechanism in coordination with the UN. According to the UN, the action plan resulted in the disengagement of 150 children from SDF ranks during the year. NGOs allege that some Popular Mobilization Forces-affiliated militias in Iraq recruit boys in Iraq to fight in Syria. As in previous reporting periods, credible sources widely report that Iran's Islamic Revolutionary Guard Corps (IRGC), the Iranian Basij Resistance Force, and IRGC-supported militias actively recruit and use—including through force or coercive means—Afghan children and adults, Afghan migrant and refugee men and children living in Iran, Syrian children, and Iranian children to fight in IRGC-led and -funded Shia militias deployed to Syria.

Terrorist groups, including ISIS and HTS, reportedly force, coerce, or fraudulently recruit foreigners—including migrants from Central Asia and women, including Western women—to join them. Central Asian women traveling with men to Syria are also vulnerable to sex trafficking and forced labor on arrival; many are reportedly placed alongside other Central Asian family members in makeshift camp communities, where their travel and identity documentation is confiscated and their freedom of movement restricted. Many of these women report having lost their husbands to armed conflict, after which their economic hardships and confinement in the camps make them vulnerable to coercive local marriages that may feature corollary sex trafficking or forced labor indicators. During the reporting period, thousands of foreign women remained in IDP camps across northeastern Syria, and some had suspected family ties to foreign ISIS fighters; some of these individuals may have been unidentified trafficking victims. Some children in IDP

camps across northeastern Syria, including Al-Hol, were potential human trafficking victims used in direct hostilities or in support roles by armed groups, including ISIS. In February 2021, an international organization reported that the repatriation of foreign children from camps across northeastern Syria had slowed significantly due to the pandemic. As in previous reporting periods, the Syrian government, NDF, SDF, and SNA detained children, including trafficking victims, for their alleged association with armed groups or terrorist organizations. In July 2020, an NGO reported government officials subjected LGBTQI+ persons in Syria to various forms of sexual violence, including cases amounting to sexual slavery, in military detention centers, prisons, and checkpoints.

The Syrian refugee population is highly vulnerable to sex trafficking and forced labor in neighboring countries, particularly Jordan, Lebanon, Iraq, and Turkey. International organizations report a high number of child and early marriages of Syrian girls among refugee populations, which increases their vulnerability to trafficking. Syrian refugee women and girls are also vulnerable to forced or "temporary marriages"—for the purpose of commercial sex and other forms of exploitation—and other forms of sex trafficking in refugee camps, Lebanon, Jordan, and cities in the Iraqi Kurdistan Region, including Sulaimaniya. Commercial sex rings in Turkey and Lebanon compel Syrian refugee women and girls into sex trafficking. In Turkey, some female Syrian refugees are reportedly exploited in sex or labor trafficking after accepting fraudulent job offers to work in hair salons, modeling, entertainment, or domestic work. An NGO reported Syrian boys, especially unaccompanied and separated boys, were vulnerable to sexual trafficking in exchange for the cost of being smuggled across the border to Turkey and further destinations. In Turkey, Lebanon, and Jordan, Syrian refugee children continue to engage in street begging or peddling goods, some of which may be forced or coerced. Syrian children are also observed working in Turkey's agricultural sector and informally in textile workshops and the service sector, where they experience long working hours, low wages, and poor working conditions; children in these sectors may be vulnerable to forced labor. In Jordan and Lebanon, traffickers force Syrian refugee children to work in agriculture alongside their families; in Lebanon's Bekaa Valley, Syrian gangs force refugee adults and children to work in agriculture under harsh conditions, including physical abuse, with little to no pay. LGBTQI+ persons among the Syrian refugee population in Lebanon are reportedly vulnerable to sex trafficking. During the previous reporting period, Sudanese authorities identified seven Syrian trafficking victims in Khartoum. North Korean nationals working in Syria may have been forced to work by the North Korean government. Isolated media reporting in 2020 alleged Syrian men were fraudulently recruited to fight in the Nagorno-Karabakh conflict, believing they were going to Azerbaijan for work opportunities.

## TAIWAN: TIER 1

Taiwanese authorities fully meet the minimum standards for the elimination of trafficking. Authorities continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on their anti-trafficking capacity; therefore Taiwan remained on Tier 1. These efforts included convicting significantly more traffickers and referring more victims to protection services than in 2020; improving victim-centered shelter intake procedures for foreign survivors; enhancing the formal consultative role of non-government stakeholders in the victim identification, referral, and case management processes; and penalizing a significantly higher number of recruitment brokers for abusive practices than in 2020, including in the form of precedent-setting trafficking convictions. Although Taiwan met the minimum standards, authorities investigated and prosecuted fewer alleged traffickers and identified fewer victims than in 2020. Some official stakeholders continued to operate under disparate and often ineffective victim identification procedures, complicating some victims' access to justice and protective care. Authorities' insufficient staffing and inspection protocols continued to impede efforts to identify, investigate, and prosecute forced labor on fishing vessels in Taiwan's highly vulnerable Distant Water Fleet

(DWF). Taiwan authorities' lack of specific labor laws ensuring the rights of migrant domestic caregivers continued to leave thousands vulnerable to exploitation in forced labor.



## PRIORITIZED RECOMMENDATIONS:

Increase inspections and, where appropriate, prosecute the senior crew and owners of Taiwan-owned and -flagged as well as Taiwan-owned, foreign-flagged fishing vessels suspected of forced labor in the DWF, including vessels stopping in special foreign docking zones. • Increase efforts to prosecute and convict traffickers under the anti-trafficking law, and sentence convicted traffickers to adequate penalties, which should include significant prison terms. • Expand the mandate of foreign port-based fisheries agency (FA) personnel to include victim-centered screening for forced labor indicators among foreign fishing crewmembers; increase inspector coverage to all authorized overseas ports; train all maritime inspection authorities on victim identification, referral, and law enforcement notification procedures; and expand the availability of interpretation services for such inspections, especially for Bahasa and Tagalog languages. • Formally include civil society input into the labor broker evaluation process. • Amend relevant policies and legislative loopholes to eliminate the imposition of all recruitment, registration, and service fees and deposits on workers, and coordinate with sending countries to monitor and harmonize contract provisions and facilitate direct hiring. • Continue to strengthen efforts to screen for trafficking among vulnerable populations, including foreign students recruited to for-profit universities; individuals returned to Taiwan in connection with alleged overseas criminal activity; and foreign workers falling out of visa status within Taiwan after fleeing abusive working conditions and/or surrendering to immigration authorities, and refer them to protective services. • Enact legislation that would address gaps in basic labor protections for household caregivers and domestic workers, including by instituting a full ban on the retention of migrant workers' identity and travel documentation. • Extend trafficking victim identification authority to key stakeholder agencies. • Increase resources for and implement anti-trafficking training for police, prosecutors, and judges.

## PROSECUTION

Taiwan authorities increased law enforcement efforts, but they did not sufficiently prioritize the detection, investigation, or prosecution of forced labor crimes in the coastal-offshore or DWF fishing industries. The Human Trafficking Prevention and Control Act (HTPCA) criminalized all forms of trafficking and prescribed penalties of up to seven years' imprisonment and fines up to 5 million New Taiwan Dollars (NT) ($180,460); these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other grave crimes, such as rape. HTPCA amendments enacted in 2018 increased penalties to a maximum of one year in prison and a possible fine of 300,000 NT ($10,830) for individuals who, "through recruitment, seduction, shelter, arrangement, assistance, exploitation, or other means, cause a child to act as a host or hostess in a bar or club or engage in acts associated with tour escort and singing or dancing companion services that involve sexual activities." The amendment prescribed a maximum penalty of five years' imprisonment and a possible fine of 1.5 million NT ($54,140) for such crimes committed by means of "violence, coercion, drugs, fraud, hypnosis, or other means violating the free will of the child or youth concerned." Authorities continued to prosecute the majority of trafficking cases under other laws in the criminal code and the Child and Youth Sexual Exploitation Prevention Act (CYSEPA); some penalties prescribed for child sex trafficking crimes under these laws were not sufficiently stringent or commensurate with other grave crimes, such as rape, although other laws retained appropriate penalties.

**TAIWAN**

Authorities prosecuted and convicted some traffickers under criminal code provisions proscribing crimes outside the standard definition of trafficking, such as Article 231 (forced sexual intercourse or obscene acts), Article 296 ("trading or mortgaging of humans"), and Article 302 (false imprisonment), some of which carried lesser penalties.

Authorities reported initiating 99 new criminal trafficking investigations involving 229 alleged perpetrators, including 62 alleged perpetrators of labor trafficking and 167 alleged perpetrators of sex trafficking, compared with 159 total investigations involving 458 alleged perpetrators in 2020. Officials attributed this decrease to reduced law enforcement staffing, strict border controls, and the long-term closure of businesses that facilitated commercial sex as a health precaution during the pandemic. Authorities also continued ongoing investigations of 143 cases involving 341 alleged sex traffickers and 55 alleged labor traffickers initiated in 2020. They newly prosecuted 73 individuals—25 for alleged forced labor and 48 for alleged sex trafficking—compared with 116 new prosecutions in 2020. This figure included 38 individuals indicted under the CYSEPA, six under the HTPCA, and 29 under other laws and sections of the criminal code (compared with 58 under CYSEPA, 15 under HTPCA, and 43 under other laws in 2020). The six individuals indicted under the HTPCA were all charged with labor trafficking (compared with eight charged with sex trafficking and seven charged with labor trafficking in 2020). Authorities convicted 73 traffickers; this included four individuals convicted for forced labor and 69 for sex trafficking (compared with four for forced labor, 45 for sex trafficking, and one for both in 2020). In prior years, authorities ascribed the tendency to impose lenient penalties to Taiwan's judicial evaluation and promotion system, which reportedly penalized judges if courts granted convicted individuals' appeals to overturn or shorten their sentences. However, for the fourth consecutive year, sentences imposed on the majority of convicted traffickers (62, compared with at least 43 in 2020) exceeded one year imprisonment. Taiwan authorities investigated five foreign nationals—one each from Republic of Korea and Japan and three from Indonesia—for suspected CYSEPA violations, but they did not report whether these constituted child sex tourism crimes or other forms of exploitation proscribed under CYSEPA (compared with eight investigations in 2020). Authorities did not report any investigations, prosecutions, or convictions of officials complicit in human trafficking crimes. Authorities filed charges in a case referred to prosecutors in 2020 involving a Taiwan-based foreign government official suspected of colluding with her Taiwan citizen spouse to recruit three foreign nationals for sex trafficking in Taiwan; the case was awaiting trial at the end of the reporting period. Taiwan's laws criminalized sexual exploitation of children by Taiwan passport holders traveling abroad. For the first time since 2006, authorities reported indicting one such individual; the case was ongoing at the end of the reporting period. As in prior years, law enforcement bodies and court authorities maintained disparate statistical records on anti-trafficking cases; as such, the true number of trafficking indictments, prosecutions, convictions, and sentences—including those processed through appeals in multiple court systems—may have been higher than reported. Pandemic-related challenges, including widespread infection among officers in some areas, significantly impacted law enforcement anti-trafficking capacity in 2021. The Judicial Yuan also ordered courts at all levels to suspend in-person proceedings or switch to virtual conferencing during periods with high infection rates, thereby constraining prosecutions throughout the year.

Authorities and NGOs noted court personnel perceiving cases as labor disputes rather than trafficking crimes continued to hinder effective prosecution of labor trafficking cases. Ambiguities in HTPCA provisions reportedly complicated implementation in cases where victims received some financial compensation. Other HTPCA provisions protected workers from having to remit "unreasonable payments of debt" to brokers or supervisors; observers expressed concern that these provisions were too vague to effectively prevent debt-based coercion. In 2019, authorities formed an interagency working group to seek civil society input for revising the HTPCA; in December 2021, authorities submitted draft amendments that incorporated this input to the Executive Yuan, where they remained pending at the end of the reporting period. In previous years, labor rights groups alleged some low-level corruption among local officials impeded action against forced labor in the fishing industry, although no such allegations were reported in 2021.

Although pandemic-related restrictions on large gatherings curtailed some training activities, authorities again allocated approximately 1 million NT ($36,090) to train more than 1,500 law enforcement officers, prosecutors, and judges through a wide range of virtual workshops, seminars, and conferences (compared with more than 3,000 officials trained at an estimated cost of 1 million NT, or $36,090, in 2020). Despite coordination obstacles to international law enforcement due to Taiwan's unique diplomatic status, authorities continued to conduct joint anti-trafficking investigations with several countries, including Kosovo, Montenegro, Paraguay, Serbia, Turkey, and Vietnam. Officials at times closed international investigations submitted by foreign counterparts due to perceived lack of evidence.

The Ministry of Labor (MOL) reported conducting 2,363 inspections of recruitment brokers in 2021 (compared with 2,617 in 2020). Unlike in 2020, authorities reported conducting 111 follow-up investigations based on reports of improper withholding of identity documentation and illegal surcharges; this led to the indictment of eight individuals on human trafficking charges, two of which culminated in convictions (compared with no criminal investigations, prosecutions, or convictions of brokers engaged in illegal acts in 2020). The FA reported conducting unannounced inspections on 112 fishing vessels, including 98 at domestic ports, 12 at foreign ports, and two that were Taiwan-owned and foreign-flagged, interviewing a total of 641 crewmembers (compared with 124 inspections—102 at domestic ports, 20 at foreign ports, and two on the high seas, interviewing a total of 658 crew—in 2020). Observers noted DWF vessels—both Taiwan- and foreign-flagged—spent more time docked in Taiwan's ports due to the pandemic in 2021. Inspectors uncovered 62 violations relating to contract issues, excessive overtime, physical assault of crewmembers, wage discrepancies, and suspected human trafficking (compared with 141 in 2020). Forty-four of these remained under initial investigation. Authorities referred five of the cases to district prosecutors; continued prosecutorial investigation of two cases; and closed one due to perceived lack of evidence (compared with eight referrals in 2020; three in 2019; and three in 2018). Notably, two of the aforementioned referrals were for cases of suspected trafficking aboard Taiwan-owned, foreign-flagged vessels—a first in recent years.

In previous years, judicial officials noted bureaucratic lags generated by complicated reporting hierarchies impeded timely law enforcement response in maritime trafficking cases, allowing some alleged perpetrators to flee long before the competent authorities could begin formal investigations. In an effort to mitigate these delays, in 2020 Taiwan's interagency anti-trafficking task force worked with the FA to complete and promulgate a policy granting police and prosecutors the authority to initiate maritime forced labor investigations immediately upon receipt of complaints, rather than following lengthier bureaucratic approval processes; however, authorities did not implement the new procedure in 2021. Civil society groups continued to decry systemic shortcomings in Taiwan's maritime anti-trafficking law enforcement, evidenced by lack of robust investigations into formal complaints filed by NGOs and human rights watchdogs; they noted FA authorities continued to pass very few NGO-reported cases of potential maritime forced labor to prosecutors, and instead closed the vast majority of investigated allegations with no further action. Civil society observers encouraged Taiwanese law enforcement to apply the same universal jurisdiction principles cited in land-based human trafficking investigations to board and inspect maritime vessels where cases of seafarer abandonment or abuse are suspected. In an effort to increase transparency to the process, in 2021 authorities began inviting civil society representatives to observe FA interviews of migrant fishermen onboard some vessels in local ports; while noting this as a positive step, these NGO personnel observed some practices that may have discouraged victims from reporting abuses, including interviews conducted in close proximity to senior vessel crew. Only seven of the 32 international ports authorized for use by Taiwan DWF vessels had assigned FA inspectors (a decrease from nine in 2020), and observers noted these personnel operated under mandates that were largely limited to fish catch inspection and the detection of environmental abuses, rather than labor abuses. Taiwan's unique diplomatic status and the pandemic reportedly continued to complicate ongoing Ministry of Foreign Affairs (MOFA) and FA efforts to continue placing additional personnel in resident FA positions abroad. However, civil society groups continued to urge the FA to position more

Haiti AR_001009

inspectors at all authorized overseas ports, or else to reduce the number of ports authorized to receive Taiwan-flagged vessels; train FA inspectors to detect labor abuses on board these vessels, including forced labor; and ensure inspectors have access to interpretation services in languages common among the primary seafarer demographics, including Tagalog and Bahasa. Division of responsibility for foreign fishermen between MOL and the FA continued to hinder the coordination necessary to prosecute maritime forced labor cases.

## PROTECTION

Authorities maintained protection efforts, but implementation of monitoring and referral procedures remained insufficient to adequately identify and provide services to forced labor victims among the foreign crewmembers aboard Taiwan-flagged and -owned and Taiwan- flagged, foreign-owned fishing vessels. Law enforcement authorities used standardized questions and evaluation forms when interviewing and referring potential trafficking victims, including among foreigners accused of having committed immigration violations. In 2021, they identified 221 trafficking victims (164 exploited in sex trafficking and 57 in forced labor), compared with 322 identified in 2020. Authorities attributed this significant decrease in victim identification to strict border controls, reduced law enforcement staffing, and the closure of businesses known for facilitating commercial sex during the pandemic. Of the 221 victims identified, 106 were foreign and 102 were children (compared with 143 and 168, respectively, in 2020). Among the 102 children identified were 24 boys and 71 girls identified in sex trafficking (not disaggregated in 2020). Twenty-six of the forced labor victims were women and seven were girls under the age of 18 (compared with at least 48 women identified in forced labor in 2020). The National Police Agency (NPA) and National Immigration Agency (NIA) each ran its own hotline— the latter in 24-hour operation and offering Mandarin and English language services. Thirty-six calls to the three hotline systems resulted in the positive identification of eight trafficking victims and the initiation of three investigations during the reporting period (compared with 17 victims identified from at least 18 calls received and investigated in 2020). MOL maintained a separate 24-hour migrant worker hotline, from which the FA reported fielding 51 labor rights-related complaints from migrant fishermen (compared with 75 calls in 2020). Authorities resolved 22 of these cases and recovered 875,900 NT in wages ($31,610) (compared with 870,000 NT, or $31,400, recovered from 42 resolved cases in 2020). Unlike the previous year, authorities did not identify any trafficking victims through this hotline. Observers noted crewmembers aboard vessels in the DWF likely had difficulties accessing the MOL hotline due to limited awareness of its existence, lack of cellular service and internet connectivity in remote maritime areas, and restrictions on their communication imposed by senior vessel crew. Some migrant fishermen previously alleged significant lags in hotline response times, and that hotline staff had relayed complaints directly back to senior vessel crew, thereby exposing callers to potential retaliation. Officials reportedly continued to be less proactive in identifying victims of forced labor than victims of sex trafficking due to definitional ambiguities in the HTPCA. By law, only NIA officials, police, and prosecutors could formally identify victims, while the law required MOL, the FA, and other relevant stakeholders to follow notification procedures to report possible victim status. Under this arrangement, prosecutors and judges could also rescind victim designation, thereby restricting survivors' access to some protection services. NGOs and prosecutors believed many victims went undetected under this arrangement; as such, they continued to advocate for authorities to allow social workers, labor inspectors, and other stakeholders to independently identify victims as well. In an effort to address this recommendation, in August 2021 the NIA established a "Plan for Supporting Investigators during the Identification Stage of Suspected Human Trafficking Cases" that designated 90 social workers, administrative personnel, and staff from labor rights organizations to assist law enforcement in victim identification and case management. However, only one such individual provided consultation during the reporting period. NIA also completed a checklist for improved victim identification, referral, and law enforcement liaison procedures to benefit foreign seafarers on fishing vessels, but authorities had not approved it by the end of the reporting period.

MOL and NIA continued to fund civil society organizations to provide protection services to trafficking victims as outlined under the HTPCA.

MOL maintained its annual budget for overall victim protection at 10 million NT ($360,920)— an 8 million NT ($288,740) decrease from 2020 allocated to match the previous year's total expenditures. NIA allocated 13 million NT ($469,200) for operation of two shelters, equaling its 2020 earmark; both ministries may have redirected some of these funds to pandemic-mitigation activities, although official contacts denied having done so. NIA operated two shelters dedicated to foreign trafficking victims who had not acquired work visas. Citing security concerns, authorities limited shelter access for victims from the People's Republic of China (PRC) to NIA shelters, while other nationals could access a wider array of NGO shelter services. Taiwanese authorities reported referring a total of 89 victims to protection services, including 52 sex trafficking victims and 37 forced labor victims (compared with 83 total referrals in 2020). Officials separately reported 230 victims received some form of protection service from government or government-supported NGOs, including 174 sex trafficking victims and 56 forced labor victims; it was unclear if the aforementioned 89 were included in this figure (unreported in 2020). NIA shelters provided both male and female trafficking victims with medical and psychological services, legal counseling, accompanied interviews, vocational training, small stipends, language interpretation, and repatriation assistance. According to partial data, authorities offered these services to foreign trafficking victims in a total of at least 384 instances, including 186 instances of interpretation assistance and 198 instances of accompanied interviewing (compared with 1,162 instances of service provision, including 517 cases of interpretation assistance and nine instances of legal aid in 2020). Following reports that the requirement to verbally explain their circumstances to shelter providers discouraged some foreign victims from accessing protection services, NIA implemented a new policy requiring shelters to record and translate written victim testimonials in any of four key languages (Bahasa, Tagalog, Thai, and Vietnamese); more than 1,000 shelter residents, many of them trafficking victims, reportedly benefitted from this service in 2021. NIA operated an additional 22 "resettlement institutions," through which it reportedly provided psychiatric counseling and other consultative services in more than 350 instances during the reporting period.

Taiwan implemented a new policy allowing migrant workers to petition for work permits and/or residency extensions through a third-party intermediary— a step intended to expand these services for migrant workers who were unable to administer these processes on their own. Authorities reported granting foreign victims 65 temporary residency extensions and 78 work permits in 2021 (compared with 58 new temporary residency permits and 69 temporary work permits in 2020). During pandemic-related travel restrictions, they also granted immigration extensions to 78 foreign victims unable to return to their home countries for them to benefit from shelter services and other new forms of assistance, including in special private residences provided as a public health precaution when shelters were deemed unsafe (unreported in 2020). On a case-by-case basis, authorities also allowed foreign victims to extend their prior work and residency permits repeatedly in six-month increments, rather than deporting them. Eight victims who received shelter services in 2021 were foreign nationals in Taiwan without work documentation. NIA officials reportedly worked with shelter organizations to facilitate the repatriation of 10 foreign trafficking victims in 2021, including seven victims of sex trafficking and three victims of forced labor (compared with 17 total in 2020 and 59 in 2019); authorities attributed this decrease to pandemic-related travel and entry restrictions. Authorities encouraged victims to participate in their traffickers' criminal investigations by conducting video interviews as a public health measure during the pandemic, allowing them to provide written statements for trials, and enabling them to testify through video equipment. They permitted victims to obtain compensation through out-of-court settlements or file civil suits against traffickers but required them to provide all relevant evidence themselves. During the reporting period, four foreign survivors filed civil trafficking suits; district courts concluded two of these cases, awarding a total of 106,000 NT ($3,830) to the victims (compared with four civil suits concluded in favor of plaintiffs with compensation orders totaling more than 7.93 million NT, or $286,210, in 2020). The other two cases remained in process at the end of the reporting period. According to an NIA survey conducted in a prior reporting period, the most common complaints among foreign trafficking victims at the conclusion of their publicly funded protection services involved the quality of legal counseling, the lengthy duration of

TAIWAN

judicial proceedings, and general difficulty in obtaining compensation from their traffickers.

The FA maintained guidelines on victim identification and law enforcement notification procedures for inspections of fishing vessels operating in both the DWF and in domestic waters; these included updated trafficking indicator questionnaires for migrant fishermen and senior vessel crew intended to detect cases of debt-based coercion, restricted freedom of movement, wage irregularities, physical abuse, retention of travel and identity documents, and other such forced labor indicators. They also outlined specific responsibilities among stakeholder agencies for the proper detection and referral of potential trafficking cases to police, MFA, and/or foreign government counterpart agencies, depending on available evidence. According to NGO observers, some migrant fishermen were hesitant to relay their experiences to the FA or coast guard interviewers due to fear of reprisal and concerns over personal safety.

Taiwan law provided victims with immunity for unlawful acts traffickers compelled them to commit. Authorities reportedly screened individuals initially detained for commercial sex acts and positively identified several victims in the process. Unlike the previous reporting period, there were no specific allegations of victim penalization in 2021 (compared with one illustrative case in 2020). However, civil society contacts reported limited or inconsistent understanding of trafficking among front-line law enforcement officers and judges, compounded by high turnover impacting institutional memory, continued to constrain victims' access to protective care while leaving them vulnerable to temporary detention, fines, and jail time. In 2021, authorities cooperated with the Government of North Macedonia to repatriate 48 Taiwanese individuals who had been subjected to forced criminality in telecommunications fraud schemes there. Authorities did not provide further information on these cases, including as to whether they received adequate protection services. In prior years, Taiwanese law enforcement treated survivors of similar Europe-based forced criminality as both victims and criminals, generating some concern over adherence to victim protection standards.

## PREVENTION

Authorities increased efforts to prevent trafficking. Taiwan maintained its "2021-2022 Anti-Exploitation Action Plan" outlining steps to prevent sex trafficking and forced labor among key vulnerable groups. A cabinet-level minister-without-portfolio continued to implement the national action plan and oversee an interagency working group that met semiannually. The working group maintained two subgroups—one to focus on domestic workers and the other on migrant fishermen—that convened meetings more frequently and included participation from NGOs and academics. Pandemic-related restrictions prevented some central- and local-level meetings on coordination of prevention efforts. Various agencies continued to fund advertisements, public service announcements, and other materials on trafficking, and held trainings for vulnerable populations, including youth, foreign workers, and fishing sector workers. Due to pandemic-related restrictions on public gatherings, authorities held many publicly funded anti-trafficking information and education campaigns via videoconference.

The FA continued to conduct unannounced inspections of some DWF vessels moored in Taiwanese ports, in foreign ports, and on the high seas; the violations they detected through this process culminated in a total of 14.84 million NT ($535,600) in fines (compared with 18 million NT, or $649,660, in 2020), as well as the three-month annulment of operating licenses in two cases. The authorities required vessel owners or brokers to record videos of mandatory discussions informing all foreign crewmembers of their basic rights prior to signing employment contracts; the FA randomly selected an unspecified number of such video recordings from 54 brokers during the reporting period to screen for compliance with these required discussions and proof of employee consent (compared with 82 recordings from 16 brokers in 2020). Authorities reported an 81 percent compliance rate from this audit but did not provide information on the circumstances of, or consequences for, the 18 percent of cases in violation (compared with 96 percent compliance in 2020).

Taiwan's Labor Standards Act did not protect fishing workers hired to work aboard DWF vessels, who instead fell under the jurisdiction of the FA. Civil society groups noted overlapping mandates and procedural gaps between the MOL and the FA continued to hinder effective oversight of labor conditions in the fishing industry. The FA maintained regulations that standardized fishing workers' employment contracts, set a minimum wage with direct payment options, provided medical and life insurance, unified working hours and rest time, and established access to new complaint mechanisms. However, NGOs remained concerned the minimum compensation established in these regulations was below Taiwan's broader minimum wage, and senior vessel crew continued to delay or withhold salary remittance in violation of contractual pay schedules, leaving some foreign fishing workers vulnerable to debt-based coercion. Civil society activists called for the elimination of all such worker-paid fees and instead advocated for their imposition on the employers of seafarers and land-based migrant workers alike. They also described the FA's purview over Taiwan fishermen's associations—which played a role in the approval of labor recruitment systems—as a possible conflict of interest. Observers reported insufficient FA staffing and oversight mechanisms in the DWF were permissive of forced labor and other abuses. In an effort to enhance this oversight, in 2019 authorities agreed to pursue regulatory "harmonization" with the contents of the International Labor Organization's Work in Fishing Convention (C188); the regulatory language required standardized working conditions and benefits and raised the minimum wage for DWF and coastal-offshore migrant fishermen. However, implementation measures remained under consideration at the end of the reporting period for a third year. In 2020, authorities amended the Regulations on the Approval of Investment in or the Operation of Foreign Flag Fishing Vessels to revoke or deny licensure to Taiwanese individuals who owned foreign-flagged fishing vessels engaged in forced labor; they did not provide information on the implementation of this amendment for the second consecutive year. The FA distributed multilingual cards containing information on worker rights and hotline numbers to foreign crewmembers during unannounced inspections of ships docking at certain foreign ports. It did not provide updates to a 2020 pilot program to provide free satellite-based wireless internet for crew aboard fishing vessels to facilitate contact with family members and channels for communication of labor and safety grievances; labor rights groups noted many seafarers were unable to access complaint mechanisms in the absence of this connectivity.

Notably, during the reporting period the Executive Yuan led an interagency process in consultation with civil society groups to draft and finalize a Fisheries and Human Rights Action Plan that included provisions outlining maximum time at sea; direct payment to crewmembers from Taiwan-based entities in order to eliminate predatory third-party intermediaries based in sending countries; and closed-circuit television onboard vessels to expand oversight of working conditions. Authorities had not yet approved the plan at the end of the reporting period, but civil society groups commended its contents as a significant step toward safeguarding vulnerable seafarers. Additionally, in late 2021 the FA published for comment a draft amendment to the Regulations on the Authorization and Management of Overseas Employment of Foreign Crew Members that would require Taiwan-authorized labor agents to work solely with legally authorized foreign brokers; this remained under review at the close of the reporting period. Authorities required all Taiwan-flagged DWF vessels to have an International Maritime Organization identification number or Lloyd's Register number to obtain a DWF operating license, and to log these registration numbers along with their radio callsigns, vessel names, license numbers, authorized fishing areas, and crew lists in a standardized FA database for 24-hour monitoring. While many civil society observers lauded this as a positive step, they noted these regulations did not apply to Taiwan-owned, foreign-flagged vessels; they also stressed that increasing the transparency of the vessel monitoring system—particularly by publishing information on vessel ownership and operating location—would significantly improve anti-trafficking coordination between the authorities and maritime labor NGOs. The FA continued to sponsor a national university to conduct a two-year field study on labor rights within the DWF that concluded at the end of the reporting period. The Control Yuan also issued three reports issuing recommendations to the authorities on improving migrant fishermen's rights. During strict pandemic-related entry bans in the first half of 2021, many migrant seafarers were required by law to remain on their vessels, faced fines if they attempted to come ashore, or transferred

to employment on other ships through informal arrangements that may have catalyzed additional trafficking vulnerabilities. Civil society groups expressed public concern that this policy might increase vulnerabilities to trafficking among migrant seafarers stranded on fishing vessels in Taiwanese ports; in response, authorities issued an exemption allowing DWF crewmembers to come ashore for quarantine, medical care, and transfer to new maritime or land-based employers.

An online Direct Hiring Service Center (DHSC) allowed employers to hire foreign workers without utilizing brokers who may charge illegally excessive fees; nearly 5,000 employees and more than 6,000 employers reportedly benefited from this service in 2021 (compared with more than 5,000 and nearly 6,000, respectively, in 2020). In prior years, NGOs noted the DHSC was not used widely enough to significantly reduce brokerage vulnerability. Most employers continued to deem it easier and more expedient to use brokers, and labor rights groups continued to call on the authorities to eliminate legal loopholes that enable excessive fees. Taiwan maintained a broker evaluation system initiated in 2015 that could revoke the business licenses of low-scoring brokerage firms and impose fines for certain violations, including imposition of illegal fees. In 2021, the MOL fined 159 brokers for charging illicit fees, reporting false information, failing to safeguard migrant workers' rights, and operating illegal recruitment systems— a significant increase from 12 brokers fined in 2020. The FA also reported using a similar evaluation system to conduct annual reviews 54 authorized DWF recruitment agencies (compared with 49 in 2020), of which it suspended three (compared with one suspension and one license revocation in 2020). Authorities did not fine any DWF recruitment agencies in 2021 (compared with three receiving fines of 1 million NT, or $36,090, in 2020; two in 2019; four in 2018; and six in 2017). Civil society observers continued to express concern the evaluation system could not be sufficiently objective or accurate in detecting abuses, including forced labor, because the authorities provided brokers with advance notification prior to inspections. Some recruitment agencies were able to circumvent accountability through this system by falsifying worker data during self-evaluations, and by voluntarily shutting down their operations and re-opening under a different agency name and license. Human rights NGOs claimed the system would be more effective with unannounced inspections; if the authorities granted NGOs a role in the formal approval and licensure review process; and if the authorities worked in closer concert with counterparts in sending countries to ensure protections inherent to recruitment practices and contract provisions were sufficient. Authorities continued to operate international airport service counters and foreign-worker service stations around Taiwan to assist foreign workers and educate them on their rights. MOL maintained regulations to impose fines between 60,000 NT and 300,000 NT ($2,170 - $10,830) for employers who illegally dock migrant workers' pay; authorities did not report implementing this policy for the second consecutive year.

NGOs and official stakeholders continued to stress the need for Taiwan to pass a long-stalled domestic worker protection bill that would mandate hours of rest, days off, and annual leave. Amendments to the Employment Services Act that entered into force in 2018 required employment agencies to report abuses their clients committed against migrant workers—especially foreign household caregivers—or face severe fines. The amendments also banned employers from retaining passports, work permits, or any identity documents of migrant domestic workers and fishermen without their consent. Civil society groups continued to argue these amendments were insufficient to deter forced labor, as employers were reportedly easily able to coerce migrant workers into "voluntarily" turning over their identity documentation. Lawmakers reported easing respite care regulations in 2018 to encourage employers to grant workers annual leave, ostensibly mitigating a key freedom of movement concern for migrant workers employed as household caregivers. However, NGOs previously claimed these administrative changes did little to enhance migrant domestic worker protections in implementation; instead, they continued to call for an amendment to bring migrant domestic workers under the broader protections and jurisdictions outlined in Taiwan's Labor Standards Act, or to adopt and implement new legislation to enhance relevant protections.

In 2021, Taiwan added provisions to the draft HTPCA amendment that would prohibit persons or companies convicted of human trafficking crimes from participating in public procurement processes, being awarded public contracts, or receiving work as a subcontractor on a public procurement contact for five years; this amendment remained under review in the beginning of 2022. Despite Taiwan's unique diplomatic status, it maintained bilateral trafficking memorandums of understanding with 22 foreign countries. It also entered into law enforcement coordination agreements that included anti-trafficking equities with four new countries in 2021—Belize, Nauru, Poland, and Slovakia. Some bilateral agreements did not outline adequate screening for forced labor aboard Taiwan-owned and-flagged or Taiwan- owned, foreign-flagged fishing vessels docking at certain designated foreign vessel harbor areas. Authorities made efforts to reduce the demand for commercial sex acts, including through Tourism Bureau awareness campaigns and industry training sessions.

## TRAFFICKING PROFILE

As reported over the last five years, human traffickers subject foreign men and women to forced labor and sex trafficking in Taiwan, and they subject local men and women to forced labor and local women and children to sex trafficking. Traffickers also subject Taiwanese people to forced labor in some European countries. Taiwanese traffickers increasingly use the internet, smartphone apps, livestreaming, and other such online technologies to conduct recruitment activities, often targeting child victims, and to mask their identities from law enforcement. Taiwanese traffickers also exploit persons with disabilities in sex trafficking.

Traffickers lure women from the PRC and Southeast Asian countries to Taiwan through fraudulent marriages and deceptive employment offers for purposes of sex trafficking. Many trafficking victims are migrant workers from Indonesia, the Philippines, Thailand, Vietnam, and, to a lesser extent, individuals from the PRC, Cambodia, and Sri Lanka. Indonesian, Vietnamese, and Thai nationals continue to represent the majority of foreign sex trafficking and forced labor victims in Taiwan. Taiwan is host to nearly 700,000 foreign workers, most of whom are hired in their home countries through recruitment agencies and brokers—including some from Taiwan—to perform low-skilled work as home caregivers and domestic workers (34 percent), or in farming, manufacturing, meat processing, construction, and fishing. In order to pay brokers' often exorbitantly high recruitment fees and deposits, some foreign workers incur substantial debts, which the brokers or employers use as tools of coercion to obtain or retain their labor. After recruitment fee and guarantee deposit repayments are garnished from their wages, many foreign workers in Taiwan earn significantly less than the minimum wage. Foreign workers who leave their contracted positions—more than 55,000 at any given time—are at particularly high risk of trafficking because they lose their immigration status and access to formal sector employment; some of them initially flee due to abusive work conditions, including forced labor. Domestic workers and home caregivers are also especially vulnerable to exploitation, since they often live in their employers' residences, making it difficult to monitor their working and living conditions. One NGO survey found that 90 percent of all migrant domestic caregivers have their travel and identity documents withheld by their employers, constituting a significant freedom of movement concern. Brokers in Taiwan sometimes assist employers in forcibly deporting "problematic" foreign employees should they complain, enabling brokers to fill the empty positions with new foreign workers facing continued debt-based coercion. Some traffickers use Indonesian-owned stores in Taiwan as illegal remittance channels, confining Indonesian workers and subjecting them to sex trafficking. Traffickers reportedly take advantage of relaxed visa requirements under Taiwan's "New Southbound Policy" to lure Southeast Asian students and tourists to Taiwan and subject them to forced labor and sex trafficking. According to NGOs, a large number of for-profit universities in Taiwan aggressively recruit foreign students and subsequently place them into exploitative labor conditions under the pretense of educational opportunities. These students are often unaware of the work component prior to arrival and reportedly experience contract switching, excessive working hours, and poor living conditions contrary to their original agreements. University students from Sri Lanka and Eswatini who traveled to Taiwan under similarly deceptive circumstances have been subjected to coerced labor with extremely harsh working conditions in slaughterhouses and meat processing factories.

TAJIKISTAN

Documented and undocumented PRC, Indonesian, Filipino, and Vietnamese fishermen working on Taiwan-owned and -flagged and Taiwan-owned, foreign-flagged fishing vessels have experienced non- or under-payment of wages, long working hours, physical abuse, lack of food or medical care, denial of sleep, substandard safety equipment, and poor living conditions while indebted to complex, multinational brokerage networks through the continued imposition of recruitment fees and deposits. Migrant fishermen have reported senior crewmembers employ such coercive tactics as threats of physical violence, beatings, withholding of food and water, retention of identity documents, wage deductions, and non-contractual compulsory sharing of vessel operational costs to retain their labor. These abuses are particularly prevalent in Taiwan's DWF, comprising 1,140 Taiwan-owned and -flagged fishing vessels, as well as on 230 Taiwan-owned, foreign-flagged fishing vessels operating thousands of miles from Taiwan and without adequate oversight. According to FA estimates, approximately 8,000 Filipinos and more than 20,000 Indonesians work onboard DWF vessels. Senior crew force migrant workers to fish illegal stock, including threatened, endangered, and protected species, placing them at higher risk of criminal repercussions. Many ships remain at sea for years at a time, selectively disabling their transponders and stopping at "refrigeration mother ships" or remote, uninhabited islands to resupply, transfer victims to other ships, and offload illegally caught fish while avoiding detection by law enforcement. Vessel owners and operators take advantage of maritime jurisdictional complexities and ambiguities to perpetrate these crimes with relative impunity; they also frequently change their fishing vessel's names and nationalities of registry to evade detection by law enforcement. Some migrant fishermen subjected to forced labor onboard international fishing vessels transit Taiwanese ports, especially Kaohsiung, en route to other maritime locations. Taiwan's pandemic-related entry restrictions have at times compounded trafficking vulnerabilities for migrant fishermen stranded on board vessels beyond the length of their original contracts, placing them at risk of being "sold" to other recruitment agencies through unregulated channels. Some Taiwan-based labor brokerage firms reportedly supply fishing vessels operating under the auspices of the PRC's highly vulnerable DWF with migrant workers as well. Traffickers in several European countries lure Taiwanese men and women with false promises of high-paying employment opportunities and then subject them to illegal confinement and forced criminality in telephone scams. There are reports that the Taiwanese managers of some foreign-based companies in Lesotho subject local workers to conditions indicative of forced labor.

## TAJIKISTAN: TIER 2

The Government of Tajikistan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Tajikistan remained on Tier 2. These efforts included increasing investigations of trafficking cases and funding for Tajikistan's trafficking shelter. The government also adopted a new National Action Plan (NAP) 2022-2024, which was drafted and finalized with participation from civil society and international organizations. However, the government did not meet the minimum standards in several key areas. The government did not report convicting any traffickers. For the fourth consecutive year, the government did not adopt standard operating procedures (SOPs) for victim identification and referral to care, contributing to inadequate victim identification efforts and potential penalization of sex trafficking victims due to the lack of screening by law enforcement. Despite allegations of possible official complicity in some localities, including forced labor by local officials in the cotton harvest, the government did not report any criminal investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes. Authorities continued to mobilize citizens for public works, including in agriculture and beautification projects, and although the government has, in previous years, publicized the ban on child labor

in the cotton harvest, children continued to be at risk of forced labor in the harvest.



### PRIORITIZED RECOMMENDATIONS:

Adopt and implement SOPs to identify trafficking victims and refer them to care and train stakeholders on their use to increase victim identification and screening among vulnerable populations, including adults in commercial sex, migrant workers, children and adults working in the cotton sector, and rural women working in the informal sector. • Increase oversight of provincial and local authorities' seasonal labor recruitment processes to ensure no adults or children are subjected to forced labor in the cotton harvest and hold those in violation criminally accountable. • Ensure victims are not penalized for unlawful acts traffickers compel them to commit, including victims of sex trafficking. • While respecting due process, vigorously investigate and prosecute suspected traffickers, including officials complicit in trafficking, and sentence convicted traffickers with significant prison terms. • Increase funding and in-kind support to provide comprehensive care to victims and expand available protection services for male victims. • Provide anti-trafficking training or guidance for diplomatic personnel and other government employees, including law enforcement officers, border guards, and customs officials, to prevent their engagement in or facilitation of trafficking crimes and to increase their capacity to identify and assist victims domestically and abroad. • Develop mechanisms to prevent trafficking of returned migrants and families that depend on remittances, including by coordinating with international organizations and civil society. • Implement a witness protection program and train law enforcement and judicial officials on a victim-centered approach for the treatment of victims and witnesses of trafficking crimes during investigations and court proceedings. • In partnership with international organizations, conduct screening among women and children returned from Iraq, Syria, and Afghanistan for trafficking and child soldiering indicators, respectively, and provide them with rehabilitation and reintegration support. • Improve the collection of anti-trafficking law enforcement data and statistics on labor migration trends. • Increase awareness of pre-departure and post-return support services available to Tajikistani migrant workers. • Monitor private employment agencies for recruitment fees charged to workers and take steps to eliminate employee-paid fees.

### PROSECUTION

The government decreased anti-trafficking law enforcement efforts. Article 130.1 and Article 167 of the criminal code criminalized labor trafficking and sex trafficking and prescribed penalties of five to eight years' imprisonment, which were sufficiently stringent and, with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. Article 167 defined child trafficking broadly to include illegal adoption without the purpose of exploitation; as such, it was difficult to ascertain how many cases investigated, prosecuted, and convicted under Article 167 featured elements consistent with the standard definition of trafficking.

The government investigated 22 trafficking cases involving 25 suspected perpetrators in 2021, compared with 10 cases involving 21 suspected traffickers in 2020. The government prosecuted 14 trafficking cases in 2021, the same number as were prosecuted in 2020. The government did not report any convictions during the reporting period, a significant decrease from 26 convictions in 2020. Even though law enforcement had specialized trafficking in persons units, observers reported law enforcement did not prioritize trafficking investigations due to other competing priorities.

Haiti AR_001013

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity remained significant concerns, inhibiting law enforcement action during the year. The government banned the practice of mobilizing schoolchildren and students for the cotton harvest several years ago; however, students were taken to the fields under the guise of *Hashar* (collective community work) or to help farmers. Observers reported a group of children were taken to Mehnatobod village to pick cotton at the request of police and teachers on a field that allegedly belonged to a high-ranking law enforcement officer; a 15-year-old child died after falling from a tractor, and the government did not report opening an investigation. The government reportedly mobilized some citizens to perform public works, such as cleaning roads and park maintenance, as part of subotnik (a Soviet era tradition in which individuals "volunteer" to help the community). Private companies have reportedly used subotnik to get their employees to work overtime without pay. Some state employees may have been subjected to forced labor as part of provincial authorities' efforts to increase participation in the annual cotton harvest, although no information was available on compensation, recruitment methods, or consequences for inability or unwillingness to participate. Authorities opened a criminal case into a senior military official in the previous reporting period for exacting bribes in exchange for exempting an individual from mandatory military service—an arrangement under which failure to pay has often resulted in kidnapping and forcible conscription; the case remained pending at the end of the reporting period. The Ministry of Internal Affairs (MIA) continued to conduct training on human trafficking for cadets as part of its training academy curriculum. State university law students received training on trafficking legislation and investigative techniques as part of a government-mandated curriculum. The government also cooperated with an international organization to train judicial officials on methods for successfully prosecuting trafficking cases in criminal courts. Tajikistan maintained a joint law enforcement agreement with the Commonwealth of Independent States that included anti-trafficking provisions, but authorities did not report information on whether the agreement was implemented in 2021.

## PROTECTION

The government maintained inadequate protection efforts. Authorities identified 15 victims and referred them all to an international organization for protection services, compared with 24 trafficking victims identified and 15 referred during the previous reporting period. Of the 15 identified victims, at least four were Tajikistani citizens exploited in sex trafficking abroad. Tajikistan continued to operate under a National Referral Mechanism (NRM) that included formal written procedures outlining screening, referral, and assistance protocols, but these were generally insufficient to guide interagency anti-trafficking work. In 2018, the government established a working group to append the NRM with SOPs for victim identification; for the fourth consecutive year, authorities did not take action to adopt these guidelines. Article 30 of the trafficking law mandated the creation of governmental and private institutions to directly aid victims with food and shelter, in addition to social, legal, and reintegration assistance; despite these provisions, an international organization continued to fund most victim protection services. A 2014 victim protection law ostensibly formalized the roles of agencies tasked with providing services and established standards for service delivery among government and NGO providers. However, absent standardized and promulgated victim identification procedures, roles and responsibilities among key stakeholder ministries remained unclear. In practice, observers have noted official victim status designation required a complex application procedure that may have prevented some victims from accessing care. The government's Trafficking in Persons Center continued to train law enforcement and other government employees on screening for trafficking indicators, and some government officials benefited from additional training sessions on victim support provided by an international organization. Gaps remained in the implementation of victim protection law; Tajikistani law enforcement agencies did not develop procedures to grant legal status to victims, forcing some victims to pay for legal and medical services otherwise provided by the government.

The Ministry of Health operated the country's only dedicated trafficking shelter. The government provided 600,000 Tajikistani somoni ($53,190)

for the shelter's operating costs, medical assistance for victims, legal consultations, and partial funding of staff salaries in 2021, an increase compared with 253,670 somoni ($22,490) in 2020. Additionally, the government allocated 187,900 somoni ($16,660) to an NGO to provide social assistance, including healthcare, psychological, and legal assistance to victims of TIP and domestic abuse, as well as vulnerable labor migrants. The shelter assisted one victim of trafficking in 2021, compared with 28 victims in 2020—the country relied heavily on an international organization to provide assistance to victims. The government reported that facilities are available for both men and women. Neither the government nor NGOs provided residential shelter services outside of Dushanbe, and there were no options for long-term victim support. Insufficient personnel and financial resources reportedly constrained delivery of psycho-social care and funding for victim reintegration services, respectively. An NGO ran a shelter in Dushanbe that provided support to victims of crimes, including trafficking; the NGO reported that 34 women and 36 children lived in the shelter in 2021. The NGO offered women courses in job skills and education skills in different trades. The government funded several NGO-run shelters for of victims of domestic violence, which could also assist trafficking victims. Observers reported there continued to be a lack of sufficient funding for victim services. Some female sex trafficking victims were reluctant to seek protection services due to social norms that stigmatized female victims of sexual exploitation.

Despite provisions in the 2014 law outlining security measures for trafficking victims, the government did not keep victims' personal information confidential or provide protection for victim witnesses or their advocates. Foreign victims who agreed to cooperate with law enforcement agencies had the legal right to request temporary residency, subject to a one-year extension upon completion of criminal proceedings; no such cases were reported in 2021, 2020, or 2019. Beyond residency, the 2014 victim protection law did not link other benefits to victims' participation in trials, and protection services were available regardless of legal status or prior consent to participate in subsequently identified trafficking crimes. Victims must appear in person with the trafficker during court proceedings.

In February 2021, the government announced plans to repatriate hundreds of Tajikistani women and children from camps in Syria, some of whom may have been trafficking victims, in continuation of a 2019 process that was subsequently suspended in 2020 as a pandemic mitigation measure. However, the government did not report if it had initiated any of these repatriations at the close of the reporting period. According to media reports, Tajikistani courts have sentenced at least five women repatriated from conflict zones to prison terms on terrorism charges—the women claimed they had been deceived by their husbands to travel to Iraq, Syria, and Afghanistan; it is unknown if the women were screened for trafficking indicators. The government estimates that approximately 575 women and children currently reside in the Syrian Al-Hawl and Al-Roj refugee camps. Approximately 10,000 Afghan refugees have entered Tajikistan, and refugee camps have been established with foreign donor support. An NGO noted thousands of Afghan refugees in Tajikistan faced difficulties securing refugee status, increasing vulnerabilities to trafficking.

Due to a lack of formal identification procedures, authorities may have detained some unidentified trafficking victims for unlawful acts traffickers forced them to commit. Officials sometimes temporarily detained sex trafficking victims with their traffickers but later released and referred them to protective care. In previous years, law enforcement officials routinely deported foreign migrant workers without adequate screening for potential trafficking indicators. Law enforcement officers did not attempt to identify sex trafficking victims proactively during law enforcement operations on businesses suspected of engaging in commercial sex nor within sectors known for forced labor. Observers reported several cases involving sex trafficking of children in nightclubs and private homes. Tajikistan has reportedly detained and deported Uyghurs to the People's Republic of China (PRC), where they could face retribution or hardship. In September 2021, the government signed a memorandum of understanding on labor migration with Russia and agreed to establish offices in Dushanbe and other regions of Tajikistan.

TAJIKISTAN

## PREVENTION

The government slightly increased efforts to prevent trafficking. The 2014 law outlined a framework for the government to address human trafficking and established a national anti-trafficking commission tasked with coordinating the government's anti-trafficking efforts. On February 2022, the government adopted the NAP for Combatting Trafficking in Persons 2022-2024; the NAP was drafted and finalized with participation from state agencies, representatives from civil society, and international organizations. The government operated a 24-hour hotline for potential victims but did not provide information on how many calls led to the identification of trafficking cases in 2021, for a second consecutive year. The Ministry of Labor launched a hotline for Tajikistani migrant workers in Russia to provide legal and employment assistance, among other services. The government collaborated, including by providing in-kind support, with civil society for awareness-raising activities. Observers reported there is a limited awareness of sex trafficking among the general public.

Unlike in previous years, authorities did not report whether the Ministry of Education disseminated letters to local governments highlighting prohibitions against the use of child labor in the annual cotton harvest. These prior government-funded campaigns targeted potential victims, local officials responsible for preventing trafficking, and school authorities who had previously mobilized children in the cotton harvest. MIA officials instructed local authorities to report incidents of forced or child labor, but no such reports were issued in 2021. It was unclear if the government assigned inspectors to conduct monitoring for child labor in the cotton harvest in continuation of a practice begun in 2010. During previous harvests, NGOs independently monitored the fields on an informal basis for forced labor concerns; no information was available on the extent to which this monitoring took place. The Ministry of Labor (MOL) previously invited an international organization to conduct independent inspections during the cotton harvest season, but these inspections did not occur due to insufficient funding; the government did not report whether any independent inspections occurred during the reporting period. Observers reported lack of sufficient staff, frequent use of inspection moratoriums, and low fines made it difficult to ensure compliance with Tajikistan's labor laws. According to authorities, 60 qualified inspectors have authority to carry out 2,000 inspections annually throughout the country and 50 percent are in Dushanbe.

Entities engaged in the recruitment of workers for employment abroad were legally required to obtain licenses from migration authorities, and the law established punitive measures for violations; however, Tajikistan did not monitor for the imposition of worker-paid recruitment fees. The government did not report initiating investigations into labor recruitment firms suspected of trafficking, nor did it provide information on the status or outcomes of four such investigations initiated in 2019. The MOL maintained four pre-departure counseling centers in different regions of the country that provided migrants with information on the risk of trafficking prior to travel abroad. However, observers noted that incomplete and disparate data collection on migration among key stakeholder agencies, poor interagency coordination, and deficient cooperation with destination country counterpart entities continued to constrain effective prevention measures among vulnerable labor migrants. A survey conducted by a civil society organization found only 10 percent of Tajikistani migrant workers were aware of support services available to them. In previous years, the pre-departure centers sought to assist migrant workers in diversifying geographical options for work abroad; it was unclear if this work continued. The government continued to support returning migrants, including those banned from re-entering Russia—the returning migrants were provided with employment assistance, vocational training, financial services, and paid public works. Authorities at times were reportedly uncooperative with foreign donor organizations implementing programs to prevent trafficking among vulnerable migrant populations. Tajikistan maintained international labor agreements with Qatar and the United Arab Emirates (UAE). The government did not report anti-trafficking training for its diplomatic personnel. The government did not provide anti-trafficking training to its troops prior to their deployment as peacekeepers. The government made no efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit victims from Tajikistan abroad and, to a lesser extent, traffickers exploit domestic and foreign victims within Tajikistan. Extensive economic migration exposes Tajikistani men, women, and children to the risk of human trafficking. Labor traffickers exploit Tajikistani men and women in agriculture and construction primarily in Russia, UAE, Kazakhstan, and Saudi Arabia, as well as in other neighboring Central Asian countries, Turkey, and Afghanistan. Labor traffickers exploit men in agriculture, construction, and at markets in Tajikistan; there are limited reports of domestic sex trafficking of men. According to an international organization, a large number of domestic trafficking cases involved women and girls in sex trafficking or domestic servitude. Sex traffickers exploit women and children from Tajikistan most commonly in Turkey, UAE, and Russia; also in Saudi Arabia, Kazakhstan, Georgia, India, and Afghanistan; and within Tajikistan.

More than one million Tajikistanis seek employment annually in Russia. Between January and September 2021, the Russian government registered more than two million Tajikistani citizens entering the country, including 1.6 million for work. According to international organizations, Tajikistanis in Russia are primarily employed in construction, agriculture, industry, domestic work, and transport; thousands of men, women, and children among them are vulnerable to forced labor. Women traveling with their husbands abroad for this work are also reportedly at elevated risk of sex trafficking and other forms of exploitation. The current economic crisis in Russia has pushed many Tajikistani migrants to return to Tajikistan due to job losses and the devaluation of the ruble—2.5 times more migrants returned in the first quarter of 2022 compared with the same period in 2021. The value of the remittances sent by Tajikistani migrants to their families has decreased, leaving families vulnerable to trafficking. Tajikistani migrant workers in Russia work in industries that were immediately affected by the economic contraction, leaving them vulnerable to trafficking in Russia. Some men among the approximately 2,000 Tajikistanis who have traveled to Syria, Iraq, and Afghanistan to fight alongside or seek employment within armed groups are subsequently subjected to forced labor in cooking, cleaning, and portering. Tajikistani women and children traveling with these men, at times under deception, are also vulnerable to sex trafficking and forced labor on arrival; some are reportedly placed alongside other Central Asian family members in makeshift camp communities, where their travel and identity documentation is confiscated and their freedom of movement is restricted. Many of these women report having lost their husbands to armed conflict, after which their economic hardships and confinement in the camps make them vulnerable to coercive local marriages that may feature corollary sex trafficking or forced labor indicators. Some women who have traveled to Syria or Iraq with promises of marriage have instead been sold into sexual slavery. Some children of Tajikistani ISIS combatants in Iraq and Syria are reportedly trained for deployment in combatant roles. Traffickers transport Tajikistani women and girls to Afghanistan and force them into marriages that feature elements of sex trafficking and forced domestic service, including through debt-based coercion. Traffickers exploit Tajikistani children in sex trafficking and forced labor, including forced begging, in Tajikistan and Afghanistan.

Experts have pointed to the significant gaps in social protections that put rural women at a higher risk of trafficking in Tajikistan; they face discrimination and limited access to education and employment—the majority of rural women work in the informal sector. Widows of male migrants, divorced women, and the families of migrant workers remaining in Tajikistan are also at a higher risk of trafficking. Children separated from their families due to international and domestic migrations are at increasingly high risk of sex trafficking. Thousands of Tajikistani migrant workers were banned from re-entering Russia as a result of alleged immigration violations; these individuals are vulnerable to trafficking due to unemployment and economic hardships.

Tajikistani children and adults may have been subjected to forced labor in agriculture, mainly during Tajikistan's fall cotton harvest, and in dried fruit production. Some boys, particularly from economically disadvantaged rural communities, are vulnerable to kidnapping by government personnel for the purpose of forcible conscription into military service as part of annual "*oblava*" recruitment sweeps. The government reportedly subjects

some citizens to participate in manual labor, such as cleaning roads and park maintenance. Tajikistani nationals employed by PRC companies engaged in local construction projects experience wage irregularities, threats of termination, and other labor rights violations that may be indicative of forced labor. Some Afghan and Bangladeshi citizens are victims of forced labor in Tajikistan, including in the construction industry. Tajikistani nationals may be vulnerable to forced labor in illegal artisanal coal mines located near formalized commercial mining operations. In past years, police have at times used a punitive registry containing the names of LGBTQI+ individuals to blackmail some members of these communities into sex trafficking and forced informant roles. LGBTQI+ individuals are vulnerable to trafficking amid widespread discrimination that often jeopardizes their employment status or prospects in the formal sector and complicates their access to justice. Widespread social stigma and discrimination against LGBTQI+ individuals also compound their vulnerability to family-brokered forced marriages that may feature corollary sex trafficking or forced labor indicators.

## TANZANIA: TIER 2

The Government of Tanzania does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Tanzania was upgraded to Tier 2. These efforts included investigating significantly more trafficking cases, convicting more traffickers, and identifying more trafficking victims. The government officially established and allocated funds to an expenditure account for the Anti-Trafficking Fund and provided more funding for anti-trafficking programs led by the Anti-Trafficking Secretariat (ATS). The government, in partnership with international organizations, provided more training to law enforcement officials on victim-centered investigation practices and finalized the 2021-2024 anti-trafficking national action plan (NAP). However, the government did not meet the minimum standards in several key areas. Although the government convicted more traffickers during the reporting period, the lenient sentencing for the majority of convicted traffickers and the failure to sentence many convicted traffickers consistent with the 2008 anti-trafficking law weakened deterrence and did not adequately address the nature of the crimes. Due to inconsistent use of formal identification procedures and limited protection services, authorities reportedly deported, detained, and arrested potential trafficking victims, including children, for alleged prostitution or immigration violations without screening for trafficking indicators. Government efforts to protect Tanzanian trafficking victims abroad, particularly migrant workers, remained minimal, and the government did not report any efforts to hold fraudulent recruitment agencies criminally accountable for facilitating trafficking crimes.



### PRIORITIZED RECOMMENDATIONS:

Amend the 2008 anti-trafficking law to remove sentencing provisions that allow fines in lieu of imprisonment and align the procedural law pertaining to trafficking-related arrests within the act with the requirements for other serious crimes. • While respecting due process of law and human rights, increase efforts to investigate and prosecute trafficking offenders, including complicit officials, and seek significant prison terms for convicted traffickers. • Using the established standard operating procedures, systematically and proactively identify trafficking victims by screening for trafficking indicators among vulnerable populations,

including individuals involved in commercial sex, refugees, and foreign workers from Cuba and North Korea, and refer all trafficking victims to appropriate services. • Implement a systemic victim-witness program to increase protective services for victims participating in the criminal justice process and prevent re-traumatization. • Allocate increased financial and personnel resources for the Anti-Trafficking Committee and Anti-Trafficking Secretariat to execute its mandate fully, including to expand the provision of services for victims in partnership with NGOs. • In Zanzibar, adopt the 2008 anti-trafficking law. • Provide adequate funding and resources to implement the 2021-2024 NAP. • Implement and consistently enforce strong regulations and oversight of labor recruitment companies, including training labor inspectors to identify and report trafficking crimes and holding fraudulent labor recruiters criminally accountable. • Develop and implement a comprehensive and centralized database on trafficking that allows for the disaggregation of data, including the demographics of victims and type of exploitation.

### PROSECUTION

The government increased anti-trafficking law enforcement efforts. The 2008 Anti-Trafficking in Persons Act criminalized sex trafficking and labor trafficking and prescribed punishments of two to 10 years' imprisonment, a fine between 5 million and 100 million Tanzania shilling (TZS) ($2,170 to $43,440), or both for offenses involving adult victims, and 10 to 20 years' imprisonment, a fine between 5 million and 150 million TZS ($2,170 to $65,160), or both for those involving child victims. These penalties were sufficiently stringent, but, with regard to sex trafficking, by allowing a fine in lieu of imprisonment, the penalties were not commensurate with those for other serious crimes, such as rape. During the reporting period, the government enacted amendments to the 2008 anti-trafficking law. The amendments criminalized attempted trafficking and required some trafficking cases to be tried in the High Court. The 2008 anti-trafficking law contained a separate procedural provision that required police to obtain a warrant before making a trafficking-related arrest; this provision created a higher threshold for law enforcement that does not exist for other similarly serious crimes, which may hinder prosecution efforts. The government reportedly drafted an amendment to the 2008 anti-trafficking act to remove the option of a fine in lieu of imprisonment; however, the amendment had not been sent to Parliament at the end of the reporting period.

The government did not maintain a centralized law enforcement data system on trafficking crimes, hindering the government's ability to disaggregate national human trafficking statistics. The government investigated 113 trafficking cases, a significant increase compared with 19 investigations during the previous reporting period. The government initiated seven prosecutions involving 18 alleged traffickers under the 2008 anti-trafficking law, compared with 18 alleged traffickers prosecuted in the previous reporting period. The government convicted 13 traffickers, compared with three convictions in the prior year. Of the 13 convictions, courts sentenced one trafficker to one year imprisonment; one trafficker to two years' imprisonment or a 5 million TZS ($2,170) fine; ten traffickers to two years imprisonment or a 500,000 TZS ($220) fine; and one trafficker to one year imprisonment or a 500,000 TZS ($220) fine. The failure to sentence many convicted traffickers consistent with the 2008 anti-trafficking weakened deterrence, may have undercut broader efforts to hold traffickers accountable, and did not adequately address the nature of the crime. Courts dismissed or withdrew three cases due to inability to gather sufficient evidence, and one case remained pending at the end of the reporting period. Officials did not disaggregate data to distinguish between sex and labor trafficking cases. In some cases, families or village elders continued to settle many criminal allegations, possibly including sex trafficking and child domestic servitude, informally through traditional means without recourse to the formal criminal justice system.

The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The government did not provide updates on investigations into five police officers for complicity in human trafficking initiated during the previous reporting period. Although not explicitly reported as human trafficking, the UN reported there were two new allegations submitted

in 2021 of alleged sexual exploitation with trafficking indicators by Tanzanian peacekeepers deployed to the UN peacekeeping mission in the Democratic Republic of the Congo (MONUSCO). UN investigations into both allegations were pending at the end of the reporting period, and the government had not yet reported accountability actions taken, if any. Investigations and accountability actions also remained pending for similar allegations reported in previous years, including two in 2020, one in 2019, and two in 2018.

The government, both independently and in partnership with international organizations, trained law enforcement officials, immigration officials, social welfare officers, and magistrates on trafficking trends and vulnerabilities, victim-centered investigations and prosecutions, and victim identification. Despite these trainings, observers reported officials' limited understanding of trafficking hampered law enforcement efforts and led to some potential trafficking crimes being misidentified and prosecuted as migrant smuggling or kidnapping. The government continued to collaborate with the Government of Botswana to arrange for three Tanzanian witnesses to testify against an alleged Tanzanian trafficker in a child trafficking case in Botswana; courts convicted the trafficker in December 2021.

## PROTECTION

The government slightly increased protection efforts. Due to the lack of coordinated data collection at the national level, the government did not report comprehensive data and only provided data representative of shelters that have a formal memorandum of understanding (MOU) with ATS. The government identified 185 potential trafficking victims, compared with 165 victims during the previous reporting period. Of the 185 identified victims, 166 were female, 19 were male, 29 were adults, and 156 were children; this compared with 143 female, 22 male, 28 adults, and 132 children identified in the previous reporting period. The government did not provide disaggregated data on victim nationality or type of trafficking. The government coordinated information sharing between ATS and the Department of Social Welfare; social welfare officers often worked closely with police and designated "gender desk officers" to identify and refer victims to assistance. Although the government maintained formal standard operating procedures (SOPs) to guide officials in the proactive identification of victims and their subsequent referral to care, relevant officials did not consistently use these SOPs, and few officials were trained to do so; in practice, officials routinely bypassed written SOPs and directly contacted NGOs to provide victim assistance. In May 2021, in collaboration with the Director of Refugee Services, ATS conducted trafficking screening in the Nduta and Nyarugusu refugee camps; however, the government did not provide information on the number of victims identified during these specific screenings, nor did it proactively screen vulnerable populations in refugee camps throughout the year.

The government continued to rely on government-vetted NGOs to provide the vast majority of victim services, and some NGOs continued to provide services to victims without government support. The government reported referring all 185 identified victims to NGO-operated shelter services; the Department of Social Welfare (DSW) reported directly providing medical assistance and psycho-social counseling to victims in addition to referring them to NGO-provided services. The government did not operate any trafficking-specific shelters; however, ATS maintained MOUs with eight NGO-operated shelters that could provide shelter, medical assistance, psycho-social counseling, and family tracing to trafficking victims. Some NGO shelters for children provided access to government schools, vocational training, and separate accommodations for boys and girls. While most NGO shelters were dedicated to children, female adult trafficking victims could seek assistance at a shelter dedicated to young girls; however, there were no shelters available for adult male trafficking victims. In 2021, the government opened an expenditure account for the Anti-Trafficking Fund, as required by the 2008 anti-trafficking law and approved by the Ministry of Finance and Planning in 2020, to provide assistance to trafficking victims. The government allocated 3 million TZS ($1,300) to set up the fund; however, the government did not disperse funds to assist victims by the end of the reporting period.

Due to the inconsistent use of formal identification SOPs, authorities reportedly deported, detained, and arrested potential trafficking victims, including children, for alleged prostitution or immigration violations without screening for trafficking indicators. Additionally, given the limited availability of protection services, the government sometimes held potential victims in detention facilities for extended periods of time, often alongside traffickers; authorities did not always separate children from adults. The 2008 anti-trafficking law required authorities to consider legal alternatives for foreign trafficking victims who believed they may face hardship or retribution if returned to their country of origin, but the government did not report providing this protection to victims during the reporting period. The government allowed foreign victims the same access to services, such as counseling, medical care, and training, as domestic victims and facilitated travel documents for repatriation and family reunification. In 2021, the government partnered with an international organization and local NGOs to repatriate Tanzanian trafficking victims exploited in Iraq and Kenya; the government also collaborated with the Government of Burundi to repatriate Burundian victims exploited in Tanzania. Victims typically testified in trafficking cases, but the Whistle Blowers and Witness Protection Act of 2015 and the 2008 anti-trafficking law allowed any crime victim, including trafficking victims, the option to refuse to participate in prosecution efforts. Victims could testify during trial in private sessions or via video testimony. The government did not provide witness protection to victims during criminal proceedings, deterring some victims from testifying in court. The anti-trafficking law entitled victims to restitution from convicted traffickers; however, the government did not report awarding restitution during the reporting period.

## PREVENTION

The government maintained efforts to prevent trafficking. ATS, the government's national coordinating task force composed of working-level officials, continued to lead anti-trafficking efforts. The Anti-Trafficking Committee (ATC), composed of 19 senior-level representatives from various government agencies, maintained oversight over ATS; however, ATC's efforts were limited during the reporting period. The law mandated ATC to meet quarterly; however, ATC met only once in 2021, the same number of meetings as the previous year. For the second consecutive year, the government provided an increased allocation for anti-trafficking programs led by ATS; the 2021 federal budget provided 150 million TZS ($65,160) to ATS, compared with 120.3 million TZS ($52,260) in 2020. Despite the increase in funding, observers reported the change was insufficient for ATS to undertake all of its planned anti-trafficking activities, and the need for increased personnel and financial resources remained. The government, in partnership with international organizations and local civil society, finalized the 2021-2024 NAP in March 2022. ATS, in partnership with international organizations and local civil society, held awareness campaigns throughout the country targeting religious leaders, law enforcement officials, social welfare officers, teachers, journalists, and community leaders to discuss trafficking trends and potential vulnerabilities in communities. The government continued to fund and publicize a national hotline operated by a local NGO to report child abuse, including child trafficking. The hotline identified and referred to the Department of Social Welfare 16 cases of child trafficking in 2021, compared with 35 cases in 2020.

The Ministry of Labor performed periodic inspections of large employers; however, the government did not report identifying any cases of potential trafficking during these inspections or if it had inspectors trained to do so. The Companies Act of 2002 required recruitment agencies to be registered and licensed, and the government required recruitment agencies to provide migrant workers with training on worker rights and destination countries' laws prior to departure. Tanzanian embassies abroad continued to require employers to submit security deposits to the embassy to ensure the employer would register the migrant worker upon arrival, so the embassy could verify the worker arrived and possessed the proper documentation, including contract and passport. Despite these requirements, the government continued to report recruitment agencies often did not provide pre-departure training to migrant workers, and an NGO previously reported the small deposit amount was an insufficient incentive for employers to present migrant workers upon arrival to the Tanzanian embassy. The government cooperated

with a foreign donor to provide Tanzanian troops with anti-trafficking training prior to their deployment abroad on international peacekeeping missions. The government did not make efforts to reduce the demand for commercial sex acts.

## ZANZIBAR

Trafficking in persons occurs in Zanzibar, a semi-autonomous region of Tanzania. Zanzibar did not adopt the 2008 anti-trafficking law. Therefore, the law did not apply within the province. Zanzibar had other laws that it could use to prosecute some forms of trafficking. The Penal Act Decree of 2004 criminalized some forms of labor trafficking and sex trafficking. The Children's Act of 2011 criminalized some forms of child labor trafficking and child sex trafficking. ATS conducted a validation meeting of the 2008 anti-trafficking law with the Attorney General of Zanzibar in November 2021; however, the law was pending submission to the Zanzibar House of Representatives at the end of the reporting period. Of the 113 investigations, 18 prosecutions, and 13 convictions the government reported, none were in Zanzibar. Of the 185 victims identified during the reporting period, 38 victims, all girls, were identified in Zanzibar. The government provided services, including shelter, medical care, and counseling, to all 38 victims at a government-operated safe house in Unguja. ATS incorporated input from officials in Zanzibar for the 2021-2024 NAP. The government hosted a three-day workshop in Zanzibar with African Union Member States to validate draft policies on the prevention of trafficking in persons on the African continent. ATS, in partnership with international organizations and local civil society, conducted awareness campaigns in Pemba and Unguja targeting religious leaders, law enforcement officials, social welfare officers, teachers, journalists, and community leaders to discuss trafficking trends and potential vulnerabilities in communities.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Tanzania, and traffickers exploit victims from Tanzania abroad. Traffickers exploit men, women, children, and individuals from underserved communities—particularly impoverished children, orphans, and children with disabilities from rural areas—in forced labor in domestic work, mining, agriculture, and forced begging and in sex trafficking in urban cities, such as Arusha, Dar es Salaam, Dodoma, Mbeya, and Mwanza. Traffickers may exploit children in sex trafficking, including child sex tourism, in Zanzibar. Traffickers and brokers often fraudulently promise family members, friends, or intermediaries to provide their children with education, better living conditions, or employment, but instead they exploit them in forced labor and sex trafficking. Some unscrupulous individuals manipulate the traditional practice of child fostering—in which parents entrust their children into the care of wealthier relatives or respected community members—and exploit children in domestic servitude. Traffickers often promise Tanzanian women and girls marriage, education, or employment in Zanzibar, facilitate their travel from the mainland, and subsequently exploit them in forced labor in domestic work and farming. Traffickers subject children to forced labor on farms—including as cattle herders and occasionally as hunters—in gold and gemstone mines and quarries, the informal commercial sector, and on fishing vessels operating in Tanzanian and international waters. Traffickers exploit women and girls in domestic servitude throughout the country and in sex trafficking, particularly in tourist hubs along the border with Kenya. Previously, NGOs reported traffickers target young girls from rural villages, pay their parents a small fee, and exploit the girls in sex trafficking, specifically targeting businesspeople. NGOs report Tanzanian fishermen working on foreign-flagged fishing vessels may experience working conditions indicative of forced labor. Increasingly, traffickers bring children and persons with physical disabilities from Tanzania to Kenya and exploit them in forced begging; traffickers often coerce victims to serve as facilitators to further such trafficking schemes. Traffickers exploit Tanzanians in forced labor and sex trafficking in other African countries, the Middle East, Europe, Asia, and the United States. Traffickers increasingly use Zanzibar to transit women to the Middle East, namely Oman and the United Arab Emirates, where traffickers subsequently exploit them in domestic servitude.

Tanzania hosts more than 240,000 refugees and asylum-seekers from Burundi and the Democratic Republic of the Congo, a population vulnerable to trafficking due to economic insecurity and lack of access to support systems. Refugee populations are particularly vulnerable to domestic servitude in Kigoma and Mwanza regions, and refugee children are vulnerable to forced labor in farming and sex trafficking. Traffickers exploit migrant children, particularly from Burundi and Rwanda, in forced labor in agriculture and girls from Burundi and Malawi in domestic servitude and sex trafficking in Tanzania. Observers report vulnerable migrants, including potential trafficking victims, from the Horn of Africa transit Tanzania en route to South Africa where they are vulnerable to trafficking. Observers also report migrants from neighboring countries, primarily Burundi, are increasingly transiting Dar es Salaam en route to the Middle East, where traffickers may exploit them in domestic servitude. Cuban medical professionals and North Korean nationals working in Tanzania may have been forced to work by the Cuban and North Korean governments, respectively.

## THAILAND: TIER 2

The Government of Thailand does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Thailand was upgraded to Tier 2. These efforts included increasing the number of trafficking investigations, finalizing a national referral mechanism (NRM) that authorized a 45-day reflection period, finalizing implementing guidelines for the forced labor provision of the anti-trafficking law, and initiating investigations of 17 alleged complicit officials in 2021 and sentencing two to terms of imprisonment. The government also established a new trafficking victim identification center, developed guidelines for labor officials to refer suspected trafficking victims to multidisciplinary teams, and identified more victims than in the previous reporting period. However, the government did not meet the minimum standards in several key areas. The number of trafficking prosecutions and convictions decreased compared with the previous reporting period. Despite reports that forced labor was prevalent among migrant workers in many industries in Thailand, inconsistent and ineffective interviewing practices during labor inspections left many labor trafficking victims unidentified, officials often lacked an understanding of indicators of labor trafficking, and Thai authorities have never reported identifying a victim of labor trafficking as a result of fishing vessel inspections conducted at ports. There continued to be significant gaps in the government's provision of services to victims, and some victims residing in government shelters lacked freedom of movement. Corruption and official complicity continued to impede anti-trafficking efforts.



THAILAND TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase trafficking prosecutions and convictions, particularly for labor trafficking. • Train officials on and ensure effective implementation of new guidelines for the implementation of Section 6/1 of the anti-trafficking law and identification of labor trafficking victims. • Ensure multidisciplinary teams (MDTs) are composed of officials who are trained and have sufficient experience working trafficking cases to improve the effectiveness of victim identifications. • Proactively investigate and prosecute officials allegedly complicit in facilitating trafficking and convict and punish those found guilty with adequate sentences.

Haiti AR_001018

• Increase the ability of victims, especially adults, to move freely in and out of shelters and access communication devices and reassess shelter placements periodically to ensure victims are not required to remain in shelters longer than necessary. • Ensure the use of trauma-informed procedures by government officials during interviews with potential victims, including during labor inspections. • Ensure the effective implementation of the NRM and extension of the new reflection period for victims. • Increase awareness among relevant officials of less understood trafficking indicators, such as debt-based coercion, excessive overtime, confiscation of documents, and nonpayment of wages. • Ensure government and NGO-operated shelters provide victims with adequate trauma-informed and individualized care, such as legal assistance and psychological care, and develop consistent policies on victim services across all shelters. • Ensure labor violations and migrant workers' complaints that include indicators of forced labor are investigated for trafficking crimes, including by enforcing procedures for labor officials to refer potential cases of labor trafficking to MDTs and law enforcement. • Expand legal alternatives to foreign victims' placement in shelters, such as enabling victims to exit the shelter system when they are ready to pursue outside employment opportunities. • Do not make victims' formal identification and access to services dependent on their willingness to participate in investigations against their traffickers. • Enforce regular payment of wages, requirements that employees pay recruitment fees of migrant workers, and the rights of employees to retain possession of their own identity and financial documents and contracts. • Foster an environment conducive to victims and advocates reporting human trafficking crimes without fear of facing spurious retributive charges pursued by employers, including by utilizing recent legal amendments to dismiss cases filed with dishonest intent or to intimidate defendants.

## PROSECUTION

The government increased law enforcement efforts; however, the government prosecuted and convicted fewer traffickers than in 2020. Section 6 of the 2008 anti-trafficking law, as amended, criminalized sex trafficking and labor trafficking and prescribed penalties of four to 12 years' imprisonment and a fine of 400,000 to 1.2 million baht ($11,980 to $35,930) for offenses involving an adult victim and six to 20 years' imprisonment and a fine of 600,000 to 2 million baht ($17,960 to $59,880) for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. An amendment to the 2008 anti-trafficking law in 2019 included a separate provision under Section 6/1, specifically addressing "forced labor or services," which prescribed penalties of six months' to four years' imprisonment, a fine of 50,000 to 400,000 baht ($1,500 to $11,980) per victim, or both. This provision prescribed significantly lower penalties for labor trafficking crimes than those already available under the existing human trafficking provision of the law.

In 2021, the government reported investigating 188 potential trafficking cases (133 in 2020), initiating prosecutions of 125 suspected traffickers (302 in 2020), and convicting 82 traffickers (233 in 2020). Courts sentenced 75 convicted traffickers in 2021, with approximately 97 percent sentenced to two or more years imprisonment. In 2021, courts issued forfeiture orders for assets valued at approximately 161,066 baht ($4,820) in trafficking cases litigated by the Anti-Money Laundering Office. The Thai Internet Crimes Against Children Task Force (TICAC) investigated 79 cases of internet crimes against children in 2021 (94 in 2020), including 11 cases of internet-facilitated trafficking (22 in 2020); TICAC initiated an additional 19 investigations of internet-facilitated trafficking cases in January-March 2022. Officials initiated investigations of 22 potential cases of labor trafficking—including two cases involving the fishing sector—compared to 14 labor trafficking investigations in 2020. NGOs assessed the relatively low number of investigations and prosecutions for labor trafficking stemmed in large part from a lack of understanding of forced labor among officials and a lack of clarity on how to apply Section 6 and Section 6/1 in labor trafficking cases, especially in the absence of implementing guidelines for the majority of the reporting period. Some observers reported officials often did not identify debt-based coercion, excessive overtime, or withholding of wages as indicators of labor trafficking. Police and labor inspectors did not consistently investigate migrant workers' reports of

exploitation that included trafficking indicators, and they often pursued trafficking cases as labor law violations without pursuing criminal prosecutions against traffickers. In some cases, officials encouraged potential trafficking victims to mediate with their employer or referred their cases to labor courts, rather than recognizing them as trafficking victims and recommending criminal investigation of their cases. An NGO from a neighboring country asserted Thai authorities increasingly charged trafficking crimes involving its citizens exploited in Thailand under lesser charges, which impacted the ability of victims to obtain services and compensation, especially in cases involving exploitation in agriculture and child domestic servitude.

The Office of the Attorney General (OAG) developed standard operating procedures (SOPs) that promoted the use of trauma-informed approaches by prosecutors when interviewing victims and preparing them to provide testimony. While the SOP included a requirement that prosecutors meet with all victims prior to court proceedings, observers previously reported the OAG did not have sufficient capacity to enable prosecutors to meet with and prepare all victims before trials, and NGOs recommended victims partner with NGO or private attorneys for this support. Law enforcement often used the results of victim identification interviews, which observers reported were sometimes ineffective, as the final determination of whether a trafficking case existed. The OAG trafficking litigation unit conducted a study to assess trafficking prosecutions for the purpose of developing a strategy to improve the efficacy of prosecutions. Prosecutors worked with NGOs to prepare victims to testify, courts allowed NGO lawyers to serve as co-plaintiffs in some cases to legally support victims, and government shelters enabled victims to participate in mock courts to prepare them for participating in proceedings against traffickers. However, fears of detention and extended shelter stays, a lack of adequate services, and fears of retaliation from traffickers made some victims reluctant to participate in prosecutions. Some judges and other court officials lacked sufficient understanding of trauma-informed care, which resulted in harmful treatment of victims during court proceedings. For example, while courts reportedly followed protocols to protect victim-witnesses in most instances, NGOs reported some incidents where the court failed to provide a non-confrontational cross examining area, despite advance request, and asked victim-witnesses to verbally confirm sensitive information in front of suspects during proceedings. In March 2022, the government finalized SOPs for trafficking cases for the Courts of Justice to encourage the use of victim-centered approaches during court procedures.

The government operated specialized anti-trafficking divisions within the Bangkok Criminal Court, OAG, Department of Special Investigation (DSI), and Royal Thai Police (RTP). DSI hosted a conference with participants from OAG, RTP, and NGOs, as well as foreign law enforcement liaisons, to strengthen coordination among the anti-trafficking community. Thai authorities continued to share information and evidence with other countries. In addition, law enforcement officials cooperated with foreign counterparts to investigate the trafficking of Thai victims abroad. The government arrested and extradited to Malaysia three suspected traffickers associated with the 2015 discovery of mass graves of Rohingya along the countries' border.

To address concerns that police officers inexperienced with anti-trafficking efforts were frequently assigned to trafficking cases, in December 2021, the Ministry of Social Development and Human Security (MSDHS) amended its regulations on qualifications for law enforcement officers, requiring officers assigned to anti-trafficking activities have at least one year of anti-trafficking experience. The government provided numerous workshops and trainings for police, immigration officials, and labor officials on topics including victim identification, labor trafficking, online investigative techniques, and conducing forensic interviews. The OAG collaborated with a foreign government to provide trainings for prosecutors on human trafficking, including Section 6/1 of the anti-trafficking law and child trafficking. OAG also trained prosecutors on victims' rights and preparing victims for prosecutions against traffickers. The Courts of Justice collaborated with an international organization to provide training for judges overseeing trafficking cases. The government held workshops for law enforcement officers to improve their capacity to successfully prosecute traffickers and assigned those who completed the workshops to supervise other officers on trafficking cases. The OAG's

Haiti AR_001019

trafficking litigation unit developed teams of prosecutors with experience working trafficking cases in each region to advise less experienced prosecutors and law enforcement; the government reported these teams deployed within 24 hours after an arrest to advise local officials. With donor support, MSDHS trained 120 officials from numerous agencies to become anti-trafficking specialists; authorities assigned these officials to provide consultation and assistance to provincial officers and MDTs on trafficking prosecutions and victim identification. Some observers reported government trainings often only involved senior officials, rather than working level officers who were more likely to come into contact with potential victims.

A Deputy Prime Minister chaired the National Committee on Prevention of Official Complicity in Human Trafficking. DSI established the Complicit Officials in Human Trafficking Monitoring and Investigation Center, which monitored and investigated suspected complicit officials. DSI also initiated work to establish a database of public officials who worked on trafficking cases, which would allow DSI to monitor the progress of cases. The government reported initiating investigations of 17 officials accused of complicity in trafficking crimes in 2021, compared with nine new investigations in 2020. Of these 17, at the end of the reporting period, seven remained under investigation, eight were under prosecutors' consideration, one was filed for consideration of the court of first instance, and one was acquitted of charges. Among previously reported cases, in 2021, the government instituted prosecutions of six allegedly complicit officials and sentenced two other officials to terms of imprisonment. Among the 79 officials investigated for official complicity since 2013, by the end of the reporting period, the government had filed 12 for consideration of the court of first instance, convicted and sentenced 38 to terms of imprisonment, and acquitted eight of charges; seven officials remained under investigation, nine were under prosecutors' consideration, and five fled charges.

**PROTECTION**
The government increased efforts to identify and protect victims. The government identified 414 trafficking victims in 2021, compared with approximately 231 victims identified in 2020 and 868 in 2019. The 414 trafficking victims identified included 151 male and 263 female victims; 72 child victims; 312 Thai, 94 victims from Burma, two Laotian victims and six from unspecified countries; and 181 victims of sex trafficking and 233 victims of labor trafficking. Of the 414 victims identified in 2021, the government reported providing services to 354 (compared to 148 victims identified in 2020), including through the provision of shelter, reintegration support, legal assistance, financial assistance, and other support; 128 received assistance in government shelters, while 20 victims resided in NGO government-registered shelters.

Of the 233 labor trafficking victims identified by Thai authorities in 2021, 109 were Thai victims forced to work for an online gambling website identified in coordination with Cambodian authorities; by the end of the reporting period, the government had identified a total of 227 Thai victims exploited in Cambodia. Authorities identified 90 migrant labor trafficking victims exploited within Thailand in 2021, including two exploited in the fishing sector. Despite reports traffickers exploited children in forced labor in various sectors, the government only identified two child labor trafficking victims in 2021. Authorities did not identify victims in part due to a lack of understanding of labor trafficking among many authorities. In March 2022, the government approved SOPs for the identification of labor trafficking victims and implementation of the 2019 forced labor amendment of the trafficking law (Section 6/1). Labor inspectors and members of the Royal Thai Navy screened migrant workers for trafficking during inspections, including during inspections of fishing vessels. However, inconsistent and ineffective interviewing practices during inspections left many labor trafficking victims unidentified, including among migrant fishermen. Observers also reported labor inspectors did not understand that part of their role was to identify trafficking victims. In an attempt to improve the effectiveness of inspections, the Ministry of Labor (MOL) developed guidelines in March 2022 to improve inspectors' ability to identify potential cases of trafficking and authorized inspectors to conduct identification interviews of potential victims; under the new guidelines, inspectors were required to report suspected trafficking cases to law enforcement and MDTs to conduct formal identification interviews. NGOs raised concerns that officials did

not screen undocumented migrants for trafficking, particularly those fleeing political instability in Burma, and often detained and deported migrants without screening.

MDTs, which included representatives from government agencies and NGOs, utilized standard screening guidelines to formally identify victims and refer them to services. Adapting to pandemic-related restrictions, some MDTs conducted online victim identification interviews. Officials did not effectively implement identification procedures consistently throughout the country, in part due to a lack of understanding of trafficking among some officials. Some officials utilized practices during victim interviews that hindered the ability of victims to recount their exploitation, such as allowing employers of potential victims to be present during victim interviews. NGOs reported improvement, however, in the use of victim-centered approaches by some RTP officials when conducting victim interviews. The government relied on MDTs, which sometimes included local police officers, provincial MSDHS staff, and local labor officials who at times did not have sufficient experience working trafficking cases, to confirm an individual as a trafficking victim. To address gaps in victim identification among provincial level officials, the government established teams that traveled to support less experienced MDTs in the identification process.

Section 29 of the anti-trafficking law permitted officials to take potential trafficking victims into the government's custody for no more than 24 hours, or up to eight days with the permission of a court. During this period, MDTs conducted victim identification interviews; formal identification by MDTs was necessary for victims to obtain a legal right to services, including access to the government's trafficking shelters. This process acted as a significant barrier for some victims who were not physically or psychologically prepared to undergo the MDT identification process to obtain services. Furthermore, the absence of a suitable reflection period in which victims could access stabilizing services from the government did not allow officials sufficient time to build rapport and trust with victims, including to obtain sufficient information to make a formal identification and to encourage victims' participation in investigations. In some cases during the reporting period, officials provided victims with additional time to recover before initiating the identification process. In March 2022, the government approved a new NRM, which included guidelines for the screening, identification, and protection process, as well as the extension of a 45-day reflection period to enable officials to provide services to potential victims prior to their formal identification. The government solicited feedback from civil society on the draft NRM prior to its approval.

In December 2021, DSI established a human trafficking victim identification center to accommodate potential victims, prepare them for identification interviews, and to serve as an operations and training center for relevant agencies. The government continued to refer victims formally identified by MDTs to government-operated shelters where they had access to counseling, legal assistance, medical care, civil compensation, financial aid, witness protection, education or vocational trainings, and employment opportunities. While MSDHS reported providing some services to victims who did not agree to participate in the prosecution process, authorities often made the provision of many services contingent upon victims' willingness to participate in law enforcement investigations. MSDHS operated 76 short-stay shelters and nine long-term regional trafficking shelters, including four dedicated to adult male victims and families, four for female victims, and one for male child victims. The government typically only permitted foreign victims who held a valid visa or work permit at the time of their identification to stay outside government shelters during legal proceedings against traffickers; during the year, 13 victims employed as domestic workers resided with their employers, a common practice for domestic workers in Thailand. Authorities sometimes required undocumented foreign victims of trafficking to remain in government shelters while the government processed applications for permits to temporarily stay and work in Thailand. MSDHS trafficking shelters did not allow some victims—including adults—to leave without permission, which authorities determined on a case-by-case basis; only victims who received permission to work outside shelters could leave the shelter on a regular basis for work. Furthermore, authorities often required victims to stay in shelters until the completion of proceedings, even in cases in which they advanced testimony against traffickers, even in cases in which they

were physically and psychologically ready to exit the shelter system. In addition, shelter staff sometimes restricted victims' access to personal cell phones, particularly at the beginning of shelter stays, sometimes required victims obtain permission to make personal phone calls, and often monitored their calls. MSDHS did not implement a consistent policy across all shelters to guarantee victims' rights to communication; however, the government reported it permitted victims who had completed the process of participating as witnesses in prosecutions against traffickers to use communication devices without supervision. Officials said these measures were taken to ensure the victims' safety and to prevent re-victimization; however, requiring victims to remain in shelters longer than necessary, combined with the restrictions on their movement and communication during shelter stays, may have contributed to some victims' re-traumatization and inhibited their ability to earn an income. In one region, officials cooperated with an NGO to develop an open-concept shelter, where authorities provided victims full freedom of movement and access to communication devices on a short-term basis.

The government permitted some victims residing in shelters to obtain outside employment; however, for some foreign victims, especially Rohingya, the government did not identify suitable employment opportunities and some shelter officials cited fears Rohingya would "flee" shelters as a rationale for restricting their freedom of movement. The required shelter stays continued to deter foreign victims from cooperating with law enforcement, with some preferring to be deported to their home countries instead. The government permitted some victims to reside and obtain services at three government-registered NGO shelters; victims preferred to stay at these shelters over government-operated shelters, in part due to more freedom of movement. Victims obtaining these services could still obtain compensation from the government's anti-trafficking fund; however, the government did not provide these shelters with additional funding to support their operations. In addition, observers reported that strict requirements for NGO-operated shelters to receive permission to assist formally identified victims made it challenging for additional NGOs to obtain this registration. The government implemented a 7- to 14-day COVID-19 quarantine for victims before they could enter government shelters.

MSDHS shelters employed inconsistent policies and provision of care to victims. Government shelters often lacked adequate numbers of psychologists and staff trained on trauma-informed care, inhibiting victims from obtaining psycho-social care. Shelters did not always provide victims with individualized care or private counseling and instead relied on group counseling sessions with social workers. In 2021, however, shelters began using individual development plans that increased victims' input into their assistance needs. MSDHS reported all shelters had the capacity to provide temporary accommodation to LGBTQI+ victims, and one shelter could provide long-term accommodation; however, the long-term shelter did not provide separate bedrooms and restroom facilities for LGBTQI+ victims. In addition, aspects of the identification process made it difficult for LGBTQI+ victims to express their gender preferences, and authorities often did not ask victims their shelter preferences. MSDHS conducted a training for its shelter staff on services for LGBTQI+ victims. MSDHS did not equip its shelters to provide adequate accommodations for victims with disabilities and often lacked sufficient numbers of interpreters, especially for Rohingya victims, which weakened their ability to provide adequate services to victims. NGOs reported interpreters who participated in victim identification interviews and in court proceedings were not always trained to assist in trafficking cases and inappropriately communicated with victims, sometimes by attempting to convince victims to not report their exploitation or recommending they confess to crimes traffickers compelled them to commit. MSDHS collaborated with an NGO to provide training for shelter staff on protection issues, provide MDT officials training on trauma-informed care during the identification process, and develop an online training course for officials providing psychological care to victims.

Authorities facilitated the return of 245 Thais exploited in trafficking abroad, including 13 sex trafficking victims and 232 labor trafficking victims; the government reported all 245 victims chose not to utilize shelter services and returned to their hometowns, and MSDHS monitored their reintegration to prevent re-victimization. In 2021, the government provided 4.13 million baht ($123,650) to trafficking victims from its anti-trafficking fund (compared with 7.63 million baht ($228,440) in 2020),

including 1.12 million baht ($33,530) that went to victims residing outside government shelters for living expenses, payments for work inside shelters, education, medical care, and other expenses. NGOs reported the process for victims to access this fund was complex, which likely prevented some victims from obtaining necessary monetary support. Thai law legally obligated prosecutors to file restitution claims when a victim expressed intention to make a claim. The Human Trafficking Criminal Procedures Act allowed judges to award compensation or restitution to victims, including in the absence of a victim request for these funds. The government filed restitution claims in 25 cases in 2021 and reported courts ordered 10.7 million baht ($320,360) in restitution for victims, a decrease compared with 26 million baht ($778,440) in 2020. MSDHS provided legal assistance to victims to file compensation claims and ensure enforcement of orders; however only two cases resulted in the successful execution of restitution orders. Thai law permitted foreign trafficking victims and witnesses to stay and work in Thailand for up to two years upon the completion of legal proceedings against traffickers; however, the government did not report extending this benefit to any victims during the reporting period.

MSDHS operated a mobile application for trafficking victims and witnesses to report exploitation and request protective services, including interpretation, and it provided information on the rights of trafficking victims in seven languages; 46 potential trafficking cases were reported through this application in 2021, compared with 32 in 2020. MSDHS and MOL operated hotlines with operators fluent in 19 foreign languages. In 2021, the MSDHS trafficking hotline received calls related to 64 possible trafficking cases, which were referred to relevant agencies for investigation, including 12 involving forced labor and 31 involving commercial sex (70 cases in 2020).

The law protected victims from prosecution for unlawful acts traffickers compelled them to commit; however, flaws in the government's implementation of victim identification procedures increased the risk of authorities penalizing victims, including for prostitution and immigration violations. This deterred some undocumented foreign victims, who likely feared risks of arrest and deportation, from reporting their exploitation to authorities. Observers reported that some employers retaliated against migrant workers, including potential trafficking victims and activists seeking to improve working conditions, including by dismissing workers. In addition, Thailand's criminal defamation laws continued to allow companies to pursue criminal charges against potential victims and advocates, sometimes through strategic lawsuits against public participation, which resulted in advocates facing years of legal harassment. Observers continued to report these types of cases deterred advocates and victims from reporting exploitation. In one case involving Thai sex trafficking victims exploited overseas, the government secured bail and provided legal representation to the victims after the alleged offenders filed criminal defamation charges against the victims. Despite making amendments to the Criminal Procedure Code in March 2019 that would enable courts to immediately dismiss cases filed with dishonest intent or to intimidate defendants, as well as amendments in February 2019 that strengthened the rights of defendants in cases where their employers filed criminal defamation charges, the government did not report utilizing these amendments to drop criminal defamation charges pursued against advocates or victims.

## PREVENTION

The government maintained efforts to prevent trafficking. A Deputy Prime Minister directed the National Anti-Trafficking in Persons Committee and the Coordinating and Monitoring of Anti-Trafficking in Persons Performance Committee, which met multiple times during the year. The government continued to monitor its progress to combat trafficking through data collection and annual reports to the Prime Minister and the Cabinet. In 2021, the government allocated approximately 4.46 billion baht ($133.53 million) towards its prevention and suppression of trafficking budget, compared with approximately 4.02 billion baht ($120.36 million) in 2020. Government agencies conducted numerous anti-trafficking awareness and prevention campaigns, including through awareness trainings aimed to prevent child sex trafficking and online child sexual exploitation, and the production of a video raising awareness of trafficking among the general public. Civil society expressed concern that provisions of a draft law seeking to increase regulations on NGOs in

Thailand would, if enacted, negatively impact NGO's ability to conduct anti-trafficking work in Thailand.

Thai law permitted recruitment agencies to charge limited amount of recruitment fees to Thais seeking overseas employment. Excessive fees incurred by some workers charged by unscrupulous recruitment agencies made them vulnerable to debt-based coercion. In fiscal year 2021, the government conducted 243 inspections of employment agencies that recruited Thai workers for overseas employment but did not find any unlawful practices. The Department of Employment charged 123 individuals for recruiting workers without a license and labor fraud. MOL and RTP collaborated to investigate unauthorized online advertisements for jobs for Thai workers overseas that involved trafficking, fraudulent employment, smuggling, and commercial sex.

The government maintained bilateral memoranda of understanding (MOUs) with neighboring countries to recruit migrant workers to Thailand. Recruitment under these MOUs was suspended in March 2020 due to the pandemic and resumed on December 1, 2021. The complicated nature of the government's migrant worker registration programs often resulted in workers' reliance on brokers and employers, who charged fees to workers in addition to fees charged by the government, thereby increasing their vulnerability to debt-based coercion. The government implemented programs to enable workers to stay in the country after their initial registration expired and to provide work permits to unregistered workers already in the country. The 2018 Royal Ordinance on Management of Migrant Workers required employers to provide workers a copy of their employment contracts and to cover some costs, such as recruitment fees and transportation costs, and it prohibited employers from deducting more than 10 percent of workers' monthly salaries for personal expenses and from retaining travel or other personal documents; the law prescribed penalties of fines ranging from 10,000 to 100,000 baht ($300-$2,990) and up to six months' imprisonment for employers who violated these rules. However, it did not prohibit employers and recruiters from charging migrant workers with some costs related to their recruitment, such as expenses for passports, medical checks, and work permits. NGOs reported the regulations on recruitment fees were poorly defined and enforced and recruitment agencies and brokers still required workers to pay recruitment fees and transportation costs. The Ordinance enabled employers to retain workers' documents if they obtained their consent and if the employer provided access to the documents; however, observers reported that because enforcement was lacking, in some cases unscrupulous employers retained workers' documents, especially in cases in which workers were not familiar with their rights under Thai law. The government did not report investigating illegal retention of documents or salary deductions. Although government regulations permitted exploited migrant workers to change employers, some policies restricted their ability to do so in practice. Labor laws prevented migrant workers from forming labor unions, which according to civil society organizations further contributed to exploitation. The government inspected 227 migrant worker recruitment agencies but did not find any violations.

A lack of clear guidance to measure work and rest hours for workers aboard fishing vessels heightened their risk of trafficking. The Ministerial Regulations on the Protection of Labour in the Marine Fisheries, which came into force during the reporting period, required that employers provide migrant fishermen a contract in a language they can understand, maintain a record of payments to workers, and provide sufficient meals and drinking water to fishermen on vessels. Regulations also required employers to pay workers' salaries at least once per month through electronic deposits and to share catch profits. However, there remained concerns that some workers were still paid in cash or were unable to access their funds due to a lack of ATMs near some ports, were not sufficiently trained on how to use the system, and had their ATM cards and PINs withheld by vessel owners, captains, or brokers. In August 2021, provincial authorities in Phuket issued an order to quarantine fishermen on their vessels, which increased their risk to exploitation, including longer work hours and inability to leave exploitative conditions.

The government previously reported operating five post-arrival and reintegration centers that assisted migrant workers who entered Thailand through the MOU process by providing information on labor rights, Thai culture, employment contracts, trafficking awareness, and complaint

mechanisms; however, it was unclear to what extent these centers operated during the reporting period. MOL also worked with NGOs to provide services at 10 migrant worker assistance centers, including to receive complaints of labor violations, assist workers to change employers, and update workers' registration documents. In November 2021, MOL established the Anti-Labour Trafficking Ad Hoc Working Group, which inspected employers and workplaces with high risks of trafficking; the group investigated reports from NGOs, including reports of trafficking on fishing vessels, and inspected seven workplaces, which resulted in the prosecution of one trafficking case. The Department of Labor Protection and Welfare conducted inspections at high-risk workplaces and seafood processing facilities and found 4,278 violation of labor laws. MOL's Command Center for Labor Trafficking Prevention inspected 56,186 employers and workplaces for unregistered migrant workers and identified 1,154 employers in violation of labor laws; MOL referred 973 of these cases for further investigation and fined employers a total of 1.39 million baht ($41,620) for employing unregistered migrant workers. The government operated inspection centers at ports to verify whether fishing vessels were operating legally and reported identifying 17 vessels in violation of the law, including for failure to pay workers' wages through bank transfers, failure to provide workers a copy of their contracts, and other labor violations. At-port inspection centers did not universally apply a standardized procedure for referring cases of fishermen who went missing at sea, including to identify indicators of trafficking on the vessels from which they went missing, and the number of crewmembers who went missing at sea continued to increase compared to recent years. The government also conducted at-sea inspections of 671 vessels but did not identify any violations. At-sea inspections did not include sufficient checks for labor violations or consistently have interpreters available for interviewing foreign crewmembers. The government has never reported identifying trafficking victims as a result of labor inspections of fishing vessels. Despite using a manual on standardized inspection practices introduced in 2019, at-port labor inspections continued to be inconsistent and ineffective at identifying potential cases of forced labor on fishing vessels often due to a lack of victim-centered interview practices. Observers indicated some vessel owners and other workplaces received advance warning of labor inspections; observers also noted an absence of interpreters available to assist workers during inspections and employers, including vessel captains, were present during inspections, which likely deterred workers from reporting their exploitation to authorities. A lack of access to remote workplaces prevented sufficient child labor inspections in some informal sectors. In December 2021, allegations emerged that inmates producing fishing nets under a prison work program faced exploitative conditions, including indicators of forced labor. In response, the Department of Corrections issued orders to 143 prisons to cease the production of fishing nets, and the Department committed to establishing advisors within each prison to ensure labor conditions in prisons meet international standards. The government made efforts to reduce the demand for commercial sex acts, including by displaying a video in four languages in Thai airports and on Thai airline flights discouraging child sex tourism. In addition, the government coordinated with foreign governments to deny entry to known sex offenders.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Thailand, and traffickers exploit Thai victims abroad. Labor and sex traffickers exploit women, men, LGBTQI+ individuals, and children from Thailand, other Southeast Asian countries, Sri Lanka, Russia, Uzbekistan, and some African countries in Thailand. Members of ethnic minorities, highland persons, and stateless persons in Thailand have experienced instances of abuse indicative of trafficking. Children from Thailand, Burma, Laos, and Cambodia are victims of sex trafficking in brothels, massage parlors, bars, karaoke lounges, hotels, and private residences. Traffickers induce young Thai girls and boys to perform sex acts through videos and photos on the internet, sometimes by blackmailing victims with explicit images. The government and NGOs reported a continued increase in online sexual exploitation, especially of children, during the pandemic. Children are lured by traffickers into commercial sex through the internet, chat, and dating applications, as well as other social networking platforms. Children in orphanages are at risk of trafficking. Children of families that lost employment due to

the impacts of the pandemic, including among migrant families, were increasingly at risk of trafficking. Approximately 177,000 Thai children, mostly boys, are involved in child labor, including in agriculture, auto repair and other service trades, construction, manufacturing, and in the hospitality industry, and were at risk of facing conditions indicative of forced labor. More than half of these children are not in school, and many worked in hazardous conditions, with long and irregular working hours and were at risk of sexual exploitation. Some brokers or parents force children from Thailand, Cambodia, and Burma to sell flowers or other items in streets, beg, or work in domestic service in urban areas. Elderly persons and persons with disabilities from Cambodia are also forced to beg in Thailand.

Traffickers subject Thai nationals to forced labor and sex trafficking in countries in North America, Europe, Africa, Asia, and the Middle East. Thai women and LGBTQI+ individuals are exploited in Switzerland in sex trafficking. Thai citizens who travel to Norway for family reunification are at risk of sex and labor trafficking. Traffickers subject some Thai men and women to forced labor in Israel's agricultural sector, imposing conditions of long working hours, no breaks or rest days, withheld passports, and difficulty changing employers due to limitations on work permits. More than 100,000 Thais work in South Korea, where traffickers subject Thai men and women to forced labor and sex trafficking, including by forcing victims who owe debts to entertainment establishment owners or loan sharks into commercial sex. Traffickers increasingly subjected Thai workers to forced labor in Cambodia and Laos, including in special economic zones, for operators of online gambling and scamming websites.

Traffickers and smugglers operating between Burma and Thailand charge Burmese migrants approximately 10,000 to 70,000 baht ($300 to $2,100) to smuggle them into Thailand. Observers reported these smuggling networks are supported by complicit police, military, and other local authorities. Smugglers, brokers, employers, and others exploit Thai and migrant workers in labor trafficking in commercial fishing and related industries, the poultry industry, manufacturing, agriculture, domestic work, and street begging. Many workers pay high fees to brokers, recruitment agencies, and others before and after they arrive in Thailand. Traffickers often use debt-based coercion, deceptive recruitment practices, retention of identity documents and ATM cards, illegal wage deductions, physical violence, and other means to subject victims to forced labor. Employers confiscate workers' identity documents as a means to compel workers to remain in their jobs, especially in agricultural plantations, often in addition to paying below the minimum wage and failing to provide workers a day off. Workers in the seafood processing and fishing sectors increasingly face forced overtime as a result of increasing demand for shelf-stable seafood during the pandemic, as well as unsafe working conditions.

Vessel owners, brokers, and senior vessel crew subject Thai, Burmese, Cambodian, Vietnamese, and Indonesian men and boys to forced labor on Thai and foreign-owned fishing boats. Some are paid little or irregularly, incur debts from brokers and employers, work as much as 18 to 20 hours per day, seven days a week, and without adequate food, water, or medical supplies. Some boat captains threaten, beat, and drug fishermen to work longer and sell fishermen drugs as a means to generate additional debt. Vessel owners confiscate the identify documents of fishermen without their consent. Some trafficking victims in the fishing sector have difficulty returning home due to isolated workplaces, unpaid wages, and the lack of legitimate identity documents or safe means to travel. Employers in fishing and seafood processing often make confusing wage deductions for documentation fees, advances, and other charges, making it difficult for workers to account for their wages accurately. Research published in 2019 and 2020 found that between 14 and 18 percent of migrant fishermen were exploited in forced labor in the Thai fishing industry, indicating traffickers exploited thousands of workers on fishing vessels.

Corruption continues to undermine anti-trafficking efforts. Some government officials are directly complicit in trafficking crimes, including through accepting bribes or loans from business owners and brothels that exploit victims. Corrupt immigration officials facilitate trafficking by accepting bribes from brokers and smugglers along Thai borders. Throughout the pandemic, police reportedly increasingly arrested undocumented migrant workers and required them to pay bribes for their release. Credible reports indicate some corrupt officials protect brothels, other commercial sex venues, factory owners, and fishing vessel owners from raids, inspections, and prosecutions, and they collude with traffickers. Some local police reportedly withhold information from prosecutors to protect traffickers. Some government officials profit from bribes and direct involvement in extortion from and exploitation of migrants.

## TIMOR-LESTE: TIER 2

The Government of Timor-Leste does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Timor-Leste was upgraded to Tier 2. The government investigated, prosecuted, and convicted traffickers, including the first two convictions since 2018. The government also established a national anti-trafficking commission, finalized a national anti-trafficking action plan (NAP) for 2022, signed a cooperative agreement and allocated funding to an international organization to train law enforcement officials on victim identification measures, and dedicated a budget to overall anti-trafficking efforts. However, the government did not meet the minimum standards in several key areas. Lack of expertise and understanding of trafficking crimes among some relevant officials remained an impediment to the government effectively combating trafficking. The government did not finalize or approve government-wide standard operating procedures (SOPs) for victim identification for the seventh consecutive year—a critical need as official understanding of trafficking remained low. Officials did not proactively screen for trafficking nor identify victims among vulnerable populations; as a result, they continued to risk penalizing potential trafficking victims for crimes traffickers compelled them to commit. Victim protection services continued to draw from established services for gender-based violence (GBV) victims; protection services tailored to the needs of victims of all forms of trafficking remained inadequate.



PRIORITIZED RECOMMENDATIONS:
Increase investigations of trafficking crimes, proactively initiate prosecutions, and convict and punish traffickers, including complicit officials, in accordance with anti-trafficking laws. • Proactively identify trafficking victims among vulnerable populations, including individuals in commercial sex, domestic workers, and migrant workers on fishing vessels. • Finalize, implement, and train all relevant officials on formal procedures for victim identification and employ proper screening procedures when encountering vulnerable populations, such as during raids, upon detention, or prior to initiating deportation. • Develop and establish SOPs on referring trafficking victims—as distinct from victims of other crimes—to appropriate, specialized care and train officials on their use. • Strengthen efforts to ensure officials do not arrest, deport, or punish victims for unlawful acts traffickers compelled them to commit. • Increase resources for protective services for trafficking victims and proactively offer male victims the same services offered to female victims. • Fully implement the 2022 anti-trafficking NAP and finalize and adequately fund implementation of its extended 2022-2026 action plan. • Improve nationwide law enforcement and victim identification data collection. • Screen for trafficking indicators among Cuban overseas workers, including medical professionals.

## PROSECUTION

The government moderately increased law enforcement efforts. Articles 163 and 164 of the criminal code criminalized all forms of labor and sex trafficking and prescribed penalties of eight to 20 years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Although some law enforcement and judicial officials were familiar with trafficking crimes, it was likely that officials continued to inaccurately classify some trafficking cases as immigration or labor violations. The government collected data on trafficking, but it was not fully comprehensive. In 2021, the government continued to investigate two trafficking cases involving three alleged perpetrators initiated in previous reporting periods. The government reported prosecuting seven cases of trafficking, six of which it initiated in previous reporting periods, involving a total of 18 alleged perpetrators. The one case it initiated in this reporting period—in October 2021—involved five perpetrators, including a village police officer, prosecuted for child sex trafficking; the case was pending at the end of the reporting period. Of the remaining six cases, courts dismissed four for lack of evidence, one was pending trial, and one resulted in the conviction of two child sex traffickers under the anti-trafficking law. The court sentenced one of the traffickers to four years' imprisonment and the other to five years' imprisonment. The government last obtained a trafficking conviction in 2018. During the previous reporting period, the government investigated four suspected perpetrators for sex trafficking, but it did not initiate any new prosecutions or convict any traffickers. The government acknowledged possible trafficking crimes in the fishing industry in Timor-Leste's coastal waters and exclusive economic zone to the south; however, the government lacked the resources, training, and human resources to patrol, inspect, and interdict vessels in its waters and investigate possible trafficking crimes on these vessels.

Pandemic-related restrictions, including a state of emergency in effect for half of the reporting period, hindered the government from fully providing anti-trafficking trainings to personnel. The Ombudsman for Human Rights and Justice also conducted anti-trafficking socialization trainings to local authorities, communities, and students.

## PROTECTION

The government moderately improved efforts to identify and protect victims. The government identified one Timorese child sex trafficking victim involved in a prosecution in October 2021; the national Police's Vulnerable Persons Unit and Ministry of Social Solidarity and Inclusion (MSSI) assisted the victim to return to her family after she requested to do so and conducted regular home visits after her return. In comparison, during the previous reporting period, the government identified and offered protection services to three trafficking victims. Immigration and police officials continued to report their ad hoc use of trafficking indicators based on the Bali Process to identify victims; however, for the seventh consecutive year, the government did not finalize or widely disseminate comprehensive, government-wide SOPs for victim identification. While relevant ministries collaborated to share information on trafficking victims, there was no formal referral process; generally, authorities based their referral process on the well-established process used for victims of GBV, which did not address the needs of victims of all forms of trafficking. To address this issue, in January 2022, the Ministry of Interior, on behalf of the government, signed a cooperative agreement with and allocated $300,000 to an international organization to conduct trainings on victim identification and assistance for police and immigration officials in 2022. MSSI reported it maintained technical officers in each of the 13 districts of the country that continued to work closely with an NGO to provide victims of GBV and trafficking with assistance, including medical and psychological care, security, and legal assistance. MSSI did not report any cases of trafficking to the NGO; however, the NGO reported it received one victim referral from law enforcement during the reporting period. MSSI reported it had $10,000 available to provide for trafficking victims during the reporting period, but the government did not utilize this funding. Despite the availability of care for victims, the quality of care was below international standards and did not adequately address the needs of male trafficking victims. Furthermore, the greatest level of care was available in Dili and other urban areas in the different municipalities, as limited infrastructure and

human resources hindered victims' access to care in rural areas. Article 9 of the anti-trafficking law permitted victims to seek compensation for losses and damages incurred as a result of the trafficking crime, but no victims received such benefits during the reporting period. The government's policies allowed foreign victims alternatives to their removal to countries where they may face hardship or retribution; it did not provide such assistance during the reporting period.

The government implemented regulations and guidance on the 2017 Law on Preventing and Combating Human Trafficking, which stated trafficking victims may not be detained, accused, or judged for having entered or resided illegally in Timor-Leste nor for having perpetrated crimes traffickers compelled them to commit. Neither the government nor civil society partners reported incidents where authorities penalized trafficking victims for unlawful acts traffickers compelled them to commit. However, due to a failure to properly screen for and identify trafficking indicators, immigration and law enforcement officials may have detained or deported some unidentified trafficking victims, including during routine raids on establishments known for commercial sex. Police officials and victim assistance NGOs also reported traffickers coached victims to state they were voluntarily in commercial sex, which officials reported made it difficult for them to identify victims during raids. Nevertheless, law enforcement officials risked re-traumatizing some victims due to a lack of victim-centered screening procedures.

## PREVENTION

The government increased efforts to prevent trafficking. In June 2021, the government promulgated Decree Law No. 9 that established the Commission to Combat Trafficking in Persons (KLATU), which was responsible for coordinating the government's anti-trafficking efforts and included a representative of civil society to serve as a member. KLATU has met five times since its formation, during which it developed a plan to establish a Commission Secretariat and finalized an anti-trafficking NAP for 2022 that outlined the government's various anti-trafficking activities and goals for the year; officials initiated integrating this plan into the government's five-year anti-trafficking NAP for 2022-2026, which KLATU continued to draft at the end of the reporting period. The government allocated $475,000 to anti-trafficking activities in fiscal year 2022, a portion of which funded KLATU. The government did not conduct research to assess the human trafficking problem in the country, nor did it systemically monitor its anti-trafficking efforts. The government did not conduct a country-wide anti-trafficking awareness campaign, but the HIV Commission—under the Ministry of Social Solidarity and Inclusion—incorporated human trafficking issues into HIV/ AIDS socialization and awareness activities for local communities in Dili and other municipalities. The government did not have an anti-trafficking hotline. Some government agencies utilized screening measures to address fraudulent labor recruitment practices, but vulnerabilities for Timorese nationals seeking work abroad remained. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Timor-Leste, and traffickers exploit victims from Timor-Leste abroad. Poor economic conditions and limited educational opportunities create trafficking vulnerabilities for Timorese nationals, in particular women and girls from rural areas; limited economic opportunities also create increased trafficking vulnerabilities for LGBTQI+ persons. Traffickers lead Timorese women, girls, and occasionally young men and boys from rural areas to the capital with the promise of employment or education and exploit them in sex trafficking or domestic servitude. Traffickers exploit Timorese men in forced labor in agriculture, construction, and mining. Some Timorese family members place children in bonded household and agricultural labor, primarily in domestic rural areas but also abroad, to pay off family debts. Communities affected by HIV/AIDS are believed to be vulnerable to trafficking. Traffickers deceive women and teenagers with promises of scholarship opportunities or employment in Indonesia, Malaysia, and other countries in the region; often, traffickers take the victim to a different country than promised, withhold their passports, pay them little to nothing, and force them into labor, including domestic servitude. Frequently, Timorese victims overseas first transit through the porous

TOGO

border with Indonesia; some remain and are exploited in Indonesia. Some routes used by smugglers along the Indonesia-Timor-Leste border are also possible routes used by traffickers. Immigration and police officials and civil society representatives reported in 2020 and 2021 that trafficking of foreign victims through legal points of entry, such as airports, ports, and official land border crossings, had likely decreased due to the government's increased scrutiny of those entering the country due to pandemic-related limitations on the entry of both Timorese and foreign arrivals. Due to these ongoing pandemic-related restrictions and the state of emergency throughout most of 2021, reports of irregular movement across the porous land border with Indonesia increased. Some civil society contacts believed that perpetrators of human trafficking may have used these informal routes due to increased scrutiny at legal points of entry. Sex traffickers in Timor-Leste target foreign women from East and Southeast Asia. Transnational traffickers may be members of Indonesian or People's Republic of China (PRC) national organized crime syndicates, which rotate foreign victims of sex trafficking in and out of the country for the length of a 30-day tourist visa to avoid raising the suspicions of law enforcement officers through visa overstay violations. Traffickers also recruit Timorese women, send them to the PRC, Indonesia, or Malaysia, and force them into commercial sex. Police accept bribes from establishments involved in trafficking or from traffickers attempting to cross borders illegally. Traffickers exploit foreign fishing crews in forced labor on foreign-flagged vessels that transit Timor-Leste waters. Each year, the Cuban government sends thousands of workers, including medical workers, around the globe under multi-year cooperation agreements negotiated with receiving countries. Observers have expressed serious concerns of exploitation and forced labor within Cuba's overseas labor export program; some former participants assert that the Cuban government coerced them to remain in the program. There were approximately 100 Cuban medical workers in Timor-Leste in 2020; they may have been forced to work by the Cuban government.

## TOGO: TIER 2

The Government of Togo does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. Despite the documented impact of the pandemic on the government's anti-trafficking capacity, the government demonstrated overall increasing efforts compared to the previous reporting period; therefore Togo remained on Tier 2. Togolese authorities convicted more traffickers than previous years, continued an awareness raising campaign, and established a new national anti-trafficking committee to coordinate efforts. However, the government did not meet the minimum standards in several key areas. Authorities identified fewer child victims and did not identify any adult victims. The government also did not update its national action plan (NAP) for the 14th consecutive year.



TOGO TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

While maintaining the current stringent penalties Togo's law calls for, allow courts outside of the Assize Court system to hear trafficking cases to expedite adjudication of pending and future cases. • Update the existing victim referral manual to include standard operating procedures (SOPs) for victim identification among adults and high-risk populations, and train law enforcement, justice sector personnel, and community-based child protection organizations on those procedures. • Draft, resource, and implement an updated NAP that incorporates adult victims and increases coordination with NGOs, neighboring countries,

and regional organizations. • Provide training and institutional support to law enforcement and judicial officials to increase their ability to effectively investigate and prosecute trafficking cases; disseminate trafficking indicator documents to all police stations. • Designate focal points within the Ministry of Interior and Gendarmerie to coordinate and lead anti-trafficking law enforcement efforts. • Enact anti-trafficking legislation that includes provisions for victim protection, including witness protection in the law enforcement and judicial process, as well as the provision of shelter, medical care, and psychosocial services. • Work with NGOs and international organizations to increase the accessibility to shelter and provision of protective services to all trafficking victims. • Organize anti-trafficking outreach campaigns in collaboration with civil society to raise awareness of trafficking. • Develop a data collection and information management system to organize law enforcement and victim referral data, in collaboration with NGOs and international organizations. • Increase efforts to distribute birth certificates and national identity documents to citizens to reduce their vulnerability to trafficking. • Given significant concerns about forced labor indicators in Cuban international work programs, screen Cuban overseas workers, including medical professionals, and refer trafficking victims to appropriate services.

## PROSECUTION

The government maintained law enforcement efforts. Articles 317 through 320 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of 10 to 20 years' imprisonment and fines between 10 million and 50 million West African CFA francs (FCFA) ($17,190 and $85,930) for offenses involving an adult victim and 20 to 30 years' imprisonment and fines between 20 million and 50 million FCFA ($34,370 and $85,930) for offenses involving a child victim. These penalties were sufficiently stringent, and with regard to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape.

The Ministry of Justice's anti-trafficking unit reported investigating 60 cases, compared with investigating 63 cases in 2020. Officials reported prosecuting 43 cases with 51 suspects, compared with prosecuting 54 suspects in 2020. The government convicted seven traffickers, compared with no convictions during the previous reporting period. Observers noted the Assize Court system, which handles all trafficking cases, had a substantial backlog of cases, which deterred victims from participating in judicial proceedings and resulted in some victims waiting years for their cases to be adjudicated. The lack of coordination between law enforcement and victim care providers hindered the government's ability to prosecute cases. The absence of designated focal points for trafficking issues in the Gendarmerie and Ministry of Interior hindered law enforcement cooperation. Lack of witness protection programs and legal assistance likely also negatively affected witness cooperation. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes, although judicial corruption may have hindered some trafficking investigations. In past years, officials reported adjudicating some forced child labor cases through informal mediation processes.

The government continued to provide written instructions on victim identification to its law enforcement and immigration officials through the course of their basic training. The government partnered with an international organization to provide anti-trafficking training to judicial police officers. Observers stated in past years that frequent turnover hindered the development of some law enforcement units' institutional knowledge. Officials did not report utilizing the country's 2019 tripartite agreement with Benin and Burkina Faso to synchronize law enforcement efforts on transnational trafficking cases during the reporting period, although the pandemic hindered effective implementation.

## PROTECTION

The government maintained weak protection efforts. For the second consecutive year, the government identified fewer trafficking victims than the previous year. The Ministry of Social Affairs' (MSA) Child Protection Director General reported the government identified 23 child trafficking victims (one boy and 22 girls) and no adult victims, compared with 132 child victims and 43 adult victims in 2020. The Child Protection Directorate General reported officials intercepted children at Togo's border destined for Nigeria, Gabon, Benin, and Burkina Faso, but

it did not provide information on the number of children intercepted, compared with 250 children intercepted during the prior reporting period. Government officials reported movement restrictions due to the pandemic may have hindered victim identification efforts. NGOs and international organizations reported identifying 419 victims during the reporting period, which included 417 children (316 girls and 101 boys) and two adult women. Law enforcement, immigration, and social service personnel used a written manual, last updated in 2012, to identify and refer victims to services in coordination with NGOs; however, the manual did not include SOPs for identifying victims among high-risk populations, such as women in commercial sex. The MSA continued to run a toll-free hotline for reporting child abuse, which operated 16 hours per day, seven days a week. Officials reported identifying 12 child victims from hotline tips during the reporting period, compared with 13 child victims during the previous reporting period. The MSA provided cell phones to Allo 10-11's network of 150 contacts to facilitate nationwide coverage and utilized an informal referral system when callers identified potential victims.

The government reported providing psychological support, food, clothing, and health care to 11 victims, compared with providing services to 48 child victims in 2020. While the government ran a shelter for vulnerable children, including child trafficking victims, there were no shelters specifically for adult trafficking victims, severely limiting their access to care and justice. Instead, the government referred adult trafficking victims to a center intended for victims of natural and humanitarian disasters. The MSA continued to operate the Reference Center for the Guidance and Care of Children in a Difficult Situation (CROPESDI). The CROPESDI shelter, located in Lomé, received victims referred by the national child abuse hotline and provided shelter, as well as legal, medical, and social services, before transferring them to care facilities managed by NGOs. The government did not report how many child trafficking victims the shelter served. Observers reported the lack of shelter options for adult victims adversely impacted efforts to investigate potential cases; in some cases, officers reported using their own resources for shelter and basic necessities for adult victims, which disincentivized some police from pursuing viable cases. The government reportedly offered foreign trafficking victims the same access to shelters as domestic victims and performed a risk evaluation before it repatriated potential victims. The government identified and assisted an NGO in the repatriation of ten Ghanian children.

For the third consecutive year, the government allocated 18 million FCFA ($30,940) to efforts combatting child trafficking, of which it designated 11 million FCFA ($18,910) for victim care. The government additionally committed to providing 600,000 FCFA ($1,030) to each of the six NGO shelters that it supported but did not report if these funds were dispersed by the end of the reporting period. In 2020, the government formed a 5,000-person taskforce to enforce the country's state of emergency due to the COVID-19 pandemic; the participation of officials with anti-trafficking responsibilities in the taskforce continued to limit the government's ability to implement protection efforts. The government did not have a formal process to encourage victims' participation in the investigation and prosecution of their traffickers and did not report providing protection services to adult victims who testified during court proceedings. Due to a lack of comprehensive identification procedures, authorities may have detained or deported some unidentified trafficking victims.

## PREVENTION
The government increased efforts to prevent trafficking in persons. The government established the National Commission Against Trafficking in Persons (CNLTP) in 2021 and appointed the Commission's 13 members, including two members from civil society organizations, in January 2022. The Commission began holding meetings in January. The Ministry of Social Action's General Director of Child Protection chaired the Commission and was responsible for coordinating the government's anti-trafficking policies and programs. The National Committee for the Reception and Social Reintegration of Child Victims of Trafficking (CNARSEVT) acted as the government's central hub of information and statistics for child trafficking in Togo, gathering data for the annual trafficking in persons report to ECOWAS. CNARSVET serves as the primary point of contact for NGOs and international organizations to

return child trafficking victims to Togo. Observers noted a lack of financial resources limited CNARSEVT's effectiveness. The government has not updated its anti-trafficking NAP since 2008. In 2020, officials finalized Togo's five-year NAP on child labor, which partially addressed trafficking. The government continued a national awareness raising campaign, promoting it with print, radio, and community dialogue components, which included information on child trafficking. However, the campaign's reach was limited due to pandemic-related travel restrictions, including border closures and periodic curfews, and financial constraints resulting from the diversion of resources to pandemic-mitigation efforts. Protection committees comprised of local, traditional, community, and religious leaders existed in 116 municipalities and six administrative regions. These committees occasionally reported suspected trafficking cases to government officials.

Despite past allegations of fraudulent recruiters facilitating the exploitation of Togolese abroad, authorities did not report investigating any foreign labor recruiters for trafficking crimes. The Ministries of Labor and Social Action regulated labor recruitment firms, including foreign recruiters, but the government's weak information management systems hindered its ability to provide enforcement statistics. The government worked to reduce the demand for forced child labor by continuing to partner with traditional religious leaders to eliminate exploitation in religious "apprenticeships," which involve parents entrusting their children to religious leaders for education and employment purposes, who exploit them in forced domestic work or sexual slavery when parents are unable to pay "apprenticeship fees." The government employed 123 labor inspectors who conducted 651 inspections in the first half of 2021, but it did not report whether any inspections identified child trafficking. The government did not report providing training on identifying human trafficking cases to labor inspectors. Financial constraints, including lack of funds for fuel, limited the effectiveness of inspections. The government currently registers approximately half of all children at birth, though the percentage is lower in rural areas; the lack of identification documents contributed to an increased vulnerability to trafficking in persons.

The government did not take any discernible measures to reduce the demand for commercial sex acts. Officials provided anti-trafficking training to Togolese troops prior to their deployment abroad on international peacekeeping missions. Although not explicitly reported as human trafficking, there was one open case of alleged sexual exploitation with trafficking indicators by a Togolese peacekeeper deployed to the UN peacekeeping mission in Mali in 2020; the UN substantiated the allegations and repatriated the offender. The government had not yet reported the accountability measures taken, if any, by the end of the reporting period. The Ministry of Foreign Affairs provided its diplomats a guide to hiring domestic workers but did not report delivering trafficking-specific training.

## TRAFFICKING PROFILE
As reported over the past five years, human traffickers exploit domestic and foreign victims in Togo, and traffickers exploit victims from Togo abroad. While travel restrictions intended to slow the spread of the pandemic may have decreased transnational human trafficking, restrictions such as curfews imposed on the population—and the resulting deleterious economic impacts on livelihoods for individuals in the service and retail sectors—likely increased the vulnerability of many Togolese to exploitation during the reporting period.

Most trafficking victims are children from economically disadvantaged families in rural areas. Traffickers force men and boys to work in agriculture, quarries, and mechanical and carpentry shops. Women and girls are forced to work in markets, domestic service, bars and restaurants, and in commercial sex. Victims exploited in foreign countries are most often sent by land to Ghana, Benin, Burkina Faso, and Nigeria and via ship to Gabon. Togolese and other West African trafficking victims are also sent through Togo to the Middle East. Observers noted an increase in adult male and female trafficking victims working in Nigerian and Ivorian plantations. Families and trusted intermediaries take advantage of high levels of poverty throughout the country to exploit many Togolese trafficking victims, with the Centrale, Kara, and Savanes regions serving as primary source regions. NGOs and

**TONGA**

government officials reported markets selling Togolese children for commercial sex acts ("small girls markets" or *devissime*) exist in Lomé and elsewhere in the country. Traffickers force Togolese children to work in the agricultural sector—particularly on coffee, cocoa, and cotton farms—as well as in stone and sand quarries.

In past years, the western border of the Plateau region, which provides easy access to major roads between Lomé and Accra, Ghana, served as a primary area traffickers used to transport victims. NGOs noted the Abidjan-Lagos corridor remains a prominent route for cross-border trafficking of persons—as well as the smuggling of illicit goods—with criminals using Togo as a transit country. Civil society actors and law enforcement officers reported the country's rise as a regional economic and logistics hub has led to a corresponding increase in human trafficking and migrant smuggling. Observers stated trafficking networks are predominantly community-based and loosely organized by local actors, while syndicates with ties to the Middle East are more organized.

Traffickers recruit children from Benin and Ghana and transport them to Togo for forced labor. Illicit networks exploit Ghanaian girls in sex trafficking in Togo. In past years, many Togolese adults and children migrated in search of economic opportunities to Benin, Burkina Faso, Mali, and Niger, where criminal elements may exploit them in forced labor and sex trafficking. Traffickers force victims to work in cocoa harvesting in Ghana and Cote d'Ivoire; palm wine production and other agriculture sectors in rural Nigeria; gold mining in Burkina Faso; domestic service in urban Nigeria; and sex trafficking in Beninese and Nigerian bars and restaurants. Officials noted sex tourists from Lebanon, France, and Nigeria have exploited children in Togo during previous years, although pandemic-related travel restrictions likely minimized these risks for most of the reporting period. Cuban nationals working in Togo on medical missions may be forced to work by the Cuban government.

## TONGA: TIER 2 WATCH LIST

The Government of Tonga does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included providing funding to an NGO available to assist trafficking victims. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government did not identify any victims, develop procedures to identify them, or investigate any cases of trafficking. Therefore Tonga remained on Tier 2 Watch List for the second consecutive year.



TONGA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Develop and fully implement procedures for proactive identification of trafficking victims among vulnerable groups. • Increase efforts to proactively investigate and prosecute trafficking crimes. • Amend trafficking laws to criminalize all forms of trafficking in line with the definition under international law, including such crimes lacking cross-border movement. • Develop, adopt, fund, and implement a national action plan. • Utilize the Asian liaison position to facilitate proactive identification of foreign victims and their referral to care. • Provide explicit protections and benefits for trafficking victims, such as restitution, legal and medical benefits, and immigration relief. • Develop and conduct anti-trafficking information and education campaigns. • Accede to the 2000 UN TIP Protocol.

## PROSECUTION

The government continued to make negligible anti-trafficking law enforcement efforts; however, natural disasters and the pandemic significantly impacted the capacity of the government to implement anti-trafficking activities during the reporting period. The Counter Terrorism and Transnational Organised Crime Act of 2013 did not criminalize all forms of trafficking because it required transnationality to constitute a trafficking offense. Additionally, inconsistent with the definition of trafficking under international law, the law did not include force, fraud, or coercion as an essential element of the crime. The law prescribed penalties of up to 15 years' imprisonment for trafficking offenses involving adult victims and 20 years' imprisonment for offenses involving children; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties for other serious crimes, such as rape.

The government did not investigate any potential trafficking cases for the third consecutive year. Since convicting its first trafficker in April 2011, the government has not prosecuted or convicted any traffickers. Law enforcement reported language barriers and resource limitations impacted their ability to investigate trafficking. The government did not report if the Tongan police force continued to provide anti-trafficking training for new police recruits. Government officials participated in a foreign government-funded training on collecting and reporting trafficking data. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking offenses.

## PROTECTION

The government maintained weak victim protection efforts and did not take steps to proactively identify victims. Since the government's identification of four potential trafficking victims in 2015, the government has not identified any victims of trafficking. The government did not develop or employ systematic procedures for victim identification among at-risk groups, such as migrant workers or women in commercial sex. The government had procedures to refer victims of crime, including potential trafficking victims, to an NGO, but did not use the procedures during the year. Due to a lack of formal identification procedures, authorities likely detained, arrested, or deported some unidentified trafficking victims. The public's distrust of Tongan courts, as well as low levels of understanding of human trafficking, likely contributed to the absence of identified victims. The government continued to provide an unknown amount of funding to an NGO for operations to assist adult female and child victims of crime, including shelter, counseling, and legal services. Although authorities did not identify any victims during the year, adult female and child victims of trafficking were eligible for these services. There were no shelter facilities available to male victims older than 14; however, male counselors were available to assist male victims of any age. Under the immigration act, the principal immigration officer had broad discretionary authority to grant permits to victims to stay in the country for any length of time necessary for their protection. Victims could receive asylum in Tonga if they feared retribution or hardship in their country of origin, though no trafficking victim has ever requested asylum.

## PREVENTION

The government maintained minimal efforts to prevent trafficking. The Ministry of Police's trafficking task force was responsible for leading anti-trafficking efforts. The government did not have a national action plan, which reportedly continued to hinder governmental anti-trafficking coordination. The government did not conduct awareness campaigns. Authorities provided briefings to Tongans participating in seasonal worker programs overseas, which included information on workers' rights. Under Tongan law labor, recruiters and brokers who used fraudulent recruitment methods were liable to up to 10 years' imprisonment, but the government did not report if it monitored or held any recruiters and brokers liable for fraudulent recruitment during the reporting period. The government did not make efforts to reduce the demand for commercial sex acts. The government did not provide anti-trafficking training to its diplomatic personnel. Tonga is not a party to the 2000 UN TIP Protocol.

## TRAFFICKING PROFILE

As reported over the past five years, some Tongan and foreign individuals are vulnerable to trafficking in Tonga, and some Tongans are vulnerable to trafficking abroad. As a result of the government's pandemic-related mitigation efforts, entry into Tonga was severely restricted. East Asian women, especially those from the People's Republic of China (PRC), who are recruited from their home countries for legitimate work in Tonga and often pay excessive recruitment fees, are vulnerable to sex trafficking in clandestine establishments operating as legitimate businesses. Some Tongan women and children are vulnerable to forced labor in domestic work. Tongan children were vulnerable to sex trafficking. Reports indicate Fijians working in the domestic service industry in Tonga experience mistreatment indicative of labor trafficking. PRC nationals working in construction on government infrastructure projects in Tonga were vulnerable to labor trafficking. Tongan adults working overseas, including in Australia and New Zealand, are vulnerable to labor trafficking, including through withholding of wages and excessive work hours. Some Tongan seasonal workers unable to leave Australia due to pandemic-related border closures subsequently become vulnerable to exploitation. Employers rush some workers to sign employment contracts they may not fully understand, and others are unable to retain copies of their contracts, exacerbating the potential for employers to exploit these workers in labor trafficking.

## TRINIDAD AND TOBAGO: TIER 2 WATCH LIST

The Government of Trinidad and Tobago does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included increasing investigations and prosecutions, identifying more victims, and expanding training to a broader range of stakeholders. However, the government did not demonstrate overall increasing efforts compared to the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government has never convicted a trafficker under its 2011 anti-trafficking law. Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action, and the government did not take action against senior government officials alleged in 2020 to be involved in human trafficking. Victim identification and services remained weak, and the government did not formally adopt the National Action Plan (NAP) for 2021-2023. Therefore Trinidad and Tobago remained on Tier 2 Watch List for the second consecutive year.



TRINIDAD & TOBAGO TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Increase efforts to investigate, prosecute, and convict traffickers, including complicit officials and staff. • Increase proactive victim identification, screening, and protection among vulnerable communities, including migrants, asylum-seekers, and refugees, especially Venezuelans. • Ensure victims are not penalized for unlawful acts traffickers compelled them to commit. • Strengthen rules and regulations to ensure immigration enforcement does not hinder human trafficking detection, criminal law enforcement, or victim protections. • Ensure trafficking is investigated and prosecuted using the anti-trafficking law and not as other or lesser crimes. • Implement a formalized protocol and a functioning and active coordinating committee for victim care. • Improve the quality of victim care—especially for children—and increase bilingual services. • Reduce judicial backlog. • Approve, fund, and implement the anti-trafficking

NAP for 2021-2023. • Provide adequate funding for robust trafficking investigations and victim services, including accommodations. • Train law enforcement and prosecutors in proactively identifying, obtaining, preserving, and corroborating evidence of trafficking. • Improve cooperation between the Counter Trafficking Unit (CTU), prosecutors, the judiciary, and NGOs to increase the number of cases that proceed to trial. • Strengthen oversight, regulation, and inspections of private labor recruitment agencies and domestic work locations, including by appointing a license officer. • Increase trauma-informed training on trafficking for NGO, shelter, social services, and law enforcement staff to improve their ability to identify and care for potential trafficking victims.

## PROSECUTION

The government increased prosecution efforts, but official complicity remained a significant concern. The Trafficking in Persons (TIP) Act of 2011 criminalized sex trafficking and labor trafficking and prescribed penalties of no less than 15 years' imprisonment and a fine of no less than 500,000 Trinidad and Tobago dollars (TTD) ($73,980) for offenses involving an adult victim and no less than 20 years' imprisonment and a fine of no less than 1 million TTD ($147,950) for those involving a child victim. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. The government reported it prepared draft legislation in December 2020 to increase the penalties for trafficking, including for public officials complicit in trafficking crimes; the draft legislation remained pending with the Ministry of National Security at the end of the reporting period.

The CTU investigated 23 new trafficking cases in 2021 under the TIP Act, including nine for sex trafficking, five for labor trafficking, and nine for unspecified trafficking-related crimes. This compares with 12 cases in 2020 (nine for sex trafficking and three for labor trafficking); the government continued 11 sex trafficking investigations from prior reporting periods. The government initiated prosecution of 15 suspected sex traffickers, including three police officers, compared with prosecuting two alleged sex traffickers in 2020. The government continued the prosecution of 51 alleged sex traffickers begun in previous reporting periods, compared with 11 in 2020. Of the total number of new and ongoing cases, the government prosecuted 10 defendants including two police officers under the TIP Act and 15 defendants including three police officers under other laws, including the Immigration Act, the Anti-Gang Act, and the Children's Act. The government did not report convicting any traffickers in 2021 and has not convicted any traffickers since the enactment of the 2011 TIP Act.

Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The government did not take action against senior government officials alleged in 2020 to be involved in trafficking. Authorities continued an investigation of two dozen police officers allegedly involved in trafficking begun in the previous reporting period. The government reported none of these police investigations moved to prosecution. The government continued prosecution of three police officers for trafficking crimes. The prosecutions initiated against three police officers during the current reporting period involved two cases. In April 2021, authorities charged a customs and border officer under the Immigration Act for aiding and abetting the illegal entry of a Venezuelan migrant, and an investigation—including into whether the case involved trafficking—remained pending. In December 2021, authorities brought charges against two police officers for offenses under the TIP Act, the Children's Act, and the Anti-Gang Act for aiding and abetting the illegal entry of a Venezuelan female migrant who was subsequently identified as a trafficking victim. Courts released the alleged traffickers on 300,000 TTD ($44,390) bail.

The CTU, a specialized anti-trafficking police unit within the Ministry of National Security, had the sole mandate for investigating trafficking cases. The CTU was responsible for trafficking investigations in all jurisdictions but lacked sufficient funding, staffing resources, and expertise to adequately fulfill its mandate; the government reassigned officials from other agencies to assist the CTU. The Children's Authority of Trinidad and Tobago (CATT) referred cases involving children to the CTU and the Child Protection Unit of the police for investigation; the

CATT and the Ministry of National Security maintained a Memorandum of Understanding that facilitated coordination on trafficking cases. The Child Protection Unit developed referral and management procedures for cases received from the CTU and the Immigration Division, which remained pending finalization at the end of the reporting period.

Evidence collection for trafficking investigations remained a significant problem. Police did not obtain sufficient evidence from victim-witnesses before their repatriation. The CTU also reported challenges in obtaining, preserving, and authenticating other evidence, such as using cell phones or financial data to corroborate trafficking network affiliations to add charges under existing gang and money-laundering laws. Observers noted poor interagency coordination resulted in weaker law enforcement and prosecution case management. NGOs reported that the CTU failed to act on trafficking crime tips.

The CTU referred trafficking cases to the Director of Public Prosecutions and the judiciary for hearings and trial. Observers noted authorities did not pursue a prosecution if the victims were not willing to testify against an alleged trafficker. Courts continued to have a backlog and often took five to 10 years to resolve cases, including trafficking cases, despite adopting justice system reforms in 2019 to address the problem. Observers noted the judiciary's broad discretion and inconsistency in granting bail, as well as reports of fraud and corruption within the bail process, engendered concomitant recidivism, victim re-traumatization, and a perception of impunity. Magistrates Courts with specialized trafficking divisions heard preliminary inquiries for trafficking cases, after which a case would move to jury trials in the High Court. Authorities prosecuted child trafficking cases in child care courts. As a result of the pandemic, prosecutions continued entirely virtually. Police could collect victims' written statements as testimony and use them in trials. Due to the pandemic, the High Court held no jury trials, which were required for trafficking cases; the court held some judge-only trials in person. The pandemic delayed investigations as the Ministry of Health quarantined some victim-witnesses. The pandemic affected investigative capacity, especially of the CATT, as staff tested positive for the COVID-19 virus or remained in quarantine.

The country's oversight bodies and outside observers consistently alleged that law enforcement and security officials continued to be complicit in trafficking. A study funded by a foreign organization and conducted by a foreign company reported that 10 percent of the police force was under active investigation for misconduct, including trafficking. In cases of alleged official complicity, the Police Complaints Authority (PCA) could receive a complaint against one of the investigating or other police officers involved in the enquiry and require the intervention of the Director of Public Prosecutions via consultation. Authorities reported the Second Schedule of the Proceeds of Crime Act included sexual exploitation and trafficking as specified offenses from which forfeitures/confiscations/money laundering charges could be generated; actions taken under the Civil Asset Recovery and Unexplained Wealth laws required citizens, including public officials, to account for the source of their wealth. The government proposed an amendment to the Police Services Act in January 2021 that would allow additional disciplinary action, including polygraph testing and dismissal, for officers suspected to be involved in trafficking; the proposal was pending with the Attorney General at the end of the reporting period. Reports alleged complicit Coast Guard officials facilitated the entry of women and girls—some of whom may have been trafficking victims—from Venezuela into the country, and complicit immigration and customs officers then ensured the women and girls arrived and received entry. Reports also alleged police accepted bribes to facilitate transportation of potential trafficking victims and colluded with brothel, casino, and business owners to protect their establishments from police raids. Observers reported tipoffs or notifications preceded such raids. A civil society organization continued to report authorities rarely raided some venues and suggested these venues were connected to corrupt immigration officials and police officers.

The government adopted an amendment to its Mutual Assistance in Criminal Matters Act, which gave the government broader scope to collaborate with international partners on investigations—including trafficking cases. The government signed a Memorandum of Understanding in November 2021 with Colombia on human trafficking.

The government cooperated with the Maduro regime in Venezuela and an international organization to target a transnational trafficking network, resulting in prosecution of three suspected traffickers. The government established a law enforcement liaison with a foreign government. Law enforcement initiated an investigation based on information received from an international organization. The government also continued to cooperate with another country on a trafficking case from a previous reporting period.

The government provided anti-trafficking training to the police, intelligence community, national security agency, immigration department, Coast Guard, CATT, Ministry of Education, the Caribbean Financial Action Task Force, the Global Financial Task Force, and NGOs on the law, case studies, improving government-NGO cooperation, and surveillance. The government also provided Spanish-language training to four CTU contract staff members.

## PROTECTION

The government maintained limited protection efforts. The government identified 80 trafficking victims; 46 were exploited in sex trafficking, two were exploited in labor trafficking, and 32 were for unspecified exploitation. This compares with six identified trafficking victims in 2020 and 34 in 2019. All 46 sex trafficking victims were Venezuelan, including 21 women and 25 girls. The labor trafficking victims were both Indian men. Reports suggested some unidentified victims feared retaliation from authorities, including during police raids, trials, and interdiction operations involving Venezuelan migrants. The CTU was the primary entity responsible for identifying victims, and it used existing screening protocols. NGOs identified one of the adult female Venezuelan victims and referred her to the CTU. However, NGOs also referred another adult Venezuelan victim to the CTU, which denied the identification due to a lack of shelter space; an NGO subsequently provided groceries and shelter. Observers noted the government's victim statistics were not reliable. Experts noted working-level staff at NGOs and shelters required more training on trafficking indicators to better identify potential trafficking victims.

Authorities provided some assistance to 54 victims, compared with 70 potential victims in 2020. The government could provide medical care; accommodation; basic necessities for adults; language classes and life skills training; psychosocial support; pre-natal care and parenting classes; support for family members; access to social workers; interpretation and translation services; drug rehabilitation; pandemic response support; and passport support. Observers noted that in some cases victims received few of these available services and government care was haphazard and inferior to care provided by an international organization. An NGO provided shelter services to one victim. NGOs reported reluctance to provide shelter or services to foreign victims in irregular status who were not officially referred by the government, due to possible retaliation against the NGO under the Immigration Act. An international organization reported caring for 60 trafficking and gender-based violence victims identified in the current and former reporting periods. The Children Court instructed the Children's Authority on the placement (usually in a Children's Home), services, and repatriation involving child trafficking victims. Child advocates assigned by the state could apply for wardship and care court orders on behalf of unaccompanied or separated child victims. NGOs reported authorities did not provide adult victims the same level of care, access, and protection as child victims.

The government reported services were not time-limited or conditional on participation in the prosecution of the trafficker; however, victims who cooperated with an investigation or prosecution would receive legal aid, transportation, and lodging for themselves and their families. Although the government reported victims used all available services, observers noted that without a standardized program for victim care, the government did not adequately address many of the short- and long-term needs of adult victims. Observers noted that although the Ministry of Social Development and Family Services working group finalized a victim care manual, senior government officials had not approved the manual by the end of the reporting period.

The government reported the CTU had a dedicated budget for victim assistance but did not report the amount, compared with spending 120,000 TTD ($17,750) in 2020, 120,000 TTD ($17,750) on victim protection and assistance in 2019, and 203,100 TTD ($30,050) in 2018. The Ministry of

Social Development and Family Services reported providing funding for NGOs and three statutory boards for victims of trafficking and other crimes. The Ministry of National Security had an agreement with an international organization to provide adult victims food and shelter; psycho-social services were provided by third parties. The Ministry of Health assisted foreign trafficking victims and funded the assistance from its annual budget. The CATT funded advocates for child victims from its general budget. Outside experts noted there was insufficient government funding and personnel for comprehensive victim care, including appropriate shelters with adequate staff and security personnel, especially due to the pandemic.

The CTU screened migrants for trafficking indicators using a standard form. The government began screening migrants for trafficking indicators at an immigration facility in February 2022. The CTU disseminated a Pocket Guide for Frontline Officers, which included information on identifying victims of trafficking; while the guide was widely available, high-level officials lacked an understanding of trafficking. The CATT, in consultation with the CTU, immigration services, and CPU, drafted but did not finalize or implement a new process for identifying child trafficking victims, regardless of nationality or immigration status. The government, in collaboration with an international organization, reviewed and updated the national referral mechanism. The government did not implement a formalized protocol for victim care; the CTU instead relied on verbal agreements with different ministries, which observers noted were inconsistently implemented. The government lacked quality victim care, including specialized placement facilities for children equipped with adequate personnel and services and placement facilities for children transitioning out of the care system. Authorities and an international organization also reported victims lacked access to certified bilingual service providers. Shelters required victims quarantine and be tested for COVID-19 prior to entry, which could take up to two weeks. However, the government did not have quarantine facilities specifically for child trafficking victims. The government continued to provide emergency response to trafficking cases and reported it typically responded within 24 hours following receipt of a report. However, observers noted the CTU did not respond in a timely manner to cases referred by NGOs, international organizations, or others.

The government did not provide funding for or manage any trafficking specific shelters. Authorities placed adult female victims in NGO-run shelters for victims of gender-based violence, funded by an international organization; they placed adult male victims in safe houses operated by the security services. Victims did not have a choice of which shelter to use. Outside experts noted the shelters had strict rules restricting movement and communication; these restrictions caused some victims to run away from shelters or ask to be repatriated before authorities completed investigations. The Children's Authority placed child victims in government-funded children's homes in the community, which also could house children who were criminal offenders. The government consulted with trafficking survivors to develop a shelter program. The government initiated an Alternative Care Program (ACP) and trained its psychologists in cooperation with an NGO and an international organization to recruit potential foster caregivers, specifically for foreign children including potential child trafficking victims. An international organization reported that some victims requested assistance through local NGOs, private individuals, government agencies working with Venezuelan migrants, or through international organizations, which then referred the cases to the CTU.

The CTU reported victims participated in investigations and prosecutions against traffickers, and authorities did not detain, fine, or jail potential trafficking victims for unlawful acts traffickers compelled them to commit. The government reported 48 foreign victims entered the country illegally due to border closures; observers reported officials did not penalize them. However, some observers indicated that following police actions or immigration raids, authorities detained some foreign victims for violating immigration laws without screening for trafficking indicators.

Most victims lacked legal immigration status and feared being referred to immigration authorities for detention, fines, or reprisal from well-connected traffickers, including allegedly corrupt police and immigration officials. A victim's refugee status did not impact the victim's legal status in the country, and refugee children could not access public education,

heightening their risk for trafficking. Observers noted the lack of legal standing for those who illicitly entered the country seeking refuge or asylum heightened their vulnerability to trafficking. The victims from a May 2021 raid reportedly declined to participate in police operations, and authorities arrested one victim during the operation. The government reported detained migrants, or any individual or organization on their behalf, could post a security bond equal to the cost of deportation, but observers reported abuse, extortion, and exploitation in the application of this process and noted it increased victims' dependency on traffickers. Some trafficking victims who lodged complaints against immigration authorities subsequently faced immigration charges that resulted in deportation proceedings, and media reported authorities charged two immigration officers with procuring and selling forged immigration documents. The CTU relocated some foreign victims from detention facilities to shelters; it repatriated nine victims to Venezuela. According to NGOs, the Coast Guard and local authorities did not implement international best practices and screen detained refugees or asylum-seekers for trafficking indicators. In addition, NGOs asserted the Venezuelan embassy did not render assistance and its involvement in the repatriation process put individuals at risk if they had a legitimate fear of persecution. The government did not report measures to monitor Cuban medical professionals for trafficking indicators nor did it put protection measures into its agreement with the Cuban government to prevent forced labor.

Foreign adult victims who agreed to cooperate with an investigation could remain in the country for the duration of court proceedings and work legally; they could apply for permanent residency after the completion of court proceedings. Foreign victims frequently could not return to their countries of origin because they did not possess valid identification or travel documents; in many cases, the traffickers held their original documents. The government offered some immigration relief for potential victims at the end of the previous reporting period by initially extending the registration cards for Venezuelan refugees and migrants through July 2021; however, this was only available for 16,523 individuals previously registered in 2019, not for more numerous recent arrivals. Although the government periodically extended the permits through the end of 2021, it closed the process to new applicants following the original registration period and did not renew the permits, which lapsed in 2022. Authorities said the registration card allowed them to work in the country but not obtain other official documents. The Children Court provided protections for children involved in trafficking cases. Despite progress in court procedures allowing victims to testify remotely without being in the same courtroom as traffickers, many victims eventually preferred to be voluntarily deported rather than wait for a case to be brought to trial, which could take several years. Observers noted victims were often re-traumatized when courts granted bail to alleged traffickers. The anti-trafficking law provided for restitution in trafficking crimes, but courts did not order any restitution during the reporting period. The government established standard operating procedures between the CTU and the Criminal Injuries Compensation Board, which managed the victim compensation program; the procedures were not used due to a lack of convictions. The government trained social workers, NGOs, hotline operators, police, and a private taxi firm on trafficking indicators and screening. In February 2022, the government published guidelines to reduce second-hand trauma among front-line workers interacting with victims.

## PREVENTION

The government increased efforts to prevent trafficking. The National Task Force Against Trafficking in Persons (task force), which included 10 agencies and five NGOs, coordinated national efforts. It expanded its duties to lead the implementation of the draft NAP and collaborated with the CTU on anti-trafficking efforts. The government consulted with NGOs, international organizations, foreign embassies, religious bodies, a university, and survivors to draft a NAP for 2021-2023 that included efforts to identify official complicity in trafficking crimes; the NAP was still pending cabinet approval at the end of the reporting period, but agencies began its implementation. The government sought the input of survivors in its policies. In June 2021, the Minister of National Security established a Strategic Working Committee, which met bi-weekly to address policy and operational issues affecting the CTU and its partner agencies. Trafficking committees and interagency task forces continued to meet during the pandemic. The CTU submitted quarterly reports and an annual report to

the task force for approval, although the government did not make these reports available to the public. The government issued press releases and participated in Parliamentary hearings on trafficking. The government did not provide its overall budget allocations for trafficking for 2021; the last time the government provided a budget, in 2017, it totaled 7 million TTD ($1.04 million).

The CTU operated a 24/7 English-language trafficking hotline, through which it identified three victims, referred three individuals for care, and launched four criminal investigations, compared with receiving 47 calls and referring one case for investigation in the previous reporting period. The police also launched a Spanish version of its mobile phone app to report crimes. A 24-hour bilingual hotline operated by an NGO identified one victim. The government publicized the hotline, but an international organization reported the hotline was not widely used. Observers noted the need for more Spanish-language operators for the hotline. The CTU had a weekly radio program and news column dedicated to trafficking issues. The government conducted extensive online and in-person outreach in English and Spanish on trafficking awareness, the use of social media to recruit victims, and labor rights for both government employees and the general public.

The Employment Exchange Act prohibited recruitment fees. Labor recruiters required a license to operate; the licensing officer could accept as equivalent a license issued by the competent authority of a foreign country. However, the Ministry of Labor did not report how many recruiters authorities had licensed under the Act, and the government had never appointed a licensing officer. Forced labor cases could be referred to the labor inspectorate for investigation, and the inspectorate met with employers about paying employees unpaid wages. The law did not differentiate between citizens and foreign employees. Domestic workers were covered under the law, but observers noted the oversight and regulation of domestic workers remained weak. The Ministry of Labor (MOLSED) did not finalize a labor migration policy, begun in 2019, that included measures to mitigate trafficking. The government trained all labor inspectors to use trafficking screening forms. The government produced online videos to reduce the demand for commercial sex; it also provided a presentation on trafficking to college-age men. The government reported its laws allowed for the prosecution of suspected sex tourists for crimes committed abroad and it developed draft legislation to strengthen the registration and reporting of sexual offenders; the legislation remained pending at the end of the reporting period. The government trained diplomats and other staff at overseas missions on trafficking indicators and victim identification during the first quarter of 2022.

**TRAFFICKING PROFILE**

As reported over the past five years, traffickers exploit domestic and foreign victims in Trinidad and Tobago, and traffickers exploit victims from Trinidad and Tobago abroad. Trinidad and Tobago also serves as a transit point for Venezuelan refugees and migrants en route to Europe, North Africa, and elsewhere in the Caribbean. The ongoing humanitarian crisis in neighboring Venezuela and the economic effects of the pandemic have contributed to a large influx of refugees and migrants who are at high risk for trafficking. An international organization reported more than 21,000 foreigners—86 percent Venezuelan and 6 percent Cuban—were registered with the international organization for asylum or refugee status in the country during the reporting period. Trinidad and Tobago closed its borders due to the pandemic from March 2020 through July 2021, but an international organization reported Venezuelans continued to arrive in large numbers on a daily basis. Unaccompanied or separated Venezuelan children are at increased risk for sex trafficking. Many victims enter the country legally via Trinidad's international airport, while others enter illegally via small boats from nearby Venezuela. Migrants from the Caribbean region and from Asia, in particular those lacking legal status, are at risk for forced labor in domestic service and the retail sector. Sex trafficking victims are women and girls primarily from Venezuela, Colombia, the Dominican Republic, and Guyana; traffickers offer employment in brothels and clubs, including via social media—which increased as a result of the pandemic—along with advertisements in Venezuelan newspapers and recruitment by other victims. NGOs reported some victims from a December 2021 raid had been forced to recruit other victims. Some trafficking networks operated through businesses acting as a cover for trafficking operations. Traffickers also exploit individuals from Puerto

Rico, the Philippines, the People's Republic of China, India, Nepal, and St. Vincent and the Grenadines. Traffickers are increasingly targeting and accompanying vulnerable foreign young women and girls between the ages of 15 and 21. LGBTQI+ persons are at risk for sex trafficking. In July 2021, 30 Cuban medical professionals followed a May 2020 group of 12 Cuban medical professionals to the country to assist with pandemic response efforts. Cuban medical professionals may have been forced to work by the Cuban government. Corruption in police and immigration has been associated with facilitating labor and sex trafficking. Observers report that law enforcement and security officials are implicated in trafficking, including coast guard officials who facilitate the transit of women and girls from Venezuela to the country; immigration and customs officers who ensure that women and girls arrive and receive entry; and members of the police who accept bribes to facilitate transport to houses across the country and work with brothel owners to protect their establishments from police raids, particularly in the southern police districts where most Venezuelan refugees and displaced persons attempt to enter the country. Transnational organized crime with a link to *megabandas*—large criminal gangs with more than 50 members who are part of transnational organized crime networks in Latin America—may increasingly be involved in trafficking. Traffickers coerce victims into exploiting their friends or associates in trafficking through fraudulent promises of gainful employment. Trinidad and Tobago is likely a sex tourism destination. After the country closed its borders in March 2020 due to the pandemic, recruitment shifted to online platforms, more victims arrived by sea through illegal points of entry, and trafficking moved from brothels, spas, salons, and bars to private, clandestine locations.

## TUNISIA: TIER 2

The Government of Tunisia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore Tunisia remained on Tier 2. These efforts included convicting sex and labor traffickers for the first time in three years. In addition, the government significantly increased investigations and prosecutions of alleged traffickers. The government publicly released its national victim identification and referral mechanism (NRM), thereby increasing awareness and coordination among government and civil society stakeholders, and continued to coordinate with civil society organizations to ensure all identified victims received appropriate care. However, the government did not meet the minimum standards in several key areas. The government identified fewer trafficking victims, and access to services was conditioned on official identification from a limited number of authorities, thereby possibly delaying identification and even subjecting unidentified victims to penalization for unlawful acts traffickers compelled them to commit. While the government provided some services for victims, overall government services appropriate for the needs of all trafficking victims outside of major cities remained limited. Despite training efforts, limited understanding of trafficking among officials and the small number of ministries that could legally identify trafficking victims slowed the process for victims to receive care.



TUNISIA TIER RANKING BY YEAR

**PRIORITIZED RECOMMENDATIONS:**

Continue investigating, prosecuting, and convicting traffickers and sentence convicted traffickers to significant prison terms, using the

2016 anti-trafficking law. • Fully implement formal procedures for all relevant officials to screen and proactively identify sex and labor trafficking victims—particularly among vulnerable groups such as domestic workers, undocumented migrants, children experiencing homelessness, and persons in commercial sex—and train officials on their use. • Authorize more government officials, including throughout the country, to officially identify trafficking victims to allow for more efficient access to protection services. • Train and build the capacity of judicial and law enforcement officials on the application of the anti-trafficking law, investigative techniques, and evidence collection specific to trafficking cases; witness and victim protection best practices during trial; and alternatives to victim testimony. • Expand implementation of the NRM using a victim-centered approach to ensure officials refer all trafficking victims to appropriate protection services and train law enforcement and judicial authorities on appropriately referring victims to care. • Provide adequate protection services to adult and child victims of all forms of trafficking, including appropriate shelter, psycho-social, long-term, and rehabilitative services tailored specifically to trafficking victims. • Train staff at government-operated centers for vulnerable populations to provide trafficking victims with appropriate and specialized care and increase resources for provision of care at these centers. • Improve coordination among government ministries to combat trafficking. • Provide funding or in-kind support to NGOs that provide care to trafficking victims. • Develop procedures, especially for law enforcement, judicial, and border officials, to ensure victims are not punished for unlawful acts traffickers compelled them to commit, such as prostitution and immigration violations.

## PROSECUTION

The government increased overall law enforcement efforts. Tunisia's anti-trafficking law, Organic Law 2016-61, enacted in July 2016, criminalized sex trafficking and labor trafficking and prescribed penalties of 10 years' imprisonment and a fine for offenses involving adult victims and 15 years' imprisonment and a fine for those involving child victims. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as kidnapping. Article 171 of the penal code criminalized begging and using children to beg and prescribed penalties of six months to two years' imprisonment.

In 2021, the Ministry of Interior (MOI) conducted a total of 332 investigations, which included 27 cases of sex trafficking, 122 cases of forced labor, 135 cases of child "economic exploitation" (forced labor), 12 cases of child forced criminality, and 36 unspecified forms of trafficking. This demonstrated a significant increase from the 181 investigations—73 cases of forced labor, 62 cases of "economic exploitation" (forced labor), 28 cases of sexual exploitation, and 10 cases of child forced criminality, and 8 unspecified forms of trafficking—the government initiated in 2020. The National Authority to Combat Trafficking in Persons ("National Authority")—the government's lead agency coordinating anti-trafficking efforts—reported the government, with the assistance of a legal aid NGO, initiated 200 new forced labor prosecutions under the anti-trafficking law in 2021. In addition, the government continued 114 sex trafficking prosecutions and 136 prosecutions for unspecified forms of trafficking initiated in previous reporting periods. This was a significant increase compared to 32 prosecutions in 2020. Courts completed 56 trafficking cases in 2021, resulting in eight convictions (one sex trafficking conviction, three child forced labor convictions, three forced begging convictions, and one forced criminality in drug trafficking conviction); seven of the convicted traffickers were convicted under the anti-trafficking law, and one was convicted of forced begging under Article 171 of the penal code. These were the first trafficking convictions since 2018. Of the 56 completed cases, courts issued 40 default judgements in cases where the defendants were tried in absentia, and an additional eight judgements were subject to appeal. Sentences ranged from four months' imprisonment to five years' imprisonment; of the seven convictions under the anti-trafficking law, at least five traffickers were sentenced to prison terms greater than one year. The government investigated an employee of a publicly-funded social assistance center for alleged complicity in child trafficking but otherwise did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes.

The Ministry of Justice (MOJ) designated a judge at each tribunal of first instance, for a total of 28, to serve as focal points to prosecute and investigate human trafficking cases. The MOI's special victims unit, established in 2017, included brigades of judicial police and national guard officers throughout the country who specialized in cybercrime and assistance to victims of trafficking and gender-based violence. The MOJ continued to monitor and maintain statistics on human trafficking cases brought before the judiciary through a specialized office; this office also had the authority to conduct research on the application of the anti-trafficking law and advise the Minister of Justice on policies related to the implementation of the law. Although pandemic-related restrictions and lockdowns limited in-person gatherings for a portion of the reporting period, the government—in coordination with international and civil society organizations—conducted a wide variety of anti-trafficking trainings for law enforcement and judicial officials, healthcare practitioners, social workers, and other government officials on identifying and assisting trafficking victims, as well as investigating and prosecuting trafficking cases. Nevertheless, insufficient training of judicial and law enforcement officials hindered investigations and victim identification efforts, and some officials conflated trafficking and migrant smuggling. The National Authority reported the lack of an independent budget and insufficient capacity building hindered the government's efforts to fully implement the law. Furthermore, civil society organizations reported there continued to be a low level of awareness among police and judicial authorities on the application of the anti-trafficking law and handling of trafficking cases. Due to their lack of familiarity with the law, some judicial officials used other laws that had less stringent sentences to prosecute and convict trafficking offenders. Observers also reported courts dismissed several potential trafficking cases due to a lack of evidence on the exploitative nature of the crimes; lack of victim or witness testimony also created challenges for officials to successfully prosecute and convict trafficking offenders.

## PROTECTION

The government maintained protection efforts. In 2021, the National Authority identified 718 trafficking victims; while this represented a decrease from the 907 victims it identified in 2020 and 1,313 identified victims in 2019, it was an increase compared with 780 in 2018 and 285 in 2017. More than half of the identified victims were women and children, and 387 were foreign victims from Algeria, Benin, Burkina Faso, Cameroon, Chad, Cote d'Ivoire, the Democratic Republic of the Congo, Djibouti, Guinea, Italy, Japan, Mali, Nigeria, Philippines, Senegal, Sierra Leone, Sudan, and Syria. Of the 718 identified victims, 107 were sex trafficking victims, 292 were labor trafficking victims, and 319 were subjected to unspecified forms of trafficking. During the reporting period, the government identified eight Tunisian victims in other Arab countries; the government provided reintegration assistance to six of the victims upon their return to Tunisia. The government referred or directly provided assistance to all identified victims of trafficking in 2021. The Ministry of Health (MOH) provided healthcare to 127 trafficking victims, including both Tunisian and foreign victims. NGOs reported the government continued to collaborate with civil society organizations to provide assistance to victims. The government also assisted in the repatriation of 38 Tunisian trafficking victims in 2021: 27 women and 11 men. The government continued assisting the reintegration of 34 female Tunisian trafficking victims repatriated in 2020, who Tunisian authorities identified in Gulf countries in 2018 and 2019.

The government continued implementing the NRM, which streamlined all stages of the referral process from victim identification and assistance to civil and criminal proceedings. In December 2021, the National Authority publicly released the NRM and published the NRM on its website in both Arabic and French. Judicial and border police continued to have practices in place to screen for potential trafficking victims among those who overstayed their legal residency or who were subject to expulsion after serving a prison sentence. The government also provided practical guides to security officers and judicial police on victim identification techniques. In addition, the Ministry of Social Affairs (MSA) continued to train all labor inspectors to identify potential trafficking victims; there were 26 labor inspectors and 24 social workers in the MSA's labor inspectorate that were trained as specialized points of contact for child trafficking victims. Despite these efforts, the National Authority and

MOI special victims unit were the only government entities authorized to officially identify trafficking victims, thereby allowing victims access to state-run services and requesting exemptions from exit visas for foreign victims. During the reporting period, the National Authority requested exemptions from exit penalties for 38 potential trafficking victims; the Ministry of Finance approved all requests. NGOs continued to report that the limited number of ministries that could legally identify trafficking victims slowed the process for identification and, subsequently, for victims to receive care. Moreover, insufficient interagency coordination and resources reportedly hindered the timely identification and referral to services for trafficking victims. In addition, civil society organizations reported the special victims unit did not have sufficient personnel or resources to provide adequate assistance to trafficking victims, nor did personnel have the cultural understanding or training to communicate with vulnerable migrants from the sub-Saharan African population, including potential trafficking victims. Civil society organizations also expressed concern that the government's process to provide exemption from visa penalties for foreign trafficking victims was slow and cumbersome, thereby creating difficulties for civil society to assist victims in a timely manner. As a result of the official identification procedures and the other constraints outlined above, civil society noted authorities may have punished some unidentified victims for unlawful acts traffickers compelled them to commit, such as prostitution or immigration violations.

The MSA continued to operate two shelters for children in Tunis and Sidi Bouzid and shelters for adults in Tunis, Sousse, and Sfax; at least two of the five shelters had designated areas for trafficking victims where victims could enter and exit freely and return on a regular basis for assistance seeking employment. The five MSA shelters supported 129 victims in 2021, including 47 women, 35 men, and 35 boys. The MSA shelters provided psychological care, family reintegration, social support, material assistance, professional integration, and health services. The MSA—in collaboration with an international organization—continued to provide training for the centers' staff on rehabilitation and care for trafficking victims. The MSA and National Authority continued to uphold an agreement, signed in January 2019, for the MSA to dedicate one room in all social care centers for victims of trafficking and violence. An MOH-operated hospital in Tunis continued to have a unit with trained personnel dedicated to caring for victims of violence, including sexual exploitation, which offered psycho-social support, medical documentation, and legal expertise; the government did not report if this unit assisted any trafficking victims. The government's rehabilitation center for torture victims could also assist trafficking victims with psychological and therapeutic support; the rehabilitation center assisted 18 trafficking victims with short-term psychological support in 2021. The government ran 79 youth centers around the country that provided psycho-educational services to at-risk children ages six to 18, including child trafficking victims, one of which was dedicated solely for abandoned or otherwise vulnerable children, including child trafficking victims; however, the government did not report if any child trafficking victims received assistance at these centers during the reporting period. Civil society contacts reported there were overall limited services throughout the country for child trafficking victims, especially long-term, reintegration, and relocation services. Despite the centers and services provided by the MSA and MOH, the National Authority and civil society partners continued to report the country lacked sufficient shelters to support vulnerable populations, including trafficking victims. Although the National Authority and NGOs partnered to reintegrate victims into society, the lack of resources, trained personnel, and sufficient shelter beds—especially outside of Tunis—created challenges in doing so. The government offered foreign trafficking victims legal alternatives to their removal to countries where they might face hardship or retribution. The anti-trafficking law provided all identified foreign trafficking victims relief from deportation; the government did not report whether it provided temporary relief from deportation for any foreign trafficking victims in 2021. Victims had the right to free legal aid to assist them in engaging in civil and criminal proceedings against their traffickers and provisions to protect victims' privacy during court proceedings, such as recorded testimony and physical protection. The government allowed trafficking victims a 30-day reflection period, renewable once, while they decided whether to assist law enforcement; victim assistance

was not dependent on assisting law enforcement. Prosecutors could seek restitution in trafficking cases; however, the government did not report whether courts issued restitution in trafficking cases in 2021. Trafficking victims could request legal aid to assist them in civil suits; the government did not report whether courts ordered defendants to pay compensation in the form of damages through civil suits during the reporting period.

## PREVENTION

The government maintained overall efforts to prevent trafficking. The government drafted, but had not yet adopted, a 2022-2023 national strategy and action plan to combat trafficking, and the MOJ continued to lead the National Authority, which included representatives from 13 ministries and experts from civil society. The National Authority continued implementing and updating its contingency plan drafted in 2020 to manage its crisis response to trafficking amid the pandemic and to prepare for similar situations in the future. Decree law number 2019-653 issued in 2019 established operating procedures and guidelines for the National Authority and four specialized commissions to focus on monitoring and evaluation, research, training and development, and tracking victim cases. The National Authority continued to consult a network of trafficking survivors established in 2019 that served as a council to share experiences, advise, and present recommendations to the committee to help improve its work. During the reporting period, the National Authority completed its annual report that detailed its activities in 2020 and recommendations on how to improve the government's fight against human trafficking; the National Authority published the report in October 2021. In addition, the government partnered with several international organizations and academic institutions to research trafficking trends in Tunisia, including the intersection of trafficking and irregular migration; the government plans to publish the results of these studies in 2022. The government continued to conduct numerous anti-trafficking public awareness and information campaigns, at times in partnership with civil society organizations, including workshops for journalists and media engagements. The government continued to operate a hotline to report potential trafficking crimes, which was operational five days a week during regular business hours and whose operators spoke Arabic, French, and English. The hotline received 1,505 calls in 2021, but the government did not report identifying any potential trafficking victims through the hotline; 70 percent of calls were related to case follow-up, and 16 percent of calls were related to requests for interviews. In 2020, the government did not report the number of calls to the hotline but reported identifying three potential trafficking victims through the hotline.

The government continued to make efforts to address fraudulent labor recruitment practices. The Agency for Placement Abroad in Private Establishments (EPPA) continued to regulate private labor recruiters and had 31 EPPAs in Tunisian embassies abroad to oversee labor migration. Article 4 of Law 2010-2948 on EPPAs prohibited worker-paid recruitment fees. The Ministry of Vocational Training and Employment (MFPE) coordinated with the Ministry of Foreign Affairs, Immigration, and Tunisians Abroad and created labor attaché positions at the Tunisian embassies in Qatar, France, and Saudi Arabia. The MFPE also maintained three resource centers for Tunisian labor migrants to offer support and services before, during, and after traveling abroad for work. In addition, the Directorate General for Immigration continued to coordinate with the Minister of Vocational Training and Employment to combat illegal job recruitment agencies. The National Agency for Employment and Independent Work (ANETI) maintained a network of 120 approved private recruiting agencies, 1,000 job advisors, and an online platform to improve employment searches in Tunisia and prevent exploitative work contracts. ANETI raised awareness about its work and advised job seekers to avoid communicating with unauthorized recruitment agencies as they may use exploitative contracts. The government also used a Qatar-Tunisia visa center to organize the process of recruiting Tunisians to work in Qatar and oversee employment contracts. In July 2021, Law No.37 of 2021 was published in the official gazette to regulate domestic work. The law defines the terms of employment for domestic workers and the rights and obligations of the employer and wage earner, as well as monitoring and inspection mechanisms; the government did not report on the status of implementation of the law by the end of

the reporting period. Nevertheless, civil society organizations reported concerns the government did not provide sufficient initiatives to address the internal child domestic servitude problem. The government did not report efforts to reduce the demand for commercial sex acts or child sex tourism.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Tunisia, and traffickers exploit victims from Tunisia abroad. Some Tunisian children are vulnerable to forced labor and sex trafficking in Tunisia. During the reporting period, the government reported child sex trafficking, including online sexual exploitation and recruitment through social media, increased during the pandemic; the government also reported family members were at times the alleged trafficker(s). Tunisian girls working in domestic service for wealthy families in Tunis and major coastal cities are highly vulnerable to trafficking, experiencing restrictions on movement, physical and psychological violence, and sexual abuse. Tunisian children—many of whom dropped out of school and were between the ages of 11 and 12 years old—worked in small workshops, auto mechanic garages, and domestic service; some of these children may be vulnerable to trafficking. International organizations report a continued presence of children who were homeless or street vendors and rural children working in agriculture to support their families in Tunisia; these children are vulnerable to forced labor or sex trafficking. Tunisian officials reported organized gangs reportedly forced children who were homeless to serve as thieves and beggars and to transport drugs. Tunisian women are reportedly exploited in sex trafficking under false promises of work, both within the country and elsewhere in the region, such as Lebanon, the United Arab Emirates, and Jordan.

Foreign migrants are particularly vulnerable to sex trafficking, domestic servitude, and other forms of forced labor in Tunisia. According to an NGO, foreign trafficking victims typically arrived in Tunisia on a valid tourist or student visa and remained in an exploitative situation for an average of five to 13 months, surpassing the validity of their visa. Civil society and international organizations continue to report an increase in traffickers exploiting women, primarily from West Africa and increasingly from Cote d'Ivoire, in domestic servitude in private homes in Tunis, Sfax, Sousse, and Gabes. An NGO also reported traffickers forced some men from Cote d'Ivoire to work on farms and construction sites. Traffickers reportedly coerce Ivoirians to smuggle cannabis and opioids into Tunisia. According to a Tunisian NGO, recruiters in Cote d'Ivoire target both well-educated and non-skilled individuals in the country with false and fraudulent promises of work in Tunisia. Well-educated Ivoirians, who pay a recruiter to assist them to find work in Tunisia, are promised jobs that do not exist upon arrival in Tunisia, are held in debt bondage, and are forced into domestic service in Tunisian households. Recruiters also target unskilled and uneducated individuals primarily from San Pedro, Cote d'Ivoire, to work in domestic service, construction, or agriculture in Tunisia; these individuals are then required to repay the transportation costs and recruitment fees upon arrival and are thereby held in debt bondage by their employers. Civil society organizations continue to report traffickers appear to coach some of their victims on how to answer questions about their trafficking experiences so victims can access benefits—such as a reprieve from exit fines—which would further allow the traffickers to exploit victims. An NGO reported that female victims of domestic servitude and other forms of forced labor, whose employers hold them in debt bondage, are further exploited by nightclub owners that cater to sub-Saharan African communities in Tunisia. The nightclub owners falsely promise to pay the women's debts in exchange for working in the nightclubs as servers, but the owners subsequently force the women into commercial sex for the nightclubs' clientele. Civil society organizations also report male migrants from sub-Saharan Africa, who work in poor working conditions in Tunisia, could be vulnerable to forced labor. Tunisian LGBTQI+ rights associations report migrants and asylum-seekers from neighboring countries who escaped violence or discrimination due to their gender identity or sexual orientation may be particularly vulnerable to sex trafficking and forced labor in Tunisia. NGOs and international organizations observe a slight increase in boys from sub-Saharan and West Africa, including Cote d'Ivoire, who were vulnerable to trafficking after accepting fraudulent offers of soccer

careers in Tunisia. In 2020 and 2021, Italian authorities reported a sharp increase in undocumented Tunisian migrants arriving in Italy, in part due to pandemic-related economic fallout; these undocumented migrants were vulnerable to trafficking.

# TURKEY: TIER 2

The Government of Turkey does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Turkey remained on Tier 2. These efforts included convicting more traffickers and identifying more victims. The government improved coordination by convening anti-trafficking boards in all provinces and continued to expand delivery of trainings. The Turkish National Police Department of Migrant Smuggling and Border Gates (DMSBG) increased its number of officers dedicated to trafficking and conducted joint inspections with labor inspectors for the first time. The Gendarmerie created working groups to coordinate law enforcement efforts, and the government expanded the number of Judicial Support and Victims Services Offices (JSVSO) and judicial interview rooms. The government allocated more resources to in-kind assistance to victims and designated the Turkish Human Rights and Equality Institution (THREI) as the National Rapporteur for anti-trafficking. However, the government did not meet the minimum standards in several key areas. Courts continued to acquit most of the defendants prosecuted for trafficking, and prosecutors often referred trafficking cases to general investigative police departments, which did not possess specialized skills and knowledge necessary to investigate trafficking. Many judges and prosecutors lacked experience and resources to prosecute complex cases and lacked efforts to encourage victims to voluntarily cooperate in investigations, resulting in the government dropping, acquitting, or reclassifying cases to lesser crimes. The government did not maintain the capacity to accommodate and provide specialized support to all victims, and domestic civil society stakeholders did not participate in anti-trafficking efforts. The government did not update its national action plan, in place since 2009.



TURKEY TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers. • Expand and institutionalize training to investigators, prosecutors, and judges on victim-centered approaches to trafficking cases, including advanced training on trafficking investigations and prosecutions. • Establish procedures or structures, such as a specialized prosecutorial unit, to ensure trafficking cases are handled by trained prosecutors and investigators. • Increase and strengthen specialized services, including shelter and psycho-social support for all victims. • Increase proactive victim identification efforts among vulnerable populations, such as refugees and asylum-seekers, persons in LGBTQI+ communities, migrants awaiting deportation, Turkish and foreign women and girls in commercial sex, and children begging in the streets and working in the agricultural and industrial sectors. • Expand partnerships with civil society to better identify victims and provide victim services. • Encourage victims' participation in investigations and prosecutions, including using remote testimony or funding for travel and other expenses for victims to attend court hearings. • Continue to improve interagency cooperation and adopt a national action plan. • Train judges on restitution in criminal cases, establish procedures to seize assets from traffickers, and create

TURKEY

effective methods to allocate restitution in a timely manner. • Inform all identified victims of their right to pursue compensation and encourage them to do so. • Increase resources to the labor inspectorate to fully inspect and monitor businesses and workplaces for forced labor.

## PROSECUTION

The government increased prosecution efforts. Article 80 of the penal code criminalized sex trafficking and labor trafficking and prescribed penalties of eight to 12 years' imprisonment and a fine, which were sufficiently stringent and, with regard to sex trafficking, commensurate with those for serious crimes, such as rape. The government investigated 408 new cases with 591 suspects, compared with 269 cases with 880 suspects in 2020. The government continued to investigate 198 cases with 535 suspects from previous years. The Ministry of Justice (MOJ) prosecuted 78 new cases with 238 defendants, compared with 68 new cases with 347 defendants in 2020. The MOJ continued to prosecute 314 cases with 1,808 defendants from previous years. Courts convicted 72 traffickers, compared to 30 traffickers in 2020. Judges sentenced all traffickers with imprisonment and 61 traffickers with an additional fine, but the government did not report length of sentences. Courts continued to acquit most defendants prosecuted for trafficking; courts acquitted 267 of 339 defendants and 177 of 214 defendants in 2020. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes.

Turkish National Police (TNP) maintained DMSBG that specialized in trafficking investigations. DMSBG increased the number of officers at headquarters to 141 from 114 in 2021 and maintained offices in all 81 provinces with approximately 1,600 officers. For the first time, DMSBG conducted 664 joint inspections with labor inspectors on unregistered businesses; joint inspections identified labor violations but did not lead to any trafficking cases. The Gendarmerie maintained the Department of Counter Migrant Smuggling and Human Trafficking (DCST) with jurisdiction to investigate trafficking in rural areas. The Gendarmerie created trafficking working groups in 33 provinces identified as "high risk" to share intelligence and coordinate investigations and inspections.

Prosecutors often referred cases to general investigative departments, rather than the specialized TNP or Gendarmerie units, which did not possess the skills and knowledge necessary to investigate trafficking. Additionally, a lack of experience and specialization among prosecutors and judges regarding trafficking limited the government's ability and means to prosecute complex crimes like trafficking. Experts continued to report misperceptions about trafficking among law enforcement authorities, including confusion between sex trafficking and "encouragement of prostitution" (Article 227) or labor trafficking and "violation of freedom of work and labor" (Article 117). Judiciary officials dropped and/or reclassified cases to lesser offenses, or acquitted defendants due to a lack of evidence, particularly a lack of testimony, as victims and witnesses rarely participated in court proceedings. The government, independently and with technical and financial support from international organizations, provided various anti-trafficking trainings to TNP, Gendarmerie, prosecutors, and judges. The government cooperated with authorities from Austria, Bulgaria, Indonesia, Moldova, Germany, Georgia, and Taiwan on trafficking investigations. The government also extradited a suspected trafficker from Germany and requested the extradition of five suspected traffickers from Georgia.

## PROTECTION

The government increased victim protection efforts. The government identified 349 victims, an increase compared with 276 victims in 2020. Of these, 201 were victims of sex trafficking, 133 were victims of forced labor, 14 were victims of child soldiering, and one victim's exploitation was not reported; 322 were female, and 81 were male; 120 were children; and 361 were foreign nationals. The government continued to support children recruited by the PKK, successfully reintegrating 14 victims. Standard operating procedures (SOPs) provided guidelines for identifying and referring victims to assistance and required first responders to refer potential victims to the Presidency of Migration Management (PMM), which officially recognized victims. DMSMG referred 145 potential victims, and DCST referred 360 potential victims to PMM. PMM maintained two identification experts in each of the 81 provincial offices to interview victims; PMM interviewed 8,077 potential victims, a significant increase compared with 4,919 potential victims in 2020. The Ministry of Family and Social Services (MOFSS) operated 274 mobile teams in all 81 provinces that conducted outreach to children who were homeless or used the streets as a source of livelihood. While international organizations reported awareness and implementation of screening procedures increased from trainings over the past years, law enforcement and other first responders did not consistently screen or proactively identify victims. Law enforcement did not effectively differentiate elements of sex trafficking and "encouragement of prostitution;" and observers continued to report limited capacity among first responders and inadequate proactive identification efforts, particularly for forced labor, Turkish nationals, children, and persons in the LGBTQI+ community. The government did not proactively identify victims in highly vulnerable refugee and migrant communities. For example, media and civil society reports continued to indicate forced repatriation to Syria without screening for indicators of trafficking. PMM trained police, civil servants, migration specialists, social workers, psychologists, hotline operators, officials, and PMM staff on victim identification.

The government did not report the total amount allocated for anti-trafficking efforts in 2021 or 2020 and did not provide funding to domestic NGOs. However, PMM reported allocating 313,967 lira ($24,230) for in-kind assistance to victims, including hygienic products and travel costs, an increase compared with 172,083 lira ($13,280) in 2020. The Ankara Municipality government also provided 38,311 lira ($2,960) for operational costs at the anti-trafficking shelter in Ankara. The law entitled officially identified trafficking victims to services, including shelter, medical and psycho-social services, work options, education, translation services, temporary residency, repatriation assistance, vocational training, and legal counseling; the government provided support services to 149 victims, a decrease compared with 209 victims in 2020. The Kirikkale Municipal government dispersed 100 lira ($7.72) per month to adult victims with an additional 100 lira ($7.72) for each of their children, and the Ankara Municipal government dispersed 300 lira ($23) per month to adult victims and 50 lira ($3.86) for each of their children. The government did not report the number of victims that received financial assistance (22 in 2020). The Kirikkale and Ankara Municipal governments allocated 39,970 lira ($3,090) and 27,500 lira ($2,120) for cash assistance, respectively.

PMM operated three specialized shelters for trafficking victims; the shelter in Kirikkale had the capacity to accommodate 20 victims, the Ankara shelter could accommodate 30 victims, and the Aydin shelter could accommodate 40 victims. While PMM started plans to open two new shelters by the end of 2022, observers continued to report the lack of capacity to accommodate and provide specialized support to all victims and shortages in clothing and supplies at the shelter in Ankara. Additionally, victims stayed at PMM-run shelters for longer than expected due to the pandemic, which exacerbated limited capacities. MOFSS operated 145 shelters with the capacity to accommodate 3,482 people that provided accommodation for victims of violence, including trafficking victims, and the government-operated Monitoring Centers for Children provided support to child victims of violence. The PMM-run shelters and MOFSS-run shelters allowed victims to leave the shelter voluntarily once security officials completed an assessment and deemed conditions safe. PMM maintained a manual for shelter staff with SOPs on service provision and rules for shelter operations. The government provided COVID-19 tests and personal protective equipment to victims staying at the shelters. The government provided job placement support to victims but did not report the number of victims that found employment through job placement (three in 2020). PMM drafted protocols and procedures for cooperating with domestic NGOs on shelter operations; however, civil society actors continued to express concern that the government's victim protection efforts were not sufficiently inclusive of NGOs, including funding of independent organizations.

The government reported screening migrants for trafficking indicators in deportation centers. The law entitled foreign victims to a temporary residence permit for 30 days, which authorities could extend up to three years with the option to apply for a work permit. PMM, in cooperation with an international organization, operated 26 repatriation centers, covered costs, and maintained repatriation protocols, including escorting victims to passport control; the government voluntarily repatriated 91 victims. Observers reported victims often chose not to participate in prosecutions and repatriate as soon as possible, partly due to the lack of options for accommodation outside of shelters. Judges and prosecutors reported procedural law does not allow victim statements prior to repatriation

Haiti AR_001035

as evidence in court proceedings, and observers reported that limited opportunities to encourage victim cooperation in prosecutions with victim-centered approaches, protection measures, and legal assistance exacerbated the high number of acquittals and cases prosecuted under lesser charges. The government expanded the number of JSVSO dedicated to providing legal assistance and psycho-social support to 161 courthouses (106 in 2020) and increased the number of judicial interview rooms, which allowed victims to testify in private to reduce re-traumatization, to 120 rooms in 115 courthouses (86 courthouses in 2020). The law provided witness protection and legal aid; the government provided legal support to 40 victims but did not report how many victims participated in criminal investigations or legal procedures. Criminal courts often did not issue restitution and recommended victims pursue compensation through civil suits; however, civil courts often required a criminal conviction, which could take years, before awarding victims with compensation. Criminal courts did not issue restitution, and the civil courts did not issue compensation in 2021, 2020, and 2019.

## PREVENTION

The government maintained prevention efforts. The government did not update its national action plan, in place since 2009. The Coordination Board for Combating Trafficking (the Board) coordinated interagency anti-trafficking efforts and convened in December 2021. The Board adopted a decision to officially designate the THREI as the national rapporteur for anti-trafficking, for the first time, with the responsibility to monitor government anti-trafficking efforts. The government also maintained provincial coordinating boards for anti-trafficking for all 81 provinces that met at least once during the year and implemented anti-trafficking efforts at the provincial level. The Board and PMM continued to publish annual data reports. PMM and other government institutions organized awareness campaigns targeting the public, rural areas, and students. PMM maintained a 24-hour migration-related national hotline in seven languages, whose operators were also trained to handle trafficking-related calls; calls to the hotline led to six identified victims and initiated 10 prosecutions.

The law required recruitment agencies to maintain a license, approve all contracts with the government, seek worker agreement in contract changes, and provide foreign workers with information on trafficking. However, resources and inspections were insufficient to effectively monitor and enforce prohibitions against the use of child labor. Inspectors did not generally visit private agricultural enterprises employing 50 or fewer workers unless a complaint was filed, resulting in enterprises vulnerable to forced labor. The law allowed both Syrians under temporary protection and non-Syrian conditional refugees the right to work, provided they were registered in the province they wished to work in for at least the preceding six months. Applying for a work permit was the responsibility of the employer, and refugee advocates reported the procedure was burdensome and costly, resulting in few employers pursuing that path. As a consequence, the vast majority of conditional refugees and those under temporary protection remained without legal employment options, leaving them vulnerable to exploitation, including trafficking. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Turkey, and traffickers exploit victims from Turkey abroad. Trafficking victims in Turkey are primarily from Central and South Asia, Eastern Europe, Azerbaijan, and Syria. Of the 349 victims identified in 2021, most were Syrian (159), followed by Uzbek (63), Afghan (22), and Kyrgyz (12). Traffickers reportedly exploited some Georgian men and women in forced labor and some Turkish men in forced labor in Israel and Moldova. Romani children were frequently seen on the streets in major cities where they worked as garbage collectors, street musicians, and beggars, raising concerns about exploitative conditions and forced labor. Human rights groups reported commercial sexual exploitation, including sex trafficking, remained a problem in the LGBTQI+ community, which faced discrimination and hostility from both authorities and the local population. Due to the pandemic, traffickers increasingly focused on recruitment of victims for domestic servitude and increased their use of online recruitment methods, including social media, dating sites, and online job search platforms. Due to COVID restrictions on business operations

that historically employ victims, such as entertainment venues, beauty centers, and massage parlors, traffickers were more likely to exploit victims in private homes for both sex trafficking and forced labor. Agricultural workers, particularly hazelnut farmers, were vulnerable to forced labor with low pay, wage withholding, long hours, and hazardous working conditions, and at times, middlemen coerce farmers into indentured servitude with loans between harvests. The PKK, a U.S.-designated terrorist organization, recruited and forcibly abducted children for conscription. There were also reports that some women detained by non-state armed groups in Syria were likely transported and exploited in Turkey. In previous years, reports from human rights groups and international bodies indicate the government provided operational, equipment, and financial support to a Turkish-supported armed opposition group in Syria that recruited child soldiers.

Turkey continues to host a large refugee population that remains highly vulnerable to trafficking and exploitation: approximately 3.7 million displaced Syrians and more than 350,000 refugees of other nationalities resided in Turkey during the reporting period. Criminal networks coerce and pressure Syrian women and girls into sex trafficking. NGOs report refugee camp officials and volunteers collaborate with criminal networks to recruit girls with false job offers into sex trafficking, while Syrian boys remained vulnerable to sex trafficking with allegations of rape and sexual abuse at refugee camps. Syrian girls as young as 12 are married to adults in unofficial religious ceremonies, particularly in poor and rural regions, and subsequently are vulnerable to domestic servitude and sex trafficking. Reports claim the number of Syrian refugee families who married off their underage daughters to Turkish men as an economic coping mechanism increased in the wake of the pandemic, as did the rate of children participating in child labor. Syrian and other refugees, including children, are vulnerable to forced labor from engaging in street begging and also reportedly working in agriculture, restaurants, textile factories, markets, shops, and other workplaces. Experts report children work long hours with low wages, in some cases in substandard working conditions.

## TURKMENISTAN: TIER 3

The Government of Turkmenistan does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Turkmenistan remained on Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including by continuing to participate in anti-trafficking awareness campaigns and continuing to purchase equipment for mechanization of the cotton harvest to reduce its dependence on handpicking. However, there was a government policy or pattern of forced labor; the government continued to direct policies that perpetuated the mobilization of adults and children for forced labor in the annual cotton harvest, in public works projects, and in other sectors in some areas of the country. The government's denial of access to independent monitoring missions prevented robust observation of the cotton harvest. The government did not report any investigations, prosecutions, or convictions; did not hold any officials accountable for their complicity in forced labor crimes; identified no victims; and did not fund any victim assistance programs.



**TURKMENISTAN TIER RANKING BY YEAR**

## PRIORITIZED RECOMMENDATIONS:

End government policies or actions that compel or create pressure for the mobilization of forced labor, to include eliminating the cotton and silk production quotas, mandatory participation in public works, and

the practice of requiring fees for replacement pickers or contributions from businesses and entrepreneurs to support the harvest. • Grant independent observers full access to freely and independently monitor cotton cultivation and deliver an unfiltered report of the annual cotton harvest, and cease the harassment, detention, and abuse of individuals for documenting labor conditions. • Amend the provision, under Article 8 of the Labor Code, that allows for the mobilization of civilians into public works, which would include cotton harvesting. • While respecting due process, investigate and prosecute suspected sex and labor trafficking offenses under Article 129/1 of the criminal code; convict, sentence, and incarcerate traffickers, including government officials complicit in the mobilization of forced labor. • Provide victim care services directly or by otherwise funding organizations to do so, including for male victims, in accordance with provisions of the 2016 anti-trafficking law. • Finalize, implement, and train police, migration officers, and other relevant stakeholders on standard operating procedures (SOPs) to identify and refer victims to protection services. • Allocate direct financial resources for implementation of the National Action Plan (NAP). • Establish, train relevant personnel on, and implement labor inspection and recruitment oversight protocols to improve forced labor identification and prevention. • Train police to detect and investigate sex and labor trafficking crimes. • Establish a trafficking-specific hotline and publicize it among vulnerable communities. • Expand training for relevant government authorities on implementation of the provisions of the 2016 anti-trafficking law and article 129, as amended in 2016. • Increase awareness of trafficking and the labor rights of individuals among the general public through government-run campaigns or financial and in-kind support for NGO-run campaigns.

## PROSECUTION

The government maintained negligible anti-trafficking law enforcement efforts. Article 129/1 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of four to 10 years' imprisonment for offenses involving adult victims and eight to 15 years' imprisonment for offenses involving child victims; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Article 8 of the Labor Code separately defined "forced or obligatory labor" to exclude work "which is part of regular civil obligations of citizens."

The Prosecutor General's Office coordinates anti-trafficking efforts among law enforcement agencies. For the second consecutive year, authorities did not report initiating any criminal investigations (compared to one investigation in 2019) and, for the third consecutive year, they did not report any prosecutions or convictions (compared with one investigation and one prosecution in 2019). Authorities, in collaboration with an international organization, supported trainings for local government representatives based in Ashgabat and the five provinces on anti-trafficking policies and prevention of forced labor. Authorities also trained officials from the State Migration Service on anti-trafficking enforcement and laws. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Authorities did not report any efforts to end officials' mobilization of persons for forced labor in the cotton harvest, public works projects, or domestic service. According to one media report, the government sent to work in the cotton fields citizens who had utility or alimony debts or were detained in public places without masks, in violation of pandemic protocols; the police allegedly beat them with rubber truncheons if they refused. The government did not report efforts to investigate reports from the previous year where, under direct orders from the provincial government, police officers in Mary began detaining dozens of individuals experiencing homelessness and others suspected of being homeless and forcing them to work on farms, in domestic service—including in the residences of their relatives and friends—and in other capacities. It was previously reported that authorities threatened family members who attempted to locate relatives detained under this campaign. The government did not report any international investigations or extraditions of suspected traffickers. State-imposed restrictions on the access of independent observers to the cotton harvest likely impeded the detection and referral to law

enforcement of forced labor crimes; however, the government reported it has begun coordination with an international organization to arrange a monitoring mission of the cotton harvest for the first time in 2022.

## PROTECTION

The government maintained negligible protection efforts. For the third consecutive year, authorities did not identify any trafficking victims, compared with eight victims in 2018, one in 2017, and 11 in 2016. An international organization reported assisting 15 victims, including one female sex trafficking victim, eight female forced labor victims, and six male forced labor victims (compared with 13 female victims and five male victims in 2020); all victims of forced labor were Turkmen, but the organization did not report the nationality of the sex trafficking victim. The Government of Turkey repatriated two of the 15 victims from Turkey to Turkmenistan. The government reported 2,691 calls to the foreign-funded, international organization-run trafficking hotlines in Ashgabat and Turkmenabat since May 2020; nine victims were identified and referred to services, and all were migrants who returned to Turkmenistan before the government stopped commercial flights in response to the pandemic. The hotline in Turkmenabat ceased operations during the reporting period due to a lack of funding. The Ministry of the Interior also runs a general hotline for crimes, including trafficking in persons, but did not report any victims identified. The government did not publicize these hotlines as avenues for trafficking victims seeking to report their exploitation; NGOs published advertisements on government owned newspapers to raise awareness. An international organization reported that, due to the pandemic, almost all international travel throughout 2021 was suspended, drastically reducing the number of Turkmen citizens traveling abroad, which likely reduced the identification of potential victims of trafficking. Despite international organizations utilizing thorough victim identification protocols accepted by the wider international community, it was previously reported that the prosecutor general's office baselessly asserted that most trafficking claims were fraudulent. For the fourth consecutive year, the government failed to adopt and implement SOPs for victim identification and referral developed in partnership with an international organization in 2018. In previous years, law enforcement agencies only designated individuals as trafficking victims if their cases led to trafficking convictions.

The anti-trafficking law required the government to provide a wide range of services to trafficking victims, including shelter, food, medical care, and financial support; however, for the sixth consecutive year, the government did not provide comprehensive services to any trafficking victims, nor did it fund international organizations or NGOs to provide such services. Additionally, the government passed and enacted the Law on Social Services, effective January 2022, which requires that victims of crime, including trafficking victims, are provided a tailored aid package, which could include medical, financial, legal, educational, and employment support. NGOs indicated in prior years that some victims were required to pay for their own medical treatment. The law on the Legal Status of Foreign Citizens in Turkmenistan (Foreign Citizens Law), adopted in November 2021, entitled foreign victims to the same benefits as citizens. Currently, assistance to victims is only provided by international organizations in conjunction with local civil society. An NGO operated a foreign donor-funded shelter for female and child trafficking victims. The shelter could provide psychological counseling and local reintegration services, including housing, food, personal hygiene products, medical examinations, vocational training and job placement, and small grants to support livelihood generation, legal services, education, and transportation.

By law, victims—including those participating in criminal proceedings—were exempt from administrative or criminal liability for crimes their traffickers compelled them to commit. The legal code guaranteed victims the option to seek employment; required law enforcement agencies to respect their confidentiality; and provided free legal assistance for those who apply for official victim status, as well as the option to request temporary residency in Turkmenistan for the duration of relevant criminal proceedings. The trafficking law does not require victim participation in investigations or prosecutions of alleged traffickers in order to access protection services. The law also gives victim witnesses the right to state protection, which includes social support. The government did not report providing any of these forms of assistance, and there were

**UGANDA**

public spaces in advance of presidential visits and in unpaid support roles during government-sponsored parades and holiday celebrations. Authorities have also forced public servants and students to serve in uncompensated support roles during government-sponsored events, such as the 2018 World Weightlifting Championship and World Bicycle Day; similarly, financial hardships stemming from land expropriation, forcible evictions, and home demolition in advance of high-profile sporting events may have made some communities vulnerable to trafficking. Police reportedly conduct sweeps to remove individuals experiencing homelessness and subsequently place them in agricultural work or domestic servitude at the residences of law enforcement-connected families. Families living in poverty often compel children to serve as porters in local marketplaces and to harvest carrots in the fields. Children are reportedly forced to work in cotton and potato fields during summer educational camps. Workers in the construction sector and at small-scale sericulture operations are vulnerable to forced labor. Turkmenistan's small stateless population—primarily consisting of undocumented residents with expired Soviet nationality documentation—are vulnerable to trafficking. Criminalization of consensual sexual intercourse between men makes some members of Turkmenistan's LGBTQI+ communities vulnerable to police abuse, extortion, and coercion into informant roles; widespread social stigma and discrimination against LGBTQI+ individuals also compound their vulnerability to family-brokered forced marriages that may result in corollary sex trafficking or forced labor indicators. Residents of rural areas in Turkmenistan are at highest risk of becoming trafficking victims, both within the country and abroad.

Turkmen men and women are subjected to forced labor after migrating abroad for employment in the textile, agricultural, construction, and domestic service sectors; Turkmen migrant men are also subjected to forced criminality in drug trafficking. Sex traffickers exploit Turkmen women abroad. Turkey, Russia, and India are the most frequent destinations of Turkmen victims, followed by other countries in the Middle East, South and Central Asia, and Europe. Enduring government restrictions on freedom of movement, preventing citizens from leaving the country, incentivize some citizens to pursue unofficial migration channels rife with trafficking vulnerabilities. Government austerity measures limiting certain foreign financial transactions, coupled with travel and entry restrictions, may increase the risk of sex or labor exploitation among Turkmen citizens stranded abroad during the pandemic.

## UGANDA: TIER 2

The Government of Uganda does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity; therefore Uganda was upgraded to Tier 2. These efforts included investigating and prosecuting more trafficking crimes; convicting the most traffickers ever reported in a single year; and developing robust standardized operating procedures (SOPs) for law enforcement and increasing trainings for investigators and prosecutors. Government officials increased use of the National Referral Guidelines for Management of Victims of Trafficking in Uganda (NRG), resulting in the government identifying more trafficking victims. For the first time in six years, the government reported directly assisting victims and referring victims to protection services. The government enacted new employment regulations to increase the ethical recruitment of Ugandan migrant workers; the government implemented these regulations by investigating and suspending more recruitment companies engaging in fraudulent and exploitative recruitment activities. The government allocated significantly more funds for anti-trafficking activities. However, the government did not meet the minimum standards in several key areas. Access to adequate services for some victims, particularly adult males and individuals in rural areas, remained limited, and the lack of shelters in the country, both long-term and short-term, continued to adversely affect the government's ability to adequately protect trafficking victims. The absence of victim-witness protection policies hindered some investigations and prosecutions; additionally, some law

enforcement officials lacked a victim-centered approach when working with victims, potentially discouraging them from participating in criminal proceedings. Government efforts to protect Ugandan trafficking victims exploited abroad, particularly among migrant workers, remained minimal.



### PRIORITIZED RECOMMENDATIONS:

Significantly increase the availability of shelter and specialized services for all trafficking victims—particularly adult males and victims identified in rural areas—including by partnering with and allocating sufficient funding to NGOs that provide victim care. • Strengthen the partnership between police and prosecutors to more efficiently and effectively complete the judicial proceedings of trafficking cases, including increased training on strong evidence gathering and victim-centered investigations. • Vigorously investigate and prosecute alleged traffickers, and sentence convicted traffickers, including complicit officials, to penalties as prescribed by the 2009 anti-trafficking law. • Using the NRG, systematically and proactively identify trafficking victims by screening vulnerable populations, such as refugees, asylum-seekers, individuals in commercial sex, children in the Karamoja region, and Cuban medical professionals, for trafficking indicators and refer all trafficking victims to appropriate services. • Enact witness protection legislation and implement a witness protection program for victims participating in criminal proceedings. • Increase protection for Ugandan trafficking victims exploited abroad, including by training Ugandan embassy staff to identify and assist victims, establishing and implementing additional bilateral labor agreements with destination countries, and assigning additional labor attachés to Ugandan embassies to monitor migrants abroad. • Consistently enforce strong regulations and oversight of labor recruitment companies, including eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable. • Strengthen the capacity of labor inspectors to identify and report potential trafficking crimes and refer victims of labor trafficking to appropriate services. • Establish and institutionalize the use of a centralized national data collection and reporting tool to synthesize and analyze nationwide law enforcement and victim protection data related to trafficking crimes. • Accede to the 2000 UN TIP Protocol.

### PROSECUTION

The government increased anti-trafficking law enforcement efforts. The Preventing Trafficking in Persons Act of 2009 criminalized sex trafficking and labor trafficking and prescribed punishments of up to 15 years' imprisonment for offenses involving adult victims and up to life imprisonment for those involving child victims. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as kidnapping. The Children Amendment Act of 2016 conflicted with the 2009 anti-trafficking act in some respects—for example, it defined child sex trafficking to require force, fraud, or coercion, which was inconsistent with the definition of trafficking under international law, and prescribed substantially lower penalties for the crime.

The Coordination Office to Prevent Trafficking in Persons (COPTIP) remained responsible for compiling law enforcement data. COPTIP continued to report "incidents" related to human trafficking, which included simple inquires up to full police investigations; the government did not provide a breakdown of the various categories that make up an incident or how many incidents resulted in full investigation. In 2021, the government reported investigating 421 incidents of human trafficking involving 501 suspects, a significant increase compared with 214 incidents involving 154 suspects in 2020. Of the 421 reported incidents of human trafficking, at least 278 involved exploitation in Uganda and at least 113 involved exploitation abroad; 30 incidents of trafficking were unknown.

The government reported initiating prosecutions against 537 alleged traffickers in 403 cases in 2021, a significant increase compared with prosecuting 283 individuals in 202 cases in 2020. Of the 403 cases filed, at least 256 involved sex trafficking, 103 involved forced labor, and 44 involved unknown exploitation; 357 involved exploitation in Uganda and 46 involved exploitation abroad. The government withdrew 11 cases due to lack of evidence, while 361 cases remained ongoing at the end of the reporting period. Courts convicted 30 traffickers under the 2009 anti-trafficking act—the most convictions ever reported in a single year—compared with 11 convictions in 2020. Of the 30 convictions, courts convicted 14 traffickers for sex trafficking and 16 for forced labor. Courts sentenced the majority of traffickers to significant prison terms, including the first reported life sentence for a trafficker convicted of child sex trafficking; the average sentence was approximately 10 years' imprisonment. Courts acquitted one trafficker for unspecified reasons. In response to the pandemic, courts nationwide closed or significantly scaled down operations from June 2021 to November 2021. During this time, some courts in urban areas utilized virtual options; however, the court closures exacerbated previous case backlogs. The Office of the Director of Public Prosecutions (ODPP) Department of Gender, Children, and Sexual Offenses held special court sessions to alleviate the case backlog related to sexual and gender-based violence, including potential trafficking crimes; ODPP did not systematically track trafficking cases tried during these special sessions.

Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Observers reported police officers and immigration officials, particularly at airports and border crossings, accepted bribes to facilitate trafficking crimes or to warn traffickers of impending operations and investigations. Media and senior government officials reported high-level officials may have owned or been associated with some labor recruitment companies suspected of trafficking. In 2021, the government investigated six government officials—including police officers, local defense units, and immigration officials—involved in potential trafficking crimes; all six cases remained ongoing at the end of the reporting period. Courts convicted one army officer charged with child sex trafficking in 2020 and sentenced him to six years' imprisonment.

The Criminal Investigation Directorate (CID) within the Ugandan Police Force (UPF) and ODPP maintained anti-trafficking units, which were responsible for responding to trafficking crimes and coordinating between law enforcement officers. In 2021, COPTIP, in partnership with other sections of the Ministry of Internal Affairs (MIA), established an anti-trafficking unit at major border crossings. In 2019, UPF announced the creation of an Anti-Trafficking Department within CID; however, the department remained awaiting final approval by the public service commission for the second consecutive year. While awaiting final approval and direct funding, the department relied on the UPF's Department of Sexual Offenses and Children Cases for resources. Officials continued to use an electronic application, set up by ODPP in response to pandemic-related movement restrictions in the previous year, to facilitate communication between police and prosecutors and to share best practices for human trafficking investigations and prosecutions across the country. In 2021, ODPP, in partnership with an NGO, developed and implemented a mobile phone app to collect and disseminate standardized data pertaining to human trafficking investigations and prosecutions, enabling government agencies to track suspected and convicted traffickers and nationwide trafficking trends.

The government, in partnership with NGOs and international organizations, trained police, border agents, immigration officials, and community elders on the anti-trafficking law, victim-centered investigation strategies, evidence gathering for successful prosecutions, and victim identification and referral procedures. During the reporting period, the UPF developed a best practices guide for anti-trafficking investigations and an anti-trafficking training manual for police training academies; the UPF also partnered with ODPP to create SOPs for investigating and prosecuting trafficking cases. ODPP also developed and disseminated new prosecution guidelines, which outlined best practices for prosecutors handling trafficking cases. The government allocated 50 million Ugandan shillings (UGX) ($14,140) to assist with prosecution-led investigations of trafficking cases, including support for victim protection. Despite more trainings and new protocols, some Ugandan police and immigration

officers continued to lack an understanding of the anti-trafficking law and may have misclassified trafficking cases as other crimes or collected insufficient evidence for trafficking cases to proceed to prosecution. Due to the limited availability of shelters and other protections, the government often quickly repatriated foreign victims before obtaining their testimony, which continued to impede the completion of trials. The government collaborated with the Government of Kenya and INTERPOL on one case involving forced labor in Kenya; the cooperation with foreign counterparts led to the arrest of three traffickers in Uganda, who regularly exploited Ugandan girls in Kenya. The UPF also coordinated with the Government of Kenya to conduct cross-border trainings on identifying and investigating trafficking crimes.

## PROTECTION

The government increased victim protection efforts. The government reported identifying 710 victims in 2021, compared with 257 victims in 2020. Additionally, the government also intercepted 305 potential victims using screening tools at sites known for transporting trafficking victims, including airports, border crossings, and internal highways; this compared with 378 potential victims intercepted in 2020. NGOs and international organizations reported identifying and assisting at least 826 potential victims, providing them with various services, including medical care, shelter, psycho-social counseling, family reunification, and repatriation assistance. Government officials continued to use the NRG to identify trafficking victims and refer them to services. The NRG provided victim referral guidelines for stakeholders—including police, prosecutors, immigration officials, and NGOs—and described resources and recommendations for victim protection. The government took significant steps to enhance implementation of the NRG, which was adopted in July 2020, including by distributing copies of the NRG to stakeholders and training them on its use. Several government agencies, including the MIA, developed unit-level guidance to further operationalize the NRG. In 2021, COPTIP, in partnership with an NGO, developed a national directory of trafficking victim service providers to complement the NRG. Additionally, the Ministry of Gender, Labor, and Social Development (MGLSD) partnered with a local NGO to develop trauma-informed standards of care for survivors of trafficking. The government continued to operate under the implementing regulations of the 2009 anti-trafficking act; these regulations outlined responsibilities for relevant stakeholders, including law enforcement, medical professionals, and civil society members, to combat trafficking.

For the first time in six years, the government reported directly assisting victims and referring victims to protection services using the NRG, the newly developed service provider directory, and the country's multi-sectoral victim support system. The UPF continued to operate a short-term shelter for trafficking victims in Kampala. The government provided temporary shelter and support to 334 victims at the center in 2021; in some cases, officials allowed victims to stay at the shelter for longer periods of time to participate in criminal proceedings against traffickers. The government, in partnership with civil society organizations, also provided an unreported number of victims with various protection services, including shelter, medical services, psycho-social counseling, vocational training, and community reintegration. The availability of victim care remained inadequate to meet the needs of victims, especially outside of the central and eastern parts of the country, and services were primarily for women and children, limiting the services available for male victims. Government officials and civil society reported the lack of shelters in the country, both long-term and short-term, continued to adversely affect the government's ability to adequately protect trafficking victims. In some cases, police reportedly returned child victims exploited by their guardians to their homes due to the limited availability of shelters or alternative forms of care. In response to the pandemic, some NGO shelters and government-run centers acted as quarantine or testing centers and operated under limited capacity due to social distancing measures, added steps for victim intake, or staffing gaps; the government reported this decreased its ability to refer all victims to care. The government also reported pandemic-related measures, such as travel restrictions, mandatory quarantine and testing, social distancing, and curfews, during the May 2021 to September 2021 lockdown decreased the ability for the government to provide in-person care or transport victims to NGO-run services. Due to the continued

**UGANDA**

demand for trafficking victims protection services, the government provided some NGOs with exemptions to continue operating at full capacity during strict lockdown periods.

To address the exploitation of Ugandan nationals abroad, the Ministry of Foreign Affairs, in partnership with the MGLSD, continued to offer temporary shelter to vulnerable migrant workers, including potential trafficking victims, in Saudi Arabia and the United Arab Emirates (UAE); however, the government did not report the numbers of victims that received these services during the year. In September 2021, the Cabinet approved the establishment of shelters for vulnerable migrant workers, including potential trafficking victims, in Qatar, Saudi Arabia, and the UAE. The government, in partnership with international organizations and local NGOs, continued to provide repatriation assistance to Ugandan victims exploited abroad.

The government remained without victim-witness legislation or a program to protect trafficking victims participating in criminal proceedings and prevent re-traumatization and generally relied on NGOs to provide these services; however, the government took some ad hoc steps to protect victims absent standardized procedures, including providing transportation, physical protection, shelter, interpretation services, and legal counsel. ODPP, in partnership with local NGOs, established child-friendly interviewing rooms in four regional offices where law enforcement, NGOs, and social workers could conduct forensic interviews with child trafficking victims. The absence of victim-witness protection policies hindered some investigations and prosecutions due to traffickers' access to victims, leading to threats to discourage their participation in trials; additionally, some law enforcement officials lacked a victim-centered approach when working with victims, potentially discouraging them from participating in criminal proceedings. The 2009 anti-trafficking law permitted foreign trafficking victims to remain in Uganda during the investigation of their cases and to apply for residence and work permits, but the government did not report providing these services. The law permitted victims to provide testimony via video or written statement or to anonymously provide information. ODPP reported increasing training for investigators to collect supporting evidence to ensure strong evidence gathering in cases where survivors opted not to testify. The law allowed victims to seek restitution and compensation in both criminal and civil suits; the government reported courts increasingly ordered restitution or compensation but did not provide specific case details.

## PREVENTION

The government increased prevention efforts. The National Task Force, led by the MIA Permanent Secretary with COPTIP serving as its secretariat, met regularly to coordinate anti-trafficking efforts. The government allocated 360 million UGX ($101,780) for coordination of anti-trafficking activities, a significant increase compared with 168 million UGX ($47,500) in 2020. The government reported pandemic-related restrictions, such as limited capacity of social gatherings and social distancing, led to the cancelation of some planned meetings and activities by the National Task Force. In addition to pandemic-related restraints, observers noted that COPTIP did not have sufficient staffing or funding to fulfill its mandate, hindering progress on new anti-trafficking efforts. Similar to previous years, COPTIP published an annual report containing general information on human trafficking and a summary of its anti-trafficking efforts. The government continued to implement its 2019-2024 anti-trafficking national action plan, including by seeking input from NGOs and survivors on activities. The government, both independently and in partnership with NGOs and international organizations, held various awareness campaigns targeting government officials, civil society, community leaders, and the public to educate stakeholders on recognizing trafficking crimes, vulnerabilities to trafficking, and victim protection measures. The government did not operate a trafficking-specific hotline, but it continued to support, in partnership with an international organization, the Uganda Child Helpline (UCH) to receive calls related to crimes against children, including trafficking. COPTIP provided training to UCH staff on trafficking and data collection. UCH identified 108 potential child trafficking victims and referred all cases to law enforcement or services, compared with 81 potential victims identified through hotline calls in 2020.

The MGLSD continued to regulate labor migration and other labor-related matters, including labor trafficking, and increased efforts to improve ethical recruitment practices. In August 2021, the government enacted the Employment (Recruitment of Ugandan Migrant Workers) Regulations of 2021, strengthening the previous 2005 Employment Regulations. The 2021 regulations increased the basic financial and personnel requirements for new and existing labor recruitment companies, prohibited the licensure of companies whose personnel had previous criminal records related to illegal recruitment or human trafficking, increased penalties for violations, and deemed companies' exploitation of workers in forced labor as grounds for suspension of a recruitment license. In 2021, MGLSD suspended 12 companies' recruitment licenses for engaging in fraudulent and exploitative recruitment activities, compared with no suspensions in 2020. Police reported arresting three individuals for illegally operating a recruitment company, compared with one in 2020. The government's external employment management system, which functioned as a "one stop" internet portal, where Ugandans could search and apply for all pre-vetted overseas employment opportunities through licensed recruitment companies, remained operational. MGLSD continued to contract private companies to conduct mandatory pre-departure training for Ugandans utilizing registered labor recruitment companies to travel to the Middle East for employment as domestic workers. The weeklong residential training, paid for by the recruitment company, trained 60-70 women each week, including on domestic work skills, contract appreciation, migrant worker rights, and resources for assistance.

Despite efforts to improve recruitment practices and enforce regulations, observers noted insufficient funding, staffing gaps, corruption, and the continued operation of illegal recruitment agencies may have limited MGLSD's overall anti-trafficking efforts. The 2021 regulations allowed recruiting agencies to charge migrant workers recruitment fees up to 20,000 UGX ($6) for administrative costs and various costs for placement fees and travel preparations, such as pre-departure trainings, visa application, and medical examinations. The MGLSD continued to employ labor attachés in Uganda diplomatic missions in Jordan, Qatar, Saudi Arabia, and the UAE; the government continued negotiations to place labor attachés in Bahrain, Israel, and Oman. Reportedly, the attachés advocated for Ugandan workers' rights with host governments, screened workers for trafficking indicators, resolved workplace disputes, provided identity documents, and partnered with licensed employment agencies to find legitimate work opportunities for Ugandans; however, the government did not report specific actions taken by the attachés during the reporting period. Labor inspectors overseeing working conditions in the country did not receive training on trafficking and did not report efforts to identify or report potential trafficking crimes to law enforcement. The government did not make efforts to reduce the demand for commercial sex acts. Uganda was not a party to the 2000 UN TIP Protocol.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Uganda, and traffickers exploit victims from Uganda abroad. Traffickers exploit Ugandan adults and children in forced labor in various industries, including agriculture, fishing, mining, street vending, hospitality, and domestic work. Traffickers increasingly use local radio and social media to advertise fraudulent job opportunities in Kampala to lure children from rural areas into exploitative situations. Traffickers also exploit women, girls, and boys in sex trafficking throughout the country, particularly in Kampala and other urban areas, in brothels, bars, residential homes, and on the street. Children from the Karamoja region are particularly vulnerable to trafficking due to lack of economic and educational opportunities in the region; NGOs estimate the majority of child sex trafficking victims in Uganda are ethnically Karamojong. Traffickers, sometimes known as community "elders," also exploit children from the Karamoja region in forced begging and domestic servitude; in some cases, traffickers force children to meet them at international borders, where they organized markets to sell the children into domestic servitude or sex trafficking. In response to the pandemic, most schools closed from March 2020 to January 2022; during this time, traffickers increasingly exploited children in sex trafficking, including online commercial sexual exploitation, and forced labor in domestic work and begging. In some cases, parents exploit their children in forced

labor and sex trafficking to supplement family income lost as a result of pandemic-related job loss. Observers also report teachers who lost their jobs during school closures may be increasingly vulnerable to trafficking.

Employment agencies based in Uganda and abroad, both legal and fraudulent, recruit Ugandans to work in the Middle East—particularly Saudi Arabia, Qatar, Jordan, the UAE, and Oman—where, at times, traffickers exploit them in forced labor in domestic work, hospitality, or construction; Ugandans who voluntarily migrate in search of employment opportunities are also vulnerable to exploitative conditions. In one research study, an NGO estimates 89 percent of Ugandans working in the Middle East experience conditions indicative of forced labor, including non-payment of wages, physical abuse, passport confiscation, and excessive working hours. To circumvent the 2016 government ban on migrant worker travel to Oman, some licensed and unlicensed agencies send Ugandans through Kenya and Tanzania, increasing their vulnerability to debt bondage due to higher recruitment and travel fees. Traffickers also exploit Ugandans in forced labor and sex trafficking in neighboring African countries, Asia, and North America. During the pandemic, many Ugandans abroad experienced loss of employment, leaving them trapped in the country due to pandemic-related travel restrictions, border closures, and economic scarcity; unable to find new work or a safe way home, these individuals are increasingly vulnerable to trafficking. Traffickers are increasingly targeting university graduates with the promise of high-paying, skilled jobs abroad; however, upon arrival in the destination country, traffickers exploit these individuals in domestic servitude. Kenyan business owners and employers exploit Ugandan girls, particularly from the Karamoja region, in sex trafficking and forced labor in Nairobi's Eastleigh neighborhood. Criminals involved in terrorist networks may lure and recruit Ugandan adults and children to Somalia via Kenya to join non-state armed groups, primarily al-Shabaab, sometimes with fraudulent promises of lucrative employment.

Uganda hosts more than 1.6 million refugees, primarily from South Sudan, the Democratic Republic of the Congo, and Burundi. Observers report traffickers increasingly exploit refugees, both in village settlements and urban areas, in forced labor and sex trafficking. Uganda continues to serve as a transit point for migrants seeking work in the Middle East; traffickers exploit this transiting population in forced labor and sex trafficking. Increasingly, traffickers pose as recruitment agencies to facilitate the placement of former trafficking victims, primarily from Burundi, by falsely advertising employment in Middle East; instead, traffickers often exploit these women in Uganda before transporting them to Kenya for further exploitation. Traffickers exploit children from neighboring East African countries, including Kenya, Rwanda, and Tanzania, in forced labor, primarily in agriculture and domestic work, and sex trafficking in Uganda. Cuban medical professionals working in Uganda may have been forced to work by the Cuban government.

## UKRAINE: TIER 2

The Government of Ukraine does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. Despite the documented impact of the COVID-19 pandemic on the government's anti-trafficking capacity, the government demonstrated overall increasing efforts compared to the previous reporting period; therefore Ukraine remained on Tier 2. These efforts included investigating more suspected traffickers, allocating significantly more money to the national budget for anti-trafficking measures, and improving access to identification documentation and official registration for vulnerable populations. The government also took steps to prevent child trafficking and reduce re-traumatization of child victims during the criminal justice process. However, the government did not meet the minimum standards in several key areas. Authorities convicted fewer traffickers and most convicted traffickers avoided imprisonment, likely due to judges' underestimation of the severity of trafficking crimes, entrenched stereotypes about what constitutes trafficking in persons, and corruption. This lenient sentencing weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. Reports of officials complicit in human trafficking persisted. While the

government initiated an investigation into two allegedly complicit officials during the reporting period, for the fifth consecutive year it did not secure any convictions. The government officially identified far fewer victims in 2021 than in 2020, while international organizations continued to identify far more victims than the government, highlighting the government's inadequate identification efforts and a continuing lack of trust in authorities' ability to protect or assist victims. Observers highlighted the government's ineffective coordination and implementation of anti-trafficking policies, and NGOs continued to identify systemic shortcomings in implementation of the national referral mechanism (NRM) at the regional level.



UKRAINE TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Identify and certify the official status of more victims to ensure they are afforded their rights under the trafficking law and modify the procedure for granting victim status to lessen the burden on victims to self-identify and divulge sensitive information. • Vigorously investigate and prosecute alleged trafficking crimes and punish convicted traffickers with significant prison terms. • Increase efforts to investigate, prosecute, and convict officials allegedly complicit in trafficking crimes under the trafficking statute. • Establish and fill a dedicated National Coordinator position to lead national efforts to coordinate and implement anti-trafficking policies. • Provide additional, extensive training on the NRM to local officials and service providers throughout the decentralization process to minimize disruption in identification, referral, and assistance to trafficking victims. • Increase worker protections by eliminating recruitment fees charged to workers by labor recruiters and ensuring employers pay any recruitment fees. • Increase training for law enforcement, prosecutors, and judges in the investigation and prosecution of trafficking cases (particularly on forced labor), using a victim-centered and trauma-informed approach, and on how to gather evidence outside of victims' testimony. • Increase victims' access to legal assistance throughout the criminal process and improve victims' ability to access court-ordered restitution in criminal cases and compensation through civil proceedings. • Increase government funding for anti-trafficking efforts, particularly funding for local communities. • Increase training for officials on victim identification, particularly in proactive screening for labor trafficking and of vulnerable populations, such as women in commercial sex, children exploited in sex trafficking, foreign migrant workers, and internally displaced persons (IDPs). • Increase law enforcement investigations and prosecutions of labor recruitment firms engaged in fraudulent practices.

### PROSECUTION

The government maintained law enforcement efforts. Article 149 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of three to eight years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Law enforcement investigated 222 trafficking cases in 2021, an increase from 203 in 2020. These included 85 new sex trafficking cases and 137 new labor trafficking cases, of which 54 were for forced involvement in criminal activity. An international organization stated pandemic-related travel restrictions changed traffickers' recruitment tactics and exploitation patterns, hampering law enforcement's detection capabilities. The government prosecuted 101 suspected traffickers in 2021, compared with the prosecution of 51 cases with an unknown number of defendants in 2020. The government convicted 24 traffickers in 2021, compared with 29 in 2020 and 35 in 2019. Of the 24 convicted traffickers sentenced in 2021, only five (21 percent) received prison sentences, all for a term of five to 10 years; nineteen traffickers received suspended sentences. This was similar to 2020 when courts sentenced only 17 percent of convicted traffickers to imprisonment. Observers reported many judges

underestimated the severity of trafficking offenses and continued to hold entrenched stereotypes about what constitutes trafficking in persons, while some engaged in corrupt practices. These lenient sentences weakened deterrence, did not adequately reflect the nature of the crime, and undercut broader efforts to fight trafficking. An international organization reported pandemic-related restrictions adversely affected the court system, delaying some legal proceedings. In a notable case during the reporting period, law enforcement arrested the leader and indicted in absentia eight members of an organized criminal group operating in Russia-controlled eastern Ukraine accused of exploiting illegally detained residents for labor to support Russia-led forces' military activities. Authorities cooperated with foreign governments on multiple transnational investigations, including through joint investigation teams (JIT) established with Georgia, Greece, France, and Italy. In April 2021, authorities established a JIT with Georgia, Greece, and Italy to investigate a criminal organization that used fraud to coerce hundreds of Ukrainian citizens to smuggle migrants from Iran, Iraq, Syria, and other Middle Eastern countries to Europe by sea. Authorities worked with foreign law enforcement to extradite one suspected trafficker to Moldova and to support the extradition from Cyprus to Ukraine of one suspected trafficker. The government amended an agreement with the government of Turkey to improve law enforcement cooperation between the two countries, including cooperation on anti-trafficking efforts.

Continued institutional reforms led to widespread turnover in many government institutions, including within the ranks of the National Police and the judiciary. Experts reported these institutional reforms created temporary obstacles to anti-trafficking efforts but ultimately could lead to improved efforts if changes were properly implemented. The National Police counter-trafficking unit was incorporated into the Migration Police (MiPol) in December 2020; MiPol headquarters staffing almost doubled from 27 to 45 officials in 2021. Observers assessed many of the newly hired MiPol staff, as well as National Police investigators, were not sufficiently trained on trafficking. As of November 2021, the government reported nearly 2,000 judicial vacancies; these vacancies exacerbated delays in court cases caused by pandemic-related restrictions. Turnover of personnel led to a lack of qualified prosecutors to supervise trafficking cases at the regional level. The government, in conjunction with international funding and partners, conducted multiple trainings for law enforcement and other officials. All new police recruits received trafficking training. Observers reported the National Police counter-trafficking unit used outdated online investigative tools and collaborated poorly with other financial or cybercrime investigations, leading to missed opportunities to identify trafficking crimes in money laundering or pornography cases.

Corruption remained a serious concern in the police and judiciary. Authorities investigated two city council members for recruiting and transporting vulnerable people to two agricultural companies for the purpose of forced labor. Although the government continued to report investigations of officials allegedly complicit in trafficking, for the fifth consecutive year, the government did not report any convictions of complicit officials. The government also did not report on the status of high-profile cases from previous years, many of which have remained stalled with the courts for years, including those against the former commander of the Kyiv City police counter-trafficking unit, three police officers, recruiters accused of trafficking Ukrainians into a drug-trafficking ring in Russia, and a teacher at a government-run boarding school for orphans in Kharkiv who attempted to sell one of her students.

## PROTECTION

The government demonstrated mixed efforts in victim protection; although the government allocated significantly more funding to the national budget for victim protection efforts and took steps to reduce re-traumatization of child victims, the government identified, officially recognized, and provided services to far fewer victims. In 2021, authorities reported there were 64 officially-identified victims—a status that granted victims access to government services upon approval of an application—a decrease compared with 134 officially-identified victims in 2020, although the number of applications decreased by almost 60 percent from 2020 to 2021. The government reported police identified and referred to services 155 potential victims in 2021 (146 in 2020 and 262 in 2019). The majority of the 64 officially-identified victims were

men (45); authorities identified two female child victims. Observers noted the pandemic exacerbated existing long-term problems in victim identification and assistance. NGOs reported the government nearly ceased targeted proactive identification efforts because of the pandemic and pandemic-related restrictions reduced cross-border movements, including the return of trafficking victims exploited abroad. The government reported screening undocumented foreign migrants for indicators of trafficking; however, observers noted authorities did not consistently do so.

The government provided services, including medical, psychological, and legal assistance and temporary shelter, to victims granted official victim status. The government approved 67 percent (64 of 96) of applications for official victim status in 2021, compared with 57 percent (134 of 235) of applications in 2020. The National Social Service (NSS), formed in 2020, assumed the role of granting official victim status to potential victims in May 2021 and began devolving the responsibility of granting official victim status to local communities through the ongoing decentralization reform process. The government took steps to improve the victim designation process by introducing an electronic register of victims and outlining the procedures for notifying potential victims of the outcome of their application; observers attributed the decrease in the number of applications in 2021 to a lack of qualified personnel and infrastructure at the NSS and pandemic-related restrictions. Civil society previously reported the government rejected a high percentage of applications due to strict internal guidelines for classifying cases as trafficking crimes, police pursuing indictments under statutes other than the trafficking law, and the government demanding additional evidence to confirm victim status contrary to Ukrainian law, including confirmation that the victim was recognized as such in court proceedings or demanding evidence to show movement across a border. Victims not requiring specialized services may have chosen not to apply for official victim status, and NGOs reported the emphasis on documents requiring the divulging of sensitive information likely deterred some applicants from applying. An international organization reported pandemic-related restrictions likely limited the number of applications for official victim status as potential victims must submit applications in person. The government granted official victim status to one individual incarcerated abroad in 2021, compared with zero in 2020 and 40 in 2019; in 2020, the government discontinued the use of a simplified application process for potential victims incarcerated abroad, which included waiving the in-person interview requirement.

Although the government, in collaboration with partner organizations, trained local officials in effectively assisting potential victims, newly-devolved local administrative structures were not yet officially part of the NRM, resulting in some confusion over responsibilities. Civil society reported continued systemic shortcomings in the functioning of the NRM at the regional level and emphasized government agencies identified a low number of victims through the NRM. Some newly established communities, especially smaller communities, lacked sufficient personnel, infrastructure, and financial resources to effectively provide services to trafficking victims. Observers noted some local officials responsible for identifying and screening victims were not trained on trafficking. Moreover, pandemic-related restrictions and the diversion of funding to combat the pandemic further limited trafficking victims' access to state assistance. The government continued to rely on international organizations and NGOs, with international donor funding, to identify victims and provide the vast majority of victim protection and assistance. An international organization in Ukraine assisted 1,010 victims in 2021, compared with 1,680 victims in 2020. International organizations reported the majority (93 percent) of their identified victims were exploited by labor traffickers. An international organization reported NGOs identified 102 victims in eastern Ukraine, including in Russia-occupied and Russia-controlled territories; the majority of these victims were IDPs, and 98 of the 102 victims were exploited for forced labor.

The government allocated 2.03 million hryvnia ($74,350) to the national budget for anti-trafficking measures in 2021, a significant increase from 548,800 hryvnia ($20,090) in 2020. No funding was allocated for local budgets in 2021, compared with 219,220 hryvnia ($8,020) in 2020. Ukraine's trafficking law entitled victims with official victim status to housing at a government shelter, psychological assistance, medical services, employment counseling, and vocational training, regardless

of whether a criminal case proceeded or the victim cooperated with law enforcement. The government did not integrate a rehabilitation center run by an international organization into the national social and health care system, despite the government's prior stated commitment to assume operation of the center; some trafficking victims received shelter at this center. Adult victims could also stay at government-run centers for psycho-social assistance for up to 90 days, with the option to extend, and receive psychological and medical support, lodging, food, and legal and social assistance. Authorities could accommodate child victims in centers for socio-psychological support of children for up to nine months and administer social, medical, psychological, education, legal, and other types of assistance. Authorities identified two child trafficking victims in 2021 but did not report what services they received, if any. The government maintained 21 centers for socio-psychological assistance, 33 state shelters for domestic violence and trafficking victims, and 796 social services centers. The government amended the regulations governing the centers for socio-psychological assistance to ensure trafficking victims receive the full range of necessary services available. Observers reported that state assistance remained insufficient to meet victims' needs, and victims continued to rely on NGOs for assistance. Foreign victims were entitled to the same benefits as Ukrainian citizens and had additional access to interpretation services, temporary legal stay, and voluntary repatriation. Although legally entitled to the same benefits, observers noted some foreign nationals and members of underserved communities faced barriers to accessing services. Authorities could grant permanent residency to foreign victims in danger of retribution should they return to their country of origin. Foreign victims were able to obtain an immigration permit after residing continuously in Ukraine for three years.

The government, often in partnership with international organizations, provided training for officials on victim identification and assistance. In collaboration with an international organization, the government conducted five simulation exercises for law enforcement and frontline responders from ten regions to strengthen collaboration among anti-trafficking stakeholders in responding to suspected trafficking cases. The Witness Protection Law provided protections for victims, but observers noted courts rarely used protection measures. Closed hearings and remote procedures for questioning and identification were the most frequently used witness and victim protection mechanisms. The government did not restrict victims' movement. The government did not report if it granted personal protection to victims in 2021 (in 2020, the government granted eight victims personal protection and changed the personal data of three witnesses in criminal proceedings). Video testimony systems that ensured the complete separation of victims or witnesses from the accused existed in 14 courts in various regions; the courts used these systems 19 times during hearings of trafficking-related crimes in 2021. In 2021, prosecutors created specialized units to handle cases involving child trafficking victims and took measures to avoid their re-traumatization, including by preventing direct visual contact between the victim and other participants. The government, with the assistance of an international organization, also established several regional specialized centers for child victims or witnesses; at these centers, specialized staff interviewed children in a trauma-informed manner and children received psycho-social, legal, and medical care, as needed. For the third consecutive year, the government did not report cases of courts ordering restitution for trafficking victims; however, an international organization confirmed some victims collected court-awarded restitution in 2021.

## PREVENTION

The government increased prevention efforts. The Ministry of Social Policy (MSP) continued to lead anti-trafficking efforts at the national and local levels, but observers widely criticized the ministry for ineffective coordination and engagement on anti-trafficking efforts. Experts noted no one individual held the position of National Coordinator to execute the ministry's anti-trafficking responsibilities, weakening its leadership on this issue. In July 2021, the government approved a general draft concept for a 2021-2025 national action plan; no further progress was made by the end of the reporting period. The MSP did not publish a report on the implementation of the government's anti-trafficking policies. The government and members of parliament created a working

group to draft and implement a law to combat sexual exploitation of women. In November 2021, the government issued standard operating procedures for a government-sponsored hotline dedicated to trafficking, gender-based violence, and violence against children. The government did not report how many calls the hotline received in 2021 (29,344 calls received in 2020), nor if any calls led to the identification of victims or their referral to services (38 victims identified and referred to services in 2020). A local NGO, with funding from international donors, operated a counter-trafficking and migrant advice hotline. In 2021, the hotline received 22,128 calls, compared with 22,921 calls in 2020; 75 potential victims were identified and referred to responsible local agencies and NGOs for assistance (77 in 2020). The Office of the Prosecutor General, in collaboration with partner organizations, created dedicated channels on social media platforms to communicate with children to increase detection efforts, prevent child trafficking, and improve communication with child trafficking victims or witnesses. The government took several measures to improve access to identification documentation and official registration for vulnerable populations; lack of documentation and access to state services was a risk factor for trafficking. In December 2021, legislation to facilitate residence registration, a pre-requisite for accessing state services, went into effect; experts believed this new law would reduce the risk of trafficking by ensuring the six million Ukrainians with incomplete registration could be recognized by the government. In April 2021, the government launched a statelessness determination process to facilitate the provision of documentation, residency, and citizenship for stateless persons, a vulnerable population; an international organization estimated there were 36,000 stateless persons in Ukraine. In October 2021, the government adopted a revised strategy to assist IDPs; the strategy included a focus on facilitating employment and education, documentation, and integration into host communities. In November 2021, the government passed legislation to allow Ukrainians living in temporarily Russia-occupied territories to register their existing residences and obtain identity documents. Authorities, in coordination with NGOs, international organizations, and local partners, continued to conduct a wide range of awareness campaigns throughout the country, including via television, social media, print media, and public events. In December 2021, MiPol, in collaboration with an international organization and a local university, launched an anti-trafficking chatbot to assist online users in quickly finding information on safe employment, study, and travel, as well as information on how to assist trafficking victims. The State Labor Service (SLS) published on its website recommendations for Ukrainians contemplating working abroad, including information on trafficking risks.

Police continued to monitor and investigate formal and informal recruitment networks, including companies advertising jobs abroad, and worked with other stakeholders to raise awareness about known recruitment schemes. The Ministry of Economic Development and Trade oversaw the licensing of labor recruitment agencies and conducted regular and random inspections on their activities. Legislation banning recruitment companies from charging fees to citizens seeking employment abroad was registered in parliament; the legislation had not been adopted by the end of the reporting period. Labor inspectors conducted 7,231 inspections in 2021, compared with 14,803 unscheduled inspections in 2020; the government did not report if inspectors identified any potential trafficking victims in 2021. The government, in collaboration with an international organization, developed a distance learning anti-trafficking training for labor inspectors. NGOs previously reported there was an insufficient number of labor inspectors to effectively meet their mandate. The SLS maintained cooperation with Lithuania's labor inspectors, including by publishing information on employment opportunities and legal regulations for foreign nationals in Lithuania on Lithuania's State Labor Inspectorate website. The government made some efforts to reduce the demand for commercial sex acts; Article 149 reportedly criminalized the act of knowingly soliciting or patronizing a sex trafficking victim, but an NGO noted the language in the statute is broad. The government continued to provide victim identification and referral training to diplomats.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Ukraine, and traffickers exploit victims from

UNITED ARAB EMIRATES

Ukraine abroad. Ukrainian victims are exploited in sex trafficking and forced labor in Ukraine as well as in Russia, Poland, Germany, other parts of Europe, the People's Republic of China (PRC), Kazakhstan, and the Middle East. Ukrainian victims are increasingly exploited in EU member states. Traffickers exploit most victims for forced labor. Traffickers exploit some Ukrainian children and vulnerable adults in forced begging. NGOs estimate 10-15 percent of the Roma community lack identification documents, leaving them unable to access state social assistance programs and thereby increasing their vulnerability to trafficking. Traffickers exploit a small number of foreign nationals in forced labor in Ukraine. A growing number of forced labor victims in Ukraine and abroad are exploited in a variety of sectors, including construction, manufacturing, agriculture, criminal activity, and street begging. Traffickers force some victims to participate in the illegal production of counterfeit tobacco products and well-established criminal groups force some Ukrainian victims to engage in other illegal activities abroad. Some traffickers exploit victims in forced labor at rehabilitation centers under the guise of providing treatment for alcohol or drug addiction. Pandemic-related movement restrictions and border closures resulted in traffickers exploiting a larger number of Ukrainians in labor trafficking within Ukraine and in commercial sex, increasingly online. Traffickers target low-skilled workers transiting Ukraine. Increasingly, well-educated workers are vulnerable to labor exploitation. The approximately 104,000 children institutionalized in state-run orphanages are at especially high risk of trafficking. Officials of several state-run residential institutions and orphanages have allegedly been complicit or willfully negligent in the sex and labor trafficking of girls and boys under their care.

Prior to Russia's 2022 invasion, in areas of eastern Ukraine controlled by Russia-led forces, employment options were limited and Russia's proxy "authorities" placed restrictions on international humanitarian aid intended to help meet civilian needs. IDPs, those living in Russia-controlled territory or within 20 km of the line of contact in the Donbas, and residents of Crimea faced significant barriers to obtaining or renewing identification documents, increasing their vulnerability to exploitation. Uncorroborated reports indicated Russia-led forces exploited Ukrainians for labor, particularly in the mines of Russia-controlled Donbas. International organizations reported the demographics of Ukrainian trafficking victims have shifted since the beginning of the conflict in 2014 to include more urban, younger, and male victims exploited increasingly in forced labor and criminality, such as for drug trafficking and as couriers. Traffickers reportedly kidnapped women and girls from conflict-affected areas for sex and labor trafficking in Ukraine and Russia. Traffickers targeted IDPs and subjected some Ukrainians to forced labor on territory not under government control, often via kidnapping, torture, and extortion. These abuses and vulnerabilities likely continued after Russia launched its all-out war against Ukraine in February 2022.

Russia's full-scale invasion of Ukraine forced more than four million people to flee Ukraine in the first five weeks of war and displaced almost 6.5 million more within its borders, a total of almost one quarter of Ukraine's population. Experts estimate as many as 90 percent of those who have fled the country are women and children, and that more than half of Ukraine's children—4.3 million out of seven million—have been displaced. These refugee and displaced populations are especially vulnerable to human trafficking. Even for those not displaced, the war heightens individuals' vulnerability to trafficking. By the end of March 2022, Ukrainian officials assessed Russian forces relocated thousands of Ukrainians to Russia, including some to remote areas; press reports indicate many of these Ukrainians were transferred forcibly. These citizens are highly vulnerable to trafficking.

Uncorroborated reports of Russia-led forces using children as soldiers, informants, and human shields persist. Russia-led forces in Russia-controlled areas of the Donbas have reportedly used children to take direct and indirect part in the armed conflict to perform armed duty at checkpoints, as fighters, and to serve as guards, mailpersons, and secretaries. The recruitment of children by Russia-led forces took place in territory controlled by Russia and in areas where the government was unable to enforce national prohibitions against the use of children in armed conflict.

# UNITED ARAB EMIRATES:
## TIER 2

The Government of the United Arab Emirates (UAE) does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the United Arab Emirates remained on Tier 2. These efforts included convicting more traffickers overall, reporting a forced labor prosecution for the first time since 2018, and identifying a victim of forced labor for the first time in five years. However, the government did not meet the minimum standards in several key areas. The government did not convict any traffickers for the forced labor of a migrant worker during the year and has not ever done so; it also did not report the number of trafficking cases authorities investigated for the 10th consecutive year. Officials did not regularly investigate labor law violations that exhibited trafficking indicators—such as cases of unpaid or withheld wages, passport retention, restriction of movement, and related abuses—as potential trafficking crimes, addressing them administratively instead of through criminal proceedings, which undercut efforts to hold traffickers accountable and weakened deterrence. Finally, the government did not consistently screen vulnerable populations for trafficking indicators, which may have penalized some victims for unlawful acts traffickers compelled them to commit, such as immigration or "prostitution" violations, and the deportation of other unidentified victims. This contributed to the lowest number of victims the government identified in five years.



PRIORITIZED RECOMMENDATIONS:
Significantly increase efforts to investigate, prosecute, and convict traffickers of forced labor crimes, specifically of migrant workers, including domestic servitude, under the anti-trafficking law. • Increase efforts to identify and provide protective services for labor trafficking victims. • Expand trainings to officials across all emirates to better identify potential trafficking cases that originate as labor violations. • Strengthen efforts to punish potential forced labor crimes criminally instead of administratively and refer cases with trafficking indicators, such as complaints of non-payment of wages, passport confiscation, and restriction of movement, for investigation as potential trafficking crimes. • Regularly employ standard procedures for victim identification and referral to quality care among foreign workers, particularly women in commercial sex, domestic workers who have fled their employers, and other vulnerable documented and undocumented migrants, to ensure authorities do not penalize victims. • Report the number of trafficking investigations and the number of identified victims that were not involved in active court proceedings. • Report the number of labor law violations—such as passport retention, withholding of wages, and other complaints of abuse reported by workers, employers, and recruitment agencies, and identified from inspections. • Continue to expand use of the Wage Protection System (WPS) pilot program for domestic workers to ensure all workers are covered under the system. • Execute implementing regulations for and strengthen enforcement of the domestic worker law that expands legal protections for domestic workers. • Strictly enforce prohibitions on withholding workers' passports.

## PROSECUTION
The government demonstrated uneven law enforcement efforts; it convicted more traffickers and prosecuted an alleged labor trafficker for the first time since 2018, but it continued to focus efforts overwhelmingly on sex trafficking and has not historically reported forced labor

convictions. Federal Law No. 51 of 2006 and its amendments in Federal Law No. 1 of 2015 criminalized sex trafficking and labor trafficking and prescribed penalties ranging from five years to life in prison, as well as fines and deportation for non-citizens. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape.

The government did not report statistics on investigations of suspected trafficking cases for the 10th consecutive year. During the reporting year, the government prosecuted 40 alleged traffickers in 19 cases, including 34 individuals in 15 sex trafficking cases, two individuals in two forced begging cases, and three individuals in one case for "selling" victims across the seven emirates. This was a decrease compared with the prosecution of 57 alleged traffickers in 20 cases during the previous year: 54 individuals in 19 sex trafficking cases and three individuals in one child forced begging case. For the first time since 2018, the government reported prosecuting one individual for forced labor during the year. Of the prosecutions, 14 alleged perpetrators in five sex trafficking cases and one alleged perpetrator in one forced labor case remained pending verdicts at the close of the reporting period. Courts convicted 23 traffickers, including 18 sex traffickers, two individuals for forced begging, and three individuals for "selling victims," and sentenced them to between six months and life imprisonment, with the majority of perpetrators receiving three years or more with additional fines. While the government did not report the nationalities of traffickers, the vast majority were foreign nationals subject to deportation at the conclusion of their sentences. In 2020, courts convicted 15 sex traffickers under trafficking laws and handed down similar punishments, while in 2019, courts convicted 67 sex traffickers under the trafficking law. The government has not ever reported convictions for the forced labor of migrant workers—the largest trafficking problem in the UAE. In one specific case during the year, the Dubai Court of Appeals convicted six individuals for trafficking, forging documents, and abusing a child; the perpetrators deceived a 16-year-old female into coming to the UAE with a false job offer as a domestic worker and forged her documents to facilitate her entry into the country, where she was sexually assaulted by the traffickers and then forced into domestic work, where her salary was withheld and provided to one of the six traffickers as a means of coercing her into commercial sex to receive payment. The court sentenced three of the traffickers to 10 years' imprisonment, two traffickers to seven years' imprisonment, and one trafficker to six months' imprisonment.

Observers noted Emirati institutions had limited understanding of how to differentiate between labor trafficking crimes and labor violations. The government did not routinely investigate as possible trafficking crimes labor law violations that exhibited trafficking indicators, such as passport confiscation, delayed or nonpayment of wages, fraud, and contract switching; generally, the government settled these cases by levying administrative fines or canceling business licenses in lieu of criminal proceedings. Labor violations, including those involving forced labor, continued to be addressed by Ministry of Human Resources and Emiratization (MOHRE) through administrative dispute resolution processes and labor courts. The government did not report any investigations, prosecutions, or convictions of officials complicit in trafficking crimes during the reporting year. Police, judges, prison officials, and immigration authorities continued to receive training to identify trafficking victims; the specialized anti-trafficking units within local police headquarters and public prosecution offices at the federal and local level throughout the Emirates routinely facilitated trainings for staff on handling trafficking cases. For example, the Abu Dhabi Police trained more than 1,300 judges and prosecution staff through 34 different courses and training programs focused on anti-trafficking; the Dubai Police provided the same training to more than 400 police officers through 10 courses during the year. In addition, the Ministry of Interior (MOI) provided at least 38 different courses and training programs for police officers throughout the Emirates, training more than 3,000 police staff on topics including victim-centered approaches to investigating trafficking cases. In October 2021, the National Committee to Combat Human Trafficking (NCCHT) and Dubai Police inaugurated the seventh iteration of the "Human Trafficking Specialist" program at the Dubai Judicial Institute (DJI) in collaboration with an international organization; this was a five-week diploma program on ways to detect and prevent trafficking, protect victims, and raise societal awareness

of the problem. The program was expanded in 2021 to include 101 virtual participants representing national police authorities, human rights associations, shelters, and federal and national government bodies, as well as participants from across the Gulf Cooperation Council countries. Employees of Abu Dhabi and Dubai airports continued to receive training on trafficking awareness and reporting processes, including identifying potential cases and victims upon arrival at the airports or on flights. Additionally, the Federal Authority for Identity and Citizenship provided multiple anti-trafficking trainings to staff employed at UAE entry points—including customs, border, and port security officials—on topics such as forgery detection, human rights, and uncovering signs of trafficking. Finally, MOHRE provided training to more than 300 labor inspectors on understanding anti-trafficking legislation. However, observers noted Emirati officials would benefit from additional targeted training on effective implementation of the anti-trafficking law, victim-centered approaches to law enforcement efforts, and identifying potential labor trafficking cases from labor violations that exhibit trafficking indicators.

## PROTECTION

The government made uneven efforts to protect trafficking victims; for the first time since 2016, the government identified one forced labor victim, but it did not increase any other protection efforts, nor did it consistently screen vulnerable populations for trafficking indicators, which may have resulted in the penalization of some victims for unlawful acts traffickers compelled them to commit. Consistent with prior years, the government reported the number of trafficking victims it identified as the number of victims involved in active court cases and did not otherwise track potential victims or those victims whose cases did not go to trial. It reported identifying the lowest number of victims in the last five years. The government identified and referred to care 25 victims, including 21 of sex trafficking, two of forced begging, one of "selling," and—for the first time since 2016—one victim of forced labor. This was compared with 33 sex trafficking victims and one child forced begging victim identified and referred to care during the previous reporting period.

While the government had standard procedures for victim identification, officials did not regularly employ these procedures proactively and continued to rely predominantly on third-party referrals to identify victims, including from foreign embassies, religious institutions, or tips received through government hotlines, smartphone applications, and the internet. Authorities continued to implement a formal referral process to transfer potential trafficking victims from detention centers, hospitals, houses of worship, and facilities run by source country embassies or consulates, as well as those identified from shelter-operated hotlines, to government shelters. Government shelter staff reported that although police were supposed to refer all potential trafficking victims to government shelters, in some cases, police only referred individuals that law enforcement had already officially determined to be trafficking victims. Shelter staff also assessed all individuals referred to the shelter upon arrival using an international organization-issued screening questionnaire to better assess victims' needs. While this assessment was shared with law enforcement, authorities did not always consider the shelter's determination and instead came to a separate conclusion on whether the individual was officially a trafficking victim. However, shelter staff reported all potential victims had access to shelter and services regardless of law enforcement's determination. Authorities also sometimes held potential victims who encountered law enforcement first at a transitional center until they could make an official determination of their trafficking victim status. At times, female or male police officers in plain clothes—intended to allay victims' anxieties—escorted officially identified victims from a government-run detention center to a shelter. In previous reporting periods, some diplomatic contacts and community leaders reported they were hesitant to refer victims of forced labor to shelters, as authorities did not always recognize these crimes as trafficking and rather considered them labor violations.

The shelters were largely funded through individual donations, notably from the ruling family of Abu Dhabi emirate, as well as contributions from public and private companies and religious institutions. The government maintained oversight and funding for shelters in four of the seven emirates (Dubai, Abu Dhabi, Ras Al Khaimah, and Sharjah),

offering housing and assistance for all female and child sex trafficking and abuse victims across the country. The government operated one shelter for men in Abu Dhabi and served one male victim during the year. Protective services included medical, psychological, legal, educational, rehabilitation and reintegration, vocational training and certificates, and voluntary repatriation with follow-up care after the victim returned home. Child trafficking victims and dependents of trafficking victims received services tailored to their needs, including separate living sections and case managers, as well as teachers who provided age-appropriate educational and psycho-social support. All police departments had a special room for interviewing children and other vulnerable victims. The Philippine, Indian, and Sri Lankan embassies in Abu Dhabi and the Philippine, Indonesian, and Sri Lankan consulates in Dubai provided shelter and other protective services to an unspecified number of their nationals who had been subjected to trafficking during the reporting period. In 2021, the Ugandan embassy in Abu Dhabi began providing shelter to its nationals on an ad-hoc basis, and the Bangladeshi embassy also provided shelter and services to an unknown number of female domestic workers during the year. Other consulates used "foster families" of the same nationality to host victims until their cases were resolved. During the reporting year, officials distributed 191,000 Emirati dirhams ($52,000) through the Victims Support Fund to trafficking victims residing at government shelters across the Emirates, which financially supported victims by providing housing and education services, and covering medical expenses, repatriation, or resettlement.

Independent observers alleged authorities jailed some potential victims for "prostitution" offenses, consensual sex outside marriage, or "absconding" from their employers. Reports also persisted that some potential victims were unwilling to approach law enforcement officials due to fear of being sent to prison for immigration or other violations, such as "absconding" from their employer, rather than being accepted into a shelter. MOHRE could reject an "absconding" charge on several grounds, including if the charge was filed for vexatious or fictitious reasons or if the worker already had a pending claim against their employer with the government, and it also did not force the employee to return to his or her former place of employment. MOHRE did not report how many absconding claims it received nor the number it rejected. In September 2021, an NGO alleged the government arrested at least 800 African migrants based on their race and national origin and deported them without charge. Rights groups alleged the migrants were detained for approximately five weeks, with some experiencing abuses amounting to torture and were forcibly deported despite most possessing valid documentation and visas. The government did not report screening the African migrants for trafficking indicators prior to deportation despite the vulnerability of this population. Furthermore, because the government did not routinely use victim identification procedures or screen for potential trafficking crimes among vulnerable populations, it may have penalized some unidentified victims during the year. During the previous reporting period, the Dubai Public Prosecution announced an initiative to encourage employers to report their "absconded" domestic workers to authorities to prevent employers from hiring illegal workers and reduce losses incurred by employers whose workers flee. Employers could be fined for hiring a worker illegally and could be compensated for filing "absconding" charges against a worker; employers had 10 days to report "absconding" workers or risk being fined. This policy continued in 2021 and may have exacerbated vulnerabilities of some workers attempting to leave exploitative situations; to this end, officials may have penalized potential trafficking victims whose employers filed malicious "absconding" charges during the year.

The government reported it exempted from fines trafficking victims who had overstayed their visas, but it did not report how many benefitted from this exemption during the reporting period. The government did not provide permanent or formal temporary residency status to victims; however, it permitted victims to stay in shelters and participate in court proceedings and worked with international organizations to resettle (in third countries) victims who could not return to their countries of origin. MOI officials could amend the status of victims to assist them in seeking follow-on job opportunities in the UAE. Migrant workers whose employer had not paid them for 60 days were entitled to legally remain in country and search for a new employer. The government reported it provided repatriation assistance to trafficking victims

who wished to return to their home countries but did not report the number of victims that were repatriated during the reporting period. Shelter staff noted they assisted an unknown number of trafficking victims in finding new employment or sponsors on an ad-hoc basis. The government encouraged victims to assist in the investigation and prosecution of traffickers and provided victim-witness protective services, including private interview rooms, free legal counseling, and safe transportation to court hearings. Police took measures to prevent communication between the victim and suspect. Police also enforced two governmental decrees aimed at ensuring the media adhered to victims' right to privacy and that shelters adequately protected victims. According to the NCCHT, victims were informed and assured of their rights when giving testimony. Shelter staff reported courts attempted to accommodate victims' desire to leave the country and most victims were able to depart the UAE with a letter from the presiding judge after the first court hearing. Both police and shelter representatives reported victims often chose immediate repatriation at the UAE's expense rather than remaining in country to testify against alleged traffickers or see a case through to final adjudication. In 2021, remote court trials continued to be utilized due to the pandemic; observers noted the use of remote courts eased the burden on trafficking victims from appearing in the courtroom and made trials move more quickly while keeping the victims' safety and wellbeing protected. However, the government did not report how many trafficking victims had their court proceedings conducted remotely. During the previous reporting period, the government established a Witness Protection Program by expanding Federal Law No. 14 of 2020, which gave judicial officials the authority to enroll witnesses in the protection program to keep their identities confidential during legal proceedings; the government did not report if any trafficking victims were enrolled in the program during the year. The government reported victims could file civil suits seeking damages from traffickers but did not report if any victims did so during the reporting period.

## PREVENTION

The government maintained efforts to prevent trafficking. It continued to carry out its national action plan to address trafficking, driven chiefly by the NCCHT; the plan focused on prevention, protection, prosecution, punishment, promotion of international cooperation, redress, rehabilitation, reintegration, and capacity building. The NCCHT met four times during the year. In January, the government restructured the NCCHT under the leadership of the Minister of Justice. The government made efforts to prevent forced labor primarily through labor regulatory and monitoring mechanisms, including labor inspection programs that incorporated routine and unannounced inspections of company housing and work sites by a team of full-time labor inspectors and seven dedicated anti-trafficking inspectors. If a company was found to have violated the labor law following an inspection, the government could fine the company or curtail its ability to operate or hire additional workers. Furthermore, the government reported individuals found to have engaged in fraud that led to forced labor could face jail time. During the year, the NCCHT reported MOHRE conducted 354,902 inspection visits but, as in previous years, did not report how many labor law violations were identified or if any were referred for further investigation or criminal prosecution as a potential trafficking case. MOHRE also continued to oversee, regulate, and enforce labor-related complaints; however, authorities generally dealt with labor law violations administratively and did not report investigating such cases for trafficking indicators or referring any for criminal prosecution. Workplace grievances routinely resulted in fines, suspended permits to hire new workers, or the cancellation of business licenses; for example, in July 2021, MOHRE's Supreme Arbitration Committee for Collective Labor Disputes settled 22 collective labor disputes for 18,670 workers amounting to 300.6 million Emirati dirhams ($81.84 million). The government did not report how many complaints it received from workers, employers, or recruitment agencies during the year or the nature of those complaints.

The government's WPS required and monitored electronic salary payments for private sector workers via vetted banks, currency exchanges, and financial institutions for all onshore companies employing more than 100 workers (95 percent of the private sector workforce). The WPS automatically alerted officials to delayed salary payments

of more than 60 days or payments that were less than contractually agreed upon, and after a period of 15 days, authorities administered fines and other enforcement actions. MOHRE reported that letters were issued to companies and sent to the Public Prosecutor for WPS violations; MOHRE also reported that cases were only dropped when the missing wages were paid and the company was up to date with all salary payments. Although the NCCHT reported the government fined 3,050 companies that failed to provide payments to workers via the WPS in 2021, for the 14th consecutive year, the government did not report the number of complaints of unpaid wages it investigated as a result of its dispute resolution process or the WPS or if any such complaints were criminally investigated as potential trafficking crimes. However, Ministerial Resolution No. 43 of 2022 introduced new penalties on non-compliant companies and employers, including suspending their ability to issue new work permits, increased inspections, and a 1,000 Emirati dirham ($270) fine imposed for each worker. The government reported that through this resolution, continued violations resulted in referral to the Public Prosecutor's Office; during 2021, 2,051 non-compliant companies were referred to judicial authorities for violating the WPS. Media and diplomatic sources continued to report that some companies retained workers' bank cards or accompanied workers to withdraw cash, coercively shortchanging the employees even though the WPS showed the proper amount paid. Such cases were difficult to prove in labor courts, given the WPS documented accurate payments via designated bank accounts. Furthermore, domestic worker salaries were not required to be paid via the WPS; this, coupled with the lack of legal provisions requiring inspections of domestic worker accommodations, wage payment, and work hours, heightened domestic workers' vulnerability to exploitation. The government continued its pilot program from a previous reporting period through MOHRE's agreement with First Abu Dhabi Bank to incorporate domestic workers into the WPS. The NCCHT reported that the pilot program integrated 16,771 domestic workers at the close of the reporting period, a significant increase compared with 423 domestic workers enrolled at the close of the previous reporting period. The NCCHT reported that although the enrollment of domestic workers under the WPS was currently voluntary, the renewal of domestic worker permits will make enrollment mandatory, with the intent that all domestic workers will be integrated under the WPS in 2022.

Since 2017, the government has issued Tadbeer licenses to private recruitment agencies to recruit domestic workers to the Emirates. Agencies with Tadbeer licenses were mandated to provide training to recruited workers, educate them on their legal rights, resolve employee-employer disputes, and verify worker accommodations for compliance with domestic worker law minimum standards. Each licensed agency was equipped with a room solely for grievance mediation with a video connection to MOHRE for official oversight. Officials also reported when a dispute occurred between a domestic worker and employer, the worker could approach the Tadbeer-licensed agency for assistance instead of fleeing their employer, which rendered a worker undocumented and vulnerable to exploitation. However, Tadbeer-licensed agencies could not enter or inspect private homes, which made verification of worker accommodations and other protections outlined in the law difficult to obtain. Since 2019, MOHRE had mandated licensed agencies cover the cost of employer recruitment fees for domestic workers through an insurance policy with a two-year warranty; this policy aimed at ensuring recruitment fees would not be transferred to domestic workers from employers once they arrived in the UAE. In certain circumstances where a domestic worker terminated employment, employers were entitled to a full refund of the recruitment fees, which the licensed agency would cover. However, observers noted this insurance policy did not protect workers from fees they incurred from both legal and unregulated recruiters in their home country. Despite the expansion of agencies with Tadbeer licenses, the expensive costs to obtain a license—coupled with mandated insurance requirements to cover recruitment costs—disincentivized some private recruitment agencies from obtaining a Tadbeer certification. Furthermore, non-Tadbeer-licensed recruitment agencies remained popular as their services were viewed as cheaper and more flexible and accessible compared with Tadbeer-licensed agencies. However, as these agencies were not strictly regulated, many continued to be accused of violating labor and immigration laws and failing to guarantee the rights of workers and employers.

NGOs continued to raise concerns about the ease with which tourist visas could be converted to work visas for domestic workers looking to circumvent their home countries' recruitment ban in the UAE—a practice that exacerbated the risk of trafficking for these workers, as they often paid fees to recruitment agencies in both their home countries and in the UAE and had no protection under UAE law when they arrived on tourist visas. Furthermore, some workers were unable to switch their visas to employment visas and so continued to work illegally, heightening their vulnerability to exploitation. In the previous reporting period, in a purported effort to address this practice and solely use Tadbeer-licensed agencies for the recruitment and regulation of all domestic workers, MOHRE mandated the closure of 250 non-Tadbeer-licensed recruitment agencies in January 2021; agencies had the option to obtain a Tadbeer license, switch to another sector or shut down by March 2021. MOHRE reported, as of March 2021, citizens and residents would be required to hire domestic workers only through Tadbeer-licensed agencies. At the close of the reporting period, 68 Tadbeer-licensed agencies were operational across the Emirates, an increase from the 56 agencies that were operational at the end of the previous reporting period. Nonetheless, despite authorities mandating all hiring be conducted through the Tadbeer system, many UAE households continued to employ domestic workers directly or through other recruitment agencies, further increasing the vulnerability of domestic workers to exploitation and trafficking without protection under the law.

Federal Law No. 10 of 2017 provided additional protections for domestic workers, as well as regulations for recruitment agencies and employers of such workers, including those pertaining to hiring practices, working conditions, and employment contracts. Federal Law No. 10 also protected domestic workers' rights to retain their own identity documents but did not stipulate penalties for employers who confiscated workers' passports. Cabinet Resolution No. 22 of 2019 granted domestic workers the right to terminate their employment if an employer failed to meet contractual obligations, such as payment of wages, or if the employee was subject to sexual harassment or physical or verbal abuse by the employer; in these cases, a Tadbeer-licensed recruitment agency was required to provide shelter to the domestic worker. The government did not strengthen regulatory enforcement of in-home inspections and workplace grievance resolutions. In addition, legal barriers against government interference with private households continued to hamper monitoring and enforcement efforts of these laws relevant to domestic workers. Cabinet Resolution No. 22 included the right for employees to retain personal documents, sign standardized contracts with designated working conditions, access specialized tribunals for settling workplace grievances, and observe mandatory time off. It also stipulated in-home inspections on the basis of complaints or reasonable evidence of violations. Under the law's provisions, a recruitment agency or person who hindered law enforcement, anyone who disclosed information unveiled in an investigation, or anyone who facilitated the abandonment of a domestic worker may be jailed for a minimum of six months and ordered to pay a fine between 10,000 and 100,000 Emirati dirhams ($2,720 to $27,230).

Private sector workers were granted the freedom to leave and switch employers at any time without employer approval through Ministerial Decrees No. 765 and 766 of 2015; however, this decision included the requirement that the worker had to provide between one month and three-months' notice, depending on the initial contract terms, to leave an employer. In addition, workers had to physically possess their passport to leave the country or switch employers. Because the government did not enforce a prohibition on employers confiscating workers' passports, this practice remained pervasive and may have left some workers vulnerable to exploitation and potentially trafficking. The government reported that if an employer withheld a worker's passport, the worker could contact MOHRE's hotline where a legal advisor would speak to both parties and explain the worker's legal rights—including the prohibition of retention of identity documents; if the problem could not be resolved through arbitration, the case was referred to the labor courts. According to the NCCHT, 465,557 workers changed employers during 2021. As with domestic workers, in instances where a private sector worker faced physical or verbal abuse or sexual harassment, the worker had the freedom to leave the job without notice. All workers were able to terminate employment at any time in the absence

of abuse or a contractual breach but may be required to forego certain benefits including end of service gratuity and a return ticket to their home country. In those instances, a domestic worker may have had to pay their employer compensation equal to one month's wages and other entitlements deemed necessary by a court. In such instances, MOHRE could issue the domestic worker a new work permit to move to a new employer, and the worker was not subject to immediate deportation to ensure the worker had sufficient time to find a new job. Most workers chose to remain in the UAE to work for another employer under a new work permit or contract after terminating their previous employment. In February 2022, the government passed a revised private sector labor law under Federal Law No. 33 of 2021 that replaced Federal Law No. 8 of 1980, the previous private sector law, in its entirety. This law does not apply to domestic workers; however, it does outline new requirements for termination of a contract for both the employer and employee during and after the probationary period concludes. For example, if a worker wants to terminate a contract during the probationary period, the worker must give one month's notice if they want to change employers in the UAE or 14 days' notice if the worker wants to leave the country; the employer must also provide 14 days' notice to the worker if they plan to terminate the contract during that period. Notably, if a worker or employer terminated the contract, under the new law, the worker has 180 days to find a new job, compared with 30 days under the previous labor law, without incurring overstay fines or becoming undocumented. Furthermore, the new law prohibited discrimination of any form in the workplace, provided new flexible employment options, and introduced explicit prohibitions against forced labor, which previously only existed in the anti-trafficking law.

The government continued to post informational anti-trafficking notices at airports, implement training courses for high-risk groups, and disseminate publications in various languages directed at the most at-risk communities, reaching almost two million individuals during the year. The campaigns also raised awareness of penalties for trafficking and publicized hotlines. Airport banners specifically targeted terminals based on nationalities with high workforce numbers in the UAE. Relevant authorities, including the MOI, Dubai Police, and MOHRE, held a series of lectures and training programs in workers' residences and in recruiting offices to raise awareness on the types of trafficking crimes and ways to communicate with law enforcement authorities and shelters. The MOI conducted four different campaigns aimed at approximately 300 domestic workers and hotel workers; domestic-worker campaigns focused on raising awareness of their rights and the anti-trafficking law while the campaign for hotel workers explained indicators of trafficking. MOHRE continued to conduct lectures on the labor law and trainings on human rights and human trafficking issues to workers; it also began publishing a magazine aimed in part at raising awareness for workers on different labor issues. The PPO led a public campaign on social media on the anti-trafficking law and further explained "force" as an element of the crime, specifically in the context of force begging.

During the reporting period, the Dubai Foundation for Women and Children (DFWAC) provided information on human trafficking in five different languages through lectures, leaflets, and podcasts aimed at employees in the retail sector and for staff and students at local universities; in addition, it provided lectures and trainings to foreign embassies on trafficking and services available for victims. The Aman Shelter for Women and Children continued its campaign titled "No to Human Trafficking," scheduled to continue through 2025; the campaign used leaflets and public meetings to raise awareness of the crime. The shelter also targeted workers in beauty salons and spas to raise awareness of labor rights and trafficking indicators. In December 2021, shelter staff launched an interactive art display at the Dubai Expo; artists worked with two trafficking survivors to develop the installation, which featured audio commentary narrating the victims' experiences. Additionally, the Abu Dhabi Police worked with media outlets to warn job seekers about fraudulent internet employment ads that emerged as a result of increased unemployment due to the pandemic and cautioned laid-off workers to be cognizant of fraudulent job offers that charged recruitment fees, an illegal practice in UAE. The government funded and ran a 24-hour toll-free hotline for reporting cases of trafficking, delayed wage payments, or other labor violations, which operated in Arabic, English, Russian, and Urdu. Calls were categorized and automatically alerted police in

suspected trafficking cases. Additionally, MOHRE, MOI, and DFWAC had dedicated multilingual toll-free hotlines; MOI continued to host a mobile phone application that allowed users to access certain police services on their phones, and victims of trafficking or witnesses to the crime could use the application to file reports as well. In Dubai, law enforcement authorities ran a separate line, and UAE-wide there remained a 24-hour toll-free number for migrant workers to vocalize complaints or general inquiries. Analogous to previous years, the government did not report how many trafficking or trafficking-related calls any hotline received, how many victims were identified, or how many investigations were initiated during the reporting year.

In November 2021, in coordination with an international organization, the government hosted the "Inter-regional Meeting on Combating Trafficking by Air" to discuss challenges in detecting, investigating, and prosecuting trafficking cases where victims traveled to their destination and location of exploitation through commercial airlines; representatives from the region and East Africa participated, including airport law enforcement officers and staff from specialized trafficking police and prosecutions units. In the previous reporting period, the government announced a partnership between the UAE, Saudi Arabia, and the African Union to pilot and implement an orientation program for Gulf-bound workers from Africa; however, during the current reporting period, the government reported that all three stakeholders placed the program on hold due to the pandemic. The government continued to utilize its trafficking-related memoranda of understanding with Armenia, Australia, Azerbaijan, Bangladesh, The Gambia, India, Indonesia, Nepal, Pakistan, the Philippines, Sierra Leone, Thailand, Uganda, and Vietnam to regulate recruitment mechanisms and prevent contract switching. The government did not take measures to reduce the demand for commercial sex acts in the UAE. The Ministry of Foreign Affairs maintained provision of workshops and awareness programs on human trafficking for its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit foreign victims in the UAE. Foreign workers comprise nearly 90 percent of the UAE's population and are recruited globally. Lower wage labor, including most manual labor and a significant portion of the service sector, is provided almost entirely by migrant workers predominantly from South and Southeast Asia and the Middle East, with a growing percentage from East and West Africa. It is not uncommon for employers to subject some of these workers to conditions indicative of forced labor, such as passport retention, non-payment of wages and unpaid overtime, restrictions on movement, contract switching, fraudulent employment promises, substandard food and housing provisions, or a failure to meet other contractual agreements. Adults from some of these countries travel willingly to the UAE to work as domestic workers, security guards, drivers, gardeners, massage therapists, beauticians, hotel cleaners, or elsewhere in the service sector, but traffickers subject some of them to forced labor or sex trafficking after arrival. During the year, one human rights group reported migrant workers employed to support the Dubai Expo—held between September 2021 and March 2022—were allegedly subjected to conditions indicative of forced labor, including being charged recruitment fees, non-payment or delayed payment of wages, passport confiscation, and other abuses, including racial discrimination. Workers were also reportedly reluctant to access available grievance mechanisms for fear of reprisal by employers or authorities.

Observers continue to report the UAE serves as a trafficking hub where recruiters sell migrants to families who subsequently illegally transport them to other countries in the Gulf. As reported in the previous year, the UAE has in recent years become a primary destination for Ugandans seeking employment as domestic workers and security guards. Many Pakistanis are reportedly hired on promises they will receive handsome salaries, medical benefits, and accommodations, but after reaching the UAE, the promises go unfulfilled, with some Pakistanis discovering that the companies that hired them are fraudulent and workers are instead forced to obtain unregulated work due to their legal status, rendering them at increased vulnerability of exploitation and trafficking. For expatriate workers and domestic workers especially, the *kafala* or visa sponsorship system in the UAE restricts their ability to leave a position without prior notice. Despite legal measures allowing workers to change

sponsors or terminate their employment, some employers continue to exercise unilateral power over foreign workers' movements, deny laborers working illegally the ability to change employers, restrict permission for them to leave the country, and threaten employees with abuse of immigration processes, which heightens their vulnerability to trafficking. Traffickers subject some women, predominantly from Central Asia, South and Southeast Asia, East Africa, Eastern Europe, Iraq, Iran, and Morocco, to sex trafficking in the UAE, and most trafficking cases registered in the UAE are classified as sexual exploitation despite significant labor trafficking concerns. Anecdotal reports alleged an increase of traffickers in Laos recruiting young women through social media for commercial sex in Dubai. Anecdotal reports also alleged Mongolian nationals were subjected to labor trafficking in the UAE for herding, domestic work, and in circus performances during the year. Per media sources, some cases of child sex trafficking involve traffickers forging ages on passports to facilitate undetected entry into the UAE. Recruiters in some source countries work as individual agents rather than for regulated companies, complicating law enforcement and monitoring efforts.

Many source-country labor recruiters charge workers exorbitant fees in their home countries, causing workers to commence employment in the UAE owing debts in their respective countries of origin, increasing their vulnerability to trafficking through debt-based coercion. Reports of employers engaging in the practice of contract-switching persist, leading to less desirable and lower paying jobs for migrant workers post-arrival in the UAE. Traffickers often recruit victims from the large foreign national population already in the country. Some migrant workers enter the UAE on tourist visas and work for an employer who does not apply to exchange the worker's tourist visa for the required work visa in order for the worker to have legal residency; this subsequently can be used as coercion to exploit the worker. As pandemic-related border closures and travel restrictions eased by mid-2021, the use of tourist visas as a method to circumvent immigration and labor laws increased; migrants, especially from Africa, sought entry in the UAE via this method during the year. However, as in the previous reporting period, due to pandemic-related restrictions and the subsequent decrease in new workers entering the UAE, traffickers reportedly continued to use illegal online markets on social media to advertise and sell domestic workers already residing in the country. During the reporting period, workers continued to experience pandemic-related job loss, non-payment of wages, or forced leave without pay, which heightened their vulnerability to trafficking and trafficker's recruitment pitches; during the year, traffickers continued to target workers already residing in the country who had experienced pandemic-related job loss with false promises of better jobs through online platforms. In the previous reporting period, pandemic-related lockdown measures increased the vulnerability of domestic workers to trafficking by reinforcing their isolation and restricting their movement. In June 2021, media sources reported the government denied the renewal of work permits or issuance of new work permits for Nigerian nationals in certain employment categories working in the Emirates; one media source reported, as of October 2021, more than 700 Nigerians experienced job loss and therefore became undocumented in the country; some migrants traveled back to Nigeria, while others remained stranded due to their inability to pay for travel home, increasing their vulnerability to exploitation, including trafficking. Many UAE households continued to employ domestic workers directly or through private recruitment agencies instead of through Tadbeer-licensed agencies that had additional government oversight, further increasing the vulnerability of domestic workers to exploitation and trafficking without protection under the law. Furthermore, some employers sponsoring domestic workers continued to use online platforms to advertise the selling of domestic workers. According to UAE shelter staff, migrant workers will sometimes start with one employer and for various reasons, including abuse or exploitation, low salary, or simple dissatisfaction with the job, will follow alternate employment opportunities that ultimately prove fictitious, as traffickers in the UAE are adept at using manipulation to entice laborers with fraudulent higher salaries. Cuban nationals working in the UAE may have been forced to work by the Cuban government.

During the reporting period, there were no allegations the UAE unlawfully recruited or used child soldiers. In September 2019, the UAE reportedly ceased providing direct support to Security Belt Forces in Yemen, which allegedly unlawfully recruited or used child soldiers. In June 2020,

the UN Secretary-General delisted the Saudi-led Coalition in Yemen from the annexes of the UN report on Children and Armed Conflict. During a previous reporting period, an international organization alleged the government, as a member of a multi-nation coalition that commenced military operations against Houthi rebel forces in Yemen in 2015, provided training and coordinated operations with the Security Belt Forces, Hadhrami Elite Forces, and Shabwani Elite Forces—proxy militias fighting Houthi forces and terrorists in Yemen that allegedly unlawfully recruited or used child soldiers. Media also previously reported officers associated with Sudan's Rapid Support Force took bribes from families to unlawfully recruit children to serve as combatants in Yemen during that same period. Emirati officers allegedly trained and commanded some Sudanese combatants during the previous reporting period. While the UAE did not directly commission those forces, the Saudi-led Coalition fighting with Emirati and Yemeni government forces coordinated with Sudanese units that allegedly unlawfully recruited or used child soldiers during those years.

## UNITED KINGDOM: TIER 1

The Government of the United Kingdom (UK) fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore the UK remained on Tier 1. These efforts included prosecuting and convicting significantly more traffickers and issuing revised sentencing guidelines in England and Wales with recommended increased penalties for some traffickers. Additionally, the government identified more victims, expanded the Independent Child Trafficking Guardians (ICTG) program, and took steps to improve victim support, including by providing specialist support for some victims to navigate the criminal justice process and providing accommodation for some victims upon identification. Furthermore, the government launched a fund to support organizations in delivering targeted prevention activities and to build evidence of effective interventions, and ministerial government departments published their first annual modern slavery statements setting out measures they took to prevent trafficking in their operations and supply chains. Although the government meets the minimum standards, it did not report sentencing data of convicted traffickers; thus, it was unclear if judges consistently treated trafficking as a serious crime. The government also introduced measures observers believed would hinder victim identification and protection efforts, particularly among undocumented migrants. Observers continued to report long-term care and reintegration support for victims were inadequate, and many potential victims continued to face long wait times to enter the National Referral Mechanism (NRM) and begin receiving support. Observers reported the government penalized some victims for unlawful acts traffickers compelled them to commit. Children in the protection system remained vulnerable to trafficking, and foreign victims faced hurdles in obtaining residence permits.



UNITED KINGDOM TIER RANKING BY YEAR

### PRIORITIZED RECOMMENDATIONS:

Implement reforms to the NRM, including timely determination of victim status, to encourage more victims to come forward, particularly undocumented migrants. • Expand long-term care and reintegration support and monitor and assess outcomes of post-NRM support. • Ensure all potential victims, including individuals subject to immigration control, are consistently screened for trafficking indicators and referred to services. • Expand nationwide the ICTG program and train more social workers and

UNITED KINGDOM

care providers to better safeguard child victims. • Ensure victims are not penalized for unlawful acts, including immigration violations, traffickers compelled them to commit. • Ensure convicted traffickers are sentenced to significant prison terms to adequately deter trafficking. • Vigorously prosecute and convict suspected traffickers, particularly in Scotland and Northern Ireland. • Establish a database on investigations, prosecutions, convictions, and prison sentence data across the UK, categorized by type of trafficking. • Provide a clear route to residency for foreign victims and ensure potential foreign victims who are referred into the NRM can work. • Improve victims' ability to access court-ordered restitution in criminal cases and compensation through civil proceedings. • Ensure the statutory definition of trafficking under the Modern Slavery Act (MSA) and similar provisions in Northern Ireland do not require movement of the victim as an element of the crime. • Provide a trafficking-specific long-term alternative for foreign victims at risk if returned to their home country.

## PROSECUTION

The government increased prosecution efforts. The 2015 MSA, applicable to England and Wales, and similar statutes in Scotland and Northern Ireland, criminalized sex trafficking and labor trafficking and prescribed penalties of up to life imprisonment, which were sufficiently stringent and, with regard to sex trafficking, commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with international law, the laws in England, Wales, and Northern Ireland required the element of movement of a victim in the definition of "trafficking." However, these jurisdictions criminalized "slavery and servitude, and forced or compulsory labour" in other provisions of their law, which could be utilized to prosecute trafficking crimes that did not involve victim movement. Scotland, by contrast, did not require victim movement in the definition of trafficking.

In August 2021, there were at least 3,335 active law enforcement investigations of suspected trafficking crimes, compared with 1,845 in June 2020. The Crown Prosecution Service (CPS) prosecuted 466 defendants on trafficking charges, a significant increase from 267 defendants prosecuted in 2020. Courts convicted 332 traffickers in 2021, a significant increase from 197 convictions in 2020. CPS data did not differentiate between sex and labor trafficking, nor did the government provide data on the range of sentences of convicted traffickers or percentage of convicted traffickers serving prison time. In August 2021, the Sentencing Council published new sentencing guidelines—applicable to England and Wales—for trafficking crimes; judges and magistrates were advised to issue sentences of up to 18 years to traffickers in a leading role who expect substantial financial gains and who expose victims to an extremely high risk of death. Due to pandemic restrictions in 2020, courts experienced a backlog of more than 54,000 cases—including trafficking cases—in England and Wales by January 2021. In September 2021, media reported courts convicted three labor traffickers for exploiting up to 400 victims, in what was reported to be the UK's largest human trafficking prosecution to date. Law enforcement coordinated with financial institutions through the Joint Money Laundering Intelligence Taskforce to assist human trafficking investigations. Through the National Crime Agency-led Project AIDANT, UK law enforcement authorities participated in awareness-raising activities and anti-trafficking operations, including operations focused on labor exploitation and domestic servitude, child trafficking, and sexual exploitation. In June 2021, law enforcement arrested 38 suspected traffickers and identified 99 potential victims in a Project AIDANT operation targeting child traffickers.

Scottish authorities prosecuted 23 suspected traffickers (10 for sex trafficking and 13 for unspecified forms of trafficking) under the Scotland Human Trafficking and Exploitation Act (2015) between April 2021 and March 2022. Scottish authorities did not convict any traffickers during this period, compared with five convictions between April 2019 and March 2020, the most recent period for which data was available. Police Scotland had a specialized anti-trafficking unit to coordinate information and intelligence and work with law enforcement agencies across Europe to investigate trafficking cases. Due to the pandemic, courts in Scotland operated at reduced capacity and continued to face a backlog of cases from 2020. In 2021, authorities in Northern Ireland conducted 370 trafficking-related investigations. Northern Irish authorities prosecuted six suspected traffickers (five in 2020) and convicted one trafficker (zero in 2020). In March 2022, media reported the Police Service of Northern Ireland (PSNI) arrested a suspected trafficker for exploiting foreign nationals for labor on fishing vessels. Observers noted the

greatest impediment to the timely prosecution of alleged traffickers in Northern Ireland remained inherent delays in the legal system, often taking two or more years from the time of initial arrest to conviction.

The government provided a wide variety of anti-trafficking training to law enforcement officers, prosecutors, and first responders. The Home Office continued funding the Modern Slavery and Organized Immigration Crime Programme with an additional £1.4 million ($1.89 million) to support the police in combating trafficking and organized immigration crime. The government trained trafficking victim liaison officers to work with trafficking victims and victims of other serious crimes; these officers were trained to recognize trafficking indicators and refer potential victims into the NRM. The government trained law enforcement and prosecutors on the MSA's statutory defence for trafficking victims who were compelled by traffickers to commit unlawful acts. In May 2021, the government published a response to an official NGO complaint that the current police response resulted in victims not engaging with the police or supporting trafficking investigations and prosecutions; the response included several recommendations, including increased training for law enforcement and commissioning research into how victims' experiences with law enforcement can be improved. The PSNI collaborated with an NGO to download a smartphone application on all officers' mobile devices to support them in recognizing trafficking indicators. In coordination with the interagency and civil society, Police Scotland published a First Responder NRM Toolkit to support first responders and enable improved victim engagement and trauma-informed information gathering from victims. Observers reported training for criminal justice officials had improved but was still insufficient, particularly training on the non-punishment of victims and a trauma-informed approach.

The UK participated in 17 Joint Investigation Teams with EU Member States and EUROPOL, including a complex sex trafficking investigation targeting a Romanian organized criminal group operating in Scotland, England, and Romania and resulting in the arrest of approximately 27 Romanian nationals and the identification of more than 30 trafficking victims throughout Europe. The government convicted members of an international organized criminal group in 2021, including five Slovak nationals who committed trafficking crimes in Slovakia and the UK, with prison sentences ranging from four to eight years. Northern Irish authorities cooperated closely with Irish counterparts on law enforcement efforts across the island of Ireland. The supreme court's final decision on a 2019 ruling by the Employment Tribunal that diplomatic immunity did not protect against trafficking charges remained pending at the end of the reporting period. The government did not report any investigations, prosecutions, or convictions of government employees complicit in trafficking crimes.

## PROTECTION

The government demonstrated mixed protection efforts; although the government identified significantly more victims and expanded the ICTG program for children, it created a dual system for identifying victims among individuals who lacked secure immigration status and introduced legislation that experts widely believed would hinder identification and protection efforts. Through the NRM, authorities referred 12,727 potential trafficking victims for care nationwide in 2021, an increase from 10,613 in 2020. The Home Office maintained a detailed online database with disaggregated information, including source of referral, nationality, jurisdiction handling the referral, and type of trafficking. Of the referred victims, 77 percent were male, and 23 percent were female. Authorities identified 5,468 children, an increase from 4,946 in 2020. Authorities flagged 2,053 referrals (an increase from 1,544 in 2020) as "county lines" referrals, cases in which children were coerced to transport illegal drugs from one area to another, the majority (1,551) of these referrals were boys. The majority of identified victims were UK citizens (3,952), followed by Albanian (2,511) and Vietnamese (991) nationals. Labor trafficking, including forced criminality, was the most common form of exploitation of adults and children. In Scotland, 419 potential victims were referred to the NRM, an increase from 387 in 2020. In Northern Ireland, officials reported a significant increase in the number of potential victims referred to the NRM from 128 in 2020 to 363 in 2021. In Wales, 479 potential victims were referred to the NRM, an increase from 384 in 2020.

The NRM was the framework for identifying and providing care and support for victims. First responders, such as police, Border Force, local

Haiti AR_001051

authorities, and NGOs, continued to refer potential victims into the NRM. The Home Office's Single Competent Authority (SCA) handled most NRM referrals and ensured victims continued to receive support. After a "reasonable grounds" decision that an individual may be a trafficking victim, adult victims awaiting a "conclusive grounds" decision received a recovery and reflection period during which they could access support and protection measures; victims received support for at least 45 calendar days or up to the point a "conclusive grounds" decision was made, whichever was longer. If authorities recognized an individual as a victim per the "conclusive grounds" determination, they guaranteed the victim a minimum of 45 additional days of support; the government utilized a recovery needs assessment to tailor ongoing support to the victim's specific recovery needs and to determine the point at which a victim would exit the support services under the Modern Slavery Victim Care Contract (MSVCC). Observers expressed concern that the recovery needs assessment was too restrictive and placed the burden of documenting ongoing needs on survivors. After a confirmed victim transitioned out of MSVCC support, they could access assistance through the "reach-in service," a post-NRM service that offered transitional support, including provision of information and assistance to housing, health care, translation, employment, and support with submitting paperwork. In November 2021, the government created the Immigration Enforcement Competent Authority (IECA) to make reasonable grounds and conclusive grounds decisions in cases involving adults subject to immigration control, including adults in deportation proceedings and individuals served a notice of intent of potential inadmissibility of an asylum claim. The Independent Anti-Slavery Commissioner (IASC) and NGOs strongly criticized the creation of the IECA and the return to a dual system approach for identifying victims, underscoring that many victims who lacked secure immigration status may not be identified or protected and would subsequently fear coming forward to seek support; observers noted the government did not consult with civil society or the survivor community prior to making this change. The government sent a Nationality and Borders bill to parliament with the stated intent to clarify in law the UK's international obligations and entitlements for victims. Experts widely and strongly criticized the bill for increasing the burden of proof for victim identification and creating impediments regarding disclosure of status; conflating human trafficking with immigration; and disqualifying some victims, including children, who were compelled by traffickers to commit unlawful acts. UN Special Rapporteurs urged the government to reverse the bill's proposed measures and underscored the bill would seriously undermine the protection of trafficking victims. In Northern Ireland, potential victims received support for a minimum of 45 days while authorities reviewed their cases, and in Scotland, potential victims received support for 90 days or until authorities made a conclusive grounds decision, whichever came first. Support was also available for longer than 90 days in some circumstances. The Wales Anti-Slavery Leadership Group's "Survivor Care Pathway" provided a long-term post-NRM individualized plan for survivors.

Observers called on the government to improve victim screening measures and allow for more NGOs to be designated as first responder organizations (FROs), noting that only 12 NGOs held this status and could refer potential victims into the NRM. FROs were responsible for training first responders in their organization. In 2021, the government created a forum of first responder representatives to communicate with the Home Office and ensure that FROs had the tools and guidance to identify victims as efficiently as possible. In July 2021, the Home Office launched an e-learning tool for first responders focused on the vulnerabilities of child victims. The government updated guidance for housing authority staff to improve victim identification and support for potential victims experiencing homelessness. Observers noted that the quality of information provided to victims on their rights varied widely among first responders and interpretation and translation services were not fully available in practice at all stages of the victim support process. Experts also expressed concern victims often faced long wait times to receive a conclusive grounds determination under the NRM and that the current system did not adequately ensure victims exiting the system had a plan for sustainable independence, particularly foreign victims who may not be allowed to work, putting them at greater risk of re-trafficking. According to the Home Office, of the 12,727 NRM referrals during 2021, 80 percent (10,214) were awaiting conclusive grounds determinations at the end of the year. To reduce wait times, the government initiated a recruitment process for more than 200 new employees for the SCA throughout 2021.

The government continued implementing a five-year contract, valued at more than £300 million ($405.41 million), with the anti-trafficking NGO sector to coordinate the provision of care for adult victims in England and Wales under the NRM. Support services included financial support to meet essential living needs and assist with social, psychological, and physical recovery, access to a dedicated support worker to assist victims in accessing support services such as health care and legal aid, and safehouse accommodation where necessary. Observers expressed concern that consistent access to legal aid remained a challenge for many trafficking victims, undermining protection efforts. Moreover, GRETA expressed concern that potential victims were not provided legal aid prior to entering the NRM, preventing potential victims from receiving advice that would allow them to make informed choices, including whether to enter the NRM. An NGO noted that accommodation was provided according to availability rather than need and there was limited support available for victims with complex needs. An NGO observed many female trafficking victims were not offered safe house accommodations but were rather placed in unsafe asylum housing. The IASC further urged the government to increase efforts to provide safe mainstream accommodation for victims after they exit a safe house. Northern Ireland increased its budget from £350,000 ($472,970) for the 2020-2021 fiscal year to £600,000 ($810,810) for the 2021-2022 fiscal year for contracted support services by two local NGOs. The Northern Ireland Assembly considered legislation that would enshrine existing support and assistance for trafficking victims into law; the legislation was pending at the end of the reporting period. The Scottish Government provided £1.4 million ($1.89 million) in 2021-2022 funding to the two NGOs providing victim protection and support. The Scottish Government continued to fund the Scottish Guardianship Service to provide additional legal and practical support to unaccompanied children and victims of trafficking. To avoid re-traumatization, authorities encouraged police to use intelligence-led investigations, pre-recorded cross-examination for vulnerable victims, and allowed victims to apply for reporting restrictions and other measures to maintain anonymity. In 2021, the Home Office funded six projects to assist law enforcement and the Gangmasters and Labour Abuse Authority (GLAA) in improving support measures for victims; these projects included the provision of specialist support for victims to navigate the criminal justice process, specialist advice for investigators, temporary accommodation for victims upon identification, and translated information explaining criminal justice processes and support available to victims. Additionally, the Home Office commissioned independent research of three NGO models of support for victims navigating the criminal justice process; the government reported the results will be published in 2022. In 2021, Police Scotland seconded an NGO representative to the National Human Trafficking Unit to improve victim support.

Children received care through children's services offices in local jurisdictions; social workers worked with potential child victims to assess needs and create a care plan that included health, legal, education, and accommodation support. In May 2021, the government expanded the ICTG program to cover eleven additional geographical areas; the program covered two thirds of local authorities across England and Wales by the end of the reporting period. ICTG guardians provided an additional source of advice, support, and advocacy for child trafficking victims. Whereas ICTG direct workers provided direct support to children without a parental figure, ICTG Regional Practice Coordinators (RPCs) worked with social workers who supported children with a parental figure. NGOs expressed concern children assigned an RPC did not receive the full benefits of an ICTG direct worker who could advocate on their behalf. The government tested in various locations three of the MSA review committee's recommendations for improving the ICTG program by: removing the 18-month limit for ICTG support, enabling children who need it to continue to receive ICTG support upon reaching the age of 18, and allowing children who have a parental figure to access one-to-one support where there is an exceptional need. In addition, the MSA review committee also called on the government to implement the ICTG system nationally and require police to track cases of missing children until they are located, regardless of timeframe. NGOs highlighted concerns about the difficulty of safeguarding children who the government relocated away from their home to parts of the country where services are available; criminal gangs actively targeted vulnerable children who are taken out of their communities and run away or go missing. Observers noted unaccompanied migrant children were particularly vulnerable to trafficking and many of these children went missing after

their arrival in the UK. Media reported some unaccompanied migrant children were housed in hotels and provided limited assistance and supervision. The government developed Operation Innerste in England and Wales to improve the safeguarding response to unaccompanied migrant children across England and Wales. The Home Office conducted a pilot program to devolve NRM decision-making for children to local authorities. The Scottish Government created a strategic working group to support Glasgow City Council, one of 10 pilot sites throughout the UK, and operational partners with program implementation. Scotland and Northern Ireland required the appointment of independent legal guardians for child trafficking victims and trained the guardians on the support services available.

The government did not automatically grant foreign victims legal status in the UK; authorities reviewed requests for permission to remain in the UK outside the immigration rules, known as "discretionary leave," on a case-by-case basis. Discretionary leave decisions were not linked to an individual's status as a confirmed trafficking victim but were judged on individual circumstances. As of June 2021, European Economic Area (EEA) citizens were subject to immigration control and most trafficking victims from EEA countries were required to apply for discretionary leave to remain in the UK. Foreign victims who were granted a reflection period could not be removed from the UK during that period. Observers reported discretionary leave was only issued in a minority of cases and then often only for 12 months. Media reported that the government granted discretionary leave to only 7 percent of confirmed trafficking victims who requested it from April 2016 to June 2021. Observers further noted that foreign victims without legal status were unable to work until they received a positive conclusive grounds decision which could entitle them to discretionary leave. In October 2021, the High Court ruled that the Home Office's failure to grant discretionary leave to a trafficking victim under the NRM was unlawful because it did not consider whether the victim needed to stay in the country to pursue an asylum claim based on fear of re-trafficking. NGOs continued to express concern some foreign victims may have declined to enter the NRM out of fear of deportation upon exiting the system.

Victims had a statutory defense in England and Wales for many crimes committed as a direct result of being subjected to trafficking; the defense did not apply to the most serious crimes, such as sexual offenses or offenses involving serious violence. In these cases, the CPS had to consider whether it was in the public interest to prosecute the trafficking victim. GRETA concluded the statutory defense did not apply to more than one hundred offenses of varying degrees of seriousness, leading to a too narrow interpretation of the non-punishment principle. Moreover, observers expressed concern that many criminal defense lawyers did not have sufficient knowledge of trafficking and the non-punishment principle; GRETA noted that investigators, prosecutors and judges were insufficiently trained on this issue and that the burden of proof required of victims substantially hindered the use of the statutory defense. According to NGOs, authorities detained at least 2,914 potential victims of trafficking for immigration violations between January 2019 and September 2020. Observers expressed concern the government stripped citizenship from British citizens who went to Syria and Iraq to join ISIS without screening them for indicators of trafficking, despite indications some of them may have been victims of trafficking. In February 2022, a parliamentary group published a report stating there was "compelling evidence" that some British women and children currently detained in Syria were trafficking victims and claimed the government did not screen these individuals for trafficking indicators. Observers in Scotland noted an increase in the proportion of criminally exploited children who were charged with crimes and underscored that more trafficking victims faced criminal justice processes than traffickers. The courts allowed victims to testify by video, behind a screen, or with the public removed from the courtroom during hearings. Courts could grant restitution, but only after conviction of the trafficker and if satisfied that the defendant had the means to pay. However, NGOs noted courts infrequently granted restitution, and although victims could apply for compensation, this remedy was difficult to access given the small number of legal aid providers available to file such claims. During the 2020-2021 fiscal year, courts granted a total of £91,052 ($123,040) in compensation to trafficking victims in England, Wales, and Northern Ireland. Moreover, traffickers could appeal or contest a compensation order and observers noted traffickers often

moved assets, meaning that awards were often not paid in practice. In July 2021, the supreme court determined that trafficking victims who have unexpired convictions that are still part of the individual's criminal record are not entitled to seek compensation under the Criminal Injuries Compensation Scheme. GRETA further noted that free legal assistance was not provided in practice to victims seeking compensation under this scheme in England and Wales in spite of a complex compensation procedure and the requirement that victims prove they have suffered a physical or psychiatric injury as a direct result of a violent crime in order to receive an award; the Northern Ireland Criminal Injuries Compensation Authority could withhold or reduce compensation if the victim did not report the circumstances of the injury to the police and could not offer a reasonable explanation for not doing so, did not cooperate with law enforcement, or had a criminal conviction.

## PREVENTION

The government increased prevention efforts. The Home Office was responsible for coordinating the government's anti-trafficking prevention and protection efforts. The Home Office published its 2021 annual report in October, with detailed data on anti-trafficking efforts across the UK as well as an outline of achievements and remaining challenges to fully implement the MSA. The UK government conducted a review of the 2014 Modern Slavery Strategy, to be completed in 2022; the Home Office engaged with a range of actors, including the interagency, business, academia, civil society, and the survivor community to develop the new strategy. The IASC encouraged good practice in the prevention, detection, investigation, and prosecution of trafficking crimes as well as the identification of victims. In 2021, Northern Ireland's Department of Justice created a Modern Slavery and Human Trafficking Branch, responsible for developing the government's Modern Slavery and Human Trafficking Strategy; in May 2021, Northern Ireland released its fourth annual strategy. In January 2022, Scotland published its fourth annual Trafficking and Exploitation Strategy progress report, developed with survivor input.

The government continued to support the Modern Slavery and Human Rights Policy and Evidence Centre through a five-year £10 million ($13.51 million) investment through the 2023-2024 fiscal year to better understand how to combat trafficking and to develop research to inform policy choices. The center published policy briefs on trafficking and international development and the effectiveness of forced labor bans, in addition to funding a research project assessing potential interventions for trafficking prevention in the UK and funding five research projects focused on long-term survivor outcomes and recovery. Notably, one research project included survivors of trafficking in research design, data collection, and analysis. The Scottish Government commissioned a fifth annual public awareness study to explore the public's understanding of human trafficking, noting a slight decrease in awareness compared with 2020 results. Northern Ireland used the results of a PSNI Modern Slavery Human Trafficking Unit (MSHTU)-commissioned academic research project exploring the use of social media in offering support to potential victims and in raising awareness about the MSHTU to design a social media strategy for the UK's October 2021 Anti-Slavery Day.

The government funded a specialist helpline which provided advice and support to children and adults on "county lines," criminal exploitation, and gangs. The government conducted awareness campaigns across the UK with a wide range of partners. In November 2021, the Home Office launched the Modern Slavery Prevention Fund to support organizations and key practitioners in delivering targeted prevention activities and to build evidence of effective interventions; the government funded seven projects, including projects focused on communication and awareness raising campaigns, educational initiatives, promotion of industry standards, tackling slavery in supply chains, and data analysis. Police Scotland launched a media campaign encouraging businesses to examine recruitment and supply chains. The government launched a Responsible Car Wash Scheme, a voluntary licensing scheme that required the operator to consent to certain measures, including the prevention of worker exploitation and the provision of safe and hygienic working conditions; in June 2021, the government awarded accreditation to two car wash operators. In August 2021, a GLAA-led case resulted in the conviction of a trafficker; the court sentenced the man to six years' imprisonment and issued a 10-year Slavery and Trafficking Prevention

Order (STPO), allowing the court to impose restrictions to prevent the trafficker from committing further trafficking crimes upon release; this was the first time the GLAA used an STPO. In response to continued concern from NGOs about the garment industry's use of forced labor in Leicester, England, a government taskforce continued investigating apparel companies; the taskforce has visited more than 300 locations to date. In June 2021, the government announced it would establish a new consolidated labor protection watchdog to improve enforcement through better coordination and intelligence sharing.

Foreign overseas domestic workers (ODW) could legally change employers during the remaining six-month period of their visa. Observers criticized the short-term nature of the visa, noting that workers struggled to change employment in the visa's short time frame, leading to the workers' heightened vulnerability to trafficking. Workers on the ODW visa identified as trafficking victims could apply for a two-year visa as a domestic worker, although NGOs contended workers who had suffered abuse would be unlikely to want to return to the same sector. NGOs urged the government to adopt reforms to the ODW visa, particularly in light of the heightened exploitation overseas domestic workers faced as a result of the pandemic. Observers also expressed concern about the government's transit visa scheme for workers in the fishing industry, noting the inability to change vessels or leave the vessel without violating the terms of the visa left workers at risk of labor rights abuses and labor trafficking. In May 2021, UN Rapporteurs called on the government to allow migrant workers the right to change employers at any given time and for any reason and the ability to apply for a visa extension. In December 2021, the government published an evaluation of the seasonal workers pilot for non-EU migrants, noting several areas of concern regarding the welfare and rights of migrants. NGOs urged reform of the program, noting it left migrant workers vulnerable to exploitation; according to an NGO study, many of the workers accrued large debts and were limited in their ability to change employers. Moreover, NGOs expressed concern the government's strict immigration policies, which criminalized the act of working while undocumented, continued to prevent trafficking victims from seeking help. Observers noted the absence of secure reporting options for undocumented individuals to come forward as victims of crime undermined the government's identification and protection efforts.

The government continued to require organizations with annual turnover exceeding £36 million ($48.65 million) to publish an annual statement on the government's modern slavery statement registry detailing efforts to ensure its operations and supply chains were free of human trafficking, although observers noted the MSA did not include a mechanism to ensure compliance. In November 2021, the government published a progress report outlining the government's efforts to meet the goals set out in the 2020-2021 UK Government Modern Slavery Statement, and ministerial government departments published their first annual modern slavery statements outlining measures they took to prevent trafficking in their operations and supply chains. In July 2021, the government launched a virtual course for public sector commercial employees on ways to identify and mitigate human trafficking risks throughout the commercial lifecycle. The government commissioned the development of tailored guidance for buyers and suppliers of personal protective equipment to prevent human trafficking in supply chains. The Welsh Government published for consultation draft legislation seeking to ensure socially responsible public procurement in Wales, including consideration of fair labor standards. During its G7 Presidency, the government secured commitments to address forced labor in global supply chains. The government continued efforts under its national action plan on combating international child sex tourism. The government criminalized soliciting a sex trafficking victim. In June 2021, the Scottish Government published a response to Scotland's first national consultation on the government's future approach to combating demand for commercial sex; the government created a working group to develop a concept to tackle this issue.

The government funded a wide range of anti-trafficking programs globally, including continued implementation of programs under the £33.5 million ($45.27 million) Modern Slavery Fund (MSF), of which the government committed more than £4 million ($5.41 million) to a range of anti-trafficking efforts in fiscal year 2021-2022, particularly in Albania, Nigeria, and Vietnam. In Nigeria, the MSF provided embedded

capacity-building support to Nigerian law enforcement through a peer mentoring program, improving authorities' ability to conduct active investigations. To date, the government reported the MSF provided direct assistance to more than 2,500 victims of trafficking, contributed to 35 anti-trafficking policies in 14 countries, and delivered more than 30 "evidence products" helping to advance collective understanding of human trafficking. Through the Modern Slavery Innovation Fund, the government funded projects to improve workers' rights in Mauritius and Malaysia; support victims in India; tackle stigma as a driver of trafficking in Ethiopia and Indonesia; and strengthen the global evidence base. In 2021, the government committed £235,000 ($317,570) in funding for Romania to build law enforcement capacity, enable safe reporting of cases, and strengthen coordination between the two countries; the government additionally supported Romanian government and civil society efforts to prevent trafficking and protect victims. In April 2022, the UK embassy in Poland reconvened a human trafficking working group with Polish law enforcement and judicial sector representatives after a two-year hiatus; initially created to address the exploitation of Polish nationals in the UK, the working group was reconstituted to address the refugee crisis resulting from Russia's full-scale invasion of Ukraine and associated trafficking risks. The UK's Commonwealth Parliamentary Association worked with Commonwealth countries to pass human trafficking legislation, using a tailored approach suited to each country's needs and capacity. Observers reported many of the government's global anti-trafficking aid programs did not demonstrate direct impact in reducing the prevalence of trafficking and did not adequately include monitoring and evaluation mechanisms. The government funded UNODC's Inter-Agency Coordination Group against Trafficking in Persons (ICAT) to produce a strategic mapping exercise of the activities, mandates, and partnerships of ICAT members to inform the development of multilateral strategies and capacity-building activities. The government also partnered with the United States, Liechtenstein, Canada, and others to secure language in a UN resolution to ensure trafficking prevention measures are included in UN procurement.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in the UK, and traffickers exploit victims from the UK abroad. Although the government reported 12,727 potential victims came through the NRM in 2021, one NGO estimates the actual number of victims in the UK is closer to 100,000. The UK, Albania, and Vietnam are the leading nationalities of potential victims referred into the NRM. Thirty-one percent of potential victims assert their exploitation occurred entirely outside of the UK. Labor trafficking, including forced criminality, is the most common form of exploitation among adults and children. Migrants crossing the English Channel in small boats are vulnerable to exploitation; more than 28,300 migrants crossed the channel in 2021, many of whom were unaccompanied children. Nearly half of all victims identified are children. Children in the care system and unaccompanied migrant children are particularly at risk of trafficking. Gangs force children to act as drug couriers from larger cities into rural areas across the UK. Traffickers force adults and children to work in agriculture, cannabis cultivation, construction, food processing, factories, domestic service, nail salons, food services, the hospitality industry, car washes, food supply industry, and warehousing, as well as on fishing boats. Labor traffickers target adults with disabilities and adults from low socio-economic backgrounds. Traffickers increasingly recruit and exploit sex trafficking victims, predominantly from Eastern Europe, through social media and online platforms. Following Brexit, EEA citizens who had not gained legal status in the UK were at increased risk of trafficking. Thousands of Ukrainian refugees, predominantly women and children who are fleeing Russia's full-scale invasion of Ukraine, have crossed the UK border seeking sanctuary and are vulnerable to trafficking. In Scotland, most victims are from Vietnam with many forced to work in agriculture, cannabis farms, and nail salons. In Northern Ireland, there are cases of perpetrators forcing victims into shoplifting and the cultivation and distribution of illicit drugs; paramilitary groups exploit children for criminal purposes. Young women and girls from Albania, Bulgaria, and Romania, including ethnic Roma, remain vulnerable to sex trafficking in Northern Ireland.

# UNITED STATES OF AMERICA:
## TIER 1

The Government of the United States fully meets the minimum standards for the elimination of trafficking. The government continued to demonstrate serious and sustained efforts during the reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore the United States remained on Tier 1. These efforts included significantly increasing the number of victims served by federal grantees; issuing new policies and guidance to improve adjudication of trafficking-specific immigration options; passing laws that prohibit federal law enforcement officers from engaging in a sexual act or contact with anyone in their custody and raising the penalty for doing so for law enforcement officers at any level of government; and increasing enforcement of the prohibition of imports made wholly or in part by forced labor. The government made progress in implementing its national action plan to combat trafficking, and several government agencies issued and began to implement their own internal action plans and strategies. Although the government meets the minimum standards, in some cases survivors continued to be arrested for the unlawful acts traffickers compelled them to commit, and some victim-witnesses did not receive needed protections during their case. There was a continued lack of progress to comprehensively address labor trafficking in the United States, including in efforts to identify victims, provide them specialized services, and hold labor traffickers, including contractors and recruiters, accountable. The government continued not to mandate human trafficking screening for all foreign national adults in immigration detention or custody and did not screen for trafficking indicators among the people it removed. Advocates continued to report concerns that trafficking survivors were held in immigration detention and that the government's policy to return to Mexico certain individuals from the Western Hemisphere, while their U.S. removal proceedings were pending, exacerbated their vulnerability to human trafficking.



**PRIORITIZED RECOMMENDATIONS:**
Increase efforts to comprehensively address labor trafficking in the United States, including identification of and provision of services to labor trafficking victims. • Screen all individuals in immigration detention or custody for human trafficking indicators. • Assess government systems and programs to ensure they advance equity for and decrease the vulnerability of marginalized communities to human trafficking. • Improve access to emergency and long-term housing for all victims. • Increase access to and accessibility of specialized services for all victims. • Mitigate vulnerabilities in employment-based or other nonimmigrant U.S. visa programs, including by holding accountable noncompliant employers and labor contractors, as well as their agents, and improve workers' access to timely and comprehensive job information. • Increase the number of requests by federal law enforcement officials for Continued Presence. • Shorten processing times for trafficking-related immigration benefits and remove barriers for victims to obtain those benefits. • Encourage state, local, and tribal authorities to implement policies not to prosecute victims for unlawful acts traffickers compelled them to commit and to adopt laws to prohibit law enforcement officials from engaging in sexual acts with victims. • Evaluate the effectiveness of current federal law enforcement strategies in identifying and supporting victims and adjust strategies as necessary. • Train investigators, prosecutors, and judges to increase the number of forfeiture orders and mandatory restitution orders for trafficking victims and use all available authorities to ensure restitution is paid. • Increase survivor engagement, including by establishing accessible mechanisms for receiving and providing

compensation for survivor input when forming policies, programs, outreach materials, and trainings. • Strengthen efforts to address demand for all forms of human trafficking.

As described in the Methodology section of this report, these recommendations were drawn from input solicited from multiple anti-trafficking stakeholders, such as advocates (which includes NGOs and subject matter experts who have survived human trafficking), academia, and government agencies, on how the United States could better meet the minimum standards set forth in the TVPA.

**PROSECUTION**
The government maintained prosecution efforts. The TVPA, as amended and codified at Title 18 U.S. Code sections 1581, et seq., criminalizes sex and labor trafficking. U.S. law confers extraterritorial jurisdiction for these human trafficking offenses, as long as the defendant (whether individual or entity) is a U.S. national, U.S. lawful permanent resident, or is present in the United States, regardless of the defendant's nationality. The penalties prescribed under these provisions, which can include up to life imprisonment, are sufficiently stringent and, with respect to sex trafficking, commensurate with the penalties prescribed for other serious crimes, such as rape. U.S. law prohibits conspiracy and the attempt to violate these provisions, obstruction of the statutes' enforcement, and benefiting from such acts. Additionally, a criminal statute prohibits the use of fraud to recruit, solicit, or hire workers abroad to come to the United States to work, or to recruit workers to work on a U.S. government contract performed outside the United States, on U.S. property, or on military installations outside the United States. The U.S. Congress passed several laws that address human trafficking and related crimes, including a provision that requires the federal government to create a process through which survivors with certain documentation can request to remove information about adverse credit activity from their credit report if the information is linked to their trafficking experience; a provision that prohibits federal law enforcement officers from engaging in a sexual act or contact with anyone, including potential victims of human trafficking, in their custody, under arrest, in detention, or under their supervision, regardless of consent; and another provision that raises the penalty from a misdemeanor to a felony whenever anyone acting under color of law (at any level of government) engages in nonconsensual sexual acts or contact.

The Department of Justice (DOJ), Department of Homeland Security (DHS), and Department of State (State) are the primary investigating agencies for federal human trafficking and other related offenses, with the Department of Defense (DoD) enforcing the U.S. military code to prosecute sex trafficking-related offenses. DOJ prosecutes federal human trafficking cases. DOJ, DHS, and State support victims by engaging law enforcement victim assistance specialists during trafficking investigations and prosecutions, including by connecting identified victims to victim service providers. DOJ increased the number of trial attorneys in its specialized national human trafficking prosecution unit that works with federal prosecutors throughout the United States. In Fiscal Year (FY) 2021, DHS forensic interview specialists conducted 542 trafficking-focused interviews using a trauma-informed approach, and DHS victim assistance specialists assisted 728 victims of human trafficking. DOJ forensic interview specialists conducted 202 human trafficking forensic interviews of victims, and DOJ's 172 victim specialists provided services to human trafficking victims in 708 cases. The Department of the Interior (DOI) added four victim specialist positions, bringing the total number of victim specialists to 29, to provide services to victims in DOI criminal cases, including human trafficking cases, and established a hotline that its law enforcement officers can use to reach the victim specialists. DHS issued internal guidance directing DHS officials to no longer conduct mass worksite enforcement operations aimed at identifying unauthorized workers and instead shift enforcement resources to investigate employers allegedly engaged in forced labor and other illegal acts.

DOJ, in coordination with DHS and the Department of Labor (DOL), continued to support complex human trafficking investigations and prosecutions initiated and developed in Phase II of the Anti-Trafficking Coordination Team (ACTeam) Initiative. In FY 2021, DOJ provided $22.3 million to support the work of 15 Enhanced Collaborative Model (ECM) anti-trafficking task forces, which included awards to 15 state

and local law enforcement agencies and 15 victim service providers, compared with more than $17.7 million for 14 ECM task forces in FY 2020 (13 state and local law enforcement agencies and 14 victim service providers). In addition, DOJ provided $2.4 million to develop strategies and models to support jurisdictions' human trafficking law enforcement and prosecution efforts and to improve stakeholders' ability to implement victim-centered and trauma-informed investigations and prosecutions. The Department of the Treasury (Treasury) identified hundreds of shell companies registered in the United States that were part of supply chains where forced labor was found, and it shared that information with law enforcement. In June 2021, Treasury issued the first government-wide priorities for anti-money laundering and countering the financing of terrorism, which identified human trafficking as an anti-money laundering priority. Several federal agencies participated in other human trafficking task forces nationwide consisting of federal, state, and local law enforcement, as well as victim service providers.

DOJ and DHS continued to advance bilateral investigations and prosecutions of transnational trafficking enterprises operating across the U.S.-Mexico border by facilitating exchanges of leads, intelligence, and expertise between U.S. and Mexican anti-trafficking authorities and providing support to Mexican state-level authorities and human trafficking task forces. DOJ, in collaboration with Treasury, increased engagement with Mexican anti-money laundering authorities to enhance capacity to identify and combat human trafficking and trace trafficking proceeds. DOJ assisted Mexican authorities with establishing an anti-trafficking task force that handled complex investigations.

Advocates maintained that the use of traditional vice investigative strategies, like undercover sting operations, by law enforcement and federally funded task forces, has not been effective in identifying trafficking cases or leading to prosecutions for human trafficking offenses. According to these advocates, such operations have resulted in the re-traumatization of trafficking victims, including through the arrest of victims who did not self-identify to law enforcement as such, rough physical treatment, and the threat of criminal charges to compel cooperation. Advocates reported federally funded task forces did not sufficiently engage with local survivor leaders and service providers to improve victim services and better understand the communities and populations they served. One study found, through interviews with law enforcement officers, that officers sometimes chose not to work with service providers, especially if they believed those providers would inform survivors of their right not to speak with law enforcement. A federally funded study of 10 task forces found when law enforcement and service providers did collaborate, it improved task force efficacy. Advocates called on federal, state, and local governments to redirect funding from law enforcement to community-led organizations to identify human trafficking situations in ways that would inflict less harm, in particular on Black and Brown communities, and better assist victims. Advocates also called for federal prosecutors and law enforcement officers to adopt protocols to inform trafficking victims of their legal rights at the start of and throughout their investigations.

Advocates reported instances of trafficking victims who, as a result of encounters with various law enforcement agencies, were arrested, threatened with charges if they did not cooperate in a case against their trafficker, prosecuted, convicted, and—in cases where they were convicted of a certain criminal offense—required to register as a sex offender for unlawful acts traffickers compelled them to commit. Survivors in some cases received a criminal penalty that included fees or fines, which required many of them to incur large financial hardship to pay. Although U.S. Supreme Court caselaw obligates states to return fees, court costs, and restitution assessed against defendants whose convictions were vacated and to not impose anything more than minimal procedures for seeking such refunds, one NGO noted many states did not inform trafficking survivors of these obligations, resulting in survivors potentially not receiving refunds in such a manner due to lack of awareness. The federally funded study found half of the 10 ECM task forces included in the study indicated they arrested survivors as part of the investigative strategy. Another study that included interviews with law enforcement officials, survivors, and anti-trafficking advocates found law enforcement disproportionately arrested victims who were Black women and girls during sting operations, and it noted bias inhibited

victim identification among communities of color. One NGO noted law enforcement disproportionately dismissed requests for help from survivors who were Black, Indigenous, or people of color, or arrested them when they came forward. Advocates noted cases where law enforcement used access to victim services as a tool to secure victims' cooperation and deprioritized the protection of victim-witnesses as the case progressed. Some diversion courts made survivors choose between enrollment in services or incarceration. Advocates reported the arrest and poor treatment of victims during the criminal justice process increased those victims' distrust of law enforcement and gave credibility to traffickers' warnings to not seek help. One NGO recommended the government adopt standardized trafficking screening for the judicial and criminal justice system to reduce the penalization of victims for unlawful acts traffickers compelled them to commit.

The federal government reports its law enforcement data by fiscal year, which may include joint federal and state or local actions but does not include separate state or local law enforcement data. In FY 2021, DHS opened 1,111 investigations related to human trafficking, an increase from 947 in FY 2020. Six of those investigations were of individuals and entities that may be benefiting from goods produced using forced labor overseas. DOJ formally opened 603 human trafficking investigations in FY 2021, a decrease from 663 in FY 2020. Of DOJ's FY 2021 investigations, 577 involved predominantly sex trafficking and 26 involved predominantly labor trafficking, compared with 619 and 41, respectively, and three involving both sex and labor trafficking in FY 2020. State reported investigating 111 human trafficking-related cases worldwide during FY 2021, an increase from 95 in FY 2020. In FY 2021, DoD reported investigating 108 human trafficking-related cases involving DoD military, civilian, and contractor personnel, a significant decrease from 160 in FY 2020, and 53 of those cases were referred for criminal investigation. Of the 108 human trafficking-related cases, 31 were related to forced labor (compared with 112 in FY 2020), most of which DoD investigated through an administrative process that referred cases to criminal investigators if appropriate. The 31 forced labor investigations are detailed in the Prevention section below.

DOJ initiated a total of 228 federal human trafficking prosecutions in FY 2021, an increase from 210 in FY 2020 and 220 in FY 2019, but a decrease from 230 in FY 2018 and 282 in FY 2017. DOJ charged 347 defendants in FY 2021, an increase from 337 in FY 2020 and 343 in FY 2019, but a decrease from 386 in FY 2018 and 553 in FY 2017. Of these FY 2021 prosecutions, 221 involved predominantly sex trafficking and seven involved predominantly labor trafficking, compared with 195 and 15 in FY 2020; 208 and 12 in FY 2019; 213 and 17 in FY 2018; and 266 and 16 in FY 2017, respectively.

During FY 2021, DOJ secured the convictions of 203 traffickers, a decrease from 309 in FY 2020, 475 in FY 2019, and 526 in FY 2018. Of these, 190 involved predominantly sex trafficking and 13 involved predominantly labor trafficking, compared with 297 and 12 in FY 2020; 454 and 21 in FY 2019; and 501 and 25 in FY 2018, respectively.

These prosecutions and convictions included cases brought under trafficking-specific criminal statutes and non-trafficking criminal statutes, but they did not include child sex trafficking cases brought under non-trafficking statutes. Among the 177 traffickers sentenced to prison in cases brought under trafficking-specific criminal statutes, which excludes trafficking cases brought under non-trafficking statutes, judges imposed terms ranging from six months to life imprisonment, with more than 84 percent of defendants receiving prison sentences of five or more years. Three traffickers received a probation-only sentence, and eight received a suspended sentence. This sentencing data came from federal courts, which tracked cases only by trafficking-specific criminal statutes, did not indicate all applicable charges when a defendant was charged with more than five offenses, and did not capture trafficking cases resolved by pleas to non-trafficking charges.

A DHS inspector general report found DHS did not accurately track dissemination and receipt of tips on human trafficking through its tip line, take follow-up actions on the tips, or maintain accurate data on investigative cases and victims. In response, DHS formalized its intake process and tracking policy for human trafficking tips that come through

UNITED STATES OF AMERICA

UNITED STATES OF AMERICA

its tip line to require each DHS field office to track tips and report any investigative or enforcement outcome resulting from a tip.

Advocates and racial justice experts have noted that increases in the number of investigations, prosecutions, and convictions do not on their own indicate progress in anti-trafficking efforts, in securing equitable outcomes for members of racial and ethnic minorities, or in implementing victim-centered, trauma-informed approaches. Advocates recommended that assessing law enforcement anti-trafficking efforts must center on the treatment of survivors throughout the criminal justice process, such as how many survivors law enforcement arrested and how many survivors law enforcement connected to services. Advocates called for the government to disaggregate law enforcement data by demographic groups to better understand its approaches to different communities.

Federal human trafficking cases continued to involve predominantly sex trafficking despite service providers assisting significant numbers of labor trafficking victims. Advocates noted in particular the low number of federal labor trafficking cases involving child labor trafficking victims, private employer or corporate defendants, and forced criminality.

Advocates continued to call for federal prosecutors to seek, and for courts to award, mandatory restitution for both sex and labor trafficking cases, citing concerns about both the low number of cases in which it was ordered and the low rate of payment of restitution to trafficking victims consistent with restitution orders. One NGO noted that about 34 percent of defendants convicted of a crime that triggered mandatory restitution were ordered to pay restitution in 2021, compared with approximately 47 percent in 2020. Advocates again called for increased and improved training of investigators, prosecutors, and judges on mandatory restitution and urged the government to use its available authorities, such as freezing or seizing assets and seeking forfeiture, to ensure compliance with restitution orders. Advocates again noted that, while not required by law, many victims lacked independent legal counsel to assist them in obtaining restitution, and one advocate reported survivors were pressured into accepting lesser amounts.

State laws form the basis of most criminal actions in the United States. All U.S. states and territories have anti-trafficking criminal statutes. The federal government expanded its collection of state, local, and tribal data on human trafficking investigations through the Uniform Crime Reporting Program and began to migrate it to a more dynamic platform. It made data from 2020, collected from participating jurisdictions, publicly available. All 50 U.S. states had some participating jurisdictions in 2020, compared with 48 states the previous year, although the numbers of participating jurisdictions within states varied. In 2020, participating jurisdictions reported 2,023 human trafficking offenses. There is no formal mechanism for the federal government to track prosecutions at the state, local, and tribal levels.

An NGO-funded project reported 48 states have laws allowing survivors to seek a court order vacating, expunging, or sealing criminal convictions entered against them that resulted from unlawful acts traffickers compelled them to commit, compared with 46 states in the previous reporting period. In three of these states, however, such relief is only available to child trafficking victims. One advocate reported some state vacatur laws only pertained to sex-related crimes, excluding other acts traffickers may have compelled survivors to commit like drug trafficking or financial crimes. Even with such laws, the cost of applying for criminal record relief, including processing fees, legal representation, and travel to hearings, often created financial hardship and inhibited survivors' ability to obtain such relief. These costs from pursuing criminal record relief compounded the significant financial burden survivors may have already faced from contesting the charges and convictions. NGOs continued to call for the adoption of federal vacatur legislation.

According to one NGO report, 27 states and the District of Columbia had laws that prohibited the prosecution of child trafficking victims for commercial sex, eight of which also prohibited arresting, detaining, and charging them. That same report noted only 17 states had laws that prohibited the prosecution of child sex trafficking victims for unlawful acts traffickers compelled them to commit and only 32 states formally recognized all child sex trafficking victims as such, whether or not there was third-party control, under their criminal codes. That NGO called for states to reduce reliance on live, in-court testimony from child sex

trafficking survivors in criminal cases by offering alternative means of providing testimony.

There were reports of government personnel complicit in human trafficking crimes, and the government took action to increase its ability to hold such personnel accountable in some cases. There were also reported instances of law enforcement officers sexually abusing or engaging in sexual acts with known or suspected victims of sex trafficking in the course of conducting criminal investigations. Federal investigations into incidents involving federal law enforcement officers remained ongoing, and in the second half of 2021, DOJ issued a policy notice prohibiting undercover personnel from engaging in sexual acts to obtain intelligence or evidence from investigative subjects or other persons of interest. One study noted even where law enforcement officers did not engage in sex acts with victims, some of those officers thought they were allowed to do so. Advocates called for state legislation prohibiting engagement in sexual conduct with victims during law enforcement actions, which only one state in the country had in place.

Domestically, the U.S. government continued to build the capacity of law enforcement, judges, military personnel, and labor inspectors, among others, to respond more effectively to human trafficking cases through trainings and workshops. DOJ partnered with an NGO to develop training materials for law enforcement and prosecutors on labor trafficking. State began mandating biennial human trafficking training for its law enforcement and security personnel. Internationally, through case-based mentoring and expert legal advice, the U.S. government worked with foreign counterparts to strengthen their capabilities to investigate and prosecute human trafficking.

Advocates again called for increased training—including in consultation with survivor leaders—across all criminal justice system sectors, including law enforcement, prosecutors, and judges, to correct misconceptions about what constitutes a human trafficking crime and to identify forced criminality. Advocates highlighted, in particular, the need to increase training for law enforcement and judges on victim identification and trauma-informed approaches to interacting with victims, noting failures to inform survivors of their rights throughout the criminal justice process, to update survivors on the status of their cases, and to allow victim-witnesses to access legally required and adequate protections during the investigation and prosecution.

## PROTECTION

The government increased overall protection efforts. The government significantly increased the number of victims served. It also adjudicated more Continued Presence applications, granted more Certification Letters, and granted significantly more Eligibility Letters. The government implemented policies intended to improve access to immigration benefits, including Continued Presence and T and U nonimmigrant status, for foreign national trafficking victims. However, the number of victims granted T nonimmigrant status significantly decreased. Although the median processing time for T nonimmigrant status slightly decreased, victims still faced long periods of time without support services, legal status, and employment authorization. Advocates reported the government made efforts to improve access to trafficking-specific immigration options but again expressed concerns about previous immigration policies and ongoing policies related to immigration enforcement at the border. Advocates noted that trafficking survivors continued to fear reporting their cases to government officials, pursuing immigration options, or seeking services and that trafficking survivors were held in immigration detention facilities. The government did not provide sufficient services for labor trafficking survivors, boys and men, LGBTQI+ persons, survivors struggling with addiction, persons with limited English proficiency, children aging out of services, and those who did not wish to participate in the criminal justice process.

The government continued to identify victims of trafficking and fund trafficking-specific services. Certain federal agencies used formal procedures to identify victims and refer them to service providers. DHS and DOJ were required by law to establish law enforcement screening protocols to identify human trafficking victims and started efforts to do so. The government funded several federal tip lines, including an NGO-operated national hotline and referral service, as well as victim assistance organizations that provided trafficking-specific services.

Federally funded trafficking-specific services, primarily through DOJ and the Department of Health and Human Services (HHS), served foreign national and domestic trafficking victims and included case management, mental health and medical care, substance use treatment, housing and shelter, translation and interpretation services, legal services, employment training and job placement services, transportation assistance, and financial assistance. DOJ and HHS record-keeping systems did not allow for cross-referencing to determine which victims were served by grantees of both agencies.

During FY 2021, DOJ provided about $60 million for 85 awards to support human trafficking victim assistance programs across the United States, compared with $74.6 million for 131 awards in FY 2020. Specific programs included $15 million for housing assistance awards, $22 million for 36 victim service awards addressing a broad range of case management and specialized service needs, $13 million to provide specialized services for children, $2 million to enhance juvenile and family court responses to human trafficking, and $8 million for training and technical assistance to improve identification of and assistance to trafficking victims nationwide. As DOJ transitioned performance management systems for grantees during the reporting period, comprehensive data from grantees on the total number of clients served in FY 2021 were unavailable. A subset of DOJ anti-trafficking grantees reported 10,070 open trafficking client cases from July 1, 2020, to June 30, 2021, compared with 9,854 open client cases the previous year. Of these cases, 5,931 were new clients, compared with 5,968 new clients reported the previous year. DOJ's grantees reported 61 percent of clients served were U.S. citizens or lawful permanent residents, 34 percent were foreign nationals, and the status of 5 percent was unknown. Grantees reported 61 percent of clients served were victims of sex trafficking, 23 percent were victims of labor trafficking, 7 percent were identified as victims of both sex and labor trafficking, and the form of trafficking for 9 percent was unknown.

HHS runs two victim assistance programs—one for foreign national victims and the other for domestic victims of human trafficking. In FY 2021, HHS awarded $2 million in new funding and made available funding from previous fiscal years that was unspent, totaling $14 million, for the provision of case management services to foreign national victims to one NGO that contracted with a nationwide network of NGO sub-recipients, compared with $5.4 million in FY 2020 and $10.9 million in FY 2019. Through this program, HHS served 3,461 individuals, including 2,047 victims of trafficking and 1,414 qualified family members in 40 states, the District of Columbia, and one U.S. territory, a significant increase from 2,352 individuals served the previous fiscal year. Of the individuals served, 68 percent were victims of labor trafficking, 20 percent were victims of sex trafficking, 9 percent were identified as victims of both sex and labor trafficking, and the form of trafficking for 3 percent was unknown. For the provision of case management services to domestic victims of human trafficking, HHS awarded $5.3 million in FY 2021, compared with $5.4 million in FY 2020 and $2.9 million in FY 2019, to 18 grantees that served 829 victims of trafficking in 17 states through collaborative partnerships with 89 service providers, a decrease from 884 individuals served the previous year. HHS's grantees in its victim assistance program for domestic victims of human trafficking reported 47 percent of individuals served were victims of sex trafficking, 4 percent were victims of labor trafficking, 4 percent were identified as victims of both sex and labor trafficking, and the form of trafficking for 45 percent was unknown.

Advocates noted funding for victim services remained inadequate to cover the high cost of providing services and the increased demand for services due to the pandemic. Some federally funded services and organizations' program models continued to focus on time-limited and immediate crisis intervention rather than long-term, holistic care. Emergency, transitional, and long-term housing options for trafficking survivors were limited, as demand and costs increased during the pandemic, exacerbating preexisting housing constraints. Advocates also called for increased access to mental health services, childcare, and economic empowerment opportunities for survivors. Advocates called for Congress to remove or suspend the legislative requirement for some federal programs that grantees match 25 percent of the total award. Advocates stated the pandemic limited grantees' fundraising capabilities and volunteer workforces, whose time can be included as

part of the match, making it difficult to meet this matching requirement. In addition, advocates called for the government to establish feedback loops in programming to gather and act on survivor input in real time and to establish minimum standards of care for human trafficking survivors that all federal victim services grantees would be required to meet to increase oversight of grantees.

Federal resources or specialized services for labor trafficking survivors, boys and men, LGBTQI+ persons, survivors struggling with substance abuse issues, persons with limited English proficiency, and children aging out of services, as well as those who did not wish to participate in the criminal justice system, continued to be insufficient. Advocates called for the government to provide technical assistance to service providers to improve their ability to assess survivors for disabilities they had prior to their trafficking or that resulted from their trafficking and to ensure services are fully accessible to those with disabilities. Survivors with criminal records resulting from unlawful acts traffickers compelled them to commit were still often excluded from employment, housing, and higher education; were ineligible for government programs; and faced difficulties meeting needs essential to their safety and recovery. Of those survivors, some who were required to register as sex offenders by their state or local government as a result of a conviction for unlawful acts traffickers compelled them to commit faced social or familial ostracization; restrictions on travel or relocation; additional limitations on accessing services, housing, and public amenities; and in some cases lost custody of their children because of their status as a sex offender. Advocates reported the government provided insufficient protections and support for victim-witnesses, including relocation and living expenses for those vulnerable to retaliation from traffickers. The denial of these protections increased victim-witnesses' instability and vulnerability to re-trafficking.

As part of HHS's assistance to foreign national victims, HHS provides Certification Letters to foreign national adult victims of severe forms of trafficking in persons, which enables them to apply for benefits and services to the same extent as refugees, after DHS grants Continued Presence or when a victim has a bona fide or approved application for T nonimmigrant status, as described further below. HHS also provides Eligibility or Interim Assistance Letters to foreign national children, which enables them to apply for benefits and services to the same extent as refugees, upon receipt of credible information the child is or may be a victim of a severe form of trafficking in persons under the TVPA. HHS issued 527 Certification Letters to foreign national adults in FY 2021, an increase from 508 in FY 2020 and 311 in FY 2019. Of the 527 foreign national adults certified in FY 2021, 14 percent were sex trafficking victims, 68 percent were labor trafficking victims, 16 percent were victims of both sex and labor trafficking, and 2 percent were victims of a severe form of trafficking in persons unknown to HHS. HHS issued 1,200 Eligibility Letters to foreign national children in FY 2021, a significant increase from 673 in FY 2020 and 892 in FY 2019. Of the 1,143 foreign national children certified in FY 2021, 25 percent were sex trafficking victims, 68 percent were labor trafficking victims, 6 percent were victims of both labor and sex trafficking, and 1 percent were victims of a severe form of trafficking in persons unknown to HHS. Foreign national children currently in the United States who are identified as survivors of trafficking and receive an Eligibility Letter are also eligible to participate in HHS's Unaccompanied Refugee Minors Program. This program requires states to provide such child victims with the same assistance, care, and services available to children in foster care. In FY 2021, the program served 399 child trafficking victims, including 129 new enrollees, compared with 329 child trafficking victims that included 142 new enrollees in FY 2020.

DHS provides immigration options specifically for survivors of trafficking through Continued Presence, a temporary immigration designation, and T nonimmigrant status, another temporary immigration benefit (commonly referred to as the "T visa"). Both immigration options strengthen law enforcement's ability to detect, investigate, or prosecute human trafficking by offering foreign national survivors temporary immigration relief. Another immigration benefit available to survivors of certain qualifying crimes, including human trafficking, is U nonimmigrant status (commonly referred to as the "U visa"). This status can be granted to survivors who are, have been, or are likely to be helpful in the detection,

UNITED STATES OF AMERICA

investigation, prosecution, conviction, or sentencing of the qualifying criminal activity and meet other specific eligibility requirements. DHS is unable to accurately track the number of approved petitions for U nonimmigrant status based on the specific underlying qualifying criminal activity, so it is unknown how many U visa petitions were approved specifically for trafficking victims.

To qualify for Continued Presence, law enforcement must identify an individual as a victim of human trafficking who may be a potential witness in the investigation or prosecution of the trafficker. DHS manages all requests from federal, state, and local law enforcement for Continued Presence, authorizing foreign nationals identified by law enforcement as trafficking victims who may be potential witnesses to lawfully remain and work in the United States during the investigation and prosecution of the crime for two years, renewable for up to two-year increments. In FY 2021, DHS granted 247 initial Continued Presence requests and 57 extensions, compared with 97 initial grants and 57 extensions in FY 2020. (The FY 2020 number of Continued Presence initial requests granted (97) represents a correction to the number cited last year (117).)

To qualify for T nonimmigrant status, an applicant must demonstrate that they (1) are a victim of a severe form of trafficking in persons; (2) are physically present in the United States, its territories and outlying possessions, or at a U.S. port of entry on account of trafficking; (3) have complied with reasonable requests from law enforcement, unless they are younger than the age of 18 or unable to cooperate due to trauma suffered; and (4) would suffer extreme hardship involving unusual and severe harm upon removal from the United States. T nonimmigrant applicants may also apply for certain family members to receive derivative T nonimmigrant status, including certain extended family members who face a present danger of retaliation because of the principal applicant's escape from trafficking or cooperation with law enforcement. Individuals with T nonimmigrant status are authorized to work, and their derivative family members can apply for employment authorization. Both are eligible to receive certain benefits and services to the same extent as refugees. T nonimmigrant status is granted for a period of four years and may be extended under certain limited circumstances. After three years, or upon the completion of the investigation or prosecution, individuals with T nonimmigrant status may apply for lawful permanent resident status, if they meet certain requirements, and eventually for U.S. citizenship. DHS granted T nonimmigrant status to 829 victims and 622 family members in FY 2021, a decrease from 1,040 victims and 1,018 family members in FY 2020. The median processing time for T nonimmigrant status applications was 18 months in FY 2021, compared to 18.6 months in FY 2020, 16.2 months in FY 2019, and 12.1 months in FY 2018.

DHS made efforts to support victims' access to immigration options. In October 2021, DHS issued updated policy guidance on T nonimmigrant status applications, including on eligibility requirements, evidentiary standards, burdens of proof, and the physical presence eligibility ground. In January 2022, DHS updated the T nonimmigrant status application to clarify filing requirements and assist applicants, attorneys, and representatives with preparing their petitions. Further, DHS expanded outreach to stakeholders to increase their awareness of humanitarian immigration programs. These efforts increased transparency and helped victims and their advocates prepare applications.

DHS also released updated resource guides on Continued Presence and T nonimmigrant status and conducted corresponding trainings for law enforcement to improve accessibility to these immigration options. DHS updated its immigration enforcement case management system to better ensure it did not subject individuals approved for Continued Presence to inappropriate enforcement actions, such as detention or removal, and moved to electronic processing of Continued Presence applications. In June 2021, DHS updated its policy to newly conduct bona fide determinations for U nonimmigrant status petitions, whereby DHS determines a petition is compliant with initial requirements and other relevant considerations. A bona fide determination allows DHS to provide employment authorization and deferred action to eligible applicants while they await final adjudication of their petitions.

To implement a victim-centered approach in civil immigration enforcement actions involving foreign national crime victims, including human trafficking victims, DHS issued a directive stating it will exercise

prosecutorial discretion in appropriate circumstances to facilitate access to justice and victim-based immigration benefits. The policy also states DHS officials will look for indicia, or evidence, that suggests a foreign national is a victim of crime, seek expedited adjudication of victim-based immigration applications, and refrain from taking civil immigration enforcement action against foreign national victims of crime, including releasing foreign national victims from immigration detention and granting a stay of removal or deferred action.

Advocates noted improvements in DHS trainings, policies, and public outreach on human trafficking and immigration relief available to victims. Advocates again reported the administration's actions to review, rescind, or not implement prior modifications to certain forms of humanitarian relief as well as the re-establishment of stakeholder communication improved transparency and access to immigration protection.

However, advocates again reported significant obstacles to obtaining T nonimmigrant status. For instance, advocates noted adjudicators continued to request additional evidence and continued to inappropriately issue T nonimmigrant status denials, such as denials based on unlawful acts traffickers compelled victims to commit, based on improperly interpreted statutes and regulations or narrower interpretations of the physical presence requirement; the additional requests for evidence increased overall processing times. Lengthy T nonimmigrant status processing times added vulnerabilities for survivors who lacked legal status or whose time-limited support services expired. Advocates called for improvements to T nonimmigrant status processing, such as hiring additional staff and streamlining forms. NGOs again voiced concern with the fact that DHS generally does not conduct bona fide determinations for T nonimmigrant status applications, which could allow applicants to receive deferred action from removal and employment authorization while they await final adjudication of their application. Advocates reported this has left trafficking victims in vulnerable situations, whether in immigration detention, unable to legally work, or at risk of removal, the latter of which would make them ineligible for T nonimmigrant status. NGOs again called for DHS to improve training for adjudicators and incorporate input from survivors and other nongovernmental subject matter experts.

Advocates reported continued concern with the low number of Continued Presence requests made by law enforcement and noted the heightened importance of this temporary status to access services given increased obstacles to obtaining T nonimmigrant status. NGOs again called for targeted training of law enforcement in geographic areas with the greatest disparities between requests for Continued Presence and applications for T nonimmigrant status. Advocates again reported survivors of sex trafficking were more likely to obtain Continued Presence than survivors of labor trafficking.

DHS is required to screen certain individuals for human trafficking, including unaccompanied children and some detained individuals. In the case of foreign national adults apprehended, interdicted, or in detention pending removal from the United States, DHS does not mandate screening of such individuals for trafficking indicators. To enhance protections for unaccompanied children and combat child trafficking, DHS and HHS share responsibility for the processing, treatment, and placement of unaccompanied children. This includes a screening by DHS within 48 hours of apprehension, transfer of certain unaccompanied children to HHS custody within 72 hours, and prompt placement by HHS in the least restrictive setting that is in the best interest of the child. When foreign national children are placed in the care and custody of HHS, they are screened for human trafficking. HHS assesses the safety of sponsor placements for unaccompanied children prior to their release from the government's custody and provides post-release case management services to certain unaccompanied children to promote their safety and well-being. The TVPA also requires any federal, state, or local official with information on a foreign national minor who may have experienced human trafficking to refer those cases to HHS to assess whether the minor is eligible for services to the same extent as a refugee.

DHS made efforts to identify victims among individuals encountered at the border and during immigration enforcement. These efforts

UNITED STATES OF AMERICA

included implementing a new requirement for all DHS officers at the border to complete human trafficking awareness training, creating a working group to add human trafficking-specific questions to DHS's medical screening form for detained individuals, and designating points of contact in its immigration enforcement field offices to identify and refer potential trafficking victims to appropriate DHS offices and coordinate with attorneys or representatives on immigration benefits applications.

The government continued to implement an order under Title 42 of the U.S. Code that authorized the government to suspend the introduction of certain migrants arriving to the northern and southwest border who would otherwise be introduced into a congregate setting. In March 2022, an appellate court ruled the government can continue expelling individuals from the United States under Title 42 but cannot expel them to places where they will be persecuted or tortured, although this order had not gone into effect by the end of the reporting period. Separately, in December 2021 pursuant to a federal court order, the government reimplemented its policy to return to Mexico certain foreign nationals who arrived by land while their U.S. removal proceedings were pending. The government updated the policy to apply to all nationals within the Western Hemisphere (other than Mexico), added individualized exemptions for the program based on certain vulnerabilities such as known mental or physical health issues, and provided that individuals encountered will be affirmatively asked questions by DHS personnel about their potential fear of return to Mexico. While implementing this policy, the government did not screen for trafficking among the individuals it returned to Mexico.

Advocates expressed concern about the long-term, cumulative effects on trafficking survivors of prior immigration enforcement policies, as well as the government's ongoing implementation of Title 42 and its policy to return potential asylum-seekers to Mexico while their cases were pending. They noted the two ongoing policies left migrants at higher risk of human trafficking and without access to legal protections called for by U.S. and international law. NGOs noted concern about the heightened risk of human trafficking for individuals forced to return to Mexico and find shelter in unsecured and unsanitary temporary camps, where they were often targeted by gangs and other criminals while awaiting asylum interviews. Further, NGOs have identified cases where unaccompanied children, whose families were returned to Mexico, were subsequently subjected to trafficking in the United States. One NGO report recorded more than 7,600 reports of crimes, including several potential cases involving human trafficking, perpetrated against individuals between February 2021 and October 2021 after they were forced to return to Mexico by the U.S. government. NGOs noted this policy expanded and would expel to Mexico migrants from Haiti and other Caribbean countries who are predominantly Black, placing these migrants at heightened risk of crime victimization, such as human trafficking, due to racial discrimination, language barriers, and lack of legal status. Advocates continued to report foreign national victims remained in trafficking situations because they were afraid to report their cases to law enforcement, pursue immigration options, or seek services. NGOs also reported transgender individuals were less likely than cisgender individuals to be released from immigration detention, even after being identified as trafficking victims by law enforcement. Advocates continued to report that though the TVPA requires trafficking screening and the provision of age-appropriate services and protections, the government failed to fully implement these protections and provide comprehensive legal and social services to unaccompanied children released from HHS custody. Advocates recommended HHS provide services, such as case management and legal representation, to all unaccompanied children upon the children's release from its custody to better support them with rebuilding their life in a new country and subsequently decrease their vulnerability to human trafficking.

The U.S. government continued to provide training, both directly and through NGO partnerships, for federal, state, local, and tribal officials, as well as for NGO service providers and health and human service providers, to encourage more consistent application of victim-centered, trauma-informed, and culturally responsive approaches in all phases of victim identification, assistance, recovery, and participation in the criminal justice process.

## PREVENTION

The U.S. government increased efforts to prevent trafficking. The government continued to implement a comprehensive three-year national action plan to combat human trafficking and in December 2021 released an updated version that incorporated actions to advance gender and racial equity; workers' rights; safe, orderly, and humane migration; and support for underserved communities. To enhance transparency and stakeholder input, the President's Interagency Task Force to Monitor and Combat Trafficking in Persons reported on agency accomplishments and future efforts and again invited members of the presidentially-appointed survivor advisory council to join its meeting. DOJ released a comprehensive multi-year national strategy to strengthen capacity and coordination within DOJ to combat human trafficking. HHS announced the establishment of a task force to prevent human trafficking, focusing on expanding access to services for survivors and preventing forced labor in health care supply chains, among other initiatives. The U.S. Agency for International Development (USAID) released its revised policy to combat trafficking in persons aimed at promoting trauma-informed and survivor-centered approaches and strengthening partnerships. In FY 2021, Congress made available $99 million in foreign assistance resources to State and USAID to support international anti-trafficking initiatives in countries in every region of the world. Although it increased overall efforts to prevent trafficking, advocates continued to call for the government to prioritize a more comprehensive and proactive approach to address the factors and conditions that increase vulnerabilities to human trafficking, such as the exclusion of domestic and agricultural workers from legal worker protections. In addition, the government did not increase its ability to prevent human trafficking in its employment-based and other nonimmigrant visa programs or to hold employers, farm labor contractors, and their agents, including labor recruiters, accountable for practices known to lead to human trafficking.

HHS continued to fund an NGO to operate the national human trafficking hotline. In FY 2021, the hotline received 66,308 signals, including calls, texts, chats, online tips, and emails that were substantive in nature (i.e., excluding hang-ups, wrong numbers, missed signals, and signals in which the hotline could not determine the signaler's reason for calling); identified 10,983 potential human trafficking cases; and provided referrals for 10,633 unique signalers. More than 13,538 signals came from individuals who identified themselves as potential victims of trafficking seeking help. The government operated other tip lines that received calls or messages related to suspected human trafficking cases.

The government continued public outreach measures on the causes and consequences of human trafficking and continued to seek and incorporate survivors' expertise into policies and programs. Agencies provided funding, materials, and trainings related to human trafficking awareness to federal grantees, school communities, public health providers, and public and private sector transportation stakeholders, among others, including on trauma-informed and victim-centered approaches to human trafficking. For the fifth year, HHS continued its leadership academy composed of survivors and anti-trafficking professionals, with the latest cohort developing recommendations for service providers that receive federal, state, or local funding to build their capacity to address institutional inequities and better serve communities of color and those at risk of human trafficking.

Advocates urged the government to evaluate the effectiveness of anti-trafficking outreach efforts, including trainings, and ensure educational materials are survivor-informed and tailored to the industry of those being trained. NGOs called for all professionals, especially healthcare workers and educators who are likely to encounter potential human trafficking victims and survivors, to receive human trafficking training, including on how to identify vulnerabilities traffickers target and connect victims to support. NGOs noted the lack of prevalence data is a barrier to effective anti-trafficking prevention efforts and that the government did not publish a report on prevalence in the United States as required by law; they called for additional nationwide prevalence studies to better target anti-trafficking efforts.

Advocates continued to call for the government to prioritize a more comprehensive and proactive approach to address the factors and conditions—including those created by government policies or structures like the criminal justice system, immigration system, housing, and

UNITED STATES OF AMERICA

healthcare—that increase vulnerabilities to human trafficking. For example, advocates called for the government to create economic opportunities to empower individuals in communities it has historically placed at higher risk of human trafficking through discriminatory policies, such as individuals who are Black, Indigenous, people of color, or LGBTQI+, and to further examine racism and discrimination as root causes. Workers in domestic and agricultural sectors, performing duties historically performed by people who were enslaved, people who were formerly enslaved, and their descendants, remained specifically excluded from legal worker protections under federal law. Their lack of legal protections, combined with the heightened isolation, economic uncertainty, and health risks due to COVID-19, increased their risk of human trafficking.

DOL, DHS, and State screen and approve employers and workers for temporary foreign worker programs to ensure compliance with program requirements, including worker protections. To reduce workers' vulnerability to exploitation, including human trafficking, the United States bars employers participating in these programs and/or their agents (whether or not those agents or others in the recruitment chain are in contractual privity with the employer or a recruiter, whether or not located in the United States, and whether or not such agents are governmental or non-governmental entities) from seeking or receiving payments from workers for any activities related to obtaining labor certification or employment. These payments include job placement and recruitment fees and salary and wage deductions. The United States requires that the terms of employment be disclosed. When State conducts visa interviews, it has direct contact with visa applicants and can apprise applicants of their legal rights pertaining to worker protections related to their temporary employment. In addition, the government can use the criminal statute that prohibits the use of fraud to recruit, solicit, or hire workers abroad to come to the United States to work to hold employers and their agents criminally responsible for abusive employment practices commonly associated with forced labor. In FY 2021, DOL conducted 248 and 538 audits of temporary labor certifications for H-2A and H-2B petitions, respectively, and as it did not receive any voluntary disclosures from employers applying for a temporary labor certification that they or their agents charged workers a prohibited fee, did not deny any temporary labor certification applications solely on that basis. DOJ initiated one prosecution for fraud in foreign labor contracting in FY 2021. State extended its interview waiver authorization for certain first-time H-2 visa applicants and expanded the waiver to include additional visa categories, which again reduced the government's ability to verbally ensure applicants knew their rights and to detect potential cases of fraud that increase applicants' vulnerability to human trafficking. As part of the administration's strategy to promote safe, orderly, and humane migration in and from North and Central America, as well as the Caribbean, the government expanded access to legal migration pathways, including the H-2 visa program. To do so, USAID provided technical assistance and staffing to the governments in northern Central America to increase their ability to recruit potential H-2 workers within their country, connect with U.S. businesses to increase demand for workers from those countries, and facilitate the completion and submission of H-2 visa applications. The U.S. government issued H-2 visas to 9,797 northern Central American applicants in FY 2021. Of those, 1,776 applicants applied with USAID assistance (the remaining visas were issued to workers recruited through private recruiters).

Oversight of employment-based and other nonimmigrant visa programs remained weak, and structural conditions embedded in some of these programs continued to enable human traffickers—employers, labor contractors, or agents—to maintain control of workers. NGOs stated the administration's expansion of the H-2 visa program without having first addressed insufficient oversight and the longstanding structural weaknesses of it placed workers at greater risk to human trafficking. Advocates called for the government to launch an investigation into how a group of 24 employers and farm labor contractors who allegedly subjected more than 100 H-2 workers to forced labor were able to petition for more than 70,000 H-2A positions over the course of six years. Advocates called for an audit of the H-2A program and expressed concern that the government had not followed up with the other workers on the defendants' petitions to ensure they were not being

exploited. Advocates continued to call for regulatory changes to uncouple employment visas from an employer or sponsor and to protect individuals in certain temporary worker programs to the same extent as workers in other programs. NGOs recommended the government develop a more accessible database with real-time information to enable workers to verify the existence of a job, self-petition, and access job-related information. In June 2021, the U.S. Supreme Court found a state regulation allowing labor organizers onto private agricultural property during non-work hours to talk with employees constituted taking private property for public use without just compensation. NGOs said this decision further isolated farmworkers and left them more vulnerable to exploitation, especially among H-2A workers, whose visas are tied to their employers.

Formal and informal recruiters, labor contractors, and agents continued to charge workers prohibited fees, and the government's enforcement of the ban on worker-paid recruitment fees and other prohibited practices meant to prevent workers from experiencing situations of heightened risk to human trafficking remained weak. NGOs urged DOL to require H-2A labor contractors to submit an H-2A application with an agricultural business as a joint employer so that the business is also liable for the recruitment and treatment of workers. NGOs called for the government to increase transparency of the recruitment process, prioritize holding accountable employers and farm labor contractors, as well as their agents who have exploited workers and violated visa program regulations, and pass federal legislation to regulate foreign labor recruitment, including creation of a public registry of certified labor recruiters.

State continued its oversight of the Exchange Visitor Program (EVP, commonly referred to as the "J-1 visa"), which includes among others the Summer Work Travel (SWT) and Au Pair programs. State continued to monitor exchange visitors to help safeguard their health, safety, and welfare and to identify and investigate program fraud and abuse. It also continued to increase its virtual monitoring capabilities through exchange visitor surveys and reached approximately 42,000 exchange visitors that way in 2021. State conducted outreach to raise program sponsors' awareness of their administrative oversight and reporting obligations to State with respect to the health, safety, and welfare of exchange visitors. State continued to liaise and collaborate with law enforcement on criminal investigations relating to the EVP and created a pamphlet to educate exchange visitors on their rights. State continued to sanction sponsors that violated EVP regulations throughout the reporting period, but none were for trafficking or trafficking-related crimes.

Advocates continued to report the need for additional steps to reduce the risks of exploitation in some EVP categories, noting two recent cases of EVP abuse, potential human trafficking cases identified by the national human trafficking hotline, and concerns with fraudulent recruitment practices. Advocates noted that program fees left some SWT participants indebted upon arrival to the United States. One advocacy group noted SWT participants in hospitality placements in one Midwestern state were often at increased risk to trafficking due to isolation and dependency on their employer for housing. A news report featuring interviews with former and current au pairs in the EVP detailed a lack of oversight of sponsors and families, including false promises, threats of removal, and frequent sponsor non-compliance with the program's reporting requirements. Advocates called for increased protections for the SWT (specifically for hospitality placements) and au pair categories under U.S. labor and employment laws. Specifically, for the au pair category, advocates recommended increased program oversight by State, more accountability of sponsors and participating employers, and greater transparency about employers and occupations.

State and the U.S. Mission to the UN continued to implement their respective domestic worker in-person registration programs for A-3 and G-5 visa holders employed by foreign mission and international organization personnel in the United States. Due to the pandemic, the programs remained virtual, using phone and video registrations. In June 2021, in accordance with the TVPA, State suspended for five years the A-3 visa sponsorship privileges afforded to Cameroonian bilateral mission members because the Government of Cameroon declined to waive diplomatic immunity for U.S. criminal proceedings involving mistreatment of a domestic worker and did not initiate its own prosecution. This suspension followed State's March 2021 request that

the Government of Cameroon waive immunity of a Cameroonian mission member following an investigation into allegations including fraud in foreign labor contracting and collection of data and State's requiring the departure of the individual from the United States.

Lawsuits in Colorado, Georgia, Texas, and California remained pending against privately owned and operated detention facilities contracted by DHS. These lawsuits allege the contractors forced detained non-citizens to work in violation of the TVPA during their federal immigration detention. DHS is not party to the lawsuits, nor are any of its component agencies.

Advocates again asserted that labor by individuals in immigration detention and prisons perpetuates slavery and its legacy of racial injustice. They continued to call for the government to end its use of labor in immigrant detention facilities, whether government-operated or operated through contracts with private entities, as these detained non-citizens have not been convicted of a crime. They also called on the government to close all privately run immigration detention facilities and amend the U.S. Constitution to eliminate the exception to the Thirteenth Amendment that allows for slavery or involuntary servitude as punishment for those convicted of a crime.

Civil enforcement of federal laws continued to be a significant component of the government's anti-trafficking efforts. DOL investigated complaints and conducted targeted civil labor investigations involving workers in industries and sectors known to be vulnerable to labor trafficking, including complaints or investigations related to temporary foreign worker programs. Where appropriate, DOL refers these cases for criminal investigation. In FY 2021, DOL continued such enforcement activities in industries including agriculture, landscaping, hospitality, seafood processing, construction, garment, health care, and child care. In FY 2021, DOL made seven referrals to federal, state, and local law enforcement agencies or task forces and referred two cases involving allegations of human trafficking within the H-2 visa program to DOL's inspector general, compared with nine referrals and two cases in FY 2020, respectively. (The FY 2020 number of referrals to law enforcement agencies (nine) and cases involving allegations of human trafficking within the H-2 visa program (two) represent corrections to the numbers cited last year (14 and six, respectively).) Additionally, five law enforcement agencies referred cases to DOL, and one law enforcement agency requested DOL assistance. The Equal Employment Opportunity Commission (EEOC) enforces federal employment discrimination statutes and continued to investigate civil employment discrimination charges filed by or on behalf of victims of trafficking and seek compensation where evidence of discrimination was found. At the conclusion of the investigation, the EEOC has the authority to file lawsuits to protect the rights of individuals and the interests of the public; it litigates a small percentage of the charges it investigates. In FY 2021, the EEOC received 15 new charges of discrimination linked to human trafficking, compared to three in FY 2020. For the seven charges of discrimination the EEOC resolved in FY 2021, the EEOC recovered $6,750 in monetary benefits, compared to $0 in monetary benefits it recovered in resolution of charges in FY 2020. In May 2021, the EEOC recovered more than $4.8 million to satisfy a judgement in a national origin and race discrimination lawsuit against a U.S.-based employer in Hawaii who, along with a farm labor contractor, subjected workers to physical violence, removal threats, a variety of discriminatory pay practices, and inhumane living and working conditions. As of September 30, 2021, the EEOC had 11 pending charges linked to human trafficking.

NGOs stated DOL and the EEOC investigative divisions continued to be significantly underfunded and their work to protect workers underprioritized, which inhibited meaningful or systematic enforcement of labor laws and detection of forced labor in industry supply chains. Advocates called for expanded authorities and additional resources to be allocated to DOL and the EEOC to enhance efforts to address labor trafficking cases.

The government made efforts to reduce the demand for commercial sex acts, including by prosecuting individuals for sex trafficking involving children. DHS conducted operations targeting online platforms used by sex traffickers to disrupt and dismantle their operations and to identify and assist victims of human trafficking. The government's ad hoc working group on demand reduction convened two listening sessions with anti-trafficking stakeholders. The government provided anti-trafficking training to its diplomats.

Advocates called for greater efforts to address demand for all forms of human trafficking. Advocates urged the government to ensure stakeholder engagement on demand reduction is trauma-informed, is survivor-informed, and prioritizes the inclusion of diverse experiences and voices.

The government made efforts to reduce the demand for participation in extraterritorial sexual exploitation and abuse (commonly referred to as "international sex tourism") by its citizens, including by proactively investigating allegations of child sexual exploitation crimes perpetrated overseas by U.S. citizens and partnering with foreign law enforcement counterparts to share information regarding international travel of registered child sex offenders. Four defendants were federally convicted in FY 2021 of engaging in extraterritorial child sexual exploitation and abuse, compared to at least three in FY 2020. Offenders who abuse children abroad may have been prosecuted under other statutes, which are not reflected in this statistic.

DOJ and other federal law enforcement agencies did not receive any allegations of forced labor or recruitment fees charged to third-country nationals working on certain U.S. government contracts abroad. DOJ did not initiate any federal criminal prosecutions of employers or labor contractors for such violations in FY 2021.

The Office of Management and Budget (OMB) notified agencies' procurement offices three times of specific concerns regarding human trafficking risks in certain supply chains. Additionally, OMB updated the human trafficking training for the acquisition workforce. Despite a 2019 directive for certain agencies to designate a senior accountable official to ensure effective implementation of anti-trafficking acquisition rules and best practices, not all had done so by the end of the reporting period. As stated in the Prosecution section above, in FY 2021, DoD reported investigating 31 cases related to forced labor in federal contracts, compared to 112 cases in FY 2020. DoD took action against noncompliant employers and labor contractors resulting in 16 local corrective actions, one guilty plea in federal court, 12 actions with outcomes not reported, and two cases with no action taken by DoD. Where appropriate, DoD refers these cases for criminal investigation or pursues criminal investigations. DHS did not debar any entities and did not convict any individuals of engaging in human trafficking from conducting business with the federal government.

The government increased efforts to prevent human trafficking in U.S. private sector supply chains. DHS continued to enforce the law that prohibits the importation of goods mined, produced, or manufactured, wholly or in part, under forced labor conditions, including forced child labor. DHS received 42 allegations and issued nine Withhold Release Orders and one finding for shipments of goods where information reasonably indicated that merchandise within the purview of Title 19 U.S. Code section 1307 is being, or is likely to be, imported into the United States, resulting in the detention of 1,469 shipments worth approximately $486 million, compared with 50 allegations and 16 Withhold Release Orders and one finding within the previous reporting period. DHS modified three Withhold Release Orders and one finding after determining the companies remediated concerns about the use of forced labor. DHS did not collect any civil penalties for violations of U.S. trade law regarding goods produced with forced labor. The Office of the U.S. Trade Representative engaged with trade ministers to coordinate with partner countries, regional and multilateral organizations, worker organizations, businesses, civil society, and other key stakeholders to combat forced labor in their supply chains. DOL launched a new online compliance and accountability tool that shows which U.S. imports may be at higher risk for being made with child labor, forced labor, or forced child labor.

The government continued its efforts to prevent U.S. businesses and consumers from interacting with or purchasing from entities engaged in forced labor and other human rights abuses in the Xinjiang Uyghur Autonomous Region (Xinjiang) and beyond, including by issuing an updated business advisory, imposing export controls, and issuing sanctions against officials and entities. In December 2021, Congress passed and agencies began implementing legislation

giving the government new tools to prevent goods made with forced labor in Xinjiang from entering U.S. markets, such as the creation of a rebuttable presumption that all goods manufactured wholly or in part in Xinjiang are the product of forced labor and not entitled to entry at U.S. ports of entry.

The Government Accountability Office made recommendations for DoD to prevent the availability of goods produced by forced labor at its military commissaries and exchanges, including establishing an overarching policy and consistent processes to prevent the availability of such goods, establishing an oversight mechanism to monitor implementation, and using available federal information to identify risks. NGOs commended DHS's increased enforcement of its prohibition on the importation of goods produced with forced labor but recommended DHS increase transparency of its processes.

In April 2021, DOI established a new unit to support interagency work to resolve "cold cases" involving missing or murdered American Indians and Alaska Natives and to address underlying causes, including human trafficking. DOJ funded approximately $2.5 million to a grantee in Alaska for a five-year project to design and implement a human trafficking public awareness victim services campaign that will reach the entire state of Alaska. In FY 2021, HHS again funded a grant program in six locations to strengthen the response to victims of human trafficking in American Indian and Alaska Native communities. In FY 2021, HHS again funded a demonstration grant program to provide comprehensive case management services for Indigenous survivors of human trafficking in Alaska, Hawaii, Minnesota, North Carolina, Washington, and Wisconsin. HHS continued to offer online training to educate health care providers serving American Indians, Alaska Natives, Native Hawaiians, and Pacific Islanders regarding human trafficking and its effect on their communities. In FY 2021, DOJ awarded more than $32 million to tribal governments under its program to address domestic violence, dating violence, sexual assault, sex trafficking, and stalking and awarded $733,691 to tribal governments to exercise special domestic violence criminal jurisdiction. In March 2022, the U.S. Congress reauthorized a law that included a provision to expand the special criminal jurisdiction of tribal courts to cover non-Native perpetrators of violent crime, including sex trafficking; other provisions of the law increase access to federal resources and data for Native communities and support the development of a pilot project to enhance access to safety for survivors in Alaska Native villages.

Advocates expressed concern that the government did not adequately address human trafficking within American Indian and Alaska Native communities, noted existing programs were not designed to meet their needs, and highlighted the vulnerabilities created by systemic oppression, continued underfunding, and historical trauma that have led to significant rates of human trafficking among those communities. Advocates recommended increased investment in these communities, including trauma-informed cultural humility training for service providers, law enforcement, and court systems, and more culturally appropriate and community-specific support and services.

## U.S. INSULAR AREAS
Trafficking in persons occurs in the U.S. insular areas, including American Samoa, Guam, the Commonwealth of the Northern Mariana Islands (CNMI), Puerto Rico, and the U.S. Virgin Islands (USVI).

In Guam and CNMI, DHS continued to engage with community partners to provide victim services, train law enforcement, and share strategies for improving victim identification. DOJ continued to advance an initiative that enhances coordination with stakeholders in the Pacific Region on victim services, law enforcement responses, training, community outreach, and prevention programs. DOJ and DHS continued to participate, along with local authorities in Puerto Rico, in the crimes against children task force. In Puerto Rico, DHS engaged with federal, state, and local partners to combat sex trafficking and sexual exploitation of minors, as well as the prevalence of online child sexual abuse material.

HHS provided comprehensive case management services to foreign national victims of trafficking identified in American Samoa, Guam, CNMI, Puerto Rico, and USVI, and two DOJ grantees provided comprehensive and legal services to victims of all forms of trafficking

in CNMI. HHS partnered with an NGO to provide virtual trainings on human trafficking and trauma-informed care for individuals with lived experience of human trafficking to government and nongovernment stakeholders in Guam, including what human trafficking looks like in the local context, identifying key partners that should comprise a multidisciplinary response, and providing trauma-informed practices for frontline professionals. HHS announced a new program to fund local organizations in Pacific territories, including America Samoa, Guam, and CNMI, to deliver services to foreign nationals who have experienced trafficking in those territories.

As part of the prosecution statistics previously mentioned, DOJ filed two new human trafficking cases, one each in Puerto Rico and USVI, and convicted three defendants in the same locations.

## TRAFFICKING PROFILE
As reported over the past five years, human traffickers exploit domestic and foreign national victims in the United States, and traffickers exploit victims from the United States abroad. Human trafficking cases have been reported in all 50 states, the District of Columbia, and U.S. territories. Individuals who entered the United States with and without legal status have been identified as trafficking victims. Victims originate from almost every region of the world; the top three countries of origin of victims identified by federally funded providers in FY 2021 were the United States, Mexico, and Honduras. Human trafficking patterns in the United States continued to reflect the living legacy of the systemic racism and colonization globalized during the transatlantic slave trade through chattel slavery and regional practices of Indigenous dispossession. Traffickers often target those who experience compounding forms of discrimination (such as discrimination because of one's racial or ethnic group, gender identity, disability, or sexual orientation), experience violence (such as intimate partner or domestic violence), or interact with government-run programs (such as the criminal justice system, runaway and homeless youth services, foster or institutional care, and the immigration enforcement system). Traffickers compel victims to engage in commercial sex and to work in both legal and illicit industries and sectors, including in hospitality, traveling sales crews, agriculture, janitorial services, construction, landscaping, restaurants, factories and manufacturing, care for persons with disabilities, salon services, massage parlors, retail, fairs and carnivals, peddling and begging, drug smuggling and distribution, religious institutions, child care, and domestic work. Traffickers continued to increasingly use social media platforms to recruit and advertise victims. NGOs reported increasingly seeing cases of human trafficking by a family member, guardian, or intimate partner. Some U.S. citizens engage in extraterritorial child sexual exploitation and abuse in foreign countries.

## URUGUAY: TIER 2

The Government of Uruguay does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Uruguay remained on Tier 2. These efforts included adopting and beginning to implement a new interinstitutional victim identification and referral protocol, designating an agency responsible for coordinating care for male trafficking victims, and investigating more alleged traffickers. However, the government did not meet the minimum standards in several key areas. Officials did not identify any adult male trafficking victims, the government did not provide adequate victim services or consistent access to shelters, and law enforcement officials did not proactively and systematically identify victims. The government devoted inadequate resources to combating labor trafficking and protecting labor trafficking victims. The government's national action plan (NAP) to combat trafficking expired without replacement.



URUGUAY TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Provide adequate services and shelter for all victims, especially male victims and those outside the capital. • Train law enforcement officials, labor inspectors, coast guard officers, prosecutors, judges, and social workers to understand human trafficking and utilize the interagency mechanism for victim identification and referral. • Operationalize a centralized database to systematically record official statistics on anti-trafficking law enforcement efforts and victim identification, including those outside the capital. • Refer labor trafficking victims to services upon identification, hold labor traffickers criminally accountable, and establish standard operating procedures for Ministry of Labor officials to combat labor trafficking. • Adopt and fund a new NAP to combat human trafficking. • Allocate a dedicated anti-trafficking budget and expand funding for victim services, including daytime, long-term, and reintegration services. • Proactively screen foreign workers for trafficking indicators, including through inspections aboard foreign-flagged vessels in Uruguayan waters and docked at port. • Vigorously investigate and prosecute all forms of human trafficking, including forced labor and child sex trafficking. • Sentence convicted traffickers to adequate penalties, which should involve significant prison terms. • Consistently inform victims of their rights under the law, including to apply for permanent residence permits and compensation from their traffickers, and support those victims who wish to pursue these rights. • Revise the definition of trafficking under Uruguayan law to align with the definition in the 2000 UN TIP Protocol.

## PROSECUTION

The government maintained law enforcement efforts. Article 78 of the 2008 immigration law criminalized sex trafficking and labor trafficking, prescribing penalties of four to 16 years' imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. The penalties were increased by one-third to one-half if the trafficking offense involved a child victim. Inconsistent with the definition of trafficking under international law, the law established the use of force, fraud, or coercion as an aggravating factor rather than as an essential element of the crime.

The government reported partial law enforcement statistics representing 11 months of 2021. The government initiated 33 trafficking investigations through November 2021, compared with 22 investigations in 2020 and 23 in 2019. The government prosecuted nine alleged traffickers through November 2021, compared with 11 alleged traffickers in 2020 and four in 2019. The government did not report whether these alleged traffickers were accused of sex or labor trafficking or whether they were Uruguayan citizens or foreign nationals. Officials also prosecuted at least nine individuals for soliciting child sex trafficking victims, compared with 39 such prosecutions in 2020 and two in 2019. The government convicted four traffickers through November 2021, compared with four traffickers convicted in 2020 and eight in 2019. The government did not report sentencing data for traffickers convicted in 2021; by comparison, judges sentenced traffickers convicted in 2020 to between 17 months and six years' imprisonment. In the past five years, the government reported prosecuting 51 alleged traffickers but convicted just 16 traffickers. The government reported convicting 13 individuals for soliciting a child sex trafficking victim in 2021, compared with one in 2020. The government reported it prosecuted three law enforcement officials for alleged complicity in trafficking crimes. The national prosecutor's office collected data on active cases, including trafficking cases, via the Accusatory Penal Process Information System (SIPPAU). However, the system did not compile key metrics, such as convicted traffickers' sentences or whether authorities charged alleged traffickers with sex or labor trafficking; it

remained difficult to analyze trends and obtain comprehensive data, especially on trafficking investigations, prosecutions, and convictions outside the capital region.

The Ministry of Interior's organized crime division was the primary entity responsible for anti-trafficking law enforcement efforts. The Ministry of Labor (MTSS) directed most efforts related to labor trafficking; MTSS primarily punished labor traffickers through administrative processes, although the national prosecutor's office could also criminally prosecute labor trafficking cases under the anti-trafficking law. The attorney general's office in Montevideo had three gender-based violence units that prioritized investigating and prosecuting crimes related to human trafficking and the exploitation of children; there were no specialized units outside of the capital.

The government offered limited anti-trafficking training to law enforcement officials responsible for victim identification and investigation, but it collaborated with an international organization to provide prosecutors a series of trainings on prosecuting human trafficking and other sexual crimes. The government included trafficking-specific modules in standard gender-based violence training and offered an optional online anti-trafficking training for law enforcement. Observers indicated law enforcement officials' use of systematic procedures to proactively identify victims varied throughout the country. Uruguayan officials coordinated with foreign counterparts on two anti-trafficking cases; in a joint operation with Spanish authorities, officials detained and prosecuted three alleged traffickers accused of recruiting Uruguayan women to travel to Spain with fraudulent job offers, where they exploited them in sex trafficking. The government reported the ongoing pandemic had a limited impact on efforts to investigate, prosecute, and convict traffickers; courts did not experience pandemic-related closures or modify proceedings due to the pandemic.

## PROTECTION

The government increased protection efforts. The government reported identifying 357 trafficking victims (39 adult women and 318 children) in 2021, compared with identifying 37 adult female victims in 2020. The Ministry of Social Development (MIDES) and its agencies facilitated the care and protection of trafficking victims. The National Institute for Women (Inmujeres) served adult female trafficking victims, and the National Institute for Children and Adolescents (INAU) served child trafficking victims. Both institutions primarily catered to sex trafficking victims. In 2021, MIDES designated its sociocultural promotion office as the entity responsible for coordinating care for adult male trafficking victims, filling a gap in the government's care framework. MIDES coordinated with MTSS when providing care to labor trafficking victims; MTSS could provide additional services, such as vocational training, and ensure labor trafficking victims understood relevant labor regulations. Inmujeres assisted 140 trafficking victims in 2021, compared with assisting 37 victims in 2020 and 83 victims in 2019; the adult female victims Inmujeres assisted were mostly Uruguayan and Dominican, but authorities also identified women victims from Bolivia, Cuba, Peru, and Venezuela. INAU assisted 318 child trafficking victims during the reporting period; INAU provided victims care (based on their needs) through its residential programs, mobile units, and daytime care centers. INAU did not collect trafficking-specific demographic statistics; it reported most of the child victims of sexual exploitation, including trafficking, it identified in 2021 were teenage girls. The Human Rights Division did not assist any adult male trafficking victims during the reporting period. MTSS coordinated with a civil society organization to provide additional support, including legal advice, for three potential labor trafficking victims, all adult women. MIDES reported its agencies assisted six LGBTQI+ individuals, including a transgender girl, although it did not specify whether the child was a victim of trafficking as opposed to other forms of exploitation.

The government had a variety of victim protection protocols and written referral mechanisms on assisting victims, including an interagency response system. The government worked with an international organization to draft a new interinstitutional protocol outlining interagency procedures for identifying and referring trafficking victims to services; the government approved the plan in 2021 and implemented it in 2022. MIDES was the principal provider of services for victims of

URUGUAY

all crimes, including trafficking. The government coordinated with civil society to provide trafficking victims with similar services as those available to victims of other crimes and vulnerable populations, such as individuals experiencing homelessness, refugees, and citizens receiving social support. These services included housing, vocational training, immediate response care, and counseling; however, specialized services for victims of trafficking were very limited in Uruguay and, in practice, most accessible to adult female sex trafficking victims. Civil society reported government-funded services focused mostly on psycho-social and legal assistance, while long-term services, such as housing, vocational support, and job placement, were insufficient. Inmujeres continued to coordinate with civil society to provide services for female sex trafficking victims at its specialized centers in Montevideo and Cerro Largo and established a new center in Paso de los Toros. INAU had a partial-service center for child sex trafficking victims in Paysandú and coordinated with civil society to operate a 14-member mobile team of psychologists, social workers, and lawyers that responded to cases involving child victims in the broader Montevideo region. Although the government had some facilities that could temporarily house victims, it did not have dedicated shelters for trafficking victims. Government officials expressed concern that victims' security would be at risk in a centrally located, trafficking-specific shelter, due to the country's small size. The government instead preferred to lodge victims in hotels and occasionally referred them to shelters or group homes serving other populations, such as victims of domestic violence. Civil society expressed concerns about the suitability of these facilities, as they did not meet the needs of trafficking victims, and reported challenges finding shelter for trafficking victims, particularly for those identified outside the capital. Many shelters were overnight-only facilities; observers identified a need for daytime facilities and programming. The government did not have specialized services or shelters designed to accommodate male, LGBTQI+, or labor trafficking victims. When officials identified such victims, the government could usually arrange ad hoc housing in hotels or non-specialized shelters designed to serve other vulnerable populations, such as individuals experiencing housing insecurity or recovering from addiction.

Inmujeres provided some services by phone or video call during the reporting period to limit disruption under pandemic-related restrictions, although it could not administer all services virtually, and these services were unavailable to victims for periods of time. The government adapted physical spaces to continue accommodating victims in person where possible, including by installing barriers and screening for symptoms. Inmujeres provided 14.32 million pesos ($322,160), compared with 11.37 million pesos ($255,790) in 2020, to its NGO partners to fund provision of services. The government did not report allocating funding to cover short-term hotel stays for victims, compared with 304,500 pesos ($6,850) in 2020. The government did not report other budget allocations or funding for victim assistance. The government had a protocol to provide security and protection measures to victims. Uruguayan law required courts to order restitution upon a trafficker's conviction; the government reported courts ordered restitution payments in four cases in 2021. Separately, victims could file civil suit to seek compensation from their traffickers with support from public prosecutors, but the government did not report whether any victims did so in 2021. The law entitled foreign victims to work permits and permanent residency status, and they had 180 days to decide whether to stay in the country, return to their country of origin, or resettle in a third country. However, the government did not report issuing residence permits to any foreign victims, and there was no record it had done so since the 2018 legislation establishing this entitlement. The government offered limited training opportunities related to victim identification, referral, and care throughout the year, often virtually and with the support of international organizations.

PREVENTION

The government maintained prevention efforts. The national anti-trafficking council, composed of high-level government agencies and civil society participants and led by MIDES, met twice during the reporting period. The council was responsible for the implementation of recommendations from international organizations and institutional oversight on the implementation of Law 19.643 and the NAP to combat

trafficking. However, the government's 2018-2020 NAP expired without replacement; the government did not establish a new NAP during the reporting period. The national anti-trafficking council did not release a required public report on anti-trafficking efforts for the second consecutive year. The government did not allocate funding to implement the trafficking law or the NAP, and the trafficking council lacked an operational budget.

The government conducted activities to promote awareness of human trafficking in 2021. It displayed information on trafficking risks prominently on its websites and conducted awareness-raising workshops on trafficking risks for local officials. The government continued to distribute to the public informational and awareness-raising materials developed in previous reporting periods. In 2021, it allocated 46,750 pesos ($1,050) to producing and distributing awareness materials. The government's awareness-raising efforts primarily featured trafficking as a sub-topic of wider programming on gender-based violence and other crimes; however, some efforts were trafficking-specific, including the guide the government developed and distributed to journalists on accurately depicting trafficking situations in media. The government implemented a new annual anti-trafficking training course for diplomats. The government operated telephone hotlines and a corresponding cellphone app where the public could report crimes; in 2021, it established a separate line for reports of sexual violence and trafficking. The government did not report how many calls it received trafficking cases. The Ministry of Labor reported it trained its inspectors to identify labor trafficking indicators; these inspectors continued to perform regular labor inspections during the pandemic, including in establishments known to facilitate commercial sex. Labor inspectors did not have agency-specific procedures to identify trafficking during inspections, although they had access to the new interinstitutional identification and referral protocol. The government coordinated with an international organization to fund a program to reduce demand for commercial sex acts involving children.

TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Uruguay, and traffickers exploit victims from Uruguay abroad. Uruguayan women and girls—and, to a more limited extent, transgender adults and male adolescents—are exploited in sex trafficking within the country. Traffickers force Uruguayan women and LGBTQI+ individuals into commercial sex in Argentina, Brazil, Italy, and Spain. Traffickers exploit women from Cuba, the Dominican Republic, Haiti, and to a lesser extent South American countries, in sex trafficking in Uruguay. Many victims are South American women of African descent. Foreign workers, mainly from Argentina, Bolivia, Brazil, Cuba, the Dominican Republic, and Paraguay, are exploited in forced labor in construction, domestic service, cleaning services, elder care, wholesale stores, textile industries, agriculture, fishing, and lumber processing. Cuban nationals working in Uruguay may be forced to work by the Cuban government. Sex traffickers exploit migrants, particularly women, from Cuba in border cities; sex traffickers may move victims city-to-city to avoid detection and prolong exploitation. From 2018 to 2020, 17 crewmember deaths were associated with Taiwan-, People's Republic of China (PRC)-, and other foreign-flagged fishing vessels docked at the Montevideo port and in Uruguay's waters; before 2018, observers reported an average of 11 crewmember deaths per year. Foreign workers aboard these vessels are subjected to abuses indicative of forced labor, including unpaid wages, confiscated identification documents, and physical abuse, and there are anecdotal reports of murder at sea. Citizens of other countries, including the PRC and the Dominican Republic, may transit Uruguay en route to other destinations, particularly Argentina, where some are exploited in trafficking. There is heightened vulnerability to trafficking in the interior of the country, where the government's monitoring and anti-trafficking efforts have limited reach; in particular, domestic workers employed in the interior of the country are at greater risk of trafficking.

Haiti AR_001065

# UZBEKISTAN: TIER 2

The Government of Uzbekistan does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared to the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Uzbekistan remained on Tier 2. These efforts included prosecuting, convicting, and sentencing more traffickers; prosecuting officials allegedly complicit in forced labor in the cotton harvest; and identifying more victims. Authorities also increased funding for victim shelters, continued to dedicate funding to the Community Works Fund, and continued to significantly reduce the incidence of forced labor in the annual cotton harvest. However, the government did not meet the minimum standards in several key areas. Local officials in some districts continued to impose cotton production quotas in contravention of the national ban on the practice, perpetuating incentives for the mobilization of civil servants into cotton harvest forced labor in some areas of the country. Existing laws establishing forced labor as an administrative violation at first offense continued to constrain effective enforcement. The absence of victim-witness protection policies hindered some investigations and prosecutions; additionally, some law enforcement officials lacked a victim-centered approach when working with victims, potentially discouraging them from cooperating in investigations and prosecutions.



**UZBEKISTAN TIER RANKING BY YEAR**

## PRIORITIZED RECOMMENDATIONS:

Vigorously strengthen enforcement of the national ban on cotton production quotas at local levels and continue substantive action to end all government-compelled forced labor. • Strengthen continued efforts to ensure all citizens are aware of their "right to refuse" participation in the cotton harvest or other work outside their professional duties and of the requirement to pay for replacement workers, without suffering consequences. • Amend the provision, under Article 148 (2) of the Criminal Code, to remove the option for administrative violations for first time offenders of adult forced labor. • Respecting due process, increase investigations, prosecutions, and convictions of trafficking crimes and adequately sentence convicted traffickers, including officials involved in mobilizing forced labor. • Establish and implement a legal framework to regulate labor brokers involved in the recruitment of seasonal agricultural workers. • Continue to grant and expand the access of independent observers to monitor cotton cultivation and fully cease the harassment, detention, and abuse of activists and journalists for documenting labor conditions. • Amend Article 135 of the Criminal Code to prevent allowing house arrest in lieu of imprisonment for sex trafficking crimes and ensure penalties are commensurate with those prescribed for other serious crimes, such as rape. • Train all first responders to officially identify potential trafficking victims and refer them to care, including among vulnerable populations such as returned migrants, foreign nationals, and Uzbekistani families repatriated from armed conflict zones. • Ensure an equitable and transparent process in the allocation of land for cotton clusters, including by increasing oversight of worker contracts, and ensure workers have bargaining power and the choice of cluster-affiliation. • Expand space for civil society and freedom of association for labor activists, including by ensuring local governments do not interfere with the formation of labor unions and by removing obstacles to streamline and increase registration of anti-trafficking NGOs. • Continue training law enforcement officials and labor inspectors on proper identification and handling of trafficking cases, with an emphasis on anti-trafficking legislation and evidence gathering

procedures. • Establish a victim-witness program to ensure a victim-centered approach to any participation in criminal justice proceedings and increase training for prosecutors and judges to proactively seek victim restitution in criminal cases. • Improve anti-trafficking coordination and communication between government agencies, NGOs, and the international donor community by establishing a secretariat within the national trafficking in persons commission and allocate adequate funding. • Amend legislation to ensure victims are not penalized for any unlawful acts traffickers compel them to commit, particularly for illegal border crossings or loss of personal identification documents. • Monitor private employment agencies for recruitment fees and ensure they are paid by employers rather than prospective job applicants.

## PROSECUTION

The government continued to increase law enforcement efforts. Article 135 of the criminal code criminalized sex trafficking and labor trafficking and prescribed penalties of three to five years' imprisonment for offenses involving an adult victim and eight to 12 years' imprisonment for those involving a child victim, which were sufficiently stringent. However, with respect to sex trafficking, by allowing for house arrest in lieu of imprisonment, these penalties were not commensurate with those prescribed for other serious crimes, such as rape. Inconsistent with the definition of trafficking under international law, Article 135 established the use of force, fraud, or coercion as aggravating factors rather than essential elements of the crime. Article 148 (2) of the criminal code addressed "administrative forced labor." Such offenses involving adult victims were only considered administrative violations for first time offenses; repeated offenses were penalized with a fine or imprisonment of up to two years. Article 148 (2) criminalized all "administrative forced labor" offenses involving children with a fine or up to three years' imprisonment. Civil society and government contacts alike have noted these provisions, coupled with limited capacity to identify the crime among judicial officials and frontline officers, significantly constrained Uzbekistan's ability to prosecute and convict labor traffickers.

The government reported conducting 162 investigations, including 96 for sex trafficking, 11 for labor trafficking, and 55 involving unspecified exploitation of children, compared with 566 investigations in 2020. The government reported prosecuting 107 cases, including 46 cases for sex trafficking, eight for forced labor, and 53 involving unspecified exploitation of children, involving 155 suspects, compared with 93 prosecutions involving 129 defendants in 2020. Because of a tendency to conflate cases involving "sexual intercourse with a person under the age of 16" with sex trafficking and illegal adoption with child exploitation, it is possible some of the 162 reported investigations contained elements inconsistent with international law. The government reported convicting 154 defendants for crimes involving trafficking in 2021, compared with 100 in 2020. Of the 154 convicted traffickers, courts sentenced 94 to imprisonment, 43 to house arrest, two to correctional labor, and 15 to probation, compared with sentencing 33 to imprisonment, 35 to house arrest, one to correctional labor, and 20 to probation in 2020. Law enforcement efforts were, at times, constrained by gaps in technical capacity, lack of familiarity with existing laws, insufficient evidence gathering procedures, and poor coordination between the labor inspectorate and judicial officials. Some law enforcement officers were hesitant to investigate trafficking crimes due to a perception that cases would be too difficult to prosecute. The Prosecutor General's Office worked closely with counterparts in Kazakhstan to extradite two Uzbekistani individuals involved in trafficking crimes back to Uzbekistan during the reporting period; the case remained pending at the end of the reporting period. The government signed MOUs with South Korea, the Kingdom of Saudi Arabia, Belarus, and Turkey to enhance law enforcement collaboration on transnational crimes, including trafficking. Observers reported there may have been some delays in trafficking cases due to the impact of the pandemic. In previous years, victims reached financial settlements outside of the justice system, in some cases with the facilitation of low-level officials. The government's requirement for law enforcement to obtain hard evidence in order to open a trafficking case, noting victim testimony alone was not sufficient, inhibited law enforcement's ability to fully investigate all trafficking crimes.

The Ministry of Interior (MOI) maintained an investigatory unit dedicated to trafficking crimes. In November 2021, the government established

UZBEKISTAN

procedures for entering trafficking data into the government's Unified Information Database on Crimes, which includes information on traffickers and trafficking crimes; the database was not yet operational by the end of the reporting period. The government continued to provide trafficking-specific training, seminars, and conferences to police, judges, and other government officials, including the labor inspectorate, and conducted some activities in partnership with international organizations and civil society.

The labor inspectorate continued to gather evidence against local *hokims* and other officials for their alleged involvement in cotton harvest-related crimes, including trafficking. The government administratively penalized 65 officials for violating labor laws during the reporting period, compared with 170 in 2020; fines totaled 198.4 million soum ($18,360), compared with 653.2 soum ($62,450) in 2020. The government reported five officials were prosecuted under Article 51 of the Code of Administrative Liability for allowing forced labor in the cotton harvest; the five officials were removed from their jobs, but the cases remained pending at the end of the reporting period. The government did not report criminally prosecuting any officials for their alleged complicity in forced labor crimes. Observers reported individuals with political connections are more likely to go unpunished for crimes they commit, including human trafficking. Police continued to arbitrarily detain and threaten LGBTQI+ persons under legislation criminalizing homosexuality, at times resorting to threats and physical abuse to extort bribes or coerce them into informant roles or pornography; authorities spuriously charged some LGBTQI+ persons under anti-prostitution provisions. The government reported coordinating with international law enforcement agencies and counterparts from other countries through diplomatic missions abroad to coordinate the return of an Uzbekistani victims.

**PROTECTION**

The government increased protection efforts. Authorities identified 175 victims of trafficking in 2021, compared with 150 in 2020. Of the 175 victims, 120 were victims of sex trafficking, 33 were victims of forced labor, and 22 were victims of unspecified exploitation, compared with 89, 12, and 49, respectively, in 2020; all victims were Uzbekistani citizens exploited within Uzbekistan—there were 124 women and 38 men (compared with 138 and 12, respectively, in 2020), 12 girls, and one boy. Of the cases categorized as unspecified exploitation, the government did not report if these included sex trafficking or forced labor indicators. The government did not identify any foreign national victims, but reported foreign victims are entitled to the same benefits as citizens of Uzbekistan. An NGO identified and assisted 327 victims.

The government had standard operating procedures (SOPs) for victim identification and referral, which outlined ministries authorized to make initial victim identification and approve victims for receipt of government assistance, after which cases would be referred to local trafficking in persons commissions for final verification. Officials authorized to identify trafficking victims could refer victims to either a state-run shelter or NGOs for services. Civil society observers previously expressed concern that the two-step verification process in the SOPs was not sufficiently detailed or inclusive of NGO roles, lacked victim-centered approaches outlined in relevant legislation, was overly bureaucratic in nature, and might therefore incentivize territorial commissions to refer victims to NGO services directly, rather than first confirming victim designation with officials. In October 2021, the government released guidance to enhance the use of its SOPs on the identification and protection of victims, with support from an international organization. Experts have noted that the implementation of the SOPs is limited—regional branches of the Subcommittee on Combating Trafficking in Persons have minimal knowledge on the legislation and the crime, in some cases do not want to take responsibility for victim identification, and have an unclear division of labor. Regional governors who chair TIP commissions make the final decision on granting victim status do not have dedicated funds to assist victims and therefore are not incentivized to grant such status. Due to insufficient use of formal identification procedures, authorities may have detained some unidentified trafficking victims, including individuals in commercial sex and migrant workers. Some victims were reluctant to contact or cooperate with law enforcement due to distrust in the authorities and fear for their personal and familial safety. Local

officials regularly referred victims who did not wish to pursue a criminal case to NGO offices for assistance. During the previous reporting period, the government adopted Resolution No.60 "On the Referral System for Victims of Trafficking in Persons or Presumed Victims of Trafficking in Persons," which specifies measures for victim identification and designations of government agencies, as well as offices responsible, and it includes the implementation of measures to prevent risk of re-traumatization. Under the new resolution, 153 victims of trafficking were referred to protection services.

The government reported it referred all 175 identified victims of trafficking to care, compared with no victims referred in 2020 and 171 in 2019; all victims received services at the Republican Rehabilitation Center, which provided shelter, medical, psychological care, and legal services. An NGO supported the repatriation of 295 victims and provided legal consultations to 241 victims and 178 vulnerable migrants, including 134 legal consultations on recovery of wages. A local NGO provided legal and psycho-social services and return and reintegration support to 250 individuals, including trafficking victims, returned migrants, and at-risk groups. In 2021, the government allocated 1.03 billion soum ($95,320) for the Republican Rehabilitation Center and an additional 5.5 billion soum ($508,990) to support the activities of other shelters for trafficking victims (compared with 1.2 billion soum ($111,050) and 962 million soum ($89,030) in the previous reporting period). The government continued to provide in-kind support to local NGOs for the provision of victim assistance, such as food and clothing, and for the second consecutive year, it reported provision of direct funding assistance to some anti-trafficking NGOs—345 million soum ($31,930) (compared with 451 million soum ($41,740) in the previous reporting period). The government did not report accommodating foreign victims in the center since 2009. The government also operated 197 centers to assist victims of violence, including trafficking victims; these centers were managed and funded by regional governments, some of which coordinated with local anti-trafficking organizations. However, observers reported concerns that some centers did not provide adequate protection. In addition, the government established 29 centers throughout the country for female victims of violence. Civil society observers noted ongoing delays in NGO registration constrained some civil society efforts to monitor and assist victims, including in the cotton harvest.

Per Article 27 of the law, victims of human trafficking were exempted from civil, administrative, and criminal liability for acts committed under coercion. Current law did not explicitly exempt transnational sex and labor trafficking victims from facing a criminal penalty for illegally crossing international borders, which may have deterred some victims from reporting their traffickers. As part of its "*Mehr*" or "Compassion" campaign, the government also located and repatriated Uzbekistani women and children (more than 120 women and 380 children) who had traveled with their male relatives to Syria, Iraq, and Afghanistan and had subsequently been confined to camps, often in exploitative conditions. Although the government did not identify any of these women or children as victims of trafficking, it funded and provided them with shelter, education, legal, limited psychosocial care, and other medical services for five-week cycles throughout the reporting period—some NGO observers have previously claimed capacity was low among psycho-social care providers in these facilities.

Although victims could bring civil suits against traffickers, such instances were rare due to the high cost of legal representation, which was neither provided by the government nor affordable to most victims. Authorities reported legal services were offered by the government but did not report if these services were provided to any victims during the reporting period. NGOs filed 11 applications to initiate criminal cases on behalf of victims; authorities reported three criminal cases were initiated as a result (compared with none in the previous reporting period). Authorities did not report support for victims' participation in investigations or prosecutions of alleged traffickers. Experts reported the government does not adequately ensure victim's protection in court trials, as reporting victims were verbally attacked and threatened; authorities also allowed perpetrators and victims to enter the courtrooms at the same time. Observers reported some victims felt pressured and ashamed as court trials are open to the public and held in victims' communities; due to the lack of safety, victims sometimes refuse to testify against traffickers. In 2021, courts ordered 52 trafficking victims

Haiti AR_001067

to receive $55,853 in restitution—no information was provided whether the victims collected any funds.

## PREVENTION

The government maintained prevention efforts. The government's National Commission on Trafficking in Persons and Forced Labor (the Commission) coordinated anti-trafficking efforts with the Chair of the Senate serving as the National Rapporteur. The Commission convened four meetings in 2021, which included participation from government agencies, regional government representatives, and civil society. The Commission directed the activities of regional commissions in 12 regions, one autonomous republic, and one independent city (Tashkent). Some international observers described insufficient coordination and communication between the Commission and civil society partners in the absence of a secretariat structure. The government did not centrally allocate funding for the Commission, which instead required funding contributions from individual member ministries' budgets; this arrangement reportedly led to overreliance on NGO and international assistance. The government reportedly updated its national action plan to reflect input from international stakeholders in 2021 but did not provide information on these updates.

A combination of ongoing robust mechanization efforts, continued awareness-raising activities, continued consolidation of the cotton sector into a privatized "cluster"-based system, increased wages for cotton pickers, some improved recruitment practices, and the government-facilitated voluntary participation of unemployed individuals continued to significantly reduce the incidence of forced labor in the 2021 harvest. According to the ILO, reports of forced labor in cotton picking decreased by 75 percent in 2021 (compared with 33 percent in 2020). Monitors noted signs of coercion in only 1 percent of cotton pickers interviewed (compared with 4 percent in 2020 and 6 percent in 2019). Representatives from the ILO and civil society reported only a small number of scattered instances of forced labor persisted in the annual cotton harvest. The government continued to implement ILO recommendations, further reduced land allocated for cotton cultivation, and purchased more machinery to work toward the mechanization of the harvest. In 2021, the government reported increasing the total number of private textile-cotton clusters to 124—28 more than the previous year—accounting for nearly 100 percent of arable production land (an increase from 90 percent in 2020). The clusters processed cotton from cultivation to finished textile products and paid higher wages to workers.

While most observers assessed the government had made significant strides in combating forced labor in the cotton sector, including by abolishing the national cotton quota in 2020, experts noted the incentive structures that supported government-led coercion in the past remained, functioning much like the former quota system as mahallas (neighborhood-level governments) still required cotton pickers, whose benefits they control, to meet the local government targets in direct violation of the decree. Mahallas sometimes resorted to coercive practices to recruit pickers due to shortages in some regions or at some stages of the harvest. International experts reported the limited cases of forced labor involved perceived threats rather than explicit coercion; there is an expectation and belief that refusal results in negative consequences, such as losing a job or benefits, particularly among health care workers, teachers, employees of state-owned enterprises, and local government staff, as well as individuals who receive public benefits. Employees of public institution have reportedly been forced to pay for replacement pickers if they refused to participate in the harvest in the past. NGOs have reported in the past that many of the voluntary pickers preferred to be hired as replacement pickers by those seeking to avoid the cotton fields, as this enabled them to earn income beyond the standard picking wages. Civil society experts noted continuous involvement of government officials in the organization of the harvest can lead to the use of coercion due to the disparate power balance from a reliance on mahalla to recruit pickers and a lack of independent recruitment systems. Civil society experts have reported clusters do not typically face any penalties from local officials when they violate contract obligations with farmers—such as delay of payments for cotton delivered. *Hokims* have reportedly forced farmers to sign contracts with the clusters in their districts. Media and civil society reports indicated ongoing development of the privatized cluster system inadvertently generated other vulnerabilities, including

avenues for private businesses to subject harvest workers to contract violations, loss of bargaining power or choice of cluster-affiliation, coerced cultivation of cotton under threat of land loss, wage irregularities, and forced overtime. Some authorities reportedly expropriated land formerly leased or owned by individual farmers for the creation of new cluster sites without adequately compensating them, increasing their vulnerability to forced labor at those cluster sites. NGO observers noted the absence of a legal framework to ensure oversight of worker contracts and regulate and ensure proper licensing of labor recruitment intermediaries left seasonal agricultural workers vulnerable to forced labor in some cluster sites. The government continued its commitment to prohibit child labor in the cotton harvest; while there were isolated reports of children working in the fields—these appeared to have involved children trying to earn extra money for their families—there continued to be no reports of systemic mobilization. The government, in coordination with the ILO, continued to conduct awareness-raising campaigns to ensure citizens were aware of their labor rights. *Hokims* were instructed by the Deputy Prime Minister not to use forced labor to pick cotton.

For the seventh consecutive year, the government allowed the ILO to monitor the cotton harvest for child and forced labor, and ILO monitors had unimpeded access to the cotton fields for observations and to interview laborers. The government continued to issue official monitoring access permits to civil society groups. The ILO assessed that government entities compelled 1 percent of the estimated two million pickers who participated in the 2021 harvest—or approximately 20,000 individuals. This figure compares with 80,000 in 2020, 102,000 in 2019, 170,000 in 2018, and 336,000 in 2017. The government maintained the size of the labor inspectorate, keeping the total number of labor investigators assigned to look into these complaints across the country to 600. The labor inspectorate investigated 128 allegations of forced labor violations during the 2021 cotton harvest and conducted monitoring of more than 13,419 farms and privatized cotton clusters. User assessments of the Cotton Harvest Feedback Mechanism in 2021 were not yet available by the end of the reporting period; observers reported concerns about the effectiveness of the mechanism, the credibility and efficacy of ensuing investigations, and fear of retaliation for its use. For the fourth year, the government included independent human rights activists in harvest monitoring, field interviews, awareness raising activities, and the review of cases gathered through the mechanism. Observers previously reported isolated incidents in which local government officials harassed and temporarily detained independent civil society activists who attempted to monitor the cotton harvest. Media, including state media outlets, continued to report on forced labor practices and violations, generally without penalization or censorship; however, at least one high-profile blogger was subjected to politically motivated arrest and sentenced to six-and-a-half years in prison after reporting on issues such as corruption and farmers' rights. In 2021, local authorities reportedly harassed and threatened several activists in response to their efforts to establish Uzbekistan's first independent labor union. Some civil society experts noted a lack of freedom of association for independent monitoring and reporting of labor rights violations.

The government encouraged Ministers to use a special fund under the Ministry of Employment and Labor Relations to recruit unemployed individuals for public works, instead of subjecting civil servants and students to forced labor therein. Over the past five years, 1.4 million people have benefitted from 1.3 trillion soum ($120.3 million) from the Community Works Fund, serving to curtail economic drivers of potential exploitation; 243.3 billion soum ($22.52 million) was allocated in 2021, compared with 479.6 billion soum ($44.38 million) in 2020. An NGO previously reported the central government continued to set silk cocoon production quotas. NGO accounts of forced labor in the silk cocoon harvest alleged direct local government involvement and that some silk cocoon clusters forced farmers to sign compulsory contracts, requiring them to provide a specific amount of silk cocoons for every hectare of land—farmers who failed to produce the required quota risked the expropriation of their land by the local government. In 2021, the government, in cooperation with an international organization, carried out a survey of the silk cocoon industry and reported no systemic forced labor and no children in the production of silkworms.

VANUATU

The government continued to provide support to labor migrants abroad, including victims of forced labor, and allocated a budget of 15.5 billion soum ($1.43 million), an increase from 9.1 billion soum ($842,150) in 2020. Uzbekistan's Agency for External Labor Migration provided legal, financial, and social assistance to 323,620 labor migrants overseas; the agency also provided entrepreneurship and/or vocational training to 23,878 returned labor migrants. The agency conducted pre-departure consultations with migrant workers, through which it provided information on primary destination countries' labor and immigration laws—especially Russia and Kazakhstan; issued some prospective migrant workers health insurance; and provided micro-loans to cover basic expenses such as transportation and insurance. The government operated a hotline to identify human trafficking victims and refer them to services—the hotline received 840 calls in 2021, and 195 led to criminal investigations; the government did not provide information about the number of victims who received assistance as a result of hotline calls. The Commission also maintained a website where victims could request assistance. The government operated a 24-hour hotline in Russia that provided Uzbekistani labor migrants with legal advice, advised them of their rights, and directed them to the nearest consulate for assistance. An NGO operated a widely publicized 24/7 hotline, which received 12,082 calls on trafficking in 2021—the NGO provided assistance to 2,652 individuals. Additionally, the government, in cooperation with an NGO, provided information and support for labor migrants on safe work abroad and their rights. The government maintained agreements to enhance coordination on labor migration with eight countries, including the four with the highest populations of Uzbekistani labor migrants: Russia, Kazakhstan, Turkey, and South Korea. Private companies, including foreign and local, had official permission from the government to recruit Uzbekistani citizens for jobs abroad and within Uzbekistan. Although the companies were required to obtain recruitment licenses, the government did not report the number of such licenses granted. Labor recruitment laws in Uzbekistan prohibit charging workers recruitment fees; however, it was unclear to what extent authorities enforced this ban.

The government's labor inspectorate reported conducting 27,471 inspections in 2021 in all sectors of the economy, not counting those for farmers and clusters, (compared with 19,226 in 2020), and it collected 24 billion soum ($2.22 million) in fines (11.6 billion soum [$1.07 million] in 2020) and contributed the amount to the Community Works Fund. As in previous years, the inspectorate did not report screening for trafficking indicators. Labor inspectors were not empowered to bring criminal charges for first time violations of the law against forced labor, and international observers noted some inspectors also demonstrated limited comfort with their administrative enforcement mandate. Authorities continued to conduct public awareness efforts on transnational sex and labor trafficking, including through events, print media, television, and radio, often in partnership with and through in-kind support to NGOs. The government supported public awareness activities on the trafficking risk in the hotel industry and trafficking awareness raising campaigns for migrants departing airports. The government did not conduct efforts to reduce the demand for commercial sex acts. The government reported providing anti-trafficking training for its diplomatic personnel, as they are authorized to identify and refer trafficking victims in their host countries.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit Uzbekistani victims domestically and abroad, and some foreign nationals may be vulnerable to trafficking within Uzbekistan. Forced labor in the annual cotton harvest continues to decrease as a function of ongoing national reforms within the sector; however, isolated instances of forced labor from local officials persist in several areas of the country. The majority of pickers that participated in the most recent cotton harvest were women from rural areas. Some adults who refuse to pick cotton, are unable or unwilling to pay for a replacement worker, or do not fulfill their daily quota, at times feel threatened by the loss of social benefits, termination of employment, or other forms of harassment. Some employees and market vendors choose to hire a replacement picker directly, pay a fee for the mobilizer to find a replacement picker, or pay a fine, rather than pick cotton; this generates a coercive arrangement that penalizes those who choose not to participate in the harvest while

also creating a lucrative means of extortion for corrupt managers and officials. Private companies in some regions mobilize employees for the harvest. Farmers forced to vacate and remit their land to private cotton operators are at high risk of forced labor, including in the cluster sites established on their former land, due to disruption of livelihoods and ensuing economic hardships.

Local government officials subject adults to forced labor in other sectors as well. Some local officials reportedly provide silkworms to farmers and force them to sign contracts stating they will agree to cultivate silk cocoons in furtherance of national production quotas. Despite a 2018 government prohibition on the practice, some local officials continue to force teachers, students (including children), private businesses employees, and others to work in construction and other forms of non-cotton agriculture and to clean parks, streets, and buildings. Officials occasionally cast these compulsory tasks as part of Uzbekistan's traditional *Hashar* system, under which community members are expected to perform voluntary work for communal benefit. Criminalization of same-sex relationships between men makes some members of Uzbekistan's LGBTQI+ communities vulnerable to police abuse, extortion, and coercion into pornography and informant roles; widespread social stigma and discrimination against LGBTQI+ individuals also compound their vulnerability to family-brokered forced marriages that may feature corollary sex trafficking or forced labor indicators. Children in institutions are vulnerable to sex trafficking. According to international organization experts, 24 percent of children in Uzbekistan live in poverty and many end up working to help their families, facing high risk for trafficking. Traffickers exploit Uzbekistani nationals domestically in brothels, clubs, and private residences.

Traffickers exploit Uzbekistani nationals in sex trafficking and forced labor in the Middle East, including in Bahrain, Saudi Arabia, Iran, and the United Arab Emirates; in Europe, including Estonia, Georgia, Latvia, Moldova, Russia, and Turkey; and in Central, South, and East Asia, including in Kazakhstan, Sri Lanka, and Thailand, respectively. Uzbekistani nationals are subjected to forced labor in these regions in the construction, transportation, oil and gas, agricultural, retail, and food sectors. Hundreds of thousands of Uzbekistani migrant workers are at elevated risk of trafficking within Russia, where employers and authorities charge high work permit fees that catalyze debt-based coercion, subject them to poor living and working conditions, and garnish or withhold their wages; these vulnerabilities are often compounded by Russian employers' failure to register Uzbekistani migrant workers with the relevant authorities. More than half of Uzbekistani migrant workers reportedly forego the complex bureaucratic processes required to obtain proper documentation, exacerbating their vulnerability within the system. More than 70 percent of Uzbekistani migrants abroad reside in Russia, many Uzbekistani migrants face unemployment amidst the current Russian invasion of Ukraine, and thousands have returned to Uzbekistan, making them vulnerable to exploitation. Due to the dependence on remittances, families of Uzbekistani migrants working in Russia may become vulnerable as the value of the ruble continues to decrease and as they face obstacles in transferring money from Russia. Some Uzbekistani men travel to Syria, Iraq, and Afghanistan to fight alongside or seek employment within armed groups and are subsequently subjected to forced labor in cooking, cleaning, and portering. Uzbekistani women and children traveling with these men are also vulnerable to sex trafficking and forced labor on arrival; many are reportedly placed alongside other Uzbekistani family members in makeshift camp communities, where their travel and identity documentation is confiscated and their freedom of movement is restricted. Many of these women report having lost their husbands to armed conflict, after which their economic hardships and confinement in the camps make them vulnerable to coercive local marriages that may feature corollary sex trafficking or forced labor indicators.

## VANUATU: TIER 2

The Government of Vanuatu does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared

Haiti AR_001069

with the previous reporting period, considering the impact of the COVID-19 pandemic, if any, on its anti-trafficking capacity; therefore Vanuatu remained on Tier 2. These efforts included convicting four traffickers in the country's first trafficking case and establishing a national interagency coordinating body to lead the government's anti-trafficking efforts. However, the government did not meet the minimum standards in several key areas. The government did not provide any protective services, and for the third consecutive year, authorities did not identify any trafficking victims. For the second consecutive year, the government did not initiate any new trafficking investigations, nor did it conduct public awareness campaigns or administer systematic anti-trafficking training for its law enforcement officials. Contrary to a victim-centered protection approach, the government did not provide effective legal alternatives to removal to countries in which the victims would face retribution or hardship, such as adequate documentation for victims to seek refuge in neighboring countries.



**PRIORITIZED RECOMMENDATIONS:**
Amend anti-trafficking legislation to remove sentencing provisions that allow fines in lieu of imprisonment for sex trafficking offenses. • Increase efforts to investigate, prosecute, and convict traffickers under anti-trafficking laws and sentence convicted traffickers to adequate penalties, which should involve significant prison terms. • In coordination with civil society, develop and implement comprehensive standard operating procedures (SOPs) for victim identification and referral, including by screening for trafficking indicators among vulnerable populations, such as individuals in commercial sex, LGBTQI+ persons, migrant workers, and persons displaced by natural disasters. • Provide systematic training for all relevant officials on the trafficking law, victim identification, and referral mechanisms. • Allocate increased resources for and implement victim protection benefits, including permission to work for foreign victims who wish to participate in prosecutions against their alleged traffickers, taking into consideration humanitarian and compassionate factors. • Ensure all identified victims are referred to services. • Cease compelling foreign victims to remain in Vanuatu for the length of prosecutions against their alleged traffickers. • Institute a campaign to raise public awareness of trafficking, including among remote and vulnerable communities. • Improve anti-trafficking coordination with international partners, including by increasing information sharing with sending countries and instituting standard repatriation procedures. • Accede to the 2000 UN TIP Protocol.

**PROSECUTION**
The government slightly increased law enforcement efforts. Vanuatu law criminalized sex trafficking and labor trafficking. Article 34 of the Counter Terrorism and Transnational Organized Crime (CTTOC) Act criminalized trafficking in persons offenses involving adult victims and prescribed penalties of up to 10 years' imprisonment, a fine of up to 50 million Vanuatu Vatu (VT) ($449,560), or both. Article 35 criminalized trafficking in persons offenses involving child victims and prescribed penalties of up to 15 years' imprisonment, a fine of up to 75 million VT ($674,340), or both. These penalties were sufficiently stringent; however, with respect to sex trafficking, by allowing fines in lieu of imprisonment, these penalties were not commensurate with those prescribed for other serious crimes, such as rape.

In November 2021, courts convicted four Bangladeshi nationals on trafficking and related charges under the CCTOC and other crimes under the Penal Code. The government first arrested the defendants in March 2019 for allegedly exploiting 101 Bangladeshi victims in forced labor and in November 2020 initiated their prosecution—the first trafficking prosecution in the country's history. Courts convicted one trafficker

of slavery, human trafficking, money laundering, intentional assault, threats to kill, and employing non-citizens without a work permit and convicted another of trafficking, slavery, money laundering, employing non-citizens without a work permit, and furnishing false information to a labor officer; the remaining two were convicted of trafficking, slavery, and intentional assault. The government did not report sentencing information for the four convicted traffickers. The government did not report any new trafficking investigations or prosecutions. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking crimes. The National Intelligence Unit (NIU) within the Vanuatu Police Force was the lead agency for trafficking investigations; however, the lack of dedicated funding and training in the country's anti-trafficking policy infrastructure reportedly continued to constrain NIU officials' ability to adequately investigate trafficking cases. The government did not report any anti-trafficking training activities for law enforcement or other government officials.

**PROTECTION**
The government maintained inadequate efforts to protect victims. For the third consecutive year, the government did not identify any trafficking victims. The government continued to lack comprehensive, government-wide victim identification and referral SOPs. The government continued to implement border control screening procedures that reportedly contained gaps in passenger verification in trafficking victim identification measures. Officials expressed concern that the procedures may have adversely affected the government's efforts to identify trafficking cases; the government did not report updating the screening procedures to address these gaps. Observers noted that police would tolerate violence and discrimination against LGBTQI+ persons; therefore, criminal acts and trafficking indicators may have gone unreported and resulted in unidentified trafficking victims. Due to a lack of formal identification procedures, authorities likely punished or deported some unidentified trafficking victims.

For the second consecutive year, the government had only limited services available for victims and did not provide any victim protection services. In 2018, with assistance from an international organization, the government identified 101 Bangladeshi adult male victims in forced labor in construction and domestic service. Upon discovery of that case, the government, with support from partners, provided a broad range of services to the victims. Three Bangladeshi forced labor victims identified in 2018 remained in country. These victims sought refuge from neighboring countries, however, the countries were reportedly unable to respond without formal documentation from the Vanuatu government stating the victims' victimhood or refugee status. The government refused to provide such documentation, citing that Vanuatu was not signatory to the UN TIP Protocol. In addition, these victims applied for asylum in Vanuatu; the asylum claims were pending at the end of the reporting period. In the interim, authorities granted the victims temporary visas to remain and work in Vanuatu.

When available, protection services were time-limited, and authorities conditioned some services on victims' participation in court proceedings against the alleged traffickers. As part of the 2018 Bangladeshi forced labor case, the government required victims to remain in Vanuatu to serve as witnesses in the prosecution and tied their repatriation to a final court ruling; an international organization reported this requirement may have re-traumatized several victims in prior reporting periods. The government did not share information or coordinate with the Government of Bangladesh on repatriation options for the remaining victims; the government did not provide any funding or assistance to repatriation efforts. The government did not have a process in place to change victims' immigration status to grant them permission to work until the court reached a verdict, which could compound some victims' indebtedness. In 2020, one of the Bangladeshi forced labor victims sought restitution, which remained pending with the court. The government provided temporary visas to victims who participated in court proceedings; however, the government did not provide victims who did not participate the option to obtain a visa.

VENEZUELA

## PREVENTION

The government increased efforts to prevent trafficking. The government, in partnership with an international organization, established the National Steering Committee on Migrant Protection (NSC) as the national anti-trafficking coordinating body; the NSC held its first meeting in November 2021. The NSC was an interagency committee composed of senior government officials from multiple agencies, including Vanuatu Immigration Services, Transnational Crime Unit, Department of Labor, and National Security Council. The NSC, in partnership with an international organization, performed an assessment of existing anti-trafficking policies and legislation; the assessment was ongoing at the end of the reporting period. The Transnational Crime Unit had an action plan, which included anti-trafficking action items; however, it did not address all forms of trafficking, and limited resources continued to hinder its implementation.

For the third consecutive year, the government did not conduct systematic anti-trafficking awareness campaigns. The government did not have a trafficking hotline and lacked an adequate system to research and assess the scope of its trafficking problem. The labor department licensed and monitored agencies that could recruit workers from Vanuatu for overseas work. The government prohibited recruitment fees for seasonal work outside of Vanuatu and issued a notice of "non-compliance" to agents who charged migrant workers recruitment fees. During the previous reporting period, the government proposed policy and legislative action to abolish seasonal worker recruitment agents and create a centralized government-managed process to connect workers with employment; however, the government did not pass or implement the proposed actions by the end of the reporting period. The government, in partnership with an international organization, continued to implement a program to digitize and streamline citizen access to voter cards, citizenship documents, and national identification cards. The government did not provide anti-trafficking training to its diplomatic personnel. The government did not make efforts to reduce the demand for commercial sex acts. Vanuatu was not a party to the 2000 UN TIP Protocol.

## TRAFFICKING PROFILE

Human traffickers exploit domestic and foreign victims in Vanuatu, and traffickers exploit victims from Vanuatu abroad. Labor traffickers exploit individuals from the People's Republic of China (PRC), Thailand, Bangladesh, and the Philippines in Vanuatu. Individuals from the PRC may have been forced to work in Vanuatu at projects run by PRC-based companies. Traffickers target migrant women in the hospitality and tourism sectors and low-skilled foreign workers in high-risk sectors, such as agriculture, mining, fishing, logging, construction, and domestic service. PRC national and South Asian migrant women are particularly at risk for labor trafficking in bars, beauty salons, and massage parlors. Bangladeshi criminal groups have reportedly lured Bangladeshi individuals with false promises of high-paying job opportunities in Australia, transported them through Fiji, India, and Singapore, and then subjected them to forced labor in the construction industry in Vanuatu. Some of the victims take out substantial loans to pay relevant travel expenses, which traffickers exploit through debt-based coercion. Foreign fishermen working on Vanuatu-flagged, Taiwan-owned vessels have experienced indicators of forced labor, including deceptive recruitment practices, abuse of vulnerability, excessive overtime, withholding of wages, physical and sexual violence, and abusive living and working conditions on board.

Natural disasters and climate-induced displacement significantly increases ni-Vanuatu vulnerability to trafficking, particularly as a majority of the population relies on small-scale and subsistence agriculture. Thousands of ni-Vanuatu, who permanently or temporarily evacuated from the islands of Ambae and Ambrym due to volcanic activity, are at higher risk of trafficking due to the economic hardships ensuing from their ongoing displacement. Women and girls may also be at risk of debt-based coercion in sex trafficking and domestic servitude via the customary practice of "bride-price payments," where a man's family gives a woman's male relatives money or other valuables in order for the man and woman to become married. The man's family may at times force the woman to "pay back" the money through commercial sex acts or forced domestic service. The incidence of bride-price payments is linked to broader economic hardship and vulnerability, particularly in the context of the country's frequent natural disasters; increased reports of child marriage, where children may be exploited in domestic servitude or sex trafficking,

occurred immediately after a cyclone in April 2020. Children are also subjected to trafficking through "child swapping"—brokered as an inter-familial cultural practice or as a method to pay off debts. Women in commercial sex face physical and sexual violence and are reportedly coerced into forced pregnancy and forced marriage; reports acknowledge a correlation between the lack of economic opportunities and an increase in commercial sex. The limited ability for women and girls in commercial sex to seek justice increases vulnerability to trafficking. Reports show taxi drivers may facilitate the exploitation of children in commercial sex. Forced labor and child sex trafficking occur on fishing vessels in Vanuatu. Foreign tourists aboard boats reportedly approach remote ni-Vanuatu communities and offer money in exchange for marriage with underage girls as a ploy for short-term sexual exploitation. Locals onshore, acting as recruiters, also reportedly take underage girls aboard vessels and subject them to commercial sexual exploitation by foreign workers, often for weeks at a time. The local recruiters, and in some instances the families, receive payment for recruiting and transporting the girls to the boats. LGBTQI+ individuals are vulnerable to trafficking. Children may also experience conditions indicative of forced labor in the illegal logging industry and in newspaper sales.

# VENEZUELA: TIER 3

The Venezuela does not fully meet the minimum standards for the elimination of trafficking and is not making any efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Venezuela remained on Tier 3. On January 10, 2019, the term of former president Nicolás Maduro ended. On January 23, 2019, National Assembly president Juan Guaidó assumed the role of interim president based on a presidential vacancy clause in the Venezuelan Constitution. Maduro refused to cede control, preventing interim President Guaidó from exercising authority within the country. The United States continues to recognize the authority of the democratically elected 2015 National Assembly and Juan Guaidó as the interim president of Venezuela. References herein reflect efforts made, or lack thereof, by the Maduro regime representatives and not the democratically elected administration that was unable to exercise its' authority within the country during the reporting period. Mentions of "representatives," "regime," "regime representatives," or "Maduro regime" below are not intended to indicate that the United States considers such entities to be the recognized government of Venezuela. Despite the lack of significant efforts, the regime representatives took some steps to address trafficking, including arresting some complicit individuals and issuing a decree for the development of the national action plan (NAP). However, regime representatives did not report assisting any victims or prosecuting or convicting any traffickers. Regime restrictions on the press and pandemic-related measures limited reporting. Maduro and regime representatives continued to provide support and maintained a permissive environment to non-state armed groups that recruited and used child soldiers for armed conflict and engaged in sex trafficking and forced labor while operating with impunity. Despite such reports, representatives did not make sufficient efforts to curb forced recruitment of children by non-state armed groups.



VENEZUELA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers, including complicit regime representatives and those involved in the forcible recruitment of children into illegal armed groups. • Provide specialized services for all trafficking victims, including repatriated victims, child soldiers, men, boys, and LGBTQI+ individuals. • Proactively inform

Venezuelans fleeing the country on the risks of human trafficking, as well as where and how to seek services. • Train all migration and law enforcement personnel operating in border crossings to identify and respond appropriately to trafficking indicators. • Draft and enact comprehensive anti-trafficking legislation criminalizing all forms of trafficking, including the criminalization of child sex trafficking without elements of force, fraud, or coercion, and the trafficking of men and boys. • Increase staffing and funding for the office of the special prosecutor to combat trafficking. • Given significant concerns about forced labor indicators in Cuban international work programs, screen Cuban overseas workers, including medical professionals, for trafficking indicators and refer those identified to appropriate services. • Fund and collaborate with civil society organizations and other service providers to increase protection and assistance for victims. • Implement formal procedures and training for identifying victims among vulnerable populations, such as individuals in commercial sex, and for referring victims for care. • Finalize, fund, and implement a NAP to address trafficking and present challenges, including mass migration and displacement, regime complicity, and forced recruitment of children for armed conflict. • Enhance interagency cooperation by forming a permanent anti-trafficking working group. • Improve data collection of anti-trafficking efforts and make this data publicly available.

## PROSECUTION

Regime representatives under Maduro maintained inadequate law enforcement efforts. Venezuelan law did not criminalize all forms of trafficking. The law criminalized labor trafficking and some forms of sex trafficking of women and girls through a 2007 law on women's rights that prescribed penalties of 15 to 20 years' imprisonment. Inconsistent with international law, it required a demonstration of force, fraud, or coercion to constitute child sex trafficking and therefore did not criminalize all forms of trafficking. Venezuelan law failed to criminalize trafficking of men and boys when perpetrators were not part of an organized criminal organization. The law addressing organized crime criminalized trafficking by organized criminal groups of three or more individuals, with penalties of 20 to 30 years' imprisonment. The penalties for trafficking crimes by organized criminal groups were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape.

The organized crime office (ONCDOFT) focused on trafficking crimes and continued to be the lead entity for trafficking issues. Regime representatives did not report investigating, prosecuting, or convicting any traffickers. A media outlet reported that the regime arrested between 26 and 30 alleged traffickers in 2021, compared with similar reports from previous years noting the arrest or indictment of 63 individuals in 2020, 17 in 2019, and 99 in 2018. In previous years, observers asserted some of the arrests and investigations reported in the media were politically motivated persecutions by the Maduro regime of individuals helping opposition supporters and others depart Venezuela. Years of corruption, incompetence, and abuse weakened the Maduro regime's capacity to govern and hollowed out the country's institutions, fostering a permissive environment for non-state armed groups to operate with impunity. According to stakeholders, regime representatives at high levels linked to Maduro were complicit in trafficking crimes perpetrated by non-state armed groups and provided support and a permissive environment. NGOs indicated that regime representatives continued to overlook the forced recruitment of children by illegal armed groups. Near border crossings, survivors reported national guard personnel facilitated, and sometimes actively participated in, trafficking crimes. According to family members of those who disappeared at sea, regime representatives were unwilling to investigate a trafficking network between Venezuela and Caribbean countries because those same individuals were involved in the perpetration of trafficking crimes. Media sources reported some regime representatives charged between $300 to $400 to allow the departure of boats transporting trafficking victims to nearby Caribbean islands. The regime did not make notable efforts to investigate official complicity, including in a case reported last year involving 13 alleged traffickers, including seven members of the national guard who may have facilitated the transport of victims to Trinidad and Tobago in a ship that capsized and killed 28 alleged victims of trafficking. In a press statement, the regime reported arresting five civil servants for trafficking crimes.

Regime representatives did not report any prosecutions or convictions of public representatives complicit in trafficking crimes.

There were two special prosecutor's offices responsible for investigating trafficking crimes against women, developing anti-trafficking policies, and facilitating victims' access to justice. The special prosecutor's mandate did not include trafficking crimes against transgender individuals, children, or men, leading to impunity of traffickers and leaving victims unprotected and at risk of re-victimization. Media reporting indicated the specialized prosecutor's office was handling the investigation of a child sex trafficking ring operating in Apure that led to numerous arrests including some complicit regime-affiliated individuals. Civil society organizations expressed some doubt whether the special prosecutor's offices were active. Venezuelan prosecutors facilitated two workshops for civil servants on the criminalization of trafficking crimes.

## PROTECTION

Regime representatives under Maduro maintained inadequate protection efforts. Regime representatives did not report identifying or referring victims to services during the reporting period. In a press statement, the attorney general noted that since 2017, the regime and its predecessor had identified nearly 696 victims of human trafficking, of which 14 were identified in 2021. Availability of victim services remained limited, and there were no specialized shelters for trafficking victims in the country. While civil society and religious organizations provided some services to victims of trafficking, such assistance may have been temporarily suspended or limited as a result of the pandemic. In addition, regime efforts to restrict foreign funding limited their ability to provide services to trafficking victims. The regime claimed to have a non-specialized victim care program under the public ministry. Regime representatives reportedly provided services based on a victim's degree of vulnerability and social risk, the type of crime involved, the victim's relationship with the aggressor, and the victim's individual psychological, social, and economic profile. NGOs remained skeptical of the regime's reported efforts. Historically, victims could reportedly access regime centers for victims of domestic violence or at-risk youth, although services for male victims were minimal. Venezuelan law and the regime representatives focused primarily on women and girls as potential victims of human trafficking crimes to the exclusion of boys, men, and LGBTQI+ persons, leaving them vulnerable and unprotected. The regime reportedly made psychological and medical examinations available to trafficking victims, but additional victim services, such as follow-up medical aid, legal assistance with filing a complaint, job training, and reintegration assistance, were minimal. According to media sources, the ONCDOFT continued to operate a 24-hour hotline to receive general reports of abuse against women, including trafficking allegations; however, in previous years several of the numbers provided were often inactive. Stakeholders reported unemployment, caused by pandemic quarantine measures, increased the vulnerability of Venezuelans to sex trafficking and forced labor, as many were unable to secure employment in the formal or informal sector. Civil society organizations reported the regime used resources that would otherwise have been dedicated to victim identification and support to address the impact of the pandemic. International media sources continued to report on the growing number of Venezuelan victims identified abroad; many repatriated or were deported back to Venezuela; the regime did not report what assistance, if any, they provided victims upon their return or if they coordinated with foreign governments to ensure the protection of those victims.

## PREVENTION

Regime representatives under Maduro maintained inadequate prevention efforts. No permanent anti-trafficking interagency body existed. In 2021, the regime approved a decree for the development of the 2021-2025 NAP; however, regime representatives did not report efforts to implement or fund the NAP. NGOs noted it was impossible to verify progress made due to lack of transparency and coordination with external actors. In addition, the regime did not report on the content of the plan, including whether it addressed present challenges, such as the increase in cases of forced labor in domestic service, the forced recruitment of children into armed conflict, the increase in victim repatriations from other countries, and efforts necessary to mitigate the exploitation of those leaving the country as a result of the economic crisis. ONCDOFT conducted an awareness

**VIETNAM**

campaign in the State of Portuguesa and separately participated in the trafficking in persons breakout meeting at the South American Conference on Migration. The regime did not provide anti-trafficking training for their diplomatic personnel and did not report any specific activities to reduce the demand for commercial sex acts.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Venezuela, and traffickers exploit Venezuelan victims abroad. As the economic situation continues to spiral into critical deterioration, more than six million Venezuelans have fled Venezuela to neighboring countries. Traffickers exploit Venezuelan nationals in Aruba, The Bahamas, Bolivia, Brazil, Chile, the People's Republic of China, Colombia, Costa Rica, Curaçao, Dominican Republic, Ecuador, Egypt, Germany, Guyana, Haiti, Iceland, Macau, Mexico, Panama, Peru, Spain, Suriname, and Trinidad and Tobago. Venezuelan women and girls are particularly at risk of sex trafficking in Colombia, Ecuador, and Trinidad and Tobago. In 2021, traffickers lured women, including transgender women, to Spain and Germany with fraudulent employment opportunities and subjected them to forced surgical procedures before exploiting them in commercial sex. A civil society organization reported 517 victims were identified in 2020, of which 124 were children, 210 were identified domestically, 60 in Colombia and Guyana, 52 in Trinidad and Tobago, 39 in Spain, 32 in the Dominican Republic, and 26 in Mexico. Traffickers increasingly exploit Venezuelan men in forced labor in other countries, including Aruba and Curaçao.

Non-state armed groups, including Colombian illegal armed groups, especially near border regions, subject Venezuelans to forced criminality and use child soldiers. In 2019, the UN, foreign governments, media outlets, and credible NGOs reported Maduro regime representatives, including members of security forces and local representatives, including those near border regions, colluded with, tolerated, and allowed Colombian illegal armed groups to operate in Venezuelan territory with impunity, while also confronting groups at other times. These officials reportedly provided support and a permissive environment to non-state armed groups that recruited children for armed conflict and forced criminality. These non-state armed groups grew through the recruitment of child soldiers and engaged in sex trafficking and forced labor. They lured children in vulnerable conditions and dire economic circumstances with gifts and promises of basic sustenance for themselves and their families to later recruit them into their ranks. These groups recruited children to strengthen their operations and terrorize border communities in Venezuela and neighboring countries, especially Colombia, in areas with limited governance. An NGO reported non-state armed groups indoctrinated, recruited, and engaged children in five Venezuelan states using lectures, brochures, and school supply donations. Reports have documented the presence of six dissident movements comprising FARC dissident combatants in at least seven of 24 Venezuelan states, including Amazonas, Apure, Bolívar, Guárico, Mérida, Táchira, and Zulia, five of which are border states. In 2019, Colombian authorities estimated there were approximately 36 ELN camps located on the Venezuela side of the Colombia-Venezuela border. In 2021, the regime imprisoned a civil society activist under politically motivated pretexts after his organization denounced and documented the regime's support for non-state armed groups, including those that recruited children for armed conflict among other crimes. Members of the Maduro regime probably profit from such non-state armed groups' criminal and terrorist activities inside Venezuela, including human trafficking, and such funds likely contribute to their efforts to maintain their control. According to documents reportedly from the regime's intelligence agency (SEBIN) and published in Colombian press, the Armed Forces in 2019 ordered members of the Army, National Guard, and militias present in four states along the Colombia-Venezuela border to avoid engaging unspecified allied groups in Venezuelan territory and encouraged the armed forces to aid and support their operations. These groups threaten to destabilize the region, as they grow their ranks exploiting children in sex trafficking, forced labor, and forced recruitment. According to NGOs, forced labor is a common punishment for violating rules imposed by armed groups. Illegal armed groups forced Venezuelans, including children, to work in mining areas and women and girls into sex trafficking.

Traffickers subject Venezuelan women and girls, including some lured from poor interior regions to Caracas, Maracaibo, and Margarita Island, to sex trafficking and child sex tourism within the country. Traffickers, often relatives of the victims, exploit Venezuelan children in domestic servitude within the country. Regime representatives and international organizations have reported identifying sex and labor trafficking victims from South American, Caribbean, Asian, and African countries in Venezuela. Foreign nationals living in Venezuela subject Ecuadorians, Filipinos, and other foreign nationals to domestic servitude. Illegal gold mining operations exist in some of the country's most remote areas, including the Orinoco Mining Arc in Bolívar state, where traffickers exploit girls in sex trafficking, forcibly recruit youth to join armed criminal groups, and force children to work in the mines under dangerous conditions; Approximately 45 percent of miners in Bolívar state were children and extremely vulnerable to trafficking. Armed groups exploit civilians and kidnapping victims in sex trafficking and forced labor, including farming, domestic service, and construction. Workers recruited from other areas of the country were victims of forced labor and manipulated through debt, threats of violence, and even death. In 2021, an NGO reported non-state armed groups operating near Delta Amacuro in Bolívar State led members of the Indigenous Warao community into Guyana to work long shifts in illegal mines with no medical care and under precarious conditions. Traffickers recruited Warao women to work as cooks in the mines and later subjected them to sex trafficking in Guyana. Some doctors participating in Cuba's overseas medical program showed indicators of forced labor. In 2021, there were between 19,500 and 21,000 Cuban medical workers in the country. The Cuban government may be exploiting Cuban overseas workers, participating in its government-sponsored medical missions in Venezuela, in forced labor. Some Cuban medical professionals posted in Venezuela indicated Cuban minders withheld their documentation and coerced them to falsify medical records. An NGO reported failure to obtain adequate personal protective equipment for potential medical worker victims could have contributed to the death of at least one Cuban medical worker. NGOs reported an increased incidence of domestic servitude and sex trafficking within the country. According to civil society organizations, Venezuela has the highest rate in Latin America of people exploited in human trafficking with 5.6 per 1,000 people.

## VIETNAM: TIER 3

The Government of Vietnam does not fully meet the minimum standards for the elimination of trafficking and is not making significant efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Vietnam was downgraded to Tier 3. Despite the lack of significant efforts, the government took some steps to address trafficking, including instituting formal child-centered investigative policies that aimed to address longstanding insufficiencies in preexisting law; increasing international law enforcement cooperation; initiating a process to evaluate a preexisting anti-trafficking law for eventual amendment; achieving the first modest increase in victim identification in five years; and assisting more victims than in 2020. It also enacted a series of policies to eliminate worker-paid service fees and commissions that have historically placed Vietnamese workers at high risk of debt-based coercion in several sectors and key destination countries. However, the government reported a decline in convictions of traffickers for the fifth consecutive year; it also achieved significantly fewer prosecutions than in 2020. Authorities again inspected thousands of establishments most at risk for sex trafficking without identifying any victims of sex trafficking in the process, despite widespread prevalence at such sites. The government did not hold criminally or administratively accountable two Vietnamese diplomats who were allegedly complicit in subjecting Vietnamese nationals to trafficking abroad during the reporting period, and it did not make sufficient effort to protect the victims in these cases. To the contrary, authorities at times reportedly harassed and pressured survivors and their families in an effort to silence allegations of official complicity.



VIETNAM TIER RANKING BY YEAR

PRIORITIZED RECOMMENDATIONS:

Collaborate with NGOs and civil society to revise anti-trafficking legislation, including by amending the penal code to fully criminalize the sex trafficking of 16- and 17-year-old children consistent with international law. • Vigorously prosecute all forms of trafficking and convict and punish traffickers, including in cases involving forced labor or complicit officials. • Continue to train officials on implementing guidelines for Articles 150 and 151 of the penal code, with a focus on identifying and investigating forced labor and internal trafficking cases, including those involving male victims. • In coordination with civil society, update and train officials on victim identification guidelines, and enhance interagency coordination to identify and assist victims among vulnerable groups, such as migrant workers; individuals in commercial sex, including women and girls discovered during police raids and inspections of business establishments that facilitate commercial sex; child laborers; and North Korean and People's Republic of China (PRC) nationals. • Finalize and implement revisions to the 2014 National Referral Mechanism (NRM). • Eliminate all worker-paid recruitment fees and predatory recruitment practices for workers migrating abroad or to Vietnam; strengthen efforts to monitor labor recruitment companies, third-party sub-brokers, and the protections outlined in migrant worker contracts; and prosecute predatory or illegal sub-brokerage networks. • Expand training for social workers, first responders, diplomats, and the judiciary on trauma-informed care and other victim-centered approaches to working with victims of trafficking. • Implement and allocate sufficient resources to the 2021-2025 national action plan (NAP). • Invite independent verification of the termination of forced labor within drug treatment centers and make public the results of such verification.

PROSECUTION

The government decreased law enforcement efforts, including by failing to hold criminally or administratively accountable two officials who were allegedly complicit in forced labor crimes. Article 150 of the penal code criminalized labor trafficking and sex trafficking of adults and prescribed penalties of five to 10 years' imprisonment and fines of 20 million to 100 million Vietnamese dong (VND) ($879 to $4,390). Article 151 criminalized labor trafficking and sex trafficking of children younger than the age of 16 and prescribed penalties of seven to 12 years' imprisonment and fines of 50 million to 200 million VND ($2,200 to $8,790). These penalties were sufficiently stringent and, with regard to sex trafficking, commensurate with other serious crimes, such as rape. Inconsistent with international law, Article 150 applied to children between the ages of 16 and 17 years old and required a demonstration of force, fraud, or coercion to constitute a sex trafficking crime; it therefore did not criminalize all forms of child sex trafficking. Civil society observers previously reported this led to confusion among the courts on how to handle cases involving 16- and 17-year-old children—particularly for cases involving labor trafficking—and that it precluded child-centered best practices in such cases. In an effort to address this concern, in 2021, the Ministry of Public Security (MPS) issued a new policy outlining child-centered procedures for the investigation of trafficking crimes committed against persons younger than the age of 18; this was the first government-issued guidance instructing law enforcement to handle trafficking cases involving 16- and 17-year-olds as child trafficking cases. Authorities did not report statistics on its implementation in 2021. Vietnam also maintained a broad 2011 anti-trafficking law that focused primarily on preventative measures; it contained some provisions that reportedly conflicted with the definitions outlined in the penal code. According to NGO representatives, some officials were therefore unsure whether to apply the 2011 law or penal code provisions when handling trafficking cases. The government completed review of this law and issued a six-step action plan to address these deficiencies, along with the gap in

coverage for 16- and 17-year-old children, in advance of projected 2023 amendments. It also issued a formal decision approving Vietnam's first Program to Protect Children Online for 2021-2025, which included specific guidance on prosecutions. No further information on content of these initiatives or their status was available at the end of the reporting period.

The government investigated more alleged traffickers in 2021 but prosecuted and convicted fewer individuals than the prior year. Despite pandemic-related challenges, the government again provided disaggregated law enforcement data by trafficking type. According to MPS, authorities investigated 149 suspected traffickers in 77 cases in 2021 (compared with 144 suspected traffickers investigated in 110 cases in 2020). This figure included seven sex trafficking investigations, three forced labor investigations, and 67 investigations into unspecified exploitation "for the purpose of transferring or receiving money, property, or other material benefit" as defined in penal code Articles 150 and 151 (not disaggregated in 2020). Authorities did not provide sufficient information to determine if the aforementioned 67 cases met international definitional standards of trafficking. The Supreme People's Procuracy (SPP) submitted 98 cases involving 177 alleged traffickers for prosecution in 2021, compared with 106 cases involving 180 suspects submitted in 2020. Of these, 68 cases involving 120 suspects were accepted for prosecution, including 44 cases under Article 150 and 24 cases under Article 151; this marked a decrease from 102 cases—65 and 37, respectively—involving 161 suspects in 2020. The 68 accepted cases included 14 sex trafficking cases, three forced labor cases, and 51 cases of unspecified exploitation; three cases involved domestic trafficking crimes and 65 were transnational in nature (compared with 79 sex trafficking cases, 18 forced labor cases, and five cases of unspecified exploitation, with five domestic and 97 transnational cases in 2020). Courts ultimately accepted 66 cases featuring 132 alleged traffickers for full prosecution but only initiated proceedings in 49 cases involving 94 defendants (compared with accepting 107 cases involving 175 alleged traffickers, leading to 84 prosecutions of 136 defendants, in 2020). Among the 49 cases prosecuted, courts tried 27 cases involving 51 defendants under Article 150 and 22 cases involving 43 defendants under Article 151 (compared with 60 cases involving 95 defendants and 24 cases involving 136 defendants, respectively, in 2020). Vietnam maintained a high conviction rate and continued to impose strict sentencing for convicted traffickers. The court system convicted all 94 individuals (compared with 136 in 2020) under Articles 150 and 151. Sentences for convicted traffickers ranged from less than three years' to life imprisonment under both Articles 150 and 151 (compared with three years' to 20 years' imprisonment in 2020).

Throughout the reporting period, courts were intermittently closed due to the pandemic; however, to ensure that all criminal cases—including human trafficking cases—were adjudicated in a timely manner, the Supreme People's Court (SPC) issued a resolution allowing for all criminal, civil, and administrative trials to be conducted online beginning in January 2022. It also continued to direct the courts to schedule trials on the weekends, rent additional space or utilize outdoor locations to hold hearings, and prioritize trials set to expire. Civil society observers noted incremental improvements in some provincial anti-trafficking law enforcement practices, including efforts to address child forced labor in the garment sector in the northwest part of the country. Anticipating that pandemic-related border closures may lead to a spike in domestic trafficking, MPS also issued policies directing law enforcement to focus on the detection and handling of trafficking crimes occurring within Vietnam. Police continued to conduct raids of establishments suspected of sex trafficking despite pandemic-related challenges. Law enforcement authorities reportedly increased information-sharing activities and joint operations with counterpart agencies in the PRC, Germany, the Netherlands, Sweden, the United States, and several Lower Mekong countries, including in special economic zones (SEZs) in Laos. The government did not receive extradition requests related to human trafficking cases in 2021.

In 2021, a Vietnamese labor attaché in Saudi Arabia and another staff member allegedly directly facilitated the forced labor of several Vietnamese nationals in Saudi Arabia. The government reported initiating an inquiry into the case; the inquiry remained ongoing at the end of the reporting period. Authorities allowed the diplomat to remain in his post and did not file criminal charges or implement any administrative penalties. Although authorities imposed administrative penalties on some of the entities involved in the initial fraudulent recruitment or transportation of the

victims to Saudi Arabia, they did not seek criminal accountability; some of these alleged accomplices returned to Vietnam or traveled elsewhere, and at least one reportedly continued recruitment activities with impunity. Vietnamese authorities penalized one labor export company for failing to resolve a pay issue; the company alleged that this action was a response to its attempting to assist some of the victims who reported these abuses. In a separate case, the government arrested and charged four high-ranking Ministry of Foreign Affairs (MFA) consular officials for their alleged role in scheming to profit by forcing Vietnamese nationals stranded abroad during the pandemic to pay exorbitant repatriation fees—a common source of indebtedness that traffickers were known to exploit. Authorities did not provide further information on these charges, which did not appear to result from the aforementioned incidents in Saudi Arabia. Police noted the extraction, storage, and analysis of digital evidence, combined with ambiguities surrounding its permissibility in court proceedings, negatively impacted the government's ability to combat internet-facilitated trafficking crimes. The government continued to provide multiple anti-trafficking trainings—at times with support from international organizations, NGOs, and foreign governments—to its personnel, including law enforcement officers, border guard forces, prosecutors, judges, and social workers at the district, provincial, and commune levels. In conjunction with foreign donors, the SPC continued to examine and hold discussions on a series of concluded trafficking cases in an effort to establish legal precedent for reference in future prosecutions.

## PROTECTION

The government maintained efforts to protect victims, but two allegedly complicit officials took measures to harass, intimidate, and facilitate the re-exploitation of some survivors of trafficking with impunity. The government reported identifying 126 victims in 2021, of whom 114 were female and 12 were male; 45 were children (compared with a total of 121 victims comprising 112 females, nine males, and 32 children in 2020). Of these, 120 were Vietnamese nationals, and 96 were subjected to transnational trafficking. Twenty-two individuals were victims of forced labor and 28 were victims of "sexual exploitation;" some of the latter cases may have fallen outside international definitional standards for trafficking crimes. Slightly more than half of identified victims (64) were members of ethnic minority communities. Seventy-six individuals were victims of unspecified trafficking, which in prior years included "illegal marriage" and "illegal adoption," neither of which was consistent with international definitions of trafficking (64 and three, respectively, in 2020). The government utilized victim identification criteria as part of the Coordinated Mekong Ministerial Initiative against Human Trafficking (COMMIT), along with its own victim identification procedures approved in 2014; however, identification procedures remained largely reactive—rather than proactive—across various key agencies. The victim identification process remained overly cumbersome and complex, requiring approval from multiple ministries before victims could be formally identified and assisted. Ineffective implementing guidelines on victim identification procedures prevented border guards, law enforcement, and other officials from fully detecting and assisting victims. Authorities did not proactively employ the COMMIT criteria or their own procedures to screen for trafficking indicators among key vulnerable populations, including individuals in commercial sex, individuals transiting border stations, workers in the fishing and seafood processing industries, migrant workers returning from abroad, and child laborers. Despite conducting more than 36,000 inspections of establishments most at risk for sex trafficking, authorities did not identify any sex trafficking victims during these inspections.

The government maintained an NRM approved in 2014, but some local officials' unfamiliarity with anti-trafficking protocol and policies, insufficient inter-jurisdictional cooperation, and limited social worker capacity continued to hinder its systematic implementation. The labor and social affairs ministry (MOLISA) led an inter-ministerial process during the reporting period to review and revise the NRM, as well as to draft supplementary guidance on receiving and providing protection services to trafficking victims; neither effort was complete at the end of the reporting period. The government did not report the total number of victims it referred to NGO or state protection services (compared with 25 referrals to protection centers, 20 to police, 19 to an NGO, and three to the to the Vietnam Women's Union (VWU) Center for Women's Development in 2020), nor did it disaggregate data according to whether victims received assistance from NGOs or official sources. Authorities

did record and grant 111 total requests for victim support in the form of medical and psychological care, legal aid, lodging, essential needs, travel expenses, vocational training, and loans (compared with 84 assisted in 2020). Survivors benefitting from these services included 12 male and 99 female individuals, and five were foreign nationals—four Cambodians and one Thai national (unreported in 2020). Thirty-four victims requested and were granted legal aid. As with victim identification, more than half of assisted survivors were members of ethnic minority groups (64). With donor funding, MOLISA continued to operate a 24-hour hotline for victims of various crimes, including trafficking. Hotline operators could speak Vietnamese, English, and seven ethnic minority languages. Although the hotline reported an increase in the total number of calls received—3,808, up from 2,826 in 2020—it received fewer trafficking-specific calls during the reporting period: 35 calls involving 39 victims, compared with 59 calls involving an unspecified number of victims in 2020. The majority of these cases (28) involved children. Observers ascribed this change to an increase in reported missing persons cases and a decrease in the movement of vulnerable people across international borders during pandemic-related travel restrictions. The hotline referred 19 of these cases to police for recovery and investigations, 16 to MOLISA for further assistance, two to an NGO, and one to a VWU shelter. The government maintained labor representatives at diplomatic missions in countries that hosted large numbers of documented Vietnamese migrant workers, such as Japan, Malaysia, Saudi Arabia, South Korea, Taiwan, and the United Arab Emirates (UAE). These missions could provide basic provisions, transportation, and health care to Vietnamese citizens subjected to trafficking abroad. MFA authorities did not report complete repatriation data, but Vietnam's diplomatic mission in Burma reported receiving, identifying, and providing various support services to 16 Vietnamese female victims of sexual exploitation there—14 women and two girls—compared to nine victims repatriated from Burma in 2020. MFA worked with Burmese authorities to fund and conduct repatriation for 11 of these victims after five opted to remain in Burma.

Mandatory quarantine periods and other pandemic-related restrictions negatively affected some victim care and support services during the reporting period. The government continued to assist vulnerable groups, including trafficking victims, through 51 social protection and 43 social service centers nationwide; some of these facilities operated with NGO funding, and none provided services to male or child victims exclusively. The government also announced a series of protection-related actions to supplement or clarify preexisting policies, laws, and initiatives during the reporting period. In May 2021, the Prime Minister issued a formal decision approving a new national Child Labor Prevention and Reduction Program for 2021-2025 which focused on the provision of timely support to all children subjected to sex trafficking and forced labor. The government also approved new policy guidance for a 2020 overseas employment law that added or increased financial, legal, and vocational assistance options for Vietnamese workers who return home prior to the end of their contracts, including for those who are fleeing forced labor. Another new policy outlined the development of income generation projects for trafficking survivors in predominantly ethnic minority communities in mountainous regions. Authorities did not provide information on the implementation of any of these policies in 2021. Authorities allowed victims to stay at support facilities for up to three months with a meal stipend and medical assistance according to a circular issued in 2020. A decree issued in the prior reporting period entitled foreign trafficking victims to four support services: essential needs and travel expenses, medical support, psychological support, and legal aid. However, NGOs reported the government did not have adequately trained or experienced social workers to provide appropriate support to trafficking victims. Vietnamese law guaranteed trafficking victims the right to legal representation; the law did not require victims to be present at or testify in-person in court. The law also entitled trafficking victims to compensation in trafficking cases; the government did not provide complete data on this entitlement, but review of case records indicated at least seven cases concluded with compensation orders ranging from 10 million to 100 million VND ($439 to $4,390) in 2021 (compared with at least ten cases resulting in non-disaggregated compensation orders, the highest of which was 45.3 million VND, or $1,990, in 2020). The government encouraged trafficking victims to assist in judicial proceedings against traffickers; however, NGOs previously reported victims were at times less likely to come forward about their abuses in a judicial setting due to fears they may face arrest

Haiti AR_001075

or deportation for crossing the border without documentation. During the reporting period, MPS established 25 child-friendly investigation rooms at the provincial level for testimony from persons younger than the age of 18, but officials did not report statistics on their use.

The government continued to train officials in various agencies on victim identification and protection. In conjunction with an international organization, MFA continued work on standard operating procedures for diplomats' reference in supporting overseas Vietnamese women who were victims of violence, including trafficking. However, official complicity was a significant concern during the reporting period, including in cases allegedly perpetrated by two members of Vietnam's diplomatic service. A Vietnamese MFA official reportedly harassed, threatened, and restricted the communication of some of the victims of the aforementioned Saudi Arabia forced labor case after they attempted to request assistance. Some victims escaped and attempted to seek assistance at the Vietnamese Embassy, only to be forcibly returned to the traffickers by the same official. In other instances, after survivors sought shelter with a local organization, the same official reportedly deceived them with promises of repatriation in order to lure them out and then "sell" them to new local employers, who continued to exploit them in forced labor. NGOs and Saudi police conducted the recovery and repatriation of most of the victims—reportedly without any assistance from the Vietnamese government—despite a Vietnamese law mandating the provision of repatriation expenses for all Vietnamese victims subjected to trafficking abroad. An international organization interviewed 10 of the women repatriated from Saudi Arabia and assessed four as victims of human trafficking. Local authorities attempted to request victim compensation from a Vietnam-based representative of one of the sending companies; however, the compensation was only partially paid or not paid at all in some cases. The government reportedly examined, inspected, and administratively sanctioned 11 out of 20 enterprises sending workers to Saudi Arabia, but authorities did not pursue criminal accountability for their role in facilitating trafficking crimes. Authorities also penalized one labor export company for failure to resolve its employees' salary disputes, which NGO representatives interpreted as government retaliation for its initial attempts to respond to victim allegations with support services. In Vietnam, police reportedly harassed and surveilled the family members of some of these victims, rather than assisting them in an attempt to silence relevant allegations.

Due to a lack of systematic implementation of victim-centered screening procedures during police raids on establishments most at risk for sex trafficking, authorities may have penalized some women and children for unlawful acts traffickers compelled them to commit. This insufficiency also continued to place foreign victims, including children, at high risk of punitive deportation, although the government claimed it screened all deported individuals for trafficking indicators and did not identify any such cases. Civil society groups previously reported Vietnamese victims who migrated via irregular means or who were forced to commit unlawful acts as a result of their trafficking feared reprisals from authorities. These victims were less likely to seek support and were vulnerable to re-trafficking. International observers previously reported government officials often blamed Vietnamese citizens for their exploitative conditions abroad or suggested victims inflated abuses to avoid immigration violations. The government did not report offering foreign victims legal alternatives to their removal to countries where they may face retribution or hardship.

## PREVENTION
The government increased efforts to prevent trafficking. A steering committee chaired by a deputy prime minister, with the minister and a vice minister of public security as deputy chairs, continued to direct Vietnam's anti-trafficking efforts. The government maintained a national anti-trafficking action plan for 2021-2025. The government's 2021 budget for trafficking prevention was 17 billion VND ($746,760), an increase from the 2020 budget of 15.44 billion VND ($678,100). Authorities did not report individual provincial budget allocations included within this amount (compared with 9.8 billion VND, or $430,490, per province in 2020). The central government, including provinces and municipalities, continued to organize several large-scale public anti-trafficking awareness campaigns, many with financial and technical support from international organizations and foreign governments. MOLISA, in coordination with other government ministries, international organizations, and NGOs, organized

public awareness campaigns to promote its hotline. The government did not make public any information on the implementation of its NAP, but it continued to monitor and evaluate its own progress against the plan through internal weekly, monthly, and semi-annual reports.

In 2021, the government worked with an international organization to pass subordinate legislation for prior revisions to Law 69 that prohibited charging contract-based Vietnamese overseas workers certain brokerage fees and service charges and expanded their protections, including the right to unilaterally terminate a contract. Notably, this included elimination of worker-paid service charges for Vietnamese participants in Japan's Technical Intern Training Program (TITP), in which fees and commissions had previously placed thousands of Vietnamese workers at high risk of debt-based coercion into forced labor. It also outlined new protections for seafarers, preventative measures onboard fishing vessels, and the mandatory placement of support personnel in key migrant labor destination countries, among other improvements. Another decree established additional fees as penalties for predatory entities that use false advertising or deceptive recruitment practices to lure workers for the purpose of exploitation or forced labor; that fail to conduct pre-departure trainings or compensate workers for damages; and that collect unlawful fees from workers. Authorities did not provide information on implementation of any of these initiatives. Some destination countries' individual labor recruitment regulations at times conflicted with these reforms; for example, Japan passed a regulation in 2021 affirming that Vietnamese workers were still required to pay service fees in order to participate in work programs there. Vietnamese labor recruitment firms—in particular, those affiliated with state-owned enterprises—and unlicensed brokers reportedly continued to charge some workers seeking overseas employment higher fees than the law allowed, placing many in indebtedness that traffickers could use to exploit them.

MOLISA received 58 civil complaints related to labor recruitment practices in 2021, compared with 160 in 2020; this led to the inspection of 16 labor export enterprises, of which it fined 12 for administrative violations to a total of 699 million VND ($30,710) (compared with 84 inspections and 32 fines leading to 2 billion VND ($87,850) in 2020). MOLISA did not revoke the business licenses of any recruiters for violations of the 2006 Law on Guest Workers (compared to six business licenses revoked in 2020). Authorities continued to work with local police to investigate and verify 128 cases of organizations and individuals sending workers abroad without licenses (compared with 150 cases in 2020). In conjunction with an international organization and foreign donors, the government held a consultation workshop to review new anti-trafficking training materials for Vietnam Border Guard (VBG) and police. In previous years, MOLISA raised awareness on labor laws and safe migration practices among employment services centers and businesses. However, some NGO reports indicated Vietnam did not make sufficient efforts to educate the public on the risks inherent to seeking work abroad through unscrupulous labor export companies or vulnerable recruitment channels.

In 2021, MOLISA continued negotiations with the governments of Israel and Kuwait to sign labor cooperation agreements; it had not finalized these by the end of the reporting period. The government also maintained preexisting labor migration agreements with the Government of the UAE for domestic workers and with the Government of Japan for skilled and technical workers and interns. It also maintained a 2017 Memorandum of Cooperation with the Government of Japan to improve protections for Vietnamese participants in Japan's TITP amid continued reports of severe exploitation of Vietnamese workers. Previous reports indicate the government did not exercise sufficient oversight of contract and recruitment processes under the auspices of some of these bilateral agreements. Within the country, NGO observers noted an inability to form independent unions continued to constrain the protection of worker's rights, and restrictions on freedom of expression and association continued to impede some public discourse on key labor and land rights issues related to trafficking vulnerabilities. Unlike in 2020, the government made efforts to reduce the demand for commercial sex acts and child sex tourism, including by issuing a new decree to double fines for administrative violations related to "prostitution" and to seek accountability for businesses that facilitate it. The government did not take steps to deny entry of known U.S. sex offenders.

ZAMBIA

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Vietnam, and they exploit victims from Vietnam abroad. Vietnamese men and women migrate abroad for work informally, including through illicit brokerage networks operated by other Vietnamese nationals based abroad, or through state-owned or state-regulated labor recruitment enterprises. Some recruitment companies are unresponsive to workers' requests for assistance in situations of exploitation, and some charge excessive fees that make workers vulnerable to forced labor through debt bondage. Traffickers subject victims to forced labor in construction, agriculture, mining, maritime industries, logging, and manufacturing, primarily in Malaysia, South Korea, Laos, Japan, and—to a lesser extent—in some parts of the Middle East, Europe, and the UK, including in nail salons and on cannabis farms. There are increasing reports of Vietnamese labor trafficking victims in Taiwan, continental Europe, the Middle East, and in Pacific maritime industries, including on Indonesian and Taiwanese fishing vessels operating under complex ownership and registration arrangements that enable traffickers to evade detection and intervention by law enforcement. Vietnamese traffickers, including members of Vietnam's diplomatic service, have reportedly subjected Vietnamese nationals to forced labor in Saudi Arabia. Many Vietnamese nationals are subjected to forced labor under the auspices of Japan's TITP and within agricultural education programs in Israel. Vietnamese nationals are subjected to restricted freedom of movement, travel and identity document confiscation, threats of physical violence, poor living and working conditions, contract irregularities, fraudulent recruitment, and punitive deportation at PRC national-owned factories affiliated with the PRC's Belt and Road Initiative in the Balkan region. Pandemic-related travel restrictions compound these vulnerabilities for many Vietnamese migrant workers overseas, including by forcing some to remain in their positions long after the conclusion of their contracts.

Traffickers are increasingly taking advantage of pandemic-induced unemployment to lure Vietnamese nationals—especially women and members of ethnic minority groups—with false promises of job opportunities abroad. Traffickers exploit Vietnamese women and children in sex trafficking overseas, misleading many victims with fraudulent employment opportunities and transferring them to brothel operators on the borders of the PRC, Cambodia, and Laos, or to elsewhere in Asia, West Africa, and Europe. An increasing number of Vietnamese women and girls are reportedly subjected to sex trafficking in Burma. Some Vietnamese women who travel abroad for internationally brokered marriages or jobs in restaurants, massage parlors, and karaoke bars—including to Burma, Japan, South Korea, Malaysia, the PRC, Saudi Arabia, Singapore, and Taiwan—are subjected to forced labor in domestic service or sex trafficking. Traffickers in border villages reportedly abduct Vietnamese women, particularly from the Hmong ethnic minority group, and transport them to the PRC for forced marriages that often feature corollary sex trafficking and/or forced labor indicators. There are reports of Vietnamese women and girls in forced childbearing, including cases in which traffickers lure them to the PRC with false job offers, abduct them at the border, and transfer them to unregulated hospital facilities, where they are subjected to forcible artificial insemination and confined until they give birth. Vietnamese women and girls are reportedly vulnerable to forced labor and sex trafficking at "girl bars"—entertainment sites advertising paid "accompaniment" services often involving sex acts with young women and girls—in urban areas in Japan. Organized crime syndicates operating within SEZs in Southeast Asia—particularly in the Golden Triangle SEZ at the intersection of the Burmese, Thai, and Lao borders—subject Vietnamese nationals to deceptive recruitment and sex trafficking. Traffickers increasingly use the internet, gaming sites, and social media to lure victims, proliferate trafficking operations, and control victims by restricting their social media access, impersonating them, and spreading disinformation online. Men often entice young women and girls with online dating relationships, persuade them to move abroad, then subject them to forced labor or sex trafficking. During the migration process, European gangs and traffickers often exploit Vietnamese victims in forced labor and sex trafficking before they reach their final destination. The operators of Vietnamese national-owned agricultural plantations subject local internal migrants to forced labor in neighboring Laos.

Within the country, pandemic-related unemployment, restrictions on movement, and other socio-economic stressors are increasing vulnerabilities to trafficking, particularly for women and children in rural areas and among ethnic minorities. Traffickers are sometimes parents, family members, or small-scale networks exploiting Vietnamese men, women, and children—including unhoused children and children with disabilities—in forced labor, although little information is available on these cases. One study indicates 80 percent of known trafficking victims in Vietnam are members of ethnic minority communities. Another suggests 5.6 percent of children in Vietnam may experience coercion or exploitation indicative of trafficking or in the context of migration, with children from rural and underserved communities at particularly high risk. Traffickers exploit children and adults in forced labor in the garment sector, in street hawking and begging in major urban centers, and in forced or bonded labor in brick factories, urban family homes, and privately-run rural gold mines. Sex traffickers target many children from impoverished rural areas and a rising number of women from middle class and urban settings. Traffickers increasingly channel their criminal activities through the traditional practice of "bride kidnapping" to exploit girls from ethnic minority communities in the northwest highlands, including in sex trafficking and forced labor in domestic service. Child sex tourists, reportedly from elsewhere in Asia, the UK, other countries in Europe, Australia, Canada, and the United States, exploit children in Vietnam.

The North Korean government may have forced North Koreans to work in Vietnam. In 2021, Vietnamese government and NGO officials reported an increase in Cambodian female adult and child trafficking victims transiting Vietnam en route to the PRC. In prior years there were reports of some complicit Vietnamese officials, primarily at commune and village levels, who allegedly facilitated trafficking or exploited victims by accepting bribes from traffickers, overlooking trafficking indicators, and extorting money in exchange for reuniting victims with their families. In 2019, the government reported it had ceased the practice of subjecting drug users to forced labor in its 105 rehabilitation centers. A 2014 legal provision requires a judicial proceeding before detention of drug users in compulsory drug rehabilitation centers and restricts detainees' maximum workday to four hours. There were prior reports that prisoners, including political and religious dissidents, had been forced to work in agriculture, manufacturing, and hazardous industries, such as cashew processing.

## ZAMBIA: TIER 2 WATCH LIST

The Government of Zambia does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included increasing investigations, prosecutions, and convictions of trafficking crimes; launching the national action plan (NAP) for trafficking in persons and implementing the national referral mechanism (NRM); and increasing screening and identification of trafficking victims among migrant populations. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity. The government did not amend the anti-trafficking law to criminalize all forms of child sex trafficking. The government did not approve guidelines for the Anti-Human Trafficking Fund or for shelter operations. Because the government has devoted sufficient resources to a written plan that, if implemented, would constitute significant efforts to meet the minimum standards, Zambia was granted a waiver per the Trafficking Victims Protection Act from an otherwise required downgrade to Tier 3. Therefore Zambia remained on Tier 2 Watch List for the third consecutive year.



ZAMBIA TIER RANKING BY YEAR

## PRIORITIZED RECOMMENDATIONS:

Institutionalize the NRM and train all relevant agencies to proactively identify trafficking victims by screening for trafficking indicators among vulnerable populations, including individuals involved in commercial sex, migrants, former refugees, and workers from the People's Republic of China (PRC), and refer all trafficking victims to appropriate services. • Expand training for police, immigration officials, prosecutors, and judges on investigating and prosecuting trafficking crimes to increase investigations and prosecutions of alleged traffickers. • Amend the anti-trafficking law to define child sex trafficking as not requiring force, fraud, or coercion. • Consistently investigate and prosecute human trafficking crimes, separate from smuggling cases, and sentence convicted traffickers to adequate penalties. • Collaborate with NGOs and international organizations to increase the government's capacity to provide shelter and protective services to more trafficking victims, including adult males and foreign nationals. • Establish a network of interpreters to ensure provision of interpretation services for foreign victims to deliver comprehensive legal and protective services. • Appropriately fund the Secretariat on Human Trafficking to increase coordination and capacity across the government. • Appoint investigators with specialized training on human trafficking investigation as trafficking in persons focal points in all provinces. • Compile and make public information on trafficking cases and trends, separating data regarding smuggling and other crimes. • Seek input from survivors of human trafficking and civil society organizations on crafting policies and programs. • Implement and consistently enforce strong regulations and oversight of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable.

## PROSECUTION

The government maintained anti-trafficking law enforcement efforts. The Anti-Trafficking Act of 2008 criminalized some forms of sex trafficking and labor trafficking. Inconsistent with the definition of trafficking under international law, the law required a demonstration of threats, force, intimidation, or other forms of coercion to constitute a child sex trafficking offense and therefore did not criminalize all forms of child sex trafficking. The act prescribed penalties ranging from 20 years to life imprisonment, which were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. For the third consecutive year, the government reported that draft amendments to bring the law in line with international standards were awaiting ratification by parliament.

The government initiated 12 trafficking investigations in 2021 and continued eight investigations from 2020, compared with 17 investigations initiated in 2020. The government initiated 16 prosecutions involving 17 defendants and continued four prosecutions involving four defendants, compared with eight prosecutions involving 11 defendants reported in 2020. The government convicted six traffickers in five cases, compared with none in the previous reporting period. Courts acquitted two alleged traffickers in 2021. Due to conflation between migrant smuggling and human trafficking, the government may have prosecuted migrant smuggling crimes under its anti-trafficking law. Law enforcement and the court system did not operate at full capacity during the reporting period due to pandemic-related restrictions imposed by health authorities.

Corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. The government reported some law enforcement, military, security, and other government officials were complicit in human trafficking crimes. The government investigated two cases of law enforcement and border officers allegedly complicit in human trafficking; however, investigations concluded the cases to be migrant smuggling. In 2019, the government investigated one government official for alleged complicity in forced labor of a child in domestic work, but it did not provide any updates for the second consecutive year. In December 2021, the government settled the final judgement in a Maryland federal court case against a former Zambian World Bank employee and her husband, a Zambian mission member posted in the United States, in a civil lawsuit brought by their former G-5 domestic worker. The court found the couple violated federal and state labor law, and the World Bank employee breached her employment contract.

The government did not implement its plan to direct human trafficking cases to two fast-track human trafficking courts; instead, in Lusaka, the subordinate court appointed two magistrates as trafficking focal points to increase capacity to hear trafficking cases. The government trained all 1,297 newly recruited police officers on human trafficking, focusing on the NRM and the anti-trafficking law. The government, in collaboration with an international organization, provided training for 75 law enforcement officers and immigration officials in the Eastern, Southern, and Western provinces, focused on child trafficking. The government reported collaboration on human trafficking investigations and victim repatriation with the Governments of Egypt, Turkey, and the Democratic Republic of the Congo (DRC) during the reporting period. The Directors General of the Namibian and Zambian Departments of Immigration met to increase future collaboration on human trafficking.

## PROTECTION

The government increased victim protection efforts. The government identified 42 trafficking victims in 2021, compared with 199 victims identified in 2020, of which 140 were identified in two cases. The government also identified an additional 174 potential trafficking victims. The government reported referring all 216 trafficking victims and potential victims to care, which is comparable with previous years. The Zambia Police Service and Department of Social Welfare (DSW) jointly conducted enforcement operations in brothels where families exploited their children in sex trafficking, resulting in the identification of 85 child victims in the previous reporting period. This case was still under investigation at the end of the reporting period.

The government revised and operationalized its NRM during the reporting period with the assistance of an international organization. When victims were identified, the DSW received victim referrals, conducted assessments, and facilitated victims' access to services provided by NGOs, international organizations, and the government. While use of the NRM reportedly increased in 2021, some front-line officials and NGOs neglected to use proper procedures to identify and refer victims to care, particularly in rural areas, which resulted in delays for victims obtaining services and benefits, including immigration documentation. The government, in partnership with an international organization, continued to disseminate an updated standard victim identification form to better guide front-line officials in proactively identifying trafficking victims; however, wider dissemination and training on the use of different forms was needed.

The government partnered with NGOs and international organizations to offer routine assistance to both foreign and domestic potential victims, including shelter, basic needs, medical care, counseling, and other protection services. Foreign victims were entitled to the same benefits as Zambian victims. The Ministry of Community Development and Social Services (MCDSS) operated one 40-person shelter in Luapula Province and other shelters in Central and Western Provinces. Shelters were typically designated for survivors of gender-based violence or child abuse but were made available to trafficking victims. Most shelters only assisted women and children, but some accommodated adult male victims of trafficking. Shelters across the country, especially in rural areas outside Lusaka and Copperbelt Provinces, continued to lack training for shelter and victim support officers, resources, and funding, as well as available space, education opportunities, and integration services for victims. The government developed guidelines to operationalize the Anti-Human Trafficking Fund as designated by law; however, the guidelines remained pending approval at the end of the reporting period. With assistance from an international organization, the government developed standard operating procedures (SOPs) and guidelines for shelters; however, the guidelines awaited final approval by the Ministry of Home Affairs and Internal Security (MHA) at the end of the reporting period. The government allocated 282,846 Zambian kwacha ($17,010) to support four government-operated shelters in 2021, the same amount as the previous year.

The government reported it proactively screened detained migrants for trafficking and referred identified victims to care based on the NRM. The government did not report the number of victims identified in immigration detention facilities or if victims were still detained alongside potential traffickers, as in previous years. The government reported children were

**ZIMBABWE**

no longer detained alongside adults in immigration detention facilities. In 2021, 59 victims cooperated with law enforcement on investigations and prosecutions of traffickers, which was not required to access protection services. The government increased opportunities for victim testimony via video or written statements and assisted in protecting victims' identities. The Department of Immigration (DOI) provided temporary immigration status for all foreign victims in accordance with the 2008 trafficking law, which was dependent on cooperation with law enforcement, and offered a legal alternative to the removal of victims to countries where they may face hardship or retribution. The government did not report the number of victims who received immigration remedies. Additionally, the pandemic caused logistical difficulties and delays in repatriating victims during the reporting period. The government reported interpretation services were provided free of charge to victims; however, the lack of interpreters available continued to be a barrier to providing timely and comprehensive care for victims. The government did not report any court orders of restitution for trafficking victims during the reporting period. The government provided legal assistance through legal aid organizations for victims, including foreign nationals, through a witness management fund by the National Prosecution Authority.

**PREVENTION**

The government increased efforts to prevent trafficking. The MHA continued to oversee the government's inter-ministerial National Committee on Human Trafficking, through its Secretariat on Human Trafficking National Office, which met regularly to conduct oversight of national anti-trafficking efforts. The Committee developed and launched a new 2022-2024 NAP on trafficking in persons and migrant smuggling, coordinated trainings on human trafficking hosted by international organizations, reviewed policy and legislation, and developed and launched NRMs on trafficking in persons, migration, and migrant smuggling. The government committed funding of 50,000 kwacha ($3,001) to the DOI and 390,000 kwacha ($23,450) to the DSW to support implementation of the NAP. The Committee moved the Secretariat from the DOI to a dedicated office in the MHA, as mandated under Zambian law. The Secretariat reported a lack of funding hampered its efforts to effectively collect human trafficking data across agencies and appoint trafficking in persons focal points in each province. The Committee created a subcommittee to develop mechanisms for protecting Zambian workers abroad, and the government signed a bilateral agreement with the Government of Seychelles to prevent potential exploitation of Zambian migrant workers. Pandemic-related restrictions hampered collaboration and awareness raising efforts, but the government adapted by holding virtual meetings and awareness events.

The government contributed in-kind resources to awareness campaigns facilitated by NGOs and international organizations, including public events and TV and radio programs. The government did not operate a hotline specifically for potential victims of trafficking; however, NGO-operated hotlines reported receiving 75 calls related to human trafficking. Of these calls, 15 calls were reported to law enforcement, resulting in three prosecutions and one conviction. The Employment Act set forth requirements for the regulation of labor brokers and prohibited labor brokers from charging prospective employees for any services rendered; however, the act allowed recruiters to charge workers 5 percent from their first wage. The act also required a security bond be paid by recruiters taking Zambian workers out of the country. The Ministry of Labor and Social Services (MOL) continued to regularly conduct inspections and investigations of labor brokers throughout the country to enforce recruitment regulations and prevent fraudulent job offers that may lead to exploitation. The MOL conducted 1,800 labor inspections in 2021, compared to 922 in 2020; however, the government did not report identifying any victims of forced or child labor during these inspections. In 2021, the MOL employed 240 labor inspectors, who were not trained on identifying human trafficking, compared with 154 employed the previous year. In partnership with various stakeholders, the government conducted an assessment in the Eastern Province of Zambia of increased flows of irregular migration, which resulted in a collaborative effort with an international organization to repatriate Ethiopian nationals, including a portion who were identified as trafficking victims. The National Committee on Human Trafficking generated a national report on trafficking in persons for 2020, which remained pending release due

to administrative constraints at the end of the reporting period. The government did not make efforts to reduce the demand for commercial sex acts. The government provided pre-deployment training for its diplomatic corps to prevent trafficking in persons, conducted by the Zambia Institute of Diplomacy and International Studies and the Zambia Police Service. Zambian peacekeepers received pre-deployment anti-trafficking training before deployment to UN missions in South Sudan and AU missions in Somalia.

**TRAFFICKING PROFILE**

As reported over the past five years, human traffickers exploit domestic and foreign victims in Zambia, and traffickers exploit victims from Zambia abroad. Most trafficking occurs within the country's borders and involves traffickers exploiting women and children from rural areas in cities in domestic servitude or forced labor in agriculture, textile production, mining, construction, small businesses such as bakeries, and forced begging. *Jerabo* gangs may force Zambian children to engage in illegal mining operations, such as loading stolen copper or crushing rocks. Orphans and children from rural areas remain vulnerable to trafficking. Because of the perceived increase in status, families are enticed to send children to work in cities without verifying conditions. School closures due to the pandemic increased children's vulnerability to exploitation, including in sex trafficking and forced labor. Truck drivers exploit Zambian boys and girls in sex trafficking in towns along the Zimbabwean and Tanzanian borders, and miners exploit them in Solwezi. Traffickers exploit Zambian boys in sex trafficking in Zimbabwe and exploit women and girls in sex trafficking in South Africa. Domestically, extended families and trusted family acquaintances facilitate trafficking. Traffickers exploit Zambians, including children, from rural areas in the Western province in forced labor on cattle farms in Namibia.

Traffickers exploit women and children from neighboring countries in forced labor and sex trafficking in Zambia, including transiting migrants whose intended destination is South Africa. Zambian women are recruited for domestic servitude in Lebanon and Oman. In recent years, traffickers lure Rwandan women to Zambia with promises of refugee status and coerce them into registering as DRC nationals seeking refugee status in Zambia. They are subsequently exploited in sex trafficking, threatened with physical abuse, and reported to immigration officials for fraudulent refugee claims. Traffickers increasingly exploit victims from Tanzania and Malawi in the Zambian timber industry. PRC nationals bring PRC women and girls to Zambia for sexual exploitation in brothels and massage businesses in Lusaka; traffickers use front companies posing as travel agencies to lure PRC victims and coordinate with Zambian facilitators and middlemen. Indian-Zambian nationals operating in India facilitate illegal adoption of Indian children for the purpose of exploiting them in domestic servitude in Zambia.

## ZIMBABWE: TIER 2 WATCH LIST

The Government of Zimbabwe does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. These efforts included investigating and prosecuting human trafficking cases and conducting training for law enforcement, immigration officials, and other key anti-trafficking officials. However, the government did not demonstrate overall increasing efforts compared with the previous reporting period, even considering the impact of the COVID-19 pandemic, on its anti-trafficking capacity. The government did not amend its anti-trafficking law to criminalize all forms of trafficking. The government did not identify any trafficking victims or provide care for victims in its designated shelter. The government did not convict any traffickers. Therefore Zimbabwe remained on Tier 2 Watch List for the second consecutive year.



**ZIMBABWE TIER RANKING BY YEAR**

## PRIORITIZED RECOMMENDATIONS:

Amend the anti-trafficking law to criminalize all forms of trafficking in line with the 2000 UN TIP Protocol. • Renew, implement, and allocate sufficient resources to the anti-trafficking national action plan (NAP). • Expedite trafficking cases in courts to address the significant backlog of cases. • Increase collaboration with, and provide financial or in-kind support to, NGOs that assist trafficking victims. • Increase efforts to investigate and prosecute trafficking crimes, including complicit government officials and individuals who purchase commercial sex from children, through adequately funding law enforcement and developing capacity to conduct thorough investigations using enhanced evidence collection. • Provide specialized training to law enforcement, labor inspectors, prosecutors, and judiciary officials on human trafficking investigations and prosecutions, particularly as distinct from labor law and immigration violations, and on a victim-centered approach to investigations and prosecutions. • Train frontline workers to proactively identify trafficking victims among vulnerable populations, including orphaned children, migrant workers, and Cuban medical workers, and refer them to appropriate services using the national referral mechanism (NRM). • Implement and consistently enforce strong regulations and oversight of labor recruitment companies, including by eliminating recruitment fees charged to migrant workers and holding fraudulent labor recruiters criminally accountable. • Establish shelters for trafficking victims in each province and actively refer identified victims to care. • Develop mutual legal assistance treaties and other agreements to facilitate information gathering and sharing with foreign governments. • Collect data on human trafficking trends within Zimbabwe to better inform government anti-trafficking efforts.

## PROSECUTION

The government maintained mixed anti-trafficking law enforcement efforts. Zimbabwean law criminalized some forms of sex trafficking and labor trafficking. Inconsistent with international law, the 2014 Trafficking in Persons Act defined trafficking in persons as a movement-based crime and did not adequately define "exploitation." The 2014 act criminalized the involuntary transport of a person and the voluntary transport for an unlawful purpose, into, outside, or within Zimbabwe. The focus on transport and the inadequate definition of "exploitation" left Zimbabwe without comprehensive prohibitions of trafficking crimes. The law prescribed penalties of 10 years to life imprisonment, which were sufficiently stringent and, with respect to sex trafficking crimes, commensurate with penalties for other serious crimes, such as rape. Zimbabwe's Labor Relations Amendment Act criminalized forced labor and prescribed penalties of up to two years' imprisonment, which were not sufficiently stringent. The Criminal Law (Codification and Reform) Act criminalized procuring a person for unlawful sexual conduct, inside or outside of Zimbabwe, and prescribed penalties of up to two years' imprisonment; these penalties were not sufficiently stringent when applied to cases of sex trafficking. The act also criminalized coercing or inducing anyone to engage in unlawful sexual conduct with another person by threat or intimidation, prescribing sufficiently stringent penalties of one to five years' imprisonment. For the third consecutive year, the government made no progress passing its 2019 draft Trafficking in Persons Act Amendment Bill. The government did not consult civil society during drafting, which several organizations viewed as an intentional move to avoid addressing deficiencies in farming and mining laws that facilitate forced labor.

The government reported investigating seven trafficking cases, including three cases of forced labor and four cases of sex trafficking, compared with initiating none in the previous reporting period. The government initiated prosecutions of four suspects, compared with none initiated in

the previous reported period. The government did not report convicting any traffickers for forced labor or sex trafficking, compared with one conviction in the previous reporting period. The government did not report the status of five ongoing prosecutions initiated in 2020. The pandemic severely curtailed investigations and operation of courts during the reporting period, resulting in a backlog of trafficking cases. Despite continued urging from victims to take action in the 17 alleged trafficking cases of Zimbabwean women exploited in Kuwait in 2016 and the victims' stated willingness to participate in the trials, the government did not do so for the fifth consecutive year. The government arrested a Zimbabwean labor recruiter for recruiting Zimbabwean women to work in Oman, where they were allegedly exploited in domestic servitude; the case remained pending at the end of the reporting period. The government reported collaborating with the Governments of South Africa, Botswana, and Oman on investigations involving trafficking of Zimbabwean victims.

The government did not report any investigations, prosecutions, or convictions of government officials complicit in human trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year. Observers reported the government did not have a system to investigate and prosecute complicit officials. Reportedly, senior government officials obstructed investigations into allegations of child labor violations on farms in Mazowe district. For the fourth consecutive year, the government did not investigate serious, credible claims that complicit magistrates, judges, and senior government officials undermined judicial independence, including by bribing judges with farms and homes. Military officers patrolling the Beitbridge border post received bribes to facilitate unauthorized crossings, including in past years from organized criminal groups likely transporting victims of human trafficking. During the previous reporting period, an NGO assisted four potential labor trafficking victims allegedly exploited on a member of Parliament's farm; the government did not report any action to investigate the allegations by the end of the reporting period. Officials accepted bribes to not inspect farms and businesses that used exploitative labor practices. Observers reported that children taken to one of the government-operated vulnerable children's homes were allegedly forced to work on citrus farms in Mazowe. Violent gangs forced workers into labor in some artisanal and defunct gold mines, operating with impunity due to their connections to police and local politicians who allegedly accepted bribes and allowed individuals to enter the mines and work without oversight. Trafficking victims reported law enforcement threatened and intimidated them when they tried to report their cases.

With support from an international organization, the government reported training 500 police officers, 10 immigration officers, and 20 members of the Anti-Trafficking Inter-Ministerial Committee (ATIMC) on trafficking, including topics such as anti-trafficking laws, victim interviewing, and the NRM. However, observers reported the government lacked systematic procedures to effectively investigate cases and immigration officials lacked capacity to detect and investigate trafficking. Because law enforcement and prosecutors lacked specialized training, they routinely prosecuted trafficking cases as wage infractions or immigration violations.

## PROTECTION

The government demonstrated negligible victim identification and protection efforts. For the second consecutive year, the government did not report identifying any trafficking victims. NGOs reported the Ministry of Public Service, Labor, and Social Welfare (MPSLSW) referred six trafficking victims for services. Media reported the government identified at least 18 Zimbabwean victims abroad through investigations; repatriation efforts remained ongoing at the end of the reporting period. After reports of numerous Zimbabwean women exploited in Oman in domestic servitude, the government dispatched an investigative team to engage with the Omani government, identify additional victims, and facilitate repatriation. NGO-operated hotlines identified and referred an additional 51 trafficking victims to care. NGOs and international organizations provided all care for trafficking survivors, including shelter, food, medical treatment, family reunification and reintegration, counseling, and income-generating assistance; government social

workers facilitated access to government benefits. Shelters and services for trafficking, domestic violence, and gender-based violence (GBV) victims were available to males and females, nationals and foreigners, irrespective of the victim's participation in legal proceedings. Additionally, NGOs reported pandemic lockdowns restricted their ability to identify victims and provide services during the reporting period. For at least the fifth consecutive year, the government relied on NGOs and foreign donors to fund trafficking victim services; organizations struggled to operate without adequate and consistent financial support, and some could only provide short-term care. While the government had one operational shelter that could accommodate 30 GBV and trafficking victims and 24 vulnerable children's homes, these shelters did not report providing care for any trafficking victims during the reporting period. The 2014 anti-trafficking act required the government to establish service centers in each of Zimbabwe's 10 provinces and provide counseling and reintegration services to survivors; however, the government had not established these centers.

The government continued to use the NRM, which outlined standard operating procedures for the identification, referral, and assistance of victims. The government did not report if the technical steering committee for trafficking victim protection, led by the MPSLSW, met during the reporting period. The MPSLSW had a system whereby an NGO and a Department of Social Development caseworker jointly handled each reported potential trafficking case, but it did not use the system in practice. The government had policies to encourage victim cooperation in investigations and prosecutions, but police unfamiliarity with trafficking crimes often caused re-victimization or re-traumatization of trafficking victims during the legal process. Courts had a separate room for victims to testify separately from their alleged perpetrators, and victims could choose to testify via video; however, observers reported not every court had access to the necessary equipment, especially in rural areas, and the government did not report whether any victims utilized these services during the reporting period. While the trafficking act required judges to order compensation from convicted traffickers to their victims, no judge did so. The government did not have legal alternatives to repatriation for foreign trafficking victims, even if they would face retribution or hardship in their countries of origin.

## PREVENTION

The government decreased efforts to prevent trafficking. The ATIMC served as the national coordinating body for all anti-trafficking activities, and its secretariat led the government's trafficking efforts, including overseeing awareness-raising events. The ATIMC met twice during the reporting period. While the government launched its 2019-2021 NAP in the previous reporting period, the government did not operationalize it due to funding limitations. The government, in collaboration with an international organization, provided training to members of the ATIMC. While the pandemic imposed restrictions on gatherings, international organizations reported the continued lack of political will, resources, and staff contributed to the ATIMC's inaction. The government raised public awareness of human trafficking through exhibitions at two trade and agricultural fairs.

The government continued to lack the political will to address child and forced labor, particularly in agriculture. During the previous reporting period, a tripartite committee of government, labor unions, and business representatives determined the MPSLSW would lead efforts to raise awareness of child and forced labor among the tobacco industry and conduct regular inspections; however, the ministry took no steps to do so. The government did not report the number of labor inspections conducted during the reporting period, compared with 1,860 labor inspections in the previous reporting period, none of which identified any cases of forced or child labor. Inspectors had the authority to monitor private farms and homes for underage or forced child domestic labor but did not report doing so. The government opened a criminal investigation into a fraudulent recruiter during the reporting period but did not report any efforts to regulate labor recruiters to address fraudulent recruitment. The government did not report contributing information to a regional centralized anti-trafficking database, despite doing so in previous years. The government began conducting anti-trafficking trainings for diplomats assigned to foreign missions through

its Consular Assistance course. The government did not make efforts to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Zimbabwe, and traffickers exploit victims from Zimbabwe abroad. Internal trafficking is prevalent and underreported. Traffickers exploit Zimbabwean adults and children in sex trafficking and forced labor, including in cattle herding, domestic service, and mining in gold and diamond sectors. More than 71 percent of child labor occurs in the agriculture sector, including on tobacco, sugarcane, and cotton farms, as well as in forestry and fishing sectors, where children weed, spray, harvest, and pack goods. Some of these children are victims of forced labor, including some who work on small, unregulated farms. Due to pandemic-induced school closures and worsening economic conditions, observers reported child sex trafficking and child labor likely increased, particularly in agriculture, domestic service, informal trading, begging, and artisanal mining. Children ages 9 to 14 work as nannies, housemaids, and gardeners in urban areas and mining communities; some employers force children to work by withholding wages, denying them access to school, and subjecting them to GBV. Several traditional practices rendered young girls vulnerable to forced labor and sex trafficking, including the practice of trading daughters for food or money, using them as "replacement" brides for a deceased family member, and for ngozi, a reconciliation process where a family gives a family member to another family to make amends for a murdered relative. Traffickers exploit women and girls from Zimbabwean towns bordering South Africa, Mozambique, and Zambia in forced labor, including domestic servitude, and sex trafficking in brothels catering to long-distance truck drivers on both sides of the border.

Traffickers exploit child laborers working as gold-panners and ore couriers by providing inadequate compensation, stealing their income, exacerbating food insecurity, and forcing them to take drugs to perform strenuous tasks. Near gold and diamond mines, traffickers force children to sell illicit drugs, which increased during the pandemic. Illegal mining syndicates exploit Zimbabweans in trafficking. Experts estimate thousands of children have joined illegal diamond mining syndicates in the Marange fields in Chiadzwa since March 2020; some syndicates target vulnerable populations, including illiterate individuals, and transport them to the mines at night to disorient potential victims and prevent their escape. Armed gangs known as "Mashurugwi" lure young men to abandoned gold mines through promises of self-employment but force them to work the artisanal gold mines with threats of violence and death. Child vendors, some of whom walk more than 25 kilometers per day to sell goods or offer cooking and cleaning services to miners, are exploited by sex traffickers in illegal mining areas or by long-distance truckers who transport coal and minerals. Girls as young as 12 are exploited in sex trafficking along the Harare-Chinhoyi highway, in the informal settlement of Caledonia, and in gold mining communities in Mashonaland East, Mazowe, Bindura, and Shurugwi. During the pandemic, organizations and media identified hundreds of children in sex trafficking near the Mazowe mines. Miners force girls to enter into coercive "relationships" where they are sexually exploited in exchange for money and food and sometimes forced to assist with mining operations. In Chiredzi, sex traffickers recruit girls as young as 11 from surrounding areas. Children were forced to engage in sexual acts in exchange for water in Chitungwiza.

Traffickers use false promises of legitimate employment opportunities, particularly in nursing, including through social media and messaging applications, to lure Zimbabweans into sex trafficking and forced labor in neighboring countries, particularly South Africa, and the Middle East. In South Africa, traffickers exploit Zimbabweans for labor without pay in agriculture, construction, factories, mines, information technology, and hospitality businesses. Syndicates operating in South Africa recruit undocumented Zimbabwean migrants with promises of legitimate employment in mining and force them into labor in the illegal mining industry. Due to economic conditions caused by the pandemic, undocumented Zimbabwean women and children increasingly travel to South Africa for employment, where their lack of legal status increases their vulnerability to traffickers. Facilitators recruit and transport Zimbabwean migrants to South Africa, where

international criminal syndicates subject them to sex trafficking in Musina, Pretoria, Johannesburg, and Durban. Traffickers have exploited Zimbabwean women in domestic servitude, forced labor, and sex trafficking in Iraq, Kenya, Kuwait, Saudi Arabia, Oman, the People's Republic of China (PRC), and Uganda, often under the guise of legitimate employment. Zimbabwean labor recruiters recruit Zimbabwean women for exploitation in domestic servitude in Oman, where their passports are confiscated, and they are forced to work without pay. Traffickers use fraudulent scholarship schemes to lure Zimbabwean students to Cyprus ostensibly for educational purposes and exploit them in forced labor and sex trafficking. Media reported Zimbabweans living abroad, particularly in the United Kingdom and Ireland, trick Zimbabweans to travel abroad under the pretenses of tourism or legitimate employment and force them into domestic servitude. Traffickers recruit Zimbabwean girls into neighboring countries with promises of marriage and, during marriage, force them into domestic work.

Zimbabwe is a transit country for Somalis, Ethiopians, Malawians, and Zambians en route to exploitation in South Africa. Zimbabwe is also a destination country for forced labor and sex trafficking. Traffickers subject Mozambican children to forced labor in street vending, including in Mbare, the largest informal market in Harare. Mozambican children who work on relatives' farms in Zimbabwe are often undocumented and cannot enroll in school, which increases their vulnerability of trafficking. In prior years, there were reports of refugees from Somalia and the Democratic Republic of the Congo traveling from Zimbabwe's Tongogara Refugee Camp to Harare, where traffickers exploited them. Refugees and asylum-seekers are not permitted bank accounts and experience difficulties in obtaining identification documents, which limits employment opportunities and increases vulnerability to trafficking. Traffickers force some PRC nationals to work in restaurants in Zimbabwe. Construction and mining companies owned by both PRC nationals and PRC parastatal entities in Zimbabwe reportedly employ practices indicative of forced labor, including verbal, physical, and sexual abuse, as well as coercion to induce work in unsafe or otherwise undesirable conditions. Cuban nationals working as doctors in Zimbabwe may have been forced to work by the Cuban government.

# SPECIAL CASE: LIBYA

Libya is a Special Case for the seventh consecutive year. The Libyan Government of National Unity (GNU), established through a UN-led process in March 2021, did not effectively govern large swaths of Libyan territory, as it did not exercise control in several parts of the country. The judicial system was not fully functioning, as courts in major cities throughout the country have not been operational since 2014. Although the government and non-state actors largely upheld the October 2020 ceasefire agreement, isolated violence throughout the country and political strife between the Tripoli-based GNU and rival eastern institutions, including the self-styled Libyan National Army (LNA) and the House of Representatives-appointed Government of National Stability, continued to foment instability during the reporting period. Financial or military contributions from other states in the region continued to destabilize the country, with Turkey supporting the GNU, and Russia, the United Arab Emirates, and Egypt supporting the LNA, although some military support abated following the ceasefire. Extra-legal armed groups, including foreign mercenaries, continued to fill a security vacuum across the country; such groups varied widely in their make-up and the extent to which they were under the direction of state authorities. These disparate groups committed various human rights abuses, including unlawful killings, forcible recruitment, forced labor, and sex trafficking. Impunity by those committing abuses against civilians was a pervasive problem. There were continued reports that criminal networks, militia groups, government officials, and private employers exploited migrants, refugees, and asylum-seekers in sex and labor trafficking. Endemic corruption and militias' influence over government ministries contributed to the GNU's inability to effectively address human trafficking.

# GOVERNMENT EFFORTS

Lack of institutional capacity, as well as lack of Libyan law enforcement, customs, and military personnel, especially along the country's borders, hindered authorities' efforts to combat human trafficking crimes. Libyan law criminalized some forms of sex trafficking but did not criminalize labor trafficking. Articles 418, 419, and 420 of the penal code criminalized some forms of sex trafficking involving women and prescribed penalties of up to 10 years' imprisonment and a fine, which were sufficiently stringent and commensurate with penalties prescribed for other serious crimes, such as rape. However, inconsistent with international law, the definition of trafficking within these provisions required transnational movement of the victim and did not criminalize sex trafficking acts that were induced through fraudulent or coercive means. The law did not criminalize sex trafficking involving adult male victims. Article 425 criminalized slavery and prescribed penalties of five to 15 years' imprisonment. Article 426 criminalized the buying and selling of slaves and prescribed penalties of up to 10 years' imprisonment. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes.

Libya's criminal judicial system was not fully functioning in 2021, nor were there administrative units and courts specifically dedicated to overseeing human trafficking cases. Law enforcement and judicial authorities often lacked the knowledge and understanding of the crime of human trafficking. The Ministry of Interior (MOI), which was nominally responsible for anti-trafficking law enforcement efforts, was limited in its ability to carry out anti-trafficking operations. Although entities such as the Ministry of Justice (MOJ) and Office of the Attorney General issued arrest warrants for alleged perpetrators of various crimes including trafficking, limited policing capacity hindered the government's ability to pursue these trafficking cases. During the reporting period, the Attorney General's Office announced the arrest of two suspects for trafficking and migrant smuggling and related crimes including the torturing, extortion, and killing of migrants; in both cases, the suspects remained in pre-trial detention at the end of the reporting period. Law enforcement functions sometimes fell to disparate armed groups, which received salaries from the government and performed their activities without formal training and with varying degrees of accountability. The MOI and MOJ's human rights offices, which continued to function throughout the reporting period, were mandated to raise awareness of human rights violations including human trafficking crimes; however, international NGOs reported the offices lacked the capacity to carry out their mandates. Perpetrators committing human rights abuses, including human trafficking crimes, generally operated with impunity. The government did not publicly report statistics on prosecutions or convictions of trafficking offenders, including government officials and government-aligned militias that were allegedly complicit in trafficking crimes; the government has never reported prosecuting or convicting anyone for forced labor or sex trafficking crimes. As in previous years, international organizations and foreign governments facilitated anti-trafficking training for some legislators and government officials during the reporting period.

International observers continued to report systemic and prevalent complicity of government officials in human trafficking, including Libyan Coast Guard (LCG) officials, immigration officers, security officials, Ministry of Defense (MOD) officials, members of armed groups formally integrated into state institutions, and officials from the MOI and MOI's Department to Combat Illegal Migration (DCIM). Various armed groups, militias, and criminal networks infiltrated the administrative ranks of the government and abused their positions to engage in illicit activities, including human trafficking and alleged unlawful child soldier recruitment and use. Several credible sources continued to report that DCIM detention center guards and administrative staff forced detained migrants to work at these detention centers and at third locations, such as farms and construction sites. An NGO reported that refugees and migrants as young as 14 years old, detained in DCIM detention centers in 2021, were forced to carry out construction or cleaning work in sites such as military encampments and farms. There were reports that DCIM staff at detention centers contracted armed groups and militias—some of whom likely had ties to human trafficking networks—to provide security services at individual detention centers. Reports also suggested staff in some DCIM migrant detention centers in western Libya coerced

detainees to clean and load weapons during active hostilities. In addition, DCIM guards and staff systematically subjected migrants detained in DCIM detention centers to sex trafficking and other forms of sexual exploitation; guards and staff coerced women, girls, men, and boys to perform sexual favors in exchange for essentials such as food, clean water, and at times, their freedom. An NGO reported DCIM guards and military officials also "sold" at least one female detainee to outside individuals who then exploited the woman in sex trafficking. In April 2021, authorities released from prison the UN-sanctioned commander of the Zawiya Libyan Coast Guard (LCG), arrested in October 2020 for trafficking crimes—including selling female migrant detainees into sexual slavery—citing lack of evidence; media reported the government promoted the commander while he was in detention.

The government arrested, detained, deported, or otherwise punished victims for unlawful acts traffickers compelled them to commit, such as immigration and prostitution violations and alleged affiliation to armed groups. During the reporting period, the government, at times working with local militias, deported Sub-Saharan African migrants—a population highly vulnerable to trafficking—without screening for trafficking indicators. Reports indicate authorities sometimes expelled migrants outside of official deportation procedures, including at times leaving migrants in the desert at the Niger border. In January 2022, the UN estimated more than 12,000 migrants and refugees—many of whom were unidentified trafficking victims—were held officially in 27 prisons and detention centers across Libya where armed groups and government officials subjected them to a wide range of abuses including sex trafficking and forced labor; the UN estimates thousands more are held illegally in facilities controlled by armed groups or in secret facilities. Despite previous announcements the government would close detention centers rife with abuse, international organizations and NGOs reported the government opened new detention centers with repeated patterns of abuse or re-opened centers that had been closed because of past human rights violations; DCIM also legitimized and integrated informal sites previously run by affiliated militias without holding any individuals accountable for abuses committed while operating detention centers. DCIM-run detention facilities suffered from massive overcrowding, lack of basic infrastructure, dire sanitation problems, and food shortages. Detainees, including trafficking victims, had limited access to medical care, legal aid, and other forms of protective services. During the reporting period, DCIM allowed international organizations and NGOs to conduct limited protection monitoring and medical visits to DCIM detention centers; however, authorities frequently denied humanitarian actors access to DCIM centers or otherwise significantly constrained their ability to provide regular protection services. Detainees did not have access to immigration courts or other forms of due process. No DCIM detention centers employed female guards, except for the Tariq al-Sekka detention center; the lack of female personnel at the majority of detention centers and environment of impunity for sexual violence contributed to the increased vulnerability of female detainees to abuse and exploitation. In October 2021, security forces conducted mass raids to round up undocumented and documented migrants and asylum-seekers—including trafficking victims—in Tripoli, using excessive and lethal force and causing casualties resulting in the arrest and detention in DCIM centers of more than 5,000 individuals; international organizations reported these raids pushed already vulnerable individuals to unwittingly seek aid from traffickers to avoid arrest and detention.

The government did not have any policy structures, institutional capacity, widespread political will, or resources to proactively identify and protect trafficking victims among vulnerable groups, such as migrants, refugees, and asylum-seekers; women in commercial sex; and children recruited and used by armed groups. The government did not report identifying any victims nor providing foreign trafficking victims with legal alternatives to their removal to countries where they could face hardship or retribution. Libyan authorities continued to cooperate with international organizations to repatriate, resettle, or evacuate some migrants, which likely included unidentified trafficking victims; however, the government suspended international organization-operated voluntary return flights several times throughout the reporting period. The government allowed international organizations to be present at some of the official disembarkation points along the western coastline where migrants arrived after the LCG intercepted or rescued them at

sea; however, the government's procedures for disembarked migrants remained unclear and put migrants further at risk of exploitation. In addition, an NGO reported the quick and chaotic nature of disembarkation hampered the ability of international organizations to assess specific needs and vulnerabilities, monitor violations, or record claims for protection before refugees and migrants were funneled into detention; the NGO also reported refugees and migrants were unable to confidentially raise concerns, report abuse, or seek protection. The government continued to operate a limited number of social rehabilitation centers for women in commercial sex and victims of sex trafficking and other forms of sexual abuse; however, these centers reportedly operated as de facto prisons, and international observers continued to document incidents of abuse in these centers.

Libya is a party to the 2000 UN TIP Protocol, but the government lacked the institutional capacity and resources to prevent human trafficking. The GNU did not have a national coordinating body responsible for combating human trafficking. The government did not conduct any public anti-trafficking awareness campaigns, nor did it take actions to reduce the demand for commercial sex acts or child sex tourism. The government did not report steps to prevent the recruitment and use of children by militia groups, armed groups affiliated or aligned with the government, or other armed groups operating throughout the country. During the reporting period, the GNU continued to partner with some European countries to disrupt human trafficking and migrant smuggling operations, reducing irregular migration flows across the Mediterranean over previous years. However, some European and international NGOs criticized this cooperation, citing severe security and human rights conditions and an increased risk of trafficking for migrants forced to remain in Libya. The government did not provide anti-trafficking training for its diplomatic personnel.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Libya. Instability, conflict, and lack of government oversight and capacity in Libya continued to allow for human trafficking crimes to persist and be highly profitable for traffickers. Trafficking victims—both adults and children—are highly vulnerable to extreme violence and human rights abuses in Libya by governmental and non-state armed groups, including physical, sexual, and verbal assault; abduction for ransom; extortion; arbitrary killings; inhumane detention; and child soldiering. Credible reports since 2013 indicate numerous armed groups and militias, some of which are used as combat forces or security enforcement by the government, recruit and use children. During previous reporting periods, an international organization verified former Government of National Accord (GNA), LNA, GNA-affiliated armed groups, and LNA-affiliated armed groups all recruited and used child soldiers. In 2018, an international organization documented incidents in which local armed groups forcibly recruited boys 13-15 years old. Sources continue to report Chadian mercenary groups recruit children as young as 13 years old as combatants. Uncorroborated media reports in 2018 also claimed that ISIS trained and used children in suicide attacks, to fire weapons, and to make improvised explosive devices. Children associated with armed groups in Libya are also reportedly exposed to sexual violence. IDPs, including both Libyans and foreigners, are vulnerable to both labor and sex trafficking. As of November 2021, there were an estimated 179,047 IDPs in Libya, of whom 92 percent were displaced due to the deterioration of security conditions in the country.

Migrants in Libya are extremely vulnerable to sex and labor trafficking, including those seeking employment in Libya or transiting Libya en route to Europe. Migrants living in Libya are vulnerable to exploitation by state and non-state actors, including employers who refuse to pay laborers' wages. As of October 2021, international organizations estimated there were at least 610,128 migrants and 41,000 refugees and asylum-seekers in Libya. Migrant workers in Libya typically come from Sub-Saharan and Sahel states. Informal recruitment agencies recruit undocumented migrants to work in the agriculture, construction, and domestic work sectors; the lack of government oversight and workers' undocumented status increase migrants' vulnerability to trafficking. The country continues to serve as a departure point for migrants, including unaccompanied children, crossing the Mediterranean to Europe from North Africa; the number of sea departures from Libya to Europe

increased in 2021 by 150 percent, in part due to decreased economic opportunities in Libya and the region. Elements of the LCG reportedly work with armed groups and other criminals, including traffickers, to exploit migrants for profit. There are financial incentives for smugglers and traffickers to prevent the disembarkation of migrants transiting the Mediterranean and to return migrants to Libya for detention and further exploitation. An international organization reports the LCG intercepted and returned 32,425 refugees and migrants to Libya in 2021, an increase of 173 percent compared to 11,891 in 2020. Since 2019, due to violence and localized conflict, as well as pandemic-related border closures and movement restrictions, traditional smuggling and trafficking routes became more clandestine, creating greater risks and dangers for migrants.

Various armed groups, criminal gangs and networks, tribal groups, smugglers, and traffickers cooperate and compete in the smuggling and trafficking of migrants to and through Libya, while carrying out serious human rights abuses and violations against migrants, including torture, sexual abuse and exploitation, rape, extortion, ransom, theft, and forced labor. International organizations report smugglers and traffickers trade migrants and refugees within illicit networks, while holding them in inhumane conditions. Highly organized trafficking networks subject migrants to forced labor and sex trafficking through fraudulent recruitment, confiscation of identity and travel documents, withholding or non-payment of wages, debt-based coercion, and verbal, physical, and sexual abuse. In some cases, migrants reportedly pay smuggling fees to reach Tripoli, but once they cross the Libyan border they are sometimes abandoned in southern cities or the desert where they are susceptible to severe forms of abuse, including human trafficking.

Several credible sources continue to report that migrants held in detention centers controlled by both the DCIM and non-state armed groups and militias were subject to severe abuse, rampant sexual violence, and forced labor. An unknown number of migrants are also held in criminal prisons affiliated with the MOJ, MOI, and MOD. Private employers and DCIM officials use detained migrants for forced labor in domestic work, garbage collection, construction, road paving, and agriculture. According to international observers, detention center operators also force migrants to provide ancillary services to armed groups, such as offloading and transporting weapons, cooking food, cleaning, and clearing unexploded ordnance; armed groups also forcibly recruit detained migrants. Once the work is completed, employers and detention center officials return the migrants to detention. In some cases, detained migrants are forced to work or exploited in sex trafficking in exchange for basic necessities or their release from prison. An international organization reported most detained migrants are Sub-Saharan Africans and that they are treated in a harsher manner than other nationalities, suggesting discriminatory treatment. In November 2017, an international media outlet released a video depicting unidentified individuals "selling" African migrants reportedly for labor in an undisclosed location in Libya. Furthermore, an international organization reported in 2017 that many militias in Libya fill their ranks with migrants from Niger, Nigeria, and Chad to perform labor or to serve in other non-combat roles. During the reporting period, there were reports Chadian mercenary groups in Libya fraudulently recruited and "sold" newly recruited fighters between Chadian and Libyan armed groups, mostly affiliated with the LNA; some recruits reported being forced to engage in criminal activities. In November 2020, an NGO reported a UAE-based private security firm fraudulently recruited more than 390 Sudanese nationals to fight in Libya for the LNA and guard oil facilities in Ras Lanuf; the Sudanese recruits believed they would be working as security guards in the UAE.

There is reportedly a high prevalence of sexual assault and other forms of sexual violence and exploitation of female migrants along the migration routes to Libya and in DCIM-run and militia-run detention facilities in Libya; perpetrators of sexual violence against female migrants include various armed groups, smugglers, traffickers, and MOI officials. International NGOs also report migrant men and boys are increasingly vulnerable to rape and other forms of sexual abuse. Commercial sex rings reportedly subject Sub-Saharan women and girls to sex trafficking in brothels, particularly in the towns of Ubari, Sebha, and Murzuq in southern Libya; Nigerian women and girls are at increased risk of sex trafficking in Libya. According to a European NGO, Nigerian gangs recruit Nigerian girls from rural regions of the country and facilitate the transportation of the girls through Libya for sex trafficking in Italy and other European countries.

## SPECIAL CASE: SOMALIA

Somalia remains a Special Case for the 20th consecutive year. The country continued to face protracted conflict, insecurity, and ongoing humanitarian crises, while the ongoing COVID-19 pandemic exacerbated the crises and further hampered government, international community, and NGO operations. The Federal Government of Somalia (FGS) controlled its capital city, Mogadishu, and Federal Member State (FMS) governments retained control over their respective capitals. The FGS had limited influence outside Mogadishu. Al-Shabaab, an al-Qa'ida-affiliated terrorist organization based in Somalia, continued to occupy and control many rural areas and maintained freedom of movement in other areas, including south-central Somalia. The group exploited the local population by collecting illegal "taxes" from businesses, conducting indiscriminate attacks against civilians and civilian infrastructure across the country, and perpetrating human trafficking. The sustained insurgency by al-Shabaab continued to be a significant obstacle to the government's ability to address human trafficking. The government continued nascent improvements to civilian justice systems and criminal investigation programs to address most crimes; however, it also conflated human trafficking and migrant smuggling, hindering the effectiveness of its anti-trafficking efforts. Government complicity in trafficking crimes and limited ability to counter the recruitment and use of child soldiers by al-Shabaab also continued to hamper anti-trafficking efforts. Overall, the government demonstrated minimal efforts in all regions on prosecution, protection, and prevention of human trafficking.

### GOVERNMENT EFFORTS

FGS and FMS authorities sustained minimal efforts to combat trafficking during the reporting period. Law enforcement, prosecutorial personnel, and courts remained understaffed and undertrained and lacked capacity to effectively enforce anti-trafficking laws. The FGS continued to lack a comprehensive legal framework to address human trafficking. The pre-1991 penal code—applicable at the federal and regional levels—criminalized labor trafficking and some forms of sex trafficking. Article 455 criminalized slavery, prescribing penalties of five to 20 years' imprisonment. Article 464 criminalized forced labor, prescribing penalties of six months to five years' imprisonment. Article 457 criminalized the transferring, disposing, taking possession, or holding of a person and prescribed penalties of three to 12 years' imprisonment. All these penalties were sufficiently stringent. Article 408(1) criminalized compelled prostitution of a person through violence or threats, prescribing penalties of two to six years' imprisonment, which were sufficiently stringent but not commensurate with those prescribed for other serious crimes, such as rape. The provisional constitution prohibited slavery, servitude, trafficking, and forced labor under Article 14. Article 29(6) under the provisional constitution prohibited the use of children in armed conflict. In November 2017, the Puntland FMS ratified a human trafficking legislative framework after three years of consultations with an international organization. The legal framework was composed of new penal and criminal procedure codes and a law that specifically prohibited trafficking; however, international organizations continued to report authorities had not yet implemented the anti-trafficking law.

Similar to previous years, neither the FGS nor the FMS gathered or shared comprehensive statistics on investigations, prosecutions, or convictions related to trafficking. During the reporting year, the FGS Office of the Attorney General (AGO) reported 30 trafficking investigations, compared with one forced labor investigation and 479 arrests related to immigration violations, which may have included potential trafficking crimes or penalized potential unidentified victims, in 2020. Of the 30 investigations, nine involved forced labor; the government did not report any other case details. The government reported 21 investigations remained ongoing from the previous reporting period; however, the government did not provide updates on these cases. The AGO reported prosecuting 30 alleged traffickers—of which nine involved forced labor—compared with

two trafficking-related prosecutions in 2020. The government convicted nine traffickers—the first convictions reported since 2018. Officials prosecuted and convicted traffickers under trafficking-related laws of the penal code (Articles 455-457) and false identity laws (Article 383); however, the government did not report disaggregated case data or sentencing details. The government reported cooperating informally with officials in Libya, South Sudan, and Sudan on migration issues, which may have included potential trafficking crimes; however, the government did not report any specific anti-trafficking law enforcement actions during the year. The government did not report any investigations, prosecutions, or convictions of government employees complicit in human trafficking offenses, including military officials for the unlawful recruitment and use of children; however, corruption and official complicity in trafficking crimes remained significant concerns, inhibiting law enforcement action during the year.

The Somali Police Force (SPF) Criminal Investigations Department maintained a specialized anti-trafficking and migrant smuggling unit in Mogadishu mandated to investigate potential cases of trafficking, which employed an unspecified number of police officers. The unit, supported by an international organization and a foreign donor, did not report investigating any potential trafficking cases for the third consecutive year, compared with 43 investigations in 2018. Observers previously reported that the SPF regularly tasked the anti-trafficking unit to undertake other assignments unrelated to human trafficking. In December 2021, the SPF, in partnership with foreign donors, established a new specialized anti-trafficking and migrant smuggling unit in Puntland and began developing an additional unit in South West State. Foreign donors and international organizations supported training for police officers across the country on investigating and prosecuting human trafficking crimes, international cooperation in trafficking cases, and the distinction between migrant smuggling and human trafficking. Officials noted a lack of comprehensive training for FGS and FMS officials, language constraints, and lack of personnel capacity limited the effectiveness of some training.

Similar to previous years, the government did not systematically gather or report statistics for trafficking victims, and reporting remained largely anecdotal. The government did not have standardized procedures to identify or refer trafficking victims to protective services at any level, and all levels of government relied fully on international organizations and NGOs to provide victim assistance and reintegration services. The FGS did not possess sufficient financial resources to provide direct services or auxiliary support to organizations assisting victims and vulnerable populations. The government reported identifying and referring 45 trafficking victims to services, compared with identifying 329 potential victims in 2020. Of the 45 victims identified, traffickers exploited nine in forced labor, and the type of trafficking for the other 36 victims was unknown.

An international organization continued to operate Migration Response Centers (MRCs) in Mogadishu and Bosasso and provided services for transiting migrants, including potential trafficking victims. The MRCs offered medical care, psycho-social counseling, and shelter, in addition to operating a hotline. The MRCs registered 12 vulnerable migrants in Mogadishu and 2,631 vulnerable migrants in Bosasso; an international organization screened all registered migrants for trafficking indicators and reported identifying many individuals as potential trafficking victims. Victim support varied significantly across the country, and specialized care was sporadic due to limited availability of services in country; victims in areas not serviced by the MRCs had irregular access to protective services. Due to a lack of formal identification procedures, authorities routinely arrested, detained, or deported unidentified trafficking victims for immigration violations, including possession of fraudulent visas; however, the government reportedly screened some detained individuals for trafficking indicators at ports of entry, particularly in Mogadishu. The government did not have a legal alternative to the removal of foreign trafficking victims from Somalia to countries where they may face hardship or retribution, nor did it provide government benefits or services to foreign victims.

The government maintained a ministerial-level task force, chaired by the Ministry of Internal Security, focused on migration issues, which included a working group on human trafficking; however, the group

was inactive during the reporting period. For the second consecutive year, the government did not report whether its lead anti-trafficking official, the special envoy for children and migrants' rights, continued to function; observers previously reported the special envoy's role was possibly reduced. Additionally, the government did not report if the Ministry of Women and Human Rights technical task force, which included a working group on human trafficking and migration, continued to function, after reports indicated the group's inactivity in the previous reporting period. A lack of technical expertise and limited capacity continued to hinder the government's overall efforts to develop and coordinate effective anti-trafficking policy. For the second consecutive reporting period, the FGS did not report conducting anti-trafficking awareness campaigns during the reporting period, compared with multiple campaigns targeting first responders in 2019. The government did not operate a hotline to report human trafficking crimes or refer potential victims to services. The Ministry of Labor and Social Affairs, which established a labor inspectorate in 2020 and hired 35 labor inspectors, remained without an operational budget. The government did not report providing anti-trafficking training to labor inspectors or identifying any potential trafficking crimes. The government did not provide anti-trafficking training for its diplomatic personnel, nor did it make efforts to reduce the demand for commercial sex acts. Somalia was not a party to the 2000 UN TIP Protocol.

The dire security situation and restrictions on movement of humanitarian actors continued to hamper comprehensive efforts to address the unlawful recruitment and use of child soldiers during the year. Observers reported pandemic-related travel restrictions decreased general access to monitor the recruitment and use of children, while threats of recruitment and use of children increased during the pandemic. Al-Shabaab continued to commit the vast majority of violations, although reports continued of the Somali federal defense and police forces—which included the Somali National Army (SNA) and the SPF—Puntland forces and police, Jubaland forces, Galmudug forces and police, Hirshabelle police, and clan militias unlawfully recruiting and using child soldiers, many between 10 and 17 years old. According to an international organization, state and non-state actors unlawfully recruited and used children in various roles, including as combatants, security escorts, checkpoint guards, messengers, and cleaners; however, perpetrators used the majority of children for unknown purposes.

The government continued to implement the 2012 action plan to end the unlawful recruitment and use of children by the SNA; however, the FGS exercised inconsistent command and control of SNA forces. In 2021, the government established a national children and armed conflict working group chaired by the Ministry of Defense and composed of representatives from the FGS, FMS, and international organizations. The national working group met four times to discuss internal organization structures and procedures to strengthen efforts to prevent the unlawful recruitment and use of child soldiers. The government also established and regularly convened regional-level working groups but did not report any actions taken by these groups. The Ministry of Defense's Child Protection Unit (CPU), in partnership with international organizations and foreign donors, screened 3,296 SNA personnel at five military bases, compared with screening 4,899 personnel during the previous reporting period. The CPU identified and referred to care one child soldier among those ranks, compared with no child soldier identifications in the previous reporting period. Most Somalis lacked birth certificates, and in the absence of established birth registration systems or standardized methods for recruitment, verifying claims of unlawful child soldiering remained difficult. In 2018, the FGS undertook a process of biometric registration of SNA soldiers to validate their identities, force numbers, locales, electronic payment accounts, and registered weapons to increase transparency and accountability in the security sector and curb the recruitment and use of child soldiers in the SNA. The government did not report implementing this biometric registration mechanism for the third consecutive reporting period, though some SNA units have reportedly enrolled in the system. In collaboration with an international organization and foreign donors, the CPU continued to conduct training and awareness campaigns targeted toward hundreds of military and community leaders to prevent the recruitment and use of child soldiers. International organizations continued to report some government forces arrested and detained children for their actual or alleged association

with al-Shabaab and did not apply juvenile justice standards or adhere to international obligations.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Somalia, and traffickers exploit victims from Somalia abroad. Information regarding trafficking trends and victims in Somalia remains challenging to obtain or authenticate. Anecdotal evidence indicates al-Shabaab continues to facilitate human trafficking crimes, using deception, infiltration of *madrassas* and mosques, coercion or harassment of clan elders or family members, school raids, and abductions to recruit and subsequently force victims—including children from south-central Somalia and Kenya—into sex trafficking, military support roles, direct combat, and marriages to al-Shabaab militants. Al-Shabaab continues to enslave an indeterminate number of young girls and exploit them in forced marriage and sexual servitude. IDPs, certain minority and marginalized communities, people residing in al-Shabaab territory, and children remain the most vulnerable to sex trafficking and forced labor. Some Somalis willingly surrender custody of their children to people with whom they share familial ties and clan linkages and who may subsequently exploit some of these children in forced labor or sex trafficking. While many children work within their own households or family businesses, some traffickers may force children into labor in agriculture, domestic work, herding livestock, selling or portering *Khat*, crushing stones, or the construction industry. Somali children working in the informal sector are vulnerable to trafficking, as they often are driven by familial or economic pressure to seek employment opportunities abroad. Economic migrants sometimes incur debts under the trafficking scheme dubbed "go now, pay later" or through economic exploitation. According to an international organization, traffickers extort payments from families left behind or exert threats if they refuse or are unable to pay.

Traffickers exploit victims from Somalia and neighboring countries along cross-border routes, mirroring migration flows: a northern route to Europe via Libya; an eastern route to Europe via Turkey; a direct southern path to Kenya, Tanzania, or South Africa; and a path from south-central Somalia through Puntland onward to Yemen via the Bab el-Mandeb strait. In prior years, the FGS anecdotally reported fewer Somalis arrived in their intended destination countries but rather became stranded in transit countries, increasing their vulnerability to trafficking. An international organization reported pandemic-related travel restrictions and border closures increased the number of migrants stranded in Somalia while in transit to their destination, leading migrant smugglers to charge higher fees for their services and increasing migrants' vulnerability to forced labor and sex trafficking. Since the ongoing conflict in Ethiopia began in November 2020, observers reported an increasing number of Ethiopians stranded in Somalia, increasing their vulnerability to trafficking.

Most trafficking networks continue to be organized by a combination of Somali, Djiboutian, Eritrean, and North African traffickers. Traffickers increasingly recruit individuals through social media platforms and travel agencies, with a growing level of network sophistication. Traffickers also target and recruit children, without their parents' awareness or support, using false promises that no payment will be demanded until they reach their targeted destinations. Traffickers and smugglers reportedly take advantage of the vulnerability of internally displaced women and children, mostly from southern and central Somalia, at times using false promises of lucrative jobs in Europe and North America. Traffickers transport Somali women, sometimes via Djibouti, to the Middle East, where they frequently endure forced labor, including in domestic service, or sex trafficking. Traffickers subject Somali men to forced labor in farming and construction in the Gulf States. Traffickers transport children to Djibouti, Saudi Arabia, and the UAE and force them to beg on the streets. Dubious employment agencies facilitate human trafficking by targeting individuals desiring to migrate to the Gulf States or Europe for employment.

## THE SOMALILAND REGION

The northwestern region of Somalia is administered as a self-declared but unrecognized independent region. In 1991, members of the Somali National Movement proclaimed the area an independent republic. The United States does not recognize Somaliland as an independent nation, nor does any other country.

Somaliland's "penal code" criminalized some forms of trafficking. Article 464 criminalized forcing a person into or benefitting from compulsory labor and prescribed penalties of six months to five years' imprisonment and a fine. Articles 455-458 criminalized reducing a person to slavery," "dealing in trading in slaves," and "sale and purchase of slaves" and prescribed penalties ranging from three to 20 years' imprisonment. Article 407 criminalized instigating, aiding, facilitating, or exploiting the proceeds of prostitution, prescribing a punishment of two months to two years' imprisonment and a fine. Inconsistent with international law, the penal code appeared to require force, fraud, or coercion to prove an offense of child sex trafficking. These penalties were sufficiently stringent but, with regards to sex trafficking, did not appear to be commensurate with those prescribed for other serious crimes, such as rape. In January 2022, Somaliland's parliament passed an anti-trafficking law designed in consultation with an international organization in 2017; the law remained pending the president's signature at the end of the reporting period. In the absence of an anti-trafficking law in previous years, Somaliland representatives relied predominantly on immigration laws to prosecute trafficking crimes.

For the second consecutive year, Somaliland did not report any anti-trafficking enforcement actions, compared with the arrest of six individuals in connection with an alleged human trafficking and migrant smuggling case in 2019. Somaliland representatives did not report any information regarding ongoing cases from prior reporting periods. Somaliland did not report any investigations, prosecutions, or convictions of Somaliland representatives complicit in human trafficking crimes; however, corruption and complicity among Somaliland representatives in trafficking crimes remained significant concerns, inhibiting authorities' action during the year. An international organization reported Somaliland forces unlawfully recruited and used two child soldiers (between 10 and 17 years old) during the reporting period. Somaliland did not report identifying any trafficking victims or efforts to provide protection services to victims. Somaliland did not have standardized procedures to identify or refer trafficking victims to protective services, and officials at all levels relied fully on international organizations and NGOs to provide victim assistance and reintegration services. International NGOs continued to provide the Somaliland Immigration and Border Control Agency with two buses to transport migrants and potential trafficking victims from remote regions to more populated areas where they could be provided with services. Potential trafficking victims in Somaliland received assistance at an international organization-run MRC in Hargeisa until the MRC could reunite them with their respective families; the international organization registered 1,693 vulnerable migrants, which may have included potential trafficking victims, in Hargeisa in 2021. The Somaliland Ministry of Justice, in partnership with international organizations, reportedly maintained a mixed migration task force that could oversee trafficking-related issues; however, authorities did not report the task force undertaking anti-trafficking efforts for the second consecutive year. Somaliland representatives did not report conducting awareness campaigns, operating a hotline for trafficking victims, or making efforts to reduce the demand for commercial sex acts.

As reported over the past five years, human traffickers exploit domestic and foreign victims in Somaliland and traffickers exploit victims from Somaliland abroad. Information regarding trafficking trends and victims in Somaliland remains challenging to obtain or authenticate. Traffickers exploit women and children in domestic servitude and sex trafficking in Somaliland. International organizations report some women in Somaliland may act as recruiters and intermediaries to transport victims to Djibouti and Ethiopia for the purposes of forced labor in domestic work or sex trafficking. Somaliland continues to receive economic migrants and refugees from war-torn Yemen and the Oromia region of Ethiopia, in addition to returnees primarily from Yemen and Saudi Arabia; these populations remain vulnerable to human trafficking due to lack of documentation, job access, or education opportunities.

# SPECIAL CASE: YEMEN

Yemen remains a Special Case for the seventh consecutive year. The civil conflict and humanitarian crisis in Yemen continued during the reporting period, while the COVID-19 pandemic exacerbated the crisis and further hampered both government and NGO operations. Information on human trafficking in the country has been increasingly difficult to obtain since March 2015, when much of the Republic of Yemen Government (ROYG) took refuge in Riyadh following the takeover of Sana'a by Iranian-backed Houthi rebels and lost control of significant portions of the country. Although a ROYG and Southern Transitional Council (STC) power-sharing agreement returned the ROYG to its temporary capital of Aden in December 2020, implementation of the agreement remained incomplete at the close of the reporting period. Furthermore, de facto control over territory in northern Yemen by the Houthis hindered the ROYG from exercising control over large portions of the country or adequately combating trafficking and collecting data on trafficking during the reporting period. NGOs and international organizations reported vulnerable populations in Yemen were at an increased risk of human trafficking due to the protracted armed conflict, civil unrest, lawlessness, and worsening economic conditions. During the reporting period, the Yemen Armed Forces (YAF) continued recruiting or using child soldiers. Migrant workers, especially women and children from the Horn of Africa who remained or arrived in Yemen during the reporting period, may have endured intensified violence. Due to pandemic-related border closures and movement restrictions, many migrants traveling through Yemen to Gulf countries were stranded in Yemen, heightening their risk to trafficking. The international organizations and NGOs remaining in Yemen focused primarily on providing humanitarian assistance to the local population and lacked adequate resources and capacity to gather reliable data on human trafficking. Most Yemenis required all types of assistance and basic social services, as the national infrastructure had collapsed.

## GOVERNMENT EFFORTS

Due to the protracted conflict and tenuous political situation, the government faced serious challenges to combat trafficking, including substantial internal security threats, weak institutions, systemic corruption, economic deprivation, food insecurity, social disintegration, limited territorial control, and poor law enforcement capabilities. Although the ROYG exercised only nominal control over government-controlled areas and formal state institutions, increased government reporting suggests some, albeit limited, capacity to address trafficking in persons. The absence of a law criminalizing all forms of trafficking and the government's conflation of human trafficking with migrant smuggling hindered government efforts to investigate and prosecute trafficking offenders. Article 248 of the penal code criminalized slavery and prescribed penalties of up to 10 years' imprisonment; these penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with the penalties prescribed for other grave crimes, such as rape. But Article 248 narrowly focused on transactions and movement, and therefore did not criminalize many forms of labor and sex trafficking as defined under international law. Article 279 criminalized child sex trafficking under its prostitution provision and prescribed penalties of up to seven years' imprisonment, which could be increased to up to 15 years' imprisonment under aggravating circumstances; these penalties were sufficiently stringent and commensurate with those prescribed for other serious crimes, such as rape. In 2014, the government adopted a bill that it subsequently referred to the Parliament, which aimed to combat all forms of trafficking, protect and assist victims, generate societal awareness of the risks of trafficking to reduce the incidence of the crime, and promote national cooperation.

Although the ROYG had some oversight over its court system, experts noted that due to the conflict-inflicted infrastructure damage, severe staff shortages, financial and security challenges, weak law enforcement capacity, and the fragmented nature of authority in several areas in Yemen, the government was unable to ensure judicial institutions functioned fully across the country during the year. Despite this limitation, for the first time since 2010, the government reported efforts to investigate and prosecute traffickers during the year. In February

2022, authorities arrested two males for allegedly exploiting a female in sex trafficking; the government reported it referred the case to judicial authorities where the case remained pending prosecution at the close of the reporting period. One alleged perpetrator brought a female victim to a hotel for the purposes of commercial sex; law enforcement authorities subsequently raided the hotel room and arrested the male and detained him pending prosecution. The government reported the second perpetrator was arrested separately for participating in the crime. The government did not report any investigations, prosecutions, or convictions of government officials allegedly complicit in trafficking crimes; however, corruption and official complicity in trafficking crimes remained significant concerns, including the alleged recruitment and use of child soldiers by the YAF, inhibiting law enforcement action during the year. The government reported it received training from an international organization on preventing the unlawful recruitment or use of child soldiers and reintegrating former child soldiers but did not report if it conducted training on trafficking for any government officials or provided support to NGOs or international organizations that may have conducted anti-trafficking training throughout the year.

ROYG authorities and institutions that oversaw migrant flows, provided services and protection to migrants, and assisted vulnerable groups—which may have interacted with trafficking victims—exhibited minimal function during the year. The government had limited capacity to identify and provide adequate protection services to trafficking victims among vulnerable groups, such as women in commercial sex and migrant workers, some of whom were in transit to the Gulf States. However, the government reported some efforts to protect potential and identified trafficking victims, as well as vulnerable migrants who were stranded in Yemen due to pandemic-related movement restrictions during the year. The government reported the female victim identified as part of the sex trafficking case mentioned above was returned to her family following police intervention; however, the government did not report whether the victim was provided protective services. In addition, the government reported coordinating with an international organization, funded by a foreign government, to assist Gulf-bound undocumented migrants with medical assistance and referrals to hospitals during the year. Although formal standard operating procedures for proactive identification of trafficking victims existed, the government did not make efforts to implement or train law enforcement on these procedures due to prolonged unrest; consequently, some potential victims—such as women in commercial sex, migrant workers, and vulnerable migrants traveling to the Gulf through Yemen—may have remained unidentified within the law enforcement system. Furthermore, the government was not able to encourage victims to assist in investigations or prosecutions of traffickers and was financially unable to help its nationals repatriated after enduring trafficking abroad.

Due to its broad lack of access and capacity limitations, as well as the ongoing conflict, the government did not make sufficient efforts to prevent trafficking during the reporting period. The government maintained the National Committee to Combat Human Trafficking pursuant to the Council of Ministers Decision No.46 of 2012; its members included governmental and nongovernmental interlocutors. The government reported the committee was unable to meet due to pandemic-related mitigation measures, unstable conditions in the country, the lack of functioning state institutions, and the need to prioritize the worsening humanitarian crisis. A draft national strategy to combat trafficking initiated by the Ministry of Human Rights in a previous reporting period, in coordination with an international organization, remained pending. The draft included plans for raising awareness, increasing cooperation between Yemen and neighboring countries, training officials in victim identification, and instituting procedures to protect victims. The government did not provide anti-trafficking training to its diplomatic personnel and did not make efforts to reduce the demand for commercial sex acts.

During the reporting period, both government-aligned and militia forces continued to unlawfully recruit and use child soldiers. Since the escalation of armed conflict in March 2015, human rights organizations reported all parties to the conflict continued their unlawful recruitment and use of child soldiers. However, documentation of such cases remained challenging due to intensified military campaigns, security threats against the monitors and communities of interest, continued access

Haiti AR_001087

restrictions, and waves of increasing COVID-19 infections. As a result of its limited capacity and the ongoing conflict, the ROYG did not implement a 2014 UN action plan to end the recruitment and use of child soldiers, although it continued to express interest in revitalizing the discussion on implementation. In 2018, the government entered into an agreement with the UN on a roadmap for implementation of the existing action plan to prevent the recruitment and use of child soldiers. During the reporting period, the government held a two-day workshop of the Joint Technical Committee of the Government of Yemen to discuss priority activities to expedite the implementation of the 2014 national action plan (NAP) and 2018 related roadmap. An international organization welcomed the government's renewed engagement to implement the NAP and roadmap but remained concerned that political impediments in the south continued to hinder its implementation. Due to continued military activity by government and Houthi forces, tribal elements, and other foreign-backed militias during 2021, the recruitment, training, and mobilization of children as participants in the conflict by nongovernmental armed forces and by affiliated governmental armed forces continued. An international organization reported armed groups used boys mostly in combatant roles, to guard checkpoints or to drive military vehicles, and forced other children to carry out support duties, such as delivering supplies, escorting, and logistics. During the reporting period, an international organization noted the heightened use of "summer camps" by the Houthis to recruit, indoctrinate, and use children; Houthis ran 186 "summer camps" that were documented during the reporting period and attended by children ages 10 to 15. Reportedly, these camps were held in schools with the objective to deliver cultural, ideological, political, and religious sessions and, in some cases, military and combat training. During the reporting period, cases of the unlawful recruitment and use of child soldiers occurred with some familial knowledge or consent, and monetary and material support were reportedly incentives for joining both the Houthis and the YAF. According to an international organization, between April and December 2021, armed groups unlawfully recruited and used at least 54 children between the ages of 9 and 17, compared with at least 118 from the previous reporting period who were between the ages of 12 and 17. Despite challenges in documenting information due to continued persistent security threats and pandemic-related movement restrictions, the recruitment and use of children remained a significant concern during the reporting period; in addition, the age at which children were being recruited and used by the Houthis dropped to the age of 9, indicating the deeply concerning effect of the ongoing conflict on children in Yemen. Recruitment and use of child soldiers were reportedly attributed to Houthis and affiliated factions, the government's YAF, and Security Belt Forces. In 2021, Yemeni officials did not report demobilizing any child soldiers. In the previous reporting period, the government operated a Saudi-funded interim care center in Marib to assist former child soldiers; however, the center was not operational during the reporting period while it underwent a comprehensive review. It is expected to resume services in 2022. In contrast, an international organization reported instances of YAF detaining boys for their alleged association with an opposition armed group in the conflict; the boys were between the ages of 14 and 17, and some were reportedly interrogated and suffered ill-treatment before they were released. Detention ranged from two days to six months.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Yemen, and traffickers exploit victims from Yemen who reside abroad. The ongoing conflict, lack of rule of law, economic degradation, pervasive corruption, and fractional territorial control have disrupted some trafficking patterns and exacerbated others. Prior to the conflict, Yemen was a transit point and destination for women and children, primarily from the Horn of Africa, who were exploited in sex trafficking and forced labor. Many Ethiopians and Somalis traveled voluntarily to Yemen with the hope of employment in Gulf countries; traffickers exploited some of these migrants in forced labor and sex trafficking in transit countries, reportedly most often in Yemen. Prior to the conflict's escalation and the government's departure from Sana'a in March 2015, Saudi Arabia allegedly deported Yemeni migrant workers and returned them to Yemen through the al-Tuwal and al-Buq border crossings. Most deportees reportedly returned to the impoverished

Tihamah region located on the west coast of Yemen, many of whom remained displaced and highly vulnerable to exploitation, including trafficking. In July 2021, rights groups reported Saudi Arabia began to terminate or not renew contracts of Yemeni professionals in the country following a policy change that required businesses to limit the percentage of their workers from certain nationalities, including Yemen. Due to Saudi Arabia's visa sponsorship system, workers who were terminated or unable to renew their contracts had to find another employer to act as a sponsor to avoid leaving the country or risked detainment and deportation if found to be residing illegally. Furthermore, Yemeni workers who chose to stay in Saudi Arabia without legal status increased their vulnerability to exploitation and trafficking. As the civil war in Yemen continued, Yemeni workers who were forced to return because they could not find employment or were deported by Saudi authorities likely faced famine, extreme violence, and increased vulnerability to exploitation upon their return. Similar to 2020, movement restrictions and border closures related to the pandemic led to a low rate of migrant arrivals in Yemen during the current reporting period; a total of 27,693 people arrived in 2021, a decrease from 37,535 arrivals in 2020. Like previous years, most migrants were from Ethiopia and Somalia.

In 2021, an international organization reported large groups of migrants stranded in traditional transit hubs due to border closures, as well as impacts to internal migrant flows due to escalating military campaigns. Many migrants remained stranded, living in overcrowded informal settlements, detained by smugglers and traffickers, and subsequently forcibly transferred across the frontlines of the conflict. An international organization estimated nearly 35,000 migrants were stranded in 2021 throughout the country, facing heightened vulnerability to exploitation and trafficking. Moreover, during the reporting period, there continued to be reports of migrants subjected to sex trafficking, forced labor, physical and sexual abuse, and abduction for ransom. Due to a decrease in migrants transiting through Yemen, an international organization continued to report traffickers were increasingly forcing migrant women to work off debts on farms or moving them to cities to work as domestic laborers, subjecting them to debt bondage. During the reporting period, both the pandemic and the country's civil war continued to generate a substantial flow of reverse migration for migrants who originated in the Horn of Africa, specifically Ethiopia. An international organization reported it repatriated 2,027 Ethiopian migrants in 2021. However, repatriations to Ethiopia were placed on hold due to conflict in the country, pushing some migrants to seek irregular pathways to return home by engaging with smugglers, putting them at risk of exploitation. In 2021, approximately 11,620 migrants returned to the Horn of Africa via smuggling boats. Since the escalation of armed conflict in March 2015, human rights organizations reported all parties to the conflict continued their unlawful recruitment and use of child soldiers. However, documentation of such cases remained challenging during the reporting period due to intensified military campaigns, security threats against the monitors and communities of interest, continued access restrictions, and waves of increasing COVID-19 infections. Civil society organizations and media outlets assessed in the previous reporting period that traffickers had increasingly targeted Yemeni children since the civil war commenced and that children were disproportionately affected by its protracted escalation.

RELEVANT INTERNATIONAL CONVENTIONS

# RELEVANT INTERNATIONAL CONVENTIONS

The chart below shows the Ratification, Accession (a), or Acceptance (A) of relevant international conventions for those countries that have ratified, acceded to, or accepted any such conventions between April 2021 and March 2022. A complete list that includes all of the countries covered by the Trafficking in Persons Report is available at: https://www.state.gov/international-and-domestic-law/#conventions.

| Country | UN Protocol to Prevent, Suppress and Punish Trafficking in Persons (2000) | Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography (2000) | Optional Protocol to the Convention on the Rights of the Child on the involvement of children in Armed Conflict (2000) | ILO Convention Forced 29 Labour (1930) | 2014 ILO Protocol of to the Forced Labour Convention | ILO Convention ,105 Abolition of Forced Labour (1957) | ILO Convention ,182 Elimination of Worst Forms of ,Child Labor (1999) | ,189 ILO Convention Domestic Workers (2011) |
|---|---|---|---|---|---|---|---|---|
| Antigua and Barbuda | 2010 | 2002 | — | 1983 | 2021 (will enter into force on 28 July 2022) | 1983 | 2002 | 2021 (will enter into force on 28 July 2022) |
| Australia | 2005 | 2007 | 2006 | 1932 | 2022 (will enter into force on 31 March 2023) | 1960 | 2006 | — |
| Bangladesh | 2019(a) | 2000 | 2000 | 1972 | 2022 (will enter into force on 20 January 2023) | 1972 | 2001 | — |
| Comoros | 2020(a) | 2007 (a) | — | 1978 | 2021 (will enter into force on 15 July 2022) | 1978 | 2004 | — |
| Fiji | 2017(a) | 9 March 2021 | 29 March 2021 | 1974 | — | 1974 | 2002 | — |
| Luxembourg | 2009 | 2011 | 2004 | 1964 | 2021 (entered into force on 18 March 2022) | 1964 | 2001 | — |
| Malaysia | 2009(a) | 2012(a) | 2012(a) | 1957 | 2022 (will enter into force on 21 March 2023) | | 2000 | — |
| Malta | 2003 | 2010 | 2002 | 1965 | 2019 | 1965 | 2001 | 2021 (will enter into force on 14 May 2022) |
| Norway | 2003 | 2001 | 2003 | 1932 | 2015 | 1958 | 2000 | 2021 (will enter into force on 8 July 2022) |
| Peru | 2002 | 2002 | 2002 | 1960 | 2021 (will enter into force on 18 June 2022) | 1960 | 2002 | 2018 |
| Republic of Korea | 2015 | 2004 | 2004 | 2021 (will enter into force on 20 April 2022) | — | | 2001 | — |
| Saudi Arabia | 2007 | 2010(a) | 2011(a) | 1978 | 2021 (will enter into force on 26 May 2022) | 1978 | 2001 | — |
| Sierra Leone | 2014 | 2001 | 2002 | 1961 | 2021 (will enter into force on 25 August 2022) | 1961 | 2011 | 2021 (will enter into force on 25 August 2022) |
| Suriname | 2007(a) | 2012 | 16 November 2021 | 1976 | 2019 | 1976 | 2006 | |

Haiti AR_001089

# STOPPING HUMAN TRAFFICKING AND SEXUAL EXPLOITATION AND ABUSE BY INTERNATIONAL PEACEKEEPERS AND CIVILIAN PERSONNEL

As required by law, this section summarizes actions taken by the UN, the North Atlantic Treaty Organization (NATO), and the OSCE to prevent trafficking in persons or the exploitation of victims of trafficking.

| | UNITED NATIONS | OSCE | NATO |
|---|---|---|---|
| Total Number of Peacekeeping and Support Personnel | 75,252<br><br>(including 5,750 women) | 3,603 | 20,967 |
| Total Number of Missions | 12 | 14 | 2 |
| Prevention Policy | "Special Measures for Protection from Sexual Exploitation and Sexual Abuse" (SEA) (2003) | "Code of Conduct for Staff and Mission Members" | "NATO Policy on Combating Trafficking in Human Beings" (2004) |
| Lead Office Responsible for Implementation | Department of Management Strategy, Policy and Compliance | Office of Human Resources | Human Security Unit(political)<br><br>International Military Staff – Gender Advisor (Military Advice)<br><br>Heads of NATO Military Bodies (e.g. SACEUR, SACT) |
| Prevention Training | Pre-deployment and at mission, including a new e-learning program | Pre-deployment | or preventing human trafficking, conflict-related sexual violence and SEA, training is done via Pre-deployment and during any missions or operations. Nations are responsible for the provision of pre-deployment training of their personnel in accordance with NATO standards. Heads of NATO Bodies are responsible for providing training to their personnel. |
| Number of Allegations in 2021 | 75 SEA allegations were made against military, police, and civilian personnel. The majority of the allegations were in the Central African Republic (CAR), and Democratic Republic of Congo (DROC).<br><br>25 of the allegations affected children. | No reported allegations | No reported allegations – NATO relies on contributing countries to report allegations. |

INTERNATIONAL PEACEKEEPERS

| | UNITED NATIONS | OSCE | NATO |
|---|---|---|---|
| New Initiatives | The Secretary-General, in September 2021, repatriated a contingent deployed to the Central African due to credible reports of widespread SEA and due to history of non-responsiveness by national authorities.<br><br>Full-time Senior Victims' Rights Officers were deployed to the CAR, Democratic Republic of the Congo, Haiti, and South Sudan to coordinate urgent medical care, psychosocial support; facilitate access to legal aid; and provide livelihood support for victims and their families.<br><br>The Office of Internal Oversight Services, with the Department of Peace Operations and the Office of the High Commissioner for Human Rights, developed a "train-the-trainer" program to strengthen the capacity of member states to investigate complaints against deployed personnel. The training focuses on SEA and an emphasis on a victim-centered approach and standards of conduct expected of UN personnel.<br><br>UNICEF, with other UN organizations, developed technical guidance on implementation of a UN protocol on provision of technical assistance to victims of SEA which was finalized and released with a training package launched in Democratic Republic of the Congo in late 2021.<br><br>The Office of the Victims' Rights Advocate, in concert with the Office of Legal Affairs and other UN organizations, developed a roster of pro-bono lawyers and legal aid organizations to assist victims. | The Secretariat developed and launched an online training module for OSCE staff on trafficking in human beings. This is mandatory for all new OSCE employees.<br><br>The Secretary General introduced a zero-tolerance policy to prevent sexual harassment in 2018 that was reiterated by the new Secretary General upon taking office in January 2021.<br><br>The staff instructions and revisions to the Code of Conduct are in preparation to be adopted by the OSCE Permanent Council in 2022.<br><br>The Secretariat is also developing a staff instruction to prevent sexual exploitation by staff and mission members.<br><br>Ongoing measures and training to ensure that procurement of the OSCE does not contribute to human trafficking or forced labor; expanded initiative to field operations in 2021-2022. | 2021 Conflict Related Sexual Violence policy<br><br>2019 NATO Policy on Preventing and Responding to Sexual Exploitation and Abuse<br><br>2022 – NATO will update it's Combating Trafficking in Human Beings policy |
| Links for Additional Information | https://conduct.unmissions.org/ | http://www.osce.org/what/trafficking | http://www.nato.int/cps/en/natolive/topics_50315.htm |

# INTERNATIONAL, REGIONAL, AND SUB-REGIONAL ORGANIZATIONS COMBATING TRAFFICKING IN PERSONS

| ORGANIZATIONS AND SELECTED LINKS OF INTEREST | FRAMEWORK DOCUMENT RELEVANT TO TIP | TIP FOCAL POINT |
|---|---|---|
| United Nations (UN)<br><br>www.un.org<br><br>**United Nations Office on Drugs and Crime (UNODC) – Trafficking in Persons**<br>https://www.unodc.org/unodc/en/human-trafficking/index.html<br><br>**United Nations Office of the High Commissioner on Human Rights**<br>www.ohchr.org<br><br>**High-level Political Forum on SDGs**<br><br>https://sustainabledevelopment.un.org/hlpf<br><br>**The Inter-agency Coordination Group against Trafficking in Persons (ICAT):**<br>http://icat.network/<br><br>(ILO is listed under the UN box and is not its own individual box) | UN Convention and Protocol:<br><br>Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime (A/RES/55/25) (2000)<br><br>United Nations Global Plan of Action to Combat Trafficking in Persons (A/RES/64/293) (2010)<br><br>Political Declaration on the Implementation of the Global Plan of Action to Combat Trafficking in Persons (2017) (A/RES/72/1)<br><br>Political Declaration on the Implementation of the United Nations Global Plan of Action to Combat Trafficking in Persons (2021) (A/76/L.11)<br><br>UNSC Resolutions:<br><br>UNSC Resolutions on Trafficking in Persons in Conflict Situations 2331 (2016), 2388 (2017) and 2493 (2019 S/RES/2493)<br><br>UNODC Global Report on Trafficking in Persons (2020)<br><br>Legislative Guide for the Implementation of the Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children (2020)<br><br>Model Legislative Provisions against Trafficking in Persons (2020)<br><br>Female Victims of Trafficking for Sexual Exploitation as Defendants (2020)<br><br>UNODC Toolkit for Mainstreaming Human Rights and Gender Equality into Criminal Justice Intervention to Address Trafficking in Persons and Smuggling of Migrants (2021)<br><br>UN Sustainable Development Goal targets 5.2, 8.7, and 16.2 (SDGs)<br><br>Toolkit on Trafficking in Persons for Organ Removal (2022)<br><br>Conflict in Ukraine: Key evidence on risks of trafficking in persons (2022) | UN Special Rapporteur on Trafficking in Persons, Especially Women and Children<br><br>UN Special Rapporteur on Contemporary Forms of Slavery<br><br>UN Special Rapporteur on the Sale of Children, Child Prostitution, and Child Pornography |
| **International Labour Organization (ILO)**<br><br>www.ilo.org<br><br>http://www.ilo.org/sapfl/Informationresources/ILOPublications/Byregion/Global/lang--en/index.htm<br><br>http://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:1:0 | ILO Conventions:<br><br>-C29 Forced Labour Convention (1930)<br><br>-P029 Protocol of 2014 and Recommendation R203, supplementing the Forced Labour Convention (1930)<br><br>-C105 Abolition of Forced Labour Convention (1957)<br><br>-C182 Worst Forms of Child Labour Convention (1999)<br><br>-C189 Domestic Workers Convention, and its Recommendation R201 (2011)<br><br>ILO training package on inspection of labour conditions on board fishing vessels (2020)<br><br>Making decent work a reality for domestic workers – Progress and prospects ten years after the adoption of the Domestic Workers Convention, 2011 (No. 189) (2021)<br><br>Child Labour: Global estimates 2020, trends and the road forward (2021) | |

MULTILATERAL ORGANIZATIONS COMBATING TRAFFICKING IN PERSONS

| ORGANIZATIONS AND SELECTED LINKS OF INTEREST | FRAMEWORK DOCUMENT RELEVANT TO TIP | TIP FOCAL POINT |
|---|---|---|
| African Union (AU)<br><br>https://au.int/ | Ouagadougou Action Plan to Combat Trafficking in Human Beings, Especially Women and Children (2006)<br><br>AU Commission Initiative against Trafficking Campaign (AU.COMMIT)<br><br>October 1, 2020, Virtual Event, 2nd Virtual Technical Meeting on Data Collection on Irregular Migration and Associated Protection Risks towards the Production of a Statistical Report on Human Trafficking and Migrant Smuggling in the Horn of Africa and Surrounding Region<br><br>January 23-24, 2020, Bishoftu, Ethiopia, National Stakeholder Workshop on the AU-Horn of Africa Mainstreaming Initiative for Countering Human Trafficking and Migrant Smuggling<br><br>African Union Ten Year Action Plan on Eradication of Child Labour, Forced Labour, Human Trafficking and Modern Slavery in Africa (2020-2030)<br><br>October 6-8, 2021 Technical Workshop of Senior Officials of AU Member States and RECs to Validate the Draft Policies on the Prevention of Trafficking in Persons (TIP) and Prevention of Smuggling of Migrants (SOM) in Africa | N/A |
| Khartoum Process<br><br>(EU/Horn of Africa Migration Route Initiative)<br><br>https://www.khartoumprocess.net/ | Khartoum Process Factsheet<br><br>Khartoum Declaration on AU-Horn of Africa Initiative on Human Trafficking and Smuggling of Migrants (2014)<br><br>Valletta Summit Action Plan (2015)<br><br>Valletta Summit Political Declaration (2015)<br><br>EU-Africa Action Plan on Migration and Mobility (2014-2017)<br><br>4-Module Webinar Series titled Trafficking in Human Beings: The 4Ps Revisited (March-April 2021) | |
| Association of Southeast Asian Nations (ASEAN)<br><br>www.asean.org | ASEAN Declaration Against Trafficking in Persons, Particularly Women and Children (2004)<br><br>ASEAN Convention Against Trafficking in Persons, Especially Women and Children (2015)<br><br>ASEAN Plan of Action Against Trafficking in Persons, Especially Women and Children (2015)<br><br>ASEAN Roadmap on the Elimination of the Worst Forms of Child Labour by 2025 (2020) | ASEAN Senior Officials Meeting on Transnational Crime |

MULTILATERAL ORGANIZATIONS COMBATING TRAFFICKING IN PERSONS

| ORGANIZATIONS AND SELECTED LINKS OF INTEREST | FRAMEWORK DOCUMENT RELEVANT TO TIP | TIP FOCAL POINT |
|---|---|---|
| **Bali Regional Ministerial Conference On People Smuggling, Trafficking in Persons and Related Transnational Crime (Bali Process)**<br><br>www.baliprocess.net | Co Chairs' Statements of the first (2002), second (2003), third (2009), fourth (2011), fifth (2013), sixth (2016) and seventh (2018) Declaration of the Seventh Ministerial Conference of the Bali Process on People Smuggling, Trafficking in Persons and Related Transnational Crime (2018) Policy Guides & Handbooks:<br><br>Guidelines for Information Sharing to Address People Smuggling, Trafficking in Persons and Related Transnational Crime<br><br>Handbook on Addressing Irregular Migration through Effective Information Campaigns<br><br>Policy Guides on Criminalizing Migrant Smuggling and Trafficking in Persons<br><br>Policy Guides on Identification and Protection of Victims of Trafficking<br><br>Policy Guide on Following the Money in Trafficking in Persons Cases<br><br>Policy Guide on Returns and Reintegration<br><br>Protecting Migrants at Sea: Practical Guide to Fulfilling International Obligations<br><br>Corruption as a facilitator of smuggling of migrants and trafficking in persons (2021)<br><br>Compendium of Good Practice Examples to Combat Exploitation in Supply Chains (2021) | Bali Process Working Group on Trafficking in Persons |
| **Colombo Process**<br><br>https://www.colomboprocess.org | Colombo Process Member States identified concrete collaborative actions for advancing ethical recruitment (2017)<br><br>Colombo Process Member States gathered to discuss good practices as well as possible obstacles to migrant workers' access to Complaints Mechanisms (2018)<br><br>8th meeting of the Thematic Area Working Group (TAWG) on Fostering Ethical Recruitment Practices (FERP) (2021) | |
| Commonwealth of Independent States (CIS)<br><br>www.cis.minsk.by/ (in Russian only) | Agreement on the Cooperation of the CIS Member States in Combating Trafficking in Persons, Human Organs and Tissues (2005)<br><br>Program of Cooperation between the CIS Member States against Trafficking in Persons for 2014–2018 | N/A |
| Coordinated Mekong Ministerial Initiative against Trafficking (COMMIT)<br><br>http://un-act.org/ | COMMIT Memorandum of Understanding on Cooperation Against Trafficking in Greater Mekong Sub-Region (2004)<br><br>COMMIT 4th Sub-Regional Plan of Action (COMMIT SPA IV 2015-2018)Victim Identification and Referral Mechanisms: Common Guidelines for the Greater Mekong Sub-region<br><br>Supporting the Reintegration of Trafficked Persons: A Guidebook for the Greater Mekong Sub-Region: | United Nations Action for Cooperation against Trafficking in Persons<br><br>Regional COMMIT Task Force (TF) |
| Council of the Baltic Sea States (CBSS)<br><br>https://cbss.org/our-work/safe-secure-region/anti-trafficking/ | A Vision for the Baltic Sea region by 2020, CBSS Summit 2010<br><br>Task Force against Trafficking in Human Beings Strategic Plan 2020-2025<br><br>Human Trafficking 2020 – Baltic Sea Round-up Report<br><br>Guidelines for journalists reporting on cases of human trafficking: Media and Trafficking in Human Beings (2019)<br><br>Joint Statement of commitment to work against human trafficking for labour exploitation in the Baltic Sea Region (2021) | Task Force against Trafficking in Human Beings (TF-THB)<br><br>Expert Group on Children at Risk<br><br>Task Force Against Trafficking in Human Beings |

CHILD SOLDIERS REPORT



Haiti AR_001084

# ANNUAL REPORT TO CONGRESS ON THE USE OF CHILD SOLDIERS UNDER SECTION 405(C) OF THE CHILD SOLDIERS PREVENTION ACT OF 2008

This report is submitted in accordance with section 405(c) of the Child Soldiers Prevention Act of 2008 (22 U.S.C. 2370c-2(c)) (CSPA). Section 1 lists the countries identified as being in violation of the standards under the CSPA in 2021. Section 2 provides a description and the amounts of assistance withheld pursuant to section 404(a) of the CSPA. Section 3 provides a list of waivers or exceptions exercised under the CSPA. Section 4 contains the justifications for such waivers. Section 5 provides a description and the amounts of assistance provided to countries pursuant to such waivers.

## SECTION 1. COUNTRIES IN VIOLATION OF THE STANDARDS UNDER THE CSPA IN 2021.

The Secretary of State identified the following countries as having governmental armed forces, police, or other security forces or government-supported armed groups that recruited or used child soldiers within the meaning of section 404(a) of the CSPA during the reporting period of April 1, 2020 – March 31, 2021: Afghanistan, Burma, Democratic Republic of the Congo (DRC), Iran, Iraq, Libya, Mali, Nigeria, Pakistan, Somalia, South Sudan, Syria, Turkey, Venezuela, and Yemen.

## SECTION 2. DESCRIPTION AND AMOUNT OF ASSISTANCE WITHHELD PURSUANT TO SECTION 404(A).

No security assistance subject to section 404(a) of the CSPA was planned to be provided to Afghanistan, Burma, Iran, Libya, Mali, Syria, or Venezuela in fiscal year (FY) 2022.

## SECTION 3. LIST OF WAIVERS OR EXCEPTIONS EXERCISED UNDER SECTION 404(A).

On October 8, 2021, the President determined that it is in the national interest of the United States to waive the application of the prohibition in section 404(a) of the CSPA with respect to Iraq, Nigeria, Pakistan, and Turkey; and to waive the application of the prohibition in section 404(a) of the CSPA with respect to the DRC to allow for the provision of International Military Education and Training (IMET) and Peacekeeping Operations (PKO) assistance, to the extent that the CSPA would restrict such assistance or support; to waive the application of the prohibition in section 404(a) of the CSPA with respect to Libya, Somalia, and Yemen to allow for the provision of IMET and PKO assistance and DoD support provided pursuant to 10 U.S.C. 333, to the extent that the CSPA would restrict such assistance or support; and to waive the application of the prohibition in section 404(a) of the CSPA with respect to South Sudan to allow for the provision of PKO assistance, to the extent that the CSPA would restrict such assistance or support. The President further certified that the governments of the above countries are taking effective and continuing steps to address the problems of child soldiers.

On October 4, 2021, pursuant to a Presidential Delegation of Authority dated October 14, 2020, the Secretary of State determined that it is in the national interest of the United States to waive, in part, the application of the prohibition in section 404(a) of the CSPA with respect to Mali to allow for the issuance of licenses for direct commercial sales of military equipment, to the extent that the CSPA would restrict such assistance or support. The Secretary has further certified that the Government of Mali is taking effective and continuing steps to address the problem of child soldiers.

## SECTION 4. JUSTIFICATIONS FOR WAIVERS AND EXCEPTIONS.

MEMORANDUM OF JUSTIFICATION REGARDING THE PRESIDENT'S DETERMINATION AND CERTIFICATION PURSUANT TO THE CHILD SOLDIERS PREVENTION ACT OF 2008

Pursuant to section 404 of the Child Soldiers Prevention Act of 2008 (CSPA) (22 U.S.C. 2370c-1), the President has determined that it is in the national interest of the United States to waive the application of the prohibition in section 404(a) of the CSPA with respect to Iraq, Nigeria, Pakistan, and Turkey; to waive, in part, the application of the prohibition with respect to the Democratic Republic of the Congo, Libya, Somalia, South Sudan, and Yemen; and to waive the application of the prohibition to allow for the issuance of licenses for direct commercial sales of military equipment related to other U.S. government assistance programs for such countries that are not subject to the prohibition in section 404(a). The President has further certified that the governments of the above countries are taking effective and continuing steps to address the problem of child soldiers. The justification for this determination and certification with respect to each country is set forth in this Memorandum.

**The Democratic Republic of the Congo (DRC)**

The President has determined it is in the national interest of the United States to waive in part the application of the prohibition in section 404(a) of the CSPA with respect to DRC to allow for the provision of IMET and PKO assistance and has certified that the Government of the DRC is taking effective and continuing steps to address the problem of child soldiers.

The DRC plays a critical role in regional stability and security as malign influences continue to expand in the region. President Felix Tshisekedi has demonstrated that he is a willing partner committed to addressing instability and conflict in DRC but needs U.S. security assistance to succeed in defeating armed groups threatening local populations, including ISIS-DRC, also known as the Allied Democratic Forces (ADF). The country faces numerous longstanding challenges, including: inadequate infrastructure and human resources; the government's inability to project authority across the sizable country; corruption; a limited capacity to raise and manage revenues; outbreaks of infectious disease; as well as the destabilizing activity of numerous armed groups. Unlike during the years under former President Kabila, senior Congolese Armed Forces (FARDC) leadership now welcomes increased military cooperation with the United States. PKO and IMET funding for DRC would enable the United States to continue to work to increase professionalization of the military, allowing it to provide security within its territory while respecting human rights and international humanitarian law (IHL). In addition, PKO and IMET funding has supported areas such as military justice, civil-military relations, human rights training, IHL training, English language training, military engineering, and resource management and logistics, which not only enhances security provision, but also helps make the FARDC a more transparent, accountable institution. Building on this successful cooperation, the United States signed a memorandum of understanding (MOU) with the Government of DRC (GDRC) in August 2020, to launch new cooperation in civil military operations (CMO), strategic communications, engineering, and English language training. We are also working with the FARDC to revamp their human resources infrastructure which, among other things, would allow for enhanced accountability. President Tshisekedi has stated that he believes that improved security will enable health workers to counter COVID and other global health threats, stem illicit mineral smuggling and other illicit trafficking of natural resources and transnational criminal organizations, catalyze regional economic integration, and provide a much-needed boost to DRC's development.

A secure DRC is essential to attracting the foreign investment and business necessary to leverage the country's estimated $24 trillion in mineral wealth and improve the welfare and livelihood of millions of Congolese people. Greater stability and self-reliance is one of our top strategic objectives in the DRC. U.S. security assistance supports a more stable, democratically governed nation through improving the capacity and governance of core national-level security institutions, creating an environment conducive to economic opportunities, responding to urgent humanitarian needs, and addressing the root causes of conflict. As the DRC's principal partner in ending three Ebola outbreaks and a major contributor to humanitarian assistance overall, the United States can leverage existing relationships to multiply and synergize the impact of PKO and IMET assistance. This waiver will allow the United States to provide security assistance that will support improving governance and the rule of law, promoting peace and security, combating corruption, advancing respect for human rights, and creating conditions for greater U.S. investment and economic growth. It also offers an opportunity to improve civil-military relations and influence the next generation of FARDC leadership at a time when the government is undertaking initiatives to institute security sector reforms.

The GDRC is taking effective and continuing steps to address the problem of child soldiers and these efforts have accelerated since President Tshisekedi took office in January 2019. The number of prosecutions of both state and armed group actors for crimes involving human rights violations and abuses, including unlawful recruitment and use of children, is at an all-time high, as are the number of separations of children from armed groups. During the reporting period, there were no cases of unlawful use of children by FARDC in combat roles. In a landmark case, in November 2020 the government convicted ex-warlord and prolific child soldier recruiter Ntabo Ntaberi Sheka and sentenced him to life in prison. In December 2020, the Chair of the UN Working Group on Children in Armed Conflict welcomed "the continued commitment of the [GDRC] to consolidate the gains of its action plan to end and prevent the recruitment and use of children, sexual violence and the other four grave violations against children, to sustainably prevent the recruitment and use of children by its armed and security forces." An August 2020 decree by the Minister of Defense reiterating the zero-tolerance policy for FARDC support for armed groups that unlawfully recruit or use children led to the demobilization of 29 children from militias. Among the armed groups that most frequently use child soldiers in the DRC are Nyatura, Mai Mai Mazembe, Apa Na Pale, Kamuina Nsapu, ADF and Congrès National pour le Renouveau et la Démocratie (CNRD), which the FARDC are actively engaging to demobilize child soldiers. The government established a formal anti-trafficking inter-ministerial committee that monitored shelters, coordinated with NGOs and international organizations to identify and protect victims and drafted and launched the government's first national anti-trafficking action plan. In partnership with international organizations, the government also continued to undertake measures to prevent and end the use of child soldiers, including separating child soldiers from non-state armed groups, and conducting age verification screening of recruits into the FARDC. Regarding the three cases of children used unlawfully by FARDC officers in support roles, MONUSCO's Child Protection Section concluded that there had not been a pattern of recruitment or use of children and that military authorities took corrective action consistent with the national plan against the use of child soldiers. Additionally, military courts continued to demonstrate their ability and willingness to prosecute FARDC soldiers implicated in crimes involving children by initiating prosecutions of two FARDC soldiers accused of kidnapping children for the purpose of sexual enslavement and arresting an officer for his alleged role in a child trafficking ring.

**Iraq**

The President has determined it is in the national interest of the United States to waive the application of the prohibition in section 404(a) of the CSPA with respect to Iraq and has certified that the Government of Iraq (GOI) is taking effective and continuing steps to address the problem of child soldiers.

U.S. strategy in Iraq is focused on working with the GOI to achieve a unified, democratic, peaceful, and inclusive Iraq by defeating ISIS; promoting good governance and reform; supporting the increased capacity and professionalization of Iraq's security forces to bring them more in line with international best practices; promoting respect for human rights; and promoting the protection of Iraq's diverse and often marginalized communities. This waiver will allow the United States to continue to provide the assistance, support, and human rights training necessary to achieve these goals, and to help Iraq build its capacity to continue conducting effective, sustained counterterrorism operations against ISIS.

The GOI is taking effective and continuing steps to address the problem of child soldiers. As of 2020, Iraqi law prohibited recruitment of any person younger than age 18 into governmental armed forces, including governmental paramilitary forces, militia groups, or other armed groups. There were no reports of child soldiers used within the Iraqi military during the most recent CSPA reporting period, and the government reportedly provided training to military officers on child soldier issues. The Iraqi government's inter-ministerial senior committee

to monitor, evaluate, and report on human rights violations involving children in conflict zones in Iraq continued to closely coordinate with an international organization during 2020 and thus far in 2021. The government also continued to discuss the development of an action plan with an international organization to address the recruitment and use of children by militias under Iraqi government control.

The U.S. Government will continue to encourage the GOI to monitor progress and take additional actions to prevent the unlawful recruitment and use of child soldiers, and to identify, demobilize, rehabilitate, and reintegrate any children found serving in militias associated with the Popular Mobilization Forces (PMF). The United States government urges the GOI to continue its efforts to assert command and control over all elements of the PMF.

## Libya

The President has determined it is in the national interest of the United States to waive the application of the prohibition in section 404(a) of the CSPA with respect to the Government of National Unity (GNU) in Libya to allow for the provision of IMET and PKO assistance and DoD support provided pursuant to 10 U.S.C. 333 and has certified the GNU is taking effective and continuing steps to address the problem of child soldiers.

The Department of State assesses that immense insecurity coupled with social and economic hardships caused by periods of prolonged conflict are the primary drivers for the ongoing unlawful recruitment and use of child soldiers in Libya. In addition to GNU-aligned units, others, including the self-styled Libyan National Army, have engaged in the recruitment and use of child soldiers. The Department of State further assesses that the most durable solution to the unlawful recruitment and use of child soldiers will be a negotiated political settlement that ends Libya's instability and the cycles of conflict. The October 2020 ceasefire agreement, the Libya Political Dialogue Forum roadmap for elections in December 2021, and the establishment of the internationally recognized GNU, Libya's interim government, represent progress in this regard. The GNU and its military leaders are critical interlocutors in these discussions. In the absence of a political settlement, fighting could resume in Libya and further destabilize the broader region, creating the operating space for violent extremists to regroup.

The United States provides targeted assistance to strengthen key Libyan institutions and build security capacity, promote political reconciliation, and increase Libya's capacity to stand on its own through more effective governance.

The Department of Defense intends to re-engage with and build the capacity of the Libyan armed forces under 10 U.S.C. 333 in support of U.S. national interests in fighting terrorism, countering violent extremist organizations, and addressing improvised explosive devices. This support would be intended to provide carefully calibrated capacity-building for units not directly engaged in the current conflict.

The GNU is taking effective and continuing steps to address the problem of child soldiers, including by working closely with the U.S. government in the context of our recurring bilateral Security Dialogue to disarm and demobilize militias, which engage in child soldier recruitment and use. GNU security sector leaders are also closely engaged in UN-led efforts to implement the terms of the October 23, 2020, Libyan ceasefire agreement, which could remove the impetus for the unlawful recruitment and use of child soldiers. The U.S. government will continue to engage with the Libyan government to urge militias to cease the unlawful recruitment of children and to make proper referrals for such children. The GNU has also agreed to continue providing access to an international fact-finding mission created under the auspices of the UN Human Rights Council in June 2020 to document human rights abuses in Libya. The fact-finding mission has a mandate to document abuses by the Libyan government and non-state militias, including the unlawful recruitment or use of children.

## Nigeria

The President has determined it is in the national interest of the United States to waive the application of the prohibition in section 404(a) of the CSPA with respect to the Government of Nigeria (GON), and has certified that the GON is taking effective and continuing steps to address the problem of child soldiers.

This waiver is needed to achieve our national security goals during the next fiscal year; restricting security assistance for Nigeria would undermine our ability to carry out these national security objectives. Nigeria has shown notable progress in its efforts to end recruitment and use of child soldiers. Nigeria was included on the 2021 CSPA list due to the use of two children by the Civilian Joint Task Force (CJTF), a government-supported non-state armed group, at a single checkpoint in Borno State, which was immediately remedied. The quick remediation is a strong indication of progress Nigeria has made. The UN has also commended Nigeria for the progress it has made and the Secretary General's 2020 Children And Armed Conflict Report for Nigeria delisted the CJTF following a significant decrease in the recruitment and use of children through the continued implementation of its action plan, which was signed with the United Nations in 2017.

The U.S. government's current security assistance goals with Nigeria are to: build more capable, professional, and accountable Nigerian security forces that respect human rights and protect civilians while building its ability to participate in counterterrorism operations and build its maritime security capabilities. These goals are directly aligned with the interim National Security Strategy, Africa Strategy, Africa Bureau, and Mission Nigeria goals for security assistance.

A full waiver would allow the ability to provide IMET, FMF, PKO, EDA, and Department of Defense support provided pursuant to 10 U.S.C. 333. IMET funds training and education to increase the professionalization of the military, including through professional military education (PME) training in the United States. Nigeria would be eligible to receive FMF in FY 2022 through the Countering Chinese Influence Fund (CCIF). Section 333 is used to increase Nigeria's counterterrorism capabilities including supporting the Air-to-Ground Integration (AGI) program, which integrates intelligence, surveillance and reconnaissance (ISR), precision strike, and military intelligence to increase the effectiveness of the Nigerian Air Force while reducing the potential for civilian harm through human rights and IHL training in support of the nationally funded FMS Super Tucano A-29 lines of effort. Section 333 is also used to support a related ISR effort to provide tactical Unmanned Aerospace Systems (UAS). Lastly, section 333 is used to support counter-improvised explosive devices (C-IED) or route clearance programming which enables the Nigerian military to escort humanitarian assistance convoys in the volatile Northeast where the violence wrought by ISIS-West Africa and Boko Haram has displaced 1.8 million civilians and rendered 9.8 million in the Lake Chad region in need of humanitarian assistance. Nigeria may receive EDA for maritime security improvements in the form of former U.S. Coast Guard vessels, which have been used to improve maritime navigation and counter-piracy efforts in the Gulf of Guinea and Niger Delta. PKO-funded assistance to Nigeria includes support through the Trans Sahara Counterterrorism Partnership (TSCTP) program to build its counterterrorism capacities including AGI advisory support to increase Nigerian Air Force effectiveness and reduce civilian harm; advisory support for Nigerian military intelligence institutions; and Civil-Military Operations training. In FY 2022, support is expected to strengthen Nigerian cadre and training facilities at their basic and advanced infantry schools and develop curriculum for Nigeria's Defence Intelligence College. A full waiver of the application of the prohibition

in section 404(a) of the CSPA with respect to Nigeria allows the U.S. government to continue to provide security assistance in delivery of the above lines of effort. Waiver of the application of the prohibition on the issuance of export licenses for DCSis also critical to maintaining existing security cooperation efforts.

The Government of Nigeria is taking effective and continuing steps to address the problem of child soldiers, including the steps outlined above. In addition, consistent with the Action Plan signed with the UN, the Borno State government continues to work with the CJTF to release any child soldiers and cease the recruitment of any new child soldiers.

## Pakistan

The President has determined it is in the national interest of the United States to waive the application of the prohibition in section 404(a) of the CSPA with respect to Pakistan and has certified that the Government of Pakistan (GOP) is taking effective and continuing steps to address the problem of child soldiers.

Security assistance to Pakistan subject to the CSPA restriction supports critical U.S. objectives of promoting regional stability and counterterrorism in South Asia. The U.S.-Pakistan security relationship is vitally important to U.S. Afghanistan policy, including the ongoing withdrawal of U.S. troops and the evacuation of U.S. government personnel, U.S. citizens, certain third country nationals, and vulnerable Afghans. In particular, the United States relies heavily on Pakistan's influence with Taliban-affiliated groups in the ongoing Afghan negotiation process: Pakistan has facilitated Taliban leaders' participation in negotiations, which is one of the few venues by which the United States can exert influence on conditions in Afghanistan following the withdrawal of U.S. forces. The continued provision of U.S. security assistance will be essential for Pakistan's ability and willingness to play a helpful role in this process and to furthering our broader regional security objectives.

Further, the GOP is one of the only external actors potentially able to influence Taliban groups in Afghanistan that recruit and use child soldiers. While the United States must be clear-eyed that Pakistan has a limited ability to impact local recruitment decisions by Taliban-affiliated commanders in Afghanistan, preserving our security relationship with Pakistan gives us more space to encourage the GOP to engage with Taliban leaders on this issue.

The GOP is taking effective and continuing steps to address the problem of child soldiers. The Pakistani military does not recruit, use, or condone the use of child soldiers. In accordance with the Pakistan National Service Ordinance of 1970, the Pakistani military does not permit voluntary enlistment before the age of 16 or deployment for combat before the age of 18. Pakistan does not have compulsory recruitment at any age. The Government of Pakistan has expressed openness to working with us to identify ways to pressure the Taliban groups to cease its recruitment and use of child soldiers. Specifically, the Pakistani MFA noted in a July 2 press release that "it expects the sharing of 'credible information' on cases involving Trafficking in Persons as well as on allegations pertaining to support to armed groups using child soldiers." We will work with Pakistani authorities to develop an engagement plan over the coming year.

Finally, U.S. security assistance to Pakistan protects U.S. national security by helping maintain a system of end-use authorization monitoring and technical security for equipment, which the United States has already provided to Pakistan, such as F-16s and affiliated ammunitions. Halting U.S. assistance in these areas would put at risk the technical security of these sensitive U.S. military technologies. Further, in the wake of the Taliban takeover of Afghanistan, we will be increasingly reliant on Pakistan to conduct counterterrorism operations and allow continued access to their Air Lines of Communication, which is currently our only access.

## Somalia

The President has determined it is in the national interest of the United States to waive in part the application of the prohibition in section 404(a) of the CSPA with respect to Somalia to allow for the provision of IMET, PKO, and support provided pursuant to 10 U.S.C. 333 and has certified that the Government of Somalia is taking effective and continuing steps to address the problem of child soldiers.

The U.S. strategy in Somalia focuses on achieving a unified, peaceful, and democratic Somalia, with a stable and representative government able to defeat the foreign terrorist organization al-Shabaab; prevent terrorists and pirates from using its territory as a safe haven; provide for its own internal defense; and facilitate and foster development, growth, and political inclusion, while progressing towards long-term stability and prosperity. The waiver for IMET assistance will support the professionalization of the Somali military. This assistance enables the U.S. government to continue to fulfill its goal of assisting the Federal Government of Somalia (FGS) to build effective and rights-respecting security forces, which are indispensable to achieving greater military effectiveness. The waiver for PKO assistance, used in assisting efforts to form broad-based, multi-clan Somali security forces, will also support this goal. Further, a waiver for support provided by the Department of Defense pursuant to 10 U.S.C. 333 will allow for U.S. government assistance to build the Somali military's capacity to conduct effective, sustained counterterrorism operations against al-Shabaab and, through cooperation, help reinforce U.S. values including those related to preventing and responding to the unlawful recruitment and use of child soldiers.

The FGS is taking effective and continuing steps to address the problem of child soldiers. The FGS agreed on an action plan with the United Nations in 2012 to end the recruitment and use of children by the Somali National Army (SNA). While implementation of the action plan at the subnational level was limited until 2016, the SNA's Child Protection Unit (CPU), which is partially funded by the United States, has put particular emphasis on screening, training, and disseminating media to prevent the recruitment and use of child soldiers. The FGS continued to rely on the CPU, which uses UN-approved materials on the prevention of child soldiers in its SNA screenings. In 2020, the CPU reported that it screened 4,899 SNA soldiers, a three-fold increase from its screening of approximately 1,500 troops in 2019. The CPU did not find any cases of recruitment or use of children among the screened forces in 2020. The CPU raised awareness of child protection activities in line with UN guidelines through inter-ministerial meetings with the Ministries of Women and Human Rights Development, Internal Security, Justice, Health, and Education and developed and disseminated radio and print media content regarding the prevention of child recruitment and conscription in armed conflict. The CPU also led efforts within the Ministry of Defense to draft a human rights policy to ensure Somali armed forces' compliance with international human rights obligations and commitments, including those relating to the recruitment and use of children in armed conflict.

The United States continues to work with the FGS through the CPU and the UN to monitor progress and urge additional actions to prevent the unlawful recruitment and use of child soldiers and to demobilize, rehabilitate, and reintegrate children identified in the SNA or associated groups or previously associated with al-Shabaab.

## South Sudan

The President has determined that it is in the U.S. national interest to waive in part the application of the prohibition in section 404(a) of the CSPA with respect to South Sudan to allow for provision of PKO assistance and has certified that the Government of South Sudan is taking effective and continuing steps to address the problem of child soldiers.

PKO funds will be used to continue to support the Ceasefire and Transitional Security Arrangements Monitoring and Verification Mechanism (CTSAMVM), which includes regional and international personnel that monitor, identify, and report on parties responsible for violations of the December 2017 Agreement on the Cessation of Hostilities and the ceasefire provisions of the September 2018 Revitalized Agreement on the Resolution of the Conflict in the Republic of South Sudan (R-ARCSS). PKO funds will also be used to continue support to the Reconstituted Joint Monitoring and Evaluation Commission (RJMEC), which oversees overall implementation of the R-ARCSS. Notably, the R-ARCSS requires the Government of South Sudan to refrain from the recruitment and/or use of child soldiers. PKO funds have been used to support UNICEF's child soldier prevention efforts in South Sudan. Given the essential role that these monitoring mechanisms or efforts play as the parties to the R-ARCSS continue to work to implement the peace agreement and form a transitional government, waiving restrictions to PKO assistance is in the U.S. national interest to help avoid a return to conflict.

The Government of South Sudan is aware that recruitment and use of child soldiers is a problem and is taking effective and continuing steps to release child soldiers and prevent future recruitment and use. However, lack of capacity, poor communication, poor command and control of troops, and traditional cultural practices have impeded the government's ability to fully address the problem of child soldiers.

By signing and beginning to implement the R-ARCSS the government has affirmed its intent to end the recruitment and use of child soldiers. The government's efforts to address child soldiers are continually discussed at regular RJMEC and CTSAMVM meetings. South Sudan is party to the Optional Protocol to the Convention on the Rights of the Child on the involvement of children in armed conflict, and in the first half of 2020, armed groups released an additional 44 child soldiers. UNMISS and UNICEF worked with the government to establish a process for identifying child soldiers and advocating for their release through the Disarmament, Demobilization, and Reintegration (DDR) commission, established under the R-ARCSS. UNMISS reported that the government has been cooperative in its efforts to assess and verify child soldiers. In February 2020, the Government of South Sudan signed a comprehensive action plan with the UN to address the "six grave violations against children," including unlawful recruitment and use, through the establishment of high-level and technical committees to ensure independent and prompt investigations and prosecutions of government perpetrators of crimes involving unlawful recruitment or use of children. Despite commitments from the Government of South Sudan and armed groups, the UN continues to verify reports of unlawful recruitment or use of children committed by all parties to the conflict, and implementation of the action has been delayed. Significant work needs to be done to address this practice in South Sudan, and the U.S. government will continue to urge the government to take additional steps to prevent the unlawful recruitment or use of child soldiers. Multiple NGO reports indicate the continued unlawful recruitment and use of child soldiers by governmental armed forces and that the collection and verification of information pertaining to child soldier recruitment and use was often hindered by access constraints. A waiver to allow the continuation of PKO assistance to support CTSAMVM and RJMEC will help to address the Government of South Sudan's unlawful recruitment and use of child soldiers by allowing critical funding for the continued operation of these key oversight and monitoring mechanisms.

## Turkey

The President has determined it is in the national interest of the United States to waive the application of the prohibition in section 404(a) of the CSPA with respect to Turkey and has certified that the Government of Turkey is taking effective and continuing steps to address the problem of child soldiers.

U.S. strategic interests overlap with Turkey's in many areas, including countering terrorism, ending the conflict in Syria, and supporting NATO deterrence objectives. Turkey makes crucial contributions to NATO missions around the world. Our partnership with Turkey—which has the second largest standing military in NATO— enables us to project power in the region and defend NATO's eastern and southern flanks. Turkey helps constrain Russian influence in the region—both through Ankara's support of Ukraine's and Georgia's sovereignty as well as through Turkey's role in Syria, the Caucasus, and Libya. In Syria, Turkey's presence in the northwest acts as an important counterweight to indiscriminate offensives by the Assad regime, protecting some 4 million Syrians; new attacks there would be both a humanitarian catastrophe and likely launch a new wave of refugees into Turkey and Europe. Within its own borders, Turkey also supports four million refugees, including 3.6 million Syrians, making Turkey the largest refugee-hosting country in the world. The United States also has an important economic relationship with Turkey, one that generates upwards of $20 billion in annual bilateral trade. The Department approves arms sales to Turkey which protect U.S. interests in the region, maintain NATO deterrence, cohesion, and interoperability, and ensure Turkey can continue its productive role in NATO missions around the world.

Turkey was included on the 2021 CSPA list because Turkey provided support to the Sultan Murad Division, a Syrian non-state armed group that recruited and used child soldiers. The Department of State is not aware of evidence that Sultan Murad recruited child soldiers while in Turkey. This is the first time Turkey has been included on the CSPA list. Military assistance as well as the issuance of export licenses for Direct Commercial Sales (DCS) of military equipment to the Government of Turkey, are crucial to maintaining cooperation with Turkey that advance U.S. interests and strengthen the NATO alliance.

The Government of Turkey is taking effective and continuing steps to address the problem of child soldiers, including the recruitment or use of child soldiers by armed groups it supports, including the Syrian National Army (SNA) umbrella under which the Sultan Murad Division falls. Following Turkish pressure, in summer 2020 the SNA conducted training on the law of armed conflict. Following Turkish pressure, the Syrian Interim Government (SIG) Ministry of Defense, which is designated to oversee the SNA, also issued a decree in May 2020 prohibiting the recruitment or use of persons under the age of 18. Mission Turkey also continues to engage with the Turkish government to urge Turkey to cease support, including operational, in-kind, and financial support, to armed groups that recruit or use child soldiers. The U.S. government also continues to urge Turkey to use its influence with the SNA to end its recruitment and use of child soldiers, including in support roles.

**Yemen**

The President has determined that it is in the national interest of the United States to waive in part the application of the prohibition in section 404(a) of the CSPA with respect to Yemen to allow for provision of PKO, IMET, and DOD support provided pursuant to 10 U.S.C 333 and has certified that the Government of Yemen is taking effective and continuing steps to address the problem of child soldiers.

It is in the U.S. national interest to support efforts to bring about a negotiated political settlement led by the United Nations Office of the Special Envoy of the Secretary-General for Yemen and supported by the U.S. Special Envoy for Yemen. This waiver will allow assistance that directly contributes to efforts to advance the UN-led political process. Additionally, a critical element of ending the conflict in Yemen is our counterterrorism campaign and efforts to counter Iranian arms smuggling to the Houthis. Building the capacity of the Republic of Yemen Government (ROYG) to meet these goals furthers important U.S. government security interests to include enhancing homeland security, while simultaneously moving toward the goal of ending the conflict in Yemen. An end to the conflict will be critical in preventing the further deterioration of socio-economic and security conditions, ensuring long-term stability, and securing the space for restoring effective governance institutions that can partner with the United States and the international community in combatting terrorism. The Department of State assesses that the social and economic disruption caused by the conflict are the primary drivers for the ongoing unlawful recruitment and use of child soldiers in Yemen by all parties to the conflict.

To that end, PKO funding may be used to support UN Special Envoy efforts, including the participation of Yemen's military leadership, to reach an agreement to end the Yemeni conflict and allow for the resumption of a peaceful, inclusive, and Yemeni-led political transition.

IMET funding will be used to build capacity within the ROYG military by sending selected military officers to the United States for non-technical training. These Professional Military Education courses would focus on the professionalization of military forces and would bolster respect for the rule of law within the Yemeni Armed Forces. In turn, this training would support our efforts to prevent recruitment and use of child soldiers both now and in the future.

The Department of Defense intends to use its authority under 10 U.S.C. 333 to re-engage with and build the capacity of the Yemeni Armed Forces—the military of the recognized government of Yemen—in support of U.S. national interests in fighting terrorism, countering violent extremist organizations and illicit smuggling, and ensuring freedom of navigation through the Bab Al-Mandeb Strait. Critically, this focused support would increase Yemeni capacity to counter malign Iranian activity, including the smuggling of lethal weapons that are contributing to the continuation of the conflict. This carefully calibrated support would be provided to the Yemen Border Guard, Yemen Coast Guard, and Yemen Special Operations Forces units not directly engaged in the current battlefront in the region surrounding Ma'rib, but rather working to limit malign third-party influences contributing to the on-going conflict and crisis.

The ROYG is taking effective and continuing steps to address the problem of child soldiers. However, military escalation by the Houthis, political tensions with the Southern Transitional Council, the COVID-19 pandemic, and the ROYG's exercise of only nominal control of large areas of the country during the reporting period have posed serious challenges. In March 2020, the government launched a rehabilitation program for Houthi-recruited child soldiers in Ma'rib, in collaboration with NGOs and funding support from King Salman Humanitarian Aid and Relief Center (KS Relief). In the face of decreased funding from KS Relief during the summer of 2020, the ROYG pursued funding from European missions to continue programming in Mar'ib to address child soldiering. In October 2020, at the direction of President Hadi, the ROYG pursued reports by the UN that armed forces under its control had engaged in recruitment or use of child soldiers by requesting details from the UN Task Force as to specific military units, dates, and/or locations as to the incidents for the President to address. On June 6, 2020, the ROYG Information Minister Muammar al-Eryani condemned Houthi child soldier recruitment. On June 7, 2021, the ROYG Ministry of Legal Affairs and Human Rights organized a workshop in Aden on detecting child soldier recruitment and the Deputy Minister, Dr. Samir al-Shaibani, affirmed the government's commitment to implement the road map jointly developed with the United Nations that the ROYG signed in December 2018 to end and prevent child solider recruitment. Public statements by government officials against the unlawful recruitment and use of child soldiers and improvements in reporting, prevention, and protection mechanisms demonstrate that, even with its limited capacity, the Government of Yemen continues to address the issue of child soldiers in a meaningful manner.

## SECTION 5. DESCRIPTION AND AMOUNT OF ASSISTANCE PROVIDED PURSUANT TO A WAIVER.

The information provided below only includes assistance obligated as of April 5, 2022. Additional assistance will be obligated during FY 2022.

**Democratic Republic of the Congo**

*International Military Education Training*                                                                    $158,213.26

As of April 5, 2022, IMET funding was obligated for the following activity:
military professionalization training.

*Peacekeeping Operations*                                                                                    $2,998,537.00

As of April 5, 2022, PKO funding was obligated in FY 2022 to support a military engineering capacity building project.

**Iraq**

*International Military Education Training*                                                                    $461,952.46

As of April 5, 2022, IMET funding was obligated for the following activity:
military professionalization training.

**Nigeria**

*International Military Education Training*                                    $308,034.36

As of April 5, 2022, IMET funding was obligated for the following activity:
military professionalization training.

*Peacekeeping Operations*                                    $281,985.00

As of April 5, 2022, PKO funding was obligated in FY 2022 to support military intelligence
capacity building as part of the Trans Sahara Counterterrorism Partnership program.

***10 U.S.C.333***                                    $1,357,703.45

As of April 5, 2022, DoD section 333 funding was obligated for the following activities: training
and equipment.

**Pakistan**

*International Military Education Training*                                    $439,072.49

As of April 5, 2022, IMET funding was obligated for the following activity:
military professionalization training.

**Somalia**

*International Military Education Training*                                    $216,891.57

As of April 5, 2022, IMET funding was obligated for the following activity:
military professionalization training.

*Peacekeeping Operations*                                    $27,884,475.23

As of April 5, 2022, PKO funding was obligated for Somali National Army and Somali Ministry
of Defense for the following activities: logistical support; stipends; advisory support; training; equipment;
and program oversight.

***10 U.S.C. 333***                                    $3,705,191.38

As of April 5, 2022, 333 funding was obligated for the following activities: training and equipment.

**South Sudan**

As of April 5, 2022, no PKO funds have been obligated.

**Turkey**

*International Military Education Training*                                    $100,749.45

As of April 5, 2022, IMET funding was obligated for the following activity:
military professionalization training.

**Yemen**

*International Military Education Training*                                    $526,295.66

As of April 5, 2022, IMET funding was obligated for the following activity:
military professionalization training.

GLOSSARY

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ASEAN | **Association of Southeast Asian Nations** |
| ECOWAS | **Economic Community of West African States** |
| EU | **European Union** |
| EUROPOL | **European Union Agency for Law Enforcement Cooperation** |
| FARC | **Revolutionary Armed Forces of Colombia** |
| GRETA | **Council of Europe's Group of Experts on Action against Trafficking in Human Beings** |
| IDP | **Internally displaced person** |
| ILO | **International Labour Organization** |
| INTERPOL | **International Criminal Police Organization** |
| IOM | **International Organization for Migration** |
| ISIS | **Islamic State of Iraq and Syria** |
| LGBTQI+ | **Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex** |
| NGO | **Nongovernmental organization** |
| OAS | **Organization of American States** |
| OSCE | **Organization for Security and Co-operation in Europe** |
| UN | **United Nations** |
| UNHCR | **United Nations High Commissioner for Refugees** |
| UNICEF | **United Nations Children's Fund** |
| UNODC | **United Nations Office on Drugs and Crime** |
| UN TIP Protocol (Palermo Protocol) | **Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime** |

**Note:** Local currencies have been converted to U.S. dollars ($) using the currency exchange rates reported by the U.S. Department of the Treasury on December 31, 2021.

# PHOTO CREDITS

Inside Cover: Sara Hylton

Page iii: Matilde Simas

Page v: Sara Hylton

Table of Contents: Panos Pictures/Karla Gatchet

Page 3: Smita Sharma

Page 4: Elisabetta Zavoli

Page 5: Katie Orlinsky

Pages 6-7: Matilde Simas

Page 8: Getty/kecl

Page 10: Smita Sharma

Page 12: Getty/Azri Suratmin

Page 13: Matilde Simas

Page 15: Elisabetta Zavoli

Page 16: Panos Pictures/Tommy Trenchard

Page 17: Katie Orlinsky

Page 18 (descending order):
Elisabetta Zavoli, Getty/Lisa Schaetzle

Page 19: Getty/David Buchmann/UIG

Page 21: Katie Orlinsky

Page 23: Elisabetta Zavoli

Page 25: Emily Teague

Page 27: Smita Sharma

Page 29: Katie Orlinsky

Page 30 (left to right): Getty/Johner Images,
Getty/Per-Anders Pettersson

Page 31: Emily Teague

Page 32: Matilde Simas

Page 36: Emily Teague

Page 38: Getty/Mathias Genterczewsky/EyeEm

Page 40: Getty/David Engelhardt

Page 41: Getty/Paula Bronstein

Page 42: Matilde Simas

Page 44: Getty/Sean Justice

Page 46: Panos Pictures/Atul Loke

Page 49: Getty/Edwin Remsberg

Page 50: Street Art Mankind/Loic Ercolessi

Page 53: Emily Teague

Page 54: Getty/Taheer Photography

Page 57: Sara Hylton

Page 59: Panos Pictures/Nyani Quarmyne

Page 63: Katie Orlinsky

Page 64: Emily Teague

Page 68: Katie Orlinsky

Page 77:  Katie Orlinsky

Page 614:  Katie Orlinsky

Page 624: Katie Orlinsky

Back Inside Cover: Street Art Mankind/Jo Di Bona

# ACKNOWLEDGMENTS



**THE STAFF OF THE OFFICE TO MONITOR AND COMBAT TRAFFICKING IN PERSONS IS:**

Carter Allen
Sylvia Amegashie
Andrea Balint
Shonnie R. Ball
Getoria Berry
David Biggs
MacKenzie Bills
Michelle Cooper Bloom
Alexandria Boling
Katherine Borgen
Gregory Borgstede
Kelsey Brennan
Ravi Buck
Makira Burns
Carla M. Bury
Erin Chapman
Chane Corp
Sarah Davis
Steven Davis
Amelia Didier
Vivian Ekey
Sarah Evans
Daniel Evensen
Anna Fraser
Lauren Frey

Mark Forstrom
Rachel Fox Smothermon
Lucia Gallegos
Janine Gannon
Beatriz Garcia Velazquez
Brianna Gildner
Natasha Greenberg
Andrew Grimmer
Takiyah Golden
Olivia Hasegawa
Tegan Hare
Jocelyn Harrison
Caitlin B. Heidenreich
Ashley Hernandez
J. Brett Hernandez
Sonia Helmy-Dentzel
Julie Hicks
Crystal Hill
William Hine-Ramsberger
Megan Hjelle-Lantsman
Jennifer M. Ho
Ariana Holly
Moira Honohan
Renee Huffman
Veronica Jablonski

Harold Jahnsen
Sarah Jennings
Maurice W. Johnson
Kari A. Johnstone
Chelsea Kaser
Catherine E. Kay
Emily A. Korenak
Kendra L. Kreider
Christine Leming
Rebecca Lesnak
Abigail Long
LaTina Marsh
Jason Martin
Myrtis Martin
Sunny Massa
Monica Maurer
Kerry McBride
Jasmine McClam
Rendi McCoy
Estelle McKinney
Maura K. McManus
Leah Meyer
Todd Miller
Kristy Mordhorst
Rebecca Morgan

Ericka Moten
Ryan Mulvenna
Cristina Narvaez
Nicole Netzel
Jen Nilson
Amy O'Neill Richard
Zury Palencia
Sarah Phillips
Marissa Pietrobono
Justin D. Pollard
Patrick Read
Andrea E. Reed
Shanique Reed
Stephanie Reed
Casey Risko
Adrienne Sgarlato
Jessica Singh
Stephen Shade
Kaela Shear
Soumya Silver
Susan Snyder
Desirée Suo Weymont
Francesca J. Tadle
Atsuki Takahashi
James Taylor

Chaiszar Turner
Wanda Toney
Kathy Unlu
Melissa Verlaque
Matthew Villemain
Kathleen Vogel
Myrna E. Walch
Frances Wallman
Bianca Washington
Tatum West
Shelly Westebbe
Danielle (Nikki) Wetsel
Shanice Williams
Harrison York
Joshua Youle
Janet Zinn
Salia Zouande

*Special thanks to Bukola Oriola, Dawn Schiller, Jeri Moomaw, Jessa Dillow Crisp, Megan Lundstrom, and Tanya M. Gould, and other subject matter experts with lived experience from the Human Trafficking Expert Consultant Network for their contributions to the introductory essay.*

*Special thanks to Daniel Kim, Lamya Shawki El-Shacke, and the creative services team at Global Publishing Solutions.*

*In loving memory of Wanda Ramsey. Thank you for your years of service and support to the TIP Office and our annual TIP Report.*

Haiti AR_001105