

Haiti AR_001107

Haiti AR_001108




UNITED STATES DEPARTMENT OF STATE PUBLICATION
OFFICE TO MONITOR AND COMBAT TRAFFICKING IN PERSONS

Designed by A/GIS/GPS, July 2022

Haiti AR_001109

**UNCLASSIFIED**
SBU





| | |
|---|---|
| **MRN:** | 22 PORT AU PRINCE 1392 |
| **Date/DTG:** | Sep 23, 2022 / 230156Z SEP 22 |
| **From:** | AMEMBASSY PORT AU PRINCE |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | PGOV, PHUM, PINR, ECON, ENRG, ASEC, CASC, KPAO, KCRM, WFP, HT |
| **Captions:** | SENSITIVE |
| **Subject:** | Haiti: September 22, Fewer Protests, Some Looting, Continued Fuel and other Shortages due to Blockades, but Business and Daily Activities Resuming |

1. (SBU) **Key Points:**

- Although several barricades remain and continue to block areas around the ports, there were fewer protests.
- The Task Force is unable to clear access roads to the fuel terminal Varreux due to barricades and G9 gang presence.
- Businesses continue to suffer and fuel shortages persist, affecting power plants, but the airports are functioning and banks are open.
- Some humanitarian assistance continues, while other help is hindered by looting, blockades, and fuel shortages.
- Media report traffic and commerce throughout the country, despite continued fuel shortages.
- Embassy operations are near normal thanks to OBO and MSAU support.
- Consular has been creative with U.S. Direct Hires taking on LE Staff duties when needed.

**Security Update**

2. (SBU)
Protests continued overnight in some locations throughout the country. In some instances, the intensity appeared to have escalated. The
reasons for protesting have not changed. According to several Haitian National Police (HNP)

department directors, the crowds are getting bolder and more determined to cause damage.
According to the Director of International Narcotics and Law Enforcement
 (INL), the HNP continues to perform to the best of their abilities, despite limited resources.
HNP continues to face the same resource challenges.  HNP continues to work with the joint
Task Force clearing the streets, but some are still blocked and barricaded.
 Although several barricades remain and continue to block areas around the ports,
Post Regional Security Office (RSO) reports that the HNP promptly cleared a small number of
unmanned barricades set up along Port-au-Prince's
 main throughfare, Route Delmas, without incident.



4.
(SBU)
 The prison directorate (DAP) reported that an unknown number of inmates escaped the
women's prison in Cabaret, located on the northern outskirts of Port-au-Prince in the
Arcahaie District
 of the West department.  DAP did not confirm if either inmates or HNP were injured at the time
of this reporting.  Earlier, a social media posting from Cabaret showed a woman who was ill and
died.  There is no confirmation she was a Cabaret prison detainee.

5.  (SBU)
 Grand-Anse Department Director (DDGA) reported that protesters were active outside the
entire day.  The crowd attacked the home of former Senator Sorrel Yacinte and tried to loot it.
They were pushed back by private security.  HNP subsequently responded and
 dispersed the crowd.  Protesters appeared to be more aggressive while some wore hoods to
shield their identity.  Some protesters were arrested but later released because the commissariat
holding cells have limited space to detain them.

6.  (SBU) The South Departmental
 Director (DDS) experienced similar protests, which were violent at times.  Protesters are
targeting NGOs and big commercial establishments.  Many streets remain blocked and

barricaded.

7.  (SBU) The North-West Departmental
 Director (DDN) reported protests all day September 21.  Protesters attacked the HNP, and one protestor was killed.  He is identified as the leader of "Guepe Noir Gang," also known as "Maitre Carrefour."  He was the leader that planned the attack on the CARITAS
 warehouse a few days ago.

8.  (SBU) The South-East Departmental
 Director (DDSE) reported protests as well and the crowd attempted to loot some stores, but the HNP was able to deter and disperse the crowds.

**Economic/Commercial Update**

9.  (SBU) On September 21, Caracol
 Industrial Park tenants and energy operator NRECA agreed to cut power to manufacturing operations to funnel energy to the Caracol expatriate residences and surrounding communities. As of 5:00 pm on September 21, Caracol had 18,000 gallons left of heavy fuel
 remaining.  NRECA will disconnect the power supply each night in hopes the current fuel supply will last until September 25.  NRECA has purchased 174,000 gallons of heavy fuel from fuel distributor Dinasa but has been unable to retrieve the fuel from Terminal
 Varreux in Port-au-Prince due to roadblocks and trenches outside the port.  On September 22, Dinasa CEO told Post he was not aware of any pending heavy fuel import orders for NRECA but said he would further investigate the matter.

10.  (SBU) The Dinasa CEO has prioritized
 providing heavy fuel oil to Port-au-Prince private electrical powerplant E-Power, although he said if the government told him to prioritize NRECA instead he would.  The Director General of the national utility company Electricity of Haiti reported E-Power
 was currently one of only two operational powerplants in Port-au-Prince on September 18. (Note:  Port-au-Prince's electrical grid is separate from the NRECA operations.  End Note.) Dinasa chooses to prioritize E-Power given that a previously scheduled heavy
 fuel vessel was indefinitely postponed, due to the terminal's inability to unload the vessel in a timely manner.  E-Power and NRECA should be able to utilize diesel to operate in lieu of heavy fuel oil.  Based on E-power's average consumption, Dinasa said
 it would have approximately enough heavy fuel oil to last E-power until October third.

**Airports**

11.  (SBU)
Flightsâ€¯operated normally September 22â€¯from Port-au-Prince and Cap-Haitien to the United States.  â€¯Two of three U.S. airlineâ€¯operational staffâ€¯continuedâ€¯staying overnight near the airportâ€¯to insure flight operations.â€¯ The three U.S. airline general managers told
Postâ€¯September 21 that they and theirâ€¯headquartersâ€¯intend to continue normal flight operations.  â€¯A Spirit Airlines representative told Post its
Cap-Haitien flight would start carrying enough fuel to make the roundtrip without refueling, as Cap-Haitien airport only had about a three-day stock of jet fuel.â€¯

**Ports**

12.  (SBU) The fuel terminal Varreux
(TEVASA) and the Haitian International Port remain inaccessible, after an unsuccessful September 21 HNP intervention to restore access.  Four importers said it is urgent to unblock ports, noting they believe the HNP needs further support.  HNP had begun an operation to secure the TEVESA port area, preventing fuel trucks from leaving.  Multiple sources reported gunfire near TEVESA late afternoon September 21 as part of an HNP operation to restore access to the port.

13.  (SBU) Caribbean Grain Company
S.A., one of the largest rice importers in Haiti, said a ship with 30,000 metric tons of rice successfully discharged its cargo September 20, adding to its 17,000 metric tons already in country to be distributed.  An additional order of 15,000 metric tons
is scheduled for delivery once roads are accessible.  Additionally, Post confirmed that WFP is considering commercial options to replace looted food commodities.

**Public/Private Banks**

14.  (SBU)
On September 22, private businesses, banks, and grocery stores in Port-au-Prince remained

open following the removal of barricades by HNP and the onset of relative calm throughout the city.

**Humanitarian Update**

15.  (SBU) The diesel reserves which USAID's supply chain partner, Procurement and Supply Management (PSM), uses to maintain the appropriate temperature for approximately $6.5 million worth of U.S.-funded health commodities, are perilously low and will run out by September 26.  The PSM implementer is discussing with USAID how to safely transport up to 5,000 gallons of fuel (approximately 22 days' worth) to its warehouse by September 26.  WFP reports that the road to the SHODECOSA Industrial Park remains blocked, preventing ships from offloading their cargo to include food and water reserves.

16.  (U) Humanitarian organizations like Concern Worldwide report all staff safe, activities resuming, and no plan to evacuate anyone while ACTED's residence in Jérémie was looted of mattresses, appliances, televisions, five motorcycles and other items on September 20.  The International Organization for Migration's compound in Les Cayes was looted on September 21.  As a result of recent events, CARE has shifted to remote/home-based work, allowing for continued support to select activities.  Despite CARE offices being unoccupied, neighbors and HNP have thwarted efforts to loot a sub-office in Jérémie.  In Les Cayes, the WFP sub-office was attacked and looted September 21, with approximately 700 metric tons of foodstuffs stolen.

**Media/Social Media Updates**

17.  (SBU) Local media reported a return of traffic and commerce throughout the country, especially in Port-Au-Prince.  However, they also noted that fuel is still not available at many gas stations and the fuel terminal is inaccessible.



**Consular Operations**

20. (U) The Consular section provided
regular ACS and IV services September 22. Consular is tracking three U.S. citizen
Kidnappings for Ransom and learned of the prison break at Cabaret Women's Prison where one
U.S. citizen is serving a 10-year sentence. Post is following up with prison authorities.
ACS call volume remained at normal levels.

SENSITIVE BUT UNCLASSIFIED

| Signature: | Stromayer |
|---|---|

| Drafted By: | PORT AU PRINCE:Fette, Joseph A (Port-Au-Prince) |
|---|---|
| Cleared By: | Economic Section:Kemp, Robert E (Port-au-Prince) |
| | POL:Sanders, Robert P (Port-au-Prince) |
| | INL/PROG:Mergy, Jennifer (Port-au-Prince) |
| | RSO:Reece, Scott (Port-au-Prince) |
| | MGT:Peterson, Richard J (Port-au-Prince) |
| | USAID/EXO:Oddo, Oghale A (Port-Au-Prince) |
| | PD:Cole, Charles G (Port-au-Prince) |
| | POL:McCabe, Christopher (Port-au-Prince) |
| | CONS/AG:Bongiovanni, Kristin (Port-au-Prince) |
| Approved By: | EXEC:Stromayer, Eric W (Port-au-Prince) |
| Released By: | PORT AU PRINCE:Fette, Joseph A (Port-au-Prince) |
| Info: | NATIONAL SECURITY COUNCIL WASHINGTON DC *ROUTINE*; DIA |
| | WASHINGTON DC *ROUTINE*; CIA WASHINGTON DC *ROUTINE*; |
| | WESTERN HEMISPHERIC AFFAIRS DIPL POSTS *ROUTINE*; HAITI |

| | COLLECTIVE *ROUTINE* |
|---|---|
| **XMT:** | CARACAS, AMEMBASSY |

| **Dissemination Rule:** | Archive Copy |

**UNCLASSIFIED**
SBU



**Subject:**          FW: Haiti: October 1, Calm Reigns over Haiti, but the Lights Might Go Out

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.



**Sent:** Saturday, October 1, 2022 8:48 PM
**Cc:**
**Subject:** Haiti: October 1, Calm Reigns over Haiti, but the Lights Might Go Out

**<span style="color:green">UNCLASSIFIED</span>**
SBU

**Info Office:**          WHA, TNC_NARC, WHA_ABSC, INR_AO_WHA

| | |
|---|---|
| **MRN:** | 22 PORT AU PRINCE 1440 |
| **Date/DTG:** | Oct 02, 2022 / 020044Z OCT 22 |
| **From:** | AMEMBASSY PORT AU PRINCE |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | PGOV, PHUM, PINR, ECON, ENRG, ASEC, CASC, KPAO, KCRM, AID, HT |
| **Captions:** | SENSITIVE |
| **Reference:** | 22 PORT AU PRINCE 1426 |
| **Subject:** | Haiti: October 1, Calm Reigns over Haiti, but the Lights Might Go Out |

1. (SBU) **Key Points:**

- Relative quiet around Haiti and in Port-au-Prince as RSO teams escorted Embassy personnel to grocery stores.
- A Haitian Coast Guard member was shot in the face while driving to work with four colleagues near the National Port Authority.

- Lack of fuel plagued commerce, transportation, police operations, and power production as the Embassy implemented plans to acquire fuel from Embassy Santo Domingo.

**Security Update**

2.  (SBU) The Regional Security Office (RSO) received no reports of and tracked no barricades, blockages, or demonstrations in metropolitan Port-au-Prince.  The Haitian National Police (HNP) continued its customary checkpoints and normal roving patrols in the areas around Embassy facilities and housing compounds.  All Embassy Guard Force positions were staffed with absenteeism consistent with pre-fuel crisis/unrest levels.  RSO protective teams conducted multiple movements throughout Port-au-Prince including support for Embassy grocery shuttles.

3.  (SBU) After a Haitian Coast Guard member was shot in the face while driving to work with four colleagues near the National Port Authority, his vehicle was set on fire by the assailants, according to the HNP.  Having dug trenches in the road, the G9 gang and its allies from Bel Air, Cité Soleil, and Jérémie Wharf maintained control of access to the Varreux fuel terminal.  (Note:  The Special Weapons and Tactics unit reported that the gangs near Varreux repaired the stolen excavator that HNP had dismantled. End Note.)  The HNP reported that the North, North East, and South Departments were quiet.  Residents in the South even assisted the HNP to clear a make-shift roadblock in Les Cayes—HNP donated the wood to the local prison for cooking (see photo).  The HNP in the North received 100 gallons of fuel from the communications company Digicel on September 30, but the North East and the South lacked fuel as well as tear gas.  The South director rejected a request from a political party to demonstrate October 1-17.



**Economic/Commercial Update**

4.  (SBU) Rice importers unloaded 10,000 metric tons of rice October 1 with plans to distribute bags to the South Department by barge October 1-3 because the North Department is still difficult to reach even by barge due to volatility.  The importers reported rice prices have risen to 5,000 HTG ($40.00) per 25 kg bag, but USDA local staff believe prices to be higher.  Private banks will begin operating three days per week, due to lack of fuel and security.

**Caracol Industrial Park and CODEVI Free Trade Zone near the DR**

5.  (SBU) On September 30, the Dominican Republic (DR) Ministry of Industry and Commerce denied Caracol's request to purchase fuel.  Although the Caracol complex has remained closed since September 25

due to lack of fuel, tenant S+H purchased generators and some diesel, attempting to sustain the housing compound for the only workers that have not departed for the DR.  As the border crossing near CODEVI reopened after closing September 29, citizens resumed activities, and the border market was bustling.  However, in Cap-Haitien a shortage of food, fuel, and water remained due to roadblocks and business closures.

**Airport Operations**

6.  (SBU) On October 1, many U.S. airline employees in Port-au-Prince returned to their homes and families, while those without fuel to travel remained in a hotel near the airport.  Nonetheless, the employees plan to return to the hotel between October 2-3 to ensure airline operations will continue.

**Power Supply**

7.  (SBU) The National Electricity Utility (EDH) did not have fuel to provide power to any of Haiti's ten departments.  EDH told Post it will have meetings with the International Development Bank to assess and optimize Port-au-Prince's soon-to-be remaining energy supplier, the Pelligre Hydro-Electric power plant.  E-Power, Port-au-Prince's other electricity provider, was projected to run out of fuel October 3.

**Humanitarian Update: No Malice towards the Humanitarian Community**

8.  (SBU) On September 30, USAID discussed the demonstrations and looting of humanitarian agency warehouses and disaster response stockpiles with Dr. Jerry Chandler, the Director General of the Directorate of Civil Protection (DGPC).  According to Dr. Chandler, there was no general negative sentiment among the population concerning humanitarian agencies, but certain actors viewed NGO facilities as easy targets for looting.  He noted that these losses, including several of DGPC's Emergency Operations Centers around Haiti, eroded its ability to respond.

**Media/Social Media Updates**

9.  (U) Headlines in the most prominent news outlet, *le Nouvelliste*, noted the impact of the fuel crisis, the protests, and the remarks of former Ambassador to Haiti Pamela White.  *Le National* led with "*Le mouvement de protestation a perdu en intensité*" ("The protest movement has lost momentum") and "*La reprise progressive des activités*" ("The gradual resumption of activities"); however, those articles detailed how planned movements next week show the demands of the protesters have not changed and that high prices and lack of transportation have inhibited economic activity despite businesses operating.  *Le National* also published two Op-Eds regarding the government's plan to open the school year on October 3.  Both opined that this will be a huge challenge for the government, and one detailed how the start was postponed due to the crisis, which has worsened.

10.  (U) On Twitter, the September 29 incident at CODEVI (reftel) remained a topic of conversation, with users discussing comments from former Senator Jean Charles Moïse to wit:  Dominican soldiers entering CODEVI indicates that Prime Minister Ariel Henry has lost control of Haitian territory, which can only be regained through his resignation.

**Embassy Operations**

3

12.  (SBU) American staff and eligible family members utilized POVs and Embassy shuttle services to shop at Belmart and Delimart grocery stores October 1 to replenish food supplies.  Shuttle service will be available again October 2 pending confirmation that stores are open.  The Embassy's new permanently assigned U.S. medical provider arrived the week of September 26, assuming management of the Health Unit.

███████████████████████████████████████████████
████████████████████████████████

## Consular Operations

14.  (U) Consular, which is closed for the weekend, had nothing to report.

SENSITIVE BUT UNCLASSIFIED

| | |
|---|---|
| **Signature:** | Stromayer |

| | |
|---|---|
| **Drafted By:** | PORT AU PRINCE:Fette, Joseph A (Port-Au-Prince) |
| **Cleared By:** | ECON:Tafoya, Samantha N (Port-au-Prince) |
| | CONS/AG:Bongiovanni, Kristin (Port-au-Prince) |
| | PD:Cole, Charles G (Port-au-Prince) |
| | USAID:Oddo, Oghale |
| | A/DCM:Kemp, Robert E (Port-au-Prince) |
| | POL:McCabe, Christopher (Port-au-Prince) |
| | INL/PROG:Mergy, Jennifer (Port-au-Prince) |
| | MGT:Peterson, Richard J (Port-au-Prince) |
| | RSO:Reece, Scott (Port-au-Prince) |
| **Approved By:** | EXEC:Stromayer, Eric W (Port-au-Prince) |
| **Released By:** | PORT AU PRINCE:Fette, Joseph A (Port-au-Prince) |
| **Info:** | NATIONAL SECURITY COUNCIL WASHINGTON DC *ROUTINE*; DIA WASHINGTON DC *ROUTINE*; CIA WASHINGTON DC *ROUTINE*; WESTERN HEMISPHERIC AFFAIRS DIPL POSTS *ROUTINE*; HAITI COLLECTIVE *ROUTINE* |
| **XMT:** | CARACAS, AMEMBASSY |

| | |
|---|---|
| **Action Post:** | NONE |
| **Dissemination Rule:** | DIS_WHA, DIS_TNC_NARC, DIS_WHA_ABSC, DIS_INR_AO_WHA |

## UNCLASSIFIED
SBU

UNCLASSIFIED

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 22 PORT AU PRINCE 1542 |
| **Date/DTG:** | Oct 17, 2022 / 171639Z OCT 22 |
| **From:** | AMEMBASSY PORT AU PRINCE |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | ECON, ECIN, ETRD, EPET, PGOV, EWWT, ASEC, ENRG, KCOR, KSAN, AID, CDC, 4R, HT |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 22 PORT AU PRINCE 1440<br>B) 22 PORT AU PRINCE 1114<br>C) 22 PORT AU PRINCE 1066<br>D) 22 PORT AU PRICE 45 |
| **Subject:** | Haiti: Fuel Shortages and Port Blockages Increase Food Insecurity |

1.  (SBU) Summary:  Since the main ports in Port-au-Prince were blocked on their landward sides beginning September 12, the immediate challenges to food security and particularly rice imports has been fuel scarcity, coupled with increased insecurity and road barricades. These issues have created significant food supply chain disruptions. The disruptions—alongside low domestic food production and decreased food stocks—have reinforced inflationary trends for food.  The rise in food prices now outpaces the overall national inflation rate of 29 percent.  Efforts to open the Varreux fuel terminal and all Port-au-Prince commercial ports continue and would be the first short-term steps to reducing food insecurity in Haiti.   End Summary.

SITUATION AT THE PORTS SINCE SEPTEMBER 12

2.  (SBU) Since gangs cut off land access to several ports beginning the week of September 12, the primary challenges to food security and particularly rice imports have been heightened insecurity around the ports, road barricades, and lack of fuel, all of which have created significant food supply chain disruptions.  For example, Haiti's Caribbean Grain Company S.A., one of Haiti's top four rice importers, reported that a ship carrying 18,000 metric tons of rice could not fully discharge and distribute due to roadblocks and that the lack of fuel prevented ground transportation to the North and South departments (refs A, B).   Similarly, on October 4 shipping lines Seaboard and CMA temporarily halted their container shipping operations after weeks of unrest that prevented essential container transfers.  The three Port-au-Prince ports now have a three-week backlog of containers on their docks, decreasing storage space that in turn has prevented shipping lines, including some carrying food and general cargo from coming to Haiti.

UNCLASSIFIED

DECREASED FOOD SUPPLY

3.  (SBU) Although accurately assessing the amount of food in country remains difficult, it is clear warehouses storing imported products have limited storage space remaining.  Food importers' stocks were already low before the September riots, due to macroeconomic issues, including a rapid currency devaluation, that reduced all importers' purchasing power (ref C).  Various food sector sources have told Post that small importers have low stocks of food remaining inside, and that increased insecurity has restricted farmers in rural areas from bringing produce to urban markets. They also underscored recent events of humanitarian aid having been looted.  The Famine Early Warning System's October report noted that "an increase in the number of people in crisis is very likely," and explained that the summer and fall harvests would be below normal due to the lack of capital to finance the summer/fall seasons' crops inputs.

4.  (SBU) Foreign Agriculture Service's Haiti local staff and USAID staff affirmed that food scarcity is amplified in the Southern and Northern departments because of their dependence on food arriving from the metropolitan Port-au-Prince area, lack of fuel, and unrest in the North.  Large rice importers explained deliveries to the North and particularly Cap-Haitien have been increasingly difficult due to unrest and the ransacking of warehouses.  The importers added that on October 5 they could no longer move by barge a scheduled delivery of 70,000 25-kilogram bags of rice to the South department, since gangs have now augmented their sea presence with small motor vessels. However, the October 12 arrival of a U.S. Coast Guard vessel near the Port Lafito provided the rice importers coverage to continue barging rice during the days the cutter was on station.

RISING FOOD PRICES

5.  (SBU) Decreased food supply and distribution coupled with rising agricultural input prices have caused acute spikes in food prices, increasing the average cost of a household food basket well beyond the national rate of  29 percent, which was calculated before the ongoing fuel shortages.  Even before the unrest, inflation of staple food products was extremely high.  Year-on-year from April 2021 – April 2022, imported rice rose by 40 percent, imported cooking oil rose 84 percent, imported flour rose 60 percent, and imported sugar rose by 84 percent.  USAID has received anecdotal reports from across the country that food inflation over the last month is increasing quickly, further exacerbating food security and personal security.  The USAID emergency surge team, whose members reside throughout Haiti, reported that since August the price of a bag of flour increased by 130 percent, cooking oil by 80 percent, and spaghetti by 100 percent in the South.  The data table below, which was collected from consumers and sellers in a market in the northern town of  Port-de-Paix, further documents staple food price increases during the period of heightened unrest.    This is corroborated by rice importers, who told Post the price of a 25-kilogram bag of rice has increased by 61 percent since protests erupted late September 12, which disrupted merchandise distribution and indirectly increased food prices.  The dearth of fuel additionally increased food prices as agricultural transportation and food production heavily rely on it.

| Port-de-Paix,  octobre 04,  2022 | | | | | |
|---|---|---|---|---|---|
| **Variation in the prices of basic necessities due to fuel scarcity** | | | | | |
| items | Description | unit of measurement | Price before sept. | Current price | |
| 1 | Rice | bag of 8 pots | 3400 ($ 29.06 usd) | HTG 5,500.00 | 47.01 usd |
| 2 | Black beans | pots | 750 ($ 6.41 usd) | HTG 1,200.00 | 10.26 usd |
| 3 | oil | Galon de cinq litres | 1400 ($ 11.97 usd) | HTG 1,600.00 | 13.68 usd |
| 4 | Flour | pots | 300 ($ 2.56 usd) | HTG 450.00 | 3.85 usd |
| 5 | Corn | pots | 450 ($ 3.85 usd) | HTG 600.00 | 5.13 usd |

FUEL REMAINS LINCHPIN

6.  (SBU) Humanitarian organizations, grocery stores, food importers, and warehouses cannot operate without fuel, which means access to fuel terminal Varreux is the linchpin to improving food stability.  Riots in Port-au-Prince, that led to felled telephone lines, raiding of commercial business, and vandalized government offices, decreased over the month of September and early October, as did fuel.  Rice importers have said their distribution capacity has decreased by 70 percent, in part due to fuel scarcity.  On October 3, the WFP shared that in addition to losing fuel to looters it has not had a fuel delivery since August.  The transportation of food internally requires fuel that has been quoted as high as $40 per gallon on the fuel black market.  This price increase is expected to pass through to Haitian households, only furthering food instability and scarcity.

SUSTAINED SUPPLY CHAIN ISSUES IN FUTURE THREATEN FOOD SECURITY

7.  (SBU) Obstruction of the ports will obviously have a domino effect on the economy and hinder food security.  High demurrage costs, terminal and storage port fees have accrued as the main shipping ports have remained inaccessible by land for four weeks.  Private port manager Caribbean Port Services warned that once barricades were gone and transportation normalized, there would be further supply chain issues regarding equipment and port capacity to deliver goods.  In addition to the pass-through fuel cost impact, Haitian households will likely experience higher food insecurity because of the increased supply chain cost related to port fees.  Mitigating long term macroeconomic impacts would require government intervention and potentially increased multilateral financing.

8.  (SBU) Comment:  Opening the Varreux fuel terminal would be the first short-term step to reduce food instability in Haiti.  However, reintroducing fuel to markets would require

synchronized government and private sector management and messaging, coordinated service station re-opening, pre-established social compensatory campaigns, and political harmonization.  Post has received numerous reports from trusted interlocutors that politically and economically motivated actors exploited general disenchantment over fuel price increases and customs reforms to destabilize the current government and further their own interests.  Their actions have led many to believe that the structural reforms alone provoked violent protest, but political involvement blurs the truth.  Analyzing popular Haitian political sentiments and ideology is increasingly difficult when oligarchs provide financing for protest materials, incite via local media the targeted looting of humanitarian warehouses, and orchestrate the G9 gang's fuel terminal blockade (Ref D).  Popular democratic protest movements exist in Haiti, but it is unclear how organic they really are, and long-term food stability would require holding both political and economic bad actors accountable.  End Comment.

SENSITIVE BUT UNCLASSIFIED

| | |
|---|---|
| **Signature:** | Stromayer |

| | |
|---|---|
| **Drafted By:** | ECON:Jones, Allecia (Port-au-Prince) |
| **Cleared By:** | POL:USAID: Bushy, Adam (Port-au-Prince) |
| | McCabe, Christopher (Port-au-Prince) |
| | A/ECON: Tafoya, Samantha (Port-au-Prince) |
| | A/DCM: Kemp, Robert (Port-au-Prince) |
| **Approved By:** | EXEC:Stromayer, Eric W (Port-au-Prince) |
| **Released By:** | PORT AU PRINCE:Jones, Allecia |
| **Info:** | NATIONAL SECURITY COUNCIL WASHINGTON DC *ROUTINE*; CIA WASHINGTON DC *ROUTINE*; DEPT OF TREASURY WASHINGTON DC *ROUTINE*; DEPT OF COMMERCE WASHINGTON DC *ROUTINE*; DEPT OF HOMELAND SECURITY WASHINGTON DC *ROUTINE*; DEPT OF LABOR WASHINGTON DC *ROUTINE*; DEPT OF AGRICULTURE WASHINGTON DC *ROUTINE*; US TRADE REP WASHINGTON DC *ROUTINE*; CDR USSOUTHCOM MIAMI FL *ROUTINE*; SOUTHCOM IESS MIAMI FL *ROUTINE*; WESTERN HEMISPHERIC AFFAIRS DIPL POSTS *ROUTINE*; HAITI COLLECTIVE *ROUTINE* |
| **XMT:** | CARACAS, AMEMBASSY |

| | |
|---|---|
| **Dissemination Rule:** | Archive Copy |

**UNCLASSIFIED**
SBU

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 22 PORT AU PRINCE 1562 |
| **Date/DTG:** | Oct 21, 2022 / 210018Z OCT 22 |
| **From:** | AMEMBASSY PORT AU PRINCE |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | PGOV, PHUM, PINR, ECON, ENRG, ASEC, CASC, SHLH, KPAO, KCRM, KHIV, AID, CDC, DO, HT |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 22 PORT AU PRINCE 1544<br>B) 22 PORT AU PRINCE 1510 |
| **Subject:** | Haiti: Relative Calm Continues, First Suspected Case of Cholera Detected in the Dominican Republic |

1. (SBU) **Key Points:**

- Post reported no barricades overnight in Port-au-Prince and received no reports of barricades on October 20.  Routes from the Embassy to the airport remained clear and the airport continued operations.
- Despite Varreux fuel terminal's continued inaccessibility, Port- au-Prince ports and Varreux have been relatively calm with regard to gang violence since an October 15 robbery at Varreux.  Seaborne gang activity has remained  low since the  October 12 arrival of a U.S. Coast Guard cutter.
- The Haitian National Police (HNP) did not conduct operations at Varreux fuel terminal October 20.
- CDC Haiti is tracking the report of the first suspected cholera case in the Dominican Republic.
- Some agencies have begun to destroy equipment per their mandatory schedules relative to possible further reduction in operations.  Others are now approximately 10 days away from initiating destruction protocols.
- The ongoing fuel shortage has forced NGOs to adjust security and fuel usage plans.
- There are still currently no local means in place for the Embassy to obtain diesel.

**Security Update**

2.  (SBU) Post's Regional Security Office (RSO) reported no barricades overnight in Port-au-Prince and received no reports of barricades set up on October 20.  The areas surrounding the

Embassy and the housing compounds and the routes from the Embassy to the airport remained open.  The HNP continued its checkpoints and roving patrols in the areas around the Embassy and RSO reported all Embassy Local Guard Force positions were staffed at pre-fuel crisis/protest levels.

**HNP Update**

3.  (SBU) Inspector General (IG) Nassar of the Inspector General of the HNP reported a critical incident, which involved one HNP officer responding to a large violent demonstration in Cap-Haitien.  He had his M4 rifle taken from him during the incident, but it was later returned to the HNP by the local population.  IG Nassar further advised there were expected additional protests in the North October 20.

4.  (SBU) The Director of the South Department (DDS) reported Les Cayes had experienced daily protests aimed at the HNP.  The protesters claimed the HNP has used excessive force when responding to demonstrations.

5.  (SBU) The Department Director of the West Department-1 (DDO-1) advised the HNP was able to successfully get a fuel tanker of gasoline and diesel from the Thor fuel terminal through the National Port Authority, and it was delivered to HNP Headquarters October 19.

6.  (SBU) The Director of the West Department-1 (DDO-1) reported the HNP made two arrests and seized one vehicle in connection with an ongoing kidnapping case in the Port-au-Prince area.

7.  (SBU) Director of the West Department-2 (DDO-2) advised there was an ongoing operation in the Tapage area, also known as Eddy 1.  (Comment:  The operation was near the U.S. Embassy and personnel may have heard possible gunfire.  End Comment.)

8.  (SBU) Director of the Penitentiary reported no deaths at the National Penitentiary in the past 24 hours.

**Economic/Commercial Update**

9.  (SBU) Haiti's National Office of Civilian Aviation reported having about two months of jet fuel at Port-au-Prince's Toussaint Louverture International Airport, and that the airport staff intend to procure more fuel.

10.  (SBU) A local bank executive with Capital Bank S.A. told Post the bank may further reduce service hours, and that banks have had trouble accessing currency due to the continued fuel crisis.  Fuel retailers have prioritized Haiti's Central Bank, which has been able to remain open for routine operations.

11.  (SBU) In terms of gang violence, Port- au-Prince Ports and Varreux fuel terminal have been relatively calm since an October 15 robbery at Varreux (ref A).  Seaborne gang

activity has remained low since the October 12 arrival of a U.S. Coast Guard cutter (ref B), according to private port operators and a UN contact.  HNP did not conduct operations at Varreux fuel terminal October 20.

**Health Update**

12.  (U) As of October 19, 91 percent of USAID-supported health facilities were open and offering health services (185 out of 204).  The provision of fuel, however, would be critical to support reliable and high-quality health services, including maternal and child health.  Indeed, while most facilities remained open, health care personnel were working in challenging conditions.  Albert Schweitzer Hospital, a state-of-the-art NGO-run tertiary care facility offering services to a broad catchment area in Artibonite department, reported it had been relying exclusively on solar power during the day since running out of fuel on October 14, and it was using flashlights for patient care during the night.

13.  (U) CDC Haiti is tracking the first suspected cholera case in the Dominican Republic.  The case is allegedly a Haitian woman residing in the Altagracia area.  In collaboration with the Pan American Health Organization and CDC DR, CDC Haiti is working to confirm the case's status and point of origin in Haiti.  Of note, there have been anecdotal reports of acute watery diarrhea cases in the northeast region of Haiti that borders the Dominican Republic.

**Humanitarian Update**

14.  (SBU) The ongoing fuel shortage has forced NGOs to adjust security and fuel usage plans.  USAID's partner Mercy Corps is coordinating with other international NGOs to identify locations where fuel remains available and safe routes exist for transporting larger volumes of fuel.  The NGO has the capacity to store up to 1,500 gallons of fuel in its sub-offices in Cap-HaÃ¯tien, MiragoÃ¢ne, and JÃ©rÃ©mie communes, but is avoiding stocking large amounts of fuel due to security risks.  Mercy Corps maintained a stock of approximately 300 gallons of fuel as of October 18.

15.  (SBU) USAID's partner ACTED suspended its field activities during the week of October 17 following exhaustion of its fuel supplies in areas where it operates.  Electricity is nearly unavailable on the public grid, communication networks are failing, and drinking water supply is down, the NGO reported.

**Media/Social Media Update**

16.  (U) In an interview on Radio MÃ©tropole's talk show "Le Point" October 20, Jean MoÃ¯se Destin, a professor of International Relations at the University of Haiti, said the HNP was incapable of solving its gang problem.  He argued, "The current situation looks more like an urban guerrilla war, so well-trained people and adequate equipment are needed to solve the problem."  Destin argued a foreign military presence could work with the Haitian police and army to solve the security problem without interfering in the internal and political affairs of the

country.  He also pointed out that armed assistance differed from an occupation, which is when the country is totally controlled by a foreign force.

17.  (U) A Twitter user reported the HNP were allegedly welding pieces of metal onto the armored vehicle that they recently received.  Many commenters accused the government of having wasted money on the vehicles, while others accused the person who posted the tweet of endangering the lives of police officers.

18.  (U) At mid-day October 20, Twitter and Facebook users commented on a post by the Noailles Artist Village in Croix-des-Bouquets, indicating it had suffered a deadly attack.  The Spanish Embassy condemned the attack and the Swiss Embassy posted that it responded to an appeal from the artist village to help secure its artwork.

19.  (U) The most predominant topic on both social and traditional media was the death of Haitian musician Michael (Mikaben) Benjamin.  *Le Nouvelliste* and *Le National* newspapers published op-eds citing his death and calling for national unity on October 18 and 19, respectively.

20.  (U) The media continued to report on UN Security Council discussion of resolutions on sanctions and a potential multinational force, as well as reports that the Bahamas is prepared to send troops to Haiti as part of any multinational force.

21.  (U) Haitians also shared the news on social media that former Senator John JoÃ«l Joseph pleaded innocent in a Florida court October 19 in connection with the assassination of President Jovenel MoÃ¯se.

22.  (U) A video circulated on WhatsApp of a man wearing a military uniform with a Dominican flag emblem on his shoulder, grabbing a Haitian flag from the hands of another man in front of a group of people, cutting the flag with a knife, throwing the pieces on the ground, and stomping them.  Former Prime Minister Claude Joseph posted about the video on Twitter, decrying the lack of respect Dominicans have for Haiti.





## Consular Update

26.  (SBU) Consular continues to provide all routine ACS and emergency services, while also tracking three U.S. citizen kidnappings for ransom.

SENSITIVE BUT UNCLASSIFIED

| | |
|---|---|
| **Signature:** | Stromayer |

| | |
|---|---|
| **Drafted By:** | PORT AU PRINCE:McCabe, Christopher (Port-au-Prince) |
| **Cleared By:** | INL/PROG:Mergy, Jennifer (Port-au-Prince) |
| | RSO:Reece, Scott (Port-au-Prince) |
| | ECON:Tafoya, Samantha N (Port-au-Prince) |
| | MGT:Peterson, Richard J (Port-au-Prince) |
| | USAID:Link, Jennifer M |
| | PD:Cole, Charles G (Port-au-Prince) |
| | CONS/AG:Bongiovanni, Kristin (Port-au-Prince) |
| | HHS/CDC:Grant-Greene, Yoran |
| | POL:Sanders, Robert P (Port-au-Prince) |
| **Approved By:** | EXEC:Stromayer, Eric W (Port-au-Prince) |
| **Released By:** | PORT AU PRINCE:McCabe, Christopher (Port-au-Prince) |
| **Info:** | DIA WASHINGTON DC *ROUTINE*; CIA WASHINGTON DC *ROUTINE*; NATIONAL SECURITY COUNCIL WASHINGTON DC *ROUTINE*; HAITI COLLECTIVE *ROUTINE*; WESTERN HEMISPHERIC AFFAIRS DIPL POSTS *ROUTINE* |
| **XMT:** | CARACAS, AMEMBASSY |

| | |
|---|---|
| **Dissemination Rule:** | Archive Copy |

**UNCLASSIFIED**
SBU

Current Cable 33137153



**CABLE PRODUCED BY**
*AMEMBASSY MEXICO*

| | |
|---|---|
| **Processed** | 01 Dec 2022 - 00:10 |
| **Doc #** | 33137153 |
| **EMS #** | 22-HQS165635230 |
| **Serial #** | AMEMBASSY MEXICO 003134 |
| **DTG** | 2022-12-01 00:10:00 |
| **TOPICS** | TERR and HSEC |
| **Countries** | Worldwide |

**Addressing**

To Addressees
ZEN/SECSTATE WASHDC

Field Dissem
None

Points of Contact
• Office:
  Not Available

CL BY:

DRV FROM:

**(U) (SBU) Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico**

Access Controls

| | | | |
|---|---|---|---|
| Classification | UNCLASSIFIED/// | | |
| COI Level | 1 | | |
| Product Type | Cable | Producers | AMEMBASSY MEXICO |
| Reporting Type | CABLE | Audience | IC |

Summary: (U) (U) NONE

22 MEXICO 3134

SENSITIVE

E.O. 13526: N/A
TAGS: PGOV, PREL, PREF, PHUM, SMIG, KNCV, SHLH, MX, ECON, EINT, ELTN, ETRD
SUBJECT: (SBU) Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico

1. (SBU) Summary:  In the wake of a U.S. district court decision to end Title 42-based operations by December 21, Mexican authorities have expressed concern regarding an upcoming surge of migrants.  This concern is corroborated by comments from many migrants and asylum seekers in Mexico, who report they plan to attempt entry into the United States once Title 42 is no longer in effect.  Mexicos National Institute of Migration (INM) has little capacity to deal with further migration streams (whether arriving from the south or returned from the United States), having already seen a dramatic rise in apprehensions since installing 234 checkpoints in southern Mexico in October.  As a result, Mexico has little remaining detention shelter space and limited ability to repatriate most of those who are apprehended.  Commercial trade flows and non-trade traffic at the U.S.-Mexico border could experience disruptions under a post-December 21 migrant surge.  End Summary.

2. (SBU) Comment:  The Government of Mexicos (GOM) inability to provide shelter and repatriate migrants beyond current limits shows post-Title 42 flows may overwhelm local authorities ability to conduct enforcement absent significant action.  Even if the United States were to grant parole to other nationalities, INM and CBP encounter data shows northbound flows of irregular migrants not eligible for parole would quickly fill the gap.  End comment.

(SBU) End of Title 42 Could Incite Migrant Surge, Some Unprepared

3. (SBU) In the wake of the November 15 U.S. district court decision to end Title 42-based operations by December 21, there is widespread unease among GOM and NGO partners regarding the prospect of an upcoming migrant surge.  In discussions with embassy and consulate officers, GOM officials at the federal, state, and local levels have expressed concern regarding constrained capacity to apprehend, detain, and/or shelter the current levels of irregular migrants and asylum-seekers (ref A), much less those resulting from an additional surge.  Four INM staff members in Ciudad Acuna told Consulate Nuevo Laredo PolOffs they were unprepared for large-scale, irregular migrant flows to the border and noted their top priority was to prevent gatherings akin to the

Haiti AR_001130

September 2021 influx of Haitian migrants to Del Rio that disrupted commercial
traffic (ref B).  Chihuahua state officials in Ciudad Juarez expressed concern
the lifting of Title 42 would spur migrants to travel in large groups to the
border to seek asylum, noting such movements could quickly overwhelm shelters
and strain other migrant resources.

(SBU) President Lopez Obrador Calls for Venezuela Parole Process Expansion to
Other Nationalities, but Shelters in Mexico Already at Capacity

4. (SBU) While President Lopez Obrador has called for the United States to
expand the current Venezuelan parole process to include other nationalities,
shelter capacity  which humanitarian actors note would be important to
post-Title 42 orderly processing  has already surpassed occupancy limits.
Incoming northbound flows after December 21 may further test shelter
constraints, humanitarian actors expressed.  In Tijuana, a makeshift shelter at
the Unidad Deportiva housing over 300 Venezuelans is in quarantine until
December 16 due to a chicken pox outbreak, while private shelters are fully
occupied, according to consulate officials.  Another Tijuana shelter  La
Embajada Migrante  reportedly also announced its plan to close in response to
alleged increased criminal activity and police extortion.  Piedras Negras,
Coahuila shelters have no remaining capacity.  Shelters across Tamaulipas are
similarly overcrowded or closed due to security concerns.  According to one
shelter director in Reynosa, a group of Haitians reportedly attacked a shelter
guard on November 29 out of frustration related to conflicting information they
are receiving regarding the Title 42 exception process.  Shelters in Ciudad
Juarez, Hermosillo, and Nogales have also surpassed their capacity, IOs
reported, while Mexico City shelters are at a 191 percent occupancy rate.
Overcrowding and health issues in the shelter in San Pedro Tapanatepec, Oaxaca
housing 8,000 migrants prompted calls from local authorities and humanitarian
actors to relocate to another facility.

(SBU) Migrants Take a Wait and See Approach to Policy Changes

5. (SBU) Most migrants and asylum seekers currently in Mexico plan to wait
until Title 42 is lifted on December 21 before attempting to enter the United
States, IOs reported on November 25.  Speculation regarding how the United
States will manage the end of Title 42 and what policy decisions come next will
affect migrants decisions, IOs told PolOffs.  They assessed the typical
seasonal slowdown in migration during December and early January would likely
occur this year as well, however, despite the lifting of Title 42.
Highlighting the estimated 50,000 migrants and asylum seekers congregated along
Mexico's northern border, UNHCR emphasized the need for an orderly and humane
process to manage flows seeking entry into the United States and offered to
provide input into any such system to ensure it satisfies protection
principles.

(SBU) Messaging Important to Combat Post-Title 42 Misinformation

6. (SBU) IOM flagged fraud and abuse concerns, which they characterized as
rampant in the current Title 42 exception process, cautioning that any
migration management process should avoid providing too much control to local
organizations in determining who was permitted access to the United States.
IOM stressed the need for clear and proactive U.S. messaging on what post-Title
42 migration enforcement would look like to combat misinformation from human
smuggling operations that would falsely promise the border is open.  IOs
indicated they would continue efforts to provide accurate information to
migrants, and IOM and UNHCR reported they were mobilizing increased assistance
to migrants and shelters in northern Mexico as temperatures drop and the need
for blankets, heating units, and warm clothing grows.

Haiti AR_001131

(SBU) INM Apprehensions Spike, Repatriations Remain Low


7. (SBU) Since the implementation of the Venezuelan parole process, Mexico has increased migrant interdictions more than three-fold, but lagging repatriations demonstrate limitations to Mexicos enforcement, according to DHS officials at Post.  INM apprehensions of Cubans, Nicaraguans, and Venezuelans sharply increased after adding 234 checkpoints along highways and migration routes in southern Mexico on October 8, but repatriations have remained low due to INMs limited ability to repatriate those nationalities.  Currently, INM conducts one repatriation flight with approximately 135 Nicaraguans per week, while Cubans and Venezuelans are mostly detained and then eventually released, INM told DHS.  The dramatic rise in apprehensions of these nationalities led to maximum occupancy in INM detention centers, prompting authorities to contain approximately 18,000 migrants in non-detention facilities in Oaxaca and 17,000 in Chiapas by late October.  INM replaced an open-door shelter in Oaxaca with migrant processing facilities in Tapachula and Huixtla, Chiapas after local authorities complained about overcrowding and health issues.  INM told DHS the Huixtla and Tapachula facilities had thus far prevented caravans but projected that continued high flows in Tapachula could cause them to start.


(SBU) Migrant Influx Could Disrupt Commercial Trade, Increase Wait Times
8. (SBU) Disruptions to commercial trade flows at the U.S.-Mexico border could occur in the face of a migrant surge, warned Mexican associations representing customs agents and the freight transport sector (ref C).  Migrant arrivals in large groups would overwhelm customs authorities, reduce traffic lanes, and lengthen wait times at ports of entry.  Customs and transport contacts cautioned migrants could board commercial trucks in waiting areas leading to POE inspection lines without operator knowledge, harming trade flows.  They also warned that if U.S. border states were to implement additional vehicle inspections after vehicles cleared CBP inspection areas  as Texas did in April northbound commercial traffic would be severely disrupted.


(SBU) Concerns about Disruption to Pedestrian and Vehicle Lanes Vary


9. (SBU) Migrant stakeholders along the U.S.-Mexico border conveyed to PolOffs that migrant arrivals in large groups after Title 42 ends would pose low-to-moderate risks of disruption to non-trade traffic.  In Nuevo Laredo, contacts told consulate PolOffs the risk is low, noting migrant numbers were unlikely to spike due to the precarious security environment and cartel threats deterring migrant arrivals.  CBP Tucson told Consulate Nogales PolOffs they would likely need to close private vehicle lanes and pull personnel to process asylum seekers if a large group of migrants were to present at the POE, increasing wait times for vehicle crossings.  Northern Coahuila officials were confident that the aggressive border security and highway checkpoints maintained by their state officials, coupled with their swiftness in enacting stringent measures to maintain order in Piedras Negras and Ciudad Acuna, put them in a low risk category for disruptions.  Officials in Tijuana and Matamoros voiced concern migrants could flood pedestrian lanes, forcing them to shut down normal pedestrian traffic.
SALAZAR

Attached Image

12/12/22, 11:14 AM    Remarks by Ambassador Linda Thomas-Greenfield at a UN Security Council Briefing on Haiti - United States Mission to the Un…

Case 6:23-cv-00007 Document 93-5 Filed on 03/24/23 in TXSD Page 28 of 199

United States Mission to
the United Nations

# Remarks by Ambassador Linda Thomas-Greenfield at a UN Security Council Briefing on Haiti

Ambassador Linda Thomas-Greenfield
U.S. Representative to the United Nations
New York, New York
October 17, 2022

AS DELIVERED

Thank you, Mr. President. And let me thank Special Representative La Lime for your briefing and for your work. I'd also like to thank in advance Madam Kontoleontos of the International Organization of La Francophonie. And I'd also like to acknowledge Foreign Minister Geneus of Haiti and Foreign Minister Alvarez of the Dominican Republic and Representative Fuller of Belize, who is here on behalf of the CARICOM. We look forward to hearing your remarks and your important regional perspectives.

Recently, *The New York Times* published a heartbreaking story on Haiti. It features Christelle Pierre – a civilian who knows the instability and violence that plagues Haiti all too well. Gang members descended on Christelle's neighborhood in Port-au-Prince when she was six months pregnant. And in their wake, they left death and destruction. Her neighborhood was burned to the ground. Her husband was shot in the head and left to burn in the street.

Now, Christelle and her newborn baby are homeless – in a country engulfed in crisis. As she told *The Times*, "There is no shelter, no food, no medicine, no work. There is only chaos."

Colleagues, if there was ever a moment to come to the aid of Haitians in dire need, it is now. Faced with extreme violence and instability, Haiti's leaders and people are crying out for help. Haiti's Prime Minister and Council of Ministers, as well as the Secretary-General, have called on the international community to address the deteriorating security situation and increase our humanitarian support. In response, our teams

Privacy · Terms

Haiti AR_001133

12/12/22, 11:14 AM    Remarks by Ambassador Linda Thomas-Greenfield at a UN Security Council Briefing on Haiti | United States Mission to the Un…

Case 6:23-cv-00007   Document 93-5   Filed on 03/24/23 in TXSD   Page 29 of 199

are on the ground, working alongside Haitian health workers and NGOs to help address the cholera outbreak and assist others in need. And we remain the single largest donor of humanitarian assistance to Haiti.

In the coming days, the United States will deliver additional assistance to Haiti, including critical medical support. We are also deeply focused on the security situation. One way we've helped, alongside Canada, was to coordinate the delivery of vital Haitian government-purchased security equipment to the Haitian National Police. That included tactical and armored vehicles and other supplies. This assistance will help the Haitian National Police counter gang violence and re-establish stability and security under the rule of law.

And the United States is proactively going after the bad actors. Our new visa restriction policies target current or former Haitian government officials and other individuals believed to be connected to street gangs and other criminal organizations. There must be consequences for those that support the facilitation of illicit arms or narcotics trafficking.

But a problem of this magnitude cannot be solved by one country or even by a handful of partners in the region. It requires a concerted international response. It requires robust international cooperation. And it requires urgent action by this Council. It is not enough to express our concerns or to condemn the violence. As mandated in the Charter, we need to mobilize the resources and power of this Council and the broader United Nations.

That is why the United States and Mexico have worked closely to draft two new resolutions – resolutions we hope this Council will unanimously support.

The first resolution would impose financial sanctions on criminal actors that are inflicting so much suffering on the Haitian people. It is time to hold them accountable for their actions. It would target those responsible for gang violence, for trafficking arms, for attacking UN personnel, for kidnapping innocent citizens, and for human rights abuses and sexual and gender-based violence. And it would go after individuals blocking Haiti's ports and the delivery of humanitarian assistance to the Haitian people. The UN sanctions regime aims to stop these criminal actors from having access to reputable financial institutions. And it would work to freeze their assets and prohibit their international travel.

Additionally, its arms embargo provisions would prevent the direct or indirect supply, sale, or transfer of arms to criminal gangs and their leaders, as designated by this Council. The draft resolution specifically lists Jimmy Cherizier – also known as "Barbeque" – as the subject of such sanctions. He is directly responsible for the devastating fuel shortage that is crippling the country. By passing this resolution, we would take concrete actions to hold him – and so many other violent criminals – to account.

Haiti AR_001134

The second resolution we're working on would authorize a non-UN international security assistance mission to help improve the security situation and enable the flow of desperately needed humanitarian aid. This reflects one of the options that the Secretary-General recommended the Security Council consider. This is also a direct response to Prime Minister Henry's and the Haitian Council of Ministers' request for international assistance to help restore security and alleviate the humanitarian crisis. And we have also consulted broadly with other stakeholders in Haiti, including civil society and the private sector.

This resolution will propose a limited, carefully scoped, non-UN mission led by a partner country with the deep, necessary experience required for such an effort to be effective. At the United Nations and across the United States government, we will work with partners and other Council members to set defined and specific parameters for the mission, and the United States will consider the most effective means to directly support, enable, and resource it.

This non-UN international security assistance mission would operate under Chapter VII of the UN Charter. And it would facilitate international support to the Haitian National Police, as well as the Coast Guard. By helping improve the security situation on the ground, the delivery of desperately needed aid could reach those in need and address the ongoing cholera crisis. Ultimately, such a mission will rely on support from UN Member States, and this draft resolution explicitly asks for contributions of personnel, equipment, and other resources.

This is the moment for this Council – and the world – to step up.

To be clear, we are keenly aware of the history of international intervention in Haiti and specifically of concerns about the Council authorizing a response that could lead to an open-ended peacekeeping role. This Security Council and the international community must look at its role differently than it has in the past. We must seek a different course, one that can better respond to the humanitarian and security crisis in Haiti and be able to directly address the needs of the Haitian people.

With the dire humanitarian consequences on a level we have not seen previously, we need effective, yet targeted, international assistance. And that needs to be coupled with support for political dialogue and backed by sustained international pressure on the actors supporting gang activity. This will provide the Haitian people with the breathing room they need – breathing room that will allow them to think beyond survival and focus on charting a better future.

Colleagues, a Member State has reached out to us, the United Nations, for urgent assistance. Haiti has come to us in a time of need. As Security Council members charged with maintaining international peace and security, it is our responsibility to come together to help restore peace and security for the people of

Haiti AR_001135

Haiti. We must work with Haiti to re-establish the rule of law in a way that respects human rights. And we must hold those responsible for so much pain and violence accountable.

Families across Haiti who don't know where their next meal will come from are counting on us. The humanitarian and health workers desperately trying to contain a cholera outbreak are counting on us. And victims of gang violence like Christelle Pierre are counting on us.

These two resolutions will help Haiti build a brighter, more secure future. And I ask all of you for your support.

Thank you, Mr. President.

### 

This is the official website of the U.S. Mission to the United Nations. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.





# COLLABORATIVE MIGRATION MANAGEMENT STRATEGY

JULY 2021

NATIONAL SECURITY COUNCIL



THE WHITE HOUSE
WASHINGTON

Haiti AR_001137



# TABLE OF CONTENTS

I.    Executive Summary
II.   Strategic Environment
III.  U.S. Interests
IV.   Desired End State
V.    Strategic Objectives
VI.   Lines of Action

Haiti AR_001138



# Executive Summary

The humanitarian situation in the Northern Triangle (El Salvador, Guatemala, and Honduras) has deteriorated significantly in recent years, prompting an increasing number of people to make the difficult choice to migrate.  In addition to the long-standing drivers of migration, including violence, lack of employment opportunities, and corruption, the COVID-19 pandemic, recurrent droughts, and two hurricanes in November 2020 have devastated communities, created crisis-level food insecurity, and placed the Northern Triangle on the map with other global humanitarian emergencies.  This situation demands both immediate responses and a new, strategic approach for managing regional migration in the medium- to long-term.

 The United States has strong national security, economic, and humanitarian interests in **promoting safe, orderly, and humane migration.**

The United States has strong national security, economic, and humanitarian interests in promoting safe, orderly, and humane migration.  Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, issued February 2, 2021, lays out a four-pronged comprehensive approach that includes addressing the root causes of irregular migration, collaboratively managing migration in the region, expanding lawful pathways for protection and opportunity in the United States, and restoring and enhancing asylum processing at the U.S. Southwest border.  The Executive Order directs the Assistant to the President for National Security Affairs, in coordination with U.S. departments and agencies, to prepare a Root Causes Strategy and a Collaborative Migration Management Strategy (Migration Strategy).

The Migration Strategy identifies and prioritizes actions to strengthen cooperative efforts to manage safe, orderly, and humane migration in North and Central America, in line with our Nation's highest values, while the Root Causes Strategy addresses the underlying factors leading to migration.  Both strategies are driven by the U.S. Government belief that all individuals should be able to find safety and achieve a stable and dignified life within their own countries.  When that is not the case, asylum and other legal migration pathways should be readily available to those who need them.

The Migration Strategy aims to address urgent humanitarian needs in the Northern Triangle, promote access to protection, improve secure and humane border management, provide support for returnees, and enhance access to legal pathways for migration.  Individuals and families' internal and international migration decisions are often interlinked with their access to protection, the availability of legal migration pathways, and their ability to live safe and prosperous lives.  By enhancing humanitarian support, regional protections, and investing in migration management, the United States will help build a more stable region, strengthen legal pathways for those who choose to or are forced to migrate, and reduce irregular migration.

The U.S. Government consulted with a wide range of stakeholders to inform the Migration Strategy, including governments in the region, Members of Congress and their staff, international organizations, civil society organizations, labor unions, and the private sector.

**3**



# Strategic Environment

Over the past decade, millions of people from Mexico, Guatemala, Honduras, and El Salvador have arrived at the U.S. Southwest border in search of protection and opportunity.  Some of the primary factors driving this migration include high levels of crime and violence, lack of economic opportunity, weak governance, widespread corruption and impunity, the impacts of climate change, food insecurity, and the desire for family reunification.  Since 2015, hundreds of thousands of these individuals submitted asylum claims in the United States, showing the scope of regional challenges and contributing to significant backlogs in the U.S. asylum system.

In recent years, there have been some successes in strengthening regional protection frameworks, recognizing and responding to internal displacement, creating effective labor migration programs, strengthening border security, and scaling returnee reception efforts. However, the COVID-19 pandemic and two devastating hurricanes in Central America in November 2020 strained governments in the region, caused severe economic disruption, and made efforts to institutionalize migration management practices even more challenging.



The Migration Strategy **identifies and prioritizes actions to strengthen cooperative efforts** to manage safe, orderly, and humane migration in North and Central America.

The United States has strong relationships with a broad range of actors who will be critical partners for implementing the Migration Strategy.  The United States will continue to work closely with international organizations that provide support for refugees, asylum seekers, internally displaced persons (IDPs), and returned migrants, and assist governments with migration management in the region.  Civil society organizations will also be critical as they advise governments on protection and migration management and implement programs to fill gaps in government capacity.  The private sector will be an important player in expanding and supporting labor migration pathways and has a role in helping governments improve migration management.

4



# U.S. Interests

The United States has strong national security, economic, and humanitarian interests in reducing irregular migration and promoting safe, orderly, and humane migration.  Irregular migration places a heavy burden on U.S. border security infrastructure and personnel and presents opportunities for criminal actors to exploit vulnerable populations.  The United States is seeking to expand U.S. and international efforts to address the humanitarian situation in the Northern Triangle and improve regional collaborative migration management by promoting strong migration management practices, encouraging greater regional responsibility-sharing, and expanding access to legal pathways.  The United States believes that all individuals should be able to find safety and achieve a stable and dignified life within their own countries, while ensuring that asylum and other legal migration pathways remain available to those who need them.

 The United States believes that all individuals should be able to find safety and achieve a stable and dignified life within their own countries, while **ensuring that asylum and other legal migration pathways remain available to those who need them.**



# Desired End State

This Strategy does not seek to end migration.  To the contrary – human mobility is part of the fabric and tradition of Central and North America.  Instead, the Migration Strategy envisions that migration within and through Mexico and Central America would be by choice, and that fewer people would feel compelled to make that choice.  It envisions more legal pathways available for those who choose to leave. If individuals must flee, they would have options to seek protection within their own countries, within the region, or in the United States.



# Strategic Objectives

Our strategic objectives are to: stabilize populations facing acute needs; strengthen international and in-country protections throughout North and Central America so individuals seeking safety have access to protection and services within their countries of origin or in the region; support third country labor migration programs that facilitate equitable access to work opportunities that ensure and expand worker protections; increase reception and reintegration of returned migrants or IDPs to allow them to find safety and support in their countries of origin; support secure and humane border practices that allow regional governments to regulate the movement of people into and out of their territory and respond to large-scale migration events; coordinate migration messaging campaigns to share accurate and timely information about migration laws and policies and counter mis- and disinformation; and expand lawful pathways for protection and opportunity in the United States.

As a part of our work, we will:

***Consult and Coordinate***: The U.S. Government will continue to consult with Congress, civil society, international organizations, the private sector, labor unions, and governments inside and outside the region. We will listen, learn the lessons from past efforts, create an approach that draws on input from across sectors, and develop a broad base of support that advances efforts across the Migration Strategy.

***Communicate:*** We will create a robust communications plan, leveraging independent and social media, to convey our efforts to improve migration cooperation, build support for our approach, and instill hope in the region.

***Assess:*** Throughout implementation, we will build in assessment points to ensure our efforts are producing the desired results, strengthening where needed, adjusting course where warranted, and discontinuing as required.

Haiti AR_001142



# Lines of Action

To achieve the strategic objectives set out above, the Migration Strategy sets out concrete lines of effort the United States will pursue to support regional programs to stabilize populations with acute needs; expand access to international protection; strengthen access to protection in countries of origin; expand access to third country labor migration programs that ensure and improve worker protections; assist and reintegrate returned persons; promote secure and humane border management; strengthen regional public messaging on migration, and expand access to lawful pathways for protection and opportunity in the United States. The Migration Strategy will also help guide U.S. diplomatic engagements with governments in the region and outside the Western Hemisphere, including through multilateral fora and platforms, such as the Regional Conference on Migration and the Comprehensive Regional Protections and Solutions Framework (MIRPS).

## 1. Stabilize Populations with Acute Needs

The United States will provide and mobilize assistance to address the increased humanitarian needs in the Northern Triangle given the COVID-19 pandemic, November 2020 hurricanes, and prolonged droughts.

- **Surge U.S. assistance.** The United States will provide increased assistance to address food insecurity and malnutrition, support the agricultural sector to mitigate the effects of droughts and increasingly unpredictable weather and build resilience to future shocks, provide materials to support the rebuilding of shelter and schools, and address the immediate safety and protection needs of refugees, asylum seekers, internally displaced persons, and other vulnerable populations in the region.

- **Work multilaterally.** The United States will work with the United Nations to mobilize a Humanitarian Response Plan to galvanize international support for the deteriorating situation in the Northern Triangle and coordinate activities under one system.

## 2. Expand Access to International Protection

A critical element of this strategy is expanding access to international protections for refugees, asylum seekers, and vulnerable migrants within the region, including new mechanisms for protection referrals. These efforts will be complemented by expanding efforts to integrate refugees into their new communities and specialized programming and support for the most at-risk groups.

- **Build and improve national asylum systems.** The United States will support regional government efforts to strengthen and expand their asylum systems to provide vulnerable individuals with protection closer to home. These systems have historically been limited, but with U.S. support, there is potential to offer protections to tens of thousands of people within

7

the region.  For example, since 2016, the Mexican Commission for Refugee Assistance has expanded dramatically with U.S. support, opening new field offices and tripling its annual case processing capacity.  The United States will continue to work with Mexico to build on this success and with other regional governments to help expand their asylum systems.

- **Establish Migration Resource Centers (MRCs).**  The United States will work with international organizations and in coordination with governments to support the establishment of MRCs throughout the region.  These facilities will focus on protection screening, services for people in need of protection, and referrals to protection or other lawful migration pathways.  MRCs will also have referral mechanisms for existing labor migration and reintegration programs for people who do not have protection needs.  Fixed location and mobile MRCs will be strategically located to benefit communities at risk of displacement, those with high levels of emigration, and in major transit hubs.

- **Increase efforts to integrate refugees in the region.**  Once people receive protection within the region, they still face the challenge of integrating into new communities.  The United States will support inclusion and integration programs that ensure individuals can access livelihood opportunities, services, healthcare, and education, and can develop roots in their new communities.  The United States will look to expand successful ongoing integration efforts, such as a program that relocates protection recipients from southern Mexico to industrial belt municipalities in Mexico with labor needs.

- **Support assistance for asylum seekers and refugees.**  The United States will increase shelters and other safe space networks for asylum seekers, refugees, and other vulnerable migrants within the region.  This assistance also includes, but is not limited to, assisting asylum seekers with access to accurate information, legal representation, education, livelihood opportunities, cash and **voucher** assistance, and health care.  The United States will also respond to and support the water, sanitation, and hygiene (WASH) needs for refugees and asylum seekers across the region.

- **Scale up protection efforts for at-risk groups.**  While all displaced individuals are vulnerable, some face heightened risks, including women, children, families, individuals with disabilities, LGBTQI+ individuals, indigenous peoples, and racial minorities.  The United States will support protections for these groups by funding international organizations for targeted programming, encouraging governments to pass and implement legislation that protects these groups, and providing technical assistance to regional government agencies that interact with these populations.  Additionally, the United States will work with regional governments to develop human rights violation early warning systems and prevent and respond to human rights violations and abuses against migrants.

- **Enhance efforts to resettle refugees from the region.**  In recent years, countries including Australia, Brazil, Canada, and Uruguay have resettled small numbers of refugees from El Salvador, Guatemala, and Honduras.  The United States will continue to work with these countries, particularly Canada, to resettle larger numbers of refugees and encourage other governments to do the same.

## 3.  Expand Access to Protection in Countries of Origin

Individuals seeking protection in a third country have often been previously forcibly displaced at least once within their countries of origin before crossing an international border.  By strengthening protection, assistance, and solutions for IDPs and encouraging governments to find durable solutions, the United States can help people obtain safety and sustainable livelihoods within countries of origin and reduce international forced displacement.

- **Improve protections for IDPs.**  IDPs are often unrecognized or marginalized in their countries of origin, making it a significant humanitarian, human rights, and governance issue. The United States will encourage governments to pass legislation and implement laws recognizing and providing services for IDPs, and fund additional research on internal displacement within the region to better understand the needs of IDPs.

- **Support humanitarian assistance and integration for IDPs.**  The United States will continue to increase shelters and other safe space networks for IDPs.  The United States will support programs offering solutions for these populations, such as relocation and integration support to help them reestablish their lives in their new homes.  This support includes, but is not limited to, assisting IDPs with access to protection services, prevention and response to gender-based violence, education, livelihood opportunities, cash and voucher assistance, health care and WASH needs.

- **Include IDPs and affected communities in development programs.**  The United States will include and prioritize IDPs in development programs that aim to combat insecurity and gender-based violence, reduce poverty, increase opportunities to access permanent housing, improve health outcomes, increase access to justice, and strengthen access to education.

## 4.  Expand Third Country Labor Migration Programs While Improving Worker Protections

The United States aims to enhance coordination with third countries on labor migration programs and worker protections.  Third country labor migration programs allow individuals to find work opportunities and provide support for their families through formalized migration channels.  These programs also provide critical labor to economies, particularly since the COVID-19 pandemic has resulted in reduced inter-regional travel.

- **Expand access to third country labor migration programs with worker protections.**  The United States will support efforts to develop and expand labor migration programs that protect workers' rights and allow equitable access for individuals in the region to find meaningful economic opportunities in a third country while improving worker protections.  Some successful regional labor programs could be expanded or replicated in line with local conditions.  For example, in 2020, a successful pilot program connected workers from Panama with the seasonal coffee harvest in Costa Rica.  This program then expanded to

include temporary workers from Nicaragua. The United States will support countries with labor needs in developing or expanding similar programs that match regional workers with labor demands, such as Canada and Mexico's temporary worker programs. The United States will also continue to build the capacity of governments in the region to better assist their populations in identifying temporary labor opportunities and eliminating discriminatory or exploitative labor practices.

- **Expand support for migrant worker protections, including ethical recruitment.** Ensuring protections for migrant workers are a critical component to sustainable and ethical work programs. The United States will enhance our programming to ensure recruitment and treatment of migrant workers is fair and humane throughout the region by engaging with the private sector, labor unions, governments, and civil society. The United States will also increase awareness and access to resources to combat labor trafficking.

## 5. Assist and Reintegrate Returned Persons

Governments have limited capacity to receive their nationals from other countries. Individuals who are returned to their countries of origin may have spent significant time living abroad and may have limited knowledge on how to obtain documentation, access information, find work, or receive support. Returned minors may require support to re-enroll in the education system, and they and their families may benefit from psychosocial and other support to increase resilience and overall well-being. Targeted development assistance programming to reintegrate returned persons into their communities helps them create safe and prosperous lives in the region.

- **Expand reception centers.** The United States will continue to expand the capacity of governments to develop and sustain reception centers for individuals returning to their countries of origin. This includes expanding existing centers and adding reception centers. These centers will allow governments to provide specialized services, conduct interviews, connect individuals to reintegration opportunities, and provide medical, counseling, and protection services.

- **Build out reintegration services.** The United States will work with governments, international organizations, civil society, and the private sector to create and expand reintegration programs that match returnees with jobs that capitalize on skills learned abroad, such as English language proficiency, IT skills, and training in the hospitality sector, among others. These services will also assist returnees with integration in their host communities through job placement and skills training, and will address the different needs of returnees, including women, minors, and indigenous people. To support these populations, the United States will work with regional governments, international organizations, and civil society organizations to include and prioritize returnees in development programs and community initiatives.

- **Assist with reintegration policies and frameworks.** The United States will work with regional governments to develop and implement policies that enable individuals to overcome structural challenges associated with being returned after living overseas. Programs will facilitate validation of school and work certifications, financial inclusion, nationality status

and identity card issuance, and access to social programs.  The United States will also engage in outreach campaigns to help prevent discrimination.

- **Support Assisted Voluntary Return (AVR).**  The United States will continue to support efforts by regional governments and international organizations to offer individuals the opportunity for AVR should they choose to return to their countries of origin.  These AVR opportunities will provide these individuals with a safe, humane, and dignified way to return home.

## 6.  Foster Secure and Humane Management of Borders

Securing borders with humane border management policies and practices is essential to reducing irregular migration and collaboratively managing migration within the region.  Making advances in these areas requires improving institutional governance and regulation within the region, encouraging collaborative migration and border management approaches, providing equipment to modernize and improve border infrastructure and technology, and taking a comprehensive and coordinated approach to supporting migrant smuggling and human trafficking investigations and enforcement.

- **Provide institutional capacity building, training, technical assistance, and support equipment needs for national migration authorities in the region.**  The United States will work with governments to build the region's migration-focused departments and agencies to develop institutional capacity; establish comprehensive training programs and dedicated professional units, consistent with international law and standards; ensure the development and implementation of humane migration practices; screen for protection needs; institute transparency and internal accountability mechanisms; and secure the necessary resources to fulfill their missions.  The United States will also consider support to regional governments to improve their ability to identify, process, detain, and repatriate individuals without legal standing in a safe and humane manner that is consistent with international law.

- **Support for border infrastructure and technology.**  The United States will provide support for the modernization of border infrastructure and technology.  Improved technology allows regional border officials to monitor trends, identify persons of interest, share information with regional government partners, and use resources more efficiently.  Such efforts can help enhance economic growth and reduce corruption in the region by professionalizing ports of entry and customs authorities and processes.  The United States will also support deploying technologies to increase electronic processing of people and goods, implementing of the World Trade Organization Trade Facilitation Act, and promoting best practices in professional responsibility.

- **Enhance migrant-smuggling and human-trafficking investigations and prosecutions.**  The United States, in partnership with regional governments, will expand and strengthen efforts to hold individuals involved in migrant smuggling, human trafficking, and other crimes against migrants accountable, whether through prosecutions, or, where appropriate, additional financial or other penalties.  For example, in April 2021, the United

**11**

States announced Operation Sentinel, a new counter-network targeting operation focused on transnational criminal organizations involved in migrant smuggling.

- **Promote collaborative migration and border management approaches.** The United States will facilitate and encourage regional approaches to address migration, including improving or establishing legal frameworks; promoting border security, migration management, and migration enforcement best practices and standards; and enhancing coordination and information sharing. The United States will also continue to support regional coordination to address large coordinated migration movements.

- **Increase information sharing with and among regional partners.** The United States will continue to develop and expand efforts to share information with and among regional partners on humane border management best practices, migrant smuggling and human trafficking efforts, and data sharing and transparency. This includes replicating and enhancing support for programs that facilitate greater information sharing and coordination among local and regional law enforcement, and with U.S. law enforcement partners related to migrant smuggling, human trafficking, other crimes against migrants, and gang activity.

## 7.  Strengthen Regional Public Messaging on Migration

Effective regional communications and messaging allow the United States and other governments to share factual information about their migration policies, counter disinformation, and discourage irregular migration. Partnerships with international organizations and other stakeholders can amplify these messages and provide complementary messaging.

- **Support regional messaging campaigns.** The United States will expand its work with regional governments, international organizations, civil society organizations, the private sector, and other stakeholders to share information on regional migration policies and ensure consistent messaging that discourages irregular migration and promotes safe, orderly, and humane migration.

## 8.  Expand Access to Lawful Pathways for Protection and Opportunity in the United States

The United States is committed to enhancing access to protection and opportunity in the United States. The United States is taking a number of steps to increase access to the U.S. Refugee Admissions Program (USRAP) for Northern Triangle nationals. The United States is also examining parole options for Northern Triangle nationals, as recommended by Executive Order 14010. In addition, the United States is evaluating options to enhance access for Northern Triangle nationals to immigrant and non-immigrant visas to the United States, as appropriate and consistent with the law.

- **Restart and expand the Central American Minors (CAM) program.** The CAM program provides certain minors in El Salvador, Guatemala, and Honduras the opportunity to be considered for refugee resettlement in the United States. Individuals who are determined to be ineligible for refugee status are considered for the possibility of entering the United States under parole. In March 2021, the United States announced that the CAM program would reopen and process cases that were closed when the program was paused in 2018. In June 2021, the United States announced the expansion of the program to increase the categories of eligible U.S.-based relatives who can petition for their children in the Northern Triangle. The United States will continue to consider ways to expand the program.

- **Expand refugee processing in the region.** The United States is seeking to enhance the capacity of international organizations and civil society to identify and refer more individuals with urgent protection needs. The Costa Rican government paused implementation of the Protection Transfer Arrangement (PTA) in September 2020 due to COVID-19. With support from the United States, Costa Rica resumed PTA transfers in early April 2021. In addition, the United States is working to increase USRAP processing capacity in the region during the COVID-19 pandemic, including by implementing and exploring new processes and technologies to support remote case processing. The United States will also continue to explore additional ways to enhance and expand refugee processing in the region.

- **Increase access to nonimmigrant work visas while ensuring worker protections.** Expanding legal pathways for Northern Triangle nationals seeking to provide for their families is an important component of a comprehensive regional migration response. It must also address the vulnerability of workers to abusive labor practices. The United States will undertake efforts to significantly increase the number of Northern Triangle agricultural workers who receive an H-2A visa in FY 2022, paying particular attention to improving recruitment practices in the Northern Triangle and labor conditions in the United States. The United States will enhance outreach and engagement with U.S. employers; work with Northern Triangle governments, international organizations, civil society, and the private sector to develop a more robust pipeline of Northern Triangle nationals who can meet the needs of U.S. employers when there are insufficient U.S. workers who are qualified and available to perform the work; assist the Northern Triangle governments with registering and vetting workers; connect workers with U.S. employers; and engage with labor unions and worker rights organizations to identify ways to improve transparency in the recruitment process and overall worker protections. The United States also made 6,000 supplemental H-2B temporary non-agricultural visas available for Northern Triangle nationals in FY 2021.

- **Reduce immigrant visa backlogs.** The United States aims to reduce the backlog of immigrant visa applications for Northern Triangle nationals as quickly as possible.



Haiti AR_001150

JUNE 10, 2022

# Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables

Today, President Biden joins leaders from across the Western Hemisphere to present the Los Angeles Declaration on Migration and Protection at the Summit of the Americas. The Declaration seeks to mobilize the entire region around bold actions that will transform our approach to managing migration in the Americas. The Declaration is organized around four key pillars: (1) stability and assistance for communities; (2) expansion of legal pathways; (3) humane migration management; and (4) coordinated emergency response.

In preparation for the Summit, the United States and other countries in the region developed a suite of bold new migration-related deliverables.

**Pillar I: Stability and Assistance for Communities**

Addressing the unprecedented migration crisis in the region requires us to rethink how we view multilateral development finance and how we manage the strains on our economies. Globally, International Financial Institutions (IFIs) and development assistance have been directed to poor and low-income countries, designations which no longer apply to most of Latin America and the Caribbean. The need for economic stabilization and support is particularly important in countries housing the more than six million refugees and migrants.

- **Belize will implement in August 2022 a program to regularize Central American and CARICOM migrants** who have been living illegally in the country for a specified time.

- **Colombia's leadership in responding to Venezuelan migrants and refugees with forward-leaning policies based on solidarity, humanitarian relief, and protection:** Colombia reaffirms its commitment to fully implement its announcement of temporary protected status for displaced Venezuelan migrants and refugees in its territory. As of June 10, it has granted regularization documents to over 1.2 million individuals, allowing them to work legally, access public and private services, integrate successfully, and contribute to Colombia's economy and society. Colombia further reaffirms its commitment to grant

Haiti AR_001151

regularization permits to 1.5M Venezuelan migrants and refugees in total, by the end of August 2022.

- **Costa Rica commits to plan for a renewal of the special temporary complementary protection category scheme for migrants from Venezuela, Nicaragua, and Cuba**, that have arrived prior to March 2020, contingent on obtaining necessary financial resources, and to convene an international task force to secure additional direct support and financial resources to support its implementation.

- **Ecuador issued an executive decree that creates a path to a regular migration status for Venezuelans who entered the country regularly via an official port of entry, but who are currently out of status.** This process includes unaccompanied or separated migrant children and a migration amnesty. It contemplates the provision of identification documents for the regularization process, taking into account the current difficulties facing Venezuelan citizens. It intends to expand this process to include all Venezuelans.

- **The United States will provide additional U.S. support for a crisis response mechanism on migration**. Working with Congress, we will provide an additional $25 million to the Global Concessional Financing Facility (GCFF) housed at the World Bank to prioritize countries in Latin America such as Ecuador and Costa Rica in their newly announced regularization programs for displaced migrant and refugee populations residing within their respective countries.  The new funding would support registration processes, the extension of social services, integration programs, and would benefit host communities that have generously opened their doors to the most vulnerable.

- **The United States will announce $314 million in new PRM and USAID funding for stabilization efforts in the Americas.** USAID and the State Department's Bureau of Population, Refugees, and Migration (PRM) will announce more than $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere. This includes support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.

**Pillar II: Legal Pathways and Protection**

Expanding legal pathways for protection and opportunity is at the heart of efforts to humanely address irregular migration in the Americas. The goal is to *change the way* people migrate. Countries in the region have strategically pegged priority legal pathway programs with the primary reasons for migrating: (1) jobs; (2) protection; and (3) family reunification.

- **Canada's resettlement and complementary pathways initiative:** Canada is welcoming record numbers of refugees and in line with Canada's immigration levels plans. As part of these growing efforts, Canada will increase refugee resettlement from the Americas and aims to welcome up to 4,000 individuals by 2028, providing durable solutions to a number of refugees in the region. Canada recognizes the important support of the UNHCR and the IOM in the region. Canada will also look to promote its regular pathways in the region to help provide opportunities including to those in vulnerable situations. For example, Canada will advance a promotion and recruitment efforts related to its Francophone Immigration Program which may offer opportunities to French speaking newcomers such as Haitians with skills and experience, some of which may gave have been displaced due to the pandemic.

- **Canada is addressing root causes and investing $26.9 million, in 2022-2023, in additional funding toward migration- and protection-related capacity building in the Americas.** This funding is supporting projects across Latin America and the Caribbean focused on supporting the socio-economic and labour market integration of refugees and migrants; improving border and migration management systems; contributing to the safeguarding of migrants, refugees and host communities' rights; advancing gender equality and inclusive economic growth; and preventing and tackling migrant smuggling and trafficking in persons.

- **Canada expects to welcome more than 50,000 agricultural workers from Mexico, Guatemala and the Caribbean in 2022.** Canada is a strong supporter of labour mobility and continues to actively promote regular pathways for migration, including temporary foreign worker programs that respond to employer labour needs, to address our labour market gaps and as alternatives to irregular migration.

- **Guatemala approves new legislation to promote legal labor migration programs.** On June 1, the Government of Guatemala approved new legislation to incentivize fair recruitment and expand legal pathways for its citizens. The legislation exempts airline tickets from value-added and departure taxes for those traveling for temporary work abroad contracts obtained through the Ministry of Labor.  The new initiative is part of a broader set of Guatemalan programs and policies to expand access to labor migration programs, ensure ethical recruitment, and promote legal protections for Guatemalan workers.

- **Mexico will expand the existing Border Worker Card program to include 10,000 to 20,000 additional beneficiaries.** This program allows greater labor mobility to meet

employer needs in Mexico, promote economic development in Central America, and provide an alternative to irregular migration.

- **Mexico will launch a new temporary labor program providing work opportunities in Mexico for 15,000 to 20,000 workers from Guatemala per year.** The Government of Mexico aims to expand eligibility for that program to include Honduras and El Salvador in the medium-term.

- **Mexico will integrate 20,000 recognized refugees into the Mexican labor market over the next three years.** With the support of UNHCR, the program would connect individuals with legal status as recognized refugees in Mexico to work opportunities in regions with labor shortages. A joint initiative with UNHCR, the private sector and the Mexican Government, both refugees and firms will benefit from successful integration into Mexico's formal labor market.

- **The United States will launch the development of a $65 million U.S. Department of Agriculture (USDA) pilot program to support U.S. farmers hiring agricultural workers under the H-2A program.** In collaboration with other agencies, USDA is exploring a multi-year pilot program funded by the President's American Rescue Plan to provide grants to agricultural employers that hire farmworkers from Northern Central American countries under the seasonal H-2A visa program and agree to additional protections to benefit both U.S. and H-2A workers. The pilot will promote the resiliency of our food and agricultural supply chain and three major Administration priorities: (1) driving U.S. economic recovery by addressing current labor shortages in agriculture; (2) reducing irregular migration through the expansion of legal pathways; and (3) improving working conditions for U.S. and migrant agricultural workers. USDA will enter into a cooperative agreement with the United Farm Workers of America (UFW), which will work with relevant stakeholders, including farmers, farmworkers, farmworker advocates and unions, to ensure that the agency benefits from a wide range of views in designing this program.

- **The United States will provide 11,500 H-2B nonagricultural seasonal worker visas for nationals of Northern Central America and Haiti.** To address labor shortages in key sectors of the U.S. economy and reduce irregular migration, the Department of Homeland Security (DHS) and Department of Labor (DOL) made an additional 11,500 H-2B visas available in late May. These visas are dedicated for nationals of the Northern Central America countries and Haiti for this fiscal year. This is combined with new employer oversight provisions.

- **The United States will roll out new Fair Recruitment Practices Guidance for Temporary Migrant Workers with the cooperation of major employers, including Walmart.** As the United States and various other countries expand temporary worker programs in the Western Hemisphere, President Biden recognizes the importance of safeguarding against exploitation of workers. This is why his Administration will issue first-of-its-kind "Guidance on Fair Recruitment Practices for Temporary Workers." The guidance promotes best practices for governments seeking to increase participation in the H-2 visa programs and employers relying on these programs. The United States has also mobilized the support of major U.S. retailer Walmart, which notes the importance of H-2A migrant workers to U.S. agriculture and that the fair recruitment guidance aligns with the company's own expectations around responsible recruitment.

- **The United States will commit to resettle 20,000 refugees from the Americas during Fiscal Years 2023 to 2024.** This represents a three-fold increase from this year and reflects the Biden Administration's strong commitment to welcoming refugees. The protection needs are significant in the Western Hemisphere. More than 5 million Venezuelans have been displaced in the Americas, and hundreds of thousands more people from other countries across Latin America and the Caribbean are also displaced [across borders]. As the United States scales up its resettlement operations in the Americas, we call on other governments to do the same.

- **The United States will increase resettlement of Haitian refugees.** Reflecting the President's commitment to support the people of Haiti, the United States also commits to receiving an increased number of referrals to the U.S. Refugee Admissions Program for Haitians. The United States encourages other governments to join us in strengthening legal pathways for protection and opportunity for Haitians and other displaced populations in the Americas.

- **The United States will resume and increase participation in the Haitian Family Reunification Parole Program.** The Department of Homeland Security will announce the resumption of the Haitian Family Reunification Parole Program, which allows certain eligible U.S. citizens and lawful permanent residents to apply for parole for their family members in Haiti. Additionally, U.S. Citizenship and Immigration Services will take steps to increase participation in the program by reducing barriers to access. New invitations to apply under the program are anticipated to be issued in early fall 2022. Concurrently, the Department of State will increase efforts to process Haitian immigrant visas and reduce the existing backlog. State is in the process of assessing options to augment consular adjudicator staffing in Embassy Port-au-Prince and review additional operational efficiencies to decrease the immigrant visa backlog for Haitians.

- **The United States will resume the Cuban Family Reunification Parole Program.** Last month, the United States announced the resumption of operations for the Cuban Family Reunification Parole Program (CFRP). CFRP provides a safe, orderly pathway to the United States for certain Cuban beneficiaries of approved family-based immigrant petitions. DHS will resume processing cases this summer, work with the Department of State to begin interviews in Cuba by early fall, and build capacity to consider and process approved applicants, thus contributing to migration accord targets over the next two years.

*Observer States*

- **Spain will double the number of labor pathways for Hondurans** to participate in Spain's circular migration programs.

**Pillar III: Humane Border Management**

Securing borders with humane border management policies and practices is essential to reducing irregular migration and collaboratively managing migration across the hemisphere. The focus moving forward should be on: 1) humane border enforcement; 2) return of migrants lacking protection needs or other legal basis to remain; 3) facilitating returns to countries of most recent residence or origin; 4) support for assisted voluntary returns; and 5) strengthened bilateral and regional law enforcement information sharing and cooperation to combat migrant smuggling and human trafficking.

- **The United States will announce a multilateral "Sting Operation" to disrupt human smuggling networks across the Hemisphere.** The President will announce a first of its kind campaign, unprecedented in scale, to disrupt and dismantle smuggling networks in Latin America. In the last two months, the United States, led by DHS, has surged over 1,300 personnel throughout the region and invested over $50 million to support these activities. Through the end of May, efforts have produced approximately 20,000 total disruption actions including arrests and prosecutions, seizures of property such as houses and vehicles used to hide and smuggle people, and criminal investigations. DHS assesses that this has led to 900 fewer migrants arriving at the Southwest border each day, and we are just getting started. The U.S. will seek to expand efforts with other governments in the region to improve information sharing, build capacity, and advance criminal investigations.

- **The United States will improve the efficiency and fairness of asylum at the border.** In late May, DHS and Department of Justice began implementing a new process that improves and expedites processing of asylum claims made by noncitizens subject to expedited removal, to ensure that those who are eligible for asylum are granted relief

quickly, and those who are not are promptly removed. The new process is a further step toward a more functional and sensible asylum system that reduces the caseload in immigration courts while also providing individuals with a prompt and fair decision in their case. DHS is phasing in the implementation of this rule and when fully implemented, the rule will shorten the administrative process from several years to just several months.

JUNE 10, 2022

# Los Angeles Declaration on Migration and Protection

We, the Heads of State and Government of the Argentine Republic, Barbados, Belize, the Federative Republic of Brazil, Canada, the Republic of Chile, the Republic of Colombia, the Republic of Costa Rica, the Republic of Ecuador, the Republic of El Salvador, the Republic of Guatemala, Co-operative Republic of Guyana, the Republic of Haiti, the Republic of Honduras, Jamaica, the United Mexican States, the Republic of Panama, the Republic of Paraguay, the Republic of Peru, the United States of America, and the Oriental Republic of Uruguay, gathered in Los Angeles on the margins of the Ninth Summit of the Americas, reiterate our will to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration and to strengthen frameworks for international protection and cooperation.

We embrace the need to promote the political, economic, security, social, and environmental conditions for people to lead peaceful, productive, and dignified lives in their countries of origin.  Migration should be a voluntary, informed choice and not a necessity.

We are committed to protecting the safety and dignity of all migrants, refugees, asylum seekers, and stateless persons, regardless of their migratory status, and respecting their human rights and fundamental freedoms.  We intend to cooperate closely to facilitate safe, orderly, humane, and regular migration and, as appropriate, promote safe and dignified returns, consistent with national legislation, the principle of non-refoulement, and our respective obligations under international law.

We acknowledge that addressing irregular international migration requires a regional approach, and that ongoing health, social, and economic challenges of the pandemic exacerbate the root causes driving irregular migration, including the vulnerabilities of many migrants and their communities.

We value the tradition of our region in welcoming refugees and migrants and showing solidarity with our neighbors.  We recognize the positive contributions of refugees and migrants to the socio-economic development of their host communities.  We recognize the sustained efforts of States in our hemisphere in hosting refugees, providing regular migration

Haiti AR_001158

pathways, promoting local economic and social integration, facilitating safe, dignified, and voluntary return, and supporting the sustainable reintegration of returnees.

We remain committed to collectively leveraging the benefits of migration while addressing its challenges in countries and communities of origin, transit, destination, and return. We do so in a spirit of collaboration, solidarity, and shared responsibility among States and in partnership with civil society and international organizations. We reaffirm our shared commitment to supporting host communities; strengthening and expanding regular pathways and access to international protection; fostering opportunities for decent work; facilitating regularization and access to basic services; and promoting principles of safe, orderly, humane, and regular migration.

We also intend to strengthen the institutions that are responsible for migration management in our countries and exchange best practices in order to provide efficient and adequate care to migrants and access to protection for refugees.

**Promoting Stability and Assistance for Communities of Destination, Origin, Transit, and Return**

We affirm that countries of origin and countries and communities hosting large numbers of migrants and refugees may need international financing and assistance related to development, basic humanitarian needs, protection, security, public health, education, financial inclusion, and employment, among others. We support efforts that allow all migrants, refugees, asylum seekers, and persons in situations of vulnerability to integrate into host countries and access legal identity, regular status, dignified employment, public services, and international protection, when appropriate and in accordance with national legislation, to rebuild their lives and contribute to those communities. We plan to continue efforts to prevent and reduce statelessness. We intend to expand efforts to address the root causes of irregular migration throughout our hemisphere, improving conditions and opportunities in countries of origin and promoting respect for human rights. We reaffirm the importance of safe, dignified, and sustainable return, readmission, and reintegration of migrants to help them reestablish themselves in their communities of origin. We further reaffirm the importance of ensuring all foreign nationals receive prompt consular assistance when needed or requested, and returnees are treated humanely and in a dignified manner, regardless of their immigration status, including in the process of their repatriation and return.

**Promoting Regular Pathways for Migration and International Protection**

We affirm that regular pathways, including circular and seasonal labor migration opportunities, family reunification, temporary migration mechanisms, and regularization programs promote safer and more orderly migration.  We intend to strengthen fair labor migration opportunities in the region, integrating robust safeguards to ensure ethical recruitment and employment free of exploitation, violence, and discrimination, consistent with respect for human rights and with a gender perspective.  We intend to promote, in accordance with national legislation, the recognition of qualifications and the portability of social benefits.  We intend to pursue accountability for those who commit human rights violations and abuses.  We plan to promote access to protection and complementary pathways for asylum seekers, refugees, and stateless persons in accordance with national legislation and with respect for the principle of non-refoulement.  We seek to promote border security and management processes that respect human rights and encourage and facilitate lawful, safe, and secure travel within the region.  We commit to guarantee human rights to individuals in vulnerable situations and to provide access to international protection, as appropriate.  We further intend to provide specialized and gender-responsive attention to individuals in situations of vulnerability.

**Promoting Humane Migration Management**

Renewing our commitment to respect and ensure the human rights of all migrants and persons in need of international protection, we recognize each country's responsibility to manage mixed movements across international borders in a secure, humane, orderly, and regular manner.  We intend to expand collaborative efforts to save lives, address violence and discrimination, counter xenophobia, and combat smuggling of migrants and trafficking in persons.  This includes expanded collaboration to prosecute migrant smuggling and human trafficking criminal organizations as well as their facilitators and money laundering networks.  We commit to provide appropriate protection and assistance to victimized individuals.  We intend, in accordance with national legislation, to improve and facilitate regional law enforcement information sharing, with the purpose of supporting the investigation and prosecution of crimes. We intend to explore new mechanisms, while preserving and leveraging existing regional, subregional, hemispheric, and global fora, to strengthen cooperation on border management and apply current mechanisms on visa regimes and regularization processes to combat exploitation by criminal groups.  In the instance of foreign nationals without a need for international protection and without a legal basis to remain in their country of presence, we commit to conduct any returns in a manner consistent with our respective obligations under international human rights law and international refugee law, and that respects the dignity of the individual, integrates safeguards to prevent refoulement, and promotes the return of children to safe conditions.

**Promoting a Coordinated Emergency Response**

Recognizing the imperative of promoting safe, orderly, and regular migration, and the safety of migrants, refugees, and asylum seekers in the region, we intend to work to cooperate in emergency response and humanitarian assistance in situations of mass migration and refugee movements.  We plan to strengthen existing regional coordination mechanisms and, as appropriate, the participation of civil society and international organizations to advance those aims.  This includes strengthening information sharing, as appropriate and in accordance with national legislation, enhancing early warning systems, leveraging existing relevant fora and processes, and defining a common set of triggers that activate a coordinated response.

**A Shared Approach to Reduce and Manage Irregular Migration**

To advance the common goals laid out in this Declaration and create the conditions for safe, orderly, humane, and regular migration through robust responsibility sharing, we intend to work together across the hemisphere to:

- Convene multilateral development banks, international financial institutions, and traditional and non-traditional donors to review financial support instruments for countries hosting migrant populations and facing other migration challenges, without prejudice to existing financing priorities and programs.

- Improve regional cooperation mechanisms for law enforcement cooperation, information sharing, protection-sensitive border management, visa regimes, and regularization processes, as appropriate and in accordance with national legislation.

- Strengthen and expand temporary labor migration pathways, as feasible, that benefit countries across the region, including through new programs promoting connections between employers and migrant workers, robust safeguards for ethical recruitment, and legal protections for workers' rights.

- Improve access to public and private services for all migrants, refugees, and stateless persons to promote their full social and economic inclusion in host communities.

- Expand access to regular pathways for migrants and refugees to include family reunification options where appropriate and feasible, in accordance with national legislation.

This Declaration builds upon existing efforts and international commitments and advances the vision set forth in the Global Compact on Refugees and the Global Compact for Safe, Orderly and Regular Migration (GCM) anchored in the 2030 Agenda for Sustainable Development. We acknowledge the progress noted in the International Migration Review Forum Progress Declaration for the GCM. We affirm the fundamental work that continues under the Comprehensive Regional Protection and Solutions Framework (MIRPS), the Regional Conference on Migration (RCM), and the South American Conference on Migration (SACM), as key regional bodies to facilitate the implementation of this Declaration, as well as the Quito Process and the Regional Inter-agency Coordination Platform for refugees and migrants from Venezuela. The United Nations 1951 Refugee Convention; its 1967 Protocol; the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment; the Geneva Conventions of 1949 and International Humanitarian Law; the United Nations Convention against Transnational Organized Crime; its Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children; its Protocol against the Smuggling of Migrants by Land, Sea and Air; the United Nations Convention on the Rights of the Child; the International Convention on the Protection of the Rights of all Migrant Workers and Members of their Families; as well as other international conventions, remain binding on Parties to those conventions that endorse this Declaration. This Declaration aligns with States' commitments in the International Labour Organization's Declaration on Fundamental Principles and Rights at Work and its General Principles and Operational Guidelines for Fair Recruitment. We reiterate the importance and meaning of the principle of non-refoulement as a cornerstone of the international protection of refugees. We applaud efforts throughout the region to provide a coordinated and comprehensive response to all migrants, returnees, refugees, asylum seekers, and stateless persons. We make this Declaration of non-legally binding commitments to enhance cooperation and shared responsibilities on managing migration and protection in ways grounded in human rights, transparency, nondiscrimination, and State sovereignty.

###



# U.S. STRATEGY FOR ADDRESSING THE ROOT CAUSES OF MIGRATION IN CENTRAL AMERICA

JULY 2021

NATIONAL SECURITY COUNCIL



THE WHITE HOUSE
WASHINGTON

Haiti AR_001163



# U.S. Strategy for Addressing the Root Causes of Migration in Central America

## *Cover Message from Vice President Kamala Harris*

In Central America, the root causes of migration run deep—and migration from the region has a direct impact on the United States. For that reason, our nation must consistently engage with the region to address the hardships that cause people to leave Central America and come to our border.

For decades, our nation has engaged in Central America. Often well intentioned, the engagement has often not been consistent. And over the last few years, the United States significantly pulled back from work in the region.

Under our Administration, President Joe Biden and I have restarted our nation's engagement in Central America and diplomatic efforts with Central American governments. Our Root Causes Strategy is comprehensive and draws from decades of experience—and is based on four core pieces of evidence.

**First, addressing the root causes of migration is critical to our overall immigration effort.**

Just after we took office, President Joe Biden outlined our Administration's vision to reform our immigration system by creating a pathway to citizenship for the nearly 11 million undocumented migrants in our country, modernizing our immigration process, and effectively managing our border.

Shortly after that, the President asked me to lead our nation's efforts to address the root causes of that migration. That is because migration to our border is also a symptom of much larger issues in the region.

**Second, providing relief is not sufficient to stem migration from the region.**

The COVID-19 pandemic and extreme weather conditions have indeed exacerbated the root causes of migration—which include corruption, violence, trafficking, and poverty. While our Administration is proud that we have sent millions of vaccine doses and hurricane relief, we know that it is not enough to alleviate suffering in the long term.

The root causes must be addressed both in addition to relief efforts—and apart from these efforts. In everything we do, we must target our efforts in those areas of highest out-migration—and ensure that these programs meet the highest standards of accountability and effectiveness.

**Third, unless we address all of the root causes, problems will persist.**

Recently, I travelled to Guatemala, where one of the largest challenges is corruption. Our Administration knows that, where corruption goes unchecked, people suffer. And so, on that trip, the United States announced that we will launch an Anticorruption Task Force which will include U.S. prosecutors and law enforcement experts who will investigate corruption cases. It is our goal that, in dealing directly with corruption, we will also mitigate the lack of economic and educational opportunities on the ground.

1



**Fourth, and most importantly, the United States cannot do this work alone.**

Our Strategy is far-reaching—and focuses on our partnerships with other governments, international institutions, businesses, foundations, and civil society. At this writing, we have already received commitments from the governments of Mexico, Japan, and Korea, and the United Nations, to join the United States in providing relief to the region. Our Administration is also working hand-in-hand with foundations and non-profits to accelerate efforts in Central America.

While, in the past, the private sector has been an underutilized partner, our Administration is calling on U.S. and international businesses to invest in the region – and thus far, 12 have done so. Private sector investment not only boosts economic opportunity, but it also incentivizes regional governments to create the conditions on the ground to attract such investment.

\* \* \*

**Ultimately, our Administration will consistently engage in the region to address the root causes of migration. We will build on what works, and we will pivot away from what does not work. It will not be easy, and progress will not be instantaneous, but we are committed to getting it right. Because we know: The strength and security of the United States depends on the implementation of strategies like this one**

Haiti AR_001165



# TABLE OF CONTENTS

I.      Introduction

II.     Strategic Environment

III.    Desired End State

IV.     Strategic Framework

V.      Pillar I: Addressing Economic Insecurity and Inequality

VI.     Pillar II: Combating corruption, strengthening
        democratic governance, and advancing the rule of law

VII.    Pillar III:  Promoting respect for human rights, labor
        rights, and a free press

VIII.   Pillar IV:  Countering and preventing violence,
        extortion, and other crimes perpetrated by criminal
        gangs, trafficking networks, and other organized
        criminal organizations

IX.     Pillar V:  Combating sexual, gender-based, and
        domestic violence

X.      Implementation Sequencing Highlights

Haiti AR_001166



# Introduction

It is in the national security interest of the United States to promote a democratic, prosperous, and secure Central America, a region closely connected to the United States by culture, geography, and trade. COVID-19, extreme weather, and severe economic decline are compounding longstanding challenges in the region, forcing far too many Central Americans to conclude the future they desire for themselves and their children cannot be found at home. They have lost hope and are fleeing in record numbers.

Persistent instability and insecurity in Central America have gone on for too long. Poverty and economic inequality, pervasive crime and corruption, and political leaders' drift toward authoritarian rule have stunted economic growth and diverted critical resources from healthcare and education, robbing citizens of hope and spurring migration. The worsening impacts of climate change, manifesting as prolonged periods of drought and devastating storms, have exacerbated these conditions and undermine U.S. and international interests. All of these factors contribute to irregular migration, and none of them can ultimately be addressed without honest and inclusive democratic governance that is responsive to the needs of citizens in the region.

 This Strategy lays out a framework to use the policy, resources, and diplomacy of the United States, and to leverage the expertise and resources of a broad group of public and private stakeholders, **to build hope for citizens in the region that the life they desire can be found at home.**

The Root Causes Strategy, directed by the President in Executive Order 14010, focuses on a coordinated, place-based approach to improve the underlying causes that push Central Americans to migrate, and that "take(s) into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society." This Strategy lays out a framework to use the policy, resources, and diplomacy of the United States, and to leverage the expertise and resources of a broad group of public and private stakeholders, to build hope for citizens in the region that the life they desire can be found at home.

The U.S. government consulted with a wide range of stakeholders to inform this Strategy, including governments in the region, Members of Congress and their staff, international organizations, civil society organizations, labor unions, and the private sector. Consultations will continue throughout implementation.



# Strategic Environment

Weak investment in infrastructure and education and poor rule of law leaves Central America at a competitive disadvantage for external investments, economic growth, and talent retention. Weather shocks due to climate change contribute to growing poverty, homelessness, and food insecurity. Corruption and other government actions to undermine transparency and democratic governance limit confidence of the public in their governments and discourage domestic and foreign investment. Threats

such as gang violence, criminal activity, and illicit drug flows challenge the security environment in Central America.

Nevertheless, opportunities for change exist.  A growing number of stakeholders, including from civil society and the private sector, are interested in pushing governments toward reforms that foster greater transparency and address climate change.  Likeminded government actors, as well as multilateral banks, private companies, foundations, civil society organizations, and international organizations, are interested in partnering on efforts to address the root causes of migration.  Sustainable technology can help increase access to government services and economic opportunities.  We will take advantage of these opportunities to address the reasons individuals choose to leave their home.



# Desired End State

*A democratic, prosperous, and safe Central America, where people advance economically, live, work, and learn in safety and dignity, contribute to and benefit from the democratic process, have confidence in public institutions, and enjoy opportunities to create futures for themselves and their families at home.*



# Strategic Framework

The Strategy focuses on the most commonly cited factors limiting progress in Central America, particularly those related to economic opportunity, governance and transparency, and crime and insecurity.  It is often a combination of multiple factors, resulting in a lack of hope that their country will improve, that marginalizes large populations within the region and pushes some people to migrate.  As such, we must work across all pillars to create economic opportunities, empower women and youth, support responsive and transparent governments, and build communities where people feel safe.  As individuals observe and experience improvements in these areas, we anticipate more people in El Salvador, Guatemala, and Honduras will have a reason to believe they can build successful lives at home rather than abroad.

> " Effecting systemic change and achieving the desired end state of a democratic, prosperous, and safe region will require the governments of El Salvador, Guatemala, and Honduras to govern in a transparent, professional and inclusive manner **that favors the public interest over narrow private interests.**

U.S. foreign assistance cannot substitute for political will in these countries. Used strategically, however,

U.S. development, diplomatic, and related tools can generate political leverage, empower champions of change, combat impunity and state capture, and catalyze improvements in governance, private investment, and human capital.

Execution of the Strategy will draw on the breadth of the U.S. government and a diverse group of public and private stakeholders.  It will draw on technological advances and leverage existing technology to offer dynamic, creative, efficient, and transparent solutions.  Throughout, it will focus on ensuring opportunities are available to all citizens regardless of gender, race, ethnicity, or sexual orientation.

The strategy is organized under five pillars:

- Pillar I:  Addressing economic insecurity and inequality

- Pillar II:  Combating corruption, strengthening democratic governance, and advancing the rule of law

- Pillar III:  Promoting respect for human rights, labor rights, and a free press

- Pillar IV:  Countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations

- Pillar V:  Combating sexual, gender-based, and domestic violence

Each Pillar is supported by various lines of effort, many of which advance progress in multiple pillars.  While implementation of the lines of effort will be similar in each country, the specifics will differ.  To build political will among leaders in Central America, the United States will utilize diplomacy, public diplomacy, sanctions and visa revocations, and targeted foreign assistance programs.

 **Even with a strong, sustained commitment, the type of systemic change envisioned in the Strategy will take time to achieve**, and progress will not be linear.

The United States will combine our efforts with those of other governments, including in Central America and beyond, the private sector, civil society, international organizations, and multilateral banks and institutions, to leverage investments and speak with a similar voice as we advocate for partner government actions to affect sustainable change.  This holistic approach utilizes all U.S. government tools and a broad array of partnerships to leverage expertise, creative ideas, and the power of multiple voices to generate necessary change to provide citizens in the region with hope.  Even with a strong, sustained commitment, the type of systemic change envisioned in the Strategy will take time to achieve, and progress will not be linear.  Implementing the Strategy demands a disciplined approach that relies on innovation and evidence, but also clear accomplishments along the way to maintain momentum.

Across all pillars of our work, we will:

- ***Consult and Coordinate:***  To further develop our path forward, the administration will continue to consult with Congress, civil society, international organizations, the private sector, like-minded partners, and governments.  We will listen, learn the lessons of past efforts, create an approach, which draws on input from across sectors, and develop a broad base of support that advances efforts across the Strategy.

- **Communicate:**  We will create a robust communications plan, leveraging independent and social media, to convey our efforts to improve conditions in the region, build support for our approach, and instill hope in the region.  We will also seek to discourage irregular migration and dispel misinformation.

- *Assess:*  We will move forward deliberately with clear goals, measurable objectives, and strong safeguards to guide our efforts.  Throughout implementation, we will build in assessment points to ensure our efforts are producing the results we seek, strengthening where needed, adjusting course where warranted, and discontinuing as required.



# Pillar I: Addressing Economic Insecurity and Inequality

Despite reductions in poverty rates and increases in GDP per capita prior to the double impacts of the pandemic and hurricanes Eta and Iota, the economies of El Salvador, Guatemala, and Honduras remain largely informal and highly unequal.  Key to growth will be structural reforms to address impediments to investment, economic diversification, increased judicial transparency, improved governance and transparency, expanded access to financial capital for businesses, streamlining of government procedures to start businesses and pay taxes, investment in workers, and formalization of the economy.  Inclusive growth, that reaches women and marginalized populations, and includes decent work, will be critical to creating hope among citizens in the region.  The COVID-19 pandemic exposed weakness in national health care systems, led to severe economic downturns, and devastated tourism.  The consequences of climate change are only projected to get worse, further disrupting growing cycles, upending farmer livelihoods, and exacerbating food insecurity and malnutrition.  Securing commitments from regional governments while working with the private sector, international donors, foundations, international financial institutions (IFIs), and multilateral development banks (MDBs) will be critical to fostering the reforms necessary for businesses to thrive, mobilizing investment, and promoting economic development in the region.  Across these efforts, we will focus on empowering women, youth, and marginalized communities.

## Strategic Objectives:

1. ***Foster a Business Enabling Environment for Inclusive Economic Growth***:  Governments build an enabling environment for business by implementing reforms to address structural impediments to growth, streamlining and digitalizing business registration and operations processes, offering legal certainty, reducing opportunities for corruption, enforcing labor and environmental rules, combating insecurity and extortion, and leveling the playing field for international businesses.  Governments promote and facilitate economic growth in a manner that is available to all sectors of society, including women, minorities, and other marginalized populations.

2. ***Increase and Diversify Trade:***  Customs and border systems are more efficient and less subject to malfeasance, there is increased alignment and reduced redundancy of regulations across the

region, and infrastructure projects better facilitate trade.  Enhance and diversify trade to include new export sectors, including those that reinforce U.S. supply chain needs.

3. ***Enhance Workforce Development, Health, Education, and Protection:***  Governments are able to effectively manage the COVID-19 response and prepare for the potential of future pandemics, and all citizens, including women and girls, have improved access to quality education, health care and clean water access, and social safety nets.

4. ***Build Resilience to Address Climate Change and Food Insecurity:***  Governments target investments so they are better able to mitigate the impact of severe weather events, including flooding and drought.  Agriculture, including fisheries and aquaculture, is developed toward higher levels of climate resilience, leading to affordable and available food that can be utilized for a healthy diet, contributing to greater food security.

## Lines of Effort:

1. **Foster a business-enabling environment for inclusive economic growth.**  The United States will work with governments to streamline regulatory processes and services, including via digitalization of government services such as records, databases, permitting, and tax collection. This will include efforts to address structural impediments to investment; support business incubation and acceleration to strengthen value chains by helping businesses produce higher-value goods in the agricultural and emerging sectors, and ensure all populations are incorporated into economic development policies.

   - **Promote legal certainty.**  Weak rule of law is often cited as the top factor limiting new investment in El Salvador, Guatemala, and Honduras.  We will work with the private sector, governments, and civil society to strengthen transparency, promote business ethics, and foster predictable legal and regulatory business environments.

   - **Promote investment-enabling reforms.**  The United States will partner with regional governments, multilateral development banks, and the private sector to promote reforms to address structural impediments to investment and facilitate greater private sector participation in these economies, leveraging U.S. government partnerships with these entities to support business development and create jobs.

   - **Embrace technological solutions.**  The United States will leverage rights-respecting technology to facilitate economic growth, increase opportunities for excluded populations, promote financial inclusion, and strengthen education and workforce development in coordination with the private sector.  This will include extending existing technological solutions to our areas of focus, and guarding against unintended consequences of technological expansion.

   - **Expand opportunity for women, youth, and minorities.**  The United States will work to ensure government programs and financial capital reach underserved groups, including small and medium sized enterprises (SMEs), youth, women- and indigenous-owned businesses, businesses serving rural areas, and internally displaced persons (IDPs).

2. **Enhance and diversify trade.**  The United States will work with a variety of stakeholders to increase trade, diversify industry, and create decent work for citizens in the region, while working with governments to promote reforms needed to facilitate this growth.

- **Facilitate trade.**  The United States will work with governments to expand and diversify trade by reducing malfeasance and corruption in customs regimes; promoting prioritization of lending and technical support for infrastructure projects that facilitate trade; aligning and integrating regional customs systems; harmonizing regulatory certification requirements; and supporting business compliance with internationally recognized labor rights, environmental protections, and complex international trade rules.

- **Partner with International Financial Institutions (IFIs) and Multilateral Development Banks (MDBs).**  The United States will partner with IFIs and MDBs to diversify donors and provide a wide range of financing options to governments and private sectors in the region.  We will leverage the IFIs and MDBs to prioritize support for infrastructure development that facilitates trade and investment while incorporating transparency and good governance priorities in their financing and technical assistance initiatives.

- **Partner with the Private sector.**  The United States will partner with private sector companies to sustainably grow economies by attracting greater private investment while encouraging governance, economic, and other reforms to support business-enabling environments that create decent work.  We will conduct outreach to U.S. and vetted multinational businesses that already operate in the region, as well as business chambers of commerce in Central America.

- **Promote cross-border energy infrastructure.**  The United States will support cleaner and more efficient cross-border energy systems including new energy delivery infrastructure to facilitate increased reliability and cross border power integration and trade.

3. **Enhance workforce development, health, and education.**  The United States will support workforce training and vocational education programs, including improving the quality of existing education and increasing children enrolled in education and food programs that ensure children's basic nutritional needs are met; expand access to clean and potable water; and support a stronger COVID-19 response.

   - **Increase access to quality education.**  The United States will support governments in providing youth with appropriate, safe, and accessible educational opportunities; and ensuring educational and vocational offerings reflect labor market needs so youth are able to access decent work upon completion of their studies.

   - **Improve health.**  The United States will support water and sanitation programs to expand access to clean water.  The United States will support programs to strengthen health systems to address current and future public health challenges.

4. **Build resilience to address climate change and food insecurity.**  The United States will partner with governments, MDBs, IFIs, and the private sector to facilitate the development of agricultural practices to ensure farmers can better respond to the impacts of climate change and extreme weather events, which have contributed to food insecurity.

   - **Increase resilience.**  The United States will support improved agriculture production and income generation to reduce food insecurity while supporting sustainable food systems. We will support efforts to improve crop resilience, adopt environmentally and economically sustainable agricultural practices, and improve land and water

management; improve the resilience of residential, commercial, and public buildings and core public infrastructure; and mitigate the impacts of and support a more rapid recovery from hurricanes and other severe weather events.

- **Enhance renewable energy.**  The United States will support new electricity generation projects, including in renewable energy and power grid improvement; a more efficient regulatory framework, especially for distributed generation, increased reliability, grid sustainability, and cross-border power integration and trade.  We will focus on investment categories including power generation with a focus on renewable energy, energy efficiency, and storage; residential, commercial, and public buildings; and water efficient agriculture.



# Pillar II:  Combating corruption, strengthening democratic governance, and advancing the rule of law

Governance challenges, including widespread corruption, undercut progress on economic opportunity, protection of human rights, and civilian security.  Private companies cite corruption as an impediment to investment.  Weak democratic institutions, coupled with rampant impunity, have lowered citizens' trust in their governments and the independence of judicial systems.  Contested elections and opaque government decision-making have led to violence.

As seen during the COVID-19 pandemic, governments all too often fail to provide needed services to their citizens and lack of government investment in infrastructure, education, health, and civilian security has hobbled advancement.  We will partner with civil society and independent media so they can maintain their critical oversight role and will work with civil society, the private sector, governments, and international institutions to advocate for sustainable progress in these areas.

## Strategic Objectives:

1. ***Strengthen Democratic Institutions to Improve Governance and Rule of Law:***  Governments enact and implement legislative reforms towards transparent and participatory policy making and electoral processes, including broad civic engagement.  Oversight is instituted at all levels of government.

2. ***Combat Corruption***:  Governments are freed from entrenched networks of corruption and impunity.  They develop and strengthen independent and transparent systems to eliminate conflicts of interest, including in selection of judges and other government personnel.

3. ***Improve Government Service Delivery:***  Governments improve capacity to raise and manage public resources, initiate reforms to improve fiscal and operational transparency, and provide services to all citizens.

## Lines of Effort:

1. **Strengthen democratic institutions to improve governance and rule of law.**  The United States will work with countries to promote reform agendas across all branches of government so government better serves all citizens.  This will include a focus on adequately resourcing judicial and oversight institutions, ensuring their independence, and promoting reform of personnel selection and retention processes.

   - **Strengthen the independence of the justice sector.**  The United States will promote a merit-based, independent process for nomination and selection of justice and oversight officials, and establish anti-corruption norms limiting immunity of officials from prosecution and banning candidates for office with disqualifying criminal records.  We will promote adequate funding of justice institutions so they have the resources to serve the country.

   - **Promote transparency.**  The United States will work with partners to promote transparency in electoral systems through reform and enforcement of electoral campaign finance rules and open list systems to allow for direct representation.  We will empower independent audit and oversight institutions to monitor use of public funds, and promote transparency in government processes, including open government mechanisms and the promotion of open data.  We will explore how to leverage the concept of "vetted units" to bring trusted actors into key roles in oversight bodies, including in legislative committees.

   - **Improve efficacy of legislative branches.**  The United States will work with partners to root out corruption in legislative branches and improve the transparent and efficient functioning of those bodies.

   - **Empower public and private sector actors.**  The United States will partner with civil society and independent media so they have the tools, knowledge, and networks needed to safely identify government neglect and abuse, raise awareness, and demand accountability.  We will partner with the private sector to advocate for necessary reforms and regulations to promote transparency.

2. **Prioritize an anticorruption agenda.**  The United States will work regionally, bilaterally, and, if we must, unilaterally to root out corruption and enhance transparency across the region.

   - **Support civil society and media organizations.**  Across Central America, citizens, nongovernmental organizations, and media organizations have led efforts to promote transparency and demand improved governance.  The United States will expand support for NGOs and other entities in the region focused on governance promotion to encourage local leadership of such efforts and foster resiliency and sustainability.

   - **Prevent, detect, investigate, and prosecute corruption.**  The United States will work with partners to develop and implement a variety of anti-corruption tools aimed at preventing, detecting, investigating, and ultimately punishing corruption at all levels and in all branches of the government, and throughout society.  We will identify, support, and

11

partner with prosecutorial teams that demonstrate a commitment to holding corrupt actors to account.

- **Sanction corrupt actors.**  The United States will use various tools, including financial sanctions and visa restrictions, to signal we will not tolerate corruption and antidemocratic behavior.  We will press governments to strengthen transparency, accountability, and the rule of law with decisive and meaningful reforms.

3. **Improve administration of public resources.**  The United States will work with governments to establish proper budgeting, management, and use of public resources at the local and national levels to enhance service delivery for all citizens, including in underserved areas and vulnerable populations.

- **Improve government finances.**  The United States will work with governments to review fiscal policy to identify gaps and incongruences in taxation, and opportunities to progressively expand the tax base, incentivizing individuals and businesses to move into the formal economy and to transition public procurement to a competitive, transparent, and merit-based system to curb political influence and diminish the opportunities for corruption.

- **Target key populations.**  The United States will work with governments to establish strategies to provide services in marginalized communities, including IDPs, high-threat crime areas, and regions with highest outbound migration.



# Pillar III:  Promoting respect for human rights, labor rights, and a free press

Respect for human rights, labor rights, and press freedom are essential elements to democratic and social development in the region.  Marginalized populations, including women and girls, indigenous, Afro-descendent, and LGBTQI+ populations often suffer discrimination and may be victims of hate crimes.  Victims of violence at the hand of the state or criminal organizations suffer from systemic violations of their rights under the law (including redress, protection, and recognition), and IDPs are particularly at risk.  Labor rights activists, human rights and environmental defenders, and independent journalists face violence and intimidation.  Authorities often do not hold perpetrators of these crimes accountable and labor law enforcement is weak.  We will work with partners in the region, including civil society, to promote respect for human rights for all citizens.

## Strategic Objectives:

1. ***Enhance Respect for Human Rights:***  Governments prevent, reduce, and mitigate risk factors and reduce human rights violations.  Civil society organizations and a robust free press hold government actors accountable.  At-risk populations have national and international recourse, including U.S. government support and advocacy.

2. ***Enhance Respect for Labor Rights:*** Governments ensure labor laws are enforced as required by CAFTA-DR, with a particular emphasis on freedom of association and the right to organize and bargain collectively, addressing child labor and forced labor, and promoting decent work in safe, healthy, and inclusive workplaces free from discrimination.

3. ***Promote a Free Press:*** Governments respect the independence of all forms of media so citizens can access information necessary to make informed decisions and hold governments accountable.

## Lines of Effort:

1. **Strengthen respect for human rights.** The United States will work with governments and civil society to strengthen legal frameworks, promote the enforcement of laws that protect citizens' rights, support regional and domestic early warning systems to track risks for violations, and build institutional capacity to protect citizens' rights.

   - **Protect human rights defenders and at-risk populations.** The United States will work with governments and civil society to protect marginalized individuals and groups, including human rights and environmental defenders, youth activists, LGBTQI+ people, indigenous people, IDPs forcibly displaced by violence, labor rights activists, and other individuals who are at risk of persecution or abuse.

   - **Respond promptly and decisively to ensure accountability.** The United States will work with governments so they decisively respond when human rights violations occur, extending access to justice for all citizens, and reducing impunity by ensuring justice and security actors hold perpetrators accountable.

   - **Curb extrajudicial killings.** The United States will support efforts to curb abuses by security personnel, including the police, and hold perpetrators accountable.

   - **Strengthen civil society protections.** The United States will work with governments and civil society organizations to ensure that civil society and media groups are able to hold governments accountable without legal restriction and free from intimidation.

2. **Strengthen respect for labor rights.** The United States will work with governments to strengthen legal frameworks and the enforcement of labor laws, promote decent work, and support workers in exercising their freedom of association and collective bargaining rights.

   - **Protect trade unionists and the right to organize.** The United States will work with governments to ensure laws that protect the rights of workers to organize and bargain collectively are in place and are effectively enforced. The United States will work with governments to empower workers to claim their rights, protect labor rights activists, and build the capacity of democratic, worker-led organizations.

   - **Improve legal frameworks, enforcement, and awareness.** The United States will work with governments to ensure laws that protect fundamental labor rights are in place and enforced, with appropriate dispute resolution mechanisms and proactive outreach to communities, unions, civil society, and employers. The United States will promote labor rights compliance among employers, including accountability in the supply chains of priority sectors. The United States will work with governments, employers, and worker organizations to promote constructive dialogue on labor issues to improve legal

**13**

frameworks, inform enforcement strategies, and strengthen worker voices related to labor and employment issues.

3. **Promote a free press.**  The United States will work with governments and civil society to ensure citizens have access to information from independent sources to inform their choices.

   • **Strengthen independent media.**  The United States will support a regulatory environment that ensures independent media can operate without fear of reprisal or intimidation, and will support development of media that can serve as an effective oversight tool to those in power.



# Pillar IV:  Countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations

U.S. assistance contributed to important advances in the professionalism and capability of law enforcement and security services throughout Central America, in particular with the capacity of vetted units, community policing, and violence prevention initiatives.  Homicide rates have decreased and capacity to seize illicit drugs has increased in recent years, though violence against women and children has increased.  Gangs and extortion remain a threat, and transnational crime is on the rise.  Challenges remain with uneven capabilities among law enforcement and security services, inadequate resourcing of security needs, the impact of the pandemic on law enforcement, and the military's role in policing.

Obtaining clear and meaningful commitments from our partners to tackle corruption and support transparency is a foundational element for sustainable progress across the criminal justice systems of Central America.  Increasing security within communities is key to generating hope for citizens in the region so they can move safely to school and work, but also to attract investment.  We will work with partner governments and community organizations to build professional security forces and focus on violence prevention and intervention to build a more secure region.

## Strategic Objectives:

1. ***Professionalize Security Forces***:  Governments support the development of accountable security forces that earn the respect of the citizens they serve.  This includes adopting budgets for security forces that enable them to be sufficiently staffed, trained, equipped, and compensated, and have internal oversight to strengthen accountability.  Governments establish legal limitations on the use of militaries in civilian policing and implement plans for the removal of militaries from civilian policing.

**14**

2. ***Counter Organized Crime*:**  Security forces counter organized crime and using place-based strategies, disrupt and dismantle transnational criminal organizations and other criminal actors in key corridors to improve citizen security.

3. ***Build Safe Communities through Violence Prevention and Intervention*:**  Governments make legal and policy reforms in violence prevention, support rehabilitation and re-insertion into society of former gang members and individuals previously incarcerated, and provide protection to at-risk youth and victims of violence, and other marginalized populations, including prevention of human trafficking.

## Lines of Effort:

1. **Professionalize security forces.**  The United States will support the development of well-trained civilian law enforcement and other security forces that can provide effective, accountable services with respect for the rule of law and human rights.  We will work with governments so civilian law enforcement has the resources and capacity to assume full responsibility for civilian security, enabling the drawdown of military from policing roles.

   - **Improve civilian policing.**  The United States will work with governments to target resources at the most pressing security challenges, while ensuring intelligence-led and community policing concepts are introduced and implemented nationwide, designed to increase dialogue and trust with populations, and establish community-based solutions to crime that respect human rights.

   - **Enhance accountability.**  The United States will work with governments to build accountability into security forces through initiatives to support audit and oversight functions to root out and address misconduct and poor performance.

2. **Counter organized crime.**  The United States will work with governments to increase capacity of law enforcement and other security forces to address the unique transnational and national threats to the region, such as drug trafficking, gangs, extortion, smuggling, corruption, and money laundering, including through vetted and specialized units, regional cooperation, and legislative reform to increase penalties for organized crime.

   - **Build trusted partners.**  The United States will work with and expand vetted and specialized units to build capacity to address complex crimes, including human and drug trafficking, and ensure trusted partners that can work with the United States and others in the region.

   - **Promote regional cooperation.**  The United States will promote coordination and information sharing among countries in the region to address transnational crime, including to combat narcotics and other illicit trafficking.

3. **Build safe communities.**  The United States will work with governments, law enforcement, community organizations, and others to build trust between the community and government, prevent crime, and provide alternatives to youth considering a life of crime.

   - **Create safe spaces.**  The United States will work with municipalities and community organizations to increase the availability of safe spaces, such as parks and youth centers,

and improve the safety of public transportation, so that citizens can engage in economic and social life without fear

- **Create meaningful alternative for at-risk youth.**  The United States will work with a diverse range of stakeholders from government, civil society, and the private sector to prevent youth from joining gangs, including through opportunities to play, learn, work, and feel connected with their families and communities.

- **Reintegrate offenders.**  The United States will work with governments and civil society to support offenders' efforts to disengage from gangs and reintegrate into communities by addressing trauma, community resiliency, education and economic opportunity, and case management services.



# Pillar V:  Combating sexual, gender-based, and domestic violence

Across the region, gender-based violence (GBV)--including, but not limited to, intimate partner violence, rape, gender-based murder of women and girls (femicide)--and other crimes, including sex and labor trafficking, significantly hinder the ability of women and girls to participate fully in society and contribute to their families and communities.  Women and youth from historically marginalized communities often face even higher levels of GBV.  In El Salvador, Guatemala, and Honduras, women and youth subjected to violence or human trafficking lack sufficient access to justice and protection services.  The ability of law enforcement to combat sexual, gender-based, and domestic violence remains a challenge, and domestic violence has been exacerbated by the COVID-19 pandemic.  We will work with partner governments, civil society organizations, and others to combat violence in the region.

## Strategic Objectives:

1. *Combat sexual, gender-based, and domestic violence:*  Governments and civil society take steps to prevent sexual, gender-based, and domestic violence; hold perpetrators accountable; and protect and provide services for victims.

## Lines of Effort:

1. **Combat sexual, gender-based, and domestic violence.**  The United States will work with governments and civil society to prevent, address, and support victims of sexual, gender-based, and domestic violence.

   - **Prevent and prosecute sexual, gender-based, and domestic violence.**  The United States will work with governments in the region to implement existing legislation relating to sexual, gender-based, and domestic violence, and ensure law enforcement and the justice sector is equipped to investigate and prosecute these crimes, reducing impunity for

16

these crimes.  We will work with community-based organizations to change the culture around gender-based violence and empower women.

- **Support victims.**  The United States will work with governments and civil society to increase support and protection for survivors of these crimes, and break down stereotypes and cultural norms that permit these crimes to continue.



# Implementation Sequencing Highlights

## Short-Term:

**Build Partnerships:**  We will build a coalition of people, organizations, and businesses committed to creating economic opportunity and fostering political will for structural reforms in Guatemala, El Salvador, and Honduras.

**Mobilize Investment:**  We will work with the private sector to mobilize investment in the region to create economic opportunity.

**Address Acute Causes:**  We will address humanitarian needs from the fall 2020 hurricanes, provide training and finance to jump start the economies after COVID-19 and hurricane devastation, and provide critical support to those in need of food assistance.  We will focus on education and training for youth.

**Communicate:**  We will ensure people in the region know about the United States' commitment to supporting good governance, economic opportunities, and security so they understand help is on the way to build hope for a better future at home.  We will communicate clearly to governments in the region that the United States wants to be a partner in their success, but that this partnership requires a shared commitment to inclusive and transparent democratic governance.

## Medium Term:

**Promote Reforms:**  We will focus our efforts on deepening implementation of initiatives that promote reforms fundamental to addressing root causes of migration, employing the full range of U.S. government tools to combat corruption and promote political will where necessary.

**Create Economic Opportunity:**  We will expand our partnership with foundations, civil society, and the private sector to deliver new economic opportunities to citizens in the region, and mobilize appropriate technological solutions.

**Fight Corruption:**  We will launch a regional anti-corruption initiative and work closely with partners to prosecute corruption and transnational criminal operations, including illicit political finance, migrant smuggling and trafficking cases, that will help improve governance in Central America.

**Combat Insecurity:**  We will target security assistance on the most common security-related drivers of migration, including extortion and gender-based violence.

**Address Climate Change and Improve Disaster Preparedness:**  We will work with partners to reinforce national and regional preparedness and disaster response capabilities and implement programs to adapt to and mitigate the impacts of climate change.

**Communicate:**  We will continue to communicate progress and actions to build hope across society.

## Long-Term:

**Deepen Partnerships:**  We will solidify and expand implementation across the pillars, informed by constant feedback and consultation from stakeholders in Congress, civil society, international organizations, the private sector, and partner governments.

**Institutionalize Programs:**  We will aim for institutionalization of longer-term structural changes in governance to ensure strong democratic institutions and governments that invest in the well-being of their societies.  We will assess our progress and increase the sustainability of our efforts by transferring increased ownership to partners in the region.

**Integrate Regionally:**  We will seek deeper economic and political integration across Central America, and with North America, to safely and humanely manage migration and to help realize a vision of a more prosperous and stable region.

Haiti AR_001181



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Information Technology*
Washington, DC  20529



U.S. Citizenship
and Immigration
Services

# Memorandum

TO:        Dominic Mancini,
Deputy Administrator,
Office of Information and Regulatory Affairs,
Office of Management and Budget

THROUGH:   Eric Hysen
DHS Chief Information Officer

ERIC N HYSEN
Digitally signed by ERIC N HYSEN
Date: 2022.12.29 15:46:20 -05'00'

FROM:     Samantha Deshommes
USCIS Office of Policy and Strategy,
Chief Regulatory Officer

SAMANTHA L DESHOMMES
Digitally signed by SAMANTHA L DESHOMMES
Date: 2022.12.29 13:34:32 -05'00'

SUBJECT:    Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – Form
I-134A, Online Request to be a Supporter and Declaration of Financial Support;
and USCIS Form I-134, Declaration of Financial Support

**Purpose:** USCIS is requesting emergency approval of the new USCIS Form I-134A, Online
Request to be a Supporter and Declaration of Financial Support, which is a new collection of
information.  USCIS is also requesting emergency approval of a revision of USCIS Form I-134,
Declaration of Financial Support, to remove the electronic collection of information, which is the
basis for the new USCIS Form I-134A.  USCIS is seeking approval for both collections of
information under 5 CFR 1320.13.

**Background:**  Section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C.
1182(d)(5)) provides the Secretary of Homeland Security with the discretionary authority to
parole noncitizens into the United States temporarily, under such reasonable conditions that the
Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant
public benefit." *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); see also 6 U.S.C. 202(4)
(charging the Secretary with the responsibility for "[e]stablishing and administering
rule…governing…parole").  To support DHS's current efforts to curb a surge in migrants

Haiti AR_001183

crossing the Southwest Border (SWB) without authorization and immediately expand the avenues for lawful migration into the United States, DHS has created a streamlined process that allows certain citizens of designated countries and their immediate family members to come to the United States temporarily as parolees for urgent humanitarian reasons or significant public benefit.  The process currently applies to Ukraine and Venezuela (with a numerical cap), but, with this emergency revision, it is being extended to Nicaragua, Cuba, and Haiti, and the numerical cap on Venezuela is being lifted.  DHS will use Form I-134A to determine whether a U.S.-based individual has sufficient financial resources and access to those funds to support the beneficiary for the duration of their temporary stay in the United States.  Form I-134A is used by a U.S. based individual (the supporter) to request to be considered as a supporter and to agree to provide financial support to the beneficiary named on the form during the beneficiary's period of stay in the United States.

USCIS is now splitting the two versions of the USCIS Form I-134 into separate OMB-controlled collections of information as the populations are different and the purposes for which the information collections are conducted are different enough to warrant their separation.  As a result, USCIS will revert use of USCIS Form I-134 for its original purpose and will begin use of USCIS Form I-134A for the persons identified above as seeking parole into the United States.  Other than expanding the eligible countries and associated instructions, the USCIS Form I-134A will match the previously approved online Form I-134 content.  To facilitate the transition between versions, Form I-134 online requests that are saved and in process when the Form I-134A is deployed, will be automatically converted to Form I-134As upon submission and the receipt notices will reflect the new form number and name.

**Discussion:**  OMB has previously approved a revision to USCIS Form I-134, *Declaration of Financial Support* (OMB control number 1615-0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. To support the expanded efforts and make the collection more flexible, DHS has created a new information collection that will be the first step in these parole processes and will cease using the paper USCIS Form I-134 for this purpose.  U.S.-based supporters will submit USCIS Form I-134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States.

DHS requests emergency approval because the delay associated with the normal information collection request clearance process would harm the public interest.  The expansion of these processes to include Cubans, Haitians, and Nicaraguans and the expansion of the current process for Venezuelans will improve border security, limit irregular migration, and create additional safe and orderly processes for people fleeing humanitarian crises to come to the United States.

Each of these countries is experiencing significant political, economic, and humanitarian challenges.  Cuba, Nicaragua, and Venezuela are under the control of repressive authoritarian regimes that routinely oppress dissenting voices.  Haiti, the poorest country in our hemisphere, faces an extremely challenging security environment punctuated by extreme political instability, and its citizens are subject to endemic, indiscriminate violence imposed by the criminal organizations and gangs.  These conditions are driving irregular migration throughout the hemisphere as well as to our border.

There has been a significant increase in unique encounters of Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals, which jumped by more than 10-fold from an average of 15,557 in FY 2014 – FY 2019 to 169,436 in FY 2021.  CHNV encounters increased further – and sharply – in fiscal year (FY) 2022.  DHS encountered an estimated 605,000 unique CHNV nationals in FY 2022.

This process is directly responsive to requests from key foreign partners—including the Government of Mexico (GOM)—to provide a lawful process for Cuban, Haitian, Nicaraguan, and Venezuelan nationals to enter the United States.  The United States will only implement the new parole process while able to return or remove to Mexico such nationals who enter without authorization across the SWB.  The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of individuals who bypass this process and enter the United States without authorization.  Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this independent U.S. action and ongoing, sensitive diplomatic engagements.

Delaying the information collection approval would be contrary to the public interest because it would incentivize even more irregular migration of Cuban, Haitian, Nicaraguan, and Venezuelan nationals seeking to enter the United States.  Thus, the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration would be exacerbated by a delay of the approval of this request.

USCIS seeks emergency processing of both the Form I-134 and I-134A information collection packages in accordance with 5 CFR 1320.13. USCIS certifies that the requirements of 5 CFR 1320.13(a) are met and that:

- The collection of information is needed immediately and is essential to the mission of the agency.
- The use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information.
- Public harm is reasonably likely to result if normal clearance procedures are followed.

USCIS greatly appreciates the timely consideration of this request.

**Recommendation**: Please sign decision memo requesting emergency approval of this collection of information under 5 CFR 1320.13.

Haiti AR_001185



# Declaration of Financial Support

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134**
OMB No. 1615-0014
Expires 12/31/2024

▶ **START HERE - Type or print in black ink.**

## Part 1.  Basis for Filing

**1.**  I am filing this form on behalf of: ☐ Myself as the beneficiary. ☐ Another individual who is the beneficiary.

## Part 2.  Information about the Beneficiary

Complete **Part 2.** regardless of whether you are filing this form on behalf of yourself as the beneficiary or on behalf of another individual who is the beneficiary.

**1.**  Beneficiary's Current Legal Name (**Do not** provide a nickname.)

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
|  |  |  |

**2.**  Other Names Used

Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
|  |  |  |
|  |  |  |

**3.**  Date of Birth (mm/dd/yyyy)

**4.**  Gender  ☐ Male  ☐ Female

**5.**  Alien Registration Number (A-Number) (if any)  ▶ **A-**

**6.**  Place of Birth

City or Town

State or Province

Country

**7.**  Country of Citizenship or Nationality

**8.**  Marital Status

☐ Single, Never Married  ☐ Married  ☐ Divorced  ☐ Widowed  ☐ Legally Separated  ☐ Marriage Annulled

☐ Other (Explain):

Haiti AR_001186

**Part 2.  Information about the Beneficiary** (continued)

9.    Beneficiary's Mailing Address

In Care Of Name (if any)

Street Number and Name                                                    Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                              State        ZIP Code

Province                              Postal Code            Country

10.    Are the beneficiary's mailing address and physical address the same?                    ☐ Yes ☐ No

If you answered "No" to **Item Number 10.**, provide your physical address in **Item Number 11.**

11.    Beneficiary's Physical Address

In Care Of Name (if any)

Street Number and Name (Do **not** provide a PO Box in this space unless it is your **ONLY** address.)   Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                              State        ZIP Code

Province                              Postal Code            Country

*Beneficiary's Anticipated Length of Stay*

12.    Beneficiary's Anticipated Period of Stay in the United States

From (mm/dd/yyyy)

To (select one):

☐ (mm/dd/yyyy)

☐ No End Date

Haiti AR_001187

## Part 2.  Information about the Beneficiary (continued)

### Beneficiary's Financial Information

Provide information about the beneficiary's income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information**.

**Beneficiary's Income**

13.   Provide all of the information requested in the table below about the beneficiary, all of the beneficiary's dependents, and any other individuals the beneficiary financially supports (do not include any individuals named in **Part 3.**).  Information about assets that are not based on employment should be added in **Item Number 16.** and not in **Item Number 13.**

| Individual's Full Name<br>(First, Middle, Last) (do not include any individuals named in **Part 3.**) | Date of Birth<br>(mm/dd/yyyy) | Relationship to the Beneficiary<br>(Type or print "Self" if you are filing for yourself as the beneficiary or "Beneficiary" if someone is agreeing to support you in **Part 3.**) | Income contribution to the beneficiary annually (if none, type or print $0) |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | **Total** Number of Dependents | |
| | | Total Income $ | |

14.   Does any of the beneficiary's total income (including income from dependents and other individuals who contribute to the beneficiary's income, excluding any individuals named in **Part 3.**) come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?     ☐ Yes   ☐ No

15.   If you answered "Yes" to **Item Number 14.**, what amount of the beneficiary's total income comes from an illegal activity or source?     $ _____

**Part 2.  Information about the Beneficiary** (continued)

**Beneficiary's Assets**

16.  In the table below, provide the amounts of assets available to the beneficiary for the expected period of his or her stay (excluding assets from any individuals named in **Part 3.**).  Attach evidence showing that the beneficiary has these assets.

| Full Name of Asset Holder (First, Middle, Last) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Current Cash Value (U.S. dollars)  $ | |
| | **TOTAL** (U.S. dollars)  $ | |

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.**

If you are not the beneficiary named in **Part 2.**, complete **Part 3.**

1.  Current Legal Name (**Do not** provide a nickname.)

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |

2.  Other Names Used

Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |
| | | |

3.  Current Mailing Address

In Care Of Name (if any)

Street Number and Name                           Apt.Ste. Flr.  Number

City or Town                                     State   ZIP Code

Province               Postal Code   Country

Form I-134   Edition   12/20/22

Haiti AR_001189

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

4.   Is your current mailing address the same as your current physical address?      ☐ Yes   ☐ No

If you answered "No" to **Item Number 4.**, provide your current physical address in **Item Numbers 5.**

5.   Physical Address

In Care Of Name (if any)

Street Number and Name                                                      Apt.Ste. Flr.   Number

City or Town                                                                    State    ZIP Code

Province                                    Postal Code                  Country

*Other Information*

6.   Date of Birth (mm/dd/yyyy)

7.   Place of Birth

City or Town                                                                  State or Province

Country

8.   Alien Registration Number (A-Number) (if any)     9.   USCIS Online Account Number (if any)

▶ **A-**                                                    ▶

*Immigration Status*

10.   What is your current immigration status?  Provide documentation as provided in the instructions.

☐ U.S. Citizen

☐ U.S. National

☐ Lawful Permanent Resident   A-Number

▶ **A-**

☐ Nonimmigrant   Form I-94 Arrival-Departure Record Number

▶

Other (Explain):

Form I-134   Edition   12/20/22

Haiti AR_001190

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

### Employment Information

11. Employment Status

☐ Employed (full-time, part-time, seasonal, self-employed)   ☐ Unemployed or Not Employed   ☐ Retired

☐ Other (Explain): [                                                                    ]

If you indicated that you are employed in **Item Number 11.**, provide the information requested in **Item Numbers 12. - 13.**

12. **A.**  ☐ I am currently employed as a/an          Name of Employer

[                                    ]        [                                    ]

**B.**  ☐ I am currently self-employed as a/an

[                                    ]

13. Current Employer's Address

Street Number and Name                                    Apt.Ste. Flr.   Number

[                                                          ]   ☐ ☐ ☐   [                    ]

City or Town                                              State   ZIP Code

[                                                          ]   [        ]   [                    ]

Province                          Postal Code          Country

[                        ]        [                ]   [                        ]

### Financial Information

Provide information about your income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8.  Additional Information**.

**Income**

14. Provide all of the information requested in the table below about yourself, all of your dependents, and any other individuals you financially support (do not include any individuals named in **Part 2.**).  Information about assets that are not based on employment should be added in **Item Number 17.** and not in **Item Number 14.**

| **Full Name** (First, Middle, Last) (do not include any individuals named in **Part 2.**) | **Date of Birth** (mm/dd/yyyy) | **Relationship to the Individual Agreeing to Financially Support** (Type or print "Self" for Individual Agreeing to Financially Support the Beneficiary) | **Income Contribution to the Beneficiary Annually** (if none, type or print $0) |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | **Total** Number of Dependents | |
| | | Total Income $ | |

Haiti AR_001191

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

**15.** Does any of the income listed above come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?  ☐ Yes  ☐ No

**16.** If you answered "Yes" to **Item Number 15.**, what amount of income comes from an illegal activity?  $ [                    ]

### Assets

**17.** Fill out the table below regarding the assets available to **you** (do not include any assets from any individuals named in **Part 2.**). Attach evidence showing you have these assets.

| Full Name of Asset Holder (you or your household member) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | Current Cash Value (U.S. dollars)  $ |  |
|  | **TOTAL** (U.S. dollars)  $ |  |

### *Financial Responsibility for Other Beneficiaries*

**18.** Have you previously submitted a Form I-134 on behalf of a person other than the beneficiary listed on this Form I-134?  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 18.**, provide the information requested in **Item Numbers 19. - 20.** If you need additional space to complete this section, use the space provided in **Part 8. Additional Information**.

**19.** Person 1

Family Name (Last Name)  [                    ]   Given Name (First Name)  [                    ]   Middle Name  [                    ]

A-Number
► A- [ ][ ][ ][ ][ ][ ][ ][ ]   Date Submitted (mm/dd/yyyy)  [                    ]

**20.** Person 2

Family Name (Last Name)  [                    ]   Given Name (First Name)  [                    ]   Middle Name  [                    ]

A-Number
► A- [ ][ ][ ][ ][ ][ ][ ][ ]   Date Submitted (mm/dd/yyyy)  [                    ]

Form I-134   Edition   12/20/22

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

*Intent to Provide Specific Contributions to the Beneficiary*

**21.**   I   ☐ intend   ☐ do not intend to make specific contributions to the support of the beneficiary named in **Part 2.**

Explain the contribution.  For example, if you intend to furnish room and board, state for how long.  If you intend to provide money, state the amount in U.S. dollars and whether it is to be given in a lump sum, weekly, or monthly, and for how long.  If you need additional space, use **Part 8. Additional Information**.

_____

**Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf)**

If you are the beneficiary and are filing Form I-134 on your own behalf, complete and sign **Part 4.**

**NOTE:**  Read the **Penalties** section of the Form I-134 Instructions before completing this section.

*Beneficiary's Statement*

**NOTE:** Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.**   I, as the beneficiary, certify the following:

**A.**   ☐   I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question**.**

**B.**   ☐   The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood everything.

**2.**   ☐   At my request, the preparer named in **Part 7.**, _____, prepared this declaration for me based only upon information I provided or authorized.

*Beneficiary's Contact Information*

**3.**   Beneficiary's Daytime Telephone Number

_____

**4.**   Beneficiary's Mobile Telephone Number (if any)

_____

**5.**   Beneficiary's Email Address (if any)

_____

*Beneficiary's Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

Haiti AR_001193

## Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf) (continued)

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

**1)** I reviewed and provided or authorized all of the information in my declaration;

**2)** I understood all of the information contained in, and submitted with, my declaration; and

**3)** All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that I will be able to financially support myself while in the United States.

That I am willing and able to pay for necessary expenses for the duration of my temporary stay in the United States.

### Beneficiary's Signature

**6.** Beneficiary's Signature

➡️

Date of Signature (mm/dd/yyyy)

## Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary

If you are filing Form I-134 on behalf of someone else (the beneficiary listed in **Part 2.**), complete and sign **Part 5.**

**NOTE:**  Read the **Penalties** section of the Form I-134 Instructions before completing this section.

### Statement of Individual Agreeing to Financially Support the Beneficiary

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.** I, as the individual agreeing to financially support the beneficiary, certify the following:

**A.** ☐ I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question.

**B.** ☐ The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood

**2.** ☐ At my request, the preparer named in **Part 7.,** _____, prepared this declaration for me based only upon information I provided or authorized.

### Contact Information of Individual Agreeing to Financially Support the Beneficiary

**3.** Daytime Telephone Number

**4.** Mobile Telephone Number (if any)

**5.** Email Address (if any)

**Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary** (continued)

### *Certification of Individual Agreeing to Financially Support the Beneficiary*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

**1)** I reviewed and provided or authorized all of the information in my declaration;

**2)** I understood all of the information contained in, and submitted with, my declaration; and

**3)** All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that the person named in **Part 2.** will be financially supported while in the United States.

That I am willing and able to receive, maintain, and support the person named in **Part 2.** to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States.

I acknowledge that I have read this section, and I am aware of my responsibilities as an individual agreeing to financially support the beneficiary.

### *Signature of Individual Agreeing to Financially Support the Beneficiary*

**6.** Signature

Date of Signature (mm/dd/yyyy)

**NOTE TO ALL INDIVIDUALS AGREEING TO FINANCIALLY SUPPORT THE BENEFICIARY:**  If you do not completely fill out this declaration or if you fail to submit required documents listed in the Instructions, USCIS or the Department of State may deny or not consider your declaration.

**Part 6.  Interpreter's Contact Information, Certification, and Signature**

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.** Interpreter's Family Name (Last Name)

Interpreter's Given Name (First Name)

**2.** Interpreter's Business or Organization Name (if any)

**Part 6.  Interpreter's Contact Information, Certification, and Signature** (continued)

### *Interpreter's Mailing Address*

**3.**   Street Number and Name                                         Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                              State     ZIP Code

Province                              Postal Code             Country

### *Interpreter's Contact Information*

**4.**   Interpreter's Daytime Telephone Number          **5.**   Interpreter's Mobile Telephone Number (if any)

**6.**   Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and _____ which is the same language specified in **Part 4.**
or in **Part 5.**, **Item B.** in **Item Number 1.**, and I have read to this individual agreeing to financially support the beneficiary in the identified language every question and instruction on this declaration and his or her answer to every question.  The individual agreeing to financially support the beneficiary informed me that he or she understands every instruction, question, and answer on the declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and has verified the accuracy of every answer.

### *Interpreter's Signature*

**7.**   Interpreter's Signature                                         Date of Signature (mm/dd/yyyy)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary**

Provide the following information about the preparer.

### *Preparer's Full Name*

**1.**   Preparer's Family Name (Last Name)               Preparer's Given Name (First Name)

**2.**   Preparer's Business or Organization Name (if any)

**Part 7.   Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary** (continued)

### Preparer's Mailing Address

**3.**   Street Number and Name                                                           Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                                 State   ZIP Code

Province                              Postal Code              Country

### Preparer's Contact Information

**4.**   Preparer's Daytime Telephone Number           **5.**   Preparer's Mobile Telephone Number

**6.**   Preparer's Email Address (if any)

### Preparer's Statement

**7.**   **A.** ☐   I am not an attorney or accredited representative but have prepared this declaration on behalf of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) and with that individual's consent.

**B.** ☐   I am an attorney or accredited representative and my representation of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) in this case ☐ extends   ☐ does not extend beyond the preparation of this declaration.

**NOTE:**  If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this declaration at the request of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself).  The individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) then reviewed this completed declaration and informed me that he or she understands all of the information contained in, and submitted with, his or her declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and that all of this information is complete, true, and correct.  I completed this declaration based only on information that the individual agreeing to financially support the beneficiary provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.**   Preparer's Signature                                                           Date of Signature (mm/dd/yyyy)

## Part 8.  Additional Information

If you need extra space to provide any additional information within this declaration, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this declaration or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.**   Family Name (Last Name)          Given Name (First Name)          Middle Name

**2.**   A-Number (if any) ▶ **A-**

**3.**   **A.**   Page Number   **B.**   Part Number   **C.**   Item Number

   **D.**

**4.**   **A.**   Page Number   **B.**   Part Number   **C.**   Item Number

   **D.**

**5.**   **A.**   Page Number   **B.**   Part Number   **C.**   Item Number

   **D.**

**6.**   **A.**   Page Number   **B.**   Part Number   **C.**   Item Number

   **D.**

Haiti AR_001108



# Declaration of Financial Support

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134**
OMB No. 1615-0014
Expires 12/31/2024

## What Is the Purpose of Form I-134?

Some immigration benefits that involve a temporary stay in the United States require U.S. Citizenship and Immigration Services (USCIS) to determine whether the applicant or beneficiary of the request has sufficient financial resources or financial support to pay for expenses during the temporary stay. The individual who signs and submits Form I-134 must establish that he or she has both sufficient financial resources and access to those funds to support the beneficiary listed on Form I-134 for the duration of the beneficiary's stay in the United States.

This version of Form I-134, Declaration of Financial Support, replaces the previously titled "Form I-134, Affidavit of Support."

## Who Must File Form I-134?

Certain individuals applying for parole based on urgent humanitarian reasons or significant public benefit filed on Form I-131, Application for Travel Document, must submit this form with Form I-131. Form I-134 is filed either by the applicant for parole on his or her own behalf, or by another individual on the parole applicant's behalf.

**NOTE:** Whether or not the beneficiary of this Form I-134 will have sufficient means of support while in the United States is an important factor in determining whether to exercise discretion to authorize parole. We require evidence that the beneficiary of this Form I-134 has financial support for the duration of his or her stay in the United States. Lack of evidence of financial support while in the United States is a strong negative factor that may lead to a denial of parole.

## Who May File Form I-134?

You may file this form on behalf of yourself or on behalf of a B, F, or M nonimmigrant requesting extension of stay or change of status.

Form I-134 may also be requested by Department of State in certain instances.

**Do not use Form I-134 if the beneficiary you are agreeing to financially support must have Form I-864, Affidavit of Support Under Section 213A of the INA, filed on his or her behalf instead.**

## Submission of Declaration

If you are agreeing to financially support more than one beneficiary, you must submit a separate Form I-134 for each beneficiary. You, as the individual agreeing to financially support the beneficiary, must sign your full name on the form.

## General Instructions

USCIS provides forms free of charge through the USCIS website.  To view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** and ask that we mail a form to you.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Signature.**  Each declaration must be properly signed and filed.  For all signatures on this declaration, USCIS will not accept a stamped or typewritten name in place of a signature.  A legal guardian may also sign for a mentally incompetent person.  If the request is not signed or if the requisite signature on the request is not valid, USCIS will reject the request.  See 8 CFR 103.2(a)(7)(ii)(A).  If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS will deny the request.

**Validity of Signatures.**  USCIS will consider a photocopied, faxed, or scanned copy of the original handwritten signature valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.**  There is no filing fee to file Form I-134.

**Evidence.**  You must submit all evidence requested in these Instructions with your declaration.  If you fail to submit required evidence, USCIS may reject or deny your declaration for failure to submit requested evidence or supporting documents in accordance with 8 CFR 103.2(b)(1) and these Instructions.

**Biometric Services Appointment.**  USCIS may require that you appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition.  After USCIS receives your declaration and ensures it is complete, we will inform you if you need to attend a biometric services appointment.  If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

1.  You provided or authorized all information in the declaration;

2.  You reviewed and understood all of the information contained in, and submitted with, your declaration; and

3.  All of this information was complete, true, and correct at the time of filing.

**Copies.**  You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document.  USCIS may request an original document at the time of filing or at any time during processing of an application or petition.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.  The certification should also include the translator's signature, printed name, the signature date, and the translator's contact information.

### How To Fill Out Form I-134

1.  Type or print legibly in black ink.

2. If you need extra space to complete any item within this declaration, use the space provided in **Part 8. Additional Information** or attach a separate sheet of paper. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately. If a question does not apply to you (for example, if you have never been married and the question asks "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed. If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

4. **Part 4. Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf).** You must sign in **Part 4.** if you are filing Form I-134 on your own behalf. Select the appropriate box to indicate whether you read this declaration yourself or whether you had an interpreter assist you. If someone helped you complete the declaration, select the box indicating that you used a preparer. You also must sign and date your declaration and provide your daytime telephone number, mobile telephone number, and email address. A stamped or typewritten name in place of a signature is not acceptable.

5. **Part 5. Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary.** You must sign **Part 5.** if you are filing Form I-134 on behalf of someone else (a beneficiary). Select the appropriate box to indicate whether you read this declaration yourself or whether you had an interpreter assist you. If someone assisted you in completing the declaration, select the box indicating that you used a preparer. Further, you must sign and date your declaration and provide your daytime telephone number, mobile telephone number (if any), and email address (if any). Every declaration **MUST** contain the signature of the individual agreeing to financially support the beneficiary (or parent or legal guardian, if applicable). A stamped or typewritten name in place of a signature is not acceptable.

6. **Part 6. Interpreter's Contact Information, Certification, and Signature.** If you used anyone as an interpreter to read the Instructions and questions on this declaration to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any). The interpreter must sign and date the declaration.

7. **Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary.** If someone other than you, the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself), completed your declaration, this section must contain the signature. If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 6.** and **Part 7.** If the person who completed this declaration is associated with a business or organization, that person should complete the business or organization name and address information. Anyone who helped you complete this declaration **MUST** sign and date the declaration. A stamped or typewritten name in place of a signature is not acceptable. If the person who helped you prepare your declaration is an attorney or accredited representative, he or she may also need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your declaration.

---

> **We recommend that you print or save a copy of your completed declaration to review in the future and for your records.**

---

## Specific Instruction

**Part 1. Basis for Filing.** Select the appropriate box for **Item Number 1.**

Select the first box if you are the beneficiary who is the alien applying for an immigration benefit. A beneficiary may file Form I-134 on his or her own behalf.

---

Select the second box if you are the individual agreeing to financially support the beneficiary.

**Part 2. Information about the Beneficiary**

The beneficiary is the alien who is applying for an immigration benefit. A beneficiary may file Form I-134 on behalf of himself or herself.

**Item Number 1. Beneficiary's Current Legal Name.** Provide the beneficiary's legal name, as shown on his or her birth certificate or legal name change document. If the beneficiary has two last names, include both and use a hyphen (-) between the names, if appropriate. Type or print the beneficiary's last, first, and middle names in each appropriate field.

**Item Number 3. Date of Birth.** Enter the beneficiary's date of birth in mm/dd/yyyy format in the space provided. For example, type or print October 5, 1967 as 10/05/1967.

**Item Number 4. Gender.** Provide the beneficiary's gender.

**Item Number 5. Alien Registration Number (A-Number).** Provide the beneficiary's A-Number. The A-Number is the number used to identify an individual's immigration records. It begins with an "A" and can be found on correspondence the beneficiary received from the Department of Homeland Security (DHS) or USCIS.

**Item Number 6. Place of Birth.** Enter the name of the city or town, state or province, and country where the beneficiary was born. Type or print the name of the country as it was named when the beneficiary was born, even if the country's name has changed or the country no longer exists.

**Item Number 7. Country of Citizenship or Nationality.** Provide the name of the country where the beneficiary is a citizen and/or national. This is not necessarily the country where the beneficiary was born. If the beneficiary does not have citizenship in any country, type or print "stateless" and provide an explanation in **Part 8. Additional Information**.

**Item Number 8. Marital Status.** Select the appropriate box.

**Item Numbers 9. - 11. Beneficiary's Physical Address.** Provide the physical address where the beneficiary lives.

**Item Number 12. Beneficiary's Anticipated Length of Stay.** Enter the anticipated start date of the beneficiary's stay in the United States in **Item Number 12.** Select the option that matches the anticipated end date of the beneficiary's stay. If the beneficiary's stay has an end date, you must enter the anticipated end date in mm/dd/yyyy format in the space provided for that option. If the beneficiary's anticipated stay does not have an end date, select the "No End Date" option.

**Item Number 13. Beneficiary's Income.** Provide information on any income the beneficiary will receive. If the beneficiary will not receive any income, then type or print $0 in the table. Do not include any individuals named in **Part 3.**

**Item Numbers 14. - 15.** Identify whether any of the beneficiary's total income comes from an illegal activity or source, such as proceeds from illegal gambling or illegal drug sales or other activities and identify the amount. Do not include income from illegal gambling or illegal drug sales attributed to any individuals named in **Part 3.**

**Item Number 16. Beneficiary's Assets.** Provide information about any assets available to the beneficiary for the anticipated period of his or her stay. List only assets that can be converted into cash within 12 months and that will be used to support the beneficiary while the beneficiary is in the United States. Provide the value of all assets listed in U.S. dollars, regardless of whether the assets are held in the United States or outside of the United States. Do not include assets from any individuals named in **Part 3.**

You may include the net value of the beneficiary's home as an asset. The net value of the home is the appraised value of the home, minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home. If you list the net value of the beneficiary's home, then you must include documentation demonstrating that the beneficiary owns the home, a recent appraisal by a licensed appraiser, and evidence of the amount of all loans secured by a mortgage, trust deed, or other lien on the home.

You may not include the net value of the beneficiary's automobile unless the beneficiary has more than one automobile, and at least one automobile is not included as an asset. Submit evidence of the value of the assets listed. Evidence must include the name of the asset holder, a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.**

**Item Number 1.  Current Legal Name.**  Provide the full name of the individual who is agreeing to financially the support the beneficiary named in **Part 2**.  Provide your legal name, as shown on your birth certificate or legal name change document.  If you have two last names, include both and use a hyphen (-) between the names, if appropriate.  Type or print your last, first, and middle names in each appropriate field.

**Item Number 8.  Alien Registration Number (A-Number).**  Provide your A-Number.  Your A-Number is the number used to identify your immigration records.  It begins with an "A" and can be found on correspondence you have received from the Department of Homeland Security (DHS) or USCIS.

**Item Number 10.  Immigration Status.**  Select the appropriate box for your current immigration status.  Provide evidence of your status.  A U.S. citizen or U.S. national may submit a copy of a birth certificate, certificate of naturalization, certificate of citizenship, consular report of birth abroad to U.S. parents, or a copy of the biographic data page on your U.S. passport.  Proof of lawful permanent resident status includes a photocopy of both sides of the Permanent Resident Card or Alien Registration Receipt Card (Form I-551), or a photocopy of an unexpired temporary Form I-551 stamp in either a foreign passport or DHS Form I-94 Arrival Departure Record.  Proof of lawful nonimmigrant status may include a copy of an unexpired visa in a foreign passport.

**Item Number 17.  Assets.**  Provide information about any assets you will use to support the beneficiary for the anticipated period of his or her stay.  List only assets that can be converted into cash within 12 months and that will be used to support the beneficiary while the beneficiary is in the United States.  Provide the value of all assets listed in U.S. dollars, regardless of whether they are held in the United States or outside of the United States.  Do not include assets from any individuals named in **Part 2**.

You may include the net value of a home as an asset.  The net value of the home is the appraised value of the home, minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home.  If you include the net value of your home, then you must include documentation demonstrating that you own the home, a recent appraisal by a licensed appraiser, and evidence of the amount of all loans secured by a mortgage, trust deed, or other lien on the home.

You may not include the net value of an automobile unless you show that you have more than one automobile, and at least one automobile is not included as an asset.

Submit evidence of the value of your or your household members' assets.  Evidence must include the name of the asset holder, a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

## Supporting Evidence (for beneficiary and person providing support to beneficiary)

As the beneficiary or the person who agrees to financially support the beneficiary, you must show you have sufficient income or financial resources to support the beneficiary.

Evidence should consist of copies of any of the documents listed below that apply.

Failure to provide evidence of sufficient income or financial resources may result in the denial of the foreign national's application for a visa or his or her removal from the United States.

Submit in duplicate evidence of income and resources, as appropriate:

1. Statement from an officer of the bank or other financial institutions with deposits, identifying the following details regarding the account:

   A. Date account opened;

   B. Total amount deposited for the past year; and

   C. Present balance.

2. Statement(s) from your employer on business stationery showing:

   A. Date and nature of employment;

   **B.**  Salary paid; and

   **C.**  Whether the position is temporary or permanent.

**1.**  Copy of last U.S. federal income tax return filed (tax transcript); or

**2.**  List containing serial numbers and denominations of bonds and name of record owner(s).

## What Is the Filing Fee?

There is not filing fee for Form I-134.

## Where to File?

Please see our website at **www.uscis.gov/I-134** or visit the USCIS Contact Center at **www.uscis.gov/contactcenter** to connect with a USCIS representative for the most current information about where to file this declaration.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

## Address Change

If you are not a U.S citizen or U.S. national, you must notify USCIS of your new address within 10 days of moving from your previous residence.  For information on filing a change of address, go to the USCIS website at **www.uscis.gov/ addresschange** or reach out to the USCIS Contact Center at **www.uscis.gov/contactcenter** for help.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox facilities because the Lockbox does not process change of address requests.

## Processing Information

**Initial Processing.**  Once USCIS accepts your declaration, we will check it for completeness.  If you do not completely fill out this declaration, you will not establish a basis of support for the beneficiary or for yourself (if you are applying on your own behalf), and USCIS or the Department of State may reject or deny your declaration.

**Requests for More Information.**  USCIS or Department of State may request that you provide more information or evidence to support your declaration.  We may also request that you provide the originals of any copies you submit.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your declaration.  At the time of any interview or other appearance at a USCIS office, we may require that you provide your biometrics to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-134 involves a determination of whether you have established a basis of support for the beneficiary seeking an immigration benefit.  USCIS will notify you of the decision in writing.

## USCIS Forms and Instructions

To ensure you are using the latest version of this declaration, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** and ask that we mail a form to you.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

Please visit us at **www.uscis.gov/contactcenter** to get basic information about immigration services and ask questions about a pending case.  Through our digital self-help tools and live assistance, the USCIS Contact Center provides a pathway for you to get consistent, accurate information and answers to immigration case questions.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-134, we will deny your Form I-134 and may deny any other immigration benefit the beneficiary seeks.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this declaration, and the associated evidence, is collected under the Immigration and Nationality Act (INA), sections 1101, 1182(a)(4), 1183, 1184(a), and 1258.

**PURPOSE:**  The primary purpose for providing the requested information on this declaration is to show that the applying immigrant has enough financial support to live without concern of becoming reliant on U.S. Government welfare.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in denial of your immigration benefit.

**ROUTINE USES:**  DHS may share the information you provide on this declaration and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-001 - Alien File, Index, and National File Tracking System and DHS/USCIS-007 - Benefits Information System, and DHS/USCIS-018 Immigration Biometric and Background Check.] and the published privacy impact assessments [DHS/USCIS/PIA-016a Computer Linked Application Information Management System and Associated Systems, DHS/USCIS/PIA-051 Case and Activity Management for International Operations (CAMINO), and DHS/USCIS/PIA-003 Integrated Digitization Document Management Program (IDDMP).] which you can find at **www.dhs.gov/privacy**.  DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 2 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the declaration, preparing statements, attaching necessary documentation, and submitting the declaration.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0014.  **Do not mail your completed Form I-134 to this address.**

**SUPPORTING STATEMENT FOR**
**Declaration of Financial Support**
**OMB Control No.: 1615-0014**
**COLLECTION INSTRUMENT(S): Form I-134**

**A. Justification**

1.  **Explain the circumstances that make the collection of information necessary.
    Identify any legal or administrative requirements that necessitate the collection.
    Attach a copy of the appropriate section of each statute and regulation mandating
    or authorizing the collection of information.**

    Certain aliens seeking parole into the United States pursuant to section 212(d)(5) of the
    Immigration and Nationality Act (INA), and B, F, and M nonimmigrants seeking
    extension of stay or change of status under sections 214 and 248 of the INA, must
    demonstrate that they have sufficient financial resources for the duration of their stay.

2.  **Indicate how, by whom, and for what purpose the information is to be used. Except
    for a new collection, indicate the actual use the agency has made of the information
    received from the current collection.**

    The U.S. Department of Homeland Security (DHS) and consular officers of the
    Department of State (DOS) use both the online and paper versions of Form I-134 to
    determine whether, at the time of the beneficiary's application, petition, or request for
    certain immigration benefits, that beneficiary has sufficient financial support to pay for
    expenses for the duration of their temporary stay in the United States.

3.  **Describe whether, and to what extent, the collection of information involves the use
    of automated, electronic, mechanical, or other technological collection techniques or
    other forms of information technology, e.g., permitting electronic submission of
    responses, and the basis for the decision for adopting this means of collection. Also
    describe any consideration of using information technology to reduce burden.**

    This information collection provides the most efficient means for gathering and
    processing information about whether certain noncitizens have financial support to pay
    for expenses that arise during their temporary stay in the United States.  Form I-134 is
    available as a fillable PDF on the USCIS website at uscis.gov/i-134.  The form can be
    completed electronically, printed, signed, and submitted to U.S. Citizenship and
    Immigration Services (USCIS) by mail.  Form I-134 can also be filed with DOS. See
    www.travel.state.gov for more information on filing.

4.  **Describe efforts to identify duplication. Show specifically why any similar
    information already available cannot be used or modified for use for the purposes**

1

described in Item 2 above.

A search of USCIS' automated forms tracking system revealed no duplication. There is no similar data collected.

**5.     If the collection of information impacts small businesses or other small entities (Item 5 of OMB Form 83-I), describe any methods used to minimize burden.**

This collection of information does not have an impact on small businesses or other small entities.

**6.     Describe the consequence to Federal program or policy activities if the collection is not conducted or is conducted less frequently, as well as any technical or legal obstacles to reducing burden.**

If the information is not collected, USCIS would not be able to determine whether certain noncitizens seeking to come to the United States temporarily have sufficient financial support to cover expenses for the duration of their stay in the United States.

**7.     Explain any special circumstances that would cause an information collection to be conducted in a manner:**

- **Requiring respondents to report information to the agency more often than quarterly;**

- **Requiring respondents to prepare a written response to a collection of information in fewer than 30 days after receipt of it;**

- **Requiring respondents to submit more than an original and two copies of any document;**

- **Requiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records for more than three years;**

- **In connection with a statistical survey, that is not designed to produce valid and reliable results that can be generalized to the universe of study;**

- **Requiring the use of a statistical data classification that has not been reviewed and approved by OMB;**

- **That includes a pledge of confidentiality that is not supported by authority established in statute or regulation, that is not supported by disclosure and data security policies that are consistent with the pledge, or which unnecessarily impedes sharing of data with other agencies for compatible confidential use; or**

2

- **Requiring respondents to submit proprietary trade secret, or other confidential information unless the agency can demonstrate that it has instituted procedures to protect the information's confidentiality to the extent permitted by law.**

This information collection is conducted in a manner consistent with the guidelines in 5 CFR 1320.5(d)(2).

8. **If applicable, provide a copy and identify the data and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB. Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments. Specifically address comments received on cost and hour burden.**

   **Describe efforts to consult with persons outside the agency to obtain their views on the availability of data, frequency of collection, the clarity of instructions and recordkeeping, disclosure, or reporting format (if any), and on the data elements to be recorded, disclosed, or reported.**

   **Consultation with representatives of those from whom information is to be obtained or those who must compile records should occur at least once every 3 years - even if the collection of information activity is the same as in prior periods. There may be circumstances that may preclude consultation in a specific situation. These circumstances should be explained.**

   USCIS is seeking emergency approval under 5 CFR 1320.13 and, as such, has not yet published a notice in the Federal Register. Public comments will be solicited, and this information collection request will go through a normal Paperwork Reduction Act (PRA) approval process, including a response to all comments received from the public, no later than six months after the approval of this emergency request.

9. **Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

   USCIS does not provide any payment for benefit sought.

10. **Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation or agency policy.**

    There is no assurance of confidentiality.

    This collection is covered under the following Privacy Impact Assessments:

    - DHS/USCIS/PIA-051 - Case and Activity Management for International Operations (CAMINO); and,

3

- DHS/USCIS/PIA-003 - Integrated Digitization Document Management Program (IDDMP);

The collection is covered under the following System of Records Notices:
- DHS/USCIS/ICE/CBP-001 - Alien File, Index, and National File Tracking System of Records November 21, 2013, 78 FR 69864;
- DHS/USCIS-007 - Benefits Information System September 29, 2008, 73 FR 56596; and
- DHS/USCIS-018 - Immigration Biometric and Background Check July 31, 2018, 83 FR 36950.

**11.** **Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private. This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

This information collection contains questions that are of a sensitive nature. Respondents must provide information and records about personal income and financial resources. This information is necessary to establish that the beneficiary named on Form I-134 has sufficient financial resources to pay for expenses during their temporary stay in the United States.

**12.** **Provide estimates of the hour burden of the collection of information. The statement should:**

- **Indicate the number of respondents, frequency of response, annual hour burden, and an explanation of how the burden was estimated. Unless directed to do so, agencies should not conduct special surveys to obtain information on which to base hour burden estimates. Consultation with a sample (fewer than 10) of potential respondents is desirable. If the hour burden on respondents is expected to vary widely because of differences in activity, size, or complexity, show the range of estimated hour burden, and explain the reasons for the variance. Generally, estimates should not include burden hours for customary and usual business practices.**

- **If this request for approval covers more than one form, provide separate hour burden estimates for each form and aggregate the hour burdens in Item 13 of OMB Form 83-I.**

- **Provide estimates of annualized cost to respondents for the hour burdens for collections of information, identifying and using appropriate wage rate categories. The cost of contracting out or paying outside parties for information**

4

**collection activities should not be included here. Instead, this cost should be included in Item 14.**

| Type of Respondent | Form Name / Form Number | A<br>#. of Respondents | B<br># of Responses per Respondent | C (=AxB)<br># of Responses | D<br>Avg. Burden per Response (in hours) | E (=CxD)<br>Total Annual Burden (in hours) | F<br>Avg. Hourly Wage Rate* | (=ExF)<br>Total Annual Respondent Cost |
|---|---|---|---|---|---|---|---|---|
| Individuals and Households | Declaration of Financial Support, Form I-134 (paper) | 2,500 | 1 | 2,500 | 2 | 5,000 | $40.89 | $204,450 |
| **Total** | | | | **2,500**** | | **5,000** | | **$204,450** |

    *   *The above Average Hourly Wage Rate is the May 2021 Bureau of Labor Statistics average wage for All Occupations of $28.01 times the wage rate benefit multiplier of 1.46 (to account for benefits provided) equaling $40.89. The selection of "All Occupations" was chosen because respondents to this collection could be expected from any occupation.*
*\*\* The estimated number of respondents includes receipts of Form I-134 by both USCIS and Department of State.*

13. **Provide an estimate of the total annual cost burden to respondents or record keepers resulting from the collection of information. (Do not include the cost of any hour burden shown in Items 12 and 14).**

   • **The cost estimate should be split into two components:  (a) a total capital and start-up cost component (annualized over its expected useful life); and (b) a total operation and maintenance and purchase of services component. The estimates should take into account costs associated with generating, maintaining, and disclosing or providing the information. Include descriptions of methods used to estimate major cost factors including system and technology acquisition, expected useful life of capital equipment, the discount rate(s), and the time period over which costs will be incurred. Capital and start-up costs include, among other items, preparations for collecting information such as purchasing computers and software; monitoring, sampling, drilling and testing equipment; and record storage facilities.**

   • **If cost estimates are expected to vary widely, agencies should present ranges of cost burdens and explain the reasons for the variance. The cost of purchasing or contracting out information collection services should be a part of this cost burden estimate. In developing cost burden estimates, agencies may consult with a sample of respondents (fewer than 10), utilize the 60-day pre-OMB submission public comment process and use existing economic or regulatory impact analysis associated with the rulemaking containing the information collection, as appropriate.**

5

- Generally, estimates should not include purchases of equipment or services, or portions thereof, made: (1) prior to October 1, 1995; (2) to achieve regulatory compliance with requirements not associated with the information collection; (3) for reasons other than to provide information or keep records for the government; or, (4) as part of customary and usual business or private practices.

There are no capital, start-up, operational or maintenance costs associated with this collection of information. There is no fee cost to respondents for filing these requests. USCIS, however, estimates that respondents will incur an estimated cost of $4.25 average postage cost for each respondent to submit the completed I-134 (paper) package to USCIS.

Postage to mail completed package (2,500 x $4.25 average postage) = **$10,625** (total annual cost burden to respondents).

14. **Provide estimates of annualized cost to the Federal government. Also, provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment, overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information. Agencies also may aggregate cost estimates from Items 12, 13, and 14 in a single table.**

USCIS establishes its fees using an activity-based costing model to assign costs to an adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs, plus an amount to recover unassigned overhead (which includes the suggested average hourly rate for clerical, officer, and managerial time with benefits) and immigration benefits provided for free. USCIS uses the fee associated with an information collection as a reasonable measure of the collection's costs to USCIS, since these fees are based on resource expenditures related to the benefit in question. In addition, this figure includes the estimated overhead cost for printing, stocking, distributing and processing of this form.

**The estimated cost to the Government is $161,625.** This figure is calculated by multiplying the estimated number of respondents (2,500) by the time required to adjudicate the form (1 hour), which is multiplied by the average hourly rate of USCIS adjudicators ($64.65), for a total of $161,625.

15. **Explain the reasons for any program changes or adjustments reporting in Items 13 or 14 of the OMB Form 83-I.**

USCIS is uniquely revising this information collection to remove the online Form I-134 collection instrument burden.  The online collection of information contains unique data elements for a specific population of filers, not applicable to all I-134 filers.  That data

6

collection and respondent population is being submitted under its own information collection.

| Data collection Activity/Instrument (in hours) | Program Change (hours currently on OMB Inventory) | Program Change (New) | Difference | Adjustment (hours currently on OMB Inventory) | Adjustment (New) [new minus current] | Difference |
|---|---|---|---|---|---|---|
| Form I-134 (paper) | 5,000 | 5,000 | 0 | | | |
| Form I-134 (online) | 251,983 | 0 | -251,983 | | | |
| **Total(s)** | **256,983** | **5,000** | **-251,983** | | | |

USCIS is reporting a decrease of 251,983 hours in the estimated annual hour burden to respondents for this collection of information. This decrease is the result of establishing an separate information collect with unique data elements for a specific population of respondents who can file the information collection online.

USCIS is reporting no change in the estimated annual cost burden to respondents for this collection of information. The cost captured is representative of respondents that will be mailing paper forms to file the information collection.

16. **For collections of information whose results will be published, outline plans for tabulation, and publication. Address any complex analytical techniques that will be used. Provide the time schedule for the entire project, including beginning and ending dates of the collection of information, completion of report, publication dates, and other actions.**

This information collection will not be published for statistical purposes.

17. **If seeking approval to not display the expiration date for OMB approval of the information collection, explain the reasons that display would be inappropriate.**

USCIS will display the expiration date for OMB approval of this information collection.

18. **Explain each exception to the certification statement identified in Item 19, "Certification for Paperwork Reduction Act Submission," of OMB 83-I.**

USCIS does not request an exception to the certification of this information collection.

7

**B. Collections of Information Employing Statistical Methods.**

There is no statistical methodology involved with this collection.

8

# Online Request to be a Supporter and
# Declaration of Financial Support



### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS
Form I-134A**

► **START HERE - Type or print in black ink.**

## Part 1.  Basis for Filing

**1.** I am filing this form on behalf of:  ☐ Myself as the beneficiary.  ☐ Another individual who is the beneficiary.

**2.** I am filing this form under one of the following: [                    ]

## Part 2.  Information about the Beneficiary

Complete **Part 2.** regardless of whether you are filing this form on behalf of yourself as the beneficiary or on behalf of another individual who is the beneficiary.

**1.** Beneficiary's Current Legal Name (**Do not** provide a nickname.)

Family Name (Last Name) | Given Name (First Name) | Middle Name
--- | --- | ---
[                    ] | [                    ] | [                    ]

**2.** Other Names Used

Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

Family Name (Last Name) | Given Name (First Name) | Middle Name
--- | --- | ---
[                    ] | [                    ] | [                    ]
[                    ] | [                    ] | [                    ]

**3.** Date of Birth (mm/dd/yyyy)  **4.** Sex  ☐ M  ☐ F  ☐ X  **5.** Alien Registration Number (A-Number)
► A- [          ]

**6.** Place of Birth

City or Town | State or Province
--- | ---
[                    ] | [                    ]

Country
[                    ]

**7.** Country of Citizenship or Nationality
[                    ]

**8.** Passport Number of the beneficiary's most recently issued passport
[                    ]

Country that issued the most recently issued passport | Expiration date for the most recently issued passport (mm/dd/yyyy)
--- | ---
[                    ] | [                    ]

**9.** Marital Status

☐ Single, Never Married   ☐ Married   ☐ Divorced   ☐ Widowed   ☐ Legally Separated   ☐ Marriage Annulled

☐ Other (Explain): [                    ]

**Part 2.  Information about the Beneficiary** (continued)

10.   Beneficiary's Mailing Address

In Care Of Name

Street Number and Name | Apt. Ste. Flr. | Number

City or Town | State | ZIP Code

Province | Postal Code | Country

11.   Are the beneficiary's mailing address and physical address the same? ☐ Yes ☐ No

If you answered "No" to **Item Number 11.**, provide your physical address in **Item Number 12.**

12.   Beneficiary's Physical Address

In Care Of Name

Street Number and Name (Do **not** provide a PO Box in this space unless it is your **ONLY** address.) | Apt. Ste. Flr. | Number

City or Town | State | ZIP Code

Province | Postal Code | Country

13.   Beneficiary's Daytime Telephone Number       14.   Beneficiary's Mobile Telephone Number (if any)

15.   Beneficiary's Email Address (if any)

*Beneficiary's Anticipated Length of Stay*

16.   Beneficiary's Anticipated Period of Stay in the United States

From (mm/dd/yyyy)

To (select one):

☐ (mm/dd/yyyy)

☐ No End Date

## Part 2.  Information about the Beneficiary (continued)

### *Beneficiary's Financial Information*

Provide information about the beneficiary's income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information**.

**Beneficiary's Income**

17. Provide all of the information requested in the table below about the beneficiary, all of the beneficiary's dependents, and any other individuals the beneficiary financially supports (do not include any individuals named in **Part 3.**).  Information about assets that are not based on employment should be added in **Item Number 22.** and not in **Item Number 17.**

| **Individual's Full Name** (First, Middle, Last) (do not include any individuals named in **Part 3.**) | **Date of Birth** (mm/dd/yyyy) | **Relationship to the Beneficiary** (Type or print "Self" if you are filing for yourself as the beneficiary or "Beneficiary" if someone is agreeing to support you in **Part 3.**) | **Income contribution to the beneficiary annually** (if none, type or print $0) |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  | **Total** Number of Dependents |  |
|  |  | Total Income | $ |

18. Does any of the beneficiary's total income (including income from dependents and other individuals who contribute to the beneficiary's income, excluding any individuals named in **Part 3.**) come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?    ☐ Yes    ☐ No

19. If you answered "Yes" to **Item Number 18.**, what amount of the beneficiary's total income comes from an illegal activity or source?  (Type or print "N/A" if you answered "No" to **Item Number 18.**)    $ _____

20. Does any of the beneficiary's total income come from means-tested public benefits as defined in 8 CFR 213a.1?    ☐ Yes    ☐ No

21. If you answered "Yes" to **Item Number 20.**, what amount of the beneficiary's total income comes from means-tested public benefits?    $ _____

Haiti AR_001217

## Part 2.  Information about the Beneficiary (continued)

**Beneficiary's Assets**

22.    In the table below, provide the amounts of assets available to the beneficiary for the expected period of his or her stay (excluding assets from any individuals named in **Part 3.**).  Attach evidence showing that the beneficiary has these assets.

| Full Name of Asset Holder (First, Middle, Last) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **TOTAL** (U.S. dollars) $ |  |

## Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.

If you are not the beneficiary named in **Part 2.**, complete **Part 3.**

1.    Current Legal Name (**Do not** provide a nickname.)

Family Name (Last Name)

Given Name (First Name)

Middle Name

2.    Other Names Used

Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

Family Name (Last Name)

Given Name (First Name)

Middle Name

3.    Provide the name of the organization, group, or entity that is providing support to the beneficiary with you (if any).

Organization, Group, Entity Name

4.    Current Mailing Address

In Care Of Name

Street Number and Name

Apt.Ste. Flr.  ☐ ☐ ☐    Number

City or Town

State

ZIP Code

Province

Postal Code

Country

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

**5.**   Is your current mailing address the same as your current physical address?      ☐ Yes   ☐ No

If you answered "No" to **Item Number 5.**, provide your current physical address in **Item Numbers 6.**

**6.**   Physical Address

In Care Of Name

Street Number and Name                                          Apt.Ste. Flr.   Number
                                                                ☐ ☐ ☐

City or Town                                                    State    ZIP Code

Province                       Postal Code          Country

*Other Information*

**7.**   Date of Birth (mm/dd/yyyy)                  **8.**   Sex   ☐ M   ☐ F   ☐ X

**9.**   Place of Birth

City or Town                                        State or Province

Country

**10.**  Alien Registration Number (A-Number)    **11.**   USCIS Online Account Number
        ▶ **A-**

**12.**  Social Security Number                  **13.**   What is your relationship to the beneficiary?
        ▶

*Immigration Status*

**14.**  What is your current immigration status?  Provide documentation as provided in the instructions.

☐ U.S. Citizen

☐ U.S. National

☐ Lawful Permanent Resident

☐ Nonimmigrant   Form I-94 Arrival-Departure Record Number
        ▶

Other (Explain):

## Part 3. Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2. (continued)

### Employment Information

**15.** Employment Status

☐ Employed (full-time, part-time, seasonal, self-employed)   ☐ Unemployed or Not Employed   ☐ Retired

☐ Other (Explain): _____

If you indicated that you are employed in **Item Number 15.**, provide the information requested in **Item Numbers 16. - 17.**

**16.**   **A.**   ☐ I am currently employed as a/an          Name of Employer

**B.**   ☐ I am currently self-employed as a/an

**17.**   Current Employer's Address

Street Number and Name          Apt.Ste. Flr.   Number
☐ ☐ ☐

City or Town          State   ZIP Code

Province          Postal Code          Country

### Financial Information

Provide information about your income and assets. If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information**.

**Income**

**18.** Provide all of the information requested in the table below about yourself, all of your dependents, and any other individuals you financially support (do not include any individuals named in **Part 2.**). Information about assets that are not based on employment should be added in **Item Number 23.** and not in **Item Number 18.**

| Full Name (First, Middle, Last) (do not include any individuals named in **Part 2.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Individual Agreeing to Financially Support (Type or print "Self" for Individual Agreeing to Financially Support the Beneficiary) | Income Contribution to the Beneficiary Annually (if none, type or print $0) |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  | **Total** Number of Dependents |  |
|  |  | Total Income | $ |

Haiti AR_001220

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

19. Does any of the income listed above come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?  ☐ Yes  ☐ No

20. If you answered "Yes" to **Item Number 19.**, what amount of income comes from an illegal activity? (Type or print "N/A" if you answered "No" to **Item Number 19.**)  $ [        ]

21. Does any of the income listed above come from means-tested public benefits as defined in 8 CFR 213a.1?  ☐ Yes  ☐ No

22. If you answered "Yes" to **Item Number 21.**, what amount of income is from means-tested public benefits?  $ [        ]

**Assets**

23. Fill out the table below regarding the assets available to **you** (do not include any assets from any individuals named in **Part 2.**). Attach evidence showing you have these assets.

| Full Name of Asset Holder (you or your household member) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **TOTAL** (U.S. dollars) $ |  |

*Financial Responsibility for Other Beneficiaries*

24. Have you previously submitted a Form I-134A on behalf of a person other than the beneficiary named in **Part 2?**  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 24.**, provide the information requested in **Item Numbers 25. - 26.**  If you need additional space to complete this section, use the space provided in **Part 8. Additional Information**.

25. Person 1

Family Name (Last Name) [        ]  Given Name (First Name) [        ]  Middle Name [        ]

A-Number
► A- [        ]  Date Submitted (mm/dd/yyyy) [        ]

26. Person 2

Family Name (Last Name) [        ]  Given Name (First Name) [        ]  Middle Name [        ]

A-Number
► A- [        ]  Date Submitted (mm/dd/yyyy) [        ]

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

*Intent to Provide Specific Contributions to the Beneficiary*

27.  You are responsible for receiving, maintaining, and supporting the beneficiary for the duration of their temporary stay in the United States.  Describe the resources you plan to use or provide to ensure the beneficiary has adequate financial support to cover their basic living needs.

28.  You are responsible for ensuring that the beneficiary has safe and appropriate housing for the duration of their parole in the United States.  Describe how you will ensure that the beneficiary's housing needs are met, including where the beneficiary will reside during their temporary stay in the United States, if known.

29.  You are responsible for assisting the beneficiary's access to available services and benefits such as learning English, securing employment opportunities once authorized to work, enrolling children in school, and helping to enroll for benefits for which they are eligible.  Describe what steps you plan to take as part of these responsibilities.

**Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (Only complete this section if Part 1. Basis for Filing selection is "Myself as the beneficiary", otherwise continued to Part 5.)**

If you are the beneficiary and are filing Form I-134A on your own behalf, complete and sign **Part 4.**

**NOTE:** Read the **Penalties** section of the Form I-134A Instructions before completing this section.

### Beneficiary's Statement

**NOTE:** Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.**   I, as the beneficiary, certify the following:

  **A.**  ☐  I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question**.**

  **B.**  ☐  The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in ⬚_____, a language in which I am fluent and I understood everything.

**2.**   ☐  At my request, the preparer named in **Part 7.,** ⬚_____, prepared this declaration for me based only upon information I provided or authorized.

### Beneficiary's Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

  **1)**  I reviewed and provided or authorized all of the information in my declaration;

  **2)**  I understood all of the information contained in, and submitted with, my declaration; and

  **3)**  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that I will be able to financially support myself while in the United States.

That I am willing and able to pay for necessary expenses for the duration of my temporary stay in the United States.

### Beneficiary's Signature

**3.**   Beneficiary's Signature

➡  _____

Date of Signature (mm/dd/yyyy)

_____

## Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary

If you are filing Form I-134A on behalf of someone else (the beneficiary listed in **Part 2.**), complete and sign **Part 5.**

**NOTE:**  Read the Penalties section of the Form I-134A Instructions before completing this section.

### Statement of Individual Agreeing to Financially Support the Beneficiary

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.**   I, as the individual agreeing to financially support the beneficiary, certify the following:

  **A.** ☐  I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question.

  **B.** ☐  The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood.

**2.** ☐  At my request, the preparer named in **Part 7.,** _____, prepared this declaration for me based only upon information I provided or authorized.

### Contact Information of Individual Agreeing to Financially Support the Beneficiary

**3.**   Daytime Telephone Number

_____

**4.**   Mobile Telephone Number (if any)

_____

**5.**   Email Address (if any)

_____

### Certification of Individual Agreeing to Financially Support the Beneficiary

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

  **1)**  I reviewed and provided or authorized all of the information in my declaration;

  **2)**  I understood all of the information contained in, and submitted with, my declaration; and

  **3)**  All of this information was complete, true, and correct at the time of filing.

Haiti AR_001224

**Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary** (continued)

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that the person named in **Part 2.** will be financially supported while in the United States.

That I am willing and able to receive, maintain, and support the person named in **Part 2.** to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States.

I acknowledge that I have read this section, and I am aware of my responsibilities as an individual agreeing to financially support the beneficiary.

### *Signature of Individual Agreeing to Financially Support the Beneficiary*

**6.**  Signature

➡️

Date of Signature (mm/dd/yyyy)

**NOTE TO ALL INDIVIDUALS AGREEING TO FINANCIALLY SUPPORT THE BENEFICIARY:**  If you do not completely fill out this declaration or if you fail to submit required documents listed in the Instructions, USCIS or the Department of State may deny or not consider your declaration.

### Part 6.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.**  Interpreter's Family Name (Last Name)

Interpreter's Given Name (First Name)

**2.**  Interpreter's Business or Organization Name (if any)

### *Interpreter's Mailing Address*

**3.**  Street Number and Name

Apt. Ste. Flr.  Number

City or Town

State   ZIP Code

Province

Postal Code

Country

### *Interpreter's Contact Information*

**4.**  Interpreter's Daytime Telephone Number

**5.**  Interpreter's Mobile Telephone Number (if any)

**6.**  Interpreter's Email Address (if any)

**Part 6.  Interpreter's Contact Information, Certification, and Signature** (continued)

*Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and _____ which is the same language specified in **Part 4.** or in **Part 5.**, **Item B.** in **Item Number 1.**, and I have read to this individual agreeing to financially support the beneficiary in the identified language every question and instruction on this declaration and his or her answer to every question.  The individual agreeing to financially support the beneficiary informed me that he or she understands every instruction, question, and answer on the declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and has verified the accuracy of every answer.

*Interpreter's Signature*

**7.**  Interpreter's Signature _____   Date of Signature (mm/dd/yyyy) _____

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary**

Provide the following information about the preparer.

*Preparer's Full Name*

**1.**  Preparer's Family Name (Last Name) _____   Preparer's Given Name (First Name) _____

**2.**  Preparer's Business or Organization Name (if any) _____

*Preparer's Mailing Address*

**3.**  Street Number and Name _____   Apt. Ste. Flr. ☐ ☐ ☐   Number _____

City or Town _____   State _____   ZIP Code _____

Province _____   Postal Code _____   Country _____

*Preparer's Contact Information*

**4.**  Preparer's Daytime Telephone Number _____   **5.**  Preparer's Mobile Telephone Number _____

**6.**  Preparer's Email Address (if any) _____

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary** (continued)

### *Preparer's Statement*

7.   **A.**   ☐   I am not an attorney or accredited representative but have prepared this declaration on behalf of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) and with that individual's consent.

   **B.**   ☐   I am an attorney or accredited representative and my representation of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) in this case ☐ extends   ☐ does not extend beyond the preparation of this declaration.

**NOTE:** If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### *Preparer's Certification*

By my signature, I certify, under penalty of perjury, that I prepared this declaration at the request of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself).  The individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) then reviewed this completed declaration and informed me that he or she understands all of the information contained in, and submitted with, his or her declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and that all of this information is complete, true, and correct.  I completed this declaration based only on information that the individual agreeing to financially support the beneficiary provided to me or authorized me to obtain or use.

### *Preparer's Signature*

8.   Preparer's Signature

Date of Signature (mm/dd/yyyy)

## Part 8.  Additional Information

If you need extra space to provide any additional information within this declaration, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this declaration or attach a separate sheet of paper. Type or print your name and A-Number at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.** Family Name (Last Name)          Given Name (First Name)          Middle Name

**2.** A-Number          ▶ **A-**

**3.** **A.** Page Number   **B.** Part Number   **C.** Item Number

**D.**

**4.** **A.** Page Number   **B.** Part Number   **C.** Item Number

**D.**

**5.** **A.** Page Number   **B.** Part Number   **C.** Item Number

**D.**

**6.** **A.** Page Number   **B.** Part Number   **C.** Item Number

**D.**



1300 Pennsylvania Avenue, NW
Washington, DC 20229

U.S. Customs and
Border Protection

December 14, 2022

TO:              Dominic Mancini, Deputy Administrator
                 Office of Information and Regulatory Affairs
                 Office of Management and Budget

THROUGH:   Eric Hysen
                 Chief Information Officer
                 Department of Homeland Security

ELIZABETH A CAPPELLO
Digitally signed by ELIZABETH A CAPPELLO
Date: 2022.12.15 17:57:24 -05'00'

FROM:        Matthew S. Davies
                 Executive Director, Admissibility & Passenger Programs
                 U.S. Customs and Border Protection

MATTHEW S DAVIES
Digitally signed by MATTHEW S DAVIES
Date: 2022.12.14 15:10:52 -05'00'

SUBJECT:     Emergency Approval Request for Advance Travel Authorization Capability under
                 the Paperwork Reduction Act

This memorandum requests an emergency approval to revise the existing collection of
information under the Paperwork Reduction Act (PRA) for U.S. Customs and Border
Protection's (CBP) Advance Travel Authorization (ATA) capability to collect certain
information, including photographs, in advance of travel.  This information collection was
approved on an emergency basis on October 18, 2022 under Office of Management and Budget
(OMB) Control Number 1651-0143.  This information collection was approved for use by
certain undocumented noncitizens from Venezuela.  At the direction of the Department of
Homeland Security (DHS), CBP plans to expand this to include certain undocumented
noncitizens from Nicaragua, Cuba, and Haiti, and to remove the previously approved numerical
cap for noncitizens from Venezuela.  CBP currently collects photographs of individuals from
these four countries as part of the inspection process at the time of encounter.

DHS is working with its interagency partners to allow certain noncitizens from Venezuela,
Nicaragua, Cuba, and Haiti, and their qualifying immediate family members[1], to submit
information through the recently developed CBP ATA capability within the CBP One™
application as part of the process to request an advance authorization to travel to the United
States to seek a discretionary grant of parole. There is no numerical cap on the number of
noncitizens from these four countries who may apply. Implementation of ATA requires the

_____

[1] Immediate family members include spouse and unmarried children under the age of 21.  Eligible family members
must travel with the principal noncitizen to be processed under an ATA program upon arrival in the United States.
Unaccompanied children are not eligible for this process.

collection of a facial photograph via CBP One™.  Participation will be limited to those individuals who meet certain DHS established criteria, including possession of a valid, unexpired passport, as well as having an approved U.S.-based supporter.  Pending OMB approval, this functionality may launch as early as December 20, 2022.

It is expected that DHS will establish eligibility criteria to identify individuals from certain countries, as identified by the Secretary of DHS, who are able to request advance authorization to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis.  It is expected that the identified eligible population includes nationals of countries suffering under repressive authoritarian regimes that are experiencing significant political, economic, and humanitarian crises.  Additionally, the United States is currently encountering a large number of undocumented noncitizens at the Southwest Border (SWB) of the United States where, despite surging resources and personnel, CBP is facing significant and unprecedented challenges processing such individuals in a timely manner.

CBP's Office of Field Operations (OFO) developed the ATA capability, a new functionality in CBP One™, which collects a facial photograph and biographic information from a noncitizen who is submitting information to request an advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis.

The facial photograph collected from the noncitizens will be linked to biographic information provided by the individual to U.S. Citizenship and Immigration Services (USCIS).  CBP will conduct vetting of noncitizens using the biographic information provided to CBP by USCIS and the facial photograph collected by CBP via CBP One™.  This information collection will facilitate the vetting of noncitizens seeking to obtain advance authorization to travel and give air carriers that participate in CBP's document validation program the ability to validate an approved travel authorization, facilitating generation of a noncitizen's boarding pass without having to use other manual validation processes.

CBP One™ allows the user to capture their image and confirm submission after viewing the captured image.  If the user is not satisfied with the image captured, the user can retake the image.  A user can retake the image up to three times.  If after three attempts CBP One™ cannot successfully capture the user's image, CBP One™ will provide the user an error message notifying them that their submission was unable to be completed and that they can access the capability and try again.  If the user continues to experience technical difficulties, the CBP One™ application provides a help desk email to provide assistance.  In the event that the user is not authorized to travel under this process, they may still seek entry through another process, including by filing a request for consideration of parole with USCIS or applying with the Department of State (DOS) to obtain a visa.

Once submitted, CBP will vet available biographic information and the facial photograph against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety.  DHS will limit use and sharing of the

photograph to what is strictly necessary to perform this vetting.  Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.  CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek parole.  If the travel authorization is denied, the individual will not be authorized to travel to the United States to seek parole under this process.  If approved, the approval establishes that the individual has obtained advance authorization to travel to the United States to seek parole, consistent with 8 C.F.R. 212.5(f), but does not guarantee boarding or a specific processing disposition at a port of entry (POE). Upon arrival to a United States POE, the traveler will be subject to inspection by a CBP officer, who will make a case-by-case processing disposition determination.

DHS requests an emergency approval to revise the existing ATA data collection (OMB Control Number 1651-0143) to allow CBP to collect a facial photograph in advance to permit individuals from Venezuela, Nicaragua, Cuba, and Haiti to obtain advance authorization to travel to the United States to seek a discretionary grant of parole. To support this effort, DHS will soon be publishing accompanying Federal Register notices to announce and establish the parole processes for Venezuela, Nicaragua, Cuba, and Haiti nationals.

The information collected through this emergency will allow DHS to vet noncitizens who may otherwise present themselves for inspection at a southwest land border POE, or enter the United States between POEs, without any prior vetting.  The advance vetting affords the noncitizen the opportunity to book international travel to arrive near their intended United States destination address and, as a result, is expected to reduce the strain on CBP resources at the southwest land border.  Data will be collected on the efficacy of this process in achieving the desired outcomes, to include reduction in southwest land border encounters, identifying derogatory information before individuals travel, increased arrivals to final destination and grants of parole, and access to employment authorization as well as assessment of the usability of the CBP One™ application and efficacy of automated facial matching, including by demographic group, in order to assess whether this emergency measure has been effective.

Development and deployment of this ATA capability has been expedited to facilitate DHS' ability to respond to the current U.S. Government (USG) resource strain along the SWB, and to enable certain individuals, based on urgent humanitarian reasons or significant public benefit, to travel to the United States to seek a discretionary grant of parole at the POE.  This process may also ease the burden on certain locations outside the United States that are unable to continue to support the influx of these migrants because of already overburdened humanitarian relief mechanisms.

DHS is requesting an emergency information collection under 5 CFR 1320.13, with the intention of carrying out all the regular requirements for publication and review after implementation. This collection of information is needed prior to the expiration of time periods established under the normal PRA notice and comment process and is essential to the mission of the agency. Further, the agency cannot reasonably comply with the normal clearance procedures under this part because delayed implementation and awareness of DHS' intent would likely have unpredictable impact on the movement and may further raise pressure on U.S. border operations and the migration management conducted by our foreign partners and could jeopardize our relations with foreign partners.

After implementation of the revised collection, CBP will undergo the normal PRA renewal process.  After publication of the two Federal Register Notices (FRNs) required under the PRA, DHS will address comments and concerns as necessary under the PRA and submit the ICR to OMB for renewal within the required timeframe.

Thank you for your consideration of this Emergency Request.

**From:** ▓▓▓▓▓
**To:** ▓▓▓▓▓
**Cc:**
**Subject:** RE: ATA Burden Estimate
**Date:** Monday, December 19, 2022 2:06:10 PM

▓▓▓▓▓

▓▓▓▓▓. No, this is not a cap, this is just a different estimate that (as described in the text) takes into account more than just the total number of encounters in FY 22. Leadership advised that this is the current best estimate, accounting for experience with the Venezuela process and resource constraints that limit the rate at which USCIS is expected to adjudicate supporter requests. Happy to hop on a call if helpful.



**Supporting Statement**
**Advance Travel Authorization (ATA)**
**1651-0143**

## A.    Justification

1.    **Explain the circumstances that make the collection of information necessary.  Identify any legal or administrative requirements that necessitate the collection.  Attach a copy of the appropriate section of each statute and regulation mandating or authorizing the collection of information.**

The newly developed CBP Advance Travel Authorization (ATA) allows certain noncitizens from Venezuela and their qualifying immediate family members[1] to submit information within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek a discretionary grant of parole.  CBP is seeking to expand this collection to also include certain noncitizens from Nicaragua, Cuba, and Haiti and their qualifying immediate family members and to remove the previously approved numerical cap for noncitizens from Venezuela. ATA requires the collection of a facial photograph via CBP One™ from those eligible noncitizens who voluntarily elect to participate in the process.  Participation is limited to those individuals who meet certain DHS established criteria, including possession of a valid, unexpired passport, as well as having an approved U.S.-based supporter.  Pending Office of Management and Budget (OMB) approval, the expansion of this functionality will be available as early as late December, 2022.

**Background:**
The United States is currently encountering a large number of undocumented noncitizens at the Southwest Border (SWB) of the United States where, despite surging resources and personnel, CBP is facing unprecedented challenges processing such individuals in a timely manner.

CBP's Office of Field Operations (OFO) developed the ATA capability, a new functionality in CBP One™, which collects biographic information and a facial photograph from a noncitizen who is submitting information to request an advance authorization to travel to the United States to seek a discretionary grant of parole.

**Advance Travel Authorization (ATA):**

The facial photograph collected from the noncitizens will be linked to biographic information provided by the individual to U.S. Citizenship and Immigration Services (USCIS).  CBP will conduct vetting of noncitizens using the biographic information provided to CBP by USCIS and the facial photograph collected by CBP via CBP One™.  This information collection will facilitate the vetting of noncitizens seeking to obtain

---

1 Immediate family members include spouse and unmarried children under the age of 21.  Eligible family members must travel with the principal noncitizen to be processed under an ATA program upon arrival in the United States. Unaccompanied children are not eligible for this process.

1

advance authorization to travel and give air carriers that participate in CBP's document validation program the ability to validate an approved travel authorization, facilitating generation of a noncitizen's boarding pass without having to use other manual validation processes.

CBP One™ allows the user to capture their image and confirm submission after viewing the captured image. If the user is not satisfied with the image captured, the user can retake the image. A user can retake the image up to three times.  If after three attempts CBP One™ cannot successfully capture the user's image, CBP One™ will provide the user an error message notifying them that their submission was unable to be completed and that they can access the capability and try again.  If the user continues to experience technical difficulties, the CBP One™ application provides a help desk email to provide assistance.  In the event that the user is not authorized to travel under this process, they may still seek entry through another process, including by filing a request for consideration of parole with USCIS or applying with the Department of State (DOS) to obtain a visa.

Once submitted, CBP will vet available biographic information and the facial photograph against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety.  DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting.  Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.  CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek a discretionary grant of parole at the port of entry (POE).  There is no numerical cap on the number of noncitizens from these four countries who may apply.

If the travel authorization is denied, the individual will not be authorized to travel to the United States to seek parole under this process.  If approved, the approval establishes that the individual has obtained advance authorization to travel to the United States to seek parole, consistent with 8 C.F.R. 212.5(f), but does not guarantee boarding or a specific processing disposition at a POE.  Upon arrival to a United States POE, the traveler will be subject to inspection by a CBP officer, who will make a case-by-case processing disposition determination.

This collection of information is authorized by 8 U.S.C. 1182(d)(5), 8 C.F.R. 212.5(f).  The Department has also publicly announced the policy and accompanying collection on its website, and will be promptly issuing a *Federal Register* notice for each of the four named countries.

CBP One™ collects the following information from the individual submitting a request for an advance authorization to travel to the United States to seek parole:

1. Facial Photograph
2. Photo obtained from the passport or Chip on ePassport, where available

3. Alien Registration Number
4. First and Last Name
5. Date of Birth
6. Passport Number

Data will be collected on the efficacy of this process in achieving the desired outcomes, to include reduction in SWB encounters, identifying derogatory information before individuals travel, increased arrivals to final destination and grants of parole, and access to employment authorization, as well as assessment of the usability of the CBP One™ application and the efficacy of automated facial matching, including by demographic group, in order to assess whether this emergency measure has been effective.

**2.** **Indicate how, by whom, and for what purpose the information is to be used.  Except for a new collection, indicate the actual use the agency has made of the information received from the current collection**.

This information is used by CBP to vet against selected security and law enforcement databases available to DHS and other federal agencies, for national security, border security, public health and safety.  CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek parole.  DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting.  Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.

**3.** **Describe whether, and to what extent, the collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g. permitting electronic submission of responses, and the basis for the decision for adopting this means of collection.  Also describe any consideration of using information technology to reduce burden**.

The information is submitted to CBP via the CBP One™ mobile application, which the individual can access to provide basic biographic information.  This biographic information is provided solely to verify that the individual accessing the specific functionality within CBP One™ has a USCIS-approved U.S.-based supporter, has verified their biographic information, and has attested to DHS required attestations related to process eligibility criteria.

**4.** **Describe efforts to identify duplication.  Show specifically why any similar information already available cannot be used or modified for use for the purposes described in Item 2 above.**

This information is not duplicated in any other place or any other form.

3

**5.    If the collection of information impacts small businesses or other small entities describe any methods used to minimize burden.**

This information collection does not have an impact on small businesses or other small entities.

**6.    Describe consequences to Federal program or policy activities if the collection is not conducted or is conducted less frequently.**

Failure to collect this information would prevent CBP from having access to information needed to conduct vetting to ascertain security and safety risks posed by individuals requesting advance authorization to travel to the United States to seek parole.

**7.    Explain any special circumstances.**

This information is collected in a manner consistent with the guidelines of 5 CFR 1320.5(d)(2).

**8.    If applicable, provide a copy and identify the date and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB.  Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments. Specifically address comments received on cost and hour burden.**

Public comments will be solicited, and this information collection request will go through a normal Paperwork Reduction Act (PRA) approval process, including a response to all comments received from the public, no later than six months after the approval of this emergency request.

**9.    Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

There is no offer of a monetary or material value for this information collection.

**10.    Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation, or agency policy.**

CBP published the DHS/CBP/PIA-073 Advance Travel Authorization (ATA) to document the general workflow of ATA and the information collected, stored, and used at each step. In addition to the standalone PIA, CBP also concurrently published an appendix update to the DHS/CBP/PIA-068 CBP One Mobile Application.  The System of Record Notice (SORN) that permits this information collection is the ATS SORN (DHS/CBP-006 Automated Targeting System, May 22, 2012, 77 FR 30297), which permits collection of information from persons, including operators, crew, and passengers, who seek to, or do in fact, enter,

4

exit, or transit through the United States or through other locations where CBP maintains an enforcement or operational presence by land, air, or sea. Information submitted by noncitizens seeking advance authorization to travel to the United States to seek parole is broadly covered by the ATS SORN.  CBP uses the advance information to compare it against law enforcement and intelligence databases to identify individuals and cargo requiring additional scrutiny, which aligns to the border security mission of DHS.  DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting. Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.

11. **Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private.  This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

There are no questions of a sensitive nature.

12. **Provide estimates of the hour burden of the collection of information.**

| INFORMATION COLLECTION | TOTAL ANNUAL BURDEN HOURS | NO. OF RESPONDENTS | NO. OF RESPONSES PER RESPONDENT | TOTAL RESPONSES | TIME PER RESPONSE |
|---|---|---|---|---|---|
| Venezuela | 17,517 | 104,894 | 1 | 104,894 | 10 minutes (0.167 hours) |
| Nicaragua | 15,287 | 91,539 | 1 | 91,539 | 10 minutes (0.167 hours) |
| Cuba | 20,615 | 123,442 | 1 | 123,442 | 10 minutes (0.167 hours) |
| Haiti | 5,031 | 30,125 | 1 | 30,125 | 10 minutes (0.167 hours) |
| **Total ATA Process** | 58,450 | 350,000 | 1 | 350,000 | 10 minutes (0.167 hours) |

**Public Cost**

5

The table above provide an estimate of the total annual number of respondents CBP anticipates, broken down by country. This estimate is based on unique CBP encounters and apprehensions of inadmissible nationals of Venezuela, Nicaragua, Cuba, and Haiti in Fiscal Year 2022, resource limitations in processing supporter requests, and the Department's experience administering the Venezuela process, including expected effect on migration flows. It may represent an over-estimate depending on eligibility for consideration and actual interest in each parole process. This breakdown does not suggest a limit or numerical cap for each country; rather, it represents CBP's best guess as to the approximate annual number of responses and how they may be distributed. As of December 2022, the Secretary has directed that the number of travel authorizations granted across all four processes may not exceed 30,000 each month.  That direction is consistent with the estimates presented here.

The estimated cost to the respondents is $2,752,995.  This is based on the estimated burden hours (58,450) multiplied by the average hourly wage rate for all-purpose air travelers ($47.10).  CBP used the U.S. Department of Transportation's (DOT) recommended hourly value of travel time savings for intercity, all-purpose travel by air and high-speed rail, which is provided in 2015 U.S. dollars. CBP assumes an annual growth rate of 0 percent; the 2015 U.S. dollar value is equal to the 2022 U.S. dollar value.[2]

13.  **Provide an estimate of the total annual cost burden to respondents or record keepers resulting from the collection of information.**

There are no record keeping, capital, start-up or maintenance costs associated with this information collection.

14.  **Provide estimates of annualized cost to the Federal Government.  Also provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information.**

It is estimated that 70% of submissions received will be approved automatically by the system, and 30% of the submissions will be reviewed manually by a CBP Officer.

The estimated annual cost to the Federal Government associated with the review of these submissions is $2,353,428. This is based on the number of responses that must be reviewed manually (105,000) multiplied by the time burden to review and process each response (0.33 hours) = 34,650 hours multiplied by the average hourly loaded rate for a CBP Officer

---

2 Source: U.S. Department of Transportation, Office of Transportation Policy. *The Value of Travel Time Savings: Departmental Guidance for Conducting Economic Evaluations Revision 2 (2016 Update)*, "Table 4 (Revision 2 - 2016 Update): Recommended Hourly Values of Travel Time Savings for Intercity, All-Purpose Travel by Air and High-Speed Rail."  September 27, 2016.  Available at https://www.transportation.gov/sites/dot.gov /files/docs/2016%20Revised%20Value%20of%20Travel%20Time%20Guidance.pdf. Accessed May 25, 2022.

Haiti AR_001239

($67.92)[3] = \$2,353,428.

15. **Explain the reasons for any program changes or adjustments reported in Items 12 or 13.**

There is an increase to the previously reported burden for this information collection due to an increase in respondents and submissions being received; CBP is seeking to expand this collection to remove the previous numerical cap for noncitizens from Venezuela and also include certain noncitizens from Nicaragua, Cuba, Haiti, and their qualifying immediate family members.

16. **For collection of information whose results will be published, outline plans for tabulation, and publication.**

This information collection will not be published for statistical purposes.

17. **If seeking approval to not display the expiration date, explain the reasons that displaying the expiration date would be inappropriate.**

CBP will display the expiration date for OMB approval of this information collection.

18. **"Certification for Paperwork Reduction Act Submissions."**

CBP does not request an exception to the certification of this information collection.

19. **Collection of Information Employing Statistical Methods**

No statistical methods were employed.

---

3 CBP bases this wage on the FY 2022 salary and benefits of the national average of CBP Officer Positions, which is equal to a GS-11, Step 10.  Source: Email correspondence with CBP's Office of Finance on June 27, 2022.

Haiti AR_001240

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**U.S. Customs and Border Protection (CBP) Enforcement Encounters - Northern Border (NBO)**

U.S. Border Patrol (USBP) T8 Apprehensions, USBP T42 Expulsions, Office of Field Operations (OFO) T8 Inadmissible
Migrants, and OFO T42 Expulsions by Country of Citizenship and Demographic
FY22

*Data Includes T8 Deportable and Inadmissible Migrants and T42 Expulsions*
Source: Official End of Year Reporting

| Country of Citizenship | OFO | | | | | USBP | | | | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehens | Single Adults | UC/Single Minors | OFO Total | Family Unit Apprehensions | Single Adults | UC/Single Minors | USBP Total | |
| AFGHANISTAN | 22 | 82 | 219 | 3 | 326 | 0 | 2 | 0 | 2 | 328 |
| ALAND ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ALBANIA | 4 | 34 | 86 | 0 | 124 | 3 | 3 | 0 | 6 | 130 |
| ALGERIA | 50 | 59 | 1,449 | 0 | 1,558 | 0 | 1 | 0 | 1 | 1,559 |
| AMERICAN SAMOA | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ANGOLA | 0 | 13 | 8 | 0 | 21 | 0 | 0 | 0 | 0 | 21 |
| ANTIGUA AND BARBUDA | 0 | 4 | 5 | 0 | 9 | 0 | 0 | 0 | 0 | 9 |
| ARGENTINA | 3 | 0 | 44 | 0 | 47 | 0 | 2 | 0 | 2 | 49 |
| ARMENIA | 0 | 0 | 17 | 0 | 17 | 0 | 0 | 0 | 0 | 17 |
| AUSTRALIA | 17 | 58 | 233 | 0 | 308 | 0 | 0 | 0 | 0 | 308 |
| AUSTRIA | 3 | 5 | 20 | 0 | 28 | 0 | 0 | 0 | 0 | 28 |
| AZERBAIJAN | 0 | 2 | 16 | 0 | 18 | 0 | 0 | 0 | 0 | 18 |
| BAHAMAS | 2 | 13 | 79 | 0 | 94 | 0 | 0 | 0 | 0 | 94 |
| BAHRAIN | 0 | 3 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| BANGLADESH | 3 | 16 | 355 | 2 | 376 | 2 | 2 | 0 | 4 | 380 |
| BARBADOS | 1 | 8 | 29 | 0 | 38 | 0 | 0 | 0 | 0 | 38 |
| BELARUS | 0 | 4 | 8 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| BELGIUM | 18 | 84 | 294 | 0 | 396 | 3 | 2 | 0 | 5 | 401 |
| BELIZE | 0 | 0 | 3 | 0 | 3 | 0 | 1 | 0 | 1 | 4 |
| BENIN | 5 | 3 | 175 | 0 | 183 | 0 | 0 | 0 | 0 | 183 |
| BERMUDA | 5 | 0 | 2 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
| BHUTAN | 0 | 0 | 24 | 0 | 24 | 0 | 0 | 0 | 0 | 24 |
| BOLIVIA | 0 | 1 | 11 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| BOSNIA-HERZEGOVINA | 0 | 2 | 11 | 0 | 13 | 0 | 1 | 0 | 1 | 14 |
| BOTSWANA | 0 | 5 | 1 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| BRAZIL | 62 | 343 | 909 | 1 | 1,315 | 4 | 39 | 0 | 43 | 1,358 |
| BRUNEI | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BULGARIA | 1 | 6 | 28 | 0 | 35 | 0 | 4 | 0 | 4 | 39 |
| BURKINA FASO (UPPER VOLTA) | 2 | 2 | 125 | 0 | 129 | 0 | 0 | 0 | 0 | 129 |
| BURUNDI | 2 | 1 | 41 | 0 | 44 | 0 | 0 | 0 | 0 | 44 |
| CAMBODIA | 1 | 0 | 15 | 0 | 16 | 0 | 0 | 0 | 0 | 16 |
| CAMEROON | 24 | 41 | 567 | 0 | 632 | 0 | 0 | 0 | 0 | 632 |
| CANADA | 755 | 3,261 | 36,411 | 41 | 40,468 | 16 | 115 | 1 | 132 | 40,600 |
| CAPE VERDE, REPUBLIC OF | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| CAYMAN ISLANDS | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| CENTRAL AFRICAN REPUBLIC | 0 | 1 | 5 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| CHAD | 3 | 0 | 10 | 0 | 13 | 0 | 0 | 0 | 0 | 13 |
| CHILE | 27 | 144 | 279 | 0 | 450 | 0 | 10 | 0 | 10 | 460 |
| CHINA, PEOPLES REPUBLIC OF | 138 | 944 | 5,597 | 7 | 6,686 | 0 | 12 | 0 | 12 | 6,698 |
| COLOMBIA | 135 | 526 | 1,276 | 1 | 1,938 | 4 | 29 | 0 | 33 | 1,971 |
| COSTA RICA | 0 | 15 | 52 | 0 | 67 | 0 | 1 | 0 | 1 | 68 |
| CROATIA | 0 | 2 | 25 | 0 | 27 | 0 | 1 | 0 | 1 | 28 |
| CUBA | 13 | 45 | 323 | 0 | 381 | 3 | 29 | 0 | 32 | 413 |
| CYPRUS | 0 | 12 | 2 | 0 | 14 | 0 | 0 | 0 | 0 | 14 |
| CZECH REPUBLIC | 0 | 3 | 49 | 2 | 54 | 0 | 0 | 0 | 0 | 54 |
| DEMOCRATIC REPUBLIC OF CONGO (ZAIRE) | 4 | 37 | 232 | 2 | 275 | 0 | 0 | 0 | 0 | 275 |
| DENMARK | 0 | 17 | 24 | 0 | 41 | 0 | 0 | 0 | 0 | 41 |
| DJIBOUTI | 0 | 2 | 6 | 0 | 8 | 0 | 0 | 0 | 0 | 8 |
| DOMINICA | 0 | 2 | 8 | 0 | 10 | 0 | 0 | 0 | 0 | 10 |
| DOMINICAN REPUBLIC | 6 | 31 | 89 | 0 | 126 | 0 | 10 | 0 | 10 | 136 |
| ECUADOR | 1 | 11 | 146 | 0 | 158 | 0 | 86 | 2 | 88 | 246 |
| EGYPT | 8 | 44 | 143 | 0 | 195 | 0 | 0 | 0 | 0 | 195 |
| EL SALVADOR | 2 | 19 | 92 | 0 | 113 | 0 | 30 | 0 | 30 | 143 |
| EQUATORIAL GUINEA | 0 | 0 | 9 | 0 | 9 | 0 | 0 | 0 | 0 | 9 |
| ERITREA | 2 | 11 | 77 | 0 | 90 | 0 | 4 | 0 | 4 | 94 |
| ESTONIA | 0 | 0 | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| ESWATINI | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ETHIOPIA | 0 | 5 | 46 | 0 | 51 | 0 | 0 | 0 | 1 | 52 |
| FIJI | 0 | 0 | 14 | 0 | 14 | 0 | 2 | 0 | 2 | 16 |
| FINLAND | 3 | 13 | 25 | 0 | 41 | 0 | 0 | 0 | 0 | 41 |
| FRANCE | 329 | 1,569 | 6,095 | 2 | 7,995 | 3 | 2 | 0 | 5 | 8,000 |
| GABON | 0 | 4 | 25 | 0 | 29 | 0 | 0 | 0 | 0 | 29 |
| GAMBIA | 0 | 0 | 10 | 0 | 10 | 0 | 1 | 0 | 1 | 11 |
| GEORGIA | 0 | 4 | 37 | 0 | 41 | 0 | 0 | 0 | 0 | 41 |
| GERMANY | 30 | 128 | 420 | 2 | 580 | 0 | 1 | 0 | 1 | 581 |
| GHANA | 18 | 14 | 166 | 1 | 199 | 0 | 2 | 0 | 2 | 201 |
| GREECE | 0 | 45 | 145 | 0 | 190 | 0 | 0 | 0 | 0 | 190 |
| GRENADA | 0 | 1 | 2 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| GUATEMALA | 1 | 36 | 205 | 1 | 243 | 3 | 248 | 2 | 253 | 496 |

UNCLASSIFIED // FOR OFFICIAL USE ONLY





Haiti AR_00121

UNCLASSIFIED // FOR OFFICIAL USE ONLY

| Country of Citizenship | OFO | | | | OFO Total | USBP | | | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehens | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | |
| GUINEA | 4 | 4 | 129 | 0 | 137 | 0 | 0 | 0 | 0 | 137 |
| GUINEA-BISSAU | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| GUYANA | 2 | 2 | 49 | 0 | 53 | 0 | 0 | 0 | 0 | 53 |
| HAITI | 5 | 57 | 284 | 0 | 346 | 3 | 5 | 0 | 8 | 354 |
| HONDURAS | 0 | 23 | 120 | 0 | 143 | 4 | 73 | 0 | 77 | 220 |
| HONG KONG | 2 | 22 | 57 | 0 | 81 | 0 | 2 | 0 | 2 | 83 |
| HUNGARY | 4 | 19 | 93 | 0 | 116 | 0 | 2 | 0 | 2 | 118 |
| ICELAND | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| INDIA | 197 | 1,391 | 15,498 | 8 | 17,094 | 47 | 189 | 1 | 237 | 17,331 |
| INDONESIA | 1 | 2 | 103 | 0 | 106 | 0 | 1 | 0 | 1 | 107 |
| IRAN | 94 | 441 | 2,185 | 1 | 2,721 | 0 | 1 | 0 | 1 | 2,722 |
| IRAQ | 10 | 19 | 101 | 2 | 132 | 0 | 0 | 0 | 0 | 132 |
| IRELAND | 10 | 58 | 184 | 0 | 252 | 4 | 6 | 0 | 10 | 262 |
| ISLE OF MAN | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ISRAEL | 33 | 189 | 260 | 0 | 482 | 0 | 6 | 0 | 6 | 488 |
| ITALY | 25 | 153 | 362 | 1 | 541 | 1 | 5 | 0 | 6 | 547 |
| IVORY COAST | 10 | 7 | 239 | 0 | 256 | 0 | 0 | 0 | 0 | 256 |
| JAMAICA | 10 | 84 | 325 | 0 | 419 | 0 | 7 | 0 | 7 | 426 |
| JAPAN | 1 | 8 | 205 | 0 | 214 | 0 | 0 | 0 | 0 | 214 |
| JORDAN | 15 | 10 | 95 | 0 | 120 | 0 | 3 | 0 | 3 | 123 |
| KAZAKHSTAN | 0 | 7 | 30 | 0 | 37 | 0 | 0 | 0 | 0 | 37 |
| KENYA | 1 | 12 | 83 | 0 | 96 | 0 | 0 | 0 | 0 | 96 |
| KOREA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| KOSOVO | 0 | 1 | 16 | 0 | 17 | 1 | 0 | 0 | 1 | 18 |
| KUWAIT | 0 | 0 | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| KYRGYZSTAN | 0 | 3 | 8 | 0 | 11 | 0 | 0 | 0 | 0 | 11 |
| LAOS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| LATVIA | 0 | 2 | 6 | 0 | 8 | 0 | 0 | 0 | 0 | 8 |
| LEBANON | 4 | 38 | 168 | 0 | 210 | 0 | 0 | 0 | 0 | 210 |
| LESOTHO | 0 | 3 | 4 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
| LIBERIA | 0 | 0 | 11 | 0 | 11 | 0 | 0 | 0 | 0 | 11 |
| LIBYA | 17 | 2 | 43 | 0 | 62 | 0 | 0 | 0 | 0 | 62 |
| LITHUANIA | 0 | 12 | 14 | 0 | 26 | 0 | 0 | 0 | 0 | 26 |
| LUXEMBOURG | 1 | 0 | 6 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
| MACAO (MACAU) | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MADAGASCAR | 0 | 3 | 34 | 0 | 37 | 0 | 0 | 0 | 0 | 37 |
| MALAWI | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| MALAYSIA | 0 | 3 | 27 | 0 | 30 | 0 | 0 | 0 | 0 | 30 |
| MALI | 3 | 4 | 128 | 0 | 135 | 0 | 0 | 0 | 0 | 135 |
| MARSHALL ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MARTINIQUE | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MAURITANIA | 0 | 0 | 15 | 0 | 15 | 0 | 1 | 0 | 1 | 16 |
| MAURITIUS | 4 | 6 | 61 | 0 | 71 | 0 | 0 | 0 | 0 | 71 |
| MEXICO | 106 | 475 | 1,756 | 2 | 2,339 | 69 | 812 | 1 | 882 | 3,221 |
| MICRONESIA, FEDERATED STATES OF | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MOLDOVA | 2 | 6 | 28 | 0 | 36 | 0 | 0 | 0 | 0 | 36 |
| MONGOLIA | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
| MONTENEGRO | 0 | 1 | 17 | 0 | 18 | 0 | 0 | 0 | 0 | 18 |
| MOROCCO | 17 | 50 | 856 | 1 | 924 | 0 | 0 | 0 | 0 | 924 |
| MOZAMBIQUE | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| MYANMAR (BURMA) | 0 | 6 | 15 | 0 | 21 | 0 | 0 | 0 | 0 | 21 |
| NAMIBIA | 0 | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| NEPAL | 2 | 12 | 136 | 0 | 150 | 0 | 0 | 0 | 0 | 150 |
| NETHERLANDS | 10 | 77 | 173 | 0 | 260 | 0 | 2 | 0 | 2 | 262 |
| NEW ZEALAND | 0 | 16 | 86 | 0 | 102 | 0 | 1 | 0 | 1 | 103 |
| NICARAGUA | 0 | 23 | 73 | 0 | 96 | 0 | 14 | 0 | 14 | 110 |
| NIGER | 0 | 0 | 42 | 0 | 42 | 0 | 0 | 0 | 0 | 42 |
| NIGERIA | 29 | 277 | 820 | 2 | 1,128 | 0 | 1 | 0 | 1 | 1,129 |
| NIUE | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTH KOREA | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTH MACEDONIA | 0 | 10 | 10 | 0 | 20 | 0 | 0 | 0 | 0 | 20 |
| NORWAY | 0 | 2 | 10 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| OMAN | 0 | 3 | 3 | 0 | 6 | 0 | 0 | 0 | 0 | 6 |
| PAKISTAN | 14 | 102 | 491 | 0 | 607 | 0 | 4 | 0 | 4 | 611 |
| PALESTINE | 0 | 1 | 22 | 0 | 23 | 0 | 0 | 0 | 0 | 23 |
| PANAMA | 2 | 2 | 7 | 0 | 11 | 0 | 2 | 0 | 2 | 13 |
| PARAGUAY | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| PERU | 3 | 19 | 123 | 0 | 145 | 0 | 3 | 0 | 3 | 148 |
| PHILIPPINES | 29 | 223 | 1,268 | 1 | 1,521 | 0 | 4 | 0 | 4 | 1,525 |
| POLAND | 2 | 23 | 180 | 0 | 205 | 0 | 0 | 0 | 0 | 205 |
| PORTUGAL | 7 | 78 | 373 | 0 | 458 | 0 | 2 | 0 | 2 | 460 |
| QATAR | 0 | 0 | 4 | 0 | 4 | 0 | 1 | 0 | 1 | 5 |
| REPUBLIC OF CONGO (BRAZZAVILLE) | 0 | 14 | 79 | 1 | 94 | 0 | 0 | 0 | 0 | 94 |
| REPUBLIC OF SOUTH AFRICA | 4 | 39 | 77 | 0 | 120 | 0 | 0 | 0 | 0 | 120 |
| REUNION | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ROMANIA | 18 | 66 | 192 | 0 | 276 | 99 | 72 | 2 | 173 | 449 |



U.S. Customs and Border Protection

Haiti AR_001212 

UNCLASSIFIED // FOR OFFICIAL USE ONLY

| Country of Citizenship | OFO | | | | OFO Total | USBP | | | USBP Total | FY22 CBP Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | AM | Family Unit Apprehens | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | |
| RUSSIA | 3 | 19 | 181 | 0 | 203 | 0 | 0 | 0 | 0 | 203 |
| RWANDA | 4 | 19 | 123 | 0 | 146 | 0 | 0 | 0 | 0 | 146 |
| SAN MARINO | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SAUDI ARABIA | 7 | 16 | 46 | 0 | 69 | 0 | 0 | 0 | 0 | 69 |
| SENEGAL | 17 | 17 | 319 | 0 | 353 | 0 | 2 | 0 | 2 | 355 |
| SERBIA | 0 | 9 | 26 | 0 | 35 | 1 | 1 | 0 | 2 | 37 |
| SIERRA LEONE | 0 | 3 | 7 | 0 | 10 | 0 | 0 | 0 | 0 | 10 |
| SINGAPORE | 0 | 13 | 27 | 0 | 40 | 0 | 0 | 0 | 0 | 40 |
| SLOVAKIA | 0 | 1 | 18 | 0 | 19 | 0 | 1 | 0 | 1 | 20 |
| SLOVENIA | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| SOLOMON ISLANDS | 0 | 3 | 2 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
| SOMALIA | 0 | 2 | 56 | 0 | 58 | 0 | 5 | 0 | 5 | 63 |
| SOUTH KOREA | 42 | 503 | 699 | 1 | 1,245 | 0 | 0 | 0 | 0 | 1,245 |
| SOUTH SUDAN | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| SPAIN | 15 | 53 | 319 | 0 | 387 | 1 | 16 | 1 | 18 | 405 |
| SRI LANKA | 2 | 40 | 138 | 0 | 180 | 0 | 2 | 0 | 0 | 182 |
| ST. KITTS-NEVIS ISLANDS | 0 | 0 | 15 | 0 | 15 | 0 | 0 | 0 | 0 | 15 |
| ST. LUCIA | 0 | 0 | 13 | 0 | 13 | 0 | 0 | 0 | 0 | 13 |
| ST. VINCENT AND THE GRENADINES | 0 | 0 | 21 | 0 | 21 | 0 | 0 | 0 | 0 | 21 |
| SUDAN | 0 | 3 | 22 | 0 | 25 | 0 | 3 | 0 | 3 | 28 |
| SURINAME | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SWEDEN | 4 | 34 | 102 | 0 | 140 | 0 | 1 | 0 | 1 | 141 |
| SWITZERLAND | 3 | 20 | 90 | 0 | 113 | 0 | 0 | 0 | 0 | 113 |
| SYRIA | 35 | 29 | 138 | 3 | 205 | 7 | 1 | 0 | 8 | 213 |
| TAIWAN - REPUBLIC OF CHINA | 2 | 28 | 160 | 0 | 190 | 0 | 2 | 0 | 2 | 192 |
| TAJIKISTAN | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| TANZANIA | 0 | 4 | 33 | 0 | 37 | 0 | 1 | 0 | 1 | 38 |
| THAILAND | 5 | 22 | 53 | 0 | 80 | 0 | 0 | 0 | 0 | 80 |
| TOGO | 0 | 0 | 103 | 0 | 103 | 0 | 0 | 0 | 0 | 103 |
| TONGA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| TRINIDAD AND TOBAGO | 5 | 9 | 49 | 0 | 63 | 0 | 0 | 0 | 0 | 63 |
| TUNISIA | 25 | 119 | 690 | 0 | 834 | 0 | 0 | 0 | 0 | 834 |
| TURKEY | 12 | 52 | 295 | 1 | 360 | 0 | 2 | 1 | 3 | 363 |
| TURKMENISTAN | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| TURKS AND CAICOS ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| UGANDA | 0 | 13 | 31 | 0 | 44 | 0 | 0 | 0 | 0 | 44 |
| UKRAINE | 43 | 484 | 781 | 6 | 1,314 | 5 | 0 | 0 | 5 | 1,319 |
| UNITED ARAB EMIRATES | 0 | 2 | 12 | 0 | 14 | 0 | 0 | 0 | 0 | 14 |
| UNITED KINGDOM | 21 | 200 | 824 | 0 | 1,045 | 5 | 7 | 0 | 12 | 1,057 |
| UNITED STATES OF AMERICA | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| UNKNOWN | 4 | 3 | 57 | 0 | 64 | 0 | 0 | 0 | 0 | 64 |
| URUGUAY | 3 | 2 | 9 | 0 | 14 | 0 | 0 | 0 | 0 | 14 |
| UZBEKISTAN | 3 | 2 | 11 | 0 | 16 | 0 | 0 | 0 | 0 | 16 |
| VANUATU | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| VENEZUELA | 2 | 42 | 152 | 0 | 196 | 2 | 3 | 0 | 5 | 201 |
| VIETNAM | 14 | 100 | 452 | 0 | 566 | 0 | 24 | 1 | 25 | 591 |
| YEMEN | 0 | 8 | 22 | 0 | 30 | 0 | 1 | 0 | 1 | 31 |
| YUGOSLAVIA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| ZAMBIA | 0 | 0 | 12 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| ZIMBABWE | 0 | 11 | 23 | 0 | 34 | 0 | 0 | 0 | 0 | 34 |
| Grand Total | 2,669 | 13,732 | 90,801 | 95 | 107,297 | 290 | 1,936 | 12 | 2,238 | 109,535 |



U.S. Customs and Border Protection

Haiti AR_001215 

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**U.S. Customs and Border Protection (CBP) Enforcement Encounters - Southwest Border (SBO)**
**U.S. Border Patrol (USBP) T8 Apprehensions, USBP T42 Expulsions, Office of Field Operations (OFO) T8 Inadmissible Migrants, and OFO T42 Expulsions by Country of Citizenship and Demographic**
**FY22**
*Data Includes T8 Deportable and Inadmissible Migrants and T42 Expulsions*
*Source: Official End of Year Reporting*

| Country of Citizenship | OFO | | | | OFO Total | USBP | | | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehensions | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | |
| AFGHANISTAN | 3 | 45 | 25 | 0 | 73 | 201 | 553 | 11 | 765 | 838 |
| ALBANIA | 0 | 0 | 1 | 0 | 1 | 8 | 82 | 3 | 93 | 94 |
| ALGERIA | 0 | 0 | 2 | 0 | 2 | 0 | 15 | 0 | 15 | 17 |
| ANDORRA | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 2 |
| ANGOLA | 2 | 1 | 4 | 0 | 7 | 1,260 | 455 | 26 | 1,741 | 1,748 |
| ANTIGUA AND BARBUDA | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| ARGENTINA | 0 | 25 | 29 | 0 | 54 | 336 | 141 | 2 | 479 | 533 |
| ARMENIA | 4 | 1,077 | 1,838 | 29 | 2,948 | 208 | 113 | 2 | 323 | 3,271 |
| ARUBA | 0 | 0 | 0 | 0 | 0 | 5 | 1 | 0 | 6 | 6 |
| AUSTRALIA | 0 | 0 | 8 | 0 | 8 | 0 | 1 | 0 | 1 | 9 |
| AUSTRIA | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| AZERBAIJAN | 0 | 79 | 58 | 0 | 137 | 71 | 126 | 0 | 197 | 334 |
| BAHAMAS | 0 | 0 | 1 | 0 | 1 | 2 | 1 | 0 | 3 | 4 |
| BANGLADESH | 0 | 0 | 10 | 0 | 10 | 279 | 2,080 | 80 | 2,439 | 2,449 |
| BARBADOS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BELARUS | 4 | 947 | 610 | 0 | 1,561 | 143 | 124 | 0 | 267 | 1,828 |
| BELGIUM | 0 | 0 | 2 | 0 | 2 | 3 | 0 | 0 | 3 | 5 |
| BELIZE | 2 | 58 | 155 | 11 | 226 | 263 | 219 | 61 | 543 | 769 |
| BENIN | 0 | 0 | 0 | 0 | 0 | 9 | 48 | 0 | 57 | 57 |
| BOLIVIA | 0 | 0 | 12 | 0 | 12 | 658 | 590 | 15 | 1,263 | 1,275 |
| BRAZIL | 6 | 2,449 | 51 | 1 | 2,507 | 38,524 | 12,231 | 195 | 50,950 | 53,457 |
| BULGARIA | 0 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 4 |
| BURKINA FASO (UPPER VOLTA) | 0 | 0 | 5 | 0 | 5 | 30 | 234 | 0 | 264 | 269 |
| CAMBODIA | 0 | 0 | 1 | 0 | 1 | 0 | 3 | 0 | 3 | 4 |
| CAMEROON | 0 | 8 | 11 | 3 | 22 | 64 | 1,149 | 2 | 1,215 | 1,237 |
| CANADA | 10 | 6 | 78 | 1 | 95 | 14 | 3 | 1 | 18 | 113 |
| CAPE VERDE, REPUBLIC OF | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 4 | 4 |
| CAYMAN ISLANDS | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 4 | 4 |
| CENTRAL AFRICAN REPUBLIC | 0 | 0 | 1 | 0 | 1 | 3 | 10 | 0 | 13 | 14 |
| CHAD | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 0 | 6 | 6 |
| CHILE | 3 | 2,288 | 33 | 1 | 2,325 | 4,782 | 71 | 3 | 4,856 | 7,181 |
| CHINA, PEOPLES REPUBLIC OF | 1 | 11 | 194 | 0 | 206 | 150 | 1,818 | 2 | 1,970 | 2,176 |
| COCOS ISLANDS | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 |
| COLOMBIA | 26 | 190 | 403 | 13 | 632 | 59,245 | 64,492 | 803 | 124,540 | 125,172 |
| COOK ISLANDS | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 2 | 2 |
| COSTA RICA | 1 | 7 | 18 | 2 | 28 | 264 | 305 | 14 | 583 | 611 |
| CUBA | 4 | 35 | 542 | 6 | 587 | 51,617 | 167,744 | 960 | 220,321 | 220,908 |
| CURACAO | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 |
| CZECH REPUBLIC | 0 | 2 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| DEMOCRATIC REPUBLIC OF CONGO (ZAIRE) | 0 | 0 | 2 | 0 | 2 | 342 | 166 | 4 | 512 | 514 |
| DENMARK | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| DJIBOUTI | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| DOMINICA | 0 | 0 | 2 | 0 | 2 | 6 | 5 | 0 | 11 | 13 |
| DOMINICAN REPUBLIC | 0 | 18 | 41 | 0 | 59 | 845 | 4,939 | 30 | 5,814 | 5,873 |
| ECUADOR | 2 | 48 | 62 | 4 | 116 | 12,835 | 10,083 | 1,026 | 23,944 | 24,060 |
| EGYPT | 0 | 0 | 6 | 0 | 6 | 6 | 59 | 0 | 65 | 71 |
| EL SALVADOR | 24 | 2,536 | 1,171 | 103 | 3,834 | 26,288 | 50,580 | 16,328 | 93,196 | 97,030 |
| EQUATORIAL GUINEA | 0 | 0 | 1 | 0 | 1 | 2 | 22 | 0 | 24 | 25 |
| ERITREA | 0 | 0 | 0 | 0 | 0 | 28 | 599 | 2 | 629 | 629 |
| ETHIOPIA | 0 | 0 | 3 | 0 | 3 | 7 | 202 | 2 | 211 | 214 |
| FINLAND | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| FRANCE | 0 | 13 | 17 | 1 | 31 | 53 | 4 | 2 | 59 | 90 |
| FRENCH GUIANA | 0 | 53 | 1 | 0 | 54 | 28 | 0 | 0 | 28 | 82 |
| GAMBIA | 0 | 0 | 0 | 0 | 0 | 2 | 75 | 0 | 77 | 77 |
| GEORGIA | 0 | 52 | 209 | 1 | 262 | 311 | 5,671 | 1 | 5,983 | 6,245 |
| GERMANY | 6 | 8 | 56 | 1 | 71 | 6 | 5 | 0 | 11 | 82 |
| GHANA | 0 | 16 | 46 | 4 | 66 | 455 | 1,573 | 68 | 2,096 | 2,162 |
| GREECE | 1 | 3 | 5 | 0 | 9 | 6 | 1 | 0 | 7 | 16 |
| GUADELOUPE | 0 | 0 | 1 | 0 | 1 | 6 | 73 | 7 | 96 | 97 |
| GUATEMALA | 21 | 2,075 | 982 | 267 | 3,345 | 33,935 | 133,772 | 60,513 | 228,220 | 231,565 |
| GUINEA | 0 | 0 | 6 | 1 | 7 | 78 | 372 | 18 | 468 | 475 |
| GUINEA-BISSAU | 0 | 0 | 0 | 0 | 0 | 6 | 40 | 0 | 46 | 46 |
| GUYANA | 0 | 19 | 4 | 0 | 23 | 58 | 10 | 0 | 68 | 91 |
| HAITI | 5 | 13,122 | 11,723 | 56 | 24,906 | 18,304 | 10,473 | 227 | 29,004 | 53,910 |
| HONDURAS | 88 | 10,290 | 3,265 | 194 | 13,837 | 64,903 | 97,103 | 37,180 | 199,186 | 213,023 |
| HONG KONG | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 2 |
| HUNGARY | 0 | 2 | 7 | 0 | 9 | 0 | 1 | 0 | 1 | 10 |



 Haiti AR_001244

| Country of Citizenship | AM | OFO — Family Unit Apprehensions | OFO — Single Adults | OFO — UC/Single Minors | OFO Total | USBP — Family Unit Apprehensions | USBP — Single Adults | USBP — UC/Single Minors | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| INDIA | 1 | 6 | 63 | 2 | 72 | 4,979 | 12,862 | 395 | 18,236 | 18,308 |
| INDONESIA | 0 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 2 | 4 |
| IRAN | 0 | 7 | 23 | 0 | 30 | 49 | 146 | 1 | 196 | 226 |
| IRAQ | 0 | 0 | 6 | 0 | 6 | 5 | 23 | 0 | 28 | 34 |
| IRELAND | 2 | 0 | 0 | 0 | 2 | 9 | 6 | 0 | 15 | 17 |
| ISRAEL | 0 | 5 | 7 | 0 | 12 | 5 | 20 | 0 | 25 | 37 |
| ITALY | 4 | 0 | 33 | 0 | 37 | 28 | 11 | 2 | 41 | 78 |
| IVORY COAST | 0 | 0 | 2 | 0 | 2 | 11 | 55 | 0 | 66 | 68 |
| JAMAICA | 2 | 79 | 412 | 3 | 496 | 1,250 | 1,909 | 54 | 3,213 | 3,709 |
| JAPAN | 2 | 1 | 11 | 0 | 14 | 0 | 1 | 0 | 1 | 15 |
| JORDAN | 0 | 2 | 3 | 0 | 5 | 10 | 15 | 0 | 25 | 30 |
| KAZAKHSTAN | 0 | 121 | 36 | 2 | 159 | 141 | 117 | 1 | 259 | 418 |
| KENYA | 0 | 0 | 3 | 0 | 3 | 0 | 14 | 0 | 14 | 17 |
| KOSOVO | 0 | 0 | 0 | 0 | 0 | 0 | 80 | 0 | 80 | 80 |
| KUWAIT | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| KYRGYZSTAN | 0 | 223 | 217 | 3 | 443 | 123 | 202 | 0 | 325 | 768 |
| LAOS | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| LATVIA | 0 | 1 | 5 | 0 | 6 | 0 | 3 | 0 | 3 | 9 |
| LEBANON | 0 | 0 | 3 | 0 | 3 | 14 | 34 | 0 | 48 | 51 |
| LIBERIA | 0 | 0 | 1 | 0 | 1 | 0 | 10 | 1 | 11 | 12 |
| LIBYA | 0 | 0 | 1 | 0 | 1 | 0 | 3 | 0 | 3 | 4 |
| LITHUANIA | 0 | 3 | 2 | 0 | 5 | 0 | 2 | 0 | 2 | 7 |
| LUXEMBOURG | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| MACAO (MACAU) | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| MACAU | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| MADAGASCAR | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| MALAWI | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MALAYSIA | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 1 |
| MALDIVE ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MALI | 0 | 0 | 2 | 0 | 2 | 34 | 179 | 1 | 214 | 216 |
| MARSHALL ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| MARTINIQUE | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 2 |
| MAURITANIA | 0 | 0 | 2 | 0 | 2 | 9 | 316 | 0 | 325 | 327 |
| MEXICO | 2,536 | 16,444 | 48,535 | 2,044 | 69,559 | 23,362 | 689,528 | 25,950 | 738,780 | 808,339 |
| MICRONESIA, FEDERATED STATES OF | 0 | 0 | 2 | 0 | 2 | 2 | 4 | 0 | 6 | 8 |
| MOLDOVA | 1 | 133 | 104 | 0 | 238 | 33 | 29 | 0 | 62 | 300 |
| MONGOLIA | 0 | 10 | 0 | 0 | 10 | 1 | 1 | 0 | 2 | 12 |
| MONTENEGRO | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 |
| MOROCCO | 0 | 0 | 2 | 0 | 2 | 0 | 33 | 0 | 33 | 35 |
| MOZAMBIQUE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 9 | 10 | 10 |
| MYANMAR (BURMA) | 0 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 8 |
| NAMIBIA | 0 | 0 | 1 | 0 | 1 | 4 | 1 | 0 | 5 | 6 |
| NEPAL | 0 | 0 | 12 | 0 | 12 | 32 | 1,433 | 29 | 1,494 | 1,506 |
| NETHERLANDS | 0 | 0 | 7 | 0 | 7 | 1 | 1 | 0 | 2 | 9 |
| NETHERLANDS ANTILLES | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| NEW ZEALAND | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| NICARAGUA | 8 | 74 | 230 | 12 | 324 | 29,827 | 130,579 | 3,146 | 163,552 | 163,876 |
| NIGER | 0 | 0 | 0 | 0 | 0 | 11 | 40 | 0 | 51 | 51 |
| NIGERIA | 0 | 3 | 12 | 0 | 15 | 116 | 413 | 2 | 531 | 546 |
| NORTH KOREA | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 4 |
| OMAN | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| PAKISTAN | 0 | 0 | 5 | 0 | 5 | 37 | 296 | 1 | 334 | 339 |
| PALESTINE | 0 | 5 | 2 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
| PANAMA | 1 | 11 | 8 | 0 | 20 | 1,133 | 197 | 4 | 1,334 | 1,354 |
| PAPUA NEW GUINEA | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 3 |
| PARAGUAY | 0 | 0 | 2 | 0 | 2 | 22 | 26 | 0 | 48 | 50 |
| PERU | 4 | 64 | 150 | 4 | 218 | 25,464 | 24,601 | 379 | 50,444 | 50,662 |
| PHILIPPINES | 0 | 1 | 9 | 0 | 10 | 2 | 11 | 0 | 13 | 23 |
| POLAND | 0 | 2 | 8 | 0 | 10 | 1 | 8 | 0 | 9 | 19 |
| PORTUGAL | 0 | 2 | 4 | 0 | 6 | 27 | 3 | 0 | 30 | 36 |
| REPUBLIC OF CONGO (BRAZZAVILLE) | 0 | 0 | 4 | 0 | 4 | 304 | 179 | 18 | 501 | 505 |
| REPUBLIC OF SOUTH AFRICA | 0 | 0 | 4 | 0 | 4 | 15 | 6 | 0 | 21 | 25 |
| ROMANIA | 0 | 46 | 51 | 0 | 97 | 4,649 | 1,089 | 157 | 5,895 | 5,992 |
| RUSSIA | 48 | 9,420 | 7,069 | 29 | 16,566 | 3,028 | 2,155 | 14 | 5,197 | 21,763 |
| RWANDA | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 6 | 9 | 9 |
| SAO TOME AND PRINCIPE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| SAUDI ARABIA | 0 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 4 |
| SENEGAL | 0 | 0 | 7 | 0 | 7 | 86 | 2,458 | 2 | 2,546 | 2,553 |
| SERBIA | 0 | 0 | 3 | 0 | 3 | 0 | 34 | 1 | 35 | 38 |
| SIERRA LEONE | 0 | 3 | 0 | 0 | 3 | 60 | 112 | 6 | 178 | 181 |
| SINGAPORE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| SLOVAKIA | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| SLOVENIA | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| SOLOMON ISLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SOMALIA | 0 | 0 | 5 | 0 | 5 | 7 | 1,134 | 15 | 1,156 | 1,161 |
| SOUTH KOREA | 1 | 0 | 29 | 0 | 30 | 0 | 5 | 0 | 5 | 35 |
| SOUTH SUDAN | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| SPAIN | 7 | 4 | 93 | 2 | 106 | 75 | 30 | 0 | 105 | 211 |
| SRI LANKA | 0 | 0 | 0 | 0 | 0 | 0 | 233 | 1 | 234 | 234 |
| ST. LUCIA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 2 |
| STATELESS | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 3 |
| SUDAN | 0 | 0 | 2 | 0 | 2 | 2 | 54 | 0 | 56 | 58 |
| SURINAME | 0 | 4 | 0 | 1 | 5 | 19 | 2 | 0 | 21 | 26 |
| SWEDEN | 2 | 0 | 4 | 0 | 6 | 1 | 1 | 0 | 2 | 8 |



| Country of Citizenship | OFO | | | | OFO Total | USBP | | | | USBP Total | FY22 CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | AM | Family Unit Apprehensions | Single Adults | UC/Single Minors | | Family Unit Apprehensions | Single Adults | UC/Single Minors | | | |
| SWITZERLAND | 0 | 2 | 2 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| SYRIA | 0 | 5 | 7 | 0 | 12 | 35 | 118 | 1 | 154 | 166 |
| TAIWAN - REPUBLIC OF CHINA | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 3 |
| TAJIKISTAN | 0 | 25 | 64 | 0 | 89 | 93 | 218 | 4 | 315 | 404 |
| TANZANIA | 0 | 0 | 1 | 0 | 1 | 0 | 6 | 0 | 6 | 7 |
| THAILAND | 0 | 0 | 3 | 0 | 3 | 0 | 4 | 0 | 4 | 7 |
| TOGO | 0 | 0 | 0 | 0 | 0 | 55 | 132 | 0 | 187 | 187 |
| TRINIDAD AND TOBAGO | 0 | 0 | 4 | 0 | 4 | 31 | 8 | 1 | 40 | 44 |
| TUNISIA | 0 | 0 | 1 | 0 | 1 | 0 | 5 | 0 | 5 | 6 |
| TURKEY | 3 | 43 | 42 | 1 | 89 | 3,321 | 11,864 | 171 | 15,356 | 15,445 |
| TURKMENISTAN | 0 | 2 | 1 | 0 | 3 | 0 | 5 | 0 | 5 | 8 |
| UGANDA | 0 | 0 | 5 | 0 | 5 | 2 | 14 | 0 | 16 | 21 |
| UKRAINE | 88 | 15,239 | 9,328 | 124 | 24,779 | 353 | 231 | 1 | 585 | 25,364 |
| UNITED ARAB EMIRATES | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 |
| UNITED KINGDOM | 0 | 1 | 24 | 0 | 25 | 20 | 3 | 0 | 23 | 48 |
| UNITED STATES OF AMERICA | 1 | 0 | 4 | 1 | 6 | 0 | 0 | 0 | 0 | 6 |
| UNKNOWN | 11 | 8 | 138 | 27 | 184 | 0 | 0 | 0 | 0 | 184 |
| URUGUAY | 0 | 1 | 3 | 0 | 4 | 253 | 49 | 0 | 302 | 306 |
| USSR | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| UZBEKISTAN | 1 | 60 | 82 | 0 | 143 | 967 | 2,252 | 13 | 3,232 | 3,375 |
| VENEZUELA | 26 | 145 | 249 | 10 | 430 | 66,198 | 119,959 | 1,129 | 187,286 | 187,716 |
| VIETNAM | 0 | 0 | 1 | 0 | 1 | 14 | 243 | 5 | 262 | 263 |
| WESTERN SAHARA | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 4 |
| YEMEN | 0 | 0 | 11 | 0 | 11 | 13 | 51 | 0 | 64 | 75 |
| YUGOSLAVIA | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 |
| ZAMBIA | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 2 | 2 |
| ZIMBABWE | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 |
| Grand Total | 2,963 | 77,684 | 88,897 | 2,964 | 172,508 | 482,962 | 1,574,381 | 149,093 | 2,206,436 | 2,378,944 |


U.S. Customs and
Border Protection

Haiti AR_001246 

**COUNCIL** *on*
**FOREIGN**
**RELATIONS**

**IN BRIEF**

# Why Are Haitian Migrants Gathering at the U.S. Border?

*By* Edward Alden, *CFR Expert and* Alex Tippett  |  *October 1, 2021 11:35 am (EST)*

*The arrival of tens of thousands of Haitian migrants at the U.S.-Mexico border has generated domestic criticism from all sides that the Biden administration has poorly handled a cascading humanitarian crisis.*

## What happened at the U.S.-Mexico border in September?

Over two weeks, U.S. Border Patrol agents apprehended or expelled nearly thirty thousand migrants, the majority of them Haitian nationals sheltering near Del Rio, Texas. Widely circulated images of Border Patrol agents on horseback attempting to prevent migrants from crossing the Rio Grande triggered renewed debate over President Joe Biden's immigration policy.

*More From Our Experts*

James M. Lindsay
## TWE Celebrates Presidents' Day

Edward Alden
## More Lost Chances on Immigration Reform Hurt the U.S. Economy

By September 24, federal authorities had finished clearing an encampment that had housed up to fifteen thousand Haitian migrants. Secretary of Homeland Security Alejandro Mayorkas reported that two thousand of those migrants had been deported to Haiti on U.S.-chartered flights and eight thousand had willingly returned to Mexico. The administration allowed twelve thousand migrants to enter the United States and have their requests for asylum or other permission to remain in the country evaluated by U.S. immigration judges. An additional five thousand migrants are being considered for the same opportunity.

This incident is part of a sharp increase in attempted border crossings over the past year and a half. In March 2020, citing the COVID-19 pandemic, the Donald Trump administration began using Title 42, an emergency public health order allowing for the immediate expulsion of migrants. Since then, Customs and Border Protection (CBP) has expelled most migrants detained at the border without considering their asylum claims, as usually required by U.S. law. The Biden administration has continued to uphold Title 42 and maintains restrictions on where and how migrants can apply for asylum. In July 2021, CBP announced that it had stopped 212,672 migrants at the border, a 21-year high.

*Haitian migrants cross the Rio Grande to enter the United States. The Washington Post/Getty Images*

### What is driving the surge of Haitian migrants to the United States?

Haiti has recently suffered fresh experiences of both political instability and natural disasters: earlier this year, a group of mercenaries assassinated Haitian President Jovenel Moise, and an earthquake left more than two thousand people dead. But corruption, poverty, and violence have long spurred migration, and for most Haitians at the U.S.-Mexico border, their arrival is the culmination of a years-long journey.

### The World This Week

A weekly digest of the latest from CFR on the biggest foreign policy stories of the week, featuring briefs, opinions, and explainers. *Every Friday.*

Email Address

| Subscribe |

View all newsletters ›

Following a devastating earthquake in 2010, many Haitians emigrated to South America. One of their first destinations was Brazil, where preparations for the 2014 FIFA World Cup and 2016 Summer Olympics offered promising job prospects. But the COVID-19 pandemic made employment opportunities scarcer, and countries in the region closed their borders. Chile, one of the top Latin American destinations for Haitian migrants, enacted a restrictive new immigration law. As a result, many Haitians began a perilous northward march.

*More From Our Experts*

James M. Lindsay
**TWE Celebrates Presidents' Day**

Edward Alden
**More Lost Chances on Immigration Reform Hurt the U.S. Economy**

Fear of violence, particularly from organized crime, informs where they attempt to cross. Rumors spread that the area around Del Rio was a relatively safe crossing site, reportedly pushing migrants to congregate in camps in the vicinity. But this is only part of a broader migration wave. Officials in Colombia told the BBC that nineteen thousand migrants, primarily Haitians, were waiting to cross the border into Panama.

## What is behind the Biden administration's response?

The administration has been clear that its use of deportation flights is intended to deter future migrants. Officials have told reporters they believe that deportees, upon arriving in Haiti, will share their experience and convince would-be migrants to avoid the

journey.

The reliance on Title 42 to carry out expulsion flights remains controversial. It has been challenged in a lawsuit by advocacy groups, and it led Daniel Foote, the U.S. special envoy to Haiti, to resign over what he called the "inhumane and counterproductive decision" to deport the migrants. While the administration continues to defend Title 42 in court, its use has slowly declined. In January 2020, more than 80 percent of enforcement actions at the U.S.-Mexico border were Title 42 expulsions; by August 2021, less than half were.

The administration's public embrace of a relatively aggressive expulsion policy could be calculated to shore up perceived political weaknesses, much to the frustration of immigration advocates. In public polling, Biden has so far received low marks on his handling of immigration. With leading Republicans criticizing what they see as chaos at the border, some within the administration also argue that aggressive enforcement is necessary to gain congressional support for broader immigration reform.

## What other options does the administration have?

The administration could choose to restore the previous asylum rules, or even expand opportunities for Haitian migrants to apply. This summer, the administration indicated its desire for a deeper reform of the asylum process, but without congressional support for additional resources, it has limited tools. Biden did take executive action to ensure that an estimated 155,000 Haitian migrants who have been in the United States since July 29, 2021, are eligible to receive work authorizations and protection from deportation by granting them a Temporary Protected Status designation.

He could also use another form of relief known as Deferred Enforced Departure (DED), which similarly prevents the removal of certain migrants for a designated period of time. In 1997, amid political turmoil and the fallout from a U.S. military intervention in

Haiti, President Bill Clinton used DED to grant a one-year exemption to roughly twenty thousand Haitians.

 Creative Commons: Some rights reserved.

# More than 100 Haitian migrants found on island near Puerto Rico

*Group found on uninhabited Mona Island, which smugglers use as drop-off point for vessels leaving Dominican Republic.*



Haiti is currently in the grips of a humanitarian crisis, spurred by months of political instability and surging gang violence [File: Ricardo Arduengo/Reuters]
Published On 18 Oct 202218 Oct 2022

More than 100 Haitian migrants have been found on an uninhabited island near Puerto Rico, United States authorities said, as Haiti continues to reel from a humanitarian crisis brought on by surging gang violence.

Park rangers working for the Puerto Rico Department of Environment and Natural Resources found the group on Mona Island, US Customs and Border Protection (CBP) spokesman Jeffrey Quinones said on Tuesday.

"What we know preliminarily is that they were transported in just one vessel," he said.

It was not immediately clear if anyone in their group drowned before authorities were notified of the situation. Quinones said authorities are still interviewing the migrants.

Anais Rodriguez, secretary of the Puerto Rico department that found them, said the group included 60 women, including three who are pregnant, as well as 38 men and five children ranging in age from five to 13 years old.

Increasing numbers of Haitian migrants and asylum seekers have sought to reach the US in recent months, often by sea, as the Caribbean nation experienced spiralling violence and political instability.

The United Nations warned late last week that approximately 4.7 million people currently face acute hunger across the country.

A gang blockade on Haiti's main fuel terminal in the capital, Port-au-Prince, has led to dire shortages of electricity, water and food, especially in already impoverished areas of the city where violence is rampant.

Hospitals have been forced to cut back on services as a result of the lack of petrol needed to power generators, and the crumbling healthcare network has complicated efforts to respond to a dangerous cholera outbreak.

Meanwhile, Haiti's government has called on the international community to help establish a "specialised armed force" to respond to the gangs – but Haitian civil society leaders have rejected the prospect of foreign intervention.

The US ambassador to the UN, Linda Thomas-Greenfield, said on Monday that the United States and Mexico were working on draft Security Council resolutions in response to the continuing crisis.

The first would impose financial sanctions on Haitian "criminal actors" involved in the recent surge of violence, Thomas-Greenfield said, while the second would "authorise a non-UN, international security assistance mission" in Haiti to restore security and help the flow of humanitarian aid.

It remains unclear what countries would participate, and in what capacity. Thomas-Greenfield said the mission would be led by a "partner country", but did not say which one that would be.

White House spokeswoman Karine Jean-Pierre on Tuesday also evaded questions about the potential Haiti mission, telling reporters during a news conference only that "conversations are ongoing".

As the security situation in Haiti deteriorated after last year's killing of President Jovenel Moise, and conditions worsened in host communities elsewhere in the Americas region, new waves of Haitian asylum seekers have journeyed towards the US.

On Sunday, the US Coast Guard said it had rescued almost 100 people, mostly from Haiti, from an overcrowded boat off the Florida coast. The passengers told Coast Guard crew members that they had been at sea for a week and lacked food and water during the last two days.

Meanwhile, from October 2021 to March, 571 Haitians and 252 people from the Dominican Republic were detained in waters around Puerto Rico and the US Virgin Islands, according to CBP. Of the Haitians, 348 landed on Mona Island and were rescued.

Smugglers frequently use Mona Island as a drop-off point for vessels leaving the Dominican Republic, and often tell migrants that they have reached Puerto Rico even though Mona Island is uninhabited and inhospitable, Quinones said.

"Smugglers do not have any regard for the safety of people they're transporting. They basically pile them up in a boat," he said.

Source: Al Jazeera and news agencies

https://www.aljazeera.com/news/2022/10/18/more-than-100-haitian-migrants-found-on-island-near-puerto-rico

# First on CNN: A record number of migrants have died crossing the US-Mexico border

By Priscilla Alvarez, CNN

Published 3:53 PM EDT, Wed September 7, 2022

 politics

AudioLive TV

📺 Video Ad Feedback

See the dangerous risks migrants take crossing US-Mexican border

02:44 - Source: CNN

**(CNN)** — Nearly 750 migrants have died at the southern border this fiscal year, a record that surpasses last year's total by more than 200 people, according to Department of Homeland Security figures shared with CNN.

Migrants often face treacherous terrain when crossing the border – including oppressive desert heat, dangerous waters and falling from the border wall.

Since October 1, which marks the start of the fiscal year, there have been 748 deaths, a Homeland Security official told CNN, with a month still left to go in the fiscal year. That's up from 557 southwest border deaths during fiscal year 2021, the previous record.

Haiti AR_001256



**RELATED VIDEO**
How these migrants are faring 1 week after Texas paid to bus them out of state

The figures don't always capture all deaths, as other state and local agencies may recover bodies without Border Patrol involvement, meaning the number of deaths is likely higher.

Last week, the bodies of at least eight migrants trying to cross the US border from Mexico were found in the Rio Grande, Customs and Border Protection said. The remains were discovered by agents and Mexican authorities while rescuing other migrants in the river.

An increasing number of migrants continue to appear at the US-Mexico border as conditions deteriorate in Latin America. Arrests of migrants along the US southern border this year remained high, including during months when numbers usually dip, meaning that thousands were exposed to even more difficult elements.

In July, the US Border Patrol made more than 181,000 arrests on the US southern border, according to the latest available agency data.

In the past, many migrant deaths have been related to heat exposure, according to the Border Patrol.

Advocates for migrants say they may be forced to take increasingly risky paths to reach the US, citing border policies like a Trump-era pandemic emergency restriction that allows authorities to turn people away at the border.

"Migrants, refugees, and entire families are using more distant and dangerous routes to come to the United States," Fernando García, executive director of the Border Network for Human Rights, previously told CNN.

Deaths along the US southern border have been rising over the years. In fiscal year 2020, there were 247 deaths and 300 deaths in 2019, marking a significant increase amid a 30-record year for border crossings. The agency data on deaths dates to 1998.

Customs and Border Protection declined to comment on the figures, but said smugglers are taking advantage of desperate migrants.

"Transnational criminal organizations continue to recklessly endanger the lives of individuals they smuggle for their own financial gain with no regard for human life," CBP said in a statement. "Smuggling organizations are abandoning migrants in remote and

Haiti.AR_001257

dangerous areas, leading to a rise in the number of rescues but also tragically a rise in the number of deaths. The terrain along the border is extreme, the summer heat is severe, and the miles of desert migrants must hike after crossing the border in many areas are unforgiving."

So far this fiscal year, there have been nearly 19,000 searches and rescues along the US southern border, according to CBP – an increase from 12,833 in fiscal year 2021.

**Paid Links**

Search CNN...



Log In

Live TV

Audio

US

World

Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More



**FOLLOW CNN POLITICS**

___

   

Terms of Use   Privacy Policy   Cookie Settings   Ad Choices   Accessibility & CC   About   Newsletters   Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

   

World | Africa | Asia | Australia | Europe | Latin America | Middle East

# Haiti gang violence: 209 killed in Cité Soleil in 10 days

🕐 26 July



WFP/THERESA PIORR

With food and water supplies disrupted due to the violence, UN aid agencies have delivered essentials

**By Vanessa Buschschlüter**

BBC News

Haiti AR_001261

**More than 200 people have been killed in gang violence in Haiti's capital, Port-au-Prince, in the space of 10 days, United Nations figures reveal.**

Almost half of those who died were residents without ties to the gangs which are fighting for control of the Cité Soleil neighbourhood, the UN says.

Locals say they are running out of drinking water and food as deliveries have been halted amid the shoot-outs.

One resident described his life as "a cycle of fear, stress and despair".

Gang violence had already shot up since the assassination of President Jovenel Moïse by mercenaries a year ago, but it has reached shocking new levels since a battle erupted on 8 July between two criminal alliances, known as G9 and G-Pèp.



> "

I go to bed and wake up to the sound of gunfire

**"Edwin" (not his real name)**
Youth leader in Brooklyn, Cité Soleil

The UN says that 209 people were killed between 8 and 17 July, of which 114 were gang members. A further 254 people have sustained gunshot wounds, more than half of them residents without links to the gangs.

A youth leader from Brooklyn, the area within the sprawling Cité Soleil neighbourhood which has been worst hit by the fighting, described how his life had changed.

"I go to bed and wake up to the sound of gunfire, which is very stressful. But even if the shooting terrifies me, I try to use the rhythmic sounds of bullets being fired to lull me to sleep; this is the only way I can survive," the young man told the UN.

"Sometimes you can use music to escape the constant shooting noise, but not when shots are being fired so close to your house; it's just too loud," said the man, who withheld his real name for security reasons.

Haiti AR_001262

About 3,000 residents have been forced to flee. Many have nothing to go back to after their homes were destroyed or burned down by the gangs.

Others do not dare leave their homes for fear of being killed by stray bullets.

With fuel, food and drinking water supplies disrupted, the World Food Programme and the UN Children's Fund have started delivering aid directly to the most vulnerable people in Cité Soleil.

**Hundreds of children have also taken refuge at a high school in the capital**.

The youth leader from Cité Soleil said he hoped the violence would stop so he could return to his work bringing together young people from areas controlled by rival gangs to play sports together.

## More on this story



**Haitian children take shelter from deadly gang war**

22 July



Haiti AR_001263





### Scores killed in gang warfare in Haitian capital

14 July

## Related Topics

Haiti    Port-au-Prince    Gangs

## Top Stories

### 'They beat my son for refusing to fight in Ukraine'

10 hours ago

### Iran carries out second execution linked to protests

Haiti AR_001264

1 hour ago

▶ **The secret diaries of women protesting in Iran**

15 hours ago

## Features



**'They beat my son for refusing to fight in Ukraine'**



**They are K-pop's next stars… and they're entirely virtual**



**The themes of two unexpected World Cup semi-finals**



**Check out the World Cup schedule**





**The secret diaries of women protesting in**



**One of Central America's most active**



**What was Genghis Khan's 'secret weapon' on the battlefield?**

**'We witnessed history as Morocco won'**



**'Brutal - this England exit is even more painful'**

## Elsewhere on the BBC



**The French breakfast you don't know**



**The rise of the remote helicopter boss**



Haiti AR_001266



## Most Read

1   'They beat my son for refusing to fight in Ukraine'

2   Iran executes 23-year-old protester in public

3   They lied to protect my brother, claims Harry

4   Shooting of three women at cafe shocks Italy

5   'Very serious' corruption scandal rattles the EU

6   Two police officers killed in Queensland shooting

7   Three children die in icy lake tragedy

8   Twitter's paid blue tick re-launches after pause

9   Eagles storm into play-offs & rookie routs Brady

10   Afghan forces kill Pakistan civilians across border

## BBC News Services

On your mobile

On smart speakers

Get news alerts

Contact BBC News

| Home | Sport | Worklife | Future | Music | Weather |
|------|-------|----------|--------|-------|---------|
| News | Reel | Travel | Culture | TV | Sounds |

Terms of Use    About the BBC    Privacy Policy    Cookies    Accessibility Help    Parental Guidance

Contact the BBC    Get Personalised Newsletters    Why you can trust the BBC    Advertise with us

AdChoices / Do Not Sell My Info

© 2022 BBC. The BBC is not responsible for the content of external sites. **Read about our approach to external linking.**

Haiti AR_001268

**The Washington Post**

*Democracy Dies in Darkness*

CAPITAL WEATHER GANG

# Tropical Depression Grace drenching Haiti days after major earthquake

Widespread rain totals of 5 to 10 inches with localized 15-inch amounts are possible, increasing the threat of flooding and mudslides

By Matthew Cappucci

August 16, 2021 at 5:21 p.m. EDT

Tropical Depression Grace is deluging Haiti just days after a devastating earthquake leveled scores of buildings and claimed about 1,300 lives. The tremor, registering at magnitude 7.2, struck around 8:30 a.m. Saturday, collapsing apartment buildings and sending residents running through the streets in fear.

Now, heavy downpours are pivoting onto Hispaniola and overspreading Haiti late Monday, bringing rainfall rates topping two inches per hour and the threat of flooding and mudslides. The National Hurricane Center wrote "torrential" rains were falling over both the Dominican Republic and Haiti in its 5 p.m. advisory Monday.

Search-and-rescue efforts continue in the wake of the earthquake but could be hampered by the adverse meteorological conditions.

There are growing signs that Grace could threaten Mexico, too, barreling westward through the Caribbean and the Gulf of Mexico and intensifying into a potentially more formidable tropical storm or even hurricane.

## Short-term forecast for Grace

TROPICAL UPDATE: As #Haiti still reels from a strong #earthquake on Saturday, @NOAA's #GOES16 🛰 is closely watching Tropical Depression #Grace as it passes just south of the nation. #FlashFlooding and #mudslides will be possible today. https://t.co/OT12jdQfNe #HaitiQuake pic.twitter.com/sGdocZ76fE
— NOAA Satellites - Public Affairs (@NOAASatellitePA) August 16, 2021

As of 5 p.m. Monday, Grace had 35 mph winds and was just shy of tropical-storm intensity as it swept westward at 15 mph about 50 miles south of Port Au Prince, Haiti. Deluging downpours were pinwheeling westward over the nation by midafternoon and will continue into Tuesday.

The strongest winds should remain offshore, but gusts to 35 mph are still possible in areas reeling from Saturday's quake. Widespread rain totals of 5 to 10 inches with localized 15-inch amounts will be possible. Haiti, a nation known for its widespread deforestation, is especially susceptible to heavy rainfall. With less vegetation to anchor topsoil, mudslides and landslides are routine during heavy rain events.

That may cause additional casualties while also isolating more remote locales, posing complications for dispatching resources to areas in need.

## Compounding disaster in Haiti

Saturday's earthquake occurred in western Haiti along the Massif de la Hotte Mountains. While the quake was stronger than the one that struck in 2010, it was farther from Port-au-Prince, dramatically reducing shaking in the capital. The temblor was a strike-slip quake, meaning two plates moved side to side. That meant there was little to no tsunami threat. Tsunamis occur when the sea floor moves up and down.

The quake appears to have occurred along the southern rim of the Gonâve Microplate. The depth was very shallow, at only about six miles below ground, causing stronger shaking at the surface. The fault is known as the Enriquillo-Plantain Garden Fault. Plates slide past each other at the fault by about 20 millimeters every year, but big "slips" occur during earthquakes. This one occurred farther west than the 2010 event. In some places, the ground moved horizontally by up to eight feet.

The same fault was responsible for the 2010 quake, as well as a 1907 earthquake that brought widespread damage to Kingstown, Jamaica.

Numerous aftershocks have occurred, including some stronger than magnitude 5. Strong quakes are likely to occur for months to come. Some strong aftershocks may occur during the height of heavy rainfall associated with Grace, amplifying the landslide risk even more.

## Grace's longer-term forecast

Chance of **tropical storm winds** over five days    ◎ Cat. 3-5   ◎ Cat. 1-2   • T.S.   ○ T.D.

5%    50%    90%

⋯⋯ Forecast path    ⬭ Tropical storm winds

Updated 4:16 p.m.

Show impact times

*North A*
*Oce*

© Mapbox © OpenStreetMap

Source: National Weather Service. Note: Impact lines represent the earliest reasonable arrival time of tropical storm winds. All times are Eastern.

By later Tuesday, Grace will be pulling westward in the Caribbean away from Hispaniola and is forecast to regain tropical-storm strength. Jamaica could experience tropical-storm conditions Tuesday, as could Cuba's southern coast.

Assuming the center remains south of Cuba, which is increasingly likely, the storm may continue intensifying as it transits warm ocean waters. That could allow it to grow into a hurricane as it approaches the Yucatán Peninsula late Wednesday into Thursday.

"There is an increasing risk of wind and rainfall impacts over the Yucatán Peninsula of Mexico," the National Hurricane Center wrote.

If that scenario were realized, it would spell an additional round of land interaction for Grace, which would temporarily weaken it. But it could again intensify north of the Bay of Campeche in the southern Gulf of Mexico and make a run for areas just south of the U.S.-Mexico border late week.

*Jason Samenow contributed to this report.*



**KGUN 9 ON YOUR SIDE**  ›  **NEWS**  ›  **LOCAL & REGIONAL NEWS**

# Local migrant shelter reaching max capacity as it receives hundreds per day

*Posted: 3:00 PM, Sep 22, 2022  Updated: 11:42 AM, Sep 23, 2022*

 By: Denelle Confair



Casa Alitas is reaching max capacity.

 TUCSON

Watch Now

TUCSON, Ariz. — A local migrant shelter may soon have to turn away migrants as they near capacity. That could mean Border Patrol will start to have to do community releases for migrants in their custody.

The influx the shelter has been seeing is putting a strain on their resources. Shelter workers describe the increased numbers as hectic and are hoping for relief.

Recent Stories from kgun9.com



"Unfortunately, the reality is that's increased our numbers past the point that Alitas is able to welcome all of these folks and it could result in straight releases here in Tucson," said Executive Director of Casa Alitas Teresa Cavendish.

Several buses were seen dropping off an upwards of 50 people at the Tucson shelter on Thursday.

 TUCSON

**Watch Now**

"We're tapped out on how many we can receive safely, where it is safe for both our guests, for our volunteers and for our staff. And so anything in excess of our maximum numbers are what they call community releases," explained Cavendish.

For the past three weeks, she says they have been receiving about 400 to 450 migrants a day. The shelter usually receives an average of 300 guests a day.

From men and women to infants, some may start to be turned away. Despite the challenges, volunteers here just do what they can, for the people they can help.

"All of us somewhere in our background. Most likely grandparents more than anything are coming from Europe after World War II or God only knows where," said Laurence Olivier, a volunteer at Casa Alitas.

Casa Alitas is in need of volunteers, as well as supplies such as clothing and toiletries. For more information on donating, check out the Casa Alitas website.

———-
***Denelle Confair** is an anchor and investigative reporter for KGUN 9. It's been her dream to tell your stories for the past decade. She is extremely curious and wants to continue to use her storytelling for the greater good. Share your story ideas and important issues with Denelle by emailing **denelle.confair@kgun9.com** or by connecting on Facebook, and Twitter.*



News   Weather   Traffic   You Ask. We Investigate.™
Support

Scripps Local Media
© 2023 Scripps Media, Inc

Sitemap   Privacy Policy   Privacy Center
Journalism Ethics Guidelines   Terms of Use   EEO   Careers

Haiti AR_001274





Free 24/7 News | National News | Weather | TV Schedule | Paramount+

☰   CW44 TAMPA BAY                                    🔍    Login

**LOCAL NEWS** ›

# More than 180 people rescued from overloaded vessel in Florida Keys



BY ASHLEY COX
NOVEMBER 22, 2022 / 7:09 PM / CNN



**Be the first to know**

Get browser notifications for breaking news, live
events, and exclusive reporting.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree",
you acknowledge that you have read and agree to the updated Terms.

Agree

Haiti AR_001276

UNKNOWN
Watch CBS News

FLORIDA KEYS. (CNN) -- More than 180 people were rescued from an overloaded boat early Monday in the Florida Keys, according to the US Coast Guard and the US Border Patrol.

Some 18 Haitian migrants "who were trapped in dangerous ocean currents while attempting to swim to shore" also were rescued by federal, state and local law enforcement, US Border Patrol Chief Patrol Agent Walter Slosar said Tuesday on Twitter.

More than 180 rescued people are aboard a cutter, Coast Guard spokesperson Nicole Groll said Tuesday.

Groll said everyone is believed to have been rescued after the migrants were trapped in dangerous ocean currents. No deaths have been reported, Groll said.

The migrants are being processed and, once officials are done speaking to everyone, authorities will have a better idea of what the next steps will be for them, according to Groll.

As the vessel hit the sand bar off Whale Harbor, there were "reports of people in the water and our land partners are on scene," the Coast Guard Southeast said in a tweet on Monday. Rescue efforts were launched, the Coast Guard said.

Conditions were rough for rescue crews, with 6- to 10-foot seas and winds of 25 mph, the Coast Guard told CNN. Whale Harbor is in Islamorada, in the Upper Florida Keys.

Clothing, pots, backpacks and life jackets could be seen on the vessel, photos from a CNN team on the ground show.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

...ported the vessel to the Key West ...t.

...d after a homemade vessel ...re rescued from the vessel,

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Watch CBS News

The agency reported nearly 57,000 encounters with Haitian migrants in Florida in 2022, an increase from nearly 49,000 the prior year.

The-CNN-Wire™ & © 2022 Cable News Network, Inc., a Warner Bros. Discovery Company. All rights reserved.

**In:**   **Florida Keys**    **Immigration**    **Florida**

*First published on November 22, 2022 / 7:09 PM*

*The-CNN-Wire ™ © 2022 Cable News Network, Inc., a Warner Bros. Discovery Company. All rights reserved.*

## This New CPAP Can Do What

AirSense 11: The World's Newest And Most Advanced CPAP

 PAID   THE EASY BLOG BY EASYBREATHE.COM

## Search For GPS Tracking for Fleet Vehicles: Tracking Units For Fleet Vehicles

PAID   GPS | YAHOO! SEARCH

## Americans Are Vacationing in Turks and Caicos This Season

Huge Discounts on Turks and Caicos Vacation Packages, All Inclusive Resorts, & More. Getaway to Paradise. See More Savings & Discounts With These Searches.

PAID   TURKS & CAICOS VACATION DEALS



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

**...inally Here**

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

**Agree**



Watch CBS News

# Amazing Air Pump Every Car Needs (It's Genius!)

How A Kind Stranger SAVED Me Thousands and Rescued Our Stranded Family

PAID   AUTO SAFETY NEWS

# District Of Columbia: Say Bye To Your Car Insurance If You Live In These Zip Codes

PAID   ULTIMATEINSURANCE

# Do You Know What Atopic Dermatitis Is? (Take A Look)

PAID   ATOPIC DERMATITIS | SEARCH ADS

# The Stunning New 2023 Volvo Lineup is Here

PAID   VOLVO DEALS | TOP SEARCHES

# District Of Columbia: "Flex Spending Card" Everyone on Medicare Can Apply for

PAID   FLEX ALLOWANCE

# Why Hearing Aids Are $4000+ But Don't Have To Be (Its Genius)

Bossa Hearing revolutionizing hearing aids: top-rated, easy, nearly invisible, comfy, under $100!

PAID   BOSSA HEARING

# Research Cremation Services Cost: What Happens at a Cremation Service?

PAID   YAHOO! SEARCH

# High Interest Savings Accounts That Could Earn You A Small Fortune

...ney you deposit into the account. The
...ccount,



## Be the first to know

Get browser notifications for breaking news, live events, and exclusive reporting.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Haiti AR_001279

Terms of Use
Watch CBS News

Privacy Policy

Do Not Sell My Personal Information

Public File for WTOG-TV/CW-44

Public Inspection File Help

FCC Applications

EEO Report

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree",
you acknowledge that you have read and agree to the updated Terms.

Agree

12/12/22, 10:54 AM
Haiti's President Assassinated in Nighttime Raid - The New York Times

**The New York Times** | https://www.nytimes.com/2021/07/07/world/americas/haiti-president-assassinated-killed.html

# Haiti's President Assassinated in Nighttime Raid, Shaking a Fragile Nation

A group of assailants stormed Mr. Moïse's residence early on Wednesday, shooting him and wounding his wife. The interim prime minister declared a "state of siege."

By Catherine Porter, Michael Crowley and Constant Méheut

Published July 7, 2021   Updated Oct. 18, 2021

The first explosions rang out after 1 a.m., shattering the calm in the neighborhood that was home to President Jovenel Moïse and many of Haiti's most affluent citizens.

Residents immediately feared two of the terrors that have plagued the nation — gang violence or an earthquake — but by dawn, a much different reality had emerged: The president was dead.

A group of assailants had stormed Mr. Moïse's residence on the outskirts of the capital, Port-au-Prince, early on Wednesday, shooting him and wounding his wife, Martine Moïse, in what officials called a well-planned operation that included "foreigners" who spoke Spanish.



The New York Times

In a televised broadcast to the nation, the nation's interim prime minister, Claude Joseph, appealed for calm and presented himself as the new head of the government, announcing that he and his fellow ministers had declared a "state of siege" and placed Haiti under a form of martial law.

The assassination left a political void that deepened the turmoil and violence that has gripped Haiti for months, threatening to tip one of the world's most troubled nations further into lawlessness.

While the details of who shot the president and why remained unknown, four people suspected of being involved in the assassination were killed by the police in a gun battle and two others were arrested, Haiti's police chief said late Wednesday. The chief, Léon Charles, also said that three police officers who had been held hostage were freed.

"The police are engaged in a battle with the assailants," he said at a news conference, noting that the authorities were still chasing some suspects. "We are pursuing them so that, in a gunfight, they meet their fate or in gunfight they die, or we apprehend them."

The authorities did not name any of the suspects or cite any evidence linking them to the assassination.



Haiti AR_001281



The main street into Port-au-Prince was lined by military personnel on Wednesday.
Valerie Baeriswyl/Agence France-Presse — Getty Images

In recent months, protesters had taken to the streets, demanding that Mr. Moïse step down years after his election, at what they deemed was the end of his term.

Armed gangs have taken greater control of the streets of the capital, with thousands fleeing, kidnapping even schoolchildren and church pastors in the middle of their services. Poverty and hunger are rising, with many accusing members of the government of enriching themselves while not providing the population with even the most basic services.

In an interview, Mr. Joseph told The New York Times that he was now in control of the country, but it was unclear how much legitimacy he had, or how long it might last. A new prime minister had been scheduled to replace Mr. Joseph this week — he would have been the sixth to hold the job in Mr. Moïse's term. The head of the nation's highest court, who might have helped establish order, died of Covid-19 in June.

"We are in total confusion," said Jacky Lumarque, rector of Quisqueya University, a large private university in Port-au-Prince. "We have two prime ministers. We can't say which is more legitimate than the other."



Claude Joseph, the nation's interim prime minister, said he is now in charge of the government.  Orlando Barria/EPA, via Shutterstock

"This is the first time where we've seen that the state is so weak," he added.

Haiti's ambassador to the United States, Bocchit Edmond, said at a news conference that the killing of the country's president had been carried out "by well-trained professionals, killers, commandos."

He said that the attackers had presented themselves as agents of the U.S. Drug Enforcement Agency, but that they were "fake D.E.A." and "professional killers." He said he was basing his assessment on security camera footage of the attack.

Mr. Moïse's wife survived and was "stable, but in critical condition," Mr. Edmond said. She was transported to Miami for treatment, arriving there Wednesday evening.



Haiti AR_001282

Case 6:23-cv-00007   Document 93-5   Filed on 03/24/23 in TXSD   Page 178 of 199

Military personnel guard the hospital where the first lady was taken after the attack on Wednesday.  Valerie Baeriswyl/Agence France-Presse — Getty Images

President Biden said Wednesday that he was "shocked and saddened" by the assassination and the shooting of the president's wife. "We condemn this heinous act," Mr. Biden said in a statement. Secretary of State Antony J. Blinken spoke with Mr. Joseph, offering condolences, the State Department said.

Mr. Moïse had held on to the office, arguing he had only occupied the position for four years of the five-year term. In the first year after he was elected, an interim president took over as the country investigated allegations of fraud. Many Haitians — including constitutional scholars and legal experts — contended that his five-year term started when he was elected, and has since expired. But the United States and the Organization of American States backed Mr. Moïse.

While the United States and other nations have long supplied Haiti with much-needed aid and financial assistance, including help in recovering from a devastating earthquake in 2010, Western powers have also exerted an overwhelming influence over the country's political destiny. The United States occupied the country from 1915 to 1934, and a series of coups in the 20th and 21st centuries were backed by Western powers.

France, in particular, has had a long and difficult relationship with Haiti. More than two centuries ago, Haitians fought to throw off the yoke of colonial France and to bring an end to one of the world's most brutal slave colonies, which had brought France great wealth.

What started as an uprising by enslaved people at the turn of the 18th century eventually led to the stunning defeat of Napoleon's forces in 1803. While many in Haiti's professional class study in France, others harbor anti-French sentiment. The first visit by a French president was not until 2010.

France's foreign minister, Jean-Yves Le Drian, said in a statement that he was "shocked" by Mr. Moïse's killing. "All light must be shed on this crime, which comes amid a very deteriorated political and security climate," Mr. Le Drian said. He urged "all of the actors of Haitian political life" to observe "calm and restraint."

Within Haiti, experts warned, the political vacuum left by Mr. Moïse's killing could fuel a renewed cycle of violence. As the population struggled to assess the situation, the normally clogged streets of the capital remained ominously empty.

Banks and stores were shuttered; university classrooms vacant; the ti machann — or market women — who normally line the shoulders of roads selling their wares were conspicuously absent.



The streets of Port-au-Prince were largely deserted on Wednesday.  Valerie Baeriswyl/Agence France-Presse — Getty Images

Lines formed as some people tried to stock up on water — which is normally bought by the container in poorer areas — in case they end up hunkered down for a long time. Many others huddled at home, calling friends and family to check their safety and to ask for updates. In some middle-class neighborhoods, people gathered on the sidewalks, sharing their fears for the country's future.

"Things are hard and ugly now," said Jenny Joseph, a university student from the suburb of Carrefour. "For the next few days, things will be crazy in Haiti."

Under the martial law declaration, the police and security members can enter homes, control traffic and take special security measures and "all general measures that permit the arrest of the assassins" for 15 days. The decree also forbids meetings meant to incite disorder.

Haiti AR_001283

However, it is unclear whether Mr. Joseph has the authority to do this, or even the authority to run the country in the wake of President Moïse's death. The country has two constitutions, neither of which tap the interim prime minister to take over. The first one, published in 1987, says the country's most senior judge should step in. In 2012, however, it was amended to say that if there's a vacancy in the last year of a president's term, the Parliament should vote for a provisional president.

Unfortunately, the Constitution was amended in one of the country's official languages, French, but not in the other, Creole. So as it stands, the country has two constitutions.

"It's a very grave situation," said Georges Michel, a Haitian historian who helped write the 1987 Constitution.

At the moment, Haiti has no functioning Parliament. Mr. Moïse's government did not call elections, even after the terms of the entire lower house expired more than a year ago. Only 10 of Haiti's 30 senate seats are currently filled.

Mr. Moïse had been struggling to quell growing public anger over remaining in power.

After Mr. Moïse did not leave office in February, when many in the opposition deemed his term over, thousands of Haitians took to the streets in large marches, demanding his resignation. The government responded by arresting 23 people, including a top judge and a senior police officer, who the president said had tried to kill him and overthrow the government.



Thousands of protesters rallied in the streets of Port-au-Prince in 2019 to call for Mr. Moïse's resignation. Meridith Kohut for The New York Times

Mr. Moïse counted on a high level of protection, traveling regularly with more than a dozen armored cars and police guards. There are often 100 officers from the presidential guard around the president's home, said former Prime Minister Laurent Lamothe.

There had been no specific warning of the overnight attack, said the ambassador, Mr. Edmond.

It was not clear whether any of the suspected assassins who had not been killed or arrested in the gun battle with the police were still in Haiti. Because the country's airport was closed down on Wednesday, some might have slipped across the border to the Dominican Republic, which shares the island of Hispaniola with Haiti, or escaped by sea.

Mr. Edmond said he has been in touch with the White House, the State Department and the American ambassador to Haiti, and has called on the United States for help.

The support, he said, would help "to make sure Haiti doesn't go even deeper into a spiral of violence," and specifically, "to make sure that the Haitian police have the necessary means to put the situation under control."

Because of its chronic instability, Haiti has a large diaspora, with some of the largest communities based in the United States, Canada, France and the Dominican Republic. Generally politically divided, Haitians abroad followed the news of Mr. Moïse's killing united by their shock and despair, said Leonie Hermantin, a Haitian community leader in Miami.

"Even for those of us who weren't necessarily in support of him, this is not what we had envisioned as an outcome of regime change," she said.

"The diaspora is united in its sadness," she added. "There's no one celebrating."

Reporting was contributed by Frances Robles, Lara Jakes, Maria Abi-Habib, Harold Isaac and Dieu-Nalio Chery.

Haiti AR_001284

Case 6:23-cv-00007 Document 93-5 Filed on 03/24/23 in TXSD Page 180 of 199

The New York Times | https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html

## Confusion on the Border as Appeals Court Rules Against Trump's 'Remain in Mexico' Policy

The court upheld an injunction blocking a policy that requires asylum applicants to wait in Mexico until their cases are decided. But a stay on the order means the policy could remain in effect.

 **By Caitlin Dickerson**

Published Feb. 28, 2020    Updated Oct. 29, 2021

A federal appeals court found a central pillar of the Trump administration's immigration agenda legally invalid on Friday, ruling that asylum seekers must be allowed into the United States while their cases weave through American immigration courts.

The court stayed its decision, however, in order to allow the government time to appeal the ruling.

After a year in which nearly a million migrants crossed the southwestern border, jamming processing facilities and defying President Trump's attempts to curtail immigration, border crossings have dropped sharply in recent months, in part because of the administration's "Remain in Mexico" policy, the subject of Friday's court ruling. The decision from the United States Court of Appeals for the Ninth Circuit, if allowed to stand, would eliminate one of the administration's key levers for controlling the arrival of new asylum seekers.

A three-judge panel in San Francisco upheld an injunction blocking the policy, which has required people applying for asylum at the border to wait in Mexico while their claims for protection are reviewed, a process that often takes months or years.

The judges gave lawyers in the case until Monday to respond to the stay.

Since the "Remain in Mexico" restrictions were rolled out early in 2019, more than 59,000 asylum seekers have been turned back by American authorities into Mexican border cities, where kidnappings and violence have surged. Because shelters in Mexico are scant and overrun, many of the migrants are living in vast tent encampments exposed to the elements. Powerful Mexican drug cartels have moved in to exploit them.

"It's a resounding rejection," Judy Rabinovitz of the American Civil Liberties Union, who was the lead lawyer representing the plaintiffs, said of the court's ruling earlier Friday. She added, "The policy is a disgrace, it's illegal, it's morally indefensible, and it needs to stop."

Chad Wolf, acting secretary of homeland security, said U.S. border officials have continued to process meritorious asylum claims and reduced fraudulent and invalid claims.

"Should this ruling stand, the safety and security of our border communities, international relationships and regional stability is at risk," he said in a statement.

"This nationwide injunction is grave and reckless, rewrites the laws passed by Congress and undermines the U.S. Constitution," he said.

Lawyers who brought the challenge represented a group of 11 asylum seekers who had been returned to Mexico and several legal advocacy organizations. The plaintiffs won a nationwide injunction, but because a higher court stayed the ruling, the policy has continued to expand — most recently taking effect in Nogales, Ariz., in December.

Haiti AR_001285

Case 6:23-cv-00007   Document 93-5   Filed on 03/24/23 in TXSD   Page 181 of 199



These families from Honduras heard rumors that people in the Remain in Mexico Program might be allowed into the United States and went to the bridge to find out.  Cengiz Yar for The New York Times

Friday's appeals court ruling, before it was stayed, prompted widespread celebration among those who had been fighting the policy, followed by hours of confusion over when and how it might go into effect. Mr. Wolf said his department was working with the Justice Department "to expeditiously appeal this inexplicable decision." Human rights organizers in the Mexican border cities where asylum seekers are clustered — including Tijuana, Ciudad Juárez and Matamoros — scrambled to analyze the opinion, while also trying to maintain calm among the thousands of migrants now held up in those cities to prevent a panicked rush toward the United States.

Migrants held in Mexico under the policy began gathering at several international bridges. About 50 collected Friday evening at the Paso Del Norte bridge in Ciudad Juárez, hoping to cross into El Paso, but Mexican authorities closed the bridge to all traffic.

A 28-year-old man from Cuba, who was among those trying to cross, said he would wait for an opportunity. "If God wants us to, we will cross," said the man, who did not want his name published for fear of jeopardizing his asylum case. "I'm going to wait here."

Late Friday, the Customs and Border Protection agency said it had halted processing of new cases under the program, but that was before the stay. "We are continuing to utilize every tool at C.B.P.'s disposal to ensure the integrity of our immigration system and processing programs," the agency said in a statement.

The policy at issue is known formally as "migrant protection protocols" — though the lawyers who challenged it argued that it did just the opposite by placing vulnerable people in harm's way. Instead of safeguarding people fleeing persecution abroad, as is required under federal law, the policy banished them to perilous conditions in a different place, the lawyers said.

Government lawyers defended the policy based on a little-known provision of the 1996 federal immigration law allowing the American government to return some migrants to contiguous countries while their cases for entry into the United States are being processed.

They argued that the provision could be applied to asylum seekers, and that the United States had fulfilled its legal duty to protect people fleeing persecution by conducting a screening to identify possible fears before it sends people back to Mexico.

But those challenging the policy countered that asylum seekers are exempt from the legal provision, and said the government's provisions for screening to determine whether migrants had a credible fear of persecution was insufficient. They pointed to cases of people who had been kidnapped or raped while they were waiting in Mexico and were told afterward by American authorities that their fear of residing in Mexico was not credible.

In a 2-to-1 opinion on Friday, the appeals court judges said the policy violated the federal government's obligation to avoid returning migrants to dangerous places, and they concluded that the legal provision invoked by the government in creating the policy was never meant to be applied to asylum seekers.

They found that the policy was "invalid in its entirety" and concluded that a lower-court ruling that initially enjoined its implementation was "not an abuse of discretion." The stay issued Friday night, the court said, would remain in effect pending review of the government's petition for an immediate appeal.

Haiti AR_001286

Case 6:23-cv-00007   Document 93-5   Filed on 03/24/23 in TXSD   Page 182 of 199

Judge William A. Fletcher, an appointee of President Bill Clinton, wrote the opinion, joined by Judge Richard A. Paez, also a Clinton appointee. Judge Ferdinand F. Fernandez, nominated to the court by President George Bush, dissented.

In a separate ruling on Friday, the same panel of appeals court judges rejected another of the Trump administration's attempts to restrict asylum. In that case, the judges reviewed a policy that blocks anyone who entered the United States illegally — as opposed to presenting themselves at a legal port of entry — from applying for asylum.

The court found unanimously that the policy runs counter to asylum law, which states that people can apply for the status regardless of where they enter the country. That policy had been enjoined by a district court judge shortly after it was announced, and the appeals court on Friday reaffirmed the injunction.

"What's especially significant is that, in both cases, the court found that the administration ignored Congress," said Lee Gelernt, deputy director of the American Civil Liberties Union's Immigrants' Rights Project, who argued the case.

The administration took additional steps last year to make it harder to apply for asylum, signing a deal with Guatemala to resettle asylum seekers there, instead of in the United States. It also adopted a policy requiring most applicants from Central America to first seek asylum in another country along their route of travel.

That policy is also being challenged in federal court.

The policies are part of a constellation of measures undertaken by the Trump administration to help stem the record number of migrant families, mainly from Central America, who began crossing the border in the fall of 2018.

The influx led to overcrowded detention facilities and overwhelmed immigration courts, prompting President Trump to double down on his pledges to build a wall and clamp down on immigration across the southwestern border.



The Migration Protection Protocols Immigration Hearing Facility in Laredo, Texas.  Tamir Kalifa for The New York Times

Taken together, the policies have effectively shrunk the American asylum system to a fraction of what it once was. By the end of the 2019 fiscal year, in October, overall border apprehensions had shrunk to 60,781, from a high of 144,116 in May.

The news that the "Remain in Mexico" policy might be invalidated sparked chaos in some areas of the border, where some migrants have been living for months in filthy and crime-ridden areas, with little hope of entering the United States. Emma Obando, 42, had been cooking plantains for her two sons in the Matamoros tent encampment on Friday when a crying woman ran toward her, yelling to everyone she passed, "We should go; we should cross right now because they have undone the law of M.P.P."

Ms. Obando has been living in Matamoros with her 7- and 10-year-old sons, the elder of whom has autism, since September, after having fled their home in Honduras. She said many migrants flocked to the border after hearing news of the court ruling on Friday, but soon after, organizers called them off, instead advising people not to "make a big fuss" yet, and to prepare their government documents instead.

Eventually, Ms. Obando said, the mood calmed. She decided to try crossing into the United States with her sons on Saturday.

Haiti AR_001287

Mexican officials and civic leaders were also trying to make sense of how the ruling might impact their communities.

"There are various unknowns, various questions," said Dirvin Luis García Gutiérrez, the head of the migration program for the population agency in the state of Chihuahua.

He said that Ciudad Juárez, where more than 19,700 migrants have been returned under the program, was currently supporting a transient population of between 13,000 and 15,000 migrants, including migrants returned under the program as well as those who are still waiting to cross into the United States to apply for asylum.

In an immigration court in downtown San Diego on Friday morning, more than a dozen migrants who had been subjected to "Remain in Mexico" were in court for their asylum hearings when the appeals court's opinion was released. Most were not represented by lawyers and had little guidance on how to proceed.

When the "Remain in Mexico" program was initially enjoined by a federal judge in California in April of last year, migrants who had been in court on that day ended up spending more than two weeks in government holding cells while officials decided how to proceed. When the injunction was stayed, the migrants were returned to Mexico, allowed to enter the United States only for their court hearings.

Government officials moved quickly to reverse the decision. It appeared clear that, whatever the immediate outcome, the issue would ultimately be decided by the United States Supreme Court.

Hundreds of asylum seekers who have been returned to Mexico have since given up their claims, accepting free transportation provided by the American government and the United Nations back to their homes in Central America. But others have vowed to continue with their cases.

Yoleydi Gonzalez Jimenez, 26, arrived from Cuba with her husband in the Mexican city of Matamoros in September and has been living in a tent encampment at the end of an international bridge into the United States ever since. With little access to public bathrooms, the camp smells of human waste.

Ms. Gonzalez Jimenez wears socks with her flip-flops to keep warm. A donated air mattress covered with pink and purple sheets fills the tent that has become the couple's home. Their few possessions are stacked on top and become soaked with water that seeps inside when it rains.

"I can't give up after all the time I've been waiting here, even though I feel like I'm going to die," she said after a court hearing in December. Her next hearing was scheduled in Brownsville, Texas. Until then, she was told, she would have to go back to Mexico.

Reporting was contributed by Max Rivlin-Nadler, Manny Fernandez, Zolan Kanno-Youngs and Kirk Semple.

# Chile's Retooled Migration Law Offers More Restrictions, Less Welcome

May 2021

*By Cristián Doña-Reveco*

The Chilean Congress marked a historic milestone when it approved a new immigration law in December 2020. This law will replace Decree Law (DL) 1094, which was enacted in the early years of Augusto Pinochet's dictatorship and has served as the basis for all migration governance in Chile since 1975. Passage of the new immigration legislation represented a significant political victory for President Sebastián Piñera who, among other issues, campaigned on a message of immigration control and a pledge to reduce immigration, specially from places such as Haiti and Venezuela. Paradoxically, even though the law is framed as one protecting human rights, it is likely to increase immigrant vulnerability, as will be discussed in this insight.



For decades, academics, immigration advocates, and politicians have argued that DL 1094 was outdated and no longer matched the reality of immigration flows arriving in Chile since the mid-1990s. There have been two main criticisms of the law. First, it was framed within a national security paradigm that viewed migrants as possible enemies and did not facilitate their inclusion. Second, immigration has grown significantly and become more diverse than in previous historical eras. While the 1980 census counted approximately 84,000 foreign-born people in Chile, by 2009 the number had risen to an estimated 450,000.

In the past decade, Chile's immigration landscape has continued to change remarkably, further underscoring the need for an updated migratory legal framework after failed legislative reform efforts in 2012 and 2017. According to the latest available data from the Department of Foreign Relations and Migration, 1.5 million immigrants lived in Chile as of December 2019—representing 8 percent of the country's population. There also has been an important diversification in migrant origins. While earlier in the decade most migrants were from Peru and Colombia, Venezuelans now represent almost one-third of immigrants in the country. Moreover, Haitians have become the third largest immigrant group, with roughly 180,000 people, up from just 50 in 2002. Immigration also has become a ubiquitous topic for public and media focus, even at a time of pandemic, heightened antigovernment protests, and a political crisis unseen since the Pinochet dictatorship.

Congress approved the migration bill (Proyecto de Ley de Migración y Extranjería) in December 2020, but it had to surmount a constitutional inquiry before being signed into law. In January 2021, several opposition members of Congress asked the Chilean Constitutional Court to review the law, arguing that it contravenes the Chilean constitution and is incompatible with the Convention on Migrant Workers ratified by Chile in 1992, among other human-rights conventions adopted by Chile. A month later, this court partially approved the request, which means that seven of the bill's articles will have to be modified or eliminated. Finally, the law was promulgated in April 2021, although it will only enter into full effect once the government defines the rules and regulations that oversee implementation of this highly complex law. The current government has up to one year to develop these rules, suggesting the law's full implementation would occur in mid-2022.

**The Road to a New Migration Policy**

The components of the law itself are not entirely new. In order to expedite the process, in April 2018 Piñera sent Congress a set of 89 proposed amendments to a migration bill proposed in 2014, during the last year of his first administration. This 2014 bill, which was only briefly discussed and was not passed by Congress, saw immigration mostly as an economic and security issue. The 2020 version approved by Congress frames migration in a broad language of human-rights protection, while at the same time setting up limits and restrictions on accessing these protections, thus maintaining the national security focus of the 1975 DL1094.

It is only in reading the fine print of the legislation that the limits and protections become evident, in some cases conflicting with other text. This results in what Finn and Umpierrez de Reguero, in their 2020 article on the Piñera administration's immigration management practices, call actions that are inclusive in language but exclusionary in their migration policy outcomes. For example, the immigration law's third article reads, "the Chilean state shall protect and respect the human rights of foreign-born individuals that are in the country, regardless of their migration status," in accordance with national laws and the international human-rights agreements signed by the country. The same article, however, states that only foreign-born people who are "legally" within the Chilean territory have the right to freedom of movement and freedom of residency. In other places, the law guarantees migrants equal access to labor rights, health services, social security, education, and home ownership. Within these same articles, however, the law establishes that only immigrants who have resided in Chile for at least 24 months will be able to receive state-funded social security and related benefits. Similarly, only

those with a permanent residency permit have the same housing rights as nationals. In addition to these fine-print restrictions, the 2020 law incorporates an article stating that the rights granted will be interpreted according to the most favorable law, whereas the suspension or restriction of rights will be interpreted according to the most restrictive law (the Pro Homine principle).

Academics and immigrant-rights organizations have raised questions about these provisions, and these concerns are at the core of the constitutional assessment request presented by opposition legislators to the Constitutional Tribunal. The provisions described above, however, were not among those rejected by the tribunal.

The securitization framework embedded in the law also raises concerns. This has been a main component of Piñera's "cleaning up the house" (ordenar la casa) doctrine, which includes specific visa requirements for Venezuelan and Haitian migrants, among other initiatives. The new law authorizes the state to promote actions that make migration regular (i.e.: legal), orderly, and safe. The law also proclaims that it is grounded in the need to protect "the state's internal and external national security, as well as the maintenance of public order" (Article 22.3). This concept of public order is also present as one of the reasons under which the state can require a visa or previous authorization for the entry of those with a temporary permit. A second reason to request previous authorization to those coming from a country with low compliance of Chilean migratory norms was deemed unconstitutional by the Constitutional Tribunal. While the law states that "irregular immigration is not on itself, a crime" (Article 9), it does stress the government's ability to close border entry points and facilitates the detention and deportation of migrants based on internal and external security, public health, and individual safety grounds. Although this law is not yet in effect, this doctrine was put into action in February 2021, and reinforced since then. That month, the Piñera administration signed a decree giving the army a border enforcement role and since then has expelled more than 200 immigrants from Venezuela, Colombia, Peru, and Bolivia. These decisions and expulsions have been heavily criticized by local immigrant-rights groups, Amnesty International, and the United Nations' Committee on Migrant Workers at the Office of the High Commissioner for Human Rights.

**Looking Ahead**

While the law includes provisions aimed at protecting the rights of immigrants and promoting their inclusion in Chilean society, the fine print limits access to these rights and the possibility of effective integration. Additionally, the law requires the government to revise its national immigration policy at least every four years. As the current presidential term limit is also four years, this might lead to politically motivated changes that could create instability for current and future immigrants, as well as for the host society as a whole.

The securitization framework adopted as a result of the Piñera administration's focus on reducing immigration is likely to increase the vulnerability of many migrants. Since January 2021, at least six immigrants have died after crossing the Andes and entering the Atacama Desert. The new visa requirements, including compulsory consular visas, prohibitions on adjustments from a tourist permit to a temporary residence, and the increasing difficulty in moving from temporary to permanent status once in the country, are likely to contribute to an increase in the number of people living in irregular status.

Lastly, regional cooperation processes and agreements on migration, such as the Mercosur Residence Agreement or the South American Conference on Migration are not mentioned at all in this legislation. This deprioritization of regional collaboration contrasts with Chile's approach to migration for most of the early 21st century.

Amazingly, the new immigration law might make Chile an even less welcoming country to immigrants than it was with the DL1094 created more than 40 years ago under Augusto Pinochet's military dictatorship.

---

*Dr. Cristián Doña-Reveco is Associate Professor of sociology and anthropology at the University of Nebraska at Omaha and directs its Office of Latino/Latin American Studies.*

←What Comes Next Now that Colombia Has Taken a Historic Step on Migration?

Inaugural Statement of the North and Central American Task Force on Migration →

Portal en español

Subscribe

Search …

## About the Portal

This Portal is the first comprehensive website that tracks developments on immigration policy in Latin America and the Caribbean, presenting authoritative research, data, and analysis produced by MPI, governments, international organizations, researchers, and civil society.

Topics



Copyright © 2023 Migration Policy Institute. All rights reserved.

www.migrationpolicy.org

1400 16th St NW, Suite 300, Washington DC, 2003 | 202-266-1940

CNN  World                                                                          AudioLive TV

WATCH LIVE

Disgraced former lawyer Alex Murdaugh takes the stand in his own defense at his double-murder trial

# Haiti government asks for international military assistance

By Etant Dupain and Hande Atay Alam, CNN

Updated 2:39 PM EDT, Fri October 7, 2022



Odelyn Joseph/AP

People suffering symptoms of cholera pictured on October 7.

**(CNN)** — Haiti's government has asked for international military assistance as it grapples with interlocked health, energy and security crises, according to a statement from Jean-Junior Joseph, advisor to Haiti's Prime Minister.

"After serious reflections, facing a dire humanitarian crisis in Haiti, where hospitals are not having enough energy to function, cholera is back inside the shanties, it was decided in the Council of Ministers last night, October 7th to request military assistance from the international community to deal with such unbelievable humanitarian crisis," reads the statement sent to CNN on Thursday.

It was not clear which countries the government requested military assistance from.



Marcio Jose Sanchez/AP

Haitian Prime Minister Ariel Henry pictured on June 10.

The request came after Haitian Prime Minister Ariel Henry called for international help during a televised speech to the nation on Wednesday night.

"I am calling the international community to help us, to support us in every necessary way to avoid the situation worsening. We need to be able to distribute water, and medicine as cholera is making a comeback," said Henry.



Ralph Tedy Erol/Reuters

An ambulance in Port-au-Prince, Haiti, on October 4.

"We need to reopen businesses and clear the roads for doctors and nurses to be able to do work. We asking for their help to be able to distribute the fuel and for school to reopen," he added.

Dozens more cases of cholera have been diagnosed in Haiti, adding new urgency to warnings of the Caribbean nation's descent into chaos amid political and economic crises.



Richard Pierrin/AFP/Getty Images

Protesters in the streets of Port-au-Prince, Haiti, on October 3.

The deadly infection has already killed eight people, according to Haiti's health ministry, and 68 new cases have been identified in the first week of October according to the medical humanitarian group, Médecins Sans Frontières (MSF).



**RELATED ARTICLE**
Haiti prime minister announces gas hike despite weeks of protests

The burgeoning new public health emergency could hardly come at a worse time.

Haiti.AR_001294

Anti-government protests – now in their seventh week – have paralyzed the country, with schools, businesses, and public transportation across the country mostly shuttered. Since August 22, Haitians have been demonstrating against chronic gang violence, poverty, food insecurity, inflation, and fuel shortages.



**RELATED ARTICLE**
Cholera returns to Haiti as nation lurches from one crisis to the next

Their fury was further fueled last month when Prime Minister Ariel Henry announced that he would cut fuel subsidies in order to fund the government – a move that would double prices at the pump. Haiti's powerful gangs have exacerbated the fuel crisis by blocking the country's main port in the capital city Port-au-Prince.

Thousands of Haitian people continue to protest in various cities across the country, calling on the government to step down.

**Paid Links**

Search CNN...

Log In

Live TV

Audio

Haiti AR_001295

US

World

Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More

 World

FOLLOW CNN

  

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Haiti AR_001297

Haiti AR_001298

Haiti AR_001299

Haiti AR_001300

Haiti AR_001301



## The New Era of Mexican Migration to the United States

Jorge Durand; Douglas S. Massey; Emilio A. Parrado

*The Journal of American History*, Vol. 86, No. 2, Rethinking History and the Nation-State: Mexico and the United States as a Case Study: A Special Issue. (Sep., 1999), pp. 518-536.

Stable URL:
http://links.jstor.org/sici?sici=0021-8723%28199909%2986%3A2%3C518%3ATNEOMM%3E2.0.CO%3B2-H

*The Journal of American History* is currently published by Organization of American Historians.

Your use of the JSTOR archive indicates your acceptance of JSTOR's Terms and Conditions of Use, available at http://www.jstor.org/about/terms.html. JSTOR's Terms and Conditions of Use provides, in part, that unless you have obtained prior permission, you may not download an entire issue of a journal or multiple copies of articles, and you may use content in the JSTOR archive only for your personal, non-commercial use.

Please contact the publisher regarding any further use of this work. Publisher contact information may be obtained at http://www.jstor.org/journals/oah.html.

Each copy of any part of a JSTOR transmission must contain the same copyright notice that appears on the screen or printed page of such transmission.

JSTOR is an independent not-for-profit organization dedicated to creating and preserving a digital archive of scholarly journals. For more information regarding JSTOR, please contact support@jstor.org.

Haiti AR_001302

# The New Era of Mexican Migration to the United States

Jorge Durand, Douglas S. Massey, and Emilio A. Parrado

The decade of the 1970s ended a long period of economic growth based on a development model applied widely in the years after World War II. The fundamental aim of this model was to create and sustain internal markets that could serve as springboards for broader economic growth. In industrial nations, governments employed regulation, spending, and monetary policies to generate consumer demand capable of supporting mass production and sustained growth. In developing nations, officials undertook large-scale spending and investment to generate income and eliminate bottlenecks in production; at the same time they erected barriers to the entry of foreign goods and services, thus creating internal demand that national producers—both public and private—could satisfy to initiate and sustain industrialization.

The promotion of economic development through these strategies instigated new migratory movements. In the developing world, much of the geographic mobility was internal, with high rates of rural-to-urban migration and rapid urbanization. In developed countries, domestic labor reserves were quickly exhausted, and foreign workers were imported to enable rapid economic growth without inflation. In Western Europe, for example, immigrant workers were initially recruited from culturally similar but less advantaged countries in the south, such as Spain, Italy, Portugal, and Greece, but by the 1960s these sources were tapped out and migrants from culturally dissimilar and much poorer nations in North Africa and the Middle East were recruited in their stead. By the early 1970s, a series of guest-worker agreements and bilateral treaties had brought hundreds of thousands of Turkish workers into Germany and large numbers of Algerians, Moroccans, and Tunisians into France.[1]

In the United States, foreign workers were imported under the aegis of the 1942 Bracero Accord, which over the next twenty-two years arranged for the recruitment

Jorge Durand is professor in the department for the study of social movements at the University of Guadalajara; Douglas S. Massey is the Dorothy Swaine Thomas Professor of Sociology at the University of Pennsylvania; and Emilio A. Parrado is assistant professor of sociology at Duke University.

[1] Samuel H. Preston, "Urban Growth in Developing Countries: A Demographic Reappraisal," *Population and Development Review,* 5 (June 1979), 195–216; Michael P. Todaro, *Internal Migration in Developing Countries: A Review of Theory, Evidence, Methodology, and Research Priorities* (Geneva, 1976). Charles P. Kindleberger, *Europe's Postwar Growth: The Role of Labor Supply* (Cambridge, Mass., 1967). Solon Ardittis, "Labour Migration and the Single European Market: A Synthetic and Prospective Note," *International Sociology* (Rome), 5 (no. 4, 1990), 461–74. Philip L. Martin, *The Unfinished Story: Turkish Labour Migration to Western Europe* (Geneva, 1991); Gildas Simon, *Géodynamique des migrations internationales dans le monde* (Geodynamics of global international migration) (Paris, 1995).

Plaintiff AR_001303

and importation of 4.6 million temporary workers from Mexico. When the program finally ended in 1964, the United States did not stop employing Mexican workers; it simply shifted from a de jure policy of active labor recruitment to a de facto policy of passive labor acceptance, combining modest legal immigration with massive undocumented entry. Despite successive amendments to the U.S. Immigration and Nationality Act (in 1965, 1976, 1978, and 1980) intended to restrict Mexican immigration, the number of legal immigrants rose from 38,000 in 1964 to 67,000 in 1986; and over the same period gross undocumented migration grew from 87,000 to 3.8 million entries per year.[2]

The postwar model of industrial growth based on internal market development came undone in the early 1970s, and over the course of the next decade it was progressively abandoned in favor of a new economic model based on international trade. In developed nations, production grew more capital intensive and markets fragmented as mass production methods gave way to just-in-time delivery, flexible accumulation, out-sourcing, and continuous flow manufacturing, all carried out on a global scale. In developing nations, state bureaucracies were slashed, government-owned firms were privatized, and tariff barriers were dismantled to expose formerly protected, insular economies to the full force of global competition.

These changes came earliest in Mexico's northern border region, where in the 1970s the government launched an ambitious industrialization program based on export processing.[3] Binational agreements were negotiated to create a special trade zone along the border within which companies could import unfinished inputs into Mexico, assemble them into final goods, and then reexport them back to the United States paying tax only on the value added (that is, the relatively small cost of labor inputs). Soon *maquila* factories were sprouting up in cities throughout northern Mexico, initiating a wave of rapid economic and demographic growth along the border.

This model of export-led development was ultimately expanded to embrace all of Mexico under presidents Miguel de la Madrid and Carlos Salinas de Gortari in the 1980s. First, Mexico joined the General Agreement on Tariffs and Trade in 1986 and then, in 1988, entered into negotiations with the United States and Canada to create a continent-wide free-trade zone.[4] These negotiations led to the implementation of the North American Free Trade Agreement (NAFTA) on January 1, 1994, creating an open market area extending from the Arctic Ocean to Central America.

The new economic order envisioned by NAFTA had different effects in different regions of Mexico. Along the northern border—especially within dynamic urban centers such as Tijuana, Mexicali, Ciudad Juarez, Nuevo Laredo, and Monterrey—

[2] Kitty Calavita, *Inside the State: The Bracero Program, Immigration, and the I.N.S.* (New York, 1992). Douglas S. Massey and Audrey Singer, "New Estimates of Undocumented Mexican Migration and the Probability of Apprehension," *Demography*, 32 (May 1995), 203–13; U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1990).

[3] Leslie Sklair, *Assembling for Development: The Maquila Industry in Mexico and the United States* (San Diego, 1993).

[4] Richard S. Belous and Jonathan Lemco, eds., *NAFTA as a Model of Development: The Benefits and Costs of Merging High- and Low-Wage Areas* (Albany, 1995); Maria de los Angeles Pozas, *Industrial Restructuring in Mexico: Corporate Adaptation, Technological Innovation, and Changing Patterns of Industrial Relations in Monterrey* (La Jolla, 1993).