free trade and closer ties with the United States brought economic expansion and continued high rates of growth, but interior cities were not so well positioned to compete globally and found themselves sinking further into poverty. For millions of Mexicans, economic restructuring under the neoliberal regime of President Salinas brought joblessness, hardship, neglect, and growing economic marginalization.[5]

Within economically marginalized regions of Mexico, especially, households were left with little more than a decision of whether to emigrate or revolt. It is no coincidence that the first popular armed uprising since the early 1940s occurred in Chiapas, a poor, predominantly rural, and heavily Indian state lacking a strong tradition of migration to the United States.[6] Without social ties connecting residents to work in the United States, the only feasible option for poor Chiapanecos was rebellion. However, in other states also characterized by high levels of marginalization, large Indian populations, and pervasive poverty—but with strong connections to the United States—sporadic guerrilla movements emerged but never evolved into mass popular uprisings (for example, in Guerrero, Oaxaca, and Michoacán). In these states, the inflow of migradollars mitigated the pressures for revolt and circumscribed the appeal of armed rebellion.

The expansion of the global economy also had serious consequences for the United States. After 1973, wages stagnated, unemployment rose, income inequality grew, and the distribution of wealth became progressively more skewed. During the 1970s and 1980s, economic insecurity was confined mainly to blue-collar workers; by the early 1990s, however, economic fears and anxieties had spread to white-collar workers as well, as computerization eliminated routine clerical tasks and corporate downsizing condensed successive layers of management. These structural changes coincided with a cyclical recession triggered by the end of the Cold War, a downturn that was especially pronounced in California.[7]

That state, of course, had long been the leading destination for Mexican migrants to the United States. In 1992, 62 percent of all Mexicans legally admitted for permanent residence intended to settle in California, and 60 percent of all undocumented migrants were located in this state. Although some argue that California's economic crisis would have been even more severe were it not for cheap Mexican labor, the coincidence of high immigration with rising income inequality, stagnat-

[5] Fernando Cortés, "La Evolución de la Desigualdad del Ingreso Familiar Durante la Década de los Ochenta" (Trends in family income during the 1980s), typescript, 1993, working paper, Centro de Estudios Sociológicos (El Colegio de México, Mexico, D.F.); Fernando Cortés and Rosa María Rubalcava, "El Ingreso Familiar: Su Distribución y Desigualdad 1984–1989" (Family income: Its distribution and inequality), *Demos: Carta Demográfica sobre México,* 5 (1992), 28–30.

[6] Rodolfo O. de la Garza and Gabriel Szekely, "Policy, Politics, and Emigration: Reexamining the Mexican Experience," in *At the Crossroads: Mexican Migration and U.S. Policy,* ed. Frank D. Bean et al. (Lanham, 1997), 201–26. George Collier, *Basta! Land and the Zapatista Rebellion in Chiapas* (Oakland, 1994).

[7] Sheldon Danziger and Peter Gottschalk, *America Unequal* (Cambridge, Mass., 1995); Edward N. Wolff, "The Rich Get Increasingly Richer: Latest Data on Household Wealth during the 1980s," in *Research in Politics and Society,* vol. V, ed. Richard E. Ratcliff, Melvin L. Oliver, and Thomas M. Shapiro (Greenwich, 1995), 33–68. Bennett Harrison, *Lean and Mean: The Changing Landscape of Corporate Power in the Age of Flexibility* (New York, 1994); Jeremy Rifkin, *The End of Work: The Decline of the Global Labor Force and the Dawn of the Post-Market Era* (New York, 1995).

Haiti AR_001305

ing wages, and widespread unemployment created a new politics of nativism.[8] Although it began in California, this nativist movement ultimately spread nationwide and produced legislative and policy changes whose effects on immigration were modest but whose long-term consequences for both Mexico and the United States were far-reaching.

### The Road to the Immigration Reform and Control Act (IRCA)

In a 1985 speech intended to frame political debate for the 1986 congressional elections, President Ronald Reagan asserted that the United States had "lost control" of its borders to an "invasion" of illegal migrants. In doing so, he transformed undocumented immigration from a useful political issue (which it had always been) into a more fundamental question of national security. He thus moved the issue of border control out of the backwaters of the federal bureaucracy and into the realm of high politics. Henceforth immigrants were connected symbolically with invaders, criminals, and drug smugglers, who were pictured as poised menacingly along a lightly defended two-thousand-mile frontier dividing the United States from Mexico and the poor masses of the Third World.

Posed as an issue of national security, undocumented migration by definition required immediate and forceful action. The most promising proposal for repelling the "invasion" came from a bill that had languished in the United States Congress for more than a decade. Reintroduced and cosponsored in 1985 by Sen. Alan Simpson of Wyoming and Rep. Peter Rodino of New Jersey, the bill made its way through various congressional committees and reached the floor of both chambers in late 1986. With the midterm elections approaching, "doing something" about undocumented migration had become a popular cause and a hot political issue. The bill passed Congress in late October and was signed into law by President Reagan on the eve of the November elections.

The final bill, known as the Immigration Reform and Control Act (or IRCA), contained four key provisions: new resources were allocated to the United States Border Patrol for enforcement along the Mexico–United States border; sanctions were enacted to remove the lure of United States jobs by penalizing employers who knowingly hired unauthorized workers; long-term undocumented residents were offered an amnesty (the so-called LAW, Legally Authorized Worker, program) to wipe the slate clean and secure the support of Latino and civil rights groups; and undocumented agricultural workers were offered a special legalization program (known as the Special Agricultural Worker program, SAW) to placate growers in Texas and California and earn their support.

Even though IRCA was enacted as a general change to immigration policy and did

---

[8] U.S. Immigration and Naturalization Service, *1992 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1993); Robert Warren, "Estimates of the Undocumented Immigrant Population Residing in the United States, by Country of Origin and State of Residence: October 1992," typescript, 1995, working papers, Statistical Branch (U.S. Immigration and Naturalization Service, Washington, D.C.). Katrina Burguess and Abraham F. Lowenthal, "Los Desafíos que Vienen del Sur" (Challenges from the south), in *La Conexión México California,* ed. Abraham F. Lowenthal and Katrina Burguess (Mexico, D.F., 1995), 305–28.

Haiti AR_001306



Retablo of M. Esther Tapia Picón. Undated. Oil on Metal. The caption reads: We give
thanks to the Virgin of San Juan for saving us from the migration
authorities on our way to Los Angeles.
*From Jorge Durand and Douglas S. Massey,* Miracles on the Border *(Tucson, 1995).*

not single out any particular country for enforcement action, there is little doubt
that its primary purpose was to curb undocumented migration from Mexico.
Accordingly, immigrants from that country have borne the brunt of the law's conse-
quences: Mexicans constitute 70 percent of those granted amnesty under the LAW
program, 80 percent of those legalized under the SAW program, and 95 percent of
those apprehended by the Border Patrol since the bill's passage.

Although IRCA's primary purpose may have been to deter undocumented migrants,
it does not seem to have made much progress in meeting that goal.[9] Rather than slow-
ing down the rate of undocumented entry, IRCA seems only to have succeeded in
transforming a seasonal flow of temporary workers into a more permanent popula-
tion of settled legal immigrants. Indeed, more than any other factor, IRCA is respon-
sible for creating a new era in Mexican immigration to the United States and thus
transforming social, economic, and political conditions on both sides of the border.

[9] Shirley J. Smith, Roger G. Kramer, and Audrey Singer, *Characteristics and Labor Market Behavior of the Legal-
ized Population: Five Years Following Legalization* (Washington, 1996). Keith Crane et al., *The Effect of Employer
Sanctions on the Flow of Undocumented Immigrants to the United States* (Santa Monica, 1990); Katharine M.
Donato, Jorge Durand, and Douglas S. Massey, "Stemming the Tide? Assessing the Deterrent Effects of the
Immigration Reform and Control Act," *Demography,* 29 (May 1992), 139–57; Douglas S. Massey and Kristin E.
Espinosa, "What's Driving Mexico-U.S. Migration? A Theoretical, Empirical, and Policy Analysis," *American
Journal of Sociology,* 102 (Jan. 1997), 939–99.

Haiti AR_001307

## The Great Transformation

The fact that so many Mexicans (2.3 million) took advantage of IRCA's legalization provisions reflects economic circumstances in Mexico as well as opportunities in the United States. The implementation of the SAW and LAW programs (during 1987–1989) coincided with a period of unusually severe inflation and unemployment in Mexico, as presidents de la Madrid and Salinas successively administered the harsh medicine of neoliberalism: balanced budgets, slashed spending, reduced wages, and downsized bureaucracies.[10] The resulting economic dislocations rendered the traditional alternative of returning to Mexico infeasible for many migrants working in the United States. In view of the weak economic conditions at home, migrants opted to remain abroad, accept the proffered legalization, and settle more permanently into a United States life.

IRCA thus dramatically altered the rhythms of seasonal migration back and forth across the border. Prior to 1986, most migrants sought to work abroad temporarily in order to manage risks and acquire capital for a specific goal or purchase. By sending one family member abroad for a limited period of foreign labor, households could diversify their sources of income (thus managing risks) and accumulate savings from their United States earnings (thus acquiring capital). In both cases, the fundamental objective was to return to Mexico. The various privations and sacrifices endured while working abroad were justified ultimately by the dream of a better life at home.

IRCA ruptured this dream in several ways. First, legalization offered migrants the prospect of a secure existence north of the border during a period of exceptional economic and political turmoil at home. The LAW program, in particular, virtually *required* undocumented migrants who had formerly circulated back and forth to remain in the United States until their petitions for legalization were resolved. As soon as the program was announced, all undocumented migrants with a potential claim for amnesty ceased circulating immediately and began preparing their petitions.[11]

Thus, some 461,000 Mexicans filed for legalization under the LAW program in 1987, followed by another 728,000 in 1988 and 41,000 in 1989. These people were joined by 106,000 SAW applicants in 1987, 544,000 in 1988, and 424,000 in 1989. Of the 2.3 million Mexicans who ultimately filed for legalization, most ceased crossing illegally in early 1987, and their removal from the seasonal flow of undocumented migrants caused a sharp reduction in the number of apprehensions in subsequent years. Indeed, arrests along the border fell from 1.6 million in 1986 to 830,000 in 1989, a decline of nearly 50 percent in just three years.[12]

---

[10] De los Angeles Pozas, *Industrial Restructuring in Mexico;* Miguel Angel Centeno, *Democracy within Reason: Technocratic Revolution in Mexico* (University Park, 1994).

[11] Jacqueline Maria Hagan, *Deciding to Be Legal: A Maya Community in Houston* (Philadelphia, 1994).

[12] U.S. Immigration and Naturalization Service, *1986 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1987); U.S. Immigration and Naturalization Service, *1987 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1988); U.S. Immigration and Naturalization Service, *1988 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1989); U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.* Thomas J. Espenshade, "Undocumented Migration to the United States: Evidence from a Repeated Trials Model," in *Undocumented Migration to the United States: IRCA and the Experience of the 1980s,* ed. Frank D. Bean, Barry Edmonston, and Jeffrey S. Passel (Washington, 1990), 159–82; Michael J. White, Frank D. Bean, and Thomas Espenshade, "The U.S. 1986 Immigration Reform and Control Act and Undocumented Migration to the United States," *Population Research and Policy Review,* 9 (May 1990), 93–116; U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.*

Haiti AR_001308

Even after being legalized, most Mexican migrants did not return home as frequently as before. For one thing, IRCA required them to remain in the United States and take classes in English and civics in order to obtain their permanent "green cards." Once permanent legal status was achieved, moreover, migrants who returned home were compelled to reenter the United States each year in order to maintain a bona fide status as legal resident aliens, and few families could afford to throw away the economic security represented by having legal residence papers.

Congress had intended legalization to wipe the slate clean, while employer sanctions and border enforcement were intended to prevent the entry of new undocumented immigrants, thus "solving" the problem of undocumented migration. In practice, however, IRCA's border controls and employer sanctions backfired. They did not deter undocumented Mexicans from heading northward or prevent them from crossing the border so much as they discouraged them from returning *home*.[13] Because migrants are at greatest risk while crossing the border, a buildup of enforcement resources there perversely creates strong incentives for undocumented migrants to stay put. Rather than returning home to face another risky crossing later on, migrants rationally chose to hang onto their jobs and settle into the expatriate Mexican community.

Figure 1 illustrates these various perverse effects by showing trends in the probability of returning to Mexico among migrants already in the United States. The probabilities were estimated from life histories complied for 3,166 migrant household heads enumerated in the Mexican Migration Project (MMP), which since 1982 has randomly sampled communities throughout Mexico and combined them with parallel surveys of out-migrants from those places who have settled in the United States, thus creating a representative database on documented and undocumented migration.[14] Further information on these data can be obtained from the MMP website: http://lexis.pop.upenn.edu/mexmig/.

We computed probabilities of returning to Mexico by following respondents year by year from the moment they entered the United States. We then counted up the number of return moves in each year and divided by the number of person-years spent in the United States. To smooth trends over time, we computed three-year moving averages. As figure 1 shows, the likelihood of returning home peaked in 1980, fell through 1986, and then plummeted to very low levels thereafter, remaining at historical lows through the 1990s. Throughout the 1990s, the probability of return migration hovered at just 10 percent to 11 percent.

[13] Wayne Cornelius, "Impacts of the 1986 U.S. Immigration Law on Emigration from Rural Mexican Sending Communities," *Population and Development Review,* 15 (Dec. 1989), 689–705; Donato, Durand, and Massey, "Stemming the Tide?"; Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"; Massey and Singer, "New Estimates of Undocumented Mexican Migration"; Audrey Singer and Douglas S. Massey, "The Social Process of Undocumented Border Crossing among Mexican Migrants," *International Migration Review,* 32 (Fall 1998), 561–92. Sherrie A. Kossoudji, "Playing Cat and Mouse at the U.S.-Mexican Border," *Demography,* 29 (May 1992), 159–80; Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"

[14] These data are described and evaluated in René Zenteno and Douglas S. Massey, "Especifidad versus Representatividad: Enfoques Metodológicos para el Estudio de la Migración Internacional" (Specificity versus representativeness: Methodological foci for the study of international migration), *Estudios Demográficos y Urbanos* (Mexico, D.F.), 14 (Jan. 1999), 75–116.

Haiti AR_001309

New Era of Mexico–United States Migration                                    525



**Figure 1**
Trends in the Likelihood of Returning to Mexico, 1975–1993



SOURCE: Mexican Migration Project Database (http://lexis.pop.upenn.edu/mexmig/), Population Studies Center, University of Pennsylvania.

As migrant household heads began settling and staying in the United States longer, they naturally sought to reunite with their wives and children, and IRCA consequently became a trigger for additional migration. Some of this new movement was legal, of course. In 1992, for example, 52,000 dependents of persons earlier legalized under IRCA were granted permanent residence, followed by another 55,000 in 1992 and 34,000 in 1994. But most of the post-IRCA movement for family reunification was illegal, averaging perhaps 300,000 persons per year. One study found that having a newly legalized migrant in the family increased the probability of undocumented migration by a factor of seven.[15]

IRCA thus unleashed an intense process of family reunification involving the parents, spouses, children, and siblings of recently legalized immigrants. In doing so, it substantially feminized and urbanized the population of migrants. A relatively large share of those legalized under the LAW program, 43 percent, were women; and although the percentage of women among SAW applicants was smaller, it was nonetheless significant at around 15 percent. The vast majority of those who qualified for amnesty, meanwhile, lived in large cities. Some 95 percent of those legalized under the LAW program, for example, lived in metropolitan areas; and even among SAWs,

---

[15] Smith, Kramer, and Singer, *Characteristics and Labor Market Behavior of the Legalized Population. Encuesta sobre Migración en la Frontera Norte: Síntesis Ejecutiva* (Survey of migration on the northern border: Executive summary) (Tijuana, 1996). Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"

Haiti AR_001310

**Table 1**
Selected Characteristics of Mexico–United States Migrants on Their First Trip
to the United States

|  | Pre-IRCA 1980–1986 | Transition Period 1987–1990 | New Era 1991–1996 |
|---|---|---|---|
| Undocumented migrants |  |  |  |
| In agriculture | 33.1% | 21.8% | 19.5% |
| Female | 21.3% | 27.8% | 25.6% |
| Women <18 | 22.6% | 26.6% | 31.1% |
| Hourly wage earned (1990 dollars) | $4.81 | $5.14 | $4.44 |
| Employed through contractor | 6.7% | 4.9% | 9.2% |
| In California | 65.7% | 72.2% | 58.6% |
| Number of cases | 2,762 | 389 | 235 |
| Documented migrants |  |  |  |
| In agriculture | 7.4% | 7.7% | 2.6% |
| Female | 47.8% | 50.9% | 59.1% |
| Women <18 | 71.7% | 57.1% | 48.2% |
| Hourly wage earned (1990 dollars) | $6.04 | $5.52 | $4.44 |
| Employed through contractor | 13.2% | 15.4% | 9.4% |
| In California | 73.0% | 72.2% | 65.5% |
| Number of cases | 636 | 389 | 235 |

SOURCE: Mexican Migration Project Database (http://lexis.pop.upenn.edu/mexmig/), Population Studies Center, University of Pennsylvania.

who were, in theory, agrarian laborers, 84 percent of the applicants gave metropolitan addresses.[16]

Among migrants working in agriculture, moreover, there was a pronounced shift toward urban occupations in the years after legalization. Agricultural growers, of course, had envisioned just such a turn of events and had successfully lobbied Congress to have IRCA include a Replenishment Agricultural Worker (RAW) program so that the newly legalized workers could be replaced after they left for the city. They also lobbied successfully for an expansion of the H-2A program, a Bracero-like temporary worker program that grew from 2,000 Mexicans in 1986 to 6,000 in 1995.[17]

[16] Smith, Kramer, and Singer, *Characteristics and Labor Market Behavior of the Legalized Population.* U.S. Immigration and Naturalization Service, *1990 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1991).

[17] Katharine M. Donato, Jorge Durand, and Douglas S. Massey, "Changing Conditions in the U.S. Labor Market: Effects of the Immigration Reform and Control Act of 1986," *Population Research and Policy Review,* 11 (no. 2, 1992), 93–115. Philip L. Martin and J. Edward Taylor, "Harvest of Confusion: SAWS, RAWS, and Farmworkers," Working Paper PRIP-UI-4, 1988, Program for Research on Immigration Policy (The Urban Institute, Washington, D.C.). Jorge Durand, "Enganchadores y Contratistas: Un Eslabón Parted en la Migración de Trabajadores Mexicanos a Estados Unidos" (Hookers and contractors: A lost step in the migration of Mexican workers to the United States), in *Las Relaciones México–Estados Unidos desde la Perspectiva Regional* (Mexico–United States relations from a regional perspective), ed. Tomás Calvillo (forthcoming); U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1996).

Haiti AR_001311

As a program of legalization, therefore, IRCA was a great success: more than two million Mexicans—including many women and children—achieved legal status under the legislation. As an enforcement policy intended to control undocumented migration, however, IRCA was an unequivocal failure. Not only did it fail to deter undocumented migrants from leaving Mexico but it actually encouraged additional undocumented migration by family and friends who had remained behind, and it was instrumental in transforming a predominantly rural, male, and temporary flow of migrant workers into a feminized, urbanized, and permanent population of settled immigrants.

The foregoing trends are documented in table 1, which again uses data from the Mexican Migration Project, showing the characteristics of documented and undocumented migrants leaving on their first trip to the United States during three periods: the pre-IRCA period of 1980–1986, the transition phase of 1987–1990, and the new era of migration of the 1990s. As can be seen, the percentage of undocumented migrants working in agriculture falls steadily over time, reaching just 19.5 percent in 1991–1996. Likewise, the percentage of agrarian workers among those with legal documents, already low before IRCA, reaches just 2.6 percent in the new era. At the same time, the percentage of women rises in both categories. Among the undocumented migrants, the percentage female goes from 21.3 percent in 1980–1986 to 25.6 percent in 1991–1996, whereas among documented migrants the shift is even more dramatic, with the share of women rising from 47.8 percent in the pre-IRCA period to 59.1 percent most recently. Moreover, among undocumented migrants, who have found it increasingly difficult to move back and forth across the border, a growing fraction were dependents. Among undocumented women, for example, the fraction under eighteen rose from 22.6 percent in 1980–1986 to 31.1 percent in 1991–1996.

IRCA's employer sanctions also had profound effects on the United States labor market. In developing them, the United States Congress was mindful of the needs of employers, requiring that sanctions be applied *gradually* to give them time to adjust to the new regime. Congress also did not require employers to verify the *authenticity* of documents offered by laborers to prove their identity and right to work in the United States. Instead, they simply had to fill out an I-9 form to demonstrate they had *seen* what *appeared to be* valid documents. Even if these documents later turned out to be false and the worker was deported, the employer was not liable to prosecution if he or she could produce an I-9 form and a photocopy of the document they had seen. The predictable result was a boom in the market for fraudulent documents.[18]

Despite the low odds of prosecution under the law, employers did face *some* new risks, particularly if they relied heavily on unauthorized labor. To compensate them-

[18] Michael Fix and Paul T. Hill, *Enforcing Employer Sanctions: Challeges and Strategies* (Santa Monica, 1990); Manuel García y Griego and Mónica Verea Campos, "La Crisis Económica Fiscal de California y la Nueva Ofensiva Verbal en Contra de los Indocumentados" (The economic and fiscal crisis of California and the new verbal offensive against undocumented migrants), in *California: Problemas Económicos, Políticos y Sociales* (California: Economic, political, and social problems), ed. Rosa Cusminsky (Mexico, D.F., 1995), 125–52. Gustavo López Castro, "Coyotes and Alien Smuggling," in *Migration between Mexico and the United States, Volume 3,* ed. the staff of the Binational Study of Migration between Mexico and the U.S. (Washington, 1998), 1965–74.

selves for these new risks, employers embarked on a pattern of systematic wage discrimination against Latinos in general and undocumented Mexicans in particular. Rather than taking the time and trouble to identify which migrants were undocumented, they simply discriminated against foreign-looking workers; and rather than denying them jobs, they simply lowered their wages.[19]

Among foreigners, post-IRCA wage discrimination was especially severe against undocumented migrants. Whereas before IRCA undocumented migrants earned the same wages as documented migrants, and rates of pay were determined largely by education, United States experience, and English language ability, afterward undocumented migrants earned wages that were 28 percent less than those earned by documented migrants; and rather than being determined by schooling, experience, and English ability, they were determined by a person's social contacts. As wages deteriorated for undocumented migrants in the wake of IRCA, so did working conditions, with higher proportions earning wages below the legal minimum and larger numbers working under irregular circumstances.[20] As table 1 indicates, entry-level wages for undocumented Mexican workers averaged $4.81 during 1980–1986, rose temporarily to $5.14 during the transition period, and then fell to $4.44 during 1991–1996 (expressed in constant 1990 dollars).

The imposition of employer sanctions also generated significant paperwork burdens for employers, who were required to keep I-9 forms on file for every person they hired. In seasonal industries such as agriculture, construction, food service, janitorial services, and private household work, where the use of casual workers is common and turnover is high, the added burdens were significant, and the prospect of so much paperwork caused many employers to shift from direct hiring of immigrants to a subcontracting arrangement.[21] Labor subcontractors are typically citizens or legal resident aliens who sign a contract with an employer to provide a specific number of workers, for a specified period of time, to engage in a particular task, at a set rate per hour. By working through a subcontractor, employers at once eliminate the risk of prosecution under IRCA and escape the law's tiresome paperwork requirements. As table 1 indicates, the percentage of undocumented migrants hired through a

[19] Deborah A. Cobb-Clark, Clinton R. Shiells, and B. Lindsay Lowell, "Immigration Reform: The Effects of Employer Sanctions and Legalization on Wages," *Journal of Labor Economics,* 13 (July 1995), 472–98; Richard Fry, B. Lindsay Lowell, and E. Haghighat, "The Impact of Employer Sanctions on Metropolitan Wage Rates," *Industrial Relations,* 34 (July 1995), 464–84; B. Lindsay Lowell, Jay Teachman, and Zhongren Jing, "Unintended Consequences of Immigration Reform: Discrimination and Hispanic Employment," *Demography,* 32 (Nov. 1995), 617–28.

[20] Barry R. Chiswick, "Illegal Aliens in the United States Labor Market: An Analysis of Occupational Attainment and Earnings," *International Migration Review,* 18 (no. 3, 1984), 714–32; Barry R. Chiswick, *Illegal Aliens: Their Employment and Employers* (Kalamazoo, 1988); Barry R. Chiswick, "Speaking, Reading, and Earnings among Low-Skilled Immigrants," *Journal of Labor Economics,* 9 (April 1991), 149–70; Katharine M. Donato and Douglas S. Massey, "Effect of the Immigration Reform and Control Act on the Wages of Mexican Migrants," *Social Science Quarterly,* 74 (Sept. 1993), 523–41; Douglas S. Massey, "Do Undocumented Migrants Earn Lower Wages than Legal Immigrants? New Evidence from Mexico," *International Migration Review,* 21 (Summer 1987), 236–74. Julie A. Phillips and Douglas S. Massey, "The New Labor Market for Mexican Immigrants to the United States," *Demography,* 36 (forthcoming). Donato, Durand, and Massey, "Changing Conditions in the U.S. Labor Market."

[21] Philip L. Martin and J. Edward Taylor, "Immigration Reform and Farm Labor Contracting in California," in *The Paper Curtain: Employer Sanctions' Implementation, Impact, and Reform,* ed. Michael Fix (Washington, 1991), 239–61.



Retablo of Braulio Barrientos. 1986. Oil on Metal. Part of the caption reads: While I was
reemigrating to the United States with three friends, the water we were carrying
ran out. Traveling in such great heat and with such thirst, and without
hope of drinking even a little water, we invoked the Virgin of
San Juan and were able to arrive at our destination
and return to our homeland in health.
*From Jorge Durand and Douglas S. Massey,* Miracles on the Border *(Tucson, 1995).*

subcontractor, which fell to 4.9 percent in the transition period, nearly doubled to 9.2
percent by the early 1990s.

In return for absorbing the risks of prosecution and the burdens of paperwork,
subcontractors retain a share of the migrants' earnings, further reducing their net
wages. Whereas before IRCA, migrants employed through a subcontractor earned the
same wages as others, after IRCA they earned 30 percent less.[22] Thus, IRCA's employer
sanctions did not block access of undocumented immigrants to United States jobs;
it simply pushed their employment further underground and induced greater wage
discrimination against Latinos. In short, it created black market conditions that put
downward pressure on all workers regardless of nativity or citizenship.

The new underground economy created by IRCA appears to have had spillover
effects on the native-born working in the same sectors. Whereas research conducted
using the 1980 census (that is, before IRCA) found few effects of immigration on the
wages or employment of natives, work done using the 1990 census (after IRCA)

---

[22] Phillips and Massey, "New Labor Market for Mexican Immigrants."

uncovered significant negative effects on certain racial and ethnic subgroups.[23] The attempt to eliminate the lure of United States jobs through employer sanctions thus appears to have gone badly awry, contributing to the deterioration of wages at the lower end of the labor market and exacerbating income inequality in the United States. As a result, not only have the wages of undocumented workers fallen, so have the wages of documented workers, which went from an average of $6.04 per hour before IRCA to $4.44 in the early 1990s (again expressed in constant 1990 dollars).

IRCA had one final consequence: the geographic dispersion of Mexican immigrants away from traditional gateway regions. Among migrants legalized under the LAW program, there was a clear pattern of geographic mobility away from areas of Mexican concentration in the years after legalization.[24] With documents in hand, Mexicans were suddenly free to leave historical enclaves and established niches to search for better opportunities elsewhere; and, as legalized immigrants dispersed geographically, so did later waves of immigrants arriving to join them.

Whereas 82 percent of Mexican immigrants arriving in 1986 stated their intention to settle in California, Illinois, or Texas, by 1995 the percentage had dropped to 71 percent. Moreover, only five states received more than a thousand Mexican immigrants in 1986 (the traditional receiving states of Arizona, California, Illinois, New Mexico, and Texas); but by 1995 the number had grown to 11 (with the addition of Colorado, Florida, Georgia, Nevada, Oregon, and Washington). New Jersey–New York combined to equal a twelfth region receiving more than a thousand Mexican immigrants per year. According to data from the Census and Current Population Survey, the proportion of recent Mexican immigrants going to California dropped from 63 percent to 40 percent between 1990 and 1996 while the percentage going to nontraditional states grew from 13 percent to 31 percent, yielding a sharp increase in the diversity of destinations.[25] This dispersion is reflected in the survey data shown in table 1, where the share of undocumented migrants going to California drops from 65.7 percent in 1980–1986 to 58.6 percent in 1991–1996, and the share of documented migrants doing so drops from 73.0 percent to 65.5 percent over the same period.

## Political Aftershocks

IRCA was thus instrumental in transforming Mexican immigration from a seasonal and predominantly male flow of rural, undocumented workers going to a handful of states into an urbanized population of settled legal immigrant families dispersed widely throughout the United States. This transformation has dramatically altered the horizons of life and work for Mexicans north of the border and has transfigured

[23] George J. Borjas, *Friends or Strangers: The Impact of Immigrants on the U.S. Economy* (New York, 1990). George J. Borjas, "The Economics of Immigration," *Journal of Economic Literature,* 32 (Dec. 1994), 1667–1717.

[24] Kristin E. Neuman and Marta Tienda, "The Settlement and Secondary Migration Patterns of Legalized Aliens: Insights from LAPS [Legally Authorized Population Survey] Data," in *Immigration and Ethnicity: The Integration of America's Newest Arrivals,* ed. Barry Edmonston and Jeffrey Passel (Washington, 1994), 187–226.

[25] Jorge Durand, Douglas S. Massey, and Fernando Charvet, "The Changing Geography of Mexican Immigration to the United States, 1910–1996," *Social Science Quarterly* (forthcoming).

Haiti AR_001315

the political landscape of both countries. As they have put down roots, Mexican immigrants have come to value political participation as never before, and they have begun to enter public debates, political organizations, and electoral campaigns and ultimately to become important political actors north as well as south of the border.

The issue of international migration was barely mentioned in the NAFTA accords, and no steps were taken to prepare for the emergence of a transnational population with claims on citizenship in both the United States and Mexico. Indeed, both sides tacitly agreed to sweep the issue of immigration under the rug. President Salinas opined that Mexico's goal in implementing NAFTA was to export goods and not people, and presidents George Bush and Bill Clinton stated that by encouraging job formation in Mexico NAFTA would ultimately reduce the pressures for undocumented migration to the United States.

Unfortunately, in the same year that NAFTA was implemented, Mexico's intertwined political and economic crises returned with a vengeance. On the very day that the agreement took effect, armed guerrillas launched an offensive in the state of Chiapas; in the ensuing months, both the leader of Mexico's ruling party and its presidential candidate were assassinated. The year ended with Mexico's new finance minister, in office for just three weeks, bungling a devaluation and igniting a new round of capital flight, hyperinflation, and unemployment. Despite the appearance of political stability and economic progress during the Salinas presidency, two ancient problems refused to go away: the economic marginalization of large sectors of the population and the resistance of Mexico's ruling elite to political change.

Given the selling of NAFTA as a means of helping Mexico "export goods and not people," the failure of the Mexican economic miracle created an opening for the return of immigration as a political issue in the United States. With the Mexican economy in distress and a United States financial bailout on the horizon, the specter of massive undocumented migration returned as newspapers throughout the country ran features on the crisis and its likely effects. Mexico's economic collapse and deepening political crisis once again turned the United States public against Mexican immigrants and offered politicians a ripe opportunity.

With the end of the Cold War, the United States obsession with external threats gave way to worries about its internal enemies. As IRCA's massive legalization and its accompanying settlement and dispersal increased the salience of Mexicans in the public eye, immigrants came to be blamed for everything from the high cost of welfare to the fiscal crisis of the social service system. United States politicians deliberately encouraged the belief that United States schools, hospitals, and public services were spending massive resources on immigrants, both legal and illegal, who came to the United States to take unfair advantage of public generosity and the taxes paid by ordinary United States citizens.

Immigration revealed its potency as a political issue in 1994 when California governor Pete Wilson found himself struggling for reelection. With his state still mired in a recession, he was unpopular and far down in the polls until he made immigration his chief campaign issue. He endorsed Proposition 187, a referendum to ban undocumented migrants from receiving public health, education, and welfare ser-

vices, and made it his rallying cry. This initiative also obliged government employees to report immigrants they suspected of receiving unauthorized services, effectively deputizing them to enforce United States immigration law. Both the governor and the proposition were endorsed by a substantial majority of the state's voters.

Although it began in California, the anti-immigrant bandwagon soon went national and swept up documented as well as undocumented migrants. The political wave crested in 1996 with the passage of two landmark pieces of legislation: the Illegal Immigration Reform and Immigrant Responsibility Act (better known as the 1996 Immigration Reform Act) and the Personal Responsibility and Work Opportunity Reconciliation Act (better known as the 1996 Welfare Reform Act). The net effect of these two laws was to bar noncitizen immigrants (legal as well as undocumented) from receiving means-tested federal and state benefits and to raise the income threshold required for immigrants to sponsor the entry of relatives. The immigration act also enacted harsher penalties against people who overstayed visas or entered the United States without inspection.[26]

In the political climate of the late 1990s, Mexican immigrants were left with very few ways of protecting themselves and their interests. The only foolproof way of forestalling the potential loss of rights and privileges was through naturalization, which not only guaranteed unhindered access to the full array of United States government benefits but also offered the possibility of voting to fight further losses and restrictions. The reaction of Mexican immigrants to the new political climate was thus predictable: a rush toward United States citizenship. As nativist movements gained strength and began to achieve legislative success, applications for naturalization mushroomed. From 1980 to 1990, the total number of petitions for naturalization fluctuated between 200,000 and 300,000 per year, and as late as 1991 only 207,000 applications were filed (it is not possible to tabulate petitions by Mexicans separately from published INS data). Beginning in that year, however, the number of filings rose precipitously, reaching just under a million in 1995.[27]

Mexicans historically have had the lowest rate of naturalization of any major immigrant group. According to one estimate, only 17 percent of the 1973 cohort of Mexican immigrants had naturalized by 1989, sixteen years later. As a result, Mexicans constitute the largest single population of noncitizen legal immigrants present in the United States. In 1990, 77 percent of all Mexican immigrants—some 3.3 million persons—were unnaturalized. Thus, the potential for increase in naturalization among Mexican immigrants is huge, and, in fact, the number of Mexicans becoming citizens increased by 383 percent from 1990 to 1995.[28]

As if the actions of the United States Congress were not enough, the move toward citizenship was also encouraged by the Mexican congress, which late in 1996 approved amendments to the Mexican constitution permitting dual nationality.

[26] Austin T. Fragomen, "The Illegal Immigration Reform and Immigrant Responsibility Act of 1996: An Overview," *International Migration Review*, 31 (Summer 1997), 438–60.

[27] U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook.*

[28] Zai Liang, "On the Measurement of Naturalization," *Demography*, 3 (Aug. 1994), 525–48. U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook.*

Haiti AR_001317

Before, naturalization in the United States implied the relinquishment of Mexican citizenship and the loss of rights to live, work, own property, and travel freely in Mexico. The new amendments allow Mexicans who become United States citizens to keep Mexican nationality and retain those rights. By recognizing dual nationality, Mexico thus removed a major impediment to naturalization in the United States precisely at a time when legislative and political changes there had dramatically increased the costs of remaining unnaturalized. The end result has been a flood of naturalization.

In reversing its historical opposition to dual nationality, the Mexican government sought to accomplish several goals. First, it sought to mobilize Mexican immigrants to defend their rights in the United States. Second, it also saw immigrant voters as a potential means of influencing United States policy on issues involving trade and bilateral relations. Finally, the political elite paradoxically saw it as a way of incorporating immigrants more effectively into the Mexican political system. The extension of dual nationality represents an important gesture signaling that although political realities may compel immigrants to naturalize, in the eyes of the state they will remain Mexicans. In concert with the move toward dual nationality, various programs were established through Mexican consulates in the United States to organize the Mexican diaspora and to facilitate investment in their home communities.

Assuming that millions of Mexicans respond to the new incentives and suddenly seek United States citizenship, the implications for the future of immigration are enormous, as under United States law the acquisition of citizenship creates legal entitlements for entry by family members. Whereas the spouses and minor children of unnaturalized legal resident aliens have to wait in line for immigrant visas that are numerically limited, the spouses and minor children of United States citizens enter immediately, *outside of* these limitations; and whereas legal resident aliens cannot sponsor the legal entry of parents, siblings, or unmarried adult children, citizens immediately acquire these rights upon naturalization.

Thus, each new person that becomes a United States citizen creates more people entitled to immigrate to the United States without numerical restriction, as well as new classes of people entitled to come in under numerically limited categories. In seeking to discourage immigration by restricting the access of foreigners to United States social services, therefore, Congress has inadvertently encouraged additional immigration. By pushing 3.3 million noncitizen Mexican immigrants decisively toward United States citizenship, it has sown the seeds for an even larger influx of Mexican immigrants down the road.

The massive acquisition of citizenship by Mexicans and other immigrants will thus have political consequences of great importance. To the extent that citizenship brings voter mobilization, it represents a radical change from the past, when Mexican immigrants displayed low rates of political participation in the United States.[29]

---

[29] Rodolfo O. de la Garza and Louis DeSipio, "The Changing Hispanic Political Landscape," in *Redistricting in the 1990s: A Guide for Minority Groups,* ed. William P. O'Hare (Washington, 1989), 171–80; Rodolfo O. de la Garza, Martha Menchaca, and Louis DeSipio, *Barrio Ballots: Latino Politics in the 1990 Elections* (Boulder, 1994).

Haiti AR_001318

The passage of anti-immigrant referenda and legislation pushed Mexican immigrants decisively toward new strategies of naturalization and voter mobilization. These strategies paid their first dividends in November 1996, when Rep. Robert Dornan, a conservative Republican from Orange County, California, who made no secret of his anti-immigrant stance, was defeated for reelection by a pan-ethnic coalition of Latinos in which naturalized immigrants cast the decisive votes. Without intending to, United States immigration policy has succeeded in consolidating a broad political coalition among Latinos (and Asians) that cuts across specific nationalities to unite Mexicans, Cubans, Puerto Ricans, and other Central and South Americans.

Like IRCA, therefore, the latest anti-immigrant measures have boomeranged, yielding results contrary to those anticipated by the politicians who instigated them. All signs are that the next several years will yield an intense political battle reminiscent of the civil rights movement of the 1960s, except that Mexican immigrants will now be full partners in the social struggle. A large demonstration in Washington, D.C., during October 1996 included undocumented as well as legal immigrants and was organized by a coalition of different Latinos, who together will soon comprise the largest minority group in the United States.

The reaction has not been long in coming, of course. Republicans, the principal promoters of the anti-immigrant fervor, have viewed the avalanche of naturalizations with alarm and have accused Clinton administration officials of speeding up the process to create Democratic voters and of slipshod practices that have granted citizenship to criminals (once again creating a symbolic link between immigration and criminality). The stage is thus set for a political showdown.

Political mobilization does not stop at the border, however. The economic crisis that persists in Mexico and widespread disenchantment with the performance of the ruling party have turned migrants into vocal critics of the Mexican government's policies. Although discontent in Mexico has led some to armed resistance and others to homegrown justice, it has also led to the mobilization of opposition through established political parties such as the National Action Party (PAN) and the Party of the Democratic Revolution (PRD), in which migrants have contributed both financial and human resources. Just as migrants have awakened to their political potential in the United States, they have become less tolerant of the deficiencies of the Mexican political system, which ultimately is responsible for the social and economic conditions that led them to emigrate in the first place.[30]

Mexican immigrants have thus openly welcomed opposition candidates touring the United States, and they have contributed generously to electoral campaigns in their regions of origin. They have also helped to finance local public works even when elected authorities are not members of the official party. The historical disinterest of Mexican authorities in the situation of migrant communities and in the specific problems of the immigrants themselves has spurred many current and former migrants to political action in Mexico, often within channels outside the official party.

[30] De la Garza and Szekely, "Policy, Politics, and Emigration."

Haiti AR_001319

## The New Era of Mexico–United States Migration

In retrospect, it is now clear that the passage of the Immigration Reform and Control Act in late 1986 was a watershed event in the history of Mexico–United States migration. From the end of the Bracero Program in 1964 through November 1986, the United States for all intents and purposes sponsored a liberal temporary worker program in which millions of workers, predominantly undocumented, circulated back and forth between Mexico and the United States. Although some migrants established ties north of the border and ultimately settled more permanently in the United States, illegal status constituted a deterrent to settlement and there were few reasons to remain anyway. The border was porous, United States jobs were accessible, and employers cared little about whether one was documented or not, so migrants lacked strong incentives to prolong their stay once a savings target or short-term income goal had been reached.

According to computations recently published by Audrey Singer and Douglas Massey, from 1965 through 1986 some 27.9 million undocumented Mexicans entered the United States and 23.3 million returned to Mexico, yielding a net increase of just 4.6 million persons. Over the same period, just 1.3 million Mexicans were admitted to permanent legal residence in the United States. From the end of the Bracero Program to the passage of IRCA, in other words, 84 percent of undocumented entries from Mexico were offset by departures. In an earlier study, when we classified migrants interviewed in 1982–1983 according to the strategy they employed during their years of active United States labor, we found that only 20 percent relied on a settlement strategy; the rest simply crossed into the United States temporarily.[31]

The passage of IRCA inaugurated a new era of Mexico–United States migration in which the United States applied increasingly coercive sanctions and border controls in an effort to constrict established flows while offering regularization to undocumented farm workers and long-term settlers already in the country. The rising hazards of border crossing and the ongoing economic crisis in Mexico gave undocumented migrants new reasons to remain abroad and, when combined with IRCA's legalization of 2.3 million persons, tilted Mexican immigration decisively toward permanent United States settlement. In a few short years it was transformed from a seasonal, undocumented, and regionally specific flow in which rural males predominated into an urbanized and substantially female population of permanent settlers who were increasingly dispersed throughout the United States. In the nine years from 1987 through 1995, 2.7 million Mexicans were admitted to permanent resident status, twice the number admitted over the prior twenty-two years.[32]

The implementation of IRCA's employer sanctions, meanwhile, undermined wages and working conditions for Mexican workers in the United States, opening up wide gaps between documented and undocumented migrants. In addition to fomenting

---

[31] Singer and Massey, "The Social Process of Undocumented Border Crossing." U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.* Douglas S. Massey et al., *Return to Aztlan: The Social Process of International Migration from Western Mexico* (Berkeley, 1987).

[32] U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook.*

wage discrimination, IRCA pushed employers toward labor subcontracting in order to escape its burdensome paperwork requirements and to eliminate the risk of prosecution for unauthorized hiring. The passage of California's Proposition 187 in 1994 sought to bar undocumented migrants from attending public schools, using public hospitals or clinics, or receiving public assistance, and in 1996 the United States Congress disenfranchised noncitizen legal immigrants from means-tested social programs. The post-IRCA period is thus characterized by growing political distinctions between undocumented, documented, and naturalized immigrants and widening economic gaps between them.

The creation of invidious distinctions on the basis of citizenship and the approval of recent amendments to the Mexican constitution permitting dual nationality have unleashed a stampede toward naturalization by millions of Mexican immigrants, a move that will further strengthen the trend toward long-term settlement and integration in the United States and generate additional future immigration as newly naturalized immigrants acquire rights to sponsor the entry of their relatives. In concert with this unprecedented wave of naturalization, the anti-immigrant drift of United States politics has led to a new mobilization of Mexicans as voters. Once politically mobilized, moreover, migrants have felt empowered to express their dissatisfactions with political affairs in Mexico as well as in the United States, giving rise to new transnational political movements.[33]

Although this interplay between politics in Mexico and in the United States may worry officials on both sides of the border, it is nonetheless a harbinger of things to come. Post-IRCA policies in the United States, when combined with political and economic developments occurring under the North American Free Trade Agreement, have had rather unexpected social, economic, and political consequences in promoting a new transnational politics. Authorities in both countries now face a newly mobilized population of Mexicans who operate in a sphere beyond the full control of either government, simultaneously working to defend their rights in the United States and helping to bring about political change in Mexico.

[33] S. Mara Perez Godoy, "Social Movements and International Migration: The Mexican Diaspora Seeks Inclusion in Mexico's Political Affairs: 1968–1998" (Ph.D. diss., University of Chicago, 1998).

BRIEFING PAPER

# GLOBAL CLIMATE RISK INDEX 2021

## Who Suffers Most from Extreme Weather Events? Weather-Related Loss Events in 2019 and 2000-2019

David Eckstein, Vera Künzel, Laura Schäfer





GERMANWATCH

Haiti AR_001322

## Brief Summary

The Global Climate Risk Index 2021 analyses and ranks to what extent countries and regions have been affected by impacts of climate related extreme weather events (storms, floods, heatwaves etc.). The most recent data available for 2019 and from 2000 to 2019 was taken into account.

The countries most affected in 2019 were Mozambique, Zimbabwe as well as the Bahamas. For the period from 2000 to 2019 Puerto Rico, Myanmar and Haiti rank highest.

This year's 16th edition of the Climate Risk Index clearly shows: Signs of escalating climate change can no longer be ignored – on any continent or in any region. Impacts from extreme-weather events hit the poorest countries hardest as these are particularly vulnerable to the damaging effects of a hazard, have a lower coping capacity and may need more time to rebuild and recover. The Global Climate Risk Index indicates a level of exposure and vulnerability to extreme weather events, which countries should understand as warnings in order to be prepared for more frequent and/or more severe events in the future. The storms in Japan show: Also high-income countries are feeling climate impacts more clearly than ever before. Effective climate change mitigation and adaptation to prevent or minimize potential damage is therefore in the self-interest of all countries worldwide.

## Imprint

**Authors:** David Eckstein, Vera Künzel, Laura Schäfer

**Contributors:** Emma Opfer and Rixa Schwarz

**Editing:** Joanne Chapman-Rose, Janina Longwitz

The Climate Risk Index is based on data from Munich RE. Germanwatch particularly thanks Petra Löw for her support.

**Publisher:**

Germanwatch e.V.

Office Bonn
Dr. Werner-Schuster-Haus
Kaiserstr. 201
D-53113 Bonn
Phone +49 (0)228 / 60 492-0, Fax -19

Office Berlin

Stresemannstr. 72
D-10963 Berlin
Phone +49 (0)30 / 28 88 356-0, Fax -1

Internet: www.germanwatch.org
Email: info@germanwatch.org

January 2021
Purchase order number: 21-2-01e
ISBN 978-3-943704-84-6
This publication can be downloaded at: **www.germanwatch.org/en/cri**



This publication is financially supported by Bread for the World – Protestant Development Service. Germanwatch is responsible for the content of this publication.

Comments welcome. For correspondence with the authors, please contact: kri@germanwatch.org

1

# Content

How to Interpret the Global Climate Risk Index ............................................. 3

Key Messages ................................................................................. 5

1        Key Results of the Global Climate Risk Index 2021 ................................ 6

2 Effects of Climate Change on Extreme Weather Events and Ways to Deal with
   the Related Impacts............................................................... 16

   The effects of climate change on tropical cyclones ................................. 19

   Exemplary approaches to address the impacts of tropical cyclones.............. 21

   Loss and damage: when adaptation and risk management reach their limits
   ................................................................................. 23

3 Status Quo of International Resilience Policy ......................................... 24

   International climate policy developments and expectations for 2021.......... 27

4 Methodological Remarks ......................................................... 29

5 References ....................................................................... 33

Annexes ......................................................................... 39

Haiti AR_001324

# How to Interpret the Global Climate Risk Index

The Germanwatch Global Climate Risk Index is an analysis based on one of the most reliable data sets available on the impacts of extreme weather events and associated socio-economic data, the MunichRe NatCatSERVICE. The Global Climate Risk Index 2021 is the 16th edition of this annual analysis. Its aim is to contextualise ongoing climate policy debates – especially the international climate negotiations – looking at real-world impacts over the last year and the last 20 years.

However, the index must not be mistaken for a comprehensive climate vulnerability[1] scoring. It represents one important piece in the overall puzzle of climate-related impacts and the associated vulnerabilities. The index focuses on extreme weather events such as storms, floods and heatwaves but does not take into account important slow-onset processes such as rising sea levels, glacier melting or ocean warming and acidification. It is based on past data and should not be used as a basis for a linear projection of future climate impacts. More specifically, not too far-reaching conclusions should be drawn for the purpose of political discussions regarding which country or region is the most vulnerable to climate change. Also, it is important to note that the occurrence of a single extreme event cannot be easily attributed to anthropogenic climate change. Nevertheless, climate change is an increasingly important factor for changing the likelihood of the occurrence and the intensity of these events. There is a growing body of research that is looking into the attribution of the risk[2] of extreme events to the influences of climate change[3] (see chapter 2).

The Climate Risk Index (CRI) indicates a level of exposure and vulnerability to extreme events, which countries should understand as warnings in order to be prepared for more frequent and/or more severe events in the future. In the CRI 2021, data from 180 countries were analysed. However, not being mentioned in the CRI

---

[1] According to IPCC (2014b) we define vulnerability as "the propensity or predisposition to be adversely affected. Vulnerability encompasses a variety of concepts and elements including sensitivity or susceptibility to harm and lack of capacity to cope and adapt".

[2] According to IPCC (2012) we define disaster risk as "the likelihood over a specified time period of severe alterations in the normal functioning of a community or a society due to hazardous physical events interacting with vulnerable social conditions, leading to widespread adverse human, material, economic, or environmental effects that require immediate emergency response to satisfy critical human needs and that may require external support for recovery.

[3] See, for instance: American Meteorological Society 2018, Herring et al. (2018), Trenberth et al. (2018), Zhang et al. (2016); Hansen et al. (2016); Haustein et al. (2016) & Committee on Extreme Weather Events and Climate Change Attribution et al. (2016); Stott et al. (2015)

does not mean there are no impacts occurring in these countries. Due to the limitations of the available data[4], particularly long-term comparative data, including socio-economic data, some very small countries, such as certain small island states, are not included in this analysis. Moreover, the data only reflects the direct impacts (direct losses and fatalities) of extreme weather events, whereas, indirect impacts (e.g. as a result of droughts and food scarcity) are not captured. The results of this index must be viewed against the background of data availability and quality as well as the underlying methodology for their collection. Data quality and coverage may vary from country to country as well as within countries. This has led to an underrepresentation of, for example, African countries when it comes to heatwaves. Finally, the index does not include the total number of affected people (in addition to the fatalities), since the comparability of such data is very limited.

---

[4] See also the Methodological Remarks in Chapter 5.

Haiti AR_001326

## Key Messages

- Mozambique, Zimbabwe and the Bahamas were the countries most affected by the impacts of extreme weather events in 2019.

- Between 2000 and 2019, Puerto Rico, Myanmar and Haiti were the countries most affected by the impacts of extreme weather events.

- Altogether, between 2000 and 2019 over 475 000 people lost their lives as a direct result of more than 11 000 extreme weather events globally and losses amounted to around US$ 2.56 trillion (in purchasing power parities).

- Storms and their direct implications – precipitation, floods and landslides – were one major cause of losses and damages in 2019. Of the ten most affected countries in 2019, six were hit by tropical cyclones. Recent science suggests that the number of severe tropical cyclones will increase with every tenth of a degree in global average temperature rise.

- In many cases, single exceptionally intense extreme weather events have such a strong impact that the countries and territories concerned also have a high ranking in the long-term index. Over the last few years, another category of countries has been gaining relevance: Countries like Haiti, the Philippines and Pakistan that are recurrently affected by catastrophes continuously rank among the most affected countries both in the long-term index and in the index for the respective year.

- Developing countries are particularly affected by the impacts of climate change. They are hit hardest because they are more vulnerable to the damaging effects of a hazard but have lower coping capacity. Eight out of the ten countries most affected by the quantified impacts of extreme weather events in 2019 belong to the low- to lower-middle income category. Half of them are Least Developed Countries.

- The global COVID-19 pandemic has reiterated the fact that both risks and vulnerability are systemic and interconnected. It is therefore important to strengthen the resilience of the most vulnerable against different types of risk (climatic, geophysical, economic or health-related).

- After the international climate policy process stalled in 2020 due to the Covid-19 pandemic expectations regarding progress on the long-term finance goal and adequate support for adaptation and L&D lie in 2021 and 2022. The process needs to deliver: a) a decision on how the need for support for vulnerable countries concerning future loss and damage is to be determined on an ongoing basis; b) the necessary steps to generate and make available financial resources to meet these needs; and c) strengthening the implementation of measures for adapting to climate change.

Haiti AR_001327

# 1  Key Results of the Global Climate Risk Index 2021

People all over the world are facing the reality of climate change – in many parts of the world this is manifesting in an increased volatility of extreme weather events. Between 2000 and 2019, over 475 000 people lost their lives worldwide and losses of US$ 2.56 trillion[5] (in PPP) were incurred as a direct result of more than 11 000 extreme weather events. Slow-onset processes are already adding an additional burden and will increasingly do so in the future. According to the UNEP Adaptation Gap Report 2016, increasing impacts will result in increases in global adaptation costs: By 2030 it is estimated that these costs will amount to between US$ 140 billion and US$ 300 billion annually and by 2050 to between US$ 280 billion and US$ 500 billion.[6] Costs resulting from residual risks or unavoidable loss and damage are not covered in these numbers. Current estimates of climate finance needs for residual loss and damage in developing countries range between US$ 290 billion to US$ 580 billion in 2030.[7] Similarly, the Intergovernmental Panel on Climate Change (IPCC) estimates in its Special Report "Global Warming of 1.5°C" that the "mean net present value of the costs of damage from warming in 2100 for 1.5°C and 2°C (including costs associated with climate change induced market and non-market impacts, impacts due to sea level rise, and impacts associated with large scale discontinuities) are US$ 54 trillion and US$ 69 trillion, respectively, relative to 1961–1990".[8] This indicates that the gap between the necessary financing to deal with climate-induced risks and impacts is even greater than earlier projected. On the other hand, the report highlights the importance of enhanced mitigation action towards limiting a global temperature increase to well below 2°C or even to 1.5°C, which could avoid substantive costs and hardships.[9]

---

[5] Note: Contrary to previous years, the underlying database for the calculation of the CRI 2021 does NOT include data for the United States of America. This results in a significantly lower number for the overall losses in PPP for the 20-year period, compared to, for instance, the number presented in the CRI 2020 (overall losses of US$ 3.54 trillion). As a comparison: Excluding the United States of America, the overall losses in the CRI 2020 amounted to US$ 2.51 trillion.

[6] UNEP 2016, p. 40ff

[7] Markandya/González-Eguino 2018 - Their figures depend on the climate scenario, the discount rate, the assumed parameters of the climate model and the socioeconomic model. The analysis is based on the case where equilibrium temperatures increase by 2.5–3.4 °C, implying some mitigation, but less than is required under the Paris accord. They note that the uncertainties regarding these sources are very large and meaningful projections of residual damage in the medium to long-term are not possible

[8] IPCC 2018a, p 153

[9] Ibid. 2018a

Haiti AR_001328

The **Global Climate Risk Index (CRI)** developed by Germanwatch analyses quantified impacts of extreme weather events[10] – both in terms of the fatalities as well as the economic losses that occurred. The index is based on data from the Munich Re NatCatSERVICE[11], which is considered worldwide as one of the most reliable and complete databases on this matter. The CRI examines both absolute and relative impacts to create an average ranking of countries in four indicative categories, with a stronger emphasis on the relative indicators (see chapter 4 "Methodological Remarks" for further details on the calculation). The countries ranking highest (figuring in the "Bottom 10"[12]) are the ones most impacted by extreme weather events and should consider the CRI as a warning sign that they are at risk of either frequent events or rare but extraordinary catastrophes.

The CRI does not provide an all-encompassing analysis of the risks of anthropogenic climate change, but should be seen as one analysis, which contributes to explaining countries' exposure and vulnerability to climate-related risks based on the most reliable quantified data available – alongside other analyses.[13] It is based on data reflecting the current and past climate variability and also on climate change – to the extent that it has already left its footprint on climate variability over the last 20 years.

**Countries Most Affected in 2019**

**Mozambique**, **Zimbabwe** and the **Bahamas** were the most affected countries in 2019 followed by **Japan**, **Malawi** and the **Islamic Republic of Afghanistan**. Table 1 shows the ten most affected countries (Bottom 10) in 2019, with their average weighted ranking (CRI score) and the specific results relating to the four indicators analysed.

---

[10] Meteorological events such as tropical storms, winter storms, severe weather, hail, tornados, local storms; hydrological events such as storm surges, river floods, flash floods, mass movement (landslide); climatological events such as freezing, wildfires, droughts.

[11] For further information visit https://www.munichre.com/en/solutions/reinsurance-property-casualty/natcatservice.html

[12] The term "Bottom 10" refers to the 10 most affected countries in the respective time period.

[13] See e.g. analyses of Columbia University; Maplecroft's Climate Change Vulnerability Index

Haiti AR_001329

**Table 1: The 10 most affected countries in 2019**

| Ranking 2019 (2018) | Country | CRI score | Fatalities | Fatalities per 100 000 inhabitants | Absolute losses (in million US$ PPP) | Losses per unit GDP in % | Human Development Index 2020 Ranking[14] |
|---|---|---|---|---|---|---|---|
| **1** (54) | Mozambique | 2.67 | 700 | 2.25 | 4 930.08 | 12.16 | 181 |
| **2** (132) | Zimbabwe | 6.17 | 347 | 2.33 | 1 836.82 | 4.26 | 150 |
| **3** (135) | The Bahamas | 6.50 | 56 | 14.70 | 4 758.21 | 31.59 | 58 |
| **4** (1) | Japan | 14.50 | 290 | 0.23 | 28 899.79 | 0.53 | 19 |
| **5** (93) | Malawi | 15.17 | 95 | 0.47 | 452.14 | 2.22 | 174 |
| **6** (24) | Islamic Republic of Afghanistan | 16.00 | 191 | 0.51 | 548.73 | 0.67 | 169 |
| **7** (5) | India | 16.67 | 2 267 | 0.17 | 68 812.35 | 0.72 | 131 |
| **8** (133) | South Sudan | 17.33 | 185 | 1.38 | 85.86 | 0.74 | 185 |
| **9** (27) | Niger | 18.17 | 117 | 0.50 | 219.58 | 0.74 | 189 |
| **10** (59) | Bolivia | 19.67 | 33 | 0.29 | 798.91 | 0.76 | 107 |

PPP = Purchasing Power Parities. GDP = Gross Domestic Product.

In March 2019, the intense tropical Cyclone Idai hit **Mozambique** (1), **Zimbabwe** (2) and **Malawi** (5), causing catastrophic damage and a humanitarian crisis in all three countries. Quickly becoming the deadliest and costliest tropical cyclone in the South-West Indian Ocean, Idai was labelled as "one of the worst weather-related catastrophes in the history of Africa" by United Nations Secretary-General António Guterres.[15][16] The torrential rains and destructive winds with top speeds of 195 kilometres per hour[17] caused flash floods and landslides, which caused economic losses amounting to US$ 2.2 billion. Overall, the cyclone affected three million people and caused over 1 000 fatalities. [18] [19]

In **Zimbabwe** (2) Idai affected more than 270 000 people, leaving over 340 dead and many others missing.[20] The cyclone pummelled the eastern parts of Zimbabwe mainly Chimanimani and parts of Chiping at night, with less preparedness by the

---

[14] UNDP 2020
[15] United Nations Secretary-General Official Twitter Account
[16] United Nations Secretary-General 2019.
[17] GDACS
[18] Reliefweb 2019a
[19] AON 2019a
[20] Reliefweb 2019b

Haiti AR_001330

local communities as well as the government.[21] The road infrastructure was grossly damaged with more than 90% of the road networks in Chimanimani and Chipinge being negatively affected, including 584 km of the roads being damaged by landslides.[22] Overall, the cyclone impacted 50 000 households and displaced over 60 000 people in the country, causing as much as US$ 622 million worth of damage.[23]

For **Malawi** (5) the year 2019 started with heavy rainfalls, which led to an increased risk of floods. When Idai hit Malawi in March, it directly affected 975 000 people and left over 125 000 homeless.[24] Due to the heavy rainfalls and floods caused by Idai, 60 people were killed and over 650 injured.[25] Malawi's economy is heavily dependent on agriculture, employing nearly 80% of the population, and it is therefore vulnerable to external shocks, particularly climatic shocks.[26]

Six weeks after the devastation of Cyclone Idai, Mozambique (1) was hit by another cyclone when category 4 Cyclone Kenneth made landfall in Northern Mozambique. Kenneth was the strongest cyclone ever recorded on the African continent with wind speeds peaking at 220 kilometres per hour and floods with a height of 2.5 metres.[27] Overall, Idai and Kenneth led to the deaths of over 600 people and over 1 600 were injured. 2.5 million people were in need of humanitarian services and over 200 000 houses were destroyed.[28] The overall damage amounted to more than US$ 3.2 billion (approximately as high as half of Mozambique's national budget), mostly in the manufacturing, infrastructure and social sectors.[29] [30]

Hurricane Dorian made landfall on the **Bahamas** (3) in September 2019 as a category 5 hurricane – the most powerful hurricane on record to hit the island state.[31] Dorian reached sustained wind speeds of 300 kilometres per hour[32] causing heavy rainfalls of 914 millimetres (about 80% of the annual average) of rain within a few hours.[33] 74 people were killed. Overall, the hurricane caused damage of US$ 3.4 billion and damaged or destroyed 13 000 houses. On Grand Bahama and Abaco,

---

[21] Ibid.
[22] Ibid.
[23] Reliefweb 2019c
[24] Reliefweb 2019d
[25] Reliefweb 2019e
[26] World Bank 2020a
[27] UN News
[28] Reliefweb 2019f
[29] World Bank 2020b
[30] Oxfam 2020b
[31] Reliefweb 2020a
[32] Miami Herald
[33] Cambridge

which were the two most affected islands, about 45% of the homes were damaged or destroyed.[34] Moreover, during the storm an oil spill occurred at an oil port of the Norwegian state oil and gas company Equinor on Grand Bahama, which polluted the soil and negatively impacted the marine life.[35]

In October 2019, **Japan** (4) was hit by Typhoon Hagibis, the most powerful typhoon in Japan in more than 60 years. With top wind speeds reaching 250 kilometres per hour, Hagibis was classified as "very strong", which is equivalent to a category 5 hurricane. In Tokai, Kanto, and Tohoku regions, the total rainfall in 72 hours was up to between 750mm and 1 000mm (between 50% to 70% of the annual average).[36] Overall, nearly 100 people died, over 230 people were injured, and 13 000 houses were damaged, destroyed or exposed to water. In September, Japan had already been hit by Typhoon Faxai, which made landfall near Tokyo, leaving more than 900 000 homes without power. With winds of up to 210 kilometres per hour, Faxai has been one of the strongest typhoons to hit the Japanese capital in a decade.[37] The economic damage caused by the two typhoons is estimated at US$ 25 billion.[38] Moreover, Japan experienced a heatwave in August 2019, causing over 18 000 heat-related hospitalisations and killing 57 people.[39] But Japan was also hit by other types of extreme weather: In May 2019, the temperatures in the prefecture of Hokkaido had already gone up to 39.5°C, the highest figure ever recorded in the month of May anywhere in Japan.[40]

The **Islamic Republic of Afghanistan** (6) experienced several floods and landslides throughout the year, caused by heavy rainfall. The floods in March 2019 were the most devastating - approximately 120 000 people were affected, and 12 000 homes were either destroyed or damaged by the floods and mudslides.[41] Over 75 people died. In April and May 2019 another 40 people died because of deadly flash floods.[42] Furthermore, landslides occurred in January and December, killing a total of 35

---

[34] Guardian
[35] Zeit Online
[36] Reliefweb 2019g
[37] BBC 2019a
[38] AON 2019b
[39] The Japan Times
[40] South China Morning Post
[41] Reuters 2019
[42] Floodlist 2019a

10

people.[43][44] Due to severe droughts in 2018, the coping capacity of the people affected was already very low.[45]

**India** (7) was affected by the yearly monsoon season, which typically lasts from June to early September. In 2019, the monsoon conditions continued for a month longer than usual, with the surplus of rain causing major hardship. From June to end of September 2019, 110% of the normal rainfall occurred, the most since 1994.[46] The floods caused by the heavy rains were responsible for 1 800 deaths across 14 states and led to the displacement of 1.8 million people.[47] Overall, 11.8 million people were affected by the intense monsoon season with the economic damage estimated to be US$ 10 billion.[48] Furthermore, with a total of eight tropical cyclones, the year 2019 was one of the most active Northern Indian Ocean cyclone seasons on record. Six of the eight cyclones intensified to become "very severe".[49] The worst was Cyclone Fani in May 2019, which affected a total of 28 million people, killing nearly 90 people in India and Bangladesh and causing economic losses of US$ 8.1 billion.[50]

**South Sudan** (8) suffered because of abnormally severe flooding following heavy rainfalls lasting from June 2019 until the end of the year. These affected over 900 000 people; 620 000 of whom required immediate humanitarian assistance. The floods damaged 74 000 hectares of cultivated land, which amounts to a loss of over 70 000 metric tons of cereal.[51] South Sudan required US$ 61.5 million to respond to immediate flood-induced damage.[52] Despite the floods, bush fires intensified and spread due to strong winds and hit four villages in South Sudan's Western Bahr el Ghazal region, causing 50 fatalities and injuring over 60 more people.[53] The fires destroyed 138 houses and killed 10 000 cattle.[54]

Heavy rains caused massive flooding in **Niger** (9), mainly in the regions Maradi, Zinder and Agadez. The Niger River reached an alarming water level of 640 centimetres (the normal level being 550 centimetres), damaging houses as well as various

---

[43] The Washington Post
[44] Reliefweb 2019h
[45] Reliefweb 2019i
[46] Earth Observatory
[47] Reliefweb 2020b
[48] AON 2019b
[49] The Weather Channel
[50] AON 2019a
[51] Anadolu Agency
[52] Reliefweb 2019j
[53] Reliefweb 2019k
[54] Africanews

crops and hydro-agricultural developments.[55] [56] The floods were responsible for 57 fatalities and over 16 000 destroyed houses, affecting more than 210 000 people – of which 123 000 were children.[57]

**Bolivia** (10) suffered due to wildfires that destroyed two million hectares of forest and grassland with almost half of the losses being protected areas with high biodiversity. It is estimated that the regeneration of the local ecosystem will take about 300 years.[58] Furthermore, Bolivia experienced heavy rainfalls and flooding throughout the year. In April 2019, 79 of the 338 municipalities were under a state of disaster and 25 were under a state of emergency. In total, 34 people died and over 23 000 families became homeless.[59] In January 2019, the Isiboro River near Gundonovia stood at 9.35 metres – about one metre above the danger mark.[60]

**Countries Most Affected in the Period 2000-2019**

**Puerto Rico, Myanmar** and **Haiti** have been identified as the most affected countries[61] in this twenty-year period. They are followed by the **Philippines, Mozambique** and the **Bahamas**. Table 2 shows the ten most affected countries over the last two decades with their average weighted ranking (CRI score) and the specific results relating to the four indicators analysed.

---

[55] Floodlist 2019b
[56] IOM
[57] Reliefweb 2020c
[58] BBC 2019b
[59] Reliefweb 2020c
[60] Floodlist 2019c
[61] Note: Puerto Rico is not an independent national state but an unincorporated U.S. territory. Nevertheless, based on its geographical location and socio-economic indicators Puerto Rico has different conditions and exposure to extreme weather events than the rest of the USA. The Global Climate Risk Index aims to provide a comprehensive and detailed overview of which countries and regions are particularly affected by extreme weather events. Therefore, Puerto Rico was considered separately to rest of the USA in our analysis.

Haiti AR_001334

**Table 2: The Long-Term Climate Risk Index (CRI): The 10 countries most affected from 2000 to 2019 (annual averages)**

| CRI 2000-2019 (1999-2018) | Country | CRI score | Fatalities | Fatalities per 100 000 inhabitants | Losses in million US$ PPP | Losses per unit GDP in % | Number of events (2000–2019) |
|---|---|---|---|---|---|---|---|
| **1** (1) | Puerto Rico | 7.17 | 149.85 | 4.12 | 4 149.98 | 3.66 | 24 |
| **2** (2) | Myanmar | 10.00 | 7 056.45 | 14.35 | 1 512.11 | 0.80 | 57 |
| **3** (3) | Haiti | 13.67 | 274.05 | 2.78 | 392.54 | 2.30 | 80 |
| **4** (4) | Philippines | 18.17 | 859.35 | 0.93 | 3 179.12 | 0.54 | 317 |
| **5** (14) | Mozambique | 25.83 | 125.40 | 0.52 | 303.03 | 1.33 | 57 |
| **6** (20) | The Bahamas | 27.67 | 5.35 | 1.56 | 426.88 | 3.81 | 13 |
| **7** (7) | Bangladesh | 28.33 | 572.50 | 0.38 | 1 860.04 | 0.41 | 185 |
| **8** (5) | Pakistan | 29.00 | 502.45 | 0.30 | 3 771.91 | 0.52 | 173 |
| **9** (8) | Thailand | 29.83 | 137.75 | 0.21 | 7 719.15 | 0.82 | 146 |
| **10** (9) | Nepal | 31.33 | 217.15 | 0.82 | 233.06 | 0.39 | 191 |

Compared to the long-term CRI 2020, which considered the period from 1999 to 2018[62], two new countries have entered the Bottom 10, while most countries have ranked similarly to the year before. Puerto Rico, Myanmar and Haiti have remained the three most affected countries over the past two decades. These rankings are attributed to the aftermath of exceptionally devastating events such as Hurricane Maria in Puerto Rico in 2017 and Hurricanes Jeanne (2004) and Sandy (2012) in Haiti. Likewise, Myanmar was struck hard by Cyclone Nargis in 2008, which was responsible for the loss of an estimated 140 000 lives as well as the loss and damage of property of approximately 2.4 million people.[63] Mozambique and the Bahamas, which are the countries that are new to the Bottom 10, also feature in a high position in the ranking as a consequence of exceptionally devastating storms. In 2019, Cyclone Idai and Kenneth made landfall in Mozambique and Hurricane Dorian hit the Bahamas.

These results emphasise the particular vulnerability, particularly in relative terms, of poor countries to climatic risks, despite the fact that the absolute monetary

---

[62] See Eckstein et al. 2019
[63] See OCHA 2012

losses are much higher in richer countries. Loss of life, personal hardship and existential threats are also much more widespread in low-income countries.[64]

**Exceptional Catastrophes or Continuous Threats?**

The Global Climate Risk Index 2021 for the period 2000–2019 is based on average values over a twenty-year period. However, the list of countries featured in the long-term Bottom 10 can be divided into two groups: firstly, those which were most affected due to exceptional catastrophes and secondly, those which are affected by extreme events on an ongoing basis.

Countries falling into the first category include Myanmar, where Cyclone Nargis in 2008 caused more than 95% of the damage and fatalities over the past two decades, and Puerto Rico, where more than 98% of the damage in both categories was caused by Hurricane Maria in 2017. With new superlatives like Cyclone Idai in March 2019 being the deadliest and costliest cyclone on record in the Indian Ocean, and one of the worst tropical cyclones ever to affect Africa and the Southern Hemisphere, it seems to be just a matter of time until the next exceptional catastrophe occurs.[65] The severe 2017 hurricane season had already made 2017 the costliest year ever in terms of global weather disasters.[66]

Over the last few years, the second category of countries has been gaining relevance: Countries like Haiti, the Philippines and Pakistan, that are recurrently affected by catastrophes, continuously rank among the most affected countries both in the long-term index and in the index for each respective year. Furthermore, some countries were still in the process of recovering from the previous year's impacts. One example is the Philippines, which is regularly exposed to tropical cyclones such as Bopha 2012, Hayan 2013 and Mangkhut 2018, due to its geographical location.

The appearance of some European countries among the Bottom 30 countries[67] can to a large extent be attributed to the extraordinary number of fatalities due to the 2003 heatwave, in which more than 70 000 people died across Europe. Although some of these countries are often hit by extreme events, the relative economic losses and the fatalities are usually relatively minor compared to the countries' populations and economic power due to their high coping capacity.

---

[64] See World Bank country classifications: https://blogs.worldbank.org/opendata/new-world-bank-country-classifications-income-level-2020-2021
[65] New York Times 2019a, World Bank 2019
[66] MunichRe 2018
[67] The full rankings can be found in the Annexes.

© 2021 Germanwatch

**Figure 1: World Map of the Global Climate Risk Index 2000 – 2019**

Source: Germanwatch and Munich Re NatCatSERVICE





| Countries most affected by extreme weather events (2000-2019) | |
|---|---|
| 1 | Puerto Rico |
| 2 | Myanmar |
| 3 | Haiti |
| 4 | Philippines |
| 4 | Mozambique |
| 6 | The Bahamas |
| 7 | Bangladesh |
| 8 | Pakistan |
| 9 | Thailand |

Italics: Countries where more than 90% of the losses or deaths occurred in one year or event

**Climate Risk Index: Ranking 2000 - 2019**

1 - 10   11 - 20   21 - 50   51 - 100   >100   No data

Haiti AR_001337

# 2 Effects of Climate Change on Extreme Weather Events and Ways to Deal with the Related Impacts

Extreme weather events and how they are formed is complex. Numerous interrelated factors must be taken into account when seeking to explain the causes. However, science has been able to sufficiently demonstrate that climate change has a significant effect on extreme weather events, increasing their frequency, intensity and duration. Understanding the relation between the human-induced climate crisis and extreme weather events is essential for being able to mitigate the risks and prepare for these types of events.

Back in its "Fifth Assessment Report", which was published in 2014, the Intergovernmental Panel on Climate Change (IPCC) had already stated that the risks associated with extreme events will continue to increase as the global mean temperature rises.[68] Linking particular extreme weather events to human-induced and natural climate drivers remains a scientific challenge which attribution science is trying to tackle. The field has recently taken huge leaps forward – even though gaps in knowledge and especially in data remain. In general, many studies conclude that "the observed frequency, intensity, and duration of some extreme weather events have been changing as the climate system has warmed".[69] Nevertheless, it is not trivial to investigate the impact of climate change on a single weather event as different regional circumstances need to be taken into account and data might be very limited.[70] Over the past few years, substantial research has been conducted on the attribution of extreme events to climate change, i.e. to what extend anthropogenic climate change has contributed to the events' likelihood and strength.[71] In the field known as Probabilistic Event Attribution (PEA), based on climate model experiments, studies compare the probability of an extreme weather situation, in today's world with human-caused greenhouse gas emissions, to a world without anthropogenic climate change.[72] Due to methodological improvement, "fast track attribution" is now more feasible and can be undertaken within months of the event (as opposed to decades).[73] Additionally, more knowledge has been generated on how underlying factors contributing to extreme weathers are influenced by global warming. For example, higher temperatures intensify the water cycle, leading to more

---

[68] IPCC 2014a, p.12
[69] Committee on Extreme Weather Events and Climate Change Attribution et al. 2016, p. 2
[70] Hansen et al. 2016
[71] Stott et al. 2015
[72] Carbon Brief 2014
[73] Haustein et al. 2016

16

droughts as well as floods due to drier soil and increased humidity.[74] Of course, these approaches can only lead to statements about the change in probability of a certain event happening.

Considering this, the report "Explaining Extreme Events of 2017 from a Climate Perspective" offered findings from 17 peer-reviewed analyses. The American Meteorological Society has published such a report in its bulletin on an annual basis since 2012, analysing selected extreme weather events. Out of the 146 research findings, 70% "identified a substantial link between an extreme event and climate change".[75] Again, "scientists have identified extreme weather events that they said could not have happened without the warming of the climate through human-induced climate change."[76] Among others, one of the cited studies concluded that the intense marine heatwaves in the Tasman Sea off Australia in 2017 and 2018 would have been "virtually impossible" without climate change.[77] Another study in the report of the following year "Explaining Extreme Events of 2018 From a Climate Perspective" took a closer look at the heatwave in South Korea in the summer of 2018. It concluded that the likelihood of a 2018-like extreme heat wave with that intensity and maximum duration had increased by four times due to anthropogenic climate change.[78] For its part, the "Fourth Climate Assessment Report" (2018) considers, with a high level of confidence, a future increase in the frequency and intensity of extreme high temperature and precipitation events as the global temperature increases as being "virtually certain".[79]

The data on the countries in the CRI 2021 demonstrate how destructive extreme precipitation can be – namely through the floods and landslides, which have hit many regions in South and South East Asia and Africa – regions which now feature in the Bottom 10. Extreme precipitation is expected to increase as global warming intensifies the global hydrological cycle. Thereby, single precipitation events are expected to increase in intensity at a higher rate than global mean changes in total precipitation as outlined by Donat et al. (2016). Furthermore, those increases are expected in wet as well as dry regions.[80] A study by Lehmann et al. (2015) strengthens the scientific link between record-breaking rainfall events since 1980 and rising temperatures. According to the scientists, the likelihood of a new extreme rainfall event being caused by climate change reached 26% in 2010.[81] A study by Blöschel

---

[74] WMO 2017
[75] American Meteorological Society 2018, without page number
[76] Ibid.
[77] Perkins-Kirkpatrick et al 2018, p54
[78] Wang et al. 2018
[79] Wuebbles el al. 2017
[80] Donat et al. 2016
[81] Lehmann et al. 2015

et al. (2017) concludes that the timing of floods is shifting due to climate change. The research focuses on Europe and shows that floods occur earlier in the year, posing timing risks to people and animals. Flooding rivers affect more people worldwide than any other natural disasters and result in multi-billion dollars of damage annually.[82] Nevertheless, the study is not fully able to single out human-induced global warming as a cause – a problem researchers on extreme weather attribution are still facing.

Researchers explained that the sea surface temperature plays a key role in increasing storms, wind speeds and precipitation.[83] They conclude that Hurricane Harvey in 2017 would not have been able to produce such an enormous amount of rain without human-induced climate change.[84] Moreover, a study shows that torrential rains like those in 2016 in Louisiana, USA, are now 40% more likely than in pre-industrial times. The rainfall was increased because the storm was able to absorb abnormal amounts of tropical moisture on its way to the US coast, releasing three times the precipitation of Hurricane Katrina in 2005.[85]

Another example is a regional model used to analyse the occurrence of heatwaves in India, finding causalities regarding the 2016 heatwave and climate change. The model indicated that sea surface temperatures influence the likelihood of record-breaking heat.[86] Other studies have found similar results. A publication regarding the 2015 Southern African droughts also found causalities with regards to sea surface temperatures causing reduced rainfall, increased local air temperatures and more evaporation.[87]

Furthermore, there is increasing evidence on the link between extreme El Niño events and global warming. Cai et al. (2018) found that the robust increase in the variability of sea surface temperatures is "largely influenced by greenhouse-warming-induced intensification of upper-ocean stratification in the equatorial Pacific, which enhances ocean-atmosphere coupling."[88] As a consequence, the frequency of strong El Niño events increases as well as extreme La Niña events. This finding is considered a milestone in climate research[89] and confirms past research in the field.[90]

---

[82] Blöschl et al. 2017
[83] Trenberth et al. 2015; Zhang et al. 2016
[84] Trenberth et al. 2018
[85] Climate Central 2016a
[86] Climate Central 2016b
[87] Funk et al. 2016
[88] Cai et al. 2018, p. 201.
[89] Ham Y-G 2018
[90] Cai et al. 2014, Cai et al. 2015, Yeh et al. 2009

Haiti AR_001340

Extreme weather events and the related risks are not the only type of risks aggravated by the influences of climate change. In addition, slow-onset processes and the related hazards, like the rising sea levels, desertification or the loss of biodiversity, are triggered or reinforced. In its latest reports, the IPCC (2019)[91] focuses on the effect of climate change on the desertification and degradation of land. It suggests that climate change will accelerate several desertification processes and that, in the future, the risks of desertification will increase. This has various implications, such as the loss of biodiversity and an increase in the likelihood of wildfires.

## The effects of climate change on tropical cyclones

In the Climate Risk Index 2021 tropical cyclones led to six countries being listed among the Bottom 10. Mozambique (1), Zimbabwe (2) and Malawi (5) were struck by Cyclone Idai (and Kenneth), the Bahamas (3) were hit by Hurricane Dorian, in Japan (4) Typhoon Hagibis caused massive destruction, and various cyclones affected India (7).

The following info-box highlights the role of climate change in increasing the intensity of tropical cyclones and in increasing precipitation.

---

[91] IPCC 2019

Haiti AR_001341

## How will climate change affect tropical cyclones?

There is little doubt that climate change will bring about the following challenges:



Illustration: Germanwatch

If the increase in the global mean temperature is limited to 1.5°C or even 2°C, the total *number* of tropical cyclones is actually expected to decrease. However, we also have to note that this might differ regionally. According to the IPCC 1.5°C Special Report, the *intensity* of the storms is likely to increase and more of the highest category tropical cyclones will occur. This is due to warmer oceans acting like fuel: The heat provides more energy to feed the storms, hence making them stronger and thus potentially more damaging. In addition, warmer air can absorb more moisture leading to an increase in the precipitation associated with the storms. Tropical cyclones are also getting slower. Consequently, they can release more rain on the affected area,[91] although scientific debate on this matter continues.[92] Peak wind speeds and precipitation will therefore most likely increase more significantly if average temperatures rise by 2°C compared to if they only rise by 1.5°C.[93] Further rises in sea levels will result in more severe storm surges. In 2020 the Atlantic hurricane season was so active that it has exhausted the regular alphabetical list of storm names. New storms were named after Greek letters. The Greek alphabet was used for only the second time on record.

Tropical cyclones have different names depending on where they occur. In the Atlantic and Northeast Pacific, the weather phenomenon is described as a *hurricane* whereas the term *cyclone* is used when the storm occurs in the South Pacific and Indian Ocean. The term *typhoon* describes the same weather event in the Northwest Pacific. Moreover, such storms have different scales to classify their intensity depending on the region in which they occur. There are at least five common tropical cyclone scales, and all are based on wind speeds. The line between storms and tropical cyclones is drawn very differently in different regions of the world, which makes it difficult to compare the storms based on these categories. For example, a cyclone in Australia and Fiji starts at 63 km/h, while a hurricane in the Caribbean will only be defined as such from 119 km/h upwards. Then again, the highest category of hurricanes – category five – starts at 252 km/h. In Australia and Fiji, a cyclone has to reach 280 km/h to reach the highest classification, which is also named category five. The box below describes how tropical cyclones form.

## How tropical cyclones form

Vast amounts of water evaporate; humid air ascends spinning around an eye, creating a self-reinforcing process fueled by ever warmer humid air. Once tropical cyclones hit the shore, this supply is interrupted and the storm weakens. Highest wind speeds are reached directly around the eye at the so-called eye-wall. Precipitation is most intense in that area as well. Huge storms can have several eyewalls.



Illustration: eskp.de/CC-BY (modified).

For a tropical cyclone to form, several conditions need to be fulfilled. Usually sea temperature has to reach 26.5°C down to 50 metres below sea level. The atmosphere needs to be unstable i.e. there has to be a significant difference in air temperature at different altitudes allowing for convection. In contrast, the (vertical) wind shear should be low, otherwise the energy will be scattered over an area too large to form a strong storm. This is the main reason why tropical cyclones are extremely rare in the Southern Atlantic Ocean (NASA, 2004). High humidity in the lower to middle levels of the troposphere – the lowest layer of the Earth's atmosphere and the one where most weather takes place – contributes to the convection of air masses. Furthermore, sufficient Coriolis force is needed. Last but not least, tropical cyclones do not form out of nowhere. They need at least some form of disturbance close to the surface with a horizontal inflow of air (convergence) and a certain degree of horizontal circulation (vorticity) (NOAA 2018).

## Exemplary approaches to address the impacts of tropical cyclones

The impact of the tropical cyclones in 2019 again sends a stark signal that knowledge about and pre-hazard responses to existing vulnerabilities and risk exposure remains a critical issue – even more so with climate change playing an increasing role in the intensity of tropical cyclones. Countries and communities that have been hit by cyclones are often left more vulnerable to other hazards and the impacts of climate change. In order to ensure better protection of the affected pop-

ulations, adaptation measures and integrated risk management strategies are required that include the key steps of risk assessment, risk reduction, risk retention and transfer, preparedness, as well as response and recovery.[92]

Strategies to successfully deal with tropical cyclones include a variety of measures from the fields of disaster risk reduction, preparedness, adaptation and financial protection: Community-based adaptation projects, for example, can contribute to building better flood barriers[93]. An example of such a project is the planting of mangrove trees which can prevent coastal erosion[94]; a solution that is now used in Puerto Rico for instance.[95] In case of an emergency, awareness and preparation are key for people to be able to react swiftly. Training and checklists can support this,[96] and evacuation plans are essential.[97] In Bangladesh, a country particularly vulnerable to tropical cyclones, a dense network of small cyclone shelters, early warning systems, evacuation plans, reforestation schemes and increased communication has contributed to reducing cyclone-related mortality by more than 100-fold over a period of 40 years (reducing deaths from 500 000 in 1970 to 4 234 in 2007).[98] Another strategy in Bangladesh is growing crops on floating rafts, which can at least help to minimise flood damage.[99] Furthermore, regulations play a key role in addressing risks posed by tropical cyclones. To give an example, Australia has noted successes by tightening building codes: buildings are required to be constructed in a way that makes them less vulnerable to extreme winds.[100]

Furthermore, large-scale engineering projects like floodgates and dams can contribute to reducing damage. Such measures, however, are expensive, and often have adverse impacts on ecosystems.

There are already some ambitious initiatives, which aim to increase the financial resilience of the countries affected by tropical cyclones. Through pre-arranged funding that will be paid out in case of a disaster, the fiscal balance of (sub-) national governments, households and businesses can be protected. For example, the "Caribbean Catastrophe Risk Insurance Facility" (CCRIF SPC) is a regional catastrophe fund for the Caribbean and Central American governments to limit the financial impacts of devastating tropical cyclones, excessive rainfall and earthquakes. In order

---

[92] Le Quesne et al. 2017
[93] IIED 2018
[94] Reid 2016
[95] U.S. Climate Resilience Toolkit 2017
[96] American Red Cross 2018
[97] Haque et al. 2012
[98] Haque et al. 2012
[99] Huq 2008
[100] Mason & Haynes 2010

Haiti AR_001344

to do so, the insurance facility provides financial liquidity to the respective member state when a threshold is triggered. Following Hurricane Dorian, CCRIF paid out US$ 10,936,103 to the Bahamas. CCRIF's payouts are made within 14 days of an event, but in this case CCRIF made an 'advance payment' of 50% of the preliminary estimated payout within 7 days to allow the government to begin to address its most pressing needs – with the remaining 50% being paid within the 14-day window which applies to all the CCRIF payouts.[101]

Another example is the "Pacific Catastrophe Risk Assessment and Financing Facility" (PCRAFI), a regional risk pool in the Pacific, which aims to provide disaster risk management and finance solutions to help increase the resilience of Pacific Island states. Countries can insure themselves against tropical cyclones, earthquakes and tsunamis. In parallel, disaster risk management work is being conducted under the Pacific Resilience Program, which aims to strengthen early warning systems and preparedness and improve countries' post-disaster response capacities.

While these initiatives are an important step forwards in addressing the particularly vulnerable countries and can help to provide the necessary financial backup in case of tropical cyclones and other extreme events, direct access to international climate finance through national entities is still fairly limited for some of the most affected countries.

## Loss and damage: when adaptation and risk management reach their limits

As extreme weather events like tropical cyclones are likely to increase in quantity and/or severity with ongoing climate change, it is extremely important that more emphasis be put on the issue of loss and damage. The term loss and damage refers to the "adverse impacts of human-induced climate change that cannot be avoided by mitigation or adaptation, or that will not be avoided in the future by adaptation due to insufficient resources".[102] A main distinction can be made between economic and non-economic loss and damage. Climate change hazards cause loss and damage of, for example, resources, goods and services that are commonly traded in markets. Examples include buildings and services such as telecommunications and power. But those people who are affected also experience the loss of material and non-material items that cannot be traded. Loss and damage can be caused by extreme weather events as described in this Index, but in order to form a complete

---

[101] The Caribbean Catastrophe Risk Insurance Facility 2019
[102] Mace/Verheyen 2016. Mace, M./ Verheyen, R. 2016: Loss, Damage and Responsibility after COP21: All Options Open for the Paris Agreement. In: Review of European, Comparative & International Environmental Law 25 (2), 197-214.

picture of the climate risk, slow-onset processes (rises in sea levels, glacier melting, etc.) also need to be included.[103]

In the international climate policy process, the topic of loss and damage is highly controversial. Particularly the question of how financing to deal with such losses and damages should be provided has so far remained unanswered (see Chapter 3).

# 3 Status Quo of International Resilience Policy

The Climate Risk Index 2021 clearly shows that the effects of climate change are already being felt worldwide and that increasingly intense and frequent extreme weather events are a major driver of disaster losses. However, the Index also shows that developing countries are particularly affected by the impacts of climate change. Eight out of the ten countries most affected by the quantified impacts of extreme weather events in 2019 belong to the category low to lower-middle income. Five of them fall into the category Least Developed Countries. A similar picture emerges from the long-term index: Six of the ten countries most affected from 2000 to 2019 belong to the category low to lower-middle income. Climate impacts, such as increasingly intense and frequent extreme weather events, affect people in developing countries disproportionately, threatening lives and livelihoods, human security and sustainable development. These countries, and especially the most vulnerable parts of the population, are particularly affected by the damaging effects of a hazard (as, for example, their livelihood depends on fewer assets) and have a lower coping capacity (e.g. they cannot rely on savings to buffer the impacts and may need more time to rebuild and recover).

Moreover, the year 2020 has demonstrated that these countries are vulnerable to a variety of risks – Including climatic and geophysical hazards but also economic, social and health risks. The Covid-19 pandemic has led to an unprecedented humanitarian crisis. This is a particular problem for developing countries, as disaster management systems are often overburdened and the already scarce emergency funds have been exhausted. The World Bank estimates that the Covid-19 crisis could plunge up to an additional 115 million people into extreme poverty in 2020 – and

---

[103] Schäfer et al. 2021

24

this number could rise to 150 million in 2021.[104] Moreover, the Covid-19 crisis, similar to the climate crisis, will lead to a higher indebtedness of vulnerable countries.[105]

The Covid-19 pandemic has reminded us of the fact that both risk-affectedness and vulnerability are systemic and interconnected.[106] A recent study by the Red Cross Red Crescent Movement shows that of the 132 extreme weather events that occurred between January and September 2020, 90 overlapped with the Covid-19 pandemic. Globally, 51.6 million people had to simultaneously deal with the impacts of floods, droughts or storms whilst trying to contain the pandemic and deal with its consequences. It is therefore important to strengthen the resilience of the most vulnerable against different types of risk (i.e. climatic, geophysical, economic and health-related risks).

Comprehensive disaster risk reduction strategies can play a key role in increasing resilience to different types of risks. As part of its global targets, the Sendai Framework[107] aims to substantially increase the number of countries with national and local disaster risk reduction strategies by 2020. Only 40 of the 195 countries of the Sendai Framework have achieved this so far. Looking at the Bottom 10 of both the annual and the long-term Climate Risk Index, Japan is the only country which appears on both these lists and which has also achieved this goal. Other Bottom 10 countries like Malawi, India, Niger, the Philippines, and Nepal are working on national and local disaster risk reduction strategies; for the other countries, no specific details were available.

Adaptation efforts also help to mitigate climate impacts. In 2019, eighteen countries completed and submitted their National Adaptation Plans (NAPs) to the Secretariat of the United Nations Framework Convention on Climate Change (UNFCCC), five of them being Least Developed Countries (LDCs) and four being Small Island Developing States (SIDS). Moreover, at least 120 developing countries were in the process of formulating and implementing the NAPs.[108]

---

[104] World Bank 2020c

[105] This is true for many different countries. Mozambique was forced to take US$ 118 million in debt for responding to the cyclone-induced damages due to the lack of own funds (as the sixth poorest country worldwide) and support (see CARE et al. 2019). AOSIS raised awareness for the difficult situation SIDS: "Small Island Developing States are sinking: not just from climate-induced sea level rise and other impacts, we are sinking in debt," (see https://www.aosis.org/wp-content/uploads/2020/09/AOSIS-Media-Briefing-Press-Release.pdf)

[106] Künzel/Schäfer 2020.

[107] The Sendai Framework aims to achieve the substantial reduction of disaster risk and losses in lives, livelihoods and health and in the economic, physical, social, cultural and environmental assets of persons, businesses, communities and countries over the next 15 years.

[108] United Nations 2020

While the first priority should be to prevent and minimise potential losses and damages through effective mitigation, adaptation and risk reduction measures, it is no longer possible to prevent or minimise all loss and damage. Climate change is already leading to unavoidable loss and damage and will increasingly do so in the future. Taking this into account it appears essential to address the residual loss and damage, which cannot be avoided through mitigation and adaptation efforts, especially for those countries, which are particularly vulnerable to the impacts of climate change. However, **financial support** is clearly lacking – measured against the scale of what is necessary. In the direct aftermath of a disaster, it is especially the poor and vulnerable countries, which rely on **humanitarian assistance** for immediate relief and also recovery. However, as current numbers show, the amount of financial support available is far from sufficient. According to the United Nations Office for the Coordination of Humanitarian Affairs (UN OCHA), only 54% of the global humanitarian appeals[109] could be funded in 2019[110]. After cyclones Idai and Kenneth, Mozambique issued an appeal for support in dealing with the massive destruction. Only 39% of the funding was covered by July 2019[111] and just 47% by the end of 2019[112]. The already indebted state was left to deal with the remaining costs on its own.

**International climate financing** has increased over the years and in 2018 a total of US$ 78.9 billion was provided and mobilised.[113] However, the goal to mobilise US$ 100 billion annually from 2020 onwards, which, in 2009, developed countries agreed to provide for developing countries to finance mitigation and adaptation efforts, does not seem to be met. A recent study also points to challenges regarding the amount of money labelled as climate finance provided. The argument is made that most loans are counted at their full face-value, rather than the grant equivalent – therefore repayments by the recipient countries, interest and other factors are also counted as part of climate finance.[114] In light of the ever-increasing impacts and costs of covering the related damage, it is all the more worrying that in 2018 70% of the climate finance provided was spent on mitigation efforts, whereas the share spent on adaptation funding was only about 21% of the total funding (the other 9% can be attributed to cross-cutting)[115] – thus, well below the target of 50% in order to achieve a fair balance. As it has been shown that the main amount of private climate finance mobilised is invested in mitigation efforts, the argument should be

---

[109] Not only focused on extreme weather events
[110] UN OCHA 2019
[111] CARE et al. 2019
[112] UN OCHA 2020
[113] OECD 2020
[114] Oxfam 2020
[115] OECD 2020

made to provide an even higher share of adaptation finance in order to avoid im-
balance. The geographical distribution additionally reveals another challenge in
terms of the fair distribution of the financial means: Only 8% of the funding goes to
low-income countries, the majority is provided to middle-income countries
(69%).[116]

Estimates of the United Nations Environmental Program (UNEP) additionally show
how far these numbers are from meeting the needs of those countries struggling
with climate impacts: Even with a temperature increase of below 2°C, adaptation
costs are expected to increase to up to US$ 300 billion per year by 2030 – potentially
rising even further[117] and this does not cover costs concerning climate related loss
and damage. As no specific percentage of international climate finance has been
assigned to address loss and damage, the necessary response costs will be even
higher when loss and damage is taken into account[118]. For developing countries,
the estimated cost of residual loss and damage could rise to between US$ 290 bil-
lion and US$ 580 billion in 2030 according to Markandya/ González-Eguino (2018).[119]

However, reacting to the increased financial pressure due to the consequences of
the Covid-19 pandemic on the most vulnerable countries and their national house-
holds, donors have provided additional support. One example for this support is the
African Risk Capacity, a regional risk pool governed by the African Union. In order to
ensure that climate risk management is not compromised under the challenging
conditions when dealing with measures to control the Covid-19 pandemic, do-
nors[120] offered premium support to countries, which allowed them to join the risk
pool.

## International climate policy developments and expectations for 2021

The disruptions caused by the Covid-19 pandemic also affected the **international
climate policy agenda**. In 2020, no **UNFCCC** negotiations could be held and thus
no decisions could be taken. Only the thematic bodies and committees were able

---

[116] Ibid
[117] UNEP 2016
[118] Even if some funding was provided to conduct projects that also included L&D components, those costs were calculated as part of adaptation finance.
[119] Markandya, A./ González-Eguino, M. 2018: Integrated Assessment for Identifying Climate Finance Needs for Loss and Dam-age: A Critical Review. In: Mechler R./ Bouwer, L./ Schinko, T./ Sur-minski, S./ Linnerooth-Bayer, J. (eds): Loss and damage from climate change. Concepts, methods and policy options. Springer, 343-362.

[120] BMZ 2020

Haiti AR_001349

to meet virtually. Therefore, no substantive progress regarding the discussions on climate finance, adaptation and loss and damage could be achieved.

However, the **Climate Ambition Summit** on December 12, 2020, announced the "Race to Resilience" campaign as the sibling to "Race to Zero". It aims to catalyse a significant change in global ambition for climate resilience and wants to catalyse action by non-state actors that, by 2030, builds the resilience of four billion people from groups and communities, which are vulnerable to climate risks.

According to the 2020 **progress reports on the Sustainable Development Goals (SDGs)**, there is room for improvement in achieving SDG 13 ("Take urgent action to combat climate change and its impacts"). As stated in the report, the global temperature increase is not on track to meet the Paris Goals but instead could potentially reach 3.2°C by the end of the century. On the other hand, recent estimates by the **Climate Action Tracker** have calculated that global warming by 2100 could be as low as 2.1°C as a result of all the net zero pledges announced as of November 2020.[121] Nevertheless, developments are especially worrying as climate change threatens to destroy decades of progress in development[122] and could lead to severe human and national security implications, as debated in the UN Security Council in July 2020.[123] It can be seen in the long-term index, that major events undid years of development in the affected countries. The progress report also pointed to the fact that those countries most vulnerable to climate change do not receive adequate financial support to deal with these impacts.

After the debate having stalled in 2020, expectations regarding progress in the discussions about the long-term finance goal and adequate support for adaptation and loss and damage have shifted to 2021 and 2022. The following milestones are worth mentioning:

- After the **Climate Ambition Summit** on December 12, 2020 did not deliver sufficient commitments to increase global (adaptation) finance, expectations for the **Global Climate Adaptation Summit** in January 2021 are especially high in this regard.

---

[121] Climate Action Tracker 2020

[122] United Nations 2020

[123] Experts called on the Security Council to let climate change, while "further intensifying resource competition, exacerbate conflicts and drive hundreds of millions of people from their homes" to "take center stage" in its work and debates. With great concern it was pointed to the consequences for "conflict prevention, peacemaking and sustaining peace, and risk, trapping vulnerable countries in a vicious cycle of climate disaster and conflict" if the impacts would be further ignored from a security policy perspective. ( https://www.un.org/press/en/2020/sc14260.doc.htm)

Haiti AR_001350

- More support, in terms of finance and capacity building through strong partnerships, is required in order to prepare those countries, which do not possess the capacity to do so on their own for the effects of climate change and in order to share successful approaches. The Santiago Network, as an outcome of COP25, could be a key milestone in providing this type of support and act as a knowledge and capacity building hub. It should be operationalised and provided with adequate financial resources soon.

- For **COP26**, adaptation and resilience[124], as well as finance[125] are part of the five priority areas of the COP Presidency. Moreover, the question of whether the US$ 100 billion goal has been met, will be high on the agenda. Discussion must lead to action and support for the most vulnerable countries and people who have to deal with climate impacts. During the upcoming climate summits one of the big issues therefore must be: How can developing countries be supported in dealing with increasing loss and damage? How can polluters, in particular, contribute to the costs?

# 4 Methodological Remarks

The presented analyses are based on the worldwide data collection and analysis provided by MunichRe's NatCatSERVICE.[126] "The information collated by MunichRe, the world's leading re-insurance company, can be used to document and perform risk and trend analyses on the extent and intensity of individual natural hazard events in various parts of the world."[127] Broken down by countries and territories, MunichRe collects the number of total losses caused by weather events, the number of deaths, the insured damages and the total economic damages. The last two indicators are stated in million US$ (original values, inflation adjusted).

In the present analysis, only weather-related events – storms, floods as well as temperature extremes and mass movements (heat and cold waves etc.) – are incorporated. Geological incidents like earthquakes, volcanic eruptions or tsunamis, for which data are also available, are not relevant in this context as they do not depend

---

[124] Helping people, economies and the environment adapt and prepare for the impacts of climate change.

[125] We need to unleash the finance which will make all of this possible and power the shift to a zero carbon economy.

[126] Note: Contrary to previous years, the underlying database for the calculation of the CRI 2021 does NOT include data for the United States of America. This results in a significantly lower number for the overall losses in PPP of the 20-year period, compared to, for instance, the number presented in the CRI 2020 (overall losses of US$ 3.54 trillion). As a comparison: Without the United States of America, the over losses in the CRI 2020 amount to US$ 2.51 trillion.

[127] MunichRe NatCatSERVICE

on the weather and therefore are not possibly related to climate change. To enhance the manageability of the large amount of data, the different categories within the weather-related events were combined. For single case studies on particularly devastating events, it is stated whether they concern floods, storms or another type of event.

It is important to note that this event-related examination does not allow for an assessment of continuous changes of important climate parameters. For instance, a long-term decline in precipitation that was shown in some African countries as a consequence of climate change cannot be displayed by the CRI. Nevertheless, such parameters often substantially influence important development factors like agricultural outputs and the availability of drinking water.

Preparing an index requires the analysis of a vast amount of data. Thus, data availability and quality play an important role as well as the underlying methodology for their collection. For instance, the accurate attribution of a human loss to a particular extreme weather event faces certain methodological boundaries that data collectors have to work with (e.g. to determine whether the death of an elderly person during a heatwave is indeed the result of the extreme temperature or due to the high age alone). Similarly, data quality and coverage may vary from country to country as well as within countries. A study by Campbell et al. (2018) found that heatwave and health impact research is not evenly distributed across the globe. They highlight that "regions most at risk from heatwaves and health impact are under-represented in the research."[128] The data analysed for the CRI rely on scientific best practice and methodologies used are constantly evolving with the view of ensuring the highest degree of accuracy, completeness and granularity.

Although certainly an interesting area for analysis, the present data do not allow for comprehensive conclusions about the distribution of damages below the national level. The respective data quality would only be sufficient for a limited number of countries. The island of Réunion, for example, would qualify for a separate treatment but data are insufficient.

**Analysed Indicators**

For the examination of the CRI, the following indicators were analysed:

1. number of deaths,
2. number of deaths per 100 000 inhabitants,
3. sum of losses in US$ in purchasing power parity (PPP) as well as
4. losses per unit of gross domestic product (GDP).

---

[128] Campbell et al. 2018

For the indicators 2–4, economic and population data primarily provided by the International Monetary Fund were taken into account. It must be added, however, that especially for small (e.g. Pacific Small Island Developing States) or extremely politically unstable countries (e.g. Somalia), the required data are not always available in sufficient quality for the entire time period observed. Those countries needed to be omitted from the analyses.

The CRI 2021 is based on the loss figures of 180 countries from the year 2019 and the period 2000 to 2019. This ranking represents the most affected countries. In each of the four categories ranking is used as a normalisation technique. Each country's index score has been derived from a country's average ranking in all four indicating categories, according to the following weighting: death toll, 1/6; deaths per 100 000 inhabitants, 1/3; absolute losses in PPP, 1/6; losses per GDP unit, 1/3.

For example, in the Climate Risk Index for 2000-2019, Bangladesh ranks 9th in annual fatalities among all countries analysed in this study, 37th in Fatalities per 100 000 inhabitants, 13th in losses and 37th in losses per unit GDP (see Annexes, Table 4). Hence, its CRI Score is calculated as follows:

CRI Score = 9 x 1/6 + 37 x 1/3 + 13 x 1/6 + 37 x 1/3 = 28.33

Only six countries have a lower CRI Score for 2000-2019, hence Bangladesh ranks 7th in this index category (see Table 2).

**The Relative Consequences Also Depend on Economic and Population Growth**

Identifying relative values in this index represents an important complement to the otherwise often dominating absolute values because it allows for analysing country specific data on damages in relation to real conditions and capacities in those countries. It is obvious, for example, that for richer countries like the USA or Japan damages of one billion US$ cause much less economic consequences than for the world's poorest countries, where damages in many cases constitute a substantial share of the annual GDP. This is being backed up by the relative analysis.

It should be noted that values, and hence the rankings of countries regarding the respective indicators do not only change due to the absolute impacts of extreme weather events, but also due to economic and population growth or decline. If, for example, population increases, which is the case in most of the countries, the same absolute number of deaths leads to a relatively lower assessment in the following year. The same applies to economic growth. However, this does not affect the significance of the relative approach. Society's ability of coping with damages through precaution, mitigation and disaster preparedness, insurances or the improved availability of means for emergency aid, generally grows along with increasing economic

31

strength. Nevertheless, an improved ability does not necessarily imply enhanced implementation of effective preparation and response measures. While absolute numbers tend to overestimate populous or economically capable countries, relative values give more prominence to smaller and poorer countries. In order to consider both effects, the analysis of the CRI is based on absolute (indicators 1 and 3) as well as on relative (indicators 2 and 4) scores. Being double weighted in the average ranking of all indicators generating the CRI Score, more emphasis and therefore higher importance is given to the relative losses.

**The Indicator "Losses in Purchasing Power Parity" Allows for a More Comprehensive Estimation of How Different Societies are Actually Affected**

The indicator "absolute losses in US$" is identified by purchasing power parity (PPP) because using this figure expresses more appropriately how people are actually affected by the loss of US$ 1 than by using nominal exchange rates. Purchasing power parity is a currency exchange rate, which permits a comparison of, for instance, national GDPs, by incorporating price differences between countries. This means that a farmer in India can buy more crops with US$ 1 than a farmer in the USA with the same amount of money. Thus, the real consequences of the same nominal damage are much higher in India. For most countries, US$ values according to exchange rates must therefore be multiplied by a factor bigger than one.

# 5 References

Africanews. 2019. Bush fire guts 4 villages, kills 33 in South Sudan. Available at https://www.afri-canews.com/2019/05/07/bush-fire-guts-4-villages-kills-33-in-south-sudan (16 Dev 2020).

Anadolu Ageny. 2019. South Sudan: Ongoing floods hit millions. Available at https://www.aa.com.tr/en/africa/south-sudan-ongoing-floods-hit-millions/1682830 (16 Dev 2020).

American Meteorological Society. 2018. Heatwaves, Droughts and Floods Among Recent Weather Ex-tremes Linked to Climate Change. New Studies Reveal Clear Ties between Today's Extremes and Human Causes. Press Release. Available at https://www.ametsoc.org/index.cfm/ams/about-ams/news/news-releases/heatwaves-droughts-and-floods-among-recent-weather-extremes-linked-to-climate-change/ (05 Nov 2019).

American Red Cross. 2018. Hurricane Safety: Learn how to keep your home and family safe during a hur-ricane or typhoon. Available at www.redcross.org/get-help/how-to-prepare-for-emergen-cies/types-of-emergencies/hurricane.html (16 Nov 2018).

AON. 2019a. Global Catastrophe Recap: First Half of 2019. Available at http://thoughtleadership.aon-benfield.com//Documents/20190723-analytics-if-1h-global-report.pdf (16 Dev 2020).

AON. 2019b. Weather, Climate & Catastrophe Insight. Available at http://thoughtleader-ship.aon.com/Documents/20200122-if-natcat2020.pdf (16 Dev 2020).

AOSIS. 2020. Island States, sinking in debt, urge climate action. Available at https://www.aosis.org/wp-content/uploads/2020/09/AOSIS-Media-Briefing-Press-Release.pdf (16 Dec 2020).

Bai, L., Ding, G., Gu, S., Bi, P., Su, B., Qin, D., Xu, G., Liu, Q. 2014. The effects of summer temperature and heat waves on heat-related illness in a coastal city of China, 2011–2013. Environ. Res 132, 212–219.

BBC. 2019a. Typhoon Faxai: Storm cuts power to 900,000 homes. Available at https://www.bbc.com/news/world-asia-49629845 (16 Dev 2020).

BBC. 2019b. Bolivian wildfires destroy two million hectares of forest. Available at https://www.bbc.com/news/world-latin-america-49646409 (16 Dev 2020).

Blöschl, G., Hall, J., Paraijka, J., et al. 2017. Changing Climate Shifts Timing of European Floods. Science, 357, 588-590.

BMZ. 2020.  Germany helps African countries maintain drought insurance in view of COVID-19. Available at https://www.bmz.de/en/press/aktuelleMeldungen/2020/juni/200616_Germany-helps-African-countries-maintain-drought-insurance-in-view-of-COVID-19/index.html (16 Dec 2020).

Cai, W, Borlace, S., Lengaigne, M., Rensch, P. v., Collins, M., Vecchi, G., Timmermann, A., Santoso, A., McPhaden, M. J., Wu, L., England, M. H., Wang, G., Guilyardi, E., Jin, F. 2014. Increasing frequency of extreme El Niño events due to greenhouse warming. Nature Climate Change, 4, 111–116.

Cai, W, Wang, G, Santoso A., McPhaden M., Wu L., Jin, F-F., Timmermann, A., Collins, M., Vecchi, G., Lengaigne, M., England, M., Dommenget, D.,Takahashi, K., Guilyardi, E. 2015. Increased frequency of extreme La Niña events under greenhouse warming. Nature Climate Change, 5, 132-137.

Cai, W., Wang, G., Dewitte, B. Wu, L., Santoso, A., Takahashi, K., Yang, Y., Carréric, A.,McPhaden, M., 2018. Increased variability of eastern Pacific El Niño under greenhouse warming. Nature 564, 201–206. Available at https://doi.org/10.1038/s41586-018-0776-9 (11 Nov 2019).

Cambridge, N. 2019. Hurricane Dorian in The Bahamas. Available at https://storymaps.arcgis.com/sto-ries/026f7bafa8724e7e861cbdf1263e611a

Campbell, S., Remenyi, T., White, C., Johnston, F. 2018. Heatwave and health impact research: A global review.  Available  at  https://www.sciencedirect.com/science/article/pii/S1353829218301205 (27 Nov 2019).

Carbon Brief. 2014. Attributing extreme weather to climate change in real-time. Available atwww.carbon-brief.org/attributing-extreme-weather-to-climate-change-in-real-time (16 Nov 2018).

CARE et al 2019. From Cyclone to Food Crisis: Ensuring the needs of women and girls are prioritized in the Cyclone Idai and Kenneth responses. Availableat: https://reliefweb.int/report/mozambique/cyclone-food-crisis-ensuring-needs-women-and-girls-are-prioritized-cy-clone-idai. (27 Nov 2020).

Climate Action Tracker. 2020. Global Update: Paris Agreement Turning Point. Available at https://climate-actiontracker.org/publications/global-update-paris-agreement-turning-point/ (17 Dec 2020).

Climate Central. 2016a. Louisiana Precipitation 2016. Available at www.climatecentral.org/analyses/loui-siana-downpours-august-2016/ (16 Nov 2018).

Climate Central. 2016b. Heat Wave in India. Available at www.climatecentral.org/analyses/india-heat-wave-2016/ (16 Nov 2018).

Columbia University. 2012. Integrated Assessment OF Climate Change: Model Visualization and Analysis (MVA). Available at www.ciesin.columbia.edu/data/climate/ (16 Nov 2018).

Committee on Extreme Weather Events and Climate Change Attribution et al. 2016: Attribution of Extreme Weather Events in the Context of Climate Change. Available at: https://www.nap.edu/read/21852/chapter/1.

Donat, M.G., Lowry, A.L., Alexander, L.V., O'Gorman, P.A. & Maher, N. 2016. More extreme precipitation in the world's dry and wet regions. Nature Climate Change, 6, 508-513.

DoFunk, C.; Shukla, S.; Hoell, A., Livneh, B. 2016. Assessing the Contributions of East African and West Pacific Warming to the 2014 Boreal Spring East African Drought. Bull. Amer. Meteor. Soc., 97 (12), 75-80.

Eath Observatory. 2019. Unusual Monsoon Season Causes Flooding in India. Available at https://earthob-servatory.nasa.gov/images/145703/unusual-monsoon-season-causes-flooding-in-india (16 Dev 2020).

Eckstein, D., Hutfils, M.-L., Winges, M. 2018. Global Climate Risk Index 2019. Available at https://germanwatch.org/en/16046 (07 Nov 2019).

Floodlist. 2019a. Afghanistan – More Flash Floods Leave 24 Dead, Houses Destroyed. Available at http://floodlist.com/asia/afghanistan-flash-floods-may-2019 (16 Dev 2020).

Floodlist. 2019b. Niger – Floods Leave 42 Dead and 5,000 Homes Destroyed. Available at http://flood-list.com/africa/niger-floods-september-2019 (16 Dev 2020).

Floodlist. 2019c. Bolivia – Flooding Reported in Central and Southern Areas. Available at http://flood-list.com/america/bolivia-floods-january-2019-santa-cruz-cochabamba-chuquisaca-tarija (16 Dev 2020).

GDACS. 2019. Event summary. Available at https://www.gdacs.org/report.aspx?eventtype=TC&even-tid=1000552 (16 Dev 2020).

Germanwatch. 2019. Climate risk insurance and informal-risk sharing. A Critical Literature Appraisal. Munich Climate Insurance Initiative Discussion Paper. Forthcoming.

Guardian. 2019. Hurricane Dorian destruction set to cost Bahamas 'up to billions'. Available at https://www.theguardian.com/world/2019/sep/04/bahamas-reels-hurricane-dorian-damage-cost-hundreds-millions (16 Dev 2020).

Ham, Y.-G. 2018. El Niño events will intensify under global warming. Nature 564. 192-193. Available at https://www.nature.com/articles/d41586-018-07638-w#ref-CR3 (08 Nov 2019).

Hansen, G., Stone, D., Auffhammer, M., Huggel, C., Cramer, W. 2016.Linking local impacts to changes in climate: a guide to attribution.Reg Environ Change 16, 527.

Haustein, K., Otto, F., Uhe, P., Allen, M., Cullen, H. 2016.Fast-track extreme event attribution: How fast can we disentangle thermodynamic (forced) and dynamic (internal) contributions? Geophysical Research Abstracts, 18, EGU2016-14875, EGU General Assembly 2016.

Herring, S. C., Christidis, N., Hoell, A., Kossin, J. P., Schreck, C. J. III, Stott, P. A., (Eds). 2018. Explaining Extreme Events of 2016 from a Climate Perspective. Bull. Amer. Meteor. Soc., 99 (1).

Haque, U, Hashizume, M., Kolivras, K.N., Overgaard, H.J., Das, B. & Yamamotoa, T. 2012. Reduced death rates from cyclones in Bangladesh: what more needs to be done? Bulletin of the World Health Organisation, 90(2), 150–156.

Horstmann, B. 2018. What priorities does the new Global Commission on Adaptation need to set? The Current Column of 18 October 2018. German Development Institute. Available at: www.die-gdi.de/uploads/media/German_Development_Institute_Horstmann_18.10.2018.pdf (16 Nov 2018).

International Institute for Environment and Development. 2018. Introduction to community-based adaptation to climate change. Available at https://www.iied.org/introduction-community-based-adaptation-climate-change (16 Nov 2018).

IPCC. 2014a. Summary for policymakers. In: Climate Change 2014: Impacts, Adaptation, and Vulnerability. Part A: Global and Sectoral Aspects. Contribution of Working Group II to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change.

IPCC. 2018a. IPCC Chapter 3: Impacts of 1.5°C global warming on natural and human systems. In: Global Warming of 1.5 °C. Special Report of the Intergovernmental Panel on Climate Change.

IPCC. 2018b. Summary for Policymakers. In: Global Warming of 1.5 °C. Special Report of the Intergovernmental Panel on Climate Change.

IPCC. 2019a. An IPCC Special Report on the Ocean and Cryosphere in a Changing Climate. Available at: https://www.ipcc.ch/site/assets/uploads/sites/3/2019/09/SROCC_SPM_HeadlineStatements.pdf

IPCC. 2019b. Climate Change and Land: An IPCC Special Report on climate change, desertification, land degradation, sustainable land management, food security, and greenhouse gas fluxes in terrestrial ecosystems. Available at: https://www.ipcc.ch/site/assets/uploads/2019/08/3.-Summary-of-Headline-Statements.pdf

IOM. 2019. Humanitarian Assistance Provided to Vulnerable Communities Affected by Floods in Niger . Available at https://www.un.org/africarenewal/news/humanitarian-assistance-provided-vulnerable-communities-affected-floods-niger%E2%80%AF (16 Dev 2020).

Künzel. V., Schäfer, L. 2020: Fünf Lehren aus der Coronakrise. Katastrophenmanagement und gesellschaftliche Widerstandsfähigkeit. In: Politische Ökologie 38.

Lehmann, J.; Coumou, D., Frieler, K. 2015.Increased record-breaking precipitation events under global warming. Climate Change, 132(4), 501-515.

Le Monde. 2018. Le bilan du cyclone Ava à Madagascar s'élève à 51 morts. Available at https://www.lemonde.fr/climat/article/2018/01/15/le-bilan-du-cyclone-ava-a-madagascar-s-eleve-a-51-morts_5241747_1652612.html (07 Nov 2019)

Le Quesne, F. et al. 2017: The role of insurance in integrated disaster & climate risk management: evidence and lessons learned. MCII/GIZ. Available at https://climate-insurance.org/wp-content/uploads/2020/04/ACRI__2017_Role_of_Insurance_in_ICRM_online-2.pdf (16 Dec 2020).

Mason, M & Haynes, K. 2010. Adaptation lessons from Cyclone Tracy, National Climate Change Adaptation Research Facility, Gold Coast, 82pp.

Miami Herald. 2019. The Bahamas have a tough road ahead. Dorian caused $3.4 billion worth of damage, report says. Available at https://www.miamiherald.com/news/nation-world/world/americas/article237435814.html (16 Dev 2020).

Neue Zürcher Zeitung. 2017. Peru kämpft gegen sintflutartige Regenfälle. Available at www.nzz.ch/pano-rama/kuesten-el-nino-peru-kaempft-gegen-sintflutartige-regenfaelle-ld.153881 (16 Nov 2018).

OECD. 2020. Climate Finance Provided and Mobilised by Developed Countries in 2013-18. OECD Publish-ing: Paris. Available at https://read.oecd.org/10.1787/f0773d55-en?format=pdf (27Nov 2020).

Oxfam. 2020a. Tracy Carty, Jan Kowalzig, Bertram Zagema. Climate Finance Shadow Report 2020 - As-sessing progress towards the $100 billion commitment. Available at https://oxfamilibrary.open-repository.com/bitstream/handle/10546/621066/bp-climate-finance-shadow-report-2020-201020-en.pdf (27 Nov 2020).

Oxfam. 2020b. Tens of thousands of people are still suffering one year on from Cyclone Idai. Available at https://www.oxfam.org/en/press-releases/tens-thousands-people-are-still-suffering-one-year-cy-clone-idai (16 Dev 2020).

Perkins-Kirkpatrick, S. E., King, A. D., Cougnon, E.A., Grosese, M.R., Oliver,E.C.J., N. J. Holbrook, S. C. Lewis, Pourasghar, F. 2018. The Role of Natural Variability and Anthropogenic Climate Change in the 2017/18 Tasman Sea Marine Heatwave.

Reid, H. 2016. Ecosystem- and community-based adaptation: learning from community-based natural re-source management. Climate and Development, 8(1), 4-9

Reliefweb. 2019a. Cyclone Idai: Facts and Figures - Mozambique, Zimbabwe and Malawi (March – May 2019) Available at https://reliefweb.int/report/mozambique/cyclone-idai-facts-and-figures-mozambique-zimbabwe-and-malawi-march-may-2019 (16 Dev 2020).

Reliefweb. 2019b. Zimbabwe: Tropical Cyclone Idai Final Report, DREF Operation n°: MDRZW014: https://reliefweb.int/report/zimbabwe/zimbabwe-tropical-cyclone-idai-final-report-dref-opera-tion-n-mdrzw014

Reliefweb. 2019c. One year on: Cyclone Idai recovery efforts continue in Zimbabwe. Available at https://re-liefweb.int/report/zimbabwe/one-year-cyclone-idai-recovery-efforts-continue-zimbabwe  (16 Dev 2020).

Reliefweb. 2019d. Malawi - Floods Briefing note – 12 March 2019. Available at https://reliefweb.int/re-port/malawi/malawi-floods-briefing-note-12-march-2019 (16 Dev 2020).

Reliefweb. 2019e. Learning from Cyclone Idai to strengthen Climate Information and Early Warning Ser-vices in Malawi. Available at https://reliefweb.int/report/malawi/learning-cyclone-idai-strengthen-climate-information-and-early-warning-services-malawi (16 Dev 2020).

Reliefweb. 2019f. MOZAMBIQUE CYCLONE IDAI RESPONSE. Available at https://reliefweb.int/sites/re-liefweb.int/files/resources/IOM%20Mozambique-%20Cyclone%20Idai%20Re-sponse%20sitrep%203-%2004-08%20April%202019-final-compressed.pdf (16 Dev 2020).

Reliefweb. 2019g. Japan: Typhoon Hagibis - Information Bulletin. Available at https://reliefweb.int/re-port/japan/japan-typhoon-hagibis-information-bulletin (16 Dev 2020).

Reliefweb. 2019h. Afghanistan: Flash Floods - Mar 2019. Available at https://reliefweb.int/disaster/ff-2019-000018-afg (16 Dev 2020).

Reliefweb. 2019i. Afghanistan - Landslide (DG ECHO, NOAA-CPC, media). Available at https://re-liefweb.int/report/afghanistan/afghanistan-landslide-dg-echo-noaa-cpc-media-echo-daily-flash-12-december-2019 (16 Dev 2020).

Reliefweb. 2019j. South Sudan: Floods Emergency Response strategy and funding requirements. Availa-ble at https://reliefweb.int/report/south-sudan/south-sudan-floods-emergency-response-strategy-and-funding-requirements-14 (16 Dev 2020).

Reliefweb. 2019k. Wildfire kills 50 people in South Sudan Available at https://reliefweb.int/report/south-sudan/wildfire-kills-50-people-south-sudan (16 Dev 2020).

Haiti AR_001358

Reliefweb. 2020a. The facts: Hurricane Dorian's devastating effect on The Bahamas. Available at https://reliefweb.int/report/bahamas/facts-hurricane-dorian-s-devastating-effect-bahamas (16 Dev 2020).

Reliefweb. 2020b. India: Floods and Landslides - Jun 2019. Available at https://reliefweb.int/disaster/fl-2019-000084-ind (16 Dev 2020).

Reliefweb. 2020c. Niger: Floods - Aug 2019. Available at https://reliefweb.int/disaster/fl-2019-000101-ner (16 Dev 2020).

Reuters. 2018. In India's parched Bundelkhand, drought brings a tide of migration. Available athttps://news.trust.org/item/20180705064417-wk8ls/ (27 Nov 2019)

Reuters. 2019. After drought and floods, Afghanistan confronts critical harvest. Available at https://www.reuters.com/article/us-afghanistan-farming/after-drought-and-floods-afghanistan-confronts-critical-harvest-idUSKCN1R90FP (16 Dev 2020).

Schäfer, L., Jorks, P., Seck, E., Koulibaly, O. 2021: Slow-Onset Processes and Resulting Losses and Damages – an Introduction. Germanwatch.

South China Morning Post. 2019. Health warnings for tourists as Japan swelters during record heatwave. Available at https://www.scmp.com/news/asia/east-asia/article/3011937/health-warnings-tourists-japan-swelters-during-record-heatwave (16 Dev 2020).

Spiegel. 2019. "Viele haben kein Zuhause mehr, in das sie zurückkehren können". Available at https://www.spiegel.de/panorama/mosambik-und-malawi-helfer-berichten-von-den-folgen-von-zyklon-idai-a-1259795.html (16 Dev 2020).

Stott, P.A., Christidis, N., Otto, F.E.L., Sun, Y., Vanderlinden, J., van Oldenborgh, J.G., Vautard, R., von Storch, H., Walton, P., Yiou, P., Zwiers, F.W. 2015. Attribution of extreme weather and climate-related events. WIREs Clim Change 2016, 7, 23–41.

The Carribbean Catatrophe Risk Insurance Facility. 2019. The Bahamas' Insurance Policy with CCRIF Triggers following Hurricane Dorian. Available at https://www.ccrif.org/node/12093 (16 Dec 2020).

The Japan Times. 2019. 57 dead and 18,000 taken to hospitals in one week amid Japan heat wave. Available at https://www.japantimes.co.jp/news/2019/08/06/national/57-dead-18000-taken-hospitals-one-week-amid-japan-heat-wave/ (16 Dev 2020).

The New York Times. 2019a. Cyclone Idai May Be 'One of the Worst' Disasters in the Southern. Available at https://www.nytimes.com/2019/03/19/world/africa/cyclone-idai-mozambique.html (11 Nov 2019).

The Washington Post. 2019. At least 30 gold miners killed in Afghanistan landslide. Available at https://www.washingtonpost.com/world/at-least-30-gold-miners-killed-in-afghanistan-landslide/2019/01/06/cb698f9e-11a5-11e9-a896-f104373c7ffd_story.html (16 Dev 2020).

The Weather Company. 2020. Throwback to a Stormy Year: A Look at the 8 North Indian Ocean Cyclones of 2019. Available at https://weather.com/en-IN/india/news/news/2020-01-03-stormy-year-8-north-indian-ocean-cyclones-2019 (16 Dev 2020).

The World Bank. 2019. Statement on High-Level Meeting on Humanitarian and Recovery Efforts Following Cyclone Idai. Available at https://www.worldbank.org/en/news/statement/2019/04/11/statement-on-high-level-meeting-on-humanitarian-and-recovery-efforts-following-cyclone-idai (11 Nov 2019).

The World Bank. 2020a. The World Bank in Malawi. Available at https://www.worldbank.org/en/country/malawi/overview (16 Dev 2020).

The World Bank. 2020b. Mozambique: Cyclone Idai & Kenneth Emergency Recovery and Resilience Project(P171040). Available at http://documents1.worldbank.org/curated/en/727131568020768626/pdf/Project-Information-Document-Mozambique-Cyclone-Idai-Kenneth-Emergency-Recovery-and-Resilience-Project-P171040.pdf

The World Bank 2020c: Poverty and Shared Prosperity 2020. Available at: https://openknowledge.worldbank.org/bitstream/handle/10986/34496/9781464816024.pdf(16 Dev 2020).

Thomas, A., Pringle, P., Pfleiderer, P. & Schleussner, C.-F. 2018. Tropical Cyclones: Impacts, the link to Climate Change and Adaptation. Available at: www.climateanalytics.org/media/tropical-cyclones_impacts_cc_adaptation.pdf (16 Nov 2018).

Trenberth, K., Fasullo, J., Shepherd, T. 2015. Attribution of climate extreme events. Nature Climate Change, 5, 725-730.

Trenberth, K. E., Cheng, L., Jacobs, P., Zhang, Y., Fasullo, J. 2018. Hurricane Harvey links to ocean heat content and climate change adaptation. *Earth's Future, 6,* 730–744.

United Nations. 2020. The Sustainable Development Goals Report 2020. Available at: https://un-stats.un.org/sdgs/report/2020/# (27 Nov 2020).

United Nations Secretary General. 2019. Opening remarks at press encounter on Cyclone Idai. Available at https://www.un.org/sg/en/content/sg/speeches/2019-03-26/remarks-press-encounter-cyclone-idai (16 Dec 2020).

UNDP. 2020. Human Development Report 2020: The Next Frontier. Available at http://report.hdr.undp.org/ (13 Jan 2021).

UNEP. 2016. The Adaptation Finance Gap Report. Available at http://web.unep.org/adaptationgapreport/2016 (16 Nov 2018).

UN News. 2020. Many Mozambicans still struggling to get back on their feet, one year after cyclone. Available at https://news.un.org/en/story/2020/03/1059411 (16 Dev 2020).

UN OCHA 2019: Global Humanitarian Overview 2020. Available at https://www.unocha.org/sites/unocha/files/GHO-2020_v9.1.pdf (27 Nov 2020).

Wang, S., Yuan, X., Wu, R. 2018. Attribution of the Persistent Spring-Summer Hot and Dry Extremes Over Northeast China in 2017.

WMO. 2017. (Un)natural Disasters: Communicating Linkages Between Extreme Events and Climate Change. Available at https://public.wmo.int/en/resources/bulletin/unnatural-disasters-communicating-linkages-between-extreme-events-and-climate (16 Nov 2018).

Wuebbles, D.J., Fahey, D.W., Hibbard, K.A., DeAngelo, B., Doherty, S., Hayhoe, K., Horton, R., Kossin, J.P.,. Taylor, P.C,. Waple, A.M, Weaver, C.P.. 2017. Climate Science Special Report: Fourth National Climate Assessment, Volume I [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 12-34.

Yeh, S., Kug, J., Dewitte, B., Kwon, M., Kirtman, B. 2009. El Niño in a changing climate. Nature 461, 511–514.

Zeit Online. 2019. Noch immer 2.500 Vermisste auf den Bahamas. Available at https://www.zeit.de/gesellschaft/zeitgeschehen/2019-09/naturkatastrophe-hurrikan-dorian-bahamas-vermisste-opfer

Zhang, W.-Z., Lin, S., Jiang, X-M.. 2016. Influence of Tropical Cyclones on the Western north Pacific. Bull. Amer. Meteor. Soc., 97 (12), S131-S135.

Haiti AR_001360

# Annexes

CRI = Climate Risk Index; GDP = gross domestic product; PPP = purchasing power parity

**Table 3: Climate Risk Index for 2019**

| CRI Rank | Country | CRI score | Fatalities in 2019 (Rank) | Fatalities per 100 000 inhabitants (Rank) | Losses in million US$ (PPP) (Rank) | Losses per unit GDP in % (Rank) |
|---|---|---|---|---|---|---|
| 130 | Albania | 118.00 | 106 | 106 | 130 | 130 |
| 125 | Algeria | 105.17 | 65 | 95 | 122 | 127 |
| 23 | Angola | 32.33 | 44 | 50 | 22 | 14 |
| 130 | Antigua and Barbuda | 118.00 | 106 | 106 | 130 | 130 |
| 55 | Argentina | 60.00 | 60 | 86 | 28 | 50 |
| 113 | Armenia | 98.17 | 90 | 62 | 125 | 125 |
| 19 | Australia | 28.00 | 37 | 37 | 9 | 24 |
| 47 | Austria | 56.83 | 84 | 79 | 25 | 37 |
| 130 | Azerbaijan | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Bahrain | 118.00 | 106 | 106 | 130 | 130 |
| 13 | Bangladesh | 23.50 | 7 | 29 | 20 | 28 |
| 130 | Barbados | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Belarus | 118.00 | 106 | 106 | 130 | 130 |
| 64 | Belgium | 66.00 | 84 | 85 | 36 | 53 |
| 130 | Belize | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Benin | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Bhutan | 118.00 | 106 | 106 | 130 | 130 |
| 10 | Bolivia | 19.67 | 43 | 15 | 27 | 9 |
| 48 | Bosnia and Herzegovina | 57.83 | 98 | 82 | 45 | 20 |
| 117 | Botswana | 99.83 | 106 | 106 | 107 | 87 |
| 27 | Brazil | 33.67 | 5 | 32 | 17 | 58 |
| 130 | Brunei Darussalam | 118.00 | 106 | 106 | 130 | 130 |
| 119 | Bulgaria | 101.00 | 98 | 96 | 98 | 109 |
| 130 | Burkina Faso | 118.00 | 106 | 106 | 130 | 130 |
| 57 | Burundi | 61.83 | 26 | 10 | 121 | 102 |
| 84 | Cambodia | 75.83 | 60 | 63 | 97 | 86 |
| 68 | Cameroon | 67.33 | 32 | 27 | 104 | 107 |
| 62 | Canada | 65.67 | 90 | 104 | 16 | 40 |
| 130 | Cape Verde | 118.00 | 106 | 106 | 130 | 130 |
| 70 | Central African Republic | 67.50 | 98 | 92 | 89 | 17 |
| 130 | Chad | 118.00 | 106 | 106 | 130 | 130 |
| 25 | Chile | 33.00 | 52 | 59 | 12 | 8 |

Haiti AR_001361

| CRI Rank | Country | CRI score | Fatalities in 2019 (Rank) | Fatalities per 100 000 inhabitants (Rank) | Losses in million US$ (PPP) (Rank) | Losses per unit GDP in % (Rank) |
|---|---|---|---|---|---|---|
| 32 | **China** | 42.83 | 4 | 83 | 3 | 42 |
| 116 | **Chinese Taipei** | 99.67 | 84 | 98 | 80 | 119 |
| 28 | **Colombia** | 36.33 | 17 | 18 | 37 | 64 |
| 16 | **Comoros** | 25.33 | 67 | 6 | 65 | 4 |
| 130 | **Costa Rica** | 118.00 | 106 | 106 | 130 | 130 |
| 129 | **Côte d'Ivoire** | 111.67 | 84 | 101 | 128 | 128 |
| 81 | **Croatia** | 75.17 | 106 | 106 | 51 | 41 |
| 130 | **Cyprus** | 118.00 | 106 | 106 | 130 | 130 |
| 107 | **Czech Republic** | 92.83 | 106 | 106 | 63 | 88 |
| 51 | **Democratic Republic of Congo** | 58.67 | 14 | 41 | 90 | 83 |
| 130 | **Democratic Republic of Timor-Leste** | 118.00 | 106 | 106 | 130 | 130 |
| 82 | **Denmark** | 75.50 | 72 | 49 | 75 | 104 |
| 75 | **Djibouti** | 73.00 | 64 | 5 | 124 | 120 |
| 88 | **Dominica** | 77.67 | 106 | 106 | 110 | 19 |
| 130 | **Dominican Republic** | 118.00 | 106 | 106 | 130 | 130 |
| 121 | **Ecuador** | 103.83 | 98 | 103 | 95 | 112 |
| 120 | **Egypt** | 102.00 | 58 | 99 | 112 | 122 |
| 103 | **El Salvador** | 91.83 | 80 | 67 | 111 | 113 |
| 130 | **Eritrea** | 118.00 | 106 | 106 | 130 | 130 |
| 83 | **Estonia** | 75.67 | 98 | 60 | 92 | 72 |
| 130 | **Eswatini** | 118.00 | 106 | 106 | 130 | 130 |
| 72 | **Ethiopia** | 69.33 | 39 | 74 | 67 | 81 |
| 75 | **Fiji** | 73.00 | 90 | 23 | 118 | 92 |
| 112 | **Finland** | 97.83 | 106 | 106 | 73 | 98 |
| 40 | **France** | 52.50 | 41 | 68 | 18 | 60 |
| 130 | **Gabon** | 118.00 | 106 | 106 | 130 | 130 |
| 108 | **Georgia** | 93.17 | 106 | 106 | 91 | 75 |
| 56 | **Germany** | 61.33 | 65 | 102 | 11 | 44 |
| 42 | **Ghana** | 53.33 | 29 | 30 | 71 | 80 |
| 36 | **Greece** | 45.00 | 50 | 34 | 44 | 54 |
| 130 | **Grenada** | 118.00 | 106 | 106 | 130 | 130 |
| 62 | **Guatemala** | 65.67 | 60 | 66 | 66 | 68 |
| 115 | **Guinea** | 99.17 | 72 | 72 | 127 | 126 |
| 130 | **Guinea-Bissau** | 118.00 | 106 | 106 | 130 | 130 |
| 130 | **Guyana** | 118.00 | 106 | 106 | 130 | 130 |
| 50 | **Haiti** | 58.33 | 60 | 51 | 94 | 47 |

| CRI Rank | Country | CRI score | Fatalities in 2019 (Rank) | Fatalities per 100 000 inhabitants (Rank) | Losses in million US$ (PPP) (Rank) | Losses per unit GDP in % (Rank) |
|---|---|---|---|---|---|---|
| 79 | Honduras | 73.33 | 90 | 93 | 72 | 46 |
| 97 | Hungary | 85.83 | 106 | 106 | 55 | 71 |
| 100 | Iceland | 88.83 | 106 | 106 | 101 | 57 |
| 7 | India | 16.67 | 1 | 36 | 1 | 13 |
| 14 | Indonesia | 24.83 | 3 | 31 | 6 | 39 |
| 94 | Iraq | 84.33 | 56 | 77 | 76 | 110 |
| 123 | Ireland | 104.50 | 106 | 106 | 81 | 114 |
| 6 | Islamic Republic of Afghanistan | 16.00 | 11 | 11 | 33 | 15 |
| 18 | Islamic Republic of Iran | 27.00 | 22 | 45 | 8 | 21 |
| 128 | Israel | 108.83 | 90 | 88 | 129 | 129 |
| 35 | Italy | 43.50 | 46 | 70 | 7 | 34 |
| 130 | Jamaica | 118.00 | 106 | 106 | 130 | 130 |
| 4 | Japan | 14.50 | 9 | 20 | 2 | 18 |
| 130 | Jordan | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Kazakhstan | 118.00 | 106 | 106 | 130 | 130 |
| 25 | Kenya | 33.00 | 15 | 16 | 49 | 51 |
| 130 | Kiribati | 118.00 | 106 | 106 | 130 | 130 |
| 60 | Korea. Republic of | 64.00 | 52 | 81 | 24 | 73 |
| 130 | Kosovo | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Kuwait | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Kyrgyz Republic | 118.00 | 106 | 106 | 130 | 130 |
| 45 | Lao People's Democratic Republic | 55.17 | 57 | 28 | 86 | 66 |
| 98 | Latvia | 86.83 | 106 | 106 | 79 | 62 |
| 44 | Lebanon | 54.67 | 72 | 55 | 60 | 43 |
| 61 | Lesotho | 64.67 | 106 | 106 | 58 | 6 |
| 101 | Liberia | 89.50 | 106 | 106 | 109 | 55 |
| 80 | Libya | 73.67 | 67 | 48 | 93 | 93 |
| 130 | Lithuania | 118.00 | 106 | 106 | 130 | 130 |
| 74 | Luxembourg | 72.83 | 106 | 106 | 53 | 33 |
| 29 | Madagascar | 40.33 | 19 | 14 | 83 | 56 |
| 5 | Malawi | 15.17 | 20 | 13 | 35 | 5 |
| 99 | Malaysia | 87.33 | 58 | 78 | 74 | 118 |
| 111 | Maldives | 97.33 | 106 | 106 | 114 | 76 |
| 90 | Mali | 79.67 | 52 | 58 | 108 | 101 |
| 68 | Malta | 67.33 | 106 | 106 | 54 | 16 |
| 130 | Marshall Islands | 118.00 | 106 | 106 | 130 | 130 |

| CRI Rank | Country | CRI score | Fatalities in 2019 (Rank) | Fatalities per 100 000 inhab- itants (Rank) | Losses in million US$ (PPP) (Rank) | Losses per unit GDP in % (Rank) |
|---|---|---|---|---|---|---|
| 58 | Mauritania | 63.00 | 76 | 44 | 96 | 59 |
| 125 | Mauritius | 105.17 | 106 | 106 | 113 | 100 |
| 54 | Mexico | 59.50 | 31 | 73 | 26 | 77 |
| 130 | Micronesia | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Moldova | 118.00 | 106 | 106 | 130 | 130 |
| 22 | Mongolia | 31.67 | 50 | 9 | 62 | 30 |
| 89 | Montenegro | 78.00 | 80 | 8 | 126 | 123 |
| 90 | Morocco | 79.67 | 35 | 42 | 117 | 121 |
| 1 | Mozambique | 2.67 | 2 | 3 | 4 | 2 |
| 21 | Myanmar | 31.33 | 24 | 38 | 30 | 29 |
| 113 | Namibia | 98.17 | 98 | 75 | 119 | 111 |
| 12 | Nepal | 20.00 | 10 | 7 | 42 | 27 |
| 109 | Netherlands | 97.17 | 106 | 106 | 59 | 103 |
| 66 | New Zealand | 66.33 | 90 | 76 | 52 | 52 |
| 49 | Nicaragua | 58.00 | 72 | 52 | 82 | 45 |
| 9 | Niger | 18.17 | 17 | 12 | 46 | 11 |
| 73 | Nigeria | 70.00 | 27 | 84 | 47 | 89 |
| 130 | North Macedonia | 118.00 | 106 | 106 | 130 | 130 |
| 106 | Norway | 92.33 | 98 | 94 | 70 | 99 |
| 95 | Oman | 84.67 | 67 | 35 | 123 | 124 |
| 15 | Pakistan | 25.00 | 8 | 39 | 14 | 25 |
| 127 | Panama | 108.33 | 106 | 106 | 102 | 115 |
| 51 | Papua New Guinea | 58.67 | 49 | 17 | 105 | 82 |
| 20 | Paraguay | 30.00 | 52 | 22 | 38 | 23 |
| 46 | Peru | 56.33 | 37 | 43 | 57 | 79 |
| 17 | Philippines | 26.67 | 13 | 40 | 15 | 26 |
| 93 | Poland | 80.00 | 76 | 97 | 40 | 85 |
| 37 | Portugal | 48.33 | 67 | 61 | 29 | 36 |
| 130 | Puerto Rico | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Qatar | 118.00 | 106 | 106 | 130 | 130 |
| 109 | Republic of Congo | 97.17 | 98 | 89 | 115 | 96 |
| 53 | Republic of Yemen | 59.33 | 42 | 46 | 84 | 69 |
| 123 | Romania | 104.50 | 106 | 106 | 77 | 116 |
| 39 | Russia | 50.67 | 33 | 80 | 13 | 49 |
| 42 | Rwanda | 53.33 | 45 | 21 | 99 | 67 |
| 130 | Samoa | 118.00 | 106 | 106 | 130 | 130 |
| 75 | Saudi Arabia | 73.00 | 48 | 65 | 50 | 105 |
| 70 | Senegal | 67.50 | 106 | 106 | 43 | 22 |

| CRI Rank | Country | CRI score | Fatalities in 2019 (Rank) | Fatalities per 100 000 inhabitants (Rank) | Losses in million US$ (PPP) (Rank) | Losses per unit GDP in % (Rank) |
|---|---|---|---|---|---|---|
| 105 | Serbia | 92.00 | 106 | 106 | 78 | 78 |
| 130 | Seychelles | 118.00 | 106 | 106 | 130 | 130 |
| 86 | Sierra Leone | 76.50 | 67 | 54 | 116 | 84 |
| 130 | Singapore | 118.00 | 106 | 106 | 130 | 130 |
| 87 | Slovak Republic | 77.17 | 76 | 53 | 87 | 97 |
| 103 | Slovenia | 91.83 | 106 | 106 | 85 | 74 |
| 130 | Solomon Islands | 118.00 | 106 | 106 | 130 | 130 |
| 24 | South Africa | 32.50 | 16 | 26 | 31 | 48 |
| 8 | South Sudan | 17.33 | 12 | 4 | 64 | 10 |
| 32 | Spain | 42.83 | 47 | 69 | 10 | 31 |
| 30 | Sri Lanka | 41.83 | 33 | 24 | 48 | 61 |
| 130 | St. Kitts and Nevis | 118.00 | 106 | 106 | 130 | 130 |
| 130 | St. Lucia | 118.00 | 106 | 106 | 130 | 130 |
| 130 | St. Vincent and the Grenadines | 118.00 | 106 | 106 | 130 | 130 |
| 11 | Sudan | 19.83 | 22 | 25 | 23 | 12 |
| 130 | Suriname | 118.00 | 106 | 106 | 130 | 130 |
| 118 | Sweden | 100.50 | 106 | 106 | 69 | 108 |
| 96 | Switzerland | 85.50 | 90 | 87 | 61 | 94 |
| 122 | Tajikistan | 104.33 | 90 | 91 | 120 | 117 |
| 67 | Tanzania | 66.50 | 27 | 47 | 88 | 95 |
| 34 | Thailand | 43.17 | 36 | 64 | 19 | 38 |
| 3 | The Bahamas | 6.50 | 30 | 1 | 5 | 1 |
| 41 | The Gambia | 53.17 | 80 | 33 | 103 | 35 |
| 130 | Togo | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Tonga | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Trinidad and Tobago | 118.00 | 106 | 106 | 130 | 130 |
| 130 | Tunisia | 118.00 | 106 | 106 | 130 | 130 |
| 64 | Turkey | 66.00 | 40 | 71 | 34 | 90 |
| 130 | Tuvalu | 118.00 | 106 | 106 | 130 | 130 |
| 31 | Uganda | 42.17 | 21 | 19 | 68 | 63 |
| 85 | Ukraine | 76.17 | 76 | 100 | 41 | 70 |
| 130 | United Arab Emirates | 118.00 | 106 | 106 | 130 | 130 |
| 102 | United Kingdom | 90.83 | 84 | 105 | 39 | 106 |
| 90 | Uruguay | 79.67 | 84 | 56 | 100 | 91 |
| 130 | Uzbekistan | 118.00 | 106 | 106 | 130 | 130 |
| 75 | Vanuatu | 73.00 | 106 | 106 | 106 | 7 |
| 130 | Venezuela | 118.00 | 106 | 106 | 130 | 130 |

| CRI Rank | Country | CRI score | Fatalities in 2019 (Rank) | Fatalities per 100 000 inhabitants (Rank) | Losses in million US$ (PPP) (Rank) | Losses per unit GDP in % (Rank) |
|---|---|---|---|---|---|---|
| 38 | **Vietnam** | 50.17 | 25 | 57 | 32 | 65 |
| 59 | **Zambia** | 63.33 | 80 | 90 | 56 | 32 |
| 2 | **Zimbabwe** | 6.17 | 6 | 2 | 21 | 3 |

**Table 4: Climate Risk Index for 2000–2019**

Exemplary calculation: Albania ranks 134th in fatalities among all countries analysed in this study. 128th in Fatalities per 100 000 inhabitants. 113th in losses and 89th in losses per unit GDP. Hence. its CRI Score is calculated as follows:

CRI Score = 134 x 1/6 + 128 x 1/3 + 113 x 1/6 + 89 x 1/3 = 113.5

| CRI Rank | Country | CRI score | Average Fatalities 2000-2019 (Rank) | Average Fatalities per 100 000 inhabitants 2000-2019 (Rank) | Average Losses in million US$ (PPP) 2000-2019 (Rank) | Average Losses per unit GDP in % 2000-2019 (Rank) |
|---|---|---|---|---|---|---|
| 125 | **Albania** | 113.50 | 134 | 128 | 113 | 89 |
| 101 | **Algeria** | 92.83 | 34 | 65 | 87 | 153 |
| 87 | **Angola** | 84.00 | 51 | 70 | 79 | 117 |
| 56 | **Antigua and Barbuda** | 64.50 | 161 | 56 | 100 | 7 |
| 80 | **Argentina** | 77.00 | 61 | 113 | 21 | 77 |
| 156 | **Armenia** | 142.83 | 167 | 170 | 128 | 111 |
| 31 | **Australia** | 47.67 | 42 | 59 | 10 | 58 |
| 43 | **Austria** | 56.50 | 63 | 51 | 30 | 72 |
| 146 | **Azerbaijan** | 133.50 | 124 | 152 | 101 | 136 |
| 178 | **Bahrain** | 170.83 | 167 | 167 | 174 | 175 |
| 7 | **Bangladesh** | 28.33 | 9 | 37 | 13 | 37 |
| 148 | **Barbados** | 135.33 | 171 | 158 | 153 | 86 |
| 166 | **Belarus** | 156.17 | 136 | 161 | 145 | 167 |
| 53 | **Belgium** | 63.67 | 25 | 15 | 61 | 133 |
| 33 | **Belize** | 48.67 | 128 | 26 | 96 | 8 |
| 152 | **Benin** | 139.83 | 112 | 136 | 155 | 150 |
| 105 | **Bhutan** | 95.17 | 131 | 53 | 154 | 90 |
| 25 | **Bolivia** | 40.17 | 47 | 33 | 50 | 39 |
| 63 | **Bosnia and Herzegovina** | 68.17 | 122 | 111 | 37 | 14 |
| 143 | **Botswana** | 130.17 | 150 | 148 | 123 | 106 |
| 81 | **Brazil** | 79.50 | 17 | 98 | 16 | 124 |
| 176 | **Brunei Darussalam** | 167.50 | 167 | 151 | 178 | 179 |

| CRI Rank | Country | CRI score | Average Fatalities 2000-2019 (Rank) | Average Fatalities per 100 000 inhabitants 2000-2019 (Rank) | Average Losses in million US$ (PPP) 2000-2019 (Rank) | Average Losses per unit GDP in % 2000-2019 (Rank) |
|---|---|---|---|---|---|---|
| 68 | Bulgaria | 71.67 | 87 | 89 | 47 | 59 |
| 112 | Burkina Faso | 101.00 | 91 | 126 | 107 | 78 |
| 74 | Burundi | 74.50 | 75 | 69 | 126 | 54 |
| 14 | Cambodia | 36.17 | 38 | 35 | 53 | 28 |
| 140 | Cameroon | 128.17 | 83 | 123 | 136 | 152 |
| 93 | Canada | 87.33 | 77 | 133 | 15 | 83 |
| 150 | Cape Verde | 137.67 | 160 | 124 | 166 | 126 |
| 151 | Central African Republic | 138.83 | 136 | 147 | 163 | 120 |
| 115 | Chad | 104.67 | 104 | 138 | 106 | 71 |
| 83 | Chile | 81.33 | 84 | 116 | 32 | 70 |
| 41 | China | 56.33 | 5 | 106 | 1 | 60 |
| 36 | Chinese Taipei | 53.50 | 32 | 44 | 25 | 88 |
| 38 | Colombia | 54.83 | 24 | 49 | 33 | 87 |
| 97 | Comoros | 90.00 | 134 | 63 | 158 | 61 |
| 89 | Costa Rica | 84.50 | 96 | 81 | 89 | 80 |
| 153 | Côte d'Ivoire | 141.33 | 89 | 139 | 151 | 165 |
| 30 | Croatia | 47.00 | 53 | 19 | 63 | 64 |
| 142 | Cyprus | 129.67 | 149 | 99 | 147 | 142 |
| 82 | Czech Republic | 80.67 | 90 | 107 | 34 | 73 |
| 135 | Democratic Republic of Congo | 118.83 | 39 | 109 | 146 | 155 |
| 174 | Democratic Republic of Timor-Leste | 166.83 | 167 | 166 | 176 | 163 |
| 132 | Denmark | 118.00 | 146 | 160 | 52 | 95 |
| 65 | Djibouti | 70.33 | 107 | 32 | 141 | 55 |
| 11 | Dominica | 33.00 | 115 | 2 | 77 | 1 |
| 50 | Dominican Republic | 59.50 | 52 | 36 | 69 | 82 |
| 103 | Ecuador | 94.17 | 67 | 84 | 86 | 122 |
| 155 | Egypt | 142.17 | 76 | 157 | 119 | 172 |
| 28 | El Salvador | 43.67 | 65 | 41 | 57 | 29 |
| 129 | Eritrea | 115.83 | 163 | 168 | 124 | 36 |
| 158 | Estonia | 144.50 | 153 | 140 | 142 | 146 |
| 107 | Eswatini | 97.33 | 150 | 117 | 114 | 43 |
| 60 | Ethiopia | 66.50 | 27 | 92 | 54 | 67 |
| 19 | Fiji | 38.33 | 92 | 17 | 80 | 12 |

| CRI Rank | Country | CRI score | Average Fatalities 2000-2019 (Rank) | Average Fatalities per 100 000 inhabitants 2000-2019 (Rank) | Average Losses in million US$ (PPP) 2000-2019 (Rank) | Average Losses per unit GDP in % 2000-2019 (Rank) |
|---|---|---|---|---|---|---|
| 163 | Finland | 153.50 | 161 | 169 | 110 | 156 |
| 27 | France | 41.67 | 4 | 8 | 14 | 108 |
| 173 | Gabon | 165.83 | 155 | 150 | 180 | 180 |
| 104 | Georgia | 94.67 | 113 | 95 | 103 | 81 |
| 18 | Germany | 38.17 | 10 | 22 | 5 | 85 |
| 113 | Ghana | 101.33 | 54 | 80 | 112 | 141 |
| 75 | Greece | 75.00 | 69 | 68 | 49 | 98 |
| 24 | Grenada | 39.67 | 125 | 7 | 93 | 3 |
| 16 | Guatemala | 37.50 | 30 | 27 | 45 | 48 |
| 167 | Guinea | 159.83 | 128 | 159 | 173 | 170 |
| 109 | Guinea-Bissau | 99.17 | 140 | 102 | 149 | 51 |
| 119 | Guyana | 108.17 | 159 | 135 | 122 | 49 |
| 3 | Haiti | 13.67 | 13 | 4 | 41 | 10 |
| 44 | Honduras | 57.00 | 68 | 57 | 78 | 41 |
| 72 | Hungary | 74.00 | 59 | 48 | 65 | 112 |
| 177 | Iceland | 168.50 | 172 | 172 | 167 | 164 |
| 20 | India | 38.50 | 3 | 61 | 2 | 52 |
| 72 | Indonesia | 74.00 | 14 | 91 | 18 | 115 |
| 157 | Iraq | 143.17 | 93 | 155 | 120 | 168 |
| 137 | Ireland | 121.17 | 143 | 156 | 64 | 104 |
| 17 | Islamic Republic of Afghanistan | 37.83 | 12 | 14 | 75 | 56 |
| 97 | Islamic Republic of Iran | 90.00 | 41 | 110 | 29 | 125 |
| 136 | Israel | 120.33 | 108 | 122 | 92 | 139 |
| 22 | Italy | 39.00 | 6 | 9 | 12 | 99 |
| 54 | Jamaica | 63.83 | 111 | 77 | 70 | 24 |
| 57 | Japan | 64.83 | 21 | 90 | 4 | 92 |
| 141 | Jordan | 129.50 | 109 | 120 | 130 | 149 |
| 154 | Kazakhstan | 141.83 | 98 | 145 | 125 | 169 |
| 34 | Kenya | 52.00 | 36 | 67 | 42 | 50 |
| 131 | Kiribati | 116.33 | 172 | 172 | 160 | 11 |
| 91 | Korea. Republic of | 85.17 | 49 | 101 | 24 | 118 |
| 162 | Kuwait | 152.00 | 155 | 164 | 109 | 160 |
| 120 | Kyrgyz Republic | 109.67 | 77 | 52 | 159 | 159 |
| 52 | Lao People's Democratic Republic | 60.50 | 82 | 66 | 73 | 38 |

| CRI Rank | Country | CRI score | Average Fatalities 2000-2019 (Rank) | Average Fatalities per 100 000 inhabitants 2000-2019 (Rank) | Average Losses in million US$ (PPP) 2000-2019 (Rank) | Average Losses per unit GDP in % 2000-2019 (Rank) |
|---|---|---|---|---|---|---|
| 86 | Latvia | 82.83 | 106 | 62 | 99 | 84 |
| 132 | Lebanon | 118.00 | 114 | 114 | 108 | 129 |
| 109 | Lesotho | 99.17 | 146 | 132 | 121 | 32 |
| 164 | Liberia | 154.83 | 158 | 165 | 165 | 138 |
| 168 | Libya | 160.33 | 133 | 154 | 169 | 176 |
| 134 | Lithuania | 118.17 | 140 | 141 | 95 | 96 |
| 95 | Luxembourg | 89.00 | 94 | 13 | 134 | 140 |
| 12 | Madagascar | 34.67 | 31 | 38 | 55 | 23 |
| 62 | Malawi | 67.83 | 74 | 94 | 91 | 27 |
| 116 | Malaysia | 105.67 | 64 | 108 | 66 | 144 |
| 174 | Maldives | 166.83 | 172 | 172 | 171 | 157 |
| 121 | Mali | 110.50 | 95 | 129 | 116 | 97 |
| 147 | Malta | 134.00 | 163 | 142 | 139 | 109 |
| 172 | Marshall Islands | 164.83 | 172 | 172 | 179 | 147 |
| 85 | Mauritania | 82.00 | 103 | 79 | 105 | 63 |
| 139 | Mauritius | 124.17 | 143 | 104 | 138 | 128 |
| 59 | Mexico | 65.50 | 28 | 103 | 9 | 75 |
| 40 | Micronesia | 55.67 | 120 | 5 | 164 | 20 |
| 84 | Moldova | 81.67 | 131 | 118 | 71 | 26 |
| 48 | Mongolia | 59.17 | 88 | 46 | 83 | 46 |
| 106 | Morocco | 96.17 | 70 | 119 | 67 | 101 |
| 5 | Mozambique | 25.83 | 23 | 30 | 46 | 13 |
| 2 | Myanmar | 10.00 | 1 | 1 | 19 | 19 |
| 55 | Namibia | 64.33 | 81 | 28 | 111 | 69 |
| 10 | Nepal | 31.33 | 16 | 18 | 56 | 40 |
| 69 | Netherlands | 72.50 | 29 | 31 | 58 | 143 |
| 90 | New Zealand | 85.00 | 116 | 105 | 48 | 68 |
| 35 | Nicaragua | 53.00 | 66 | 40 | 88 | 42 |
| 64 | Niger | 68.67 | 60 | 74 | 98 | 53 |
| 114 | Nigeria | 104.33 | 26 | 115 | 68 | 151 |
| 108 | North Macedonia | 98.33 | 118 | 83 | 118 | 94 |
| 149 | Norway | 137.50 | 139 | 153 | 90 | 145 |
| 26 | Oman | 41.17 | 85 | 43 | 26 | 25 |
| 8 | Pakistan | 29.00 | 11 | 45 | 7 | 33 |
| 118 | Panama | 107.00 | 101 | 78 | 115 | 135 |
| 99 | Papua New Guinea | 90.83 | 72 | 50 | 135 | 119 |

| CRI Rank | Country | CRI score | Average Fatalities 2000-2019 (Rank) | Average Fatalities per 100 000 inhabitants 2000-2019 (Rank) | Average Losses in million US$ (PPP) 2000-2019 (Rank) | Average Losses per unit GDP in % 2000-2019 (Rank) |
|---|---|---|---|---|---|---|
| 61 | Paraguay | 67.00 | 102 | 100 | 40 | 30 |
| 45 | Peru | 57.67 | 33 | 58 | 39 | 79 |
| 4 | Philippines | 18.17 | 7 | 16 | 8 | 31 |
| 76 | Poland | 75.17 | 44 | 87 | 27 | 103 |
| 21 | Portugal | 38.67 | 20 | 12 | 36 | 76 |
| 1 | Puerto Rico | 7.17 | 19 | 3 | 6 | 6 |
| 180 | Qatar | 173.67 | 172 | 172 | 170 | 178 |
| 160 | Republic of Congo | 148.67 | 127 | 121 | 175 | 174 |
| 79 | Republic of Yemen | 76.17 | 48 | 71 | 85 | 91 |
| 41 | Romania | 56.33 | 56 | 73 | 22 | 57 |
| 32 | Russia | 48.50 | 2 | 6 | 17 | 130 |
| 117 | Rwanda | 105.83 | 73 | 72 | 150 | 134 |
| 70 | Samoa | 72.67 | 155 | 54 | 143 | 15 |
| 111 | Saudi Arabia | 100.33 | 57 | 93 | 51 | 154 |
| 138 | Senegal | 123.00 | 109 | 146 | 117 | 110 |
| 67 | Serbia & Montenegro | 70.83 | 96 | 112 | 35 | 35 |
| 168 | Seychelles | 160.33 | 172 | 172 | 172 | 137 |
| 92 | Sierra Leone | 85.83 | 55 | 29 | 156 | 123 |
| 179 | Singapore | 172.00 | 172 | 172 | 162 | 177 |
| 128 | Slovak Republic | 114.83 | 119 | 127 | 84 | 116 |
| 39 | Slovenia | 55.00 | 80 | 25 | 76 | 62 |
| 71 | Solomon Islands | 73.00 | 125 | 34 | 157 | 44 |
| 78 | South Africa | 76.00 | 45 | 97 | 31 | 93 |
| 100 | South Sudan | 92.67 | 71 | 75 | 131 | 102 |
| 29 | Spain | 46.50 | 8 | 11 | 23 | 113 |
| 23 | Sri Lanka | 39.50 | 35 | 42 | 28 | 45 |
| 130 | St. Kitts and Nevis | 116.00 | 172 | 172 | 144 | 18 |
| 51 | St. Lucia | 60.33 | 142 | 23 | 132 | 21 |
| 48 | St. Vincent and the Grenadines | 59.17 | 146 | 20 | 137 | 16 |
| 88 | Sudan | 84.33 | 46 | 88 | 74 | 105 |
| 171 | Suriname | 164.00 | 163 | 149 | 177 | 173 |
| 144 | Sweden | 131.33 | 138 | 163 | 62 | 131 |
| 45 | Switzerland | 57.67 | 40 | 24 | 44 | 107 |
| 47 | Tajikistan | 59.00 | 77 | 64 | 81 | 34 |
| 122 | Tanzania | 111.33 | 62 | 125 | 102 | 127 |

| CRI Rank | Country | CRI score | Average Fatalities 2000-2019 (Rank) | Average Fatalities per 100 000 inhabitants 2000-2019 (Rank) | Average Losses in million US$ (PPP) 2000-2019 (Rank) | Average Losses per unit GDP in % 2000-2019 (Rank) |
|---|---|---|---|---|---|---|
| 9 | Thailand | 29.83 | 22 | 60 | 3 | 17 |
| 6 | The Bahamas | 27.67 | 100 | 10 | 38 | 4 |
| 102 | The Gambia | 93.83 | 121 | 82 | 148 | 65 |
| 161 | Togo | 148.83 | 123 | 143 | 168 | 158 |
| 77 | Tonga | 75.67 | 163 | 76 | 129 | 5 |
| 159 | Trinidad and Tobago | 148.00 | 152 | 131 | 152 | 161 |
| 127 | Tunisia | 114.50 | 105 | 130 | 94 | 114 |
| 123 | Turkey | 111.83 | 58 | 137 | 43 | 148 |
| 125 | Tuvalu | 113.50 | 172 | 172 | 161 | 2 |
| 66 | Uganda | 70.67 | 50 | 85 | 72 | 66 |
| 94 | Ukraine | 88.83 | 37 | 86 | 60 | 132 |
| 165 | United Arab Emirates | 156.00 | 143 | 162 | 127 | 171 |
| 58 | United Kingdom | 65.00 | 18 | 55 | 20 | 121 |
| 96 | Uruguay | 89.83 | 117 | 96 | 82 | 74 |
| 170 | Uzbekistan | 161.17 | 153 | 171 | 140 | 166 |
| 37 | Vanuatu | 53.83 | 130 | 21 | 133 | 9 |
| 145 | Venezuela | 132.50 | 86 | 144 | 97 | 162 |
| 13 | Vietnam | 35.67 | 15 | 47 | 11 | 47 |
| 123 | Zambia | 111.83 | 99 | 134 | 104 | 100 |
| 15 | Zimbabwe | 37.33 | 43 | 39 | 59 | 22 |

**... did you find this publication interesting and helpful?**

You can support the work of Germanwatch with a donation to:

Bank fuer Sozialwirtschaft AG
BIC/Swift: BFSWDE33BER
IBAN: DE33 1002 0500 0003 212300

Thank you for your support!

Haiti AR_001372

# Germanwatch

Following the motto of Observing. Analysing. Acting. Germanwatch has been actively promoting global equity and livelihood preservation since 1991. We focus on the politics and economics of the Global North and their worldwide consequences. The situation of marginalised people in the Global South is the starting point for our work. Together with our members and supporters, and with other actors in civil society, we strive to serve as a strong lobbying force for sustainable development. We aim at our goals by advocating for prevention of dangerous climate change and its negative impacts, for guaranteeing food security, and for corporate compliance with human rights standards.

Germanwatch is funded by membership fees, Donations, programme funding from Stiftung Zukunftsfähigkeit (Foundation for Sustainability), and grants from public and private donors.

You can also help us to achieve our goals by becoming a member or by making a donation via the following account:

Bank für Sozialwirtschaft AG.
IBAN: DE33 1002 0500 0003 2123 00.
BIC/Swift: BFSWDE33BER

For further information, please contact one of our offices

**Germanwatch – Bonn Office**
Kaiserstrasse 201
D-53113 Bonn. Germany
Phone: +49 (0)228 / 60492-0
Fax: +49 (0)228 / 60492-19

**Germanwatch – Berlin Office**
Stresemannstr. 72
D-10963 Berlin. Germany
Phone: +49 (0)30 / 2888 356-0
Fax: +49 (0)30 / 2888 356 -1

E-mail: info@germanwatch.org

or visit our website:

**www.germanwatch.org**



**GERMANWATCH**

**Observing. Analysing. Acting.**
For Global Equity and the Preservation of Livelihoods.

WATCH LIVE

 US                                                              AudioLive TV

# Washington, DC, approves creation of new agency to provide services for migrants arriving from other states

By Aya Elamroussi and Adrienne Winston, CNN

Updated 3:51 AM EDT, Wed September 21, 2022



Marat Sadana/Reuters

A group of mainly Venezuelan migrants, who were sent by bus from detention in Texas, are dropped off outside the Naval Observatory, the official residence of U.S. Vice President Kamala Harris in Washington, DC, on September 17.

(CNN) — The Washington, DC, city council voted Tuesday to create a new office focusing on the recent arrival of migrants who were sent to the district from states whose leaders oppose the Biden administration's stance on immigration policies.

The move aims to improve response to the thousands of migrants who have been arriving in the nation's capital from Arizona and Texas, whose Republican leaders have come under scrutiny for the tactic.

The Washington city council approved the launch of the new agency in a unanimous vote after Mayor Muriel Bowser requested it to address the needs of migrants.

Haiti AR_001374

"With the establishment of the Office of Migrant Services, we stay true to our DC values by creating a framework for providing support to individuals and families while ensuring our homeless services systems continue to support our DC residents," said Bowser, who is a Democrat.



**RELATED ARTICLE**
Texas is sending migrants to New York and Washington, DC, by bus. Many are glad to go

The new agency will be housed within the district's Department of Human Services. Its goal is to provide arriving migrants with basic needs– including meals, transportation, urgent medical care as well as transportation to connect people to resettlement services.

The district will allocate $10 million to establish and support the new office, and Bowser said she will seek reimbursement for part of that funding through the US Federal Emergency Management Agency.

About 8,000 migrants have arrived in the capital over the past six months, according to councilmember Brianna Nadeau, who sponsored the bill proposing the creation of the agency. Nadeau believes that the passage of the bill can help the city provide better assistance to the migrants, according to her spokesperson.

"This legislation will ensure that every migrant is greeted by a bilingual, culturally competent professional; that they have respite; that they have food and clothing, and that they are safe, and welcome," Nadeau said.



Stefani Reynolds/AFP/Getty Images

Migrants from Venezuela, who boarded a bus in Texas, wait to be taken to a local church by volunteers after being dropped off outside the residence of US Vice President Kamala Harris on September 15.

The new agency is being created as at least three Republican governors send migrants out of their states to liberal cities, including Chicago and New York, and recently Martha's Vineyard in Massachusetts. The drop-offs, some of which were done with little notice, have left officials on the receiving end struggling to accommodate the needs of thousands of people

Last week, Texas Gov. Greg Abbott said the state deliberately sent two buses of migrants to Vice President Kamala Harris' official residence in Washington, DC.

Dozens of migrants were left outside the gated residence on grass and sidewalks because those in charge of responding to the group weren't prepared to meet them at that location, leaving volunteers scrambling to make arrangements.

SAMU First Response, one of the groups helping migrants in Washington, was not provided prior notice of the drop-off location, according to the group's managing director, Tatiana Laborde.

"By the time our team got to the migrants, they were very lost," Laborde told CNN Thursday morning. "(The migrants) didn't understand where they were standing – this is a very residential area."


**RELATED ARTICLE**
Legal group files class action lawsuit on behalf of advocacy group and migrants flown to Martha's Vineyard

Abbott's efforts to send migrants to Washington and New York has cost his state more than $12 million.

"VP Harris claims our border is 'secure' & denies the crisis," Abbott tweeted at the time. "We're sending migrants to her backyard to call on the Biden Administration to do its job & secure the border."

Also last week, Florida Gov. Ron DeSantis took credit for flying about 50 migrants to Martha's Vineyard in Massachusetts, which was not expecting the group. The Republican governor's move was met by backlash from White House, migrants' advocates and Democratic officials.

"We are not a sanctuary state, and it's better to be able to go to a sanctuary jurisdiction, and yes, we will help facilitate that transport for you to be able to go to greener pastures," DeSantis said last week. "Every community in America should be sharing in the burdens. It shouldn't all fall on a handful of red states."

The term "sanctuary state" is a broad description applied to jurisdictions that have policies in place designed to limit cooperation with or involvement in federal immigration enforcement actions.

Similarly, Arizona Gov. Doug Ducey has sent more than 1,800 migrants to Washington, DC, and has no plans to stop, according to the Republican governor's office. As of last week, 50 buses carrying migrants from Colombia, Peru, Venezuela have dropped off migrants in the capital, with efforts costing

about $4 million.

CNN's Paradise Afshar contributed to this report.

**Paid Links**

Search CNN...

Log In

Live TV

Audio

US

World

Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More

 US

FOLLOW CNN

  

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Haiti AR_001379

Haiti AR_001380

Haiti AR_001381

Haiti AR_001382

Haiti AR_001383



ABOUT US    EVENTS    DONATE

Home > News > Haiti Gangs Recruiting, Arming More Children



NEWS

# Haiti Gangs Recruiting, Arming More Children

CARIBBEAN / 3 JUN 2022 BY ALESSANDRO FORD        EN

Gangs in the Haitian capital of Port-au-Prince are rounding up homeless and at-risk teens, who are increasingly being used as foot soldiers in gang wars that have forced schools to close and engulfed neighborhoods.

Homeless minors are disappearing from streets and shelters as armed groups recruit them with offers of money and security. One shelter near the National Palace was down to nearly 10 percent capacity, having been targeted by the Ti Lapli, Bougoy and 100 Jours gangs, reported Spanish news agency EFE on May 30.

The child recruitment reports come just weeks after United Nations (UN) High Commissioner for Human Rights Michelle Bachelet expressed alarm at the extreme gang violence in Port-au-Prince, which has caused thousands of families to flee. The UN noted in a news release the gangs were using minors as combatants and killing them for being informants to rivals. The gangs are also imposing control through sexual violence, including raping children as young as ten.

> **SEE ALSO:** *Why Haiti's Gang War Keeps On Getting Worse*

By early May, gang violence forced the closure of almost 1,700 schools and deprived half a million children of access to education, according to UNICEF, the UN's children's rights body.

"Giving children weapons to fight and using them as soldiers or spies is a violation of their child rights and condemned by both national and international laws," Bruno Maes, UNICEF Representative in Haiti, said in the news release.

Gangs arming children in Haiti drew attention in early April, when a video circulated on social media of a boy carrying an M4 rifle. In the video, the boy proclaims his gang membership while wielding the firearm. The video was shot in the fiercely contested neighborhood of Martissant, at the capital's southern entrance.

## InSight Crime Analysis

In Haiti – as in countries like Colombia, Argentina and Mexico – urban gangs have long used minors in supporting roles, such as lookouts and couriers for arms or drugs. But escalating gang warfare in Haiti's capital has led youths to be press-ganged and recruited for street battles.

Child recruitment in Haiti first became visible in the early 2000s, when the country's fledgling gangs took advantage of political and economic chaos to recruit vulnerable children. The gangs offered them food and safety, according to a 2008 report by the non-governmental organization Child Soldiers International.

In return, notes the report, the children served as messengers, watched over kidnap victims and even conducted sabotage missions against UN peacekeepers, such as one case in which very young children cut the brake cables of UN tanks during an operation to arrest gang leaders.

Child combatants existed, but they were relatively rare. Previously, many gang leaders in Martissant would not even allow young children to hang around their soldiers, said Eric Calpas, a researcher who has studied gangs in Haiti. Around 2018, when sporadic gang violence escalated into a criminal war in Port-au-Prince, Haiti began to see a significant increase in minors equipped with firearms.

**Tags**

CARIBBEAN

HAITI

HUMAN RIGHTS

HUMAN TRAFFICKING

**Was this content helpful?**

We want to sustain Latin America's largest organized crime database, but in order to do so, we need resources.

DONATE

SEE ALSO: *Child Trafficking Thrives Along Haitian-Dominican Border*

"Today, because of the war situation ... they are forced to recruit really broadly: adults and teenagers and children as young as 10 to 12 years old," Calpas said.

Two hotspots for child recruitment have been the battleground districts of Martissant and Croix-des-Bouquets, where conflicts have raged since mid-2021. According to Calpas, Haiti's most notorious gang, 400 Mawozo, is the worst offender, relying on intimidation to force minors into its ranks as it wages an expansionist campaign across the capital's northern areas.

However, the majority of underage recruits have joined willingly, said Calpas, seeking emotional belonging as much as food and shelter. In this, they have resembled the child aspirants of Central American street gangs like the MS13 more than the often forced conscripts of Colombia's rural armed groups.

Some of Haiti's gang leaders today began as child recruits, he noted.

CARIBBEAN     HAITI     HUMAN RIGHTS     HUMAN TRAFFICKING

share     f    𝕏    in

### Was this content helpful?

We want to sustain Latin America's largest organized crime database, but in order to do so, we need resources.

DONATE

---

**What are your thoughts? Click here to send InSight Crime your comments.**

We encourage readers to copy and distribute our work for non-commercial purposes, with attribution to InSight Crime in the byline and links to the original at both the top and bottom of the article. Check the Creative Commons website for more details of how to share our work, and please send us an email if you use an article.

## Latest News

**Historic Judgement Shows How Guatemala is Still Fighting Its Past**

NEWS / 12 DEC 2022

**Panama Became Logistics Drug Trafficking 'Super Ca...**

NEWS / 9 DEC 2022

## Related Content

SEE MORE



**'Somos.': One of Mexico's Worst Massacres Told Through its Victims**

HUMAN RIGHTS / 14 JUL 2021

The new Netflix series, "Somos.," (We Are), offers a respectful but powerful look at the Allende massacre, one of the...



**Fuel, Water, International Aid: Haiti's Gangs Weaponize Essential Services**

HAITI / 4 NOV 2021

The ability and willingness of Haiti's gangs to choke off essential services such as power and water, seemingly at will,...



**Legitimate Businesses Used as Fronts for Human Trafficking in Argentina**

ARGENTINA / 15 SEP 2022

Human traffickers in Argentina are using legitimate business to continue their illicit activities and elude authorities.

About InSight Crime

ABOUT US



THE ORGANIZATION

### 'Ndrangheta Investigation, Exclusive Interview With Suriname President Make Waves

2 DEC 2022

Two weeks ago, InSight Crime published an investigation into how Italian mafia clan the 'Ndrangheta built a cocaine trafficking network from South America to 'Ndrangheta-controlled Italian ports. The investigation generated...

## Stay Informed with Weekly InSight

Get fresh updates on organized crime from across the region delivered to your inbox.

SUBSCRIBE

ABOUT US

OUR MISSION

WHAT MAKES US DIFFERENT

DIRECTORS AND TEAM

SITEMAP

HOME

NEWS

COUNTRIES

INVESTIGATIONS

CRIMINAL ACTORS

INDEPTH

INFORMATION PROCESSING POLICIES

PRIVACY POLICY

REFUND POLICY

CONTACT US

Creative Commons Attribution
Noncommercial 3.0 Unported License

*We go into the field to interview, report and investigate. We then verify, write and edit, providing the tools to generate real impact.*

*Our work is costly and high risk. Please support our mission investigating organized crime.*

--> DONATE

Sponsored by:    |        Member of:  



ABOUT US    EVENTS    DONATE

EN ES  🔍 ☰

Home > News > Scandal at Haiti Customs After Over 100,000 Rounds of Smuggled Ammunition Seized



NEWS

# Scandal at Haiti Customs After Over 100,000 Rounds of Smuggled Ammunition Seized

ARMS TRAFFICKING  /    8 JUL 2022  BY ALESSANDRO FORD    EN    🔗

Haiti's Customs Agency has seized an extremely large quantity of illegally imported ammunition the same day that its director was replaced on suspicion of arms trafficking, highlighting the Caribbean nation's struggle in combating weapons flows.

On July 1, customs and police authorities interdicted roughly 100,000 rounds of ammunition on board a container ship at Port-au-Paix wharf. The illegal cargo, which had come from the US state of Florida, was almost entirely composed of bullets and magazines for high-powered assault rifles.

Police have issued arrest warrants for three individuals, one of whom was reportedly detained and then released last year on charges of arms trafficking, according to Haitian news outlet Le Nouvelliste, citing senior law enforcement.

> SEE ALSO:  *US Guns Flow into Haiti, Fuel Gang Violence*

The operation came the same day that the Haitian government appointed a new director and deputy-director of Customs, to replace the agency's former head, Rommel Bell. Since May, Bell has been under investigation by Haiti's anti-corruption unit (Unité de lutte contre la corruption – ULCC).

The accusations against him reportedly stem from allegations of illegal arms trafficking, which he has strongly denied, according to statements made by both him and the customs union.

On May 20, the ULCC raided the customs building and initially prohibited staff from accessing computers and files. However, by May 24 this measure was reversed after the customs union retaliated by announcing a departmental strike that shut down port controls.

## InSight Crime Analysis

While US-to-Haiti gun smuggling is not new, Haiti's current customs debacle touches on a number of important developments within the country's security crisis.

Firstly, the alleged role played by state institutions in arming gangs. Haitian police have been implicated in illegal arms trafficking before and the current PHTK administration has reportedly provided weapons and vehicles on several occasions to leaders of the "G9 and Family" gang alliance (G9 an fanmi – G9).

After the raid of the customs building, the director of a prominent Haitian NGO made headlines by telling news outlet Alterpresse that state-sanctioned illegal arms regularly arrive at both private and public harbors of Port-au-Prince, with customs agents who seize them risking punishment.

> SEE ALSO:  *Haiti Police, Senator Implicated in US Arms Trafficking Case*

"The situation has worsened under the leadership of Rommel Bell….[t]he Haitian State, through the customs offices, is the largest supplier of arms and ammunition to armed groups, particularly to the G9 federation," he said in late May.

Secondly, and related to the first point, the dire need among the gangs of Port-au-Prince for a steady stream of bullets. Many parts of the US are currently experiencing an ammunition shortage, including the state of Florida, one of the main export hubs for illegal arms to Latin America and the Caribbean.

### Tags

ARMS TRAFFICKING

CARIBBEAN

ELITES AND CRIME

G9

HAITI

**Was this content helpful?**

We want to sustain Latin America's largest organized crime database, but in order to do so, we need resources.

DONATE

Privacy · Terms

Haiti AR_001387

This has raised ammunition prices, yet with battles raging across both Port-au-Prince, particularly in Croix-des-Missions and Martissant, Haitian crime groups cannot afford to count cartridges. The possibility has therefore even been raised that the June invasion of the Palace of Justice was simply about securing money for munitions.

ARMS TRAFFICKING    CARIBBEAN    ELITES AND CRIME    G9    HAITI

share    f    ⟨twitter⟩    in

## Was this content helpful?

We want to sustain Latin America's largest organized crime database, but in order to do so, we need resources.

DONATE

---

**What are your thoughts?** Click here to send InSight Crime your comments.

We encourage readers to copy and distribute our work for non-commercial purposes, with attribution to InSight Crime in the byline and links to the original at both the top and bottom of the article. Check the Creative Commons website for more details of how to share our work, and please send us an email if you use an article.

## Latest News

○    **Historic Judgement Shows How Guatemala is Still Fighting Its Past**
NEWS / 12 DEC 2022

**Panama Became Logistics Drug Trafficking 'Super Car**
NEWS / 9 DEC 2022    ○

## Related Content

SEE MORE



**Haiti Gang Has Occupied Supreme Court for Almost a Week**

CARIBBEAN / 16 JUN 2022

For nearly a week, a powerful Haitian gang has forcibly occupied the country's Palace of Justice, with no response from...



**3 Security Takeaways from Xiomara Castro's Historic Win in Honduras**

COVID AND CRIME / 30 NOV 2021

Leftist opposition candidate Xiomara Castro appears to have ridden a wave of outrage to become Honduras' next president, beating out...



**Made-in-Mexico 'Ghost Guns' Find Way to Cartels**

ARMS TRAFFICKING / 29 APR 2022

A US national who received smuggled AR-15 parts in Mexico and assembled the weapons for two of the country's most...

## About InSight Crime

ABOUT US



THE ORGANIZATION

**'Ndrangheta Investigation, Exclusive Interview With Suriname President Make Waves**

2 DEC 2022

Two weeks ago, InSight Crime published an investigation into how Italian mafia clan the 'Ndrangheta built a cocaine trafficking network from South America to 'Ndrangheta-controlled Italian ports. The investigation generated...

○  ○  ○  ○  ○

## Stay Informed with Weekly InSight

Get fresh updates on organized crime from across the
region delivered to your inbox.

SUBSCRIBE

ABOUT US                          SITEMAP                          INFORMATION PROCESSING POLICIES

OUR MISSION                       HOME                             PRIVACY POLICY

WHAT MAKES US DIFFERENT           NEWS                             REFUND POLICY

DIRECTORS AND TEAM                COUNTRIES                        CONTACT US

                                  INVESTIGATIONS                   

                                  CRIMINAL ACTORS                  Creative Commons Attribution
                                                                   Noncommercial 3.0 Unported License
                                  INDEPTH

*We go into the field to interview, report and investigate. We then verify, write and edit, providing the tools to generate real impact.*

*Our work is costly and high risk. Please support our mission investigating organized crime.*

   DONATE

Sponsored
by:                       Member
                                                                             of:     



FREEDOM IN THE WORLD 2022

# Haiti

NOT FREE

## 33 /100

| Political Rights | 11 /40 |
|---|---|
| Civil Liberties | 22 /60 |

### LAST YEAR'S SCORE & STATUS

**37** /100    **Partly Free**

Global freedom statuses are calculated on a weighted scale. See the methodology.



TOP

Haiti AR_001390

# Status Change

Haiti's status declined from Partly Free to Not Free due to the assassination of President Jovenel Moïse, an ongoing breakdown in the electoral system and other state institutions, and the corrosive effects of organized crime and violence on civic life.

# Overview

Worsening breakdowns of the Haitian electoral system in recent years have led to a series of expired mandates and constitutional impasses, leaving citizens without proper political representation. Rampant corruption and violence by armed criminal groups undermine basic services and contribute to physical insecurity for the population. The judiciary and law enforcement agencies lack the resources, independence, and integrity to uphold due process and the rule of law. Antigovernment protests often result in excessive use of force by police.

# Key Developments in 2021

- The first half of the year was dominated by protests and political disputes over the expiration of President Jovenel Moïse's term, his plans to hold a referendum on constitutional reforms, and the continued postponement of overdue elections.
- In July, Moïse was assassinated by a group of heavily armed men who entered his residence, and the resulting succession crisis was exacerbated by the lack of a sitting Parliament, as the terms of most lawmakers had expired in 2020.
- Ariel Henry, who took office as acting prime minster and acting president with support from foreign diplomats, again postponed elections in September. Amid ongoing doubts about the legitimacy of his government, Henry was accused of obstructing the criminal investigation into Moïse's assassination, which remained stalled at year's end.

Haiti AR_001391

Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 88 of 382

# Political Rights

# A. Electoral Process

**A1**   0-4 pts

| Was the current head of government or other chief national authority elected through free and fair elections? | **1**/4 |
| --- | --- |

In Haiti's semipresidential system, the president is directly elected for a five-year term. The prime minister is appointed by the president and confirmed by Parliament.

Jovenel Moïse of the Haitian Tet Kale Party (PHTK), the handpicked successor of then president Michel Martelly, won the 2015 presidential election, but the results were nullified due to extensive fraud. Moïse went on to win a repeat election in 2016, taking 55.6 percent of the vote. He was inaugurated in February 2017 after an electoral tribunal verified the outcome, citing irregularities but no evidence of widespread fraud. Some members of the political opposition and civil society groups claimed that fraud in the vote tally, inconsistent voter registration lists, and a low voter turnout of 21 percent undermined the new president's mandate.

The events surrounding the repeat election later resulted in a political and legal dispute over whether Moïse's term expired in February 2021, five years after the end of Martelly's term, or February 2022, five years after Moïse was inaugurated.

President Moïse frequently replaced the prime minister during his tenure, but after the terms of most lawmakers expired in early 2020, his appointees were unable to obtain parliamentary approval in keeping with the constitution. In April 2021, Moïse accepted the resignation of Prime Minister Joseph Jouthe and appointed Claude Joseph, the minister of foreign affairs and worship, to replace him. Joseph then submitted his resignation in early July, and Moïse, through a decree published in the official state newspaper *Le Moniteur,* appointed Ariel Henry as the new prime

Haiti AR_001392

minister. Henry had not yet been installed when, days later, Moïse was assassinated at his residence.

The assassination set off a dispute among the local political, civic, and economic actors as to who should head the executive branch, but key diplomatic representatives in the country—known as the Core Group—called on Henry to lead a new government, and Joseph stepped down. In September, Henry dismissed the Provisional Electoral Council (CEP) and indefinitely postponed general elections, which were already overdue. He remained in place as acting prime minister and acting president at year's end.

*Score Change: The score declined from 2 to 1 due to the assassination of President Moïse and the indefinite postponement of elections to replace him.*

**A2** 0-4 pts

| | |
|---|---|
| Were the current national legislative representatives elected through free and fair elections? | **0** / 4 |

The directly elected, bicameral Parliament is composed of a Senate, with 30 members who serve six-year terms, and a Chamber of Deputies, with 119 members who serve four-year terms. The 2015 legislative elections were plagued by disorder, fraud, and violence. Despite concerns about the elections' credibility, 92 lawmakers took office in early 2016. Elections for a portion of the Senate and the runoff elections for the remaining seats in the Chamber of Deputies were held in 2016 along with the repeat presidential election, and the contests were marred by low voter turnout and fraud. The PHTK emerged as the largest single party in both chambers, followed by Vérité (Truth), though most of the seats were divided among a large number of smaller parties.

Elections for the Chamber of Deputies, two-thirds of the Senate, and local mayoralties were canceled in October 2019. As a result, Parliament was dissolved in January 2020. Ten senators still had mandates, however, and after Moïse's assassination in July 2021, they supported Senate president Joseph Lambert's short-

12/12/22, 10:21 AM
Case 6:23-cv-00007    Document 93-6    Filed on 03/24/23 in TXSD    Page 90 of 382
Haiti: Freedom in the World 2022 Country Report | Freedom House

lived bid to serve as acting president. Following the dismissal of the CEP in September, fresh elections had yet to be scheduled at year's end.

| **A3**  0-4 pts | |
|---|---|
| **Are the electoral laws and framework fair, and are they implemented impartially by the relevant election management bodies?** | **2** / 4 |

The CEP was established in the late 1980s as a temporary body, but it remains responsible for managing the electoral process. Despite constitutional safeguards against executive dominance of the CEP, the executive branch asserts significant control over it in practice. In September 2020, Moïse appointed a new CEP by presidential decree. Human rights observers argued that both the appointments and the decree's mandate for the council to organize a constitutional referendum were unconstitutional. Moïse's proposed constitutional reforms were reportedly designed to increase the power of the presidency, drawing harsh criticism from his opponents. Plans to hold the referendum and general elections in November 2021 were scuttled that September, when Henry, as acting president, dismissed the existing CEP and pledged to assemble a new council with broader legitimacy.

# B. Political Pluralism and Participation

| **B1**  0-4 pts | |
|---|---|
| **Do the people have the right to organize in different political parties or other competitive political groupings of their choice, and is the system free of undue obstacles to the rise and fall of these competing parties or groupings?** | **1** / 4 |

Legal and administrative barriers that prevented some parties from registering or running in past elections have largely been eliminated. The number of members required to form a political party was reduced from 500 to 20 in 2014, leading to the creation of dozens of new parties. However, the risk of violence seriously impairs

normal political activity. Opposition party leaders are subject to threats and abductions, and protests organized by opposition parties are regularly met with repressive force by the government.

Criminal violence increased sharply in 2021, with the estimated number of kidnappings more than tripling for the second consecutive year. President Moïse, meanwhile, was accused of using allied criminal groups to intimidate his political opponents and the neighborhoods that formed their bases of support. The insecurity continued after Moïse's assassination and remained a major obstacle to political mobilization.

*Score Change: The score declined from 2 to 1 because political activity was severely hampered by an increased risk of violence and kidnapping by armed criminal groups.*

**B2**  0-4 pts

| Is there a realistic opportunity for the opposition to increase its support or gain power through elections? | **1** / 4 |
|---|---|

Haiti has a poor record of peaceful democratic transfers of power. It remains difficult for the opposition to increase its support or gain power through elections, which are regularly disrupted by violence, marred by accusations of fraud, and postponed. In recent years the PHTK has consolidated power in the legislature and at the local level, in part through alliances with smaller parties. However, it has also suffered from internal divisions, particularly between factions loyal to Moïse and to former president Martelly, respectively. The country's various opposition parties remain highly fragmented.

**B3**  0-4 pts

| Are the people's political choices free from domination by forces that are external to the political sphere, or by political forces that employ extrapolitical means? | **1** / 4 |
|---|---|

Haitians' political choices are subject to undue influence or effective marginalization by corrupt patronage networks, organized crime, and foreign actors. Many politicians

Haiti AR_001395

rely on money linked to drug trafficking, gang activity, and other illegal sources of funding to finance their campaigns. Politicians from the PHTK as well as opposition parties have enlisted armed criminal groups to either incite or halt residents' involvement in protests and other political activities, according to local human rights activists.

The assassination of President Moïse and its aftermath represented a further degradation of the democratic autonomy of Haitian citizens and politicians. In addition to the violence and criminality associated with the murder itself, many observers decried the role of the Core Group—comprising ambassadors or representatives from Brazil, Canada, France, Germany, Spain, the United States, the European Union, the Organization of American States, and the United Nations—in confirming Ariel Henry as the new acting prime minister and acting president. In a September 2021 resignation letter, the US special envoy to Haiti, Daniel Foote, denounced the diplomatic endorsement of Henry, arguing that it improperly sidelined an alternative plan advanced by a commission of Haitian civil society representatives, which called for a longer transition period to enable thorough institutional reforms before any elections or political settlement.

*Score Change: The score declined from 2 to 1 due to the increased role of criminal and foreign actors in shaping political outcomes.*

**B4**   0-4 pts

| Do various segments of the population (including ethnic, racial, religious, gender, LGBT+, and other relevant groups) have full political rights and electoral opportunities? | **2**/4 |
|---|---|

Haitian women are underrepresented in political life, with only four out of 149 parliamentary seats held by women from 2017 to 2019. The constitution mandates that 30 percent of public officials be women, but there are no penalties for noncompliance. Election-related violence and social and cultural norms discourage women from participating in politics. Due to societal discrimination, the interests of LGBT+ people are not represented in the political system, and there are no openly LGBT+ politicians.

Haiti AR_001396

# C. Functioning of Government

**C1**   0-4 pts

| Do the freely elected head of government and national legislative representatives determine the policies of the government? | **1** / 4 |
|---|---|

Parliament was dissolved in January 2020 as the mandates of two-thirds of Senate members and all Chamber of Deputies members expired, and no new elections were held. President Moïse attempted to rule by decree until his July 2021 assassination, but the legitimacy of his actions was questioned, since only members of Parliament have the constitutional authority to pass laws. Similar legitimacy questions continued to undermine the mandates of the prime minister and various government ministries throughout the year. Corruption, instability, and security threats hinder the government's ability to carry out its own policies and provide basic services across the country.

**C2**   0-4 pts

| Are safeguards against official corruption strong and effective? | **1** / 4 |
|---|---|

Corruption is widespread in Haiti, as are allegations of impunity for government officials. A 2017 law reduced the independence and powers of the Central Financial Intelligence Unit (UCREF), which was responsible for investigating money-laundering cases. Also that year, Moïse replaced the heads of the Anticorruption Unit (ULCC) and the UCREF with political allies and former members of the Martelly administration; both units had been investigating Moïse for potential money laundering.

In August 2020, the Superior Court of Auditors and Administrative Disputes (CSCCA) issued its third and final report on corruption among government officials involving a low-interest development-loan program operated by Venezuela, but the findings have not resulted in prosecutions. A month later, despite objections from the CSCCA's

Haiti AR_001397

president, Moïse issued a decree that rendered the court's opinions on public procurement contracts advisory and nonbinding, which would allow for the awarding of state contracts without prior court approval.

### C3    0-4 pts

| Does the government operate with openness and transparency? | $1/4$ |
| --- | --- |

Haitians' general distrust of the government stems in large part from the absence of transparency and accountability measures that are needed to reduce corruption. There are no laws providing the public with access to state information, and it is reportedly very difficult to obtain government documents and data in practice. All government officials must file financial disclosure forms within 90 days of taking office and within 90 days of leaving office, though these requirements are not well enforced, and the reports are not made public. A 2020 presidential decree that created the National Intelligence Agency (ANI) granted it total secrecy and the ability to conduct surveillance on individuals and businesses at any time, even if there is no relevant ongoing investigation.

The events and governance conditions of 2021—including disputes about the presidential term, executive rule in the absence of legislative oversight, and the investigation of Moïse's assassination—raised further transparency concerns. In September, Henry dismissed the justice minister and a chief prosecutor after investigators under their supervision uncovered evidence that appeared to link Henry himself to a top suspect in the case, prompting accusations that he was obstructing justice. The investigation remained stalled at year's end.

*Score Change: The score declined from 2 to 1 due to the prolongation of opaque executive rule and allegations of obstruction surrounding the investigation into Moïse's assassination.*

# Civil Liberties

Haiti AR_001398

# D. Freedom of Expression and Belief

**D1**  0-4 pts

| Are there free and independent media? | **2** / 4 |
|---|---|

The constitution includes protections for press freedom, and the media sector is pluralistic, but the work of journalists is constrained by threats and violence, government interference, and a lack of financial resources.

In 2020, a presidential decree prohibited the sharing of photos or videos of the bodies of people who died from COVID-19, drawing criticism from human rights groups.

Attacks on journalists occur frequently, and impunity for perpetrators is the norm. In June 2021, two journalists and activists, Diego Charles and Antoinette Duclair, were shot and killed by unidentified men in Port-au-Prince. Also in June, photojournalist Dieu-Nalio Chéry was forced to leave Haiti because of death threats from armed gangs.

**D2**  0-4 pts

| Are individuals free to practice and express their religious faith or nonbelief in public and private? | **3** / 4 |
|---|---|

Freedom of religion is constitutionally guaranteed, and religious groups generally practice freely. However, the traditionally dominant Roman Catholic and Protestant churches and schools receive certain privileges from the state, while Vodou religious leaders have experienced social stigmatization and violence for their beliefs and practices. The government has denied registration to the country's small Muslim communities.

Haiti AR_001399

**D3**  0-4 pts

| Is there academic freedom, and is the educational system free from extensive political indoctrination? | **2** / 4 |
|---|---|

Educational institutions and academics choose their curriculum freely, but university associations and student groups that protest government actions are often met with police violence. Academic freedom is also negatively affected by the general climate of insecurity, and some scholars may self-censor to avoid conflicts with powerful groups or individuals.

**D4**  0-4 pts

| Are individuals free to express their personal views on political or other sensitive topics without fear of surveillance or retribution? | **2** / 4 |
|---|---|

There are some formal constraints on the expression of personal views, including criminal defamation laws, and the risk of violent reprisals also serves as a deterrent to unfettered discussion of sensitive issues such as corruption, gangs, and organized crime. The government has been accused of using allied gangs to help suppress dissent. Security conditions grew worse during 2021, with the number of documented kidnappings surging to more than 1,200, further dampening citizens' sense of freedom to air their grievances.

*Score Change: The score declined from 3 to 2 because an increase in gang violence and kidnappings has contributed to a climate of fear among ordinary citizens.*

# E. Associational and Organizational Rights

**E1**  0-4 pts

| Is there freedom of assembly? | **2**/4 |
|---|---|

The constitution enshrines freedom of assembly, but this right is often violated in practice, and police have used excessive force including live rounds of ammunition to disperse protesters. Despite the risk of violence, politicians, civil society groups, and ordinary citizens continued to mount demonstrations during 2021, with participants calling for Moïse's resignation and condemning criminal activity. Police regularly used tear gas and gunshots in response, but the severity of the protest-related violence and the number of casualties remained far lower than in 2019, when more than 80 people were killed.

*Score Change: The score improved from 1 to 2 because activists continued to hold demonstrations against the government and organized crime, and the violence that accompanied such events was not as severe as in some previous years.*

**E2** 0-4 pts

| Is there freedom for nongovernmental organizations, particularly those that are engaged in human rights– and governance-related work? | **1**/4 |
|---|---|

Numerous domestic and international nongovernmental organizations (NGOs) operate in Haiti, but human rights defenders and activists who address sensitive topics are subject to threats and violence, which creates a climate of fear. Violence against activists is rarely investigated or prosecuted. Among other high-profile cases, an investigation into the 2020 assassination of Monferrier Dorval, a government critic and head of the Port-au-Prince Bar Association, remained unsolved in 2021.

**E3** 0-4 pts

| Is there freedom for trade unions and similar professional or labor organizations? | **1**/4 |
|---|---|

Workers' right to unionize is protected under the law, and strikes are not uncommon, though the union movement in Haiti is weak and lacks collective bargaining power in practice. Most citizens are informally employed. Workers who engage in union activity frequently face harassment, suspension, termination, and other repercussions from employers.

# F. Rule of Law

**F1**  0-4 pts

| Is there an independent judiciary? | **1**/4 |
|---|---|

Despite constitutional guarantees of independence, the judiciary is susceptible to political pressure. A lack of resources has contributed to bribery throughout the judicial system, and weak oversight means that most corrupt officials are not held accountable. During his time in office, President Moïse repeatedly declined to renew the mandates of judges, and in February 2021—amid the dispute over the expiration of his term—Moïse forced three members of the Supreme Court to retire. Given Parliament's inability to play its constitutional role in judicial appointments, the number of vacancies has continued to grow. The head of the Supreme Court died in June, after which the body lacked the quorum it needed to function.

**F2**  0-4 pts

| Does due process prevail in civil and criminal matters? | **1**/4 |
|---|---|

Constitutionally protected due process rights are regularly violated in practice. Arbitrary arrest is common, as are extortion attempts by police and at all levels of the legal system. Most suspects do not have legal representation, and even those who do suffer from long delays and case mismanagement. More than 80 percent of the prison population consisted of pretrial detainees as of 2021. Many have never

appeared before a judge despite the legal requirement of a court hearing within 48 hours of arrest.

In November 2020, President Moïse published two decrees that expanded the definition of terrorism and created the ANI to gather information on and prevent terrorist acts that ostensibly threaten national security. Human rights groups criticized the vague new definition of "terrorist act," which included robbery, extortion, arson, and the destruction of public and private goods. According to the decrees, the ANI would have broad discretion to conduct searches and surveillance, and its staff cannot be held legally accountable for abuses without prior authorization from the president.

**F3**   0-4 pts

| Is there protection from the illegitimate use of physical force and freedom from war and insurgencies? | **1** / 4 |
|---|---|

A culture of impunity in law enforcement leaves civilians in Haiti with little protection from the illegitimate use of force, and police themselves are subject to lethal attacks by heavily armed criminal groups. According to the United Nations, at least 36 officers were killed in the first eight months of 2021. Criminal groups fight one another for territory and prey on residents in areas under their control, earning revenue from kidnappings, extortion, and other illegal activities. Overall crime statistics are difficult to authenticate, and crimes are underreported, but more than 1,600 murders were registered during 2021, representing an 18 percent increase over the previous year's total. The resulting homicide rate was about 13.7 per 100,000 residents. Police are regularly accused of abusing suspects and detainees. Conditions in Haiti's prisons, which are among the world's most overcrowded, are extremely poor.

**F4**   0-4 pts

| Do laws, policies, and practices guarantee equal treatment of various segments of the population? | **1** / 4 |
|---|---|

12/12/22, 10:21 AM
Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 100 of 382
Haiti: Freedom in the World 2022 Country Report | Freedom House

Discrimination against women, the LGBT+ community, and people with disabilities is pervasive. Among other problems, women face bias in employment and disparities in access to financial services.

A reformed penal code, published in June 2020 by executive decree and set to take effect in June 2022, prohibits gender-based violence, sexual harassment, and discrimination on the basis of sexual orientation, which occur regularly in practice. The reform was met with sharp resistance and public protest by conservative cultural and religious groups.

# G. Personal Autonomy and Individual Rights

### G1   0-4 pts

| Do individuals enjoy freedom of movement, including the ability to change their place of residence, employment, or education? | **1** / 4 |
|---|---|

The government generally does not restrict travel or place limits on the ability to change one's place of employment or education. However, insecurity has prevented free movement, particularly in Port-au-Prince, as roads are frequently blockaded by criminal groups, police, or protesters, and many residents avoid unnecessary travel due to widespread gang violence.

The government's flawed response to natural disasters has prevented many displaced residents from returning to their homes, forcing them to live in poor conditions for extended periods. As of early August 2021, according to the United Nations, about 19,000 people were internally displaced. Tens of thousands more were displaced as a result of an earthquake in mid-August. In addition, more than 6,125 people, or 1,500 households, had been displaced when their houses were burned down by armed gangs in October 2020.

### G2   0-4 pts

Case 6:23-cv-00007    Document 93-6    Filed on 03/24/23 in TXSD    Page 101 of 382

| Are individuals able to exercise the right to own property and establish private businesses without undue interference from state or nonstate actors? | 2 / 4 |
|---|---|

Although the legal framework protects property rights and private business activity, it is difficult in practice to register property, enforce contracts, and obtain credit. Poor record keeping and corruption contribute to inconsistent enforcement of property rights, and business owners are subject to extortion by criminal groups.

### G3    0-4 pts

| Do individuals enjoy personal social freedoms, including choice of marriage partner and size of family, protection from domestic violence, and control over appearance? | 2 / 4 |
|---|---|

Basic freedoms related to marriage, divorce, and custody are generally respected. However, there are no laws specifically addressing domestic violence, which is a widespread problem. Both domestic violence and rape are underreported and rarely result in successful prosecutions, with justice officials often favoring reconciliation or other forms of settlement. Spousal rape is not recognized as a criminal offense.

The reformed penal code that was set to take effect in June 2022 would decriminalize abortion in the first 12 weeks of pregnancy, in cases of rape or incest, or when there is a threat to the physical or mental health of the pregnant woman. Abortion was prohibited entirely under existing law. The reformed code would also reportedly lower the legal age of sexual consent to 15.

### G4    0-4 pts

| Do individuals enjoy equality of opportunity and freedom from economic exploitation? | 0 / 4 |
|---|---|

Socioeconomic mobility is obstructed by entrenched poverty and inequality. Legal protections against exploitative working conditions in formal employment are weakly

Haiti AR_001405

Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 102 of 382

enforced, and most workers are informally employed. As many as 300,000 children work as domestic servants, often without pay or access to education; they are especially vulnerable to physical or sexual abuse. Other forms of child labor are common.

To escape dire social and economic conditions at home, many Haitians have risked human trafficking and dangerous land and sea journeys to reach countries including the Bahamas, Brazil, Chile, the Dominican Republic, Mexico, and the United States.




**On Haiti**

See all data, scores & information on this country or territory.

See More  ›

*Country Facts*

**Global Freedom Score**

**33**/100     **Not Free**

*Other Years*

2021

# Be the first to know what's happening.

Join the Freedom House weekly newsletter

Subscribe

Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 103 of 382

ADDRESS

1850 M St. NW Floor 11
Washington, DC 20036

(202) 296-5101

GENERAL INQUIRIES

info@freedomhouse.org

PRESS & MEDIA

press@freedomhouse.org

@2022 FreedomHouse

Haiti AR_001407

Learn more about    REFINITIV

REUTERS®

My View      Following      Saved

LIVE                                                                                        ✕

Ukraine's Zelenskiy holds news conference on anniversary of Russia's invasion

Watch here

Americas

4 minute read · December 10, 2021 4:37 AM EST · Last Updated a year ago

## Migrant truck crashes in Mexico killing 54

By Jacob Garcia





TUXTLA GUTIERREZ, Mexico, Dec 9 (Reuters) - Fifty-four mostly Central Americans were killed on Thursday when the

**You have reached your article limit**

## Register for FREE to continue using Reuters.com

Free registration gives you access to:

- ✅ Unmatched, global, round-the-clock news
- ✅ Hand-picked insights that are easy to find and use
- ✅ Our Daily Briefing newsletter, delivering the day's headlines right to your inbox

Register now          Already registered?Sign in

Terms & Conditions apply

Our Standards: The Thomson Reuters Trust Principles.

### Read Next

India
**G20 tussles over Ukraine war as West steps up sanctions**
an hour ago

Business
**Pemex hit by fires at three facilities in one day**
12:45 AM EST

Macro Matters
**Canada records C$5.54 bln budget deficit over first nine months of 2022/23**
11:07 AM EST

FOCUS
**European thirst for tequila aggravates agave crunch**
6:13 AM EST

Newsletter | Every weekday.

**Reuters Daily Briefing**

All the news you need to start your day. (This includes the Reuters Weekend Briefing.)

Haiti AR_001409

Sign up

## More from Reuters

Mayor Klitschko inspects defense drills near Kyiv
(0:47) – February 23, 2023
[Watch more videos](#)




**Mayor Klitschko inspects defense drills near Kyiv**
00:47


**Paris lights up for Ukraine ahead of war anniversary**
00:38


**Ukraine war: a year that shook the world**
10:52


**London vigil marks Ukraine war anniversary**
00:46

## Sponsored Content


**Hands Down One of the Best Cards for Good Credit**
Sponsored by The Motley Fool

**Hiring financial advisors. Bring your Series 7 to Fidelity.**
Sponsored by Fidelity Investments


5 Financ
Sponsored


**The 4 Dumbest Things We Keep Spending Too Much Money On**
Sponsored by The Penny Hoarder

**APYs Are On the Rise. Discover Standout Savings Accounts.**
Sponsored by NerdWallet


Why Is N "Twist" T
Sponsored

**World**

## UK issues export bans on every item used by Russia in war

United Kingdom · February 24, 2023 · 11:22 AM EST

Britain marked the one-year anniversary of the invasion of Ukraine by issuing more sanctions against Russia, including export bans on every item it has used on the battlefield and import bans of iron and steel goods.

---

FOCUS
**European thirst for tequila aggravates agave crunch**

6:13 AM EST

---

World
**Factbox: The countries in the grip of debt crises**

an hour ago

---

Europe
**German peace activists park rusty tank outside Russian embassy**

35 min ago

---

United Kingdom
**Scotland's next leader faces battle to unite country and party**

Haiti AR_001411

## Sponsored Content

**Robotics Stocks Could Be 2023's Next Big Surprise**
Sponsored by Aftermath Silver



**How To Mitigate Work Performance Anxiety as a Hybrid Employee**
Sponsored by Indeed



**APYs Are ...
Savings A...**
Sponsored...

**7 Of The Laziest Ways People Are Making Extra Cash**
Sponsored by FinanceBuzz



**5 Investing Mistakes to Avoid**
Sponsored by Charles Schwab



**Legendar...
True? Wh...**
Sponsored...

## Sponsored Content

**The 4 Dumbest Things We Keep Spending Too Much Money On**
Sponsored by The Penny Hoarder

**Best trading technology + $0 commission equities & options.**
Sponsored by TradeStation

**Earn Cas...**
Sponsored...

**Expect the unexpected for your Series 7 career. Apply today.**
Sponsored by Fidelity Investments

**Elevate your stays with Automatic IHG® Silver Elite status**
Sponsored by Chase IHG® Traveler Card

**Why Is N...
Transform...**
Sponsored...

Latest

Home

Media

🎥 Videos ⎘

📷 Pictures ⎘

🖼 Graphics ⎘

Browse

World

Business

Legal

Markets

Breakingviews

Technology

Investigations ⎘

Lifestyle

About Reuters

About Reuters ⎘

Careers ⎘

Reuters News Agency ⎘

Brand Attribution Guidelines ⎘

Reuters Leadership ⎘

Reuters Fact Check ⎘

Reuters Diversity Report ⎘

Stay Informed

Download the App ⎘

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

    

Thomson Reuters Products

**Westlaw** ⧉

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⧉

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⧉

The industry leader for online information for tax, accounting and finance professionals.

Refinitiv Products

**Refinitiv Workspace** ⧉

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Refinitiv Data Catalogue** ⧉

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**Refinitiv World-Check** ⧉

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

**Advertise With Us** ⧉     **Advertising Guidelines** ⧉

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ⧉     **Terms of Use** ⧉     **Privacy** ⧉     **Digital Accessibility** ⧉     **Corrections** ⧉     **Site Feedback** ⧉

© 2023 Reuters. All rights reserved

Haiti AR_001414

Haiti AR_001415

Haiti AR_001416

Haiti AR_001417

Sign in

**Support us** →

News  Opinion  Sport  Culture  Lifestyle



**US-Mexico border**

# Migrants risk death crossing treacherous Rio Grande river for 'American dream'

Nine died while swimming the Rio Grande on Friday as deaths became commonplace this year after a migration shift pushed thousands here

*Valerie Gonzalez in Eagle Pass, Texas*

Mon 5 Sep 2022 02.00 EDT

Haiti AR_001418

Two small inflatable floats with printed aquatic animals in bright colors lay by the river under the Eagle Pass port of entry in Texas on Saturday, a day after nine migrants died while swimming the Rio Grande.

A parent had placed their child in the floats and jumped in a river that looked deceptively calm. National guardsmen tasked with watching that section of Eagle Pass saw it for what it was: a treacherous, deep body of water with whirlpools between pillars holding up the international bridge.

"That's the problem with people from other countries," said Tom Schmerber, the Maverick county sheriff. "When they come, they're used to seeing big rivers. Then they see this one. It's not too big for them. But the Rio Grande carries a lot of currents."

Deaths in the river became commonplace this year, after a migration shift pushed thousands here.

"Almost every single day we respond to the river and recover at least one body a day," said Manuel Mello, the Eagle Pass fire chief. "Some days you won't recover for two or three days. [But] Monday or Tuesday we recovered four bodies with the Border Patrol."

Mello estimates about 30 bodies have been taken from the river each month since March.

Migrant encounters, rescues and recidivism rates increased dramatically when Title 42, a public health policy barring migrants from seeking asylum, went into place in the Covid pandemic.

Locals said rains over the last two weeks dumped more water into the river, which had been in drought, adding to its volatility.

Many migrants cross dangerous terrain like the infamous Darien Gap in southern Panama or other perilous routes.

Jhoana Contreras, a 33-year-old Venezuelan mother of three who made it to Eagle Pass after border patrol released her and sent her to Mission: Border Hope, a welcome center in Eagle Pass helping guide migrants through their journeys into the US.

"I didn't think it would ever end," she said of the journey, adding, "because it took days, days and days, rivers, rivers and rivers".

Contreras broke down as she recounted other times she, her husband and brother nearly lost it all.

Haiti AR_001419

"We were kidnapped in Guatemala. We went through things we never imagined we'd go through. I thank God who always kept us safe."

Contreras and family members crossed into the US via the Rio Grande, or Rio Bravo as it's known in Mexico, for its wild nature. At one point, she said, she went under the water and was rescued by her husband.

She was one of the lucky ones.



📷 Migrant families enter the Unites States after being smuggled across the Rio Grande river from Mexico into Roma, Texas, on 26 August. Photograph: Adrees Latif/Reuters

On Saturday, dozens of migrants were dropped off and picked up from Mission: Border Hope. Parents shuffled down charter buses with children in their arms. Some children were fast asleep. Others were wide awake.

Contreras' children were not with her.

"I wouldn't want the experience that so many children had on the way," she said. "I saw some children who would faint. They needed food, water, and medicine."

Her mother is watching them while Contreras and her husband work to get permission to bring them to the US.

Some parents, like Andrés Lecuna, a 39-year-old Venezuelan father of a five-year-old girl, brought their families in spite of the danger.

"It's something I lived through myself, because my daughter and wife nearly drowned. Some people we were traveling with helped save them," Lecuna said. "My arms were giving out, because the current was too strong. I felt I was drowning."

Lecuna's daughter, who wore a pink shirt and braids made by her mother, played with rocks outside the welcome center as her father contemplated the fate of those who died Friday in the same waters.

"I was surprised, because some of those who died were people traveling with us. A mother of an autistic son died. She was traveling with her husband and a daughter," Lecuna said.

The Guardian was not able to verify his account.

He said other men went under, men who knew how to swim like he did.

"I went under with my feet touching the ground and the top of my head wouldn't even touch the surface," he said. He calculated the depth was between 6ft and 9ft. "You get a cramp. Your arms get tired. You go into shock."

Migrants often travel in groups, to help each other through tough spots.

"If we come together, we cross together," said Jorge Luis Acosta, a 34-year-old single man from Cuba in Eagle Pass. "It was a bit dangerous, because it was deep. We were keeping watch over women and children so nothing bad would happen to them."

The last two years have seen record-breaking numbers of people attempting to cross the border illegally. The border patrol sector that includes Eagle Pass has seen almost as many migrants this year as the Rio Grande Valley sector, the traditional route of entry. The Eagle Pass region has seen about 376,000 encounters, while the Valley had nearly 413,000. Many tried to get in more than once.

Recidivism rates increased from 14% in 2015 to 26% and 27% in the last two years.

As desperation grows, more people are willing to risk their lives. From 2019 to 2022, rescues nearly tripled, with a 284% increase, according to US government data. The change started last year, up to nearly 13,000 from about 5,000 in 2020.

"You have females drowning. We found some who were pregnant. Their kids drown. It's not only just them, but families," Sheriff Schmerber said.

For many, the risk seems worth it.

"It's not easy to go through so much adversity, but it's worth it because I believe in the American dream," said Lecuna, who traveled with his wife and daughter.

Acosta said: "They're people just like you. People who are looking for a better life: a better economy, a way to feed, clothe and educate their children. That's all they want."

---

I hope you appreciated this article. Before you move on, I was hoping you would consider taking the step of supporting the Guardian's journalism.

From Elon Musk to Rupert Murdoch, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest - not profit motives.

And we avoid the trap that befalls much US media - the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. While fairness guides everything we do, we know there is a right and a wrong position in the fight against racism and for reproductive justice. When we report on issues like the climate crisis, we're not afraid to name who is responsible. And as a global news organization, we're able to provide a fresh, outsider perspective on US politics - one so often missing from the insular American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone - whether they can afford to pay for news, or not.

**If you can, please consider supporting the Guardian today. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

| Single | Monthly | Annual |
|--------|---------|--------|

Haiti AR_001422

| $7 per month | **$13 per month** | Other |

**Continue** →    **Remind me in April**    VISA   mastercard   AMERICAN EXPRESS   PayPal

# Most viewed

Haiti AR_001425

Haiti AR_001426

Haiti AR_001427

Haiti AR_001428

Haiti AR_001429



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

# LEY DE MIGRACIÓN

**Nueva Ley publicada en el Diario Oficial de la Federación el 25 de mayo de 2011**

**TEXTO VIGENTE**
**Última reforma publicada DOF 29-04-2022**

Al margen un sello con el Escudo Nacional, que dice: Estados Unidos Mexicanos.- Presidencia de la República.

**FELIPE DE JESÚS CALDERÓN HINOJOSA**, Presidente de los Estados Unidos Mexicanos, a sus habitantes sabed:

Que el Honorable Congreso de la Unión, se ha servido dirigirme el siguiente

**DECRETO**

**"**EL CONGRESO GENERAL DE LOS ESTADOS UNIDOS MEXICANOS, D E C R E T A :

SE EXPIDE LA LEY DE MIGRACIÓN Y SE REFORMAN, DEROGAN Y ADICIONAN DIVERSAS DISPOSICIONES DE LA LEY GENERAL DE POBLACIÓN, DEL CÓDIGO PENAL FEDERAL, DEL CÓDIGO FEDERAL DE PROCEDIMIENTOS PENALES, DE LA LEY FEDERAL CONTRA LA DELINCUENCIA ORGANIZADA, DE LA LEY DE LA POLICÍA FEDERAL, DE LA LEY DE ASOCIACIONES RELIGIOSAS Y CULTO PÚBLICO, DE LA LEY DE INVERSIÓN EXTRANJERA, Y DE LA LEY GENERAL DE TURISMO.

**ARTÍCULO PRIMERO.** Se expide la Ley de Migración.

## LEY DE MIGRACION

### TÍTULO PRIMERO
### DISPOSICIONES PRELIMINARES

### CAPÍTULO ÚNICO
### DISPOSICIONES PRELIMINARES

**Artículo 1.** Las disposiciones de esta Ley son de orden público y de observancia general en toda la República y tienen por objeto regular lo relativo al ingreso y salida de mexicanos y extranjeros al territorio de los Estados Unidos Mexicanos y el tránsito y la estancia de los extranjeros en el mismo, en un marco de respeto, protección y salvaguarda de los derechos humanos, de contribución al desarrollo nacional, así como de preservación de la soberanía y de la seguridad nacionales.

**Artículo 2.** La política migratoria del Estado Mexicano es el conjunto de decisiones estratégicas para alcanzar objetivos determinados que con fundamento en los principios generales y demás preceptos contenidos en la Constitución Política de los Estados Unidos Mexicanos, los tratados y convenios internacionales en los que el Estado Mexicano sea parte y la presente Ley, se plasman en el Reglamento, normas secundarias, diversos programas y acciones concretas para atender el fenómeno migratorio de México de manera integral, como país de origen, tránsito, destino y retorno de migrantes.
*Párrafo reformado DOF 04-05-2021*

Son principios en los que debe sustentarse la política migratoria del Estado mexicano los siguientes:

Haiti AR_001430

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

Respeto irrestricto de los derechos humanos de los migrantes, nacionales y extranjeros, sea cual fuere su origen, nacionalidad, género, etnia, edad y situación migratoria, con especial atención a grupos vulnerables como menores de edad, mujeres, indígenas, adolescentes y personas de la tercera edad, así como a víctimas del delito. En ningún caso una situación migratoria irregular preconfigurará por sí misma la comisión de un delito ni se prejuzgará la comisión de ilícitos por parte de un migrante por el hecho de encontrarse en condición no documentada.

Congruencia de manera que el Estado mexicano garantice la vigencia de los derechos que reclama para sus connacionales en el exterior, en la admisión, ingreso, permanencia, tránsito, deportación y retorno asistido de extranjeros en su territorio.

Enfoque integral acorde con la complejidad de la movilidad internacional de personas, que atienda las diversas manifestaciones de migración en México como país de origen, tránsito, destino y retorno de migrantes, considerando sus causas estructurales y sus consecuencias inmediatas y futuras.

Responsabilidad compartida con los gobiernos de los diversos países y entre las instituciones nacionales y extranjeras involucradas en el tema migratorio.

Hospitalidad y solidaridad internacional con las personas que necesitan un nuevo lugar de residencia temporal o permanente debido a condiciones extremas en su país de origen que ponen en riesgo su vida o su convivencia, de acuerdo con la tradición mexicana en este sentido, los tratados y el derecho internacional.

Facilitación de la movilidad internacional de personas, salvaguardando el orden y la seguridad. Este principio reconoce el aporte de los migrantes a las sociedades de origen y destino. Al mismo tiempo, pugna por fortalecer la contribución de la autoridad migratoria a la seguridad pública y fronteriza, a la seguridad regional y al combate contra el crimen organizado, especialmente en el combate al tráfico o secuestro de migrantes, y a la trata de personas en todas sus modalidades.

Complementariedad de los mercados laborales con los países de la región, como fundamento para una gestión adecuada de la migración laboral acorde a las necesidades nacionales.

Equidad entre nacionales y extranjeros, como indica la Constitución Política de los Estados Unidos Mexicanos, especialmente en lo que respecta a la plena observancia de las garantías individuales, tanto para nacionales como para extranjeros.

Reconocimiento a los derechos adquiridos de los inmigrantes, en tanto que los extranjeros con arraigo o vínculos familiares, laborales o de negocios en México han generado una serie de derechos y compromisos a partir de su convivencia cotidiana en el país, aún cuando puedan haber incurrido en una situación migratoria irregular por aspectos administrativos y siempre que el extranjero haya cumplido con las leyes aplicables.

Unidad familiar e interés superior de la niña, niño y adolescente, como criterio prioritario de internación y estancia de extranjeros para la residencia temporal o permanente en México, junto con las necesidades laborales y las causas humanitarias, en tanto que la unidad familiar es un elemento sustantivo para la conformación de un sano y productivo tejido social de las comunidades de extranjeros en el país.

Integración social y cultural entre nacionales y extranjeros residentes en el país con base en el multiculturalismo y la libertad de elección y el pleno respeto de las culturas y costumbres de sus comunidades de origen, siempre que no contravengan las leyes del país.

Haiti AR_001431



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

Facilitar el retorno al territorio nacional y la reinserción social de los emigrantes mexicanos y sus familias, a través de programas interinstitucionales y de reforzar los vínculos entre las comunidades de origen y destino de la emigración mexicana, en provecho del bienestar familiar y del desarrollo regional y nacional.

Interés superior de la niña, niño o adolescente y la perspectiva de género.

*Párrafo adicionado DOF 04-05-2021*

Convencionalidad, en términos de lo dispuesto por el párrafo tercero del artículo 1o. de la Constitución Política de los Estados Unidos Mexicanos.

*Párrafo adicionado DOF 04-05-2021*

El Poder Ejecutivo determinará la política migratoria del país en su parte operativa, para lo cual deberá recoger las demandas y posicionamientos de los otros Poderes de la Unión, de los gobiernos de las entidades federativas y de la sociedad civil organizada, tomando en consideración la tradición humanitaria de México y su compromiso indeclinable con los derechos humanos, el desarrollo y la seguridad nacional, pública y fronteriza.

**Artículo 3.** Para efectos de la presente Ley se entenderá por:

**I.** Autoridad migratoria, al servidor público que ejerce la potestad legal expresamente conferida para realizar determinadas funciones y actos de autoridad en materia migratoria;

**II.** Acuerdo de readmisión: al acto por el cual la Secretaría determina autorizar la internación al país de un extranjero deportado con anterioridad;

**III.** Asilado: a todo extranjero que sea reconocido como tal en los términos de la Ley sobre Refugiados, Protección Complementaria y Asilo Político;

*Fracción reformada DOF 30-10-2014*

**IV.** Apátrida: toda persona que no sea considerada como nacional por, ningún Estado, conforme a su legislación. La ley concederá igual trato a las personas que tienen una nacionalidad pero que no es efectiva.

**V.** Centro de Asistencia Social: El establecimiento, lugar o espacio de cuidado alternativo o acogimiento residencial para niñas, niños y adolescentes sin cuidado parental o familiar que brindan instituciones públicas, privadas y asociaciones;

*Fracción adicionada DOF 11-11-2020*

**VI.** Centro de Evaluación: al Centro de Evaluación y Control de Confianza del Instituto Nacional de Migración;

*Fracción recorrida DOF 11-11-2020*

**VII.** Condición de estancia: a la situación regular en la que se ubica a un extranjero en atención a su intención de residencia y, en algunos casos, en atención a la actividad que desarrollarán en el país, o bien, en atención a criterios humanitarios o de solidaridad internacional.

*Fracción recorrida DOF 11-11-2020*

**VIII.** Constitución: a la Constitución Política de los Estados Unidos Mexicanos;

*Fracción recorrida DOF 11-11-2020*

**IX.** Cuota: al número máximo de extranjeros para ingresar a trabajar al país ya sea en general por actividad económica o por zona de residencia.

*Fracción recorrida DOF 11-11-2020*

Haiti AR_001432



**X.** Defensor de derechos humanos: a toda persona u organización de la sociedad civil que individual o colectivamente promueva o procure la protección o realización de los derechos humanos, libertades fundamentales y garantías individuales en los planos nacional o internacional.

*Fracción recorrida DOF 11-11-2020*

**XI.** Estación Migratoria: a la instalación física que establece el Instituto para alojar temporalmente a los extranjeros que no acrediten su situación migratoria regular, en tanto se resuelve su situación migratoria;

*Fracción recorrida DOF 11-11-2020*

**XII.** Extranjero: a la persona que no posea la calidad de mexicano, conforme a lo previsto en el artículo 30 de la Constitución;

*Fracción recorrida DOF 11-11-2020*

**XIII.** Filtro de revisión migratoria: al espacio ubicado en el lugar destinado al tránsito internacional de personas, donde el Instituto autoriza o rechaza la internación regular de personas al territorio de los Estados Unidos Mexicanos;

*Fracción recorrida DOF 11-11-2020*

**XIV.** Instituto: al Instituto Nacional de Migración;

*Fracción recorrida DOF 11-11-2020*

**XV.** Ley: a la presente Ley;

*Fracción recorrida DOF 11-11-2020*

**XVI.** Lugar destinado al tránsito internacional de personas: al espacio físico fijado por la Secretaría para el paso de personas de un país a otro;

*Fracción recorrida DOF 11-11-2020*

**XVII.** Mexicano: a la persona que posea las calidades determinadas en el artículo 30 de la Constitución;

*Fracción recorrida DOF 11-11-2020*

**XVIII.** Migrante: al individuo que sale, transita o llega al territorio de un Estado distinto al de su residencia por cualquier tipo de motivación.

*Fracción recorrida DOF 11-11-2020*

**XIX.** Niña, niño o adolescente migrante: cualquier persona migrante, nacional o extranjera, menor de dieciocho años de edad. Son niñas y niños los menores de doce años, y adolescentes las personas entre doce años cumplidos y menos de dieciocho años de edad.

Cuando exista la duda de si se trata de una persona mayor de dieciocho años de edad, se presumirá que es adolescente. Cuando exista la duda de si se trata de una persona mayor o menor a doce años, se presumirá que es niña o niño;

*Fracción reformada y recorrida DOF 11-11-2020*

**XX.** Niña, niño o adolescente migrante no acompañado: cualquier persona migrante menor de dieciocho años de edad que no se encuentra acompañada por la persona adulta que ejerce la patria potestad, que la tenga bajo su guarda y custodia, por su tutor o persona adulta bajo cuyos cuidados se encuentre habitualmente por costumbre;

*Fracción adicionada DOF 11-11-2020*

**XXI.** Niña, niño o adolescente migrante acompañado: cualquier persona migrante menor de dieciocho años de edad que se encuentra acompañada por la persona adulta que ejerce la patria potestad, la tenga bajo su guarda y custodia o por su tutor;

Haiti AR_001433



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN                    *Última Reforma DOF 29-04-2022*
Secretaría General
Secretaría de Servicios Parlamentarios

*Fracción adicionada DOF 11-11-2020*

**XXII.** Niña, niño o adolescente migrante separado: cualquier persona migrante menor de dieciocho años de edad que se encuentra acompañada de una persona adulta bajo cuyos cuidados se encuentra habitualmente por costumbre y no en virtud de ley;

*Fracción adicionada DOF 11-11-2020*

**XXIII.** Oficina consular: a las representaciones del Estado mexicano ante el gobierno de otro país en las que se realizan de carácter permanente las siguientes funciones: proteger a los mexicanos que se localizan en su circunscripción, fomentar las relaciones comerciales, económicas, culturales y científicas entre ambos países y expedir la documentación a mexicanos y extranjeros en términos de la Ley del Servicio Exterior Mexicano y su Reglamento;

*Fracción recorrida DOF 11-11-2020*

**XXIV.** Presentación: a la medida dictada por el Instituto mediante la cual se acuerda el alojamiento temporal de un extranjero que no acredita su situación migratoria para la regularización de su estancia o la asistencia para el retorno.

*Fracción recorrida DOF 11-11-2020*

**XXV.** Procuradurías de Protección: la Procuraduría Federal de Protección de Niñas, Niños y Adolescentes y las procuradurías de protección de niñas, niños y adolescentes de cada entidad federativa;

*Fracción adicionada DOF 11-11-2020*

**XXVI.** Protección complementaria: a la protección que la Secretaría otorga al extranjero que no ha sido reconocido como refugiado, consistente en no devolverlo al territorio de otro país en donde su vida se vería amenazada o se encontraría en peligro de ser sometido a tortura u otros tratos o penas crueles, inhumanos o degradantes;

*Fracción recorrida DOF 11-11-2020*

**XXVII.** Refugiado: a todo extranjero que se encuentre en territorio nacional y que sea reconocido como refugiado por parte de las autoridades competentes, conforme a los tratados y convenios internacionales de que es parte el Estado Mexicano y a la legislación vigente;

*Fracción recorrida DOF 11-11-2020*

**XXVIII.** Reglamento: al Reglamento de la presente Ley;

*Fracción recorrida DOF 11-11-2020*

**XXIX.** Retorno asistido es el procedimiento por el que el Instituto Nacional de Migración hace abandonar el territorio nacional a un extranjero, remitiéndolo a su país de origen o de residencia habitual;

*Fracción recorrida DOF 11-11-2020*

**XXX.** Remuneración: a las percepciones que reciban las personas en el territorio de los Estados Unidos Mexicanos por la prestación de un servicio personal subordinado o por la prestación de un servicio profesional independiente;

*Fracción recorrida DOF 11-11-2020*

**XXXI.** Secretaría: a la Secretaría de Gobernación;

*Fracción recorrida DOF 11-11-2020*

**XXXII.** Servicio Profesional de Carrera Migratoria: al mecanismo que garantiza la igualdad de oportunidades para el ingreso, permanencia y desarrollo de los servidores públicos con cargos de confianza del Instituto.

*Fracción adicionada DOF 07-06-2013. Recorrida DOF 11-11-2020*

Haiti AR_001434



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

**XXXIII.** Situación migratoria: a la hipótesis jurídica en la que se ubica un extranjero en función del cumplimiento o incumplimiento de las disposiciones migratorias para su internación y estancia en el país. Se considera que el extranjero tiene situación migratoria regular cuando ha cumplido dichas disposiciones y que tiene situación migratoria irregular cuando haya incumplido con las mismas;
*Fracción recorrida DOF 07-06-2013. Reformada DOF 12-07-2018. Recorrida DOF 11-11-2020*

**XXXIV.** Tarjeta de residencia: al documento que expide el Instituto con el que los extranjeros acreditan su situación migratoria regular de residencia temporal o permanente;
*Fracción recorrida DOF 07-06-2013, 11-11-2020*

**XXXV.** Trámite migratorio: Cualquier solicitud o entrega de información que formulen las personas físicas y morales ante la autoridad migratoria, para cumplir una obligación, obtener un beneficio o servicio de carácter migratorio a fin de que se emita una resolución, así como cualquier otro documento que dichas personas estén obligadas a conservar, no comprendiéndose aquélla documentación o información que solo tenga que presentarse en caso de un requerimiento del Instituto, y
*Fracción recorrida DOF 07-06-2013, 11-11-2020*

**XXXVI.** Visa: a la autorización que se otorga en una oficina consular que evidencia la acreditación de los requisitos para obtener una condición de estancia en el país y que se expresa mediante un documento que se imprime, adhiere o adjunta a un pasaporte u otro documento. La visa también se puede otorgar a través de medios y registros electrónicos pudiéndose denominar visa electrónica o virtual. La visa autoriza al extranjero para presentarse a un lugar destinado al tránsito internacional de personas y solicitar, según el tipo de visado su estancia, siempre que se reúnan los demás requisitos para el ingreso.
*Fracción recorrida DOF 07-06-2013, 11-11-2020*

**Artículo 4.** La aplicación de esta Ley corresponde a la Secretaría, para lo cual podrá auxiliarse y coordinarse con las demás dependencias y entidades de la Administración Pública Federal cuyas atribuciones estén vinculadas con la materia migratoria.

**Artículo 5.** Quedan exceptuados de la inspección migratoria los representantes y funcionarios de gobiernos extranjeros y de organismos internacionales que se internen al país en comisión oficial, sus familiares y los miembros del personal de servicio, así como las personas que, conforme a los tratados y convenios de los cuales sea parte el Estado Mexicano, a las leyes y a las prácticas internacionales reconocidas por el Estado Mexicano, gocen de inmunidades respecto de la jurisdicción territorial, atendiendo siempre a la reciprocidad internacional.

Los extranjeros que concluyan su encargo oficial en los Estados Unidos Mexicanos y deseen permanecer en el país, así como aquéllos que gocen de inmunidad y renuncien a ella con el fin de realizar actividades lucrativas, deberán cumplir con lo dispuesto en esta Ley y demás disposiciones jurídicas aplicables.

# TÍTULO SEGUNDO
# DERECHOS Y OBLIGACIONES DE LOS MIGRANTES

## CAPÍTULO ÚNICO
## DERECHOS Y OBLIGACIONES

**Artículo 6.** El Estado mexicano garantizará a toda persona extranjera el ejercicio de los derechos y libertades reconocidos en la Constitución, en los tratados y convenios internacionales de los cuales sea parte el Estado mexicano y en las disposiciones jurídicas aplicables, con independencia de su situación migratoria.

Haiti AR_001435



En el caso de niñas, niños y adolescentes migrantes se garantizarán, de manera adicional a lo establecido en el párrafo anterior, los derechos y principios establecidos en la Ley General de los Derechos de Niñas, Niños y Adolescentes y su Reglamento, incluyendo el de la no privación de la libertad por motivos migratorios.

*Artículo reformado DOF 11-11-2020*

**Artículo 7.** La libertad de toda persona para ingresar, permanecer, transitar y salir del territorio nacional tendrá las limitaciones establecidas en la Constitución, los tratados y convenios internacionales de los cuales sea parte el Estado mexicano, esta Ley y demás disposiciones jurídicas aplicables.

El libre tránsito es un derecho de toda persona y es deber de cualquier autoridad promoverlo y respetarlo. Ninguna persona será requerida de comprobar su nacionalidad y situación migratoria en el territorio nacional, más que por la autoridad competente en los casos y bajo las circunstancias establecidos en la presente Ley.

**Artículo 8.** Los migrantes podrán acceder a los servicios educativos provistos por los sectores público y privado, independientemente de su situación migratoria y conforme a las disposiciones legales y reglamentarias aplicables.

Los migrantes tendrán derecho a recibir cualquier tipo de atención médica, provista por los sectores público y privado, independientemente de su situación migratoria, conforme a las disposiciones legales y reglamentarias aplicables.

Los migrantes independientemente de su situación migratoria, tendrán derecho a recibir de manera gratuita y sin restricción alguna, cualquier tipo de atención médica urgente que resulte necesaria para preservar su vida.

En la prestación de servicios educativos y médicos, ningún acto administrativo establecerá restricciones al extranjero, mayores a las establecidas de manera general para los mexicanos.

**Artículo 9.** Los jueces u oficiales del Registro Civil no podrán negar a los migrantes, independientemente de su situación migratoria, la autorización de los actos del estado civil ni la expedición de las actas relativas a nacimiento, reconocimiento de hijos, matrimonio, divorcio y muerte.

**Artículo 10.** El Estado mexicano garantizará a los migrantes que pretendan ingresar de forma regular al país o que residan en territorio nacional con situación migratoria regular, así como a aquéllos que pretendan regularizar su situación migratoria en el país, el derecho a la preservación de la unidad familiar.

**Artículo 11.** En cualquier caso, independientemente de su situación migratoria, los migrantes tendrán derecho a la procuración e impartición de justicia, respetando en todo momento el derecho al debido proceso, así como a presentar quejas en materia de derechos humanos, de conformidad con las disposiciones contenidas en la Constitución y demás leyes aplicables.

Los procedimientos aplicables a niñas, niños y adolescentes migrantes, se regirán por los derechos y principios establecidos en la Constitución, los tratados internacionales, la Ley General de los Derechos de Niñas, Niños y Adolescentes y demás disposiciones normativas aplicables en la materia. Previo al inicio de dichos procedimientos, se dará aviso inmediato a la Procuraduría de Protección. En todo momento se observará el principio de la no privación de la libertad de niñas, niños y adolescentes por motivos migratorios.

*Artículo reformado DOF 11-11-2020*

Haiti AR_001436



**Artículo 12.** Los migrantes, independientemente de su situación migratoria, tendrán derecho al reconocimiento de su personalidad jurídica, de conformidad con lo dispuesto en la Constitución y en los tratados y convenios internacionales de los cuales sea parte el Estado mexicano.

**Artículo 13.** Los migrantes y sus familiares que se encuentren en el territorio de los Estados Unidos Mexicanos tendrán derecho a que se les proporcione información acerca de:

**I.** Sus derechos y obligaciones, conforme a la legislación vigente;

**II.** Los requisitos establecidos por la legislación aplicable para su admisión, permanencia y salida, y

**III.** La posibilidad de solicitar el reconocimiento de la condición de refugiado, del otorgamiento de protección complementaria o de la concesión de asilo político y la determinación de apátrida, así como los procedimientos respectivos para obtener dichas condiciones.

La Secretaría adoptará las medidas que considere apropiadas para dar a conocer la información mencionada, de conformidad con la legislación aplicable.

**Artículo 14.** Cuando el migrante, independientemente de su situación migratoria, no hable o no entienda el idioma español, se le nombrará de oficio un traductor o intérprete que tenga conocimiento de su lengua, para facilitar la comunicación.

Cuando el migrante sea sordo y sepa leer y escribir, se le interrogará por escrito o por medio de un intérprete. En caso contrario, se designará como intérprete a una persona que pueda entenderlo.

En caso de dictarse sentencia condenatoria a un migrante, independientemente de su condición migratoria, las autoridades judiciales estarán obligadas a informarle de los tratados y convenios internacionales suscritos por el Estado mexicano en materia de traslado de reos, así como de cualquier otro que pudiera beneficiarlo.

**Artículo 15.** El Estado mexicano promoverá el acceso y la integración de los migrantes que obtengan la condición de estancia de residentes temporales y residentes permanentes, a los distintos ámbitos de la vida económica y social del país, garantizando el respeto a su identidad y a su diversidad étnica y cultural.

**Artículo 16.** Los migrantes deberán cumplir con las siguientes obligaciones:

**I.** Cuando se trate de extranjeros con, situación migratoria regular, resguardar y custodiar la documentación que acredite su identidad y su situación.

**II.** Mostrar la documentación que acredite su identidad o su situación migratoria regular, cuando les sea requerida por las autoridades migratorias;

**III.** Proporcionar la información y datos personales que les sean solicitados por las autoridades competentes, en el ámbito de sus atribuciones, lo anterior sin perjuicio de lo previsto en la Ley Federal de Transparencia y Acceso a la Información Pública Gubernamental y demás disposiciones aplicables en la materia, y

**IV.** Las demás obligaciones establecidas en la Constitución, en la presente Ley, su Reglamento y demás disposiciones aplicables.

**Artículo 17.** Sólo las autoridades migratorias podrán retener la documentación que acredite la identidad o situación migratoria de los migrantes cuando existan elementos para presumir que son

Haiti AR_001437



**LEY DE MIGRACIÓN**
CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios
*Última Reforma DOF 29-04-2022*

apócrifas, en cuyo caso deberán inmediatamente hacerlo del conocimiento de las autoridades competentes para que éstas resuelvan lo conducente.

## TÍTULO TERCERO
## DE LAS AUTORIDADES EN MATERIA MIGRATORIA

## CAPÍTULO I
## DE LA AUTORIDADES MIGRATORIAS

**Artículo 18.** La Secretaría tendrá las siguientes atribuciones en materia migratoria:

**I.** Formular y dirigir la política migratoria del país, tomando en cuenta la opinión de las autoridades que al efecto se establezcan en el Reglamento, así como las demandas y posicionamientos de los otros Poderes de la Unión, de los Gobiernos de las entidades federativas y de la sociedad civil;

**II.** Fijar las cuotas, requisitos o procedimientos para la emisión de visas y la autorización de condiciones de estancia, siempre que de ellas se desprenda para su titular la posibilidad de realizar actividades a cambio de una remuneración; así como determinar los municipios o entidades federativas que conforman las regiones fronterizas o aquellas que reciben trabajadores temporales y la vigencia correspondiente de las autorizaciones para la condición de estancia expedida en esas regiones, en los términos de la presente Ley. En todos estos supuestos la Secretaría deberá obtener previamente la opinión favorable de la Secretaría del Trabajo y Previsión Social y tomará en cuenta la opinión de las demás autoridades que al efecto se establezcan en el Reglamento;

**III.** Establecer o suprimir requisitos para el ingreso de extranjeros al territorio nacional, mediante disposiciones de carácter general publicadas en el Diario Oficial de la Federación, tomando en cuenta la opinión de las autoridades que al efecto se establezcan en el Reglamento;

**IV.** Suspender o prohibir el ingreso de extranjeros, en términos de la presente Ley y su Reglamento;

**V.** En coordinación con la Secretaría de Relaciones Exteriores, promover y suscribir instrumentos internacionales en materia de retorno asistido tanto de mexicanos como de extranjeros;

**VI.** Fijar y suprimir los lugares destinados al tránsito internacional de personas, en términos de esta Ley y su Reglamento;

**VII.** Dictar los Acuerdos de readmisión, en los supuestos previstos en esta Ley, y

**VIII.** Las demás que le señale la Ley General de Población, esta Ley, su Reglamento y otras disposiciones jurídicas aplicables.

**Artículo 19.** El Instituto es un órgano administrativo desconcentrado de la Secretaría, que tiene por objeto la ejecución, control y supervisión de los actos realizados por las autoridades migratorias en territorio nacional, así como la instrumentación de políticas en la materia, con base en los lineamientos que expida la misma Secretaría.

**Artículo 20.** El Instituto tendrá las siguientes atribuciones en materia migratoria:

**I.** Instrumentar la política en materia migratoria;

**II.** Vigilar la entrada y salida de personas al territorio de los Estados Unidos Mexicanos y revisar su documentación;

Haiti AR_001438

**III.** En los casos señalados en esta Ley, tramitar y resolver sobre la internación, estancia y salida del país de los extranjeros;

**IV.** Conocer, resolver y ejecutar la deportación o el retorno asistido de personas extranjeras, en los términos y condiciones establecidos en la presente Ley y en su Reglamento; salvo que, en el caso de deportación o retorno asistido de niñas, niños y adolescentes migrantes, el plan de restitución de derechos que emita la Procuraduría de Protección determine lo contrario;

*Fracción reformada DOF 11-11-2020*

**V.** Imponer las sanciones previstas por esta Ley y su Reglamento;

**VI.** Llevar y mantener actualizado el Registro Nacional de Extranjeros;

**VII.** Presentar en las estaciones migratorias o en los lugares habilitados para tal fin, a las personas extranjeras que lo ameriten conforme a las disposiciones de esta Ley, respetando en todo momento sus derechos humanos;

*Fracción reformada DOF 11-11-2020*

**VIII.** Coordinar la operación de los grupos de atención a migrantes que se encuentren en territorio nacional;

**IX.** Proporcionar información contenida en las bases de datos de los distintos sistemas informáticos que administra, a las diversas instituciones de seguridad nacional que así lo soliciten, de conformidad con las disposiciones jurídicas aplicables;

*Fracción reformada DOF 11-11-2020*

**X.** Gestionar ante la autoridad correspondiente la asignación de la clave única del registro de población para niñas, niños y adolescentes a quienes se les otorgue autorización de estancia como Visitante por Razones Humanitarias o como Residente;

*Fracción adicionada DOF 11-11-2020*

**XI.** Recibir a niñas, niños y adolescentes mexicanos repatriados y de manera inmediata notificar a la Procuraduría de Protección y canalizar a la niña, niño o adolescente al Sistema DIF correspondiente, y

*Fracción adicionada DOF 11-11-2020*

**XII.** Las demás que le señale esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

*Fracción recorrida DOF 11-11-2020*

**Artículo 21.** La Secretaría de Relaciones Exteriores tendrá las siguientes atribuciones en materia migratoria:

**I.** Aplicar en el ámbito de su competencia las disposiciones de esta Ley, su Reglamento y demás disposiciones legales;

**II.** Promover conjuntamente con la Secretaría la suscripción de instrumentos internacionales en materia de retorno asistido de mexicanos y extranjeros;

**III.** Promover conjuntamente con la Secretaría de Gobernación, la suscripción de acuerdos bilaterales que regulen el flujo migratorio;

**IV.** En los casos previstos en esta Ley, tramitar y resolver la expedición de visas, y

**V.** Las demás que le señale esta Ley, su Reglamento y otras disposiciones jurídicas aplicables.

Haiti AR_001439



## CAPÍTULO II
## DE LA PROFESIONALIZACIÓN Y CERTIFICACIÓN DEL PERSONAL DEL INSTITUTO

**Artículo 22.** La actuación de los servidores públicos del Instituto se sujetará, invariablemente, a los principios de legalidad, objetividad, eficiencia, profesionalismo, honradez y respeto a los derechos humanos reconocidos en la Constitución y en la presente Ley.

**Artículo 23.** En términos del artículo 96 de la Ley General del Sistema Nacional de Seguridad Pública, los servidores públicos del Instituto están obligados a someterse al proceso de certificación que consiste en la comprobación del cumplimiento de los perfiles de personalidad, éticos, socioeconómicos y médicos, necesarios para el ejercicio de sus funciones, en los procedimientos de ingreso, promoción y permanencia, en los términos del Reglamento.

La certificación es requisito indispensable de ingreso, permanencia y promoción.

Para efectos de la certificación, el Instituto, contará con un Centro de Evaluación acreditado por el Centro Nacional de Certificación y Acreditación, en términos de la Ley General del Sistema Nacional de Seguridad Pública y demás disposiciones jurídicas aplicables.

El Centro de Evaluación se integrará con el personal de las áreas técnicas y administrativas necesario para el cumplimiento de sus atribuciones.

**Artículo 24.** El Centro de Evaluación tendrá las siguientes atribuciones:

**I.** Llevar a cabo las evaluaciones periódicas a los Integrantes del Instituto, a fin de comprobar el cumplimiento de los perfiles de personalidad, éticos, socioeconómicos y médicos, en los procedimientos de ingreso, promoción y permanencia necesarios para el cumplimiento de sus funciones;

**II.** Comunicar a las unidades administrativas competentes los resultados de las evaluaciones que practique, para los efectos del ingreso, promoción o permanencia de los servidores públicos del Instituto, según corresponda;

**III.** Emitir y actualizar el certificado correspondiente al personal del Instituto que acredite las evaluaciones correspondientes;

**IV.** Contribuir a identificar los factores de riesgo que repercutan o pongan en peligro el desempeño de las funciones migratorias, con el fin de garantizar la adecuada operación de los servicios migratorios;

**V.** Establecer una base de datos que contenga los archivos de los procesos de certificación de las personas a quienes se les hayan practicado e implementar las medidas de seguridad necesarias para el resguardo de la información contenida en dichas bases;

**VI.** Recomendar la capacitación y la implementación de las medidas que se deriven de los resultados de las evaluaciones practicadas, y

**VII.** Las demás que señale esta Ley, su Reglamento y otras disposiciones jurídicas aplicables.

**Artículo 25.** Los servidores públicos del Instituto para su ingreso, desarrollo y permanencia deberán cursar y aprobar los programas de formación, capacitación y profesionalización, incluyendo normatividad en materia migratoria y derechos humanos impartidos a través del Servicio Profesional de Carrera Migratoria, posterior a contar con la certificación a que hace referencia el artículo 23 de esta Ley.

Haiti AR_001440



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN                    *Última Reforma DOF 29-04-2022*
Secretaría General
Secretaría de Servicios Parlamentarios

Para la eficiencia y eficacia de la gestión migratoria, los procedimientos para la selección, ingreso, formación, capacitación, adiestramiento, desarrollo, actualización, permanencia y promoción de los servidores públicos del Instituto, así como los relativos a la organización y funcionamiento del Servicio Profesional de Carrera Migratoria, serán establecidos en el Reglamento de esta Ley.

*Artículo reformado DOF 07-06-2013*

# CAPÍTULO III
## DE LAS AUTORIDADES AUXILIARES EN MATERIA MIGRATORIA

**Artículo 26.** Corresponde a la Secretaría de Turismo:

**I.** Difundir información oficial de los trámites y requisitos migratorios que se requieran para la internación, tránsito, estancia regular y salida de los extranjeros que pretendan visitar el país;

**II.** Participar en las acciones interinstitucionales en materia migratoria, que coadyuven en la implementación de programas que fomenten y promuevan el turismo en destinos nacionales, para el desarrollo y beneficio del país, y

**III.** Las demás que señale esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

**Artículo 27.** Corresponde a la Secretaría de Salud:

**I.** Promover en coordinación con las autoridades sanitarias de los diferentes niveles de gobierno que, la prestación de servicios de salud que se otorgue a los extranjeros, se brinde sin importar su situación migratoria y conforme a las disposiciones jurídicas aplicables;

**II.** Establecer requisitos sanitarios para la internación de personas al territorio nacional, conforme a las disposiciones jurídicas aplicables;

**III.** Ejercer la vigilancia de los servicios de sanidad en los lugares destinados al tránsito internacional de personas, en transportes nacionales o extranjeros, marítimos, aéreos y terrestres, mediante visitas de inspección conforme a las disposiciones jurídicas aplicables;

**IV.** Diseñar y difundir campañas en los lugares destinados al tránsito internacional de personas, para la prevención y control de enfermedades, conforme a las disposiciones jurídicas aplicables, y

**V.** Las demás que señale esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

**Artículo 28.** Corresponde a la Fiscalía General de la República:

*Párrafo reformado DOF 20-05-2021*

**I.** Promover la formación y especialización de Agentes de la Policía Federal Ministerial, Agentes del Ministerio Público y Oficiales Ministeriales en materia de derechos humanos;

**II.** Proporcionar a los migrantes orientación y asesoría para su eficaz atención y protección, de conformidad con la Ley de la Fiscalía General de la República, su Estatuto Orgánico y demás ordenamientos aplicables;

*Fracción reformada DOF 20-05-2021*

**III.** Proporcionar a las instancias encargadas de realizar estadísticas las referencias necesarias sobre el número de averiguaciones previas, carpetas de investigación y procesos penales respecto de los delitos de los que son víctimas los migrantes;

Haiti AR_001441

*Fracción reformada DOF 20-05-2021*

**IV.** Celebrar convenios de cooperación y coordinación, así como realizar en el ámbito de sus atribuciones, las acciones necesarias para lograr una eficaz investigación y persecución de los delitos de los que son víctimas u ofendidos los migrantes;

*Fracción reformada DOF 04-05-2021*

**V.** Conocer respecto de los delitos previstos en los artículos 159 y 161 de esta Ley, y

**VI.** Las demás que señale esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

**Artículo 29.** Corresponde al Sistema Nacional para el Desarrollo Integral de la Familia, a los Sistemas Estatales DIF y al de la Ciudad de México:

**I.** Proporcionar asistencia social para la atención de niñas, niños y adolescentes migrantes que requieran servicios para su protección;

**II.** Otorgar facilidades de estancia y garantizar la protección y los derechos de niñas, niños y adolescentes migrantes, independientemente de su nacionalidad y situación migratoria, garantizando el principio de unidad familiar y el cumplimiento de las medidas de protección para la restitución integral de derechos vulnerados de niñas, niños y adolescentes de conformidad con los artículos 122 y 123 de la Ley General de los Derechos de Niñas, Niños y Adolescentes;

**III.** El Sistema Nacional DIF y los sistemas de las entidades federativas, en coordinación con las instituciones competentes, deberán identificar a las niñas, niños y adolescentes extranjeros que requieren de protección internacional, ya sea como refugiado o de algún otro tipo, a través de una evaluación inicial con garantías de seguridad y privacidad, con el fin de proporcionarles el tratamiento adecuado e individualizado que sea necesario mediante la adopción de medidas de protección especial;

**IV.** Coadyuvar con el Instituto en la implementación de acciones que permitan brindar una atención adecuada a los migrantes que por diferentes factores o la combinación de ellos, enfrentan situaciones de mayor vulnerabilidad;

**V.** Coadyuvar con defensores de derechos humanos y la Comisión Nacional de los Derechos Humanos para garantizar la protección integral de los derechos de niñas, niños y adolescentes;

**VI.** Establecer convenios de coordinación con dependencias y entidades de la Administración Pública Federal, de las entidades federativas, municipios y demarcaciones territoriales y con las organizaciones de la sociedad civil especializadas para garantizar la protección integral de los derechos de niñas, niños y adolescentes, y

**VII.** Las demás que señale esta Ley, su Reglamento, la Ley General de los Derechos de Niñas, Niños y Adolescentes y su Reglamento y otras disposiciones jurídicas aplicables.

*Artículo reformado DOF 09-11-2017, 11-11-2020*

**Artículo 30.** Corresponde al Instituto Nacional de las Mujeres:

**I.** Realizar acciones interinstitucionales, de manera coordinada con el Instituto, que permitan atender la problemática, así como la prevención de la violencia contra las mujeres migrantes, y avanzar en el cumplimiento de los tratados y convenios internacionales de los cuales sea parte el Estado Mexicano.

*Fracción reformada DOF 25-06-2018*

Haiti AR_001442



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**II.** Promover acciones dirigidas a mejorar la condición social de la población femenina migrante y la erradicación de todas las formas de discriminación en su contra;

**III.** Proporcionar a las autoridades migratorias capacitación en materia de igualdad de género, con énfasis en el respeto y protección de los derechos humanos de las migrantes, y

**IV.** Las demás que señale esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

## TÍTULO CUARTO
## DEL MOVIMIENTO INTERNACIONAL DE PERSONAS Y LA ESTANCIA DE EXTRANJEROS EN TERRITORIO NACIONAL

## CAPÍTULO I
## DE LA ENTRADA Y SALIDA DEL TERRITORIO NACIONAL

**Artículo 31.** Es facultad exclusiva de la Secretaría fijar y suprimir los lugares destinados al tránsito internacional de personas por tierra, mar y aire, previa opinión de las Secretarías de Hacienda y Crédito Público; de Comunicaciones y Transportes; de Salud; de Relaciones Exteriores; de Agricultura, Ganadería, Desarrollo Rural, Pesca y Alimentación, y en su caso, de Marina. Asimismo, consultará a las dependencias que juzgue convenientes.

Las dependencias que se mencionan están obligadas a proporcionar los elementos necesarios para prestar los servicios correspondientes a sus respectivas competencias.

**Artículo 32.** La Secretaría, podrá cerrar temporalmente los lugares destinados al tránsito internacional de personas por tierra, mar y aire, por causas de interés público.

**Artículo 33.** Los concesionarios o permisionarios que operen o administren lugares destinados al tránsito internacional de personas por tierra, mar y aire, estarán obligados a poner a disposición del Instituto las instalaciones necesarias para el adecuado desempeño de sus funciones, así como cumplir con los lineamientos que al efecto se emitan.

Las características que deberán tener las instalaciones del Instituto en los lugares destinados al tránsito internacional de personas por tierra, mar y aire, se especificarán en el Reglamento.

**Artículo 34.** Los mexicanos y extranjeros sólo pueden entrar y salir del territorio nacional por los lugares destinados al tránsito internacional de personas por tierra, mar y aire.

La internación regular al país se efectuará en el momento en que la persona pasa por los filtros de revisión migratoria ubicados en los lugares destinados al tránsito internacional de personas por tierra, mar y aire, dentro de los horarios establecidos para tal efecto y con intervención de las autoridades migratorias.

**Artículo 35.** Para entrar y salir del país, los mexicanos y extranjeros deben cumplir con los requisitos exigidos por la presente Ley, su Reglamento y demás disposiciones jurídicas aplicables.

Corresponde de forma exclusiva al personal del Instituto vigilar la entrada y salida de los nacionales y extranjeros y revisar la documentación de los mismos, para lo cual se podrán auxiliar de herramientas tecnológicas automatizadas, observando lo dispuesto en el artículo 16 de esta Ley.

*Artículo reformado DOF 29-04-2022*

Haiti AR_001443



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**Artículo 36.** Los mexicanos no podrán ser privados del derecho a ingresar a territorio nacional. Para tal efecto, deben acreditar su nacionalidad además de cumplir con los demás requisitos que se establecen en esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

Los mexicanos comprobarán su nacionalidad, con alguno de los documentos siguientes:

**I.** Pasaporte;

**II.** Cédula de Identidad Ciudadana o Cédula de Identidad Personal o su equivalente;

**III.** Copia certificada del Acta de Nacimiento;

**IV.** Matrícula consular;

**V.** Carta de Naturalización, o

**VI.** Certificado de Nacionalidad Mexicana.

En su caso, podrá identificarse con credencial para votar con fotografía, expedida por la autoridad electoral nacional, o cualquier otro documento expedido por la autoridad en el ejercicio de sus funciones.

A falta de los documentos probatorios mencionados en las fracciones anteriores, para los efectos de lo dispuesto en este artículo, se podrá acreditar la nacionalidad mexicana mediante cualquier otro elemento objetivo de convicción que permita al Instituto determinar que se cumplen con los supuestos de acreditación de la nacionalidad mexicana.

En los casos en que el Instituto cuente con elementos suficientes para presumir la falta de autenticidad de los documentos o de veracidad de los elementos aportados para acreditar la nacionalidad mexicana, determinará el ingreso o rechazo de la persona de que se trate, después de realizar la investigación respectiva. Este procedimiento deberá ser racional y en ningún caso excederá de 4 horas.

De igual forma, al ingresar al país, los mexicanos estarán obligados a proporcionar la información y los datos personales que, en el ámbito de sus atribuciones, les sea solicitada por las autoridades competentes y tendrán derecho a ser informados sobre los requerimientos legales establecidos para su ingreso y salida del territorio nacional.

**Artículo 37.** Para internarse al país, los extranjeros deberán:

**I.** Presentar en el filtro de revisión migratoria ante el Instituto, los documentos siguientes:

**a)** Pasaporte o documento de identidad y viaje que sea válido de conformidad con el derecho internacional vigente, y

**b)** Cuando así se requiera, visa válidamente expedida y en vigor, en términos del artículo 40 de esta Ley; o

**c)** Tarjeta de residencia o autorización en la condición de estancia de visitante regional, visitante trabajador fronterizo o visitante por razones humanitarias.

**II.** Proporcionar la información y los datos personales que las autoridades competentes soliciten en el ámbito de sus atribuciones.

**III.** No necesitan visa los extranjeros que se ubiquen en alguno de los siguientes supuestos:

Haiti AR_001444



**a)** Nacionales de países con los que se haya suscrito un acuerdo de supresión de visas o que no se requiera de visado en virtud de una decisión unilateral asumida por el Estado mexicano;

**b)** Solicitantes de la condición de estancia de visitante regional y visitante trabajador fronterizo;

**c)** Titulares de un permiso de salida y regreso;

**d)** Titulares de una condición de estancia autorizada, en los casos que previamente determine la Secretaría;

**e)** Solicitantes de la condición de refugiado, de protección complementaria y de la determinación de apátrida, o por razones humanitarias o causas de fuerza mayor, y

**f)** Miembros de la tripulación de embarcaciones o aeronaves comerciales conforme a los compromisos internacionales asumidos por México.

**Artículo 38.** La Secretaría, por causas de interés público y mientras subsistan las causas que la motiven podrá suspender o prohibir la admisión de extranjeros mediante la expedición de disposiciones administrativas de carácter general, que deberán ser publicadas en el Diario Oficial de la Federación.

**Artículo 39.** En los términos de esta Ley y su Reglamento, en el procedimiento de trámite y expedición de visas y autorización de condiciones de estancia intervendrán:

**I.** Las oficinas establecidas por la Secretaría en territorio nacional, y

**II.** Las oficinas consulares, de conformidad con la Ley del Servicio Exterior Mexicano y su Reglamento.

**Artículo 40.** Los extranjeros que pretendan ingresar al país deben presentar alguno de los siguientes tipos de visa, válidamente expedidas y vigentes:

**I.** Visa de visitante sin permiso para realizar actividades remuneradas, que autoriza al extranjero para presentarse en cualquier lugar destinado al tránsito internacional de personas y solicitar su ingreso a territorio nacional, con el objeto de permanecer por un tiempo ininterrumpido no mayor a ciento ochenta días, contados a partir de la fecha de entrada.

**II.** Visa de visitante con permiso para realizar actividades remuneradas, que autoriza al extranjero para presentarse en cualquier lugar destinado al tránsito internacional de personas y solicitar su ingreso a territorio nacional, con el objeto de permanecer por un tiempo ininterrumpido no mayor a ciento ochenta días, contados a partir de la fecha de entrada y realizar actividades remuneradas.

**III.** Visa de visitante para realizar trámites de adopción, que autoriza al extranjero vinculado con un proceso de adopción en los Estados Unidos Mexicanos, a presentarse en cualquier lugar destinado al tránsito internacional de personas y solicitar su ingreso a territorio nacional, con el objeto de permanecer en el país hasta en tanto se dicte la resolución ejecutoriada y, en su caso, se inscriba en el Registro Civil la nueva acta del niño, niña o adolescente adoptado, así como se expida el pasaporte respectivo y todos los trámites necesarios para garantizar la salida del niño, niña o adolescente del país. La expedición de esta autorización, sólo procederá respecto de ciudadanos de países con los que los Estados Unidos Mexicanos hayan suscrito algún convenio en la materia.

**IV.** Visa de residencia temporal, que autoriza al extranjero para presentarse en cualquier lugar destinado al tránsito internacional de personas y solicitar su ingreso a territorio nacional, con el objeto de permanecer por un tiempo no mayor a cuatro años.

Haiti AR_001445



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**V.** Visa de residente temporal estudiante, que autoriza al extranjero para presentarse en cualquier lugar destinado al tránsito internacional de personas y solicitar su ingreso a territorio nacional, con el objeto de permanecer por el tiempo que duren los cursos, estudios, proyectos de investigación o formación que acredite que se llevarán a cabo en instituciones educativas pertenecientes al sistema educativo nacional, y realizar actividades remuneradas conforme a lo dispuesto por la fracción VIII del artículo 52 de esta Ley.

**VI.** Visa de residencia permanente, que autoriza al extranjero para presentarse en cualquier lugar destinado al tránsito internacional de personas y solicitar su ingreso a territorio nacional, con el objeto de permanecer de manera indefinida.

Los criterios para emitir visas serán establecidos en el Reglamento y los lineamientos serán determinados en conjunto por la Secretaría y la Secretaría de Relaciones Exteriores, privilegiando una gestión migratoria congruente que otorgue facilidades en la expedición de visas a fin de favorecer los flujos migratorios ordenados y regulares privilegiando la dignidad de los migrantes.

Ninguna de las visas otorga el permiso para trabajar a cambio de una remuneración, a menos que sea explícitamente referido en dicho documento.

La visa acredita requisitos para una condición de estancia y autoriza al extranjero para presentarse en cualquier lugar destinado al tránsito internacional de personas y solicitar su ingreso al país en dicha condición de estancia, sin perjuicio de que posteriormente obtenga una tarjeta de residencia.

**Artículo 41.** Los extranjeros solicitarán la visa en las oficinas consulares. Estas autorizarán y expedirán las visas, de conformidad con las disposiciones jurídicas aplicables.

En los casos del derecho a la preservación de la unidad familiar, por oferta de empleo o por razones humanitarias, la solicitud de visa se podrá realizar en las oficinas del Instituto. En estos supuestos, corresponde al Instituto la autorización y a las oficinas consulares de México en el exterior, la expedición de la visa conforme se instruya.

La oficina consular podrá solicitar al Instituto la reconsideración de la autorización si a su juicio el solicitante no cumple con los requisitos establecidos en esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

El Instituto resolverá en definitiva sin responsabilidad para la oficina consular.

**Artículo 42.** La Secretaría podrá autorizar el ingreso de extranjeros que soliciten el reconocimiento de la condición de refugiado, asilo político, determinación de apátrida, o por causas de fuerza mayor o por razones humanitarias, sin cumplir con alguno de los requisitos establecidos en el artículo 37 de esta Ley.

**Artículo 43.** Sin perjuicio de lo dispuesto en el artículo 42 de este ordenamiento, las autoridades migratorias podrán negar la expedición de la visa, la internación regular a territorio nacional o su permanencia a los extranjeros que se ubiquen en alguno de los siguientes supuestos:

**I.** Cuando derivado de sus antecedentes en México o en el extranjero se comprometa la seguridad nacional o la seguridad pública;

*Fracción reformada DOF 07-01-2021*

**II.** Cuando no cumplan con los requisitos establecidos en esta Ley, su Reglamento y otras disposiciones jurídicas aplicables;

Haiti AR_001446

**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN                    *Última Reforma DOF 29-04-2022*
Secretaría General
Secretaría de Servicios Parlamentarios

**III.**    Cuando se verifique que los documentos o los elementos aportados no son auténticos;

*Fracción reformada DOF 07-01-2021*

**IV.**    Estar sujeto a prohibiciones expresas de autoridad competente, o

**V.**    Lo prevean otras disposiciones jurídicas.

Las autoridades migratorias, en el ámbito de sus atribuciones, contarán con los medios necesarios para verificar los supuestos anteriores y para este fin podrán solicitar al extranjero la información o datos que se requieran.

El hecho de que el extranjero haya incumplido con lo dispuesto en la fracción II de este artículo, no impedirá a la autoridad migratoria analizar de nueva cuenta su solicitud de visa, siempre que cumpla con lo dispuesto en esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

En los casos en que la autoridad judicial imponga a la persona extranjera sentencia firme condenatoria, el Instituto valorará su condición migratoria atendiendo los principios de la reinserción social, así como los relativos a la reunificación familiar.

*Párrafo reformado DOF 07-01-2021*

**Artículo 44.** Las empresas de transporte internacional de pasajeros marítimo o aéreo, tienen la obligación de verificar que los extranjeros que transporten, cuenten con la documentación válida y vigente que se requiere para internarse al territorio nacional o al país de destino final.

**Artículo 45.** Los tripulantes extranjeros de empresas en tránsito internacional de transportes aéreos, terrestres o marítimos que lleguen al territorio nacional en servicio activo, sólo podrán permanecer en el país por el tiempo necesario para reiniciar el servicio en la próxima salida que tengan asignada.

Los gastos que origine la presentación, deportación o salida del país de tripulantes que no cumplan con esta disposición, serán cubiertos por la empresa de transporte para la cual laboran.

**Artículo 46.** Las empresas aéreas y marítimas, así como las aeronaves y los barcos de carácter privado que efectúen el transporte internacional de pasajeros deberán transmitir electrónicamente al Instituto la información relativa a los pasajeros, tripulación y medios de transporte que entren o salgan del país.

En el Reglamento se especificará la información que se solicitará, y los términos para su envío serán determinados en las disposiciones administrativas de carácter general que expida el Instituto.

**Artículo 47.** Para la salida de personas del territorio nacional, éstas deberán:

**I.** Hacerlo por lugares destinados al tránsito internacional de personas;

**II.** Identificarse mediante la presentación del pasaporte o documento de identidad o viaje válido y vigente;

**III.** Presentar al Instituto la información que se requiera con fines estadísticos;

**IV.** En el caso de extranjeros, acreditar su situación migratoria regular en el país, o el permiso expedido por la autoridad migratoria en los términos del artículo 137 de esta Ley, y

**V.** Sujetarse a lo que establezcan otras disposiciones aplicables en la materia.

Haiti AR_001447



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**Artículo 48.** La salida de mexicanos y extranjeros del territorio nacional podrá realizarse libremente, excepto en los siguientes casos:

I.   Se le haya dictado por autoridad judicial, providencia precautoria o medida cautelar, siempre que tenga por objeto restringir la libertad de tránsito de la persona;

II.   Que se encuentre bajo libertad caucional por vinculación a proceso;

III.   Que goce de libertad preparatoria o condicional, salvo con permiso de la autoridad competente;

IV.   Por razones de seguridad nacional, de conformidad con las disposiciones jurídicas aplicables;

*Fracción reformada DOF 21-04-2016*

V.   Tratándose de niñas, niños y adolescentes sujetos a un procedimiento de restitución internacional, de conformidad con lo establecido en los tratados y convenios internacionales de los cuales sea parte el Estado mexicano, y

*Fracción reformada DOF 21-04-2016*

VI.   Las personas que, en su carácter de deudoras alimentarias, dejen de cumplir con las obligaciones que impone la legislación civil en materia de alimentos por un período mayor de sesenta días, previa solicitud de la autoridad judicial competente, sin perjuicio de las excepciones previstas por la legislación civil aplicable, así como de aquellas conductas consideradas como delitos por las leyes penales correspondientes. Para efectos de esta fracción y tratándose de extranjeros, el Instituto definirá su situación migratoria y resolverá con base en lo que se establezca en otros ordenamientos y en el reglamento de esta Ley.

*Fracción adicionada DOF 21-04-2016*

El Instituto contará con los medios adecuados para verificar los supuestos anteriores, de conformidad con lo dispuesto en el Reglamento.

**Artículo 49.** La salida del país de niñas, niños y adolescentes o de personas bajo tutela jurídica en términos de la legislación civil, sean mexicanos o extranjeros, se sujetará además a las siguientes reglas:

I. Deberán ir acompañados de alguna de las personas que ejerzan sobre ellos la patria potestad o la tutela, y cumpliendo los requisitos de la legislación Civil.

II. En el caso de que vayan acompañados por un tercero mayor de edad o viajen solos, se deberá presentar el pasaporte y el documento en el que conste la autorización de quiénes ejerzan la patria potestad o la tutela, ante fedatario público o por las autoridades que tengan facultades para ello.

**Artículo 50.** El Instituto verificará la situación migratoria de los polizones que se encuentren en transportes aéreos, marítimos o terrestres y determinará lo conducente, de conformidad con lo dispuesto en el Reglamento.

**Artículo 51.** La Secretaría estará facultada para emitir políticas y disposiciones administrativas de carácter general, que se publicarán en el Diario Oficial de la Federación, con el objeto de atender las necesidades migratorias del país, tomando en cuenta la opinión del Consejo Nacional de Población.

# CAPÍTULO II
## DE LA ESTANCIA DE EXTRANJEROS EN EL TERRITORIO NACIONAL

**Artículo 52.** Los extranjeros podrán permanecer en el territorio nacional en las condiciones de estancia de visitante, residente temporal y residente permanente, siempre que cumplan con los requisitos

Haiti AR_001448



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN                                                 *Última Reforma DOF 29-04-2022*
Secretaría General
Secretaría de Servicios Parlamentarios

establecidos en esta Ley, su Reglamento y demás disposiciones jurídicas aplicables, de conformidad con lo siguiente:

**I.** VISITANTE SIN PERMISO PARA REALIZAR ACTIVIDADES REMUNERADAS. Autoriza al extranjero para transitar o permanecer en territorio nacional por un tiempo ininterrumpido no mayor a ciento ochenta días, contados a partir de la fecha de entrada, sin permiso para realizar actividades sujetas a una remuneración en el país.

**II.** VISITANTE CON PERMISO PARA REALIZAR ACTIVIDADES REMUNERADAS. Autoriza al extranjero que cuente con una oferta de empleo, con una invitación por parte de alguna autoridad o institución académica, artística, deportiva o cultural por la cual perciba una remuneración en el país, o venga a desempeñar una actividad remunerada por temporada estacional en virtud de acuerdos interinstitucionales celebrados con entidades extranjeras, para permanecer en territorio nacional por un tiempo ininterrumpido no mayor a ciento ochenta días, contados a partir de la fecha de entrada.

**III.** VISITANTE REGIONAL. Autoriza al extranjero nacional o residente de los países vecinos para ingresar a las regiones fronterizas con derecho a entrar y salir de las mismas cuantas veces lo deseen, sin que su permanencia exceda de siete días y sin permiso para recibir remuneración en el país.

*Párrafo reformado DOF 19-05-2017*

Mediante disposiciones de carácter administrativo, la Secretaría establecerá la vigencia de las autorizaciones y los municipios y entidades federativas que conforman las regiones fronterizas, para efectos del otorgamiento de la condición de estancia de visitante regional.

**IV.** VISITANTE TRABAJADOR FRONTERIZO. Autoriza al extranjero que sea nacional de los países con los cuales los Estados Unidos Mexicanos comparten límites territoriales, para permanecer hasta por un año en las entidades federativas que determine la Secretaría. El visitante trabajador fronterizo contará con permiso para trabajar a cambio de una remuneración en el país, en la actividad relacionada con la oferta de empleo con que cuente y con derecho a entrar y salir del territorio nacional cuantas veces lo desee.

**V.** VISITANTE POR RAZONES HUMANITARIAS. Se autorizará esta condición de estancia a los extranjeros que se encuentren en cualquiera de los siguientes supuestos:

**a)** Ser ofendido, víctima o testigo de algún delito cometido en territorio nacional.

Para efectos de esta Ley, sin perjuicio de lo establecido en otras disposiciones jurídicas aplicables, se considerará ofendido o víctima a la persona que sea el sujeto pasivo de la conducta delictiva, independientemente de que se identifique, aprehenda, enjuicie o condene al perpetrador e independientemente de la relación familiar entre el perpetrador y la víctima.

Al ofendido, víctima o testigo de un delito a quien se autorice la condición de estancia de Visitante por Razones Humanitarias, se le autorizará para permanecer en el país hasta que concluya el proceso, al término del cual deberán salir del país o solicitar una nueva condición de estancia, con derecho a entrar y salir del país cuantas veces lo desee y con permiso para trabajar a cambio de una remuneración en el país. Posteriormente, podrá solicitar la condición de estancia de residente permanente;

**b)** Ser niña, niño o adolescente migrante, en términos del artículo 74 de esta Ley.

La autorización de la condición de estancia por razones humanitarias deberá ser inmediata y no podrá negarse o condicionarse a la presentación de documental alguna ni al pago de derechos.

Haiti AR_001449

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

Esta condición de estancia se otorgará como medida de carácter temporal en tanto la Procuraduría de Protección determina el plan de restitución de derechos en los términos establecidos en la Ley General de los Derechos de Niñas, Niños y Adolescentes.

La expedición del documento migratorio con dicha autorización deberá contener la CURP que la autoridad competente hubiera asignado y señalar expresamente la razón humanitaria de que se trata.

En el caso de niñas, niños y adolescentes acompañados y separados, la autorización de esta condición de estancia beneficiará de manera solidaria a la persona adulta a cargo de su cuidado.

El Instituto podrá negar el otorgamiento de la autorización a aquellas personas adultas de quien la Procuraduría de Protección hubiera determinado ser contrarios al interés superior de la niña, niño o adolescente de quien se trate.

*Inciso reformado DOF 11-11-2020*

**c)** Ser solicitante de asilo político, de reconocimiento de la condición de refugiado o de protección complementaria del Estado Mexicano, hasta en tanto no se resuelva su situación migratoria. Si la solicitud es positiva se les otorgará la condición de estancia de residente permanente, en términos del artículo 54 de esta Ley.

También la Secretaría podrá autorizar la condición de estancia de visitante por razones humanitarias a los extranjeros que no se ubiquen en los supuestos anteriores, cuando exista una causa humanitaria o de interés público que haga necesaria su internación o regularización en el país, en cuyo caso contarán con permiso para trabajar a cambio de una remuneración.

**VI.** VISITANTE CON FINES DE ADOPCIÓN. Autoriza al extranjero vinculado con un proceso de adopción en los Estados Unidos Mexicanos, a permanecer en el país hasta en tanto se dicte la resolución ejecutoriada y en su caso, se inscriba en el registro civil la nueva acta del niño, niña o adolescente adoptado, así como se expida el pasaporte respectivo y todos los trámites necesarios para garantizar la salida del niño, niña o adolescente del país. La expedición de esta autorización solo procederá respecto de ciudadanos de países con los que los Estados Unidos Mexicanos haya suscrito algún convenio en la materia.

**VII.** RESIDENTE TEMPORAL. Autoriza al extranjero para permanecer en el país por un tiempo no mayor a cuatro años, con la posibilidad de obtener un permiso para trabajar a cambio de una remuneración en el país, sujeto a una oferta de empleo con derecho a entrar y salir del territorio nacional cuantas veces lo desee y con derecho a la preservación de la unidad familiar por lo que podrá ingresar con o solicitar posteriormente la internación de las personas que se señalan a continuación, quienes podrán residir regularmente en territorio nacional por el tiempo que dure el permiso del residente temporal:

**a)** Hijos del residente temporal y los hijos del cónyuge, concubinario o concubina, siempre y cuando sean niñas, niños y adolescentes y no hayan contraído matrimonio, o se encuentren bajo su tutela o custodia;

**b)** Cónyuge;

**c)** Concubinario, concubina o figura equivalente, acreditando dicha situación jurídica conforme a los supuestos que señala la legislación mexicana, y

**d)** Padre o madre del residente temporal.

Haiti AR_001450

Las personas a que se refieren los incisos anteriores serán autorizados para residir regularmente en territorio nacional bajo la condición de estancia de residente temporal, con la posibilidad de obtener un permiso para trabajar a cambio de una remuneración en el país sujeto a una oferta de empleo, y con derecho a entrar y salir del territorio nacional cuantas veces lo deseen.

En el caso de que el residente temporal cuente con una oferta de empleo, se le otorgará permiso para trabajar a cambio de una remuneración en el país, en la actividad relacionada con dicha oferta de empleo.

Los extranjeros a quienes se les otorgue la condición de estancia de residentes temporales podrán introducir sus bienes muebles, en la forma y términos que determine la legislación aplicable.

**VIII.** RESIDENTE TEMPORAL ESTUDIANTE. Autoriza al extranjero para permanecer en el territorio nacional por el tiempo que duren los cursos, estudios, proyectos de investigación o formación que acredite que va a realizar en instituciones educativas pertenecientes al sistema educativo nacional, hasta la obtención del certificado, constancia, diploma, título o grado académico correspondiente, con derecho a entrar y salir del territorio nacional cuantas veces lo desee, con permiso para realizar actividades remuneradas cuando se trate de estudios de nivel superior, posgrado e investigación.

La autorización de estancia de los estudiantes está sujeta a la presentación por parte del extranjero de la carta de invitación o de aceptación de la institución educativa correspondiente y deberá renovarse anualmente, para lo cual el extranjero acreditará que subsisten las condiciones requeridas para la expedición de la autorización inicial. La autorización para realizar actividades remuneradas se otorgará por el Instituto cuando exista carta de conformidad de la institución educativa correspondiente y estará sujeta a una oferta de trabajo en actividades relacionadas con la materia de sus estudios. El residente temporal estudiante tendrá derecho a entrar y salir del territorio nacional cuantas veces lo desee y contará también con el derecho a la preservación de la unidad familiar, por lo que podrá ingresar con o solicitar posteriormente el ingreso de las personas que se señalan en la fracción anterior.

**IX.** RESIDENTE PERMANENTE. Autoriza al extranjero para permanecer en el territorio nacional de manera indefinida, con permiso para trabajar a cambio de una remuneración en el país.

**Artículo 53.** Los visitantes, con excepción de aquéllos por razones humanitarias y de quienes tengan vínculo con mexicano o con extranjero con residencia regular en México, no podrán cambiar de condición de estancia y tendrán que salir del país al concluir el período de permanencia autorizado.

**Artículo 54.** Se otorgará la condición de residente permanente al extranjero que se ubique en cualquiera de los siguientes supuestos:

**I.** Por razones de asilo político, reconocimiento de la condición de refugiado y protección complementaria o por la determinación de apátrida, previo cumplimiento de los requisitos establecidos en esta Ley, su Reglamento y demás disposiciones jurídicas aplicables;

**II.** Por el derecho a la preservación de la unidad familiar en los supuestos del artículo 55 de esta Ley;

**III.** Que sean jubilados o pensionados que perciban de un gobierno extranjero o de organismos internacionales o de empresas particulares por servicios prestados en el exterior, un ingreso que les permita vivir en el país;

**IV.** Por decisión del Instituto, conforme al sistema de puntos que al efecto se establezca, en términos del artículo 57 de esta Ley;

Haiti AR_001451



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**V.** Porque hayan transcurrido cuatro años desde que el extranjero cuenta con un permiso de residencia temporal;

**VI.** Por tener hijos de nacionalidad mexicana por nacimiento, y

**VII.** Por ser ascendiente o descendiente en línea recta hasta el segundo grado de un mexicano por nacimiento.

Los extranjeros a quienes se les otorgue la condición de estancia de residentes permanentes tendrán la posibilidad de obtener un permiso para trabajar a cambio de una remuneración en el país sujeto a una oferta de empleo, y con derecho a entrar y salir del territorio nacional cuantas veces lo deseen.

Asimismo, los residentes permanentes podrán introducir sus bienes muebles, en la forma y términos que determine la legislación aplicable.

Las cuestiones relacionadas con el reconocimiento de la condición de refugiado, el otorgamiento de la protección complementaria y la determinación de apátrida, se regirán por lo dispuesto en los tratados y convenios internacionales de los cuales sea parte el Estado mexicano y demás leyes aplicables.

**Artículo 55.** Los residentes permanentes tendrán derecho a la preservación de la unidad familiar por lo que podrán ingresar con o solicitar posteriormente el ingreso de las siguientes personas, mismas que podrán residir en territorio nacional bajo la misma condición de estancia y con las prerrogativas señaladas en el artículo anterior:

**I.** Padre o madre del residente permanente;

**II.** Cónyuge, al cual se le concederá la condición de estancia de residente temporal por dos años, transcurridos los cuales podrá obtener la condición de estancia de residente permanente, siempre y cuando subsista el vínculo matrimonial;

**III.** Concubinario, concubina, o figura equivalente al cual se le concederá la condición de estancia de residente temporal por dos años, transcurridos los cuales podrá obtener la condición de estancia de residente permanente, siempre y cuando subsista el concubinato;

**IV.** Hijos del residente permanente y los hijos del cónyuge o concubinario o concubina, siempre y cuando sean niñas, niños y adolescentes y no hayan contraído matrimonio, o se encuentren bajo su tutela o custodia, y

**V.** Hermanos del residente permanente, siempre y cuando sean niñas, niños y adolescentes y no hayan contraído matrimonio, o estén bajo su representación legal.

Para el ejercicio del derecho consagrado en el presente artículo de las personas que se les otorgue asilo político u obtengan el reconocimiento de la condición de refugiado, se atenderá a lo dispuesto en los tratados internacionales de los que el Estado Mexicano sea parte y demás legislación aplicable.
*Párrafo reformado DOF 30-10-2014*

**Artículo 56.** Los mexicanos tendrán el derecho a la preservación de la unidad familiar por lo que podrán ingresar con o solicitar posteriormente el ingreso de las siguientes personas extranjeras:

**I.** Padre o madre;

Haiti AR_001452



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**II.** Cónyuge, al cual se le concederá la condición de estancia de residente temporal por dos años, transcurridos los cuales podrá obtener la condición de estancia de residente permanente, siempre y cuando subsista el vínculo matrimonial;

**III.** Concubinario o concubina, acreditando dicha situación jurídica conforme a los supuestos que señala la legislación civil mexicana, al cual se le concederá la condición de estancia de residente temporal por dos años, transcurridos los cuales podrá obtener la condición de estancia de residente permanente, siempre y cuando subsista el concubinato;

**IV.** Hijos nacidos en el extranjero, cuando de conformidad con el artículo 30 de la Constitución no sean mexicanos;

**V.** Hijos del cónyuge, concubinario o concubina extranjeros, siempre y cuando sean niñas, niños y adolescentes y no hayan contraído matrimonio, o estén bajo su representación legal, y

**VI.** Hermanos, siempre y cuando sean niñas, niños y adolescentes y no hayan contraído matrimonio, o estén bajo su representación legal.

**Artículo 57.** La Secretaría, podrá establecer mediante disposiciones administrativas de carácter general que se publicarán en el Diario Oficial de la Federación, un sistema de puntos para que los extranjeros puedan adquirir la residencia permanente sin cumplir con los cuatro años de residencia previa. Los extranjeros que ingresen a territorio nacional por la vía del sistema de puntos contarán con permiso de trabajo y tendrán derecho a la preservación de la unidad familiar por lo que podrán ingresar con o solicitar posteriormente el ingreso de las personas señaladas en el artículo 55 de esta Ley.

La Secretaría a través del Sistema de Puntos, permitirá a los extranjeros adquirir la residencia permanente en el país. Dicho sistema deberá considerar como mínimo lo siguiente:

**I.** Los criterios para el ingreso por la vía del sistema de puntos, tomando en cuenta lo establecido en el artículo 18, fracción II de esta Ley para el establecimiento de cuotas para el ingreso de extranjeros al territorio nacional;

**II.** Las capacidades del solicitante tomando en cuenta entre otros aspectos el nivel educativo; la experiencia laboral; las aptitudes en áreas relacionadas con el desarrollo de la ciencia y la tecnología; los reconocimientos internacionales, así como las aptitudes para desarrollar actividades que requiera el país, y

**III.** El procedimiento para solicitar el ingreso por dicha vía.

**Artículo 58.** Los extranjeros tienen derecho a que las autoridades migratorias les expidan la documentación que acredite su situación migratoria regular una vez cubiertos los requisitos establecidos en esta Ley y su Reglamento. Cuando la documentación que expidan las autoridades migratorias no contenga fotografía, el extranjero deberá exhibir adicionalmente su pasaporte o documento de identidad y viaje vigente.

**Artículo 59.** Los residentes temporales y permanentes, con excepción de aquellos que soliciten asilo político, reconocimiento de la condición de refugiado o determinación de apátridas, tendrán un plazo de treinta días naturales contados a partir de su ingreso a territorio nacional, para gestionar ante el Instituto la tarjeta de residencia correspondiente, misma que permanecerá vigente por el tiempo que se haya autorizado la estancia. Con esta tarjeta acreditarán su situación migratoria regular en territorio nacional mientras esté vigente.

Haiti AR_001453



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

Los solicitantes de asilo político, reconocimiento de la condición de refugiado, que sean determinados como apátridas o que se les otorgue protección complementaria, obtendrán su tarjeta de residencia permanente a la conclusión del procedimiento correspondiente.

Obtenida la tarjeta de residencia, los residentes temporales y permanentes tendrán derecho a obtener de la Secretaría la Clave Única de Registro de Población.

Los requisitos y procedimientos para obtener la tarjeta de residencia correspondiente serán establecidos en el Reglamento.

**Artículo 60.** Los extranjeros independientemente de su condición de estancia, por sí o mediante apoderado, podrán, sin que para ello requieran permiso del Instituto, adquirir valores de renta fija o variable y realizar depósitos bancarios, así como adquirir bienes inmuebles urbanos y derechos reales sobre los mismos, con las restricciones señaladas en el artículo 27 de la Constitución y demás disposiciones aplicables.

**Artículo 61.** Ningún extranjero podrá tener dos condiciones de estancia simultáneamente.

**Artículo 62.** Los extranjeros a quienes se autorice la condición de estancia de residentes temporales podrán solicitar al Instituto que autorice el cambio de su condición de estancia, previo cumplimiento de los requisitos establecidos en el Reglamento.

**Artículo 63.** El Registro Nacional de Extranjeros, se integra por la información relativa a todos aquellos extranjeros que adquieren la condición de estancia de residente temporal o de residente permanente.

Los extranjeros tendrán la obligación de comunicar al Instituto de cualquier cambio de estado civil, cambio de nacionalidad por una diversa a la cual ingresó, domicilio o lugar de trabajo dentro de los noventa días posteriores a que ocurra dicho cambio.

**Artículo 64.** El Instituto deberá cancelar la condición de residente temporal o permanente, por las siguientes causas:

**I.** Manifestación del extranjero de que su salida es definitiva;

**II.** Autorización al extranjero de otra condición de estancia;

**III.** Proporcionar información falsa o exhibir ante el Instituto documentación oficial apócrifa o legítima pero que haya sido obtenida de manera fraudulenta;

**IV.** Perder el extranjero su condición de estancia por las demás causas establecidas en esta Ley;

**V.** Perder el extranjero el reconocimiento de su condición de refugiado o protección complementaria, de conformidad con las disposiciones jurídicas que resulten aplicables, y

**VI.** Cuando derivado de sus antecedentes en México o en el extranjero se comprometa la seguridad nacional o la seguridad pública.

*Fracción reformada DOF 07-01-2021*

**Artículo 65.** Los extranjeros deberán acreditar su situación migratoria regular en el país, en los actos jurídicos en los que se requiera de la intervención de los notarios públicos, los que sustituyan a éstos o hagan sus veces, en lo relativo a cuestiones inmobiliarias, y los corredores de comercio.

Haiti AR_001454



De conformidad con lo dispuesto en el artículo 27 de la Constitución, la Ley de Inversión Extranjera y demás leyes y disposiciones aplicables, los extranjeros deberán formular las renuncias correspondientes.

## TÍTULO QUINTO
## DE LA PROTECCIÓN A LOS MIGRANTES QUE TRANSITAN POR EL TERRITORIO NACIONAL

### CAPÍTULO ÚNICO
### DISPOSICIONES GENERALES

**Artículo 66.** La situación migratoria de un migrante no impedirá el ejercicio de sus derechos y libertades reconocidos en la Constitución, en los tratados y convenios internacionales de los cuales sea parte el Estado mexicano, así como en la presente Ley.

El Estado mexicano garantizará el derecho a la seguridad personal de los migrantes, con independencia de su situación migratoria.

**Artículo 67.** Todos los migrantes en situación migratoria irregular tienen derecho a ser tratados sin discriminación alguna y con el debido respeto a sus derechos humanos.

**Artículo 68.** La presentación de los migrantes en situación migratoria irregular sólo puede realizarse por el Instituto en los casos previstos en esta Ley; deberá constar en actas y no podrá exceder del término de 36 horas contadas a partir de su puesta a disposición.

Durante el procedimiento administrativo migratorio que incluye la presentación, el alojamiento en las estaciones migratorias o en los Centros de Asistencia Social para el caso de niñas, niños y adolescentes migrantes, el retorno asistido y la deportación, los servidores públicos del Instituto deberán de respetar los derechos reconocidos a los migrantes en situación migratoria irregular establecidos en el Título Sexto de la presente Ley.

*Párrafo reformado DOF 11-11-2020*

**Artículo 69.** Los migrantes que se encuentren en situación migratoria irregular en el país tendrán derecho a que las autoridades migratorias, al momento de su presentación, les proporcionen información acerca de:

**I.** Sus derechos y garantías de acuerdo con lo establecido en la legislación aplicable y en los tratados y convenios internacionales de los cuales sea parte el Estado mexicano;

**II.** El motivo de su presentación;

**III.** Los requisitos establecidos para su admisión, sus derechos y obligaciones de acuerdo con lo establecido por la legislación aplicable;

**IV.** La notificación inmediata de su presentación por parte de la autoridad migratoria, al consulado del país del cual manifiesta ser nacional, excepto en el caso de que el extranjero pudiera acceder al asilo político o al reconocimiento de la condición de refugiado;

**V.** La posibilidad de regularizar su situación migratoria, en términos de lo dispuesto por los artículos 132, 133 y 134 de esta Ley, y

**VI.** La posibilidad de constituir garantía en los términos del artículo 102 de esta Ley.

Haiti AR_001455



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**Artículo 70.** Todo migrante tiene derecho a ser asistido o representado legalmente por la persona que designe durante el procedimiento administrativo migratorio. El Instituto podrá celebrar los convenios de colaboración que se requieran y establecerá facilidades para que las organizaciones de la sociedad civil ofrezcan servicios de asesoría y representación legal a los migrantes en situación migratoria irregular a quienes se les haya iniciado un procedimiento administrativo migratorio.

Durante el procedimiento administrativo migratorio los migrantes tendrán derecho al debido proceso que consiste en que el procedimiento sea sustanciado por autoridad competente; el derecho a ofrecer pruebas y alegar lo que a su derecho convenga, a tener acceso a las constancias del expediente administrativo migratorio; a contar con un traductor o intérprete para facilitar la comunicación, en caso de que no hable o no entienda el español y a que las resoluciones de la autoridad estén debidamente fundadas y motivadas.

**Artículo 71.** La Secretaría creará grupos de protección a migrantes que se encuentren en territorio nacional, los que tendrán por objeto la promoción, protección y defensa de sus derechos, con independencia de su nacionalidad o situación migratoria.

La Secretaría celebrará convenios de colaboración y concertación con las dependencias y entidades de la Administración Pública Federal, de las entidades federativas o municipios, con las organizaciones de la sociedad civil o con los particulares, con el objeto de que participen en la instalación y funcionamiento de los grupos de protección a migrantes.

En el caso de niñas, niños y adolescentes migrantes los convenios deberán regirse por lo establecido en la presente Ley, la Ley General de los Derechos de Niñas, Niños y Adolescentes y demás disposiciones aplicables.

*Artículo reformado DOF 11-11-2020*

**Artículo 72.** La Secretaría celebrará convenios con las dependencias y entidades del Gobierno Federal, de las entidades federativas y de los municipios para implementar acciones tendientes a coadyuvar con los actos humanitarios, de asistencia o de protección a los migrantes que realizan las organizaciones de la sociedad civil legalmente constituidas.

**Artículo 73.** La Secretaría deberá implementar acciones que permitan brindar una atención adecuada a los migrantes que por diferentes factores o la combinación de ellos, enfrentan situaciones de vulnerabilidad como son las niñas, niños y adolescentes, las mujeres, las víctimas de delitos, las personas con discapacidad y las adultas mayores.

Para tal efecto, la Secretaría podrá establecer convenios de coordinación con dependencias y entidades de la Administración Pública Federal, de las entidades federativas, municipios o demarcaciones territoriales y con las organizaciones de la sociedad civil especializadas en la atención de personas en situación de vulnerabilidad.

En el caso de las niñas, niños y adolescentes migrantes, la atención diferenciada se prestará con independencia de su situación migratoria, y no podrá condicionarse o restringirse al inicio, suspensión o continuidad de trámite administrativo o judicial alguno. Dicha atención deberá prestarse de conformidad con lo dispuesto en la Ley General de los Derechos de Niñas, Niños y Adolescentes, su Reglamento y demás disposiciones aplicables.

*Artículo reformado DOF 11-11-2020*

**Artículo 74.** En tanto la Procuraduría de Protección determina el interés superior de la niña, niño o adolescente y presenta al Instituto el Plan de Restitución de Derechos, toda niña, niño o adolescente será documentada como Visitante por Razones Humanitarias, en términos del artículo 52, fracción V, de esta

Haiti AR_001456



Ley y recibirá protección conforme a lo establecido por la Ley General de los Derechos de Niñas, Niños y Adolescentes, su reglamento y demás disposiciones aplicables.

La vigencia de esta autorización se extenderá hasta que se concrete el acto administrativo migratorio que dicten las medidas de protección especial.

En ningún caso la autoridad migratoria podrá devolver, expulsar, deportar, retornar, rechazar en frontera o no admitir a una niña, niño o adolescente sin que antes la autoridad competente valore si su vida, libertad o seguridad se encuentra en peligro. Para ello, la autoridad migratoria en contacto con la niña, niño o adolescente deberá notificarle a la Procuraduría de Protección de manera inmediata.

*Artículo reformado DOF 11-11-2020*

**Artículo 75.** La Secretaría celebrará convenios de colaboración con dependencias y entidades del Gobierno Federal, de las entidades federativas y de los municipios para el efecto de establecer acciones de coordinación en materia de prevención, persecución, combate y atención a los migrantes que son víctimas del delito.

**Artículo 76.** El Instituto no podrá realizar visitas de verificación migratoria en los lugares donde se encuentre migrantes albergados por organizaciones de la sociedad civil o personas que realicen actos humanitarios, de asistencia o de protección a los migrantes.

## TÍTULO SEXTO
## DEL PROCEDIMIENTO ADMINISTRATIVO MIGRATORIO

## CAPÍTULO I
## DISPOSICIONES COMUNES EN MATERIA DE VERIFICACIÓN Y REGULACIÓN MIGRATORIA

**Artículo 77.** El procedimiento administrativo migratorio se regirá por las disposiciones contenidas en este Título, en el Reglamento y en las disposiciones administrativas de carácter general que emita la Secretaría, y en forma supletoria por la Ley Federal de Procedimiento Administrativo. Durante su sustanciación se respetarán plenamente los derechos humanos de los migrantes.

**Artículo 78.** Los interesados podrán solicitar copia certificada de las promociones y documentos que hayan presentado en el procedimiento administrativo migratorio y de las resoluciones que recaigan a éstos, las que serán entregadas en un plazo no mayor de quince días hábiles.

Lo anterior sin perjuicio de lo previsto en la Ley Federal de Transparencia y Acceso a la Información Pública Gubernamental respecto de información reservada y confidencial.

**Artículo 79.** El Instituto podrá allegarse de los medios de prueba que considere necesarios para mejor proveer, sin más limitaciones que las establecidas en esta Ley.

En el caso de procedimientos en los que esté involucrada directa o indirectamente una niña, niño o adolescente, el Instituto deberá implementar las medidas migratorias que correspondan para coadyuvar en el cumplimiento e implementación del plan de restitución de derechos que emita la Procuraduría de Protección.

*Artículo reformado DOF 11-11-2020*

**Artículo 80.** Al ejercer sus facultades de control, verificación y revisión migratoria, el Instituto deberá consultar e informar a las autoridades responsables de la Seguridad Nacional sobre la presentación o identificación de sujetos que tengan vínculos con el terrorismo o la delincuencia organizada, o cualquier

Haiti AR_001457



otra actividad que ponga en riesgo la Seguridad Nacional y deberá, adicionalmente, coadyuvar en las investigaciones que dichas autoridades le requieran.

# CAPÍTULO II
## DEL CONTROL MIGRATORIO

**Artículo 81.** Son acciones de control migratorio, la revisión de documentación de personas que pretendan internarse o salir del país, así como la inspección de los medios de transporte utilizados para tales fines. En dichas acciones, la Policía Federal actuará en auxilio y coordinación con el Instituto.

El Instituto podrá llevar a cabo sus funciones de control migratorio en lugares distintos a los destinados al tránsito internacional de personas por mar y aire, a solicitud expresa debidamente fundada y motivada de la Secretaría de Comunicaciones y Transportes.

**Artículo 82.** El personal del Instituto tiene prioridad, con excepción del servicio de sanidad, para inspeccionar la entrada o salida de personas en cualquier forma que lo hagan, ya sea en medios de transportes nacionales o extranjeros, marítimos, aéreos o terrestres, en los puertos, fronteras y aeropuertos.

**Artículo 83.** Ningún pasajero o tripulante de transporte marítimo podrá desembarcar antes de que el Instituto efectúe la inspección correspondiente.

**Artículo 84.** Ningún transporte aéreo o marítimo en tránsito internacional podrá salir de aeropuertos o puertos, antes de que se realice la inspección de salida por el Instituto y de haberse recibido de éstas la autorización para su despacho.

**Artículo 85.** Quedan exceptuadas de la inspección, las aeronaves oficiales de gobiernos extranjeros y las de organismos internacionales que se internen en el país en comisión oficial, así como los funcionarios de dichos gobiernos u organismos, sus familias y empleados, y aquellas personas que se encuentren a bordo de dichas aeronaves y que, conforme a las leyes, tratados y convenios internacionales de los cuales sea parte el Estado mexicano, gocen de inmunidades.

De acuerdo con la costumbre internacional, a los funcionarios de gobiernos extranjeros y de organismos internacionales en comisión oficial se les darán las facilidades necesarias para internarse al país, cumpliendo con los requisitos de control migratorio.

**Artículo 86.** El extranjero cuya internación sea rechazada por el Instituto por no cumplir con los requisitos establecidos en el artículo 37 de la presente Ley, deberá abandonar el país por cuenta de la empresa que lo transportó, sin perjuicio de las sanciones que correspondan de acuerdo con esta Ley.

El rechazo a que se refiere el párrafo anterior, es la determinación adoptada por el Instituto en los filtros de revisión migratoria ubicados en los lugares destinados al tránsito internacional de personas por tierra, mar y aire, por la que se niega la internación regular de una persona a territorio nacional por no cumplir con los requisitos que establecen esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

En el caso de transporte marítimo, cuando se determine el rechazo del extranjero, no se autorizará su desembarco. Cuando exista imposibilidad material de salida de la embarcación de territorio nacional, el extranjero será presentado y se procederá a su inmediata salida del país con cargo a la empresa naviera.

Haiti AR_001458



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**Artículo 87.** Cuando las autoridades migratorias adviertan alguna irregularidad en la documentación que presente una persona que se pretenda internar al territorio nacional, o no satisfaga los requisitos exigidos en esta Ley o tenga algún impedimento legal, se procederá a efectuar una segunda revisión.

**Artículo 88.** En el caso de que el Instituto determine el rechazo del extranjero, se levantará constancia por escrito en la que se funde y motive la causa de inadmisibilidad al país de la persona de que se trate.

**Artículo 89.** Los lugares destinados al tránsito internacional de personas por tierra, mar y aire deberán contar con espacios adecuados para la estancia temporal de éstas en tanto se autoriza su ingreso, o bien, se resuelve el rechazo a que hubiere lugar, conforme a las disposiciones jurídicas aplicables.

**Artículo 90.** No se permitirá la visita a ningún transporte marítimo en tránsito internacional sin la autorización previa de las autoridades sanitarias y del personal del Instituto.

**Artículo 91.** Las empresas de transporte responderán pecuniariamente de las violaciones que a la presente Ley y su Reglamento cometan sus empleados, agentes o representantes, sin perjuicio de la responsabilidad directa en que incurran éstos.

# CAPÍTULO III
## DE LA VERIFICACIÓN MIGRATORIA

**Artículo 92.** El Instituto realizará visitas de verificación para comprobar que los extranjeros que se encuentren en territorio nacional cumplan con las obligaciones previstas en esta Ley y su Reglamento.

Los supuestos para que el Instituto lleve a cabo una visita de verificación son los siguientes:

**I.** Confirmar la veracidad de los datos proporcionados en trámites migratorios;

**II.** Cuando se advierta que ha expirado la vigencia de estancia de extranjeros en el país, y

**III.** Para la obtención de elementos necesarios para la aplicación de esta Ley, su Reglamento y demás disposiciones jurídicas aplicables, siempre que funde y motive su proceder.

La facultad para realizar visitas de verificación se ejercitará de oficio por tratarse de cuestiones de orden público.

La orden por la que se disponga la verificación migratoria deberá ser expedida por el Instituto y precisar el responsable de la diligencia y el personal asignado para la realización de la misma, el lugar o zona que ha de verificarse, el objeto de la verificación, el alcance que deba tener y las disposiciones jurídicas aplicables que la fundamenten y la motiven.

**Artículo 93.** El Instituto solicitará información al Ministerio Público sobre las denuncias formuladas en contra de los extranjeros por la presunta comisión de los delitos, solo para efectos de control, verificación o revisión migratoria.

Cuando los particulares presenten denuncias ante él, deberá informar a los particulares que no es la autoridad competente para conocer y enviará de forma inmediata al particular ante la autoridad competente para que presente la denuncia correspondiente.

*Artículo reformado DOF 13-04-2020*

**Artículo 94.** Los extranjeros, cuando sean requeridos por el Instituto deberán comprobar su situación migratoria regular en el país, en los términos señalados en esta Ley y su Reglamento.

Haiti AR_001459



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**Artículo 95.** Si con motivo de la visita de verificación se detecta que algún extranjero no cuenta con documentos que acrediten su situación migratoria regular en el país, se pondrá al extranjero a disposición del Instituto para que resuelva su situación migratoria, en los términos previstos en el Capítulo V del presente Título.

Fuera de los casos a que se refiere el párrafo anterior, el acta que al efecto se levante deberá contener los datos necesarios para que se proceda a citar al extranjero para continuar el procedimiento de que se trate.

En caso de detectar niñas, niños o adolescentes migrantes, la autoridad migratoria deberá, en coadyuvancia, notificar inmediatamente a la Procuraduría de Protección y hacer la canalización al Sistema DIF correspondiente. En ningún caso se llevará a cabo la presentación de una niña, niño o adolescente ni se iniciará el Procedimiento Administrativo Migratorio previo a dicha notificación. El Instituto emitirá un acta de canalización en la que conste la notificación a la Procuraduría de Protección y la canalización de la niña, niño o adolescente al Sistema DIF.

*Párrafo adicionado DOF 11-11-2020*

La presentación de la persona extranjera a cuyo cuidado se encuentren niñas, niños o adolescentes presentes durante la verificación, se pospondrá hasta el momento en que se apersone la Procuraduría de Protección y se levante el correspondiente oficio de canalización del caso de las niñas, niños o adolescentes de que se trate a la Procuraduría.

*Párrafo adicionado DOF 11-11-2020*

Si de la visita de verificación se determina la presentación de una persona extranjera y ésta manifiesta la existencia de niñas, niños o adolescentes a su cargo, quienes derivado de la presentación de la persona ante el Instituto, pudieran quedar en desamparo, las autoridades migratorias deberán tomar toda la información conducente y notificar inmediatamente a la Procuraduría de Protección para que proceda de conformidad con la Ley General de los Derechos de Niñas, Niños y Adolescentes.

*Párrafo adicionado DOF 11-11-2020*

**Artículo 96.** Las autoridades colaborarán con el Instituto para el ejercicio de sus funciones, cuando éste así lo solicite, sin que ello implique que puedan realizar de forma independiente funciones de control, verificación y revisión migratoria.

## CAPÍTULO IV
## DE LA REVISIÓN MIGRATORIA

**Artículo 97.** Además de los lugares destinados al tránsito internacional de personas establecidos, el Instituto podrá llevar a cabo revisiones de carácter migratorio dentro del territorio nacional a efecto de comprobar la situación migratoria de los extranjeros.

La orden por la que se disponga la revisión migratoria deberá estar fundada y motivada; ser expedida por el Instituto y precisar el responsable de la diligencia y el personal asignado para la realización de la misma; la duración de la revisión y la zona geográfica o el lugar en el que se efectuará.

**Artículo 98.** Si con motivo de la revisión migratoria se detecta que algún extranjero no cuenta con documentos que acrediten su situación migratoria regular en el país, se procederá en los términos del artículo 100 de esta Ley.

En caso de detectar niñas, niños o adolescentes migrantes, la autoridad migratoria deberá, en coadyuvancia, notificar inmediatamente a la Procuraduría de Protección y hacer la canalización al Sistema DIF correspondiente. En ningún caso se llevará a cabo la presentación de una niña, niño o

Haiti AR_001460



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

adolescente ni se iniciará el Procedimiento Administrativo Migratorio previo a dicha notificación. El Instituto emitirá un acta de canalización en la que conste la notificación a la Procuraduría de Protección y la canalización de la niña, niño o adolescente al Sistema DIF.

La presentación de la persona extranjera a cuyo cuidado se encuentren niñas, niños o adolescentes presentes durante la revisión migratoria, se pospondrá hasta el momento en que se apersone la Procuraduría de Protección y se levante el correspondiente oficio de canalización del caso de las niñas, niños o adolescentes de que se trate a la Procuraduría.

Si de la revisión migratoria se determina la presentación de una persona extranjera y ésta manifiesta la existencia de niñas, niños o adolescentes a su cargo, quienes derivado de la presentación de la persona ante el Instituto, pudieran quedar en desamparo, las autoridades migratorias deberán tomar toda la información conducente y notificar inmediatamente a la Procuraduría de Protección para que proceda de conformidad con la Ley General de los Derechos de Niñas, Niños y Adolescentes.

*Artículo reformado DOF 11-11-2020*

## CAPÍTULO V
## DE LA PRESENTACIÓN DE EXTRANJEROS

**Artículo 99.** Es de orden público la presentación de los extranjeros adultos en estaciones migratorias o en lugares habilitados para ello, en tanto se determina su situación migratoria en territorio nacional.

La presentación de extranjeros es la medida dictada por el Instituto mediante la cual se acuerda el alojamiento temporal de un extranjero adulto que no acredita su situación migratoria para la regularización de su estancia o la asistencia para el retorno.

En ningún caso, el Instituto presentará ni alojará a niñas, niños o adolescentes migrantes en estaciones migratorias ni en lugares habilitados para ello.

La presentación de las personas adultas bajo cuyo cuidado estén niñas, niños o adolescentes migrantes deberá evitarse atendiendo al principio de unidad familiar y del interés superior de niñas, niños y adolescentes.

*Artículo reformado DOF 11-11-2020*

**Artículo 100.** Cuando un extranjero sea puesto a disposición del Instituto, derivado de diligencias de verificación o revisión migratoria, y se actualice alguno de los supuestos previstos en el artículo 144 de la presente Ley, se emitirá el acuerdo de presentación correspondiente dentro de las veinticuatro horas siguientes a la puesta a disposición.

**Artículo 101.** Una vez emitido el acuerdo de presentación, y hasta que no se dicte resolución respecto de la situación migratoria del extranjero, en los casos y de conformidad con los requisitos que se señalen en el Reglamento, el extranjero podrá ser entregado en custodia a la representación diplomática del país del que sea nacional, o bien a persona moral o institución de reconocida solvencia cuyo objeto esté vinculado con la protección a los derechos humanos, con la obligación del extranjero de permanecer en un domicilio ubicado en la circunscripción territorial en donde se encuentre la estación migratoria, con el objeto de dar debido seguimiento al procedimiento administrativo migratorio.

**Artículo 102.** El extranjero sometido a un procedimiento administrativo, a fin de lograr su estancia regular en el país, en lo que se dicta resolución definitiva, podrá:

**a)** Otorgar garantía suficiente y a satisfacción de la autoridad;

**b)** Establecer domicilio o lugar en el que permanecerá;

Haiti AR_001461



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**c)** No ausentarse del mismo sin previa autorización de la autoridad, y

**d)** Presentar una solicitud con responsiva firmada por un ciudadano u organización social mexicana.

La garantía podrá constituirse en póliza de fianza, billete de depósito o por cualquier otro medio permitido por la ley.

**Artículo 103.** Las autoridades judiciales deberán dar a conocer al Instituto la filiación del extranjero que se encuentre sujeto a providencias precautorias o medidas cautelares, o bien, que cuente con una orden de presentación, orden de aprehensión o auto de vinculación a proceso, en el momento en que se dicten, informando del delito del que sean presuntos responsables.

En el caso del auto de vinculación a proceso y la sentencia firme condenatoria o absolutoria, deberán notificarlo al Instituto, dentro de las veinticuatro horas siguientes a que ésta se dicte.

**Artículo 104.** Una vez que se haya cumplimentado la sentencia a que se refiere el artículo anterior, la autoridad judicial o administrativa competente de inmediato pondrá al extranjero con el certificado médico que haga constar su estado físico, a disposición del Instituto para que se resuelva su situación migratoria, en los términos previstos en el Capítulo V del presente Título.

**Artículo 105.** En los traslados de extranjeros presentados o en proceso de retorno voluntario, el Instituto podrá solicitar el apoyo de la Policía Federal de conformidad con el artículo 96 de esta Ley y demás disposiciones jurídicas aplicables.

## CAPÍTULO VI
## DE LOS DERECHOS DE LOS ALOJADOS EN LAS ESTACIONES MIGRATORIAS

**Artículo 106.** Para la presentación de migrantes, el Instituto establecerá estaciones migratorias o habilitará estancias provisionales en los lugares de la República que estime convenientes.

No se alojará a un número de migrantes que supere la capacidad física de la estación migratoria asignada. En ningún caso se podrán habilitar como estaciones migratorias los centros de encarcelamiento, de reclusión preventiva o de ejecución de sentencias, o cualquier otro inmueble que no cumpla con las características, ni preste los servicios descritos en el artículo siguiente.

**Artículo 107.** Las estaciones migratorias, deberán cumplir al menos los siguientes requisitos:

**I.** Prestar servicios de asistencia médica, psicológica y jurídica;

**II.** Atender los requerimientos alimentarios del extranjero presentado, ofreciéndole tres alimentos al día. El Instituto deberá supervisar que la calidad de los alimentos sea adecuada. Las personas con necesidades especiales de nutrición, como personas de la tercera edad y mujeres embarazadas, recibirán una dieta adecuada, con el fin de que su salud no se vea afectada en tanto se define su situación migratoria.

*Párrafo reformado DOF 11-11-2020*

Asimismo, cuando así lo requiera el tratamiento médico que se haya; prescrito al alojado, se autorizarán dietas especiales de alimentación. De igual manera se procederá con las personas que por cuestiones religiosas así lo soliciten;

**III.** Mantener en lugares separados y con medidas que aseguran la integridad física de las personas extranjeras, a hombres y mujeres;



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Fracción reformada DOF 11-11-2020*

**IV.** Promover el derecho a la preservación de la unidad familiar;

**V.** Garantizar el respeto de los derechos humanos del extranjero presentado;

**VI.** Mantener instalaciones adecuadas que eviten el hacinamiento;

**VII.** Contar con espacios de recreación deportiva y cultural;

**VIII.** Permitir el acceso de representantes legales, o persona de su confianza y la asistencia consular;

**IX.** Permitir la visita de las personas que cumplan con los requisitos establecidos en las disposiciones jurídicas aplicables. En caso de negativa de acceso, ésta deberá entregarse por escrito debidamente fundado y motivado, y

**X.** Las demás que establezca el Reglamento.

El Instituto facilitará la verificación de la Comisión Nacional de los Derechos Humanos del cumplimiento de los requisitos señalados en este artículo, y el acceso de organizaciones de la sociedad civil, conforme a lo dispuesto en las disposiciones jurídicas aplicables.

**Artículo 108.** A fin de lograr una convivencia armónica y preservar la seguridad de los extranjeros alojados en las estaciones migratorias, el orden y la disciplina se mantendrán con apego a las disposiciones administrativas que emita la Secretaría y respetando en todo momento sus derechos humanos.

**Artículo 109.** Todo presentado, en su caso, tendrá los siguientes derechos desde su ingreso a la estación migratoria:

**I.** Conocer la ubicación de la estación migratoria en la que se encuentra alojado, de las reglas aplicables y los servicios a los que tendrá acceso;

**II.** Ser informado del motivo de su ingreso a la estación migratoria; del procedimiento migratorio; de su derecho a solicitar el reconocimiento de la condición de refugiado o la determinación de apátrida; del derecho a regularizar su estancia en términos de los artículos 132, 133 y 134 de la presente ley, en su caso, de la posibilidad de solicitar voluntariamente el retorno asistido a su país de origen; así como del derecho de interponer un recurso efectivo contra las resoluciones del Instituto;

**III.** Recibir protección de su representación consular y comunicarse con ella. En caso de que el extranjero desee recibir la protección de su representación consular, se le facilitarán los medios para comunicarse con ésta lo antes posible;

**IV.** Recibir por escrito sus derechos y obligaciones, así como las instancias donde puede presentar sus denuncias y quejas;

**V.** Que el procedimiento sea sustanciado por autoridad competente y el derecho a recibir asesoría legal, ofrecer pruebas y alegar lo que a su derecho convenga, así como tener acceso a las constancias del expediente administrativo migratorio;

**VI.** Contar con un traductor o intérprete para facilitar la comunicación, en caso de que no hable o no entienda el español;

Haiti AR_001463

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**VII.** Acceder a comunicación telefónica;

**VIII.** A recibir durante su estancia un espacio digno, alimentos, enseres básicos para su aseo personal y atención médica en caso de ser necesario;

**IX.** Ser visitado por sus familiares y por su representante legal;

**X.** Participar en actividades recreativas, educativas y culturales que se organicen dentro de las instalaciones;

**XI.** No ser discriminado por las autoridades a causa de su origen étnico o nacional, sexo, género, edad, discapacidad, condición social o; económica, estado de salud, embarazo, lengua, religión, opiniones, preferencias sexuales, estado civil o cualquier otra circunstancia que tenga por objeto impedir o anular el reconocimiento o el ejercicio de los derechos y la igualdad real de oportunidades de las personas;

**XII.** Recibir un trato digno y humano durante toda su estancia en la Estación Migratoria;

**XIII.** Que las Estaciones Migratorias cuenten con áreas de estancia separadas para mujeres y hombres, garantizando en todo momento el derecho a la preservación de la unidad familiar, y
*Fracción reformada DOF 11-11-2020*

**XIV.** Las demás que se establezcan en disposiciones de carácter general que expida la Secretaría.
*Fracción reformada DOF 03-07-2019. Reformada y recorrida DOF 11-11-2020*
*Reforma DOF 11-11-2020: Suprimió del artículo la entonces fracción XIV*

**Artículo 110.** El personal de seguridad, vigilancia y custodia que realice sus funciones en los dormitorios de mujeres, será exclusivamente del sexo femenino.

**Artículo 111.** El Instituto resolverá la situación migratoria de los extranjeros presentados en un plazo no mayor de 15 días hábiles, contados a partir de su presentación.
*Párrafo reformado DOF 12-07-2018*

El alojamiento en las estaciones migratorias únicamente podrá exceder de los 15 días hábiles a que se refiere el párrafo anterior cuando se actualicen cualquiera de los siguientes supuestos:

**I.** Que no exista información fehaciente sobre su identidad y/o nacionalidad, o exista dificultad para la obtención de los documentos de identidad y viaje;

**II.** Que los consulados o secciones consulares del país de origen o residencia requieran mayor tiempo para la expedición de los documentos de identidad y viaje;

**III.** Que exista impedimento para su tránsito por terceros países u obstáculo para establecer el itinerario de viaje al destino final;

**IV.** Que exista enfermedad o discapacidad física o mental médicamente acreditada que imposibilite viajar al migrante presentado, y

**V.** Que se haya interpuesto un recurso administrativo o judicial en que se reclamen cuestiones inherentes a su situación migratoria en territorio nacional; o se haya interpuesto un juicio de amparo y exista una prohibición expresa de la autoridad competente para que el extranjero pueda ser trasladado o para que pueda abandonar el país.

Haiti AR_001464



En los supuestos de las fracciones I, II, III y IV de este artículo el alojamiento de los extranjeros en las estaciones migratorias no podrá exceder de 60 días hábiles.

Transcurrido dicho plazo, el Instituto les otorgará la condición de estancia de visitante con permiso para recibir una remuneración en el país, mientras subsista el supuesto por el que se les otorgó dicha condición de estancia. Agotado el mismo, el Instituto deberá determinar la situación migratoria del extranjero.

## CAPÍTULO VII
## DEL PROCEDIMIENTO EN LA ATENCIÓN DE PERSONAS EN SITUACIÓN DE VULNERABILIDAD

**Artículo 112.** Cuando alguna niña, niño o adolescente sea puesta a disposición del Instituto, quedará bajo su total responsabilidad en tanto procede la notificación inmediata a la Procuraduría de Protección y la canalización al Sistema DIF correspondiente, y se deberá garantizar el respeto a sus derechos humanos, sujetándose particularmente a lo siguiente:

**I.** Por lo que respecta a la seguridad y cuidado de niñas, niños y adolescentes, el Instituto deberá ponerles de inmediato a disposición del Sistema Nacional DIF o su equivalente en las diferentes entidades federativas, municipios o demarcaciones territoriales y notificar del caso a la Procuraduría de Protección, para proceder a su gestión conforme a lo establecido en la Ley General de los Derechos de Niñas, Niños y Adolescentes.

De manera cautelar, el Instituto reconocerá a toda niña, niño y adolescente migrante la condición de Visitante por Razones Humanitarias, en los términos establecidos en la presente Ley y su Reglamento.

El Instituto emitirá un acta de canalización de la niña, niño o adolescente en la que conste la notificación a la Procuraduría de Protección y la canalización de la niña, niño o adolescente al Sistema DIF correspondiente;

**II.** Por lo que respecta a la determinación y resolución de la situación administrativa migratoria de niñas, niños y adolescentes, el Instituto deberá iniciar el procedimiento administrativo migratorio previa notificación a la Procuraduría de Protección para su oportuna intervención;

**III.** Será el Instituto quien determine y resuelva el procedimiento administrativo correspondiente, atendiendo las determinaciones que en ese sentido provea el plan de restitución de derechos emitido por la Procuraduría de Protección.

En el caso de que el plan de restitución de derechos que emita la Procuraduría de Protección recomiende la permanencia de la niña, niño o adolescente, el Instituto lo podrá regularizar bajo los supuestos establecidos en los artículos 132, 133 y 134 de esta Ley, y tendrá derecho a la preservación de la unidad familiar.

En el caso de que el plan de restitución de derechos que emita la Procuraduría de Protección estipule la posibilidad de que la niña, niño o adolescente salga del país, el Instituto procederá al retorno asistido y se notificará de esta situación al Consulado correspondiente, con tiempo suficiente para la recepción del niño, niña o adolescente en su país de nacionalidad o residencia.

El retorno asistido de la niña, niño o adolescente migrante a su país de nacionalidad o residencia se realizará atendiendo al interés superior de la niña, niño y adolescente y su situación de vulnerabilidad, con pleno respeto a sus derechos humanos y con la intervención de la autoridad competente del país de nacionalidad o residencia.

Haiti AR_001465



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

Todo traslado y retorno asistido deberá de hacerse en acompañamiento de personal especializado en el tema de infancia.

Tratándose de niña, niño o adolescente nacional no acompañado, corresponderá al Sistema Nacional para el Desarrollo Integral de la Familia, en coordinación y coadyuvancia con los Sistemas Estatales DIF y de la Ciudad de México que correspondan, garantizar el eficaz retorno asistido de la niña, niño o adolescente con sus familiares adultos o personas adultas bajo cuyos cuidados se encuentre habitualmente ya sea en virtud de ley o por costumbre, atendiéndose en todo momento el interés superior de la niña, niño y adolescente y su situación de vulnerabilidad, considerando las causas de su migración: reunificación familiar, en busca de empleo, violencia intrafamiliar, violencia e inseguridad social, entre otras;

**IV.** Se informará en lenguaje claro y conforme a su edad y madurez a la niña, niño o adolescente de las implicaciones de la canalización al Sistema DIF, la notificación de su caso a la Procuraduría de Protección, del proceso administrativo migratorio, de sus derechos y del proceso de retorno a su país o comunidad de origen, en el caso de las niñas, niños y adolescentes nacionales repatriados;

**V.** Se le pondrá en contacto con el consulado de su país, salvo que a juicio del Instituto o a solicitud de la niña, niño o adolescente pudiera acceder al asilo político, al reconocimiento de la condición de refugiado, o se identifiquen indicios de necesidad de protección internacional, en cuyo caso no se entablará contacto con la representación consular.

En estos casos, además de a la Procuraduría de Protección, el Instituto deberá notificar a la Comisión Mexicana de Ayuda a Refugiados de manera inmediata.

En los casos en que corresponda, se notificará al consulado del país de nacionalidad o residencia del niño, niña o adolescente, sobre la canalización al Sistema DIF y la notificación a la Procuraduría de Protección, incluyendo los datos de contacto para ambos casos;

**VI.** Personal del Instituto, especializado en la protección de la infancia, capacitado en los derechos de niñas, niños y adolescentes, podrá entrevistarles con el único objeto de conocer su identidad, su país de nacionalidad o residencia, su situación migratoria, el paradero de sus familiares y sus necesidades particulares de protección, de atención médica y psicológica. Dicha información se compartirá con los Sistemas DIF y la Procuraduría Federal en los términos que establecen la Ley General de los Derechos de Niñas, Niños y Adolescentes y su Reglamento.

Un representante de la Comisión Nacional de los Derechos Humanos podrá estar presente en estas entrevistas, sin perjuicio de las facultades que le corresponden al representante legal o persona de confianza del niño, niña o adolescente.

*Artículo reformado DOF 04-06-2013, 09-11-2017, 11-11-2020*

**Artículo 113.** En el caso de que los extranjeros sean mujeres embarazadas, adultos mayores, personas con discapacidad, e indígenas. O bien, víctimas o testigos de delitos graves cometidos en territorio nacional cuyo estado emocional no les permita tomar una decisión respecto a si desean retornar a su país de origen o permanecer en territorio nacional, el Instituto tomará las medidas pertinentes a fin de que si así lo requieren se privilegie su estancia en instituciones públicas o privadas especializadas que puedan brindarles la atención que requieren.

En el caso de que los extranjeros víctimas de delito tengan situación migratoria regular en el país o hayan sido regularizados por el Instituto en términos de lo dispuesto por la presente Ley, el Instituto podrá canalizarlos a las instancias especializadas para su debida atención.

Haiti AR_001466



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

El procedimiento que deberá seguir el Instituto para la detección, identificación y atención de extranjeros víctimas del delito se regulará en el Reglamento.

## CAPÍTULO VIII
## DEL RETORNO ASISTIDO Y LA DEPORTACIÓN DE EXTRANJEROS QUE SE ENCUENTREN IRREGULARMENTE EN TERRITORIO NACIONAL

**Artículo 114.** Corresponde de manera exclusiva al titular del Poder Ejecutivo Federal expulsar del territorio nacional al extranjero cuya permanencia juzgue inconveniente, conforme a lo dispuesto en el artículo 33 de la Constitución Política de los Estados Unidos Mexicanos.

**Artículo 115.** El Instituto contará con los mecanismos de retorno asistido y deportación para hacer abandonar el territorio nacional a aquél extranjero que no observó las disposiciones contenidas en esta Ley y su Reglamento.

**Artículo 116.** La Secretaría en· coordinación con la Secretaría de Relaciones Exteriores podrá suscribir instrumentos internacionales con dependencias u órganos de otros países y con organismos internacionales, en materia de retorno asistido, seguro, digno, ordenado y humano de extranjeros que se encuentren irregularmente en territorio nacional, de conformidad con las disposiciones jurídicas aplicables.

**Artículo 117.** El Reglamento establecerá los lineamientos que deben contener los instrumentos interinstitucionales a que se refiere el artículo anterior, así como las previsiones necesarias para la regulación de este Capítulo.

**Artículo 118.** Podrán solicitar el beneficio del retorno asistido, sin perjuicio de lo que al efecto se establezca en los instrumentos interinstitucionales, los extranjeros que se ubiquen en los siguientes supuestos:

**I.** Se encuentren irregularmente en el territorio nacional, a disposición del Instituto, y

**II.** No exista restricción legal emitida por autoridad competente para que abandonen el país.

En el caso de que el extranjero decida no solicitar el beneficio del retorno asistido, se procederá a su presentación, conforme a lo dispuesto en esta Ley.

**Artículo 119.** El retorno asistido de mayores de dieciocho años que se encuentren irregularmente en territorio nacional se llevará a cabo a petición expresa del extranjero y durante el procedimiento se garantizará el pleno respeto de sus derechos humanos. Previo al retorno asistido, el extranjero tendrá derecho a:

**I.** Ser informado de su derecho a recibir protección de su representación consular y comunicarse con ella. En caso de que el extranjero desee recibir la protección de su representación consular, se le facilitarán los medios para comunicarse con ésta lo antes posible;

**II.** Recibir información acerca de la posibilidad de permanecer en el país de manera regular, así como del procedimiento de retorno asistido, incluyendo aquella relativa a los recursos jurídicos disponibles;

**III.** Avisar a sus familiares, representante legal o persona de su confianza, ya sea en territorio nacional o fuera de éste, para tal efecto, se le facilitarán los medios para comunicarse con ésta lo antes posible;

Haiti AR_001467

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**IV.** Contar con un traductor o intérprete para facilitar la comunicación, para el caso de que no hable o no entienda el español;

**V.** Que el procedimiento sea sustanciado por autoridad competente y el derecho a recibir asesoría legal, ofrecer pruebas y alegar lo que a su derecho convenga, así como tener acceso a las constancias del expediente administrativo migratorio;

**VI.** Que el Instituto se cerciore que el extranjero posee la nacionalidad o residencia regular del país receptor;

**VII.** Ser trasladado junto con sus efectos personales, y

**VIII.** Que en el caso de que el extranjero sea rechazado por el país de destino, sea devuelto al territorio de los Estados Unidos Mexicanos para que el Instituto defina su situación migratoria.

**Artículo 120.** En el procedimiento de retorno asistido se privilegiarán los principios de preservación de la unidad familiar y de especial atención a personas en situación de vulnerabilidad, procurando que los integrantes de la misma familia viajen juntos.

En el caso de niñas, niños y adolescentes, mujeres embarazadas, víctimas o testigos de delitos cometidos en territorio nacional, personas con discapacidad y adultos mayores, se aplicará el procedimiento de retorno asistido con la intervención de los funcionarios consulares o migratorios del país receptor. Asimismo, se deberán tomar en consideración:

**I.** El interés superior de niñas, niños y adolescentes para garantizar su mayor protección, y

**II.** Su situación de vulnerabilidad para establecer la forma y términos en que serán trasladados a su país de origen.

En el caso de niñas, niños y adolescentes y el de víctimas o testigos de delitos cometidos en territorio nacional, no serán deportados y atendiendo a su voluntad o al interés superior para garantizar su mayor protección, podrán sujetarse al procedimiento de retorno asistido o de regularización de su situación migratoria.

*Artículo reformado DOF 11-11-2020*

**Artículo 121.** El extranjero que es sujeto a un procedimiento administrativo migratorio de retorno asistido o de deportación, permanecerá presentado en la estación migratoria, observándose lo dispuesto en el artículo 111 de la presente Ley.

El retorno asistido y la deportación no podrán realizarse más que al país de origen o de residencia del extranjero, exceptuando el caso de quiénes hayan solicitado el asilo político o el reconocimiento de la condición de refugiado, en cuyo caso se observará el principio de no devolución.

**Artículo 122.** En el procedimiento de deportación, los extranjeros tendrán derecho a:

**I.** Ser notificados del inicio del procedimiento administrativo migratorio;

**II.** Recibir protección de su representación consular y comunicarse con ésta, excepto en el caso de que hayan solicitado el asilo político o el reconocimiento de la condición de refugiado. En caso de que el extranjero desee recibir la protección de su representación consular, se le facilitarán los medios para comunicarse con ésta lo antes posible;

Haiti AR_001468



**III.** Avisar a sus familiares o persona de confianza, ya sea en territorio nacional o fuera de éste, para tal efecto se le facilitarán los medios para comunicarse con ésta lo antes posible;

**IV.** Recibir información acerca del procedimiento de deportación, así como del derecho de interponer un recurso efectivo contra las resoluciones del Instituto;

**V.** Contar con un traductor o intérprete para facilitar la comunicación, para el caso de que no hable o no entienda el español, y

**VI.** Recibir asesoría legal.

**Artículo 123.** En todo caso, el Instituto proporcionará los medios de transporte necesarios para el traslado de los extranjeros al país de origen o de residencia. Asimismo, deberá preverse de ser el caso, el suministro de agua potable y los alimentos necesarios durante el trayecto, conforme a las disposiciones jurídicas aplicables.

En los mecanismos contenidos en este capítulo, los extranjeros deberán estar acompañados por las autoridades migratorias mexicanas, las cuales deberán en todo momento respetar los derechos humanos de los extranjeros.

**Artículo 124.** Los extranjeros que con motivo del procedimiento administrativo migratorio de retorno asistido regresen a su país de origen o de residencia, serán puestos a disposición de la autoridad competente en el país receptor, en la forma y términos pactados en los instrumentos interinstitucionales celebrados con los países de origen.

**Artículo 125.** Sólo por caso fortuito o fuerza mayor podrá suspenderse temporalmente el traslado de extranjeros que soliciten el retorno asistido, reanudándose una vez que sea superada la causa que originó la suspensión.

# CAPÍTULO IX
## DEL PROCEDIMIENTO ADMINISTRATIVO MIGRATORIO EN MATERIA DE REGULACIÓN MIGRATORIA

**Artículo 126.** Las solicitudes de trámite migratorio deberán contener los datos y requisitos que se precisen en la Ley, el Reglamento y en otras disposiciones administrativas de carácter general.

**Artículo 127.** La solicitud de visa deberá presentarla personalmente el extranjero interesado en las oficinas consulares, con excepción de los casos de derecho a la preservación de la unidad familiar, oferta de empleo o razones humanitarias, que podrán tramitar en territorio nacional, en los términos establecidos en el artículo 41 de esta Ley.

**Artículo 128.** La autoridad migratoria deberá dictar resolución en los trámites migratorios en un plazo no mayor a veinte días hábiles contados a partir de la fecha en que el solicitante cumpla con todos los requisitos formales exigidos por esta Ley, su Reglamento y demás disposiciones administrativas aplicables. Transcurrido dicho plazo sin que la resolución se dicte, se entenderá que es en sentido negativo.

Si el particular lo requiere, la autoridad emitirá constancia de tal hecho, dentro de los dos días hábiles siguientes a la presentación de la solicitud de expedición de la referida constancia.

**Artículo 129.** Las solicitudes de expedición de visa presentadas en las oficinas consulares deberán resolverse en un plazo de diez días hábiles.

Haiti AR_001469



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**Artículo 130.** Si el interesado no cumple con los requisitos aplicables al trámite migratorio que solicita, la autoridad migratoria lo prevendrá conforme a lo dispuesto en la Ley Federal de Procedimiento Administrativo y le otorgará un plazo de diez días hábiles a partir de que se le notifique dicha prevención para que subsane los requisitos omitidos. En caso de que no se subsanen los requisitos, se desechará el trámite.

**Artículo 131.** Los informes u opiniones necesarios para la resolución de algún trámite migratorio que se soliciten a otras autoridades deberán emitirse en un plazo no mayor a diez días naturales. En caso de no recibirse el informe u opinión en dicho plazo, el Instituto entenderá que no existe objeción a las pretensiones del interesado.

**Artículo 132.** Los extranjeros tendrán derecho a solicitar la regularización de su situación migratoria, cuando se encuentren en alguno de los siguientes supuestos:

**I.** Que carezcan de la documentación necesaria para acreditar su situación migratoria regular;

**II.** Que la documentación con la que acrediten su situación migratoria se encuentre vencida, o

**III.** Que hayan dejado de satisfacer los requisitos en virtud de los cuales se les otorgó una determinada condición de estancia.

**Artículo 133.** El Instituto podrá regularizar la situación migratoria de los extranjeros que se ubiquen en territorio nacional y manifiesten su interés de residir de forma temporal o permanente en territorio nacional, siempre y cuando cumplan con los requisitos de esta Ley, su Reglamento y demás disposiciones jurídicas aplicables. La regularización se podrá otorgar concediendo al extranjero la condición de estancia que corresponda conforme a esta Ley.

Con independencia de lo anterior, tienen derecho a la regularización de su situación migratoria los extranjeros que se ubiquen en territorio nacional y se encuentren en alguno de los siguientes supuestos:

**I.** Acredite ser cónyuge, concubina o concubinario de persona mexicana o de persona extranjera con condición de estancia de residente;

**II.** Acredite ser padre, madre o hijo, o tener la representación legal o custodia de persona mexicana o extranjera con condición de estancia de residente;

**III.** Que el extranjero sea identificado por el Instituto o por autoridad competente, como víctima o testigo de algún delito grave cometido en territorio nacional;

**IV.** Que se trate de personas cuyo grado de vulnerabilidad dificulte o haga imposible su deportación o retorno asistido, y

**V.** Cuando se trate de niñas, niños y adolescentes que se encuentren sujetos al procedimiento de sustracción y restitución internacional de niños, niñas o adolescentes.

**Artículo 134.** Los extranjeros también podrán solicitar la regularización de su situación migratoria, salvo lo dispuesto en el artículo 43 de esta Ley, cuando:

**I.** Habiendo obtenido autorización para internarse de forma regular al país, hayan excedido el período de estancia inicialmente otorgado, siempre y cuando presenten su solicitud dentro de los sesenta días naturales siguientes al vencimiento del período de estancia autorizado, o

Haiti AR_001470



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

**II.** Realicen actividades distintas a las que les permita su condición de estancia.

Para el efecto anterior, deberán cumplir los requisitos que establecen esta Ley, su Reglamento y demás disposiciones jurídicas aplicables.

**Artículo 135.** Para realizar el trámite de regularización de la situación migratoria, el extranjero deberá cumplir con lo siguiente:

**I.** Presentar ante el Instituto un escrito por el que solicite la regularización de su situación migratoria, especificando la irregularidad en la que incurrió;

**II.** Presentar documento oficial que acredite su identidad;

**III.** Para el caso de que tengan vínculo con mexicano o persona extranjera con residencia regular en territorio nacional, deberán exhibir los documentos que así lo acrediten;

**IV.** Para el supuesto de que se hayan excedido el período de estancia inicialmente otorgado, deberán presentar el documento migratorio vencido;

**V.** Acreditar el pago de la multa determinada en esta Ley, y

**VI.** Los previstos en esta Ley y su Reglamento para la condición de estancia que desea adquirir.

**Artículo 136.** El Instituto no podrá presentar al extranjero que acuda ante el mismo a solicitar la regularización de su situación migratoria.

Para el caso de que el extranjero se encuentre en una estación migratoria y se ubique en los supuestos previstos en los artículos 133 y 134 de esta Ley, se les extenderá dentro de las veinticuatro horas siguientes, contadas a partir de que el extranjero acredite que cumple con los requisitos establecidos en esta Ley y su Reglamento, el oficio de salida de la estación para el efecto de que acudan a las oficinas del Instituto a regularizar su situación migratoria, salvo lo previsto en el artículo 113 en el que se deberá respetar el período de reflexión a las víctimas o testigos de delito.

El Instituto contará con un término de treinta días naturales, contados a partir del ingreso del trámite correspondiente, para resolver sobre la solicitud de regularización de la situación migratoria.

**Artículo 137.** El Instituto podrá expedir permisos de salida y regreso por un periodo determinado a los extranjeros que tengan un trámite pendiente de resolución que no haya causado estado.

El Instituto expedirá una orden de salida del país a los extranjeros, cuando:

**I.** Se desistan de su trámite migratorio;

**II.** El trámite migratorio le sea negado, y

**III.** Así lo solicite el extranjero.

En estos casos, el extranjero deberá abandonar el territorio nacional en el plazo concedido por el Instituto y podrá reingresar de forma inmediata, previo cumplimiento de los requisitos que establece esta Ley.

## TÍTULO SÉPTIMO

Haiti AR_001471

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

# DE LAS SANCIONES

## CAPÍTULO I
## DISPOSICIONES GENERALES RELATIVAS A LAS SANCIONES

**Artículo 138.** El Instituto impondrá las sanciones a que se refiere esta Ley, dentro de los límites señalados para cada infracción, con base en la gravedad de la misma y el grado de responsabilidad del infractor, tomando en cuenta:

**I.** Las circunstancias socioeconómicas del infractor;

**II.** Las condiciones exteriores, los antecedentes del infractor y los medios de ejecución;

**III.** La reincidencia en el incumplimiento de obligaciones;

**IV.** El monto del beneficio, lucro o daño o perjuicio derivado del incumplimiento de obligaciones, y

**V.** El nivel jerárquico del infractor y su antigüedad en el servicio, tratándose de autoridades distintas al Instituto.

**Artículo 139.** Los ingresos que la Federación obtenga efectivamente de multas por infracción a esta Ley, se destinarán al Instituto para mejorar los servicios que en materia migratoria proporciona.

## CAPÍTULO II
## DE LAS CAUSAS PARA SANCIONAR A LOS SERVIDORES PÚBLICOS DEL INSTITUTO

**Artículo 140.** Los servidores públicos del Instituto serán sancionados por las siguientes conductas:

**I.**   Sin estar autorizados, den a conocer cualquier información de carácter confidencial o reservado;

**II.**   Dolosamente o por negligencia retrasen el trámite normal de los asuntos migratorios;

**III.**   Por sí o por intermediarios intervengan de cualquier forma en la gestión de los asuntos a que se refiere esta Ley o su Reglamento o patrocinen o aconsejen la manera de evadir las disposiciones o trámites migratorios a los interesados o a sus representantes;

**IV.**   Dolosamente hagan uso indebido o proporcionen a terceras personas documentación migratoria;

**V.**   Faciliten a los extranjeros sujetos al control migratorio los medios para evadir el cumplimiento de esta Ley y su Reglamento;

**VI.**   Por violación a los derechos humanos de los migrantes, acreditada ante la autoridad competente, y

**VII.**   Las demás que establezcan otras disposiciones jurídicas aplicables.

Se considerará infracción grave y se sancionará con la destitución e inhabilitación, la actualización de las conductas previstas en las fracciones IV y VI del presente artículo, de conformidad con lo previsto en la Ley General de Responsabilidades Administrativas y sin perjuicio de lo previsto en otras disposiciones jurídicas aplicables.

Haiti AR_001472



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

*Párrafo reformado DOF 03-07-2019*

**Artículo 141.** Las sanciones a los servidores públicos del Instituto, serán aplicadas en los términos de la Ley Federal de Responsabilidades Administrativas de los Servidores Públicos.

**Artículo 142.** Se impondrá multa de cien a un mil días de salario mínimo general vigente en el Distrito Federal, al que sin permiso del Instituto autorice u ordene el despacho de un transporte que haya de salir del territorio nacional.

# CAPÍTULO III
## DE LAS SANCIONES A LAS PERSONAS FÍSICAS Y MORALES

**Artículo 143.** La aplicación de las sanciones a las personas físicas y morales se regirá por las disposiciones contenidas en este capítulo y en forma supletoria por la Ley Federal de Procedimiento Administrativo. En su sustanciación se respetarán plenamente los derechos humanos de los migrantes.

Son de orden público para todos los efectos legales, la deportación de los extranjeros y las medidas que dicte la Secretaría conforme a la presente Ley.

La deportación es la medida dictada por el Instituto mediante la cual se ordena la salida del territorio nacional de un extranjero y se determina el período durante el cual no podrá reingresar al mismo, cuando incurra en los supuestos previstos en el artículo 144 de esta Ley.

**Artículo 144.** Será deportado del territorio nacional el extranjero presentado que:

**I.** Se haya internado al país sin la documentación requerida o por un lugar no autorizado para el tránsito internacional de personas;

**II.** Habiendo sido deportado, se interne nuevamente al territorio nacional sin haber obtenido el Acuerdo de readmisión, aún y cuando haya obtenido una condición de estancia;

**III.** Se ostente como mexicano ante el Instituto sin serlo;

**IV.** Cuando derivado de sus antecedentes en México o en el extranjero se comprometa la seguridad nacional o la seguridad pública;

*Fracción reformada DOF 07-01-2021*

**V.** Proporcione información falsa o exhiba ante el Instituto documentación apócrifa, alterada o legítima, pero que haya sido obtenida de manera fraudulenta, y

**VI.** Haya incumplido con una orden de salida de territorio nacional expedida por el Instituto.

En todos estos casos, el Instituto determinará el período durante el cual el extranjero deportado no deberá reingresar al país, conforme a lo establecido en el Reglamento. Durante dicho periodo, sólo podrá ser readmitido por acuerdo expreso de la Secretaría.

En el supuesto de que el extranjero, por sus antecedentes en los Estados Unidos Mexicanos o en el extranjero, pudiera comprometer la soberanía nacional, la seguridad nacional o la seguridad pública, la deportación será definitiva.

**Artículo 145.** A los extranjeros que soliciten la regularización de su situación migratoria en los términos previstos en las fracciones I y II del artículo 133 de esta Ley, se les impondrá una multa de veinte a cuarenta días de salario mínimo general vigente en el Distrito Federal.

Haiti AR_001473



Los extranjeros que se encuentren en los supuestos de las fracciones III, IV y V del artículo 133 de esta Ley no serán acreedores a ninguna multa.

**Artículo 146.** A los extranjeros que se les autorice la regularización de su situación migratoria en los términos previstos en el artículo 134 de esta Ley, se les impondrá una multa de veinte a cien días de salario mínimo general vigente en el Distrito Federal.

**Artículo 147.** Salvo que se trate de autoridad competente a quien, sin autorización de su titular retenga la documentación que acredite la identidad o la situación migratoria de un extranjero en el país, se impondrá multa de un mil a diez mil días de salario mínimo general vigente en el Distrito Federal.

**Artículo 148.** El servidor público que, sin mediar causa justificada o de fuerza mayor, niegue a los migrantes la prestación de los servicios o el ejercicio de los derechos previstos en esta Ley, así como los que soliciten requisitos adicionales a los previstos en las disposiciones legales y reglamentarias aplicables, se harán acreedores a una multa de veinte a mil días de salario mínimo general vigente en el Distrito Federal, con independencia de las responsabilidades de carácter administrativo en que incurran.

Esta sanción será aplicada en términos de la Ley Federal de Responsabilidades Administrativas de los Servidores Públicos, o de la ley que corresponda, de acuerdo con el carácter del servidor público responsable.

**Artículo 149.** A cualquier particular que reciba en custodia a un extranjero y permita que se sustraiga del control del Instituto, se le sancionará con multa de quinientos a dos mil días de salario mínimo general vigente en el Distrito Federal, sin perjuicio de las responsabilidades en que incurra cuando ello constituya un delito y de que se le haga efectiva la garantía prevista en el artículo 102 de esta Ley.

**Artículo 150.** Se impondrá multa de cien a quinientos días de salario mínimo general vigente en el Distrito Federal al mexicano que contraiga matrimonio con extranjero sólo con el objeto de que éste último pueda radicar en el país, acogiéndose a los beneficios que esta Ley establece para estos casos.

Igual sanción se impondrá al extranjero que contraiga matrimonio con mexicano en los términos del párrafo anterior.

**Artículo 151.** Se impondrá multa de mil a diez mil días de salario mínimo general vigente en el Distrito Federal a las empresas de transportes marítimos, cuando permitan que los pasajeros o tripulantes bajen a tierra antes de que el Instituto otorgue el permiso correspondiente.

**Artículo 152.** El desembarco de personas de transportes procedentes del extranjero, efectuado en lugares distintos a los destinados al tránsito internacional de personas, se castigará con multa de mil a diez mil días de salario mínimo general vigente en el Distrito Federal, que se impondrá a las personas físicas o morales con actividades comerciales dedicadas al transporte internacional de personas, sin perjuicio de las sanciones previstas en otras leyes.

**Artículo 153.** Las empresas dedicadas al transporte internacional terrestre, marítimo o aéreo que trasladen al país extranjeros sin documentación migratoria vigente, serán sancionadas con multa de mil a diez mil días de salario mínimo general vigente en el Distrito Federal, sin perjuicio de que el extranjero de que se trate sea rechazado y de que la empresa lo regrese, por su cuenta, al lugar de procedencia.

**Artículo 154.** Serán responsables solidarios, la empresa propietaria, los representantes, sus consignatarios, así como los capitanes o quienes se encuentren al mando de transportes marítimos, que desobedezcan la orden de conducir pasajeros extranjeros que hayan sido rechazados o deportados por

Haiti AR_001474



la autoridad competente de territorio nacional, y serán sancionados con multa de mil a diez mil días de salario mínimo general vigente en el Distrito Federal.

A las empresas propietarias de transportes aéreos se les impondrá la misma sanción. En ambos supuestos se levantará acta circunstanciada en la que se hará constar las particularidades del caso.

**Artículo 155.** Se impondrá multa de mil a diez mil días de salario mínimo general vigente en el Distrito Federal a la empresa propietaria, sus representantes o sus consignatarios cuando la embarcación salga de puertos nacionales en tráfico de altura antes de que se realice la inspección de salida por el Instituto y de haber recibido de éstas, la autorización para efectuar el viaje.

**Artículo 156.** La persona que visite un transporte marítimo extranjero, sin permiso de las autoridades migratorias, será castigada con multa de diez hasta cien días de salario mínimo general vigente en el Distrito Federal o arresto hasta por treinta y seis horas.

La misma sanción se impondrá a la persona que, sin facultades para ello autorice la visita a que se refiere el párrafo anterior.

**Artículo 157.** Se impondrá multa de mil a diez mil días de salario mínimo general vigente en el Distrito Federal, a la empresa de transporte internacional aéreo o marítimo que incumpla con la obligación de transmitir electrónicamente la información señalada en el artículo 46 de esta Ley.

Igual sanción podrá imponerse para el caso de que la transmisión electrónica sea extemporánea, incompleta o contenga información incorrecta.

**Artículo 158.** Se impondrá multa de veinte hasta cien días de salario mínimo general vigente en el Distrito Federal, a los residentes temporales y permanentes que se abstengan de informar al Instituto de su cambio de estado civil, domicilio, nacionalidad o lugar de trabajo, o lo hagan de forma extemporánea.

## TÍTULO OCTAVO
## DE LOS DELITOS EN MATERIA MIGRATORIA

## CAPÍTULO ÚNICO
## DE LOS DELITOS

**Artículo 159.** Se impondrá pena de ocho a dieciséis años de prisión y multa de cinco mil a quince mil días de salario mínimo general vigente en el Distrito Federal, a quien:

**I.** Con propósito de tráfico lleve a una o más personas a internarse en otro país sin la documentación correspondiente, con objeto de obtener directa o indirectamente un lucro;

**II.** Introduzca, sin la documentación correspondiente, a uno o varios extranjeros a territorio mexicano, con objeto de obtener directa o indirectamente un lucro, o

**III.** Albergue o transporte por el territorio nacional, con el objeto de obtener directa o indirectamente un lucro, a uno o varios extranjeros con el fin de evadir la revisión migratoria.

Para efectos de la actualización del delito previsto en este artículo, será necesario que quede demostrada la intención del sujeto activo de obtener un beneficio económico en dinero o en especie, cierto, actual o inminente.

Haiti AR_001475



No se impondrá pena a las personas de reconocida solvencia moral, que por razones estrictamente humanitarias y sin buscar beneficio alguno, presten ayuda a la persona que se ha internado en el país de manera irregular, aun cuando reciban donativos o recursos para la continuación de su labor humanitaria.

**Artículo 160.** Se aumentarán hasta en una mitad las penas previstas en el artículo anterior, cuando las conductas descritas en el mismo se realicen:

**I.** Respecto de niñas, niños y adolescentes o cuando se induzca, procure, facilite u obligue a un niño, niña o adolescente o a quien no tenga capacidad para comprender el significado del hecho, a realizar cualquiera de las conductas descritas en el artículo anterior;

**II.** En condiciones o por medios que pongan o puedan poner en peligro la salud, la integridad, la seguridad o la vida o den lugar a un trato inhumano o degradante de las personas en quienes recaiga la conducta, o

**III.** Cuando el autor material o intelectual sea servidor público.

**Artículo 161.** Al servidor público que auxilie, encubra o induzca a cualquier persona a violar las disposiciones contenidas en la presente Ley, con el objeto de obtener directa o indirectamente un lucro en dinero o en especie, se le impondrá una pena de cuatro a ocho años de prisión y multa de quinientos hasta un mil días de salario mínimo general vigente en el Distrito Federal.

**Artículo 162.** En los casos de los delitos a que esta Ley se refiere, el ejercicio de la acción penal por parte del Ministerio Público de la Federación se realizará de oficio. El Instituto estará obligado a proporcionar al Ministerio Público de la Federación todos los elementos necesarios para la persecución de estos delitos.

## TRANSITORIOS

**PRIMERO.** La Ley de Migración entrará en vigor al día siguiente de su publicación en el Diario Oficial de la Federación, excepto las disposiciones que están sujetas a la vacancia prevista en el artículo Segundo Transitorio.

**SEGUNDO.** El artículo 10; las fracciones I, II, III y VI del artículo 18; el artículo 21; los Capítulos I y II del Título Cuarto; el último párrafo del artículo 74; los artículos 101 y 102; el artículo 117; el último párrafo del artículo 112; los artículos 126 y 127, y los artículos 149, 157 y 158 de la Ley de Migración, entrarán en vigor hasta que se encuentre vigente el Reglamento de la misma Ley.

**TERCERO.** Dentro del término de ciento ochenta días contados a partir de la entrada en vigor de la presente Ley, el Ejecutivo Federal deberá expedir el Reglamento de la Ley de Migración, en tanto, continuará aplicándose en lo que no se oponga, el Reglamento de la Ley General de Población.

**CUARTO.** Las disposiciones administrativas de carácter general en materia migratoria emitidas con anterioridad a la entrada en vigor de la Ley de Migración, continuarán vigentes en todo lo que no se le opongan, hasta en tanto se expidan las disposiciones que las sustituyan con arreglo a la misma.

**QUINTO.** Las erogaciones que las dependencias y entidades de la Administración Pública Federal, así como la Procuraduría General de la República, deban realizar para dar cumplimiento a las acciones establecidas en la Ley de Migración, se sujetarán a su disponibilidad presupuestaria aprobada para ese fin por la Cámara de Diputados en el Decreto de Presupuesto de Egresos de la Federación.

**SEXTO.** Para efectos de la aplicación de la Ley de Migración, se deberá tener en cuenta lo siguiente:

Haiti AR_001476



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN   *Última Reforma DOF 29-04-2022*
Secretaría General
Secretaría de Servicios Parlamentarios

**I.** Los extranjeros que hayan obtenido la calidad migratoria de No inmigrante, dentro de las características de turista, transmigrante, visitante en todas sus modalidades excepto los extranjeros que hayan obtenido la calidad migratoria de No inmigrante dentro de la característica de Visitante Local, otorgada a los nacionales de los países vecinos para su visita a las poblaciones fronterizas de los Estados Unidos Mexicanos, ministro de culto, visitante distinguido, visitante provisional y corresponsal, se equipararán al Visitante sin permiso para realizar actividades remuneradas;

**II.** Los extranjeros que hayan obtenido la calidad migratoria de No inmigrante dentro de la característica de Visitante Local, otorgada a los nacionales de los países vecinos para su visita a las poblaciones fronterizas de los Estados Unidos Mexicanos, se equipararán al Visitante Regional;

**III.** Los extranjeros que hayan obtenido la calidad migratoria de No inmigrante, dentro la característica de estudiante, se equipararán al Residente temporal Estudiante;

**IV.** Los extranjeros que hayan obtenido la calidad migratoria de No inmigrante, dentro las características de asilado político y refugiado, se equipararán al Residente permanente;

**V.** Los extranjeros que hayan obtenido la calidad migratoria de Inmigrante, dentro las características de rentista, inversionista, profesional, cargo de confianza, científico, técnico, familiar, artista y deportista o asimilados, se equipararán al Residente temporal, y

**VI.** Los extranjeros que hayan obtenido la calidad migratoria de inmigrado, se equipararán al Residente permanente.

**SÉPTIMO.** Las referencias realizadas en la Ley de Migración al auto de vinculación a proceso, quedarán entendidas al término vigente de auto de formal prisión, toda vez que con este Decreto no entra en vigor el artículo 19 constitucional sujeto a la vacancia prevista en el artículo Segundo Transitorio del Decreto por el que se reforman y adicionan diversas disposiciones de la Constitución Política de los Estados Unidos Mexicanos, publicado en el Diario Oficial de la Federación el 18 de junio de 2008.

**OCTAVO.** La Secretaría de Gobernación publicará en el Diario Oficial de la Federación, las reglas relativas al Sistema de Puntos previsto en la Ley de Migración, dentro del término de ciento ochenta días contados a partir de su entrada en vigor.

**NOVENO.** Los trámites migratorios que se encuentren en proceso o pendientes de resolución a la fecha de entrada en vigor de la Ley de Migración, deberán concluirse de conformidad con las disposiciones vigentes al momento en que se iniciaron.

**DÉCIMO.** Los procedimientos penales iniciados antes de la entrada en vigor de la Ley de Migración, por el delito previsto en el artículo 138 de la Ley General de Población, se seguirán tramitando hasta su conclusión conforme a las disposiciones vigentes al momento de la comisión de los hechos que le dieron origen. Lo mismo se observará respecto de la ejecución de las penas correspondientes.

**ARTÍCULOS SEGUNDO A NOVENO.** ..........

**TRANSITORIOS DEL DECRETO POR EL QUE EXPIDE LA LEY DE MIGRACIÓN Y SE REFORMAN, DEROGAN Y ADICIONAN DIVERSAS DISPOSICIONES DE LA LEY GENERAL DE POBLACIÓN, DEL CÓDIGO PENAL FEDERAL, DEL CÓDIGO FEDERAL DE PROCEDIMIENTOS PENALES, DE LA LEY FEDERAL CONTRA LA DELINCUENCIA ORGANIZADA, DE LA LEY DE LA POLICÍA FEDERAL, DE LA LEY DE ASOCIACIONES RELIGIOSAS Y CULTO PÚBLICO, DE LA LEY DE INVERSIÓN EXTRANJERA, Y DE LA LEY GENERAL DE TURISMO.**

Haiti AR_001477

**PRIMERO.** El presente Decreto entrará en vigor al día siguiente de su publicación en el Diario Oficial de la Federación.

**SEGUNDO.** Las reformas a la Ley General de Población entrarán en vigor al día siguiente de su publicación en el Diario Oficial de la Federación, excepto las derogaciones a las fracciones VII y VIII del artículo 3o. y a los artículos 7 a 75, que entrarán en vigor hasta que se encuentre vigente el Reglamento de la Ley de Migración.

Las reformas a la Ley de Asociaciones Religiosas y Culto Público, a la Ley de Inversión Extranjera y la Ley General de Turismo, entrarán en vigor hasta que se encuentre vigente el Reglamento de la Ley de Migración.

**TERCERO.** Las referencias que en otras leyes y demás disposiciones jurídicas se realicen a la Ley General de Población por lo que hace a cuestiones de carácter migratorio, se entenderán referidas a la Ley de Migración.

**CUARTO.** Las resoluciones dictadas por la autoridad migratoria durante la vigencia de las disposiciones de la Ley General de Población que se derogan, surtirán sus plenos efectos jurídicos.

México, D. F., a 29 de abril de 2011.- Sen. **Manlio Fabio Beltrones Rivera**, Presidente.- Dip. **Jorge Carlos Ramírez Marín**, Presidente.- Sen. **Renan Cleominio Zoreda Novelo**, Secretario.- Dip. **María Dolores Del Río Sánchez**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, Distrito Federal, a veinticuatro de mayo de dos mil once.- **Felipe de Jesús Calderón Hinojosa**.- Rúbrica.- El Secretario de Gobernación, **José Francisco Blake Mora**.- Rúbrica.

Haiti AR_001478



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

## ARTÍCULOS TRANSITORIOS DE DECRETOS DE REFORMA

**DECRETO por el que se reforma y adiciona el artículo 112 de la Ley de Migración.**

Publicado en el Diario Oficial de la Federación el 4 de junio de 2013

**ARTÍCULO ÚNICO.-** Se reforman el primer párrafo; la fracción I y se adiciona un tercer párrafo a la fracción VI del artículo 112 de la Ley de Migración, para quedar como sigue:

………

### TRANSITORIO

**ÚNICO.-** El presente Decreto entrará en vigor al día siguiente de su publicación en el Diario Oficial de la Federación.

México, D.F., a 24 de abril de 2013.- Dip. **Francisco Arroyo Vieyra**, Presidente.- Sen. **Ernesto Cordero Arroyo**, Presidente.- Dip. **Angel Cedillo Hernandez**, Secretario.- Sen. **Lilia Guadalupe Merodio Reza**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, Distrito Federal, a treinta y uno de mayo de dos mil trece.- **Enrique Peña Nieto**.- Rúbrica.- El Secretario de Gobernación, **Miguel Ángel Osorio Chong**.- Rúbrica.

Haiti AR_001479



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

## DECRETO por el que se reforman los artículos 3 y 25 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 7 de junio de 2013

**Artículo Único.** Se adiciona una fracción XXVII, recorriéndose las subsecuentes en su orden, al artículo 3 y se reforma el artículo 25 de la Ley de Migración, para quedar como sigue:

………

### Transitorios

**Primero.** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

**Segundo.** Dentro de un plazo de noventa días naturales, contados a partir de la vigencia de este Decreto, el Ejecutivo Federal publicará las modificaciones que sean necesarias.

México, D.F., a 29 de abril de 2013.- Sen. **Ernesto Cordero Arroyo**, Presidente.- Dip. **Francisco Arroyo Vieyra**, Presidente.- Sen. **Rosa Adriana Díaz Lizama**, Secretaria.- Dip. **Tanya Rellstab Carreto**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, Distrito Federal, a cinco de junio de dos mil trece.- **Enrique Peña Nieto**.- Rúbrica.- El Secretario de Gobernación, **Miguel Ángel Osorio Chong**.- Rúbrica.

Haiti AR_001480



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

**DECRETO por el que se reforman y adicionan diversas disposiciones, así como la denominación de la Ley sobre Refugiados y Protección Complementaria; y se reforman y adicionan diversos artículos de la Ley de Migración.**

Publicado en el Diario Oficial de la Federación el 30 de octubre de 2014

**Artículo Segundo.-** Se reforman los artículos 3, fracción III; y 55, segundo párrafo de la Ley de Migración, para quedar como sigue:

……….

## Transitorios

**Primero.** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

**Segundo.** Los asilados reconocidos anteriormente a la entrada en vigor del presente Decreto podrán solicitar que se les expida el documento migratorio, que acredite su condición de estancia en el país de conformidad con lo establecido en la Ley de Migración.

**Tercero.** La Secretaría de Gobernación y la Secretaría de Relaciones Exteriores realizarán las acciones necesarias para que la implementación de las presentes modificaciones se lleven a cabo con los recursos aprobados en su presupuesto, por lo que no requerirán recursos adicionales para tales efectos y no incrementarán su presupuesto regularizable para el presente ejercicio fiscal y los subsecuentes.

**Cuarto.** Se deberá establecer en los reglamentos respectivos el procedimiento por medio del cual la Comisión Mexicana de Ayuda a Refugiados atenderá y desahogará los casos a los que hacen referencia los artículos 35 Bis y 70 de la presente Ley.

México, D.F., a 25 de septiembre de 2014.- Sen. **Miguel Barbosa Huerta**, Presidente.- Dip. **Silvano Aureoles Conejo**, Presidente.- Sen. **María Elena Barrera Tapia**, Secretaria.- Dip. **Javier Orozco Gómez**, Secretario.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, Distrito Federal, a veintisiete de octubre de dos mil catorce.- **Enrique Peña Nieto**.- Rúbrica.- El Secretario de Gobernación, **Miguel Ángel Osorio Chong**.- Rúbrica.

Haiti AR_001481

**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

## DECRETO por el que se adiciona una fracción VI al artículo 48 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 21 de abril de 2016

**Artículo Único.-** Se adiciona una fracción VI al artículo 48 de la Ley de Migración, para quedar como sigue:

……..

### TRANSITORIO

**ÚNICO.-** El presente Decreto entrará en vigor al día siguiente al de su publicación en el Diario Oficial de la Federación.

Ciudad de México, a 16 de marzo de 2016.- Dip. **José de Jesús Zambrano Grijalva**, Presidente.- Sen. **Roberto Gil Zuarth**, Presidente.- Dip. **Verónica Delgadillo García**, Secretaria.- Sen. **César Octavio Pedroza Gaitán**, Secretario.- Rúbricas."

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a dieciocho de abril de dos mil dieciséis.- **Enrique Peña Nieto**.- Rúbrica.- El Secretario de Gobernación, **Miguel Ángel Osorio Chong**.- Rúbrica.

Haiti AR_001482

**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

## DECRETO por el que se reforma la fracción III del artículo 52 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 19 de mayo de 2017

**Artículo Único.-** Se reforma la fracción III del artículo 52 de la Ley de Migración, para quedar como sigue:

………

## Transitorio

**ÚNICO.-** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

Ciudad de México, a 6 de abril de 2017.- Dip. **María Guadalupe Murguía Gutiérrez**, Presidenta.- Sen. **Pablo Escudero Morales**, Presidente.- Dip. **María Eugenia Ocampo Bedolla**, Secretaria.- Sen. **Lorena Cuéllar Cisneros**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a diecisiete de mayo de dos mil diecisiete.- **Enrique Peña Nieto**.- Rúbrica.- El Secretario de Gobernación, **Miguel Ángel Osorio Chong**.- Rúbrica.

Haiti AR_001483

**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN          *Última Reforma DOF 29-04-2022*
Secretaría General
Secretaría de Servicios Parlamentarios

## DECRETO por el que se reforman los artículos 29 y 112 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 9 de noviembre de 2017

**Artículo Único:** Se reforman los artículos 29, primer párrafo, y 112, fracciones I y VI, tercer párrafo de la Ley de Migración, para quedar como sigue:

……….

## Transitorio

**Único.** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

Ciudad de México, a 26 de septiembre de 2017.- Dip. **Jorge Carlos Ramírez Marín**, Presidente.- Sen. **Ernesto Cordero Arroyo**, Presidente.- Dip. **Alejandra Noemi Reynoso Sánchez**, Secretaria.- Sen. **Itzel S. Ríos de la Mora**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a ocho de noviembre de dos mil diecisiete.- **Enrique Peña Nieto**.- Rúbrica.- El Secretario de Gobernación, **Miguel Ángel Osorio Chong**.- Rúbrica.

Haiti AR_001484

## DECRETO por el que se reforma la fracción I del artículo 30 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 25 de junio de 2018

**Artículo Único.-** Se reforma la fracción I del artículo 30 de la Ley de Migración, para quedar como sigue:

………

## Transitorio

**Único.-** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

Ciudad de México, a 26 de abril de 2018.- Dip. **Edgar Romo García**, Presidente.- Sen. **Ernesto Cordero Arroyo**, Presidente.- Dip. **Sofía Del Sagrario De León Maza**, Secretaria.- Sen. **Juan G. Flores Ramírez**, Secretario.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a veinte de junio de dos mil dieciocho.- **Enrique Peña Nieto**.- Rúbrica.- El Secretario de Gobernación, Dr. **Jesús Alfonso Navarrete Prida**.- Rúbrica.

Haiti AR_001485

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

## DECRETO por el que se reforman los artículos 3 y 111 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 12 de julio de 2018

**Artículo Único.-** Se reforma la fracción XXVIII del artículo 3 y el primer párrafo del artículo 111 de la Ley de Migración, para quedar como sigue:

……….

### Transitorio

**Único.** El presente Decreto entrará en vigor al día siguiente de su publicación en el Diario Oficial de la Federación.

Ciudad de México, a 26 de abril de 2018.- Dip. **Edgar Romo García**, Presidente.- Sen. **Ernesto Cordero Arroyo**, Presidente.- Dip. **Ana Guadalupe Perea Santos**, Secretaria.- Sen. **Juan G. Flores Ramírez**, Secretario.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a seis de julio de dos mil dieciocho.- **Enrique Peña Nieto**.- Rúbrica.- El Secretario de Gobernación, Dr. **Jesús Alfonso Navarrete Prida**.- Rúbrica.

Haiti AR_001486

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

## DECRETO por el que se reforman los artículos 109 y 140 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 3 de julio de 2019

**Artículo Único.-** Se reforman la fracción XV del artículo 109 y el segundo párrafo del artículo 140 de la Ley de Migración, para quedar como sigue:

………

## Transitorio

**Único.** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

Ciudad de México, a 3 de abril de 2019.- Sen. **Martí Batres Guadarrama**, Presidente.- Dip. **Porfirio Muñoz Ledo**, Presidente.- Sen. **Antares G. Vázquez Alatorre**, Secretaria.- Dip. **Julieta Macías Rábago**, Secretaria.- Rúbricas."

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a 2 de julio de 2019.- **Andrés Manuel López Obrador**.- Rúbrica.- La Secretaria de Gobernación, Dra. **Olga María del Carmen Sánchez Cordero Dávila**.- Rúbrica.

Haiti AR_001487

## DECRETO por el que se reforma el artículo 93 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 13 de abril de 2020

**Artículo Único.-** Se reforma el artículo 93 de la Ley de Migración, para quedar como sigue:

……..

## Transitorio

**Único.** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

Ciudad de México, a 27 de febrero de 2020.- Dip. **Laura Angélica Rojas Hernández**, Presidenta.- Sen. **Mónica Fernández Balboa**, Presidenta.- Dip. **Lizbeth Mata Lozano**, Secretaria.- Sen. **Primo Dothé Mata**, Secretario.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a 7 de abril de 2020.- **Andrés Manuel López Obrador**.- Rúbrica.- La Secretaria de Gobernación, Dra. **Olga María del Carmen Sánchez Cordero Dávila**.- Rúbrica.

Haiti AR_001488



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

## DECRETO por el que se reforman diversos artículos de la Ley de Migración y de la Ley sobre Refugiados, Protección Complementaria y Asilo Político, en materia de Infancia Migrante.

Publicado en el Diario Oficial de la Federación el 11 de noviembre de 2020

**Artículo Primero.-** Se **adicionan** las fracciones V, XX, XXI, XXII y XXV, recorriendo en su numeración a las subsecuentes del artículo 3; un segundo párrafo al artículo 6; las fracciones X y XI, recorriendo en su numeración a las subsecuentes del artículo 20; un párrafo tercero al artículo 71; un párrafo segundo al artículo 79; los párrafos tercero, cuarto y quinto al artículo 95; los párrafos segundo, tercero y cuarto al artículo 98; se **reforman** la fracción XIX recorrida del artículo 3; el primer párrafo del artículo 6; el segundo párrafo del artículo 11; las fracciones IV, VII y IX del artículo 20; el artículo 29; el inciso b) de la fracción V del artículo 52; el párrafo segundo del artículo 68; el primer párrafo del artículo 71; los artículos 73 y 74; el artículo 99; las fracciones II y III del artículo 107; la fracción XIII del artículo 109; el artículo 112; el párrafo segundo y sus fracciones I y II y el párrafo tercero del artículo 120; se **suprime** la fracción XIV, recorriendo en su numeración las subsecuentes del artículo 109; de la Ley de Migración, para quedar como sigue:

…….

## Transitorios

**Primero.** El presente Decreto entrará en vigor a los 60 días de su publicación en el Diario Oficial  de la Federación.

**Segundo.** El Ejecutivo Federal, a más tardar dentro de seis meses a partir de la publicación de este Decreto, expedirá las reformas reglamentarias correspondientes.

**Tercero.** El Congreso de la Unión deberá destinar los recursos necesarios para la operación de los Centros de Asistencia Social, así como para el funcionamiento de las Procuradurías de Protección, de conformidad con la Ley General de los Derechos de Niñas, Niños y Adolescentes y su Reglamento. Las partidas presupuéstales deberán señalarse en el presupuesto inmediato siguiente a la entrada en vigor del presente Decreto y en los presupuestos sucesivos.

Ciudad de México, a 29 de septiembre de 2020.- Sen. **Eduardo Ramírez Aguilar**, Presidente.- Dip. **Dulce María Sauri Riancho**, Presidenta.- Sen. **Lilia Margarita Valdez Martínez**, Secretaria.- Dip. **Martha Hortencia Garay Cadena**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a 6 de noviembre de 2020.- **Andrés Manuel López Obrador**.- Rúbrica.- La Secretaria de Gobernación, Dra. **Olga María del Carmen Sánchez Cordero Dávila**.- Rúbrica.

Haiti AR_001489

## DECRETO por el que se reforman los artículos 43, 64 y 144 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 7 de enero de 2021

**Artículo Único.-** Se reforman los artículos 43, fracciones I y III y el párrafo cuarto; 64, fracción VI, y 144, fracción IV de la Ley de Migración, para quedar como sigue:

………

## Transitorios

**Primero.-** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

**Segundo.-** Se derogan todas las disposiciones legales y reglamentarias contrarias a las disposiciones del presente Decreto.

Ciudad de México, a 26 de noviembre de 2020.- Sen. **Eduardo Ramírez Aguilar**, Presidente.- Dip. **Dulce María Sauri Riancho**, Presidenta.- Sen. **Lilia Margarita Valdez Martínez**, Secretaria.- Dip. **Martha Hortencia Garay Cadena**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a 4 de enero de 2021.- **Andrés Manuel López Obrador**.- Rúbrica.- La Secretaria de Gobernación, Dra. **Olga María del Carmen Sánchez Cordero Dávila**.- Rúbrica.

Haiti AR_001490

## DECRETO por el que se reforman y adicionan los artículos 2 y 28 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 4 de mayo de 2021

**Artículo Único.-** Se reforman los artículos 2, primer párrafo; 28, fracción IV y se adicionan los párrafos quince y dieciséis, pasando el actual párrafo quince a ser diecisiete al artículo 2 de la Ley de Migración, para quedar como sigue:

………..

## Transitorio

**Único.-** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación.

Ciudad de México, a 25 de marzo de 2021.- Sen. **Oscar Eduardo Ramírez Aguilar**, Presidente.-  Dip. **Dulce María Sauri Riancho**, Presidenta.- Sen. **Lilia Margarita Valdez Martínez**, Secretaria.- Dip. **María Guadalupe Díaz Avilez**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a 28 de abril de 2021.- **Andrés Manuel López Obrador**.- Rúbrica.- La Secretaria de Gobernación, Dra. **Olga María del Carmen Sánchez Cordero Dávila**.- Rúbrica.

Haiti AR_001491



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

## DECRETO por el que se expide la Ley de la Fiscalía General de la República, se abroga la Ley Orgánica de la Fiscalía General de la República y se reforman, adicionan y derogan diversas disposiciones de distintos ordenamientos legales.

Publicado en el Diario Oficial de la Federación el 20 de mayo de 2021

**Artículo Trigésimo Cuarto.-** Se reforma el párrafo primero y las fracciones II y III del artículo 28 de la Ley de Migración, para quedar como sigue:

……..

## Transitorios

**Primero.** El presente Decreto entrará en vigor al día siguiente de su publicación en el Diario Oficial de la Federación y se expide en cumplimiento al artículo Décimo Tercero transitorio del Decreto por el que se expidió la Ley Orgánica de la Fiscalía General de la República.

**Segundo.** Se abroga la Ley Orgánica de la Fiscalía General de la República.

Todas las referencias normativas a la Procuraduría General de la República o del Procurador General de la República, se entenderán referidas a la Fiscalía General de la República o a su persona titular, respectivamente, en los términos de sus funciones constitucionales vigentes.

**Tercero.** Las designaciones, nombramientos y procesos en curso para designación, realizados de conformidad con las disposiciones constitucionales y legales, relativos a la persona titular de la Fiscalía General de la República, las Fiscalías Especializadas, el Órgano Interno de Control y las demás personas titulares de las unidades administrativas, órganos desconcentrados y órganos que se encuentren en el ámbito de la Fiscalía General de la República, así como de las personas integrantes del Consejo Ciudadano de la Fiscalía General de la República, continuarán vigentes por el periodo para el cual fueron designados o hasta la conclusión en el ejercicio de la función o, en su caso, hasta la terminación del proceso pendiente.

**Cuarto.** La persona titular de la Fiscalía General de la República contará con un término de noventa días naturales siguientes a la entrada en vigor del presente Decreto, para expedir el Estatuto orgánico de la Fiscalía General de la República y de ciento ochenta días naturales, contados a partir de la expedición de éste, para expedir el Estatuto del Servicio Profesional de Carrera.

En tanto se expiden los Estatutos y normatividad, continuarán aplicándose las normas y actos jurídicos que se han venido aplicando, en lo que no se opongan al presente Decreto.

Los instrumentos jurídicos, convenios, acuerdos interinstitucionales, contratos o actos equivalentes, celebrados o emitidos por la Procuraduría General de la República o la Fiscalía General de la República se entenderán como vigentes y obligarán en sus términos a la Institución, en lo que no se opongan al presente Decreto, sin perjuicio del derecho de las partes a ratificarlos, modificarlos o rescindirlos posteriormente o, en su caso, de ser derogados o abrogados.

**Quinto.** A partir de la entrada en vigor de este Decreto quedará desincorporado de la Administración Pública Federal el organismo descentralizado denominado Instituto Nacional de Ciencias Penales que pasará a ser un órgano con personalidad jurídica y patrimonio propio, que gozará de autonomía técnica y de gestión, dentro del ámbito de la Fiscalía General de la República.

Haiti AR_001492



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

Las personas servidoras públicas que en ese momento se encuentren prestando sus servicios para el Instituto Nacional de Ciencias Penales tendrán derecho a participar en el proceso de evaluación para transitar al servicio profesional de carrera.

Para acceder al servicio profesional de carrera, el personal que deseé continuar prestando sus servicios al Instituto Nacional de Ciencias Penales deberá sujetarse al proceso de evaluación según disponga el Estatuto del Servicio Profesional de Carrera, dándose por terminada aquella relación con aquellos servidores públicos que no se sometan o no acrediten el proceso de evaluación.

El Instituto Nacional de Ciencias Penales deberá terminar sus relaciones laborales con sus personas trabajadoras una vez que se instale el servicio profesional de carrera, conforme al programa de liquidación del personal que autorice la Junta de Gobierno, hasta que esto no suceda, las relaciones laborales subsistirán.

A la entrada en vigor de este Decreto, las personas integrantes de la Junta de Gobierno del Instituto Nacional de Ciencias Penales pertenecientes a la Administración Pública Federal dejarán el cargo, y sus lugares serán ocupados por las personas que determine la persona titular de la Fiscalía General de la República.

Dentro de los sesenta días naturales siguientes a la entrada en vigor de este Decreto, la Junta de Gobierno emitirá un nuevo Estatuto orgánico y establecerá un servicio profesional de carrera, así como un programa de liquidación del personal que, por cualquier causa, no transite al servicio profesional de carrera que se instale.

Los recursos materiales, financieros y presupuestales, incluyendo los bienes muebles, con los que cuente el Instituto a la entrada en vigor del presente Decreto, pasarán al Instituto Nacional de Ciencias Penales de la Fiscalía General de la República conforme al Décimo Primero Transitorio del presente Decreto.

**Sexto.** El conocimiento y resolución de los asuntos que se encuentren en trámite a la entrada en vigor del presente Decreto o que se inicien con posterioridad a éste, corresponderá a las unidades competentes, en términos de la normatividad aplicable o a aquellas que de conformidad con las atribuciones que les otorga el presente Decreto, asuman su conocimiento, hasta en tanto se expiden los Estatutos y demás normatividad derivada del presente Decreto.

**Séptimo.** El personal que a la fecha de entrada en vigor del presente Decreto tenga nombramiento o Formato Único de Personal expedido por la entonces Procuraduría General de la República, conservará los derechos que haya adquirido en virtud de su calidad de persona servidora pública, con independencia de la denominación que corresponda a sus actividades o naturaleza de la plaza que ocupe. Para acceder al servicio profesional de carrera el personal que deseé continuar prestando sus servicios con la Fiscalía General de la República deberá sujetarse al proceso de evaluación según disponga el Estatuto del servicio profesional de carrera. Se dará por terminada aquella relación con aquellas personas servidoras públicas que no se sometan o no acrediten el proceso de evaluación.

El personal contratado por la Fiscalía General de la República se sujetará a la vigencia de su nombramiento, de conformidad con los Lineamientos L/001/19 y L/003/19, por los que se regula la contratación del personal de transición, así como al personal adscrito a la entonces Procuraduría General de la República que continúa en la Fiscalía General de la República, así como para el personal de transición.

**Octavo.** Las personas servidoras públicas que cuenten con nombramiento o Formato Único de Personal expedido por la entonces Procuraduría General de la República a la fecha de entrada en vigor

Haiti AR_001493



CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

de este Decreto y que, por cualquier causa, no transiten al servicio profesional de carrera deberán adherirse a los programas de liquidación que para tales efectos se expidan.

**Noveno.** La persona titular de la Oficialía Mayor contará con el plazo de noventa días naturales para constituir el Fideicomiso denominado "Fondo para el Mejoramiento de la Procuración de Justicia" o modificar el objeto de cualquier instrumento jurídico ya existente de naturaleza igual, similar o análoga.

**Décimo.** La persona titular de la Oficialía Mayor emitirá los lineamientos para la transferencia de recursos humanos, materiales, financieros o presupuestales, incluyendo los muebles, con los que cuente la Fiscalía General de la República en el momento de la entrada en vigor de este Decreto, así como para la liquidación de pasivos y demás obligaciones que se encuentren pendientes respecto de la extinción de la Procuraduría General de la República.

Queda sin efectos el Plan Estratégico de Transición establecido en el artículo Noveno transitorio de la Ley Orgánica de la Fiscalía General de la República que se abroga a través del presente Decreto.

**Décimo Primero.** Los bienes inmuebles que sean propiedad de la Fiscalía General de la República, o de los órganos que se encuentren dentro su ámbito o de la Federación que, a la fecha de entrada en vigor del presente Decreto se encuentren dados en asignación o destino a la Fiscalía General de la República, pasarán a formar parte de su patrimonio.

Los bienes muebles y demás recursos materiales, financieros o presupuestales, que hayan sido asignados o destinados, a la Fiscalía General de la República pasarán a formar parte de su patrimonio a la entrada en vigor del presente Decreto.

**Décimo Segundo.** La persona titular de la Fiscalía General de la República contará con un plazo de un año a partir de la publicación del presente Decreto para emitir el Plan Estratégico de Procuración de Justicia de la Fiscalía General de la República, con el que se conducirá la labor sustantiva de la Institución conforme a la obligación a que refiere el artículo 88 del presente Decreto. Mismo que deberá ser presentado por la persona titular de la Fiscalía General de la República en términos del párrafo tercero del artículo 88 del presente Decreto.

El Plan Estratégico de Procuración de Justicia se presentará ante el Senado de la República, durante el segundo periodo ordinario de sesiones, en su caso, seis meses después de la entrada en vigor del presente Decreto.

Para la emisión del Plan Estratégico de Procuración de Justicia, la Fiscalía General de la República contará con la opinión del Consejo Ciudadano. La falta de instalación de dicho Consejo Ciudadano no impedirá la presentación del Plan Estratégico de Procuración de Justicia.

**Décimo Tercero.** Las unidades administrativas de la Fiscalía General de la República que a la fecha de entrada en vigor del presente Decreto se encargan de los procedimientos relativos a las responsabilidades administrativas de las personas servidoras públicas de la Fiscalía General de la República, tendrán el plazo de noventa días naturales para remitirlos al Órgano Interno de Control, para que se encargue de su conocimiento y resolución, atendiendo a la competencia que se prevé en el presente Decreto.

**Décimo Cuarto.** Por lo que hace a la fiscalización del Instituto Nacional de Ciencias Penales, corresponderá al Órgano Interno de Control de la Fiscalía General de la República, a la entrada en vigor del presente Decreto, sin perjuicio de las atribuciones que correspondan a la Auditoría Superior de la Federación.

Haiti AR_001494

**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN                Última Reforma DOF 29-04-2022
Secretaría General
Secretaría de Servicios Parlamentarios

Los expedientes iniciados y pendientes de trámite a la entrada en vigor del presente Decreto, serán resueltos por la Secretaría de la Función Pública.

Por cuanto hace a la estructura orgánica, así como a los recursos materiales, financieros o presupuestales del Órgano Interno de Control en el Instituto Nacional de Ciencias Penales, pasarán al Órgano Interno de Control de la Fiscalía General de la República.

**Décimo Quinto.** Los bienes que hayan sido asegurados por la Procuraduría General de la República o Fiscalía General de la República, con anterioridad a la entrada en vigor de este Decreto, que sean susceptibles de administración o se determine su destino legal, se pondrán a disposición del Instituto para Devolver al Pueblo lo Robado, conforme a la legislación aplicable.

**Décimo Sexto.** Quedan derogadas todas las disposiciones que se opongan a este Decreto.

Ciudad de México, a 29 de abril de 2021.- Dip. **Dulce María Sauri Riancho**, Presidenta.- Sen. **Oscar Eduardo Ramírez Aguilar**, Presidente.- Dip. **Lizbeth Mata Lozano**, Secretaria.- Sen. **María Merced González González**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a 18 de mayo de 2021.- **Andrés Manuel López Obrador**.- Rúbrica.- La Secretaria de Gobernación, Dra. **Olga María del Carmen Sánchez Cordero Dávila**.- Rúbrica.

Haiti AR_001495



**LEY DE MIGRACIÓN**

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 29-04-2022*

## DECRETO por el que se reforma el segundo párrafo del artículo 35 de la Ley de Migración.

Publicado en el Diario Oficial de la Federación el 29 de abril de 2022

**Artículo Único.-** Se reforma el segundo párrafo del artículo 35 de la Ley de Migración, para quedar como sigue:

……..

### Transitorio

**Único.-** El presente Decreto entrará en vigor el día siguiente al de su publicación en el Diario Oficial de la Federación, para que el personal del Instituto Nacional de Migración pueda auxiliarse de herramientas tecnológicas automatizadas en la vigilancia de entrada y salida de nacionales y extranjeros.

**Ciudad de México, a 24 de marzo de 2022**.- Dip. **Sergio Carlos Gutiérrez Luna**, Presidente.-  Sen. **Olga Sánchez Cordero Dávila**, Presidenta.- Dip. **Jessica María Guadalupe Ortega De la Cruz**, Secretaria.- Sen. **Verónica Delgadillo García**, Secretaria.- Rúbricas.**"**

En cumplimiento de lo dispuesto por la fracción I del Artículo 89 de la Constitución Política de los Estados Unidos Mexicanos, y para su debida publicación y observancia, expido el presente Decreto en la Residencia del Poder Ejecutivo Federal, en la Ciudad de México, a 21 de abril de 2022.- **Andrés Manuel López Obrador**.- Rúbrica.- El Secretario de Gobernación, Lic. **Adán Augusto López Hernández**.- Rúbrica.

Haiti AR_001496

Case 6:23-cv-00007 Document 93-6 Filed on 03/24/23 in TXSD Page 193 of 382



🏠 (http://www.gob.mx) › Secretaría de Relaciones Exteriores (/sre) › **Prensa**

Publicaciones Recientes  Washington DC para afinar Cumbre de Líderes de América d

# Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU.

Comunicado No. 401

Secretaría de Relaciones Exteriores | 25 de octubre de 2022 | Comunicado

Haiti AR_001497

12/21/22, 4:48 PM    Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad d...

Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 194 of 382



Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU.

Con respecto a la implementación unilateral de la sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de los Estados Unidos, también conocidos como Protocolos de Protección al Migrante (MPP, por sus siglas en inglés), el Gobierno de México informa lo siguiente:

El 17 de junio de 2022, la Organización Internacional para las Migraciones (OIM) notificó a la Secretaría de Relaciones Exteriores (SRE) sobre la falta de espacio en los albergues en Tijuana, Baja California, para procesar más casos bajo el citado programa. Por tal razón, el ingreso de personas migrantes a México por ese punto de entrada se detuvo a partir del 19 de junio.

El 8 de agosto de 2022, el Departamento de Seguridad Nacional estadounidense (DHS, por sus siglas en inglés) informó que, a partir de esa fecha, comenzaría el fin de la implementación de dicha sección, en cumplimiento con el mandato ordenado por una Corte Federal de Distrito y en concordancia con la decisión de la Suprema Corte de los Estados Unidos del 30 de junio de 2022 sobre este particular.

Haiti AR_001498

12/21/22, 4:48 PM    Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad d…

Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 195 of 382

El Gobierno de México, a través de la SRE, ha venido verificado que se otorgue la atención humanitaria necesaria a las personas migrantes participantes en el programa, incluyendo la administración de pruebas para COVID-19 y la atención de casos positivos, y seguirá garantizando su adecuada estancia y protección en territorio nacional en esta etapa de terminación de la implementación de la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de los Estados Unidos.

Contesta nuestra encuesta de satisfacción. 📊

---

## ¿Cómo fue tu experiencia en gob.mx?

Twittear

Compartir (https://www.facebook.com/sharer/sharer.php?
u=https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-

Haiti AR_001499

migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-ee-uu&src=sdkpreparse)

🖨 Imprime la página completa

La legalidad, veracidad y la calidad de la información es estricta responsabilidad de la dependencia, entidad o empresa productiva del Estado que la proporcionó en virtud de sus atribuciones y/o facultades normativas.

Haiti AR_001500

*1.- SOLICITUDES*

**SOLICITUDES POR DELEGACION**

| DELEGACION | 2020 | | 2021 | | 2022 Nov. | |
|---|---|---|---|---|---|---|
| | CASOS | PERSONAS | CASOS | PERSONAS | CASOS | PERSONAS |
| BAJA CALIFORNIA | 1,306 | 1,676 | 2,462 | 3,683 | 2,302 | 3,269 |
| **CDMX | 5,840 | 7,714 | 11,318 | 18,093 | 11,477 | 15,635 |
| CHIAPAS/PALPA. | 17,146 | 26,503 | 48,849 | 89,550 | 43,677 | 71,974 |
| CHIAPAS/PALTA | 124 | 157 | 3,437 | 5,489 | 5,085 | 7,393 |
| TABASCO | 1,988 | 2,745 | 4,323 | 7,110 | 2,835 | 5,458 |
| **VERACRUZ | 1,574 | 2,119 | 3,484 | 5,668 | 5,419 | 7,528 |
| TOTAL | 27,978 | 40,914 | 74,473 | 129,793 | 70,795 | 111,257 |

**SOLICITANTES AÑOS 2013-2022 (personas)**

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| 1,296 | 2,137 | 3,423 | 8,796 | 14,619 | 29,570 | 70,336 | 40,914 | 129,793 | 111,257 |

Total de solicitantes del 2013 a 2022    412,121

**SOLICITANTES X NACIONALIDAD 2020, 2021 Y 2022 (PERSONAS)**

| TOP10 | NACIONALIDAD | 2020 PERSONAS | TOP10 | NACIONALIDAD | 2021 PERSONAS | TOP 10 | NACIONALIDAD | Nov. 2022 PERSONAS |
|---|---|---|---|---|---|---|---|---|
| 1- | HAITI | 15,364 | 1- | HONDURAS | 50,959 | 1- | HONDURAS | 29,390 |
| 2- | HONDURAS | 5,909 | 2- | HAITI | 50,959 | 2- | CUBA | 17,487 |
| 3- | HAITI | 5,712 | 3- | CUBA | 8,246 | 3- | HAITI | 15,780 |
| 4- | CUBA | 4,011 | 4- | CHILE | 6,893 | 4- | VENEZUELA | 12,998 |
| 5- | VENEZUELA | 3,241 | 5- | VENEZUELA | 6,122 | 5- | NICARAGUA | 8,760 |
| 6- | GUATEMALA | 3,002 | 6- | EL SALVADOR | 5,344 | 6- | EL SALVADOR | 7,441 |
| 7- | CHILE | 808 | 7- | GUATEMALA | 4,321 | 7- | GUATEMALA | 6,674 |
| 8- | NICARAGUA | 803 | 8- | BRASIL | 2,898 | 8- | BRASIL | 2,398 |
| 9- | COLOMBIA | 496 | 9- | NICARAGUA | 2,894 | 9- | COLOMBIA | 2,367 |
| 10- | BRASIL | 486 | 10- | COLOMBIA | 1,236 | 10- | REPÚBLICA DOMINICANA | 1,325 |
| | OTROS PAISES | 1,202 | | OTROS PAISES | 3,497 | | OTROS PAISES | 6,387 |
| | **TOTAL** | **40,914** | | **TOTAL** | **129,793** | | **TOTAL** | **111,257** |

*2.- COMPARATIVO ENERO-NOVIEMBRE (2020-2021-2022)*

****SOLICITANTES DE ENERO-NOVIEMBRE 2020**

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. |
|---|---|---|---|---|---|---|---|---|---|---|
| 5,966 | 5,900 | 5,278 | 968 | 928 | 1,225 | 1,760 | 1,966 | 3,309 | 4,644 | 4,208 |

**total Ene-Nov 2020** 36,152

**SOLICITANTES DE ENERO-NOVIEMBRE 2021**

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. |
|---|---|---|---|---|---|---|---|---|---|---|
| 6,497 | 6,931 | 8,993 | 9,061 | 9,209 | 10,297 | 12,677 | 12,934 | 12,775 | 17,487 | 14,787 |

**total Ene-Nov 2021** 123,648

**SOLICITANTES DE ENERO-NOVIEMBRE 2022**

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. |
|---|---|---|---|---|---|---|---|---|---|---|
| 5,838 | 10,168 | 13,131 | 10,396 | 9,132 | 9,677 | 8,504 | 10,745 | 8,967 | 11,482 | 13,217 |

**total Ene-Nov 2022** 111,357



*Comparativo Enero-Noviembre de los años (2020, 2021, 2022)*

*3.- TASA DE RECONOCIDOS COMO REFUGIADOS (TOP 5)*

**TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2019.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 8,214 | 6,273 | 76% |
| VENEZUELA | 4,741 | 4,677 | 99% |
| EL SALVADOR | 3,470 | 2,364 | 68% |
| CUBA | 1,766 | 340 | 19% |
| GUATEMALA | 992 | 467 | 47% |
| OTROS | 1,316 | 546 | 41% |
| TOTAL | 20,499 | 14,667 | 72% |

**TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2019.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 8,214 | 528 | 6% |
| VENEZUELA | 4,741 | 2 | 0% |
| EL SALVADOR | 3,470 | 617 | 18% |
| CUBA | 1,766 | 134 | 8% |
| GUATEMALA | 992 | 150 | 15% |
| OTROS | 1,316 | 300 | 23% |
| TOTAL | 20,499 | 1,731 | 8% |

**TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2019.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 8,214 | 6,801 | 83% |
| VENEZUELA | 4,741 | 4,679 | 99% |
| EL SALVADOR | 3,470 | 2,981 | 86% |
| CUBA | 1,766 | 474 | 27% |
| GUATEMALA | 992 | 617 | 62% |
| OTROS | 1,316 | 846 | 64% |
| TOTAL | 20,499 | 16,398 | 80% |

**TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2020.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 7,509 | 6,408 | 85% |
| VENEZUELA | 4,331 | 4,233 | 98% |
| CUBA | 3,431 | 1,536 | 45% |
| GUATEMALA | 2,400 | 2,003 | 83% |
| HAITI | 2,319 | 501 | 22% |
| OTROS | 2,683 | 1,274 | 47% |
| TOTAL | 22,673 | 15,955 | 70% |

**TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2020.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 7,509 | 7 | 0% |
| VENEZUELA | 4,331 | 12 | 0% |
| CUBA | 3,431 | 133 | 4% |
| EL SALVADOR | 2,400 | - | 0% |
| HAITI | 2,319 | 664 | 29% |
| OTROS | 2,683 | 312 | 12% |
| TOTAL | 22,673 | 1,128 | 5% |

**TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2020.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 7,509 | 6,415 | 85% |
| VENEZUELA | 4,331 | 4,245 | 98% |
| CUBA | 3,431 | 1,669 | 49% |
| EL SALVADOR | 2,400 | 2,003 | 83% |
| HAITI | 2,319 | 1,165 | 50% |
| OTROS | 2,683 | 1,586 | 59% |
| TOTAL | 22,673 | 17,083 | 75% |

**TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2021.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 17,705 | 14,954 | 84% |
| HAITI | 5,522 | 1,261 | 23% |
| EL SALVADOR | 3,574 | — | 0% |
| VENEZUELA | 3,993 | 3,872 | 97% |
| CUBA | 2,568 | 1,779 | 69% |
| OTROS | 4,737 | 2,446 | 52% |
| TOTAL | 38,099 | 27,352 | 72% |

**TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2021.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 17,705 | 4 | 0% |
| HAITI | 5,522 | 657 | 12% |
| EL SALVADOR | 3,574 | — | 0% |
| VENEZUELA | 3,993 | 1 | 0% |
| CUBA | 2,568 | 2 | 0% |
| OTROS | 4,737 | 182 | 4% |
| TOTAL | 38,099 | 846 | 2% |

**TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2021.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 17,705 | 14,958 | 84% |
| HAITI | 5,522 | 1,918 | 35% |
| EL SALVADOR | 3,574 | — | 0% |
| VENEZUELA | 3,993 | 3,873 | 97% |
| CUBA | 2,568 | 1,781 | 69% |
| OTROS | 4,737 | 2,628 | 55% |
| TOTAL | 38,099 | 28,197 | 74% |

**TASA DE POSITIVOS EN RELACION AL TOTAL DE RESUELTOS 2022.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 11,120 | 10,016 | 90% |
| HAITI | 8,187 | 1,053 | 13% |
| VENEZUELA | 3,674 | 3,408 | 93% |
| EL SALVADOR | 2,899 | 2,552 | 88% |
| CUBA | 1,850 | 915 | 49% |
| OTROS | 4,870 | 1,857 | 38% |
| TOTAL | 32,600 | 19,802 | 61% |

**TASA DE P.C. EN RELACION AL TOTAL DE RESUELTOS 2022.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 11,120 | 1 | 0% |
| HAITI | 8,187 | 580 | 7% |
| VENEZUELA | 3,674 | 1 | 0% |
| EL SALVADOR | 2,899 | — | 0% |
| CUBA | 1,850 | — | 0% |
| OTROS | 4,870 | 132 | 3% |
| TOTAL | 32,600 | 714 | 2% |

**TASA DE POSITIVOS MAS P.C. EN RELACION AL TOTAL DE RESUELTOS 2022.**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 11,120 | 10,017 | 90% |
| HAITI | 8,187 | 1,633 | 20% |
| VENEZUELA | 3,674 | 3,409 | 93% |
| EL SALVADOR | 2,899 | 2,552 | 88% |
| CUBA | 1,850 | 915 | 49% |
| OTROS | 4,870 | 1,989 | 41% |
| TOTAL | 32,600 | 20,515 | 63% |

*4.- RECONOCIDOS COMO REFUGIADOS (TOP 7)*

**REFUGIADOS RECONOCIDOS, POR NACIONALIDAD TOTAL (2013 - 2022).**

| PAIS | RESUELTOS: Positivo, P.C, Negativo. | RECONOCIDOS POSITIVOS | OTORGADOS P.C. | NO RECONOCIDOS (Negativo) |
|---|---|---|---|---|
| HONDURAS | 54,111 | 40,812 | 2,640 | 10,699 |
| VENEZUELA | 22,289 | 21,611 | 31 | 647 |
| EL SALVADOR | 20,559 | 13,418 | 2,509 | 4,632 |
| HAITI | 16,512 | 2,860 | 1,950 | 11,702 |
| CUBA | 9,847 | 4,600 | 277 | 4,970 |
| GUATEMALA | 7,095 | 3,676 | 446 | 2,973 |
| NICARAGUA | 3,584 | 1,844 | 474 | 1,266 |
| OTROS | 5,641 | 1,701 | 543 | 3,397 |
| TOTAL | 139,678 | 90,522 | 8,870 | 40,286 |

| PAIS | POSITIVOS + P.C. |
|---|---|
| HONDURAS | 43,452 |
| VENEZUELA | 21,642 |
| EL SALVADOR | 15,927 |
| CUBA | 4,877 |
| HAITI | 4,810 |
| GUATEMALA | 4,122 |
| NICARAGUA | 2,318 |
| OTROS | 2,244 |
| TOTAL | 99,392 |

* El número de solicitudes, no necesariamente es el número de solicitantes en trámite, toda vez que puede haber anexiones a algunas de ellas se encuentran aún en prevención.

** Se debe tomar en cuenta que la oficina de Veracruz incluye además de este estado a Oaxaca, Quintano Roo, Campeche y Yucatan, mientras que la oficina de la CDMX cubre, a CDMX  y todas las entidades restantes con la excepción de las cubiertas por Veracruz, Chiapas, Tabasco y Baja California.

*** Los datos presentados son preliminares, tienen carácter informativo y no son definitivos.
**** Solicitudes refiere al titular del procedimiento, más dependientes en caso de tenerlos. Solicitantes refiere a personas individuales.
P.C.= Protección Complementaria.
*(Datos al cierre de Noviembre 2022)*

01/Diciembre/2022

**Cuadro No. 001 TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA POR REGIÓN SEGÚN ORDEN DE IMPORTANCIA: AÑO 2022**

| Región | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| América del Sur | 180,944 | 1,780 | 1,991 | 2,099 | 3,147 | 10,900 | 12,490 | 18,737 | 26,439 | 43,173 | 51,978 | 8,210 | - |
| Antillas | 24,674 | 1,012 | 817 | 876 | 1,311 | 1,493 | 1,369 | 1,789 | 2,501 | 3,049 | 4,926 | 5,531 | - |
| África | 11,058 | 1,316 | 1,056 | 1,259 | 1,072 | 764 | 942 | 1,031 | 1,012 | 841 | 967 | 798 | - |
| Asia | 11,186 | 576 | 378 | 588 | 600 | 734 | 808 | 1,252 | 1,145 | 1,131 | 1,886 | 2,088 | - |
| Europa | 56 | 12 | 7 | 2 | 1 | - | 19 | 8 | 1 | 2 | 3 | 1 | - |
| América Central | 35 | 1 | 2 | 1 | 1 | 1 | 2 | 5 | 4 | 7 | 10 | 1 | - |
| Eurasia | 16 | 3 | 4 | - | - | 2 | 2 | - | - | 1 | 2 | 2 | - |
| Oceanía | 10 | - | 7 | 1 | 2 | - | - | - | - | - | - | - | - |
| América del Norte | 6 | 2 | - | 1 | - | - | 1 | - | 1 | - | 1 | - | - |
| Otras regiones | 2 | - | - | - | - | - | - | - | 1 | - | - | 1 | - |

*Cifras preliminares al 30 de noviembre del 2022 sujetas a revisión y actualización.*

**Cuadro No. 002 TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN: AÑO 2022**

| Condición | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Hombres | 165,596 | 3,557 | 3,047 | 3,449 | 4,632 | 10,316 | 11,632 | 17,239 | 23,481 | 35,550 | 41,735 | 10,958 | - |
| Mujeres | 62,391 | 1,145 | 1,215 | 1,378 | 1,502 | 3,578 | 4,001 | 5,583 | 7,623 | 12,654 | 18,038 | 5,674 | - |

**Gráfico No. 001 TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA: AÑO 2022**



**Gráfico No. 002 PORCENTAJE DE TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN REGIÓN DE PROCEDENCIA: AÑO 2022**



Cuadro No. 003  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA POR PAÍS SEGÚN ORDEN DE IMPORTANCIA: AÑO 2022

| País | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Venezuela | 148,953 | 1,421 | 1,573 | 1,704 | 2,694 | 9,844 | 11,359 | 17,066 | 23,632 | 38,399 | 40,593 | 668 | - |
| Ecuador | 21,535 | 100 | 156 | 121 | 181 | 527 | 555 | 883 | 1,581 | 2,594 | 8,487 | 6,350 | - |
| Haití | 16,933 | 630 | 471 | 485 | 628 | 810 | 860 | 1,021 | 1,538 | 2,170 | 3,713 | 4,607 | - |
| Cuba | 5,530 | 367 | 334 | 361 | 634 | 567 | 416 | 574 | 589 | 490 | 663 | 535 | - |
| Colombia | 4,876 | 48 | 72 | 59 | 72 | 248 | 287 | 407 | 569 | 1,306 | 1,600 | 208 | - |
| India | 3,248 | 67 | 74 | 88 | 172 | 179 | 228 | 431 | 332 | 350 | 604 | 723 | - |
| Brasil | 2,614 | 168 | 139 | 160 | 134 | 150 | 121 | 149 | 271 | 282 | 488 | 552 | - |
| Senegal | 1,928 | 589 | 280 | 264 | 328 | 127 | 109 | 77 | 95 | 34 | 18 | 7 | - |
| Rep. Dominicana | 2,183 | 15 | 12 | 30 | 48 | 115 | 88 | 194 | 373 | 388 | 542 | 378 | - |
| Bangladesh | 1,829 | 70 | 81 | 201 | 126 | 254 | 210 | 236 | 150 | 189 | 143 | 169 | - |
| Perú | 1,504 | 17 | 23 | 18 | 29 | 88 | 109 | 136 | 247 | 365 | 438 | 34 | - |
| Nepal | 1,512 | 108 | 64 | 56 | 121 | 75 | 136 | 217 | 276 | 117 | 167 | 175 | - |
| Afganistán | 1,624 | 1 | 3 | 40 | 31 | 67 | 82 | 162 | 128 | 180 | 551 | 379 | - |
| Angola | 1,271 | 198 | 304 | 378 | 107 | 32 | 26 | 68 | 71 | 26 | 29 | 32 | - |
| Somalia | 1,366 | 84 | 27 | 60 | 83 | 103 | 149 | 201 | 182 | 134 | 193 | 150 | - |
| Ghana | 1,230 | 113 | 83 | 90 | 141 | 88 | 354 | 84 | 91 | 85 | 55 | 46 | - |
| Camerún | 1,248 | 31 | 24 | 92 | 91 | 103 | 41 | 210 | 132 | 199 | 209 | 116 | - |
| China | 1,310 | 32 | 39 | 56 | 59 | 67 | 66 | 85 | 119 | 136 | 274 | 377 | - |
| Chile | 1,205 | 9 | 17 | 13 | 23 | 37 | 44 | 75 | 112 | 190 | 324 | 361 | - |
| Congo | 610 | 69 | 141 | 143 | 38 | 24 | 13 | 64 | 47 | 5 | 27 | 39 | - |
| Eritrea | 591 | 30 | 32 | 34 | 56 | 72 | 50 | 91 | 69 | 48 | 49 | 60 | - |
| Nigeria | 615 | 23 | 54 | 45 | 53 | 41 | 49 | 31 | 63 | 72 | 72 | 112 | - |
| Guinea | 457 | 40 | 10 | 44 | 40 | 39 | 37 | 31 | 39 | 57 | 72 | 48 | - |
| Uzbekistán | 410 | 164 | 42 | 60 | 13 | 6 | 14 | 31 | 28 | 48 | 3 | 1 | - |
| Mauritania | 300 | 18 | 7 | 8 | 21 | 15 | 17 | 31 | 53 | 28 | 74 | 28 | - |
| Burkina Faso | 317 | 18 | 17 | 22 | 19 | 25 | 24 | 33 | 36 | 34 | 32 | 57 | - |
| Pakistán | 253 | 27 | 9 | 20 | 18 | 30 | 24 | 17 | 24 | 16 | 29 | 39 | - |
| Mali | 227 | 18 | 12 | 19 | 13 | 19 | 10 | 17 | 31 | 47 | 25 | 16 | - |
| Tayikistán | 195 | 88 | 11 | 17 | 2 | 1 | 7 | 16 | 30 | 20 | 3 | - | - |
| Etiopía | 210 | 9 | 7 | 4 | 21 | 20 | 15 | 23 | 26 | 27 | 37 | 21 | - |
| Sri Lanka | 188 | 5 | 12 | 12 | 12 | 26 | 15 | 7 | 13 | 34 | 16 | 36 | - |
| Kirguistán | 198 | 3 | 31 | 2 | 21 | 5 | 14 | 17 | 11 | 8 | 27 | 59 | - |
| Sierra Leona | 153 | 18 | 6 | 9 | 27 | 10 | 8 | 23 | 6 | 10 | 22 | 14 | - |
| Siria | 85 | 6 | 3 | 21 | 3 | 13 | 4 | 7 | 4 | 10 | 13 | 1 | - |
| Togo | 82 | 18 | 16 | 6 | 12 | 2 | 5 | 4 | 4 | 3 | 4 | 8 | - |
| Otros Países | 1,197 | 80 | 76 | 85 | 63 | 65 | 87 | 103 | 132 | 103 | 177 | 226 | - |

Cuadro No. 004  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN: AÑO 2022

| Condición | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Adultos | 191,854 | 4,059 | 3,527 | 3,958 | 5,358 | 11,885 | 13,296 | 19,784 | 26,939 | 41,198 | 48,863 | 12,987 | - |
| Menores | 36,133 | 643 | 735 | 869 | 776 | 2,009 | 2,337 | 3,038 | 4,165 | 7,006 | 10,910 | 3,645 | - |

Gráfico No. 003  PORCENTAJE DE TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA
FRONTERA CON COLOMBIA SEGÚN CONDICIÓN : AÑO 2022





Servicio N. Haiti AR_001503

**MINISTERIO DE SEGURIDAD PÚBLICA**
**SERVICIO NACIONAL DE MIGRACIÓN**
**DICIEMBRE 2021**



| País | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **129,993** | **1,071** | **1,857** | **2,694** | **5,865** | **4,462** | **10,267** | **18,813** | **25,332** | **21,772** | **25,904** | **7,762** | **4,194** |
| Haití | 79,219 | 623 | 981 | 1,893 | 3,306 | 1,851 | 5,293 | 13,141 | 17,279 | 13,876 | 17,114 | 3,111 | 751 |
| Cuba | 18,600 | 176 | 205 | 198 | 1,306 | 1,514 | 2,770 | 2,354 | 2,857 | 1,566 | 3,018 | 1,639 | 997 |
| Chile (1) | 9,587 | 57 | 71 | 253 | 293 | 116 | 911 | 1,621 | 2,490 | 2,206 | 1,501 | 46 | 22 |
| Brasil (1) | 8,533 | 40 | 179 | 47 | 219 | 213 | 323 | 726 | 1,516 | 2,658 | 2,011 | 438 | 163 |
| Venezuela | 2,819 | 3 | 9 | - | 3 | 113 | 205 | 248 | 568 | 437 | 339 | 352 | 542 |
| Bangladesh | 1,657 | 38 | 90 | 15 | 127 | 118 | 131 | 210 | 128 | 102 | 325 | 222 | 151 |
| Ghana | 919 | 10 | 17 | 30 | 68 | 50 | 64 | 31 | 34 | 194 | 284 | 77 | 60 |
| Uzbekistán | 1,191 | 10 | 14 | - | 20 | 28 | 69 | 81 | 50 | 143 | 268 | 165 | 343 |
| Senegal | 954 | 11 | 30 | 16 | 40 | 199 | 182 | 21 | 8 | 39 | 81 | 135 | 192 |
| India | 592 | 3 | - | 30 | 102 | 44 | 44 | 34 | 1 | 40 | 65 | 158 | 71 |
| Nepal | 523 | 5 | 24 | 29 | 103 | 41 | 52 | 13 | 11 | 30 | 77 | 30 | 108 |
| África | 479 | - | - | - | - | - | - | - | - | - | - | 370 | 109 |
| Angola | 470 | 6 | 13 | 7 | 5 | 31 | 49 | 74 | 45 | 25 | 45 | 70 | 100 |
| Camerún | 354 | 1 | 6 | 17 | 26 | 20 | 20 | 27 | 42 | 24 | 73 | 69 | 29 |
| Ecuador | 330 | 3 | 2 | 14 | 12 | 5 | 9 | 19 | 22 | 48 | 88 | 65 | 43 |

Haiti_AR_001504

Haiti_AR_001505

| | | 15 | 10 | 12 | 38 | 18 | 8 | 37 | 27 | 21 | 40 | 46 | 29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Congo | **301** | 15 | 10 | 12 | 38 | 18 | 8 | 37 | 27 | 21 | 40 | 46 | 29 |
| Guinea | **245** | 2 | 23 | 14 | 38 | 9 | 20 | 17 | 31 | 25 | 41 | 23 | 2 |
| Guyana | **232** | - | - | 2 | 1 | - | 1 | 9 | 42 | 44 | 107 | 26 | - |
| Paraguay | **228** | - | - | - | - | - | - | - | - | - | - | 196 | 32 |
| Sierra Leona | **218** | - | 34 | 24 | 40 | 2 | 2 | 2 | 3 | 1 | 33 | 22 | 55 |
| Rep. Dominicana | **168** | - | - | - | 2 | 1 | 7 | 6 | 23 | 38 | 64 | 21 | 6 |
| Burkina Faso | **165** | 11 | 37 | 21 | 13 | 4 | 8 | 8 | 8 | 21 | 13 | 7 | 14 |
| Uruguay | **170** | - | - | - | 3 | 6 | 11 | 12 | 19 | 17 | 45 | 25 | 32 |
| Nigeria | **141** | - | 13 | 4 | 5 | 2 | 7 | 16 | 19 | 33 | 21 | 9 | 12 |
| Eritrea | **139** | 3 | 9 | 9 | 7 | 6 | 12 | 12 | 1 | 18 | 24 | 22 | 16 |
| Togo | **145** | - | 10 | 18 | 15 | 8 | 5 | 2 | 13 | 8 | 17 | 24 | 25 |
| Pakistán | **136** | 3 | 9 | 2 | 9 | 18 | - | 25 | 8 | 3 | 20 | 18 | 21 |
| Colombia | **156** | 8 | 7 | 1 | - | - | 4 | 8 | 8 | 31 | 29 | 18 | 42 |
| Mauritania | **118** | 7 | 20 | 4 | 17 | 6 | 13 | 3 | 6 | 1 | 10 | 23 | 8 |
| Somalia | **95** | 2 | 11 | 5 | 6 | 1 | 2 | 1 | 3 | 11 | 3 | 33 | 17 |
| Yemen | **79** | 2 | - | - | 6 | 1 | 7 | 1 | 1 | 7 | 6 | 47 | 1 |
| Mali | **113** | 9 | 9 | 5 | 7 | 1 | 4 | 5 | 3 | 11 | 11 | 9 | 39 |
| Argentina | **74** | 1 | - | 1 | 3 | 3 | 1 | 4 | 17 | 13 | 23 | 1 | 7 |
| Siri Lanka | **65** | - | 5 | 4 | - | - | 3 | 5 | 5 | 2 | 8 | 33 | - |
| Guyana Francesa | **85** | - | - | - | - | - | - | - | - | - | 2 | 54 | 29 |
| Otros Países | **693** | 22 | 19 | 19 | 25 | 33 | 30 | 40 | 44 | 79 | 98 | 158 | 126 |

 

# Irregulares en tránsito por Darién por país

| País | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|------|-------|------|------|------|------|------|------|------|------|------|------|------|------|
| Total | 151,582 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | - | - | - |
| Venezuela | 107,692 | 1,421 | 1,573 | 1,704 | 2,694 | 9,844 | 11,359 | 17,066 | 23,632 | 38,399 | - | - | - |
| Haití | 8,613 | 630 | 471 | 485 | 628 | 810 | 860 | 1,021 | 1,538 | 2,170 | - | - | - |
| Ecuador | 6,698 | 100 | 156 | 121 | 181 | 527 | 555 | 883 | 1,581 | 2,594 | - | - | - |
| Cuba | 4,332 | 367 | 334 | 361 | 634 | 567 | 416 | 574 | 589 | 490 | - | - | - |
| Colombia | 3,068 | 48 | 72 | 59 | 72 | 248 | 287 | 407 | 569 | 1,306 | - | - | - |
| India | 1,921 | 67 | 74 | 88 | 172 | 179 | 228 | 431 | 332 | 350 | - | - | - |
| Senegal | 1,903 | 589 | 280 | 264 | 328 | 127 | 109 | 77 | 95 | 34 | - | - | - |
| Brasil | 1,574 | 168 | 139 | 160 | 134 | 150 | 121 | 149 | 271 | 282 | - | - | - |
| Bangladesh | 1,517 | 70 | 81 | 201 | 126 | 254 | 210 | 236 | 150 | 189 | - | - | - |
| Rep. Dominicana | 1,263 | 15 | 12 | 30 | 48 | 115 | 88 | 194 | 373 | 388 | - | - | - |
| Angola | 1,210 | 198 | 304 | 378 | 107 | 32 | 26 | 68 | 71 | 26 | - | - | - |
| Nepal | 1,170 | 108 | 64 | 56 | 121 | 75 | 136 | 217 | 276 | 117 | - | - | - |
| Ghana | 1,129 | 113 | 83 | 90 | 141 | 88 | 354 | 84 | 91 | 85 | - | - | - |
| Perú | 1,032 | 17 | 23 | 18 | 29 | 88 | 109 | 136 | 247 | 365 | - | - | - |
| Somalia | 1,023 | 84 | 27 | 60 | 83 | 103 | 149 | 201 | 182 | 134 | - | - | - |
| Camerún | 923 | 31 | 24 | 92 | 91 | 103 | 41 | 210 | 132 | 199 | - | - | - |
| Afganistán | 694 | 1 | 3 | 40 | 31 | 67 | 82 | 162 | 128 | 180 | - | - | - |
| China | 659 | 32 | 39 | 56 | 59 | 67 | 66 | 85 | 119 | 136 | - | - | - |
| Chile | 520 | 9 | 17 | 13 | 23 | 37 | 44 | 75 | 112 | 190 | - | - | - |
| Congo | 544 | 69 | 141 | 143 | 38 | 24 | 13 | 64 | 47 | 5 | - | - | - |
| Eritrea | 482 | 30 | 32 | 34 | 56 | 72 | 50 | 91 | 69 | 48 | - | - | - |
| Nigeria | 431 | 23 | 54 | 45 | 53 | 41 | 49 | 31 | 63 | 72 | - | - | - |
| Uzbekistán | 406 | 164 | 42 | 60 | 13 | 6 | 14 | 31 | 28 | 48 | - | - | - |
| Guinea | 337 | 40 | 10 | 44 | 40 | 39 | 37 | 31 | 39 | 57 | - | - | - |
| Burkina Faso | 228 | 18 | 17 | 22 | 19 | 25 | 24 | 33 | 36 | 34 | - | - | - |
| Mauritania | 198 | 18 | 7 | 8 | 21 | 15 | 17 | 31 | 53 | 28 | - | - | - |
| Mali | 186 | 18 | 12 | 19 | 13 | 19 | 10 | 17 | 31 | 47 | - | - | - |
| Tayikistán | 192 | 88 | 11 | 17 | 2 | 1 | 7 | 16 | 30 | 20 | - | - | - |
| Pakistán | 185 | 27 | 9 | 20 | 18 | 30 | 24 | 17 | 24 | 16 | - | - | - |
| Etiopía | 152 | 9 | 7 | 4 | 21 | 20 | 15 | 23 | 26 | 27 | - | - | - |
| Sri Lanka | 136 | 5 | 12 | 12 | 12 | 26 | 15 | 7 | 13 | 34 | - | - | - |
| Sierra Leona | 117 | 18 | 6 | 9 | 27 | 10 | 8 | 23 | 6 | 10 | - | - | - |
| Kirguistán | 112 | 3 | 31 | 2 | 21 | 5 | 14 | 17 | 11 | 8 | - | - | - |
| Siria | 71 | 6 | 3 | 21 | 3 | 13 | 4 | 7 | 4 | 10 | - | - | - |
| Togo | 70 | 18 | 16 | 6 | 12 | 2 | 5 | 4 | 4 | 3 | - | - | - |
| Otros Países | 794 | 80 | 76 | 85 | 63 | 65 | 87 | 103 | 132 | 103 | - | - | - |





# Human Smuggling and Associated Revenues

## What Do or Can We Know About Routes from Central America to the United States?

VICTORIA A. GREENFIELD, BLAS NUÑEZ-NETO, IAN MITCH, JOSEPH C. CHANG, ETIENNE ROSAS



HOMELAND SECURITY
OPERATIONAL ANALYSIS CENTER

An FFRDC operated by the RAND Corporation under contract with DHS

Haiti AR_001507

Published in 2019

Haiti AR_001508

## Preface

This report presents initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study, which was completed in less than two months, was to develop a preliminary estimate of transnational criminal organizations' (TCOs') revenues from smuggling migrants from the Northern Triangle region of Central America—consisting of Guatemala, Honduras, and El Salvador—to the United States. In addition, we sought to establish what is known or knowable about the characteristics, including the structure, operations, and financing, of TCOs that engage in human smuggling along those routes.

From the start, we intended to frame any revenue estimate as a range to accommodate a short study period and considerable uncertainty; however, as the research progressed, we encountered further challenges. We learned that human smuggling involves many different types of actors and that we could not credibly distinguish most TCOs' activities and revenues from those of other actors, including ad hoc groups and independent operators, that engage in human smuggling. Thus, we could provide, at best, a range for revenues to all types of smugglers, largely irrespective of their affiliations.

Although our findings are subject to a high degree of uncertainty, they represent a contribution to the evidence base informing ongoing U.S. government efforts to address threats to homeland security posed by TCOs and other actors that participate in human smuggling. The U.S. Department of Homeland Security (DHS) can use the insights provided in this report regarding the characteristics of human-smuggling operations to help shape policies and prioritize resources to counter that threat. The findings will also be of interest to others in the policy community, including those who undertake research on its behalf.

This research was sponsored by DHS's Science and Technology Directorate and conducted within the Strategy, Policy, and Operations Program of the Homeland Security Operational Analysis Center federally funded research and development center (FFRDC).

## About the Homeland Security Operational Analysis Center

The Homeland Security Act of 2002 (Section 305 of Public Law 107-296, as codified at 6 U.S.C. § 185), authorizes the Secretary of Homeland Security, acting through the Under Secretary for Science and Technology, to establish one or more FFRDCs to provide independent analysis of homeland security issues. The RAND Corporation operates the Homeland Security Operational Analysis Center (HSOAC) as an FFRDC for the U.S. Department of Homeland Security (DHS) under contract HSHQDC-16-D-00007.

Haiti AR_001509

The HSOAC FFRDC provides the government with independent and objective analyses and advice in core areas important to the department in support of policy development, decisionmaking, alternative approaches, and new ideas on issues of significance. The HSOAC FFRDC also works with and supports other federal, state, local, tribal, and public- and private-sector organizations that make up the homeland security enterprise. The HSOAC FFRDC's research is undertaken by mutual consent with DHS and is organized as a set of discrete tasks. This report presents the results of research and analysis conducted under 70RSAT18FR0000145, the Economic Value of Human Smuggling to Transnational Criminal Organizations.

The results presented in this report do not necessarily reflect official DHS opinion or policy.

For more information on HSOAC, see www.rand.org/hsoac.

For more information on this publication, visit www.rand.org/t/RR2852.

Haiti AR_001510

# Contents

Preface ..................................................................................................................... iii

Figures .................................................................................................................... vii

Tables .................................................................................................................... viii

Summary .................................................................................................................. ix

Acknowledgments ................................................................................................. xix

Abbreviations .......................................................................................................... xx

1. Introduction .......................................................................................................... 1

Definition of *Transnational Criminal Organization* ............................................. 3

Technical Approach to Analysis ............................................................................. 4

Challenges, Uncertainties, and Mitigations .......................................................... 6

2. The Characteristics of Human Smuggling ........................................................... 9

Taxonomy of Human Smugglers ......................................................................... 10

Independent Operators ........................................................................................ 11

Ad Hoc Groups .................................................................................................... 12

Loose Networks .................................................................................................. 12

More-Formal Networks ........................................................................................ 13

Dynamism Within the Spectrum .......................................................................... 13

Key Roles in Human Smuggling .......................................................................... 14

The Relationship Between Smuggling Services and Fees ................................... 15

All-Inclusive Packages ........................................................................................ 15

Pay-as-You-Go Arrangements ............................................................................ 18

The Difficulty of Calculating Human-Smuggling Profits ...................................... 19

Drug-Trafficking TCOs' Involvement in Human Smuggling ................................. 21

Paying the Tax, or *Piso* ...................................................................................... 22

Potential for Broader Convergence of Human Smuggling and Drug Trafficking ............ 23

Conclusion ........................................................................................................... 25

3. Preliminary Findings on Revenue Estimation .................................................... 26

Flows of Unlawful Migrants ................................................................................. 27

Percentage of Unlawful Migrants Hiring Smugglers ............................................ 30

Human-Smuggling Fees and Payments .............................................................. 31

Ranges of Estimates of Smuggling Revenues and *Piso* Collections .................. 35

Smuggling Revenues ........................................................................................... 35

Drug-Trafficking TCOs' *Piso* Collections ........................................................... 37

Profitability, Risk, and Other Economic Considerations ...................................... 38

4. Concluding Remarks .......................................................................................... 40

Targeting Human Smuggling ............................................................................... 40

Allocating Resources ........................................................................................... 41

Improving Data Collection................................................................................................42

Appendix A. Guidance for Literature Review ..........................................................................44

Appendix B. Discussion Points and Questions for Subject-Matter Experts ...............................45

Appendix C. Guidance for Data Analysis .................................................................................47

Appendix D. DHS and EMIF Sur Data on Smuggling Fees .......................................................50

References ..............................................................................................................................51

vi

# Figures

Figure S.1. Revenues to and Types of Actors Engaged in Human Smuggling............................ xiii

Figure S.2. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars) ............................................................xv

Figure 1.1. Smuggling Routes from the Northern Triangle to the United States............................1

Figure 1.2. General Framework for Economic Analysis, Including Revenue Estimation..............5

Figure 3.1. Revenues to and Types of Actors Engaged in Human Smuggling............................26

Figure 3.2. Estimated Flows of Migrants from the Northern Triangle to the United States.........29

Figure 3.3a. Guatemala: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ...........32

Figure 3.3b. Honduras: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ...........33

Figure 3.3c. El Salvador: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ...........33

Figure 3.4. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars) ............................................................34

Haiti AR_001513

# Tables

Table S.1. The Spectrum of Actors Engaged in Human Smuggling..............................................xi

Table 2.1. The Spectrum of Actors Engaged in Human Smuggling ............................................11

Table 3.1. Preliminary Estimates of Smuggling Revenues, by Country of Origin for 2017 (in millions of U.S. dollars) ........................................................................................................36

Table 3.2. Preliminary Estimates of Drug-Trafficking TCOs' Tax, or *Piso*, Collections, by Country of Origin for 2017 (in millions of U.S. dollars) ......................................................37

Table D.1. Smuggling Fees Reported in DHS Data for Fiscal Year 2017 ...................................50

Table D.2. Smuggling Fees Reported in EMIF Sur Data for Calendar Year 2017 ......................50

viii

Haiti AR_001514

# Summary

This report presents initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study was to develop a preliminary estimate of transnational criminal organizations' (TCOs') revenues from smuggling unlawful migrants from the Northern Triangle (NT) region of Central America—consisting of Guatemala, Honduras, and El Salvador—to the United States. Given a tight deadline and the inherent challenges of research on illicit activities, we recognized the infeasibility of developing a point estimate for revenue and, instead, sought to develop a range of estimates. We also sought to establish what is known or knowable about the characteristics, including structure, operations, and financing, of TCOs that engage in human smuggling along routes from the NT to the United States and the markets in which they operate.

Providing the U.S. Department of Homeland Security (DHS) with a better understanding of how TCOs and other actors that participate in human smuggling are structured, do business, and are financed could help inform efforts to investigate and disrupt them and to make decisions about how to allocate resources to those efforts. For example, such understanding could help DHS identify TCOs' vulnerabilities and supply evidence to weigh the benefits of action. However, our interviews with subject-matter experts (SMEs), review of the literature, and data analysis indicated that many different types of smugglers are involved in human smuggling and that we could not credibly distinguish the activities and revenues of TCOs that smuggle humans ("human-smuggling TCOs") from those of independent operators, ad hoc groups, and others who also engage in human smuggling.

Thus, we could not consider the characteristics of human-smuggling TCOs in isolation, nor could we provide a preliminary estimate—or even a range of estimates—for smuggling revenues that flow solely to these TCOs. Instead, we developed a range for the "aggregate" revenues that flow to all types of smugglers, including not just TCOs but also independent operators, ad hoc groups, and other actors. Separately, we were able to identify and evaluate the "taxes," or *pisos*, that migrants pay to drug-trafficking TCOs for the right to pass through their territories en route to the United States and at the U.S.-Mexico border. Revenues from *pisos* appear to be modest compared with revenues from smuggling.

This summary presents an overview of our findings on the characteristics of human smugglers that operate along routes from the NT to the United States, as well as the characteristics of smuggling, more generally, and preliminary estimates of revenues from this activity along with drug-trafficking TCOs' *piso* collections.

Haiti AR_001515

## The Characteristics of Human Smuggling

We found that many different types of smugglers—or "actors"—are involved in moving unlawful migrants from the NT to the United States and that they provide similarly wide-ranging services. These actors comprise a spectrum, spanning from independent operators who move unlawful migrants along particular segments of the route or offer other discrete services (e.g., a taxi driver based out of one town that ferries migrants to the next major town) to more formally structured networks that may include a central figure who coordinates smuggling efforts along the entire route.

There is some debate in the literature about the extent to which groups of smugglers are becoming more professional and sophisticated, particularly in light of possible increases in smuggling fees. However, our analysis suggests that many, if not most, of these groups are loosely organized, nonhierarchical, and generally do not maintain a definable command structure. The diversity and proliferation of individuals and groups involved in some aspect of human smuggling make it challenging to identify the extent to which these activities are conducted by actual TCOs.

### Taxonomy of Human Smugglers

Table S.1 presents a taxonomy of types actors engaged in human smuggling, based on our review of the literature, including academic articles, press reports, and reports written by government agencies, nongovernmental organizations, and multilateral entities and interviews with SMEs. The table starts with the least organized types of smugglers and ends with the most organized types. At each level, actors differ by organizational cohesion, membership, and geographic dispersion along smuggling corridors.

Haiti AR_001516

**Table S.1. The Spectrum of Actors Engaged in Human Smuggling**

| Type of Actor | Organizational Structure | Services | Group Membership | Geographic Reach |
|---|---|---|---|---|
| Independent operators | One "cell" composed of one or a few individuals | Provide a discrete service (e.g., transportation or lodging) | Do not generally work with other cells or actors | Generally work in one location, or between two locations |
| Ad hoc groups | Two or more independent operators that may not always work together | Provide multiple, complementary services | Generally unaware of other actors and groups more than one degree of separation removed | Work in one, two, or more locations |
| Loose networks | A larger number of small groups that usually work together | May provide end-to-end service along the full route or a portion of the route | Members may know only a limited number of other members | Working in many locations, potentially the full route |
| More-formal networks | A central figure who coordinates groups that consistently work together | Provide end-to-end services | Members generally know each other | Working along the full route |

Many of the actors engaged in human smuggling do not appear to meet the statutory definition of a TCO. For example, few of the actors shown in Table S.1 appear to feature "self-perpetuating associations" that protect their activities through "a pattern of corruption and/or violence," with a "transnational organizational structure," as articulated in 10 U.S.C. § 284(i)(6). Adding another layer of complication, smugglers commonly move between levels or can operate at more than one level along the spectrum, depending on their opportunities. In fact, many of these actors can be thought of as subcontractors, that might offer their services to different networks, groups, or other independent operators at the same time. Partly for these reasons, we were largely unable to disentangle the activities and revenues of TCOs from those of other actors that engage in human smuggling.

*Human-Smuggling Services and Roles*

The broad spectrum of actors engaged in human smuggling supports a wide range of service options for unlawful migrants. At one end of the range, the migrants can opt for "all-inclusive" or "end-to-end" arrangements, in which migrants pay a large fee to a network that arranges all their travel—and may even send a representative to travel with them—that can amount to upward of $10,000. At the other end, migrants can "pay as they go" and travel on their own for portions of the route and then connect with local smugglers to pay for transportation and logistical support for other portions of the route, which can cost much less. There is no consensus in the literature or among SMEs concerning what percentage of migrants uses "all-inclusive" arrangements and what percentage chooses to "pay as they go."

Haiti AR_001517

Smugglers typically fill a number of roles, whether they are working as independent operators or as part of a group or network. Depending on the sophistication of the operation, individuals or small groups of people (sometimes referred to as a *cell* by law enforcement) can fill these roles. Below is a brief description of the key roles:

- **Facilitation/coordination.** Identify and recruit migrants, collect up-front fees, pay other smuggling organizations during the migrants' journey, and coordinate some or all the migrants' travel from their source country to their final destination.
- **Transportation.** Transport migrants from one location to another along the route north using conveyances that range from taxis to charter buses and tractor-trailers.
- **Logistics/stash houses.** Provide logistical support, often in the form of lodging or "stash houses" where migrants can take shelter for a few days or even a few weeks.
- **Fraudulent documents.** Provide unlawful migrants with fraudulent documents, including Mexican visas, national identity cards, or birth certificates, to facilitate their travel through Mexico, create synthetic families, or avoid detention.
- **Footguides/coyotes/*polleros*.** Guide migrants seeking to avoid detection while entering the United States—generally single adults—across the border between ports of entry in order to circumvent border security personnel.

*Relationship Between Human Smuggling and Drug Trafficking*

A handful of drug-trafficking organizations that are commonly identified as TCOs maintain control of the primary trafficking corridors into the United States, which allows them to regulate and tax illicit trade through their territory. Controlling prime smuggling territory also affords the drug traffickers an opportunity to charge migrants a "tax," or *piso*, for the right to pass through. According to U.S. government sources, it is all but impossible for migrants to cross some sections of the border, particularly those most tightly controlled by the drug traffickers, without paying the *piso*. Collecting the *piso* requires fairly extensive regulation of migrants passing through a drug-trafficking organization's territory, pointing to coordination between human smugglers and drug traffickers before a migrant reaches the U.S.-Mexico border. The *piso* is perhaps the clearest example of identifiable TCO earnings that can be associated with human smuggling, even if it is not "smuggling revenue," per se. In addition to coordinating *piso* collections, there are some reports that drug-trafficking TCOs coordinate unlawful migrants' border crossing to divert attention from other illicit activities, and that they may recruit or coerce some migrants into carrying drugs for them. Beyond these activities, however, there is little evidence that drug-trafficking TCOs are involved in human smuggling writ large.

## Preliminary Findings on Revenue Estimation

Although we could neither develop a point estimate for revenues from smuggling unlawful migrants from the NT to the United States nor attribute such revenues to particular types of smugglers, we were able to use data from DHS and other sources to construct a range of preliminary estimates of revenue to all smugglers, without regard to their type. Separately, we

Haiti AR_001518

were able to identify migrants' payments to drug-trafficking TCOs, specifically, for passing through these TCOs' territories.

Figure S.1 depicts the flows of revenues associated with human smuggling to human smugglers of all types, including TCOs, and to drug-trafficking TCOs. The larger oval to the right represents the former, designated as "aggregate" smuggling revenue, and the smaller oval to the left represents the latter, designated as "tax" revenue. The intersection of the two ovals represents instances in which smuggling fees cover the tax.

**Figure S.1. Revenues to and Types of Actors Engaged in Human Smuggling**



To estimate revenue to all types of human smugglers (i.e., aggregate smuggling revenue) along routes from the NT to the United States, we required data on three variables: (1) the number of unlawful migrants along a route, (2) the percentage of those migrants who hire smugglers, and (3) the typical payments made, per migrant, to smugglers. We defined three general routes, by country of origin, as "Guatemala–United States," "Honduras–United States," and "El Salvador–United States." We also produced an ancillary, preliminary estimate of drug-trafficking TCOs' *piso* collections.

We analyzed data from 2015–2017 and earlier, but we worked primarily with data from the most recent available year, i.e., 2017, for the smuggling revenue and tax estimates.

Haiti AR_001519

*Flows of Unlawful Migrants*

To estimate the flow of unlawful migrants from the NT to the United States, we used data on apprehensions and other activity at the U.S.-Mexico border, between ports of entry (POEs), that are collected by the U.S. Border Patrol and data from an analysis of apprehension rates, also between POEs, reported in a 2017 DHS Office of Immigration Statistics study. We tried four different estimation methods (see Appendix C), using different combinations of these data, to produce a range of estimates for unlawful migration from Guatemala, Honduras, and El Salvador. By that approach, we found that the flow of unlawful migrants from the NT to the United States in 2017 could have ranged from about 218,000 to about 345,000 between POEs.

*Percentage of Unlawful Migrants Hiring Smugglers*

To estimate the percentage of unlawful migrants who hire smugglers along the routes, we drew on data from DHS and from a survey of migrants called the Encuesta sobre Migración en la Frontera Sur de México, which translates to "Survey of Migration at Mexico's Southern Border" (we will refer to it by its Spanish abbreviation, EMIF Sur). This survey is conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, which is located in Mexico. Because the DHS data on migrants' use of smugglers might fail to capture a substantial amount of smuggling activity (see Chapter 3), the DHS data suggest a lower bound. From the two sources, we concluded that about one-quarter to two-thirds of unlawful migrants from the NT might have hired smugglers in recent years, with some variation by country of origin.

*Human-Smuggling Fees and Payments*

For this calculation, we also drew from DHS and EMIF Sur data and turned to other sources, including our own interviews with SMEs. We used the DHS data to calculate mean and median smuggling fees, by country of origin, as reported to U.S. Border Patrol agents by unlawful migrants who are apprehended at the U.S.-Mexico border, between POEs. We also looked at the EMIF Sur data on unlawful migrants' actual and agreed payments to smugglers along routes from the NT to and into the United States. The results using the EMIF Sur data, which might include some unrealized payments and more transit in the United States, were substantially higher than the results using the DHS data and—importantly—better aligned with anecdotal evidence and most SME perspectives.

Taking the properties of the DHS and EMIF Sur data into account, we chose to work with the median values for the fees for transit from each country in 2017 to create ranges. Route by route, the median value from the DHS data represented the low end of the range, and the median value from the EMIF Sur data represented the high end (see Figure S.2).

Haiti AR_001520

**Figure S.2. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

*Ranges of Estimates of Smuggling Revenues*

We constructed a preliminary estimate, or range of estimates, of smuggling revenue from the low- and high-end figures for (1) unlawful migrant flows, (2) the percentage of those migrants who use smugglers, and (3) the migrants' payments to smugglers. First, we multiplied the low-end figures for each route, then we multiplied the high-end figures for each route, producing a low- and high-end estimate for each route. The DHS data yielded the low-end estimates, route by route, because they were lower for fees and the percentage of migrants using smugglers. At the high end, we were able to differentiate between payments en route to the U.S.-Mexico border as one "segment" of the journey and payments across that border as another "segment," because the EMIF Sur data on fees draw this distinction.

We found that the revenues from smuggling migrants from El Salvador, Guatemala, and Honduras, combined (as would correspond to the larger oval to the right in Figure S.1), could have ranged from a total of about $200 million to a total of about $2.3 billion in 2017 (see Table 3.1 in Chapter 3). The breadth of the range reflects the considerable uncertainty of the underlying estimates of unlawful migrant flows, migrants' use of smugglers, and smuggling fees. At the low end, this estimate very likely understates revenues, partly because of missing information on border crossings between POEs; at the high end, this estimate might be too high, partly because the fee data from EMIF Sur include agreed payments, some of which might not have materialized, in addition to actual payments.

Haiti AR_001521

However, neither end of the range includes fees from migrants who present themselves at POEs, which could increase the revenue estimates slightly, and neither end has been adjusted to account for recidivism, which could decrease them slightly (see Chapter 3).

### Ranges of Estimates of Drug-Trafficking TCOs' Piso Collections

Separately, we developed an ancillary, preliminary estimate for drug-trafficking TCOs' tax, or *piso*, collections, using a similar methodology. The migrant flow numbers were the same as for the preliminary estimate of smuggling revenue, but the percentage and payment estimates differed substantially. Drawing on evidence from the literature review and discussion with SMEs, we postulated that the percentage of migrants who pay these taxes ranged from 50 percent to 75 percent and that the payment figures ranged from $300 to $700. On that basis, the total amount of *pisos* that migrants from the NT might have paid drug-trafficking TCOs in 2017—for traveling the three routes, combined (as would correspond to the smaller oval to the left in Figure S.1)—could have ranged from about $30 million to $180 million in 2017 (see Table 3.2 in Chapter 3).

Whether these sums are reflected in the human-smuggling revenues estimated above, as a pass through to drug-trafficking TCOs, or constitute an additional payment, depends on the smuggling arrangement, be it "all-inclusive" or "pay as you go." If the arrangement were all-inclusive, the tax might be folded into the smuggling fee (as depicted in the intersection of the two ovals in Figure S.1), but it would, nevertheless pass through to the drug-trafficking TCO that demanded payment for the migrant's passage. For this reason, and because of the attribution of the taxes to drug-trafficking TCOs, we present the estimate on its own.

## Concluding Remarks

We developed a preliminary estimate of aggregate revenue from smuggling unlawful migrants from the NT to the United States that ranges from about $200 million to $2.3 billion in 2017. This estimate, as the range implies, is highly uncertain, owing largely to a scarcity of reliable data on migrant flows, migrants' use of smugglers, and smuggling fees. Likewise, we produced an ancillary and still preliminary estimate of drug-trafficking TCOs' tax, or *piso*, collections that also spanned an order of magnitude, from about $30 million to $180 million.

To conclude, we present implications of our findings for targeting human smuggling, informing resource allocation decisions, and improving data collection.

### Targeting Human Smuggling

A key finding of this report is that human smuggling involves many different types of smugglers, or "actors," with organizations that are often informal and based on relationships instead of well-established, enduring hierarchies. Absent formality and strict hierarchical structures, it might be difficult for DHS to effectively target these actors with legal sanctions:

Haiti AR_001522

Loose networks are difficult to disrupt, ad hoc groups are even less susceptible to disruption, and independent operators are easily replaceable. Facilitators might be less replaceable than other market participants and present a more fruitful avenue for intervention, but going after them might be challenging, especially when they are based in foreign countries, as is typical. Although targeting might be difficult, DHS could consider expanding existing efforts to investigate payments made to human smugglers, especially in the United States, and working more closely with formal and informal banking services to identify suspicious payments. DHS could also consider expanding current efforts to work with foreign law enforcement partners.

### Allocating Resources

As DHS considers how to allocate resources, it might look to compare the size of the human-smuggling market, as measured by estimated revenues, and the sizes of other illicit markets of concern. Our high-end estimate for revenue from human smuggling, i.e., $2.3 billion, was on the same order of magnitude as estimates for revenues from trafficking marijuana, cocaine, and heroin through Mexico and across the U.S.-Mexico border that were developed in a 2010 RAND report by Kilmer et al., which could have totaled up to $7.1 billion, without netting out the costs of the drugs. However, as noted above, we cannot say how much of the revenue from human smuggling flows to TCOs that engage in human smuggling. Moreover, the 2010 RAND estimates for drug-trafficking revenues include only revenues from moving drugs through Mexico and across the U.S.-Mexico border and do not include revenue that drug-trafficking TCOs garner subsequently from distribution, wholesale, or retail activities that occur in the United States. To shed additional light on the dimensions of human smuggling, we also compared revenues from human smuggling with spending on related licit activities, such as air, rail, truck, and other transportation services reported in national accounts, and, from that perspective, the smuggling revenues looked much smaller.

### Improving Data Collection

We also identified potential improvements in data collection and methods that DHS could consider if it wanted to refine the estimate, to better inform policymaking. For example, DHS could standardize its line of questioning during migrant interviews, across apprehension sites, and seek details from migrants that would increase DHS's ability to assess revenues, by route, and distinguish different types of smugglers and payments. DHS could also create a shared portal for data entry that screens for errors, if it has not done so already, and use a randomized survey process to reduce the administrative burden of data collection on frontline personnel and increase the likelihood of successful data entry.

However, a longer-term research project might be able to reduce some of the uncertainty of the revenue estimate even using the imperfect data that DHS already has. For example, we could build on the calculations in this report by taking more time to explore the sensitivity of the

Haiti AR_001523

calculations to underlying assumptions about behavior and markets and explore additional ways to filter and analyze the data.

Haiti AR_001524

# Acknowledgments

We would like to thank John Vehmeyer for his work as our primary point of contact in the Science and Technology Directorate of the U.S. Department of Homeland Security (DHS) and Shawna Garrison, Advisor to the Commissioner for U.S. Customs and Border Protection, for her insight and assistance. In addition, we would like to thank the subject-matter experts within DHS—at U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement—and at academic institutions for their participation in interviews for this project. Because their participation was confidential, we cannot name them individually, but their contributions were critical to our understanding of the issues and the timely completion of the analysis. We would also like to thank Marc Rosenblum, Deputy Assistant Secretary for the Office of Immigration Statistics, for providing us with the DHS data that formed a large part of the analysis, and the Colegio de la Frontera Norte for publicly posting the data from its "Survey of Migration at Mexico's Southern Border" (EMIF Sur).

Lastly, we are grateful to several RAND colleagues, including Daniel Egel and Elina Treygor for their constructive feedback on earlier drafts of the report, Shelly Culberston for her contributions to the project design and interview protocol, Elizabeth Hammes for helping us conduct a rapid and wide-ranging literature review, Krista Romita Grocholski for her assistance with the data analysis, Holly Johnson for her support in formatting and preparing the report, James Torr for his thoughtful edits, and Erica Robles for her efforts to help us navigate Homeland Security Operational Analysis Center processes and meet challenging deadlines.

Haiti AR_001525

# Abbreviations

| | |
|---|---|
| DHS | U.S. Department of Homeland Security |
| EMIF Sur | Encuesta sobre Migración en la Frontera Sur de México/Survey of Migration at Mexico's Southern Border |
| HSOAC | Homeland Security Operational Analysis Center |
| POE | port of entry |
| NT | Northern Triangle (Guatemala, Honduras, and El Salvador) |
| SME | subject-matter expert |
| TCO | transnational criminal organization |

Haiti AR_001526

# 1. Introduction

In 2017, U.S. Border Patrol agents apprehended about 160,000 unlawful migrants from the Northern Triangle (NT) of Central America—consisting of Guatemala, Honduras, and El Salvador—at the U.S.-Mexico border between ports of entry (POEs). An additional roughly 20,000 family units and unaccompanied children from these three countries presented themselves to U.S. Customs and Border Protection officers at POEs to enter the asylum process in 2017. Many or most of the migrants hired smugglers for assistance or paid others for rights of way at some point during the journey north. Migrants from the NT who hire smugglers might pay them thousands of dollars to make that journey, regardless of whether they attempt to evade capture or present themselves directly to border officials at or between POEs in order to claim asylum.[1] Figure 1.1 depicts common smuggling routes from NT countries through Mexico.

**Figure 1.1. Smuggling Routes from the Northern Triangle to the United States**



SOURCE: Amnesty International, 2010 (now CC BY-NC-ND 4.0).

Of particular concern to policymakers is the possibility that a substantial share of the migrants' expenditures on smuggling services is flowing to transnational criminal organizations

---

[1] In this context, we are using the term *border officials* to refer to U.S. Border Patrol agents *between* POEs and U.S. Customs and Border Protection officers *at* POEs because families and unaccompanied minors from the NT who use smugglers generally present themselves directly to agents and officers in both environments in order to enter the asylum process.

Haiti AR_001527

(TCOs). TCOs that benefit from smuggling migrants from the NT to the United States across the U.S.-Mexico border represent a potential threat to homeland security. They can create, contribute to, or help to shape a criminal industry that exploits and harms the people smuggled, challenges the rule of law in U.S. border states and the countries along transit routes, and degrades confidence in U.S. immigration laws.

To date, the U.S. Department of Homeland Security (DHS) and larger policy community have lacked evidence on the full extent and distribution of migrants' expenditures on smuggling and the characteristics of the smugglers, be they TCOs or others. Providing DHS with a better understanding of how TCOs and other actors that participate in human smuggling are structured, do business, and are financed could help inform efforts to investigate and disrupt them and to make decisions about how to allocate resources to those efforts. For example, such understanding could help DHS identify TCOs' vulnerabilities and supply evidence to weigh the benefits of action.

This report attempts to fill some of these knowledge gaps by presenting initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study, which was conducted in less than two months, was to develop a preliminary estimate of TCOs' revenues from smuggling unlawful migrants from the NT to the United States. In addition, we sought to establish what is known or knowable about the characteristics, including the structure, operations, and financing, of TCOs that engage in human smuggling ("human-smuggling TCOs") along routes from the NT to the United States and the markets in which they operate.[2]

However, we encountered an immediate obstacle to meeting the study's research goals, particularly those of revenue estimation. We found, by interviewing subject-matter experts (SMEs), reviewing the literature, and analyzing data, that many different types of smugglers participate in this market and that we could not credibly distinguish the activities and revenues of human-smuggling TCOs from those of independent operators, ad hoc groups, and others who also benefit from human smuggling. Thus, we could not consider the characteristics of human-smuggling TCOs in isolation nor could we provide an estimate, or even a range of estimates, for revenues flowing solely to human-smuggling TCOs. Instead, we developed a range for revenues that flow to all types of human smugglers, including TCOs. We were, however, able to attribute the revenues from taxes levied on migrants by drug-trafficking TCOs on portions of routes they control directly to those TCOs and estimate them separately.

---

[2] Notwithstanding the focus on revenue as a starting point for understanding "economic value," profitability might say more about human smuggling's contribution to the financial health and viability of these TCOs.

Haiti AR_001528

## Definition of *Transnational Criminal Organization*

To start, we examined formal definitions of *transnational criminal organization* to try to distinguish such organizations from others that might engage in human smuggling along routes from the NT to the United States. TCOs have been defined in U.S. law as

> . . . self-perpetuating associations who operate transnationally for the purpose of obtaining power, influence, monetary and/or commercial gains, wholly or in part by illegal means, while protecting their activities through a pattern of corruption and/or violence, or while protecting their illegal activities through a transnational organizational structure and the exploitation of transnational commerce or communication mechanisms.[3]

The White House's 2011 *Strategy to Combat Transnational Organized Crime* provides further guidance:

> There is no single structure under which transnational organized criminals operate; they vary from hierarchies to clans, networks, and cells, and may evolve to other structures. The crimes they commit also vary. Transnational organized criminals act conspiratorially in their criminal activities and possess certain characteristics which may include, but are not limited to:
>
> - In at least part of their activities they commit violence or other acts which are likely to intimidate, or make actual or implicit threats to do so;
> - They exploit differences between countries to further their objectives, enriching their organization, expanding its power, and/or avoiding detection/apprehension;
> - They attempt to gain influence in government, politics, and commerce through corrupt as well as legitimate means;
> - They have economic gain as their primary goal, not only from patently illegal activities but also from investment in legitimate businesses; and
> - They attempt to insulate both their leadership and membership from detection, sanction, and/or prosecution through their organizational structure.[4]

These definitions and guidance allow for different types of organizational structures, ranging from hierarchies to cells, but they start from the point of "self-perpetuating associations" that act

---

[3] 10 U.S.C. § 284(i)(6). For an alternative definition, see United Nations Office on Drugs and Crime, *Legislative Guide for the Implementation of the United Nations Convention Against Transnational Organized Crime*, 2004. For the purposes of that convention, the United Nations specifies,

> (a) "Organized criminal group" shall mean a structured group of three or more persons, existing for a period of time and acting in concert with the aim of committing one or more serious crimes or offences established in accordance with this Convention, in order to obtain, directly or indirectly, a financial or other material benefit; (b) "Serious crime" shall mean conduct constituting an offence punishable by a maximum deprivation of liberty of at least four years or a more serious penalty; (c) "Structured group" shall mean a group that is not randomly formed for the immediate commission of an offence and that does not need to have formally defined roles for its members, continuity of its membership or a developed structure.

[4] United States, Executive Office of the President, 2011.

3

like organizations and call out particular behavior, including violence in pursuit of influence and economic gain. These descriptions suggest that, to be considered a TCO, a human-smuggling group or network needs to have some level of organization and hierarchy; that is, it should be more than just an ad hoc collection of individuals who operate along distinct parts of a route and work together opportunistically with other individuals in various configurations to move people from Central America, across Mexico, and to the U.S. border. One gray area involves slightly more organized groups, consisting of loose networks of individuals who consistently work together or generally leverage the same set of connections along a route.

As Chapter 2 shows, our review of the literature and interviews with SMEs suggest that smugglers bringing migrants from the NT to the U.S. border fall along a spectrum from independent operators, to ad hoc groups of individuals, to loose networks, and to more-formal networks that consistently work together—and it is possible that the same actor may be engaging in human smuggling in some or all of those ways at any given time. This means that even with a formal, official definition, the lines between TCOs and other kinds of smugglers and smuggling networks are blurry. These blurry lines presented substantial analytical challenges and contributed to the difficulty of determining whether migrants are hiring TCOs to smuggle them along a route and how much they are paying them.

## Technical Approach to Analysis

Given the short time frame for this study, we turned to existing literature, available data, and SMEs to learn more about the characteristics of human-smuggling TCOs and other actors that engage in human smuggling:

- **We reviewed existing literature** related, for example, to the types of TCOs that engage in human smuggling along routes from the NT, the flows of migrants from the NT to the United States, the fees that migrants pay to smugglers, and the costs of smuggling.[5]
- **We reviewed available DHS and other data** to cast light on the structure, operations, and financing of TCOs and support revenue estimation, including data on migration flows, smuggling fees, and smugglers' costs.
- **We reached out to SMEs,** including U.S. government officials and academics, to gain their perspectives on this topic and to learn more about available documentation and data. (See Appendix B for more details.)

With this evidence, we implemented a multimethod analysis: We developed a qualitative narrative (see Chapter 2) and scoped the market for smuggling services quantitatively (see Chapter 3). The distinction between the approaches as "quantitative" and "qualitative" is not clear-cut; for example, for our narrative we drew on anecdotal quantitative evidence, culled from

---

[5] Our literature review included academic articles, press reports, and reports written by government agencies, non-governmental organizations, and multilateral entities. See Appendix A for more details.

Haiti AR_001530

the literature, and for the scoping exercise we drew partly from qualitative survey data. By "triangulating" among methods and evidence, we could characterize the TCOs and other entities that engage in human smuggling and set out a general analytical framework for conceptualizing and addressing revenue estimation.

Our study framework, shown in Figure 1.2, depicts a generic, stylized route that begins at a point of origin in the NT, continues through Mexico, and ends at a destination in the United States, given the possibilities that a route can consist of multiple segments, that not all smugglers are TCOs, that not all unlawful migrants hire smugglers of any type for all segments, and various other route characteristics. The route characteristics suggest the kinds of data that would be necessary to conduct an economic analysis, including revenue estimation. The characteristics depicted in Figure 1.2 consist of the route segment, types of smugglers (e.g., TCO, other, or self), smuggling fees, other migrant payments, costs to smugglers, and the number of migrants along the route who travel under those conditions.

**Figure 1.2. General Framework for Economic Analysis, Including Revenue Estimation**



NOTES: Hash lines along the segmented route suggest the potential for more segments.

Some of these characteristics could be parsed further; for example, "other payments" could be divided into bribes to officials and taxes, or *pisos*, that drug-trafficking TCOs levy along the

Haiti AR_001531

routes they control. These bribes and taxes might or might not be included in smuggling fees, as a pass through, depending on the particulars of the smuggling arrangement.[6]

Although not apparent in Figure 1.2, we confined our analysis to a recent period, mostly 2015–2017, and to unlawful migrants coming from and originating in NT countries. As addressed below and in later chapters of this report, data on important elements of the framework were lacking, which substantially hindered progress on revenue estimation, even as a range, and generated considerable uncertainty.[7]

## Challenges, Uncertainties, and Mitigations

We faced analytical challenges relating to time constraints and data quality, completeness, and relevance that yielded a high degree of uncertainty about the findings, especially those concerning revenues.

To mitigate the challenges of an abbreviated timeline (less than two months for the evidence collection, analysis, and writing), we "triangulated," as noted above; independently analyzed the data that we obtained from DHS and other sources; and cross-checked our results with those of other researchers who have worked with similar and different data sets to identify and understand apparent divergences. In addition, as addressed below, we set out to frame our preliminary estimates of revenue, including embedded calculations of unlawful migrant flows, smuggling fees, etc., in terms of ranges. Lastly, we also considered options for improving the fidelity of our estimates under less-binding time constraints.

The data-related challenges were at least as noteworthy.

The data on unlawful migration and human smuggling—like any data on illicit activities—tend to be partial, unreliable, and sometimes ill-suited to the policy questions at hand. Some data derive from direct observation (i.e., the number of individuals that U.S. Border Patrol agents apprehend, see turning back, or see getting away), some derive from statistical analysis that extrapolates from current trends (e.g., migrant flow–estimation methodologies related to recidivism rates), and others derive from surveys of or interviews with migrants and smugglers. All of them have limitations, which are discussed in Chapter 3.

Inevitably, researchers must also grapple with what criminologists call the "dark figure," referring to the amount of unreported or undiscovered illicit activity. For human smuggling, this gap in the data could pertain both to the activities of smugglers and to the flows of unlawful migrants from the NT to the United States. For example, law enforcement is unlikely to observe or understand the totality of a TCO's operations, partly because TCOs seek to conceal them and also because individuals who are affiliated with TCOs may not divulge this information upon

---

[6] Chapter 2 includes a detailed discussion of migrants' payments of taxes, or *pisos*, to TCOs, specifically drug-trafficking TCOs, and Chapter 3 provides an ancillary preliminary estimate of their worth.

[7] For more information about the estimation method, see Chapter 3 and Appendix C.

6

Haiti AR_001532

capture. Indeed, some or even most people working for a TCO may have little knowledge of the TCO's overall activity. Similarly, government officials will not see all individuals who turn back or get away, and migrants may not provide full information about their journeys. Smuggling, like other illicit activities, tends to rely on trust relationships, and disclosures would violate that trust, risking reprisals and denials of service in the future.

Moreover, researchers cannot presume the accuracy of data related to smuggling or migration. For example, U.S. Border Patrol agents often interview migrants and ask them questions about the details of their journeys, such as smuggling fees, and record the results. However, these officials might ask these questions differently at different locations and might misinterpret or mis-enter the results and migrants might answer these questions incorrectly, either purposefully or because they did not understand the questions.[8]

In addition, as noted above, not all human smugglers are affiliated with TCOs, howsoever defined, and the data provide little insight as to whether migrants hire human-smuggling TCOs or other types of actors. To the best of our knowledge, neither DHS nor any other agency or academic researcher has collected data on smuggling fees that specify smuggler "type" or provide information that could tie the DHS data on smuggling fees to data on smugglers' organizational affiliations. Thus, even if we could distinguish clearly between human-smuggling TCOs and other types of smugglers, and even if we could also develop a reliable estimate of revenues from smuggling NT migrants to the United States, we could not parse the revenues to those TCOs, specifically.

Lastly, estimating revenue from human smuggling, as compared with drug trafficking, presents other challenges relating both to the diversity of the individuals seeking to be smuggled and to the diversity of smuggling services being offered. Drugs are relatively simple, near-homogeneous commodities, and trafficking them involves commensurately little differentiation. A kilogram of cocaine is a kilogram of cocaine, after some adjustment for purity, and trafficking involves moving that kilogram from one place to another, with limited options, e.g., regarding routes and modes of transportation.[9] By contrast, people differ widely—e.g., by gender, age, health status, and physical capability—as do their needs and financial resources. Consequently, human smugglers can differentiate their services, with options including comprehensive "all-inclusive" or "end-to-end" packages on one end of the spectrum, and "pay-as-you go" arrangements, in which migrants pay for discrete services, at the other. (See Chapter 2.) As a result, smuggling fees can and do vary greatly from one journey to another.

None of these challenges has a fully satisfying "fix." For example, to estimate migrant flows, researchers have developed methods based largely on data on apprehensions of unlawful

---

[8] For more information about specific shortcomings of the data, see Chapter 3.

[9] See, for example, Paoli, Greenfield, and Zoutendijk, 2013. For more on drug supply chains, see also Paoli and Greenfield, 2017.

Haiti AR_001533

migrants. These results may be biased upward or downward, depending on the approach, and some of them may be controversial, but they can be and are used to estimate ranges.[10] Regarding the revenues and profits associated with human smuggling, one researcher asks whether it is even possible to conduct economic analyses of this market, because the activity is illegal and highly differentiated.[11] Notwithstanding the "dark figure," other researchers have found ways to deal with illegality in more homogeneous markets, but the diversity of services in this arena would add a layer of complexity.[12]

Some of the least "fixable" challenges are among those most closely aligned with the primary goal of the study: revenue estimation. From the start, we recognized the infeasibility of developing a point estimate for smuggling revenues and intended, instead, to frame any revenue estimate as a range, from low to high, because of the time constraint and also to accommodate the considerable uncertainty in the data. Furthermore, as the research progressed, we found that we lacked an empirical basis for separating the activities and revenues of human-smuggling TCOs from those of others, including ad hoc groups and independent operators, who engage in human smuggling. Thus, we could provide, at best, a range for revenues to all smugglers, irrespective of their affiliations, although we were able to provide a separate preliminary estimate of the right-of-way taxes that migrants pay to drug-trafficking TCOs.

The following chapter presents initial findings on the characteristics of human smugglers that operate along routes from the NT to the United States, as well as the characteristics of human smuggling, more generally, with a focus on actors' roles and the services they provide.

---

[10] See, for example, DHS, Office of Immigration Statistics, 2017.

[11] See Sanchez, 2017, 2018.

[12] Reuter and Greenfield, 2001; Paoli, Greenfield, and Reuter, 2009.

Haiti AR_001534

## 2. The Characteristics of Human Smuggling

This chapter focuses on the characteristics of human smuggling from the NT countries (Guatemala, Honduras, and El Salvador) to the United States, including the structure, operations, and financing of human smugglers. We provide an overview of the main types of smugglers, or "actors," that engage in this market, analyze the roles they typically fill, and discuss the services such actors provide, the fees they charge for those services, and the costs they incur. In effect, this chapter covers the "who," "what," "how," and financial dimensions of human smuggling along routes from the NT to the United States. We conclude the chapter by exploring the linkages between human smuggling and drug-trafficking TCOs.

Smugglers that move migrants from the NT to the United States take many forms, only some of which appear to meet the definition of *transnational criminal organization* laid out in U.S. law and policy guidance, as discussed in Chapter 1. While most unlawful migrants report having engaged the services of a smuggler for at least a portion of the route, it is unclear how many migrants engage smugglers to arrange their entire journey north or engage smugglers for discrete portions of the journey, and how many are using more-organized TCO-like networks as compared with independent operators and ad hoc groups.

The routes migrants use to travel north are well established and primarily follow overland transportation corridors from the NT to Mexico's southern border with Guatemala, and then up through Mexico to the border with the United States. The main variation appears to involve the modes of transportation or conveyances that migrants use, which include buses, taxis, tractor trailers, and freight trains, with comparatively few NT migrants using sea vessels or airplanes for parts of the journey.

Fees paid by unlawful migrants also differ widely, depending on the comprehensiveness and quality of smuggling services that migrants engage. Some migrants can pay thousands of dollars to be smuggled from their home country to the interior of the United States, while others may only pay a few hundred dollars for discrete portions of their journey. Migrants often pay taxes, or *pisos*, to drug-trafficking TCOs (or "cartels") to travel through territory the cartels control, and bribes to officials to go through checkpoints along the routes. Such payments might be in addition to other smuggling fees or included in them, depending on the particular arrangements that migrants make with their smugglers. Migrants' payments to drug-trafficking TCOs are not payments for smuggling, per se, but they are the only revenue associated with human smuggling that we could attribute directly to TCOs of some kind.

Lastly, while the scope of this report is limited to migrants from the NT, our literature review and SME interviews suggest that the smuggling groups operating along this corridor are also moving people of other nationalities. The evidence suggests that these migrants—particularly those from countries outside the Western Hemisphere—may be paying smuggling fees that are

Haiti AR_001535

orders of magnitude higher. Additionally, the groups specializing in facilitating this extra-hemispheric flow may be more organized and, thus, potentially more liable to meet the definition of a TCO.

## Taxonomy of Human Smugglers

Different types of actors participate in human smuggling, including independent operators that move migrants along particular segments of the route or offer other discrete services (for example, a taxi driver based out of one town on the route that ferries migrants to the next major town); ad hoc or opportunistic groups that might work together from time to time but not regularly; and more-formal enterprises or networks.[13] This reality means that migrants who intend to travel to the United States from Central America can choose from a wide range of service options. At one end of the spectrum, migrants can opt for "all-inclusive" or "end-to-end" arrangements, whereby they pay one facilitator, group, or network that arranges all their travel and may even send a representative to travel with them; at the other end, migrants can "pay as they go," traveling on their own for parts of the route and connecting with local smugglers to pay for transportation and logistical support for other parts of the route. The differences in the kinds of services that are provided by these actors are discussed in more detail below.

There is some debate in the literature about the extent to which groups of smugglers are becoming more professional and sophisticated, in light of possible increases in smuggling fees.[14] However, the majority of sources suggest that most of these groups are loosely organized, are nonhierarchical, and do not maintain a definable command structure.[15] The diversity and proliferation of individuals and groups involved in some aspect of human smuggling make it challenging to identify the extent to which these activities are conducted by actual TCOs.

As noted in Chapter 1, the statutory definition of a TCO includes components that do not appear to be present in many human-smuggling operations, including TCOs being "self-perpetuating associations" that protect their activities through "a pattern of corruption and/or violence," with a "transnational organizational structure."[16]

Table 2.1 presents a taxonomy of human smugglers, based on our review of the literature and interviews with SMEs, starting with the least organized types of smugglers and ending with the most organized. At each level, actors differ by organizational cohesion, membership, and

---

[13] See, for example, Guevara González, 2018.

[14] For a discussion of debate among academic sources on organizational coherence of smuggling organizations, see Sanchez and Zhang, 2018.

[15] Sanchez, 2017, p. 14; Zhang, 2007, p. 89; Guevara González, 2018, pp. 180–184. For example, "A key feature of the smuggling strategy along the U.S.-Mexico border is its relatively low entry costs and lack of vertical integration" (Wuebbels, 2004, p. 23).

[16] 10 U.S.C. § 284.

Haiti AR_001536

geographic dispersion along smuggling corridors. The more organized networks can feature transnational organizational structures, but relatively few appear to meet the bar of being "self-perpetuating associations." And while many of these actors rely on corruption to protect their activities in the form of bribes to officials, relatively few of them appear to use violence for this purpose. The taxonomy should be thought of as a spectrum rather than a set of firm categories; smugglers commonly move between levels or can operate at more than one level along the spectrum, depending on their opportunities. Many of these actors, even those toward the more organized end of the spectrum, can function as subcontractors to other actors at the same or different levels of the spectrum.

**Table 2.1. The Spectrum of Actors Engaged in Human Smuggling**

| Type of Actor | Organizational Structure | Services | Group Membership | Geographic Reach |
|---|---|---|---|---|
| Independent operators | One "cell" composed of one or a few individuals | Provide a discrete service (e.g., transportation or lodging) | Do not generally work with other cells or actors | Generally work in one location, or between two locations |
| Ad hoc groups | Two or more independent operators that may not always work together | Provide multiple, complementary services | Generally unaware of other actors and groups more than one degree of separation removed | Work in one, two, or more locations |
| Loose networks | A larger number of small groups that usually work together | May provide end-to-end service along the full route or a portion of the route | Members may only know a limited number of other members | Working in many locations, potentially the full route |
| More-formal networks | A central figure who coordinates groups that consistently work together | Provide end-to-end services | Members generally know each other | Working along the full route |

### Independent Operators

Smuggling services are often provided by local, independent operators who generally operate in one area and facilitate the movement of migrants along discrete sections of the route from Central America to the U.S. border.[17] These services can include providing facilitation, transportation, housing, food, and fraudulent documents.[18] For example, there may be a "transportation cell," or a small group of individuals, in Tapachula that specializes in recruiting recently arrived migrants from the bus station or border and transporting them to the next major

---

[17] Sanchez, 2018.

[18] For example, "Martinez appears to be an independent contractor. He said he charges $2,500 for the trip from the Guatemalan border to the U.S. border, where he gives Central American migrants fake Mexican identity cards and makes them learn the first stanza of the Mexican national anthem before handing them off to another smuggler" (Associated Press, 2014).

Haiti AR_001537

waypoint along the route north.[19] This group may not have any formal connections to other smuggling groups, instead focusing solely on moving migrants that it encounters or recruits from one city to the next one.[20]

## Ad Hoc Groups

Sometimes, several generally independent operators may come together to pool their services for a given migrant or group of migrants.[21] These opportunistic or ad hoc groupings of smugglers are generally not stable or allegiant to each other, and the smugglers may be working with several different groups at the same time. Expanding on the previous example, the transportation cell in Tapachula may know several different operators that provide housing in the next major waypoint for migrants, and the cell will put its clients in contact with one of them. The group that provides housing might essentially direct migrants to a low-grade hotel (also known as a "stash house") that takes in migrants from other organizations operating along that segment of the route. The stash house operator, in turn, might then connect the migrants with another transportation cell that the migrants would use for the next portion of their journey. The two transportation cells may not be aware of each other, even though both cells participated in smuggling the same migrants along the route.

## Loose Networks

Some smuggling networks along the routes consist of groups that might not be attached formally and consistently to one organization—that is, they might not answer uniformly to the same person—but that generally work with the same preferred or trusted partners along longer sections of the route.[22] These loose networks generally work together, and in some cases the chain of facilitation can extend all the way from the NT to the United States, although the links in the chain might not all know or be aware of each other. The main difference between these loose networks and the ad hoc groupings is that these networks are more organized and the

---

[19] In an interview with PBS Frontline, a smuggler operating as an independent operator admits to finding clients at a bus stop where recently unlawful migrants who have been removed are released (Frontline/World, 2018).

[20] See, for example, Sanchez, 2018; Zhang, 2007; Campana, 2016; Associated Press, 2014.

[21] See, for example, this description of how unlawful migrants arriving at a town on the Guatemala border with Mexico are connected with smugglers:

> As migrants arrive into town, they are approached by taxi drivers who offer their transportation services. Drivers recommend specific hotels or accommodations to their customers, receiving in turn a commission based on the amount of business they bring in. Hotels also serve as brokerage points for those who arrive without a guide. Once at a hotel, migrants in transit can select from a vast range of options, including accommodations, meals, transportation toward the border with Mexico, and assistance crossing the southern border for a fee. (Guevara González, 2018).

[22] See, for example, a Mexican news magazine's description of how three coyotes coordinate the travel of El Salvadorans to Houston (Martinez, 2017).

12

Haiti AR_001538

various components of the network along the route tend to work together consistently, even if one person does not manage the overall network.[23] An example of this kind of network would involve a facilitator in Guatemala who recruits migrants and then tasks another individual or group with transporting the migrant to the border with Mexico, where yet another individual or group would take custody of the migrant and be responsible for transporting the migrant further north.[24] The migrant may be handed off several times along the trip, with the facilitator being generally aware of the migrant's progress, but the groups that transport and provide housing to the migrant may only be loosely aware of each other.

## More-Formal Networks

Formal, relatively more-hierarchical smuggling networks reportedly exist along the routes from Central America to the United States.[25] However, even these relatively more-organized groups feature command structures that are not truly hierarchical, particularly compared with other organized crime actors, such as cartels or drug-trafficking TCOs. For example, one individual might not have command and control over all of their affiliates or subsidiaries. These relatively more-formal networks generally feature one person or a group of persons that oversees the activities of others in the network, and these networks usually offer "all-inclusive" packages, whereby migrants pay a substantial fee for end-to-end service all the way from their point of origin to their destination in the United States. Some of these networks also appear to specialize in moving migrants from outside the Western Hemisphere.[26]

## Dynamism Within the Spectrum

Low barriers to entry, opportunistic behavior, and fluid allegiances suggest dynamism within the spectrum and make it difficult to reliably assign smugglers—including, individuals, cells, or even some groups—to particular parts of the spectrum. Even if would-be smugglers must have some risk tolerance, many of the activities they engage in do not require specialized knowledge (e.g., driving a taxi, operating a hotel or stash house), such that individuals, in particular, can

---

[23] See, for example, the hierarchy of human-smuggling groups in Palacios's (2014) academic article from less to more organized, culminating with "Systematic complex networks are more extensive and have a hierarchical structure in which a leader manages the network's business and finances" (p. 327).

[24] See, for example, Martinez, 2017.

[25] See, for example, the description of human-smuggling networks in Associated Press (2014) as "a complex corporate structure. Guides at the border usually work for honchos who run the operation from afar and only pocket a fraction of the price charged to the migrants. One of the most important coyotes moving immigrants from El Salvador lives in Texas."

[26] See, for example, U.S. Immigration and Customs Enforcement, 2016.

Haiti AR_001539

come and go easily.[27] Additionally, at any point in time a smuggler might be operating independently, as a member of an ad hoc group, and as a member of a loose network. That is to say, the coalitions of smugglers that operate along the routes from Central America to the United States are opportunistic, extremely fluid, and prone to change, making it extremely difficult to pin down the exact nature of smuggling or of specific groups and networks that are involved in the trade. As noted above and described in the taxonomy, only some actors appear to meet the definition of *transnational criminal organization* found in U.S. law and policy guidance.

## Key Roles in Human Smuggling

Smugglers typically fill a number of roles, whether they are working as independent operators or as part of a network or group. Depending on the sophistication of the operation, individuals or small groups of people (sometimes referred to as a *cell* by law enforcement) can fill these roles.[28] Some of these individuals and cells work as subcontractors or independent operators and may offer their services to several different networks or other smugglers at the same time. This means that human-smuggling networks may feature several cells that work together occasionally or consistently, depending on the relative strength of the networks.

The following is a brief description of the key roles:[29]

- **Facilitation/coordination.** Identify and recruit migrants, collect up-front fees, pay other smuggling organizations during the migrant's journey, and coordinate some or all of the migrants' travel from their source country to their final destination. These individuals or small groups are often based in the NT countries, though some might also be present in population centers in Mexico.[30]
- **Transportation.** Transport migrants from one location to another along the route north. Transportation involves conveyances of different types and sophistication, with actors and modes ranging from local taxi drivers that transport small numbers of migrants from one town to another, to organizations that charter buses or retain tractor trailers to transport large groups long distances. Part of this service often includes paying fees or taxes, including bribes and *pisos* (see the later discussion), to other criminal networks or corrupt officials to cross their territory or pass a checkpoint.

---

[27] For example, Guevara González (2018) describes an interview with a woman who recounts that the first two times she journeyed north, she used smugglers: "By her third trip, she felt confident enough to travel on her own—and now she puts her experience to work facilitating the journeys of unlawful migrants through Mexico."

[28] For further discussion of the unique roles of participants of smuggling organizations, see United Nations Office on Drugs and Crime, 2011, p. 70.

[29] As noted earlier, Guevara González (2018) explains how many of these functions work along the border between Guatemala and Mexico.

[30] See, for example, Garsd's (2016) interview with a smuggler based in Mexico who describes how his network coordinates a series of "walkers" to help Honduran migrants traverse Mexico to the border with the United States.

Haiti AR_001540

- **Logistics/stash houses.** Provide logistical support, often in the form of lodging or stash houses where migrants can take shelter for a few days or even a few weeks. On the U.S. side of the border, stash house operators often move migrants between houses every few days to attract less attention from neighbors and law enforcement.[31]
- **Fraudulent documents.** Provide fraudulent documents for unlawful migrants, such as Mexican visas, national identity cards, and birth certificates. These documents can help migrants travel freely through Mexico and, in some cases, can also be used to create evidence of "synthetic families" with unaccompanied children to present to border officials upon entry into the United States.[32]
- **Footguides/coyotes/*polleros*.** Guide unlawful migrants—generally single adults—on foot across the land border between POEs, to avoid detection by U.S. Border Patrol agents while entering the United States. These footguides are commonly known as *coyotes* or *polleros*. The term *coyote* is also used interchangeably to describe human smugglers in general, and some reports note that these more broadly defined coyotes may operate in the NT countries, travel with migrants throughout their journey, and operate along the U.S.-Mexico border.[33] At the border, footguides often work in concert with "spotters" who try to locate law enforcement assets and personnel to maneuver groups around them via radio or cell phone.

## The Relationship Between Smuggling Services and Fees

Human smugglers provide migrants with a wide range of services, including transportation, lodging, and specialized knowledge to help migrants avoid arrest, extortion, and violence by evading detection or paying bribes and protection fees. Migrants can choose to "pay as they go" and find the services they need for discrete sections of the route north (which may cost them very little in fees), or use "all-inclusive" or "end-to-end" packages that cover their travel from their point of origin to their final destination in the United States (such packages, by comparison, may cost them more than $10,000).[34] We were unable to find much evidence in the literature on how many unlawful migrants are using all-inclusive arrangements versus choosing to pay as they go. Smugglers' services can differ widely based on the needs and financial resources of their clients and, consequently, so can their fees.

*All-Inclusive Packages*

Our review of the literature revealed substantial variation in the fees that smugglers charge for all-inclusive services, but there appears to be broad convergence around these kinds of

---

[31] For example, Nixon and Heisler (2018) describe the key role stash houses play in smuggling migrants in Texas.

[32] For example, Castellano (2014) reports how smugglers in Guatemala describe their connections with Mexican immigration authorities and their ability to procure visas to facilitate travel through Mexico, and Hennessy-Fiske (2018) reports on unrelated adults and children posing as families at the border.

[33] See Martinez's (2017) discussion of the three coyotes involved in smuggling migrants from the NT to Houston.

[34] Sanchez, 2018.

Haiti AR_001541

services costing migrants between $6,000 and $10,000, which is roughly in line with the results of the Encuesta sobre Migración en la Frontera Sur de México, or Survey of Migration at Mexico's Southern Border (which we refer to by its Spanish abbreviation, EMIF Sur), conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, located in Mexico. However, some articles suggest that the fees can be substantially higher. There is also evidence that the fees can vary, depending on whether unlawful migrants are attempting to evade detection at the border, and thus must be smuggled into the interior of the United States (generally single adults), or whether they are turning themselves into border officials at and between POEs and entering the asylum process (generally families and unaccompanied children).[35]

Smugglers can also provide specialized services for clients such as children, pregnant women, and the elderly that reduce exposure to risks and do not require extensive physical activity, such as scaling walls or extended hikes through remote terrain.[36] As one smuggler explains, specialized services that increase a person's chances of successfully evading detection, such as the use of decoys, lookouts, and safe houses, are likely to drive up costs and therefore prices.[37] Some reporting also suggests that smugglers can charge exorbitant fees if they have access to corrupt customs officials who take bribes in exchange for "looking the other way" as migrants' pass through borders.[38] Alternatively, migrants of greater means may choose transportation methods that are more comfortable, such as taxis or personal vehicles, or pay additional fees for smuggling tactics that minimize the risk of detection, such as using fraudulent travel documents. As one scholar notes, "the more money you have, the better service you get."[39]

Selected examples of smuggling fees in press reports are broadly representative:

- A 2018 *New York Times* article drawing on interviews with unlawful migrants found that the fee to enter the United States illegally represented more than half of the overall fee of $12,500 that a family paid for one individual's journey: "The nearly 2,000-mile trip had already cost Mr. Cruz's family more than $6,000 and brought him within sight of Brownsville, Tex. The remaining 500 miles to Houston—terrain prowled by the United States Border Patrol as well as the state and local police—would set them back another $6,500."[40]

---

[35] See, for example, Martinez's (2017) description of the *viaje corto*, or short journey, taken by asylum seekers that allows them to avoid paying the extra fees to avoid detection. Miroff (2018) describes the increasing trend of migrants turning themselves in to border officials. For additional reporting on fees and cost, see *Daily Mail* and Associated Press Reporters, 2014, and Kulish, 2018.

[36] Sanchez, 2017.

[37] González and Solis, 2017.

[38] Frontline/World, 2018.

[39] Cleek, 2018.

[40] Kulish, 2018.

Haiti AR_001542

- A Public Radio International news segment in 2018 described smuggling fees doubling over the past decade: "But in the past few years, the price of this trip has skyrocketed to between $7,000 and $10,000, more than double what it was a decade ago."[41]
- A Mexican online magazine interviewed a smuggler specializing in bringing unlawful migrants from El Salvador to the United States who described how he had raised his fees in 2017 after increased enforcement. The smuggler noted that he used to charge around $8,000 for travel from El Salvador to Houston, but he was now charging $9,500 to $10,000—plus another $1,500 if the unlawful migrants wanted to go past Houston.[42]
- During a National Public Radio interview in 2016, a smuggler claimed to charge as much as $17,000–$19,000 during the interview, while the director of a nonprofit working with unlawful migrants cited a lower figure: "You have to assume the average price is between 6,000 and 10,000. If you pay more, you're more likely to get through without being detected."[43]
- An academic researcher who volunteered at a migrant shelter along the Mexico-Guatemala border during parts of 2014, 2015, and 2016 noted: "Coyotes are known for providing a full-service package, which includes the facilitation of journeys across Mexico and into specific destinations within the United States from the place of origin or residence of the migrant. Few migrants travel in this all-inclusive way, though, because of cost: coyote-led door-to-door journeys are quite expensive. During the period in which this research was carried out, the prices of such all-inclusive packages ranged between 4,000 and 6,000 U.S. dollars."[44]
- An article detailed negotiations with several smugglers in Guatemala in 2014; loosely translated, it stated: "Besides 'The Chuluyo' we negotiated separately with three more Guatemalan traffickers to move 'Karen.' The cost ranged from 6,000–9,000 dollars, with two to three attempts to achieve it." [45]
- An Associated Press article in 2014 included interviews with smugglers: "The trafficker on the Guatemalan border, who spoke with The Associated Press after an intermediary negotiated the time and place, said the people he smuggles pay $10,000 a head for the trip from Central America, which covers everything from hotel and train payments to official bribes and cartel taxes. But occasionally, he said, a cartel will demand as much as an extra $5,000 on threat of death."[46]

These reports generally do not, however, shed light on another key research question: What percentage of unlawful migrants are opting to pay for these "all-inclusive" packages? One exception is an investigative report by the Mexican newspaper *El Universal* into human smuggling from Guatemala, which noted that 75 percent of unaccompanied children hired a

---

[41] Cleek, 2018.

[42] Martinez, 2017.

[43] Garsd, 2018.

[44] Guevara González, 2018, p. 182.

[45] Castellano, 2014.

[46] Associated Press, 2014.

Haiti AR_001543

smuggling network and were accompanied by representatives of these networks—"coyotes"—during their entire journey.[47]

*Pay-as-You-Go Arrangements*

An unknown percentage of unlawful migrants choose to travel on their own without engaging a smuggler to coordinate their entire journey. Instead, they obtain services, as needed, along the route. During their journey, they can enter into agreements with multiple facilitators at different stages in their journeys north, each of which might offer different level of services, possibly tailored to their needs and resources, a model often described as "pay-as-you-go."[48] Because the arrangements are spontaneous, we were unable to find many estimates of what unlawful migrants pay for these discrete services.

One researcher who spent time living in a shelter, known as "La 72," catering to unlawful migrants along Mexico's border with Guatemala noted that "Most Central American migrants staying at La 72 reported relying on the segmented facilitation, where they relied on a guide (*guía* in Spanish) to lead them through specific portions of their journeys. *Guías* are typically local residents . . . with knowledge of the terrain."[49] The researcher went on to describe how unlawful migrants arriving at the town are approached by taxi drivers who offer them transportation and connect them with other logistics providers in the town, who in turn can connect them with a wide array of other services.[50] The fees charged to migrants for segmented facilitation varied significantly, but some of the prices she observed being negotiated for discrete services included

- $15 per night for a bed in a shared hotel room
- $1–$4 to cross the river in a boat
- $1,000 for a guaranteed crossing of the Mexico-Guatemala border past immigration checkpoints on the Mexican side.[51]

In another example, a *New York Times* reporter followed the travels of an unlawful migrant from El Salvador whose family in the United States wired money at different points in the journey when he was unable to continue on his own—including a substantial payment at the beginning of his travel: "Just two days into Mr. Cruz's journey, his family had to wire the smuggling network $1,900 to get him through southern Mexico."[52]

---

[47] Castellano, 2014.

[48] Sanchez, 2018; Organisation for Economic Co-operation and Development, 2015.

[49] Guevara González, 2018, p. 182.

[50] Guevara González, 2018, p. 183.

[51] Guevara González, 2018, pp. 183–187.

[52] Kulish, 2018.

Haiti AR_001544

In yet another example, experts interviewed by Public Radio International described the range of options available to unlawful migrants who set out on their own: "Migrants who have no money can hitchhike, walk or take the train. . . . Some families pay smugglers a few hundred dollars to explain the route. . . . With a little more money, families can pay for a smuggler to book the bus tickets in advance, so migrants just show up and hop from one bus to the next."[53]

An Associated Press article included this description of the service provided by an "independent contractor" who facilitated travel through Mexico:

> He said he charges $2,500 for the trip from the Guatemalan border to the U.S. border, where he gives Central American migrants fake Mexican identity cards and makes them learn the first stanza of the Mexican national anthem before handing them off to another smuggler. Hopefully, if they are apprehended in the U.S., they'll only be sent back to Mexico, where they can try again.[54]

Other sources describe how migrants traveling on their own can choose to ride a freight train for part of their journey north (popularly known as La Bestia, or "the Beast") that may cost nothing, apart from payment to criminals in order to avoid harm.[55]

## The Difficulty of Calculating Human-Smuggling Profits

Although profitability might say more about the financial health and viability of smuggling operations than revenue, profit estimation poses substantially greater challenges. The diversity of business models, and differentiation of smugglers' services among and within models, can yield substantial variation in smuggling fees and, possibly, in the smugglers' profits.[56] For these same reasons—as well as inherent data limitations (see Chapters 1 and 3) and the far greater scarcity of data on smugglers' costs—profit estimation is extremely difficult.[57] As noted elsewhere in this report, some scholars call into question whether it is even possible to undertake economic assessments in this arena, because of both illegality and data deficiencies.[58]

Nevertheless, we found scattered evidence on the reported costs to smugglers for discrete services they provide that, in combination with the evidence on fees cited previously and explored more thoroughly in Chapter 3, could say something about profitability. For example, some reporting describes smuggling organizations that recruit larger numbers of clients can pool

---

[53] Cleek, 2018.

[54] Associated Press, 2014.

[55] See, for example, the description of how migrants may be pushed off the trains if they don't pay protection fees, in Domingo Villegas (2014). For additional reporting on fees and costs, see Tiempo.hn (2017).

[56] As noted in Chapter 3, the smuggler's "accounting profits" might not equate to "economic profits."

[57] For additional comments on the paucity of data on smugglers' costs, see United Nations Office on Drugs and Crime, 2011, p. 85.

[58] Sanchez, 2017, 2018.

Haiti AR_001545

migrants and transport them great distances in tractor trailers or on charter buses, sometimes all the way across Mexico.[59]

A handful of press reports offers more detail on specific costs borne by smugglers. One set of data points on logistics costs, possibly originating in a 2014 Associated Press report, shows up intermittently across news sources and over time and recounts various transportation, lodging, and other costs incurred by smugglers that might sum to around $2,000 or more per migrant.[60] As presented in the 2014 Associated Press report:

- guide who makes the trip: $500–$600
- boatmen at Mexico's southern border: $1.50 to cross Suchiate River from Guatemala
- lodging: $11.50 a room, which can hold many migrants
- Central American gang: At least $100 per migrant to board Mexican freight train known as La Bestia, or "the Beast"
- Mexican police and immigration officials: $230–$540 to pass; $25–$40 per person to free detained migrant[61]
- drug cartels: $250–$300 for Mexican migrant, $500–$700 for Central American, about $1,500 for someone from Europe or Asia, plus 10 percent flat fee per smuggler to cross northern Mexico to the U.S. border
- boatmen at Mexico's northern border: $100 per immigrant to cross Rio Grande into the United States
- drivers: $150 for ride from Rio Grande to stash house; $200 for ride north of the U.S. Border Patrol's highway checkpoint to Houston
- caretaker at stash house: $20 per person per day.

An online magazine in Mexico that interviewed smugglers bringing unlawful migrants from El Salvador to the United States in 2017 identified three different coyotes involved in a loose network: one was based in El Salvador and coordinated the journey, one traveled with the unlawful migrants until the U.S.-Mexico border, and a third took the clients across the land border and to Houston. Before 2017, the fees charged to unlawful migrants totaled $8,000 to Houston, but after the increased enforcement by U.S. authorities in 2017, the coyotes were now asking for $9,500–$10,000. Of this total:

- $2,000 covered expenses to get to Reynosa (including corruption of police checkpoints in Guatemala and Mexico, transport, housing, food)
- $300 covered the "cartel fee," or *piso*

---

[59] Caldwell, 2018.

[60] These data have appeared in an online article authored by *Daily Mail* and Associated Press Reporters (2014), citing "Migrants, Coyotes, Court Testimony." This same material has also appeared in several other press reports, with some dated at about the same time as the *Daily Mail* article and some as recently as 2016 and 2017.

[61] It seems unlikely that the fee to free a detainee would be less than the fee to pass by, as implied.

Haiti AR_001546

- $5,000 paid for the coyote in charge of U.S. border crossing and the travel to Houston (an additional $1,500 was charged if the unlawful migrants wanted to travel past Houston into the interior)
- $1,000 went to the coyote who traveled through Mexico with the unlawful migrants
- $1,700 was the profit earned by the individual who facilitated the overall journey.[62]

A 2018 news article broke down the costs incurred by smugglers involved with the last leg of the journey for those seeking to evade detection while crossing into California. A smuggler specializing in bringing unlawful migrants from Mexicali to Los Angeles claimed to make up to $2,500 per unlawful migrant of the $5,000 to $6,500 that he charged. Of this fee,

> The biggest share, $2,800 to $3,000, goes to the guy driving the migrants to Los Angeles, because he's taking the biggest risk if caught by the Border Patrol. Alexis pays another $100 to $300 per migrant to polleros who work as decoys, lookouts, pickups, or who operate safe houses in Calexico. Alexis says he also has to pay off the Mexican police. They get $200 per migrant.[63]

Lastly, one smuggler interviewed by the Mexican newspaper *El Universal* noted that smugglers in general were making millions of dollars, but in their view most of these profits were being generated from crossings into the United States from Mexico.[64]

The evidence, albeit sparse, suggests that the actors that coordinate the overall travel of unlawful migrants may be netting up to $2,000 per journey, while the actors that coordinate illegal entries between POEs may be netting up to $2,500 per crossing. Others along the line, including the stash house operators who charge a few dollars a day to accommodate migrants, the lookouts who help coyotes avoid law enforcement, and those who transport migrants at various points in the journey, might see substantially less. However, because of the extremely limited data on potential profits that we were able to identify, we did not believe it was possible to generate a credible estimate for profits, and, as addressed in Chapter 3, it is unclear whether these figures would hold up more generally—or in relation to DHS or EMIF Sur data on fees—and how much "economic" profit would remain after accounting for risk.

## Drug-Trafficking TCOs' Involvement in Human Smuggling

The most direct interaction between human smugglers and drug-trafficking organizations, many or most of which clearly manifest the attributes of TCOs, involves the payment of a one-time "tax," referred to at different parts of the border as a toll, mafia fee, or *piso,* that provides migrants with access to smuggling corridors on the U.S.-Mexico border under the control of drug traffickers. The open literature and interviews with SMEs suggest broad agreement about the

---

[62] Martinez, 2017.

[63] González and Solis, 2017.

[64] Castellano, 2014.

Haiti AR_001547

existence of this financial relationship;[65] however, they raise questions about the extent to which these markets and networks overlap more generally.

Human smugglers and drug traffickers conduct similar activities—providing illicit transportation services across international borders—and do so along common smuggling corridors, suggesting opportunities for overlapping business. Some sources suggest that drug-trafficking TCOs have greater financial incentive to participate in human-smuggling activities because smuggling fees have increased in recent years, but the data on trends in fees are mixed, as discussed in Chapter 3.[66] While the open literature is thin in this area, much of it suggests only minimal convergence between human smuggling and drug trafficking, beyond the collection of the *piso*, deconfliction of smuggling routes along the U.S.-Mexico border,[67] and, possibly, strategic use of human smuggling to draw attention from drug trafficking.[68] Several reports suggest that migrants, on occasion, carry drugs across the U.S.-Mexico border in exchange for reduced fees,[69] and other sources suggest that elements of certain drug-trafficking TCOs, particularly Los Zetas, have attempted to play a more direct role in human-smuggling activities.[70] However, our literature review and discussions with SMEs provided little evidence of a broader convergence of these networks and business operations.

### Paying the Tax, or Piso

Over the past decade, the landscape of Mexico's main drug-trafficking TCOs has been characterized by a trend toward fragmentation and splintering, with the emergence of new groups that compete or collaborate with traditional groups.[71] However, despite the fluid nature of these organizations, a handful maintain control of most of the primary trafficking corridors into the

---

[65] For example,

> The most commonly reported interaction between migrants and drug traffickers—and perhaps the only one pointing to the existence of a structured system of financial transactions connecting drug trafficking and migrant facilitators—involved the payment of piso, a one-time toll to access specific parts of the migrant trail under the control of a [drug-trafficking organization]. (Sanchez and Zhang, 2018, p. 141)

[66] Weden, 2016; Olson, 2016; Slack and Whiteford, 2013.

[67] For example, "'Drug traffickers dictate where and when illegal crossings occur,' he said. 'Human smugglers arrange crossings through their 'business relationship' with drug traffickers'" (Prendergast, 2017).

[68] Cabrera, 2015; Slack and Campbell, 2016. The latter write that "Migrants in Altar were consistently being sent in staggered groups of 10 or 20 each half hour with a group of burreros behind the last group as a way to distract the border patrol" (p. 13).

[69] See, for example, Prendergast, 2017; Burnett, 2011.

[70] See, for example, Gallagher's (2018) description of Los Zetas coordinating the movement of tractor-trailers with up to 100 migrants inside.

[71] Beittel, 2018.

Haiti AR_001548

United States.[72] Such control allows these groups to both regulate and tax illicit trade through these territories, whether the trade occurs between or at POEs.[73] The purpose of regulating these movements is partly to ensure that other smuggling activities do not disrupt a drug-trafficking TCO's main drug-trafficking business, for example, by attracting the attention of authorities to key smuggling corridors. As such, drug traffickers would coordinate with human smugglers to deconflict and strategically position their activities and tell them when and where to move migrants across the U.S. border.

Controlling prime smuggling territory also affords drug-trafficking TCOs an opportunity to charge a tax on unlawful migrants seeking to pass through on their way to the United States. These protection payments or security fees function as tolls or taxes and are known to migrants as mafia fees, or *pisos*, depending on the region of the border.[74] According to U.S. government sources, it is all but impossible for migrants to cross some sections of the border, particularly those most tightly controlled by the drug traffickers, without paying the tax.[75]

Collecting the *piso* requires fairly extensive regulation of migrants passing through a drug-trafficking organization's territory, pointing to coordination between human smugglers and drug traffickers before a migrant reaches the U.S.-Mexico border. Migrants are often given a *clave* (or code) that indicates that they "belong to" or have been traveling with a particular human-smuggling organization, and they must provide this *clave* to lookouts who are affiliated with the drug-trafficking TCOs when they enter a border town.[76] Migrants traveling on their own are approached by lookouts and signed up by a smuggling group that requires payment of the *piso*. This system of regulation by drug-trafficking TCOs also depends on retribution against migrants or smugglers who do not pay the *piso* or follow directions about when and where to smuggle. Reports suggest the drug trafficker will kidnap, torture, and sometimes kill migrants and smugglers who do not do as instructed.[77]

*Potential for Broader Convergence of Human Smuggling and Drug Trafficking*

Whereas we found evidence in the open literature and SME interviews that suggests financial transactions and coordination among human smugglers and drug traffickers, we found little to

---

[72] U.S. Department of Justice, Drug Enforcement Administration, 2017.

[73] See, for example, the transcript of a *60 Minutes* episode (Pelley, 2018) in which drug-trafficking TCOs are described as a "regulatory mechanism" on the border that "essentially set the rules, so to speak, for illegal activities in the region. It has led to this professionalization, this need to collaborate and coordinate with the drug cartels." See also Leutert, 2017.

[74] Kulish, 2018.

[75] Olson, 2016; Nixon and Heisler, 2018.

[76] Olson, 2016.

[77] Slack and Campbell, 2016, pp. 12–18.

Haiti AR_001549

suggest broader convergence.[78] In particular, evidence that drug-trafficking TCOs are directly involved in human-smuggling operations is lacking. Although some sources suggest that drug traffickers may sometimes force migrants to carry backpacks of drugs across the border, it is not clear how common this practice is.[79] Studies that include testimonials of migrants suggest they are often motivated by financial considerations,[80] and it appears that drug-trafficking TCOs commonly waive the *piso* for migrants that carry drug loads, and sometimes pay them.[81] In this scenario, migrants who do not have enough money to pay for the final leg of their journey sometimes agree to carry drugs in lieu of payment.

We also uncovered reports suggesting that some drug-trafficking TCOs, specifically Los Zetas, are attempting to profit from human smuggling beyond the collection of a tax near the U.S.-Mexico border and have even established affiliates in some of Mexico's southern states and Central American countries.[82] If true, these activities appear to be more focused on extorting migrants than transportation them. For example, Los Zetas affiliates reportedly collected fees from migrants boarding freight trains in southern Mexico.[83] In addition, some of these reports of drug-trafficking TCOs' activities are inconsistent with other studies, including ones involving testimonials from migrant smugglers who operate on the U.S.-Mexico border, suggesting that drug-trafficking groups tend not to become directly involved in transporting migrants.[84] These studies suggest that human smuggling and drug trafficking are separate businesses and indicate that human smugglers are deterred from engaging in drug trafficking because of the risks of retribution and because it could harm their primary business, which depends on referrals.[85] A perception that human smugglers are members of drug-trafficking organizations that are known to extort and kidnap migrants might hurt business.

These studies similarly highlight the disincentives for drug traffickers to become more involved in human smuggling, principally because of the comparatively smaller profit margins involved in smuggling people as opposed to drugs. As one study notes: "In economic terms,

---

[78] Sanchez and Zhang, 2018, pp. 135–151.

[79] Leutert, 2017.

[80] See, for example, Sanchez and Zhang, 2018, p. 143:

> In our study, respondents' testimonies indicated that the decision to carry drugs often was a personal, complex choice, rather than the result of coercion. Lacking financial resources to cover basic needs like room or board, or having run out of money after traveling vast distances and no longer able to afford smuggling fees, some migrants opted to assist drug traffickers in exchange for financial compensation or transportation within the United States.

[81] Sanchez and Zhang, 2018.

[82] International Crisis Group, 2016.

[83] Farah and Lum, 2013.

[84] Palacios, 2014.

[85] Palacios, 2014.

Haiti AR_001550

taking control of migrant smuggling networks (does) not make sense: why engage in the complex activities this business requires when criminals can make large revenues from (smugglers) without doing anything themselves?"[86]

## Conclusion

Our literature review and interviews with SMEs at DHS revealed that many different types of actors are involved in facilitating the movement of unlawful migrants from the NT of Central America to the United States. These smugglers reside on a spectrum that ranges from independent operators to more-formal networks. Only some of these networks appear to meet the statutory definition of a TCO, in that many do not appear to be "self-perpetuating," use violence and corruption systematically, or feature a truly transnational organizational structure. In line with this diversity of actors, smugglers also offer a wide array of services to unlawful migrants, spanning "pay-as-you-go" and "all-inclusive" arrangements. While the routes that unlawful migrants take are well established and primarily follow overland transportation networks, these migrants make use of various conveyances along the route depending on their needs and the fees they pay. Lastly, unlawful migrants generally are required to pay taxes, or *pisos*, to drug-trafficking TCOs along the U.S.-Mexico border for the right to pass through their territory, either directly or through human smugglers.

---

[86] Palacios, 2014.

Haiti AR_001551

# 3. Preliminary Findings on Revenue Estimation

Drawing from the principles of the general framework presented in Chapter 1, we set about estimating revenues from human smuggling, without regard to the type of smuggler. As discussed in Chapter 2, we found that we could not attribute smuggling revenues to particular types of smugglers, although we could evaluate the taxes, or *pisos*, that migrants pay drug-trafficking TCOs to traverse their territory. Unlike the revenue from smuggling fees, the entirety of the revenue from the tax goes to TCOs, specifically drug-trafficking TCOs, that control certain transit routes and border crossings.

Figure 3.1 depicts the flows of revenues associated with human smuggling to human smugglers of all types, including TCOs, and to drug-trafficking TCOs. The larger oval to the right represents the former, designated as "aggregate" smuggling revenue, and the smaller oval to the left represents the latter, designated as "tax" revenue. The intersection of the two ovals represents instances in which smuggling fees cover the tax.

**Figure 3.1. Revenues to and Types of Actors Engaged in Human Smuggling**



Haiti AR_001552

To estimate revenue to all types of human smugglers (i.e., aggregate smuggling revenue) along routes from the NT to the United States, we needed data on three variables: (1) the number of unlawful migrants along a route, (2) the percentage of those migrants who hire smugglers, and (3) the typical payments made, per migrant, to smugglers. Lacking data for specific routes from the NT to the United States, we defined three general routes, by country of origin, as "Guatemala–United States," "Honduras–United States," and "El Salvador–United States"; however, for our high-end estimate, we were also able to differentiate between payments en route to the U.S.-Mexico border as one "segment" of the journey and payments across that border as another segment.

Separately, we developed an ancillary, preliminary estimate for drug-trafficking TCOs' *piso* collections. If migrants hire a smuggler, they might pay the taxes through him or her, as a conduit; alternatively they might pay the taxes directly to the TCO, in which case the taxes would not be included in the smuggling fee. In either case, we could still attribute the payments directly to drug-trafficking TCOs.

For each variable, we present ranges of estimates, based on various assumptions about behavior and markets and data from DHS and other sources, as discussed below. We analyzed data from 2015–2017 or earlier, but, unless noted otherwise, we worked with the most recent available data (2017) for each step of the analysis.[87]

## Flows of Unlawful Migrants

We developed a range of estimates for unlawful migrant flows from DHS data on "apprehensions," "got-aways," and "turn-backs" between POEs at the southwest border and from estimates of apprehension rates, also between POEs.[88] By implication, the data omit activity at POEs, including arrivals of unaccompanied children and families that present themselves to border officials, without attempting evasion, which we address separately, below.

In this context, an *apprehension* is an unlawful migrant who U.S. Border Patrol agents apprehend at the U.S. border; a *got-away* is "a subject who, after making an illegal entry, is not turned back or apprehended"; and a *turn-back* is "a subject who, after making an illegal entry into the United States, returns to the country from which he or she entered, not resulting in an apprehension or got away."[89] Reported apprehensions, got-aways, and turn-backs are parts of the

---

[87] In some instances, such as those of unlawful migrant flows, we looked at data as far back as 2012, but given a spike in reported apprehensions and, hence, in apparent flows in 2014 (see Figure 3.2), we chose to work primarily with the data after that year.

[88] DHS provided us with the underlying data for apprehensions, got-aways, and turn-backs and the point estimates for the so-called "partial apprehension rate" that is depicted in DHS Office of Immigration Statistics, 2017, p. 8, Figure 3. (The estimates in that study extend only as far as 2016, so we applied the 2016 rate to the 2017 data.) We then used these data and the point estimates for the apprehension rate to construct its estimates on flows.

[89] DHS Office of Immigration Statistics, 2017, p. 5.

Haiti AR_001553

"known flows," either by direct observation or by inference, e.g., because of camera views, sensor activations, or other evidence. As discussed in Appendix C, researchers have developed methods to estimate the apprehension rate, which is the share of apprehensions in total attempted border crossings, and overcome the analytical obstacle of unobserved and uninferred got-aways (i.e., "unknown flows").[90] An estimate of migrant flows that makes use of this rate should be more complete than an estimate that makes use of the data on reported got-aways, but the methods for estimating apprehension rate are also imperfect.[91]

We undertook four sets of calculations of unlawful migrant flows (see Appendix C), using two basic methods—one with data on reported got-aways and one with estimates of the apprehension rate—and different combinations of the data on turn-backs, to account for uncertainty about the behavior of turn-backs.[92] First, at the low end, we calculated total flows from each NT country to the United States as the sum of just the apprehensions and got-aways from that country, assuming that all turn-backs will try to cross into the United States again and, eventually, will be apprehended or get away.[93] Second, we dropped that assumption and treated turn-backs as an additive category, with total flows consisting of the sum of apprehensions, got-aways, and turn-backs. Third, we divided apprehensions by the apprehension rate to account for unknown flows, without regard to turn-backs. Fourth, at the high end, we applied the same apprehension rate, but added turn-backs. Got-aways are not included in the final calculation because they are assumed to have been included in the operation involving the apprehension rate.

We found that the range progressed steadily from the low to the high end, but the difference in methods—the use of got-aways or the apprehension rate—accounted for substantially more of the bump-up than the inclusion of turn-backs in either approach.

On that basis, migrant flows from the NT in 2017 could have been as low as about 218,000 and as high as about 345,000, with Guatemala accounting for the largest share, just over 88,000, or about 40 percent, of either estimate (see Figure 3.2).[94] However, the low-end figure is almost certainly too low, because U.S. Border Patrol agents cannot observe or infer every got-away.[95]

---

[90] Estimation is necessary because of the "denominator problem" (see, e.g., DHS Office of Immigration Statistics, 2017, p. 3). To obtain an apprehension rate, one must divide the number of apprehensions by the total number of attempted border crossings, both failed and successful, which include got-aways that cannot be observed or inferred fully. See also Morral, Willis, and Brownell, 2011.

[91] For an overview of various limitations that might make the rate too high or too low, see DHS Office of Immigration Statistics, 2017, pp. 7–8.

[92] With some adaptation to account for uncertainty about the behavior of turn-backs and the limitations of each approach, we drew from concepts and methods presented in DHS Office of Immigration Statistics, 2017.

[93] Lacking country-specific data on turn-backs and got-aways, we assumed that a country's share of all turn-backs and got-aways at the border was the same as its share of all apprehensions at the border. U.S. Border Patrol agents observe turn-backs and got-aways without knowledge of their origin.

[94] These estimates do not include migrants who are apprehended in Mexico or elsewhere en route and do not, eventually, make their way to the U.S.-Mexico border as either an apprehension, turn-back, or got-away. Rodríguez

Haiti AR_001554



**Figure 3.2. Estimated Flows of Migrants from the Northern Triangle to the United States**

SOURCE: Author calculations, based on fiscal-year data provided by DHS.

Given modest rates of recidivism for Central Americans in the DHS data, e.g., less than 5 percent for migrants from each NT country in 2017,[96] we did not adjust the flow data for individuals who try to enter the United States repeatedly. However, failure to make an adjustment will result in an upward bias in the preliminary estimates of smuggling revenue, by "double counting" some fees, if migrants purchase a package of smuggling services that includes multiple journeys and need a second or third try (see Chapter 2).

We include a short discussion of the implications of omitting both activity at POEs, which might bias the revenue estimate downward, and adjustments for recidivism, which might bias it upward, after presenting the preliminary revenue estimate.

---

Chávez (2016, p. 9) provides a broader, preliminary estimate of flows of Central American migrants in 2015 that is higher than the DHS-derived, high-end estimate for that year: i.e., 377,000 as compared with 291,000.

[95] Recent research in this arena (e.g., Egan et al., 2018; DHS Office of Immigration Statistics, 2017) has focused on establishing interdiction effectiveness, apprehension rates, and, by extension, successful entries or got-aways. As a related matter, Hale et al. (2018) present estimates of smuggling capacity along routes from Guatemala to the United State that are roughly consistent with our medium-to-high-end estimates for Guatemala.

[96] We calculated recidivism rates as shares of unique NT migrants, based on fingerprint identification numbers, who try to enter the United States and are apprehended more than once in a given period, e.g., a year.

Haiti AR_001555

## Percentage of Unlawful Migrants Hiring Smugglers

For insight into the percentage of unlawful migrants who hire smugglers to help them get from the NT to the United States, we drew data from both DHS and EMIF Sur, a survey conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, which is located in Mexico.[97]

As discussed in other research, the DHS data on migrants' use of smugglers might fail to capture a substantial amount of smuggling activity.[98] One group of researchers noted in 2010 that the "primary concern is that the reported use of smugglers by apprehended migrants in the administrative record is much lower than the reported use of smugglers in migrant survey data," including the EMIF Sur data.[99] It is also lower than one might expect from anecdotal evidence (see Chapter 2) and from our conversations with SMEs. By our calculation, about 32, 22, and 14 percent of the NT migrants in the DHS data reported use of smugglers in 2015, 2016, and 2017, respectively, whereas a 2018 publication from the EMIF Sur data suggests upward of 60 to 65 percent over that period,[100] consistently, and SMEs tend to agree that many or most NT migrants hire a smuggler at some point.[101]

A 2017 publication from the EMIF Sur data offers country-specific figures and suggests slightly lower use rates, ranging from 46.6 percent for migrants from Honduras in 2015 to 66.2 percent for migrants from Guatemala in 2016.[102] For 2017, that source reports 63.4, 61.1, and 57.5 percent for migrants from Guatemala, Honduras, and El Salvador, respectively.

On the basis of those sources, about 25 to 67 percent of NT migrants might have hired smugglers in recent years, with some variation by country of origin. Given difficulty reconciling the country-specific and regional data within and across sources, we chose to work with that broad range, regardless of the route or year under consideration.[103]

---

[97] The EMIF website sets out objectives of the survey at the southern border, e.g., to "increase understanding of the flows of migrants who cross between Mexico and Guatemala in order to work in Mexico or the United States, along with the undocumented migrants that cross Mexican territory and are returned to Guatemala, Honduras and El Salvador by Mexican and U.S. immigration officials" (EMIF, undated-b). For this report, we focused on undocumented migrants from the three NT countries who are returned by U.S. immigration officials, not those returned by Mexican officials. For information about the survey methodology, see EMIF, undated-c.

[98] Roberts et al., 2010; Sanchez, 2016.

[99] Roberts et al., 2010, p. 2.

[100] EMIF Sur, 2018b, p. 3, Chart 8.

[101] Similarly, Hale et al. (2018) asked 270 Central American migrants, "Did someone help or facilitate you make your journey?" and 69 percent of respondents said "yes."

[102] EMIF Sur, 2018a, p. 5, Chart 9b.

[103] Given more time, we would have appealed to the underlying EMIF Sur data, which are available online, to reconcile the country-specific and regional figures and refine the estimate. As for a trend, the DHS data show a pronounced decline in migrants' use of smugglers over the past three years, but the EMIF Sur data do not.

Haiti AR_001556

Separate from those estimates, we postulated, based on conversations with SMEs and information found in the literature, that about half or more migrants, say 50 to 75 percent, pay some form of tax, or *piso*, to drug-trafficking TCOs that they "encounter" on their journeys, regardless of whether they are working with a smuggler or traveling on their own. SMEs indicated that nearly all migrants pay the tax along some routes. Consistent with the proposed range, a taxation rate of about 60 percent of migrants appears in a recent study of organized crime and Central American migration in Mexico.[104]

## Human-Smuggling Fees and Payments

For this calculation, we also drew from DHS and EMIF Sur data and turned to other sources, including our interviews with SMEs.

To start, we used the DHS data to calculate mean and median smuggling fees as reported to U.S. Border Patrol agents by unlawful migrants who are apprehended at the U.S.-Mexico border, between POEs. It is our understanding that the reported fees should cover those migrants' payments to smugglers along the entire route, from the NT into the United States, including fees for travel within the United States, but that the figures might not include all payments. For example, they might only encompass fees for part of the journey, e.g., to the U.S. border, or *pisos* paid to drug-trafficking TCOs.

In data plots, we observed a large number of low-end fees, which might validate concerns about fragmentation or simply reflect the migrants' preferences for inexpensive, pay-as-you-go services (see Chapter 2). We also found extreme high-end outliers, possibly indicating confusion over currency or data entry errors.

In 2017, the averages of the reported smuggling fees in the DHS data were about $4,700 per person for Guatemalan migrants, $3,800 per person for Honduran migrants, $4,600 per person for Salvadorian migrants, and about $4,400 per person for NT migrants overall.[105] (See Appendix D, Table D.1, for more information about the properties of the DHS data.) The median figures for the same year were similar but predictably lower, given the density of low-end observations, the presence of high-end outliers, and considerable other "noise" in the data, with $4,000 for Guatemalan migrants, $3,000 for Honduran migrants, $4,000 for Salvadorian migrants, and $4,000 for NT migrants overall. These mean and median figures were less than expected, given recent press reports (discussed in Chapter 2) and conversations with some SMEs that suggested fees ranging from $6,000 to $10,000 or more but, as noted above, could also reflect migrants' preferences for particular or fewer services.

---

[104] Leutert, 2018.

[105] We also calculated an adjusted mean for each country, by removing observations greater or less than two standard deviations from the unadjusted mean, but this approach had no effect at the low end because there were no observations below the two-standard-deviation threshold.

Haiti AR_001557

For comparative purposes, we also looked at the EMIF Sur data on migrants' actual and agreed payments to smugglers. EMIF Sur asks Guatemalan, Honduran, and Salvadorian migrants who have been returned to their respective countries of origin by U.S. immigration officials how much they paid or agreed to pay to travel (1) from their home country, through Mexico, and to the U.S.-Mexico border and (2) from the U.S.-Mexico border into the United States.[106] The results from the EMIF Sur data, which might include some unrealized payments and more transit in the United States, were higher than the results from the DHS data and better aligned with expectations. The averages and medians for 2017 were similar, with averages of about $10,700, $10,600, and $8,000 for migrants from Guatemala, Honduras, and El Salvador, respectively, and with medians of about $10,300, $11,500, and $8,000 for migrants from Guatemala, Honduras, and El Salvador, respectively (see Appendix D, Table D.2).[107]

Figures 3.3a–3.3c compare mean and median smuggling fees across sources, by country of origin for 2015–2017. Whereas the EMIF Sur data indicate a possible upward trend in smuggling fees over the past three years, the DHS data do not.

**Figure 3.3a. Guatemala: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

---

[106] EMIF Sur also asks similar questions of migrants who have been returned by Mexican immigration officials, but we did not work with those data.

[107] These figures are the sums of the means or medians, respectively, for each country for each segment, first, from the country of origin to the U.S. border and, second, across the U.S. border.

Haiti AR_001558

**Figure 3.3b. Honduras: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

**Figure 3.3c. El Salvador: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

33

Haiti AR_001559

Taking the properties of the DHS and EMIF Sur data into account, we chose to work with the median values for the fees for each route in 2017 to create ranges. Route by route, the median value from the DHS data represents the low end, and the median value from the EMIF Sur data represents the high end (see Figure 3.4); for example, for the Honduras–United States route, the median values span $3,000 (from the DHS data) and $11,500 (from the EMIF Sur data).

**Figure 3.4. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

In addition, we found estimates of taxes, or *pisos*, paid to drug-trafficking TCOs' of about $300 per person on the low end[108] and about $500–$700 per person on the high end[109] in various press reports and in discussion with SMEs. For computational purposes, we used a range of $300 to $700 for migrants from all countries and without regard to year.

---

[108] See for example, a human smuggler's description of the $300 *cuota de cartel*, or cartel tax, that he has to pay in Martinez, 2017.
[109] These data have appeared in *Daily Mail* and Associated Press Reporters (2014) and elsewhere. One SME suggested a higher figure, i.e., about $1,100 for one transit zone, but this looked like an outlier.

Haiti AR_001560

## Ranges of Estimates of Smuggling Revenues and *Piso* Collections

Working with ranges for each variable, we constructed a set of preliminary low- and high-end estimates of revenues to all types of smugglers in 2017, by route (Guatemala–United States, Honduras–United States, and El Salvador–United States) and for the NT overall. We did not attempt to parse those revenues by human-smuggling TCO, ad hoc group, independent operator, or other type of smuggler. We also developed an ancillary set of preliminary estimates for drug-trafficking TCOs' *piso* collections that might or might not add to the estimates of smuggling revenue.

### Smuggling Revenues

For each general route from the NT to the United States, we constructed a preliminary estimate—or range of estimates—for smugglers' revenue from the low-end and high-end figures for (1) unlawful migrant flows, (2) the percentage of those migrants who use smugglers, and (3) the migrants' payments to smugglers. First, we multiplied the low-end figures for each route, and then we multiplied the high-end figures for each route, producing a corresponding low- and high-end estimate for each route. To illustrate a low-end calculation, using the 2017 data, for Guatemala, we multiplied the low-end flow estimate of just over 88,000 by the low-end use estimate of about 25 percent and then multiplied the product by the low-end fee estimate of about $4,000. The calculation resulted in a low-end, preliminary revenue estimate of $88 million dollars for the Guatemala–United States route in 2017.

To develop the corresponding high-end estimates, by route, we repeated the process, using the high-end estimates for each of the three variables on migrant flows, migrants' use of smugglers, and smuggling fees. At the high end, we also differentiated between payments en route to the U.S.-Mexico border, as one "segment" of the journey, and payments across the border, as another segment. We were able to draw this distinction because the EMIF Sur data on fees, which uniformly constitute the high end of the range, draw this distinction.

On that basis, smugglers' revenues from smuggling migrants from the three NT countries combined (as would correspond to the larger oval to the right in Figure 3.1) could have ranged from about $200 million to $2.3 billion, reflecting the considerable uncertainty of the underlying estimates of migrant flows, migrants' use of smugglers, and smuggling fees (see Table 3.1). At the high end, somewhat more revenue might accrue en route to the U.S.-Mexico border than across that border, and some of the revenue that accrues "across" might pertain to expenditures for domestic U.S. travel.

Haiti AR_001561

**Table 3.1. Preliminary Estimates of Smuggling Revenues, by Country of Origin for 2017 (in millions of U.S. dollars)**

| Country of Origin | Total into United States | | To U.S.-Mexico Border | Across U.S.-Mexico Border |
| --- | --- | --- | --- | --- |
| | Low End | High End | High End | High End |
| Guatemala | 88 | 957 | 574 | 383 |
| Honduras | 48 | 768 | 434 | 334 |
| El Salvador | 67 | 563 | 281 | 281 |
| **Total Northern Triangle** | **203** | **2,288** | **1,290** | **998** |

SOURCE: Author estimates based on analysis of DHS, EMIF Sur, and other data.

We have no basis for attributing the preliminary "aggregate" estimate of smuggling revenue to any particular type of smuggler, be it TCO or not, but the preponderance of the evidence (see Chapter 2) suggests that much of the revenue from smuggling would not accrue to organizations that one might identify as TCOs, based on official definitions.

At the outset and at each stage of the calculations, we encountered analytical challenges that might suggest, in some instances, that the low end of the preliminary revenue estimate is too low, and, in other instances, that the high end is too high. For example, at the low end, the data are missing observations on got-aways, and, at the high end, the data might include some agreed payments that never materialize.[110] But, some analytical challenges could have affected both ends of the range. In particular, we worked with data on apprehensions between POEs, which meant excluding potentially relevant activity at POEs and undercounting migrant flows, and we did not make any adjustments for recidivism, which introduced the possibility of double counting fees and overstating revenue.

To better understand the implications of omitting POE activity and recidivism adjustments, we undertook two sets of side calculations to account, first, for the missing activity and, second, for possible double counting. In the first instance, if one were to assume that unaccompanied children and families that present themselves to authorities at POEs use smuggling services to travel to the U.S.-Mexico border in the same ways as other unlawful migrants, then, with that activity, the preliminary revenue estimate for all three routes, combined, could have been about 5.5 percent higher at the low end of the range and 3.3 percent higher at the high end.[111] In the second instance, if one were to reduce the preliminary estimates for each country of origin by the

---

[110] Recalling that the fee data from EMIF Sur include not just actual payments, but also agreed payments, the high end of the range might overstate actual revenues, whether before or after crossing the border.

[111] At the high end, we multiplied the number of unaccompanied children and family members who presented themselves at POEs in 2017, by country of origin, by the high-end percentage of use and the EMIF Sur figures for smuggling fees, limited to transit as far as the U.S.-Mexico border, which amounted to 50–60 percent of the total, by country. At the low end, we multiplied the same flows by the low-end percentage and apportioned the DHS figures for fees, using the 50–60 percent shares found in the EMIF Sur data.

Haiti AR_001562

applicable recidivism rate, the estimate for the three routes, combined, would have been about 3.4 percent lower at both ends of the range.[112]

### Drug-Trafficking TCOs' Piso Collections

Unlike the preliminary estimate of revenues from smuggling, the preliminary tax, or *piso*, estimate tracks directly to TCOs, specifically drug-trafficking TCOs. As previously, we arrived at a total value by multiplying migrant flows, by percentages, by payments, but, in this case, the percentages indicate "encounters" with the drug-trafficking TCOs rather than "use" of smugglers and the payments refer to taxes rather than fees. Whereas the migrant flow numbers were the same as for the foregoing revenue estimate, the relevant low- and high-end percentages for these calculations were 50 percent and 75 percent, the relevant payment figures were $300 and $700, and neither the percentages nor payments differed by route.[113]

On that basis, the total amount of *pisos* that unlawful migrants from the NT might have paid to drug-trafficking TCOs in 2017—for traveling the three routes, combined (as would correspond to the smaller oval to the left in Figure 3.1)—could have ranged from about $30 million to $180 million (see Table 3.2). Whether these sums would constitute a share of the foregoing revenue figures or an additional payment would depend, in part, on the smuggling arrangement and whether it was "all-inclusive." If the arrangement were all-inclusive, the tax might be folded into the smuggling fee (as depicted in the intersection of the two ovals in Figure 3.1), but it would, nevertheless, pass through to the drug-trafficking TCO that demanded payment for the migrant's passage.

**Table 3.2. Preliminary Estimates of Drug-Trafficking TCOs' Tax, or *Piso*, Collections, by Country of Origin for 2017 (in millions of U.S. dollars)**

| Country of Origin | Low End | High End |
|---|---|---|
| Guatemala | 13 | 73 |
| Honduras | 10 | 53 |
| El Salvador | 10 | 55 |
| **Total Northern Triangle** | **33** | **181** |

SOURCE: Author estimates based on analysis of DHS and other data.

---

[112] At the low and high end, we simply applied the recidivism rates, by country of origin, ranging from 2.5 to 4.5 percent, to the preliminary estimates of smuggling revenue, by country of origin.

[113] We recognized that TCOs have more or less control along certain routes and at certain border crossings, but we lacked the data to include that level of refinement in its tax estimates.

Haiti AR_001563

## Profitability, Risk, and Other Economic Considerations

Our quantitative analysis has so far focused strictly on revenues, but profitability might be more relevant as a measure of human smuggling's contributions to the financial health and viability of TCOs and other smuggling operations. Unfortunately, the data on smugglers' costs, which would be necessary to calculate profit, are even scarcer than the data on revenue; we are unaware of any systematic collection of data on costs (see Chapter 2).[114]

We found scattered anecdotal evidence suggesting that smugglers' costs are nontrivial but that they could leave room for profit (see Chapter 2). For example, the press has reported transit costs that might sum to around $2,000 or more, depending on incidentals.[115] With costs at that level or even higher, smuggling could be "profitable," at least as an accounting matter, but perhaps not as an economic matter. Some of the difference between revenues and costs might constitute a "risk premium," or compensation for the risks that actors take on when they engage in human smuggling, such as those of a driver who transports unlawful migrants from the U.S.-Mexico border to Los Angeles. Given low barriers to entry in this market—that is, nearly anyone willing to bear the risks of smuggling can offer smuggling services—it is possible that competition among smugglers for migrants' business might drive economic profits to zero or near to zero, after compensating for the risk.

Other researchers admit the difficulty of profit estimation but also call profitability of almost any type into question.[116] One researcher asserts, "it is virtually impossible to estimate the size of the smuggling market. It is even harder to determine its profits, given its underground, unregulated nature."[117] But this researcher also suggests that profits tend to be modest and are absorbed locally. In a prior article, the same researcher finds that "individual facilitators earnings vary considerably," after accounting for all costs, and that "smuggling constitutes in the majority of cases only a supplemental income-generating strategy."[118]

The taxes, or *pisos*, that migrants pay to drug-trafficking TCOs present fewer analytical challenges insomuch as they might amount to pure or nearly pure profit. The TCOs that control particular transit routes and border crossings collect the tax, but they provide few reciprocal services (see Chapter 2). Even if a drug-trafficking TCO describes the payment as "protection" or "security," the protection is largely from the TCO itself. As for risk premium, it is possible that drug-trafficking TCOs incur some risk when they allow migrants to pass through their territory, but these TCOs might use the migrants' passage strategically to divert attention from or

---

[114] For additional comments on the paucity of data on smugglers' costs, see also United Nations Office on Drugs and Crime, 2011, p. 85.

[115] These figures appeared in *Daily Mail* and Associated Press Reporters (2014) and elsewhere.

[116] Sanchez, 2017, 2018.

[117] Sanchez, 2018, p. 2.

[118] Sanchez, 2017, p. 17.

Haiti AR_001564

conceal other illegal activities, such as drug smuggling, and to mitigate their risks.[119] In addition, drug-trafficking TCOs might also employ migrants as unremunerated "mules," or drug couriers, if the migrants cannot afford the *piso*.

---

[119] See, for example, Cabrera, 2015.

Haiti AR_001565

# 4. Concluding Remarks

In this scoping study, we set out to characterize TCOs that smuggle unlawful migrants from the NT of Central America (Guatemala, Honduras, and El Salvador) to the United States and to develop a preliminary estimate of the TCOs' smuggling revenues.

However, as the research progressed, it became clear that many different types of actors engage in human smuggling along those routes, only some of which appear to meet official definitions (in legislation and formal policy guidance) of a TCO. The literature presented strong evidence, confirmed by SMEs, that smugglers operating along the routes from the NT to the United States reside along a spectrum that ranges widely from independent operators, to ad hoc groups, to loose networks, to more-formal networks. Importantly, we could not identify the percentage of unlawful migrants that use each type of smuggler, and thus we could not distinguish the revenues that flow to human-smuggling TCOs from the revenues that flow to other actors engaged in human smuggling. However, we could separately identify the taxes, or *pisos*, that migrants pay to drug-trafficking TCOs to transit through their territory.

With those limitations in mind, we undertook a broader assessment of human smuggling, smugglers, and aggregate smuggling revenues. We developed preliminary estimates—ranges of estimates—of revenue from smuggling unlawful migrants along three routes, from Guatemala, Honduras, and El Salvador to the United States, without regard to the type of smuggler, be it a TCO, independent operator, or other type. We based the estimates on three variables: the flow of unlawful migrants from each country to the United States, the percentage of those migrants that use smugglers along the way, and the fees that the migrants pay to smugglers, each of which entailed estimation of its own.

On that basis, we developed a preliminary estimate of aggregate smuggling revenue—for the three routes, combined, in 2017—that ranged from about $200 million to $2.3 billion. This estimate is, as the range implies, highly uncertain, owing largely to a scarcity of reliable data for each variable. Likewise, we produced an ancillary and still preliminary estimate of drug-trafficking TCOs' *piso* collections that also spanned an order of magnitude, from about $30 million to $180 million.

The rest of this chapter focuses on implications of these findings for DHS for targeting human smuggling, informing resource allocation decisions, and improving data collection.

## Targeting Human Smuggling

A key finding of this report is that human smuggling involves many different types of smugglers, or "actors," with organizations that are often informal and based on relationships

Haiti AR_001566

instead of well-established hierarchies. Absent formality and strict hierarchical structures, it might be difficult for DHS to effectively target them with legal sanctions, for several reasons:

- Loose networks are difficult to disrupt, ad hoc groups are even less susceptible, and independent operators are easily replaceable. As described in Chapter 2, key actors associated with loose networks and involved in smuggling people north may not know each other well or at all, ad hoc groups are even less cohesive and more amenable to reconfiguration, and the independent operators that form part of both kinds of networks have immediate substitutes. This means that even if DHS can apply sanctions to some individuals in a given network or group or to individuals who operate independently, its ability to disrupt their organizations or affect the market may be limited.

- Low barriers to entry can further impede disruption. While individuals might face some personal risk when they engage in smuggling, they appear to engage fluidly—part-time or as opportunities present themselves—at least at low levels (e.g., taxi drivers and hotel or stash house operators) and possibly as facilitators. To build on the above example, this means that even if DHS can apply sanctions to such actors, the actors can generally be replaced easily, and others can fill their roles.

- Going after facilitators might be more fruitful, but doing so effectively might be challenging. To the extent that human-smuggling networks are hierarchical, their leaders are based in foreign countries (i.e., facilitators based in Mexico and the NT for the flows this report has addressed). This means that DHS must be able to work with partner agencies in those countries to apply sanctions to the leaders of these networks, which can be challenging. DHS can and does target individuals involved in human smuggling that are based in the United States, but, as discussed in Chapter 2, these actors are generally not prominent figures in human-smuggling networks, but rather subcontractors.

One area where DHS may be able to affect networks, groups, or the market involves money transfers that take place once individuals arrive in the United States. As noted in Chapter 2, many migrants only make their final payment to smugglers after they arrive in the United States. DHS might consider expanding existing efforts to investigate these kinds of payments, including working more closely with formal and informal banking services, to identify suspicious payments. DHS could also consider expanding current efforts to work with foreign law enforcement partners. As noted above, to the extent that human-smuggling networks are hierarchical, their leadership is almost always foreign-based. This means that DHS must work with foreign partners to effectively sanction the individuals involved.

## Allocating Resources

Comparing the preliminary estimate of revenues from human smuggling to information about other types of illicit—and even licit—activities could help inform DHS's resource allocation decisions. For example, DHS might consider how much it should prioritize efforts to disrupt human-smuggling operations in light of other concerns about TCOs.

To approach that question, we searched for analogous estimates of TCOs' revenues from transporting illicit drugs through Mexico and across the U.S.-Mexico border and compared them

Haiti AR_001567

to our preliminary estimate of revenues from human smuggling. Although we were not able to find recent estimates of drug-trafficking revenues, estimates developed in a 2010 RAND report for marijuana, cocaine, heroin, and methamphetamine trafficking in that era provided a basis for a rough comparison.[120] According to that report, drug-trafficking organizations' revenues from transporting marijuana through Mexico and across the U.S.-Mexico border, without netting the cost of acquiring the drug, could have amounted to $1.1 billion to $2.0 billion, and the analogous figures for cocaine, heroin, and methamphetamine could have amounted to $3.4, $1.1, and, $0.6 billion, respectively, suggesting a total of up to $7.1 billion.[121]

On that basis, our high-end, preliminary estimate of revenue from human smuggling of $2.3 billion was the same order of magnitude as RAND's earlier estimate of revenue from drug trafficking. However, as noted above, we cannot say how much of the revenue from human smuggling flows to TCOs that engage in human smuggling, as compared with other types of smugglers. Moreover, the RAND estimates for drug-trafficking revenues only included revenues from moving drugs through Mexico and across the U.S.-Mexico border and did not include revenue that drug-trafficking TCOs garner from distribution, wholesale, or retail activities that occur in the United States.

To shed additional light on the dimensions of human smuggling, we also compared revenues from human smuggling to spending on related forms of licit-market activities. Albeit another imperfect analogy, final household consumption expenditures on air, rail, truck and other transportation services in Mexico totaled almost $46 billion in 2015, making revenues from human smuggling look relatively small by comparison—about 5 percent or less—and suggesting little possibility of a noteworthy economywide effect.[122]

## Improving Data Collection

Within the scope of this project, DHS asked the Homeland Security Operational Analysis Center to identify ways to improve its ability to develop estimates of revenues from human smuggling. To that end, some of the data deficiencies uncovered in this report might be insurmountable, given the illicit nature of human smuggling, but some might not be. We have identified potential improvements in data collection and methods that DHS could consider to refine the revenue estimate, reduce the breadth of the range, and better inform policymaking. Not everything can be knowable about smugglers and revenues, let alone profits, along the routes

---

[120] Kilmer et al., 2010.

[121] Kilmer et al. (2010) acknowledge that their estimates are 'substantially less than others,' but they approached revenue estimation with a well-documented and transparent methodology.

[122] Organisation for Economic Co-operation and Development (OECD) data in then-year Mexican pesos, converted using midyear exchange rates.

Haiti AR_001568

from the NT to the United States, but certainly more is knowable than is known already. For example:

- **DHS could standardize its line of questioning during migrant interviews across apprehension sites.** This would allow DHS to collect more consistent information about the interactions between unlawful migrants and human smugglers—including the types of smugglers they encounter and the fees they pay to smugglers.
- **DHS could seek details from migrants that would increase its ability to assess revenues, by route, and distinguish different types of smugglers and payments.** For example, DHS could ask not just "Did you use a smuggler?" and "What did you pay the smuggler?" but also "How many different smugglers did you encounter?" "Were the smugglers operating alone or with others?" "How did you come in contact with the smuggler(s)?" "Did you pay the smuggler(s) up front?" "How many payments did you make?" "What services did you receive for each of these payments?" etc. DHS might also include questions concerning the details of the route, modes of transportation, and preferences for hiring smugglers at different points along the route, such as border crossings. DHS might also seek to distinguish between fees for transit through Mexico and for transit across the U.S.-Mexico border and between those smuggling fees and drug-trafficking TCOs' taxes.
- **DHS could create a shared portal for data entry that screens for errors, if it has not done so already, and use a randomized survey process.** These actions could reduce the administrative burden of data collection on frontline personnel and increase the likelihood of successful data entry. A shared portal that provides a common interface for data entry for all U.S. Border Patrol agents and feeds into a consolidated database could be programmed to recognize inconsistencies, outliers, and other errors. Moreover, if officials interview just a random sample of unlawful migrants, they might have more time to process migrants and attend to other needs, even with additional questions.

We recognize that DHS would need to invest in developing appropriate survey instruments, training personnel to administer them consistently, and developing supporting infrastructure to implement such suggestions.

Even with the imperfect data at hand, a longer-term research project might be able to reduce some of the uncertainty of the preliminary revenue estimate, which could result in better evidence for resource allocation decisions. For example, a research team could build on the calculations in this report by taking more time to explore the sensitivity of the calculations to underlying assumptions about smugglers' and migrants' behavior, how markets operate, trends in pricing, etc. It could also explore additional ways to filter and eliminate "noise" in the data that could result from data entry problems, confusion over payments to smugglers versus other actors, and confusion over the currency that migrants use to pay smugglers.

These are just a few technical suggestions, but with greater awareness of the diversity of actors that engage in human smuggling, DHS might be able to reorient its data collection to reflect that diversity and analyze its implications for homeland security.

43

# Appendix A. Guidance for Literature Review

We developed guidance for reviewing the literature (academic articles, press reports, and reports written by government agencies, nongovernmental organizations, and multilateral entities), consisting of instructions, search terms, parameters, and examples of relevant "hits." The guidance included a detailed outline of themes of interest and key terms pertaining to human smuggling from the NT to the United States, drawn from our discussion points for the SME interviews (discussed in Appendix B).

To start, we shared this guidance with library staff, who made a preliminary sweep through the literature in the final days of September 2018 and the first few days of October 2018. The staff used the guidance to create various threads, including, "(smuggler* OR trafficker* OR "human smuggling organization" OR "alien smuggling organization" OR "migrant smuggling organization" OR "human trafficking organization" OR "drug trafficking organization*" OR "transnational smuggling" OR coyote*) AND ("central america*" OR salvador* OR guatemala* OR hondura*) AND (cost OR costs OR piso* OR revenue* OR fee OR fees OR profit*)," and tried other combinations of terms and phrases, including "governance."

The searches covered several bibliographic databases, including Academic Search Complete, Business Search Complete, Social Science Abstracts, Criminal Justice Abstracts, Sociological Abstracts, PAIS Index, Index to Legal Periodicals, eBook Business Book Collection, EBSCO eBook Collection, ERIC, GREENFIle, MEDLINE, EconLit, US Major Dailies, Regional Business News, PsychInfo, Education Abstracts, MAS Ultra, CINAL Plus, Health Source, Military and Government Collection, and Open Source.

Upon completion of the initial sweep, we began scanning the results for relevant material, also working with the guidance.

Haiti AR_001570

# Appendix B. Discussion Points and Questions for Subject-Matter Experts

We developed a set of discussion points and questions, formed as an outline, to guide interviews with SMEs, and slides, including a synopsis of these points and questions, as read-ahead materials for the SMEs.

The discussion points and questions are reprinted below.[123]

## Human Smuggling, Transnational Criminal Organizations, and Revenues Along Routes from Northern Triangle Countries to the United States

### The Nature of Transnational Criminal Organizations (TCOs) that Engage in Human Smuggling from the Northern Triangle (NT) and Across the U.S.-Mexican Border

- Where are the TCOs located?
- Do they have operatives or a presence in the United States?
- How are they structured and how big are they?

  - How centralized is decisionmaking?
  - How many employees or affiliates do they have?
  - Do they subcontract for services?

- How do they advertise their services or recruit/connect with migrants?
- To what extent—and how—do they interact with other TCOs, e.g., collaboratively, competitively, or violently?
- To what extent—and how—do they interact with law enforcement?
- Do TCOs that engage in human smuggling also engage in other criminal activities?

### Extent and Form of NT Migrants' Engagement with TCOs and Other Smugglers

- What percentage of NT migrants seeks services of TCOs?
- What percentage seeks services of individual operators along the route or travel independently without such services?
- To what extent do NT migrants seek services of TCOs/others for an entire route, as compared to separate segments of a route or border crossings?
- If migrants tend to seek services for particular routes, segments, or crossing, which ones?
- How do NT migrants obtain information about TCOs and other smugglers?

---

[123] The discussion points and questions have been edited only slightly, largely for purposes of formatting.

Haiti AR_001571

*Fees Charged to NT Migrants and Operating Costs*

- What is the average fee a migrant from the NT pays to TCOs?

  - What is the fee for an entire route?
  - What are the fees for particular segments?
  - What is the fee just to cross into the United States?

- How do TCOs receive payment and collect fees?

  - Lump sum or installment?
  - Before departure, along the way, or upon arrival/release in the United States?

- What is included in this fee?

  - How many attempts—or trips—do they get?
  - What kind of transportation do they receive?
  - Does the fee include transportation inside the United States?
  - How do TCOs enforce payments of fees that are to be collected upon arrival/release?

- What costs do TCOs incur en route, e.g., basic transportation, food and shelter, weapons, or bribes and do migrants' fees cover them?
- How much do TCOs profit from smuggling?

*TCO Tactics Along Routes from the Northern Triangle to the United States*

- What routes do TCOs that engage in human smuggling typically use?
- How do those TCOs decide what route to take?
- Do they use buses, cars, trains, boats?
- How closely do they coordinate or interact with other TCOs,
  including those that engage in drug and/or weapon trafficking, along the routes?
- How do they choose when and where to cross the border into the United States?
- How closely do different TCOs coordinate border crossings with each other?
- Do they pay off or avoid law enforcement and, if so, how?
- Do TCOs that engage in human smuggling typically engage concurrently in other forms of smuggling, e.g., drugs or weapons, or criminal activities?
- To what extent do TCOs or other smugglers invoke violence, e.g., directed at immigrants or other smugglers, and under what circumstances?

*Data Sources, Prior Studies, and Methodologies*

- Are estimates of migrant flows, routes, fees, revenues, costs, etc., available in official reports (e.g., DHS), academic studies, or other documents or databases?
- Are you aware of any official reports (e.g., DHS), academic studies, or other documents that discuss any of these issues, including the fees paid by migrants and the tactics and costs borne by TCOs that engage in human smuggling?
- Are you aware of any promising methodological developments in this arena?

Haiti AR_001572

# Appendix C. Guidance for Data Analysis

Working primarily with data from DHS,[124] and treating migrant flows from each country as "routes," we undertook aggregate revenue calculations based on the numbers of individuals traveling each route, the percentage of migrants who hire smugglers along the route, and the amount that those migrants pay smugglers to help them along the route. Simply put, revenues would equal the product of the number of migrants along each route, the percentages of those migrants who hire smugglers, and the payments, per migrant, to smugglers.

We referred to this as an "aggregate" calculation because the data do not distinguish smugglers by type, e.g., TCO, ad hoc group, or independent operator.

We developed a data analysis outline, or guidance, and embarked on estimating the flows of migrants from each of the NT countries and from the NT overall, their use of smugglers, and their payments to smugglers. In addition, we considered the extent of recidivism among unlawful migrants from each of the NT countries. The data analysis outline is reprinted below.

## Data Analysis Outline[125]

Time frame is 2012–2017, by fiscal year, if corresponding to other U.S. Customs and Border Protection/DHS data regarding apprehensions, turn-backs, got-ways, smuggling costs, etc. In each case calculate for individuals traveling from each of Guatemala, Honduras, and El Salvador and the three countries combined, which is the region known as the "Northern Triangle" (NT).

1. Flows of migrants for each year, calculated as

   a. Apprehensions$_i$ (APP$_i$) + Observed Got-Aways$_i$ (GA$_i$)

   b. APP$_i$ + Observed Turn-Backs$_i$ (TB$_i$) + GA$_i$

   c. APP$_i$/r$_{app}$

   d. APP$_i$/r$_{app}$ + TB$_i$

   **Where:**

   i = Country (Guatemala, Honduras, or El Salvador) or region (NT).

   GA$_i$ = APP$_i$/APP$_{SWB}$ * GA$_{SWB}$

   TB$_i$ = APP$_i$/APP$_{SWB}$ * TBS$_{SWB}$

   SWB = Southwest border, between POEs

   r$_{app}$ = estimated "partial apprehension rate" [DHS Office of Immigration Statistics, 2017, p. 8].[126]

---

[124] We also worked with EMIF Sur data on use of smugglers and smuggling fees.

[125] This outline, developed by the project team to guide the estimation process, has been edited only slightly, largely for purposes of formatting and for consistency with the use of vocabulary in the rest of the report.

Haiti AR_001573

**Assumptions:**

- Recidivism is relatively minor for the NT, pending rate results, below.
- Most NT migrants travel through SWB.
- NT country's and the NT region's share of observed turn-backs and got-aways is approximately the same as its share of recorded apprehensions.
- NT country's and the NT region's apprehension rate is about the same as the overall apprehension rate, $r_{app}$.[127]
- For calculations without turn-backs, someone who turns back will try again and eventually will be apprehended or get away.

2. Recidivism rates[128]

   a. Over the period 2012–2017
   b. For 2012, 2013, 2014, etc., individually
   c. For 2- or 3-year moving averages, as appropriate, pending calculations of days between contacts with border enforcement and numbers of contacts[129]
   d. For appropriate moving averages, either 2- or 3-year, create a table of 'number of tries' and 'number of individuals.'

3. Percentage of migrants that report use of smugglers.
4. Average smuggling fees, adjusted for outliers, e.g., by removing "tails."[130]
5. Median smuggling fees, without adjusting for outliers, etc.

## Recidivism, Apprehension Rates, and Migrant Flows

Recidivism, which appears to be most common among Mexican nationals, can manifest in the DHS apprehension data when an unlawful migrant who is apprehended between POEs along the southwest border has been apprehended previously. (As noted above, the way to determine whether someone is a recidivist is by comparing fingerprint numbers across records in the apprehension data.) The recidivism phenomenon—namely, apprehension and re-apprehension—is closely related to the class of capture-recapture models commonly used in ecology to estimate wildlife populations, where exhaustive sampling is impractical. In the ecological context, the "recaptured" populations (like recidivists in the border security context) provide critical information for estimating the total wildlife populations (like the entire flow of illegal migrants in the border security context).

---

[126] DHS provided us with the underlying point estimates for the rate.

[127] If 2017 rate is unavailable, use 2016 rate or extrapolate from trends.

[128] Calculated as shares of unique individuals who try to enter the United States and are apprehended more than once in a given period, as specified, based on a comparison of fingerprint numbers in the apprehension data.

[129] Two-year moving averages calculated as 2012–2013, 2013–2014, 2014–2015, 2015–2016, and 2016–2017, and three-year moving averages calculated as 2012–2014, 2013–2015, 2014–2016, and 2015–2017.

[130] We set the cutoff at two standard deviations.

Haiti AR_001574

Espenshade first proposed the repeated trials model (RTM), in 1995, based on the capture-recapture models, to measure the flow of illegal migrants across the southwest border.[131] In addition to the flow, the RTM also estimates the apprehension rate or the probability of apprehension. In the RTM, both the flow and the apprehension rate are functions of the numbers of total apprehensions and recidivist apprehensions. To make the RTM more realistic, Chang and his co-authors later proposed a modified RTM that incorporates at-the-border deterrence, and he developed revised formulas for the flow and the apprehension rate.[132] As recidivism is mainly characteristic of Mexican nationals, Chang also suggested that the apprehension rate should be estimated by using just those records pertaining to Mexican nationals in the apprehension database. The apprehension rate thus obtained is then assumed to be applicable to the entire population.[133] Deterrence is not measured directly, and must be estimated via other means, such as surveys or econometric models. A recent Office of Immigration Statistics report, *Efforts by DHS to Estimate Southwest Border Security between Ports of Entry*, summarizes the development of the estimate of the apprehension rate and its limitations.[134]

---

[131] Espenshade, 1995, pp. 545–565.

[132] Chang et al., 2006.

[133] Whitley et al., 2016.

[134] DHS Office of Immigration Statistics, 2017.

Haiti AR_001575

# Appendix D. DHS and EMIF Sur Data on Smuggling Fees

This appendix presents information on the properties of the data on smuggling fees from DHS and EMIF Sur in Tables D.1 and D.2.

### Table D.1. Smuggling Fees Reported in DHS Data for Fiscal Year 2017

| Country of Origin | Mean Fee | Median Fee | Standard Deviation | Sample Size |
|---|---|---|---|---|
| Guatemala | $4,725 | $4,000 | $4,632 | 6,417 |
| Honduras | $3,777 | $3,000 | $2,936 | 4,379 |
| El Salvador | $4,560 | $4,000 | $3,062 | 5,735 |

### Table D.2. Smuggling Fees Reported in EMIF Sur Data for Calendar Year 2017

| Country of Origin | Mean Fee | Median Fee | Standard Deviation | Sample Size |
|---|---|---|---|---|
| For transit from country of origin to U.S. border | | | | |
| Guatemala | $6,085 | $6,164 | $2,793 | 1,044 |
| Honduras | $6,386 | $6,500 | $1,227 | 462 |
| El Salvador | $3,985 | $4,000 | $1,525 | 1,081 |
| For transit across U.S. border | | | | |
| Guatemala | $4,615 | $4,110 | $3,109 | 1,196 |
| Honduras | $4,230 | $5,000 | $2,427 | 529 |
| El Salvador | $4,040 | $4,000 | $2,305 | 1,486 |
| Totals for transit from country of origin to and across U.S. border | | | | |
| Guatemala | $10,700[a] | $10,274[a] | -- | -- |
| Honduras | $10,617[a] | $11,500[a] | -- | -- |
| El Salvador | $8,025[a] | $8,000[a] | -- | -- |

SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals). Figures might not add due to rounding.
[a] These figures are the sums of the means or medians, respectively, for each country for each segment, first, from the country of origin to the U.S. border and, second, across the U.S. border.

Haiti AR_001576

# References

Amnesty International, *Mexico: Invisible Victims. Migrants on the Move in Mexico*, 2010. As of November 29, 2018:
https://www.amnesty.org/en/documents/AMR41/014/2010/en/

Associated Press, "Human Smugglers Cash In on Central American Migration to U.S.," CBC News website, July 21, 2014. As of October 28, 2018:
https://www.cbc.ca/news/world/human-smugglers-cash-in-on-central-american-migration-to-u-s-1.2712878

Beittel, June S., *Mexico: Organized Crime and Drug Trafficking Organizations*, Washington, D.C.: Congressional Research Service, R41576, July 3, 2018.

Burnett, John, "Migrants Say They're Unwilling Mules for Cartels," NPR website, December 4, 2011. As of October 28, 2018:
https://www.npr.org/2011/12/04/143025654/migrants-say-theyre-unwilling-mules-for-cartels

Cabrera, Chris, testimony on behalf of the National Border Patrol Council before the U.S. Senate Homeland Security and Governmental Affairs Committee, Washington, D.C., October 21, 2015. As of November 8, 2018:
https://www.hsgac.senate.gov/imo/media/doc/Testimony-Cabrera-2015-10-21.pdf

Caldwell, Alicia A., "U.S. Border Crossings Are Fewer, Riskier and More Expensive," *Wall Street Journal*, October 5, 2018

Campana, Paolo, "The Structure of Human Trafficking: Lifting the Bonnet on a Nigerian Transnational Network," *British Journal of Criminology*, Vol. 56, No. 1, 2016, pp. 68–86.

Castellano, Laura, "Devoran Coyotes Millones con Niños," *El Universal*, July 29, 2014. As of October 29, 2018:
http://www.pressreader.com/mexico/el-universal/20140729/281530814157297

Chang, Joseph C., R. Kohout, H. R. Blacksten, and S. Bernard, *CBP Apprehensions at the Border*, Arlington, Va.: Homeland Security Institute, HSI Publication Number RP05-25f-04, 2006.

Cleek, Ashley, "With Smuggling Costs Skyrocketing, Parents Balance Risk and Debt for Their Children's Future," Public Radio International website, February 28, 2018. As of November 7, 2018:
https://www.pri.org/stories/2018-02-28/smuggling-costs-skyrocketing-parents-balance-risk-and-debt-their-childrens-future

Haiti AR_001577

*Daily Mail* and Associated Press Reporters, "From Bribing Drug Cartels and Immigration Officials to Paying for Hotels and Train Rides: Coyote Smugglers Reveal Costs Involved in Smuggling Child Migrants from Central America to the U.S.," *Daily Mail*, July 22, 2014. As of October 18, 2018:
https://www.dailymail.co.uk/news/article-2700946/From-bribing-drug-cartels-immigration-officials-paying-hotels-train-rides-Coyote-smugglers-reveal-costs-involved-smuggling-child-migrants-Central-America-U-S.html

Domingo Villegas, Rodrigo, "Central American Migrants and 'La Bestia': The Route, Dangers, and Government Responses," *Migration Policy Institute*, September 10, 2014. As of November 18, 2018:
https://www.migrationpolicy.org/article/central-american-migrants-and-"la-bestia"-route-dangers-and-government-responses

Egan, Dennis, Paul Kantor, Fred Roberts, Vladimir Menkov, and Katie McKeon, "Estimating Missed Detections at the Southern Border," unpublished presentation at George Mason University by the Borders, Trade, and Immigration Institute: A DHS Center of Excellence led by the University of Houston, via subcontract to Rutgers, 2018.

EMIF, homepage, undated-a. As of November 28, 2018:
https://www.colef.mx/emif/eng/index.php#

EMIF, "Surveys of Migration at Mexico's Northern and Southern Borders: Background and Objective," El Colegio de la Frontera Norte website, undated-b. As of November 8, 2018:
https://www.colef.mx/emif/eng/antecedentes_objetivos.php

EMIF, "Surveys of Migration at Mexico's Northern and Southern Borders: Research Methodology," El Colegio de la Frontera Norte website, undated-c. As of November 8, 2018:
https://www.colef.mx/emif/eng/bases_metodologicas.php

EMIF Sur, "Indicadores Anuales 2017," COLEF.mx website, p. 5, Chart 9b, 2018a. As of November 8, 2018:
https://www.colef.mx/emif/resultados/indicadores/indicadores/Sur/2017/Anual/SUR-Indicadores-ANUALES%202017.pdf

EMIF Sur, "Indicadores Semestrales EMIF Sur: OCT 2017-MZO 2018," COLEF.mx website, March 2018b. As of November 8, 2018:
https://www.colef.mx/emif/resultados/indicadores/indicadores/Sur/2017/S1/SUR-Indicadores-S1-oct2017-marzo2018.pdf

Espenshade, Thomas J., "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing the U.S.-Mexico Frontier," *International Migration Review*, Vol. 29, No. 2, 1995, pp. 545–565.

Haiti AR_001578

Farah, Douglas, and Pamela P. Lum, *Central American Gangs and Transnational Criminal Organizations: The Changing Relationships in a Time of Turmoil*, Washington, D.C.: International Assessment and Strategy Center, February 2013.

Finckenauer, James O., *Chinese Transnational Organized Crime: The Fuk Ching*, Washington, D.C.: National Institute of Justice, 2001. As of November 7, 2018: https://www.ncjrs.gov/pdffiles1/nij/218463.pdf

Frontline/World, "Extended Interview: A Human Smuggler," PBS website, 2018. As of October 13, 2018: http://www.pbs.org/frontlineworld/stories/mexico704/interview/smuggler.html

Gallagher, Mike, "Drugs, Guns and People: Smuggling Is a Growing Border Problem," *Albuquerque Journal*, June 10, 2018. As of October 28, 2018: https://www.abqjournal.com/1183179/drugs-guns-and-people-smuggling-is-a-growing-border-problem.html

Garsd, Jasmine, "Human Smuggler: Central Americans Are Worth Their Weight in Gold," transcript, NPR website, January 28, 2016. As of November 7, 2018: https://www.npr.org/2016/01/28/464664750/human-smuggler-central-americans-are-worth-their-weight-in-gold

González, Daniel, and Gustavo Solis, "The Wall: A Human Smuggler, and the Wall That Will Make Him Rich," *USA Today*, 2017. As of October 28, 2018: https://www.usatoday.com/border-wall/story/human-smuggling-crossing-border-illegally-methods/559784001/

Guevara González, Yaatsil, "Navigating with Coyotes: Pathways of Central American Migrants in Mexico's Southern Borders," *Annals of the American Academy of Political and Social Science*, Vol. 676, No. 1, March 2018, pp. 174–193.

Hale, Gary J., Adam N. Hale, Nathan P. Jones, and Russell Lundberg, "Uncovering Human Trafficking Patterns from Guatemala to the U.S.," unpublished presentation at George Mason University by the Borders, Trade, and Immigration Institute: A DHS Center of Excellence led by the University of Houston, 2018.

Hennessy-Fiske, M., "Migrants, Young and Old, Are Not Always Related; Border Patrol Says Fear of Child Trafficking Forces Separations," *Los Angeles Times*, May 8, 2018. As of November 7, 2018: http://www.latimes.com/nation/la-na-border-patrol-dna-20180508-htmlstory.html

International Crisis Group, *Easy Prey: Criminal Violence and Central American Migration*, Report 57, July 2016.

Haiti AR_001579

Kilmer, Beau, Jonathan P. Caulkins, Brittany M. Bond, and Peter H. Reuter, *Reducing Drug Trafficking Revenues and Violence in Mexico: Would Legalizing Marijuana in California Help?* Santa Monica, Calif.: RAND Corporation, OP-325-RC, 2010. As of November 14, 2018:
https://www.rand.org/pubs/occasional_papers/OP325.html

Kulish, Nicholas, "What It Costs to Be Smuggled Across the U.S. Border," *New York Times,* June 30, 2018. As of October 24, 2018:
https://www.nytimes.com/interactive/2018/06/30/world/smuggling-illegal-immigration-costs.html

Leutert, Stephanie, "When Drug Trafficking Is Your Only Option," *Foreign Policy*, July 14, 2017.

Leutert, Stephanie, *Organized Crime and Central American Migration in Mexico*, Lyndon B. Johnson School of Public Affairs, Policy Research Project 198, 2018.

Martinez, Oscar, "Los Coyotes del Norte Están Aumentando las Cuotas por TRUMP," *Animal Politico*, February 10, 2017. As of October 28, 2018:
https://www.animalpolitico.com/2017/02/coyotes-migracion-trump/

McAuliffe, Marie, and F. Laczko, *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base*, Geneva, Switzerland: International Organization for Migration, 2016.

Miroff, Nick, "The Border Is Tougher to Cross Than Ever. But There's Still One Way into America," *Washington Post*, October 24, 2018. As of November 21, 2018:
https://www.washingtonpost.com/graphics/2018/national/border-asylum-claims/?utm_term=.c35364dae56d

Morral, Andrew R., Henry H. Willis, and Peter Brownell, *Measuring Illegal Border Crossing Between Ports of Entry: An Assessment of Four Promising Methods*, Santa Monica, Calif.: RAND Corporation, OP-328-OSD, 2011. As of November 14, 2018:
https://www.rand.org/pubs/occasional_papers/OP328.html

Nixon, R., and T. Heisler, "High Profits and Misery Meet at Door of Smugglers' Stash Houses," *New York Times*, August 26, 2018. As of November 7, 2018:
https://www.nytimes.com/2018/08/26/us/politics/smugglers-border-immigrants-money.html

Olson, Eric L., *Migrant Smuggling and Trafficking at the Rio Grande Valley: Ten Observations and Questions*, Washington, D.C.: The Wilson Center, September 2016. As of November 8, 2018:
https://www.wilsoncenter.org/sites/default/files/olson_border_2016_0.pdf

Haiti AR_001580

Organisation for Economic Co-operation and Development, *Can We Put an End to Human Smuggling?* Paris, France, MPD No. 9, December 2015.

Palacios, S. P. Izcara, "Coyotaje and Drugs: Two Different Businesses," *Bulletin of Latin American Research*, Vol. 34, No. 3, December 30, 2014, pp. 324–329.

Paoli, Letizia, and V. Greenfield, "The Supply of Doping Products and the Relevance of Market-Based Perspectives: Implications of Recent Research in Italy," in Jens Beckert and Matias Dewey, eds., *Everything Legal? Interfaces Between legality and Illegality in Markets*, Oxford: Oxford University Press, 2017, pp. 245–267.

Paoli, Letizia, V. Greenfield, and P. Reuter, *The World Heroin Market: Can Supply Be Cut?* New York: Oxford University Press, 2009.

Paoli, Letizia, V. Greenfield, and A. Zoutendijk, "The Harms of Cocaine Trafficking: Applying a New Framework for Assessment," *Journal of Drug Issues*, Vol. 43, No. 4, 2013, pp. 407–436.

Pelley, Scott, correspondent, CBS News, transcript of *60 Minutes* episode, "Human Smuggling Across the Southern Border; Desperation and Fear Are Driving a Dangerous Industry That's Virtually Impossible to Completely Stop," March 11, 2018. As of October 28, 2018: https://www.cbsnews.com/news/human-smuggling-across-the-southern-border/

Prendergast, Curt, "Costly Crossing Fees Turn Illegal Immigrants into Marijuana Smugglers," *Arizona Daily Star*, April 8, 2017. As of October 29, 2018: https://tucson.com/news/local/border/costly-crossing-fees-turn-illegal-immigrants-into-marijuana-smugglers/article_1e95e570-080c-5dd7-a240-687cce94ca8f.html

Reuter, Peter, and V. Greenfield, "Measuring Global Drug Markets: How Good Are the Numbers and Why Should We Care About Them?" *World Economics*, Vol. 2, No. 4, October–December 2001, pp. 159–173.

Roberts, Bryan, G. Hanson, D. Cornwall, and S. Borger, *An Analysis of Migrant Smuggling Costs Along the Southwest Border*, Washington, D.C.: U.S. Department of Homeland Security, Office of Immigration Statistics, working paper, November 2010.

Rodríguez Chávez, Ernesto, *Migración centroamericana en tránsito irregular por México. Nuevas cifras y tendencias*, Instituto Tecnológico Autónomo de México (ITAM)/El Colegio de la Frontera Norte (Colef), PB #14, December 2016.

Sanchez, Gabriella, "Latin America," in Marie McAuliffe and Frank Laczko, eds., *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base*, Geneva, Switzerland: International Organization for Migration, 2016, pp. 269–301.

Haiti AR_001581

Sanchez, Gabriella, "Critical Perspectives on Clandestine Migration Facilitation: An Overview of Migrant Smuggling Research," *Journal on Migration and Human Security*, Vol. 5, No. 1, 2017, pp. 9–27.

Sanchez, Gabriella, "Five Misconceptions About Migrant Smuggling," *Migration Policy Center*, Issue 2018/07, May 2018.

Sanchez, Gabriella E., and Sheldon. X. Zhang, "Rumors, Encounters, Collaborations, and Survival: The Migrant Smuggling–Drug Trafficking Nexus in the U.S. Southwest," *Annals of the American Academy of Political and Social Science*, Vol. 676, No. 1, 2018.

Slack, Jeremy, and Howard Campbell, "On Narco-Coyotaje: Illicit Regimes and Their Impacts on the US-Mexico Border; Sociology and Anthropology," *Antipode*, Vol. 48, No. 5, 2016.

Slack, Jeremy, and Scott Whiteford, "Caught in the Middle: Undocumented Migrant's Experiences with Drug Violence," in T. Payan, K. Staudt, and Z. A. Kruszewski, eds., *A War That Can't Be Won: Binational Perspectives on the War on Drugs*, Tucson, Ariz.: University of Arizona Press, 2013, pp. 193–213.

Tiempo.hn, "Human Smugglers Charge at Least $7,000 to Take Migrants to US," in Spanish, August 7, 2017. As of November 7, 2018: https://tiempo.hn/compatriotas-necesitan-7-mil-dolares-coyote-eeuu/

United Nations Office on Drugs and Crime, *Legislative Guide for the Implementation of the United Nations Convention Against Transnational Organized Crime*, Vienna, Austria, 2004. As of October 25, 2018: http://www.unodc.org/documents/treaties/Legislative_Guide_2017/Legislative_Guide_E.pdf

United Nations Office on Drugs and Crime, *Smuggling of Migrants: A Global Review and Annotated Bibliography of Recent Publications*, New York, 2011.

United States, Executive Office of the President, *Strategy to Combat Transnational Organized Crime: Addressing Converging Threats to National Security*, Washington, D.C.: Executive Office of the President, July 2011.

U.S. Code, Title 10: Armed Forces; Subtitle A: General Military Law; Part I: Organization and General Military Powers; Chapter 15: Military Support for Law Enforcement Agencies; Section 284: Support for counterdrug activities and activities to counter transnational organized crime.

U.S. Department of Homeland Security, Office of Immigration Statistics, *Efforts by DHS to Estimate Southwest Border Security Between Ports of Entry*, Washington, D.C., 2017. As of October 23, 2018: https://www.dhs.gov/sites/default/files/publications/17_0914_estimates-of-border-security.pdf

Haiti AR_001582

U.S. Department of Justice, Drug Enforcement Administration, *2017 National Drug Threat Assessment*, DEA-DCT-DIR-040-17, Washington, D.C., October, 2017.

U.S. Immigration and Customs Enforcement, "41 Arrested in Multinational Human Smuggling Takedown in Central America and South America," Washington, D.C., July 8, 2016. As of November 7, 2018:
https://www.ice.gov/es/news/releases/41-arrested-multinational-human-smuggling-takedown-central-america-and-south-america

Weden, Axel Storen, "Deadly Human Trafficking Business on Mexico-US Border," *Al Jazeera*, January 24, 2016. As of November 7, 2018:
https://www.aljazeera.com/indepth/features/2016/01/deadly-human-trafficking-business-mexico-border-160117073423022.html

Whitley, John E., J. W. Bailey, S. K. Burns, D. F. Eisler, C. C. Fletcher, T. P. Frazier, B. R. Gould, K. M. Guerrera, T. C. Heuring, B. Q. Rieksts, and B. Roberts, *Assessing Southern Border Security*, Arlington, Va.: Institute for Defense Analyses, IDA Paper NS P-5304, 2016.

Wuebbels, Mark, "Demystifying Human Smuggling Operations Along the Arizona-Mexican Border," 2004. As of October 13, 2018:
http://traccc.gmu.edu/pdfs/publications/human_trafficking_publications/wuebbe01.pdf

Zhang, Sheldon X., *Smuggling and Trafficking in Human Beings: All Roads Lead to America*, Westport, Conn.: Praeger, 2007.

Zhang, Sheldon X., "The United States," in Marie McAuliffe and Frank Laczko, eds., *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base,* Geneva, Switzerland: International Organization for Migration, 2016, pp. 303–324.

Haiti AR_001583

Unlawful migrants from Central America apprehended at the U.S.-Mexico border each year often hire smugglers for assistance or pay others for rights of way at some point during their journey north. Policymakers face concerns that a substantial share of migrants' expenditures on smuggling services could be flowing to transnational criminal organizations (TCOs), entities that represent a potential threat to homeland security. In response to these concerns, the authors of this report conducted a scoping study to develop a preliminary estimate of TCOs' revenues from smuggling migrants from the Northern Triangle region of Central America (Guatemala, Honduras, and El Salvador) to the United States and to characterize the TCOs' structure, operations, and financing. They conducted interviews with subject-matter experts, a review of literature, and an analysis of governmental and nongovernmental data on migration and human smuggling and found that human smuggling involves many different types of actors and that most TCOs' activities and revenues cannot be separated credibly from those of ad hoc groups, independent operators, and others who engage in human smuggling. They developed a preliminary estimate of revenues from human smuggling flowing to all types of smugglers, not just TCOs—ranging from about $200 million to $2.3 billion in 2017—with uncertainty stemming largely from analytical challenges related to data limitations and time constraints. Separately, they also produced a preliminary estimate of the taxes, or pisos, that migrants pay to drug-trafficking TCOs to pass through their territories, ranging from about $30 million to $180 million.

$24.00

ISBN-10 1-9774-0208-9
ISBN-13 978-1-9774-0208-0



52400

9 781977 402080

Cover images: CBP.gov, Harry Hu/Adobe Stock
RR-2852-DHS

Haiti AR_001584



# Killing with Impunity:

## State-Sanctioned Massacres in Haiti

Harvard Law School International Human Rights Clinic
Observatoire Haïtien des crimes contre l'humanité

Haiti AR_001585

 

Cover Illustration
© David Duverseau, Nègès Mawon

Design
Tutaev Design

Copyright © 2021 President and Fellows of Harvard College. All rights reserved.

**Killing with Impunity:**

State-Sanctioned Massacres in Haiti

Harvard Law School International Human Rights Clinic

Observatoire Haïtien des crimes contre l'humanité

April 2021

Haiti AR_001587

# Table of Contents

**Acknowledgments**                                                              **2**

**Executive Summary**                                                            **3**
A Pattern of Sustained Attacks                                                    3
Legal Framework                                                                   4
Findings                                                                          5

**I. Political Context of the Attacks**                                          **6**
President Moïse's Consolidation of Power                                           6
Anti-Government Protests                                                           7
Repression of Government Opposition and Violence Against Civil Society             7
The Expanding Role of Gangs and Their Relationship to State Actors                8

**II. Emblematic Attacks Against Civilians**                                     **9**
The Attack on La Saline, November 13-14, 2018                                      9
  • Leadup to the Attack                                                           9
  • The Attack                                                                    10
  • State Response                                                                11
Attack on Bel-Air, November 4-6, 2019                                            11
  • Leadup to the Attack                                                          11
  • The Attack                                                                    12
  • State Response                                                                13
Attack on Cité Soleil, May-July 2020                                             13
  • Leadup to the Attack                                                          13
  • The Attack                                                                    14
  • State Response                                                                15

**III. Legal Analysis: There Is a Reasonable Basis to Conclude That the Attacks**  **16**
**Amount to Crimes Against Humanity**
Crimes Against Humanity Under International Law                                   16
The Attacks Involved Qualifying Acts of Violence                                  16
  • Murder                                                                        17
  • Rape                                                                          17
  • Torture                                                                        17
  • Persecution Against an Identifiable Group or Collectivity on Political Grounds  18
  • The Underlying Crimes Are a Part of the Attacks                               19
The Attacks Were Directed Against a Civilian Population                           19
  • The Assaults on La Saline, Bel-Air and Cité Soleil Constitute Attacks         19
  • The Attacks Were Directed Agains,t a Civilian Population                       20
The Attacks Were Widespread and Systematic in Nature                             20
  • The Attacks Were Widespread                                                   20
  • The Attacks Were Systematic                                                   20
The Attacks Furthered a State or Organizational Policy                            21
  • The Attacks Furthered a State Policy                                          22
  • The Attacks Furthered a Separate Gang Policy to Attack                        23

**IV. The Available Evidence Points to Several State Actors Who May Be Liable**   **24**
**for Crimes Against Humanity**
Direct Commission                                                                       25
Aiding and Abetting                                                                     25
  • Haitian National Police                                                   26
  • Moïse Administration Officials                                             27
Ordering, Soliciting, or Inducing the Crimes                                            27
Common Enterprise                                                                       28
  • Moïse Administration Officials                                             28
  • Haitian National Police                                                    28
President Moïse May Be Responsible for Crimes Against Humanity Under                     28
the Doctrine of Command Responsibility

**V. Ensuring Accountability for Perpetrators of Crimes Against Humanity**   **30**
The Crimes Have Been Carried Out with Impunity                                          30
Implications for Accountability                                                         30

**Recommendations**                                                                     **32**

**Conclusion**                                                                          **34**

**Annex I**                                                                             **35**

**Endnotes**                                                                            **37**

# Acknowledgements

This is a report of the International Human Rights Clinic (IHRC) at Harvard Law School and the *Observatoire Haïtien des crimes contre l'humanité* (OHCCH).

**The International Human Rights Clinic (IHRC) at Harvard Law School** seeks to protect and promote human rights and international humanitarian law through documentation; legal, factual, and strategic analysis; litigation before national, regional, and international bodies; treaty negotiations; and policy and advocacy initiatives. IHRC also engages in innovative clinical education to develop advanced practice techniques and approaches to human rights advocacy. IHRC has significant experience documenting and seeking accountability for international crimes around the world, including in Bolivia, Myanmar, and South Africa. IHRC Clinical Instructor Beatrice Lindstrom has worked on human rights issues in Haiti since 2010. For more information, please visit IHRC's website: https://hrp.law.harvard.edu/clinic/.

**The *Observatoire Haïtien des crimes contre l'humanité*** is a consortium of Haitian civil society organizations and prominent leaders that came together in October 2020 with a mission of monitoring human rights violations in Haiti that may amount to crimes against humanity. Members include the Bureau des Avocats Internationaux (BAI), the Réseau National de Défense des Droits Humains (RNDDH), and individual civil society leaders and prominent lawyers. OHCCH's members have a long history of documenting human rights violations in Haiti, accompanying victims in legal proceedings to seek accountability, and advocating for justice and respect for human rights on the national and international stage.

This report was written by Harvard Law School students Joey Bui, JD '21, and Nathalie Gunasekera, JD '21, together with Clinical Instructor and Lecturer on Law Beatrice Lindstrom. Ellie Abramov, an LLM student in the Fall of 2020, contributed legal research. Members of OHCCH conducted critical investigations into the attacks in La Saline, Bel-Air, and Cité Soleil that form the basis for the report. The primary investigations relied on in this report are contained in Annex I. OHCCH also provided vital analysis and review of this report.

The authors are grateful for additional input and feedback on drafts from Nixon Boumba, Brian Concannon, Sasha Filippova, and Susan Farbstein. The authors further wish to thank the survivors of the attacks and Haitian civil society who have provided crucial testimony and information about the attacks, and who continue to courageously call for justice.

# Executive Summary

## A Pattern of Sustained Attacks

Over the course of President Jovenel Moïse's presidency, Haitian civil society has raised alarm that armed gangs are carrying out heinous, state-sanctioned attacks against civilians in impoverished neighborhoods in Port-au-Prince. The scale, pattern, and context of the attacks indicate that they may amount to crimes against humanity.

The attacks have taken place in the context of an escalating political crisis. President Moïse's rule has become increasingly authoritarian and has turned to repression to quell dissent. Since 2018, massive public protests calling for government accountability and Moïse's resignation have periodically shut down the country.[1] The government has responded to the protests with aggressive measures, including criminalizing common non-violent protest tactics and increasing illegal surveillance of opponents.[2] Targeted assassinations and threats against government critics have been carried out with impunity.[3]

During the four years of Moïse's presidency, human rights observers have documented at least ten brutal attacks in impoverished parts of the capital where opposition against his administration runs strong.[4] Three attacks—in La Saline, Bel-Air, and Cité Soleil—are particularly well-documented and severe.[5] These three attacks offer insights into the means and methods used to carry out the assaults, and the ways in which state actors have supported the orchestration and execution of the attacks. When viewed together, they reveal a pattern of state-sanctioned violence, human rights abuses, and refusal to hold perpetrators accountable that likely amounts to crimes against humanity.

**La Saline:** In November 2018, the worst massacre in decades was carried out in La Saline, a neighborhood that was playing a leading role in organizing protests against the President.[6] In the weeks before the attack, two senior officials from Moïse's administration, Pierre Richard Duplan and Fednel Monchéry, met with then-police officer and gang leader Jimmy Chérizier *alias* Barbecue to plan and provide resources for the attack.[7] On November 13-14, 2018, armed gangs led by Chérizier carried out a vicious attack on the community. Over the course of fourteen hours, the assailants systematically extracted victims, including children, from their homes and executed them at gunpoint and with machetes.[8] Bodies were burned, dismembered, and disposed of in trash piles.[9] At least 71 people were killed, 11 women were raped, and 150 homes were looted and destroyed.[10] Despite widespread outrage in Haiti and internationally, President Moïse has failed to condemn his subordinates' role in the massacre or support their prosecutions.[11]

**Bel-Air:** In September 2019, as popular protests escalated into a nationwide shutdown, demonstrators placed flaming barricades on the main roads of Bel-Air, another opposition stronghold.[12] After several failed attempts to remove the barriers, an official from the Moïse administration reportedly hired Chérizier to secure the removal of the barriers and prevent further protests in Bel-Air.[13] Over the course of three days from November 4-6, 2019, Chérizier and allied gang leaders carried out an armed attack on Bel-Air. The assailants shot civilians and set fire to homes, killing at least 24 people.[14] Eyewitnesses identified three police officers in civilian clothes among the attackers.[15] Although the attack took place in an area surrounded by police stations, the police failed to intervene to protect residents despite repeated pleas for help broadcasted over the radio and social media.[16]

**Cité Soleil:** Between May and July 2020, Chérizier and allied gang leaders—now operating under the newly formed G9 alliance[17]—coordinated simultaneous attacks across several neighborhoods in Cité Soleil. They killed at least 145 civilians, raped multiple women, and burnt homes in efforts to claim areas held by rivals with ties to Moïse's political opponents.[18] Police resources were reportedly utilized at numerous points in the attacks.[19] Like La Saline and Bel-Air, Cité Soleil is known as an opposition stronghold.[20] The area is also strategically important for electoral purposes, with many polling stations located there.[21] Residents believe they were targeted for their political affiliations, in an effort to secure electoral support for the president and his party.[22]

To date, the Haitian government has failed to hold perpetrators accountable, allowing them to act with near complete impunity. Known perpetrators such as Chérizier, who is implicated as a principal actor in repeated attacks, remain free.[23] Moreover, the government has failed to reckon with the criminal responsibility of officials and police officers within its ranks.[24] Duplan and Monchéry remained in office for almost a year after the 2018 La Saline attack,[25] and prosecutions have failed to progress.[26] Police officers implicated in the attacks have not been brought to justice.[27] Despite indications that Moïse himself has sanctioned the attacks,[28] his role remains unscrutinized by any official investigation. This lack of justice has allowed a culture of impunity to grow, emboldening criminals and leaving civilians vulnerable to politically-motivated violence.[29]

In the absence of an official response, Haitian human rights organizations have been at the forefront of responding to the attacks, including being the first to investigate the attacks in their aftermath and publishing detailed reports of their findings.[30] Significant facts surrounding the attacks are now well-documented. This report builds on that critical work to analyze the attacks under international criminal law.

## Legal Framework

Relying on publicly available information, this report synthesizes what is currently known about the attacks in La Saline, Bel-Air, and Cité Soleil and applies international criminal law to analyze whether they amount to crimes against humanity. The three attacks were selected for analysis because of a combination of their severity and the existence of detailed documentation of facts surrounding the attacks.

The report uses the definition of crimes against humanity as contained in the Rome Statute, the international treaty that established the International Criminal Court (ICC), as well as related international jurisprudence from the ICC and other international criminal tribunals. The Rome Statute contains the most recent and widely accepted definition of the crime under international law.[31]

Under Article 7 of the Rome Statute, certain crimes may constitute crimes against humanity when they are committed as part of a widespread or systematic attack against a civilian population and are carried out pursuant to a state or organizational policy.[32] Using this framework, the report assesses whether there is a reasonable basis to conclude that the attacks amount to crimes against humanity.

Determining whether an attack constitutes crimes against humanity entails analyzing the violent acts to assess the scale, pattern, and context in which they took place. It also allows for a broader examination of individual criminal responsibility. Under international criminal law, liability for crimes against humanity is not limited to the persons who carried out the criminal acts, but also includes those who solicited, oversaw, and aided and abetted the crimes, as well as those who failed in their duties to punish the crimes after the fact. Given the compelling evidence that state actors—including

President Moïse himself and others in his administration—are implicated in the attacks, such an inquiry provides a fuller picture of the actors who may be held responsible for the attacks and who have allowed the attacks to be carried out with impunity.

## Findings

This report finds that there is a reasonable basis to conclude that both state and non-state actors may have committed crimes against humanity in Haiti. The attacks analyzed here involve murder, rape, torture, and persecution of a group based on their political identity—the types of underlying crimes that form a foundation for crimes against humanity.[33] The scale, pattern, and intensity of violence indicate that the acts were neither isolated nor random, but rather constitute both widespread and systematic attacks targeted at civilians. Furthermore, evidence suggests that the attacks were pre-planned and furthered both an organizational policy of the gangs and an implicit state policy to repress political opposition. This state policy can be gleaned from the consistent targeting of opposition neighborhoods and the repeated involvement of government officials, police officers, and police resources in the attacks. Moreover, state actors allowed the attacks to be carried out without police intervention and have since failed to punish those responsible.

> Under Article 7 of the Rome Statute, qualifying underlying crimes may constitute crimes against humanity when they are committed as part of a widespread or systematic attack against a civilian population that is carried out pursuant to a state or organizational policy.

Based on what is currently known about the attacks, it is likely that further investigations could establish individual criminal responsibility for gang members and leaders, as well as government officials, including police officers and high-level Moïse administration officials who were involved in the attacks. As much of the international attention on the attacks has focused on the role of gangs,[34] this report instead focuses on the lesser-examined role of state actors who either actively provided material support to perpetrators or supported the perpetrators passively by failing in duties to prevent or punish them. The report identifies key legal theories under which state actors may be responsible for crimes against humanity: direct commission; aiding and abetting; ordering, soliciting, or inducing the crimes; and common enterprise. Under the doctrine of command responsibility, President Moïse himself may also be liable for the crimes committed by his subordinates, particularly with respect to the attack in La Saline.

The findings that crimes against humanity have likely taken place in Haiti, and that state actors may be liable for the crimes, have important ramifications for accountability. Haiti is a party to the American Convention on Human Rights, which under Haiti's Constitution becomes part of domestic law.[35] Haiti has also accepted the binding jurisdiction of the Inter-American Court of Human Rights, tasked with interpreting the American Convention. The Court has not only endorsed universal application of crimes against humanity,[36] but has also held that no statute of limitations applies to such crimes.[37] The Haitian government therefore has a duty to investigate and punish those who are responsible for crimes against humanity.[38] A finding of crimes against humanity also opens the door for other countries to prosecute perpetrators found outside of Haiti on the basis of universal jurisdiction.[39] Finally, although Haiti is not a party to the ICC, the situation could be referred to the ICC by the UN Security Council.[40]

It is crucial that the Haitian government and others fulfill their duty to hold perpetrators responsible for these crimes, in line with the recommendations set forth at the end of this report. Accountability is critical to supporting rule of law, but also to ensuring an end to the grave human rights abuses that have placed Haitian communities in a state of terror.

# I. Political Context of the Attacks

## President Moïse's Consolidation of Power

President Moïse was elected in 2016, after an extended process marked by fraud and low voter turnout.[41] Throughout his term, Moïse has systematically consolidated power by weakening branches of government and agencies meant to serve as a check on the presidency.

At the time of this report, Moïse is one of only 11 elected officials in the entire country.[42] In January 2020, the terms of most members of Parliament expired without elections being held for their replacements.[43] Defying calls to limit the use of executive decrees to the scheduling of legislative elections,[44] Moïse has instead used them to undertake significant legislative action, including creating a domestic intelligence agency with extensive policing and surveillance powers that is only subjected to limited judicial review,[45] and ordering an unlawful constitutional referendum.[46] When the mandates of mayors in all 141 of Haiti's municipalities expired in July 2020, Moïse used a decree to give himself the power to appoint municipal commissions.[47] In March 2021, Moïse used a decree to expand the law on states of emergency, granting him the power to suspend fundamental rights and enabling security forces, including the remobilized army, to take "necessary measures" to respond to threats to public security as defined by the executive.[48]

President Moïse has also undermined autonomous government oversight bodies that have implicated him, along with a large swath of government officials across administrations, in the disappearance of $3.8 billion in public funds made available through the PetroCaribe loan program.[49] Moïse has denied the allegations, and there has been no meaningful judicial accountability for the misspending, aside from the prosecution of a political rival of Moïse's administration.[50] The scandal has sparked widespread and persistent protests across Haiti.

Moïse's approach to overdue elections raises further concerns about his consolidation of power. Moïse's term as president was widely interpreted to end on February 7, 2021, but he has refused to step down, citing an alternative interpretation of the Constitution that he contends allows him to stay in office until at least February 2022.[51] Haitian civil society and opposition parties have called for a transition government to be put in place to credibly and independently organize elections.[52] In September 2020, Moïse instead appointed a controversial provisional electoral council, mandating it to organize elections and hold a constitutional referendum.[53] Constitutional amendments by referendum are prohibited under the constitution, after it was used by Haiti's former dictator Jean-Claude Duvalier to make him "president-for-life."[54] Moïse's proposed amendments would fundamentally restructure government and concentrate power with the presidency at the expense of other branches,[55] and grant him indefinite immunity for acts related to his official functions as President.[56]

On February 7, 2021, the day many argued Moïse's term was set to end, the police arrested 18 individuals, including Supreme Court Justice Yvickel Dabrésil, for allegedly planning a coup.[57] The next day, Moïse issued a decree illegally "retiring" three Supreme Court justices appointed by the opposition,[58] and replaced them with new judges appointed by decree.[59] The police also seized control of the Supreme Court.[60] These actions have sparked widespread condemnation as attacks on judicial independence.[61]


## Anti-Government Protests

Civil society has strongly objected to President Moïse's seizure of power and the lack of accountability for corruption and other human rights violations. Protests calling for his resignation have repeatedly gripped the nation. These protests form an important backdrop to the brutal attacks carried out against civilians in neighborhoods that have been particularly active in opposing the government during Moïse's term.

In August 2018, a robust national movement erupted in response to the PetroCaribe corruption scandal, sparking a series of mass protests that have continued into 2021.[62] On October 17, 2018, an estimated 10,000 to 15,000 Haitians marched across the country, constituting one of the largest public demonstrations in Haiti's recent history.[63] The protests culminated in multiple operations '*peyi lok*,' during which businesses, schools, and public transportation were shut down across Haiti as a result of widespread demonstrations.[64] During a three-month *peyi lok* beginning in September 2019, large demonstrations took place almost every day.[65]

As living conditions deteriorated and impunity reigned, Haiti saw a sharp rise in violence and kidnappings in 2020.[66] These worsening conditions also underlie the continued protests and calls for Moïse's resignation.[67] In February 2021, protests again erupted over Moïse's refusal to step down.[68] Demonstrators accused Moïse of reinstating a dictatorship and called for his ouster.[69]

## Repression of Government Opposition and Violence Against Civil Society

The government has responded to demonstrations and growing opposition with increasingly aggressive tactics. As analyzed below, government officials have sought to suppress anti-government organizing through bribery, and when that has failed, have enlisted gangs to carry out targeted attacks against anti-government strongholds active in the protests.[70] The events in La Saline, Bel-Air, and Cité Soleil provide vivid examples of such attacks, but are far from the only instances.[71]

The Haitian National Police (PNH) has repeatedly used excessive force—including shooting live rounds and teargas—to shut down peaceful sit-ins and other demonstrations.[72] In November 2020, as violence and kidnappings were surging with impunity, Moïse targeted those protesting impunity by issuing a decree that criminalizes popular forms of non-violent protest as 'terrorist acts.'[73] The decree also subjects PNH officers to harsh prison sentences for failing to quell demonstrations, which observers fear will encourage even more aggressive use of force.[74]

Targeting and surveillance of government critics has also increased during Moïse's presidency. In August 2020, for example, Monferrier Dorval, the head of the Port-au-Prince Bar Association, was assassinated outside his home.[75] Hours before his death, Dorval gave a radio interview in which he criticized the government for dysfunction and called for "another kind of country."[76] Dorval had previously also joined a statement denouncing more than two dozen presidential decrees signed by Moïse.[77] Although Dorval's case was transferred to an investigative judge, crime-scene evidence disappeared from the court the following month, and the investigation has stalled.[78] One of the four individuals who were eventually arrested in connection with the killing allegedly has ties to the Moïse administration.[79]

The Moïse administration has also threatened human rights organizations and activists that have documented abuses and called for accountability. In 2019, human rights groups raised alarm about an alleged plan between the Minister of the Interior and gang leader Jimmy 'Barbecue' Chérizier to assassinate Pierre Esperance, the head of RNDDH.[80] Following a hearing before the Inter-American

Commission on Human Rights (IACHR) in December 2020, where lawyers from the *Bureau des Avocats Internationaux* (BAI) and the Institute for Justice & Democracy in Haiti (IJDH) testified about the rise in impunity for human rights violations, the Minister of Justice publicly denounced the BAI, IJDH, and RNDDH as "tools of instability" and accused them of enabling violence and insecurity in the country.[81] Around the same time, the government announced that the newly-instituted national intelligence agency has begun to monitor opposition activity,[82] leading to further concern that a crackdown on political dissent and civil liberties will follow.[83]

Moïse also reinstated the military (FAdH) in 2018, sparking concern that he will deploy the army to further curb dissent and opposition.[84] FAdH was notorious for mounting coups and perpetrating human rights abuses before its disbandment in 1995.[85] Moïse appointed former high-ranking army officers to the new FAdH, including Jean-Robert Gabriel, who was convicted *in absentia* for his role as a military commander in the 1994 Raboteau Massacre.[86]

## The Expanding Role of Gangs and Their Relationship to State Actors

In recent years, armed gangs have amassed significant power and control over impoverished neighborhoods.[87] Warring gangs with competing political affiliations rule neighborhoods like fiefdoms, using violence and terror to secure cooperation and extract bribes from the population.[88] They also wield significant socioeconomic power by taking on quasi-governmental functions and serving as conduits for government and financial assistance in the areas they control.[89]

Credible investigations have documented that many gangs receive financing, weapons, and ammunition from government sources in exchange for their political support.[90] This relationship serves an important political function; by controlling key segments of the population, gangs are able to deliver electoral support for politicians.[91] The UN has observed that gang violence has especially surged in impoverished neighborhoods with large polling stations, where gangs can use terror to influence electoral outcomes.[92]

In June 2020, a new gang alliance formed under the name 'G9 Family and Allies,' marking an alarming consolidation of power and raising concerns that state institutions will be further undermined.[93] The alliance is led by Chérizier, a former PNH officer and notorious gang leader implicated as the principal perpetrator in numerous brutal attacks against civilians, including the ones discussed here.[94] As of September 2020, the alliance included fifteen gangs and controlled vast swaths of territory in the Port-au-Prince metropolitan area.[95] G9 reportedly enjoys ties to both the Moïse administration and PNH.[96] The National Commission for Disarmament, Demobilization and Reintegration (CNDDR)—which was reinstituted by President Moïse in 2019 with a stated goal of dismantling gangs—initially indicated that it encouraged G9's formation to help facilitate negotiations, and stressed that it had a "good relationship with the G9 gang."[97] The CNDDR later denied that it participated in the G9's formation.[98]

The gangs also have a complicated relationship with PNH. Numerous police officers have personal ties to gangs.[99] Witnesses to violent gang attacks against civilians have reported seeing PNH officers participate directly in the attacks, and official PNH vehicles and uniforms have regularly been used in such attacks.[100] PNH has also systematically failed to provide protection to targeted neighborhoods, to intervene during the perpetration of crimes, or to arrest perpetrators with warrants issued against them.[101] PNH faces significant budgetary and other resource constraints that limits its ability to effectively tackle gang violence,[102] but the police's failure to take any action during the course of vicious, lengthy attacks against civilians raises the specter of intentional complicity, especially when viewed in contrast to the strong showings of force against demonstrators.

# II. Emblematic Attacks Against Civilians

During Jovenel Moïse's presidency, gangs acting with the support of state actors have perpetrated numerous brutal attacks against communities in impoverished neighborhoods around the capital. This report focuses on three such attacks: the 2018 attack in La Saline, the 2019 attack in Bel-Air, and the 2020 attack in Cité Soleil. These attacks were selected for analysis based on their severity and on the availability of existing documentation collected through credible investigations by a diversity of actors.

Common elements present in each of the three attacks raise particular concern that they amount to crimes against humanity under international law. The attacks have had grave impacts on the affected communities; together, at least 240 people were killed,[103] at least 45 injured,[104] at least 25 were raped,[105] and hundreds of homes were destroyed leading to widespread displacement.[106] The attacks targeted civilians who reside in impoverished neighborhoods where opposition to the government runs strong and anti-government protests are common.[107] The attacks were carried out by prominent gang leaders, including Jimmy Chérizier, Serge Alectis *alias* Ti Junior, Iscar Andrice *alias* Isca, and Micanor Altès *alias* Roi Mikano, who in June 2020 formed the G9 gang alliance. The attacks each involve some degree of state involvement—ranging from high-level officials in Moïse's administration to individual PNH officers and resources—indicating that gang attacks are being systematically deployed as a tool of political repression.

A number of independent state, non-governmental, and international actors have investigated the attacks, including the Haitian judicial police (DCPJ), prominent Haitian human rights organizations RNDDH and *Fondasyon Jè Klere* (FJKL), the United Nations through the UN Mission for Justice Support in Haiti (MINUJUSTH) and the UN Integrated Office in Haiti (BINUH), and the media.[108] These investigations have involved interviews with victims, witnesses, community leaders, suspected perpetrators, and state authorities.[109] The following section draws on the findings of these investigations to summarize the key facts of the attacks. Where material discrepancies exist between accounts, it is noted accordingly.

## The Attack on La Saline, November 13-14, 2018

### Lead-up to the Attack

On November 13-14, 2018, armed gangs operating with government support carried out a brutal massacre of residents in La Saline, a neighborhood of Port-au-Prince that has long been the center of anti-government organizing and resistance.[110]

La Saline is a long-standing stronghold of *Fanmi Lavalas*, the political party of former President Jean-Bertrand Aristide and one of the key opposition parties to Moïse's PHTK.[111] The neighborhood is known to have "an exceptional ability to either mobilize or thwart street demonstrations," as protests frequently begin in La Saline and then proceed around the capital.[112] La Saline's political significance has made it a highly contested area for gangs of different political affiliations.[113] Gangs also vie for control of La Saline's *Croix-des-Bossales* market, where they can extort businesses and charge fees for allocating space.[114]

The La Saline community has played an active role in organizing protests against the Moïse administration,[115] and government officials have repeatedly tried to suppress anti-government activity there. In 2017, First Lady Martine Moïse, two government ministers, and other state officials reportedly

met with gang leaders and community leaders in La Saline and offered to invest in community projects in exchange for a reduction in anti-government activities in the area.[116] The proposal was rejected as "bold and inappropriate."[117] As the PetroCaribe movement intensified in 2018, organizers planned large protests for October 17, 2018, the national commemoration day for Haiti's revolutionary leader Jean-Jacques Dessalines.[118] On October 15, 2018, political opposition leaders held a joint press conference in La Saline, rallying support for the movement and demanding Moïse's resignation.[119] Two days later, one of the largest protest in Haiti's recent history took place, with particularly large crowds gathering in and around Port-au-Prince, including in La Saline.[120] Protestors blocked President Moïse from entering La Saline to lay a ceremonial wreath at Dessalines' monument in Pont Rouge, leading to clashes with the police and the police firing guns into the crowd.[121]

With the protest movement in full swing, activists planned another round of nationwide demonstrations for November 18, 2018. On November 6, two weeks before the scheduled protests, Joseph Pierre Richard Duplan, then President Moïse's Delegate for the West Department,[122] and Fednel Monchéry, then Director General of the Ministry of the Interior, reportedly met with Jimmy Chérizier in Delmas 6 to plan an attack against the residents of La Saline.[123] At the time, Chérizier was still a PNH officer and the head of the Delmas 6 gang.[124] He had a reputation for violence and was widely known as a key perpetrator of an earlier massacre in the 2017 Grand Ravine neighborhood, in which nine civilians were killed.[125] According to witnesses, Duplan and Monchéry supplied Chérizier and his gang with weapons, police uniforms, and government vehicles to use in the attack.[126]

| Events leading up to the La Saline attack | |
| --- | --- |
| **Oct. 2017** | First Lady Martine Moïse visits La Saline to ask gang leaders to reduce antigovernment activity in return for investments. |
| **Aug.-Oct. 2018** | PetroCaribe protest movement intensifies. |
| **Oct. 15, 2018** | Political opposition leaders hold joint press conference in La Saline to support antigovernment protests. |
| **Oct. 17, 2018** | Largest protest in Haiti's recent history. Protesters block President Moïse from entering La Saline to lay a ceremonial wreath. |
| **Nov. 6, 2018** | Duplan and Monchéry meet gang leaders to plan an attack in La Saline and provide supplies. |
| **Nov. 13, 2018** | Gangs attack La Saline residents and kill at least 71. |

## The Attack

The details of the massacre that took place seven days later are well-documented.[127] On November 13, heavily armed gangs led by Alectis, Chérizier and other allied gang leaders arrived in La Saline in several vehicles, including an armored vehicle from the Departmental Intervention Unit (BOID), a unit of PNH.[128] The perpetrators began firing automatic weapons around 4pm, and over the course of fourteen hours, killed at least 71 residents, including children and a ten-month-old infant.[129] Some of the perpetrators wore BOID uniforms and lured residents out of their homes under the guise of a PNH operation, then executed them in the streets.[130] Many of the residents were shot and some were beheaded with machetes.[131] At least eleven women were raped, including two gang rapes carried out

inside the victims' homes.[132] The assailants looted at least 150 homes, destroying many of them.[133] An estimated 300 people were forced to flee their homes and sought shelter in the nearby neighborhood of Wharf Jérémie.[134]

The perpetrators removed some corpses to unknown locations and threw others in garbage piles where pigs fed on them.[135] In the morning of November 14, photos and videos of bodies began circulating on social media, allowing online commentators to identify some victims.[136] That evening, the perpetrators dismembered and burned remaining bodies, and transported some of the remains by tractor to another destination.[137] Other remains that could no longer be identified were only retrieved days later when a pastor was able to negotiate safe passage with gang leaders.[138]

The attacks were spearheaded by Chérizier, Alectis, Chrisla, and Andrice, leaders of allied gangs who went on to form the G9 alliance.[139] Eyewitnesses also reported that Duplan, President Moïse's Delegate, was personally present during the attack, talking to Chérizier and other gang leaders.[140] The UN has documented that in addition to Chérizier, at least two other PNH officers participated in the attack.[141]

## State Response

During the course of the 14-hour attack, PNH never intervened to protect the community.[142] PNH has several outposts within a kilometer of the site of the attack, and several police patrol cars were seen near La Saline during the attack.[143] The La Saline police station reportedly informed the Departmental West Directorate of the attack as soon as it began,[144] and by 5pm, at least five PNH units were on notice that the attack was taking place.[145] Citing inadequate resources, no part of PNH made an attempt to intervene.[146]

Even as photos and videos of the gruesome massacre spread across social media, President Moïse did not publicly condemn the violence or pay respects to the community.[147] The government has not offered any assistance or reparations to the survivors or those who are still displaced as a result of the massacre.[148]

Following public outcry, DCPJ conducted an investigation into the attack and reportedly identified 70 individuals responsible for carrying out the massacre, including Duplan, Monchéry, and Chérizier.[149] Prosecutions have been slow to progress, however, and none of the orchestrators of the attack have been arrested.[150] Both Duplan and Monchéry remained in their government roles until September 2019—nearly a full year after the perpetration of the attack— when they were replaced amidst intensifying protests.[151] While PNH fired Chérizier in December 2018, he remains at large despite an outstanding arrest warrant for his role in a massacre in Grand Ravine the year prior.[152] He has gone on to carry out several other massacres since, including the attacks in Bel-Air and Cité Soleil, described below.

## Attack on Bel-Air, November 4-6, 2019

### Leadup to the Attack

Like La Saline, Bel-Air is a key stronghold for government opposition.[153] The neighborhood has traditionally supported *Fanmi Lavalas*, dating back to Jean-Bertrand Aristide's ascent to the presidency.[154] Since Bel-Air is generally a locus for popular protest, gangs in control of the area are well-positioned to prevent demonstrations and hold off political opposition in exchange for payment.[155] The area is also a key access point to several large markets.[156]



In September 2019, anti-corruption protests escalated into a three-month *peyi lok*, in which businesses, schools, and public transportation were closed, and demonstrations against the government took place almost daily.[157] Protestors placed flaming barricades on Bel-Air's main roads, shutting down traffic and blocking government entry to the neighborhood.[158] According to testimony from community leaders, government officials made several attempts to persuade residents to remove the barriers.[159] When these efforts were repeatedly rejected, the Secretary of State for Public Security, Léon Ronsard Saint-Cyr, reportedly approached Chérizier on October 31, 2019 and asked him to secure the removal of barriers and prevent further anti-government protests in Bel-Air.[160] In exchange, Saint-Cyr allegedly provided Chérizier with a large sum of money and several new motorcycles.[161] At the time of this exchange, Chérizier was widely known for his role in both the Grand Ravine and La Saline massacres.[162] Saint-Cyr denies these allegations.[163]

| Events leading to the Bel-Air attack | |
|---|---|
| **Sep.-Nov. 2019** | *Peyi lok* - nation-wide shutdown with regular antigovernment protests known. |
| **Sep.-Oct. 2019** | Government officials fail to persuade residents to remove *peyi lok* road barriers in Bel-Air. |
| **Oct. 31, 2019** | Government official Saint-Cyr reportedly asks Chérizier to remove barriers and to prevent further protests. |
| **Nov. 3, 2019** | Chérizier, 40 armed men, and other gang leaders ask Bel-Air residents to remove barriers. Residents refuse. |
| **Nov. 4-7, 2019** | Chérizier and armed gang members attack residents and burn down houses, killing at least 24. |

## The Attack

On November 3, 2019, 40 armed men led by Chérizier and two allied gang leaders, Wilson Pierre *alias* Ti Sonson and Alex *alias* Malkomprann, went to Bel-Air and offered residents money to remove the barriers.[164] The residents rejected the proposition, noting that the barricades were erected as a part of popular movement that they did not control.[165]

Over the course of the next four days, the gangs carried out attacks that killed at least 24 people, injured five, and burned 28 residences and 11 vehicles.[166] The attacks began on November 4, when Chérizier and his co-perpetrators returned to Bel-Air with 50 heavily armed men carrying automatic assault rifles.[167] Multiple eyewitnesses confirmed the presence of three plain-clothed PNH officers with ties to Chérizier's Delmas 6 gang among the attackers.[168] The assailants fired at residents and homes and set fire to numerous vehicles and residences, injuring at least two residents.[169] The attack was reported on numerous radio stations as it was taking place, but the police did not deploy to intervene.[170] Later in the day, a BOID patrol vehicle happened to pass through Bel-Air and exchanged fire with the attackers, causing the assailants to temporarily retreat.[171] The BOID officers notified central command of the situation, but did not call for reinforcements, physically pursue the attackers, return to provide protection, nor take measures to investigate the attack or identify victims and damage.[172]

In the middle of the night on November 5, Chérizier and his co-perpetrators returned to Bel-Air, again firing at civilian homes while residents slept inside, injuring at least one woman.[173] A group of off-duty police officers residing in an adjacent neighborhood opened fire in response, killing Alex in the shootout.[174] On November 6, Chérizier, Pierre and their men returned to avenge Alex death.[175] Armed with military rifles and assault rifles, they killed two men and a 16-year-old girl and set 26 homes ablaze.[176] Deadly attacks on Bel-Air continued for several days throughout November.[177]

### State Response

Bel-Air is surrounded by police outposts, including four local police stations, the main Port-au-Prince station, and three police department headquarters.[178] Over the course of the multiple-day attacks, residents repeatedly called on the authorities for help.[179] These requests were widely circulated over the radio and social media, but PNH did not intervene or provide protection.[180] Investigations and prosecution of these crimes have largely stalled, and the UN has expressed concern that this lack of accountability contributed to an increase in gang attacks throughout 2020, including the attack on Cité Soleil.[181]

## Attack on Cité Soleil, May-July 2020

### Leadup to the Attack

Cité Soleil is a deeply impoverished and densely populated commune with approximately 250,000 residents.[182] It borders La Saline to the north. Like La Saline and Bel-Air, it is a historical stronghold for *Fanmi Lavalas*.[183] For decades, warring gangs have controlled different neighborhoods in Cité Soleil, but gang fighting has intensified in recent years.[184] Control over Cité Soleil has political implications because it is an area with many large polling stations; the gangs that hold territorial control are in a position to influence electoral outcomes and political activities.[185]

Violent gang fighting surged in 2020 during the solidification of the G9 alliance and in anticipation of elections, in what appears to be a concerted effort to turn Cité Soleil into an area controlled by pro-government gangs.[186] In May 2020, Altès, the leader of one of the anti-government gangs in Cité Soleil, was allegedly paid by an unidentified state actor to switch political alliances and eliminate Ernso Nicolas, another anti-government gang leader in the area.[187] He allegedly received 40,000 US dollars, five new firearms, the return of three other weapons previously seized by the police, and the withdrawal of official 'wanted person' notifications as a part of the deal.[188] After Nicolas was murdered, several gangs with ties to the government joined forces to take control of additional anti-government strongholds.[189]

To this end, on May 23, 2020, Chérizier convened a meeting of 13 gang leaders—who would go on to form the G9 alliance—to plan simultaneous attacks in various parts of Cité Soleil and the adjacent neighborhood of Nan Tokyo.[190] The attacks targeted Pont Rouge, where residents had blocked Moïse from laying a wreath the year prior; Nan Brooklyn, a neighborhood in Cité Soleil controlled by Gabriel Jean-Pierre *alias* Ti Gabriel, who reportedly supported government opposition during *peyi lok*; and Nan Tokyo, which had previously been brutally attacked by Chérizier and Alectis.[191]

| Timeline of the Cité Soleil Attack | |
|---|---|
| **May 2020** | Government official reportedly pays gang leader Micanor Altès to switch alliance from antigovernment gang to Chérizier-allied gangs, kill another antigovernment gang leader. |
| **May 23, 2020** | Chérizier convened meeting of 13 gang leaders, including Altès, to plan simultaneous attacks against in parts of Cité Soleil and Nan Tokyo. |
| **May 24-27, 2020** | Chérizier and allied gangs attack Cité Soleil and Nan Tokyo, killing at least 34 people. As a result, Chérizier and allies take control of nine more areas. |
| **Jun. 2020** | Chérizier and allies form the G9 gang alliance. |
| **Jun.-Jul. 2020** | G9 focuses attacks on Nan Brooklyn neighborhood of Cité Soleil, controlled by their rival Gabriel Jean-Pierre. During this period, at least 111 were killed. |

### The Attack

Between May 24 and July 31, 2020, communities in Cité Soleil faced an onslaught of gang-led assaults during which at least 145 people were killed and 98 homes were destroyed.[192]

On May 24, Chérizier and his men arrived in Nan Tokyo, while gangs led by Altès and Alectis besieged Pont Rouge.[193] Throughout the afternoon and evening and carrying into the following day, the gangs fired automatic weapons at civilians, reportedly killing numerous people.[194] When rival gangs hid in a post-earthquake resettlement camp for disabled people, attackers followed them there on May 25 and set 24 residences on fire, killing two residents.[195]

On May 26, at around 3pm, five armored PNH vehicles parked outside a key entrance to Nan Brooklyn.[196] According to survivors' accounts, tear gas tubes and cylinders were indiscriminately fired, forcing residents to flee and leading to an eruption of gunfire from all directions.[197] Residents were shot and attacked with knives and stones as they tried to escape.[198] Some were beheaded.[199] Many bodies were burned and thrown into the water.[200] On May 26 and 27, gangs attacked Nan Brooklyn killing at least four people, injuring 20 others, and setting fire to multiple houses.[201] G9 gangs also attacked displaced persons from La Saline who had taken refuge at the Wharf Jérémie after the November 2018 massacre, killing them and throwing their remains into the sea.[202] As a result of these attacks, the G9 took control of nine more areas, including Chancerelles, Nan Tokyo, and Fort Dimanche.[203]

After the May 2020 attacks, the entire commune of Cité Soleil was subject to greater gang-related violence. Between June and July 2020, G9 gangs murdered at least 111 people, a number of whom were first captured and then shot in the head.[204] The gangs also committed rapes and burned houses.[205] The G9 particularly focused attacks in Nan Brooklyn, the neighborhood still controlled by their rival and anti-government leader Gabriel Jean-Pierre.[206] They carried out five separate attacks on the Nan Brooklyn Market during this period and monitored all roads into Nan Brooklyn.[207]

## State Response

There is no indication that police intervened in order to protect civilians during the course of the sustained attack. RNDHH notes that police presence in the area was markedly lower throughout this time,[208] and that PNH officers twice abandoned the Cite Soleil police station during the height of the attack, citing a lack of resources and reinforcements.[209] Given the scale of the insecurity, police interviewed as a part of RNDDH's investigation noted that units needed reinforcements and a comprehensive plan for intervention from senior officials, including the Directorate General of PNH, but no such plan was issued.[210] Meanwhile, some PNH officers and resources were periodically used to perpetrate the attacks. In addition to PNH's involvement in the May attack, on July 2, 2020, two armored PNH vehicles passed through an area under G9 attack and shot at passersby in the direction of homes, killing at least five civilians and injuring ten others.[211] Four armored PNH carriers also assisted G9 gangs on July 19, 2020 to take back a building seized by Jean-Pierre.[212] While the Prime Minister and the Minister of Justice and Public Safety have allegedly issued orders to pursue accountability for perpetrators, no arrests appear to have been made in connection with the attack.[213]

RNDDH interviewed residents of Cité Soleil who believe that the attacks were politically motivated, carried out as a part of a concerted effort between gangs and the government to control the neighborhoods for electoral purposes.[214] Former Deputy for Cité Soleil, Pierre Lemaire, told FKJL that President Moïse set out to remove Jean-Pierre from control of the neighborhood after learning of his role in organizing anti-government activity during *peyi lok* in 2019.[215] Residents of Pont Rouge believe they were targeted in retaliation for denying Moïse entry to the area for the October 17, 2018 wreath-laying ceremony.[216] While additional evidence is needed to confirm these theories, they are consistent with a broader pattern of state-sponsored gang attacks being used for political aims.

| Gangs implicated in each attack | |
|---|---|
| **La Saline attack 2018** | • Chabon led by Alectis • Delmas 6 led by Chérizier <br> • Nan Bwadom led by Jimmy Joseph • Belekou led by Iscar Andrice <br> • Twi Bwa led by Chrisla • Base Pilate led by Wilson Pierre <br> • St Martin Street gang led by Alex |
| **Bel-Air attack 2019** | • Delmas 6 led by Chérizier • Chabon led by Alectis <br> • Krache Dife led by Pierre • St Martin Street gang led by Malkonprann |
| **Cité Soleil attack 2020** | • Wharf Jérémie gang led by Altès • Chabon led by Alectis <br> • Delmas 6 led by Chérizier • Simon Pélé gang led by Zouma <br> • Belekou led by Iscar Andrice • Nan Boston gang led by Matias Saintil |


# III. Legal Analysis: There Is a Reasonable Basis to Conclude That the Attacks Amount to Crimes Against Humanity

## Crimes Against Humanity Under International Law

Crimes against humanity are among the gravest crimes under international law. They are considered crimes not just against the individual victims, but humanity as a whole.[217] Crimes against humanity are prohibited under customary international law and are considered *jus cogens*, a peremptory norm from which no derogation is permitted.[218] They are therefore prohibited internationally regardless of whether a state has affirmatively joined a treaty that outlaws such crimes.

This section assesses whether the attacks in La Saline, Bel-Air, and Cité Soleil meet the legal definition of crimes against humanity under international criminal law. The report uses the definition of crimes against humanity articulated in the Rome Statute, the international treaty that created the International Criminal Court (ICC), because the Rome Statute and related jurisprudence is regarded as the most widely accepted and recent articulation of the crime under international law.[219] Where instructive, the analysis in this section also draws on case law from other international criminal tribunals.

To find that crimes against humanity are taking place under the Rome Statute's definition, several elements must be present. First, the attack must involve at least one of the underlying crimes listed in Article 7(1) of the Rome Statute, such as murder or rape.[220] Second, several contextual elements must be met: the underlying crimes must be (1) committed as part of an attack directed against any civilian population; (2) that is widespread or systematic; and (3) that is pursuant to or in furtherance of a state or organizational policy.[221]

Based on the publicly available evidence, there is a reasonable basis to conclude that all these elements are met, and that the attacks in La Saline, Bel-Air, and Cité Soleil amount to crimes against humanity. The report uses the "reasonable basis" standard because it is the one used by the ICC prosecutor to determine whether to open an investigation into a given situation, with a view to prosecuting the individuals who are personally responsible for committing the crimes.[222] While Haiti has signed, but not ratified the Rome Statute, and therefore is not subject to the prosecutor directly opening an investigation, the framework is useful for evaluating Haiti's international duty to fully investigate and prosecute the crimes. Moreover, the UN Security Council may refer crimes against humanity in Haiti to the ICC, regardless of whether Haiti is a party to the Rome Statute.[223] Potential venues for trying crimes against humanity are discussed in Section V, below.

## The Attacks Involved Qualifying Acts of Violence

To find that a crime against humanity has taken place, at least one of the underlying crimes listed in Article 7(1) of the Rome Statute must be present. There is evidence that at least four such crimes were perpetrated in the attacks in La Saline, Bel-Air, and Cité Soleil: murder, rape, torture, and the persecution of groups based on their political identity. Each are analyzed in turn.

## Murder

The Rome Statute and Elements of Crime define murder as the killing of one or more persons.[224] Investigations into the attacks have documented at least 240 civilians who were killed in the three attacks. In the La Saline attack of November 2018, RNDDH documented that at least 71 people were killed as assailants systematically shot and beheaded civilians.[225] This number is likely an undercount; since many bodies were burned, chopped into pieces, and disposed of by the gangs, human rights investigators have noted that the true number of deaths may never be known.[226] In the Bel-Air attack of November 2019, Chérizier and his associates killed at least 24 people.[227] Between May 23 and July 28, 2020, armed gangs led by G9 members killed at least 145 people in numerous attacks on and around Cite Soleil.[228]

## Rape

Rape is another prohibited act under the Rome Statute. Rape requires the invasion, committed by force, threat of force, or coercion,[229] of a person's body "by conduct resulting in penetration, however slight, of any part of the body of the victim or of the perpetrator with a sexual organ."[230]

Human rights groups have documented the use of rape as a tool to terrorize civilians in the La Saline and Cité Soleil attacks. Haitian human rights organizations have reported 11 cases of rapes, including gang rapes, that took place during the 2018 attack on La Saline.[231] RNDDH interviewed a 19-year old woman who recalled that at least five men broke into her house and gang raped her.[232] J.J.L., a 26-year-old survivor, described how armed men entered her house, raped her, and then set her house on fire.[233] Similarly, J.J., a 27-year-old woman, reported that she was in her home when two armed individuals broke into her house and then took turns raping her.[234] Another 23-year-old woman was beaten with rifles before the assailants raped her.[235] A 14-year old girl also reported on the radio that she was raped by Alectis, leader of the Chabon gang.[236]

During the course of the attack on Cité Soleil from May 24 to July 28, 2020, RNDDH documented that at least 18 women were raped by gang members.[237] Many survivors named the armed gangs led by Iscard Andrice as key perpetrators.[238] A.C., a 38-year-old woman, reported being raped by three members of Andrice's gang in her home on June 3.[239] On the same day, 25-year-old F.P. was beaten and raped by at least five of Andrice's men.[240] Other survivors described how they were accosted by gang members as they were walking to work or on their way to buy groceries. L.T. was on her way to buy food for her three children when two armed men beat her, dragged her into an alley, and then took turns raping her.[241] On July 7, two young women were captured by three armed men and held for several hours during which they repeatedly raped. S.R., a 59-year-old woman, was walking in Cité Soleil when armed gang members stopped her and began to beat her. One of the perpetrators dragged her into a street corner and raped her.[242]

These testimonies likely do not capture the full scale of rapes committed during the attacks, as social stigma often stifles the reporting of the crime.[243]

## Torture

Torture is another crime that underlies crimes against humanity.[244] The Rome Statute defines torture as the intentional infliction of severe pain or suffering, whether physical or mental, and which does not arise from lawful sanctions.[245] Courts have further elaborated that, to rise to torture, the infliction

of severe pain or suffering must be aimed at "obtaining information or a confession, or at punishing, intimidating or coercing the victim or a third person, or at discriminating, on any ground, against the victim or third person."[246]

Courts have consistently found that rape is a form of torture.[247] As discussed above, rape—and therefore torture—was used as a tool to terrorize civilians in at least 11 instances in the La Saline attacks and in at least 18 instances in the Cité Soleil attacks. Perpetrators in the La Saline attacks also tortured victims by raping them while relatives were watching, and by causing victims to watch the rape of their relatives. Such acts inflict severe mental suffering that amounts to torture.[248] The UN verified that in the La Saline attacks, gang rapes took place in the homes of the victims, in front of their parents or children.[249] In one such case, the perpetrators also mutilated the rape victim's parents.[250] Such mutilation inflicts severe pain in itself, and especially rises to torture in the context of mental suffering from watching the rape of a child.[251]

Other acts in the attacks also likely inflicted severe pain that amount to torture. In the aftermath of the La Saline attacks, for example, human bodies were found charred, mutilated, dismembered, and left for pigs to feed on.[252]

These acts amount to torture as they appear aimed to punish or intimidate the victims. Each of the attacks were perpetrated against residents in neighborhoods known as antigovernment strongholds and sites of recent antigovernment activity. As further discussed below, the perpetrators likely attacked these victims to punish them for perceived antigovernment activity and to intimidate them from further antigovernment activity. Moreover, in the Bel-Air attack, RNDDH reports that a man named Etienne Monbrun was captured and taken to Delmas 4, where he was brutally beaten and eventually killed for failing to provide the information that gang members requested.[253] This particular act also amounts to torture as the pain was inflicted in order to obtain information.

## Persecution against an identifiable group or collectivity on political grounds

Persecution of identifiable groups on political grounds is another prohibited act. The Rome Statute defines persecution as the intentional and severe violation of fundamental rights contrary to international law by reason of the identity of the group or collectivity.[254] The severe deprivation of fundamental rights can include murder, sexual assault, and property damage such as the burning and pillaging of homes.[255]

The neighborhoods of La Saline, Bel-Air, and Cité Soleil are all known strongholds of the political opposition. The communities were particularly active in organizing and carrying out protests against Moïse that included publicly calling for his resignation. They are also historical strongholds of the *Fanmi Lavalas* party, a key opposition party to Moïse's PHTK, and have become rallying sites for broader alliances opposed to PHTK.[256] As set out in Section II, the massacre in La Saline followed several failed attempts by senior government officials to bribe the community into discontinuing anti-government demonstrations.[257] The attacks in Bel-Air similarly took place after failed government attempts to persuade residents to remove blockades during the *peyi lok* anti-government protests.[258] Finally, residents of Cité Soleil believe that they were targeted because of their political affiliations with *Fanmi Lavalas*, in an effort to ensure pro-government election outcomes.[259] The community in Pont Rouge further believes that they were targeted in retaliation for having blocked President Moïse from laying a wreath there during the October 2018 protests.[260] These common characteristics and the context in which the attacks were perpetrated suggest that the residents of La Saline, Bel-Air, and Cité Soleil were targeted because of their identity as supporters of the political opposition.

### The underlying crimes are a part of the attacks

In order to meet the requirements for crimes against humanity, the underlying crimes must be a part of the attack.[261] The crime cannot be an isolated act so far removed from an attack that, considering the context and circumstances, it cannot reasonably be said to have been part of the attack.[262] In order to determine whether a specific act of violence has an adequate nexus to the attack, an individualized inquiry is needed. For the purpose of meeting the definition of crimes against humanity, however, it is sufficient to view the acts as whole to assess whether their "characteristics, aims, nature, or consequence" demonstrate that they are objectively connected to the attack.[263]

The acts enumerated above—murder, rape, torture, and destruction of property—make up the heart of the attacks on La Saline, Bel-Air, and Cité Soleil. These acts are not isolated or disconnected from the attacks, but rather appear to be carried out pursuant to a pre-established plan.[264] This conclusion is reinforced by the fact that in each of the attacks, the perpetrators came to the sites of the attack together, they were sufficiently armed to cause widespread harm, and they worked together to inflict violence in a coordinated manner.[265]

Further fact-finding may also reveal additional acts that formed parts of these attacks.

## The Attacks Were Directed Against a Civilian Population

### The assaults on La Saline, Bel-Air, and Cité Soleil constitute attacks

The Rome Statute requires that the prohibited acts must be part of "an attack directed against any civilian population."[266] An "attack" refers to multiple commissions of prohibited acts that form a course of conduct or pattern of behavior.[267] It describes a series or overall flow of events as opposed to a mere aggregate of random acts.[268]

The evidence indicates that the events in La Saline, Bel-Air, and Cité Soleil each meet the definition of an attack. The killings, rapes, and property destruction in La Saline were carried out pursuant to a preconceived plan and followed a systematic pattern that formed an attack on the neighborhood.[269] In Bel-Air, the killings and property destruction were also carried out pursuant to a plan. They took place over the course of three days, and were carried out by the same perpetrators who repeatedly returned to continue the attack.[270] Finally, the crimes committed by G9 in Cité Soleil also follow a pattern that indicates that they were not merely an aggregate of random acts. The assaults on May 24-27 were carried out pursuant to a plan to simultaneously target Nan Brooklyn, Nan Tokyo, and Pont Rouge.[271] As a result, G9 gained control of nine new neighborhoods in Cité Soleil.[272] Nan Brooklyn, however, remained under the control of rival Jean-Pierre.[273] G9 then continued to carry out killings, rapes, and property damage in June and July that focused on Nan Brooklyn, using a similar pattern of violence targeted at civilians.[274] The evidence indicates that these were not random acts of gang violence, but a part of an ongoing attack over an extended period of time.[275]

The assaults on La Saline, Bel-Air, and Cité Soleil could also potentially be viewed as components of a sustained, multi-year attack against civilians pursuant to an effort to exert control over communities opposed to the government.[276] The repeated involvement of Chérizier, the common characteristics of the targeted neighborhoods, and similarities in how the attacks were carried out, may establish a broader pattern indicative of such a sustained attack. Since the available evidence supports a finding that each of the assaults in and of themselves amount to crimes against humanity, however, this report primarily analyses each event as a separate attack.

### The attacks were directed against a civilian population

The attacks must be directed at a civilian population. This distinguishes crimes against humanity from attacks directed against "armed forces and other legitimate combatants."[277] To meet this element, civilians must be the "primary object of the attack," and not just incidental victims of the attack. [278] Moreover, the attack must target a broader group and not merely a "limited and randomly selected number of individuals."[279] The targeted civilian population can include a group defined by its perceived political affiliation.[280]

The primary objects of the three attacks are civilian residents of the targeted opposition neighborhoods. The manner in which the residents were targeted—including being extracted from or sought out in their homes to be murdered or raped—demonstrates that they were primary targets of the attacks, and not merely collateral damage in the context of gang fighting.

## The Attacks Were Widespread and Systematic in Nature

In order for specific crimes to amount to crimes against humanity, they must also be a part of an attack that is either widespread or systematic in nature.[281] While only one of the two is required to establish this element,[282] the existing evidence supports a finding that the attacks in La Saline, Bel-Air, and Cité Soleil were both widespread and systematic.

### The attacks were widespread

An attack is widespread when it is a large-scale attack with numerous victims.[283] While no numerical threshold of victims must be met and no large geographic area is required,[284] courts have taken into account the consequences of the attack on the targeted population, the number of victims, and the nature of the acts.[285]

Each of the three attacks meet this requirement. In La Saline, the attackers killed at least 71 people, raped seven people, and vandalized 150 homes.[286] In Bel-Air, the gangs killed at least 24 people and set 28 houses on fire.[287] In the attack on Cité Soleil, the perpetrators killed at least 145 people and burned or vandalized more than 90 houses.[288] The cumulative number of deaths as a result of these attacks is at least 240. Beyond the number of causalities and physical injuries, the attacks have had dire economic and social consequences on the civilian population in these neighborhoods. According to human rights groups, hundreds of civilians were displaced as a result of the La Saline massacre.[289] Many have not been able to return to their homes and became homeless, and some who sought shelter in Wharf Jérémie were executed during the attack on Cité Soleil two years later.[290] The UN reports that the attacks in Cité Soleil rendered at least 298 households displaced,[291] and Haiti's Office for Civil Protection estimates the number of displaced persons to be over 1000.[292] As insecurity persists, terror and trauma continues to prevail in the targeted communities.

### The attacks were systematic

While it is only necessary to demonstrate that an attack is widespread, there is also evidence that the attacks were systematic. Systematic refers to the "the organized nature of the acts of violence and the improbability of their random occurrence."[293] A systematic attack may be demonstrated through "patterns of crimes—that is the non-accidental repetition of similar criminal conduct on a regular basis."[294] Other factors that are indicative of a systematic and organized attack include the identification of a target population prior to the commencement of the attack, the ferrying of attackers

from other locations specifically for the purpose of the attack, and the provision of uniforms and weapons to the attackers.[295]

The attacks in La Saline, Bel-Air, and Cité Soleil were far from spontaneous or random; rather, each attack was organized and entails a pattern of similar criminal conduct.

The 2018 La Saline attack was well-organized and carried out pursuant to an established plan. Two weeks before the attack, Richard Duplan, then President Moïse's Delegate for the West Department; Fednel Monchéry, then Director General of the Ministry of the Interior; and gang leaders including Chérizier met to plan the attack.[296] During the planning meeting, Duplan and Monchéry reportedly furnished the gangs with weapons, police uniforms, and government vehicles that were used in the attack, and provided payment for the execution of the attack.[297] On November 13, 2018, about 50 heavily-armed assailants arrived in La Saline together in order to carry out the attack.[298] The acts of violence carried out during the attack follow a pattern of similar criminal conduct: over the course of fourteen hours, the assailants divided into four groups and systematically went from house to house, pulling residents out their homes and killing them with single shots or machete blows.[299] Numerous bodies were hacked to pieces and several women were raped.[300] An estimated 150 homes were looted and burned.[301] Gangs also appear to have coordinated in the disposal of bodies; gangs burned the corpses in the evening, and a tractor picked up the burnt bodies and moved them to another location on the night of November 15-16.[302]

The 2019 Bel-Air attack was similarly planned and organized, and showed a pattern of terrorizing civilians. After failed attempts to remove flaming barriers placed on Bel-Air's roads as part of the *peyi lok* protests, then Secretary of State for Public Security Léon Saint-Cyr reportedly met with Chérizier and paid him a significant sum of money to secure the removal of the barriers and prevent further anti-government protests in Bel-Air.[303] Chérizier initially approached organizers with 40 armed men and sought to bribe them into removing the barricades.[304] After he was rebuffed, Chérizier brought 50 heavily-armed men carrying automatic assault rifles to Bel-Air on November 4, 2019, to carry out the attack.[305] They terrorized the neighborhood, shooting civilians and setting fire to homes.[306] Gangs returned for two consecutive nights, wearing coordinated military uniforms and again firing at civilians and setting fire to their homes while they slept inside.[307]

The May-July 2020 attack on Cité Soleil also reveals organization and a pattern of terrorizing civilians through similar criminal conduct. Thirteen gang leaders from the G9 alliance met on May 23, 2020 to plan simultaneous assaults on Pont Rouge, Chancerelles, and Nan Tokyo.[308] In these attacks, gangs again fired at civilians, burned their bodies, and set houses on fire.[309] Those who tried to flee were specifically targeted and shot, attacked with knives or stones.[310] Some were beheaded. Throughout June and July, the G9 continued its assault on the residents of Cité Soleil to capture parts of the area not yet under their control.[311] G9 particularly focused on Nan Brooklyn, a neighborhood controlled by their rival Jean-Pierre.[312] Within these attacks, gang members followed a similar pattern of terrorizing civilians by capturing them and then shooting or raping them and burning numerous houses.[313] The violence does not appear to be random, accidental, or isolated.

## The Attacks Furthered a State or Organizational Policy

The Rome Statute also requires that the attacks were committed pursuant to, or in furtherance of, a state or organizational policy to commit the attack.[314] The policy element does not refer to a formally defined policy in the commonly used sense; rather, any attack "which is planned, directed or organized—as opposed to spontaneous or isolated acts of violence"[315] will qualify as a policy.


To establish a policy, it is relevant that the state or organization actively promoted or encouraged an attack against a civilian population;[316] however, attacks do not have to be predetermined in order to be part of a policy. A policy may "only crystallize and develop as actions are set in train and undertaken by perpetrators," such that it is only possible to define the overall policy in retrospect.[317] Motive or purpose is not required to prove a policy to attack a civilian population.[318]

The policy element shares many similarities with the systematic element, such that evidence relevant to demonstrating the systematic nature of an attack is also relevant to whether the attack was carried out pursuant to a policy.[319] However, the two elements are not simply synonymous.[320] The systematic nature of an attack concerns the pattern of repeated, non-random acts of crime, but "to establish a 'policy' it need be demonstrated only that the State or organization meant to commit an attack against a civilian population."[321]

### The attacks furthered a state policy

There are substantial grounds to find that the attacks in La Saline, Bel-Air, and Cité Soleil furthered a state policy to attack civilians in order to discourage or repress political opposition. A state policy does not have to be explicit or formal; indeed, it is relatively rare that a "State or organization seeking to encourage an attack against a civilian population might adopt and disseminate a pre-established design or plan to that effect."[322] Instead, a state policy to attack can be inferred from such evidence as preparations or collective mobilization coordinated by the state,[323] including "the enlistment of gangs to unleash violence on perceived rival communities."[324] The police's deliberate failure to take action, with the aim of encouraging the attack,[325] and the political background against which the attack took place,[326] are also relevant.

The involvement of various Moïse administration officials and police officers in planning and executing the attacks point to a state policy to attack civilians. As set out in the preceding section, each attack was carried out pursuant to a plan, and evidence suggests that government officials were active in the preparations of at least the La Saline and Bel-Air attacks and that they enlisted gangs to carry out the attacks. The attack in Cité Soleil was triggered by an unidentified government official paying Altès to switch political alliances and kill another anti-government gang leader in the area.[327] Even if the government official did not commission the attack on civilians *per se*, this reinforces a pattern of gangs being used to effectuate a state policy.

Persistent use of police resources in the execution of the attacks also support an inference of a policy.[328] Gang members arrived in a BOID vehicle in the La Saline attack,[329] undercover police officers attacked civilians alongside gang members in the Bel-Air attacks,[330] and Chérizier arrived in Cité Soleil in a PNH vehicle in the May 2020 attacks.[331] Moreover, the police failed to intervene to protect civilians in each of the attacks. The La Saline attack lasted for 14 hours without any intervention from PNH, even though two police sub-stations were less than a kilometer away and five different police units were on notice of the attacks.[332] The Bel-Air attack took place over a three-day period without PNH intervention, even though police stations surround the area and a BOID control alerted the police force of the attacks.[333] The police also did not intervene in the May attack on Cité Soleil, and RNDDH reports that PNH's presence generally declined in the area despite continued violence against civilians over the subsequent months.[334] The extended time periods of the attacks provided ample opportunity to at least attempt to intervene, call in reinforcements, and/or gather additional resources. Especially when viewed in contrast to the strong show of force by police against protesters, these facts may suggest a conscious aim to encourage the attacks.

Finally, the political background of the attacks suggest that they furthered a broader state policy to repress. As set out in Section I, President Moïse has engaged in a persistent pattern of repression against the political opposition. Moreover, as detailed above, each of the attacked neighborhoods are opposition strongholds and each attack took place in the context of growing protests against Moïse's administration. This political background, and state actors' involvement in the planning and execution of the attacks, indicate that the attacks furthered a state policy.

### The attacks furthered a separate gang policy to attack

The attacks also appear to have furthered the gangs' own organizational policy to attack civilians in order to gain territorial control. First, the gangs that carried out the attacks are organizations within the meaning of the Rome Statute. "Organizations" include non-state-actors and do not need to be organized similarly to a state.[335] Rather, instructive factors include: (1) whether the group is under a responsible command or has an established hierarchy;[336] (2) whether it has the necessary capacities to "allow an attack to be executed", including having the membership and resources to undertake the "action, mutual agreement and coordination;"[337] (3) whether it exercises control over part of the territory of a state; and (4) whether it has criminal activities against civilians as a primary purpose. Applying such factors, organized gangs in other contexts have been found to meet the definition of an organization under the Rome Statute.[338]

As noted in Section I of this report, the gangs involved in these attacks are structured entities organized under a leader who exerts command over the membership.[339] The gangs exercise authority over distinct territories, command significant resources, and often carry out state-like functions with regards to the populations they control. These structures and resources allow gang leaders to efficiently coordinate attacks against a civilian population.

Ample evidence indicates that the gangs were acting pursuant to a policy to gain territorial control by attacking the civilian population. While analyzing each specific gang implicated in each attack is beyond the scope of this report, these gangs generally follow an economic model that relies on exerting authority over territory through the use of violence.[340] As discussed above, the attacks were directed by established gang leaders, planned in advance, and well-organized in their execution. Chérizier, who orchestrated each of the attacks, has himself articulated a policy of sorts, calling his gang activities an "armed revolution," while noting that he would "put guns in the hands of every child if we have to."[341] These aspects all point to the attacks having been carried out in furtherance of an organizational policy.

Thus, there is a reasonable basis to conclude that the elements of crimes against humanity are met in the attacks on La Saline, Bel-Air, and Cité Soleil.

# IV. The Available Evidence Points to Several State Actors Who May Be Liable for Crimes Against Humanity

Under international criminal law, criminal liability for crimes against humanity extends both to the individuals who carry out the underlying violent acts, and to the individuals who have planned, instigated, ordered, or otherwise aided and abetted in the planning, preparation, or execution of the attacks.

To date, much of the international reporting on these attacks has focused on gangs as the chief perpetrators.[342] Indeed, the attacks were led by gang leaders, most prominent among them Jimmy Chérizier, who appears to have played a central role in orchestrating and executing each of the three emblematic attacks. Investigators have also identified the gangs that directly participated in carrying out these attacks, and in some cases, the individuals who committed the specific crimes.[343] It is critical for these individuals to be fully investigated, tried, and punished for crimes against humanity. As the UN has stressed, the ongoing failure to hold perpetrators accountable for these attacks is "creating an enabling environment for further violence."[344]

Yet the available evidence also suggests repeated involvement of state actors in both the commission of the crimes, and in ordering, instigating, and enabling the attacks. These state actors include officers within PNH who participated in carrying out the attacks or otherwise supported their execution; senior officials in the Moïse administration who appear to have commissioned the attacks; and President Moïse himself, whose position of control and failure to act in response may trigger liability under the doctrine of command responsibility. Individuals in a position of superiority who fail in their duty to prevent or punish crimes against humanity may be considered more culpable than the direct perpetrators, in light of their leadership position and their failure to uphold duties to prevent or punish the crimes.[345]

Despite the potential liability of state actors for these attacks, their role in perpetrating crimes against humanity in Haiti has received relatively less attention at the international level.[346] In order to provide a fuller picture of the actors who could be responsible for crimes against humanity in Haiti, this section identifies the principal legal theories under which state actors may be held criminally responsible for the attacks.

Assigning criminal responsibility to specific individuals requires an extensive, individualized inquiry into the actions and state of mind of specific perpetrators, and will necessitate additional fact-finding and investigation. While such an analysis is thus beyond the scope of this report, this section sets out the most relevant analytical frameworks for understanding potential liability of the state actors implicated in the attacks to date. Further investigations are needed to establish the extent of state involvement, the specific acts in which various individuals were involved, and the state of mind of the accused.

## Direct Commission

In addition to gang members, the available evidence implicates state actors in the direct commission of certain crimes. These individuals can be held criminally responsible if their acts were a part of the widespread or systematic attack and they acted with knowledge that their conduct was part of such an attack.[347]

Investigations have found that multiple PNH officers participated in the attacks alongside gang members. Chérizier was still a police officer at the time of the La Saline attack and has been consistently singled out for responsibility in the attacks.[348] Then-police officer Gregory Antoine, *alias* Ti Greg, and Gustave *alias* Chupit are also accused of participating in the La Saline attack.[349] In the Bel-Air attack, eyewitnesses report that three police officers in civilian clothes who had ties to Chérizier's gang shot residents and burned vehicles alongside gang members.[350] The UN's investigation identified two of the police officers by precinct and noted that the third was believed to be a member of the National Palace security.[351] In Cité Soleil, police officers in armored vehicles who drove through the neighborhood during the course of an attack reportedly shot and killed five civilians.[352]

These officers may be responsible for directly committing crimes against humanity if they knew or intended for these acts to be a part of the attacks.[353] Given that the PNH officers were seen working closely with gang members during the attacks, it is likely that such knowledge existed. Further fact-finding and an individualized inquiry into the actions and states of mind of specific officers are required to establish their responsibility.

## Aiding and Abetting

Even if there is not adequate evidence to establish that state actors personally carried out the underlying criminal acts, they may still be responsible for aiding and abetting crimes against humanity.[354] Aiding and abetting refers to acts or omissions that assist, encourage, or lend moral support to crimes.[355] The assistance may either be practical, material, moral, or psychological,[356] provided that it had an effect on the crime.[357] Moreover, under the Rome Statute, the aider and abettor must also have acted with the purpose of facilitating the commission of the crime.[358]

### Haitian National Police

The existing evidence indicates that PNH officers may have aided and abetted the crimes through: (1) their presence and actions during the course of the attacks;[359] (2) the provision of PNH resources for use in the attacks;[360] and (3) their failure to intervene and protect civilians under attack.[361]

First, as noted above, a number of police officers actively supported gang perpetrators in each of the three attacks. In La Saline and Bel-Air, the officers were identified as participating in the attack alongside gang members.[362] Even if evidence is inadequate to hold them responsible for directly committing the underlying crimes, their presence likely served as encouragement to the principal perpetrators, especially in light of their positions of authority.[363] The circumstances of the attacks, including the pre-planning, scale, concentration, extended period of the attacks, and the fact that the PNH officers worked alongside gang members during the attacks, suggest that they intended to facilitate the crimes through their presence. In Cité Soleil, the police arrived separately from the gangs, but did not intervene to stop the attacks and instead may have assisted through their own use of force against civilians. On May 26, 2020, five armored PNH vehicles parked at the entrance to Nan Brooklyn and fired gas tubes and cylinders that forced residents to flee and set the stage for gangs to systematically chase down and attack civilians.[364] In July, two armored PNH vehicles passed through an area under G9 attack and shot at passersby, killing at least five civilians.[365] Additional investigations may further support the conclusion that the police acted with the purpose of facilitating the attacks.

Moreover, RNDDH has documented that Chérizier generally operates with the assistance of PNH officers, who facilitate his travel and ensure his safety, including during the course of criminal activities.[366] RNDDH has identified officers Garry Sanon, Alain Boyard, Mackendy Cantave, David

Diverant, and Luckson Dessources as acting in collusion with Chérizier.[367] If further investigations show that their services were used in the attacks discussed here, and that the services were provided with the purpose of facilitating the attacks, these officers could also be liable for aiding and abetting crimes against humanity.

Second, official PNH resources including weapons, vehicles, and uniforms were used in the attacks on La Saline and Cité Soleil. In La Saline, some of the assailants were transported to the scene in an armored BOID vehicle, wearing BOID uniforms that induced residents to believe they were a part of an official PNH operation rather than an operation aimed at the residents themselves.[368] RNDDH's investigation indicates that these resources may have been furnished by Duplan and Monchéry, but further investigation may show that police officers were also complicit in making the resources available for the purpose of facilitating the crimes.[369] In Cité Soleil, Chérizier again arrived at the scene of the May attack in a PNH vehicle.[370] In July 2020, four armored PNH personnel carriers assisted armed gangs led by Andrice and Saintil in taking over a building where multiple people were killed.[371] While investigations to date do not establish how these vehicles were obtained, further investigations may find that they were provided by PNH officials to facilitate the crime.[372]

Finally, the police may have facilitated the crimes by failing in their legal duty to intervene to protect civilians during the attacks. During the multiple-day attacks in Bel-Air, residents made repeated pleas for help, the attacks took place in a neighborhood surrounded by police outposts, and a police patrol notified central command of the attack, yet PNH did not respond. As the UN has found, the police's failure to respond to La Saline, moreover, may not only have signaled official approval for the attacks, but also facilitated the ongoing perpetration of the crimes and the high death toll.[373] RNDDH has similarly found that the decreased PNH presence in Cite Soleil "facilitates the intensification of armed attacks against the city by G-9 members."[374] To find that this inaction violated a legal duty to act, however, the police must have had the means to act,[375] which PNH has contested.[376]

### Moïse Administration Officials

Government officials may also be liable for aiding and abetting crimes against humanity under the legal framework set out above. There is significant evidence that officials in the Moïse administration provided practical, material, and moral assistance to the gangs in the commission of the attacks in La Saline and Bel-Air. Duplan and Monchéry allegedly furnished weapons and vehicles for use in the La Saline attack.[377] Duplan was also physically present with Chérizier, Gregory Antoine, and other assailants at the scene of the La Saline attack, which may have had the effect of providing encouragement and moral support.[378] The fact that Duplan and Monchéry provided resources in the context of a planning meeting suggests intent to assist in the attack.

Moreover, Léon Saint-Cyr's alleged payment to Chérizier to put an end to growing anti-government protests in advance of the Bel-Air attack[379] likely served as essential encouragement for the attack. Saint-Cyr's decision to hire Chérizier for the task, when Chérizier was well-known for his use of violence against civilians in both Grand Ravine and La Saline, may indicate an intent to facilitate a violent attack. However, a more extensive inquiry into the effect of the support and Saint-Cyr's state of mind would be required, especially in light of Saint-Cyr's denials.[380]

## Ordering, Soliciting, or Inducing the Crimes

Under international criminal law, individuals are liable for crimes against humanity if they are found to have ordered, solicited, or induced the crimes carried out by others.[381] Individuals in a position of

authority can be liable for ordering a crime if they used their authority to instruct another person to commit an offence.[382] A formal superior-subordinate relationship is not necessary.[383] Orders must entail a positive act, rather than an omission, but do not need to be issued directly, in writing, or given in any particular form.[384] The individuals must also have intended to order a crime or must be aware of the substantial likelihood that the crime would be committed due to their order.[385] Individuals can be equally liable for soliciting, inducing, or instigating the perpetrators to commit the underlying crimes by prompting or urging them to do so.[386] There must be a causal link, or nexus, between the instigation and the final offence; the instigation must substantially contribute to the final offense.[387] Moreover, they must have acted with either the intent to instigate another person to commit a crime, or alternatively, with awareness of the "substantial likelihood that a crime will be committed in the execution of the act or omission instigated."[388]

Senior government officials in the Moïse administration may be liable for ordering, inducing, soliciting, or instigating gangs to perpetrate the crimes in La Saline and Bel-Air. Evidence strongly suggests that government officials Duplan and Monchéry ordered, induced, or solicited gangs to attack civilians in La Saline. The DCPJ has identified them as the "presumed authors" of the La Saline attack.[389] They commissioned Chérizier and others to commit the crime in exchange for payment.[390] They also actively participated in the planning of the attack and reportedly provided key resources, including weapons, government vehicles, and police uniforms that made a substantial contribution to the resulting offenses.[391] Eyewitnesses report that Duplan was personally present during the attack in La Saline, and that he told Chérizier "you killed too many people," suggesting that he knew that a crime was likely to be committed in the execution of the act.[392] The senior government officials' advanced planning is evidence of their intent to engage in the criminal act, and demonstrates their awareness that their conduct would influence gang members' perpetration of the crimes.

Similarly, government official Leon Saint-Cyr may have ordered, induced, or solicited Chérizier and his gang to attack civilians in Bel-Air. Saint-Cyr allegedly asked Chérizier to remove the road barriers and prevent further antigovernment protests, in exchange for a substantial sum of money and several motorcycles.[393] This conduct prompted Chérizier to remove the barriers by force, attacking civilians in November 2019. The paid exchange indicates that Saint-Cyr's request made a substantial contribution to the Bel-Air attacks against civilians, and was perhaps the catalyst. In light of Chérizier's well known record of using violence against civilians, Saint-Cyr would have been aware that Chérizier's involvement in this type of operation was likely to lead to criminal acts.[394]

## Common Enterprise

Government officials and PNH officers may also potentially be liable for taking part in a joint criminal enterprise with those who carried out the attacks. A joint criminal enterprise does not have to be formally organized in a military, political, or administrative structure;[395] rather, the existence of a common plan, design, or purpose that involves the commission of a crime is relevant.[396] There is no need for the purpose to have been previously arranged or formulated; it may materialize extemporaneously and be inferred from the facts.[397] To be liable under this theory, a person must have substantially assisted or significantly affected the furtherance of the goals of the enterprise, such as by procuring weapons for the plan.[398] Moreover, all co-perpetrators, including the accused, must have had the shared intent to perpetrate the crime.[399]

### Moïse Administration Officials

Though the requirement of a significant contribution to the planned crime creates a high bar to hold



individuals liable in a joint criminal enterprise, Duplan and Monchéry may meet this bar for their role in the La Saline attack. The common plan is evident in their meeting with gang members two weeks prior to the attack to plan it.[400] This planning meeting also demonstrates a shared intent among the co-perpetrators—Duplan, Monchéry, and the gang leaders—to commit the attack. Duplan and Monchéry significantly contributed to the crime by planning the attack and furnishing resources for the attack, including weapons, vehicles, and police uniforms.[401] Furthermore, Duplan was present at the attack along with gang members.[402] This significant contribution indicates that they intended to perpetrate the attack against civilians.

## Haitian National Police

Further investigations may also reveal that police officers were engaged in a common enterprise with gang leaders. The evidence to date does not indicate how all the police resources used in the attacks were obtained, but if it is shown that police officers made them available for the purpose of facilitating the attacks, a common enterprise may be found.

# President Moïse May Be Responsible for Crimes Against Humanity Under the Doctrine of Command Responsibility

President Moïse may personally be criminally responsible for crimes against humanity committed during his term as president. In particular, the prominent role of Moïse's senior officials in planning and executing the La Saline attack may trigger liability under the doctrine of command responsibility. It is a well-established norm of international law that "military commanders and other persons occupying positions of superior authority may be held criminally responsible for the unlawful conduct of their subordinates."[403] This criminal responsibility "may arise either out of the positive acts of the superior or from his culpable omissions," such as "failing to take measures to prevent or repress the unlawful conduct of his subordinates."[404]

For President Moïse to be criminally responsible under the doctrine of command responsibility, three elements must be met: (1) there is a superior-subordinate relationship between the commander and the perpetrator of the crime;[405] (2) the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit criminal acts;[406] and (3) the commander failed to prevent the commission for the crime, or failed to punish the subordinates after the commission of the crime.[407]

With respect to the first element of command responsibility, the superior-subordinate relationship centers on whether the superior had "effective control" over the subordinate.[408] Effective control can be indicated by the power to prevent or punish the subordinate.[409] It extends to situations where the superior has less than absolute power, such as a degree of "influence" that does not amount to "formal powers of command."[410] Persons in senior government offices, including presidents, have been subject to liability under the command responsibility doctrine.[411] Moreover, command responsibility is not limited to liability within military structures, but applies to civilian structures as well, so long as the superior had the power to prevent or punish the subordinate.[412]

First, there is a reasonable basis to conclude that President Moïse occupied a superior position over both Duplan and Monchéry, the two officials in his administration that DCPJ identified as the "presumed authors" of the La Saline attack.[413] At the time of the attack, Duplan held a senior government position as the Delegate to the West Department, Moïse's official representative for one

of Haiti's ten geographical territories. Delegates report directly to the president.[414] Moreover, Moïse personally appointed Duplan to the position in 2017, and was empowered to unilaterally remove him from the position.[415] Monchéry was serving as Director General of the Ministry of the Interior, a position that oversees the principal execution of the Ministry's work.[416] Moïse also personally appointed Monchéry to the position in 2017.[417] Moïse's position of superiority and oversight gave him effective control over Duplan and Monchéry; that is, he had the power to prevent their acts or punish them for acts that rise to the level of crimes against humanity.

Second, Moïse is likely to have known, and certainly should have known, that his subordinates had committed, were committing, or planned to commit the acts rising to crimes against humanity. Duplan and Monchéry's proximity to the President creates an inference of knowledge. This is reinforced by the fact that the attack was planned specifically to suppress protests against Moïse. Moreover, President Moïse and his wife were personally involved in efforts to control anti-government activity in La Saline prior to the planning of the attacks. On October 13, 2017, about a year before the attack, First Lady Martine Moïse and then-Minister of Interior Max Rudolph Saint-Albin personally led a delegation to La Saline to offer state resources in exchange for the discontinuation of protests.[418] In the days before anti-government protests were scheduled to take place in October 2018, residents report that the First Lady returned to La Saline to bribe the community into compliance (an allegation she has denied).[419] Around the same time, President Moïse also personally visited police stations across the capital and reportedly distributed cash to officers to encourage them to quell the protests.[420] Haiti's former police chief denounced the action, interpreting it as a sign of the President's state of panic in the context of growing opposition.[421] The protests proceeded anyway and demonstrators blocked President Moïse and the First Lady from entering La Saline for the official commemoration ceremony, injuring one of their security guards in the process.[422] The plan to attack residents of La Saline was put into motion by Moïse's senior officials two weeks later.

Furthermore, President Moïse certainly should have known that crimes had been committed by his subordinates in La Saline after the fact. The massacre was a major event. In the immediate aftermath, photos and videos of corpses circulated widely on social media and the attacks were reported across Haitian news.[423] An estimated 300 people fled La Saline and took up shelter in a makeshift camp across the street from the Haitian Parliament.[424] RNDDH identified Duplan and Monchéry as key suspects in a report published just two weeks after the attack.[425] This information was reinforced by DCPJ's official investigation, which was made public in May 2019, and named Duplan and Monchéry as the "presumed authors" of the attack.[426] Under the doctrine of command responsibility, Moïse cannot escape liability by claiming ignorance that his subordinates had planned and committed these crimes.

Finally, President Moïse failed to properly investigate and punish his subordinates after the commission of the crime. Despite many credible sources, including the UN and the DCPJ, implicating Duplan and Monchéry in the attack, Moïse did not immediately remove them from their posts. Instead, they remained in their official government roles for almost a year after the La Saline attack.[427] Prosecutions of both Duplan and Monchéry have stalled, and neither has been arrested for their roles in the massacre. They initially sought to avoid responsibility by asserting that, as high-level officials, they could not be prosecuted without the President's consent.[428] President Moïse has not taken action to issue such consent or otherwise ensure that the prosecution moves forward.

Based on the currently available evidence, there is a reasonable basis to conclude that President Moïse may be liable for crimes against humanity committed in La Saline under the doctrine of command responsibility. Further investigations may reveal culpability in other attacks as well.


# V. Ensuring Accountability for Perpetrators of Crimes Against Humanity

## The Crimes Have Been Carried Out with Impunity

To date, the attacks on civilians have largely been carried out with impunity. In 2020, the UN expressed concern that the ongoing "lack of accountability for human rights violations committed by State agents," and the "chronic absence of progress on judicial proceedings against alleged perpetrators."[429] Indeed, criminal investigations and prosecutions for the attacks have been slow to non-existent. Out of nearly one hundred suspects identified, only 11 people have been arrested for the La Saline massacre,[430] and the prosecution has stalled since July 2019.[431] None of the chief perpetrators or implicated police officers are among those arrested.[432] Chérizier remains at large despite a warrant for his arrest for involvement in the Grand Ravine massacre, and has continued to gain power over the course of Moïse's presidency. While the government maintains that he has eluded capture, he has been seen in the company of police officers who have declined to arrest him[433] and has repeatedly been interviewed by media.[434] Duplan and Monchéry also remain free. Monchéry was briefly arrested for driving with a government license plate in February 2021, and then promptly released.[435] Similarly, no one has been held criminally responsible for the attacks in Bel-Air or Cité Soleil.[436] It is unclear whether Saint Cyr's alleged involvement in Bel-Air is subject to any formal investigation.

The Moïse administration has also persistently rejected international calls for accountability. In 2018, when the UN Special Representative to the Secretary-General in Haiti urged an investigation into the 2017 Grand Ravine and Lilavois massacres, Moïse responded by recalling Haiti's ambassador to the UN and summoning the Special Representative to explain her comments.[437] She was recalled and replaced shortly thereafter.[438] A year later, when members of the U.S. Congress publicly urged an independent investigation of the La Saline massacre, the Haitian Embassy condemned the statement and categorically denied the existence of human rights violations in Haiti.[439] In December 2020, the United States government issued civil sanctions against Duplan, Monchéry, and Chérizier for their involvement in the attack,[440] but Haitian authorities have not taken any subsequent meaningful steps towards holding them accountable.

## Implications for Accountability

The finding that crimes against humanity have likely taken place in Haiti has important implications for accountability, as it heightens the duty to investigate and prosecute perpetrators and opens additional avenues for doing so. Specifically, it (1) triggers an international obligation on the Haitian government to investigate and prosecute individuals responsible for these crimes;[441] (2) allows other states and international bodies to investigate and prosecute the crimes under certain circumstances;[442] and (3) limits the application of domestic statutes of limitations and immunity provisions so even high-ranking government officials can be tried for crimes indefinitely into the future.[443]

Haiti has a duty to investigate and prosecute crimes against humanity.[444]  Haiti is a party to the American Convention on Human Rights, which recognizes the universal application of the crime.[445] Under Haiti's Constitution, international agreements ratified by Haiti, such as the American Convention, become part of the country's domestic laws. Indeed, in 2014, because of the country's ratification of the American Convention, the Port-au-Prince Court of Appeals decided to reopen a domestic investigation against former dictator Jean-Claude Duvalier for alleged crimes against humanity.[446]

Duvalier had just returned to Haiti after 25 years in exile, and stood accused of overseeing brutal crimes against civilians carried out by *tonton macoutes*—state-sponsored gangs operating within an apparatus that shares some similar characteristics to the patterns of terrorizing civilians seen today.[447] The prosecution has stalled since his death in 2014, but the case serves as a relevant example.[448] The Haitian government must promptly investigate and prosecute the crimes against humanity that are taking place in present day.

The finding that crimes against humanity have likely been committed also opens the door for other countries and international bodies to ensure that justice is served. Crimes against humanity are crimes so serious and heinous that they are an "attack on the very quality of being human."[449] They not only represent a crime against the individual victims, but are an affront against humanity as a whole. Humankind, therefore, has an interest in ensuring that crimes against humanity do not go unpunished.[450] Haiti is not a party to the Rome Statute, so the ICC prosecutor cannot directly open an investigation into the situation, but the UN Security Council has the power to refer the situation to the Court.[451] The Security Council could also decide to establish an ad hoc tribunal or mechanism for Haiti, as it has in prior circumstances where the host state was unable or unwilling to prosecute international crimes.[452] Finally, domestic courts of other countries could prosecute crimes against humanity under the principle of universal jurisdiction, should the Haitian state continue to prove unwilling or unable to do so.[453] The principle of universal jurisdiction allows states to prosecute certain crimes—including crimes against humanity—regardless of the location of the crime or the nationality of the perpetrators or victims.[454] Initially codified in the 1949 Geneva Conventions on the laws of war, governments have increased the application of universal jurisdiction in the past 15 years. [455] This is a significant step in offering redress to victims who have no legal recourse in the states where the crimes were committed, and combating a culture of impunity for perpetrators of grave human rights violations.

Importantly, Haitian and international courts have held that there is no statute of limitations for crimes against humanity, meaning that alleged perpetrators can be tried even after time limits under domestic law have lapsed.[456] Thus, there can and should be accountability for these abuses into the future. There are also limitations to the application of immunity for crimes against humanity. As noted above, the draft constitution proposed by Moïse's administration in January 2021 introduces immunity for acts taken by the head of state in an official capacity, and applies it retroactively even beyond the end of mandate. If the new constitution passes by referendum, questions will remain as to its enforceability, however, given that the current constitution bans amendments through referendum. Moreover, the immunity clause should not serve as a bar to prosecution for crimes against humanity, as acts that are incompatible with the president's mandate and that do not fall within the exercise of presidential functions are not covered by immunity.[457] Since crimes against humanity are prohibited in Haiti as *jus cogens* and through Haiti's incorporation of the American Convention on Human Rights into domestic law,[458] there is a strong argument that such conduct is incompatible with the president's mandate and exercise of functions. Moreover, both international and national courts have found that *jus cogens* violations such as crimes against humanity cannot be a state actor's "official acts" for the purpose of immunity, and therefore allowed prosecution of heads of state in domestic courts.[459] As for international courts, head of state immunity does not apply to international crimes under customary international law.[460] Therefore, an international court may issue a warrant for the arrest of a head of state, and also request another states to arrest and surrender a head of state.[461]

It is imperative that actors within and outside of Haiti fulfil their duties to ensure accountability for these heinous crimes.

# Recommendations

Based on the finding that there is compelling evidence that crimes against humanity have been committed in Haiti, we recommend the following actions:

## Haiti

We urge Haiti to urgently and rigorously investigate and prosecute the crimes discussed in this report. As Haiti has a duty to investigate crimes against humanity as a result of its international obligations and as statute of limitations do not apply, perpetrators of crimes against humanity can, and should, be tried directly in Haiti's domestic courts. The justice system must ensure that criminal accountability extends to government officials and other state agents who share culpability for the attacks.  Moreover, individuals identified by DCPJ as implicated in the La Saline massacre should immediately be placed under arrest.

## The Inter-American Commission on Human Rights

The Inter-American Commission on Human Rights (IACHR) has historically played an important role in supporting an end to impunity for gross human rights violations in Haiti. We ask the Commission to address crimes against humanity in Haiti as a situation that requires special attention in its annual report, by conducting a country visit on the concerns raised herein, and requesting that the Haitian government submit a written report outlining a concrete plan of action for addressing crimes against humanity.[462] We also encourage the IACHR to offer the Haitian government technical assistance to prosecute the crimes against humanity identified in this report.

In January 2020, the IACHR granted precautionary measures in favor of La Saline Victims' Committee, a group comprised of victims of the La Saline attack, their families, and human rights defenders.[463] The IACHR found that members of the La Saline Victims' Committee face serious, urgent risk of suffering irreparable damages and requested that the Haitian government protect the rights to life and integrity of the affected individuals. The IACHR further demanded that the government ensure that members of the La Saline Victims' Committee can do their work as human rights defenders without being subject to threats, harassment, or other acts of violence, and that Haiti report on any actions taken to investigate the La Saline attack.[464]

To date, the Haitian government has markedly failed to comply with the measures recommended by the IACHR. We urge the Commission to ensure that Haiti complies with the precautionary measures by convening working meetings or hearings, initiating an exchange of communications, and holding a follow-up visit to Haiti.[465] In addition, should Haiti continue its history of noncompliance, we encourage IACHR to file a provisional measure request with the Inter-American Court of Human Rights.[466]

## The United Nations

The UN should strongly condemn the crimes against humanity identified in this report and support investigations and prosecutions of the perpetrators.

Specifically, we urge BINUH and the Office of the High Commissioner for Human Rights (OHCHR) to pursue further investigations into the attacks on civilians in Haiti, including the attack in Cité

Soleil that has not been subject of a UN investigation. While UN actors have undertaken important documentation of gang violence, similar investigations into the role of state actors are merited. We also encourage the offices to provide technical support for the prosecution of perpetrators, as was done for the prosecution of Jean-Claude Duvalier for crimes against humanity.

We also encourage the UN Security Council to continue to monitor the human right situation in Haiti, with a renewed focus on the role of state actors in the commission of gross human rights violations, and to consider referring the situation in Haiti to the ICC. The Haitian government has proven unable or unwilling to try these crimes, and since Haiti is not a party to the Rome Statute, Security Council referral is the only avenue to bring the crimes before the ICC.

## The United States

The United States has responded to the Moïse administration's consolidation of power and record of human rights abuses with mixed messages.[467]

In December 2020, the U.S. Treasury Department sanctioned Chérizier, Duplan, and Monchéry for their roles in the La Saline attack, and has repeatedly called for the prosecution of perpetrators of human rights violations. At the same time, the State Department has taken several concerning positions that run contrary to supporting civil society's calls to hold the Haitian government accountable for human rights abuse. On September 16, 2020, a senior State Department official encouraged President Moïse to unilaterally appoint a provisional electoral council (CEP) to organize elections and warned Haitian civil society and opposition groups to comply with the process, threatening that further resistance is "going to start to have consequences for those who stand in the way of it."[468] In the context of the brutal attacks already carried out against the political opposition, observers have expressed concern that this statement condones the actions of the Moïse administration.[469] Further, in February 2021, the State Department explicitly endorsed President Moïse's position that he is entitled to remain in office until February 2022,[470] contrary to the interpretation of Haitian legal experts, opposition groups, and members of U.S. Congress.[471] After Haitians who protested faced violent repression, the State Department commented that the "remarkable lack of popular response to calls for mass protests" indicates that the Haitian people are tired of "squabbles over power."[472] Members of the U.S. Congress have strongly condemned these positions and repeatedly called on the State Department to promote democracy and human rights in Haiti.[473]

We urge the United States government to support accountability for human rights in Haiti by continuing to call for investigations and prosecutions of the perpetrators in all instances of crimes against humanity, and by extending sanctions to other perpetrators as merited by the evidence. We also encourage the United States to consider the Haitian government's role in these crimes as it formulates foreign policy vis-à-vis Haiti and to respect Haitian sovereignty by refraining from supporting political moves that are inconsistent with the Haitian constitution and rule of law.

## Governments with Universal Jurisdiction Statutes

To the extent that the Haitian government fails to prosecute the crimes against humanity discussed in this report, we appeal to governments with universal jurisdiction statutes, such as Canada, France, Senegal, Switzerland, and the United States, to prosecute any perpetrators found within their jurisdictions.

# Conclusion

There is a reasonable basis to conclude that state and non-state actors have committed crimes against humanity in Haiti during Jovenel Moïse's presidency. The brutal killings, rapes, and torture of civilians in La Saline, Bel-Air, and Cité Soleil appear to follow a widespread and systematic pattern that further state and organizational policies to control and repress communities at the forefront of government opposition. This finding must serve as an urgent call to action to ensure that accountability follows.

The attacks show an alarming pattern of state involvement. Evidence suggests that senior government officials in Moïse's administration have planned, provided resources for, and solicited attacks against civilians. Police resources were used in all three attacks, and police officers directly participated in the attacks alongside gang members. The police also failed to intervene to protect civilians during the course of the attacks, despite their close proximity to the sites and repeated pleas for help. Each attack targeted neighborhoods known as opposition strongholds and where recent protests against Moïse's administration had taken place. In short, there is strong indication that these massacres were politically motivated.

The human cost is intolerable. At least 240 civilians were killed in these three attacks. Hundreds of homes have been vandalized or burned. Human rights groups documented at least 25 rapes in the attacks. The full toll is likely far greater, as incomplete access to evidence, disposal of bodies, fear of retribution, and social stigma often stifles the reporting of these crimes. Beyond the number of casualties and physical injuries, the attacks have had dire economic, social, and psychological consequences for the victims and their communities, including widespread displacement, homelessness, and survival in a state of terror.

The Haitian government has so far appeared unwilling or unable to hold perpetrators accountable and has instead fostered a culture of impunity that the UN has cautioned may encourage further attacks. Indeed, after the government failed to take action to hold perpetrators accountable for the attack in La Saline, the BAI noted that this "begs the question, when will the next carnage happen?" The answer came a year later in Bel-Air, and recurred the following year in Cité Soleil. Since that time, Chérizier and other perpetrators have gone on to carry out similar attacks.

The Haitian government must heed mounting calls from Haitian civil society to urgently investigate and prosecute the crimes discussed in this report. The finding that crimes against humanity are likely taking place should also trigger action by the international community, as these crimes are not only an affront to the victims in Haiti, but against humanity as a whole. The UN, the Inter-American Commission on Human Rights, and other governments must do more to unequivocally condemn the crimes taking place under Moïse's rule and facilitate the investigation and prosecution of perpetrators – whether in Haiti or abroad.

Putting an end to impunity for gross human rights violations is critical for Haiti's future. As Moïse takes steps to remove limits on his power, Haitian civil society is increasingly raising concerns of a slide back to Haiti's dictatorial past. That past was characterized by brutal repression and extensive rights violations. Accountability and rule of law are critical pre-requisites for human rights and democracy to thrive in Haiti and beyond.



# Annex I

This report draws on the extensive fact-finding conducted by Haitian human rights organizations, the UN, and other international actors. The report primarily relies on findings from the following investigations:

**National Network for the Defense of Human Rights (RNDDH),** *The events in La Saline: from power struggle between armed gangs to State-sanctioned massacre* **(Dec. 1, 2018)** documenting the events of and leading up to the La Saline attack. RNDHH interviewed 439 residents of La Saline, including victims and their families; government officials, including Richard Duplan and then-police officer Gregory Antoine, members of the judiciary, police authorities; and members of grassroots organizations. Available at https://web.rnddh.org/wp-content/uploads/2018/12/10-Rap-La-Saline-1Dec2018-Ang1.pdf.

**Mission des Nations Unies Pour L'Appui A La Justice en Haiti (MINUJUSTH),** *La Saline: Justice pour les victims. L'Etat a l'obligation de protéger tous les citoyens* **(June 2019)** presenting the findings of the Human Rights Service (SDH) division of MINUJUSTH on the attacks of November 13 and 14, 2018, in La Saline. The report is based on 55 interviews with survivors, eyewitnesses and family members of those killed, as well as 10 meeting with civil society and 25 meetings with state actors. Available at https://reliefweb.int/sites/reliefweb.int/files/resources/minujusth_hcdh_rapport_la_saline_1.pdf.

**Judith Mirkinson and Seth Donnelly,** *The Lasalin Massacre and the Human Rights Crisis in Haiti, National Lawyers Guild and Haiti Action Committee* **(Jul. 8, 2019)** report documenting the events of the La Saline attack based on interviews with victims and their families. Available at https://www.nlg.org/wp-content/uploads/2019/07/The-Lasalin-Massacre-ONLINE-7-11-19-Nat-NLG.pdf.

**National Network for the Defense of Human Rights (RNDDH),** *Massacre au Bel-Air: Banalisation du droit a la vie par les autorités étatiques* **(Dec. 17, 2019)** report documenting the Bel-Air attack from Nov. 4-8, 2019. RNDDH interviewed victims and their families, government officials, including Ronsard Saint-Cyr, Secretary of State for Public Security, and a Judge at the Tribunal of Peace in Delmas. Available at https://www.haitilibre.com/docs/6-Rap-Massacre-Bel-Air-17Dec2019.pdf.

**Fondasyon Je Klere (FJKL),** *Conflit au Bel-Air et à la ruelle Mayard : la Fondasyon Je Klere (FJKL) s'inquiète de l'instrumentalisation politique des groupes armés* **(Nov. 29, 2019)** documenting attacks in Bel-Air and its contiguous neighborhoods from November 4-6, 2019. Available at https://www.fjkl.org.ht/images/doc/FJKL_conflit_au_Bel_Air.pdf.

**BINUH,** *Rapport sur les allegations d eviolations et abus des droits de l'homme lors des attques dans le quartier de Bel-Air, a Port-au-Prince, du 4 au 6 novembre 2019* **(Feb. 2020)** report documenting the human rights abuses that occurred between Nov. 4 and 6, 2019, in Bel-Air. BINUH's human rights section conducted 34 interviews with victims, witnesses, hospital staff, government officials such as members of the Port-au-Prince Public Prosecutor's Office, the General Inspectorate of the Haitian National Police, the Investigative Service of the Port-au-Prince Police Station, and the Departmental Judicial Police Section (SDPJ) of the West Department. Available at https://reliefweb.int/sites/reliefweb.int/files/resources/20200217_haiti_-_rapport_bel-air_-_final_master_version.pdf.

**RNDDH,** *Attacks on deprived neighborhoods: The RNDDH demands the end of the protection of armed gangs by the authorities in power,* **(Jun. 23, 2020)** documenting attacks from May 23-27, 2020, in several impoverished areas of Port-au-Prince, including Pont Rouge, Fort Dimanche, La Saline, and Nan Tokyo. RNDDH conducted interviews with 27 victims, police authorities, judicial authorities, the Director General of the Social Assistance Fund, Frantz Indrice, and Pierre Lemaire, former member of parliament for Cité Soleil. Available at https://web.rnddh.org/wp-content/uploads/2020/06/7-Rap-Attaque-Quartiers-Defavorise-Version-Anglaise-23Jun2020-2.pdf.

**RNDDH,** *Assassinations, Ambushes, Hostage-taking, Rape, Fires, Raids: The authorities in power have installed terror in Cité Soleil* **(Aug. 13, 2020)** reporting on armed attacks in Cité Soleil from June 30 to August 8, 2020 by interviewing several government officials, including officials from Central Directorate of Administrative Police, PNH, Public Prosecutor's Office at the Court of First Instance in Port-au-Prince, and 108 victims and their families. Available at https://web.rnddh.org/wp-content/uploads/2020/08/Version-Anglaise-Rap-Cité-Soleil-082020.pdf.


# Endnotes

1   Bureau intégré des Nations Unies en Haïti (BINUH), *Rapport sur les allegations de violations et abus des droits de l'homme lors des attaques dans le quartier de Bel-Air, a Port-au-Prince, du 4 au 6 novembre 2019*, ¶5 (2020) (noting that multiple waves of protests began in 2018, and that the 2019 demonstrations, which demanded the departure of the President, paralyzed the country for many weeks) [hereinafter BINUH]; U.N. Secretary-General, United Nations Integrated Office in Haiti, ¶3, U.N. Doc. S/2020/123 (Feb. 13, 2020) ("the wave of civil unrest that gripped the country between September and November 2019 [was] the longest period of continued protests since the President, Jovenel Moïse, assumed office.")[hereinafter Secretary-General Feb. 2020 Report]; *see also* Inst. Just. & Democracy in Haiti (IJDH), *Haiti at a Crossroads: An Analysis of the Drivers Behind Haiti's Political Crisis* (2019) (describing the immediate, medium and long-term drivers of the protests) [hereinafter IJDH, *Haiti at a Crossroads*].

2   Jake Johnston & Kira Paulemon, *What's in Haiti's New National Security Decrees: An Intelligence Agency and an Expanded Definition of Terrorism*, Ctr. Econ. & Pol'y Research (Dec. 14, 2020) (discussing Moïse's creation of a domestic intelligence agency with sweeping surveillance powers that is not subject to judicial review and criminalizing popular forms of non-violent protests as "terrorist acts."). In January 2021, Moïse announced that the agency had begun surveilling opponents. *See* Robenson Geffrard, *L'Agence nationale d'intelligence opérationnelle, les adversaires de Jovenel Moïse sous surveillance*, Le Nouvelliste (Jan. 19, 2021).

3   *See e.g.* Jacqueline Charles, *Haitian lawyer, constitutional expert gunned down hours after controversial radio interview*, Miami Herald (Aug. 29, 2020) (reporting the assassination of prominent lawyer Monferrier Dorval, hours after he criticized the government on a radio interview.); Campaign Letter by Amnesty International, *Haiti: Human Rights Defender Fears for Safety* (May 16, 2019), https://www.amnesty.org/download/Documents/AMR3603432019ENGLISH.pdf (addressing the death threats made to Pierre Espérance, a prominent Haitian human rights defender).

4   In addition to the attacks on La Saline, Bel-Air, and Cité Soleil that are the focus of this report, attacks also took place in the neighborhoods of Lilavois (October 2017), Grand Ravine (November 2017), Nan Tokyo (four separate occasions between March 2019 and December 2019), and Bel-Air (August 2020). *See* U.N. Secretary-General, *United Nations Integrated Office in Haiti*, U.N. Doc. S/2020/537, ¶24 (June 15, 2020)[hereinafter Secretary-General June 2020 Report] (noting no new concrete judicial action in response to Lilavois, Grand Ravine, La Saline or Bel-Air); Réseau National de défense des droits de l'homme (RNDDH), *Attacks on Deprived Neighborhoods: The RNDDH Demands the End of the Protection of Armed Gangs by the Authorities in Power*, ¶¶24-29 (2020) (documenting four separate attacks in Nan Tokyo between March 2019 and December 2019)[hereinafter RNDDH, *Attacks on Deprived Neighborhoods*]; Onz Chery, *HaitiPM: Helping During Bel-Air Massacre Could Have Hurt More People*, Haitian Times (Sept. 14, 2020) (noting that at least 12 people died during the Bel-Air attack carried out by the G9 alliance on Aug. 31, 2020); *see also* Danio Darius, *Cinquante personnes tuées à Cité Soleil en juillet, selon Pierre Espérance*, Le Nouvelliste (Aug. 10, 2021) (quoting RNDDH Director Pierre Espérance counting nine massacres between November 2017 and July 2020).

5   *See generally* RNDDH, *The Events in La Saline: from Power Struggle Between Armed Gangs to State-Sanctioned Massacre* (2018) [hereinafter RNDDH, The Events in La Saline]; Mission des Nations Unies Pour L'Appui a la Justice en Haïti (MINUJUSTH), *La Saline: Justice pour les Victims. L'Etat a L'Obligation de Protéger tous les Citoyens* (2019) [hereinafter MINUJUSTH]; BINUH, *supra* note 1; RNDDH, *Attacks on Deprived Neighborhoods: The RNDDH Demands the End of the Protection of Armed Gangs by the Authorities in Power* (2020); RNDDH, *Assassinations, Ambushes, Hostage-taking, Rape, Fires, Raids: The Authorities in Power Have Installed Terror in Cité Soleil* (2020) [hereinafter RNDDH, *Terror in Cité Soleil*].

6   RNDDH, *The Events in La Saline*, *supra* note 5, ¶10 ("La Saline has an exceptional ability to either mobilize or thwart street demonstrations…" and noting that political opposition rallied protesters on Oct. 15, 2018 and the antigovernment demonstration in La Saline on October 17, 2018.); *see also* Fondasyon Je Klere (FJKL), *Situation de Terreur a la Saline: La Fondasyon Je Klere (FJKL) Deplore L'incapacite de L'etat a Garantir la Securite des Citoyens et des Citoyennes* 3 (2018) (noting that Moïse's procession was attacked by demonstrators at the Pont Rouge as one of the causes of the La Saline attack); Sojourner Truth with Margaret Prescod, *Sojourner Truth Radio: La Saline, Haiti Speaks Out Against Poverty and State Violence*, KPFK Radio, at 11:58 (Apr. 5, 2019), https://soundcloud.com/sojournertruthradio/sojourner-truth-radio-april-5 (a victim of the attack saying that La Saline "has a reputation of revolution" and that is a reason why the "government does not like the community.").

7   RNDDH, *The Events in La Saline*, *supra* note 5, ¶58.

8   *Id.*, ¶¶38-40.

9   MINUJUSTH, *supra* note 5, ¶5 (confirming that the bodies of victims were mutilated, burned and left in a dump at the mercy of animals.)

10  Press Release, RNDDH, *Communique de presse: Massacre d'Etat à La Saline : Révision à la hausse du bilan des personnes tuées et violées le 13 novembre 2018*, at 3 (Dec. 20, 2018) [hereinafter RNDDH, *Revised Toll*]; *see also* Jacqueline Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, Police Say. 'Even Young Children Were not Spared'*, Miami Herald (May 15, 2019) (reporting that human rights groups put the death toll between 15 and 71) [hereinafter "Charles, *Dozens Brutally Killed*"]; *cf.* MINUJUSTH, *supra* note 5, ¶5 (separately able to confirm 26 deaths,12 missing, three injured, and two gang rapes).

11  Instead, Duplan and Monchéry stayed in their government roles until September 2019. *See Fednel Monchéry et Joseph Pierre Richard Duplan révoqués*, Le Nouvelliste (Sep. 9, 2019).

12  BINUH, *supra* note 1, ¶6 (noting that Bel-Air is also considered to be one of the traditional bases of anti-government mobilization and that demonstrators placed barricades on the main axes of the district in support of *peyi lok*).

13  RNDDH, *Massacre au Bel-Air : Banalisation du droit a la vie par les autorités* étatique ¶20 (Dec. 17, 2019), [hereinafter RNDDH, *Massacre au Bel-Air*]; *see also* BINUH, *supra* note 1, ¶17 (finding a link between the state representative and Cherizier's acts).

14  RNDDH, *Massacre au Bel-Air*, *supra* note 13, ¶31; *cf.* BINUH, *supra* note 1, ¶2 (confirming that the attacks left at least 3 dead).

15  BINUH, *supra* note 1, ¶19.

16  BINUH, *supra* note 1, ¶¶20-21.

17  U.N. Secretary-General, *United Nations Integrated Office in Haiti*, ¶16, U.N. Doc. S/2020/944 (Sept. 25, 2020), [hereinafter Secretary-General Sept. 2020 Report].

18   RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶55 (documenting 34 killings between May 24-27, 2020); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶3 (documenting 111 killings between June and July 2020).

19   RNNDH, *Terror in Cité Soleil, supra* note 5, ¶58.

20   *Id.*, ¶¶17-21.

21   *Id.*, ¶87.

22   RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶¶61-68.

23   U.N. Secretary-General, *United Nations Integrated Office in Haiti,* ¶33, U.N. Doc. S/2021/133 (Feb. 11, 2021), [hereinafter Secretary-General Feb. 2021 Report].

24   MINUJUSTH, *supra* note 5, ¶17 (noting that Duplan and Monchéry are still at large).

25   *Fednel Monchéry et Joseph Pierre Richard Duplan révoqués,* Le Nouvelliste, *supra* note 11; *see also* Edwidge Danticat, *Demonstrators in Haiti are Fighting for an Uncertain Future,* New Yorker (Oct. 19, 2019) (noting that Duplan and Monchéry were only fired as protests against the government intensified and stating that "Moïse has not directly denounced the La Saline massacre, nor has his government sought to prosecute any of the perpetrators.")

26   IJDH, Request for a thematic hearing on impunity for serious human rights violations and the lack of judicial independence in Haiti, at 7 (Sept. 23, 2020) (noting that senior state actors implicated in the La Saline attack have not been arrested and that judicial processes appear blocked).

27   *See* Secretary-General Sept. 2020 Report, *supra* note 17, ¶34 ("The lack of accountability for human rights violations committed by State agents… remains concerning, because of the chronic absence of progress on judicial proceedings against alleged perpetrators, including those within the national police.").

28   Moïse was likely to have known, or should have known, that senior government officials Duplan and Monchéry orchestrated the La Saline attack and failed to prevent their acts and punish them. *See* Section IV of this report.

29   Secretary-General Sept. 2020 Report, *supra* note 17, ¶32 (noting that known perpetrators of past attacks, such as Cherizier, have committed more recent attacks, which "underscores how impunity and a manifest lack of accountability fuel recurrent cycles of violence.").

30   See Annex 1 for a list of principal investigations relied on in this report.

31   *See* U.N. Office on Genocide Protection and the Responsibility to Protect, Definitions: Crimes Against Humanity, https://www.un.org/en/genocideprevention/crimes-against-humanity.shtml (last visited Feb. 25, 2021) (the Rome Statute "reflects the latest consensus among the international community…[and] offers the most extensive list of specific acts that may constitute the crime."); Sean Murphy (Special Rapporteur), *First Report on Crimes Against Humanity,* U.N. Doc A/CN.4/680, ¶8 (Feb. 17, 2015) ("Article 7 of the Rome Statute marks the culmination of almost a century of development of the concept of crimes against humanity and expresses the core elements of the crime.").

32   Rome Statute of the International Criminal Court, art. 7, Jul. 17, 1998, 2187 U.N.T.S. 38544.

33   *Id.*, art. 7(1).

34   *See, e.g.,* Secretary-General Feb. 2021 Report, *supra* note 23, ¶33 (discussing attacks in the context of gang violence and mentioning the state's failure to protect but omitting any reference to state actors in the commission of the crimes); Secretary-General Sept. 2020 Report, *supra* note 17 (discussing the rise in G-9 and Cherizier's role in massacres without acknowledging documentation of state actor involvement); *see also* IJDH, *Human Rights and Rule of Law in Haiti: Key Recent Developments* fn. 5 (Feb. 2020) ("Though BINUH reports and Security Council comments extensively discuss gang violence, Jimmy Chérizier, and the G-9, the UN and Security Council Members systematically ignore well-documented evidence from civil society regarding state actor complicity in that violence and requests for investigation and accountability.") [hereinafter IJDH, *Human Rights and the Rule of Law in Haiti*].

35   Constitution de la République d'Haïti, art. 276(2) (1987) (English translation), *available at* https://www.constituteproject.org/constitution/Haiti_2012.pdf?lang=en [hereinafter Haiti Const.].

36   Arellano v. Chile, Preliminary Objections, Merits, Reparations and Costs, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 154, ¶¶152, 110 (Sep. 26, 2006) (crimes against humanity are "intolerable in the eyes of the international community and offend humanity as a whole. The damage caused by these crimes … demand that those responsible be investigated and punished"); ("The obligation that arises pursuant to international law to try, and if, if found guilty, to punish the perpetrators of certain international crimes, among which are crimes against humanity, is derived from the duty of protection embodied in Article 1(1) of the American Convention.").

37   *Id.*, ¶152.

38   *Id.*, ¶110.

39   *See* U.N.G.A. 6th Comm., 73rd Sess., The scope and application of the principle of universal jurisdiction: Summary of work (2018), https://www.un.org/en/ga/sixth/73/universal_jurisdiction.shtml ("Delegations generally stated that universal jurisdiction was an important, well-established principle of international law aimed at combating impunity… which should be exercised in accordance with the principle of subsidiarity."); Basic Facts on Universal Jurisdiction, Human Rights Watch (Oct. 19, 2009), https://www.hrw.org/news/2009/10/19/basic-facts-universal-jurisdiction ("Universal jurisdiction is the ability of the domestic judicial systems of a state to investigate and prosecute certain crimes, even if they were not committed on its territory, by one of its nationals, or against one of its nationals.").

40   Rome Statute, *supra* note 32, art. 13(b) (granting the Security Council the power, acting under Chapter VII of the UN Charter, to refer to the ICC situations in which crimes under the jurisdiction of the court have taken place).

41   After the initial 2015 election was nullified due to extensive fraud, the 2016 re-run election saw the lowest turnout since the end of the Duvalier dictatorship in 1987. In 2016, Moïse received a mere 600,000 votes in a country of 10 million people, representing the support of less than 10% of registered voters. IJDH, *Haiti at a Crossroads, supra* note 1; *see also* Freedom House, *Freedom in the World 2018 Haiti* (2019); Int'l Ass'n Democratic Law. & Nat'l Law. Guild, *Haiti's Unrepresentative Democracy: Exclusion and Discouragement in the November 20, 2016, Elections* 9-13 (2017).

42   Jacqueline Charles, *Trump Administration Wants Haiti to Hold Overdue Legislative Elections by January*, Miami Herald (Oct. 27, 2020).

43   Parliamentary elections scheduled for October 2019 were postponed due to failures to achieve a ratified government and budget since March 2019. On January 13, 2020, one-third of the seats in the Senate, all seats in the lower chamber of Deputies, and all locally elected posts had expired. IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34, at 1; Kim Ives, *Haitian Opposition Condemns Moïse's Appointment of New De Facto Prime Minister*, Haïti Liberté (Mar. 4, 2020) (noting that Moïse dissolved the Haitian Parliament on Jan. 13, 2020).

44  *See e.g.,* Secretary-General Feb. 2021 Report, *supra* note 23, ¶13 ("several actors, both domestic and foreign, reiterated strong calls to the President to limit his use of executive decrees to govern"); U.S. Dept of State, Department Press Briefing – February 5, 2021: Ned Price (Department Spokesperson) (Feb. 5, 2021) ("The United States continues to maintain that the Haitian Government should exercise restraint in issuing decrees, only using that power to schedule legislative elections…").

45  Robenson Geffrard, *Jovenel Moïse apporte quelques modifications au décret portant création de l'Agence nationale d'intelligence,* Le Nouvelliste (Feb. 4, 2021) (noting that while citizens may file a complaint with the General Inspectorate of Intelligence Services should they have been harmed by the agency's activities, the government is under no obligation to disclose the details of its operations).

46  Johnston & Paulemon, *supra* note 2; *see also* Jacqueline Charles, *Slew of Presidential Decrees Have Some Wondering If Haiti Is On the Road to Dictatorship,* Miami Herald (Dec. 21, 2020); Moïse has issued at least 44 unilateral decrees since the Parliament termed out. Kim Ives, *The Year the Regime and Empire Struck Back, Assisted by Covid-19,* Haïti Liberté (Dec. 30, 2020).

47  Robenson Geffrard, *La présidence prend le contrôle des mairies,* Le Nouvelliste (Jul. 8, 2020).

48  Décret du 15 mars 2021 révisant la Loi du 15 avril 2010 portant amendement de celle du 9 septembre 2008 sur l'État d'Urgence, 176 Le Moniteur 17 (Mar. 15, 2021)(on file); Arrêté instaurant l'État d'Urgence dans les zones de Village de Dieu; de Grand-Ravine; de Delmas 2; de Savien, dans la Petite Rivière de l'Artibonite; et dans toutes autres zones rouges identifiées par le Conseil supérieur de la Police nationale, pour une période d'un (1) mois, 176 *Le Moniteur* 18 (Mar. 16, 2021)(on file); *see also* Robenson Geffrard, *Jovenel Moïse modifie la loi sur l'état d'urgence et se donne de nouveaux pouvoirs,* Le Nouvelliste (Mar. 17, 2021).

49  The PetroCaribe loan program provided access to low-interest fuel from Venezuela, with revenue intended to finance socioeconomic development. IJDH, *Haiti at a Crossroads, supra* note 1, at 3. In July 2017, Moïse replaced the Director General of the Central Financial Intelligence Unit (UCREF), an anti-corruption unit that found that Moïse had laundered approximately $6 million through his company. Kim Ives, *Illegally Ousted Anti-Corruption Chief: "We Have a Dictatorship taking Place,* Haïti Liberté (Jul 12, 2017). Moïse also constrained the powers of the Superior Court of Auditors and Administrative Disputes (CSCCA), which has implicated him and a large swath of government officials in the PetroCaribe scandal. Jake Johnston & Kira Paulemon, *At Odds with Presidency, a Government Watchdog is Weakened by Executive Decree,* Ctr. Econ. & Pol'y Research (Nov. 12, 2020).

50  IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34, 4 (Nov. 2020); Secretary-General Feb. 2020 Report, *supra* note 1, ¶10 (noting that the only ongoing prosecution related to PetroCaribe accountability initiated by the Moïse administration has been characterized by human rights groups as an "instrumentalization of the judiciary for political purposes," selectively prosecuting only one political rival in order to achieve the administrations political goals related to electricity).

51  Haiti presidents are elected to a five-year term. Moïse was elected in 2016, in a re-run of the 2015 election. Moïse argues that because he did not take office until 2017, his five-year term runs until February 2022, but this is inconsistent with the Haitian Constitution and the 2015 Electoral Law. The Constitution specifies that the presidential term starts on February 7 after elections are held. Haiti Const., *supra* note 35, art. 134-1. Article 134-2 further specifies that when elections are delayed, "the president elected enters into his functions immediately after the validation of the ballot and his mandate is considered to have commenced on 7 February of the year of the election." *Id.* art. 134-2. The 2016 elections were organized pursuant to the 2015 Electoral Law, which specified that the president's term would end five years from the mandated start date, regardless of when the president actually took office. Electoral Law of 2015, art. 239(a), Le Moniteur, https://www.haitilibre.com/docs/decretelectoral2015.pdf  ("The term of office of the President of the Republic shall end on the seventh (7th) of February in the fifth year of his term of office, regardless of the date of his entry into office."). The Superior Council of Judicial Power, the Haitian Bar Federation, and many other legal experts and civil society endorse this interpretation. *See e.g.,* Conseil Superieur du Pouvoir Judiciaire, *Resolution of the Superior Council of the Judicial Power (CSPJ) on the issue of the expiry of the constitutional mandate of the President of the Republica His Excellency Mr. Jovenel Moïse, adopted* Feb. 6, 2021, *available at* https://www.haitiwatch.org/home/cspj6feb2021en; Haitian Bar Federation, Institutional Crisis and the End of the Presidential Term, Resolution 2021-01, *adopted* Jan. 30, 2021, *available at* https://bdhhaiti.org/archives/754. The U.S. State Department and Secretary-General of the Organizations of American States have sided with Moïse's interpretation. U.S. Dept. of State, *supra* note 44 ("In accordance with the OAS position on the need to proceed with the democratic transfer of executive power, a new elected president should succeed President Moise when his term ends on February 2nd, 2022.").

52  IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34, at 1; *see also* Caleb Lefevre, *L'opposition crée une direction politique pour préparer l'après Jovenel Moïse,* Le Nouvelliste (Oct. 15, 2020) (reporting that opposition organizations and political parties are working together to call and prepare for a transitional government).

53  The Haitian Bar Federation has objected to the CEP's constitutionality, and Haiti's Supreme Court refused to swear in the CEP. Jacqueline Charles, *Haiti's supreme court declines to swear in election council. Moïse installed them anyway,* Miami Herald (Sep. 22, 2020).

54  Haiti Const., *supra* note 35, art. 284-3 ("General elections to amend the Constitution by referendum are strictly forbidden.").

55  The proposed changes would completely eliminate the Senate, replace the semi-independent Prime Minister with a Vice-President, and allow Moïse to hand-pick an electoral council that would run the next two Presidential elections. *See* Winnie Hugot Gabriel Duvil, *L'avant-projet de nouvelle constitution consacre un président avec des pouvoirs exorbitants,* Le Nouvelliste (Feb. 5, 2021)(constitutional amendments would profoundly change the organization of the three branches of government); U.S. Rep. Maxine Waters, *Haiti's President Jovenel Moïse's shameful assault on democracy,* Miami Herald (Feb. 27, 2021)(calling the referendum Moïse's "most audacious and dangerous power grab yet."); Farah Stockman, *Did a Coup Really Happen Two Weeks Ago in Haiti?,* N.Y. Times (Feb. 23, 2021) (noting that the "nakedly unconstitutional referendum…would strengthen his grip on power).

56  Comité Consultatif Independant, Avant-Project Constitution art. 139 (Jan. 2021), https://www.haitilibre.com/docs/CCI-CONSTITUTION_Projet-de-Constitution-2-fevrier-2021-20h00.pdf.

57  Jacqueline Charles, *Amid calls for Moïse's ouster, Haiti announces arrest of 23 people in alleged coup* attempt, Miami Herald (Feb. 7, 2021). Human rights organizations view the arrests as a crackdown against Moïse's political opponents. *Id.; see also* Stockman, *supra* note 55 (questioning the evidence of a coup).

58  Robenson Geffrard, *Jovenel Moïse met à la retraite les trois juges de la Cour de cassation pressentis pour le remplacer,* Le Nouvelliste (Feb. 9, 2021). Article 177 of the Constitution provides that Supreme Court judges are "irremovable" unless they have been legally determined to have abused their authority. Haiti Const., *supra* note 35, art 177**.**

59   Winnie Hugot Gabriel Duvil, *Le Président Moïse Nomme Trois Nouveaux Juges à la Cour de Cassation*, Le Nouvelliste (Feb. 12, 2021). The Constitution requires that the president nominate judges chosen from a list provided by the Senate. Haiti Const., *supra* note 35, art. 175. Although Moïse claimed in a Tweet to have followed this procedure, the Senate has not been in session for many months, since the terms of most members of parliament have expired. Ives, *supra* note 43 (noting that Moïse dissolved the Haitian Parliament on Jan. 13, 2020).

60   *Après la Cour de cassation, l'École de la magistrature est placée sous contrôle de la police,* Haiti Standard (Feb. 8, 2021).

61   *See e.g., UN Human Rights Office Alarmed by 'Attacks' on Judicial Independence in Haiti,* U.N. News (Feb. 19, 2021); *Haiti: Attacks on Judicial Independence,* Human Rights Watch (Feb. 22, 2021).

62   *See* U.N. Secretary-General, *United Nations Mission for Justice Support in Haiti,* ¶2, U.N. Doc. S/2018/1059 (Nov. 28, 2018) [hereinafter Secretary-General Nov. 2018 Report] (noting that the PetroCaribe scandal gave rise to widespread yet predominantly peaceful civil society demonstrations nationwide in 2018); Jacqueline Charles, *'Where did the money go?" Haitians denounce corruption in social media campaign*, Miami Herald (Aug. 5, 2020) (reporting on the continued protests related to PetroCaribe in 2020); *'Down with the Dictatorship': Protests continue in Haiti,* Al Jazeera (Feb. 15, 2021) (reporting that mass protests in 2021 were in part due to the PetroCaribe corruption scandal).

63   Secretary-General Nov. 2018 Report, *supra* note 62, ¶3.

64   BINUH, *supra* note 1, ¶6.

65   *Id.* (noting that *peyi lok* began in September 2019 and continued up to the Bel-Air attack in November 2019); Danticat, *supra* note 25 (noting that since the *peyi lok* began in September 2019, large demonstrations have taken place almost every day).

66   According to the UN, kidnappings increased by 200% from Feb. 2020 to Feb. 2021 compared to the previous year and voluntary homicide increased by 20% in 2020. Secretary-General Feb. 2021 Report, *supra* note 23, ¶19.

67   *Id.* at ¶17 ("The mounting insecurity, driven by a growing wave of kidnappings combined with several ruthless killings, increased public outraged, as evidenced by a monthly average of 84 demonstrations in the second half of 2020."); Sandra Lemaire & Renan Toussaint, *Thousands of Haitians Protest Violence, Impunity on Human Rights Day,* VOA News (Dec. 20, 2020).

68   Ralph Tomassaint Joseph, *What is Happening in Haiti, Where Political Crisis Persists?,* Al Jazeera, Feb. 28, 2021.

69   Jacqueline Charles, *Thousands march in Haiti to say 'No to dictatorship' as peaceful protest turned violent,* Miami Herald (Feb. 14, 2021).

70   RNDDH, *The Events in La Saline, supra* note 5, ¶¶25-29, 54, 58 (reporting that in 2017 First Lady Martine Moïse and other government officials offered to invest in community projects in La Saline in exchange for a reduction in anti-government protests in the area, and that just prior to the La Saline attack in 2018 two high-level government officials, Fednel Monchéry and Richard Duplan, held a planning meeting with Chérizier, providing resources for the attack); BINUH, *supra* note 1, ¶¶17-18 (noting that Chérizier's attack on Bel-Air followed shortly after government officials unsuccessfully tried to bribe local organizations to remove the barricades from the neighborhood); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶¶35, 54, 64 (reporting that a government actor allegedly paid off an anti-government gang leader, Altès, to take control of anti-government strongholds in Cité Soleil).

71   *See* fn. 4, *supra.*

72   The UN has documented 60 violations of the right to life and 171 violations of the right to personal security committed by state actors against protesters between July 6, 2018 and December 10, 2019. BINUH & Le Haut-Commissariat des Nations Unies aux droits de l'homme (HCDH), *Manifestations en Haïti : Leurs impacts sur les droits humains et l'obligation de l'État de protéger tous les citoyens* 12 (2011). Between June-July 2020, for example, the PNH repeatedly shot live rounds and teargas to break up peaceful sit-ins and other demonstrations. IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34.

73   Johnston & Paulemon, *supra* note 2; Jacqueline Charles, *Is democracy in Haiti eroding? The president's new intelligence agency has many uneasy,* Miami Herald (Dec. 12, 2020).

74   *Id.*

75   Charles, *Haitian Lawyer, Constitutional Expert Gunned Down, supra* note 3.

76   *Id.*

77   *Id.*

78   Secretary-General Feb. 2021 Report, *supra* note 23, ¶¶35, 61.

79   After significant civil society and international pressure, investigations into the killing have resulted in four arrests, including of a businessman who allegedly worked at the National Palace and has close ties to Moïse's *Parti Haïtien Tet Kale* (PHTK). Pierre Emmanuella Tanis, *Enquête sur l'assassinat de Me Monferrer Dorval: Arrestation de l'homme d'affaires Vilpique Dunès,* Juno7 (Sep. 12, 2020); *see also* Le Nouvelliste, *Le téléphone de Me Monferrier Dorval mène aux présumés exécutants et complices, un juge d'instruction saisi* (Sept. 25, 2020).

80   Fédération internationale pour les droits humains (FIDH), *Haïti : Planification d'assassinat à l'encontre de M. Pierre Espérance* (May 9, 2019), https://www.fidh.org/fr/themes/defenseurs-des-droits-humains/haiti-planification-d-assassinat-a-l-encontre-de-m-pierre-esperance.

81   Le Nouvelliste, *Le ministre de la Justice accuse des organisations de défense des droits humains d'être « des outils de déstabilisation »* (Dec. 14, 2020).

82   Le Nouvelliste, *L'Agence nationale d'intelligence opérationnelle, les adversaires de Jovenel Moïse sous surveillance* (Jan. 19, 2021).

83   Johnston, *supra* note 2; Charles, *Thousands march in Haiti to say 'No to dictatorship,' supra* note 69.

84   Jake Johnston, *Meet the New Haitian Military? It's Starting to Look a Lot Like the Old One,* Ctr. Econ. & Pol'y Research (Mar. 16, 2018); Freedom House, *Freedom in the World 2018 – Haiti* (Aug. 1, 2018); *see also* Jacqueline Charles, *Haiti has a new army with much of the old leadership. Some in the U.S. aren't happy,* Miami Herald (Mar. 26, 2018).

85   Andres Martinez Casares & Joseph Guyler Delva, *Haitian army set to make controversial after two decades,* Reuters (Nov. 18, 2017).

86   Press Release, IJDH & BAI, *The BAI Denounces the Appointment of an Ex-Torturer of the Bloody Coup d'Etat of 30 September 1991 to the So-Called High Command of the Haitian Armed Forces* (Mar. 14, 2018).

87   In 2019, the Haitian National Commission for Disarmament, Demobilization and Reintegration (CNDDR) documented the existence of at least 76 armed gangs in Haiti. Danio Darius, *76 gangs armés répertoriés en Haïti par la Commission de désarmement,* Le Nouvelliste (May 6, 2019).

88   *Id.* For example, control over areas such as the *Croix-des-Bossales* market in La Saline is highly contested, as it allows for the extortion of businesses and collection of fees for space allocation. RNDDH, *The events in La Saline: supra* note 5, ¶¶16-19.

89  *See* RNDDH, *Terror in Cité Soleil, supra* note 5, ¶¶38-49; FKJL, *Terreur dans les quariers populaires/Pont Rouge au Coeur d'une stratégie electoral macabre* ¶42 (June 22, 2020).

90  *See e.g.,* RNDDH, *The Events in La Saline, supra* note 5, ¶¶14, 17; RNDDH, *Massacre au Bel-Air, supra* note 13, ¶20; FKJL, *Conflit au Bel-Air et à la ruelle Mayard : la Fondasyon Je Klere (FJKL) s'inquiète de l'instrumentalisation politique des groupes armés.*, at 11-12 (Nov. 29, 2019) [hereinafter FKJL, *Conflit au Bel-Air*]; RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶¶35, 62; Hamed Aleaziz, *DHS Officials Are Deporting Haitian Immigrants Despite Knowing They May Face Danger,* BuzzFeed News (Mar. 2, 2021)(citing U.S. Department of Homeland Security document acknowledging that the Haitian government was using gangs to "repress the opposition."); *cf.* Darius, *supra* note 87 (quoting Jean Rebel Dorcénat, member of the CNDDR, as stating that gang members have confirmed to him that they lack the means to purchase arms but are rather armed by politicians close to the government, as well as the opposition and the private sector).

91  FKJL, *Terreur dans les quariers populaires, supra* note 89, ¶36 (noting that it is well-known that electoral outcomes in impoverished neighborhoods reflect the will of the gangs in control, not the will of the people); Secretary-General Sept. 2020 Report, *supra* note 17, ¶15 (noting "linkages between gang violence and political developments…which suggest that competition among gangs is growing in anticipation of elections.").

92  Secretary-General Sept. 2020 Report, *supra* note 17, ¶15.

93  *Id.*, at ¶16 (noting that G9's creation has "raised concerns among political and civil society actors about the detrimental impact partisan gangs can have on State institutions."); Ingrid Arnesen & Anthony Faiola, *In Haiti, coronavirus and a man named Barbecue test the rule of law,* Wash. Post (Aug. 14, 2020).

94  *Id.*

95  *Id.*

96  *See e.g.,* RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶98 ("armed gangs protected by the power of Jovenel Moïse become more powerful day by day. They organize themselves with the blessing of the authorities who provide them with weapons and ammunition. They benefit, for the protection of the police institution. This is the case for example of Jimmy Chérizier alias Barbecue, which is allowed to use the rolling stock of the PNH for as long as it says it wants attack underprivileged neighborhoods housing close relatives of the political opposition."); ¶¶84-87 (noting that members of G9 participate in high-level government meetings and are able to influence government appointments, including the appointment of Frantz Iderice as head of the Caisse d'Assistance Social). Chérizier has denied such ties. *Jimmy CHERIZIER Alyas BARBECUE ap esplike kisa ki G9 an Fanmi e Alye a*, June 10, 2020, YouTube.com, https://www.youtube.com/watch?v=Fc3Rq_3PZ5g (presenting on G-9's formation and insisting on its independence from the government and other political forces).

97  Haitian Popular News Agency, *Social movements in Haiti denounce president's links to criminal gangs*, Peoples Dispatch (Sept. 9, 2020); *see also* Danio Darius, *Les gangs se sont fédérés sur proposition de la Commission nationale de désarmement, démantèlement et reinsertion,* Le Nouvelliste (Sept. 2, 2020).

98  *Haiti – G9: Formal denial of the National Disarmament Commission,* Haiti Libre (Sept. 20, 2020), https://www.haitilibre.com/en/news-31847-haiti-g9-formal-denial-of-the-national-disarmament-commission.html.

99  *See e.g.,* RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶¶88-93 (documenting that Chérizier generally operates with the assistance of PNH officers, who facilitate his travel and ensure his safety); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶¶31, 101 (in Cité Soleil, residents believe calling on police for protection is futile because local police officers regularly participate in recreational activities with armed gangs, including celebrating gang members' birthdays, watching soccer matches and consuming alcohol with them).

100  See *Emblematic Attacks Against Civilians, infra.*

101  *Id.*; MINUJUSTH noted that the La Saline attack lasted at least fourteen hours, yet the PNH did not intervene to protect civilians. This is particularly striking as two police stations were located less than one kilometre from the site of the attack. MINUJUSTH, *supra* note 5, ¶¶23-26. It was only following public outcry that the DCJP conducted an investigation into the La Saline attack. The investigation implicated 70 individuals responsible for carrying out their the attack, including Duplan, Monchéry and Chérizier. Jacqueline Charles, *U.N. investigators say Haitian government condoned massacre that left dozens dead,* Miami Herald (June 21, 2019); Press Release, IJDH & BAI, *Human Rights Groups Petition Inter-American Commission to Protect Survivors of Haiti's La Saline Massacre* (Aug. 13, 2019), http://www.ijdh.org/wp-content/uploads/2019/08/Press-Release-La-Saline-PMs-8-31-FINAL.pdf. Nevertheless, none of them have been arrested. *See also* Press Release, Security Council, Haiti's Stability in Peril without Strong Response to COVID-19, Legal Experts Tell Security Council, U.N. Press Release SC/14218 (June 19, 2020 (noting that "[A]ccountability is a challenge, seen in the lack of progress in investigating and prosecuting the Lilavois, Grand Ravine, La Saline and Bel-Air cases, involving abuses by gang members, law enforcement agents and political officials."); Secretary-General Sept. 2020 Report, *supra* note 17, ¶31 (highlighting the "lack of accountability for past abuses, including emblematic cases like Grand Ravine (2017), La Saline (2018) and Bel-Air (2019).").

102  PNH has cited these constraints as a reason for their failure to intervene in the attacks. *See, e.g.,*BINUH, *supra* note 1, ¶21. Strengthening the police force through capacity building and training has also been a key objective of the UN deployed peacekeeping missions to Haiti from 2004-2019.  MINUJUSTH, *MINUJUSTH Completes its Mandate, Putting an End to 15 Consecutive Years of Peacekeeping in Haiti* (Oct. 16, 2019), https://minujusth.unmissions.org/en/minujusth-completes-its-mandate-putting-end-15-consecutive-years-peacekeeping-haiti-0. Yet PNH has continued to suffer from some systemic constraints, including poor pay and difficult working conditions. Jacqueline Charles, *While Haiti police take frustration out on streets, U.N. sounds alarm on gangs, bad cops,* Miami Herald (Feb. 18, 2020). In September 2020, the Moïse administration increased funding for PNH for the first time in 13 years. Secretary-General Feb. 2021 Report, *supra* note 23, ¶17.

103  At least 71 people were killed in the 2018 La Saline attack. RNDDH, Revised Toll, *supra* note 10; Seth Donnelly & Judith Mirkinson, *The Lasalin massacre and the human rights crisis in Haiti* 6 (Aug. 23, 2019) (noting that "residents and local human rights defenders maintain that this number is deplorably low, based only on the number of bodies actually left on the ground and not taking into account either those buried or taken away."); *cf.* MINUJUSTH, *supra* note 5, ¶5 (separately able to confirm 26 deaths) The death toll of the attack is at least 24 people. RNDDH, *Massacre au Bel-Air, supra* note 13, ¶31; *cf.* BINUH, *supra* note 1, ¶¶2, 4 (separately able to confirm that the attacks left at least 3 dead but noting that this is likely an undercount). Between May and July 2020, at least 145 people were killed in Cité Soleil. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 5, ¶55 (documenting the death of 34 people in Pont Rouge, Nan Brooklyn, Chancerelles, Fort Dimanche, and Nan Tokyo between May 24-27, 2020); RNNDH, *Terror in Cité Soleil, supra* note 5, ¶3 (documenting 111 killings between June and July 2020).



104 RNDDH reported that 5 were injured in the Bel-Air attack. RNDDH, *Massacre au Bel-Air, supra* note 13, ¶34. At least 40 people were shot and injured in Cité Soleil between May 24–July 28, 2020. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶51 (reporting that at least 20 people were injured on May 26 and 27); RNNDH, *Terror in Cité Soleil, supra* note 5, ¶65 (documenting that at least 20 people were injured between June 1 and July 28, 2020).

105 At least 7 women were raped in La Saline. RNDDH, *The Events in La Saline, supra* note 5, ¶43. Between June 1 and July 28, 2020, 18 women and girls were reported raped in Cité-Soleil. RNNDH, *Terror in Cité Soleil, supra* note 5, ¶65.

106 RNDDH documented that 150 houses were vandalized by the attackers La Saline. RNDDH, *The Events of La Saline, supra* note 5, ¶46. Moreover, at least 300 people are estimated to have fled La Saline after the attack. Press Release, RNDHH, *supra* note 11. 28 houses were set on fire during the Bel-Air attack. RNDDH, *Massacre au Bel-Air, supra* note 13, ¶35. 98 houses were set on fire in Cité-Soleil May 23 to 27, 2020. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 5, ¶59. As a consequence of the various attacks, the UN estimates that at least 298 households have been displaced in Bel-Air and Cité-Soleil. Secretary-General Sept. 2020 Report, *supra* note 17, ¶15. *See also* Office for Civil Protection Haiti, *Profile – Site de Déplacés Poste Marchand* (Sept. 17, 2020), https://www.humanitarianresponse.info/sites/www. humanitarianresponse.info/files/documents/files/dpc_oim_bel_air_3_sites_de_deplaces.pdf.

107 RNDDH, *The Events of La Saline, supra* note 5, ¶¶10, 30-31 (noting that "La Saline has an exceptional ability to either mobilize or thwart street demonstrations, which is why this community is often courted by opposition political clans" and highlighting the anti-government demonstrations on October 15 and 17, 2018); BINUH, *supra* note 1, ¶¶6, 16 (emphasizing Bel-Air's central role in the 2019 *peyi lok* protests where almost daily demonstrations against the government took place); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶¶17-18 (highlighting Cité-Soleil's historical support for *Fanmi Lavalas*, the government opposition).

108 See Annex I for a list of the principal investigations relied on in this report.

109 *Id.*

110 RNDDH, *The Events in La Saline, supra* note 5; MINUJUSTH, *supra* note 5; Donnelly & Mirkinson, *supra* note 103.

111 *See* Donnelly & Mirkinson, *supra* note 103, at 4 ("La Saline has been known as a stronghold of Lavalas"); Press Release, Human Rights Delegation Condemns Political Massacres Tied to Haiti's Government (May 8, 2019), http://www.ijdh.org/ wp-content/uploads/2019/05/DelegationPressReleaseFinal5-08-2.pdf (human rights delegation finding that "the months-long series of attacks in poor neighborhoods of Port-au-Prince …were done to punish neighborhood residents-many of whom identify as supporters of the Fanmi Lavalas party-for playing a leading role in a series of demonstrations opposing government corruption, mismanagement and brutality."); Bureau des Avocats Internationaux (BAI) & IJDH, Precautionary Measures Request for Anonymous Petitioners of La Saline, Inter-Am. Comm'n H.R., ¶¶11-13, http://www.ijdh.org/wp-content/uploads/2019/08/IACHR-Precautionary-Measures-Request_Haiti_La-Saline_August-9-2019.pdf [hereinafter BAI & IJDH, Petition for Precautionary Measures] (setting out the political background of La Saline); Prescod, *supra* note 6.

112 RNDDH, *The Events in La Saline, supra* note 5, ¶10; *see also* Randall White, *Haiti Government Complicit in La Saline Massacre,* haitiaction.net (Dec. 4, 2018), http://www.haitiaction.net/News/RAW/12_4_18/12_4_18.html (describing La Saline as a frequent starting point for demonstrations).

113 RNDDH, *The Events in La Saline, supra* note 5, ¶17.

114 *Id.* ¶16; MINUJUSTH, *supra* note 5, ¶10.

115 Press Release, Human Rights Delegation, *supra* note 111; RNDDH, *The Events in La Saline, supra* note 5, at 6; Prescod, *supra* note 6.

116 RNDDH, *The Events in La Saline, supra* note 5, ¶¶25-28; Donnelly & Mirkinson, *supra* note 103, at 4.

117 RNDDH, *The Events in La Saline, supra* note 5, ¶29.

118 Secretary-General Nov. 2018 Report, *supra* note 60, ¶3.

119 RNDDH, *The Events in La Saline, supra* note 5, ¶30; Donnelly & Mirkinson, *supra* note 103, at 4.

120 Secretary-General Nov. 2018 Report, *supra* note 60, ¶3; RNDDH, *The Events in La Saline, supra* note 5, ¶31.

121 Donnelly & Mirkinson, *supra* note 103, at 4-5; FKJL, *Situation de Terreur a La Saline* 3 (Nov. 2018).

122 The President's delegates serve as their official representative in each of Haiti's ten geographic departments, and are responsible for the coordination and control of public services there. Haiti Const. *supra* note 35, art. 85.

123 RNDDH, *The Events in La Saline, supra* note 5, ¶58.

124 MINUJUSTH, *supra* note 5, ¶21.

125 Jake Johnston, *A UN-Backed Police Force Carried out a Massacre in Haiti. The Killings Have Been Almost Entirely Ignore,* The Intercept (Jan. 10, 2018).

126 RNDDH, *The Events in La Saline, supra* note 5, ¶¶54-58; *see also* Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, U.S. Treasury Dept. (Dec. 10, 2020), https://home.treasury.gov/news/ press-releases/sm1208 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack.…Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings.").

127 *See e.g.,* RNDDH, *The Events in La Saline, supra* note 5; MINUJUSTH, *supra* note 5; Donnelly & Mirkinson, *supra* note 103.

128 MINUJUSTH, *supra* note 5, ¶¶12-15; RNDDH, *The Events in La Saline, supra* note 5, ¶¶38-40.

129 RNDDH Revised Toll, *supra* note 103; *see also* Donnelly & Mirkinson, *supra* note 103 (noting that "residents and local human rights defenders maintain that this number is deplorably low, based only on the number of bodies actually left on the ground and not taking into account either those buried or taken away."). MINUJUSTH was separately able to confirm 26 deaths,12 missing, three injured, and two gang rapes. MINUJUSTH, *supra* note 5, ¶4.

130 MINUJUSTH, *supra* note 5, ¶¶13-15.

131 RNDDH, *The Events in La Saline, supra* note 5, ¶39; MINJUSTH, *supra* note 5, ¶15.

132 RNDDH, *The Events in La Saline, supra* note 5, ¶48 (documenting 7 rapes); MINJUSTH, *supra* note 5, ¶7 (noting that Haitian human rights organizations documented 11 cases of rape, including two gang rapes).

133 RNDDH, *The Events in La Saline, supra* note 5, ¶46.

134 BAI & IJDH, Petition for Precautionary Measures, *supra* note 111, at 2.

135 MINUJUSTH, *supra* note 5, ¶19; RNDDH, *The Events in La Saline, supra* note 5, ¶4, 6; Donnelly & Mirkinson, *supra* note 103, at 2.

136 MINUJUSTH, *supra* note 5, ¶18; Haiti Breaking News – Massacre a La Saline, bidonville de Port-au-Prince, TVImage, Nov. 14, 2018, https://www.youtube.com/watch?v=U1X6IpEhTvc (showing bodies disposed of in trash piles).

137 MINUJUSTH, *supra* note 5, ¶19.

138  *Id.*¶20; Jacqueline Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, Police Say. 'Even Young Children Were Not Spared'*, Miami Herald (May 15, 2019).

139  RNDDH, *The events in La Saline, supra* note 5, ¶39; MINUJUSTH, *supra* note 5, ¶¶12-14.

140  MINUJUSTH, *supra* note 5, ¶¶21-22.

141  The UN documented that then-police officers Gregory Antoine and Gustave alias Chupit also participated in the attacks. *Id.*, ¶25.

142  *Id.*, ¶¶23-26 (documenting the proximity of various police outposts to the site of the attack and that police was put on notice of the attack as it was ongoing).

143  *Id.*

144  *Id.*, ¶24.

145  *Id.*, ¶26.

146  *Id.*

147  BAI & IJDH, Petition for Precautionary Measures, *supra* note 111, at 11-12 ("Despite the scale and horror of the atrocities, President Moïse has not spoken out about the massacre, condemned the massacre, or paid visitis to the survivors."); RNDDH, *The Events in La Saline, supra* note 5, ¶75 (noting that in the two weeks that followed the massacre, the only official comment on the attack was made by Prime Minister Céant); Michael Weissenstein, *Witnesses: Men in police garb massacred civlians in Haiti*, Associated Press (Jan. 14, 2019) ("The authorities have said nothing…they haven't even condemned this massacre)(quoting FJKL director Marie-Ylene Gilles).

148  BAI & IJDH, Petition for Precautionary Measures, *supra* note 111, at 12; *see also* Hearing on Access to Justice and Judicial Independence in Haiti, Inter-Am. Comm'n H.R., PS 178 18, at 51:04, (Dec. 10, 2020), https://www.youtube.com/watch?v=FUgzRzOl-BU (Commission President Joel Hernández García calling on Haitian government to take concrete steps to advance reparations for victims of the La Saline massacre).

149  Charles, *supra* note 138 (reporting on the findings. The results of the investigation have been referred to the prosecutor, but remain confidential in accordance with Haitian criminal procedure. MINUJUSTH, *supra* note 5, ¶¶31-34.

150  *See e.g.,* BAI & IJDH, Written Submission for the Dec. 10, 2020 Thematic Hearing, *supra* note 26 (noting lack of accountability for La Saline attack, including that the legal process has stalled since 2019); Secretary-General Feb. 2021 Report, *supra* note 23, ¶33 (Cherizier remains at large despite continuing domestic and international appeals for justice); Worlgenson Noël, *Deux ans après le massacre à la Saline, toujours pas de justice pour les victimes…*, Le Nouvelliste (Nov. 12, 2020) (quoting RNDDH lamenting that government officials implicated in the massacre still hold political power). Monchéry was briefly arrested in 2021 for driving with illegal plates, but quickly released. Robenson Geffrard, *Indexé dans le cadre du massacre de La Saline, Fednel Monchéry arrêté puis libéré par la police,* Le Nouvelliste (Feb. 18, 2021).

151  Haïti - Politique : Fednel Monchéry, DG du Ministère de l'intérieur démissione, Haiti Libre (Sept. 26, 2019) (citing letter of resignation from Monchéry); Fednel Monchéry et Joseph Pierre Richard Duplan révoqués, Le Nouvelliste (Sept. 26, 2019) (reporting on Duplan and Monchéry's revocations and replacements) ; *see also* Danticat, *supra* note 11 (noting that they were fired as protests intensified).

152  BINUH, *supra* note 1, at 4 (citing warrant issued by an investigating judge on February 6, 2019); Sandra Lemaire, *UN Security Council Expresses Serious Concern About Haiti, Calls for Elections,* VOA News (Feb. 23, 2021) (France's Deputy Permanent Representative to the UN asking Moïse "how is it possible today that Jimmy Chérizier is still walking free?").

153  BINUH, *supra* note 1, ¶6.

154  Chelsey Kivland, *Street Sovereigns: Young Men and the Makeshift State in Urban Haiti* 87 (2000).

155  FJKL, *Conflit au Bel-Air,  supra* note 90, at 11-12.

156  BINUH, *supra* note 1, ¶8.

157  *See e.g.,* Secretary-General Feb. 2020 Report, *supra* note 1, ¶3; Danticat, *supra* note 11; BINUH, *supra* note 1, ¶5.

158  BINUH, *supra* note 1, ¶6.

159  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶19; BINUH, *supra* note 1, ¶17.

160  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶20.

161  *Id.*, ¶¶20, 41.

162  *See e.g.,* BINUH, *supra* note 1, ¶7 (noting Cherizier's documented involvement in Grand Ravine and La Saline).

163  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶42.

164  RNDDH, *supra* note 1, ¶9.

165  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶19.

166  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶31. BINUH reported that multiple sources confirmed at least three deaths and six injured, while also noting that this may be a severe undercount in view of the office's inability to access certain sites and reluctance by victims and witnesses to come forward. BINUH, *supra* note 1, ¶4.

167  BINUH, *supra* note 1, ¶10.

168  *Id.*, ¶19.

169  *Id.*, ¶10.

170  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶2; BINUH, *supra* note 1, ¶20.

171  BINUH, *supra* note 1, ¶11.

172  *Id.*

173  *Id.*, ¶12.

174  *Id.*

175  *Id.*, ¶13.

176  *Id.*; RNDDH, *Massacre au Bel-Air, supra* note 13, ¶27.

177  BINUH, *supra* note 1, ¶15.

178  *Id.*, ¶20.

179  *Id.*, ¶22.

180  *Id.*

181  BINUH, *supra* note 1, ¶28 (as of February 2020, no warrants for arrests were issued in connection with the attack); Press Release, Security Council, Haiti's Stability in Peril without Strong Response to COVID-19, Legal Experts Tell Security Council, U.N. Press Release SC/14218,  (Jun. 19, 2020), https://www.un.org/press/en/2020/sc14218.doc.htm ("Accountability is a challenge, seen in the lack of progress in investigating and prosecuting the Lilavois, Grand Ravine, La Saline and Bel-Air cases, involving abuses by gang members, law enforcement agents and political officials."); *see also*

Secretary-General Sept. 2020 Report, *supra* note 17, ¶31 (discussing an increase in attacks by gangs targeting the population, a development that can be explained by the establishment of the G9 and "lack of accountability for past abuses, including in emblematic cases like Grand Ravine (2017), La Saline (2018) and Bel-Air (2019).").

182  RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶¶6-13 (describing the neighborhood); Cité Soleil, Wikipedia, https://en.wikipedia.org/wiki/Cité_Soleil.

183  RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶17.

184  *Id.,* ¶¶18-43 (setting out the background of gangs in Cite Soleil); RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶¶12-15 (noting that a situation of relative peace among gangs changed in 2018).

185  *See* Secretary-General Sept. 2020 Report, *supra* note 17, ¶15 (observing a rise in gang violence linked to competition in anticipation of elections); *Id.,* ¶87; RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶¶61-63 (testimony of former Cité Soleil parliamentary representative Pierre Lemaire, attributing the attacks to the "will of the authorities [and] the power to politically control the territories…for electoral purposes."), ¶65 (noting that residents interviewed as a part of the investigation agree with the assessment of motive); *cf. id.* ¶68 (reporting that other residents believe they are being targeted as retribution for their anti-government positions and activities, rather than specifically for electoral control).

186  Secretary-General Sept. 2020 Report, *supra* note 17, ¶15; RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶70 (reporting that police officers interviewed as a part of the investigation believe the May 23-27 attack was planned in part because of the new G9 alliance); RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶¶1, 6 (observing that the rise in G-9 has contributed to inter-gang violence as they vie for control); *see also* text accompanying fns. 96-98 (discussing ties between the government and G-9).

187  RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 5, ¶¶32-37 (discussing the circumstances of Ernso Nicolas' murder).

188  RNDDH, *Attaques contre des quartiers défavorisés: Le RNDDH exige la fin de la protection des gangs armés par les autorités au pouvoir*, ¶¶34-35, 62-64 (June 23, 2020) (French original including references to state involvement in payments, based on testimony of Pierre Lemaire).

189  RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶40.

190  *Id.,* ¶¶41-42.

191  *See e.g.,* text accompanying fn. 121 (describing the blockage of the wreath-laying ceremony); RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶14 ("for some, Pont Rouge, in the same way as La Saline, is hated by the authorities in power because of its anti-government resistance."); *id.*, ¶¶25-31 (describing prior attacks in Nan Tokyo in 2019); FKJL, *Terreur dans les quartiers populaires*, *supra* note 89, ¶52 (President Moise reportedly became aware of Jean-Pierre's role in *peyi lok*).

192  RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶55 (documenting toll of gang assaults in Cité Soleil between May 23-27, 2020); RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶59 (documenting toll of gang assaults in Cité Soleil between June and July 2020).

193  RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶43.

194  *Id.,* ¶¶43-44.

195  *Id.,* ¶45.

196  *Id.,* ¶46.

197  *Id.*

198  *Id.*

199  *Id.,* ¶48.

200  *Id.,* ¶46.

201  *Id.,* ¶51.

202  *Id.,* ¶53.

203  In the aftermath of the attacks, G9 leaders appointed new gang leaders in the areas they had conquered. *Id.,* ¶77.

204  RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶59.

205  *Id.,* ¶¶63-64, 69, 71.

206  *Id.,* ¶52-57.

207  *Id.,* ¶¶55-56.

208  *Id.,* ¶58.

209  *Id.,* ¶¶73, 79.

210  *Id.,* ¶¶72-76, 79-81.

211  *Id.,* ¶58.

212  *Id.*

213  Id., ¶84; *see also* Secretary-General Feb. 2021 Report, *supra* note 23, at ¶¶33-34 (noting the continued lack of accountability for human rights abuses committed by law enforcement and by prominent gang members such as Cherizier, who still remains at large.)

214  RNDDH, *Attacks on deprived neighborhoods*, *supra* note 4, ¶61.

215  FKJL, *Terreur dans les quartiers populaires*, *supra* note 89, ¶¶52-54.

216  RNDDH, *Attacks on deprived neighborhoods*, *supra* note 4, ¶68.

217  Murphy, *supra* note 31, ¶27.

218  *Id.,* ¶39; *see also Arellano*, *supra* note 36, ¶99 (acknowledging the jus cogens status of crimes against humanity).

219  Murphy, *supra* note 31, ¶¶8, 122; Int'l Hum. Rts. Clinic Harv. L. Sch., *Crimes in Burma* fn.4 (2009) (the Rome Statute reflects customary international law on key elements of crimes against humanity).

220  Rome Statute, *supra* note 32, art. 7.

221  *Id.*

222  *Id.,* art. 53.

223  Article 13(b) of the Rome Statute grants the Security Council the power, acting under Chapter VII of the UN Charter, to refer to the ICC situations in which crimes under the jurisdiction of the court have taken place. Rome Statute, *supra* note 32, art. 13(b).

224  International Criminal Court, *Elements of Crime,* ICC-ASP/1/3 (part II-B), at 5 (Sep. 9, 2002).

225  RNDDH, *Revised Toll*, *supra* note 10.

226  Donnelly & Mirkinson, *supra* note 103, at 7.

227  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶31; *cf.* BINUH *Rapport sur Bel Air, supra* note 1, ¶¶4, 13, 15, 27 (separately confirming 3 murders, and 5 complaints for murder filed with the police, while noting that the toll could be much higher since they were unable to verify several allegations due to challenges including accessing certain sites and the reluctance of victims and witnesses to give information for fear of reprisals).

228  34 people were killed in Pont Rouge, Nan Brooklyn, Chancerelles, Fort Dimanche, and Nan Tokyo between May 23-27, 2020. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶55. 111 people were killed in Cité-Soleil between June 1 and July 28 2020. RNDDH, *Terror in Cité Soleil, supra* note 5, ¶59.

229  Prosecutor v. Furundžija, Case No. IT-97-17/1-T, Judgment, ¶185 (Int'l Crim. Trib. For the Former Yugoslavia Dec. 10, 1998).

230  Prosecutor v. Jean-Pierre Bemba Gombo, ICC-01/05-01/08, Trial Judgement of Judge Steiner, ¶99-101 (Mar. 21, 2016).

231  MINUJUSTH, *supra* note 5, ¶7 (noting that 11 cases of rape were reported by Haitian human rights organizations, of which they could verify 2); *see also* RNDDH, *Revised Toll, supra* note 10.

232  RNDDH, *The Events in la Saline, supra* note 5, ¶48.

233  *Id.*

234  *Id.*

235  MINUJUSTH, *supra* note 5, ¶7.

236  Donnelly & Mirkinson, *supra* note 103, at 7.

237  RNDDH, *Terror in Cité Soleil, supra* note 5, ¶3.

238  *Id.,* at ¶69.

239  *Id.*

240  *Id.*

241  *Id.*

242  *Id.*

243  Donnelly & Mirkinson, *supra* note 103, at 7.

244  Rome Statute, *supra* note 32, art. 7(1)(f).

245  *Id.* art. 7(2)(e).

246  Prosecutor v. Karadžić, Case No. IT-95-5/18-T, Judgment, ¶506 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 24, 2016).

247  Prosecutor v. Kunarac, Case No. IT-96-23-T and IT-96-23/1-A, Judgment ¶¶150-151 (Int'l Crim. Trib. for the Former Yugoslavia Jun. 12, 2002)("rape is viewed as an 'obvious' per se act of torture. Severe pain or suffering, as required by the definition of the crime of torture, can thus be said to be established once rape has been proved, since the act of rape necessarily implies such pain or suffering."); *see also* Prosecutor v. *Delalić et al.*, Case No. IT-96-21-T, Judgment ¶480 (Int'l Crim. Trib. for the Former Yugoslavia Nov. 16, 1998).

248  Prosecutor v. Kvočka, Case No. IT-98-30/1-T, Judgement ¶149 (Int'l Crim. Trib. for the Former Yugoslavia  Nov. 2, 2001) ("The mental suffering caused to an individual who is forced to watch severe mistreatment inflicted on a relative would rise to the level of gravity required under the crime of torture. Similarly, the Furundžija Trial Chamber found that being forced to watch serious sexual attacks inflicted on a female acquaintance was torture for the forced observer. The presence of onlookers, particularly family members, also inflicts severe mental harm amounting to torture on the person being raped.").

249  MINUJUSTH, *supra* note 5, ¶7.

250  *Id.*

251  Courts have not delineated the degree of pain required to constitute torture, but take the general circumstances into consideration. *See Kvočka, supra* note 248, ¶161 ("[T]he degree of physical or mental suffering required to prove cruel treatment is lower than the one required for torture, though it must be at the same level as 'willfully causing great suffering or serious injury to body or health'."); *see also* Prosecutor v. Krnojelac, Case No. IT-97-25-T, Judgment ¶¶182-183, (Int'l Crim. Trib. for the Former Yugoslavia Mar. 15, 2002) ("[T]he Trial Chamber must take into account all the circumstances of the case, including the nature and context of the infliction of pain, the premeditation and institutionalisation of the ill-treatment, the physical condition of the victim, the manner and method used, and the position of inferiority of the victim.").

252  MINUJUSTH, *supra* note 5, ¶5.

253  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶33.

254  Rome Statute, *supra* note 32, art. 7(1)(h).

255  *See e.g.* Prosecutor v. Kupreškić et al., Case No. IT-95-16-T, Judgment, ¶¶593-631 (Int'l Crim. Trib. for the Former Yugoslavia Jan. 14, 2000) (finding that murder, imprisonment, and deportation can constitute persecution); Prosecutor v. Blaškić, Case No. IT-95-14-T, Judgment, ¶233 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 3, 2000)(finding that persecution includes harm to property, so long as the "victimised persons were specially selected on grounds linked to their belonging to a particular community.") [hereinafter Blaškić Trial Chamber Judgment]; Prosecutor v. Kordić, Case No. IT-95-14-/2, Judgment, ¶205 (Feb. 26, 2001); Prosecutor v. Milutinović, Case No. IT-05-87, Trial Judgment, ¶¶193-4 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 26 2009) (establishing that sexual assault may be a form of persecution.).

256  The Democratic and Popular Sector is a coalition of several opposition leaders and social sectors that have organized protests against Moïse in La Saline. *Port-au-Prince slum exemplifies dire problems of crisis-racked Haiti*, Agencia EFE (Feb. 22, 2019).

257  RNDDH, *The Events in La Saline, supra* note 5, ¶¶25-28; Donnelly & Mirkinson, *supra* note 103, at 4.

258  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶19; BINUH, *supra* note 1, ¶17.

259  RNDDH, *Attacks on deprived neighborhoods, supra* note 4, ¶61.

260  *Id.,* ¶68

261  *Kunarac, supra* note 247, ¶417.

262  *Id.,* ¶100; *see also* Prosecutor v. Kayishema, Case No. ICTR-95-1-T, Judgment, ¶122 (May 21, 1999).

263  *Situation in Kenya*, ICC-01/09 Decision Pursuant to Article 15 of the Rome Statute on the Authorization of an Investigation into the Situation in the Republic of Kenya, ¶135 (Mar. 31, 2010) [hereinafter *Situation in Kenya*] ("the issue of whether an act was committed as part of a widespread or systematic attack needs to be analyzed on a case-by-case basis with regard to each particular act. At the current stage of the proceedings, the Chamber merely considers the situation as a whole without focusing beyond what is necessary for the purpose of the present decision on specific criminal acts. In this regard, the Chamber observes that the nature, aims and consequences of many of the individual acts recall either the characteristics of the initial attacks, the retaliatory attacks or the attacks emanating from the police.").

264  See Section III of this report.

265  See Section II of this report.

266 Rome Statute, *supra* note 32, art. 7(1).

267 *Id.,* art. 7(2)(a).

268 Prosecutor v. Gbagbo, ICC-02/11-01/11-656-Red, Pre-Trial Chamber I Decision on the confirmation of charges, ¶209 (Jun. 12, 2014).

269 See Section II of this report.

270 BINUH, *supra* note 1, ¶¶8-12.

271 RNDDH, *Attacks on deprived neighborhoods, supra* note 5, ¶¶41-42.

272 *Id.,* ¶77.

273 RNDDH, *Terror in Cité Soleil, supra* note 5, ¶52.

274 *Id.,* ¶¶54-58 (G9 gangs monitored all roads in and out of Nan Brooklyn, and carried out seven attacks against Nan Brooklyn in June and July.)

275 It is common for courts to find that one attack can take place over an extended period of time. *See e.g., Kunarac, supra* note 247, ¶3 (charging three individuals with an attack that took place over the course of three days).

276 *See* BINUH, *supra* note 1, at 4 (observing that the attack on Bel Air is "far from an isolated incident," with similarities to other attacks including La Saline that illustrate a broader reality in Haiti.)

277 Prosecutor v. Bemba, ICC-01/05-01/08-424, Decision Pursuant to Article 61(7)(a) and (b) of the Rome Statute on the Charges of the Prosecutor Against Jean-Pierre Bemba Gombo, ¶78 (Jun. 15, 2009) [hereinafter *Bemba* Confirmation of Charges Decision].

278 *Id.,* ¶¶76-77.

279 Prosecutor v. Ntaganda, ICC-01/04-02/06-2359, Judgment, ¶667 (Jul. 9, 2019).

280 Prosecutor v. Muthaura, ICC-01/09-02/11-382-Red, Decision on the Confirmation of Charges Pursuant to Article 61(7)(a) and (b) of the Rome Statute ¶110 (Jan. 23, 2012).

281 Rome Statute, *supra* note 32, art. 7.

282 *See, e.g.,* Prosecutor v. Kayishema, Case No. ICTR-95-1-T, Judgment, ¶123 (May 21, 1999) ("The attack must contain one of the alternative conditions of being widespread or systematic.").

283 Prosecutor v. Prlić, Case No. IT-04-74-T, Judgment, ¶49 (Int'l Crim. Trib. for the Former Yugoslavia May 29, 2013).

284 Blaškić, Trial Chamber Judgment, *supra* note 255, ¶207 ("The quantitative criterion is not objectively definable as witnessed by the fact that neither international texts nor international and national case-law set any threshold starting with which a crime against humanity is constituted."); *Kordić,* supra note 255, ¶179 ("a crime may be widespread or committed on a large scale by the 'cumulative effect of a series of inhumane acts or the singular effect of an inhumane act of extraordinary magnitude.'").

285 *Kunarac, supra* note 247, ¶95.

286 RNDDH, *Revised Toll, supra* note 10.

287 RNDDH, *Massacre au Bel-Air, supra* note 13, ¶31.

288 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶55 (documenting 34 deaths between May 23-27, 2020); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶59 (documenting 111 deaths between June 1-July 28, 2020).

289 BAI & IJDH, *Precautionary Measures Request, supra* note 111, ¶4 (noting that at least 300 people fled La Saline after the massacre and seeking precautionary measures on behalf of those still displaced).

290 Donnelly & Mirkinson, *supra* note 103, RNDDH, *Attacks on deprived neighborhoods, supra* note 4, ¶53.

291 Secretary-General Sept. 2020 Report, *supra* note 17, ¶15.

292 *See* IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34 (citing Office de la Protection du Citoyen, *Profile – Site de Déplacés Poste Marchand* (Sept. 17, 2020)).

293 *Blaškić,* Case No. IT-95-14-A, Judgment, ¶101 (Int'l Crim. Trib. for the Former Yugoslavia, Jul. 29, 2004)[hereinafter *Blaškić,* Appeals Chamber Judgment]; Prosecutor v. Ndindiliyimana, Case No. ICTR-00-56-A, Judgement, ¶260 (Feb. 11, 2014).

294 *Kunarac, supra* note 247, ¶94.

295 Prosecutor v. Muthaura, ICC-01/09-02/11, Decision on the Confirmation of Charges, ¶158 (Jan. 23, 2012).

296 RNDDH, *The Events in La Saline, supra* note 5, ¶58.

297 RNDDH, *The Events in La Saline, supra* note 5, ¶¶54-58. The ICC Pre-Trial Chamber has found that the provision of uniforms and weapons to the attackers supported a conclusion that an attack was systematic and organized. *Muthaura, supra* note 295, ¶158.

298 Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, supra* note 138.

299 RNDDH, *The Events in La Saline, supra* note 5, ¶39; *see also* Weissenstein, *supra* note 147.

300 RNDDH, *The Events in La Saline, supra* note 5, ¶¶39, 43.

301 *Id.,* ¶46.

302 MINUJUSTH, *supra* note 5, ¶19.

303 RNDDH, *Massacre au Bel-Air, supra* note 13, ¶20.

304 BINUH, *supra* note 1, ¶9.

305 *Id.,* ¶10.

306 *Id.,* ¶¶9-11.

307 *Id.,* ¶¶12-14.

308 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 5, ¶¶41-42.

309 *Id.,* ¶¶43-44.

310 *Id.,* ¶46.

311 RNDDH, *Terror in Cité Soleil, supra* note 5, ¶59.

312 *Id.,* ¶52.

313 *Id.,* ¶¶54-57, 64.

314 Rome Statute, *supra* note 32, art. 7(2). The ICTY has held that there is no separate policy requirement under customary international law, but that it is a relevant factor to assessing the systematic nature of an attack. *Kunarac, supra* note 247, ¶20; *see also* Marjolein Cupido, *The Policy Underlying Crimes Against Humanity,* 22 Crim. L. Forum 275, 283 (2011). While the analysis in this report applies the higher threshold of the Rome Statute, this element would not need to be established if the customary international law definition of crimes against humanity were applied. *See, e.g, Kunarac, supra* note 247, ¶98.

315 *Situation in Kenya*, *supra* note 263, ¶84; *see also* Prosecutor v. Katanga, ICC-01/04-01/07-3436-tENG, Judgment, ¶1108 (Mar. 7, 2014); Open Society Justice Initiatives (OSJI), *Undeniable Atrocities: Confronting Crimes Against Humanity in Mexico* 50 (2016) [hereinafter OSJI].

316 ICC, *Elements of Crimes*, *supra* note 224, at 5; *see also Gbagbo*, *supra* note 268, ¶214.

317 *Katanga*, *supra* note 315, ¶1110.

318 Prosecutor v. Ruto, ICC-01/09-01/11-373, Decision on the Confirmation of Charges, ¶213 (Jan. 23, 2012).

319 *See Cupido*, *supra* note 314, at 287 (analyzing ICC treatment of the policy element and finding that similar evidence is used under the policy and systematic elements).

320 *Katanga*, *supra* note 315, ¶1112 ("Indeed it should be recalled that it is not so much the policy as it is the widespread or systematic nature of the attack – *viz.* a consideration of the scale and regular nature of the pattern followed — which first and foremost distinguishes a crime against humanity and constitutes its 'hallmark'"… if an attack is 'systematic' because the existence of a policy had been demonstrated, that would be in "contradiction with the Statute's disjunctive wording.").

321 *Id.*, ¶1113.

322 *Id.*, ¶1109.

323 *Situation in Kenya*, *supra* note 263, ¶119 (citing preparatory meetings during which perpetrators were "given instructions, supplied with weapons and distributed money" as relevant to finding a policy).

324 *Cupido*, *supra* note 314, at 295 (citing *Situation in Kenya*, *supra* note 263, ¶127); *see also Gbagbo*, *supra* note 268, ¶¶219-20 (holding that the actions of "pro-Gbagbo forces," which included "youth militia and mercenaries" acting under the leadership of Gbagbo, could be attributed to either a "State" or an "organizational" policy for purposes of Article 7(2) of the Statute); *see also* Aleaziz, *supra* note 89 (U.S. Department of Homeland Security acknowledging that the Haitian government is using gangs to "repress the opposition."); *OSJI*, *supra* note 315, at 50.

325 Prosecutor v. Ruto, *supra* note 318, ¶210.

326 *Katanga*, *supra* note 315, ¶1109; *see also Situation in Kenya*, *supra* note 263, ¶79.

327 RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶64.

328 *See Situation in Kenya*, *supra* note 263, ¶117 (noting participation of members of the police as indicative that violence was "not a mere accumulation of spontaneous or isolated acts").

329 Donnelly & Mirkinson, *supra* note 103, at 5; RNDDH, *The Events in La Saline, supra* note 5, ¶40.

330 BINUH, *supra* note 1, ¶19.

331 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶52.

332 MINUJUSTH, *supra* note 5, ¶¶23, 48 [Translated from French] ("The lack of intervention by the PNH during the attack, which lasted for several hours, may have allowed the attackers to act with impunity and contributed to the very high number of victims.").

333 BINUH, *supra* note 1, ¶20.

334 RNDDH, Terror in Cité Soleil, *supra* note 5, ¶58.

335 *Situation in Kenya*, *supra* note 263, ¶90.

336 *Id.*, ¶93 (stressing that these factors do not constitute a strict legal definition, and do not need to be exhaustively fulfilled).

337 *Katanga*, *supra* note 315, ¶1120.

338 *See e.g., Muthaura, supra* note 295, ¶¶186, 190-223 (finding that the Mungiki gang constitutes an organization under the Rome Statute, pointing to factors such as the existence of leadership and  the gang's role as a quasi-public authority in certain slums. The Pre-trial Chamber expressly rejected an argument that shifting political affiliations of the gang suggests that it was not an 'organization'); *see also* OSJI, *supra* note 315, at 87-92 (finding that the Mexican Zetas cartel meets the definition of an organization.)

339 Gangs also form structured and hierarchical alliance. In the Bel-Air attack, for example, the UN observed that different gang leaders pledged allegiance to Cherizier and operated under his authority. BINUH, *supra* note 1, ¶8.

340 See Section I, infra, at 9-10; *see also* OSJI, *supra* note 315, at 92 (pointing to this as indicative of a policy to attack civilians).

341 Arnesen & Faiola, *supra* note 93.

342 *See* IJDH, *Human Rights & Rule of Law in Haiti, supra* note 34, fn.95 (noting a disproportionate UN focus on gang violence while ignoring the role of state actor complicity in violence).

343 See text box in Section II.

344 Secretary-General June 2020 Report, *supra* note 4, ¶56.

345 *See e.g.,* Prosecutor v. Blaškic, Case No. IT-95-14-T, Judgment, ¶789, (Int'l Crim. Trib. For the Former Yugoslavia Mar. 3, 2000)("... [w]hen a commander fails in his duty to prevent the crime or to punish the perpetrator thereof he should receive a heavier sentence than the subordinates who committed the crime insofar as the failing conveys some intolerance or even approval on the part of the commander towards the commission of crimes by his subordinates and thus contributes to encouraging the commission of new crimes. It would not be in fact consistent to punish a simple perpetrator with a sentence equal or greater to that of the commander.")

346 *See, e.g.,* Secretary-General Feb. 2021 Report, *supra* note 23, ¶33 (discussing attacks in the context of gang violence and mentioning the state's failure to protect but omitting any reference to state actors in the commission of the crimes); Secretary-General Sept. 2020 Report, *supra* note 17 (discussing the rise in G-9 and Cherizier's role in massacres without acknowledging documentation of state actor involvement); *see also* IJDH, *Human Rights and Rule of Law in Haiti*, *supra* note 34, fn. 95 ("Though BINUH reports and Security Council comments extensively discuss gang violence, Jimmy Chérizier, and the G-9, the UN and Security Council Members systematically ignore well-documented evidence from civil society regarding state actor complicity in that violence and requests for investigation and accountability.").

347 Rome Statute, *supra* note 32, art. 7(1).

348 BINUH, *supra* note 1, ¶7 (noting that Chérizier was a police officer until Dec. 14, 2018, and was found to be implicated as a perpetrator of the La Saline massacre by police and judicial investigations); *see also* Dánica Coto, *Leader or Killer? A day with 'Barbecue in Haiti's capital*, Associated Press, June 7, 2019, https://apnews.com/article/ebc2cee089f149309bd73afa07816a63 (Chérizier has been personally implicated in carrying out at least two of the murders in La Saline); BINUH, *supra* note 1, ¶¶9-15 (identifying Chérizier as a lead perpetrator in the Bel-Air attack); RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶43 (Chérizier personally lead the May 24 attack on Nan Tokyo and May 26-27 attack on Nan Brooklyn); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶67 (documenting that Chérizier personally captured 17-year old Waldo Jean in Cité Soleil on June 3, 2020, who has since been missing).

349 MINUJUSTH, *supra* note 5, ¶21 (Witnesses identified Gregory Antoine, an administrative police agent, dressed in civilian clothes at the center of the attack, and Gustave alias Chupit, a PNH agent with the CIMO agency, among members of the Chabon gang); RNDDH, *The Events in La Saline*, *supra* note 5, ¶56 ("Gregory Antoine alias Ti Greg presented by all interviewees as the Chief of *Base Pilate* is accused of having actively participated with his troop, alongside the *Base Nan Chabon* in the killings of November 13, 2018."). Note that some sources maintain that Gregory Antoine has since died. Weissenstein *supra* note 147 (noting that family reports he was killed in a gang fight in January 2019; MINUJUSTH, *supra* note 5, ¶37 (noting that he is "allegedly dead.").

350 BINUH, *supra* note 1, ¶19 (multiple eyewitnesses identified three police officers with ties to Cherizier's Delmas 6 gang as armed and active participants throughout the three-day attack); RNDDH, *Massacre au Bel-Air*, *supra* note 13, ¶28 (police officers took part in the attack on Nov. 6, including setting a house where civilians were hiding on fire, killing 13 people).

351 BINUH, *supra* note 1, ¶19 (the officers belonged to the Petite-Rivière precinct in the Artibonite Department, the Pignon precinct in the North Department, and the 'Unité de sécurité générale du Palais National (USGPN)).

352 RNDDH, *Terror in Cite Soleil*, *supra* note 5, ¶58.

353 Rome Statute, *supra* note 32, art. 7(1).

354 *Id.*, art. 25(3)(c); *see generally* Oona Hathaway et al., *Aiding and Abetting in International Criminal Law*, 104:6 Cornell L. Rev. 1593 (2019) (analyzing the state of international criminal law on aiding and abetting).

355 Bemba, Case No. ICC-0105-01/13, Trial Judgment Pursuant to Article 74 of the Statute, ¶¶88-89 (Oct. 19, 2016). Blaškić, Appeals Chamber Judgment, *supra* note 293, ¶46.

356 *Bemba*, *supra* note 355, ¶¶88-89.

357 *Id.*, ¶¶90-93 (holding that the Rome Statute does not require the meeting of any specific or minimum threshold); *but see* Hathaway et al., *supra* note 354, at 1611(noting that the ad hoc tribunals and hybrid tribunals apply a "substantial effect" standard). Even under this standard, acquittals on the basis that the "substantial effect" requirement was not met are rare, however. *Id.* at 1611 (finding only two instances of such a basis for "acquittal).

358 Rome Statute, *supra* note 32, art. 25(3)(c); Bemba, *supra* note 355, ¶97; Prosecutor v. Mbarushimana, Case No. ICC-01/04-01/10, Decision on the Confirmation of the Charges, ¶274 (2011); *but see* Hathaway et al., *supra* note 354, at 1607 (finding that the ad hoc and hybrid tribunals only require knowledge that their act will assist the commission of the underlying crime).

359 *See* Bemba, *supra* note 355, ¶89 ("Under certain circumstances, even the act of being present at the crime scene (or in its vicinity) as a 'silent spectator' can be construed as tacit approval or encouragement of the crime."); *see also* Prosecutor v. Aleksovski, Case No. IT-95-14/1-T, Judgment, ¶87 (Int'l Crim. Trib. For the Former Yugoslavia June 25, 1999)(finding a prison warden liable for aiding and abetting abuse due to his presence during the mistreatment of detainees, failure to object to it, and his necessary awareness that this would act as tacit approval, support and encouragement).

360 *See e.g.,* Prosecutor v. Semanza, Case No. ICTR-97-20-T, Judgment, ¶432 (Mar. 3, 2003)(finding an individual liable for aiding and abetting genocide by bringing equipment to the site where a large-scale massacre of Tutsi refugees was occurring, thus providing substantial assistance to the genocidal enterprise).

361 *See* Prosecutor v. Mrkšić, Case No. IT-95-13/1-A, Judgment, ¶49 (Int'l Crim. Trib. For Former Yugoslavia May 5, 2009) ("The *actus reus* of aiding and abetting by omission will thus be fulfilled when it is established that the failure to discharge a legal duty assisted, encouraged or lent moral support to the perpetration of the crime and had a substantial effect on the realisation of that crime.").

362 MINUJUSTH, *supra* note 5, ¶21 (discussing police involvement in La Saline); RNDDH, *The Events in La Saline*, *supra* note 5, ¶56; BINUH, *supra* note 1, ¶19 (discussing police participation throughout the three-day attack on Bel-Air); RNDDH, *Massacre au Bel-Air*, *supra* note 13, ¶28 (police officers took part in the attack on Nov. 6).

363 *See e.g.,* Semanza, *supra* note 360, ¶386 ("The authority of an individual is frequently a strong indication that the principal perpetrators will perceive his presence as an act of encouragement."); *Aleksovski*, *supra* note 359, ¶¶62-64 (while the mere presence of an individual in authority is not in itself enough to establish encouragement, "it can hardly be doubted that the presence of an individual with authority will frequently be perceived by the perpetrators of the criminal act as a sign of encouragement likely to have a significant or even decisive effect on promoting its commission."). Previous active role in similar acts by the same group also strengthens the liability for aiding and abetting by presence. Prosecutor v. Tadić, Case No. IT-94-1-T, Opinion and Judgment, ¶690 (Int'l Crim. Trib. For Former Yugoslavia May 7, 1997) (when an accused is present and participates in the beating of one person and remains with the group when it moves on to beat another person, his presence would have an encouraging effect).

364 RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶46.

365 RNDDH, *Terror in Cite Soleil*, *supra* note 5, ¶58.

366 RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶¶88-93.

367 *Id.*

368 MINUJUSTH, *supra* note 5, ¶¶12-15; RNDDH, *The Events in La Saline*, *supra* note 5, ¶¶38-40; *Weissenstein*, *supra* note 147.

369 RNDDH, *The Events in La Saline*, *supra* note 5, ¶¶54-55 (residents interviewed report that Monchéry and Duplan provided weapons, government vehicles and uniforms); Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack.…Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings."); *but see Weissenstein*, *supra* note 147 ("Armed gangs have bought or stolen untold amounts of Haitian police gear in recent years, so the degree of official involvement in the La Saline massacre remains unclear.").

370 RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶52 (eyewitnesses report that Chérizier was transported to Cite Soleil in an armored PNH vehicle and that he requested photos and videos to be taken of his arrival).

371 RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶58.

372 Police officers interviewed as a part of RNDDH's investigation into the May attack on Cité Soleil believe they are being intentionally furnished to support gang violence. RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶71 (noting with concern that "authorities in power" are providing "the continued supply of weapons and ammunition to armed gangs" at the expense of resourcing official PNH operations).

373 MINUJUSTH, *supra* note 5, at 17 ("The lack of intervention by the PNH during the attack, which lasted for several hours, may have allowed the attackers to act with impunity and contributed to the very high number of victims.")(Translated from French).

374 RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶58.

Haiti AR_001636

375 Mrkšić, *supra* note 361, ¶49 (aiding and abetting by omission implicitly requires that the accused had the ability to act, such that there were means available to the accused to fulfil his duty).

376 *See* MINUJUSTH, *supra* note 5, ¶26 (PNH confirmed having notice of the attack on La Saline but maintained that it could nto intervene due to limited available resources); BINUH, *supra* note 1, ¶21 (in response to questioning about inaction in Bel-Air, PNH cited the presence of barricades, and the lack of vehicles, communication equipment, and personal protective equipment); RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶¶72-81 (reporting on interviews with various police units citing the need for reinforcements and a response as a part of a comprehensive plan developed by senior leadership of PNH).

377 RNDDH, *The events in La Saline, supra* note 5, ¶¶54-55; Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack….Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings.").

378 MINUJUSTH, *supra* note 5, ¶21. Presence itself can amount to abetting under certain circumstances, especially where the individual is in a position of authority. *See* Bemba, *supra* note 355, ¶89 ("Under certain circumstances, even the act of being present at the crime scene (or in its vicinity) as a 'silent spectator' can be construed as tacit approval or encouragement of the crime."); *Semanza*, *supra* note 360, ¶386 (the presence of an individual in position of authority is a strong indication that it will serve as an act of encouragement.)

379 RNDDH, *Massacre au Bel-Air, supra* note 13, ¶¶20, 41-43.

380 *Id.*, ¶42 (noting that Saint-Cyr categorically denied the allegations to RNDDH, insisting that he learned of the attack on the radio).

381 Rome Statute art. 25(3)(b).

382 *Prlić*, *supra* note 283, ¶231.

383 *Id.*; *Ndindiliyimana*, *supra* note 293, ¶1911.

384 *Prlić*, *supra* note 283, ¶231; *Karadžić*, *supra* note 246, ¶573.

385 *Karadžić*, *supra* note 246, ¶573.

386 Prosecutor v. Sešelj, Case No. IT-03-67-T, Judgment, ¶295 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 31, 2016) ("The physical element of instigation involves prompting another person to commit an offense."); *see also Prlić*, *supra* note 284, ¶229("… the very notion of instigation requires a positive act on the part of the instigator. The verb "to instigate" – to urge on or to incite a person to do something – implicitly suggests a positive action.").

387 Prosecutor v. Nahimana, Case No. ICTR-99-52-A, Judgment, ¶480 (Nov. 28, 2007).

388 *Karadžić*, *supra* note 246, ¶572; *Ndindiliyimana*, *supra* note 293, ¶1913.

389 Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, supra* note 10.

390 RNDDH, *The Events in La Saline, supra* note 5; MINUJUSTH, *supra* note 5.

391 RNDDH, *The Events in La Saline, supra* note 5, ¶¶53-55; *see also* Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack….Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings.").

392 MINUJUSTH, *supra* note 5, ¶22 (reporting that Duplan was overheard stating « *Nou touye twop moun, se pa misyon sa yo te bay nou* » (Vous avez tué trop de personnes, ce n'était pas ça votre mission)).

393 BINUH, *supra* note 1, ¶17; RNDDH, *Massacre au Bel-Air, supra* note 13, ¶41.

394 Leon Saint-Cyr denies that he requested Chérizier's help in removing the protesters' barricades. *See* RNDDH, *Massacre au Bel-Air, supra* note 14, ¶42.

395 Prosecutor v. Tadić, Case No. IT-94-1-A, Judgment, ¶227 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999) [hereinafter *Tadić*, Appeals Judgment].

396 *Id.*, ¶227; Prosecutor v. Brđanin, Case No. IT-99-36-T, Judgment, ¶260 (Int'l Crim. Trib. for the Former Yugoslavia Sept. 1, 2004).

397 *Tadić*, Appeals Judgment, *supra* note 395, ¶227; Prosecutor v. Stakić, Case No. IT-97-24-A, Judgment, ¶64 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 22, 2006).

398 Prosecutor v. Brđanin, Case No. IT-99-36-A, Judgment, ¶439 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007).

399 *Tadić*, Appeals Judgment, *supra* note 395, ¶228.

400 RNDDH, *The Events in La Saline*, *supra* note 5, ¶58.

401 *Id.*, ¶¶54-55.

402 MINUJUSTH, *supra* note 5, ¶22; *see also* Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack….Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings.").

403 Prosecutor v Delalic, Case No. IT-96-21-T, Judgment, ¶333 (Int'l Crim. Trib. for the Former Yugoslavia Nov. 16, 1998).

404 *Id.*

405 A superior-subordinate relationship exists (i) when the subordinate who committed the crime is subject to the effective control of the accused, that is to say, (ii) when the accused has the material ability to prevent the crime or punish the criminally responsible subordinate." *Prlić*, *supra* note 283, ¶238.

406 *Id.*, ¶246 ("For this purpose, the Prosecution must prove: (1) that the superior actually knew, taking into consideration the direct or circumstantial evidence at his disposal, that his subordinates (i) were committing, preparing to commit, or had committed the crimes referred to in Articles 2 through 5 of the Statute; or (2) that the superior possessed information of a sort that would at least alert him to such risks insofar as they might indicate additional inquiries were needed (ii) to ascertain whether such crimes had been committed or were about to be. The assessment of the mental element required under Article 7(3) of the Statute must be conducted according to the circumstances of the case by taking into account the specific situation of the superior concerned at the time in question.").

407 *Karadžić*, *supra* note 246, ¶587 ("For the accused to be held responsible under Article 7(3), it must be established that he failed to take the necessary and reasonable measures to prevent or punish the commission of the crimes charged."); *see also* U.N. Secretary-General, Report of the Secretary-General pursuant to paragraph 5 of Security Council resolution 955 (1994), U.N. Doc. S/1995/134, ¶56 (Feb. 13, 1995) ("a person in a position of superior authority should, therefore, be held individually responsible for giving the unlawful order to commit a crime under the present statute. But he should also be held responsible for failure to prevent a crime or to deter the unlawful behaviour of his subordinates. This imputed responsibility or criminal negligence is engaged if the person in superior authority knew, or had reason to know, that his subordinates

were about to commit or had committed crimes and yet failed to take the necessary and reasonable steps to prevent or repress the commission of such crimes or to punish those who had committed them.")

408   Prosecutor v. Momčilo Perišić, Case No. IT-04-81-A, Judgement, ¶87 (Int'l. Crim. Trib. for the Former Yugoslavia Feb. 28, 2013).

409   *Id.*

410   *Delalic, supra* note 403, ¶375.

411   *See Mamani v. Sánchez de Lozada,* No. 18-12728, at 49-50 (11ᵗʰ Cir. Aug. 3, 2020)(confirming the viability of a jury verdict finding former Bolivian president and minister of defense liable under the command responsibility doctrine); *Yousuf v. Samantar,* 2012 WL 3730617, at *11–12 (E.D. Va. Aug. 28, 2012) (First Vice President and Minister of Defense liable as persons "with higher authority"); Ford ex rel. Est. of Ford v. Garcia, 289 F.3d 1283, 1288-94 (11th Cir. 2002) (accepting that defendants, former Salvadoran Ministers of Defense, could have been held liable under the doctrine of command responsibility); *see also* OSJI, *The Trial of Charles Taylor before the Special* Court for Sierra Leone: the Appeal Judgment (Sept. 2013) (noting that former President Taylor was indicted on five counts of crimes against humanity based in part on liability under command responsibility, though the court ultimately disagreed that sufficient evidence existed to convict him on this theory of liability).

412   *Karadžić, supra* note 246, ¶580 ("In assessing whether there is a superior-subordinate relationship it does not matter whether the accused was a civilian or military superior. An evaluation of effective control is more a question of fact than of law and requires consideration of factors that show "that the accused had the power to prevent, punish, or initiate measures leading to proceedings against the alleged perpetrators where appropriate."); *see also Prlić, supra* note 284, ¶240 ("The superior-subordinate relationship manifests itself in the exercise of effective control over subordinates. That control has been defined as "the material ability to prevent or punish criminal conduct" and pertains to every superior, whether a military chief or any civilian person vested with authority within a hierarchy, even a leader of a paramilitary group.").

413   Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, supra* note 11.

414   Haiti Const., *supra* note 35, art. 85-86.

415   *See id.* art. 85; New Wave of Appointments, Haiti Libre (Mar. 31, 2017), https://www.haitilibre.com/en/news-20517-haiti-flash-new-wave-of-appointments.html; BAI & IJDH, Petition for Precautionary Measures, *supra* note 111, ¶28.

416   *See* Ministère de l'Intérieur et des Collectivités Territoriales, Direction Générale, http://www.mict.gouv.ht/direction-generale/ (describing the role of the directorate general).

417   *See* Robenson Geffrard, *Jovenel Moïse commence à prendre le contrôle de l'administration publique,* Le Nouvelliste (Mar. 27, 2017) (reporting on the appointment of Fednel Monchéry by presidential decree).

418   Donnelly & Mirkinson, *supra* note 103, at 4; RNDDH, *The Events of La Saline, supra* note 5, ¶¶25-29.

419   Donnelly & Mirkinson, *supra* note 103, at 5; *see also Le Point* (Tele Metropole broadcast Dec. 4, 2018), https://www.youtube.com/watch?v=xY7J0kFggXs (Interview with Martine Moïse denying reports that she was in La Saline in the days preceding the massacre).

420   IJDH, *Haiti at a Crossroads, supra* note 1, at 8; *Andrésol dénonce les visites de Jovenel Moïse dans les commissariats et les distributions d'argent,* Rezo Nodwes (Oct. 14, 2018), https://rezonodwes.com/2018/10/14/andresol-denonce-les-visites-de-jovenel-moise-dans-les-commissariats-et-les-distributions-dargent/.

421   Rezo Nodwes, *supra* note 420.

422   Charles, *Thousands Protest Corruption in Haiti as President Calls for Unity and Patience, supra* note 69.

423   MINUJUSTH, *supra* note 5, ¶18.

424   BAI & IJDH, *Precautionary Measures Request, supra* note 111, ¶18.

425   RNDDH, *The Events in La Saline, supra* note 5, ¶24.

426   Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, supra* note 10.

427   *Fednel Monchéry et Joseph Pierre Richard Duplan révoqués,* Le Nouvelliste (Sep. 9, 2019); *see also* Danticat, *supra* note 25.

428   Legal experts have contested the viability of such a defense, noting that Duplan and Monchery's positions did not fall within the definition of the article, and that since leaving their positions, the provision no longer applies. *See e.g.,* BAI & IJDH, Petition for Precautionary Measures, *supra* note 111, ¶29; Caleb Lefèvre, *Fednel Monchery and Joseph Pierre Richard Duplan sont susceptibles d'être arrêtés,* Le Nouvelliste (Oct. 1, 2019).

429   Press Release, Security Council, Haiti's Stability in Peril without Strong Response to COVID-19, Legal Experts Tell Security Council, U.N. Press Release SC/14218 (June 19, 2020 (noting that "accountability is a challenge, seen in the lack of progress in investigating and prosecuting the Lilavois, Grand Ravine, La Saline and Bel-Air cases, involving abuses by gang members, law enforcement agents and political officials."); Secretary-General Sept. 2020 Report, *supra* note 17, ¶31 (highlighting the "lack of accountability for past abuses, including emblematic cases like Grand Ravine (2017), La Saline (2018) and Bel-Air (2019).").

430   MINUJUSTH, *supra* note 5, ¶33.

431   BAI & IJDH, Written Submission for the Dec. 10, 2020 Thematic Hearing, *supra* note 26.

432   MINUJUSTH, *supra* note 5, ¶33 (those arrested so far are all presumed gang members).

433   RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶¶99, 100.

434   Coto, *supra* note 348; Arnesen, *supra* note 93.

435   *Fednel Monchery Libéré,* Gazette Haiti (Feb. 13, 2021), https://www.gazettehaiti.com/node/2622.

436   Secretary-General Sept. 2020 Report, *supra* note 17, ¶56

437   Jake Johnston, *Haitian Government on the Defensive Following UN Welcoming of Corruption Investigation,* Ctr. Econ. & Pol. Research (Mar. 7, 2018), https://cepr.net/haitian-government-on-the-defensive-following-un-welcoming-of-corruption-investigation/.

438   *Id.*

439   Press Release, Embassy of the Republic of Haiti, Allegations of Human Rights Violations by Congress of the United States (Mar. 28, 2019), https://www.haiti.org/allegations-of-human-rights-violations-by-congress-of-the-united-states/ (responding to a letter from a bipartisan group of 104 U.S. House of Representatives members calling on U.S. Secretary of State Mike Pompeo to support thorough and independent investigations into the extrajudicial killings that have taken place during the current crisis in Haiti, including the massacre at La Saline. *See* Letter from Members of Congress to Mike Pompeo, Sec'y of State, U.S. Dept. of State (Mar. 20, 2019), http://www.ijdh.org/wp-content/uploads/2019/03/LevinLee-Haiti-ltr-03-2019-1.pdf; Jacqueline Charles & Harold Isaac, *U.S. Congresswoman Maxine Waters, Actor Danny Glover Make Impromptu Visit to Haiti,* Miami Herald (Apr. 24, 2019).

440 Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126.

441 *Arellano*, *supra* note 36, ¶110.

442 U.N.G.A. 6th Comm., *supra* note 39; Human Rights Watch, *supra* note 39.

443 *Id.*, ¶152.

444 IACHR, Statement on the Duty of the Haitian State to Investigate the Gross Violations of Human Rights Committed during the Regime of Jean-Claude Duvalier (May 17, 2011), http://www.oas.org/en/iachr/docs/other/Haiti2011.asp; MINUJUSTH, *supra* note 5, ¶42.

445 *Arellano*, *supra* note 36, ¶¶152, 110 (stating that crimes against humanity are "intolerable in the eyes of the international community and offend humanity as a whole. The damage caused by these crimes … demand that those responsible be investigated and punished"); ("The obligation that arises pursuant to international law to try, and if, if found guilty, to punish the perpetrators of certain international crimes, among which are crimes against humanity, is derived from the duty of protection embodied in Article 1(1) of the American Convention.").

446 Amélie Baron, *Haiti court says human rights charges can be brought against Duvalier*, Reuters (Feb. 20, 2014), https://www.reuters.com/article/us-haiti-duvalier/haiti-court-says-human-rights-charges-can-be-brought-against-duvalier-idUSBREA1J2D220140220; Int'l Just. Resource Ctr., *In Landmarking Ruling, Haitian Court opens investigation into Jean-Claude Duvalier for crimes against humanity* (Feb. 25, 2014), https://ijrcenter.org/2014/02/25/in-landmark-ruling-haitian-court-opens-investigation-into-jean-claude-duvalier-for-crimes-against-humanity/.

447 Trenton Daniel, *Haiti court urges further probes on Duvalier trial*, Associated Press (Feb. 20, 2014), https://apnews.com/article/045e363f6bdc485e8e18abdc056ed2b2.

448 Justice Denied by Duvalier's Death, Human Rights Watch (Oct. 4, 2014), https://www.hrw.org/news/2014/10/04/haiti-justice-denied-duvaliers-death; Human Rights Watch, *World Report 2020* 255 (2020).

449 Murphy, *supra* note 31, ¶27.

450 *Id.*

451 Article 13(b) of the Rome Statute grants the Security Council the power, acting under Chapter VII of the UN Charter, to refer to the ICC situations in which crimes under the jurisdiction of the court have taken place. Rome Statute, *supra* note 32, art. 13(b); *see also* Security Council Rpt., *In Hindsight: The Security Council and the International Criminal Court* (Jul. 31, 2008), https://www.securitycouncilreport.org/monthly-forecast/2018-08/in_hindsight_the_security_council_and_the_international_criminal_court.php.

452 For example, the Security Council established ad hoc tribunals for Yugoslavia and Rwanda. *See* United Nations Security Council, International Tribunals, https://www.un.org/securitycouncil/content/repertoire/international-tribunals. More recently, the General Assembly established an International, Impartial, Independent Mechanism to assist in the investigation and prosecution of international crimes committed in Syria. G.A. Res. 71/248 (Jan. 11, 2017).

453 *See* fn. 441, *supra*.

454 Xavier Philippe, *The principles of universal jurisdiction and complementarity: how do the two principles intermesh?*, 88 Int'l Rev. of the Red Cross 375, 377 (2006).

455 Human Rights Watch, *supra* note 39; *see also* Trial Int'l, *Make Way for Justice #3*, Universal Jurisdiction Annual Rev. 2017, 67-70 (2017); Trial Int'l, *Make Way for Justice #6*, Universal Jurisdiction Annual Rev. (2020).

456 Int'l Just. Resource Ctr., *supra* note 446; *Arellano*, *supra* note 37, ¶152.

457 Comité Consultatif Independant, Avant-Project Constitution art. 139 (Jan. 2021), https://www.haitilibre.com/docs/CCI-CONSTITUTION_Projet-de-Constitution-2-fevrier-2021-20h00.pdf.

458 Haiti Const., *supra* note 35, art. 276(2); *see also* Arellano, *supra* note 36, ¶¶110, 152 (stating that crimes against humanity are "intolerable in the eyes of the international community and offend humanity as a whole. The damage caused by these crimes still prevails in the national society and the international community, both of which demand that those responsible be investigated and punished" and holding that "to punish the perpetrators of certain international crimes, among which are crimes against humanity, is derived from the duty of protection embodied in Article 1(1) of the American Convention.").

459 *See, e.g.* Regina v. Bartle and the Commissioner of Police for the Metropolis and others *ex parte* Pinochet, [1999] 38 I.L.M. at 581 (H.L.) ¶581 (appeal taken from Eng.); Bouterse Case, Petition Nos. R 97/163/12 Sv & R 97/176/12 Sv, P 5.1 (Amsterdam Ct. App. Nov. 20, 2000) (Neth.) [Unofficial International Commission of Jurists Translation] ("the commission of very serious offences as are concerned here--cannot be considered to be one of the official duties of a head of state."); Ould Dah v. France, 2009-I Eur. Ct. H.R., *48 I.L.M. 884, 891 (2009)* (determining that *ratione materiae* immunity was inapplicable to acts of torture, which are prohibited under international law as a matter of *jus cogens*.); A v. Office of the Attorney General of Switzerland, No. BB.2011.140, A, Bundesstrafgericht [BStR] [Federal Criminal Court] July 25, 2012 (Switz.) [unofficial translation by TRIAL] ("[I]t is generally reocgnized that the prohibition of serious crimes against humanity… is mandatory in nature (*jus cogens*)… [I]t would be difficult to admit that conduct contrary to fundamental values of the international legal order can be protected by rules of the very same legal order. Such situation would be paradoxical… It follows that, in the present case, the suspect cannot claim any immunity *ratione materiae*."); Questions Relating to Obligation to Prosecute or Extradite (Belg. v. Sen.), 2012 I.C.J. 1, P 22 (July 20) (Ordering Senegal to submit the case to prosecution or extradite Hissène Habré for alleged acts of torture "committed in the exercise of his functions" as the President of Chad.); Thomas Weatherall, *Jus Cogens and Sovereign Immunity: Reconciling Divergence in Contemporary* Jurisprudence, 46 Geo. J. Int'L. 1151 at 1188 ("One might infer from this decision [by the ICJ on Habré's claim of immunity] that the precedent had been sufficiently established by 2012 that immunity *ratione materiae* does not apply to the criminal prosecution of *jus cogens* violations before domestic courts.").

460 Prosecutor v. Omar Hassan Ahmad Al-Bashir, Judgment in the Jordan Referral re Al-Bashir Appeal, Case No. ICC-02/05-01/09 OA2, ¶1 (May 6, 2019)( "[t]here is neither State practice nor *opinio juris* that would support the existence of Head of State immunity under customary international law *vis-à-vis* an international court."); *see also Prosecutor v. Taylor*, Decision on Immunity from Jurisdictional Immunity, Case No. SCSL-03-01-I, ¶53 (May 31, 2004) ("the principle seems now established that the sovereign equality of states does not prevent a Head of State from being prosecuted before an international criminal tribunal or court.").

461 Prosecutor v Omar Hassan Ahmad Al-Bashir, *supra* note 460 at ¶2.



462 We endorse the specific recommendations made by the BAI and IJDH in their recent submission to the IACHR calling for (1) including Haiti in Chapter IV.B of its Annual Report, (2) including the crimes against humanity, the pervasive impunity, and lack of accountability in Haiti among the working topics for the expected new Special Rapporteurship on judicial independence, (3) conducting a country visit on the concerns raised herein, and issuing a focused report with recommendations, (4) requesting that the government of Haiti submit a written report outlining a concrete plan of action for addressing the concerns raised herein; and (5) providing to the government of Haiti with technical and material support for strengthening the independence and capacity of Haiti's judicial system, in particular to prosecute the crimes against humanity identified in this report. BAI & IJDH, Written Submission for the Dec. 10, 2020 Thematic Hearing, *supra* note 26.

463 Press Release, IACHR Grants Precautionary Measures in Favor of Victims of La Saline in Haiti, Inter-Am. Comm'n for Hum. Rts. (Jan. 29, 2020), https://www.oas.org/en/iachr/media_center/PReleases/2020/017.asp.

464 The IACHR also asked Haiti to come to an agreement with beneficiaries and their representatives regarding any measures that need to be taken. Press Release, IACHR Grants Precautionary Measures in Favor of Victims of La Saline in Haiti, Inter-Am. Comm'n for Hum. Rts. (Jan. 29, 2020), https://www.oas.org/en/iachr/media_center/PReleases/2020/017.asp.

465 *See* Inter-American Commission on Human Rights, About Precautionary Measures, available at https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/decisions/about-precautionary.asp.

466 Article 63(2)of the American Convention and Article 27 of the Court's Rules of Procedure (2009).

467 *See* Joint Statement from U.S. Human Rights Clinics on the Constitutional and Human Rights Crisis in Haiti (Feb. 13, 2021), https://law.yale.edu/sites/default/files/area/clinic/document/210213-final_human_rights_clinics_statement_re_haiti_-_nyu_hls_yls8.pdf.

468 Jacqueline Charles, *U.S. tells Haiti leaders on delayed elections: 'Do your respective jobs'*, Miami Herald (Sept. 16, 2020), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article245788370.html.

469 Joint Statement from U.S. Human Rights Clinics, *supra* note 466.

470 Amy MacKinnon & Robbie Gramer, *Political Crisis in Haiti poses Challenges for Biden's Democracy Push*, Foreign Policy (Feb. 10, 2021), https://foreignpolicy.com/2021/02/10/haiti-political-crisis-biden-state-department-challenge/.

471 *See e.g.,* Conseil Superieur du Pouvoir Judiciaire, *supra* note 51; Haitian Bar Federation, *supra* note 51; Letter from Rep. Yvette D. Clark et al. to Sec'y of State Antony Blinken (Feb. 6, 2021), *available at* https://clarke.house.gov/clarke-and-meeks-co-lead-letter-to-secretary-blinken-urging-the-u-s-to-condemn-the-undemocratic-actions-of-president-moise-and-support-the-establishment-of-a-transitional-government-in-haiti/ (urging the Sec'y of State to "unambiguously reject any attempt by President Moïse to retain power in contravention" of the rule of law and democracy); Patrick Leahy (Sen. Patrick Leahy), Twitter (Feb. 6, 2021, 1:10 PM), https://twitter.com/SenatorLeahy/status/1358115921114578945 (stating that "US should join in calling for an inclusive transition that represents the Haitian people.").

472 Statement by Ned Price, Department Spokesperson, Press Briefing (Feb. 12, 2021), https://www.state.gov/briefings/department-press-briefing-february-12-2021/#post-218259-HAITI

473 Letter from Rep. Frederica Wilson et al. to Sec'y of State Mike Pompeo (Oct. 15, 2020), available at https://www.dropbox.com/s/tw0vquftj3sdtx4/Markey%20Wilson%20Letter%20Haiti%2010.15.20%5B3%5D.pdf?dl=0.

Haiti AR_001641



LANGUAGES          DONATE NOW

# Haiti
## *Events of 2021*

A billboard of slain Haitian President Jovenel Moïse is used to block a
road during an anti-government protest in Port-au-Prince, Haiti,
October 21, 2021.
© AP Photo/Matias Delacroix.

AVAILABLE IN

 

The Covid-19 pandemic and associated economic crisis, the assassination of President Jovenel
Moïse in July 2021, and a 7.2 magnitude earthquake in August exacerbated Haiti's existing
challenges of political instability and violence by gangs often tied to state actors. Haiti has
continuously struggled to meet the basic needs of its people and resolve long-standing human
rights problems.

Since the government's announcement in 2018 that it would eliminate fuel subsidies,
widespread civil unrest has paralyzed Haiti. Demonstrations intensified in 2019, amid evidence
of embezzlement of funds intended for infrastructure and healthcare under the last three
governments. Demonstrations increased again in 2021, against Moïse's government and his
proposed constitutional referendum. Police responded with excessive force. Impunity for gang
and police violence continued.

The earthquake, followed by Tropical Storm Grace, affected 2 million people in Haiti's
southern peninsula—77 percent of which lived below the poverty line—and left 2,246 dead,
more than 12,700 injured, up to 26,000 displaced, and at least 329 missing.

LANGUAGES

DONATE NOW

Haiti's Superior Council of the Judiciary ruled on February 6, 2021, that Moïse's presidency would end the next day, but Moïse argued his term would end on February 7, 2022, five years after he took office. He had been ruling by decree since January 2020, due to the inexistence of a seated parliament given postponed legislative elections.

On February 7, 2021, police detained Supreme Court Justice Yvickel Dieujuste Dabrésil, whom the political opposition was allegedly poised to nominate as provisional president. The following day, Moïse decreed Dabrésil's retirement, along with those of Justices Joseph Mécènes Jean-Louis, whom the opposition appointed as provisional president after Dabrésil's arrest, and Wendelle Coq Thélot, who had opposed Moïse's appointment by decree of all members of the Provisional Electoral Council (CEP) in September 2020.

Moïse charged the CEP with carrying out presidential and legislative elections and a constitutional referendum in 2021, despite a constitutional prohibition on modifying the constitution through a referendum.

Demonstrators who opposed the referendum and planning for elections demanded that the president step down and that a transitional government be put in place.

On July 7, a group of armed people burst into President Moïse's private residence in Port-au-Prince, killed him, and injured his wife. On July 20, Ariel Henry, whom Moïse had appointed prime minister days before the assassination, was installed as head of a new government. Some civil society organizations said his installment as head of state was unconstitutional.

In September, an Independent Advisory Committee created by Moïse in 2020 presented the draft of a new constitution to Ariel Henry, who signed a political agreement with the opposition to carry out general elections in 2022.

## Investigation of President Moïse's Assassination

A day after the assassination, Haitian police engaged in a shootout with suspected assassins, killing several and taking others into custody.

In late July, two judges and two clerks of the Court of Peace who conducted judicial proceedings regarding the murder of President Moïse were threatened.

On August 9, Justice Mathieu Chanlatte was appointed to lead the judicial investigation into President Moïse's killing. In circumstances still under investigation, his clerk died on August 11.



LANGUAGES          DONATE NOW

As of August, the Haitian National Police (HNP) and the National Human Rights Defense Network (RNDDH) reported 3 people killed and 44 arrested—including former Colombian military officers—in connection with President Moïse's assassination. Officials of the Colombian Ombudsperson's Office who visited the Colombian ex-military detainees in Port-au-Prince reported that they had not been presented to a judicial authority, had not had access to legal assistance, and were being held incommunicado in a six-by-two-meter cell without sunlight, handcuffed, and sleeping on the floor. Some of the detainees claimed they had been tortured by police.

## Violence and Displacement

Violence is escalating. The United Nations Integrated Office in Haiti (BINUH) reported 1,074 intentional homicides and 328 kidnappings from January to August 2021. Intentional homicides increased by 14 per cent, compared with 944 cases in the same period of 2020, and kidnappings continued to rise, compared with 234 for all of 2020. According to the Bureau des Avocats Internationaux (BAI) and the Institute for Justice & Democracy in Haiti (IJDH) gender-based violence is chronically under-reported.

Some 95 gangs are fighting over territory in Port-au-Prince, where approximately 1.5 million people live, displacing 19,100. Haitian civil society groups say insecurity is exacerbated by alleged complicity between politicians and gangs.

Under Moïse, since 2018, the IJDH, the RNDDH, and the Fondasyon Je Klere (FJKL), three nongovernmental organizations, documented 18 massacres in Port-au-Prince. In 2021, in Martissant, according to the UN Office for the Coordination of Humanitarian Affairs, gang members killed 4 people and injured 2 more; in Cité Soleil, gang clashes killed a minor and 10 gang members; and in Delmas 32 and other neighborhoods armed individuals killed 19 people. At time of writing, no one had been charged or convicted for these massacres. Former policeman Jimmy Chérizier, who leads the "G9" gangs federation, is allegedly implicated in most cases and remains free.

## Human Rights Defenders

BINUH documented 32 cases of attacks, threats, and intimidation against judges, human rights defenders and journalists, from February to August 2021.

activist, and journalist, were both killed on June 29 by armed individuals at the Christ-Roi neighborhood.

At time of writing, eight people had been detained in connection with the August 2020 killing of Monferrier Dorval, head of the Port-au-Prince bar association, but no one had been charged.

In 2019, Charlot Jeudy, the President of Kouraj, an organization advocating for the rights of lesbian, gay, bisexual, and transgender (LGBT) people, was found dead in his home. Circumstances surrounding his death and the results of an autopsy remained publicly unknown at the time of writing.

## Criminal Justice System

Haiti's prisons remain severely overcrowded, with many detainees living in inhumane conditions. Overcrowding is largely attributable to pretrial detentions, BINUH and OHCHR reported in 2021.

As of September, prisons housed nearly 11,000 detainees, 82 percent of whom were awaiting trial. New criminal and criminal procedure codes set to enter into force in June 2022 provide alternative measures to pretrial detention and establish detention of children as a measure of last resort.

## Abuses by Security Forces

Protests against the government continued to be repressed with excessive use of force. The RNDDH, in January 2021, reported at least 8 journalists injured, 10 demonstrators and 13 political activists arbitrarily arrested, and 2 students beaten by police during several protests. In February, the Inter-American Commission on Human Rights (IACHR) reported two cases of journalists injured with rubber bullets.

On February 25, a prison breakout at the Croix-des-Bouquets penitentiary left the prison director and 29 prisoners dead. BINUH reported law enforcement agents arbitrarily killed 25.

From February to May, BINUH reported 238 cases of human rights violations by police, including 42 killings and indiscriminate use of tear gas.

## Accountability for Past Abuses

presidency (1971-1986). As of September 2021, investigations remained pending.

In 2020, former Haitian death squad leader Emmanuel "Toto" Constant was deported from the US. In 2000, he had been convicted in absentia for involvement in a 1994 massacre in Gonaïves. He remained in detention at time of writing.

## Rights to Health, Water, and Food

The country's most vulnerable communities face dramatic floods and soil erosion caused by deforestation that has nearly eliminated forest cover in the country, leading to reduced agricultural productivity.

Over a third of the population lacks access to clean water and two-thirds have limited or no sanitation service. More than a third of Haitians—4.4 million—live with food insecurity, international agencies report, and 217,000 children suffer moderate to severe malnutrition.

Without appropriate adaptation, decreased rainfall and rising temperatures driven by climate change will increasingly negatively impact agriculture and access to water.

After the 2021 earthquake, water and sanitation infrastructure suffered extensive damage. Of 159 health facilities, 88 had been reportedly affected. Displaced people are exposed to a heightened risk of infectious diseases and the virus that causes Covid-19.

## Inequality and Barriers to Education

Just under half of Haitians aged 15 and older are illiterate. The country's education system is highly unequal. The quality of public education is generally very poor, and 85 percent of schools are private, charging fees that exclude most children from low-income families.

Over 3 million children had been unable to attend school for months at a time during the past two years, for security reasons, as well as Covid-19 related restrictions.

The 2021 earthquake destroyed or heavily damaged 308 schools, affecting 100,000 children. Schools were set to open on September 21, but the opening delayed until October 4 in the affected area. Before the earthquake, UNICEF estimated that 500,000 children were at risk of dropping out.

## Women's and Girls' Rights

Haiti AR_001646

women in the southern province even before the earthquake, with sexual exploitation prevalent in some areas; these risks were expected to rise in the wake of the 2021 earthquake.

A new penal code set to enter into force in June 2022 lists sexual harassment and gender-based violence as punishable offenses. The code will legalize abortion in all circumstances until the twelfth week of pregnancy, in cases of rape or incest, or if the mental or physical health of the woman is in danger. It will lower the legal age for consensual sex to 15.

## Disability Rights

Around 15 percent of the Haitian population lives with a disability, the World Health Organization reports.

Although Haiti ratified the Convention on the Rights of Persons with Disabilities, its legislative framework has not been harmonized and includes offensive and discriminatory provisions against people with disabilities. People with disabilities continue experiencing discrimination in access to public services such as health, education, and justice and are at higher risk of suffering violence due to the significant social stigma and exclusion they face. Civil legislation restricts legal capacity for people with certain types of disabilities.

The new penal code includes provisions prohibiting violence or incitement against people with disabilities.

## Sexual Orientation and Gender Identity

LGBT people continue to suffer high levels of discrimination in Haiti, and no comprehensive legal framework forbids it.

The new penal code, not yet in force, will make any crime motivated by its target's real or perceived sexual orientation an aggravated offense. The code punishes any murder motivated by a victim's sexual orientation with up to life imprisonment.

In 2017, the Senate passed two anti-LGBT bills, which remained pending in the Chamber of Deputies at time of writing. One bans same-sex marriage and public support or advocacy for LGBT rights. The other establishes homosexuality as a one of the possible reasons for denial of a Certificat de Bonne Vie et Mœurs (a certificate of good standing required as proof that a person has not committed a felony).

LANGUAGES          DONATE NOW

In September 2020, the Dominican Republic restarted deportations of undocumented Haitians, ending a pandemic moratorium. In January 2021, Dominican Republic President Luis Abinader and Jovenel Moïse agreed to address irregular migration and improve border security. The precarious status of Dominicans of Haitian descent and Haitian migrants in the Dominican Republic remains a serious concern.

In February 2021, Abinader announced construction of a wall on the border. In August, the Dominican Ministry of Defense reported more than 178,000 Haitians forcibly repatriated. On September 28, the Dominican Republic's National Migration Council adopted a policy that prevents any foreign person who "would result in an unreasonable burden on public finances" from entering the country, including women who are at least six months pregnant.

In May 2021, the US extended a Temporary Protected Status 18-month designation for Haitians in the US for another 18 months. However, the US has continued to carry out expulsions of arriving Haitian migrants and asylum seekers to Haiti throughout the pandemic and, in September, it deployed border agents on horseback against Haitians seeking to enter the US through the US-Mexico border. Between taking office on January 20, 2021, and late November, the Biden administration expelled approximately 12,000 Haitians, a dramatic increase from 2020, when 895 Haitians were expelled from the country.

## Mining and Access to Information

Haiti is one of the most densely populated countries in the Western Hemisphere, and environmental degradation is a concern. In the past decade, foreign investors have pursued the development of the mining sector. Resistance is widespread, as communities fear the industry will destroy their farmland and further contaminate their water.

A 2017 draft mining law is silent on the rights of those displaced by mining activities, the Global Justice Clinic of New York University School of Law reports, and it grants insufficient time for review of the environmental impacts of new mining projects. It contains provisions that could render company documents, including environmental and social impacts, confidential for 10 years, preventing meaningful consultation with communities. The draft remained under consideration as of September 2021.

## Key International Actors

In November 2020, the International Federation of Football Association (FIFA) Ethics Committee sanctioned Haitian Football Federation (FHF) President Yves Jean-Bart with a

Haiti AR_001648



with the abuses and banned another one from the sport for life.

After the August 2021 earthquake, the UN appealed for US$187.3 million to provide relief including shelter, water and sanitation, emergency healthcare, food, protection, and early recovery. In August, the US Agency for International Development announced $32 million in humanitarian assistance in response to the earthquake.

The US government and the Organization of American States supported Ariel Henry and his aim to hold elections in 2022, though activists warned that conditions were not conducive to free and fair elections.

Haiti's political and humanitarian situation continue being discussed at the UN Security Council. UN Secretary-General António Guterres called on all member states to support Haiti in overcoming the humanitarian crisis. BINUH's mandate was extended to July 15, 2022.

Browse Countries                Choose

## Keynote

Haiti AR_001649



LANGUAGES     DONATE NOW



## With Autocrats on the Defensive, Can Democrats Rise to the Occasion?



### Kenneth Roth
Former Executive Director

## Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in 90 countries worldwide,
spotlighting abuses and bringing perpetrators to justice

**DONATE NOW**



## Get Updates On Rights Issues From Around The Globe



LANGUAGES          DONATE NOW

## Connect With Us

Contact Us | Corrections | Privacy Policy | Permissions | Blackbaud Security Incident | Site Map | Child Safeguarding

© 2022 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | **t** 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

NEWS · GLOBAL   22 October 2021

## IOM Assists Over 10,800 Haitians Returned from the US, Mexico and Caribbean in Past Month



Migrants returning to Haiti immediately receive meals, juice and water, hygiene kits and pocket money, and are screened for medical and psychosocial support. Photo: IOM.

**Port-au-Prince –** The International Organization for Migration (IOM) has given post-arrival assistance to a total of 10,831 Haitian migrants returned over the past month from the United States, Mexico, Cuba, The Bahamas and Turks and Caicos Islands, or returned by the Coast Guard.

At the two main reception points Port-au-Prince Toussaint Louverture Airport and the Cap-Haitien International Airport, returnees receive hot meals, juice and water, hygiene kits and pocket money, while IOM protection teams conduct rapid screenings to identify vulnerable returnees and offer medical and psychosocial support. Returnees can contact relatives by phones at their disposal, while IOM's 8840 free hotline remains open for feedback and questions.

Details about IOM's Response here (https://www.crisisresponse.iom.int/sites/default/files/appeal/documents/SitRep %231 - Reception of Returnees Haiti - 19 Sept. to 19 Oct. 2021.pdf).

IOM supports the National Office for Migration (ONM) with the coordination and provision of post-arrival assistance, including the registration process and referrals to specialized services. Haiti's Ministry of Health and Population (MSPP), supported by the World Health Organization (WHO), performs rapid COVID-19 tests upon arrival.

"The on-arrival reception activities conducted in the past month are the result of a coordinated effort between the Government of Haiti, IOM and all partners," said Giuseppe Loprete, IOM's Chief of Mission in Haiti.

"Migrants returned to Haiti need immediate assistance, as many of them have been out of the country for years, while others only recently attempted to leave due to the (14 August) earthquake. IOM remains committed to supporting all of them in returning home, joining their families or resettling in Haiti while the root causes are identified and addressed by governments in the region."

Adult men represent 61 per cent of the total number of returnees, while women make up 23 per cent  and children 16 per cent. Among those returned specifically from the US, adult men also represent the majority (56 per cent), especially among those arriving to Cap-Haitien (74 per cent).

Most of those returned from the US who were assisted by IOM had been living in Latin American countries for several years before starting their journey towards the US. Over a quarter of the children returned were born outside Haiti and acquired a foreign nationality, mostly Chilean and Brazilian.

Among the 1,789 children returned, 15 unaccompanied migrant children were travelling by sea to the US or Caribbean islands when they were identified and sent back to Haiti. Family reunification has been possible through IOM's collaboration with Haiti's Institute of Social Welfare and Research (IBESR).

Some returnees – particularly those travelling by sea – had started their journeys in recent years motivated by various factors, such as lack of income or job opportunities, insufficient access to services, the August earthquake, insecurity, and political instability.

The precarious conditions that Haitian migrants face while transiting the region, particularly in the Darien Gap, make them vulnerable to protection risks, including gender-based violence, trafficking in persons, migrant smuggling and other forms of abuse or violence, now exacerbated by the COVID-19 pandemic. More than 100,000 people have made the perilous jungle crossing this year.

The assistance for Haitian returnees is currently funded by USAID and the European Civil Protection and Humanitarian Aid Operations (ECHO).

IOM's Global Crisis Response Platform (https://eur02.safelinks.protection.outlook.com/? url=https%3A%2F%2Fcrisisresponse.iom.int%2F&data=04%7C01%7Cjnewland%40iom.int%7C4a6e53fd0e52740175f2508d963c10c90%7C1588262d23fb43b4bd6ebce49c provides an overview of IOM's plans and funding requirements to respond to the evolving needs and aspirations of those impacted by, or at risk of, crisis and displacement in 2021 and beyond. The Platform is regularly updated as crises evolve, and new situations emerge.

*For more information, please contact Antón Galán Torrego at IOM Haiti, Tel: +509 4612-0436, Email: agtorrego@iom.int (mailto:agtorrego@iom.int).*

Haiti AR_001652

 (https://developmentfund.iom.int/)     (https://www.iom.int/migration-health)

(https://www.iom.int/reducing-global-inequalities)

## RELATED NEWS

(/news/iom-responds-powerful-floods-needs-deeper-earthquake-affected-communities)

(/news/iom-welcomes-guineas-first-ever-migration-governance-framework)

(/news/venezuelan-refugees-migrants-and-their-hosts-need-help-chart-brighter-future)

(/news/solidarity-and-action-iom-director-general-appeals-long-haul-support-visit-earthquake-zone)

NEWS   17 Mar 2023

NEWS   15 Mar 2023

NEWS   14 Mar 2023

NEWS   11 Mar 2023

IOM Responds to Powerful Floods as Needs Deepen for Earthquake Affected Communities (/news/iom-responds-...

IOM Welcomes Guinea's First Ever Migration Governance Framework (/news/iom-welcomes-guineas-first-ever-...

Venezuelan Refugees, Migrants, and Their Hosts Need Help to Chart a Brighter Future (/news/venezuelan-refugees-...

Solidarity and Action: IOM Director General Appeals for "Long Haul" Support on Visit to Earthquake Zone...

**VIEW MORE (/NEWS)**

MIGRATION UPDATES

Subscribe to IOM newsletter to receive the latest news and stories about migration.

SUBSCRIBE (HTTPS://IOM.US19.LIST-MANAGE.COM/SUBSCRIBE?U=2DCA09F67EFB6FC090574A83F&ID=E55D72A0A5)

IOM
UN MIGRATION

 (https://www.facebook.com/IOM)   (https://twitter.com/UNmigration)   (https://www.instagram.com/unmigration/)

M (https://medium.com/@UNmigration)   (http://www.flickr.com/photos/iom-migration/)   in (https://www.linkedin.com/company/iom)

 (https://www.iom.int/rss-feeds)   (http://snapchat.com/add/unmigration)   (https://www.youtube.com/user/IOMMigration)

 (https://www.tiktok.com/@unmigration)

INTERNATIONAL ORGANIZATION FOR MIGRATION

17 Route des Morillons, 1211 Geneva 19, Switzerland

+41 22 717 9111

Contact Us (/contact-us)

ADMINISTRATIVE CENTRES AND OFFICES

Manila Administrative Centre (https://www.iom.int/manila-administrative-centre)

Panama Administrative Centre (https://panama.iom.int/)

Regional and Country Offices (/where-we-work)

RELATED IOM PARTNER SITES

UN Network on Migration (https://migrationnetwork.un.org/)

Environmental Migration (https://environmentalmigration.iom.int/)

Migration Data Portal (https://migrationdataportal.org)

Displacement Tracking Matrix (https://dtm.iom.int/)

iDiaspora (https://www.idiaspora.org/fr/)

IOM Development Fund (https://developmentfund.iom.int)

Global Data Hub on Human Trafficking (https://www.ctdatacollaborative.org/)

Global Migration Data Analysis Centre (https://gmdac.iom.int)

Return and Reintegration Platform (https://returnandreintegration.iom.int/)

SHORTCUTS

Careers (/iom-careers-and-job-vacancies)

Report Abuse, Fraud or Misconduct (https://weareallin.iom.int/)

Procurement (/do-business-us-procurement)

Publications (https://publications.iom.int)

Copyright © 2023 International Organization for Migration

Report Abuse, Fraud or Misconduct (https://weareallin.iom.int/)

Cybersecurity Issues (/report-cybersecurity-issue)     Terms & Conditions (/terms-and-conditions)

Haiti AR_001653



**IOM HAITI:**
DISPLACEMENT DASHBOARD #1
JUNE 2021

 17,105 IDPs           2,906 households           10 sites

Since the beginning of June 2021, an increase in fights and violence among armed gangs in the metropolitan area of Port-au-Prince continues to fuel the insecurity and the displacement of the civilian population. As of 24 June 2021, 17,105 internally displaced persons (IDPs) have been identified in 10 sites (host communities, spontaneous sites or organised sites).

In the sites, where the data has been verified, 2,683 female and 2,247 male have been recorded, including 1,340 children.

## DEMOGRAPHICS



Female 56%



Male 44%

## TYPE OF SITE



## VULNERABILITIES

                              

1,340
children

103
pregnant women

156
elderly

274
persons with disabilities

328
persons with chronic ilness

## SITE LIST

| Site | Type of site | IDPs |
|---|---|---|
| Bel-Air | organised site | 1,242 |
| Centre Sportif de Carrefour | organised site | 1,115 |
| Delmas 103 (Ecole) | spontaneous site | 565 |
| Delmas 2 (Ecole Komite) | spontaneous site | 1,000 |
| Delmas 2 / Armée du Salut | organised site | 500 |
| Eglise St. Yves | spontaneous site | 1,000 |
| Familles accueil à Martissant/Delmas 2 | host community | 5,110 |
| Quartier de Saint Martin / Delmas 2 | host community | 4,000 |
| Tabarre Issa | host community | 2,160 |
| Toussaint Brave | host community | 413 |

Haiti AR_001654



# IOM HAITI:
## DISPLACEMENT DASHBOARD #1
### JUNE 2021

 17,105 IDPs

 2,906 households

 10 sites



For more information, please contact: dtmhaiti@iom.int



International Organization for Migration (IOM)

The UN Migration Agency

Haiti_AR_001655

**NEWS · LOCAL**   24 September 2022

# IOM condemns violence and looting of humanitarian supplies in Haiti



PORT-AU-PRINCE - The International Organization for Migration (IOM) strongly condemned the latest looting of its humanitarian supplies following two weeks of civil unrest in Haiti.

On Wednesday, 21 September, IOM premises in Les Cayes (150 km southwest of Port Au Prince), containing more than 12,000 relief items, were ransacked. Kitchen and hygiene kits, plastic sheets, and water containers, intended to provide urgent assistance to more than 10,000 vulnerable people in Haiti, disappeared from the vandalized facility.

One week before, on 15 September, IOM stock of humanitarian kits prepositioned for eventual emergency response was looted in Gonaives, approximately 100 km north of the nation's capital, after local protests turned violent. The stolen aid, enough to support 10,000 people, included hygiene kits, jerrycans, tarpaulins, kitchen sets, and blankets.

IOM is currently working on the replenishment of the stock in Gonaives and Les Cayes to have the capacity to respond to future emergencies.

"I strongly condemn the violence happening in the country and the looting of humanitarian supplies of IOM, as they have a dramatic impact on the people we serve," said Michele Klein Solomon, IOM Regional Director for Central and North America and the Caribbean. "Such an attack severely impedes our ability to deliver to the people who need it the most".

Several warehouses used by UN agencies have been attacked by protesters in cities including Gonaives and Les Cayes. UN's Resident and Humanitarian Coordinator in Haiti, Ulrika Richardson, has called for an immediate stop to attacks on humanitarian infrastructure and the looting of humanitarian supplies. WFP, UNDP, UNOPS and PAHO are some of the UN agencies that have seen their operations seriously constrained by this second week of civil unrest.

The overall situation continues to deteriorate across the country. Some IOM programs are on hold due to roadblocks, demonstrations, and limited access to fuel.

Despite the civil unrest that has paralyzed the country, IOM in collaboration with partners, authorities, and local leaders, continues to provide lifesaving assistance and transportation to migrants repatriated from the Dominican Republic and vulnerable migrants with specific needs stranded at the border following principles of humanity, neutrality, and independence in the delivery of humanitarian assistance.

IOM has been present in Haiti since 1994, supporting the Government in its immediate and long-term migration-related programs. IOM remains committed to its partners to stay and continues delivering humanitarian assistance to support vulnerable communities.

For more information contact Jorge Gallo at the IOM Regional Office in Costa Rica, email **jgallo@iom.int (mailto:jgallo@iom.int)**, Tel: +506 7203 6536.

## RELATED NEWS

(/news/iom-and-onm-launch-pale-verite-awareness-raising-campaign-anse-pitres)

(/news/iom-inagurates-midas-land-border-point-belladere)

(/news/1-success-story-nurse-duchity-clinic-benefiting-new-solar-system)

(/news/international-migration-needs-more-just-collective-attention-it-needs-collective-action)

NEWS   20 Sep 2022

NEWS   22 Jul 2022

NEWS   27 May 2022

NEWS   17 Dec 2021

IOM and ONM launch the "Pale Verite" awareness raising campaign in Anse-...

IOM Inagurates MIDAS at the Land Border Point of Belladère (/news/iom-...

1 A Success Story on a Nurse in Duchity Clinic Benefiting from a New...

International Migration Needs More Than Just Collective Attention; It...

### MIGRATION UPDATES

Subscribe to IOM newsletter to receive the latest news and stories about migration.

SUBSCRIBE (HTTPS://IOM.US19.LIST-MANAGE.COM/SUBSCRIBE?U=2DCA09F(



(/) 

🅕 (https://www.facebook.com/IOMHaiti/)      🐦 (https://twitter.com/IOMHaiti)

🅕 (https://www.flickr.com/photos/haitilense2010/collections/)

▶ (https://www.youtube.com/channel/UCmNCF7L-ssmIxfBn5aANEcQ)

**IOM HAITI**

Rue E. Pierre, 11 (Zone Ambassade Etats Unis]

Tabarre 27

Port-au-Prince, Haiti

Contact Us (/contact-us)

**SHORTCUTS**

Media Contacts (/media-contacts)

Publications (http://publications.iom.int/)

Careers (/vacancies]

CAVB (/cavb)

CAVC (/cavc)

Procurement (https://www.iom.int/do-business-us-procurement]

**ADMINISTRATIVE CENTRES AND OFFICES**

IOM Headquarters (https://www.iom.int/contact-us)

IOM Manila Administrative Centre (https://www.iom.int/manila-administrative-centre)

IOM Panama Administrative Centre (https://panama.iom.int/en)

Regional and Country Offices (https://www.iom.int/where-we-work)

RELATED IOM PARTNERS SITES

UN Network on Migration
(https://migrationnetwork.un.org/)

Environmental Migration
(https://environmentalmigration.iom.int/)

Migration Data Portal
(https://migrationdataportal.org)

Displacement Tracking Matrix
(https://dtm.iom.int/haiti)

IDiaspora (https://idiaspora.org/)

IOM Development Fund
(https://developmentfund.iom.int/)

Global Data Hub on Human Trafficking
(https://www.ctdatacollaborative.org/)

Global Migration Data Analysis Centre
(https://gmdac.iom.int)

Copyright © 2023 International Organization for Migration

Report Abuse (https://weareallin.iom.int/fr)

Terms and Conditions (https://www.iom.int/fr/conditions-dutilisation-des-sites-web-de-loim)



**The New York Times** | https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html

## Smuggling Migrants at the Border Now a Billion-Dollar Business

With demand for smugglers on the rise, organized crime has moved in, with cruel and violent results.

**By Miriam Jordan**

July 25, 2022

CARRIZO SPRINGS, Texas — From the street, the little brown house was unremarkable yet pleasant. A bright yellow toy school bus and red truck hung on the hog-wire fence, and the home's facade featured a large Texas lone star. But in the backyard was a gutted mobile home that a prosecutor later described as a "house of horrors."

It was discovered one day in 2014, when a man called from Maryland to report that his stepfather, Moises Ferrera, a migrant from Honduras, was being held there and tortured by the smugglers who had brought him into the United States. His captors wanted more money, the stepson said, and were pounding Mr. Ferrera's hands repeatedly with a hammer, vowing to continue until his family sent it.

When federal agents and sheriff's deputies descended on the house, they discovered that Mr. Ferrara was not the sole victim. Smugglers had held hundreds of migrants for ransom there, their investigation found. They had mutilated limbs and raped women.

"What transpired there is the subject of science fiction, of a horror movie — and something we simply don't see in the United States," the prosecutor, Matthew Watters, told a jury when the accused smugglers went on trial. Organized crime cartels, he said, had "brought this terror across the border."

But if it was one of the first such cases, it was not the last. Migrant smuggling on the U.S. southern border has evolved over the past 10 years from a scattered network of freelance "coyotes" into a multi-billion-dollar international business controlled by organized crime, including some of Mexico's most violent drug cartels.



Haiti_AR_001659

Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 356 of 382

The deaths of 53 migrants in San Antonio last month who were packed in the back of a suffocating tractor-trailer without air conditioning — the deadliest smuggling incident in the country to date — came as tightened U.S. border restrictions, exacerbated by a pandemic-related public health rule, have encouraged more migrants to turn to smugglers.

While migrants have long faced kidnappings and extortion in Mexican border cities, such incidents have been on the rise on the U.S. side, according to federal authorities.

More than 5,046 people were arrested and charged with human smuggling last year, up from 2,762 in 2014.

Over the past year, federal agents have raided stash houses holding dozens of migrants on nearly a daily basis.

Title 42, the public health order introduced by the Trump administration at the beginning of the coronavirus pandemic, has authorized the immediate expulsion of those caught crossing the border illegally, allowing migrants to cross repeatedly in the hope of eventually succeeding. This has led to a substantial escalation in the number of migrant encounters on the border — 1.7 million in fiscal 2021 — and brisk business for smugglers.

In March, agents near El Paso rescued 34 migrants from two cargo containers without ventilation on a single day. The following month, 24 people being held against their will were found in a stash house.



The dense brush in South Texas conceals migrants and smugglers trying to evade detection by U.S. authorities. "You could hide a million elephants here," said Jerry Martinez, a captain in the Dimmit County Sheriff's Office.  Christopher Lee for The New York Times

Law enforcement agents have engaged in so many high-speed chases of smugglers lately in Uvalde, Texas — there were nearly 50 such "bailouts" in the town between February and May — that some school employees said they failed to take a lockdown order seriously during a mass shooting in May because so many previous lockdowns had been ordered when smugglers raced through the streets.

Haiti AR_001660

Smuggling Migrants at the Border Now a Billion-Dollar Business - The New York Times

Teófilo Valencia, whose 17- and 19-year-old sons perished in the San Antonio tragedy, said he had taken out a loan against the family home to pay the smugglers $10,000 for each son's transport.

Fees typically range from $4,000, for migrants coming from Latin America, to $20,000, if they must be moved from Africa, Eastern Europe or Asia, according to Guadalupe Correa-Cabrera, an expert on smuggling at George Mason University.

For years, independent coyotes paid cartels a tax to move migrants through territory they controlled along the border, and the criminal syndicates stuck to their traditional line of business, drug smuggling, which was far more profitable.

That began to change around 2019, Patrick Lechleitner, the acting deputy director at U.S. Immigration and Customs Enforcement, told Congress last year. The sheer number of people seeking to cross made migrant smuggling an irresistible moneymaker for some cartels, he said.

The enterprises have teams specializing in logistics, transportation, surveillance, stash houses and accounting — all supporting an industry whose revenues have soared to an estimated $13 billion today from $500 million in 2018, according to Homeland Security Investigations, the federal agency that investigates such cases.



Rigs hauling migrants blend with the 20,000 trucks that travel daily on the I-35 freeway to and from Laredo, the country's busiest land port. Christopher Lee for The New York Times

Migrants are moved by plane, bus and private vehicles. In some border regions, such as the Mexican state of Tamaulipas, smugglers affix color-coded bands to the wrists of migrants to designate that they belong to them and what services they are receiving.

"They are organizing the merchandise in ways you could never imagine five or 10 years ago," said Ms. Correa-Cabrera.

Groups of Central American families who crossed the Rio Grande recently into La Joya, Texas, wore blue bracelets with the logo of the Gulf Cartel, a dolphin, and the word "entregas," or "deliveries" — meaning they intended to surrender to U.S. authorities and seek asylum. Once they had crossed the river, they were no longer the cartel's business.

Haiti AR_001661

Previously, migrants entering Laredo, Texas, waded across the river on their own and faded into the dense, urban landscape. Now, according to interviews with migrants and law enforcement officials, it is impossible to cross without paying a coyote connected to the Cartel del Noreste, a splinter of the Los Zetas syndicate.

Smugglers often enlist teenagers to transport arrivals to stash houses in working-class neighborhoods. After they gather several dozen people, they load the migrants onto trucks parked in Laredo's vast warehouse district around Killam Industrial Boulevard.

"Drivers are recruited at bars, strip joints, truck stops," said Timothy Tubbs, who was deputy special agent in charge of Homeland Security Investigations for Laredo until he retired in January.

Haiti AR_001662



Haiti AR_001663

Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 360 of 382

"Before smugglers controlled the Rio Grande, some migrants crossed back and forth daily," said Timothy Tubbs, a retired agent with Homeland Security Investigations in Laredo, Texas, a busy smuggling corridor.  Christopher Lee for The New York Times

Rigs hauling migrants blend with the 20,000 trucks that travel daily on the I-35 freeway to and from Laredo, the country's busiest land port. Border Patrol agents posted at checkpoints inspect only a fraction of all the vehicles to ensure traffic keeps flowing.

The tractor-trailer discovered on June 27 with its tragic cargo had passed through a checkpoint about 30 miles north of Laredo without arousing suspicions. By the time it stopped three hours later on a remote road in San Antonio, most of the 64 people inside had already died.

The driver, Homero Zamorano Jr., one of two men indicted on Thursday in connection with the tragedy, said that he was unaware that the air-conditioning system had failed.

The 2014 incident at the stash house in Texas resulted in the arrest of the perpetrators and a subsequent trial, providing an unusually vivid look at the brutal tactics of smuggling operations. Though kidnapping and extortion happen with some frequency, such trials with cooperating witnesses are relatively rare, federal law enforcement officials say. Fearing deportation, undocumented relatives of kidnapped migrants seldom call the authorities.

That case began in the thick brush country eight miles from the Rio Grande, in Carrizo Springs, a popular transit point for people trying to elude detection. "You could hide a million elephants here, this brush is so thick," said Jerry Martinez, a captain in the Dimmit County Sheriff's Office.

Mr. Ferrera, 54, the torture victim, first migrated to the United States in 1993, heading to construction sites in Los Angeles and San Francisco, where he made more than 10 times what he earned back in Honduras. He returned home a few years later.



Moises Ferrera lost mobility in his right hand after smugglers struck it repeatedly with a hammer. "I came here for a better life, to help my family," he said in court testimony. "This is how my hand ended up. This hand's not any good now to work with."  Amanda Andrade-Rhoades for The New York Times

"In those days, you didn't need a coyote," he said in an interview from his home in Maryland. "I came and went a couple times."

Haiti AR_001664

Case 6:23-cv-00007    Document 93-6    Filed on 03/24/23 in TXSD    Page 361 of 382

When he set out in early 2014, Mr. Ferrera knew that he would have to hire a smuggler to breach the border. In Piedras Negras, Mexico, a man promised to guide him all the way to Houston. Mr. Ferrera's stepson, Mario Pena, said he wired $1,500 as payment.

After reaching Texas, Mr. Ferrera and several other migrants were delivered to the trailer in Carrizo Springs.

Before long, Mr. Ferrera's stepson received a call demanding an additional $3,500. He said he did not have any more money.

The calls became frequent and menacing, Mr. Pena recalled in an interview; the smugglers let him hear the sound of his stepfather's shrieks and groans as a hammer came down on his fingers.

Mr. Pena managed to wire $2,000 via Western Union, he said, but when the captors realized they could not collect the cash because it was a Sunday, they intensified their assaults.

Mr. Pena called 911.

Law enforcement agents found Mr. Ferrera in the trailer "severely, severely physically harmed, with lots of blood all over him, laying on a sofa" in the living room, according to testimony by one of the agents, Jonathan Bonds.

Another migrant, stripped down to his underwear, was squirming in pain, his bludgeoned hand held aloft, in the front bedroom. In the rear bedroom, agents encountered a nude woman, another migrant, who had just been raped by a smuggler who emerged naked from the bathroom.

The house's owner, Eduardo Rocha Sr., who went by Lalo and was identified as the leader of the smuggling ring, was arrested along with several others, including his son, Eduardo Rocha Jr. The younger Mr. Rocha testified that their cell was affiliated with the Los Zetas cartel and that over two years it had funneled hundreds of migrants into the United States and collected hundreds of thousands of dollars.

The elder Mr. Rocha was sentenced to life in prison. His son and the man who had carried out most of the physical abuse received 15- and 20-year sentences.

Mr. Ferrera testified at their trial. As a victim of a crime who had assisted law enforcement, he was allowed to remain in the United States. But his new life had come with a cost, which he displayed when he held up his right arm for the jury, the fingers now lifeless. "This is how my hand ended up," he said.

Susan C. Beachy contributed research.



**Immigration**

# As United States' 'Remain in Mexico' plan begins, Mexico plans to shut its 'too successful' humanitarian visa program

**GlobalPost**

*January 24, 2019 • 9:45 PM EST*

By **Sarah Kinosian**



Migrants, part of a caravan travelling to the US, make a human chain to pull people from the river between Guatemala to Mexico in Ciudad Hidalgo and continuing to walk in Mexico, in October 2018. Many migrants headed for the border will likely find themselves waiting in Mexico as part of the US's new "remain in Mexico" policy.

Credit: Leah Millis/Reuters





said. "But it depends on the amount of people we are really talking about. ... This is a US

¨The irony of this measure is that it is going to drive people who are trying to apply for asylum at ports of entry and do things the right



could create total disorder," said Cesar Palencia, head of migrant services in Tijuana. "What are we going to do with all the people they just let in?"



asylum. Urbina said he was facing threats after gang members killed his 16-year-old brother.





**US' indefinite ban on Iranians drafted into Iran's Revolutionary Guard continues to separate families**



**sky**

**'Kneel and apologize!': 76 years after island-wide massacre, Taiwan continues to commemorate — and debate — the tragedy**





**The New York Times** | https://www.nytimes.com/2022/11/19/world/americas/haiti-cholera-gang-violence.html

# Gang Warfare Cripples Haiti's Fight Against Cholera

The disease is spreading in the Caribbean nation in part because armed groups control poor neighborhoods with ruthless violence and prevent doctors from providing basic care.

**By Natalie Kitroeff   Photographs by Adriana Zehbrauskas**

Natalie Kitroeff, who oversees the Mexico City bureau, and Adriana Zehbrauskas, a photographer, traveled to a hospital in a Port-au-Prince slum to witness Haiti's struggle to combat cholera in gang-controlled areas.

Published Nov. 19, 2022   Updated Nov. 29, 2022

PORT-AU-PRINCE, Haiti — To reach the hospital, the mothers traveled the front lines of a gang war, bringing sick babies during lulls in gun battles and passing corpses along the way.

They had no choice: Cholera, resurgent in Haiti, had come for their children.

"I didn't want to come, because I was so scared," said Benette Regis, clutching her 5-year-old son, Lovelson, as he vomited, his frail body at war with cholera. "But I knew he could die."

Cholera is soaring across the globe, as a record number of outbreaks have strained already reeling health systems in regions including Africa and South Asia.

**Show Full Article**

COUNCIL *on*
FOREIGN
RELATIONS

*Backgrounder*

# Haiti's Troubled Path to Development

Hobbled by foreign interventions, political instability, and natural disasters, the former French colony has long suffered from underdevelopment.

**WRITTEN BY**
Rocio Cara Labrador *and* Diana Roy

**UPDATED**
*Last updated September 9, 2022 4:37 pm (EST)*

---

## Summary

Once the wealthiest colony in the Americas, Haiti is now the Western Hemisphere's poorest country, with more than half of its population living below the World Bank's poverty line.

Foreign intervention and debt, political instability, and natural disasters have stymied the Caribbean country's development.

The assassination of Haiti's president, growing civil unrest, and the ongoing pandemic have increasingly challenged the Biden administration's plans for closer ties.

## Introduction

Few countries have struggled with development like Haiti. Since breaking free from French colonial rule over two centuries ago, the Caribbean state has weathered multiple foreign interventions, chronic political instability, and devastating natural disasters. The confluence of these forces has transformed what was once the wealthiest colony in the Americas into the poorest country in the Western Hemisphere.

The United States has had a long and troubled history with Haiti, including a nearly twenty-year, sometimes bloody, occupation in the early twentieth century. Despite an often rocky relationship, the two countries maintain close economic and social ties, although bilateral relations were

Haiti AR_001678

strained under President Donald Trump. During his tenure, Trump sought to restrict immigration from Haiti, and while President Joe Biden promised a new approach toward the country, the assassination of Haiti's president, widespread civil unrest, and a worsening economic crisis have challenged U.S. policy on multiple fronts.

## What are Haiti's origins?

Spanish settlers arrived on the island of Hispaniola, which comprises modern-day Haiti and the Dominican Republic, in 1492. Within a quarter-century, diseases brought by Europeans, such as smallpox and measles, decimated the Indigenous Taíno population. Over the next three centuries, European colonizers imported hundreds of thousands of enslaved people from western and central Africa to harvest sugar, coffee, and timber, all lucrative exports.

In the early 1600s, French traders established an outpost on the western third of the island, which Paris annexed as the colony of Saint-Domingue several decades later. In the late 1700s, Toussaint L'Ouverture and Jean-Jacques Dessalines, both formerly enslaved, led a rebellion against French rule that culminated with the creation of Haiti in 1804. The first postcolonial Black republic, Haiti became a beacon of abolition, self-determination, and racial equality.



**HAITI AT A GLANCE**

| Area | Primary religions | Population |
|---|---|---|
| 27,750 sq km (about the size of | Catholicism 55%, Protestantism | 11.5 million (20 |

Haiti AR_001679

| | | |
|---|---|---|
| Maryland) | 29%, none 10% (2018 est.) | **Primary languag** |
| **Life expectancy** | **GDP** | French, Creole |
| 64 years (2020) | $20.9 billion (2021) | |
| **Form of government** | **GDP per capita** | |
| Semi-presidential republic | $1,815 (2021) | |

*Sources:* CIA World Factbook; U.S. Department of State; World Bank.

COUNC
FOREIG
RELATI

## What is Haiti's economic situation?

Haiti is the poorest country in the Western Hemisphere. More than half the population lives under the poverty line, and many people rely on subsistence farming to feed their families. The country is also heavily dependent on external revenue: between 2010 and 2020, the United Nations allocated more than $13 billion in international aid for Haiti, most of which has funded disaster-relief missions and development programs. Meanwhile, remittances from the Haitian diaspora have steadily risen over the last few years, totaling a record $3.8 billion [PDF] in 2020, or nearly 24 percent of Haiti's gross domestic product (GDP).

Since 2010, trade has composed 43 percent of Haiti's GDP on average. The country's major industries include sugar refining, flour milling, and cement and textile manufacturing; textiles accounted for about 86 percent of all exports in 2020. The United States is Haiti's largest trade partner, followed by Canada and Mexico.

In recent years, natural disasters, disease, political instability, mismanagement of humanitarian relief, and a depreciation of the gourde—Haiti's currency—have strained the economy. Tourism, once a vibrant sector, has declined. Compared to a record 1.3 million tourists in 2018, which drew in $620 million, Haiti welcomed only 938,000 travelers in 2019. That same year, the neighboring Dominican Republic welcomed nearly 7.6 million tourists. However, the COVID-19 pandemic significantly reduced travel and economic activity in both countries.

International lenders canceled Haiti's debt following a massive earthquake in 2010, but its borrowing has since risen to about $3.57 billion, including nearly $2 billion from PetroCaribe—the Venezuela-led regional alliance that offers its members subsidized oil. Further upheaval, including an escalating protest movement, the 2021 assassination of President Jovenel Moïse, back-to-back natural disasters in July and August 2021, and rampant gang violence have placed further stress on the country's economic situation.

Haiti AR_001680

Growing Instability in Haiti

# Why has Haiti had such difficulty developing?

Since its independence from France, Haiti's development has been menaced by forces that run the gamut, including interference of foreign powers, domestic political malfeasance, natural disasters, and epidemics.

*Foreign intervention and debt*. Freedom from France in 1804 did not mean an end to foreign powers intervening in Haiti. France only recognized an independent Haiti in 1825, after its former colony agreed to pay reparations that would be worth $22 billion today. Over the next 120 years, as much as 80 percent of Haiti's revenues went to paying off this debt.

The United States recognized Haiti only in 1862, when President Abraham Lincoln was championing emancipation at home and abroad. Subsequent U.S. administrations viewed Haiti through a mostly strategic lens. Wary of encroaching German influence in the Caribbean at the outset of World War I, President Woodrow Wilson ordered Marines to Haiti in 1915, purportedly to restore political stability. In the five years prior, seven Haitian presidents were ousted from office or assassinated. During the nearly two-decade occupation, the United States controlled Haiti's security and finances. It also imposed racial segregation, forced labor, and press censorship, and deposed presidents and legislatures that opposed the U.S. presence. Some fifteen thousand Haitians were killed in rebellions against the U.S. administration, the bloodiest of which occurred in 1919 and 1929. President Franklin D. Roosevelt withdrew U.S. troops in 1934 as part of his Good Neighbor Policy.

*Political instability*. The U.S. withdrawal was followed by a series of unstable governments, which culminated in 1957 with the establishment of a dictatorship under François Duvalier and his son, Jean-Claude. Their twenty-nine-year rule was characterized by corruption that drained the nation's coffers and human rights violations that left some thirty thousand people dead or missing. In 1986, massive protests and international pressure forced the younger Duvalier to flee the country, giving way to a new constitution and democratic institutions [PDF].

However, political instability persisted. Jean-Bertrand Aristide, the country's first democratically elected president, was twice deposed in coups, in 1991 and 2004. Both prompted U.S. military interventions supported by the United Nations. In 2004, the United Nations launched a thirteen-year peacekeeping mission, the Brazil-led UN Stabilization Mission in Haiti (MINUSTAH) [PDF],

Haiti AR_001681

which sought to restore order after the fall of the Aristide government. In 2011, the election of Michel Martelly as president was clouded by allegations of U.S. meddling on his behalf. He later stepped down after postponing presidential elections twice and ruling by decree for more than a year. Haiti was cast into a political vacuum in 2016, when fraud allegations against Martelly's successor, Jovenel Moïse, postponed Moïse's official election until early 2017.

Moïse's presidency saw mass protests and calls for his resignation in response to increased fuel prices and the removal of government subsidies, accusations of corruption, a worsening economic crisis, and dispute over his administration's legitimacy. The widespread social unrest culminated in Moïse's assassination on July 7, 2021. U.S. authorities initially arrested several mercenaries, many of whom had received U.S. military training, on suspicion of involvement in the killing, but only three men have been charged so far as Haiti's own investigation has stalled. Ariel Henry, named prime minister only days before the murder, took over as acting president and has since come under suspicion after Haiti's chief prosecutor alleged that Henry was in communication with a key suspect. In January 2022, Henry survived an assassination attempt himself. The government has yet to hold a presidential election after it was postponed several times.

*Natural disasters*. Located on a geological fault line in a region prone to severe storms, Haiti suffers more natural disasters [PDF] than most Caribbean nations. Widespread deforestation has left the country especially prone to flooding and mudslides, which strike Haiti at twice the rate as the Dominican Republic.

Moreover, a number of factors magnify the impact of disasters, including a lack of city planning, substandard infrastructure and housing, large coastal populations, and widespread dependence on subsistence farming.

A massive earthquake near the capital in 2010 killed about 220,000 Haitians and displaced 1.5 million more. At $8 billion, basic reconstruction costs surpassed the country's annual GDP. Between 2015 and 2017, drought led to crop losses of 70 percent, and in 2016, Hurricane Matthew decimated the country's housing, livestock, and infrastructure. Haiti was then struck by back-to-back disasters in August 2021, when a magnitude 7.2 earthquake rocked the southern peninsula, destroying 30 percent of local homes, killing over 2,000 people, and displacing tens of thousands more. Days later, Tropical Storm Grace exacerbated the destruction, dumping heavy rains and triggering flash flooding and landslides.

Epidemics and aid mismanagement have further complicated matters. Dengue and malaria run rampant, and cholera, introduced by UN peacekeepers from Nepal after the 2010 earthquake, has killed ten thousand people and infected nearly one million more. At the same time, critics say nongovernmental organizations have poorly administered billions of dollars in aid.

## How has the COVID-19 pandemic affected Haiti?

Haiti has had relatively low COVID-19 case numbers since the start of the pandemic, when the government turned away two offers to receive donations of the AstraZeneca vaccine, citing low fatalities and concerns about the vaccine's efficacy. In early 2021, the Haitian government enforced preventative measures, including a mask mandate, social-distancing requirements, and a curfew, but the government has since relaxed restrictions. Since July 2021, Haiti has received more than one million vaccine doses, all from the United States. Unlike most of the region, Haiti's COVID-19 death toll remains under one thousand people and its number of infections under thirty-five thousand, although the true number could be higher due to minimal testing. Some doctors say Haiti's young population—the average age is twenty-four—could also play a role in the country's low infection rate.

However, health authorities warn about a resurgence of cases and the spread of new virus variants, and say vaccine hesitancy, misinformation, and a weak health-care system are hampering Haiti's immunization campaign. (Less than 2 percent of the population has been fully vaccinated.) "We live in a land of non-believers," Lauré Adrien, general director of Haiti's Ministry of Health, told the Associated Press. "The vaccination campaign is progressing slowly." In May 2022, the World Bank approved an additional $35 million to improve Haiti's COVID-19 response, including vaccine distribution.

## How have recent U.S. administrations approached Haiti?

Washington's stated aims have been to bring political and economic stability to its southern neighbor while easing Haiti's humanitarian distress. The Barack Obama administration focused on strengthening Haiti's national police force, boosting economic security, improving health and education services, and buttressing infrastructure. Under Obama, the United States led the international responses to Haiti's crises, calling the country its "top foreign assistance priority" [PDF] in the Caribbean, and continued to support the United Nations' MINUSTAH mission. Since the 2010 earthquake, the U.S. Agency for International Development (USAID) has been Haiti's top donor, contributing roughly $5 billion, including millions in support of disaster-risk reduction programs.

On trade, a series of accords struck by President George W. Bush and extended under Obama provide Haitian textiles with duty-free access to the United States. As of 2020, more than 80 percent of all Haitian exports were going to the United States.

Immigration has been a central issue in the U.S.-Haiti relationship. Between 1990 and 2015, the Haitian immigrant population in the United States tripled as Haitians fled political instability and natural disasters, though some previous U.S. administrations responded with harsh detention and repatriation policies. After the 2010 earthquake, Obama granted Haitians temporary protected status (TPS), which affords undocumented migrants from troubled countries the right to live and work in the United States for renewable periods of up to eighteen months.

According to the latest American Community Survey, more than one million people of full or partial Haitian descent resided in the United States in 2020, making the country home to the largest Haitian population outside of Haiti.

## What did Trump do?

The Trump administration cut USAID's humanitarian and development assistance to Haiti by nearly 18 percent in 2017 as part of broader reductions to U.S. foreign aid, but preserved funding for initiatives to reduce poverty, improve infrastructure and services, and promote democratic institutions. Several trade agreements from the Obama era have likewise endured, including Haiti's duty-free access to U.S. markets, which was among the deals renewed by the Trump administration. When protests erupted across Haiti in 2019, Trump supported President Moise, who faced accusations of political illegitimacy and growing authoritarianism.

At the same time, Trump diverged from his recent predecessors on immigration, particularly with regard to TPS, which he sought to end for many countries. In late 2017, he denied some 59,000 Haitians an extension of their protected status, leading to the deportation of more than 2,500 [PDF] of them between 2018 and 2020. However, Haiti's TPS designation was subsequently extended several times due to legal rulings against the Trump administration's policies, as well as Haiti's ongoing instability.

## What is Biden's approach?

Before taking office, President Biden promised a new era of U.S. engagement with Latin America and the Caribbean. However, his response to Haiti's ongoing crises has drawn ire from locals who say the United States has done little to help and spurred calls for stronger action.

Haiti AR_001684

In January 2021, the administration announced that it was sending $75.5 million in development aid and health assistance to Haiti. Following the August earthquake, the administration approved an additional $32 million in disaster-relief funds and authorized USAID rescue teams to be dispatched to the island. In response to the country's deteriorating political and security situation, the Biden administration revived TPS for an estimated 155,000 Haitians, announcing a new, eighteen-month designation [PDF] in May 2021. It also contributed another $50 million to Haiti's recovery fund alongside other UN members during an international aid conference led by the United Nations in February 2022. The United States later designated Haiti a priority country under the 2022 Global Fragility Act, which aims to provide funding to prevent and reduce violent conflict and promote stability in five at-risk countries and regions.

But Biden has maintained some aspects of Trump's border policy. The administration continues to uphold Title 42, a public health order allowing for the immediate expulsion of migrants, after a federal court in Louisiana blocked efforts to terminate it. Among those affected by the policy are thousands of Haitian asylum seekers; between January 2021 and February 2022, the United States deported more than twenty-five thousand Haitian migrants.

Meanwhile, some policy analysts have argued that the Biden administration's response in the aftermath of President Moïse's murder was lackluster. Some members of Congress have urged Biden to withdraw his support [PDF] for Prime Minister Henry, arguing that he lacks the political sway needed to organize elections to determine Haiti's next president. Others in Congress have pressed the administration to halt mass deportations of Haitians under Title 42—a practice that drove the U.S. special envoy to Haiti to resign in October 2021. In addition, the White House continues to rule out sending U.S. troops or additional military assistance to Haiti, despite requests from the Haitian government.

## Recommended Resources

For the Center for Preventive Action, the University of Michigan's Susan D. Page argues that the United States needs a smarter assistance strategy in Haiti.

Former CFR fellow Paul J. Angelo and former research associate David Gevarter detail the assassination of President Moïse and what it means for Haiti's future.

Edwidge Danticat looks at the legacy of Haiti's occupation in the *New Yorker*.

The *New York Times*' Matt Apuzzo, Selam Gebrekidan, Constant Méheut, and Catherine Porter analyze how Haiti's current troubles stem from its colonial past.

Haiti AR_001685

12/12/22, 11:23 AM
Case 6:23-cv-00007   Document 93-6   Filed on 03/24/23 in TXSD   Page 382 of 382
Haiti's Troubled Path to Development | Council on Foreign Relations

Nathalie Baptiste explores the legacy of the Duvalier dictatorships on Haiti and its diaspora for Foreign Policy In Focus and the *Nation*.

For the U.S. Institute of Peace, Georges Fauriol, Peter Hakim, Enrique ter Horst, and Keith Mines present options to break Haiti's political stalemate.

 Creative Commons: Some rights reserved.

Michael Bricknell and Will Merrow created the map for this Backgrounder.

**For media inquiries on this topic, please reach out to communications@cfr.org.**