### B.  Refugee Processing and Parole in the Context of the Former Soviet Union

Before 1988, Soviet refugee applicants were processed in Rome.  The shift to in-country processing in Moscow began in August 1988 with approximately 2000 Armenians who were divested of their Soviet citizenship, but unable to leave the Soviet Union for lack of State Department funding for their transportation and temporary support in Rome.  At the inception of in-country refugee processing in Moscow, INS adjudicators apparently construed refugee eligibility more broadly than permitted by the statute and, as a result, approval rates were high.  Attorney General Edwin Meese instructed INS to bring the Moscow program "into sync" with existing statutes and INS procedures, but nonetheless offered to parole into the United States those individuals who did not qualify as refugees.[1]

*The Lautenberg Amendment (1990)*:  When INS aligned its overseas refugee processing with the standards set out in the Act, refugee approval rates in the Moscow program declined appreciably.  Congress responded by adopting a provision, commonly known as the Lautenberg Amendment, designed to restore the traditionally high approval rates for certain categories of refugee applicants by reducing the evidentiary burden for establishing eligibility for refugee status.[2]  While not expressly endorsing parole of those denied refugee status, section 599E of the Lautenberg Amendment does permit nationals of the Soviet Union, Vietnam, Laos, or Cambodia to adjust their status if they had been paroled into the United States after being denied refugee status.

To date, INS in Moscow continues both to process qualified refugee applicants under the reduced evidentiary standards set out in the Lautenberg Amendment and also to parole into the United States a high percentage of Lautenberg category members who are denied refugee status.

---

[1]  Letter from Edwin Meese, Attorney General, to then Lt. General Colin Powell, Assistant to the President for National Security Affairs (Aug. 4, 1988) (on file with the INS, Office of the General Counsel).

[2]  Sections 599D and E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Pub. L. No. 101-167, 103 Stat. 1195 (1989).  An introductory note to the July 13, 1989, Senate Voting Record on the Lautenberg Amendment explains:

> Proponents stated that this amendment is necessary to correct the actions of Attorney General Meese, who, in 1988, changed the criteria under which Soviet Jews and Vietnamese . . . could qualify as refugees.  In the past, these two groups of people have been assumed to have a well-founded fear of persecution and, therefore, have automatically qualified as refugees.  As a result of the Attorney General's actions in March 1988, the denial rate for Soviet Jews rose from seven percent to a high of 38 percent. . . .  Many of the refugees from the Soviet Union and Vietnam, who have been turned down, are displaced and uprooted.  They have given up their country, homes, and families because they thought they could rely on the U.S. government's long-standing promise of resettlement.

Senate Voting Record No. 134, Bill No. S.1160 (H.R. 1487), Amendment No. 367.  Temp. Cong. Rec. S-8394 (July 20, 1989).

Memorandum for Jeffrey L. Weiss
Subject: Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status

Page 3

Parole decisions are made on a case-by-case basis in accordance with section 212(d)(5)(A) of the Act.

### C. Evolution of INA Section 212(d)(5)

The Attorney General's parole authority has changed little since 1952, when it was codified into section 212(d)(5) of the INA.  Though subsequent Congresses often debated the proper scope of the Attorney General's parole power,[3] section 212(d)(5) has been amended only three times in the past fifty years.  As originally enacted, section 212(d)(5) of the Act provided:

> (5)  The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5) (1952); Act of June 27, 1952, 66 Stat. 163.

*The Refugee Act of 1980*:  As part of the comprehensive restructuring of refugee admission procedures achieved in the Refugee Act of 1980,[4] the 96th Congress split section 212(d)(5) into subparagraphs (A) and (B), adding the underlined text as follows:

> (A)  The Attorney General may, except as provided in subparagraph (B), in his discretion parole into the United States. . . .

> (B)  The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.

1980 Refugee Act § 202(f).  This language was designed to funnel all refugee admissions under the numerical cap to be established annually by the President after consultations with Congress,

---

[3] See, e.g., Arthur Helton, *Immigration Parole Power: Toward Flexible Responses to Migration Emergencies*, 71 INTERPRETER RELEASES 1637 (Dec. 12, 1994); Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis:  A Legislative History of the Refugee Act of 1980*, 19 SAN DIEGO L. REV. 9 (1981); Elizabeth J. Harper, IMMIGRATION LAWS OF THE UNITED STATES 503-14 (3d ed. 1975).

[4] Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 108, *codified as* 8 U.S.C. §§ 1157-1159 (1980) (hereinafter 1980 Refugee Act).

and thus to discourage the admission of additional refugees under the Attorney General's parole power.[5]

*The Immigration Act of 1990*:  In 1990, the 101st Congress added a minor limitation to section 212(d)(5)(A):  "The [AG] may, except as provided in subparagraph (B) or in section 214(f), in his discretion parole. . ." (emphasis added).[6]  This amendment curtails the Attorney General's power to parole an alien crewmember who is present in the United States during a labor dispute that leads to a strike or lockout.  See also INA § 214(f)(2)(A).  Until this point, no Congress had modified the substantive criteria that guide the Attorney General's exercise of the parole authority.

*The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)*:  In 1996, as part of its overhaul of the INA, the 104th Congress narrowed the Attorney General's parole authority by striking "for emergent reasons or for reasons deemed strictly in the public interest" and inserting "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  IIRIRA § 602(a).[7]

## D.  Construing INA Section 212(d)(5)(A), as Amended by IIRIRA Section 602

The question presented is whether, under the amended statutory criteria, INS may continue to parole into the United States persons denied refugee status.

*Plain Meaning*:  The preferred method of statutory construction is to carry out the plain meaning of the text of a statute.  Perry v. Commerce Loan Co., 383 U.S. 392, 400, reh'g denied, 384 U.S. 934 (1966), *cited in* Matter of H-N-, Int. Dec. 3414 (BIA 1999).  The 104th Congress replaced "emergent" reasons with "urgent humanitarian" reasons, and "strictly in the public interest" with "significant public benefit."  IIRIRA § 602(a).  The differences between these phrases are perceptible, but the text alone is insufficient to determine whether Congress intended, by this amendment, to end the practice of paroling those denied refugee status from the Former Soviet Union.

---

[5]  For analysis of this amendment to section 212(d)(5) of the Act and of the 1980 Refugee Act in general, see Anker & Posner, *supra* note 3.

[6]  Reference to section 214(f) added by section 202(b) of the Immigration Act of 1990, Act of Nov. 29, 1990, Pub. L. 101-649, 104 Stat. 4978.

[7]  Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009-546 (Sept. 30, 1996).  At the same time, Congress also inserted a provision requiring the Attorney General to submit an annual report describing the number and category of aliens paroled into the United States, including information such as the country of origin, duration of parole, current status of such parolees.  IIRIRA § 602(b).

Section 602 of IIRIRA, which amends INA section 212(d)(5), is entitled "Limitation on Use of Parole."[8] Titles have a communicative function. They may be considered to clarify uncertainty in the text but cannot limit the text's plain meaning. 2A Sutherland, *Statutes and Statutory Con-·-·uction* (6th ed., Norman Singer ed.) § 47.03. The title "Limitation on Use of Parole" confii    vhat the text suggests, but does not resolve by *how much* Congress intended to curtail the Atto.:   / General's parole authority.

*Legislative History*: The legislative history of IIRIRA section 602 is similarly vague. Describing the import of proposed language that would ultimately be adopted in the final version of IIRIRA section 602, a Senate Report states only that the amendment "[t]ightens The [sic] Attorney General's parole authority. . . ." S. Rep. No. 249, 104th Cong., 2d Sess. 21 (1996). Nor does the final Conference Report for IIRIRA explain to what extent parole should be "tightened." H.R. Conf. Rep. No. 828, 104th Cong., 2d Sess. 245 (1996).

While the legislative history does not clarify to what extent Congress sought to limit the parole authority, it does indicate that the 104th Congress rejected language that would have circumscribed the Attorney General's authority to parole individuals who were denied refugee status. The adopted Senate language replaced an earlier House proposal, section 524 of H.R. 2202, that enumerated four exclusive reasons for which the Attorney General could parole an individual into the United States: medical emergency; organ donation; to visit a dying relative; and to assist U.S. law enforcement efforts (or to protect an individual who so assisted). In addition, section 524 provided:

> (D) LIMITATION ON THE USE OF PAROLE AUTHORITY- The Attorney
> General may not use the parole authority under this paragraph to permit to come to
> the United States aliens who have applied for and have been found to be ineligible for
> refugee status or any alien to whom the provisions of this paragraph do not apply.

The 104th Congress specifically considered, but rejected, the House's proposal to limit the practice of paroling into the United States those denied refugee status. "[W]here the language under question was rejected by the legislature and thus not contained in the statute it provides an indication that the legislature did not want the issue considered." 2A Sutherland, *supra*, § 48.04.

*Re-Authorization of the Lautenberg Amendment*: Within the Omnibus Consolidated Appropriations Act of 1997, Congress both amended the Attorney General's parole authority (Division C) and re-authorized the Lautenberg Amendment for an additional year (Division A). *Compare* Pub. L. 104-208, Div. C, Title VI § 602(a), 110 Stat. 3009-689 (Sept. 30, 1996), *with* Pub. L. 104-208, Div. A, Title I § 101(c) [Title V, § 575(2)], 110 Stat. 3009-168 (Sept. 30, 1996). As discussed above, the Lautenberg Amendment affords adjustment of status to those who are paroled into the United States after being denied refugee status. Not only did the 104th Congress specifically reject proposed limits to the Attorney General's authority to parole denied

---

[8] This title is not codified into the INA.

refugee applicants, it tacitly approved of the practice by renewing an existing provision that permitted these parolees to adjust their status to that of lawful permanent residents.  Subsequent Congresses have re-authorized the Lautenberg Amendment four (4) times since IIRIRA.[9]

 *Case-by-case basis of parole decisions*:  For indivi\_\_\_\_ s found to be ineligible to be classified as a refugees, parole decisions must comply with \_ \_ case-by-case requirement of amended section 212(d)(5)(A) of the Act and may not be made on a "blanket" basis.  Designating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with a "case-by-case" decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case.

 Under current practice, every refugee applicant is interviewed by an immigration officer for possible classification as a refugee.  If the applicant is found not to be eligible for refugee status, the officer considers the merits of the case for an offer of parole.  So long as individual consideration is given to parole decisions, the Service's determination - that it is generally in the public interest to parole denied refugee applicants from Moscow who belong to groups specified in the Lautenberg Amendment - does not violate the case-by-case requirement.

## IV.  Conclusion:

 While section 602 of IIRIRA generally tightens the criteria by which parole decisions are made, it is the opinion of the General Counsel that section 212(d)(5)(A), as amended, does not curtail the Attorney General's legal authority to parole into the United State individuals from the Former Soviet Union who are denied refugee status.

---

[9] Pub. L. 105-118, Title V, § 574(2), Nov. 26, 1997, 111 Stat. 2432; Pub. L. 105-277, Div. A, § 101(f) [Title VII, § 705(2)], Oct. 21, 1998, [12 Stat. 2681-389; Pub. L. 106-113, Div. B, § 1000(a)(4) [Title II, § 214(2)], Nov. 29, 1999, 113 Stat. 1535, 1501A-240; Pub. L. 106-554, enacting by reference Title II, § 212(2) of H.R. 5656, Dec. 21, 2000, 14 Stat. 2763A-25.

Nicaragua AR_000097

UNCLASSIFIED//FOR OFFICIAL USE ONLY



Homeland Security

August 21, 2022

**INFORMATION**

MEMORANDUM FOR THE SECRETARY

THROUGH:         John W. Priddy
                 Acting Director, Joint Task Force – East (JTF-E)

                 John K. Tien
                 Deputy Secretary, U.S. Department of Homeland Security

FROM:            RADM Brendan C. McPherson
                 Director, Homeland Security Task Force – Southeast (HSTF-SE)

SUBJECT:         **OPERATION VIGILANT SENTRY (OVS) Phase 1B**

REFERENCE:       (a) Homeland Security Act of 2002, P.L. 107-296
                 (b) DHS MASS MIGRATION PLAN (DMMP), dtd 8 SEP 2011
                 (c) OPERATION VIGILANT SENTRY, Rev. 5 dtd 13 JUL 2021

1.  This memorandum provides formal notification that I have directed the HSTF-SE Unified Command to transition from Operation Vigilant Sentry (OVS) Phase 1a (*Steady State - Preparation*) to Phase 1b (*Surge - Prevention*), in accordance with references (a) through (c).  I directed this change in order to enhance our collective preparedness to effectively address a marked, enduring increase in irregular maritime migration flow within the Caribbean area of operations in recent months, most notably originating from Cuba and Haiti.  The current conditions in Cuba and Haiti remain fragile and conducive to seeing additional foreign nationals taking to the sea, in significant numbers, with the intent of reaching the United States.

2.  HSTF-SE will immediately implement operational and tactical level plans and activities to deter and prevent any threat of maritime mass migration.  The principal objectives of this operation will focus on: effective deterrence; early interdiction; safe, efficient and humane care and processing of migrants; and direct repatriation of migrants rescued and interdicted at sea in support of U.S. national security interests. Ultimately, the mission of HSTF-SE is to save lives and secure our borders.

3.  HSTF-SE will coordinate all interagency requests for assistance, requests for forces, recommendations for suspension of protection screening (if deemed necessary and appropriate), determination for state and local assistance, or other operational matters with JTF-E and the DHS Office of the Military Advisor.

1

UNCLASSIFIED//FOR OFFICIAL USE ONLY

4.  HSTF-SE will maintain OVS Phase 1b *(Surge)* until operational conditions permit a timely transition back to OVS Phase 1a *(Steady State)*.

5.  All DHS components are responsible for their own costs in support of HSTF-SE.  Each component is responsible for establishing appropriate mechanisms for capturing and documenting costs in support of HSTF-SE operations.  The Under Secretary for Management will centrally collect cost information from across all DHS agencies.  The Under Secretary for Management and Chief Financial Officer will also periodically review the situation and make adjustments accordingly.

Attach: Graphic - Operation Vigilant Sentry (OVS) Phases and Command Structure

cc:      Commandant, U.S. Coast Guard
         Commissioner, U.S. Customs and Border Protection
         Acting Director, U.S. Immigration and Customs Enforcement
         Administrator, Federal Emergency Management Agency
         DHS, Under Secretary for Management
         DHS, Director of Operations Coordination
         DHS, Office of the Military Advisor
         HSTF-SE Unified Command
         Commander, U.S. Southern Command
         Commander, U.S. Northern Command

UNCLASSIFIED//FOR OFFICIAL USE ONLY

PRE-DECISIONAL/DELIBERATIVE



**U.S. Department of Homeland Security**
Washington, DC 20528

October 12, 2022

**ACTION**

MEMORANDUM FOR THE SECRETARY

FROM:              Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

ROBERT P SILVERS — Digitally signed by ROBERT P SILVERS Date: 2022.10.12 16:12:28 -04'00'

                   Christopher Magnus
                   Commissioner
                   U.S. Customs and Border Protection

CHRISTOPHER J MAGNUS — Digitally signed by CHRISTOPHER J MAGNUS Date: 2022.10.12 15:32:11 -04'00'

                   Ur M. Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

UR M JADDOU — Digitally signed by UR M JADDOU Date: 2022.10.12 14:50:21 -04'00'

SUBJECT:          **Parole Process for Certain Venezuelan Nationals**

**Summary**

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating meaningful and safe, orderly, and humane processes for migration throughout the region. While this strategy shows great promise, it will take time to fully implement in a way that will have meaningful effects on migratory patterns in the region. These changes will not take effect quickly enough to have an immediate impact on the significant challenges we face today along the southwest border (SWB).

In light of this reality, DHS is proposing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between ports of entry (POE) along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe, orderly, and streamlined manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, we anticipate that this effort will serve as a deterrent to irregular migration, by

PRE-DECISIONAL/DELIBERATIVE

providing a meaningful alternative to irregular migration, and by imposing immediate consequences on Venezuelan nationals who seek to irregularly enter the United States between POEs. It would provide an incentive for Venezuelans to avoid the often-dangerous journey to the border altogether by putting in place a safe, orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[1] After this process is announced, Venezuelan nationals attempting to irregularly enter the United States between POEs would be subject to expulsion or removal to Mexico or other third countries and ineligible for parole under this process as a result. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process will be conditioned on the GOM—for the first time— accepting the expulsion or removal of large numbers of Venezuelan nationals seeking to irregularly enter the United States between POEs on the SWB. As such, this new process will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB.

The new parole policy would be modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at POEs along the SWB. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safer and more orderly process. This new process would be procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual (and certain non-Venezuelan nationals who are immediate family members of a primary beneficiary) and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Venezuelan nationals would be required to meet several eligibility criteria to be considered, on a case-by-case basis, for advance travel authorization or parole. Individuals would be ineligible if they have been ordered removed from the United States within the prior five years. They are ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after the date of the announcement. Venezuelan nationals also are ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela. In addition, Venezuelan nationals must meet the following criteria: (i) beneficiaries must travel by air to seek entry at a POE; and (ii) beneficiaries must pass vetting for national security and public safety purposes prior to traveling to the United States and again at the POE. Only those who meet all specified criteria would be eligible to receive advance

---

[1] *See* 8 U.S.C. § 118d(d)(5) (granting the Secretary the "discretion [to] parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit").

PRE-DECISIONAL/DELIBERATIVE

Nicaragua AR_000101

PRE-DECISIONAL/DELIBERATIVE

authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

A discretionary grant of parole would be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate nonetheless and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period would also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States as they do so. Those who are not granted asylum or other immigration benefits will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process would provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate it would: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere. The process would be capped at 24,000 Venezuelan beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

This memo includes information on the current conditions at the border; outlines the proposed process; details eligibility criteria and vetting mechanisms; further explains the significant public benefit and urgent humanitarian reasons that warrant temporary parole of covered individuals on a case-by-case basis; assesses possible alternatives; and recommends that you approve the policy and policy rationale identified in this memo.

## I.  Background

1. Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from

3

PRE-DECISIONAL/DELIBERATIVE

2011–2017.[2] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID-19 pandemic—continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America[3] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[4]

The most recent rise in the numbers of encounters at the border have been driven in significant part by a surge in migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. They increased again by almost four-fold in FY 2022, to an estimated 186,000 unique encounters—comprising 11 percent of all unique encounters in FY 2022. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, compared to a monthly average of 127 unique encounters from FY 2014–2019.[5] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three Northern Central American countries combined.[6]

---

[2] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[3] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[4] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[5] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[6] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

4

Nicaragua AR_000103

2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe, orderly, and humane migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to expel or remove Venezuelan nationals to Venezuela or elsewhere, as described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

*Factors pushing migration from Venezuela*

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[7]  Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[8]  In a February 2022 report, Amnesty International noted that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity."[9]  Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[10]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[11]  At least in the short-term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere. As described below, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

---

[7] UNHCR, Venezuela Situation, available at: https://www.unhcr.org/en-us/venezuela-emergency.html (last visited September 24, 2022)

[8] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, April 12, 2022, available at: https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/ (last visited September 24, 2022)

[9] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.11, Feb. 10, 2022, available at:
https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited September 25, 2022)

[10] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at:
https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited September 25, 2022)

[11] *Id.*

5

Nicaragua AR_000104

PRE-DECISIONAL/DELIBERATIVE

*Return Limitations*

There are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[12] But Venezuela does not allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally failed to accept Venezuelans as well. As a result, DHS was only able to repatriate 22 Venezuelan nationals to Venezuela in FY 2022.

*Overall Effect*

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly incentivized irregular migration. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of return flights, average daily encounters fell by 37 percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[13] Since then, encounters for both countries have fluctuated but remain well below the pre-August 4 numbers; in September 2022, encounters averaged 509 per day for Guatemala and 474 per day for Honduras.[14]

---

[12] *Louisiana v. CDC*, -- F. Supp. 3d --, 2022 WL 1604901 (W.D. La. May 20, 2022).

[13] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[14] OIS analysis of UIP data pulled October 6, 2022.

6

PRE-DECISIONAL/DELIBERATIVE

Nicaragua AR_000105

PRE-DECISIONAL/DELIBERATIVE

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1 – November 1, 2021



Note: Figure depicts 30-day average of daily encounters.
Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The proposed process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This proposal is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[15] Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

3. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022.

---

[15] OIS Persist Dataset based on data through August 31, 2022.

7

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program – Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in FY 2022 appropriations for SWB enforcement and processing capacities.[16]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[17] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), a ten-fold increase over the average for FY 2014 - FY 2019, primarily as a result of increases in Venezuelans and other non-traditional source countries.[18] The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22—September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[19] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[20] Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in

---

[16] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, April 26, 2022.
[17] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1 – 30, 2022.
[18] OIS analysis of OIS Persist Dataset through August 31, 2022.
[19] Data from SBCC, as of September 29, 2022.
[20] Data SBCC, as of September 29, 2022.

8

PRE-DECISIONAL/DELIBERATIVE

the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II.     Overview and Discussion of Proposed Venezuela Parole Process

This process would provide a streamlined way for individuals from Venezuela who are outside the United States to be considered, on a case-by-case basis, for advance authorization to travel to the United States and seek a temporary period of parole for up to two years for urgent humanitarian reasons and significant public benefit. Such individuals must have a supporter in the United States; pass robust national security and public safety vetting; meet other specified criteria; and warrant a favorable exercise of discretion. The following provides additional detail and analysis of the process's planned design.

*Supporters*: U.S.-based supporters will initiate an application on behalf of a Venezuelan national and, if applicable, their immediate family members. Supporters can be individuals filing on their own, with other individuals, or on behalf of entities. They must provide evidence of income and assets and declare their willingness to provide financial support to parolees for the length of parole. Supporters will be required to undergo vetting, including to identify potential human trafficking concerns.

*Beneficiaries*: To benefit from this process, Venezuelan nationals must be outside the United States; have a U.S.-based supporter who has agreed to provide financial assistance, as needed; possess a valid passport for international travel; provide for their own commercial travel to an air POE and final U.S. destination; pass required screening and vetting. They must comply with additional requirements including vaccination requirements and other public health guidelines identified by the DHS Chief Medical Officer following consultation with the CDC.

Venezuelan nationals are ineligible for this process if they have been ordered removed from the United States within the past five years or if they are subject to a bar based on a prior removal order;[21] have crossed without authorization into the United States between the POEs or have irregularly crossed the Mexican or Panamanian border after the date of the announcement. They are ineligible if they are a permanent resident or dual national of any country other than Venezuela, or currently hold refugee status in any country. Venezuelans who are currently in Mexico or Panama as of the date of the announcement, however, will be eligible if they meet all the other eligibility criteria.

Unaccompanied children (*i.e.*, children under 18 not traveling with a parent or legal guardian) are not eligible for this process.

*Beneficiary vetting*: Potential beneficiaries will be required to submit biographic and biometric information in the form of a live photograph in advance of travel. This information will be used for vetting by the National Targeting Center (NTC) and to inform classified vetting

---

[21] *See* Immigration and Nationality Act (INA) § 212(a)(9)(A), 8 U.S.C. § 1182(a)(9)(A).

9

Nicaragua AR_000108

support by national security partners leveraging the process and technology of the National Vetting Center (NVC).

Upon arrival at a POE, DHS will collect an additional photograph and fingerprints. This biometric information will support further vetting against available databases to inform an independent and case-by-case determination by CBP officers whether parole is warranted.

Beneficiaries also will be subject to continuous vetting throughout their period of parole. If derogatory information emerges during this continuous vetting, parole may be terminated and the noncitizen placed into removal proceedings.

*Online processing*: All touchpoints in the travel authorization and parole processes—for both supporters and potential beneficiaries up to their arrival at a POE—are accessible online. Potential beneficiaries can access and advance their case online from their home country or other third countries, including Mexico. Approved beneficiaries who pass all the requisite vetting may receive electronically an advance authorization to travel, allowing them to fly via commercial carrier into the United States and seek parole at a POE. Beneficiaries will be responsible for arranging and funding their own travel.

*Duration and Conditions of Parole*: If approved on a case-by-case basis at the port of entry, parole generally will be granted for a period of up to two years. Individuals who do not acquire another lawful means of remaining in the United States will be required to leave prior to the expiration of their parole. Those who overstay the grant of parole without acquiring a lawful means of remaining in the United States will be placed in removal proceedings. During this two-year period, the Department will continue to work to address the root causes of irregular migration, improve refugee processing and other safe, lawful, and orderly immigration processes, and increase removal options for Venezuelan nationals.

*Employment Authorization and Public Benefits*: Parolees will be eligible to apply for employment authorization for the duration of the parole.[22] USCIS anticipates that it will be able to adjudicate the majority of such applications within a few weeks after the application is filed.

Because of a combination of work authorization and the supporter requirement, DHS expects this population to require less in the way of emergency services, short-term shelter, or food bank resources than the population of Venezuelans currently encountered crossing the SWB, thus minimizing—and ultimately reducing—the burden on states and localities.[23]

---

[22] 8 C.F.R. § 274a.12(c)(11).

[23] *Id.* Venezuelans paroled for a period of one year or more are considered "Qualified Aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. *See generally, e.g.*, 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS

10

*Scale and Pace:* The process will be capped at 24,000 Venezuelan beneficiaries. DHS anticipates significant public interest in the process. If needed in order to better manage the processing workload and volume, DHS may cap throughput or travel authorization output to a fixed amount per day.

*Sunset/Renewal/Termination*: As described above, the process will be capped at 24,000 Venezuelan beneficiaries over a six-month time period. After this cap is reached, the process will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

### III.    Justification for Venezuela Parole Process

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[24] Parole is not an admission of the individual to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[25] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. DHS may terminate parole in its discretion at any time.[26] Under the current regulations, parolees may apply for and be granted employment authorization to work lawfully in the United States.[27]

*Significant Public Benefit*

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines new consequences for those who seek to enter the United States irregularly between POEs, with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple intersecting reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process could result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhancing border security and national security by vetting individuals

---

does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. Section 202(c)(2)(B), (d)(11) of the Real ID Act of 2005.

[24] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[25] INA §§ 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)A).

[26] *See* 8 C.F.R. § 212.5(e).

[27] *See* 8 C.F.R. § 274a.12(c)(11).

11

Nicaragua AR_000110

PRE-DECISIONAL/DELIBERATIVE

before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhance the security of our border by reducing irregular migration of Venezuelan nationals.

Implementation of the parole process is contingent on the GOM agreeing to accept the return of a significant number of Venezuelan nationals encountered at the SWB attempting to irregularly enter the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public health Order, these returns would take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal, who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico would impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a parole, this process will create a combination of incentives and disincentives that could lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

2. Enhance border security and national security by vetting individuals before they arrive at our border.

The Venezuelan parole process described above would allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to undertake this vetting *before* an individual arrives at the border so that we can stop individuals who could pose threats to national security or public safety threats from even crossing into the country.

12

Nicaragua AR_000111

As described above, the proposed vetting will require prospective beneficiaries to upload a live photograph via an app. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel *before* they arrive at our border. This is an improvement over the status quo.

3. Reduce the burden on DHS personnel and resources.

As already described, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through the streamlined process DHS is contemplating, we anticipate the process could relieve some of this burden. This could free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the proposed process would also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

4. Minimize the domestic impact.

The increased migratory flows have put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more provisional releases, the strains are shared by others as well. Given the inability to return or repatriate Venezuelans in substantial numbers, DHS is currently conditionally releasing 95 percent of the Venezuelan nationals it encounters at the border pending their removal proceedings or the initiation of such proceedings. Venezuelan nationals accounted for 27 percent of all encounters released at the border in September 2022.[28] Venezuelan nationals thus account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This

---

[28] OIS analysis of CBP book-out dispositions for September 1 – 27, 2022 based on CBP UIP data pulled September 28, 2022.
[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, September 21, 2022, available at:
https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office. (Last visited: September 29, 2022).

13

Nicaragua AR_000112

funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30]  Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32]  The proposed parole process would address these concerns by diverting flows of Venezuelan nationals to interior POEs through an orderly and lawful process.  DHS anticipates this will yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances.  They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support.  Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves.  We anticipate that this process will help reduce the burden on communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

5.  <u>Disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks.</u>

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34]  The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36]  Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since

---

[30] Lauren Villagran. El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. September 14, 2022, available at: https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/. (Last visited: September 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. September 20, 2022, available at: https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/. (Last visited September 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, September 23, 2022.

[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, September 23, 2022, available at: https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day, (Last visited: September 29, 2022).

[33] https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, September 7, 2022, available at: https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html, (Last visited: September 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

14

Nicaragua AR_000113

March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly vulnerable. Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that require immediate attention.[39] According to Panamá Migración, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migratory movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

The proposed process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

---

[37] Migrants risk death crossing treacherous Rio Grande river for 'American dream' | US-Mexico border | The Guardian https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream
[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.
[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., October 11, 2021, available at: https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us (last visited September 29, 2022).
[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá – Colombia 2022, available at: https://www.migracion.gob.pa/inicio/estadisticas
[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, April 26, 2022.
[42] Migrant truck crashes in Mexico killing 54, available at: https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R (last visited September 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X (last visited October 2, 2022)

15

Nicaragua AR_000114

6. Fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Signatory countries are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example. The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. According to the Venezuelan Ambassador to Costa Rica, 1,700 Venezuelan migrants were entering Costa Rica daily in the month of September 2022.[44] Colombia, Peru and Ecuador are now hosting almost 4 million displaced Venezuelans between them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of which are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[45] Unofficial accounts indicate Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

---

[43] L.A. Declaration
[44] The Department of State Cable, 22 San Jose 796
[45] The Department of State Cable, 22 Panama 624

16

PRE-DECISIONAL/DELIBERATIVE

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap, February – September 2022



Note: September figure is a preliminary estimate.
Source: Panama Migration Report, September 24, 2022

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and Panama, all of which are also affected by the increased movement of Venezuelan nationals—have been seeking greater action to address these challenging flows for some time. Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends that contribute to large populations of migrants, many of whom are Venezuelan, entering Mexico. These entries strain local governmental and civil society resources in Mexican border communities in both the south and north, and have at times led to violence, crime, and unsafe and unhealthy encampments.

The United States is already taking key steps to address some of these concerns. On June 10, 2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the U.S. Agency for International Development (USAID) announced $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.[46] And on September 22, 2022, PRM and USAID announced nearly $376 million in additional humanitarian assistance, which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed

---

[46] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at: https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela (last visited October 11, 2022).

17

PRE-DECISIONAL/DELIBERATIVE

Nicaragua AR_000116

PRE-DECISIONAL/DELIBERATIVE

assistance for migrants, refugees, and host communities across the region.  This funding will further address humanitarian needs in the region.[47]

The new process adds to these efforts and enables the United States to lead by example.  It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere.  It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them.  Costa Rica is developing plans to renew temporary protection for Venezuelans.  And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a two-year temporary residency visa.[48]  Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly across the SWB.  The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States.  As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—will require careful, deliberate, and regular assessment of GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration domestic and foreign policy priorities in the region.  It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve

---

[47] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, September 22, 2022, available at: https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela, (last visited September 30, 2022).

18

Nicaragua AR_000117

conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this proposed process would address the urgent humanitarian needs of many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without making a dangerous journey that puts them in the hands of smugglers.

## IV.     Consideration of changes to this process

1.  Length of parole and employment authorization

The proposed length of parole is up to two years. This is consistent with other parole processes, such as U4U for Ukrainian nationals and their qualifying immediate family members, Operation Allies Welcome for Afghan nationals, and the Cuban Family Reunification Parole Program established in 2007. A two-year period of parole would provide significant public benefit and meets the urgent humanitarian needs of Venezuelan nationals are seeking entry into the United States, for the following reasons:

*First*, the period of parole needs to be sufficiently long to make it an attractive alternative to the status quo, in which migrants put their lives in smugglers' hands to enter the country irregularly. DHS believes that a period of two years achieves that goal. It allows beneficiaries to gain work authorization and contribute to the U.S. economy, and achieve stability and predictability in their lives, even if temporarily.

*Second*, a two-year period of parole provides eligible beneficiaries sufficient time to pursue a durable immigration status or benefit under the law. Some Venezuelan beneficiaries may qualify for asylum, while others may qualify for adjustment of status based on the availability of a family- or employment-based immigrant visa.

*Third*, a two-year time period provides a meaningful amount of time for the United States government, in conjunction with foreign partners, to continue its ongoing work to help address the root causes of migration, including the humanitarian and economic conditions in the region that are spurring a large migratory flow. For similar reasons, a two-year time period also provides a window for the U.S. Government to work with Venezuela to increasingly accept the return of Venezuelan nationals who are subject to a final order of removal. Finally, this two-year period will provide meaningful time to fully develop the multi-prong, regional strategy to address migration in our region, including improving refugee processing and other lawful immigration pathways, both for the United States and to other partner nations.

19

2.   Supporter Issues

DHS has learned of certain instances in which U4U supporters, including family members, have ceased providing housing and other support for parolees prior to the end of their parole period.  DHS has learned from the U4U experience and is making form changes and associated vetting enhancements to improve confirmation of supporter suitability, clarify guidance on minimum supporter requirements, and communicate to beneficiaries about what rights, protections and benefits may be available if they are a victim of exploitation and other forms of abuse.  This is intended to further reduce the risk that supporters do not follow through on their obligations; it is also intended to address risks of human trafficking, and other forms of abuse and exploitation.

This is particularly important because human smuggling and trafficking, including forced labor, is a major concern in this region.[49]  While such risks cannot be completely mitigated, this parole process is being structured to address these risks to the greatest extent possible.  The process—with the reviews and vetting in place—poses a significantly lower risk of exploitation than the dangerous journey to the SWB.  As described above, all migrants, but particularly women and children, are susceptible to the risk of kidnapping, exploitation, sexual abuse, and human trafficking along smuggling routes.[50]  A significant portion of such migrants pay smugglers exorbitant fees, thus enriching and supporting the smuggling organizations.  Almost all, if not all, are required to pay compulsory fees and taxes by criminal organizations at different points along their journey North.  We thus assess that the parole of individuals pursuant to this process, even if we cannot completely mitigate the risk of exploitation, will meaningfully serve the significant public benefit of decreasing reliance on smuggling networks and protecting individuals from trafficking and exploitation.

3.   Eligibility Criteria

DHS has separately considered whether it should further focus eligibility only on beneficiaries who may have vulnerabilities or other compelling circumstances.  We have ultimately concluded that such a requirement is not preferable for a combination of operational and substantive reasons.

*First*, it would be very difficult to implement an objective and fair screening mechanism.  For instance, any such vulnerability screening would require a process for triaging potential beneficiaries and identifying those who are more vulnerable.  To be effective, it would require third parties—likely international NGOs—to play a role in the screening.  However, DHS lacks authority to fund such screening outside the United States.  Such a screening requirement also would substantially delay the implementation of this new process, in that it would require the creation of infrastructure and deployment of personnel that currently are not in place.

---

[49] 2022 Trafficking in Persons Report, available at: https://www.state.gov/reports/2022-trafficking-in-persons-report/ (last visited September 30, 2022).
[50] *Id.* at 386.

20

*Second*, imposition of a vulnerability screening requirement would fail to meet the foreign policy goals of providing an alternative option for a broader swath of Venezuelan nationals who would otherwise make the dangerous journey to the U.S.-Mexico border. Because only a subset would likely meet vulnerability criteria (particularly if there is a high standard for establishing vulnerability), the parole process might not be deemed a viable alternative to irregularly crossing and entry; it would, as a result, fail to serve the disincentive to irregular migration this process seeks to achieve.

For these reasons, DHS determined that keeping eligibility at the nationality level—like U4U—is the best option to achieving the multiple goals of reducing flows to the border, responding to the foreign policy requests of partner nations, and providing protections to deserving Venezuelan nationals.

## V.    Consideration of alternative approaches

DHS has considered several alternative approaches to managing the current surge in migration from Venezuela. These alternative approaches are weighed based on the following key goals, as identified above: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

1. <u>Status quo</u>

First, DHS considered the impact of keeping the status quo, which has resulted in record encounters at the SWB driven by a surge in migration by Venezuelan nationals. Venezuelans account for an estimated 186,000 unique encounters in FY 2022, up from 47,328 unique encounters in FY 2021, an increase of 293 percent. Venezuelans alone account for 22 percent of the total growth in unique encounters between 2021 and 2022.[51]

Importantly, DHS anticipates that encounters of Venezuelan nationals at the border are likely to continue to increase in the coming weeks and months. As noted above, Panama has seen a 30-fold increase of Venezuelan nationals crossing irregularly into its territory from Colombia over the past six months, with more than 12,700 entering irregularly during the week ending October 1, 2022. And, as noted above, Panama is currently encountering more than 3,000 people, mostly Venezuelans, entering from Colombia through the Darién Gap each day. This sharp increase shows no signs of abating absent material changes such as those proposed here.

---

[51] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data through September 30, 2022.

21

Nicaragua AR_000120

PRE-DECISIONAL/DELIBERATIVE

As described above, the current surge in Venezuelan migration has forced DHS to reallocate resources and personnel to the SWB. Although DHS will continue to use all available resources to enforce the immigration laws of the United States and secure our borders, maintaining this level of emergency supplemental appropriations and TDY staffing to support SWB operations is simply not sustainable in the long term.

For these reasons, DHS has concluded that maintaining the status quo is not an option.

2.   Increased enforcement by third countries

DHS considered whether there is more that could be done to diplomatically influence other foreign partners in the region to do more to address these irregular migratory flows. However, we have already been engaging at the highest levels of government with these countries and many have extended themselves in historic ways with limited results. The bottom line is that our foreign partners in the region have seen record movements of migrants that far outstrip their capacity to process and provide protection, and they simply do not have the capability to meaningfully impact these flows in the immediate term, as is needed.

Simply pressing foreign partners to do more—without also taking steps to provide a lawful process for entry to the United States that can meaningfully shift incentives against irregular migration—will not achieve the desired goals of this process.

3.   Increasing removals to home countries

As noted above, DHS data shows that increases in returns of individuals from a given country can reduce encounters at the border over time. For example, increases in returns to Guatemala, Honduras, and El Salvador from the United States and Mexico over the past year have led to a sustained decrease in encounters at the border.

DHS considered whether more could be done in the immediate term to increase returns of Venezuelans to Venezuela. However, that is currently not a viable option given the current status of diplomatic relations with Venezuela.

As stated above, DHS intends to continue to work to address root causes, including the political instability and repression that have led to difficulties in returning Venezuelans to Venezuela. That, however, will require time and is not a viable option to meet immediate needs.

4.   Utilizing contiguous territory return authority

DHS considered whether resuming and greatly scaling up the return of Venezuela individuals to Mexico under section 235(b)(2)(C) of the INA, either by restarting the Migrant Protection Protocols (MPP) or via another programmatic use of the authority, would have a similar effect to the proposed process. Notably, the contiguous territory return authority that was used to implement MPP can only be used with individuals "pending a proceeding" under INA § 240— meaning that any individual returned to Mexico under this authority would need to be placed in

22

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

full removal proceedings, in the United States, and continue to come in and out of the United States for court hearings. DHS has concluded that this is not a feasible or preferred option for the following key reasons:

*First*, it would not necessarily diminish the strains at the border and could potentially exacerbate them. Moreover, those enrolled in MPP need to periodically enter the United States for their court hearings and then return to Mexico afterwards. The need to process these individuals each they time for their court hearings, and maintain custody of them while they are in the United States, adds to the strain on already stretched resources along the SWB.

By contrast, the parole process DHS is proposing is specifically designed to provide significant incentives for Venezuelan nationals to apply to travel to the United States from where they are situated, and to incentivize them not to travel to Mexico in the first instance. Venezuelan nationals who are in Mexico as of the day of the announcement would also have no need to travel to, or congregate along, the SWB.

*Second,* the application of MPP generally results in concentrating individuals close to the border, in some of the most dangerous parts of Mexico. This is because individuals who are enrolled in MPP must remain proximate to the border so that they can travel to and from their court hearings—creating significant humanitarian concerns.[52] In previously considering whether to continue MPP, the Secretary ultimately concluded that the "substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico" outweighed any potential gain in terms of reduced migratory flows.[53] The recent court-ordered reimplementation of MPP confirmed these concerns, as individuals were subject to kidnappings, rapes, and other targeted violence.[54]

*Third,* it is operationally infeasible. Even at its height in August 2019, only 12,000 individuals per month were enrolled in the MPP program, or roughly 400 a day. This is considerably less than the more than 1,200 Venezuelan nationals currently being encountered at the border daily. To employ the contiguous return authority at scale, the United States would need to build and develop a massive amount of infrastructure for noncitizens to be processed in and out of the United States throughout the duration of their removal proceedings. This would require, among other things, the construction of additional court capacity along the border, additional funding for transportation and security contracts, additional immigration judges and ICE prosecutors to conduct the hearings, and more CBP personnel to receive and process those who are coming into and out of the country to attend court. The number of resources needed to put

---

[52] Robbie Whelan. *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program.* Wall Street Journal. December 28, 2019. Available at: https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000

[53] *See* Memorandum from Secretary Mayorkas to ICE Director Tae D. Johnson et al re Termination of the Migrant Protection Protocols at 2 (Oct. 29, 2021); *see also* DHS, Explanation of the Decision to Terminate the Migrant Protection Protocols (Oct. 29, 2021).

[54] Human Rights First. *New Report Documents Devastating Toll of Court-Ordered Reimplementation of Remain in Mexico.* September 15, 2022. Available at https://humanrightsfirst.org/library/new-report-documents-devastating-toll-of-court-ordered-reimplementation-of-remain-in-mexico/.

23

Nicaragua AR_000122

PRE-DECISIONAL/DELIBERATIVE

in place a program at the scale needed to address the current flows, and with the appropriate humanitarian protections, is simply not operationally feasible.

*Fourth,* implementation of MPP requires Mexico's unilateral concurrence and support—something that is unlikely at scale. When the Department was under a court-ordered obligation to re-implement MPP, Mexico only agreed to accept the return of a small number of MPP enrollees, consistent with available shelter capacity in specific regions. Even those limited returns had to be paused on a number of occasions due to security concerns raised by Mexico or a lack of shelter capacity.

5. Increasing the use of detention for Venezuelan nationals

DHS considered whether it could detain all or most Venezuelan nationals instead of conditionally releasing them, and thus deter flows and avoid some of the impact in border communities as a result. There are, however, legal and operational limits in the ability to do so.

*First,* there are legal limits on the duration of detention for those ordered removed and who—like the Venezuelan nationals—do not have a significant likelihood of removal in the foreseeable future. Specifically, the U.S. Supreme Court's ruling in *Zadvydas v. Davis* restricts DHS from detaining individuals with final orders of removal for more than 180 days unless there is a significant likelihood of removal in the reasonably foreseeable future.[55]

*Second,* it is not a viable option operationally. Even if ICE diverted all of its detention space to focus on Venezuelan nationals, it would reach its detention capacity in three weeks. Doing so would, however, mean that ICE would no longer have space to detain those put in expedited removal who *could* be removed to their home countries. It would mean releasing others, some of whom may be deemed national security and public safety threats, in contradiction of both statutory mandates and the common-sense policy decision to focus detention space on those who pose a threat to public safety. For these reasons, DHS assesses that addressing the problem by detaining large numbers of Venezuelan nationals is not a viable option at this time.

6. Increasing other lawful pathways to the United States and other countries

DHS could focus *only* on the lawful pathways, including protection processes, that are already in place and have been already announced. As part of these efforts to meet the deliverables outlined in the L.A. Declaration, the U.S. Government committed during the Summit of the Americas in June 2022 to resettle 20,000 refugees from the Western Hemisphere in FY 2023. The U.S. Government also committed to increasing immigrant visa adjudications.[56] However, those alternative processes are narrow and in many cases difficult to access.

---

[55] *Zadvydas v. Davis*, 533 U.S. 678 (2001).
[56] Fact Sheet: The Los Angeles Declaration.

24

A key feature of this new process that differentiates it from other processes and programs—and that we deem critical to meet the current moment—is that it is intended to be fully virtual and accessible from anywhere. We thus assess that existing programs are unlikely to provide a sufficiently available and attractive incentive to impact the flows from Venezuela today—and that regional efforts to improve lawful pathways, while critically important, will not be sufficiently timely to address the immediate needs. We thus assess a need to implement the process being considered in order to provide the incentive to wait, rather than make the dangerous journey to the border that we are trying to deter.

## VI.   Administrative Procedure Act

This proposal is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[57] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[58]

*Second*, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[59] In addition, although under the Administrative Procedure Act, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[60] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Venezuelan nationals to enter the United States. The United States will not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly across the SWB to Mexico, and the United States ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is

---

[57] 5 U.S.C. § 553(b)(A).

[58] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

[59] 5 U.S.C. § 553(a)(1).

[60] *See, e.g., Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

25

Nicaragua AR_000124

prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. In 2017, for example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[61]

*Third*, DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[62] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of the proposed process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

---

[61] *See* 82 FR 4902 (January 17, 2017).
[62] *See* 5 U.S.C. § 553(b)(B).

26

Nicaragua AR_000125

**Recommendation**

Given the immediate challenge we face along the SWB as described in this memo, and the time it will take for the long-term administration strategy to produce durable and lasting results to irregular migration, we recommend the immediate and temporary approach described in this memo to address the current challenge as we await results from the long term, durable approach. Therefore, we recommend that you approve this memo in full, including the proposed parole process for Venezuelan nationals and the accompanying rationale.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

Approve/d██████████████████████████████approve/date _____

Modify/date _____    Needs discussion/date _____

PRE-DECISIONAL/DELIBERATIVE

U.S. Department of Homeland Security
Washington, DC 20528



December 22, 2022

**ACTION**

**MEMORANDUM FOR THE SECRETARY**

**FROM:**          Robert Silvers                          ROBERT P     Digitally signed by
                   Under Secretary                         SILVERS      ROBERT P SILVERS
                   Office of Strategy, Policy, and Plans                 Date: 2022.12.22
                                                                         18:03:06 -05'00'

                   Troy Miller                             TROY A       Digitally signed
                   Acting Commissioner                     MILLER       by TROY A MILLER
                   U.S. Customs and Border Protection                   Date: 2022.12.22
                                                                        19:36:20 -05'00'

                   Ur M. Jaddou                            UR M         Digitally signed
                   Director                                JADDOU       by UR M JADDOU
                   U.S. Citizenship and Immigration Services            Date: 2022.12.22
                                                                        18:37:08 -05'00'

**SUBJECT:**       **Parole Process for Certain Nicaraguan Nationals**

**I. Summary**

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges
posed by irregular migration. This long-term strategy—a shared endeavor with partner
nations—focuses on addressing the root causes of migration, which are currently fueling
unprecedented levels of irregular migration, and on creating safe, orderly, and humane processes
for migrants seeking protection throughout the region. This includes domestic efforts to expand
processing capacity and multinational collaboration to prosecute migrant smuggling and human
trafficking criminal organizations as well as their facilitators and money laundering networks.
While this strategy shows great promise, it will take time to fully implement. In the interim, we
need to take immediate steps to provide safe, orderly pathways for the large numbers of
individuals seeking to access the United States, and to disincentivize such individuals from
taking the dangerous journey to and arriving, without authorization, at the southwest border
(SWB).

Building on the success of the migration enforcement process for Venezuelans, DHS is
proposing to implement a similar process to address the increasing number of encounters of
Nicaraguan nationals at the SWB, which have reached record levels over the past six months.
Similar to Venezuela, Nicaragua has restricted DHS's ability to remove individuals to Nicaragua,
which has constrained the Department's ability to respond to this surge.

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[1]  Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make a dangerous journey to the SWB.  Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process.  Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2]  It also has led to a precipitous decline in Venezuelan irregular migration throughout the Western Hemisphere.  The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October to just 668 in November.[3]

DHS anticipates that implementing a similar process for Nicaraguans would reduce the number of Nicaraguans seeking to irregularly enter the United States between POEs along the SWB, by coupling a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process.  Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.  Implementation of the new parole process for Nicaraguans will be contingent on the GOM accepting the return, departure, or removal to Mexico of Nicaraguan nationals seeking to irregularly enter the United States between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States would be required to initiate the application, apply on behalf of a Nicaraguan national (and certain non-Nicaraguan nationals who are immediate family members of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Nicaraguan nationals would be required to meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole.  Individuals would be ineligible if they:

    1)  have been ordered removed from the United States within the prior five years;

---

[1] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).
[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.
[3] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEM BRE_2022.pdf (last viewed Dec. 11, 2022).

2

PRE-DECISIONAL/DELIBERATIVE

2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: such individuals may be permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;

3) have entered Mexico or Panama without authorization after the date of the announcement; or

4) are a permanent resident or dual national of any country or hold refugee status in any country other than Nicaragua, unless DHS operates a similar parole process for the country's nationals.

Only those who meet all specified criteria would be eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel to seek entry at an interior port of entry.

A grant of parole under this process would be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and to allow for increased removals of Nicaraguans from both the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period would also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally would be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Nicaraguan nationals pursuant to this process would provide a significant public benefit for the United States, by reducing unauthorized entries along our SWB, while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Nicaraguans to flee their home country, to include widespread and violent repression and human rights violations by the Ortega regime. Most significantly, DHS anticipates this process would: (i) enhance the security of the U.S. SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary would retain the sole discretion to terminate the process at any point. The number of travel authorizations granted under this process would be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole

3

PRE-DECISIONAL/DELIBERATIVE

Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month. Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memo describes the current conditions at the border; the measurable impact of the process for Venezuelans; the parameters of the proposed process for Nicaraguans, including eligibility criteria and vetting mechanisms, and the significant public benefit and urgent humanitarian reasons that warrant temporary parole of covered individuals on a case-by-case basis; assesses possible alternatives; and recommends approval of the policy and policy rationale identified in this memo.

**II. Background and Rationale**

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[4] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[5] Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[6]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and

---

[4] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[5] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[6] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEM BRE_2022.pdf (last viewed Dec. 11, 2022).

4

PRE-DECISIONAL/DELIBERATIVE

Panama, as well as civil society.[7]  Other migrants who were about to enter the Darién Gap turned around and headed back south.[8]  And still others who were intending to migrate north are staying where they were to apply for this parole process.[9]  Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change of migratory flows.

2.  Increase of Nicaraguan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered.  Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[10]  By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[11]  However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID-19 pandemic—continued to increase at a similar pace in 2021 and 2022.[12]

Shifts in demographics have also had a significant effect on migration flows.  Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[13]  Beginning in the 2010s, a growing share of migrants have come from Northern Central America[14] (NCA) and, since the late 2010s, from countries throughout the Americas.[15]  Migrant populations from these newer source countries have

---

[7] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama*, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/, Nov. 9 2022 (last viewed Dec. 8, 2022).

[8] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route*, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[9] Axios, *Biden's new border policy throws Venezuelan migrants into limbo*, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap, Nov. 7 2022 (last viewed Dec. 8, 2022).

[10] OIS analysis of historic CBP data.

[11] *Id*

[12] *Id*.

[13] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518-536.

[14] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[15] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3

5

PRE-DECISIONAL/DELIBERATIVE

included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[16]

*Trends in Migration of Nicaraguans*

Historically, Nicaraguans migrated south to Costa Rica, resulting in relatively few Nicaraguan encounters at the U.S. Southwest Border.[17]  Consistent with this trend, the number of Nicaraguans seeking asylum in Costa Rica has grown rapidly in recent years, putting immense pressure on the country's asylum system, and causing many asylum seekers to wait years for an initial interview.[18]  According to United Nations High Commissioner for Refugees (UNHCR), as of February 2022, "more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined, during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence."[19]  According to international organization estimates, Costa Rica is home to an estimated 500,000 – 600,000 Nicaraguan migrants, while Costa Rican officials estimate the number is over 1 million.[20]  The Government of Costa Rica recently announced its intention to regularize the status of more than 200,000 Nicaraguan migrants and asylum seekers providing them with access to jobs and healthcare as part of the process.[21]

Despite Costa Rica's efforts, increasing numbers of Nicaraguans are traveling north to the SWB due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica.  As a result, the U.S. and Mexico are seeing surges in migration from Nicaragua, with Nicaraguans claiming asylum in Mexico at three times the rate this year than the previous year and with a surge in

---

percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014 – FY 2019, the last full year before the start of the COVID-19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010 – FY 2013, and for 10 percent of total encounters in FY 2014 – FY 2019.

[16] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[17] AP News, *Fleeing Nicaraguans Strain Costa Rica's Asylum System,* Sept. 2, 2022, https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5, (last viewed Dec. 17, 2022).

[18] *Id.*

[19] UNHCR, '*Sharp rise' in Nicaraguans fleeing to Costa Rica, strains asylum system*, March 25, 2022, https://news.un.org/en/story/2022/03/1114792, (last viewed December 9, 2022).

[20] The Department of State Cable, 22 San Jose 4796.

[21] Reuters, *Costa Rica prepares plan to regularize status of 200,000 mostly Nicaraguan migrants*, Aug. 10, 2022, https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/, (last viewed Dec. 4, 2022).

Nicaragua AR_000132

PRE-DECISIONAL/DELIBERATIVE

migration having significantly contribute to the rising number of encounters at the SWB. [22] Unique encounters of Nicaraguan nationals increased throughout fiscal year (FY) 2021, totaling 47,300, and increased further—and sharply—in FY 2022.[23] DHS encountered an estimated 157,400 unique Nicaraguan nationals in FY 2022, which comprised nine percent of all unique encounters and was the fourth largest origin group.[24] Between FY 2021 and FY 2022, unique encounters of Nicaraguan nationals rose 232 percent while unique encounters of all other nationalities combined increased just 47 percent.[25] FY 2022 average unique monthly encounters of Nicaraguan nationals at the land border totaled 13,113 as opposed to an average monthly rate of 316 encounters in FYs 2014—2019, a 41-fold increase.[26]

These trends thus far are only accelerating in FY 2023. In October and November of this year, DHS has encountered 51,000 Nicaraguan nationals at the border—nearly one third of the record total of Nicaraguan encounters in FY 2022.[27]

  3.  <u>Push and Pull Factors</u>

DHS assesses that the high—and rising—number of Nicaraguan nationals encountered at the SWB is driven by two key factors: First, a confluence of political, economic, and humanitarian crises in Nicaragua—exacerbated by the widespread and violent crackdown on democratic freedoms by the Ortega regime and the government's numerous human rights violations against its own population—are causing thousands to leave the country. This is compounded by the fact that increasingly sophisticated human smugglers often target migrants in such circumstances to offer them a facilitated opportunity to travel to the U.S. – at a cost. Second, the United States faces significant limits on the ability to remove Nicaraguan nationals who do not establish a legal basis to remain in the United States to Nicaragua or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

*Factors pushing migration from Nicaragua*

Current political, economic, and humanitarian crises in Nicaragua are driving migration of Nicaraguans throughout the hemisphere as well as to our border.[28] As conditions have

---

[22] UNHCR, *Number of displaced Nicaraguans in Costa Rica doubles in less than a year*, Mar. 25, 2022, https://www.unhcr.org/news/briefing/2022/3/623d894c4/number-displaced-nicaraguans-costa-rica-doubles-year.html, (last viewed Dec. 7, 2022).

[23] OIS analysis of OIS Persist Dataset based on data through October 31, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[24] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[25] *Id.*

[26] *Id.*

[27] *Id.*, and OIS analysis of UIP CBP data pulled on November 28, 2022.

[28] Voice of America, *With Turmoil at Home, More Nicaraguans Flee to the US*, July 29, 2021, https://www.voanews.com/a/americas_turmoil-home-more-nicaraguans-flee-us/6208907.html.

7

PRE-DECISIONAL/DELIBERATIVE

deteriorated there due to this confluence of factors, the Government of Nicaragua has shown little tolerance for those who openly criticize their regime and moves swiftly to brazenly silence dissent.[29]

Since 2007, Daniel Ortega and his party, the Sandinista National Liberation Front (FSLN), have gradually consolidated control over the country's institutions and society, including by eliminating presidential term limits.[30]  Human Rights Watch (HRW) reported in July 2022 that "Since taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary."[31]  According to the Inter-American Commission on Human Rights (IACHR), this consolidation of power in the executive "has facilitated Nicaragua's transformation into a police state in which the executive branch has instituted a regime of terror and of suppression of all freedoms . . . supported by the other branches of government."[32]  The IACHR reported in June 2022 that "the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua,"[33] and that as of late September, "more than 2000 organizations of civil society – linked to political parties, academic, and religious spaces – have been cancelled" since April 2018.[34]  Further, HRW reported that the shutting down of non-governmental organizations in Nicaragua "is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation, intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists."[35]

Since early 2021, the IACHR has observed the escalation of repression by the Nicaraguan government, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held.[36]  In December 2021, the IACHR expressed its concern "about the increasing number of people who have been forced to

---

[29] Los Angeles Times, *Sandinistas Complete Their Political Domination of Nicaragua Following Local Elections*, Nov. 8, 2022, https://www.latimes.com/world-nation/story/2022-11-08/sandinistas-complete-political-domination-nicaragua-local-elections.

[30] Reuters, *Ortega's Path to Run for Fourth Straight Re-election as Nicaraguan President*, Nov. 3, 2021, https://www.reuters.com/world/americas/ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/.

[31] Office of the United Nations High Commissioner for Human Rights (OHCHR), *Human Rights Situation in Nicaragua*, 2, (Sep. 2, 2022, https://reliefweb.int/report/nicaragua/human-rights-situation-nicaragua-report-united-nations-high-commissioner-human-rights-ahrc5142-unofficial-english-translation.

[32] Inter-American Commission On Human Rights, *Nicaragua: Concentration of Power and the Undermining of the Rule of Law*, OEA/Ser.L/V/II, Doc. 288, 65, Oct. 25, 2021, https://www.oas.org/en/iachr/reports/pdfs/2021_nicaragua-en.pdf.

[33] Inter-American Commission on Human Rights (IACHR), *Annual Report 2021*, Chapter IV.B – Nicaragua, 775, Jun. 2, 2022, https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.

[34] IACHR, *In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms*, Sep. 28, 2022, https://www.oas.org/en/iachr/expression/showarticle.asp?lID=1&artID=1257

[35] Human Rights Watch, *Nicaragua: Government Dismantles Civil Society*, Jul. 19, 2022, https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society.

[36] IACHR, *Annual Report 2021*, Chapter IV.B – Nicaragua, 775 (Jun. 2, 2022), https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.

8

PRE-DECISIONAL/DELIBERATIVE

flee Nicaragua and to request international protection in the context of the ongoing serious human rights crisis in the country."[37]  In August 2022, Ortega had a bishop, five priests, and two seminarians arrested, claiming that the bishop "persisted in destabilizing and provocative activities."[38]  Prior to the November 2022 municipalities election, the government closed 200 nongovernmental groups and over 50 media outlets.[39]

Exacerbated by political repression, Nicaragua is one of the poorest countries in Latin America. According to the World Bank, Nicaragua's gross domestic product (GDP) per capita in 2021 was only $2,090.80, the second lowest in the region above Haiti.[40]  According to the World Food Program, almost 30 percent of Nicaraguan families live in poverty in the country, "over 8 percent struggle in extreme poverty, surviving on less than $1.25 daily", and "17 percent of children aged under five suffer from chronic malnutrition.[41]  Migrants often seek economic opportunities to be able to support their families that remain in Nicaragua.  Remittances from the United States to Nicaragua from January—September 2022 have surpassed the total remittances sent in all of 2021.[42]

According to the UNHCR, approximately 200,000 Nicaraguans have sought international protection worldwide.[43]  More than 100,000 filed asylum applications in 2021; this is a five-fold increase from 2020.[44]  Daniel Ortega's repressive policies, coupled with widespread poverty, have pushed thousands of Nicaraguans to seek humanitarian relief in the Western Hemisphere, including increasingly in the United States.

Human smugglers often target vulnerable populations who face the types of circumstances that Nicaraguans face, such as repression and lack of economic opportunity.  Smugglers' increasingly sophisticated use of social media increases their ability to reach vulnerable migrants, advertise services, and fuel misinformation designed to encourage migrants to take a dangerous journey

---

[37] IACHR, *IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua,* Dec. 20, 2021,
http://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/346.asp.
[38] The Washington Post, *Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent,* Aug. 19, 2022,
https://www.washingtonpost.com/world/2022/08/19/nicaragua-bishop-rolando-alvarez-arrest-ortega/.
[39] Politico, *Sandinistas Complete Their Political Domination of Nicaragua,* Nov. 8, 2022,
https://www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603.
[40] The World Bank, *GDP per Capita (Current US$) – Latin America & Caribbean, Nicaragua,*
https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=ZJ-NI&most_recent_value_desc=false (last visited Dec. 6, 2022).
[41] World Food Programme, *Nicaragua,* https://www.wfp.org/countries/nicaragua (last visited: Sept. 26, 2022)
[42] Banco Central De Nicaragua, *Remesas Por País de Origen,*
https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm, (last visited Dec. 6, 2022).
[43] UNHCR USA, *Displacement in Central America,* https://www.unhcr.org/en-us/displacement-in-central-america.html.
[44] UNHCR, *2021 Global Trends Report,* June 16, 2022, https://www.unhcr.org/62a9d1494/global-trends-report-2021.

9

PRE-DECISIONAL/DELIBERATIVE

north.[45]  The U.S. economy's historic recovery from the pandemic[46] and strong labor market provide additional incentive to migrate.[47]  Interviews with migrants encountered along the SWB indicate that economic opportunity, violence, and perceptions of U.S. policy underscored the decision to leave their home.[48]

*Return Limitations*

The Government of Nicaragua is not accepting returns or removals of their nationals at a volume that allows the U.S. to effectively manage the number of encounters of Nicaraguans by the United States.  Additionally, the GOM has generally not allowed returns of Nicaraguan nationals pursuant to Title 42 authorities, or their removal from the United States pursuant to Title 8 authorities.[49]  Other countries have similarly refused to accept Title 8 removals of Nicaraguan nationals.

For the United States, the Government of Nicaragua permits one charter removal flight every other week of up to 135 individuals per flight, which allows DHS to remove a small fraction of the Nicaraguan migrants it currently encounters and who do not have a legal basis to remain in the United States.  In FY 2022, DHS repatriated 12 Nicaraguans encountered at the SWB, and expelled 4,148 (a total of 4,160) Nicaraguans encountered at the SWB.[50]  This is equivalent to 3 percent of Nicaraguan encounters during the same period.[51]  DHS, in coordination with the Department of State, has repeatedly engaged with the Government of Nicaragua to increase the permitted cadence of flights but has so far not been successful.

Returns alone, however, are not sufficient.  The proposed process seeks to *combine* a consequence for Nicaraguan nationals who seek to enter the United States irregularly at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to and seek parole into enter the United States, without making the dangerous journey to the border.

4.  Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Nicaraguan nationals encountered—

---

[45] (U/SBU) DHS Office of Intelligence and Analysis, *Human Smuggler Using Social Media to Broaden Access to Illicit Pathways in the United States*, June 6, 2022.
[46] U.S. Department of the Treasury, *The U.S. Economic Recovery in International Context*, June 8, 2022, https://home.treasury.gov/news/featured-stories/the-us-economic-recovery-in-international-context.
[47] CNN Business, *US economy added a robust 263,000 jobs in November*, Dec. 2, 2022, https://www.cnn.com/2022/12/02/economy/november-jobs-report/index.html.
[48] (U/LES) DHS Migration Indications and Warning Cell Update Dec. 14, 2022.
[49] There are some limited exceptions to this prohibition, including Nicaraguan nationals that have Mexican family members.
[50] OIS analysis of CBP subject-level data through October 31, 2022.
[51] OIS analysis of OIS Persist Dataset and CBP subject-level data based on data through October 31, 2022.

10

PRE-DECISIONAL/DELIBERATIVE

DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program – Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[52]

The impact has been particularly acute in certain border sectors. The increased flows of Nicaraguan nationals are disproportionately occurring within the remote Del Rio and Rio Grande Valley sectors, all of which are at risk of operating, or are currently operating, over capacity.[53] In FY 2022, 80 percent of unique encounters of Nicaraguan nationals occurred in these two sectors.[54] There have also been a growing number of encounters in El Paso sector since September 2022. In FY 2023, Del Rio, El Paso, and Rio Grande Valley sectors have accounted for 88 percent of encounters of Nicaraguan nationals.[55] In FY 2022, Del Rio sector encountered almost double (85 percent increase) the number of migrants as compared to FY 2021. Driven in part by the sharp increase in Nicaraguan nationals being encountered in this sector, this was an eighteen-fold increase over the average for FY 2014—FY 2019.[56]

The focused increase in encounters within those three sectors is particularly challenging. Del Rio sector is geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering irregularly, has limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, U.S. Border Patrol (USBP) sectors along the SWB

---

[52] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[53] OIS analysis of data pulled from CBP UIP December 7, 2022.

[54] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[55] *Id.*, and CBP UIP data for November 1–27 pulled on November 28, 2022.

[56] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

11