PRE-DECISIONAL/DELIBERATIVE

operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[57]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to remove Nicaraguans and other populations by sending the message that there is no consequence for illegal entry. DHS assesses that a reduction in the flow of Nicaraguan nationals arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

**III. Overview and Discussion of Proposed Nicaraguan Parole Process**

Like the Venezuelan process, this proposed Nicaraguan parole process would provide a streamlined way for individuals from Nicaragua who are outside the United States to be considered, on a case-by-case basis, for advance authorization to travel to the United States and to seek a temporary period of parole for up to two years for significant public benefit and urgent humanitarian reasons, provided that they have a supporter in the United States, pass robust national security and public safety vetting, meet other specified criteria, and warrant a favorable exercise of discretion. The following provides additional detail and analysis of the process's proposed design.

*Supporters*: U.S.-based supporters would initiate an application on behalf of a Nicaraguan national and, if applicable, the national's immediate family members. Supporters could be individuals filing on their own, with other individuals, or on behalf of entities. They would be required to provide evidence of income and assets and declare their willingness to provide financial support to parolees for the length of parole. Supporters would be required to undergo vetting, including to identify potential human trafficking concerns.

*Beneficiaries*: To benefit from this process, Nicaraguan nationals would need to be outside the United States; have a U.S.-based supporter who has agreed to provide financial assistance, as needed; possess a valid passport for international travel; provide for their own commercial travel to an interior POE and final U.S. destination; pass required screening and vetting; and comply with all additional requirements, including vaccination requirements and other public health guidelines identified by the DHS Chief Medical Officer following consultation with the Centers for Disease Control and Prevention (CDC).

Nicaraguan nationals would be ineligible for this process if they;
    1) have been ordered removed from the United States within the prior five years;

---

[57] Data from SBCC, as of December 11, 2022.

12

PRE-DECISIONAL/DELIBERATIVE

2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: individuals may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;

3) have entered Mexico or Panama without authorization after the date of the announcement; or

4) are a permanent resident or dual national of any country or hold refugee status in any country other than Nicaragua, unless DHS operates a similar parole process for the country's nationals.

Unaccompanied children (i.e., children under 18 not traveling with a parent or legal guardian) would not be eligible for this process.

*Beneficiary vetting*:  Potential beneficiaries would be required to submit biographic and biometric information—in the form of a live photograph—in advance of travel.  This information would be used for vetting by the National Targeting Center (NTC) and to inform classified vetting support by national security partners leveraging the process and technology of the National Vetting Center (NVC).

Upon arrival at a POE, DHS will collect additional biometrics—namely, an additional photograph and fingerprints.  This biometric information would support additional vetting against available databases to inform an independent and case-by-case determination by CBP officers whether parole is warranted on a discretionary basis.

Beneficiaries also would be subject to continuous vetting throughout their period of parole. Parole could be terminated, and the noncitizen placed into removal proceedings, if derogatory information emerges during continuous vetting.

*Online processing*:  All touchpoints in the travel authorization and parole processes—for both supporters and potential beneficiaries up to their arrival at a POE—are accessible online. Potential beneficiaries would be able to access and advance their case online from their home country or other third countries, including Mexico.  Approved beneficiaries who pass all the requisite vetting would receive an advance authorization to travel electronically, which would facilitate their ability to fly via commercial carrier into the United States and seek parole at a POE.  Beneficiaries would be responsible for arranging and funding their own travel.

*Duration and Conditions of Parole*:  If approved on a case-by-case basis at the POE, parole generally would be granted for a period of up to two years.  Individuals who do not acquire another lawful means of remaining in the United States would be required to leave prior to the expiration of their parole.  Those who overstay the grant of parole without acquiring a lawful means of remaining in the United States generally would be placed in removal proceedings. During this two-year period, the Department would continue to work to address the root causes of irregular migration, improve refugee processing and other safe, lawful, and orderly

13

PRE-DECISIONAL/DELIBERATIVE

immigration processes, and increase removal options for Nicaraguan nationals who are subject to a final order of removal.

*Employment Authorization and Public Benefits*: Parolees would be eligible to apply for employment authorization for the duration of the parole.[58] U.S. Citizenship and Immigration Services (USCIS) anticipates that it would be able to adjudicate the majority of such applications within a few weeks after the application is filed.

Because of a combination of work authorization and the supporter requirement, DHS expects this population to require less in the way of emergency services, short-term shelter, or food banks, than the population of Nicaraguan nationals currently encountered crossing the SWB, thus minimizing—and ultimately reducing—the burden on the states.[59]

*Scope/Termination*: The Secretary would retain the sole discretion to terminate the process at any point. The number of travel authorizations granted under this process would be spread across this process and the separate and independent parole Processes for Cubans, Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month. Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memorandum, once approved, would be an internal policy statement of the Department of Homeland Security. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## IV. Justification for Nicaraguan Parole Process

The Secretary of Homeland Security has, under section 212(d)(5)(A) of the Immigration and Nationality Act (INA), the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-

---

[58] 8 C.F.R. § 274a.12(c)(11).

[59] *Id.* Noncitizens paroled for a period of one year or more are considered "qualified aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. *See generally, e.g.*, 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. REAL ID Act of 2005, Pub. L. 109-13, Div. B, section 202(c)(2)(B), (d)(11), 119 Stat. 313, 315 (49 U.S.C. 30301 note).

14

PRE-DECISIONAL/DELIBERATIVE

case basis for urgent humanitarian reasons or significant public benefit."[60]  Parole is not an admission of the individual to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[61]  DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[62]  DHS may terminate parole in its discretion at any time.[63]  By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[64]

### 1.  Significant Public Benefit

The proposed process, which would impose new consequences for Nicaraguans who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Nicaraguan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States would serve a significant public benefit, for several, interrelated reasons.  Specifically, we anticipate that the parole of eligible individuals pursuant to this process could result in the following: (i) enhanced border security through a reduction in irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improved vetting for national security and public safety; (iii) reduced strain on DHS personnel and resources; (iv) minimized domestic impact of irregular migration from Nicaragua; (v) a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfillment of important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

*Enhanced border security by reducing irregular migration of Nicaraguan nationals*

As described above, Nicaraguan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly.  DHS assesses that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Nicaraguans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Nicaraguan individuals along the SWB.  This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns

---

[60] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").
[61] INA §§ 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A).
[62] *See* 8 C.F.R. § 212.5(c).
[63] *See* 8 C.F.R. § 212.5(e).
[64] *See* 8 C.F.R. § 274a.12(c)(11).

15

Nicaragua AR_000141

PRE-DECISIONAL/DELIBERATIVE

that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of this parole process will be contingent on the GOM's acceptance of Nicaraguan nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be returned to Nicaragua or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Nicaraguan nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

*Improved vetting for national security and public safety*

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before such individuals arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Nicaraguan parole process described above would allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described above, the proposed vetting would require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

*Reduced burden on DHS personnel and resources*

By reducing encounters of Nicaraguan nationals at the SWB, and channeling decreased flows of Nicaraguan nationals to interior POEs, we anticipate the proposed process could relieve some of the impact increased migratory flows has had on the DHS workforce along the SWB. This process could free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the proposed process would also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In addition, allowing Nicaraguans permitted to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute

16

PRE-DECISIONAL/DELIBERATIVE

a final order of removal.  This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

*Minimize the domestic impact*

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities.  Given the inability to remove, return, or repatriate Nicaraguan nationals in substantial numbers, DHS is currently conditionally releasing 96 percent of the Nicaraguan nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Nicaraguan nationals accounted for 18 percent of all encounters released at the border in October 2022.[65]  The increased volume of provisional releases of Nicaraguan nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB.  These entities have engaged to provide services and assistance to Nicaraguan nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[66]  FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services.  Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[67] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[68]  Since Nicaraguan nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this proposed parole process would address these concerns by diverting flows of Nicaraguan nationals into a safe and orderly process, in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process would help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants

---

[65] OIS analysis of and CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022.

[66] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States,* Sept. 21, 2022, https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.

[67] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave,* Apr. 27, 2022, https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[68] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day,* Sept. 23, 2022, https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

17

PRE-DECISIONAL/DELIBERATIVE

at the SWB. Beneficiaries would be required to fly to the interior, rather than arriving at the SWB. They also would only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also would be eligible to apply for work authorization, thus enabling them to support themselves.

*Disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks*

The proposed process, which would incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because TCOs—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[69]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[70] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[71] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[72] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[73] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[74] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[75] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the

---

[69] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.
[70] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border,* Sept. 7, 2022, https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.
[71] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*
[72] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border,* Sept. 7, 2022, https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.
[73] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*
[74] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream',* Sept. 5, 2022, https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.
[75] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

18

PRE-DECISIONAL/DELIBERATIVE

migrants are pawns;[76] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.[77]  Tragically, a significant number of individuals perish along the way.  The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[78]

DHS anticipates this process would save lives and undermine the profits and operations of the dangerous TCOs that put migrants lives at risk for profit because it would incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights rather, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB.  By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants.  DHS and federal partners have taken extraordinary measures—including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[79]

*Fulfill important foreign policy goals to manage migration collaboratively in the hemisphere*

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration.  This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[80] the Collaborative Migration Management Strategy (CMMS);[81] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration),

---

[76] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[77] New York Times, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* July 25, 2022, https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

[78] Reuters, *Migrant Truck Crashes in Mexico Killing 54,* Dec. 9, 2021, https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico,* July 25, 2022, https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.

[79] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42, Dec. 13, 2022, https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42.

[80] National Security Council, *Root Causes of Migration in Central America* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

[81] National Security Council, *Collaborative Migration Management Strategy* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.

19

PRE-DECISIONAL/DELIBERATIVE

which was endorsed in June 2022 by 21 countries.[82]  The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[83]  The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[84]

This new process would help achieve these goals by providing an immediate and temporary orderly process for Nicaraguan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries.  It thus would provide the United States another avenue to lead by example.

The process also would respond to an acute foreign policy need.  Key allies in the region— including specifically the Governments of Mexico and Costa Rica—are affected by the increased movement of Nicaraguan nationals and have been seeking greater U.S. action to address these challenging flows for some time.  These Nicaraguan flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—and something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process would add to these efforts and enable the United States to lead by example.  Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere.  It would also strengthen the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, as part of a regional response—many of which are already taking important steps.  Any effort to meaningfully address the crisis in Nicaragua would require continued efforts by these and other regional partners.

Importantly, the United States would not implement the new parole process without the ability to remove or return to Mexico Nicaraguan nationals who attempt to enter the United States irregularly across the SWB.  The United States' ability to execute this process thus would be contingent on the GOM's willingness to accept the return of Nicaraguan nationals who bypass this new process and attempt to enter the United States irregularly between POEs.

---

[82] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.
[83] *Id.*
[84] *Id.*

Nicaragua AR_000146

PRE-DECISIONAL/DELIBERATIVE

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—would require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this proposed process would be responsive to the GOM's request that the United States increase lawful pathways for migrants and would also be aligned with broader Administration domestic and foreign policy priorities in the Region. It would couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process would be to reduce the irregular migration of Nicaraguan nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more immigration and refugee pathways in the region, including to the United States.

### 2. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this proposed process would address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua for the reasons outlined in this memo. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose their positions.[85] This process provides a safe mechanism for Nicaraguan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey here.

### V. Consideration of process elements

### 1. Length of parole and employment authorization

The proposed length of parole is up to two years. This is consistent with other parole processes, such as the process for Venezuelan nationals and Uniting for Ukraine (U4U) for Ukrainian nationals and their qualifying immediate family members, Operation Allies Welcome for Afghan nationals, and the Cuban Family Reunification Parole Program established in 2007. A two-year period of parole would enable a realization of the significant public benefits and meets the urgent

---

[85] OHCHR, Presentation of Report on the Human Rights Situation in Nicaragua, Human Rights Council Resolution 49/3 (Sept. 13, 2022), https://www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua.

21

PRE-DECISIONAL/DELIBERATIVE

humanitarian reasons that Nicaraguan nationals are seeking entry into the United States, for the following reasons:

*First*, the period of parole would need to be sufficiently long to make it an attractive alternative to the status quo, where migrants put their lives in smugglers' hands to enter the country irregularly. DHS believes that a period of two years would achieve that goal. It would allow beneficiaries to gain work authorization, contribute to the U.S. economy, and achieve stability and predictability in their lives, even if temporarily.

*Second*, a two-year period of parole would provide eligible beneficiaries sufficient time to pursue a durable immigration status or benefit if eligible under the law. Beneficiaries may qualify for asylum; others may qualify for adjustment of status based on the immediate availability of a family- or employment-based immigrant visa.

*Third*, a two-year period would provide a meaningful amount of time for the United States government, in conjunction with foreign partners, to continue its ongoing work to help address the root causes of migration, including the humanitarian and economic conditions in Nicaragua that are spurring a large migratory flow. For similar reasons, a two-year period would also provide a window for the U.S. Government to work with the Government of Nicaragua to increasingly accept the return of Nicaraguan nationals who are subject to a final order of removal. Finally, this two-year period would provide meaningful time to fully develop the multi-prong, regional strategy to address migration in our region, including improving refugee processing and other immigration pathways, both to the United States and to other partner nations.

2. Supporter Vetting

After DHS learned of certain instances in which U4U supporters, including family members, ceased providing housing and other support for parolees prior to the end of their parole period, DHS made form changes and associated vetting enhancements to improve confirmation of supporter suitability, clarify guidance on minimum supporter requirements, and communicate to beneficiaries about what rights, protections and benefits may be available if they are a victim of exploitation. This was intended to further reduce the risk that supporters do not follow through on their obligations; it was also intended to address risks of human trafficking and other forms of abuse.

This is particularly important because human smuggling and trafficking, including forced labor, is a major concern in this region.[86] While such risks cannot be completely mitigated, this parole process is structured to address these risks to the greatest extent possible. The process—with the reviews and vetting in place—poses a significantly lower risk of exploitation than the dangerous journey to the SWB. As described above, all migrants, but particularly women and children, are

---

[86] Department of State, *Trafficking in Persons Report* (July 2022), https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf.

22

PRE-DECISIONAL/DELIBERATIVE

susceptible to the risk of kidnapping, exploitation, sexual abuse, and human trafficking along smuggling routes.[87] A significant portion of such migrants pay smugglers exorbitant fees, thus enriching and supporting the smuggling organizations. Almost all, if not all, migrants are required to pay compulsory fees and taxes by criminal organizations at different points along their journey north.[88] We thus assess that the parole of individuals pursuant to this process, even if we cannot completely mitigate the risk of exploitation, would meaningfully serve the significant public benefit of decreasing reliance on smuggling networks and protecting individuals from trafficking and exploitation.

3.  Eligibility Criteria

*Exception for One-Time Voluntary Departure or Withdrawal of an Application for Admission*

Individuals encountered entering the United States irregularly between POEs may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility to seek parole via the Nicaragua process. This exception provides an incentive for migrants, who would otherwise be ineligible for this process, to accept the option to voluntarily leave the United States, and thus, reduce strain on limited DHS personnel and resources associated with obtaining and later executing an order of removal.

*Consideration of Beneficiaries with Particular Vulnerabilities or other Compelling Circumstances*

DHS has separately considered whether it should further focus eligibility only on beneficiaries who may have particular vulnerabilities or other compelling circumstances. We have ultimately concluded that such a requirement is not preferable for a combination of operational and policy reasons.

*First*, it would be very difficult to implement an objective and fair screening mechanism. For instance, any such vulnerability screening would require a process for triaging potential beneficiaries and identifying those who are more vulnerable. To be effective, it would require third parties—likely international NGOs—to play a role in the screening. However, DHS lacks authority to fund such screening outside the United States. Such a screening requirement would also substantially delay the implementation of this new process, in that it would require the creation of infrastructure and deployment of personnel that currently are not in place.

*Second*, imposition of a vulnerability screening requirement would fail to meet the foreign policy goals of providing an alternative option for a broader swath of Nicaraguan nationals who would

---

[87] *Id.* at 386.
[88] Homeland Security Operational Analysis Center operated by the RAND Corporation, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States?*, 2019. https://www.rand.org/pubs/research_reports/RR2852.html.

23

PRE-DECISIONAL/DELIBERATIVE

otherwise make the dangerous journey to the U.S.-Mexico border. Because only a subset would likely meet vulnerability criteria (particularly if there is a high standard for establishing vulnerability), the parole process might not be deemed a viable alternative to irregularly crossing and entry; it would, as a result, fail to serve the disincentive to irregular migration that this process seeks to achieve.

For these programmatic reasons, DHS determined that keeping eligibility at the nationality level—like U4U and the Venezuela process—is the best option to achieving the multiple goals of reducing flows to the border, responding to the foreign policy requests of partner nations, and providing protections to deserving Nicaraguan nationals. DHS similarly rejected this consideration in weighing the scope of the process for Venezuelans.

## VI. Consideration of alternative approaches

DHS has considered several alternative approaches to the proposed parole process coupled with an enforcement mechanism to manage the current surge in migration from Nicaraguan nationals. These alternative approaches are weighed based on the following key goals, as identified above: (i) enhance the security of our SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

1. Status quo

DHS considered the impact of keeping the status quo, which has resulted in record encounters at the SWB, driven in increasing part by a surge in migration by Nicaraguan nationals. Importantly, DHS anticipates that encounters of Nicaraguan nationals at the border are likely to continue to increase in the coming weeks and months. This sharp increase shows no signs of abating absent material changes such as those proposed here.

As described above, the current surge in irregular migration from Nicaragua has forced DHS to reallocate resources and personnel to the SWB. Although DHS will continue to use all available resources to enforce the immigration laws of the United States and secure our borders, maintaining this level of emergency supplemental appropriations and TDY staffing to support SWB operations is simply not sustainable in the long term. For these reasons, DHS has concluded that maintaining the status quo is not an option.

2. Increased enforcement by third countries

DHS considered whether there is more that could be done to diplomatically influence other foreign partners in the region to do more to address these irregular migratory flows. We continue to engage in such efforts. That said, partner countries have already extended

24

PRE-DECISIONAL/DELIBERATIVE

themselves in historic ways with limited results. The bottom line is that our foreign partners do not have the capability to sufficiently impact these flows in the immediate term.

Simply pressing foreign partners to do more—without also taking steps to provide a lawful process for entry to the United States that can meaningfully shift incentives against irregular migration—will not achieve the desired goals of this process in the time that is needed.

3. Increasing removals to Nicaragua

DHS data show that increases in returns of individuals from a given country can reduce encounters at the border over time.[89]   For example, increases in returns to Guatemala, Honduras, and El Salvador from the United States and Mexico during specific periods of time over the past year have led to a sustained decrease in encounters of migrants from those countries at the border.

DHS considered whether more could be done in the immediate term to increase returns of Nicaraguan nationals to Nicaragua and continues to engage in those efforts. DHS has already been engaging with the Government of Nicaragua to increase its ability to repatriate their citizens who do not have a legal basis to remain in the United States. Despite these concerted efforts, which are ongoing, DHS has not received cooperation from the government to allow an increase of removals.

Because of these factors, return to Nicaragua – while an effective consequence regime for those who enter the United States irregularly and do not have a valid asylum claim – is not a viable option, at scale. As stated above, DHS intends to continue to work to address root causes, including the political instability and repression that have led to difficulties in returning Nicaraguan nationals to Nicaragua. That, however, will require time and is not a viable option to meet immediate needs.

4. Utilizing contiguous territory return authority

DHS considered whether returning Nicaraguan nationals to Mexico under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C), either through the Migrant Protection Protocols (MPP) or via another programmatic use of the authority, would have a similar effect to the proposed process. As this policy was being finalized, a district court stayed your October 29, 2021 memorandum terminating MPP. *See* Dkt. 178, *Texas v. Biden*, No. 21-cv-67 (N.D. Tex. Dec. 15, 2022). For two reasons, we have decided that proceeding with the proposed process is preferable to attempting to manage the current surge in migration by relying on the programmatic use of the contiguous territory return authority at this time and for this population.

---

[89] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, U.S. Customs and Border Protection Commissioner, and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

25

PRE-DECISIONAL/DELIBERATIVE

*First*, the resources and infrastructure necessary to use contiguous return authority at the scale that would be required given current—and anticipated—flows are not currently available.  To employ the contiguous return authority at a scale sufficient to meaningfully address the anticipated migrant flows, the United States would need to rebuild, redevelop, and significantly expand infrastructure for noncitizens to be processed in and out of the United States and attend immigration court hearings throughout the duration of their removal proceedings.  This would require, among other things, the construction of substantial additional court capacity along the border.  It would also require the reassignment of immigration judges and ICE attorneys to conduct the hearings and CBP personnel to receive and process those who are coming into and out of the country to attend hearings.

*Second*, programmatic implementation of the contiguous territory return authority requires Mexico's concurrence and support.  When DHS was previously under an injunction requiring it to re-implement MPP, the GOM would only accept the return of MPP enrollees consistent with available shelter capacity in specific regions, and indeed had to pause the process at times due to shelter constraints.  Notably, Mexico's shelter network is already strained from the high volume of northbound irregular migration we are seeing today.[90]  The GOM announced the end of the court-ordered reimplementation of MPP on October 25, 2022.[91]  Any potential re-starting of returns under MPP or another programmatic use of the contiguous-territory return authority would require the GOM to make a new independent decision to accept noncitizens that would be returned under this authority.

DHS is, however, continuing to evaluate the recent district court decision and considering the effect of the court's stay and other relevant developments on the use of contiguous territory return authority going forward.

5.   Increasing the use of detention for Nicaraguan nationals

DHS considered whether it could detain all or most Nicaraguan nationals instead of conditionally releasing them, and thus deter flows and avoid some of the impact in border communities as a result.  There are, however, legal and operational limits in the ability to do so.

*First*, there are legal limits on the duration of detention for those ordered removed and who—like the Nicaraguan nationals—do not have a significant likelihood of removal in the foreseeable future.  Specifically, the U.S. Supreme Court's ruling in *Zadvydas v. Davis* restricts DHS from

---

[90] WTOL News, *U.S. Court Rejects Maintaining COVID-19 Asylum Restrictions,* Dec. 16, 2022, https://www.wtol.com/article/news/nation-world/migrants-mexico-us-border-asylum-limits-end/507-02a353b7-d61f-4536-b3c9-bb45c3fbb388, (last visited Dec. 17, 2022).
[91] Government of Mexico, *Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU,* Oct. 25, 2022, https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-ee-uu. (last visited Dec. 19, 2022).

26

Nicaragua AR_000152

PRE-DECISIONAL/DELIBERATIVE

detaining individuals with final orders of removal for more than 180 days unless there is a significant likelihood of removal in the reasonably foreseeable future.[92]

*Second*, it is not a viable option operationally. Even if ICE diverted all of its detention space to focus on Nicaraguan nationals, it would reach its detention capacity in three weeks. Doing so would, however, mean that ICE would no longer have space to detain those put in expedited removal who *could* be removed to their home countries. It would mean releasing others, some of whom may be deemed national security and public safety threats, in contradiction of both statutory mandates and the common-sense policy decision to focus detention space on those who pose a threat to public safety. For these reasons, DHS assesses that addressing the problem by detaining large numbers of Nicaraguan nationals is not a viable option at this time.

6. Increasing other lawful pathways to the United States and other countries

DHS could focus *only* on the lawful pathways, including protection processes, that are already in place and have been already announced. As part of these efforts to meet the deliverables outlined in the L.A. Declaration, the U.S. Government committed during the Summit of the Americas in June 2022 to resettle 20,000 refugees from the Western Hemisphere in FY 2023. The U.S. Government also committed to increasing immigrant visa adjudication.[93] DHS and interagency partners will continue these efforts and more. However, those alternative processes are narrow and require, in many cases, multiple steps and in-person engagement or referrals that are difficult for many individuals to access.

A key feature of this proposed process that differentiates it from other processes and programs—and that we deem critical to meet the current moment—is that it is intended to be fully virtual and accessible from anywhere. We assess that existing programs are unlikely to provide a sufficiently available and attractive incentive to impact the flows from Nicaragua today—and that regional efforts to improve lawful pathways, while critically important, will not be sufficiently timely to address the immediate needs. We thus assess a need to implement the process being considered in order to provide the incentive to wait, rather than make the dangerous journey to the border that we are trying to deter.

**VII. Administrative Procedure Act**

This proposal would be exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

---

[92] *See Zadvydas v. Davis*, 533 U.S. 678 (2001).
[93] The White House, *Fact Sheet: The Los Angeles Declaration* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.

27

PRE-DECISIONAL/DELIBERATIVE

*First*, the Department would merely be adopting a general statement of policy,[94] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[95]  As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second*, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[96]  Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[97]  In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[98]  This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Nicaraguan nationals to enter the United States.  The United States would not implement the new parole process without the ability to return Nicaraguan nationals who attempt to enter irregularly across the SWB to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and attempt to enter the United States irregularly between POEs.  Thus, initiating and managing this process would require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now.  It also would complicate broader discussions and negotiations about migration management.  For now, the GOM has indicated it is prepared to make an independent decision to accept a substantial number of Nicaraguan returns or removals.  The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date.  Additionally, making it publicly known that we plan to return or remove nationals of Nicaragua to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

---

[94] 5 U.S.C. § 553(b)(A).
[95] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).
[96] 5 U.S.C. § 553(a)(1).
[97] *Mast Indus. v. Regan*, 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).
[98] *See, e.g., Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

28

PRE-DECISIONAL/DELIBERATIVE

Moreover, this process is not only responsive to the interests of the GOM and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration).  It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent.  For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[99]  DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[100]

*Third*, DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be contrary to the public interest and impracticable.  The numbers of Nicaraguans encountered at the SWB are already high, and the Office of Immigration Statistics estimates border encounters will continue to rise, and potentially rise dramatically, should the Title 42 public health order be lifted.  While DHS has already taken multiple additional measures to address and prepare, a delay would exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[101]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the proposed process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Nicaraguan nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[102]  It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would

---

[99] *See* 82 Fed. Reg. 4902 (Jan. 17, 2017).

[100] *See* 87 Fed. Reg. 63,507 (Oct. 19, 2022).

[101] *See Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[102] *See* 5 U.S.C. § 553(b)(B).

29

PRE-DECISIONAL/DELIBERATIVE

result from the notice-and-comment process.[103]  If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[104]  A number of cases follow this logic in the context of economic regulation.

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges.  It is well-established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy. For example, as detailed above, implementation of parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans.  Had the parole process been announced prior to a lengthy notice and comment period, it likely would have had the opposite effect, resulting in many hundreds and thousands of Venezuelan nationals attempting to cross the border before the program went into effect.  Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have at times been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States.  And it is well-established that such persons may change their behavior in response to perceived imminent changes in U.S. immigration policy.[105]  Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Nicaraguan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions.  At

---

[103] *See, e.g.*, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94-95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . .  Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'— or avoid them—before the freeze deadline." (cleaned up)).

[104] *See, e.g.*, *Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[105] Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media*, https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media, July 26, 2022, (last viewed Dec. 6, 2022).

30

PRE-DECISIONAL/DELIBERATIVE

current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[106] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[107] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[108] DHS concluded that "a surge could result in significant loss of human life."[109]

### Recommendation

Given the immediate challenge we face along the SWB as described in this memo, and the time it will take for the long-term administration strategy to produce durable and lasting results to irregular migration, we recommend the immediate and temporary approach described in this memo to address the current challenge as we await results from the long term, durable approach. Therefore, we recommend that you approve this memo in full, including the proposed parole process for Nicaraguan nationals and the accompanying rationale.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

Approve _____     ____ove/date _____

**DEC 2 2 2022**

---

[106] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[107] *Id.*

[108] *Id.*

[109] *Id.*; *accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

Nicaragua AR_000157

Modify/date_____     Needs discussion/date_____

Nicaragua AR_000158

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



October 29, 2021

MEMORANDUM TO:     Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Ur M. Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

                   Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, ████████████

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           **Termination of the Migrant Protection Protocols**

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*. In this Executive Order, President Biden directed the Secretary of Homeland Security "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." After completing a comprehensive review as directed by EO 14010, I concluded that the Migrant Protection Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect (the "June 1 memo").

1

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations.  *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021).  As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration.  *Id.* at *27.  The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original).  The Department is fully complying with the District Court's order.  At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways.  In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border.  I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated.  In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.  Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving

2

either of these goals.  Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities.  It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.  Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border.  Of course, correlation does not equal causation and, even here, the evidence is not conclusive.  I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims.  I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border.  This is a shared responsibility of all countries across the region.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.  This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements.  Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.  Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

3

and lasting changes to the asylum system.  MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts.  MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix.  Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form.  For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP.  Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP.  The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP.  But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

4



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

April 26, 2█

MEMORANDUM FOR:    Interested Parties

FROM:    Alejandro N. Mayorka▉
                Secretary of Homelan▉

SUBJECT:    **DHS Plan for Southwest Border Security and Preparedness**

---

## EXECUTIVE SUMMARY

Under the Biden-Harris Administration, the Department of Homeland Security (DHS) has been executing a comprehensive and deliberate strategy to secure our borders and build a safe, orderly, and humane immigration system. After inheriting a broken and dismantled immigration system, since January 2021 DHS has effectively managed an unprecedented number of noncitizens seeking to enter the United States and interdicted more drugs and disrupted more smuggling operations than ever before.

The legal authority for enforcing our border security and immigration laws comes from Title 8 of the U.S Code. Among other things, Title 8 provides that individuals who cross the border without legal authorization are processed for removal and, if unable to establish a legal basis to remain in the United States, promptly removed from the country.

In March 2020, the Centers for Disease Control and Prevention (CDC) invoked a section of Title 42 of the U.S. Code, a law addressing public health, not immigration, to require the immediate expulsion of noncitizen single adults and families in order to protect Americans from the spread of COVID-19. As a result, a significant percentage of all noncitizens encountered at the Southwest Border are currently expelled pursuant to the Title 42 public health Order. Beginning in September 2021, DHS began planning in anticipation of the eventual lifting of Title 42. On April 1, 2022, CDC announced that it was lifting the Order effective May 23. All noncitizens will then be processed pursuant to Title 8 once again.

When the Title 42 public health Order is lifted, we anticipate migration levels will increase, as smugglers will seek to take advantage of and profit from vulnerable migrants. The increase in migration being experienced by the United States is consistent with larger global trends: there are currently more people in the world displaced from their homes than at any time since World War II, including in the Western Hemisphere.

This memorandum provides more details on how DHS is leading the execution of a whole-of-government plan to prepare for and manage increased encounters of noncitizens at our Southwest Border.  Many elements of this plan are already being implemented as we manage a historic number of encounters, including a record number of noncitizens trying to enter the United States multiple times.  Others are elements that we are prepared to implement once the Title 42 termination goes into effect.  The six pillars of our plan are as follows:

*Border Security Pillar 1*: **We are surging resources, including personnel, transportation, medical support, and facilities to support border operations.**

U.S. Customs and Border Protection (CBP) currently has 23,000 Agents and Officers working along the Southwest Border, which includes a recent increase of 600 personnel and support of law enforcement officers and agents from other government agencies.  Additionally, approximately 500 Agents have been returned to the vital border security mission as a result of increased civilian processing personnel to perform those functions, as well as processing efficiency.  By May 23, we will be prepared to hold approximately 18,000 noncitizens in CBP custody at any given time, up from 13,000 at the beginning of 2021, and we have doubled our ability to transport noncitizens on a daily basis, with flexibility to increase further.   In order to safeguard public health and the safety of our workforce, noncitizens, and border communities, our efforts also include medical support and COVID-19 mitigation protocols, including testing and administering age-appropriate COVID-19 vaccines in 24 CBP sites by May 23, building on our existing vaccination program for those in Immigration and Customs Enforcement (ICE) custody.

*Border Security Pillar 2*: **We are increasing CBP processing efficiency and moving with deliberate speed to mitigate potential overcrowding at Border Patrol stations and to alleviate the burden on the surrounding border communities.**

This includes launching three new initiatives, which will support these decompression efforts, while ensuring the continued integrity of our security screening processes: Enhanced Central Processing Centers; en route processing; and streamlined processing.  CBP is also working to increase processing efficiency at Ports of Entry (POEs) to further facilitate safe and orderly inspection of noncitizens.

*Border Security Pillar 3*: **We are administering consequences for unlawful entry, including removal, detention, and prosecution.**

Core to this plan is our commitment to continue to strictly enforce our immigration laws.  This includes increased use of Expedited Removal, detaining single adults when appropriate, referring for prosecution those whose conduct warrants it, and accelerating asylum adjudications that enable us to more quickly process and remove from the United States those who do not qualify for relief under our laws.

*Border Security Pillar 4*: **We are bolstering the capacity of non-governmental organizations (NGOs) to receive noncitizens after they have been processed by CBP and are awaiting the results of their immigration removal proceedings.  And, we are ensuring appropriate**

**coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities.**

Our goal is to help communities alleviate the pressures they experience by expanding NGO capacity, through communication and coordination with all relevant partners, and other assistance such as the Emergency Food and Shelter Program (EFSP), a Federal Emergency Management Agency (FEMA) grant program that supplements and expands ongoing work of local NGOs to meet the needs of local agencies.

*Border Security Pillar 5*: **We are targeting and disrupting the transnational criminal organizations (TCOs) and smugglers who take advantage of and profit from vulnerable migrants, and who seek to traffic drugs into our country.**

In April 2022, DHS and other federal agencies intensified our disruption efforts, marshalling the largest surge of resources and disruptive activities against human smuggling networks in recent memory.  The immediate result has been over 2,500 arrests, investigations, and disruptions of smuggling infrastructure, such as buses and safe houses.  The federal government has also established a new intelligence unit to coordinate and strengthen the capability for early warning of migrant movements.

*Border Security Pillar 6*: **We are deterring irregular migration south of our border, in partnership with the Department of State (DOS), other federal agencies, and nations throughout the Western Hemisphere, to ensure that we are sharing the responsibility throughout the region.**

In the past two months, we have signed new migration agreements with Costa Rica and Panama and continue close cooperation with Mexico.  We are also sending a clear message in the region to counteract misinformation from smugglers, including that the termination of the Title 42 public health Order does not mean that the U.S. border is open. As we execute this work, our objective continues to be the safe, orderly, and humane processing of noncitizens, consistent with our laws, while protecting national security and public safety. Across all of our work in this space, we are ensuring we can uphold our laws and our values in treating noncitizens in a humane way, as we did last year when we rapidly addressed the acute needs of unaccompanied children at the Southwest Border.

**Conclusion**

Our outdated immigration system was not built to manage the current levels and types of migratory flows that we are experiencing and is already under strain.  This is true at the federal level, as well as for state, local, and NGO partners.  However, we have been able to manage increased encounters because of prudent planning and execution, and the talent and unwavering dedication of the DHS workforce and our state, local, and community partners.

Despite these efforts, a significant increase in migrant encounters will substantially strain our system even further.  We will address this challenge successfully, but it will take time, and we need the partnership of Congress, state and local officials, NGOs, and communities to do so.  We are operating within a fundamentally broken immigration system that only Congress can fix.

Nicaragua AR_000165

# BACKGROUND

**After inheriting a broken and dismantled immigration system, the Biden-Harris Administration is securing the border and building a fair, orderly, and humane immigration system, with demonstrable results since January 2021.**

The Biden-Harris Administration inherited a broken and dismantled immigration system.  On January 20, 2021, the President sent the *U.S. Citizenship Act of 2021* to Congress with a call for urgent action.  At DHS, we are working every day, despite that broken system, to secure our borders and build a more just immigration system.

## Securing the Border

DHS works tirelessly to secure the Southwest Border through a combination of highly trained personnel, sophisticated ground and aerial monitoring systems, and robust intelligence and information sharing networks.  Through this layered border security network, we have a better understanding of who is attempting to enter the country than ever before and can focus our enforcement efforts more effectively to address potential threats.

The greatest asset in our border security network is the DHS workforce.  There are currently over 23,000 CBP Agents and Officers working along the Southwest Border.  Over the past year, DHS has supplemented permanent staff by overseeing the deployment of more than 10,000 additional federal personnel to the Southwest Border in multiple rotations.  This includes CBP Agents and Officers; other agency law enforcement personnel; personnel from the Department of Defense (DOD), which has supporting CBP operations since 2006, and the DHS Volunteer Force.  Personnel have been added to increase patrols along the Southwest Border to prevent the entry of people and goods between POEs, enhance processing efficiency, and increase humanitarian capacity.  DHS also has worked to train thousands of additional agents and officers and execute contracts for processing assistance to further augment border security efforts.

DHS has been investing in technology and installing new systems to enhance border security and the effectiveness of our operations, including advanced automated surveillance towers, ground movement detection systems, and new aerial platforms.  These efforts have delivered concrete results, as further described below.

With support from Congress, DHS has been applying appropriated financial resources to support our efforts.  In the Fiscal Year (FY) 2022 budget, DHS secured additional resources: $100 million to strengthen Border Patrol Agent hiring programs and contract for processors to work in Border Patrol stations; more than $250 million in funding for border security technology; over $85 million for non-intrusive inspection technology to scan vehicles and goods entering the country; and more than $70 million for additional aircraft and sensors.  In addition, Congress allocated $1.4 billion to support contingency operations on the Southwest Border.

## Building a More Just Immigration System

Along with our efforts to secure the border, over the past 15 months, we implemented critical reforms that ended cruel and unjust policies of the prior Administration.  We have issued new guidelines regarding immigration enforcement priorities that focus the Department's resources

Nicaragua AR_000166

on the apprehension and removal of noncitizens who pose a threat to our national security, border security, or public safety.  These guidelines mark a new approach to enforcement as they focus resources on those who pose the greatest threat.  The most recent guidelines also enable the Department's experienced personnel to use their discretion and focus DHS enforcement resources in a more targeted way, while protecting civil rights and civil liberties.

The results speak for themselves.  ICE Enforcement and Removal Operations (ERO) arrested an average of 1,034 aggravated felons per month from February through September 2021, a 53 percent increase over the monthly average during 2016 and a 51 percent increase over the period 2017-2020.  During the same period in 2021, ICE removed an average of 937 aggravated felons per month, the highest level ever recorded and the greatest public safety impact since ICE began collecting detailed criminality data.  From February-September 2021, 46 percent of ICE removals were of serious criminals overall (persons convicted of felonies or aggravated felonies), compared to 17 percent during 2016 and 18 percent during 2017-2020.

The Department is committed to protecting vulnerable populations and has taken several significant steps to advance our efforts on this front.  A few examples:

- We have implemented actions to promote a fair labor market by focusing our enforcement on unscrupulous employers, thereby supporting more effective enforcement of wage protections, workplace safety, labor rights, and other employment laws and standards.
- We have issued a new, comprehensive policy that provides an expanded and non-exhaustive list of Protected Areas – such as courthouses, places of worship, and disaster or emergency relief sites – to ensure that enforcement actions, to the fullest extent possible, are not taken at or near a location that would restrain people's access to essential services or engagement in essential activities.
- We have made significant strides in improving the conditions of care in detention facilities including implementing trauma-informed care in CBP facilities, hiring additional child welfare and medical providers to work in CBP facilities, implementing new policies establishing standards of care for vulnerable individuals, and closing facilities that repeatedly have failed to maintain safe conditions.
- In partnership with DOS, we reimplemented and expanded the Central American Minors program to increase the pool of qualified candidates who can access this safe, orderly pathway.  For example, the expansion now allows legal guardians in the United States with a pending asylum application or U visa petition to sponsor their children for resettlement consideration.
- In partnership with the Department of Health and Human Services (HHS), we ensured the safe and humane treatment of unaccompanied children in our custody by quickly reducing the average time to transfer a child into HHS care and the number of unaccompanied children in Border Patrol facilities.
- And critically, we have reunited more than 200 families who were cruelly and unjustly separated at the U.S.-Mexico border by the prior Administration and are working to reunite many more.

Nicaragua AR_000167

# STATE OF MIGRATION

**The United States is experiencing an increase in migration, consistent with larger global trends.  There are currently more people in the world displaced from their homes than at any time since World War II, including in the Western Hemisphere.**

Over the past few years, irregular migration along the Southwest Border has increased to unprecedented levels and presents new challenges that affect our processing and complicate removals.  In the past three weeks, CBP has encountered an average of over 7,800 migrants per day across the Southwest Border.  This is compared to a historical average of 1,600 per day in the pre-pandemic years (2014-2019).  In addition to this exponential increase, DHS has seen a pronounced shift in the demographics and nationalities of noncitizens encountered at and between land ports of entry – with more single adults claiming fear, varying levels of family units, and a steady flow of unaccompanied children, who have unique vulnerabilities and needs.  Migrants from Cuba, Venezuela, and Nicaragua have steadily increased, accounting for 37 percent of FY 2022 non-Mexican encounters to-date, up from 8 percent between 2014-2019.  And due to the sharp increase in encounters of Ukrainians at the Southwest Border in the wake of the Russian invasion of Ukraine, we have established a new program for processing Ukrainians in Europe that will substantially reduce incentives to seek admission via Mexico.

The United States is not alone in experiencing an increase in migration.  There are currently more people displaced from their homes across the world than at any time since World War II.  In our hemisphere, violence, food insecurity, severe poverty, corruption, climate change, the COVID-19 pandemic, and dire economic conditions all contribute to the increase.  More than 6 million Venezuelan refugees and migrants have fled their homes, making this the second-largest external displacement crisis in the world.  Seventeen countries in Latin America and the Caribbean generously host approximately 80 percent of this Venezuelan diaspora, including an estimated 1.8 million in Colombia, 1.3 million in Peru, and large numbers in Ecuador, Chile, Brazil and elsewhere.  Costa Rica, a country of only 5 million people, is hosting approximately 150,000 Nicaraguan migrants.

Noncitizens making their way to the Southwest Border travel via air, land, and sea into Mexico and up to Mexico's northern states.  These movements into and through Mexico are often facilitated by numerous human smuggling organizations that exploit them for profit, and involve crossing inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow.  Upon reaching the border area, noncitizens seeking to enter the United States without going through the POEs pay cartels to guide them along the final miles of their journey.  This cartel-controlled movement of people across the border is a billion-dollar criminal enterprise.  The cartels willfully place noncitizens in danger during their journey.  Tragically, a significant number of individuals perish along the way.  The depth of suffering these migrants are willing to endure speaks to the desperation they feel about their prospects in their home countries.

**When the Title 42 public health Order is lifted, we anticipate migration levels will increase further, as smugglers will seek to take advantage of and profit from vulnerable migrants.  We will continue to remove individuals without legal claims under Title 8, consistent with our laws.**

Nicaragua AR_000168

Following the lifting of CDC's Title 42 public health Order, we expect increased border flows, in light of exploitation by smugglers, continued demand for access to the United States from people fleeing violence and economic turmoil in their home countries, and other factors discussed above.  In preparation for this, DHS operational agencies and partners have planned for multiple scenarios to ensure preparedness and the safe, orderly, and humane processing of individuals, consistent with our laws.

## Migration Authorities

As noted above, we have been managing historic levels of migration: 1.72 million encounters by CBP in FY 2021.  DHS completed 1.2 million repatriations in FY 2021, via a combination of immigration enforcement removals pursuant to Title 8 and public health expulsions pursuant to Title 42.  This was the highest number of repatriations since 2006.

Since March 2020, CDC's Title 42 public health Order has required the immediate expulsion of noncitizen single adults and families at the Southwest Border to mitigate risk to the American public due to COVID-19.  As a result, a significant percentage of all noncitizens encountered at the Southwest Border are currently expelled pursuant to Title 42.  The large number of expulsions during the pandemic has contributed to a higher-than-usual number of noncitizens making repeated border crossing attempts: more than one in three encounters at the Southwest Border are repeat entrants, including almost half of single adult encounters.  Thus, while total enforcement encounters increased 82 percent between 2019 (the last pre-pandemic year) and 2021, the number of unique individuals encountered at the border increased by 30 percent.

In light of CDC's decision to terminate Title 42, beginning on May 23, 2022, families and single adults who cross the border without legal authorization will be placed into Title 8 removal proceedings.  Under Title 8 authorities, noncitizens without a viable asylum claim or unable to establish a legal basis to remain in the United States are removed to their home countries.  Economic need and flight from generalized violence are not a basis for asylum in the United States.  Only those with a well-founded fear of persecution based on protected grounds are eligible for asylum.  Expedited Removal is a tool to quickly remove individuals who do not express a fear of return to their home country, following an assessment of asylum claims.  In addition, Mexican migrants can be quickly removed under Voluntary Removal, a process that in practice takes about the same amount of time as an expulsion pursuant to Title 42.  There are consequences to entering without authorization.  Recent arrivals ordered for removal or subject to Expedited Removal are generally subject to a five-year bar on admission to the United States, and reentry within this five-year period after removal is subject to felony prosecution.

Of note, our border security efforts also address irregular maritime migration, which is always dangerous and often deadly.  The termination of Title 42 will not impact the U.S. Coast Guard's (USCG) ability to rescue and intercept individuals attempting this dangerous journey.  Individuals interdicted at sea who are attempting to enter the United States irregularly are, and will continue to be, subject to repatriation to their home country.  DHS continues to maintain its readiness in the maritime domain and has longstanding plans and procedures that govern how to respond to any potential increase in maritime migration.

**Border Processing**

CBP Agents and Officers work tirelessly to detect and interdict noncitizens who cross the border. Upon encountering individuals who have entered between POEs, Border Patrol Agents transport them to stations for processing. This includes verifying their identities through a review of their documents and biographic information, as well as the collection of biometric records. Each individual processed by CBP is screened against numerous records systems, including the FBI's Terrorist Screening Database, to determine whether or not they pose a national security or public safety threat. After initial identity verification and record checks, CBP Agents and Officers determine the appropriate processing pathway from the available options, which are determined based on an individual's nationality, age, family status, and results of security screening and vetting. This process, including final processing for each pathway, takes, on average, one to two hours per individual.

Adults and families commonly spend 48 to 72 hours in CBP custody awaiting processing and then transfer or release. During this time, individuals are provided food, water, medical care, clothing, and other necessities to ensure their safety. Upon completion of CBP processing, certain noncitizens may be quickly removed and others may be transferred to ICE for continued detention. Unaccompanied children must be transferred to HHS. Noncitizens not transferred to other government agencies are processed for release during the pendency of their removal proceedings. This often includes enrollment in an ICE Alternatives to Detention (ATD) program and coordination with NGOs to assist with planning for travel away from the border and the provision of other basic services. Noncitizens placed into proceedings will have an opportunity to present their case before an Asylum Officer or Immigration Judge who will review their claims and either order their removal or grant them asylum or other relief in accordance with law.

**Our broken immigration system was not built to manage the migration levels and types we are currently experiencing and is already under strain. However, we have been able to effectively manage these encounters because of prudent planning and execution, the talent and unwavering dedication of the DHS workforce, and our state, local, and community partners.**

Congress designed the U.S. border management system over 25 years ago. At the time, the migrant population largely consisted of single adult males who were seeking employment opportunities. As described above, the populations DHS now encounters at the border are substantially different, including many families and unaccompanied children who are seeking humanitarian relief. The current system is outdated, was further dismantled by the last Administration, and was not built to contend with these demands. Further, social media and other online platforms have increased smugglers' access to potential migrants, creating an environment ripe for manipulation of information with respect to migration policies at the border.

As noted above, we are already managing a high volume of migrant encounters (on average 7,800 over the past three weeks), which is significantly higher than our system was built to manage and process effectively. While CBP, ICE, and our community partners are all strained under current operations, we are processing individuals in a safe, humane, and orderly manner as

Nicaragua AR_000170

a result of improvements we have made over the past year and thanks to the collaboration of outside partners.  DHS efforts include capacity building, strengthened logistics and processing (including the deployment of soft-sided facilities and virtual processing), and decompression tactics to ensure U.S. Border Patrol sectors can most efficiently support one another.

# BORDER SECURITY PLAN

Building on lessons learned and in preparation for the termination of CDC's Title 42 public health Order, DHS commenced planning exercises in Fall 2021.  In February 2022, DHS formally launched the Southwest Border Coordination Center (SBCC), which is coordinating a whole-of-government response to the anticipated increase in border encounters.  I designated a Senior Coordinating Official (SCO) to oversee the SBCC, who reports directly to me.

The SBCC has centralized coordination among key government agencies within a single structure to ensure effective, holistic planning and execution.  It is staffed by dozens of experienced professionals from across DHS and contains subject matter expert representatives from throughout the federal government.  In addition to the full complement of DHS agencies and offices, several federal agencies are supporting the whole-of-government response, including:

- DOS is continuing intensive diplomacy throughout the region designed to limit irregular migration to the Southwest Border;
- DOD will provide, as needed, rapid contracting support for air and ground transportation, as well as land for the establishment of temporary facilities for migrant processing and lodging for housing federal employees near the Southwest Border;
- The Department of Justice (DOJ) is providing transportation support and law enforcement personnel from the Bureau of Prisons and U.S. Marshals Service, and prosecuting smugglers, repeat offenders, and others whose conduct warrants such a response;
- HHS continues to accept the transfer of unaccompanied children from CBP custody, as well as adjudicate requests for medical support via the ESF-8 council, which governs the allocation of Federal medical responses; and,
- The Office of the Director of National Intelligence (ODNI) is providing intelligence coordination and support to strengthen the capability for early warning of migrant surges at the Southwest Border.

**Building on work to date and informed by input from our partners, we developed and are currently executing the DHS Border Security plan, described below.  Our objective continues to be the safe, orderly, and humane processing of noncitizens consistent with our laws to ensure national security and public safety.**

The plan has six pillars: surge resources; increase efficiency to reduce strain on the border; employ an aggressive consequence regime; bolster the capacity of NGOs and partner with state and local partners; go after cartels and smugglers; and work with our regional partners.  This comprehensive plan leverages a whole-of-government approach to prepare for and manage the current and anticipated increases in encounters of noncitizens at our Southwest Border.

Nicaragua AR_000171

Across each of the lines of effort, DHS has undertaken a deliberate and methodical approach to readiness prior to and for May 23.  Following months of planning based on multiple potential scenarios, we are pre-positioning and expanding available resources.  We are also conducting extensive testing of processes that have not been used at scale since the implementation of Title 42 and new approaches like an en route processing capability, which will be explained below.  Finally, our preparations culminate with us scaling to meet migration levels as they increase over time by accessing additional resources through interagency agreements and contracts.

## *Border Security Pillar 1:* We are surging resources, including personnel, transportation, medical support, and facilities to support border operations.

### Increased Personnel

Over the past several months, we have deployed additional personnel in support of several key functions.  First and foremost, we are working to maximize the number of CBP Agents and Officers in the field.  As of April 25, CBP has over 23,000 Agents and Officers working along the Southwest Border, over 600 of whom have deployed since February 1 in response to increasing operational demands.  The SBCC will continue to augment CBP's operations by bringing in law enforcement agents and officers from other parts of the country as needed.

Additionally, there are currently over 300 civilian Border Patrol Processing Coordinators who work in Border Patrol stations to complete processing duties; the volume of processing has required some Border Patrol Agents to be assigned to processing.  Over the next few months, we are on track to deploy over 500 additional full-time and contract processors, which relieves Border Patrol Agents to return to the field and continue their tireless work to secure the border.  President Biden's FY 2023 Budget request to Congress proposes hiring an additional 300 Border Patrol Agents and an additional 300 Border Patrol Processing Coordinators.  If enacted, this would be the first increase in the number of Border Patrol Agents since 2011.

The SBCC is augmenting CBP's operations by bringing in law enforcement officers and agents from other parts of the country.  We are also hiring, contracting for, and soliciting volunteers for administrative processing support to enable law enforcement officers and agents to focus on front-line work.

### Increased Transportation Capacity

CBP utilizes air and ground transportation to prevent Border Patrol facilities from becoming overcrowded.  This long-standing process enables increased efficiency, while better protecting the health and safety of our workforce and noncitizens.   Building on this approach, the SBCC is expanding the capacity for lateral movements of noncitizens within and between Border Patrol sectors to help relieve overcrowded sectors quickly.  For example, CBP will complete a blanket purchase agreement to contract for 394 additional bus movements per day by April 29.  CBP can currently move about 4,900 people per day and this additional capacity will enable the movement of an additional 4,100 people per day, almost double, with the potential for further expansion.  The SBCC has secured eight U.S. Bureau of Prisons buses with supporting personnel to replace buses and drivers currently staffed by Border Patrol Agents.  Those Border Patrol Agents currently staffing buses will then be able to return to the field and perform their critical

Nicaragua AR_000172

law enforcement and border security missions.  The SBCC is also finalizing an interagency agreement with ICE for contracted ground transportation resources for an additional 40 bus movements per day and air movements for family units.

**Additional Medical Support**

It is among DHS's top priorities to ensure the health, safety, and well-being of those in DHS care and custody, the DHS workforce, and surrounding communities.  To this end, we have invested in ensuring that we have appropriate and accessible medical care, including for those with unique vulnerabilities, medical conditions, and for tender-aged children.  The SBCC is working to make medical resources available by the end of April to provide urgent clinical care for a planning scenario of 18,000 noncitizens in CBP custody at any given time.  The SBCC has developed a medical support plan, which has been reviewed by interagency medical experts, and is currently determining which federal agencies can provide support through an interagency agreement signed with DOD, HHS, USCG, and FEMA.

Beginning in 2021, DHS rapidly scaled its COVID-19 vaccine program to noncitizens in ICE custody.  The provision of vaccines, coupled with the testing of noncitizens on intake and rigorous isolation and quarantine protocols, has led to markedly low morbidity and mortality in ICE facilities.  Separately, on March 28, 2022, DHS expanded its COVID-19 vaccine program to include noncitizens in CBP custody with a goal to expand to 24 sites by May 23.  All Title 8, age-eligible, non-citizens are eligible for the CBP COVID-19 vaccine program and receive their first dose prior to onward travel.  Additionally, at the highest-volume CBP sectors, unaccompanied children are tested on intake for COVID-19 and, if positive, are triaged for immediate movement to HHS facilities.  These mitigation measures at CBP and ICE have kept COVID-19 rates among noncitizens at or lower than surrounding communities during most of 2021 and 2022.

**Increased CBP's Border Holding Capacity**

We have worked to increase CBP's holding capacity, currently at over 17,000 compared to less than 13,000 in January 2021.  This includes three soft-sided facility expansions totaling approximately 1,300 in holding capacity initiated in the past two months and one that will be completed in mid-May.  There are additional facility expansions still in the planning phase.  By April 27, CBP will also complete its assessment of DOD sites for potential additional temporary facilities.

## *Border Security Pillar 2*: We are increasing CBP processing efficiency and moving with deliberate speed to mitigate potential overcrowding at Border Patrol stations and alleviate the burden on the surrounding border communities.

As noted above, CBP's goal at Border Patrol stations is to hold noncitizens in a safe, orderly, and humane environment; ensure appropriate security screening; and to quickly process and transfer screened noncitizens out of CBP custody to ensure that facilities do not become overcrowded, while facilitating the lawful trade and travel that is critical to our economy.  CBP, which initially encounters and apprehends migrants, does not have sufficient capacity or resources in its short-term facilities to hold individuals for over 72 hours.  In the case of unaccompanied children, CBP

Nicaragua AR_000173

must, by law, transfer these children to the custody of the HHS Office of Refugee Resettlement (ORR) within 72 hours of encounter.

CBP will continue to achieve these goals by employing several strategies, such as transferring noncitizens from stations that are over capacity to those that have capacity and transferring them to ICE ERO for Expedited Removal and detention, where appropriate.  The SBCC is also launching the following three new initiatives to support decompression efforts, which ensure the continued integrity of our security screening processes: enhanced central processing center, en route processing, and streamlined processing.  Further, CBP is working to increase processing efficiency at POEs to allow noncitizens to present for inspection in a safe and orderly manner.

### Enhanced Central Processing Centers (ECPC)
Processing a noncitizen upon apprehension and entering them into immigration removal proceedings involves multiple steps, multiple electronic systems, and, often, multiple federal agencies.  Specific issues include the referral process from CBP to ICE, coordination between CBP and ICE on custody and transportation of noncitizens, and coordination between CBP and HHS on the transfer of unaccompanied children.  To address these challenges, the SBCC is testing and rapidly developing a model that will co-locate CBP, ICE, NGOs, and possibly other entities at ECPCs to eliminate any inefficiencies and more rapidly process noncitizens.  This innovative model will allow CBP to quickly triage noncitizens it encounters based on risk, ensuring that higher risk individuals are held in secure, hardened facilities until they are placed in detention, while lower risk individuals are processed quickly and humanely at facilities that do not require as significant a law enforcement presence.

This will allow the Border Patrol to focus more of its agents on its priority mission to secure our border rather than processing and administrative duties.  ICE personnel will be on-site in order to minimize delays associated with referrals, and NGOs will be present as well to provide legal orientation services and onward transportation for those low-risk individuals who are ultimately released on ATD.  The first ECPC will be operational in Laredo, Texas effective April 29.  Informed by this experience, the SBCC will complete a plan for the development of additional enhanced central processing centers beyond Laredo.

### En Route Processing
As noted above, processing of noncitizens at CBP facilities can be time intensive.  When noncitizens are transported to alleviate overcrowding, the time in transit is an opportunity to process those being transported.  By testing and refining operational plans to complete processing of noncitizens while in transit, the SBCC can move noncitizens out of CBP facilities faster, while retaining the integrity of biometric and biographic screening processes and ensuring noncitizens apprehended at the border are placed expeditiously into removal proceedings.

As part of DHS's strategic use of existing Title 8 processing pathways, this processing would be reserved for family units, especially from countries that do not accept repatriations quickly or at all.  The SBCC is actively engaging with cities that are located within a six-hour drive of the border and will employ en route processing to relieve pressure on Border Patrol facilities and border communities. The SBCC is working closely with local governments, including law

Nicaragua AR_000174

enforcement, in these cities to ensure that local governments and receiving NGOs have the support and resources they need, as described further below.

The SBCC is testing en route processing and is continuing to develop options to expand its capacity further.  In particular:
- *Del Rio to Laredo:* The SBCC has developed a concept of operations for en route processing from Del Rio to Laredo that has already been successfully tested.
- *Bus Technology:* Border Patrol is outfitting buses with necessary technology to support processing requirements while in transit.

## Streamlining Processing Methods

Processing a single noncitizen for a Notice to Appear (NTA) can take two to three hours, including the time to complete the processing documents and subsequent review between CBP and ICE to ensure accuracy.  An NTA is a charging document, issued by ICE or CBP, which initiates removal proceedings against a noncitizen, and specifies the date and time for the noncitizen to appear in immigration court.  Last year, DHS launched the Southwest Border Technology Integration Program to digitize and automate noncitizen processing.  Today, over 70 percent of Title 8 cases are reviewed and signed digitally by CBP.  We project this has saved over 20,000 hours of processing time already.

The SBCC is identifying and implementing further technological and administrative improvements to reduce overall processing time of noncitizens, while also maintaining security.  For example, the SBCC is focused on expanding digital processing towards a fully digital "A-File," which is shared across CBP, ICE, U.S. Citizenship and Immigration Services (USCIS), and DOJ throughout the immigration lifecycle.  Digital A-Files for voluntary returns and digital review and signatures for other disposition types will be implemented by May 23.  DHS will continue to focus on digitizing all other elements of the A-File to maximize efficiency.  In addition, the SBCC is eliminating administrative redundancy by identifying and removing certain forms in the document exchange between CBP and ICE.

## Port of Entry Processing

The imposition of the Title 42 public health Order severely restricted the ability of undocumented noncitizens to present at POEs for inspection and processing under Title 8.  The closure of this immigration pathway for much of the time Title 42 has been in effect has driven people between POEs at the hands of the cartels.  Returning to robust POE processing is an essential part of DHS border security efforts.  Beginning in the summer of 2021, DHS restarted processing vulnerable individuals through POEs under Title 8, on a case-by-case basis for humanitarian reasons, pursuant to the exception criteria laid out in CDC's Title 42 Order.  These efforts, which we have recently expanded, offer individuals in vulnerable situations a safe and orderly method to submit their information in advance and present at POEs for inspection and subsequent immigration processing under Title 8.  We also have enhanced Title 8 POE processing through the development of the CBP One mobile application, which powers advanced information submission and appointment scheduling prior to an individual presenting at a POE.  We will make this tool publicly available and continue to expand its use to facilitate orderly immigration processing at POEs.

Nicaragua AR_000175

## *Border Security Pillar 3*: We are administering consequences for unlawful entry, including removal, detention, and prosecution.

Attempting to enter the United States without authorization carries potential long-term consequences, including removal from the United States, bars on subsequent admission, and criminal liability.  By expeditiously removing individuals who do not have a lawful basis to stay in our country, the United States is making clear that while we are a nation of immigrants, we are also a nation of laws.  We will continue fully enforcing those laws, employing a combination of Expedited Removal and removal proceedings before an immigration judge, detaining single adults where appropriate, and referring for prosecution border-related criminal activity.

### Expedited Removal

DHS is preparing to maximize the use of Expedited Removal for populations where removal is possible or likely, consistent with the law, and is working to streamline Expedited Removal processes across relevant federal agencies, with an eye towards quickly removing those who receive a negative credible fear finding while in ICE custody.  DHS is increasing the availability of interview facilities and USCIS officers to conduct credible fear interviews, creating an electronic process to refer appeals of negative fear findings to the DOJ Executive Office for Immigration Review (EOIR), and working with partner countries throughout the hemisphere to significantly improve our ability to quickly remove and repatriate individuals with final orders of removal.

Increased use of Expedited Removal serves key law enforcement and operational goals.  It is a fair and effective means of efficiently removing those with no lawful basis to remain in the United States.  Those subject to Expedited Removal also face a five-year bar on admission from the date of removal and potential criminal prosecution if they seek to unlawfully re-enter, thus serving to deter would-be border crossers.

Single adults placed in Expedited Removal are generally detained throughout the process, making the capacity to detain critical to its effectiveness and to increasing its use.  DHS utilizes a network of detention facilities across the country to detain noncitizens who are subject to Expedited Removal, who pose a threat to public safety or national security, to ensure presence at immigration proceedings, and to effectuate removals.  As COVID-19 physical distancing restrictions are revised, DHS will regain additional bed space within its existing facility footprint.

### Asylum Office Rule

Individuals in Expedited Removal who establish a credible fear of persecution or torture are currently referred to an immigration court for full consideration of their applications for asylum and related protection.  Under the new Asylum Office rule, effective May 31, DHS can instead refer these cases to USCIS for significantly more expeditious adjudication.  The new rule will allow DHS and DOJ to conclude certain asylum cases in months instead of years, meaning that those deemed ineligible for asylum can be removed more quickly.  While full implementation will take time, this will have a transformative impact on the asylum system.

Nicaragua AR_000176

### Timely Immigration Court Proceedings

For families not processed through Expedited Removal and who are instead placed in removal proceedings, DOJ and DHS have jointly established a new, more efficient process known as the Dedicated Docket to conduct speedier immigration court proceedings that comport with due process.  DHS is utilizing the Dedicated Docket for certain family unit members who arrive between POEs at the Southwest Border and are traveling to one of 11 destination cities.  Families placed on the Dedicated Docket are prioritized for adjudication and are generally expected to receive final decisions in their cases within 300 days of initiation, as opposed to several years.  The Dedicated Docket includes a Family Group Legal Orientation Program in which nonprofit organizations explain the immigration court process and provide referrals to pro bono legal services to support families placed on this Docket.

In addition to the Dedicated Docket, DOJ will continue to operate its long-standing detained docket for individuals in ICE custody, moving cases through the immigration court system in a matter of months, rather than years.

### Prosecuting Border-Related Criminal Activity

DHS will continue to refer border-related criminal activity to DOJ for prosecution where warranted, including that of smugglers, repeat offenders, and other noncitizens whose conduct warrants such law enforcement action.  We also continue to enforce CBP's Repeat Offender initiative to target recidivism.  This enforcement regime has improved DHS's ability to leverage legal consequences to deter irregular migration while conserving limited processing resources.

### *Border Security Pillar 4*: We are bolstering the capacity of NGOs to receive noncitizens after they have been processed by CBP and are awaiting the results of their immigration removal proceedings.  And, we are ensuring appropriate coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities.

Increased migration levels put additional pressure not only on DHS personnel and resources, but also on border communities and NGO partners who play a critical role in helping noncitizens who are released from DHS custody for the pendency of their removal proceedings.  Noncitizens who are not subject to ICE detention are screened by CBP as described above, entered into immigration removal proceedings, and permitted to travel to onward destinations, where they are subject to ongoing supervision.  Once a noncitizen is released from custody by DHS, the Department is no longer operationally engaged in their transportation, medical care, or shelter.  Nonetheless, our goal is to help communities alleviate the pressures they experience by expanding NGO capacity, through communication and coordination, and grants through the Emergency Food and Shelter Program (EFSP).  We are also exploring other ways to provide assistance to communities and welcome the ongoing dialogue we have with local leaders to that end.

### Bolstering NGO Capacity

NGOs play a critical role in providing care and support with onward travel to noncitizens who are entered into immigration removal proceedings, not subject to detention, and released from

Nicaragua AR_000177

CBP custody.  The SBCC has assessed and is tracking NGO capacity and sharing information to ensure there is a common operating picture across all relevant parties, to include gaps that can be remediated with external assistance.

The EFSP, administered by DHS through FEMA, supplements and expands ongoing work of local NGOs to meet the urgent needs of local agencies assisting the unique and vulnerable migration population encountered by DHS.  In FY 2022, Congress authorized $150 million for EFSP Southwest Border support, and this month, FEMA has taken necessary steps to ensure these funds can be accessed by eligible partners in short order.  We are working to ensure the eligibility criteria for EFSP can cover the broadest set of possible needs and will provide more information for entities that are not familiar with EFSP by the end of April.

For the subset of non-citizens who may be released from custody directly into a community (i.e., those who cannot be released in coordination with an NGO due to capacity constraints or other issues), DHS is defining required criteria for CBP leadership to reference when determining whether and how to release individuals.  This is particularly important given the potential for increases in this population going forward.  The criteria will include safety checks, notification to local officials, information on local resources and legal services, and required documentation. The SBCC will complete an operational checklist, informed by feedback from our local stakeholders including law enforcement partners, also by the end of April.

Additionally, by the beginning of May, the SBCC will complete an updated information package to distribute to all noncitizens released from federal custody. The update was designed to ensure individuals more clearly understand their obligations and requirements for compliance with the enforcement and removal process.

**Communication with State, Local, and Community Leaders**
To ensure close operational coordination and support ongoing local planning efforts, the SBCC and CBP leaders continue to engage extensively with state and local governments, including law enforcement entities, public health authorities, and NGOs, including in California, Arizona, New Mexico, and Texas, as well as other locations as needed.  This regular coordination includes a focus on noncitizen transport and capacity planning, resolving logistical challenges, and addressing community concerns through shared solutions.  These and other coordination sessions will increase as operations necessitate.

***Border Security Pillar 5:* We are targeting and disrupting the transnational criminal organizations (TCOs) and smugglers who take advantage of and profit from vulnerable migrants, and who seek to traffic drugs into our country.**

DHS works at home and abroad to identify, investigate, and interdict the TCOs that smuggle people and drugs into our country.  Human smuggling organizations peddle misinformation that the border is open, in order to profit from the vulnerability of migrants.  DHS is targeting these organizations, in close collaboration with other federal agencies, state and local law enforcement, and international partners.  While this has been a consistent priority, our efforts have intensified in recent months.

16 of 20

## Migration Intelligence

Building on the Intelligence Community's existing work to monitor migration activity in the Western Hemisphere, in April, ODNI stood up a Migration Intelligence Cell with the goal of providing advanced geographic and time-based warning of large human smuggling movements in the region and analysis and targeting information for disruption activities. The Migration Intelligence Cell has highlighted to the entire Intelligence Community the priority of human smuggling to prompt additional focus. This intelligence will be used for disruption activities as well as border security and management actions.

## Disrupting Smuggling Networks

Building on existing efforts, in April 2022 DHS surged disruption efforts in partnership with other federal agencies along six coordinated and interconnected lines of effort. These include:

- Operation Expanded Impact led by Homeland Security Investigations (HSI), a division of ICE. HSI is focusing its investigative efforts along the Southwest Border to launch additional criminal investigations of the organizations taking advantage of vulnerable individuals, working to detect, disrupt, and dismantle TCOs involved in narcotics, human smuggling, and human trafficking. HSI has assigned approximately 250 special agents and criminal analysts to carry out investigations in the United States;
- Operation Sentinel, which is an interagency counter-network operation targeting TCOs affiliated with the smuggling of migrants;
- Joint Task Force Alpha, a DOJ-led effort to target smuggling and trafficking groups;
- Blue Indigo, led by DOJ and DHS to disrupt cartel operations and illicit networks in South Texas;
- Financial disruption conducted by the Treasury Department; and,
- The ODNI cell referenced above.

This is the largest surge of resources and disruptive activities against human smuggling networks in recent memory. So far this month, these lines of effort produced over 2,500 arrests, investigations, and disruptions of smuggling infrastructure, such as buses and safe houses, among other actions, and have slowed, stopped, or reversed the flows of thousands of migrants. This activity represents a dramatic increase in human smuggling network-related disruption events in FY 2022 compared to the same time and in the same region in FY 2021.

Partnerships with Mexican and Central American counterparts have resulted in multiple significant enforcement actions against human smuggling and trafficking groups operating in Mexico, Guatemala, El Salvador, and Honduras. In Guatemala, efforts have focused on the indictments and extraditions of Guatemalan human smugglers to face prosecution. In Honduras, DHS has provided robust support to Operation Scorpion, a border surge initiative of the Honduran National Police that targets human smugglers and traffickers.

## Drug Seizures and Enforcement

DHS has increased efforts to stem the flow of illegal drugs into the United States. In FY 2021, HSI Special Agents conducted 12,920 criminal arrests and seized over 2.4 million pounds of narcotics, which included 14,530 pounds of fentanyl. This compares to FY 2020 seizures of more than 1.4 million pounds. In addition, HSI Special Agents seized more than $188 million in

total currency and assets.  In FY 2021, CBP seized 900,000 pounds of narcotics, a significant increase over the previous year.

DHS employs a multi-layered approach to countering narcotics trafficking, in close partnership with other federal and partner government agencies.  CBP's National Targeting Center uses advanced analytics and targeting capabilities to identify critical logistics, financial, and communication nodes and exploit areas of weakness in opioid trafficking networks.  ICE HSI Special Agents exchange information, coordinate investigations, and facilitate enforcement actions with law enforcement partners abroad to deter the ability of TCOs to smuggle drugs, people, and contraband into and out of the United States.

## *Border Security Pillar 6:* **We are deterring irregular migration south of our border, in partnership with the Department of State, other federal agencies, and nations throughout the Western Hemisphere, to ensure that we are sharing the responsibility throughout the region.**

Deterring migrants who will not meet the criteria for asylum is an important tool to alleviate pressure at the border.  As described earlier, that is a challenge.  Across the world, more people are displaced from their homes than at any time since World War II.  While the United States is a destination country for those fleeing their homes, we do not experience the phenomenon alone.  Colombia, Costa Rica, Ecuador, and many other countries in the region are experiencing increases in migration, especially of Venezuelans, but of other nationalities as well.  In light of the increased levels we are experiencing, DHS, working with DOS and other partners, has intensified our work to manage and deter irregular migration throughout the region.

### New Bilateral Arrangements on Migration and Protection
On March 15, I traveled to Costa Rica and joined President Alvarado in announcing a bilateral Migration Arrangement, which outlines our shared commitment to both manage migrant flows and promote economic growth in the region.  On April 19, the U.S. government signed a Bilateral Arrangement on Migration and Protection with the Government of Panama, similarly detailing our collaborative commitments to improve migration management, expand stabilization efforts, and increase access to legal pathways and protection for those in the region.  DHS and DOS are actively engaged with other countries in the region to advance similar bilateral arrangements, as well as a Hemispheric Declaration on Migration and Protection to be completed at the upcoming Summit of the Americas in June 2022.

### Partnership with the Government of Mexico
The Biden-Harris Administration continues to maintain a close partnership with the Government of Mexico to stem irregular migration, which includes creating viable legal pathways, facilitating lawful trade and travel, and combating the shared dangers of transnational organized crime.  Last month, I made my fourth official visit to Mexico City where I met with President López Obrador to intensify our shared commitment to promoting lawful trade and travel and developing a regional approach to migration management.

Nicaragua AR_000180

**In-Region Messaging**

DHS coordinates closely with DOS to track trends, share research, and coordinate messaging to counter disinformation that smugglers use to victimize vulnerable migrants. Our approach has included paid advertising on radio and digital platforms and press conferences and media interviews in source and transit countries. These messages counter disinformation propagated by human smugglers and warn migrants of the dangers of being exploited and facing death at the hands of unscrupulous criminal organizations.

# CONCLUSION

**Despite the efforts of our dedicated DHS workforce and our partners executing this comprehensive plan, a significant increase in migrant encounters will substantially strain our system even further. We will address this challenge, but it will take time, and we need partnership and support to do so successfully. We are also operating within a fundamentally broken immigration system that only Congress can fix.**

As described above, DHS and its federal and community partners have been taking steps for months to prepare for the lifting of Title 42, while operating within a system that is not designed to handle the current volume of migrants nor the increased volume we expect over the coming months. The preparations and deliberate planning detailed in this memorandum will enable us to manage and mitigate known and unanticipated challenges more effectively, while protecting the safety and security of our communities. But notwithstanding the efforts described in this paper, a significant increase will substantially strain our system even further.

We are especially mindful of the following challenges and potential developments at higher levels of encounters:

- For several months, CBP, ICE, NGOs, and other critical partners have been managing levels beyond the capacity for which their infrastructure was designed and resourced, meaning additional increases will create further pressure and potential overcrowding in specific locations along the border.
- With NGOs strained, there is a potential for a higher number of single adults and families to be released into communities without NGO or other sponsor support. The federal government has few tools or authorities to support the related impacts on local communities, though we are actively working to develop more.
- Depending on levels, land ports of entry could experience processing delays and disruptions at specific points in time.
- Communication and coordination across state, local, and community leaders requires good faith engagement of all parties, to help ensure we can effectively manage these developments together.

We welcome partners' support in mitigating these risks and challenges. We appreciate Congress' support in FY 2022, appropriating $1.4 billion for DHS to manage an increase in Southwest Border encounters. DHS is currently managing these resources responsibly and has submitted the required spend plan to Congress. DHS expenditures for the $1.4 billion appropriated in FY 2022 include but are not limited to: soft-sided facilities; medical contracts;

Nicaragua AR_000181

transportation; and support for NGOs through the EFSP.  DHS will also need to utilize its limited transfer and reprogramming authority once the $1.4 billion is exhausted.  Should additional resources be necessary to manage a sustained increase in encounters, DHS will engage Congress on any potential need for supplemental appropriations.

Over the past 15 months, the Department of Homeland Security has demonstrated time and time again our ability to tackle significant challenges, while operating consistent with our laws and our values.  From responding to unprecedented levels of migration and ensuring the safety of individuals in our care to vetting and processing tens of thousands of evacuees from Afghanistan and Ukraine, we have consistently risen to the challenge in extremely difficult circumstances. We will continue to work tirelessly on behalf of the American people, but there is broad agreement that our immigration system is fundamentally broken.  As it has since its first day in office, the Biden-Harris Administration continues to call on Congress to pass legislation that holistically addresses the root causes of migration, strengthens border security, fixes our immigration system, and improves legal pathways.

Nicaragua AR_000182



U.S. Department of Homeland Security
Washington, DC 20528

December 20, 2022

MEMORANDUM TO FILE

FROM:     ▮▮▮▮▮▮     Blas Nuñez-Neto
                            Acting Assistant Secretary for Border and Immigration
                            Office of Strategy, Policy, and Plans

SUBJECT:                Data on Migration through the Western Hemisphere

Purpose

This memorandum commits to writing data and information considered by the Department of
Homeland Security's (DHS) Office of Strategy, Policy and Plans (PLCY) ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Description of Data or Information

PLCY states that, according to reporting from U.S. Embassy San Jose, nearly 1,500 Venezuelans
requested asylum in Costa Rica in the latter half of October, which nearly matched the number of
applicants of all nationalities for the first eight months of the year.

PLCY also mentions that, according to reporting from U.S. Embassy San Jose, the Government
of Costa Rica established the Special Temporary Category (STC) of status for Cubans,
Nicaraguans and Venezuelans in Costa Rica who applied for asylum between January 1, 2010
and September 30, 2022 and desire to withdraw their application in favor of receiving STC and
having access to employment authorization and social services.

PLCY states that, according to reporting from U.S. Embassy Bogota, the Government of
Colombia was working on plans to expedite the 26,000-case backlog of asylum cases in the latter
half of 2022.

PLCY describes the Government of Ecuador's phased registration process for temporary
residence permits. Specifically, according to reporting from U.S. Embassy Quito, that the first
phase was launched on September 1, 2022, by opening online registration to an estimated
120,000 Venezuelans who hold or previously held a regular migration stat us and all
unaccompanied minors. More than 68,500 individuals registered within the first week.

PLCY relays how the Government of Ecuador opened Phase Two on November 16, 2022, to
approximately 100,000 non-Venezuelan migrants who entered regularly. As of November 25,

more than 89,000 individuals had registered and over 22,000 have already received their temporary residency visa. PLCY continues to explain that Phase Three will open February 17, 2023, to an estimated 350,000 Venezuelans who entered irregularly.

PLCY outlines the parameters of the new amnesty program, according to reporting from U.S. Embassy Belmopan. This program will include asylum applicants who had previously been denied as long as they were registered in Belize by March 31, 2020. Among other categories that qualify under this amnesty program are individuals who resided in Belize before December 31, 2016. Total beneficiaries are estimated to range between 6,000-8,000 and will receive permanent residency and a path to citizenship.

PLCY mentions how the Government of Mexico would not accept more noncitizens returned to Mexico via the Migrant Protection Protocols (MPP) than local shelters had the capacity for, which was limited. Additionally, reporting from U.S. Embassy Mexico City that describes how MPP returns were paused in San Diego for an extended amount of time in the summer of 2022 due to a lack of shelter space in Tijuana.

PLCY describes concern from international partners, as conveyed by Embassy reporting, about the potential consequences of lifting Title 42, as was originally planned on May 23, 2022. Specifically, partners expressed concern that the end of Title 42 would be perceived by migrants—and messaged by smugglers—as an opening of the U.S. border, which could cause a dramatic and overwhelming increase in migration flows through partner countries. Another potential pull factor cited by partners was the perception that U.S. immigration officials release migrants into the community. Additionally, one partner expressed concern that in the past, rumors alone of the end of Title 42 had spurred the creation of caravans moving towards the border.  In conversations, another foreign partner noted that the lack of consequences at our border is a driver for irregular migration.

PLCY describes conversations with international partners, as relayed in a meeting readout from the Department of State, in which at least one country encouraged the U.S. Government to expand the Venezuela parole process to other nationalities as a pathway for individuals to reach the United States without making the dangerous journey through the hemisphere. PLCY relays information from other conversations with international partners in which they worry that these pathways will be undermined when the Centers for Disease Control and Prevention's Title 42 Order is no longer being implemented.

PLCY describes conversations with international partners in which they conveyed that their willingness to receive increased returns of migrants was contingent on expanding the model provided by U4U and the Venezuela process, which decreased irregular migration throughout the hemisphere by increasing options for lawful pathways and adding consequences for noncitizens who bypass those opportunities to travel irregularly to the United States. In general, international partners have been active participants in carrying out actions related to stabilizing populations, expanding lawful pathways and humanely managing borders, as per the Los Angeles Declaration on Migration and Protection.  However, our foreign partners regularly express concern about having to divert resources from other priorities to respond to the ongoing surge in migration, and believe that the U.S. Government should be doing more, particularly now, to reduce these irregular flows and channel them into safe and orderly processes.

PLCY reports that the Venezuela process was predicated on returning nationals of that country to Mexico under Title 42 authorities, and Mexico has historically not accepted the return under Title 8 of third-country nationals with final orders of removal.

PLCY describes conversations with at least one international partner that refused to entertain negotiating a Safe Third Country Agreement with the United States, claiming it is not a politically viable option for them.

Finally, PLCY considered reporting from U.S. Embassy Panama City stating that 59,800 irregular migrants crossed the Darien Gap in October 2022, which was a 130 percent increase over October 2021. However, there was a sharp decline in migrants crossing from Colombia into Panama after DHS announced the process for Venezuela on October 12. The daily average dropped from 2,500 migrants in the first two weeks of October 2022 to about 1,000 migrants in the last two weeks. Embassy Panama City cited a seasonal decrease from October to November 2021. However, in the same period in 2022, the overall number of Venezuelan migrants crossing has decreased, whereas the overall the number of Ecuadorians and Haitians saw much smaller variation.

10/11/22, 5:33 PM    The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans ...

Case 6:23-cv-00007 Document 94-3 Filed on 03/24/23 in TXSD Page 49 of 220

# THE UNITED STATES ANNOUNCES MORE THAN $314 MILLION IN NEW STABILIZATION EFFORTS AND HUMANITARIAN ASSISTANCE FOR VENEZUELANS AND OTHER MIGRANTS AT THE SUMMIT OF THE AMERICAS

### For Immediate Release

Friday, June 10, 2022

Office of Press Relations
press@usaid.gov

During the Summit of the Americas, President Biden announced new efforts by the Department of State and USAID that will assi
vulnerable refugees and migrants across the region, including those displaced from the political and economic crisis in Venezue
and humanitarian assistance for vulnerable Venezuelans in Venezuela.

### $40 Million in USAID Development Funding

- With $35.9 million in FY 2021 Development Assistance (DA), Economic Support Fund (ESF), and Global Health Programs–
  USAID funds for South America, including in Brazil, Colombia, Ecuador, and Peru, USAID will promote the social and econom
  integration of the millions of Venezuelan migrants through policy reform, pathways for legal status, professional certificatio
  job training and placement, microenterprise creation, access to financial services, and other socio-economic integration
  efforts.

- In Central America, with $4.1 million in FY 2018 and FY 2019 ESF, USAID will expand integration efforts in Belize, Costa Rica,
  and Panama, to support the dignified social and economic integration of third country migrants from Nicaragua, as well as
  from Venezuela, Haiti, and other countries around the region.

### $171 Million USAID Humanitarian Funding

- This new funding will provide direct relief to vulnerable Venezuelans who have remained within the country, including
  healthcare, food, nutrition, water and sanitation, and protection services. The new funding will also help Venezuelan migra
  and refugees who have fled to Brazil, Colombia, Ecuador, and Peru by providing emergency food assistance. With USAID
  support, partners aim to address acute food insecurity among Venezuelan migrants and refugees in these four countries by
  providing them with hot meals, cash transfers, food vouchers, and food kits.

### Nearly $103 Million Department of State Humanitarian Funding

- This new funding through the State Department's Bureau of Population, Refugees, and Migration (PRM) supports a wide ran
  of life-saving humanitarian programs for Venezuelan refugees and migrants, such as emergency shelter; access to health ca
  water, sanitation, and hygiene supplies; increased access to education; support for livelihoods; COVID-19 support, and
  protection for vulnerable groups including women, youth, LGBTQI+, and indigenous people in seventeen countries includin
  Argentina, Aruba, Brazil, Chile, Colombia, Costa Rica, Curacao, Dominican Republic, Ecuador, Guyana, Mexico, Panama,
  Paraguay, Peru, Trinidad and Tobago, Uruguay, and Venezuela.

Nicaragua AR_000186

10/11/22, 5:33 PM    United States Announces More than $314 Million New Stabilization Efforts and Humanitarian Assistance for Venezuelans ...

Case 6:23-cv-00007   Document 94-3   Filed on 03/24/23 in TXSD   Page 50 of 220

Last updated: September 23, 2022

**SHARE THIS PAGE**

Nicaragua AR_000187

Nicaragua AR_000188

| | USBP encounters of Venezuela nationals |
|---|---|
| Average encounters 10/1 - 10/11/22 | 1,212  1-Oct  1240 |
| Average encounters 10/18 - 10/24 | 170  2-Oct  1510 |
| Average encounters 11/28 - 12/4 | 86  3-Oct  1366 |
| | 4-Oct  1260 |
| | 5-Oct  1139 |
| | 6-Oct  1174 |
| | 7-Oct  1083 |
| | 8-Oct  1006 |
| | 9-Oct  1202 |
| | 10-Oct  1224 |
| | 11-Oct  1128 |
| | 12-Oct  796 |
| | 13-Oct  1256 |
| | 14-Oct  1056 |
| | 15-Oct  834 |
| | 16-Oct  484 |
| | 17-Oct  298 |
| | 18-Oct  187 |
| | 19-Oct  158 |
| | 20-Oct  159 |
| | 21-Oct  132 |
| | 22-Oct  145 |
| | 23-Oct  160 |
| | 24-Oct  247 |
| | 25-Oct  296 |
| | 26-Oct  415 |
| | 27-Oct  301 |
| | 28-Oct  408 |
| | 29-Oct  405 |
| | 30-Oct  331 |
| | 31-Oct  430 |
| | 1-Nov  412 |
| | 2-Nov  331 |
| | 3-Nov  305 |
| | 4-Nov  348 |
| | 5-Nov  250 |
| | 6-Nov  239 |
| | 7-Nov  265 |
| | 8-Nov  260 |
| | 9-Nov  262 |
| | 10-Nov  262 |
| | 11-Nov  338 |
| | 12-Nov  192 |

Nicaragua AR_000189

| | |
|---|---|
| 13-Nov | 197 |
| 14-Nov | 158 |
| 15-Nov | 168 |
| 16-Nov | 490 |
| 17-Nov | 1074 |
| 18-Nov | 210 |
| 19-Nov | 90 |
| 20-Nov | 116 |
| 21-Nov | 84 |
| 22-Nov | 126 |
| 23-Nov | 80 |
| 24-Nov | 60 |
| 25-Nov | 51 |
| 26-Nov | 55 |
| 27-Nov | 75 |
| 28-Nov | 66 |
| 29-Nov | 83 |
| 30-Nov | 86 |
| 1-Dec | 102 |
| 2-Dec | 95 |
| 3-Dec | 79 |
| 4-Dec | 93 |
| Oct persist | |
| Data pulled from UIP on 12/5/2022 | |

Nicaragua_AR_000190

Average encounters 10/1 - 10/11/22
Average encounters 10/18 - 10/24
Average encounters 11/28 - 12/4

USBP encounters of Venezuela nationals

| Date | Value |
| --- | --- |
| 1,212 1-Oct | 1240 |
| 170 2-Oct | 1510 |
| 86 3-Oct | 1366 |
| 4-Oct | 1260 |
| 5-Oct | 1139 |
| 6-Oct | 1174 |
| 7-Oct | 1083 |
| 8-Oct | 1006 |
| 9-Oct | 1202 |
| 10-Oct | 1224 |
| 11-Oct | 1128 |
| 12-Oct | 796 |
| 13-Oct | 1256 |
| 14-Oct | 1056 |
| 15-Oct | 834 |
| 16-Oct | 484 |
| 17-Oct | 298 |
| 18-Oct | 187 |
| 19-Oct | 158 |
| 20-Oct | 159 |
| 21-Oct | 132 |
| 22-Oct | 145 |
| 23-Oct | 160 |
| 24-Oct | 247 |
| 25-Oct | 296 |
| 26-Oct | 415 |
| 27-Oct | 301 |
| 28-Oct | 408 |
| 29-Oct | 405 |
| 30-Oct | 331 |
| 31-Oct | 430 |
| 1-Nov | 412 |
| 2-Nov | 331 |
| 3-Nov | 305 |
| 4-Nov | 348 |
| 5-Nov | 250 |
| 6-Nov | 239 |
| 7-Nov | 265 |
| 8-Nov | 260 |
| 9-Nov | 262 |
| 10-Nov | 262 |
| 11-Nov | 338 |
| 12-Nov | 192 |

Nicaragua AR_000191

| | |
|---|---|
| 13-Nov | 197 |
| 14-Nov | 158 |
| 15-Nov | 168 |
| 16-Nov | 490 |
| 17-Nov | 1074 |
| 18-Nov | 210 |
| 19-Nov | 90 |
| 20-Nov | 116 |
| 21-Nov | 84 |
| 22-Nov | 126 |
| 23-Nov | 80 |
| 24-Nov | 60 |
| 25-Nov | 51 |
| 26-Nov | 55 |
| 27-Nov | 75 |
| 28-Nov | 66 |
| 29-Nov | 83 |
| 30-Nov | 86 |
| 1-Dec | 102 |
| 2-Dec | 95 |
| 3-Dec | 79 |
| 4-Dec | 93 |
| Oct persist | |
| Data pulled from UIP on 12/5/2022 | |

Nicaragua AR_000192

| | Apprehensions of EWIs: total | Apprehensions of EWIs: Mexican nationals | MX% total |
|---|---|---|---|
| 1981 | 898,550 | 894,771 | 100% |
| 1982 | | | |
| 1983 | | | |
| 1984 | | | |
| 1985 | 1,300,691 | 1,291,734 | 99% |
| 1986 | | | |
| 1987 | | | |
| 1988 | | | |
| 1989 | | | |
| 1990 | 1,131,454 | 1,080,699 | 96% |
| 1991 | | | |
| 1992 | | | |
| 1993 | | | |
| 1994 | | | |
| 1995 | | | |
| 1996 | 1,620,033 | 1,586,492 | 98% |
| 1997 | | | |
| 1998 | | | |
| 1999 | | | |
| 2000 | 1781968 | 1732205 | 97% |
| 2001 | | | |

OIS Yearbooks, various years
Note: Limited to USBP. Data pulled from PDF copies of OIS Yearbook of Immigration Statistics, various years. Reported percentages are based on annual tables describing apprehensions of persons who entered without inspection by citizenship. Since

Nicaragua AR_000193

these data required manual processing, only a representative sample of years are included in the table.

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Enco[unters] d (APSO) | 1,566,421 | 1,231,412 | 930,341 | 906,734 | 1,140,247 | 1,269,230 | 1,168,309 | 954,396 | 792,396 | 619,113 | 527,413 | 401,058 | 426,105 | 489,612 |
| **CF Cases Complete d (APSO)** | | | | | | | | | | | | | | |
| CF Fo | 10,107 | 13,232 | 10,198 | 6,480 | 8,230 | 9,695 | 5,659 | 5,770 | 5,749 | 6,615 | 11,030 | 14,405 | 18,625 | 43,219 |
| CF Fo | 9,320 | 12,381 | 9,253 | 5,554 | 7,436 | 8,414 | 3,467 | 3,328 | 3,413 | 3,798 | 7,208 | 9,996 | 12,218 | 32,811 |
| CF Nc | 133 | 171 | 222 | 168 | 159 | 193 | 760 | 1,213 | 1,086 | 1,439 | 1,925 | 1,722 | 2,313 | 4,281 |
| Close | 654 | 680 | 723 | 758 | 635 | 1,088 | 1,432 | 1,229 | 1,250 | 1,378 | 1,897 | 2,687 | 4,094 | 6,127 |
|  | 92% | 94% | 91% | 86% | 90% | 87% | 61% | 58% | 59% | 57% | 65% | 69% | 66% | 76% |
|  | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 1% | 1% | 1% | 2% | 4% | 4% | 9% |

Source: OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 20, 2022.

## Final or Most Current Outcomes, Total SW

| MOST CURRENT OUTCOMES | 2013 | 2014 | 2015 | 2016 | 2017 | TO[TAL] |
|---|---|---|---|---|---|---|
| Total E[nc] | 477,459 | 544,668 | 403,473 | 505,086 | 385,192 | |
| Processec | 236,330 | 229,389 | 180,679 | 228,019 | 160,397 | |
| No fear | 197,061 | 174,897 | 130,485 | 130,298 | 89,147 | |
| No Fe[ar] | 187,507 | 165,138 | 129,198 | 127,236 | 86,205 | |
| Credible F | 38,981 | 54,230 | 50,043 | 97,575 | 71,121 | |
|  | 8% | 10% | 12% | 19% | 18% | |
|  | 16% | 24% | 28% | 43% | 44% | |
| Credible F | 36,026 | 48,670 | 46,394 | 92,709 | 68,711 | |
| Positiv | 30,800 | 34,997 | 33,904 | 73,564 | 53,509 | |
| Negati | 2,641 | 9,086 | 7,517 | 9,388 | 7,301 | |
| Nega | 2,380 | 7,240 | 6,235 | 7,593 | 5,868 | |
| Neg | 225 | 1,258 | 1,227 | 1,995 | 1,437 | |
| Neg | 2,155 | 5,982 | 5,008 | 5,598 | 4,431 | |
| Case cl | 2,985 | 4,587 | 4,973 | 9,757 | 7,901 | |
| Case | 965 | 1,543 | 1,810 | 4,639 | 3,839 | |
| Case | 1,620 | 3,044 | 3,163 | 5,118 | 4,062 | |
| Non-Referrals to EOIR | 6,991 | 16,432 | 13,102 | 17,377 | 12,336 | |
| Executed Removal Orders | 4,222 | 10,609 | 8,977 | 11,889 | 9,627 | |

Nicaragua AR_000194

| | | | | | |
|---|---|---|---|---|---|
| Total Referrals to EOIR (Includes closed cases, vacated negative decisions and positive decisions) | 31,990 | 37,798 | 36,941 | 80,198 | 58,785 |
| **EOIR ca** | 31,667 | 37,367 | 36,611 | 78,515 | 56,965 |
| Still in I | 12,205 | 12,066 | 12,573 | 30,216 | 26,329 |
| EOIR C | 19,398 | 24,310 | 23,978 | 48,040 | 30,340 |
| Asylu | 5,643 | 7,181 | 7,590 | 13,049 | 8,887 |
| Gr | 273 | 515 | 532 | 961 | 686 |
| Remo | 13,755 | 17,129 | 16,388 | 34,991 | 21,453 |
| E | 2,635 | 4,459 | 5,610 | 12,061 | 6,376 |

| | | | | | |
|---|---|---|---|---|---|
| Ex ecu ted Re mo val Or der s | 3,982 | 5,443 | 5,003 | 7,158 | 6,007 |
| T | 2,908 | 4,974 | 6,142 | 13,922 | 7,062 |

Nicaragua AR_000195

Nicaragua_AR_000196

# Border Encounters by Fear Claims

TAL.

| | 2018 | 2019 | 2020 | 2021 | 2022Q3 |
|---|---|---|---|---|---|
| | 497,699 | 957,155 | 448,731 | #### | #### |
| | 214,822 | 223,291 | 91,765 | 84,707 | 84,513 |
| | 114,822 | 121,450 | 66,035 | 15,055 | 29,389 |
| | 109,204 | 117,749 | 62,059 | 10,313 | 18,661 |
| | 99,825 | 101,734 | 25,705 | 69,635 | 55,119 |
| | 20% | 11% | 6% | 4% | 3% |
| | 46% | 46% | 28% | 82% | 65% |
| | 95,660 | 98,279 | 23,955 | 48,410 | 29,139 |
| | 74,531 | 70,967 | 8,494 | 33,534 | 17,047 |
| | 9,134 | 17,704 | 12,410 | 13,216 | 9,639 |
| | 6,744 | 14,307 | 9,754 | 12,778 | 9,056 |
| | 1,273 | 3,866 | 3,172 | 3,492 | 2,113 |
| | 5,471 | 10,441 | 6,582 | 9,286 | 6,943 |
| | 11,995 | 9,608 | 3,051 | 1,660 | 2,453 |
| | 6,585 | 3,310 | 950 | 821 | 780 |
| | 5,410 | 6,298 | 2,101 | 839 | 1,673 |

| | 2018 | 2019 | 2020 | 2021 | 2022Q3 |
|---|---|---|---|---|---|
| | 17,436 | 23,591 | 13,089 | 31,788 | 35,179 |
| | 12,008 | 18,834 | 8,690 | 6,048 | 2,290 |

Nicaragua AR_000197

| | | | | |
|---|---|---|---|---|
| 82,389 | 78,143 | 12,616 | 37,847 | 19,940 |
| 77,406 | 71,706 | 11,772 | 30,723 | 13,362 |
| 38,995 | 37,686 | 8,080 | 25,947 | 10,557 |
| 37,153 | 31,523 | 3,235 | 1,072 | 552 |
| 12,535 | 13,174 | 1,522 | 498 | 78 |
| 572 | 466 | 90 | 15 | 3 |
| 24,618 | 18,349 | 1,713 | 1,474 | 474 |
| 5,483 | 3,651 | 509 | 166 | 25 |

| | | | | |
|---|---|---|---|---|
| 7,207 | 10,705 | 729 | 303 | 110 |
| 6,055 | 4,117 | 599 | 181 | 28 |

Nicaragua AR_000198

Nicaragua AR_000199



USBP Encounters at Southwest Border by Sector, FY 1960 - August 2022

| FY | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1960 | 732 | 3,023 | 1,839 | 3,630 | 1,024 | 5,515 | 3,371 | 1,255 | 633 | 21,022 |
| 1961 | 954 | 3,458 | 1,878 | 3,540 | 1,172 | 6,713 | 2,279 | 1,178 | 573 | 21,745 |
| 1962 | 1,431 | 3,250 | 1,426 | 3,304 | 1,274 | 5,569 | 3,091 | 1,247 | 511 | 21,103 |
| 1963 | 2,026 | 4,417 | 1,690 | 3,813 | 1,753 | 9,992 | 3,768 | 1,466 | 719 | 29,644 |
| 1964 | 3,146 | 4,489 | 2,640 | 4,486 | 2,168 | 9,173 | 4,521 | 1,200 | 696 | 32,519 |
| 1965 | 3,973 | 4,292 | 5,344 | 6,355 | 2,310 | 8,057 | 6,558 | 1,480 | 1,651 | 40,020 |
| 1966 | 6,592 | 6,845 | 6,916 | 10,119 | 3,658 | 8,706 | 13,362 | 2,392 | 4,050 | 62,640 |
| 1967 | 7,049 | 7,906 | 6,974 | 13,656 | 4,178 | 9,029 | 17,844 | 3,068 | 4,269 | 73,973 |
| 1968 | 8,834 | 9,576 | 8,358 | 19,408 | 5,715 | 10,093 | 24,116 | 4,537 | 6,004 | 96,641 |
| 1969 | 11,973 | 12,991 | 9,195 | 31,159 | 8,129 | 14,076 | 33,311 | 8,301 | 8,833 | 137,968 |
| 1970 | 16,770 | 18,711 | 12,028 | 43,640 | 11,569 | 20,708 | 50,663 | 14,222 | 13,469 | 201,780 |
| 1971 | 22,026 | 25,780 | 14,292 | 57,796 | 17,665 | 28,281 | 59,375 | 23,548 | 15,228 | 263,991 |
| 1972 | 20,269 | 31,110 | 15,327 | 78,168 | 21,781 | 29,338 | 73,115 | 32,272 | 19,946 | 321,326 |
| 1973 | 22,378 | 42,232 | 23,125 | 82,386 | 23,854 | 37,092 | 128,889 | 44,824 | 36,286 | 441,066 |
| 1974 | 23,291 | 44,098 | 26,143 | 112,432 | 30,061 | 38,668 | 196,981 | 50,108 | 49,824 | 571,606 |
| 1975 | 20,472 | 32,008 | 27,217 | 99,000 | 26,199 | 31,300 | 185,499 | 39,941 | 50,628 | 512,264 |
| 1976 | 19,846 | 32,988 | 32,327 | 114,886 | 24,665 | 38,839 | 266,709 | 34,641 | 42,598 | 607,499 |
| 1977 | 22,239 | 42,322 | 38,421 | 145,059 | 27,289 | 38,704 | 337,105 | 33,295 | 48,669 | 733,193 |
| 1978 | 23,501 | 54,098 | 42,118 | 174,010 | 36,627 | 45,201 | 325,557 | 34,991 | 53,338 | 789,441 |
| 1979 | 20,116 | 50,262 | 50,455 | 149,722 | 50,666 | 41,915 | 337,930 | 37,075 | 52,580 | 795,798 |
| 1980 | 15,602 | 50,762 | 57,009 | 127,488 | 39,167 | 35,012 | 285,984 | 33,668 | 45,862 | 690,554 |
| 1981 | 17,584 | 50,455 | 59,774 | 146,872 | 36,910 | 32,809 | 326,836 | 33,085 | 45,483 | 749,808 |
| 1982 | 20,268 | 48,753 | 55,440 | 152,882 | 40,385 | 32,533 | 314,979 | 32,344 | 48,236 | 745,820 |
| 1983 | 20,829 | 83,733 | 71,897 | 205,944 | 65,279 | 57,706 | 429,121 | 35,870 | 63,595 | 1,033,974 |
| 1984 | 22,196 | 87,058 | 68,563 | 212,652 | 87,059 | 66,860 | 407,828 | 46,283 | 59,777 | 1,058,276 |
| 1985 | 23,667 | 99,280 | 71,519 | 240,350 | 114,931 | 82,826 | 427,772 | 55,269 | 67,737 | 1,183,351 |
| 1986 | 23,796 | 123,952 | 95,186 | 312,892 | 143,685 | 121,783 | 629,656 | 71,675 | 93,219 | 1,615,844 |
| 1987 | 9,586 | 64,934 | 55,291 | 231,994 | 74,139 | 71,038 | 500,327 | 47,481 | 67,277 | 1,122,067 |
| 1988 | 6,209 | 59,403 | 41,179 | 182,566 | 69,912 | 60,294 | 431,592 | 48,683 | 42,723 | 942,561 |
| 1989 | 5,560 | 46,786 | 27,524 | 168,105 | 75,292 | 79,650 | 366,757 | 51,445 | 31,387 | 852,506 |
| 1990 | 7,180 | 41,373 | 28,708 | 223,219 | 89,052 | 97,018 | 473,323 | 53,061 | 36,387 | 1,049,321 |
| 1991 | 8,764 | 38,554 | 30,554 | 211,775 | 72,293 | 87,319 | 540,347 | 59,728 | 28,646 | 1,077,876 |
| 1992 | 13,819 | 33,414 | 29,852 | 248,642 | 72,449 | 85,889 | 565,581 | 71,036 | 24,892 | 1,145,574 |
| 1993 | 15,446 | 42,289 | 30,058 | 285,781 | 82,348 | 109,048 | 531,689 | 92,639 | 23,548 | 1,212,886 |
| 1994 | 13,494 | 50,036 | 27,654 | 79,688 | 73,142 | 124,251 | 450,152 | 139,473 | 21,211 | 979,101 |
| 1995 | 11,552 | 76,490 | 37,137 | 110,971 | 93,305 | 169,101 | 524,231 | 227,529 | 20,894 | 1,271,390 |
| 1996 | 13,214 | 121,137 | 66,873 | 145,929 | 131,841 | 210,553 | 483,815 | 305,348 | 28,310 | 1,507,020 |
| 1997 | 12,692 | 113,280 | 146,210 | 124,376 | 141,893 | 243,793 | 283,889 | 272,397 | 30,177 | 1,368,707 |
| 1998 | 14,509 | 131,058 | 226,695 | 125,035 | 103,433 | 204,257 | 248,092 | 387,406 | 76,195 | 1,516,680 |
| 1999 | 14,952 | 156,653 | 225,279 | 110,857 | 114,004 | 169,151 | 182,267 | 470,449 | 93,388 | 1,537,000 |
| 2000 | 13,689 | 157,178 | 238,126 | 115,696 | 108,973 | 133,243 | 151,681 | 616,346 | 108,747 | 1,643,679 |
| 2001 | 12,087 | 104,875 | 172,852 | 112,857 | 87,068 | 107,844 | 110,075 | 449,675 | 78,385 | 1,235,718 |

Nicaragua_AR_000200

| Year | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2002 | 11,392 | 66,985 | 108,273 | 94,154 | 82,095 | 89,927 | 100,681 | 333,648 | 42,654 | 929,809 |
| 2003 | 10,319 | 50,145 | 92,099 | 88,816 | 70,521 | 77,749 | 111,515 | 347,263 | 56,638 | 905,065 |
| 2004 | 10,530 | 53,794 | 74,467 | 104,399 | 74,706 | 92,947 | 138,608 | 491,771 | 98,060 | 1,139,282 |
| 2005 | 10,536 | 68,506 | 55,722 | 122,679 | 75,346 | 134,186 | 126,904 | 439,079 | 138,438 | 1,171,396 |
| 2006 | 7,520 | 42,636 | 61,465 | 122,256 | 74,840 | 110,528 | 142,104 | 392,074 | 118,549 | 1,071,972 |
| 2007 | 5,536 | 22,920 | 55,883 | 75,464 | 56,714 | 73,430 | 152,460 | 378,239 | 37,992 | 858,638 |
| 2008 | 5,391 | 20,761 | 40,961 | 30,312 | 43,658 | 75,473 | 162,390 | 317,696 | 8,363 | 705,005 |
| 2009 | 6,360 | 17,082 | 33,521 | 14,999 | 40,569 | 60,989 | 118,721 | 241,673 | 6,951 | 540,865 |
| 2010 | 5,288 | 14,694 | 32,562 | 12,251 | 35,287 | 59,766 | 68,565 | 212,202 | 7,116 | 447,731 |
| 2011 | 4,036 | 16,144 | 30,191 | 10,345 | 36,053 | 59,243 | 42,447 | 123,285 | 5,833 | 327,577 |
| 2012 | 3,964 | 21,720 | 23,916 | 9,678 | 44,872 | 97,762 | 28,461 | 120,000 | 6,500 | 356,873 |
| 2013 | 3684 | 23510 | 16306 | 11154 | 50749 | 154453 | 27496 | 120939 | 6106 | 414397 |
| 2014 | 4096 | 24255 | 14511 | 12339 | 44049 | 256392 | 29911 | 87915 | 5902 | 479370 |
| 2015 | 5031 | 19013 | 12820 | 14495 | 35888 | 147257 | 26290 | 63397 | 7142 | 331333 |
| 2016 | 6366 | 23078 | 19448 | 25634 | 36562 | 186830 | 31891 | 64891 | 14170 | 408870 |
| 2017 | 6002 | 13476 | 18633 | 25193 | 25460 | 137562 | 26086 | 38657 | 12847 | 303916 |
| 2018 | 8045 | 15833 | 29230 | 31561 | 32641 | 162262 | 38591 | 52172 | 26244 | 396579 |
| 2019 | 9637 | 57269 | 35138 | 182143 | 38378 | 339135 | 58049 | 63490 | 68269 | 851508 |
| 2020 | 8627 | 40342 | 27487 | 54396 | 51425 | 90203 | 53277 | 66074 | 8804 | 400635 |
| 2021 | 37266 | 259294 | 59231 | 193918 | 112241 | 549077 | 142459 | 191232 | 114488 | 1659206 |
| 2022* | 30684 | 428556 | 64221 | 258766 | 100495 | 440423 | 160312 | 230235 | 284078 | 1997770 |

Note: FY 2022 data limited to first 11 months of the fiscal year.
Source: FY 1960 - FY 2012 from US Border Patrol; FY 2013-FY2021 from OIS Persist Dataset.

Nicaragua AR_000201

Nicaragua AR_000202

AR_000203

Nicaragua AR_000204

Total encounters by citizenship grouping

| | Mexico | N. Central | Other Cou | Total | | Mexico | N. Central | Other Cou | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | 467,461 | 43,590 | 16,362 | 527,413 | | 89% | 8% | 3% | 100% |
| 2011 | 344,013 | 40,505 | 16,540 | 401,058 | | 86% | 10% | 4% | 100% |
| 2012 | 316,890 | 88,322 | 20,893 | 426,105 | | 74% | 21% | 5% | 100% |
| 2013 | 317,559 | 140,441 | 31,607 | 489,607 | | 65% | 29% | 6% | 100% |
| 2014 | 285,499 | 248,063 | 36,483 | 570,045 | | 50% | 44% | 6% | 100% |
| 2015 | 253,656 | 142,341 | 48,855 | 444,852 | | 57% | 32% | 11% | 100% |
| 2016 | 255,669 | 227,456 | 75,403 | 558,528 | | 46% | 41% | 14% | 100% |
| 2017 | 180,929 | 187,534 | 46,117 | 414,580 | | 44% | 45% | 11% | 100% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | | 43% | 50% | 8% | 100% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | | 24% | 64% | 12% | 100% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | | 65% | 23% | 12% | 100% |
| 2021 | 655,591 | 701,049 | 378,043 | 1,696,569 | | 39% | 41% | 22% | 100% |
| 2022 | 808,340 | 541,618 | 1,028,987 | 2,378,945 | | 34% | 23% | 43% | 100% |

| | NCA | All other |
|---|---|---|
| FY10-13 average | 17% | 5% |
| FY14-19 average | 46% | 10% |

Source: OIS analysis of CBP data
OIS Production data

Nicaragua AR_000205

AR_000206

Nicaragua AR_000207

unique_1yr Unique
country_sin **Nicaragua**
app_region SW Land Border

| Row Labels | Sum of count |
|---|---|
| 2013 | 1,348 |
| 2014 | 1,766 |
| 2015 | 998 |
| 2016 | 1,329 |
| 2017 | 1,091 |
| 2018 | 3,497 |
| 2019 | 14,103 |
| 2020 | 1,605 |
| 2021 | 47,347 |
| 2022 | 157,356 |
| 2023 | 20,651 |
| Grand Total | 251,091 |

Source: OIS analysis of OIS Persist data through October 31, 2022.

Nicaragua AR_000208

**unique_1y Unique**
country_si **Nicaragua**
app_region SW Land Border

| Row Labels | Sum of count |
|---|---|
| 2013 | 1,348 |
| 2014 | 1,766 |
| 2015 | 998 |
| 2016 | 1,329 |
| 2017 | 1,091 |
| 2018 | 3,497 |
| 2019 | 14,103 |
| 2020 | 1,605 |
| 2021 | 47,347 |
| 2022 | 157,356 |
| 2023 | 20,651 |
| Grand Tot | 251,091 |

**all countries**
Unique totals
unique_1yr Unique
app_region SW Land Border

| Row Labels | Sum of count |
|---|---|
| 2013 | 365,546 |
| 2014 | 435,693 |
| 2015 | 324,897 |
| 2016 | 427,096 |
| 2017 | 330,917 |
| 2018 | 434,514 |
| 2019 | 874,162 |
| 2020 | 299,984 |
| 2021 | 1,126,659 |
| 2022 | 1,741,368 |
| 2023 | 185,527 |
| Grand Tota | 6,546,363 |

| FY22 Nic% | 157356 |
| | 1741368 |
| | 9% |

unique_1yr Unique
app_region SW Land Border

Sum of cou Column Labels

| Row Labels | 2022 | Grand Total |
|---|---|---|
| Brazil | 3% | 0.029478 |
| Chile | 0% | 0.003814 |
| Colombia | 7% | 0.07034 |
| Cuba | 12% | 0.122725 |
| Ecuador | 1% | 0.01278 |
| El Salvador | 4% | 0.037136 |
| Guatemala | 9% | 0.091908 |
| Haiti | 3% | 0.027968 |
| Honduras | 8% | 0.084713 |
| India | 1% | 0.008414 |
| Mexico | 23% | 0.227947 |
| Nicaragua | 9% | 0.090363 |
| Other | 4% | 0.039685 |
| Peru | 3% | 0.028769 |
| Romania | 0% | 0.003383 |
| Russia | 1% | 0.012235 |

**All except Nicaragua**
unique_1y Unique
country_si (Multiple Items)
app_region SW Land Border

| Row Label | Sum of count |
|---|---|
| 2013 | 364,198 |
| 2014 | 433,927 |
| 2015 | 323,899 |
| 2016 | 425,767 |
| 2017 | 329,826 |
| 2018 | 431,017 |
| 2019 | 860,059 |
| 2020 | 298,379 |
| 2021 | 1,079,312 |
| 2022 | 1,584,012 |
| 2023 | 164,876 |
| Grand Tot | 6,295,272 |

Nicaragua_AR_000209

| | | |
|---|---|---|
| Ukraine | 0% | 0.001568 |
| Venezuela | 11% | 0.106773 |
| Grand Tota | 1 | 1 |

Source: OIS analysis of OIS Persist Dataset base on data through October 31, 2022.

Nicaragua_AR_000210

**unique_1y Unique**
country_si **Nicaragua**
app_regio SW Land Border

| Row Label | Sum of count |
|---|---|
| 2013 | 1,348 |
| 2014 | 1,766 |
| 2015 | 998 |
| 2016 | 1,329 |
| 2017 | 1,091 |
| 2018 | 3,497 |
| 2019 | 14,103 |
| 2020 | 1,605 |
| 2021 | 47,347 |
| 2022 | 157,356 |
| 2023 | 20,651 |
| Grand Tot | 251,091 |

**total-all countries**
Unique totals
unique_1y Unique
app_regio SW Land Border

| Row Label | Sum of count |
|---|---|
| 2013 | 365,546 |
| 2014 | 435,693 |
| 2015 | 324,897 |
| 2016 | 427,096 |
| 2017 | 330,917 |
| 2018 | 434,514 |
| 2019 | 874,162 |
| 2020 | 299,984 |
| 2021 | 1,126,659 |
| 2022 | 1,741,368 |
| 2023 | 185,527 |
| Grand Tot | 6,546,363 |

Source: OIS analysis of OIS Persist Dataset base on data through October 31, 2022.

**All except Nicaragua**
unique_1y Unique
country_si (Multiple Items)
app_regio SW Land Border

| Row Label | Sum of count |
|---|---|
| 2013 | 364,198 |
| 2014 | 433,927 |
| 2015 | 323,899 |
| 2016 | 425,767 |
| 2017 | 329,826 |
| 2018 | 431,017 |
| 2019 | 860,059 |
| 2020 | 298,379 |
| 2021 | 1,079,312 |
| 2022 | 1,584,012 |
| 2023 | 164,876 |
| Grand Tot | 6,295,272 |

|  | 20 | 21 % | 21 | 22 % |
|---|---|---|---|---|
| Nic % change | 1,605 | 47,347 2850% | 47,347 | 157,356 232% |
| Other % change |  | 1,079,312 47% | 1,584,012 |  |

| | 20 to 22 | | |
|---|---|---|---|
| | 1,605 | 157,356 | 9704% |

Nicaragua AR_000211

| | Unique Encounters | Total Encounters |
|---|---|---|
| Oct-20 | 162 | 256 |
| Nov-20 | 255 | 387 |
| Dec-20 | 385 | 640 |
| Jan-21 | 299 | 534 |
| Feb-21 | 535 | 706 |
| Mar-21 | 1,729 | 1,930 |
| Apr-21 | 2,872 | 3,074 |
| May-21 | 4,205 | 4,414 |
| Jun-21 | 7,175 | 7,435 |
| Jul-21 | 13,219 | 13,456 |
| Aug-21 | 9,505 | 9,979 |
| Sep-21 | 7,006 | 7,298 |
| Oct-21 | 9,005 | 9,255 |
| Nov-21 | 13,130 | 13,627 |
| Dec-21 | 14,439 | 15,297 |
| Jan-22 | 11,169 | 11,564 |
| Feb-22 | 12,971 | 13,296 |
| Mar-22 | 15,430 | 16,017 |
| Apr-22 | 12,182 | 12,565 |
| May-22 | 17,642 | 19,034 |
| Jun-22 | 10,496 | 11,200 |
| Jul-22 | 11,603 | 12,073 |
| Aug-22 | 11,353 | 11,749 |
| Sep-22 | 17,936 | 18,199 |
| Oct-22 | 20,651 | 20,917 |

13,113

| | Unique Encounters | average monthly |
|---|---|---|
| FY 2014 | 1,766 | 147.17 |
| FY 2015 | 998 | 83.17 |
| FY 2016 | 1,329 | 110.75 |
| FY 2017 | 1,091 | 90.92 |
| FY 2018 | 3,497 | 291.42 |
| FY 2019 | 14,103 | 1,175.25 |
| | | 316.44 |
| % increase | | 4044% |
| fold | | 41.438553 |

Notes: Southwest land border apprehensions of Nicaraguans.
Source: OIS Persist Data as of October 31, 2022.

Nicaragua_AR_000212

| | Unique Encounters | Total Encounters | |
|---|---|---|---|
| Oct-22 | 20,651 | 20,917 | 674.74 |

| Row Label | Count of CIVID |
|---|---|
| 1-Nov | 1132 |
| 2-Nov | 1211 |
| 3-Nov | 686 |
| 4-Nov | 987 |
| 5-Nov | 686 |
| 6-Nov | 1506 |
| 7-Nov | 996 |
| 8-Nov | 1169 |
| 9-Nov | 903 |
| 10-Nov | 1167 |
| 11-Nov | 957 |
| 12-Nov | 846 |
| 13-Nov | 918 |
| 14-Nov | 975 |
| 15-Nov | 1090 |
| 16-Nov | 1222 |
| 17-Nov | 1096 |
| 18-Nov | 955 |
| 19-Nov | 1206 |
| 20-Nov | 1220 |
| 21-Nov | 1424 |
| 22-Nov | 1280 |
| 23-Nov | 1012 |
| 24-Nov | 1222 |
| 25-Nov | 1303 |
| 26-Nov | 1281 |
| 27-Nov | 1668 |
| Grand Tot: | 30118 |

Nov daily average   1115.481

FY23 total   51,035

Source: OIS analysis of UIP CBP data pulled on November 28, 2022

Nicaragua_AR_000213

| Month-Year | encounters | CBP Repatriation | | CBP Release | | | OFO Parole | Processing | Transfer to ICE | | % released |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | T42 | on | NTR | NTA | Parole ATD | | | UC ORR Transfer | Other | |
| Oct-20 | 256 | 70 | - | - | 118 | - | - | 52 | 16 | - | 46% |
| Nov-20 | 387 | 105 | 1 | - | 204 | - | - | 58 | 19 | - | 53% |
| Dec-20 | 640 | 160 | 1 | - | 309 | - | 1 | 134 | 35 | - | 48% |
| Jan-21 | 534 | 186 | - | - | 187 | - | - | 145 | 16 | - | 35% |
| Feb-21 | 706 | 169 | - | - | 212 | - | - | 267 | 57 | - | 30% |
| Mar-21 | 1,930 | 240 | - | 304 | 420 | - | 1 | 794 | 171 | - | 38% |
| Apr-21 | 3,074 | 280 | 1 | 835 | 500 | - | 1 | 1,233 | 224 | - | 43% |
| May-21 | 4,414 | 223 | 1 | 885 | 728 | - | 1 | 2,314 | 263 | - | 37% |
| Jun-21 | 7,435 | 291 | - | 917 | 1,507 | - | - | 4,442 | 276 | - | 33% |
| Jul-21 | 13,456 | 667 | - | 1,927 | 2,074 | - | 2 | 8,398 | 388 | - | 30% |
| Aug-21 | 9,979 | 631 | - | 592 | 1,511 | 844 | 1 | 6,132 | 268 | - | 30% |
| Sep-21 | 7,298 | 269 | - | 114 | 484 | 1,565 | 1 | 4,674 | 192 | - | 30% |
| Oct-21 | 9,255 | 178 | - | - | 450 | 1,426 | 1 | 6,974 | 226 | - | 20% |
| Nov-21 | 13,627 | 895 | 1 | - | 6,764 | 617 | 1 | 5,027 | 322 | - | 54% |
| Dec-21 | 15,297 | 579 | 3 | - | 7,966 | 2,036 | 1 | 4,407 | 305 | - | 65% |
| Jan-22 | 11,564 | 185 | 3 | - | 7,512 | 869 | 6 | 2,750 | 241 | - | 73% |
| Feb-22 | 13,296 | 75 | 4 | - | 8,444 | 548 | - | 3,996 | 229 | - | 68% |
| Mar-22 | 16,017 | 306 | - | - | 5,989 | 4,678 | 1 | 4,774 | 269 | - | 67% |
| Apr-22 | 12,565 | 100 | 1 | - | 1,705 | 7,930 | 2 | 2,620 | 207 | - | 77% |
| May-22 | 19,034 | 1,360 | 1 | - | 2,721 | 12,990 | 1 | 1,628 | 332 | 1 | 83% |
| Jun-22 | 11,200 | 289 | 1 | - | 3,241 | 6,772 | 4 | 679 | 214 | - | 89% |
| Jul-22 | 12,073 | 80 | - | - | 4,683 | 5,261 | 2 | 1,796 | 251 | - | 82% |
| Aug-22 | 11,749 | 53 | - | - | 4,703 | 3,432 | 1 | 3,316 | 244 | - | 69% |
| Sep-22 | 18,199 | 48 | - | - | 599 | 16,413 | - | 821 | 318 | - | 93% |
| Oct-22 | 20,917 | 44 | - | - | 1,830 | 18,170 | 1 | 473 | 397 | 2 | 96% |
| FY22 | 4,148 | | 12 | - | 54,777 | 62,972 | 20 | 38,788 | 3,158 | 1 | |

total 4,160

released 117,769

% of enc. 72%

41,946

26%

fy22 total encounters of NIC 163,876

% of encounters 3%

Source: OIS analysis of CBP subject-level data through October 31, 2022.

Notes: Data valid as of November 1, 2022. CBP Repatriation includes OFO Voluntary Returns, Withdrawals (WD and

Nicaragua AR_000214

Nicaragua AR_000215

## Custody Summary

| Sector | Count in Custody | | | | Capacity | % Capacit |
|---|---|---|---|---|---|---|
| | SA | FM | UC | Total | | |
| San Diego | 1,387 | 318 | 13 | 1,718 | 1,966 | 87% |
| El Centro | 568 | 286 | 4 | 858 | 512 | 168% |
| Yuma | 1,275 | 734 | 20 | 2,029 | 1,291 | 157% |
| Tucson | 1,204 | 396 | 96 | 1,696 | 1,191 | 142% |
| El Paso | 2,729 | 1,323 | 164 | 4,216 | 2,392 | 176% |
| Big Bend | 1 | 0 | 0 | 1 | 542 | 0% |
| Del Rio | 1,231 | 396 | 87 | 1,714 | 1,845 | 93% |
| Laredo | 531 | 692 | 18 | 1,241 | 2,155 | 58% |
| RGV | 1,400 | 633 | 128 | 2,161 | 4,045 | 53% |
| **USBP Total** | **10,326** | **4,778** | **530** | **15,634** | **15,939** | **98%** |
| San Diego FO | 44 | 28 | 9 | 81 | 386 | 21% |
| Tucson FO | 0 | 0 | 0 | 0 | 96 | 0% |
| El Paso FO | 11 | 7 | 0 | 18 | 137 | 13% |
| Laredo FO | 3 | 0 | 0 | 3 | 283 | 1% |
| **OFO Total** | **58** | **35** | **9** | **102** | **902** | **11%** |
| **Grand Total** | **10,384** | **4,813** | **539** | **15,736** | **16,841** | **93%** |

**Source:** UIP Custody Fact Table as of 12/7/22.

| | |
|---|---|
| unique_1yr | All |
| app_region | SW Land Border |
| initial_agency | USBP |

overall sector change

**Sum of count**

| Row Labels | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total | fy22% inc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 4,096 | 5,031 | 6,366 | 6,002 | 8,045 | 9,637 | 8,627 | 37,266 | 31,948 | 1,303 | 118,321 | -14% |
| Del Rio, TX | 24,255 | 19,013 | 23,078 | 13,476 | 15,833 | 57,269 | 40,342 | 259,294 | 480,932 | 42,376 | 975,868 | 85% |
| El Centro, CA | 14,511 | 12,820 | 19,448 | 18,633 | 29,230 | 35,138 | 27,487 | 59,231 | 72,378 | 7,297 | 296,173 | 22% |
| El Paso, TX | 12,339 | 14,495 | 25,634 | 25,193 | 31,561 | 182,143 | 54,396 | 193,918 | 307,844 | 53,284 | 900,807 | 59% |
| Laredo, TX | 44,049 | 35,888 | 36,562 | 25,460 | 32,641 | 38,378 | 51,425 | 112,241 | 106,843 | 5,953 | 489,440 | -5% |
| Rio Grande Valley, TX | 256,392 | 147,257 | 186,830 | 137,562 | 162,262 | 339,135 | 90,203 | 549,077 | 468,124 | 28,279 | 2,365,121 | -15% |
| San Diego, CA | 29,911 | 26,290 | 31,891 | 26,086 | 38,591 | 58,049 | 53,277 | 142,459 | 176,290 | 17,758 | 600,602 | 24% |
| Tucson, AZ | 87,915 | 63,397 | 64,891 | 38,657 | 52,172 | 63,490 | 66,074 | 191,232 | 251,984 | 22,933 | 902,745 | 32% |
| Yuma, AZ | 5,902 | 7,142 | 14,170 | 12,847 | 26,244 | 68,269 | 8,804 | 114,488 | 310,094 | 25,090 | 593,050 | 171% |
| Grand Total | 479,370 | 331,333 | 408,870 | 303,916 | 396,579 | 851,508 | 400,635 | 1,659,206 | 2,206,437 | 204,273 | 7,242,127 | 33% |

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Del Rio | 24,255 | 19,013 | 23,078 | 13,476 | 15,833 | 57,269 | 40,342 | 259,294 | 480,932 |

fy14-19 average: 25,487

480,932

85% %change from last year
1787% %change 14-19 average

Nicaraguan encounters by sector

| | |
|---|---|
| unique_1yr | Unique |
| app_region | SW Land Border |
| country_simple | Nicaragua |

**Sum of count**

| Row Labels | 2019 | 2020 | 2021 | 2022 10 | 2022 11 | 2022 12 | 2023 1 | 2023 2 | 2023 3 | 2023 4 | 2023 5 | 2023 6 | 2023 7 | 2023 8 | 2023 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 1044 | 130 | 171 | 3 | 43 | 9 | 9 | 17 | 9 | 7 | 20 | 24 | 13 | 37 | 28 |
| Del Rio, TX | 39 | 7 | 118 | 5 | 9 | 8 | 2 | 14 | 9 | 15 | 14 | 5 | 9 | 20 | 8 |
| El Centro, CA | 695 | 227 | 8429 | 2385 | 2988 | 3838 | 2690 | 3246 | 4636 | 3479 | 5620 | 4116 | 5160 | 5197 | 7319 |
| El Paso, TX | 89 | 19 | 65 | 11 | 11 | 56 | 77 | 160 | 272 | 215 | 475 | 355 | 247 | 380 | 356 |
| Laredo, TX | 1739 | 169 | 861 | 219 | 968 | 1406 | 1676 | 1780 | 1195 | 960 | 904 | 159 | 175 | 382 | 2835 |
| Rio Grande Valley, TX | 222 | 55 | 263 | 9 | 22 | 5 | 11 | 12 | 15 | 3 | 2 | 22 | 27 | 9 | 6 |
| San Diego, CA | 8437 | 738 | 27034 | 4428 | 6679 | 7258 | 5871 | 6988 | 8531 | 6695 | 9641 | 5151 | 4776 | 4012 | 5083 |
| Tucson, AZ | 279 | 84 | 731 | 117 | 365 | 643 | 541 | 452 | 348 | 458 | 287 | 186 | 305 | 330 | 413 |
| (blank) | 247 | 156 | 1788 | 758 | 1019 | 283 | 99 | 110 | 92 | 94 | 110 | 38 | 49 | 72 | 56 |
| Yuma, AZ | 1312 | 20 | 7887 | 1070 | 1026 | 933 | 193 | 192 | 323 | 256 | 569 | 440 | 842 | 914 | 1832 |
| Grand Total | 14103 | 1605 | 47347 | 9005 | 13130 | 14439 | 11169 | 12971 | 15430 | 12182 | 17642 | 10496 | 11603 | 11353 | 17936 |

| | |
|---|---|
| unique_1yr | Unique |

Nicaragua AR_000216

| app_region | SW Land Border |
| --- | --- |
| country_simple | Nicaragua |

**Sum of count**

**Column Labels**

| Row Labels | 2019 | 2020 | 2021 | 2022 | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Big Bend, TX | 7.40% | 8.10% | 0.36% | 0.03% | 0.33% | 0.06% | 0.06% | 0.13% | 0.06% | 0.06% | 0.11% | 0.23% | 0.11% | 0.33% | 0.16% |
| Del Rio, TX | 0.28% | 0.44% | 0.25% | 0.06% | 0.07% | 0.06% | 0.02% | 0.11% | 0.01% | 0.12% | 0.08% | 0.05% | 0.08% | 0.18% | 0.04% |
| El Centro, CA | 4.93% | 14.14% | 17.80% | 26.49% | 22.76% | 26.58% | 24.08% | 25.03% | 30.05% | 28.56% | 31.86% | 39.21% | 44.47% | 45.78% | 40.81% |
| El Paso, TX | 0.63% | 1.18% | 0.14% | 0.12% | 0.08% | 0.39% | 0.69% | 1.23% | 1.76% | 1.76% | 2.69% | 3.38% | 2.13% | 3.35% | 1.98% |
| Laredo, TX | 12.33% | 10.53% | 1.82% | 2.43% | 7.37% | 9.74% | 15.01% | 13.72% | 7.74% | 7.88% | 5.12% | 1.51% | 1.51% | 3.36% | 15.81% |
| | 1.57% | 3.43% | 0.56% | 0.10% | 0.17% | 0.03% | 0.10% | 0.09% | 0.10% | 0.02% | 0.01% | 0.21% | 0.23% | 0.08% | 0.03% |
| Rio Grande Valley, TX | 59.82% | 45.98% | 57.10% | 49.17% | 50.87% | 50.27% | 52.57% | 53.87% | 55.29% | 54.96% | 54.65% | 49.08% | 41.16% | 35.34% | 28.34% |
| San Diego, CA | 1.98% | 5.23% | 1.54% | 1.30% | 2.78% | 4.45% | 4.84% | 3.48% | 2.26% | 3.76% | 1.63% | 1.77% | 2.63% | 2.91% | 2.30% |
| Tucson, AZ | 1.75% | 9.72% | 3.78% | 8.42% | 7.76% | 1.96% | 0.90% | 0.85% | 0.64% | 0.77% | 0.62% | 0.36% | 0.42% | 0.63% | 0.31% |
| Yuma, AZ | 9.30% | 1.25% | 16.66% | 11.88% | 7.81% | 6.46% | 1.73% | 1.48% | 2.09% | 2.10% | 3.23% | 4.19% | 7.26% | 8.05% | 10.21% |
| Grand Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

Source: OIS analysis of OIS Persist Dataset based on data through October 31, 2022

Nicaragua AR_000217

Nicaragua AR_000218

| app_region | SW Land Border | |
|---|---|---|
| country_simple | Nicaragua | |
| | | |
| Sum of count | Column Labels | |
| Row Labels | 2023 | Grand Total |
| Big Bend, TX | 24 | 24 |
| Del Rio, TX | 6282 | 6282 |
| El Centro, CA | 251 | 251 |
| El Paso, TX | 5763 | 5763 |
| Laredo, TX | 9 | 9 |
| Rio Grande Valley, TX | 5974 | 5974 |
| San Diego, CA | 850 | 850 |
| Tucson, AZ | 85 | 85 |
| Yuma, AZ | 1675 | 1675 |
| **Grand Total** | **20917** | **20917** |

top 3    18019

SWB Nicaraguan Encounters UIP 11/1-11/27, pulled 11/28

| Row Labels | Count of CIV ID | |
|---|---|---|
| Big Bend Sector | 6 | 0% |
| Del Rio Sector | 6,942 | 23% |
| El Centro Sector | 357 | 1% |
| El PASO Field Office | 11 | 0% |
| El Paso Sector | 13,128 | 44% |
| LAREDO Field Office | 12 | 0% |
| Laredo Sector | 11 | 0% |
| Rio Grande Valley Sector | 6,985 | 23% |
| SAN DIEGO Field Office | 15 | 0% |
| San Diego Sector | 810 | 3% |
| TUCSON Field Office | 2 | 0% |
| Tucson Sector | 268 | 1% |
| Yuma Sector | 1,571 | 5% |
| Grand Total | 30,118 | 100% |

Source: CBP UIP data for November 1-27 pulled on November 28, 2022
top 3    27,055

| 2022 Total | 2023 | Grand Total |
|---|---|---|
| 217 | 22 | 1584 |
| 111 | 4 | 279 |
| 50674 | 6204 | 66229 |
| 2615 | 248 | 3036 |
| 12659 | 5698 | 21126 |
| 143 | 9 | 692 |
| 75113 | 5901 | 117223 |
| 4445 | 834 | 6373 |
| 2789 | 82 | 5062 |
| 8590 | 1649 | 19458 |
| **157356** | **20651** | **241062** |

Nicaragua AR_000219

fy23 top 3    45,074
fy 23 total   51,035
%             88%

79.94% fy22 top 2 sectors

| 2022 Total | | 2023 Grand Total | |
| --- | --- | --- | --- |
| 0.14% | 0.11% | 0.66% | |
| 0.07% | 0.02% | 0.12% | |
| 32.20% | 30.04% | 27.47% | |
| 1.66% | 1.20% | 1.26% | |
| 8.04% | 27.59% | 8.76% | |
| 0.09% | 0.04% | 0.29% | |
| 47.73% | 28.57% | 48.63% | |
| 2.82% | 4.04% | 2.64% | |
| 1.77% | 0.40% | 2.10% | |
| 5.46% | 7.99% | 8.07% | |
| 100.00% | 100.00% | 100.00% | |

Nicaragua AR_000220

nicaragua

| Month-Year | encounters | T42 | CBP Repatriation | NTR | CBP Release | | Transfer to ICE | | | | % released |
| | | | | | NTA | Parole ATD | OFO Parole | Processing | UC ORR Transfer | Other | |
| Oct-22 | 20,917 | 44 | - | - | 1,830 | 18,170 | 1 | 473 | 397 | 2 | 96% |

Notes: Data valid as of November 1, 2022. CBP Repatriation includes OFO Voluntary Returns, Withdrawals (WD and T42), Withdrawals (WD and
Source: OIS analysis of CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022

nicaraguan releases          20,001
total number of releases in oct22      111288 *
                   %              18%

Nicaragua AR_000221



**Explanation of the Decision to Terminate the Migrant Protection Protocols**

October 29, 2021

I.      Executive Summary ................................................................................................ 2

II.     Background ............................................................................................................. 3

   A.    MPP's Statutory Basis and Implementation .................................................... 5

   B.    Prior Evaluations of MPP ................................................................................ 7

   C.    Litigation Regarding the Prior Implementation of MPP .................................. 9

   D.    Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP ........................................................................... 10

   E.    Challenge to the Suspension and Termination ................................................ 10

III.    Evaluation of MPP ............................................................................................... 11

   A.    Conditions for Migrants in Mexico ................................................................ 12

   B.    *Non-Refoulement* Concerns ........................................................................... 14

   C.    Access to Counsel, Notice of Hearings, and Other Process Concerns ........... 16

   D.    Impacts of MPP on Immigration Court Appearance Rates and Outcomes ..... 18

   E.    MPP and Recidivist Irregular Re-Entries ...................................................... 21

   F.    Investments and Resources Required to Operate MPP .................................... 22

   G.    Impact of MPP and its Termination on SWB Migration Flows ...................... 23

   H.    Addressing the Concerns of States and Border Communities ........................ 24

   I.    Relationship between Implementation of MPP and Statutory Mandates ........ 26

   J.    Impact on U.S.-Mexico Relationship ............................................................. 29

IV.     The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management ................................................................................................................... 30

   A.    Managing Flows ............................................................................................. 31

   B.    Managing Asylum Claims .............................................................................. 34

      1.    Dedicated Docket ...................................................................................... 34

      2.    Asylum Officer Rule ................................................................................. 35

V.      Consideration of Alternatives to Terminating MPP ............................................. 36

VI.     Conclusion ............................................................................................................ 38

I.     **Executive Summary**

On February 2, 2021, President Biden issued an Executive Order directing the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[1]  After extensive review, the Secretary of Homeland Security concluded that the Migrant Protection Protocols (MPP) should be terminated, and on June 1, 2021, issued a memorandum to that effect.[2]  On August 13, 2021, however, the U.S. District Court for the Northern District of Texas determined that the June 1, 2021, memorandum was not issued in compliance with the Administrative Procedure Act (APA) and caused DHS to violate 8 U.S.C. § 1225, vacated the memorandum, and remanded it to the Department for further consideration.  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA"—a ruling that the government is vigorously appealing.

Pursuant to the Texas court's remand, and in continuing compliance with the President's direction in the Executive Order, the Secretary has considered anew whether MPP should be maintained, terminated, or modified in a variety of different ways.  After carefully considering the arguments, evidence, and perspectives of those who support continuing to use MPP, those who support terminating the program, and those who have argued for the use of MPP with modifications, the Secretary has determined that MPP should be terminated.  In reaching this conclusion, the Secretary recognizes that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that will disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving either of these goals.  Significant evidence indicates that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico.  It is possible that some of these humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.

---

[1] Exec. Order No. 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[2] Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of the Migrant Protection Protocols Program* (June 1, 2021) [hereinafter June 1 Memo].

Nicaragua AR_000223

Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

Importantly, as the Secretary has emphasized, the management of migratory flows is a shared responsibility among all countries in the hemisphere.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader, and more enduring, solutions.  Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.

Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program—the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systemically tackle the problem of irregular migration and protect our border.  Moreover, the personnel required to adequately screen MPP enrollees, potentially multiple times—to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases—pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.

Having assessed the benefits and costs of the previous implementation of MPP as well as how the program could potentially be improved, the Secretary has concluded that there are inherent problems with the program—including the vulnerability of migrants to criminal networks, and the challenges associated with accessing counsel and courts across an international border—that resources cannot sufficiently fix.  Others cannot be addressed without detracting from other key Administration priorities.  It is thus the Secretary's judgment that the benefits of MPP are far outweighed by the costs of the program, in whatever form.

As a result, for the many reasons described in what follows, the Secretary in a memorandum issued today entitled, "Termination of the Migrant Protection Protocols," has decided to terminate MPP.[3]  This determination will be implemented as soon as practicable after a final judicial decision to vacate the Texas injunction that currently requires good-faith enforcement of MPP.

## II.   Background

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols."  On January 20, 2021, Acting Secretary David Pekoske issued a memorandum temporarily suspending new enrollments into the Migrant Protection Protocols (MPP) pending

---

[3] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Sec., *Termination of the Migrant Protection Protocols* (Oct. 29, 2021).

Nicaragua AR_000224

further review.[4]  Two weeks later, on February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*.[5]  In this Executive Order, President Biden directed the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols" and "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[6]  In response, Secretary Mayorkas initiated a comprehensive review of MPP.  The Secretary, in conjunction with other agencies, also implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and certain of their immediate family members for proceedings.[7]

At the conclusion of his review, on June 1, 2021, Secretary Mayorkas issued a memorandum announcing and explaining his determination that MPP should be terminated (the "June 1 Memorandum").[8]  On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 Memorandum did not reflect reasoned decision-making and thus was not issued in compliance with the Administrative Procedure Act (APA), and that the memorandum caused the Department to violate detention provisions found in 8 U.S.C. § 1225.[9]  The court vacated the June 1 Memorandum in its entirety and remanded it to the Department of Homeland Security (DHS) for further consideration.[10]  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA."[11]  The government is complying with that injunction while appealing the decision.

Pursuant to the district court's remand, and consistent with the President's direction in EO 14010, the Secretary has considered anew whether MPP should be maintained, terminated, or modified.  This memorandum sets forth the results of that analysis and the basis for the Secretary's decision to terminate MPP by way of a separate memorandum being issued today.  The Secretary's memorandum immediately supersedes and rescinds the June 1 Memorandum, as well as Secretary Nielsen's January 25, 2019 memorandum and any other guidance or other documents prepared by the Department to implement it.  The Secretary's decision to terminate

---

[4] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocol Program* (Jan. 20, 2021) [hereinafter MPP Suspension Memorandum].

[5] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[6] *Id.* at 8270.

[7] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[8] *See supra* note 2.

[9] *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021), *appeal pending*, No. 21-10806 (5th Cir. filed Aug. 16, 2021).

[10] *Id.* at *27.

[11] *Id*. (emphasis in original).

4

MPP is to be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction that currently requires good faith implementation and enforcement of MPP.

A. MPP's Statutory Basis and Implementation

Enacted in 1996, Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), grants DHS discretionary authority to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a.  Historically, DHS and the legacy Immigration and Naturalization Service (INS) used this discretionary authority on a case-by-case basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry; occasionally, the provision also was used for third-country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.[12]  On December 20, 2018, the Department announced a decision to initiate MPP—a novel programmatic implementation of Section 235(b)(2)(C)—along the Southwest Border (SWB).  That same day, Mexico announced its independent decision to accept those returned to Mexico through the program—a key precondition to implementation.[13]

At the time of its initial announcement, DHS stated that the program was intended to: (1) reduce unlawful migration and false claims of asylum; (2) ensure that migrants are not able to "disappear" into the United States prior to a court decision; (3) focus attention on more quickly assisting legitimate asylum seekers; (4) free up personnel and resources to better protect U.S. territory and clear the backlog of unadjudicated asylum applications; and (5) offer protection to vulnerable populations while they wait in Mexico for their removal proceedings.[14]

---

[12] Prior to MPP, DHS and the former INS primarily used Section 235(b)(2)(C) on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry. CBP, for instance, invoked Section 235(b)(2)(C) to return certain Mexican nationals who were U.S. lawful permanent residents (LPRs) and whose criminal histories potentially subjected them to removal, as well as LPRs who appeared to have abandoned their permanent residence in the United States but were not willing to execute a Form I-407, Record of Abandonment of Lawful Permanent Residence. At the Northern Border, CBP used Section 235(b)(2)(C) to return certain Canadian nationals or those with status in Canada who, for instance, appear to be subject to a criminal ground of inadmissibility. Although guidance is scant, DHS and the former INS also used Section 235(b)(2)(C), on a case-by-case basis, for certain third country nationals even prior to MPP. For example, CBP issued field guidance in 2005 advising that a Cuban national arriving at a land border port of entry may "be returned to contiguous territory pending section 240 proceedings . . . if: (1) the alien cannot demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico." Mem. from Jayson P. Ahern, Asst. Comm'r, Office of Field Ops., CBP, *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry* 2-3 (June 10, 2005). The INS also issued guidance in 1997 and 1998 contemplating the use of Section 235(b)(2)(C) only as a "last resort" and only when the individual does not claim a fear of persecution related to Canada or Mexico. Mem. from Michael A. Pearson, Executive Assoc. Comm'r, Office of Field Ops., INS, *Detention Guidelines Effective October 9, 1998* 3 (Oct. 7, 1998); Mem. from Chris Sale, Deputy Comm'r, INS, *Implementation of Expedited Removal* 4 (Mar. 31, 1997) (same).

[13] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[14] Press Release, DHS, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration [hereinafter Nielsen Release].

On January 25, 2019, DHS issued policy guidance for implementing MPP,[15] which was augmented a few days later by operational guidance from U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).[16]  Under MPP, certain non-Mexican applicants for admission who arrived on land at the SWB were placed in removal proceedings and returned to Mexico to await their immigration court proceedings under Section 240 of the INA.[17]  For those enrolled in MPP, DHS attempted to facilitate entry to and exit from the United States to attend their immigration proceedings, which were prioritized on the non-detained docket by the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

MPP was initially piloted at the San Ysidro port of entry and San Diego Immigration Court.  In July 2019, the program was expanded into Texas and as of January 2020, individuals could be enrolled in MPP at locations across the SWB.  Individuals returned to Mexico were processed back into the United States to attend their removal proceedings at one of four immigration court locations in California and Texas.[18]  It was initially anticipated that enrollees' first hearings would be scheduled within 30-45 days, consistent with the goal of timely adjudication of cases.  But enrollment quickly outpaced EOIR's capacity to hear cases.  Over time, capacity constraints meant that even initial hearings were scheduled many months after enrollment.  Large numbers of migrants ended up living in camps in Northern Mexico that were, as well-documented in numerous reports and as described below, crowded, unsanitary, and beset by violence.[19]

Due to public health concerns brought on by the COVID-19 pandemic, EOIR paused immigration court hearings for all non-detained individuals, including those enrolled in MPP, in March 2020.[20]  MPP hearings never resumed prior to the program's January 2021 suspension,

---

[15] Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[16] Guidance documents are available at the archived MPP landing page under the *MPP Guidance Documentation heading:* https://www.dhs.gov/archive/migrant-protection-protocols.

[17] Individuals who could be enrolled into MPP were, generally, individuals from Spanish-speaking countries and Brazil.

[18] Individuals enrolled in MPP in the San Diego or El Paso jurisdictions attended hearings at the immigration courts in San Diego or El Paso; individuals enrolled in MPP in San Antonio or Harlingen jurisdictions attended hearings at the Immigration Hearing Facilities (IHFs) in Laredo or Brownsville, respectively.

[19] *See infra* Section III.A; *see also* Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times, Oct. 23, 2020; Miriam Jordan,  *'I'm Kidnapped': A Father's Nightmare on the Border*, N.Y. Times, Dec. 21, 2019; Nomaan Merchant, *Tents, stench, smoke: Health risks are gripping migrant camp*, A.P. News, Nov. 14, 2019; Human Rights Watch, *Like I'm Drowning: Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Jan. 6, 2021 ("As a result [of MPP], thousands of people are concentrated in dangerous Mexican border towns indefinitely, living lives in limbo . . . . Migrant shelters in Ciudad Juárez and Tijuana quickly filled, and a large shelter run by Mexican federal authorities in Ciudad Juárez also quickly hit capacity soon after it opened in late 2019. In Matamoros, dangers in the city have led as many as 2,600 people to live in an informal camp on the banks of the river marking the border between Mexico and the United States, a location prone to flooding.").

[20] *See* Press Release, DHS, "Joint DHS/EOIR Statement of MPP Rescheduling," Mar. 23, 2020, https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

Nicaragua AR_000227

but new enrollments into MPP continued during this period, albeit at significantly reduced rates.[21]

In total, between the initial implementation of MPP on January 25, 2019, and the suspension of new enrollments that became effective on January 21, 2021,[22] DHS returned to Mexico approximately 68,000 individuals, according to DHS and EOIR data.[23]  During that same period, CBP processed a total of 1.5 million SWB encounters, including approximately 1 million encounters processed under Title 8 authorities (including the 68,000 processed through MPP) and approximately 500,000 Title 42 expulsions.[24]

B.  Prior Evaluations of MPP

Prior to the Secretary's June 1, 2021, termination memorandum, the Department produced two notable assessments of the program that reached divergent conclusions.

In June 2019, as the Department prepared to expand MPP across the entire SWB, it formed a committee of senior leaders from multiple components (known as the "Red Team") to conduct a "top-down review of MPP's policies and implementation strategy and provide overall recommendations to increase the effectiveness of the program."[25]  The Red Team members were chosen, in part, because they had "little to no involvement developing policy or with implementing MPP," thus helping to ensure an independent assessment.[26]  The report and recommendations (the "Red Team Report") was issued October 25, 2019, but not publicly released.[27]  In preparing its report, the Red Team reviewed key MPP background documents, conducted dozens of interviews, made site visits, and performed additional research.[28]  The Red Team identified significant deficiencies in MPP and made multiple recommendations for improving MPP, organized around five different areas: the need for standardization and clarity

---

[21] *See* U.S. Customs and Border Protection, "Migrant Protection Protocols FY2021," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols; U.S. Customs and Border Protection, "Migrant Protection Protocols FY2020," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020; *see also* MPP Suspension Memorandum, *supra* note 4.

[22] MPP Suspension Memorandum, *supra* note 4.

[23] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, https://www.dhs.gov/publication/metrics-and-measures.

[24] DHS Office of Immigration Statistics analysis of U.S. CBP administrative records. In March 2020, the U.S. Centers for Disease Control and Prevention (CDC) issued a public health order under 42 U.S.C. §§ 265 and 268 to prevent the spread of COVID-19 in CBP holding facilities and in the United States.  85 Fed. Reg. 16,559 (Mar. 24, 2020).  The Order temporarily suspending the introduction of certain persons into the United States from countries where a communicable disease exists. *Id*. In August 2021, CDC issued a new Order, which replaced, reaffirmed, and superseded the previous Orders. *See* 86 Fed. Reg. 42,828 (Aug. 5, 2021).

[25] Memorandum from Kevin McAleenan, Acting Sec'y of Homeland Sec., *Review of Migrant Protection Protocols Policy and Implementation* (June 12, 2019).

[26] *Id.* Working under the oversight of the Acting Deputy Secretary of Homeland Security, the Red Team was composed of individuals from the Offices of Privacy, Management, Civil Rights and Civil Liberties, and the Coast Guard.

[27] DHS Office of Operations Coordination, *The Migrant Protection Protocols Red Team Report* (Oct. 25, 2019) [hereinafter Red Team Report].

[28] *Id.* at 4.

with respect to information provided to migrants upon initial screening and processing; the need for better access to counsel and better mechanisms for communication with counsel; the need to ensure better *non-refoulement* protections;[29] the need for safe housing and protections for those returned to Mexico; and the need for administrative and logistical improvements, including the establishment of measures of effectiveness and better mechanisms for the sharing of key information between migrants and relevant government agencies.  In December 2020—at a point when new enrollments into MPP had already dropped significantly and only a month before the program's suspension—the Department issued supplementary policy and operational guidance designed to address several of the Red Team's recommendations.[30]

Three days after the issuance of the Red Team Report, the Department released publicly a separate review of MPP (the "October 2019 Assessment"), which offered a very different assessment of the program.[31]  The October 2019 Assessment declared that MPP had demonstrated operational effectiveness, including by helping to address "the ongoing crisis at the southern border and restoring integrity to the immigration system."[32]  The assessment noted that apprehensions of noncitizens at and between ports of entry decreased from May through September 2019; reported that rapid and substantial declines in apprehensions occurred in areas where the greatest number of MPP-amenable noncitizens had been processed and returned to Mexico through MPP; asserted that MPP was restoring integrity to the immigration system; claimed that both the U.S. Government and the Government of Mexico (GOM) were endeavoring to provide safety and security for migrants returned to Mexico; and stated that the

---

[29] Article 33 of the 1951 Convention Relating to the Status of Refugees provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Convention Relating to the Status of Refugees, done July 28, 1951, 19 U.S.T. 6259, 6276, 189 U.N.T.S. 150, 176. The United States is not a party to the 1951 Convention, but the United States is a party to the 1967 Protocol Relating to the Status of Refugees, done Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577, which incorporates Article 33 of the 1951 Convention. The phrase "life or freedom would be threatened" is interpreted in U.S. law as meaning that it is more likely than not that the individual would be persecuted. *See, e.g.*, *INS v. Stevic*, 467 U.S. 407, 428 & n.22 (1984). Separately, Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) provides, "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-2822 (8 U.S.C. § 1231 note). Article 3 of the CAT likewise is understood in U.S. law as requiring a "more likely than not" standard.  *See, e.g.*, *Auguste v. Ridge*, 395 F.3d 123, 149 (3d Cir. 2005) (citing Senate Resolution, 136 Cong. Rec. S17,486, S17491-92 (daily ed. 1990)). These *non-refoulement* obligations are non-self-executing, *see, e.g.*, *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009) (1967 Refugee Protocol); *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) (CAT), and are not specifically required by statute with respect to MPP returns.

[30] The policy and operational guidance was published on an MPP website and took the form of a series of memoranda that provided clarity on matters like access to counsel during the *non-refoulement* interview, the importance of maintaining family unity, and more consistent application of the "known mental and physical health" exclusion for enrollment in MPP. DHS, *Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocols Guidance, Initial Document Service* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocol Guidance, MPP Amenability* (Dec. 7, 2020).

[31] DHS, "Assessment of the Migrant Protection Protocols (MPP)," Oct. 28, 2019, https://www.dhs.gov/publication/assessment-migrant-protection-protocols-mpp [hereinafter Oct. 2019 Assessment].

[32] *Id.*

Nicaragua AR_000229

screening protocols in place were appropriately assessing noncitizens' fear of persecution or torture in Mexico.

The public October 2019 Assessment presented MPP as a resounding success, whereas the internal Red Team Report raised serious concerns with the program.  Notably, the October 2019 Assessment did not acknowledge or address any of the shortcomings identified by the Red Team Report, despite the fact that the Assessment was released *after* the Red Team Report was completed.

### C.  Litigation Regarding the Prior Implementation of MPP

MPP was challenged many times on multiple grounds in federal court and remains the subject of ongoing litigation in several jurisdictions.  Among other claims, litigants challenged the program as an impermissible exercise of the underlying statutory authority; argued that MPP caused DHS to return noncitizens to Mexico to face persecution, abuse, and other harms and that its procedures inadequately implemented *non-refoulement* protections; argued that their right to access counsel before and during *non-refoulement* interviews had been violated; contested the return to Mexico pursuant to MPP of noncitizens with mental and physical disabilities; asserted that the program had been implemented in violation of the APA; and contended that MPP's expansion across the SWB was unlawful because it led to the return of migrants to places that were particularly dangerous.[33]  Both in the course of litigation and otherwise, litigants described, and some courts credited, extreme violence and substantial hardships faced by those returned to Mexico to await their immigration court proceedings, as well as substantial danger traveling to and from ports of entry to those hearings.  Litigants described being exposed to violent crime, such as rape and kidnapping, as well as difficulty obtaining needed support and services in Mexico, including adequate food and shelter.[34]  In addition, more than one hundred MPP enrollees who received final orders of removal have petitioned the federal courts of appeal for review of such orders on the grounds that various features of MPP, including limited access to

---

[33] *See, e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021); *Bollat Vasquez v. Wolf*, 520 F. Supp. 3d 94 (D. Mass. 2021); *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020); *E.A.R.R. v. Dep't of Homeland Sec.*, No. 3:20-cv-2146 (S.D. Cal. filed Nov. 2, 2020); *Adrianza v. Trump*, 505 F. Supp. 3d 164 (E.D.N.Y. 2020), *dismissed*, No. 1:20-cv-03919 (E.D.N.Y. Sept. 2, 2021); *Nora v. Wolf*, No. 20-993, 2020 WL 3469670 (D.D.C. June 25, 2020); *Turcios v. Wolf*, No. 1:20-cv-1982, 2020 WL 10788713 (S.D. Tex. Oct. 16, 2020).

[34] For example, in *Innovation Law Lab v. Wolf*, the Ninth Circuit observed:

> The MPP has had serious adverse consequences for the individual plaintiffs. Plaintiffs presented evidence in the district court that they, as well as others returned to Mexico under the MPP, face targeted discrimination, physical violence, sexual assault, overwhelmed and corrupt law enforcement, lack of food and shelter, and practical obstacles to participation in court proceedings in the United States. The hardship and danger to individuals returned to Mexico under the MPP have been repeatedly confirmed by reliable news reports.

951 F.3d at 1078; *see also Bollat Vasquez*, 520 F. Supp. 3d at 111–12 (describing plaintiffs' unrebutted descriptions of rape, death threats, kidnapping risks, and insufficient food and shelter as supported by the U.S. State Department's assignment to Tamaulipas of a "Level 4: Do Not Travel" warning "due to crime and kidnapping").

Nicaragua AR_000230

counsel and inability to access court hearings, prejudiced their ability to pursue relief in removal proceedings.[35]

D. <u>Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP</u>

On January 20, 2021, Acting Secretary David Pekoske issued a memorandum suspending new enrollments into MPP, effective January 21, 2021, pending further review of the program.[36] The MPP Suspension Memorandum was followed by the President's issuance of EO 14010 on February 2, 2021, which, in addition to requiring the Secretary to review the program, directed the Secretary to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[37]

From February 19, 2021, until the effective date of the district court's order on August 25, 2021, DHS implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and remained outside the United States.[38]  Certain individuals whose removal proceedings were pending before EOIR or whose proceedings resulted in an *in absentia* order of removal or termination, and certain of their immediate family members, were processed into the United States to continue their Section 240 removal proceedings.[39]  About 13,000 individuals were processed into the United States to participate in Section 240 removal proceedings as a result of this process.[40]

E. <u>Challenge to the Suspension and Termination</u>

On April 13, 2021, the States of Missouri and Texas filed suit in the U.S. District Court for the Northern District of Texas, challenging the suspension of new enrollments into MPP on the grounds that the January 20, 2021, suspension memorandum violated the APA, 8 U.S.C. § 1225, the Constitution, and a purported agreement between Texas and the federal government.

---

[35] *See, e.g.*, *Hernandez Ortiz v. Garland*, No. 20-71506 (9th Cir. filed Mar. 15, 2021) (describing repeated failed attempts to contact legal service providers from within Mexico and ultimately agreeing to proceed pro se because the alternative was to wait longer in Mexico at continued risk to the family's safety); *Del Toro v. Garland*, No. 20-60900 (5th Cir. filed Dec. 14, 2020) (explaining that MPP restricted access to counsel, which prevented the individual from filing an update State Department country report on Cuba for his individual hearing); *Del Carmen Valle v. Garland*, No. 20-72071 (9th Cir. filed July 16, 2020) (arguing that the individual's "extreme distress and vulnerability in Mexico, lack of access to counsel, and difficulty in preparing and presenting her asylum application" as grounds for appeal).

[36] MPP Suspension Memorandum, *supra* note 4.

[37] Exec. Order No. 14010, 86 Fed. Reg. at 8270.

[38] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[39] *Id.*; Press Release, DHS, "DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who Are Eligible for Processing into the United States," June 23, 2021, https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing.

[40] Data on the number of people permitted to enter the United States under this phased process, February 19-August 25, 2021, provided by the Department of State on October 24, 2021.

Nicaragua AR_000231

Subsequent to the Secretary's June 1, 2021, termination memorandum, Missouri and Texas
amended their complaint to challenge the June 1 Memorandum and filed a motion to enjoin the
memorandum.

On August 13, 2021, the district court issued a nationwide permanent injunction requiring
DHS "to enforce and implement MPP *in good faith*" until certain conditions were satisfied.[41]
The district court determined that the June 1 Memorandum was arbitrary and capricious because,
according to the court, the Department ignored critical factors and reached unjustified
conclusions.  In particular, the district court found that the June 1 Memorandum failed to
sufficiently account for several considerations, including the prior administration's assessment
of the benefits of MPP; warnings allegedly made by career DHS personnel during the presidential
transition process that suspending MPP would lead to a surge of border crossers; the costs of
terminating MPP to the States as well as their reliance on MPP; the impact that terminating MPP
would have on the Department's ability to comply with detention provisions in the INA, which
the court construed to require detention and to foreclose release based on detention capacity
concerns; and modifications to MPP short of termination that could similarly achieve the
Department's goals.[42]  As a result, the district court enjoined the June 1 Memorandum in its
entirety and "remanded" it to the Department for further consideration.[43]  The district court
denied a request for a stay of the injunction pending appeal, and the U.S. Court of Appeals for
the Fifth Circuit and the Supreme Court of the United States also denied stays.[44]  As a result, the
district court's order, as construed by the Fifth Circuit, went into effect at 12:01 a.m. on August
25, 2021.

Since August, the Department has worked actively to reimplement MPP in good faith, as
required by the district court's order.[45] At the same time, pursuant to the district court's order and
in continuing compliance with the President's direction in EO 14010, the Secretary has
considered anew whether to maintain, terminate, or modify MPP in various ways.

## III.  Evaluation of MPP

In considering whether to maintain, terminate, or modify MPP anew, the Department
considered, among other things, the decisions of the *Texas* district court, Fifth Circuit, and
Supreme Court; the decisions of multiple other courts in litigation challenging MPP or its
termination; the briefs and declarations filed in all such lawsuits pertaining to MPP; various
Departmental assessments of MPP, including both the Red Team Report and agency responses
and the October 2019 Assessment; a confidential December 2019 Rapid Protection Assessment
from the U.N. High Commissioner for Refugees (UNHCR) and publicly available sources of
information, including news reports and publicly available sources of information, pertaining to
conditions in Mexico; records and testimony from Congressional hearings on MPP and reports

---

[41] *Texas*, 2021 WL at 3603341, at *27 (emphasis in original).

[42] *Id*. at *17-22.

[43] *Id.* at * 27.

[44] *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (U.S. Aug. 24, 2021); *Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021).

[45] *See* Declaration of Blas Nuñez-Neto, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021); Defendants' First Supplemental Notice of Compliance with Injunction, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021).

Nicaragua AR_000232

by nongovernmental entities; and data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings conducted for MPP enrollees; and the impact of other government programs and policies concerning migration and the southern border.  In addition, over the course of several months, the Secretary and his staff met with a broad array of internal and external stakeholders with divergent views about MPP, including members of the DHS workforce engaged in border management, state and local elected officials across the border region, including from Texas, California, Arizona, and New Mexico, border sheriffs and other law enforcement officials, representatives from multiple nonprofit organizations providing legal access and humanitarian aid to noncitizens across the SWB, and dozens of Members of Congress focused on border and immigration policy.  The Secretary also assessed other migration-related initiatives the Administration is undertaking or considering undertaking.  And he examined the considerations that the district court determined were insufficiently addressed in the June 1 Memorandum, including the view that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its obligations under 8 U.S.C. § 1225.

After carefully considering the arguments, evidence, and perspectives of those who support resuming MPP, with or without modification, as well as those who support termination, the Secretary has determined that MPP should be terminated.  The following outlines the considerations that informed the Secretary's decision.

A. <u>Conditions for Migrants in Mexico</u>

In January 2019, the Department implemented MPP with the stated expectation that vulnerable populations would get the protection they needed while they waited in Mexico during the pendency of their removal proceedings.[46]  In practice, however, there were pervasive and widespread reports of MPP enrollees being exposed to extreme violence and insecurity at the hands of transnational criminal organizations that prey on vulnerable migrants as they waited in Mexico for their immigration court hearings in the United States.  These security concerns, together with barriers many individuals faced in accessing stable and safe housing, health care and other services, and sufficient food, made it challenging for some to remain in Mexico for the duration of their proceedings.  Notably, the United States has limited ability to fix these issues, given that they relate to migrant living conditions and access to benefits in Mexico—an independent sovereign nation.

Concerns about migrants' safety and security in Mexico, and the effect this had on their ability to attend and effectively participate in court proceedings in the United States, have been highlighted in internal Department documents, court filings, and a range of external studies and press reports.  In its internal evaluation of the program, the Department's Red Team Report emphasized the need for safe housing for vulnerable populations.[47]  The Ninth Circuit, in affirming a district court ruling that enjoined implementation of MPP, determined that

---

[46] *See* Nielsen Release, *supra* note 14; *see also* Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[47] Red Team Report, *supra* note 27, at 7.

Nicaragua AR_000233

"[u]ncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."[48]  A Massachusetts district court similarly described the plaintiffs' claims of extreme violence and insecurity in Mexico and observed that "[t]heir personal accounts are unrebutted and are supported by affidavits from employees of two nongovernmental organizations and the U.S. State Department's assignment to Tamaulipas of a 'Level 4: Do Not Travel' warning 'due to crime and kidnapping.'"[49]  The court further cited a Human Rights First report that included a list of 1,544 allegations of serious harm (including homicide, rape, and kidnapping) faced by individuals placed in MPP from January 2019 to February 2021.[50]

Multiple other reports have similarly highlighted security and treatment concerns. A December 2019 UNHCR Rapid Protection Assessment found that 81% of individuals and families returned to Mexico under MPP did not feel safe in Mexico, and that 48% had been a victim or witness of violence in Mexico.[51]  According to this assessment, children represented about half (48%) of targets for physical violence, and about half (48%) of kidnapping victims.[52] The organization Médecins Sans Frontières (Doctors Without Borders) noted that 75% of its patients who were in Nuevo Laredo in October 2019 due to MPP reported having been kidnapped.[53]  In 2019, a U.S. Commission on Civil Rights report similarly credited several news and NGO reports in noting that "asylum seekers [awaiting proceedings in Mexico] have been killed, women have been raped, and children have been kidnapped."[54]  Similar accounts of insecurity and violence were the subject of numerous press reports describing squalor and violence in the "camps" where many MPP enrollees lived as they waited their court hearings.[55] But as bad as conditions often were in the makeshift border camps, migrants gathered there because the threat of violence and kidnapping in surrounding areas outside of the camps could be

---

[48] *Innovation Law Lab*, 951 F.3d at 1093.

[49] *Bollat Vasquez*, 520 F. Supp. 3d at 111-12 (issuing a preliminary injunction ordering the Department to return to the United States seven plaintiffs who had been enrolled in MPP).

[50] Human Rights First, *Delivered to Danger; Trump Administration sending asylum seekers and migrants to danger*, Feb. 19, 2021, https://www.humanrightsfirst.org/campaign/remain-mexico; *see Bollat Vasquez*, 520 F. Supp. 3d at 99 n.10 (citing a declaration by Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First, regarding an earlier version of this list explaining that "'[a]s of December 15, 2020, Human Rights First has identified 1,314 public reports of murder, torture, rape, kidnapping, and other violent assaults against asylum seekers returned to Mexico under MPP' and that 'the security situation in Mexico, including in the state of Tamaulipas has worsened' with one of Mexico's 'most powerful and violent cartels' reportedly increasing its activities in Tamaulipas and migrants in Matamoros and Nuevo Laredo have been repeatedly targeted'").

[51] UNHCR, *Rapid Protection Assessment: MPP Returnees at the Northern Border of Mexico* 15, Dec. 2019. The UNHCR assessment, shared confidentially with the United States government, is cited here with the express permission of UNHCR.

[52] According to the UNHCR survey, it did not take long for MPP enrollees to experience danger in Mexico. Just over half of the individuals surveyed (51%) had been in Mexico for less than one month and more than nine-in-ten had been in Mexico for less than three months. *Id*. at 7, 17.

[53] Médecins Sans Frontières, *The devastating toll of 'Remain in Mexico' asylum policy one year later*, Jan. 29, 2020, https://www.msf.org/one-year-inhumane-remain-mexico-asylum-seeker-policy; *cf*. Emily Green, *Trump's Asylum Policies Sent Him Back to Mexico. He was Kidnapped 5 Hours Later By a Cartel.*, Vice, Sept. 16, 2019.

[54] U.S. Commission on Civil Rights, *Trauma at the Border; The Human Cost of Inhumane Immigration Policies*, Oct. 2019, https://www.usccr.gov/files/pubs/2019/10-24-Trauma-at-the-Border.pdf.

[55] *See*, *e.g.*, Dickerson, *supra* note 19; Jordan, *supra* note 19; Merchant, *supra* note 19; This American Life, *The Out Crowd*, Nov. 15, 2019, https://www.thisamericanlife.org/688/transcript.

Nicaragua AR_000234

greater.[56]  Poor conditions and violence in the Matamoros camp also created an operational challenge when migrants at the camp blocked traffic in both directions on the Gateway International Bridge for hours as a sign of protest.[57]  The security and treatment of MPP enrollees also been the subject of congressional oversight and investigation.[58]

The adverse living conditions and violence experienced by migrants returned to Mexico pursuant to MPP are of grave concern to the Secretary.  The return of noncitizens to Mexico under MPP is predicated, by statute, upon individuals' ability to remain in Mexico during the pendency of their removal proceedings.[59]  In practice, however, myriad problems faced by noncitizens returned to Mexico impeded their ability to access those removal proceedings.  As a result, the Secretary has determined that the key predicate on which the statutory authority underlying the program is built—that noncitizens stay in Mexico and continue to participate in their removal proceedings—was upended by reality in too many cases.  This is an intolerable result that is inconsistent with this Administration's values, which include ensuring the rights of migrants to seek lawful protection from removal in a safe environment.

Moreover, these are problems that cannot easily be fixed.  Once migrants are returned to Mexico—an independent sovereign nation—the United States' ability to respond and provide adequate conditions and safety is diminished.

B. _Non-Refoulement_ Concerns

Concerns about the _non-refoulement_ process under MPP as it was previously implemented and the additional costs and resources that would be required to address those concerns also weigh against continued reliance on MPP.  As previously designed and implemented, MPP's _non-refoulement_ screening process—used to assess whether individuals would likely face persecution on account of a protected ground or torture in Mexico—was limited in at least four respects.

First, as originally implemented, individuals processed for MPP were not questioned by CBP about their fear of persecution or torture in Mexico, but were instead required to affirmatively articulate such a fear regarding return to Mexico—a sharp contrast to the approach

---

[56] _See_, _e.g._, María Verza and Fernanda Llano, _Lawless Limbo Within Sight of America_, Associated Press, Nov. 18, 2019; Delphine Schrank, _Asylum seekers cling to hope, safety in camp at U.S.-Mexico Border_, Reuters, Oct. 16, 2019, https://www.reuters.com/article/us-usa-immigration-mexico-matamoros-feat-idUSKBN1WV1DY.

[57] Adolfo Flores, "Asylum-Seekers Protesting Squalid Conditions Shut Down A US Border Crossing For 15 Hours," Buzzfeed, Oct. 11, 2019, https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-protesting-bridge-close-matamoros-texas.

[58] _See_, _e.g._, Press Release, H. Comm. on the Judiciary, "Chairman Nadler Announces House Judiciary Investigation into Trump Administration's 'Remain in Mexico' Policy," Jan. 14, 2020, https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2397; _Examining the Human Rights and Legal Implications of DHS's "Remain in Mexico" Policy_: Hearing Before the H. Comm. on Homeland Sec., 116th Cong. _passim_ (2019).

[59] _See_ 8 U.S.C. § 1225(b)(2)(C) (specifying that the Secretary may return a noncitizen to a contiguous territory "pending a proceeding under [8 U.S.C. §] 1229a").

14

used in the expedited removal context, in which individuals are affirmatively asked standard questions about fear of return to their home countries and the responses are recorded.[60]

Second, rather than using a screening standard familiar to asylum officers (such as the "significant possibility" standard used for credible fear interviews or the "reasonable possibility" standard used for reasonable fear interviews to screen for possible withholding or deferral of removal claims), *non-refoulement* screenings for MPP applied a more restrictive "more likely than not" standard.[61]  Under this standard, noncitizens had to demonstrate to an asylum officer that it was more likely than not that they would be persecuted or tortured if returned to Mexico in order to avoid a return to Mexico—a higher substantive standard than they would ultimately have had to establish to secure asylum and the same substantive standard they would have had to establish to an immigration judge if they were ineligible for asylum but were seeking withholding or deferral of removal under the INA or regulations implementing CAT.

Third, the Department did not initially allow counsel to participate in the *non-refoulement* interviews.[62]  This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative.[63]  Eventually, and in part as response to a district court order, these restrictions were eased.[64]

---

[60] *See* 8 C.F.R. § 235.3(b)(2). Importantly, even if migrants processed for MPP expressed a fear of repatriation to their home country, they were never asked about any fear of being returned to Mexico. Assessing this feature of the program, Judge Watford of the U.S. Court of Appeals for the Ninth Circuit stated in *Innovation Law Lab* that it was "virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations," as many individuals returned under MPP who feared persecution or torture in Mexico would "be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J. concurring).

[61] Prior to MPP implementation, this standard had been used almost exclusively by immigration judges to adjudicate statutory withholding of removal or withholding or deferral of removal under regulations implementing the Convention Against Torture (CAT). *See* 8 C.F.R. §§ 208.16(a), (c)(4); 208.17(b)(1); 208.31(c); 1208.16(b); 1208.17(b). It was, as a result, not a standard that had previously been used by asylum officers in the screening context, which resulted in additional, burdensome training and implementation requirements.

[62] U.S Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, PM-602-0169 3 (Jan. 28, 2019) ("DHS is currently unable to provide access to counsel during the [*non-refoulement*] assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals."). This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative. *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[63] *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[64] *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020). Previously retained counsel were permitted to participate in *non-refoulement* interviews conducted at Immigration Hearing Facilities (IHFs) in Laredo and Brownsville as of December 2019 and within the Ninth Circuit in January 2020. Supplemental guidance issued in December 2020 expanded this access to counsel to all MPP locations and required DHS to ensure the ability of retained counsel to participate telephonically in USCIS' MPP *non-refoulement* assessments, but only "where it does not delay the interview, or is required by court order." Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols, *supra* note 30, at 1-2.

15

Fourth, in practice, there were multiple challenges and inconsistencies in the implementation of *non-refoulement* screenings.  The Red Team Report emphasized the need for standard operating procedures to ensure consistency and address problems such as the use of a "pre-screening process" by CBP personnel at some locations that "preempt[ed] or prevent[ed]" USCIS from ever having cases referred for a determination.[65]  The report additionally noted that some CBP officials "pressure[d] USCIS to arrive at negative outcomes when interviewing migrants on their claim of fear of persecution or torture."[66]

Moreover, throughout the use of MPP, more than 2,500 individuals raised fear claims at multiple points in this process, leading to multiple screenings for those individuals during the pendency of their cases.[67]  These kinds of unproductive, redundant screenings are a drain on resources that may be more likely to occur in MPP as individuals are returned to Mexico multiple times over the pendency of a single removal proceeding, often to unsafe conditions.

For all these reasons, the Secretary has concluded that continuation of MPP in its prior form is not advisable.  These concerns likely could be addressed by policy changes that require the affirmative asking, the use of a more appropriate screening standard that protects those who face a reasonable or significant possibility of persecution or torture upon return to Mexico, the opportunity for individuals to consult with counsel prior to screenings, and better training and oversight.  But making these changes would likely lengthen the screenings and require DHS to devote additional asylum officers and detention space to these screenings, both of which are in short supply, especially as a result of challenges related to the COVID-19 pandemic.  New procedures could lengthen the screening process.  Such an approach would divert critical personnel and resources from other Administration priorities, including ongoing efforts to build a more durable, fair, and efficacious asylum system as discussed in greater detail in Section IV.  The additional burdens that would be required to implement a *non-refoulement* process acceptable to the Department weigh against retention of MPP.  Moreover, even if making these changes better protected individuals from being returned to persecution or torture, it would not protect people from generalized violence or other extreme hardships that have no nexus to statutorily protected grounds, and that have been experienced by many returnees.

### C.  Access to Counsel, Notice of Hearings, and Other Process Concerns

Individuals in MPP faced multiple challenges accessing counsel and receiving sufficient information about court hearings.  First, there were several problems in communicating accurate and up-to-date information to migrants about rescheduled court hearings.  As noted in the Red Team Report, some migrants in MPP had to give up their shelter space in Mexico when they returned to the United States for their court hearings.  As a result, they were unable to provide the court an address for follow-up communications.[68]  To submit a change of address while in Mexico, migrants had to print and mail a Change of Address Form, which posed logistical challenges for individuals who lacked internet access and who could not readily print and mail

---

[65] Red Team Report, *supra* note 27, at 6.

[66] *Id*. at 4-5.

[67] Data on MPP Cases with Multiple Referrals, provided by USCIS on October 28, 2021.

[68] Red Team Report, *supra* note 27, at 7.

Nicaragua AR_000237

documents internationally.  This made it difficult to communicate updates regarding enrollees' court cases and hearing dates.

Second, MPP enrollees faced several barriers in accessing counsel both in the United States and in Mexico.  Although MPP enrollees were permitted to meet with counsel at hearing locations prior to their hearings, these meetings were limited to a single hour before the court hearing took place.[69]  Opportunities for attorneys to meet with their clients outside of those organized at the hearing locations were limited due to, among other constraints, complications associated with cross-border communication.  Many migrants lacked access to a telephone with international coverage or other forms of technology that could be used to communicate with counsel.  Some legal services organizations also adopted policies against visiting clients in Mexico due to serious safety concerns.[70]  In addition, because hearings for the tens of thousands of people enrolled in MPP were concentrated in a handful of courts along the border, demand for legal assistance far outstripped supply.[71]

These problems are of significant concern to the Secretary.  Inadequate access to counsel casts doubt on the reliability of removal proceeding.  It also undermines the program's overall effectiveness at achieving final resolution of immigration proceedings; in several cases, noncitizens challenged adverse immigration-judge decisions on the ground that they did not have an adequate opportunity to identify and retain counsel, or to gather or present the evidence in support of their claims.[72]  More broadly, access to counsel is critical to ensuring migrants receive a full and fair hearing; this Administration recognizes the importance of access to counsel in civil contexts, including in immigration proceedings, and considers fostering legal representation and access to justice a priority.[73]

Meanwhile, some of these flaws are exceedingly challenging to fix.  While migrants could be provided additional means to communicate from Mexico with counsel by video or telephone, doing so requires a significant expenditure of resources to ensure that the appropriate technology is available in Mexico.  In-person consultations are significantly constrained by the

---

[69] *See* U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance* 3 (Feb. 12, 2019).  As noted above, DHS also did not initially allow counsel to participate in *non-refoulement* interviews conducted by USCIS.

[70] *See* Brief for the Laredo Project, et al. as Amici Curiae Supporting Respondents at 20-21, *Wolf v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021) ("The Laredo Project considered providing assistance across the border in Nuevo Laredo, but determined that it was far too dangerous. When Laredo Project attorneys took an exploratory trip across the border, the local pastor with whom they were scheduled to meet (who ran a shelter for migrants) was missing; he had been kidnapped by cartel members, reportedly because he attempted to stop them from kidnapping Cuban asylum seekers.").

[71] Human Rights Watch, *We Can't Help You Here"*; *U.S. Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico ("[U]nder the MPP, thousands of asylum seekers have been forcibly concentrated in El Paso and San Diego, overwhelming the limited number of immigration attorneys who practice there.").

[72] *See supra* note 35.

[73] White House, "FACT SHEET: President Biden to Sign Presidential Memorandum to Expand Access to Legal Representation and the Courts," May 18, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/18/fact-sheet-president-biden-to-sign-presidential-memorandum-to-expand-access-to-legal-representation-and-the-courts/.

Nicaragua AR_000238

reality that migrants are in Mexico and space for meetings with counsel to take place at ports of entry or upon their return to court is extremely limited.  Providing migrants with additional time to consult with attorneys would likely require them to spend a night in detention, which would also place additional strain on CBP facilities that have consistently been operating over their COVID restricted capacity.  In fact, the holding areas in six out of nine Border Patrol Sectors are over COVID-capacity as of October 27, 2021.[74]

   D.  Impacts of MPP on Immigration Court Appearance Rates and Outcomes

   The Department's October 2019 Assessment of MPP concluded that MPP was "restoring integrity to the immigration system" by (1) providing bona fide asylum seekers the opportunity to obtain relief in months, not years, and (2) eliminating the "perverse incentives" that reward and encourage people with non-meritorious asylum claims to enter the United States.[75]  But upon further consideration and examination, the facts tell a more complex story, thus undermining the claimed benefits.

   MPP did result in some removal proceedings being completed more expeditiously than is typical for non-detained cases.  Overall, 41 percent of MPP cases resulted in a final enforcement disposition as of June 30, 2021, versus 35 percent of comparable non-MPP cases.[76]  But the fact that MPP may have resolved cases more quickly does not mean that the cases were resolved fairly or accurately.  The integrity of the nation's immigration system should be assessed by whether immigration proceedings achieve fair and just outcomes, both for individuals who merit relief and those who do not. In the Secretary's judgment, the data show that MPP generally failed to meet that bar.

   Importantly, noncitizens in MPP were substantially more likely to receive *in absentia* removal orders than comparable noncitizens who were not placed in MPP during the relevant time period.  Overall, of the 67,694 cases of individuals enrolled in MPP,[77] 21,818 were subject to an *in absentia* order of removal at some point during their removal proceedings—32 percent of all individuals enrolled in MPP.[78]  For comparable noncitizens who were not processed

---

[74] Data on holding area capacity by U.S. Border Patrol Sector, provided by CBP on October 28, 2021.

[75] Oct. 2019 Assessment, *supra* note 31, at 3, 6.

[76] For the purposes of this memorandum, comparable noncitizens or comparable non-MPP cases are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 20, 2021, were not enrolled in MPP and were not detained throughout the pendency of their proceedings. Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020) [hereinafter FY 2020 Enforcement Lifecycle Report].

[77] *Id*. This is based on DHS's Office of Immigration Statistics (OIS) analysis of MPP cases; this analysis excludes 345 cases originally identified as MPP enrollees in CBP data because the records are for unaccompanied children, accompanied minors, or Mexican nationals, all of whom are ineligible for the program, or because the records could not be matched to other administrative data.

[78] In his June 1 Memorandum, the Secretary referenced a 44% *in absentia* rate for this time period. The Department has since updated its methodology for measuring *in absentia* rates in two important ways. First, the Department did not count *in absentia* orders that were subject to subsequent motions to reopen or any other further action by DHS or

18

through MPP during that same time period and who were also not detained for the duration of their proceedings, the *in absentia* rate was 13 percent—about two-fifths the rate of the MPP group.[79]

Moreover, an additional 6,151 MPP cases were terminated by the immigration court.[80] Courts generally issued such orders in MPP cases when a noncitizen failed to appear but the immigration judge declined to issue an *in absentia* removal given concerns that the noncitizen did not have proper notice of how to attend his or her hearing.[81]  Including these cases brings the total number of cases of individuals in MPP that involved the issuance of an *in absentia* order of removal or termination to 27,969 (41 percent of all MPP cases and nearly three-and-a-half times higher than the *in absentia* rate for comparable noncitizens not enrolled in MPP).[82]

The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP.  For instance, the October 2019 Assessment concluded that MPP was incentivizing people without meritorious claims to voluntarily leave Mexico and return home.[83]  That assessment pointed to the fact that out of more than 55,000 MPP enrollees (at that time), only 20,000 were sheltered in northern Mexico and an additional 900 had returned home through International Organization for Migration's Assisted Voluntary Return program.

---

DOJ, thus undercounting the total number of *in absentia* orders that had been issued. Second, the *in absentia* rate of 44 percent only included cases in which there was a final disposition, rather than the full universe of MPP cases including those that were still pending, thus overstating the percentage. The updated numbers in this memorandum, by contrast, take into account the total number of *in absentia* orders issued in MPP cases, irrespective of whether there was a subsequent motion to reopen or other further action in the case, as well as the total number of MPP cases, including both active cases and those with a final disposition. This analysis captures all *in absentia* orders and compares them to the full set of MPP cases.

[79] *Id.*

[80] For individuals in removal proceedings under Section 240 of the INA who are not in MPP, termination of proceedings is frequently reported by DHS OIS as a form of relief because it generally marks the end of efforts to remove the noncitizen from the country. That situation is very different for noncitizens enrolled in MPP, who are outside of the country during the pendency of removal proceedings and have no basis upon which to seek admission to the United States once proceedings are terminated.

[81] *Matter of Herrera-Vasquez*, 27 I&N Dec. 825 (BIA 2020); *Matter of Rodriguez-Rodriguez*, 27 I&N Dec. 762 (BIA 2020).

[82] The district court in *Texas v. Biden* cited EOIR data indicating that *in absentia* rates in removal proceedings were also quite high in 2015 and 2017—42% and 47% percent, respectively. 2021 WL 3603341, at *21. But there are critical methodological differences between the ways in which these numbers are calculated and the *in absentia* rates presented in this memorandum. As explained in note 77, *supra*, the data presented in this memorandum measure *in absentia* rates as a share of the *total* number of cases. The EOIR data measures *in absentia* orders as a share of *completed* cases only, which excludes cases that remain ongoing that are disproportionately likely to not result in such cases. *See* Ingrid Eagley and Steven Shafer, *Measuring* In Absentia *Removal in Immigration Court*, American Immigration Council, Jan. 2021, https://www.americanimmigrationcouncil.org/research/measuring-absentia-removal-immigration-court. A recalculation of the 2015 and 2017 *in absentia* rates as a share of *total* cases referred to EOIR in those years yields rates of 21 percent and 20 percent, respectively. This is one-half the *in absentia* and termination rate found in MPP cases.

[83] Oct. 2019 Assessment, *supra* note 31, at 3.

Nicaragua AR_000240

Other reports suggest, however, that individuals abandoned claims or otherwise failed to appear for proceedings because of insecurity in Mexico and inadequate notice about court hearings.[84]  The difficulties that MPP enrollees faced in Mexico, including the threat of violence and kidnapping, coupled with inadequate and unreliable access to food and shelter, likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their cases had merit.  Indeed, a number of petitions for review filed in federal courts of appeals by individuals in MPP who received *in absentia* removal orders explain their failure to appear based on serious threats to their personal safety.[85]

While individuals in MPP were more likely to receive *in absentia* removal orders than comparable noncitizens not enrolled in MPP, they were also less likely to receive relief or protection from removal.  This was true even though the decision to place someone in MPP was not linked to any assessment of the likely merits of the individual's claim.  DHS data reflect that only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection from removal—a grant rate of just 1.1.[86]  For the comparable set of non-MPP cases from the same time period, the relief-granted rate was nearly two-and-a-half times as high (2.7 percent).[87]

The remarkably low 1.1 percent grant rate for MPP cases—the majority of which involved individuals from the Northern Triangle countries of Central America—is notable also because when MPP was first announced the Department observed that "approximately 9 out of

---

[84] *See, e.g.*, Kevin Sieff, "They missed their U.S. court dates because they were kidnapped. Now they're blocked from applying for asylum.," Washington Post, Apr. 24, 2021; Camilo Montoya-Galvez, "'Leave me in a cell': The desperate pleas of asylum seekers inside El Paso's immigration court," CBS News, Aug. 11, 2019, https://www.cbsnews.com/news/remain-in-mexico-the-desperate-pleas-of-asylum-seekers-in-el-paso-who-are-subject-to-trumps-policy/.

[85] *See, e.g.*, *Tabera-Columbi v. Garland*, No. 20-60978 (5th Cir. filed Oct. 26, 2020) (noting that MPP enrollee had been sexually assaulted by the police and was in a hospital as a result on the morning of the hearing); *Quinones Rodriguez v. Garland*, No. 20-61204 (5th Cir. filed Dec. 17, 2020) (describing an individual who did not attend the MPP hearing because he was hiding from gangs who threatened to kidnap him on his way to the hearing); *Miranda-Cruz v. Garland*, No. 21-60065 (5th Cir. filed Feb. 1, 2021) (describing a family that was kidnapped en route to an MPP hearing and held for ransom); *see also* Hamed Aleaziz and Adolfo Flores, "They Missed Their US Asylum Hearings Fearing the Cartel Would Kill Them. Now They're Stuck in Mexico," Buzzfeed, May 18, 2021.

[86] Relief or protection from removal is defined to include EOIR grants of asylum, grants of relief in non-asylum removal proceedings, withholding of removal, or conditional grants; DHS grants of Special Immigrant Juvenile (SIJ) status, lawful permanent residence, S, T, or U nonimmigrant status, and Temporary Protected Status (TPS); the exercise of DHS prosecutorial discretion; and findings by DHS that the subject is a U.S. citizen or lawfully present noncitizen not subject to removal. *See* FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

[87] As discussed in note 79, this figure includes cases that were terminated. For those located in the United States, termination ends removal proceedings and effectively allows the subject to remain in the United States until further action is taken. The low relief-granted rates for both the MPP and comparable non-MPP cases are likely the result of a number of different factors. During this period, a policy was implemented that barred asylum for individuals who transited through third countries and decisions were issued that limited humanitarian claims based on family membership and gender; these likely depressed grant rates. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019); *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019), *vacated*, 28 I&N Dec. 304 (A.G. 2021); *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), *vacated*, 28 I&N Dec. 307 (A.G. 2021). Additionally, the period of time being analyzed is both brief and recent. OIS analysis indicates that relief-granted rates tend to increase over the first three to four years after a case resulting from a credible or reasonable fear claim is initiated in immigration court. None of this, however, explains the substantial discrepancy in outcomes between MPP case and comparable non-MPP cases over the same time period. And none of this diminishes the statutory obligation to fairly assess asylum applications with the goal of producing reliable adjudications.

20

10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges."[88]  DHS does not have a record of the methodology used to generate this "9 out of 10" statistic.  To the contrary, an analysis of EOIR case outcomes for Northern Triangle asylum-related claims originating in border encounters (i.e., all EOIR removal proceedings originating with border encounters followed by credible fear or reasonable fear claims) in the years leading up to MPP yields a relief-granted rate of about 29 percent—significantly higher than the 10 percent reflected in Department's January 2019 statement.  That relief-granted rate is more than 26 times the 1.1 percent grant rate observed for all forms of relief or protection among MPP enrollees.  These discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by migrants in Mexico and barriers to legal access.[89]

Based on the Department's experience with MPP and informed by the data above, the Secretary has determined that the program did not succeed in a sufficient number of cases at achieving timely and reliable adjudication of migrants' removal proceedings.  Multiple features of MPP, especially combined with the difficulties in accessing counsel and migrants' living experience in Mexico as described above, have led the Secretary to conclude that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims.  Given the Administration's values, commitments, and policy preferences, the Secretary has concluded that this is an unacceptable result.  Individuals who may have abandoned meritorious protection claims should have been offered a meaningful opportunity to seek protection in the United States.  As stated above, the return-to-contiguous-territory authority at INA § 235(b)(2)(C) is predicated on the notion that individuals will be able to pursue their removal proceedings from within Mexico; the fact that so many individuals enrolled in MPP were unable to complete their proceedings due to their tenuous situation in Mexico undercuts a key requirement of the statute.  As a global leader in offering protection and resettlement to refugees, the United States also has a moral obligation to fairly consider such claims.  The Secretary is committed to ensuring meritorious claims are heard, even if that means non-meritorious claims end up being adjudicated as well.

E.  MPP and Recidivist Irregular Re-Entries

As discussed below, CBP encounters along the SWB decreased dramatically over a number of months in which MPP was fully operational across the SWB.  But the data also show that a significant share of individuals enrolled in MPP—33 percent as of June 30, 2021—were subsequently encountered attempting to reenter the country without inspection, rather than continuing to wait in Mexico for the resolution of their removal proceedings.[90]  This rate is more

---

[88] Nielsen Release, *supra* note 14.

[89] Indeed, that conclusion is not dissimilar to the one reached in the October 2019 Assessment, when the Department found that "MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, *many of which may be meritless*, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings." Oct. 2019 Assessment, *supra* note 31, at 6 (emphasis added). Implicit in this statement is an acknowledgment that some such claims do have merit.

[90] FY 2020 Enforcement Lifecycle Report, *supra* note 75. When the Department previously considered this issue in June, 27 percent of MPP enrollees had been re-encountered by CBP subsequent to their enrollment in MPP (not

Nicaragua AR_000242

than two-and-a-half times higher than the historical average for recidivism (defined as re-encounters within 12 months of initial apprehension) of 14 percent for individuals processed under Title 8 authorities.[91]  The high rate of repeat encounters undercuts one of MPP's key claimed advantages—namely its deterrent effect on would-be border crossers.  Contrary to such claims, the data show that MPP enrollees were much more likely try to cross the border after being returned to Mexico than individuals who were removed from the country under other Title 8 authorities.  Such re-encounters also impose significant additional work on frontline Border Patrol agents, who had to encounter, track, and process MPP enrollees multiple times—resources that could and should have been deployed to other objectives.

F.  Investments and Resources Required to Operate MPP

MPP was, according to the December 2018 announcement, intended to reduce burdens on border security personnel and resources to free them up to better protect the U.S. territory.  It was also intended to help clear the backlog of unadjudicated asylum claims.  In reality, however, backlogs in the Nation's immigration courts and asylum offices grew significantly during the period that MPP was in effect.[92]  In addition, MPP created substantial additional responsibilities on Department personnel that detracted from other critically important mission sets. This played out in numerous ways.

First, each time an MPP enrollee returns to the United States to attend a court proceeding, which could happen multiple times over the life of a case, DHS personnel are required to conduct additional rounds of processing, including biographic and biometric collection, property collection and return, and medical screenings.  None of this is required for those in removal proceedings in the United States.  The labor-intensive process of bringing migrants back into the United States for their court proceedings directly impacts staffing at the four U.S. ports of entry where migrants re-entered, taking frontline personnel away from other key missions—such as facilitating legal cross-border trade and travel.

Second, in order to implement and operate MPP, the Department devoted significant resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities (IHFs) to support EOIR.  During the period when MPP was operational during the prior Administration, IHFs cost approximately $168 million to build and operate.[93]  As part of its current efforts to comply the *Texas* court order and reimplement MPP in good faith, the Department has procured new contracts for IHFs, at a cost of approximately $14.1 million to build and $10.5 million per month to operate.[94]

---

counting encounters at POEs in connection with MPP). The increase since then reflects that individuals enrolled in MPP continued to seek entry without inspection to the United States.

[91] DHS Office of Immigration Statistics data provided on 10/29/2021.

[92] Between January 2019 and January 2021—the period when MPP was operational—the number of pending immigration court cases increased from 829,200 to 1,283,090 (a 55 percent increase). Data on pending caseload, provided by EOIR on October 28, 2021. The backlog of pending affirmative asylum claims increased over the same time period from 331,100 to 399,100. Data on the affirmative asylum backlog, USCIS Refugee, Asylum, and International Operations Directorate on October 27, 2021.

[93] DHS Office of the Chief Financial Officer analysis.

[94] Nuñez-Neto Decl., *supra* note 45, at ¶ 15.

Nicaragua AR_000243

Third, adjudication of claims by individuals in MPP diverts asylum officers and immigration judges from other key efforts designed, as described in Section IV.B, to more effectively process cases and reduce backlogs. As initially implemented, MPP required the training of asylum officers to learn the newly applied *non-refoulement* screening standards and support an additional adjudicative caseload. Moreover, each time migrants came in and out of the United States for court hearings, there was another opportunity to claim fear—and another possible fear screening. Department data shows that in the short time that MPP was operational, more than 2,500 individuals had repeat fear screenings.[95]

Fourth, the program drew on the same limited resources that non-profits and humanitarian organizations used to help other individuals in Mexico—thus focusing efforts on northern Mexico and diverting resources and services away from other parts of Mexico and the broader region.

Each of these, and other investments or resources, divest resources from other critically important Departmental missions and undercut the Department's ability to pursue longer-term, durable reform.

G.  Impact of MPP and its Termination on SWB Migration Flows

In making his determination decision, the Secretary has presumed—as is likely—that MPP contributed to a decrease in migration flows. From January through May 2019, when MPP was used in a limited number of locations, encounters rose.[96]  But from June 2019, when DHS announced that MPP would be fully implemented along the entire SWB, through September 2019, border encounters decreased rapidly, falling 64 percent in just three months. Border encounters continued to decrease until April 2020. Beginning in May 2020, encounters once again started rising.[97]  At that point, individuals continued to be enrolled into MPP, however, at lower rates than previously; immigration court hearings for MPP enrollees were also suspended.

The sharp decrease in SWB encounters during the months in which MPP was fully operational is notable. Of course, correlation does not equal causation. And even at the height of MPP's implementation in August 2019, it was not the Department's primary enforcement tool; approximately 12,000 migrants were enrolled in MPP but more than 50,000 were processed under other Title 8 authorities.[98]  In addition, beginning in April 2019, Mexico surged its own enforcement, thus increasing their level of apprehensions and returns. This, coupled with a range of other push and pull factors, both known and unknown, likely contributed to the decline in encounters.[99]  The relevant data is simply insufficiently precise to make an exact estimate of the extent to which MPP may have contributed to decreased flows at the southwest border.

---

[95] *See supra* note 66.

[96] U.S. Customs and Border Protection, "Southwest Land Border Encounters," https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[97] *Id.*

[98] DHS OIS analysis of U.S. CBP administrative records.

[99] *See* Congressional Research Service, *Mexico's Immigration Control Efforts* (May 28, 2021).

23

Nicaragua AR_000244

That said, the Secretary has, nonetheless, evaluated MPP on the premise that it contributed to decreased flows.[100]  Even so, the Secretary has concluded that this benefit cannot be justified, particularly given the substantial and unjustifiable human costs on the migrants who were exposed to harm while in Mexico, and the way in which MPP detracts from other regional and domestic goals and policy initiatives that better align with this Administration's values while also serving to manage migratory flows, as described in Section IV.

H.  Addressing the Concerns of States and Border Communities

In the course of litigation, plaintiffs have alleged that the Secretary's June 1 Memorandum failed to consider the additional costs that States would allegedly incur as a result of the decision to terminate MPP.  Texas and Missouri, for example, argued—and the district court found—that the termination of MPP could lead to an increased number of noncitizens without proper documentation in their States, which might cause the States to incur additional costs related to the costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs.[101]  State-plaintiffs also alleged that terminating MPP led to an increase in organized crime, human trafficking, and drug cartel activity, specifically with respect to the illegal trafficking of fentanyl.[102]  And State-plaintiffs further claimed that they had developed "reliance interests" dependent on the continued operation of MPP.

The Secretary takes these concerns seriously.  He has sought to understand and address the impacts that Departmental policies and practices may have on communities and has consulted with numerous state and local officials from across the SWB about the Department's border management strategy, including the decision to terminate MPP.  The Secretary has, as a result taken and will continue to take, steps designed to minimize adverse consequences of any policy shifts on border states.

Prior to the district court's injunction, for example, the Department facilitated the safe and orderly entry into the United States of about 13,000 individuals previously enrolled in MPP for purposes of participating in their removal proceedings.  Prior to doing so, however, the Department ensured that these individuals received COVID-19 tests before crossing the border and entering the United States.  The Department also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that facilitated their onward movement to final destinations away from the border.

---

[100] The district court faulted the Secretary for not taking into account alleged warnings to members of the Biden-Harris transition team by career DHS officials that terminating MPP would cause a spike in border encounters. *Texas*, 2021 WL 3603341, at *7. The Department is unaware of any such specific conversations, yet is aware of, and has taken into account, similar concerns raised by others.

[101] *See Texas*, 2021 WL 3603341, at *9-10.

[102] First Amended Complaint at 2, 38-39, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. filed June 3, 2021); *see also* Complaint, *West Virginia v. Biden*, No. 2:21-cv-22 (N.D. W.Va. filed Aug. 19, 2021); First Amended Complaint, *Arizona v. Mayorkas*, No. 2:21-cv-617 (D. Ariz. filed July 12, 2021).

Nicaragua AR_000245

In addition, the Secretary has devoted extensive resources on efforts designed to stop trafficking networks and protect border states from risks associated with criminal activity. Shortly after assuming office, the Secretary directed FEMA to increase funding for SWB law enforcement through FEMA's Operation Stonegarden, a $90 million grant that supports law enforcement partners, with more than 80% of such funds being been directed to SWB areas. Multiple and significant narcotics seizures have resulted from this initiative.[103]  The Secretary also directed DHS to work with GOM partners on joint law enforcement operations designed to attack the smuggling and trafficking organizations.  Operation Sentinel, which was launched in April, is a key example of these efforts—a multifaceted counter-network operation focused on identifying and taking law enforcement actions against transnational criminal organizations involved in the facilitation of mass migration to the SWB of the United States.  Working with the GOM, DHS law enforcement has identified over 2,200 targets associated with transnational criminal organizations and revoked multiple visas and Trusted Traveler memberships, blocked bank accounts, and blocked certain entities from conducting business with the U.S. government.[104]

These efforts build on the Department's longstanding partnership with state, local, territorial, and tribal (SLTT) governments and law enforcement agencies, including many on the SWB, to address transnational crime, including human smuggling and trafficking.  ICE's Homeland Security Investigations, for example, operates 79 Border Enforcement Security Task Forces nationwide, staffed by more than 700 State and Local law enforcement officers, that work cooperatively to combat emerging and existing transnational criminal organizations.  Operational successes resulted in the seizure of 2,503 weapons, 215,301 pounds of narcotics, and $104,742,957 in FY20.[105]  The ICE Criminal Apprehension Program also helps SLTT law enforcement partners better identify, arrest, and remove priority noncitizens who have been convicted of crimes in the United States and are incarcerated within federal, state, and local prisons and jails.  In FY21, ICE issued 65,940 immigration detainers to noncitizens booked in jails or prisons.[106] All such activities are ongoing.

The Department also has carefully reviewed the available information and has not seen any evidence that MPP had any effect on human trafficking and crime, including drug trafficking.  Seizures of narcotics, while not necessarily indicative of trafficking activity, are nonetheless the best available data, and do not show any impact related to MPP's implementation.  Seizure of narcotics between ports of entry have declined steadily from FY18 to FY21, including a decline of almost 40 percent since the point in time when MPP was fully implemented, through FY21, a time MPP was largely not being implemented.[107]  These declines have been driven by a substantial decrease in marijuana smuggling.  Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation.  Seizure trends for

---

[103] FEMA data on Operation Stonegarden provided on Oct. 28, 2021.

[104] CBP data on Operational Sentinel, provided on Oct. 28, 2021.

[105] ICE data on Border Enforcement Security Task Forces, provided on Oct. 28, 2021.

[106] ICE data on the Criminal Apprehension Program, provided on Oct. 28, 2021.

[107] Analysis of CBP data on drug seizures by U.S. Border Patrol agents, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics.

Nicaragua AR_000246

hard drugs at ports of entry have been mixed, with fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20.[108]

Meanwhile, the fact that some noncitizens might reside in the United States rather than being returned to Mexico and thus access certain services or impose law enforcement costs is not, in the Secretary's view, a sufficiently sound reason to continue MPP. Federal immigration policy virtually always affects the number of people living within the States. Notably, not all of those burdens are borne by border States—many noncitizens proceed to interior States; others are detained by the federal government. In this case, the Secretary has made the judgment that any marginal costs that might have been inflicted on the States as a result of the termination of MPP are outweighed by the other considerations and policy concerns; it is also the Secretary's view that the other policies and initiatives being pursued by this Administration will ultimately yield better outcomes than MPP.

Moreover, even after his many consultations, the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation (or in response to the prior termination) of MPP. State-plaintiffs in the litigation also have not identified any specific actions they took in reliance on MPP.[109] Moreover, any claimed reliance interest is undermined by the fact that the program itself is discretionary, as are decisions to detain or parole individuals into the country. *No* administration has ever done what State-plaintiffs in the litigation argue is required here—detain or return to Mexico everyone that the Department encounters along the border. States cannot have a reliance interest based on something that has never previously been implemented. Notably, only 6.5 percent of noncitizens encountered along the SWB and processed through Title 8 were enrolled in MPP during the period it was in place. In no month when MPP was operating—including in August 2019, the month with the highest number of MPP enrollments—were more than one-in-five noncitizens encountered at the SWB and processed through Title 8 placed in MPP.[110] The short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the SWB who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States.

I.  Relationship between Implementation of MPP and Statutory Mandates

In enjoining the June 1 Memorandum, the district court faulted the Department for not considering the impact terminating MPP would have on the Department's ability to comply with the detention requirements in 8 U.S.C. § 1225.[111] In so doing, the district court accepted plaintiffs' argument that, pursuant to 8 U.S.C. § 1225, DHS has two options with regard to

---

[108] *Id.*

[109] The district court in *Texas* also discussed a purported "agreement" that the Department entered into with the State of Texas and several other states in early January 2021. *Texas*, 2021 WL 3603341, at *6-7. As the Department has explained in litigation, those documents were void *ab initio* and unenforceable. Any reliance on those documents is therefore unreasonable. To the extent those documents were ever valid, the Department has since terminated them and, in any event, Texas conceded in litigation that the "agreement" was no longer binding as of August 1, 2021.

[110] DHS OIS analysis of CBP administrative records.

[111] *Texas*, 2021 WL 3603341, at *21-23.

26

noncitizens seeking asylum at the border: (1) mandatory detention or (2) return to a contiguous territory.[112]  This is a clear misreading of the statute for all of the reasons explained at length by the U.S. Government in the litigation—including a misreading of Section 1225 to effectively mandate detention of all those who are not subject to the contiguous-territory-return provision of 8 U.S.C. § 1225(b)(2)(C) if the agency lacks detention capacity to detain all noncitizens not otherwise subject to contiguous territory return.  It is also completely at odds with the history of immigration detention in this country, and the agency's consistent and longstanding interpretation of its statutory authorities.  Section 1225(b)(2)(C) is discretionary, and nothing in section 1225's text or history suggests any relationship between Congress's grant of return authority and section 1225's detention provisions.

Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory.  Section 1225 "does not mean" that every noncitizen "must be detained from the moment of apprehension until the completion of removal proceedings."[113]  The INA provides DHS with latitude for processing noncitizens beyond returns or detention.  DHS "may ... in [its] discretion" release a noncitizen placed in Section 1229a proceedings through "parole," pursuant to 8 U.S.C. § 1182(d)(5) "for urgent humanitarian reasons or significant public benefit."[114]

Pursuant to Section 1182(d)(5)'s parole authority, Congress has expressly granted DHS the broad authority to release applicants for admission from detention as an exercise of the Department's parole power.  That power has been exercised for as long as the federal government has been regulating immigration.[115]  Indeed, Congress enacted 8 U.S.C. § 1182(d)(5) as a "codification of the [prior] administrative practice."[116]  And in the decades since, immigration agencies have continued to broadly exercise their parole power to release certain noncitizens from detention.  Notably, the statute does not set any limit on the number of individuals DHS can decide to release on parole.  Nor does it provide that the agency cannot rely on its limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225.  Rather, Congress simply required that parole decisions be made on a case-by-case basis and that they be based on "urgent humanitarian reasons" or "significant public benefit."[117]  As the statute does not define those ambiguous terms, Congress left it to the

---

[112] *Id*. at *22.

[113] *Matter of M-S-*, 27 I&N Dec. 509, 516-517 (A.G. 2019); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018).

[114] 8 U.S.C. § 1182(d)(5)(A); *see* 8 C.F.R. §§ 212.5(b), 235.3(c). Additionally, "pending a decision on whether the alien is to be removed" and "[e]xcept as provided in [§ 1226(c)]," noncitizens present in the United States "may" be released on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(2)(A)-(B).

[115] *See, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 651, 661 (1892) (discussing release of noncitizen to care of private organization); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (same).

[116] *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958).

[117] In a section entitled "Limitation on the Use of Parole," Congress amended the parole statute in 1996 to recharacterize the permissible purposes of parole from "emergent reasons or for reasons deemed strictly in the public interest" to "*only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, §§ 302, 602, 110 Stat 3009 (emphasis added). But it did not otherwise alter DHS's parole authority and did not define these manifestly ambiguous statutory terms. Accordingly, after the 1996 amendment to the parole statute, the agency

27

agency to define them.[118]   In implementing section 1182(d)(5), the agency has long interpreted the phrase "significant public benefit" to permit it to parole noncitizens "whose continued detention is not in the public interest as determined by" specific agency officials.[119]   And in turn, the agency has for decades viewed detention as not being in the "public interest" where, in light of available detention resources, detention of a specific noncitizen would limit the agency's ability to detain another noncitizen whose release may pose a greater risk of flight or danger to the community.[120]

Moreover, no administration has *ever* interpreted or implemented 8 U.S.C § 1225, as the district court in *Texas* has read it, to require the detention of virtually all inadmissible applicants for admission, except for those returned to Mexico.  The Department does not have—and has never had under any prior administration—sufficient detention capacity to maintain in custody every single person described in section 1225.  In September 2021, for example, CBP encountered approximately 192,000 individuals along the SWB.[121]   And as discussed above, even in August 2019, when MPP enrollments were at their zenith, CBP encountered nearly 63,000 individuals along the SWB.  Meanwhile, ICE Enforcement and Removal Operations (ERO) is generally appropriated for approximately 34,000 detention beds nationwide with some modest fluctuation from year to year.

This variance between border crossings and detention capacity is not new and was in fact the reality even when MPP was in place (see Appendix 1).  From Fiscal Years 2013 to 2019, nearly three-quarters of single adult and family unit members who were encountered at the SWB were either never placed in or released from detention during the pendency of their proceedings—more than 1.1 million (41 percent) were never booked into ICE detention and nearly 900,000 (33 percent) were booked in for a period of time but released prior to the conclusion of their removal proceedings.[122]   Even during the period that MPP was in effect from late January 2019 to January 20, 2021, more than two-thirds of single adults and individuals in family units encountered along the SWB and processed through non-MPP Title 8 authorities— more than 650,000 individuals—were never detained or released from ICE custody during the

---

incorporated the new "case-by-case" requirement into its regulation, while also maintaining its longstanding regulatory authority to release when "continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5), which remained consistent with the statute after the 1996 amendment. Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997).

[118] 8 U.S.C § 1103(a)(1); *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *cf., e.g., Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of same parole regulation).

[119] 8 C.F.R. § 212.5(b)(5).

[120] *See, e.g.*, *Interim Guidance for Implementation of Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture; ICE Policy No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009); *see also Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1377-78 (S.D. Fla. 2002) (referring to INS detention use policies, including parole policies, based on having to establish "priorities for the use of limited detention space"), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

[121] Southwest Land Border Encounters, *supra* note 95.

[122] FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

Nicaragua AR_000249

duration of their proceedings; a full 42 percent (more than 415,000 individuals) were never booked into ICE detention at all.[123]

By interpreting Section 1225 to mandate either detention or return to Mexico, the court essentially concluded that every single administration since 1997 has repeatedly and consistently violated Section 1225, by exercising the parole authority to release noncitizens detained under that authority, on a case-by-case basis, where detention of a specific noncitizen would limit the agency's ability to detain another noncitizen who release may pose a greater risk of flight or danger to the community. There is no indication that Congress, in enacting Section 1225, intended to *require* the Secretary to use the explicitly *discretionary* return authority found at 8 U.S.C. § 1225(b)(2)(C) for virtually any noncitizen the Department fails to detain because of resource limitations.[124] Rather, the decision to use the authority found in 8 U.S.C. § 1225(b)(2)(C) is entrusted to the Secretary's discretion and to his discretion alone. Given these clear statutory authorities, and DHS's longstanding interpretation of the ambiguous parole statute, the Secretary's decision to terminate MPP creates no conflict with the detention authorities in Section 1225.

J.   Impact on U.S.-Mexico Relationship

Mexico is a sovereign nation. This means that the U.S. Government cannot return individuals to Mexico without an independent decision by the GOM to accept their entry. It was for good reason that MPP was put into effect only *after* the U.S. government had conducted diplomatic engagement with GOM and *after* the GOM announced its independent decision to accept returnees. The initiation of MPP required substantial diplomatic engagement in 2019; it does in 2021 as well.[125]

In deciding to accept returns of non-Mexican nationals under MPP, the GOM agrees to shoulder the burden of receiving these individuals, facilitating legal status and shelter, and accounting for their safety and security. Not only does this place a great deal of strain on the GOM's ability to provide services for its own citizens and lawful residents, it diverts Mexican law enforcement resources from other missions that are important to the United States—

---

[123] *Id*. Indeed, when the last Administration created MPP, it expressly excluded from its coverage as a matter of discretion certain noncitizens, including citizens or nationals of Mexico, returning lawful permanent residents seeking admission, noncitizens with known physical or mental health issues, and other noncitizens. DHS, "Migrant Protection Protocols (Trump Administration Archive)," https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.

[124] Congress is aware that it would need to appropriate substantial additional funds to detain everyone potentially subject to detention under Section 1225; yet, it has never done so. *See* 8 U.S.C. § 1368(b) (providing for bi-annual reports to Congress on detention space, including estimates on "the amount of detention space that will be required" during "the succeeding fiscal year"). Although Congress has amended Section 1225 since 1996, *see* Pub. L. 110-229, 122 Stat. 754, 867 (2008), it has never amended Section 1225 to mandate the use of return authority when the agency lacks resources to detain all applicants for admission or to override the agency's longstanding interpretation permitting the use of parole to address capacity limitations as a significant public benefit. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[125] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act*, *supra* note 13.

Nicaragua AR_000250

including addressing transnational organized crime networks and root causes of migration.  Over the past nearly three years, MPP has played an outsized role in its policy and operational engagement with GOM, thus distracting from other diplomatic initiatives and programs concerning migration flows.  These engagements, which have increased substantially in tempo and intensity since the court's order, require enormous amounts of time to prepare for and execute, and involve the same individuals at DHS and DOS who would otherwise be working on advancing other key bilateral priorities.

The Department is eager to expand the focus of the relationship with GOM to address broader issues related to migration to and through Mexico.  This includes implementing the bilateral economic and security frameworks adopted in September and October 2021, respectively;[126] addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more.  Terminating MPP will, over time, help to broaden the United States' engagement with the GOM to address these critical efforts, which we expect will produce more effective and sustainable results than what we achieved through MPP.  It will also provide more space and resources to address the many other bilateral issues that fall within DHS's diverse mission, such as countering transnational organized crime, cybersecurity, trade and travel facilitation, cargo and port security, emergency management, biosurveillance, and much more.

## IV.   The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management

In December 2018, when DHS announced the start of MPP, the Department stated that MPP was expected to provide numerous benefits for the immigration system, including reducing false asylum claims, more quickly adjudicating meritorious asylum claims, clearing the backlog of unadjudicated asylum applications, and, perhaps most importantly, stemming migration flows across the SWB.  All of these goals remain top priorities for the Department and Administration.  But the Secretary assesses that there are ways to advance these goals through means other than MPP—through policies and practices that will more effectively and more humanely achieve the stated goals than continuing to implement MPP as designed or in modified form.

Not only has MPP failed to deliver many of its promised benefits, but the burden and attention required to reimplement and maintain MPP will undermine the Department's efforts to address irregular migration and achieve lasting reform of the asylum system through other means.  As noted earlier, the Secretary is undertaking this review on the premise that MPP was responsible for a share of the significant decrease in SWB encounters that occurred during many months of MPP's operations.  However, MPP is not the only, and certainly not the preferred, means of tackling irregular migration.  To the contrary, the Department is currently pursuing a range of other measures that it anticipates will disincentivize irregular migration in ways that are

---

[126] White House, "Joint Statement: U.S.-Mexico High-Level Security Dialogue," Oct. 8, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/joint-statement-u-s-mexico-high-level-security-dialogue/; White House, "Fact Sheet: U.S.-Mexico High-Level Economic Dialogue," Sept. 9, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/09/fact-sheet-u-s-mexico-high-level-economic-dialogue/.

more consistent with this Administration's values and enduring, including by addressing root causes and building regional solutions.  In addition, the Department is committed to channeling migration through safe and orderly pathways and reforming our asylum adjudication system to achieve more timely, fair, and efficient results,

In July 2021, the Administration released a Blueprint describing its overarching strategy—as well as the concrete steps that will be taken—to ensure a secure, humane, and well-managed border, implement orderly and fair asylum processing, strengthen collaborative migration management with regional partners, and invest in the root causes of migration in Central America.[127]  The Administration, with DHS playing a critical role, has made significant investments and taken substantial actions to move forward with its strategy.

A. <u>Managing Flows</u>

The current Administration is pursuing a comprehensive vision for managing migration and facilitating safe, orderly, and legal pathways for individuals seeking protection or intending to migrate.[128]  A key part of this vision involves disincentivizing unlawful entries by robustly enforcing our laws at the land border while also ensuring the humane and lawful treatment of those who do arrive in the United States.  Doing so requires a concerted effort to address root causes of migration, provide alternative protection solutions in the region, enhance lawful pathways for migration to the United States, and streamline the fair adjudication of asylum claims at the border—efforts that the Department has determined will be more effective at reducing irregular migration than continuing to implement MPP.

To disincentivize irregular migration, the Administration is pursuing a multi-pronged approach.  At our border, we are employing expedited removal to rapidly, but humanely, return certain individuals and families that are encountered unlawfully crossing between POEs.  Those who do not express fear of persecution or torture, and who are nationals of countries that allow electronic nationality verification (ENV), are returned to their countries within a few days of being encountered.  DHS is working closely with the Department of State to expand the use of these ENV agreements throughout the hemisphere to more expeditiously facilitate removals of individuals who do not claim a fear of persecution or torture.  The Department additionally treats any noncitizen who unlawfully entered the United States on or after November 1, 2020, as a presumed border security enforcement and removal priority under current guidance,[129] as well as in guidance that will become effective on November 29, 2021.[130]

---

[127] White House, "Fact Sheet: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System," July 27, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/.

[128] EO 14010 directed the creation of a Root Causes Strategy and Collaborative Migration Management Strategy. Published in July 2021, the strategies articulate a bold and comprehensive vision for managing migration throughout the Western Hemisphere. *Id.*

[129] Memorandum from Tae D. Johnson, Acting Director, ICE, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021).

[130] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Security, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021).

Nicaragua AR_000252

Recognizing that the management of migration is a shared responsibility among sending, transiting, and receiving countries, the Administration is also working with our partner countries across the region to manage migratory flows.  As part of these efforts, the United States is working bilaterally and multilaterally with countries across the Western Hemisphere, seeking to encourage humane border enforcement and enhance legal pathways throughout the region.  DHS is also working closely with the Department of State to provide additional technical assistance, mentoring, and resources to border and immigration authorities in the region, with the goal of enhancing the capability and effectiveness of our partners' efforts to identify and interdict unlawful activity.  As part of these efforts, the United States and Colombia co-hosted a regional conference on migration in Colombia on October 20, 2021 that brought together foreign ministries and immigration authorities from 17 partner nations across the hemisphere to directly address recent trends in irregular migration in the region. During this conference, countries committed to enhancing protection, combating human smuggling and trafficking, and expanding humane enforcement efforts.

The Department is also working bilaterally with countries across the region to build law enforcement capacity, tackle transborder crime, and slow migratory flows.  Beginning in April 2021, for example, DHS deployed dozens of CBP personnel to Guatemala to train and support local law enforcement units and help enhance the security of Guatemalan border crossings, checkpoints, and ports.[131]  And in October 2021, for example, the United States and Mexico agreed on joint actions to prevent transborder crime, with a particular focus on reducing arms trafficking, targeting illicit supply chains, and reducing human trafficking and smuggling.[132]  Such efforts build on the successes of Operation Sentinel, in which DHS is working with other U.S. government agencies and the GOM to identify and impose meaningful sanctions on those involved in human smuggling, including by freezing their assets, revoking their visas, and curtailing their trade activities.  DHS seeks to expand these efforts across the hemisphere, with the GOM as a key partner.  However, the senior U.S. and Mexican officials who would lead these efforts are the same officials that have spent much of the past three months negotiating the reimplementation of MPP—detracting from efforts to advance other key parts of the bilateral relationship.

The Administration is also expanding efforts to address root causes of migration and enhance legal pathways for individuals who intend to migrate, as well as building and improving asylum systems in other countries and scaling up protection efforts for at-risk groups.  These efforts reduce incentives to come to the United States to seek protection and, for those who still choose to do so, reduce incentives to cross the border unlawfully.  As part of these efforts, DHS is working with Department of State to expand efforts to build and improve asylum systems in other countries and scale up protection efforts for at-risk groups, thereby providing alternative opportunities for individuals to seek protection without making the often-dangerous journey to the SWB.

The Department of State and DHS, for example, are working to stand up Migrant Resource Centers (MRC) in key sending countries, including Guatemala, where individuals who

---

[131] CBP data on Guatemalan deployments provided on 10/29/2021.

[132] Joint Statement: U.S.-Mexico High-Level Security Dialogue, *supra* note 125.

Nicaragua AR_000253

intend to migrate can apply for a visa or seek other available protection.[133]  The Department of State established the first MRC in Guatemala this year, and is working with international organizations to expand the MRCs to multiple locations and countries over the coming year.  The Administration is also working to continue to expand the legal pathways that are available for individuals who apply at these facilities.  We are also expanding refugee processing in Central America—including through in-country processing in Northern Triangle countries—and are helping international organizations and local non-governmental organizations identify and refer individuals with urgent protection needs to the U.S. Refugee Admissions Program and resettlement agencies in other countries.

Additionally, on March 10, 2021, DHS, in close coordination with the Department of State, restarted the Central American Minors (CAM) program to reunite eligible children from El Salvador, Guatemala, and Honduras with parents who are lawfully present in the United States. On June 15, 2021, the Departments expanded CAM eligibility to include certain U.S.-based parents or legal guardians who have a pending asylum application or U visa petition filed before May 15, 2021, thereby allowing them to file petitions on behalf of children who are nationals of El Salvador, Guatemala, or Honduras for potential resettlement in the United States.  This important program provides an avenue for children to come to the United States that would not otherwise be available, which in turn supports family unity and reduces the incentives for unlawful entry.  By restarting and expanding this safe, orderly, and lawful pathway through which children may reunite with their parent or legal guardians in the United States, CAM reduces the incentive for such vulnerable and often unaccompanied children to make the dangerous journey to the United States border.[134]

The Department also has expanded access to temporary work visas in the region, thereby providing a lawful pathway to work temporarily in the United States for individuals who might otherwise take the irregular and dangerous journey to the United States in search of economic opportunities and cross the border unlawfully.  To that end, on May 21, 2021, DHS published a temporary final rule making available 6,000 H-2B supplemental visas for temporary non-agricultural workers from Honduras, Guatemala, and El Salvador in FY21.[135]  The Administration is also working to enhance access to H-2A visas for temporary agricultural workers, for when there are insufficient qualified U.S. workers to fill these jobs.  Departments and agencies are engaged with the Northern Triangle governments, international organizations, the private sector, civil society, labor unions, and worker rights organizations to promote this program.

---

[133] *Id.*

[134] *See* "Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program," June 15, 2021, https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.  Under the expanded guidance, eligible minors may apply for refugee status if they are sponsored by a parent or legal guardian in the United States who is in one of the categories: lawful permanent residence; temporary protected status; parole; deferred action; deferred enforced departure; withholding of removal; or certain parents or legal guardians who have a pending asylum application or a pending U visa petition filed before May 15, 2021.

[135] Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 86 Fed. Reg. 28,198 (May 25, 2021).

Nicaragua AR_000254

These efforts, all of which have only recently been initiated, require diplomatic engagement and investment of resources.  They will take some time to achieve substantial results.  Once fully operational, they will provide legal and regular pathways for individuals seeking protection and opportunity to work in the United States, thus reducing the need for unlawful crossings and reducing the appeal of exploitative smugglers.  By incentivizing migration through lawful channels, and disincentivizing the use of unlawful channels, these initiatives achieve several key goals of MPP, but in a more humane way that matches the Administration's values.

    B.  <u>Managing Asylum Claims</u>

The Department also is taking a number of different steps to better manage asylum claims that will allow the United States to more humanely, and fairly, achieve some of MPP's stated benefits: reducing false asylum claims, more quickly adjudicating meritorious asylum claims, and clearing the backlog of unadjudicated asylum applications.

    1.  *Dedicated Docket*

In May 2021, DHS and DOJ jointly announced a new Dedicated Docket, designed to expeditiously and fairly conduct removal proceedings for families who enter the United States between ports of entry at the SWB.[136]  With a goal that immigration judges will generally complete cases on the Dedicated Docket within 300 days, the process is intended to significantly decrease the length of time for adjudication of such noncitizens' cases, while also providing fair hearings for families seeking asylum and other forms of relief or protection from removal. Dedicated Dockets have been established in 11 cities (Boston, Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle) chosen because they are common destination cities for migrants and have robust communities of legal service providers.  Once fully up and running, it is expected to adjudicate approximately 80,000 cases each year.

The Dedicated Docket serves multiple goals: It provides a mechanism for the more efficient adjudication of claims.  It ensures compliance with court proceedings through use of case management services provided through ICE's Alternatives to Detention (ATD) program.[137] It promotes efficiency and fairness in those proceedings through robust access to legal orientation for families on the docket (including group and individual legal orientations and friend-of-the-court services for unrepresented individuals).  And, as MPP was designed to do, it discourages non-meritorious claims by dramatically reducing the amount of time that a noncitizen may remain in the United States while his or her claims for relief or protection are adjudicated.

---

[136] Press Release, DHS, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2021, https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

[137] ICE Enforcement and Removal Operations (ERO), "Alternatives to Detention Program," https://www.ice.gov/detain/detention-management.

Nicaragua AR_000255

Moreover, it is expected to achieve these goals in ways that avoid the pitfalls associated with MPP.  Unlike MPP, which was plagued with high *in absentia* rates, the Dedicated Docket is designed, via the use of ATD and case management services, to ensure high appearance rates and contribute to the proper functioning of our immigration system.  As of October 25, 2021, EOIR had conducted nearly 12,000 initial hearings for individuals in Dedicated Docket cases, just 4.5 percent of which had ended in issuance of an *in absentia* order of removal.[138]  ICE data reflect a 98.9% attendance rate at all hearings for individuals enrolled into ATD from the SWB from FY14 to FY21.[139]

Two immigration court locations currently hearing Dedicated Docket cases—El Paso and San Diego—are slated for use as part of the court-ordered reimplementation of MPP because of their proximity to ports of entry along the border.  To staff MPP cases, EOIR will have to either divert judges from existing initiatives such as the Dedicated Docket—which will prolong those cases and undermine the effort—or reassign other immigration judges handling other non-detained cases, which will exacerbate the 1.4 million case backlog that already exists.  It is the Department's reasoned decision—working in close partnership with EOIR—that the limited pool of asylum officers and immigration judges are best spent supporting the Dedicated Docket and other initiatives that achieve the goals of timely and fair adjudications.

## 2.  *Asylum Officer Rule*

On August 20, 2021, DHS and DOJ promulgated a Notice of Proposed Rulemaking (NPRM) for the so-called "Asylum Officer Rule," which seeks to address systemic problems with the asylum system in an enduring way consistent with the Administration's values.  Specifically, it amends the procedures for credible fear screenings and consideration of asylum, withholding of removal, and CAT, so as to streamline the asylum process and address the current backlogs in the system.[140]  The comment period of this NPRM recently closed, and DHS and DOJ are currently reviewing the comments received and working on a final rule.

The proposed rule addresses the fact that the number of asylum and related protection claims at the SWB has increased dramatically over the years, that the system has not been able to keep pace, and that large immigration court backlogs and lengthy adjudicated delays are the result.[141]  As stated in the NPRM, the proposed rule also evidences this Administration's recognition that "[a] system that takes years to reach a result is simply not a functional one.  It delays justice and certainty for those who need protection, and it encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit."[142]  The Asylum Officer Rule thus responds to the very same concerns identified by the last Administration when

---

[138] Data on the number of initial hearings for individuals on Dedicate Docket, provided by EOIR on Oct. 25, 2021.

[139] Data from ICE ERO Custody Management Division FY14, 15, 16, 17, 18, 19, 20, and 21 through Aug. 31, 2021 FAMU BP Apprehensions-Subsequently Enrolled into ATD, ISAP IV EOIR Court Appearance Rates FY14 & FY15 & FY16 & FY17 & FY18 & FY19 & FY20 & FY21 through Aug. 31, 2021.

[140] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021).

[141] *Id*. at 46,907.

[142] *Id*.

35

it adopted MPP—and to a number of the concerns relied upon by the *Texas* court—but tackles them in a transformative and systemic way, while holding true to our laws and values.

To support the more expeditious and fair adjudication of claims, the proposed rule would transfer from immigration judges to USCIS asylum officers the initial responsibility for adjudicating asylum and related protection claims made by noncitizens who are encountered at or near the border and who are placed into expedited removal proceedings.  Individuals who establish a credible fear of persecution or torture following an initial screening interview would have their applications referred to USCIS, rather than the immigration court, for further consideration of their claim.  The initial credible fear interview would serve as the basis for the individual's asylum application, thereby introducing a key efficiency into the process.

Allowing cases with positive credible-fear findings to remain within USCIS for the full asylum merits adjudication, rather than being shifted to immigration judge-review, will capitalize on the investment of time and expertise developed during the screening interview and allow cases to be resolved more quickly.  This will, in turn, employ limited asylum officer and immigration court resources more efficiently, reduce asylum backlogs, and protect against further expansions of the already large immigration court backlog.  As currently drafted, the NPRM is also designed to include key procedural safeguards—including the ability to appeal, be represented by counsel, and present additional evidence as necessary to ensure due process, respect for human dignity, and equity.  Once implemented, the Asylum Officer Rule is expected to represent a transformative and lasting shift in asylum claim processing that will ensure rapid and fair processing in a way that delivers appropriate outcomes and realistically keeps pace with the workflow.

Achieving the rule's objectives will require substantial investment in resources, training, and personnel; to fully implement this new process, USCIS will need to quadruple the current asylum officer corps.[143]  Importantly, these are the same asylum officers needed to conduct *non-refoulement* interviews for MPP.  Restarting MPP will likely undercut the ability to implement this new rule as designed.

It is the Department's reasoned view that these limited resources are better expended on implementing both the Dedicated Docket and the Asylum Officer Rule.  Like MPP, both the Dedicated Docket and the Asylum Officer Rule are designed to render timely decisions and discourage non-meritorious claims.  Unlike MPP, however, they do so without subjecting vulnerable individuals to increased risk in Mexico and without creating the inevitable barriers to accessing counsel that exist for those returned to Mexico.

## V.    Consideration of Alternatives to Terminating MPP

The Department has considered the following as alternatives to terminating MPP: First, implementing MPP in the same manner as the prior Administration.  Second, implementing with modifications designed to address some of the access-to-counsel, safety, and other humanitarian considerations, consistent with demands from the GOM.  (These modifications are currently

---

[143] *Id*. at 46,933.

36

being planned pursuant to the court's order to implement MPP in good faith.)  Third, implementing a significantly modified programmatic use of the Section 235(b)(2)(C) authority, as described below.

Reimplementation of MPP in the same manner as the prior Administration is not currently an available option.  As has been described in court filings, the United States cannot unilaterally implement MPP without the independent agreement of the GOM to accept those who the United States seeks to return.  In ongoing discussions with the GOM, the GOM has made clear it would agree to accept such returns only if certain changes were implemented, including (i) measures to ensure that cases are generally adjudicated within six months, thus limiting the amount of time individuals are waiting in Mexico; (ii) clear means of communicating to MPP enrollees accurate information about the time and date of their hearings; (iii) improved access to counsel; and (iv) better screenings to protect particularly vulnerable individuals from being returned to Mexico.  Each of these changes would, as a result, need to be made in any reimplementation.  Unless the GOM significantly changes its position, resuming the program as it existed previously is simply not possible in the foreseeable future as a matter of international diplomacy.

Moreover, the Secretary has his own independent and significant concerns about the prior implementation of MPP, including concerns about the safety and security of those returned to Mexico, deficiencies in the *non-refoulement* interview process, barriers to access to counsel, and the ways in which reimplementation of MPP would divert from other Administration goals and result in significant burdens for the Department that would limit DHS's opportunities to make other needed reforms consistent with this Administration's policy priorities.  In light of these concerns, the Secretary has decided not to resume MPP in precisely the same form as it previously existed, even if were a viable option.

As an alternative, the Secretary considered a modified implementation and enforcement plan, in the manner that the Administration is planning to start doing in the coming weeks— pending an independent decision by the GOM to facilitate returns—in order to comply with the district court's order.  As the Department moves to reimplement, it is making changes to account for GOM's concerns—changes which are designed to better protect individuals returned to Mexico and ensure, among other things, timely and accurate notice about court hearings.  In addition, the Department is evaluating what changes could be made to address the issues raised in the Red Team Report, to include changes announced by the December 2020 supplementary guidance to better ensure family unity, access to counsel during *non-refoulement* interviews, and assessment of vulnerability.  In addition, in the near term, the Department will need to put in place robust COVID-19 mitigation measures to safeguard DHS personnel, the public, and the migrants themselves from the spread of the pandemic.

The Secretary has carefully considered whether these changes would sufficiently address his concerns regarding MPP to such an extent that he would support reimplementation of a modified MPP in lieu of termination.  But ultimately he has concluded that, while helpful, they fail to address the fundamental problems with MPP—which is that it puts an international barrier between migrants and their counsel and relevant immigration court where their proceedings are pending and it places their security and safety in the hands of a sovereign nation, over which the

Nicaragua AR_000258

United States does not exercise control.  Further, the reimplementation of MPP diverts resources from key priorities that designed to address the same policy goals more effectively and in a more humane way, including this Administration's landmark efforts to transform our asylum system and address the root causes of migration.

A third alternative still would be to attempt to do even more to address the humanitarian and other concerns associated with MPP, thus designing a programmatic use of the Section 235(b)(2)(C) authority that aggressively tackles the humanitarian concern and is more fully aligned with the Administration's broader vision for migration management.  It is doubtful that DHS *could* adequately address these problems, given Mexican territorial sovereignty.  At best, any such effort would require the provision of significant U.S. foreign assistance to counterparts operating in Mexico to assist with housing, transportation to and from court hearings, and other protections to address safety and security concerns.  Attempting to do so would divert enormous Department of State resources away from the Administration's signature policy goals—to address the root causes and develop regional solutions for enforcing against irregular migration while providing regional approaches to lawful pathways.  Meanwhile, the fundamental flaws with MPP remain.

After careful consideration, and for all the reasons laid out in his termination memo and this explanatory document, the Secretary has concluded that there are inherent problems with the program that no amount of resources can sufficiently fix, and others that cannot be sufficiently addressed without detracting from key Administration priorities and more enduring solutions.

## VI.   <u>Conclusion</u>

In sum, continuation of MPP—even in a significantly modified format—is inconsistent with the current policy approach of this Administration.  Rather than forcing individuals to return to Mexico to await court hearings, this Administration is pursuing a range of other policies and rulemaking efforts—including regional approaches to addressing the root causes of migration and a reform of the asylum system—to better achieve the key goals of securing the border, reducing migratory flows, timely and fairly adjudicating asylum claims, and reducing the asylum backlog.  Many of these efforts are currently underway and will bear fruit over time; the resources needed to implement MPP will detract from these efforts.

It is squarely within the authority of the Secretary of Homeland Security to decide to pursue the immigration policies and practices that he believes are most effective, and to decide not to exercise the discretion granted him by Congress in Section 235(b)(2)(C) of the INA to continue MPP.  The Secretary reserves the prerogative to exercise this discretionary authority if circumstances—and the factors that led to this conclusion—change.  Until such time, the Secretary has determined that MPP is incompatible with his goals for managing migratory flows at the border, and doing so in a humane way, consistent with the Administration's values.

38

**Appendix 1: Encounters by Detention, Fiscal Years 2013-2021**

| Fiscal Year | Total Encounters | Continuous detention | | Booked out prior to final outcome | | Never detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 287,535 | 114,673 | 40% | 76,776 | 27% | 96,086 | 33% |
| 2014 | 338,650 | 113,005 | 33% | 102,371 | 30% | 123,274 | 36% |
| 2015 | 296,856 | 105,425 | 36% | 82,221 | 28% | 109,210 | 37% |
| 2016 | 373,506 | 105,295 | 28% | 131,147 | 35% | 137,064 | 37% |
| 2017 | 292,102 | 73,809 | 25% | 106,405 | 36% | 111,888 | 38% |
| 2018 | 360,574 | 93,449 | 26% | 149,183 | 41% | 117,942 | 33% |
| 2019 | 762,912 | 100,700 | 13% | 246,099 | 32% | 416,113 | 55% |
| 2020 | 312,794 | 61,751 | 20% | 37,981 | 12% | 213,062 | 68% |
| 2021 | 665,158 | 27,402 | 4% | 62,744 | 9% | 575,012 | 86% |
| 2013-2019 | 2,712,135 | 706,356 | 26% | 894,202 | 33% | 1,111,577 | 41% |
| 2013-2021 | 3,690,087 | 795,509 | 22% | 994,927 | 27% | 1,899,651 | 51% |
| Non-MPP Cases | 991,012 | 323,425 | 33% | 251023 | 25% | 416,564 | 42% |

*Note: Non-MPP cases are defined as single adults and family units encountered between Jan. 25, 2019, and Jan. 20, 2021, and not enrolled in MPP and not expelled under Title 42.*

Source: Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020).

Nicaragua AR_000260



U.S. Department of Homeland Security

# FACT SHEET: Counter Human Smuggler Campaign Update

**Release Date:** October 6, 2022

*DHS-Led Effort Makes 5,000th Smuggler Arrest in Fewer Than 6 Months*

Launched in April 2022, the Biden Administration's "Counter Human Smuggler" campaign—a first-of-its-kind effort of unprecedented scale led by the Department of Homeland Security (DHS)—is designed to disrupt and dismantle human smuggling networks. In less than six months, this new strategy has produced over a 500% increase in human smuggling disruption activity compared to similar past operations and has recently surpassed 5,000 smuggler arrests.

Transnational criminal organizations (TCOs) that control human smuggling are increasingly exploiting migrants seeking to get to our borders, capitalizing on lies and misinformation and showing very little regard for the lives they endanger every day. Human smuggling syndicates are run like businesses, drawn by high profit margins in what is now a multi-billion-dollar operation. Smuggling networks can be extensive and complex. The Counter Human Smuggler campaign focuses on disrupting key aspects of their criminal operations, including their territory, activities, financial assets, and ability to travel and conduct commerce. DHS has committed over $60 million to the effort and surged more than 1,300 personnel in Latin America and along the Southwest Border.

Because of these increased law enforcement efforts, human smuggling organizations have been forced to change their tactics. Some have shifted their routes. They moved their stash houses – the locations where they hold people being smuggled or stash illicit weapons– further away from the border. They have also increased what they charge and often do not guarantee passage across the border. The smugglers have begun using new methods to conceal and transport migrants. In addition to the arrests, 5,549 disruptions of human smuggler infrastructure have also been carried out, which includes raiding smuggler stash houses, impounding tractor trailers that are used to smuggle migrants, and confiscating smuggler IT to track down more smugglers.

Achieving the 5,000[th] arrest milestone in less than six months demonstrates the effectiveness of this DHS-led interagency collaboration with partners from the U.S. Department of Justice, U.S. Department of State, and other federal, state, local, tribal, territorial, and foreign allies.

A snapshot of the campaign's results, which includes DHS components U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP):

- Homeland Security Investigations (HSI) Midland, HSI Guatemala City, the HSI Guatemala Transnational Criminal Investigative Unit (TCIU), and over 500 Guatemalan law enforcement and military personnel executed a large-scale takedown of human smugglers, consisting of 28 search warrants, resulting in the seizures and arrests of 19 individuals for human smuggling.  Four of the subjects will be extradited to the U.S. for prosecution in the Western District of Texas for the death of a migrant in a human smuggling event, the first time for this type of extradition from Guatemala.  HSI seized over 200 cell phones, 10 vehicles, six firearms, and foreign currency valued at $90,000 in U.S. dollars.
- HSI, with assistance from the United States Border Patrol (USBP) and its state and local law enforcement partners, successfully executed four search warrants, arrested 13 subjects, and apprehended 12 undocumented non-citizens (UNC).  Included in these arrests were several leaders of a human smuggling and money laundering organization.  The 12 UNCs, all Mexican nationals, were apprehended at a stash house in Laredo, Texas.  HSI seized numerous phones, ledgers, computers, seven firearms, three vehicles, 1,000 rounds of ammunition, and an estimated $150,000 in cash and monetary instruments. Additionally, HSI indicted three residences in and around Austin, Texas and anticipate the seizure of these properties, which were purchased with illicit proceeds.
- This interagency campaign also moved quickly to respond to the June 2022 mass casualty event that occurred in San Antonio, Texas, when more than 50 UNCs from Mexico and countries in Central America lost their lives s inside the back of a tractor trailer.  The swift investigation led to four (4) criminal arrests to date in the United States linked to a criminal smuggling organization, and a main target of investigation has been identified outside of the United States.  Investigators continue to gather evidence against the organization responsible in anticipation of future enforcement actions.

Human smuggling is, by definition, a transnational problem. Through its Counter Human Smuggling campaign, the Biden Administration is focused on putting these organizations out of business and working with regional partners in the Americas to apply collective expertise and resources to disrupt and dismantle these transnational criminal organizations.

Nicaragua AR_000261

12/20/22, 9:37 AM    Fact Sheet: Counter Human Smuggler Campaign Update: DHS-led Effort Makes 5,000th Arrest in Fewer Than 6 M…

Case 6:23-cv-00007 Document 94-3 Filed on 03/24/23 in TXSD Page 125 of 220

###

*This campaign is consistent with our commitments under the Los Angeles Declaration on Migration and Protection endorsed at the Summit of the Americas in June of this year. On October 6, 2022, foreign ministers and representatives from among the twenty-one endorsing countries of the Los Angeles Declaration on Migration and Protection met in Lima, Peru, to advance the shared response to irregular migration and forced displacement throughout the Western Hemisphere. A U.S. Department of State fact sheet detailing progress on existing commitments made under the Los Angeles Declaration can be found* here *(https://www.state.gov/los-angeles-declaration-on-migration-and-protection-lima-ministerial-meeting/).*

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)    HUMAN TRAFFICKING (/TOPICS/HUMAN-TRAFFICKING)

## Keywords

DEPARTMENT OF JUSTICE (DOJ) (/KEYWORDS/DEPARTMENT-JUSTICE-DOJ)    ENFORCEMENT (/KEYWORDS/ENFORCEMENT)
HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)    HUMAN SMUGGLING (/KEYWORDS/HUMAN-SMUGGLING)
U. S. BORDER PATROL (/KEYWORDS/U-S-BORDER-PATROL)

Last Updated: 11/03/2022

Nicaragua AR_000262

Case 6:23-cv-00007   Document 94-3   Filed on 03/24/23 in TXSD   Page 126 of 220



**Homeland Security**

U.S. Department of Homeland Security

# Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42

Under the Biden-Harris Administration, the Department of Homeland Security (DHS) has been executing a comprehensive strategy to continue to secure our borders and build a safe, orderly, and humane immigration process. After inheriting a broken and dismantled immigration system, since January 2021 DHS has effectively managed an unprecedented number of noncitizens seeking to enter the United States, interdicted more drugs, and disrupted more smuggling operations than ever before.

This update reviews the DHS-led whole-of-government framework guiding preparations for and management of increased encounters of noncitizens at our Southwest Border following the lifting of the Title 42 public health order, as was outlined in the April 26, 2022 memorandum.

| Attachment | Ext. | Size | Date |
|---|---|---|---|
| Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42 (https://www.dhs.gov/sites/default/files/2022-12/22_1213_plcy_update-sw-border-security-preparedness.pdf) | PDF | 237.78 KB | 12/13/2022 |

## Keywords

BORDER SECURITY ((KEYWORDS/BORDER-SECURITY))     IMMIGRATION ((KEYWORDS/IMMIGRATION))     PRESIDENT BIDEN ((KEYWORDS/PRESIDENT-BIDEN))

SMUGGLING ((KEYWORDS/SMUGGLING))

Last Updated: 12/13/2022

Nicaragua AR_000263

Nicaragua AR_000264

Table 21.
PERSONS NATURALIZED BY REGION AND COUNTRY OF BIRTH: FISCAL YEARS 2011 TO 2020

| Region and country of birth | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **REGION** | | | | | | | | | | |
| Total | 694,193 | 757,434 | 779,929 | 653,416 | 730,259 | 753,060 | 707,265 | 761,901 | 843,593 | 628,254 |
| Africa | 69,738 | 74,775 | 71,872 | 62,175 | 71,492 | 72,338 | 61,851 | 64,934 | 84,990 | 66,436 |
| Asia | 249,940 | 257,035 | 275,700 | 233,163 | 261,374 | 271,733 | 255,306 | 275,621 | 327,273 | 246,099 |
| Europe | 82,209 | 82,714 | 80,333 | 71,325 | 78,074 | 74,344 | 65,141 | 71,438 | 81,040 | 57,403 |
| North America | 217,750 | 261,673 | 271,807 | 222,547 | 247,492 | 259,845 | 258,371 | 277,592 | 276,910 | 204,250 |
| Oceania | 3,734 | 3,886 | 3,849 | 3,399 | 3,811 | 3,953 | 3,327 | 3,792 | 4,308 | 3,392 |
| South America | 70,485 | 76,992 | 76,167 | 60,665 | 67,927 | 70,821 | 63,063 | 67,892 | 68,678 | 50,441 |
| Unknown | 337 | 359 | 201 | 142 | 89 | 26 | 206 | 634 | 394 | 233 |
| **COUNTRY** | | | | | | | | | | |
| Total | 694,193 | 757,434 | 779,929 | 653,416 | 730,259 | 753,060 | 707,265 | 761,901 | 843,593 | 628,254 |
| Afghanistan | 1,998 | 1,758 | 2,074 | 1,853 | 1,589 | 1,444 | 1,414 | 1,569 | 2,794 | 4,025 |
| Albania | 4,267 | 3,615 | 3,538 | 3,131 | 3,237 | 2,813 | 2,169 | 2,203 | 2,778 | 2,308 |
| Algeria | 773 | 891 | 841 | 928 | 943 | 1,035 | 949 | 918 | 1,235 | 1,063 |
| American Samoa | 205 | 180 | 265 | 187 | 296 | 285 | 216 | 182 | 279 | 177 |
| Angola | 162 | 166 | 143 | 145 | 132 | 131 | 125 | 147 | 136 | 94 |
| Anguilla | 38 | 30 | 26 | 18 | 31 | 16 | 20 | 34 | 25 | 19 |
| Antigua and Barbuda | 386 | 390 | 366 | 358 | 381 | 383 | 311 | 356 | 386 | 265 |
| Argentina | 3,870 | 3,909 | 4,177 | 3,683 | 3,886 | 4,015 | 3,486 | 3,977 | 3,956 | 2,884 |
| Armenia | 3,965 | 3,285 | 3,203 | 2,488 | 2,874 | 2,516 | 1,994 | 2,085 | 2,327 | 1,852 |
| Aruba | 40 | 27 | 42 | 28 | 37 | 28 | 32 | 33 | 54 | 37 |
| Australia | 1,291 | 1,312 | 1,296 | 1,159 | 1,379 | 1,389 | 1,235 | 1,545 | 1,838 | 1,436 |
| Austria | 271 | 241 | 248 | 223 | 207 | 221 | 177 | 238 | 214 | 160 |
| Azerbaijan | 1,153 | 958 | 786 | 585 | 568 | 574 | 483 | 512 | 597 | 451 |
| Bahamas | 609 | 647 | 681 | 545 | 570 | 590 | 481 | 590 | 640 | 481 |
| Bahrain | 80 | 93 | 76 | 90 | 79 | 80 | 77 | 86 | 116 | 79 |
| Bangladesh | 7,325 | 8,417 | 9,571 | 7,475 | 9,750 | 9,949 | 8,629 | 7,797 | 9,067 | 6,883 |
| Barbados | 648 | 687 | 683 | 550 | 646 | 651 | 645 | 555 | 625 | 399 |
| Belarus | 1,814 | 1,896 | 1,797 | 1,437 | 1,710 | 1,518 | 1,313 | 1,393 | 1,735 | 1,302 |
| Belgium | 525 | 522 | 513 | 408 | 505 | 514 | 493 | 520 | 575 | 430 |
| Belize | 742 | 817 | 966 | 773 | 851 | 870 | 810 | 859 | 950 | 669 |
| Benin | 183 | 210 | 206 | 229 | 310 | 317 | 309 | 249 | 343 | 297 |
| Bermuda | 58 | 65 | 59 | 67 | 66 | 61 | 65 | 70 | 64 | 52 |
| Bhutan | 55 | 42 | 275 | 2,639 | 4,562 | 5,563 | 5,557 | 6,180 | 6,920 | 4,536 |
| Bolivia | 1,446 | 2,063 | 1,961 | 1,527 | 1,689 | 1,862 | 1,806 | 1,575 | 1,679 | 1,208 |
| Bosnia and Herzegovina | 4,259 | 4,904 | 3,602 | 2,509 | 3,304 | 2,257 | 1,780 | 1,805 | 1,709 | 1,059 |
| Botswana | 9 | 11 | 29 | 29 | 28 | 28 | 27 | 38 | 41 | 34 |
| Brazil | 10,251 | 9,884 | 9,665 | 8,625 | 10,516 | 10,268 | 9,701 | 10,538 | 10,451 | 8,323 |
| Brunei | 11 | 17 | 11 | 15 | 13 | 11 | 11 | 15 | 26 | 19 |
| Bulgaria | 3,103 | 2,964 | 2,646 | 2,226 | 2,336 | 2,086 | 1,887 | 1,825 | 2,251 | 1,656 |
| Burkina Faso | 163 | 166 | 230 | 235 | 307 | 322 | 303 | 347 | 426 | 376 |
| Burma | 2,321 | 2,384 | 3,489 | 4,225 | 6,045 | 6,956 | 6,825 | 7,858 | 11,674 | 9,181 |
| Burundi | 168 | 209 | 379 | 415 | 437 | 406 | 266 | 284 | 394 | 280 |
| Cabo Verde | 974 | 1,037 | 1,014 | 979 | 1,054 | 1,207 | 1,355 | 1,429 | 1,316 | 930 |
| Cambodia | 4,589 | 6,189 | 4,161 | 2,866 | 2,878 | 2,756 | 2,164 | 2,467 | 2,877 | 2,405 |
| Cameroon | 2,172 | 2,459 | 2,541 | 2,120 | 2,616 | 3,088 | 2,319 | 2,416 | 2,873 | 2,873 |
| Canada | 9,318 | 9,077 | 8,690 | 8,385 | 9,492 | 9,346 | 7,829 | 9,379 | 11,059 | 8,423 |
| Cayman Islands | 15 | 29 | 17 | 13 | 30 | 80 | 23 | 23 | 35 | 20 |
| Central African Republic | 34 | 56 | 54 | 44 | 52 | 80 | 61 | 73 | 120 | 82 |
| Chad | 50 | 69 | 64 | 74 | 84 | 105 | 78 | 72 | 90 | 56 |
| Chile | 1,527 | 1,586 | 1,649 | 1,435 | 1,486 | 1,666 | 1,620 | 1,752 | 1,784 | 1,329 |

Nicaragua AR_000265

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| China, People's Republic | 32,864 | 31,868 | 35,387 | 30,284 | 31,241 | 35,794 | 37,674 | 39,600 | 39,490 | 26,110 |
| Colombia | 22,693 | 23,972 | 22,196 | 16,478 | 17,207 | 18,601 | 16,184 | 17,564 | 17,126 | 12,768 |
| Congo, Democratic Republic | 908 | 1,173 | 1,250 | 1,246 | 1,490 | 1,437 | 841 | 1,776 | 2,877 | 2,482 |
| Congo, Republic | 345 | 381 | 402 | 438 | 473 | 395 | 322 | 316 | 351 | 191 |
| Costa Rica | 1,511 | 1,597 | 1,661 | 1,461 | 1,633 | 1,862 | 1,720 | 1,860 | 1,859 | 1,394 |
| Cote d'Ivoire | 694 | 868 | 958 | 910 | 1,078 | 1,127 | 907 | 908 | 1,206 | 1,012 |
| Croatia | 569 | 725 | 561 | 428 | 563 | 438 | 351 | 371 | 412 | 271 |
| Cuba | 21,071 | 31,244 | 30,482 | 24,092 | 25,770 | 32,101 | 25,961 | 32,089 | 36,246 | 31,369 |
| Curacao | - | - | - | 11 | 13 | 13 | 20 | 20 | 30 | 28 |
| Cyprus | 115 | 92 | 112 | 112 | 107 | 105 | 84 | 125 | 115 | 81 |
| Czechia | 485 | 477 | 562 | 565 | 733 | 692 | 595 | 644 | 600 | 426 |
| Czechoslovakia (former) | 310 | 291 | 232 | 303 | 371 | 344 | 251 | 260 | 325 | 206 |
| Denmark | 124 | 133 | 127 | 129 | 243 | 1,193 | 769 | 650 | 656 | 508 |
| Djibouti | 22 | 26 | 39 | 26 | 26 | 52 | 48 | 65 | 96 | 94 |
| Dominica | 594 | 597 | 642 | 520 | 653 | 610 | 539 | 612 | 740 | 391 |
| Dominican Republic | 20,508 | 33,351 | 39,590 | 23,775 | 26,665 | 31,320 | 29,734 | 22,970 | 23,101 | 18,675 |
| Ecuador | 6,929 | 8,763 | 9,470 | 6,952 | 7,664 | 8,568 | 7,748 | 7,996 | 7,731 | 5,204 |
| Egypt | 5,848 | 6,191 | 6,213 | 5,094 | 5,693 | 5,696 | 5,154 | 6,549 | 8,311 | 6,336 |
| El Salvador | 13,834 | 16,685 | 18,401 | 15,598 | 16,930 | 17,213 | 16,941 | 17,300 | 18,260 | 12,606 |
| Equatorial Guinea | 9 | 19 | 14 | 12 | 14 | 18 | 8 | 8 | 15 | 18 |
| Eritrea | 985 | 1,059 | 1,145 | 1,045 | 1,494 | 1,797 | 1,424 | 1,457 | 1,951 | 1,597 |
| Estonia | 217 | 234 | 213 | 183 | 208 | 183 | 157 | 190 | 210 | 157 |
| Eswatini | 15 | 10 | 15 | 7 | 12 | 8 | 16 | 16 | 25 | D |
| Ethiopia | 8,519 | 8,803 | 8,323 | 7,002 | 8,312 | 8,725 | 7,370 | 6,769 | 9,065 | 7,385 |
| Fiji | 1,118 | 1,134 | 1,003 | 770 | 850 | 996 | 841 | 875 | 778 | 624 |
| Finland | 344 | 329 | 300 | 274 | 301 | 303 | 279 | 283 | 343 | 250 |
| France | 2,527 | 2,358 | 2,534 | 2,589 | 2,784 | 2,841 | 2,812 | 2,854 | 3,315 | 2,553 |
| French Polynesia | 14 | 15 | 8 | 20 | 14 | 18 | 14 | 13 | 18 | 15 |
| Gabon | 53 | 80 | 72 | 63 | 89 | 83 | 67 | 81 | 113 | 87 |
| Gambia | 505 | 556 | 573 | 510 | 685 | 724 | 586 | 650 | 729 | 610 |
| Georgia | 1,253 | 1,271 | 1,205 | 898 | 1,027 | 988 | 889 | 751 | 973 | 709 |
| Germany | 4,461 | 4,192 | 4,066 | 4,375 | 4,380 | 4,329 | 3,879 | 4,284 | 4,745 | 3,162 |
| Ghana | 4,690 | 5,344 | 5,105 | 5,108 | 6,033 | 6,411 | 5,777 | 6,047 | 6,936 | 4,973 |
| Greece | 844 | 867 | 938 | 780 | 867 | 1,013 | 945 | 1,074 | 1,137 | 878 |
| Grenada | 528 | 683 | 717 | 544 | 664 | 658 | 629 | 463 | 640 | 478 |
| Guatemala | 7,285 | 8,797 | 9,530 | 8,549 | 9,344 | 9,764 | 9,131 | 9,566 | 8,948 | 6,421 |
| Guinea | 575 | 787 | 958 | 908 | 999 | 1,077 | 957 | 924 | 1,069 | 771 |
| Guinea-Bissau | 29 | 30 | 24 | 27 | 29 | 20 | 25 | 28 | 23 | 20 |
| Guyana | 5,413 | 6,201 | 6,295 | 4,327 | 5,162 | 5,284 | 4,527 | 4,625 | 5,089 | 3,631 |
| Haiti | 14,191 | 19,114 | 23,480 | 13,676 | 14,053 | 15,276 | 12,794 | 14,389 | 14,308 | 10,865 |
| Honduras | 3,980 | 5,294 | 5,462 | 4,433 | 5,039 | 5,819 | 7,875 | 5,310 | 6,353 | 5,150 |
| Hong Kong | 2,184 | 1,980 | 2,093 | 1,801 | 1,716 | 1,602 | 1,323 | 1,708 | 1,768 | 1,545 |
| Hungary | 953 | 1,014 | 984 | 891 | 941 | 934 | 729 | 922 | 983 | 754 |
| Iceland | 76 | 97 | 75 | 70 | 88 | 88 | 83 | 69 | 101 | 69 |
| India | 45,985 | 42,928 | 49,897 | 37,854 | 42,213 | 46,188 | 50,802 | 52,194 | 64,631 | 48,109 |
| Indonesia | 2,345 | 2,123 | 2,190 | 1,568 | 1,743 | 1,641 | 1,566 | 1,807 | 2,093 | 1,359 |
| Iran | 9,286 | 9,627 | 11,623 | 9,620 | 10,344 | 9,507 | 8,324 | 8,409 | 11,310 | 8,828 |
| Iraq | 3,360 | 3,523 | 7,771 | 12,377 | 14,899 | 12,130 | 7,875 | 12,448 | 18,366 | 12,321 |
| Ireland | 1,171 | 1,239 | 1,296 | 1,413 | 1,375 | 1,383 | 1,406 | 1,621 | 1,698 | 1,179 |
| Israel | 3,153 | 2,859 | 3,466 | 3,015 | 3,182 | 3,071 | 2,466 | 2,743 | 3,265 | 2,383 |
| Italy | 2,231 | 2,234 | 2,355 | 2,313 | 2,760 | 2,692 | 2,501 | 2,920 | 3,244 | 2,324 |
| Jamaica | 14,591 | 15,531 | 16,442 | 13,547 | 16,566 | 16,772 | 15,097 | 17,213 | 18,010 | 13,465 |
| Japan | 1,744 | 1,663 | 1,837 | 1,635 | 1,858 | 1,758 | 1,713 | 1,869 | 1,969 | 1,584 |
| Jordan | 2,345 | 2,436 | 2,816 | 2,427 | 2,461 | 2,552 | 2,239 | 2,630 | 3,430 | 2,607 |
| Kazakhstan | 891 | 1,040 | 909 | 789 | 819 | 760 | 729 | 823 | 1,147 | 803 |

Nicaragua AR_000266

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Kenya | 3,621 | 4,170 | 4,257 | 3,885 | 4,738 | 4,834 | 4,348 | 4,302 | 5,329 | 4,186 |
| Korea, North | 13 | 19 | 27 | 24 | 23 | 16 | 15 | 30 | 25 | 17 |
| Korea, South | 12,664 | 13,790 | 15,786 | 13,587 | 14,230 | 14,347 | 14,643 | 16,031 | 16,298 | 11,350 |
| Kosovo | 465 | 510 | 487 | 392 | 547 | 530 | 410 | 451 | 597 | 482 |
| Kuwait | 869 | 820 | 920 | 791 | 819 | 790 | 677 | 789 | 1,111 | 840 |
| Kyrgyzstan | 440 | 420 | 395 | 305 | 418 | 408 | 412 | 483 | 534 | 411 |
| Laos | 5,452 | 7,027 | 3,932 | 2,564 | 2,042 | 1,999 | 1,726 | 2,027 | 2,303 | 1,704 |
| Latvia | 401 | 392 | 364 | 366 | 392 | 356 | 306 | 315 | 365 | 241 |
| Lebanon | 3,127 | 3,002 | 3,002 | 2,528 | 2,463 | 2,284 | 2,081 | 2,339 | 2,683 | 1,715 |
| Lesotho | 11 | 11 | 10 | 8 | 11 | 9 | 8 | 8 | 18 | 7 |
| Liberia | 3,794 | 4,322 | 3,923 | 3,035 | 3,042 | 3,022 | 2,421 | 2,752 | 3,334 | 2,429 |
| Libya | 180 | 195 | 206 | 228 | 193 | 210 | 207 | 308 | 447 | 309 |
| Lithuania | 973 | 938 | 933 | 744 | 752 | 626 | 584 | 699 | 885 | 529 |
| Luxembourg | 18 | 23 | 16 | 34 | 20 | 18 | 14 | 20 | 23 | 20 |
| Macau | 86 | 106 | 97 | 102 | 109 | 101 | 70 | 79 | 92 | 61 |
| Madagascar | 44 | 37 | 50 | 50 | 65 | 75 | 61 | 63 | 63 | 47 |
| Malawi | 86 | 83 | 83 | 76 | 91 | 95 | 84 | 114 | 120 | 91 |
| Malaysia | 1,137 | 1,150 | 1,169 | 1,052 | 1,113 | 1,189 | 1,170 | 1,388 | 1,406 | 942 |
| Mali | 274 | 288 | 332 | 352 | 405 | 456 | 391 | 398 | 446 | 390 |
| Malta | 54 | 44 | 40 | 40 | 50 | 43 | 47 | 51 | 49 | 37 |
| Marshall Islands | 32 | 21 | 17 | 20 | 22 | 27 | 16 | 21 | 15 | 13 |
| Mauritania | 405 | 495 | 520 | 376 | 355 | 323 | 288 | 252 | 319 | 188 |
| Mauritius | 64 | 57 | 67 | 69 | 60 | 63 | 65 | 67 | 67 | 55 |
| Mexico | 94,783 | 102,181 | 99,385 | 94,889 | 105,958 | 103,550 | 118,559 | 131,977 | 122,286 | 84,081 |
| Micronesia, Federated States | 74 | 73 | 96 | 62 | 85 | 67 | 53 | 34 | 39 | 26 |
| Moldova | 1,398 | 1,602 | 1,594 | 1,279 | 1,681 | 1,689 | 1,442 | 1,680 | 2,010 | 1,494 |
| Mongolia | 242 | 286 | 347 | 335 | 324 | 437 | 416 | 468 | 541 | 426 |
| Montenegro | 205 | 227 | 231 | 202 | 209 | 222 | 187 | 205 | 254 | 162 |
| Montserrat | 63 | 51 | 65 | 47 | 43 | 45 | 45 | 52 | 50 | 37 |
| Morocco | 3,656 | 3,872 | 3,768 | 3,538 | 3,805 | 3,684 | 2,943 | 2,644 | 3,142 | 2,462 |
| Mozambique | 49 | 48 | 51 | 34 | 43 | 51 | 38 | 43 | 63 | 32 |
| Namibia | 29 | 42 | 40 | 31 | 31 | 33 | 27 | 29 | 61 | 39 |
| Nepal | 2,235 | 2,446 | 2,711 | 2,888 | 4,225 | 5,004 | 4,509 | 5,352 | 7,409 | 5,793 |
| Netherlands | 778 | 919 | 786 | 665 | 778 | 829 | 699 | 851 | 953 | 667 |
| Netherlands Antilles (former) | 60 | 76 | 82 | 43 | 35 | 43 | 48 | 48 | 56 | 48 |
| New Zealand | 480 | 563 | 482 | 453 | 514 | 565 | 468 | 577 | 668 | 577 |
| Nicaragua | 5,092 | 5,870 | 5,064 | 3,775 | 3,951 | 4,663 | 4,181 | 4,277 | 4,346 | 3,474 |
| Niger | 124 | 143 | 167 | 161 | 180 | 140 | 126 | 110 | 143 | 112 |
| Nigeria | 9,344 | 9,322 | 9,545 | 8,667 | 10,363 | 9,520 | 7,652 | 8,459 | 11,360 | 8,929 |
| North Macedonia | 578 | 635 | 665 | 625 | 611 | 704 | 582 | 669 | 800 | 577 |
| Norway | 90 | 87 | 80 | 92 | 93 | 93 | 60 | 93 | 111 | 270 |
| Oman | 37 | 37 | 39 | 41 | 44 | 58 | 30 | 30 | 68 | 66 |
| Pakistan | 10,655 | 11,150 | 12,948 | 11,210 | 11,912 | 11,729 | 10,166 | 10,414 | 13,079 | 9,975 |
| Palau | 68 | 68 | 64 | 50 | 44 | 43 | 43 | 28 | 32 | 23 |
| Panama | 1,340 | 1,532 | 1,598 | 1,277 | 1,412 | 1,458 | 1,266 | 1,308 | 1,361 | 989 |
| Papua New Guinea | 17 | 16 | 7 | 7 | 21 | 19 | 13 | 17 | 19 | 20 |
| Paraguay | 289 | 338 | 331 | 256 | 338 | 396 | 343 | 401 | 387 | 278 |
| Peru | 10,266 | 11,814 | 11,782 | 9,572 | 10,701 | 11,319 | 10,014 | 10,043 | 9,899 | 6,910 |
| Philippines | 42,520 | 44,958 | 43,489 | 34,591 | 40,815 | 41,285 | 36,828 | 38,816 | 43,668 | 33,417 |
| Poland | 8,844 | 8,715 | 8,697 | 8,304 | 7,886 | 7,198 | 5,840 | 6,370 | 6,973 | 4,653 |
| Portugal | 1,426 | 1,607 | 1,585 | 1,587 | 1,690 | 1,665 | 1,607 | 2,031 | 1,712 | 1,081 |
| Qatar | 101 | 101 | 107 | 69 | 75 | 98 | 95 | 92 | 105 | 120 |
| Romania | 4,314 | 4,253 | 4,050 | 3,267 | 3,478 | 3,379 | 2,986 | 3,104 | 3,627 | 2,320 |
| Russia | 8,257 | 8,154 | 8,222 | 6,824 | 6,552 | 6,067 | 5,534 | 6,225 | 7,628 | 5,360 |
| Rwanda | 265 | 285 | 374 | 302 | 300 | 369 | 267 | 343 | 466 | 410 |

Nicaragua_AR_000267

| Country | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Saint Kitts and Nevis | 306 | 319 | 315 | 270 | 360 | 345 | 317 | 281 | 335 | 211 |
| Saint Lucia | 600 | 724 | 856 | 635 | 775 | 791 | 697 | 604 | 758 | 574 |
| Saint Vincent and the Grenadines | 416 | 511 | 574 | 405 | 467 | 500 | 507 | 401 | 528 | 363 |
| Samoa | 172 | 178 | 206 | 181 | 213 | 192 | 164 | 168 | 239 | 159 |
| Saudi Arabia | 814 | 779 | 927 | 795 | 796 | 869 | 872 | 990 | 1,313 | 998 |
| Senegal | 752 | 790 | 869 | 806 | 974 | 969 | 882 | 848 | 956 | 742 |
| Serbia | 85 | 109 | 117 | 276 | 522 | 532 | 476 | 596 | 829 | 569 |
| Serbia and Montenegro (former) | 2,185 | 2,012 | 1,830 | 1,338 | 1,297 | 1,164 | 820 | 805 | 820 | 494 |
| Seychelles | 19 | 8 | 15 | 9 | 7 | 17 | 5 | 11 | D | 13 |
| Sierra Leone | 1,831 | 1,861 | 1,613 | 1,406 | 1,692 | 1,662 | 1,328 | 1,177 | 1,604 | 1,319 |
| Singapore | 311 | 293 | 263 | 258 | 285 | 308 | 279 | 332 | 359 | 255 |
| Sint Maarten | - | - | - | 7 | 17 | 33 | 21 | 22 | D | D |
| Slovakia | 421 | 401 | 413 | 317 | 443 | 428 | 384 | 394 | 432 | 275 |
| Slovenia | 57 | 64 | 58 | 52 | 61 | 63 | 52 | 57 | 68 | 68 |
| Somalia | 7,971 | 9,286 | 6,875 | 4,097 | 3,691 | 3,998 | 3,774 | 3,979 | 6,915 | 5,684 |
| South Africa | 2,566 | 2,294 | 2,283 | 2,083 | 2,538 | 2,197 | 1,901 | 2,262 | 2,967 | 2,084 |
| South Sudan | - | 81 | 139 | 132 | 131 | 101 | 74 | 109 | 146 | 101 |
| Soviet Union (former) | 2,812 | 2,610 | 2,807 | 2,334 | 2,372 | 2,288 | 2,123 | 2,252 | 2,280 | 1,589 |
| Spain | 1,253 | 1,242 | 1,367 | 1,326 | 1,414 | 1,515 | 1,469 | 1,674 | 1,945 | 1,517 |
| Sri Lanka | 1,334 | 1,146 | 1,258 | 1,104 | 1,246 | 1,497 | 1,364 | 1,480 | 1,609 | 1,140 |
| Sudan | 2,444 | 2,291 | 1,924 | 1,482 | 1,740 | 1,776 | 1,348 | 1,611 | 2,527 | 1,753 |
| Suriname | 194 | 189 | 160 | 127 | 183 | 164 | 143 | 176 | 170 | 91 |
| Sweden | 872 | 798 | 783 | 724 | 885 | 795 | 708 | 797 | 936 | 731 |
| Switzerland | 427 | 427 | 452 | 388 | 411 | 375 | 333 | 436 | 488 | 365 |
| Syria | 1,981 | 1,814 | 2,196 | 1,832 | 2,004 | 2,043 | 1,789 | 2,475 | 3,364 | 2,455 |
| Taiwan | 5,065 | 4,573 | 5,255 | 4,326 | 4,420 | 4,043 | 4,151 | 4,576 | 4,821 | 3,422 |
| Tajikistan | 155 | 142 | 168 | 146 | 156 | 212 | 222 | 261 | 364 | 251 |
| Tanzania | 516 | 543 | 647 | 525 | 553 | 639 | 547 | 561 | 731 | 530 |
| Thailand | 5,299 | 6,585 | 5,544 | 4,805 | 5,213 | 5,211 | 4,672 | 5,324 | 6,678 | 5,572 |
| Togo | 1,523 | 1,448 | 1,380 | 1,141 | 1,171 | 1,099 | 907 | 893 | 1,054 | 927 |
| Tonga | 251 | 306 | 371 | 473 | 352 | 337 | 262 | 319 | 354 | 300 |
| Trinidad and Tobago | 5,014 | 5,596 | 5,784 | 4,147 | 4,869 | 4,867 | 4,504 | 4,378 | 4,592 | 3,027 |
| Tunisia | 377 | 345 | 362 | 310 | 314 | 352 | 344 | 306 | 393 | 295 |
| Turkey | 3,100 | 3,329 | 3,390 | 2,925 | 3,150 | 3,201 | 3,108 | 3,275 | 3,289 | 2,305 |
| Turkmenistan | 146 | 136 | 160 | 110 | 153 | 102 | 109 | 117 | 203 | 122 |
| Turks and Caicos Islands | 36 | 49 | 47 | 26 | 33 | 31 | 26 | 40 | 28 | 28 |
| Uganda | 838 | 820 | 763 | 724 | 817 | 823 | 742 | 703 | 922 | 727 |
| Ukraine | 8,489 | 9,459 | 8,624 | 6,984 | 8,926 | 8,374 | 6,644 | 6,990 | 8,019 | 5,444 |
| United Arab Emirates | 425 | 431 | 499 | 435 | 443 | 473 | 475 | 542 | 730 | 545 |
| United Kingdom | 9,246 | 9,145 | 9,459 | 8,906 | 10,095 | 9,562 | 9,049 | 10,530 | 12,195 | 8,842 |
| United States | 45 | 60 | 55 | 31 | 75 | 95 | 84 | 122 | 179 | 163 |
| Uruguay | 751 | 849 | 933 | 812 | 902 | 1,044 | 1,028 | 1,073 | 1,088 | 822 |
| Uzbekistan | 2,463 | 3,071 | 2,482 | 1,725 | 1,660 | 1,685 | 1,498 | 1,532 | 1,950 | 1,482 |
| Venezuela | 6,856 | 7,404 | 7,648 | 6,871 | 8,192 | 7,633 | 6,463 | 8,172 | 9,317 | 6,993 |
| Vietnam | 20,922 | 23,490 | 24,277 | 18,837 | 21,976 | 24,848 | 19,323 | 21,082 | 25,646 | 22,705 |
| Virgin Islands, British | 48 | 41 | 45 | 49 | 59 | 46 | 42 | 54 | 59 | 45 |
| Yemen | 1,320 | 1,452 | 1,355 | 1,160 | 1,284 | 1,490 | 1,445 | 1,544 | 2,509 | 2,158 |
| Zambia | 337 | 338 | 352 | 318 | 370 | 404 | 401 | 402 | 501 | 340 |
| Zimbabwe | 715 | 691 | 658 | 734 | 852 | 843 | 675 | 709 | 810 | 559 |
| All other countries[1] | 45 | 40 | 41 | 41 | 41 | 42 | 38 | 42 | 63 | 50 |
| Unknown | 337 | 359 | 201 | 142 | 89 | 26 | 206 | 634 | 394 | 233 |

D Data withheld to limit disclosure.
- Represents zero.
[1] Includes countries with fewer than 10 naturalizations per year.
Note: Based on N-400 data for persons aged 18 and over.

Nicaragua AR_000268

Source: U.S. Department of Homeland Security.

Nicaragua AR_000269

Total daily SWB encounters

| Date | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| 1/1/2022 | 724 | 405 | 1,625 | 2,754 |
| 1/2/2022 | 766 | 569 | 1,832 | 3,167 |
| 1/3/2022 | 1,214 | 775 | 1,470 | 3,459 |
| 1/4/2022 | 1,371 | 927 | 1,211 | 3,509 |
| 1/5/2022 | 1,513 | 872 | 1,467 | 3,852 |
| 1/6/2022 | 1,573 | 949 | 1,712 | 4,234 |
| 1/7/2022 | 1,658 | 770 | 1,604 | 4,032 |
| 1/8/2022 | 1,528 | 697 | 1,561 | 3,786 |
| 1/9/2022 | 1,534 | 601 | 1,381 | 3,516 |
| 1/10/2022 | 1,833 | 697 | 1,465 | 3,995 |
| 1/11/2022 | 2,164 | 856 | 1,247 | 4,267 |
| 1/12/2022 | 2,063 | 923 | 1,646 | 4,632 |
| 1/13/2022 | 2,031 | 1,129 | 1,945 | 5,105 |
| 1/14/2022 | 2,015 | 931 | 1,741 | 4,687 |
| 1/15/2022 | 2,083 | 1,010 | 2,027 | 5,120 |
| 1/16/2022 | 1,889 | 791 | 2,668 | 5,348 |
| 1/17/2022 | 2,264 | 1,046 | 2,567 | 5,877 |
| 1/18/2022 | 2,495 | 1,613 | 2,970 | 7,078 |
| 1/19/2022 | 2,372 | 1,483 | 2,555 | 6,410 |
| 1/20/2022 | 2,251 | 1,199 | 2,826 | 6,276 |
| 1/21/2022 | 2,166 | 1,187 | 2,577 | 5,930 |
| 1/22/2022 | 2,062 | 1,136 | 2,867 | 6,065 |
| 1/23/2022 | 1,742 | 1,016 | 2,553 | 5,311 |
| 1/24/2022 | 2,255 | 1,249 | 2,628 | 6,132 |
| 1/25/2022 | 2,473 | 1,360 | 2,203 | 6,036 |
| 1/26/2022 | 2,395 | 1,294 | 1,994 | 5,683 |
| 1/27/2022 | 2,588 | 1,557 | 2,304 | 6,449 |
| 1/28/2022 | 2,547 | 1,173 | 2,274 | 5,994 |
| 1/29/2022 | 2,299 | 1,307 | 2,222 | 5,828 |
| 1/30/2022 | 2,087 | 918 | 1,952 | 4,957 |
| 1/31/2022 | 2,386 | 1,237 | 1,762 | 5,385 |
| 2/1/2022 | 2,475 | 1,391 | 2,024 | 5,890 |
| 2/2/2022 | 2,836 | 1,651 | 2,039 | 6,526 |
| 2/3/2022 | 2,506 | 1,436 | 1,823 | 5,765 |
| 2/4/2022 | 2,079 | 1,156 | 1,642 | 4,877 |
| 2/5/2022 | 1,945 | 1,429 | 1,760 | 5,134 |
| 2/6/2022 | 2,009 | 1,115 | 2,023 | 5,147 |
| 2/7/2022 | 2,314 | 1,231 | 1,672 | 5,217 |
| 2/8/2022 | 2,650 | 1,707 | 1,767 | 6,124 |
| 2/9/2022 | 2,576 | 1,675 | 1,710 | 5,961 |
| 2/10/2022 | 2,782 | 1,469 | 1,579 | 5,830 |
| 2/11/2022 | 2,573 | 1,661 | 2,280 | 6,514 |
| 2/12/2022 | 2,400 | 1,684 | 1,973 | 6,057 |

Total Monthly SWB Encounters

| Month | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| Oct-21 | 66,049 | 51,036 | 47,752 | 164,837 |
| Nov-21 | 63,846 | 50,238 | 60,761 | 174,845 |
| Dec-21 | 51,475 | 48,024 | 79,754 | 179,253 |
| Jan-22 | 60,341 | 31,677 | 62,856 | 154,874 |
| Feb-22 | 71,850 | 39,436 | 54,724 | 166,010 |
| Mar-22 | 88,132 | 46,008 | 88,434 | 222,574 |
| Apr-22 | 82,568 | 43,999 | 109,218 | 235,785 |
| May-22 | 77,454 | 50,178 | 113,505 | 241,137 |
| Jun-22 | 66,730 | 57,948 | 83,156 | 207,834 |
| Jul-22 | 55,692 | 48,504 | 95,966 | 200,162 |
| Aug-22 | 60,772 | 38,575 | 104,740 | 204,087 |
| Sep-22 | 63,431 | 35,995 | 128,121 | 227,547 |
| Oct-22 | 65,788 | 34,851 | 130,039 | 230,678 |

| | |
|---|---|
| Average in 30 days ending 12/13/22 | 8,281 |
| Average in 30 days ending 4/1/22 | 7,227 |
| Average in November 2021 | 5,828 |

Nicaragua AR_000270

| Date | | | | |
|---|---|---|---|---|
| 2/13/2022 | 2,167 | 1,134 | 1,934 | 5,235 |
| 2/14/2022 | 2,390 | 1,184 | 2,346 | 5,920 |
| 2/15/2022 | 2,893 | 1,526 | 1,638 | 6,057 |
| 2/16/2022 | 2,961 | 1,713 | 1,830 | 6,504 |
| 2/17/2022 | 2,925 | 1,484 | 1,993 | 6,402 |
| 2/18/2022 | 2,958 | 1,339 | 2,257 | 6,554 |
| 2/19/2022 | 2,261 | 1,243 | 2,065 | 5,569 |
| 2/20/2022 | 2,347 | 1,144 | 2,078 | 5,569 |
| 2/21/2022 | 2,702 | 1,219 | 1,673 | 5,594 |
| 2/22/2022 | 3,064 | 1,619 | 2,015 | 6,698 |
| 2/23/2022 | 2,895 | 1,556 | 1,610 | 6,061 |
| 2/24/2022 | 2,840 | 1,531 | 2,460 | 6,831 |
| 2/25/2022 | 2,795 | 1,365 | 2,087 | 6,247 |
| 2/26/2022 | 2,480 | 1,364 | 2,210 | 6,054 |
| 2/27/2022 | 2,398 | 1,097 | 2,044 | 5,539 |
| 2/28/2022 | 2,629 | 1,313 | 2,192 | 6,134 |
| 3/1/2022 | 3,057 | 1,805 | 2,276 | 7,138 |
| 3/2/2022 | 3,061 | 1,663 | 2,408 | 7,132 |
| 3/3/2022 | 2,957 | 1,482 | 2,417 | 6,856 |
| 3/4/2022 | 2,961 | 1,384 | 2,711 | 7,056 |
| 3/5/2022 | 2,675 | 1,352 | 2,968 | 6,995 |
| 3/6/2022 | 2,155 | 1,107 | 2,593 | 5,855 |
| 3/7/2022 | 2,527 | 1,347 | 2,544 | 6,418 |
| 3/8/2022 | 3,431 | 1,725 | 2,782 | 7,938 |
| 3/9/2022 | 3,227 | 1,697 | 2,413 | 7,337 |
| 3/10/2022 | 3,209 | 1,445 | 1,991 | 6,645 |
| 3/11/2022 | 3,275 | 1,665 | 2,768 | 7,708 |
| 3/12/2022 | 2,534 | 1,415 | 2,727 | 6,676 |
| 3/13/2022 | 2,150 | 1,091 | 3,193 | 6,434 |
| 3/14/2022 | 2,850 | 1,343 | 2,599 | 6,792 |
| 3/15/2022 | 2,759 | 1,516 | 2,858 | 7,133 |
| 3/16/2022 | 2,803 | 1,444 | 3,016 | 7,263 |
| 3/17/2022 | 3,020 | 1,497 | 2,897 | 7,414 |
| 3/18/2022 | 2,754 | 1,450 | 3,098 | 7,302 |
| 3/19/2022 | 2,619 | 1,135 | 2,986 | 6,740 |
| 3/20/2022 | 2,202 | 954 | 3,529 | 6,685 |
| 3/21/2022 | 2,444 | 1,386 | 3,466 | 7,296 |
| 3/22/2022 | 3,125 | 1,728 | 3,156 | 8,009 |
| 3/23/2022 | 2,887 | 1,546 | 2,805 | 7,238 |
| 3/24/2022 | 2,924 | 1,755 | 2,948 | 7,627 |
| 3/25/2022 | 2,975 | 1,510 | 2,760 | 7,245 |
| 3/26/2022 | 2,579 | 1,519 | 2,810 | 6,908 |
| 3/27/2022 | 2,399 | 1,190 | 3,320 | 6,909 |
| 3/28/2022 | 2,880 | 1,491 | 2,634 | 7,005 |
| 3/29/2022 | 3,010 | 1,669 | 2,928 | 7,607 |
| 3/30/2022 | 3,216 | 1,893 | 3,682 | 8,791 |
| 3/31/2022 | 3,467 | 1,804 | 3,151 | 8,422 |

Nicaragua AR_000271

| Date | | | | |
|---|---|---|---|---|
| 4/1/2022 | 3,218 | 1,694 | 3,584 | 8,496 |
| 4/2/2022 | 2,783 | 1,640 | 3,668 | 8,091 |
| 4/3/2022 | 2,509 | 1,388 | 3,633 | 7,530 |
| 4/4/2022 | 2,769 | 1,548 | 3,501 | 7,818 |
| 4/5/2022 | 3,416 | 1,898 | 3,651 | 8,965 |
| 4/6/2022 | 3,057 | 1,599 | 3,905 | 8,561 |
| 4/7/2022 | 3,195 | 1,462 | 3,671 | 8,328 |
| 4/8/2022 | 3,090 | 1,581 | 3,943 | 9,162 |
| 4/9/2022 | 2,834 | 1,469 | 4,150 | 8,246 |
| 4/10/2022 | 2,422 | 1,300 | 4,529 | 7,872 |
| 4/11/2022 | 2,816 | 1,590 | 4,192 | 8,935 |
| 4/12/2022 | 3,077 | 1,659 | 4,298 | 8,928 |
| 4/13/2022 | 3,098 | 1,871 | 4,132 | 9,267 |
| 4/14/2022 | 3,054 | 1,753 | 4,368 | 8,939 |
| 4/15/2022 | 2,761 | 1,774 | 3,453 | 8,903 |
| 4/16/2022 | 2,006 | 1,286 | 3,249 | 6,745 |
| 4/17/2022 | 1,638 | 851 | 3,027 | 5,738 |
| 4/18/2022 | 1,869 | 1,151 | 3,532 | 6,047 |
| 4/19/2022 | 2,641 | 1,671 | 3,052 | 7,844 |
| 4/20/2022 | 3,153 | 1,451 | 3,113 | 7,656 |
| 4/21/2022 | 2,947 | 1,556 | 3,213 | 7,616 |
| 4/22/2022 | 2,467 | 1,305 | 3,249 | 7,333 |
| 4/23/2022 | 2,150 | 1,191 | 3,191 | 6,907 |
| 4/24/2022 | 2,411 | 1,079 | 3,734 | 6,420 |
| 4/25/2022 | 3,229 | 1,099 | 3,193 | 7,244 |
| 4/26/2022 | 2,691 | 1,424 | 3,067 | 7,720 |
| 4/27/2022 | 2,914 | 1,376 | 3,193 | 7,260 |
| 4/28/2022 | 3,047 | 1,544 | 2,928 | 7,519 |
| 4/29/2022 | 2,491 | 1,403 | 3,915 | 8,232 |
| 4/30/2022 | 2,491 | 1,386 | 3,586 | 7,463 |
| 5/1/2022 | 2,246 | 955 | 3,395 | 6,596 |
| 5/2/2022 | 2,593 | 1,295 | 3,293 | 7,181 |
| 5/3/2022 | 3,060 | 1,535 | 3,277 | 7,872 |
| 5/4/2022 | 2,693 | 1,494 | 2,952 | 7,139 |
| 5/5/2022 | 2,938 | 1,553 | 3,530 | 8,021 |
| 5/6/2022 | 2,904 | 1,755 | 3,591 | 8,250 |
| 5/7/2022 | 2,490 | 1,315 | 4,265 | 8,070 |
| 5/8/2022 | 1,978 | 1,295 | 3,611 | 6,884 |
| 5/9/2022 | 2,614 | 1,867 | 3,546 | 8,027 |
| 5/10/2022 | 2,552 | 1,449 | 2,856 | 8,145 |
| 5/11/2022 | 2,702 | 1,697 | 3,895 | 6,857 |
| 5/12/2022 | 2,880 | 1,815 | 4,267 | 8,784 |
| 5/13/2022 | 2,273 | 1,487 | 4,180 | 8,547 |
| 5/14/2022 | 2,073 | 1,547 | 4,364 | 8,184 |
| 5/15/2022 | 2,402 | 1,091 | 4,171 | 7,335 |
| 5/16/2022 | 3,016 | 1,470 | 3,625 | 7,497 |
| 5/17/2022 | | 1,981 | 4,016 | 9,013 |

Nicaragua AR_000272

| Date | | | | |
|---|---|---|---|---|
| 5/18/2022 | 2,809 | 1,649 | 3,912 | 8,370 |
| 5/19/2022 | 2,921 | 1,922 | 4,043 | 8,886 |
| 5/20/2022 | 2,796 | 1,380 | 4,682 | 8,858 |
| 5/21/2022 | 2,337 | 1,731 | 4,595 | 8,663 |
| 5/22/2022 | 2,043 | 1,262 | 4,101 | 7,406 |
| 5/23/2022 | 2,234 | 1,759 | 3,111 | 7,104 |
| 5/24/2022 | 2,574 | 2,177 | 3,807 | 8,558 |
| 5/25/2022 | 2,333 | 1,863 | 3,738 | 7,934 |
| 5/26/2022 | 2,574 | 1,926 | 3,241 | 7,741 |
| 5/27/2022 | 2,309 | 1,671 | 3,603 | 7,583 |
| 5/28/2022 | 2,131 | 1,744 | 3,427 | 7,302 |
| 5/29/2022 | 1,920 | 1,316 | 3,198 | 6,434 |
| 5/30/2022 | 2,071 | 1,721 | 2,985 | 6,777 |
| 5/31/2022 | 2,435 | 2,456 | 2,228 | 7,119 |
| 6/1/2022 | 2,571 | 1,900 | 2,615 | 7,086 |
| 6/2/2022 | 2,364 | 1,911 | 2,417 | 6,692 |
| 6/3/2022 | 2,622 | 1,769 | 2,676 | 7,067 |
| 6/4/2022 | 1,863 | 1,671 | 2,821 | 6,355 |
| 6/5/2022 | 1,656 | 1,657 | 2,565 | 5,878 |
| 6/6/2022 | 2,422 | 2,074 | 2,380 | 6,876 |
| 6/7/2022 | 2,553 | 2,028 | 2,707 | 7,288 |
| 6/8/2022 | 2,634 | 2,258 | 2,088 | 6,980 |
| 6/9/2022 | 2,551 | 2,173 | 2,493 | 7,217 |
| 6/10/2022 | 2,595 | 1,741 | 2,370 | 6,706 |
| 6/11/2022 | 1,995 | 1,586 | 2,874 | 6,455 |
| 6/12/2022 | 1,952 | 1,468 | 2,999 | 6,419 |
| 6/13/2022 | 1,892 | 1,876 | 2,115 | 5,883 |
| 6/14/2022 | 2,361 | 2,272 | 2,572 | 7,205 |
| 6/15/2022 | 2,451 | 2,274 | 3,299 | 8,024 |
| 6/16/2022 | 2,537 | 1,980 | 3,091 | 7,608 |
| 6/17/2022 | 2,319 | 2,006 | 2,723 | 7,048 |
| 6/18/2022 | 1,963 | 1,705 | 3,503 | 7,171 |
| 6/19/2022 | 1,654 | 1,594 | 3,436 | 6,684 |
| 6/20/2022 | 1,782 | 1,616 | 2,842 | 6,240 |
| 6/21/2022 | 2,558 | 2,104 | 3,380 | 8,042 |
| 6/22/2022 | 2,499 | 2,217 | 2,839 | 7,555 |
| 6/23/2022 | 2,129 | 2,089 | 2,908 | 7,126 |
| 6/24/2022 | 2,278 | 2,162 | 3,005 | 7,445 |
| 6/25/2022 | 1,961 | 1,646 | 2,753 | 6,360 |
| 6/26/2022 | 1,714 | 1,698 | 2,497 | 5,909 |
| 6/27/2022 | 2,064 | 2,025 | 2,719 | 6,808 |
| 6/28/2022 | 2,253 | 2,165 | 2,466 | 6,884 |
| 6/29/2022 | 2,377 | 2,204 | 2,696 | 7,277 |
| 6/30/2022 | 2,160 | 2,079 | 3,307 | 7,546 |
| 7/1/2022 | 1,870 | 1,690 | 2,994 | 6,554 |
| 7/2/2022 | 1,900 | 1,783 | 3,441 | 7,124 |
| 7/3/2022 | 1,701 | 1,322 | 2,991 | 6,014 |

Nicaragua AR_000273

| Date | | | | |
|---|---|---|---|---|
| 7/4/2022 | 1,993 | 1,782 | 3,101 | 6,876 |
| 7/5/2022 | 2,126 | 1,876 | 3,239 | 7,241 |
| 7/6/2022 | 2,130 | 1,958 | 3,605 | 7,693 |
| 7/7/2022 | 1,796 | 1,711 | 3,383 | 6,890 |
| 7/8/2022 | 1,867 | 1,572 | 3,089 | 6,528 |
| 7/9/2022 | 1,579 | 1,526 | 3,515 | 6,620 |
| 7/10/2022 | 1,488 | 1,469 | 3,381 | 6,338 |
| 7/11/2022 | 1,703 | 1,729 | 2,965 | 6,397 |
| 7/12/2022 | 2,052 | 1,837 | 3,923 | 7,812 |
| 7/13/2022 | 2,056 | 1,744 | 3,735 | 7,535 |
| 7/14/2022 | 1,930 | 1,849 | 3,173 | 6,952 |
| 7/15/2022 | 1,768 | 1,631 | 2,672 | 6,071 |
| 7/16/2022 | 1,609 | 1,557 | 3,678 | 6,844 |
| 7/17/2022 | 1,579 | 1,199 | 3,104 | 5,882 |
| 7/18/2022 | 1,475 | 1,566 | 2,950 | 5,991 |
| 7/19/2022 | 1,966 | 1,971 | 3,442 | 7,379 |
| 7/20/2022 | 1,941 | 1,516 | 2,908 | 6,365 |
| 7/21/2022 | 1,709 | 1,553 | 3,574 | 6,836 |
| 7/22/2022 | 1,933 | 1,400 | 3,033 | 6,366 |
| 7/23/2022 | 1,464 | 1,168 | 3,141 | 5,773 |
| 7/24/2022 | 1,539 | 1,235 | 2,762 | 5,536 |
| 7/25/2022 | 1,586 | 1,415 | 2,293 | 5,294 |
| 7/26/2022 | 2,031 | 1,602 | 2,855 | 6,488 |
| 7/27/2022 | 1,942 | 1,554 | 2,690 | 6,186 |
| 7/28/2022 | 1,867 | 1,528 | 2,676 | 6,071 |
| 7/29/2022 | 1,773 | 1,214 | 2,473 | 5,460 |
| 7/30/2022 | 1,798 | 1,250 | 2,589 | 5,637 |
| 7/31/2022 | 1,521 | 1,297 | 2,591 | 5,409 |
| 8/1/2022 | 1,532 | 1,290 | 2,354 | 5,176 |
| 8/2/2022 | 1,927 | 1,658 | 2,820 | 6,405 |
| 8/3/2022 | 2,003 | 1,409 | 2,739 | 6,151 |
| 8/4/2022 | 1,900 | 1,508 | 2,269 | 5,677 |
| 8/5/2022 | 2,056 | 1,440 | 2,828 | 6,324 |
| 8/6/2022 | 1,859 | 1,233 | 3,113 | 6,205 |
| 8/7/2022 | 1,728 | 995 | 3,037 | 5,760 |
| 8/8/2022 | 1,922 | 1,256 | 2,889 | 6,067 |
| 8/9/2022 | 2,400 | 1,467 | 3,348 | 7,215 |
| 8/10/2022 | 2,192 | 1,235 | 3,759 | 7,186 |
| 8/11/2022 | 2,182 | 1,479 | 3,156 | 6,817 |
| 8/12/2022 | 1,731 | 1,129 | 3,596 | 6,456 |
| 8/13/2022 | 1,887 | 1,180 | 2,919 | 5,986 |
| 8/14/2022 | 1,667 | 945 | 3,443 | 6,055 |
| 8/15/2022 | 1,651 | 1,164 | 3,498 | 6,313 |
| 8/16/2022 | 1,900 | 1,363 | 3,129 | 6,392 |
| 8/17/2022 | 2,151 | 1,482 | 3,663 | 7,296 |
| 8/18/2022 | 2,096 | 1,232 | 3,449 | 6,777 |
| 8/19/2022 | 2,032 | 1,130 | 3,740 | 6,902 |

Nicaragua AR_000274

| Date | | | | |
|---|---|---|---|---|
| 8/20/2022 | 1,811 | 1,137 | 4,020 | 6,968 |
| 8/21/2022 | 1,740 | 986 | 3,686 | 6,412 |
| 8/22/2022 | 1,806 | 1,040 | 4,061 | 6,907 |
| 8/23/2022 | 2,090 | 1,172 | 3,992 | 7,254 |
| 8/24/2022 | 2,200 | 1,451 | 3,608 | 7,259 |
| 8/25/2022 | 2,242 | 1,253 | 3,787 | 7,282 |
| 8/26/2022 | 2,079 | 1,228 | 3,355 | 6,662 |
| 8/27/2022 | 1,857 | 1,208 | 3,915 | 6,980 |
| 8/28/2022 | 1,662 | 1,010 | 4,288 | 6,960 |
| 8/29/2022 | 1,978 | 1,275 | 3,967 | 7,220 |
| 8/30/2022 | 2,361 | 1,234 | 3,196 | 6,791 |
| 8/31/2022 | 2,130 | 986 | 3,116 | 6,232 |
| 9/1/2022 | 2,203 | 1,186 | 3,838 | 7,227 |
| 9/2/2022 | 2,348 | 1,039 | 4,319 | 7,706 |
| 9/3/2022 | 1,756 | 999 | 4,921 | 7,676 |
| 9/4/2022 | 1,543 | 668 | 3,372 | 5,583 |
| 9/5/2022 | 1,607 | 979 | 4,546 | 7,132 |
| 9/6/2022 | 2,097 | 1,271 | 4,047 | 7,415 |
| 9/7/2022 | 2,209 | 1,363 | 4,540 | 8,112 |
| 9/8/2022 | 2,147 | 1,341 | 4,860 | 8,348 |
| 9/9/2022 | 2,232 | 1,171 | 4,590 | 7,993 |
| 9/10/2022 | 1,912 | 1,061 | 4,356 | 7,329 |
| 9/11/2022 | 1,732 | 1,118 | 4,452 | 7,302 |
| 9/12/2022 | 1,843 | 1,060 | 4,621 | 7,524 |
| 9/13/2022 | 2,379 | 1,393 | 4,827 | 8,599 |
| 9/14/2022 | 2,263 | 1,231 | 4,795 | 8,289 |
| 9/15/2022 | 2,491 | 1,372 | 3,701 | 7,564 |
| 9/16/2022 | 1,851 | 1,127 | 4,405 | 7,383 |
| 9/17/2022 | 1,546 | 1,214 | 4,511 | 7,271 |
| 9/18/2022 | 1,641 | 968 | 4,134 | 6,743 |
| 9/19/2022 | 1,925 | 1,184 | 3,296 | 6,405 |
| 9/20/2022 | 2,432 | 1,420 | 4,014 | 7,866 |
| 9/21/2022 | 2,384 | 1,392 | 3,955 | 7,731 |
| 9/22/2022 | 2,272 | 1,245 | 4,082 | 7,599 |
| 9/23/2022 | 2,213 | 1,399 | 4,081 | 7,693 |
| 9/24/2022 | 1,910 | 1,017 | 4,436 | 7,363 |
| 9/25/2022 | 1,992 | 1,071 | 4,122 | 7,185 |
| 9/26/2022 | 2,427 | 1,197 | 4,086 | 7,710 |
| 9/27/2022 | 2,541 | 1,379 | 4,182 | 8,102 |
| 9/28/2022 | 2,435 | 1,408 | 4,139 | 7,982 |
| 9/29/2022 | 2,501 | 1,490 | 4,429 | 8,420 |
| 9/30/2022 | 2,599 | 1,232 | 4,464 | 8,295 |
| 10/1/2022 | 1,877 | 885 | 4,409 | 7,333 |
| 10/2/2022 | 1,815 | 1,047 | 4,988 | 7,688 |
| 10/3/2022 | 2,044 | 1,063 | 4,408 | 7,515 |
| 10/4/2022 | 2,574 | 1,319 | 4,607 | 8,500 |
| 10/5/2022 | 2,505 | 1,397 | 5,003 | 8,905 |

Nicaragua_AR_000275

| Date | | | | |
|---|---|---|---|---|
| 10/6/2022 | 2,515 | 1,422 | 4,577 | 8,514 |
| 10/7/2022 | 2,336 | 1,259 | 4,357 | 7,952 |
| 10/8/2022 | 2,040 | 1,250 | 4,641 | 7,931 |
| 10/9/2022 | 1,822 | 1,098 | 4,638 | 7,558 |
| 10/10/2022 | 1,903 | 1,078 | 4,328 | 7,309 |
| 10/11/2022 | 2,273 | 1,290 | 4,257 | 7,820 |
| 10/12/2022 | 2,285 | 1,080 | 3,922 | 7,287 |
| 10/13/2022 | 2,107 | 1,325 | 4,740 | 8,172 |
| 10/14/2022 | 1,929 | 1,100 | 4,437 | 7,466 |
| 10/15/2022 | 1,826 | 1,046 | 3,818 | 6,690 |
| 10/16/2022 | 1,816 | 748 | 3,592 | 6,156 |
| 10/17/2022 | 1,974 | 1,078 | 3,442 | 6,494 |
| 10/18/2022 | 2,513 | 1,405 | 2,930 | 6,848 |
| 10/19/2022 | 2,237 | 1,217 | 3,605 | 7,059 |
| 10/20/2022 | 2,435 | 1,270 | 3,667 | 7,372 |
| 10/21/2022 | 2,372 | 1,065 | 4,018 | 7,455 |
| 10/22/2022 | 2,079 | 1,079 | 3,760 | 6,918 |
| 10/23/2022 | 1,857 | 876 | 4,147 | 6,880 |
| 10/24/2022 | 2,084 | 1,054 | 3,575 | 6,713 |
| 10/25/2022 | 2,582 | 1,322 | 4,235 | 8,139 |
| 10/26/2022 | 2,438 | 1,179 | 4,002 | 7,619 |
| 10/27/2022 | 2,314 | 1,138 | 4,464 | 7,916 |
| 10/28/2022 | 2,231 | 972 | 4,529 | 7,732 |
| 10/29/2022 | 1,979 | 1,098 | 4,908 | 7,985 |
| 10/30/2022 | 1,491 | 906 | 4,093 | 6,490 |
| 10/31/2022 | 1,968 | 945 | 3,965 | 6,878 |
| 11/1/2022 | 2,032 | 1,170 | 4,606 | 7,808 |
| 11/2/2022 | 2,100 | 1,182 | 4,958 | 8,240 |
| 11/3/2022 | 1,983 | 1,094 | 3,950 | 7,027 |
| 11/4/2022 | 2,086 | 1,097 | 4,607 | 7,790 |
| 11/5/2022 | 1,836 | 1,138 | 4,007 | 6,981 |
| 11/6/2022 | 1,619 | 910 | 5,331 | 7,860 |
| 11/7/2022 | 2,044 | 1,127 | 4,216 | 7,387 |
| 11/8/2022 | 2,466 | 1,354 | 4,585 | 8,405 |
| 11/9/2022 | 2,215 | 1,038 | 4,296 | 7,549 |
| 11/10/2022 | 2,162 | 1,226 | 4,695 | 8,083 |
| 11/11/2022 | 2,291 | 1,123 | 5,048 | 8,462 |
| 11/12/2022 | 1,930 | 1,109 | 4,441 | 7,480 |
| 11/13/2022 | 1,638 | 916 | 4,529 | 7,083 |
| 11/14/2022 | 2,088 | 1,066 | 4,732 | 7,886 Production |
| 11/15/2022 | 2469 | 1142 | 4,525 | 8136 UIP |
| 11/16/2022 | 2345 | 1213 | 4,635 | 8193 |
| 11/17/2022 | 2234 | 1268 | 6,063 | 9565 |
| 11/18/2022 | 2068 | 1126 | 4,696 | 7890 |
| 11/19/2022 | 1805 | 1004 | 5,082 | 7891 |
| 11/20/2022 | 1501 | 859 | 4,565 | 6925 |
| 11/21/2022 | 1775 | 1020 | 5,179 | 7974 |

Nicaragua AR_000276

| Date | | | | |
|------|------|------|-------|------|
| 11/22/2022 | 1958 | 1221 | 4,762 | 7941 |
| 11/23/2022 | 1802 | 1077 | 4643 | 7522 |
| 11/24/2022 | 1851 | 1257 | 4251 | 7359 |
| 11/25/2022 | 1761 | 831 | 4566 | 7158 |
| 11/26/2022 | 1632 | 925 | 5461 | 8018 |
| 11/27/2022 | 1505 | 861 | 4746 | 7112 |
| 11/28/2022 | 1796 | 1186 | 4747 | 7729 |
| 11/29/2022 | 2092 | 1263 | 4322 | 7677 |
| 11/30/2022 | 1931 | 1216 | 6068 | 9215 |
| 12/1/2022 | 2218 | 1203 | 5092 | 8513 |
| 12/2/2022 | 1901 | 1236 | 6500 | 9637 |
| 12/3/2022 | 1492 | 951 | 5471 | 7914 |
| 12/4/2022 | 1344 | 914 | 5700 | 7958 |
| 12/5/2022 | 1888 | 1142 | 5280 | 8310 |
| 12/6/2022 | 1887 | 1085 | 5411 | 8383 |
| 12/7/2022 | 1971 | 1181 | 6170 | 9322 |
| 12/8/2022 | 1914 | 1422 | 5949 | 9285 |
| 12/9/2022 | 1875 | 1023 | 6505 | 9403 |
| 12/10/2022 | 1487 | 1100 | 6571 | 9158 |
| 12/11/2022 | 1381 | 1186 | 6260 | 8827 |
| 12/12/2022 | 1501 | 934 | 6279 | 8714 |
| 12/13/2022 | 1738 | 1234 | 5830 | 8802 |

Source: OIS pull of UIP 12/14/22

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE



## OFFICE *of* INTELLIGENCE *and* ANALYSIS

### INTELLIGENCE IN FOCUS

6 JUNE 2022

DHS-IA-IF-2022-00774-A

*B O R D E R   S E C U R I T Y*

## *(U//LES)* Human Smugglers Using Social Media to Broaden Access to Illicit Pathways to the United States

*(U//LES)* **Widespread use of social media platforms by human smugglers broadens client access to illicit pathways to the United States, probably improving the chance of successfully arriving at the southern border.** Social media platforms enable smugglers and clients to connect online, facilitate payments, and coordinate smuggling operations—helping migrants who otherwise would struggle to navigate transnational networks and border security operations along smuggling routes, according to DHS and FBI reporting.

- *(U//SBU)* Human smugglers often target vulnerable populations who view illegal migration as a necessary means to escape natural disasters, poverty, war, or oppression, according to US Government and open source reporting. Broad access to online networks has expanded the way smugglers and migrants connect, allowing migrants to seek out facilitation services and communicate directly as an alternative to third-party introductions and word-of-mouth, according to Western press reporting.

- *(U//LES)* Human smugglers advertise their services on sites like Facebook and YouTube and use encrypted messaging platforms, such as WhatsApp and Telegram, as well as some gaming platforms to discuss logistics, according to DHS reporting. Encrypted messaging platforms enable smugglers to provide directions and receive payments from their clients without revealing any personally identifiable information, judging from DHS and FBI reporting.

*(U)* Prepared by the Counterintelligence Mission Center, the Counterterrorism Mission Center, the Transnational Organized Crime Mission Center, and ICE's Human Smuggling and Extraterritorial Criminal Travel Unit. Coordinated within the DHS Intelligence Enterprise (CBP and USCG) and with FBI and SOUTHCOM. For questions, contact ██████████@hq.dhs.gov

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

*(U//LES)* **Illicit Pathways Vulnerable to Exploitation by Foreign Adversaries**

*(U//LES)* Some smugglers and their clients use encrypted platforms to help conceal their identities, which would appeal to individuals with ties to terrorists or foreign adversaries seeking illicit access to the United States, judging from DHS, FBI, and open source reporting. We judge that human smugglers primarily are profit-driven but vary in their tolerance for exposing operations to the law enforcement scrutiny associated with facilitating travel for terrorists or foreign adversaries.

*(U//FOUO)* **Law enforcement efforts to de-platform human smugglers on social media will probably be challenged by privacy concerns and the large scale of online content providing guidance on illicit pathways to the United States.** ████████████
████████████████████████████████████████████████
██████████████████████████

- *(U)* The privacy policies of companies like Snapchat[USPER] and Instagram[USPER] enable users to share photos and messages without restrictions. Many social media companies, including Meta[USPER] and Twitter[USPER], claim to remove harmful content, but face limitations due to terms of service agreements, according to Twitter's company policy and Western press accounts of US media company policies.

- *(U//LES)* ███████████████████████████████
████████████████████████████████████████████
█████████████ In March, a list of five Facebook groups for intending migrants in Mexico, Guatemala, and Honduras jointly had an estimated 406,000 members, according to DHS reporting.

- *(U//SBU/LES)* Human smugglers' engagement with prospective clients on social media platforms probably makes their advertising efforts vulnerable to detection by law enforcement authorities, judging from DHS reporting. ████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

## Source, Reference, and Dissemination Information

| | |
|---|---|
| **Source Summary Statement** | *(U//LES)* We have **moderate confidence** in our assessment that the widespread use of social media platforms by human smugglers broadens client access to illicit pathways to the United States, improving the chance of successfully arriving at the southern border. Our assessment is based on a body of DHS, US Government, and FBI reporting, as well as Western press. Our confidence in this assessment is based upon reliable, firsthand reporting, most of which has been corroborated. |
| | *(U//LES)* We have **moderate confidence** in our assessment that law enforcement efforts to de-platform human smugglers on social media will be challenged by privacy concerns and the large scale of online content providing guidance on illicit pathways to the United States. This assessment is based on a body of DHS, US Government, and Western press reporting, all of which we deem to be reliable. |
| **Reporting Suspicious Activity** | *(U)* **To report suspicious activity, law enforcement, Fire-EMS, private security personnel, and emergency managers should follow established protocols; all other personnel should call 911 or contact local law enforcement.** Suspicious activity reports (SARs) will be forwarded to the appropriate fusion center and FBI Joint Terrorism Task Force for further action. For more information on the Nationwide SAR Initiative, visit www.dhs.gov/nsi. |
| **Privacy, Civil Rights, Civil Liberties, Intelligence Oversight Notice** | *(U//FOUO)* US persons linking, citing, quoting, or voicing the same arguments raised by these foreign influence activities likely are engaging in First Amendment-protected activity, unless they are acting at the direction or control of a foreign threat actor. Furthermore, variants of the topics covered in this product, even those that include divisive terms, should not be assumed to reflect foreign influence or malign activity absent information specifically attributing the content to malign foreign actors. This information should be considered in the context of all applicable legal and policy authorities to use open source information while protecting privacy, civil rights, and civil liberties. |
| **Dissemination** | *(U)* DHS Intelligence Enterprise, Intelligence Community, and federal, state, local, tribal, and territorial partners. |
| **Warning Notices & Handling Caveats** | *(U)* **LAW ENFORCEMENT SENSITIVE:** The information marked (U//LES) in this document is the property of DHS and may be distributed within the Federal Government (and its contractors), US intelligence, law enforcement, public safety or protection officials, and individuals with a need to know. Distribution beyond these entities without DHS authorization is prohibited. Precautions should be taken to ensure this information is stored and/or destroyed in a manner that precludes unauthorized access. Information bearing the LES caveat may not be used in legal proceeding without first receiving authorization from the originating agency. Recipients are prohibited from subsequently posting the information marked LES on a website on an unclassified network. |
| | *(U)* This product contains US person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label USPER and should be handled in accordance with the recipient's intelligence oversight and/or information handling procedures. |
| | *(U)* **Warning:** This document contains UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need to know without prior approval of an authorized DHS official. |

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

State and local homeland security officials may not share this document with critical infrastructure and key resource personnel or private sector security officials without further approval from DHS.

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE



## Office of Intelligence and Analysis
# Customer Feedback Form

Product Title:  (U//LES) Human Smugglers Using Social Media to Broaden Access to Illicit Pathways to the United States

All survey responses are completely anonymous.  No personally identifiable information is captured unless you voluntarily offer personal or contact information in any of the comment fields.  Additionally, your responses are combined with those of many others and summarized in a report to further protect your anonymity.

**1. Please select partner type:** Select One   **and function:** Select One

**2. What is the highest level of intelligence information that you receive?** Select One

**3. Please complete the following sentence: "I focus most of my time on:"** Select One

**4. Please rate your satisfaction with each of the following:**

|  | Very Satisfied | Somewhat Satisfied | Neither Satisfied nor Dissatisfied | Somewhat Dissatisfied | Very Dissatisfied | N/A |
|---|---|---|---|---|---|---|
| Product's overall usefulness | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's relevance to your mission | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's timeliness | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's responsiveness to your intelligence needs | ○ | ○ | ○ | ○ | ○ | ○ |

**5. How do you plan to use this product in support of your mission?**  *(Check all that apply.)*

- ☐ Drive planning and preparedness efforts, training, and/or emergency response operations
- ☐ Observe, identify, and/or disrupt threats
- ☐ Share with partners
- ☐ Allocate resources (e.g. equipment and personnel)
- ☐ Reprioritize organizational focus
- ☐ Author or adjust policies and guidelines
- ☐ Initiate a law enforcement investigation
- ☐ Intiate your own regional-specific analysis
- ☐ Intiate your own topic-specific analysis
- ☐ Develop long-term homeland security strategies
- ☐ Do not plan to use
- ☐ Other:

**6. To further understand your response to question #5, please provide specific details about situations in which you might use this product.**

**7. What did this product _not_ address that you anticipated it would?**

**8. To what extent do you agree with the following two statements?**

|  | Strongly Agree | Agree | Neither Agree nor Disagree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|---|
| This product will enable me to make better decisions regarding this topic. | ○ | ○ | ○ | ○ | ○ | ○ |
| This product provided me with intelligence information I did not find elsewhere. | ○ | ○ | ○ | ○ | ○ | ○ |

**9. How did you obtain this product?** Select One

**10. Would you be willing to participate in a follow-up conversation about your feedback?** Yes

*To help us understand more about your organization so we can better tailor future products, please provide:*

| Name: | | Position: | |
|---|---|---|---|
| Organization: | | State: | |
| Contact Number: | | Email: | |

*Privacy Act Statement*

**Submit Feedback** ▶

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE



DHS INTELLIGENCE ENTERPRISE

DHS MIGRATION INDICATIONS AND WARNINGS CELL UPDATE

14 December 2022                                                    DHS-INB-NIW–23-2807994

## (U)  Indications and Warning Report - Migration

*(U//FOUO) Scope Note:* *The narrative provided herein reflects DHS Irregular Migration Cell's best attempt to convey events accurately at the time of publication; however, the frequently tentative, fragmentary, and uncorroborated nature of cited information precludes CBP from expressing high confidence in all findings presented. This product cites raw intelligence, including migrant numbers from the* ███████████ *reports to CBP attachés, to provide weekly updates on the movement of migrant groups through Mexico, whether as part of a caravan or via other means.*

*(U//LES) As of 14 December, U.S. Customs and Border Protection (CBP) encountered 8,803 migrants along the southwest border (SWB)—an increase of 23.4 percent from a month ago (7,134), and 49.2 percent from a year ago (5,900).*

— (U//LES) 1,738 Mexican nationals
— (U//LES) 1,547 Nicaraguan nationals
— (U//LES) 1,447 Cuban nationals
— (U//LES) 682 Ecuadorian nationals
— (U//LES) 531 Honduran nationals
— (U//LES) 521 Guatemalan nationals
— (U//LES) 437 Colombian nationals
— (U//LES) 336 Peruvian nationals
— (U//LES) 275 Dominican nationals
— (U//LES) 231 Haitian nationals

| Sector / Field Office | Encounters |
|---|---|
| Totals | 8,803 |
| El Paso Sector | 2,330 |
| Del Rio Sector | 1,632 |
| Yuma Sector | 1,060 |
| Rio Grande Valley Sector | 1,043 |
| Tucson Sector | 717 |
| LAREDO Field Office | 532 |
| San Diego Sector | 525 |
| El Centro Sector | 342 |
| SAN DIEGO Field Office | 333 |
| Laredo Sector | 98 |
| EL PASO Field Office | 92 |
| TUCSON Field Office | 65 |
| Big Bend Sector | 34 |

*(U//LES) CBP encounters along the SWB have a 7-day average of 9,073 and a 21-day average of 8,381 per day, led by a continued surge of Cuban, Nicaraguan, Colombian, and Ecuadorian nationals. U.S. Border Patrol (USBP) key apprehension locations in Fiscal Year to Date (FYTD) 2023 mirror patterns identified in late FY 2022, with El Paso Sector being a preferred entry point followed by Del Rio Sector.* The perception among migrants of safer transit led to a sharp rise in USBP apprehensions in El Paso Sector toward the end of FY 2022 and has continued into FY 2023.

— (U) The El Paso sector saw a major spike in apprehensions from 10 –11 December, averaging 2,460 per day. Mexican officials concerned for their safety bused 1,500 migrants to Juarez on 10 December. Many of those migrants were Nicaraguans exempt from Title 42 expulsions, while others were Venezuelans and Central Americans who could not wait until 21 December.[1]

— (U//LES) From 9 – 10 December, the El Paso Sector saw more than 2,600 migrant apprehensions. Migrants waited in line to be taken into custody by Border Patrol prior to Mexican police escorting 20 busses full of migrants into Ciudad Juarez.[2]

— (U//LES) On 13 December, the El Paso Sector apprehended more than 2,300 migrants, while the Del Rio Sector apprehended over 1,632 migrants. Most migrants apprehended

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

are from Nicaragua, Cuba, Colombia, and Ecuador.[3]

---

**(U) Migrant Encounter Shift as of 11/28/2022**

(U//LES) In FYTD 2023, El Paso Sector (EPT) has seen an increase in apprehensions while Rio Grande Valley (RGV) has seen a decrease.

- (U//LES) EPT accounts for 22.9% of all apprehensions in FYTD 2023 compared to 13.9% in FY 2022.
- (U//LES) DRT accounts for 19.4% of all apprehensions in FYTD 2023 compared to 21.8% in FY 2022.
- (U//LES) RGV accounts for 12.0% of all apprehensions in FYTD 2023 compared to 21.2% in FY 2022.

---

(U//LES) ***USBP continues to encounter record levels of large groups (100 or more) along the SWB, primarily Cuban, Nicaraguan, Venezuelan, and Colombian migrants.*** Large group apprehensions have risen since FY 2021 when there were 223 such events comprised of 31,094 migrants, increasing to 614 events in FY 2022 with 100,722 migrants. This trend has continued into FY 2023 with 217 large groups comprised of 41,471 migrants in just the first ten weeks of the fiscal year.

— (U//LES) Del Rio Sector accounted for most large groups from 6-12 December; Border Patrol agents assigned to Eagle Pass apprehended seventeen groups totaling 4,775 undocumented migrants. These groups were comprised of nationals primarily from Central and South America, Cuba, and the Dominican Republic.[4]

— (U//LES) On 8 December, USBP agents assigned to the Ajo, AZ Station apprehended 154 undocumented migrants from the Caribbean, Africa, India, and Central and South America near Lukeville, AZ.[5]

— (U//LES) On 8 December, Eagle Pass Border Patrol Agents apprehended a group of 704 migrants north of Eagle Pass. Seventy-six percent (535) of those migrants stem from Cuba, while the rest stem from Mexico, Central, and South America.[6] Migrant interviews reveal they made they made their way after hearing Title 42 would end in December and that the smugglers chose the crossing destinations.[7]



UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

(U//LES) *Analysis of migrant interviews indicates that the recent increase in migrant flow is fueled by economic opportunities, violence, and perceptions of U.S. policy allowing them to remain in the United States.* In the wake of a U.S. district court decision to end Title 42-based operations by 21 December, Mexican authorities have expressed concern regarding an upcoming surge of migrants. This concern is corroborated by comments from many migrants and asylum seekers in Mexico who report they plan to attempt entry into the United States once Title 42 is no longer in effect. Mexico's National Institute of Migration (INM) has little capacity to deal with further migration streams (whether arriving from the south or returned from the United States), having already seen a dramatic rise in apprehensions since installing 234 checkpoints in southern Mexico in October.[8]

— (U//LES) A migrant interview with a Nicaraguan national reveal it is commonly known in Nicaragua that Nicaraguans will be released upon illegally entering the United States. Additionally, the Nicaraguan migrant stated the president of the United States has open borders and is allowing Nicaraguans to stay.[9]

—

— (U//LES) Social media research conducted on 6 December reveals Facebook posts discussing the end of Title 42 claim the border will be open after 21 December and all that is required is to claim credible fear to enter the United States.[10]

— (U//LES) According to news articles from Ciudad Juarez, Mexican shelters are providing mass wedding services to Venezuelan migrants offered by the state government to people in mobility. Venezuelan migrants were told that if they get married, they will get processed together and avoid separation by U.S. authorities.[11]

(U//LES) *CBP encounters along the southwest border will likely surpass more than 10,000 encounters a day following the lifting of T-42 on 21 December.* Data analysis shows a slight increase (1.6 percent) in CBP encounters along the SWB from October to November 2022, increasing from 230,678 to 234,374. Preliminary data, as of 14 December, indicates CBP encounters at the SWB totaled 63,512–an increase of 13 percent compared to November. CBP's overall SWB encounter rate has increased 7.6 percent when comparing the 7-day average of 9,073 to the 21-day average of 8,381. This is driven primarily by an increase in the number of Ecuadorian, Nicaraguan, and Cuban migrants arriving to the SWB.

— (U) According to open-source reporting, as of 8 December, migrants are amassing in the streets of Matamoros waiting for Title 42 to be lifted. Migrants consisting of Venezuelans, Haitians, Peruvians, and Mexican nationals are not allowed to set up tents or tarps for shelter.[12]

— (U//LES) According to open-source research, the eviction of Venezuelan migrants from encampments in Ciudad Juarez has not prevented Venezuelans from continuing to arrive or remain close the border, but merely just dispersed the Venezuelans to migrant shelters to await the end of Title 42.[13]

— (U//LES) Open-source research conducted on 8 December revealed migrant organizations estimate the arrival of 8,000 migrants, mainly migrants from Haiti in the

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

municipality of Tapachula at the end of December. Groups of migrants are coming from Central and South America with the expectation that they will head to the United States.[14]

(U//LES) *CBP analysis of migrant camps and migrant shelters indicate there are likely at least 40,000 intending migrants in proximity to the SWB. The presumed expiration of Title 42 and growing number of migrant arrivals has caused most of Mexico's migrant shelters to surpass capacity limits and exhaust resources.* There is likely an intending migrant population of more than 120,000 Haitians and Venezuelans currently in Mexico who could make their way to the SWB within a matter of days if the perception of eased entry becomes prevalent. Migrants from certain countries such as Colombia, Peru, Guatemala, Honduras, and El Salvador pose challenges to intending migrant population estimates given their relative ease of travel into and throughout Mexico due proximity to Mexico and commercial aviation use.

— (U) Open-source reporting on 9 December indicates there are 1,500 migrants that arrived in the state of Chihuahua in a caravan. The Governor of Chihuahua stated she will retain these migrants in shelters and seek help from the federal government to repatriate migrants due to the saturation of migrants along the border near Juarez. Durango authorities warn that the group of 1,500 migrants are part of a group of more than 2,500 migrants who are in transit.[15]

— (U) On 9 December migrant shelter director of Casa del Migrante reports shelters are at capacity limits as caravans of Venezuelans come from Torreon and Chihuahua. Venezuelan migrants have not stopped arriving to Ciudad Juarez since the announcement of the end of Title 42. Officials report that the Leona Vicario is almost at capacity, housing another 900 migrants.[16]

(U//LES) *Cuban, Ecuadorian, Colombian, and Nicaraguan migrants will likely account for the majority of CBP's Other Than Mexican (OTM) encounters on the SWB over the next 30 days, based on recent trend analysis and encounter numbers from foreign partners along the migrant pathway.* In the past seven days, migrants from Cuba, Ecuador, and Nicaragua accounted for 27,595 of the 63,512 total CBP encounters along the SWB (approximately 43.4 percent). CBP encounters along the SWB increased over 1,900 percent in FY 2022 compared to FY 2021, from 6,202 to 125,172 encounters, respectively.

— (U//FOUO) As of 12 December, irregular migrants encountered in the Darian Gap are averaging approximately 650 a day, totaling 5,157 migrants for the month of December. The top 5 nationalities encountered during 2 – 8 December were Ecuador (1,906), Haiti (1,113), Venezuela (213).[17,18]

— (U//LES) CBP reporting indicates that Nicaraguan migrants are extremely organized in coordinating movements of large groups of migrants to the U.S. border. Migrant interviews indicate migrants pay a fee to initiate their journey north through Honduras and bussed to the Honduras/Guatemala border.[19,20]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

— (U//LES) According to social media research a group of Venezuelans are waiting for January to being making their way to the Darien gap. Additional research revealed the date of 31 January for a possible migrant caravan with destination to the United States.[21]

---

[1] [Border Report | El Paso could get 4,500 migrants a day once Title 42 lifted | 12 December 2022 | (U) | (U) |El Paso could get 4,500 migrants a day once Title 42 lifted | BorderReport ]

[2] [CBP | Analytical Exchange | Large Group of Migrants headed to Ciudad Juarez | 12 December 2022| (U//LES) | (U//LES)]

[3] [CBP | UIP CBP SBO Dashboard | 14 December 2022 | (U//LES) | (U//LES)]

[4] [ CBP | CBP Watch Operations Report | 6–12 December 2022 | (U//LES) | (U//LES)]

[5] [CBP | CBP Watch Operations Report | 10 December 2022 | (U//LES) | (U//LES)]

[6] [CBP | FIR-EGT-23-2802005 | 9 December 2022 | (U//LES) Large group of 704 undocumented migrants apprehended at the Lehman Ranch in Eagle Pass, Texas | (U//LES) | (U//LES)]

[7] [CBP | FIR-EGT-23-2802005 | 9 December 2022 | (U//LES) Large group of 704 undocumented migrants apprehended at the Lehman Ranch in Eagle Pass, Texas | (U//LES) | (U//LES)]

[8] [DoS | 22 Mexico 3134 | 1 December 2022 | (U//SBU) Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico | (U//SBU) | (U//SBU)]

[9] [CBP | 48717516 | 04 December 2022 | EPT SIU HUMINT DAR DAYS 12/04/2022 | (U//LES) | (U//LES)]

[10] [CBP | FIR-EPT-23-2800104 | OSINT – Social Media Update – Migrant Situation – December 7, 2022 | 7 December 2022 | (U//LES) | (U//LES)]

[11] [CBP | FIR-EPT-23-2802996 | Ciudad Juarez has seen an increase in Venezuelan migrant getting married to avoid separation by United States authorities. | 5 December 2022 | (U//LES) | (U//LES)]

[12] [Border Report | 8 December 2022 | (U) Thousands sleeping on the streets of Matomoros, migrant advocates say | (U) | (U) | https://www.borderreport.com/regions/mexico/thousands-sleeping-on-the-streets-of-matamoros-migrant-advocates-say/ ]

[13] [CBP | FIR-EPT-23-2800104 | OSINT – Social Media Update – Migrant Situation – December 7, 2022 | 7 December 2022 | (U//LES) | (U//LES)]

[14] [CBP | OSINT - social media - 8000 Migrants Expected By The End of 2022- Tapachula Mexico - December 9,2022 | 10 December 2022 | (U//LES) | (U//LES)]

[15] [El Heraldo de Chihuahhua | 1,500 Caravan migrants arrive in the state; Another group of a thousand is missing | 9 December 2022| (U) | (U) | One thousand 500 caravan migrants arrive in the state; Another group of a thousand is missing - El Heraldo de Chihuahua | Local News, Police, Mexico, Chihuahua and the World]

[16] [ El Heraldo de Juarez | Shelters at Capacity Limits | 9 December 2022 | (U) | (U) | PressReader.com - Digital Newspaper & Magazine Subscriptions}]

[17] [CBP | FIR-EPT-23-2786992 | 1 December 2022 | (U//FOUO) Migrants from Nicaragua are seeking to reach the United States by boarding buses in Managua, Nicaragua | (U//FOUO) | (U//FOUO)]

[18] [CBP | Panama Attaché Office | Panama Irregular Migration Update | 12 December 2022 | (U//LES) | (U//ES)]

[19] [DoS | 22 MANAGUA 966 | 29 November 2022 | (U//FOUO) Nicaragua: Record-Breaking Irregular Migration Has Become the New Normal | (U//FOUO) | (U//FOUO)]

[20] [CBP | IB-SPW-23-2796087 | 6 December 2022 | (U//LES) ████████████████████████ | (U//LES) | (U//LES)]

[21] [CBP | FIR-EPT-23-2800104 | OSINT – Social Media Update – Migrant Situation – December 7, 2022 | 7 December 2022 | (U//LES) | (U//LES)]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // FOR OFFICIAL USE ONLY

Nicaragua AR_000287

# DHS Southwest Border Task Force Executive Leadership Report

## 23 SEPTEMBER 2022

## Table of Contents

2.  Encounters

3.  Encounters: Recent Trends

4.  Unaccompanied Children (UC) Dashboard

5.  CBP in Custody

6.  CBP Encounters

7.  Unaccompanied Child Encounters & HHS in Care

8.  Unaccompanied Children in Custody & CBP Transfers

9.  Family Unit Individual Encounters

10. Family Unit Individual CBP Book-out Dispositions

11. Single Adult Encounters

12. Single Adult CBP Book-out Dispositions

13. Glossary

UNCLASSIFIED // FOR OFFICIAL USE ONLY

Case 6:23-cv-00007 Document 94-3 Filed on 03/24/23 in TXSD Page 151 of 220

2

# Encounters

## DAILY ENCOUNTERS YESTERDAY

**7,055**
**Total Encounters**
Total includes accompanied minors.
- ▼ 7% vs. previous day
- ▼ 8% vs. last week's avg
- 7,596 encounters 2-days ago

**359**
Unaccompanied Children
- ▼ 23% vs. previous day
- ▼ 6% vs. last week's avg
- 468 encounters 2-days ago

**1,777**
Family Unit Individuals
- ▲ 5% vs. previous day
- ▼ 9% vs. last week's avg
- 1,688 encounters 2-days ago

**4,913**
Single Adults
- ▼ 10% vs. previous day
- ▼ 8% vs. last week's avg
- 5,434 encounters 2-days ago

## AVERAGE WEEKLY ENCOUNTERS BY SECTOR

El Paso Sector — Del Rio Sector — RGV — Rio Grande Valley Sector — Other

|           | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|-----------|-------|--------|--------|--------|-------|-------|--------|--------|
| El Paso   | 733   | 922    | 931    | 1,040  | 1,108 | 1,245 | 1,725  | 1,689  |
| Del Rio   | 1,237 | 1,699  | 1,778  | 1,912  | 1,631 | 1,937 | 1,827  | 1,525  |
| RGV       | 912   | 945    | 810    | 802    | 931   | 912   | 895    | 867    |
| All Other | 2,827 | 2,948  | 2,953  | 3,237  | 3,192 | 3,328 | 3,335  | 3,078  |

## AVERAGE WEEKLY ENCOUNTERS BY NATIONALITY

Northern Central America — Mexico — Other

|       | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|-------|-------|--------|--------|--------|-------|-------|--------|--------|
| NCA   | 1,377 | 1,301  | 1,215  | 1,168  | 1,161 | 1,095 | 1,195  | 1,181  |
| Mex   | 1,780 | 2,048  | 1,869  | 1,988  | 2,034 | 1,955 | 2,114  | 1,936  |
| Other | 2,552 | 3,165  | 3,387  | 3,834  | 3,667 | 4,373 | 4,473  | 4,042  |
| Total | 5,709 | 6,514  | 6,471  | 6,990  | 6,862 | 7,423 | 7,782  | 7,159  |

## AVERAGE WEEKLY ENCOUNTERS BY FAMILY STATUS



Unaccompanied Children — Family Unit Individuals — Single Adults

|       | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|-------|-------|--------|--------|--------|-------|-------|--------|--------|
| UC    | 365   | 370    | 361    | 343    | 392   | 389   | 400    | 378    |
| FM    | 1,355 | 1,622  | 1,735  | 1,831  | 1,687 | 1,791 | 1,887  | 1,713  |
| SA    | 3,980 | 4,510  | 4,366  | 4,807  | 4,776 | 5,237 | 5,489  | 5,061  |
| Total | 5,709 | 6,514  | 6,471  | 6,990  | 6,862 | 7,423 | 7,782  | 7,159  |

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Encounters: Recent Trends

## DAILY ENCOUNTERS BY NATIONALITY

| | Mexico | Venezuela | Cuba | Nicaragua | Guatemala | Honduras | Colombia | Peru | El Salvador | Ecuador | Haiti | Dom. Rep. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Daily Encounters | 1,936 | 1,078 | 838 | 566 | 489 | 486 | 465 | 261 | 205 | 166 | 136 | 63 |
| 7-Day Average UC | 74 | 8 | 6 | 9 | 143 | 86 | 3 | 2 | 35 | 7 | 0 | 0 |
| 7-Day Average FM | 161 | 285 | 242 | 101 | 51 | 118 | 240 | 122 | 50 | 105 | 43 | 15 |
| 7-Day Average SA | 1,695 | 785 | 590 | 456 | 296 | 282 | 222 | 136 | 121 | 54 | 92 | 48 |
| 12-Month Change | 1% | 220% | 434% | 144% | -39% | -48% | 507% | 808% | -46% | -33% | -71% | N/A |
| 3-Month Change | -10% | 163% | 59% | 59% | -40% | -42% | 8% | 39% | -36% | -52% | 25% | N/A |
| 1-Month Change | -3% | 11% | 22% | 27% | 1% | -1% | 2% | -15% | 7% | 32% | -42% | 49% |
| 1-Week Change | -8% | -11% | -12% | -14% | -3% | -3% | 12% | 2% | 9% | 1% | -22% | -9% |

Data valid as of September 22, 2022 0545. Change percentages reflect the daily average compared to the daily average from the respective period.

## ENCOUNTERS: TOP 5 NON-MEXICAN COUNTRIES

## ENCOUNTERS: TOP 6 OTHER COUNTRIES



Guatemala — Honduras — El Salvador — Venezuela — Cuba

Nicaragua — Ecuador — Colombia — Haiti — Peru

Nicaragua AR_000289public



UNCLASSIFIED // FOR OFFICIAL USE ONLY

# UC Dashboard

23 September 2022

Nicaragua AR_000290

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# CBP in Custody

## CBP in Custody

| Country of Citizenship | Total Count | 1-Day Change | 7-Day Avg | 1-Week Change | Avg TIC | < 72 hours | 72 =<120 hours | >= 120 hours |
|---|---|---|---|---|---|---|---|---|
| Mexico | 471 | ▼8% | 466 | ▲15% | 33 | 443 | 8 | 20 |
| Guatemala | 538 | ▼32% | 689 | ▲11% | 42 | 456 | 37 | 45 |
| Honduras | 558 | ▲21% | 520 | ▲1% | 48 | 413 | 125 | 20 |
| El Salvador | 199 | ▼4% | 240 | ▼14% | 56 | 137 | 30 | 32 |
| NCA Total | 1,295 | ▼11% | 1,450 | ▲2% | 47 | 1,006 | 192 | 97 |
| Venezuela | 2,904 | ▼6% | 3,285 | ▼4% | 64 | 1,785 | 683 | 436 |
| Cuba | 1,395 | ▲11% | 1,666 | ▲26% | 42 | 1,169 | 155 | 71 |
| Nicaragua | 1,254 | ▼23% | 1,740 | ▲11% | 50 | 953 | 208 | 93 |
| Colombia | 1,091 | ▼8% | 1,503 | ▼2% | 53 | 838 | 129 | 124 |
| Peru | 473 | ▲16% | 668 | ▲4% | 57 | 368 | 36 | 69 |
| Ecuador | 461 | ▼5% | 525 | ▲9% | 73 | 302 | 67 | 92 |
| Haiti | 38 | ▼24% | 39 | ▲181% | 58 | 28 | 5 | 5 |
| Dom. Rep. | 188 | ▲6% | 245 | ▲2% | 91 | 90 | 40 | 58 |
| Other | 1,020 | ▼10% | 1,342 | ▼8% | 76 | 686 | 87 | 247 |
| Other Total | 8,824 | ▼10% | 11,013 | ▼9% | 59 | 6,219 | 1,410 | 1,195 |
| CBP Total | 10,590 | ▼10% | 12,928 | ▲8% | 56 | 7,668 | 1,610 | 1,312 |

CBP custody data covers persons in custody as of September 23, 2022 05:28.

## CBP Family Unit Individuals in Custody by Location

| USBP Sector/ OFO Field Office | Count | 7-Day Avg | 1-Day Chg | 1-Week Change | % Capacity | Avg TIC |
|---|---|---|---|---|---|---|
| San Diego | 126 | 181 | ▲16% | ▲19% | 22% | 33 |
| El Centro | 66 | 102 | ▼4% | ▼33% | 52% | 27 |
| Yuma | 497 | 443 | ▲4% | ▼33% | 140% | 52 |
| Tucson | 139 | 193 | ▼26% | ▼22% | 28% | 34 |
| El Paso | 584 | 835 | ▼5% | - flat - | 68% | 26 |
| Big Bend | 0 | 0 | - flat - | - flat - | 0% | 0 |
| Del Rio | 250 | 281 | - flat - | ▼45% | 54% | 21 |
| Laredo | 35 | 107 | ▲73% | ▼58% | 6% | 31 |
| RGV | 458 | 728 | ▼6% | ▲22% | 36% | 55 |
| USBP Total | 2,155 | 2,869 | ▼6% | ▼16% | 43% | 39 |
| San Diego FO | 44 | 40 | ▼47% | ▲20% | 42% | 25 |
| Tucson FO | 0 | 1 | - flat - | ▼14% | 0% | 0 |
| El Paso FO | 4 | 1 | N/A | ▲89% | 9% | 17 |
| Laredo FO | 0 | 8 | ▲100% | ▲440% | 0% | 0 |
| OFO Total | 48 | 49 | ▲2% | ▲19% | 18% | 24 |
| Total | 2,203 | 2,919 | ▼6% | ▼15% | 42% | 38 |

Data covers family unit individuals in custody as of September 23, 2022 05:28.

## CBP Single Adults in Custody by Location

| USBP Sector/ OFO Field Office | Count | 1-Day Change | 7-Day Avg | 1-Week Change | % Capacity | Avg TIC |
|---|---|---|---|---|---|---|
| San Diego | 694 | ▼13% | 843 | ▲11% | 122% | 62 |
| El Centro | 175 | ▲4% | 245 | ▲37% | 137% | 38 |
| Yuma | 685 | ▲26% | 605 | ▼22% | 194% | 36 |
| Tucson | 448 | ▼19% | 571 | ▲12% | 91% | 55 |
| El Paso | 2,423 | ▼10% | 2,592 | ▲6% | 282% | 60 |
| Big Bend | 74 | ▲469% | 47 | ▲313% | 28% | 53 |
| Del Rio | 828 | ▼10% | 795 | ▼46% | 178% | 25 |
| Laredo | 681 | ▼14% | 769 | ▼22% | 125% | 81 |
| RGV | 1,672 | ▲25% | 2,811 | ▲1% | 131% | 102 |
| USBP Total | 7,680 | ▼12% | 9,278 | ▼7% | 155% | 65 |
| San Diego FO | 85 | - flat - | 93 | ▲1% | 80% | 39 |
| Tucson FO | 0 | ▲100% | 3 | ▼10% | 0% | 0 |
| El Paso FO | 7 | ▲40% | 5 | ▲27% | 16% | 20 |
| Laredo FO | 7 | ▲42% | 12 | ▲200% | 9% | 18 |
| OFO Total | 99 | ▼7% | 112 | ▲7% | 37% | 36 |
| Total | 7,779 | ▼12% | 9,390 | ▲6% | 149% | 64 |

Data covers single adults in custody as of September 23, 2022 05:28.

Nicaragua AR_000291

# CBP Encounters

| Country of Citizenship | USBP Encounters | | | | | | OFO Encounters | | | | | | CBP Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 7-Day Avg | 21-Day Avg | UC | FM | SA | Total | 7-Day Avg | 21-Day Avg | UC | FM | SA | Total | 7-Day Avg | 21-Day Avg |
| **Mexico** | 1,652 | 1,663 | 1,738 | 63 | 57 | 1,532 | 308 | 273 | 264 | 10 | 138 | 155 | 1,960 | 1,936 | 2,002 |
| Guatemala | 460 | 480 | 481 | 123 | 62 | 275 | 11 | 9 | 13 | 0 | 5 | 6 | 471 | 489 | 494 |
| Honduras | 399 | 412 | 398 | 89 | 80 | 230 | 80 | 74 | 70 | 1 | 55 | 24 | 479 | 486 | 469 |
| El Salvador | 168 | 188 | 179 | 26 | 43 | 99 | 6 | 18 | 16 | 0 | 4 | 2 | 174 | 205 | 195 |
| **NCA Total** | 1,027 | 1,080 | 1,058 | 238 | 185 | 604 | 97 | 101 | 99 | 1 | 64 | 32 | 1,124 | 1,181 | 1,157 |
| Venezuela | 1,096 | 1,077 | 1,164 | 8 | 293 | 795 | 0 | 1 | 1 | 0 | 0 | 0 | 1,096 | 1,078 | 1,165 |
| Cuba | 767 | 837 | 873 | 9 | 207 | 551 | 2 | 1 | 1 | 0 | 0 | 2 | 769 | 838 | 873 |
| Nicaragua | 501 | 566 | 597 | 13 | 97 | 391 | 0 | 0 | 1 | 0 | 0 | 0 | 501 | 566 | 598 |
| Colombia | 445 | 463 | 451 | 5 | 229 | 211 | 7 | 1 | 2 | 0 | 2 | 5 | 452 | 465 | 453 |
| Peru | 231 | 260 | 268 | 2 | 120 | 109 | 0 | 1 | 1 | 0 | 0 | 0 | 231 | 261 | 269 |
| Ecuador | 165 | 165 | 164 | 6 | 105 | 54 | 0 | 0 | 0 | 0 | 0 | 0 | 165 | 166 | 164 |
| Haiti | 12 | 11 | 6 | 0 | 5 | 7 | 204 | 124 | 163 | 0 | 90 | 114 | 216 | 136 | 169 |
| Dom. Rep. | 54 | 63 | 59 | 0 | 11 | 43 | 0 | 0 | 0 | 0 | 0 | 0 | 54 | 63 | 59 |
| Other | 371 | 360 | 428 | 4 | 103 | 264 | 116 | 110 | 118 | 0 | 71 | 44 | 487 | 470 | 546 |
| **Other Total** | 3,642 | 3,803 | 4,009 | 47 | 1,170 | 2,425 | 329 | 238 | 287 | 0 | 163 | 165 | 3,971 | 4,042 | 4,296 |
| **CBP Total** | 6,321 | 6,546 | 6,805 | 348 | 1,412 | 4,561 | 734 | 613 | 650 | 11 | 365 | 352 | 7,055 | 7,159 | 7,455 |

Note: Data as of 9/23/2022 05:28 describes previous day's total encounters. OFO and CBP total rows also include accompanied minors encountered at ports of entry.

** NOTE: Data reports on all previous day's encounters by CBP; data valid as of 9/23/22 05:28. Daily reporting pulled from the live CBP system are based on interim numbers; values reported today do not capture final data. All Encounters are represent between next day and end-of-month reporting.

23 September 2022

# Unaccompanied Child Encounters & HHS in Care

## Encounters

| | Count | 21-Day Avg |
|---|---|---|
| Non-Mexicans | 286 | 316 |
| Mexicans 13 and younger | 10 | 10 |
| Mexicans 14 and older | 63 | 64 |
| **Total** | **359** | **389** |

## CBP Unaccompanied Children in Custody

| | In Custody | In Custody > 72 hours | Avg TIC (hours) | Processed Complete |
|---|---|---|---|---|
| Non-Mexicans | 451 | 0 | 24 | 302 |
| Mexicans 13 and younger | 12 | 0 | 14 | 8 |
| Mexicans 14 and older | 52 | 0 | 18 | 28 |
| **Total** | **515** | **0** | **23** | **338** |

## Transfers

| | TOT ERO | Mexican Returns |
|---|---|---|
| Non-Mexicans | 260 | 0 |
| Mexicans 13 and younger | 1 | 4 |
| Mexicans 14 and older | 3 | 57 |
| **Total** | **264** | **61** |

Data as of 9/23/22 05:28 describes previous day's unaccompanied child encounters and transfers by CBP, and today's unaccompanied children in custody.

## CBP Unaccompanied Child Encounters by Country

| Country of Citizenship | % of Total | Count | 1-day Change | 7-day Average | 1-week Change |
|---|---|---|---|---|---|
| **Mexico** | 20% | 73 | - flat - | 74 | ▼5% |
| Guatemala | 34% | 123 | ▲29% | 143 | ▲2% |
| Honduras | 25% | 90 | ▲26% | 86 | ▼9% |
| El Salvador | 7% | 26 | ▲54% | 35 | ▼15% |
| **NCA Total** | 67% | 239 | ▲32% | 264 | ▼6% |
| Venezuela | 2% | 8 | ▲20% | 8 | ▲38% |
| Cuba | 3% | 9 | ▲18% | 6 | ▲11% |
| Nicaragua | 4% | 13 | ▲160% | 9 | ▼23% |
| Colombia | 1% | 5 | ▲25% | 3 | ▲57% |
| Peru | 1% | 2 | ▲100% | 2 | ▲50% |
| Ecuador | 2% | 6 | ▲20% | 7 | ▼11% |
| Haiti | 0% | 0 | ▲100% | 0 | ▲200% |
| Dominican Republic | 0% | 0 | - flat - | 0 | ▲100% |
| Other | 1% | 4 | ▲20% | 4 | ▲4% |
| **Other Total** | 13% | 47 | ▲12% | 40 | - flat - |
| **Total** | | 359 | ▼23% | 378 | ▲6% |

Data as of 9/23/22 05:28 describes previous day's encounters by CBP.

## CBP Unaccompanied Child Encounters by Location

| USBP Sector / OFO Field Office | % of Total | Count | 1-Day Change | 7-day Average | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 2% | 7 | ▲46% | 10 | ▲3% |
| El Centro | 3% | 9 | ▲50% | 6 | ▲39% |
| Yuma | 6% | 20 | ▲100% | 19 | ▼18% |
| Tucson | 16% | 59 | ▼8% | 50 | ▼17% |
| El Paso | 15% | 54 | ▲53% | 68 | ▼4% |
| Big Bend | 1% | 2 | N/A | 2 | ▼7% |
| Del Rio | 12% | 43 | ▲54% | 36 | ▼8% |
| Laredo | 3% | 11 | ▲35% | 10 | ▲1% |
| RGV | 40% | 143 | ▲30% | 166 | ▲3% |
| **USBP Total** | 97% | 348 | ▲24% | 366 | ▲6% |
| San Diego FO | 1% | 2 | ▼33% | 3 | ▲45% |
| Tucson FO | 1% | 4 | ▲20% | 3 | ▲77% |
| El Paso FO | 1% | 3 | ▲200% | 1 | - flat - |
| Laredo FO | 1% | 2 | ▲33% | 4 | ▲138% |
| **OFO Total** | 3% | 11 | ▼8% | 12 | ▲6% |
| **Total** | | 359 | ▼23% | 378 | ▼6% |

Data as of 9/23/22 05:28 describes previous day's encounters by CBP.

## HHS ORR Unaccompanied Child Discharges by Sponsor Type

| | # Discharges | % Discharges | Avg Days |
|---|---|---|---|
| 1. Parent or Guardian | 779 | 35% | 18 |
| 2. Other Close Relative | 1,015 | 46% | 28 |
| 3. Other Sponsor | 318 | 14% | 56 |
| 4. No Sponsor | 83 | 4% | 97 |
| **Total** | **2,195** | | **31** |

Data as of 9/23/22 05:00 describe unaccompanied child discharges for week ending 9/22/22.

## HHS ORR Unaccompanied Children in Care

| | Previous Day | 7-Day Avg | 21-Day Avg |
|---|---|---|---|
| UCs Referred from DHS | 341 | 321 | 331 |
| UCs Discharged from HHS | 339 | 314 | 306 |
| Total in Care | 9,530 | 9,397 | 9,212 |
| Operational Occupancy | 65% | 62% | 61% |
| Discharge Rate | 3.5% | 3.3% | 3.3% |

Data as of 9/23/22 05:00 describe unaccompanied children in care. Operational occupancy includes active influx.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

DHS Southwest Border Task Force Executive Leadership Report – Data Tables

Nicaragua AR_000293

# Unaccompanied Children in Custody & CBP Transfers

| USBP Sector / OFO Field Office | CBP Unaccompanied Children in Custody | | | | | | | | Transfers | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Count | 1-Day Change | 7-Day Average | 1-Week Change | % Capacity | Avg TIC | Processed Complete | TOT ERO | Mexican Returns | |
| San Diego | 10 | - flat - | 8 | ▼ 30% | 2% | 16 | 4 | 3 | 8 | |
| El Centro | 11 | ▲ 267% | 6 | ▲ 48% | 9% | 21 | 9 | 1 | 0 | |
| Yuma | 18 | ▲ 6% | 20 | ▼ 24% | 5% | 17 | 14 | 17 | 4 | |
| Tucson | 93 | ▲ 133% | 59 | ▼ 35% | 19% | 26 | 61 | 18 | 18 | |
| El Paso | 123 | ▲ 4% | 123 | ▲ 3% | 14% | 32 | 84 | 43 | 4 | |
| Big Bend | 1 | N/A | 2 | ▲ 300% | 0% | 6 | 0 | 0 | 0 | |
| Del Rio | 56 | ▲ 124% | 42 | ▼ 34% | 12% | 22 | 37 | 21 | 6 | |
| Laredo | 11 | ▼ 27% | 9 | ▲ 6% | 2% | 18 | 8 | 5 | 11 | |
| RGV | 189 | ▲ 16% | 188 | ▲ 13% | 15% | 17 | 121 | 154 | 9 | |
| **USBP Total** | **512** | **▲ 31%** | **457** | **▼ 7%** | **10%** | **23** | **338** | **262** | **60** | |
| San Diego FO | 2 | ▼ 50% | 5 | ▼ 33% | 2% | 20 | 0 | 2 | 1 | |
| Tucson FO | 0 | - flat - | 1 | N/A | 0% | 0 | 0 | 0 | 0 | |
| El Paso FO | 1 | N/A | 0 | ▼ 50% | 2% | 9 | 0 | 0 | 0 | |
| Laredo FO | 0 | ▲ 100% | 2 | ▲ 175% | 0% | 0 | 0 | 0 | 0 | |
| **OFO Total** | **3** | **▼ 50%** | **8** | **▲ 10%** | **1%** | **16** | **0** | **2** | **1** | |
| **Total** | **515** | **▲ 30%** | **465** | **▼ 7%** | **10%** | **23** | **338** | **264** | **61** | |

Data as of 9/23/22 05:28 describes today's unaccompanied children in custody and previous day's unaccompanied child transfers by CBP.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Family Unit Individual Encounters

| Country of Citizenship | USBP Encounters | | | | | OFO Encounters | | | | | CBP Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change | Count | 1-day Change | 7-day Average | 1-Week Change | % of Total | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change |
| Mexico | 3% | 57 | ▼20% | 62 | ▼13% | 138 | ▼5% | 99 | ▲5% | 8% | 11% | 195 | ▼10% | 161 | ▼3% |
| Guatemala | 3% | 62 | ▲48% | 46 | ▼4% | 5 | ▼44% | 5 | ▼58% | 0% | 4% | 67 | ▲31% | 51 | ▼14% |
| Honduras | 5% | 80 | ▲12% | 71 | ▼3% | 55 | ▲19% | 47 | ▼30% | 3% | 8% | 135 | ▲15% | 118 | ▼13% |
| El Salvador | 2% | 43 | ▲8% | 41 | ▼13% | 4 | ▼60% | 9 | ▲27% | 0% | 3% | 47 | ▼6% | 50 | ▲15% |
| NCA Total | 10% | 185 | ▲7% | 158 | ▲3% | 64 | ▼26% | 60 | ▼30% | 4% | 14% | 249 | ▲4% | 218 | ▼9% |
| Venezuela | 16% | 293 | ▼24% | 285 | ▼14% | 0 | -flat- | 0 | ▼80% | 0% | 16% | 293 | ▼24% | 285 | ▼15% |
| Cuba | 12% | 207 | ▲13% | 242 | ▲7% | 0 | -flat- | 0 | -flat- | 0% | 12% | 207 | ▲13% | 242 | ▼7% |
| Nicaragua | 5% | 97 | ▲9% | 101 | ▼9% | 0 | -flat- | 0 | -flat- | 0% | 5% | 97 | ▲9% | 101 | ▼9% |
| Colombia | 13% | 229 | ▲3% | 239 | ▲15% | 2 | N/A | 0 | N/A | 0% | 13% | 231 | ▲4% | 240 | ▲15% |
| Peru | 7% | 122 | ▲18% | 122 | -flat- | 0 | -flat- | 0 | ▼100% | 0% | 7% | 120 | ▲18% | 122 | ▲1% |
| Ecuador | 6% | 105 | ▲13% | 105 | ▲2% | 0 | -flat- | 0 | N/A | 0% | 6% | 105 | ▲13% | 105 | ▼2% |
| Haiti | 0% | 5 | N/A | 3 | ▲100% | 90 | ▲84% | 40 | ▼52% | 5% | 5% | 95 | ▲94% | 43 | ▼49% |
| Dom. Rep. | 1% | 11 | ▼31% | 15 | ▼53% | 0 | -flat- | 0 | -flat- | 0% | 1% | 11 | ▼31% | 15 | ▼53% |
| Other | 6% | 103 | ▲13% | 123 | ▲28% | 71 | ▲137% | 59 | ▼24% | 4% | 10% | 174 | ▲44% | 181 | ▼26% |
| Other Total | 66% | 1,170 | ▲3% | 1,235 | ▲7% | 163 | ▲17% | 99 | ▼39% | 9% | 75% | 1,333 | ▲10% | 1,334 | ▼10% |
| CBP Total | 79% | 1,412 | ▲3% | 1,455 | ▲6% | 365 | ▲17% | 258 | ▼24% | 21% | 100% | 1,777 | ▲5% | 1,713 | ▼9% |

Data reports on previous day's family unit individual encounters by CBP; data valid as of September 23, 2022 0528.

## CBP Family Unit Individual Encounters by Location

| USBP Sector / OFO Field Office | % of Total | Count | 1-day Change | 7-day Avg | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 4% | 68 | ▼24% | 99 | ▼13% |
| El Centro | 3% | 49 | ▼23% | 69 | ▼1% |
| Yuma | 20% | 358 | ▼52% | 303 | ▼3% |
| Tucson | 3% | 55 | ▼41% | 65 | ▲6% |
| El Paso | 24% | 431 | ▲10% | 456 | ▲3% |
| Big Bend | 0% | 3 | N/A | 0 | ▲50% |
| Del Rio | 16% | 285 | -flat- | 289 | ▼18% |
| Laredo | 0% | 2 | ▼67% | 4 | ▲26% |
| RGV | 9% | 161 | ▼11% | 171 | ▲5% |
| USBP Total | 79% | 1,412 | ▲3% | 1,455 | ▼6% |
| San Diego FO | 9% | 153 | ▲31% | 136 | ▲21% |
| Tucson FO | 2% | 33 | ▼54% | 26 | ▲46% |
| El Paso FO | 1% | 16 | ▼11% | 7 | ▲79% |
| Laredo FO | 9% | 163 | ▼55% | 88 | ▼50% |
| OFO Total | 21% | 365 | ▲17% | 258 | ▼24% |
| Total | | 1,777 | ▲5% | 1,713 | ▼9% |

Nicaragua AR_000295

9

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

10

# Family Unit Individual CBP Book-out Dispositions

## CBP Family Unit Individual Book-out Dispositions by Country of Citizenship

| Disposition Type | Mexico | Guatemala | Honduras | El Salvador | Venezuela | Cuba | Nicaragua | Colombia | Peru | Ecuador | Haiti | Dom. Rep. | Other | CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 29 | 21 | 26 | 5 | N/A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 81 |
| Title 42 delayed | 25 | 141 | 10 | 10 | N/A | 0 | 0 | 33 | 0 | 0 | 0 | 0 | 0 | 219 |
| Repatriations processed by CBP | 8 | 1 | 0 | 0 | N/A | 0 | 0 | N/A | N/A | N/A | N/A | N/A | N/A | 9 |
| Transfer to ICE for removal processing | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Transfer to ICE for release with NTA | 5 | 0 | 3 | 0 | 0 | 8 | 0 | 6 | 14 | 0 | 0 | 0 | 4 | 40 |
| Release with NTA | 121 | 9 | 54 | 4 | 0 | 0 | 2 | 34 | 3 | 0 | 96 | 0 | 101 | 424 |
| Release with I-94 parole ATD | 3 | 6 | 12 | 19 | 279 | 213 | 148 | 145 | 66 | 97 | 1 | 18 | 83 | 1,090 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 210 | 178 | 105 | 38 | 279 | 221 | 151 | 185 | 116 | 97 | 97 | 18 | 188 | 1,883 |

## CBP Family Unit Individual Book-out Dispositions by USBP Sector

| Disposition Type | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | USBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 0 | 36 | 0 | 37 | 2 | 0 | 6 | 0 | 0 | 81 |
| Title 42 delayed | 0 | 0 | 0 | 0 | 2 | 146 | 4 | 21 | 46 | 219 |
| Repatriations processed by CBP | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 3 |
| Transfer to ICE for removal processing | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 4 |
| Transfer to ICE for release with NTA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 32 |
| Release with NTA | 0 | 0 | 2 | 0 | 0 | 2 | 82 | 0 | 0 | 86 |
| Release with I-94 parole ATD | 0 | 181 | 50 | 473 | 119 | 87 | 0 | 115 | 65 | 1,090 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 0 | 217 | 52 | 510 | 123 | 237 | 92 | 139 | 145 | 1,515 |

## CBP Family Unit Individual Book-out Dispositions by OFO Field Office

| Disposition Type | El Paso | Laredo | San Diego | Tucson | OFO Total |
|---|---|---|---|---|---|
| Title 42 immediate | 0 | 0 | 0 | 0 | 0 |
| Title 42 delayed | 0 | 0 | 0 | 0 | 0 |
| Repatriations processed by CBP | 0 | 4 | 0 | 2 | 6 |
| Transfer to ICE for removal processing | 0 | 0 | 0 | 0 | 0 |
| Transfer to ICE for release with NTA | 0 | 0 | 8 | 0 | 8 |
| Release with NTA | 9 | 172 | 137 | 20 | 338 |
| Release with I-94 parole ATD | 0 | 0 | 0 | 0 | 0 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 3 | 2 | 0 | 11 | 16 |
| Other | 0 | 0 | 0 | 0 | 0 |
| Total | 12 | 178 | 145 | 33 | 368 |

Data in "Repatriations processed by CBP" rows represent ER or reinstatement, no fear claim, bag and baggage, voluntary return, and withdrawal dispositions limited to nationals of Mexico, Guatemala, Honduras, and El Salvador.

Data valid as of September 23, 2022 05:28 describes previous day's book-outs of family unit individuals.

Nicaragua AR_000296

# Single Adult Encounters

| Country of Citizenship | USBP Encounters | | | | | | OFO Encounters | | | | | CBP Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change |
| Mexico | 31% | 1,532 | ▼15% | 1,537 | ▼10% | 3% | 155 | ▼28% | 159 | ▲5% | 34% | 1,687 | ▼16% | 1,695 | ▼9% |
| Guatemala | 6% | 275 | ▼18% | 292 | ▲2% | 0% | 6 | ▲500% | 4 | ▼58% | 6% | 281 | ▲16% | 296 | ▲2% |
| Honduras | 5% | 230 | ▲11% | 256 | ▼3% | 0% | 24 | ▲25% | 27 | ▲30% | 5% | 254 | ▼6% | 282 | ▲5% |
| El Salvador | 2% | 99 | ▼29% | 112 | ▲13% | 0% | 2 | ▼83% | 9 | ▲27% | 2% | 101 | ▲34% | 121 | ▲16% |
| NCA Total | 12% | 604 | ▼11% | 659 | ▲2% | 1% | 32 | ▼29% | 39 | ▲30% | 13% | 636 | ▼13% | 698 | ▲4% |
| Venezuela | 16% | 795 | ▲5% | 784 | ▼10% | 0% | 0 | ▲100% | 1 | ▲80% | 16% | 795 | ▲5% | 785 | ▼10% |
| Cuba | 11% | 551 | ▼4% | 589 | ▼14% | 0% | 2 | N/A | 1 | -flat- | 11% | 553 | ▲3% | 590 | ▼14% |
| Nicaragua | 8% | 391 | ▲19% | 456 | ▼15% | 0% | 0 | ▲100% | 0 | -flat- | 8% | 391 | ▲19% | 456 | ▼15% |
| Colombia | 4% | 211 | ▲6% | 221 | ▲9% | 0% | 5 | N/A | 1 | N/A | 4% | 216 | ▲9% | 222 | ▲8% |
| Peru | 2% | 109 | ▲12% | 136 | ▼4% | 0% | 0 | -flat- | 1 | ▲100% | 2% | 109 | ▲12% | 136 | ▲5% |
| Ecuador | 1% | 54 | ▼22% | 54 | ▲9% | 0% | 0 | -flat- | 0 | N/A | 1% | 54 | ▼22% | 54 | ▼8% |
| Haiti | 0% | 7 | ▲13% | 8 | ▲100% | 2% | 114 | ▲35% | 84 | ▲52% | 1% | 121 | ▲34% | 92 | ▲4% |
| Dom. Rep. | 1% | 43 | ▲13% | 48 | ▲18% | 0% | 0 | -flat- | 0 | -flat- | 1% | 43 | ▲13% | 48 | ▼18% |
| Other | 5% | 264 | ▲10% | 234 | ▼15% | 1% | 44 | ▼21% | 51 | ▼24% | 6% | 308 | ▲4% | 285 | ▼12% |
| Other Total | 49% | 2,425 | ▲1% | 2,529 | ▼10% | 3% | 165 | ▼29% | 139 | ▼39% | 53% | 2,590 | ▲4% | 2,667 | ▼10% |
| CBP Total | 93% | 4,561 | ▼8% | 4,725 | ▼9% | 7% | 352 | ▼29% | 336 | ▼24% | 100% | 4,913 | ▼10% | 5,061 | ▼8% |

Data reports on previous day's single adult encounters by CBP; data valid as of September 23, 2022 05:28.

### CBP Single Adult Encounters by Location

| USBP Sector / OFO Field Office | % of Total | Count | 1-Day Change | 7-Day Average | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 8% | 403 | ▲25% | 382 | ▼3% |
| El Centro | 3% | 155 | ▼14% | 185 | ▲4% |
| Yuma | 12% | 597 | ▲35% | 493 | ▼11% |
| Tucson | 14% | 671 | ▼6% | 530 | ▼15% |
| El Paso | 20% | 964 | ▲25% | 1,165 | ▲4% |
| Big Bend | 1% | 46 | ▲318% | 38 | ▼7% |
| Del Rio | 23% | 1,130 | ▲1% | 1,201 | ▲16% |
| Laredo | 4% | 188 | ▲31% | 201 | ▲4% |
| RGV | 8% | 407 | ▼32% | 530 | ▼3% |
| USBP Total | 93% | 4,561 | ▼8% | 4,725 | ▼9% |
| San Diego FO | 2% | 121 | ▲26% | 128 | ▲2% |
| Tucson FO | 0% | 20 | ▼77% | 32 | ▲20% |
| El Paso FO | 1% | 29 | ▼12% | 25 | ▼16% |
| Laredo FO | 4% | 182 | ▼14% | 151 | ▲10% |
| OFO Total | 7% | 352 | ▼29% | 336 | ▼5% |
| Total | | 4,913 | ▼10% | 5,061 | ▼8% |

UNCLASSIFIED // FOR OFFICIAL USE ONLY

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

12

# Single Adult CBP Book-out Dispositions

## CBP Single Adult Book-out Dispositions by Country of Citizenship

| Disposition Type | Mexico | Guatemala | Honduras | El Salvador | Venezuela | Cuba | Nicaragua | Colombia | Peru | Ecuador | Haiti | Dom. Rep. | Other | CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title 42: immediate | 1,084 | 224 | 169 | 60 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 1,543 |
| Title 42 delayed | 266 | 151 | 12 | 22 | N/A | 0 | 3 | 99 | N/A | 0 | N/A | N/A | 0 | 554 |
| Repatriations processed by CBP | 177 | 2 | 7 | 2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 188 |
| Transfer to ICE for removal processing | 3 | 2 | 2 | 4 | 130 | 11 | 82 | 63 | 53 | 14 | 8 | 22 | 173 | 567 |
| Transfer to ICE for release with NTA | 1 | 0 | 15 | 2 | 34 | 18 | 5 | 3 | 7 | 1 | 0 | 6 | 19 | 112 |
| Release with NTA | 10 | 5 | 24 | 2 | 47 | 13 | 0 | 3 | 3 | 0 | 104 | 1 | 31 | 243 |
| Release with I-94 parole ATD | 0 | 1 | 1 | 0 | 834 | 661 | 625 | 202 | 88 | 46 | 6 | 29 | 129 | 2,622 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 20 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 23 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 1,561 | 387 | 231 | 92 | 1,045 | 703 | 715 | 370 | 152 | 64 | 118 | 58 | 356 | 5,852 |

## CBP Single Adult Book-out Dispositions by USBP Sector

| Disposition Type | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | USBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Title 42: immediate | 7 | 452 | 57 | 180 | 225 | 46 | 72 | 444 | 0 | 1,483 |
| Title 42 delayed | 0 | 11 | 32 | 46 | 22 | 164 | 113 | 85 | 81 | 554 |
| Repatriations processed by CBP | 11 | 5 | 2 | 3 | 8 | 23 | 9 | 37 | 28 | 126 |
| Transfer to ICE for removal processing | 0 | 80 | 10 | 150 | 222 | 27 | 22 | 42 | 3 | 556 |
| Transfer to ICE for release with NTA | 0 | 0 | 0 | 0 | 0 | 21 | 34 | 0 | 40 | 95 |
| Release with NTA | 0 | 4 | 2 | 1 | 0 | 0 | 65 | 0 | 1 | 73 |
| Release with I-94 parole ATD | 0 | 521 | 105 | 319 | 366 | 637 | 348 | 262 | 64 | 2,622 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 18 | 1,073 | 208 | 699 | 843 | 918 | 663 | 870 | 217 | 5,509 |

## CBP Single Adult Book-out Dispositions by OFO Field Office

| Disposition Type | El Paso | Laredo | San Diego | Tucson | OFO Total |
|---|---|---|---|---|---|
| Title 42: immediate | 8 | 34 | 14 | 4 | 60 |
| Title 42 delayed | 0 | 0 | 0 | 0 | 0 |
| Repatriations processed by CBP | 8 | 27 | 18 | 9 | 62 |
| Transfer to ICE for removal processing | 2 | 2 | 6 | 1 | 11 |
| Transfer to ICE for release with NTA | 1 | 1 | 15 | 0 | 17 |
| Release with NTA | 5 | 120 | 45 | 0 | 170 |
| Release with I-94 parole ATD | 0 | 0 | 0 | 0 | 0 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 4 | 4 | 5 | 10 | 23 |
| Other | 0 | 0 | 0 | 0 | 0 |
| Total | 28 | 188 | 103 | 24 | 343 |

Data in "Repatriations processed by CBP" rows represent ER or reinstatement, no fear claim, bag and baggage, voluntary return, and withdrawal dispositions limited to nationals of Mexico, Guatemala, Honduras, and El Salvador.

Data valid as of September 23, 2022 05:28 describes previous day's book-outs of single adults.

Nicaragua AR_000298

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Leadership Report Glossary

Definitions are in alphabetical order from left to right, top to bottom

## SW Border Executive Leadership Report Color Chart

| By Demographic – | By Citizenship – | By Agency – |
|---|---|---|
| Unaccompanied Child (UC) | Mexico (Mex) | Customs and Border Protection (CBP) |
| Single Adult (SA) | Northern Triangle Countries (NTC) | Health and Human Services (HHS) |
| Family Unit (FM) | Other | Immigration and Customs Enforcement (ICE) |

| Term | Definition |
|---|---|
| **Accompanied Minor** | A child who has no lawful immigration status in the United States, is younger than 18 years old, and is traveling with a lawfully admissible adult. |
| **All non-Mexican UCs and Mexican UCs 13 or younger** | Refers to combined apprehensions/inadmissibles (under Title 8) processed under CBP's immigration authority. Under the Homeland Security Act (as amended by the Trafficking Victims Protection Reauthorization Act) non-Mexican UCs are admitted into ORR care; most Mexican UCs younger than 14 years-old are also transferred into ORR care. |
| **Alternatives to detention (ATD) enrollments with tech / without tech** | ICE program using technology and other tools to manage a noncitizen's compliance with release conditions while they are on the / non-detained docket. |
| **Available beds for SW border transfer** | Operational metric based on field reporting used by ICE to describe the number of beds in interior facilities available to accept transfers from the border. |
| **Average days in care for children discharged in last 7 days** | The average number of days spent in ORR care by unaccompanied children who were discharged from ORR care over the past 7 days. |
| **Average length of stay (ICE detention)** | Calculated as time between book-in and book-out for noncitizens booked out of ICE custody. (Not calculated for noncitizens remaining in ICE custody). |
| **Beds available for border designation or transfer (UC Dashboard)** | The number of beds ostensibly available for ORR designation or transfer. This includes beds that are available for direct border placement, as well as beds that are technically available, but not necessarily for direct border placement. |
| **Capacity (CBP)** | Total short-term holding space in CBP border facilities, accounting for COVID-related restrictions. |
| **Capacity (ICE)** | Total funded ICE detention beds for single adults under current appropriations law, excluding beds that are unavailable due to litigation, COVID, and for operational or other reasons. |
| **CBP holding (UC Dashboard)** | Noncitizens held for processing in CBP border facilities. |
| **CBP processed complete** | Noncitizens in CBP facilities who have been completely processed and are awaiting transfer. |
| **Children discharged in last 7 days by individual sponsor category (UC Dashboard)** | The number of unaccompanied children who have been discharged in the last 7 days, divided into 1 of 4 sponsor categories: 1. Parent or legal guardian; 2. An immediate relative - a brother, sister, grandparent or other close relatives (aunt, uncle, first cousin) who either was or was not previously the UC's primary caregiver; 3. Other sponsor, such as distant relatives and unrelated adult individuals; 4. No sponsors identified. |

| Term | Definition |
|---|---|
| **Children transferred out of CBP custody (UC Dashboard)** | Unaccompanied children who are booked out of CBP custody for transfer to ORR care facilities. |
| **Encounter forecast – UC Dashboard** | CBP's projected number of daily encounters with unaccompanied children from countries other than Mexico. |
| **Encounters** | The sum of USBP Title 8 apprehensions, OFO Title 8 inadmissibles, and noncitizens processed for expulsions under Title 42 authority by USBP or OFO. |
| **Expulsions** | Noncitizens expelled under Title 42 authority (see Title 42). |
| **Family unit individuals (FM)** | Individuals processed by CBP who belong to a family unit, defined as one or more minors plus their parent(s) or legal guardian(s) with whom they are traveling; excludes minor children (under the age of 18) traveling with adult family members who are not their parents or legal guardians. All references to family units or FMs are to numbers of individuals in families, not to family groupings. |
| **Flight capacity (Ice Air)** | The percentage of seats occupied based on total number of seats per flight. |
| **I-94 parole-ATD (CBP book-out disposition)** | Noncitizens paroled into the United States by CBP and enrolled in an ICE alternatives to detention (ATD) program prior to their release. |
| **In CBP holding > 72 hours (UC Dashboard)** | The number of Unaccompanied Children (excluding those from Mexico) in CBP custody over 72 hours. With the exception of Mexican and Canadian children who are amenable to Voluntary Return (VR), the trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) requires CBP to transfer the child to ORR custody within 72 hours of determining they meet the Unaccompanied Child definition. |
| **In Detention (ICE)** | Noncitizens detained in ICE civil immigration detention system in furtherance of their removal proceedings or to affect their departure from the United States after a final order of removal from a federal immigration judge. |
| **In ORR Care > 35 days (UC Dashboard)** | Unaccompanied children who have been in ORR care over 35 days (excluding long term foster care) - an indicator that a child has been in ORR care for a long time, as the process of finding, vetting, and reunifying a sponsor with a child is ideally fewer than 35 days. |

Nicaragua AR_000299

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Leadership Report Glossary

Definitions are in alphabetical order from left to right, top to bottom

| Term | Definition |
|---|---|
| Mexicans 14 or older (UC Dashboard) | Unaccompanied Children from Mexico may be repatriated by CBP if the following are true: • The child has not been a victim of trafficking in persons and there is no credible evidence that the minor is at risk of being trafficked upon return to his/her country of nationality or last habitual residence (as documented on CBP Form 93); • The child does not have a fear of returning to his/her country of nationality or last habitual residence owing to a credible fear of persecution; and • The child is able to decide independently to return voluntarily to his/her country of nationality or last habitual residence. |
| Northern Central America (NCA) | El Salvador, Guatemala, and Honduras. |
| Notice to appear (NTA) | The I-862 form, a document that instructs an individual to appear before an immigration judge. This is the first step in starting removal proceedings under Section 240 of the Immigration and Nationality Act. |
| Other releases (FM and SA Dashboards) | Persons released from CBP custody without being booked into ICE custody or enrolled in ATD. |
| Parole (CBP) | Discretionary permission granted to an otherwise inadmissible noncitizen to temporarily enter the United States due to an emergency and urgent humanitarian reason or significant public benefit |
| Ports of entry | Any location in the United States or its territories that is designated as a point of entry for noncitizens and U.S. citizens. |
| Released ATD - no Tech (FM and SA Dashboards) | Noncitizens released from CBP custody and immediately enrolled in ATD without some form of technology. |
| Released ATD with Tech (FM and SA Dashboards) | Noncitizens released from CBP custody and immediately enrolled in ATD with some form of technology. |
| Repatriations | The sum of Title 8 removals and returns to countries of citizenship. |
| Room occupancy (FM Dashboard) | Number of rooms housing family units in ICE custody divided by the number of total rooms available. |

| Term | Definition |
|---|---|
| Single adults (SA) | Individuals encountered by CBP who are at least 18 years of age and not part of a family unit. |
| Time in custody (TIC) | Elapsed time between a noncitizen's border encounter and the time at which TIC is calculated (applies to noncitizens who remain in CBP custody at the time of the report). |
| Title 42 (T42) | Title 42 of the United States Code, which includes provisions related to public health. Under a March 2020 CDC order, border encounters processed under Title 42 authority are expelled from the United States as expeditiously as possible in the interest of U.S. public health to prevent the spread of COVID-19. |
| Title 42 delayed expulsions | Noncitizens expelled under Title 42 authority following transfer from their encounter area of responsibility to another CBP area of responsibility or to ICE for expulsion by air. |
| Title 42 immediate expulsions | Noncitizens expelled under Title 42 authority by CBP from the area of responsibility of their encounter. |
| Title 8 (T8) | Title 8 of the United States Code, which includes most provisions for immigration enforcement. Encounters processed under Title 8 authority may be subject to removal from the United States. |
| Total beds (UC Dashboard) | The number of 'total beds designated' plus the number of 'beds available to designate' (see definitions of each term). |
| Total beds designated (UC Dashboard) | The number of beds designated to unaccompanied children based on the current census of children (includes those pending transfer from CBP, in transit, and physically in ORR's care). Total beds designated = beds designated to kids in care + beds designated to kids who haven't arrived yet. |
| Total discharges from ORR care (UC Dashboard) | The number of unaccompanied children who have exited ORR's care. |
| Unaccompanied children (UC) | Children who have no lawful immigration status in the United States, are younger than 18 years old, and either: 1. Do not have a parent or legal guardian in the U.S., or 2. Do not have a parent or legal guardian in the U.S. who is able to provide care and physical custody. |
| Unaccompanied children system capacity (UC Dashboard) | A ratio (expressed as a percentage) that compares the total number of unaccompanied children in CBP and ORR care to the total number of ORR beds in use or available for initial ORR designations. |

# Uniting for Ukraine



**Since previous report, 792 supporter applications were filed on behalf of Ukrainian U4U paroles. Since March 24th, a total of 152,660 Ukrainians have entered the United States, including 58,356 U4U paroles and 0 unaccompanied children.**

I-134 Data Transmitted From USCIS to CBP · Approval/Denial Status Sent to USCIS · Approved Ukrainian Citizens Schedule Travel · Travel Status Checked For Arriving Ukrainians

## U4U ARRIVALS AT POES

**58,356**

**Cumulative paroles**
+605 since previous report

**0**

**Cumulative UC paroles**
+ 0 since previous report

**Port of Entry Parole Grants**

| | |
|---|---|
| Air | 57,908 |
| Land | 445 |
| Sea | 3 |

**152,660**

**Total Entries Since March 24th**
+1,042 since previous report

## TRAVEL AUTHORIZATIONS

**94,306**

**Cumulative approvals**
+564 since previous report

- Pending
- Approvals/Confirmations
- Denials/Non-Confirmations
- Active approvals

## U4U USCIS ACCOUNTS

**96,797**

**Cumulative beneficiary accounts**
+594 since previous report

## U4U SUPPORTER APPLICATIONS

**133,711**

**Cumulative applications**
+792 since previous report

## ADMISSIONS & NON-U4U PAROLE
SINCE MAR. 24TH

Immigrants
Nonimmigrants
Traditional Paroles
Refugees

- B1/B2
- Other
- Total

**24,469**
Admissions
+166 since previous report

**45,966**
Admissions
+247 since previous report

**22,936**
Entries
+5 since previous report

**933**
Admissions
+19 since previous report

## EAD APPLICATIONS
SINCE MAR. 24TH

**50,853**

**Cumulative applications**
+558 since previous report

TPS Applicants · Traditional Paroles · U4U Paroles

## OTHER ADMISSIONS & HUMANITARIAN RELIEF

## TPS APPLICATIONS
SINCE APR. 19TH

**24,452**

**Cumulative applications**
+87 since previous report

Nicaragua AR-000301

Notes: Report data are person-level (i.e., exclude duplicate entry records). U4U supporter application denials data include expired applications and exclude administrative closures. Active approvals include unexpired approvals for beneficiaries who remain outside the United States (and are therefore eligible to enter in the future). As of 9/22/22, 100% of Ukrainians with approved U4U travel authorizations arriving at POEs have entered the United States as parolees. TPS application denials data include withdrawn applications. Non-U4U admission and parole data exclude returning LPRs, crew members, inadmissible Ukrainians, and unknown classes of admission. Data validity times: 6:35 AM for U4U parole application and my USCIS account data, 6:12 AM for travel authorization, U4U entries, and other Ukrainian admissions data, 6:43 AM for TPS applications data valid, and 9:00 AM for EAD applications data.

# Uniting for Ukraine

## I-134 Supporters by Top Metro Areas

| Metro Area | Total | % of Total |
|---|---|---|
| New York-Newark-Jersey City, NY-NJ-PA | 22,220 | 17% |
| Chicago-Naperville-Elgin, IL-IN-WI | 16,997 | 13% |
| Seattle-Tacoma-Bellevue, WA | 7,244 | 5% |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 6,046 | 5% |
| Los Angeles-Long Beach-Anaheim, CA | 4,579 | 3% |
| Sacramento-Roseville-Folsom, CA | 3,861 | 3% |
| Miami-Fort Lauderdale-Pompano Beach, FL | 3,529 | 3% |
| Portland-Vancouver-Hillsboro, OR-WA | 3,249 | 2% |
| Detroit-Warren-Dearborn, MI | 2,983 | 2% |
| Cleveland-Elyria, OH | 2,966 | 2% |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 2,587 | 2% |
| San Francisco-Oakland-Berkeley, CA | 1,974 | 1% |
| Non-CBSA | 1,896 | 1% |
| Atlanta-Sandy Springs-Alpharetta, GA | 1,779 | 1% |
| Boston-Cambridge-Newton, MA-NH | 1,634 | 1% |
| Other | 50,167 | 38% |
| **Total** | **133,711** | **N/A** |

## U4U Entries by Top POEs

| Port of Entry | Total | % of Total |
|---|---|---|
| JFK | 12,369 | 21% |
| ORD | 11,207 | 19% |
| EWR | 5,736 | 10% |
| SEA | 3,967 | 7% |
| LAX | 3,178 | 5% |
| MIA | 3,128 | 5% |
| SFO | 2,462 | 4% |
| ATL | 2,324 | 4% |
| IAD | 1,662 | 3% |
| BOS | 1,596 | 3% |
| Other | 10,727 | 18% |
| **Total** | **58,356** | **N/A** |

## U4U Parolees by Age & Sex



Notes: Age group 0-17 contains 3 parolees whose gender is unknown. Age group 31-44 contains 2 parolees whose gender is unknown. Data validity times: 6:35 AM for I-134 supporters; 6:12 AM for U4U entries by POE and U4U Paroles by age & sex.

Nicaragua AR_000302





**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

November 15, 2013                                          PM-602-0091

# Policy Memorandum

SUBJECT:   Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S.
Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on
Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

### Purpose

This policy memorandum (PM) amends Chapter 21.1 of the Adjudicator's Field Manual (AFM) to
ensure consistent adjudication of parole requests made on behalf of aliens who are present without
admission or parole and who are spouses, children and parents of those serving on active duty in the
U.S. Armed Forces, in the Selected Reserve of the Ready Reserve or who previously served in the U.S.
Armed Forces or Selected Reserve of the Ready Reserve.

This PM also amends AFM Chapter 40.6 concerning the effects of parole on an alien's inadmissibility
under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i).  This amendment to AFM chapter
40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel.

### Scope

This PM applies to and is binding on all U.S. Citizenship and Immigration Services (USCIS)
employees.

### Authority

INA §§ 212(a)(6)(A)(i), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1182(a)(6)(A)(i),
1182(d)(5)(A), 1225(a), and 1255(a), (c)

### Background

**Parole of Spouses, children and parents of Armed Forces personnel**

- In partnership with the Department of Defense (DoD), USCIS has launched a number of initiatives
  to assist military members, veterans, and their families to navigate our complex immigration
  system and apply for naturalization and other immigration services and benefits.
- This PM builds on these important initiatives as there is concern within DoD that some active
  members of the U.S. Armed Services, individuals serving in the Selected Reserve of the Ready
  Reserve and individuals who have previously served in the U.S. Armed Forces or Selected Reserve

Nicaragua AR_000303

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 2

of the Ready Reserve face stress and anxiety because of the immigration status of their family members in the United States.

- Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children.

- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them. It is a commitment that begins at enlistment, and continues as they become veterans.

- Responding to these and similar concerns by several Members of Congress about soldiers and veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's commitment to assisting military families. The Secretary identified several of the discretionary tools that the Department utilizes "to help military dependents secure permanent immigration status in the United States as soon as possible." Among the tools listed was "parole … to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members."[1]

- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States. Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission. This latter use of parole is sometimes called "parole in place." The legal authority for granting parole in place was formally recognized by the then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2] That opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3] In 2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in relevant part.[4] The basic authority for parole in place is INA § 212(d)(5)(A), which expressly grants discretion to parole "any alien applying for admission to the United States." INA § 235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives (Aug. 30, 2010).
[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.
[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).
[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007). The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to release from detention under INA § 236(a)(2)(B) (so-called "conditional parole"), see Matter of Castillo-Padilla, 25 I&N Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole under INA § 212(d)(5)(A)).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 3

- This PM addresses two related issues.  The first is a policy question:  Should parole in place be granted to certain family members of active duty members of the U.S. Armed Forces, *individuals in the Selected Reserve of the Ready Reserve, or individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve?*  The second is a legal question: Does parole in place (for military family members or anyone else) affect whether an alien is inadmissible under INA § 212(a)(6)(A)(i)?  That provision is discussed below and is critical to determining the alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, parole in place is to be granted only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS[5] decides to grant parole in that situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds.  The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).  Aliens who have entered the United States without inspection, while not "arriving aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up.  Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.  As is true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate.  In enacting the various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

---

[5] ICE and CBP also have parole authority.  "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008).  Their decisions whether to grant parole are outside the scope of the present PM.
[6] INA § 235(a)(1).

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 4

individual grounds cover past, present, or future events, or some combination thereof.[7]  In particular,
when Congress intended that a ground cover both past and present events, it said so explicitly.[8]  In
contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense.
Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien
who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i)
would be practically superfluous.  Ordinarily, the only way for an alien to be present in the United
States without admission or parole, as the first prong requires, is to have entered without inspection at
some point in the past.[9]  Those individuals would already be covered by the second prong if "arrives"
were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.
Together, they capture aliens who have already achieved entry without inspection and those who are in
the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two
anomalies.  First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically
superfluous.  Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i),
reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not
possibly have intended.  The latter ground renders inadmissible any alien who has ever been
unlawfully present in the United States for more than 180 days and then departs, but it limits the
inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence.  If the
second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct.  *See, e.g.*, sections
212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added);
212(a)(1)(A)(iv) ("determined … to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis
added).  Other grounds cover only events that have occurred in the past (up to and including the present time).  *See, e.g.*,
sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity) (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted,
or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any
other alien to enter or to try to enter the United States in violation of law") (emphasis added).  Still others cover only
predictions of future activity.  *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge");
212(a)(10)(A) ("coming to the United States to practice polygamy").
[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted
to procure … prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist … party");
212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or
admission into the United States or other benefit …"); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented,
himself or herself" to be a U.S. citizen).
[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within
even the more expansive interpretation of the second prong.  If the alien seeks admission at a designated port of entry, is
denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be
inadmissible under the first ground but not the second one.  It would be far-fetched, however, to assume that this was the
only intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).
[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the
United States."  But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even
after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have
to be that "arrives" means "arrives or, if the person has not departed, has arrived."  There is no apparent legal basis or
policy reason to interpret "arrives" in that way.

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 5

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless. One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i). Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years. That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole. Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled. And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place. It is not a question of *parole* curing or erasing the second inadmissibility ground. Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies. An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status. First, adjustment of status requires that the person be "admissible." INA § 245(a)(2). As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i). Second, adjustment of status requires that the alien have been "inspected and admitted or paroled." INA § 245(a). The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well. The alien must still, however, satisfy all the other requirements for adjustment of status. One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection). Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific legislative focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i). It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 6

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States." INA § 245(c)(2). Parole does not erase any periods of prior unlawful status. Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**
AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞    1. A new section 21.1(c) is added to read:

## 21.1   General Information About Relative Petitions

* * * * *

(c) <u>Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve</u>.  The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, USCIS grants parole <u>in place</u> only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

o  Completed Form I-131, Application for Travel Document (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

o  Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or *less*, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and  certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 7

- o Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173);

- o Two identical, color, passport style photographs; and

- o Evidence of any additional favorable discretionary factors that the requestor wishes considered.

☞ 2. Chapter 40.6.2(a) of the AFM is revised:

    a. By amending Chapter 40.6.2(a)(1);

    b. By deleting Chapter 40.6.2(a)(3)(ii);

    c. By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as Chapter 40.6.2(a)(4)(ii); and

    d. By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

## 40.6.2 Individual Grounds of Inadmissibility Under INA Section 212(a)(6)

### (a) INA Section 212(a)(6)(A):  Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place

(1) General.  INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.  Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

*Parole.*  An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 8

(even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.  Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a). The grant of parole overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  Parole does not erase any periods of prior unlawful status or any other applicable grounds of inadmissibility.  An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

* * * * *

 (4) Exemptions and Waivers

* * * * *

 (ii) Waivers.  There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c).  As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 9

☞   3.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:

| AFM Update AD12-30 11/15/2013 | **Chapter 21.1(c)** **Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |
|---|---|---|

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Field Operations Directorate.

Nicaragua AR_000311



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Division**

## Nicaragua: COI Update

April 2017 to June 2022
Last updated: June 15, 2022

***Socio-Political & Human Rights Crisis***

The Inter-American Commission on Human Rights (IACHR) reported in June 2022 that "the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua."[1]  While Nicaragua has, historically, experienced "a long series of civil conflicts that have deeply divided the Central American country and drawn in the United States and other nations,"[2] its current crisis began in April 2018,[3] when "university students spearheaded a civil insurrection in the streets that quickly drew the support of key independent pillars of Nicaraguan society, including the private sector and the Catholic Church."[4]  A 2018 report by the Brookings Institution described the origins and initial evolution of the "2018 civil insurrection" in Nicaragua as follows:

> In what would prove to be a fateful tactical error, the government announced a cost-cutting reform of the public pension system, but without sufficient public discussion or buy-in. On April 18, 2018, senior citizens and their student supporters took to the streets to protest. The government responded with disproportionate force, generating a rapid escalation of repression-protests-repression. Virulent rhetoric by Murillo[5] further incensed the demonstrators, communicating rapidly among themselves on social media (especially Twitter, Facebook, and WhatsApp).

> Among the opposition, the issue quickly morphed into the repression itself—and the legitimacy of the Ortega-Murillo regime. In reference to the 1978-1979 uprising, protestors shouted this slogan: "Ortega y Somoza[6], la misma cosa" (Ortega and Somoza are the same thing).

> Shocked by the unprecedented level of official violence, and already irritated by if not estranged from El Carmen (Ortega's compound), the lead private sector associations, the Catholic Church, and various civil society organizations and

---

[1] Annual Report 2021 - Chapter IV.B - Nicaragua, Inter-American Commission on Human Rights (IACHR), p.775, Jun. 2, 2022.

[2] Feinberg, Richard E., Nicaragua: Revolution and Restoration, Brookings Institution, p.2, Nov. 2018.

[3] Feinberg, Richard E., Nicaragua: Revolution and Restoration, Brookings Institution, p.2, 7, Nov. 2018; Annual Report 2021 - Chapter IV.B - Nicaragua, Inter-American Commission on Human Rights (IACHR), p.775, Jun. 2, 2022; Four Years into Nicaragua's Human Rights Crisis, the IACHR Stresses Its Commitment To the Country, Inter-American Commission on Human Rights (IACHR), Apr. 18, 2022.

[4] Feinberg, Richard E., Nicaragua: Revolution and Restoration, Brookings Institution, p.2, Nov. 2018.

[5] Nicaraguan Vice-President Rosario Murillo, who is the wife of Nicaraguan President Daniel Ortega.  Daniel Ortega has been president of Nicaragua since 2007, while Murillo was his running mate in the 2016 elections.  *See* Feinberg, Richard E., Nicaragua: Revolution and Restoration, Brookings Institution, Nov. 2018.

[6] Somoza is a reference to the "autocratic family dynasty" which governed Nicaragua from 1934-1979.  *See* Feinberg, Richard E., Nicaragua: Revolution and Restoration, Brookings Institution, p.3, Nov. 2018.



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Division**

unions announced their support for the aggrieved students. Massive marches and three one-day general strikes supported by business brought the urban economy to a momentary halt.[7]

Moreover, in an October 2021 report, the IACHR cited a wildfire in a nature reserve in late March and early April 2018—which led to protests regarding the state's response to the wildfire and subsequent state repression of said protests—as "immediate background to the April protests."[8]  Other factors identified by the Brookings Institution as "drivers of rebellion" in Nicaragua included: "closing off channels of dissent"; fears of an Ortega-Murillo family dynasty; "brazen displays of official corruption"; "politicization of the public sector"; plans to construct an inter-oceanic canal (at the perceived expense of national sovereignty); frustrations of university students; "imposition of hierarchical control" within the Sandinista National Liberation Front (FSLN), the ruling political party; and the deterioration of relations between the regime and "key interest groups."[9]

In its annual report covering 2021, the IACHR commented on the "progressive deterioration of the human rights situation and rule of law in Nicaragua," and noted that the country's "political, social, and human rights crisis" that began in April 2018:

> three years later continues to spread even further owing to, among other factors, the de facto installation of a status of exception in the country, as well as the long standing undermining of democratic institutions because of the concentration of power in the executive branch, the absence of independence of the judiciary and the Attorney General's Office, and the perception that the National Assembly is operating in full alignment with the executive branch. At the same time, the Nicaraguan population continues to be impacted by the installation of a police state which makes it possible for coordination between the National Police and groups of government supporters to assault, patrol, threaten, and harass any person who is identified as an opponent of the current government.

> As a result of these factors, more than three years after the beginning of social protests in April 18, 2018, the IACHR observes that there still is a context of widespread impunity with respect to the gross human rights violations committed in the framework of the state repression, which has led to the death of 355 persons, more than 2,000 persons injured, more than 1,614 persons detained, hundreds of health professionals arbitrarily dismissed, and more than 150 university students unjustifiably expelled. […]

> In view of the continuation of the serious human rights crisis and the drastic deterioration of the country's democratic institutions, the general elections held on

---

[7] Feinberg, Richard E., Nicaragua: Revolution and Restoration, Brookings Institution, p.7, Nov. 2018.
[8] Nicaragua: Concentration of Power and the Undermining of the Rule of Law, Inter-American Commission on Human Rights (IACHR), p.18, Oct. 25, 2021.
[9] Feinberg, Richard E., Nicaragua: Revolution and Restoration, Brookings Institution, p.7-9, Nov. 2018.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

November 7, 2021 represented for Nicaraguan society the possibility of beginning a transitional period to restore the rule of law and democracy, as well as guaranteeing the right to memory, truth, and access to justice for the victims of state violence. Since early 2021, however, the IACHR has observed the escalation of a new stage of repression, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held. In particular, through the Special Monitoring Mechanism for Nicaragua (MESENI), the IACHR received distressing information about the removal of the legal status of political parties of the opposition, the detention and criminalization of leaders, including persons who had presented their preliminary candidacy to run for president, the enactment and enforcement of criminal laws with ambiguous wording that arbitrarily restricts the political rights of the Nicaraguan population, and amendments to the electoral law contrary to international human rights law.[10]

In December 2021, the IACHR expressed its concern "about the increasing number of people who have been forced to flee Nicaragua and to request international protection in the context of the ongoing serious human rights crisis in the country."[11]  The organization reported that:

In 2021, the IACHR has heard reports of an increase in the number of Nicaraguans who have been forcibly displaced due to more intense repression and to the atmosphere of fear and persecution that persists in Nicaragua against all individuals who are considered government critics. […]

Based on statements and other information received by the Special Monitoring Mechanism for Nicaragua (MESENI), the IACHR notes that, in many cases, the people who have been forcibly displaced had previously been victims of direct threats of arrest by officers of the National Police or government supporters. In many other cases, the affected individuals said they lived in a climate of fear and unease due to the constant presence of National Police officers close to their homes and to the fact that they had been followed and subjected to surveillance or had even been denied the option of moving to other departments.

Some of the main groups who have fled Nicaragua are human rights defenders and journalists; students who had taken part in demonstrations in April 2018; legal representatives of individuals who were deprived of liberty; healthcare workers who opposed government policies; people who had been released from detention based on the 2019 Amnesty Act; relatives of individuals who had been detained or murdered in the context of the crisis; and, in general, political and social movement leaders who had been subjected to threats given the persistence of arbitrary arrests in the country.

---

[10] Annual Report 2021 - Chapter IV.B - Nicaragua, Inter-American Commission on Human Rights (IACHR), p.775, Jun. 2, 2022.
[11] IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua, Inter-American Commission on Human Rights (IACHR), Dec. 20, 2021.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

Individuals who are identified as government critics and seek to leave Nicaragua are sometimes interrogated and subjected to reviews of their personal documents, computers, and cell phones by National Police officers at the airport. According to the statements the IACHR has had access to, these actions allegedly seek to prevent the relevant individuals from exposing on an international scale the situation of human rights in Nicaragua. These practices allegedly encourage people to attempt to flee through irregular routes or "blind spots."[12]

Furthermore, the United Nations High Commissioner for Refugees (UNHCR) has reported that:

> Political turmoil in Nicaragua since April 2018 meanwhile, has led some 200,000 people to flee persecution and human rights abuses, the vast majority – 150,000 — into neighbouring Costa Rica. More Nicaraguans have sought protection in Costa Rica since 2018 than people fleeing Central America's civil wars in the 1980s.[13]

In reference to recent trends in homicides and violence, according to InSight Crime, Nicaragua's homicide rate[14] in 2017 was "7 per 100,000 people, with 431 total murders, continuing a positive trend of lower violence seen over several years."[15]  While it was unable to calculate a homicide rate for 2018 due to a lack of complete statistics, InSight Crime nevertheless reported that "levels of violence soared […] due to the brutal repression of civilian protesters by the regime of President Daniel Ortega."[16]  In regards to 2019, InSight Crime reported that:

> After spiking in 2018 due to nation-wide unrest and a brutal crackdown on opposition protesters by President Daniel Ortega, levels of recorded violence in 2019 appear to have dropped back to earlier levels seen in 2017 and 2016. The 488 homicides tallied in 2019 represented a murder rate of 7.5 per 100,000 citizens.
>
> While the turmoil is still ongoing, state security forces and pro-government paramilitary groups do not appear to have violently cracked down on and disappeared hundreds of students, activists and oppositions leaders in 2019 with as much frequency as they did in 2018. That said, scores of opposition members

---

[12] IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua, Inter-American Commission on Human Rights (IACHR), Dec. 20, 2021.
[13] Displacement in Central America, United Nations High Commissioner for Refugees (UNHCR), last visited Jun. 14, 2022, https://web.archive.org/web/20220614224244/https://www.unhcr.org/en-us/displacement-in-central-america.html
[14] According to a 2019 global study on homicide by the United Nations Office on Drugs and Crime (UNODC), "A homicide rate of 10 per 100,000 population has been termed 'epidemic' in the literature, although it is questionable whether this medical metaphor is appropriate in such a context and why the threshold for calling it 'epidemic' is set exactly at this rate. This designation is widely used by the media, and is often ascribed to the United Nations, but its exact origin remains unclear. A search of the literature uncovered several reports that refer to the term as originating from the World Health Organization." *See* Global Study on Homicide 2019, United Nations Office on Drugs and Crime (UNODC), p.18, 2019.
[15] Dalby, Chris, and Carranza, Camilo, InSight Crime's 2018 Homicide Round-Up, InSight Crime, Jan. 22, 2019.
[16] Dalby, Chris, and Carranza, Camilo, InSight Crime's 2018 Homicide Round-Up, InSight Crime, Jan. 22, 2019.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

continue to be detained arbitrarily on trumped up charges, and the country's security outlook remains uncertain at best.[17]

For 2020, InSight Crime noted that while "Official homicide data is tough to come by in Nicaragua," it estimated the country's homicide rate "to be at least 4.4 per 100,000 based on population estimates."[18]  When discussing homicides in 2021, the organization reported that:

> According to security expert Elvira Cuadra, who tracks murders in the country through media reports and other independent sources, 189 people were killed during the first six months of last year, putting the country on pace for a homicide rate of 5.7 per 100,00 in 2021, according to InSight Crime's calculations.
>
> Between January and June, Cuadra recorded 153 murder cases, a jump from 104 during the same period in 2020.[19]

Moreover, InSight Crime also commented on political violence and repression in its analysis of homicides in Nicaragua during 2021:

> Outright violence where citizens were harmed did not appear to occur ahead of Ortega securing his fourth consecutive term. However, Urnas Abiertas, an election observation group, recorded more than 1,600 instances of political violence. This included police and paramilitary groups holding people hostage in targeted areas for hours or even days, during which they were harassed and threatened.
>
> Ortega also harnessed the justice system to crack down on opponents. According to Human Rights Watch, authorities detained seven presidential candidates and at least 32 government critics, some of whom were subjected to abuse that included "daily interrogations, prolonged solitary confinement, and insufficient food."[20]

### *Environmental Concerns*

The U.S. Agency for International Development (USAID) reported in September 2021 that Nicaragua:

> is prone to numerous environmental shocks, including droughts, flooding, and landslides. The country also regularly experiences tropical storms during the June–November Atlantic hurricane season, which can result in flooding, damage structures, destroy crops, and disrupt livelihoods. Nicaragua's western coastline is also susceptible to recurrent periods of drought, followed by heavy, irregular rains, which can trigger flooding and landslides. These recurring natural disasters—

---

[17] Asmann, Parker, and O'Reilly, Eimhin, InSight Crime's 2019 Homicide Round-Up, InSight Crime, Jan. 28, 2020.
[18] Asmann, Parker, and Jones, Katie, InSight Crime's 2020 Homicide Round-Up, InSight Crime, Jan. 29, 2021.
[19] InSight Crime's 2021 Homicide Round-Up, InSight Crime, Feb. 1, 2022.
[20] InSight Crime's 2021 Homicide Round-Up, InSight Crime, Feb. 1, 2022.



**Refugee, Asylum and
Int'l Operations
Research Division**

coupled with the economic effects of the coronavirus disease (COVID-19) pandemic and sociopolitical instability—regularly exacerbate food insecurity among vulnerable populations in Nicaragua.[21]

Similarly, in September 2021, the International Federation of Red Cross and Red Crescent Societies (IFRC) reported that:

> In the last 20 years, Nicaragua has been hit by major, extreme weather events such as Hurricanes Mitch in 1998, Beta in 2005, Felix in 2007, and most recently by hurricanes Eta and Iota in November 2020, which hit the North Atlantic Autonomous Region (RAAN) 15 days apart with maximum intensity. The economic, social, housing, and infrastructure losses have been devastating for the region, as the two latter hurricanes combined affected 56 municipalities nationwide and put three million people at risk. […]

> According to the Global Climate Risk Index (Germanwatch, 2019), from 1998 to 2017 Nicaragua was ranked sixth among the top ten countries most exposed and vulnerable to extreme weather events. […]

> While Nicaragua is strategically located for the development of various socioeconomic sectors, geographically speaking it is highly vulnerable to a wide range of hazards (seismic, volcanic, climatic, hydro-meteorological).[22]

Moreover, the World Bank stated in November 2021 that Nicaragua "is classified as being at the highest risk level for climate-related and other natural disasters; it is in the high-risk group for earthquakes, floods, and epidemics and in the medium-risk group for drought and hurricanes."[23] Nicaragua has 18 volcanoes (each with different levels of activity), with over 1.1 million people at risk of exposure to a possible volcanic eruption.[24]

According to a 2019 report published by the World Bank Group:

> Hydrometeorological phenomena such as hurricanes, flooding, drought and landslides have significant influence on the population and economy of Nicaragua. Between 1994 and 2013, the average number of deaths due to hydrometeorological disasters was 160 per year, with average annual losses of 301.75 million dollars […], which is equivalent to an average annual loss per unit of GDP of 1.71%

---

[21] Nicaragua Assistance Overview, U.S. Agency for International Development (USAID), p.1, Sep. 2021.

[22] Nicaragua: Preparatory Action for Disaster/Crisis - DREF Plan of Action, Operation N° MDRNI011, International Federation of Red Cross and Red Crescent Societies (IFRC), p.2, Sep. 3, 2021.

[23] Pooling Catastrophe Risk to Protect against Natural Hazards: Nicaragua's Experience in Disaster Risk Management and Finance, The World Bank, Nov. 1, 2021.

[24] Tórrez García, Cinthya, Más de un millón de nicaragüenses viven en riesgo por una posible erupción volcánica [More than a million Nicaraguans live at risk of a possible volcanic eruption], La Prensa (Ni.), Feb. 20, 2018.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

In Nicaragua, extreme rainfall is the most common natural phenomenon, with the highest social impact. The greatest source of damage and loss of life is linked to hurricanes that generate storms that lead to flooding, erosion and landslides.[25]

In November 2020, Nicaragua was impacted by "two devastating hurricanes, Eta and Iota, category 4 and 5, respectively," which "hit the country in quick succession."[26]  According to the IFRC, "Hurricane Eta, a category 4 storm, impacted the Northern Caribbean coast on 3 November, and Hurricane Iota, a category 5 storm, impacted the same area on 16 November and extended to the Pacific region, leaving severe damage in the region, including loss of lives."[27]  The "back-to-back major hurricanes affected 60 per cent of the national territory,"[28] while "Coastal areas such as the North Caribbean Coast Autonomous Region (RACCN), a rural area mostly inhabited by indigenous and Afro-descendant peoples, bore the brunt of the destruction."[29]  According to a plan of action developed by various United Nations agencies in coordination with the Nicaraguan government:

> With torrential rains and winds upwards of 230 km/h, Eta and Iota trigged intense flooding and landslides which led to the destruction of homes as well as agriculture and fishery-based livelihoods. More than three million people were exposed to these devastating storms, with an estimated 1.8 million people affected.[30]

Damages from the hurricanes were estimated at "US$738 million (6.2% of GDP)."[31]  Furthermore, USAID reported in September 2021 that:

> The storms limited access to safe drinking water and sanitation facilities for an estimated 500,000 people and left more than 730,000 people in need of humanitarian assistance, the GoN [Government of Nicaragua] and UN reported.
>
> Populations in Nicaragua already faced constrained livelihood opportunities prior to Eta and Iota as a result of the country's ongoing economic crisis and the socioeconomic impacts of the COVID-19 pandemic. The storms further reduced

---

[25] Hydrometeorological and Climate Services Modernisation Plan For Nicaragua, World Bank Group, p.2, Jan. 2019.

[26] Nicaragua Action Plan to focus on recovery efforts after hurricanes Eta and Iota, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Mar. 17, 2021.

[27] Nicaragua: Hurricanes Eta & Iota - Emergency Appeal n° MDR43007, Operation Update no. 2, International Federation of Red Cross and Red Crescent Societies (IFRC), p. 2, Jan. 20, 2021.

[28] Plan of Action | Hurricanes Eta and Iota, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA) et. al, Feb. 22, 2021.

[29] Nicaragua Action Plan to focus on recovery efforts after hurricanes Eta and Iota, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Mar. 17, 2021.

[30] Plan of Action | Hurricanes Eta and Iota, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA) et. al, Feb. 22, 2021.

[31] Plan of Action | Hurricanes Eta and Iota, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA) et. al, Feb. 22, 2021.



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Division**

livelihood opportunities and damaged staple crops, worsening food insecurity for vulnerable individuals.[32]

In addition to hurricanes, Nicaragua has also been impacted by other hydrometeorological events.[33]  For instance, in mid-October 2018, a Nicaraguan media outlet reported that—during the first 18 days of October—heavy rains led to the deaths of 14 people, while 6,191 individuals were affected by flooding.[34]  In October 2017, Nicaragua's Caribbean Coast was impacted by Tropical Depression Nate, which "caused heavy rain and floods mainly in the Northern Autonomous Caribbean Region and the Rivas, Jinotepe[35], Leon, Chinandega, Matagalpa and Juigalpa[36] departments in the country's central Pacific region."[37]  The Nicaraguan government reported that 16 people were killed, 682 communities were affected in 14 departments, 5,952 homes were damaged, and 29,110 people were impacted.[38]

In addition, Nicaragua is "one of the countries in the Dry Corridor" of Central America.[39]  According to *Reuters*, "Central America's 'Dry Corridor' - running through Guatemala, El Salvador, Honduras and Nicaragua - is particularly vulnerable to the El Nino phenomenon, a warming of the Pacific Ocean surface that typically occurs every few years, causing hot and drier conditions."[40]  The Dry Corridor "suffers from continuous droughts" due to El Niño.[41]  A Nicaraguan media outlet reported in February 2018 that, per Nicaraguan government data, "A total of 596 communities"—around 300,000 people—"are at high risk from the threat of a drought" in Nicaragua.[42]

In a June 2019 article on drought in Nicaragua, *DW* reported that:

> When El Nino hit from 2014 to 2016, drought laid waste to food production in the Dry Corridor. […]
>
> According to local NGO, the Humboldt Center, 90% of maize and 60% of bean crops in Nicaragua were lost in 2016. […]

[32] Nicaragua Assistance Overview, U.S. Agency for International Development (USAID), p.1, Sep. 2021.

[33] Hydrometeorological and Climate Services Modernisation Plan For Nicaragua, World Bank Group, p.2, Jan. 2019.

[34] Velásquez, Uriel, Lluvias dejan 14 muertos en Nicaragua [Rains leave 14 dead in Nicaragua], El Nuevo Diario (Ni.), Oct. 19, 2018.

[35] Jinotepe is the capital of Carazo department.

[36] Juigalpa is the capital of Chontales department.

[37] Nicaragua floods: DREF final report (8 July 2018), International Federation of Red Cross and Red Crescent Societies (IFRC), p.1, Jul. 8, 2018.

[38] Nicaragua floods: DREF final report (8 July 2018), International Federation of Red Cross and Red Crescent Societies (IFRC), p.2, Jul. 8, 2018.

[39] A comprehensive action plan for the Dry Corridor in Nicaragua, Food and Agriculture Organization of the United Nations (FAO), Nov. 27, 2017.

[40] Moloney, Anastasia, In Honduras, years of drought pressure farmers to leave land, Reuters, Sep. 27, 2019.

[41] A comprehensive action plan for the Dry Corridor in Nicaragua, Food and Agriculture Organization of the United Nations (FAO), Nov. 27, 2017.

[42] Tórrez García, Cinthya, Trescientos mil nicaragüenses viven en riesgo ante sequía [Three hundred thousand Nicaraguans live at risk of drought], La Prensa (Ni.), Feb. 27, 2018.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

"Because of climate change, the conditions for agricultural production in the Dry Corridor don't exist anymore," Victor Campos, director of the Humboldt Center, told DW. "That creates a food crisis, and if there isn't another kind of income available for families, it leads to famine." […]

Tania Guillen, a Nicaraguan researcher at the Climate Service Center Germany, told DW that with small farmers losing crops, food insecurity in Nicaragua "could be a decisive factor to migrate to other countries in the region."[43]

In late July 2019, ACAPS reported that "[a]n El Niño phenomenon, although weak, has developed since February affecting several Central American countries, in particular Guatemala, Honduras, El Salvador and Nicaragua, known as the Dry Corridor."[44]

### Health Concerns

Nicaragua recorded its first case of COVID-19 in March 2020.[45]  In early June 2022, *Agencia EFE* reported that, according to Nicaragua's Ministry of Health, the country had registered "240 deaths from COVID-19 and 18,936 confirmed cases since the pandemic was detected in the country in March 2020."[46]  Moreover, government officials also stated that 80% of the population over the age of 2 was fully vaccinated, while 92% of Nicaraguans had received at least one dose of the COVID vaccine.[47]  Yet, when discussing COVID-19 cases and deaths, *Agencia EFE* also reported that:

The official data contrasts with that of the COVID-19 Citizen Observatory, a network of independent doctors that monitors the pandemic and that until the end of this past April reported 5,994 deaths from pneumonia and other symptoms related to the coronavirus, as well as 32,174 suspected cases of contagion.[48]

Furthermore, in its 2022 annual report on Nicaragua (covering the events of 2021), Human Rights Watch reported on the Nicaraguan government's response to the COVID-19 pandemic:

Denial, inaction, and opacity have characterized the government's response to the Covid-19 pandemic. The government took no emergency measures in response to

[43] Josefsen Hermann, Lise, Caught between floods and drought: Farmers in Nicaragua living in uncertainty, DW, Jun. 12, 2019.
[44] NICARAGUA: Dry spell in northern Nicaragua, ACAPS, p.1, Jul. 24, 2019.
[45] Nicaragua registers first case of coronavirus infection, Reuters, Mar. 18, 2020.
[46] Nicaragua registra 240 muertos y 18.936 casos de covid-19 desde marzo de 2020 [Nicaragua registers 240 deaths and 18,936 cases of COVID-19 since March 2020], Agencia EFE, Jun. 7, 2022.
[47] Nicaragua registra 240 muertos y 18.936 casos de covid-19 desde marzo de 2020 [Nicaragua registers 240 deaths and 18,936 cases of COVID-19 since March 2020], Agencia EFE, Jun. 7, 2022.
[48] Nicaragua registra 240 muertos y 18.936 casos de covid-19 desde marzo de 2020 [Nicaragua registers 240 deaths and 18,936 cases of COVID-19 since March 2020], Agencia EFE, Jun. 7, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

the pandemic, kept schools open, and fired doctors critical of the government who disagreed with its management of the Covid-19 response.

While the government reported over 13,000 cases and more than 200 deaths, as of September 2021, the nongovernmental organization (NGO) Covid-19 Citizen Observatory registered almost twice as many suspected cases and 4,500 suspected deaths. The government has accused the organization and critical doctors of promoting "health terrorism." The Inter-American Commission on Human Rights (IACHR) reported that "state agents" were persecuting and harassing members of the Observatory, as well as from the medical associations Nicaraguan Medical Unit (UMN) and Interdisciplinary Scientific Committee.

As of October 2021, just over 8 percent of the population was fully vaccinated.

During the 2018 crackdown, at least 405 doctors, nurses, and other health workers were fired from public hospitals, seemingly for providing care to protesters or criticizing the government.

No specific policies to diminish the negative economic impact of the pandemic were enacted.[49]

In 2019, Latin America experienced a "record year for dengue fever[50]," with Nicaragua among the "hardest hit" countries in the region.[51]  In early December 2019, *Voz de América* reported that Nicaragua was "one of the three countries in Latin America that reported the highest rate of dengue cases during 2019.  To date, the disease has claimed the lives of 27 people, and the rates of risk have increased up to seven times according to experts."[52]  A Nicaraguan media outlet reported in mid-December 2019 that Nicaragua had registered over 178,000 suspected cases of dengue in 2019 (up to December 7).[53]

---

[49] World Report 2022 - Nicaragua, Human Rights Watch, Jan. 2022.
[50] According to the World Health Organization (WHO), "Dengue is a viral infection transmitted to humans through the bite of infected mosquitoes. […] The virus responsible for causing dengue, is called dengue virus (DENV). […] While many DENV infections produce only mild illness, DENV can cause an acute flu-like illness. Occasionally this develops into a potentially lethal complication, called severe dengue."  Severe dengue "is a leading cause of serious illness and death in some Asian and Latin American countries."  *See* Dengue and severe dengue, World Health Organization (WHO), Jan. 10, 2022.
[51] Huang, Pien, Why Dengue Fever Cases Are Hitting Record Highs In Latin America, NPR, Dec. 17, 2019.
[52] Nicaragüenses gastaron 50 millones de dólares para atender el dengue en 2019 [Nicaraguans spent 50 million dollars to treat dengue in 2019], Voz de América, Dec. 2, 2019.
[53] López B., Lidia, Por qué este año hubo una epidemia de dengue en Nicaragua si el mosquito trasmisor siempre está presente [Why there was a dengue epidemic in Nicaragua this year if the transmitting mosquito is always present], La Prensa (Ni.), Dec. 16, 2019.



**U.S. Citizenship
and Immigration
Services**

**Refugee, Asylum and
Int'l Operations
Research Division**

## <u>Nicaragua: COI Update</u>
June 2022 – October 2022
Last updated: October 31, 2022

***Socio-Political & Human Rights Crisis***

In an early September 2022 report on the human rights situation in Nicaragua, the Office of the United Nations High Commissioner for Human Rights (OHCHR) reported that the "human rights situation in Nicaragua has progressively deteriorated since 2018."[1]  *The Associated Press* noted in August 2022 that political stability in Nicaragua "has never fully returned" since the outbreak of protests in 2018 and the subsequent "crackdown by security forces and allied civilian militias."[2]  *Al Jazeera* reported in August 2022 that—according to "rights observers"—Nicaraguan President Daniel Ortega "continues to crack down on freedom of expression and speech following massive anti-government protests that broke out in April 2018."[3]

Human Rights Watch reported in July 2022 that "Since taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary."[4]  In mid-June 2022, *The Associated Press* assessed that "With all government institutions firmly within Ortega's grasp and the opposition exiled, jailed or in hiding, the 75-year-old leader eroded what hope remained the country could soon return to a democratic path."[5]

According to OHCHR, the deterioration in Nicaragua's human rights situation has been demonstrated by the:

> lack of institutional and legislative reforms aimed at restoring the rule of law and the separation of powers, the isolation from the international community, as well as the severe restrictions on civic space, the harassment of critical voices and the situation of persons detained in the context of the crisis […].[6]

In October 2022, *The Associated Press* reported that Ortega had:

> stepped up repression since clearing the field of potential opposition candidates ahead of his re-election to a fourth consecutive term last November. In addition to jailing dozens of opposition figures, the government has closed more than 1,000

---

[1] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.2, Sep. 2, 2022.
[2] Selser, Gabriela, and Hernández, María Teresa, EXPLAINER: Tension between Nicaragua and the Catholic Church, The Associated Press, Aug. 14, 2022.
[3] Nicaraguan Catholics gather for mass after gov't bans procession, Al Jazeera, Aug. 14, 2022.
[4] Nicaragua: Government Dismantles Civil Society, Human Rights Watch, Jul. 19, 2022.
[5] US sanctions 93 Nicaraguan officials for crackdown, The Associated Press, Jun. 13, 2022.
[6] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.16, Sep. 2, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

civil society groups, shuttered independent media outlets and most recently jailed a Roman Catholic bishop and other clergy.[7]

The Inter-American Commission on Human Rights (IACHR) reported in late September 2022 that "Restrictions on fundamental freedoms have reached a critical point in Nicaragua."[8] Moreover, OHCHR reported that it had noted "a deterioration of the human rights situation" in 2022, "particularly regarding civil and political rights, in a context characterized by the absence of dialogue, the deepening of the political crisis, and the isolation of Nicaragua from the international community."[9]

In regards to "civic space restrictions," OHCHR reported that Nicaragua "has continued to restrict civic space, with a particular impact on the rights to freedom of association and expression."[10]  According to the IACHR, there is "no longer any space for critical voices" in Nicaragua, "as the Government's censorship strategy has been steadily deployed against any person that questions it and against all available areas of democratic participation."[11]

According to *The Associated Press*, "Since massive street protests erupted in April 2018 and were eventually violently put down by government forces, Ortega's administration has pursued any organizations it views as a threat."[12]  Since November 2018, the Nicaraguan government has "shut down civil society organizations on the grounds that they had supported terrorist actions and/or breached administrative duties."[13]  Human Rights Watch has reported that the shutting down of non-governmental organizations in Nicaragua "is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation, intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists."[14]  OHCHR reported in early September that, in 2022, the Nicaraguan government had:

> cancelled the legal personality of 1,112 human rights, development and other organizations, professional associations, including medical associations, entities linked to the Catholic Church and others, totalling [*sic*] at least 1,178 since 2018.

---

[7] Selser, Gabriela, Nicaragua's Ortega says US sanctions will make more migrants, The Associated Press, Oct. 27, 2022.

[8] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, Inter-American Commission on Human Rights (IACHR), Sep. 28, 2022.

[9] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.2, Sep. 2, 2022.

[10] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.4, Sep. 2, 2022.

[11] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, Inter-American Commission on Human Rights (IACHR), Sep. 28, 2022.

[12] Selser, Gabriela, Nicaragua newspaper says staff have fled the country, The Associated Press, Jul. 21, 2022.

[13] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.9, Sep. 2, 2022.

[14] Nicaragua: Government Dismantles Civil Society, Human Rights Watch, Jul. 19, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

In July, the Special Rapporteur on the rights to freedom of peaceful assembly and of association expressed concern about the cancellation of the legal personality of hundreds of organizations.

Twelve universities have also had their legal personality cancelled, affecting the right to education. This right was also impacted by other measures restricting university autonomy and academic freedom, such as the reform of the Law of Autonomy of Higher Education Institution. The reform subjects the approval of the academic programs of all universities to the authority of a central body.[15]

In late September, the IACHR reported that "more than 2000 organizations of civil society – linked to political parties, academic, and religious spaces – have been cancelled" since April 2018.[16]

OHCHR has also identified "a serious deterioration of freedom of expression" in Nicaragua since 2018.[17]  Likewise, the IACHR reported in late September that:

Furthermore, attacks and unlawful interference with the freedom of the media is a serious trend that has increased in the last four years. Since then, at least 54 national media outlets have been closed, and the occupation and confiscation of the facilities of the media outlets *100% Noticias*, *Confidencial*, and *La Prensa* continues. The censorship strategy has also extended to the international press, creating a siege that hinders and prevents the circulation of relevant information about what is happening in the country: in recent years, the Government has prevented the entry of journalists from foreign media on at least seven occasions, and recently took *CNN en Español* off the air, without making public the reasons for the decision. In their onslaught against all forms of independent expression, the authorities have also banned religious processions; prevented academics and researchers from entering the country; pushed to censor and veto writers; expelled musicians from the country; and violently arrested priests and other critical religious leaders.[18]

In its September 2022 report on the human rights situation in Nicaragua, OHCHR reported that "enjoyment of freedom of expression" had deteriorated, and noted the following examples:

---

[15] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.4, Sep. 2, 2022.
[16] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, Inter-American Commission on Human Rights (IACHR), Sep. 28, 2022.
[17] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.9, Sep. 2, 2022.
[18] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, Inter-American Commission on Human Rights (IACHR), Sep. 28, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

In July, staff of La Prensa left the country alleging the constant police siege against them[19], joining the 120 other journalists who are in exile. In addition, three journalists were sentenced to up to 13 years in prison for the crimes of spreading fake news and undermining national integrity. The Government has also censored musical artists, preventing them from entering Nicaragua or detaining and then expelling them from the country, despite their Nicaraguan nationality. Between May and August, the authorities ceased the operations of 12 radio and television media outlets of the Catholic Church, especially in Matagalpa, arguing that they did not have operating permits. This was objected to by representatives of the affected media organizations. At least five nondenominational media were also forced to cease operations, allegedly due to non-compliance with the sector's regulations.[20]

As of September 2018, police in Nicaragua have "prohibited demonstrations and required applications to authorize public rallies."[21]  In its early September report, OHCHR noted that "Communications and requests for demonstrations were automatically rejected or unacknowledged to those who were perceived as opponents by the police. Any unauthorized protests, or attempts to carry them out, were immediately dispelled or prevented."[22]  OHCHR also reported that "antigovernment demonstrations and those demanding the release of the detainees continued to be repressed with excessive use of force by the police, or attacked by pro-government elements with the tolerance of the security force."[23]

In late September 2022, the IACHR mentioned the existence of "attacks, judicial persecution and activation of control and surveillance mechanisms against journalists, human rights defenders, civil society actors, academics, students, members of the Catholic Church, political parties and government opponents" in Nicaragua.[24]  In a June 2022 submission to the UN Committee against Torture, the *Centro Nicaragüense de Derechos Humanos* (Nicaraguan Center for Human Rights – CENIDH) and the *Organización Mundial Contra la Tortura* (World Organisation Against Torture – OMCT) reported that Nicaragua had "implemented a policy of mass and/or selective detention, as a deterrent to protests and any form of opposition; these detentions are characterized by the arbitrariness, and the systematic and widespread practice of torture and

---

[19] For additional information on the staff of *La Prensa* fleeing the country, *see* Selser, Gabriela, Nicaragua newspaper says staff have fled the country, The Associated Press, Jul. 21, 2022.
[20] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.5, Sep. 2, 2022.
[21] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.9, Sep. 2, 2022.
[22] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.9, Sep. 2, 2022.
[23] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.8, Sep. 2, 2022.
[24] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, Inter-American Commission on Human Rights (IACHR), Sep. 28, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

other cruel, inhuman, and degrading treatment."[25]  The IACHR reported in late September that there were over 200 political prisoners in Nicaragua, "many of whom are held in unhealthy conditions, without access to adequate medical care, subjected to solitary confinement regimes, and prevented from receiving visits from their families, among other cruel, inhuman, and degrading treatment."[26]

Moreover, in its early September report, OHCHR stated that it:

> continued to document acts of harassment, especially against human rights defenders, journalists, clergymen, political opponents or persons considered as such, which have consisted mainly of constant and intimidating police presence in front of their homes or workplaces, affecting their privacy and activities, permanent monitoring, selective detention of vehicles, photographing and requiring documents from their occupants, and fencing off access roads to the facilities of organizations considered critical of the Government. Officials and citizens related to the Sandinista National Liberation Front also allegedly participated in these acts of harassment, intimidating individuals for allegedly using social networks against the Government.[27]

In mid-August, the IACHR condemned the "escalating repression against members of the Roman Catholic Church in Nicaragua" in response to the arbitrary arrest of a bishop and seven clerics in Matagalpa.[28]  The IACHR stated that these arbitrary arrests occurred in a context of:

> systematic persecution, criminalization, harassment, police hounding, stigmatizing comments by State authorities, and, more generally, acts of repression targeting members of the Roman Catholic Church in Nicaragua, due to its mediation efforts in the national talks of 2018 and its critical position to denounce human rights violations committed in the context of Nicaragua's ongoing crisis.[29]

Additional incidents highlighted by the IACHR which occurred in August 2022 include: a Catholic priest allegedly being forced to go into exile; threats against priests by police officers; the banning of scheduled religious processions in Managua by the police; police officers

---

[25] Informe sobre el estado de cumplimiento de las obligaciones bajo la Convencion contra la Tortura – Estado a evaluar: Nicaragua [Report on the status of compliance with the obligations under the Convention against Torture – State to be evaluated: Nicaragua], Centro Nicaragüense de Derechos Humanos (CENIDH) and Organización Mundial Contra la Tortura (OMCT), p.2, Jun. 2022.

[26] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, Inter-American Commission on Human Rights (IACHR), Sep. 28, 2022.

[27] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.5, Sep. 2, 2022.

[28] IACHR Condemns Repression and Arrests of Members of Roman Catholic Church in Nicaragua, Inter-American Commission on Human Rights (IACHR), Aug. 19, 2022.

[29] IACHR Condemns Repression and Arrests of Members of Roman Catholic Church in Nicaragua, Inter-American Commission on Human Rights (IACHR), Aug. 19, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

allegedly preventing people from accessing churches to attend mass in certain communities; and a police raid on a chapel to "seize radio and TV broadcasting equipment."[30]

According to OHCHR, Nicaraguan authorities "continued to make stigmatizing statements and hate speech against their critics and opponents" in 2021 and 2022.[31]  OHCHR also reported in early September that:

> Other violations of the rights of persons perceived to be opponents of the Government have consisted of depriving them of the right to leave the country, by withholding their passports by immigration officials. In three other cases documented by OHCHR, consular officials abroad demanded that exiled activists return to Nicaragua to renew their passports, at the express instruction of the capital. The Office has also documented four cases in which Nicaraguan citizens were arbitrarily prevented from entering or returning to their own country.[32]

In early October 2022, *The Associated Press* reported that "Ortega's government has stepped up its persecution of political opponents. Apparently no longer satisfied by driving them into exile, it is now pursuing their relatives criminally."[33]  The media outlet also reported that "Human rights organizations have accused the government of making relatives 'hostages.'"[34]

In early July 2022, *The Associated Press* reported that Nicaraguan police had "taken over the city halls of five municipalities that had been in the hands of an opposition party."[35]  Citizens for Freedom—"a political party disallowed by the Nicaraguan government before presidential elections last year"—had "won each of those town halls in the 2017 elections."[36]  The media outlet reported at the time that "Of Nicaragua's 153 municipalities, Ortega's Sandinista Front now controls 140. Two allied parties control the other 13."[37]  Nicaragua is scheduled to hold local elections in November 2022.[38]

In mid-June 2022, UN High Commissioner for Human Rights Michelle Bachelet stated that the "sociopolitical, economic and human rights crises we are witnessing in Nicaragua are driving thousands of people from the safety of their homes. The number of Nicaraguans leaving the

---

[30] IACHR Condemns Repression and Arrests of Members of Roman Catholic Church in Nicaragua, Inter-American Commission on Human Rights (IACHR), Aug. 19, 2022.
[31] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.10, Sep. 2, 2022.
[32] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.5-6, Sep. 2, 2022.
[33] Selser, Gabriela, Nicaragua charging exiled opponents' relatives, The Associated Press, Oct. 5, 2022.
[34] Selser, Gabriela, Nicaragua charging exiled opponents' relatives, The Associated Press, Oct. 5, 2022.
[35] Nicaragua government takes over five opposition-held towns, The Associated Press, Jul. 4, 2022.
[36] Nicaragua government takes over five opposition-held towns, The Associated Press, Jul. 4, 2022.
[37] Nicaragua government takes over five opposition-held towns, The Associated Press, Jul. 4, 2022.
[38] Selser, Gabriela, Concern that Nicaragua repression could be "model" in region, The Associated Press, Aug. 4, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

country is growing in unprecedented numbers, even higher than in the 1980s."[39]  In late October 2022, *The Associated Press* reported that:

> Since widespread social protests broke out in April 2018, most fleeing Nicaraguans headed to neighboring Costa Rica. But with that country's overwhelmed asylum system and struggling economy more have instead migrated to the United States. For the fiscal year that ended in September, U.S. border agents encountered Nicaraguans nearly 164,000 times at the southwest border — more than triple the level for the previous year.[40]

Similarly, OHCHR reported in early September that there had been "an increase in the number of people leaving Nicaragua for the United States, from 5,450 people intercepted at the border in all of 2020, to 84,055 in the first six months of 2022."[41]  OHCHR identified "Restrictions on civic space and persecution of perceived opponents, in addition to the worsening socio-economic situation," as factors leading to this increase.[42]

 In early September 2022, *The Associated Press* reported that since the summer of 2021, "Nicaraguans have been seeking asylum in Costa Rica at the highest levels since Nicaragua's political crisis exploded in April 2018."[43]  The media outlet noted that, of the more than "200,000 pending applications and another 50,000 people waiting for their appointment to make a formal application" to seek asylum in Costa Rica, "Nicaraguans account for nearly nine out of 10 applicants."[44]  Similarly, in mid-June 2022, *Al Jazeera* reported that UN High Commissioner for Human Rights Michelle Bachelet "said that over the last eight months 'the number of Nicaraguan refugees and asylum seekers in Costa Rica has doubled, reaching a total of 150,000 new applicants since 2018.'"[45]

In late October 2022, the Biden administration targeted Nicaragua's gold industry—"one of its biggest sources of revenue"—via an executive order and sanctions which "all but makes it illegal for Americans to do business with Nicaragua's gold industry."[46]  According to *The Associated Press*, the executive order "also paves the way for the U.S. to restrict investment and trade with Nicaragua — a move recalling the punishing embargo imposed by the U.S. in the 1980s during

[39] UN rights chief warns of 'unprecedented' exodus from Nicaragua, Al Jazeera, Jun. 16, 2022.
[40] Selser, Gabriela, Nicaragua's Ortega says US sanctions will make more migrants, The Associated Press, Oct. 27, 2022.
[41] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.6, Sep. 2, 2022.
[42] Human rights situation in Nicaragua, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.6, Sep. 2, 2022.
[43] Castillo, Moises, and Sherman, Christopher, Fleeing Nicaraguans strain Costa Rica's asylum system, The Associated Press, Sep. 2, 2022.
[44] Castillo, Moises, and Sherman, Christopher, Fleeing Nicaraguans strain Costa Rica's asylum system, The Associated Press, Sep. 2, 2022.
[45] UN rights chief warns of 'unprecedented' exodus from Nicaragua, Al Jazeera, Jun. 16, 2022.
[46] Goodman, Joshua, and Sherman, Christopher, Biden targets Nicaragua's gold in new move against Ortega, The Associated Press, Oct. 24, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

Ortega's first stint as president following the country's bloody civil war."[47]  Furthermore, the media outlet reported that the U.S. government also froze the assets of one of Ortega's close advisors, and will revoke the visas "of more than 500 Nicaraguan individuals and their family members who either work for the Ortega government or help formulate, implement and benefit from policies that undermine democracy in the country."[48]  Previously, the Biden administration had "sanctioned the state-owned mining company," and "reallocated the country's sugar quota, taking away a valuable U.S. subsidy worth millions of dollars every year."[49]  In mid-June 2022, *The Associated Press* reported on both recent and prior examples of visa restrictions and sanctions imposed by the United States against Nicaraguan officials:

> The U.S. State Department imposed visa restrictions Monday on 93 more Nicaraguan officials for their role in supporting the regime of President Daniel Ortega. […]

> The State Department announced it had pulled the visas of judges who convicted the opposition leaders, as well as legislators who had cooperated in banning NGOs and civic groups. […]

> The State Department had previously imposed visa restrictions on 116 individuals linked to the Ortega regime, "including mayors, prosecutors, university administrators, as well as police, prison, and military officials."

> In recent months, the Treasury Department has frozen the U.S. assets of the defense minister and other officials in the army, telecom and mining sectors. As with dozens of Nicaraguan officials already under sanctions, U.S. citizens were prohibited from having dealings with them.[50]

*Environmental Concerns*

Nicaragua is "vulnerable to recurrent natural hazards."[51]  As the International Federation of Red Cross and Red Crescent Societies (IFRC) noted in an early October 2022 report:

> According to the Global Climate Risk Index, from 1998 to 2017, Nicaragua was ranked sixth among the top ten countries most exposed and vulnerable to extreme weather events. Due to its geographical position, Nicaragua is exposed to the recurrent impact of multiple natural phenomena such as earthquakes, volcanic eruptions, tsunamis, floods, landslides, droughts, and tropical cyclones.

---

[47] Goodman, Joshua, and Sherman, Christopher, Biden targets Nicaragua's gold in new move against Ortega, The Associated Press, Oct. 24, 2022.
[48] Goodman, Joshua, and Sherman, Christopher, Biden targets Nicaragua's gold in new move against Ortega, The Associated Press, Oct. 24, 2022.
[49] Goodman, Joshua, and Sherman, Christopher, Biden targets Nicaragua's gold in new move against Ortega, The Associated Press, Oct. 24, 2022.
[50] US sanctions 93 Nicaraguan officials for crackdown, The Associated Press, Jun. 13, 2022.
[51] WFP Nicaragua Country Brief – August 2022, World Food Programme (WFP), p.1, Sep. 23, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

In the last 20 years, Nicaragua has been hit by major extreme weather events such as Hurricanes Mitch in 1998, Beta in 2005, Felix in 2007, and most recently by hurricanes Eta and Iota in November 2020, which hit the North Atlantic Autonomous Region (RAAN) 15 days apart with maximum intensity. The economic, social, housing, and infrastructure losses caused by these two last hurricanes have devastated the region. According to the National System for Disaster Prevention, Mitigation and Response (SINAPRED by its Spanish acronym), these hurricanes combined affected 56 municipalities nationwide and put three million people at risk.[52]

On October 9, 2022, Hurricane Julia "hit Nicaragua's central Caribbean coast and dumped torrential rains across Central America before reemerging over the Pacific as a tropical storm."[53] The storm "made landfall near Bluefields, Nicaragua, as a category 1 hurricane. It remained at hurricane strength for the next eight hours, while moving across Nicaragua and was then downgraded to a tropical storm, continuing to cross Nicaragua" before moving offshore into the Pacific Ocean.[54] On October 10, *Reuters* discussed the impact of the storm in Nicaragua:

> Tropical storm Julia emerged over the Eastern Pacific on Sunday evening after pummelling [*sic*] Nicaragua with rain and winds that damaged hundreds of homes but left no reported casualties in that country, according to government officials. […]
>
> About one million residents of Nicaragua's coastal region lost power and internet due to fallen lines as well as a decision by the government to cut electricity for safety reasons, said Vice President Rosario Murillo, according to local media.
>
> The Nicaraguan National Disaster System said in a tweet on Sunday that the entire country was under "red alert," after heavy rains caused multiple rivers to flood.
>
> Guillermo Gonzalez, director of Nicaragua's disaster system, told a press conference that Julia had not caused any fatalities in the country but that more than 13,000 families had been evacuated, more than 800 houses had been flooded and many roofs had been damaged.[55]

On July 1, 2022, Tropical Storm Bonnie "hit the Caribbean coast of Nicaragua near the border with Costa Rica."[56] The storm "caused flash flooding, overflow in rivers and landslides in the

---

[52] Nicaragua: Preparatory Action for Tropical Storms - Operation Update No. 1, DREF N° MDRNI012, International Federation of Red Cross and Red Crescent Societies (IFRC), p.2-3, Oct. 3, 2022.
[53] Hurricane Julia hits Nicaragua with torrential rainfall, The Associated Press, Oct. 9, 2022.
[54] Final Event Briefing - Wind and Storm Surge - TC Julia - Nicaragua - October 18 2022, The Caribbean Catastrophe Risk Insurance Facility (CCRIF SPC), p.2, Oct. 18, 2022.
[55] Tropical Storm Julia emerges over Pacific after crossing Nicaragua, Reuters, Oct. 10, 2022.
[56] Tropical Storm Bonnie hits Nicaragua's Caribbean coast, The Associated Press, Jul. 1, 2022.



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

North and South Caribbean Coast,"[57] and "affected 21 municipalities, flooding 300 homes, ripping off the roofs of 123 homes, and destroying 3 homes."[58]  At least 3,000 people were evacuated,[59] and "Tens of thousands of people across Nicaragua were left without power and more than 10,000 homes had no water."[60]  In addition, 12 people were injured,[61] and four people were killed when they were "swept away by rivers which had been turned into raging torrents by the heavy rains."[62]

---

[57] WFP Nicaragua Country Brief – July 2022, World Food Programme (WFP), p.1, Aug. 26, 2022.

[58] Natural Hazards Monitoring - 5 August 2022, Pan American Health Organization (PAHO), Aug. 5, 2022.

[59] Nicaragua - Floods (PAHO, SINAPRED, INETER) (ECHO Daily Flash of 06 July 2022), European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations (ECHO), Jul. 6, 2022.

[60] Buschschlüter, Vanessa, Storm Bonnie leaves deadly trail in Central America, BBC, Jul. 4, 2022.

[61] Nicaragua - Floods (PAHO, SINAPRED, INETER) (ECHO Daily Flash of 06 July 2022), European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations (ECHO), Jul. 6, 2022.

[62] Buschschlüter, Vanessa, Storm Bonnie leaves deadly trail in Central America, BBC, Jul. 4, 2022.

FOUO//LAW ENFORCEMENT SENSITIVE

# Customs and Border Protection
# After Action Report (AAR)
# Mass Migration Event (MME)
# Del Rio, Texas
# September 8, 2021 – September 24, 2021
# Report Date: October 7, 2021



# United States Border Patrol

# Del Rio Sector

FOUO/LAW ENFORCEMENT SENSITIVE

| | |
|---|---|
| **Op Order Name:** | Del Rio, TX Mass Migration Event (MME) |
| **Report Date:** | October 5, 2021 |
| **Authors:** | PAIC ████████, PAIC ████████, PAIC ████████, |
| PAIC ████████ | |

## DATES

A.  Mass Migration Event Operational Dates:  September 8, 2021 – September 24, 2021

## LOCATION

Del Rio, Texas, Del Rio Sector (DRT) ████████
████████

## COMMAND

A.  **Mass Migration Event Chain of Command**:

| | |
|---|---|
| ████████ | Del Rio Sector (Interim) Chief Patrol Agent |
| | Laredo Sector Deputy Chief Patrol Agent (Incident Commander) |
| ████████ | Del Rio Station Patrol Agent in Charge (Deputy IC) |
| | Eagle Pass Station Patrol Agent in Charge (Deputy IC) |
| | Special Operations Detachment Patrol Agent in Charge (Deputy IC) |

## DESCRIPTION:

A.  **Executive Summary**

From September 8, 2021 to September 24, 2021, Del Rio Sector (DRT) experienced an unprecedented Mass Migration Event (MME) of primarily Haitian nationals illegally crossing into the United States that created a humanitarian crisis which overwhelmed U.S. Border Patrol (USBP), CBP and greater DHS resources.  This was the largest mass migration event in recorded history of the USBP.  A gap in intelligence dissemination and inadequate resourcing and response capabilities resulted in DRT being unprepared to initially manage the volume and speed of which migrants illegally crossed into the United States in a short period of time.  An Incident Command Post (ICP) stood up by USBP and supported by numerous federal, state, local law enforcement components, and non-governmental organizations (NGOs), led efforts to manage the MME.  During the 17-day MME, DRT, supported by internal and external partners encountered 19,752 migrants making illegal entry seeking passage into the United States.

DRT faced significant challenges when thousands of primarily Haitian nationals illegally crossed into the United States in ████ at the weir dam and accumulated underneath the Del Rio Port of Entry (DRL POE) International Bridge.  At one point, the mass of subjects underneath the bridge reached approximately 15,000 migrants from 58 different

FOUO//LAW ENFORCEMENT SENSITIVE

countries.  USBP, along with internal and external partners, faced conditions consistent with those of a mass casualty type event, public health and humanitarian crisis.  Already faced with overcrowded temporary holding facilities and limited ground and air transport capabilities, DRT could not relocate subjects to safer facilities/environments from the bridge in an expeditious manner commensurate with the need.  Many of the subjects suffering from heat exhaustion or other conditions necessitated immediate medical attention.  Additionally, migrants required water and nourishment while waiting for days in areas that became increasingly unsanitary.

Supported by multiple sectors, internal and external partners, the Incident Commander (IC) employed over ███ law enforcement and support personnel to feed, provide general and medical care, transport and process the migrants over the 17-day span.  On September 24, 2021, DRT transported the last remaining migrants from underneath the bridge and formally returned command of operations back to Del Rio Station.  During the MME, DRT fortunately did not experience any migrant deaths, violent events, or use of force incidents.

## B.  Mission Statement

CBP will protect our nation's borders, personnel, infrastructure, and ensure the health and safety of the traveling public, while managing the effects of a land mass migration surge.  CBP will provide additional manpower and resources to Del Rio Sector and Field Office to ensure border security in coordination with State and Local law enforcement partners.

## C.  Intelligence/ Events Leading to Event

a.  Since June of 2021, in the Del Rio Station (DRS) area of responsibility, large numbers of migrants began congregating at the boundary fence near the ████████ ████████" waiting to turn themselves in to law enforcement and Border Patrol agents.  There was no shelter at this location for migrants, especially families with vulnerable persons, small children and pregnant females, were consistently experiencing medical issues due to the heat and exposure to the elements.

b.  On July 30, 2021, DRT implemented a temporary staging area under the DRL POE International Bridge to allow the freely congregating migrants shelter from the elements while they waited to surrender to Border Patrol agents.  Due to the number of migrants congregating at this location DRT provided security, 900 feet of temporary fencing, water, four light plants, twelve port-a-potties, hand washing stations, and dumpsters to maintain sanitation and to prevent the spread of disease as much as possible with limited resources.

c.  On average, between 200 to 1,000 migrants were staged under the bridge while DRT arranged for transportation to various stations and other Sectors for processing.  A large portion these migrants were Haitian.  The identified catalyst

LE USE/LAW ENFORCEMENT SENSITIVE

that caused a rapid increase in migrants staged under the International Bridge was the short notice cancelation of Title 42 expulsion flights from September 8, 2021, until September 19, 2021, to Haiti.  Throughput was interrupted as 900 migrants that were processed for expulsion flights had to be re-processed through other available dispositional pathways.  DRT was already holding approximately 3,200 migrants in temporary holding facilities, 688% over its capacity, when the mass migration event began.  The number of staged migrants rapidly increased from 2,456 on September 13, 2021, to a high of 14,921 on September 18, 2021.

**D. Timeline of Events**

Day 1: Wednesday September 8, 2021
- DRT holding 2,159 in custody / 648 unprocessed
- Title 42 Flights to Haiti Cancelled
- Total DRT POE (Bridge) Encounters 345

Day 2: Thursday September 9, 2021
- Total DRT POE Encounters 454

Day 3: Friday September 10, 2021
- Total DRT POE Encounters 486

Day 4: Saturday September 11, 2021
- Current state of DRT POE is 907 subjects under the bridge.  Most are identified as Haitian migrants.
- Numbers of illegal crossings begin to rapidly increase

Day 5: Sunday September 12, 2021
- DRT holding 2,274 in custody / 1,015 unprocessed
- Additional 499 DRT POE Encounters
- A total of 1,500 migrants are reported to be staged under the DRT POE Bridge

Day 6: Monday September 13, 2021
- Additional 738 DRT POE Encounters
- A total of 2,456 migrants are staged under the DRT POE Bridge

Day 7: Tuesday September 14, 2021
- Additional 848 DRT POE Encounters
- A total of 3,171 migrants are staged under the DRT POE Bridge
- Intelligence reports 8 full charter buses arrive in Ciudad Acuna with more on the way

Day 8: Wednesday September 15, 2021
- 7,007 migrants staged under the DRT POE Bridge
- Del Rio Sector requests additional manpower and OA assistance
- Overtime guidance is updated for all USBP manpower

FOUO//LAW ENFORCEMENT SENSITIVE

Day 9: Thursday September 16, 2021
- Encounters increase to over 1,000 per day and rapidly increase
- A total of 10,503 migrants are staged under the DRT POE Bridge
- Initial request to close the Del Rio POE is submitted
- ICE Aviation Operations is directed to resume Haitian flights beginning next week
- OA assistance begins to arrive in mass

Day 10: Friday September 17, 2021
- DRT holding 2,286 in custody / 1,255 unprocessed
- A total of 13,965 migrants are staged under the DRT POE Bridge
- EOC expands for additional OA tracking and transportation coordination
- Del Rio Sector begins transporting migrants to other Sectors for processing assistance
- DHS Volunteer Force reaches high water mark of ▮ personnel
- Bureau of Prisons reaches high water mark of ▮ personnel
- Texas DPS begins relocating up to ▮ troopers to assist in securing the border
- Texas National Guard is activated and begins to arrive in Del Rio
- DRT POE closes at 1600 hours and reroutes traffic to the Eagle Pass POE.
- Eagle Pass POE entry lanes are reduced to one lane of entry for all cross-border traffic
- All Del Rio Sector Checkpoints closed
- SOG Mobile Command Center (MCC) arrives and becomes operational as ICP

Day 11: Saturday September 18, 2021
- A high-water mark of 14,921 migrants staged under the DRT POE bridge
- Outside temperature reaching 106° Fahrenheit.
- Government of Mexico (GOM) increases efforts to deter migrants in Ciudad Acuna
- GOM established 5 active checkpoints on highways leading into the State of Coahuila, Mexico.  All buses with migrants are being turned around.
- ICE ERO increases manpower support to Del Rio Sector

Day 12: Sunday September 19, 2021
- DRT holding 2,789 in custody / 1,986 unprocessed
- A total of 11,941 migrants are staged under the DRT POE bridge
- Texas DPS hits a high-water mark of ▮ personnel
- First 3 Title 42 Expulsion Flights to Haiti begin
- Del Rio Police Department deployed to assist
- Kinney County Sheriff's Office deployed to assist
- Val Verde County Sheriff's Office deployed to assist

Day 13: Monday September 20, 2021
- A total of 10,413 migrants are staged under the DRT POE bridge
- HHS DMAT reaches high water mark of ▮ personnel for medical assistance
- San Antonio Fire Department personnel arrive for medical assistance

- HSI reaches high water mark of ▮ personnel
- OFO begins processing migrants at the Export Lot and Passport Control Area.
- Prosecution accepted for migrant bus event in Sarita, Texas (escape)

Day 14: Tuesday September 21, 2021
- A total of 8,556 migrants are staged under the DRT POE bridge
- ICE ERO reaches high water mark of ▮ personnel
- Expulsion flights continue to Haiti

Day 15: Wednesday September 22, 2021
- DRT holding in custody 2,745 / 1,103 unprocessed
- A total of 4,994 migrants are staged under the DRT POE bridge
- OFO manpower reaches a high-water mark of ▮ officers
- USBP manpower reaches a high-water mark of ▮ agents

Day 16: Thursday September 23, 2021
- DRT holding 3,216 in custody / 1,059 unprocessed
- A total of 3,447 migrants are staged under the DRT POE bridge

Day 17: Friday September 24, 2021
- DRT holding 2,959 in custody / 743 unprocessed
- All migrants moved to processing facilities.  Zero (0) remain under the DRT POE bridge
- Demobilization begins and OA support begins to reduce
- Operational control of DRT POE is transferred back to Del Rio Station PAIC
- Del Rio POE issues a press release for the re-opening of the port at 1600 hours



**E.  Statistics/ Outcomes based on the information from e3 (All statistics are preliminary, subject to change, and should be considered unofficial)**

    a.  Total Encounters (T8 and T42): 19,752
- No Entry Zone Confirmed: 107
- Del Rio Zone ▮: 19,538
- 5 Encounters (Mexican Nationals) are amenable to Title 42 immediate and therefore do not have an assigned Zone in e3

    b.  Disposition Breakdown:
- Deportable Apprehensions (T8): 13,926
- Title 42 Delayed (T42): 5,821
- Title 42 Immediate (T42): 5

    c.  Demographics:
- Family Unit (FMUA): 10,646
- Single Adults (SAs and FMGs): 9,047
- Unaccompanied Children (UACs): 59

    d.  Peak Holding at POE Bridge was 14,921 on 9/18/2021

    e.  Peak Day: 09/21/2021 had a total of 2,958 encounters

    f.  Highest in custody number 3,216 on 9/23/2021 (DRT only)

    g.  Citizenship:
- A total of 58 unique Countries of Citizenship were encountered.
- Top 5 Countries (95% of all encounters):
    1. Haiti: 13,893 (70%)
    2. Chile: 2,146 (11%)
    3. Cuba: 1,210 (6%)
    4. Venezuela: 1,077 (5%)
    5. Brazil: 489 (2%)
- Haitian subjects traveled through multiple countries prior to entering the United States. Some subjects from Chile, Brazil, or other countries may belong to Haitian Family Units but have citizenship in the country in which they were born.
- See Country Breakdown (Annex A) for a full list of the 58 countries and encounters.

    h.  Total number processed for Title 42 expulsion to Haiti was 4,435 with 3,440 expelled during the reporting period.
- As of September 30, 2021, 6,085 Haitians have been expelled by aircraft (additional flights are expected)

    i.  There were ▮▮▮ Law Enforcement and support personnel who responded to the MME (Refer to Annex B for agency breakdown)

    j.  Contracts for 139 porta potties, 28 hand washing stations, and 8 bulk trash bins were used to support the migrants (this was wholly insufficient but also exhausted total regional supplies)

FOUO//LAW ENFORCEMENT SENSITIVE

k.  Red Cross provided 17,000 hygiene kits (each kit contained a razor blade that had to be removed prior to issuance)
l.  World Central Kitchen and local contracted vendors provided 14,000 meals daily to migrants on average.
**m.**  CBP medical personnel responded to 672 calls for assistance to evaluate and treat migrants.  A total of 425 migrants required advanced care and were referred to HHS DMAT medical personnel.  Migrants were treated for a variety of issues ranging from seizures to respiratory distress.  Medical teams delivered one baby at the POE bridge and 10 others were born at local hospitals.  A total of 16 migrants were transported to local hospitals after being evaluated by DMAT medical personnel.  **There were zero (0) deaths during the MME.**
n.  Border Patrol Search and Rescue teams successfully performed 56 water rescues in the Rio Grande River.  Most water rescues occurred on September 23, 2021 (53 rescues)
o.  ▮ transport buses and ▮ transport vans were surged into Del Rio for assistance. (There actual requirement was ▮ busses, but the requirement could not be met from current government/private sector supplies)
  * ▮  USBP buses
  * ▮  Contract Services buses
  * ▮ United States Marshal Service buses
  * ▮ Bureau of Prison buses
  * ▮  leases buses
  * ▮  Vans
  * ▮ contracted vans

**F.  Law Enforcement and Support Partners**
a.  Air and Marine Operations
b.  Office of Field Operations
c.  Department of Homeland Security Volunteer Force
d.  Immigration and Customs Enforcement, Enforcement and Removal Operations Special Response Team (ERO/SRT)
e.  Homeland Security Investigations Special Response Team (HSI/SRT)
f.  Department of Justice (DOJ) Bureau of Prisons (BOP)
g.  Health and Human Services (HHS)
h.  Texas Department of Public Safety (DPS)
i.  Texas Military Department (Texas National Guard)
j.  Val Verde County Sheriff's Office (VVSO)
k.  City of Del Rio, Mayor's Office
l.  Del Rio Police Department (DRPD)
m.  Texas Parks and Wildlife Department (TPWD)
n.  San Antonio Fire Department (FDSA)
o.  Texas Intrastate Fire Mutual Aid System (TIFMAS)
p.  National Institute of Migration of Mexico (INM)

FOUO//LAW ENFORCEMENT SENSITIVE

q.  Mission Border Hope (NGO, Eagle Pass, TX)
r.  Val Verde Border Humanitarian Coalition (NGO, Del Rio, TX)
s.  World Central Kitchen (NGO)

## G.  Roles and Responsibilities

The U.S. Border Patrol was the lead Component charged with managing the MME due to statutory authority.  The Incident Command Post (ICP) was stood up on September 16, 2021, and the Incident Commander (IC) was responsible for coordination with supporting federal, state, local partners, and non-governmental organizations.  The IC conducted daily operational briefs with supporting partners for situational awareness as well as task assignments.  Responsibilities were broken down into the support categories of Administrative Support, Intelligence Support, Operational Support, Logistical Support and Medical Support.  The DRT Sector Chief maintained responsibility of controlling the outer perimeter and security patrols within the crowds in the containment zone, which afforded the ability to provide security and immediate medical assistance when necessary



## H.  Technical Performance

The current processing pathways in place are adequate for normal migrant and seasonal flow.  However, the sheer volume of the mass migration overwhelmed throughput within CBP, ICE, and HHS.  Personnel, CBP facility holding/detention capacities, and transportation (ground and air) are wholly insufficient to safely manage this type of Mass Migration event. Synchronization between USBP and ERO manifests continues to evolve to decrease processing and transfer of custody time.

## I.  Equipment Performance

All equipment performed as expected.  Del Rio Sector and CBP Facilities, Maintenance, and Equipment (FM&E) facilitated many contracts in support of life sustaining functions

for migrants and personnel assisting with operations, security, and support. Equipment not readily available to CBP was contracted through local vendors.

**J. Finance and Resources**

  a. Del Rio Sector Finance Office continues to work through pending acquisitions and reconciliation processes. Actual figures are expected to fluctuate as reimbursements and fiscal year closeouts continue. Estimates are current as of October 7, 2021.
  b. DRT Sector Expenses: ███
  c. OFAM / FM&E Expenses: ███
  d. PMOD Expenses: ███
  e. SPAD Expenses: ███
  f. Border Patrol TDY estimate per day ███
  g. Overtime cost estimate ███
  h. HHS DMAT cost estimate: ███
  i. Loyal Source Contract for 13 days: ███
  j. Sanitation Expenses: ███
  k. Del Rio Sector weekly fuel cost: ███
  l. Ground Transportation: ███
  m. ICE flight cost ███
  n. Department of Defense flight support cost estimate - ███
  o. DHS Volunteer Force ███
  **p. Total DRT / Border Patrol Cost Estimate:** ███
  q. Additionally, Office of Field Operations (OFO) reported a loss of an average of ███ daily in estimated duties and fees collected as well as an estimated ███ lost in import value.

**K. Safety Concerns**

Ensuring the safety of migrants, law enforcement, and support personnel was the first line of effort for the IC.

  a. The Del Rio POE closure mitigated potential risk to all personnel below the bridge.
  b. A Temporary Flight Restriction (TFR) was put in place for the safety and security of the migrants and the numerous law enforcement aviation assets supporting operations. Media and privately owned drones caused a concern and the TFR provided an effective way to mitigate safety issues while allowing operations to continue uninterrupted.
  c. AMO was able to synchronize aviation support and leverage local organic resources to provide ISR capabilities to maintain situational awareness and enhance officer safety on a 24 hour cycle.
  d. Local and national media requests for drone coverage were coordinated through the DRT Strategic Communications Office.

LAW ENFORCEMENT SENSITIVE

    e.  CBP EMTs were immediately requested and redirected to support medical needs.

    f.  COVID exposure and other contagious disease spread in a mass migration event continues to be a safety issue for law enforcement and the general public. Multiple CBP employees deployed to Del Rio reported testing positive for COVID either during or immediately after their deployment as well as one agent contracting SCABIES infection.

    g.  FBI continually monitored information from both anti-law enforcement and anti-immigrant threat groups.  Many National Security issues were mitigated during the mass migration event to include two special interest migrants with national security concerns being apprehended and the interception of a possible violent actor at the Del Rio Port of Entry.

### L.  Communication of Directions, Events and Changes to Plans

Incident command conducted daily scheduled and hasty meetings with all executive leaders throughout the MME.  Communication was adequate to ensure operational expectations and requirements were clear for supporting law enforcement personnel.  On-site visits by Headquarters personnel and White House officials ensured the full scope of the event was understood for maximum support of resources and planned actions.

### M. Strategic Communications

Strategic Communications (StratCom) and CBP Public Affairs (PA) are a critical role to ensure leadership at all levels as well as the media and the general public have the perspective of the agents on the ground managing the MME.  Both DRT StratCom and CBP PA are co-located in Del Rio and synchronizes the messaging.  Del Rio Sector StratCom had been messaging the use of the bridge as a staging location for large groups of migrants arriving since July 31, 2021.  This created an advantage with the Del Rio Mayor and local law enforcement officials as they were already aware of the situation before the mass migration event occurred.  Del Rio Sector had previously posted the use of the bridge and current situation on social media, new articles, distributed photos, and even had Congressional visits at the location before the mass migration event.

On September 13, 2021, numbers staged at the bridge began to rapidly increase.  Due to the previous engagements with the City of Del Rio, resources began to arrive in support of the efforts.  Messaging was put on hold until press conferences could be held that were approved by the Office of Public Affairs (OPA).  The only messaging that StratCom released was the POE closure to the Office of Congressional Affairs (OCA) on September 17, 2021.  Media and community members were the only entities distributing information which caused the Border Patrol to lose control of the messaging.

Chief Ortiz provided a short interview with local KENS 5 on September 17, 2021 and held a formal press conference on September 19, 2021.  The DHS Secretary also held a press conference on September 20, 2021.  Headquarters approval was required for all social media posts.  The early and consistent release of unconstrained accurate messaging

LAW ENFORCEMENT SENSITIVE

from the Border Patrol would have provided a more holistic view to the public and other law enforcement agencies.

Detailing media support and additional StratCom personnel early in the crisis was needed to manage multiple site visits which overwhelmed the small Del Rio StratCom team.

**N. Environmental Concerns**

Summer temperatures reached as high as 106° and weather threatened the safety of the migrants that illegally crossed the border and the law enforcement personnel managing on scene issues. Additionally, migrants had no water, food, or shelter to protect themselves from the environmental hazards. Medical support was needed for on-site assistance for minor and advanced medical care. CBP EMTs were the first to surge to the area followed by HHS DMAT personnel for an increased capability and capacity. Zero fatalities occurred during the MME.

**O. Physiological Impacts (Stress and Fatigue Impact)**

The chaotic scene and high level of coordination required long hours of work in a very stressful environment. Leadership and personnel performing tasks to care for the migrants endured physical and mental exhaustion to ensure solutions were carried through to manage the MME. Mandated overtime further reduced rest cycles. The arrival of additional high-level leadership and detailers was needed early in the mass migration event to reduce physical and physiological impacts. CBP, State and Local law enforcement as well as all support personnel rose to the challenges of the crisis that produced a highly successful resolution of the MME.

**Lessons Learned (issues/ recommendations)**

**A. Title 42 Flights Cancelled**
   a. On September 8, 2021, DRT Staff was informed by ICE/ERO that Title 42 flights supporting the expulsion of migrants from the United States would be cancelled. USBP was required to reprocess hundreds of migrants under Parole ATD, which created an immediate backlog of nearly over 1000 migrants. Additionally, it is believed the halt in expulsions was communicated immediately within the Haitian population creating an added pull factor and a rush to cross illegally into the U.S.
   b. In leu of Title 42 expulsion and expected termination of CDC Tile 42 authority, USBP and DHS partners should seek alternative options to immediately remove amenable migrants from custody upon completion of processing.
   c. Advanced warning needs to be given when expulsion flights are cancelled in order to avoid a disruption in throughput due to re-processing requirements.

**B. Del Rio POE Closure**
   a. DRT Staff coordinated with DRL Staff for several days prior to the closure of the DRL POE. On September 16, 2021, USBP formally made the request the close the Del Rio POE due to increasing number of migrants under the bridge and for

LAW ENFORCEMENT SENSITIVE

security and safety concerns. On the evening of September 17, 2021, the Del Rio Field Office closed the Del Rio POE. Additionally, the Eagle Pass POE, the nearest POE (approximately 50 miles away) was reduced to one lane due to OFO manpower supporting the MME. The closures resulted in significant delays for all essential and commercial cross border travel from Ciudad Acuna to Piedras Negras.

b. In future MMEs, POE closures should be considered, discussed, and planned with OFO to be engaged swiftly to address security concerns. The POE closure mitigated risks to the migrants directly below the bridge, POE footprint security, and allowed Mexican authorities an opportunity to disperse migrants staged along the Rio Grande River, thus reducing cross border activity at the Weir Dam and the Boat Ramp crossings.

## C. Migrant Transportation Coordination (Busses)

a. DHS lacked sufficient transportation and there was no mass transportation coordination mechanism within the Department to relocate the mass of migrants in Del Rio. CBP and ERO transportation capabilities were also limited. DOJ Bureau of Prisons assisted CBP by providing busses and drivers that could drive beyond the time restrictions set forth in current CBP transportation contracts. The Commissioner's Action Group (CAG) assisted with the reallocation of CBP contracted buses and communicated directly with the IC to coordinate additional transportation throughout the Southern United States and to Haiti as well.

b. Establish a scalable, high capacity CBP transportation contract. A scalable contract will allow CBP to increase or redirect contracted transportation assets throughout the nation or throughout established regions to better support sectors when migrant flows develop and or evolve.

c. Establish inter and intra agency MOUs to expand transportation capacity immediately within hours, not days.

d. As the MME emerged, DRT expanded their sector transportation cell from a minimally staffed coordination element that mostly coordinated movement within sector to a fully staffed unit comprised of subject matter experts who coordinated detainee movement from the incident site to CPCs and stations in and outside of DRT.

## D. ERO Manifest Issues

a. USBP does not have access to ERO systems of record utilized for passenger manifests, nor does ERO have access to USBP's detention module in e3. This lack of access forces USBP agents to manually enter names and dates of birth to generate manifest rosters for ERO. This process is not efficient – the process to generate a manifest for an expulsion flight of 130 passengers requires 8-man hours to produce from DRT personnel alone.

b. USBP and ERO systems must be linked to generate passenger manifests more efficiently, or DHS should have a singular processing system that accommodates

FOUO//LAW ENFORCEMENT SENSITIVE

all Departmental requirements from intake/processing, care and custody, and finally book-out/manifesting. It is also recommended USBP maintain ERO teams imbedded onsite at USBP sectors or temporary holding facilities to expedite manifest coordination.

c. CBP and ERO functions in a mass migration event are intertwined with what CBP interdicts.  Greater volumes of people need to be swiftly and effectively moved by ERO to expanded ERO holding capacities across the nation.

**E. Lead Field Command Construct**

a. The Lead CBP Field Coordinator (LFC) construct provides an identified CBP leader directed to develop and maintain a regional based preparedness plan that incorporates coordinated planning and leverages the resources and capabilities of all CBP Components within a region.  Although the Del Rio MME warranted unified emergency and humanitarian responses from CBP, DHS, and local law enforcement resources, the LFC construct was not activated.

b. It is recommended for CBP leadership to consider at what point during a crisis, such as the Del Rio MME, a LFC activation is warranted.  Trigger points may need to be identified that would assist with LFC activation requirements.

**F. Detention Capacity**

a. Del Rio Sector's (DRT) total detention capacity is ▮▮▮▮ and has been averaging 500 percent over capacity at any given time which results in excessive time-in-custody and overcrowding at every station, including the soft side processing facility in Eagle Pass.  DRT, along with USBP Sectors along the Southwest Border (SWB), continue to experience overcrowding at levels not seen before. There is no indication that ICE/ERO detention capacity will ever increase to meet the flow of migrants illegally entering the Unites States through Del Rio Sector or any SWB sector.  ICE/ERO needs to immediately address their shortfall in holding capacity across the nation.

b. It is recommended that USBP HQ in collaboration with ICE ERO take ownership of the detention space problem and, with the support of all pertinent DHS partners, embark on a Regional Processing and Detention Centers (RPDC) initiative that will alleviate overcrowding in DRT, LRT, and RGV (specifically) as well as the rest of the SWB.  Multiple RPCD facilities centrally located in the southwest or south-central area of Texas and supported by DHS ICE partners would be responsible for Housing, Processing, and the proper disposition of migrants.  The centers would also serve and the central transportation coordination hub.  Initial holding capacities ▮▮▮▮▮▮ should be scalable and gauged by current in custody numbers, projections for evolving large migration volume headed to our southwest border, and processing times.

LAW ENFORCEMENT SENSITIVE

### G.  Designated Areas at IC for Supporting Agencies

a. Law Enforcement command and supporting elements should be considered when establishing the location of the Incident Command Post (ICP).  The ICP in Del Rio was comprised of a Mobile Command Center (MCC) provided by USBP SOG.  The MCC was located approximately 100 yards away from the migrant staging area.  Although AMO, ERO and Texas DPS had representation in the ICP, no other supporting components or agencies were staged nearby.

b. When establishing the ICP, the IC, Deputy ICs and planners should allocate adjacent or nearby footprints for support federal, state, and local LE partners to situate their command elements.  Consider climate-controlled shelters for cooperating agency meetings and government or non-government delegation visits.

### H.  Regional Mobile Command Centers

a. DRT does not possess its own MCC and therefore requested SOG's MCC which arrived on September 17, twenty-four hours after it was requested.  Prior to establishing a location for the ICP, the IC staff maintained a mobile posture on foot or in vehicles.

b. The IC recommends the procurement of sector MCCs to support future incidents. At a minimum, one MCC could support multiple sectors using a regional concept. For example, one centrally located MCC could support incidents from Rio Grande Valley to Del Rio Sector.  This should evolve to every sector having an MCC with further ability to create expanded climate-controlled IC tent structures to supplement for multiple LE partner collaboration.

### I.  Personnel Lodging

a. There were ▮▮▮▮ law enforcement, first responder, and support personnel (internal and external to DHS) supporting the Del Rio MME.  Del Rio, TX has an approximate population of 36,000 and limited lodging options throughout the local and regional economies.  Many deployed personnel could not secure lodging within a 55-mile radius and traveled over 100 miles from their lodging sites to the Del Rio POE daily.  DRT coordinated with the City of Del Rio to secure 500 retrofitted lodging spaces at the local convention center through contractual services made available to DHS employees.

b. At the onset of an imminent MME, sectors should immediately examine lodging availability and begin communicating with contractual service representatives to secure available lodging accommodations and other associated resources to support deployed personnel.

### J.  Sensitive Compartmented Information Facilities (SCIF)

a. The dissemination of relevant information for MMEs is critical for Sectors when preparing for mass migration management, and all other law enforcement operations.  Most USBP Sectors do not have the ability to communicate high-

LAW ENFORCEMENT SENSITIVE

level law enforcement and sensitive information from the Intelligence Community (IC) without Sensitive Compartmented Information Facilities (SCIF).

b.  All USBP Sectors must have access to SCIFs located at designated sites within a sector or within reasonable commuting distances to receive pertinent IC information or other sensitive law-enforcement information.  Even portable solutions like Yuma Sector's capability would be acceptable access.  DHS needs to invest in SCIF buildouts for all USBP Sectors.

**K.  Department of Defense (DoD) Crisis Response Force (CRF) Support**

a.  Even with the combined resources from DHS and DOJ, DRT experienced significant challenges at the onset of the mass migration event (MME).  The most significant challenges were the transportation, housing, feeding, security, and welfare of migrants.

b.  Sectors planning for an MME should consider Department of Defense (DoD) Requests for Assistance (RFA) for Crisis Response Force (CRF) elements.  The CRF was an approved duty description for RFA FY21 however, DoD did not approve the CRF for RFA FY22.  A separate or updated RFA is required for this function to be available to CBP during a mass migration event.  A CRF would provide DHS with assistance to enhance force protection, medical, aviation, and engineering capabilities.  More specifically, the CRF should include additional support functions to include CDL Drivers, high-capacity Transportation Vehicles, high-capacity Field Holding Structures, security functions associated with the stand up of high-capacity field holding structures, medical, and high-capacity fixed wing support for moving both CBP personnel and migrants.  DoD RFAs are submitted through the CBP Executive Agent as requirements are identified by CBP. This RFA needs to be approved yearly, all associated actions executable with preset timelines when CBP identifies emerging incidents and continues to evolve with the expanding MME problem sets impacting the country.

c.  The speed, number, and frequency of MMEs require DoD pre-coordinated assistance that is immediately responsive and agile.  DHS always looks internally before seeking assistance outside the department.  CBP currently does not have the organic resources to fill the various capability gaps identified during large mass migration events.

## SUMMARY

The seventeen (17) day Mass Migration Event (MME) required a whole of government response to ensure the safety, rapid transport, and efficient processing of migrants from 58 different countries that illegally crossed into the United States and congregated under the Del Rio Port of Entry International Bridge.  The MME was unlike anything that CBP had encountered in its history and at its peak, 14,921 migrants were staged under the bridge.  CBP temporary holding facilities were already over capacity and local resources were inadequate to manage the speed and volume of migrants flowing into the United States.  State, Local, and Community partners

FOUO/LAW ENFORCEMENT SENSITIVE

responded to CBP's support request and exhausted all available resources to assist in managing the event. All Southwest Border Patrol Sectors assisted by sending personnel and resources to Del Rio and hundreds of Border Patrol agents and CBP officers from across the country arrived to assist.

A massive effort to care for the migrant's safety and basic needs was underway as ground and air transportation relocated thousands of migrants to facilities across the Southwest Border for processing. This unprecedented historical response to the MME successfully prevented any loss of life and treated hundreds of migrants in need of medical assistance. The Office of Field Operations played a key role in assisting the Border Patrol and in the closure of the Port of Entry was the turning point that increased safety and gained a greater response from the Government of Mexico and officials in the National Capital Region. The response by the State of Texas and the surge of Department of Public Safety Troopers was monumental.

Intelligence and open-source reporting have indicated that tens of thousands more migrants are traveling to the southern border of the United States that intend to make illegal entry. Transnational Organized Crime (TOC) elements have exploited policy changes and are facilitating the movement of migrants through the Western Hemisphere to the U.S. Southern Border with profit being the primary driving factor. National Security continues to be at greater risk as CBP collapses resources and personnel to manage large groups of migrants. TOC will continue to exploit our border in areas left vulnerable while CBP attends to MME as they occur. Policy changes and increased capacity and capabilities of all components and agencies that have a role in Border Security and thereby National Security, the immigration process, and the detention/adjudication continuum are needed for the humane and efficient management of mass migration.

## ANNEXES:

- Annex A: Country Breakdown of Encounters
- Annex B: Supporting Personnel and Asset List
- Annex C: Photos

End of Report

**ANNEX A: Country Encounter Breakdown (September 8, 2021 to September 24, 2021)**

| Country | Deportable Apprehensions | T42 Delayed | T42 Immediate | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 1 | 0 | 0 | 1 | 0% |
| ANGOLA | 49 | 0 | 0 | 49 | 0% |
| ARGENTINA | 3 | 0 | 0 | 3 | 0% |
| BAHAMAS | 2 | 0 | 0 | 2 | 0% |
| BANGLADESH | 1 | 0 | 0 | 1 | 0% |
| BENIN | 1 | 0 | 0 | 1 | 0% |
| BOLIVIA | 6 | 0 | 0 | 6 | 0% |
| BRAZIL | 375 | 114 | 0 | 489 | 2% |
| BURKINA FASO | 18 | 1 | 0 | 19 | 0% |
| CAMEROON | 14 | 1 | 0 | 15 | 0% |
| CENTRAL AFRICAN REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| CHAD | 3 | 0 | 0 | 3 | 0% |
| CHILE | 1,626 | 520 | 0 | 2,146 | 11% |
| COLOMBIA | 62 | 0 | 0 | 62 | 0% |
| CONGO | 11 | 0 | 0 | 11 | 0% |
| COSTA RICA | 6 | 0 | 0 | 6 | 0% |
| CUBA | 1,204 | 6 | 0 | 1,210 | 6% |
| CZECH REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| DEM REP OF THE CONGO | 12 | 0 | 0 | 12 | 0% |
| DOMINICAN REPUBLIC | 54 | 1 | 0 | 55 | 0% |
| ECUADOR | 35 | 12 | 0 | 47 | 0% |
| EL SALVADOR | 4 | 8 | 3 | 15 | 0% |
| EQUATORIAL GUINEA | 2 | 0 | 0 | 2 | 0% |
| ERITREA | 5 | 0 | 0 | 5 | 0% |
| ETHIOPIA | 1 | 0 | 0 | 1 | 0% |
| FRANCE | 2 | 1 | 0 | 3 | 0% |
| FRENCH GUIANA | 5 | 0 | 0 | 5 | 0% |
| GAMBIA | 2 | 0 | 0 | 2 | 0% |
| GHANA | 50 | 0 | 0 | 50 | 0% |
| GUATEMALA | 4 | 9 | 0 | 13 | 0% |
| GUINEA | 23 | 0 | 0 | 23 | 0% |
| GUYANA | 9 | 0 | 0 | 9 | 0% |
| HAITI | 8,878 | 5,015 | 0 | 13,893 | 70% |
| HONDURAS | 22 | 54 | 2 | 78 | 0% |
| MALI | 3 | 0 | 0 | 3 | 0% |
| MAURITANIA | 5 | 0 | 0 | 5 | 0% |
| MEXICO | 31 | 69 | 0 | 100 | 1% |
| NICARAGUA | 169 | 1 | 0 | 170 | 1% |
| NIGER | 3 | 0 | 0 | 3 | 0% |
| NIGERIA | 9 | 0 | 0 | 9 | 0% |
| PAKISTAN | 5 | 0 | 0 | 5 | 0% |
| PANAMA | 12 | 1 | 0 | 13 | 0% |
| PAPUA NEW GUINEA | 1 | 0 | 0 | 1 | 0% |
| PERU | 19 | 0 | 0 | 19 | 0% |
| PHILIPPINES | 1 | 0 | 0 | 1 | 0% |
| SAO TOME AND PRINCIPE | 1 | 0 | 0 | 1 | 0% |
| SENEGAL | 48 | 2 | 0 | 50 | 0% |
| SIERRA LEONE | 5 | 0 | 0 | 5 | 0% |
| SOMALIA | 4 | 0 | 0 | 4 | 0% |
| SOUTH AFRICA | 4 | 0 | 0 | 4 | 0% |
| SURINAME | 1 | 0 | 0 | 1 | 0% |
| TAJIKISTAN | 2 | 0 | 0 | 2 | 0% |
| TOGO | 4 | 0 | 0 | 4 | 0% |
| TURKEY | 1 | 0 | 0 | 1 | 0% |
| URUGUAY | 23 | 0 | 0 | 23 | 0% |
| UZBEKISTAN | 9 | 0 | 0 | 9 | 0% |
| VANUATU | 1 | 0 | 0 | 1 | 0% |
| VENEZUELA | 1,071 | 6 | 0 | 1,077 | 5% |
| Total | 13926 | 5821 | 5 | 19752 | |

| Country | FMUA | Single Adult | UAC | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 0 | 1 | 0 | 1 | 0% |
| ANGOLA | 35 | 12 | 2 | 49 | 0% |
| ARGENTINA | 2 | 1 | 0 | 3 | 0% |
| BAHAMAS | 1 | 1 | 0 | 2 | 0% |
| BANGLADESH | 0 | 1 | 0 | 1 | 0% |
| BENIN | 0 | 1 | 0 | 1 | 0% |
| BOLIVIA | 2 | 4 | 0 | 6 | 0% |
| BRAZIL | 485 | 4 | 0 | 489 | 2% |
| BURKINA FASO | 9 | 10 | 0 | 19 | 0% |
| CAMEROON | 0 | 15 | 0 | 15 | 0% |
| CENTRAL AFRICAN REPUBLIC | 0 | 2 | 0 | 2 | 0% |
| CHAD | 3 | 0 | 0 | 3 | 0% |
| CHILE | 2,144 | 1 | 1 | 2,146 | 11% |
| COLOMBIA | 35 | 27 | 0 | 62 | 0% |
| CONGO | 8 | 3 | 0 | 11 | 0% |
| COSTA RICA | 5 | 1 | 0 | 6 | 0% |
| CUBA | 219 | 988 | 3 | 1,210 | 6% |
| CZECH REPUBLIC | 0 | 2 | 0 | 2 | 0% |
| DEM REP OF THE CONGO | 10 | 1 | 1 | 12 | 0% |
| DOMINICAN REPUBLIC | 25 | 29 | 1 | 55 | 0% |
| ECUADOR | 32 | 15 | 0 | 47 | 0% |
| EL SALVADOR | 8 | 6 | 1 | 15 | 0% |
| EQUATORIAL GUINEA | 0 | 2 | 0 | 2 | 0% |
| ERITREA | 0 | 5 | 0 | 5 | 0% |
| ETHIOPIA | 0 | 1 | 0 | 1 | 0% |
| FRANCE | 3 | 0 | 0 | 3 | 0% |
| FRENCH GUIANA | 4 | 1 | 0 | 5 | 0% |
| GAMBIA | 0 | 2 | 0 | 2 | 0% |
| GHANA | 16 | 34 | 0 | 50 | 0% |
| GUATEMALA | 10 | 3 | 0 | 13 | 0% |
| GUINEA | 3 | 17 | 3 | 23 | 0% |
| GUYANA | 3 | 6 | 0 | 9 | 0% |
| HAITI | 6,805 | 7,063 | 25 | 13,893 | 70% |
| HONDURAS | 45 | 25 | 8 | 78 | 0% |
| MALI | 1 | 2 | 0 | 3 | 0% |
| MAURITANIA | 0 | 5 | 0 | 5 | 0% |
| MEXICO | 27 | 71 | 2 | 100 | 1% |
| NICARAGUA | 69 | 98 | 3 | 170 | 1% |
| NIGER | 3 | 0 | 0 | 3 | 0% |
| NIGERIA | 4 | 5 | 0 | 9 | 0% |
| PAKISTAN | 0 | 5 | 0 | 5 | 0% |
| PANAMA | 12 | 1 | 0 | 13 | 0% |
| PAPUA NEW GUINEA | 0 | 1 | 0 | 1 | 0% |
| PERU | 12 | 7 | 0 | 19 | 0% |
| PHILIPPINES | 1 | 0 | 0 | 1 | 0% |
| SAO TOME AND PRINCIPE | 0 | 1 | 0 | 1 | 0% |
| SENEGAL | 3 | 47 | 0 | 50 | 0% |
| SIERRA LEONE | 4 | 1 | 0 | 5 | 0% |
| SOMALIA | 0 | 4 | 0 | 4 | 0% |
| SOUTH AFRICA | 0 | 4 | 0 | 4 | 0% |
| SURINAME | 1 | 0 | 0 | 1 | 0% |
| TAJIKISTAN | 0 | 2 | 0 | 2 | 0% |
| TOGO | 0 | 4 | 0 | 4 | 0% |
| TURKEY | 0 | 1 | 0 | 1 | 0% |
| URUGUAY | 20 | 2 | 1 | 23 | 0% |
| UZBEKISTAN | 0 | 9 | 0 | 9 | 0% |
| VANUATU | 0 | 1 | 0 | 1 | 0% |
| VENEZUELA | 569 | 500 | 8 | 1,077 | 5% |
| Total | 10,646 | 9,047 | 59 | 19,752 | |



Annex C
Photo Annex
Del Rio Mass Migration Event

LAYDOWN at ONSET



BUILDUP



Annex C
Photo Annex
Del Rio Mass Migration Event

FINAL LAYDOWN





Annex C
Photo Annex
Del Rio Mass Migration Event

September 16, 2021



September 17, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 18, 2021



September 19, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 22, 2021



September 22, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 23, 2021



September 24, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event



