

TUCSON, Ariz. — A local migrant shelter may soon have to turn away migrants as they near capacity. That could mean Border Patrol will start to have to do community releases for migrants in their custody.

The influx the shelter has been seeing is putting a strain on their resources. Shelter workers describe the increased numbers as hectic and are hoping for relief.

Recent Stories from kgun9.com



"Unfortunately, the reality is that's increased our numbers past the point that Alitas is able to welcome all of these folks and it could result in straight releases here in Tucson," said Executive Director of Casa Alitas Teresa Cavendish.

Several buses were seen dropping off an upwards of 50 people at the Tucson shelter on Thursday.

At Casa Alitas, they are given COVID tests along with food, water and travel arrangements but with the influx of guests, workers say they just can't keep up.

Nicaragua AR_001220

"We're tapped out on how many we can receive safely, where it is safe for both our guests, for our volunteers and for our staff. And so anything in excess of our maximum numbers are what they call community releases," explained Cavendish.

For the past three weeks, she says they have been receiving about 400 to 450 migrants a day. The shelter usually receives an average of 300 guests a day.

From men and women to infants, some may start to be turned away. Despite the challenges, volunteers here just do what they can, for the people they can help.

"All of us somewhere in our background. Most likely grandparents more than anything are coming from Europe after World War II or God only knows where," said Laurence Olivier, a volunteer at Casa Alitas.

Casa Alitas is in need of volunteers, as well as supplies such as clothing and toiletries. For more information on donating, check out the Casa Alitas website.

———-

**Denelle Confair** is *an anchor and investigative reporter for KGUN 9. It's been her dream to tell your stories for the past decade. She is extremely curious and wants to continue to use her storytelling for the greater good. Share your story ideas and important issues with Denelle by emailing* **denelle.confair@kgun9.com** *or by connecting on* Facebook, *and* Twitter.



News    Weather    Traffic    You Ask. We Investigate.™    Support

Scripps Local Media
© 2022 Scripps Media, Inc

*Give Light and the People Will Find Their Own Way*

Sitemap    Privacy Policy    Privacy Center
Journalism Ethics Guidelines    Terms of Use    EEO    Careers
KGUN FCC Public File    KWBA FCC Public File
FCC Application    Public File Contact    Accessibility Statement
Closed Captioning Contact

Nicaragua AR_001222

‹ What we know about the storm and tornadoes that ripped through North Texas

What Texas coach Rodr Longhorns ›

NEWS

# Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock'

Mexico will ask the Biden administration to strengthen policies for resettling migrants in the U.S. and foster economic development in the migrants' homelands.



Migrants travelling in a caravan of more than a thousand people from countries such as Nicaragua, Peru, Ecuador, Colombia, Venezuela and the Dominican Republic cross the Rio Bravo river (or Rio Grande river, as it is called in the US) to ask for political asylum in the United States, in Ciudad Juarez, Chihuahua state,

Nicaragua AR_001223

Case 6:23-cv-00007 Document 94-5 Filed on 03/24/23 in TXSD Page 5 of 210

Mexico, on December 11, 2022. (Photo by HERIKA MARTINEZ / AFP) (Photo by HERIKA MARTINEZ/AFP via Getty Images) (HERIKA MARTINEZ / AFP via Getty Images)



By [Alfredo Corchado](Alfredo Corchado)
6:00 AM on Dec 13, 2022 CST

▶ Listen to this article now

 Powered by **Trinity Audio**

00:00                                                   05:21

MEXICO CITY — A senior Mexican official said his country stands ready to work with the Biden administration when a pandemic-related public health order lifts later this month — but if, and only if, the U.S. agrees to fundamental steps, including strengthening policies for resettling migrants in the U.S. and fostering economic development in the migrants' homelands.

In an interview with *The Dallas Morning News*, Roberto Velasco, a top diplomat and Mexico's chief officer for the North America Unit at the Mexican Secretariat of Foreign Affairs, described negotiations with the U.S. as "intense" and "round-the-clock."



**FEATURED ON DALLAS NEWS**

**Dallas Cowboys make a visit to Children's Medical Center**

Dallas Cowboys

The ongoing negotiations between officials from both countries come as more than 1,500 migrants made their way from Ciudad Juárez to El Paso on Sunday,

Nicaragua AR_001224

after some said they escaped or were rescued by Mexican federal forces from a cell controlled by members of organized crime.

The weekend's surge comes as U.S. and Mexican officials prepare for an increased migrant flow in anticipation of the Dec. 21 lifting of Title 42, the public health order that allows U.S. border agents to expel migrants without giving them a chance to apply for asylum under the justification that it was for pandemic safety.

A federal judge has ordered the end of Title 42, although the Biden administration has said it plans to appeal, it's not clear what the Biden administration's plans are after the lifting of the public health order.



Migrants travelling in a caravan of more than a thousand people from countries such as Nicaragua, Peru, Ecuador, Colombia, Venezuela and the Dominican Republic crossed the Rio Bravo (or Rio Grande, as it is called in the U.S.) to ask for political asylum in the United States in Ciudad Juarez, Chihuahua state, Mexico, on Dec. 11, 2022. (Photo by HERIKA MARTINEZ/AFP via Getty Images) (HERIKA MARTINEZ / AFP via Getty Images)

An average of about 2,400 people are turning themselves in daily to agents of the U.S. Border Patrol in El Paso. Migrants from Latin America — including Peru,

Nicaragua AR_001225

Nicaragua, Colombia, Ecuador and Venezuela — are crossing the Rio Grande and turning themselves in to agents at a processing center on the U.S. side.

> **Related:** Holding onto their dream, a Venezuelan family finds jobs at the Texas-Mexico border

To relieve pressure on the overcrowded processing center, migrants are being flown to Border Patrol locations in other regions — including the remote Big Bend area, according to U.S. Customs and Border Protection, or CBP. Between three to five flights a day depart from El Paso, according to CBP.

The drama plays out as Homeland Security Secretary Alejandro N. Mayorkas is expected to visit El Paso on Tuesday for a previously planned trip.

> **Related:** On a cold riverbank at U.S.-Mexico border, migrants endure limbo as U.S. policy shifts

It's the chaotic situation on the border that Velasco said the Mexican government wants to avoid. He said he expects the U.S. to seek help from its neighbor to take more migrants, yet declined to elaborate, describing the issue as "sensitive" and "delicate."

Velasco said any scenario where Mexico collaborates with the U.S. after the lifting of Title 42 must have these conditions:

- An expansion of a new humanitarian parole program to apply for asylum in the U.S. without have to traverse Mexico, a journey that's costly and dangerous.

- Efforts to continue the diplomatic dialogue with countries that have poor to no diplomatic ties to the U.S. — like Cuba and Venezuela. These are countries with high numbers of migrants coming to North America often because of U.S. sanctions.

- Stronger policies for resettling migrants across the Americas.

Nicaragua AR_001226

Case 6:23-cv-00007    Document 94-5    Filed on 03/24/23 in TXSD    Page 8 of 210

- A strategy for fostering economic development in the migrants' homelands with the hope of stemming migration.

Since late summer, El Paso has become ground zero for migration, with 53,000 encounters recorded by Border Patrol agents in October. A similar number is expected in November, according to the U.S. Border Patrol. Federal agents have recorded a record number of encounters along the entire southern border, more than 2.2 million, in a year.

Mexico plays an outsize influence in the migration flow, as the U.S. is limited in how to manage its ability to expel migrants to countries it has no diplomatic ties with. This is the case for Nicaraguans, the latest group that has put the U.S. in a difficult spot. Mexico won't take them, forcing U.S. immigration authorities to release the migrants with tracking devices to await a court hearing.



Migrants gathered along the banks of the Rio Grande after turning themselves in to U.S. immigration authorities on Wednesday, Nov. 16, 2022, in El Paso.  (Luis Torres / The Dallas Morning News)

Last October, the U.S. and Mexico agreed on a plan that allows some Venezuelan migrants to enter the U.S. legally without having to set foot in Mexico. Under the

Nicaragua AR_001227

Case 6:23-cv-00007    Document 94-5    Filed on 03/24/23 in TXSD    Page 9 of 210

plan, migrants were able to apply for humanitarian visas online. A cap was set at 24,000. The idea behind the plan is to ease pressure at the U.S.-Mexico border, Velasco said. More than 6 million people have left Venezuela in the past five years.

"We believe the model we used with Ukrainians and Venezuelans has worked very successfully," said Velasco. "It's a more realistic and creative approach. In essence, we look to create real pathways for a more orderly, safe and regular migration, in contrast with traveling through Mexico and Central America.

"The results are clear: The new pathways work well and irregular migration has very significantly shrunk," he said, adding that the number of Venezuelans entering Mexico has plummeted significantly, from 4,000 to daily to less than 200.

*Angela Kocherga, news director of KTEP public radio, and freelance journalist Luis Torres contributed to this report from Ciudad Juárez.*

---

**Related:**  This affluent city in Mexico has become a waystation for migrants with eyes on Texas

---

   

---



[Alfredo Corchado](). Alfredo Corchado has covered U.S.-Mexico issues for The News since 1993. A graduate of UTEP, he's also reported from Washington and Cuba. Before the News, Corchado reported at El Paso Herald-Post & The Wall Street Journal in Dallas and Philadelphia. He's author of Midnight in Mexico and Homelands.

 acorchado@dallasnews.com     /ajcorchado    @ajcorchado

**District Of Columbia Homeowners To Get Old Roofs Replaced (See If You Qualify Here)**

Nicaragua AR_001228

consumertrustalliance.com | Sponsored

**New Sleep Patch Technology Has Taken The Sleep Industry By Storm**

Zleep | Sponsored

Learn More

**New 4K HD Drone Drops To 50% Off And Takes America By Storm**

Daily Gadget Finds | Sponsored

**If You Used Baby Powder & Have Cancer, You Might Be In For A Large Cash Settlement**

Classactions Together | Sponsored

**Download PDF (Free)**

File Size: 1.2MB. OS: Windows - Convert PDF

PDF Hub | Sponsored

**Prime Is Now $139, But Few Know This Saving Trick**

Amazon Prime has millions of subscribers, but only few know about this amazing savings trick!

ExpertsInMoney.co | Sponsored

**Pizza brings people together, so fire up the love this Season with a Ooni Pizza Oven**

Ooni Pizza Ovens | Sponsored

Learn More

**Washington: Unsold SUVs Under $4,000 (Deal of the Day)**

Perform A Simple Search On The Next Page To See Deals

CarsGenius | Sponsored

Search Now

Nicaragua AR_001229

I ORDERED TWO $70.98 MIXED TOOL PALLET UNBOXING: RETAIL VALUE
WAS INSANE!!

KIROUSSI | Sponsored

Buy Now

The Killer New Cadillacs Will Leave You Breathless

Cadillac SUVS | Search Ads | Sponsored

BREAKING NEWS    Police: 1 of missing twins in AMBER Alert found safe at Dayton airport; authorities searching area for other baby **Read More »**          More (1) »

# US court rejects maintaining COVID-19 asylum restrictions

Migrants are waiting for the end of a public-health rule known as Title 42, which has left some biding time in Mexico waiting to seek asylum.



Author: **GIOVANNA DELL'ORTO (Associated Press)**
Published: **6:48 PM EST December 16, 2022**
Updated: **7:55 PM EST December 16, 2022**

 

EL PASO, Texas — Restrictions that have prevented hundreds of thousands of migrants from seeking asylum in the U.S. in recent years remained on track to expire in a matter of days after an appeals court ruling Friday, as thousands more migrants packed shelters on Mexico's border with the U.S.

The ruling from the D.C. Circuit Court of Appeals means the restrictions known as Title 42 are still set to be lifted Wednesday, unless further appeals are filed.

A coalition of 19 Republican-leaning states were pushing to keep the asylum restrictions put in place by former President Donald Trump at the start of the coronavirus pandemic. Migrants have been denied rights to seek asylum under U.S. and international law 2.5 million times since March 2020 on grounds of preventing the spread of COVID-19. The public-health has left some migrants biding time in Mexico.

Nicaragua AR_001231

Advocates for immigrants had argued that the U.S. was abandoning its longstanding history and commitments to offer refuge to people around the world fleeing persecution, and sued to end the use of Title 42. They've also argued the restrictions were a pretext by Trump for restricting migration, and in any case, vaccines and other treatments make that argument outdated.

A judge last month sided with them and set Dec. 21 as the deadline for the federal government to end the practice. Conservative states trying to keep Title 42 in place had pushed to intervene in the case. But a three-judge panel on Friday night rejected their efforts, saying the states had waited too long. Louisiana's Attorney General expressed disappointment with the decision and said they would appeal to the Supreme Court.

Border cities, most notably El Paso, Texas, are facing a daily migrant influx that the Biden administration expects to grow if asylum restrictions are lifted. Tijuana, the largest Mexican border city, has an estimated 5,000 people in more than 30 shelters, Enrique Lucero, the city's director of migrant affairs said this week.

In Reynosa, Mexico, near McAllen, Texas, nearly 300 migrants — mostly families — crammed into the Casa del Migrante, sleeping on bunk beds and even on the floor.

Rose, a 32-year-old Haitian, has been in the shelter for three weeks with her daughter and 1-year-old son. Rose, who did not provide her last name because she fears it could jeopardize her safety and her attempts to seek asylum, said she learned on her journey of possible changes to U.S. policies. She said she was happy to wait a little longer in Mexico for the lifting of restrictions that were enacted at the outset of the pandemic and that have become a cornerstone of U.S. border enforcement.

"We're very scared, because the Haitians are deported," said Rose, who is worried any mistakes in trying to get her family to the U.S. could get her sent back to Haiti.



Credit: AP
FILE - Migrants wait to cross the U.S.-Mexico border from Ciudad Juárez, Mexico, next to U.S. Border Patrol vehicles in El Paso, Texas, Wednesday, Dec. 14, 2022. A federal judge on Thursday temporarily blocked the Biden administration from ending a Trump-era policy requiring asylum-seekers to wait in Mexico for hearings in U.S. immigration court. (AP Photo/Christian Chavez, File)

Nicaragua AR_001232

Inside Senda de Vida 2, a Reynosa shelter opened by an evangelical Christian pastor when his first one reached capacity, about 3,000 migrants are living in tents pitched on concrete slabs and gravel. Flies swarm everywhere under a hot sun beating down even in mid-December.

For the many fleeing violence in Haiti, Venezuela and elsewhere, such shelters offer at least some safety from the cartels that control passage through the Rio Grande and prey on migrants.

In McAllen, about 100 migrants who avoided asylum restrictions rested on floor mats Thursday in a large hall run by Catholic Charities, waiting for transportation to families and friends across the U.S.

Gloria, a 22-year-old from Honduras who is eight months pregnant with her first child, held onto a printed sheet that read: "Please help me. I do not speak English." Gloria also did not want her last name used out of fear for her safety. She expressed concerns about navigating the airport alone and making it to Florida, where she has a family acquaintance.



Credit: AP

A migrant sits by his tent inside the Senda de Vida 2 shelter in Reynosa, Mexico, Thursday, Dec. 15, 2022. Nearly three thousand people cram inside the vast compound of tents over cement or gravel by the Rio Grande, steps from the border with the United States, and many more line up outside hoping to come in to relatively safety from the cartels that prey on migrants. (AP Photo/Giovanna Dell'Orto)

Andrea Rudnik, co-founder of an all-volunteer migrant welcome association in Brownsville, Texas, across the border from Matamoros, Mexico, was worried about having enough winter coats for migrants coming from warmer climates.

"We don't have enough supplies," she said Friday, noting donations to Team Brownsville are down.

Title 42, which is part of a 1944 public health law, applies to all nationalities but has fallen unevenly on those whom Mexico agrees to take back — Guatemalans, Hondurans, El Salvadorans and, more recently, Venezuelans, in addition to Mexicans. Illegal border crossings of single adults dipped in November, according to a Justice Department court filing released Friday, though it gave no explanation for why. It also did not account for families traveling with young children and children traveling alone.

Nicaragua AR_001233

12/20/22, 12:23 PM
Case 6:23-cv-00007    Document 94-5    Filed on 03/24/23 in TXSD    Page 15 of 210
US restrictions of migrant travel on U.S. and Mexico border | wtol.com



Credit: AP

People line up inside and outside the migrant welcome center across from the bus station in Brownsville, Texas, on Friday, Dec. 16, 2022. Volunteers from Team Brownville at the center handed out food and necessities, like toothpaste and socks, to migrants that U.S. officials detained and released across the street. Most of Friday's group said they were from Nicaragua, with a few from the Dominican Republic. (AP Photo/Giovanna Dell'Orto)

According to the filing, Border Patrol agents stopped single adults 143,903 times along the Mexican border in November, down 9% from 158,639 times in October and the lowest level since August. Nicaraguans became the second-largest nationality at the border among single adults after Mexicans, surpassing Cubans.

Venezuelan single adults were stopped 3,513 times by Border Patrol agents in November, plunging from 14,697 a month earlier, demonstrating the impact of Mexico's decision on Oct. 12 to accept migrants from the South American country who are expelled from the U.S.

Mexican single adults were stopped 43,504 times, down from 56,088 times in October, more than any other nationality. Nicaraguan adults were stopped 27,369 times, up from 16,497. Cuban adults were stopped 24,690 times, up from 20,744.

In a related development, a federal judge in Amarillo, Texas, ruled Thursday that the Biden administration wrongly ended a Trump-era policy to make asylum-seekers wait in Mexico for hearings in U.S. immigration court. The ruling had no immediate impact but could prove a longer-term setback for the White House.

White House spokesman Abdullah Hasan said immigration laws would continue to be enforced at the border and the Biden administration would work to expand legal pathways for migrants but discourage "disorderly and unsafe migration."

Nicaragua AR_001234

"To be clear: the lifting of the Title 42 public health order does not mean the border is open," he said. "Anyone who suggests otherwise is doing the work of smugglers spreading misinformation to make a quick buck off of vulnerable migrants."

More asylum-seekers bused from Texas to elsewhere in the country

## Related Articles

[Pentagon has received 'several hundreds' of new UFO reports](#)

[Brittney Griner issues first statement since release from Russian prison](#)

### These Easy-To-Install Smart Lighting Products Will Brighten Any Room

The Home Depot | Sponsored

### Here Are 50 of the Coolest Gifts for This 2022

These are the hottest gadgets in United States right now!

SmartLifestyleTrends | Sponsored

Learn_more

### Riddle Of Flight 914 - Plane That Vanished In 90's Mysteriously Lands 37 Years Later!

My Blogs List | Sponsored

### The London bag brand that's challenging industry norms to create a more sustainable future

Troubadour | Sponsored

### Electric Companies Will Hate You for Doing This, but They Can't Stop You

Nicaragua AR_001235

**SmartLifestyleTrends** | Sponsored

Learn more

**Man Finds Trap Door In His Home, Has No Idea What It Really Is!**
**My Article List** | Sponsored

**Christ the King principal placed on leave due to allegation against him**
WTOL

**UPDATE: Central Toledo 16-year-old found Thursday has gone missing again**
WTOL

LOADING NEXT ARTICLE...

Nicaragua AR_001236

Case 6:23-cv-00007   Document 94-5   Filed on 03/24/23 in TXSD   Page 18 of 210

The New York Times | https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html

## Confusion on the Border as Appeals Court Rules Against Trump's 'Remain in Mexico' Policy

The court upheld an injunction blocking a policy that requires asylum applicants to wait in Mexico until their cases are decided. But a stay on the order means the policy could remain in effect.

 **By Caitlin Dickerson**

Published Feb. 28, 2020    Updated Oct. 29, 2021

A federal appeals court found a central pillar of the Trump administration's immigration agenda legally invalid on Friday, ruling that asylum seekers must be allowed into the United States while their cases weave through American immigration courts.

The court stayed its decision, however, in order to allow the government time to appeal the ruling.

After a year in which nearly a million migrants crossed the southwestern border, jamming processing facilities and defying President Trump's attempts to curtail immigration, border crossings have dropped sharply in recent months, in part because of the administration's "Remain in Mexico" policy, the subject of Friday's court ruling. The decision from the United States Court of Appeals for the Ninth Circuit, if allowed to stand, would eliminate one of the administration's key levers for controlling the arrival of new asylum seekers.

A three-judge panel in San Francisco upheld an injunction blocking the policy, which has required people applying for asylum at the border to wait in Mexico while their claims for protection are reviewed, a process that often takes months or years.

The judges gave lawyers in the case until Monday to respond to the stay.

Since the "Remain in Mexico" restrictions were rolled out early in 2019, more than 59,000 asylum seekers have been turned back by American authorities into Mexican border cities, where kidnappings and violence have surged. Because shelters in Mexico are scant and overrun, many of the migrants are living in vast tent encampments exposed to the elements. Powerful Mexican drug cartels have moved in to exploit them.

"It's a resounding rejection," Judy Rabinovitz of the American Civil Liberties Union, who was the lead lawyer representing the plaintiffs, said of the court's ruling earlier Friday. She added, "The policy is a disgrace, it's illegal, it's morally indefensible, and it needs to stop."

Chad Wolf, acting secretary of homeland security, said U.S. border officials have continued to process meritorious asylum claims and reduced fraudulent and invalid claims.

"Should this ruling stand, the safety and security of our border communities, international relationships and regional stability is at risk," he said in a statement.

"This nationwide injunction is grave and reckless, rewrites the laws passed by Congress and undermines the U.S. Constitution," he said.

Lawyers who brought the challenge represented a group of 11 asylum seekers who had been returned to Mexico and several legal advocacy organizations. The plaintiffs won a nationwide injunction, but because a higher court stayed the ruling, the policy has continued to expand — most recently taking effect in Nogales, Ariz., in December.

Nicaragua AR_001237

Case 6:23-cv-00007   Document 94-5   Filed on 03/24/23 in TXSD   Page 19 of 210



These families from Honduras heard rumors that people in the Remain in Mexico Program might be allowed into the United States and went to the bridge to find out.  Cengiz Yar for The New York Times

Friday's appeals court ruling, before it was stayed, prompted widespread celebration among those who had been fighting the policy, followed by hours of confusion over when and how it might go into effect. Mr. Wolf said his department was working with the Justice Department "to expeditiously appeal this inexplicable decision." Human rights organizers in the Mexican border cities where asylum seekers are clustered — including Tijuana, Ciudad Juárez and Matamoros — scrambled to analyze the opinion, while also trying to maintain calm among the thousands of migrants now held up in those cities to prevent a panicked rush toward the United States.

Migrants held in Mexico under the policy began gathering at several international bridges. About 50 collected Friday evening at the Paso Del Norte bridge in Ciudad Juárez, hoping to cross into El Paso, but Mexican authorities closed the bridge to all traffic.

A 28-year-old man from Cuba, who was among those trying to cross, said he would wait for an opportunity. "If God wants us to, we will cross," said the man, who did not want his name published for fear of jeopardizing his asylum case. "I'm going to wait here."

Late Friday, the Customs and Border Protection agency said it had halted processing of new cases under the program, but that was before the stay. "We are continuing to utilize every tool at C.B.P.'s disposal to ensure the integrity of our immigration system and processing programs," the agency said in a statement.

The policy at issue is known formally as "migrant protection protocols" — though the lawyers who challenged it argued that it did just the opposite by placing vulnerable people in harm's way. Instead of safeguarding people fleeing persecution abroad, as is required under federal law, the policy banished them to perilous conditions in a different place, the lawyers said.

Government lawyers defended the policy based on a little-known provision of the 1996 federal immigration law allowing the American government to return some migrants to contiguous countries while their cases for entry into the United States are being processed.

They argued that the provision could be applied to asylum seekers, and that the United States had fulfilled its legal duty to protect people fleeing persecution by conducting a screening to identify possible fears before it sends people back to Mexico.

But those challenging the policy countered that asylum seekers are exempt from the legal provision, and said the government's provisions for screening to determine whether migrants had a credible fear of persecution was insufficient. They pointed to cases of people who had been kidnapped or raped while they were waiting in Mexico and were told afterward by American authorities that their fear of residing in Mexico was not credible.

In a 2-to-1 opinion on Friday, the appeals court judges said the policy violated the federal government's obligation to avoid returning migrants to dangerous places, and they concluded that the legal provision invoked by the government in creating the policy was never meant to be applied to asylum seekers.

They found that the policy was "invalid in its entirety" and concluded that a lower-court ruling that initially enjoined its implementation was "not an abuse of discretion." The stay issued Friday night, the court said, would remain in effect pending review of the government's petition for an immediate appeal.

Case 6:23-cv-00007 Document 94-5 Filed on 03/24/23 in TXSD Page 20 of 210

Judge William A. Fletcher, an appointee of President Bill Clinton, wrote the opinion, joined by Judge Richard A. Paez, also a Clinton appointee. Judge Ferdinand F. Fernandez, nominated to the court by President George Bush, dissented.

In a separate ruling on Friday, the same panel of appeals court judges rejected another of the Trump administration's attempts to restrict asylum. In that case, the judges reviewed a policy that blocks anyone who entered the United States illegally — as opposed to presenting themselves at a legal port of entry — from applying for asylum.

The court found unanimously that the policy runs counter to asylum law, which states that people can apply for the status regardless of where they enter the country. That policy had been enjoined by a district court judge shortly after it was announced, and the appeals court on Friday reaffirmed the injunction.

"What's especially significant is that, in both cases, the court found that the administration ignored Congress," said Lee Gelernt, deputy director of the American Civil Liberties Union's Immigrants' Rights Project, who argued the case.

The administration took additional steps last year to make it harder to apply for asylum, signing a deal with Guatemala to resettle asylum seekers there, instead of in the United States. It also adopted a policy requiring most applicants from Central America to first seek asylum in another country along their route of travel.

That policy is also being challenged in federal court.

The policies are part of a constellation of measures undertaken by the Trump administration to help stem the record number of migrant families, mainly from Central America, who began crossing the border in the fall of 2018.

The influx led to overcrowded detention facilities and overwhelmed immigration courts, prompting President Trump to double down on his pledges to build a wall and clamp down on immigration across the southwestern border.



The Migration Protection Protocols Immigration Hearing Facility in Laredo, Texas. Tamir Kalifa for The New York Times

Taken together, the policies have effectively shrunk the American asylum system to a fraction of what it once was. By the end of the 2019 fiscal year, in October, overall border apprehensions had shrunk to 60,781, from a high of 144,116 in May.

The news that the "Remain in Mexico" policy might be invalidated sparked chaos in some areas of the border, where some migrants have been living for months in filthy and crime-ridden areas, with little hope of entering the United States. Emma Obando, 42, had been cooking plantains for her two sons in the Matamoros tent encampment on Friday when a crying woman ran toward her, yelling to everyone she passed, "We should go; we should cross right now because they have undone the law of M.P.P."

Ms. Obando has been living in Matamoros with her 7- and 10-year-old sons, the elder of whom has autism, since September, after having fled their home in Honduras. She said many migrants flocked to the border after hearing news of the court ruling on Friday, but soon after, organizers called them off, instead advising people not to "make a big fuss" yet, and to prepare their government documents instead.

Eventually, Ms. Obando said, the mood calmed. She decided to try crossing into the United States with her sons on Saturday.

Court Upheld on the Border as Appeals Court Rules Again Remain in Mexico

Mexican officials and civic leaders were also trying to make sense of how the ruling might impact their communities.

"There are various unknowns, various questions," said Dirvin Luis García Gutiérrez, the head of the migration program for the population agency in the state of Chihuahua.

He said that Ciudad Juárez, where more than 19,700 migrants have been returned under the program, was currently supporting a transient population of between 13,000 and 15,000 migrants, including migrants returned under the program as well as those who are still waiting to cross into the United States to apply for asylum.

In an immigration court in downtown San Diego on Friday morning, more than a dozen migrants who had been subjected to "Remain in Mexico" were in court for their asylum hearings when the appeals court's opinion was released. Most were not represented by lawyers and had little guidance on how to proceed.

When the "Remain in Mexico" program was initially enjoined by a federal judge in California in April of last year, migrants who had been in court on that day ended up spending more than two weeks in government holding cells while officials decided how to proceed. When the injunction was stayed, the migrants were returned to Mexico, allowed to enter the United States only for their court hearings.

Government officials moved quickly to reverse the decision. It appeared clear that, whatever the immediate outcome, the issue would ultimately be decided by the United States Supreme Court.

Hundreds of asylum seekers who have been returned to Mexico have since given up their claims, accepting free transportation provided by the American government and the United Nations back to their homes in Central America. But others have vowed to continue with their cases.

Yoleydi Gonzalez Jimenez, 26, arrived from Cuba with her husband in the Mexican city of Matamoros in September and has been living in a tent encampment at the end of an international bridge into the United States ever since. With little access to public bathrooms, the camp smells of human waste.

Ms. Gonzalez Jimenez wears socks with her flip-flops to keep warm. A donated air mattress covered with pink and purple sheets fills the tent that has become the couple's home. Their few possessions are stacked on top and become soaked with water that seeps inside when it rains.

"I can't give up after all the time I've been waiting here, even though I feel like I'm going to die," she said after a court hearing in December. Her next hearing was scheduled in Brownsville, Texas. Until then, she was told, she would have to go back to Mexico.

Reporting was contributed by Max Rivlin-Nadler, Manny Fernandez, Zolan Kanno-Youngs and Kirk Semple.



The New Era of Mexican Migration to the United States

Jorge Durand; Douglas S. Massey; Emilio A. Parrado

*The Journal of American History*, Vol. 86, No. 2, Rethinking History and the Nation-State: Mexico and the United States as a Case Study: A Special Issue. (Sep., 1999), pp. 518-536.

Stable URL:
http://links.jstor.org/sici?sici=0021-8723%28199909%2986%3A2%3C518%3ATNEOMM%3E2.0.CO%3B2-H

*The Journal of American History* is currently published by Organization of American Historians.

Your use of the JSTOR archive indicates your acceptance of JSTOR's Terms and Conditions of Use, available at http://www.jstor.org/about/terms.html. JSTOR's Terms and Conditions of Use provides, in part, that unless you have obtained prior permission, you may not download an entire issue of a journal or multiple copies of articles, and you may use content in the JSTOR archive only for your personal, non-commercial use.

Please contact the publisher regarding any further use of this work. Publisher contact information may be obtained at http://www.jstor.org/journals/oah.html.

Each copy of any part of a JSTOR transmission must contain the same copyright notice that appears on the screen or printed page of such transmission.

JSTOR is an independent not-for-profit organization dedicated to creating and preserving a digital archive of scholarly journals. For more information regarding JSTOR, please contact support@jstor.org.

Nicaragua AR_001241

# The New Era of Mexican Migration to the United States

Jorge Durand, Douglas S. Massey, and Emilio A. Parrado

The decade of the 1970s ended a long period of economic growth based on a development model applied widely in the years after World War II. The fundamental aim of this model was to create and sustain internal markets that could serve as springboards for broader economic growth. In industrial nations, governments employed regulation, spending, and monetary policies to generate consumer demand capable of supporting mass production and sustained growth. In developing nations, officials undertook large-scale spending and investment to generate income and eliminate bottlenecks in production; at the same time they erected barriers to the entry of foreign goods and services, thus creating internal demand that national producers—both public and private—could satisfy to initiate and sustain industrialization.

The promotion of economic development through these strategies instigated new migratory movements. In the developing world, much of the geographic mobility was internal, with high rates of rural-to-urban migration and rapid urbanization. In developed countries, domestic labor reserves were quickly exhausted, and foreign workers were imported to enable rapid economic growth without inflation. In Western Europe, for example, immigrant workers were initially recruited from culturally similar but less advantaged countries in the south, such as Spain, Italy, Portugal, and Greece, but by the 1960s these sources were tapped out and migrants from culturally dissimilar and much poorer nations in North Africa and the Middle East were recruited in their stead. By the early 1970s, a series of guest-worker agreements and bilateral treaties had brought hundreds of thousands of Turkish workers into Germany and large numbers of Algerians, Moroccans, and Tunisians into France.[1]

In the United States, foreign workers were imported under the aegis of the 1942 Bracero Accord, which over the next twenty-two years arranged for the recruitment

---

Jorge Durand is professor in the department for the study of social movements at the University of Guadalajara; Douglas S. Massey is the Dorothy Swaine Thomas Professor of Sociology at the University of Pennsylvania; and Emilio A. Parrado is assistant professor of sociology at Duke University.

[1] Samuel H. Preston, "Urban Growth in Developing Countries: A Demographic Reappraisal," *Population and Development Review,* 5 (June 1979), 195–216; Michael P. Todaro, *Internal Migration in Developing Countries: A Review of Theory, Evidence, Methodology, and Research Priorities* (Geneva, 1976). Charles P. Kindleberger, *Europe's Postwar Growth: The Role of Labor Supply* (Cambridge, Mass., 1967). Solon Ardittis, "Labour Migration and the Single European Market: A Synthetic and Prospective Note," *International Sociology* (Rome), 5 (no. 4, 1990), 461–74. Philip L. Martin, *The Unfinished Story: Turkish Labour Migration to Western Europe* (Geneva, 1991); Gildas Simon, *Géodynamique des migrations internationales dans le monde* (Geodynamics of global international migration) (Paris, 1995).

Nicaragua AR_001242

and importation of 4.6 million temporary workers from Mexico. When the program finally ended in 1964, the United States did not stop employing Mexican workers; it simply shifted from a de jure policy of active labor recruitment to a de facto policy of passive labor acceptance, combining modest legal immigration with massive undocumented entry. Despite successive amendments to the U.S. Immigration and Nationality Act (in 1965, 1976, 1978, and 1980) intended to restrict Mexican immigration, the number of legal immigrants rose from 38,000 in 1964 to 67,000 in 1986; and over the same period gross undocumented migration grew from 87,000 to 3.8 million entries per year.[2]

The postwar model of industrial growth based on internal market development came undone in the early 1970s, and over the course of the next decade it was progressively abandoned in favor of a new economic model based on international trade. In developed nations, production grew more capital intensive and markets fragmented as mass production methods gave way to just-in-time delivery, flexible accumulation, out-sourcing, and continuous flow manufacturing, all carried out on a global scale. In developing nations, state bureaucracies were slashed, government-owned firms were privatized, and tariff barriers were dismantled to expose formerly protected, insular economies to the full force of global competition.

These changes came earliest in Mexico's northern border region, where in the 1970s the government launched an ambitious industrialization program based on export processing.[3] Binational agreements were negotiated to create a special trade zone along the border within which companies could import unfinished inputs into Mexico, assemble them into final goods, and then reexport them back to the United States paying tax only on the value added (that is, the relatively small cost of labor inputs). Soon *maquila* factories were sprouting up in cities throughout northern Mexico, initiating a wave of rapid economic and demographic growth along the border.

This model of export-led development was ultimately expanded to embrace all of Mexico under presidents Miguel de la Madrid and Carlos Salinas de Gortari in the 1980s. First, Mexico joined the General Agreement on Tariffs and Trade in 1986 and then, in 1988, entered into negotiations with the United States and Canada to create a continent-wide free-trade zone.[4] These negotiations led to the implementation of the North American Free Trade Agreement (NAFTA) on January 1, 1994, creating an open market area extending from the Arctic Ocean to Central America.

The new economic order envisioned by NAFTA had different effects in different regions of Mexico. Along the northern border—especially within dynamic urban centers such as Tijuana, Mexicali, Ciudad Juarez, Nuevo Laredo, and Monterrey—

[2] Kitty Calavita, *Inside the State: The Bracero Program, Immigration, and the I.N.S.* (New York, 1992). Douglas S. Massey and Audrey Singer, "New Estimates of Undocumented Mexican Migration and the Probability of Apprehension," *Demography,* 32 (May 1995), 203–13; U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1990).

[3] Leslie Sklair, *Assembling for Development: The Maquila Industry in Mexico and the United States* (San Diego, 1993).

[4] Richard S. Belous and Jonathan Lemco, eds., *NAFTA as a Model of Development: The Benefits and Costs of Merging High- and Low-Wage Areas* (Albany, 1995); Maria de los Angeles Pozas, *Industrial Restructuring in Mexico: Corporate Adaptation, Technological Innovation, and Changing Patterns of Industrial Relations in Monterrey* (La Jolla, 1993).

free trade and closer ties with the United States brought economic expansion and continued high rates of growth, but interior cities were not so well positioned to compete globally and found themselves sinking further into poverty. For millions of Mexicans, economic restructuring under the neoliberal regime of President Salinas brought joblessness, hardship, neglect, and growing economic marginalization.[5]

Within economically marginalized regions of Mexico, especially, households were left with little more than a decision of whether to emigrate or revolt. It is no coincidence that the first popular armed uprising since the early 1940s occurred in Chiapas, a poor, predominantly rural, and heavily Indian state lacking a strong tradition of migration to the United States.[6] Without social ties connecting residents to work in the United States, the only feasible option for poor Chiapanecos was rebellion. However, in other states also characterized by high levels of marginalization, large Indian populations, and pervasive poverty—but with strong connections to the United States—sporadic guerrilla movements emerged but never evolved into mass popular uprisings (for example, in Guerrero, Oaxaca, and Michoacán). In these states, the inflow of migradollars mitigated the pressures for revolt and circumscribed the appeal of armed rebellion.

The expansion of the global economy also had serious consequences for the United States. After 1973, wages stagnated, unemployment rates rose, income inequality grew, and the distribution of wealth became progressively more skewed. During the 1970s and 1980s, economic insecurity was confined mainly to blue-collar workers; by the early 1990s, however, economic fears and anxieties had spread to white-collar workers as well, as computerization eliminated routine clerical tasks and corporate downsizing condensed successive layers of management. These structural changes coincided with a cyclical recession triggered by the end of the Cold War, a downturn that was especially pronounced in California.[7]

That state, of course, had long been the leading destination for Mexican migrants to the United States. In 1992, 62 percent of all Mexicans legally admitted for permanent residence intended to settle in California, and 60 percent of all undocumented migrants were located in this state. Although some argue that California's economic crisis would have been even more severe were it not for cheap Mexican labor, the coincidence of high immigration with rising income inequality, stagnat-

[5] Fernando Cortés, "La Evolución de la Desigualdad del Ingreso Familiar Durante la Década de los Ochenta" (Trends in family income during the 1980s), typescript, 1993, working paper, Centro de Estudios Sociológicos (El Colegio de México, Mexico, D.F.); Fernando Cortés and Rosa María Rubalcava, "El Ingreso Familiar: Su Distribución y Desigualdad 1984–1989" (Family income: Its distribution and inequality), *Demos: Carta Demográfica sobre México,* 5 (1992), 28–30.

[6] Rodolfo O. de la Garza and Gabriel Szekely, "Policy, Politics, and Emigration: Reexamining the Mexican Experience," in *At the Crossroads: Mexican Migration and U.S. Policy,* ed. Frank D. Bean et al. (Lanham, 1997), 201–26. George Collier, *Basta! Land and the Zapatista Rebellion in Chiapas* (Oakland, 1994).

[7] Sheldon Danziger and Peter Gottschalk, *America Unequal* (Cambridge, Mass., 1995); Edward N. Wolff, "The Rich Get Increasingly Richer: Latest Data on Household Wealth during the 1980s," in *Research in Politics and Society,* vol. V, ed. Richard E. Ratcliff, Melvin L. Oliver, and Thomas M. Shapiro (Greenwich, 1995), 33–68. Bennett Harrison, *Lean and Mean: The Changing Landscape of Corporate Power in the Age of Flexibility* (New York, 1994); Jeremy Rifkin, *The End of Work: The Decline of the Global Labor Force and the Dawn of the Post-Market Era* (New York, 1995).

ing wages, and widespread unemployment created a new politics of nativism.[8] Although it began in California, this nativist movement ultimately spread nation-wide and produced legislative and policy changes whose effects on immigration were modest but whose long-term consequences for both Mexico and the United States were far-reaching.

### The Road to the Immigration Reform and Control Act (IRCA)

In a 1985 speech intended to frame political debate for the 1986 congressional elections, President Ronald Reagan asserted that the United States had "lost control" of its borders to an "invasion" of illegal migrants. In doing so, he transformed undocumented immigration from a useful political issue (which it had always been) into a more fundamental question of national security. He thus moved the issue of border control out of the backwaters of the federal bureaucracy and into the realm of high politics. Henceforth immigrants were connected symbolically with invaders, criminals, and drug smugglers, who were pictured as poised menacingly along a lightly defended two-thousand-mile frontier dividing the United States from Mexico and the poor masses of the Third World.

Posed as an issue of national security, undocumented migration by definition required immediate and forceful action. The most promising proposal for repelling the "invasion" came from a bill that had languished in the United States Congress for more than a decade. Reintroduced and cosponsored in 1985 by Sen. Alan Simpson of Wyoming and Rep. Peter Rodino of New Jersey, the bill made its way through various congressional committees and reached the floor of both chambers in late 1986. With the midterm elections approaching, "doing something" about undocumented migration had become a popular cause and a hot political issue. The bill passed Congress in late October and was signed into law by President Reagan on the eve of the November elections.

The final bill, known as the Immigration Reform and Control Act (or IRCA), contained four key provisions: new resources were allocated to the United States Border Patrol for enforcement along the Mexico–United States border; sanctions were enacted to remove the lure of United States jobs by penalizing employers who knowingly hired unauthorized workers; long-term undocumented residents were offered an amnesty (the so-called LAW, Legally Authorized Worker, program) to wipe the slate clean and secure the support of Latino and civil rights groups; and undocumented agricultural workers were offered a special legalization program (known as the Special Agricultural Worker program, SAW) to placate growers in Texas and California and earn their support.

Even though IRCA was enacted as a general change to immigration policy and did

---

[8] U.S. Immigration and Naturalization Service, *1992 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1993); Robert Warren, "Estimates of the Undocumented Immigrant Population Residing in the United States, by Country of Origin and State of Residence: October 1992," typescript, 1995, working papers, Statistical Branch (U.S. Immigration and Naturalization Service, Washington, D.C.). Katrina Burgess and Abraham F. Lowenthal, "Los Desafíos que Vienen del Sur" (Challenges from the south), in *La Conexión México California,* ed. Abraham F. Lowenthal and Katrina Burgess (Mexico, D.F., 1995), 305–28.



Retablo of M. Esther Tapia Picón. Undated. Oil on Metal. The caption reads: We give
thanks to the Virgin of San Juan for saving us from the migration
authorities on our way to Los Angeles.
*From Jorge Durand and Douglas S. Massey,* Miracles on the Border *(Tucson, 1995).*

not single out any particular country for enforcement action, there is little doubt
that its primary purpose was to curb undocumented migration from Mexico.
Accordingly, immigrants from that country have borne the brunt of the law's conse-
quences: Mexicans constitute 70 percent of those granted amnesty under the LAW
program, 80 percent of those legalized under the SAW program, and 95 percent of
those apprehended by the Border Patrol since the bill's passage.

Although IRCA's primary purpose may have been to deter undocumented migrants,
it does not seem to have made much progress in meeting that goal.[9] Rather than slow-
ing down the rate of undocumented entry, IRCA seems only to have succeeded in
transforming a seasonal flow of temporary workers into a more permanent popula-
tion of settled legal immigrants. Indeed, more than any other factor, IRCA is respon-
sible for creating a new era in Mexican immigration to the United States and thus
transforming social, economic, and political conditions on both sides of the border.

[9] Shirley J. Smith, Roger G. Kramer, and Audrey Singer, *Characteristics and Labor Market Behavior of the Legal-
ized Population: Five Years Following Legalization* (Washington, 1996). Keith Crane et al., *The Effect of Employer
Sanctions on the Flow of Undocumented Immigrants to the United States* (Santa Monica, 1990); Katharine M.
Donato, Jorge Durand, and Douglas S. Massey, "Stemming the Tide? Assessing the Deterrent Effects of the
Immigration Reform and Control Act," *Demography,* 29 (May 1992), 139–57; Douglas S. Massey and Kristin E.
Espinosa, "What's Driving Mexico-U.S. Migration? A Theoretical, Empirical, and Policy Analysis," *American
Journal of Sociology,* 102 (Jan. 1997), 939–99.

## The Great Transformation

The fact that so many Mexicans (2.3 million) took advantage of IRCA's legalization provisions reflects economic circumstances in Mexico as well as opportunities in the United States. The implementation of the SAW and LAW programs (during 1987–1989) coincided with a period of unusually severe inflation and unemployment in Mexico, as presidents de la Madrid and Salinas successively administered the harsh medicine of neoliberalism: balanced budgets, slashed spending, reduced wages, and downsized bureaucracies.[10] The resulting economic dislocations rendered the traditional alternative of returning to Mexico infeasible for many migrants working in the United States. In view of the weak economic conditions at home, migrants opted to remain abroad, accept the proffered legalization, and settle more permanently into a United States life.

IRCA thus dramatically altered the rhythms of seasonal migration back and forth across the border. Prior to 1986, most migrants sought to work abroad temporarily in order to manage risks and acquire capital for a specific goal or purchase. By sending one family member abroad for a limited period of foreign labor, households could diversify their sources of income (thus managing risks) and accumulate savings from their United States earnings (thus acquiring capital). In both cases, the fundamental objective was to return to Mexico. The various privations and sacrifices endured while working abroad were justified ultimately by the dream of a better life at home.

IRCA ruptured this dream in several ways. First, legalization offered migrants the prospect of a secure existence north of the border during a period of exceptional economic and political turmoil at home. The LAW program, in particular, virtually *required* undocumented migrants who had formerly circulated back and forth to remain in the United States until their petitions for legalization were resolved. As soon as the program was announced, all undocumented migrants with a potential claim for amnesty ceased circulating immediately and began preparing their petitions.[11]

Thus, some 461,000 Mexicans filed for legalization under the LAW program in 1987, followed by another 728,000 in 1988 and 41,000 in 1989. These people were joined by 106,000 SAW applicants in 1987, 544,000 in 1988, and 424,000 in 1989. Of the 2.3 million Mexicans who ultimately filed for legalization, most ceased crossing illegally in early 1987, and their removal from the seasonal flow of undocumented migrants caused a sharp reduction in the number of apprehensions in subsequent years. Indeed, arrests along the border fell from 1.6 million in 1986 to 830,000 in 1989, a decline of nearly 50 percent in just three years.[12]

---

[10] De los Angeles Pozas, *Industrial Restructuring in Mexico;* Miguel Angel Centeno, *Democracy within Reason: Technocratic Revolution in Mexico* (University Park, 1994).

[11] Jacqueline Maria Hagan, *Deciding to Be Legal: A Maya Community in Houston* (Philadelphia, 1994).

[12] U.S. Immigration and Naturalization Service, *1986 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1987); U.S. Immigration and Naturalization Service, *1987 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1988); U.S. Immigration and Naturalization Service, *1988 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1989); U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.* Thomas J. Espenshade, "Undocumented Migration to the United States: Evidence from a Repeated Trials Model," in *Undocumented Migration to the United States: IRCA and the Experience of the 1980s,* ed. Frank D. Bean, Barry Edmonston, and Jeffrey S. Passel (Washington, 1990), 159–82; Michael J. White, Frank D. Bean, and Thomas Espenshade, "The U.S. 1986 Immigration Reform and Control Act and Undocumented Migration to the United States," *Population Research and Policy Review,* 9 (May 1990), 93–116; U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.*

Even after being legalized, most Mexican migrants did not return home as frequently as before. For one thing, IRCA required them to remain in the United States and take classes in English and civics in order to obtain their permanent "green cards." Once permanent legal status was achieved, moreover, migrants who returned home were compelled to reenter the United States each year in order to maintain a bona fide status as legal resident aliens, and few families could afford to throw away the economic security represented by having legal residence papers.

Congress had intended legalization to wipe the slate clean, while employer sanctions and border enforcement were intended to prevent the entry of new undocumented immigrants, thus "solving" the problem of undocumented migration. In practice, however, IRCA's border controls and employer sanctions backfired. They did not deter undocumented Mexicans from heading northward or prevent them from crossing the border so much as they discouraged them from returning *home*.[13] Because migrants are at greatest risk while crossing the border, a buildup of enforcement resources there perversely creates strong incentives for undocumented migrants to stay put. Rather than returning home to face another risky crossing later on, migrants rationally chose to hang onto their jobs and settle into the expatriate Mexican community.

Figure 1 illustrates these various perverse effects by showing trends in the probability of returning to Mexico among migrants already in the United States. The probabilities were estimated from life histories complied for 3,166 migrant household heads enumerated in the Mexican Migration Project (MMP), which since 1982 has randomly sampled communities throughout Mexico and combined them with parallel surveys of out-migrants from those places who have settled in the United States, thus creating a representative database on documented and undocumented migration.[14] Further information on these data can be obtained from the MMP website: http://lexis.pop.upenn.edu/mexmig/.

We computed probabilities of returning to Mexico by following respondents year by year from the moment they entered the United States. We then counted up the number of return moves in each year and divided by the number of person-years spent in the United States. To smooth trends over time, we computed three-year moving averages. As figure 1 shows, the likelihood of returning home peaked in 1980, fell through 1986, and then plummeted to very low levels thereafter, remaining at historical lows through the 1990s. Throughout the 1990s, the probability of return migration hovered at just 10 percent to 11 percent.

[13] Wayne Cornelius, "Impacts of the 1986 U.S. Immigration Law on Emigration from Rural Mexican Sending Communities," *Population and Development Review,* 15 (Dec. 1989), 689–705; Donato, Durand, and Massey, "Stemming the Tide?"; Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"; Massey and Singer, "New Estimates of Undocumented Mexican Migration"; Audrey Singer and Douglas S. Massey, "The Social Process of Undocumented Border Crossing among Mexican Migrants," *International Migration Review,* 32 (Fall 1998), 561–92. Sherrie A. Kossoudji, "Playing Cat and Mouse at the U.S.-Mexican Border," *Demography,* 29 (May 1992), 159–80; Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"

[14] These data are described and evaluated in René Zenteno and Douglas S. Massey, "Especifidad versus Representatividad: Enfoques Metodológicos para el Estudio de la Migración Internacional" (Specificity versus representativeness: Methodological foci for the study of international migration), *Estudios Demográficos y Urbanos* (Mexico, D.F.), 14 (Jan. 1999), 75–116.



New Era of Mexico–United States Migration                               525

**Figure 1**
Trends in the Likelihood of Returning to Mexico, 1975–1993



SOURCE:  Mexican Migration Project Database (http://lexis.pop.upenn.edu/mexmig/), Population Studies Center, University of Pennsylvania.

As migrant household heads began settling and staying in the United States longer, they naturally sought to reunite with their wives and children, and IRCA consequently became a trigger for additional migration. Some of this new movement was legal, of course. In 1992, for example, 52,000 dependents of persons earlier legalized under IRCA were granted permanent residence, followed by another 55,000 in 1992 and 34,000 in 1994. But most of the post-IRCA movement for family reunification was illegal, averaging perhaps 300,000 persons per year. One study found that having a newly legalized migrant in the family increased the probability of undocumented migration by a factor of seven.[15]

IRCA thus unleashed an intense process of family reunification involving the parents, spouses, children, and siblings of recently legalized immigrants. In doing so, it substantially feminized and urbanized the population of migrants. A relatively large share of those legalized under the LAW program, 43 percent, were women; and although the percentage of women among SAW applicants was smaller, it was nonetheless significant at around 15 percent. The vast majority of those who qualified for amnesty, meanwhile, lived in large cities. Some 95 percent of those legalized under the LAW program, for example, lived in metropolitan areas; and even among SAWs,

---

[15] Smith, Kramer, and Singer, *Characteristics and Labor Market Behavior of the Legalized Population. Encuesta sobre Migración en la Frontera Norte: Síntesis Ejecutiva* (Survey of migration on the northern border: Executive summary) (Tijuana, 1996). Massey and Espinosa, "What's Driving Mexico-U.S. Migration?"

Nicaragua AR_001249

**Table 1**
Selected Characteristics of Mexico–United States Migrants on Their First Trip
to the United States

|  | Pre-IRCA 1980–1986 | Transition Period 1987–1990 | New Era 1991–1996 |
|---|---|---|---|
| Undocumented migrants |  |  |  |
| In agriculture | 33.1% | 21.8% | 19.5% |
| Female | 21.3% | 27.8% | 25.6% |
| Women <18 | 22.6% | 26.6% | 31.1% |
| Hourly wage earned (1990 dollars) | $4.81 | $5.14 | $4.44 |
| Employed through contractor | 6.7% | 4.9% | 9.2% |
| In California | 65.7% | 72.2% | 58.6% |
| Number of cases | 2,762 | 389 | 235 |
| Documented migrants |  |  |  |
| In agriculture | 7.4% | 7.7% | 2.6% |
| Female | 47.8% | 50.9% | 59.1% |
| Women <18 | 71.7% | 57.1% | 48.2% |
| Hourly wage earned (1990 dollars) | $6.04 | $5.52 | $4.44 |
| Employed through contractor | 13.2% | 15.4% | 9.4% |
| In California | 73.0% | 72.2% | 65.5% |
| Number of cases | 636 | 389 | 235 |

SOURCE: Mexican Migration Project Database (http://lexis.pop.upenn.edu/mexmig/), Population Studies Center, University of Pennsylvania.

who were, in theory, agrarian laborers, 84 percent of the applicants gave metropolitan addresses.[16]

Among migrants working in agriculture, moreover, there was a pronounced shift toward urban occupations in the years after legalization. Agricultural growers, of course, had envisioned just such a turn of events and had successfully lobbied Congress to have IRCA include a Replenishment Agricultural Worker (RAW) program so that the newly legalized workers could be replaced after they left for the city. They also lobbied successfully for an expansion of the H-2A program, a Bracero-like temporary worker program that grew from 2,000 Mexicans in 1986 to 6,000 in 1995.[17]

[16] Smith, Kramer, and Singer, *Characteristics and Labor Market Behavior of the Legalized Population.* U.S. Immigration and Naturalization Service, *1990 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1991).

[17] Katharine M. Donato, Jorge Durand, and Douglas S. Massey, "Changing Conditions in the U.S. Labor Market: Effects of the Immigration Reform and Control Act of 1986," *Population Research and Policy Review,* 11 (no. 2, 1992), 93–115. Philip L. Martin and J. Edward Taylor, "Harvest of Confusion: SAWS, RAWS, and Farmworkers," Working Paper PRIP-UI-4, 1988, Program for Research on Immigration Policy (The Urban Institute, Washington, D.C.). Jorge Durand, "Enganchadores y Contratistas: Un Eslabón Parted en la Migración de Trabajadores Mexicanos a Estados Unidos" (Hookers and contractors: A lost step in the migration of Mexican workers to the United States), in *Las Relaciones México–Estados Unidos desde la Perspectiva Regional* (Mexico–United States relations from a regional perspective), ed. Tomás Calvillo (forthcoming); U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook of the Immigration and Naturalization Service* (Washington, 1996).

Nicaragua AR_001250

As a program of legalization, therefore, IRCA was a great success: more than two million Mexicans—including many women and children—achieved legal status under the legislation. As an enforcement policy intended to control undocumented migration, however, IRCA was an unequivocal failure. Not only did it fail to deter undocumented migrants from leaving Mexico but it actually encouraged additional undocumented migration by family and friends who had remained behind, and it was instrumental in transforming a predominantly rural, male, and temporary flow of migrant workers into a feminized, urbanized, and permanent population of settled immigrants.

The foregoing trends are documented in table 1, which again uses data from the Mexican Migration Project, showing the characteristics of documented and undocumented migrants leaving on their first trip to the United States during three periods: the pre-IRCA period of 1980–1986, the transition phase of 1987–1990, and the new era of migration of the 1990s. As can be seen, the percentage of undocumented migrants working in agriculture falls steadily over time, reaching just 19.5 percent in 1991–1996. Likewise, the percentage of agrarian workers among those with legal documents, already low before IRCA, reaches just 2.6 percent in the new era. At the same time, the percentage of women rises in both categories. Among the undocumented migrants, the percentage female goes from 21.3 percent in 1980–1986 to 25.6 percent in 1991–1996, whereas among documented migrants the shift is even more dramatic, with the share of women rising from 47.8 percent in the pre-IRCA period to 59.1 percent most recently. Moreover, among undocumented migrants, who have found it increasingly difficult to move back and forth across the border, a growing fraction were dependents. Among undocumented women, for example, the fraction under eighteen rose from 22.6 percent in 1980–1986 to 31.1 percent in 1991–1996.

IRCA's employer sanctions also had profound effects on the United States labor market. In developing them, the United States Congress was mindful of the needs of employers, requiring that sanctions be applied *gradually* to give them time to adjust to the new regime. Congress also did not require employers to verify the *authenticity* of documents offered by laborers to prove their identity and right to work in the United States. Instead, they simply had to fill out an I-9 form to demonstrate they had *seen* what *appeared to be* valid documents. Even if these documents later turned out to be false and the worker was deported, the employer was not liable to prosecution if he or she could produce an I-9 form and a photocopy of the document they had seen. The predictable result was a boom in the market for fraudulent documents.[18]

Despite the low odds of prosecution under the law, employers did face *some* new risks, particularly if they relied heavily on unauthorized labor. To compensate them-

[18] Michael Fix and Paul T. Hill, *Enforcing Employer Sanctions: Challeges and Strategies* (Santa Monica, 1990); Manuel García y Griego and Mónica Verea Campos, "La Crisis Económica Fiscal de California y la Nueva Ofensiva Verbal en Contra de los Indocumentados" (The economic and fiscal crisis of California and the new verbal offensive against undocumented migrants), in *California: Problemas Económicos, Políticos y Sociales* (California: Economic, political, and social problems), ed. Rosa Cusminsky (Mexico, D.F., 1995), 125–52. Gustavo López Castro, "Coyotes and Alien Smuggling," in *Migration between Mexico and the United States, Volume 3*, ed. the staff of the Binational Study of Migration between Mexico and the U.S. (Washington, 1998), 1965–74.

selves for these new risks, employers embarked on a pattern of systematic wage discrimination against Latinos in general and undocumented Mexicans in particular. Rather than taking the time and trouble to identify which migrants were undocumented, they simply discriminated against foreign-looking workers; and rather than denying them jobs, they simply lowered their wages.[19]

Among foreigners, post-IRCA wage discrimination was especially severe against undocumented migrants. Whereas before IRCA undocumented migrants earned the same wages as documented migrants, and rates of pay were determined largely by education, United States experience, and English language ability, afterward undocumented migrants earned wages that were 28 percent less than those earned by documented migrants; and rather than being determined by schooling, experience, and English ability, they were determined by a person's social contacts. As wages deteriorated for undocumented migrants in the wake of IRCA, so did working conditions, with higher proportions earning wages below the legal minimum and larger numbers working under irregular circumstances.[20] As table 1 indicates, entry-level wages for undocumented Mexican workers averaged $4.81 during 1980–1986, rose temporarily to $5.14 during the transition period, and then fell to $4.44 during 1991–1996 (expressed in constant 1990 dollars).

The imposition of employer sanctions also generated significant paperwork burdens for employers, who were required to keep I-9 forms on file for every person they hired. In seasonal industries such as agriculture, construction, food service, janitorial services, and private household work, where the use of casual workers is common and turnover is high, the added burdens were significant, and the prospect of so much paperwork caused many employers to shift from direct hiring of immigrants to a subcontracting arrangement.[21] Labor subcontractors are typically citizens or legal resident aliens who sign a contract with an employer to provide a specific number of workers, for a specified period of time, to engage in a particular task, at a set rate per hour. By working through a subcontractor, employers at once eliminate the risk of prosecution under IRCA and escape the law's tiresome paperwork requirements. As table 1 indicates, the percentage of undocumented migrants hired through a

[19] Deborah A. Cobb-Clark, Clinton R. Shiells, and B. Lindsay Lowell, "Immigration Reform: The Effects of Employer Sanctions and Legalization on Wages," *Journal of Labor Economics,* 13 (July 1995), 472–98; Richard Fry, B. Lindsay Lowell, and E. Haghighat, "The Impact of Employer Sanctions on Metropolitan Wage Rates," *Industrial Relations,* 34 (July 1995), 464–84; B. Lindsay Lowell, Jay Teachman, and Zhongren Jing, "Unintended Consequences of Immigration Reform: Discrimination and Hispanic Employment," *Demography,* 32 (Nov. 1995), 617–28.

[20] Barry R. Chiswick, "Illegal Aliens in the United States Labor Market: An Analysis of Occupational Attainment and Earnings," *International Migration Review,* 18 (no. 3, 1984), 714–32; Barry R. Chiswick, *Illegal Aliens: Their Employment and Employers* (Kalamazoo, 1988); Barry R. Chiswick, "Speaking, Reading, and Earnings among Low-Skilled Immigrants," *Journal of Labor Economics,* 9 (April 1991), 149–70; Katharine M. Donato and Douglas S. Massey, "Effect of the Immigration Reform and Control Act on the Wages of Mexican Migrants," *Social Science Quarterly,* 74 (Sept. 1993), 523–41; Douglas S. Massey, "Do Undocumented Migrants Earn Lower Wages than Legal Immigrants? New Evidence from Mexico," *International Migration Review,* 21 (Summer 1987), 236–74. Julie A. Phillips and Douglas S. Massey, "The New Labor Market for Mexican Immigrants to the United States," *Demography,* 36 (forthcoming). Donato, Durand, and Massey, "Changing Conditions in the U.S. Labor Market."

[21] Philip L. Martin and J. Edward Taylor, "Immigration Reform and Farm Labor Contracting in California," in *The Paper Curtain: Employer Sanctions' Implementation, Impact, and Reform,* ed. Michael Fix (Washington, 1991), 239–61.

New Era of Mexico–United States Migration                                529



Retablo of Braulio Barrientos. 1986. Oil on Metal. Part of the caption reads: While I was
reemigrating to the United States with three friends, the water we were carrying
ran out. Traveling in such great heat and with such thirst, and without
hope of drinking even a little water, we invoked the Virgin of
San Juan and were able to arrive at our destination
and return to our homeland in health.
*From Jorge Durand and Douglas S. Massey,* Miracles on the Border *(Tucson, 1995).*

subcontractor, which fell to 4.9 percent in the transition period, nearly doubled to 9.2
percent by the early 1990s.

In return for absorbing the risks of prosecution and the burdens of paperwork,
subcontractors retain a share of the migrants' earnings, further reducing their net
wages. Whereas before IRCA, migrants employed through a subcontractor earned the
same wages as others, after IRCA they earned 30 percent less.[22] Thus, IRCA's employer
sanctions did not block access of undocumented immigrants to United States jobs;
it simply pushed their employment further underground and induced greater wage
discrimination against Latinos. In short, it created black market conditions that put
downward pressure on all workers regardless of nativity or citizenship.

The new underground economy created by IRCA appears to have had spillover
effects on the native-born working in the same sectors. Whereas research conducted
using the 1980 census (that is, before IRCA) found few effects of immigration on the
wages or employment of natives, work done using the 1990 census (after IRCA)

---

[22] Phillips and Massey, "New Labor Market for Mexican Immigrants."

uncovered significant negative effects on certain racial and ethnic subgroups.[23] The attempt to eliminate the lure of United States jobs through employer sanctions thus appears to have gone badly awry, contributing to the deterioration of wages at the lower end of the labor market and exacerbating income inequality in the United States. As a result, not only have the wages of undocumented workers fallen, so have the wages of documented workers, which went from an average of $6.04 per hour before IRCA to $4.44 in the early 1990s (again expressed in constant 1990 dollars).

IRCA had one final consequence: the geographic dispersion of Mexican immigrants away from traditional gateway regions. Among migrants legalized under the LAW program, there was a clear pattern of geographic mobility away from areas of Mexican concentration in the years after legalization.[24] With documents in hand, Mexicans were suddenly free to leave historical enclaves and established niches to search for better opportunities elsewhere; and, as legalized immigrants dispersed geographically, so did later waves of immigrants arriving to join them.

Whereas 82 percent of Mexican immigrants arriving in 1986 stated their intention to settle in California, Illinois, or Texas, by 1995 the percentage had dropped to 71 percent. Moreover, only five states received more than a thousand Mexican immigrants in 1986 (the traditional receiving states of Arizona, California, Illinois, New Mexico, and Texas); but by 1995 the number had grown to 11 (with the addition of Colorado, Florida, Georgia, Nevada, Oregon, and Washington). New Jersey–New York combined to equal a twelfth region receiving more than a thousand Mexican immigrants per year. According to data from the Census and Current Population Survey, the proportion of recent Mexican immigrants going to California dropped from 63 percent to 40 percent between 1990 and 1996 while the percentage going to nontraditional states grew from 13 percent to 31 percent, yielding a sharp increase in the diversity of destinations.[25] This dispersion is reflected in the survey data shown in table 1, where the share of undocumented migrants going to California drops from 65.7 percent in 1980–1986 to 58.6 percent in 1991–1996, and the share of documented migrants doing so drops from 73.0 percent to 65.5 percent over the same period.

## Political Aftershocks

IRCA was thus instrumental in transforming Mexican immigration from a seasonal and predominantly male flow of rural, undocumented workers going to a handful of states into an urbanized population of settled legal immigrant families dispersed widely throughout the United States. This transformation has dramatically altered the horizons of life and work for Mexicans north of the border and has transfigured

[23] George J. Borjas, *Friends or Strangers: The Impact of Immigrants on the U.S. Economy* (New York, 1990). George J. Borjas, "The Economics of Immigration," *Journal of Economic Literature*, 32 (Dec. 1994), 1667–1717.

[24] Kristin E. Neuman and Marta Tienda, "The Settlement and Secondary Migration Patterns of Legalized Aliens: Insights from LAPS [Legally Authorized Population Survey] Data," in *Immigration and Ethnicity: The Integration of America's Newest Arrivals,* ed. Barry Edmonston and Jeffrey Passel (Washington, 1994), 187–226.

[25] Jorge Durand, Douglas S. Massey, and Fernando Charvet, "The Changing Geography of Mexican Immigration to the United States, 1910–1996," *Social Science Quarterly* (forthcoming).

the political landscape of both countries. As they have put down roots, Mexican immigrants have come to value political participation as never before, and they have begun to enter public debates, political organizations, and electoral campaigns and ultimately to become important political actors north as well as south of the border.

The issue of international migration was barely mentioned in the NAFTA accords, and no steps were taken to prepare for the emergence of a transnational population with claims on citizenship in both the United States and Mexico. Indeed, both sides tacitly agreed to sweep the issue of immigration under the rug. President Salinas opined that Mexico's goal in implementing NAFTA was to export goods and not people, and presidents George Bush and Bill Clinton stated that by encouraging job formation in Mexico NAFTA would ultimately reduce the pressures for undocumented migration to the United States.

Unfortunately, in the same year that NAFTA was implemented, Mexico's intertwined political and economic crises returned with a vengeance. On the very day that the agreement took effect, armed guerrillas launched an offensive in the state of Chiapas; in the ensuing months, both the leader of Mexico's ruling party and its presidential candidate were assassinated. The year ended with Mexico's new finance minister, in office for just three weeks, bungling a devaluation and igniting a new round of capital flight, hyperinflation, and unemployment. Despite the appearance of political stability and economic progress during the Salinas presidency, two ancient problems refused to go away: the economic marginalization of large sectors of the population and the resistance of Mexico's ruling elite to political change.

Given the selling of NAFTA as a means of helping Mexico "export goods and not people," the failure of the Mexican economic miracle created an opening for the return of immigration as a political issue in the United States. With the Mexican economy in distress and a United States financial bailout on the horizon, the specter of massive undocumented migration returned as newspapers throughout the country ran features on the crisis and its likely effects. Mexico's economic collapse and deepening political crisis once again turned the United States public against Mexican immigrants and offered politicians a ripe opportunity.

With the end of the Cold War, the United States obsession with external threats gave way to worries about its internal enemies. As IRCA's massive legalization and its accompanying settlement and dispersal increased the salience of Mexicans in the public eye, immigrants came to be blamed for everything from the high cost of welfare to the fiscal crisis of the social service system. United States politicians deliberately encouraged the belief that United States schools, hospitals, and public services were spending massive resources on immigrants, both legal and illegal, who came to the United States to take unfair advantage of public generosity and the taxes paid by ordinary United States citizens.

Immigration revealed its potency as a political issue in 1994 when California governor Pete Wilson found himself struggling for reelection. With his state still mired in a recession, he was unpopular and far down in the polls until he made immigration his chief campaign issue. He endorsed Proposition 187, a referendum to ban undocumented migrants from receiving public health, education, and welfare ser-

vices, and made it his rallying cry. This initiative also obliged government employees to report immigrants they suspected of receiving unauthorized services, effectively deputizing them to enforce United States immigration law. Both the governor and the proposition were endorsed by a substantial majority of the state's voters.

Although it began in California, the anti-immigrant bandwagon soon went national and swept up documented as well as undocumented migrants. The political wave crested in 1996 with the passage of two landmark pieces of legislation: the Illegal Immigration Reform and Immigrant Responsibility Act (better known as the 1996 Immigration Reform Act) and the Personal Responsibility and Work Opportunity Reconciliation Act (better known as the 1996 Welfare Reform Act). The net effect of these two laws was to bar noncitizen immigrants (legal as well as undocumented) from receiving means-tested federal and state benefits and to raise the income threshold required for immigrants to sponsor the entry of relatives. The immigration act also enacted harsher penalties against people who overstayed visas or entered the United States without inspection.[26]

In the political climate of the late 1990s, Mexican immigrants were left with very few ways of protecting themselves and their interests. The only foolproof way of forestalling the potential loss of rights and privileges was through naturalization, which not only guaranteed unhindered access to the full array of United States government benefits but also offered the possibility of voting to fight further losses and restrictions. The reaction of Mexican immigrants to the new political climate was thus predictable: a rush toward United States citizenship. As nativist movements gained strength and began to achieve legislative success, applications for naturalization mushroomed. From 1980 to 1990, the total number of petitions for naturalization fluctuated between 200,000 and 300,000 per year, and as late as 1991 only 207,000 applications were filed (it is not possible to tabulate petitions by Mexicans separately from published INS data). Beginning in that year, however, the number of filings rose precipitously, reaching just under a million in 1995.[27]

Mexicans historically have had the lowest rate of naturalization of any major immigrant group. According to one estimate, only 17 percent of the 1973 cohort of Mexican immigrants had naturalized by 1989, sixteen years later. As a result, Mexicans constitute the largest single population of noncitizen legal immigrants present in the United States. In 1990, 77 percent of all Mexican immigrants—some 3.3 million persons—were unnaturalized. Thus, the potential for increase in naturalization among Mexican immigrants is huge, and, in fact, the number of Mexicans becoming citizens increased by 383 percent from 1990 to 1995.[28]

As if the actions of the United States Congress were not enough, the move toward citizenship was also encouraged by the Mexican congress, which late in 1996 approved amendments to the Mexican constitution permitting dual nationality.

---

[26] Austin T. Fragomen, "The Illegal Immigration Reform and Immigrant Responsibility Act of 1996: An Overview," *International Migration Review*, 31 (Summer 1997), 438–60.

[27] U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook*.

[28] Zai Liang, "On the Measurement of Naturalization," *Demography*, 3 (Aug. 1994), 525–48. U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook*.

Before, naturalization in the United States implied the relinquishment of Mexican citizenship and the loss of rights to live, work, own property, and travel freely in Mexico. The new amendments allow Mexicans who become United States citizens to keep Mexican nationality and retain those rights. By recognizing dual nationality, Mexico thus removed a major impediment to naturalization in the United States precisely at a time when legislative and political changes there had dramatically increased the costs of remaining unnaturalized. The end result has been a flood of naturalization.

In reversing its historical opposition to dual nationality, the Mexican government sought to accomplish several goals. First, it sought to mobilize Mexican immigrants to defend their rights in the United States. Second, it also saw immigrant voters as a potential means of influencing United States policy on issues involving trade and bilateral relations. Finally, the political elite paradoxically saw it as a way of incorporating immigrants more effectively into the Mexican political system. The extension of dual nationality represents an important gesture signaling that although political realities may compel immigrants to naturalize, in the eyes of the state they will remain Mexicans. In concert with the move toward dual nationality, various programs were established through Mexican consulates in the United States to organize the Mexican diaspora and to facilitate investment in their home communities.

Assuming that millions of Mexicans respond to the new incentives and suddenly seek United States citizenship, the implications for the future of immigration are enormous, as under United States law the acquisition of citizenship creates legal entitlements for entry by family members. Whereas the spouses and minor children of unnaturalized legal resident aliens have to wait in line for immigrant visas that are numerically limited, the spouses and minor children of United States citizens enter immediately, *outside of* these limitations; and whereas legal resident aliens cannot sponsor the legal entry of parents, siblings, or unmarried adult children, citizens immediately acquire these rights upon naturalization.

Thus, each new person that becomes a United States citizen creates more people entitled to immigrate to the United States without numerical restriction, as well as new classes of people entitled to come in under numerically limited categories. In seeking to discourage immigration by restricting the access of foreigners to United States social services, therefore, Congress has inadvertently encouraged additional immigration. By pushing 3.3 million noncitizen Mexican immigrants decisively toward United States citizenship, it has sown the seeds for an even larger influx of Mexican immigrants down the road.

The massive acquisition of citizenship by Mexicans and other immigrants will thus have political consequences of great importance. To the extent that citizenship brings voter mobilization, it represents a radical change from the past, when Mexican immigrants displayed low rates of political participation in the United States.[29]

---

[29] Rodolfo O. de la Garza and Louis DeSipio, "The Changing Hispanic Political Landscape," in *Redistricting in the 1990s: A Guide for Minority Groups,* ed. William P. O'Hare (Washington, 1989), 171–80; Rodolfo O. de la Garza, Martha Menchaca, and Louis DeSipio, *Barrio Ballots: Latino Politics in the 1990 Elections* (Boulder, 1994).

The passage of anti-immigrant referenda and legislation pushed Mexican immigrants decisively toward new strategies of naturalization and voter mobilization. These strategies paid their first dividends in November 1996, when Rep. Robert Dornan, a conservative Republican from Orange County, California, who made no secret of his anti-immigrant stance, was defeated for reelection by a pan-ethnic coalition of Latinos in which naturalized immigrants cast the decisive votes. Without intending to, United States immigration policy has succeeded in consolidating a broad political coalition among Latinos (and Asians) that cuts across specific nationalities to unite Mexicans, Cubans, Puerto Ricans, and other Central and South Americans.

Like IRCA, therefore, the latest anti-immigrant measures have boomeranged, yielding results contrary to those anticipated by the politicians who instigated them. All signs are that the next several years will yield an intense political battle reminiscent of the civil rights movement of the 1960s, except that Mexican immigrants will now be full partners in the social struggle. A large demonstration in Washington, D.C., during October 1996 included undocumented as well as legal immigrants and was organized by a coalition of different Latinos, who together will soon comprise the largest minority group in the United States.

The reaction has not been long in coming, of course. Republicans, the principal promoters of the anti-immigrant fervor, have viewed the avalanche of naturalizations with alarm and have accused Clinton administration officials of speeding up the process to create Democratic voters and of slipshod practices that have granted citizenship to criminals (once again creating a symbolic link between immigration and criminality). The stage is thus set for a political showdown.

Political mobilization does not stop at the border, however. The economic crisis that persists in Mexico and widespread disenchantment with the performance of the ruling party have turned migrants into vocal critics of the Mexican government's policies. Although discontent in Mexico has led some to armed resistance and others to homegrown justice, it has also led to the mobilization of opposition through established political parties such as the National Action Party (PAN) and the Party of the Democratic Revolution (PRD), in which migrants have contributed both financial and human resources. Just as migrants have awakened to their political potential in the United States, they have become less tolerant of the deficiencies of the Mexican political system, which ultimately is responsible for the social and economic conditions that led them to emigrate in the first place.[30]

Mexican immigrants have thus openly welcomed opposition candidates touring the United States, and they have contributed generously to electoral campaigns in their regions of origin. They have also helped to finance local public works even when elected authorities are not members of the official party. The historical disinterest of Mexican authorities in the situation of migrant communities and in the specific problems of the immigrants themselves has spurred many current and former migrants to political action in Mexico, often within channels outside the official party.

[30] De la Garza and Szekely, "Policy, Politics, and Emigration."

### The New Era of Mexico–United States Migration

In retrospect, it is now clear that the passage of the Immigration Reform and Control Act in late 1986 was a watershed event in the history of Mexico–United States migration. From the end of the Bracero Program in 1964 through November 1986, the United States for all intents and purposes sponsored a liberal temporary worker program in which millions of workers, predominantly undocumented, circulated back and forth between Mexico and the United States. Although some migrants established ties north of the border and ultimately settled more permanently in the United States, illegal status constituted a deterrent to settlement and there were few reasons to remain anyway. The border was porous, United States jobs were accessible, and employers cared little about whether one was documented or not, so migrants lacked strong incentives to prolong their stay once a savings target or short-term income goal had been reached.

According to computations recently published by Audrey Singer and Douglas Massey, from 1965 through 1986 some 27.9 million undocumented Mexicans entered the United States and 23.3 million returned to Mexico, yielding a net increase of just 4.6 million persons. Over the same period, just 1.3 million Mexicans were admitted to permanent legal residence in the United States. From the end of the Bracero Program to the passage of IRCA, in other words, 84 percent of undocumented entries from Mexico were offset by departures. In an earlier study, when we classified migrants interviewed in 1982–1983 according to the strategy they employed during their years of active United States labor, we found that only 20 percent relied on a settlement strategy; the rest simply crossed into the United States temporarily.[31]

The passage of IRCA inaugurated a new era of Mexico–United States migration in which the United States applied increasingly coercive sanctions and border controls in an effort to constrict established flows while offering regularization to undocumented farm workers and long-term settlers already in the country. The rising hazards of border crossing and the ongoing economic crisis in Mexico gave undocumented migrants new reasons to remain abroad and, when combined with IRCA's legalization of 2.3 million persons, tilted Mexican immigration decisively toward permanent United States settlement. In a few short years it was transformed from a seasonal, undocumented, and regionally specific flow in which rural males predominated into an urbanized and substantially female population of permanent settlers who were increasingly dispersed throughout the United States. In the nine years from 1987 through 1995, 2.7 million Mexicans were admitted to permanent resident status, twice the number admitted over the prior twenty-two years.[32]

The implementation of IRCA's employer sanctions, meanwhile, undermined wages and working conditions for Mexican workers in the United States, opening up wide gaps between documented and undocumented migrants. In addition to fomenting

---

[31] Singer and Massey, "The Social Process of Undocumented Border Crossing." U.S. Immigration and Naturalization Service, *1989 Statistical Yearbook.* Douglas S. Massey et al., *Return to Aztlan: The Social Process of International Migration from Western Mexico* (Berkeley, 1987).
[32] U.S. Immigration and Naturalization Service, *1995 Statistical Yearbook.*

wage discrimination, IRCA pushed employers toward labor subcontracting in order to escape its burdensome paperwork requirements and to eliminate the risk of prosecution for unauthorized hiring. The passage of California's Proposition 187 in 1994 sought to bar undocumented migrants from attending public schools, using public hospitals or clinics, or receiving public assistance, and in 1996 the United States Congress disenfranchised noncitizen legal immigrants from means-tested social programs. The post-IRCA period is thus characterized by growing political distinctions between undocumented, documented, and naturalized immigrants and widening economic gaps between them.

The creation of invidious distinctions on the basis of citizenship and the approval of recent amendments to the Mexican constitution permitting dual nationality have unleashed a stampede toward naturalization by millions of Mexican immigrants, a move that will further strengthen the trend toward long-term settlement and integration in the United States and generate additional future immigration as newly naturalized immigrants acquire rights to sponsor the entry of their relatives. In concert with this unprecedented wave of naturalization, the anti-immigrant drift of United States politics has led to a new mobilization of Mexicans as voters. Once politically mobilized, moreover, migrants have felt empowered to express their dissatisfactions with political affairs in Mexico as well as in the United States, giving rise to new transnational political movements.[33]

Although this interplay between politics in Mexico and in the United States may worry officials on both sides of the border, it is nonetheless a harbinger of things to come. Post-IRCA policies in the United States, when combined with political and economic developments occurring under the North American Free Trade Agreement, have had rather unexpected social, economic, and political consequences in promoting a new transnational politics. Authorities in both countries now face a newly mobilized population of Mexicans who operate in a sphere beyond the full control of either government, simultaneously working to defend their rights in the United States and helping to bring about political change in Mexico.

[33] S. Mara Perez Godoy, "Social Movements and International Migration: The Mexican Diaspora Seeks Inclusion in Mexico's Political Affairs: 1968–1998" (Ph.D. diss., University of Chicago, 1998).

Case 6:23-cv-00007   Document 94-5   Filed on 03/24/23 in TXSD   Page 42 of 210

# Washington, DC, approves creation of new agency to provide services for migrants arriving from other states

By Aya Elamroussi and Adrienne Winston, CNN

Updated 3:51 AM EDT, Wed September 21, 2022



A group of mainly Venezuelan migrants, who were sent by bus from detention in Texas, are dropped off outside the Naval Observatory, the official residence of U.S. Vice President Kamala Harris in Washington, DC, on September 17.

Marat Sadana/Reuters

  US                                                                     AudioLive TV

arrival of migrants who were sent to the district from states whose leaders oppose the Biden administration's stance on immigration policies.

The move aims to improve response to the thousands of migrants who have been arriving in the nation's capital from Arizona and Texas, whose Republican leaders have come under scrutiny for the tactic.

The Washington city council approved the launch of the new agency in a unanimous vote after Mayor Muriel Bowser requested it to address the needs of migrants.

"With the establishment of the Office of Migrant Services, we stay true to our DC values by creating a framework for providing support to individuals and families while ensuring our homeless services systems continue to support our DC residents," said Bowser, who is a Democrat.

Nicaragua AR_001261

Case 6:23-cv-00007   Document 94-5   Filed on 03/24/23 in TXSD   Page 43 of 210

systems continue to support our DC residents," said Bowser, who is a Democrat.



**RELATED ARTICLE**
Texas is sending migrants to New York and Washington, DC, by bus. Many are glad to go

The new agency will be housed within the district's Department of Human Services. Its goal is to provide arriving migrants with basic needs– including meals, transportation, urgent medical care as well as transportation to connect people to resettlement services.

The district will allocate $10 million to establish and support the new office, and Bowser said she will seek reimbursement for part of that funding through the US Federal Emergency Management Agency.

About 8,000 migrants have arrived in the capital over the past six months, according to councilmember Brianna Nadeau, who sponsored the bill proposing the creation of the agency. Nadeau believes that the passage of the bill can help the city provide better assistance to the migrants, according to her spokesperson.

"This legislation will ensure that every migrant is greeted by a bilingual, culturally competent professional; that they have respite; that they have food and clothing, and that they are safe, and welcome," Nadeau said.



Stefani Reynolds/AFP/Getty Images

Migrants from Venezuela, who boarded a bus in Texas, wait to be taken to a local church by volunteers after being dropped off outside the residence of US Vice President Kamala Harris on September 15.

Nicaragua AR_001262 .

Case 6:23-cv-00007    Document 94-5    Filed on 03/24/23 in TXSD    Page 44 of 210

The new agency is being created as at least three Republican governors send migrants out of their states to liberal cities, including Chicago and New York, and recently Martha's Vineyard in Massachusetts. The drop-offs, some of which were done with little notice, have left officials on the receiving end struggling to accommodate the needs of thousands of people

Last week, Texas Gov. Greg Abbott said the state deliberately sent two buses of migrants to Vice President Kamala Harris' official residence in Washington, DC.

Dozens of migrants were left outside the gated residence on grass and sidewalks because those in charge of responding to the group weren't prepared to meet them at that location, leaving volunteers scrambling to make arrangements.

SAMU First Response, one of the groups helping migrants in Washington, was not provided prior notice of the drop-off location, according to the group's managing director, Tatiana Laborde.

"By the time our team got to the migrants, they were very lost," Laborde told CNN Thursday morning. "(The migrants) didn't understand where they were standing – this is a very residential area."


**RELATED ARTICLE**
Legal group files class action lawsuit on behalf of advocacy group and migrants flown to Martha's Vineyard

Abbott's efforts to send migrants to Washington and New York has cost his state more than $12 million.

"VP Harris claims our border is 'secure' & denies the crisis," Abbott tweeted at the time. "We're sending migrants to her backyard to call on the Biden Administration to do its job & secure the border."

Also last week, Florida Gov. Ron DeSantis took credit for flying about 50 migrants to Martha's Vineyard in Massachusetts, which was not expecting the group. The Republican governor's move was met by backlash from White House, migrants' advocates and Democratic officials.

"We are not a sanctuary state, and it's better to be able to go to a sanctuary jurisdiction, and yes, we will help facilitate that transport for you to be able to go to greener pastures," DeSantis said last week. "Every community in America should be sharing in the burdens. It shouldn't all fall on a handful of red states."

The term "sanctuary state" is a broad description applied to jurisdictions that have policies in place designed to limit cooperation with or involvement in federal immigration enforcement actions.

Similarly, Arizona Gov. Doug Ducey has sent more than 1,800 migrants to Washington, DC, and has no plans to stop, according to the Republican governor's office. As of last week, 50 buses carrying migrants from Colombia, Peru, Venezuela have dropped off migrants in the capital, with efforts costing about $4 million.

CNN's Paradise Afshar contributed to this report.

Nicaragua AR_001263

12/5/22, 4:56 PM
Case 6:23-cv-00007   Document 94-5   Filed on 03/24/23 in TXSD   Page 45 of 210
DC to open services office, approve $10M agency to provide services to migrants arriving from other ...

<hr />

Search CNN...



Log In

Live TV

Audio

World

US Politics

Business

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Features

Weather

More

 US

FOLLOW CNN

Office of Migrant Services would contract, or approve the contract of, an agency to provide services for migrants arriving from other …

  

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2022 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Nicaragua AR_001265

Nicaragua AR_001266

12/5/22, 4:56 PM

Case 6:23-cv-00007 Document 94-5 Filed on 03/24/23 in TXSD Page 48 of 210
Office of Migrant Services Gaining — approved an unnamed agency to provide services for migrants arriving from other …

Nicaragua AR_001267

Nicaragua AR_001268

Nicaragua AR_001269

## REUTERS

World     Business     Markets     Breakingviews     Video     More

TOP NEWS

DECEMBER 9, 2021 / 7:45 PM / UPDATED A YEAR AGO

# Migrant truck crashes in Mexico killing 54

By Jacob Garcia

TUXTLA GUTIERREZ, Mexico (Reuters) - Fifty-four mostly Central Americans were killed on Thursday when the truck they were in flipped over in southern Mexico, in one of the worst accidents involving migrants who risk their lives to reach the United States.

**At least 54 migrants die in Mexico truck accident**

01:23

The trailer broke open, spilling out people, when the truck crashed on a sharp curve outside the city of Tuxtla Gutierrez in the state of Chiapas, according to video footage of the aftermath and civil protection authorities.

Chiapas Governor Rutilio Escandon said 49 people died at the scene, and five more while receiving medical attention.

"It took a bend, and because of the weight of us people inside, we all went with it," said a shocked-looking Guatemalan man sitting at the scene in footage broadcast on social media.

"The trailer couldn't handle the weight of people."

More than 100 people were inside the trailer, authorities said. Several dozen were injured and taken to hospitals in Chiapas, which borders Guatemala. Dozens of Guatemalan migrants were named in lists of the injured published on social media.

Nicaragua AR_001270

A Reuters witness heard cries and sobs among survivors as emergency personnel rushed to the site of where the overturned truck shuddered to a halt by a highway footbridge.

Reuters images showed a white trailer on its side, with injured people splayed out on tarps on the ground. There were also rows of what appeared to be bodies wrapped in white cloth.

A video of the scene streamed on social media showed a woman holding a child wailing in her lap, both covered in blood. Another video showed a man curled up in pain inside the destroyed trailer, hardly moving as helpers pulled out bodies.

Slideshow（4 images）

Men, women and children were among the dead, the Chiapas state government said, and President Andres Manuel Lopez Obrador on Twitter expressed his sorrow at the "very painful" incident.

'NOT THE BEST WAY'

Migrants fleeing poverty and violence in Central America typically trek through Mexico to reach the U.S. border, and sometimes cram into large trucks organized by smugglers in extremely dangerous conditions.

"This shows us that irregular migration is not the best way," Kevin Lopez, a spokesman for Guatemala's presidency, told Milenio television after the accident.

He did not know how many Guatemalan victims there were.

El Salvador's foreign minister, Alexandra Hill, said her government was working to see if Salvadorans had died.

Nicaragua AR_001271

Mexico offered lodging and humanitarian visas to the survivors, and Chiapas Governor Escandon said those responsible for the accident would be held to account.

Officials in Mexico routinely come across migrants packed into trailers, including 600 people found hidden in the back of two trucks in eastern Mexico last month.

Slideshow ( 4 images )

The journey north from Mexico's border with Guatemala is perilous and expensive, and many migrants fall prey to criminal gangs en route. In January, 19 people, mostly migrants, were massacred with suspected police involvement in northern Mexico.

Record numbers of people have been arrested on the U.S.-Mexico border this year as migrants seek to capitalize on President Joe Biden's pledge to pursue more humane immigration policies than his hardline predecessor, Donald Trump.

Mexican authorities in Chiapas have attempted to persuade migrants to not form caravans to walk thousands of miles to the U.S. border, and have begun transporting people from the southern city of Tapachula to other regions of the country.

The Biden administration has also urged migrants not to leave their homelands for the United States, and this week saw the restart of a policy initiated under Trump to send asylum seekers back to Mexico to await their court hearings.

Some critics argue that tougher policies push migrants into the hands of the human smugglers, putting their lives at risk.

"(Authorities) generate smuggled migration that generates billions of dollars in profits," said migrant activist Ruben Figueroa.

Nicaragua AR_001272

Reporting by Jacob Garcia; Additional reporting by Jose Torres, Lizbeth Diaz, Noe Torres and Stefanie Eschenbacher; Writing by Daina Beth Solomon; Editing by Aurora Ellis, Dave Graham and Robert Birsel

*Our Standards: The Thomson Reuters Trust Principles.*

PAID PROMOTIONAL LINKS                                    Promoted by Dianomi



Do You Have Enough To Retire? Use Our Free Retirement Calculator.

Personal Capital



Best trading technology + $0 commission equities & options.

TradeStation



Ask Carrie: What can I do about interest rates?

Charles Schwab



Invesco Chief Market Strategist on the central bank and rate hikes

Invesco Institutional



Finance with confidence. Lock in your rate.

Chase Multifamily Lending

MORE FROM REUTERS



China races to install hospital beds as COVID surge sparks concern...

20 Dec



Putin says situation extremely difficult in several Ukrainian regions

20 Dec



'I don't trust it:' Vaccine hesitancy lingers even as China COVID...

19 Dec



U.S. State Dept says toll of COVID in China a concern for the world

19 Dec



North Korea says sanctions won't stop its missile development –KCNA

20 Dec

Nicaragua AR_001274

Nicaragua AR_001275

12/20/22, 11:10 AM
Case 6:23-cv-00007    Document 94-5    Filed on 03/24/23 in TXSD    Page 57 of 210
Migrant massacre stirs doubts over Biden policy | Reuters

MORE FROM REUTERS



Japan set to keep ultra-low rates but doubts over yield cap grow

19 Dec



Special Report: Binance's books are a black box, filings show, as...

19 Dec



TikTok bans hit more U.S. states; security firm says most access...

19 Dec



Multiple victims after shooting in Canada's Vaughan

19 Dec



U.S. preps for more migrant crossings as COVID-era restrictions set...

19 Dec

Apps    Newsletters    Advertise with Us    Advertising Guidelines    Cookies    Terms of Use    Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

Nicaragua AR_001276

© 2022 Reuters. All Rights Reserved.

Nicaragua AR_001277

Sign in

**Support us** →

**News  Opinion  Sport  Culture  Lifestyle**



**US-Mexico border**

# Migrants risk death crossing treacherous Rio Grande river for 'American dream'

Nine died while swimming the Rio Grande on Friday as deaths became commonplace this year after a migration shift pushed thousands here

*Valerie Gonzalez in Eagle Pass, Texas*

Mon 5 Sep 2022 02.00 EDT

Nicaragua AR_001278

Two small inflatable floats with printed aquatic animals in bright colors lay by the river under the Eagle Pass port of entry in Texas on Saturday, a day after nine migrants died while swimming the Rio Grande.

A parent had placed their child in the floats and jumped in a river that looked deceptively calm. National guardsmen tasked with watching that section of Eagle Pass saw it for what it was: a treacherous, deep body of water with whirlpools between pillars holding up the international bridge.

"That's the problem with people from other countries," said Tom Schmerber, the Maverick county sheriff. "When they come, they're used to seeing big rivers. Then they see this one. It's not too big for them. But the Rio Grande carries a lot of currents."

Deaths in the river became commonplace this year, after a migration shift pushed thousands here.

"Almost every single day we respond to the river and recover at least one body a day," said Manuel Mello, the Eagle Pass fire chief. "Some days you won't recover for two or three days. [But] Monday or Tuesday we recovered four bodies with the Border Patrol."

Mello estimates about 30 bodies have been taken from the river each month since March.

Migrant encounters, rescues and recidivism rates increased dramatically when Title 42, a public health policy barring migrants from seeking asylum, went into place in the Covid pandemic.

Locals said rains over the last two weeks dumped more water into the river, which had been in drought, adding to its volatility.

Many migrants cross dangerous terrain like the infamous Darien Gap in southern Panama or other perilous routes.

Jhoana Contreras, a 33-year-old Venezuelan mother of three who made it to Eagle Pass after border patrol released her and sent her to Mission: Border Hope, a welcome center in Eagle Pass helping guide migrants through their journeys into the US.

"I didn't think it would ever end," she said of the journey, adding, "because it took days, days and days, rivers, rivers and rivers".

Contreras broke down as she recounted other times she, her husband and brother nearly lost it all.

"We were kidnapped in Guatemala. We went through things we never imagined we'd go through. I thank God who always kept us safe."

Contreras and family members crossed into the US via the Rio Grande, or Rio Bravo as it's known in Mexico, for its wild nature. At one point, she said, she went under the water and was rescued by her husband.

She was one of the lucky ones.



📷 Migrant families enter the Unites States after being smuggled across the Rio Grande river from Mexico into Roma, Texas, on 26 August. Photograph: Adrees Latif/Reuters

On Saturday, dozens of migrants were dropped off and picked up from Mission: Border Hope. Parents shuffled down charter buses with children in their arms. Some children were fast asleep. Others were wide awake.

Contreras' children were not with her.

"I wouldn't want the experience that so many children had on the way," she said. "I saw some children who would faint. They needed food, water, and medicine."

Her mother is watching them while Contreras and her husband work to get permission to bring them to the US.

Some parents, like Andrés Lecuna, a 39-year-old Venezuelan father of a five-year-old girl, brought their families in spite of the danger.

"It's something I lived through myself, because my daughter and wife nearly drowned. Some people we were traveling with helped save them," Lecuna said. "My arms were giving out, because the current was too strong. I felt I was drowning."

Lecuna's daughter, who wore a pink shirt and braids made by her mother, played with rocks outside the welcome center as her father contemplated the fate of those who died Friday in the same waters.

"I was surprised, because some of those who died were people traveling with us. A mother of an autistic son died. She was traveling with her husband and a daughter," Lecuna said.

The Guardian was not able to verify his account.

He said other men went under, men who knew how to swim like he did.

"I went under with my feet touching the ground and the top of my head wouldn't even touch the surface," he said. He calculated the depth was between 6ft and 9ft. "You get a cramp. Your arms get tired. You go into shock."

Migrants often travel in groups, to help each other through tough spots.

"If we come together, we cross together," said Jorge Luis Acosta, a 34-year-old single man from Cuba in Eagle Pass. "It was a bit dangerous, because it was deep. We were keeping watch over women and children so nothing bad would happen to them."

The last two years have seen record-breaking numbers of people attempting to cross the border illegally. The border patrol sector that includes Eagle Pass has seen almost as many migrants this year as the Rio Grande Valley sector, the traditional route of entry. The Eagle Pass region has seen about 376,000 encounters, while the Valley had nearly 413,000. Many tried to get in more than once.

Recidivism rates increased from 14% in 2015 to 26% and 27% in the last two years.

As desperation grows, more people are willing to risk their lives. From 2019 to 2022, rescues nearly tripled, with a 284% increase, according to US government data. The

change started last year, up to nearly 13,000 from about 5,000 in 2020.

"You have females drowning. We found some who were pregnant. Their kids drown. It's not only just them, but families," Sheriff Schmerber said.

For many, the risk seems worth it.

"It's not easy to go through so much adversity, but it's worth it because I believe in the American dream," said Lecuna, who traveled with his wife and daughter.

Acosta said: "They're people just like you. People who are looking for a better life: a better economy, a way to feed, clothe and educate their children. That's all they want."

---

I hope you appreciated this article. Before you move on, I was hoping you would consider taking the step of supporting the Guardian's journalism.

From Elon Musk to Rupert Murdoch, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest - not profit motives.

And we avoid the trap that befalls much US media - the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. While fairness guides everything we do, we know there is a right and a wrong position in the fight against racism and for reproductive justice. When we report on issues like the climate crisis, we're not afraid to name who is responsible. And as a global news organization, we're able to provide a fresh, outsider perspective on US politics - one so often missing from the insular American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone - whether they can afford to pay for news, or not.

**If you can, please consider supporting the Guardian today. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

Nicaragua AR_001282

| Single | Monthly | Annual |
|--------|---------|--------|

| $7 per month | $13 per month | Other |
|--------------|---------------|-------|

**Continue**  →        **Remind me in April**

## Most viewed

Nicaragua AR_001285

Nicaragua AR_001286

Nicaragua AR_001287

Nicaragua AR_001288

Nicaragua AR_001289

Nicaragua AR_001290



🏠 (http://www.gob.mx) › Secretaría de Relaciones Exteriores (/sre) › **Prensa**

Publicaciones Recientes  paña de defensa de México en Estados Unidos (/sre/articulos/

# Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU.

Comunicado No. 401

Secretaría de Relaciones Exteriores | 25 de octubre de 2022 | Comunicado

Nicaragua AR_001291





Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU.

Con respecto a la implementación unilateral de la sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de los Estados Unidos, también conocidos como Protocolos de Protección al Migrante (MPP, por sus siglas en inglés), el Gobierno de México informa lo siguiente:

El 17 de junio de 2022, la Organización Internacional para las Migraciones (OIM) notificó a la Secretaría de Relaciones Exteriores (SRE) sobre la falta de espacio en los albergues en Tijuana, Baja California, para procesar más casos bajo el citado programa. Por tal razón, el ingreso de personas migrantes a México por ese punto de entrada se detuvo a partir del 19 de junio.

El 8 de agosto de 2022, el Departamento de Seguridad Nacional estadounidense (DHS, por sus siglas en inglés) informó que, a partir de esa fecha, comenzaría el fin de la implementación de dicha sección, en cumplimiento con el mandato ordenado por una Corte Federal de Distrito y en concordancia con la decisión de la Suprema Corte de los Estados Unidos del 30 de junio de 2022 sobre este particular.

Nicaragua AR_001292

El Gobierno de México, a través de la SRE, ha venido verificado que se otorgue la atención humanitaria necesaria a las personas migrantes participantes en el programa, incluyendo la administración de pruebas para COVID-19 y la atención de casos positivos, y seguirá garantizando su adecuada estancia y protección en territorio nacional en esta etapa de terminación de la implementación de la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de los Estados Unidos.

Contesta nuestra encuesta de satisfacción. 📊

---

¿Cómo fue tu experiencia en gob.mx?

Twittear

Compartir (https://www.facebook.com/sharer/sharer.php?
u=https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-
migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-
nacionalidad-de-ee-uu&src=sdkprepasre)

Nicaragua AR_001293

Imprime la página completa

La legalidad, veracidad y la calidad de la información es estricta responsabilidad de la dependencia, entidad o empresa productiva del Estado que la proporcionó en virtud de sus atribuciones y/o facultades normativas.

Nicaragua AR_001294

*1.- SOLICITUDES*

*SOLICITUDES POR DELEGACIÓN*

| DELEGACIÓN | 2020 | | 2021 | | 2022 Nov. | |
|---|---|---|---|---|---|---|
| | CASOS | PERSONAS | CASOS | PERSONAS | CASOS | PERSONAS |
| BAJA CALIFORNIA | 1,306 | 1,676 | 2,462 | 3,683 | 2,302 | 3,269 |
| **CDMX | 5,840 | 7,714 | 11,918 | 18,093 | 11,477 | 15,635 |
| CHIAPAS/TAPA | 17,146 | 26,503 | 48,849 | 89,550 | 43,677 | 71,974 |
| CHIAPAS/PALEN | 124 | 157 | 3,437 | 5,689 | 5,085 | 7,393 |
| TABASCO | 1,988 | 2,745 | 4,323 | 7,110 | 2,835 | 5,438 |
| **VERACRUZ | 1,574 | 2,119 | 3,484 | 5,668 | 5,419 | 7,528 |
| TOTAL | 27,978 | 40,914 | 74,473 | 129,793 | 70,795 | 111,257 |

*SOLICITANTES AÑOS 2013-2022 (personas)*

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| 1,296 | 2,137 | 3,423 | 8,796 | 14,619 | 29,570 | 70,316 | 40,914 | 129,793 | 111,257 |

Total de solicitantes del 2013 a 2022     413,121

*SOLICITANTES X NACIONALIDAD 2020, 2021 Y 2022 (PERSONAS)*

| TOP10 | NACIONALIDAD | 2020 PERSONAS | TOP10 | NACIONALIDAD | 2021 PERSONAS | TOP 10 | NACIONALIDAD | Nov. 2022 PERSONAS |
|---|---|---|---|---|---|---|---|---|
| 1- | HONDURAS | 15,364 | 1- | HAITÍ | 50,559 | 1- | HONDURAS | 29,390 |
| 2- | HAITÍ | 5,909 | 2- | HONDURAS | 36,080 | 2- | CUBA | 17,487 |
| 3- | CUBA | 5,712 | 3- | CUBA | 8,248 | 3- | HAITÍ | 15,780 |
| 4- | EL SALVADOR | 4,011 | 4- | CHILE | 6,893 | 4- | VENEZUELA | 12,998 |
| 5- | VENEZUELA | 3,261 | 5- | VENEZUELA | 6,122 | 5- | EL SALVADOR | 8,740 |
| 6- | GUATEMALA | 3,002 | 6- | EL SALVADOR | 5,944 | 6- | GUATEMALA | 7,441 |
| 7- | CHILE | 806 | 7- | GUATEMALA | 4,115 | 7- | GUATEMALA | 4,374 |
| 8- | NICARAGUA | 803 | 8- | BRASIL | 3,799 | 8- | BRASIL | 2,938 |
| 9- | COLOMBIA | 496 | 9- | NICARAGUA | 2,894 | 9- | COLOMBIA | 2,347 |
| 10- | BRASIL | 368 | 10- | COLOMBIA | 1,236 | 10- | REPÚBLICA DOMINICANA | 2,367 |
| | OTROS PAÍSES | 1,202 | | OTROS PAÍSES | 3,497 | | OTROS PAÍSES | 8,387 |
| | **TOTAL** | **40,914** | | **TOTAL** | **129,793** | | **TOTAL** | **111,257** |

*2.- COMPARATIVO ENERO-NOVIEMBRE (2020-2021-2022)*



Comparativo Enero-Noviembre de los años (2020, 2021, 2022)

***SOLICITANTES DE ENERO-NOVIEMBRE 2020***

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. |
|---|---|---|---|---|---|---|---|---|---|---|
| 5,966 | 5,900 | 5,278 | 968 | 928 | 1,225 | 1,760 | 1,966 | 3,309 | 4,644 | 4,208 |

*total Ene-Nov 2020*    36,152

*SOLICITANTES DE ENERO-NOVIEMBRE 2021*

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. |
|---|---|---|---|---|---|---|---|---|---|---|
| 6,497 | 6,931 | 8,993 | 9,261 | 9,209 | 10,297 | 12,627 | 12,934 | 12,775 | 17,487 | 14,787 |

*total Ene-Nov 2021*    121,648

*SOLICITANTES DE ENERO-NOVIEMBRE 2022*

| ENE. | FEB. | MAR. | ABR. | MAY. | JUN. | JUL. | AGO. | SEPT. | OCT. | NOV. |
|---|---|---|---|---|---|---|---|---|---|---|
| 5,838 | 10,168 | 11,131 | 10,396 | 9,132 | 9,677 | 8,504 | 10,745 | 8,967 | 11,482 | 13,217 |

*total Ene-Nov 2022*    111,257

*3.- TASA DE RECONOCIDOS COMO REFUGIADOS (TOP 5)*

*TASA DE POSITIVOS EN RELACIÓN AL TOTAL DE RESUELTOS 2019.*

| PAIS | RESUELTOS: Positivo, P.C., Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 8,214 | 6,273 | 76% |
| VENEZUELA | 4,741 | 4,677 | 99% |
| EL SALVADOR | 3,470 | 2,364 | 68% |
| CUBA | 1,766 | 340 | 19% |
| GUATEMALA | 992 | 667 | 67% |
| OTROS | 1,316 | 546 | 41% |
| TOTAL | 20,499 | 14,667 | 72% |

*TASA DE P.C. EN RELACIÓN AL TOTAL DE RESUELTOS 2019.*

| PAIS | RESUELTOS: Positivo, P.C., Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 8,214 | 528 | 6% |
| VENEZUELA | 4,741 | 2 | 0% |
| EL SALVADOR | 3,470 | 617 | 18% |
| CUBA | 1,766 | 134 | 8% |
| GUATEMALA | 992 | 150 | 15% |
| OTROS | 1,316 | 300 | 23% |
| TOTAL | 20,499 | 1,731 | 8% |

*TASA DE POSITIVOS MAS P.C. EN RELACIÓN AL TOTAL DE RESUELTOS 2019.*

| PAIS | RESUELTOS: Positivo, P.C., Negativo. | POSITIVO y P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 8,214 | 6,801 | 83% |
| VENEZUELA | 4,741 | 4,679 | 99% |
| EL SALVADOR | 3,470 | 2,981 | 86% |
| CUBA | 1,766 | 474 | 27% |
| GUATEMALA | 992 | 817 | 82% |
| OTROS | 1,316 | 846 | 64% |
| TOTAL | 20,499 | 16,398 | 80% |

*TASA DE POSITIVOS EN RELACIÓN AL TOTAL DE RESUELTOS 2020.*

| PAIS | RESUELTOS: Positivo, P.C., Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 7,509 | 6,408 | 85% |
| VENEZUELA | 4,331 | 4,238 | 98% |
| CUBA | 3,431 | 1,536 | 45% |
| EL SALVADOR | 2,400 | 2,003 | 83% |
| OTROS | 2,319 | 501 | 22% |
| OTROS | 2,683 | 1,274 | 47% |
| TOTAL | 22,673 | 15,955 | 70% |

*TASA DE P.C. EN RELACIÓN AL TOTAL DE RESUELTOS 2020.*

| PAIS | RESUELTOS: Positivo, PC, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 7,509 | 7 | 0% |
| VENEZUELA | 4,331 | 12 | 0% |
| CUBA | 3,431 | 133 | 4% |
| EL SALVADOR | 2,400 | - | 0% |
| HAITÍ | 2,319 | 664 | 29% |
| OTROS | 2,683 | 312 | 12% |
| TOTAL | 22,673 | 1,128 | 5% |

*TASA DE POSITIVOS MAS P.C. EN RELACIÓN AL TOTAL DE RESUELTOS 2020.*

| PAIS | RESUELTOS: Positivo, PC, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 7,509 | 6,415 | 85% |
| VENEZUELA | 4,331 | 4,250 | 98% |
| CUBA | 3,431 | 1,669 | 49% |
| EL SALVADOR | 2,400 | 2,003 | 83% |
| HAITÍ | 2,319 | 1,165 | 50% |
| OTROS | 2,683 | 1,586 | 59% |
| TOTAL | 22,673 | 17,083 | 75% |

*TASA DE POSITIVOS EN RELACIÓN AL TOTAL DE RESUELTOS 2021.*

| PAIS | RESUELTOS: Positivos | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 17,705 | 14,954 | 84% |
| HAITÍ | 5,522 | 1,261 | 23% |
| EL SALVADOR | 3,574 | 3,039 | 85% |
| VENEZUELA | 3,993 | 3,873 | 97% |
| CUBA | 2,568 | 1,779 | 69% |
| OTROS | 4,737 | 2,446 | 52% |
| TOTAL | 38,099 | 27,351 | 72% |

*TASA DE P.C. EN RELACIÓN AL TOTAL DE RESUELTOS 2021.*

| PAIS | RESUELTOS: Positivo, PC, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 17,705 | 4 | 0% |
| HAITÍ | 5,522 | 657 | 12% |
| EL SALVADOR | 3,574 | 1 | 0% |
| VENEZUELA | 3,993 | - | 0% |
| CUBA | 2,568 | 2 | 0% |
| OTROS | 4,737 | 182 | 4% |
| TOTAL | 38,099 | 846 | 2% |

*TASA DE POSITIVOS MAS P.C. EN RELACIÓN AL TOTAL DE RESUELTOS 2021.*

| PAIS | RESUELTOS: Positivo, PC, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 17,705 | 14,958 | 84% |
| HAITÍ | 5,522 | 1,918 | 35% |
| EL SALVADOR | 3,574 | 3,039 | 85% |
| VENEZUELA | 3,993 | 3,873 | 97% |
| CUBA | 2,568 | 1,781 | 69% |
| OTROS | 4,737 | 2,628 | 55% |
| TOTAL | 38,099 | 28,197 | 74% |

*TASA DE POSITIVOS EN RELACIÓN AL TOTAL DE RESUELTOS 2022.*

| PAIS | RESUELTOS: Positivo, Negativo. | POSITIVOS | TASA DE POSITIVOS |
|---|---|---|---|
| HONDURAS | 11,120 | 10,016 | 90% |
| HAITÍ | 8,187 | 1,053 | 13% |
| VENEZUELA | 3,674 | 3,408 | 93% |
| EL SALVADOR | 2,899 | 2,552 | 88% |
| CUBA | 1,850 | 915 | 49% |
| OTROS | 4,870 | 1,857 | 38% |
| TOTAL | 32,600 | 19,801 | 61% |

*TASA DE P.C. EN RELACIÓN AL TOTAL DE RESUELTOS 2022.*

| PAIS | RESUELTOS: Positivo, PC, Negativo. | PC | TASA DE P.C. |
|---|---|---|---|
| HONDURAS | 11,120 | 1 | 0% |
| HAITÍ | 8,187 | 580 | 7% |
| VENEZUELA | 3,674 | - | 0% |
| EL SALVADOR | 2,899 | - | 0% |
| CUBA | 1,850 | 132 | 3% |
| OTROS | 4,870 | 1 | 2% |
| TOTAL | 32,600 | 714 | 2% |

*TASA DE POSITIVOS MAS P.C. EN RELACIÓN AL TOTAL DE RESUELTOS 2022.*

| PAIS | RESUELTOS: Positivo, Negativo. | POSITIVO + P.C. | TASA DE POSITIVO y P.C. |
|---|---|---|---|
| HONDURAS | 11,120 | 10,017 | 90% |
| HAITÍ | 8,187 | 1,633 | 20% |
| VENEZUELA | 3,674 | 3,409 | 93% |
| EL SALVADOR | 2,899 | 2,552 | 88% |
| CUBA | 1,850 | 915 | 49% |
| OTROS | 4,870 | 1,989 | 41% |
| TOTAL | 32,600 | 20,515 | 63% |

*4.- RECONOCIDOS COMO REFUGIADOS, 2013 A 2022 (TOP 7)*

*REFUGIADOS RECONOCIDOS, POR NACIONALIDAD TOTAL (2013 – 2022).*

| PAIS | RESUELTOS: Positivo, PC, Negativo. | RECONOCIDOS POSITIVOS | OTORGADO P.C. | NO RECONOCIDOS (Negativo) |
|---|---|---|---|---|
| HONDURAS | 54,151 | 40,812 | 2,640 | 10,699 |
| VENEZUELA | 22,289 | 21,611 | 31 | 647 |
| EL SALVADOR | 20,559 | 13,418 | 2,509 | 4,632 |
| CUBA | 16,512 | 2,860 | 1,950 | 11,702 |
| HAITÍ | 9,847 | 4,600 | 277 | 4,970 |
| GUATEMALA | 7,095 | 3,676 | 446 | 2,973 |
| NICARAGUA | 3,584 | 1,844 | 474 | 1,266 |
| OTROS | 5,641 | 1,701 | 543 | 3,397 |
| TOTAL | 139,678 | 90,522 | 8,870 | 40,286 |

| PAIS | POSITIVOS + P.C. |
|---|---|
| HONDURAS | 43,452 |
| VENEZUELA | 21,642 |
| EL SALVADOR | 15,927 |
| CUBA | 4,877 |
| HAITÍ | 4,820 |
| GUATEMALA | 4,122 |
| NICARAGUA | 2,318 |
| OTROS | 2,244 |
| TOTAL | 99,392 |

* El número de solicitudes, no necesariamente es el número en trámite, toda vez que puede haber anexiones o algunas de ellas se encuentran aún en prevención.
** Se debe tomar en cuenta que la oficina de Veracruz incluye además de ese estado a Oaxaca, Quintana Roo, Campeche y Yucatán, mientras que la oficina de la CDMX cubre, la CDMX  y todas las entidades restantes con la excepción de las cubiertas por Veracruz, Chiapas, Tabasco y Baja California.
*** Los datos presentados son preliminares, tienen carácter informativo y son no definitivos.
**** Solicitudes refiere al titular del procedimiento, más dependientes en caso de tenerlos. Solicitantes refiere a personas individuales.
   P.C.= Protección Complementaria.
   *(Datos de cierre de Noviembre 2022)*

01/Diciembre/2022

REPÚBLICA DE PANAMÁ
GOBIERNO NACIONAL

MIGRACIÓN
SERVICIO, EXCELENCIA Y CONTROL

**Cuadro No. 001  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA POR REGIÓN SEGÚN ORDEN DE IMPORTANCIA: AÑO 2022**

| Región | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| América del Sur | 180,944 | 1,780 | 1,991 | 2,099 | 3,147 | 10,900 | 12,490 | 18,737 | 26,439 | 43,173 | 51,978 | 8,210 | - |
| Antillas | 24,674 | 1,012 | 817 | 876 | 1,311 | 1,493 | 1,369 | 1,789 | 2,501 | 3,049 | 4,926 | 5,531 | - |
| África | 11,058 | 1,316 | 1,056 | 1,259 | 1,072 | 764 | 942 | 1,031 | 1,012 | 841 | 967 | 798 | - |
| Asia | 11,186 | 576 | 378 | 588 | 600 | 734 | 808 | 1,252 | 1,145 | 1,131 | 1,886 | 2,088 | - |
| Europa | 56 | 12 | 7 | 2 | 1 | - | 19 | 8 | 1 | 2 | 3 | 1 | - |
| América Central | 35 | 1 | 2 | 1 | 1 | 1 | 2 | 5 | 4 | 7 | 10 | 1 | - |
| Eurasia | 16 | 3 | 4 | - | - | 2 | 2 | - | - | 1 | 2 | 2 | - |
| Oceanía | 10 | - | 7 | 1 | 2 | - | - | - | - | - | - | - | - |
| América del Norte | 6 | 2 | - | 1 | - | - | 1 | - | 1 | - | 1 | - | - |
| Otras regiones | 2 | - | - | - | - | - | - | - | 1 | - | - | 1 | - |

*Cifras preliminares al 30 de noviembre del 2022 sujetas a revisión y actualización.*

**Cuadro No. 002  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN: AÑO 2022**

| Condición | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Hombres | 165,596 | 3,557 | 3,047 | 3,449 | 4,632 | 10,316 | 11,632 | 17,239 | 23,481 | 35,550 | 41,735 | 10,958 | - |
| Mujeres | 62,391 | 1,145 | 1,215 | 1,378 | 1,502 | 3,578 | 4,001 | 5,583 | 7,623 | 12,654 | 18,038 | 5,674 | - |

**Gráfico No. 001  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA: AÑO 2022**



**Gráfico No. 002  PORCENTAJE DE TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN REGIÓN DE PROCEDENCIA: AÑO 2022**



**Cuadro No. 003  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA POR PAÍS SEGÚN ORDEN DE IMPORTANCIA: AÑO 2022**

| País | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Venezuela | 148,953 | 1,421 | 1,573 | 1,704 | 2,694 | 9,844 | 11,359 | 17,066 | 23,632 | 38,399 | 40,593 | 668 | - |
| Ecuador | 21,535 | 100 | 156 | 121 | 181 | 527 | 555 | 883 | 1,581 | 2,594 | 8,487 | 6,350 | - |
| Haití | 16,933 | 630 | 471 | 485 | 628 | 810 | 860 | 1,021 | 1,538 | 2,170 | 3,713 | 4,607 | - |
| Cuba | 5,530 | 367 | 334 | 361 | 634 | 567 | 416 | 574 | 589 | 490 | 663 | 535 | - |
| Colombia | 4,876 | 48 | 72 | 59 | 72 | 248 | 287 | 407 | 569 | 1,306 | 1,600 | 208 | - |
| India | 3,248 | 67 | 74 | 88 | 172 | 179 | 228 | 431 | 332 | 350 | 604 | 723 | - |
| Brasil | 2,614 | 168 | 139 | 160 | 134 | 150 | 121 | 149 | 271 | 282 | 488 | 552 | - |
| Senegal | 1,928 | 589 | 280 | 264 | 328 | 127 | 109 | 77 | 95 | 34 | 18 | 7 | - |
| Rep. Dominicana | 2,183 | 15 | 12 | 30 | 48 | 115 | 88 | 194 | 373 | 388 | 542 | 378 | - |
| Bangladesh | 1,829 | 70 | 81 | 201 | 126 | 254 | 210 | 236 | 150 | 189 | 143 | 169 | - |
| Perú | 1,504 | 17 | 23 | 18 | 29 | 88 | 109 | 136 | 247 | 365 | 438 | 34 | - |
| Nepal | 1,512 | 108 | 64 | 56 | 121 | 75 | 136 | 217 | 276 | 117 | 167 | 175 | - |
| Afganistán | 1,624 | 1 | 3 | 40 | 31 | 67 | 82 | 162 | 128 | 180 | 551 | 379 | - |
| Angola | 1,271 | 198 | 304 | 378 | 107 | 32 | 26 | 68 | 71 | 26 | 29 | 32 | - |
| Somalia | 1,366 | 84 | 27 | 60 | 83 | 103 | 149 | 201 | 182 | 134 | 193 | 150 | - |
| Ghana | 1,230 | 113 | 83 | 90 | 141 | 88 | 354 | 84 | 91 | 85 | 55 | 46 | - |
| Camerún | 1,248 | 31 | 24 | 92 | 91 | 103 | 41 | 210 | 132 | 199 | 209 | 116 | - |
| China | 1,310 | 32 | 39 | 56 | 59 | 67 | 66 | 85 | 119 | 136 | 274 | 377 | - |
| Chile | 1,205 | 9 | 17 | 13 | 23 | 37 | 44 | 75 | 112 | 190 | 324 | 361 | - |
| Congo | 610 | 69 | 141 | 143 | 38 | 24 | 13 | 64 | 47 | 5 | 27 | 39 | - |
| Eritrea | 591 | 30 | 32 | 34 | 56 | 72 | 50 | 91 | 69 | 48 | 49 | 60 | - |
| Nigeria | 615 | 59 | 54 | 45 | 53 | 41 | 49 | 31 | 63 | 72 | 72 | 112 | - |
| Guinea | 457 | 40 | 10 | 44 | 40 | 39 | 37 | 31 | 39 | 57 | 72 | 48 | - |
| Uzbekistán | 410 | 164 | 42 | 60 | 13 | 6 | 14 | 31 | 28 | 48 | 3 | 1 | - |
| Mauritania | 300 | 18 | 7 | 8 | 21 | 15 | 17 | 31 | 53 | 28 | 74 | 28 | - |
| Burkina Faso | 317 | 18 | 17 | 22 | 19 | 25 | 24 | 33 | 36 | 34 | 32 | 57 | - |
| Pakistán | 253 | 27 | 9 | 20 | 18 | 30 | 24 | 17 | 24 | 16 | 29 | 39 | - |
| Mali | 227 | 18 | 12 | 19 | 13 | 19 | 10 | 17 | 31 | 47 | 25 | 16 | - |
| Tayikistán | 195 | 88 | 11 | 17 | 2 | 1 | 7 | 16 | 30 | 20 | 3 | - | - |
| Etiopía | 210 | 9 | 7 | 4 | 21 | 20 | 15 | 23 | 26 | 27 | 37 | 21 | - |
| Sri Lanka | 188 | 5 | 12 | 12 | 12 | 26 | 15 | 7 | 13 | 34 | 16 | 36 | - |
| Kirguistán | 198 | 3 | 31 | 2 | 21 | 5 | 14 | 17 | 11 | 8 | 27 | 59 | - |
| Sierra Leona | 153 | 18 | 6 | 9 | 27 | 10 | 8 | 23 | 6 | 10 | 22 | 14 | - |
| Siria | 85 | 6 | 3 | 21 | 3 | 13 | 4 | 7 | 4 | 10 | 13 | 1 | - |
| Togo | 82 | 18 | 16 | 6 | 12 | 2 | 5 | 4 | 4 | 3 | 4 | 8 | - |
| Otros Países | 1,197 | 80 | 76 | 85 | 63 | 65 | 87 | 103 | 132 | 103 | 177 | 226 | - |

**Cuadro No. 004  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN: AÑO 2022**

| Condición | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Adultos | 191,854 | 4,059 | 3,527 | 3,958 | 5,358 | 11,885 | 13,296 | 19,784 | 26,939 | 41,198 | 48,863 | 12,987 | - |
| Menores | 36,133 | 643 | 735 | 869 | 776 | 2,009 | 2,337 | 3,038 | 4,165 | 7,006 | 10,910 | 3,645 | - |

**Gráfico No. 003  PORCENTAJE DE TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN : AÑO 2022**



Menores 16%

Adultos 84%



Nicaragua AR_001297



# Human Smuggling and Associated Revenues

## What Do or Can We Know About Routes from Central America to the United States?

VICTORIA A. GREENFIELD, BLAS NUÑEZ-NETO, IAN MITCH, JOSEPH C. CHANG, ETIENNE ROSAS



HOMELAND SECURITY
OPERATIONAL ANALYSIS CENTER

An FFRDC operated by the RAND Corporation under contract with DHS

Nicaragua AR_001298

Published in 2019

## Preface

This report presents initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study, which was completed in less than two months, was to develop a preliminary estimate of transnational criminal organizations' (TCOs') revenues from smuggling migrants from the Northern Triangle region of Central America—consisting of Guatemala, Honduras, and El Salvador—to the United States. In addition, we sought to establish what is known or knowable about the characteristics, including the structure, operations, and financing, of TCOs that engage in human smuggling along those routes.

From the start, we intended to frame any revenue estimate as a range to accommodate a short study period and considerable uncertainty; however, as the research progressed, we encountered further challenges. We learned that human smuggling involves many different types of actors and that we could not credibly distinguish most TCOs' activities and revenues from those of other actors, including ad hoc groups and independent operators, that engage in human smuggling. Thus, we could provide, at best, a range for revenues to all types of smugglers, largely irrespective of their affiliations.

Although our findings are subject to a high degree of uncertainty, they represent a contribution to the evidence base informing ongoing U.S. government efforts to address threats to homeland security posed by TCOs and other actors that participate in human smuggling. The U.S. Department of Homeland Security (DHS) can use the insights provided in this report regarding the characteristics of human-smuggling operations to help shape policies and prioritize resources to counter that threat. The findings will also be of interest to others in the policy community, including those who undertake research on its behalf.

This research was sponsored by DHS's Science and Technology Directorate and conducted within the Strategy, Policy, and Operations Program of the Homeland Security Operational Analysis Center federally funded research and development center (FFRDC).

## About the Homeland Security Operational Analysis Center

The Homeland Security Act of 2002 (Section 305 of Public Law 107-296, as codified at 6 U.S.C. § 185), authorizes the Secretary of Homeland Security, acting through the Under Secretary for Science and Technology, to establish one or more FFRDCs to provide independent analysis of homeland security issues. The RAND Corporation operates the Homeland Security Operational Analysis Center (HSOAC) as an FFRDC for the U.S. Department of Homeland Security (DHS) under contract HSHQDC-16-D-00007.

Nicaragua AR_001300

The HSOAC FFRDC provides the government with independent and objective analyses and advice in core areas important to the department in support of policy development, decisionmaking, alternative approaches, and new ideas on issues of significance. The HSOAC FFRDC also works with and supports other federal, state, local, tribal, and public- and private-sector organizations that make up the homeland security enterprise. The HSOAC FFRDC's research is undertaken by mutual consent with DHS and is organized as a set of discrete tasks. This report presents the results of research and analysis conducted under 70RSAT18FR0000145, the Economic Value of Human Smuggling to Transnational Criminal Organizations.

The results presented in this report do not necessarily reflect official DHS opinion or policy.

For more information on HSOAC, see www.rand.org/hsoac.

For more information on this publication, visit www.rand.org/t/RR2852.

iv

# Contents

Preface .................................................................................................................. iii

Figures ................................................................................................................. vii

Tables .................................................................................................................. viii

Summary ............................................................................................................... ix

Acknowledgments ............................................................................................... xix

Abbreviations ....................................................................................................... xx

1. Introduction ........................................................................................................1

Definition of *Transnational Criminal Organization* ...............................................3

Technical Approach to Analysis ...........................................................................4

Challenges, Uncertainties, and Mitigations .........................................................6

2. The Characteristics of Human Smuggling .........................................................9

Taxonomy of Human Smugglers ........................................................................10

Independent Operators ..................................................................................11

Ad Hoc Groups ..............................................................................................12

Loose Networks ..............................................................................................12

More-Formal Networks ..................................................................................13

Dynamism Within the Spectrum ....................................................................13

Key Roles in Human Smuggling ........................................................................14

The Relationship Between Smuggling Services and Fees ....................................15

All-Inclusive Packages ...................................................................................15

Pay-as-You-Go Arrangements ........................................................................18

The Difficulty of Calculating Human-Smuggling Profits ....................................19

Drug-Trafficking TCOs' Involvement in Human Smuggling ...............................21

Paying the Tax, or *Piso* ..................................................................................22

Potential for Broader Convergence of Human Smuggling and Drug Trafficking ...........23

Conclusion .........................................................................................................25

3. Preliminary Findings on Revenue Estimation ...................................................26

Flows of Unlawful Migrants ...............................................................................27

Percentage of Unlawful Migrants Hiring Smugglers ..........................................30

Human-Smuggling Fees and Payments ..............................................................31

Ranges of Estimates of Smuggling Revenues and *Piso* Collections .....................35

Smuggling Revenues ......................................................................................35

Drug-Trafficking TCOs' *Piso* Collections .......................................................37

Profitability, Risk, and Other Economic Considerations .....................................38

4. Concluding Remarks .........................................................................................40

Targeting Human Smuggling .............................................................................40

Allocating Resources .........................................................................................41

v

Improving Data Collection ............................................................................................42

Appendix A. Guidance for Literature Review ............................................................44

Appendix B. Discussion Points and Questions for Subject-Matter Experts ...............45

Appendix C. Guidance for Data Analysis ..................................................................47

Appendix D. DHS and EMIF Sur Data on Smuggling Fees ........................................50

References ...................................................................................................................51

vi

Nicaragua AR_001303

# Figures

Figure S.1. Revenues to and Types of Actors Engaged in Human Smuggling............................ xiii

Figure S.2. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars) .............................................................xv

Figure 1.1. Smuggling Routes from the Northern Triangle to the United States............................1

Figure 1.2. General Framework for Economic Analysis, Including Revenue Estimation..............5

Figure 3.1. Revenues to and Types of Actors Engaged in Human Smuggling.............................26

Figure 3.2. Estimated Flows of Migrants from the Northern Triangle to the United States.........29

Figure 3.3a. Guatemala: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ...........32

Figure 3.3b. Honduras: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ...........33

Figure 3.3c. El Salvador: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars) ...........33

Figure 3.4. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars) ..........................................................34

Nicaragua AR_001304

# Tables

Table S.1. The Spectrum of Actors Engaged in Human Smuggling ................................................. xi

Table 2.1. The Spectrum of Actors Engaged in Human Smuggling ............................................ 11

Table 3.1. Preliminary Estimates of Smuggling Revenues, by Country of Origin for 2017 (in millions of U.S. dollars) ...................................................................................................... 36

Table 3.2. Preliminary Estimates of Drug-Trafficking TCOs' Tax, or *Piso*, Collections, by Country of Origin for 2017 (in millions of U.S. dollars) ...................................................... 37

Table D.1. Smuggling Fees Reported in DHS Data for Fiscal Year 2017 ................................... 50

Table D.2. Smuggling Fees Reported in EMIF Sur Data for Calendar Year 2017 ...................... 50

Nicaragua AR_001305

# Summary

This report presents initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study was to develop a preliminary estimate of transnational criminal organizations' (TCOs') revenues from smuggling unlawful migrants from the Northern Triangle (NT) region of Central America— consisting of Guatemala, Honduras, and El Salvador—to the United States. Given a tight deadline and the inherent challenges of research on illicit activities, we recognized the infeasibility of developing a point estimate for revenue and, instead, sought to develop a range of estimates. We also sought to establish what is known or knowable about the characteristics, including structure, operations, and financing, of TCOs that engage in human smuggling along routes from the NT to the United States and the markets in which they operate.

Providing the U.S. Department of Homeland Security (DHS) with a better understanding of how TCOs and other actors that participate in human smuggling are structured, do business, and are financed could help inform efforts to investigate and disrupt them and to make decisions about how to allocate resources to those efforts. For example, such understanding could help DHS identify TCOs' vulnerabilities and supply evidence to weigh the benefits of action. However, our interviews with subject-matter experts (SMEs), review of the literature, and data analysis indicated that many different types of smugglers are involved in human smuggling and that we could not credibly distinguish the activities and revenues of TCOs that smuggle humans ("human-smuggling TCOs") from those of independent operators, ad hoc groups, and others who also engage in human smuggling.

Thus, we could not consider the characteristics of human-smuggling TCOs in isolation, nor could we provide a preliminary estimate—or even a range of estimates—for smuggling revenues that flow solely to these TCOs. Instead, we developed a range for the "aggregate" revenues that flow to all types of smugglers, including not just TCOs but also independent operators, ad hoc groups, and other actors. Separately, we were able to identify and evaluate the "taxes," or *pisos*, that migrants pay to drug-trafficking TCOs for the right to pass through their territories en route to the United States and at the U.S.-Mexico border. Revenues from *pisos* appear to be modest compared with revenues from smuggling.

This summary presents an overview of our findings on the characteristics of human smugglers that operate along routes from the NT to the United States, as well as the characteristics of smuggling, more generally, and preliminary estimates of revenues from this activity along with drug-trafficking TCOs' *piso* collections.

Nicaragua AR_001306

## The Characteristics of Human Smuggling

We found that many different types of smugglers—or "actors"—are involved in moving unlawful migrants from the NT to the United States and that they provide similarly wide-ranging services. These actors comprise a spectrum, spanning from independent operators who move unlawful migrants along particular segments of the route or offer other discrete services (e.g., a taxi driver based out of one town that ferries migrants to the next major town) to more formally structured networks that may include a central figure who coordinates smuggling efforts along the entire route.

There is some debate in the literature about the extent to which groups of smugglers are becoming more professional and sophisticated, particularly in light of possible increases in smuggling fees. However, our analysis suggests that many, if not most, of these groups are loosely organized, nonhierarchical, and generally do not maintain a definable command structure. The diversity and proliferation of individuals and groups involved in some aspect of human smuggling make it challenging to identify the extent to which these activities are conducted by actual TCOs.

### Taxonomy of Human Smugglers

Table S.1 presents a taxonomy of types actors engaged in human smuggling, based on our review of the literature, including academic articles, press reports, and reports written by government agencies, nongovernmental organizations, and multilateral entities and interviews with SMEs. The table starts with the least organized types of smugglers and ends with the most organized types. At each level, actors differ by organizational cohesion, membership, and geographic dispersion along smuggling corridors.

Nicaragua AR_001307

**Table S.1. The Spectrum of Actors Engaged in Human Smuggling**

| Type of Actor | Organizational Structure | Services | Group Membership | Geographic Reach |
|---|---|---|---|---|
| Independent operators | One "cell" composed of one or a few individuals | Provide a discrete service (e.g., transportation or lodging) | Do not generally work with other cells or actors | Generally work in one location, or between two locations |
| Ad hoc groups | Two or more independent operators that may not always work together | Provide multiple, complementary services | Generally unaware of other actors and groups more than one degree of separation removed | Work in one, two, or more locations |
| Loose networks | A larger number of small groups that usually work together | May provide end-to-end service along the full route or a portion of the route | Members may know only a limited number of other members | Working in many locations, potentially the full route |
| More-formal networks | A central figure who coordinates groups that consistently work together | Provide end-to-end services | Members generally know each other | Working along the full route |

Many of the actors engaged in human smuggling do not appear to meet the statutory definition of a TCO. For example, few of the actors shown in Table S.1 appear to feature "self-perpetuating associations" that protect their activities through "a pattern of corruption and/or violence," with a "transnational organizational structure," as articulated in 10 U.S.C. § 284(i)(6). Adding another layer of complication, smugglers commonly move between levels or can operate at more than one level along the spectrum, depending on their opportunities. In fact, many of these actors can be thought of as subcontractors, that might offer their services to different networks, groups, or other independent operators at the same time. Partly for these reasons, we were largely unable to disentangle the activities and revenues of TCOs from those of other actors that engage in human smuggling.

*Human-Smuggling Services and Roles*

The broad spectrum of actors engaged in human smuggling supports a wide range of service options for unlawful migrants. At one end of the range, the migrants can opt for "all-inclusive" or "end-to-end" arrangements, in which migrants pay a large fee to a network that arranges all their travel—and may even send a representative to travel with them—that can amount to upward of $10,000. At the other end, migrants can "pay as they go" and travel on their own for portions of the route and then connect with local smugglers to pay for transportation and logistical support for other portions of the route, which can cost much less. There is no consensus in the literature or among SMEs concerning what percentage of migrants uses "all-inclusive" arrangements and what percentage chooses to "pay as they go."

xi

Smugglers typically fill a number of roles, whether they are working as independent operators or as part of a group or network. Depending on the sophistication of the operation, individuals or small groups of people (sometimes referred to as a *cell* by law enforcement) can fill these roles. Below is a brief description of the key roles:

- **Facilitation/coordination.** Identify and recruit migrants, collect up-front fees, pay other smuggling organizations during the migrants' journey, and coordinate some or all the migrants' travel from their source country to their final destination.
- **Transportation.** Transport migrants from one location to another along the route north using conveyances that range from taxis to charter buses and tractor-trailers.
- **Logistics/stash houses.** Provide logistical support, often in the form of lodging or "stash houses" where migrants can take shelter for a few days or even a few weeks.
- **Fraudulent documents.** Provide unlawful migrants with fraudulent documents, including Mexican visas, national identity cards, or birth certificates, to facilitate their travel through Mexico, create synthetic families, or avoid detention.
- **Footguides/coyotes/*polleros*.** Guide migrants seeking to avoid detection while entering the United States—generally single adults—across the border between ports of entry in order to circumvent border security personnel.

### Relationship Between Human Smuggling and Drug Trafficking

A handful of drug-trafficking organizations that are commonly identified as TCOs maintain control of the primary trafficking corridors into the United States, which allows them to regulate and tax illicit trade through their territory. Controlling prime smuggling territory also affords the drug traffickers an opportunity to charge migrants a "tax," or *piso*, for the right to pass through. According to U.S. government sources, it is all but impossible for migrants to cross some sections of the border, particularly those most tightly controlled by the drug traffickers, without paying the *piso*. Collecting the *piso* requires fairly extensive regulation of migrants passing through a drug-trafficking organization's territory, pointing to coordination between human smugglers and drug traffickers before a migrant reaches the U.S.-Mexico border. The *piso* is perhaps the clearest example of identifiable TCO earnings that can be associated with human smuggling, even if it is not "smuggling revenue," per se. In addition to coordinating *piso* collections, there are some reports that drug-trafficking TCOs coordinate unlawful migrants' border crossing to divert attention from other illicit activities, and that they may recruit or coerce some migrants into carrying drugs for them. Beyond these activities, however, there is little evidence that drug-trafficking TCOs are involved in human smuggling writ large.

## Preliminary Findings on Revenue Estimation

Although we could neither develop a point estimate for revenues from smuggling unlawful migrants from the NT to the United States nor attribute such revenues to particular types of smugglers, we were able to use data from DHS and other sources to construct a range of preliminary estimates of revenue to all smugglers, without regard to their type. Separately, we

Nicaragua AR_001309

were able to identify migrants' payments to drug-trafficking TCOs, specifically, for passing through these TCOs' territories.

Figure S.1 depicts the flows of revenues associated with human smuggling to human smugglers of all types, including TCOs, and to drug-trafficking TCOs. The larger oval to the right represents the former, designated as "aggregate" smuggling revenue, and the smaller oval to the left represents the latter, designated as "tax" revenue. The intersection of the two ovals represents instances in which smuggling fees cover the tax.

**Figure S.1. Revenues to and Types of Actors Engaged in Human Smuggling**



To estimate revenue to all types of human smugglers (i.e., aggregate smuggling revenue) along routes from the NT to the United States, we required data on three variables: (1) the number of unlawful migrants along a route, (2) the percentage of those migrants who hire smugglers, and (3) the typical payments made, per migrant, to smugglers. We defined three general routes, by country of origin, as "Guatemala–United States," "Honduras–United States," and "El Salvador–United States." We also produced an ancillary, preliminary estimate of drug-trafficking TCOs' *piso* collections.

We analyzed data from 2015–2017 and earlier, but we worked primarily with data from the most recent available year, i.e., 2017, for the smuggling revenue and tax estimates.

xiii

*Flows of Unlawful Migrants*

To estimate the flow of unlawful migrants from the NT to the United States, we used data on apprehensions and other activity at the U.S.-Mexico border, between ports of entry (POEs), that are collected by the U.S. Border Patrol and data from an analysis of apprehension rates, also between POEs, reported in a 2017 DHS Office of Immigration Statistics study. We tried four different estimation methods (see Appendix C), using different combinations of these data, to produce a range of estimates for unlawful migration from Guatemala, Honduras, and El Salvador. By that approach, we found that the flow of unlawful migrants from the NT to the United States in 2017 could have ranged from about 218,000 to about 345,000 between POEs.

*Percentage of Unlawful Migrants Hiring Smugglers*

To estimate the percentage of unlawful migrants who hire smugglers along the routes, we drew on data from DHS and from a survey of migrants called the Encuesta sobre Migración en la Frontera Sur de México, which translates to "Survey of Migration at Mexico's Southern Border" (we will refer to it by its Spanish abbreviation, EMIF Sur). This survey is conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, which is located in Mexico. Because the DHS data on migrants' use of smugglers might fail to capture a substantial amount of smuggling activity (see Chapter 3), the DHS data suggest a lower bound. From the two sources, we concluded that about one-quarter to two-thirds of unlawful migrants from the NT might have hired smugglers in recent years, with some variation by country of origin.

*Human-Smuggling Fees and Payments*

For this calculation, we also drew from DHS and EMIF Sur data and turned to other sources, including our own interviews with SMEs. We used the DHS data to calculate mean and median smuggling fees, by country of origin, as reported to U.S. Border Patrol agents by unlawful migrants who are apprehended at the U.S.-Mexico border, between POEs. We also looked at the EMIF Sur data on unlawful migrants' actual and agreed payments to smugglers along routes from the NT to and into the United States. The results using the EMIF Sur data, which might include some unrealized payments and more transit in the United States, were substantially higher than the results using the DHS data and—importantly—better aligned with anecdotal evidence and most SME perspectives.

Taking the properties of the DHS and EMIF Sur data into account, we chose to work with the median values for the fees for transit from each country in 2017 to create ranges. Route by route, the median value from the DHS data represented the low end of the range, and the median value from the EMIF Sur data represented the high end (see Figure S.2).

xiv

**Figure S.2. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

*Ranges of Estimates of Smuggling Revenues*

We constructed a preliminary estimate, or range of estimates, of smuggling revenue from the low- and high-end figures for (1) unlawful migrant flows, (2) the percentage of those migrants who use smugglers, and (3) the migrants' payments to smugglers. First, we multiplied the low-end figures for each route, then we multiplied the high-end figures for each route, producing a low- and high-end estimate for each route. The DHS data yielded the low-end estimates, route by route, because they were lower for fees and the percentage of migrants using smugglers. At the high end, we were able to differentiate between payments en route to the U.S.-Mexico border as one "segment" of the journey and payments across that border as another "segment," because the EMIF Sur data on fees draw this distinction.

We found that the revenues from smuggling migrants from El Salvador, Guatemala, and Honduras, combined (as would correspond to the larger oval to the right in Figure S.1), could have ranged from a total of about $200 million to a total of about $2.3 billion in 2017 (see Table 3.1 in Chapter 3). The breadth of the range reflects the considerable uncertainty of the underlying estimates of unlawful migrant flows, migrants' use of smugglers, and smuggling fees. At the low end, this estimate very likely understates revenues, partly because of missing information on border crossings between POEs; at the high end, this estimate might be too high, partly because the fee data from EMIF Sur include agreed payments, some of which might not have materialized, in addition to actual payments.

xv

However, neither end of the range includes fees from migrants who present themselves at POEs, which could increase the revenue estimates slightly, and neither end has been adjusted to account for recidivism, which could decrease them slightly (see Chapter 3).

### Ranges of Estimates of Drug-Trafficking TCOs' Piso Collections

Separately, we developed an ancillary, preliminary estimate for drug-trafficking TCOs' tax, or *piso*, collections, using a similar methodology. The migrant flow numbers were the same as for the preliminary estimate of smuggling revenue, but the percentage and payment estimates differed substantially. Drawing on evidence from the literature review and discussion with SMEs, we postulated that the percentage of migrants who pay these taxes ranged from 50 percent to 75 percent and that the payment figures ranged from $300 to $700. On that basis, the total amount of *pisos* that migrants from the NT might have paid drug-trafficking TCOs in 2017—for traveling the three routes, combined (as would correspond to the smaller oval to the left in Figure S.1)—could have ranged from about $30 million to $180 million in 2017 (see Table 3.2 in Chapter 3).

Whether these sums are reflected in the human-smuggling revenues estimated above, as a pass through to drug-trafficking TCOs, or constitute an additional payment, depends on the smuggling arrangement, be it "all-inclusive" or "pay as you go." If the arrangement were all-inclusive, the tax might be folded into the smuggling fee (as depicted in the intersection of the two ovals in Figure S.1), but it would, nevertheless pass through to the drug-trafficking TCO that demanded payment for the migrant's passage. For this reason, and because of the attribution of the taxes to drug-trafficking TCOs, we present the estimate on its own.

## Concluding Remarks

We developed a preliminary estimate of aggregate revenue from smuggling unlawful migrants from the NT to the United States that ranges from about $200 million to $2.3 billion in 2017. This estimate, as the range implies, is highly uncertain, owing largely to a scarcity of reliable data on migrant flows, migrants' use of smugglers, and smuggling fees. Likewise, we produced an ancillary and still preliminary estimate of drug-trafficking TCOs' tax, or *piso*, collections that also spanned an order of magnitude, from about $30 million to $180 million.

To conclude, we present implications of our findings for targeting human smuggling, informing resource allocation decisions, and improving data collection.

### Targeting Human Smuggling

A key finding of this report is that human smuggling involves many different types of smugglers, or "actors," with organizations that are often informal and based on relationships instead of well-established, enduring hierarchies. Absent formality and strict hierarchical structures, it might be difficult for DHS to effectively target these actors with legal sanctions:

Nicaragua AR_001313

Loose networks are difficult to disrupt, ad hoc groups are even less susceptible to disruption, and independent operators are easily replaceable. Facilitators might be less replaceable than other market participants and present a more fruitful avenue for intervention, but going after them might be challenging, especially when they are based in foreign countries, as is typical. Although targeting might be difficult, DHS could consider expanding existing efforts to investigate payments made to human smugglers, especially in the United States, and working more closely with formal and informal banking services to identify suspicious payments. DHS could also consider expanding current efforts to work with foreign law enforcement partners.

### Allocating Resources

As DHS considers how to allocate resources, it might look to compare the size of the human-smuggling market, as measured by estimated revenues, and the sizes of other illicit markets of concern. Our high-end estimate for revenue from human smuggling, i.e., $2.3 billion, was on the same order of magnitude as estimates for revenues from trafficking marijuana, cocaine, and heroin through Mexico and across the U.S.-Mexico border that were developed in a 2010 RAND report by Kilmer et al., which could have totaled up to $7.1 billion, without netting out the costs of the drugs. However, as noted above, we cannot say how much of the revenue from human smuggling flows to TCOs that engage in human smuggling. Moreover, the 2010 RAND estimates for drug-trafficking revenues include only revenues from moving drugs through Mexico and across the U.S.-Mexico border and do not include revenue that drug-trafficking TCOs garner subsequently from distribution, wholesale, or retail activities that occur in the United States. To shed additional light on the dimensions of human smuggling, we also compared revenues from human smuggling with spending on related licit activities, such as air, rail, truck, and other transportation services reported in national accounts, and, from that perspective, the smuggling revenues looked much smaller.

### Improving Data Collection

We also identified potential improvements in data collection and methods that DHS could consider if it wanted to refine the estimate, to better inform policymaking. For example, DHS could standardize its line of questioning during migrant interviews, across apprehension sites, and seek details from migrants that would increase DHS's ability to assess revenues, by route, and distinguish different types of smugglers and payments. DHS could also create a shared portal for data entry that screens for errors, if it has not done so already, and use a randomized survey process to reduce the administrative burden of data collection on frontline personnel and increase the likelihood of successful data entry.

However, a longer-term research project might be able to reduce some of the uncertainty of the revenue estimate even using the imperfect data that DHS already has. For example, we could build on the calculations in this report by taking more time to explore the sensitivity of the

xvii

Nicaragua AR_001314

calculations to underlying assumptions about behavior and markets and explore additional ways to filter and analyze the data.

Nicaragua AR_001315

# Acknowledgments

We would like to thank John Vehmeyer for his work as our primary point of contact in the Science and Technology Directorate of the U.S. Department of Homeland Security (DHS) and Shawna Garrison, Advisor to the Commissioner for U.S. Customs and Border Protection, for her insight and assistance. In addition, we would like to thank the subject-matter experts within DHS—at U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement—and at academic institutions for their participation in interviews for this project. Because their participation was confidential, we cannot name them individually, but their contributions were critical to our understanding of the issues and the timely completion of the analysis. We would also like to thank Marc Rosenblum, Deputy Assistant Secretary for the Office of Immigration Statistics, for providing us with the DHS data that formed a large part of the analysis, and the Colegio de la Frontera Norte for publicly posting the data from its "Survey of Migration at Mexico's Southern Border" (EMIF Sur).

Lastly, we are grateful to several RAND colleagues, including Daniel Egel and Elina Treygor for their constructive feedback on earlier drafts of the report, Shelly Culberston for her contributions to the project design and interview protocol, Elizabeth Hammes for helping us conduct a rapid and wide-ranging literature review, Krista Romita Grocholski for her assistance with the data analysis, Holly Johnson for her support in formatting and preparing the report, James Torr for his thoughtful edits, and Erica Robles for her efforts to help us navigate Homeland Security Operational Analysis Center processes and meet challenging deadlines.

Nicaragua AR_001316

## Abbreviations

| | |
|---|---|
| DHS | U.S. Department of Homeland Security |
| EMIF Sur | Encuesta sobre Migración en la Frontera Sur de México/Survey of Migration at Mexico's Southern Border |
| HSOAC | Homeland Security Operational Analysis Center |
| POE | port of entry |
| NT | Northern Triangle (Guatemala, Honduras, and El Salvador) |
| SME | subject-matter expert |
| TCO | transnational criminal organization |

# 1. Introduction

In 2017, U.S. Border Patrol agents apprehended about 160,000 unlawful migrants from the Northern Triangle (NT) of Central America—consisting of Guatemala, Honduras, and El Salvador—at the U.S.-Mexico border between ports of entry (POEs). An additional roughly 20,000 family units and unaccompanied children from these three countries presented themselves to U.S. Customs and Border Protection officers at POEs to enter the asylum process in 2017. Many or most of the migrants hired smugglers for assistance or paid others for rights of way at some point during the journey north. Migrants from the NT who hire smugglers might pay them thousands of dollars to make that journey, regardless of whether they attempt to evade capture or present themselves directly to border officials at or between POEs in order to claim asylum.[1] Figure 1.1 depicts common smuggling routes from NT countries through Mexico.

**Figure 1.1. Smuggling Routes from the Northern Triangle to the United States**



SOURCE: Amnesty International, 2010 (now CC BY-NC-ND 4.0).

Of particular concern to policymakers is the possibility that a substantial share of the migrants' expenditures on smuggling services is flowing to transnational criminal organizations

---

[1] In this context, we are using the term *border officials* to refer to U.S. Border Patrol agents *between* POEs and U.S. Customs and Border Protection officers *at* POEs because families and unaccompanied minors from the NT who use smugglers generally present themselves directly to agents and officers in both environments in order to enter the asylum process.

1

(TCOs). TCOs that benefit from smuggling migrants from the NT to the United States across the U.S.-Mexico border represent a potential threat to homeland security. They can create, contribute to, or help to shape a criminal industry that exploits and harms the people smuggled, challenges the rule of law in U.S. border states and the countries along transit routes, and degrades confidence in U.S. immigration laws.

To date, the U.S. Department of Homeland Security (DHS) and larger policy community have lacked evidence on the full extent and distribution of migrants' expenditures on smuggling and the characteristics of the smugglers, be they TCOs or others. Providing DHS with a better understanding of how TCOs and other actors that participate in human smuggling are structured, do business, and are financed could help inform efforts to investigate and disrupt them and to make decisions about how to allocate resources to those efforts. For example, such understanding could help DHS identify TCOs' vulnerabilities and supply evidence to weigh the benefits of action.

This report attempts to fill some of these knowledge gaps by presenting initial findings from a scoping study titled "Economic Value of Human Smuggling to Transnational Criminal Organizations." A primary goal of this study, which was conducted in less than two months, was to develop a preliminary estimate of TCOs' revenues from smuggling unlawful migrants from the NT to the United States. In addition, we sought to establish what is known or knowable about the characteristics, including the structure, operations, and financing, of TCOs that engage in human smuggling ("human-smuggling TCOs") along routes from the NT to the United States and the markets in which they operate.[2]

However, we encountered an immediate obstacle to meeting the study's research goals, particularly those of revenue estimation. We found, by interviewing subject-matter experts (SMEs), reviewing the literature, and analyzing data, that many different types of smugglers participate in this market and that we could not credibly distinguish the activities and revenues of human-smuggling TCOs from those of independent operators, ad hoc groups, and others who also benefit from human smuggling. Thus, we could not consider the characteristics of human-smuggling TCOs in isolation nor could we provide an estimate, or even a range of estimates, for revenues flowing solely to human-smuggling TCOs. Instead, we developed a range for revenues that flow to all types of human smugglers, including TCOs. We were, however, able to attribute the revenues from taxes levied on migrants by drug-trafficking TCOs on portions of routes they control directly to those TCOs and estimate them separately.

---

[2] Notwithstanding the focus on revenue as a starting point for understanding "economic value," profitability might say more about human smuggling's contribution to the financial health and viability of these TCOs.

Nicaragua AR_001319

## Definition of *Transnational Criminal Organization*

To start, we examined formal definitions of *transnational criminal organization* to try to distinguish such organizations from others that might engage in human smuggling along routes from the NT to the United States. TCOs have been defined in U.S. law as

> . . . self-perpetuating associations who operate transnationally for the purpose of obtaining power, influence, monetary and/or commercial gains, wholly or in part by illegal means, while protecting their activities through a pattern of corruption and/or violence, or while protecting their illegal activities through a transnational organizational structure and the exploitation of transnational commerce or communication mechanisms.[3]

The White House's 2011 *Strategy to Combat Transnational Organized Crime* provides further guidance:

> There is no single structure under which transnational organized criminals operate; they vary from hierarchies to clans, networks, and cells, and may evolve to other structures. The crimes they commit also vary. Transnational organized criminals act conspiratorially in their criminal activities and possess certain characteristics which may include, but are not limited to:
>
> - In at least part of their activities they commit violence or other acts which are likely to intimidate, or make actual or implicit threats to do so;
> - They exploit differences between countries to further their objectives, enriching their organization, expanding its power, and/or avoiding detection/apprehension;
> - They attempt to gain influence in government, politics, and commerce through corrupt as well as legitimate means;
> - They have economic gain as their primary goal, not only from patently illegal activities but also from investment in legitimate businesses; and
> - They attempt to insulate both their leadership and membership from detection, sanction, and/or prosecution through their organizational structure.[4]

These definitions and guidance allow for different types of organizational structures, ranging from hierarchies to cells, but they start from the point of "self-perpetuating associations" that act

---

[3] 10 U.S.C. § 284(i)(6). For an alternative definition, see United Nations Office on Drugs and Crime, *Legislative Guide for the Implementation of the United Nations Convention Against Transnational Organized Crime*, 2004. For the purposes of that convention, the United Nations specifies,

> (a) "Organized criminal group" shall mean a structured group of three or more persons, existing for a period of time and acting in concert with the aim of committing one or more serious crimes or offences established in accordance with this Convention, in order to obtain, directly or indirectly, a financial or other material benefit; (b) "Serious crime" shall mean conduct constituting an offence punishable by a maximum deprivation of liberty of at least four years or a more serious penalty; (c) "Structured group" shall mean a group that is not randomly formed for the immediate commission of an offence and that does not need to have formally defined roles for its members, continuity of its membership or a developed structure.

[4] United States, Executive Office of the President, 2011.

Nicaragua AR_001320

like organizations and call out particular behavior, including violence in pursuit of influence and economic gain. These descriptions suggest that, to be considered a TCO, a human-smuggling group or network needs to have some level of organization and hierarchy; that is, it should be more than just an ad hoc collection of individuals who operate along distinct parts of a route and work together opportunistically with other individuals in various configurations to move people from Central America, across Mexico, and to the U.S. border. One gray area involves slightly more organized groups, consisting of loose networks of individuals who consistently work together or generally leverage the same set of connections along a route.

As Chapter 2 shows, our review of the literature and interviews with SMEs suggest that smugglers bringing migrants from the NT to the U.S. border fall along a spectrum from independent operators, to ad hoc groups of individuals, to loose networks, and to more-formal networks that consistently work together—and it is possible that the same actor may be engaging in human smuggling in some or all of those ways at any given time. This means that even with a formal, official definition, the lines between TCOs and other kinds of smugglers and smuggling networks are blurry. These blurry lines presented substantial analytical challenges and contributed to the difficulty of determining whether migrants are hiring TCOs to smuggle them along a route and how much they are paying them.

## Technical Approach to Analysis

Given the short time frame for this study, we turned to existing literature, available data, and SMEs to learn more about the characteristics of human-smuggling TCOs and other actors that engage in human smuggling:

- **We reviewed existing literature** related, for example, to the types of TCOs that engage in human smuggling along routes from the NT, the flows of migrants from the NT to the United States, the fees that migrants pay to smugglers, and the costs of smuggling.[5]
- **We reviewed available DHS and other data** to cast light on the structure, operations, and financing of TCOs and support revenue estimation, including data on migration flows, smuggling fees, and smugglers' costs.
- **We reached out to SMEs,** including U.S. government officials and academics, to gain their perspectives on this topic and to learn more about available documentation and data. (See Appendix B for more details.)

With this evidence, we implemented a multimethod analysis: We developed a qualitative narrative (see Chapter 2) and scoped the market for smuggling services quantitatively (see Chapter 3). The distinction between the approaches as "quantitative" and "qualitative" is not clear-cut; for example, for our narrative we drew on anecdotal quantitative evidence, culled from

---

[5] Our literature review included academic articles, press reports, and reports written by government agencies, non-governmental organizations, and multilateral entities. See Appendix A for more details.

4

the literature, and for the scoping exercise we drew partly from qualitative survey data. By "triangulating" among methods and evidence, we could characterize the TCOs and other entities that engage in human smuggling and set out a general analytical framework for conceptualizing and addressing revenue estimation.

Our study framework, shown in Figure 1.2, depicts a generic, stylized route that begins at a point of origin in the NT, continues through Mexico, and ends at a destination in the United States, given the possibilities that a route can consist of multiple segments, that not all smugglers are TCOs, that not all unlawful migrants hire smugglers of any type for all segments, and various other route characteristics. The route characteristics suggest the kinds of data that would be necessary to conduct an economic analysis, including revenue estimation. The characteristics depicted in Figure 1.2 consist of the route segment, types of smugglers (e.g., TCO, other, or self), smuggling fees, other migrant payments, costs to smugglers, and the number of migrants along the route who travel under those conditions.

**Figure 1.2. General Framework for Economic Analysis, Including Revenue Estimation**



NOTES: Hash lines along the segmented route suggest the potential for more segments.

Some of these characteristics could be parsed further; for example, "other payments" could be divided into bribes to officials and taxes, or *pisos*, that drug-trafficking TCOs levy along the

Nicaragua AR_001322

routes they control. These bribes and taxes might or might not be included in smuggling fees, as a pass through, depending on the particulars of the smuggling arrangement.[6]

Although not apparent in Figure 1.2, we confined our analysis to a recent period, mostly 2015–2017, and to unlawful migrants coming from and originating in NT countries. As addressed below and in later chapters of this report, data on important elements of the framework were lacking, which substantially hindered progress on revenue estimation, even as a range, and generated considerable uncertainty.[7]

## Challenges, Uncertainties, and Mitigations

We faced analytical challenges relating to time constraints and data quality, completeness, and relevance that yielded a high degree of uncertainty about the findings, especially those concerning revenues.

To mitigate the challenges of an abbreviated timeline (less than two months for the evidence collection, analysis, and writing), we "triangulated," as noted above; independently analyzed the data that we obtained from DHS and other sources; and cross-checked our results with those of other researchers who have worked with similar and different data sets to identify and understand apparent divergences. In addition, as addressed below, we set out to frame our preliminary estimates of revenue, including embedded calculations of unlawful migrant flows, smuggling fees, etc., in terms of ranges. Lastly, we also considered options for improving the fidelity of our estimates under less-binding time constraints.

The data-related challenges were at least as noteworthy.

The data on unlawful migration and human smuggling—like any data on illicit activities— tend to be partial, unreliable, and sometimes ill-suited to the policy questions at hand. Some data derive from direct observation (i.e., the number of individuals that U.S. Border Patrol agents apprehend, see turning back, or see getting away), some derive from statistical analysis that extrapolates from current trends (e.g., migrant flow–estimation methodologies related to recidivism rates), and others derive from surveys of or interviews with migrants and smugglers. All of them have limitations, which are discussed in Chapter 3.

Inevitably, researchers must also grapple with what criminologists call the "dark figure," referring to the amount of unreported or undiscovered illicit activity. For human smuggling, this gap in the data could pertain both to the activities of smugglers and to the flows of unlawful migrants from the NT to the United States. For example, law enforcement is unlikely to observe or understand the totality of a TCO's operations, partly because TCOs seek to conceal them and also because individuals who are affiliated with TCOs may not divulge this information upon

---

[6] Chapter 2 includes a detailed discussion of migrants' payments of taxes, or *pisos*, to TCOs, specifically drug-trafficking TCOs, and Chapter 3 provides an ancillary preliminary estimate of their worth.

[7] For more information about the estimation method, see Chapter 3 and Appendix C.

Nicaragua AR_001323

capture. Indeed, some or even most people working for a TCO may have little knowledge of the TCO's overall activity. Similarly, government officials will not see all individuals who turn back or get away, and migrants may not provide full information about their journeys. Smuggling, like other illicit activities, tends to rely on trust relationships, and disclosures would violate that trust, risking reprisals and denials of service in the future.

Moreover, researchers cannot presume the accuracy of data related to smuggling or migration. For example, U.S. Border Patrol agents often interview migrants and ask them questions about the details of their journeys, such as smuggling fees, and record the results. However, these officials might ask these questions differently at different locations and might misinterpret or mis-enter the results and migrants might answer these questions incorrectly, either purposefully or because they did not understand the questions.[8]

In addition, as noted above, not all human smugglers are affiliated with TCOs, howsoever defined, and the data provide little insight as to whether migrants hire human-smuggling TCOs or other types of actors. To the best of our knowledge, neither DHS nor any other agency or academic researcher has collected data on smuggling fees that specify smuggler "type" or provide information that could tie the DHS data on smuggling fees to data on smugglers' organizational affiliations. Thus, even if we could distinguish clearly between human-smuggling TCOs and other types of smugglers, and even if we could also develop a reliable estimate of revenues from smuggling NT migrants to the United States, we could not parse the revenues to those TCOs, specifically.

Lastly, estimating revenue from human smuggling, as compared with drug trafficking, presents other challenges relating both to the diversity of the individuals seeking to be smuggled and to the diversity of smuggling services being offered. Drugs are relatively simple, near-homogeneous commodities, and trafficking them involves commensurately little differentiation. A kilogram of cocaine is a kilogram of cocaine, after some adjustment for purity, and trafficking involves moving that kilogram from one place to another, with limited options, e.g., regarding routes and modes of transportation.[9] By contrast, people differ widely—e.g., by gender, age, health status, and physical capability—as do their needs and financial resources. Consequently, human smugglers can differentiate their services, with options including comprehensive "all-inclusive" or "end-to-end" packages on one end of the spectrum, and "pay-as-you go" arrangements, in which migrants pay for discrete services, at the other. (See Chapter 2.) As a result, smuggling fees can and do vary greatly from one journey to another.

None of these challenges has a fully satisfying "fix." For example, to estimate migrant flows, researchers have developed methods based largely on data on apprehensions of unlawful

---

[8] For more information about specific shortcomings of the data, see Chapter 3.

[9] See, for example, Paoli, Greenfield, and Zoutendijk, 2013. For more on drug supply chains, see also Paoli and Greenfield, 2017.

Nicaragua AR_001324

migrants. These results may be biased upward or downward, depending on the approach, and some of them may be controversial, but they can be and are used to estimate ranges.[10] Regarding the revenues and profits associated with human smuggling, one researcher asks whether it is even possible to conduct economic analyses of this market, because the activity is illegal and highly differentiated.[11] Notwithstanding the "dark figure," other researchers have found ways to deal with illegality in more homogeneous markets, but the diversity of services in this arena would add a layer of complexity.[12]

Some of the least "fixable" challenges are among those most closely aligned with the primary goal of the study: revenue estimation. From the start, we recognized the infeasibility of developing a point estimate for smuggling revenues and intended, instead, to frame any revenue estimate as a range, from low to high, because of the time constraint and also to accommodate the considerable uncertainty in the data. Furthermore, as the research progressed, we found that we lacked an empirical basis for separating the activities and revenues of human-smuggling TCOs from those of others, including ad hoc groups and independent operators, who engage in human smuggling. Thus, we could provide, at best, a range for revenues to all smugglers, irrespective of their affiliations, although we were able to provide a separate preliminary estimate of the right-of-way taxes that migrants pay to drug-trafficking TCOs.

The following chapter presents initial findings on the characteristics of human smugglers that operate along routes from the NT to the United States, as well as the characteristics of human smuggling, more generally, with a focus on actors' roles and the services they provide.

---

[10] See, for example, DHS, Office of Immigration Statistics, 2017.

[11] See Sanchez, 2017, 2018.

[12] Reuter and Greenfield, 2001; Paoli, Greenfield, and Reuter, 2009.

Nicaragua AR_001325

## 2. The Characteristics of Human Smuggling

This chapter focuses on the characteristics of human smuggling from the NT countries (Guatemala, Honduras, and El Salvador) to the United States, including the structure, operations, and financing of human smugglers. We provide an overview of the main types of smugglers, or "actors," that engage in this market, analyze the roles they typically fill, and discuss the services such actors provide, the fees they charge for those services, and the costs they incur. In effect, this chapter covers the "who," "what," "how," and financial dimensions of human smuggling along routes from the NT to the United States. We conclude the chapter by exploring the linkages between human smuggling and drug-trafficking TCOs.

Smugglers that move migrants from the NT to the United States take many forms, only some of which appear to meet the definition of *transnational criminal organization* laid out in U.S. law and policy guidance, as discussed in Chapter 1. While most unlawful migrants report having engaged the services of a smuggler for at least a portion of the route, it is unclear how many migrants engage smugglers to arrange their entire journey north or engage smugglers for discrete portions of the journey, and how many are using more-organized TCO-like networks as compared with independent operators and ad hoc groups.

The routes migrants use to travel north are well established and primarily follow overland transportation corridors from the NT to Mexico's southern border with Guatemala, and then up through Mexico to the border with the United States. The main variation appears to involve the modes of transportation or conveyances that migrants use, which include buses, taxis, tractor trailers, and freight trains, with comparatively few NT migrants using sea vessels or airplanes for parts of the journey.

Fees paid by unlawful migrants also differ widely, depending on the comprehensiveness and quality of smuggling services that migrants engage. Some migrants can pay thousands of dollars to be smuggled from their home country to the interior of the United States, while others may only pay a few hundred dollars for discrete portions of their journey. Migrants often pay taxes, or *pisos*, to drug-trafficking TCOs (or "cartels") to travel through territory the cartels control, and bribes to officials to go through checkpoints along the routes. Such payments might be in addition to other smuggling fees or included in them, depending on the particular arrangements that migrants make with their smugglers. Migrants' payments to drug-trafficking TCOs are not payments for smuggling, per se, but they are the only revenue associated with human smuggling that we could attribute directly to TCOs of some kind.

Lastly, while the scope of this report is limited to migrants from the NT, our literature review and SME interviews suggest that the smuggling groups operating along this corridor are also moving people of other nationalities. The evidence suggests that these migrants—particularly those from countries outside the Western Hemisphere—may be paying smuggling fees that are

Nicaragua AR_001326

orders of magnitude higher. Additionally, the groups specializing in facilitating this extra-hemispheric flow may be more organized and, thus, potentially more liable to meet the definition of a TCO.

## Taxonomy of Human Smugglers

Different types of actors participate in human smuggling, including independent operators that move migrants along particular segments of the route or offer other discrete services (for example, a taxi driver based out of one town on the route that ferries migrants to the next major town); ad hoc or opportunistic groups that might work together from time to time but not regularly; and more-formal enterprises or networks.[13] This reality means that migrants who intend to travel to the United States from Central America can choose from a wide range of service options. At one end of the spectrum, migrants can opt for "all-inclusive" or "end-to-end" arrangements, whereby they pay one facilitator, group, or network that arranges all their travel and may even send a representative to travel with them; at the other end, migrants can "pay as they go," traveling on their own for parts of the route and connecting with local smugglers to pay for transportation and logistical support for other parts of the route. The differences in the kinds of services that are provided by these actors are discussed in more detail below.

There is some debate in the literature about the extent to which groups of smugglers are becoming more professional and sophisticated, in light of possible increases in smuggling fees.[14] However, the majority of sources suggest that most of these groups are loosely organized, are nonhierarchical, and do not maintain a definable command structure.[15] The diversity and proliferation of individuals and groups involved in some aspect of human smuggling make it challenging to identify the extent to which these activities are conducted by actual TCOs.

As noted in Chapter 1, the statutory definition of a TCO includes components that do not appear to be present in many human-smuggling operations, including TCOs being "self-perpetuating associations" that protect their activities through "a pattern of corruption and/or violence," with a "transnational organizational structure."[16]

Table 2.1 presents a taxonomy of human smugglers, based on our review of the literature and interviews with SMEs, starting with the least organized types of smugglers and ending with the most organized. At each level, actors differ by organizational cohesion, membership, and

---

[13] See, for example, Guevara González, 2018.

[14] For a discussion of debate among academic sources on organizational coherence of smuggling organizations, see Sanchez and Zhang, 2018.

[15] Sanchez, 2017, p. 14; Zhang, 2007, p. 89; Guevara González, 2018, pp. 180–184. For example, "A key feature of the smuggling strategy along the U.S.-Mexico border is its relatively low entry costs and lack of vertical integration" (Wuebbels, 2004, p. 23).

[16] 10 U.S.C. § 284.

Nicaragua AR_001327

geographic dispersion along smuggling corridors. The more organized networks can feature transnational organizational structures, but relatively few appear to meet the bar of being "self-perpetuating associations." And while many of these actors rely on corruption to protect their activities in the form of bribes to officials, relatively few of them appear to use violence for this purpose. The taxonomy should be thought of as a spectrum rather than a set of firm categories; smugglers commonly move between levels or can operate at more than one level along the spectrum, depending on their opportunities. Many of these actors, even those toward the more organized end of the spectrum, can function as subcontractors to other actors at the same or different levels of the spectrum.

**Table 2.1. The Spectrum of Actors Engaged in Human Smuggling**

| Type of Actor | Organizational Structure | Services | Group Membership | Geographic Reach |
|---|---|---|---|---|
| Independent operators | One "cell" composed of one or a few individuals | Provide a discrete service (e.g., transportation or lodging) | Do not generally work with other cells or actors | Generally work in one location, or between two locations |
| Ad hoc groups | Two or more independent operators that may not always work together | Provide multiple, complementary services | Generally unaware of other actors and groups more than one degree of separation removed | Work in one, two, or more locations |
| Loose networks | A larger number of small groups that usually work together | May provide end-to-end service along the full route or a portion of the route | Members may only know a limited number of other members | Working in many locations, potentially the full route |
| More-formal networks | A central figure who coordinates groups that consistently work together | Provide end-to-end services | Members generally know each other | Working along the full route |

### Independent Operators

Smuggling services are often provided by local, independent operators who generally operate in one area and facilitate the movement of migrants along discrete sections of the route from Central America to the U.S. border.[17] These services can include providing facilitation, transportation, housing, food, and fraudulent documents.[18] For example, there may be a "transportation cell," or a small group of individuals, in Tapachula that specializes in recruiting recently arrived migrants from the bus station or border and transporting them to the next major

---

[17] Sanchez, 2018.

[18] For example, "Martinez appears to be an independent contractor. He said he charges $2,500 for the trip from the Guatemalan border to the U.S. border, where he gives Central American migrants fake Mexican identity cards and makes them learn the first stanza of the Mexican national anthem before handing them off to another smuggler" (Associated Press, 2014).

Nicaragua AR_001328

waypoint along the route north.[19] This group may not have any formal connections to other smuggling groups, instead focusing solely on moving migrants that it encounters or recruits from one city to the next one.[20]

## Ad Hoc Groups

Sometimes, several generally independent operators may come together to pool their services for a given migrant or group of migrants.[21] These opportunistic or ad hoc groupings of smugglers are generally not stable or allegiant to each other, and the smugglers may be working with several different groups at the same time. Expanding on the previous example, the transportation cell in Tapachula may know several different operators that provide housing in the next major waypoint for migrants, and the cell will put its clients in contact with one of them. The group that provides housing might essentially direct migrants to a low-grade hotel (also known as a "stash house") that takes in migrants from other organizations operating along that segment of the route. The stash house operator, in turn, might then connect the migrants with another transportation cell that the migrants would use for the next portion of their journey. The two transportation cells may not be aware of each other, even though both cells participated in smuggling the same migrants along the route.

## Loose Networks

Some smuggling networks along the routes consist of groups that might not be attached formally and consistently to one organization—that is, they might not answer uniformly to the same person—but that generally work with the same preferred or trusted partners along longer sections of the route.[22] These loose networks generally work together, and in some cases the chain of facilitation can extend all the way from the NT to the United States, although the links in the chain might not all know or be aware of each other. The main difference between these loose networks and the ad hoc groupings is that these networks are more organized and the

---

[19] In an interview with PBS Frontline, a smuggler operating as an independent operator admits to finding clients at a bus stop where recently unlawful migrants who have been removed are released (Frontline/World, 2018).

[20] See, for example, Sanchez, 2018; Zhang, 2007; Campana, 2016; Associated Press, 2014.

[21] See, for example, this description of how unlawful migrants arriving at a town on the Guatemala border with Mexico are connected with smugglers:

> As migrants arrive into town, they are approached by taxi drivers who offer their transportation services. Drivers recommend specific hotels or accommodations to their customers, receiving in turn a commission based on the amount of business they bring in. Hotels also serve as brokerage points for those who arrive without a guide. Once at a hotel, migrants in transit can select from a vast range of options, including accommodations, meals, transportation toward the border with Mexico, and assistance crossing the southern border for a fee. (Guevara González, 2018).

[22] See, for example, a Mexican news magazine's description of how three coyotes coordinate the travel of El Salvadorans to Houston (Martinez, 2017).

Nicaragua AR_001329

various components of the network along the route tend to work together consistently, even if one person does not manage the overall network.[23] An example of this kind of network would involve a facilitator in Guatemala who recruits migrants and then tasks another individual or group with transporting the migrant to the border with Mexico, where yet another individual or group would take custody of the migrant and be responsible for transporting the migrant further north.[24] The migrant may be handed off several times along the trip, with the facilitator being generally aware of the migrant's progress, but the groups that transport and provide housing to the migrant may only be loosely aware of each other.

### More-Formal Networks

Formal, relatively more-hierarchical smuggling networks reportedly exist along the routes from Central America to the United States.[25] However, even these relatively more-organized groups feature command structures that are not truly hierarchical, particularly compared with other organized crime actors, such as cartels or drug-trafficking TCOs. For example, one individual might not have command and control over all of their affiliates or subsidiaries. These relatively more-formal networks generally feature one person or a group of persons that oversees the activities of others in the network, and these networks usually offer "all-inclusive" packages, whereby migrants pay a substantial fee for end-to-end service all the way from their point of origin to their destination in the United States. Some of these networks also appear to specialize in moving migrants from outside the Western Hemisphere.[26]

### Dynamism Within the Spectrum

Low barriers to entry, opportunistic behavior, and fluid allegiances suggest dynamism within the spectrum and make it difficult to reliably assign smugglers—including, individuals, cells, or even some groups—to particular parts of the spectrum. Even if would-be smugglers must have some risk tolerance, many of the activities they engage in do not require specialized knowledge (e.g., driving a taxi, operating a hotel or stash house), such that individuals, in particular, can

---

[23] See, for example, the hierarchy of human-smuggling groups in Palacios's (2014) academic article from less to more organized, culminating with "Systematic complex networks are more extensive and have a hierarchical structure in which a leader manages the network's business and finances" (p. 327).

[24] See, for example, Martinez, 2017.

[25] See, for example, the description of human-smuggling networks in Associated Press (2014) as "a complex corporate structure. Guides at the border usually work for honchos who run the operation from afar and only pocket a fraction of the price charged to the migrants. One of the most important coyotes moving immigrants from El Salvador lives in Texas."

[26] See, for example, U.S. Immigration and Customs Enforcement, 2016.

Nicaragua AR_001330

come and go easily.[27] Additionally, at any point in time a smuggler might be operating independently, as a member of an ad hoc group, and as a member of a loose network. That is to say, the coalitions of smugglers that operate along the routes from Central America to the United States are opportunistic, extremely fluid, and prone to change, making it extremely difficult to pin down the exact nature of smuggling or of specific groups and networks that are involved in the trade. As noted above and described in the taxonomy, only some actors appear to meet the definition of *transnational criminal organization* found in U.S. law and policy guidance.

## Key Roles in Human Smuggling

Smugglers typically fill a number of roles, whether they are working as independent operators or as part of a network or group. Depending on the sophistication of the operation, individuals or small groups of people (sometimes referred to as a *cell* by law enforcement) can fill these roles.[28] Some of these individuals and cells work as subcontractors or independent operators and may offer their services to several different networks or other smugglers at the same time. This means that human-smuggling networks may feature several cells that work together occasionally or consistently, depending on the relative strength of the networks.

The following is a brief description of the key roles:[29]

- **Facilitation/coordination.** Identify and recruit migrants, collect up-front fees, pay other smuggling organizations during the migrant's journey, and coordinate some or all of the migrants' travel from their source country to their final destination. These individuals or small groups are often based in the NT countries, though some might also be present in population centers in Mexico.[30]
- **Transportation.** Transport migrants from one location to another along the route north. Transportation involves conveyances of different types and sophistication, with actors and modes ranging from local taxi drivers that transport small numbers of migrants from one town to another, to organizations that charter buses or retain tractor trailers to transport large groups long distances. Part of this service often includes paying fees or taxes, including bribes and *pisos* (see the later discussion), to other criminal networks or corrupt officials to cross their territory or pass a checkpoint.

---

[27] For example, Guevara González (2018) describes an interview with a woman who recounts that the first two times she journeyed north, she used smugglers: "By her third trip, she felt confident enough to travel on her own— and now she puts her experience to work facilitating the journeys of unlawful migrants through Mexico."

[28] For further discussion of the unique roles of participants of smuggling organizations, see United Nations Office on Drugs and Crime, 2011, p. 70.

[29] As noted earlier, Guevara González (2018) explains how many of these functions work along the border between Guatemala and Mexico.

[30] See, for example, Garsd's (2016) interview with a smuggler based in Mexico who describes how his network coordinates a series of "walkers" to help Honduran migrants traverse Mexico to the border with the United States.

Nicaragua AR_001331

- **Logistics/stash houses.** Provide logistical support, often in the form of lodging or stash houses where migrants can take shelter for a few days or even a few weeks. On the U.S. side of the border, stash house operators often move migrants between houses every few days to attract less attention from neighbors and law enforcement.[31]
- **Fraudulent documents.** Provide fraudulent documents for unlawful migrants, such as Mexican visas, national identity cards, and birth certificates. These documents can help migrants travel freely through Mexico and, in some cases, can also be used to create evidence of "synthetic families" with unaccompanied children to present to border officials upon entry into the United States.[32]
- **Footguides/coyotes/*polleros*.** Guide unlawful migrants—generally single adults—on foot across the land border between POEs, to avoid detection by U.S. Border Patrol agents while entering the United States. These footguides are commonly known as *coyotes* or *polleros*. The term *coyote* is also used interchangeably to describe human smugglers in general, and some reports note that these more broadly defined coyotes may operate in the NT countries, travel with migrants throughout their journey, and operate along the U.S.-Mexico border.[33] At the border, footguides often work in concert with "spotters" who try to locate law enforcement assets and personnel to maneuver groups around them via radio or cell phone.

## The Relationship Between Smuggling Services and Fees

Human smugglers provide migrants with a wide range of services, including transportation, lodging, and specialized knowledge to help migrants avoid arrest, extortion, and violence by evading detection or paying bribes and protection fees. Migrants can choose to "pay as they go" and find the services they need for discrete sections of the route north (which may cost them very little in fees), or use "all-inclusive" or "end-to-end" packages that cover their travel from their point of origin to their final destination in the United States (such packages, by comparison, may cost them more than $10,000).[34] We were unable to find much evidence in the literature on how many unlawful migrants are using all-inclusive arrangements versus choosing to pay as they go. Smugglers' services can differ widely based on the needs and financial resources of their clients and, consequently, so can their fees.

*All-Inclusive Packages*

Our review of the literature revealed substantial variation in the fees that smugglers charge for all-inclusive services, but there appears to be broad convergence around these kinds of

---

[31] For example, Nixon and Heisler (2018) describe the key role stash houses play in smuggling migrants in Texas.

[32] For example, Castellano (2014) reports how smugglers in Guatemala describe their connections with Mexican immigration authorities and their ability to procure visas to facilitate travel through Mexico, and Hennessy-Fiske (2018) reports on unrelated adults and children posing as families at the border.

[33] See Martinez's (2017) discussion of the three coyotes involved in smuggling migrants from the NT to Houston.

[34] Sanchez, 2018.

Nicaragua AR_001332

services costing migrants between $6,000 and $10,000, which is roughly in line with the results of the Encuesta sobre Migración en la Frontera Sur de México, or Survey of Migration at Mexico's Southern Border (which we refer to by its Spanish abbreviation, EMIF Sur), conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, located in Mexico. However, some articles suggest that the fees can be substantially higher. There is also evidence that the fees can vary, depending on whether unlawful migrants are attempting to evade detection at the border, and thus must be smuggled into the interior of the United States (generally single adults), or whether they are turning themselves into border officials at and between POEs and entering the asylum process (generally families and unaccompanied children).[35]

Smugglers can also provide specialized services for clients such as children, pregnant women, and the elderly that reduce exposure to risks and do not require extensive physical activity, such as scaling walls or extended hikes through remote terrain.[36] As one smuggler explains, specialized services that increase a person's chances of successfully evading detection, such as the use of decoys, lookouts, and safe houses, are likely to drive up costs and therefore prices.[37] Some reporting also suggests that smugglers can charge exorbitant fees if they have access to corrupt customs officials who take bribes in exchange for "looking the other way" as migrants' pass through borders.[38] Alternatively, migrants of greater means may choose transportation methods that are more comfortable, such as taxis or personal vehicles, or pay additional fees for smuggling tactics that minimize the risk of detection, such as using fraudulent travel documents. As one scholar notes, "the more money you have, the better service you get."[39]

Selected examples of smuggling fees in press reports are broadly representative:

- A 2018 *New York Times* article drawing on interviews with unlawful migrants found that the fee to enter the United States illegally represented more than half of the overall fee of $12,500 that a family paid for one individual's journey: "The nearly 2,000-mile trip had already cost Mr. Cruz's family more than $6,000 and brought him within sight of Brownsville, Tex. The remaining 500 miles to Houston—terrain prowled by the United States Border Patrol as well as the state and local police—would set them back another $6,500."[40]

---

[35] See, for example, Martinez's (2017) description of the *viaje corto*, or short journey, taken by asylum seekers that allows them to avoid paying the extra fees to avoid detection. Miroff (2018) describes the increasing trend of migrants turning themselves in to border officials. For additional reporting on fees and cost, see *Daily Mail* and Associated Press Reporters, 2014, and Kulish, 2018.

[36] Sanchez, 2017.

[37] González and Solis, 2017.

[38] Frontline/World, 2018.

[39] Cleek, 2018.

[40] Kulish, 2018.

Nicaragua AR_001333

- A Public Radio International news segment in 2018 described smuggling fees doubling over the past decade: "But in the past few years, the price of this trip has skyrocketed to between $7,000 and $10,000, more than double what it was a decade ago."[41]
- A Mexican online magazine interviewed a smuggler specializing in bringing unlawful migrants from El Salvador to the United States who described how he had raised his fees in 2017 after increased enforcement. The smuggler noted that he used to charge around $8,000 for travel from El Salvador to Houston, but he was now charging $9,500 to $10,000—plus another $1,500 if the unlawful migrants wanted to go past Houston.[42]
- During a National Public Radio interview in 2016, a smuggler claimed to charge as much as $17,000–$19,000 during the interview, while the director of a nonprofit working with unlawful migrants cited a lower figure: "You have to assume the average price is between 6,000 and 10,000. If you pay more, you're more likely to get through without being detected."[43]
- An academic researcher who volunteered at a migrant shelter along the Mexico-Guatemala border during parts of 2014, 2015, and 2016 noted: "Coyotes are known for providing a full-service package, which includes the facilitation of journeys across Mexico and into specific destinations within the United States from the place of origin or residence of the migrant. Few migrants travel in this all-inclusive way, though, because of cost: coyote-led door-to-door journeys are quite expensive. During the period in which this research was carried out, the prices of such all-inclusive packages ranged between 4,000 and 6,000 U.S. dollars."[44]
- An article detailed negotiations with several smugglers in Guatemala in 2014; loosely translated, it stated: "Besides 'The Chuluyo' we negotiated separately with three more Guatemalan traffickers to move 'Karen.' The cost ranged from 6,000–9,000 dollars, with two to three attempts to achieve it."[45]
- An Associated Press article in 2014 included interviews with smugglers: "The trafficker on the Guatemalan border, who spoke with The Associated Press after an intermediary negotiated the time and place, said the people he smuggles pay $10,000 a head for the trip from Central America, which covers everything from hotel and train payments to official bribes and cartel taxes. But occasionally, he said, a cartel will demand as much as an extra $5,000 on threat of death."[46]

These reports generally do not, however, shed light on another key research question: What percentage of unlawful migrants are opting to pay for these "all-inclusive" packages? One exception is an investigative report by the Mexican newspaper *El Universal* into human smuggling from Guatemala, which noted that 75 percent of unaccompanied children hired a

---

[41] Cleek, 2018.

[42] Martinez, 2017.

[43] Garsd, 2018.

[44] Guevara González, 2018, p. 182.

[45] Castellano, 2014.

[46] Associated Press, 2014.

Nicaragua AR_001334

smuggling network and were accompanied by representatives of these networks—"coyotes"—during their entire journey.[47]

*Pay-as-You-Go Arrangements*

An unknown percentage of unlawful migrants choose to travel on their own without engaging a smuggler to coordinate their entire journey. Instead, they obtain services, as needed, along the route. During their journey, they can enter into agreements with multiple facilitators at different stages in their journeys north, each of which might offer different level of services, possibly tailored to their needs and resources, a model often described as "pay-as-you-go."[48] Because the arrangements are spontaneous, we were unable to find many estimates of what unlawful migrants pay for these discrete services.

One researcher who spent time living in a shelter, known as "La 72," catering to unlawful migrants along Mexico's border with Guatemala noted that "Most Central American migrants staying at La 72 reported relying on the segmented facilitation, where they relied on a guide (*guía* in Spanish) to lead them through specific portions of their journeys. *Guías* are typically local residents . . . with knowledge of the terrain."[49] The researcher went on to describe how unlawful migrants arriving at the town are approached by taxi drivers who offer them transportation and connect them with other logistics providers in the town, who in turn can connect them with a wide array of other services.[50] The fees charged to migrants for segmented facilitation varied significantly, but some of the prices she observed being negotiated for discrete services included

- $15 per night for a bed in a shared hotel room
- $1–$4 to cross the river in a boat
- $1,000 for a guaranteed crossing of the Mexico-Guatemala border past immigration checkpoints on the Mexican side.[51]

In another example, a *New York Times* reporter followed the travels of an unlawful migrant from El Salvador whose family in the United States wired money at different points in the journey when he was unable to continue on his own—including a substantial payment at the beginning of his travel: "Just two days into Mr. Cruz's journey, his family had to wire the smuggling network $1,900 to get him through southern Mexico."[52]

---

[47] Castellano, 2014.

[48] Sanchez, 2018; Organisation for Economic Co-operation and Development, 2015.

[49] Guevara González, 2018, p. 182.

[50] Guevara González, 2018, p. 183.

[51] Guevara González, 2018, pp. 183–187.

[52] Kulish, 2018.

Nicaragua AR_001335

In yet another example, experts interviewed by Public Radio International described the range of options available to unlawful migrants who set out on their own: "Migrants who have no money can hitchhike, walk or take the train. . . . Some families pay smugglers a few hundred dollars to explain the route. . . . With a little more money, families can pay for a smuggler to book the bus tickets in advance, so migrants just show up and hop from one bus to the next."[53]

An Associated Press article included this description of the service provided by an "independent contractor" who facilitated travel through Mexico:

> He said he charges $2,500 for the trip from the Guatemalan border to the U.S. border, where he gives Central American migrants fake Mexican identity cards and makes them learn the first stanza of the Mexican national anthem before handing them off to another smuggler. Hopefully, if they are apprehended in the U.S., they'll only be sent back to Mexico, where they can try again.[54]

Other sources describe how migrants traveling on their own can choose to ride a freight train for part of their journey north (popularly known as La Bestia, or "the Beast") that may cost nothing, apart from payment to criminals in order to avoid harm.[55]

## The Difficulty of Calculating Human-Smuggling Profits

Although profitability might say more about the financial health and viability of smuggling operations than revenue, profit estimation poses substantially greater challenges. The diversity of business models, and differentiation of smugglers' services among and within models, can yield substantial variation in smuggling fees and, possibly, in the smugglers' profits.[56] For these same reasons—as well as inherent data limitations (see Chapters 1 and 3) and the far greater scarcity of data on smugglers' costs—profit estimation is extremely difficult.[57] As noted elsewhere in this report, some scholars call into question whether it is even possible to undertake economic assessments in this arena, because of both illegality and data deficiencies.[58]

Nevertheless, we found scattered evidence on the reported costs to smugglers for discrete services they provide that, in combination with the evidence on fees cited previously and explored more thoroughly in Chapter 3, could say something about profitability. For example, some reporting describes smuggling organizations that recruit larger numbers of clients can pool

---

[53] Cleek, 2018.

[54] Associated Press, 2014.

[55] See, for example, the description of how migrants may be pushed off the trains if they don't pay protection fees, in Domingo Villegas (2014). For additional reporting on fees and costs, see Tiempo.hn (2017).

[56] As noted in Chapter 3, the smuggler's "accounting profits" might not equate to "economic profits."

[57] For additional comments on the paucity of data on smugglers' costs, see United Nations Office on Drugs and Crime, 2011, p. 85.

[58] Sanchez, 2017, 2018.

Nicaragua AR_001336

migrants and transport them great distances in tractor trailers or on charter buses, sometimes all the way across Mexico.[59]

A handful of press reports offers more detail on specific costs borne by smugglers. One set of data points on logistics costs, possibly originating in a 2014 Associated Press report, shows up intermittently across news sources and over time and recounts various transportation, lodging, and other costs incurred by smugglers that might sum to around $2,000 or more per migrant.[60] As presented in the 2014 Associated Press report:

- guide who makes the trip: $500–$600
- boatmen at Mexico's southern border: $1.50 to cross Suchiate River from Guatemala
- lodging: $11.50 a room, which can hold many migrants
- Central American gang: At least $100 per migrant to board Mexican freight train known as La Bestia, or "the Beast"
- Mexican police and immigration officials: $230–$540 to pass; $25–$40 per person to free detained migrant[61]
- drug cartels: $250–$300 for Mexican migrant, $500–$700 for Central American, about $1,500 for someone from Europe or Asia, plus 10 percent flat fee per smuggler to cross northern Mexico to the U.S. border
- boatmen at Mexico's northern border: $100 per immigrant to cross Rio Grande into the United States
- drivers: $150 for ride from Rio Grande to stash house; $200 for ride north of the U.S. Border Patrol's highway checkpoint to Houston
- caretaker at stash house: $20 per person per day.

An online magazine in Mexico that interviewed smugglers bringing unlawful migrants from El Salvador to the United States in 2017 identified three different coyotes involved in a loose network: one was based in El Salvador and coordinated the journey, one traveled with the unlawful migrants until the U.S.-Mexico border, and a third took the clients across the land border and to Houston. Before 2017, the fees charged to unlawful migrants totaled $8,000 to Houston, but after the increased enforcement by U.S. authorities in 2017, the coyotes were now asking for $9,500–$10,000. Of this total:

- $2,000 covered expenses to get to Reynosa (including corruption of police checkpoints in Guatemala and Mexico, transport, housing, food)
- $300 covered the "cartel fee," or *piso*

---

[59] Caldwell, 2018.

[60] These data have appeared in an online article authored by *Daily Mail* and Associated Press Reporters (2014), citing "Migrants, Coyotes, Court Testimony." This same material has also appeared in several other press reports, with some dated at about the same time as the *Daily Mail* article and some as recently as 2016 and 2017.

[61] It seems unlikely that the fee to free a detainee would be less than the fee to pass by, as implied.

Nicaragua AR_001337

- $5,000 paid for the coyote in charge of U.S. border crossing and the travel to Houston (an additional $1,500 was charged if the unlawful migrants wanted to travel past Houston into the interior)
- $1,000 went to the coyote who traveled through Mexico with the unlawful migrants
- $1,700 was the profit earned by the individual who facilitated the overall journey.[62]

A 2018 news article broke down the costs incurred by smugglers involved with the last leg of the journey for those seeking to evade detection while crossing into California. A smuggler specializing in bringing unlawful migrants from Mexicali to Los Angeles claimed to make up to $2,500 per unlawful migrant of the $5,000 to $6,500 that he charged. Of this fee,

> The biggest share, $2,800 to $3,000, goes to the guy driving the migrants to Los Angeles, because he's taking the biggest risk if caught by the Border Patrol. Alexis pays another $100 to $300 per migrant to polleros who work as decoys, lookouts, pickups, or who operate safe houses in Calexico. Alexis says he also has to pay off the Mexican police. They get $200 per migrant.[63]

Lastly, one smuggler interviewed by the Mexican newspaper *El Universal* noted that smugglers in general were making millions of dollars, but in their view most of these profits were being generated from crossings into the United States from Mexico.[64]

The evidence, albeit sparse, suggests that the actors that coordinate the overall travel of unlawful migrants may be netting up to $2,000 per journey, while the actors that coordinate illegal entries between POEs may be netting up to $2,500 per crossing. Others along the line, including the stash house operators who charge a few dollars a day to accommodate migrants, the lookouts who help coyotes avoid law enforcement, and those who transport migrants at various points in the journey, might see substantially less. However, because of the extremely limited data on potential profits that we were able to identify, we did not believe it was possible to generate a credible estimate for profits, and, as addressed in Chapter 3, it is unclear whether these figures would hold up more generally—or in relation to DHS or EMIF Sur data on fees—and how much "economic" profit would remain after accounting for risk.

## Drug-Trafficking TCOs' Involvement in Human Smuggling

The most direct interaction between human smugglers and drug-trafficking organizations, many or most of which clearly manifest the attributes of TCOs, involves the payment of a one-time "tax," referred to at different parts of the border as a toll, mafia fee, or *piso,* that provides migrants with access to smuggling corridors on the U.S.-Mexico border under the control of drug traffickers. The open literature and interviews with SMEs suggest broad agreement about the

---

[62] Martinez, 2017.

[63] González and Solis, 2017.

[64] Castellano, 2014.

Nicaragua AR_001338

existence of this financial relationship;[65] however, they raise questions about the extent to which these markets and networks overlap more generally.

Human smugglers and drug traffickers conduct similar activities—providing illicit transportation services across international borders—and do so along common smuggling corridors, suggesting opportunities for overlapping business. Some sources suggest that drug-trafficking TCOs have greater financial incentive to participate in human-smuggling activities because smuggling fees have increased in recent years, but the data on trends in fees are mixed, as discussed in Chapter 3.[66] While the open literature is thin in this area, much of it suggests only minimal convergence between human smuggling and drug trafficking, beyond the collection of the *piso*, deconfliction of smuggling routes along the U.S.-Mexico border,[67] and, possibly, strategic use of human smuggling to draw attention from drug trafficking.[68] Several reports suggest that migrants, on occasion, carry drugs across the U.S.-Mexico border in exchange for reduced fees,[69] and other sources suggest that elements of certain drug-trafficking TCOs, particularly Los Zetas, have attempted to play a more direct role in human-smuggling activities.[70] However, our literature review and discussions with SMEs provided little evidence of a broader convergence of these networks and business operations.

### Paying the Tax, or Piso

Over the past decade, the landscape of Mexico's main drug-trafficking TCOs has been characterized by a trend toward fragmentation and splintering, with the emergence of new groups that compete or collaborate with traditional groups.[71] However, despite the fluid nature of these organizations, a handful maintain control of most of the primary trafficking corridors into the

---

[65] For example,

> The most commonly reported interaction between migrants and drug traffickers—and perhaps the only one pointing to the existence of a structured system of financial transactions connecting drug trafficking and migrant facilitators—involved the payment of piso, a one-time toll to access specific parts of the migrant trail under the control of a [drug-trafficking organization]. (Sanchez and Zhang, 2018, p. 141)

[66] Weden, 2016; Olson, 2016; Slack and Whiteford, 2013.

[67] For example, "'Drug traffickers dictate where and when illegal crossings occur,' he said. 'Human smugglers arrange crossings through their 'business relationship' with drug traffickers'" (Prendergast, 2017).

[68] Cabrera, 2015; Slack and Campbell, 2016. The latter write that "Migrants in Altar were consistently being sent in staggered groups of 10 or 20 each half hour with a group of burreros behind the last group as a way to distract the border patrol" (p. 13).

[69] See, for example, Prendergast, 2017; Burnett, 2011.

[70] See, for example, Gallagher's (2018) description of Los Zetas coordinating the movement of tractor-trailers with up to 100 migrants inside.

[71] Beittel, 2018.

Nicaragua AR_001339

United States.[72] Such control allows these groups to both regulate and tax illicit trade through these territories, whether the trade occurs between or at POEs.[73] The purpose of regulating these movements is partly to ensure that other smuggling activities do not disrupt a drug-trafficking TCO's main drug-trafficking business, for example, by attracting the attention of authorities to key smuggling corridors. As such, drug traffickers would coordinate with human smugglers to deconflict and strategically position their activities and tell them when and where to move migrants across the U.S. border.

Controlling prime smuggling territory also affords drug-trafficking TCOs an opportunity to charge a tax on unlawful migrants seeking to pass through on their way to the United States. These protection payments or security fees function as tolls or taxes and are known to migrants as mafia fees, or *pisos*, depending on the region of the border.[74] According to U.S. government sources, it is all but impossible for migrants to cross some sections of the border, particularly those most tightly controlled by the drug traffickers, without paying the tax.[75]

Collecting the *piso* requires fairly extensive regulation of migrants passing through a drug-trafficking organization's territory, pointing to coordination between human smugglers and drug traffickers before a migrant reaches the U.S.-Mexico border. Migrants are often given a *clave* (or code) that indicates that they "belong to" or have been traveling with a particular human-smuggling organization, and they must provide this *clave* to lookouts who are affiliated with the drug-trafficking TCOs when they enter a border town.[76] Migrants traveling on their own are approached by lookouts and signed up by a smuggling group that requires payment of the *piso*. This system of regulation by drug-trafficking TCOs also depends on retribution against migrants or smugglers who do not pay the *piso* or follow directions about when and where to smuggle. Reports suggest the drug trafficker will kidnap, torture, and sometimes kill migrants and smugglers who do not do as instructed.[77]

### Potential for Broader Convergence of Human Smuggling and Drug Trafficking

Whereas we found evidence in the open literature and SME interviews that suggests financial transactions and coordination among human smugglers and drug traffickers, we found little to

---

[72] U.S. Department of Justice, Drug Enforcement Administration, 2017.

[73] See, for example, the transcript of a *60 Minutes* episode (Pelley, 2018) in which drug-trafficking TCOs are described as a "regulatory mechanism" on the border that "essentially set the rules, so to speak, for illegal activities in the region. It has led to this professionalization, this need to collaborate and coordinate with the drug cartels." See also Leutert, 2017.

[74] Kulish, 2018.

[75] Olson, 2016; Nixon and Heisler, 2018.

[76] Olson, 2016.

[77] Slack and Campbell, 2016, pp. 12–18.

Nicaragua AR_001340

suggest broader convergence.[78] In particular, evidence that drug-trafficking TCOs are directly involved in human-smuggling operations is lacking. Although some sources suggest that drug traffickers may sometimes force migrants to carry backpacks of drugs across the border, it is not clear how common this practice is.[79] Studies that include testimonials of migrants suggest they are often motivated by financial considerations,[80] and it appears that drug-trafficking TCOs commonly waive the *piso* for migrants that carry drug loads, and sometimes pay them.[81] In this scenario, migrants who do not have enough money to pay for the final leg of their journey sometimes agree to carry drugs in lieu of payment.

We also uncovered reports suggesting that some drug-trafficking TCOs, specifically Los Zetas, are attempting to profit from human smuggling beyond the collection of a tax near the U.S.-Mexico border and have even established affiliates in some of Mexico's southern states and Central American countries.[82] If true, these activities appear to be more focused on extorting migrants than transportation them. For example, Los Zetas affiliates reportedly collected fees from migrants boarding freight trains in southern Mexico.[83] In addition, some of these reports of drug-trafficking TCOs' activities are inconsistent with other studies, including ones involving testimonials from migrant smugglers who operate on the U.S.-Mexico border, suggesting that drug-trafficking groups tend not to become directly involved in transporting migrants.[84] These studies suggest that human smuggling and drug trafficking are separate businesses and indicate that human smugglers are deterred from engaging in drug trafficking because of the risks of retribution and because it could harm their primary business, which depends on referrals.[85] A perception that human smugglers are members of drug-trafficking organizations that are known to extort and kidnap migrants might hurt business.

These studies similarly highlight the disincentives for drug traffickers to become more involved in human smuggling, principally because of the comparatively smaller profit margins involved in smuggling people as opposed to drugs. As one study notes: "In economic terms,

---

[78] Sanchez and Zhang, 2018, pp. 135–151.

[79] Leutert, 2017.

[80] See, for example, Sanchez and Zhang, 2018, p. 143:

> In our study, respondents' testimonies indicated that the decision to carry drugs often was a personal, complex choice, rather than the result of coercion. Lacking financial resources to cover basic needs like room or board, or having run out of money after traveling vast distances and no longer able to afford smuggling fees, some migrants opted to assist drug traffickers in exchange for financial compensation or transportation within the United States.

[81] Sanchez and Zhang, 2018.

[82] International Crisis Group, 2016.

[83] Farah and Lum, 2013.

[84] Palacios, 2014.

[85] Palacios, 2014.

Nicaragua AR_001341

taking control of migrant smuggling networks (does) not make sense: why engage in the complex activities this business requires when criminals can make large revenues from (smugglers) without doing anything themselves?"[86]

## Conclusion

Our literature review and interviews with SMEs at DHS revealed that many different types of actors are involved in facilitating the movement of unlawful migrants from the NT of Central America to the United States. These smugglers reside on a spectrum that ranges from independent operators to more-formal networks. Only some of these networks appear to meet the statutory definition of a TCO, in that many do not appear to be "self-perpetuating," use violence and corruption systematically, or feature a truly transnational organizational structure. In line with this diversity of actors, smugglers also offer a wide array of services to unlawful migrants, spanning "pay-as-you-go" and "all-inclusive" arrangements. While the routes that unlawful migrants take are well established and primarily follow overland transportation networks, these migrants make use of various conveyances along the route depending on their needs and the fees they pay. Lastly, unlawful migrants generally are required to pay taxes, or *pisos*, to drug-trafficking TCOs along the U.S.-Mexico border for the right to pass through their territory, either directly or through human smugglers.

---

[86] Palacios, 2014.

Nicaragua AR_001342

# 3. Preliminary Findings on Revenue Estimation

Drawing from the principles of the general framework presented in Chapter 1, we set about estimating revenues from human smuggling, without regard to the type of smuggler. As discussed in Chapter 2, we found that we could not attribute smuggling revenues to particular types of smugglers, although we could evaluate the taxes, or *pisos*, that migrants pay drug-trafficking TCOs to traverse their territory. Unlike the revenue from smuggling fees, the entirety of the revenue from the tax goes to TCOs, specifically drug-trafficking TCOs, that control certain transit routes and border crossings.

Figure 3.1 depicts the flows of revenues associated with human smuggling to human smugglers of all types, including TCOs, and to drug-trafficking TCOs. The larger oval to the right represents the former, designated as "aggregate" smuggling revenue, and the smaller oval to the left represents the latter, designated as "tax" revenue. The intersection of the two ovals represents instances in which smuggling fees cover the tax.

**Figure 3.1. Revenues to and Types of Actors Engaged in Human Smuggling**



Nicaragua AR_001343

To estimate revenue to all types of human smugglers (i.e., aggregate smuggling revenue) along routes from the NT to the United States, we needed data on three variables: (1) the number of unlawful migrants along a route, (2) the percentage of those migrants who hire smugglers, and (3) the typical payments made, per migrant, to smugglers. Lacking data for specific routes from the NT to the United States, we defined three general routes, by country of origin, as "Guatemala–United States," "Honduras–United States," and "El Salvador–United States"; however, for our high-end estimate, we were also able to differentiate between payments en route to the U.S.-Mexico border as one "segment" of the journey and payments across that border as another segment.

Separately, we developed an ancillary, preliminary estimate for drug-trafficking TCOs' *piso* collections. If migrants hire a smuggler, they might pay the taxes through him or her, as a conduit; alternatively they might pay the taxes directly to the TCO, in which case the taxes would not be included in the smuggling fee. In either case, we could still attribute the payments directly to drug-trafficking TCOs.

For each variable, we present ranges of estimates, based on various assumptions about behavior and markets and data from DHS and other sources, as discussed below. We analyzed data from 2015–2017 or earlier, but, unless noted otherwise, we worked with the most recent available data (2017) for each step of the analysis.[87]

## Flows of Unlawful Migrants

We developed a range of estimates for unlawful migrant flows from DHS data on "apprehensions," "got-aways," and "turn-backs" between POEs at the southwest border and from estimates of apprehension rates, also between POEs.[88] By implication, the data omit activity at POEs, including arrivals of unaccompanied children and families that present themselves to border officials, without attempting evasion, which we address separately, below.

In this context, an *apprehension* is an unlawful migrant who U.S. Border Patrol agents apprehend at the U.S. border; a *got-away* is "a subject who, after making an illegal entry, is not turned back or apprehended"; and a *turn-back* is "a subject who, after making an illegal entry into the United States, returns to the country from which he or she entered, not resulting in an apprehension or got away."[89] Reported apprehensions, got-aways, and turn-backs are parts of the

---

[87] In some instances, such as those of unlawful migrant flows, we looked at data as far back as 2012, but given a spike in reported apprehensions and, hence, in apparent flows in 2014 (see Figure 3.2), we chose to work primarily with the data after that year.

[88] DHS provided us with the underlying data for apprehensions, got-aways, and turn-backs and the point estimates for the so-called "partial apprehension rate" that is depicted in DHS Office of Immigration Statistics, 2017, p. 8, Figure 3. (The estimates in that study extend only as far as 2016, so we applied the 2016 rate to the 2017 data.) We then used these data and the point estimates for the apprehension rate to construct its estimates on flows.

[89] DHS Office of Immigration Statistics, 2017, p. 5.

Nicaragua AR_001344

"known flows," either by direct observation or by inference, e.g., because of camera views, sensor activations, or other evidence. As discussed in Appendix C, researchers have developed methods to estimate the apprehension rate, which is the share of apprehensions in total attempted border crossings, and overcome the analytical obstacle of unobserved and uninferred got-aways (i.e., "unknown flows").[90] An estimate of migrant flows that makes use of this rate should be more complete than an estimate that makes use of the data on reported got-aways, but the methods for estimating apprehension rate are also imperfect.[91]

We undertook four sets of calculations of unlawful migrant flows (see Appendix C), using two basic methods—one with data on reported got-aways and one with estimates of the apprehension rate—and different combinations of the data on turn-backs, to account for uncertainty about the behavior of turn-backs.[92] First, at the low end, we calculated total flows from each NT country to the United States as the sum of just the apprehensions and got-aways from that country, assuming that all turn-backs will try to cross into the United States again and, eventually, will be apprehended or get away.[93] Second, we dropped that assumption and treated turn-backs as an additive category, with total flows consisting of the sum of apprehensions, got-aways, and turn-backs. Third, we divided apprehensions by the apprehension rate to account for unknown flows, without regard to turn-backs. Fourth, at the high end, we applied the same apprehension rate, but added turn-backs. Got-aways are not included in the final calculation because they are assumed to have been included in the operation involving the apprehension rate.

We found that the range progressed steadily from the low to the high end, but the difference in methods—the use of got-aways or the apprehension rate—accounted for substantially more of the bump-up than the inclusion of turn-backs in either approach.

On that basis, migrant flows from the NT in 2017 could have been as low as about 218,000 and as high as about 345,000, with Guatemala accounting for the largest share, just over 88,000, or about 40 percent, of either estimate (see Figure 3.2).[94] However, the low-end figure is almost certainly too low, because U.S. Border Patrol agents cannot observe or infer every got-away.[95]

---

[90] Estimation is necessary because of the "denominator problem" (see, e.g., DHS Office of Immigration Statistics, 2017, p. 3). To obtain an apprehension rate, one must divide the number of apprehensions by the total number of attempted border crossings, both failed and successful, which include got-aways that cannot be observed or inferred fully. See also Morral, Willis, and Brownell, 2011.

[91] For an overview of various limitations that might make the rate too high or too low, see DHS Office of Immigration Statistics, 2017, pp. 7–8.

[92] With some adaptation to account for uncertainty about the behavior of turn-backs and the limitations of each approach, we drew from concepts and methods presented in DHS Office of Immigration Statistics, 2017.

[93] Lacking country-specific data on turn-backs and got-aways, we assumed that a country's share of all turn-backs and got-aways at the border was the same as its share of all apprehensions at the border. U.S. Border Patrol agents observe turn-backs and got-aways without knowledge of their origin.

[94] These estimates do not include migrants who are apprehended in Mexico or elsewhere en route and do not, eventually, make their way to the U.S.-Mexico border as either an apprehension, turn-back, or got-away. Rodríguez

Nicaragua AR_001345



Figure 3.2. Estimated Flows of Migrants from the Northern Triangle to the United States

SOURCE: Author calculations, based on fiscal-year data provided by DHS.

Given modest rates of recidivism for Central Americans in the DHS data, e.g., less than 5 percent for migrants from each NT country in 2017,[96] we did not adjust the flow data for individuals who try to enter the United States repeatedly. However, failure to make an adjustment will result in an upward bias in the preliminary estimates of smuggling revenue, by "double counting" some fees, if migrants purchase a package of smuggling services that includes multiple journeys and need a second or third try (see Chapter 2).

We include a short discussion of the implications of omitting both activity at POEs, which might bias the revenue estimate downward, and adjustments for recidivism, which might bias it upward, after presenting the preliminary revenue estimate.

Chávez (2016, p. 9) provides a broader, preliminary estimate of flows of Central American migrants in 2015 that is higher than the DHS-derived, high-end estimate for that year: i.e., 377,000 as compared with 291,000.

[95] Recent research in this arena (e.g., Egan et al., 2018; DHS Office of Immigration Statistics, 2017) has focused on establishing interdiction effectiveness, apprehension rates, and, by extension, successful entries or got-aways. As a related matter, Hale et al. (2018) present estimates of smuggling capacity along routes from Guatemala to the United State that are roughly consistent with our medium-to-high-end estimates for Guatemala.

[96] We calculated recidivism rates as shares of unique NT migrants, based on fingerprint identification numbers, who try to enter the United States and are apprehended more than once in a given period, e.g., a year.

Nicaragua AR_001346

## Percentage of Unlawful Migrants Hiring Smugglers

For insight into the percentage of unlawful migrants who hire smugglers to help them get from the NT to the United States, we drew data from both DHS and EMIF Sur, a survey conducted at the Mexico-Guatemala border by the Colegio de la Frontera Norte, which is located in Mexico.[97]

As discussed in other research, the DHS data on migrants' use of smugglers might fail to capture a substantial amount of smuggling activity.[98] One group of researchers noted in 2010 that the "primary concern is that the reported use of smugglers by apprehended migrants in the administrative record is much lower than the reported use of smugglers in migrant survey data," including the EMIF Sur data.[99] It is also lower than one might expect from anecdotal evidence (see Chapter 2) and from our conversations with SMEs. By our calculation, about 32, 22, and 14 percent of the NT migrants in the DHS data reported use of smugglers in 2015, 2016, and 2017, respectively, whereas a 2018 publication from the EMIF Sur data suggests upward of 60 to 65 percent over that period,[100] consistently, and SMEs tend to agree that many or most NT migrants hire a smuggler at some point.[101]

A 2017 publication from the EMIF Sur data offers country-specific figures and suggests slightly lower use rates, ranging from 46.6 percent for migrants from Honduras in 2015 to 66.2 percent for migrants from Guatemala in 2016.[102] For 2017, that source reports 63.4, 61.1, and 57.5 percent for migrants from Guatemala, Honduras, and El Salvador, respectively.

On the basis of those sources, about 25 to 67 percent of NT migrants might have hired smugglers in recent years, with some variation by country of origin. Given difficulty reconciling the country-specific and regional data within and across sources, we chose to work with that broad range, regardless of the route or year under consideration.[103]

---

[97] The EMIF website sets out objectives of the survey at the southern border, e.g., to "increase understanding of the flows of migrants who cross between Mexico and Guatemala in order to work in Mexico or the United States, along with the undocumented migrants that cross Mexican territory and are returned to Guatemala, Honduras and El Salvador by Mexican and U.S. immigration officials" (EMIF, undated-b). For this report, we focused on undocumented migrants from the three NT countries who are returned by U.S. immigration officials, not those returned by Mexican officials. For information about the survey methodology, see EMIF, undated-c.

[98] Roberts et al., 2010; Sanchez, 2016.

[99] Roberts et al., 2010, p. 2.

[100] EMIF Sur, 2018b, p. 3, Chart 8.

[101] Similarly, Hale et al. (2018) asked 270 Central American migrants, "Did someone help or facilitate you make your journey?" and 69 percent of respondents said "yes."

[102] EMIF Sur, 2018a, p. 5, Chart 9b.

[103] Given more time, we would have appealed to the underlying EMIF Sur data, which are available online, to reconcile the country-specific and regional figures and refine the estimate. As for a trend, the DHS data show a pronounced decline in migrants' use of smugglers over the past three years, but the EMIF Sur data do not.

Nicaragua AR_001347

Separate from those estimates, we postulated, based on conversations with SMEs and information found in the literature, that about half or more migrants, say 50 to 75 percent, pay some form of tax, or *piso*, to drug-trafficking TCOs that they "encounter" on their journeys, regardless of whether they are working with a smuggler or traveling on their own. SMEs indicated that nearly all migrants pay the tax along some routes. Consistent with the proposed range, a taxation rate of about 60 percent of migrants appears in a recent study of organized crime and Central American migration in Mexico.[104]

## Human-Smuggling Fees and Payments

For this calculation, we also drew from DHS and EMIF Sur data and turned to other sources, including our interviews with SMEs.

To start, we used the DHS data to calculate mean and median smuggling fees as reported to U.S. Border Patrol agents by unlawful migrants who are apprehended at the U.S.-Mexico border, between POEs. It is our understanding that the reported fees should cover those migrants' payments to smugglers along the entire route, from the NT into the United States, including fees for travel within the United States, but that the figures might not include all payments. For example, they might only encompass fees for part of the journey, e.g., to the U.S. border, or *pisos* paid to drug-trafficking TCOs.

In data plots, we observed a large number of low-end fees, which might validate concerns about fragmentation or simply reflect the migrants' preferences for inexpensive, pay-as-you-go services (see Chapter 2). We also found extreme high-end outliers, possibly indicating confusion over currency or data entry errors.

In 2017, the averages of the reported smuggling fees in the DHS data were about $4,700 per person for Guatemalan migrants, $3,800 per person for Honduran migrants, $4,600 per person for Salvadorian migrants, and about $4,400 per person for NT migrants overall.[105] (See Appendix D, Table D.1, for more information about the properties of the DHS data.) The median figures for the same year were similar but predictably lower, given the density of low-end observations, the presence of high-end outliers, and considerable other "noise" in the data, with $4,000 for Guatemalan migrants, $3,000 for Honduran migrants, $4,000 for Salvadorian migrants, and $4,000 for NT migrants overall. These mean and median figures were less than expected, given recent press reports (discussed in Chapter 2) and conversations with some SMEs that suggested fees ranging from $6,000 to $10,000 or more but, as noted above, could also reflect migrants' preferences for particular or fewer services.

---

[104] Leutert, 2018.

[105] We also calculated an adjusted mean for each country, by removing observations greater or less than two standard deviations from the unadjusted mean, but this approach had no effect at the low end because there were no observations below the two-standard-deviation threshold.

Nicaragua AR_001348

For comparative purposes, we also looked at the EMIF Sur data on migrants' actual and agreed payments to smugglers. EMIF Sur asks Guatemalan, Honduran, and Salvadorian migrants who have been returned to their respective countries of origin by U.S. immigration officials how much they paid or agreed to pay to travel (1) from their home country, through Mexico, and to the U.S.-Mexico border and (2) from the U.S.-Mexico border into the United States.[106] The results from the EMIF Sur data, which might include some unrealized payments and more transit in the United States, were higher than the results from the DHS data and better aligned with expectations. The averages and medians for 2017 were similar, with averages of about $10,700, $10,600, and $8,000 for migrants from Guatemala, Honduras, and El Salvador, respectively, and with medians of about $10,300, $11,500, and $8,000 for migrants from Guatemala, Honduras, and El Salvador, respectively (see Appendix D, Table D.2).[107]

Figures 3.3a–3.3c compare mean and median smuggling fees across sources, by country of origin for 2015–2017. Whereas the EMIF Sur data indicate a possible upward trend in smuggling fees over the past three years, the DHS data do not.

**Figure 3.3a. Guatemala: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

---

[106] EMIF Sur also asks similar questions of migrants who have been returned by Mexican immigration officials, but we did not work with those data.

[107] These figures are the sums of the means or medians, respectively, for each country for each segment, first, from the country of origin to the U.S. border and, second, across the U.S. border.

Nicaragua AR_001349

**Figure 3.3b. Honduras: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

**Figure 3.3c. El Salvador: Mean and Median Values of Northern Triangle Migrants' Payments to Smugglers for 2015–2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

33

Taking the properties of the DHS and EMIF Sur data into account, we chose to work with the median values for the fees for each route in 2017 to create ranges. Route by route, the median value from the DHS data represents the low end, and the median value from the EMIF Sur data represents the high end (see Figure 3.4); for example, for the Honduras–United States route, the median values span $3,000 (from the DHS data) and $11,500 (from the EMIF Sur data).

**Figure 3.4. Median Values of Northern Triangle Migrants' Payments to Smugglers in 2017, by Country of Origin and Data Source (in U.S. dollars)**



SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals).

In addition, we found estimates of taxes, or *pisos*, paid to drug-trafficking TCOs' of about $300 per person on the low end[108] and about $500–$700 per person on the high end[109] in various press reports and in discussion with SMEs. For computational purposes, we used a range of $300 to $700 for migrants from all countries and without regard to year.

---

[108] See for example, a human smuggler's description of the $300 *cuota de cartel*, or cartel tax, that he has to pay in Martinez, 2017.
[109] These data have appeared in *Daily Mail* and Associated Press Reporters (2014) and elsewhere. One SME suggested a higher figure, i.e., about $1,100 for one transit zone, but this looked like an outlier.

Nicaragua AR_001351

## Ranges of Estimates of Smuggling Revenues and *Piso* Collections

Working with ranges for each variable, we constructed a set of preliminary low- and high-end estimates of revenues to all types of smugglers in 2017, by route (Guatemala–United States, Honduras–United States, and El Salvador–United States) and for the NT overall. We did not attempt to parse those revenues by human-smuggling TCO, ad hoc group, independent operator, or other type of smuggler. We also developed an ancillary set of preliminary estimates for drug-trafficking TCOs' *piso* collections that might or might not add to the estimates of smuggling revenue.

### Smuggling Revenues

For each general route from the NT to the United States, we constructed a preliminary estimate—or range of estimates—for smugglers' revenue from the low-end and high-end figures for (1) unlawful migrant flows, (2) the percentage of those migrants who use smugglers, and (3) the migrants' payments to smugglers. First, we multiplied the low-end figures for each route, and then we multiplied the high-end figures for each route, producing a corresponding low- and high-end estimate for each route. To illustrate a low-end calculation, using the 2017 data, for Guatemala, we multiplied the low-end flow estimate of just over 88,000 by the low-end use estimate of about 25 percent and then multiplied the product by the low-end fee estimate of about $4,000. The calculation resulted in a low-end, preliminary revenue estimate of $88 million dollars for the Guatemala–United States route in 2017.

To develop the corresponding high-end estimates, by route, we repeated the process, using the high-end estimates for each of the three variables on migrant flows, migrants' use of smugglers, and smuggling fees. At the high end, we also differentiated between payments en route to the U.S.-Mexico border, as one "segment" of the journey, and payments across the border, as another segment. We were able to draw this distinction because the EMIF Sur data on fees, which uniformly constitute the high end of the range, draw this distinction.

On that basis, smugglers' revenues from smuggling migrants from the three NT countries combined (as would correspond to the larger oval to the right in Figure 3.1) could have ranged from about $200 million to $2.3 billion, reflecting the considerable uncertainty of the underlying estimates of migrant flows, migrants' use of smugglers, and smuggling fees (see Table 3.1). At the high end, somewhat more revenue might accrue en route to the U.S.-Mexico border than across that border, and some of the revenue that accrues "across" might pertain to expenditures for domestic U.S. travel.

Nicaragua AR_001352

**Table 3.1. Preliminary Estimates of Smuggling Revenues, by Country of Origin for 2017
(in millions of U.S. dollars)**

| Country of Origin | Total into United States | | To U.S.-Mexico Border | Across U.S.-Mexico Border |
| --- | --- | --- | --- | --- |
| | Low End | High End | High End | High End |
| Guatemala | 88 | 957 | 574 | 383 |
| Honduras | 48 | 768 | 434 | 334 |
| El Salvador | 67 | 563 | 281 | 281 |
| **Total Northern Triangle** | **203** | **2,288** | **1,290** | **998** |

SOURCE: Author estimates based on analysis of DHS, EMIF Sur, and other data.

We have no basis for attributing the preliminary "aggregate" estimate of smuggling revenue to any particular type of smuggler, be it TCO or not, but the preponderance of the evidence (see Chapter 2) suggests that much of the revenue from smuggling would not accrue to organizations that one might identify as TCOs, based on official definitions.

At the outset and at each stage of the calculations, we encountered analytical challenges that might suggest, in some instances, that the low end of the preliminary revenue estimate is too low, and, in other instances, that the high end is too high. For example, at the low end, the data are missing observations on got-aways, and, at the high end, the data might include some agreed payments that never materialize.[110] But, some analytical challenges could have affected both ends of the range. In particular, we worked with data on apprehensions between POEs, which meant excluding potentially relevant activity at POEs and undercounting migrant flows, and we did not make any adjustments for recidivism, which introduced the possibility of double counting fees and overstating revenue.

To better understand the implications of omitting POE activity and recidivism adjustments, we undertook two sets of side calculations to account, first, for the missing activity and, second, for possible double counting. In the first instance, if one were to assume that unaccompanied children and families that present themselves to authorities at POEs use smuggling services to travel to the U.S.-Mexico border in the same ways as other unlawful migrants, then, with that activity, the preliminary revenue estimate for all three routes, combined, could have been about 5.5 percent higher at the low end of the range and 3.3 percent higher at the high end.[111] In the second instance, if one were to reduce the preliminary estimates for each country of origin by the

---

[110] Recalling that the fee data from EMIF Sur include not just actual payments, but also agreed payments, the high end of the range might overstate actual revenues, whether before or after crossing the border.

[111] At the high end, we multiplied the number of unaccompanied children and family members who presented themselves at POEs in 2017, by country of origin, by the high-end percentage of use and the EMIF Sur figures for smuggling fees, limited to transit as far as the U.S.-Mexico border, which amounted to 50–60 percent of the total, by country. At the low end, we multiplied the same flows by the low-end percentage and apportioned the DHS figures for fees, using the 50–60 percent shares found in the EMIF Sur data.

Nicaragua AR_001353

applicable recidivism rate, the estimate for the three routes, combined, would have been about 3.4 percent lower at both ends of the range.[112]

*Drug-Trafficking TCOs'* Piso *Collections*

Unlike the preliminary estimate of revenues from smuggling, the preliminary tax, or *piso*, estimate tracks directly to TCOs, specifically drug-trafficking TCOs. As previously, we arrived at a total value by multiplying migrant flows, by percentages, by payments, but, in this case, the percentages indicate "encounters" with the drug-trafficking TCOs rather than "use" of smugglers and the payments refer to taxes rather than fees. Whereas the migrant flow numbers were the same as for the foregoing revenue estimate, the relevant low- and high-end percentages for these calculations were 50 percent and 75 percent, the relevant payment figures were $300 and $700, and neither the percentages nor payments differed by route.[113]

On that basis, the total amount of *pisos* that unlawful migrants from the NT might have paid to drug-trafficking TCOs in 2017—for traveling the three routes, combined (as would correspond to the smaller oval to the left in Figure 3.1)—could have ranged from about $30 million to $180 million (see Table 3.2). Whether these sums would constitute a share of the foregoing revenue figures or an additional payment would depend, in part, on the smuggling arrangement and whether it was "all-inclusive." If the arrangement were all-inclusive, the tax might be folded into the smuggling fee (as depicted in the intersection of the two ovals in Figure 3.1), but it would, nevertheless, pass through to the drug-trafficking TCO that demanded payment for the migrant's passage.

**Table 3.2. Preliminary Estimates of Drug-Trafficking TCOs' Tax, or *Piso*, Collections, by Country of Origin for 2017 (in millions of U.S. dollars)**

| Country of Origin | Low End | High End |
|---|---|---|
| Guatemala | 13 | 73 |
| Honduras | 10 | 53 |
| El Salvador | 10 | 55 |
| **Total Northern Triangle** | **33** | **181** |

SOURCE: Author estimates based on analysis of DHS and other data.

---

[112] At the low and high end, we simply applied the recidivism rates, by country of origin, ranging from 2.5 to 4.5 percent, to the preliminary estimates of smuggling revenue, by country of origin.

[113] We recognized that TCOs have more or less control along certain routes and at certain border crossings, but we lacked the data to include that level of refinement in its tax estimates.

Nicaragua AR_001354

## Profitability, Risk, and Other Economic Considerations

Our quantitative analysis has so far focused strictly on revenues, but profitability might be more relevant as a measure of human smuggling's contributions to the financial health and viability of TCOs and other smuggling operations. Unfortunately, the data on smugglers' costs, which would be necessary to calculate profit, are even scarcer than the data on revenue; we are unaware of any systematic collection of data on costs (see Chapter 2).[114]

We found scattered anecdotal evidence suggesting that smugglers' costs are nontrivial but that they could leave room for profit (see Chapter 2). For example, the press has reported transit costs that might sum to around $2,000 or more, depending on incidentals.[115] With costs at that level or even higher, smuggling could be "profitable," at least as an accounting matter, but perhaps not as an economic matter. Some of the difference between revenues and costs might constitute a "risk premium," or compensation for the risks that actors take on when they engage in human smuggling, such as those of a driver who transports unlawful migrants from the U.S.-Mexico border to Los Angeles. Given low barriers to entry in this market—that is, nearly anyone willing to bear the risks of smuggling can offer smuggling services—it is possible that competition among smugglers for migrants' business might drive economic profits to zero or near to zero, after compensating for the risk.

Other researchers admit the difficulty of profit estimation but also call profitability of almost any type into question.[116] One researcher asserts, "it is virtually impossible to estimate the size of the smuggling market. It is even harder to determine its profits, given its underground, unregulated nature."[117] But this researcher also suggests that profits tend to be modest and are absorbed locally. In a prior article, the same researcher finds that "individual facilitators earnings vary considerably," after accounting for all costs, and that "smuggling constitutes in the majority of cases only a supplemental income-generating strategy."[118]

The taxes, or *pisos*, that migrants pay to drug-trafficking TCOs present fewer analytical challenges insomuch as they might amount to pure or nearly pure profit. The TCOs that control particular transit routes and border crossings collect the tax, but they provide few reciprocal services (see Chapter 2). Even if a drug-trafficking TCO describes the payment as "protection" or "security," the protection is largely from the TCO itself. As for risk premium, it is possible that drug-trafficking TCOs incur some risk when they allow migrants to pass through their territory, but these TCOs might use the migrants' passage strategically to divert attention from or

---

[114] For additional comments on the paucity of data on smugglers' costs, see also United Nations Office on Drugs and Crime, 2011, p. 85.

[115] These figures appeared in *Daily Mail* and Associated Press Reporters (2014) and elsewhere.

[116] Sanchez, 2017, 2018.

[117] Sanchez, 2018, p. 2.

[118] Sanchez, 2017, p. 17.

Nicaragua AR_001355

conceal other illegal activities, such as drug smuggling, and to mitigate their risks.[119] In addition, drug-trafficking TCOs might also employ migrants as unremunerated "mules," or drug couriers, if the migrants cannot afford the *piso*.

---

[119] See, for example, Cabrera, 2015.

Nicaragua AR_001356

# 4. Concluding Remarks

In this scoping study, we set out to characterize TCOs that smuggle unlawful migrants from the NT of Central America (Guatemala, Honduras, and El Salvador) to the United States and to develop a preliminary estimate of the TCOs' smuggling revenues.

However, as the research progressed, it became clear that many different types of actors engage in human smuggling along those routes, only some of which appear to meet official definitions (in legislation and formal policy guidance) of a TCO. The literature presented strong evidence, confirmed by SMEs, that smugglers operating along the routes from the NT to the United States reside along a spectrum that ranges widely from independent operators, to ad hoc groups, to loose networks, to more-formal networks. Importantly, we could not identify the percentage of unlawful migrants that use each type of smuggler, and thus we could not distinguish the revenues that flow to human-smuggling TCOs from the revenues that flow to other actors engaged in human smuggling. However, we could separately identify the taxes, or *pisos*, that migrants pay to drug-trafficking TCOs to transit through their territory.

With those limitations in mind, we undertook a broader assessment of human smuggling, smugglers, and aggregate smuggling revenues. We developed preliminary estimates—ranges of estimates—of revenue from smuggling unlawful migrants along three routes, from Guatemala, Honduras, and El Salvador to the United States, without regard to the type of smuggler, be it a TCO, independent operator, or other type. We based the estimates on three variables: the flow of unlawful migrants from each country to the United States, the percentage of those migrants that use smugglers along the way, and the fees that the migrants pay to smugglers, each of which entailed estimation of its own.

On that basis, we developed a preliminary estimate of aggregate smuggling revenue—for the three routes, combined, in 2017—that ranged from about $200 million to $2.3 billion. This estimate is, as the range implies, highly uncertain, owing largely to a scarcity of reliable data for each variable. Likewise, we produced an ancillary and still preliminary estimate of drug-trafficking TCOs' *piso* collections that also spanned an order of magnitude, from about $30 million to $180 million.

The rest of this chapter focuses on implications of these findings for DHS for targeting human smuggling, informing resource allocation decisions, and improving data collection.

## Targeting Human Smuggling

A key finding of this report is that human smuggling involves many different types of smugglers, or "actors," with organizations that are often informal and based on relationships

Nicaragua AR_001357

instead of well-established hierarchies. Absent formality and strict hierarchical structures, it might be difficult for DHS to effectively target them with legal sanctions, for several reasons:

- Loose networks are difficult to disrupt, ad hoc groups are even less susceptible, and independent operators are easily replaceable. As described in Chapter 2, key actors associated with loose networks and involved in smuggling people north may not know each other well or at all, ad hoc groups are even less cohesive and more amenable to reconfiguration, and the independent operators that form part of both kinds of networks have immediate substitutes. This means that even if DHS can apply sanctions to some individuals in a given network or group or to individuals who operate independently, its ability to disrupt their organizations or affect the market may be limited.
- Low barriers to entry can further impede disruption. While individuals might face some personal risk when they engage in smuggling, they appear to engage fluidly—part-time or as opportunities present themselves—at least at low levels (e.g., taxi drivers and hotel or stash house operators) and possibly as facilitators. To build on the above example, this means that even if DHS can apply sanctions to such actors, the actors can generally be replaced easily, and others can fill their roles.
- Going after facilitators might be more fruitful, but doing so effectively might be challenging. To the extent that human-smuggling networks are hierarchical, their leaders are based in foreign countries (i.e., facilitators based in Mexico and the NT for the flows this report has addressed). This means that DHS must be able to work with partner agencies in those countries to apply sanctions to the leaders of these networks, which can be challenging. DHS can and does target individuals involved in human smuggling that are based in the United States, but, as discussed in Chapter 2, these actors are generally not prominent figures in human-smuggling networks, but rather subcontractors.

One area where DHS may be able to affect networks, groups, or the market involves money transfers that take place once individuals arrive in the United States. As noted in Chapter 2, many migrants only make their final payment to smugglers after they arrive in the United States. DHS might consider expanding existing efforts to investigate these kinds of payments, including working more closely with formal and informal banking services, to identify suspicious payments. DHS could also consider expanding current efforts to work with foreign law enforcement partners. As noted above, to the extent that human-smuggling networks are hierarchical, their leadership is almost always foreign-based. This means that DHS must work with foreign partners to effectively sanction the individuals involved.

## Allocating Resources

Comparing the preliminary estimate of revenues from human smuggling to information about other types of illicit—and even licit—activities could help inform DHS's resource allocation decisions. For example, DHS might consider how much it should prioritize efforts to disrupt human-smuggling operations in light of other concerns about TCOs.

To approach that question, we searched for analogous estimates of TCOs' revenues from transporting illicit drugs through Mexico and across the U.S.-Mexico border and compared them

Nicaragua AR_001358

to our preliminary estimate of revenues from human smuggling. Although we were not able to find recent estimates of drug-trafficking revenues, estimates developed in a 2010 RAND report for marijuana, cocaine, heroin, and methamphetamine trafficking in that era provided a basis for a rough comparison.[120] According to that report, drug-trafficking organizations' revenues from transporting marijuana through Mexico and across the U.S.-Mexico border, without netting the cost of acquiring the drug, could have amounted to $1.1 billion to $2.0 billion, and the analogous figures for cocaine, heroin, and methamphetamine could have amounted to $3.4, $1.1, and, $0.6 billion, respectively, suggesting a total of up to $7.1 billion.[121]

On that basis, our high-end, preliminary estimate of revenue from human smuggling of $2.3 billion was the same order of magnitude as RAND's earlier estimate of revenue from drug trafficking. However, as noted above, we cannot say how much of the revenue from human smuggling flows to TCOs that engage in human smuggling, as compared with other types of smugglers. Moreover, the RAND estimates for drug-trafficking revenues only included revenues from moving drugs through Mexico and across the U.S.-Mexico border and did not include revenue that drug-trafficking TCOs garner from distribution, wholesale, or retail activities that occur in the United States.

To shed additional light on the dimensions of human smuggling, we also compared revenues from human smuggling to spending on related forms of licit-market activities. Albeit another imperfect analogy, final household consumption expenditures on air, rail, truck and other transportation services in Mexico totaled almost $46 billion in 2015, making revenues from human smuggling look relatively small by comparison—about 5 percent or less—and suggesting little possibility of a noteworthy economywide effect.[122]

## Improving Data Collection

Within the scope of this project, DHS asked the Homeland Security Operational Analysis Center to identify ways to improve its ability to develop estimates of revenues from human smuggling. To that end, some of the data deficiencies uncovered in this report might be insurmountable, given the illicit nature of human smuggling, but some might not be. We have identified potential improvements in data collection and methods that DHS could consider to refine the revenue estimate, reduce the breadth of the range, and better inform policymaking. Not everything can be knowable about smugglers and revenues, let alone profits, along the routes

---

[120] Kilmer et al., 2010.

[121] Kilmer et al. (2010) acknowledge that their estimates are 'substantially less than others,' but they approached revenue estimation with a well-documented and transparent methodology.

[122] Organisation for Economic Co-operation and Development (OECD) data in then-year Mexican pesos, converted using midyear exchange rates.

Nicaragua AR_001359

from the NT to the United States, but certainly more is knowable than is known already. For example:

- **DHS could standardize its line of questioning during migrant interviews across apprehension sites.** This would allow DHS to collect more consistent information about the interactions between unlawful migrants and human smugglers—including the types of smugglers they encounter and the fees they pay to smugglers.
- **DHS could seek details from migrants that would increase its ability to assess revenues, by route, and distinguish different types of smugglers and payments.** For example, DHS could ask not just "Did you use a smuggler?" and "What did you pay the smuggler?" but also "How many different smugglers did you encounter?" "Were the smugglers operating alone or with others?" "How did you come in contact with the smuggler(s)?" "Did you pay the smuggler(s) up front?" "How many payments did you make?" "What services did you receive for each of these payments?" etc. DHS might also include questions concerning the details of the route, modes of transportation, and preferences for hiring smugglers at different points along the route, such as border crossings. DHS might also seek to distinguish between fees for transit through Mexico and for transit across the U.S.-Mexico border and between those smuggling fees and drug-trafficking TCOs' taxes.
- **DHS could create a shared portal for data entry that screens for errors, if it has not done so already, and use a randomized survey process.** These actions could reduce the administrative burden of data collection on frontline personnel and increase the likelihood of successful data entry. A shared portal that provides a common interface for data entry for all U.S. Border Patrol agents and feeds into a consolidated database could be programmed to recognize inconsistencies, outliers, and other errors. Moreover, if officials interview just a random sample of unlawful migrants, they might have more time to process migrants and attend to other needs, even with additional questions.

We recognize that DHS would need to invest in developing appropriate survey instruments, training personnel to administer them consistently, and developing supporting infrastructure to implement such suggestions.

Even with the imperfect data at hand, a longer-term research project might be able to reduce some of the uncertainty of the preliminary revenue estimate, which could result in better evidence for resource allocation decisions. For example, a research team could build on the calculations in this report by taking more time to explore the sensitivity of the calculations to underlying assumptions about smugglers' and migrants' behavior, how markets operate, trends in pricing, etc. It could also explore additional ways to filter and eliminate "noise" in the data that could result from data entry problems, confusion over payments to smugglers versus other actors, and confusion over the currency that migrants use to pay smugglers.

These are just a few technical suggestions, but with greater awareness of the diversity of actors that engage in human smuggling, DHS might be able to reorient its data collection to reflect that diversity and analyze its implications for homeland security.

Nicaragua AR_001360

# Appendix A. Guidance for Literature Review

We developed guidance for reviewing the literature (academic articles, press reports, and reports written by government agencies, nongovernmental organizations, and multilateral entities), consisting of instructions, search terms, parameters, and examples of relevant "hits." The guidance included a detailed outline of themes of interest and key terms pertaining to human smuggling from the NT to the United States, drawn from our discussion points for the SME interviews (discussed in Appendix B).

To start, we shared this guidance with library staff, who made a preliminary sweep through the literature in the final days of September 2018 and the first few days of October 2018. The staff used the guidance to create various threads, including, "(smuggler* OR trafficker* OR "human smuggling organization" OR "alien smuggling organization" OR "migrant smuggling organization" OR "human trafficking organization" OR "drug trafficking organization*" OR "transnational smuggling" OR coyote*) AND ("central america*" OR salvador* OR guatemala* OR hondura*) AND (cost OR costs OR piso* OR revenue* OR fee OR fees OR profit*)," and tried other combinations of terms and phrases, including "governance."

The searches covered several bibliographic databases, including Academic Search Complete, Business Search Complete, Social Science Abstracts, Criminal Justice Abstracts, Sociological Abstracts, PAIS Index, Index to Legal Periodicals, eBook Business Book Collection, EBSCO eBook Collection, ERIC, GREENFIle, MEDLINE, EconLit, US Major Dailies, Regional Business News, PsychInfo, Education Abstracts, MAS Ultra, CINAL Plus, Health Source, Military and Government Collection, and Open Source.

Upon completion of the initial sweep, we began scanning the results for relevant material, also working with the guidance.

Nicaragua AR_001361

# Appendix B. Discussion Points and Questions for Subject-Matter Experts

We developed a set of discussion points and questions, formed as an outline, to guide interviews with SMEs, and slides, including a synopsis of these points and questions, as read-ahead materials for the SMEs.

The discussion points and questions are reprinted below.[123]

## Human Smuggling, Transnational Criminal Organizations, and Revenues Along Routes from Northern Triangle Countries to the United States

### The Nature of Transnational Criminal Organizations (TCOs) that Engage in Human Smuggling from the Northern Triangle (NT) and Across the U.S.-Mexican Border

- Where are the TCOs located?
- Do they have operatives or a presence in the United States?
- How are they structured and how big are they?
  - How centralized is decisionmaking?
  - How many employees or affiliates do they have?
  - Do they subcontract for services?
- How do they advertise their services or recruit/connect with migrants?
- To what extent—and how—do they interact with other TCOs, e.g., collaboratively, competitively, or violently?
- To what extent—and how—do they interact with law enforcement?
- Do TCOs that engage in human smuggling also engage in other criminal activities?

### Extent and Form of NT Migrants' Engagement with TCOs and Other Smugglers

- What percentage of NT migrants seeks services of TCOs?
- What percentage seeks services of individual operators along the route or travel independently without such services?
- To what extent do NT migrants seek services of TCOs/others for an entire route, as compared to separate segments of a route or border crossings?
- If migrants tend to seek services for particular routes, segments, or crossing, which ones?
- How do NT migrants obtain information about TCOs and other smugglers?

---

[123] The discussion points and questions have been edited only slightly, largely for purposes of formatting.

Nicaragua AR_001362

*Fees Charged to NT Migrants and Operating Costs*

- What is the average fee a migrant from the NT pays to TCOs?

  - What is the fee for an entire route?
  - What are the fees for particular segments?
  - What is the fee just to cross into the United States?

- How do TCOs receive payment and collect fees?

  - Lump sum or installment?
  - Before departure, along the way, or upon arrival/release in the United States?

- What is included in this fee?

  - How many attempts—or trips—do they get?
  - What kind of transportation do they receive?
  - Does the fee include transportation inside the United States?
  - How do TCOs enforce payments of fees that are to be collected upon arrival/release?

- What costs do TCOs incur en route, e.g., basic transportation, food and shelter, weapons, or bribes and do migrants' fees cover them?
- How much do TCOs profit from smuggling?

*TCO Tactics Along Routes from the Northern Triangle to the United States*

- What routes do TCOs that engage in human smuggling typically use?
- How do those TCOs decide what route to take?
- Do they use buses, cars, trains, boats?
- How closely do they coordinate or interact with other TCOs, including those that engage in drug and/or weapon trafficking, along the routes?
- How do they choose when and where to cross the border into the United States?
- How closely do different TCOs coordinate border crossings with each other?
- Do they pay off or avoid law enforcement and, if so, how?
- Do TCOs that engage in human smuggling typically engage concurrently in other forms of smuggling, e.g., drugs or weapons, or criminal activities?
- To what extent do TCOs or other smugglers invoke violence, e.g., directed at immigrants or other smugglers, and under what circumstances?

*Data Sources, Prior Studies, and Methodologies*

- Are estimates of migrant flows, routes, fees, revenues, costs, etc., available in official reports (e.g., DHS), academic studies, or other documents or databases?
- Are you aware of any official reports (e.g., DHS), academic studies, or other documents that discuss any of these issues, including the fees paid by migrants and the tactics and costs borne by TCOs that engage in human smuggling?
- Are you aware of any promising methodological developments in this arena?

46

# Appendix C. Guidance for Data Analysis

Working primarily with data from DHS,[124] and treating migrant flows from each country as "routes," we undertook aggregate revenue calculations based on the numbers of individuals traveling each route, the percentage of migrants who hire smugglers along the route, and the amount that those migrants pay smugglers to help them along the route. Simply put, revenues would equal the product of the number of migrants along each route, the percentages of those migrants who hire smugglers, and the payments, per migrant, to smugglers.

We referred to this as an "aggregate" calculation because the data do not distinguish smugglers by type, e.g., TCO, ad hoc group, or independent operator.

We developed a data analysis outline, or guidance, and embarked on estimating the flows of migrants from each of the NT countries and from the NT overall, their use of smugglers, and their payments to smugglers. In addition, we considered the extent of recidivism among unlawful migrants from each of the NT countries. The data analysis outline is reprinted below.

## Data Analysis Outline[125]

Time frame is 2012–2017, by fiscal year, if corresponding to other U.S. Customs and Border Protection/DHS data regarding apprehensions, turn-backs, got-ways, smuggling costs, etc. In each case calculate for individuals traveling from each of Guatemala, Honduras, and El Salvador and the three countries combined, which is the region known as the "Northern Triangle" (NT).

1. Flows of migrants for each year, calculated as
   a. Apprehensions$_i$ (APP$_i$) + Observed Got-Aways$_i$ (GA$_i$)
   b. APP$_i$ + Observed Turn-Backs$_i$ (TB$_i$) + GA$_i$
   c. APP$_i$/r$_{app}$
   d. APP$_i$/r$_{app}$ + TB$_i$

   **Where:**
   $i$ = Country (Guatemala, Honduras, or El Salvador) or region (NT).
   GA$_i$ = APP$_i$/APP$_{SWB}$ * GA$_{SWB}$
   TB$_i$ = APP$_i$/APP$_{SWB}$ * TBS$_{SWB}$
   SWB = Southwest border, between POEs
   r$_{app}$ = estimated "partial apprehension rate" [DHS Office of Immigration Statistics, 2017, p. 8].[126]

---

[124] We also worked with EMIF Sur data on use of smugglers and smuggling fees.

[125] This outline, developed by the project team to guide the estimation process, has been edited only slightly, largely for purposes of formatting and for consistency with the use of vocabulary in the rest of the report.

Nicaragua AR_001364

**Assumptions:**

- Recidivism is relatively minor for the NT, pending rate results, below.
- Most NT migrants travel through SWB.
- NT country's and the NT region's share of observed turn-backs and got-aways is approximately the same as its share of recorded apprehensions.
- NT country's and the NT region's apprehension rate is about the same as the overall apprehension rate, $r_{app}$.[127]
- For calculations without turn-backs, someone who turns back will try again and eventually will be apprehended or get away.

2. Recidivism rates[128]

   a. Over the period 2012–2017
   b. For 2012, 2013, 2014, etc., individually
   c. For 2- or 3-year moving averages, as appropriate, pending calculations of days between contacts with border enforcement and numbers of contacts[129]
   d. For appropriate moving averages, either 2- or 3-year, create a table of 'number of tries' and 'number of individuals.'

3. Percentage of migrants that report use of smugglers.
4. Average smuggling fees, adjusted for outliers, e.g., by removing "tails."[130]
5. Median smuggling fees, without adjusting for outliers, etc.

## Recidivism, Apprehension Rates, and Migrant Flows

Recidivism, which appears to be most common among Mexican nationals, can manifest in the DHS apprehension data when an unlawful migrant who is apprehended between POEs along the southwest border has been apprehended previously. (As noted above, the way to determine whether someone is a recidivist is by comparing fingerprint numbers across records in the apprehension data.) The recidivism phenomenon—namely, apprehension and re-apprehension—is closely related to the class of capture-recapture models commonly used in ecology to estimate wildlife populations, where exhaustive sampling is impractical. In the ecological context, the "recaptured" populations (like recidivists in the border security context) provide critical information for estimating the total wildlife populations (like the entire flow of illegal migrants in the border security context).

---

[126] DHS provided us with the underlying point estimates for the rate.

[127] If 2017 rate is unavailable, use 2016 rate or extrapolate from trends.

[128] Calculated as shares of unique individuals who try to enter the United States and are apprehended more than once in a given period, as specified, based on a comparison of fingerprint numbers in the apprehension data.

[129] Two-year moving averages calculated as 2012–2013, 2013–2014, 2014–2015, 2015–2016, and 2016–2017, and three-year moving averages calculated as 2012–2014, 2013–2015, 2014–2016, and 2015–2017.

[130] We set the cutoff at two standard deviations.

Nicaragua AR_001365

Espenshade first proposed the repeated trials model (RTM), in 1995, based on the capture-recapture models, to measure the flow of illegal migrants across the southwest border.[131] In addition to the flow, the RTM also estimates the apprehension rate or the probability of apprehension. In the RTM, both the flow and the apprehension rate are functions of the numbers of total apprehensions and recidivist apprehensions. To make the RTM more realistic, Chang and his co-authors later proposed a modified RTM that incorporates at-the-border deterrence, and he developed revised formulas for the flow and the apprehension rate.[132] As recidivism is mainly characteristic of Mexican nationals, Chang also suggested that the apprehension rate should be estimated by using just those records pertaining to Mexican nationals in the apprehension database. The apprehension rate thus obtained is then assumed to be applicable to the entire population.[133] Deterrence is not measured directly, and must be estimated via other means, such as surveys or econometric models. A recent Office of Immigration Statistics report, *Efforts by DHS to Estimate Southwest Border Security between Ports of Entry*, summarizes the development of the estimate of the apprehension rate and its limitations.[134]

---

[131] Espenshade, 1995, pp. 545–565.

[132] Chang et al., 2006.

[133] Whitley et al., 2016.

[134] DHS Office of Immigration Statistics, 2017.

Nicaragua AR_001366

# Appendix D. DHS and EMIF Sur Data on Smuggling Fees

This appendix presents information on the properties of the data on smuggling fees from DHS and EMIF Sur in Tables D.1 and D.2.

### Table D.1. Smuggling Fees Reported in DHS Data for Fiscal Year 2017

| Country of Origin | Mean Fee | Median Fee | Standard Deviation | Sample Size |
|---|---|---|---|---|
| Guatemala | $4,725 | $4,000 | $4,632 | 6,417 |
| Honduras | $3,777 | $3,000 | $2,936 | 4,379 |
| El Salvador | $4,560 | $4,000 | $3,062 | 5,735 |

### Table D.2. Smuggling Fees Reported in EMIF Sur Data for Calendar Year 2017

| Country of Origin | Mean Fee | Median Fee | Standard Deviation | Sample Size |
|---|---|---|---|---|
| For transit from country of origin to U.S. border | | | | |
| Guatemala | $6,085 | $6,164 | $2,793 | 1,044 |
| Honduras | $6,386 | $6,500 | $1,227 | 462 |
| El Salvador | $3,985 | $4,000 | $1,525 | 1,081 |
| For transit across U.S. border | | | | |
| Guatemala | $4,615 | $4,110 | $3,109 | 1,196 |
| Honduras | $4,230 | $5,000 | $2,427 | 529 |
| El Salvador | $4,040 | $4,000 | $2,305 | 1,486 |
| Totals for transit from country of origin to and across U.S. border | | | | |
| Guatemala | $10,700[a] | $10,274[a] | -- | -- |
| Honduras | $10,617[a] | $11,500[a] | -- | -- |
| El Salvador | $8,025[a] | $8,000[a] | -- | -- |

SOURCES: Author estimates based on EMIF Sur calendar-year data (EMIF, undated-a) and fiscal-year data provided by DHS.
NOTE: Cost estimates are in nominal U.S. dollars, using midyear exchange rates to adjust EMIF Sur data denominated in non-U.S. currencies (e.g., pesos or quetzals). Figures might not add due to rounding.
[a] These figures are the sums of the means or medians, respectively, for each country for each segment, first, from the country of origin to the U.S. border and, second, across the U.S. border.

Nicaragua AR_001367

# References

Amnesty International, *Mexico: Invisible Victims. Migrants on the Move in Mexico*, 2010. As of November 29, 2018:
https://www.amnesty.org/en/documents/AMR41/014/2010/en/

Associated Press, "Human Smugglers Cash In on Central American Migration to U.S.," CBC News website, July 21, 2014. As of October 28, 2018:
https://www.cbc.ca/news/world/human-smugglers-cash-in-on-central-american-migration-to-u-s-1.2712878

Beittel, June S., *Mexico: Organized Crime and Drug Trafficking Organizations*, Washington, D.C.: Congressional Research Service, R41576, July 3, 2018.

Burnett, John, "Migrants Say They're Unwilling Mules for Cartels," NPR website, December 4, 2011. As of October 28, 2018:
https://www.npr.org/2011/12/04/143025654/migrants-say-theyre-unwilling-mules-for-cartels

Cabrera, Chris, testimony on behalf of the National Border Patrol Council before the U.S. Senate Homeland Security and Governmental Affairs Committee, Washington, D.C., October 21, 2015. As of November 8, 2018:
https://www.hsgac.senate.gov/imo/media/doc/Testimony-Cabrera-2015-10-21.pdf

Caldwell, Alicia A., "U.S. Border Crossings Are Fewer, Riskier and More Expensive," *Wall Street Journal*, October 5, 2018

Campana, Paolo, "The Structure of Human Trafficking: Lifting the Bonnet on a Nigerian Transnational Network," *British Journal of Criminology*, Vol. 56, No. 1, 2016, pp. 68–86.

Castellano, Laura, "Devoran Coyotes Millones con Niños," *El Universal*, July 29, 2014. As of October 29, 2018:
http://www.pressreader.com/mexico/el-universal/20140729/281530814157297

Chang, Joseph C., R. Kohout, H. R. Blacksten, and S. Bernard, *CBP Apprehensions at the Border*, Arlington, Va.: Homeland Security Institute, HSI Publication Number RP05-25f-04, 2006.

Cleek, Ashley, "With Smuggling Costs Skyrocketing, Parents Balance Risk and Debt for Their Children's Future," Public Radio International website, February 28, 2018. As of November 7, 2018:
https://www.pri.org/stories/2018-02-28/smuggling-costs-skyrocketing-parents-balance-risk-and-debt-their-childrens-future

Nicaragua AR_001368

*Daily Mail* and Associated Press Reporters, "From Bribing Drug Cartels and Immigration Officials to Paying for Hotels and Train Rides: Coyote Smugglers Reveal Costs Involved in Smuggling Child Migrants from Central America to the U.S.," *Daily Mail*, July 22, 2014. As of October 18, 2018:
https://www.dailymail.co.uk/news/article-2700946/From-bribing-drug-cartels-immigration-officials-paying-hotels-train-rides-Coyote-smugglers-reveal-costs-involved-smuggling-child-migrants-Central-America-U-S.html

Domingo Villegas, Rodrigo, "Central American Migrants and 'La Bestia': The Route, Dangers, and Government Responses," *Migration Policy Institute*, September 10, 2014. As of November 18, 2018:
https://www.migrationpolicy.org/article/central-american-migrants-and-"la-bestia"-route-dangers-and-government-responses

Egan, Dennis, Paul Kantor, Fred Roberts, Vladimir Menkov, and Katie McKeon, "Estimating Missed Detections at the Southern Border," unpublished presentation at George Mason University by the Borders, Trade, and Immigration Institute: A DHS Center of Excellence led by the University of Houston, via subcontract to Rutgers, 2018.

EMIF, homepage, undated-a. As of November 28, 2018:
https://www.colef.mx/emif/eng/index.php#

EMIF, "Surveys of Migration at Mexico's Northern and Southern Borders: Background and Objective," El Colegio de la Frontera Norte website, undated-b. As of November 8, 2018:
https://www.colef.mx/emif/eng/antecedentes_objetivos.php

EMIF, "Surveys of Migration at Mexico's Northern and Southern Borders: Research Methodology," El Colegio de la Frontera Norte website, undated-c. As of November 8, 2018:
https://www.colef.mx/emif/eng/bases_metodologicas.php

EMIF Sur, "Indicadores Anuales 2017," COLEF.mx website, p. 5, Chart 9b, 2018a. As of November 8, 2018:
https://www.colef.mx/emif/resultados/indicadores/indicadores/Sur/2017/Anual/SUR-Indicadores-ANUALES%202017.pdf

EMIF Sur, "Indicadores Semestrales EMIF Sur: OCT 2017-MZO 2018," COLEF.mx website, March 2018b. As of November 8, 2018:
https://www.colef.mx/emif/resultados/indicadores/indicadores/Sur/2017/S1/SUR-Indicadores-S1-oct2017-marzo2018.pdf

Espenshade, Thomas J., "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing the U.S.-Mexico Frontier," *International Migration Review*, Vol. 29, No. 2, 1995, pp. 545–565.

Nicaragua AR_001369

Farah, Douglas, and Pamela P. Lum, *Central American Gangs and Transnational Criminal Organizations: The Changing Relationships in a Time of Turmoil*, Washington, D.C.: International Assessment and Strategy Center, February 2013.

Finckenauer, James O., *Chinese Transnational Organized Crime: The Fuk Ching*, Washington, D.C.: National Institute of Justice, 2001. As of November 7, 2018:
https://www.ncjrs.gov/pdffiles1/nij/218463.pdf

Frontline/World, "Extended Interview: A Human Smuggler," PBS website, 2018. As of October 13, 2018:
http://www.pbs.org/frontlineworld/stories/mexico704/interview/smuggler.html

Gallagher, Mike, "Drugs, Guns and People: Smuggling Is a Growing Border Problem," *Albuquerque Journal*, June 10, 2018. As of October 28, 2018:
https://www.abqjournal.com/1183179/drugs-guns-and-people-smuggling-is-a-growing-border-problem.html

Garsd, Jasmine, "Human Smuggler: Central Americans Are Worth Their Weight in Gold," transcript, NPR website, January 28, 2016. As of November 7, 2018:
https://www.npr.org/2016/01/28/464664750/human-smuggler-central-americans-are-worth-their-weight-in-gold

González, Daniel, and Gustavo Solis, "The Wall: A Human Smuggler, and the Wall That Will Make Him Rich," *USA Today*, 2017. As of October 28, 2018:
https://www.usatoday.com/border-wall/story/human-smuggling-crossing-border-illegally-methods/559784001/

Guevara González, Yaatsil, "Navigating with Coyotes: Pathways of Central American Migrants in Mexico's Southern Borders," *Annals of the American Academy of Political and Social Science*, Vol. 676, No. 1, March 2018, pp. 174–193.

Hale, Gary J., Adam N. Hale, Nathan P. Jones, and Russell Lundberg, "Uncovering Human Trafficking Patterns from Guatemala to the U.S.," unpublished presentation at George Mason University by the Borders, Trade, and Immigration Institute: A DHS Center of Excellence led by the University of Houston, 2018.

Hennessy-Fiske, M., "Migrants, Young and Old, Are Not Always Related; Border Patrol Says Fear of Child Trafficking Forces Separations," *Los Angeles Times*, May 8, 2018. As of November 7, 2018:
http://www.latimes.com/nation/la-na-border-patrol-dna-20180508-htmlstory.html

International Crisis Group, *Easy Prey: Criminal Violence and Central American Migration*, Report 57, July 2016.

Nicaragua AR_001370

Kilmer, Beau, Jonathan P. Caulkins, Brittany M. Bond, and Peter H. Reuter, *Reducing Drug Trafficking Revenues and Violence in Mexico: Would Legalizing Marijuana in California Help?* Santa Monica, Calif.: RAND Corporation, OP-325-RC, 2010. As of November 14, 2018:
https://www.rand.org/pubs/occasional_papers/OP325.html

Kulish, Nicholas, "What It Costs to Be Smuggled Across the U.S. Border," *New York Times*, June 30, 2018. As of October 24, 2018:
https://www.nytimes.com/interactive/2018/06/30/world/smuggling-illegal-immigration-costs.html

Leutert, Stephanie, "When Drug Trafficking Is Your Only Option," *Foreign Policy*, July 14, 2017.

Leutert, Stephanie, *Organized Crime and Central American Migration in Mexico*, Lyndon B. Johnson School of Public Affairs, Policy Research Project 198, 2018.

Martinez, Oscar, "Los Coyotes del Norte Están Aumentando las Cuotas por TRUMP," *Animal Politico*, February 10, 2017. As of October 28, 2018:
https://www.animalpolitico.com/2017/02/coyotes-migracion-trump/

McAuliffe, Marie, and F. Laczko, *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base*, Geneva, Switzerland: International Organization for Migration, 2016.

Miroff, Nick, "The Border Is Tougher to Cross Than Ever. But There's Still One Way into America," *Washington Post*, October 24, 2018. As of November 21, 2018:
https://www.washingtonpost.com/graphics/2018/national/border-asylum-claims/?utm_term=.c35364dae56d

Morral, Andrew R., Henry H. Willis, and Peter Brownell, *Measuring Illegal Border Crossing Between Ports of Entry: An Assessment of Four Promising Methods*, Santa Monica, Calif.: RAND Corporation, OP-328-OSD, 2011. As of November 14, 2018:
https://www.rand.org/pubs/occasional_papers/OP328.html

Nixon, R., and T. Heisler, "High Profits and Misery Meet at Door of Smugglers' Stash Houses," *New York Times*, August 26, 2018. As of November 7, 2018:
https://www.nytimes.com/2018/08/26/us/politics/smugglers-border-immigrants-money.html

Olson, Eric L., *Migrant Smuggling and Trafficking at the Rio Grande Valley: Ten Observations and Questions*, Washington, D.C.: The Wilson Center, September 2016. As of November 8, 2018:
https://www.wilsoncenter.org/sites/default/files/olson_border_2016_0.pdf

Nicaragua AR_001371

Organisation for Economic Co-operation and Development, *Can We Put an End to Human Smuggling?* Paris, France, MPD No. 9, December 2015.

Palacios, S. P. Izcara, "Coyotaje and Drugs: Two Different Businesses," *Bulletin of Latin American Research*, Vol. 34, No. 3, December 30, 2014, pp. 324–329.

Paoli, Letizia, and V. Greenfield, "The Supply of Doping Products and the Relevance of Market-Based Perspectives: Implications of Recent Research in Italy," in Jens Beckert and Matias Dewey, eds., *Everything Legal? Interfaces Between legality and Illegality in Markets*, Oxford: Oxford University Press, 2017, pp. 245–267.

Paoli, Letizia, V. Greenfield, and P. Reuter, *The World Heroin Market: Can Supply Be Cut?* New York: Oxford University Press, 2009.

Paoli, Letizia, V. Greenfield, and A. Zoutendijk, "The Harms of Cocaine Trafficking: Applying a New Framework for Assessment," *Journal of Drug Issues*, Vol. 43, No. 4, 2013, pp. 407–436.

Pelley, Scott, correspondent, CBS News, transcript of *60 Minutes* episode, "Human Smuggling Across the Southern Border; Desperation and Fear Are Driving a Dangerous Industry That's Virtually Impossible to Completely Stop," March 11, 2018. As of October 28, 2018: https://www.cbsnews.com/news/human-smuggling-across-the-southern-border/

Prendergast, Curt, "Costly Crossing Fees Turn Illegal Immigrants into Marijuana Smugglers," *Arizona Daily Star*, April 8, 2017. As of October 29, 2018: https://tucson.com/news/local/border/costly-crossing-fees-turn-illegal-immigrants-into-marijuana-smugglers/article_1e95e570-080c-5dd7-a240-687cce94ca8f.html

Reuter, Peter, and V. Greenfield, "Measuring Global Drug Markets: How Good Are the Numbers and Why Should We Care About Them?" *World Economics*, Vol. 2, No. 4, October–December 2001, pp. 159–173.

Roberts, Bryan, G. Hanson, D. Cornwall, and S. Borger, *An Analysis of Migrant Smuggling Costs Along the Southwest Border*, Washington, D.C.: U.S. Department of Homeland Security, Office of Immigration Statistics, working paper, November 2010.

Rodríguez Chávez, Ernesto, *Migración centroamericana en tránsito irregular por México. Nuevas cifras y tendencias*, Instituto Tecnológico Autónomo de México (ITAM)/El Colegio de la Frontera Norte (Colef), PB #14, December 2016.

Sanchez, Gabriella, "Latin America," in Marie McAuliffe and Frank Laczko, eds., *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base*, Geneva, Switzerland: International Organization for Migration, 2016, pp. 269–301.

Nicaragua AR_001372

Sanchez, Gabriella, "Critical Perspectives on Clandestine Migration Facilitation: An Overview of Migrant Smuggling Research," *Journal on Migration and Human Security*, Vol. 5, No. 1, 2017, pp. 9–27.

Sanchez, Gabriella, "Five Misconceptions About Migrant Smuggling," *Migration Policy Center*, Issue 2018/07, May 2018.

Sanchez, Gabriella E., and Sheldon. X. Zhang, "Rumors, Encounters, Collaborations, and Survival: The Migrant Smuggling–Drug Trafficking Nexus in the U.S. Southwest," *Annals of the American Academy of Political and Social Science*, Vol. 676, No. 1, 2018.

Slack, Jeremy, and Howard Campbell, "On Narco-Coyotaje: Illicit Regimes and Their Impacts on the US-Mexico Border; Sociology and Anthropology," *Antipode*, Vol. 48, No. 5, 2016.

Slack, Jeremy, and Scott Whiteford, "Caught in the Middle: Undocumented Migrant's Experiences with Drug Violence," in T. Payan, K. Staudt, and Z. A. Kruszewski, eds., *A War That Can't Be Won: Binational Perspectives on the War on Drugs*, Tucson, Ariz.: University of Arizona Press, 2013, pp. 193–213.

Tiempo.hn, "Human Smugglers Charge at Least $7,000 to Take Migrants to US," in Spanish, August 7, 2017. As of November 7, 2018:
https://tiempo.hn/compatriotas-necesitan-7-mil-dolares-coyote-eeuu/

United Nations Office on Drugs and Crime, *Legislative Guide for the Implementation of the United Nations Convention Against Transnational Organized Crime*, Vienna, Austria, 2004. As of October 25, 2018:
http://www.unodc.org/documents/treaties/Legislative_Guide_2017/Legislative_Guide_E.pdf

United Nations Office on Drugs and Crime, *Smuggling of Migrants: A Global Review and Annotated Bibliography of Recent Publications*, New York, 2011.

United States, Executive Office of the President, *Strategy to Combat Transnational Organized Crime: Addressing Converging Threats to National Security*, Washington, D.C.: Executive Office of the President, July 2011.

U.S. Code, Title 10: Armed Forces; Subtitle A: General Military Law; Part I: Organization and General Military Powers; Chapter 15: Military Support for Law Enforcement Agencies; Section 284: Support for counterdrug activities and activities to counter transnational organized crime.

U.S. Department of Homeland Security, Office of Immigration Statistics, *Efforts by DHS to Estimate Southwest Border Security Between Ports of Entry*, Washington, D.C., 2017. As of October 23, 2018:
https://www.dhs.gov/sites/default/files/publications/17_0914_estimates-of-border-security.pdf

Nicaragua AR_001373

U.S. Department of Justice, Drug Enforcement Administration, *2017 National Drug Threat Assessment*, DEA-DCT-DIR-040-17, Washington, D.C., October, 2017.

U.S. Immigration and Customs Enforcement, "41 Arrested in Multinational Human Smuggling Takedown in Central America and South America," Washington, D.C., July 8, 2016. As of November 7, 2018:
https://www.ice.gov/es/news/releases/41-arrested-multinational-human-smuggling-takedown-central-america-and-south-america

Weden, Axel Storen, "Deadly Human Trafficking Business on Mexico-US Border," *Al Jazeera*, January 24, 2016. As of November 7, 2018:
https://www.aljazeera.com/indepth/features/2016/01/deadly-human-trafficking-business-mexico-border-160117073423022.html

Whitley, John E., J. W. Bailey, S. K. Burns, D. F. Eisler, C. C. Fletcher, T. P. Frazier, B. R. Gould, K. M. Guerrera, T. C. Heuring, B. Q. Rieksts, and B. Roberts, *Assessing Southern Border Security*, Arlington, Va.: Institute for Defense Analyses, IDA Paper NS P-5304, 2016.

Wuebbels, Mark, "Demystifying Human Smuggling Operations Along the Arizona-Mexican Border," 2004. As of October 13, 2018:
http://traccc.gmu.edu/pdfs/publications/human_trafficking_publications/wuebbe01.pdf

Zhang, Sheldon X., *Smuggling and Trafficking in Human Beings: All Roads Lead to America*, Westport, Conn.: Praeger, 2007.

Zhang, Sheldon X., "The United States," in Marie McAuliffe and Frank Laczko, eds., *Migrant Smuggling Data and Research: A Global Review of the Emerging Evidence Base,* Geneva, Switzerland: International Organization for Migration, 2016, pp. 303–324.

Nicaragua AR_001374

Unlawful migrants from Central America apprehended at the U.S.-Mexico border each year often hire smugglers for assistance or pay others for rights of way at some point during their journey north. Policymakers face concerns that a substantial share of migrants' expenditures on smuggling services could be flowing to transnational criminal organizations (TCOs), entities that represent a potential threat to homeland security. In response to these concerns, the authors of this report conducted a scoping study to develop a preliminary estimate of TCOs' revenues from smuggling migrants from the Northern Triangle region of Central America (Guatemala, Honduras, and El Salvador) to the United States and to characterize the TCOs' structure, operations, and financing. They conducted interviews with subject-matter experts, a review of literature, and an analysis of governmental and nongovernmental data on migration and human smuggling and found that human smuggling involves many different types of actors and that most TCOs' activities and revenues cannot be separated credibly from those of ad hoc groups, independent operators, and others who engage in human smuggling. They developed a preliminary estimate of revenues from human smuggling flowing to all types of smugglers, not just TCOs—ranging from about $200 million to $2.3 billion in 2017—with uncertainty stemming largely from analytical challenges related to data limitations and time constraints. Separately, they also produced a preliminary estimate of the taxes, or pisos, that migrants pay to drug-trafficking TCOs to pass through their territories, ranging from about $30 million to $180 million.

$24.00

ISBN-10 1-9774-0208-9
ISBN-13 978-1-9774-0208-0



Cover images: CBP.gov, Harry Hu/Adobe Stock
RR-2852-DHS



**DONATE NOW**

July 19, 2022 9:00AM EDT

Available In    English    Español

# Nicaragua: Government Dismantles Civil Society
### Arbitrary Closures of Groups Impede Rights, Humanitarian Work

  



We use cookies, tracking technologies, and third-party
analytics tools to better understand who is using the
website and improve your experience. By using our
website you are agreeing to this. Read our privacy policy
to find out what cookies are used for and how to change
your settings.

Accept        **Other options**

Nicaragua AR_001376

condemn this systematic dismantling of civil society groups, which play a critical role in a country that has no independent state institutions left to act as a check on executive power.

Since June 6, 2022, Nicaraguan authorities have passed laws and resolutions canceling the legal registration of over 770 nongovernmental organizations and foundations, effectively forcing them to shut down their operations in the country. These include medical associations and organizations working on a range of issues from child protection to women's rights to climate change mitigation. The government has canceled the registration of more than 950 organizations since 2018. Many of these decisions are based on abusive legislation, including a "foreign agents" law, passed in recent years by lawmakers allied with the administration of President Daniel Ortega.

"The Ortega administration in Nicaragua has systematically shut down human rights organizations and other nongovernmental groups to halt their efforts to expose abuses and the authorities' inability to provide services to the Nicaraguan people," said Tamara Taraciuk Broner, acting Americas director at Human Rights Watch. "Nicaraguan authorities are so obsessed with wiping out civic space that they've gone after groups that provide critically important aid to poor communities in a country that has been severely affected by two hurricanes and a pandemic."

Among these recent actions is the National Assembly's decision to cancel, on June 30, the legal registration of 100 groups, saying they had failed to submit "detailed financial statements," the names of their board members, "prior international donations," and "information on the identity and source of all donors," and that they had failed to "promote policies of transparency, integrity, and public trust."

Shutting down nongovernmental organizations is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation, intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists. Since taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary.

Among the groups stripped of their legal registration are dozens of humanitarian organizations, which play a critically important role in ensuring access to health services, water, and food for low-income, mostly rural communities.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

Nicaragua AR_001377

In mid-August 2021, the Interior Ministry canceled the registration of an international development organization that had operated in Nicaragua for decades, including by fostering climate change resilience and food security. The work of the organization, which provided support to thousands of people in the last few years, focused primarily on improving social and economic conditions for women and Indigenous communities on the Caribbean Coast and in the northern part of the country.

Several other groups were stripped of their registration in mid-August. The authorities said the groups had failed to comply with legal requirements, including "clearly defin[ing] their financial sources, project portfolio, social impact, and if these are in accordance with the purpose and objectives of the entity." The development organization publicly rejected the allegations.

Nicaragua has one of the highest poverty rates in Latin America and the Caribbean. In March 2021, UNICEF estimated that in the aftermath of the two 2020 hurricanes, about "1.8 million people, including 720,000 children, [we]re still in need of humanitarian aid, especially among the indigenous communities of the North Caribbean Coast of Nicaragua."

The authorities have offered no clear explanation for each registration cancellation. The official decisions simply state that the organizations affected had not complied with legislation – specifically, abusive laws adopted by National Assembly members allied with the Ortega administration, including the "foreign agents" law adopted in October 2020 and the General Law for the Regulation and Control of Non-Profit Organizations adopted in March 2022.

The "regulation and control of non-profit organizations" law allows the Interior Ministry to ask the National Assembly to cancel the legal registration of groups for "using the organization[s] to promote campaigns to destabilize the country."

The legislation allows the authorities to seize a group's assets if its registration is canceled because it committed "unlawful acts," violated "public order," or hindered the Interior Ministry's "control and surveillance." The law states that all organizations can only have a maximum of 25 percent of "foreign members."

The "foreign agents" law requires people or entities to register as "foreign agents" with the Interior

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept        Other options

They must inform the ministry "in advance" of any funds they receive as well as their "use and destination," and submit "monthly reports of the activities related to their performance as 'foreign agents.'" The Interior Ministry can also require organizations to present "additional information" when "deemed convenient." Without the certificate, organizations are not able "to carry out movements of financial resources and/or material assets," or open or maintain a bank account.

Several people Human Rights Watch interviewed, including members of civil society groups closed arbitrarily, said the authorities had routinely failed to issue the certificates, based on seemingly arbitrary reasons. Some said that authorities had required the information to be presented on colored paper instead of white paper. Others alleged that authorities had pressed them to remove or replace some board members who were perceived to be government critics as a condition to issue the certificate.

"The implementation of the legislation appears to be designed in a way that makes it impossible to comply with it," said a former member of a group that was dissolved.

Your tax deductible gift can help stop human rights violations and save lives around the world.

$50

$100

$250

$500

$1000

Other

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept    Other options

Nicaragua AR_001379



March 31, 2022  |  News Release

## Nicaragua: UN Creates Rights Monitor



March 10, 2022  |  Commentary

## Government Critics Languish in Nicaraguan prisons

## REPORTS



July 18, 2022  |  Report

## "We Just Want to Live Our Lives"

**El Salvador's Need for Legal Gender Recognition**



July 11, 2022  |  Report

## Prison or Exile

**Cuba's Systematic Repression of July 2021 Demonstrators**

## MOST VIEWED

1    November 14, 2022  |  News Release

## Qatar: Rights Abuses Stain FIFA World Cup



2    December 5, 2022  |  Report



We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     Other options

4    February 7, 2013  |  Report

## Breaking the Silence



5    June 21, 2017  |  Report

## "Just Let Us Be"



## Protecting Rights, Saving Lives

**Human Rights Watch defends the rights of people in 90 countries worldwide, spotlighting abuses and bringing perpetrators to justice**

## DONATE NOW



H U M A N
R I G H T S
W A T C H

## Get Updates On Rights Issues From Around The Globe

Enter an email address        Sign Up

## Connect With Us

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our **privacy policy** to find out what cookies are used for and how to change your settings.

Accept        **Other options**

Nicaragua AR_001381

Human Rights Watch is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

Nicaragua AR_001382



IACHR Inter-American Commission on Human Rights

# Nicaragua: Concentration of power and the undermining of the Rule of Law

OAS
More rights for more people

 

OEA/Ser.L/V/II.

Doc. 288

25 october 2021

Original: Spanish

INTER-AMERICAN COMMISSION ON HUMAN RIGHTS

# Nicaragua: Concentration of Power and the Undermining of the Rule of Law

2021
cidh.org

Nicaragua AR_001384

**OAS Cataloging-in-Publication Data**

Inter-American Commission on Human Rights.

Nicaragua: Concentration of power and the undermining of the Rule of Law

: Approved by the Inter-American Commission on Human Rights on October

25, 2021.

p. ; cm. (OAS. Official records ; OEA/Ser.L/V/II)

ISBN: 978-0-8270-7362-3

1. Human rights--Nicaragua.  2. Civil rights--Nicaragua.  I. Title.  II. Series.

OEA/Ser.L/V/II  Doc.288/21

Nicaragua AR_001385

# INTER-AMERICAN COMMISSION ON HUMAN RIGHTS

## Members

Antonia Urrejola

Flávia Piovesan

Julissa Mantilla Falcón

Esmeralda Arosemena de Troitiño

Joel Hernández

Margarette May Macaulay

Edgar Stuardo Ralón Orellana

## Executive Secretary

Tania Reneaum Panszi

## Chief of Staff of the Executive Secretariat of the IACHR

Norma Colledani

## Assistant Executive Secretary for Monitoring, Promotion and Technical Cooperation

María Claudia Pulido

## Assistant Executive Secretary for Cases and Petitions

Marisol Blanchard Vera

Approved by the Inter-American Commission on Human Rights on

**October 25, 2021**

Nicaragua AR_001387

# INDEX

**EXECUTIVE SUMMARY**                                                     **8**

**CHAPTER 1 | INTRODUCTION**                                              **13**

*A.*    *Background*                                                      *16*

1.     "Alemán-Ortega Pact"                                               17

2.     Political, social and human rights crisis precipitated on April 18, 2018   18

**CHAPTER 2 | PROGRESSIVE BREACH OF THE PRINCIPLE
                OF SEPARATION OF POWERS**                                 **22**

*A.*    *Executive branch: presidential reelection without term limits ans public security*   *23*

1.     Presidential reelection without term limits                       24

*B.*    *State security forces*                                          *30*

1.     National Police                                                   30

2.     Army                                                              32

3.     Parastate groups                                                  33

4.     Surveillance apparata and political control                      35

*C.*    *The Justice Administration System*                              *38*

1.     The Judiciary                                                     38

2.     The Attorney General's Office                                     41

*D.*    *Other power concentration strategies*                           *42*

1.     Control of the autonomous regimes                                 42

2.     Immunity and privileges                                           43

**CHAPTER 3 | POLITICAL RIGHTS AND THE RIGHT
                TO PARTICIPATE IN PUBLIC AFFAIRS**                        **48**

*A.*    *Arbitrary arrests and criminalization of presidential
        nominee candidates and/or those deemed government dissidents*    *50*

*B.*    *Cancellation of political parties' legal status*                *53*

*C.*    *Closure of democratic forums and persecution
        of the media, journalists and press workers*                    *55*

*D.*    *Laws restricting rights and freedoms aimed at closing democratic spaces*   *58*

1.  Law No. 977, against Money Laundering, Terrorism Financing, and the Financing of the Proliferation of Weapons of Mass Destruction (enacted in July 2018.    58

2.  Law No. 1040, on the Regulation of Foreign Agents (October 2020)    59

3.  Law No. 1042, on Cybercrime (October 2020)    59

4.  Law No. 1055, on Defense of the Rights of the People to Independence, Sovereignty, and Self-Determination for Peace (December 2020)    60

5.  Law No. 1060, Reforming and Supplementing the Code of Penal Procedure (February 2021)    61

6.  Law No. 1070, Reforming and Supplementing the Electoral Law (May 2021)    61

**CONCLUSIONS AND RECOMMENDATIONS**    **65**



# EXECUTIVE SUMMARY

# EXECUTIVE SUMMARY

1. This aim of this report of the Inter-American Commission on Human Rights ("Commission," "Inter-American Commission, or "IACHR") is to analyze the power concentration process and the consequent undermining of the rule of law in Nicaragua and to offer recommendations to the State and the international community from a human rights perspective.

2. To understand the serious human rights situation in Nicaragua, the IACHR analyzes the concentration of power in the executive branch that began in 1999, with the so-called "Alemán-Ortega Pact", which instituted a hybrid system in order to enable the co-optation of the top government posts, a process that is still under way. A series of constitutional and legal reforms and political collaborative actions were gradually made possible through modifications to the Nicaraguan State's institutional structure to ensure control of power by the Sandinista National Liberation Front (*Frente Sandinista de Liberación Nacional* - FSLN) and the Liberal Constitutionalist Party (*Partido Liberal Constitucionalista* – PLC), undermining the principal of separation of powers in the country.

3. The implementation of this pact has had dire consequences for the exercise, protection, and guarantee of human rights and the undermining of the rule of law. This is the context for the violent state response to the social protests that began on April 18, 2018, the human rights violations perpetrated, and the impunity surrounding these events.

4. As the IACHR has extensively documented, the protests that began in April 2018 were repressed through the use of lethal force by police and parapolice groups under the rule of the President as their Commander in Chief. A police state was also established to quell dissidence and close democratic forums through of arbitrary arrest and deprivation of liberty of those deemed dissidents, making public demonstrations illegal, and raiding and seizing the facilities of human rights organizations and independent media outlets, among others.

5. This state response was made possible through the subjugation of the judiciary and the Office of the Attorney General to the government's will, as well as any other public power that may have controlled or denounced the government actions, clearly undermining the rule of law and democracy, highlighted by the disregard for the mandate of judicial independence and separation of powers, primarily through violence and criminalization of dissidence, manipulation of criminal law, lack of guarantees of judiciary independence and impartiality, and the impunity surrounding human rights violations. Moreover, the National Assembly, in full alignment with the executive branch, enacted a group of laws whose aim would be to close democratic forums and restrict the freedom of expression of dissenting voices.

6.   The Inter-American Commission had earlier pointed out that the Nicaraguan State does not have an independent judiciary owing to its hybrid composition and the legal reforms dating from 2010, which allowed appointment retention of based on factors such as nepotism and official party influence and manipulation.  By 2014, the FSLN and magistrates close to the President held three of the four judiciary chambers.  In addition to these factors, the IACHR notes a judicial career service wherein impartiality was not guaranteed.

7.   Regarding the Attorney General's Office, the appointment of party affiliates close to the President has led to the progressive loss of the instituon's independence and autonomy, also leading to the reassignment of those public prosecutors not affiliated with the governing party.  More recently, in the context of the current crisis, the lack of affinity with the national government has led to the political persecution of prosecutors, who finally resigned from their public functions.

8.   The Commission notes with concern how State security entities and institutions have played a major part in the process of concentrating and maintaining power through control by the National Police and the Army, and the creation of apparata for the control and surveillance of the public, especially political dissidents.

9.   This report mentions a group of electoral reforms that facilitated the concentration of power.  The 2000 constitutional reform lowered from 45% to 40% the percentage of valid votes required for election to the presidency and vice presidency of the Republic, even establishing the possibility of assuming the presidency with a minimum of 35% of the valid votes when a candidate exceeds the votes for the candidate coming in second by a minimum of five percentage points.

10.  Moreover, the constitutional reelection prohibition notwithstanding, in 2010, the plenary of the Supreme Court declared inapplicable *erga omnes* these constitutional provisions and therefore it, together with the Supreme Electoral Council, allowed Daniel Ortega to run for President in the November 2011 elections. Subsequently, through a 2014 constitutional reform, the National Assembly – controlled by the executive branch party – repealed Article 147 of the Constitution, which prohibited immediate reelection to the presidency of the Republic, and authorized presidential reelection without term limits, which has enabled Daniel Ortega's presidential tenure to continue.  In this regard, the Inter-American Court on Human Rights (hereinafter "Inter-American Court", "the Court" or the "IA Court HR") has recently held that authorization of candidates to run for an unlimited number of terms is incompatible with the principles of representative democracy and, therefore, the obligations set forth in the American Convention and the American Declaration of the Rights and Duties of Man.

11.  In addition, the "Alemán-Ortega Pact" made possible the enactment in 2000 of Electoral Law No. 331 and the subsequent amendments thereto until 2021, which together incorporated rules restricting electoral competition and the exercise of political rights.  In that regard, the IACHR notes that the 2000 text eliminated the legal definition of "public associations for candidate nomination" [*asociaciones de suscripción popular*] for participation in elections, restricting political participation

in electoral processes to political parties.  It also limited the formation of political parties and their form of affiliation and of obtaining legal status, and added grounds for suspension and cancellation of their legal status. As a result of these reforms, indigenous and ethnic communities were excluded from participation in the 2000 municipal elections, for which reason the indigenous organization Yapti Tasba Masraka Nanih Asla Takanka (YATAMA) lodged a complaint with the IACHR, which declared it admissible and, having analyzed its merits, referred the case to the Inter-American Court of Human Rights (IA Court HR). For its part, the Inter-American Court, in its 2005 judgment, declared the international responsibility of the Republic of Nicaragua, among others, for violation of the political right of the candidates nominated by YATAMA to be elected.  The Court ordered the State of Nicaragua of make a set of legislative modifications, which thus far have not been made.

12.   Additionally, in application of Electoral Law No. 331, on June 11, 2008, the Supreme Electoral Council (CSE-its Spanish acronym) rescinded the legal status of the Sandinisita Renovation Movement (*Movimiento Renovador Sandinista* - MRS), so that it was excluded from independent participation in the municipal and national elections It is important to note that the General Assembly of the Organization of American State (OAS) has indicated that it is essential for measures to be taken to promote free and fair elections in Nicaragua.  As of the date of adoption of this report, none of the measures proposed by the OAS General Assembly have been implemented.

13.   In the current scenario for the exercise of political rights, the Commission has condemned the systematic set of state actions undertaken in recent months to prevent the participation of the opposition in the general elections to be held in Nicaragua on November 8 of this year, as well as the persistent violations of human rights in this context.  The IACHR has noted the intensification of the repression of the political opposition, social leaders, human rights defenders, and journalists, especially through arbitrary arrests and criminalization on baseless charges.

14.   This year, over 30 persons have been arbitrarily detained and criminalized on baseless charges and without due judicial guarantees, including seven nominee candidates for the presidency, who remain deprived of liberty, some of whom have obtained provisional measures from the Inter-American Court.  The CSE also canceled the legal status of the Democratic Restoration Party (*Partido Restauración Democrática* - PRD) and decided to cancel ex officio the legal status of the Conservative Party (*Partido Conservador*) and of the Citizens for Liberty Party (*Partido Ciudadano por la Libertad*).  By these means, it eliminated the candidacy of the only opposition candidate who had succeeded in formally registering for the upcoming presidential election.   The aim of this set of actions was to prevent the participation of the opposition in the general elections to be held in November of this year, leaving Daniel Ortega and Rosario Murillo without competition in the electoral round.

15.   As shown by the facts described in the present report, the different State functions are not being fulfilled by separate, balanced and independent branches of the government.  All branches are aligned with the executive branch, so that they do not limit the exercise of power or prevent arbitrary actions. The general elections

scheduled for November 2021 are being held in this context of repression and closure of democratic forums in the country.  The intent is indefinite perpetuation in power and maintenance of privileges and immunities, in a context of repression, corruption, electoral fraud, and structural impunity. The major challenge is to search for formulas, with the participation of civil society, that enable democratic guarantees and freedoms characteristic of the democratic rule of law to be restored through the separation of powers, and to guarantee the conditions for the holding of fair, free, and transparent elections.  In this context, the IACHR makes a series of recommendations to the State of Nicaragua.



CHAPTER 1
**INTRODUCTION**

# INTRODUCTION

16.    This aim of this report of the Inter-American Commission on Human Rights ("Commission," "Inter-American Commission, or "IACHR") is to analyze the process of concentration of power and the resulting undermining of the rule of law in Nicaragua.

17.    The IACHR has followed with particular attention the progressive deterioration of the human rights situation in Nicaragua since the start of state repression of the social protests in the country in 2018.  The crisis began three years ago and human rights violations in the country have persisted, with different levels of intensity. Impunity continues surrounding the serious violent events that occurred.

18.    In particular, in 2021, the Commission has documented persecutions, threats, aggression, arbitrary arrests, and attacks on human rights defenders, members of the opposition, journalists, and Atlantic Coast communities, and the ongoing closure of democratic forums.  By the same token, actions intensified against any expression deemed contrary to or opposing the government, through the arrest and accusation, based on unfounded or disproportionate charges, without due judicial guarantees of nominee candidates and social leaders, months prior to the presidential election.  All this in a context that has made evident the concentration of absolute power in Nicaragua in the executive branch.

19.    The Commission notes that this concentration of power in the executive branch began years ago, in 1999, with the so-called "Alemán-Ortega Pact", which instituted a two-party structure with the aim of taking over the highest government posts, a process that continues today.[1]  Gradually, other State institutions were co-opted and the principle of separation of powers in the country was undermined. The implementation of this pact has had serious consequences for the exercise, protection, and guarantee of human rights and the undermining of the rule of law.

20.    In its 2018 Annual Report, the Inter-American Commission addressed in general terms the factors that led to the undermining of democratic institutions in Nicaragua, such as the concentration of power in the executive branch and the appointment of government party affiliates to different public organs, such as the Supreme Court of Justice (CSJ-its Spanish acronym), the Supreme Electoral Council (CSE-its Spanish acronym), and the Office of the Public Prosecutor of the Republic. Additionally, the IACHR reaffirmed that the scale and patterns of state violence that repressed the social protests that began in April 2018 were made possible by the control that the executive branch held for several years in relation to the other

---

[1] IACHR. <u>169/21 – The IACHR refers case on Nicaragua to the Inter-American Court.</u> Washington, D.C., July 8, 2021.

branches of government.[2] A situation that has been reported by civil society to the IACHR on many occasions.[3]

21. Since the dire human rights crisis began in Nicaragua, the Commission has monitored the situation in conformity with its mandate and through its various mechanisms, especially through the following actions:

- On May 3, 2018, the IACHR created a Rapid and Integrated Response Coordination Unit (SACROI in spanish) in order to pay special attention to the situation in Nicaragua.

- From May 17 to 21, 2018, the IACHR conducted a working visit to Nicaragua to make preliminary onsite observations of the human rights situation in the country, in connection with the violent events occurred from April 18, 2018. Upon completion of the visit, the IACHR issued its preliminary observations along with 15 initial recommendations to the State.

- On June 21, 2018, having analyzed the information received on its working visit, the IACHR published its report "Gross Human Rights Violations in the Context of Social Protests in Nicaragua," which reiterated its 15 recommendations and issued others.

- On June 24, 2018, following the invitation of the State of Nicaragua, the IACHR deployed in Managua the Special Monitoring Mechanism for Nicaragua (MESENI – its Spanish acronym), with the main objective of monitoring the implementation of the IACHR's recommendations based on its country visit and its corresponding Report.  Although on December 19, 2018, the State of Nicaragua decided to "temporarily suspend" the IACHR's presence in the country, the MESENI has continued to operate from the Commission's headquarters in Washington D.C.

- Following-up on Recommendation 3 of the preliminary observations of its working visit and in view of the invitation of the State of Nicaragua, the IACHR announced the creation of the Interdisciplinary Group of Independent Experts (GIEI-its Spanish acronym) for Nicaragua with the aim of assisting and supporting the investigations of the violent events that took place in the country from April 18 to May 30, 2018, in the context of the

---

[2]    IACHR. 2019 Annual Report. Chapter IV.B, Nicaragua, par. 45.

[3]    IACHR. Hearings: Human Rights Situation in Nicaragua (1998); Human Rights Situation in Nicaragua (2000); General Human Rights Situation in Nicaragua (2003); Situation of the administration of justice in Nicaragua (2005); Situation of the rule of law and human rights in Nicaragua (2005); Human Rights Situation in Nicaragua (2005); Situation of Justice in Nicaragua (2006); Human Rights Situation in Nicaragua (2007); Administration of Justice in Nicaragua (2008); Democratic Institutions in Nicaragua (2009); Human Rights Situation and Rule of Law in Nicaragua (private hearing) (2010); Situation of political rights in Nicaragua (2011); Situation of civil and political rights in Nicaragua (private hearing) (2011); General Human Rights Situation in Nicaragua (2012); Human Rights Situation in Nicaragua (2014); General Situation of Human Rights in Nicaragua (2016);  Situation of Political Rights in Nicaragua (2016).

social protests. The GIEI began its work on July 2, 2018, and submitted its report on December 21, 2018, at the IACHR's headquarters in light of the fact that on December 19, 2018, the State of Nicaragua requested the GIEI to leave the country, after communicating the State's decision to suspend the IACHR presence in Nicaragua.

22.   The Commission has also monitored the human rights situation in Nicaragua through press releases, the granting of precautionary measures, the request for provisional measures from the Inter-American Court of Human Rights (IA Court HR) to address critical situations, and through communications, forums, and hearings, among other actions.  Since 2018, the Commission has on three occasions included the State of Nicaragua in Chapter IV.B of its Annual Report.

23.   The MESENI concluded that, as of October 2021, the death toll resulting from the repression that began in April 2018 was at least 328 deaths, with 1614 persons deprived of liberty; over 136 persons who remain deprived of liberty; 150 students expelled; over 405 health professionals dismissed; and over 103,600 Nicaraguan exiled.

24.   The Commission has condemned, given the current scenario of restrictions on the exercise of political rights, "the systematic set of actions taken by the State in recent months to prevent opposition participation in the general election scheduled for November in Nicaragua, as well as the persistent human rights violations in this context."[4]

25.   The IACHR notes that, owing to the intensification of repression in the country, in the first half of this year alone, it received more requests for precautionary measures than it received in 2020 as a whole.  Moreover, thus far this year, the Commission has issued 25 resolutions for precautionary measures to protect persons at grave and urgent risk of irreparable harm to their human rights, as compared to the 11 resolutions granted the previous year.  Additionally, taking into account the grave and urgent situation of some beneficiaries, the IACHR, in 2021, has referred four requests for provisional measure to the IA Court HR, three of which have been granted.[5]

26.   In light of the foregoing, in order to continue its efforts to monitor the situation in Nicaragua and offer recommendations from a human rights perspective, the Commission has decided to prepare this report.  To that end, it has systematized

---

[4]   IACHR. 209/21 - IACHR Condemns the State Actions Aimed at Ending Opposition Participation in Nicaragua's Upcoming Election. Washington, D.C., August 11, 2021.

[5]   On September 17, the Inter-American Commission on Human Rights (IACHR) asked the Inter-American Court of Human Rights (IA Court HR) to extend provisional measures to include inhabitants of Miskitu indigenous communities in Nicaragua's North Caribbean Coast Region in order to include among the beneficiaries members of the Miskitu Santa Fe indigenous community. As of the closing date of this report, that request for extension has yet to be granted. 242/21 - IACHR  Asks Inter-American Court to extend provisional measures in favor of communities of Miskitu indigenous people in Nicaragua. Washington, D.C., September 17, 2021.

and analyzed the information received regarding the human rights situation in Nicaragua in recent years.  In particular, the IACHR has made use of *ex officio* investigations, input from the different mechanisms through which it has monitored the situation in the country, such as public hearings, thematic visits, requests for information under Article 41 of the American Convention and for precautionary measures, press reports, and decisions and recommendations of specialized international organizations, among others.

27.    On October 20, 2021, the IACHR transmitted to the State of Nicaragua a copy of the preliminary draft of this report and requested it to submit its observations by October 27, 2021. On October 22, 2021, the State presented its observations. In its response to the draft of this report, the State expressed its "non-acceptance and absolute rejection of the referred Draft Report, which is nothing but an insulting, offensive and absurd compilation of false, misrepresented and manipulated facts that do not reflect the reality of our country and whose sole purpose is to defame the State, in frank obedience and replication of the harmful and interfering designs of the North American Empire, in its attempt to injure our sovereignty and self-determination, in the face of its next electoral process"[6].  On October 25, the Commission approved the final version of this report.

28.    This report is divided into five chapters.  The first chapter is the Executive Summary.  The second is the introduction to the events.  The third discusses the progressive undermining of the rule of law, followed by chapter four, which describes political rights and the right to participate in public affairs. Lastly, conclusions and recommendations are offered.

## A.    *Background*

29.    For much of the 20th century (1936-1979), Nicaragua was governed by dictators who were members of the Somoza family.  At that time, the top military personnel and political posts were reserved for immediate family members, other relatives, and the governing family's inner circle.  For its part, the opposition was repressed by the police and National Guard by mean of persecution, murders, kidnappings, and torture.

30.    From October 3 to 12, 1978, the Commission made an onsite visit in view of the dire events occurring in Nicaragua and in response to requests by various groups representative of the Nicaraguan community interested in the full effectiveness of human rights in the country to the Commission for it to come to Nicaragua without delay.[7] In its report on the visit, the Commission concluded that the Government of

---

[6]    State of Nicaragua response. Note MRE/DM/DMC/00259/10/21, October 22nd, 2021.

[7]    During the 1978 visit, the IACHR received reports and met with State authorities, civil society representatives, and representatives of the church and of international organizations, and interviewed victims in Managua, Masaya, Estelí, Granada, León, Diriamba, Jinotepe, Chinandega, and Matagalpa. It also visited several jails.

Nicaragua was grossly, persistently, and generally responsible for serious infringements of the rights to life, integrity, and personal liberty, and the rights of association and freedom of expression.  It also indicated that various legal and practical impediments to voting rights were being created that were impeding their full exercise.[8]

31.    On July 19, 1979, the Sandinista National Liberation Front (*Frente Sandinista de Liberación Nacional* – FSLN-its Spanish acronym) defeated dictator Anastasio Somoza and a National Government Reconstruction Board took power, which called elections in 1985 that resulted in the election of Daniel Ortega as President of the Republic.   He governed until 1990,  year in which Violeta Chamorros was elected by popular vote as President of the Republic (1990-1997).   She was succeeded by Arnoldo Alemán (1997-2002), and then Enrique Bolaños (2002-2007).  In 2007, Daniel Ortega was reelected (2007-2012); and was again reelected for the terms 2012-2017 and 2017-2022.

32.    The 1985 elections were the first steps towards building a rule of law in Nicaragua after decades of bloody dictatorships and periods of revolution and war. That construction began to falter over the years, especially, with the so-called 1999 "Alemán-Ortega Pact", which marked the start of an ongoing and progressive process of concentration of power in the executive branch, with serious repercussions for the cementing of the rule of law and for Nicaraguans' fundamental rights.

## 1.    "Alemán-Ortega Pact"

33.    According to information in the public domain, in 1999, the Sandinista National Liberation Front (FSLN), headed by Daniel Ortega, and the Liberal Constitutionalist Party (PLC), headed by then- President Arnoldo Alemán, negotiated a set of agreements aimed at ensuring executive branch control, subordination and control of the other branches of government, and the retention and/or attainment of privileges and immunities.

34.    The so-called "Alemán-Ortega Pact" was implemented through the institution of a hybrid system in the structures for democratic representation and in government

---

[8]    On that occasion, it indicated that as a result of the conflict that occurred in September 1978, the Government was responsible for many deaths owing to the abuses perpetrated by the National Guard in the "clean-up operation" and other actions that took place several days after the end of hostilities, where many people were summarily and collectively executed merely for living in neighborhoods or villages where members of the Sandinista National Liberation Front had acted, and defenseless young people and children were murdered.. The Commission concluded its 1978 report by indicating that the human rights violations referred to in this report had impacted all sectors of the Nicaraguan population.  Their victims have been and are in particular people of limited economic means and youth aged 14 to 21. The harm and suffering caused by these violations have resulted, most apparently, in an intense and general feeling among the Nicaraguan population favoring the establishment of a system that will guarantee respect for human rights. IACHR, Report on the Situation of Human Rights in Nicaragua, 1979. Conclusions.

institutions.  This made possible a group of constitutional and legal reforms and political collaborative actions by means of modifications to the Nicaraguan state institutional structure, to ensure that the FSLN and PLC held power.  These reforms and actions, taken together, to be discussed in greater depth later in this report, "gave President Ortega the control over the institutions that encompass the context in which the state response to the social protests occurred from April 18 onwards."[9]

## 2.   Political, social and human rights crisis precipitated on April 18, 2018

35.   The Commission identified the wildfire in the Indio-Maíz natural reserve as immediate background to the April protests.[10]  The wildfire occurred in late March and early April 2018, in one of the country's largest reserves, and was said not to have been fully extinguished.[11]  According to information received, in protest against the weak state response to the fire, young people mobilized and were subjected to State repression.[12]

36.   Days after the fire, without prior public debate, the government published in the official gazette a reform of the social security system that increased worker and employer contributions and reduced retirement pensions by 5%, allocated to cover the medical care guaranteed under Article 3 of the Social Security Law.[13] This led to peaceful protests initially convened by older persons, which were violently repressed by shock forces on April 18.  This led to general peaceful protests throughout the country led by groups of students and young people, as well as workers, farmers, businessmen, environmentalists, and human rights defenders, and the general public.[14]

37.   The violent state response to the social protests triggered a serious political, social, and human rights crisis which, over three years later, has deepened as a result of the de facto institution of a state of emergency in the country, as well as prolonged

---

[9]   GIEI-NICARAGUA. Report on the violent events that took place in Nicaragua between April 18th and May 30th.

[10]   In 2015, the IACHR was informed of the violent State repression of the "Anti-Canal Movement" protests, aimed at suspending the project to build the inter-oceanic canal in the country. IACHR, Audencia sobre la Construcción del canal transoceánico y su impacto sobre los derechos humanos en Nicaragua, (Hearing on the construction of the inter-oceanic canal and its impact on human rights in Nicaragua) [Available only in Spanish], 154th period of sessions, March 16, 2015.  Various sources identified the repression of this movement as additional important background to the policy of state repression against the opposition. OHCHR, Human Rights Violations and Abuses in the Context of the Protests in Nicaragua, 2018, par.9.

[11]   Confidencial, Tres escenarios tras la insurrección de abril en Nicaragua, Analysis by the Center for Communications Research (Centro de Investigación de la Comunicación - CINCO), May 8, 2018.

[12]   Confidencial, Tres escenarios tras la insurrección de abril en Nicaragua, Analysis by the Center for Communications Research (Centro de Investigación de la Comunicación - CINCO), May 8, 2018; La Prensa, Así te contamos la marcha de los jóvenes que exigen una respuesta al incendio en Indio Maíz, April 12, 2018; Hoy! Marchas and contramarchas en Managua, and el incendio sigue en reserva Indio Maíz, April 13, 2018.

[13]   Resolution 1-317, Gazette No. 72, published on April 18, 2018.

[14]   IACHR, 2018 Annual Report, Chapter IVB: Nicaragua.

Nicaragua AR_001401

undermining of democratic institutions through the concentration of power in the executive branch and progressive breach of the principle of separation of powers. These factors are also the reason for the ongoing impunity surrounding the gross violations of human rights that began on April 18, 2018.

38.    As the IACHR has extensively documented, the protests that began in April 2018 were repressed through the use of lethal force by police and parapolice groups under the rule of the President, as their Commander in Chief.  A police state was also established to quell the dissidence and close democratic forums through measures taken by the National Police to deem public demonstrations illegal, arbitrarily require prior authorization for protests, and raid and seize the premises of human rights organizations and independent media outlets, among others.

39.    At an initial phase of the repression, the scale of state violence and the strategies deployed to discourage demonstrations made evident that actions coordinated by the executive branch had been taken to control the public arena.[15] In its Report "Gross Human Rights Violations in the Context of Social Protests in Nicaragua," the Commission revealed that State violence followed a common pattern marked, among others, by the excessive and arbitrary use of police force, including lethal force. Between April 18 and June 20, 2018, the repression by the police, parapolice force and groups of armed third parties had led to at least to 212 death people. Also, until June 6th, it recorded a total of 1,337 people injured.[16]

40.    The Commission also noted human rights violations at a second phase in the context of "clean-up operations" deployed by National Police agents and parastate groups to dismantle the roadblocks (*tranques*) and barricades around the country, which would increase the death toll since the start of the protests on April 18, 2018.[17]

41.    As of July 2018, the State of Nicaragua had retaken control of the streets and succeeded in removing all roadblocks.  However, in order to consolidate the "normalization" of activity in the country, in a third phase, it imposed a strategy of judicial persecution and criminalization of government dissidents, demonstrators, students, activists, and human rights defenders through unlawful and arbitrary arrests and prosecutions, based on unfounded and disproportionate charges,

---

[15]    In its Report "Gross human rights violations in the context of social protests in Nicaragua," the Commission revealed that state violence followed a common pattern, characterized by: the excessive and arbitrary use of police force, the use of groups vigilantes or shock groups with the acquiescence, tolerance and collaboration of state authorities, intimidation and threats against leaders of social movements, a pattern of arbitrary arrests of young people and adolescents who participated in protests, irregularities in the initiation of investigations regarding the murders and injuries that occurred in this context, obstacles in accessing emergency medical care for the injured, as a form of retaliation for their participation in the demonstrations, the dissemination of propaganda and stigmatization campaigns, direct and indirect censorship measures. IACHR. Annual Report 2018. Chapter IV.B Nicaragua. Para. 36. IACHR, Gross Human Rights Violations in the Context of Social Protests in Nicaragua, 2018, para 55.

[16]    IACHR, Gross Violations of Human Rights in the Context of Social Protests in Nicaragua, 2018, par. 86

[17]    IACHR, Press Release 156/18 - The Special Monitoring Mechanism for Nicaragua (MESENI) Completes Third Week in Action, Observes Tougher Repression and Raids by Police and Parapolice Groups. Washington, D.C./ Managua, July 19, 2018.

involving serious and widespread violations of judicial guarantees.[18]   In that regard, the Commission noted that the hundreds of arbitrary arrests; the selective and mass criminalization of dissidents; the systematic pattern of violations of due process guarantees; the ineffectiveness of the habeas corpus remedy [*recurso de exhibición personal*]; the excessive use of pretrial detention, the institution of prosecutions related to crimes such as  terrorism, interpreted incompatibly with an effective democratic society; failure to comply with orders for the release of protest participants in the country; and, in general, manipulation of criminal law aimed at prosecuting all of those identified as government dissidents, had made evident the lack of independence of the Nicaraguan system for the administration of justice as a whole.

42.  In December 2018, the Commission noted a fourth state repression phase characterized by the closure of democratic forums in the country through actions such as: increasing acts of aggression against and harassment of journalists; the raiding, closure, and censorship of the media; imprisonment or exile of journalists and social leaders; closure of civil society organizations without due process guarantees; continued detention and prosecution of leaders, human rights defenders, and government opponents; and arbitrary expulsion – or threat of expulsion – of naturalized persons and permanent residents because they had participated in protests.

43.  The GIEI's final report on the violent events that took place between April 18th and May 30th, 2018, confirmed that "[t]he social protests that began in Nicaragua on April 18th (...) did not result from isolated incidents, but were rather caused by years of institutional processes and State-sponsored practices that restricted the expressions of citizens, closed spaces for dialogue, compromised public institutions and concentrated power [in] the hands of President Ortega and Vice-President Murillo [duo]. This created and increasingly exacerbated the social disapproval that was demonstrated throughout the years by various forms of social expression which were violently suppressed". It also indicated that the persistent and ongoing articulation of the forces of repression, in 2018 showed that the decisions had been taken by the top State authorities.  In that regard, the GIEI considered that the State response to the demonstrations and protests occurred in the context of general and systematic attack on the civilian population and that the State of Nicaragua engaged in behavior that under international law should be considered crimes against humanity.[19]

44.  The IACHR has documented the breach from then onwards of the principle of separation of powers and the undermining of democratic institutions in Nicaragua through the concentration of power in the executive branch and the lack of independence of the judiciary and the Attorney General's Office, among others, as well as the perception of the National Assembly's operation in full alignment with

---

[18]   IACHR, Press Release, 187/18 – IACHR Calls On the State of Nicaragua to Cease the Criminalization of Protest and Respect Persons Deprived of Liberty and Their Families. Managua/Washington, D.C., August 24, 2018.

[19]   GIEI, Report on the violent events that took place between April 18th and May 30th, December 21, 2018.

the executive branch.  And the existing coordination between the National Police and groups sympathizing with the government to assault, surveil, threaten, and constantly harass anyone identified as a government opponent.

45.  In this context, the Commission noted, through its MESENI, from the latter half of 2019 onwards, patterns of human rights violations consisting of the intensification of surveillance, harassment and selective repression of social and political leaders, human rights defenders, journalists and press workers, and of anyone identified with the opposition; systematic attacks on indigenous communities and peoples; and reports of extrajudicial executions of dissidents and farmers.  The Commission expressed its concern regarding, in this fifth phase,  a continued de facto state of emergency through a police state that maintained suspended or severely limited fundamental rights, such as freedom of expression and association, which permitted no form of dissidence, the right of assembly, the protection of human rights, social protest, and participation in public affairs, thereby consolidating the most intense and systematic assault on public liberties that had occurred in the country since the start of the crisis.[20]

46.  In 2021, the IACHR has noted the intensification of a new phase of repression through a set of actions whose effect would be to end participation by the opposition in the electoral process, and to facilitate the perpetuation in power of the current authorities, in a context of widespread impunity and widespread and prolonged breach of the rule of law in the country, which the IACHR condemned.[21]

---

[20]   IACHR, Two Years into Nicaragua's Human Rights Crisis, the IACHR Stresses its Permanent Commitment to Victims and Confirms the Consolidation of a Fifth Phase of Repression, April 18, 2020.

[21]   IACHR. 93/21 - Three Years After the Start of the Human Rights Crisis in Nicaragua, IACHR Condemns Ongoing Impunity, Washington, D.C., April 19, 2021



CHAPTER 2

**PROGRESSIVE BREACH
OF THE PRINCIPLE OF
SEPARATION OF POWERS**

# PROGRESSIVE BREACH OF THE PRINCIPLE OF SEPARATION OF POWERS

47.   The human rights crisis precipitated in 2018 and the state's response thus far was enabled through the subjugation of the judiciary and the Attorney General's Office, among others, to the government's designs, clearly undermining the rule of law and democracy, evident in the disregard for the mandate of judicial independence and separation of powers, especially through the criminalization of dissidence, the lack of guarantees of the independence and impartiality of the judiciary, and the impunity surrounding human rights violations.  Moreover, the National Assembly, in full alignment with the Executive branch,[22] enacted a set of laws whose effect would be to close even further the democratic forums and silence dissidence in the country, including freedom of expression.  The events of 2021 make evident the government's intent to remain in power through a set of systematic actions aimed at thwarting opposition participation in the general elections to be held in November this year.

## A.   *Executive branch: presidential reelection without term limits and public security*

48.   From 2000 to 2018, a set of constitutional and legal reforms were enacted in Nicaragua that facilitated the control of power from the executive branch.  The first reforms were enacted during the presidency of Arnoldo Alemán. In 2007, during Daniel Ortega's second presidency, deeper reforms were made, intended to institute a model of absolute control, also made possible through the executive branch's control and influence in the legislature.

49.   In that regard, the IACHR notes that different factors, such as decisions of the Supreme Electoral Council intended to eliminate or abolish government opposition; laws in violation of international law; as well as reported electoral fraud starting with the 2008 municipal election period,[23] and 2011 national

---

[22]   In Chapter IV.B of its 2019 Annual Report, the IACHR indicated that the human rights crisis in Nicaragua had made evident that the Legislative Assembly posed no counterweight to the executive branch, a situation that had existed for several years.  In fact, in the context of the closure of democratic and protest forums in the country, the legislature approved the dissolution of nine human rights defender organizations in reprisal for their work; prolonged the mandate of the Truth, Justice, and Peace Commission, whose independence and impartiality had been constantly questioned by civil society, the families of the victims and the IACHR itself; and streamlined the enactment of a group of the laws incompatible with the right to truth, access to justice, and integral reparation for the victims of repression in April 2018. IACHR, 2019 Annual Report, Chapter IV.B Nicaragua, OEA/Ser.L/V/II. Doc. 5, February 24, 2020, pars. 47 ff.

[23]   La Prensa. Así fraguó el fraude el FSLN en 2008 and 2011. February 7, 2016. Confidencial. La maquinaria del fraude electoral del FSLN. April 12, 2021.

election period,[24] resulted in a National Assembly controlled by the governing party and its allies. Other events that facilitated this context were: cancellation of the legal status of the Sandinista Renovation Movement (MRS) on June 11, 2006[25] and the expulsion from the National Assembly of 29 opposition Deputies members of the Independent Liberal Party (*Partido Liberal Independiente* - PLI), the second electoral force at the time.[26]

## 1.    Presidential reelection without term limits

50.    Regarding the electoral system, it is important to mention the electoral reforms that facilitated the concentration of power. First, the IACHR notes the 2000 constitutional reform by which the percentage of valid votes required for election to the presidency and vice presidency of the Republic was reduced from 45% to 40%, establishing that "the candidates for those offices must obtain a relative majority of at least forty percent of the valid votes, except in the case of those with a minimum of thirty-five percent of the valid votes which exceeds the valid votes of the candidates who came in second place by a minimum of five percentage points."[27] Subsequently, with the 2014 constitutional reform,[28] the second round was eliminated and a simple majority of votes to win elections established.

51.    On the other hand, in 2009, Daniel Ortega was serving as President for a second term.  At the time, by constitutional mandate, he was prohibited from running for President in the 2011 elections. The Constitution in force in 2009, prohibited, through Article 147, the reelection of the president and vice president of the Republic to successive terms of office.[29]  The Constitution also prohibited the reelection of serving mayors and vice mayors, establishing in its Article 178 that

---

[24]    Carter Center. The November 2011 elections in Nicaragua. 2012.

[25]    CSE. Resolution of June 11, 2008, rescinding the legal status of the MRS.

[26]    BBC. El Parlamento de Nicaragua destituye a 28 diputados opositores. July 29, 2016.  Regarding this event, the IACHR expressed concern over the removal of the deputies and urged the State to adopt all measures necessary to guarantee the free exercise of political rights in the country. IACHR. 111/16 - IACHR Expressed Concern over Removal of Opposition Legislators in Nicaragua. Washington, D.C., August 8, 2016

[27]    Article 4 of the Constitutional Reform amending Article 147 of the Constitution.

[28]    Law Partially Amending the Constitution of the Republic of Nicaragua. Law No. 854. Enacted on January 29, 2014. Published in Gazette No. 26, of February 10, 2014.

[29]    "The following parties may not run for the offices of President or Vice President of the Republic: (a) Anyone who is serving or has served as President or acting President of the Republic at any time during the term in which the election is held for the following term, or anyone who has served for two presidential terms"; (b) the Vice President of the Republic or anyone called to replace him, if he has served as Vice President or as acting President during the twelve months prior to the date on which the election is held for the next National Assembly term. Text of the Constitution of Nicaragua incorporating the amendments as of September 16, 2010. Published in La Gaceta, Diario Oficial No. 176, of September16, 2010.

they could only be reelected for one term and that they could not be reelected to the immediately following term.[30]

52.   Notwithstanding the foregoing, on October 15, 2009, the executive branch together with mayors and vice mayors filed a petition before the Supreme Electoral Council (CSE) for the application of the constitutional principle of unconditional equality for participating in the political affairs of the nation, "without limitations other than age and citizen rights suspended by firm judgment,"[31] and for the inapplicability of the "Electoral prohibition on running for the offices of President and Vice President, and for Municipal Mayors and Vice Mayors."[32]

53.   On October 16, 2009, the CSE rejected the petition *ad portas*, arguing that even if the constitutional principle of unconditional equality was at odds with the principle of constitutional electoral prohibition for the president and vice president of the Republic, mayors and vice mayors "to participate successively in the electoral processes to be held as part of the November 2021 and 2022 elections[33]", it was not within its purview to resolve it.  That same day, the petitioners brought an amparo action to the Constitutional Chamber of the Supreme Court of Justice, arguing that the CSE decision "denying them the right to participate actively in the upcoming [national and municipal] elections constituted a veritable absolute political prohibition."[34]  In that regard, the IACHR notes that Article 173 of the Constitution in force at the time provided that there was no further remedy, ordinary or special, against electoral resolutions of the Supreme Court.[35]

54.   Despite the above, on October 19, 2009, the Constitutional Chamber of the Supreme Court, by Judgment No. 504, admitted the amparo action.  In its decision, it found that the CSE had exclusive electoral jurisdiction but not exclusive administrative jurisdiction, where it was in fact subject to jurisdictional control; that, regarding the offices of president and vice president of the Republic, and municipal mayor and vice mayor, there was unequal treatment regarding the right to run successively for the same public office in the subsequent elections and, therefore, it declared inapplicable Article 147.a of the Constitution.[36]  It also ordered the CSE to issue a certificate declaring the petitioners "to be citizens

---

[30]   National Assembly. Text of the Constitution of Nicaragua incorporating the amendments as of September 16, 2010. Published in La Gaceta, Diario Oficial No. 176, of September 16, 2010.

[31]   Judgment No. 504 of the Constitutional Chamber of the Supreme Court, of October 19, 2009.

[32]   According to the petitioners' argument, the provision generated inequality in and before the law "since it only applies to directly popularly elected offices whose represented [sic] were democratically elected," and not to other "directly popularly elected offices, such as National Assembly Deputies, Central American Parliament Deputies, Members of the Councils of the Atlantic Coast Autonomous Regions, and indirectly elected offices, such as Supreme Electoral Council (CSE) magistrates, Prosecutor of the Republic, Member of the Office of the Comptroller General of the Republic, Prosecutor for Human Rights Protection, Overseer [Intendente] and Superintendent of Banks, and the Supreme Court of Justice magistrates, among others." Constitutional Chamber of the Supreme Court. Judgment No. 504, of October 19, 2009.

[33]   Constitutional Chamber of the Supreme Court. Judgment No. 504, of October 19, 2009.

[34]   Constitutional Chamber of the Supreme Court. Judgment No. 504, of October 19, 2009.

[35]   1987 Constitution of the Republic of Nicaragua, Articles 147, 173, and 178.

[36]   Constitutional Chamber of the Supreme Court. Judgment No. 504, of October 9, 2009.

enjoying political – constitutional – electoral rights to participate in the elections to be held in 2011 and 2012, in the same offices they now hold, as candidates for president – vice president – mayor – and vice mayor, respectively,"[37] and ordered the referral of the case to the plenary of the Court for endorsement and its erga omnes effectiveness.

55.     On September 30, 2010, the plenary of the Supreme Court, by Judgment No. 6, confirmed Judgment No. 504 of the Constitutional Chamber and declared the inapplicability erga omnes of the constitutional provisions of Articles 147.a and b, and 178.[38]  Therefore, the IACHR notes, despite the constitutional prohibition, the decisions of two branches of government (Supreme Electoral Council and judiciary) allowed Daniel Ortega to run for the presidency in the November 2011 elections.

56.     Subsequently, by a 2014 constitutional reform,[39] the National Assembly – controlled by the party affiliated with the executive branch – repealed Article 147 of the Constitution that prohibited immediate reelection to the presidency of the Republic and authorized presidential reelection without term limits, which has allowed Daniel Ortega to remain as President.[40]

57.     In that regard, the IACHR has held that reelection without term limits and/or the same person serving as president for lengthy periods in certain contexts where there are no safeguards or adequate guarantees for the independence of democratic institutions, may pose some risks to the representative democratic system, fundamental pillar of the inter-American system.  To the extent that the authority in charge has the authority of nomination in the oversight bodies and other branches of government, his or her prolonged or indefinite tenure may generate a concentration of power rendering illusory the institutional equilibrium of the system of weights and counterweights, and ultimately undermine the bases of democracy, such as alternation in office and access to power as a guarantee of pluralism.[41]

58.     For its part, the Inter-American Court has held that authorizing presidential reelection without term limits is inconsistent with the principles of representative

---

[37]     Constitutional Chamber of the Supreme Court. Judgment No. 504, of October 9, 2009.

[38]     The Supreme Court wrote that:  "THIS SUPREME COURT OF JUSTICE considers and confirms that both the President of the Republic, Commander José Daniel Ortega Saavedra and the Mayors to which Judgment No. 504-2009 applied have the right to run in the national and municipal elections of 2011 and 2012 respectively, and any elections held thereafter; the former for President of the Republic and the latter for Mayors, since, as indicated in Judgments No. 504-2009 and 67-201, text of which is reiterated here: "The Principle of Popular Sovereignty and the Right to Elect and to be Elected may not be altered even by derived constituent power, since it is an essential substantive human right.  Supreme Court of Justice. Judgment No. 6, of September 30, 2010.

[39]     Law Partially Amending the Constitution of the Republic of Nicaragua. Law No. 854. Enacted on January 29, 2014. Published in Gazette No. 26, of February 10, 2014.

[40]     IACHR, 2018 Annual Report, Chapter IVB-Nicaragua. OAS, Electoral Accompaniment Mission Report. General Elections in the Republic of Nicaragua, November 6, 2011.  See also: The Carter Center, The November 2011 Elections in Nicaragua.  Study Mission Report, available at: www.cartercenter.org.

[41]     IACHR, Report No. 303/20. Case 13.727, Report on the Merits, Fabio Gadea Mantilla, Nicaragua, par. 78.

democracy, and, therefore, with the obligations set forth in the American Convention and Declaration of the Rights and Duties of Man.[42]

59.   In that regard, the Court has held that the aim of prohibition of indefinite mandates is to prevent people who hold popularly elected office from keeping themselves in power. It has also emphasized that representative democracy is characterized by the fact that the people exercise power through their representatives as are established by the Constitution, who are chosen in elections based on universal suffrage.

> Perpetuation of individuals in public office entails the risk that the people will cease to be duly represented by their elected leaders, and that the system of government may come to resemble an autocracy more than a democracy.[43]

60.   The Inter-American Court also held that enabling presidential reelection without term limits by allowing the incumbent president to run for reelection has serious consequences in terms of access to power and the functioning of democracy in general. Therefore, the removal of limits preventing presidential reelection without term limits must not be subject to being decided by the will of the majority or their representatives for their own benefit.[44] The Court also held that, as a general rule, the risks to democracy in the region of presidential reelection without term limits have materialized, and it concluded that enabling presidential reelection without term limits keeps political forces other than the person holding the office of president from gaining popular support and being elected, it affects the separation of powers and, in general, weakens the functioning of democracy.

61.   Finally, both the Commission and the I/A Court of H.R. have pointed out that the right to be reelected is not recognized in the American Convention on Human Rights. Specifically, the Inter-American Court established that indefinite presidential re-election is not protected as an autonomous right.[45] Likewise, it is not recognized in the Convention or the American Declaration, and in general, in the *corpus iuris* of international human rights law, in other international treaties, in regional customary law, or in the general principles of law. [46]

62.   In parallel, the IACHR notes that the Alemán-Ortega pact enabled Electoral Law No. 331 to be enacted in 2000, as well as the successive reforms thereto until 2021, which, together, "Far from increasing democratic participation and ensuring free,

---

[42]   IA Court HR. Advisory Opinion OC-28/21. Presidential Reelection without Term Limits in Presidential Systems in the Context of the Inter-American Human Rights System, June 7, 2021.

[43]   IA Court HR. Advisory Opinion OC-28/21. Presidential Reelection without Term Limits in Presidential Systems in the Context of the Inter-American Human Rights System. June 7, 2021, par. 73.

[44]   IA Court HR. Advisory Opinion OC-28/21. Presidential Reelection without Term Limits in Presidential Systems in the Context of the Inter-American Human Rights System. June 7, 2021, par. 144.

[45]   IA Court HR. Advisory Opinion OC-28/21. Presidential Reelection without Term Limits in Presidential Systems in the Context of the Inter-American Human Rights System. June 7, 2021, par. 91-102.

[46]   IA Court HR. Advisory Opinion OC-28/21. Presidential Reelection without Term Limits in Presidential Systems in the Context of the Inter-American Human Rights System. June 7, 2021, par. 91-102.

fair, competitive, legitimate, appropriately monitored elections, the reform in question", introduce changes that restrict electoral competition and the exercise of political rights.[47]

63. In that regard, the IACHR notes that the 2000 text eliminated the legal definition of "public association for candidate nomination" ("asociaciones de suscripción popular") for participating in elections, restricting political participation in electoral processes to political parties. Specifically, the Electoral Law No. 331 of 2000 restricts the participation in electoral processes to the figure of political parties. A form of organization that is not typical within indigenous and ethnic communities of the Atlantic Coast It also limited the formation of political parties, their form of membership and how they obtain legal status and established additional grounds for the suspension and cancellation of their legal status.[48] As a result of this reform, indigenous and ethnic communities were excluded from participating in the 2000 municipal elections. For this reason, the Yapti Tasba Masraka Nanih Asla Takanka (YATAMA) indigenous organization lodged a complaint before the IACHR, which was declared admissible,[49] and, having analyzed the merits of the case, referred it to the IA Court HR.

64. In its 2005 judgment, the Inter-American Court declared the international responsibility of the Republic of Nicaragua for violation of the political right of the candidates nominated for election by YATAMA.  The Court also found that there was no judicial remedy available to counter the decisions issued by the CSE, and that Electoral Law No. 331, of 2000, was ambiguous because it failed to establish clearly the consequences of failure to comply with certain requirements, both for those participating through a party and those participating through an alliance of parties, and ordered the State of Nicaragua to make the following legislative modifications:

- Establish a simple, prompt and effective recourse to contest the decisions of the Supreme Electoral Council that affect human rights;

- Reform the electoral law so that it regulates clearly the consequences of failure to comply with the requirements for electoral participation, the procedures that the Supreme Electoral Council should observe when determining such non-compliance, and the reasoned decisions that this Council should adopt in this regard, as well as the rights of the persons whose participation is affected by a decision of the State;

---

[47] IACHR. Press Release. 122/21 - The IACHR Expresses Concern over Electoral Reform Passed in Nicaragua and Calls on State to Guarantee Free and Fair Elections. May 14, 2021

[48] Law No. 331. Electoral Law with incorporated amendments.  Enacted on May 26, 2012, published in La Gaceta No. 168 on September 4, 2012.

[49] IACHR. Admissibility. Report No. 125/01, Case 12.388, YATAMA.

Nicaragua AR_001411

- Reform the regulation of requirements established in the Electoral Law that have been declared in violation of the American Convention on Human Rights; and

- Adopt, within a reasonable time, the necessary measures to ensure that the members of the indigenous and ethnic communities may participate in the electoral processes effectively and according to their traditions, practices and customs.[50]

65. As of the date of adoption of this report, the information available suggests that the State of Nicaragua has not complied with the judgment, this meaning, according to the Inter-American Court itself, "frontal disregard for the obligations arising from the judgment issued by the Court and the State Party's commitments under the Convention, which inhibits reparation for the human rights violations declared in the judgment and divests the Convention of its effectiveness in the instant case."[51]

66. In another vein, and in addition, in application of Electoral Law No. 331, on June 11, 2008, the CSE canceled the legal status of the Sandinista Renovation Movement (MRS), arguing that incurred in grounds of "self-dissolution," as provided by Article 74.3[52] of that law, which excluded the organization from participating independently in the municipal and national elections.[53]

67. It is important to note that the OAS General Assembly has deemed essential to adopt measures to promote free and fair elections in Nicaragua.  Notable among them are:  (a) modernization and restructuring of the Supreme Electoral Council to ensure it operates in a fully independent, transparent, and accountable fashion; (b) a pluralistic political process leading to the effective exercise of civil and political rights, including the rights of peaceful assembly and freedom of expression, and open registration of new political parties; (c) independent technical review and updating of voting registries and independent audit of voter rolls; (d) independent, credible, and accredited international electoral observation; and (e) transparent and effective voter registration, ID card distribution, and voting center management (…).[54] As of the date of adoption of this

---

[50] IA Court HR. Case of Yatama v. Nicaragua. Preliminary Objections, Merits Reparations and Costs. Judgment of June 23, 2005. Series C No. 127.

[51] IA Court HR. Caso Yatama Vs. Nicaragua. Supervisión de Cumplimiento de Sentencia. [Monitoring Compliance with Judgment. [Only in Spanish]

[52] CSE. Resolution of June 11, 2008, rescinding the legal status of the MRS.

[53] IACHR, Report No. 18/19, Petition 1261-08, Sandinista Renovation Movement et al., February 24, 2019.  On that occasion, the legal status of the Conservative Party (PC) was also canceled, which the CSE restored in May 2010. La Prensa. CSE regresa diputación and personería a conservadores [CSE restores the deputies and legal status of the conservatives], May 19, 2010.

[54] "Restoring Democratic Institutions and Respect for Human Rights in Nicaragua through Free and Fair Elections." Adopted by the OAS General Assembly at its 50th regular session, AG/CG/doc.5 (L-O/20), Washington, D.C., United States of America, October 21, 2020.

report, none of the measures proposed by the OAS General Assembly has been implemented.

## B.   *State security forces*

68.   At the Executive Branch level, the Commission notes with concern how state security entities and institutions have played an important part of the process of concentrating and maintaining power through the manipulation, control, and diversion of functions of the National Police and the Army, and the creation of apparata for control and surveillance of the citizenry, especially of the political opposition, as is analyzed below.

### 1.   National Police

69.   The National Police force was founded in 1979, only a few months after the overthrow of the Somoza dictatorship.  Nicaraguan sociologist Elvira Cuadra Lira notes that, in 1990, "with the electoral defeat of the Sandinista Revolution and the change of government that paved the way for the political transition, the police were confronted with many and prolonged social conflicts.  With its forces depleted, without the necessary equipment, and with compromised citizen confidence, the institution embarked upon a professionalization and modernization process that gained national and international recognition." [55]

70.   Subsequently, as documented by GIEI-Nicaragua, Daniel Ortega's ascent to the presidency in 2007 also marked a major change in the conception of the State whereby a subordinate police force was essential to the regime. Accordingly, it was necessary to reform the institution to alter its nature and ends, from an institution charged with ensuring the rights of all citizens to one that had to act in concert with the party allegiances that created it.[56]  The IACHR also notes the mounting political violence as of that year, as well as the number of reports and signs of police participation in repressive and violent actions where abuse of authority, disproportionate use of force, and impunity were evident.[57]  In that regard, the

---

[55]   Cuadra Lira, Elvira. Dispositivos del silencio: Control social y represión en Nicaragua [Apparata of silence: Social control and repression in Nicaragua] (Clacso, 2018).

[56]   GIEI-NICARAGUA. Report on the violent events that took place in Nicaragua between April 18th and May 30th.

[57]   As reported by various human rights organizations and security specialists, as well as obstructing marches with anti-mortar devices, the PN beat people, manifestly abusing their authority, made disproportionate use of force, and made brutal and cruel arbitrary arrests.  In the vast majority of cases, no investigations were reported, and few police involved were punished.  Some of the most relevant cases were: the conflict and violence stemming from the results of the 2008 municipal elections; the El Carrizo massacre during the 2011 presidential elections; the 2013 assault on the #OcupaInss protest; repression of a sugar workers march in Chichigalpa; the march marking March 8, 2014, in Managua; the 2015 Las Jagüitas massacre; the negligence, omission, and aggression against protesters during the "Protest Wednesdays" against the Supreme Electoral

IACHR notes that since 2008, civil society organizations have reported the promotion of selective government political persecution through a disregard for political rights, freedom of demonstration, of association, of expression, and of participation, among others, with different mechanisms against a deteriorated democracy, paving the way for the consolidation of an authoritarian regime.[58]

71. In 2014, Law 872 was enacted, "on the organization, functions, career, and special social security regime of the National Police (PN)."[59]  By virtue of that law, the National Police came to be directed by the president of the Republic it his capacity as Commander in Chief, with authority to order the use of National Police forces and resources in accordance with the Constitution and the law, thereby eliminating the Interior Ministry (Ministerio de Gobernación) as an intermediary oversight and control entity between the president and the police institution leadership.

72. This reform gave the president the authority to designate the Director General of the National Police from among the members of the National Leadership Board [*Jefatura Nacional*] and to remove him for "disobeying the orders of the President of the Republic in his capacity as Commander in Chief of the National Police in the exercise of his authorities."[60] It also established that out of "institutional interest, the time of active service of general officers may be extended by the President of the Republic and Supreme Chief of the National Police, and, for the rest of the police hierarchy, by the Director General of the National Police" and the authority to call up "retired officers of the National Police to carry out specific missions in special cases, to be reincorporated through contract."[61]

73. In its chapter on "Community Participation in Citizen Security," the law provided that the National Police were to "enhance surveillance and citizen and human security in the communities to strengthen the security of persons and their property" and created the "Voluntary Police as a National Police auxiliary and support body, composed of Nicaraguan citizens who provide their service on a voluntary and temporary basis."[62]

74. The IACHR notes that, in addition to the institutional changes introduced through the 2014 legislative reform, among the most evident executive branch transgressions into the police institutional structure were:  the prolongation of the

---

Council; the police obstruction of the farmers march to Managua and the miners protest in the town of El Limón; in 2015 and 2016, the government obstruction and repression of various protest demonstrations against irregularities in the presidential electoral process; and, in 2017, three cases of police or military brutality:  the murder of 15-month-old child Daira Junieth Blandón; the murder of Ms. Elea Valle's two minor children in an alleged confrontation between irregular armed groups and joint police and army forces; and the beating of farmer Juan Lanzas. GIEI-NICARAGUA. Report on the violent events that took place in Nicaragua between April 18th and May 30th.

58    IACHR, Public Hearing, Freedom of expression and political rights in Nicaragua, October 27, 2008.

59    Law 872, enacted on July 1, 2014, published in La Gaceta on July 7, 2014.

60    Law 872, enacted on July 1, 2014, published in La Gaceta on July 7, 2014, Article 10

61    Law 872, enacted on July 1, 2014, published in La Gaceta on July 7, 2014, Article 38.

62    Law 872, enacted on July 1, 2014, published in La Gaceta on July 7, 2014, Articles. 22 and 23.

tenure of the former First Commissioner National Director Aminta Granera for consecutive terms, from 2006 to 2018,—although the law only permitted one term in that post;[63] the promotions in rank and posts granted to officers prior to the established time in exchange for their loyalty; and the appointment by the Director General of the National Police of one of her in-laws, Francisco Javier Díaz Madrid, by Presidential Agreement 98-A- 2018, of July 5, 2018.   He exercised these functions until September 5, 2018, date on which he was promoted to First Commissioner by Presidential Agreement 130-A- 2018.[64]

## 2.   Army

75.   In another vein, the IACHR notes that following the 1979 overthrow of the Somoza dictatorship, the Sandinista Popular Army was created, conceived "as an army to defend the Revolution's political agenda."   In 1990, the institution changed its name to Army of Nicaragua and embarked upon a modernization and professionalization process.   The IACHR notes that, according to available information, the Army's 1990s decision to refrain from involvement in domestic conflicts, even when police capacities were overwhelmed by the violence and high level of social mobilization, boosted "public confidence in the military institution and its credibility."[65]  Subsequently, by virtue of presidential initiative No. 290, of 2007, whose aim was subordination of the army to the executive branch, which gained traction, the President implemented a "co-optation strategy (...) based on: reiteration of the government rhetoric that constantly reminded the army and police of their political origins and former party ties; the expansion of military autonomy, enabling it to create companies and perform different types of economic activities; and the designation of officers, active or retired, to key public offices, such as social security, construction and diplomacy."[66]

76.   By 2010, a kind of strategic agreement was established between the army and the government which would become evident in light of the set of reforms to the military institution's normative framework implemented the following year. Specifically, the laws enacted in 2010 were: (a) the National Defense Act, the Borders Legal Regime Act, and the Democratic Security of the Republic of

---

[63]   She finally retired by Presidential Agreement 113-A- 2018, of July 31, 2018.

[64]   GIEI-NICARAGUA. Report on the violent events that took place in Nicaragua between April 18th and May 30th.

[65]   Elvira Cuadra Lira. La perversión de la fuerza: el Ejército y la Policía en la crisis nicaragüense. Flasco Costa Rica. 2020.Elvira Cuadra Lira. La perversión de la fuerza: el Ejército y la Policía en la crisis nicaragüense. Flasco Costa Rica. 2020.

[66]   Elvira Cuadra Lira. La perversión de la fuerza: el Ejército y la Policía en la crisis nicaragüense. Flasco Costa Rica. 2020.Elvira Cuadra Lira. La perversión de la fuerza: el Ejército y la Policía en la crisis nicaragüense. Flasco Costa Rica. 2020.

Nicaragua Act; and (b) the Constitution and Military Code reforms, implemented in 2014; and (c) the Sovereign Security Act, enacted in 2015.[67]

## 3.    Parastate groups

77.    In its report on its working visit to the country, published in June 2018, the IACHR noted the participation by parapolice groups and shock groups or Sandinista mobs, which acted with the acquiescence, tolerance, and collaboration of state authorities, specifically, the Police.[68] In the present report, the IACHR defines "parastate groups" as groups that perform repressive functions and act in coordination with the National Police or the Army.  This in direct subordination to the presidency, vice presidency of the Republic and/or municipal mayors.  They are shock groups or Sandinista mobs, and paramilitary groups.

78.    The "shock groups," also known as Sandinista mobs, were formed in late 2007 and early 2008.  The IACHR expressed concern, in the context of the November 2008 elections, regarding the violent events stemming from the elections, noting that "individuals armed with sticks, stones, machetes, and homemade mortars participated in the street confrontations that took place after the November 9 municipal elections, resulting in several injuries."[69]

79.    As amply documented by GIEI-Nicaragua, the shock groups or Sandinista mobs are composed of members of the Sandinista Youth, residents of poor neighborhoods, and gang members or former gang members, among others, recruited by political leaders, the Citizen Power Bureaux (GPC), town halls, and state institution staff members.[70]  Their participation in attacks and assaults on the political opposition or those expressing social discontent has also been a constant of the Ortega government's eleven years.

80.    As a relevant background, it should be noted that, in 2007, Daniel Ortega formed a paramilitary group known as the "blue shirts" for the color of their clothing, to

---

[67]    Elvira Cuadra Lira. La perversión de la fuerza: el Ejército y la Policía en la crisis nicaragüense. Flacso Costa Rica. 2020.Elvira Cuadra Lira. La perversión de la fuerza: el Ejército y la Policía en la crisis nicaragüense. Flacso Costa Rica. 2020.

[68]    IACHR, Gross Violations of Human Rights in the Context of Social Protests in Nicaragua,, June 2018, par. 58 and ff.; IACHR, Press Release 124/18, IACHR Urges  Nicaragua to Dismantle Parapolice Groups and Protect the Right to Peaceful Protest, June 1, 2018.

[69]    IACHR. Press Release 51/08 - IACHR Expresses Concern ever Electoral Situation in Nicaragua, November 25, 2008.

[70]    Since 2011, the heads of gang youth reintegration centers have been issuing public warnings about recruitment by governing party political secretaries and weapons supplied for participation in assaults on political opposition groups.  The most serious case was that of the youth Samir Matamoros, who shot at a protest demonstration on the days that came to be known as "protest Wednesdays," outside the Supreme Electoral Council.  The youth had been a gang member, went through a reintegration process, and was pressured by government sympathizers to form shock groups. GIEI-NICARAGUA. Report on the violent events that took place in Nicaragua between April 18th and May 30th.

strengthen his security. They were composed of former military members, and had "a quasi-military structure, [used] weapons of war, and [carried out] military operations."[71]  Their presence was to be noted as a security force for Daniel Ortega in public activities in which the president was participating, and were used "to strike hard,"[72] violently repressing demonstrations protesting against the government and citizen protests rejecting electoral processes denounced as irregular.[73]

81.  The recruiter and head of the "blue shirts" was Manuel Alí Rivas Vallecillo, FSLN militant, Ortega confidant, and head of Ortega's security team in the 1980s.  In July 2010, Rivas Vallecito was designated the President's security advisor by presidential decree.[74]  In a report published in 2010, the Nicaraguan Center for Human Rights (*Centro Nicaraguense de Derechos Humanos* - CENIDH) considered that "the objective may have been to accord institutional status to a paramilitary group."[75]  This because the new advisor showed himself to be an unconditional loyalist to the president and completely independent from the police and Army themselves.  That same year, the President decided to promote officers also showing themselves to be his unconditional loyalists.[76]

82.  In the context of the state repression of social protests that began on April 18, 2018, initially, the state of Nicaragua had denied any linkage with parapolice forces.[77]  Through a public statement of May 31, 2018, published the day after the repression of the march that took place in support of the Madres de Abril (April Mothers), it stated that "in Nicaragua there is no there are shock forces or paramilitary groups related to the Government." Later, in public interviews, Daniel Ortega acknowledged their existence, stating that they were" right-wing groups," and later stated that they were only sympathizers of the Sandinista Front organized to

---

[71]   Cuadra Lira, Elvira. Dispositivos del silencio: Control social y represión en Nicaragua, op. cit. (Clacso, 2018).

[72]   La Prensa, Profesión: apalear, November 15, 2009; El Nuevo Diario, Condenan agresión de "camisas azules", December 20, 2007.

[73]   OHCHR, Human Rights Violations and Abuses in the Context of the Protests in Nicaragua, August 2018, p. 37. Centro Nicaraguense de Derechos Humanos (Nicaraguan Center for Human Rights-CENIDH, its Spanish acronym), Informe Impunidad de las Violaciones los Derechos Civiles y Políticos en Nicaragua en el contexto de Debilitamiento Institucional (Report on Impunity Surrounding the Violations of Civil and Political Rights in Nicaragua in the Context of the Undermining of Institutions) (Available only in Spanish), 2014.

[74]   Presidential Decree 28-10, Gaceta No. 113, Wednesday, July 16, 2010. La Prensa, Ortega crea unidad de seguridad paralela, July 8, 2010.

[75]   CENIDH. Derechos Humanos en Nicaragua 2010 (Human Rights in Nicaragua 2010) (Available only in Spanish).

[76]   CENIDH. Derechos Humanos en Nicaragua, 2010, p. 46.

[77]   On May 27, the National Police indicated that, as a result of the National Dialogue, police forces would stay in their stations to guarantee peaceful marches and that their agents would not be present in the vicinity of university campuses. In the same communiqué, the police denied they had any ties with parapolice forces. National Police, Nicaragua, Nota de Prensa 25-2018, May 27, 2018; in public statements, the Vice-President of Nicaragua indicated: "In Nicaragua there are no riot squads or paramilitary groups with ties to the government, therefore we cannot accept accusations of painful and tragic events that we have not provoked, that we will never provoke, and that, on the basis of groundless accusations, attempts are made to restrict the enforcement of the Constitutional Duty of Law Enforcement Forces to contribute to the safety of the Families." El 19 Digital, Declaraciones de Rosario Vicepresidenta de Nicaragua en Edición del Mediodía de Multinoticias, May 31, 2018.

defend themselves.[78] Nevertheless, after the implementation of the "clean-up operations"" for the lifting of roadblocks (*tranques*), on July 20, President Daniel Ortega asserted that the groups who participated in the clean-up operations were "volunteer policemen" and cited security reasons to justify their undercover operations.[79] Also, the State inform to the IACHR that, in all interventions to restore public order "only participate professional police forcers and volunteers"[80]. Regarding this, in its annual report of 2018, the Commission observed that the establishment and actions of parapolice forces and riot squads do not pertain to the duties of the Voluntary Police Force or for the purposes of their functioning as provided for in Law 872.[81]

## 4.   Surveillance apparata and political control

83.   The IACHR notes that, in parallel, beginning in 2007, the government instituted in Nicaragua a citizen surveillance and control system, organized territorially as Citizen Power Councils and Bureaux, and the Sandinista Leadership Committees.

### 4.1   Citizen Power Councils and Bureaux

84.   By Executive Decree no. 112, of November 29, 2007, President Daniel Ortega created the Citizen Power Councils (CPC) and the Citizen Power Bureaux (GPC) "so that the Nicaraguan people, in the exercise of direct participatory democracy by the country's various social sectors, organize and participate directly and actively in the nation's integral development and support the plans and policies of the President of the Republic designed to implement these objectives," with a presence "in the communities, regions, neighborhoods, districts, municipalities,

---

[78]   Confidencial, "Diez mentiras de Daniel Ortega", 10 septiembre de 2018; Confidencial, Ortega ofrece su "régimen de terror" hasta 2021, 24 de julio de 2018; Fox News, Bret Baier interviews President Daniel Ortega, 23 de Julio de 2018.

[79]   *Euronews*, "Euronews entrevista al presidente de Nicaragua Daniel Ortega sobre la mortal crisis del país", July 20, 2018.

[80]   State of Nicaragua, State's Observations on the "Chapter IV. B- Annual Report of the IACHR", February 22, 2019. p. 29.

[81]   According to Law 782, in its Article 25, The members of the Voluntary Police shall only carry out support tasks in prevention activities such as: 1) Assist the Police in surveillance, patrolling, controlling traffic, and natural disasters. 2) Assist the authorities when they are aware of the perpetration of criminal incidents, safeguarding the place, providing the necessary help to victims, and providing timely reports to the authorities having jurisdiction. In addition, "The members of the Voluntary Police, for the fulfillment of their tasks, shall be duly identified by wearing uniforms and their own badges, their activity must always be coordinated and supervised by a member of the National Police, and in their actions they are governed by the basic principles underlying the institution's performance." Nicaragua, Law 872. Organización, funciones, carrera y régimen especial de seguridad social de la Policía Nacional, July 7, 2014.

departments, autonomous regions, and nationwide."  Together with the CPC and GPC, he created a National Citizen Power Bureau.[82]

85.     Regarding the above, at a public hearing held in 2017, the IACHR was informed of the subsequent political agreements between the Liberal Constitutionalist Party and the Sandinista National Liberation Front that rendered partisan the entire State institutional structure.  According the to information received, President Daniel Ortega, since his ascent to the presidency on January 10, 2007, has disregarded the institutional structure by creating Councils that compete with institutions, including state institutions – parallel institutions that have come to usurp the powers accorded by law to the ministries and state entities. The organizations maintained that the institutional structure created for the implementation of citizen participatory processes has essentially been disregarded and restrictions imposed on the creation of forums for civil society-State communication. By these means, the President has concentrated power in himself.[83]

86.     According to the civil society organizations, the CPC were partisan shock forces to obstruct demonstrations or any form of protest or complaint to the government.[84] This organizational and citizen participation structure became part of the National Economic and Social Planning Council (CONPES).  Rosario Murillo, Ortega's wife, and who was the Coordinator of the Secretariat of Communication and Citizenship, was appointed as executive secretary of Conpes. For his part, Gustavo Porras, then a deputy of the National Assembly and president of the Assembly since 2017, was appointed as deputy executive secretary[85].

87.     The CPCs were divided into different groups to address topics of interest to the community, such as health, education, housekeeping, etc.  Among the first working groups were those related to citizen security.   In November 2007, the citizen security CPCs replaced the Crime Prevention Committees, the form of organization and citizen consultation promoted by the Police for coordination of crime and delinquency prevention activities in poor neighborhoods and communities.[86]

88.     In 2014, the National Assembly enacted the Family Code, creating the Family, Community, and Life Bureaux,[87] with presence "at the departmental, municipal,

---

[82]    Presidential Decree 112-2007, Creation of the Citizen Power Councils and Bureaux, enacted on November 29, 2007 and published in La Gaceta No. 230, of November 29, 2007.

[83]    IACHR, Public Hearing, Situation of Human Rights in Nicaragua, 127th period of sessions, March 1, 2007. See also, IACHR, Public Hearing, Administration of justice in Nicaragua, 131st period of sessions, March 12, 2008.

[84]    IACHR, Public Hearing, Freedom of expression and political rights in Nicaragua, 133rd period of sessions, October 27, 2008.

[85]    Notimérica. Nicaragua. El presidente de Nicaragua, Daniel Ortega, crea los Consejos del Poder Ciudadano por decreto.

[86]    Cuadra Lira, Elvira. Dispositivos del silencio: Control social y represión en Nicaragua. Clacso, 2018.

[87]    Law 870 – Family Code, published in La Gaceta No. 190, of October 8, 20014; Preliminary Title, Chapter V. Article 32 reads: "The Family, Community, and Life Bureaux are organized with persons, women, men, youth,

neighborhood, and rural levels." Through this reform, the Family Bureaux were formally institutionalized, replacing the CPC, which meant that they even had public budgetary allocations.[88]

89. In the context of the crisis that began on April 18, 2018, the IACHR received information on the active participation of the formerly known CPCs in the criminalization of people opposed to the government. In particular, the IACHR warned about illegal raids and arrests that were made from lists drawn up with the intelligence work of the former CPCs, who report directly to the vice presidency. In these cases, after identifying the opposition persons, police and parapolice groups entered their homes under use of force and without a court order[89].

### *4.2   Sandinista Leadership Committee*

90. The Sandinista Leadership Committees, part of the FSLN structure, and the Sandinista Youth, established themselves in public institutions to ensure public employee participation in activities such as marches, occupation of roundabouts and traffic circles in the city of Managua, counter-marches, fairs, and other political acts.[90] They are also responsible for surveillance of public employees who are not government sympathizers.[91]

### *4.3   National Sovereign Security System*

91. In addition to these security actions, in December 2015, the National Assembly enacted Law 919, on Sovereign Security, creating the National Sovereign Security System "as a group of actions intended to guarantee the security of Nicaraguans through ongoing coordination and cooperation in this field among the State institutions. They fulfill their function through basic and specialized operations, using human resources and technical means." The System is coordinated by the President of the Republic and the Army of Nicaragua, with the Department of Information for Defense of the Army of Nicaragua being the Executive Secretariat.[92]

---

*and older people living in a community, to reflect and work together. Promoting family values and family unity, self-esteem and esteem for others, responsibility, rights and obligations, communications, coexistence, understanding, and community spirit with a view to achieving consistency between what is, what is thought, and what is done. The Family, Community, and Life Bureaux draw their inspiration from Christian values, Socialist ideals, and solidarity-based practices.*

[88]   Cuadra Lira, Elvira. Dispositivos del silencio: Control social y represión en Nicaragua. Clacso, 2018.

[89]   IACHR, 2018 Annual Report, Chapter IV.B – Nicaragua.

[90]   Cuadra Lira, Elvira. Dispositivos del silencio: Control social y represión en Nicaragua (Clacso, 2018).

[91]   Confidencial, Habla exsecretaria política del FSLN en el Banco Central, Ligia Gómez,  November 18, 2018.

[92]   Law No. 919 on Sovereign Security. Enacted on December 2, 2015, and published in la Gaceta No. 241, of December 18, 2015.

92.   This law defines as anti-sovereign security action all unlawful human conduct that poses a risk or threat to sovereign security: risks to sovereign security are those uncertain or random hazardous natural or human factors with a high level of uncertainty that do not yet pose a threat to sovereign security and are expressly defined by law; and threats to sovereign security those unambiguous natural factors or unlawful acts that at time of evaluation are real, have the capacity and intent to cause harm, and are expressly defined by law.[93]

93.   Article 14 of said law provides that the "activities of the National Sovereign Security System, and its organization and internal structure, means and procedures, personnel, facilities, databases and data centers, sources of information, and information and/or data that may lead to knowledge of the above-mentioned matters are confidential public information, as provided in Law No. 621, Access to Public Information Act, published in La Gaceta, Diario Oficial No. 118, of June 22 2007."

94.   According to CENIDH, the Sovereign Security Act has had major impact on human rights because it militarizes citizen security matters, predominantly under the Army of Nicaragua, and the risks this poses for the rights of the public, and because its definition of threat to security is broad and leaves a great room for discretion.[94] In its 2015 Annual Report, the Commission indicated, regarding this law, that the "laxity with which some sovereign security objectives are addressed, and the definition of threat itself and of other terms used in the text could facilitate military interventions in domestic affairs, especially in the context of protests and public demonstrations."[95]

## C.   *The Justice Administration System*

### 1.   The Judiciary

95.   The Commission underscores how important an efficient and independent administration of justice is to strengthen democracy and making the rule of law fully effective.  A judiciary that meets such standards is able to curtail abuses and guarantee lawfulness and the protection of the rights of all people.

96.   In this sense, the IACHR has previously noted that the State of Nicaragua lacks an independent judiciary as a result of its appointment processes, impacted by factors

---

[93]   Law No. 919, on Sovereign Security. Enacted on December 2, 2015, and published in la Gaceta No. 241, of December 18, 2015, Article 5.

[94]   CENIDH, Derechos Humanos en Nicaragua, Informe 2015.  See also: La Prensa: Vigente ley de seguridad soberana que "militariza el Estado", December 26, 2015; and Ley de Seguridad Soberana: ¿Por qué es polémica?, October 28, 2015; El Nuevo Diario, Entra en vigencia Ley de seguridad soberana, December 24, 2015.

[95]   IACHR, 2015 Annual Report, Chapter IV.A *Use of Force*, par. 31.

such as nepotism and official party influence and manipulation.[96]   In particular, through the 2000 constitutional reform, the National Assembly added judiciary and electoral authority posts. In each case, the number of Supreme Electoral Council judges and co-judges (alternates) rose from 12 to 16.[97]   The number of the Supreme Electoral Council (CSE) principal members (*proprietarios*) rose from five to seven, with three alternates, and the Higher Council of the Office of the Comptroller General of the Republic was created, composed of five member comptrollers and three alternates.[98] This 2001 reform meant that the highest judiciary posts, including electoral posts, were divided between the FSL and the PLC.

97.   These changes to the number of members of these entities in practice made possible a hybrid system:  the CSE was composed of four Sandinista Front affiliates and three Liberal Party affiliates.   Similarly, the CSJ was composed of eight governing party and eight Liberal Constitutionalist Party affiliates.[99]

98.   In 2010, President Daniel Ortega issued Executive Decree 3-2010,[100] extending the tenure of all authorities of the branches of government and State institutions, including the Supreme Electoral Council and the Supreme Court of Justice, enabling them to remain in their posts although their terms had expired, thereby guaranteeing control over the highest national court.[101]

99.   In that regard, the then UN Special Rapporteur on the Independence of Judges and Lawyers, Gabriela Knaul, in her report indicated that the perpetuation in office of judges and magistrates whose term had expired was one of the serious problems of the judiciary's independence and autonomy in Nicaragua, and she noted that "[in] July 2013, the terms of all CSJ magistrates will have expired (...)" and

---

[96]   See IACHR, 2018 Annual Report, Chapter IV.B – Nicaragua. OCHCR. Report of the Special Rapporteur on the independence of judges and lawyers, Gabriela Knaul - Consulta subregional sobre la independencia del Poder Judicial en América Central (Report of the Special Rapporteur on the independence of judges and lawyers, Gabriela Knaul - Subregional consultation on the independence of the judiciary in Central America) (available only in Spanish), April 2, 2013. United States Department of State, Nicaragua 2017 Human Rights Report, April 20, 2018, p. 8. IACHR, Public Hearing, Situation of human rights in Nicaragua, 127th period of sessions, March 1, 2007.

[97]   IACHR, Public Hearing, Situation of human rights in Nicaragua, 127th period of sessions, March 1 2007

[98]   Law No. 330, Partial Reform of the Constitution of the Republic of Nicaragua. Enacted on January 18, 2000 and published in La Gaceta No. 13 on January 19, 2000.

[99]   CEJIL. Nicaragua: ¿Cómo se reformó la institucionalidad para concentrar el poder? 2017.

[100]   Executive Decree No. 3, of 2010, enacted on January 9, 2010 and published in La Gaceta No. 6, January 11, 2010.

[101]   GIEI-NICARAGUA. Report on the violent events that took place in Nicaragua between April 18th and May 30th. The executive decree indicated that: "on February 2, 2010, the terms of the Supreme Electoral Council magistrates end, and on March 7 of this year [2010], regional elections will be held on the Caribbean Coast of the Republic of Nicaragua. However, the National Assembly has not called the corresponding election for those posts, which would make it difficult to declare the citizens elected in the elections [*justas electorales*] to be held in the nation's North Caribbean and South Caribbean regions. Additionally, the electoral authority would remain totally without leadership on the first of June of this year, on the eve of the electoral process for the 2011 national elections." Executive Decree No. 3-2010, enacted on January 9, 2010, by President Daniel Ortega Saavedra.

recommended their appointment as a matter of urgency.[102] For its part, in its report, GIEI-Nicaragua concluded that "in real terms, these institutional changes meant that power was divided between the FSLN and the PLC and the doors closed to opposition political movements, limiting the right of political participation."[103]

100.    Likewise, the then UN Special Rapporteur denounced the strong political influence in the appointment of the CSJ magistrates, especially since the official party majority in the National Assembly enabled State officials to be designated without the support of any other political representation.[104] By 2014, the FSLN and magistrates close to the President held three of the four chambers of the judiciary.[105]

101.    The IACHR notes, in addition to this, a judicial career service that lacked guarantees of impartiality. In that regard, the United Nations Special Rapporteur indicated that the National Council on Administration and the Judicial Career Service was not respecting the selection and election processes, that the Judicial Career Service Act was not being applied insofar as it concerned irremovability, since it did not take into account the judge's consent, and that "the removal system lacks sufficient guarantees of impartiality."[106]

---

[102]    OCHCR. Informe de la Relatora Especial sobre la independencia de los magistrados y abogados, Gabriela Knaul - Consulta subregional sobre la independencia del Poder Judicial en América Central. April 2, 2013, par. 68 and Recommendation B.6.

[103]    GIEI-NICARAGUA. Report on the violent events that took place in Nicaragua between April 18th and May 30th.

[104]    See IACHR, 2018 Annual Report, Chapter IV.B- Nicaragua. Reference to UN, Informe de la Relatora Especial sobre la independencia de los magistrados y abogados, Gabriela Knaul, Consulta subregional sobre la independencia del Poder Judicial en América Central, April 2, 2013; In 2009, the Committee against Torture received allegations that "indicate lack of impartiality and independence of the public institutions of the judiciary, essential qualities to ensure effective application of the principle of legality and, especially, irregularities in the appointment of judges, partisan use of the judiciary structures, and cases of corruption among the judges and police agents." UN, Committee against Torture, June 10, 2009, par. 14.

[105]    El Confidencial, Instalan Corte Suprema de Ortega, April 23, 2014; See also La Prensa, La Justicia al Estilo de Ortega, August 11, 2015.

[106]    For which reason she warned of the need for "these institutions [the National Administration and Judicial Career Service Council] to be in practice independent of the supreme courts of justice, with independent members, that establish objective and transparent procedures for the selection, appointment, promotion, removal, suspension and dismissal of judges." She also indicated that "[t]he composition of this body must pluralistic, predominantly composed of magistrates and judges, and must guarantee participation by civil society entities. The process of selecting its members should also be transparent and public." OHCHR. Informe de la Relatora Especial sobre la independencia de los magistrados y abogados, Gabriela Knaul - Consulta subregional sobre la independencia del Poder Judicial en América Central. April 2, 2013, pars. 67 and 86.

Nicaragua AR_001423

## 2. The Attorney General's Office

102. As for the Attorney General's Office, Article 24 of Law No. 346, of 2000, creating the Attorney General's Office,[107] provides that the prosecutor general and deputy prosecutor general "shall be elected by the National Assembly from among separate lists proposed by the President of the Republic and the National Assembly Deputies, for a term of five years beginning on the date of assumption of office. They shall be elected by favorable vote of at least seventy percent of the total number of Deputies."

103. The IACHR notes that since the creation of the Attorney General's Office, the prosecutor general and deputy prosecutor general have been elected based on a two-party formula resulting from the "Alemán-Ortega" pact.  The designation of party affiliates close to the President has meant the progressive loss of the independence and autonomy of that Office.[108] In fact, according to the observations made in the GIEI's 2018 final report, "the top hierarchy" of the Attorney General's Office is entirely occupied by persons who formerly worked in top-level police posts, namely: Prosecutor General Ana Guido (former Commissioner General), Deputy Prosecutor General Julio González (former Senior Commissioner), and Inspector General Douglas Vargas (former police captain).  In particular, the 2014 designation of the Prosecutor General—a woman of acknowledged Sandinista trajectory, is said to have totally impacted the composition of the Attorney General's Office.  Since then, in contravention of national norms, prosecutors have been elected through internal competitions whereby entry by FSLN affiliates is always favored.[109] In addition, her appointment as Prosecutor General marked the start of process of relocation of prosecutors not affiliated with the governing party.  More recently, in the context of the current crisis, [the need for] affinity with the national government is reflected in the political persecution of prosecutors who ultimately resigned from public office.[110]

104. The IACHR notes that, in addition to this, the Political Secretaries and the Sandinista Leadership Councils or Committees (CLS), hybrid structures de facto established within each institution, facilitate executive branch influence and control over the Attorney General's Office.[111] Their function makes it possible to ensure, among other things, participation by public employees in activities such as

---

[107] <u>Law No. 346</u>, Organic Law of the Attorney General's Office. Published in La Gaceta No. 196, of October 17, 2000. This law was not enacted and its publication was not ordered by the President of the Republic.  By virtue of Article 142 of the Constitution, the President of the National Assembly ordered its publication.

[108] IACHR, 2018 Annual Report, <u>Chapter IV.B-Nicaragua.</u>

[109] This selection process was facilitated by the intervention of the Special Committee of the National Assembly, –the majority of whose members were also FSLN-, for which reason it rejected the candidacy of other people. "The policy of control exerted by the FSLN over the Office of the Public Prosecutor began in 2007 with the election by the National Assembly of Ana Julia Guido Ochoa as Deputy Attorney General, and the subsequent extension of her term by virtue of Presidential Decree No. 03/2010." GIEI, Nicaragua, <u>Report on the violent events that took place between April 18th and May 30th</u>, 2018, p. 47.

[110] GIEI-NICARAGUA. <u>Report on the violent events that took place in Nicaragua between April 18th and May 30th</u>.

[111] IACHR, 2018 Annual Report, Chapter IV.B-Nicaragua

Nicaragua AR_001424

marches and traffic circle occupations, and to keep under surveillance public employees discontent with the government.[112]

105.   In the context of the human rights crisis of 2018, the IACHR pointed out that the lack of independence of the justice administration system facilitated the use and manipulation of criminal law to criminalize and prosecute voices critical or opposed to the government. This led to hundreds of legal proceedings under unfounded and disproportionate charges, such as money laundering, terrorism, treason, as well as violations to the judicial guarantees of the detained persons. In this regard, the IACHR expressed its concern about the centralization of the processes in Managua, which would facilitate the appointment of prosecutors and judges related to Sandinismo to review the processes followed against opponents of the Government[113].

## D.    *Other power concentration strategies*

106.   The IACHR notes that the FSLN-PLC hybrid structure resulting from the "Alemán-Ortega Pact" has also impacted on other high posts and spread throughout the government, examples of which, owing to their relevance, are described below.

### 1.    Control of the autonomous regimes

107.   The IACHR notes that the hybrid system also operated in the Atlantic Coast region, undermining the autonomous regime recognized by the State in 1987 by Law No. 28, the Autonomy Statute of the Atlantic Coast.[114]   That statute recognized autonomy rights of the Coast's inhabitants, expressed in their right to their forms of social and political organizations, respect for communal property, political representation in the regional governmental entities, mother tongue education,

---

[112]    GIEI, Nicaragua, Report on the violent events that took place in Nicaragua between April 18th and May 30th, p. 47. According to documentation of the International Crisis Group, after the 18 April uprising, the FSLN sent a mandatory request to public employees to provide information regarding all of their social media accounts. International Crisis Group, A Road to Dialogue After Nicaragua's Crushed Uprising, Report No. 72, 2018, p. 4; During its working visit, the Commission learned of reports of dismissals and threats to government personnel who had supported the protests.  Some workers indicated that there were government supporters who were in charge of investigating workers' social media profiles with a view to reporting any anti-government postings. IACHR, Gross Violations of Human Rights in the Context of Social Protests in Nicaragua, June 21, 2018, par. 166; La Prensa. Despidos ilegales a trabajadores del Estado de Nicaragua. April 28, 2018; La Prensa. Desatan persecución policial y laboral a estudiantes y empleados públicos que participaron en protestas. May 6, 2018; La Prensa. Trabajadores del Estado asediados y corridos por oponerse al régimen. May 22, 2018.

[113]    La Prensa, Los siete jueces que el orteguismo usa para reprimir a los manifestantes en Nicaragua, 1 de octubre de 2018; CIDH, Informe Anual 2018, Capítulo IVB-Nicaragua.

[114]    Law No. 28. Autonomy Statute of the Atlantic Coast Regions of Nicaragua. Enacted on September 7, 1987. Published in La Gaceta No. 238, of October 30, 1987.

benefit from the natural resource exploitation, and guarantees of participation in decisions on matters of regional interest.

108.   The regional autonomy of the Coast was adopted at an historic moment and in exceptional circumstances due to the war and active participation by the indigenous insurgency through which it laid out its visions of self-government and self-determination.   But the autonomy agreement, established in the 1987 Autonomy Statute, did not reflect indigenous aspirations for real autonomy that would protect their living spaces, the territory, and forms of local autonomy.   The Statute went less than half-way between, on the one hand, the Nicaraguan State, which wished to contain the risk of secession in an external war of aggression context, and, on the other, recognition of the Coast's wish for self-determination, expressed in various ways by the conflict's belligerent groups, especially the at-arms indigenous movement.[115]

109.   The Statute created two popularly elected representative bodies, the Autonomous Regional Councils, one in each region—North and South—elected every five years, with representation of the indigenous peoples and ethnic communities inhabiting the region.[116]   In practice, a mestizo hegemonic political representation model was imposed, controlled by the FSLN and the PLC.[117]

## 2.   Immunity and privileges

110.   Another concentration of power strategy is the implementation of the legal reforms to ensure the immunity of the leaders of the main political parties.   In particular, the IACHR notes that, through the 2000 constitutional reform, the former president of the Republic and former vice president, elected by direct popular vote in the immediately preceding term, were incorporated in the National Assembly as deputies and alternates, and as Deputies, Principal and Alternate, the candidates for President and Vice President of the Republic who had participated in the corresponding election who had come in second place. This meant that Arnoldo Alemán, at the end of his term in 2002, became Deputy in the National Assembly with immunity, and Daniel Ortega as of the reform until his second term began in 2007.[118]

---

[115]   Miguel González. La tragedia de Alal: regresión (no restitución) de derechos en el Régimen de Autonomía en Nicaragua. Published in Autonomías y autogobierno en la América diversa. Miguel González, Araceli Burguete Cal and Mayor, José Marimán, Pablo Ortiz-T., Ritsuko Funaki (coordinators). 2021.

[116]   Miguel González. La tragedia de Alal: regresión (no restitución) de derechos en el Régimen de Autonomía en Nicaragua. Published in Autonomías and autogobierno en la América diversa. Miguel González, Araceli Burguete Cal and Mayor, José Marimán, Pablo Ortiz-T., Ritsuko Funaki (coordinators). 2021.

[117]   Miguel González. La tragedia de Alal: regresión (no restitución) de derechos en el Régimen de Autonomía en Nicaragua. Published in Autonomías and autogobierno en la América diversa. Miguel González, Araceli Burguete Cal and Mayor, José Marimán, Pablo Ortiz-T., Ritsuko Funaki (coordinators). 2021.

[118]   Law on Partial Reform of the Constitution of the Republic of Nicaragua. Law No. 330. Enacted on January 18, 2000 and published in La Gaceta No. 13 on January 19, 2000.

111.  In addition, the absolute majority quorum was changed to two-thirds for declaration of the stripping of immunity of the President of the Republic by the National Assembly.[119]  This action, together with Executive Decree 3-2010,[120] by which the tenure of the authorities of the branches of government and institutions of the State was extended, enabled a group of actions designed to concentrate and control power and ensure privileges and immunities. As indicated above, one action in this area was to carry out in 2009, the actions necessary to ensure that Daniel Ortega could run in the 2011 presidential elections.

112.  The "Alemán-Ortega Pact" was also evident in the prosecution of Arnoldo Alemán for money-laundering and corruption.  In 2002, during the Enrique Bolaños government, the Office of the Prosecutor General of Justice accused him of using during his term (1997-2002) public funds to defraud the State.  He was removed as deputy and sentenced in 2003 to 20 years of imprisonment for money-laundering and corruption,[121]  This was later commuted to house arrest.  In 2005, judge Roxana Zapata allowed him to live with his family and to move freely within the city of Managua; in 2007, during Daniel Ortega's second term, he was allowed to move throughout the country.[122]  On January 15, 2009, the charges of corruption against him were dropped by the Supreme Court of Nicaragua, presided over by Manuel Martínez Sevilla, PLC member and former minister during the Alemán presidency, identified as the main political operator of his party for negotiations with the FSLN.[123]

113.  Lastly, information in the public domain gives account of the wealth accumulated by Arnoldo Alemán during his presidential term and, subsequently, by Daniel Ortega, in his successive terms of office.  The IACHR notes that, according to available information, the Ortega Murillo family is of "incalculable" wealth, said to include energy, fuel, tourism, and telecommunications companies.[124]  According to a Transparency International investigator, the level of corruption in Nicaragua has risen in tandem with the concentration of power.[125]

---

[119]  Law on Partial Reform of the Constitution of the Republic of Nicaragua. Law No. 330. Enacted on January 18, 2000 and published in La Gaceta No. 13 on January 19, 2000.

[120]  Executive Decree No. 3, of 2010, enacted on January 9, 2010 and published in La Gaceta No. 6 on January 11, 2010.

[121]  Transparency International mentioned Arnoldo Alemán as among the world's ten most corrupt rulers in the last 20 years. El País. "Los más buscados" por EE UU: El expresidente nicaragüense Arnoldo Alemán. April 1, 2011.

[122]  IACHR, Public Hearing, Administration of justice in Nicaragua, 131st period of sessions, March 12, 2008. Notimerica.com. Nicaragua. El ex presidente de Nicaragua Arnoldo Alemán obtiene la libertad condicional para circular por todo el país. March 17, 2007.

[123]  Connectas.org. La Justicia del Caudillo.

[124]  Expediente Público. Familia-Partido-Gobierno-Empresas: Nicaragua, el país más corrupto de Centroamérica. February 4, 2021.

[125]  Confidencial. "En Nicaragua la corrupción se viene agravando desde 2012.". April 6, 2021.

Nicaragua AR_001427

## 2.1  Office of the Human Rights Advocate
## (Procuraduría para la Defensa de los Derechos Humanos)

114.   The Inter-American Commission has also identified the lack of independence of the Office of the Human Rights Advocate, which would act in complete alignment with the Executive. In particular, it has been pointed out for failing to fully investigate the complaints of torture and ill-treatment of detainees, as well as the human rights violations that occurred since April 2018. In the same sense, in the report of the High Commissioner of the United Nations on human rights in Nicaragua –that covered the events from August 19, 2018, to July 31, 2019- it was noted that the national human rights institution, the Office of the Human Rights Advocate, which is also the national government mechanism for the prevention of torture, would not have shown any independence. In this regard, according to the report, "during the 40th session of the Human Rights Council, the State delegation was represented by the Deputy Commissioner of the Office of the Human Rights Advocate, who repeated the Government's justification of its actions in response to the failed coup d'état and indicated that his institution had not found any evidence of torture of protesters deprived of liberty". Likewise, said report notes that in March 2019, the PDDH category was lowered from "A" to "B" as it was unable to demonstrate its independence.[126]

115.   For its part, in 2021, the United Nations Committee on Economic, Social and Cultural Rights expressed its concern about the lack of independence of the Office of the Human Rights Advocate as well as its lack of reaction to human rights violations in the State. For this reason, the Committee urged the State to adopt all necessary measures in order to guarantee that the Office of the Human Rights Advocate fulfills its mandate to protect and promote human rights, with full independence and diligence, and so that comply with the Principles Relating to the Statute and Functioning of National Human Rights Institutions.[127]

## 2.2  Truth commission

116.   In connection with the state's efforts to seek the truth, on April 29, 2018, the National Assembly approved the establishment of a Truth Commission. Since its creation, the Commission noted questioning of the effectiveness of the Commission, due to the lack of participation of civil society and the families of the victims in its creation and formation, as well as the lack of clarity in its mandate and functions.[128] Also, the reports of the Commission have been challenged[129] by

---

[126]   Human Rights Council, Report of the United Nations High Commissioner for Human Rights, A/HRC/42/18, septiember 17, 2019. para. 7.

[127]   Committee on Economic, Social and Cultural Rights, Concluding observations on the fifth periodic report of Nicaragua, Obtober 15, 2021, para. 7 (only spanish versión).

[128]   IACHR, Grave Human Rights Violations in the Context of Social Protests in Nicaragua, 21 June 2018.

[129]   Commission on Truth, Justice and Peace, Second Preliminary Report, October 15, 2018, p. 4 and 5.

civil society because of its lack of independence from the government, as well as for manipulating the facts and "attempting to make the actual perpetrators and those directly responsible disappear, by changing the dates, places, and circumstances of the offense."[130]

---

[130] See IACHR. Report Chapter IVB Nicaragua, 2018, para. 106.

Nicaragua AR_001429